UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT LONDON
CRIMINAL ACTION 6:09-CR-16-DCR

UNITED STATES OF AMERICA                    PLAINTIFF


  VERSUS

## **VOLUME 1 OF 1**

## **MARCH 23, 2009**

## **TRANSCRIPT OF DETENTION HEARING**

RUSSELL CLETUS MARICLE                    DEFENDANT

---

**THE FOLLOWING IS THE TRANSCRIPT OF DETENTION HEARING** held in the above-styled action, Robert E. Wier, Magistrate Judge, United States District Court, presiding, on Monday, March 23, 2009, beginning at the hour of 1:00 p.m., in United States District Courtroom C, 310 South Main Street, London, Laurel County, Kentucky, and before Wanda H. Rowe, Certified Verbatim Reporter and Notary Public, Commonwealth of Kentucky.

---

**W.H. ROWE REPORTING**
P.O. Box 1401, Stanton, Kentucky 40380-1401
Telephone & Message 606-424-2111
whrowe.reporting@yahoo.com

---

<u>APPEARANCES</u>

ON BEHALF OF PLAINTIFF
UNITED STATES OF AMERICA:

Hon. Stephen Smith
Hon. Jason Parman
Hon. Kent Taylor
United States Attorneys
310 South Main Street
London, Kentucky 40741

ON BEHALF OF DEFENDANT
RUSSELL CLETUS MARICLE:

Hon. Henry E. Hughes
Attorney at Law
Hughes, Lowry, Milner
  & Hayworth
Suite 510
271 W Short Street
Lexington, Kentucky 40507

Hon. Mark A. Wohlander, Retained
Attorney at Law
Wallingford Law, PSC
3141 Beaumont Centre Circle
Suite 302
Lexington, Kentucky 40513

<u>VOLUME 1</u>

<u>INDEX</u>

Caption........................................1

Appearances...................................2

Index.........................................3

By the Court..................................5


<u>SPECIAL AGENT TIMOTHY S. BRIGGS</u>

Direct Examination
   Hon. Stephen Smith..........................12

Cross-examination
   Hon. Henry E. Hughes........................43

Examination
   By the Court................................61

Re-direct Examination
   Hon. Stephen Smith..........................66

Re-cross-Examination
   Hon. Henry E. Hughes........................71

Re-re-direct Examination
   Hon. Stephen Smith..........................77

By the Court..................................78


<u>KENNETH DAY</u>

Direct Examination
   Hon. Stephen Smith..........................80

By the Court..................................86

<u>ARGUMENTS</u>

On Behalf of the United States
    Hon. Stephen Smith...........................87

On Behalf of the Defendant
    Hon. Henry E. Hughes.........................96

By the Court.................................100

<u>ATTACHMENTS</u>

Certificate of Reporter & Notary
    Public, Certificate of Service.............111

Keyword Index

<u>EXHIBITS</u>

Court Exhibits:

    1  Dated Redacted Statement..................78

    2  Undated Redacted Statement...............78

1              THE ABOVE-STYLED ACTION HAVING COME

2              BEFORE THE COURT, THE FOLLOWING

3              PROCEEDINGS WERE HAD

4         BAILIFF:   United States District Court for the

5    Eastern District of Kentucky is now in session.   The

6    Honorable Judge Robert E. Wier presiding.   Please come

7    to order and be seated.

8              BY THE COURT:

9         THE COURT:   Thank you and good afternoon.   If

10   the clerk would call the 1:00 o'clock matter, please.

11        DEPUTY CLERK:   Yes, your Honor.   London Criminal

12   Case 09-16, United States of America versus Russell

13   Cletus Maricle.

14        THE COURT:   Thank you.   The court acknowledges

15   Mr. Smith and Mr. Parman for the United States.   Good

16   afternoon.

17        HON. STEPHEN SMITH:   Good afternoon, your Honor.

18        HON. JASON PARMAN:   Good afternoon, your Honor.

19        THE COURT:   And Mr. Hughes.

20        HON. HENRY E. HUGHES:   Your Honor, I would like

21   to state that I would request that my appearance be

22   entered only for the purpose of this hearing, unless

23   the court would choose otherwise.   And then I would

24   enter my appearance completely to represent Mr.

25   Maricle.

1    THE COURT:   All right.  So your intent today is

2    only to represent the defendant with respect to the

3    detention hearing today?

4    HON. HENRY E. HUGHES:   Yes.  Yes, your Honor.

5    That's correct.

6    THE COURT:   All right.

7    HON. HENRY E. HUGHES:   I mean, I may end up

8    doing it, but right now I'm pretty well --

9    THE COURT:   All right.  Thank you, Mr. Hughes.

10    And I do see that Mr. Maricle is present in the

11    courtroom.   Good afternoon to you.

12    I see also that Mr. Wohlander is here.  And Mr.

13    Wohlander, the United States did file a motion

14    addressing your status in the case.  And I appreciate

15    Mr. Smith promptly filing that.  Have you had an

16    opportunity to see that?

17    HON. MARK A. WOHLANDER:   No, your Honor.  It

18    wasn't filed till 40 minutes after I had already left

19    the office.  And so I haven't had a chance to see it.

20    But that's why, in abundance of caution, Mr. Hughes is

21    here for the purpose of today, until I have a chance

22    to review whatever Mr. Smith might file.  I'll file

23    any response and take any steps that I may decide to

24    take as relates to the motion.

25    THE COURT:   All right.  Mr. Wohlander, you're

1    comfortable on Mr. Maricle's behalf that Mr. Hughes is

2    sufficiently up to speed in the case, and you're

3    comfortable handing off the representation for the

4    purposes of today to Mr. Hughes?

5         HON. MARK A. WOHLANDER:   I am, your Honor.

6         THE COURT:   And you've conferred with Mr.

7    Maricle about that adequately.

8         HON. MARK A. WOHLANDER:   We have, your Honor.

9    We spoke not only on Friday afternoon, but we spoke

10   again today before the hearing.  And I think Mr.

11   Maricle's also comfortable with the decision.

12        THE COURT:   All right.  And Mr. Hughes, you've

13   conferred adequately with Mr. Maricle, and you're

14   comfortable that he understands everything and the

15   limited appearance you're making here today.

16        HON. HENRY E. HUGHES:   A lot more than I do,

17   your Honor.

18        THE COURT:   All right.

19        HON. HENRY E. HUGHES:   Thank you.

20        THE COURT:   And Mr. Maricle, I just want to be

21   sure, because we're talking about your rights, of

22   course, I want to be sure that you're comfortable with

23   Mr. Hughes stepping in and representing you for

24   purposes of today.  Obviously, Mr. Wohlander's here,

25   but with Mr. Hughes essentially being in charge of the

1    lawyering for purposes of the detention hearing.

2         DEFENDANT MARICLE:   Yes, I'm very happy with

3    that.

4         THE COURT:   All right.  And you feel like you've

5    had sufficient opportunity with both lawyers?

6         DEFENDANT MARICLE:  Yes, sir.

7         THE COURT:   All right.  Thank you, Mr. Maricle.

8    Mr. Smith, any objection from the United States to

9    proceeding in the fashion that would have Mr. Hughes

10   acting as lead counsel for the defendant for today's

11   purposes?

12        HON. STEPHEN SMITH:   No objection, your Honor.

13   He is sensitive to the issues that have been addressed

14   in the motion.  But I do believe that for purposes of

15   this hearing, that we can further pursue the interest

16   of this case and not prejudice the United States in

17   this matter further until it's resolved.

18        THE COURT:   All right.  Thank you, Mr. Smith.

19   All right.  Let me first ensure that both sides have

20   received sufficient access to the pretrial services

21   report, which now has been memorialized in a written

22   report issued by the probation office.  Mr. Smith.

23        HON. STEPHEN SMITH:   Yes, your Honor.  Before we

24   go further, I do want to introduce the court Mr. Kent

25   Taylor, who is also going to make his appearance here

1    today on behalf of the United States.

2        THE COURT:  Of course.  Mr. Taylor.

3        HON. STEPHEN SMITH:  And I can acknowledge for

4    the court we have received the pretrial services

5    report.

6        THE COURT:  All right.  Thank you.  Mr. Hughes.

7        HON. HENRY E. HUGHES:  I received the pretrial

8    services report, and I have read it, your Honor, and

9    the defendant is familiar with it also.

10        THE COURT:  All right.  Thank you.  And

11    normally, that's a document of limited circulation, of

12    course.  I will allow counsel to retain copies of the

13    pretrial services report pending completion of all

14    detention-related issues.  And following that, those

15    documents will need to be returned to the probation

16    office.  I do restrict any copying or dissemination of

17    the pretrial services report.  So, although counsel

18    can retain a copy, you cannot copy or disseminate it.

19    Although, the defense counsel can, of course, share

20    the content with the defendant himself.

21        All right.  The court is here today for the

22    purposes of a detention hearing set at the arraignment

23    of the defendant on Friday.  The United States moved

24    for detention, and the court did find a threshold

25    basis had been made by the United States, and

1    scheduled the hearing today, in accordance with the

2    *Bail Reform Act*, in an effort to ensure that both

3    parties have an adequate opportunity to prepare.

4        The United States, as I reviewed the other day,

5    does have the burden both of production and persuasion

6    today.  The *Rules of Evidence* do not apply.  Either

7    side can present information to the court through

8    witnesses, documents or can proceed in whole or in

9    part by proffer.

10        The ultimate question will be, based on the

11    information presented to the court, whether there are

12    conditions the court can impose that would reasonably

13    ensure the defendant's appearance at future court

14    proceedings in the case, and the safety of the

15    community and any other person.

16        The proof standard for a detention decision based

17    on flight risk would be a preponderance of the

18    evidence.  A higher, clear-and-convincing-proof

19    standard would have to support facts underlying a

20    danger-based detention.  Because of the allocation of

21    burdens, I will hear first from the United States, and

22    then from the defendant.

23        I do at some point request that counsel present a

24    summary argument that does include a discussion of the

25    3142(g) factors.  And with that being covered, Mr.

1    Smith, I'll hear first from you.

2        HON. STEPHEN SMITH:   The United States would

3    move for separation of witnesses in this matter.

4        THE COURT:   All right.  Any potential witnesses

5    in the detention hearing would need to wait outside

6    the courtroom until called by a court security

7    officer.  And that's applicable, of course, to both

8    sides, although, the United States does have the right

9    to have a representative present in the courtroom

10   throughout the hearing.  Mr. Smith.

11       HON. STEPHEN SMITH:   Thank you, your Honor.  The

12   United States will call Special Agent Timothy S.

13   Briggs.

14       THE COURT:   Thank you.

15       MADAM CLERK:  Please raise your right hand.  Do

16   you swear or affirm, under the pains and penalties of

17   perjury, that that testimony you will now give in this

18   case shall be the truth, the whole truth, and nothing

19   but the truth?

20       SPECIAL AGENT TIMOTHY S. BRIGGS:  Yes, I do.

21       MADAM CLERK:   Thank you.

22       THE COURT:   Sir, if you'd begin by stating your

23   full name.

24       A    Timothy S. Briggs.

25       THE COURT:   Thank you.  Mr. Smith.

1              SPECIAL AGENT TIMOTHY S. BRIGGS

2              DIRECT EXAMINATION

3              HON. STEPHEN SMITH:

4        Q    Agent Briggs, if you would, tell the court

5   how you're employed.

6        A    As a special agent with the Federal Bureau

7   of Investigation.

8        Q    And how long have you been so employed?

9        A    Over 12 years.

10       Q    And where are you currently assigned with

11  the FBI?

12       A    The London Kentucky resident agency.

13       Q    And have you participated as an agent in the

14  investigation of the matters which have led to a grand

15  jury returning indictments against Cletus Maricle?

16       A    Yes, sir, I have.

17       Q    Has this case been under your investigation

18  for some time?

19       A    Yes.  For a number of years.

20       Q    And would you tell the court when it was

21  that the case in Clay County initially got kicked off

22  with your investigation.

23       A    I'd been looking at subjects in Clay County

24  since 2000.  But since 2005, late 2004-early 2005, we

25  were really -- I really began to focus my efforts,

1    investigative efforts, along with other members of my

2    office, on Clay County.

3         Q    And as you have conducted your

4    investigation, you have particularly utilized

5    cooperating witnesses during the course of this

6    investigation.

7         A    Yes, sir, I have.

8         Q    Now, the charges which Mr. Maricle face here

9    include RICO, obstruction of justice, and other

10   criminal acts.  And those, by statute, require maximum

11   punishment of 20 years.  Is that right?

12        A    That's correct.

13        Q    And particularly set forth in the indictment

14   is the charge that the grand jury returned regarding

15   that the defendant, Cletus Maricle, aided and abetted

16   by another, obstructed a federal grand jury

17   investigation.  Are you familiar with that charge?

18        A    Yes, I am.

19        Q    And in that particular instance, Agent

20   Briggs, are you aware of the cooperating witness

21   giving you a statement to the effect of Mr. Maricle's

22   involvement in how he was obstructing justice?

23        A    Yes.  I am.

24        Q    And could you relate to the court the

25   substance of that statement made to you.

1       A    Mr. Maricle was directing the witness on how

2   to testify before the federal grand jury in this

3   matter that we're here on today, that involved himself

4   and other co-conspirators.

5       Q    As part of your investigation, how is it, to

6   your knowledge, that Cletus Maricle learned that this

7   person was going to be a witness before the grand

8   jury?

9       A    This individual informed Mr. Maricle that

10  they would be a witness at the grand jury, the federal

11  grand jury.

12      Q    So he had full knowledge that this person

13  was, in fact --

14      A    Absolutely.

15      Q    And when did he first become aware that this

16  person was going to be a federal grand jury witness?

17      A    I don't recall the specific date.  I believe

18  it was, you know, 2007.

19      Q    And can you relate to the court whether, in

20  fact, there was a federal grand jury investigation

21  going on at that time?

22      A    Yes there was.

23      Q    And in what court was that investigation

24  taking place?

25      A    Eastern District of Kentucky.

1        Q     And at the time that you indicated this

2    witness gave you this information, did you seek to

3    corroborate that by means of an audio recording of

4    this defendant himself?

