# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# SOUTHERN DIVISION
# (at London)

| | |
|---|---|
| **CASE NO. 09-16-ART** | **ELECTRONICALLY FILED** |
| **UNITED STATES OF AMERICA,** | **PLAINTIFF,** |
| **VS.**   **BRIEF IN SUPPORT OF MOTON**   **TO REVOKE DETENTION ORDER** | |
| **RUSSELL CLETUS MARICLE,** | **DEFENDANT.** |

**\*\*   \*\*   \*\***

This case is before the Court on the Defendant Russell Cletus Maricle's motion pursuant to 18 U.S.C. §3145(b) for review and revocation of his detention order.  The Magistrate Judge conducted a detention hearing on March 23, 2009, at which the United States introduced evidence on several points that, due a confluence of factors, was essentially not refuted by the defense.  As a result, the Magistrate Judge ordered that Mr. Maricle be detained pending trial.  The Court thereafter granted Mr. Maricle's request to present evidence on those points and an evidentiary hearing was held on April 20, 2009.  This brief is submitted by Mr. Maricle in support of his argument that he should be granted pretrial release with the conditions recommended by the United States Probation Office in its Pretrial Services Report.  The points of concern identified by the Magistrate Judge in his Statement of Reasons for Detention as well as the scant additional evidence offered by the government at the second hearing are addressed in this brief, and the Defendant submits

that the government's arguments for detention are totally without merit.

## ALLEGED EFFORTS BY MARICLE TO GAIN INFORMATION ABOUT INVESTIGATORS

FBI Agent Timothy Briggs testified that he had "been looking at subjects in Clay County since 2000" and that he and other agents had begun focusing their efforts in "late 2004-early 2005". Page 12, transcript of hearing of March 23, 2009. Agent Briggs also testified that it "was public knowledge in Clay County that there was an investigation into….past elections of Clay County." Page 16. Indeed, Agent Briggs testified that he directed his informants to tell Mr. Maricle that he was a target of the investigation. Agent Briggs testified that an informant had told him that Mr. Maricle sought information as to the residences and vehicles driven by investigators. Notably, the government took advantage here of the Bail Reform Act provisions allowing essentially any type of information to be considered by the court on the issue of detention. The government's proof on this point is weak – the unsworn and uncross-examined word of a government informant.

Mr. Briggs opined that "the only possible reason [for such an inquiry] . . . is . . . for a possible approach for intimidation or threats or… to harm a law enforcement officer. Page 18, transcript of March 23, 2009. An objective view of the circumstances suggests a totally innocent alternative to Agent Briggs' myopic view. Any person, whether guilty or totally innocent, has a perfectly reasonable interest in those whom it is "public knowledge" are investigating that person. Natural curiosity, coupled with an understandable desire to

know who is spying on one, would prompt even the most harmless soul to ask questions.

Obviously, no agents were harmed, threatened or intimidated. Agent Briggs could point to no evidence whatsoever that anyone had made any attempt to do so. And finally, the government was unable to locate any evidence of any such activity by Mr. Maricle when no less than twenty government agents swarmed his home to execute a search warrant on the day of his arrest. The "Charles Biggs" calendar page produced at the April 20 hearing does not merit discussion beyond noting that, fortuitously, Mr. Maricle's wife was able to demonstrate that, once again, the government's twisted reading was simply wrong.

## ALLEGED JURY TAMPERING IN A CIVIL TRIAL

The United States offered testimony at the March 23 hearing that Mr. Maricle, as Clay Circuit Judge, was present when the spouse of a juror was asked to urge that juror to return a large verdict in a civil trial involving a fatal motor vehicle accident. The sole source of this allegation was Kenneth Day, who was the executor of the estate bringing the action. The Magistrate Judge recognized that Day's testimony was self impeaching, as it placed him directly in the middle of criminal activity, indeed of corruption of the judicial process. Day's motive, at the time, if his story were story true, would have been financial gain. Day thus presents himself as one who has no qualms about such corruption if he gains monetarily. But Day's current motive to lie is certainly far more powerful – Day, as the Magistrate Judge points out, is in the early years of an eighteen-year sentence in federal prison. Having endured a substantial period of imprisonment, he doubtless recognizes

that freedom is infinitely more desirable that riches. Yet Day has many years of prison still ahead. Only by pleasing his prosecutors can he hope to shorten his imprisonment. As a convicted drug lord and self–described corrupter of the court system, Day is unworthy of belief without rock solid corroboration.

