# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION AT LONDON

#### FILED ELECTRONICALLY

### CRIMINAL NO. 09-16-S-DCR

UNITED STATES OF AMERICA                                      PLAINTIFF

V.

RUSSELL CLETUS MARICLE;                                      DEFENDANTS
DOUGLAS C. ADAMS; CHARLES
WAYNE JONES; WILLIAM E.
STIVERS; FREDDY W. THOMPSON;
WILLIAM B. MORRIS; DEBRA L.
MORRIS; AND STANLEY BOWLING

---

## DEFENDANTS' RESPONSE IN OPPOSITION TO TRANSFER OF CASE TO ALTERNATE JURY DIVISION FOR TRIAL

---

Each of the Defendants, Russell Cletus Maricle, Douglas C. Adams, Charles Wayne Jones, William E. Stivers, Freddie W. Thompson, William B. Morris, Debra L. Morris and Stanley Bowling, submit the following Response pursuant to the Court's Minute Entry for Preliminary Pretrial Conference [DE# 469] in opposition to a transfer of this matter for trial in another jury division.

### INTRODUCTION

Certainly, the District Court has broad discretion in determining whether a transfer to another jury division within the district is warranted. *United States v. Lewis*, 504 F.2d 92, 97 (6th Cir. 1974) ("Trial judges traditionally have been held to have wide discretion in disposing of

1

change of venue motions.")  This discretion is not unfettered and the Court is obligated to exercise that discretion within the limits prescribed by Fed.R.Cr.P. 18 and LCrR 18.2(b). Fed.R.Cr.P. 18 provides in pertinent part that "[t]he court must set the place of trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice."  LCr.R 18.2(b) states that a case may be transferred to another jury division within the district "for the convenience of the Court, the defendant, witnesses, or in the interest of justice."  The discretion with which the Court is vested "cannot be used as an excuse not to give 'due regard to the convenience of the defendant and the witnesses' in fixing the place of trial."  *Lewis,* 504 F.2d at 97-8.  Furthermore, a decision to transfer the trial must be supported by specific findings:

> We think that a district judge's exercise of discretion resulting in a trial in an environment alien to the accused over a proper objection must be supported by a demonstration in the record that the judge gave due regard to the factors now incorporated in Rule 18…. For speedy trial considerations to outweigh such factors [of convenience to the defendants and many witnesses] they should be set forth in findings that are sufficiently detailed to allow review.

*United States v. Stanko*, 528 F.3d 581, 585 (8th Cir. 2008).

The factors identified in Fed.R.Cr.P. 18 and LCrR 18.2(b) cannot be properly evaluated without first assessing the genesis of the transfer inquiry.  Neither the United States nor any Defendant has moved for a transfer to another jury division.[1]  Rather, the issue was raised by the Court, *sua sponte*, by Notice entered on August 28, 2009 [DE# 437], through which the Court advised the parties that "[i]n light of the extensive pre-trial publicity of this action through

---

[1]     Having been notified [DE# 437] that the Court intended to consider the issue of transfer at the preliminary pretrial conference on September 2, 2009, the United States came prepared to advocate for transfer to another jury division.  While the United States clearly favors transfer, it has not moved for such relief, either orally or in writing.

various media outlets in the London jury division," it intended to consider whether a transfer was warranted at the preliminary pretrial conference on September 2, 2009. At the preliminary pretrial conference, each Defendant, through counsel, separately and independently advised the Court that he or she objected to a transfer of the case to another jury division. Primarily, Defendants objected to a transfer on the grounds that they all live within the London jury division, and that their witnesses (as well as the known witnesses of the United States) also reside within that division.[2] Defendants all persist in their separate objections and contend that a transfer will impose an undue hardship on them and on their witnesses.

Although Defendants will address the myriad factors that contribute to the analysis of the transfer question, the main focus of this Memorandum will be the "interest of justice" standard and whether, in these particular circumstances, the use of "interest of justice" as justification to transfer the trial to a different locale outweighs the inconvenience to Defendants and the witnesses. During the preliminary pretrial conference, the Court advised that its concern, motivating its consideration of transfer, arose from pretrial publicity within the London jury division and the ability of Defendants to receive a fair trial if not relocated to a different jury division. The Court did not raise any concerns with respect to its own convenience or with respect to docket congestion that would delay the trial if it were to occur in the London division or any other problem that would implicate the Speedy Trial Act. Defendants do not, therefore, attempt to analyze these administrative matters because the Court has given no indication that they bear upon its decision.

---

[2]       To the extent that a Defendant may have expressed additional grounds at the preliminary pretrial conference not repeated in this Memorandum, there is no intention to waive them, and such additional grounds are incorporated by reference. This Memorandum is not intended to be a repetition of arguments already presented, but rather seeks to draw the Court's attention to the numerous authorities militating against transfer under these circumstances.

