1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                              - - -
 3
      UNITED STATES OF AMERICA,         :  Docket No. CR 09-16-S
 4                                      :
                          Plaintiff,    :  Frankfort, Kentucky
 5                                      :  Tuesday, January 19, 2010
           versus                       :  9:00 a.m.
 6                                      :
      RUSSELL CLETUS MARICLE,           :
 7    DOUGLAS C. ADAMS                  :
      CHARLES WAYNE JONES               :        Excerpted Transcript
 8    WILLIAM R. STIVERS                :     Testimony of J.C. Lawson
      FREDDY W. THOMPSON                :
 9    WILLIAM B. MORRIS                 :
      DEBRA L. MORRIS                   :
10    STANLEY BOWLING,                  :
                                        :
11                        Defendants.   :


12


13                            - - -
                     TRANSCRIPT OF HEARING
14                 BEFORE DANNY C. REEVES
             UNITED STATES DISTRICT COURT JUDGE
15                            - - -

16    APPEARANCES:

17    For the United States:      STEPHEN C. SMITH
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
      For the Defendant          MARTIN S. PINALES, ESQ.
21    Russell Cletus Maricle:    Strauss & Troy
                                  150 E. Fourth Street
22                                Fourth Floor
                                  Cincinnati,OH  45202
23
                                  DAVID S. HOSKINS, ESQ.
24                                107 E. First Street
                                  Corbin, KY  40701
25
```

2

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          Landrum & Shouse, LLP
 2                               220 West Main Street
                                 Suite 1900
 3                               Louisville, KY 40202

 4                               BENNETT E. BAYER, ESQ.
                                 Landrum & Shouse, LLP
 5                               106 West Vine Street
                                 Suite 800
 6                               Lexington, KY  40507

 7
      For the Defendant          T. SCOTT WHITE, ESQ.
 8    Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
                                 133 West Short Street
 9                               Lexington, KY  40507

10
      For the Defendant          ROBERT L. ABELL, ESQ.
11    William R. Stivers:        271 West Short Street
                                 Lexington, KY  40507
12

13    For the Defendant          RUSSELL JAMES BALDANI, ESQ.
      Freddy W. Thompson:        Baldani, Rowland & Richardson
14                               300 West Short Street
                                 Lexington, KY  40507
15

16    For the Defendant          JERRY W. GILBERT, ESQ.
      William B. Morris:         Coy, Gilbert & Gilbert
17                               212 North Second Street
                                 Richmond, KY 40475
18

19    For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:           Gess, Mattingly & Atchison, PSC
20                               201 West Short Street
                                 Lexington,KY40507
21

22    For the Defendant          DANIEL A. SIMONS, ESQ.
      Stanley Bowling:           Thompson, Simons, Dunlop & Fore
23                               116 West Main Street
                                 Suite 2A
24                               Richmond, KY 40476

25
```

3

1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
2                                 35 W. Fifth Street
                                  P.O. Box 1073
3                                 Covington, KY  41012
                                  (859) 291-4410

4

5         Proceedings recorded by mechanical stenography,
     transcript produced with computer.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               (Beginning of excerpted proceedings)

2          J.C. LAWSON, GOVERNMENT'S WITNESS, SWORN

3               THE COURT:  Thank you.  Mr. Smith, you may proceed.

4                    DIRECT EXAMINATION

5    BY MR. SMITH:

6    Q.   State your name, please.

7    A.   J.C. Lawson.

8    Q.   Mr. Lawson, where are you from?

9    A.   Clay County.

10   Q.   Clay County?  Is that where you were born and raised?

11   A.   Yes, sir.

12   Q.   And how old are you, Mr. Lawson?

13   A.   Fifty-five.

14   Q.   And tell us a little bit about yourself.  Do you have

15   children?

16   A.   Yes, I got a daughter and a son, two grandchildren.

17   Q.   Okay.  And during the time that you lived back in Clay

18   County, did you hold any jobs?

19   A.   No, sir.

20   Q.   You refer to yourself as an employed person back in those

21   days?

22   A.   Yeah.

23   Q.   And what was your occupation?

24   A.   Self-employed farmer.

25   Q.   Okay.  And as you call yourself a farmer, what crops did

1    you specialize in?

2    A.   Marijuana.

3    Q.   And where did you grow that marijuana?

4    A.   In the mountains.

5    Q.   Okay.  And did you leave Clay County to grow your

6    marijuana?

7    A.   No, sir.

8    Q.   And did you sell that marijuana?

9    A.   Yes, sir.

10   Q.   Where did you normally sell that marijuana?

11   A.   Up north and places.

12   Q.   And when you say up north and places, you'd have buyers

13   come into town in Clay County and buy it from you?

14   A.   Yes, sir.

15   Q.   So did you normally sell it from your home place there in

16   Clay County?

17   A.   Yes, sir.

18   Q.   When did you get started in the marijuana business,

19   Mr. Lawson?

20   A.   When I was about 16, 17 years old, started growing it.

21   Q.   Okay.  And would you consider yourself a pretty good

22   grower?

23   A.   Yes, sir.

24   Q.   Have you had a lot of experience growing marijuana?

25   A.   I sure have.

*LAWSON - Direct*                                                                6

1    Q.   How many crops would you try to tend every year?

2    A.   Well, you can only get like one crop a year, but a lot of

3    plants.

