United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 8, 2010 |
| DOUGLAS C. ADAMS | ) 9:00 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 5-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:     STEPHEN C. SMITH, ESQ.
                                    JASON D. PARMAN, ESQ.

On behalf of the Defendant          DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:             MARTIN S. PINALES, ESQ.
                                    CANDACE C. CROUSE, ESQ.

On behalf of the Defendant          BENNETT E. BAYER, ESQ.
Douglas C. Adams:                   R. KENT WESTBERRY, ESQ.
                                    KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant          T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant          ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant          RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                 R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant          JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant          ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant          DANIEL A. SIMONS, ESQ.
Stanley Bowling:

2

```
 1   Appearances of Counsel:

 2

 3   On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                        JASON D. PARMAN, ESQ.
 4                                      Assistant U.S. Attorneys
                                        601 Meyers Baker Road
 5                                      Suite 200
                                        London, Kentucky  40741
 6

 7   On behalf of the Defendant        DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:           107 East First Street
 8                                      Corbin, Kentucky  40701

 9                                      MARTIN S. PINALES, ESQ.
                                        CANDACE C. CROUSE, ESQ.
10                                      150 E. Fourth Street
                                        Federal Reserve Building
11                                      Cincinnati, Ohio  45202

12
     On behalf of the Defendant        R. KENT WESTBERRY, ESQ.
13   Douglas C. Adams:                 KRISTEN N. LOGAN, ESQ.
                                        220 West Main Street
14                                      Suite 1900
                                        Louisville, Kentucky  40202
15
                                        BENNETT E. BAYER, ESQ.
16                                      106 West Vine Street
                                        Suite 800
17                                      Lexington, Kentucky  40507

18
     On behalf of the Defendant        T. SCOTT WHITE, ESQ.
19   Charles Wayne Jones:              133 West Short Street
                                        Lexington, Kentucky  40507
20
     On behalf of the Defendant        ROBERT L. ABELL, ESQ.
21   William E. Stivers:               120 North Upper Street
                                        Lexington, Kentucky  40507
22

23   On behalf of the Defendant        RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:               R. TUCKER RICHARDSON III, ESQ.
24                                      300 West Short Street
                                        Lexington, Kentucky  40507
25
```

```
 1    On behalf of the Defendant      JERRY W. GILBERT, ESQ.
      William B. Morris:              212 North Second Street
 2                                    Richmond, Kentucky  40475

 3

 4    On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:                201 West Short Street
 5                                    Lexington, Kentucky  40507

 6

 7    On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
      Stanley Bowling:                116 West Main Street
 8                                    Suite 2A
                                      Richmond, Kentucky  40475
 9

10    Court Reporter:                 CYNTHIA A. OAKES, CRR
                                      Official Court Reporter
11                                    United States District Court
                                      560 Athens Boonesboro Road
12                                    Winchester, Kentucky  40391
                                      (859) 983-4346
13

14

15

16

17

18

19

20

21

22

23

24

25    Proceedings recorded by mechanical stenography,
      transcript produced by computer.
```

1           (Whereupon, the jury entered the courtroom, after which

2    the following proceedings were had in open court.)

3           THE COURT:  Thank you.  Good morning, everyone.

4           The record will reflect that all members of the jury

5    are present.  The parties and counsel are also present.

6    Mr. Roberts has returned to the witness stand.  Of course, he's

7    still under oath.

8           THE WITNESS:  Yes, sir.

9           THE COURT:  Let's see, Mr. Hoskins, I believe you

10   were examining the witness when we broke for the evening on

11   Friday.  You may continue.

12                        TODD ROBERTS,

13   being previously duly sworn, was examined and testified further

14   as follows:

15           MR. HOSKINS:  Thank you, Your Honor.

16                   CONTINUED CROSS-EXAMINATION

17   BY MR. HOSKINS:

18   Q    Mr. Roberts, do you recall when you were — the time you

19   were on duty as a police officer in Manchester in which you

20   came upon a group of people who were impaired by drugs or

21   alcohol or something and among those people was Judge Maricle's

22   daughter, Linsey?

23   A    Yes, sir, I do.

24   Q    And do you remember calling Judge Maricle that night?

25   A    Yes, sir, I do.

1  Q    And Judge Maricle came down to where you were with these

2  young people, didn't he?

3  A    Yes, sir.

4  Q    And he told you to treat Linsey --

5        MR. SMITH:  Your Honor, I'm going to object, hearsay.

6        THE COURT:  Sustained.

7  BY MR. HOSKINS:

8  Q    You arrested Linsey that night?

9  A    Yes, sir, I did.

10 Q    Judge Maricle didn't try to stop you?

11 A    No, sir.

12       MR. HOSKINS:  That's all.  Thank you.

13       THE COURT:  All right.  Thank you.

14       Mr. Westberry.

15                    CROSS-EXAMINATION

16 BY MR. WESTBERRY:

17 Q    Mr. Roberts, good morning.  My name is Kent Westberry.  I

18 don't believe we've ever met before, have we, sir?

19 A    I don't think so, no.

20 Q    I wanted to ask you a few questions, Mr. Roberts, about

21 some of your testimony late last week in the afternoon.  I

22 recall that you testified that you and Mike Bishop all competed

23 at one time for the position of chief of police there in

24 Manchester; is that correct?

25 A    That is correct.

1  Q    What year was that, Mr. Roberts?

2  A    The best of my recollection was 2005.

3  Q    Now, it seemed that in listening to your testimony that

4  you seem to create the impression from your testimony that Mike

5  Bishop rose quickly through the ranks of the police department

6  despite some issue about qualifications.  Did I hear that

7  right?

8  A    No, sir, I said that Mr. Bishop was promoted to sergeant

9  within the police department from a school police position.

10 Q    Right.  That he moved rather quickly through the police

11 department, would that be a fair —

12 A    He was actually — yes.

13 Q    Okay.  You would agree, though, Mr. Roberts, based on the

14 information that you have, that Mike Bishop is not a convicted

15 felon; correct?

16 A    No, sir, not to my knowledge.

17 Q    However, you are a convicted felon; correct?

18 A    I am now, yes, sir.

19 Q    Do you have your plea agreement there in front of you, I

20 think it was PA8 in the exhibits, Mr. Roberts.  In particular,

21 go to the second page of that document.  I wanted to ask you

22 some questions about that plea agreement.  Do you have it in

23 front of you, sir?

24 A    Yes, sir, I do.

25 Q    Now, last week when you testified to the jury,

1  Mr. Roberts, I wrote in my notes that you said your conviction

2  resulted from you dropping someone off and not telling the

3  whole story when later questioned by law enforcement.  Are my

4  notes reasonably accurate?

5  A    Yes, sir.

6  Q    However, there was quite a bit more activity that I would

7  like to ask you about that's contained in the plea agreement.

8  Now, take a look down at page two, in particular, paragraph

9  number 3(b).  Take just a look at that for just a second,

10  please, and I would like to ask you some questions.

11      That's the plea agreement, Mr. Roberts, that you signed

12  with two of your attorneys back, I believe, in 2007; correct?

13  A    Yes, sir.

14  Q    Now, you made your appearance and entered your plea in

15  front of Judge Reeves back in 2007; correct?

16  A    Yes, sir.

17  Q    There was a building owned by a man named Johnny Tyler

18  Smith there in Manchester that Mayor Daugh White wanted to

19  purchase for the construction of the new 9-1-1 facility; is

20  that correct?

21  A    That is correct.

22  Q    And from reading what's contained in the plea agreement,

23  Mr. Smith did not want to sell the building to the City of

24  Manchester despite the requests by Mayor Daugh White; correct?

25  A    That's correct.

TODD ROBERTS - CROSS - MR. WESTBERRY                        8

1   Q    Now, you were actually hired on at the police department
2   back in '96; is that correct?
3   A    Yes, sir.
4   Q    And who was the mayor at the time that you were hired on?
5   A    Daugh White.
6   Q    You had been a Daugh White supporter for a number of
7   years; is that correct?
8   A    That is correct.
9   Q    Now, after Mr. Smith informed the City of Manchester that
10  he didn't want to sell that old building to the City, you,
11  Vernon Hacker, and Bobby Joe Curry agreed to burn the house in
12  order to force the sale; correct?
13  A    Yes, sir.
14  Q    Now, Bobby Joe Curry is a longtime and rather notorious
15  drug dealer in the Clay County area; correct?
16  A    Mr. Curry had only been charged after that for selling
17  drugs.  He had a prior conviction for stealing a load of beer
18  or alcohol.
19  Q    But it was common knowledge in Clay County that he sold
20  drugs for a number of years; correct?
21  A    Yes, he did.
22  Q    And you knew that; correct?
23  A    I didn't know that he sold drugs up until after he moved
24  up on Curry Branch and Horse Creek.
25  Q    But you got in the car that night, in fact got in the

1  police cruiser with Mr. Curry and with Vernon Hacker and

2  you-all drove over to the old building owned by Mr. Smith with

3  the intent that it would be burned; correct?

4  A    Mr. Curry set fire to the building, that's correct.

5  Q    Now, this all happened June 30th of 1999; correct?

6  A    Yes, sir.

7  Q    And you and Vernon Hacker Bobby Joe Curry not to worry as

8  he could not get caught as you-all were doing what you were

9  doing out of the police cruiser; is that correct?

10 A    I think that is correct.

11 Q    Now, Vernon Hacker is a convicted felon as well; correct?

12 A    Yes, sir.

13 Q    He was a city councilman that once headed up the 9-1-1

14 program there in Clay County?

15 A    That is correct.

16 Q    And Vernon Hacker has also been a longtime supporter of

17 Mayor Daugh White as well; is that correct?

18 A    I think that to be so, yes.

19 Q    And also a supporter of Jennings White; is that correct?

20 A    That is correct.

21 Q    Jennings White and Daugh White, Daugh also goes by "Doug,"

22 they're related; is that correct?

23 A    I'm not sure.  I think they're distant related.  I can't

24 say that with certainty.

25 Q    But they're all generally what we've been referring to as

1  the White family?

2  A    That's correct, they're all Whites in Manchester, yes.

3  Q    They have been very active and controlled politics for a

4  long time prior to 2002 there in Clay County; is that correct?

5  A    Yes, sir.

6  Q    Now, back to the evening of June 30th, 1999, the three of

7  you got back into the police cruiser and drove several times

8  around the property owned by Mr. Smith; correct?

9  A    That is correct.

10 Q    Bobby Joe Curry actually got a container of gas and you

11 and Mr. Hacker then dropped him off in front of the building

12 owned by Mr. Smith; correct?

13 A    That is correct.

14 Q    Some of the other documents that I've read indicated that

15 you actually made have gotten that can of gas over at a

16 automobile dealership called Downtown Motors, did I read that

17 correctly?

18 A    That is correct.

19 Q    And about what time of night are we talking about when

20 this is happening?

21 A    Approximately 1:00 a.m. in the morning.

22 Q    Now, the first attempt by the three of you-all to burn the

23 building owned by Mr. Smith, that failed; correct?

24 A    That is correct.

25 Q    Probably not enough oxygen, there was some problems with

TODD ROBERTS - CROSS - MR. WESTBERRY                11

1  Mr. Curry starting the fire; is that correct?

2  A    I'm not sure what would cause that.  I can't speak of

3  that, but it did not work the first time.

4  Q    But you then told Mr. Curry to go back and knock out some

5  of the windows in the building in order to facilitate the fire;

6  is that correct?

7  A    Yes, that's what he done.

8  Q    All right.  And he did that under your direction; correct?

9  A    Yes.

10  Q    And then the fire started; correct?

11  A    Yes, sir.

12  Q    Did you watch Curry while he went out and set this fire?

13  A    No, sir, we dropped him off.

14  Q    You dropped him off, then you drove away; correct?

15  A    Yes, sir.

16  Q    With Hacker in the car; correct?

17  A    Yes, sir.

18  Q    And you-all are driving a police cruiser while you're

19  doing this; correct?

20  A    Yes, sir.

21  Q    That's a police cruiser owned by the Manchester City

22  Police Department; correct?

23  A    I don't know how it's licensed, but, yes, the City of

24  Manchester owns it, yes.

25  Q    Okay.  At approximately 2:30 then the next morning,

1  July 1st of 1999, the three of you came –– or at least –– yes,

2  the three of you then came back to Mr. Smith's property where

3  you saw the fire department and other members of the police

4  department arrive at the scene; is that correct?

5  A    That is correct.

6  Q    Now, you smelled gasoline at that time, didn't you,

7  Mr. Roberts?

8  A    I'm sorry?

9  Q    You smelled gasoline at that time; is that correct?

10 A    Yes.

11 Q    As a matter of fact, you actually smelled gasoline on

12 Bobby Joe Curry at that time; correct?

13 A    Yes, sir.

14 Q    And you told Mr. Curry to go ahead and get out of there

15 for fear of him being caught because of the gasoline smell on

16 his clothes and on his body; correct?

17 A    Yes, sir.

18 Q    Now, some time passed, a number of years, you were later

19 questioned about this incident by law enforcement officials;

20 correct?

21 A    Yes, sir, in 2006.

22 Q    Right.  And you didn't tell them the truth when you were

23 questioned about what happened in that arson that particular

24 night; correct?

25 A    That is correct.

1   Q    As a matter of fact, you didn't tell them that Bobby Joe

2   Curry was present that evening and had participated with the

3   three of you-all in driving over there and setting the fire,

4   when, in fact, Mr. Curry was present that evening; correct?

5   A    That is correct.

6   Q    Mr. Roberts, I think — the material I've read, I believe

7   I've read this correctly, you have owned a gun shop in

8   Manchester during the period of time; correct?

9   A    Both Manchester and London, yes, sir.

10  Q    Now, I want to ask you a question again Vernon Hacker.

11  Was there ever a time that you witnessed Vernon Hacker buying

12  handguns from Bobby Joe Curry?

13  A    Yes, sir.

14  Q    About how many handguns do you recall that he purchased

15  from Bobby Joe Curry?

16  A    What I saw was a couple of handguns that he purchased from

17  him at his car lot there in downtown Manchester.

18  Q    And you suspected that those handguns were stolen;

19  correct?

20  A    I couldn't — no, I couldn't speculate to where he'd got

21  the handguns.  He told —

22  Q    Excuse me, I don't mean to interrupt.  Go ahead, sir.

23  A    He told Mr. Hacker that he took them in on trade on a car

24  sale or a car deal.

25  Q    That's what Curry told Hacker; correct?

1  A    In my presence, on the ones that I witnessed, yes, sir,

2  that is correct.

3  Q    But the price of those handguns were really pretty low; is

4  that correct, if you remember?

5  A    I can't really recall exactly what he paid for them.  I

6  assume there was a good deal or he probably wouldn't have

7  bought them.  I mean, you know, he had a — Mr. Hacker had a

8  pawnshop hisself in downtown Manchester, him and James Phillips

9  were in partners on a pawnshop in Manchester.

10 Q    But these handguns were purchased by Hacker from the drug

11 dealer Bobby Joe Curry; correct?

12 A    That is correct.

13 Q    Was there another situation, Mr. Roberts, a number of

14 years ago where several thousand dollars was taken from the

15 forfeiture fund there in the police department for use of a

16 conference down in Gatlinburg, Tennessee?  Do you recall that?

17 A    Yes, sir, I do.

18 Q    Now, the information, if I read that correctly, you took I

19 believe approximately $2,000 out of the forfeiture fund for use

20 to a trip down in Gatlinburg, Tennessee that you and several

21 others took; is that correct?

22 A    That is correct.  We went to the U.S. Attorney's training

23 conference in Gatlinburg, Tennessee.

24 Q    Now, talking about forfeiture funds, that's money — this

25 is cash money we're talking about; correct?

1  A    That is cash money that has been seized on a raid or

2  arrest that has been forfeited to the police department, yes,

3  sir.

4  Q    Now, did you go and use any -- or did you get permission

5  to take any of that money from any court of proper jurisdiction

6  prior to you-all doing that?

7  A    No, sir, I didn't need authority from the court because it

8  had already been forfeited to the police department, and

9  training purposes is one of the expendable uses for that money

10 according to the statute.

11 Q    Were you ever familiar with a night vision scope that

12 turned up later in connection with a police investigation?

13 A    I'm sorry?

14 Q    A night vision scope.  Are you familiar with a night

15 vision scope that may have been used in a pretty rough crime

16 that occurred down in Clay County a number of years ago?

17 A    No, sir, I am not.

18 Q    You testified last week regarding Vernon Hacker.  My notes

19 indicate that you testified that Mr. Hacker split his time

20 between the board of education and with city government; is

21 that correct?

22 A    Mr. Hacker was the 9-1-1 coordinator there in Manchester

23 which oversees the emergency dispatch, and then he was also a

24 school bus driver.  So he would leave of the mornings to make

25 his bus run -- or I guess he would actually make the bus run

1  before his job started at the 9-1-1, but he would leave during

2  the day of the evening to go make the evening run.

3  Q    Now, he was hired on as 9-1-1 coordinator by Mayor Daugh

4  White when White was the mayor; correct?

5  A    Mayor White was the mayor, but there is an independent

6  board made up of law enforcement officers, the county judge and

7  the mayor and various representatives of the government there

8  that actually hired Mr. Hacker and hires the dispatchers.

