United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) London, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 5, 2010 |
| DOUGLAS C. ADAMS | ) 3:34 p.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM R. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 4-B |
| STANLEY BOWLING | ) |

TRANSCRIPT OF CROSS-EXAMINATION OF TODD ROBERTS
BEFORE THE HONORABLE DANNY C. REEVES

Appearances of Counsel:

| | |
|---|---|
| On behalf of the United States: | STEPHEN C. SMITH, ESQ. |
| | JASON D. PARMAN, ESQ. |
| | |
| On behalf of the Defendant | DAVID S. HOSKINS, ESQ. |
| Russell Cletus Miracle: | MARTIN S. PINALES, ESQ. |
| | CANDACE C. CROUSE, ESQ. |
| | |
| On behalf of the Defendant | R. KENT WESTBERRY, ESQ. |
| Douglas C. Adams: | BENNETT E. BAYER, ESQ. |
| | KRISTEN N. LOGAN, ESQ. |
| | |
| On behalf of the Defendant | T. SCOTT WHITE, ESQ. |
| Charles Wayne Jones: | |
| | |
| On behalf of the Defendant | ROBERT L. ABELL, ESQ. |
| William R. Stivers: | |
| | |
| On behalf of the Defendant | RUSSELL JAMES BALDANI, ESQ. |
| Freddy W. Thompson: | R. TUCKER RICHARDSON III, ESQ. |
| | |
| On behalf of the Defendant | JERRY W. GILBERT, ESQ. |
| William B. Morris: | |
| | |
| On behalf of the Defendant | ELIZABETH SNOW HUGHES, ESQ. |
| Debra L. Morris: | |
| | |
| On behalf of the Defendant | DANIEL A. SIMONS, ESQ. |
| Stanley Bowling: | |

```
 1   Appearances of Counsel:

 2   On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                        JASON D. PARMAN, ESQ.
 3                                      Assistant U.S. Attorneys
                                        601 Meyers Baker Road
 4                                      Suite 200
                                        London, Kentucky  40741
 5
     On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
 6   Russell Cletus Miracle:            107 East First Street
                                        Corbin, Kentucky  40701
 7
                                        MARTIN S. PINALES, ESQ.
 8                                      CANDACE C. CROUSE, ESQ.
                                        150 East Fourth Street
 9                                      Federal Reserve Building
                                        Cincinnati, Ohio  45202
10
     On behalf of the Defendant         R. KENT WESTBERRY, ESQ.
11   Douglas C. Adams:                  KRISTEN N. LOGAN, ESQ.
                                        220 West Main Street
12                                      Suite 1900
                                        Louisville, Kentucky  40202
13
                                        BENNETT E. BAYER, ESQ.
14                                      106 West Vine Street
                                        Suite 800
15                                      Lexington, Kentucky  40507

16   On behalf of the Defendant         T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:               133 West Short Street
17                                      Lexington, Kentucky  40507

18   On behalf of the Defendant         ROBERT L. ABELL, ESQ.
     William R. Stivers:                120 North Upper Street
19                                      Lexington, Kentucky  40507

20   On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:                R. TUCKER RICHARDSON III, ESQ.
21                                      300 West Short Street
                                        Lexington, Kentucky  40507
22
     On behalf of the Defendant         JERRY W. GILBERT, ESQ.
23   William B. Morris:                 212 North Second Street
                                        Richmond, Kentucky  40475
24
     On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
25   Debra L. Morris:                   201 West Short Street
                                        Lexington, Kentucky  40507
```

```
1   On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
    Stanley Bowling:                   116 West Main Street
2                                      Suite 2A
                                       Richmond, Kentucky  40476
3
    Court Reporter:                    CYNTHIA A. OAKES, CRR
4                                      Official Court Reporter
                                       United States District Court
5                                      560 Athens Boonesboro Road
                                       Winchester, Kentucky  40391
6                                      (859) 983-4346

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
    Proceedings recorded by mechanical stenography,
25  transcript produced by computer.
```

1                          CROSS—EXAMINATION

2    BY MR. HOSKINS:

3    Q    Mr. Roberts, just to clear up a few things first.  This

4    DUI case that you talked about, Kennon White wanted to get the

5    case dismissed and you're saying it got put off and put off and

6    put off.  That case was not in Judge Maricle's court, was it?

