United States District Court
Eastern District of Kentucky
Southern Division at London

UNITED STATES OF AMERICA        ) London Criminal
                                ) Action No. 09–16–S
  vs.                           )
                                ) Frankfort, Kentucky
RUSSELL CLETUS MARICLE          ) February 25, 2010
DOUGLAS C. ADAMS                ) 9:35 a.m.
CHARLES WAYNE JONES             )
WILLIAM E. STIVERS              )
FREDDY W. THOMPSON              )
WILLIAM B. MORRIS               )
DEBRA L. MORRIS                 ) VOLUME 13–A
STANLEY BOWLING                 )

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                 JASON D. PARMAN, ESQ.

On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:          MARTIN S. PINALES, ESQ.

On behalf of the Defendant       R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant       T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant       ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:              R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant       JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant       ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                      JASON D. PARMAN, ESQ.
 3                                    Assistant U.S. Attorneys
                                      601 Meyers Baker Road
 4                                    Suite 200
                                      London, Kentucky  40741
 5

 6   On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:         107 East First Street
 7                                    Corbin, Kentucky  40701

 8                                    MARTIN S. PINALES, ESQ.
                                      150 East Fourth Street
 9                                    Federal Reserve Building
                                      Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant      R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.
12                                    220 West Main Street
                                      Suite 1900
13                                    Louisville, Kentucky  40202

14
     On behalf of the Defendant      T. SCOTT WHITE, ESQ.
15   Charles Wayne Jones:            133 West Short Street
                                      Lexington, Kentucky  40507
16

17   On behalf of the Defendant      ROBERT L. ABELL, ESQ.
     William E. Stivers:             120 North Upper Street
18                                    Lexington, Kentucky  40507

19
     On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
20   Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.
                                      300 West Short Street
21                                    Lexington, Kentucky  40507

22
     On behalf of the Defendant      JERRY W. GILBERT, ESQ.
23   William B. Morris:              212 North Second Street
                                      Richmond, Kentucky  40475
24

25
```

3

```
 1   On behalf of the Defendant     ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:               201 West Short Street
 2                                  Lexington, Kentucky  40507

 3
     On behalf of the Defendant     DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:               116 West Main Street
                                    Suite 2A
 5                                  Richmond, Kentucky  40475

 6
     Court Reporter:                CYNTHIA A. OAKES, CRR
 7                                  Official Court Reporter
                                    United States District Court
 8                                  560 Athens Boonesboro Road
                                    Winchester, Kentucky  40391
 9                                  (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

1      (Whereupon, the following proceedings were had outside the

2  presence of the jury.)

3          THE COURT:  Thank you.

4          The record will reflect the jury is not present at

5  this time.  The parties are present, and I believe most of the

6  attorneys are here.  Mr. Bayer is not here and Mr. Richardson

7  is not here at this time.

8          MR. BALDANI:  Judge, I'm here for the long part

9  today, and actually I was also going to let you know Tuesday

10 afternoon I'm going to have to be with Judge Coffman and

11 Mr. Richardson has some court appearances in the morning.  So

12 I'll be here at 8:30 every morning ready to handle any legal

13 issues.

14         THE COURT:  All right.  I appreciate you advising me

15 of that.

16         There are a couple of issues that are left over from

17 yesterday I wanted to cover with the attorneys before the jury

18 comes in.  The jury has been advised to be here at 10:00, but

19 if everyone is here, we may start a few minutes earlier.

20         First, Mr. Smith, you had raised the issue of a jury

21 instruction during Mr. Hoskins' questions of Ms. White.  He was

22 questioning her about making false statements, and she was

23 indicating that she made those statements at the direction of

24 agents in the course of the investigation.  I told you at the

25 conclusion of her testimony I would be giving the jury an

1  instruction, and this is the instruction that will be given.

2  It will be at the end of the instruction I've given several

3  times about a witness giving his or her interpretation of what

4  other people have said, but I've added this -- these two

5  sentences:  "You've also heard testimony that the witness

6  provided incorrect or misleading information to one or more

7  defendants during the course of a federal investigation.   In

8  evaluating this testimony, you may consider whether the witness

9  was acting pursuant to directions given by investigators in

10  making incorrect or misleading statements."  So I will be

11  advising the jury of that.

12           Also, at the conclusion of the end of the day

13  yesterday, Mr. Baldani had asked about questioning the witness

14  about possible state prosecution, the five-year statute of

15  limitations is the way this issue came up.

16           Mr. Baldani, is it your intention to do that with

17  this witness?

18           MR. BALDANI:  I plan to do just the two questions

19  that I told you about yesterday, Judge.

20           THE COURT:  All right.  Let me ask the other

21  defendants, I didn't give the other defendants a chance to

22  state whether they would be objecting to that line of

23  questions.

24           MR. WHITE:  No, Your Honor.

25           THE COURT:  Okay.

1          MR. WESTBERRY:  No, Your Honor.

2          THE COURT:  No?

3          Mr. Smith, I'm assuming that in response to those

4     questions that you'll be asking about whether the witness

5     considers the questions themselves to be intimidating, a threat

6     of state prosecution by virtue of the other evidence that

7     you've offered that indicates that the members of the judiciary

8     in Clay County are involved in illegal activities.  Is it your

9     intention to do that?

10         MR. SMITH:  Well, I do see that obviously we have a

11    situation where this witness being a member of -- her prior

12    activities in Clay County and having this situation brought up

13    toward -- and I see this, Judge, being an issue that can be

14    replayed tens of times through this trial because in the course

15    of this proceeding there are going to be many people who are

16    going to come in here and say that, yes, I sold my vote or I

17    hauled voters, and if this is a plan that's made, I think it's

18    going to be an issue that we're going to see multiple times.

19    So I welcome the opportunity to discuss that because I do think

20    that's going to be an issue that's going to be replayed.

21         THE COURT:  Well, I don't any good reason to ask the

22    question, and perhaps Mr. Baldani can enlighten me.  I see a

23    couple of bad reasons to ask the question, and one is the

24    implicit message that it's sending that if you testify in this

25    matter, bad things will happen to you, and if not in state

1  court, certainly in — if not in federal court, certainly in

2  state court.  It's another one of these — it's further — it

3  could be considered further evidence of sending a message, and

4  you can send messages a lot of different ways.  You can do it

5  by burning someone's trailer, you can do it by sending a

6  threatening text message or otherwise, you can do it by

7  damaging someone's car, you can do it by putting a horse head

8  in someone's bed, there are lots of ways that you can send

9  messages, and this opens up this whole issue, not only with

10 this witness but with other potential witnesses.  So I see this

11 as being offered to send a threatening message to this witness

12 and also to others that might testify in the future.

13        Those are the bad reasons I see that this is being

14 used.  I don't see any good reasons, Mr. Baldani.  Why is it

15 being offered?

16        MR. BALDANI:  Judge, in the whole scheme of things,

17 it's a minor point.  The reason I brought it up was because I'm

18 trying to avoid all the trips to the bench and I don't have any

19 problem just staying away from it.  I mean, I don't want to

20 open up — there's enough can of worms opened up, I don't want

21 to be the one to open it.

22        THE COURT:  Right.  Well, I just want to make sure

23 that you understand that if you do raise that issue then the

24 government can then come back and ask the witness whether she

25 considers that to be a threat or some form of intimidation, and

1    then we're going to get into the —

2              MR. BALDANI:  You mean by me?

3              THE COURT:  Yes, sir, by you asking the question.

4    And then the question becomes whether the other defendants

5    would object to it and then whether I would need to give a

6    limiting instruction with respect to those defendants that were

7    objecting, that it could only be considered against the person

8    or persons asking the question.  That's why I asked the

9    defendants if —

10             MR. BALDANI:  It never occurred to me that it would

11   be considered that way, but enough said, I just won't do it.

12             THE COURT:  Well, it's up to you, but it does — I

13   just want to make sure that you understood it opens up this

14   line of inquiry from the government if they — if they choose

15   to ask those questions.

16             Mr. Hoskins.

17             MR. HOSKINS:  Your Honor, until the Court made that

18   connection to that type of questioning, I didn't have any

19   objection to it because it never occurred to me either.  I will

20   now object to that line of questioning.  Frankly, the only

21   issue I saw — only relevance I saw was that this jury might

22   think if we let them off in federal court, they're not going to

23   be prosecuted at all and — but the idea that occurred to me is

24   if the jury knows, well, there is no state statute of

25   limitations that maybe these defendants here, if they're

1   acquitted in federal Court, could be prosecuted in state court.

2   But the implicit threat from the defense that we're going to

3   get you never occurred to me.  So at this point, I would say I

4   would object to that question.

5          THE COURT:  Of course, that would not be relevant in

6   any way to send that message, because the possible guilt or

7   innocence of others is not a defense to a criminal charge.  So

8   if we're saying to the jury you need to make sure she's

9   punished somewhere and it may be in state court, if that's the

10  message you're trying to send, then that would be an improper

11  message.

12         MR. HOSKINS:  No, I guess I didn't speak clearly,

13  Your Honor.  What I meant was that the only thing —— the only

14  possible relevance that occurred to me is that this jury might

15  get the idea if we don't do something about it and convict all

16  these people, nobody will.  That's the only possible relevance

17  I saw to that question.  At this point, I'm objecting, though,

18  to any questions about the statute.

19         THE COURT:  All right.  Well, if it does come up, I

20  will give a limiting instruction with respect to your

21  defendant, the other defendants have not objected, and so it

22  would only be —— a limiting instruction would only apply to

23  your client, not to the others.

24         Let's see where we are.  At the —— during the cross-

25  examination of Ms. White by Mr. Scott White, the Court made a

1    finding yesterday that Mr. Scott White had directly violated a

2    Court order in the case.  The minutes from yesterday's

3    proceeding do not reflect that and today's minutes should

4    reflect that that finding was specifically made yesterday and

5    that I indicated I would be taking that matter up later in the

6    proceeding, but we're not going to delay the proceedings at

7    this point to take up that matter.

8              Let's see, do we have -- do you know how many jurors

9    we have?

10             THE MARSHAL:  Not enough, sir.

11             THE COURT:  Not enough?  We'll be in recess until --

12             MR. ABELL:  Judge?

13             THE COURT:  Yes, sir.

14             MR. ABELL:  There's a matter I would like to discuss

15   with the Court if I could approach to the sidebar, please.

16             THE COURT:  Yes.  Yes, sir, you can come up.  Do you

17   need Mr. Smith to come up as well?

