United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) February 26, 2010 |
| DOUGLAS C. ADAMS | ) 1:00 p.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 14-B |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.

On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:         CANDACE C. CROUSE, ESQ.

On behalf of the Defendant      BENNETT E. BAYER, ESQ.
Douglas C. Adams:               R. KENT WESTBERRY, ESQ.
                                KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant      T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant      ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:             R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant      JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                      JASON D. PARMAN, ESQ.
 3                                    Assistant U.S. Attorneys
                                      601 Meyers Baker Road
 4                                    Suite 200
                                      London, Kentucky  40741
 5

 6   On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:          107 East First Street
 7                                    Corbin, Kentucky  40701

 8                                    CANDACE C. CROUSE, ESQ.
                                      150 East Fourth Street
 9                                    Federal Reserve Building
                                      Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant       BENNETT E. BAYER, ESQ.
     Douglas C. Adams:                106 West Vine Street
12                                    Suite 800
                                      Lexington, Kentucky  40507
13
                                      R. KENT WESTBERRY, ESQ.
14                                    KRISTEN N. LOGAN, ESQ.
                                      220 West Main Street
15                                    Suite 1900
                                      Louisville, Kentucky  40202
16

17   On behalf of the Defendant       T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:             133 West Short Street
18                                    Lexington, Kentucky  40507

19
20   On behalf of the Defendant       ROBERT L. ABELL, ESQ.
     William E. Stivers:              120 North Upper Street
                                      Lexington, Kentucky  40507
21

22   On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:              R. TUCKER RICHARDSON III, ESQ.
23                                    300 West Short Street
                                      Lexington, Kentucky  40507
24

25
```

```
 1    On behalf of the Defendant        JERRY W. GILBERT, ESQ.
      William B. Morris:                212 North Second Street
 2                                      Richmond, Kentucky  40475

 3
      On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
 4    Debra L. Morris:                  201 West Short Street
                                        Lexington, Kentucky  40507
 5

 6    On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
      Stanley Bowling:                  116 West Main Street
 7                                      Suite 2A
                                        Richmond, Kentucky  40475
 8

 9    Court Reporter:                   CYNTHIA A. OAKES, CRR
                                        Official Court Reporter
10                                      United States District Court
                                        560 Athens Boonesboro Road
11                                      Winchester, Kentucky  40391
                                        (859) 983-4346
12