5        A     Yes, we did.

6        Q     And were you able to obtain audible

7    recordings of him acknowledging admitting to or

8    perpetuating this scheme to obstruct justice?

9        A     Yes, multiple audio-recorded conversations

10   occurred between Mr. Maricle and the source.

11       Q     You've indicated that he was directing this

12   witness they should answer certain questions.

13       A     Correct.

14       Q     And in the course of your report from the

15   witness, how was your witness treated by Mr. Maricle

16   when she or he was making appearances at your

17   direction?

18       A     Frequently, Mr. Maricle would pad the

19   subject down in an effort to what appeared to be

20   determine if the individual was wearing a recording

21   device.

22       Q     And was this observed by you or confirmed by

23   your witnesses on multiple occasions?

24       A     Multiple occasions, yeah.  Confirmed by

25   witnesses on multiple occasions.

1          Q     While you were investigating Mr. Maricle,

2     did you learn that he had exhibited other activities

3     during the investigation which would cause you concern

4     as to his paranoia or abnormal mental state?

5          A     Yes, sir.

6          Q     If you could, tell the court what

7     observations you made.

8          A     Sources were present at Mr. Maricle's

9     residence during numerous meetings when Mr. Maricle

10    would mention that the FBI was outside of his

11    residence in the woods behind trees, observing his --

12    his, I guess, life, and his goings on at his property.

13         Also, he believed that there was a door-stop in

14    his chambers when he was still a sitting circuit judge

15    that was a recording device, and they should not have

16    meetings or talk in his office because of that.

17         Q     Now, these reports that you were getting

18    from your witness, was that during the time that they

19    were operating at your direction?

20         A     Yes, during the -- during this

21    investigating, which was public knowledge in Clay

22    County that there was an investigation into the

23    elections of -- in the past elections of Clay County.

24         Q     Was this at or about the time that the

25    defendant was attempting to obstruct a federal grand

1    jury witness by coaching them?

2         A    Yes.

3         Q    During your investigation, did you learn

4    about the -- strike that.  During the time that you

5    were conducting your investigation, did you have

6    occasion to learn that this defendant was seeking to

7    identify your place of residence?

8         A    Yes.

9         Q    If you could, tell the court how you came to

10   knowledge of that.

11        A    One of the sources had reported to us that

12   Mr. Maricle was attempting to identify my residence

13   and the residence of two task force officers working

14   on the investigation, as well, Buddy Blair and Mark

15   Hopkins, as well as the type of vehicles we drove.

16        Q    Were you able to make a confirmation by your

17   recordings that he did have an interest in finding out

18   where you were?

19        A    Yes.  In a follow-up recorded conversation,

20   the source and Mr. Maricle had further conversations

21   as to my whereabouts and -- and a general knowledge of

22   myself.

23        Q    In your experience and training, Agent

24   Briggs, can you explain what reason this defendant

25   would have wanting to know where you lived and where

1    your task force agents involved in this investigation

2    lived?

3         A    In my training and experience and -- and,

4    you know, past knowledge of involved in numerous

5    criminal investigations like this, the only possible

6    reason I can think of is for, you know, for a possible

7    approach for intimidation or threats or -- or to harm

8    a law enforcement officer.

9         Q    During your investigation, did you learn

10   that the defendant actually had others to assist him

11   in trying to find out this information?

12        A    Yes.

13        Q    And who did he rely upon to help him in

14   finding this information?

15        A    Ricky Asher.

16        Q    And have you been able to determine what

17   association he has with the defendant?

18        A    I know that they're -- they're -- according

19   to source information, they're close, and you know,

20   spend a lot of time together.  They do have an

21   association.

22        Q    Is he qualified to conduct an investigation,

23   have any experience in law enforcement or detective,

24   private investigative work, to your knowledge?

25        A    It's my understanding that he works at, I

1        believe, a home incarceration business.

2               Q     And is that one that's local in Clay County?

3               A     Yes.  Yes, sir.

4               Q     And is it affiliated in any way with this

5        defendant's court?

6               A     Yes.  I mean, they would -- they would -- if

7        -- if the judge in Mr. Maricle's court would -- would

8        put someone on home incarceration, then, this is a

9        business that would -- would monitor their -- their --

10       their home incarceration.

11              Q     So, in your investigation, at this point,

12       you've learned Asher works for this organization that

13       performs home monitoring?

14              A     I've been told that.  I've not taken steps

15       personally to verify that.  But I've been told that by

16       witnesses.

17              Q     During the pendency of this matter, you, of

18       course, are aware of the grand jury's finding of one

19       instance of alleged obstruction on one of your

20       witnesses.  During your investigation, have you

21       learned that this defendant is seeking to identify

22       other witnesses that would testify to the grand jury?

23              A     Yes.  On one occasion, during a meeting

24       between the source and Mr. Maricle, while this

25       investigation was ongoing in federal grand jury, Mr.

1        Maricle provided the source a list of individuals that
2        he had believed were witnesses at the federal grand
3        jury in this investigation, this federal investigation
4        into election fraud.  It contained approximately 22
5        names.  Many of those were, in fact -- I've not taken
6        the time to go name by name and verify that everyone
7        of them was a witness, but many of them I know were
8        witnesses at the federal grand jury in this
9        investigation.
10            Q    Was that witness list turned over to you?
11            A    Yes, it was.
12            Q    And are there many witnesses in this case?
13            A    I'd be afraid to guess.  Over a hundred at
14       least.
15            Q    You recently conducted a search of Mr.
16       Maricle's residence?
17            A    Yes, I did.
18            Q    Did you find any further evidence that he is
19       maintaining any such lists?
20            A    Yes.  I found -- I didn't, not personally,
21       but investigators that searched his residence found a
22       list which contained approximately 18 precincts.  And
23       under each of those precinct names were a list of
24       individuals.  Many of those individuals I know, based
25       upon my investigation, have been involved in vote-

1      buying and vote conspiracy, voter fraud, election

2      fraud in many of the past Clay County elections.

3          Q     Agent Briggs, in your opinion, does this

4      defendant have an interest in future elections at this

5      point?

6          A     Yes, he does.

7          Q     And what interest does he have in seeing the

8      election corrupted in Clay County in the future?

9          A     Well, his son-in-law is Phillip Moberly is

10     the property value administrator, and his wife, who is

11     Mr. Maricle's daughter, is also employed at the

12     property value administration office.  Jobs are at a

13     premium in this area, you know, in that area is a

14     socio-economic depressed area.  Jobs are at a premium,

15     and that's an obvious reason right there.

16         Q     Based on this indictment, which goes back to

17     2002, 2004 and 2006, alleging that this defendant was

18     involved in a conspiracy in those election cycles, in

19     your opinion, is there a risk he's continuing to

20     involve himself in future elections, as well?

21         A     Yes.

22         Q     During your investigation, have you sought

23     to again look into this defendant's acts of

24     lawlessness that may have been perpetrated while he

25     was judge on the bench?

1      A     Yes, sir.

2      Q     Particularly, do you have knowledge that he

3   had any involvement in suborning perjury in this

4   courtroom?

5      A     Yes.

6      Q     If you could, summarize for the court what

7   information you have to believe that he was involved

8   in suborning perjury.

9      A     Yes, the source had a brother that was

10  involved in an attempted murder or assault case.  And

11  that brother, the source's brother, was convicted of

12  those charges and received a -- a prison sentence.

13  And Mr. Maricle informed the source that if the source

14  assisted with the election fraud endeavors in Clay

15  County, that the source's brother could get out of

16  prison.

17     Q     Okay.  So in the course of your

18  investigation, you're referring to a source who had a

19  relative who had a matter pending before the court.

20     A     Yes.

21     Q     And what actions --

22     A     It's a two -- it's a two-part process.  I'm

23  sorry.

24     Q     What actions did you learn in your interview

25  that Mr. Maricle had made in attempting to have those

1    witnesses perjure himself or herself?

2       A    Mr. Maricle met with the source on a daily

3    basis, and instructed the source to tell their brother

4    what to say with regard to testimony at the ongoing

5    trial, which was an assault or attempted murder trial

6    in his court that he was presiding over.

7       That was -- that was Phase 1 of the -- of the

8    agreement.

9       Q    Do you know approximately what year this

10   trial took place in front of him?

11      A    I think it was 2005.

12      Q    And did you seek to corroborate that through

13   interviews of other witnesses?

14      A    Yes.

15      Q    And have you been able to talk to other

16   witnesses who supported that these meetings took place

17   and that he was, in fact, scripting this witness on

18   what to testify?

19      A    Yes.

20      Q    What motivation did, in your investigation,

21   did you learn this defendant would have in wanting to

22   involve himself in getting this person to perjure

23   themselves in this trial?

24      A    Testimony was scripted for this person to

25   convict the individuals on trial, because the

1    individuals on trial had information regarding some

2    activities that his daughter, Mr. Maricle's daughter,

3    was involved in.

4         Q    So you're saying it was an act of

5    retribution against these defendants?

6         A    Exactly.

7         Q    Did this defendant involve others in his

8    scheme to perjure this testimony, besides your source?

9         A    Yes.  I mean, obviously the witness, the one

10   who testified before the -- the trial.

11        Q    Were you able to corroborate any of that

12   information on your tape recordings that you made of

13   this defendant while you were conducting your

14   investigation?

15        A    Yes.

16        Q    And can you relate to the court, in

17   substance, what corroboration you received from your

18   investigation and these recordings.

19        A    Yes.  The source was promised leniency for

20   the brother who was being convicted of this charge,

21   and another promise.  And those promises were

22   confirmed on the audio recording.

23        Q    Let me ask you this, Agent.  In your

24   investigation, did you learn that the witness followed

25   through with this?  Did he actually get up on the

1    witness stand and commit perjury in a court of law?

2        A    The witness started to, but then backed out

3    and didn't say exactly what the witness was supposed

4    to say.  Cause the initial -- the initial agreement

5    was, if the witness would testify to a tee what was

6    sent to him by Mr. Maricle, he would get off the

7    charges completely.

8        Q    In your investigation, did you find that the

9    defendant acted with any retribution against this

10   fellow for not following his script?

11       A    Yeah, the script, the witness didn't follow

12   the script a hundred percent, not to Mr. Maricle's

13   satisfaction, so he did end up swaying the, I guess,

14   the proceeding so that this individual did get

15   convicted and was sentenced to prison time.

16       Q    So I'm not understanding, Agent Briggs.

17   You're telling us that the attempted perjury of this

18   witness, that that particular person actually went to

19   trial, he didn't plead guilty?

20       A    Oh, I'm sorry.  I'm sorry.  You clarified

21   that.  Yes.  There were two on trial.  The -- the

22   witness had already pled guilty.  And it was just a

23   matter of whether they would be sentenced to time or

24   not, prison time.

25       Q    So instead of getting the no jail time, what

1    did he get, Agent Briggs?

2          A    I believe it was five years in prison.

3          Q    Was that the most he could get on the

4    charges he pled guilty to?

5          A    I believe so.

6          Q    And from your investigation that you've

7    learned the motivation of this defendant to have this

8    testimony perjured before him was to get back at a

9    person who was on trial before him.

10         A    Correct.

11         Q    Then how did that person you say was on

12   trial before him, how did he communicate with a judge

13   that he was going to somehow drop his daughter in the

14   middle of this case?

15         A    I think believe it was a letter that was

16   sent to him by one of the defendants.

17         Q    In your investigation, Agent Briggs, have

18   there been other matters that have been pending in

19   front of this defendant as judge in which he has

20   exhibited acts of lawlessness?

21         A    Yes, sir.

22         Q    Would you tell us have there been any

23   instances where he has attempted to fix the outcome of

24   cases?

25         A    Yes, sir.

1      Q    If you would, share with us what you have

2     learned in your investigation in that regard.

3      A    Yeah, there was an insurance case in Clay

4     County where an insurance settlement was being sought.

5     And some of the individuals who were family of the

6     victim who was killed, in the presence of Mr. Maricle,

7     made contact with one of the jurors hearing the case,

8     and told them not to come back with less than a

9     million-dollar judgment in the case.

10     Q    Now, in your investigation, did you

11    determine what case it was?

12     A    I have, yes.

13     Q    Can you explain further what the

14    circumstances were that he would involve himself again

15    in fixing a jury.

16     A    It was -- it was an insurance case where a

17    victim had died.

18     Q    Explain to the court, if you would, Agent

19    Briggs, was this a case that occurred in the 2000s,

20    the '90s, the 80s, you know, when it occurred.

21     A    Sir, I don't recall the date.  I don't

22    recall the date that it occurred.

23     Q    Well, would it refresh your memory, Agent

24    Briggs, if I were to give you a opportunity to review

25    one of your 302s?

1        A     Yes, sir.

2        HON. HENRY E. HUGHES:   I'd like to see it, your

3   Honor.  I know we're not following any standard rules

4   of evidence, but as a professional courtesy.

5        THE COURT:   Hang on just a minute.  I'm going to

6   let Mr. Smith respond to that.

7        Mr. Hughes has made a request to be able to see

8   that 302 if you're going to use it with the witness.

9        HON. STEPHEN SMITH:   Yes, your Honor.  If the

10  court would allow the United States an opportunity to

11  produce a redacted version.  This is a very convoluted

12  and complicated series of statements, and I wish to

13  limit it to, again, the subject matter which we're

14  addressing here on the witness stand.  So I would like

15  an opportunity, briefly, to produce for the defendant

16  a copy that is redacted.

17       I do feel that if the court wishes to do an in-

18  camera review, we do have a complete copy, but at this

19  time, I would ask that we be given an opportunity to

20  give him a redacted copy.

21       THE COURT:   Well, my view would be that anything

22  that Agent Briggs reviews is part of his testimony

23  today, that the defendant should be able to see.  And

24  so, if you want to show Agent Briggs only the portion

25  that pertains to what you're talking about, then I

1     would limit what the defendant sees to that.

2          HON. STEPHEN SMITH:   That would be our desire,

3     your Honor.

4          HON. HENRY E. HUGHES:   I think the problem with

5     that, your Honor, under *Rule 26*, I think I'm entitled

6     to see it all, because he's already expressed that it

7     was convoluted, complex, and confusing.  The whole

8     report was.  And when you start piecing it together,

9     I'm not going to be able to cross-examine him on

10    something he's pasted together.