Sadly, and to its great shame, the United States failed to recognize this lack of credibility. The only charitable explanation for the government's failure here is an inclination to believe *anything* bad about the Mr. Maricle, regardless of the source. But there is no charitable explanation for the government's utter failure to investigate Day's claims – this was no last minute disclosure by Day, but an allegation he had made long enough ago that Agent Briggs had to have his recollection refreshed by reviewing a 302 report he had prepared at some point in the past. In the intervening time, Agent Briggs apparently couldn't be bothered to open the case file in the Clay Circuit Clerk's office, which would have immediately revealed to him that Judge Maricle was *not* the judge of the trial in question, which was conducted by Judge Leonard Wilson. Defendant's Exhibit 1, hearing of April 20, 2009.

Justice demands that evidence propounded by the government to deprive a citizen of his liberty be credible and that an agent providing the testimony based on interviews have a good faith belief in its truthfulness. The uncorroborated testimony of Kenny Day fails by any reasonable, objective standard to rise to this level, and Agent Briggs failed abysmally in his obligation to ensure that the Court had truthful evidence upon which to base its determination.

## ALLEGED SCRIPTING OF PERJURED TESTIMONY IN A CRIMINAL CASE

At the March 23 hearing, Agent Briggs testified that Mr. Maricle, as Clay Circuit Judge, instructed a witness to testify falsely in a criminal case to ensure the conviction of a person who had written a letter to Mr. Maricle implicating Mr. Maricle's daughter in unsavory and illegal activity. When the witness strayed from the testimony Mr. Maricle supposedly composed, the story goes, the witness was treated harshly by Mr. Maricle. The witness, one Eugene Price, was a family member of a government informant. The government's proof on this allegation is exceedingly weak, relying on unsworn, uncrossed hearsay from the informant whose motive to please the government and to injure Mr. Maricle, while yet undisclosed, is certainly strong, and Mr. Price, whom Mr. Maricle sentenced to five years in prison. Neither the informant nor Mr. Price was produced by the government to testify at either hearing, so the court has only Agent Briggs' summary allegations to support its position. The defense, on the other hand, produced at the April 20, 2009 hearing irrefutable evidence from a number of witnesses, as well as court records, which proved conclusively that the government's witnesses for this claim are lying.

Eugene "Corky" Price was far more than a witness in the state court case at issue. He was initially charged with assault in the first degree in violation of K.R.S. 508.010. The vicious crime Mr. Price plead guilty to involved slashing the throat of a young woman to prevent her testimony in a murder case. Knowing full well what would soon befall her, Mr. Price delivered the young woman to her would-be murderers, who left her to die on the side of the road in a rural part of Clay County. The penalty for first degree assault is not

less than ten years in prison, with a maximum possible sentence of twenty years.   More significantly, first degree assault is designated a violent offense under Kentucky law. K.R.S. 439.3401(1)(b).   A violent offender cannot be released on probation or parole until he has served at least eighty-five percent (85%) of his sentence.   K.R.S. 439.3401(3). With a several prior felony conviction for burglary, Mr. Price would be subject to an even stiffer sentence under KRS 532.080, Kentucky's persistent felony offender statute. Notice of Filing, document number 192.   Nonetheless, the Commonwealth's Attorney offered Mr. Price a five year sentence on a reduced charge, with a recommendation of probation.

The undisputable records of the Clay Circuit Clerk, as well as the testimony of both prosecutors and defense attorneys with personal knowledge of the matters, reveal that Mr. Price and the informant's version of events could simply not be true.   Mr. Price pled guilty to his role in the crime on April 28, 2005, less than a month after it occurred on April 6, 2005.   During the time between the crime and his plea, Mr. Price had fled the Commonwealth of Kentucky and was being held and protected by various family members (most likely guilty of harboring a fugitive).   His trial testimony was given just a few months later in November, 2005.   (Notably, Mr. Maricle's reaction to the obviously perjured testimony Mr. Price gave at trial, as seen on the trial video, was judicial in the best sense of that word.   He betrayed no displeasure whatsoever and gave no indication to the jury as to how he felt about Mr. Price's testimony.)   Mr. Price's co-defendants were convicted and their sentencings were set for early 2006.   It was during the interval between the trial and the sentencing that one of the defendants, seeking leniency, sent the

letter concerning Mr. Maricle's daughter.