Defendants acknowledge that "[t]ransfer of a particular case from one place within a district to another place within the district is a matter for the local district judges to decide, and the assent of a defendant to such a transfer is not required." *Lewis*, 504 F.2d at 98.  In analyzing the factors, however, and in light of the Court's expressed concern that it is <u>Defendants' rights</u> it seeks to protect, the Court is urged to consider the fact that, rightly or wrongly, foolishly or not, by this Response in Opposition, each Defendant waives a later claim that his or her right to a fair trial was impaired by any presumed prejudice caused by pretrial publicity that has occurred to date within the London jury division.  Defendants do not believe the pretrial publicity to be so extensive in the London jury division (as opposed to other jury divisions within the Eastern District of Kentucky) as to create presumed prejudice, and to the extent that there has been negative pretrial publicity, its potential harm is far outweighed by the burden of defending the United States' allegations far from their homes, their records and the homes and records of most, if not all, of their witnesses and those of the government.  Defendants adamantly contend that any prejudice to their interests can be ferreted out and diligently addressed in the jury selection process, and that the issue of transfer should only be considered if the Court is unable to seat a jury upon commencement of the trial in London.

### ARGUMENT

### I.  FACTORS GOVERNING WHETHER A MATTER SHOULD BE TRANSFERRED.

Fed.R.Cr.P. 18 and LCrR 18.2(b) succinctly set forth the factors governing this Court's analysis of whether the case should be transferred to another jury division for trial, *i.e.* the

4

convenience of the defendant, the convenience of the witnesses, the convenience of the Court, the prompt administration of justice and in the interest of justice. These Rules are expressions of the traditional rule of *forum non conveniens*. *United States v. Lewis*, 504 F.2d 92, 97 (6th Cir. 1974). Cases analyzing the *forum non conveniens* principles are thus helpful in interpreting the scope of Fed.R.Cr.P. 18 and LCrR 18.2(b). These principles require first that a preferable venue exist and that the court evaluate the private and public interests at stake:

> The doctrine of *forum non conveniens* provides that a district court 'may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, when it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum.' *Baumgart v. Fairchild Aircraft Corp.,* 981 F.2d 824, 828 (5th Cir.1993). Thus, this doctrine may be invoked when the district court properly has jurisdiction over a claim and constitutes an appropriate venue, but there exists another venue that is preferable.

*Venture Global Engineering, LLC v. Satyam Computer Services, Ltd.*, 233 Fed.Appx. 517, 520, 2007 WL 1544160, *2 (6th Cir. 2007).

The United States Supreme Court has provided guidelines for the kinds of <u>private</u> interests a district court should consider in evaluating a claim of *forum non conveniens*: "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises ...; and all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). <u>Public</u> interests the district court should consider include: congestion of the courts; the burden of jury duty "upon the people of a community which has no relation to the litigation"; the "local interest in having localized controversies decided at home"; and, in a diversity case, the

advantage of holding the trial "in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Id.* at 508-09, 67 S.Ct. 839.

Also instructive in analyzing the factors under Fed.R.Cr.P. 18 and LCrR 18.2(b) are cases applying Fed.R.Cr.P. 21. Although Fed.R.Cr.P. 21 applies to transfers to another district, as opposed to another division within a district, the factors a Court must consider in transferring a case include a transfer made "in the interest of justice." Inasmuch as this very same phrase is found in LCrR 18.2(b), the cases interpreting it provide assistance in its application. *Platt v. Minnesota Mining & Manufacturing,* 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964), is the seminal case setting forth the pertinent factors in determining whether a case should be transferred "in the interest of justice":

> (1) location of corporate defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer.

*Id.* 84 S.Ct. at 243-244.

In the present case, for the reasons set forth in detail below, all factors weigh against transfer, whether the case is analyzed under Fed.R.Cr.P. 18, the traditional rule of *forum non conveniens*, or under the "in the interest of justice" standard more frequently applied under Fed.R.Cr.P. 21(b).

II.    **CONSIDERATION OF THE CONVENIENCE OF DEFENDANTS AND THE WITNESSES WEIGHS HEAVILY AGAINST TRANSFER.**

Each Defendant lives within the London jury division, and each represents to this Court that most, if not all, of their witnesses also reside within the division. To travel from Manchester (the residence of most Defendants and their witnesses) to London and back already requires approximately 50 miles of round trip travel. To move the trial to Frankfort, Kentucky, would require an additional 104 miles of travel each way and create a minimum two hour trip each direction. To move the trial to Covington, Kentucky, would add an additional 152 miles to a one-way trip.[3] For a trial scheduled for seven (7) weeks – or thirty-five (35) business days – this would require an additional seven thousand two hundred eighty (7,280) miles of traveling for each Defendant if the trial is moved to Frankfort. At the federal standard mileage reimbursement rate for 2009 of $0.55 per mile, this translates to an expense of over four thousand dollars ($4,000.00) per Defendant, or a total of over twenty-eight thousand dollars ($28,000) for seven (7) Defendants.[4]