4    Q.   Did you try different places to grow your marijuana?

5    A.   Yes, sir.

6    Q.   Did you find that some places in Clay County are better

7    to grow your marijuana than others?

8    A.   Yes, sir.

9    Q.   This marijuana that you would grow, Mr. Lawson, did you

10   sell it by the pound or by the plant, or how did you sell it?

11   A.   Sell it by the pound.

12   Q.   Okay.  And when you sold it by the pound, what normally

13   would you expect to get for it?

14   A.   Most of the times, 12, 16 hundred, 18.

15   Q.   Now, during the time that you grew marijuana, you say

16   that you considered yourself a pretty good grower?

17   A.   Yes, sir.

18   Q.   Did you have any competition in Clay County?

19   A.   Yes, a lot of competition.

20   Q.   Okay.  Did you ever have any competition from Charles

21   Wayne Jones?

22   A.   No, sir.

23   Q.   Okay.  Did you ever know him to grow marijuana?

24   A.   I've seen him one time.

25   Q.   Okay.  You seen him one time.  What was he doing?

1    A.   He was growing some pretty close to where I was growing

2    some, but he never seen me.

3    Q.   Where was this place that you saw him?

4    A.   Down on Sutton Branch on 80.

5    Q.   Sutton Branch, is that what you said, Sutton Branch?

6    A.   Yeah.

7    Q.   S-u-t-t-o-n?

8    A.   S-u-t-t-o-n, Sutton.

9    Q.   Okay.  And what was your business down on Sutton Branch?

10   A.   I was growing too.

11   Q.   Okay.  And where did you see him?

12   A.   At the river.

13   Q.   And was he in his own marijuana or yours?

14   A.   He was in his.

15   Q.   Okay.  And you say he didn't get a chance to see you?

16   A.   No.

17   Q.   How come?

18   A.   I was already in there working when he come in so I just

19   set still.

20   Q.   Okay.  Had you and Mr. Jones talked about marijuana

21   growing at any point?

22   A.   No, sir.

23   Q.   Did you ever talk to him about your marijuana growing?

24   A.   No, sir.

25   Q.   Did you ever tell him that you saw him down there near

1  your patch?

2  A.  No, sir.

3  Q.  Okay.  You see Mr. Jones here in the courtroom?  You may

4  have to stand up.  I'm not sure with all these tables,

5  Mr. Lawson.  If you need to stand up.

6          MR. WHITE:  We'll stipulate identification.

7  A.  No, I couldn't say I can.  I haven't seen him in a long

8  time, in a while.

9  Q.  Well, let me ask you this.  Mr. Lawson, how many times

10 did you have a chance to meet with Mr. Jones?  You know him as

11 a friend?

12 A.  No.  Just a couple times I've met him.

13 Q.  Okay.

14 A.  Two or three.

15 Q.  And you say you don't see him here in the courtroom

16 today.  What kind of fella did he look like?  Can you tell us

17 about how tall he was?

18 A.  He was just a short, skinny fella.

19 Q.  You said he was short and skinny?

20 A.  About the size of me.

21 Q.  Did he have any noticeable facial hair or --

22 A.  Yeah, he had kind of skimpy with hair on it.

23 Q.  Skimpy with hair.  Did he wear any beards or mustaches?

24 A.  Not when I seen him.

25 Q.  Okay.  Did he hold any positions over in Clay County?

LAWSON - Direct                                                          9

1    A.   Yeah, he used to work in the food stamp office.

2    Q.   Okay.

3              THE COURT:   You can be seated.

4    Q.   Food stamp office?

5    A.   Yeah.

6    Q.   And did he work there for a long time or short time?

7    A.   Long time.

8    Q.   A long time.  And during the time that you knew him, did

9    you ever know him to get in trouble for anything?

10   A.   Yeah, when he worked in the food stamp office, I think

11   him and one of my friends, James Harris, got caught in London

12   with some pot.

13   Q.   Okay.  So he got caught with some pot.  Do you know if he

14   got convicted of that?

15   A.   No, sir, I don't.

16   Q.   You don't know?

17   A.   Uh-uh.

18   Q.   Did he get in any other kind of trouble that you know of

19   over the years that you've known him?

20   A.   I don't know him that good, you know, just --

21   Q.   How long has it been, Mr. Lawson, would you say it's been

22   since you actually laid eyes on Mr. Jones?

23   A.   About 2004, I guess, something like that.

24   Q.   Okay.  So it's been some time ago that you saw him?

25   A.   Yeah.

1    Q.   Where was it that you saw him then?

2    A.   Well, the last time I saw him was about 2004, 2005, when

3    they had the old courthouse in the Ford building in Judge

4    Maricle's office.

5    Q.   And did you see him, you say, at the courthouse or in

6    Maricle's office?

7    A.   At the courthouse in Maricle's office.

8    Q.   So he was in Maricle's office?

9    A.   Yeah.

10   Q.   Had you seen him in Maricle's office before?

11   A.   Do what now?

12   Q.   Had you ever seen him there before?

13   A.   Yeah, I seen him a couple times in there.

14   Q.   Pretty common to see him hanging out at the judge's

15   office?