9  Q    But Mayor Daugh White was the mayor of the City of

10 Manchester at the time that Hacker got hired on as the 9-1-1

11 coordinator?

12 A    Yes, sir, and he did sit on the board.

13 Q    Yes, sir.  And going back to his job as school bus driver

14 that you testified to just a moment ago, Mr. Hacker had been

15 driving a school bus for a number of years to the best of your

16 knowledge; is that correct?

17 A    That is correct.

18 Q    As a matter of fact, he was actually hired on as school

19 bus driver before Doug Adams became superintendent of schools

20 in 1999; correct?

21 A    I want to think that's right.  I can't say for a

22 certainty, but he had been driving awhile.  So I assume you're

23 right.

24 Q    Can you tell the jury who was the superintendent of

25 schools before Doug White?

TODD ROBERTS - CROSS - MR. WESTBERRY                    17

1   A    Before Doug White?

2   Q    Or, excuse me, Doug Adams.  I had a momentary lapse.

3   A    Charles White.

4   Q    White?  Charles White?

5   A    Yes, sir.

6   Q    Do — Mr. Roberts, do you know Melanda Adams of Clay

7   County?

8   A    Yes, sir, I do.

9   Q    Do you know Melanda Adams to be the daughter of Doug and

10  Laura Adams there in Clay County?

11  A    Yes, sir, I do.

12  Q    That's the same Doug Adams that's with us here in the

13  courtroom today; is that correct?

14  A    Yes, sir, is it.

15  Q    And her mother, Laura Adams, has taught school for many

16  years in Clay County as well; is that your understanding?

17  A    I think you're correct, yes, sir.

18  Q    Mr. Roberts, was there ever a time when you still served

19  as police officer there in Manchester that you and perhaps a

20  few others had to go out and pick Melanda Adams up and bring

21  her in?  Do you recall an incident?

22  A    Yes, sir, I do.

23  Q    Now, Doug and Laura Adams had actually requested that the

24  city police department go and pick their daughter up; is that

25  your understanding?

1  A    The call that I got, Mr. Westberry, was from Mike Bishop,

2  who at the time was with Mr. Adams and his — Mike Bishop's

3  father, Paul Bishop, and his request to me was that she was

4  down there with Johnny Bishop, I recall to be his name, and

5  that there had been a prior incident where he had mistreated

6  her and abused her while she was there in his presence and that

7  he wanted to know if I would come out and help them, that he

8  was afraid Mr. Adams might do something drastic, and I told

9  him, no, that I would — I would come and see what I could do.

10 Q    What kind of condition was Melanda Adams in, if you

11 recall, when you went to pick her up?

12 A    I mean, she had a drug addiction problem and she was at

13 the residence of a known drug dealer.

14 Q    Well, Johnny Bishop was a known drug dealer; is that

15 correct?

16 A    Yes, sir, that is correct.

17 Q    And you would agree that it was reasonable that Mr. and

18 Mrs. Adams would be concerned about their daughter's welfare;

19 correct?

20 A    Yes, sir.

21 Q    I believe Melanda was pretty young at the time that this

22 happened; correct?

23 A    I would say she was in her 20s.  I don't know exactly her

24 exact age at the time, but, yes, she was.

25 Q    Early twenties?

1  A    Yes, sir.

2  Q    Do you recall whether or not before you took Melanda Adams

3  in, did you take her to the hospital?

4  A    I didn't take her.  I directed her to be took because I

5  wanted to make sure she was okay.

6  Q    Right.  And she was taken to the hospital and checked out?

7  A    Yes, sir, she was.

8        MR. SMITH:  Your Honor, I'm going to object to the

9  relevancy of this line of questions.

10        THE COURT:  All right.

11        I'm not sure of the relevance.  You may need to come

12  up, Counsel.

13        MR. WESTBERRY:  I'm about to move on, if that helps.

14        THE COURT:  That will be fine.

15        MR. WESTBERRY:  Thank you.

16        THE COURT:  Yes, sir.

17  BY MR. HOSKINS:

18  Q    After the trip to the hospital with Melanda Adams, was she

19  then taken to jail, if you know?

20  A    I can't answer that with certainty.  I don't remember

21  exactly what the final disposition was with her.  But I'm

22  thinking that she maybe was in hopes of trying to get her into

23  some kind of treatment program.

24  Q    And did she ultimately get into a treatment program?

25  A    Yes, sir, I think so.

1  Q    How is she doing now?

2         MR. SMITH:  Your Honor, again, I would object to

3  relevancy.

4         THE COURT:  I'll sustain the objection.

5  BY MR. WESTBERRY:

6  Q    Are you familiar with a program called UNITE there in Clay

7  County?

8  A    Yes, sir, I am.

9  Q    What is UNITE?

10 A    It is a — it's got various different components to it.

11 It's a law enforcement division, and then there's also a

12 rehabilitation part of it, and then there's also an education

13 part of it that was started by Congressman Hal Rogers in his

14 counties, and there is a Drug Task Force that's part of it.  So

15 there's three different components of it, education,

16 rehabilitation, and law enforcement.

17 Q    It's kind of a community-based program to fight drugs in

18 Clay County; is that correct?

19 A    That is correct.

20 Q    Do you know if any members of the Adams family have ever

21 been active in UNITE?

22        MR. SMITH:  Your Honor, I'm going to object, again,

23 to relevance.

24        MR. WESTBERRY:  Judge, I would be happy to approach.

25        THE COURT:  All right.  Come on up, Counsel.

1        (Whereupon, the following discussion was had between the

2   Court and counsel at the bench, out of the hearing of the

3   jury.)

4              THE COURT:  I don't see the relevance, Mr. Westberry.

5              MR. WESTBERRY:  The government has tried to paint a

6   very broad brush, Judge Reeves, regarding drug activity in Clay

7   County.  In particular with Mr. Adams, over our objection, they

8   mentioned an Oscar Hubbard, who is a brother-in-law of

9   Mr. Adams and a known drug dealer.  The reason that Mr. Adams

10  wanted the White faction, which would include Jennings White

11  and all of the others associated with him, out of power in Clay

12  County is linked directly to the drug activity of his daughter.

13  And that's the theory that we're trying to advance.  Melanda

14  Adams has been active in UNITE since she's been free of her

15  drug addiction for a number of years.  I think this is directly

16  relevant to why Doug Adams and other members of his family

17  oppose the Jennings White's control of local government up to

18  the 2002 election, and that's the relevance that we're offering

19  it for.

20             THE COURT:  All right.

21             MR. SMITH:  Your Honor, I'm not sure, but my

22  understanding of the timeline is Melanda Adams' drug issues and

23  later treatment occurred after Jennings White was defeated in

24  2002.  So for him to then go back and try to argue that -- I

25  mean, there was no factions.  Jennings White was defeated after

1    2002.  So now he's wanting to bring up things that happened in

2    '04 basically, is when UNITE came into town, and '05 and '06.

3    I fail to see how it's relevant to try to make that the motive

4    for rigging elections.

5            MR. WESTBERRY:  If I may very briefly respond.  The

6    drug addiction problem with Melanda Adams occurred before 2002.

7    It was a problem that actually occurred when she was in high

8    school.  She's been drug-free, as we said in our opening

9    statement, for about eight years if I recall correctly.  But,

10   again, I think the Court has an idea what the relevance is as

11   to the kind of argument we're offering.

12           THE COURT:  I'm going to allow you to go into this a

13   little bit, but if you go too far into it, I'll need to

14   instruct the jury that this is not an issue for their

15   consideration.  And if you go too far, it's going to do more

16   harm than good --

17           MR. WESTBERRY:  I understand.

18           THE COURT:  -- as far as your argument is concerned.

19           MR. WESTBERRY:  I understand.

20           THE COURT:  If you want to lay the factual predicate,

21   you can certainly -- I'll let you do it through this witness,

22   if he knows.

23           MR. WESTBERRY:  If he knows.

24           THE COURT:  It sounds like he's running out of

25   information on some of this.  So I'll allow you to go a little

1   bit further on this —

2          MR. WESTBERRY:  I can tell the Court the next

3   question that I was going to ask — and, quite frankly, I don't

4   know if this witness knows, he's been incarcerated, we have no

5   way to interview him, is if he knows whether or not Melanda

6   Adams has been active in UNITE.  He may or may not know that.

7   If he knows it, fine, I'll probably stop there; if he doesn't

8   know it, obviously I'll just have to move on.

9          THE COURT:  I'll allow you to ask the question, but I

10  think to go beyond that would get outside areas of relevance,

11  so at that point I would sustain the objection.

12         MR. WESTBERRY:  Yes, sir.

13         MR. SMITH:  Your Honor, while we're here, this hasn't

14  happened for some time, Mr. Westberry has been several times

15  this morning saying, I've been reading from these documents and

16  I remember in these documents when I read from that you were

17  involved in X, Y, and Z.  And those kinds of testimonial

18  questions, number one, I believe are relating to 302s; and

19  number two is I don't see that as being a proper question in

20  the way — of course, he's laying it out for the jury.  And so

21  I'm just going to —

22         MR. WESTBERRY:  That's fair.

23         THE COURT:  Some of those were from the plea

24  agreement —

25         MR. WESTBERRY:  Right.

1          THE COURT:  -- which is in evidence.  But to the

2   extent that it's outside the scope of the plea agreement,

3   Counsel, please, avoid that type of questioning.

4          MR. WESTBERRY:  That's fair.  I will.

5          THE COURT:  All right.  Thank you.

6      (Whereupon, the following proceedings continued in open

7   court.)

8          THE COURT:  All right.  Thank you, Counsel.

9          You may continue.

10  BY MR. WESTBERRY:

11  Q    I had asked you to speak with the jury about some

12  questions about this organization called UNITE just before our

13  break a second ago.  Do you recall that, Mr. Roberts?

14  A    Yes, sir, I do.

15  Q    Would you describe to the jury just basically what UNITE

16  was in Clay County?

17  A    Yes, sir.

18  Q    It's kind of a community-based anti-drug organization, for

19  lack of a better term?

20  A    It has community involvement.  I don't know that it's

21  actually community based.  It has community involvement, but

22  it's --

23  Q    My question is this:  Do you know if Melanda Adams has

24  been active in UNITE?

25  A    Yes, sir, I think so.  I'm pretty sure I've attended some

1  speakings that she's given on behalf of UNITE.

2  Q    Thank you, I appreciate that.

3       During your testimony, Mr. Roberts, and including the

4  testimony from the others that we've heard, we have heard that

5  Jennings White and many others that he is related to had been

6  very politically powerful people in Clay County for a number of

7  years prior to 2002.  Would that be a fair statement in your

8  mind?

9  A    They have been political office holders, yes.

10 Q    Do you know where Jennings White is now?

11 A    Not for certain, no, I don't.

12 Q    But you know that he's been convicted of a federal —

13 criminal felony offense involving drugs; correct?

14 A    That is correct, yes, sir.

15 Q    Mayor Daugh White, who was your mayor when you worked in

16 the police department, has also been convicted of federal

17 felony charges involving corruption; correct?

18 A    That is correct.

19 Q    And he's serving a prison sentence somewhere as well;

20 correct?

21 A    That is correct.

22 Q    Now, his son, Kennon White, who I believe ran for jailer

23 back a number of years ago, has also pled guilty to federal

24 criminal felony offenses and is awaiting sentencing as well.

25 Is that your understanding?

1  A    Yes, sir.

2  Q    And there are other family members of — is there a fellow

3  named Phillips that is related at least by marriage to the

4  White family who has been active in Clay County politics as

5  well?

6  A    Yes, sir.

7  Q    Who is that, please?

8  A    James Phillips.

9  Q    And Barbara White Colter is a relative of them by

10 marriage, is that — is a relative, I believe a sister, of

11 Daugh White; is that correct?

12 A    That is correct.

13 Q    Would you agree, Mr. Roberts, that many people in Clay

14 County thought that it was a good thing that Jennings White and

15 many of his supporters were finally out of office?

16        MR. SMITH:  Your Honor, I'm going to object to the

17 question.

18        THE COURT:  I'll sustain the objection.

19 BY MR. WESTBERRY:

20 Q    Don't you agree, or would you not agree, that it's

21 probably a good thing that you did not get promoted chief of

22 police?

23 A    I'm sorry?

24        MR. SMITH:  I'm going to object as to the relevance.

25        THE COURT:  Sustained.  Sustained as to relevance.

1          MR. WESTBERRY:  Could I have just one second, please?

2          THE COURT:  Yes, sir, you may.

3          MR. WESTBERRY:  That's all I have of this witness.

4      Thank you, Mr. Roberts.

5          THE WITNESS:  Thank you.

6          THE COURT:  Thank you, Mr. Westberry.

7      Let's see, Mr. White, I believe we're up to you.

8          MR. WHITE:  Your Honor, I just have one or two very

9  brief ones.  If I could just ask from here?

10         THE COURT:  That will be fine, yes, sir.

11                         CROSS-EXAMINATION

12 BY MR. WHITE:

13 Q    Good morning, sir.  During your testimony on Friday we saw

14 a lot of pictures.  A few times you said the fellow -- the

15 short fellow in the hat is Charles Wayne Jones, and then

16 corrected yourself to say Charles Wayne Marcum.  Is that your

17 recollection?

18 A    That is correct.

19 Q    In other words, Charles Wayne Jones wasn't in any of those

20 photographs, was he?

21 A    No, sir.  That was my fault, I'm sorry.

22         MR. WHITE:  That's okay, I just wanted to clear it

23 up.

24      Thank you, Your Honor, that's all I have.

25         THE COURT:  All right.  Thank you.

```
1              Mr. Abell?

2              MR. ABELL:  Judge, I do have a few questions.

3              THE COURT:  Yes, sir.

4                         CROSS-EXAMINATION

5    BY MR. ABELL:

6    Q    Mr. Roberts, my name is Robert Abell, and I represent Bill

7    Stivers.

8         There is a newspaper in Manchester called The Manchester

9    Enterprise; correct?

10   A    Yes, sir.

11   Q    Do you know if published in The Manchester Enterprise are

12   the lists of the election officers?

13   A    I think so.  I'm not sure.  I think you're correct.

14   Q    And in addition to being published in the newspaper, would

15   you agree that the list of election officers are public

16   documents that anybody that wants to review and inspect can do

17   so when they want to?

18   A    Yes, sir.

19   Q    On primary day in 2002, did you spend any time with

20   Jennings White?

21   A    I seen Mr. White on a couple of occasions, but, no, as far

22   as spending time with him, no, sir.

23   Q    You did not drive in a car around the town and county with

24   Jennings White on primary election day in 2002?

25   A    No, sir.
```

1  Q    I want to ask you about Mr. Stivers' arrest.  That day --

2  first of all, it took place around the primary election in

3  2002?

4  A    No, sir, you're incorrect.  It took place in November,

5  which was the general election.

6  Q    And the significant race, you told us the other day, in

7  November of 2002 was the school board race?

8  A    I'm sorry?

9  Q    The significant race in November 2002 was the school board

10  race?

11  A    That is correct.

12  Q    And one of the candidates for the school board was your

13  friend, Charles "Dobber" Weaver?

14  A    That is correct.

15  Q    On the morning of Mr. Stivers' arrest, you arrived at the

16  Clerk's Office about 7:00 or 7:30?

17  A    Whatever time they opened up.  I don't think it was that

18  early.  It may have been that early, 7:30, 8:00, somewhere in

19  there.

20  Q    Okay.  And you were in the company of two Manchester

21  police officers; correct?

22  A    That is correct.

23  Q    One was Jeff Culver?

24  A    That is correct.

25  Q    Jeff Culver is now, in fact, the chief of the Manchester

1   Police Department?

2   A    Yes.

3   Q    The other Manchester police officer that you were with was

4   Kelly Johnson?

5   A    That is correct.

6   Q    You carried with you that day a copy of an election law

7   handbook?

8   A    That is correct.

9   Q    And when you got to the Clerk's Office, you saw

10  Mr. Stivers there?

11  A    Yes, sir, outside.

12  Q    You had known Mr. Stivers for some time before that?

13  A    Yes, I've had many run-ins with Mr. Stivers professionally

14  and personally.

15  Q    And you knew Mr. Stivers to have been a strong supporter

16  of Freddy Thompson against Jennings White back in May during

17  the primary election; correct?

18  A    That is correct.

19  Q    And at the Clerk's Office on this day when Mr. Stivers was

20  arrested, you had about a 10- to 15-minute discussion with

21  Mr. Stivers?

22  A    Yes, sir, outside.

23  Q    Okay.  And that discussion with Mr. Stivers regarded

24  whether or not a family member of a candidate could serve as an

25  election officer?

1    A    I think that to be correct, yes.

2    Q    Okay.  And in particular, the discussion focused on Homer

3    or Pauline Weaver who were the parents of Dobber Weaver;

4    correct?

5    A    That is correct.

6    Q    And Mr. Stivers was protesting that they, the parents of

7    Dobber Weaver, candidate for school board, were serving as

8    election officers?

9    A    He was —— yes, he was talking about it.

10   Q    Pauline and Homer Weaver, Dobber Weaver's parents, had

11   been appointed as election officers by Jennings White?