7    A    No, sir, it was a district court case.

8    Q    Okay.  So it would have been in front of a different

9    judge?

10   A    Yes, it would have been in front of a district court

11   judge.  There's two of them, so one of the two.  I'm not sure

12   which one it was in front of.

13   Q    Who were those two judges?

14   A    Excuse me?

15   Q    Who were those two district judges?

16   A    At the time, it would have been Judge Oscar Gayle House

17   and Renee Muncy.

18   Q    Now, Judge Muncy was also the judge who dismissed the —

19   was it alcohol intoxication and disorderly conduct charges

20   against Mr. Stivers?

21   A    That is correct.

22   Q    So that also happened in a district court where Judge

23   Maricle was not involved?

24   A    That is correct.

25   Q    And there was a big long hearing in that case when those

1   charges were dismissed when officers testified, you testified?

2   A    That's correct.

3   Q    And Jeff Culver testified?

4   A    Yes, sir, he did.

5   Q    Jeff Culver is the chief of police in Manchester now,

6   isn't he?

7   A    Now, that is correct.

8   Q    And Judge Muncy's ruling was that Mr. Stivers should not

9   have been arrested that day?

10  A    I'm not sure.  She dismissed it.  I'm not sure what she

11  put as her final disposition.  I don't know what actually she

12  put down for that, but, yes, it was dismissed.

13  Q    You were there when —

14  A    Yes, sir, I was.

15  Q    — the hearing took place and you testified?

16  A    That is correct.

17  Q    And you and Jeff Culver testified to very different facts,

18  didn't you?

19  A    That is correct.

20  Q    And the result was that your version of the facts were not

21  what held the day; correct?

22  A    Not in the court, no, sir.

23  Q    Okay.  And that was kind of big news in Manchester, wasn't

24  it?

25  A    Yes, sir, it was.

TODD ROBERTS- CROSS- MR. HOSKINS                    6

1  Q    It was on the front page of the Manchester paper that

2  Mr. Stivers was cleared of those charges?

3  A    That is correct.

4  Q    It caused you some embarrassment, didn't it?

5  A    No, not really.  I mean —

6  Q    It didn't bother you at all?

7  A    Why would it embarrass me?

8  Q    Because you were not believed by the Judge, were you?

9  A    She dismissed the case.

10  Q    You didn't want it dismissed, did you?

11  A    No, sir, I thought he was guilty.

12  Q    Now, you knew back then that Mr. Stivers and Judge Maricle

13  were friends?

14  A    Yes, sir.

15  Q    And when you had that lawsuit filed against you for

16  wrongfully arresting Mr. Stivers, you knew that Mr. Stivers and

17  Judge Maricle were friends?

18  A    Yes, sir.

19  Q    And you told your lawyers that?

20  A    Yes, sir, they knowed that.

21  Q    But nobody ever asked Judge Maricle to get off the case,

22  did they?

23  A    Not to my knowledge.

24  Q    Now, again, Clay County is a small county, population-

25  wise, isn't it?

1  A    Yes, sir.

2  Q    And you're aware that the judges, whether it's District

3  Judge Muncy or District Judge House at the time or the circuit

4  judge is frequently, in a state court, frequently going to be

5  called upon to rule in cases or to be judge in cases where they

6  may know some of the people in one degree or another; correct?

7  A    What did you say toward the end?

8  Q    That a judge in Clay County is frequently going to be

9  called upon to be judge in a case where he may personally know

10 some of the people involved?

11 A    Yes, sir.

12 Q    And, in fact, you personally knew Judge Maricle, didn't

13 you?

14 A    Yes, sir, I did.

15 Q    And you were a witness in many cases in his court?

16 A    Yes, sir, I was.

17 Q    And the fact is in the civil case that Mr. Stivers filed

18 against you for his wrongful arrest, Judge Maricle never had to

19 make any kind of type of a ruling, it went to a mediation where

20 the parties basically worked out an agreement, isn't that true?