18             MR. ABELL:  Yes, I think it would be best.

19        (Whereupon, the following discussion was had between the

20   Court and counsel at the bench, out of the hearing of the

21   jury.)

22             THE COURT:  Yes, sir, Mr. Abell.

23             MR. ABELL:  This is Robert Abell for defendant,

24   William Stivers.  It was brought to my attention yesterday

25   during the course of bringing Mr. Stivers into the courthouse

 1  that it was announced over the radio something to the effect

 2  Stivers is on his way in, and that was broadcast ——

 3          THE COURT:  Which radio was it, do you know?

 4          MR. PINALES:  Can I state, I told Mr. Abell.

 5          THE COURT:  Mr. Pinales?

 6          MR. PINALES:  As I was coming in, there was a juror

 7  that was going through security on the first floor before me.

 8  I waited back for her to clear and then I went through, but she

 9  was still putting her stuff back in her purse.  And I looked

10  behind me, and there was the second from the end of the front

11  juror right immediately behind me, and as I was coming through

12  the metal detector, there was a broadcast at that location.

13          THE COURT:  Oh, downstairs.

14          MR. PINALES:  That was on the first floor, security

15  saying "Stivers entering the building."  Then a second later,

16  "Stivers in the building, all clear," something like that.

17  There were like three very short announcements that I brought

18  to Mr. Abell's attention.

19          THE COURT:  Okay.

20          MR. ABELL:  And I meant to mention it yesterday, but

21  neglected to do so, and I'm bringing it up now and asking for

22  the Court's intervention in such a manner as you deem

23  appropriate to suggest to the officers that they refrain from

24  referring to his name in that type manner.

25          MR. PINALES:  They could give him a code like the

1    Secret Service does as long as the code is okay.

2            THE COURT:  Let me –– I'll suggest a couple of

3    things.  I'll proceed how you would like me to proceed on this.

4    I will certainly advise security –– we're dealing with two

5    forms of security, CSOs, the typical security officers that we

6    use here, and separate security downstairs on the first floor

7    for the entire building because we have more than just the

8    courthouse in this building.  And I'll certainly make sure that

9    that doesn't happen again.

10           The other thing I can do is, if you would like for me

11   to individually voir dire the juror to see if what was said ––

12   if anything was said to her, that she overheard anything while

13   she's been coming into the building about any parties.  I can

14   do it in a way that –– and it will not draw specific attention

15   to that one conversation.  I can do it back in chambers, you

16   can be present, Mr. Smith can be present, if you would like.

17           MR. ABELL:  I'm not inclined to ask that you do that

18   at this point.  I'd just like to see what we can do to avoid

19   that recurrence.

20           THE COURT:  I'll take that up now, as a matter of

21   fact, while we have a few moments while we're waiting for the

22   jury and ––

23           MR. PINALES:  For the purposes of the record, this is

24   Martin Pinales again.  It was the female, which I believe was

25   the last juror on the end.

1          THE COURT:  On the back row.

2          MR. PINALES:  On the back row, blonde.

3          THE COURT:  The younger lady on the end?

4          MR. PINALES:  Younger lady on the end.  And then the

5   other one was the second from the same end in the front row.

6          THE COURT:  That's a male.

7          MR. PINALES:  A male, yeah, with a mustache, I

8   believe.

9          THE COURT:  Right.  Okay.

10          MR. PINALES:  Apparently they have to sign in down

11   there too, so they pause longer at the front gate.

12          THE COURT:  Okay.  I'll talk to the security officers

13   in the building about that and I'll make sure that the CSOs do

14   it now while we take our break, and then if you think I need to

15   follow up later in the case on the issue, you can advise me.

16   If I need to ask the jurors any specific questions, and, again,

17   I'll try to do that as innocuously as I possibly can.

18          MR. ABELL:  Thank you, Judge.

19          MR. PINALES:  One more matter, Your Honor.  As the

20   Court knows, I was slipping out today and Candace was —

21          THE COURT:  Yes.

22          MR. PINALES:  And I think she's going to be hitting

23   the road, but I hear it's a little icy.  So she's going to be

24   on her way down slowly.  I checked with my client, but I'm

25   scared to drive back but I'm going to do it anyway, I have a

1    plane this afternoon.  If it's okay with my client and

2    Mr. Hoskins, if they are representing by themselves for an hour

3    or so today.

4            THE COURT:  Sure.

5            MR. PINALES:  So I was planning on leaving at the

6    10:30 break, but we may not get started until then.  I'll put

7    my stuff in the back, far in back, so I can leave as

8    inconspicuously as possible.

9            THE COURT:  If we get started at 10:00, we'll be

10   braking about ten minutes till 11:00.

11           MR. PINALES:  That would work.

12           THE COURT:  That would work?

13           MR. PINALES:  That would work.  I appreciate that.  I

14   just hope my flight goes.

15           THE COURT:  Since I don't know how long we're going

16   to be with a particular witness, it may be a little before or

17   little bit after that.  But that's the plan at this point.

18           MR. PINALES:  I have to pick up my bag and my wife,

19   and don't read anything into that.

20           THE COURT:  Anything else?

21           MR. PINALES:  No, Your Honor.  Thank you so much.

22       (Whereupon, the following proceedings continued in open

23   court.)

24           THE COURT:  All right.  The Court will take just a

25   short recess.  I understand that all members of the jury are

1    here.  So what we'll do is we'll take a short recess, we'll

2    bring the jury in and have the roll called, Madam Clerk, if you

3    haven't done that already, and as soon as we're ready to go,

4    you can come back and get me, but we'll be in recess for about

5    five minutes.

6         (Whereupon, a short recess was had, after which the jury

7    entered the courtroom and the following proceedings were had in

8    open court.)

9              THE COURT:  Thank you.

10             The record will reflect that all members of the jury

11   are safely present today.  Of course, there's nothing we can do

12   about the snow, but I do appreciate your being here on time,

13   which is — we're starting at 10:00 with the snow delay.  I do

14   appreciate everyone being here on time.  Also, the parties and

15   counsel are present.  Ms. White has returned to the witness

16   stand.

17             Of course, you're still under oath, ma'am.

18             And let's see, Mr. Baldani, I believe you were about

19   to start with your questions.

20             MR. BALDANI:  That's right.  Thank you, Judge.

21                        WANDA WHITE,

22   being previously duly sworn, was examined and testified further

23   as follows:

24                     CROSS-EXAMINATION

25   BY MR. BALDANI:

1  Q    Good morning, Ms. White.  I'm Russ Baldani, I'm one of

2  Freddy's lawyers.

3  A    Okay.

4  Q    I want to start out asking you about — a little bit about

5  some of your job history; okay?  You've got a good bit of

6  clerical experience, don't you?

7  A    Yes.

8  Q    You owned your own business?

9  A    I have, yes.  Yes.

10  Q    What's that?

11  A    Yes.

12  Q    And that was the beauty place?

13  A    Yes.

14  Q    Worked at the police department as a clerk?

15  A    Yes.

16  Q    And so you're pretty good at note taking and making lists

17  and documenting things and writing things; is that fair to say?

18  A    That's fair, yes.

19  Q    Okay.  Do you keep a file of documents pertaining to this

20  case?

21  A    No.

22  Q    Like your lists and notes and prior testimonies, that kind

23  of thing?

24  A    No, I have nothing like that.

25  Q    You don't have anything like that?

1  A    Huh-uh.

2  Q    Have you reviewed your prior testimonies to the grand jury

3  before testifying today?

4  A    Not that I know of, no.

5  Q    Well, I mean, do you know —

6  A    I mean, I reviewed this while I've been up here.

7  Q    Just while you've been up here.  I mean, as far as — I'm

8  assuming you probably met with the prosecutor to prepare for

9  trial; right?

10  A    Back in November, yes.

11  Q    Not since then?

12  A    Not really, no.  Through the holidays.  Not before I came

13  here, no.

14  Q    Not to go over the questions or anything?

15  A    I met with them in November, around the holidays, and a

16  few times afterwards.

17  Q    I'm not trying to imply anything is wrong with it, I'm

18  just wondering.  We're now at the end of February.  You haven't

19  met with them in trial preparation since November?

20  A    We went through trial preparations in depth in November,

21  we went through the holidays and a few — touched on a few

22  things a little bit afterwards, but nothing as in depth.

23  Q    So other than your being asked about your grand jury

24  testimony yesterday, you haven't sat down and, you know, kind

25  of studied up on what you said before, et cetera, anything like

1    that?

2    A     Since I've been here?  No.

3    Q     Okay.  I want to ask you, do you recall making about a

4    72-page or 70-page handwritten document that talks all about

5    these vote fraud allegations, you know, in '02, '04, '06, what

6    various people did?

7    A     I don't recall making that at one time, no.

8    Q     Do you recall what I'm talking about?

9    A     No, I really — no.  If you show me, I may recall it.

10           MR. BALDANI:  Judge, I have no intention of trying to

11   introduce this.  I just want to show it to her.  Would you

12   prefer I mark it as an exhibit?

13           THE COURT:  If you're not planning to introduce it,

14   you can show her the document, and then if we need to mark it

15   for other reasons, we can do that.

16           MR. BALDANI:  Okay.

17           THE COURT:  But otherwise, it's not necessary.

18           MR. BALDANI:  Your Honor, could I —

19           THE COURT:  Yes, sir.

20   BY MR. BALDANI:

21   Q     Ms. White, I want you to just look at this, and all I'm

22   asking you is, first of all, is that your writing?  Did you

23   write it?

24   A     Okay.  Half of this is my handwriting and half of it is my

25   husband's, yes.

1    Q    Okay.  So that's not all in one handwriting?

2    A    No.

3    Q    And you say it's about half and half?

4    A    Well, here's — I mean, there's two different

5    handwritings.

6    Q    All right.  Let me ask you this:  The part that you wrote,

7    when did you prepare that?

8    A    During the investigation.

9    Q    Can you be any more specific?  Let me put it this way.

10   Did you write it all at one time —

11   A    No, I didn't.

12   Q    — or was it a work in progress?

13   A    It was over a period of time.

14   Q    And what was the purpose of writing that out?  Why did you

15   do it?

16   A    Some of this that's in my handwriting was — I was — I'm

17   a — if you can refer back to my husband's handwriting, I write

18   better than him, so the majority of it was me writing what he

19   said.

20   Q    Okay.  Because it start outs in your handwriting?

21   A    It does, yeah.

22   Q    And it starts out saying things like I did this and I did

23   that, but the "I" that at least begins, that's your husband's

24   story; right?