13

14

15

16

17

18

19

20

21

22

23

24
      Proceedings recorded by mechanical stenography,
25    transcript produced by computer.
```

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1          (Whereupon, the jury returned to the courtroom, after

2   which the following proceedings were had in open court.)

3               THE COURT:  Thank you.

4               The record will reflect that all members of the jury

5   are present.  The parties and counsel are present as well.

6               Mr. Parman, will you be calling the next witness?

7               MR. PARMAN:  Yes, Your Honor.

8               THE COURT:  You may proceed.

9               MR. PARMAN:  The United States calls Carmen Webb

10  Lewis.

11                      CARMEN WEBB LEWIS,

12  having been first duly placed under oath, was examined and

13  testified as follows:

14               THE COURT:  Thank you.

15               Mr. Parman, you may proceed.

16               MR. PARMAN:  Thank you, Your Honor.

17                      DIRECT EXAMINATION

18  BY MR. PARMAN:

19  Q    Good afternoon.

20  A    Good afternoon.

21  Q    Could you state your name, please?

22  A    Carmen Webb Lewis.

23  Q    Ma'am, where are you from?

24  A    Manchester.

25  Q    How long have you lived in Manchester?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1    A    All my life.

2    Q    Were you born there?

3    A    Yes.

4    Q    Grew up there?

5    A    Uh-huh.

6    Q    Are you married?

7    A    Yes.

8    Q    What's your husband's name?

9    A    Charles.

10   Q    How long have you and Charles been married?

11   A    Since 1998.

12   Q    Do the two of you have any kids?

13   A    Two.

14   Q    What are their ages?

15   A    Ten and three.

16   Q    Ma'am, what is your current occupation?

17   A    Paid occupation?

18   Q    Yes, we'll start with your paid occupation.

19   A    Director of Senior Citizens Center.

20   Q    What do you do as the director of the Senior Citizens

21   Center?

22   A    Oversee all the operations there, mail delivery and that

23   sort of thing.

24   Q    Is this center in Manchester?

25   A    Uh-huh.

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  Q    How long have you held that position?

2  A    Since 1994.

3  Q    Do you also hold elected office?

4  A    Yes.

5  Q    And what position do you hold?

6  A    Mayor of Manchester.

7  Q    How long have you been mayor of Manchester?

8  A    I went in as mayor in January of 2007.

9  Q    When did you run for mayor?

10  A    November of '06.

11  Q    Who did you run against?

12  A    Daugh White.

13  Q    When did you first become involved in elections?

14  A    When I ran for city council, which would have been '04.

15  Q    When you run for the city council, is there a district

16  that you run from?

17  A    We just run just in the City of Manchester.

18  Q    So there's "X" number of seats available for the city

19  council?

20  A    Yes.

21  Q    How many?

22  A    Eight.

23  Q    So you run for one of the eight positions?

24  A    Uh–huh.

25  Q    Now, when you run for city council, do you run in the May

CARMEN WEBB LEWIS — DIRECT — MR. PARMAN

1  or do you run in the fall?

2  A    Usually in the fall unless there's over a certain number

3  of people that are running for that office.

4  Q    When you ran in 2004, did you run in May or ——

5  A    November.

6  Q    Prior to an election in November 2004, did anybody come to

7  you and ask for you to speak with William "Al Man" Stivers?

8  A    Yes.

9  Q    Who?

10  A    My uncle.

11  Q    What did your uncle ask you to do?

12  A    He told me that Al Man Stivers wanted to talk to me.

13  Q    Did he tell you what he wanted to talk to you about?

14  A    No, I asked him, but he said he didn't know, he just

15  wanted to speak with me.

16  Q    First of all, do you recognize William "Al Man" Stivers

17  here in the courtroom today?

18  A    Let's see if I can.

19  Q    Do you need him to stand up?

20  A    Yes, I can see him.  That's him, I guess that's a blue

21  sweater.

22        THE COURT:  The record will reflect the witness has

23  identified the defendant, William Stivers.

24  BY MR. PARMAN:

25  Q    We were talking about you knew Mr. Stivers wanted to have

CARMEN WEBB LEWIS − DIRECT − MR. PARMAN

1  a meeting with you.  Could you explain what happened next?

2  A    So my uncle tells me that Mr. Stivers wanted to speak with

3  me, and the first time I told him, I said, "What does he want

4  to speak with me about?"  And he said, "He just wants to speak

5  with you."  I said, "Well, I don't really have anything to say

6  to him."  So that first initial time that he told me that just

7  passed.  And then he came back again probably two or three

8  weeks later and he said, "I understand that you never spoke to

9  Al Man."  And I said, "No."  And he said, "Well, he's really

10 wanting to talk to you."  So then −− you want me to continue

11 with that?

12 Q    Yes.

13 A    So my husband saw Al Man in town, in Manchester, and he

14 went and said, "You know, I think you're wanting to see my wife

15 or something."  And he said, "Yes, come out to the house

16 tonight."

17 Q    Did you and your husband go see Mr. Stivers at his house?

18 A    Yes.

19 Q    What happened then?

20 A    When we got there, there was some people there −− he lived

21 right beside of his brother, and there was some people outside,

22 and he told us just to come on into his house.  So we proceeded

23 in and sat down.

24 Q    Who was present during the conversation that occurred

25 there in the house?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1   A    Al Man's wife, at the very beginning she was there, and

2   then his brother comes in a little bit later, and his child.

3   There was just people walking kind of in and out at different

4   times.  And then Wayne Jones.

5   Q    Share with the jury the content of what was said.

6   A    Okay.  The whole conversation?

7   Q    Yes.

8   A    We sat down first, and I don't think Wayne was there yet,

9   and Al Man tells me that –– kind of little chitchat to begin

10  with, and then he tells me, said, "You know you're going to

11  have to give some money to win."  And I said, "I'm not giving

12  any money."  And so the conversation goes on a little bit more

13  and then, you know, people are just kinda coming in and out,

14  and then Wayne comes into the room, and they both kind of back

15  and forth just explaining in order to win, that's the way it

16  happens, you have to give money, you have to buy into elections

17  and that sort of thing.

18      So that just kind of goes on and on for a little while,

19  and I said, "I'm not giving any money, I'm not paying to get on

20  the city council race."  And so on into probably 45 minutes or

21  something, it seemed like forever at the time, he actually

22  says –– Al Man actually says, "Well, it'll probably take at

23  least a thousand dollars."  I said, "I am not giving a thousand

24  dollars for anything, let alone a city council race."  And he

25  got a little huffy, kind of like he was mad.

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1  Q    I was going to ask you to explain what you meant by huffy,
2  so you can expound on that.
3  A    Just like it was upsetting to him.  And I couldn't
4  understand that, why he would get upset if I didn't want to
5  give money if I didn't want to win for city council, like it
6  was a personal thing.  So basically that just kind of went back
7  and forth, the same sort of thing, "You have to pay to win,
8  that's how this works, everybody does it."
9  Q    I apologize.  When he was telling you you have to pay to
10 win, did he specifically tell you that you had to pay them so
11 they could pay voters?
12 A    What was said in the conversation -- they didn't say, you
13 know, I think, at that point in time, give them money, but they
14 did say the person that would be handling the money would be
15 Vernon Hacker.
16 Q    And did you understand that handling the money meant
17 buying votes?
18 A    Yes.
19 Q    Did they tell you that?
20 A    Not really in so many words.  But, yeah, you know, when
21 you heard handling the money, what was going on.
22 Q    Was that the clear impression?
23 A    Yes, when they say, you know, "You have to buy to get in"
24 and you just continue with that, you understand.
25 Q    Who said you have to buy to get in?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  A    Wayne Jones.

2  Q    Now, this conversation, I assume that occurred before the

3  election?

4  A    Yes.

5  Q    How much before the election was it?

6  A    It was somewhere around the end of September.

7  Q    And that was in 2004?

8  A    Uh-huh.

9  Q    And how much money did they tell you that you were going

10 to have to give?

11 A    A thousand dollars.

12 Q    How did the conversation end?

13 A    I think that was pretty much it.  Right after the thousand

14 dollar remark came up, I said, "I'm not giving that, we're not

15 doing that," and like I say, he was a little huffy and we just

16 pretty much ended the conversation and left.

17 Q    You and your husband?

18 A    Uh-huh.

19 Q    Now, was that the end of the story as it pertained to this

20 or was there other attempts to get you to -- have you give

21 money?

22 A    Other attempts.

23 Q    Share with the jury what those attempts were.

24 A    Probably a day or two later I was at work at the Senior

25 Citizens Center and they told me that Vernon Hacker was outside

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1  wanting to see me.  So I stepped outside, and Mr. Hacker, we

2  just kind of spoke a little chitchat in the very beginning, and

3  he said, "Wayne and Al Man sent me to see you, they said you

4  had something to give me, something for me."  And I said, "I

5  don't understand.  They understood exactly what I meant when I

6  left, that I wasn't giving you anything."  And so it really —

7  quickly the conversation just went to more idle chitchat and we

8  just kind of spoke around just for about idle nothing and he

9  left.

10  Q    Now, the conversation that you had with Mr. Jones and

11  Mr. Stivers previously, they had told you that you had to give

12  money to Vernon Hacker?

13  A    Right.

14  Q    And then two days later —

15  A    A day or two later, yeah, he shows up at my work.

16  Q    And was asking for it?

17  A    Uh-huh.

18  Q    Now, was that the end of the story?

19  A    No.

20  Q    Continue.

21  A    Probably maybe a week or something, because we're in a

22  short period of time here before the actual election, so

23  probably a week, week-and-a-half after that, I was stepping

24  outside of the Senior Citizens Center again and Mr. Stivers and

25  Wayne Jones pulls up at the Senior Center, and I walk over to

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  their vehicle and little idle chitchat there in the beginning,

2  and then they tell me again, "You're going to have to pay to

3  win, you won't win if you don't pay."  And I pretty much just

4  said, "Listen, that's okay, I just won't win.  I'll just take

5  the chances, I'm not worried about that, I'm not winning.  If I

6  don't pay, I'm not worried about it."  And that was pretty much

7  the end of that conversation, and I just go back in the

8  building.

9  Q    Now, did Mr. Jones and Mr. Stivers tell you that at

10 this -- I guess the third encounter?

11 A    Yeah, pretty much.  I guess Al Man did most of the

12 talking, but Wayne would say a few things about, you know, "You

13 need to do this, you have to do this."

14 Q    Ma'am, if you would, look around the courtroom and see if

15 you see Wayne Jones.

16 A    Oh, I see him there.  He is in the blue shirt and the

17 jacket there in between the lady and the gentleman attorney,

18 sitting behind them.

19        THE COURT:  The record will reflect the witness has

20 identified the defendant Charles Wayne Jones.

21 BY MR. PARMAN:

22 Q    Now, are you aware of whether there was even a further

23 attempt or another encounter that was had --

24 A    Yes.

25 Q    -- in an attempt to get you to pay?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  A    Yes.

2  Q    Share that with the jury.

3  A    I think one more time my husband was taking my grandmother

4  to vote absentee at the polling place there in Manchester, and

5  when he went in, Al Man was handling –– I'm assuming handling

6  the voting machines at that point in time.  He was there.  And

7  he told my husband that ––

8            MR. ABELL:  Objection, Judge.

9            THE COURT:  Sustained as to what he told your

10 husband.

11           THE WITNESS:  Okay.

12 BY MR. PARMAN:

13 Q    Ma'am, leading up to the 2004 election, I assume at that

14 point you were concerned that there could be impropriety

15 relating to the election?

16 A    Uh–huh.

17 Q    Did you make a videotape of actions that you believed were

18 election fraud?

19 A    Yes.

20 Q    And did you give that videotape to law enforcement?

21 A    Yes.

22           MR. PARMAN:  I want to show the witness what's been

23 marked as Government's Exhibit V1, "V" as in "Victor."

24           THE COURT:  Yes, you may.

25 BY MR. PARMAN:

CARMEN WEBB LEWIS − DIRECT − MR. PARMAN

1  Q    Ma'am, do you recognize that?

2  A    Yes.

3  Q    What do you recognize that to be?

4  A    This is a copy of the tape that we gave to FBI officials.

5  Q    Is that copy a complete and accurate representation of the

6  videotape that you made?

7  A    Yes.

8  Q    In all respects?

9  A    Yes.

10 Q    Have you reviewed that?

11 A    Yes.

12 Q    And then after reviewing it, did you affix something on it

13 to see that that was the one you received?

14 A    I put my initials on it.

15        MR. PARMAN:  Your Honor, I would move for

16 introduction of Exhibit V1.

17        THE COURT:  Any objection?

18        MR. HOSKINS:  No.

19        THE COURT:  Government's Exhibit V1 will be admitted

20 at this time.

21        MR. PARMAN:  Your Honor, I move at this time to

22 publish that to the jury.

23        THE COURT:  You may.

24        MR. PARMAN:  If I could have that back.

25 BY MR. PARMAN:

CARMEN WEBB LEWIS — DIRECT — MR. PARMAN

1  Q    Now, before we start this video, I want to set the stage

2  so we know what's going on.  Share with the jury where you're

3  at and when this is.

4  A    This is on election day in '04, and the location of it is

5  just across the street — most of the time it's just across the

6  street from the Manchester precinct.  They'll be a few times

7  we'll see the Manchester precinct also.  But across the street,

8  there is a SuperAmerica station and we were sitting there

9  pointing down Green Street.

10 Q    Pointing down Green Street?

11 A    Uh-huh.

12 Q    Now, what time of day is this?

13 A    I'm thinking it's a little bit before lunch.  And you'll

14 see back and forth and maybe a part of it was a little bit

15 after lunch.  There's starts and stops in it.

16 Q    How are you positioned?  Are you outside?

17 A    No, we're in our vehicle.

18 Q    Are you driving in your vehicle?

19 A    Some of the time, yes, and some of the time we're just

20 sitting still.

21      (Whereupon, Government's Exhibit No. V1 was played to the

22 Court and jury as the following questions and answers were

23 had.)

24 BY MR. PARMAN:

25 Q    We're driving down a road.  Is that Green Street?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1   A    That's Green Street, yes.

2   Q    We saw an individual there on the left just a second ago.

3   Did you see that?

4   A    No.

5   Q    Let me back it up.

6   A    I'm sorry.

7         MR. PARMAN:  Your Honor, if I could question from the

8   table it might be a little bit easier.

9         THE COURT:  That will be fine.

10  BY MR. PARMAN:

11  Q    Ma'am, if you look on the screen, the house on the left,

12  do you recognize that house?

13  A    Uh-huh.

14  Q    Do you know whose house that is?

15  A    Uh-huh.

16  Q    Whose house is that?

17  A    Bart and Debbie Morris's.

18  Q    Do you recognize Bart and Debbie Morris in the courtroom?

19  A    Uh-huh.

20  Q    Would you point them out?

21  A    They're the first two people up against the —— well, the

22  second and third people up against the wall over there.

23        THE COURT:  The record will reflect the witness has

24  identified the defendants, William Morris and Debra Morris.

25  BY MR. PARMAN:

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  Q    Do you have the screen there immediately to your left?

2  A    Yeah.

3  Q    Is that a little easier to see?

4  A    Yeah.

5  Q    Now, there was an individual walking into the house there

6  on the video.  Did you recognize that individual?

7  A    No, I still didn't see him very well.

8         MR. PARMAN:  Your Honor, if we can have just a

9  second, we're going to put it in a program that will allow us

10  to back it up a little bit easier than what apparently this one

11  is able to do.

12         THE COURT:  That's fine.

13  BY MR. PARMAN:

14  Q    You can see an individual starting to walk into the house

15  you identified as Bart and Debbie Morris's.  Do you see that

16  individual?

17  A    Yeah.

18  Q    Are you able to identify that individual?

19  A    I still can't tell that person very well.

20  Q    Okay.  That's fine.  What is this area that's being shown

21  now?

22  A    This is the Manchester precinct where they vote on

23  election day.

24  Q    Now, there's some individuals walking in and out.  Do you

25  recognize those individuals?

CARMEN WEBB LEWIS — DIRECT — MR. PARMAN

1  A    Not those.

2  Q    Now, you've got the video panned on these two individuals.

3  Who are these?

4  A    I didn't know these two people.

5  Q    Okay.  Do you recognize that individual?

6  A    No, I don't know him specifically, no.  He had just been

7  over at the Manchester precinct and he was walking.

8  Q    Now, it looks like our location has changed again.  Where

9  are you at now?

10  A    This is at the home — the home you see there is the home

11  of Ella Wagers, which is — you go on to her lane right off of

12  Green Street.  So this is right behind SuperAmerica.

13  Q    Ma'am, why did you stop at Ella Wagers' residence?

14  A    There was — they were doing some vote hauling that day

15  also and you'll see the two gentlemen that are walking here in

16  the picture, which is Vernon Hacker and Darnell Hipsher, and

17  they had been at Ella Wagers' house and there was a lot of

18  activity going in and out of there.  Kennon and Wanda was going

19  in and out there some, too, and then they would go to different

20  places.  So there was a lot of activity there also.

21  Q    Is that the reason why you videotaped that residence?

22  A    Yeah.

23  Q    And the two individuals that you see here on the screen

24  now you said are who?

25  A    That one is Vernon Hacker, and the one to the right is

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  Darnell Hipsher.

2  Q    You mentioned Kennon and Wanda.  Explain who you're

3  referring to.

4  A    Kennon and Wanda White.

5  Q    And you saw them going to and from where?

6  A    Ella Wagers'.

7  Q    I guess there's a close-up of Darnell?

8  A    That's it.

9  Q    It looks like you panned in on these two vehicles.  Is

10  there a reason why that happened?

11  A    We were just trying to get –– you couldn't get a really

12  good view for the trees there.  So we were really trying to get

13  people that were pulling in there because it was behind the

14  trees.

15  Q    When you say "there", where are they pulled into?

16  A    They pulled in Bart and Debbie Morris's.

17  Q    So Ella Wagers' residence and Bart and Debbie's are very

18  close?

19  A    Very close, yes.  That person there is pulling into Ella

20  Wagers.  That's the driveway.

21  Q    The one that looks like the gray car?

22  A    Uh-huh.

23  Q    Okay.  The white truck that just passed, do you recognize

24  it?

25  A    Uh-huh.  That is Gary "Ouchie" Jackson's.

CARMEN WEBB LEWIS − DIRECT − MR. PARMAN

1  Q    And was he running for any type of position at that time?

2  A    City council.

3  Q    It looks like there's another individual on the road.  Do

4  you recognize that person?

5  A    The car on up there, is that the one you're talking about?

6  Q    Well, let's start with the car.

7  A    No, I don't recognize the car.  I think the person —

8  they'll come a little bit closer, but I think they're just

9  carrying groceries.

10 Q    Oh, okay.  That looks like there's an individual walking

11 across the street.  Who is that?

12 A    That's Gary "Ouchie" Jackson in the white shirt.

13 Q    It appears that he's walking into someplace.  Once again,

14 where is that?

15 A    Bart Morris's.

16 Q    Now there's a vehicle pulling out of Bart and Debbie's

17 house.  Do you recognize that vehicle?

18 A    I think this vehicle is Bart Morris's, his car.

19 Q    Is that Bart Morris driving the vehicle?

20 A    The best that I can tell from here.

21 Q    There's another vehicle leaving.  Do you recognize that

22 vehicle?

23 A    This could possibly be Kennon and Wanda's.  They would

24 change -- everybody would change vehicles all day, so they had

25 a lot of rental vehicles and that sort of thing.

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1  Q    And during the day, did you see Kennon and Wanda going

2  into Bart Morris's house?

3  A    Uh-huh.

4  Q    Two more vehicles come in the screen.  Do you recognize

5  those?

6  A    This first vehicle is Terry Gilbert's.

7  Q    Do you have any idea what he was doing there?

8  A    No, I don't think he pulls in, but that's just his

9  vehicle.  Or he doesn't at this point in time.

10 Q    What about the vehicle behind him?

11 A    I'm not sure who that one is.

12 Q    Okay.  You have a white van in the video?

13 A    This van, I'm not sure who's driving it, but somebody —

14 the person that was driving it was hauling voters that day

15 cause they was at lots of different places, they were at the

16 Manchester precinct many, many, many times, and then they would

17 let people out and they would, you know, go take them home and

18 vice versa all day.

19 Q    So just so the jury understands, you were out and about

20 all day?

21 A    Yes.

22 Q    And you didn't videotape all day?

23 A    I did not videotape all day, that's right.

24 Q    Was it after a certain period of time you decided to take

25 a videotape?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1    A    It was early — well, around lunchtime.  Like I said, you

2    just felt like you needed something to do, but then you got

3    tired after a while.  I mean, it was the same thing, and there

4    was nowhere to really video except, you know, where when you

5    wasn't getting a lot of things.  So we just gave up that idea

6    later.

7    Q    But you saw this white van?

8    A    Uh-huh.

9    Q    The same white van on multiple occasions?

10    A    Yes.

11    Q    At different places throughout the day?

12    A    Uh-huh.

13    Q    It looks like it's pulling into Bart and Debbie's house;

14    is that right?

15    A    Right.  If you'll see, I couldn't get that person because