11         THE COURT:   Well, I don't know what it's going

12    to look like.  I know we're not here to try the whole

13    case today.  We're here about detention.

14         HON. HENRY E. HUGHES:   I thought -- sounds like

15    we were.

16         THE COURT:   And I think the United States is

17    getting into areas of the defendant's other alleged

18    conduct, and that's fair game for a detention hearing,

19    within reasonable limits.  Sounds like Agent Briggs is

20    having some difficulty on specific date issues with

21    respect to this particular alleged instance of

22    misconduct.  And if the U.S. wants to use a limited

23    portion of the 302, then I'll let that occur, with the

24    defendant having access to the portion that Agent

25    Briggs looks at.  But we're not going to get into the

1    entirety of the case file for today.

2        HON. STEPHEN SMITH:   With that understanding, I

3    would ask for a brief recess in order to copy that for

4    the defendant.

5        THE COURT:   All right.  Well, can we do it in

6    about five minutes?

7        HON. STEPHEN SMITH:   I see no reason why we

8    couldn't.  I have a copier waiting downstairs, your

9    Honor.

10       THE COURT:   All right.  Then we'll be in recess

11   for five minutes to allow that document to be prepared

12   and share with the defendant.

13       HON. STEPHEN SMITH:   Thank you.

14       BAILIFF:   All rise.  United States District

15   Court stands in recess for five minutes.

16            OFF THE RECORD 1:35 P.M.

17            BACK ON THE RECORD 1:45 P.M.

18       BAILIFF:   All rise.  United States District

19   Court is now back in session.  Please come to order

20   and be seated.

21       THE COURT:   All right.  Continuing on in 09-16.

22   Mr. Hughes, what we're going to do is let the direct

23   examination continue.  I understand you've already,

24   perhaps, got the redacted version.  Is that correct?

25       HON. HENRY E. HUGHES:   Yes, I've got everything.

1     THE COURT:   All right.

2     HON. HENRY E. HUGHES:   If it doesn't go outside

3     the scope of this.

4     THE COURT:   Once his direct examination

5     concludes, as I read the rule, you can make a motion

6     to see the entire statement.  My inclination is going

7     to be to restrict it to the subject matter involved.

8     And Mr. Smith, I assume your representation to the

9     court is that you have left in the 302 matters

10    pertaining to the subject matter at issue and redacted

11    matters not pertaining to that subject matter.  Is

12    that correct?

13    HON. STEPHEN SMITH:   Yes, your Honor.  And

14    before we get lost in the context here, I'm refreshing

15    the witness's, this is for the record, memory with a

16    redacted copy.  He does not have a full copy.  He has

17    a redacted copy.

18    THE COURT:   All right.

19    HON. STEPHEN SMITH:   And I would like to tender

20    to the court a copy for the court's purposes, and also

21    have one for the witness.

22    THE COURT:   All right.  Very good.  I'll take

23    one.  The witness can have one, as well.  And then, I

24    will, on the defendant's motion, also take a copy of

25    the unredacted version, and take a look at those.  And

1     if I believe the redaction's proper, I'll preserve

2     both versions, Mr. Hughes, for the record, and then go

3     from there.  All right.

4          HON. STEPHEN SMITH:   Do you wish for the United

5     States to produce that at this time or at the end of

6     the witness's testimony, as provide by *Rule 26 and 22*?

7          THE COURT:   At the end, to the court, yes.

8     Thank you.  All right.  Mr. Smith, you can continue.

9          Mr. Hughes, you have something further?  Mr.

10    Hughes?

11         HON. HENRY E. HUGHES:   No.  I was looking at

12    something, thinking about something.

13         THE COURT:   All right.  Thank you.  Mr. Smith.

14         HON. STEPHEN SMITH:   Give the witness, if we

15    could, your Honor, an opportunity to review those.

16         THE COURT:   Certainly.

17              (REPORTER'S NOTE:  WITNESS REVIEWING

18               DOCUMENT.)

19              SPECIAL AGENT TIMOTHY S. BRIGGS

20              CONTINUE DIRECT EXAMINATION

21              HON. STEPHEN SMITH:

22    A    Yes, sir.

23    Q    Do you need me to repeat my question, Agent

24    Briggs?

25    A    Yes, sir.

1    Q    If you could, relate to the court the time

2    period in which you learned in your investigation of

3    this attempt to approach a respective juror member on

4    a case before him occurred.

5    A    In approximately 1989.

6    Q    And at that time, you indicated in your

7    initial response that there was a communication made

8    directly to a person.  Do you know who that person

9    was?

10   A    Yes, sir.

11   Q    Can you relate to the court who it was that

12   was approached?

13   A    Press or Preston Henson.

14   Q    And who approached this person?

15   A    It was -- you mean list the names of

16   individuals?

17   Q    If you recall.

18   A    Yes.  It was Mr. Maricle and others

19   approached Mr. Henson.

20   Q    Was Mr. Henson on the jury, Agent Briggs?

21   A    No, sir.  His wife was.

22   Q    And do you know what was requested of him by

23   this defendant?

24   A    Contact his wife, and Mr. Henson did contact

25   his wife and advised her to -- not to come out of the

1    jury room unless they had reached a verdict of not

2    less than one million dollars.

3         Q    And did you learn whether or not a jury

4    verdict was returned in the case?

5         A    Yes.  According to this -- according to the

6    individual that gave us this information, they reached

7    a verdict, yes.

8         Q    And how much was the verdict?  What was the

9    verdict that was returned?

10        A    The jury awarded the victim's husband five

11   or six million dollars, was the jury award.

12        Q    And do you know who the defendant was that

13   this judgment was rendered against?

14        A    It was an insurance company.  Is that what

15   -- is that what you're asking, sir?

16        Q    Agent Briggs, in your investigation, was

17   this communication of Preston Henson to his wife, the

18   juror, made in the presence of the defendant?

19        A    Yes, it was.

20        Q    And this request of this juror, did that

21   occur before the verdict had been returned by the

22   jury?

23        A    Yes.

24        Q    In your investigation, Agent Briggs, you've

25   indicated that you've been also conducting searches.

1    Have you been able to identify any frequent travel out

2    of state by this defendant?

3         A    Yes.  Yes, I have.

4         Q    And if you could, tell us what information

5    you have to support that he has been traveling out of

6    state.

7         A    Frequent trips to Florida, which was

8    discovered in a -- we've been told by witnesses that

9    Mr. Maricle and his family make frequent visits to

10   Florida, vacations to Florida.  We found planners at

11   his residence at the search which indicate trips to

12   Florida.  And there were fishing license in his wallet

13   for both he and his wife.  Florida fishing license.

14        Q    Do you have any information to suggest that

15   this defendant has been looking for places to avoid

16   the FBI investigation?

17        A    Yes.  The, you know, sources advised that he

18   -- during the course of this investigation, when

19   things were heating up in Clay County with regard to

20   the election investigation, that he would go to

21   Florida.  To try to avoid investigators or, you know,

22   potential arrest.

23        Q    In your investigation, do you have anything

24   in your investigation to help this court see how the

25   defendant might react when he's facing a felony

1   charge?

2        A    Yes, sir.

3        Q    Has he, in fact, -- have you learned that

4   he, in fact, has faced felony charges before?

5        A    Yes, sir, he has.

6        Q    And if you would --

7        HON. HENRY E. HUGHES:   Your Honor, I object.

8   The comment is certainly made for the newspaper.

9   That's not got anything to do with this case, because

10  they know that it was dismissed, the indictment was

11  dismissed, and that was 1970 something, 40 years ago.

12       THE COURT:   That's fine.  Well, I'm going to

13  hear what he has to say.  And I'll give it the weight

14  I believe appropriate.  Mr. Smith.

15            SPECIAL AGENT TIMOTHY S. BRIGGS

16            CONTINUE DIRECT EXAMINATION

17            HON. STEPHEN SMITH:

18       Q    Have you, Agent Briggs, looked into, again,

19  how this defendant reacted when he was facing charges

20  of a felony nature in the past?

21       A    Yes, sir, I have.

22       Q    And when were those charges that he faced?

23       A    It was in the 1970s.  I believe it was 1971.

24       Q    And what was the charge?

25       A    Murder.

1          Q     And during that time period, how did he

2     react, as you have learned in your investigation?

3          A     We interviewed an employee of his who said

4     that virtually for a month after that shooting

5     occurred, he was non-existent and appeared to be

6     hiding out until later when the -- when the charges

7     against him were dismissed.

8          Q     You've indicated that your investigation

9     involved numerous witnesses, I believe you said over a

10    hundred witnesses in this case, that are these

11    witnesses, witnesses which you would attribute to

12    witnesses on the RICO charges, which the defendant is

13    facing?

14         A     Yes, sir.

15         Q     And can you summarize corroboration that

16    you've been able to obtain, other than these one

17    hundred or so witnesses that you've interviewed?

18         A     Yes, sir.

19         Q     Would you like to explain that to the court,

20    the additional --

21         A     The --

22         Q     -- things that you have to support the

23    racketeering allegations.

24         A     So, the investigation that I've conducted

25    that supports the charges against Mr. Maricle?  Is

1    that correct?  Summarize that?  Or?

2        Q    I'm asking you if there are other things

3    that you could relate to the court today which you

4    believe support his involvement in this racketeering.

5        A    Yes, sir.

6        HON. HENRY E. HUGHES:   I realize again that

7    we're not proceeding by the *Rules*, but we're getting

8    completely off the subject at hand.  This has nothing

9    to do whether he is a threat or a threat to run.  This

10   is, again, I think it's said for the newspaper, and I

11   strongly object to it.

12       THE COURT:   Mr. Hughes, do you believe the

13   weight of the evidence is a statutory bail factor?

14       HON. HENRY E. HUGHES:   I understand that.

15       THE COURT:   All right.  Well, he's asking him a

16   question that goes to the weight of the evidence, and

17   I'm going to permit the question to be answered.

18       HON. HENRY E. HUGHES:   Fine.

19           SPECIAL AGENT TIMOTHY S. BRIGGS

20           CONTINUE DIRECT EXAMINATION

21           HON. STEPHEN SMITH:

22       Q    Agent Briggs, how many recordings did you

23   make during your investigation?  Can you estimate the

24   number of recordings you made?

25       A    Approximately 30.

1        Q     And could you number how many of those had

2   this defendant on it himself?

3        A     I would estimate that half or more involved

4   Mr. Maricle.

5        Q     Within your investigation, have you and

6   others at your direction, reviewed those before your

7   testimony here today?

8        A     Yes.

9        Q     And can you state to the court in substance

10  whether he acknowledged and cooperated, your

11  cooperative witnesses in this investigation, at

12  certain points during those recordings?

13       A     Yes.  That's correct.

14       Q     You have also conducted, I assume,

15  interviews of public records in Clay County?

16       A     Yes.

17       Q     And one of those records of which it's

18  alleged in this racketeering scheme that there were

19  schemes in which to perpetrate fraud upon the absentee

20  voter ballot process in Clay County?

21       A     Yes.

22       Q     Have you been able to identify numbers of

23  voters that voted absentee during these elections that

24  are alleged to be the subject of this racketeering?

25       A     Yes, sir.

1          Q    And could you summarize or give us some idea

2     about whether or not they confirm that there was

3     abnormal voting in those early voting sessions in

4     those 2002, 2004, 2006 elections.

5          A    I recall it rose over the years from '02 to

6     '06.  In '06, I believe the primary and the general

7     elections in '06, there were between 5 and 600

8     absentee voters, meaning that they had mailed in a

9     ballot or went to the voting poll on early voting the

10    12 -- I think it's 12 days prior to the actual polls

11    opening.  Which is roughly -- I've got the percentages

12    figured out, which I don't have committed to memory,

13    but it's somewhere in the neighborhood of seven

14    percent of the voting population voted absentee in

15    2006.

16         Q    I know there are other aspects that are

17    alleged to have been involved in this scheme, but

18    there was also allegations that they were stealing

19    votes in the '06 election.

20         A    Yes, sir.  That's correct.

21         Q    Were there actual voters that have been

22    interviewed that acknowledge and corroborated that the

23    fact that their votes were actually stolen as

24    described by your cooperating witnesses?

25         A    Yes, so many voters had suspected that their

1    vote had been stolen.  And we had individuals who

2    actually committed the -- the voter theft made

3    statements, as well.

4         Q    And have you had members of those actually

5    pled guilty here in federal court and acknowledge

6    under oath that they were a part of this scheme to

7    steal votes from voters in 2006?

8         A    Yes.

9         Q    These notes that you say have been recovered

10   from the residence of Mr. Maricle, do they also

11   corroborate consistently your witnesses who state that

12   certain persons were involved in certain precincts in

13   this scheme?

14        A    Yes.  As I recall, the notes encompassed, I

15   want to say, roughly 18 precincts.  There are 20

16   precincts in Clay County.  I believe 18 were

17   represented on the handwritten notes taken from Mr.

18   Maricle's residence.  Below the precincts were names

19   of individuals, many of whom I know to be involved in

20   the past in election fraud, election bribery, and vote

21   buying.

22        Q    Agent Briggs, do you have any evidence that

23   this defendant is continuing to, in the year 2009,

24   continuing to reach out to witnesses that you have in

25   this case?

1        A    Yes.

2        Q    And you've indicated that in the past he has

3  exhibited this abnormal behavior of padding down

4  witnesses.

5        A    That's correct.

6        Q    Has he padded down witnesses that have

7  approached him in 2009?

8        A    Yes.

9        Q    In this most recent list of witnesses that

10  you've advised the court of that were recovered in a

11  search of his home, what date was that that you

12  recovered those?

13       A    March 19th, 2009.

14       Q    During the time that you indicated earlier

15  that there was this abnormal paranoia that he was

16  exhibiting during the investigation, did he relate

17  that in any way to phone use?

18       A    Yes.  He had advised the source to basically

19  stay away from the phones, because that's how they

20  convicted the individuals in the Bath County election

21  fraud case was through the connection of the phone,

22  use of phones.