The government seeks to create the impression that Mr. Price's sentence was unduly harsh. His prior record, filed with this Court in Document No. 192, reveals a lawless and dangerous man. Eligible for enhanced sentencing under Kentucky's persistent felony offender law, not to mention the severe penalty required under his original charge, Mr. Price must no doubt recognize, as the United States' Attorney surely does, that he was given a remarkably lenient sentence for his crime. One need not ponder long whether this Court would countenance a probated sentence for Mr. Price.

Further undermining the government's position is the principle of Kentucky law allowing a Circuit Judge the discretion to reject a plea agreement that is too lenient. Ironically, the leading case for this point is *Hoskins v. Maricle,* 150 S.W.3d 1 (Ky. 2004). In *Hoskins,* the trial court judge refused to accept a plea agreement that would have allowed two persons charged with capital murder to plead guilty to second degree manslaughter. The Defendant Maricle was that trial judge. His rejection of the proposed agreement was upheld by the Kentucky Supreme Court.

Notable also in connection with the *Hoskins* case, the attorney who unsuccessfully sought to force Judge Maricle to accept the plea agreement was Stephan Charles of Manchester, whom the government attempted to characterize as being under the power and control of Judge Maricle. The Kentucky Supreme Court's decision in *Hoskins* was rendered in December of 2004, a relatively short time before the grand jury testimony at issue in Mr. Maricle's indictment. This further proves that Mr. Charles was in no sense

"under the control" of Judge Maricle.  To suggest otherwise is ludicrous.

In any event, Judge Maricle accepted the plea agreement allowing Price to plead guilty to a class D felony, the lowest level felony in Kentucky law, carrying only one to five years imprisonment, and <u>not</u> carrying violent offender status.  Price therefore became eligible for parole after serving only 20% of his sentence.  Also it should be noted that this crime carries no prohibition on credit for "good time", meaning that Price could serve out his entire sentence in far less than 5 years if the Kentucky Parole Board declined to grant him early release.  Had Mr. Maricle been inclined to give Mr. Price the harshest sentence possible, he could have merely rejected the plea agreement in its entirety and forced Mr. Price to either proceed to trial or plead to his original charge and receive a much harsher punishment.

The government's alleged motive for this impropriety also fails entirely.  The trial of Mr. Price's co-defendants took place in November, 2005.  Sadly, Judge Maricle's daughter's problems with drug abuse and her resulting criminal behavior were well established by that time.  Judge Maricle and his wife, far from attempting to conceal these problems, took affirmative steps to have their daughter charged with crimes and incarcerated in the hopes her problems could be addressed.  Her criminal record, filed with this court as Document numbers 192 and 193, was already lengthy, and reveals no attempt by Mr. Maricle or his wife to conceal this or protect their daughter from the consequences of her actions.  But the most convincing evidence of the lack of motive is that Mr. Maricle disclosed the letter to defense counsel the day after he received it and

Page **8** of **13**

allowed a copy of the letter to be filed in the public record.

The testimony of Clay Commonwealth's Attorney Gary Gregory further refutes the notion that Corky Price was treated harshly by Judge Maricle. Mr. Gregory referred to Mr. Price's plea agreement as a "sweetheart deal", as it no doubt appears to any objective observer. Mr. Gregory was more intent on justifying his actions in entering into that agreement with Mr. Price than he was in answering the counsel's questions, asking for a bench conference during which he took pains to explain additional reasons for the deal.

## NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED

Mr. Maricle's charges involve, in part, an accusation of obstruction of justice. Mr. Briggs and another investigator testified that they had heard inculpatory statements from Mr. Maricle on recorded conversations. At the first hearing, Mr. Maricle's counsel did not have the benefit of access to these recordings, and thus could not have known what the government agents conceded at the second hearing, that there is a great deal of exculpatory information on the recordings. As the recordings were not presented, Mr. Maricle submits that the agents no doubt characterize what they claim to be contained on those recordings in the light most favorable to their position. Mr. Maricle adamantly maintains that a full and fair hearing of the recordings as a whole will present an entirely different light than that described by the government. Moreover, Mr. Maricle enjoys the presumption of innocence guaranteed to all citizens, and the charges in the indictment do not give rise to any statutory presumption.