Defendants may undoubtedly elect to travel to Frankfort only one time per week and remain in a hotel during the week. This would still require each Defendant to travel an additional 208 miles per week, for a total of one thousand four hundred fifty-six (1,456) miles, or eight hundred dollars ($800.00). Assuming a nominal hotel room rate of seventy-five dollars ($75.00) per night (including applicable taxes and subject to locales that may be higher in cost)

---

[3]    Defendants do not evaluate the travel required by a move to Lexington or Pikeville because the Court indicated at the preliminary pretrial conference that these venues were not available for administrative reasons. Frankfort and Covington, the Court noted, were the only realistic options for an alternate place of trial.

[4]    Defendants have calculated the total cost based upon only seven (7) Defendants, inasmuch as William B. Morris and Debra Morris are married and will likely travel and/or lodge together in the event the location of the trial is moved.

for thirty-five (35) nights, the cost of each hotel room will be two thousand six hundred twenty-five dollars ($2,625.00), plus the cost of travel, for a total of three thousand four hundred twenty-five dollars ($3,425.00) per Defendant, or almost twenty-four thousand dollars ($24,000) for seven (7) Defendants.

Although witnesses need not remain at the trial's locale for the entire seven (7) weeks, it is probable that most witnesses will be required to be available for more than a day.  Thus, the burden of increased travel and necessary lodging will not be borne by Defendants alone.  *See, e.g., In Re Volkswagen of America*, 545 F.3d 304, 317 (5th Cir. 2008)  (*en banc*) ("When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a)[5] is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled.") (quoting with approval the previous decision of a Fifth Circuit panel in *In Re Volkswagen of America*, 223 Fed.Appx.305 (5th Cir. 2007)).  The Fifth Circuit further explained:

> [I]t is an "obvious conclusion" that it is more convenient for witnesses to testify at home and that "[a]dditional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time for which these fact witnesses must be away from their regular employment." …Witnesses not only suffer monetary costs, but also the personal costs associated with being away from work, family, and the community.

*Id.*

---

[5]     Although *In Re Volkswagen of America* involved a transfer in a civil case, it is instructive as a detailed analysis of the convenience factors governing the application of the rule of *forum non conveniens*, embodied in Fed.R.Cr.P. 18.  It is further important because it demonstrates that an erroneous transfer determination is so critical that it may be grounds for issuance of a writ of mandamus.

In addition, the hardship extends beyond Defendants and witnesses who actually participate in the trial to family members and friends who wish to show support for a Defendant. This, too, is an important factor that must be considered by the Court:

> In addition to convenience to the witnesses, the court must consider the convenience to the defendant. A component of that factor is the ability of family, friends, and other supporters to attend trial. Logically, holding a defendant's trial approximately 200 miles further than the nearest location permitted for such a trial would influence the ability of family and friends to attend, thus impacting the convenience to the defendant.

*United States v. Stanko*, 528 F.3d 581, 586 (8th Cir. 2008). This hardship also extends to the community at large. Citizens of the community where the events giving rise to the charges have occurred have an important interest in the trial occurring in as convenient a location as possible. There exists a "local interest in having localized interests decided at home." *In Re Volkswagen of America*, 545 F.3d at 317-318.

### III. THE HARDSHIP IS PARTICULARLY DIRE FOR DEFENDANTS ALREADY ADJUDGED INDIGENT.

The burden of additional travel will be a particular hardship for those Defendants who are indigent. At the preliminary pretrial conference, the Court suggested that there was a means by which the government could pay subsistence for Defendants who cannot otherwise afford to travel to the trial. By Notice entered on September 9, 2009 [DE# 478], the Court directed the attention of Defendants represented by court-appointed counsel to 18 U.S.C. § 4285 (payment by

the United States Marshal's Office) and 18 U.S.C. §§ 3152 to 3156 (payment by Pretrial Services).[6]

While these statutes do provide for some relief, they do not imbue the Court with the ability to sufficiently ameliorate the hardship a transfer to a different locale will impose upon an indigent Defendant in this particular case. 18 U.S.C. § 4285 only permits the Court to order reimbursement of travel expenses _to_ the place of trial and subsistence only during the course of travel, thus leaving the bulk of the expenses discussed above to be borne by a person who simply cannot afford to bear these costs.[7]  *United States v. Forest*, 597 F.Supp.2d 163 (D.Maine 2009), citing *United States v. Birdhouse*, 2007 WL 2358634 (D.N.D. 2007).  *See also United States v. Sandoval*, 812 F.Supp. 1156, 1157 (D.Kan. 1993) ("Therefore, while the court may require the Marshal to provide money for subsistence during transit, this statute does not authorize the court to enter an order requiring the Marshal to provide money for subsistence upon reaching [the place of trial].");  *United States v. Nave*, 733 F.Supp. 1002 (D.Md. 1990);  *United States v. Gonzales*, 684 F.Supp. 838 (D.Vt. 1988).