16   A.   Yeah, seemed to me like it was.  When I'd go by, it was.

17   Q.   Now, Mr. Lawson, you at some point made public, I guess,

18   in some ways that you believe marijuana growing was a good

19   thing, and you gave an interview at some point; is that right?

20   A.   Yes, sir.

21   Q.   Did you give an interview to a newspaper?

22   A.   Yeah.

23   Q.   And do you remember what newspaper it was you gave an

24   interview to?

25   A.   Lexington Herald.

1   Q.   Okay.  And did you give them any pictures of you?

2   A.   Yes, sir.

3   Q.   And what were the pictures?  Did they have a picture with

4   a background, or were you with someone, or how was the

5   pictures?

6   A.   I was standing in a pot patch, holding a plant.

7   Q.   And did that make pretty good news back in Clay County

8   when it ran?

9   A.   Yeah, it sure did.

10  Q.   Did you get a lot of attention out of it?

11  A.   Yeah, too much.

12  Q.   Too much.  Did you get in trouble?

13  A.   Yes, sure did.

14  Q.   And how come you get in trouble, Mr. Lawson?  Who caught

15  you?

16  A.   Who caught me?

17  Q.   Yeah.  Was it the federal or the state?

18  A.   The feds got me.

19  Q.   Who was it?

20  A.   FBI, Bill Sheets.

21  Q.   And did you get convicted?

22  A.   Yes, sir, I did.

23  Q.   And do you remember when that was you first got

24  convicted?

25  A.   I think they got me in '86, something like that.

1   Convicted in '87 or '88.

2   Q.   Okay.  How many times have you been convicted,

3   Mr. Lawson?

4   A.   This is the third time.

5   Q.   And what drugs -- were they all drug cases that you were

6   convicted of?

7   A.   Yes, sir.

8   Q.   And what drug was it that you were convicted of?

9   A.   Well, one time, cocaine and pot; and then this time,

10  marijuana.

11  Q.   Okay.  Now, in your time that you were there in Clay

12  County, did you make quite a bit of money?

13  A.   Yes, sir, I did.

14  Q.   What would be one of your best years that you recall as

15  far as grossing money or profiting?  How much money would you

16  make, in other words, off marijuana growing?  One of your

17  better years.

18  A.   Probably about -- one year, I'd say about 350, 400

19  thousand.

20  Q.   Okay.  And were you in partners with anyone at that time,

21  or is that pretty much all for yourself?

22  A.   That was all by myself.

23  Q.   And would that have been at or about the time you gave

24  that interview to the Lexington Herald Leader that you had

25  already realized that kind of year?  Had you made that kind of

1    money, in other words, before you gave that interview?

2    A.   Yeah, I'd made that money before.

3    Q.   Okay.  Mr. Lawson, during the time period you were living

4    over there in Clay County, did you have interest in politics?

5    Did you ever support any of the candidates over there?

6    A.   Yeah, a little bit.

7    Q.   Okay.  And why were you, as a marijuana grower,

8    interested in getting involved in politics in Clay County?

9    A.   Well, just kind of keep the law and stuff off my back,

10   you know.

11   Q.   Okay.  And did you find that it helped?  Did you feel

12   like it helped you?

13   A.   Yeah, seemed to me like it did.

14   Q.   Okay.  And did you ever give any money that you knew to

15   be going into the hands of Cletus Maricle?

16   A.   I give some money Alan Roberts and Gayle House.  Alan

17   Roberts, give him 8 or 9 thousand, which I can't say for sure

18   they got it, but it went to him.

19   Q.   You delivered it to Alan Roberts --

20        MR. BAYER:  Excuse me.  Could he repeat that answer,

21   please?  I could not hear the entire answer.

22        THE COURT:  If you could speak up a little bit.  What

23   was your last answer?  You gave the money to who?

24   A.   To Alan Roberts, 8 or 9 thousand to Gayle House and

25   Cletus.  I'm not sure the money made it to their hands,

1   because I never asked.

2   Q.   So you weren't invited over to Judge Maricle's house to

3   deliver the money?

4   A.   No, sir.

5   Q.   But you gave it to Mr. Roberts, who -- did you know

6   Mr. Roberts to be a vote buyer?

7   A.   Yes, sir.

8   Q.   Was he a long-time vote buyer over there?

9   A.   Yes.

10  Q.   Did he usually come around election time looking for

11  money for that reason?

12  A.   Yeah, sometimes he would.

13  Q.   Had he hit you up before?

14  A.   No.

15  Q.   Okay.  Could have been around the time that you gave that

16  interview to the Lexington Herald Leader that he came by for

17  the money?

18  A.   Just a little after.

19  Q.   Just a little after.  So just a little after that,

20  Mr. Roberts comes, and does he come up to your holler to see

21  you?

22  A.   No, I seen him.

23  Q.   Where did you see him?

24  A.   Down on the river creek, his house.

25  Q.   Did he call you to come down there?

1    A.   No, I was just out walking around.

2    Q.   And you gave this money, was it cash?

3    A.   Yeah.

4    Q.   Was it profits from your drug dealing?

5    A.   Yes, sir.

6    Q.   And who was present that you recall when you gave him

7    that money?