12   A    It's my understanding they were appointed deputy county

13   court clerks to serve in that capacity at the precinct.

14   Q    So Pauline and Homer Weaver were serving and functioning

15   as election officers in a race where their son was a candidate?

16   A    That is correct.

17   Q    And Mr. Stivers told you during his discussion, if you

18   recall, that Kentucky law ——

19          MR. SMITH:  Your Honor, I'm going to object to the

20   hearsay.

21          MR. ABELL:  Okay.

22   BY MR. ABELL:

23   Q    Did you learn that day after reviewing your election law

24   handbook printouts that, indeed, Kentucky law prohibited family

25   members from serving, as were Mr. and Mrs. Weaver, as election

1  officers?

2  A    I'm not sure as to the law on that, no, sir, I can't

3  answer that.

4  Q    Okay.  During your 10- or 15-minute discussion with

5  Mr. Stivers, there was nothing that made you suspect he was

6  under the influence of alcohol?

7  A    Mr. Stivers was outside.  It was cold that morning and, I

8  mean, we were not right up close to each other, but I did not

9  detect nothing when I was outside speaking to Mr. Stivers.

10  Q    And, in fact, you had no suspicion that he was

11  intoxicated?

12  A    Not until their altercation happened inside the Clerk's

13  Office.

14  Q    Okay.  You're referring to a nose-to-nose confrontation,

15  discussion, between Mr. Stivers and Jennings White?

16  A    That is correct.

17  Q    And at the conclusion of that confrontation, Jennings

18  White told you he believed Mr. Stivers was intoxicated?

19  A    That is correct.

20  Q    Someone did some type of breath test on Mr. Stivers at the

21  location; is that correct?

22  A    Kelly Johnson.

23  Q    But you never, in fact, saw the results of that breath

24  test, did you?

25  A    No, sir, I relied on the information he gave me.

TODD ROBERT CROSS - MR. ABELL                    33

1  Q    And Mr. Stivers was charged with public intoxication?

2  A    No, sir, I believe he was charged with alcohol

3  intoxication.

4  Q    Which requires that he be manifestly, obviously, and

5  flagrantly under the influence of alcohol?

6  A    I think the statute reads something like that, yes, sir.

7  Q    And you directed that he be arrested?

8  A    Not at first.  I actually told him he needed to go home

9  and sober up and then come back, and he called his brother,

10 Charles, to come down there.  And Charles had pulled up

11 outside.  And when his brother pulled up, then Mr. Stivers

12 begin to get very cocky and so forth, and he said, "No, if

13 that's what you're going to do, just arrest me."

14 Q    And, in fact, you did direct that he be arrested?

15 A    Yes, sir, he was arrested for AI, and then once he got

16 outside the Clerk's Office, then he made threats toward us and

17 then he was charged with an additional charge of terroristic

18 threatening.

19 Q    Following his arrest, Mr. Stivers requested that a blood

20 test be administered on him?

21 A    I'm not sure what he done after that.  I know that he did

22 seek a blood test later that was in the court proceedings.

23 Q    Well, in fact, you had a subpoena issued to the hospital

24 for the records of his blood test; correct?

25 A    That is correct.

1  Q    And those results were presented to the Court during the

2  proceedings you just referred to?

3  A    That is correct.

4  Q    And the blood test results showed no alcohol in

5  Mr. Stivers' system?

6  A    The best I remember, it was — ever how the hospital

7  measures it, it showed a six or something that was on the range

8  for measuring alcohol.  As far as converting that over in their

9  conversion as into our conversion as far as alcohol being

10 admissible, as far as the measurements we use, I don't know how

11 that takes place, so —

12 Q    A hearing was held in Clay District Court?

13 A    Yes, sir.

14 Q    You testified at the hearing?

15 A    That is correct.

16 Q    Jeff Culver testified?

17 A    That is correct.

18 Q    Jeff Culver testified that Mr. Stivers was not intoxicated

19 when he was arrested?

20 A    That is correct.

21 Q    Kelly Johnson testified?

22 A    That is correct.

23 Q    Kelly Johnson also testified that Mr. Stivers was not

24 intoxicated when he was arrested?

25 A    That is correct.

1    Q    And as a result of that overwhelming evidence, the charges

2    against Mr. Stivers were dismissed?

3    A    The charges were dismissed?  Yes.

4    Q    Later, you were sued for false arrest by Mr. Stivers?

5    A    That is correct.

6    Q    Because of an —— And not only you, but the City of

7    Manchester was named in that lawsuit; correct?

8    A    I personally and the City, yes, sir.

9    Q    And the City had an insurance policy through the Kentucky

10   League of Cities to provide, among other things, a lawyer to

11   represent you and the City in the lawsuit; correct?

12   A    That is correct.

13   Q    And the insurance company selected the lawyer that

14   represented you?

15   A    That is correct.

16   Q    And they selected a law firm out of London?

17   A    Mr. Bill Tooms.

18   Q    Out of London?

19   A    Yes, sir.

20   Q    Okay.  Not Clay County lawyers?

21   A    No, sir, I was ——

22   Q    And in this lawsuit, testimony was given under oath by

23   yourself and others?

24   A    Yes, sir, there was testimony in criminal court and then

25   there was depositions given later as to the civil proceedings.

1  Q    Depositions are testimony under oath, not in a courtroom,

2  but in the same type of format that we have right here; right?

3  A    That is correct, you're sworn to tell the truth.

4  Q    You testified in a deposition?

5  A    I did.

6  Q    Mr. Stivers testified in a deposition?

7  A    Yes, sir, he did.

8  Q    And a number of other people testified in a deposition?

9  A    I don't know about that.  I remember me and him being

10 there and giving depositions.  I don't know who else give a

11 deposition.

12 Q    And ultimately the insurance company decided to settle

13 that lawsuit?

14 A    Yes, sir.

15 Q    That was a lawsuit negotiated by the insurance company's

16 lawyers and I guess also Mr. Stivers?

17 A    That is correct.

18 Q    And as a result of that settlement, a sum of money, about

19 $70,000, was paid to Mr. Stivers?

20          MR. SMITH:  Your Honor, I'm going to object.

21          THE COURT:  I'll sustain the objection to the last

22 question.

23 BY MR. ABELL:

24 Q    But in any event, following the settlement reached between

25 the insurance company's lawyers on your behalf and on behalf of

1    the City of Manchester, the case — a dismissal order that we

2    saw Friday was entered in Clay Circuit Court; correct?

3    A    That is correct.

4            MR. ABELL:  Nothing further, Judge.

5            THE COURT:  All right.  Thank you.

6            Mr. Baldani.

7            MR. BALDANI:  Thank you, Your Honor.

8                        CROSS—EXAMINATION

9    BY MR. BALDANI:

10   Q    Mr. Roberts, do you recall your direct testimony from last

11   Friday?

12   A    Yes, sir.

13   Q    Do you recall the prosecutor asking you about friends of

14   Judge Maricle, who was his friends, who did he associate with,

15   who came to his chambers or his office?  Do you recall that?

16   A    I don't know that he asked me about coming to the

17   chambers.  He asked me who was friends of Judge Maricle's.

18   Q    Right.  Well, I want to ask you about some of your friends

19   today.  And I'm going to try not to rehash what Mr. Westberry

20   went through about where these people are now, but the fact of

21   the matter is Jennings White was your friend; correct?

22   A    Yes, sir.

23   Q    And his — and the Mayor Doug White was your friend; is

24   that correct?

25   A    That's correct.

TODD ROBERTS - CROSS - MR. BALDANI                    38

1  Q    And the mayor's son, Kennon White, was your friend;
2  correct?
3  A    I couldn't answer that to be correct, no, sir.
4  Q    Okay.  Let me ask you about Bobby Joe Curry, the person
5  that's been called a notorious drug dealer.  Was he your
6  friend?
7  A    As I stated earlier, Mr. Curry was an informant.  In the
8  law enforcement business you have to build a rapport with
9  people a lot of times that probably ain't reputable people, but
10 that's just the basis of what it is.  I mean, you can't get
11 Sunday School people to give you — or Sunday School teachers
12 to give you information on drug dealers or make drug buys.
13 Q    Well, we all agree with that.  So this riding in a limo to
14 strip joints, is that part of the rapport you're talking about?
15 A    I've never been to a strip joint in a limo with Mr. Curry.
16 I have been to strip clubs, but I've never been with Mr. Curry.
17 Q    Never been to one with Mr. Curry?
18 A    No, sir.
19 Q    Now, you say he was an informant of yours, so I presume
20 that you would be able to or the police department should be
21 able to provide his file that is kept on confidential
22 informants, is that a reasonable assumption?
23 A    No, sir, we didn't keep files on confidential informants.
24 We were a small police department, but that was a policy that
25 was there when I came there.  But, yes, there is documentation

1  to support the fact that he was an informant for me on several

2  occasions with Special Agent Larry Brock of the ATF.  We went

3  out and interviewed Mr. Curry in a couple of federal cases, one

4  being Gayle Roberts, which there was a conviction for in the

5  Eastern District U.S. Court in London.

6  Q    Can you produce any of this documentation, Mr. Roberts?

7  A    Mr. Brock has that information.  During my criminal

8  proceedings, he —

9  Q    So your testimony is when you sign up an informant in this

10 small police department, there's no kind of written agreement;

11 in other words, the informant, who you said, we don't get

12 Sunday School people, so the informant, you don't sign — have

13 them sign a paper acknowledging I won't use drugs, I won't do

14 this, I won't do that, there's no paperwork whatsoever in the

15 Manchester PD about Curry being an informant; is that correct?

16 A    No, sir.  What we do is, when we get ready to make a buy

17 on the tape, we stipulate that these people are not intoxicated

18 or doesn't have any drugs on their presence or so forth, once

19 we start the tape to make the initial buys.  But like I said,

20 there was no policy concerning registering informants at the

21 police department.

22 Q    You testified that you were present when Vernon Hacker

23 bought at least a couple of guns from Curry; correct?

24 A    Yes, sir.

25 Q    How many guns did you buy from Curry?

1  A    I never bought no guns from Mr. Curry.  Mr. Curry brought

2  a gentleman to my pawnshop one day in Manchester that had a

3  single—barreled shotgun wanting to sell it to me, and it was

4  worth probably $30.  I told him I wasn't interested.  But as

5  far as buying guns off of Mr. Curry, I've never bought a gun

6  off of Mr. Curry.

7  Q    Your two gun shops, you would sell guns to the city police

8  department; right?

9  A    I think the city police department has bought guns at my

10  store in London.  I don't know that — they may have bought one

11  in Manchester, but that was a pawnshop in Manchester that I

12  had, but we did sell new guns there.

13  Q    All right.  How many times other than during execution of

14  search warrants were you at Curry's house?

15  A    Twice.

16  Q    Twice?  That didn't have anything to do with a search

17  warrant; correct?

18  A    You said during search warrants, how many —

19  Q    I meant to say aside from execution of search warrants,

20  how many times were you at Curry's house?

21  A    Oh, it was numerous times, but I couldn't give you a

22  specific number of times.  I mean, I never — I don't have no

23  records to reflect.  But I've been there on several occasions,

24  yes.

25  Q    While people were using and buying drugs?

1   A    No, sir.

2   Q    What were you there for?

3   A    Mr. Curry would call and ask that I stop by or he would

4   call the dispatch and have them radio me to come by, that he

5   needed to talk to me.  He would provide information or

6   sometimes he would just want to talk, but that was the basis.

7   Q    Okay.  So then it wasn't always for legit police business,

8   then, was it?

9   A    No, sir, not a hundred percent.

10  Q    All right.  And this is you in your role as a police

11  officer and him as a so-called notorious drug dealer in the

12  county, you're at his house for nonbusiness reasons; correct?

13  A    Mr. Curry was selling drugs on Curry Branch.  I've never

14  been, except on official business, to his residence on Curry

15  Branch.  He lived on Kentucky 80 during the time that I used

16  him as an informant.  I have been at that residence.  But when

17  he moved to Curry Branch, the only time that I was ever at that

18  residence was the execution of those two search warrants.

19  Q    How many people to your knowledge have overdosed at

20  Curry's place?

21  A    I'm sorry?

22  Q    How many people have overdosed to your knowledge at

23  Curry's place on drugs?

24  A    I think two, the best I remember.

25  Q    Okay.  And how many times did Curry -- Well, we heard

1  about Curry in your police cruiser the night that the building
2  was burned down.  How many times other than that has Curry
3  ridden with you in your cruiser?
4  A    Probably two, maybe three, other occasions.
5  Q    Okay.  You recall talking to the FBI on at least a couple
6  of occasions; correct?
7  A    I'm sorry?
8  Q    Do you recall talking to the FBI on at least a couple of
9  occasions?
10 A    I talked to the FBI all the time.  What are you referring
11 to?
12 Q    I'm referring to the question I just asked you about, how
13 many times Curry rode in your police cruiser.
14 A    Just what I told you, the best of my recollection.
15 Q    All right.  I'm going to shift over a little bit to the
16 '02 election, and we went through all those photographs that
17 you took in '02; right?
18 A    That is correct.
19 Q    And you said that that was kind of prompted by complaints
20 and the Attorney General Office asking you to look into some of
21 these irregularities in '02; is that fair to say?
22 A    No, sir, my testimony was, is I took those photographs
23 after consulting with Special Agent Carl Johnson of the FBI.
24 But during election day in 2002, I was in my vehicle with the
25 Attorney General's Office and then several agents there, field

1  agents, and I accompanied them on different locations.  They

2  would ask me to point out people's houses or show them where

3  such-and-such lived or where an area of the county was.

4  Q    Well, I guess I misspoke.  The photos were not from

5  election day, they were in the days leading up when the

6  absentee vote was going on; right?

7  A    That is correct.

8  Q    And would you agree with me that the main person in those

9  photos is Charles Marcum?

10 A    He was --

11 Q    Or that most of the photos were either of Marcum or Marcum

12 family and supporters?

13 A    He was in the majority of them, yes.

14 Q    All right.  And Marcum was running for jailer; right?

15 A    That is correct.

16 Q    And he's running for jailer against Kennon White; right?

17 A    That is correct.

18 Q    So the photos -- all these photos that you took were of a

19 guy that's running against the guy that you supported; right?

20 A    The pictures were of Mr. Marcum, and, yes, I was not for

21 Mr. Marcum in the election, but there was also photographs of

22 people on both sides.

23 Q    Not a single photograph with Freddy Thompson in there, was

24 there?

25 A    Not that I recall, no.

1  Q    Now, basically you testified that you — between the

2  photos and your other activities, you basically were

3  investigating voting irregularities in '02; correct?

4  A    There was incidents of voter irregularities that I

5  reported to the FBI, that is correct.

6  Q    But the fact of the matter is that at the very same time

7  you were handling money for vote buying while you were a police

8  officer, while you're doing this investigation, weren't you?

9  A    I was what?

10 Q    Handling money for vote buying?

11 A    No, sir, I never handled no money.

12 Q    All right.  During '02, did Kennon White and Jennings

13 White give you $2,000 to give to Tommy Butler to buy votes?

14 A    That was given to Mr. Vernon Hacker.  I don't know that

15 there was a specification or whatever to buy votes, but

16 Mr. Hacker was with me and asked me if I would take him to

17 Mr. Butler's house.

18 Q    All right.  Explain that to me again.

19 A    The money was given — and I'm not sure exactly, you know,

20 what for.  You know, there was no conversation in my presence

21 when Mr. Hacker had that conversation with Mr. Butner.  He got

22 out of my vehicle.

23 Q    We've already discussed the fact that you — you've had

24 two sitdown meetings with the FBI.  I'm not talking about you

25 in your investigator or police officer role, I'm talking about

1  you in your criminal defendant role; okay?  Do you recall

2  having two separate sitdown, what we call, proffers with the

3  FBI, with the Assistant United States Attorney, perhaps with

4  your attorney?

5  A    Yes, sir.

6  Q    All right.  Do you recall one of them occurring on

7  August 21st of '07?

8  A    Yes, sir.

9         MR. BALDANI:  All right.

10        Judge, if I could ask — I'm referring to the report

11 of August 21st, '07, page seven.  If I could ask the CSO to

12 show this to the witness and see if it refreshes his memory?

13        THE COURT:  I don't think he's indicated that his

14 memory needs to be refreshed to this point.  I haven't heard

15 him say that he doesn't recall any of those meetings, so, no.

16        MR. BALDANI:  Okay.

17 BY MR. BALDANI:

18 Q    Mr. Roberts, did Kennon White and Jennings White give you

19 $2,000 to give to Tommy Butler to buy votes?

20 A    Sir, I was with Vernon Hacker, me and Vernon Hacker was

21 together.  There was money given, yes.  Mr. Hacker give that

22 money to Tommy Butler.  What the discussion was about it, I

23 don't know to the extent whether it was to haul voters or buy

24 voters.  I'm not denying or agreeing with what you're saying,

25 I'm just telling you what I know about it.

1  Q    Okay.  So the bottom line is there's a wad of money,

2  $2,000, given in your presence to Mr. Hacker for some purpose

3  relating to voting.  Are you agreeing with that?