21 A    I can't say for sure that's exactly what happened, but I

22 was never in a courtroom setting on that particular case.  I

23 know I took a deposition or I gave a deposition and then they

24 took Mr. Stivers's deposition.

25 Q    And you're not aware of any ruling that Judge Maricle made

TODD ROBERTS— CROSS— MR. HOSKINS                    8

1   in that case that went against you or went against the other

2   side, are you?

3   A    None to my knowledge, other than this order of dismissal.

4   Q    Well, the order of dismissal was after the agreement was

5   made, wasn't it?

6   A    I assume, yes.

7   Q    You looked at it a little earlier, didn't you?

8   A    Yes, sir.

9   Q    And said that it was dismissed as settled?

10  A    Excuse me?

11  Q    Was it dismissed as settled or not?

12  A    Yes, sir.

13  Q    Okay.  And a settlement means both sides got together and

14  settled the case without the Court having to do it; right?

15  A    Yes, sir.  But the insurance company, the insurance for

16  the City, there's a clause in their policy that says that the

17  insurance company can elect to settle a case without the

18  agreement with the party that they are insured if it's in their

19  best interest.

20  Q    Okay.  So I understand that you didn't like it being

21  settled, you thought Judge Muncy was wrong when she dismissed

22  the case?

23  A    Yes, sir, I did.  I thought there was other factions that

24  played a role, too.

25  Q    Okay.  So you didn't want the civil case where you got

TODD ROBERTS CROSS- MR. HOSKINS                    9

1  sued for the wrongful arrest, you didn't want that to be

2  settled either, did you?

3  A    No, sir.

4  Q    But the point is that it wasn't Judge Maricle who ruled in

5  favor of his friend, Mr. Stivers, it was an agreement that the

6  insurance company and the other people made in the case, wasn't

7  it?

8  A    I assume, yes.

9  Q    And you're not suggesting in any way that Judge Maricle

10 did anything improper in that case, are you?

11 A    No, I just explain the facts as I know them.

12 Q    Okay.  Thank you.

13      You talked about Mr. Stivers talking about guns, and you

14 also are a gun enthusiast, aren't you?

15 A    I was a licensed federal firearms dealer, yes, sir.

16 Q    You had a nice gun shop in London, Kentucky, didn't you?

17 A    Yes, sir, I did.

18 Q    It was called Todd's Guns?

19 A    That is correct.

20 Q    So lots of people knew that you were a gun enthusiast and

21 would talk to you about that kind of thing, wouldn't they?

22 A    Yes.

23 Q    Now, a few minutes ago you were asked what you did to

24 obstruct justice, and I think your phrase that you used was you

25 didn't disclose the full facts?

TODD ROBERTS- CROSS- MR. HOSKINS                    10

1    A     That's correct.

2    Q     Did you tell the FBI anything at all about you being

3    involved in burning down that building?

4    A     At the initial conversation I had with them, they asked me

5    about things that happened on the night of the fire.  They

6    didn't actually come out and ask me if I burned a house down or

7    if I assisted anybody and nor did I say anything to that

8    nature.  I just didn't disclose the facts to them at that time.

9    Q     Okay.  So my question was, you didn't tell them one single

10   thing about you being involved in burning that house down, did

11   you?

12   A     No, sir.

13   Q     Okay.  So you concealed the whole truth from the FBI that

14   day?

15   A     I didn't tell them.

16   Q     You had a career as a law enforcement officer?

17   A     Yes, sir.

18   Q     But during that career as a law enforcement officer you

19   were committing felonies, weren't you?

20   A     I don't think so.  There was the one incident.

21   Q     Well, there was the one incident where you lied to the

22   FBI, concealed facts from the FBI and lied about details of

23   what you did that night, that was one felony, wasn't it?

24   A     After I was indicted.

25   Q     That was a felony, wasn't it?

TODD ROBERTS - CROSS- MR. HOSKINS                    11

1  A    Yes, sir.

2  Q    When you burned the house down or helped —— when you

3  helped Bobby Joe Curry, the drug dealer, burn the house down,

4  picked him up, dropped him off, gave him instructions as to how

5  to do it and it didn't burn the first time, that was a felony,

6  wasn't it?