25   A    What's in the beginning of this, yes.

1   Q    And then it kind of changes to your story, and by "story,"

2   I mean, I'm not trying to say it's a lie.

3   A    Like on into it?

4   Q    Yes.

5   A    Yeah.

6        MR. SMITH:  Your Honor, I'm going to object to the

7   hearsay.

8        THE COURT:  Overruled.

9   BY MR. BALDANI:

10  Q    The point I'm making, at the beginning part is your

11  handwriting?

12  A    It is.

13  Q    But it's what your husband told you.  In other words, it

14  says "I" and it refers to "my Dad, Doug," obviously that's not

15  your dad, that's Kennon's dad?

16  A    Yeah, I told you that I was — what's the word when you

17  write for someone else?  You know, I was writing his words.

18  Q    That's what I wanted to know.  And so you kept that — you

19  put that together during the investigation and then did what

20  with it?

21  A    Well, at the end of each of these, whenever we met with

22  the agents, at the end of these — each one of these, we would

23  turn them over to them.  They would ask if we had any

24  handwritten notes or —

25  Q    "Them" as being the FBI, I suppose?

1    A    Yes, the FBI agents, yes.

2         MR. BALDANI:  Judge, maybe we should get that back so

3    it doesn't get mixed up with the exhibits.

4         THE COURT:  That will be fine, yes, sir.

5    BY MR. BALDANI:

6    Q    All right.  I want to ask you, Ms. White, about — we

7    heard a good deal about your relationship with Cletus Maricle.

8    I want to ask you about your relationship with Freddy Thompson;

9    okay?

10   A    Okay.

11   Q    Because it was really, in all fairness, a lot different

12   than your relationship with Cletus; right?

13   A    It was, yes.

14   Q    I mean, you-all were friends with Freddy; right?

15   A    We were acquaintances.

16   Q    Yeah.  I mean, you didn't go to his house, him to yours,

17   cookouts together, that —

18   A    No, I was very good friends with his son, I worked with

19   him at the 9-1-1 center.

20   Q    And that's Chad?

21   A    And that's Chad.

22   Q    Okay.

23   A    And his daughter is friends with my daughter.

24   Q    Right.  But you-all — you didn't go to his house on a

25   weekly basis —

1   A     No.  No, we didn't.

2   Q     -- or anywhere close to that; right?

3   A     Right.

4   Q     And I'm going to kind of talk about your relationship with

5   Freddy as it progressed '02, '04 and '06.  So in '02, basically

6   you're acquaintances, didn't have any social relationship with

7   him; right?

8   A     Just the same.  The same.

9   Q     And, actually, in '02, it became an adversarial

10  relationship, because obviously he's heading this ticket that's

11  running opposed to the Jennings White ticket; right?

12  A     Actually, I talked to Freddy throughout the whole '02

13  election.  I had no problem with Freddy.

14  Q     I understand that.  But my point is he's in an adversarial

15  position to your -- the people you supported; right?

16  A     In the end, yes.

17  Q     And you talked about meetings amongst people on your side,

18  about planning meetings for vote buying, et cetera, in '02;

19  right?

20  A     Yes.

21  Q     And in all fairness, Freddy wasn't at any of those

22  meetings?

23  A     Not that I recall.

24  Q     And he's not your friend on Facebook or MySpace or any of

25  those things, is he?

1  A    No.

2  Q    And prior to '02, he come from a political family?

3  A    Not that I know of.

4  Q    He was a political neophyte or newcomer, right, in '02?

5  A    Yeah, as far as I know.

6  Q    Now, in '04, obviously, the main race is, what I call,

7  Aunt Barb Colter --

8  A    Aunt Barb.

9  Q    -- versus Couch.  And Freddy was unopposed, he was the

10  County Clerk and he was unopposed in '04; right?

11  A    Yes.

12  Q    All right.  And Cletus wasn't really involved in the '04,

13  election, was he?

14  A    You'll have to ask him that.

15  Q    Well, I'm asking as far as what you observed and you have

16  personal knowledge of.

17  A    I felt as though he was, but not to the extent of others.

18  Q    Okay.  Now, you testified about planning meetings in '04

19  that were attended by Jennings White, the former clerk, Yancey

20  White, and others on, what I'll call, your side.  And in all

21  fairness, Freddy wasn't at those meetings either, was he?

22  A    No.

23  Q    And I want to ask you -- I want to follow up on something

24  Mr. Hoskins asked you --

25  A    Okay.

1  Q    -- about Cletus's involvement in '02 and '04.  And if you

2  remember, you were shown grand jury testimony and asked about

3  Cletus's involvement in '02 and 04.  Do you remember all that,

4  when Mr. Hoskins asked you do you remember the question, was

5  Judge Maricle involved in those meetings where money was

6  pooled, and you said you didn't remember?

7  A    Uh-huh.

8       MR. SMITH:  Your Honor, I'm going to object to

9  counsel going over questions that have already been asked and

10  answered.

11       THE COURT:  I think it's leading up to another area,

12  so I'll overrule.

13       MR. BALDANI:  Okay.  Thanks, Judge.  If I can have

14  the witness shown the grand jury testimony -- transcript from

15  May 3rd of '07, Judge?

16       THE COURT:  Yes, sir.

17       MR. SMITH:  What page are you going to?

18       MR. BALDANI:  Hold on one second and I'll tell you

19  the page.  On 45.

20  BY MR. BALDANI:

21  Q    Look down at the last question.  I think you were asked

22  yesterday -- Would you read the last question?

23  A    I have.  Yes, I have.

24  Q    Would you read it?

25  A    You want me to read it aloud?

1  Q    Please.

2  A    "And Was Judge Maricle involved in any of those meetings

3  where money was pooled?"

4  Q    Okay.  And you said you didn't remember your response.

5  Would you go to next page and just read your response?

6  A    It says, "No, he didn't.  He had no one running."

7  Q    Okay.  And that was talking about '02 and '04.

8  A    Yeah.

9  Q    All right.  I want to get to —— I'm done with that.  I

10  want to get to the '04 fall election; okay?

11  A    I'm sorry.  What?

12  Q    The '04 fall election.

13  A    Okay.

14  Q    And would it be fair the only real race of interest in

15  that was Dobber's school board race ——

16  A    Yes.

17  Q    —— is that correct?

18  A    Yes.

19  Q    And, of course, the same question I asked you before,

20  Freddy Thompson wasn't involved in any planning meetings or

21  anything in the fall of '04?

22  A    Not that I know of.

23  Q    And Dobber was running for school board ——

24  A    Yes.

25  Q    —— Dobber Weaver.  And you were friends with Dobber

1  Weaver, weren't you?

2  A    I am friends with Dobber Weaver.

3  Q    Still are?

4  A    Well, I've not seen him in years, but I don't — he's done

5  nothing to me.

6  Q    Well, the reason I asked, and this was kind of gone into

7  before, on those recordings you say some unfriendly things —

8  A    Uh-huh.

9  Q    — about Dobber, and I'm assuming that that's because

10  that's what you were supposed to say; is that right?

11  A    Exactly, yes.

12  Q    So the unkind things you said about Dobber wasn't because

13  they were true, that was part of your act; right?

14  A    That was what I was instructed.  Not to say those things,

15  but I was instructed to show my displeasure that Dobber may not

16  be how he was supposed to be.

17  Q    So that just to set the record straight, Dobber — You-all

18  went to school together, didn't you?

19          MR. SMITH:  Your Honor, I'm going to object to this

20  line of questioning as it's proposed.  It mischaracterizes the

21  evidence that Dobber Weaver was running in '04, and I believe

22  the record is pretty clear that it's November '02.

23          THE COURT:  All right.

24          MR. BALDANI:  Maybe I was mistaken, Judge.

25          THE COURT:  The jury will have to recall that

 1   testimony, but your questions are whether she's friends with

 2   Mr. Weaver?

 3           MR. BALDANI:  Yes.

 4           THE COURT:  All right.  You can proceed.

 5   BY MR. BALDANI:

 6   Q    Simple question.  Despite what you said on the recordings,

 7   you and Dobber were friends and that never — that friendship

 8   basically never ended?

 9   A    It hasn't changed with me.

10   Q    Now, in '06 — I asked you about '02, '04, '06, about your

11   relationship with Freddy.  Isn't it true it's fair to say in

12   '06 the whole climate in Clay County had changed quite a bit;

13   right?

14   A    I'm sorry.  What?

15   Q    The whole scene in Clay County had changed quite a bit in

16   '06?

17   A    The ticket had changed, yes.

18   Q    Well, that's not really what I'm getting at.  Basically it

19   was known that the FBI was conducting investigations of various

20   people; right?

21   A    Yes, it was known.

22   Q    In other words, the Kenny Day drug ring at the pawnshop;

23   right?

24   A    I don't know if that's — I don't know nothing about that.

25   Q    You don't know anything about —

1  A    I know what was —— what was in the paper.

2  Q    Well, I'm not asking you details about it, I'm just saying

3  it was known in '06 that the FBI was conducting various

4  investigations of various people in Clay County?

5  A    Yes.

6  Q    That's all I'm asking.

7  A    Yes.

8  Q    And so when it came time to the plan to work this

9  election, things changed a little bit, didn't it?

10 A    Yes.

11 Q    And part of the reason things changed was because there

12 was this new voting machine, the electronic voting machine;

13 right?

14 A    Right.

15 Q    So you've testified about two kinds of very different

16 types of voter fraud in '06.  You talked about the buying of

17 votes which had gone on in the previous years, according to

18 your testimony; right?

19 A    Yeah.  Freddy is aware of the vote buying.  He was

20 involved in it.

21 Q    And then —— I'm sorry, I didn't hear the answer.

22 A    I said Freddy was involved in the vote buying, he knows

23 all about it, yes.

24 Q    That's not what I asked you, Ms. White.

25 A    You just asked me what I said.

1  Q    I asked you was there two different methods ——

2  A    You said vote buying and ——

3  Q    Yeah.

4  A    Yes.

5  Q    How about this:  I'm going to try not to talk over you and

6  be respectful of you, and I ask you to do the same.

7       Let me ask the question this way:  In '06, we heard that

8  there was vote buying that you were involved in; right?

9  A    Yes.

10 Q    All right.  It was also this, what you call or what's been

11 called, manipulating the machine; right?

12 A    Yes.

13 Q    Okay.  And the —— there was meetings in '06, planning

14 meetings, just like those same ones that I talked about in '02

15 and '04; right?

16 A    Yes.

17 Q    And as far as you're concerned, as far as what you

18 observed, Freddy wasn't at any of the planning meetings in '06?

19 A    Freddy was —— my husband and I met with Freddy in his

20 office several times throughout the election.