16    of that tree.  That's what I was trying to tell you about.

17    Q    It looks like we changed positions or we stopped the

18    video.  Explain what happened there.

19    A    That's the car that you saw pulling in a while ago, but we

20    had moved and tried to turn our vehicle this way and maybe get

21    a better shot, and that's that same vehicle that went in that's

22    now coming out of Ella Wagers'.

23    Q    That's the silver car that we talked about earlier that's

24    now leaving?

25    A    Yes.

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1  Q    Ma'am, this driveway this car is pulling out of, was that

2  driveway recently paved?

3  A    Yes.

4  Q    Before Mr. White was defeated?

5  A    Yes.

6  Q    Do you know when it was paved?

7  A    That was in the whole blacktopping —— let's see, that was

8  either in late '05 —— I think it was late '05, early '06,

9  somewhere in that period that we've all talked about the

10 blacktopping incident, and it's actually not a city street,

11 it's more of a driveway, but they paved it.

12 Q    And that's this driveway that this car is pulling out of

13 here now?

14 A    Yes.

15 Q    And, of course, it does appear to be blacktopped in this

16 video?

17 A    Yes.

18 Q    Are you aware of how many voters were hauled out of that

19 residence of Ella Wagers?

20 A    I couldn't give an exact number, but she had a lot of

21 people that were supposedly living in her house.  There was

22 probably ten —— ten vehicles —— I mean, ten persons that used

23 that address, just themselves out of that household.

24 Q    Do you know whether they lived there or not?

25 A    They do not.

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  Q    It looks like we've changed the scene again.  There's an

2  individual walking back across the street?  Do you know who

3  that was?

4  A    That's Gary "Ouchie" Jackson again.

5  Q    Now, Mr. Jackson, you said, was running for what?

6  A    City council.

7  Q    Where is he leaving from?

8  A    He's leaving Bart Morris's going back to his truck that's

9  parked on the other side of the road.

10 Q    There's another individual there with him.  Do you

11 recognize that person?

12 A    I couldn't see that person good enough.

13 Q    We've got a white truck pulling out.  Who is that?

14 A    That's Gary "Ouchie" Jackson.

15 Q    So he's leaving the scene?

16 A    Uh-huh.

17 Q    And we've got a — it looks like a maroon Blazer pulling

18 out of Bart and Debbie's driveway.  Do you know who that is?

19 A    I don't know.  They had just pulled in and somebody went

20 into the building, and I couldn't get them on the — for the

21 tree again.  And now they're pulling out.  They were actually

22 hauling some people, whoever they are.  Some of these people

23 had tinted windows and I couldn't see who they were several

24 times that day also.

25 Q    It looks like we've got a Ford truck pulling out.

CARMEN WEBB LEWIS — DIRECT — MR. PARMAN

1  A    That's the person that you saw Ouchie Jackson speaking to,

2  but I couldn't see who it was.

3  Q    There's a Cavalier in the background pulling out.  Do you

4  recognize that vehicle or who was driving it?

5  A    No, they went the other way.

6  Q    Okay.  We've changed scenes again.  Explain where we're

7  at.

8  A    This was at Mountain View Apartments, and some of the

9  different vehicles that we've seen, the van and some of the

10  other vehicles, had been going up there getting people a lot in

11  the day, so we pulled up kinda there just to see what was going

12  on.  That's just a gentleman there, you know, walking in.

13  Q    Is this the front of Mountain View Apartments?

14  A    This is the office and behind where I'm headed is all the

15  apartment buildings.

16  Q    Okay.

17  A    There you can see them.

18  Q    Now, are these some of the same vehicles that we had seen

19  before?

20  A    None of these here.  We kept noticing they were going up

21  Town Branch way a lot, so as we were pulling up through there,

22  we passed some of them, so we were just circling to see if we

23  could see what was going on up there.

24  Q    And we've changed back again?

25  A    You're back at SuperAmerica again looking down Green

CARMEN WEBB LEWIS — DIRECT — MR. PARMAN

1  Street.

2  Q    And that's toward Bart and Debbie's house?

3  A    Uh-huh.

4  Q    We've got a vehicle there.  Do you recognize it?

5  A    No.

6  Q    Now, there's two individuals there in the road.  Do you

7  recognize those?

8  A    The one individual in the back is Deshae Henson.

9  Q    Do you recognize the individual —

10  A    Not in the front.

11  Q    Now, I guess he was talking to the individual and then the

12  individual kind of walked off.  Where was he walking to?

13  A    They were together.  They were actually together.  The

14  individual walked over to Bart Morris's.

15  Q    So I guess to the right of the screen is Bart Morris's

16  residence?

17  A    Right.

18  Q    Is that same individual coming back?

19  A    That's a different person, I think.  That's actually the

20  vehicle and the person there that you asked me in the very

21  beginning who it was going into Bart Morris's.  That's the

22  vehicle and the person there.

23  Q    Now, this vehicle here, does it have significance?

24  A    It's just somebody else that was there and leaving.

25  Q    And "there" being Bart and Debbie Morris's house?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1   A    Bart and Debbie Morris's; right.

2   Q    Do you recognize the individual that's walking toward the

3   car?

4   A    Yes.

5   Q    Who is that?

6   A    That's Debbie Morris.

7   Q    Any significance to the car that passed toward us?

8   A    No.

9   Q    And we've changed again?

10  A    I think you're now back over at the Manchester precinct.

11  Q    And we've got the back of a gentleman?

12  A    I can't tell who that is yet.

13  Q    Can you tell who the individual there is?

14  A    No.  Now you're back down at –– That's the 9–1–1, but to

15  your left is where Freddy Thompson's office was, so it's

16  another voting precinct.

17  Q    Immediately to the left of this building?

18  A    Yes.  Uh–huh.

19  Q    Now, there's a black vehicle that was parked there right

20  before it was screened off.  What is the significance of the

21  black car?

22  A    We had seen that person a lot during the day and they had

23  been into the office, so we were just getting him on camera.

24  Q    Because that was the same vehicle you had seen at other

25  places?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  A    Uh-huh.

2  Q    Was there any other similar vehicles here in this screen?

3  A    Not in this screen, now.

4  Q    Another vehicle?

5  A    That's Darnell Hipsher's vehicle.

6  Q    Where are we at here?

7  A    We're now, I think, back at the Manchester precinct at the

8  school.  Yeah, that's where we are.

9  Q    Okay.  We've got a red Nissan.  Do you recognize that

10  vehicle?

11  A    I don't recognize the vehicle.  We had watched it just a

12  couple of times.  They had brought some people out there and

13  let them out to go in and vote, so we were just keeping our

14  eyes, I guess I'll say, on that vehicle.

15  Q    Do you recognize the lady in the red shirt?

16  A    No.

17  Q    The gentleman?

18  A    No.

19  Q    We've got an individual, a red shirt.  Do you recognize

20  that person?

21  A    Yes.

22  Q    Who is that?

23  A    Earl Pennington.

24  Q    Do you know if he has any actions or activities related to

25  elections?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  A    He has been, I think, election officer before, yes.

2  Q    Do you know if he hauled people during this election?

3  A    Yes.

4  Q    You witnessed him do that?

5  A    Yes.

6  Q    Got his license plate, I see.

7  A    Yes.

8  Q    Now, we see an individual walking into the — it says

9  Manchester voting precinct.  Do you know who that individual

10  is?

11  A    Gary "Ouchie" Jackson.

12  Q    The same Gary "Ouchie" Jackson we spoke of previously at

13  the Morris's?

14  A    Right.

15  Q    It looks like you're trying to get the license plate of

16  another vehicle.

17  A    That's Gary "Ouchie" Jackson's truck.

18  Q    Okay.  The individual with the tank top on, do you

19  recognize him?

20  A    No, but he's with — I think he gets in the vehicle here

21  with Ouchie Jackson.  I think here in a minute.

22  Q    These two individuals on the porch area, can you tell me

23  who those are?

24  A    That's Gary "Ouchie" Jackson on the left and the right is

25  Ronald "Buzzard" Hacker.

CARMEN WEBB LEWIS — DIRECT — MR. PARMAN

1  Q    Do you know if Mr. Hacker is in any way related to Stanley

2  Bowling?

3  A    I think it's his brother.

4  Q    We see a red Blazer leaving again.  Is this the same red

5  Blazer we saw before —

6  A    Yes.

7  Q    — that's leaving the polling place?

8  A    Yes.

9  Q    Do you know whose Blazer that is?

10  A    Yes.

11  Q    Whose is it?

12  A    That's Vernon Hacker driving.

13  Q    Whose vehicle is it?

14  A    I'm assuming it's Vernon's if he's driving it.

15  Q    You don't know who the owner of the vehicle is?

16  A    No.

17  Q    But that's Vernon —

18  A    It's Vernon driving, yes.

19  Q    Now, do you recognize this younger gentleman in the white

20  T-shirt?

21  A    I don't.  I just know that he's bringing them to vote.

22  Q    Did you see Vernon Hacker a lot on that day?

23  A    Yes.

24  Q    How often did you see him?

25  A    He was — between him and Ouchie Jackson they were both at

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1  the polling places, which you're not supposed to be, especially

2  if that's not where you vote and you running for office.  They

3  were there all the time just hanging out.

4  Q    And both of these individuals arrived with Mr. Hacker?

5  A    Yes.

6  Q    Okay.  I see two more vehicles.

7  A    Yes.

8  Q    Do you recognize either of those?

9  A    No.  I think this is Kennon and Wanda.

10 Q    In the black car?

11 A    I think.

12 Q    I notice you were always trying to get a license plate.  I

13 don't believe that one had a license plate at all, did it?

14 A    No.

15 Q    Okay.  The gentleman on the left?

16 A    Vernon Hacker.

17 Q    What about the gentleman on the right?

18 A    I don't know the one on the right.  They just hanging

19 out — more of the hanging out thing I was telling you about.

20 Q    Okay.  It looks like a gentleman in a black shirt.  Do you

21 recognize him?

22 A    He's familiar, but I can't think of his name.

23 Q    And the lady?

24 A    No.

25 Q    The other gentleman that walks out, do you recognize him?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  A    No.

2  Q    Ma'am, it looked like at the end that that video was

3  approximately 14 minutes long.

4  A    Uh-huh.

5  Q    That would have been 14 minutes out of how many minutes

6  that you actually tried to observe what was going on on

7  election day, if you can just estimate?

8  A    You mean how long was I watching what was going on?

9  Q    Yes, ma'am?

10  A    Oh, goodness, probably — on and off, probably six or

11  eight hours probably.

12  Q    I want to go back to when we were talking about the

13  thousand dollars that you were told to give in order to

14  participate in the election.

15  A    Uh-huh.

16  Q    I believe you said it was Mr. Wayne Jones and Al Man

17  Stivers that told you that you needed to do that; is that

18  right?

19  A    Yeah, Al Man is the one that specifically mentioned the

20  thousand dollars, yes.

21  Q    Do you know what position Al Man Stivers held at that

22  time?  Was he any kind of election officer?

23  A    I just know that he handled, I guess I'll say, the

24  absentee voting when you went into the machine before the

25  election started.

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1  Q    What about Wayne Jones, do you know if he held any

2  position related to elections?

3  A    I don't know what the actual title of it is, but he's on

4  the county Board of Elections.

5  Q    When Mr. Jones and Mr. Stivers were encouraging you to do

6  this, did anybody else come to you and encourage you to do what

7  they said?

8  A    Just Vernon Hacker that I told you about.

9  Q    Anybody on the city council give you advice related to

10 that?

11 A    Not at that time.  Not in '04, no.

12 Q    At any time?

13 A    No, not about giving — me giving money personally.

14 Q    Were any comments made to you while you were making that

15 recording that you should stop making the recording?

16 A    Yes.  I think it was making some people nervous, and later

17 on in the day, we had stopped making the recording and we were

18 parked down below where the school — where the Manchester

19 precinct was, and I think it was my mother and myself and there

20 was another — I don't know if it was my husband, but somebody

21 else that was with us, and Wayne Jones actually came down to

22 the vehicle and told us, said "You-all" — just "You-all need

23 to get out of here, you're making some people nervous."

24 Q    So on the day you were making this recording Wayne Jones

25 stopped —

CARMEN WEBB LEWIS — DIRECT — MR. PARMAN

1   A    Later on that day, yes.

2   Q    I think it was obvious from the recording, but explain to

3   the jury where you were positioned or whether you were trying

4   to conceal yourself or not while you were making the recording.

5   A    We were — like I say, it was across from the voting

6   precinct or sometimes at the voting precinct, but we were at

7   the SuperAmerica across the — just pulled in there like

8   anybody else would pull in.

9   Q    So people could see that you were there?

10  A    People could definitely see us, yes.

11  Q    What was the result of the election as it pertained to

12  you?

13  A    In '04?

14  Q    Yes.

15  A    I won the council race.  I was one of the eight.

16  Q    Where was your placement?

17  A    I think I was last.

18  Q    Let me turn your attention to approximately the fall of

19  '05 while you were on the city council.

20  A    Uh-huh.

21  Q    Did you participate in an informal council meeting related

22  to a police chief position?

23  A    Yes, I think that was in August of '05.

24  Q    Share with the jury what occurred at that meeting.

25  A    There was just some things going on on the council, the

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1    thing — some things the mayor was doing, that sort of thing,

2    that some of the council members wanted to kind of come

3    together and talk about.  So we met at the Senior Citizens

4    Center actually, and Vernon Hacker was there, and we were

5    talking about a lot of different things that was going on and

6    one of them —

7             MR. WESTBERRY:  Judge, I'll object to hearsay.

8             THE COURT:  Statements by Mr. Hacker, overruled.

9             MR. WESTBERRY:  She's not a co-conspirator.

10            THE COURT:  I'm sorry?

11            MR. WESTBERRY:  She's not a co-conspirator.

12            THE COURT:  This statement is made by Mr. Hacker

13   she's relating?

14            MR. PARMAN:  Yes.

15            THE COURT:  Overruled.

16            THE WITNESS:  Go ahead?

17            THE COURT:  Yes.

18            THE WITNESS:  So Mr. Hacker tells the group of us

19   that we know that Doug Adams wants Mike Bishop in as police

20   chief.  He said, "We all know that."  And then a few of them

21   start talking about having phone calls, and I didn't know what

22   they were talking about or referring to, but it was to my

23   understanding some of the people that was there started saying,

24   "Well, we've had our phone calls, have you had yours?"  And I

25   didn't know what they were talking about.  And I said, "No,

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1  I've not had any phone calls."  They proceeded to say that they

2  had had phone calls pretty much asking them to put Mike Bishop

3  in as police chief.

4  Q    And why was it that he was to be put in as police chief

5  again?

6  A    Well, at that point in time, the only thing we could

7  figure out because he wasn't really next in line, I guess I'll

8  say, was — why Mr. Adams would want him on was because he was

9  really good friends with Mike Bishop's father.

10  Q    You still are the mayor; correct?

11  A    Yes.

12  Q    As mayor, is your office responsible for maintaining the

13  records of business that's conducted at the City of Manchester?

14  A    Yes.

15  Q    Ultimately I guess the mayor is responsible for all the

16  City business?

17  A    Yes.

18  Q    Is that an accurate statement?

19  A    Uh-huh.

20  Q    Is your office also responsible for contracts that the

21  City enters into with private individuals?

22  A    Yes.

23  Q    Or private companies, for that matter?

24  A    Yes.

25  Q    And if the City ends up paying private businesses or

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1  individuals for work done for the City, then your office would

2  be responsible for paying these individuals?

3  A    Yes.

4  Q    And does your office also keep those records –– keep the

5  pay stabs, the record of payment?

6  A    Yes.

7  Q    What role does the city council play in approving

8  contracts that are entered into between the City and private

9  entities?

10 A    Well, most of the time they would have to approve –– like

11 if you were getting money through certain programs, they ––

12 most of the time you have to approve even applying for those

13 monies.  So they would know that was happening.  And then some

14 of the times, it just depends as far as previously, but they

15 should approve any bids that are opened or anything you would

16 accept.

17 Q    When it comes to private entities bidding for contracts

18 with the City, explain that process to the jury, how that

19 process works.

20 A    That process –– it should go out for advertisement and we

21 usually, especially if it's a federal program or any big

22 program, we would advertise in the Lexington–Herald, at least

23 in the Lexington–Herald because it goes out to so many

24 different readers, different states, different –– everywhere.

25 And sometimes we put it in the local paper, too, but usually

39

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1    just in the Lexington-Herald.

2    Q    And when people send in bids, how do they do that, or

3    companies, businesses, whatnot?

4    A    It depends again where the company is located.  They would

5    either mail them to us or hand deliver.  We've had some people

6    that do both.

7    Q    I want to show you what's been marked as Government's

8    Exhibit M1, "M" as in "man."  Take a moment, if you would —

9    A    You want me to take them out?

10   Q    — and look through those documents.

11   A    Okay.

12   Q    Do you recognize those documents?

13   A    Uh-huh.

14   Q    What do you recognize those documents to be?

15   A    They are — there's a lot of cancelled checks here from

16   the City of Manchester, things we would have to keep.

17   Q    And those are cancelled checks paid to whom?

18   A    B and B Excavating.

19   Q    And does it appear — can you tell from those documents

20   whether that was work done for the City of Manchester?

21   A    Yes.

22   Q    It does appear to be?

23   A    Yes.

24   Q    And you're familiar with those documents?

25   A    Uh-huh.

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  Q    And do they come from your office?

2  A    Yes.

3  Q    And those are documents that are required to be kept in

4  your office in the ordinary course of business?

5  A    Yes.

6         MR. PARMAN:  Your Honor, I would move for the

7  introduction of Exhibit M1.

8         THE COURT:  All right.  Any objection?

9         MR. SIMONS:  No objection.

10        THE COURT:  Exhibit M1 will be admitted.

11 BY MR. PARMAN:

12 Q    Next I would like to show you what's been marked as

13 Government's Exhibit M2.  Do recognize those documents?

14 A    Uh-huh.

15 Q    What do you recognize those documents to be?

16 A    This is the same thing, cancelled check and purchase order

17 that's attached for payment on a sewer project.  It was through

18 the '02 Pride Program.

19 Q    Explain to the jury what the Pride Program is.

20 A    Pride program is a — is a federal program that some of it

21 pays for some sewer projects, some parts of sewer projects, or

22 it can be projects relating to garbage, they'll pay for tipping

23 fees and different things like that once or twice a year.

24 Q    So federal government money is used to help subsidize the

25 program?

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1   A    Uh-huh.

2   Q    It sounds like the program is designed for community

3   improvement?

4   A    Yes.

5   Q    And on contracts that are paid at least partially through

6   that program, is there a certain code that your office puts

7   through?

8   A    Yes.

9   Q    Is that code on that?

10  A    Yes.

11  Q    What is that code?

12  A    This one is –– I'm assuming, let me see the date on this.

13  Yeah, it was in '06.  It's got "Pride" on it.

14  Q    Once again, that's a document that's kept in the Mayor's

15  Office?

16  A    Yes.

17  Q    And required to be kept in the ordinary course of

18  business?

19  A    Yes.

20        MR. PARMAN:  Your Honor, I move for introduction of

21  Government's Exhibit M2.

22        MR. SIMONS:  Again, no objection.

23        THE COURT:  Exhibit M2 will be admitted.

24  BY MR. PARMAN:

25  Q    I would like to show you what's been marked as

CARMEN WEBB LEWIS — DIRECT — MR. PARMAN

1  Government's Exhibit M3.  If you could briefly look through

2  those.

3  A    Okay.

4  Q    Just so you can familiarize yourself with them.

5  A    Okay.

6  Q    Are you familiar with those documents?

7  A    Yes.

8  Q    What do you recognize those documents to be?

9  A    There's cancelled checks here and then there are invoices

10 from where the City takes their garbage —— or did take their

11 garbage, to B & J Transfer, and it's the tickets that we

12 receive.

13 Q    And those are all cancelled checks or invoices from B & J

14 Transfer?

15 A    Yes.

16 Q    Once again, those documents are required to be kept in

17 your office?

18 A    Yes.

19         MR. PARMAN:  I move for introduction of Exhibit M3,

20 Your Honor.

21         THE COURT:  All right.  Any objection to M3?

22     (No response.)

23         THE COURT:  Those documents will be admitted as a

24 collective exhibit.

25 BY MR. PARMAN:

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  Q    I would like to now show you M4.  Do you recognize those

2  documents?

3  A    Yes.

4  Q    What do you recognize those to be?

5  A    There's two cancelled checks here, and then there's two

6  Pride grant reimbursement requests.

7  Q    And who are the two cancelled checks written to?

8  A    B & J Transfer.

9  Q    And did you say there's reimbursements from Pride?

10 A    Yes.

11 Q    How much was the City reimbursed by Pride for that work?

12 A    Yes, they should have been, yes.