23       HON. STEPHEN SMITH:   Could I have a moment, your

24  Honor?

25       THE COURT:   You may.

1          OFF THE RECORD ONE MINUTE.

2          BACK ON THE RECORD.

3      HON. STEPHEN SMITH:   Pass the witness as this

4   time.

5          THE COURT:   Thank you.  Mr. Hughes.

6          SPECIAL AGENT TIMOTHY S. BRIGGS

7          CROSS-EXAMINATION

8          HON. HENRY E. HUGHES:

9      Q    Yes.  You were asked a minute ago, Agent,

10  and you actually guessed that you had conducted an

11  interview of the public records in Clay County.  Is

12  that correct?

13     A    We have -- I don't know if I'd use the term

14  *interview*.  We have subpoenaed records from Clay

15  County.

16     Q    Okay.  I was just curious how would you do

17  that, if you were going to conduct an interview of a

18  public record.

19     A    We have subpoenaed records and reviewed

20  records from Clay County.

21     Q    Okay.  Okay.  I'm just curious.  Now, you've

22  been an agent 12 years.

23     A    Yes, sir.

24     Q    During that 12 years, have you been a object

25  or a target of any administrative, ethical, or conduct

1    complaints by the FBI?

2         A    No, sir.

3         Q    No, sir.

4         A    No, sir.

5         Q    So you have never had any reprimand, either

6    verbal or written.

7         A    I've got nothing in my file, to my

8    knowledge, sir.

9         Q    Okay.  Now, let me ask you this.  You have a

10   good memory, I suppose.

11        A    I believe so, yes, sir.

12        Q    You've been working on this case a long

13   time, haven't you?

14        A    Yes, sir.

15        Q    I was just looking at the redacted statement

16   here.  And let me read it to you and see if you can

17   tell me what's wrong with it.

18        *In approximately in 1988, Preston Madden -- or*

19   *Preston Henson, Cletus Miracle, Scott Madden, and*

20   *fixed a Clay County jury.*

21        That's on the first redacted statement.  Is that

22   correct?

23        A    You said '88, sir.  It's -- it says 1989 on

24   this one.

25        Q    '89.  Now, in your other redacted statement,

1    said that Cletus Maricle was a judge, was the judge in

2    the case.  Did you not?

3         A    Yes, sir.

4         Q    Well, when did Cletus Maricle get to be

5    judge, Agent?

6         A    Excuse me?

7         Q    When did he become a judge?

8         A    This is an estimation by a source.  I don't

9    know.  I know the -- I've got the dates recorded, but

10   don't have them committed to memory as to when he

11   became a judge.  But this is an estimation of the time

12   frame by a source.

13        Q    Oh.  Now, you've been to the grand jury.

14   You were at the grand jury on this whole case.  Isn't

15   that correct?

16        A    Yes, sir.

17        Q    And you know he didn't become a judge till

18   1999 -- I mean 1991, don't you?

19        A    Sir, I don't have a --

20        Q    You know that.  You read this indictment.

21        A    I don't have it committed to memory, sir.

22        Q    When did you get this information?

23        A    The second redacted copy is December 15,

24   2008.  The first one does not have a date.  So I don't

25   -- I don't know when that was.

1          Q     Well, you testified while ago that the only

2    reason you can figure that he wanted what kind of car

3    you drove or what your name was or where you lived was

4    to do something to you or intimidate you.  Is that

5    correct?

6          A     Correct.

7          Q     What year was that?

8          A     What year was that?

9          Q     Yeah, what year was that?

10         A     We got confirmation during a recording

11   during 2007.  I believe it was 2007.

12         Q     Two years ago, approximately?

13   Approximately.  We're using approximately.  Two years

14   is the approximate date.

15         A     Yes, sir.

16         Q     Okay.  How do you feel?  Feeling pretty

17   good?  Physically.

18         A     Feel fine, sir.

19         Q     Okay.  Anybody try to shoot you or anything

20   since then?

21         A     I don't -- not since 2007, I don't think.

22         Q     Okay.  Okay.  So, if somebody wanted to do

23   something to you, they had two years to do something

24   to you, didn't they?

25         A     I guess, sir, if they located me, sure, they

1    had two years.

2         Q    Oh.  You've talked to him personally, even

3    before this indictment was returned, haven't you?

4         A    Yes, sir, I have.

5         Q    So he knew who you were.

6         A    We have met face to face, sir.

7         Q    Okay.  All right.  He knew you were doing an

8    investigation.  Isn't that correct?

9         A    Excuse me?

10        Q    He knew that you were heading the

11   investigations.

12        A    I would assume.  My name's been in the paper

13   quite a bit over there.

14        Q    Okay.  I mean, I mean, you knew he knew it

15   two years ago.

16        A    Whenever we subpoenaed the records from Clay

17   County.

18        Q    All right.  But you're all right.  You're

19   not hurt.  Nobody's tried to kill you or nothing.  Run

20   you over with a car, poison you, have they?

21        A    No, sir.

22        Q    Okay.  I guess if somebody wanted to, they

23   could, couldn't they?

24        A    Could what, sir?

25        Q    Hurt you.

1        A     They could certainly try.

2        Q     Yeah.  But nobody has, have they?

3        A     Not recently, no.

4        Q     Certainly not Mr. Maricle, has he?

5        A     No.  I've not had any --

6        Q     Okay.  Now, you said you were worried about

7    his mental state 40 years ago.  What kind of degree do

8    you have, medical degree do you have in psychiatry or

9    anything?

10       A     I don't have a psychology degree.

11       Q     Do you know of anybody that's not depressed

12   at one time or another?

13       A     I'd say numerous people are, sir.

14       Q     So that's no big deal, is it?  Being

15   depressed.

16       A     Well, you couple depression with --

17       Q     If you're taking medication.

18       THE COURT:  Now, Mr. Hughes, you need to let him

19   answer.  You asked a question.  Let him get his answer

20   out, and then you can ask the next one.

21       HON. HENRY E. HUGHES:  You're right.

22       THE COURT:  Agent Briggs.

23       A     If you couple depression with knowing you're

24   under investigation, knowing you're under indictment,

25   knowing that your home has been searched, you've been

1    arrested, you've recently had a loss in your family of

2    a family member, a death in your family, I mean, you

3    know, you compile all these things, and that is of

4    concern.  For any --

5         Q    That's normal, though, isn't it?  If my son

6    died -- have you got any kids?

7         A    Yes, sir.

8         Q    Either one of your kids died, would you be

9    depressed?

10        A    Absolutely.

11        Q    When was that?  When was it?  When did his

12   son die?

13        A    I believe it was late January of 2009.

14        Q    He's still here, isn't he?

15        A    Yes, sir.

16        Q    Hasn't killed himself, has he?

17        A    No, sir.

18        Q    Do you have any evidence that he attempted

19   to kill himself?

20        A    I heard that discussed the other day at the

21   hearing.

22        Q    Okay.  And he's taking -- you heard it

23   discussed.  With who?

24        A    At the -- at the hearing we had the other

25   day.

1          Q     Well, who was discussing it?  Was he

2     discussing it?

3          A     It was discussed in open court.

4          Q     Was Mr. Smith discussing it?

5          A     It was discussed in open court, sir.

6          Q     Is there any evidence that he has tried to

7     kill himself?  No iota of evidence.

8          A     What was discussed in open court the other

9     day, sir.  That's it.

10         Q     Wellbutrin.  You're talking about all these

11    drugs he's taking.  Do you know what that is?

12         A     I believe, and I don't know, but I believe

13    it to be an antidepressant or anti-anxiety medication.

14         Q     That's not even a prescription drug, is it?

15         HON. STEPHEN SMITH:   Your Honor, I'm going to

16    object to counsel exploring with this witness outside

17    his direct testimony.  I do not believe that he

18    testified about medications specifically.

19         THE COURT:   Well, I think you're right, he did

20    not testify about medications.  But I also think Mr.

21    Hughes gets some leeway on the issue of Agent Briggs'

22    concern over the defendant's mental status.  You can

23    continue, Mr. Hughes.

24              SPECIAL AGENT TIMOTHY S. HUGHES

25              CONTINUE CROSS-EXAMINATION

1            HON. HENRY E. HUGHES:

2       Q   And 40 years ago that you said that he --

3  when he was charged with this crime that you so

4  eloquently brought up, that was in November of 1971.

5  wasn't that correct?

6       A   I don't recall the date, sir.  But that

7  would be correct, other -- it happened at a polling

8  place, so November would make sense.

9       Q   And this charge was dismissed.

10      A   Yes, sir.

11      Q   In the first part of '72.  Is that correct?

12      A   It was dismissed, sir.  I don't know what

13  date it was dismissed.

14      Q   So you're saying that he hid for a month.

15  Is that right?  Or two months.

16      A   I've been told that by witnesses, yes, -- or

17  by a witness.

18      Q   Okay.  So by that, you're basing on he's

19  likely to run because he was depressed and didn't want

20  to see people when he was charged with a crime.  Isn't

21  that -- that what you're saying?

22      A   I -- I'm simply presenting evidence to the

23  court for a determination here.

24      Q   Oh, yes, you did.  You testified that one of

25  the reasons you thought he was a threat to run was

1    because of his actions back in 19 -- or whatever date

2    that was.  Approximately two years.  Did you testify

3    to that?

4         A    What was your question specifically, sir?

5         Q    Did you testify, as part of your reason that

6    you were afraid he was going to run, was because that

7    he had become a recluse for a month when he was

8    charged with murder?  Isn't that what you testified

9    to?

10        A    I believe a good judge of what a person's

11   actions are today would be what they've done in the

12   past.  He, in the past, according to a witness, he

13   basically hid out for a month during that time frame.

14   That would concern me as an investigator, yes, sir.

15        Q    So your answer is that it's your belief that

16   because he may have become a recluse for two months

17   because he was charged with murder, or a month and a

18   half, or two years, approximately, that he was a

19   threat to run.  Isn't that correct?  That what you're

20   saying?

21        A    Sir, I can only communicate with the witness

22   that he was scarce for a month.  He was hiding out for

23   a month during this time frame.

24        Q    Forty years ago.

25        A    It wasn't quite 40 years ago, but roughly.

1          Q      Okay.  Not two years ago.  Four years ago.

2          A      Roughly.

3          Q      Now, tell me about this padding down.  Did

4     you see that?

5          A      No, sir.

6          Q      What have you promised your prosecuting

7     witness?

8          HON. STEPHEN SMITH:   Your Honor, I'm going to

9     object.

10          THE COURT:   Counsel approach on this, please.

11              BENCH CONFERENCE:

12              (REPORTER'S NOTE:  BENCH CONFERENCE

13               UNDER SEAL.)

14     -

15     -

16     -

17     -

18     -

19     -

20     -

21     -

22     -

23     -

24     -

25     -

1      –

2      –

3      –

4      –

5      –

6      –

7      –

8      –

9      –

10     –

11     –

12     –

13     –

14     –

15     –

16     –

17     –

18     –

19     –

20     –

21     –

22     –

23     –

24     –

25     –

1        –
2        –
3        –
4        –
5        –
6        –
7        –
8        –
9        –
10       –
11       –
12       –
13       –
14       –
15       –
16       –
17       –
18       –
19       –
20       –
21       –
22       –
23       –
24       –
25       –

1  –

2  –

3  –

4  –

5  –

6  –

7  –

8  –

9  –

10  –

11  –

12  –

13  –

14  –

15  –

16  –

17                 END BENCH CONFERENCE.

18                 SPECIAL AGENT TIMOTHY S. BRIGGS

19                 CONTINUE CROSS-EXAMINATION

20                 HON. HENRY E. HUGHES:

21        Q    I'll even make it easier, so we won't have a

22   problem.  Have any of the cooperating witnesses been

23   promised anything by you?

24        A    By me personally?

25        Q    Yes.

1        A    No.

2        Q    By who?

3        HON. STEPHEN SMITH:   I'm going to object, your

4    Honor.

5        HON. HENRY E. HUGHES:   He opened it right up,

6    judge.

7        HON. STEPHEN SMITH:   I'm going to object, your

8    Honor.  He can't speak -- he can speak for his own

9    actions.  Counsel's now trying to seek --

10       HON. HENRY E. HUGHES:   I'd like to approach the

11   bench.

12       THE COURT:   Well, I don't believe that there's a

13   need to approach.  I'm going to ask you to rephrase

14   your question, and get back to the basis the court

15   recognized would be legitimate as a line of

16   questioning.

17       HON. HENRY E. HUGHES:   All right.

18            SPECIAL AGENT TIMOTHY S. BRIGGS

19            CONTINUE CROSS-EXAMINATION

20            HON. HENRY E. HUGHES:

21       Q    Agent Briggs, do you know the reputation for

22   truth and veracity of the witnesses you mentioned?

23       A    Yes.

24       Q    Among those people with which they reside

25   and live?

1        A    I'm sorry.  You lost me on that question.

2        Q    Okay.  What it says is, those people -- we

3    all have friends, we know people.  And are you saying

4    that those people would say that these, whoever they

5    may be, confidential witness, are reliable and

6    truthful?

7        A    I still don't understand your question.

8        Q    Do you have any reason to doubt their

9    testimony?

10       A    No.  We've corroborated them a number of

11   ways.

12       Q    Okay.  Now, a minute ago you were asked:

13   Did you make any promises to any of the cooperating

14   witnesses.

15       A    No.

16       Q    And you answered not personally.  Is that

17   correct?

18       A    I said not personally or not me, but I

19   indicated that I didn't make any promises.

20       Q    Were you there?

21       A    Was I where what?

22       Q    When the promises were made?

23       HON. STEPHEN SMITH:   Your Honor, I'm going to

24   object again.  I believe the witness has answered Mr.

25   Hughes' question.  Now he's seeking to elicit him to

1    prove a negative.  And I think that that's impossible

2    for the witness to do, and I would object.