## **HOUSEBOAT**

The only potentially significant new evidence submitted by the government at the April 27 hearing was the revelation that Mr. Maricle had neglected to mention his joint ownership, with his wife, of a houseboat on Lake Cumberland when he was interviewed by the United States Probation Officer the morning after his arrest. The government incorrectly referred to this boat as a liquid asset, and further ignored the depressed state of the market insofar as such luxury items are concerned. Recent news reports have described the closing of local businesses that manufacture houseboats as well as related industries. The government, nevertheless, points to this boat as evidence of risk of flight. The only flight indicated here is the government's flight of fancy in suggesting that a retired circuit judge with an unblemished record would abandon the county of his life-long residence, where his wife, three daughters and a grandson to whom he is obviously devoted reside, and live a life on the lam in Mexico with the proceeds from selling this vessel.

Mr. Maricle was arrested the day before his pretrial interview and had doubtless spent a sleepless night in jail. He had suffered the untimely death of his only son little more than a month before. The relatively brief pretrial interview is conducted under less than ideal conditions and at a time when events seem most chaotic to a defendant – prior to his first court appearance and within hours of an unexpected arrest. The interviewee does not have the luxury of being given detailed questionnaires to complete at his leisure over several days, nor does he have any access to his financial records or the opportunity to consult with his spouse as he gives this information. Under the circumstances, the failure

to mention the houseboat is clearly an understandable lapse of memory and not the key to Mr. Maricle's scheme to flee.

## LACK OF EVIDENCE OF SUITABILITY FOR RELEASE

The Magistrate Judge noted that "[c]uriously, the defense offered no evidence on the suitability of release" at the initial detention hearing. Document 66. This deficiency was cured at the second hearing, when uncontroverted evidence was presented from numerous witnesses as to Mr. Maricle's suitability for release. Bobby Morriss, the Jackson County Circuit Clerk, Marilyn Roberts, the long-time court reporter who worked not only with Mr. Maricle but also with his predecessor and successor, as well as the Commonwealth's Attorney and Assistant Commonwealth's Attorney testified that Mr. Maricle can be trusted to obey orders of the Court. As the Magistrate Judge noted, many of the factors specified in the Bail Reform Act are decidedly pro-release. Mr. Maricle is eminently suited for release.

## ALTERNATIVES TO DETENTION

The United States Probation Office recommended that Mr. Maricle be released on an unsecured personal recognizance bond with certain conditions. Mr. Maricle has no objection to the conditions recommended by the Probation Officer, nor to the secured bail and asset liquidation restrictions mentioned by the Magistrate Judge. While Mr. Maricle submits that the additional conditions, such as home incarceration with GPS monitoring and a pen register or similar device to monitor incoming and outgoing phone calls at his home, are unnecessary, he is also willing to accept these additional conditions if the Court

deems them appropriate.

## CONCLUSION

The Magistrate Judge properly found that appropriate conditions would reasonably assure Mr. Maricle's appearance and based his order of detention on section 3142(f)(2)(B), which requires a "serious risk" that a person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.   In order to detain under this provision, the government must sustain its burden of proof by clear and convincing evidence.    The government's proof, originally described by the Magistrate Judge as essentially unchallenged, has now been challenged and fails to withstand scrutiny.   Kenny Day has not demonstrated in any aspect of his life that his testimony should be believed.   Unsworn, uncrossed hearsay, based on the word of Eugene Price and a government informant, while allowed under the loose standards of the Bail Reform Act, is far too weak to meet the government's burden.   The government makes vague and unsubstantial allegations concerning Mr. Maricle's state of mind and mental health, but the United States Attorney's office is in no better position to assess Mr. Maricle's mental state than is the United States Probation Office, whose recommendation of release was made with all of the information known to the government on that issue. The Defendant Russell Cletus Maricle respectfully requests the Court to revoke the order of detention and release him on the conditions recommended by the Probation Office.

                      Respectfully submitted,

/s/David S. Hoskins
Attorney At Law
107 East First Street
Corbin, KY 40701
Telephone: (606) 526-9009
Facsimile: (606) 526-1021
Email:  davidhoskins@bellsouth.net
ATTORNEY FOR DEFENDANT
RUSSELL CLETUS MARICLE

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on this 4th day of May, 2009, the foregoing was filed electronically with the Clerk of the Court by using CM/ECF System which will send notice of filing to all counsel of record.

/s/David S. Hoskins