Similarly, the Pretrial Services Act, 18 U.S.C. §§ 5152 to 5156, does not provide an adequate remedy to the problem.  It appears that the Court may order the probation department of Pretrial Services to pay for lodging at a commercial hotel or motel, but if Pretrial Services

---

[6]    Contrary to the United States' assertion at the preliminary pretrial conference, there is no authority for payment of an indigent defendant's travel or lodging under the Criminal Justice Act.  Although the Criminal Justice Act, 18 U.S.C. § 3006A(e)(1), provides for payment of "investigative, expert, or other services necessary for adequate representation," no courts have expanded this authority to include the expenses in issue here.

[7]    Defendants recognize that the analysis of indigence for these purposes is separate and in addition to the determination that a Defendant is entitled to appointed counsel under the Criminal Justice Act.  If these Defendants are not also adjudged indigent for purposes of travel and subsistence, the hardship imposed upon them would be even greater.

does not have the funds available to do so, an indigent Defendant may be relegated to housing within a government-managed facility, *i.e.*, a halfway house. *United States v. Gundersen*, 978 F.2d 580 (10th Cir. 1992). Although the Court in *Gundersen* found that such a placement does not violate a person's constitutional rights so long as the conditions imposed would permit the defendant to contact counsel and would allow sufficient release time to prepare the defense, these Defendants posit that such an extreme alternative should only be utilized in the most extreme of circumstances[8] and it is clear that for the reasons set forth in Section IV below, the pretrial publicity in the present case is not extreme and does not warrant transfer of the trial and the imposition of these extreme hardships upon the various Defendants.

The facts and circumstances of the present case are far different from those in the cases addressed by the courts reviewing similar problems. This is not simply a matter of a forty-eight dollar ($48.00) bus ticket as in *Forest*; it is not a mere seven (7) day hotel stay as in *Sandoval*, or even a one month trial as in *Gunderson*. Nor is this a problem of Defendants' own making, as in *Gonzales*, where the defendant elected to return to his home in Texas while awaiting trial in Vermont. Rather, this is a problem that will be created over Defendants' articulated objections. The Defendants were charged in the London jury division, where the crimes allegedly occurred and where they live. They have not sought a transfer or change of venue, and then sought governmental assistance to defray the costs of such a transfer. It will be manifestly unfair to require the indigent Defendants to suffer the extraordinary expense of a long distance trial venue,

---

[8]     This type of governmental lodging would not be available to the indigent Defendant's families and support persons. As discussed in Section II, *supra*, the impact of a transfer upon the ability of Defendants' family, friends and supporters to attend must be considered by the Court. *United States v. Stanko*, 528 F.3d 581, 586 (8th Cir. 2008).

let alone require that any one of them, reside for any period of time in a halfway house as a result of a transfer that all Defendants uniformly oppose and believe is unnecessary.

### IV.    THE PRETRIAL PUBLICITY OFFERED BY THE UNITED STATES IS INSUFFICIENT TO CREATE PRESUMED PREJUDICE.

The issue of pretrial publicity and how it affects a trial, is whether there will be an adverse impact upon due process; due process requires that a criminal defendant receive a fair trial by an unbiased jury. *See Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). This was the concern raised by the Court at the preliminary pretrial conference and the impetus for the instant debate. In evaluating whether due process rights are implicated by pretrial publicity, the United States Supreme Court recognizes two types of jury prejudice, presumed and actual. *Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002). Presumed prejudice is "when the 'setting of the trial [is] inherently prejudicial'"; actual prejudice occurs "when review of both the jury voir dire testimony and the extent and nature of the media coverage indicates 'a fair trial [was] impossible.'" *Id.*, quoting *Nevers v. Killinger,* 169 F.3d 352, 364 (6th Cir.1999) and *Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Inasmuch as actual prejudice cannot be evaluated until after a jury is seated – or an attempt to seat a jury has begun – the analysis here **can only be** whether the pretrial publicity within the London jury division is such that it creates presumed prejudice.

The standard for analysis is a stringent one; merely establishing a large quantity of publicity is insufficient. In *Ritchie*, the Sixth Circuit explained by quoting *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977):

Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the *voir dire* examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under *Murphy [v. Florida*, 421 U.S. 794 (1975)], extensive knowledge in the community of either the crimes or the putative criminal[9] is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere ... utterly corrupted by press coverage," *Murphy v. Florida, supra,* at 798.