8    A.   Just me and him.

9    Q.   Okay.  Now, you have indicated that you've been convicted

10   before.  I'd like to hand to you Government's Exhibit

11   Number 3, Mr. Lawson, have you take a look at that.  Do you

12   recognize that to be your plea agreement, Mr. Lawson?

13   A.   Yes, sir.

14   Q.   Did you enter that plea in front of a district judge down

15   in London?

16   A.   Yes, sir.

17   Q.   Do you know which judge it was your entered your plea in

18   front of?

19   A.   Karen Caldwell.

20   Q.   And how much was -- did you get sentenced on that plea?

21   A.   Yes, sir.

22   Q.   How much time did you get?

23   A.   Ten year.

24   Q.   And as part of your plea agreement over there, I believe

25   on page 3, it says that you have agreed to cooperate fully

1   with the United States and testify if you're called as a

2   witness truthfully.  Do you see that?

3   A.   Yes, sir.

4   Q.   What's your understanding, has the government promised

5   you anything as far as a reduction in your sentence,

6   Mr. Lawson?

7   A.   No, sir.

8   Q.   What's your understanding, do you have an understanding

9   that your sentence might be reduced?

10  A.   Yes, sir.

11  Q.   And who would reduce your sentence, Mr. Lawson?

12  A.   Back before the judge.

13  Q.   Okay.  And what's your understanding would happen,

14  Mr. Lawson, if you were to testify untruthfully here today?

15  A.   Get one to five.

16  Q.   And would this plea agreement have any benefit to you if

17  you lied here today?

18  A.   No, sir.

19          MR. SMITH:  Pass the witness.

20          THE COURT:  Thank you.  Let's see.  Mr. Hoskins.

21          MR. HOSKINS:  Thank you, Your Honor.

22                          CROSS-EXAMINATION

23  BY MR. HOSKINS:

24  Q.   Mr. Lawson, you told us that when you got up with this

25  Alan Roberts, that you just went to his house?

1   A.   Yeah.

2   Q.   You knew where he lived?

3   A.   Yes, sir.

4   Q.   Was he involved in drugs too that you know of?

5   A.   No, I don't think so.

6   Q.   Okay.  You knew him to be involved in politics?

7   A.   Yes, sir.

8   Q.   How did you know that?  How did you come to know that?

9   A.   He was always at the election booth, always buying votes

10  and stuff.

11  Q.   So did he know you were coming that day?

12  A.   No.  We kind of talked a little bit, and then I just met

13  him down there at his house.

14  Q.   You had talked to him before the day you met him at his

15  house?

16  A.   Yeah, we kind of -- I always talked to him.  We see one

17  another every day all day long, passing by.  I only live about

18  five, six miles from him, daddy lived about half a mile, mile

19  from him, something like that.

20  Q.   I'm sorry.  I didn't hear what you said.  You lived five

21  or six miles away and someone --

22  A.   My daddy lived a mile from him.

23  Q.   Okay.  Thank you.  Had you talked to him before about

24  bringing money to him?

25  A.   Yeah, one time I kind of mentioned it a little bit.

1    Q.   Did you talk to anybody else --

2    A.   No, sir.

3    Q.   -- about that money?

4    A.   No, sir.

5    Q.   About any other money?

6    A.   No, sir.

7    Q.   So you never talked to Cletus Maricle about --

8    A.   No, sir.

9    Q.   -- this money?  The only person you know that got that

10   money was Alan Roberts?

11   A.   Yes, sir.

12   Q.   Do you know what year that was?

13   A.   I'm going to say '86, '87, something like that.

14   Q.   Now, was that before you went to prison the first time?

15   A.   Yes, sir.

16   Q.   So it was '86 or '87?

17   A.   Um-hmm.

18   Q.   Because you went to prison for the first time in '87 or

19   '88?

20   A.   '88.

21   Q.   You started serving your time in '88?

22   A.   I think '89 -- '88, '89, somewhere along there.

23   Q.   Okay.  Did you ever have any conversations with Cletus

24   Maricle about any of this drug business of yours?

25   A.   No, sir.

1    Q.   Ever have any conversations with him about elections or

2    politics or vote buying or anything like that?

3    A.   No, sir.

4    Q.   Mr. Lawson, the person that you were interested in having

5    access to or being friends with was the county sheriff, wasn't

6    it?

7    A.   Yes, sir.

8    Q.   Starting with Sheriff Sizemore?

9    A.   Yes, sir.

10   Q.   And you and Sheriff Sizemore were pretty tight?

11   A.   Yes, we was.

12   Q.   And you and Sheriff Sizemore's wife were pretty tight?

13   A.   Yes, sir.

14   Q.   A lot of money and jewelry and things of that nature went

15   from you to the sheriff?

16   A.   To his wife.

17   Q.   To his wife?  I'm sorry, I didn't understand.

18   A.   Yes, sir.

19   Q.   Because as a drug, marijuana farmer, you needed to know

20   who might be out trying to catch people like you, right?

21   A.   Right.

22   Q.   And that would be the sheriff or the police?

23   A.   The sheriff.

24   Q.   So you never had anything to do with any judges or

25   anything like that, did you?