4  A    Yes, sir, there was money that exchanged hands, yes, sir.

5  Q    Now, let me ask you further.  Tell us about the meeting

6  that you and Jennings White had with Edd Jordan at the time of

7  the '02 election.

8  A    Are you talking about -- you're talking about the one I

9  testified to Friday?

10 Q    Yeah.  Do you recall being in a pickup truck with Jennings

11 White and Edd Jordan meeting up with you guys?

12 A    I testified to that Friday.  That was at Patty's

13 Restaurant.  Edd Jordan and Jennings White were there with

14 Eugene "Moose" Stewart.  At that time, they asked if I would be

15 in agreeance to return his property to him.

16 Q    Do you recall an occasion that you were with Jennings

17 White where Edd Jordan, the sheriff, gave you-all or gave

18 Jennings White a bag full of money?

19 A    There was an incident that I witnessed at Diary Queen in

20 Manchester --

21 Q    Okay.  Tell us about that.

22 A    -- where money exchanged hands.

23 Q    Okay.  That's what I'm getting at, Mr. Roberts.  Tell us

24 about that.

25 A    That was between the sheriff and Jennings White, and the

TODD ROBERTS - CROSS - MR. BALDANI

1  best I remember there was a Clinton Johnson also involved in

2  that.

3  Q    All right.  But you were present?

4  A    Yes, sir, I was there.

5  Q    All right.  And Jordan gave Jennings White a quantity of

6  money in your presence; right?

7  A    He reached him a bag that had money in it, yes, sir.

8  Q    Okay.  And this, like the other money I talked about, had

9  something to do with voting, would you agree with me to that?

10 A    Yes, sir.

11 Q    All right.  Did you — and, of course, you're a police

12 officer at this time.  Did you take steps to prosecute or

13 charge Jennings White or Hacker or anyone with voting — vote

14 buying or anything to do with vote buying?

15 A    No, sir.

16 Q    All right.  So at the time that you are — around the same

17 time period that you're taking these photos and that you are

18 riding around to these precincts, you know, under the direction

19 of the AG's Office, on at least two occasions you're with

20 people that's handing over either wads or bags of money, aren't

21 you?

22 A    Yes, sir, I was at these particular places that you

23 described, but I also gave this information to Mr. Johnson.  I

24 never went in and told him one side was doing one thing and the

25 other wasn't.  I told him that both sides were doing it.  There

1  was no trying to sway it one way or the other.  I mean, that

2  would have been —— that would have been futile on my part to

3  try to say that one side was buying votes and the other one

4  wasn't.

5  Q    Well, you could have ——

6  A    I mean, I disclosed what I knowed to him.

7  Q    All right.  Well, let's just put it this way:  In '02

8  there was votes being bought on both sides; right?

9  A    That is correct.

10 Q    And that was the point you're just making, there's votes

11 being bought on both sides, I can't stop that; right?

12 A    No, sir.  For me to try to initiate an arrest over there

13 for that in the position that I was in, that would have been ——

14 I mean, that would —— there wouldn't have been ——

15 Q    Right.  But even though you can't stop it, you're there on

16 at least two occasions where a big either a sack of money or a

17 wad of money is being handed off in the presence of a police

18 officer who claims he's investigating the very activity?

19 A    I was at a restaurant when that particular money that

20 you're talking —— I was sitting in the restaurant and seen

21 that.

22 Q    I want to ask you about this stuff that you told the jury

23 about that Mike Bishop told you; okay?

24 A    Yes, sir.

25 Q    All right.  But the fact of the matter is, number one, you

1  and Mike Bishop were competing for the same job; right?

2  A    In 2005, yes, sir.

3  Q    So you —— and there was resentment that Mike Bishop got a

4  job that you wanted; true?

5  A    I was upset, yes, sir.

6  Q    All right.  Now, you testified before that Mike Bishop

7  gave you information about a meeting, apparently at Paul

8  Bishop's garage, where a bunch of money was pooled; correct?

9  A    That is correct.

10  Q    And you weren't —— unlike this business at Patty's or

11  Diary Queen, you weren't at that meeting, were you?

12  A    No, sir, I was not.

13  Q    All right.  And you don't even know if Mike Bishop was at

14  that meeting, do you?

15  A    I just know what he told me.

16  Q    All right.  Did he tell you he was at that meeting?

17  A    Yes, sir, he did.

18  Q    So he claimed to you that he was at that meeting that

19  night?

20  A    Yes, sir.

21  Q    All right.  Do you have any personal knowledge if he's

22  ever told investigating people otherwise?

23  A    No, sir, I don't know what he's told.

24  Q    So bottom line is when you talked about this person put in

25  this money, this person put in that money, you don't have

1  personal knowledge, you're talking -- you're telling the jury

2  based upon what this adversary of yours, Mike Bishop, told you;

3  right?

4  A    That's correct.  But at the time he told me, he was not an

5  adversary.  This was after the 2002 election.  All he was was a

6  school resource officer.

7  Q    Mr. Westberry asked you about money that was missing from

8  evidence at the Manchester PD; correct?

9  A    That is correct.

10 Q    And you were evidence custodian for a period of time;

11 correct?

12 A    That is correct.

13 Q    What period of time were you evidence custodian?

14 A    I think it started in 2001.  I took over when we moved

15 into the new building, and I think that's when we moved in.

16 Q    Okay.  And at some point there was like a federal audit of

17 all this evidence money, evidence drugs, items that were booked

18 into evidence at the PD; correct?

19 A    I don't know -- there was -- when I was indicted, I think

20 they may have went over there and done something, but they was

21 a -- there was an order that came down for this money that was

22 missing, is how it was discovered.

23 Q    Would you agree with me that the evidence logging and the

24 maintaining of evidence, whether it be money, drugs, or

25 whatever, was shoddy at the very best at the PD under your

1   watch?

2   A    I don't know that it was under my watch.  It was that way

3   when I came in.  I just followed the practice that was already

4   there.

5   Q    All right.  You didn't clean it up?

6   A    Yes, I made an attempt to.  I tried to get accredited

7   through the Kentucky League of Cities and also the Kentucky

8   Association of Chiefs of Police, and they came in a couple of

9   days, and basically the guy in Northern Kentucky told me that

10  he got the impression he didn't feel wanted there by the

11  higher-ups.  So that was the end of that.

12  Q    Well, the fact of the matter, at one point while you were

13  in Vegas, there was some money turned up missing from the

14  evidence room during an audit; correct?

15  A    No, sir.

16  Q    All right.  Did you come back from a trip to Vegas and

17  were confronted about there being a discrepancy in money from

18  the evidence room?

19  A    What had happened was, is there was a — the money was

20  missing prior to that.  I went to the Shot Show, which is in

21  Las Vegas, the Shot Show is an industry show for people in the

22  gun business and outdoor sports and law enforcement, sells that

23  equipment.  Right before I got ready to leave, Mr. Kennon White

24  came in and demanded that everything I had in my possession be

25  turned over, that they were going to go through it.

1  Q    "In your possession," you're talking about in the evidence

2  room; right?

3  A    That is correct.  And there was two evidence rooms in the

4  police department.  There was one that was in the common area,

5  which is called the Squad Room, and there was one that was in

6  my office.  The one that was in the common room of the police

7  department had people — more than one person besides myself

8  had access to it.  As a matter of fact, there was a key in the

9  dispatch room.

10 Q    And even prisoners that are working, trustees at the PD,

11 had access to it, didn't they?

12 A    Yes, I'm trying to get to that.

13 Q    Okay.

14 A    There was an incident to where this money that got missing

15 was in this evidence room that was in the Squad Room.  But

16 there was several incidences to where that they came in and had

17 people coming from the jail to clean and work in the police

18 department.  And during that, they would open the door to that

19 room because the supplies — cleaning supplies were there.

20 There was also an occasion in which that particular inmate

21 stole a Manchester police uniform that later turned up in a

22 incident over in London, Kentucky.  So there was two rooms that

23 were at the police department.

24 Q    Well, the reason I asked you this, Mr. Roberts, is simple.

25 Yes or no, when you got back from Vegas, was there money

1  missing and you went to your -- to the local bank, took money

2  out and made it up?

3  A    I made up half of that money.  The chief of police had

4  money that he put in for the other half.

5  Q    All right.

6  A    When I got back, Mr. White -- Kennon White's intention was

7  that he wanted rid of me.  So when I came in, the chief of

8  police told me that we had to make that money up or that the

9  mayor and Kennon was going to fire me.  That is correct.

10  Q    So you didn't make the money up because you had taken it

11  for any illegitimate purpose on this Vegas trip or otherwise,

12  you just made it up because there was a shortfall and you

13  wanted to do the right thing, so you took it out of your

14  personal account; is that what you're telling us?

15  A    Yes, sir.  I didn't need to take no money.  If I had it in

16  my personal account, there would have been no need for me to

17  have to take it from somewhere else.

18  Q    And how much money did you take out of the bank to make up

19  for the shortfall?

20  A    There was 3300-and-some dollars, the best I remember.

21  Q    All right.  Let me ask you this:  Obviously -- You're

22  wearing handcuffs today?

23  A    Yes, sir, I am.

24  Q    You're obviously in custody.  Where -- I'm not talking

25  about county jail, but where are you, what federal institution

1   are you in?

2   A    I'm at the federal —

3          MR. SMITH:  Your Honor, I would object to the

4   relevance.

5          THE COURT:  It's sustained.

6   BY MR. BALDANI:

7   Q    Where did you get the suit to wear to court today?

8   A    My family brought it to me.

9   Q    All right.  So that you didn't have to come in here in a

10  jumpsuit?

11  A    Yes, I asked to have clothes brought to me out of respect.

12  Q    When did you first become a police officer, whether it be

13  in a sheriff's department, PD, or whatever?  Approximately is

14  good enough.

15  A    It would have been around 1991 when I turned the age of

16  eligibility.

17  Q    And what kind of oath do you take to be a sworn police

18  officer?

19  A    Excuse me?

20  Q    What kind of oath do you take to become a sworn police

21  officer?

22  A    There's a sworn oath that you swear to.

23  Q    What is it?

24  A    I don't know it —

25  Q    What's the gist of it?

1   A     —— verbatim and stuff.  It's to uphold the laws and, you

2   know, that you have not fought a duel, and there's several

3   different components of it, but I can't quote it to you

4   verbatim.

5   Q     But the essence of it is you take an oath to uphold, obey

6   the law; right?

7   A     That is correct.

8   Q     And you violated that oath, didn't you, Mr. Roberts?

9   A     That is correct.

10  Q     How is that oath different than the one you took last

11  Friday?

12  A     I'm sorry?

13  Q     How's that oath different from the one you took last

14  Friday?

15  A     Oath?

16  Q     Yeah, how is that oath different?  Why does the oath you

17  took last Friday, why —— is that more meaningful than the one

18  you took when you swore to uphold the law?

19  A     No, I took an oath to uphold the law, and I violated it.

20          MR. BALDANI:  That's all, Judge.

21          THE COURT:  Mr. Gilbert.

22          MR. GILBERT:  I have no questions, Your Honor.

23          THE COURT:  Thank you.

24          Ms. Hughes, any questions?

25          MR. GILBERT:  No, sir.

1              THE COURT:  Thank you.

2              Mr. Simons?

3              MR. SIMONS:  None, Your Honor.  Thank you.

4              THE COURT:  Any redirect of the United States?

5                        REDIRECT EXAMINATION

6    BY MR. SMITH:

7    Q    Mr. Roberts, you indicated that there was apparently

8    another pawnshop in town that Vernon Hacker operated?

9    A    Yes, sir, he owned one in conjunction with James Phillips.

10   Q    When did he buy those two guns from Bobby Joe Curry?

11   A    Somewhere around 1999.  I'm not real sure on the specific

12   date and time.

13   Q    And you said he was partners with James Phillips?

14   A    That is correct.

15   Q    And is he an officeholder in Clay County?

16   A    Yes, sir, he is.

17   Q    What position does he hold?

18   A    He's the circuit court clerk.

19   Q    Now, you were asked about the UNITE program in Manchester

20   and Clay County.  And do you know when UNITE came into town?

21   A    I'm wanting to think 2003 or '04, maybe.

22   Q    So this was well after the defeat of Jennings White and

23   his power in Clay County; correct?

24   A    I think so.

25   Q    And if the Adams family joined the UNITE program, it would

1  have had to have been after '03 or '04?

2  A    I think that is correct.

3  Q    All right.  Now, you were asked about this district court

4  case where you were testifying about this arrest of

5  Mr. Stivers?

6  A    Yes, sir, I was.

7  Q    Now, as a sworn police officer, does the law in Kentucky

8  state that you have to blow a certain .010 in order to be

9  arrested for alcohol intoxication?

10  A    No, sir, it does not.

11  Q    So it's based on officer discretion?

12         MR. HOSKINS:  Object.

13         THE COURT:  I'll overrule the objection.  It's based

14  on his understanding.  It's not based upon Kentucky law but his

15  understanding.

16  BY MR. SMITH:

17  Q    If you would, state your understanding, Mr. Roberts.

18  A    You have to be -- he detected a certain level of alcohol

19  to assume that he was under the influence that day, yes.

20  Q    And you made that call based on what you observed?

21  A    Yes.  I'm sorry, yes, sir.

22  Q    And that case was taken to the Clay County Court system?

23  A    That is correct.

24  Q    And you testified seeking to prosecute this man for what

25  you believe to be a man under -- that had violated the law of

1   the State of Kentucky?

2   A    That is correct.

3   Q    And it was dismissed, I believe you said, first by the

4   District Judge, Ms. Muncy?

5   A    That is correct.

6   Q    Did she have anybody in her company in her chambers the

7   day that she was making this decision?

8           MR. HOSKINS:  Object to leading.

9           THE COURT:  Overruled.

10          THE WITNESS:  Yes, sir, I witnessed someone exiting

11  her chambers when I went in for the hearing that morning.

12  BY MR. SMITH:

13  Q    Who had been in visiting the Judge before she dismissed

14  the case?

15  A    Douglas Adams.

16  Q    Is that the same Douglas Adams seated back here at counsel

17  table?

18  A    That is correct.

19  Q    Now, you were asked to explain, I believe, these

20  circumstances which you saw actual money change hands in 2002.

21  Do you remember those?

22  A    Yes, sir.

23  Q    Why didn't you go charge that down in the Clay County

24  Court system, Mr. Roberts?

25  A    It would have been —— there would have been no need in it.

1  I mean, it's sort of like David taking on Goliath.

2  Q    What do you mean there would be no need?  If it's a state

3  violation, why not take it to the state court system in Clay

4  County?

5  A    I would have been one of them leaving town.

6  Q    So, Mr. Roberts, you were asked about the White family and

7  about them being in charge.  They got defeated in '02 as far as

8  Jennings White is concerned; correct?

9  A    That is correct.

10 Q    And Doug White, you testified earlier, joined and tried to

11 support Doug Adams after that defeat?

12          MR. BAYER:  Objection.

13          THE COURT:  Overruled.

14          THE WITNESS:  That is correct.

15 BY MR. SMITH:

16 Q    So who controlled Clay County after Jennings White?

17 A    Douglas Adams.

18          MR. SMITH:  I pass the witness.

19          THE COURT:  Mr. Hoskins.

20                   RECROSS-EXAMINATION

21 BY MR. HOSKINS:

22 Q    Mr. Roberts, that James Phillips who's the circuit clerk

23 that you mentioned?

24 A    That is correct.

25 Q    He's a first cousin of Jennings White, wasn't he?

TODD ROBERTS - RECROSS - MR. WESTBERRY          60

1   A    I think they're related, yes, sir.

2   Q    And he's still circuit clerk to this day as far as you

3   know?

4   A    To my knowledge, he is, yes.

5   Q    And Doug White was still mayor of Manchester during that

6   time period, wasn't he?

7   A    I'm sorry now?

8   Q    Doug White was still mayor of Manchester during — up till

9   2000 — actually up until 2007, wasn't he?

10  A    I think it was 2006.

11  Q    Well, he lost the election?

12  A    He was a co-defendant in my case, and that case was

13  brought in 2006, early 2007.  I think he actually lost in the

14  end of 2006.

15  Q    So the new mayor took over in 2007, didn't she?

16  A    That would be correct.

17            MR. HOSKINS:  That's all.

18            THE COURT:  Mr. Westberry.

19                       RECROSS-EXAMINATION

20  BY MR. WESTBERRY:

21  Q    Mr. Roberts, just a couple.  You told the jury just a

22  moment ago under questioning from the prosecutor about seeing

23  Mr. Adams come in and out of the courtroom or the chambers of

24  Judge Muncy.  Do you recall that a few minutes ago?

25  A    Yes, sir, I do.

TODD ROBERTS - CROSS - MR. WESTBERRY                61

```
 1  Q    Do you know what the purpose for him being there was?  You
 2  weren't in — you were not in the room itself, were you?
 3  A    No, sir, I was not.
 4  Q    Do you know whether or not it had anything to do with his
 5  daughter, Melanda?  Do you know?
 6  A    I didn't know of any pending litigation against Melanda.
 7  At that time she was actually working — or I didn't know of
 8  anything that he would be there on that purpose, no.
 9  Q    You don't know one way or the other?
10  A    No, sir, I don't.  I can't say what the discussion was.
11  Q    And you surely don't want to speculate as to anything that
12  you don't know; correct?
13  A    All I can tell you is what I seen, yes, sir.
14  Q    And you don't want to speculate; correct?
15  A    No, I'm not.
16  Q    Now, you testified as to this fellow named James Phillips
17  who is the circuit court clerk; correct?
18  A    That is correct.
19  Q    And he owns a pawnshop or did own a pawnshop at one time
20  with Vernon Hacker; correct?
21  A    Yes, sir, that is correct.
22  Q    And they sold some guns to Bobby Joe Curry; correct?
23  A    Did they sell some?
24  Q    Yeah.  Did Bobby Joe Curry buy some guns from that
25  pawnshop?  Do I recall correctly?
```

1  A    I don't know about that.  I know that Mr. Hacker bought

2  from Mr. Curry.  I don't know that Mr. Hacker ever sold Mr.