7  A    Yes, sir.

8  Q    Okay.  Now, you had been to Bobby Joe Curry's house lots

9  of times, hadn't you?

10 A    No, sir.

11 Q    You had been there?

12 A    I have been there, but not lots of times.

13 Q    Okay.  Are you telling this jury that you were only there

14 for official police business, or were you there also because he

15 was your friend?

16 A    Mr. Curry was an informant for me, and I did stop there on

17 occasions, and I did have two instances in which I raided

18 Mr. Curry.

19 Q    But when you raided Mr. Curry, he knew ahead of time that

20 he was going to be raided, didn't he?

21 A    I can't say that for sure because he didn't by me, and we

22 did seize drugs both times we raided, so I'll let you decide

23 that.

24 Q    Very small amounts of drugs?

25 A    No, sir, there was —— on the second occasion, there was

1   quite a bit of quantity of cocaine that was seized that

2   actually resulted in his being charged in federal court in this

3   particular matter.

4   Q   One time you went there, though, expecting to — or from

5   all appearances expecting to find a lot of drugs and there was

6   hardly anything there; right?

7   A   The first time we found five plants of marijuana, several

8   Xanaxes and Viagra, that was what we found on the first raid,

9   that's correct.

10   Q   Far short of what anybody would have expected if they were

11   playing it straight; right?

12   A   I don't understand what you're saying by that.  Sometimes

13   we go to do a raid and we may hit a lot of drugs, sometimes we

14   may not hit but just a small amount.  So to say that there

15   would be a set amount, that wouldn't be a fair statement.

16   Q   But you would have to have some idea what you're going to

17   find when you go to a judge and ask for a search warrant, don't

18   you?

19   A   That's right.  You have to work on either a confidential

20   informant or a drug buy.

21   Q   Now, Bobby Joe Curry did other things for you besides work

22   as an informant, didn't he?

23   A   No, sir.

24   Q   Nothing at all?

25   A   No, sir.  The only other incident that he would have been

TODD ROBERTS— CROSS— MR. HOSKINS                13

1   involved in is the house, which I have already admitted to and

2   accepted responsibility for that I explained here.

3   Q    Let me shift gears and ask you a few questions about the

4   trip to Washington, D.C.  When you were asked to go on that

5   trip, you were the assistant police chief, weren't you?

6   A    Yes, sir, I was.

7   Q    So you were a prominent citizen of Manchester, Kentucky?

8   A    Yes, I was an official of the city.

9   Q    Cletus Maricle at the time was the circuit judge?

10  A    Yes, sir.

11  Q    Doug Adams was the superintendent of the county schools?

12  A    Yes, sir.

13  Q    And the plan on that trip was to take some important folks

14  who knew about the county and knew about the city to talk to

15  your congressional people to try to get some help and money for

16  Clay County?

17  A    Yes, sir.

18  Q    Nothing improper about that, was there?

19  A    No.

20  Q    As a police officer, before you went to prison, you've

21  testified in court many times, haven't you?

22  A    Yes, sir, I have.

23  Q    State Court?

24  A    I'm sorry.

25  Q    State Court?

```
 1  A    State and federal.
 2  Q    Okay.  In fact, you worked on a lot of cases with
 3  Mr. Smith, didn't you?
 4  A    Yes, sir, I did.
 5  Q    In federal court?
 6  A    I'm sorry?
 7  Q    In federal court then?
 8  A    Yes, sir.  I have a hearing impairment and you're a real
 9  light voice, so I've only got like 60 percent hearing in this
10  ear.  So if I ask you to repeat yourself, I'm not trying to
11  stall you.
12  Q    I appreciate that, and please ask me to repeat it if I
13  don't state it clearly or loud enough.
14  A    Yeah.
15  Q    As a police officer, you had some training in how to
16  testify?
17  A    As part of the training, the ten-week training that we
18  receive at the Department of Criminal Justice, there's one day
19  on courtroom procedures.
20  Q    You're very well familiar with how the process works for a
21  defendant trying to get a reduced sentence, aren't you?
22  A    Yes, sir.
23  Q    And you understand that when you sign a plea agreement
24  that says if you commit perjury that you could be prosecuted
25  again, you know who would decide if you had committed perjury
```

1    or not, don't you?