21 Q    Okay.  Well, what ——

22 A    But if you're pertaining to the ones that we spoke of

23 earlier, no.

24 Q    Yeah.  And I'm going to ask you about those; okay?

25 A    Okay.

WANDA WHITE - CROSS - MR. BALDANI                    30

1  Q    You testified — I'm trying to get through my questions
2  about your relationship with Freddy.  I'm about done.
3  A    Okay.
4  Q    But basically you testified about a victory party that
5  Phillip Mobley had after he won in '06; right?
6  A    Yes.
7  Q    Freddy wasn't at that, was he?
8  A    No.
9  Q    Now, when you worked for the City, you first worked for
10 the police department, then you worked in City Hall; right?
11 A    Yes.  Yes.
12 Q    When you worked for the police department, that's not in
13 City Hall, is it?
14 A    No.
15 Q    And at that time, your father-in-law was the mayor; right?
16 A    Yes.
17 Q    And did the mayor — did he — when you were at City Hall,
18 did you actually have your own office?
19 A    Yes.
20 Q    Did Doug White ever come to your office?
21 A    I very seldom seen Doug White.
22 Q    But he would sometimes come to your office, wouldn't he?
23 A    Not very often.
24 Q    Is his office in the same building?
25 A    I mean, I'm answering your question honestly.  I seldom

1    ever saw him.

2    Q    All right.  Well — Okay, I'll leave it at that.

3         You testified that in the fall of '06 Freddy provided you

4    a daily rundown of the absentee votes for Carmen Webb; is that

5    right?

6    A    Yes.

7    Q    All right.  Do you have those?

8    A    I don't have — I don't have anything.

9    Q    All right.  Well, you've given various —

10   A    Everything we've had, we've turned over to the agents.

11   Q    Did you have — did you turn over such a daily rundown

12   list?

13   A    If we had them, we turned them over.  I don't — I've not

14   seen them since — you know, since we went over them.  I don't

15   know.

16   Q    All right.  Well, we've already talked about you being a

17   meticulous record keeper and we have seen various lists that

18   you have kept and turned over.  And my question is simple.  Do

19   you recall turning that list over to the FBI?

20   A    I don't recall, sir.  No, I don't know.  If I had it, I

21   turned it over.

22   Q    Okay.  And if I could, I don't know if you have D15?

23   A    I'm sorry, what?

24   Q    Exhibit D15, is that up there?

25   A    D15A?

1    Q    Did you say D15A?

2    A    Yeah.

3    Q    I think what I'm referring to is the list, the handwritten

4    list of questions.

5    A    Oh, okay.  That's on the paper?

6    Q    Yes.

7              THE COURT:  About three pages, I think?

8              MR. BALDANI:  Is that D15?

9              THE COURT:  Yes, sir.

10             MR. BALDANI:  That's what I thought.

11   BY MR. BALDANI:

12   Q    If you don't have it, hopefully we can track it down.

13   A    I think I got it.  Yeah, I have it.

14   Q    You've got that.

15   A    Yes.

16   Q    And that's the list of questions that was prepared with

17   you and the FBI about your supposed — what was going to be

18   portrayed as your grand jury testimony?

19   A    Yes.

20   Q    On that three-page list, there's no questions — Freddy

21   Thompson's name is not on it, is it?

22   A    No.

23   Q    Now, there was a list of people that testified that Cletus

24   thought had testified at a grand jury.  We went through that —

25   A    This one?  Do you want me to look at it?

1   Q    Yeah.  What's the number on that?

2   A    D16.

3   Q    And there was some confusion about which grand jury that

4   was about, but the bottom line is Freddy Thompson's name is not

5   on there, is it?

6   A    No.

7   Q    All right.  And, Ms. White, you're very well aware that

8   Freddy Thompson did testify at a grand jury, weren't you?

9   A    No, I don't know that he did.

10  Q    Did you not -- on July 12th, was your second --

11  A    Yes, yes, he was there.  He was there when I was there,

12  yes.  I thought you was referring to this --

13  Q    No.

14  A    -- testimony.

15  Q    What I was essentially getting at is July 12th was your

16  second grand jury appearance?

17  A    Yes.  Yes.

18  Q    And when you came to the grand jury in Lexington, he was

19  sitting out front waiting to go in and you-all rode in the

20  elevator together, didn't you?  Don't you remember walking in

21  with him?

22  A    I don't.

23  Q    Okay.  But you remember seeing him there?

24  A    Yes, I remember seeing him there.

25  Q    And there was a voting machine there --

1    A    Yes.

2    Q    — right?

3    A    Uh-huh.

4    Q    And to your knowledge, did he bring that voting machine

5    there?

6    A    I don't know how it got there.

7    Q    Did you see him with an attorney when he was there?

8    A    I don't remember if I did or not.

9    Q    You don't recall seeing him with an attorney, do you?

10   A    I don't know.

11   Q    You had yours; right?

12   A    I had mine, yes.

13   Q    I want you to look at D11 and D12.  Have you got them up

14   there?

15   A    D11?

16   Q    Yeah.

17   A    Yeah.

18   Q    What is D11?

19   A    It's a recap sheet.

20   Q    And where did you say you got that?

21   A    From Cletus.

22   Q    And D12 is another — some type of election record that

23   you say you got the same place; right?

24   A    Yes.

25   Q    To your knowledge, those are public open records anybody

 1  can get at the Clerk's Office; is that true?

 2  A    I don't know.  Is it?  I don't know.

 3  Q    I mean, you --

 4  A    I've never went to get them, so I don't know.

 5  Q    You don't know?  Okay.

 6       I wanted to -- you mentioned Chad, Chad Thompson --

 7  A    Uh-huh.

 8  Q    -- today, and you mentioned the other day that Vernon

 9  Hacker gave him a job at the 9-1-1 center; right?

10  A    Yes.

11  Q    Gave him a job as a janitor, didn't he?

12  A    He gave him a job, yeah.

13  Q    As a janitor?  Isn't that what he did, mop floors there?

14  A    I never seen him mop a floor, no.

15  Q    To your understanding, what did he do?

16  A    I mopped the floors.

17  Q    At the 9-1-1 center?

18  A    I did, sir, yes.

19  Q    All right.  My question is:  To your understanding, what

20  did Chad do at the 9-1-1 center?

21  A    He sat and talked to me most of the time.  Honestly, I

22  don't know what Chad's occupation there was.

23  Q    Do you know whether that job was created for him?

24  A    I would imagine it was.

25  Q    Okay.  Let me ask this:  Do you have animosity towards

1   Freddy Thompson?

2   A      No.

3   Q      But basically he headed this ticket that beat —— in '02

4   when your husband got beat and Jennings White got beat; right?

5   A      Uh-huh.

6   Q      And that sort of was the beginning of the end of the —— or

7   the beginning of the demise of the White family in politics in

8   Clay County; right?

9   A      It was, yes.

10  Q      And after that, you-all lost your jobs, et cetera, you

11  lost your house; right?

12  A      Uh-huh.

13  Q      Tell the jury about your house, the house that you lost.

14  A      What about it?

15  Q      How big was it?

16  A      Twenty-some hundred square feet.

17  Q      All right.  You're a real estate person; right?

18  A      Uh-huh.

19  Q      What was the value of the house?

20  A      The value of the house was probably 200-and-some thousand

21  dollars, although Wayne Jones went and appraised it for about a

22  hundred and some.

23  Q      Was it one of the biggest, nicest homes in Clay County?

24  A      Not at all.

25  Q      The house that you-all had was not?

```
 1   A    Not at all.

 2   Q    Did you have a barn ——

 3   A    It was a hundred years old.

 4   Q    Did you not —— you said you built the house?

 5   A    You're somewhere —— you need to go back and check your

 6   information because it's not correct.

 7   Q    Did you build a house?

 8   A    I sold that home.  I didn't — the home you're talking

 9   about, the home that I lost, was my husband's grandmother's

10   home.  An historic home.

11   Q    Let's talk about the house that you built in Clay County.

12   A    I didn't lose that house, I sold it.

13   Q    And why did you sell it?

14   A    Because I could not afford it.  I think I covered that.

15   Q    Well, then that's what I meant when you lost it, you sold

16   it because you couldn't afford it?

17   A    I made a choice —— my husband and I made a choice looking

18   at our financial stuff from our White Mobile Homes, we didn't

19   work at the City at that time, which is how you're trying to

20   portray it.  We're pretty sensible smart people and we were

21   going to close our business.  Therefore, we knew we could no

22   longer afford our home, so we sold our home, didn't have any

23   trouble selling our home, we sold our home, bought his

24   grandmother's home and moved downtown.

25   Q    Okay.  Let's do it this way:  When did you —— So you do
```

1  agree that you built — you-all built a nice new home?

2  A    We built a nice new home that in the end we couldn't

3  afford.

4  Q    All right.  And when did you build the home?

5  A    In 1998.

6  Q    How many square feet was that home?

7  A    5200 square feet.

8  Q    All right.  And when did you sell it?

9  A    Five years later, sometime in 2003.

10  Q    That's what I was getting at.  So basically after he lost

11  his election?

12  A    What did losing the election have to do with us selling

13  our home?

14  Q    I don't know.  You sold it in —

15  A    We closed our business.  That's where our income was

16  coming from.

17  Q    You couldn't afford the home and you sold it?

18  A    We couldn't afford our home and we sold it, yes.

19  Q    Looking back on the 2006, what I'll call, voter scheme

20  that you talked about?

21  A    Uh-huh.

22  Q    Would you consider yourself a supervisor or a subordinate?

23  A    I don't know.  I'm lost to what you're asking.

24  Q    How much education —

25  A    Subordinate of what, of who?

1   Q    How much education do you have?

2   A    Obviously not enough to understand your question.

3   Q    Is there something difficult about --

4   A    I don't understand your question.

5   Q    All right.  When you fill out a job application, does it

6   ask how much education you've got?

7   A    It does.  But it doesn't ask me if I'm a subordinate.

8   Q    That's why I backed up, Ms. White.  How much education

9   have you got?

10  A    High school education.

11  Q    All right.  Do you know what a superior is and what a

12  subordinate is?

13  A    I do.

14          MR. SMITH:  I'm going to object.  If counsel wants to

15  restate his question, the witness has said she doesn't

16  understand what's superior and subordinate, and now he seeks to

17  impeach her by her education level, and I object.

18          MR. BALDANI:  I'll be glad to rephrase, Judge.

19          THE COURT:  All right.  You need to get to your point

20  on that.