13 Q    Is there an amount on there how much --

14 A    There's two different amounts.  One amount is $22,500, and

15 then the other amount is $2,250.

16 Q    Are those documents from your office?

17 A    Yes.

18 Q    And required to be kept?

19 A    Uh-huh.

20        MR. PARMAN:  Your Honor, I would move for the

21 introduction of Exhibit M4.

22        THE COURT:  Any objection?

23    (No response.)

24        THE COURT:  Exhibit M4 will be admitted.

25 BY MR. PARMAN:

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  Q    Next I would like to show you Government's Exhibit M5.

2  A    Okay.

3  Q    Do you recognize that?

4  A    Yes.  It's a cancelled check from the City of Manchester.

5  Q    And who is that check written to?

6  A    Bart Morris.

7  Q    And is there anything else there besides a cancelled

8  check?

9  A    No, not with this one.

10 Q    Once again, that was a check written from the City of

11 Manchester?

12 A    Yes.

13 Q    From your office?

14 A    Yes.

15 Q    And required to be kept?

16 A    Uh–huh.

17       MR. PARMAN:  Your Honor, the United States would move

18 for introduction of Government's Exhibit M5.

19       THE COURT:  All right.  Any objection?

20    (No response.)

21       THE COURT:  Exhibit M5 will be admitted.

22 BY MR. PARMAN:

23 Q    Now, ma'am, on Government Exhibit M5, do you know what

24 that was for?

25 A    It was for a loan.

CARMEN WEBB LEWIS – DIRECT – MR. PARMAN

1  Q    The City of Manchester was loaning Bart Morris money?

2  A    Yes.

3  Q    You are currently the mayor; correct?

4  A    Yes.

5  Q    Is it normal for the City of Manchester to loan a private

6  person money?

7  A    No.

8  Q    Have you ever done that since you've been mayor?

9  A    No, we're not supposed to.

10 Q    And did that — that loan, did that take place before you

11 became mayor?

12 A    Yeah, this was in '02.

13 Q    Next I would like to show you what's been marked as

14 Government's Exhibit M6.

15 A    Uh–huh.

16 Q    Do you recognize those documents?

17 A    Yes.

18 Q    What do you recognize those documents to be?

19 A    There's different ones.  The first one is a proposal for

20 disposal of solid waste to Mayor White and the council members.

21 That was in 1994.  Then there's a contract here that the city

22 council created with B & J Transfer, which was in '94.  And

23 then there's a bid proposal, and then there's another contract

24 from 1996.

25 Q    Are all those documents, the proposal and then the bid and

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1  the contract — Briefly share with the jury how that works.

2  For somebody to get a contract, is it required for them to

3  submit a proposal to the City for a contract before they get

4  it?

5  A    For the — for something like this that would be over

6  $20,000, it should be put up for bid.

7  Q    And then do people then send proposals as to how they

8  would plan to handle certain services?

9  A    They should have — yeah, they should have, and how much

10 it would cost and that sort of thing.

11 Q    And all those documents have been kept in the Mayor's

12 Office?

13 A    Yes.

14 Q    And would be required to be kept?

15 A    Uh-huh.

16 Q    All things dealing with contracts and proposals?

17 A    Uh-huh.

18       MR. PARMAN:  Your Honor, I would move for

19 introduction of Government's Exhibit M6.

20       THE COURT:  Any objection?

21    (No response.)

22       THE COURT:  Exhibit M6 will be admitted.

23 BY MR. PARMAN:

24 Q    Finally, I would like to show you what's been marked as

25 Government's Exhibit M7.

CARMEN WEBB LEWIS — DIRECT — MR. PARMAN

1      Have you looked through those?

2   A   Uh-huh.

3   Q   What do you recognize that to be?

4   A   These are Manchester city council meeting minutes.

5   Q   Now, are city council meeting minutes kept by the Mayor's

6   Office?

7   A   Yes.

8   Q   And those are the records that came from your office?

9   A   Yes.

10         MR. PARMAN:  Your Honor, I would move for the

11   introduction of Government's Exhibit M7.

12         THE COURT:  All right.  Any objection?

13      (No response.)

14         THE COURT:  Exhibit M7 will be admitted.

15   BY MR. PARMAN:

16   Q   Now, were you present at that meeting that was —

17   A   At one of these?

18   Q   No, the one that — Well, let me direct your attention and

19   see if you recognize one meeting.  Were you present at a

20   meeting when it was discussed to place individuals on an ethics

21   board?

22   A   Yes.

23   Q   When was that?

24   A   I think it's this back one here, June 20th.  June 20th,

25   2005.

CARMEN WEBB LEWIS - DIRECT - MR. PARMAN

1   Q    What would be the purpose of an ethics board?

2   A    An ethics board should kind of keep everyone in check,

3   whether it be the mayor, the council, that sort of thing, make

4   sure that the operations are going the way they should be going

5   ethically.

6   Q    So in 2005, what happened at this meeting?

7   A    It says, "A motion was made by Vernon Hacker and seconded

8   by Laura House to appoint the following persons to the City of

9   Manchester Ethics Board:  Barbara Colter, Debbie Morris, Judy

10  Maricle, Carl Hoskins, Jimmy "Jim Bo" Lyttle, and appoint

11  Stanley Roberts and Minnie Weaver as alternates to the ethics

12  board."

13  Q    And was that motion passed?

14  A    Yes.

15  Q    Now, Government's Exhibit M6 was the contract, I believe

16  --

17  A    Uh-huh.

18  Q    -- that was proposed by Bart Morris?  I hate to -- I don't

19  mean to jump back on you.  Just take your time.

20  A    That's okay, go ahead.

21  Q    Does Mr. Morris still have that contract with the City?

22  A    No, the City does not take their garbage there anymore.

23  Q    Do you know why?

24  A    We are taking it to the City of London to save a

25  considerable amount of money.

CARMEN WEBB LEWIS — DIRECT — MR. PARMAN

1  Q    It was a cost savings to you to actually —

2  A    Yes.

3  Q    — transport it to London?

4  A    Yes.

5          MR. PARMAN:  May I have just a moment, Your Honor?

6          THE COURT:  Yes, sir.

7          MR. PARMAN:  That's all I have, Your Honor.  Thank

8  you.

9          THE COURT:  All right.  Thank you.

10          Let's see if counsel needs a moment.  I'll wait and

11  see if Mr. Hoskins needs a moment before he —

12          MS. HUGHES:  May we approach and discuss something?

13          THE COURT:  Yes, ma'am, you may.

14      (Whereupon, the following discussion was had between the

15  Court and counsel at the bench, out of the hearing of the

16  jury.)

17          THE COURT:  Ms. Hughes.

18          MS. HUGHES:  Thank you, Your Honor.  I was going to

19  ask if we could break a few minutes early because the

20  government did not play the entirety of the video, there's a

21  portion that's left off, and so I wanted to pull my copy out

22  and see exactly what was left off and be able to have a

23  consultation with my client about — and there's also audio on

24  that tape.  I don't think that I want to replay it and have the

25  audio played.  But the version that was played is not the same

1    version that was given to us.  So if we could break early so we

2    could have a little bit of time to analyze that, if that's

3    okay.

4              THE COURT:  Sure.  That's fine.

5              I did have a question, I want to follow up.

6    Mr. Westberry —

7              MR. WESTBERRY:  Yes.

8              THE COURT:  — you had objected to the witness

9    testifying to a conversation made during a — she described as

10   a meeting of city council.  It appears to me that it might have

11   been an informal meeting as opposed to a formal meeting.  I

12   understood that Mr. Hacker was present and made a statement at

13   the meeting.  Did I misunderstand that?  Was Mr. Hacker

14   present?

15             MR. SMITH:  That was my understanding as well.

16             THE COURT:  All right.  That was the United States'

17   understanding as well.  Okay.  I just wanted to make sure I was

18   clear on that.

19             MR. WESTBERRY:  My objection, Judge, just if you

20   don't mind, is less than 60 seconds.

21             THE COURT:  Yes, sir.

22             MR. WESTBERRY:  Of course, Ms. Lewis is not an

23   unindicted co-conspirator.  As far as I can tell, I don't think

24   it's ever been —

25             THE COURT:  Right.  I understand that.

1          MR. WESTBERRY:  — represented that she is.  I don't

2    believe any statement that Hacker or it could have been Hipsher

3    or any other city council member who clearly have been

4    identified as unindicted co-conspirators, any statement that

5    they would have made to Ms. Lewis could have been in

6    furtherance of the conspiracy.  So I don't think it fits within

7    that hearsay objection, and that was the basis for my objection

8    to the testimony.

9          THE COURT:  All right.  Well, I would — the Court's

10   ruling would be the same.  It does appear that this is in

11   furtherance of the conspiracy and to put Mr. Bishop in as

12   police chief as a favor to Mr. Adams, which does further the

13   conspiracy, according to the government's theory of the matter.

14   But I wasn't sure after I made the ruling as to whether

15   Mr. Hacker was present, so I was concerned about that.  All

16   right.

17         How long do you need to look at this?

18         MS. HUGHES:  We take usually 20 minutes in the

19   afternoon.  That's plenty.  I think that's plenty.

20         MR. WHITE:  I would just ask that we do that now,

21   because —

22         THE COURT:  Mr. White asked if we would do that now,

23   and I said we would.

24         MR. SMITH:  Ms. Hughes has brought up an interesting

25   topic, and that is this audio.  It's been, of course, the

1    government's position that –– and I think the defendants have

2    all agreed that any racial slurs that might have been made in

3    these tapes be taken out.  And Ms. Hughes is aware, I'm sure,

4    that Ms. Morris's husband made a racial slur during that, and

5    so my understanding, that is covered by this Court's previous

6    ruling.  If it's not, I would seek to have such a ruling by the

7    Court at this time.

8         MS. HUGHES:  I would not object to that.  In fact, I

9    don't think the omission of the audio makes any difference to

10   me.  And, in fact, I think I prefer it.  But because this is

11   different than the video we were given, I just wanted an

12   opportunity to discuss it with my client.  If I feel

13   differently and feel like I wanted some of the audio in, we'll

14   ask to see the Court before the jury comes in.  Will that be

15   fair?

16        THE COURT:  That will be fine.  At this point you

17   want to review your tape against the version that was played to

18   make sure that everything was included and, if not, if there's

19   anything that you would like to play?

20        MS. HUGHES:  Right, I needed to do that in

21   consultation with my client.

22        MR. WHITE:  Your Honor, just so I'm clear on ––

23        THE COURT:  Mr. White, yes.

24        MR. WHITE:  I'm sorry.

25        THE COURT:  That's okay, go ahead.

1             MR. WHITE:  The only question I had was, my

2   recollection is, because I was going to go back and review it

3   again as well, I just want to make sure that the only thing

4   that was excluded, as I recall, was the racial part, there

5   wasn't anything else that Your Honor excluded from the tape.

6   So when I saw your recording and it wasn't as much as I

7   expected, I was just wanting to make sure that there was other

8   things that you didn't play that had been excluded.  I don't

9   want to make a mistake.  Am I making any sense?

10            THE COURT:  We started on February 2nd, didn't we?

11            MR. WHITE:  Yes.

12            THE COURT:  Groundhog Day?

13            MR. WHITE:  Yes.

14            THE COURT:  All right.  Thank you.

15            MR. WHITE:  Your Honor, I'm sorry.  My apology.

16            THE COURT:  Thank you.

17       (Whereupon, the following proceedings continued in open

18   court.)

19            THE COURT:  Ladies and gentlemen, we are close to our

20   afternoon break, so we'll go ahead and take that break at this

21   time.  We'll take a 20-minute recess at this time.  Please keep

22   in mind the admonition that you were given previously not to

23   discuss the case among yourselves while we are in recess, and

24   the jury will be excused for 20 minutes.

25       (Whereupon, the jury retired from the courtroom, after

1  which the following proceedings were had in open court.)

2          THE COURT:  Ma'am, you can be excused for 20 minutes

3  as well.

4          We'll be in recess.

5     (Whereupon, a short recess was had, after which the

6  following proceedings were had outside the presence of the

7  jury.)

8          THE COURT:  Thank you.

9          The jury is not present at this time.

10          Ms. Hughes?

11          MS. HUGHES:  Yes, Your Honor.  There is about maybe

12  two or three minutes —

13          Do you think it's that long?

14          — (continuing) section on the end that we would like

15  to play with its audio.  That is not the audio where the racial

16  epithet is made, so that would not be relevant —

17          THE COURT:  Okay.

18          MS. HUGHES:  — with this witness who's speaking

19  narrating that portion of the tape.

20          THE COURT:  Do you have the DVD that you can actually

21  start from —

22          MS. HUGHES:  I do.  It's broken into — the one I got

23  from the government, the one I have, is broken into chapters,

24  and this is Chapter 4 on that DVD.  It starts right there where

25  the other one picked up and plays.

1              THE COURT:  Okay.  That's fine.

2              MS. HUGHES:  I don't know how to plug it in over

3   there or over here.

4              THE COURT:  Well, there's — the other option would

5   be — I assume the United States would not object to playing

6   that portion of the — Ms. Poynter already has her equipment

7   hooked up, she would be able to play that, I assume.

8              MR. SMITH:  Your Honor, the only —

9              THE COURT:  And if you — I'm sorry.

10             MR. SMITH:  The only concern that I have is, is

11  Ms. Hughes offering that out-of-court statement of a declarant

12  which is inconsistent, because if it's consistent with her

13  testimony I believe that would be hearsay.

14             THE COURT:  Right.

15             MR. SMITH:  If it's an impeaching statement, I'm not

16  aware of how it's impeaching and I'd like to hear her position.

17             THE COURT:  Okay.  I thought we were just playing the

18  tape, I didn't know you were talking about the audio portion of

19  the tape as well.

20             MS. HUGHES:  I guess that that would made it a tad

21  bit more complicated.  I don't know that I'm necessarily

22  offering the audio for the truth of the matter asserted, but if

23  she were to then make comments in cross-examination that were

24  different than the audio on the tape, then that would require

25  going back and playing the audio on the tape.

1          THE COURT:  Okay.  Well, at this point, there's no

2    inconsistent statement that's been identified, so we're talking

3    about just the audio of the tape.

4          MS. HUGHES:  Okay.  So if they've got —

5          THE COURT:  I'm sorry.

6          MS. HUGHES:  Just the video.

7          THE COURT:  Yes, ma'am.  Yes, ma'am.

8          MS. HUGHES:  That is correct.

9          THE COURT:  Just the video of the tape.  So we're

10   talking about Chapter 4, is the way it's been described, which

11   would be the last section that would follow what's been played.

12         MR. SMITH:  My assistant has been perplexed through

13   the break because she says that we played our tape to the end.

14   So she'll have to give us her copy because apparently her copy

15   is better than the government copy, so —

16         MS. HUGHES:  I got mine from the government.

17         MR. SMITH:  If you would share that, this prosecution

18   will be very pleased to play that for you.

19         MR. WHITE:  We know you're having a budget crisis.

20         THE COURT:  Let's do this:  If you have that

21   available, let's key it up now so we don't have to take another

22   break here in the next couple of minutes when we get to you to

23   do that.

24         MS. HUGHES:  I agree a hundred percent.

25         THE COURT:  The reason I suggest that Ms. Poynter

1   play this on her machine is because she'll be able to stop it.

2   If you plug in your laptop, we're going to have some delay with

3   that, and then there's some question as to whether you can stop

4   it on that program.

5           MS. HUGHES:  And I promise as soon as I try to plug

6   in my laptop it would crash, because that's just the way the

7   technology — may I —

8           THE COURT:  Yes, please.

9           Let's see if we have a counter.  15:13 on the

10  counter?  We'll turn this off until you're ready to play this

11  portion.  We'll just turn off the screen.

12          All right.  Let's see if we're ready for the jury to

13  be brought in.  Anything else?

14          Mr. Hoskins, let's see, we're going to start with

15  you.  You have questions?

16          MR. HOSKINS:  Yes, Your Honor.

17          THE COURT:  Okay.  Bring in the jury, please.

18      (Whereupon, the jury returned to the courtroom, after

19  which the following proceedings were had in open court.)

20          THE COURT:  Thank you, and please be seated.

21          The record will reflect all members of the jury are

22  present.

23          If you could bring the witness back in, please.

24          Mr. Hoskins, if you would like to set anything up,

25  you're welcome to go ahead and do that.

 1          (Whereupon, the witness returned to the stand, after which

 2   the following proceedings were had in open court.)

 3               THE COURT:  All right.  Thank you.

 4               Let me again remind the witness, of course, she's

 5   still under oath.

 6               Mr. Hoskins, you may proceed.

 7               MR. HOSKINS:  Thank you, Your Honor.

 8                         CROSS-EXAMINATION

 9   BY MR. HOSKINS:

10   Q    Hello, Ms. Lewis.  My name is David Hoskins, and I

11   represent Cletus Maricle.

12   A    Uh-huh.

13   Q    The first question I want to ask you is about that ethics

14   board that you talked about for a minute.

15   A    Uh-huh.

16   Q    Like the mayor, that's an unpaid position, isn't it?

17   A    Yes.  Yes.

18   Q    Having these City records, have you also seen a letter

19   that Judy Maricle wrote to the City about --

20   A    Resigning?

21   Q    Yes, ma'am.

22   A    Uh-huh.

23   Q    And she said that she had never accepted a position?

24               MR. PARMAN:  Objection, Your Honor.

25               THE COURT:  Sustained.

 1  BY MR. HOSKINS:

 2  Q    You know the date of that letter?

 3  A    I don't.  I'm thinking it was in January of '07, but I

 4  don't know the day.

 5  Q    Okay.  Do you have a copy of that letter with you?

 6  A    I do not have it with me.

 7  Q    Okay.  You had a copy and you turned it over to the

 8  government; is that right?

 9  A    Yes.

10  Q    So the government would have possession of that letter as

11  far as your knowledge?

12  A    I'm assuming, yes.

13  Q    During your time as a council member and as mayor, have

14  you ever seen Cletus Maricle at a City meeting?

15  A    At a City council meeting?

16  Q    Yes, ma'am.

17  A    No, not — not to my recollection, no.

18  Q    And Judge Maricle never asked you to vote one way or

19  another on an issue with the City, did he?

20  A    No.

21  Q    Do you remember talking to Judge Maricle when you were

22  campaigning for mayor?

23  A    Yes.

24  Q    And you asked for his support as a candidate?

25  A    Asked for his vote, yes.

1  Q    And he explained to you that he was a cousin to the —

2         MR. PARMAN:  Your Honor, I'm going to object again as

3  to hearsay.

4         THE COURT:  Yes, it would be.  Sustained.

5  BY MR. HOSKINS:

6  Q    Did he tell you whether or not he could support you?

7         MR. PARMAN:  Object again.

8         THE COURT:  Sustained.

9  BY MR. HOSKINS:

10 Q    You've never had any problems with Cletus Maricle at all,

11 have you?

12 A    Any problems?

13 Q    Yes, ma'am, disagreements or any conflicts of any type?

14 A    Besides tearing the courthouse down, I would say that was

15 the only thing.

16 Q    Okay.  And let's talk about that just a little bit.  There

17 was — since it's come up, there was a courthouse in the City

18 of Manchester, it was the Clay County Courthouse?

19 A    Uh-huh.

20 Q    And it was, in a lot of people's eyes, an historic

21 building?

22 A    Yes.

23 Q    A lot of people wanted to preserve that building?

24 A    Yes.

25 Q    And you were among those people who would liked to have

1   seen that building preserved?

2   A    Yes.

3   Q    But it was not; right?

4   A    Right.

5   Q    And because there was a project to build a new courthouse

6   in Manchester?

7   A    Correct.

8   Q    And the site that ended up being selected was the site of

9   the old courthouse?

10  A    Right.

11  Q    And you and some other people asked that that building be

12  preserved and another site be chosen?

13  A    Correct.

14  Q    But Judge Maricle was on that committee, I guess, as

15  judge?

16  A    Yes.

17  Q    And you were not pleased with that selection?

18  A    Correct.

19  Q    But as far as you know, it was done according to law?

20  A    Yeah, that's what they chose.  Yeah, I'd say that, yeah.

21       MR. HOSKINS:  That's all.  Thank you.

22       THE COURT:  All right.  Thank you.

23       Mr. Westberry.

24                    CROSS-EXAMINATION

25  BY MR. WESTBERRY:

1 | Q    Good afternoon, ma'am.

2 | A    Hello.

3 | Q    I'm Kent Westberry, I represent Doug Adams.  Good

4 | afternoon again.  And I've got just a couple of questions for

5 | you, Ms. Lewis, about some of the testimony a little earlier in

6 | the afternoon where you mentioned Doug Adams specifically.

7 |      You talked about an informal city council meeting I think

8 | sometime in around 2005 where Vernon Hacker and perhaps some

9 | others of you–all were getting together on an informal basis

10 | just to talk; is that correct?

11 | A    Correct.

12 | Q    Now, I think you said —— you told us a little earlier this

13 | afternoon that Vernon Hacker had said something to the effect

14 | that Doug Adams would like to have Mike Bishop appointed

15 | interim police chief.

16 | A    Police chief, yes; correct.

17 | Q    Okay.  And the idea was that Mike Bishop's father, Paul

18 | Bishop, is a friend of Doug Adams?

19 | A    Correct.

20 | Q    Okay.  Now, I don't think Doug Adams ever called you

21 | directly on that?

22 | A    He did not, no.

23 | Q    But the whole idea, according to at least what Mr. Hacker

24 | told you, it was because the Bishops and the Adams were

25 | friends; is that the idea?

1  A    Uh-huh.  I don't know if Mr. Hacker actually said that.

2  That was just the assumption of the -- of the group.