3         HON. HENRY E. HUGHES:   All right.

4         THE COURT:   You two approach briefly.

5             BENCH CONFERENCE:

6             (REPORTER'S NOTE:  BENCH CONFERENCE

7              UNDER SEAL.)

8    -

9    -

10   -

11   -

12   -

13   -

14   -

15   -

16   -

17   -

18   -

19   -

20   -

21   -

22   -

23   -

24   -

25   -

```
1      –

2      –

3      –

4      –

5      –

6      –

7      –

8      –

9      –

10     –

11     –

12     –

13     –

14     –
```

15                    END BENCH CONFERENCE.

16                    SPECIAL AGENT TIMOTHY S. BRIGGS

17                    CONTINUE CROSS-EXAMINATION

18                    HON. HENRY E. HUGHES:

19          Q    Agent Briggs, were you there when anyone

20     from the government made any promises to any witnesses

21     in this case?

22          A    Gosh, we've got a hundred plus witnesses.

23     I'm sure -- I'm sure that I was.

24          Q    Okay.  That's all I wanted to know.  That

25     was an easy question, wasn't it?  Oh, I missed one

1       thing.  I sat here and listened to you for an hour or

2       so.  Do you know one good thing about this man?

3            A    Do I?

4            Q    Do you know one good thing about him?

5            A    I don't know him personally, sir.

6            HON. HENRY E. HUGHES:   No more questions.

7                 SPECIAL AGENT TIMOTHY S. BRIGGS

8                 EXAMINATION, BY THE COURT:

9            THE COURT:   All right.  Agent Briggs, I have

10      just a few, and then I'll let counsel --

11           A    Yes, sir.

12           THE COURT:   -- follow up as they deem

13      appropriate.  The discussion you had, the testimony

14      that you gave concerning the obstruction of justice

15      charge in the indictment, my notes indicate that the

16      information was that the defendant was directing the

17      witness on how to testify to the grand jury.  And I

18      wonder if you could describe in a little bit more

19      detail the type of direction that the defendant

20      allegedly was giving to that grand jury witness.

21           A    Okay.  And again, I don't have the -- I

22      don't have those items in front of me.  But generally

23      speaking, one of the comments was, *Unless you've been*

24      *an eyewitness to a murder, don't tell them anything*

25      *short of you being an eyewitness to an eye* --

1    *eyewitness to a shooting.*

2         That was one of the statements made to the

3    sources.

4         THE COURT:   Was the suggestion to just not give

5    any information, regardless of the circumstance,

6    unless it involved something as serious as being an

7    eyewitness to a murder?  Was that the gist of it?

8         A    Don't offer any information, don't tell them

9    anything, and don't offer anything short of being the

10   -- short of being an eyewitness to a shooting.

11        THE COURT:   And the corroboration on that you

12   indicated was captured in some recordings.  Is that

13   correct?

14        A    Yes, sir.  That's correct.

15        THE COURT:   And how would you characterize that

16   taped corroboration, which I assume you've heard those

17   tapes.

18        A    Yes.

19        THE COURT:   How would you characterize that

20   taped corroboration?

21        A    Well, the statement I just made was from one

22   of the taped conversations.

23        THE COURT:   It was from a taped conversation.

24   Okay.

25        Is there an election scheduled to occur in Clay

1    County this year?  Do you know?

2         A    Gosh.  Honestly, sir, I don't know -- I

3    don't know who's running and what -- what time frame

4    we're in.  I know they're usually every -- obviously,

5    every four years are the big ones, but there may well

6    be.

7         THE COURT:  All right.  The description that you

8    gave about the defendant who testified and allegedly

9    did not follow the instructions that were given to

10   him, I'll confess to being a little bit confused about

11   that chronology.  And I think you described there

12   being sort of two phases to that story.  If you don't

13   mind, if you could just try to outline --

14        A    Okay.

15        THE COURT:  -- that event from beginning to end,

16   so that I can understand that chronology.

17        A    Yes, sir.  I explained that in a way that --

18   in a way that was, I think, confusing.  But --

19        THE COURT:  Is his mic picking up?  I'm having a

20   little trouble hearing you.  Let's see if maybe you

21   could pull it down.  Is your green light on?

22        A    Yeah, it's on.

23        THE COURT:  Okay.  Gotcha now.

24        A    Okay.  To clarify that, in 2005, there was a

25   -- a trial going on in Mr. Maricle's court.  Okay.

1      This source that I've spoken about had a brother that

2      was involved in this assault.  And other defendants in

3      that case had information regarding Mr. Maricle's

4      daughter.  And somehow word got back to him.  I

5      believe it was by way of a letter that they planned to

6      potentially give up information of his daughter.

7      Therefore, Mr. Maricle schemed with the source to

8      coach the source's brother on how to testify at that

9      case to see to it that those individuals were

10     convicted of those crimes.  That was Phase 1, which

11     was prior to the election.

12          Phase 2 was after the election.  One of the

13     promises made of the source was that if the source

14     helped carry out this election fraud which the source

15     was involved in, that that they would try to get the

16     source's brother out of prison.  So it's kind of a

17     two-fold, two-part agreement.

18          THE COURT:  Okay.  And again, the corroboration

19     on that that I think you described, if you could just

20     give me some detail on what the tapes showed that

21     would corroborate the scheme that you have described.

22          A    The source, during an audio recording, asked

23     about that, and -- and Mr. Maricle had said something

24     the effect of just have your -- have your brother's

25     attorney file the paperwork, and we'll get him out of

1     prison or something to that effect.  So that was

2     corroborated.

3          THE COURT:   Okay.  And that would be --

4          A     During the recording.

5          THE COURT:   Consistent with your description,

6     that would pertain to sort of the completion of the

7     second phase.

8          A     The agreement.

9          THE COURT:   Okay.  And Mr. Hughes asked you

10    about the issue of the dates with respect to the

11    allegation captured in the 302 that you've reviewed as

12    part of your testimony.  And I had that question, as

13    well, whether, in fact, the defendant was a judicial

14    officer at the time these events allegedly happened.

15    And it's your testimony, based on the notes, that this

16    did occur during the period when he was a judicial

17    officer.  Is that correct?

18         A     Well, the source stated that -- that -- the

19    source of this information stated that Judge Maricle

20    was presiding over the case, and estimated the time to

21    be approximately 1989.  So that was just an estimate

22    that was provided by that individual to me.

23         THE COURT:   Okay.

24         A     But the individual did say that he was

25    presiding over this trial in question.

1          THE COURT:   All right.  Thank you.  Mr. Smith.

2              SPECIAL AGENT TIMOTHY S. BRIGGS

3              RE-DIRECT EXAMINATION

4              HON. STEPHEN SMITH:

5          Q    Agent Briggs, you were asked on cross-

6      examination about the concern that you had presently

7      for your safety.  Do you remember that line of

8      questioning?

9          A    Yes, sir.

10         Q    Did you, as part of your investigation, take

11     steps to counteract this attempt to find your

12     residence and the residence of the other agents in

13     some way?

14         A    Yes.

15         Q    How did you do that?

16         A    How did I -- how did we specifically do it?

17         Q    How did you try to counteract that?

18         A    Okay.  With regard to my residence?

19         Q    Yes, sir.

20         A    I was fearful that my residence would be

21     found and my -- my family or myself would be

22     approached at my residence.  So I advised the source

23     to relay, in a meeting with Mr. Maricle, that I'd --

24     was moving out of my house and moving to a new

25     residence.  Was leaving my -- my current location.

1    So, in the event he did find out where I would live --

2    where I lived, he would not -- he would think that I'd

3    moved from that area.

4         Q    You were also asked in questions, as well,

5    about the acts of obstruction that he took pursuant to

6    this indictment that he obstructed justice on a

7    witness.  In your investigation, were you able to

8    determine by recordings that Mr. Maricle left some of

9    that direction up to another individual to actually

10   direct the witness?

11        A    Yes, sir.

12        Q    And in those recordings, did this person,

13   who is co-defendant, what's his name?

14        A    William Stivers, also known as Al Man.

15        Q    Did he actually go line by line, question by

16   question, and tell the witness exactly how to testify

17   falsely?

18        A    Did who?

19        Q    Mr. Stivers at the direction -- first, did

20   Mr. Stivers actually go through questions and direct

21   the witness specifically on how to answer grand jury

22   questions?

23        A    Yes.

24        Q    And did he acknowledge in those recordings

25   that that was at the direction or the approval of Mr.

1     Maricle?

2          A    Yes.

3          Q    And you've also been asked about the

4     prospective elections.  Mr. Maricle's son-in-law, Mr.

5     Moberly, was elected in 2006.

6          A    Yes.

7          Q    To you knowledge, is PVA an office which

8     comes up for re-election every four years?

9          A    Yes, it is.

10         Q    Be fair to say that 2010 may be an election

11    year --

12         A    Yes.

13         Q    -- of significant interest to Mr. Maricle?

14         A    Yes, it would.

15         Q    You were also asked about the two-fold

16    aspect, I guess, of this scheme to perjure testimony

17    in the case before Mr. Maricle as it related to the

18    assault.

19         A    Yes.

20         Q    And would there also be another aspect of

21    that in that once the witness failed to follow the

22    direction of Mr. Miracle in his attempt to perjure his

23    testimony, that he actually gave him a harsher

24    sentence otherwise?

25         A    Yes.

1          Q     And what was his sentence that he gave?

2          A     Well, the original agreement for Phase 1 of

3     the item that I discussed was that he -- this

4     individual had already pled guilty and was supposed to

5     not do any time whatsoever.  But after they didn't

6     follow through with exactly the way they were supposed

7     to follow through with their testimony, this

8     individual received five years in prison.

9          Q     And that was a sentence which Mr. Maricle

10     issued from his bench.

11          A     Correct.

12          HON. STEPHEN SMITH:   If I could have a moment.

13          THE COURT:   Cross.

14          HON. STEPHEN SMITH:   If we could have a moment,

15     please.

16          THE COURT:   Oh.  I'm sorry.  Yes.

17          HON. STEPHEN SMITH:   I apologize.

18          THE COURT:   I misunderstood.

19              OFF-THE-RECORD DISCUSSION.

20              SPECIAL AGENT TIMOTHY S. BRIGGS

21              CONTINUE RE-DIRECT-EXAMINATION

22              HON. STEPHEN SMITH:

23          Q     Agent Briggs, one additional follow-up area

24     here.  You testified that at the direction of Maricle,

25     Stivers gave specific direction to the witness how to

1    testify.

2         A    Yes, sir.

3         Q    Could you give the court some examples of

4    that.

5         A    Yeah.  They -- it was talked about pleading

6    the *Fifth*, don't tell them nothing, don't tell bald-

7    faced lies.  At one point he says -- he tries to

8    downplay the source's meetings with -- with Mr.

9    Maricle, saying that there's nothing out of the

10   ordinary with that.  You know.  And he even said that

11   -- that Cletus was not heavily involved in 2006, at

12   least with passing out money, anyway.  And made

13   statements to that effect.  In -- in telling the

14   source and the witness how to testify before the

15   federal grand jury.

16        Q    Did he tell her or him at one point

17   specifically to lie?

18        A    Yeah.

19        Q    In fact, is it during those recordings that

20   he advised her to deny that there was actually

21   stealing of votes that were occurring at the polls in

22   2006?

23        A    Yes.

24        HON. STEPHEN SMITH:   Thank you, your Honor.

25        THE COURT:   Mr. Hughes.

1          SPECIAL AGENT TIMOTHY S. BRIGGS

2          RE-CROSS-EXAMINATION

3          HON. HENRY E. HUGHES:

4          Q    Just a couple questions to clear some things

5     up.  Evidently on this case we were talking about,

6     Judge asked a question and I asked you questions about

7     the fellow that was supposed to do this in the script

8     and do that and he was a judge and was a co-defendant

9     and he was testifying against his co-defendant and

10    that stuff.  Do you remember that, we just talked

11    about?

12         A    Yes.

13         Q    Let me ask you something.  Did you ever view

14    that file over in Clay County?

15         A    I've got that file.

16         Q    Yeah.  And who made the recommendation of

17    five years with probation?

18         A    Sir, I don't -- I don't recall that.

19         Q    You know the commonwealth attorney makes

20    those recommendations.  The judge don't make those

21    recommendations.  You know that, don't you?  Now, look

22    at me.

23         A    I'm not familiar with the state court

24    system, sir.

25         Q    All right.

1      A    I've been a federal agent for 12 years.  I

2  don't have any knowledge.

3      Q    Does the judge ever have any say-so in

4  agreements between -- except to say no -- does he

5  enter into plea agreements?

6      A    Excuse me?

7      Q    You say you didn't know about the state, but

8  the federal.  Do you know any judge ever enter into

9  plea agreements with the defendant?

10     A    I'm sorry, sir.  I don't understand your

11  questions.

12     Q    All right.  Let me ask you something.  The

13  commonwealth attorney recommended five years

14  probation.  Is that correct?

15     A    Sir, I don't -- I don't recall that.

16     THE COURT:  Mr. Hughes, if he doesn't know, you

17  can ask him all day long, he's going to say he doesn't

18  know.

19     HON. HENRY E. HUGHES:   I understand, your Honor.

20  I'm just -- I'm getting a little irritated, and I

21  apologize to the court.

22     THE COURT:  Well, just take a deep breath and

23  ask your questions.

24     HON. HENRY E. HUGHES:   I -- I'm going to take

25  maybe a nitro pill here in a minute.

1              SPECIAL AGENT TIMOTHY S. BRIGGS

2              CONTINUE RE-CROSS-EXAMINATION

3              HON. HENRY E. HUGHES:

4        Q    You know anything about shock probation?

5        A    I've heard of it, yes.

6        Q    Okay.  Know how many days you have to file

7   that in state court?

8        A    I have no earthly idea.

9        Q    In fact, the judge gave the defendant in

10  that case more time than was recommended by the

11  commonwealth attorney.  Isn't that correct?  You just

12  testified to it on the stand.

13       A    Sir, I don't know what the commonwealth

14  attorney recommended.  You're -- you're asking me

15  something I don't know.  Okay.

16       Q    Did a minute ago you say he went beyond and

17  gave him a harsher sentence than they had agreed on?

18  Didn't you just say that?

19       A    I answered yes to was it a harsher sentence

20  than was believed to be carried out in the agreement.

21       Q    Do you know if he was a party to the

22  agreement?

23       A    Yes.

24       Q    Have you ever seen a state plea agreement?

25            THE COURT:   Counsel, it's my belief, and there's

1      no jury here, so I'm the fact finder.  It's my belief

2      that you're confusing agreements.  And I want to make

3      sure everybody's on the same page.  I think counsel is

4      asking about a plea agreement.  And Agent Briggs, I

5      just want to make sure that everybody understands that

6      we're talking about the same type of agreement.