*Dobbert,* 432 U.S. at 301-03, 97 S.Ct. 2290.  Here, the United States has offered nothing more than a large volume of publicity, without any analysis of whether that publicity has corrupted the trial atmosphere, nor has it addressed the issue of whether the pretrial publicity affects any other division.  In fact, a closer review of the various articles offered by the United States at the preliminary pretrial conference establishes that the press coverage is limited to only a small portion of the area encompassed by the London jury division.

Attached hereto as <u>Exhibit A</u> is an itemization of the newspaper articles tendered by the United States at the preliminary pretrial conference.  These articles (and whatever additional

---

[9]    This reference by the Supreme Court to the community's knowledge of the putative criminal also bears consideration in light of the United States' submission of statistics from the Kentucky Administrative Office of the Courts, purportedly demonstrating how many cases Mr. Maricle has presided over within the London jury division. The fact that a defendant may be well known within a community has no bearing upon the issue at hand, and these statistics are meaningless in the context of this analysis of the propriety of a transfer.  There is no authority for a transfer based upon a community's familiarity with a defendant independent of corrupting press coverage.  Thus, the fact that a defendant may be well known to many within the community is only important if the community's familiarity with the defendant corrupts the trial atmosphere.  There is no evidence nor any accusation that Mr. Maricle's judicial service has corrupted the trial atmosphere or that it will make it impossible to seat a jury.  That it might make the jury selection process more lengthy is not a proper consideration.  *See* discussion in Section V, *infra*.  Furthermore, the statistics offered by the United States do not purport to explain the extent of Mr. Maricle's involvement in each case.

articles the United States submits on or before the Court's deadline of September 17, 2009) [10] are the only items in the record to establish the level of pretrial publicity this case has generated. In analyzing them, the Court must also consider the geographic area comprised by the counties within the London jury division.  There are fourteen (14) counties within the division:  Bell, Clay, Harlan, Jackson, Knox, Laurel, Leslie, McCreary, Owsley, Perry, Pulaski, Rockastle, Wayne and Whitley.  LCrR 18.1(a)(5).  Based upon statistics from the U.S. Census Bureau, a summary of which are attached hereto as Exhibit B, the London jury division has a population of 387,641.  Clay County comprises only 6.2% of that population.

Of the sixty-five (65) articles submitted by the United States, forty-two (42) of them were printed and circulated by Clay County papers, the Clay County Times and the Manchester Enterprise, neither of which has significant circulation outside of Clay County.[11]   These forty-two (42) articles, therefore, can reasonably be said to have reached less than 6.2% of the jury division's population.  The London Sentinel-Echo published nine (9) articles, but the United States introduced no evidence of the circulation of that publication within the jury division, so there is no way for the Court to conclude that these nine (9) articles were circulated beyond Laurel County, which comprises less than 15% of the jury division's population.  Furthermore, the London Sentinel-Echo has not published an article in almost three (3) months.  Its coverage, therefore, certainly cannot be said to have saturated the market.  With respect to other local

---

[10]    Defendants do not believe any additional articles have been published since the pretrial conference on September 2, 2009.  If there have been additional articles, their number undoubtedly will be few.

[11]    Attached hereto as Exhibit C is the circulation of the Manchester Times organized by zip code, demonstrating that there is little circulation outside of Clay County.  The Clay County Times is a new publication and does not appear to have mail circulation at all, evidence that it does not have significant distribution outside of Clay County either.

newspapers within the jury division,[12] the United States submitted only one additional article, from the Corbin Times-Tribune in Whitley County.

Of the articles submitted by the United States, therefore, two-thirds of them are limited to only two (2) counties within a fourteen (14) county district. Moreover, of these three (3) local papers (the Clay County Times, the Manchester Enterprise, and the London Sentinel-Echo), only one has published an article about this case within the last two months according to the United States' submission. There is no evidence in the record of any coverage by other local papers, such as the Somerset Commonwealth Journal, the Hazard Herald, the Middlesboro Daily News, the Harlan Daily Enterprise, the Barbourville Mountain Advocate, the McCreary County Record, the Mt. Vernon Signal, or the Jackson County Times, to name only a few of the numerous local papers published within the London jury division. There are at least nineteen (19) separate newspapers within the London Division and, by an informal survey, it appears most have not run any articles or have had very scant coverage about this case.

Therefore, all that remains for the Court's consideration, is the ten (10) articles published by the Lexington Herald-Leader and the two (2) published by the Louisville Courier-Journal. At the preliminary pretrial conference, the Court indicated far less concern about the coverage of these regional papers, inasmuch as their coverage will have more impact nearer to their circulation base, *i.e.*, Lexington and Louisville. By moving the trial to either the Frankfort or

---

[12] The United States submitted an article from the Richmond Register, which is published in Madison County – a county within the Lexington, not London, jury division. Without any supplemental information with respect to the circulation of this publication within the London jury division, it cannot furnish support for a claim that the jury pool in that division is tainted.