1    A.   No, sir.

2              MR. HOSKINS:  That's all.  Thank you.

3              THE COURT:  Thank you.  Mr. Bayer?

4              MR. BAYER:  Thank you, Judge.

5                        CROSS-EXAMINATION

6    BY MR. BAYER:

7    Q.   Mr. Lawson, when you were interviewed for the Herald

8    Leader article, and I believe that was around September, 1987,

9    correct?

10   A.   Pretty close to there.

11   Q.   Okay.  When you were interviewed for that, how is it that

12   the Herald Leader came to talk to you?  What caused that?

13   A.   I called them.  The state police come up to my place and

14   shot a dog in front of my little young ones, one of my pups.

15   Q.   The article in the Herald Leader talked about that

16   offended you, they swooped in on the property, and you thought

17   it was time somebody stood up for the rights of marijuana

18   growers?

19   A.   Yes, sir.

20   Q.   At that point in time, if I understand through the

21   cross-examination by Mr. Hoskins and the direct examination,

22   whatever politics or whatever money you would have been

23   dealing with, allegedly, for Cletus Maricle would have been

24   before the time of that article, correct?

25             MR. SMITH:  Your Honor, I'm going to object.  That is

1    not what is in the record.  That's misstating, I believe, the

2    record, and I'm going to object on that basis.

3            THE COURT:  Well, I'll allow the witness to clarify

4    the time period as to when the actions would have taken place

5    in connection with the newspaper article.

6    A.   I think it was just a little bit after the article.

7    Q.   Because that was one of the things that you talked about

8    in the newspaper article is about how things were going on in

9    Clay County that you thought were unfair, and I suspect that

10   was because perhaps you were upset with Sheriff Sizemore over

11   the fact that the state police came in on you, weren't you?

12   A.   No, sir.  I wasn't.

13   Q.   Who did you blame for the state police coming in on you?

14   A.   Just the state police theirself.

15   Q.   And there was also some talk about maybe the governor and

16   other people had flown over your farm, or you were supposed to

17   have known about that?

18   A.   No.  Carl Sizemore found a patch of pot just below the

19   house, and he was bringing -- I want to say it's the governor

20   or somebody up there to cut it.  It was almost in the road,

21   probably outta the road 30, 40 feet.  And he said don't go cut

22   it, he said, I'm bringing the governor up to cut it.

23   Q.   And that was Sheriff Sizemore?

24   A.   Yes, sir.

25   Q.   And then after this period in the late '80s, around 1986,

1    1987, that you testified on direct, what other involvement did

2    you have in politics in Clay County?  And let me preface that

3    by saying, were you dissatisfied with the results of what you

4    had previously tried to accomplish in Clay County to benefit

5    you?

6    A.   No, sir.

7    Q.   Were you satisfied?

8    A.   Yeah, I was doing all right.

9    Q.   Sure.  So what did you do after that point in time?

10   A.   Rephrase that question again.

11   Q.   What did you do regarding Clay County politics after

12   1986?

13   A.   I just only helped one person after that in the election

14   stuff in '87.  That was when I donated the money and stuff.

15   Like I said, I don't know whether the money got to who it was

16   supposed to be going to or not.

17   Q.   So basically, you donated money in one election.  You

18   don't know where it went, you don't know who got it.  That was

19   your only involvement in Clay County politically?

20   A.   I know who got the money.  I don't know it got where it

21   supposed to went.

22   Q.   Did you ever help anybody buy votes?

23   A.   Yes, sir.

24   Q.   Who?

25   A.   Stanley Bowling.

1   Q.   Who else did you help buy votes?

2   A.   Well, it was for Stanley Bowling.

3          MR. SMITH:  Your Honor, I'm going to object unless he

4   wants to clarify the time period.  I'm asking, again, for --

5   I'm going to state an objection that his questions now are so

6   open-ended that we're now asking globally, and I would ask

7   that, again, the hearing be limited to the parts prior to --

8          THE COURT:  I believe that this is one area that's

9   listed in the notice.  Specifically, the notice states that in

10  2002, Lawson was approached by Charles Wayne Jones and Stanley

11  Bowling to buy votes for a slate of candidates.  It is in the

12  notice so I'll allow Mr. Bayer to ask the questions.

13  Objection overruled.

14         MR. BAYER:  Thank you, Judge.

15  Q.   When did that happen?

16  A.   2002.

17  Q.   Between 1986 and 2002, did you ever do it?

18         MR. SMITH:  Your Honor, I'm going to state an

19  objection as, again, I believe that this question is too

20  open-ended as phrased, and I would object as to relevance as

21  to "doing it."

22         THE COURT:  It's a rather broad question.  If you can

23  narrow the question down.

24         MR. BAYER:  I have a difficult time narrowing it to

25  an extent, Judge, because I don't know all of his background

1    based upon the information that they've given to us.  And it

2    seems strange that Mr. Smith will object to relevance, because

3    I'm trying to find out what is the relevance of all of this.

4    And that's why it's a problem.

5            THE COURT:  All right.  I think Mr. Smith is

6    objecting to the form of the question because it was vague.

7    So I'll sustain the objection.  If you don't want to rephrase

8    the question, I'll sustain the objection.

9            MR. BAYER:  I'll try to rephrase it.

10   Q.   Between 1986 and 2002, did you ever engage in vote

11   buying?

12   A.   No.  I've helped work the elections, you know, like

13   hauling voters, something like that.