3  Curry any guns.

4  Q    But there was a transaction of guns going on between

5  Mr. Hacker and Mr. Curry; correct?

6  A    The one incident that I witnessed, yes.

7  Q    Just to be clear about that, not to beat a dead horse,

8  James Phillips is related to the White family; is that correct?

9  A    That is correct.

10  Q    And how is he related, please?

11  A    I don't know that to be exact.  I think he's a cousin, but

12  I can't say that with certainty.

13  Q    But there's a family connection; right?

14  A    Yes, sir.

15        MR. WESTBERRY:  Thank you, sir.

16        THE COURT:  Thank you.  Mr. Abell.

17        MR. ABELL:  Judge, I'll ask from here.

18        THE COURT:  That's fine.

19                    RECROSS-EXAMINATION

20  BY MR. ABELL:

21  Q    Mr. Roberts, you were still a Manchester police officer

22  when the case started that's led you to appear here today in

23  handcuffs; correct?

24  A    That is correct.

25  Q    And in terms of what caused you to leave Manchester, it

1  was your criminal activity with the drug dealer Bobby Joe Curry

2  and your lies about it; correct?

3  A    No, sir, I was terminated before I ever entered a guilty

4  plea.  I received a letter of termination from the new mayor

5  prior to my ever pleading guilty.

6  Q    And eventually you left Manchester to serve the sentence

7  for your crimes; right?

8  A    I left Manchester, yes.  Manchester itself.

9          MR. ABELL:  Nothing further, Judge.

10          THE COURT:  All right.  Thank you.

11          Mr. Baldani, any additional?

12          MR. BALDANI:  I don't have anything further.

13          THE COURT:  Any of the other counsel have questions?

14  All right.  Thank you.

15          Mr. Smith, anything else of the witness?

16          MR. SMITH:  That's all we have.

17          THE COURT:  All right.

18          Thank you, Mr. Roberts.  You may step down, sir.

19          THE WITNESS:  Thank you.

20          THE COURT:  Mr. Smith, we would be taking our break

21  in about 15 minutes.  Would you like to begin with your next

22  witness or would you like to take a break early at this point?

23          MR. SMITH:  Your Honor, he's another in-custody

24  witness, and it will take a few moments if you would like to

25  take our break now.

1           THE COURT:  All right.  We'll do that.  We'll take

2    our morning recess at this time.

3           Ladies and gentlemen, we'll take a 20-minute recess.

4    Please keep in mind the admonition that you were given

5    previously not to discuss the case among yourselves while we

6    are in recess.  The jury will be excused.

7       (Whereupon, the jury retired from the courtroom, after

8    which the following proceedings were had in open court.)

9           THE COURT:  Any matters to take up outside the

10   presence of the jury?

11          MR. HOSKINS:  Yes, your Honor.

12          THE COURT:  Be seated, please.

13          MR. HOSKINS:  Just briefly, the photographs that were

14   admitted into evidence through this witness all have a notation

15   "voter fraud."  I would ask that that be redacted from the

16   photographs before they be given to the jury.

17          THE COURT:  Mr. Smith, any response?

18          MR. SMITH:  First of all, for the record, I do not

19   believe that in the publishing of that, that appeared to this

20   jury.  I believe that is the PowerPoint presentation, and hence

21   the photograph, there was no ability for the jury to see that

22   language.  The hard copies can be easily redacted, and I'll

23   take it upon myself to do that at a break if the Court would

24   allow.

25          THE COURT:  I will ask that those matters be redacted

 1  by agreement.  There was no objection to the language on the

 2  photographs at the time they were introduced, but by agreement

 3  they will be redacted before the hard copies would go back to

 4  the jury.  And Counsel are all requested not to place those on

 5  one of the screens with the information at the bottom of the

 6  page.

 7          All right.  We'll be in recess.

 8      (Whereupon, a short recess was had, after which the jury

 9  returned to the courtroom and the following proceedings were

10  had in open court.)

11          THE COURT:  Thank you.

12          The record will reflect that all members of the jury

13  are present.  Parties and counsel are all present as well.

14          Mr. Smith, you may call your next witness.

15          MR. SMITH:  Yes, thank you, Your Honor.  The United

16  States will call Vernon Hacker.

17          THE COURT:  Thank you.

18                          VERNON HACKER,

19  having been first duly placed under oath, was examined and

20  testified as follows:

21          THE COURT:  Thank you.

22          Mr. Smith, you may proceed.

23                      DIRECT EXAMINATION

24  BY MR. SMITH:

25  Q    State your name, please.

1    A    Vernon Hacker.

2    Q    And, Mr. Hacker, where were you born and raised?

3    A    I was born in Cincinnati, Ohio.  I was raised in

4    Manchester, Kentucky.

5    Q    Okay.  And when did you move to Manchester?

6    A    When I was approximately 11, 12-year-old.

7    Q    And do you have any family in Clay County?

8    A    Yes, I do.

9    Q    Do you have children?

10   A    Yes.

11   Q    How many children do you have?

12   A    I have one son.

13   Q    And what's his age?

14   A    Twenty-nine-year-old.

15   Q    And are you married?

16   A    Yes, I am.

17   Q    And how long have you been married?

18   A    Thirty-six year.

19   Q    Now, when you grew up in Clay County and Manchester, were

20   you educated there as well?

21   A    Yes, I was.

22   Q    And how far did you go in school?

23   A    I graduated from high school and I went to vocational

24   school.

25   Q    Okay.  And which high school did you graduate from?

1    A    Clay County High School.

2    Q    Is there only one high school in the county?

3    A    No, there's a Baptist Institute.

4    Q    All right.  A private school?

5    A    A private school.

6    Q    What did you do for jobs once you got out of high school,

7    Mr. Hacker?

8    A    I managed that — an IGA store there for approximately six

9    year.  I worked as purchasing agent for Interstate Coal

10   Company, I worked for them for 17 year out of London, Kentucky.

11   Q    And a purchasing agent does what?

12   A    Expedite mining equipment parts and just purchase whatever

13   is needed for the mining industry.

14   Q    And Interstate Coal, is that a small company?

15   A    No, sir, it was one of the largest coal companies in

16   Eastern Kentucky or throughout the Mideast.

17   Q    And what did you do after working that job?

18   A    I worked for Stivers Chevron, I was a night associate

19   manager there for him for approximately six, seven months.  And

20   then I worked as a 9-1-1 director, and I also drove a school

21   bus.

22   Q    All right.

23   A    And ran a pawnshop.

24   Q    This Stivers Chevron, now, who was the owner of that?

25   A    Charles Stivers.

1  Q    Now, you indicated that you also had a business known as a

2  pawnshop?

3  A    I had — worked in the pawnshop, yes, sir.

4  Q    Okay.  And were you the sole owner of that pawnshop?

5  A    No, sir, I was just an employee.

6  Q    Who owned the pawnshop?

7  A    James Phillips.

8  Q    And is he an officeholder over there in Clay County at

9  this time?

10 A    Yes, he is.

11 Q    What does he hold?

12 A    He's circuit court clerk.

13 Q    How long did you work in his pawnshop?

14 A    Approximately two-and-a-half year.

15 Q    Then you indicated that you took on other jobs.  What were

16 they?

17 A    I worked, as I said, for Stivers Chevron.  That was after

18 the pawnshop.  And I drove a school bus for ten year.

19 Q    Okay.  And who hired you as a school bus driver?

20 A    I was hired by Charles White, the Clay County

21 superintendent.

22 Q    And this position, was that a full-time employment or did

23 you have other employment while you were a school bus driver?

24 A    I had other employment.

25 Q    And what other employment did you have?

1   A     I was 9–1–1 director.

2   Q     And what does that title require you to do?

3   A     Well, we were over emergency services and as far as

4   dispatching for emergency services and addressing the county.

5   Q     All right.  And how long were you 9–1–1 director?

6   A     From July the 2nd of 2002 up until I was arrested,

7   August 17th, 2006.

8   Q     And this 9–1–1 directorship, how did you get employed for

9   that job?

10  A     Well, it was a job that ––

11  Q     Let me ask the question.  Who hired you?

12  A     I was hired by a board, 9–1–1 board.

13  Q     Okay.  And could you tell the Court and the jury who made

14  up the board?

15  A     The county judge executive, James Garrison; the Manchester

16  mayor, Daugh K. White; we had a magistrate that was on the

17  board, Terry Davidson; the ambulance director at that time was

18  on the board, Kenny Price; Clay County Sheriff Edd Jordan; and

19  Chief Dennis Rice, Chief of Manchester Police Department.  And

20  we had some other people, but I don't think they were able to

21  vote on anything, any issues.

22  Q     Had this position existed before you took this job?

23  A     Yes, it had.

24  Q     And who held the position before you?

25  A     Kevin Johnson.

1   Q    And does he hold a different position now?

2   A    Yes, he is sheriff of Clay County.

3   Q    Now, did you work with the Sheriff's Office any while

4   employed there in Clay County?

5   A    I was a bonded deputy.

6   Q    And how long were you a bonded deputy sheriff?

7   A    After I was appointed 9-1-1 director.

8   Q    And did the position of 9-1-1 director carry with it

9   responsibilities that required you to be a -- deputized as a

10  deputy sheriff?

11  A    Yes, it did.

12  Q    Did you also seek to hold an office yourself?

13  A    Yes, I did.

14  Q    And what office did you first seek?

15  A    I was city councilman for the City of Manchester.

16  Q    Do you recall when it was that you were first elected in

17  that position?

18  A    I was appointed into that position in 1993 due to a death

19  of a former council person.

20  Q    And how long did you serve as city councilman?

21  A    Up until August of 2006.

22  Q    All right.  Now, city councilmen and women in Manchester,

23  how often do they run for election?

24  A    Every two year.

25  Q    And the mayor in Manchester, how often do they run for

1   reelection?

2   A    Every two year if someone, you know, files against them.

3   Q    And when city council races occur, do they always occur in

4   the spring or the fall elections?

5   A    You have to be on the ballot during the May primary, but

6   as far as being on the ballot on machines, you're not, but you

7   have to be signed up for it.  But the elections are normally in

8   November every two year.

9   Q    How many seats are on the city council in Manchester?

10  A    I think at this time there's eight.

11  Q    And when did it become eight?

12  A    I want to say approximately the year 2000.  I'm not really

13  sure of that, but I think it was somewhere around 2000.

14  Q    And at that time, prior, how many seats were there before

15  it changed to eight?

16  A    Six.

17  Q    And do you know who got appointed for those first two

18  seats when they created the two seats?

19  A    No, sir, I really can't — I can't remember that.

20  Q    Your wife, has she been employed while you're married?

21  A    Yes, sir.

22  Q    And where has her employment been?

23  A    Clay County Board of Education.

24  Q    And how long has she worked with the Clay County Board of

25  Education?

1  A    Approximately 17 to 18 year.

2  Q    Now, when you were last employed there, who was the

3  superintendent which you worked for?

4  A    Douglas Adams.

5  Q    And how long did you work for Mr. Adams?

6  A    I'm not sure when he became superintendent, but I think it

7  was around 2000 also.

8  Q    Mr. Hacker, have you also been involved as an election

9  officer in Clay County?

10  A    I have at one time served as election officer.

11  Q    When was it that you first got involved with the Board of

12  Elections?

13  A    As far being on the Board of Elections, I've never been on

14  the Board of Elections.

15  Q    Maybe I asked the question incorrectly.  When did you

16  become employed or acting as an election officer for the Board

17  of Elections?

18  A    In the early '80s.

19  Q    Okay.  And in the course of service there, what kind of

20  positions did you hold?

21  A    I've served as a sheriff at the polling place and as the

22  clerk also.

23  Q    Okay.  And do you know how many times you've served as

24  clerk or sheriff over the years?

25  A    I think a couple of times.

1  Q    Now, Mr. Hacker, were you involved in the 2002 election?

2  A    Yes, I was.

3  Q    And did you serve in any positions with the election

4  officer — or as an election officer in 2002?

5  A    Yes, I did.

6  Q    And what position did you hold at that time?

7  A    As a deputy clerk.

8  Q    Okay.  And tell me how it was you came to serve in that

9  position.

10 A    Well, they had a heated election over there, the county

11 court clerk's election between Mr. Jennings White and

12 Mr. Freddy Thompson.  Jennings White hired me to work in the

13 clerk's office as a deputy clerk.

14 Q    And when did that come about, days before the election or

15 the day of the election, or do you recall?

16 A    No, I worked approximately one month after they opened up

17 the early voting booths for the absentee ballots.

18 Q    Now, were there known supporters of both sides working

19 that early voting?

20 A    Yes, there was.

21 Q    And could you explain to us the players and who they were?

22 A    There was myself, Lester Harmon.

23 Q    And who were you-all supporting?

24 A    We were Jennings White supporters.

25 Q    Okay.

1  A    On the other side, Freddy Thompson supporters, you had

2  Paul Bishop and William Stivers.

3  Q    All right.  Now, what position did they play, Mr. Bishop

4  and Mr. Stivers?

5  A    Well, they worked as a clerk assisting the absentee

6  voters.

7  Q    Okay.  And this would have been those days preceding the

8  actual election day?

9  A    Yes, it was.

10  Q    And you say this Harmon, Lester Harmon, worked with you?

11  A    Yes, he did.

12  Q    And he was a Jennings White supporter?

13  A    Yes.

14  Q    And what position did he hold?

15  A    The same position as myself.  We were both hired in at the

16  same time.

17  Q    Okay.  So how were you-all set up down there in

18  Manchester?

19  A    Well, we were at the County Clerk's Office, they had

20  absentee booths set up in the back.  Sort of as you entered the

21  Clerk's Office, you would have to go around to go to the

22  machines, and which Lester and myself were behind the counter

23  because we were part of the employment crew there at the

24  Clerk's Office.  But Mr. Stivers and Mr. Bishop, they sat

25  outside, had a table there with -- to check absentee voter

1  registration to see if whoever voted was — and then they would

2  come around and they would fill out their forms and they would

3  assist them in voting.

4  Q    Now, was the County Clerk's Office in the courthouse at

5  that time?

6  A    No, sir, it was in Manchester, in downtown Manchester.

7  Q    Okay.  Why was it located in the downtown area at this

8  time?

9  A    They were tearing the old courthouse down.

10 Q    All right.  So you-all set up a temporary office there at

11 that time?

12 A    Yes, there was — all the offices that was in the

13 courthouse had moved out into the private sector.

14 Q    And you indicated that this was absentee voting.  Were you

15 aware that there were people there buying votes?

16 A    Yes, sir.

17 Q    And tell us what you saw.

18 A    I seen people sell their vote, I seen people paid for

19 their vote.

20 Q    Okay.  How did it — was there a common practice that was

21 going on there in the Clerk's Office during this early voting?

22 A    Well, when they would go in and vote and as they were

23 assisted, they would be paid.

24 Q    Okay.  So who would assist these people and pay them at

25 the time of the vote?

1  A    Well, on the side there for Freddy Thompson, it was

2  William Stivers and Paul Bishop.

3  Q    Okay.  And what about the Jennings White side?

4  A    We were voting them on the inside.  Jennings was paying

5  them or he would have someone there to pay them.

6  Q    And how were you assisting them in that effort?

7  A    Well, when they would go in, when they would come out, I

8  would give a signal, and a lot of times they would already be

9  paid when they would come in.

10  Q    What kind of signal would you -- did you make?

11  A    I just give a head nod.

12  Q    And who were you giving a signal to normally?

13  A    Mr. Jennings White.

14  Q    And so what did that signal mean?

15  A    It means that he voted the way that he was supposed to.

16  Q    And then what would happen?

17  A    He would be paid.

18  Q    And do you know what they were paying these absentee

19  voters?

20  A    Depended on people that they were for.  There was a

21  slate -- if there was a slate or if they was just one person or

22  whatever, they was making sure that they got the Jennings White

23  vote.

24  Q    Now, were you aware there were slates being formed there

25  in the 2002 primary?

VERNON HACKER - DIRECT - MR. SMITH

1   A    Yes, I was.

2   Q    And what slates were you aware of?

3   A    I know there on the side with Freddy you had Freddy and

4   you had Roy Morgan was running for county judge executive.

5   They was the two most important ones.

6   Q    And what about the Jennings White side?

7   A    You had Jennings, Edd Jordan, and also James Garrison.

8   Q    And James Garrison was seeking the same office as Roy

9   Morgan?

10  A    County judge executive.

11  Q    So these slates were already put together in the early

12  voting period while you were involved?