2    A      That is correct.

3    Q      It would be the prosecutor; right?

4    A      Do what now?

5    Q      It would be the prosecutor, the United States Attorney,

6    wouldn't it?

7    A      It would be a prosecutor, yes.

8    Q      Okay.  Nobody — no defense lawyer can bring you up on

9    perjury charges, can they?

10             MR. SMITH:  Your Honor, I'm going to object.

11             THE COURT:  Sustain the objection to the question.

12   BY MR. HOSKINS:

13   Q    You understand that before you can get your sentence

14   reduced, the prosecutor, the United States Attorney, has to

15   make a request to the Judge, don't they?

16   A      Yes, sir.

17   Q      And you would like to get your sentence reduced?

18   A      Yes, sir.

19   Q      You're a police officer, former police officer, and you're

20   in prison?

21   A      Yes, sir.

22   Q      And that makes for an especially difficult time in prison,

23   doesn't it?

24   A      I assume so, yes.

25   Q      Mr. Roberts, who was the representative of the Attorney

1  General's Office that you were with the day you talked about?

2  A    They were field officers.  I don't know their names

3  exactly.

4  Q    Do you have any recollection at all?

5  A    No, sir, I don't.  They send four or five in to monitor

6  most of the elections, and each time they change.  But they

7  should have a record of who came there.

8  Q    Okay.  You talked a little bit about the home

9  incarceration business in Clay County.  Just to be clear, you

10  talked about Jo Davidson —

11  A    Yes, sir.

12  Q    — running that business?

13  A    Yes, sir.

14  Q    As far as you know, she still runs that business to this

15  day?

16  A    As far as I know.

17  Q    Okay.  At the time — And you talked about Jo Davidson

18  once being Judge Maricle's secretary.

19  A    That is correct.

20  Q    Those were two different times, weren't they?  She was not

21  his secretary and running that business at the same time, was

22  she?

23  A    You know, I can't answer that.  I don't know that for

24  sure.  I mean, only the records would reflect that.  I can't

25  really tell you that for sure.

TODD ROBERTS - CROSS- MR. HOSKINS                    17

```
 1   Q    To your knowledge, that's true, though, isn't it?

 2   A    To my knowledge, I don't know that, no, sir.

 3   Q    Jo Davidson ran for jailer once, didn't she?

 4   A    Yes, sir.

 5   Q    And got beat?

 6   A    Yes, sir.

 7             MR. HOSKINS:  Judge, could I have just a minute?

 8             THE COURT:  Yes, sir, you may.

 9   BY MR. HOSKINS:

10   Q    Mr. Roberts, while you were a police officer in

11   Manchester, you called on Judge Maricle to sign search

12   warrants?

13   A    Yes, sir.

14   Q    And he made himself available when you needed him, didn't

15   he?

16   A    Yes, sir, he did.

17             MR. HOSKINS:  Your Honor, could we approach?

18             THE COURT:  Yes.

19        (Whereupon, the following discussion was had between the

20   Court and counsel at the bench, out of the hearing of the

21   jury.)

22             MR. HOSKINS:  I have a few more topics I want to go

23   into with this witness, and we're so close to 4:00 now and I

24   would suggest this is an appropriate place to stop.

25             THE COURT:  We'll do that.  Weather is moving in as
```

1 we — the weather is moving towards Louisville, so I don't want
2 to take up too much more time.  So rather than stop you in the
3 middle of a topic, we'll just go ahead and end for the evening.
4          And, Mr. Westberry, I guess you'll be next on Monday
5 when we come back.
6          MR. WESTBERRY:  Yes, sir.
7          MR. BAYER:  Just as far as weather issues, I think
8 the Court had talked to us about that if there's a delay for
9 Franklin County schools or if they're out, in the event that
10 there is serious weather this weekend, do you want to talk
11 about this after you send the jury out?
12          THE COURT:  I was going to remind the jury of what
13 the inclement weather policy is, and that is we start at 10:00
14 if Franklin County schools are closed or delayed.  Otherwise,
15 if it gets really bad and we don't hold court, then there will
16 be a message on the recording, the clerk's message that you'll
17 be able to call in and check that.
18          MR. WHITE:  That number is on the website.  I think
19 we can call it.
20          THE COURT:  I believe so, but you can check with the
21 clerk.
22          MR. BAYER:  The second thing is, you want our expert
23 witness by 10:00 Monday morning?
24          THE COURT:  Let's see, I believe what we talked
25 about, I believe the parties were going to confer and advise me

1  at some point, you were going to supplement, I believe, on

2  Monday, and then you were going to tell me Tuesday morning

3  before we start.  I think Mr. Bayer wants to turn his in at

4  10:00.