21          MR. BALDANI:  Okay.

22  BY MR. BALDANI:

23  Q    In '06, were you giving orders or were you taking orders?

24  A    I was taking orders.

25  Q    All right.  That's what I was getting at.  Did you always

 1  follow your orders?

 2  A    Well, you would have to be more specific on that.

 3  Q    Who were you taking orders from?

 4  A    Regarding what?

 5  Q    Well, I'm talking about the 2006 vote fraud.  All these

 6  questions are about 2006.

 7  A    I generally followed what I — if that's your question

 8  you're asking me.

 9  Q    I'll be more specific.  You were given directions about

10  the voter assistance forms; right?

11  A    Yes.

12  Q    All right.  And those directions weren't from Freddy

13  Thompson, were they?

14  A    No.

15  Q    All right.  You were told not to fill out too many —

16  A    Yes.

17  Q    — voter assistance forms; right?

18  A    Yes.

19  Q    And who told you that?

20  A    Wayne Jones and Cletus Maricle.

21  Q    All right.  But you didn't follow those instructions;

22  right?

23  A    No, when it come down to it, I — my instincts, my

24  emotions, I guess, got the best of me, and, no, I didn't.

25  Q    That's all I was trying to get to.

1    A    Okay.

2    Q    So you testified you disregarded these instructions

3    because basically you were scared and you felt pressure because

4    there was –– you said there was attorneys in line?

5    A    I'm sorry.  What?

6    Q    You said there was attorneys in line; right?

7    A    There was some.  There was –– yes, there was preachers in

8    line, yes.

9    Q    All right.  Well, let me just ask it this way:  Why did

10   you go against your directions and fill out voter assistance

11   forms?

12   A    Well, in the end, I knew that more than likely they would

13   be destroyed.

14   Q    You didn't know that in May of '06?

15   A    I didn't.

16   Q    Would you agree that you testified earlier in this trial

17   that you filled out the forms because you were scared and you

18   felt under pressure because there was attorneys in line in the

19   Manchester precinct?  You did say that, didn't you?

20   A    I did.

21   Q    All right.  So I want to ask you:  And that's one of the

22   reasons you filled them out; right?

23   A    I felt under pressure.

24   Q    Okay.  And I want to ask you about who the attorneys in

25   line that you felt under pressure to fill out these forms;

1   okay?  All right?

2   A    Okay.

3   Q    All right.  It wasn't Anthony Short —

4   A    No.

5   Q    — because he's working there in the election with you;

6   right?

7   A    Yes.

8   Q    All right.  And he was sitting at like the sign-in table

9   with Lucy Marcum; right?

10  A    Yes.

11  Q    That's where he would be posted?

12  A    Yes.

13  Q    Okay.  Now, Yancey White is another local attorney.  Was

14  he one of the attorneys?

15  A    No.

16  Q    He wasn't one?

17  A    No.

18  Q    And you weren't worried about Stephan Charles being in

19  line?

20  A    He wasn't there, no.

21  Q    All right.  And Scott Madden is a local attorney whose

22  name we've heard.  You weren't worried about him?

23  A    I was — he was the one in line.

24  Q    Oh, he was the one that was in line that you were — so

25  was it just him?

```
 1  A    There was preachers behind him, yes.

 2  Q    What preachers were behind him?

 3  A    I can't recall.

 4  Q    So when you said there was attorneys in line when you —

 5  A    I felt uncomfortable doing something that wasn't legal in

 6  front of them, yes.

 7  Q    Okay.  Now, you've also testified that you filled out

 8  about 20 voter assistance forms in May of '06; right?

 9  A    That I can remember, yes.

10  Q    And that was an approximation?

11  A    Yes.

12  Q    Scott Madden wasn't in line when you filled out all 20,

13  was he?

14  A    No.  No.

15  Q    So you're not telling the jury that every time you filled

16  out a voter assistance form there was an attorney in line, are

17  you?

18  A    Of course not, no.

19  Q    Or a preacher?

20  A    No.

21  Q    All right.  And the whole purpose of these is to document

22  the fact that you're assisting a voter that's either blind,

23  unable to read, or physically disabled; right?

24  A    Uh-huh.

25  Q    That's the whole purpose; right?
```

1  A    Yes, that's the purpose.

2  Q    And I think you said you filled out about 20 in May and

3  about the same number or more in the fall; is that about right?

4  A    Yes.

5  Q    And really, in most of those instances where you filled

6  them out, the voter was able to read, to see, and to vote

7  themselves; correct?

8  A    You know what?  I didn't ask that question.  I just

9  signed -- I didn't fill the paper out, I signed my name.

10  Q    All right.  Well, you knew some of the people; right?

11  A    I didn't know many of them.

12  Q    Well, I mean, did any of them come in with a dog and a

13  white cane?

14  A    I'm sorry, what?

15  Q    Did any of them appear to be blind to you?

16  A    No.

17  Q    Did any of them say, "I can't read"?

18  A    That's what they -- they what's they would say, most of

19  them would say, "I can't read."

20  Q    Well, let me put -- let me ask this:  Wouldn't filling out

21  a form for a person that's perfectly capable of voting,

22  wouldn't that create more suspicion or create more of a scene

23  in front of this attorney or these preachers?

24  A    You know what?  I can't answer that, because when you're

25  under pressure I guess you just think you're -- that's what you

1  should be doing at the time.

2  Q    All right.  Did most — did some of the bought voters, did

3  they ask you to fill out voter assistance forms?

4  A    I don't know.

5  Q    You don't know?

6  A    I can't recall if they did or not.

7  Q    I want to refer you to your second grand jury testimony.

8  A    Do I have it?

9  Q    No, but I'm going to give it to you.

10 A    Okay.

11 Q    July the 12th.  Do you recall testifying that you felt

12 really pressured at the polls when specifically the people,

13 when they got there, they asked — they asked you to fill out

14 voter assistance forms for them?

15 A    I recall saying that, yes.

16 Q    Oh, you do.

17 A    Yeah.

18 Q    So we don't need this.  So you testified previously under

19 oath that some of these bought voters said, "Hey, fill out a

20 voter assistance form for me"?

21 A    Yes.

22 Q    Did that really happen?

23 A    Yes.  Virginia Hacker was one of those.

24 Q    Can you think of any reason — I mean, a bought — a

25 bought voter is breaking the law, too; right?

1   A    Yes.

2   Q    All right.  Can you think of any reason why a bought voter

3   would ask you to fill out a form with their name on it?

4   A    Well, in the instance of —

5        MR. SMITH:  Your Honor, I'm going to object.  He's

6   asking her to read the mind of another person.

7        THE COURT:  I'll sustain.

8   BY MR. BALDANI:

9   Q    All right.  I want to ask you about the layout of the

10  Manchester precinct; okay?

11  A    Okay.

12  Q    As far as we've all probably voted, and we know — is

13  there like a sign-in table at the front?

14  A    Yes.  Yes, there's a sign-in table.

15  Q    All right.  And that's where Anthony Short and Lucy Marcum

16  are stationed?

17  A    Yes.

18  Q    And the voters would basically line up at the table;

19  right?

20  A    No, actually — do you want me to give you — show you?

21  Q    Sure.  You want to do a diagram or what?

22  A    I can show — the assistance table where they sign in

23  would be here, the machine would be probably no further than

24  where the podium in.  So in between the table and the podium

25  would be where they would line up along the side of the wall.

1  Q    Okay.  And the table is where the voter assistance forms

2  were kept; right?

3  A    Yes.

4  Q    And you and Dobber, you're not stationed at the table,

5  you're stationed back by the machines; right?

6  A    Well, I mean, yeah.

7  Q    Yeah.  This is the machine and you and Dobber are here.

8  How many machines were there?

9  A    Two.

10  Q    And the fact of the matter is you and Dobber had complete

11  privacy back there at those machines, didn't you?

12  A    I guess as much privacy as you've got where you're at.

13  Q    You didn't have complete privacy to do whatever you wanted

14  back there at the machines?

15  A    The majority of the time -- Well, I guess if you consider

16  it privacy.  I mean, the voters were on the side of the wall.

17  It got backed up at some point where there was no privacy, but,

18  yeah, when they voted we would make it private.  It was turned

19  outwards.

20  Q    I want to ask -- I want to -- I went through your grand

21  jury testimony --

22  A    Okay.

23  Q    -- and another thing that I didn't need to show it to you

24  because you recalled it, and I'm going to just --

25  A    Okay.

1  Q    — go through the same thing.

2  A    Okay.

3  Q    Do you recall on July 12th — And July 12th grand jury,

4  that was your second appearance; right?

5  A    Yes.

6  Q    And at the second appearance there was another prosecutor

7  besides Steve Smith, a guy named Ken Taylor that's not in this

8  trial?

9  A    Yes.

10 Q    I'm not sure which one asked you this, but —

11        MR. SMITH:  Your Honor, I'm going to object to the

12 form of the question.

13        THE COURT:  All right.  Counsel, come on up.  I do

14 want to discuss this one matter with you.

15     (Whereupon, the following discussion was had between the

16 Court and counsel at the bench, out of the hearing of the

17 jury.)

18        THE COURT:  I'll sustain the objection to the form of

19 the question.  This gets back to what we've talked about

20 earlier, the difference between impeachment and refreshing

21 recollection.  I think of refreshing recollection as putting a

22 string on your finger.  It can be anything that you can use to

23 refresh recollection, but I think what you're doing is you're

24 mixing an effort to impeach with a prior inconsistent statement

25 with refreshing recollection.  In order to impeach with a prior

1  inconsistent statement, you first have to establish that there
2  is a inconsistent statement.  Once you've established that
3  there's an inconsistent statement, you can then show the
4  witness a prior — her prior testimony, the sworn grand jury
5  testimony, because we know that is her statement.  It's not a
6  302, but it's her statement.  At that point, if there's an
7  inconsistent statement, you can ask the typical questions, were
8  you asked this question and did you give this answer, and that
9  gets the inconsistent statement into the record.

10        MR. BALDANI:  Okay.

11        THE COURT:  Refreshing recollection is different,
12  because you're not reading the document and getting her to
13  agree with it, but you're showing her the document to see if it
14  does refresh her memory, and then she has to testify from her
15  memory.  Now, there are some occasions where, in fairness to
16  the parties, the Court may admit a particular document.  For
17  example, if you give a witness a piece of paper and you say,
18  does this refresh your recollection, and you've got a note at
19  the bottom of it that tells him or her how to testimony, the
20  other side may want to introduce that for obvious reasons.  But
21  in terms of refreshing recollection, if you establish that she
22  doesn't have a memory of a particular event or making a
23  statement, once you establish that she doesn't have a memory,
24  you can show her something and ask her if that refreshes her
25  memory.