3  Q    Yeah.  Long-time family relationship of some kind?

4  A    Yes. yes.

5  Q    I want to ask you a question, and there's no trick

6  question to it.  You've been on the city council since 2004?

7  A    2005.

8  Q    But you got elected on '04; right?

9  A    Yes.

10 Q    And you got elected mayor in '06?

11 A    Elected, yes.

12 Q    And you've been serving as the Mayor of the City of

13 Manchester since that time.  I mean, do people come to you from

14 time to time and ask if they can use you or ask for your

15 assistance in making job recommendations?

16 A    Are you saying do they use me as someone, I guess, to help

17 get a job; is that what you're trying to say?

18 Q    Like a reference?

19 A    A reference?  I was trying to think if they have.  I'm

20 sure somebody has in the -- in those periods for five years.

21 Q    Well, sure, it happens to a lot of people in a lot of

22 different situations; correct?

23 A    Yes.

24 Q    And family friendship frequently plays a place, a really

25 good reason why someone recommended a younger person for a job?

1  A    Could be, yes.

2  Q    Sure.  Have you and Doug Adams ever had any political

3  dealings or political discussions or anything like that?

4  A    No.

5  Q    Would it be fair to say that -- I call it a relationship

6  that you have with Doug Adams, has that been more -- kind of a

7  professional one in your capacity as a member of the Manchester

8  City government on the time that he served as superintendent of

9  schools?

10 A    Would I say it's been more of a professional relationship?

11 Q    Have you worked together on projects?

12 A    Yeah.  Yes.

13 Q    He's now retired as superintendent; correct?

14 A    Uh-huh.

15 Q    And what kind of projects have you-all worked on?

16 A    I know we worked together to preserve the B School.

17 Q    What was that?

18 A    That is a -- that was actually a black school, one of the

19 three that was in our community, and the school board actually

20 owned that building.

21 Q    Right.  Right.  You-all did a preservation effort on that

22 building?

23 A    Yes.  Yes.

24 Q    And he was supportive of that?

25 A    Yes.

1   Q    Back, again, to the police chief position that had become

2   vacant, I think this was '05; is that correct?

3   A    That's when this discussion happened, yes.

4   Q    One of the other people that had been competing for that

5   position with Mike Bishop was Todd Roberts; is that correct?

6   A    Correct.

7   Q    And you knew who Todd Roberts is?

8   A    Yes.

9   Q    And he had been the assistant police chief under the

10  administration of Daugh or Doug White; correct?

11  A    Uh-huh.

12  Q    Doug White is the fellow that you ran against and beat in

13  2006; is that correct?

14  A    Correct.

15  Q    Now, do you know where Todd Roberts is right now?

16  A    Yes.

17  Q    He's serving a prison sentence; correct?

18  A    Correct.

19  Q    And so is Daugh White; correct?

20  A    Correct.

21  Q    As a matter of fact, so many people that had served or

22  that had — so many of the White family members that had served

23  either in elective office in Clay County or people associated

24  with them are now serving jail sentences; is that fair?

25  A    Are you saying family when you say relations, as in —

1  Q    Yes, relationship.

2  A    I guess there's a couple of those, yes.

3  Q    Jennings White is one of them; is that correct?

4  A    Uh-huh.

5  Q    We mentioned Daugh White.  Of course, Vernon Hacker was a

6  political supporter of Daugh White's; correct?

7  A    He was on the council.

8  Q    Did he support Daugh White?

9  A    Oh, of course.

10  Q    That was my question.  And he's serving a jail sentence,

11  too; correct?

12  A    Yes.

13  Q    Darnell Hipsher, was he a supporter?

14  A    Darnell Hipsher, yes.

15  Q    And he supported Daugh White as well?

16  A    Yes.

17  Q    He's serving a prison sentence as well, too; is that

18  correct, ma'am?

19  A    I guess he is still in, yes.

20       MR. WESTBERRY:  Okay.  Just one second, please, Your

21  Honor.

22       THE COURT:  Yes, sir.

23  BY MR. WESTBERRY:

24  Q    Let me ask you just a question or two about your mayoral

25  race in 2006 when you -- when you ran against Daugh White and

1    won.

2    A    Uh-huh.

3    Q    Would you agree that by that time, once Jennings White and

4    others had been defeated for office in Clay County, those

5    portion of the Whites were out of power, would you agree that

6    that made it easier, more helpful for you to make a change and

7    get elected mayor of the City of Manchester?

8    A    No.

9    Q    Okay.  And why would you not agree with that?

10   A    I just don't think it made it easier.  It was definitely

11   not an easy task to do.

12   Q    Let me ask it a little differently, perhaps you'll agree.

13   You ran against Daugh White; correct?

14   A    Yes.

15   Q    In effect, you ran against many of the White supporters in

16   Clay County; is that correct?

17   A    Yes.

18   Q    Those in the City of Manchester that supported the White

19   family probably opposed you?

20   A    Probably some of them, yes.

21   Q    Yes.  Would it be a goodly portion of them, would that be

22   fair, do you think?

23   A    A pretty good portion I would say, yes.

24   Q    By the time that Jennings White was out of office, would

25   you agree that, you know, the White family political fortunes

1  had begun to slide somewhat, not only in Manchester, but in

2  Clay County as well?

3  A    I think when you're talking about a city race, it's

4  completely different than a county race.

5  Q    Okay.

6  A    So I think it's — it's just totally different.  Your

7  supporters and the way things work are a little bit different

8  in a city than they are in a county race.

9  Q    Okay.  Were the Whites, the White family, including Daugh

10  White, fairly strong politically within the city limits?

11  A    Doug White was, yes.

12  Q    All right.  And by the time '06 had come around, his

13  influence in city government — in city politics obviously had

14  begun to slide, because you beat him in that race?

15  A    Yeah, I think there was a lot more good people that came

16  out to vote, yes, that had just — had given up on the system

17  and they just decided to come out and vote.

18  Q    Had given up on Daugh White and the way he ran the town?

19  A    Well, possibly, yes.  Yes.

20          MR. WESTBERRY:  Thank you.  I appreciate it.

21          THE WITNESS:  Thank you.

22          THE COURT:  Mr. White.

23                    CROSS—EXAMINATION

24  BY MR. WHITE:

25  Q    Mayor White, good afternoon — I'm sorry, that's about the

1  third time I've done that in this trial.  Mayor Webb, I'm

2  sorry.  My name is Scott White, I'm an attorney, and I

3  represent Charles Jones.  I just have a few questions for you.

4       The first question I want to ask you is, in your testimony

5  on direct examination, which is when you were answering

6  Mr. Parman's questions, you said that you need to give — you

7  said that Mr. Jones and Mr. Stivers told you you need to give a

8  thousand dollars to Vernon Hacker for him to use to help you or

9  otherwise you would possibly lose the election?

10 A    I think Al Man Stivers is who said — actually said the

11 thousand dollars.

12 Q    Okay.  And just to be clear, you finished last in terms of

13 the group of people who won to become council?

14 A    Right, I was number eight.

15 Q    But you did win the election —

16 A    That's right.

17 Q    — in the sense of being able to win the office and then

18 assume office?

19 A    Correct.

20 Q    And I'm just going to hit a couple of things —

21 A    Okay.

22 Q    — so I don't want to trick you.  I want to ask you real

23 quick about the — on the video that we watched that you and

24 your — Was that your husband in the car with you?

25 A    Yes.

1  Q    —— (continuing) that you and your husband did, Mr. Lewis,

2  was that the primary or the general of '04?

3  A    That was November election.

4  Q    The November 2004 election; correct?

5  A    Yes.

6  Q    Okay.  At that election —— I mean, at that time, when you

7  were taking that video, do you recall where —— at any time,

8  were you parked across —— Let me start over.

9       The SuperAmerica where you were parked at some point, were

10 there other times that you —— Because you said you had been

11 there off and on during the day.

12 A    Uh-huh.

13 Q    Were there other times when you were parked across the

14 street in the middle school so you would have a different angle

15 where you could take the video?

16 A    We were parked at the middle school when we were getting

17 the pictures there where you actually saw the sign that said

18 Manchester voting precinct.

19 Q    Okay.  When you were taking that video to get the

20 Manchester precinct sign, it would be accurate to state, then,

21 you were parked in the Clay County Middle School lot?

22 A    In the parking lot, yes.  The upper parking lot, we'll

23 say.  There's two parking lots there.

24 Q    Were you in the upper or the lower?

25 A    I was in the upper.

1  Q    Do you have any knowledge as to whether or not when

2  Mr. Jones approached you and informed you that he was — had

3  complaints about you videoing, people having expressed those

4  complaints and he asked you to stop doing that, do you know

5  what the source — if those complaints came from anyone else —

6  exactly who those complaints had come from?

7  A    When he approached me, we were in the lower parking lot.

8  But what he said was, "You're making people nervous."  Nervous.

9  Q    I see.  How close is the lower parking lot to the actual

10 precinct door where you go in?  Would that be within 100 feet?

11 A    No.  You can't even see the door to the precinct if you're

12 in the lower parking lot.  It's like around the building, and

13 it's much further than a hundred feet, I would say.

14 Q    Would you agree that Green Street, which is — Is Green

15 Street one of the streets that you videoed that you saw?

16 A    Yes.

17 Q    Would you agree that Green Street is a fairly busy street

18 in Clay County or in Manchester on any given day, given its

19 location?

20 A    It depends on what day you're talking about.  Are we

21 talking about election day or are we talking about a normal

22 day?

23 Q    Well, let me ask you this:  Normal day?

24 A    Normally?

25 Q    Normally.

1  A    Fairly.  I'll say fairly busy, yes.

2  Q    And just one last area.  I want to ask you now about your

3  mayoral race in the 2006 election cycle.

4  A    Okay.

5  Q    Your race would have only been in the general election; is

6  that right?

7  A    Ours was in November, uh-huh.

8  Q    Was your husband, Charles Weaver —

9  A    Charles Lewis.

10  Q    Charles — my apologies. Your husband, Charles Lewis, was

11  he a challenger at the Manchester City precinct in the

12  November 2006 election?

13  A    Yes.

14  Q    Was he a challenger at that precinct at your request?

15  A    Yes.

16  Q    And as a candidate, you're allowed to do that under the

17  law; correct?

18  A    Yes.

19  Q    Is that the precinct where Wanda White — and now I think

20  I'll get it right — Dobber Weaver —

21  A    Yeah.

22  Q    — were election officials?

23  A    Yes.

24        MR. WHITE:  Mayor Lewis, I appreciate your time.

25  Thank you.

1              Your Honor, that's all I have.

2              THE COURT:  All right.  Thank you.

3              Thank you.  Mr. Abell.

4                          CROSS-EXAMINATION

5    BY MR. ABELL:

6    Q    Ms. Lewis, my name is Robert Abell, and I represent

7    William Stivers in this case.

8    A    Yes.

9    Q    You mentioned an uncle that suggested that you see

10   Mr. Stivers?

11   A    Yes.

12   Q    Your uncle was Jimmy Dobson?

13   A    Yes.

14   Q    Mr. Dobson works in banking?

15   A    Yes, he's on the bank board of the First National Bank.

16   Q    And do you know if he had previously served as a campaign

17   treasurer for Jennings White when Jennings White was Clerk of

18   Clay County?

19   A    I think so.

20   Q    You described some — an initial conversation at

21   Mr. Stivers' residence —

22   A    Yes.

23   Q    — in late September 2004 or perhaps even in very early

24   October 2004?

25   A    Yeah, somewhere right around that area, yes.

1  Q    And I guess the upshot of that conversation was you were

2  advised by my client, Mr. Stivers, that you needed to put up a

3  thousand dollars, get it to Vernon Hacker, and you assume that

4  meant that Mr. Hacker would then buy votes on your behalf?

5  A    Yeah.  He said Vernon handled —— would handle the money,

6  yes.

7  Q    Okay.  And it was your assumption that Vernon handling the

8  money, that Vernon would buy votes on your behalf; correct?

9  A    Uh—huh.

10 Q    So the ultimate destination was to be —— the ultimate —— I

11 guess the interim destination of the money would be Mr. Hacker

12 and then subsequently to whatever voters he identified;

13 correct?

14 A    Correct.

15 Q    All right.  And a day or two later, which probably would

16 still be in late September or still in very early October,

17 Mr. Hacker showed up I believe at your workplace; correct?

18 A    Yes.  Yes.

19 Q    And then a subsequent discussion perhaps a week later, a

20 week later could be in early October or still maybe in the

21 first week ——

22 A    Somewhere right around there, yes.

23 Q    Again, same upshot, to your understanding, a thousand

24 dollars go to Mr. Hacker and he would do —— you assume to buy

25 votes with it; correct?

1  A     Yeah, it didn't — the next conversation, you know, we

2  didn't — the thousand dollars wasn't mentioned, Vernon wasn't

3  mentioned, they just said you have to pay, you need to pay,

4  you're not going to win.  But that was the initial

5  conversation, yes.

6          MR. ABELL:  I see.  Okay.  That's all.  Thank you.

7          THE WITNESS:  Okay.  Thank you.

8          THE COURT:  Mr. Baldani.

9          MR. BALDANI:  Thanks, Judge.

10                     CROSS-EXAMINATION

11  BY MR. BALDANI:

12  Q     Good afternoon, Mayor Lewis.

13  A     Good afternoon.

14  Q     I'm Russ Baldani, one of Freddy's lawyers, Freddy

15  Thompson's lawyers.

16  A     Yes.

17  Q     How long were you director of the Senior Citizens Center

18  in Manchester?

19  A     I got that job — I'm still there, but I started in 1994.

20  Q     Okay.  And tell the jury just a little bit about what that

21  is.

22  A     We provide services and meals to the elderly of Clay

23  County.

24  Q     Okay.  And in '06, did you become aware there was going to

25  be a new voting machine used?

1   A    In 2006?  Yes.

2   Q    And did you find some of senior citizens were a little

3   apprehensive or wanting to learn about that machine?

4   A    At my direction, yes.

5   Q    Okay.  And so what did you do about that?

6   A    I think that — I was trying to remember if Freddy had

7   contacted me or if I had contacted him, I can't remember who

8   made the initial contact, but I had heard that he had shown the

9   machines at a couple of other places that I knew of, and I

10  think I called him and asked him to bring the machine to the

11  Senior Citizens Center.

12  Q    Okay.  So he may have broached it himself, but you think

13  you might have?

14  A    I think I made the initial contact, yes.

15  Q    Because you had heard about him doing it?

16  A    Yes.

17  Q    Tell the jury what he did.

18  A    We set up a date and he brought the machine to our center,

19  and myself and probably a total of 15 people, I'll say,

20  maybe — give or take, a few employees and then some of the

21  senior citizens that was there went through the machine.

22  Q    And he put the little card in and let people practice on

23  it?

24  A    Uh-huh.

25  Q    Answered questions about it?

1   A    I think so.

2   Q    Was that helpful?

3   A    Well, it made me feel better, yes.

4   Q    Did you get the impression it made others feel better?

5   A    Some of mine.  And I just wanted to — of course, when

6   you're elderly, it's a little more difficult and a lot of them

7   don't vote, so I wanted them to feel more comfortable.

8   Q    Did you — did it seem like the machine was overly

9   complicated to you?

10  A    Well, to me, no.

11  Q    Okay.  But to somebody that might not be used to a

12  computer perhaps?

13  A    Yeah, yeah.  That's what I was afraid of, yes.

14  Q    Did he stay till everybody was done and everybody had

15  their chance?

16  A    Yeah.  I think once they served the lunch everybody kind

17  of just had their lunch and went on, you know.

18  Q    All right.  Are you aware of him doing that at the Young

19  Republican's Women's Club as well?

20  A    He could have.  I don't — I don't know.  I wasn't a

21  member of that then.

22  Q    Oh, you weren't?

23  A    No.

24  Q    You are now, though?

25  A    I am now, yes.

1  Q    But you're aware of him doing it at other places?

2  A    Yeah.

3  Q    You made a comment about people kinda giving up on the

4  system.  What did you mean by that?

5  A    Just on the whole voting system, just a lot of good people

6  that had not voted in years just because of, I guess, the way

7  things were handled and some of the things that were going on,

8  they just had given up.

9  Q    And you took over an elected office from somebody that had

10 betrayed the public trust and broken the law, hadn't you -- or

11 didn't you?

12 A    I think that's fair, yes.

13 Q    What kind of problems did you encounter --

14 A    When I came in?

15 Q    -- going into -- just in general.  You took over from a

16 guy that is now in prison?

17 A    Yeah.

18 Q    And you wanted to clean things up?

19 A    A lot of work, I'll tell you that.  They were several

20 years behind on audits and just a lot of -- not a lot of good.

21 We had to -- we had to go in and start kinda over.

22 Q    Did you find yourself under pressure to prove to the

23 public that this isn't going to be business as usual, you were

24 going to try to change things?

25 A    Yes.

1          MR. BALDANI:  That's all, Your Honor.

2          THE COURT:  Thank you.

3          Mr. Gilbert.

4                         CROSS-EXAMINATION

5    BY MR. GILBERT:

6    Q    Mayor Webb-Lewis, I'm Jerry Gilbert, and I represent Bart

7    Morris.

8    A    Yes.

9    Q    I just want to ask you about some of these documents that

10   have been entered into the record.  The first one I would like

11   to discuss with you is Exhibit M6, and that's the proposal and

12   the contracts.

13   A    Uh-huh.

14   Q    And those were entered into prior to you becoming mayor;

15   is that correct?

16   A    Yes.

17   Q    Back in 1994 is when the proposal was made?

18   A    Yes.

19   Q    Now, at that time, as the proposal indicates, another

20   company was handling the transfer stations for the City of

21   Manchester?

22   A    I think it mentions that, yes.

23   Q    And the proposal —— it also indicates there wasn't a

24   contract with that company?

25   A    I think so.  Let me see here just a second.

CARMEN WEBB - CROSS - MR. GILBERT                80

1      It says that here, yes.  It says the City does not have a
2   formal contract, yes.
3   Q    And the proposal made by B & J Transfer was actually less
4   than the rate that was being currently charged by the City?
5   A    Well, it's — I guess you'll have to figure that out,
6   because some of these are per yard and then some of them are
7   per ton.  So somebody that's a little better than I would have
8   to figure that out.
9   Q    All right.  The proposal indicates that the City is
10  currently being charged $12.50 per yard?
11  A    Per yard is what it says, yes.
12  Q    All right.  And the proposal was for $12 a yard?
13  A    I was trying to find where it said that.  I see 13.25 here
14  in the contract, is what I'm then looking at.  Okay, here it
15  is, yeah, sorry.  When it starts out, yeah, it's $12 per yard.
16  Q    All right.  So that was less than what was currently being
17  charged?
18  A    With an increase.
19  Q    Over the next three years?
20  A    Starts again for 13.25, yes.
21  Q    But that rate was locked in until that increase in time?
22  A    Yes.
23  Q    All right.  And B & J Transfer provided those transfer
24  services up until recently; is that correct?
25  A    Yes.

1   Q    The City of Manchester has mandatory garbage pickup?

2   A    Mandatory, yes.

3   Q    Yes.  And so the City has –– picks up the garbage at the

4   curb, the City employees?

5   A    Uh-huh.

6   Q    And they use compactor trucks to do that?

7   A    Yes.

8   Q    And the landfill is in Laurel County?

9   A    Yeah.  I don't know what they did back in '90-whatever,

10  but now that's we have, yes.

11  Q    Right.  And when you came on, that transfer system was

12  still in place with B & J Transfer?

13  A    Yes.

14  Q    And so the City compactor trucks would take the garbage to

15  B & J Transfer's transfer station?

16  A    Right.

17  Q    And transfer the garbage to long-haul trucks, which would

18  take it to the landfill?

19  A    Correct.

20  Q    Now, you indicated that there was –– when that service

21  stopped that there were some savings to the City?

22  A    Uh-huh.

23  Q    And how does the garbage get from the city to the landfill

24  now?

25  A    We transport in our trucks to London.

1   Q    Okay.  In the compactor trucks?

2   A    Yes.  And we have another way now, though.  We have a

3   large truck with one of the large dumpster-type things that we

4   can also take it there.

5   Q    But primarily the compactor trucks which pick up the trash

6   now travel to the landfill in London?

7   A    Part of the time, yes.

8   Q    All right.  And although the savings — you may have

9   current savings, there's also — will be increased costs on the

10  wear and tear of those compactor trucks?

11  A    A little, yeah.

12  Q    Now, the minutes that were introduced are for about an

13  11-and-a-half-year period from January 24, '94, to June

14  the 20th, 2005?

15  A    2005, yeah.  I don't think they're all in here for that

16  period, but there's a lot in here, I think.

17  Q    Okay.  There would be some minutes that are missing?

18  A    Well, I don't think this was — I don't think — Well,

19  look in here, let me see the very first one.  I don't think

20  this has every month, is what I'm saying to you.

21  Q    City council meets every month?

22  A    For instance, here is January the 25th, '95, and the next

23  one is March 20th, '95.  So I'm not — I don't know if there

24  was a meeting in February of '95, that's what I'm saying.

25  There could have not been a meeting, but there should have

CARMEN WEBB LEWIS CROSS - MR. GILBERT                    83

1    been.

2    Q    That's fine.  As records custodian, you're not certifying

3    that those are --

4    A    Oh, yeah, these are the minutes.  I'm just saying that I

5    don't know if they're -- if they asked me for January the 20th,

6    1994, through June 20th, 2005, is what I'm saying.

7    Q    What did they ask you for?