7                SPECIAL AGENT TIMOTHY S. BRIGGS

8                CONTINUE RE-CROSS-EXAMINATION

9                HON. HENRY E. HUGHES:

10     A     I don't know about the plea agreement.  I

11     wasn't there.  I have not committed the case file to

12     memory.  I know that he was involved in an agreement

13     where this individual was supposed to testify a

14     certain way, and then, therefore, not -- not go to

15     prison.  I'm aware of that agreement.

16     Q     Oh.

17     A     But beyond that, no, I don't know, sir.

18     Q     Okay.  Okay.  And that was -- he did that

19     out of spite because whoever this was, and I could

20     care less, wouldn't help him in the election.  Is that

21     correct?  Wouldn't help him fix some kind of election.

22     A     No.

23     Q     Okay.  What was his reason?

24     A     As I discussed earlier, it was a two-part.

25     Q     All right.

1        A    Okay.  The first part --

2        Q    The second part's the one I want to know.

3        A    Oh, the second part.

4        Q    Yeah.

5        A    Okay.  Second part.

6        Q    Yeah.

7        A    All right.  The second part was the source

8    was supposed to assist in carrying out the election

9    fraud that occurred in Clay County.

10       Q    Yeah.

11       A    Okay?  Having done that, then the judge

12   would then seek to -- to get this source's brother out

13   of prison.

14       Q    Okay.  So you're saying that -- that can't

15   be right, then.  Because he couldn't have made that

16   deal if he was already in prison.  He couldn't have

17   made the deal you're talking about.  You understand

18   what I'm saying?

19       A    No, I don't.

20       Q    If you're talking about an election coming

21   up in the future, okay, then, his brother was already

22   in prison.  Is that correct?

23       A    Yeah.  Part 1 occurred prior to the

24   election.  Part 2 occurred after the election.

25       Q    After the election.  Okay.  So he put him in

1    jail the day of the sentencing, didn't he?

2        A    Sir, I don't -- I don't know that.

3        Q    Okay.  Did he put him in jail -- or do you

4    know?  If you don't, just say no -- the day that he

5    entered the plea agreement?

6        A    I don't recall that, sir.

7        Q    Have you talked to the commonwealth attorney

8    about this case that was commonwealth attorney at the

9    time of this -- this -- this whatever it is.

10       A    No, sir.

11       Q    You haven't even made an attempt to contact

12   him or talk to him?

13       A    Well, sir, it's a corruption investigation.

14   We -- we approach individuals very logically and in a

15   specific manner.  And we didn't want to do so.  I felt

16   it would -- would jeopardize portions of the

17   investigation.  So, no, that was not --

18       Q    Okay.  But you interviewed the record.  Is

19   that right?  Of this case.  I presume.

20       A    We subpoenaed the records.

21       HON. STEPHEN SMITH:   Your Honor, I'm going to

22   object to the continued intransigent positioning of

23   the witness's testimony.

24       THE COURT:   It's not having any effect on the

25   court.  I can promise you.

1      HON. HENRY E. HUGHES:   I understand that, Judge.

2      THE COURT:   Continue.

3      HON. HENRY E. HUGHES:   Doesn't have any effect

4  on my wife either.

5           SPECIAL AGENT TIMOTHY S. BRIGGS

6           CONTINUE RE-CROSS-EXAMINATION

7           HON. HENRY E. HUGHES:

8      Q    How long you been working on this case?

9      A    Well, it's -- it's -- heavily since 2005.

10  Late 2004, early 2005.

11     Q    No more questions.  Oh, oh, yeah, I do, too.

12  Do you ever go on vacation?

13     A    Absolutely.

14     Q    Did you ever take your family with you?

15     A    Sure.

16     Q    Did you ever go fishing?

17     A    Sure.

18     Q    You go run off anyplace?

19     A    I don't plan to.

20     HON. HENRY E. HUGHES:   No more questions.

21     THE COURT:   Any further questions?  Mr. Smith.

22           SPECIAL AGENT TIMOTHY S. BRIGGS

23           RE-RE-DIRECT EXAMINATION

24           HON. STEPHEN SMITH:

25     Q    Agent Briggs, was Gary Gregory present when

1    this attempt to script this witness testimony occurred

2    by this defendant?

3         A    I believe he was, yes.  Um-hmm.

4         HON. STEPHEN SMITH:   Thank you.  That's all I

5    have, your Honor.

6              BY THE COURT:

7         THE COURT:   Mr. Hughes.

8         HON. HENRY E. HUGHES:   I have no more questions,

9    Judge.

10        THE COURT:   And Agent Briggs, Gary Gregory is

11   who?

12        A    Commonwealth Attorney, Clay County.

13        THE COURT:   All right.  Thank you.  Anything

14   else for this witness?  All right.  Thank you, Agent

15   Briggs.  You may step down.  The court's going to mark

16   those two redacted statements as Court Exhibit 1 and

17   Exhibit 2.  We'll make the dated statement exhibit 1

18   and the undated exhibit, Exhibit 2.  And Agent Briggs,

19   if you would just leave those there.  Thank you.

20              THEREUPON, DATED REDACTED STATEMENT

21              MARKED COURT EXHIBIT 1, AND IN

22              CUSTODY OF DEPUTY CLERK; UNDATED

23              REDACTED STATEMENT MARKED COURT

24              EXHIBIT 2, AND IN CUSTODY OF DEPUTY

25              CLERK.

1        A    Okay.

2        THE COURT:   I'd like to have the court's

3   security officer fetch those and provide them to the

4   clerk.

5        THE COURT:   Further proof, Mr. Smith?

6        HON. STEPHEN SMITH:   I would like the court's

7   indulgence with a short recess to prepare for a

8   possible second witness.  And I've not had an

9   opportunity to assure that that witness is ready.  So

10  if I could have a short break, I can do that.

11       THE COURT:   All right.  Ten minutes?

12       HON. STEPHEN SMITH:   That's fine.

13       THE COURT:   All right.  We'll be in recess for

14  ten minutes.

15       BAILIFF:   All rise.  United States District

16  Court will be in recess for ten minutes.

17            OFF THE RECORD 2:45 P.M.

18            BACK ON THE RECORD 2:50 P.M.

19       BAILIFF:   The United States District Court is

20  again in session.  Be seated.

21            BY THE COURT:

22       THE COURT:   Thank you.  Continuing on in 09-16,

23  Mr. Smith, your next witness.

24       HON. STEPHEN SMITH:   Thank you, your Honor.  The

25  United States would call Kenneth Day.

1          DEPUTY CLERK:   Please raise your right hand.   Do

2     you swear or affirm, under the pains and penalties of

3     perjury, that the testimony you will now give in this

4     case shall be the truth, the whole truth, and nothing

5     but the truth?

6          MR. KENNETH DAY:  I do.

7          DEPUTY CLERK:  Thank you.

8          THE COURT:   Sir, if you'd begin by stating your

9     name and spelling your last name.

10         A    Kenneth Day, D/a/y.

11         THE COURT:   Thank you.  Mr. Smith.

12              KENNETH DAY

13              DIRECT EXAMINATION

14              HON. STEPHEN SMITH:

15         Q    Mr. Day, are you the same Kenneth Day that

16    was prosecuted here in United States District Court

17    here in London?

18         A    Yes, I am.

19         Q    And did you plead guilty to drug charges,

20    among others, federal offenses?

21         A    Yes, I did.

22         Q    And were you sentenced to a term of

23    imprisonment?

24         A    Of 18 years.

25         Q    And are you serving that term at this time?

1       A    Yes, I am.

2       Q    Did you agree to cooperate and testify, if

3    necessary, in any proceedings the government calls you

4    a witness?

5       A    I didn't understand what you said.

6       Q    Did you agree to testify, if called as a

7    witness, in any proceedings by the United States?

8       A    Yes, I did.

9       Q    And did you agree to testify truthfully if

10   called?

11      A    Yes, I did.

12      Q    I'd like to ask you, Mr. Day, do you know

13   the defendant Cletus R. Maricle -- Russell Cletus

14   Maricle?

15      A    Yes, I do.

16      Q    Do you see him here in the courtroom this

17   afternoon?

18      A    Yes.  Sitting right there.

19      Q    Would you tell the court, for the record,

20   what he's wearing.

21      A    He's wearing a striped sweater and a green

22   -- or a yellow top shirt.

23      THE COURT:   The record will reflect that the

24   witness has identified the defendant.

25      Q    How long have you known Mr. Maricle?

1          A     Most of my adult life.

2          Q     During the time that you've known him, have

3     you ever been asked to go with him in his presence to

4     approach a spouse of a potential juror or a juror in a

5     court case before him as judge?

6          A     Yes, I have.

7          Q     Would you explain to the court the

8     circumstances of that, please.

9          A     They was a civil suit going on, a lawsuit,

10    over a car wreck, where Gary Runyons run over Loretta

11    and killed her.  And they was suing the insurance

12    money -- the insurance for a settlement.

13         Q     Now, Loretta, is she -- could you give us

14    some relationship?

15         A     She's my sister-in-law.

16         Q     So it was your sister-in-law.

17         A     That is right.

18         Q     And who was bringing the case for her

19    estate?

20         A     The attorney?

21         Q     Well, did she have a representative of

22    her --

23         A     Me.  I was -- I was representative of the --

24    of the estate.

25         Q     And so, this matter was before which judge?

1       A     Cletus Maricle.

2       Q     In what county?

3       A     Clay County.

4       Q     And tell us what happened.

5       A     We went to see Press Henson, and --

6       Q     And who is *we*?

7       A     Me, Cletus, Scott Madden, and Larry Joe

8    Roberts.

9       Q     And these people, Scott Madden and Larry Joe

10   Roberts, did they have any official role in the case,

11   to your knowledge?

12      A     No, I did not -- no role whatsoever.

13      Q     Are they attorneys?

14      A     Yes, they are.

15      Q     Were they attorneys that were practicing in

16   this case that you're referring to?

17      A     No.

18      Q     Okay.  So when you're referring to *we went*

19   *to Preston Henson*, it included those individuals, as

20   well as Mr. Maricle.

21      A     That is right.

22      Q     And what happened when you approached Mr.

23   Henson?

24      A     Approached Mr. Henson to -- to -- to speak

25   to his wife, or ex-wife, whatever she was at the time,

1    I don't recall if they was divorced or separated, that

2    when she -- she was on the jury, she'd been picked for

3    the jury, not to come out of there unless a million

4    dollar settlement.  That's what Press told her when he

5    called her on the phone.

6         Q    And during the conversation that Mr. Henson

7    had with his wife, was Mr. Maricle present?

8         A    Yes, he was.

9         Q    And at that time you say that there was a

10   jury already selected for the case?

11        A    Yes.

12        Q    And you all knew that this lady was on the

13   jury?

14        A    Yes.

15        Q    And do you know the results of the jury

16   verdict?

17        A    They -- they come out with a guilty, a

18   settle -- the settlement somewhere between three and

19   four million dollars.  I don't know the exact figure.

20        Q    All right.  Now, you used a couple or words

21   that -- and I want to ask you to explain, if you can.

22   You said they returned a guilty.  Are you talking

23   about a verdict?

24        A    Well, I don't know exactly the -- the --

25        Q    You also used the word *settlement*.  Did they

1    get a jury verdict, or did it result in a settlement

2    before the jury verdict?

3        A    They -- they -- I don't know the exact

4    termination of the -- of the law on it, but when the

5    jury come out, they decided for the family of Loretta

6    Day.

7        Q    Okay.  And did they, as promised or as

8    directed by Press Henson to his wife, did they return

9    a verdict over one million dollars?

10        A    Yes, they did.

11        Q    Do you know who the defendant was as far as

12    who paid the settlement?

13        A    I don't know the insurance company.  The --

14    the guy that was driving the car hauler was Gary

15    Runyon.

16        Q    But it was an insurance company that had to

17    pay the verdict and so on.

18        A    That's right.  They never got all the money,

19    because they just had $350,000 worth of insurance is

20    all they had.  And all they collected was somewhere

21    around 400,000.  I don't exactly know the figure on

22    it, but that's all they collected.  But they come back

23    with a -- with a -- with a -- with a verdict of

24    somewhere between three and four million.  I want to

25    make sure on that.

1        Q    But the insurance only had to pay their

2   limits.

3        A    Their limit, that's right.

4        HON. STEPHEN SMITH:   Pass the witness, your

5   Honor.

6        THE COURT:   Thank you.  Mr. Hughes.

7        HON. HENRY E. HUGHES:   No questions, your Honor.

8        THE COURT:   All right.  Thank you, Mr. Day.  You

9   may step down.

10            BY THE COURT:

11       THE COURT:   Further proof, Mr. Smith?

12       HON. STEPHEN SMITH:   Not for the court, but for

13  the record, I would ask that the pretrial services

14  report be made as part of this record for

15  determination of the issue at hand.

16       THE COURT:   Thank you.  It certainly will be a

17  part of the decisional basis for the court.  I will

18  not formally make it part of the record because of

19  confidentiality of that report.  But it certainly will

20  be considered and available to the court for

21  evaluation.

22       That's the close of your proof, Mr. Smith, other

23  than argument at the end.

24       HON. STEPHEN SMITH:   Yes, your Honor.

25       THE COURT:   All right.  Thank you.  Mr. Hughes.

1    Any proof?

2         HON. HENRY E. HUGHES:   We don't have the

3    threshold, your Honor, even for that.  We have no

4    witnesses to call.

5         THE COURT:   All right.  Argument, Mr. Smith.

6              ARGUMENT ON BEHALF OF THE UNITED

7              STATES, HON. STEPHEN SMITH:

8         HON. STEPHEN SMITH:   Your Honor, as the court

9    evaluates the evidence before it, obviously, the

10   3142(g)factors are controlling as the United States

11   submits.  And in those, we look at, of course, the

12   nature and circumstances of the offense charged.  And

13   obviously, this multiple count indictment, which

14   includes racketeering, which is alleged to have been

15   led by individuals, including Mr. Maricle, are serious

16   charges, and of course, charges, which, again, we must

17   look at the weight of the evidence.