Covington jury division, the Court would be moving it closer to the influence of these newspapers.

At the time of the preliminary pretrial conference, Defendants had no opportunity to examine or analyze the articles presented by the United States.  Upon review, it becomes evident that these articles establish, at most, that only a small percentage of the population within the London jury division may have been exposed to publicity, and that the publicity is not so inflammatory as to create a "corrupt" atmosphere requiring transfer, even as to the small percentage of persons who may have been exposed to the coverage.

## V.    THE FACT THAT JURY SELECTION MAY BE CHALLENGING OR ARDUOUS IS NOT A PROPER CONSIDERATION.

The United States simply presented a stack of copies of newspaper articles to the Court at the preliminary pretrial conference on September 2, 2009, apparently assuming that a seemingly large volume of publicity would be sufficient to motivate the Court to transfer this matter to another jury division, without any analysis or argument with respect to how those articles may have created presumed prejudice.[13]  Instead, the United States focused much of its attention on anticipated difficulties in seating a jury.  At this juncture, however, it is mere speculation whether it will be difficult to seat a jury in this case.  Defendants believe that a well-drawn jury questionnaire, which the Court has already advised it intends to utilize, will go a long way to eliminate the prejudicial effect of any pretrial publicity, to the extent any has been created. Defendants also note again that Clay County is only one of the fourteen (14) counties within the

---

[13]     In fact, it was not entirely clear at the preliminary pretrial conference whether the United States believed the pretrial publicity would be prejudicial to the government or to Defendants.  The United States' only concern seemed to be the difficulty in picking a jury.

London jury division, and there is no evidence that there will be an insufficient number of jurors from the remaining thirteen (13) counties who can "lay aside [their] impression or opinion and render a verdict based on the evidence presented in court." *Murphy v. Florida*, 421 U.S. 794, 799-800, 95 S.C.t 2031, 44 L.Ed.2d 589 (1975), quoting *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

Will it be difficult to find these jurors within the London jury division?  Defendants believe it will not be, but the fact that jury selection may be challenging is not an appropriate factor for the Court's consideration in deciding whether to transfer the case:

> The district court did characterize the possibility of a difficult voir dire as an obstacle to "prompt administration."  We do not understand the term "prompt administration" to have been promulgated in the Rules with the intention of permitting courts to avoid even attempting arduous voir dire proceedings.  Rather, the triggering purpose of the "prompt administration" amendment to Rule 18 was to clarify that district courts are authorized to fix the place of trial so as to comply with the Speedy Trial Act.  That Act concerns itself solely with the timeliness of when trial *begins*, not with when either voir dire or the entire trial will *conclude*, and in this circuit, trial is deemed to begin with voir dire.

*United States v. Lipscomb*, 299 F.3d 303, 342 (5th Cir. 2002) (emphasis in original; footnotes omitted).  Thus, the Fifth Circuit reversed Mr. Lipscomb's conviction based upon a *sua sponte* transfer within a district grounded upon a general finding that "this case will involve the trial of one of the best-known sitting elected officials in the Dallas/Fort Worth metroplex for allegations of public corruption….  This case has already received significant media attention and undoubtedly will receive more."  The Fifth Circuit rejected a transfer under those circumstances, even in the face of the district court's concerns about selecting a fair and impartial jury:

17

> The court did nothing more than globally label the unspecified publicity as "significant" and "substantial" and state that voir dire in Dallas would be "no easy task,"  But surely, this is not the standard for determining whether pretrial publicity renders a trial unfair….[14]

*Id.* at 333-334.

The *Lipscomb* opinion is particularly instructive because of its similarities to the current case.  Not only did it involve a well-known public official accused of public corruption, the transfer from Dallas to Amarillo was undisputedly inconvenient for the defendant and witnesses. Like the present case, the charges against Mr. Lipscomb had no relation whatsoever to the place to which the case was to be transferred and, also like the present case, the district court had not yet tried to seat a jury.  The Fifth Circuit in *Lipscomb* noted that in all of its previous opinions affirming a *sua sponte* transfer over a defendant's objection, a mistrial had already demonstrated that the venire pool had been badly tainted by publicity and that a retrial in the same division would pose almost insurmountable difficulties.  *Id.* at 345.  Under these circumstances, the Fifth Circuit set forth the following rules:

> When as here, facts of convenience militate exclusively *against* transfer, and no factor other than pretrial publicity – some favorable and some unfavorable to both the prosecution and the defense – might, if properly developed and analyzed, militate in favor of transfer, the trial court abuses its discretion under Rule 18

---

[14]    The Fifth Circuit in *Lipscomb* also rejected the trial court's reliance upon its own transfer decisions in other cases.  "Historical facts," the Court opined, are not relevant to the particular case in issue unless there is evidence in <u>this</u> record of how events in other matters may bear upon the transfer in <u>this</u> case.  "Such reference to the court's prior venue practice verges on circularity and runs the risk of creating a *per se* rule that violates Rule 18's focus on the facts of each case."  *Id.* at 341.  These Defendants are aware that the Court has had experience with other cases arising out of Clay County corruption allegations, but *Lipscomb* stands for the proposition that this experience cannot establish grounds for transfer unless it is somehow converted into evidence in the case now at bar, subject to evaluation, analysis and cross-examination by these Defendants.