14   Q.   What is hauling voters all about?

15   A.   Well, go get people out, pay them to vote.

16   Q.   And who did you do that for?

17   A.   Honestly, about every one of them.

18   Q.   Now, this is in between the time of your marijuana

19   convictions?

20   A.   Yes, sir.

21   Q.   And were you doing this for the sheriff at the time?

22   A.   Yes, sir.

23   Q.   Were you also doing it for Ed Jordan at the time?

24   A.   Yeah, I've helped Ed Jordan, yeah.

25   Q.   Did you ever work with Kenny Day on anything?

1    A.   No, sir.

2    Q.   Do you know Kenny Day?

3    A.   Yes, sir, I know him good.

4    Q.   How do you know him?

5    A.   Well, I've knowed him before he run down the service, and

6    I knew him through the service and as jailer.

7    Q.   I didn't understand the last part.

8    A.   I've grown up around Kenny, pretty close to Kenny.  I've

9    knowed him all my life.

10   Q.   Did you ever talk politics with him?

11   A.   You're talking about Kenny Day?

12   Q.   Yes.

13   A.   I thought you were talking about Kenny Price, the jailer.

14   I never done nothing with Kenny Day, no.

15            MR. ABELL:  Judge, could he pull that closer?  It's

16   difficult to hear him.

17   Q.   What about Eugene Lewis.  Do you know Eugene Lewis?

18   A.   No, sir.  I only know his son.  I've seen Lewis, but I

19   don't know him personally.

20   Q.   So you didn't have anything to do with either Kenny Day

21   or Eugene Lewis?

22   A.   No, sir.

23            MR. BAYER:  I don't have any other questions.

24            THE COURT:  All right.  Thank you.  Mr. White?

25   ///

                          CROSS-EXAMINATION

BY MR. WHITE:

Q.   Good afternoon, sir.  Let me ask you a couple of

questions.  One, this time that you testified that you saw

Mr. Jones down by the river, was that -- did that occur prior

to -- did you testify that occurred prior to the Herald Leader

story in, I think, '87?

A.   No, that was, that was before that.

Q.   Before 1987?

A.   Yeah.

Q.   And when you had seen Mr. Jones and Judge Maricle -- or

Mr. Jones in Judge Maricle's office, it was just, they were

just there as friends and you didn't -- you didn't testify

that you heard their conversation or knew what they were

talking about; is that correct?

A.   No, sir.

Q.   You just saw them there?

A.   I just saw them.  I went to see Judge Maricle about

trying to help my son get out of jail.

Q.   Okay.  You just testified to Mr. Bayer about this 2002

visit by Stanley Bowling and Mr. Jones about -- what did he

ask you to do again?

A.   Well, Wayne come to the house first and talking about the

election and wanting me to help him out.  Then so really all

he was interested in was Freddy Thompson and Ed Jordan and

1     Gayle House.  And he never named nothing about Stanley, you

2     know.  Then after that, Stanley called.  And Stanley, you

3     know, wanted me to help him.  And Stanley growed up around

4     home, my daddy knowed him, you know.  And so --

5     Q.   And this was an election where Gayle House was a

6     candidate?  Is this 2002?

7     A.   Yeah, I think so.

8     Q.   So he talked to you about Ed Jordan, Gayle House and

9     Freddy Thompson?

10    A.   Yeah.

11    Q.   And was it your testimony he just asked you to help?

12    A.   Asked me to help buy voters and get voters stuff.

13    Q.   Were you given money by anyone to buy votes?

14    A.   Yes, sir.

15    Q.   And who was that?

16    A.   Well, Stanley had bought some money to me, and I didn't

17    want to keep it.  And so Garrett Gilbert, he got it, come up

18    to the house and set, and I would buy the votes and pay for

19    them, you know, get the money from him.

20    Q.   What precinct was that?

21    A.   I don't know.  Just over at Big Creek.

22    Q.   And that was Mr. Bowling, not Mr. Jones?

23    A.   Yeah, that was Mr. Bowling.

24    Q.   Okay.

25         MR. WHITE:  Give me just a moment, Your Honor.

LAWSON - Cross (Baldani)                                    28

1            THE COURT:  Yes.

2            MR. WHITE:  I believe that's all I have.  Thank you,

3    Your Honor.  Thank you, Mr. Lawson.

4            MR. ABELL:  No questions.

5            THE COURT:  Mr. Baldani?

6            MR. BALDANI:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. BALDANI:

9    Q.  Mr. Lawson, would it be fair to say your main income was

10   growing marijuana?

11   A.  Yes, sir.

12   Q.  You weren't a political guy?

13   A.  No, sir.

14   Q.  Never really were a political person, were you?

15   A.  Not really.

16   Q.  You're mainly living on the land and growing weed and got

17   pretty darn good at it, right?

18   A.  Yes, sir.

19   Q.  And really, the only, the only reason you even dabbled in

20   politics on the side was in the event some day you needed a

21   favor or you needed protection; is that fair to say?

22   A.  Yes, sir.

23   Q.  And for that reason, you got in good with Sheriff

24   Sizemore, right?

25   A.  Yes, sir.

1   Q.   And for the same reason, you got in good with Ed Jordan,

2   right?