13  A    Yes, they were.

14  Q    Now, this other side, Mr. Bishop, Paul Bishop, and

15  Mr. William Stivers, were you able to observe how they

16  operated?

17  A    Yes.

18  Q    And could you tell us how they operated?

19  A    Well, when they would come through, the people that was

20  for them would go to them.  I mean, it was obvious which --

21  whoever the people was there to vote for, they would come

22  either to myself and Mr. Harmon or they would come to

23  Mr. Stivers and Mr. Bishop.

24  Q    And what would happen when they'd go to the Stivers/Bishop

25  side of the table?

1  A    When they would go in to assist them, they would pay them.

2  Q    All right.  And were you able to observe this paying?

3  A    I've seen it happen a few times.

4  Q    And were these voters being taken behind the curtain when

5  they were voted?

6  A    Yes, they were.

7  Q    And was this when you had the old machine, not the new

8  computerized machine?

9  A    Right, it was the old machines.

10  Q   Were there lines forming during those days of early

11  voting?

12  A   The first couple of days, there were.

13  Q   Were there any disruptions because of the lines, the

14  people that were forming?

15  A   Yes, there was.

16  Q   And what do you recall?

17  A   I know there one day Sheriff Jordan came down and shut the

18  polls down.  There was arguing and different things going on.

19  Q   And did you observe an argument yourself?

20  A   No, I didn't.

21  Q   Were there any other signals that you saw being used other

22  than the head nods or, as you say, paying them behind the

23  curtain?

24  A   No, sir.

25  Q   Had you been involved in prior elections, Mr. Hacker, and

1  been participating in vote buying before 2002?

2  A    Yes, I have.

3  Q    And this Lester Harmon that was assisting you, did he have

4  a family member or an interest specifically in this election

5  2002 himself?

6  A    His brother was magistrate at that time.

7  Q    And was he aligned with Jennings White as well?

8  A    Yes, he was.

9  Q    Now, did you see anybody consistently showing up to

10  present voters to Bishop and Stivers in this early voting?

11  A    Yeah, both sides had vote haulers.

12  Q    Okay.  And can you identify for us some of those people

13  who were known as vote haulers?

14  A    I know Mr. Wayne Jones, he hauled some.

15  Q    Okay.  Let's talk about Mr. Wayne Jones.  Was he holding a

16  position during the 2002 election?

17  A    He may have been on the Democratic Election Commission,

18  I'm not sure.

19  Q    Okay.  Now, you mentioned that he would have been hauling

20  voters to whom?

21  A    To Mr. Bishop and Mr. Stivers.

22  Q    And just for the record, Mr. Hacker, do you see

23  Mr. Stivers here this morning in the courtroom?  You're going

24  to have to look along the wall.

25  A    Yes, I do.

1   Q    Would you point out what he's wearing and where he's

2   seated for the record, please?

3   A    Pink/orange shirt.

4        THE COURT:  The record will reflect that Mr. Hacker

5   has identified the defendant, William Stivers.

6   BY MR. SMITH:

7   Q    You identified one of the persons hauling votes to him —

8   hauling voters to him was Wayne Jones.  Do you see him here in

9   the courtroom?

10  A    Yes I do.

11  Q    Would you point out where he's seated what he's wearing

12  for the record?

13  A    He's seated there beside Mr. Doug Adams.

14  Q    What he's wearing?

15  A    He's wearing a suit.

16       THE COURT:  The record will reflect that he has

17  identified the defendant, Charles Wayne Jones.

18  BY MR. SMITH:

19  Q    Who else did you see bringing voters in to be voted?

20  A    A lot of the voters would just walk in on their own.

21  Q    All right.  Who did the side that you were supporting have

22  for vote haulers?

23  A    At that point in time, as far as vote haulers, we had none

24  during the absentees, they were mostly all walk-in voters, both

25  sides really.

1   Q    Now, do you know a fellow by the name of Bobby "Red" Sams?

2   A    Yes, I do.

3   Q    Did you see him there during the early election?

4   A    Yes.

5   Q    And what was he doing up there?

6   A    He was hauling voters.

7   Q    And who was he hauling voters for?

8   A    He was hauling for the Freddy Thompson side mostly.  But

9   to be honest, he would haul for both sides if he could make a

10  dollar.

11  Q    All right.  So he worked both factions, the White side and

12  the Thompson side?

13  A    He would haul voters in there regardless.

14  Q    Okay.  I would like to direct your attention to a

15  photograph already introduced that's identified as P28.  Do you

16  recognize anyone in that photograph, Mr. Hacker?

17  A    I know it's Bobby "Red" Sams.

18  Q    And you say you did see him there —

19  A    Yes, I did.

20  Q    — bringing voters in?

21  A    Yes.

22  Q    And were these voters being paid to vote?

23  A    Yes, they were.

24  Q    And did you pay some of the voters that were brought in?

25  A    I never did pay any that he brought in, no.

1  Q    Okay.  Did you see others paying voters that he brought

2  in?

3  A    Yes, I did.

4  Q    And who did you see paying voters for him?

5  A    I seen William Stivers and Paul Bishop.

6  Q    I would like to direct your attention now to P2.  Do you

7  recognize either of these individuals?

8  A    It looks like William Stivers and Charles Marcum maybe.

9  Q    Okay.  And you previously identified Mr. Stivers as being

10  working there for the Board of Elections as an election

11  officer?

12  A    Yes, sir.

13  Q    What was Charles Marcum doing there?

14  A    I really don't know.

15  Q    Okay.  Did you observe him being there on voting day?

16  A    Oh, there were different officials in and out of there all

17  the time checking the machines, seeing how many people voted,

18  and different things.

19  Q    Was he involved with this organized slate?

20  A    Yes, he was on the slate.

21  Q    And whose slate was he on?

22  A    He was on a slate there with — on the Freddy Thompson

23  slate.

24  Q    All right.  What was the going rate that it was taking to

25  bribe a voter to vote for your slate?

1  A    I think they were paying up to $50 and maybe —— and more.

2  Q    Now, during the course of that 2002 primary, did you

3  observe other people that were bringing voters in for one slate

4  or the other?

5  A    Yes.

6  Q    And who else do you recall?

7  A    Wanda White, she hauled a lot of voters there.  Her

8  husband, Kennon, was running for jailer.

9  Q    Okay.  Who else?

10  A    They was just so many different people, I mean —— that was

11  running for office, I mean, bringing people there to vote.

12  Q    Okay.  There were a lot of other people that you knew were

13  involved?

14  A    Yeah.

15  Q    During the course of your working for the White faction

16  and involving yourself there in the early voting, were there at

17  times, at least during the early voting or maybe on election

18  day, when they were actually sent to a place or a person by the

19  White faction to be paid?

20  A    During the regular election, yes, sir.

21  Q    Okay.  So on election day there was a different method

22  used by the Jennings White group?

23  A    Not one that it would have been for the Jennings White

24  group.  At that time, Jennings got beat there in that election

25  in May.

1  Q    How did the voters — how were they treated on election
2  day?
3  A    On election day we would always set up the headquarters at
4  some — somewhere or another, you know, and operate out of
5  that.
6  Q    And what did you do out of the headquarters, Mr. Hacker?
7  A    Well, we would set it up and pay our voters and have
8  someone to go with them to vote.
9  Q    And in 2002, where did you set up your headquarters?
10 A    We set ours up there at the residence of Bart Morris.
11 Q    And where was Bart Morris's residence at that time?
12 A    On Green Street.
13 Q    And what else took place at the headquarters?
14 A    That was — we would just — we had a voter registry, we
15 would check each person that came in to vote, see that they
16 were registered to vote, and we would have someone go over with
17 them to vote them and then come back and we would pay them.
18 Q    Now, did you use the same group of people to take them
19 from the headquarters over to the polling place?
20 A    Sometimes they would go over there on their own and
21 sometimes someone would drive them over.
22 Q    And what methods did you use as far as ensuring that they
23 were voting the way that you had agreed that they were to vote?
24 A    We would have someone there at the election polling place
25 that was on our side that would assist.

1  Q    And in 2002 on election day, who did you have inside?

2  A    I think it was Charles Weaver.

3  Q    All right.  And does he also go by a nickname?

4  A    Dobber Weaver.

5  Q    All right.  And he was working as an election officer that

6  day?

7  A    Yes, he was.

8  Q    So what was the –– what was the result after they were

9  sent up to Mr. Weaver, what would happen?

10  A    Whenever they would go in and vote, the assistants to help

11  them would come out and give one of us a nod.

12  Q    Okay.  And then what would happen?

13  A    We would go back and we would pay them.

14  Q    And where did you go back to?

15  A    The residence of Bart Morris.

16  Q    All right.  And what was –– on election day, what was it

17  averaging for you to pay to buy a voter to vote in this

18  election?

19  A    Well, after the May primary, it was really the –– most

20  everything was over with.  I mean, as far as –– because it was

21  a Republican primary.  You had very few Democrats that was

22  seeking office in the fall.  But we had our city council race,

23  and it would be approximately $20.

24  Q    Okay.  So in the fall when the city council, it was a

25  smaller amount of money it would take to bribe a voter and they

 1  wouldn't be in a competition like Freddy White and — Jennings

 2  White and Freddy Thompson were in in the spring?

 3  A    Yes, it would.

 4  Q    What was it on election day in the primary?

 5  A    $50.

 6  Q    And can you estimate how many voters you-all ran through

 7  Bart Morris's to be paid that day?

 8  A    I would say probably somewhere in the neighborhood of 250

 9  to 300.

10  Q    Now, you said there was a list that was kept at the

11  Morris's?

12  A    Yes, sir.

13  Q    What was the significance of having a list?

14  A    It's voter registry forms.

15  Q    All right.  So is this the list of the people who are

16  registered to vote in the county?

17  A    It would be a precinct list just for your precinct.

18  Q    Okay.  And what would — would there be any notations or

19  highlighting or anything like that go on during the day, did

20  you make any notations?

21  A    Yes.

22  Q    And what kind of notations did you-all make on those

23  lists?

24  A    We would highlight it showing that they had already voted,

25  that they had been there and voted.

1  Q    And did that also signify that they voted the way they

2  were paid to vote and they had been paid as well?

3  A    Yes.

4  Q    So when you highlighted it, you could just X them off your

5  list?

6  A    Yes.

7  Q    And what was the significance of doing that, Mr. Hacker?

8  A    So that we would know how many people that we actually

9  paid to vote that day.

10 Q    All right.  And was there a concern that somebody might be

11 unscrupulous and come back and try to be paid twice?

12 A    Yes.

13 Q    And did this help you to keep that from happening?

14 A    Yes, it did.

15 Q    And who kept the list?

16 A    They would be different ones of us.  I would keep it some,

17 Darnell Hipsher.

18 Q    Okay.  Now, Darnell Hipsher, is he a person that was

19 running for office in the spring of 2002 election?

20 A    He was city council person also.

21 Q    Okay.  And did he assist you in doing the same things that

22 you've talked about that you did?

23 A    Yes, he did.

24 Q    And so he was bringing voters from Morris's, taking them

25 to the poll and voting and bringing them back and getting them

1  paid that day?

2  A    Yes, he was.

3  Q    Who else?

4  A    Bart Morris.

5  Q    Okay.

6  A    Bart's wife, Debbie.

7  Q    Okay.  And what was Debbie doing?

8  A    Debbie would mostly keep the books.

9  Q    Okay.  And when you say "keep the books," what do you

10 mean?

11 A    Keep a list marking off the voters that voted and taking

12 care of the paperwork.

13 Q    And what did Bart do?

14 A    He would hustle the voters to and from the polling place

15 mostly.

16 Q    Okay.  So what did you-all use to transport these voters

17 back and forth?

18 A    We would use our personal vehicles and -- just our

19 personal vehicles.

20 Q    Okay.  During the early voting, did you-all have any other

21 means of transporting voters back and forth?  Did you-all --

22 A    No.

23 Q    Just vehicles?

24 A    Just vehicles.

25 Q    Now, these lines that were formed, were they formed

1  primarily during the early voting or did you also have lines

2  and issues during the election day?

3  A    No, the only lines that I was aware of was during the

4  absentee voting when they opened the machines up.

5  Q    Do you know how many voters would vote there in 2002 on

6  early absentee voting?

7  A    The first couple of days it was real bad, but after that

8  it just slowed down and we'd maybe vote 75 to a hundred a day,

9  and then it started tapering off.

10  Q    Seventy-five to a hundred a day?

11  A    Yeah, for a while.

12  Q    Now, when these voters were being assisted, did they have

13  to fill out those voter assistance forms?

14  A    Yes.

15  Q    And is that required by law?

16  A    Yes, it is.

17  Q    So when you would go in to assist a voter, did you try to

18  fill out those or have someone that did assist them to fill

19  them out?

20  A    Yes, we did.

21  Q    Now, a voter gets assistance because of disability, such

22  as blindness or physical problems or other issues.  Were

23  you-all ignoring the fact that some of these people may have

24  actually been able to vote but were asking for assistance

25  anyway?

1   A     Yes, we were.

2              MR. WHITE:  Objection, leading Your Honor.

3              THE COURT:  I'll sustain the objection.  You can

4   rephrase.

5   BY MR. SMITH:

6   Q     The folks that you were having fill out these forms, do

7   you recall if they were legitimately disabled?

8   A     We would ask the questions and they would say that they

9   couldn't read or something of that nature.

10  Q     All right.  When they came to you, you said they asked for

11  you by name or would ask for Bishop or Stivers by name.  Did

12  they ask for you by name?

13  A     No, they would know who to come to.  Whoever would send

14  them in would tell them.

15  Q     All right.  So they would come directly to you and you

16  knew that was the signal?

17  A     Yes.

18  Q     And that signal to you was what?

19  A     That they was wanting to vote for Jennings White.

20  Q     Where was the Morris headquarters set up?  Was it in the

21  residence or was it another place?

22  A     No, it was in his garage area.

23  Q     And could you describe for the ladies and gentlemen of the

24  jury what the garage area of Mr. Morris's looked like?

25  A     It adjoined his house there, and it was just a wide-open

1    metal building and — which Bart is a racecar driver and he had

2    an old racecar in there, and it's just a garage area.

3    Q    All right.  Now, you've identified that you were city

4    councilman, you had another city councilman, Darnell Hipsher,

5    was helping, and Bart and Debbie were helping.  Were there

6    others that you recall that were helping?

7    A    Oh, yes.

8    Q    Could you tell us who you recall?

9    A    Gary Jackson, just people that was mostly on the city

10   council.

11   Q    Was he on the city council?

12   A    Yes, he was.

13   Q    Okay.  Who else?

14   A    We would have vote haulers.  That was just in our

15   precinct.  We generally tried to take care of the Manchester

16   precinct, what they called East Manchester precinct and the

17   Whites Branch precinct.

18   Q    Okay.  Do you recall anybody that the Morrises used

19   routinely to do those kind of things?

20   A    Some of their employees.

21   Q    And what were their names?

22   A    I know a James, James Goins —

23   Q    Okay.

24   A    — is one of them, and maybe — a lot of their employees I

25   didn't know by name, just to be honest.

1  Q    Okay.  Anyone else you recall?

2  A    Debbie's son, Chris, Chris Duff.

3  Q    Chris Duff?

4  A    Yes.  He would just haul voters.  All Chris ever done was

5  haul voters.

6  Q    Anyone else?

7  A    Deshae Henson, Earl Pennington, we just used various

8  people.

9  Q    Now, were these people new to the game, did you have to

10 educate them and teach them how to do all these things?

11 A    No, they knew what to do.

12 Q    And how did they know how to do this job?

13 A    They had been doing it quite a while.

14 Q    Had you been involved with this same group in other

15 elections?

16 A    Yes, I had.

17 Q    And did you get involved with this group in later

18 elections?

19 A    Yes, I did.

20 Q    Okay.  Well, we're going to go into that in a little bit.

21      Now, you indicated that there were other precincts that

22 you–all were involving yourselves in shuttling people who had

23 been bribed to vote in the election for this slate.  Can you

24 name some other places?  Whites Branch; is that right?

25 A    Yes, Whites Branch.

1   Q    Harts Branch?

2   A    Whites Branch.

3   Q    Okay.  Was there also a Harts Branch?

4   A    Yes, but I had nothing to do with Harts Branch.

5   Q    Did other people that you were working with have anything

6   to do with Harts Branch the day of the 2002 spring election?

7   A    The only time I know of was during the magistrate's race.

8   Q    And who was involved in that?

9   A    Bart, and he was helping Stanley Bowling.

10  Q    Okay.  How was he helping Stanley Bowling that day?

11  A    Well, he was working mostly there out of the Beech Creek

12  Apartments and so forth, in that area, that particular day.

13  Q    And what was he doing as far as working?  What was his

14  job?

15  A    Well, to be honest, all I can say is that he was over

16  there.  As far as me seeing him do anything, I didn't.  I was

17  not in Harts Branch.

18  Q    Did he talk to you about it?

19  A    Yes, he did.

20  Q    What did he tell you?

21  A    He just told me that he had been working hard for Stanley.

22  Q    And did he explain or did you understand what he meant by

23  that, he was working hard for Stanley that day?