5          MR. BAYER:  I just don't want to be late.

6          THE COURT:  All right.  Mr. Bayer can turn his in at

7  10:00, everyone else can have till 5:00.

8          MR. WHITE:  Can I ask a quick question about that?

9  If it turns out — if it turns out that I'm able to work out my

10  experts with the United States and the other experts are all

11  the CPAs, would I still need to be here for the CPAs or could I

12  let Judge Caldwell know I can be at the sentencing on Friday?

13  I'm trying to get a sense of what to let her know.  Or wait

14  until Monday and see what how it works out?

15         THE COURT:  We're going to have to wait and see who

16  we have that will be disputed.

17         MR. WHITE:  I'll do that.  I'll just leave a message

18  and let their office know that I'll know Monday.

19         THE COURT:  Since I don't know what you-all are going

20  to do on the experts, it's hard for me to speculate as to who

21  might need to be here based on what might be designated.

22         MR. WHITE:  You're right.  That's right.

23         MR. WESTBERRY:  Mr. Hoskins said something.  I

24  forgot, David, did you say this to the Court?

25         MR. HOSKINS:  During the direct examination of this

1    witness, I noticed that one of the jurors, he was asleep, with

2    his head down, it went down gradually and kept it down for some

3    period of time.  But I just — I don't ask the Court to do

4    anything right now, but if it turns out that that's a

5    continuing problem with this juror, I would ask the Court to

6    perhaps maybe designate him as an alternate.

7              THE COURT:  I didn't see which person it was.

8              MR. HOSKINS:  The gentleman second from the end on

9    the left.

10              MR. WESTBERRY:  He has sort of an American flag

11    shirt.

12              THE COURT:  On the front row toward the other end of

13    the jury box?

14              MR. WESTBERRY:  Yes.  Second from the left.

15              THE COURT:  Let me tell you how I handle that.  I try

16    not to draw attention to one particular juror.  But if I do

17    notice that in course of the trial, what I'll do, if we have a

18    little break in the action, is I'll tell the jury if they need

19    to stand up and stretch they can do that.  And if that one

20    person doesn't stand up, we know they haven't gotten the

21    message.

22              MR. SMITH:  I know that I'm not the most illustrious

23    counsel here.

24              MR. WESTBERRY:  Now that that's on the record.

25              THE COURT:  I've never had a defense counsel object

1    to someone sleeping during the government's case, but we'll try

2    to prevent that from happening in the future.  But I do

3    appreciate you calling that to my attention.

4              All right.  Thank you.

5              MR. WHITE:  Can you give us some heads-up when you do

6    that, too?

7              THE COURT:  Yes, sir.

8         (Whereupon, the following proceedings continued in open

9    court.)

10             THE COURT:  All right.  Thank you, Counsel.

11             Ladies and gentlemen of the jury, as I told you

12   earlier at the beginning of this session, we'll be breaking

13   about 4:00 to make sure that you-all didn't have any weather

14   problems getting home this afternoon.  And I do want to get you

15   out of here so you can get on home, but let me again remind you

16   of the admonition that you were given previously.  Again, as we

17   take a break, and we'll be taking a break until Monday morning

18   at 9:00, at the end of the admonition I do want to remind you

19   of our inclement weather policy.  But before I get to that, let

20   me again remind you that as we take breaks, of course, you

21   should not discuss the case with any of the other jurors.  When

22   you go home tonight, you shouldn't discuss the case with any of

23   your friends or family members.  You should not allow anyone to

24   approach you to discuss the case with you.  And, of course, if

25   that should ever happen, you should report that to the Court

1   promptly through one of the security officers and I will

2   certainly deal with that.  Don't read, watch, or listen to any

3   accounts of the case.  You've heard me talk already about

4   electronic communications, either through Blackberries or

5   tweeting and twittering and all those other electronic things

6   that folks do, don't do any of that.  So don't read, watch, or

7   listen to any of the accounts of the case if there should be

8   any.  And, of course, don't communicate about the case.  Don't

9   do any type of research or investigation, and, of course, don't

10  make up your mind about the case until it is finally submitted

11  to you.