1          MR. BALDANI:  Okay.

2          THE COURT:  Now, I know that there's a problem with

3    this particular witness because as a layperson she does not

4    understand that she's not supposed to then just read the

5    document.

6          MR. BALDANI:  Right.

7          THE COURT:  But the testimony has to be her testimony

8    as opposed to what she's reading if you're doing it to refresh

9    her recollection.  So two different things and we've kind of

10   mixed some of these together, but if you're showing it to her

11   to refresh her memory, I'll tell her how to do it.  I'll tell

12   her to read it and then listen to your question, and then her

13   testimony has to be her memory and not what she's reading.

14         MR. BALDANI:  Okay.  Let me just explain what I'm

15   trying to do, because, Judge, I'm confused a little bit; okay?

16         THE COURT:  All right.

17         MR. BALDANI:  Basically she testified to the grand

18   jury that they had complete privacy back there, and she just

19   testified about as much privacy as between me and you, which is

20   obviously different.  That's an important point for us.  So I

21   understand they're two different things, but it seems to me

22   that I should be able to —— I mean, I can get it out one way or

23   the other, but it seems to me that I should be able to —— since

24   she said basically, no, we don't have complete privacy.

25         THE COURT:  I think she was jousting with you on that

1    phrase, what does privacy mean, and if that's the phrase that

2    was used in her testimony, you can ask her what her

3    understanding of complete privacy means, and she can give you

4    an answer, and you can ask her, "Isn't it true that you have

5    said that you had complete privacy?"  If she says no, I didn't

6    say that —

7          MR. BALDANI:  Can I just show it to her and ask her

8    does this refresh your recollection?

9          THE COURT:  Well, if you want to do it —

10         MR. BALDANI:  I mean, I can do it that way, too.

11         THE COURT:  Well, again, you're mixing up apples and

12    oranges here.  If you want to do that to refresh her

13    recollection, that's the steps that need to be followed to do

14    it.  If you want to impeach her, then you need to have an

15    inconsistent statement, you need to then show her the

16    statement, and you can ask her to read it at that point if

17    that's her statement.  Okay?

18         MR. BALDANI:  Okay.

19         THE COURT:  So it's your choice as to how you want to

20    do it.  If you want to refresh her recollection, you can show

21    it to her and then you can ask her if her memory is refreshed.

22         MR. BALDANI:  If it's not, then I got to establish —

23         THE COURT:  Then it's a different issue.

24         MR. BALDANI:  Yeah.  Judge —

25         THE COURT:  I understand.

1          MR. BALDANI:  —— it was my goal to try to get through

2    without any bench conferences.

3          THE COURT:  I understand that.  We're close

4    hopefully.

5          MR. BALDANI:  And I'm a betting guy, but I wouldn't

6    even bet that one.  So I appreciate the ——

7          THE COURT:  Mr. Smith, let me make sure that I

8    addressed his objection, I think I did as to the form of the

9    question.

10         MR. SMITH:  You did.

11         MR. PINALES:  I want to correct, it is the third

12   juror in the back row, the blue denim, the shorter blonde.  In

13   taking a good look today, I realized it's the one with the

14   shorter female.

15         THE COURT:  All right.  I appreciate that.  Thank

16   you.

17      (Whereupon, the following proceedings continued in open

18   court.)

19   BY MR. BALDANI:

20   Q    All right.  Ms. White, let me try it this way; okay?  My

21   question was, did you and Dobber Weaver —— We've established

22   the distance ——

23   A    Okay.

24   Q    —— between the table and where these attorneys, preachers,

25   all of that would be.  My question was, did you and Dobber

```
 1  Weaver have complete privacy back at those two machines to do

 2  basically what you wanted to do with the voters?  And that's my

 3  question.

 4  A    Yes.

 5  Q    So you did?

 6  A    Yes.

 7  Q    Okay.  Well, then, all of that was for nothing.

 8           MR. SMITH:  Your Honor, I'm going to object to the

 9  last comment in front of the jury.

10           MR. BALDANI:  I meant -- Judge, I meant my

11  understanding.  I wasn't implying that -- I'm sorry.

12           THE COURT:  All right.  The question is withdrawn.

13           MR. BALDANI:  I withdraw the comment.

14           THE COURT:  The question is withdrawn.  That's fine.

15  BY MR. BALDANI:

16  Q    Here is my question:  If you have complete -- Why did you

17  have complete privacy?  Because there's a hallway; right?

18  A    Nothing separated us from the voters.

19  Q    Okay.

20  A    Okay.  To me, you have -- I can't see what you're doing --

21  what's on your desk laying there, on your podium; okay?  But

22  although there's people lined up from me to you --

23  Q    You had the machines turned to the side; right?

24  A    Yes.

25  Q    Okay.  My question is:  If you had complete privacy, why
```

1    were you worried about what somebody might see?

2    A     It wasn't so much of what somebody might see as what they

3    might hear.   These people were very vocal about when they come

4    in.

5    Q    You took some — an election officer has to go through

6    some training; correct?

7    A     Yes.

8    Q    All right.  Tell the jury what the training consists of,

9    just in a nutshell.

10   A     If I recall correctly, Gary Gregory gave us — went over

11   the rules, the laws and the regulations of the election.

12   Q    And he's the Commonwealth Attorney?

13   A     Yes.

14   Q    So he's the one that does the election officer training?

15   A     The training.

16   Q    Okay.  And so you knew the proper purpose of the voter

17   assistance forms; right?

18   A     Yes.

19   Q    And we've already established that you filled out

20   somewhere — 40 or more of those between May and April of '06.

21   So between your training and filling them out, you're very well

22   acquainted with those forms; right?

23   A    Yes.

24   Q    Did you — when you testified at the grand jury, did you

25   know where you even were supposed to sign that form?

1  A    Did I know I was supposed to sign that form?

2  Q    Did you know where on the form you were supposed to sign?

3  A    Sure –– yeah.

4  Q    Okay.  So you don't recall having any difficulty telling

5  the grand jury where you even signed the form?

6  A    I was shown a form, so it was refreshed my memory while I

7  was at the grand jury.

8  Q    Do you recall being asked at the grand jury ––

9  A    I do.

10  Q    –– where you sign the form?

11  A    Yes.

12  Q    Do you recall not being able to answer that question?

13  A    I do, yes.

14  Q    All right.  My question is, if you filled out 40 or more,

15  why would you not know where you signed –– you're supposed to

16  sign your name?

17  A    I don't think that's that big of a question.  I mean, I

18  was refreshed –– you sign wherever it says your signature is to

19  sign.

20  Q    My question is –– And I'm not asking you how big a

21  question you think it is.

22  A    Okay.

23  Q    My question is, if you had filled out 40 or more and gone

24  through election officer training, why, when you were asked at

25  the grand jury on July 12th, didn't you even know where you're

1  supposed to sign your name?  That's my question.

2  A    How do you want me to answer that?  Because I think I just

3  did.  I hadn't seen these documents in a long time.  It had

4  been a long time since I had seen the voter assistance form.

5  Q    Ms. White, I just want you to answer it with the truth.

6         MR. SMITH:  Your Honor, I'm going to object.

7         THE COURT:  It's been asked and answered.  I'll

8  sustain the objection.

9  BY MR. BALDANI:

10 Q    But the bottom line is when originally asked where to

11 sign, you didn't recall?

12         MR. SMITH:  Object again.

13         THE COURT:  Sustained.

14 BY MR. BALDANI:

15 Q    Now, at the end of the day, who'd collect all these voter

16 assistance forms?  Would that be Anthony Short?

17 A    That's generally who it should be, yes.

18 Q    That's his job?

19 A    Yes.

20 Q    Okay.  And he's supposed to turn them in to the Clerk's

21 Office?

22 A    Yes.

23 Q    And you don't have any idea of whether he turned them in

24 to the Clerk's Office as he was supposed to or not, do you?

25 A    That was his job.

1   Q    Okay.  For all you know, he could have destroyed them

2   himself, couldn't he?

3   A    For all I know, he could have.

4   Q    Was Anthony Short using drugs while he was working at the

5   election that day?

6   A    He did.

7   Q    Did you see him doing that?

8   A    I did.

9   Q    And he was using OxyContin?

10  A    I have no idea what an OxyContin looks like.

11  Q    Well, was he — was he smoking, snorting, what was he

12  doing?  You say you saw him using drugs.  What was he doing?

13  A    Dobber brought it to my attention that he thought that

14  Anthony was snorting drugs off the desk.

15  Q    While he's sitting there at the desk?

16  A    While he's sitting at the desk.

17  Q    Is this something Dobber told you or something you saw or

18  both?

19  A    Well, he brought it to my attention and I looked.  You're

20  asking me was he snorting OxyContin.  I have — I don't know

21  what an OxyContin is.

22  Q    You saw him snorting something off the desk?

23  A    I saw his head down.

24  Q    And this was the same guy that your brother used on the

25  Corky case?

1    A    This is the same guy that Cletus asked to be put there and

2    the same guy that we were requested to use during the Corky

3    thing, yes.

4    Q    Let me ask you this:  As far as the votes —— And I'm going

5    to just use the term "stealing" them.

6    A    Okay.

7    Q    As far as the votes you stole, did anybody ever catch you

8    stealing their vote?

9    A    Not to my knowledge.  I don't know.

10   Q    Do you recall anybody catching you stealing their vote?

11   A    I can't recall right now.  There's a possibility that

12   someone knew.

13   Q    Yeah, but I'm talking about somebody confronting you, hey,

14   hey, what are you doing there?  I'm not talking about having ——

15   somebody have an idea, I'm talking about did someone catch you

16   and confront you?

17   A    I don't think so.

18   Q    How many votes do you figure that you personally stole in

19   '06?  We'll say in the May.

20   A    I'd say a hundred or more.

21   Q    Can you tell us exactly how you did it?

22   A    Well, again, Dobber and I would —— one would occupy them

23   and they would make their choices and they would say, "I've

24   cast my ballot, am I done here?"  I would say, "Yes."  They

25   would then leave and you had a certain amount of time you could

1   go in, change the choices and cast the final ballot.

2   Q     And basically it's a machine and once they push a button,

3   then another screen will come up, right, so they — there's

4   only a certain little window of opportunity?

5   A     Certain little window, yes.

6   Q     And what — how long would you say that certain little

7   window of opportunity was?  It's a matter of seconds?

8   A     Probably, yes.  I mean, I don't know.  It's been sometime

9   since I've been on one.