8    A    I don't know what this was -- when they asked us for this,

9    I don't know what they specifically asked us for, if they asked

10   us for every single month, that's what I'm telling you.

11   Because, for instance, there's no February 1995 that's here.

12   And then it jumps -- well, there's April and there's May.  So

13   there could have not -- just not been a meeting there in that

14   month.

15   Q    It could be that there was a meeting that's not

16   represented by that -- those minutes?

17   A    Well, there could be, but I'm saying there could have not

18   been a meeting there.  If they asked me for every single minute

19   from January 1994 through 2005, then they're here.

20   Q    I guess, Mayor, what my question would be is, what was the

21   request and what do those minutes represent?  Are they complete

22   minutes for that time period or are they -- or could they be

23   incomplete?

24   A    '96, '97, '98.  They're not complete minutes.  They are

25   not a complete from 1994 to 2005 set of minutes.

1   Q    There appear to be months ——

2   A    There's not —— there's not complete as in 12 months of a

3   year all the way in here.

4   Q    Okay.  There appear to be months missing?

5   A    There is some missing, yes.

6   Q    All right.  Now, if I could direct you to Exhibit M3.

7   A    M3?

8   Q    Yes, ma'am.

9   A    Okay.  That's a big one.  Yes.

10  Q    Now, that appears to be a very large exhibit?

11  A    Uh-huh.

12  Q    On my computer, it has 711 pages.

13  A    That's probably pretty accurate.

14  Q    All right.  And I believe you testified that there is a

15  check in there?

16  A    Some cancelled checks, yes.

17  Q    There's a cancelled check?

18  A    Several.

19  Q    Several?

20  A    Uh-huh.

21  Q    And other documents are tickets?

22  A    Uh-huh.

23  Q    And represent the yards that were delivered to the

24  transfer station ——

25  A    Right.

1  Q   —— transfer station on those particular dates?

2  A   Right.

3  Q   Do the receipts that are there, the receipts, do they

4  match up with the payments that are made?

5  A   They should, yes.

6  Q   Okay.  So you're —— there's no question that they're

7  improper or anything like that?

8  A   Right.  Right.

9  Q   All right.  And that appears to be for a period of time in

10 2003?

11 A   There's some 2002s in here also.

12 Q   All right.

13 A   '04, there's some '04s in here, '05, '06.  I guess that

14 may have been the last one.  There's some '07s in January.

15 Q   All right.  Now, if I could direct your attention to

16 Exhibit M4, two checks?

17 A   Uh-huh.

18 Q   And those were issued, I believe, in May of '06?

19 A   Yes.

20 Q   And those were Pride reimbursements?

21 A   Yes.

22 Q   Now, you've talked a little bit about Pride.  That money

23 is a grant to either the City or the County?

24 A   Yes.

25 Q   And it can be either one?

1   A    Yes.

2   Q    Now, are you knowledgeable about what those checks

3   represent?

4   A    These are for tipping fees.

5   Q    Okay.  And what would be a tipping fee?

6   A    Tipping fee is what you were just talking about here, how

7   much it costs when you take the garbage to the transfer

8   station.

9   Q    And Pride is a federal cleanup program?

10  A    Yes.

11  Q    And it's a countywide program, is it not?

12  A    Yeah, the City has a portion, and then County does their

13  thing, yes.

14  Q    And it's advertised that everybody is to clean up the

15  roadways, clean up their yards, bring items — discarded items

16  to a central location in an effort to clean up the county?

17  A    Yeah.  It should be advertised, yes.

18  Q    Okay.  And is that what that represents?

19  A    Yes.

20  Q    Okay.  And are the — the trash that was hauled to the

21  transfer station, is that sufficiently documented to cover

22  those costs?

23  A    It's not here.  It's not in this one, this is just the

24  cancelled checks.

25  Q    All right.  There would be documents that when someone

1  brings trash to the transfer station, it's weighed or —

2  A    It should be, yes.

3  Q    It should be weighed and a receipt would be generated to

4  justify that cost?

5  A    It should be.

6  Q    And to your knowledge, was that done?

7  A    It should be.  Some of this I know was through the County,

8  even though the City — there was — I think the City ended up

9  taking care of some of it, but the large amount came through

10 the County.

11 Q    It's a joint effort?

12 A    Yes.  Yes.

13 Q    But there's nothing that you know of was improper about

14 the submission of the bills for that Pride cleanup?

15 A    That was before me, yeah.

16         MR. GILBERT:  That's all I have, Your Honor.

17         THE COURT:  Thank you.  Ms. Hughes.

18                    CROSS-EXAMINATION

19 BY MS. HUGHES:

20 Q    Do you go by Mayor Lewis or Mayor Webb-Lewis?

21 A    Mayor Lewis.

22 Q    My name is Elizabeth Hughes, I represent Debbie Morris.

23 I'm really not that into garbage, but I feel like Mr. Gilbert

24 didn't ask a couple of questions I want to follow up on.

25 A    Okay.

1  Q    You testified that you — "you" being the City.

2  A    Right.

3  Q    I thought you said, "Now we another truck we can use to

4  haul to London"?

5  A    Yes.

6  Q    Can you describe that truck?

7  A    We have — well, we have — really have three trucks.  We

8  have two of the compactor trucks.

9  Q    Right.

10  A    And then we have a large truck, it's a roll-off dumpster,

11  I couldn't think of it a minute go, so we can use that to

12  transport also, yes.

13  Q    Okay.  So did the City purchase that?

14  A    We're in the process and we — there's a program that

15  we're using, we can either purchase it at the end of our term,

16  I guess I'll say, or we cannot.

17  Q    Is it sort of like a lease, like you and I would know a

18  lease?

19  A    Sort of like a lease, but a little bit different.  It's

20  kind of a strange operation, but it works a little bit better

21  for us.

22  Q    Who's the program through?

23  A    I'm trying to think.  It's — it's not Caterpillar, it's

24  one of the large trucking companies, and they were doing a

25  special program, I guess I want to say.  So that's what we're

1   working out.

2   Q     Do you make payments?  "You" being the City again.  I

3   realize you're not writing a personal check for this.

4   A     Yes.  Yes.

5   Q     Do you-all make payments each month?

6   A     No, what we do is at the end of our timeframe, which I

7   think is in June or July this year, we can choose to purchase

8   that or they will — it's like an insurance, almost like an

9   insurance thing, that they're guaranteed that it will only cost

10  us a certain amount of money and they'll sell it for us, so

11  then if we choose not to buy it we're not out anything but

12  just — sort of like lease payments, but we only have to pay

13  them a year later, if that makes any sense, I know it's a good

14  deal.

15  Q     So the City has possession of a large some kind of garbage

16  truck —

17  A     Truck, yes.

18  Q     — that the City has not written any money for whatsoever?

19  A     Exactly.

20  Q     But come July, after you've had it for a year, you're

21  going to have to write a check, you being the City, for some

22  amount of money?

23  A     Yes.  Right.  Right.  If we choose to purchase or not,

24  yes.

25  Q     Either the amount — basically a lease insurance-type

1   payment —

2   A    Right.

3   Q    —— that would compensate this company —

4   A    Exactly.

5   Q    —— for the City's use of the big truck for the past year?

6   A    Right.

7   Q    Do you know how much that might be?

8   A    I think it's around $20,000, yes.

9   Q    All right.  Or you can buy the truck and then the City

10  owns it for there everafter?

11  A    Exactly.

12  Q    And has there been an analysis of what the City would

13  intend to do with that extra truck?

14  A    We also use it for roll—off dumpsters.  So these companies

15  that come into cities and like if you're remodeling your house

16  or those types of things, we can take a roll—off dumpster and

17  we leave it at their premises and then we make money off of

18  that, too.  So that's what we're looking at, using it for —

19  and our recycling.  We'll use it for a lot of different things,

20  but we can make money in several areas instead of just garbage.

21  Q    So has the City done an analysis?  It sounds like you're

22  wanting to buy it because you probably want to keep it to make

23  some more money; is that fair?

24  A    Yes.  That's what we're looking at, yes.

25  Q    And if you buy it, how much is the cost going to be?

1  A    I cost of the truck and I think some of our roll–off

2  dumpsters is around $100,000.

3  Q    Now, how many trips ––

4  A    Uh–huh.

5  Q    –– do –– how many garbage runs go to London each week?

6  A    It depends on the day.  Some days we go once a day, but

7  like on Wednesday, we don't go at all.  It depends on the

8  volume of garbage that we get, it depends on if it's been a

9  holiday weekend, that sort of thing.  But we usually probably

10 three days, at least three days a week, we go once a day.

11 Q    Okay.  So at least ––

12 A    Three trips.

13 Q    –– three trips.

14 A    Uh–huh.

15 Q    Sometimes more, sometimes less?

16 A    Usually less, but it –– like I say, if it's a holiday,

17 there's more garbage.

18 Q    And how many miles is it between London and Manchester ––

19 well, the London landfill ––

20 A    Yeah.

21 Q    –– because I'm sure it's not in downtown London?

22 A    Twenty miles one way.

23 Q    Okay.  And have you or the City –– has the City

24 commissioned a study of the projected or calculated cost per

25 mile?

1  A    No.

2  Q    All right.  So let me ask you this:  When you travel for

3  the City, for example, do you get paid mileage?

4  A    No.  We have a Fleet card.

5  Q    But you would agree with me that every mile that one

6  travels in one's car causes wear and tear on a car?

7  A    Uh-huh.

8  Q    And you would agree with me that it costs more to operate

9  a large dumpster truck than it does my car or yours?

10  A    Yes.

11  Q    Okay.  I am moving off of the garbage topic.  I want to

12  talk about the video.

13  A    Okay.

14  Q    Can you tell me whether you recall whether that was the

15  entire filming that you turned over to the FBI or was there

16  more?

17  A    No, that was the entire filming.

18  Q    Did you have the camera with you all day?

19  A    Did I have the camera with me all day.  Well, it was —

20  probably when we went back out later that afternoon, I probably

21  just left it at home then, because we weren't using it anymore.

22  Q    Well, I need for you to think; okay?

23  A    Uh-huh.

24  Q    Did you do any filming in the evening towards when the

25  polls would have been closing?

1    A    No.  No.

2    Q    When you turned over -- What kind of video recorder was

3    it?  Because I had have my house a really big video recorder

4    and then a little digital thing.

5    A    It's not -- it wasn't digital, because it just had the

6    actual tapes.  It's about that big I'd say.

7    Q    All right.  So it's got an actual tape?

8    A    Yes.

9    Q    Is it one of those mini cassette tapes?

10   A    No, they have the original one.  It's about that big, I

11   would say.

12   Q    Okay.  And did you splice it together or --

13   A    No.

14   Q    So it should be in order --

15   A    Yeah.

16   Q    -- in which it was recorded?

17   A    Uh-huh.

18   Q    And you acknowledged I think in your direct testimony that

19   you -- it was not continuous recording obviously?

20   A    Right.  The tape wouldn't have lasted -- or the machine

21   wouldn't have lasted.

22   Q    Because it has to be charged, I take it?

23   A    Right.

24   Q    All right.  Now, you did identify, I believe, as you were

25   narrating through the video, that you believed it was Kennon

1   and Wanda White driving that large Mercedes in front of the

2   Manchester precinct; correct?

3   A    I said I thought –– that's who I thought it was, yes.

4   Q    All right.  Now, you said –– I think you agreed with

5   Mr. Parman that this was about 14 minutes out of eight hours;

6   correct?

7   A    Six to eight hours I think I said, yes.

8   Q    But it's your testimony that you were not recording all

9   day?

10  A    Right.

11  Q    Okay.  So what kind of time span do you think – I mean,

12  you're the one that made this video – these cuts or these clips

13  were made over?

14  A    I said it was a little bit before lunch and a little bit

15  after.  So probably if you counted the whole –– the whole time

16  period, probably a couple of hours.  Actually, the reason ––

17  one of the reasons I stopped, I was getting kind of seasick of

18  doing that.  I just couldn't do it anymore, so ––

19  Q    Now, you also testified prior to identifying what you

20  thought might be Kennon and Wanda White in the black Mercedes

21  at the Manchester precinct a black SUV that was pulling out of

22  Bart Morris's house, and you said that could be Kennon and

23  Wanda?

24  A    I said I –– yeah, I think they had a black –– everybody

25  did a lot of trading vehicles that day, yes.

1  Q    I understand that.  But you don't actually know who was in

2  that black SUV?

3  A    I'm not for sure about the black SUV; that's correct.

4  Q    And then there was another gray car.  Could that have been

5  Kennon or Wanda pulling up Ella Wagers' Way?

6  A    I didn't -- like I say, I don't know who was in that,

7  because the windows were so tinted, but I've never known them

8  to be in a -- in a silver car, but -- it could have been

9  anybody.

10 Q    All right.  But if they were not in the black SUV --

11 A    Uh-huh.

12 Q    -- your video does not reflect Kennon and Wanda going to

13 Bart Morris's house, if they're not in that SUV?

14 A    Right, if they're not -- if they weren't in the SUV.

15 Q    But your video does certainly reflect Kennon and Wanda

16 going to Ella Wagers' house?

17 A    If that was them in the -- in a silver vehicle.  That was

18 the only vehicle that went in there, was the silver vehicle.

19 Q    I thought that we saw the black Mercedes go in there.

20 A    No, that was at the Manchester voting precinct.

21 Q    Okay.  Now, this Camero that you -- that we saw pull out

22 of Bart Morris's house?

23 A    The black?

24 Q    The black Camero convertible.

25 A    Convertible, yes, I noticed that.

1  Q    You weren't sure whether or not that was Bart or not?

2  A    Yeah, that's his vehicle, I said, yeah.

3  Q    Right.

4  A    Yeah.

5  Q    But you don't know whether that was Bart inside there?

6  A    Well, I wasn't — you know, I wasn't focused in on that

7  very well, as you could see.  And then it went the opposite

8  direction.

9  Q    The opposite direction from you?

10 A    From me; right.

11 Q    Do you know his son, Bartley?

12 A    A little bit.  I've just seen him in the last little bit,

13 yes.

14 Q    All right.  And would you agree with me that based on our

15 viewing of the video that could just as easily have been

16 Bartley as Bart in that vehicle?

17 A    I guess it could have been many people.  You know, I

18 don't —

19 Q    Right.

20 A    Like I say, yeah.

21 Q    Great.  Thank you.  That's sort of my point.

22      Now, if that was, in fact, Bart in that convertible

23 Camero, you did not record on your film him returning to the

24 residence?

25 A    No.  I don't think we saw that, no.

1  Q    And if it was not Bart in that black Camero, then you

2  don't have Bart on film at all?

3  A    Bart Morris.

4  Q    Correct.  Right.

5  A    Just his home, yeah, not him personally, if that was not

6  him.

7  Q    Now, we did see Debbie Morris, though, undoubtedly?

8  A    Right.

9  Q    Can you recall -- Well, can you recall whether she was

10 coming or going?

11 A    No, I think she was coming.

12 Q    All right.  Is it your testimony that this would have been

13 in the two hours around the lunch period?

14 A    Yes.  That was the only time I was taping, yes.

15 Q    Okay.  And do you recall what Ms. Morris was carrying with

16 her?

17 A    I think I saw a bag and her purse was on her arm.

18       MS. HUGHES:  I actually have a still photo from the

19 video so that I do not have to ask the government to go along

20 and try to stop, if you don't mind.

21       THE COURT:  All right.  Yes, ma'am.

22       MS. HUGHES:  I'm going to push the power button.

23 BY MS. HUGHES:

24 Q    Would you agree with me, Mayor Lewis, that this picture

25 correctly represents a still photo from the video we just

1    watched?

2    A    Yes.  Yes.

3    Q    And that's Debbie Morris, it's very — you know, it's

4    grainy, I understand that.

5    A    Yes.

6    Q    But that's Debbie Morris there on the right?

7    A    Uh-huh.  Correct.

8    Q    Do you see the cords that are hanging, string-like things?

9    Can you tell what that is?

10   A    Well, I thought that was a key chain or something when I

11   initially saw it.

12   Q    Would you agree with me that it could be cords?  Let me

13   back up so that I can make sense.

14        Do you know what Debbie Morris does for a living?

15   A    She's a hairdresser.

16   Q    All right.  And would you agree with me that looking at

17   this photo she could certainly be carrying hairstyling

18   equipment?  When I said "cords," that's what I was talking

19   about.

20   A    Oh, you're talking about plug-in cords?

21   Q    Right.  Sorry about that.  You know, like a hair

22   straightener or hairdresser?

23   A    Well, I guess I just thought when I first looked at it on

24   the actual thing, I thought that was a key dangling down.

25   Q    Right.  Are you certain that that's what it is, or would

1  you -- I mean, it could be either one; right?

2  A    Yeah, I guess so.  But like I say, when I first looked at

3  it, because I was noticing what she had in her hand, I thought

4  it was keys.

5  Q    And she's got her purse.

6  A    Uh-huh.

7  Q    And she's clearly either coming or going, would you agree

8  with me on that?

9  A    Uh-huh.

10          MS. HUGHES:  Your Honor, may we approach for a

11  moment?

12          THE COURT:  Yes, you may.

13          MS. HUGHES:  Thank you.

14      (Whereupon, the following discussion was had between the

15  Court and counsel at the bench, out of the hearing of the

16  jury.)

17          THE COURT:  Why don't you go ahead.

18          MS. HUGHES:  I clearly have a problem here since the

19  witness has denied making any additional videos.  So if I were

20  just to play it, I think it would be publishing to the jury

21  something that clearly has not been admitted into evidence.

22  Unlike the government, I haven't given her something to look at

23  it to review in advance, I mean that's how the government got

24  it in and admitted before it was published to the jury.  So I

25  don't know how the Court wants to handle this, because I

1    certainly want her to watch this video and tell me if she was,

2    in fact, mistaken in what she represented.

3              THE COURT:  I assume there's no objection to playing

4    this last couple of minutes of the video?

5              MR. SMITH:  We've never seen that.  Technically, I

6    think the technology is such that she can watch it from her

7    screen and not publish it to the jury, and then if she can

8    identify it, we can certainly agree to play it.  I don't know,

9    Your Honor, how —

10             THE COURT:  Let me make sure with the Clerk that we

11   can —

12             Kaye, can we turn on the witness's screen and not the

13   overhead?

14             THE CLERK:  I can blackout the overhead.

15             THE COURT:  Blackout the overhead, turn on the

16   screen, we'll have her turn her screen around and you can ask

17   her to look at it.

18             MS. HUGHES:  All right.  Now, let me just anticipate

19   a problem so that we don't have to zoom back up here.  If she

20   cannot recognize it, then I would need to turn the audio on,

21   because it is clearly — no, that wouldn't be your

22   responsibility.  But —

23             THE COURT:  We'll have to take a break at that point

24   and then we'll voir dire her outside the presence of the jury

25   with the audio to see whether that — if she's able to then

1    authenticate the last couple of minutes.  I think her —— I

2    understood her answer to be to your question that she assumed

3    that she had seen all the tape, I don't think she realizes that

4    she didn't see all the tape.

5              MS. HUGHES:  Except I asked her if she videotaped in

6    the evening, and part of this tape's clearly in the evening,

7    the cars have their lights are on, it's at the end of the

8    polling day.

9              THE COURT:  My lights stay on all the time, but some

10   folks claim the lights are on but nobody is home.

11             MS. HUGHES:  Right.  That would be not be me, Your

12   Honor, let the record reflect.

13             THE COURT:  All right.  To speed this along, you can

14   show her that on the monitor, no sound.  If she recognizes it

15   and if there's no objection, it can be played on the big

16   screen.

17             MS. HUGHES:  All right.

18             THE COURT:  If she doesn't, then we'll need to take a

19   brief recess and we'll turn the sound on at that point.  So

20   that's the way we'll proceed.

21             MS. HUGHES:  Thank you, sir.

22      (Whereupon, the following proceedings continued in open

23   court.)

24             THE COURT:  Ms. Hughes, what we'll do at this point,

25   I think you want to show the witness something that hasn't been

 1 | admitted to this point.  So she'll need to look at it and see
 2 | if she can authenticate it first before we can go through the
 3 | admission process; is that correct?
 4 |         MS. HUGHES:  I'm not sure what screen I can watch.
 5 | Does the Court mind if I step back and look over the shoulder
 6 | of my colleagues?
 7 |         THE COURT:  That'll be fine.
 8 |         MS. HUGHES:  Will this be shown?
 9 |         THE COURT:  That'll be fine.
10 |         MS. HUGHES:  Thank you.
11 | BY MS. HUGHES:
12 | Q    Mayor Lewis, would you please watch the video.
13 | A    Okay.
14 |     (Whereupon, Debra Morris Exhibit No. 1 was played to the
15 | Court and witness, after which the following proceedings were
16 | had in open court.)
17 | BY MS. HUGHES:
18 | Q    Mayor Lewis, do you recognize that video?
19 | A    Do I recognize it?  Do I know the people in it, is that
20 | what you're --
21 | Q    No, ma'am.  I'm just asking you if you recorded that
22 | video.
23 | A    I don't recognize it, no.  I don't think I'm allowed to
24 | turn that around, am I?
25 |         THE COURT:  That's fine where it is.  That's fine.

1              Why don't we take just a brief recess at this time,

2     Counsel, before you proceed?

3              MS. HUGHES:  Okay.  Thank you.

4              THE COURT:  Ladies and gentlemen, we're going to take

5     about a ten-minute recess.  Please keep in mind the admonition

6     that you were given previously not to discuss the case among