18        It has been uncontroverted in the proof before

19   the court that, in addition to over 100 witnesses

20   testifying to the nature and circumstances of the

21   multiple acts of election bribery, potentially, again,

22   effected elections of federal, state, and local nature

23   for the past three election cycles, including 2002,

24   2004, and 2006, and that the corroboration, again, the

25   Agent spoke of how these witnesses corroborated each

1       other.  But in addition, I glimpse additional evidence

2       that the Federal Bureau of Investigation has acquired

3       through tapes, over 30 tapes, that have been made.

4       These were consensual recordings of his witnesses'

5       meetings with defendants, including Mr. Maricle.  And

6       the agent has supplied examples which the court can

7       look to as to means of which direct cooperation and

8       acknowledgment by the defendant.

9            One of the things that Agent Briggs specifically

10      highlighted is that in order to induce one of the

11      participants in this criminal conspiracy to effect the

12      elections and the outcome of elections in Clay County

13      was promises to assist this individual.  And Agent

14      Briggs recited that that included assistance for the

15      brother, and also promises of job or employment for

16      her.  And he recited in, I believe his testimony, that

17      the recordings substantiated that, and that the

18      defendant did acknowledge in those recordings those

19      promises.

20           And I believe that those again are examples

21      of how extensive the investigation has gone with,

22      again, this has been statements of himself.

23      Particularly, Agent outlined how this scheme to

24      obstruct a federal investigation.  I think that that

25      is something not only is Agent Briggs concerned of

1    investigatively, I believe that the 3142(g) factors

2    also recognize that offense to be one of the very

3    serious, which it goes to the very fabric of this

4    system, one who would engage in acts which would

5    undermine the criminal justice system.

6         And particularly disturbing is the weight of

7    that evidence in that we have additional witnesses who

8    are corroborating each other and tapes which this

9    defendant has been testified to, himself personally,

10   making statements which were to encourage a witness to

11   testify falsely, and then to direct her to a co-

12   defendant, Mr. Stivers, who specifically told the

13   witness to lie.  And I think that further

14   substantiated in the recording is that Mr. Stivers

15   acknowledged that that was at the direction of Mr.

16   Maricle himself.

17   And so, I believe, your Honor, as we look at

18   3142(g) factors 1 and 2, we can look specifically to

19   those acts as being most corroborated by actually

20   recordings of the defendants themselves, in addition

21   to a great number of witnesses that the agent

22   outlined.

23        Again, we look at the third factor, which is

24   the history and characteristics of the person.  It's

25   striking that when we look at the pretrial services

1    report that we see here an individual who would appear

2    on the outset to be career-minded and one who has

3    obtained great status in the community of Clay County

4    as circuit judge, the highest judicial office in this

5    Commonwealth of Kentucky as a trial judge.  And yet,

6    it is within this report reported that he has, while

7    making a salary of $7,500 a month, he has only

8    accumulated, according to his report, about $48,000 of

9    liquid assets.

10       It's disturbing that in his interview he

11    acknowledges that he's been conveying his property to

12    his wife, and his vehicles are not in his name, and

13    his home is not in his name.

14       And he has, again, acknowledged in that report,

15    that he has struggled with depression for many years.

16    In fact, he said he had withdrew, had gone through a

17    midlife crisis and did not want to practice law;

18    discussed with the probation officer that he wanted to

19    live with Indians in New Mexico.

20       Your Honor, these, again, are glimpses into the

21    past of an individual who, again, the court must look

22    at under the factor 3, which is his physical and

23    mental condition.

24       We further have to look at, again, the

25    circumstances of which this defendant is today.  As we

1      know, he is facing up to 20 years imprisonment.  He's

2      65 years old.  Essentially, if he gets 20 years, I

3      would submit to the court that that would be a life

4      sentence in most relative terms to individuals looking

5      at such a sentence in federal court.

6           He is, as enumerated, an individual who has

7      displayed a great deal of abnormal behavior for one

8      who is sitting in the highest trial court in this

9      Commonwealth of Kentucky in Clay County.  Someone who

10     would frisk down meetings with individuals.  Someone

11     who would relate to him that he sees outside his

12     window agents hiding behind the trees of his

13     residence.  A person who believes that he cannot talk

14     on the cell phone because he's been following the

15     investigation of the prosecution of Bath County

16     election officials, and says that's how they got

17     themselves in trouble.

18          This is an individual, I would submit to you

19     again, that, looking under the third category of

20     factors of history and characteristics, are most

21     disturbing.  And I think that when he further relates

22     in his interview that occurred the day of his arrest

23     or subsequent thereto, the report says that he made a

24     statement in regard to suicide that everybody thinks

25     about it.

1        Now, I would submit to the court that's not a

2   statement of someone of stable mind and condition.

3   Could be argued that everybody might have a bout of

4   depression, but a bout of thinking about suicide, I

5   would take issue with.  I think it is also enumerated

6   in the report that he is struggling to find the will

7   to live.

8        Again, put that in context with the circumstances

9   which he's in.  He is in, again, facing these charges.

10  He has to, the report enumerates, faced tremendous

11  emotional issues recently.  Not only has his

12  retirement as a sitting judge and now senior status,

13  he has the death of a son, and an indictment for RICO.

14       We can look, I believe at 3142(g) factors to also

15  look at his past conduct.  And I would submit to the

16  court that 3142(g) as passed by congress doesn't say

17  that the court can only look at five years, or the

18  court can only look at ten years, or the court should

19  only look at 20 years.  It says *past conduct*.

20       And I would ask the court to look at the past

21  conduct of this judge, who has displayed, in his

22  courtroom, a complete disregard for the law.  A man

23  who has, the testimony has come before this court here

24  today, has engaged himself personally in coaching a

25  witness to perjure himself in order to benefit this

1      individual personally, to protect his daughter.

2          This is someone who has no regard for the rule of

3      law.  And I would submit to the court if he doesn't

4      obey the rule of law in his court, then this court has

5      no confidence that he's going to obey any conditions

6      that this court might place on him upon his release.

7          Further, we see that this is an individual who

8      has practice, by live testimony, opportunity here to

9      cross-examine here today, uncontroverted, that this

10     individual testified that he was with this judge in

11     approaching a juror to set a verdict.  How outrageous

12     such conduct one would hear occurring by a person

13     who's sitting in judgment on that offense.

14         And I think, again, that goes to a person who has

15     no regard for the rule of law, and one, again, who, if

16     this court was to expect to follow those rules, would

17     not follow those.

18         Again, past conduct, we go back even further.

19     This individual has been charged with murder in 1971.

20     On January the 1st of 1972, I do not have an

21     opportunity to go back to see when the court doors

22     opened in Clay County on New Year's Day.  It was set

23     in 1972.  But according to the record, and that's all

24     we have before us, is on New Year's Day in 1972, his

25     case was dismissed.

1          Now, as strange as that might seem, we have

2     testimony that employees who worked for him found that

3     he was absent, he was awol, missing, not in the

4     office, completely gone, for at least 30 days while

5     these charges were pending.  Which, again, fits the

6     time line of what the probation's report shows that I

7     believe it was in November 1971 that he was charged

8     with murder.  So within 30 days or more or less, would

9     it fit with, again, what the witnesses have told the

10    FBI in regard to his behavior while subject to those

11    charges.

12         Is there a threat that this individual's going to

13    continue to obstruct the process and very fabric of

14    this criminal justice system that we're tasked to

15    carry out in this case?  I submit that there most

16    definitely is.

17         Special Agent Briggs testified that this

18    individual sought to find out his residence and those

19    of a co-agent that were helping him in this case.  I

20    would submit to the court that there are no set of

21    circumstances that I can imagine in Agent Briggs and

22    his experience and training, believes that this was

23    purely an attempt on his part to intimidate him as a

24    witness and possibly harm him through either his own

25    individual act or through the encouragement and

1    direction of others.

2        He has a person by the name of Asher, who the

3    agent identified as one who has assisted Mr. Maricle

4    in his court and believes as reported to him that he

5    was an individual who was tasked to find out where he

6    lived.  And in order to counteract that, Agent Briggs

7    gives a ruse.  Tells his witnesses to relate to this

8    defendant that he was not living any longer with his

9    wife.  Obviously, a way to counteract the danger.

10       There's over a hundred witnesses in this case.

11   Names of particular disturbing, name of over 15 of

12   those were found in the hands of this man while this

13   investigation was pending.  He's not been indicted.

14   He's not been brought to notice of any charges.  Yet

15   he's conducting his own operation.  And I would submit

16   to you that this is evidence of an individual, as

17   Agent Briggs would support or suggested, is someone

18   who's seeking to intimidate those witnesses.

19       Is he continuing to do so?  Absolutely.  I would

20   submit to the court that there was evidence to support

21   that.  As recently as February of 2009, witnesses who

22   have been in this man's presence have been frisked by

23   this defendant at their approach of him.  I submit to

24   you that, again, these are acts and conduct which give

25   the court no choice but to find that there are no

1    conditions which the court could craft that would

2    adequately protect the public or prevent his flight

3    would pending of the trial of this matter.  And it's

4    based, your Honor, on this evidence and these

5    arguments that the United States would request, under

6    3142, that he defendant be held, detained until the

7    trial of this matter.

8         THE COURT:  Thank you, Mr. Smith.  Mr. Hughes.

9              ARGUMENT ON BEHALF OF DEFENDANT

10             HON. HENRY E. HUGHES:

11        HON. HENRY E. HUGHES:   Your Honor, best I

12   figure, I can't go to Florida.  I don't go fishing.  I

13   got to get off my Prozac.  I can't send my daughters

14   to college.  I don't know how many children Mr. Smith

15   has, but if you've got four kids like Mr. Maricle and

16   you send them to school, and if you think that that's

17   going to go a long way, then you live in a world I

18   don't live in.

19        I make a little more than that, and it don't --

20   when I was raising my children to sent them to

21   Vanderbilt, that wasn't a whole lot of money.  At

22   least it wasn't after you paid the tuition and

23   everything.  I'll admit the vacations cut down quite a

24   bit.

25        But you know, all we're missing here today is

1    this man is presumed to be innocent.  And the only way

2    that we can keep him in jail is presume that while

3    he's out he's going to pursue an illegal course of

4    action, or he's going to flee, or along with that, or

5    he's going to hurt somebody.  It doesn't say hurt

6    yourself, but I imagine that test is likely going to

7    hurt yourself or going to commit somebody.  I don't

8    know.

9         But, be that as it may, first of all, the

10    redacted statement cannot possibly be right.  The

11    credibility cannot be right by either one of the

12    witnesses.  It's impossible.  It's impossible.  Where

13    is he going to go?  He's 65 years old.  I know I

14    graduated with him.  I've known Cletus for more years

15    than I like to remember.

16         But, okay, they want to be sure he doesn't

17    do this, he doesn't do that, he doesn't do that.  The

18    pretrial people have recommended there is a set of

19    conditions.  He's got -- you know, -- Judge, I figured

20    the guidelines the other day.  The guidelines are 63

21    to 78, and that's with a set of -- they don't group.

22    They did it perfectly on their indictment.  And I

23    complement whoever drew up the indictment so that some

24    of them don't group and we get a set of level

25    increase.  But it's 78 months.  63 to 78 months with

1    everything going wrong.  Everything.  Found guilty,

2    leadership role, and no two-point reduction for

3    acceptance or responsibility.  So you're talking about

4    73 months.  Now, there's no doubt in my mind if he

5    gets convicted before Judge Reeves, he's going to do

6    73 months.  And I've told him that.

7         So, your Honor, here's the thing about it.

8    There's plenty of circumstances we can do it.  You

9    could even go beyond what she's allowed you to do.  I

10   mean, what the probation officer has suggested.  Take

11   his phones away from him.  Take the cell phones away

12   from him.  Cut off his phone.  Put him on detention

13   center -- put him on home detention center, see nobody

14   but his lawyers or a doctor.

15        And as far as being crazy, I don't know where Mr.

16   Smith lives.  I don't know what world he lives on.

17   And I don't know of anybody that's not been tired of

18   practicing law.  There's been a thousand times I wish

19   I could quit.  But I can't.  That's the reason I don't

20   want to try the case.  I'm too old.  It's too much

21   stress.  Everybody wants to quit.  If you don't want

22   to quit, you want to keep on doing this till you die,

23   then I think there is something wrong with you.

24        I don't draw any pension.  That's why I'm still

25   here.  Cause I don't draw any pension.  But I'm too

1    close to the case to try it.  When I say too close to

2    the case, I mean, friendship-wise.

3        I'm suggesting that we let him out on $2,500

4    unsecured bond, like the suggestions.  I don't care

5    what.  I could give -- I could care less what

6    conditions you put him under.  If you want him to have

7    to stay in his bedroom and his wife bring his coffee

8    to him, I don't care.  No contact with anybody except

9    immediate family.  I don't care.  Any contact with a

10   witness, even innocent, he goes right to jail and

11   doesn't get out and stays there.

12       Judge, he's not going to hurt anybody. He hadn't

13   hurt anybody.  He looks pretty well to me.  I mean,

14   he's got an awful bad memory.  But physically he's all

15   right.  He ain't going to hurt anybody.

16       And Mr. Day in there gets 18 years.  Of course,

17   he was promised for getting that 18 years Lord telling

18   how much he was going to get if he didn't promise he'd

19   testify for it, because 18 years in the federal

20   system, this court knows is a long time.

21       I don't care what conditions you set.  But

22   there's nobody ever going to convince me that there's

23   not conditions you could release this man on under

24   those rules and satisfy every rule there is.

25       Thank you, your Honor.

1          BY THE COURT:

2          THE COURT:  All right.  Thank you both.  I've

3     heard a lot of testimony today.  And it's my practice

4     in the detention hearing context to take the matter

5     under submission, which I will do.  Counsel, I know

6     both sides are very familiar with the *Bail Reform Act*.