> by ordering a far-distant intradistrict transfer, *sua sponte* and over the defendant's objections, without (1) attempting voir dire or otherwise creating a record, (2) providing an analysis of the publicity for the record to show how it prejudiced the jury pool, or (3) conducting a *Rideau*-style presumptive analysis.[15]   In this instance, we as an appellate court can detect virtually nothing on the Rule 18 scale to counterbalance the defendant's established inconvenience; and something outweighs nothing every time.

*Id.* at 348.

Even after a mistrial, a *sua sponte* transfer to another division may well be improper.  In *United States v. Melton*, ___ F.Supp.2d ___, 2009 WL 902021 (S.D. Miss. 2009) (slip opinion), a district court within the Fifth Circuit again addressed a case against a prominent politician.  After a mistrial, the district court determined that it would transfer the jury selection portion of the re-trial.   The United States presented evidence reflecting the reach of the local media coverage and referred to the jury questionnaire responses from the first trial.   The district court, however, recognized that the issue was not that simple:

> However, the scope of media coverage and actual taint can be two different things.  Thus, the Court now considers whether the record is sufficient to justify a *sua sponte* decision to draw the jury entirely from a single division.

*Id.* at *2.  The court then held that while jury selection might be easier by transferring the jury selection portion of the trial to draw from a different jury pool, it could not find that the entire jury pool of the original location was tainted, because there were areas within that pool where the

---

[15]    *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), held in pertinent part that jury prejudice may be presumed from evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community.  This principle has been confined to the rare and extreme situations where the trial atmosphere has been corrupted and, for the reasons discussed, *supra*, is not applicable here.

media coverage had been less intense.  Thus, the court concluded, the decision was really "one of convenience, which is not a proper consideration."  *Id.*  Although there had been increased media attention since the first trial, the court noted that changes to the jury selection process, including the use of juror questionnaires sent to a larger group of potential jurors, would likely negate the effects of the publicity.  *Id.* at *3.  The same holds true here.  Although there arguably has been intense local media coverage in Clay County, the majority of the counties in the London jury division have not experienced the same.  That type of concentrated publicity simply cannot serve to taint a jury pool that is drawn from a much larger area, as the district court concluded in *Melton.*

### VI.    IF THE COURT ELECTS TO TRANSFER THIS MATTER FOR PURPOSES OF TRIAL, THE COVINGTON JURY DIVISION IS THE PREFERABLE VENUE.

In the event the Court determines that a transfer to another jury division is warranted notwithstanding the objections and authorities set forth herein, Defendants respectfully request that the trial venue be Covington, rather than Frankfort.  Although they recognize that the travel required will be increased by the choice of Covington over Frankfort, the cost of lodging will be the same in either jury division.  Furthermore, by transferring the case to one of these jury divisions, the Court then renders important that which was previously not, *i.e.,* the articles published by the <u>Lexington Herald-Leader</u>, by moving closer to its base of circulation. Defendants believe that the impact of the <u>Lexington Herald-Leader</u> will be substantially less in the Covington jury division than in the Frankfort jury division.

This belief is supported by the <u>Lexington Herald-Leader</u> circulation statistics, a copy of which are attached hereto as <u>Exhibit D</u>.[16]  The itemization by county of the newspaper's circulation begins at page 5 of the attached Audit Report.  The daily circulation within the counties which comprise the Frankfort jury division totals six thousand six hundred twenty-one (6,621); the daily circulation for the counties within the Covington jury division is one thousand five hundred eighty-three (1,583).  Given that the circulation in the Frankfort jury division is more than four (4) times greater than that in the Covington jury division, if pre-trial publicity is the reason for moving the trial, then the Covington jury division would be the far preferable venue.

With respect to other media coverage, the United States has submitted no other publications from the Covington area and Defendants believe there is little, if any, such coverage apart from the articles submitted by the United States at the preliminary pretrial conference. There is little or no reason to believe the northern Kentucky and Cincinnati papers have covered this matter or that they would begin to do so even in the event the trial is moved there. Defendants respectfully request, therefore, that the Court transfer the matter to Covington in the event it determines that a transfer is necessary.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this matter remain in the London jury division for purposes of trial.  In the alternative, if their objections are overruled, they ask that the matter be transferred to the Covington jury division.