3   A.   I never had much to do with Ed.

4   Q.   Okay.  But the point is, you weren't interested in

5   politics for politics sake.  You just basically did it as a

6   little insurance policy; is that fair to say?

7   A.   Um-hmm.

8   Q.   All right.  And you testified about Wayne Jones and

9   Bowling approaching you in '02.  Freddy Thompson never

10  approached you in '02, did he?

11  A.   No, sir.

12  Q.   And he wasn't there when either Wayne Jones or Stanley

13  Bowling came to you?

14  A.   No, sir.

15  Q.   And you cannot tell this judge that Freddy Thompson had

16  anything to do with that behind the scenes, can you?

17  A.   No, sir.  I just only had Freddy to ask me, just like

18  anybody else, just to vote and help him.  Nothing else.

19  Q.   Did you say Freddy asked you to vote for him?

20  A.   When I seen him, he asked me to help him.

21  Q.   That's all he asked you was for the legitimate act of

22  voting?

23  A.   Yes, sir, that's it.

24  Q.   And you've asked him for something before, hadn't you?

25  His hardware store after you got out of prison?

1    A.   I might of.  I can't say for sure.  I can't say for sure

2    right now.

3    Q.   How many separate times have you been to prison?

4    A.   This is the third time.

5    Q.   And the prosecutor asked you about getting a sentence

6    reduction?

7    A.   Yes, sir.

8    Q.   And you're hopeful you might get your sentence cut down,

9    aren't you?

10   A.   Yeah.

11   Q.   Because that's happened before, hasn't it?

12   A.   In '87, I think.

13   Q.   You got a sentence cut before from 34 months to 22

14   months?

15   A.   Yes.

16   Q.   What was that all about?

17   A.   That was helping out Bill Sheets.

18   Q.   You know this process of once you get sentenced, if you

19   give some assistance to the government, then you can get your

20   sentence cut, right?

21   A.   Yeah, if you don't lie.

22   Q.   Been through it before?

23   A.   Once.

24            MR. BALDANI:  That's all.

25            THE COURT:  Mr. Gilbert.

1          MR. GILBERT:  No questions, Your Honor.

2          MS. HUGHES:  No, Your Honor.

3          THE COURT:  Mr. Simons?

4                    CROSS-EXAMINATION

5     BY MR. SIMONS:

6     Q.  Afternoon, Mr. Lawson.  Can you hear me all right?

7     A.  Yeah.

8     Q.  All right.  You've talked a great deal about drug trade,

9     you were a good grower, you grew lots of pot, you sold it.

10    You mentioned my client, Stanley Bowling.  He wasn't part of

11    any of that, was he?

12    A.  In the drugs?

13    Q.  Yes.

14    A.  No, sir.

15    Q.  Stanley didn't have a thing to do with marijuana, growing

16    it, producing it, selling it, nothing to do?

17    A.  No, sir.

18    Q.  And the government in its motion says that you developed

19    a relationship with Stanley Bowling.  You didn't even know

20    Stanley Bowling before 2002, did you?

21    A.  No, sir.

22    Q.  As a matter of fact, Stanley Bowling's daddy grew up,

23    lived down in Big Creek near where you lived, didn't he?

24    A.  Right above my daddy.

25    Q.  And if you had any relationship with Stanley Bowling, it

1    would have been his daddy.  It would not have been him?

2    A.  Yes, sir.

3    Q.  Do you remember when you first met Stanley Bowling?

4    A.  Think it was in 2002, the election.  But I stated that in

5    my question before that I did not know Stanley Bowling before

6    the election.

7    Q.  Okay.

8    A.  My daddy did.

9    Q.  So from any time up to 2002, you had absolutely no

10   relationship, no talking with, no dealing with, nothing to do

11   with Stanley Bowling?

12   A.  No, sir.

13   Q.  All right.  Now, Stanley Bowling, you said, I think you

14   said he came to you after Wayne Jones had talked to you and

15   Stanley asked for your support?

16   A.  Um-hmm.

17   Q.  Is that correct?

18   A.  Yes, sir.

19   Q.  He came by himself?

20   A.  There was somebody, I think, in the vehicle.  I'm not for

21   sure.

22   Q.  And he asked you to support him in the election, and he

23   was running for magistrate, right?

24   A.  Magistrate, yes, sir.

25   Q.  And he asked you to talk to people, talk him up.  You

1    come from a big family, don't you?

2    A.   Yeah.

3    Q.   How many Lawsons are there on Lawson Mountain?

4    A.   Quite a few.

5    Q.   There's a bunch.  A bunch of Bowlings too?

6    A.   Um-hmm.

7    Q.   Stanley would ask for your help if he was seeking office.

8    The government says there was no money that changed hands

9    until after the election.  That's true, isn't it, between you

10   and Mr. Bowling, if it happened?

11   A.   It was that night.

12   Q.   After the election?

13   A.   Yeah, at night, about 10:00.

14   Q.   So the election was over, polls were closed, right?

15   A.   Before that, I bought votes, you know.

16   Q.   Well, what I'm going to ask, was this the May election in

17   2002?

18   A.   I'm not for sure now.  I know it was 2002.

19   Q.   There were two elections.  There was a primary election

20   in May of 2002.  I want you to think about it, and I want you

21   to tell me if that's the election you're talking about.