24  A    That he was working hard in the election for him and doing

25  whatever he could do probably to help him.

VERNON HACKER 5473DIRECT - MR. SMITH          94

1  Q    Okay.  And what are the things that Bart Morris did best

2  when it came to elections?

3  A    We paid the voters.

4  Q    All right.  And are you aware at that time whether Stanley

5  Bowling made any visits that day —

6  A    No, sir.

7  Q    — over to headquarters?

8  A    No, I never did see Stanley that day.

9  Q    But Bart Morris left the headquarters and went to a place

10  where he said he was going to help Stanley Bowling?

11  A    Yes.

12  Q    Did he take any money with him?

13  A    That, I cannot say.

14  Q    Where did he keep his money?

15  A    Kept it on his possession.

16  Q    Okay.  Like that could be in his car, in his home, on his

17  person.  Where did he keep it?

18  A    On our personal— in our pockets.

19  Q    In your pockets?

20  A    Yes.

21  Q    And where were you getting the money that was put together

22  to put in your pockets?

23  A    Money would be formed by a group of the people running for

24  office or just people that would give donations.

25  Q    And when did that usually take place?

VERNON HACKER - DIRECT - MR. SMITH                    95

1  A    Prior to the election.

2  Q    And do you know where these monies came from that you were

3  spending on this election in 2002?

4  A    City council race was coming from people that was running

5  within the city council themselves.

6  Q    All right.  Now, that happened in the fall, you're getting

7  ahead of me just a little bit; right?  That's was the fall

8  election?

9  A    Yes, that was in the fall race.

10  Q    But in the spring when you were talking paying these

11  voters at the Morris garage —

12  A    Yes.

13  Q    — where was that money coming from?

14  A    It came from the people running for the offices mostly.

15  Q    Did you go to any meetings where that money was pooled?

16  A    Yes, I did.

17  Q    And tell us about that, Mr. Hacker.

18  A    I went to a meeting there at the old Clay County

19  courthouse.

20  Q    Okay.

21  A    And that particular day, there was myself, Bart Morris was

22  there, Stanley Bowling, Jennings White, Sheriff Edd Jordan,

23  County Judge Executive James Garrison, Tommy Harmon, and there

24  could have been a couple of others, but I can't recall.

25  Q    And what happened during your presence there at that

1  meeting, Mr. Hacker?

2  A    They were getting their money together for the election

3  and a discussion came up about if I would help them that I

4  would get a job there within the county.

5  Q    Okay.  How much money did you see pooled that day?

6  A    I know —— I seen one person's money and I know what he put

7  in that day.

8  Q    And what was that?

9  A    That was Jennings White, $75,000.

10 Q    Were there others that put in money that you weren't able

11 to see how much?

12 A    Yes.

13 Q    And who were they?

14 A    Sheriff Edd Jordan.

15 Q    Okay.

16 A    And at that particular day, I heard Jennings White make a

17 statement that James Garrison didn't have no money to put in,

18 that he was taking care of Judge Garrison's money.

19 Q    All right.  Anybody else?

20 A    No, sir.

21 Q    So what was the purpose for you, Stanley Bowling, and Bart

22 Morris, what roles did you-all fill that day?

23 A    Well, I was there with Bart and Stanley, but —— and we

24 went there together.  And ——

25 Q    Did the group discuss what Bart and Stanley were going to

1   be doing?

2   A     Yes.

3   Q     What was it that they decide that they would do?

4   A     Well, Stanley and Bart was going to work the Harts Branch,

5   Stanley was going to be at different places and he wanted Bart

6   to work Harts Branch for him.

7   Q     Okay.  So at the time that you-all had this meeting, these

8   monies were pooled together, and then I assume —— well, you

9   were chosen, along with Stanley and Bart, as people who were

10  going to distribute the money?

11  A     Yes, sir.

12  Q     Was there anybody else?

13  A     On election day?

14  Q     At this meeting.

15  A     At the meeting?

16  Q     The ones to distribute money that were there at the

17  meeting.

18  A     Just the people that I mentioned.

19  Q     So you three were chosen among the group to distribute the

20  money that was pooled at this meeting?

21  A     Not all the money that they had there that day, no.  I

22  want to clarify that.  We didn't —— I mean, that was money

23  for —— to go to different precincts.

24  Q     Did they discuss anyone that you recall that it was going

25  to?

1  A     No, sir.

2  Q     Now, you indicated that you were in this for a purpose,

3  and that is a job?

4  A     Yes.

5  Q     And what job was it that you were promised?

6  A     At that particular time, I was promised the solid waste

7  coordinator's job.

8  Q     Okay.  And was this a position that was under the county

9  government or city government?

10  A     Under the county government.

11  Q     And who made that promise to you?

12  A     Judge Garrison.

13  Q     And what were you to do in exchange for that promise?

14  A     Work in the elections.

15  Q     Okay.  And when you say work elections, doing things that

16  you've described doing here?

17  A     Yes.

18  Q     Now, at the time that you were doing these things for the

19  White faction, were you at any time approached by the other

20  faction?

21  A     Yes, I was.

22  Q     And who was the head of the other faction?

23  A     Well, the person who approached me was Superintendent Doug

24  Adams.

25  Q     Okay.  And what were the circumstances which Mr. Doug

1  Adams approached you?

2  A    He just asked me if I could help Freddy Thompson.

3  Q    Okay.  And where were you-all when this happened?

4  A    At the superintendent's office.

5  Q    Okay.  And did he call you in there for that purpose?

6  A    Yes, sir.

7  Q    Okay.  And tell us about that discussion.  What responses

8  did you make to him?

9  A    I told him that I would have to think it over, that was

10 all that was said.  I mean, nothing more was said or anything

11 else that day.

12 Q    All right.  Were you approached at any other time?

13 A    Yes, I was.

14 Q    Okay.  Could you tell us the circumstances?

15 A    A gentleman by the name of Ronnie Hacker, he was also a

16 city council person.

17 Q    All right.  Did he have anything to do with the school

18 board at the time?

19 A    Yes, he did.

20 Q    What position did he hold at the school board?

21 A    He was working at the transportation, there at the bus

22 garage.

23 Q    Okay.  And he made an approach to you, or how did that

24 happen?

25 A    Yeah, he came to visit me at the Memorial Hospital, my

1  mother was in a coma.

2  Q    Okay.

3  A    Very, very bad ill.  He came to me and told me that

4  Mr. Adams had sent him to give me a message; that I could

5  either support Freddy Thompson and give him acknowledgment that

6  I would or I could park my school bus.

7  Q    Now, was Mr. Hacker in a position of authority when it

8  came to school buses?  Did he have any position of authority?

9  A    Yes, sir, he worked at the transportation.

10 Q    All right.  So when he made this announcement to you, what

11 did you do?

12 A    I told him I'd park the school bus.

13 Q    All right.  And did you park your school bus?

14 A    Yes, I did.

15 Q    And this school bus that you had, was it -- What kind of

16 route did you have at that time, Mr. Hacker?

17 A    I had a real good route, I -- it was in an area called

18 Littleton.  It was a good route, had a good school bus.

19 Q    And so did you hear back from the Adams faction after you

20 parked the school bus?

21 A    Yes, I did.

22 Q    And tell us about that.

23 A    Well, they told me to go to the bus garage and they would

24 tell me what my job duties would be.  I went to the bus garage,

25 and, like I said, I had a nice school bus, automatic school

1  bus, it was automatic transmission, actually one of the better

2  ones in the county.  When I got there, I was given an old

3  standard- shift school bus and I think they took garbage cans

4  and threw garbage throughout the bus and sent me to an area in

5  Goose Rock, Kentucky, and I refused to get on the bus and

6  drive.

7  Q    So you refused to drive this bus?

8  A    Yes, I did.

9  Q    And what happened?

10 A    I left.

11 Q    So you actually left the school premises?

12 A    I left the bus garage there, that's the garage where the

13 bus was parked.  I had sick days and it was in May during the

14 May –– before the May primary, school was close to being out

15 anyway, so I had a lot of days accumulated, I went ahead and

16 used what days that I had, I didn't drive no more that school

17 year.

18 Q    Okay.  Did you hear back from anyone after you made that

19 announcement?

20 A    Yes, I did.

21 Q    And tell us the circumstances of that.

22 A    After everything was over there, the election and

23 everything and a new school year had started, we was back in

24 grace and I was given my regular route back and a different

25 school bus.

1   Q    Now, were you ever called to another meeting where you

2   were told to get on board with Freddy Thompson?

3           MR. WHITE:  Objection, leading, Your Honor.

4           THE COURT:  Sustained.

5           THE WITNESS:  I was called --

6           THE COURT:  You'll need to rephrase, Mr. Smith.

7   BY MR. SMITH:

8   Q    Were there other meetings where you were approached and

9   attempted to persuade you to come on the other side?

10          MR. WHITE:  Objection, leading, Your Honor.

11          THE WITNESS:  Yes, I was.

12          THE COURT:  Overruled.

13  BY MR. SMITH:

14  Q    Could you tell us about that?

15  A    I was called by my former employer, Charles Stivers.  He

16  asked me if I could come by his house, that he would like to

17  talk to me.

18  Q    Okay.

19  A    I went out to his house, and when I got there that night,

20  there was Charles, Mr. Wayne Jones, Freddy Thompson was there,

21  William Stivers, his brother, Judge Cletus Maricle was also

22  there.

23  Q    And this was at Charles Stivers' home?

24  A    Yes, it was.

25  Q    And what were they doing when you got there?

1  A    They were just sitting around talking.

2  Q    Okay.  And when you arrived, what happened?

3  A    They just tried to encourage me to help Freddy, and I was

4  just in a bad situation.  I mean, it wasn't that I —— Freddy

5  Thompson and I —— I want to make a statement.  Me and Freddy

6  Thompson were the best of friends, I didn't —— at one time, and

7  I love —— I mean, I love Freddy.  For me to sit here and say I

8  don't, I would be lying.  I was in a bad position, they wanted

9  me to help them, I couldn't help them.

10  Q    Why couldn't you help them?

11  A    Well, I was committed to Mr. White, I worked for his first

12  cousin there, James Phillips, I was just committed to him, and

13  I just wasn't getting —— you know, change over.

14  Q    Okay.  So when you got there, did anybody ask you any

15  personal questions about yourself?

16  A    The only thing that was ever said to me personal was by

17  Mr. Stivers.  He told me my son had been following him around

18  during the election and he thought it was me.  But other than

19  that, nothing was said.  They asked me to help, and as I was

20  leaving, that was all that was ever discussed, nothing was

21  promised me by anyone there or anything.  The only thing that

22  was ever said to me was by anyone other than just talking about

23  the election itself was Judge Maricle, he just told me that he

24  thought the tide had changed.

25  Q    He thought the tide had changed?

1    A    Yes.

2    Q    And what did he mean by that?

3    A    Well, I took it that he meant that Jennings was a beat

4    man.

5    Q    And did they seek a commitment from you before you left

6    the meeting?

7    A    No, they didn't get no commitment from me.

8    Q    Did they ask for a commitment from you?

9    A    Oh, yes, they asked me to help them, but I told them I

10   couldn't.

11   Q    Were you given any promises by the group to try to get you

12   to make a commitment to them?

13          MR. WHITE:  Objection to form, again, leading, Your

14   Honor.

15          THE COURT:  Overruled.

16          THE WITNESS:  No, sir.  As far as anyone there making

17   me any promises of anything, they didn't.

18   BY MR. SMITH:

19   Q    Was there any discussion about your bus?

20   A    Not there, no.

21   Q    Had your bus been taken from you at that point?

22   A    At that point in time, no.

23   Q    So the bus got taken from you after you left the meeting?

24   A    Yes.

25          MR. BAYER:  I'm going to object, he's leading the

 1  witness.

 2          THE COURT:  He is leading, but I'm allowing some

 3  limited leading so we can get through this area.  So it's

 4  overruled.

 5          You may answer.

 6          THE WITNESS:  The bus was taken from me after the

 7  meeting.

 8  BY MR. SMITH:

 9  Q    Do you know how long after the meeting your bus was taken

10  away?

11  A    I'm going to say approximately two to three days.

12  Q    Now, Mr. Hacker, you indicated that you stuck with the

13  White faction?

14  A    Yes, I did.

15  Q    And what was the result after the election?

16  A    Well, they were beat.  They got beat.

17  Q    And what happened then as far as you had talked earlier

18  about your involvement in the fall of 2002?

19  A    Yes.

20  Q    And what was the local races of interest at that time that

21  you were involved in?

22  A    Well, actually just the city council race.

23  Q    All right.  And was there money pooled during city council

24  races?

25  A    Yes, there was.

VERNON HACKER5485DIRECT — MR. SMITH                106

1   Q   And how did that generally work, Mr. Hacker?

2   A   Well, we got our money, like I say, from the people that

3   was on the ballot running for city council, and we would form a

4   slate that we were going to help one another and —— to try to

5   put them back into office.

6   Q   So the candidates, in other words?

7   A   Yes.

8   Q   How much money were they generally asked to put in?

9   A   A thousand, $2,000 each.

10  Q   And how many candidates did you generally collect from?

11  A   Approximately six to eight.

12  Q   And then what were you doing with the money that was

13  pooled?

14  A   We would pay the voters.

15  Q   And who did the distribution of the money in the fall of

16  the November 2002 election?

17  A   In the 2002 election, there was myself, Darnell Hipsher,

18  and Ms. Debbie Morris.

19  Q   Okay.  Now, you previously indicated that there was a

20  place where this took place?

21  A   Yes.

22  Q   At the Morrises'?

23  A   At the Morris residence.

24  Q   And where did it take place during the fall election?

25  A   That was also at the Morris residence.

1    Q    At the garage?

2    A    Yes.

3    Q    And you've indicated that that was a place that was owned

4    and occupied by Bart and Debbie?

5    A    Yes.

6    Q    Just for the record this morning, do you see them in the

7    courtroom?

8    A    Yes, I do.

9    Q    If you could point out where they're seated and what

10   they're wearing for the record?

11   A    They're seated there under the projector screen.  Debbie

12   looks like she has on a brown dress maybe.  And I can't tell

13   what Bart's wearing, but he's sitting beside her.

14              THE COURT:  The record will reflect that the

15   defendant was identified the defendants, William Morris and

16   Debra Morris.

17   BY MR. SMITH:

18   Q    Now, the fall 2002 election, what kind of organization did

19   you-all have to put together to make sure you got the voters

20   out for the city council race?

21   A    Same way as always.  We had people there that would bring

22   the voters to us, and everyone there in that Manchester area

23   that would haul voters, they knew pretty well what to do year

24   in and year out if there was an election.

25   Q    And you recall some of the names, again, that would help

 1  you in the city council race?

 2  A    As far as vote haulers or ——

 3  Q    Yes, sir.

 4  A    Deshae Henson, myself, Darnell Hipsher, Chris Duff,

 5  Hawkeye Pennington, various ones.

 6  Q    Now, Hawkeye Pennington.  That's a name that we've not

 7  heard.  Is he a person — an office holder or seeking office

 8  himself?

 9  A    No, he just —— he was a vote hauler.

10  Q    Okay.  Do you know if Hawkeye is a nickname?

11  A    That's his nickname.

12  Q    Do you know his real name?

13  A    I really don't.

14  Q    And so tell us again for the fall election for the city

15  council how it was that you knew the voters had voted the way

16  they had been bribed or paid to vote.

17  A    We had a precinct registration form, and as they would

18  come in and vote, their names would be marked off, highlighted

19  through, and then they would be marked that they were paid.

20  Q    And when vote haulers took them up to the voting place,

21  did you have someone there to help make sure that they voted?

22  A    Yes.

23  Q    And who was those people or person?

24  A    I think it was Charles "Dobber" Weaver.

25  Q    Okay.  And at that particular time, was there a signal or

1  a method in which you were being able to identify whether or

2  not they voted the way they had been bribed to vote?

3  A    Whoever took them in would stand around there at the door,

4  and when they would come back out from voting them, they would

5  just nod yes, that they was all right.

6  Q    Now, do you recall Mr. Weaver being involved in an

7  election himself?

8  A    As far as —

9  Q    Did he ever run for office?

10  A    — run for office?  He ran for the Clay County board;

11  school board race.

12  Q    So he ran for school board.  Do you know when he ran for

13  school board?

14  A    Really I'm not sure.

15  Q    Were you involved in supporting his candidacy for school

16  board?

17  A    Yes.

18  Q    And how were you involved in that?

19  A    I tried to help Dobber all I could in that race.

20  Q    Did you buy votes in that race?

21  A    Yes, I did.

22  Q    And do you recall how it was that you were organized for

23  his race?

24  A    Same way.

25  Q    Okay.  Was there a slate?

1   A    No, it was just Dobber.

2   Q    Okay.  So you were personally trying to identify him as a

3   candidate for these voters?