12          With respect to our inclement weather policy, now, as

13  I think everyone knows, we may get some snow this weekend.  The

14  policy that we follow is that if the Franklin County schools

15  are closed, then you would be delayed reporting until 10:00.

16  But I will tell you that if the weather gets too bad and if I

17  determine that it's not safe for us to hold court, because I do

18  know that some of you have to drive some distance to get here,

19  that I will advise the Clerk of that fact and she will put that

20  message on the machine.  When you call in, you'll be able to

21  check that, and you'll know that you may not need to be here

22  until a later time.  But if you call that number and you're not

23  told, if you call Sunday night and the message does not

24  indicate that you should report any later than 10:00 if we have

25  a school closing, then you'll need to be here at 10:00.  So

23

1  again, if Franklin County schools are closed, then you should

2  assume that you should report at 10:00 unless you're told

3  otherwise through the message that will be left on the machine.

4  So everyone is clear on that.

5        Ladies and gentlemen, have a safe trip home, and

6  we'll see you Monday morning at 9:00 unless we do have bad

7  weather.

8     (Whereupon, the jury retired from the courtroom, after

9  which the following proceedings were had in open court.)

10        THE COURT:  All right.  Thank you.

11        Counsel, before we recess, let me ask if there's any

12  other matters that need to be taken up outside the presence of

13  the jury.

14        MR. SMITH:  Yes, Your Honor.

15        THE COURT:  All right.  Thank you.

16        MR. SMITH:  Yes, Your Honor, I do have —

17        THE COURT:  Oh, you have a matter?  Please be seated.

18  If it doesn't involve the witness, as soon as the jury exits,

19  I'm going to allow Mr. Roberts to step down.  Let me give the

20  jury a moment to exit.

21        Does this matter affect the witness's testimony?

22        MR. SMITH:  It's scheduling, Your Honor.  I'm just

23  trying —

24        THE COURT:  That's fine.

25        MR. SMITH:  — to plan for the next week; the week of

1   the 15th.  And, of course, I know on our government calendar

2   that it's highlighted in red, and I'm not sure, but somebody

3   told me that that means that it's a federal holiday.

4          THE COURT:  It's listed as President's Day on my

5   calendar.  If the parties would like, I can perhaps make some

6   arrangements to proceed with the trial on that date.  I'm not

7   sure — how many hoops I'll need to jump through in order to do

8   that.  My preference would be to be here and to proceed.  As

9   you know we have too many holidays in the country anyway.  But

10  I'll have to check about the building, because other offices

11  share this courthouse.  I'll need to check on that.  It may not

12  be Monday before I'll know, but at least by Tuesday of next

13  week, I should have a better answer on that issue; okay?  I do

14  appreciate you calling that to my attention, I just noticed

15  that as well.

16         Anything else?

17         MR. SMITH:  No, Your Honor.

18         THE COURT:  No?  All right.  Thank you, Counsel.

19  Please have a safe drive home and we will see you Monday

20  morning hopefully at 9:00.

21      (Whereupon, the proceedings were adjourned for the day at

22  4:05 p.m., to be reconvened on the following Monday as ordered

23  by the Court.)

24            C E R T I F I C A T E

25      I, Cynthia A. Oakes, certify that the foregoing is a

25

1   correct transcript from the record of proceedings in the

2   above-entitled matter.

3

4   2/8/2010                      s/CYNTHIA A. OAKES
       DATE                       CYNTHIA A. OAKES, RPR, RMR, CRR
5

6

7                          I N D E X

8                                                    PAGE

9   Testimony of TODD ROBERTS:
         Cross-Examination by Mr. Hoskins:          4
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25