10  Q     And really, it's a machine we're talking about; right?

11  A     Yes.

12  Q     Have you — have you ever been to an ATM?

13  A     Yes.

14  Q     Have you ever been to the self-checkout at Kroger's?

15  A     I have.

16  Q     Those are machines, aren't they?

17  A     Yes.

18  Q     And they're kind of similar in that you make a selection

19  and then you go to a next page and you get prompts; right?

20  A     Uh-huh.  Yes.

21  Q     Are you telling the jury that nobody in Clay County is

22  smart enough to figure out how to use that voting machine?

23  A     I'm telling the jury that I was able to steal a hundred

24  votes or more.

25  Q     I want to ask you about Freddy Thompson's voter education

1    efforts.  He had that new voting machine in his office in the

2    Clerk's Office for 30 days prior to the election; right?

3    A    If that's what — I'm going to go with you, if that's the

4    amount of time he says it was there.

5    Q    Well, I don't want you going with me, I want to — I want

6    to ask you to your knowledge.

7    A    I'll agree with that.

8    Q    Okay.  And the county clerk is just like any other county

9    clerk as far as what kind of business goes on there, documents,

10   driver's — I mean, people go into the County Clerk's Office

11   for all kinds of different reasons; right?

12   A    They do, yes.

13   Q    And that new machine is sitting right there in the front

14   of the office for anybody to become familiar with; right?

15   A    That's what it was supposed to be there for.

16   Q    All right.  And in the — leading up to the May '06

17   election, Freddy took that machine to different schools and the

18   fire department gathering to show that machine around the

19   county, didn't he?

20   A    I don't know that he did, but if — I'll agree with you on

21   that.

22   Q    Okay.  Have you —

23   A    I'm not a member of the fire department, I don't know

24   that.

25   Q    Do you recall previously testifying that he did that?

1    A    I may have.

2    Q    Okay.

3    A    I'll agree with you on that.

4    Q    Okay.  Now, we talked about — you've talked about

5    manipulating a machine.  But really, in fairness, Ms. White,

6    would you say it's not — isn't it really manipulating the

7    voter, not the machine?  I mean, the machine, do you just go

8    through certain steps and push buttons?

9    A    Well, the machine should have been constructed, I guess,

10   to not be able to be manipulated, but I would say the voter and

11   the machine were manipulated.

12   Q    So you believe that the machine was poorly designed and

13   manufactured?

14   A    I would have designed it differently.

15   Q    But would you agree that really it's more the voter being

16   manipulated than the machine; right?

17   A    We took advantage of the voter because of the poor design

18   of the machine.

19   Q    All right.  And you met with Wayne Jones several times

20   prior to May '06 to learn how to use that machine?

21   A    Yes.

22   Q    And you say that you met with Freddy Thompson two times?

23   A    That I can remember, yes.

24        THE COURT:  Mr. Baldani, when you get to a place to

25   break, I promised one of the attorneys we'd be breaking a

 1  little before 11:00.  So when you get to a stopping point.

 2          MR. BALDANI:  Well, this is kind of my last area,

 3  Judge, so I can either get through it —

 4          THE COURT:  All right.

 5          MR. BALDANI:  — or I can break.  I'll be glad to

 6  break.

 7          THE COURT:  That's fine.  If one of the attorneys

 8  needs to step out for a moment, of course, you can certainly do

 9  so.

10          You may proceed.

11          MR. BALDANI:  So you're saying keep going?

12          THE COURT:  Yes, sir.  That's fine.

13  BY MR. BALDANI:

14  Q    You met with Freddy a couple of times?

15  A    Yes.

16  Q    Who was present?

17  A    He and I.

18  Q    Just you two?

19  A    Yeah.

20  Q    Okay.  And where did that take place?

21  A    In the Clerk's Office.

22  Q    When was it?

23  A    Prior to the election.  I can't give you a specific day.

24  Q    Prior to May?

25  A    Yes.

1  Q    In that — you remember I gave you that document that —
2  where you kept notes and records —
3  A    Uh-huh.
4  Q    — for all those things?
5  A    I don't think I have it.  I don't have it.
6  Q    All right.  It's not in there, is it, when you met with
7  Freddy?
8  A    I have no idea.  I've not read over those notes today.
9  Q    Well, we can come back to that.
10 A    Okay.
11 Q    So it was just you and him; right?
12 A    Uh-huh, yes.  Well, there was, you know, other people, but
13 he and I with the machine, yes.
14 Q    Okay.  You mean it was like during regular business —
15 A    No, there was — Dobber was back in parts of the building.
16 There was other people, the Sheriff's Office was still in.
17 Q    When you were making undercover recordings of the
18 defendants in the spring of '07, you didn't go try and record
19 Freddy Thompson, did you?
20 A    I didn't, no.
21 Q    Your husband recorded him one time; right?
22 A    Yes.
23 Q    On May 1st of '07?
24 A    If that's the date, yes.
25 Q    Let me ask this:  You said you reviewed all the recordings

1    and the transcripts.  Did you review the recordings that Kennon

2    made by himself as well?

3    A    We reviewed all.

4    Q    All of them?

5    A    Yes.

6    Q    So you didn't just say I'm going to review my own?

7    A    Right, we reviewed all.

8    Q    So you've heard the one that he made with Freddy?

9    A    Yes, I have.

10   Q    And it's already been brought out that there's some tapes

11   that weren't played; okay?  My question is, to your knowledge,

12   are there any tapes of Freddy Thompson that weren't played to

13   this jury?

14            MR. SMITH:  Your Honor, I'm going to object.  Asking

15   her to comment on the total evidence in the case is —

16            THE COURT:  All right.  You can answer.  If you know

17   if there are other tapes, you can answer that question, to your

18   own personal knowledge.

19            THE WITNESS:  No.

20   BY MR. BALDANI:

21   Q    So as far as you know, that one tape of Kennon is the only

22   one of Freddy?  That's all I'm getting at.

23   A    Yes.

24   Q    So you didn't go to Freddy Thompson with your wire and

25   say —

1            MR. SMITH:  Your Honor, I'm going to object.

2   Hearsay.

3            THE COURT:  I think it's been asked and answered.

4            MR. BALDANI:  Okay.

5   BY MR. BALDANI:

6   Q    Who told you who to record and when?  Were you given

7   directions or were you given latitude to make your own call on

8   that?

9   A    I don't understand the question.

10  Q    You made all these recordings at the direction of the FBI.

11  My question is —

12  A    Well, you answered it —

13  Q    My question is —

14  A    That's — you answered it.

15  Q    — was each one planned and talked about in advance or did

16  you have a recording device where you could record —

17  A    They were planned and talked about.

18  Q    The last recording that we heard in Court was May 17th of

19  '07, that was the last one.

20  A    Yes.

21  Q    Is that — would you agree with that?

22  A    Yes.

23  Q    And at that point, had you told anyone — And when I'm

24  talking about anyone, I'm talking about the FBI, the

25  prosecution.  Had you told anyone about these schooling

 1  sessions with Freddy Thompson?

 2  A    They were aware.

 3  Q    When did you make them aware?

 4  A    You would have to ask them that.

 5  Q    Well, you're the one that made them aware.  Do you

 6  recall --

 7  A    I don't recall when I told them that.

 8  Q    You had a pretty lengthy session with the FBI March 27th

 9  of '07.  You've already been asked about that by the other

10  defense attorneys; right?

11  A    Yes.

12  Q    You didn't make them aware of it at that point, did you?

13  A    No.

14  Q    Okay.  You didn't tell them that Freddy Thompson -- in

15  other words, I'm talking about Freddy Thompson, these two

16  schooling sessions on the machine, you didn't tell them about

17  that on March 27th; right?

18  A    That was very few hours.  It would take very -- many days

19  to tell them everything I knew.

20  Q    Would you agree that that's something important?

21  A    It was, but there was other things we discussed on that

22  day.

23  Q    Now, I've asked you a few times about the second grand

24  jury testimony.

25  A    I'm sorry, you were turned and I couldn't hear you.

1    Q    I asked you a few things about the second grand jury

2    testimony.  Your first grand jury testimony was May 3rd of '07;

3    correct?

4    A    Yes.

5              THE COURT:  Before we get to that, we are going to go

6    ahead and take our break, Mr. Baldani.

7              Ladies and gentlemen, we'll take our morning break at

8    this time.  We'll take a 15-minute recess.  Please keep in mind

9    the admonitions that you were given previously not to discuss

10   the case among yourselves while we are in recess.  The jury

11   will be excused until 11:15 this morning.

12        (Whereupon, the jury retired from the courtroom, after

13   which the following proceedings were had in open court.)

14              THE COURT:  You can step down.

15              Mr. Pinales, have a safe trip.  I understand —

16              MR. PINALES:  Thank you, Mother, I will drive safely.

17              THE COURT:  I tried to stop a little bit earlier,

18   but —

19              MR. PINALES:  No, that's perfectly fine, Judge.

20              THE COURT:  All right.  We'll be in recess for

21   15 minutes.

22        (Whereupon, a short recess was had, after which the jury

23   returned to the courtroom and the following proceedings were

24   had in open court.)

25              THE COURT:  Thank you.

1          The record will reflect all members of the jury are

2    present, as well as parties and counsel.

3          Again, Ms. White, you're still under oath.

4          THE WITNESS:  Okay.

5          THE COURT:  And, Mr. Baldani, you may continue.

6          MR. BALDANI:  Thanks, Judge.

7    BY MR. BALDANI:

8    Q    Ms. White, I'm trying to wrap up.

9    A    Okay.

10   Q    I asked you right when I first started about this

11   handwritten summary of the election fraud.

12   A    Yes.

13   Q    And I think you said that you compiled this as the things

14   were happening; is that right?

15   A    I'm sorry, what?

16   Q    When did you prepare this?  The part in your handwriting,

17   when did you prepare that?

18   A    After I met with the agents.

19   Q    Okay.  So you didn't — you didn't prepare it as the

20   events were occurring, you prepared it as a document or a

21   summary of all the election fraud and of the various people

22   once you started cooperating?

23   A    That's when I made that list.

24   Q    All right.

25   A    Yes.

1          MR. BALDANI:  All right.

2          I want to hand this back to her, Judge, if I could.

3          THE COURT:  Yes, sir.

4    BY MR. BALDANI:

5    Q    Before we took our break, I'm asking you, Ms. White, about

6    the two -- well, I'm just going to call them schooling

7    sessions.

8    A    Okay.

9    Q    You say Freddy Thompson met with you twice to school you

10   on how to manipulate the machine; right?