7     yourselves, and we'll call you back in very shortly.

8         (Whereupon, the jury retired from the courtroom, after

9     which the following proceedings were had in open court.)

10             THE COURT:  Thank you.  Please be seated.

11             Ms. Hughes, I believe the counter on the tape was

12    15:13.  If you could go back to that.

13             MS. HUGHES:  I look to the table of the government

14    and Ms. Poynter and say please help me get back to that point.

15             THE COURT:  And at this point, I believe there's

16    sound that you'll be able to turn on?

17             MS. HUGHES:  Yes.

18        (Whereupon, Government's Exhibit No. V1 was played to the

19    Court and witness with audio, after which the following

20    proceedings were had in open court.)

21             MR. SMITH:  Maybe she can ask the witness now.  I

22    think I heard the voices.

23             Were you able to hear the voices?

24             THE WITNESS:  Yes.

25             THE COURT:  All right.

1  BY MS. HUGHES:

2  Q    Mayor Lewis, is that you and your husband on the video?

3  A    It sounded very much like us, yes.

4  Q    I need -- let me tell you what I'm trying to accomplish

5  and then you tell me the best way that we can get there.  I

6  would like for you to be able to authenticate this video as

7  something you also made that day.

8  A    Uh-huh.

9  Q    Do you feel that you can do that at this point or do you

10 feel that you need to watch the whole thing with the audio

11 before we do that?

12 A    Well, it sounds like me, yes.

13 Q    So if I -- after the jury comes in, if I ask you if, in

14 fact, you recognize this video as one that you made on that

15 day, would your answer be yes?

16 A    Yes.

17 Q    And that would be the entire portion that we just played.

18 A    I'm assuming, yes.

19 Q    All right.  Well, no, I don't want you to assume.

20 A    Well, I mean, that was me talking, so I'm assuming that

21 went on, that was it, yes.

22       THE COURT:  Let's play the audio a little further and

23 make sure she's able to do that.

24       MS. HUGHES:  Thank you.

25       THE WITNESS:  I mean it's me talking.

1          THE COURT:  All right.

2        (Whereupon, Debra Morris Exhibit No. 1 was played to the

3   Court and witness, after which the following proceedings were

4   had in open court.)

5          THE WITNESS:  Yeah, that's me.

6          THE COURT:  Ma'am, are you able to -- the word we use

7   is authenticate, but are you able to in your own mind establish

8   that that was a video that was taken at the same time that the

9   earlier video was taken?

10         THE WITNESS:  Well, I can't say if it was on the

11  same -- on the same day.  You know what I'm saying?

12         THE COURT:  Let me ask you if you are able to state

13  with certainty that that was a video that you had taken on or

14  about the same time that the other video was taken?

15         THE WITNESS:  Yes.

16         THE COURT:  All right.  Any other questions before we

17  bring the jury back in?

18         MS. HUGHES:  No, I would like to -- would I be able

19  to -- would you be able to help me if I ask you to stop the

20  video to ask questions like you did for Mr. Parman?

21         That would be all.

22         THE COURT:  All right.  Ms. Poynter, before we bring

23  the jury in, could you take that back to 15:13, I believe.

24         MR. PARMAN:  Your Honor?

25         THE COURT:  Yes, sir.

1           MR. PARMAN:  Before the jury comes back in, I'm not

2    certain that the exhibit that we put into evidence even has

3    this clip on it.  So would the Court prefer that we take

4    Ms. Hughes' copy and make it a supplement as a V1A?

5           THE COURT:  It will have to be a separate exhibit.

6           MS. HUGHES:  I'm going to move to introduce it, and

7    then I would ask that the Court —

8           THE COURT:  Substitute?

9           MS. HUGHES:  — to let me substitute that portion on

10   a disk that did not have the audio, or maybe I need the audio,

11   because — I need to have two, one with the audio for what we

12   played here to make the record and then one without the audio

13   that would go to the jury.

14          THE COURT:  Yes.  Yes, we'll do that.  We can do that

15   after the jury is excused to expedite matters.

16          MS. HUGHES:  Thank you.  I guess I could go on now

17   and move to introduce this portion of the video and ask the

18   Court's permission since she has, in fact, authenticated it.

19          THE COURT:  It will need to be in front of the jury.

20   You want the jury to know it's been introduced.

21          Let's bring the jury in.

22        (Whereupon, the jury returned to the courtroom, after

23   which the following proceedings were had in open court.)

24          THE COURT:  Thank you, and please be seated.

25          The record will again reflect that all members of the

 1  jury are present.  The parties and counsel are also present.

 2  Ms. Webb has returned — is at the witness stand.  Of course,

 3  she's still under oath.

 4          Ms. Hughes, you may continue.

 5  BY MS. HUGHES:

 6  Q    Mayor Lewis, we took a brief break so that you could

 7  review that video in a little more detail.

 8  A    Uh-huh.

 9  Q    Now that you have watched it, would you agree with me that

10  you made additional video recordings on or about the same date,

11  the same time you made the others?

12  A    It must have been showing — now that I've saw that, yes.

13  Q    And you agree that that is a video recording that you

14  made?

15  A    Yes.

16  Q    And that it fairly and accurately represents the things

17  that you filmed that day —

18  A    Right.

19  Q    — and that you saw?

20  A    Right.

21          MS. HUGHES:  Your Honor, I would move to introduce

22  this additional video, and I guess as Debra Morris Exhibit 1,

23  and I would also move to publish it to the jury, please.

24          THE COURT:  All right.  Let me see if there's any

25  objection.

1          MR. PARMAN:  No objection, Your Honor.

2          THE COURT:  It will be admitted at this time as

3  Debbie Morris Exhibit No. 1 and may be published.

4          Turn our overhead on.  Thank you.

5       (Whereupon, Defendant Debra Morris Exhibit No. 1 was

6  played to the Court and jury, after which the following

7  proceedings were had in open court.)

8          MS. HUGHES:  Now, Ms. Poynter, could you stop right

9  here?

10 BY MS. HUGHES:

11 Q    Mayor Lewis, do you recognize who that is?

12 A    Yes.

13 Q    Who is that?

14 A    That's Bart Morris.

15 Q    And in this video, does he appear to be by himself going

16 into the polling place?

17 A    Yes.

18 Q    All right.  And would you agree with me that he's wearing

19 a collared shirt in this video?

20 A    I think so.

21 Q    After we watch a little more --

22 A    Yeah.

23 Q    -- if you need to change that -- if you need to change

24 your mind, feel free.

25 A    Yeah.  Okay.

1   Q    And would you also agree with me that this part of the

2   video is, in fact, taken later in the day as reflected?

3   A    It looks that way.

4          MS. HUGHES:  It certainly does.

5          Okay.  Let's play some more.

6          (Whereupon, Defendant Debra Morris Exhibit No. 1 continued

7   to be played to the Court and jury, after which the following

8   proceedings were had in open court.)

9          MS. HUGHES:  If you could stop the video right there.

10  BY MS. HUGHES:

11  Q    Do you know who this person is out there, Mayor Lewis?

12  A    I can tell you one of two.

13  Q    All right.

14  A    She's a twin, so I can never can tell them apart.

15  Q    All right.  I understand that.  Who would that be?

16  A    It's either Tina or Trina Pennington.

17  Q    All right.  And thus far, have you seen any other folks

18  other than one of the Ms. Penningtons —

19  A    Yes.

20  Q    — or Mr. Morris, have you seen anyone else that you

21  recognize?

22  A    No.

23          MS. HUGHES:  All right.  If we could continue.

24          (Whereupon, Defendant Debra Morris Exhibit No. 1 continued

25  to be played to the Court and jury, after which the following

 1  proceedings were had in open court.)

 2          MS. HUGHES:  Let's stop here.

 3  BY MS. HUGHES:

 4  Q    Do you know who this person is?

 5  A    Ollie.  I don't know what his last name is, but he worked

 6  at the radio station, yes.

 7          MS. HUGHES:  Okay.

 8          And let's keep going.

 9      (Whereupon, Defendant Debra Morris Exhibit No. 1 continued

10  to be played to the Court and jury, after which the following

11  proceedings were had in open court.)

12  BY MS. HUGHES:

13  Q    This gentleman, did you know him?

14  A    I think that is Richard Pennington.

15          MS. HUGHES:  Okay.

16      (Whereupon, Defendant Debra Morris Exhibit No. 1 continued

17  to be played to the Court and jury, after which the following

18  proceedings were had in open court.)

19          MS. HUGHES:  Now, if we could stop for a second right

20  here.

21  BY MS. HUGHES:

22  Q    Because this looks like — would you agree this looks like

23  it's a clip that starts another time of day?

24  A    Uh-huh.

25  Q    In that first part of the video that we just watched, you

1  would agree with me that it didn't appear that there were

2  loadsful of cars or vans or other vehicles of voters being

3  brought in, at least at that time of the day --

4  A    Uh-huh.

5  Q    -- at that precinct?  You would agree?

6  A    Uh-huh.

7  Q    Would you say yes out loud so she can --

8  A    Yes.

9  Q    -- type it down?

10  A    Yes.

11  Q    Thank you.  And, in fact, it didn't look like there was a

12  lot of traffic at the precinct at that time?

13  A    Not a lot.

14  Q    And that would have been at the Manchester precinct?

15  A    Yes.

16  Q    The same place you had filmed earlier in the day.

17  A    Uh-huh.  Uh-huh.

18  Q    All right.  Now, you just watched -- you just watched this

19  yourself and we're replaying it so the jury can see it.

20  A    Uh-huh.

21  Q    Would you tell me where this part takes place?

22  A    That looks like it's at the Manchester precinct also.

23  Q    All right.  And do you recognize thus far in this very

24  fuzzy, still photo, do you recognize who any of these folks

25  are?

 1  A     The gentleman on the right with the hat is Gary "Ouchie"

 2  Jackson.

 3  Q     And we've talked about him already?

 4  A     Right.

 5           MS. HUGHES:  Okay.

 6           Ms. Poynter, if you don't mind.

 7       (Whereupon, Defendant Debra Morris Exhibit No. 1 continued

 8  to be played to the Court and jury, after which the following

 9  proceedings were had in open court.)

10  BY MS. HUGHES:

11  Q     Now, do you recognize that car?

12  A     No.

13  Q     Is this the same car that we've seen in the other parts of

14  the video?

15  A     No, I think -- Which one are you talking about?

16  Q     Either one, actually.

17  A     The left one, I don't think that's the same car that was

18  pulling in when we were talking about pulling in at Ella

19  Wagers's.

20  Q     Uh-huh.  Do you recognize who's driving that car?

21  A     No.

22  Q     What about the other car that we just saw in the back of

23  it?  Do you recognize who's driving that?

24  A     No, I didn't see anybody getting in it.

25           MS. HUGHES:  All right.

1          Let's keep going.

2          (Whereupon, Defendant Debra Morris Exhibit No. 1 continued

3    to be played to the Court and jury, after which the following

4    proceedings were had in open court.)

5    BY MS. HUGHES:

6    Q    So other than Mr. Jackson, did you recognize anyone in

7    that latter part of the video?

8    A    You mean besides Mr. Morris and the Ms. Pennington?

9    Q    The part that was in the bright daylight, the second half.

10   A    No.

11   Q    All right.

12   A    Those three people was it.

13   Q    With respect to the video that Mr. Parman showed you, and

14   not this part, because this part does not involve Green Street

15   or —

16   A    Nope.

17   Q    — Ella Wagers Way — Her driveway has got a name; right?

18   A    Uh-huh.

19   Q    Ella Wagers Drive or Way?

20   A    Yes.  Yes.

21   Q    Would you agree with me that that video that Mr. Parman

22   showed you and the jury, the cars that are going up to Ella

23   Wagers' house are going back and forth somewhere, but they're

24   not going to Bart Morris's house?  They don't leave Ella

25   Wagers' house to go —

1   A    The one car that went in did not, no.  It went to hers and

2   then came back and went the opposite direction.

3   Q    But you did testify that there were a number of cars going

4   up to Ella Wagers' —

5   A    There was several.

6   Q    — home that day.

7   A    There was several, yes.

8   Q    And, in fact, did you know — did you see in the video a

9   number of people sitting on Ms. Wagers' front porch in that

10  view that you took?

11  A    No, I don't think I saw anybody on the front porch.

12  Q    I'm not going to make us go —

13  A    It went fast, and I —

14  Q    All right.  Now, I believe Mr. Abell asked you about your

15  father and his relationship with Jennings White?

16  A    My uncle.

17  Q    Uncle, I mean.  I'm sorry, I apologize.

18  A    Yes.

19  Q    I'm sorry.  Your uncle is also, would you agree, a good

20  friend of J.E. Hensley?

21  A    J.D. Hensley.

22  Q    J.E.?

23  A    Oh, J.E. Hensley.  My uncle?

24  Q    Uh-huh.

25  A    I don't think they're very good friends.  I mean, they

1  know each other.  They're close to –– well, I'll say close to

2  the same age, but I wouldn't say they're very good friends.

3  Q    All right.  Now, I want to talk to you about the Ethics

4  Board for a moment.

5  A    Okay.  Okay.

6  Q    How often does the Ethics Board meet now that you are

7  mayor beginning in January of 2007?

8  A    We don't –– do not have an Ethics Board anymore.

9  Q    All right.  Was it disbanded in early 2007?

10 A    What we did was, it took us awhile, but we decided to go

11 with a regional.  The Cumberland Valley Area Development

12 District has a regional ethics board, and we placed one person

13 on that.

14 Q    Now, prior to your taking office, however, you were a

15 council person for two years?

16 A    Right.

17 Q    And in that capacity, do you know how often the Ethics

18 Board was supposed to meet?

19 A    No.  No.

20 Q    All right.  As soon as you became mayor ––

21 A    Uh–huh.

22 Q    –– and in that capacity, were you, in fact, notified by ––

23 Well, who was the chairperson of the Ethics Board or director?

24 A    Carl Hoskins.

25 Q    All right.  And as soon as you took office, were you

1   notified by Mr. Hoskins that there was an attendance problem?

2   A    I don't remember that he said that.  I know they had one

3   meeting, and I don't even know who was there, to tell you the

4   truth, but —

5        MR. PARMAN:  Your Honor, I'm going to object to the

6   hearsay.

7        THE COURT:  That's hearsay, sustained.

8        MS. HUGHES:  Okay.

9   BY MS. HUGHES:

10  Q    How long after you took office did the City change to a

11  regional Ethics Board?

12  A    We started working on it probably within a — especially

13  after Mr. Hoskins and — had resigned.  Probably right away.

14  Within two or three months, but it took us a period of time,

15  you know, to write letters and get that person on the — on the

16  board.  So I would say, just off the top of my head, maybe six

17  months maybe.  We had a lot going on at that time, so —

18  Q    I can imagine.  Did you appoint anyone during that six-

19  month period in your — other than to the regional board, did

20  you —

21  A    No.

22  Q    — appoint anyone to this board?

23  A    No.  No.

24        MS. HUGHES:  All right.

25        Your Honor, if I could have just a moment?

1          THE COURT:  Yes, ma'am.

2          MS. HUGHES:  Thank you.

3   BY MS. HUGHES:

4   Q    Mayor Lewis, do you recall in that latter part of the

5   video that I showed you that was taken later in the day --

6   A    Uh-huh.

7   Q    -- do you recall how Mr. Morris arrived?

8   A    Do I recall?  It didn't show it on the video.  No, I don't

9   recall.

10          MS. HUGHES:  Your Honor, may we approach for a

11   moment?

12          THE COURT:  Yes, ma'am.

13      (Whereupon, the following discussion was had between the

14   Court and counsel at the bench, out of the hearing of the

15   jury.)

16          MS. HUGHES:  Your Honor, on the video, of course, she

17   says Mr. Morris arrives on the scooter.  And so I think it is

18   probative because you're not hauling votes when you're

19   traveling on a scooter.

20          But more importantly than that, she does on the video

21   recognize Wanda White as one of the drivers of that car, and I

22   would like to establish that.  I want to --

23          THE COURT:  Okay.  Well, you've already played the

24   video in her presence, so it's already been -- not displayed,

25   but she's already had an opportunity to view it and listen to

1   it for the purpose of refreshing her recollection.  I don't

2   think you're offering the tape to show that he was hauling

3   votes, are you?

4           MS. HUGHES:  No, I'm certainly not.

5           THE COURT:  Well, then, so it wouldn't be admissible

6   to show — to disprove something that hasn't attempted to be

7   proven by the government.

8           With respect to the second part of that, the next —

9   or the lighted portion of the video, you can ask her if she

10  recalls whether Wanda White was in one of the vehicles.  But

11  she's already listened to it, so at that point, if you're

12  asking about refreshing her recollection, you've already shown

13  her the tape and she's listened to it, so she either remembers

14  it or she doesn't remember it.

15          MS. HUGHES:  So I can't do it as a prior inconsistent

16  statement?

17          THE COURT:  No.

18          MS. HUGHES:  Okay.

19          THE COURT:  Because it's not a statement made under

20  oath.

21          MS. HUGHES:  Right.

22          THE COURT:  You can ask her if she recalls whether

23  Wanda White was in one of the cars.  I don't know if it's the

24  one on the left or one on the right, but you can ask her if she

25  remembers that.

1        MS. HUGHES:  Can I refresh her again that she knows?

2        THE COURT:  No, you've already refreshed one time.

3        MS. HUGHES:  It shocks me that I got that answer.

4        THE COURT:  Thank you.

5     (Whereupon, the following proceedings continued in open

6  court.)

7        THE COURT:  All right.  Thank you, Counsel.

8        You may continue.

9        MS. HUGHES:  Thank you, Your Honor.

10 BY MS. HUGHES:

11 Q    Mayor Lewis, that last — the very last part of the video

12 that I asked you to watch with me —

13 A    Uh-huh.

14 Q    — do you — do you recall seeing Wanda White in any

15 portion of that video?

16 A    No.

17        THE COURT:  All right.

18        MS. HUGHES:  Your Honor I would also ask — move to

19 introduce the still photo that she identified that I had on the

20 overhead projector.

21        THE COURT:  All right.

22        MS. HUGHES:  And that would be Debra Morris No. 2.

23        THE COURT:  Yes, ma'am.

24        Any objection to the admissibility of the still

25 photo?

1           MR. PARMAN:  No, Your Honor.

2           THE COURT:  Debra Morris Exhibit 2 will be admitted

3  at this time.

4           MS. HUGHES:  Thank you, Your Honor.  I'll pass the

5  witness.

6           THE COURT:  Thank you.

7           And, Mr. Simons.

8           MR. SIMONS:  Thank you.

9                      CROSS—EXAMINATION

10 BY MR. SIMONS:

11 Q    Mayor Lewis, my name is Dan Simons, I represent Stanley

12 Bowling.

13 A    Uh-huh.

14 Q    I couldn't see you very well over there for the screen.

15 A    Sorry.

16 Q    I don't know who you —— you know Mr. Bowling?

17 A    Yes.  Yes.

18 Q    He's seated right over there?

19 A    Yes.

20 Q    I think I only have one or two brief questions for you.

21 A    Okay.

22 Q    When we watched that video ——

23 A    Uh-huh.

24 Q    —— you identified a person known as Ronnie Hacker?

25 A    Ronald, yes.

1  Q    And you knew that he was related in some fashion —

2  A    Yes.

3  Q    — to my client, Stanley Bowling?

4  A    Yes.

5  Q    And with the indulgence of the Court, you thought it was

6  his brother?

7  A    Yeah.  I wasn't for sure, yes, but —

8  Q    He is, in fact, his half brother; okay?

9  A    Okay.

10 Q    That's the only time we saw him in the video?

11 A    Yes.

12 Q    And is it the only time you saw him that day?

13 A    Possibly.  I'm not — I'm not sure.  Yes.

14 Q    Ronnie lives in the Manchester voting precinct —

15 A    Yes.

16 Q    — does he not?

17 A    Yes.

18 Q    And that would be the place he would go to vote?

19 A    Uh-huh.

20 Q    Okay.  Now, I want to ask you, a few weeks ago I — Well,

21 let me start it this way:  We've put some — introduced a

22 couple of exhibits, the first one was M1.  It's probably up

23 there in front of you.

24 A    Well —

25 Q    Okay?

 1  A    Yes.

 2  Q    Do you see it?

 3  A    Uh-huh.

 4  Q    I'm not going to ask you to go through it meticulously --

 5  A    Right.

 6  Q    -- but there are a number of cancelled checks, those are

 7  checks written on the city account, City of Manchester --

 8  A    Yes.

 9  Q    -- to B and B Excavating.

10  A    Uh-huh.

11  Q    Is that a fair statement?

12  A    Yes.

13  Q    And there are billing invoices in there --

14  A    Uh-huh.

15  Q    -- from the contractor as certain stages in the contract

16  are reached; correct?

17  A    Uh-huh.

18  Q    And it details payments on City contracts that my client,

19  Stanley Bowling, had through his company with the City --

20  A    Yes.

21  Q    -- is that right?

22  A    Yes.

23  Q    To your knowledge, is there anyplace where the numbers

24  don't add up or is there any problem with the addition or the

25  billings or the charges?

1  A    Not to my knowledge.  I didn't look through that, but —

2  Q    Okay.  That's fine.  Now, a few weeks ago, I directed a

3  letter, and I think I may have directed it to you, but I may

4  have directed it to the City Attorney.

5  A    Uh-huh.

6  Q    Is that Mr. Allen Roberts?

7  A    Allen Roberts, yes.

8  Q    And it was an open records request, and what I had asked

9  for were those?

10  A    Uh-huh.

11  Q    And I also asked for all of the contracts, copies of

12  contracts that the City may have entered into with —

13        MR. PARMAN:  Your Honor, I'm going to object to the

14  relevance.

15        THE COURT:  Counsel, you — yes, you need to come up,

16  we'll need to talk about this.

17     (Whereupon, the following discussion was had between the

18  Court and counsel at the bench, out of the hearing of the

19  jury.)

20        THE COURT:  Open records request to the City?

21        MR. SIMONS:  Yeah.  Well, I just want to know where

22  the contracts are, and that's what I was going to ask.  The

23  City didn't have them.

24        MR. SMITH:  He's contacted our office in letters,

25  acknowledged that — we had a conversation where I advised him