7     Just to remind both sides, I have a decision to make,

8     but not necessarily the final decision.  If I decide

9     the defendant can be released, I will set a hearing,

10    bring him in and explain my conditions to him.  If I

11    decide that he should be detained, I will issue a

12    written decision explaining my reasoning.  Either side

13    has a right to appear to the district judge in the

14    case, Judge Reeves.  Either side that does appeal will

15    receive a de novo review from Judge Reeves,

16    irrespective of my decision and without deference to

17    my decision.  So that's a right that both sides could

18    avail themselves of, depending on what I do.

19         My reading of the *Bail Reform Act* does require me

20    to keep the defendant in custody pending any final

21    ruling by me.  And so, I will do that, pending my

22    decision.  And I'll get my decision out as promptly as

23    I can, after reviewing what I've heard today and the

24    specifics of the *Bail Reform Act*.

25         All right.

1        HON. HENRY E. HUGHES:   Could I just ask one

2   question?

3        THE COURT:   You may.

4        HON. HENRY E. HUGHES:   I know the government has

5   filed to disqualify Mr. Wohlander.  And could I have

6   just some idea of when the court plans to hear that

7   motion so I could be here?

8        THE COURT:   Well, that's an interesting question

9   you raise, Mr. Hughes.  I do want to talk about the

10  briefing schedule on that a bit.  Mr. Wohlander has

11  the disadvantage of not yet having had a chance to go

12  through it.

13       A couple things I'm thinking.  It raises an issue

14  that, frankly, I'm going to get direction on the

15  district judge on whether he wants me to resolve it or

16  he wants to resolve it.  That would have an impact on

17  things.  And then how much time Mr. Wohlander or you

18  may need to weight in on the matter.

19       And I also have some concern about the defendant

20  needing separate counsel for evaluating the arguments

21  presented.  I know Mr. Wohlander mentioned that the

22  other day.  And Mr. Hughes, you've said today, you're

23  only here for the detention hearing.

24       HON. HENRY E. HUGHES:   I am, but that's the

25  reason I asked the court the question.  I've got a

1    little bit anxious right now, and I may end up

2    changing my mind if Mark's off the case.  So I don't

3    know.  I'm just trying to get some kind of time line,

4    Judge.  I've got murder cases here, there.

5         THE COURT:  Right.  Well, I would say my goal

6    would be as prompt as possible.

7         HON. HENRY E. HUGHES:  That's all I ask.  That's

8    all I can ask.

9         THE COURT:  But -- and Mr. Wohlander, you can

10   weight in on this.  I want you to be able to respond.

11   The motion addresses you and things you, you know,

12   you'll read the motion if you haven't.  It addresses

13   you and may call for a hearing.  And if there is a

14   hearing, and maybe even if there isn't a hearing, I

15   would want the defendant to have separate counsel to

16   walk through those issues.

17        And Mr. Hughes, I guess I probably am going to

18   ask you to evaluate with the defendant whether he

19   wants you to continue at least for the purposes of

20   getting him through the period of resolving Mr.

21   Wohlander's status.  And if he does, I'd ask you to go

22   ahead and make an appearance to that effect.

23        HON. HENRY E. HUGHES:  I will make an

24   appearance, Judge.  Like I say, and I may change --

25   I'll be here at every court appearance.

1          THE COURT:   All right.  Well, very good.  We'll

2     take that as your appearance --

3          HON. HENRY E. HUGHES:   Yes.

4          THE COURT:   -- at least until the

5     disqualification issues resolve.

6          And Mr. Wohlander, I suppose I need an idea from

7     you on how much time you would need to respond on the

8     issue and --

9          HON. MARK A. WOHLANDER:   Well, your Honor, first

10     of all, again, I've only seen a couple of lines.  If

11     Mr. Taylor will share it with me.  I haven't seen it.

12          My first request to the court is I would move to

13     unseal that.  There were allegations made by Mr. Smith

14     here in court that leaves the press thinking that I've

15     done something improper.  And I don't know what's in

16     his motion, but I want it unsealed and I want it to be

17     available to the press.  Because that goes to the very

18     heart of my reputation in the legal community and my

19     ability to get clients down the road.  And I don't

20     appreciate it being filed under seal to make it look

21     like I've done something wrong.

22          We've got the press here today being witness to

23     his move to disqualify me on Friday.  And I don't know

24     what's in it, but it needs to be unsealed.  And then,

25     I'll talk with the owner of the firm as to whether or

1     not I'll get somebody at the firm to respond to

2     anything that Mr. Smith might put in there.

3         I'm only aware of one statute of the *Code of*

4     *Federal Regulations,* and the statute is *18 U.S. Code,*

5     *Sec. 207.*  And that's says that if I was a supervising

6     attorney or a supervising employee of something that

7     was going on in the office, then, under that statute,

8     I'm not authorized to be involved in this.

9         I'm also familiar with the *Kentucky Rules of*

10    *Evidence.*  And under the *Kentucky Rules of Ethics*, I

11    don't believe I'm disqualified.  But I certainly don't

12    want to have my reputation blemished by Mr. Smith's

13    statements here in court.  I'd asked to unseal it,

14    then I'll get back to the court as quickly as I can as

15    to when I can file a response.

16        THE COURT:   Mr. Smith.

17        HON. STEPHEN SMITH:   Your Honor, I want the

18    record, number 1, to reflect the nature of the United

19    States' motion.  It is not a motion to disqualify Mr.

20    Wohlander.  It is a motion for an inquiry.

21        I disagree vehemently with Mr. Wohlander's

22    assessment of who would be harmed if this is unsealed.

23    The United States is a party to this matter.  Mr.

24    Wohlander represented the United States during a part

25    of this.  And I do believe it's proper under seal,

1   should remain under seal.  And I would request that

2   the court keep it under seal until he's had an

3   opportunity to brief it, and we've had an opportunity

4   to reply.  And at that point, if Mr. Wohlander feels

5   offended by this process, and I will revisit this

6   issue and maybe concede to him if, again, we don't

7   have sensitive issues that are, again, relating to the

8   United States, which does have an interest in the

9   matter.

10       THE COURT:   This is not an issue that's going to

11   be resolved today in terms of the merits of the

12   argument.

13       Mr. Wohlander, I want to be very careful and

14   deliberate as we proceed on this and any issues in the

15   case.  And I would say that I think Mr. Smith, the

16   other day, made only a very generic and nonspecific

17   suggestion of a position the United States might take.

18   And so, I think if he said something that would fairly

19   be characterized as derogatory toward you, then I

20   immediately would unseal that and give you a full

21   chance to explain that here in open court.  I don't

22   think that was the nature of it.  So what I want you

23   to do as part of your response, you can certainly

24   address whether the matter should be sealed.

25       Mr. Smith asked that all, as I recall, that all

1       issues related to counsel be filed under seal.  And

2       so, I took this motion under seal within that

3       category.  He made that categorical prediction that

4       the United States might take a position with respect

5       to many counsel in the case, not just you.

6           And so, I think at this stage, it's properly

7       under seal, but I'm glad to consider unsealing it.  My

8       previous position is toward open courts, and certainly

9       I'll listen to what you have to say and resolve it,

10      both the merits and whether it should be an unsealed

11      filing.  But you have an interest in that.  The United

12      States does, just as you have an interest in some

13      matters remaining sealed you talked about the other

14      day.  And so, you know, we have to take each of these

15      in the appropriate order.

16          But I guess my response is, I want you to address

17      that issue as part of your response.  And my question

18      is, when do you think you could have something filed?

19          HON. MARK A. WOHLANDER:   Judge, I've got to

20      respond to a motion for summary judgment tomorrow in

21      another case that should probably be filed this

22      afternoon.  So it'll take me a couple days.

23          THE COURT:   Well, I'm not rushing you at all.

24      Could you by the end of the week?

25          HON. MARK A. WOHLANDER:   I could by the end of

1     the week.  But the only problem that that would

2     present is my oral motion the other day, and you said

3     you wouldn't be doing anything, at least on search

4     warrants, till Tuesday.  And again, I'm in this

5     dilemma because what I fear, and I don't know what's

6     in that motion, but what I fear is, is if Mr. Smith is

7     correct, and I fear that there might be some recourse

8     that he might take and send on some complaint to the

9     Department of Justice under *42 CFR*.  And I certainly,

10    then, have to be able to defend.

11        And so, I can't do anything else for my client in

12    this case at this point in time.  And so, I would ask

13    the court to at least withhold releasing any of the

14    search warrant affidavits as I requested and the

15    transcripts, at least until I have an opportunity to

16    see whether I can stay in this case or whether I can

17    get Mr. Hughes up to speed.  And as it relates to the

18    motion that's under seal, I assume that Mr. Hughes has

19    that opportunity to look at that, Judge.  Would that

20    be fair?

21        THE COURT:   Let's take those one at a time.

22    First, on the search warrant issue, Mr. Smith, do you

23    have any objection to not releasing any search warrant

24    application information until Mr. Wohlander has had a

25    chance to have resolved whether he can continue in the

1    case?

2       HON. STEPHEN SMITH:   Your Honor, I join in that

3    motion.  As the court's related, there's a number of

4    other issues that we're going to have to carry through

5    with other counsel.  And I would join in that motion.

6    I'll tender an order to the court proposing that at

7    the conclusion of today's hearing.

8       THE COURT:  All right.  Are you satisfied in

9    that regard, Mr. Wohlander?

10       HON. MARK A. WOHLANDER:   Thank you.

11       THE COURT:  All right.  And then, certainly I

12    would, if Mr. Hughes has made appearance today, I

13    would want him to have access to the sealed motion

14    concerning the status of Mr. Wohlander.  Any objection

15    to that?

16       HON. STEPHEN SMITH:   I'll be glad to email him

17    one at the conclusion of today's hearing, your Honor,

18    if the court would like.

19       THE COURT:  All right.  Is that satisfactory,

20    Mr. Hughes?

21       HON. HENRY E. HUGHES:   Yes, that's satisfactory.

22       HON. MARK A. WOHLANDER:   Thank you, your Honor.

23       THE COURT:  Okay.  And so, I'll look for your

24    response by the end of the week, Mr. Wohlander.

25       HON. MARK A. WOHLANDER:   Yes, your Honor.

1        THE COURT:   And again, include within that,

2    address whether the motion regarding your status

3    should be sealed or unsealed, and we'll take it from

4    there.

5        HON. MARK A. WOHLANDER:   Well, even if it

6    remains sealed with this court, your Honor, I might

7    ask at some point in time I might ask that it be --

8    that I be allowed to share that with the people in

9    Washington, D.C., if it becomes necessary.

10        THE COURT:   Very good.  Well, you can raise

11    those issues as you see fit.

12        HON. MARK A. WOHLANDER:   Thank you, your Honor.

13        HON. HENRY E. HUGHES:   In the interest of

14    caution, I'm sure the judge and Mr. Smith understand

15    that my daughter is representing a co-defendant in

16    this case.  Now, we're not in the same firm.

17    Although, I did send her to Danville.  She owes me.

18        But I want to know now before I get my time

19    involved whether or not they're going to make an issue

20    of whether I have a conflict or not.

21        THE COURT:   Well, that's a matter, frankly, for

22    me that would bear a little analysis under the ethic

23    rules.  I'm not going to force the government to show

24    its hand now.  I've told the prosecution, and I think

25    Mr. Smith fully understands that issues of potential

1    disqualification effect the defendant's right to

2    counsel and need to be raised as promptly as possible.

3    And so, you flagged the issue for him.  And so, I'll

4    just rely on Mr. Smith to follow that issue.

5         HON. HENRY E. HUGHES:   That's what I was trying

6    to do, to get it out so that we could resolve it as

7    early as possible.

8         THE COURT:   All right.  Okay.  Having covered

9    those matters, Mr. Smith, is there anything addition

10   for the United States today?

11        HON. STEPHEN SMITH:   That's all we have, your

12   Honor, at this time.  Thank you.

13        THE COURT:   Thank you.  Mr. Hughes.  Anything

14   additional?

15        HON. HENRY E. HUGHES:   No, your Honor.

16        THE COURT:   All right.  Thank you, Mr. Hughes.

17   Thank you, Mr. Wohlander.

18        HON. MARK A. WOHLANDER:   Thank you, your Honor.

19        THE COURT:   Thank you.  That'll conclude matters

20   is this case for today, and court will stand

21   adjourned.

22        BAILIFF:   All rise.  United States District

23   Court is adjourned.

                  THEREUPON, THE HEARING CONCLUDED

                  AT THE HOUR OF 3:35 P.M.


          W.H. Rowe Reporting 606-424-2111        Volume 1 of Page 110

CERTIFICATE OF REPORTER & NOTARY PUBLIC

CERTIFICATE OF SERVICE

COMMONWEALTH OF KENTUCKY

SCT.

COUNTY OF LAUREL

I, Wanda H. Rowe, Certified Verbatim Reporter, Notary Public in and for the Commonwealth of Kentucky, do hereby certify that the foregoing is Volume 1 of 1 volume of the Transcript of Detention Hearing held on March 23, 2009, in the case of United States of America versus Russell Cletus Maricle, Criminal Action 6:09-CR-16-DCR; that said proceeding was taken by and before me and at the time and place stated in the caption; that the witnesses were all duly sworn by the deputy clerk; that there was no read-and-sign request made of me; that the foregoing typewritten pages, in their original form, before extracting bench conferences, constitute a true, accurate, and complete transcription of said Detention Hearing; that the bench conference portions of the Transcript of Detention Hearing were extracted from the original transcript and placed under seal, and that same are a true, accurate, and complete transcription of said bench conferences.

Further, that the original of the Transcript of

Detention Hearing was emailed to

kyed@kyed.uscourts.gov, with the exception of the

bench conferences portions, same being mailed, under

seal, via United States Postal Service to United

States District Court Clerk, Post Office Box 3074,

Lexington, Kentucky 40588-3074.

    Witness same this 1st day of April, 2009.


                           s/Wanda H. Rowe
                           Wanda H. Rowe
                           Certified Verbatim Reporter
                           W.H. Rowe Reporting
                           Post Office Box 1401
                           Stanton, Kentucky 40380-1401
                           24-Hour Telephone & Message
                               606-424-2111
                           whrowe.reporting@yahoo.com
                           Notary Public       SEAL
                           Commonwealth of Kentucky
                           MY COMMISSION EXPIRES:
                                 09-08-09

3-23-09-MaricleC