---

[16]     A simpler map showing more generally the daily circulation by county is attached hereto as <u>Exhibit E</u>.

Respectfully submitted,

/s/ David S. Hoskins    (With Permission)
David S. Hoskins
107 East First Street
Corbin, Kentucky 40701
Telephone:  (606) 526-9009
Facsimile: (606) 526-1021
Email: davidhoskins@bellsouth.net
**ATTORNEY FOR DEFENDANT**
**RUSSELL CLETUS MARICLE**

/s/ Martin Pinales (With Permission)
Martin S. Pinales
Candace C. Crouse
**SIRKIN, PINALES & SCHWARTZ, LLP**
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
Telephone: (513) 721-4876
Email:  mpinales@sirkinpinales.com
Email: ccrouse@sirkinpinales.com
**ATTORNEYS FOR DEFENDANT**
**RUSSELL CLETUS MARICLE**

/s/ Bennett E. Bayer    (With Permission)
Bennett E. Bayer
**LANDRUM & SHOUSE, LLP**
106 West Vine Street
Lexington, Kentucky 40588-0951
Telephone:  (859) 244-2423
Facsimile: (859) 233-0308
Email: bbayer@landrumshouse.com
**ATTORNEYS FOR DEFENDANT**
**DOUGLAS C. ADAMS**

/s/ R. Kent Westberry (With Permission)
R. Kent Westberry
Kristin N. Logan
**LANDRUM & SHOUSE, LLP**
220 West Main Street, Suite 1900
Louisville, Kentucky 40202-1395
Telephone: (502) 589-7616
Facsimile: (502) 589-7616
Email: kwestberry@landrumshouse.com
Email:  klogan@landrumshouse.com
**ATTORNEYS FOR DEFENDANT**
**DOUGLAS C. ADAMS**

/s/ Scott White    (With Permission)
Scott White
**MORGAN & POTTINGER, PSC**
133 West Short Street
Lexington, Kentucky 40507
Telephone: (859) 226-5288
Facsimile:  (859) 255-2038
Email: tsw@m-p.net
**ATTORNEY FOR DEFENDANT**
**CHARLES WAYNE JONES**

/s/ Robert L. Abell  (With Permission)
Robert L. Abell
271 West Short Street
Suite 500, Security Trust Building
P.O. Box 983
Lexington, Kentucky 40588-0983
Telephone: (859) 254-0706
Facsimile:  (859) 231-0691
Email:  Robert@RobertAbellLaw.com
**ATTORNEY FOR DEFENDANT**
**WILLIAM E. STIVERS**

*/s/ Russell J. Baldani (With Permission)*
Russell J. Baldani
R. Tucker Richardson, III
**BALDANI, ROWLAND & RICHARDSON**
300 West Short Street
Lexington, Kentucky 40507
Telephone: (859) 259-0727
Email: brr@brr-law.com
Email: tucker@brr-law.com
**ATTORNEY FOR DEFENDANT**
**FREDDIE W. THOMPSON**

*/s/ Daniel A. Simons (With Permission)*
Daniel A. Simons
**THOMPSON, SIMONS, DUNLOP**
                    **& FORE, PSC**
116 West Main Street, Suite 2A
P.O. Box 726
Richmond, Kentucky 40476-0726
Telephone:  (859) 623-5205
Facsimile:  (859) 623-7394
Email: daniel@tsdflaw.com
**ATTORNEY FOR DEFENDANT**
**STANLEY BOWLING**

*/s/ Jerry W. Gilbert    (With Permission)*
Jerry W. Gilbert
**COY, GILBERT & GILBERT**
212 North 2nd Street
Richmond, Kentucky 40475
Telephone: (859) 582-1598
Email: jwgilbert@coygilbert.com
**ATTORNEY FOR DEFENDANT**
**WILLIAM B. MORRIS**

*/s/ Elizabeth S. Hughes*
Elizabeth S. Hughes
**GESS MATTINGLY & ATCHISON, PSC**
201 West Short Street
Lexington, Kentucky 40507-1269
Telephone: (859) 252-9000
Facsimile: (859) 233-4269
Email: ehughes@gmalaw.com
**ATTORNEY FOR DEFENDANT**
**DEBRA L. MORRIS**

## CERTIFICATE OF SERVICE

This is to certify that a true copy of the foregoing **RESPONSE IN OPPOSITION TO TRANSFER** has been served on September 17, 2009, by filing same via the CM/ECF system, which will send electronic notice to the following counsel of record:

Stephen Craig Smith, Esq.          *Stephen.Smith4@usdoj.gov*
Jason D. Parman, Esq.               *Jason.Parman@usdoj.gov*

*/s/ Elizabeth S. Hughes*
**ATTORNEY FOR DEFENDANT**
**DEBRA L. MORRIS**