22   A.   I think it is.

23   Q.   Well, isn't it true in that election, you actually hauled

24   votes for Junior Sparks?

25   A.   No, sir.

1    Q.   That's not true?

2    A.   No, sir.  I did not haul votes for Junior Sparks.

3    Q.   Well, Junior Sparks would have been Stanley's opponent?

4    A.   Junior Sparks was my neighbor and one of my best friends.

5    Q.   How far away did you live from Junior Sparks?

6    A.   My daddy lives just rock throw.  And I lived, at that

7    time, I was staying there at daddy's.  Same place, about,

8    pretty close to it.

9    Q.   You say Junior Sparks was your neighbor and one of your

10   very best friends?

11   A.   Yes, sir.

12   Q.   Okay.  And you didn't help him in the primary election in

13   May of 2002?

14   A.   Right.

15   Q.   That's you did not?

16   A.   No.

17   Q.   Did you vote for him?

18   A.   What?

19   Q.   Did you vote for him?

20   A.   No, sir.  I couldn't vote then.  I was on probation.

21   Q.   Okay.  Now, after Stanley Bowling was -- let me ask you

22   this.  You say Stanley gave you some money the night of the

23   election at 10:00, after the election?

24   A.   10:00 or 11:00, somewhere like that.

25   Q.   Was it cash or check?  What did he give you?

1    A.   Cash.

2    Q.   How much was it?

3    A.   500.

4    Q.   500 dollars in cash?

5    A.   Yes.

6    Q.   Now, after that, let me ask you this.  Did Stanley talk

7    to you about voting for anybody -- and just he asked you only

8    about himself.  He wanted to win, and he asked you to help

9    him.  Is that fair enough?

10   A.   What now?

11   Q.   He didn't ask you to help anybody else but him?

12   A.   Only one on the ticket was Stanley, Freddy and Ed Jordan

13   and Gayle House.  That was the only four that was interested.

14   Q.   Now, Stanley was known to support Jennings White in that

15   election.  That was a big election in 2002.

16   A.   Um-hmm.

17   Q.   You're not telling me today that Stanley tried to get you

18   to vote for Fred Thompson, are you?

19   A.   I don't think nobody helped Jennings White, to be honest

20   with you.

21   Q.   Okay.  Now, after Stanley was elected, did you make any

22   calls to him or ask any favors of him?

23   A.   Yeah.  Couple times.

24   Q.   Okay.  Didn't have anything to do with drugs, though, did

25   it?

1   A.   No, sir.  It's never had nothing to do with drugs,

2   Stanley.

3   Q.   Did you call him multiple times and ask him to put gravel

4   on personal roads for your family?

5   A.   Yes, sir.

6   Q.   In fact, did he gravel a cemetery road when you had a

7   relative die?

8   A.   My brother and my mother and sister got buried, yes.

9   Q.   And he put some gravel on that?

10  A.   Yes, sir.

11  Q.   You asked him three or four other times shortly after he

12  was elected to put gravel on your roads?

13  A.   Yes, sir.

14  Q.   And he refused every time, didn't he?

15  A.   Yep.

16  Q.   You asked him a couple times to put blacktop up on Lawson

17  Hill Road there that leads up to your family's mountain?

18  A.   No, sir, never did ask him nothing about Lawson Hill.

19  Got nothing to do with them people there.

20  Q.   There never was any new blacktop put on that road, was

21  there?

22  A.   I never did ask for nothing up there.

23  Q.   What about the fall election in 2002.  Do you remember

24  it?

25  A.   No, sir, can't really recollect it.

1    Q.   You didn't have anything to do with it, right?  Did you

2    involve yourself in the fall election of 2002, November?

3    A.   I can't say for sure.

4         MR. SMITH:  Your Honor, I'm going to object.  I

5    believe that witness obviously has asked and answered, and

6    we'd ask that the Court again, based on our understanding of

7    this hearing, to limit it to basically what we put in our

8    notice.  I acknowledge the Court has pointed out we did put

9    some substance, and I believe that's been cross-examined on.

10   This does not appear to be that.  This seems to be going much

11   beyond that.

12        THE COURT:  The witness has indicated he doesn't

13   recall.

14        MR. SIMONS:  The government's motion, Your Honor,

15   didn't specify what election in '02.

16        THE COURT:  We've got it delivered through the last

17   answer, so I'll sustain the objection.

18        MR. SIMONS:  All right.  Your Honor, I don't think I

19   have anything else.  Thank you.

20        THE COURT:  All right.  Thank you, Mr. Simons.  Let's

21   see if there's any redirect of the witness.  Mr. Smith, do you

22   have any additional questions?

23        MR. SMITH:  No.  Thank you.

24        THE COURT:  Any of the other defendants have

25   questions that were generated by some of the

1  cross-examination.  No?  All right.  Thank you, Mr. Lawson,

2  you may step down, sir.

3                    (End of excerpted proceedings)

4                              - - -

5                    C E R T I F I C A T E

6        I, LISA REED WIESMAN RDR-CRR, certify that the
   foregoing is a correct transcript from the record of
7  proceedings in the above-entitled case.

8

9   \s\ Lisa Reed Wiesman              January 25, 2010
   LISA REED WIESMAN, RDR-CRR          Date of Certification
10  Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25