4   A    Yes.

5   Q    And you don't recall when that was?

6   A    I'm not sure where if it -- I want to say it was 2004.

7   I'm not sure of that, but I think it was.

8   Q    Was there a faction that opposed your support of

9   Mr. Weaver?

10  A    The school board was supporting his opponent.

11  Q    And who was his opponent?

12  A    Charles Keith.

13  Q    And did he have a relationship with the school board?

14  A    Mr. Keith?  Yes, sir.

15  Q    What was he?

16  A    He was chairman of the school board.

17  Q    Okay.  So he was an incumbent officeholder?

18  A    Yes.

19  Q    And he was chairman of the board?

20  A    Yes, sir.

21  Q    And at that time, who had the board served as their

22  superintendent?

23  A    Mr. Adams.

24  Q    Now, in the fall of 2002, you indicated that you still

25  used the same place, the Morris garage?

1  A    Yes.

2  Q    And how is it that it functioned to help you in the 2002

3  fall council race that you recall?  How was it used?

4  A    That was where we set up for the council race.

5  Q    All right.

6  A    And the May primary also.

7  Q    All right.  So you used the same method of operation there

8  in the fall?

9  A    Yes, we did.

10  Q    Okay.  Now, was Bart Morris not involved in the fall of

11  2002?

12  A    Yes, he was involved.

13  Q    And how was he assisting?

14  A    The same way as I was, we was just paying the voters and

15  hauling the voters, whatever it may have been.

16  Q    Anybody else play a similar role as yourself other than

17  Bart Morris that you recall in the fall election?

18  A    Gary Jackson, Darnell Hipsher, that would be mostly who it

19  consisted of.

20  Q    So the four of you basically were making sure that you got

21  the voters up there to the election officer, who then took them

22  in and voted?

23  A    Yes.

24  Q    And then when they were brought back and paid, who would

25  generally pay the voters after they voted?

1  A    Myself, Bart, Debbie, Darnell, we all handled money.

2  Q    Now, were there any lists maintained for these city

3  council races as you've described in the primary?

4  A    Yeah, we would always keep the lists of who voted.

5  Q    Now, you indicated that other city council candidates

6  would bring money?

7  A    Yes.

8  Q    And did they deliver it personally or would they send it

9  by someone?

10  A    They would deliver it personally.

11  Q    Okay.  And who were some of those candidates or council

12  people that brought money that you recall in the fall of 2002?

13  A    Penny Robinson, Laura House, Judge Oscar Gayle House

14  brought the money for his wife, Sherry.

15  Q    Now, Judge Oscar, is that a county judge or is that a

16  court judge?

17  A    At that time he was a district judge, I think.

18  Q    All right.  Does he hold a different position now?

19  A    I think he's circuit court judge now.

20  Q    Okay.  And he brought money.  Do you remember how much

21  money he brought?

22  A    He brought money to me, $2,000.

23  Q    Now, after the November election, did you go back to doing

24  your duties with the school board as a bus driver?

25  A    Yes, I did.

1   Q    And do you know when you resumed that position with the
2   school board — yeah, as a school bus driver?
3   A    Following the school year there after the 2002 May
4   primary.
5   Q    All right.  And what kind of bus did you get when you
6   returned back to the school board for your bus?
7   A    I got a good bus.
8   Q    All right.  And was your wife ever brought up in this
9   dilemma that you were facing?
10  A    My wife was having medical issues, and Mr. Adams just told
11  me that he would try to give her a teacher's aide job or
12  something to help her out to get her out of the cafeteria, but
13  my wife declined on it, she didn't want it.
14  Q    And this happened after the election?
15  A    Yes, it did.
16  Q    Now, you were continuing to serve as city councilman
17  during this whole time?
18  A    Yes, I was.
19  Q    How did you do in that fall 2002 election?
20  A    I won.
21  Q    And do you know who the top vote-getter for that 2002
22  election for the city council?
23  A    I think it was Darnell Hipsher.
24  Q    Do you know where you landed in the rankings?
25  A    No. 2.

1  Q    How far apart were you and Darnell in the rankings for

2  city council?

3  A    It wasn't very many votes.  I can't recall exactly how

4  many, but very view.

5  Q    Now, you-all ran, again, I assume, in 2004?

6  A    Yes, sir.

7  Q    And the county clerk that was — the Board or the Board of

8  Elections changed, I assume, after 2002; is that correct?

9  A    Yes.

10  Q    And who took over as county clerk?

11  A    Freddy Thompson.

12  Q    And during the 2004 election, did you have an organized

13  effort to assist in the election as you did in '02 at some

14  point?

15  A    As far as having anything to do with anything at the

16  courthouse or the Clerk's Office, I didn't, no.

17  Q    Well, were you aware that there were' monies being pooled

18  again by the city council in the fall of 2004?

19  A    Yes.

20  Q    Now, do you recall there being a race for state

21  representative in the spring?

22  A    Yes.

23  Q    And who was that?

24  A    Mr. Tim Couch.

25  Q    And who was he running against?

1   A    Ms. Barbara Colter.

2   Q    And were you asked to help them in that primary election

3   in any way?

4   A    Yes, I was.

5   Q    And who was it that asked you to help them in the primary?

6   A    Mr. Adams asked me to help Tim Couch.

7   Q    Okay.  And did you do that?

8   A    No, I was for Barbara Colter, but I promised Mr. Adams

9   that I would try to keep it as close as I could with what I had

10  to do with.

11  Q    All right.

12  A    And that was all that was discussed on that.

13  Q    So keep it as close as you could with what you had to do

14  with.  What does that mean?

15  A    Well, I have a large family of voters in that Manchester

16  precinct and —— but they was mostly for Barb Colter, and we

17  were —— like I say, we were buying votes for other things and

18  he just asked me if I would do what I could to keep it close.

19  Q    So you were buying votes ——

20  A    Yes, I was.

21  Q    —— in that election as well?

22  A    Yes.

23  Q    And where were you headquartered during that election?

24  A    At Bart Morris's.

25  Q    All right.  And did you offer the similar kind of service

1  of helping him take voters to the polls --

2  A    Yes.

3  Q    -- in that election?

4       All right.  And during the time that you were taking the

5  voters up there, did you have someone at the polling place?

6  A    Yes.

7  Q    And do you recall who it was helping in that election?

8  A    I think it was Ms. Wanda White and Charles Weaver.

9  Q    All right.  And at the time that this '04 state

10 representative's race was going on, did you have others helping

11 you?

12 A    Yes.

13 Q    And who do you recall helping you?

14 A    Darnell Hipsher, myself, Bart Morris, Debbie Morris, more

15 or less the same people I mentioned prior to the 2002 election.

16 Q    So while the candidates had changed, the mechanism, the

17 operation was about the same?

18 A    Stayed the same.

19 Q    Where did you-all have discussions about pooling the money

20 that you recall in 2004?

21 A    The money there in 2004 I was never in no meeting with

22 anyone that pooled any money together.  What money that was put

23 together was brought to Bart.

24 Q    All right.  So these city council meetings, you-all didn't

25 have an opportunity to discuss that after the meeting or

1   anything?

2   A     Oh, in the November race –– our race is always in

3   November, it's never in –– during May.

4   Q     So let's move forward then to the fall of '04.  Was there

5   meetings that occurred in the fall of '04 when the city council

6   itself ran?

7   A     Yes.

8   Q     And could you tell us about those?

9   A     We would always –– after a city council meeting would be

10  over, we would gather up at the old City Hall and discuss

11  things.

12  Q     And at the time that you were discussing things, what kind

13  of things did you–all discuss?

14  A     We were discussing getting our money together and a slate.

15  Q     Okay.  And did an agreement come together at that point

16  about who would make up the slate?

17  A     Yes.

18  Q     And do you recall some of the people who made up the slate

19  in the fall of November 2004?

20  A     Myself, Darnell Hipsher, Laura House, Penny Robinson, we

21  were the –– and Sherry House.

22  Q     Now, was there a newcomer to the race in 2004 November by

23  the name of Carmen Lewis?

24  A     Yes, there was.

25  Q     Was she in your slate?

1  A    No, she wasn't.

2  Q    Now, did you take money from that meeting at that point?

3  A    I didn't take money there, but I took it later.

4  Q    Who all do you recall bringing you money, Mr. Hacker, for

5  that November 2004 election?

6  A    Judge Oscar Gayle House, city council person Penny

7  Robinson, and city council person Laura House.

8  Q    Now, Darnell Hipsher, did he ever bring you money?

9  A    No.  Me and Darnell always got compensated for working the

10  election.  We never did put up no money.

11  Q    Did anyone ever send money by Darnell to you?

12  A    Not by Darnell to me, no.

13  Q    Anybody else you recall bringing you money for that 2004

14  fall election?

15  A    Mr. Adams gave me a little donation.

16  Q    Okay.  How much did he give you?

17  A    I want to say it was $500.

18  Q    Okay.  Now, Mr. Adams, have you identified him already

19  this afternoon?

20  A    Superintendent Doug Adams.

21  Q    Have you identified him already for us?

22  A    Yes, I have.  He's seated —

23  Q    What's he wearing?

24  A    He's wearing a blue suit.

25            THE COURT:  The record will reflect that the witness

1  has identified Defendant Adams.

2  BY MR. SMITH:

3  Q    Did he bring you a check for his donation?

4  A    No, he gave me cash.

5  Q    And where was it that he gave you this cash?

6  A    In his office.

7  Q    And did you-all have any discussion at that time about

8  what was going on with the election?

9  A    He asked me at that point in time there if I could help

10 Jeff Deaton.

11 Q    Okay.  Now, Jeff Deaton, was he a new candidate for the

12 city council at that time?

13 A    No, he was already on the council, but there was a lot of

14 people running.

15 Q    And did he have a job outside the city council where he

16 was employed?

17 A    He worked for the Clay County Board of Education.  I think

18 he was a custodian maybe or over the custodians there at the

19 Clay County Middle School.

20 Q    Did he talk to you about other donations he was planning

21 to make?

22 A    No, sir.

23 Q    Did he speak about any other money he was planning?

24 A    No, sir.

25 Q    Now, these monies that you put together, did you — those

1   that you collected, what did you do with the money that you

2   collected?

3   A      Used it in the election there, mostly gave it — at that

4   point in time there, in 2004, I gave it to Wayne Jones and

5   William Stivers.

6   Q      All right.  And what were they doing in the election in

7   '04?

8   A      They were working the early voting machines there at the

9   Clerk's Office.

10  Q      Okay.  So they were election officers serving at the

11  County Clerk's Office that year?

12  A      Yes, sir.

13  Q      And the County Clerk at that time would have been who?

14  A      Freddy Thompson.

15  Q      And so they were working actually at the County Clerk's

16  Office itself?

17  A      Yes.

18  Q      And what were they doing at the County Clerk's Office with

19  the money?

20  A      They were paying voters.

21  Q      All right.  Now, were there any other meetings that you

22  recall where you were approached to support — you indicated in

23  the primary you supported the Barbara White candidate.  Were

24  you ever called to any meetings and asked to change over in

25  that election?

1   A     Yes.

2   Q     What was it that you recall?

3   A     Darnell Hipsher called me on my cell phone and asked me if

4   I could come by his house.  That was during the race there with

5   Tim Couch and Barbara Colter.

6   Q     And what did you do when you got the call?

7   A     I told him I would run by.

8   Q     So who was there when you got there?

9   A     There was Mr. Douglas Adams, Tim Couch, State

10  Representative Tim Couch, and Senator Robert Stivers.

11  Q     And what happened once you got there?

12  A     They just talked to me about Tim and Barbara again and

13  thought it was going to be a close election and he asked me if

14  I would consider helping Tim.

15  Q     And what was your response at that time?

16  A     I told him that I was a — for Barbara Colter but I would

17  try to keep it — he asked me not to — if I could just keep

18  Barb from running away with it in Manchester.  I told him I

19  could do what I could do, but I was just the one person.

20  Q     Were you serving as an election officer in that election?

21  A     No, sir.

22  Q     So the involvement that you had was out there at the

23  Morris's and doing that part of the election.

24  A     Yes.

25  Q     Now, 2006, Mr. Hacker, were you still serving as city

1  councilman in 2006?

2  A    Yes, I was.

3  Q    And were you involved in the same operation that you've

4  described in 2002 and 2004 and even years prior?

5  A    In 2006, I didn't get involved in the election.

6  Q    Okay.  And why is it that you didn't get involved in the

7  election in 2006?

8  A    Well, there was no one running there that no one had any

9  concern in.  There was a lot of things happen in 2004 and

10  people was somewhat scared.

11  Q    So when you're saying "people were somewhat scared,"

12  you're talking about people who were involved with you

13  previously?

14  A    Yes, myself and those that was involved around me.

15  Everyone was scared.

16  Q    Now, there was an indictment out of federal court that

17  named you in 2006?

18  A    Yes.

19  Q    And do you recall when it was you were indicted?

20  A    August 17th, 2006.

21          MR. SMITH:  And I would like to hand the witness now,

22  Your Honor, what's marked as Government's Exhibit PA14.

23          THE COURT:  All right.  Yes, sir.

24          MR. WHITE:  I'm sorry, Your Honor.  Was that PA14?

25          THE COURT:  Fourteen.

1  BY MR. SMITH:

2  Q     Do you recognize Government's Exhibit PA14, Mr. Hacker?

3  A     Yes, I do.

4  Q     What is that?

5  A     It's a plea agreement.

6  Q     Okay.  And is that your plea agreement?

7  A     Yes, it is.

8  Q     And looking at the last page, seven, if you could, does

9  that appear to be your signature?

10 A     Yes, it is.

11 Q     Okay.  And could you tell us just generally what you pled

12 guilty to in 2000 — or to these charges in 2006, what were

13 those charges?

14 A     I pled guilty to conspiracy to possess and distribute

15 five kilos or more of cocaine and conspiracy on OxyContin.

16 Q     And what judge took your plea, if you recall?

17 A     Judge Danny C. Reeves.

18 Q     And at the time that you entered into this agreement, did

19 you agree to cooperate and testify truthfully if called to

20 testify?

21 A     Yes, I did.

22 Q     And did the government make you any promises at that time?

23 A     No, sir, they did not.

24 Q     And what's your understanding would happen to you,

25 Mr. Hacker, as far as a sentence, if it is to be reduced, who

1  would make that decision?

2  A    I think the government files a motion.

3  Q    Okay.  And after the motion is filed, who would consider

4  the motion?

5  A    The Judge himself.

6  Q    Okay.  And so what's your understanding would happen,

7  Mr. Hacker, if you were to testify here today untruthfully?

8  A    That I would not be granted anything, and -- I mean, no

9  request of anything.

10  Q    All right.  And what's your understanding about possible

11  other charges?

12  A    That I could be charged.

13        MR. SMITH:  All right.  I would move for the

14  introduction of Government's Exhibit PA14, Your Honor.

15        THE COURT:  All right.  Any objection?

16        That exhibit will be admitted into evidence at this

17  time.

18        MR. SMITH:  If I could have just a moment, Your

19  Honor.

20        THE COURT:  Yes, sir, you may.

21        MR. SMITH:  Your Honor, I believe that's the

22  questions we have for this witness.

23        THE COURT:  All right.  Thank you.

24        Before we continue with cross-examination, ladies and

25  gentlemen, we will take our lunch break.  We'll break until

1  1:00 this afternoon.  If you do need a few extra moments, you

2  can just advise the security officer, but we'll plan to resume

3  with questioning of the witness at 1:00 this afternoon.

4        Please keep in mind the admonition that you have been

5  given previously not to discuss the case among yourselves while

6  we are in recess.  The jury will be excused until 1:00 p.m.

7        (Whereupon, the jury retired from the courtroom, after

8  which the following proceedings were had in open court.)

9        THE COURT:  Thank you.

10        Any matters to be taken up outside the presence of

11  the jury, Counsel?

12        MS. HUGHES:  Yes, the Jencks Act material for this

13  gentleman.

14        THE COURT:  All right.  Mr. Smith, do you have

15  additional Jencks Act material to produce?

16        MR. SMITH:  No, Your Honor.

17        THE COURT:  No additional material.  All right.

18  Thank you.

19        We'll be in recess until 1:00 p.m.

20        (Whereupon, a recess was had for the noon hour, after

21  which the proceedings continue uninterrupted to Volume 5-B.)

22                      (Proceedings concluded at 12:00 p.m.)

23              C E R T I F I C A T E

24     I, Cynthia A. Oakes, certify that the foregoing is a

25  correct transcript from the record of proceedings in the

1 | above—entitled matter.

2

3 | 2/9/2010                          s/CYNTHIA A. OAKES
  |    DATE                    CYNTHIA A. OAKES, RPR, RMR, CRR

4

5

6

7 | I N D E X

8 | PAGE

9 | Testimony of TODD ROBERTS:

        Continued Cross—Examination by Mr. Hoskins:        4
        Cross—Examination by Mr. Westberry:                5
        Cross—Examination by Mr. White:                   27
        Cross—Examination by Mr. Abell:                   28
        Cross—Examination by Mr. Baldani:                 37
        Redirect Examination by Mr. Smith:                56
        Recross—Examination by Mr. Hoskins:               59
        Recross—Examination by Mr. Westberry:             60
        Recross—Examination by Mr. Abell:                 62

Testimony of VERNON HACKER:
        Direct Examination by Mr. Smith:                  65

18 | E X H I B I T S

| Government's Exhibit No. | Identified | Page Admitted |
|---|---|---|
| P2 | 82 | |
| PA14 | 123 | 124 |