11   A    Yes.

12   Q    Okay.  What I would like to -- And I asked you did you

13   document that in there, and so you didn't -- you say you didn't

14   recall.  So I'm giving it to you and I want you to look through

15   it and see if you documented anywhere in there that Freddy

16   Thompson had two schooling sessions on the machine with you.

17           MR. SMITH:  Your Honor, for the record, is that the

18   72-page or the 75-page one?

19           MR. BALDANI:  I don't know --

20           THE WITNESS:  It's thick.

21           MR. BALDANI:  -- the exact number of pages.

22           THE COURT:  It's not -- the pages are not numbered,

23   but it's front and back.

24           THE WITNESS:  It's probably a hundred-and-some pages.

25           THE COURT:  Let Mr. Smith look at it so he's familiar

WANDA WHITE - CROSS - MR. BALDANI                    70

1   with which one it is.

2            MR. BALDANI:  I showed him.

3            MR. SMITH:  Your Honor, if the Court please, it may

4   assist the witness if she has the original.  I don't know how

5   well the copy came out, but I do have the originals here.

6            THE COURT:  That will be fine.  That way you can look

7   at your document, and Mr. Smith can provide the original.  That

8   will be fine.

9            MR. BALDANI:  I'm sorry to hold us up.

10            THE COURT:  That's fine.

11            MR. SMITH:  Mr. Baldani, are you just showing her the

12   ones in her handwriting?

13            MR. BALDANI:  Yes.

14            MR. SMITH:  Your Honor, for the record, if this will

15   assist in this process, I have these individually marked.  I

16   know that when counsel presented — I'm sure that's his

17   discovery copy, but for identification would you like me to

18   identify these individually and then hand them to Mr. Baldani?

19            THE COURT:  It's not necessary at this time.

20   Mr. Baldani, you can look at those and make sure that it's the

21   same document that you're referring to and then we'll pass the

22   originals to the witness.

23            MR. BALDANI:  All right.

24            THE COURT:  Okay.  Thank you.

25   BY MR. BALDANI:

1  Q    Ms. White, all I'm trying to get at is, in all these

2  handwritten --

3         THE WITNESS:  Thank you.

4  BY MR. BALDANI:

5  Q    In this handwritten compilation that you made, did you

6  mention the two -- the two Freddy Thompson schooling sessions

7  anywhere in there?

8  A    I don't know.  Would you --

9  Q    That's why I'm giving them to you.

10 A    I'm going to read -- you want me to go ahead and read

11 through them?

12 Q    Well, we need to know, so --

13 A    Okay.

14        MR. BALDANI:  Judge, I've got a suggestion, it might

15 expedite this.  Would you want me to come up?

16        THE COURT:  You want to do that while she's looking

17 at the documents?

18        MR. BALDANI:  Yes, sir.

19        THE COURT:  All right.  Why don't you all come up,

20 that's fine.

21     (Whereupon, the following discussion was had between the

22 Court and counsel at the bench, out of the hearing of the

23 jury.)

24        MR. BALDANI:  Judge, this is an important point to

25 us, that she didn't document this.  But I don't want -- you

1  know, I hate to waste people's time.  I would be glad to come

2  back to it.  I'm sure there's going to be redirect, recross,

3  and I can come back to it if she wants to look it over at

4  lunch.

5          THE COURT:  There may not — I don't — we can't

6  assume that.

7          MR. BALDANI:  Okay.

8          THE COURT:  So this is the only procedure I know, and

9  I guess the other option would be for you to tell her you've

10  looked through it and you didn't see it, and she's not going to

11  necessarily agree with that, she's still going to want to look

12  through the document, so we'll be back at the same point.

13          MR. BALDANI:  I mean, I didn't know that she would

14  not acknowledge that it wasn't in there, so I didn't, you

15  know — and it is important.

16          THE COURT:  She's entitled to look at it if you want

17  to ask her about that.

18          MR. SMITH:  Most of my witnesses have photogenic

19  memory and couple of them don't.

20          MR. BALDANI:  I understand.  I'm just trying to keep

21  it legal.

22          THE COURT:  Well, we'll give her a moment to look at

23  it, that's fine.

24          MR. BALDANI:  Okay.

25      (Whereupon, the following proceedings continued in open

1    court.)

2              MR. SMITH:  Your Honor, there are more that we found

3    that she has as well and the witness will need to --

4              THE COURT:  All right.

5              MR. SMITH:  -- have the benefit of those as well.

6              THE COURT:  That's fine.  You can pass those up to

7    her.

8              Mr. Smith, were these premarked, numbers?

9              MR. SMITH:  The ones she has now before her are.

10             THE COURT:  All right.

11             MR. SMITH:  I can mark this as well.

12             THE COURT:  Well, my only thought is it may help

13   other counsel in the case if they're going to be referring to

14   specific documents, not as exhibits, but if they need to refer

15   to those themselves.

16             MR. SMITH:  The ones before the witness now are

17   marked and they can be identified.  If counsel have their

18   exhibit list, they can follow along, yes.

19             THE COURT:  All right.

20             MR. SMITH:  But I didn't read those into the record,

21   though.

22             THE COURT:  All right.  We'll see if there's a

23   request to do that.  If there is, we'll identify those so

24   counsel can --

25             MR. WHITE:  Your Honor, may I approach on a different

1  matter just very quickly?

2          THE COURT:  Yes, sir.

3      (Whereupon, the following discussion was had between the

4  Court and counsel at the bench, out of the hearing of the

5  jury.)

6          MR. WHITE:  Hello, Judge.  I received that note.  I

7  was wondering how you want me to proceed with this.  I'm not

8  aware of a revocation hearing I had.  Do you want me to have

9  Kaye check over there?  But I'm a hundred percent sure ––

10         THE COURT:  Is your cell phone out in front?

11         MR. WHITE:  Yes, I could go out downstairs.

12         THE COURT:  Why don't we do this:  Why don't you go

13 into my office ––

14         MR. WHITE:  Okay.

15         THE COURT:  –– and ask my secretary to call ––

16         MR. WHITE:  I got to find out who the judge is, too.

17         THE CLERK:  –– Lexington and check on this and then

18 if ––

19         MR. WHITE:  Do you know who the judge is, Kaye?

20         THE CLERK:  It was Susan Baker that sent us an e-mail

21 asking if our trial was still going, that you were supposed to

22 be in a revocation.  I have sent her a note.  I'm assuming

23 Judge Todd, because Susan Baker ––

24         THE COURT:  Oh, Susan Baker, his secretary.

25         MR. WHITE:  Judge Todd?

1          THE CLERK:  But it could be Judge Hood.

2          MR. WHITE:  The only thing that I was wondering

3    about, if I had an old case, Judge, where the gentleman was

4    revoked and it's in front of Judge Caldwell, and I e-mailed

5    Jamie and I said, "Do you need me to do anything," and she

6    said, "No, don't worry about it."  I'm wondering if Judge Todd

7    just wants to —

8          THE CLERK:  I sent a message that he was in our

9    Court.

10         MR. WHITE:  I'm sorry, Judge.

11         THE COURT:  That's okay.  What we'll do is we'll take

12   a break while she looks at this document.  That will give you a

13   chance —

14         MR. WHITE:  Do you want me to still go in?

15         THE COURT:  No, just a minute.  Mr. White needs to

16   make a phone call to Lexington.  So what we're going to do is

17   we're going to take about a ten-minute break to let the witness

18   look through this document.  I'm going to excuse the jury, and

19   then he can make a phone call.

20         MR. BALDANI:  You know, apparently Steve has given us

21   some things beyond this, so we need to make sure we know what

22   it is.  So we'll get it all lined out at the break.

23         THE COURT:  All right.

24         MR. WHITE:  Judge, my apologies for bringing — I

25   didn't know what to do.

76

1          (Whereupon, the following proceedings continued in open

2    court.)

3          THE COURT:  Ladies and gentlemen, what we're going to

4    do is we're going to take another short break.  One of our

5    attorneys needs to make an emergency phone call and I want to

6    give this witness a chance to look through these documents,

7    there's no reason for you to sit there while we do that.  So

8    we'll be in recess 10 to 15 minutes.  Please keep in mind the

9    admonitions that you've been given several times not to discuss

10   the case while we are in recess.  And the jury will be excused

11   at this time.

12         (Whereupon, the jury retired from the courtroom, after

13   which the following proceedings were had in open court.)

14         THE COURT:  Thank you.

15         Counsel, while we take this break, I'm going to allow

16   Ms. White to stay here on the witness stand and look through

17   the document.

18         You can also check the numbers that were premarked,

19   Mr. Smith.  Some of the first pages had —— were premarked and

20   you can refer those to defense counsel if they need those.

21         MR. SMITH:  May I approach the witness to do so?

22         THE COURT:  You can do that when we take our break.

23         And, Mr. White, if you need to use my chambers to

24   call Lexington and see exactly the nature of this other case,

25   you can do that.  We're not going to come back in session until

1  the witness has had a chance to go through this document.  So

2  we'll be in recess until that point.

3       (Whereupon, a short recess was had, after which the

4  following proceedings were had outside the presence of the

5  jury.)

6            THE COURT:  Thank you.

7            The jury is not present.  I just want to let the

8  attorneys know what we'll do is we'll go ahead and take our

9  lunch break at this time to allow Ms. White to review this

10 document.  I understand she has just now started.  The

11 attorneys now know what she's looking at and she's started

12 reviewing the document.  Rather than have the jury wait another

13 30 minutes, I'm going to go ahead and excuse them for lunch and

14 we'll start back at 1:00.

15           THE WITNESS:  Your Honor, these are my husband's

16 notes.

17           THE COURT:  All right.  You were asked to look at

18 your notes.  And so if you could separate out the portions that

19 are your notes, that's what you've been asked to look at; okay?

20           THE WITNESS:  Okay.  So far I haven't found any —

21           THE COURT:  You haven't found any of yours?  All

22 right.  Thank you.

23           We'll be in recess until 1:00.

24           If you could tell the jury that they're excused until

25 1:00, please.  Thank you.

1              (Proceedings concluded at 11:50 a.m.)

2                   C E R T I F I C A T E

3       I, Cynthia A. Oakes, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7  3/4/2010                    s/CYNTHIA A. OAKES
        DATE                   CYNTHIA A. OAKES, RPR, RMR, CRR
8

9                   I N D E X

10                                              PAGE

11 Testimony of WANDA WHITE:
        Cross-Examination by Mr. Baldani:              15
12

13

14

15

16

17

18

19

20

21

22

23

24

25