1  we have those, they're available for his inspection, he set an

2  appointment for March the 5th.  The only reason to bring this

3  in from this witness is to try to bring in a collateral matter

4  that is irrelevant, which I believe is impermissible under the

5  rules.

6          MR. SIMONS:  One is — I would disagree with

7  Mr. Smith's characterization of it.  I didn't know you never

8  told me you had the contracts.  You told me I could come back

9  and look at —

10         MR. SMITH:  Well, you acknowledge in your letter and

11  I think you sent that to me and Mr. Parman's wife, I think, got

12  a phone call from your office as well this week.  We've had

13  numerous calls about that, yes.

14         MR. SIMONS:  And are you telling me that you've told

15  me that the contracts were within your possession?

16         MR. SMITH:  I'm saying that this inquiry is

17  irrelevant, that we have cooperated with you and opened our

18  office up for you to inspect as the rules require.  It's

19  irrelevant, it's a collateral matter, it's impermissible under

20  the rules to examine the mayor about your dissatisfaction about

21  how your open records request was handled.

22         MR. SIMONS:  I wasn't trying to say that I was

23  dissatisfied with the handling of the request at all, Your

24  Honor.  What I wanted to do was get to the contracts, see where

25  they were.  It's been brought out on direct — she was asked

1  about the bidding process and the bidding laws and how you bid

2  these contracts.  Surely it's open game for me to explore what

3  contracts were awarded and how they came about.  I can't

4  imagine that's irrelevant.

5          THE COURT:  Well, every contract, I don't see the

6  relevance of it either.  Sustain the objection.

7          MR. SIMONS:  Well, my next line of questioning would

8  be directed to how the City lets out bids, such as B and B

9  Excavating does.

10         THE COURT:  Okay.

11         MR. SMITH:  That's apples and oranges.  I object.

12         MR. SIMONS:  Well, she was on the council during the

13 time that these contracts were entered.  I assume I can ask her

14 about that.

15         THE COURT:  That's a different issue.  Stick with one

16 at a time.

17         MR. SIMONS:  Okay.  I will not — I will not bring

18 up — the open records request was just trying to see where the

19 contracts were.  I'm not accusing Mr. Smith of anything

20 nefarious in any way, I did not realize you had those, Steve.

21         THE COURT:  Okay.  We've gotten past that.

22         MR. SIMONS:  I'll move away from the open records

23 request and I'll move to something else.

24         THE COURT:  All right.  Thank you.

25      (Whereupon, the following proceedings continued in open

 1 | court.)
 2 |           THE COURT:  All right.  Thank you, Counsel.
 3 |           You may continue.
 4 |           MR. SIMONS:  Thank you, Your Honor.
 5 | BY MR. SIMONS:
 6 | Q    Mayor Lewis, you were elected to the city council in 2004?
 7 | A    Elected, yes.
 8 | Q    And tough race, tough thing to do to get in, but you did
 9 | it; correct?
10 | A    Pardon me?
11 | Q    It was a tough race, tough thing to do, but you made it;
12 | correct?
13 | A    Yeah, made it.
14 | Q    And there are a number of contracts that my client or his
15 | company had with the City that were entered between 2004 and
16 | 2006.  Are you familiar with those?
17 | A    Possibly some of them.  Some of them we knew about as
18 | council members and some we did not.
19 | Q    Okay.  And did you familiarize yourself with B and B's
20 | work for the City?
21 | A    As in?
22 | Q    The quality of the work.
23 | A    No.
24 | Q    Okay.
25 | A    No.

1  Q    Was there any — were the contracts approved by the city

2  council at regularly held meetings?

3  A    Some; some were, some were not.  If you're talking about

4  some of the things here that they worked on, pump stations and

5  that sort of thing, that never comes in front of the city

6  council.

7  Q    Oh, it does not?

8  A    No.

9  Q    Okay.  On the projects that B and B did between 2004 and

10  2006, has the City had any maintenance issues with them?

11  A    We have all kinds of maintenance issues, daily maintenance

12  issues.

13  Q    Well, are you aware of any that have occurred on the

14  projects that my client's company did for the City?

15  A    Oh, we have water line breaks and sewer line breaks.  I

16  couldn't say whether it was, you know, for faulty work, I

17  guess, if that's where you're going, or not.  But that happens

18  daily.

19  Q    I was hoping to go the other way.

20  A    Oh.  Oh, good work, I'm sorry.

21  Q    Does the City from time to time let contracts now for

22  excavating sewer work, water work, et cetera?

23  A    No.

24  Q    Is it all done now by City employees?

25  A    We do it.  We do it all now.

1  Q    What about — what about larger projects like Clay

2  Pipeline did, multimillion-dollar projects?

3  A    We've not had any of those since I've been there.

4  Q    So since Mr. Bowling's company has finished and since

5  you've been mayor —

6  A    Uh-huh.

7  Q    — there haven't been any major projects needed by the

8  City of Manchester, either sewer or water line?

9  A    We've done several — a couple of hundred thousand dollar

10  jobs so far, yes.

11  Q    All right.  Okay.  And you've been mayor now since January

12  of '07?

13  A    Right.

14  Q    And just concluded your third year?

15  A    Yes.

16         MR. SIMONS:  Thank you.  I think that's all I have.

17         THE WITNESS:  Thank you.

18         THE COURT:  Okay.  Thank you, Counsel.

19         Mr. Parman, any additional questions?

20         MR. PARMAN:  Yes, Your Honor.

21         THE COURT:  All right.

22                    REDIRECT EXAMINATION

23  BY MR. PARMAN:

24  Q    Ms. Lewis, a couple of areas I want to follow up on.

25         First of all, you were asked a lot of questions about

1  trash.  I assume you recall those?

2  A    Yes.

3  Q    And there in an exhibit, M4, which is the big exhibit that

4  you were asked about ––

5  A    M4 or M3?

6  Q    It may be M3, I apologize.

7  A    This one?

8  Q    Yes.

9  A    Yeah.

10 Q    If you know, how is payment for trash collection

11 calculated?  Is that by the yard or I believe you spoke of

12 the ––

13 A    The ton.

14 Q    The yard or the ton.

15 A    Uh-huh.  These are all, I think, by the –– by the ton.

16 No, sorry, let me look at this before I speak.  These are all

17 by the yard.  Let me look back and just make sure they all go

18 that way, because it changes.  And then it goes to –– they put

19 it a lot of times just in pounds, so ––

20 Q    And when you're looking through those, those are

21 individual payments; is that correct?

22 A    Uh-huh.

23 Q    And is the exact same number of yards of trash on all of

24 those payments or does it vary?

25 A    It varies.

1  Q     Is that based, I guess, upon however much trash was in

2  each individual truck?

3  A     Right.  Right.

4  Q     Mr. Simons asked you about while you were on city council

5  about contracts and contracts being approved.  While you were

6  on the council or afterwards, did you become aware that there

7  were many contracts through Mr. Bowling's company that were not

8  approved?

9  A     Yes.  I really didn't know some of this, but there was

10 then -- like, if a sewer pump station went bad or tore up or

11 something to that effect, I assumed that City maintenance

12 workers did that, because that's what we do now.  But when we

13 started looking through some of these things, no, that was -- a

14 lot of times they got Mr. Bowling's company to repair those.

15 Q     That was without the approval of the city council?

16 A     No, that didn't have to be brought in front of the

17 council.

18 Q     Now, when you ran for city council in 2004, did Ouchie

19 Jackson also run for city council at that time?

20 A     Yes.

21 Q     And was he an incumbent at that time?

22 A     I'm not sure.  I think he was.

23 Q     And did he win reelection?

24 A     No.

25 Q     Are you aware of whether he had the support of Al Man

1   Stivers during that election?

2   A    I had heard early on that they did, but then I think there

3   was an altercation between the two maybe a week or two weeks or

4   somewhere around that time before the election.

5   Q    And then Mr. Stivers withdraws his support?

6   A    Well, I'm assuming.  That's what I heard, because they

7   kind of got in a fight, is what we'll say.

8   Q    You were also asked questions about the police chief

9   position that Mike Bishop was vying for, and I believe Todd

10  Roberts was mentioned.  Was Jeff Culver also a candidate to be

11  elected as police chief, or not elected —

12  A    I guess in some people's minds, yes, he should have been

13  considered with — maybe with Todd if we were going to have to

14  choose two to go for that, because he's been there the largest

15  amount of time.

16  Q    So there was support for Mr. Culver to have that position?

17  A    Uh-huh.

18  Q    And did you feel as if he was probably the most qualified

19  candidate?

20  A    I thought he was a good candidate.

21  Q    Was Mike Bishop your choice for police chief at the time?

22  A    No.

23  Q    Was there an official city council meeting when the police

24  chief was selected?

25  A    Yes.

1  Q    And are you aware of whether or not Doug Adams was present

2  during that meeting?

3  A    I think he was at that meeting.  There was a lot of heated

4  meetings when some of those things happened, but I think he was

5  there at that meeting.

6  Q    You were also asked about how busy Green Street was and

7  sometimes it is and sometimes it isn't.  How busy is Green

8  Street on an election day?

9  A    Back then on an election day?  Extremely, extremely busy.

10  You could –– if you could notice Green Street, it's only like

11  one–and–a–half car lengths, it's really hard kinda for two to

12  pass and it would become extremely dangerous down there when it

13  would –– when two people would meet.

14  Q    How busy is it now on Green Street on election day?

15  A    It's kinda quiet.

16  Q    You were also asked about a disagreement that you had

17  with Cletus Maricle regarding the tearing down of the old

18  courthouse.

19  A    Uh–huh.

20  Q    And you were asked whether or not it was a legal process

21  to your knowledge?

22  A    Uh–huh.

23  Q    Are you aware of any other incentive that Mr. Maricle

24  would have to have the courthouse torn down?

25  A    Not right off the top of my head, no.

1   Q    Do you know if he owns any adjacent property to the

2   courthouse?

3   A    Yes.

4   Q    He does?

5   A    Yes.

6   Q    Does it immediately abut up to the old courthouse?

7   A    No, it is next to a city street.  Our courthouse has a

8   street that goes all the way around it.  So it's across the

9   street from the courthouse.

10              MR. PARMAN:  If I could have just a moment, Your

11   Honor.

12              THE COURT:  Yes.

13              MR. PARMAN:  That's all I have, Your Honor.

14              THE COURT:  All right.  Thank you.

15              Mr. Hoskins, any -- Go ahead.  Yes, sir.

16              MR. HOSKINS:  If I could have just a moment.

17              THE COURT:  Yes, sir, go ahead.

18              MR. HOSKINS:  No questions, Your Honor.

19              THE COURT:  All right.  Thank you.

20              Mr. Westberry?

21              MR. WESTBERRY:  Very brief.

22              THE COURT:  Yes, sir.

23              MR. WESTBERRY:  Thank you.

24                       RECROSS-EXAMINATION

25   BY MR. WESTBERRY:

1   Q    Hello again.

2   A    Hi.

3   Q    I just wanted to ask you about that city council meeting

4   that you talked about a minute ago.

5   A    Uh-huh.

6   Q    You said Doug Adams may have been there?

7   A    Uh-huh.

8   Q    That's your best recollection?

9   A    Yeah.  I think he was, yes.

10  Q    Do you have any recollection of him getting up and saying

11  anything at all?

12  A    No.

13  Q    Would Doug White, Daugh White, have considered Jeff Culver

14  as chief of police in your opinion?

15  A    No.

16  Q    And did Jeff Culver had more tenure than Lonnie Napier or

17  Claude Davis?

18  A    Lonnie Napier had a little bit more than Jeff.

19  Q    Right.  And Mr. Napier was on the police department at

20  that time, too; is that correct?

21  A    Yes.

22  Q    Claude Davis —

23  A    Claude Davis is a little bit — maybe a year less than

24  Jeff Culver.  They're close to the same amount of time.

25          MR. WESTBERRY:  Okay.  Thank you, ma'am, very much.

1         THE WITNESS:  Uh-huh.  Thank you.

2         THE COURT:  Mr. White.

3         MR. WHITE:  Excuse me, Your Honor, no further

4    questions.

5         THE COURT:  Anyone else?

6         MR. ABELL:  Judge, I just have a couple I'll ask from

7    here.

8         THE COURT:  Yes, sir, that's fine.

9                   RECROSS-EXAMINATION

10   BY MR. ABELL:

11   Q    Mayor Lewis, you were asked a question about J.E. Hensley?

12   A    Uh-huh.

13   Q    J.E. Hensley and your father are first cousins?

14   A    And my father, yes.

15   Q    And in addition to being first cousins, Mr. Hensley and

16   your father are also very good friends?

17   A    I would say they're as close as first cousins can be, yes.

18        MR. ABELL:  That's it.  Thank you.

19        THE COURT:  Thank you.

20        Anyone else?

21        MR. GILBERT:  I don't have anything else.

22        THE COURT:  One question.

23        MS. HUGHES:  Well, it's actually two, but it's on a

24   Post-it note.

25        THE COURT:  All right.

1          MS. HUGHES:  And if I may remain here?

2          THE COURT:  Yes, ma'am.

3                    RECROSS-EXAMINATION

4     BY MS. HUGHES:

5     Q    Mayor Lewis, you say that Green Street is extremely busy

6     on — or used to be extremely busy on election day; right?

7     A    Yes.

8     Q    Well, isn't that what we just saw, Green Street on

9     election day?  Isn't that what you filmed in your video?

10    A    Uh-huh.

11    Q    And would you say that was extremely busy?

12    A    I'd say that was — yes.

13         MS. HUGHES:  Okay.  Thank you.

14         MR. SIMONS:  Your Honor, I have nothing further.

15         THE COURT:  All right.

16         Anything else?

17         MR. PARMAN:  No, Your Honor.  Thank you.

18         THE COURT:  All right.  Thank you.  You can leave

19    those documents there, ma'am, and you may step down, you're

20    finally excused.

21         THE WITNESS:  Okay.

22         THE COURT:  All right.  Ladies and gentlemen, we will

23    recess for the evening.  We'll be in recess until Monday

24    morning at 9:00.  I do want to again remind you as we recess of

25    the admonition that I have given to you several times.  Of

1   course, when we are in recess, you should not discuss the case

2   with anyone.  That would include friends, family members, and

3   others that you may have contact with over the weekend.  Also,

4   you should not allow anyone to ever approach you to discuss the

5   case, and if anyone should attempt to do that, then you should

6   report that to the Court promptly.

7           Don't speak with any of the parties, obviously, the

8   lawyers or any witnesses in the case.  Don't read, watch, or

9   listen to any accounts of the case if there should be any.

10  Don't attempt to perform any type of research or do any

11  investigation on your own.  And, of course, don't make up your

12  mind about the matter until it is finally submitted to you.

13          And with that admonition, the jury will be excused

14  until 9:00 a.m. on Monday morning.

15      (Whereupon, the jury retired from the courtroom, after

16  which the following proceedings were had in open court.)

17          THE COURT:  Thank you.

18          Any matters to take up outside the presence of the

19  jury?

20          MS. HUGHES:  Just the logistics, Your Honor, of —

21          THE COURT:  Why don't you all have a seat while we

22  talk about that.

23          MS. HUGHES:  As we said the last time the jury wasn't

24  here, I have moved to introduce this additional amount of the

25  video.  In the absence of the jury, we've played that video

1    with the sound, so I think that needs to be in the record.  But

2    the one I've actually introduced into evidence, I guess is the

3    one without the sound.  My copy of the video is now in

4    Ms. Poynter's possession, and I guess I need to figure out the

5    logistics of burning that on two separate disks is what I'm

6    going to need to do.  And I don't know whether or how to go

7    about that, and I would like some direction from the Court.

8              THE COURT:  All right.  What we will do is I'll allow

9    you to withdraw the exhibit that has been introduced that's now

10   in the possession of the United States.  You'll be able to

11   withdraw that until Monday.  On Monday, you will be able to

12   substitute two copies, you'll be able to maintain your

13   original, you will be able to substitute one copy, it will be

14   the Court exhibit — I'm not sure, you'll have to make these

15   yourself, these CDs.

16             MS. HUGHES:  I think I can probably do that, but they

17   will not be beautifully labeled.

18             THE COURT:  Well, the question becomes whether one

19   will have sound and one will not have sound.

20             MS. HUGHES:  I think I can do that.

21             THE COURT:  All right.  The document that will not

22   have sound will be substituted as Debra Morris Exhibit No. 1.

23   The United States will need to review it —

24             MS. HUGHES:  Right.

25             THE COURT:  — before it's given to the Clerk to make

1    sure that there are no differences.  Debra Morris Exhibit 1A
2    will be a Court exhibit, and that will be the exhibit that was
3    used to refresh memory and that will have the sound.  So that
4    will be 1A.  That will only have — that will only be a Court
5    exhibit, but that will be for the record as well.  So we'll
6    have 1 and 1A.  Make sure the United States has a chance to
7    review those before they're given to the Clerk, but the Court
8    will allow you to withdraw the original exhibit that has been
9    admitted into evidence so you can make those copies.

10          MS. HUGHES:  Perfect.  Thank you, Your Honor.

11          THE COURT:  And let's — Mr. Abell.

12          MR. ABELL:  Judge, a scheduling question.

13          THE COURT:  Yes, sir.

14          MR. ABELL:  I need to make some representations to
15   other judges in other courts as to — it seems to me I need to
16   tell them that I'm going to — I anticipate being tied up with
17   this matter at least through the week concluding March 26th,
18   although I invite being told otherwise.

19          THE COURT:  I think that's safe.  I think that's
20   safe.  That's what I'm counting on.

21          In the event that we — it appears that we're
22   proceeding more quickly than that.  Of course, I do ask
23   periodically for updates from the parties, and if it looks like
24   that the United States is moving along more quickly, then,
25   Mr. Smith, if you could advise me of that.  If we need to make

1  other arrangements beyond March, then we can -- of course,

2  Mr. Smith doesn't know the witnesses that the defense will be

3  calling, so -- but I'm assuming the government has at least an

4  additional two weeks of proof, Mr. Smith.  Is that a fair

5  assumption?

6          MR. SMITH:  We're going way behind my schedule today.

7  I will say that.  I had lots of witnesses I thought we would

8  get through today.  So if today's any indication, this trial is

9  going to be a lot longer than I expected, so --

10          THE COURT:  All right.

11          MR. SMITH:  -- we could be here until Derby Day.

12          THE COURT:  Well, I know, Counsel -- I know that

13  there's a little bit of frustration when we don't move as

14  quickly as possible and there have been some witnesses that

15  have been asked the same question many, many, many, many times,

16  over and over.  Sometimes I understand that attorneys take

17  their verbal laxatives before they come into the courtroom and

18  that's to be expected.  So we'll make every effort to move the

19  case along but also give all the parties a chance to ask

20  relevant questions in the case.  So we'll do our best.

21          Anything else we can take up before we recess for the

22  weekend?

23      (No response.)

24          THE COURT:  No?  All right.  We will be in recess

25  until 9:00 a.m. on Monday morning.

1    (Whereupon, the proceedings were adjourned for the day at

2    4:40 p.m., to be reconvened on the following Monday as ordered

3    by the Court.)

4                    (Proceedings concluded at 4:40 p.m.)

5

6                    C E R T I F I C A T E

7    I, Cynthia A. Oakes, certify that the foregoing is a

8    correct transcript from the record of proceedings in the

9    above-entitled matter.

10

11   3/4/2010                    s/CYNTHIA A. OAKES
        DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR

12

13

14

15

16                    I N D E X

17                                                    PAGE

18   Testimony of CARMEN WEBB LEWIS:
         Direct Examination by Mr. Parman:              4
19       Cross-Examination by Mr. Hoskins:             58
         Cross-Examination by Mr. Westberry:           61
20       Cross-Examination by Mr. White:               68
         Cross-Examination by Mr. Abell:               73
21       Cross-Examination by Mr.Baldani:              75
         Cross-Examination by Mr. Gilbert:             79
22       Cross-Examination by Ms. Hughes:              87
         Cross-Examination by Mr. Simons:             120
23       Redirect Examination by Mr. Parman:          128
         Recross-Examination by Mr. Westberry:        133
24       Recross-Examination by Mr. Abell:            135
         Recross-Examination by Ms. Hughes:           136

25

1

2

E X H I B I T S

3

4   Government's
    Exhibit No.                    Identified                    Page
                                                               Admitted
5
      M1                              39                          40
6     M2                              40                          41
      M3                              42                          42
7     M4                              43                          43
      M5                              44                          44
8     M6                              45                          46
      M7                              47                          47
9     V1                              14                          15

10
    Defendant
11  Debra Morris                                                Page
    Exhibit No.                    Identified                 Admitted
12
       1                             106                         108
13    *1A                            139                          *
       2                              97                         120
14
    *Court Exhibit 2
15

16

17

18

19

20

21

22

23

24

25