United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 1, 2010 |
| DOUGLAS C. ADAMS | ) 8:38 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 15-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                 JASON D. PARMAN, ESQ.

On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:          MARTIN S. PINALES, ESQ.

On behalf of the Defendant       BENNETT E. BAYER, ESQ.
Douglas C. Adams:                R. KENT WESTBERRY, ESQ.
                                 KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant       T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant       ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:              R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant       JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant       ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, Kentucky  40741
 5

 6   On behalf of the Defendant     DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:        107 East First Street
 7                                   Corbin, Kentucky  40701

 8                                   MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
 9                                   Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant     BENNETT E. BAYER, ESQ.
     Douglas C. Adams:              106 West Vine Street
12                                   Suite 800
                                     Lexington, Kentucky  40507
13
                                     R. KENT WESTBERRY, ESQ.
14                                   KRISTEN N. LOGAN, ESQ.
                                     220 West Main Street
15                                   Suite 1900
                                     Louisville, Kentucky  40202
16

17   On behalf of the Defendant     T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:           133 West Short Street
18                                   Lexington, Kentucky  40507

19
20   On behalf of the Defendant     ROBERT L. ABELL, ESQ.
     William E. Stivers:            120 North Upper Street
                                     Lexington, Kentucky  40507
21

22   On behalf of the Defendant     RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:            R. TUCKER RICHARDSON III, ESQ.
23                                   300 West Short Street
                                     Lexington, Kentucky  40507
24

25
```

```
 1   On behalf of the Defendant        JERRY W. GILBERT, ESQ.
     William B. Morris:                212 North Second Street
 2                                     Richmond, Kentucky  40475

 3
     On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
 4   Debra L. Morris:                  201 West Short Street
                                       Lexington, Kentucky  40507
 5

 6   On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                  116 West Main Street
 7                                     Suite 2A
                                       Richmond, Kentucky  40475
 8

 9   Court Reporter:                   CYNTHIA A. OAKES, CRR
                                       Official Court Reporter
10                                     United States District Court
                                       560 Athens Boonesboro Road
11                                     Winchester, Kentucky  40391
                                       (859) 983-4346
12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1          (Whereupon, the following proceedings were had outside the

2    presence of the jury.)

3               THE COURT:  All right.  Thank you.

4               The record will reflect that the parties and counsel

5    are present.  The jury is not present at this time.

6               Mr. Smith, at the end of the day on Friday, you had

7    raised an issue with the Court in terms of the case proceeding

8    a little slower than expected and expressed a little

9    frustration with that, and I certainly understand your

10   frustration.  I've gone back and looked at the witnesses that

11   have testified and gone over their cross-examination, and it

12   does appear that I have been a little bit lax in allowing

13   cross-examination beyond areas that I probably should have

14   allowed, and I want to advise the parties I'm going to tighten

15   the matter up going forward.  I want to refer the parties to a

16   couple of rules.

17              First, Rule 611, the scope of cross-examination,

18   cross-examination should be limited to the subject matter of

19   the direct examinations and matters affecting credibility of

20   the witnesses.  And if proper objection is made, I'll certainly

21   limit the scope of the examination to those areas.

22              Also, we've discussed several times Rule 612 and 613.

23   612 is the rule relating to using a writing to refresh memory

24   and 613 is essentially impeachment by inconsistent statements.

25              I have allowed some of the defendants to use Rule 612

5

1   improperly in an attempt to impeach a witness with a statement

2   that's not the witness's statement, specifically FBI 302s, and

3   to the extent that I believe that's the intent of the party,

4   either to indirectly offer into evidence the contents of a 302

5   or to impeach a witness with a 302 that's not the –– obviously

6   not the witness's –– stating the witness hasn't affirmed the

7   writing, that would be improper and I will be limiting the use

8   of that tactic going forward.

9           Also, I want to remind the parties of Rule 608 and

10  609.  608 deals with opinion and reputation evidence, evidence

11  of character.  Subsection (a) deals with general reputation,

12  subsection (b) deals with specific instances of conduct.  And

13  I've allowed the defendants to inquire into matters that go

14  beyond those areas with a number of the witnesses offered by

15  the United States.

16          And also Rule 609, impeachment by evidence of a crime

17  or of other actions involving dishonesty or false statements,

18  and I will be limiting the use of –– or applying the rules

19  going forward with respect to efforts to impeach not even

20  really witnesses but others that are not on the witness stand

21  with –– or under those rules.

22          All right.  Let me see if there are any other matters

23  that the parties wish to take up.  The jury is not –– will not

24  be coming in until 9:00, but let me see if there are other

25  issues that we need to take up.

1          MR. BALDANI:  I've got one, Judge.

2          THE COURT:  Mr. Baldani.

3          MR. BALDANI:  Your Honor, there's a — we've got the

4   hearing scheduled with Charles Marcum on his motion to quash —

5          THE COURT:  Yes, sir.

6          MR. BALDANI:  — and we've been discussing it.  We

7   very well may just withdraw our subpoena.  I can let you know

8   perhaps — we'll make a final answer at lunch today if that

9   would be helpful.

10          THE COURT:  That will be fine.  We can advise the

11   counsel.  I believe it's Mr. Storm.

12          MR. BALDANI:  Right, we've been in contact with him.

13          THE COURT:  All right.

14          MR. BALDANI:  But there's a good chance since he may

15   have a legitimate Fifth Amendment claim, we may just withdraw

16   it and obviate the need for that hearing.  So we'll let you

17   know hopefully for sure today.

18          THE COURT:  All right.  That would be appreciated.

19          MR. SIMONS:  Your Honor, I have two.

20          THE COURT:  Mr. Simons, yes, sir.

21          MR. SIMONS:  The first thing is I had issued a

22   subpoena for Larry Cann of Cann-Tech to be here at 9:00 a.m.

23   this morning.  He's bringing some documents with him.  I just

24   wanted to acknowledge his appearance.  I don't know, I don't

25   see him here, but —

7

1                THE COURT:  All right.

2                MR. SIMONS:  — I said 9:00 in the subpoena.

3                Secondly, we get moving along in the trial and I'm

4     trying to do some planning.  I have assumed, perhaps wrongly,

5     that upon completion of the government's proof we will follow

6     the order of proof with Defendant Maricle and I would be last?

7                THE COURT:  Yes, sir.

8                MR. SIMONS:  Is that correct?

9                THE COURT:  Yes, sir.

10               MR. DOTSON:  And what would the order of argument be

11    then on conclusion?

12               THE COURT:  In terms of closing arguments?

13               MR. SIMONS:  Yes.

14               THE COURT:  Same.

15               MR. SIMONS:  The same.

16               THE COURT:  The order in which the individuals are

17    listed in the indictment would be the order we follow.

18               MR. SIMONS:  Thank you.

19               THE COURT:  All right.  If you would like me to

20    recognize the witness, of course, if he gets here when the jury

21    is here, then we'll need to do it at the break, but you'll need

22    to remind me of that if he's not here before the jury is

23    brought in.

24               MR. SIMONS:  If he arrives early, I can tell the

25    Marshal.

1          THE COURT:  Yes, that will be fine.  We'll go ahead
2  and — we'll go ahead and do that in advance.

3          Ms. Hughes?

4          MS. HUGHES:  I had little more difficulty than I
5  expected.  So with the Court's permission, I'd like to — I'm
6  going to consult with Ms. Poynter during our break just to see
7  if I can work that out with copying the video.  I do still have
8  the original in my possession.

9          THE COURT:  You have the original.

10         MS. HUGHES:  So if worse comes to worse, we'll put
11  that into evidence, but I'm still working on it.

12         THE COURT:  All right.  Thank you.

13         Mr. Smith?

14         MR. SMITH:  Your Honor, I have a suggestion on that
15  issue.  If my understanding is correct, the jury, if they ask
16  to see that video again, would be played in court.  Therefore,
17  it would obviate the necessity to eliminate the audio portion.
18  We can just mute that function on our player when it is played
19  again, if it's played again.

20         THE COURT:  Yeah, that would — that's correct.  So
21  it may not be necessary to make those two recordings.

22         MS. HUGHES:  Right.

23         THE COURT:  All right.  Thank you.

24         Mr. Smith, anything on behalf of the government?

25         MR. SMITH:  No, Your Honor.

```
1              THE COURT:  All right.

2              MR. BALDANI:  Judge, I have one other thing.

3              THE COURT:  Yes, sir.

4              MR. BALDANI:  I'm here at 8:30 each morning.

5    Mr. Richardson has to be -- when his wife flies for Delta, he

6    has to drop his kids off.  I'm here to handle any legal issues,

7    but I just wanted to let you know as far as what you had to say

8    this morning, I'll make sure he reads the transcript and is

9    aware of just what you said about those rules of evidence.  And

10   I make that point because I had let you know tomorrow afternoon

11   I'm going to be in a suppression hearing with Judge Coffman,

12   but I wanted to make it clear that even though he's not here

13   because he has to take his kids to school, I'll make sure he

14   knows just what you said about the way things are going to be

15   progressing and those rules; okay?

16             THE COURT:  All right.  I appreciate that.  Thank

17   you.

18             Any other issues to take up?

19        (No response.)

20             THE COURT:  All right.  If the witness gets here,

21   you'll alert me.  Otherwise, we'll be in recess until 9:00.

22        (Whereupon, a short recess was had, after which the

23   following proceedings were had outside the presence of the

24   jury.)

25             THE COURT:  Thank you.
```

1    The record will again reflect the jury is not

2  present.

3    Mr. Simons, the witness you would like to have the

4  Court recognize is present; is that correct?

5    MR. SIMONS:  Yes, Your Honor.  It's Larry Cann, he's

6  seated in the audience.

7    THE COURT:  If he could come up to the podium for

8  just a moment.

9    MR. SIMONS:  If Your Honor please, he also has some

10 documents he's produced pursuant to the subpoena.  If I could

11 take those and copy them?

12   THE COURT:  Yes, you go ahead and get those documents

13 from the witness at this time.

14   Sir, could you state your name, please?

15   MR. CANN:  Larry Cann, from Cann-Tech.

16   THE COURT:  How do you spell your last name?

17   MR. CANN:  C-a-n-n.

18   THE COURT:  Mr. Cann, you're appearing here today

19 pursuant to subpoena that's been served upon you by one of the

20 parties.  The way we're going to proceed is we're going to

21 allow you to return at a later date in the trial so you don't

22 have to wait here in court until the defendants commence their

23 case.  What we'll do is we'll have the Clerk administer an oath

24 to you to recognize that you would be obligated to appear.

25   So, Madam Clerk, at this time, if you could please

1  administer that oath.

2          THE CLERK:  Yes, Your Honor.

3          Please raise your right hand.

4      (Whereupon, Mr. Cann complied with the request of the

5  Clerk.)

6          THE CLERK:  Do you acknowledge yourself to be

7  indebted to the United States of America in the penal sum of

8  $500 to be void, however, upon your appearance in this court on

9  further direction of the Court to testify on behalf of the

10  defendant, Stanley Bowling, in the case of United States of

11  America against Russell Cletus Maricle, et al., do you so swear

12  or affirm?

13          MR. CANN:  I do.

14          THE COURT:  Mr. Cann, Mr. Simons, counsel for

15  Mr. Bowling, will be contacting you as we get closer to his

16  presentation, his case, as to advise you as to when you should

17  appear.  If you do have any problems, of course, you will need

18  to advise the Clerk in advance if for any reason you feel that

19  you could not be here.  All right?

20          MR. CANN:  Any timeframe on notice given, when that

21  would happen?

22          THE COURT:  I would anticipate the defendants would

23  not be presenting you as a witness for the next two weeks, but

24  in the event that that schedule were to change, Mr. Simons

25  would be contacting you and advising you of any changes in the

 1    schedule.  All right?  Thank you, sir, for being here today.

 2              Let's see, do we know if we have all our jurors

 3    present?

 4              THE MARSHAL:  Yes, sir.

 5              THE COURT:  All right.  Any other matters to take up

 6    before the jury comes in?

 7         (No response.)

 8              THE COURT:  Thank you.

 9              Bring the jury in.

10         Mr. Smith, will you be ready to call your witness in,

11    your next witness?

12              MR. SMITH:  Yes, sir.

13              THE COURT:  All right.  Thank you.

14         (Whereupon, the jury entered the courtroom, after which

15    the following proceedings were had in open court.)

16              THE COURT:  Thank you, and please be seated.

17              The record will reflect that all members of the jury

18    are present.  Good morning.

19              All counsel and parties are also present.

20              Let's see, I believe we completed the testimony of

21    Ms. Webb on Friday afternoon.

22              Mr. Smith, are you ready to call your next witness?

23              MR. SMITH:  Yes, Your Honor.  The United States will

24    call Jeffrey Deaton.

25              THE COURT:  Thank you.

1        MR. WHITE:  Your Honor, can I just get something from

2   the back?

3        THE COURT:  Yes, sir, that's fine.

4        MR. WHITE:  Thank you.

5                          JEFFREY DEATON,

6   having been first duly placed under oath, was examined and

7   testified as follows:

8        THE COURT:  Thank you.

9        Mr. Smith, you may proceed.

10                     DIRECT EXAMINATION

11  BY MR. SMITH:

12  Q    Good morning.

13  A    Morning.

14  Q    State your name, please.

15  A    Jeff Deaton.

16  Q    And, Mr. Deaton, if you could, tell us a little bit about

17  yourself.  How old are you?

18  A    I'm 52 years old.

19  Q    And are you married?

20  A    I am.

21  Q    And how many children do you have?

22  A    I have two stepchildren.

23  Q    How long have you been married?

24  A    Thirty-one years.

25  Q    And during that marriage, Mr. Deaton, where did you-all

1    reside?

2    A     Mostly Hobbs Hollow Road, and then I moved to Manchester.

3    Q     And this Hobbs Hollow Road, is that in Clay County?

4    A     Yes, about six miles from Manchester.

5    Q     Have you pretty much lived in Clay County your entire

6    life?

7    A     I have.

8    Q     Now, while living in Clay County, have you held jobs?

9    A     I have.

10   Q     In fact, have you been an elected official?

11   A     I am at this time.

12   Q     Okay.  And what position do you hold as an elected

13   official?

14   A     I am a city councilman.

15   Q     And that is the City of Manchester?

16   A     Yes.

17   Q     And what other jobs have you held, Mr. Deaton?

18   A     I've worked in mining and the police department.  And

19   school board.  And I'm retired from there and now I drive a

20   truck for Smith Brothers Excavation.

21   Q     Okay.  And is that a full-time job or part-time job?

22   A     Well, it's flexible.

23   Q     Flexible?  Before taking that job, you said you were

24   working with the school board.  Is that the Clay County School

25   Board?

1  A    Yes.

2  Q    And what position did you hold with the school board?

3  A    I was a maintenance supervisor at the Clay County Middle

4  School.

5  Q    And how long were you the maintenance supervisor for the

6  Clay County School Board?

7  A    Thirteen — 12 or 13 years.

8  Q    And when did you last hold that position?

9  A    Up until 2009.

10  Q    And how did you — did you retire from that position in

11  2009?

12  A    Yes.

13  Q    During the time period that you worked as school board

14  employee, did you answer to Doug Adams as superintendent?

15  A    Yes, I did.

16  Q    Okay.  And how long did you work under his leadership

17  there?

18  A    Charles White was there when I was hired.

19  Q    Okay.

20  A    And then he came — he came next.

21  Q    When did you run first for city council, Mr. Deaton?

22  A    In 2004.

23  Q    And had you run for public office prior to that election?

24  A    No.

25  Q    When did you-all run for city council?

1   A     In November.

2   Q     Okay.

3   A     2004.

4   Q     And as that election came about, how many open seats were

5   there for city council when you ran?

6   A     None.

7   Q     Okay.  How many positions of city council --

8   A     Oh, eight.

9   Q     -- are there in the City?

10  A     Eight.  Eight.

11  Q     And when you say there were none open, is that -- they had

12  a full council that was --

13  A     Right.

14  Q     -- seated at the time that you ran?

15  A     Yes.

16  Q     Now, at this -- at this time, were you still employed with

17  the School Board?

18  A     Yes, I was.

19  Q     And did you, at some point, have a conversation with Doug

20  Adams about the prospect of you running for city council?

21  A     Yes, we did.

22  Q     Could you tell us about that conversation?

23  A     Well, Darnell came and got me at school and said that Doug

24  wanted to meet with me.

25  Q     Now, let me ask you, just to stop there.  Darnell, what is

1  his full name?

2  A    Hipsher.  Darnell Hipsher.

3  Q    And was he a city councilman at the time?

4  A    Yes, he was.

5  Q    Okay.  And was he also a School Board employee?

6  A    Yes, he was.

7  Q    Okay.  So pick up from there and tell us what happened.

8  A    He said, "Doug wants to see you."  And I went over there

9  and sit down.  And he was talking to me, and he thought — he

10 said he thought I would make a good city councilman and I was a

11 good fella and I would get a lot of support.  But in Clay

12 County, good fellas gets beat in elections all the time.  And

13 that if I was serious about running, I needed to consider

14 getting in a pool with them.

15 Q    And had you heard of pools before?

16 A    Yes.

17 Q    And what is your understanding of a pool, Mr. Deaton?

18 A    It's just where everybody puts their money together to buy

19 votes for one side.

20 Q    Okay.  And did he further explain to you how much money a

21 city council person in Manchester like yourself was going to

22 have to put up?

23 A    Yes.

24 Q    And what did he tell you?

25 A    He said a thousand dollars.

1  Q    And what did you do then?

2  A    I told him I wanted in on that.

3  Q    Okay.  And did he explain to you how the mechanics of that

4  was going to work, how you were going to get your money to

5  them?

6  A    No.  Well, he told me that he was — if I wanted in, that

7  he was going to lunch and when he went to lunch for me to bring

8  the money and put it in his desk drawer.

9  Q    In his desk drawer?

10 A    Yeah.

11 Q    Was that in the superintendent's school office?

12 A    Yeah.

13 Q    Okay.  So what happened next?

14 A    Well, I guess he went to lunch and I went and I got the

15 money and I put it in his desk drawer.  I mean, they was nobody

16 in there, and out I went, which I had access to the board at

17 all time.

18 Q    You had access to his office?

19 A    The whole board, yeah.

20 Q    Okay.  Because you were maintenance supervisor?

21 A    Right.

22 Q    So this money that you left him, was it in the form of a

23 check or —

24 A    It was cash.

25 Q    Okay.  And you put — why did you only put 500 down?

1   A    That's all I had.

2   Q    Okay.  So did you have further conversation with him or

3   others after that?

4   A    Darnell Hipsher.

5   Q    Okay.  And how soon after you dropped the money in

6   Mr. Adams' desk did you have a conversation with Mr. Hipsher?

7   A    It was probably a month or two later on.  I'm not for

8   sure.

9   Q    And where did that conversation take place, if you recall?

10  A    He said he was needing money to haul voters and to help me

11  on the absentee votes.  And he told me it would cost me $300,

12  and I tried to write him a check and he didn't want a check, he

13  wanted cash.  So I went and got him $300.

14  Q    You say you tried to write him a check?

15  A    Yeah.

16  Q    What did he say when you offered him a check?

17  A    He didn't want a check, he had to have cash.

18  Q    And what did he say he was going to do with this money?

19  A    Haul voters and it would help me in the absentee ballots.

20  Q    Now, what was your understanding when Mr. Hipsher said

21  this money was to haul voters?  What was your full

22  understanding of what that means?

23  A    That meant just going and picking up voters.  We were the

24  only race running and he said the voters wouldn't get out

25  unless they haul voters to the polls.

1  Q    Okay.  Did he mention anything about buying votes to you?

2  A    No.

3  Q    Okay.  Just use used the term "vote hauling"?

4  A    Right.

5  Q    Did you know Darnell Hipsher to have the ability to buy

6  votes at that time?

7  A    I'd say he did.  I don't know.  I never was on that side

8  of it.

9  Q    When you gave the money to Doug Adams, did he explain who

10 was going to be handling the money?

11 A    No.

12 Q    Did you later learn who was going to be handling the

13 money?

14 A    No.

15 Q    Did you ever ask?

16 A    No.

17 Q    This November '04 election, how did it turn out for you,

18 Mr. Deaton?

19 A    I won.  I came in seventh or eighth, I'm not for sure.

20 Q    Now, when Hipsher approached you, you said he said he

21 wanted to haul voters.  Did he mention absentee votes as well?

22 A    Yeah.

23 Q    What did he say about that?

24 A    He just said that the money would help with hauling voters

25 and the absentee ballots.

1   Q    Now, absentee votes in Clay County, especially in that
2   city council race, was that — what was your understanding that
3   was going to be?  Was that the mail-in or the early vote?
4   A    I figured that's the — I figured it was the mail-in.
5   Q    Okay.  Did you run for reelection in '06?
6   A    Yes.
7   Q    And in '06, did you — were you ever approached by
8   Mr. Adams and asked about —
9   A    No.
10  Q    Okay.  Did you ever have a conversation with him about you
11  running again in '06?
12  A    Well, not really.  We had conversations all the time.  I
13  mean, we're friends.
14  Q    Did anyone ever ask you if you were going to get in the
15  pool in 2006?
16  A    No.
17  Q    Why did you not have an interest in the pool in 2006?
18  A    Officer Culver came to my office, the police chief in
19  Manchester, and he said that the federal people are going to be
20  watching the election and he didn't want to see me in trouble
21  and to stay out of it, and that's exactly what I did.
22  Q    And how was your race in 2006?  Did you win?
23  A    Yes, I did.  I won by four votes, I believe.
24  Q    Now, while working for the Board of Education, were you
25  around in the 2002 election, Mr. Deaton?

1  A    Yes.

2  Q    And what were you — do you recall election day in the

3  primary of 2002?

4  A    Yes.

5  Q    Tell us what you recall about that day, Mr. Deaton.

6  A    Well, I was at the Board of Education, and Doug and

7  Charles Keith and Freddy Thompson were loading up the vehicles

8  as I came out.  And Mr. Adams told me, he says, "You work for

9  me," he said, "I'm paying you for the day," said, "come on, you

10 can ride with us."  And that's exactly what I did.

11 Q    And when he said come on and ride with us, was that in a

12 School Board vehicle?

13 A    Yes.

14 Q    What kind of vehicle was it?

15 A    It was a white —— like a Suburban but a GMC.

16 Q    And do you recall how long you traveled with those

17 gentlemen that day?

18 A    Probably three hours, two or three hours.

19 Q    And where did you-all go?

20 A    I believe we went to Goose Rock, Big Creek, and Paces

21 Creek.

22 Q    Okay.  Where did you ride?

23 A    In the front passenger seat.

24 Q    And who was driving?

25 A    Mr. Adams.

1   Q    And what did you–all do when you went around these polls

2   for two or three hours?

3   A    Well, Doug would just stop and he would get out and he'd

4   talk to people, and he would come back and he'd tell Freddy,

5   said, "The vote is going good here at Paces Creek, Big Creek,"

6   whatever we was at.

7   Q    Which one do you recall he visited, Paces Creek?

8   A    Paces Creek, Big Creek and Goose Rock.

9   Q    And Goose Rock.  And did they return you back to the

10  School Board office at some point?

11  A    They dropped me off as they came through, they were going

12  to check on Burning Springs.

13  Q    Now, is the school open on election day in Clay County?

14  A    No, it's not.

15  Q    But Adams said you work for me, you get in and we're going

16  around town?

17  A    Well, we're paid for the day.  I mean — now, we were

18  friends, if he needed me of a night, weekend, whatever, I would

19  be there.

20  Q    Okay.  And you say Freddy Thompson was with you in that

21  car?

22  A    Yes.

23  Q    Do you see him here in the courtroom?

24  A    Yes, I do.

25  Q    If you could, point out for the record where he's seated

1   and what he's wearing.

2   A    He's standing right back there.

3          THE COURT:  The record will reflect the witness has

4   identified the defendant, Freddy Thompson.

5   BY MR. SMITH:

6   Q    And, likewise, do you see Mr. Adams here this morning?

7   A    Yes, I do.

8   Q    If you could, point out for the record where he's --

9   A    Right back there.  He just stood up, in the dark colored

10  jacket.

11         THE COURT:  All right.  The record will also reflect

12  that the witness has identified the defendant, Douglas Adams.

13  BY MR. SMITH:

14  Q    Now, Mr. Deaton, are you subpoenaed to be here today by

15  the United States?

16  A    Yes.

17  Q    Have you been made any promises by the government?

18  A    No.

19         MR. SMITH:  May I have just a moment?

20         THE COURT:  Yes, sir.

21         MR. SMITH:  I pass the witness.

22         THE COURT:  Thank you.

23         Mr. Hoskins.

24         MR. HOSKINS:  No questions.

25         THE COURT:  Thank you.

1              Mr. Bayer.

2                        CROSS-EXAMINATION

3    BY MR. BAYER:

4    Q    Mr. Deaton, I'm Bennett Bayer, I'm one of the attorneys

5    for Mr. Adams.  I think you indicated that you were hired by

6    the Whites?

7    A    Yeah.  Charlie White, yeah.

8    Q    During the time that you were employed by the Board of

9    Education after the 2002 election -- Well, let me back up.

10        At some point in time, Mr. White was no longer the

11   superintendent?

12   A    Right.

13   Q    And Mr. Adams became the superintendent?

14   A    Yes.

15   Q    At any point in time, did Mr. Adams tell you that your job

16   was dependent upon --

17              MR. SMITH:  Objection, Your Honor, hearsay.

18              THE COURT:  Sustained.

19   BY MR. BAYER:

20   Q    At any time, did you come to believe that your job was

21   dependent upon political allegiance to Mr. Adams?

22   A    No, sir.

23   Q    At any point in time, did he ever try to influence your

24   vote?

25   A    No, sir.

1          MR. SMITH:  Your Honor, I'm going to object under

2    Rule 608 and 609 —

3               THE COURT:  All right.

4          MR. SMITH:  — specific instances of conduct.

5               THE COURT:  All right.  Sustained.

6    BY MR. BAYER:

7    Q    Who is Kevin Johnson?

8    A    He's the sheriff of Clay County.

9    Q    Did Mr. Johnson ever talk to you about running for city

10   council?

11   A    Yes, he did.

12   Q    What was the —

13          MR. SMITH:  Your Honor, I'm going to object to

14   hearsay.

15          MR. BAYER:  I was not going to ask the question as

16   far as what Mr. Johnson said to him.

17               THE COURT:  All right.  Overruled.

18   BY MR. BAYER:

19   Q    What was it that you decided to do after talking to

20   Mr. Johnson about the city council race?

21   A    I decided to run.

22   Q    Why?

23   A    To help the police department.

24   Q    Would you say that your initial reason for running was

25   based upon encouragement by Sheriff Johnson?

1  A    Yes.  But he wasn't —— he was a city policeman at the

2  time, he was not the sheriff.

3  Q    He is now?

4  A    Yeah.

5  Q    But at the time, he was a city policeman and based upon

6  your conversations with him, you decided to run for city

7  council?

8  A    Yes.

9  Q    During the time that you worked under Mr. Adams, how was

10 he as a superintendent, as far as you could tell?

11          MR. SMITH:  Same objection, Your Honor.

12          THE COURT:  Sustained.

13 BY MR. BAYER:

14 Q    Specifically, he was —— was he your boss?

15 A    He was my boss and also my friend.

16 Q    All right.  How did the two of you get along during the

17 course of your employment?

18 A    Very well.

19 Q    Was there any times that Mr. Adams, nonetheless, had to

20 discipline you for any particular reason?

21 A    No.

22 Q    How did you do in your job?

23 A    I thought very well.

24 Q    When you testified about going around to the different

25 precincts, I think you went to three precincts?

1   A    Yes.  I'm not for sure.  I think that's all we went to.

2   Q    And this was during the May primary, 2002?

3   A    Yes.

4   Q    And Mr. Thompson was in the vehicle with you?

5   A    Yes.

6   Q    When Mr. Adams -- when you would stop at a precinct, what

7   would happen?

8   A    We would sit in the vehicle and Mr. Adams would go talk to

9   somebody and he would come back and say, "We're doing all right

10  here, Freddy, they's a big turnout."

11  Q    And that's all you saw him doing, was just talking to

12  people?

13  A    That was it.

14  Q    Never gave anybody anything?

15  A    No.  No, not to my knowledge.

16  Q    Do you know why it was so important for -- to go check on

17  those precincts?

18            MR. SMITH:  I'll object to speculation.

19            THE COURT:  Sustained.

20            MR. BAYER:  If I could have just a moment?

21            THE COURT:  Yes, sir.

22  BY MR. BAYER:

23  Q    If I understand you correctly, you said that you were

24  friends with Mr. Adams?

25  A    Yes.

1  Q    Would it have been unusual for Mr. Adams — for you to

2  ride around with Mr. Adams on any different occasion?

3  A    No.

4  Q    So this really isn't that unusual?

5  A    No.

6        MR. BAYER:  I don't have any other questions.   Thank

7  you.

8        THE COURT:  All right.  Thank you.

9        Mr. White?

10       MR. WHITE:  No questions, Your Honor.  Thank you.

11       THE COURT:  Thank you.

12       Mr. Abell.

13       MR. ABELL:  Judge, I don't have any questions for

14  Mr. Deaton.

15       THE COURT:  Thank you.

16       Mr. Baldani or Mr. Richardson?

17       MR. BALDANI:  Thank you, Your Honor.

18       THE COURT:  I'm sorry.

19                    CROSS-EXAMINATION

20  BY MR. BALDANI:

21  Q    Good morning, Mr. Deaton.

22  A    Good morning.

23  Q    My name is Russ Baldani, I'm one of Freddy's attorneys.   I

24  want to ask you about this '02 when you were riding around

25  with, you said, Doug Adams driving and you said Charles Keith?

1  A     Yes.

2  Q     And Freddy?

3  A     Yeah.

4  Q     You didn't see Freddy get out of the car at all during

5  those hours that you-all were riding around?

6  A     No.

7  Q     So, obviously, if you didn't see him get out of the car,

8  you didn't see him approach any voters or pay any voters or

9  anything like that?

10 A     No.

11 Q     And while you-all were riding around to those three

12 precincts, did you happen to run into Jennings White and Denver

13 Sizemore doing the same thing?

14 A     Probably.  I mean, I don't recall.

15 Q     You don't specifically —

16 A     No.

17 Q     Do you know those two guys?

18 A     Yes, I do.

19 Q     All right.  And when you said "probably," why — if you

20 don't recall, why do you say "probably"?

21 A     They were probably doing the same thing we were doing,

22 they were checking on the polls.

23 Q     All right.  Did you see Freddy Thompson with any type of

24 weapon when he was in that car?

25 A     Yeah, a cigarette lighter.

1   Q    That's it.  No gun?

2   A    And he was using it.

3   Q    No guns —

4   A    No.

5   Q    — no automatic weapons or anything like that?

6   A    No.

7         MR. BALDANI:  That's all, Your Honor.

8         THE COURT:  All right.  Thank you.

9         Mr. Gilbert?

10        MR. GILBERT:  No questions, Your Honor.

11        THE COURT:  Anyone else have any questions?

12        MS. HUGHES:  No, sir.

13        MR. SIMONS:  No.

14        THE COURT:  All right.  Any redirect?

15        MR. SMITH:  No, thank you.

16        THE COURT:  Thank you.

17        Any other questions on matters brought up?

18     (No response.)

19        THE COURT:  All right.  Thank you.

20        Sir, you may step down.

21        Mr. Smith, you may call your next witness.

22        MR. SMITH:  Thank you, Your Honor.  The United States

23  will call Michael R. Bishop.

24                 MICHAEL BISHOP,

25  having been first duly placed under oath, was examined and

MICHAEL BISHOP - DIRECT - MR. SMITH                32

 1 testified as follows:

 2          THE COURT:  Thank you.

 3          Mr. Smith, you may proceed.

 4                    DIRECT EXAMINATION

 5 BY MR. SMITH:

 6 Q    Mr. Bishop, if you would make sure that mic is adjusted to

 7 your height there.

 8 A    Okay.

 9 Q    Speak into that, if you will.  State your name, please.

10 A    Michael Bishop.

11 Q    And if you could, just come a little bit closer to that

12 mic, that will help all of us hear.

13 A    Okay.

14 Q    And, Mr. Bishop, where do you live?

15 A    Manchester, Kentucky.

16 Q    And how long have you lived in the Clay County area?

17 A    All my life.

18 Q    And specifically, what area did you grow up in,

19 Mr. Bishop?

20 A    The Laurel Creek community.

21 Q    And is that -- what part of the -- well, we've been

22 hearing about voting precincts.  What area would that be in the

23 voting precinct?

24 A    That would be in the Oneida area, the South Fork precinct.

25 Q    Okay.  So there's a South Fork precinct which you live

1   in —

2   A    Uh-huh.

3   Q    — grown up in?  Do you still live in that same area?

4   A    Yes, I do.

5   Q    And are you married?

6   A    Yes.

7   Q    And do you have children?

8   A    Two children.

9   Q    And what are their ages?

10  A    My girl is 16 and my boy is nine.

11  Q    Okay.  And who are your parents, Mike?

12  A    Paul and Brenda Bishop.

13  Q    And where do they live?

14  A    Next door to me.  Laurel Creek community.

15  Q    Okay.  And let's talk a little bit about yourself,

16  Mr. Bishop.  How far did you go in school?

17  A    I graduated high school, a little bit of college.

18  Q    Okay.  And where did you attend college?

19  A    EKU Community there in Manchester.

20  Q    Okay.  What kind of jobs have you held in the past,

21  Mr. Bishop?

22  A    I've been a farmer, a janitor, a police officer.

23  Q    Okay.  You and your dad have a farm out there somewhere?

24  A    We leased farms and we did have one at one time, yes.

25  Q    What kind of farming did you-all do?

1    A    Tobacco farmers.

2    Q    Okay.  Do you raise any other crops such as hay or cattle?

3    A    Hay, corn, yeah.

4    Q    Okay.  And in addition to that, you say that you've also

5    been a police officer?

6    A    Yes, sir.

7    Q    And where were you employed as a police officer,

8    Mr. Bishop?

9    A    I started out at the Clay County Sheriff's Department in

10   the year of 1999.

11   Q    The Sheriff's Department?

12   A    Yes, sir.

13   Q    And what position did you hold for them?

14   A    I was a part-time deputy, and then I eventually went

15   through the police academy and became a full-time police

16   officer.

17   Q    Okay.  And once you graduated the academy, where did you

18   become employed after that?

19   A    Manchester Police Department.

20   Q    And what position did you start in there?

21   A    I started out as a school resource officer.

22   Q    And school resource officers, what do they do?

23   A    They take care of the problems in the schools, like any

24   kind of problems that arises, fights, drugs, anything.

25   Q    Did you work under the Superintendent Doug Adams while you

1   were there?

2   A    Uh-huh, I did.

3   Q    And what school did you actually have as —

4   A    I started out as the — at the Clay County Middle School

5   and was eventually moved to the Clay County High School.

6   Q    Okay.  How many school resource officers were employed

7   when you started, Mr. Bishop?

8   A    There was two.

9   Q    And how long did you hold that position?

10  A    Five or six years.

11  Q    Okay.  And do you know what year that would have been that

12  you stopped serving in that capacity?

13  A    That would have been — started in the school year of

14  2000.  That would have went through about 2006, I guess.

15  Q    Okay.  And did you receive a promotion at that time?

16  A    I did.

17  Q    And what were you promoted to, Mr. Bishop?

18  A    Sergeant.

19  Q    And sergeant, how long did you serve as sergeant for the

20  police department?

21  A    Maybe a year.

22  Q    Okay.

23  A    I guess.  I can't really remember.

24  Q    Where did you go from there?

25  A    I was moved to the Manchester Police Department full time.

1  Q    Okay.  Now, did you receive a promotion further than

2  sergeant, Mr. Bishop?

3  A    I did.

4  Q    And where did you go from there?

5  A    Daytime assistant police chief.

6  Q    And that was — do you know when approximately that was

7  that you got that promotion?

8  A    That would have been — I think I — let me rephrase that.

9  In 2000 — five years is when I was promoted to sergeant.  Then

10 after that I was the assistant police chief, and that would

11 have been probably around somewhere in '06, maybe close to '07.

12 Q    Did you eventually serve as chief of police at some point?

13 A    Yeah, I was the interim for a little bit.

14 Q    Okay.  And when you say you were interim, was the police

15 department suffering from some kind of loss of their chief at

16 that time?

17 A    Yes, sir, our chief of police, Dennis Rice, retired and

18 the other assistant police chief was charged and arrested.

19 Q    What was his name?

20 A    Todd Roberts.

21 Q    Okay.  So you were daytime.  Was he nighttime assistant

22 chief of police?

23 A    Yes, sir.

24 Q    So you had a daytime assistant chief and a nighttime

25 assistant chief?

1    A    Yes, sir.

2    Q    And then you became the interim chief.  Was there a city

3    council meeting that had to take place for you to become chief

4    of police?

5    A    Yes, sir.

6    Q    And do you remember that meeting?

7    A    Yes, I do.

8    Q    Do you remember if Doug Adams was there?

9    A    Yes, he was.

10   Q    Do you remember him ever being at a city council meeting

11   before that?

12   A    No.

13            MR. BAYER:  I'm going to object, Your Honor.

14            THE COURT:  Overruled.

15            THE WITNESS:  No.

16   BY MR. SMITH:

17   Q    What was your answer?

18   A    No.

19   Q    Have you ever seen him there afterward at a city council

20   meeting?

21   A    No.

22   Q    Okay.  How long have you known Doug Adams, Mr. Bishop?

23   A    Almost all my life.

24   Q    Okay.  And is he a close friend of the family?

25   A    Yes, sir, he is.

1   Q    And who is — I mean, obviously, you're friends with him.
2   Who else is friends with Mr. Adams in your family?
3   A    My father, my mother, my sisters.
4   Q    Where does your mother work?
5   A    She's retired now.
6   Q    Where did she work before she retired?
7   A    The Clay County Board of Education.
8   Q    And do you know who she worked for?
9   A    He worked under Mr. Adams.
10  Q    And do you know how she served him?
11  A    She was his — she was the Board's secretary.
12  Q    Okay.  How long did she work for Mr. Adams?
13  A    That, I'm not sure, you know.  For a while.
14  Q    Several years or months or do you have any recollection?
15  A    Years.  It will be years, yes.
16  Q    Okay.  You just don't know how many years?
17  A    Right.
18  Q    When you took this promotion from the school resource
19  officer to sergeant in the police department, did you have a
20  conversation with Doug Adams about that?
21  A    Yeah, I did.
22  Q    And what did that conversation involve?
23  A    Well, I really — I really didn't want the job, to be
24  honest with you.
25  Q    Okay.  And had you expressed that to Mr. Adams?

MICHAEL BISHOP/DIRECT - MR. SMITH          39

1   A    I had.

2   Q    And what did he say to you?

3   A    The best I can remember, Steve, it was like, "Well, you

4   know, it's whatever, your choice, your decision."

5   Q    How did the position come up to you?  Did they advertise

6   for it in the newspaper or do a flyer, how did it come up to

7   you?

8   A    No, it was offered to me by the mayor.

9   Q    Okay.  Did Doug Adams talk to you before the mayor

10  approached you?

11  A    I don't think so, no.

12  Q    Did he ever ask you if you wanted to be sergeant before

13  you learned it was available?

14  A    I don't think so.

15  Q    But in any event, the mayor approached you?

16  A    Yes, sir.

17  Q    And who was the mayor?

18  A    Daugh K. White.  I guess —— well, I don't know if it's K

19  or not.  He's Daugh White.

20  Q    And what did he say to you?

21  A    He wanted me to be the chief.

22  Q    Okay.

23  A    Pretty much.

24  Q    All right.  So he approached you for the chief's position?

25  A    Yes, sir.

MICHAEL BISHOP - DIRECT - MR. SMITH                    40

1   Q    And do you know how far in advance of this city council

2   meeting Doug Adams attended that the mayor came to you and said

3   he wanted you to be his chief of police?

4   A    A couple of months maybe, three months.

5   Q    Okay.  And what was your response when the mayor made the

6   statement to you he wanted you to be his chief of police,

7   Mr. Bishop?

8   A    Well, I mean, I thought about it.  You know, I wanted to

9   be promoted, but --

10  Q    Was that going to be a considerable pay raise for you,

11  Mr. Bishop?

12  A    No.

13  Q    What were you making as a school resource officer?

14  A    I started out as $9 an hour.

15  Q    And when you stopped the school resource position, what

16  were you making?

17  A    12.71, I believe.

18  Q    Okay.  What does chief of police pay there in Manchester,

19  to your knowledge?

20  A    16.50.

21  Q    $16.50 an hour?

22  A    I think so.  I think that's what it was.

23  Q    So you had to give it some thought before you gave an

24  answer to Mr. White?

25  A    Not as far as the money part.  It was the way it was being

1  played, I guess, is what was — concerned me.

2  Q    And how, to your understanding, was it being played,

3  Mr. Bishop?

4  A    Well, it was all the time the mayor's son was always —

5  Kennon, Kennon White is his name, was always there, I guess

6  being nosy and things, it wasn't nothing to do with him, trying

7  to run the police department.  That was the only part of it

8  that I did not like.

9  Q    You said that was Kennon White?

10 A    Yes, sir.

11 Q    And that was the part that you didn't like?

12 A    Yes, sir.

13 Q    Did you agree to take the job at some point?

14 A    I did.

15 Q    And you served as chief of police for some time?

16 A    I did.

17 Q    Do you know how long you served?

18 A    Four or five months.

19 Q    Was Kennon White also vocal in supporting you as his —

20 A    Yes, sir.

21 Q    — election for chief?

22 A    Yes, sir, he was.

23 Q    So both father, Daugh White, and son, Kennon White, were

24 on board for you to be chief?

25 A    Yes, sir.

1  Q    All right.  In addition to your employment as a police

2  officer, Mr. Bishop, have you also been an election officer

3  employed by the Clay County Board of Elections?

4  A    Yes, sir, I have.

5  Q    And do you know when you first started serving for the

6  Clay County Board of Elections as an election officer?

7  A    Probably when I was 18.  When I was of age, I guess.

8  Q    All right.  And do you remember the first election you

9  served?

10  A    No.

11  Q    Do you recall the 2002 election?

12  A    Yes, sir.

13  Q    And that would have been a primary and general election in

14  that year.  Did you serve in both the primary and the general

15  elections?

16  A    Yes, sir.

17  Q    And what position did you hold for the Clay County Board

18  of Elections in those 2002 primary and general?

19  A    I was judge.

20  Q    And for what party?

21  A    Republican.

22  Q    And do you recall who else you served with at your

23  precinct?

24  A    Dan Stockton on the Democratic, I think.

25  Q    Okay.  As far as the judge is concerned?

1   A    Peggy — no, it was — there was an alternate, Dale Day.

2   Q    Anyone else you recall serving in that primary, 2002

3   election?

4   A    No, but I'm sure there was more.

5   Q    Okay.  And what precinct did you say you served in?

6   A    South Fork.

7   Q    Now, during that election cycle, were you also operating

8   farming operations with your dad?

9   A    Yes, sir.

10  Q    And were you involved — in the days leading up to the

11  election day, they have what's called "early voting."

12  A    Uh-huh.

13  Q    Do you recall the early voting in 2002?

14  A    I do.

15  Q    And tell us what you remember about that.

16  A    Well, it was straight across form the police department,

17  so, I mean, anytime you went into the police department you

18  would see it.  And there was a large crowd, a lot of things

19  going on.

20  Q    And you say "a large crowd."  You mean of voters?

21  A    Voters, yes, sir.

22  Q    And you were reporting there for work on the days in which

23  this early voting was going on?

24  A    Uh-huh, some of them.

25  Q    Was your dad involved in the early voting, to your

1  recollection?

2  A    Yes, sir, he was.

3  Q    And how did your dad get involved in the early voting, to

4  your recollection?

5  A    He was asked to be on the -- I guess he was kind of an

6  alternate, because William Hugh Bishop was on it, but his

7  brother was running, so he couldn't be.

8  Q    Who is William Hugh Bishop's brother?

9  A    Clay Massey Bishop.

10 Q    What was he running for?

11 A    County court -- no, county attorney.

12 Q    Okay.  And tell us -- Do you remember the day your dad got

13 asked?

14 A    I do.

15 Q    Tell us what you remember.

16 A    I remember that Dad was on Sextons Creek, I think, cutting

17 hay or -- no, it was straw, because it was early, we was

18 cutting straw, and he was approached by Mr. Adams and maybe

19 Freddy Thompson needing him to be the, I guess, judge or

20 whatever for the early voting.

21 Q    So the early voting should have been handled by William

22 Hugh Bishop, who was the Republican commissioner at that time?

23 A    Yes, sir.

24 Q    But he couldn't serve because his dad -- or his brother

25 was running for county attorney?

1  A    Yes, sir.

2  Q    So Freddy Thompson and Doug Adams comes out to get your

3  dad, and you say he was in the straw or hay field?

4  A    Yes, sir.

5  Q    And did your dad end up serving down there?

6  A    He did.

7  Q    And do you know who he served with down there at the

8  election polls for that early voting?

9  A    Yes, sir.

10  Q    Who did he serve with?

11  A    He served with Al Man or William Stivers.

12  Q    Okay.  And William Stivers, you referred to him as "Al

13  Man."  Is that what he's known by?

14  A    Yes, sir.

15  Q    And how many days did your dad have to serve down there,

16  to your recollection?

17  A    Ten, 15, maybe 20.

18  Q    Okay.  And during that time, were there any interruptions

19  that you recall in his serving at that position?

20  A    Yeah, I remember that the — well, Al Man was arrested one

21  time, I think, and there was so many people or something,

22  something happened that they had to — that the sheriff at that

23  time shut it down.

24  Q    Do you know how long it was shut down?

25  A    For the day, I think.

1  Q    Now, as — you say that you had agreed to serve as the

2  Republican judge?

3  A    Yes, sir.

4  Q    Did you get approached by any candidates leading up to day

5  of election day?

6  A    In 2002?

7  Q    Yes, sir.

8  A    Yes, sir.

9  Q    And could you tell us who approached you, Mr. Bishop?

10  A    I was approached by Dennis Rice the day I was working as a

11  school resource officer.

12  Q    All right.  You were approached by Dennis Rice.  Now, was

13  he a candidate for office?

14  A    No, I'm sorry.  No, no, he was chief of police, and I

15  guess he was delivering a message.

16  Q    And what was the message?

17  A    To buy votes for the mayor's son.

18  Q    So what was his — did he make a request for you to see

19  somebody or what was his request?

20  A    His request was that if I didn't, I guess, help the

21  mayor's son that they would fire me.

22  Q    Okay.  And what did you do when you were told that?

23  A    Well, really I didn't know what to do, because I was —

24  had just started working there, I hadn't been there but a

25  couple of years and I liked my job, so it was kindly —

1    Q    Had you been involved in vote buying out there before,

2    Mr. Bishop, before this election?

3    A    No.

4    Q    You had not?

5    A    Huh-uh.

6    Q    Had you worked as an election officer —

7    A    I had.

8    Q    — before 2002?

9    A    Uh-huh.

10    Q    So how did you get educated and know how to go about doing

11    this job of vote buying?

12    A    How did I get educated?

13    Q    Yes, sir.

14    A    I've growed up around it all my life.  I mean, it was just

15    something that was always done.

16    Q    As long as you can remember?

17    A    Uh-huh.

18    Q    And tell us generally how it works, Mr. Bishop.

19    A    A group of people get together and they pool money, they

20    divide it up in between people in certain areas and they go out

21    and take care of the people in that area.

22    Q    And when you say that they divide it up, are you talking

23    about money?

24    A    Yes, sir.

25    Q    And when you say they take care of people, what do you

1   mean by that?

2   A    They pay them for their vote.

3   Q    Okay.  And generally, to your experience, how much does it

4   cost to bribe a voter to vote the way you want him to vote or

5   her to vote?

6   A    I've seen it from 20 to 50.

7   Q    Okay.  Now, when your chief told you that it was time for

8   you to get involved in this 2002 election, what did you do?

9   A    I got involved.

10  Q    And who did you meet with as a candidate?

11  A    I've met with Kennon White and -- I've seen several

12  candidates.  I mean --

13  Q    Okay.  Let's start with Kennon White.  What did you --

14  what did you do when you met him?

15  A    Well, actually he sent money to me.

16  Q    Okay.  And was this like -- how far in advance of the

17  election did Kennon White send money to you, Mr. Bishop?

18  A    That was on Monday.  The election was Tuesday.

19  Q    Okay.  And how did the money get to you, if you recall?

20  A    John Russell Brown brought it to me.

21  Q    Now, John Russell Brown, is that someone that you knew

22  before this?

23  A    Yes.

24  Q    Where does he work?

25  A    He worked at the time for the Board of Education.

1  Q    What position did he hold for the school?

2  A    He's a supervisor.  I don't know exactly what.

3  Q    Principal?

4  A    Yeah, he's been a principal, but he was, at that time, at

5  the Board actually.

6  Q    So he had an administrative office?

7  A    Yes, sir.

8  Q    Within the school board?

9  A    Yes, sir.

10 Q    And what did Mr. John Russell Brown bring you the day

11 before the election in 2002 primary?

12 A    I think it was $1500.

13 Q    And what were you told to do with that money, Mr. Bishop?

14 A    Well, to buy votes for Kennon.

15 Q    Okay.  And how were you going to be able to use that money

16 as the election officer there in that precinct?  Did you have a

17 plan?

18 A    Well, what I would do is that day, that Monday, I went and

19 give it to the group of people, and then I was there in the

20 precinct the next morning.

21 Q    And did you vote people who had sold their vote?

22 A    Uh-huh.

23 Q    And did you make sure they voted the way you paid them to

24 vote?

25 A    Yes, sir.

MICHAEL BISHOP #6458 DIRECT – MR. SMITH                50

1   Q    Now, did your dad work as an election officer with you

2   down there at that same precinct?

3   A    No, sir.

4   Q    Did he –– was he there present while you were serving as

5   election officer that day?

6   A    He was in and out.

7   Q    And what was he doing in and out, Mr. Bishop?

8   A    He was bringing voters in.

9   Q    Did you know who he was bringing voters in to be voted

10  for?

11  A    Yes, sir.

12  Q    And who was that?

13  A    The ticket was Freddy Thompson for clerk.

14  Q    Who was the jailer candidate?

15  A    Charles Marcum for jailer.

16  Q    Who was the judge candidate?

17  A    Roy Morgan.

18  Q    Anybody else you recall on the ticket?

19  A    No, sir.

20  Q    Now, how did it work when your dad would bring voters in?

21  How did you know that they were people who had been bought and

22  paid for to vote with this slate?  How would you know that?

23  A    Because it's always the same people.

24  Q    Okay.  And when you say it's always the same people, you

25  mean election cycle after election cycle you would go back to

MICHAEL BISHOP: DIRECT - MR. SMITH                51

1   the same family?

2   A      Yes.

3   Q      And so you from prior experience knew when your dad was

4   bringing in a family that it was a bought family that had been

5   paid for?

6   A      Uh-huh.

7   Q      And when he brought them to you, did they assist in their

8   voting?

9   A      If they needed it.

10  Q      And when they didn't it, did you watch the vote and make

11  sure they voted the way they're supposed to?

12  A      Sometimes I did, sometimes I didn't.  Most of the people

13  knowed how to vote and who to vote for.

14  Q      Were there some of them you could trust?

15  A      Yes, sir.

16  Q      So you wouldn't have to necessarily vote those people?

17  A      Yes, sir.

18  Q      Were there some of them you couldn't trust?

19  A      Yes, sir.

20  Q      And if you couldn't trust them, what did you do,

21  Mr. Bishop?

22  A      I watched them vote.

23  Q      Okay.  And once you had seen that they voted the way they

24  had been bought to vote, what did you do?

25  A      Nothing.  I mean --

1  Q    Were there times when you had to signal to your father

2  that somebody hadn't voted correctly?

3  A    No.  I mean, when they would get done voting, I mean,

4  would wave at him like, you know, everything is okay.

5  Q    Do you know how much your dad was paying these voters at

6  that time?

7  A    I think it was $50 a vote.

8  Q    So you had two different factions that you were working

9  for —

10  A    Yes, sir.

11  Q    — on election day in 2002, and on each side you were

12  actually involved in the vote buying scheme for both sides?

13  A    Yes, sir.

14  Q    During that 2002 election, you say you delivered some

15  money to some families before you actually began serving that

16  day on election day?

17  A    The day before, yes, sir.

18  Q    The day before?

19  A    Yes, sir.

20  Q    Do you recall who they were?

21  A    Yes, sir, I remember.

22  Q    Tell us who you recall.

23  A    That I took money to the day before?

24  Q    Yes, sir.

25  A    I took money to Larry Runyons was one, which he's deceased

 1   now.  I can't remember the amount we give him.  He would — say

 2   he would have 15, 20 voters, we would — 5-, $600.  Donald

 3   Powell, I give him 4- or $500, I can't remember how much

 4   really.

 5   Q    Did you ever run out of money that day?

 6   A    I did.

 7   Q    And what happened when you ran out of money, Mr. Bishop?

 8   A    I called Kennon and told him I had ran out.

 9   Q    And what happened?

10   A    He met me and give me another thousand.

11   Q    When you say "he" met you, who was that?

12   A    Kennon White.

13   Q    During that — at the conclusion of that day, did you have

14   opportunity to talk with any of the candidates that you had

15   worked for?

16   A    After the Monday?

17   Q    After the Tuesday election day, did you meet with any of

18   the candidates?  Let me ask it this way, Mr. Bishop:  You were

19   buying votes for Freddy Thompson on the one hand, and on the

20   other hand you were buying votes for Kennon White.  Did Kennon

21   White also have a clerk candidate he wanted you to be buying

22   votes for?

23   A    No — well, I mean, he did, but he wasn't — he didn't try

24   and enforce that.

25   Q    Okay.  Who was that other candidate?

1   A    Jennings White.

2   Q    And you say that Kennon didn't force you to buy votes for

3   him?

4   A    No.

5   Q    Who won the clerk's race?

6   A    Freddy Thompson.

7   Q    And you said you had Roy Morgan on your slate?

8   A    Yes, sir.

9   Q    Did he win?

10  A    No, sir.

11  Q    Did you talk to him after the election?

12  A    He came to the house, yes, sir.

13  Q    He came to your house?

14  A    He came to my father's building.

15  Q    And what was his conversation with you-all if you can

16  remember?

17  A    Pretty much to --

18          MR. WHITE:  Objection.

19          THE COURT:  Overruled.

20          THE WITNESS:  He came that day to get money that my

21  father hadn't spent and --

22  BY MR. SMITH:

23  Q    He came to pick up money your father hadn't spent?

24  A    Yes, sir.

25  Q    You mean spent for what reason?

1  A    For buying votes.  I guess too much money.

2  Q    Okay.  And did you hear any conversation there about the

3  money?

4  A    Yes, sir, it was $900, I'm pretty sure.  And I remember

5  Roy saying that Edd Jordan had sold him out, and if it cost him

6  90- or $95,000, he would see that he would be beat.

7  Q    Was Roy Morgan a man of substance who could carry out a

8  threat like that, to your knowledge?

9  A    Yeah.

10  Q    Did he have money?

11  A    Yes, sir.

12  Q    You had Charles Marcum on one side and Kennon White on the

13  other.  Did Charles Marcum ever send word to you?

14  A    Yeah, Charles was mad at me.

15  Q    He was mad at you?

16  A    Yes, sir.

17  Q    And do you know the reason he was mad at you?

18  A    Because I was for Kennon and not for him.

19  Q    During the day of election day, did you ever see a fellow

20  by the name of Eugene Stewart?

21  A    Yes, sir.

22  Q    And could you tell us, who is Eugene Stewart?  Does he

23  have a nickname?

24  A    Moose.  Moose Stewart.

25  Q    Okay.  And what did you see him doing the day of the

1   election?

2   A    He was hauling voters for Jennings White.  And I don't

3   think he was hauling for Kennon, I think that primarily it

4   was Jennings.

5   Q    And when you say he was hauling voters, was that to your

6   precinct?

7   A    Yes, sir.

8   Q    And did he have an election officer inside to help him?

9   A    No.

10  Q    Prior to that 2002 election, did you have any other money

11  delivered to you, Mr. Bishop?

12  A    In 2002?

13  Q    Yes, sir.

14  A    Yeah, I had some.

15  Q    Tell us about that, Mr. Bishop.

16  A    It was brought for Dad, but Dad was not at home, so they

17  brought it to me.

18  Q    And who was –– who was present?

19  A    Myself and Roy Morgan, Yancey White, Freddy Thompson, and

20  Doug Adams, and I'm not sure, but I think Wayne Jones.  I'm

21  foggy on the fifth one.

22  Q    Okay.  And do you remember what they were driving?

23  A    It was a Tahoe.  It was Roy's Tahoe.

24  Q    A Tahoe?

25  A    Yes, sir.

1  Q   And who was driving it?

2  A   Yancey.  Yancey White.

3  Q   Now, Yancey White, is he a man who served in public office

4  down there in Clay County?

5  A   No, sir, he's an attorney.

6  Q   Is he related to Roy Morgan in some way?

7  A   That's his son-in-law.

8  Q   So he was driving this group to meet your dad and then

9  your dad wasn't home.

10  A   Right.

11  Q   So tell us what they brought.

12  A   They brought an envelope, a sealed envelope, and asked me

13  to give it to my father.

14  Q   Okay.  And did your father later tell you what was in the

15  envelope?

16  A   Yes, sir.

17  Q   And what was it?

18  A   Money.

19  Q   And could you, for the purposes of the jury, kind of show

20  us the size of the envelope?

21  A   It was --

22  Q   As far as the dimensions of the envelope.

23  A   Oh, the envelope was just a letter-size envelope.

24  Q   Letter size?

25  A   Yeah, uh-huh.

1  Q    And the contents in it, was it visible that you could tell

2  it had something in it?

3  A    Yeah, it was bulky.  It was money, I know it was.

4  Q    How far in advance of the election day was it that you

5  received this money for your dad from Doug Adams and Freddy

6  Thompson?

7  A    Maybe a couple — a couple of days, I think.

8  Q    Okay.

9  A    Maybe three days.

10  Q    Were they giving you any instructions about what to do

11  with the envelope when they gave it to you?

12  A    Just give it to my father.

13  Q    Now, before that envelope was dropped off, had you

14  witnessed any gathering of these same individuals at your dad's

15  place?

16  A    Yes, sir.

17  Q    Okay.  And tell us about that, Mr. Bishop.

18  A    It was the — I can't remember exactly what night, but it

19  was the night that I guess they were having their money pooling

20  meeting.

21  Q    Okay.  And where was the money pooling meeting held?

22  A    It was held in my father's building.

23  Q    What kind of building does your father have there?

24  A    It's a 30-by-60 metal building, concrete floor.  It's got

25  heat in it and —

1  Q   And who do you recall being present at that meeting?

2  A   I was over there for —— when everybody started gathering

3  in, and I remember seeing my dad was there, Mike Hooker.

4  Q   Okay.  And was he a candidate for office?

5  A   Mike?

6  Q   Yes, sir.

7  A   I believe he was.

8  Q   Do you recall what position he was seeking?

9  A   Maybe magistrate.

10 Q   Okay.  Who else do you recall seeing there, Mr. Bishop?

11 A   I remember seeing Al Man, William Stivers.

12 Q   Okay.

13 A   Charles Marcum.

14 Q   All right.

15 A   Doug Adams, Freddy Thompson.

16 Q   Okay.

17 A   I think that's —— pretty much when Charles came, I left.

18 Q   When Charles who?

19 A   Marcum came.  Because he was mad at me anyway because I

20 was for Kennon and he was running for jailer, so I left.

21 Q   Did Charles know that you were going to have to support

22 Kennon in this election at that time?

23 A   Yes, sir.

24 Q   Okay.  How, to your knowledge, did Charles know that you

25 were being pressured to support Kennon at that time?

1  A    My father had told him.

2  Q    Now, you say you were there initially at the meeting?

3  A    At the beginning of it, yes, sir.

4  Q    And following the meeting, did you have conversations with

5  members of that meeting?

6  A    I'm sure I did.

7  Q    And in those conversations with the people who were at

8  that meeting, did they tell you what was put on the table as

9  far as money?

10         MR. ABELL:  Objection, Judge.

11         THE COURT:  You'll need to identify who told you

12  first, then I'll have to make a decision as to whether you can

13  state.

14         THE WITNESS:  Identify?

15         THE COURT:  Who told you.  If someone told you

16  something, you need to tell me who it was first.

17  BY MR. SMITH:

18  Q    I asked you a general question, if there were participants

19  at that meeting that you had conversations with about what was

20  put on the table.  Do you remember that question?

21  A    Yes, sir.

22  Q    Who did you specifically talk to that was present at the

23  meeting?

24  A    I talked to Freddy Thompson.

25  Q    Okay.  And what did Freddy tell you?

1   A    I believe it was 140-, $150,000.

2   Q    And what did he say in context —— do you remember

3   generally his words, what did he say about the 150,000?

4   A    I asked him —— we were smoking one day and I asked him how

5   much he had —— it cost him, how much he had spent in that

6   election, and I believe it was 140-, $150,000 that he told me.

7   And someone came up and we had to stop talking.

8   Q    Now, had you also talked to your father?

9   A    Yes, sir.

10  Q    And was that closer in time to the election that you

11  talked to your father?

12  A    Yes.

13  Q    Okay.  And what did your father tell you was put on the

14  table?

15  A    150-, $200,000.  He said they was —— he didn't know

16  exactly because he was not one of the guys that puts the money

17  in, but he said there was a big pile.  And that's ——

18  Q    And you're raising your hands up here showing ——

19  A    That's what he said, it was a pile.

20  Q    He just said it was a pile?

21  A    Yeah.

22  Q    Why didn't you stay for the whole meeting, Mr. Bishop?

23          MR. WHITE:  Objection, asked and answered, Your

24  Honor.

25          THE COURT:  Overruled.  You can answer.

1           THE WITNESS:  Huh?

2           THE COURT:  You can answer.

3           THE WITNESS:  Well, because I couldn't be for Charles

4    and I felt like that they would feel like I was there to get

5    information for Kennon and them, and I just —— it was just best

6    I wasn't there.

7    BY MR. SMITH:

8    Q    Now, did you also work in the 2004 election, Mr. Bishop?

9    A    I was an election officer, yes, sir.

10   Q    Okay.  And did you-all have a city council, mayor race out

11   there in that precinct?

12   A    No, sir.

13   Q    Okay.  So was there a primary election involving a state

14   representative race that you recall in 2004?

15   A    Yes, sir.

16   Q    And would that have been a race in which there would have

17   been votes cast in your precinct?

18   A    Yes, sir.

19   Q    Do you know who those candidates were running for that

20   office?

21   A    Tim Couch and Barbara Colter.

22   Q    And were you aware of money being put up for that

23   election?

24   A    Yes, sir.

25   Q    Tell us about that.

1   A    My father and — he said someone brought money to the back

2   door to him.

3   Q    Okay.

4   A    And I can't remember whom and — but he remembers someone

5   bringing him money.

6   Q    Okay.  You say your dad told you somebody showed up with

7   money at the back door.  What did the money — what was the

8   money for?

9   A    It was for Tim Couch.

10  Q    Okay.  And Tim Couch would have been a candidate for this

11  state representative office?

12  A    Yes, sir.

13  Q    How much money did your dad receive for that race?

14  A    I don't know exact, but I think it was 500 to a thousand

15  dollars.

16  Q    Were you there at the house when the mysterious dropoff of

17  money occurred?

18  A    No, sir.

19  Q    Was this — do you know if this was the day before the

20  election or days before the election that this dropoff

21  occurred?

22  A    I can't remember — it was such a small election, there

23  was only one person running, so it wasn't really a lot around

24  it.

25  Q    Did your dad serve as an election officer in that '04

1  election, to your knowledge?

2  A    No, sir.

3  Q    Did he serve in the '02 election?  I know you told us that

4  he served in the commissioner position in the early voting, but

5  did he also serve an as election officer on election day?

6  A    No, sir.

7  Q    All right.  Do you know a fellow by name of Jonathan

8  Brumley?

9  A    Yes, sir.

10  Q    And is he someone that's of significance when it comes

11  time to buy votes in Clay County?

12  A    Yes, sir.

13  Q    Tell us what you know about Mr. Brumley.

14  A    Jonathan works the -- I think the Goose Rock.  It's the

15  Goose Rock precinct.

16  Q    As an election officer, you mean?

17  A    Yes, sir.

18  Q    Okay.  And that's -- Goose Rock is a another precinct in

19  the county?

20  A    Uh-huh.  Yes, sir.

21  Q    And do you know of instances where -- instances in which

22  Mr. Brumley was entrusted with some money to be spent at a

23  particular election?

24  A    Yes, sir.

25  Q    Tell us about that, Mr. Bishop.

MICHAEL BISHOP - DIRECT - MR. SMITH                65

1    A    In 2002, I guess when Freddy and Doug and -- Freddy

2    Thompson and Doug Adams and Roy Morgan and these guys were

3    dropping their money, money was given to Jonathan.

4    Q    Okay.  And were there comments made by someone to you?

5    A    Yes, sir.

6    Q    Who made comments to you?

7    A    Mr. Adams commented on it.

8    Q    And what did he tell you?

9    A    Commented that they had to babysit Jonathan.

10   Q    And when he said "they had to babysit," did he say who was

11   with him when he said babysitting?

12   A    Yancey White.

13   Q    And did he further explain himself as to what he meant by

14   babysitting?

15   A    Yes, to make sure that he bought the votes for the slate

16   that they wanted.

17   Q    Did he indicate that he had actually been to visit him

18   during the night before?

19   A    Yes, sir, they stayed up there for a while.

20   Q    The night before the election?

21   A    Yes, sir.

22   Q    Did you see Doug Adams traveling around with Tim Couch

23   during that '04 election?

24   A    Yes.  Everybody knowed that Mr. Adams was for Tim.

25   Q    Do you see Mr. Doug Adams here in the courtroom this

1  morning?

2  A    Yes.

3  Q    Could you point out where he's seated and what he's

4  wearing for the record, please?

5  A    He's wearing a yellow shirt and a black coat.

6         THE COURT:  The record will reflect that the witness

7  has identified the defendant, Doug Adams.

8  BY MR. SMITH:

9  Q    You've also indicated in your testimony that Freddy

10 Thompson was there at the meeting pooling money.  Do you see

11 him here?

12 A    Yes, sir.

13 Q    Would you point out where he's seated and what he's

14 wearing for the record?

15 A    He's wearing a gray coat with a green shirt.

16        THE COURT:  All right.  The record will also reflect

17 that the witness has identified the defendant, Freddy Thompson.

18 BY MR. SMITH:

19 Q    You mentioned an Al Man Stivers was present at that money

20 pool.

21 A    Yes, sir.

22 Q    That meeting to pool money.  Do you see him here this

23 morning?

24 A    Yes, sir.  Blue shirt.

25        THE COURT:  Likewise, the record will reflect that

 1  the witness has identified the defendant, William Stivers.

 2  BY MR. SMITH:

 3  Q    You also indicated that Wayne Jones possibly was there at

 4  the meeting?

 5  A    Uh-huh.

 6  Q    Do you see him here?

 7          MR. WHITE:  Objection, Your Honor.

 8          THE COURT:  Overruled.

 9          Can you identify him in the courtroom?

10  BY MR. SMITH:

11  Q    If you need to stand up to see better.

12  A    Yes, sir, there he is by Mr. Adams.

13          THE COURT:  All right.  Next to Mr. Adams.  The

14  record will reflect that the witness has identified the

15  defendant, Wayne Jones.

16  BY MR. SMITH:

17  Q    Now, prior to you getting your promotion for police chief,

18  did you entertain any meetings out there where the Whites might

19  have come out to your property?

20  A    Yes, sir.

21  Q    And who else was at that meeting, to your knowledge,

22  Mr. Bishop?

23  A    There was myself and my father and Mr. Adams and the

24  mayor, Daugh White, and his son, Kennon White, came out.

25  Q    And was there a discussion that you recall between Doug

1  Adams and the Whites?

2  A    Yes, sir.

3  Q    What was the discussion about?

4  A    They were there to tell Mr. Adams that they were going to

5  put me in as chief of police and they would appreciate his help

6  in the election.

7  Q    And when they say — when they said appreciate his help in

8  the election, to your understanding, whose election were they

9  referring to?

10 A    The mayor, Daugh White.

11 Q    Did Mr. Adams make an answer to that request?

12 A    He nodded yes, like he would, and they left with the

13 impression that he was going to.

14 Q    And following that meeting, were you greeted with news

15 that you had gotten the position of chief of police?

16 A    Yes, sir.

17 Q    Now, Mike Bishop, have you been charged in this case?

18 A    No, sir.

19 Q    Have you been made any promises in this case by the

20 government?

21 A    Just that if I be honest and — Is that what — is that

22 your question?

23 Q    Have you been made any promises by the United States?

24 A    As long as I cooperate and testify truthfully that I will

25 not be charged.

1  Q    And what's your understanding today, Mr. Bishop, if you

2  were to testify in front of this jury falsely?

3  A    Then I would be charged with perjury.

4  Q    And what would happen to your agreement with the United

5  States that you wouldn't face charges in this voting fraud

6  scheme?

7  A    I don't have an agreement, it would be gone.

8            MR. SMITH:  I pass the witness.

9            THE COURT:  All right.  Thank you.

10           Mr. Hoskins.

11           MR. HOSKINS:  Thank you, Your Honor.  Just briefly.

12           THE COURT:  Yes, sir.

13                    CROSS-EXAMINATION

14  BY MR. HOSKINS:

15  Q    Mr. Bishop, the person you mentioned being the Democrat

16  judge was a Mr. Stockton; is that right?

17  A    No.  No, he was the clerk.

18  Q    Oh, he was the clerk?

19  A    Yes, sir.

20  Q    But he was one of the four election officers that you

21  served with; is that right?

22  A    Uh-huh.

23  Q    Okay.  He is the principal at Oneida Baptist Institute; is

24  that correct?

25  A    Yes, sir.

1  Q    And that's a private school?

2  A    Yes, sir.

3         MR. HOSKINS:  That's all.  Thank you.

4         THE COURT:  All right.  Thank you.

5         Mr. Bayer.

6         MR. HOSKINS:  Thank you, Judge.

7                    CROSS-EXAMINATION

8  BY MR. BAYER:

9  Q    Good morning, Mr. Bishop.  I'm Bennett Bayer.

10 A    Morning.

11 Q    I'm one of Mr. Adams' attorneys.  I want to start right

12 off with your -- the issue on the promotion.  I want to deal

13 with that right off the bat.

14      If I understand you correctly on your direct examination,

15 you indicated that Daugh White and Kennon White set up a

16 meeting at your home?

17 A    No, sir.

18 Q    How did that meeting come about?

19 A    That was on a workday.  I had been at work, and Kennon

20 had -- Kennon White had asked me where I will be that day.  And

21 we was at Mr. Adams's farm working, and Kennon came -- and his

22 father came there that evening.

23 Q    What were you doing at the farm?

24 A    The best of my knowledge, he were fixing float beds for

25 tobacco.

1  Q    So you folks were out in the field working and Daugh White

2  and Kennon White come driving up?

3  A    Yes, sir.

4  Q    Were they invited by Mr. Adams to be there?

5  A    No, sir.

6  Q    Were they invited by your father to be there?

7  A    No.

8  Q    Were they invited by you to be there?

9  A    Well, I had knowledge that they was coming, yeah.

10 Q    But you didn't invite them to be there?

11 A    No, I don't guess.

12 Q    Okay.  So they come driving up, and tell us what happens.

13 A    They get out of the vehicle and just start talking, I

14 guess making small talk.

15 Q    And they basically came there seeking assistance from, I

16 guess, Doug Adams and for your father for Daugh White's mayoral

17 race?

18         MR. SMITH:  Your Honor, I'm going to object to the

19 mischaracterization of the evidence at this point.

20         THE COURT:  All right.  Overruled.

21         MR. BAYER:  Thank you, Judge.

22         THE COURT:  You can answer the question if you can --

23 if you understand the question that's posed to you.

24         THE WITNESS:  Could you repeat that for me?

25 BY MR. BAYER:

1  Q    They came seeking your father's and Mr. Adams' assistance

2  in Daugh White's mayoral race?

3  A    Yes, sir.

4  Q    And if I understood you correctly, you said that Doug

5  Adams may have nodded or something?

6  A    Yes, sir.

7  Q    Did he ever say he was going to help them?

8  A    They got — their impression was that he was.

9  Q    They got that impression, but he never said it, did he?

10 A    No.

11 Q    As far as you know, Doug Adams never did anything for

12 Daugh White, did he?

13 A    No.

14 Q    So they came there trying to put pressure upon your father

15 and Doug Adams, and Doug Adams didn't do anything for them, did

16 he?

17 A    No.  I don't think.

18 Q    Did Doug Adams have anything to do with you getting that

19 promotion?

20 A    No, sir.

21 Q    When you were at the City meeting and Doug Adams was

22 there, did he speak?

23 A    No.

24 Q    Doug Adams had been a long long-time friend with your

25 father; correct?

1  A     Yes, sir.

2  Q     And you probably have known Doug Adams your entire life?

3  A     Yes, sir.

4  Q     You would consider yourself fairly close to Mr. Adams?

5  A     Yes, sir.

6  Q     Did you have other friends that were at that meeting that

7  night they were voting on whether or not you were going to get

8  that chief position?

9  A     Yes, sir, I'm sure I did.

10  Q     Probably had quite a few of your family and friends there,

11  weren't they?

12  A     Yeah.

13  Q     Showing you support; right?

14  A     Yes, sir.

15  Q     And that's what Doug Adams was doing there, he, as a

16  family friend, was showing his support at that meeting?

17            MR. SMITH:  Objection, Your Honor.

18            THE COURT:  Sustained.

19  BY MR. BAYER:

20  Q     He didn't speak on your behalf, did he?

21  A     No, sir.

22  Q     And if I understand you correctly, as far as you know, he

23  had nothing to do with you getting that promotion; correct?

24  A     No, sir.

25  Q     You started off as a deputy sheriff, but you went to the

1  academy; correct?

2  A    Yes, sir.

3  Q    What is the academy?

4  A    It's the police academy in Eastern — Richmond, Kentucky.

5  Q    You got formal training as a law enforcement officer?

6  A    Yes, sir.

7  Q    And you were working with the Sheriff's Office at the

8  time?

9  A    Yes, sir.

10  Q    How did you — how did you get your job with the Sheriff's

11  Office?

12  A    I was working as a dispatcher, and, actually, we had been

13  growing tobacco on the Sheriff's farm, and when we paid him at

14  the end of the year, he was, I guess, thrilled that we had been

15  honest with him, knowing we had been honest with him I believe

16  is what he said, and I eventually asked him if he would send me

17  to the police academy.

18  Q    And the sheriff at that time was Edd Jordan?

19  A    Yes, sir.

20  Q    And what happened?  You went to the police academy?

21  A    Uh-huh.  Yes, sir.

22  Q    How long did you work for the Sheriff's Office?

23  A    Probably about three months.

24  Q    Why did you leave?

25  A    I wanted to be with the Manchester Police Department as an

1  SRO.

2  Q    You didn't want to stay with the Sheriff's Office anymore,

3  did you?

4  A    No.

5  Q    Did you have any problems with the Sheriff?

6  A    Yes.

7  Q    What were they?

8  A    I didn't like, I guess, the way the Sheriff, Edd, run his

9  department.

10 Q    Did Doug Adams have anything to do with you getting that

11 job?

12 A    No, sir.

13 Q    Did Doug Adams have anything to do with you getting into

14 the academy?

15 A    No, sir.

16 Q    In fact, I believe you just happened to run in to Doug

17 Adams one time at Richmond while you were at the academy, it

18 was a surprise, wasn't it?

19 A    It was, yes, sir.

20 Q    And that was when you told him that you were at the

21 academy going into law enforcement?

22 A    Told his wife.

23 Q    And up until then, they had no idea?

24 A    No, sir.

25 Q    It was actually Kennon White who wanted you to be a police

1   officer; correct?

2   A    To be a police officer?

3   Q    To get on to the police department?

4   A    Yes, sir.

5   Q    Tell us about that.

6   A    Well, I mean, he wanted —— it was an advantage for him

7   having me work for them, me being close friends with Mr. Adams,

8   and they were trying to —— they were manipulating me, I guess,

9   to try and get political favors.

10  Q    So they were trying to curry favor with Doug Adams and

11  they thought they could do it through you?

12  A    Yes, sir.

13  Q    Did it ever work?

14  A    No, sir.

15  Q    You had been a school resources officer, and the jury may

16  not understand that, but that's really a law enforcement

17  position, isn't it?

18  A    In the schools, yes, sir.

19  Q    So you had been a deputy sheriff, you had been a school

20  resource officer for about five or six years, and then you got

21  the job with the police department.  How would you describe

22  your qualifications to become a police officer?

23  A    Good.

24  Q    As good as anybody else in Clay County?

25  A    Sure.

MICHAEL R. BRYANT - CROSS - MR. HOSKINS                77

1  Q    You rose through the ranks.  How would you describe how

2  well you were doing?

3  A    I done my job.

4  Q    And you became the assistant daytime chief?

5  A    Yes, sir.

6  Q    Todd Roberts was the assistant nighttime chief?

7  A    Yes, sir.

8  Q    How did you and Todd Roberts get along?

9  A    Not well.

10 Q    Why?

11 A    I was a threat to Todd.

12 Q    I don't understand that.  What's that mean?

13 A    He was afraid that I was going to become the chief and he

14 had tried -- wanted to be the chief forever.  So I was a threat

15 to him.

16 Q    There was a lot of conflict between you and Todd Roberts,

17 wasn't there?

18 A    Yes, sir.

19 Q    Todd Roberts was also getting into trouble, wasn't he?

20 A    Yes, sir.

21 Q    Tell us about that.

22         MR. SMITH:  Your Honor, I'm going to object.

23         THE COURT:  Sustained.  Outside the --

24         MR. BAYER:  Judge --

25         THE COURT:  Outside the scope of direct.  Sustained.

1              MR. BAYER:  Could we approach for just one moment?

2              THE COURT:  No.

3    BY MR. BAYER:

4    Q    Eventually, you were the one that was named as the interim

5    chief?

6    A    Yes, sir.

7    Q    How did that happen?  Who brought that up to you?

8    A    Kennon and the Mayor.

9    Q    And, in fact, because Todd was already in trouble?

10   A    Yes, sir.

11   Q    And the chief was resigning?

12   A    Yes, sir.

13   Q    Did you seem like the likely choice to them?

14   A    Yes, sir.

15   Q    You being named as the interim chief, did Doug Adams have

16   anything to do with that happening?

17   A    Not that I'm aware of.

18   Q    I want to talk about the 2002 election that you said you

19   participated in.  What was the big race in 2002?

20   A    Clerk's race.

21   Q    Who was the incumbent?

22   A    Who was in office?

23   Q    Yes, sir.

24   A    Jennings White.

25   Q    Tell us about the dynamics of what was going on in 2002 as

1  far as the people that were going to be working against

2  Jennings White?

3  A    Most of the people that were against Jennings White

4  were -- they were friends of mine, a lot of them was.

5  Q    Freddy Thompson was a friend of yours?

6  A    Yes, sir.

7  Q    Why did you-all decide that you needed to get Jennings

8  White out of office?

9  A    Nobody liked the way the county was at at that time.

10  Q    Can you go into detail?  Explain what you're thinking.

11          MR. SMITH:  Your Honor, I'm going to object.

12          THE COURT:  Sustained.

13  BY MR. BAYER:

14  Q    At the time, in 2002, what were your thoughts at that time

15  as far as why you needed to get Jennings White out of office?

16          MR. SMITH:  Same objection.

17          THE COURT:  Sustained.

18  BY MR. BAYER:

19  Q    It's fair to say, though, that it was a general upswell

20  within the community to get Jennings out of office?

21          MR. SMITH:  Same objection.

22          THE COURT:  Sustained.

23  BY MR. BAYER:

24  Q    You talked about the meeting that was in 2002, and you

25  said that there was a slate or something.  The only candidate

MICHAEL R. BERGER CROSS - MR. HOSKINS                    80

1  you ever heard Doug Adams talk about was supporting Freddy

2  Thompson, though; correct?

3  A     Yeah, that was his — that was his main — yes, sir.

4  Q     He was only interested in the clerk's race?

5          MR. SMITH:  Your Honor, that was not his testimony,

6  I'm going to object.

7          THE COURT:  Sustained.

8  BY MR. BAYER:

9  Q     Did you ever hear him talk about anybody else that he was

10 supporting other than Freddy Thompson in '02?

11 A     Yes, sir.

12 Q     Who?

13 A     Well, I mean, he was for Roy.

14 Q     He was for him, but did he do any campaigning for him?

15 A     Somewhat, I guess, yes, sir.

16 Q     But principally who was he supporting?

17 A     Freddy Thompson.

18 Q     Kennon White was putting a lot of pressure on you to

19 support him in the 2002 race?

20 A     Yes.

21 Q     And who was he running against?

22 A     Charles Marcum.

23 Q     Did that cause tension and friction between you and your

24 father?

25 A     No.

1  Q    Why?

2  A    Because Dad knowed -- he knowed that I had been

3  threatened.  I mean, they would fire me.

4  Q    They were going to fire you if you didn't support Kennon

5  White?

6  A    Yes, sir.  That's what they said.

7  Q    That was the indication you got?

8  A    Yes, sir.

9  Q    Kennon White, member of the White family related to

10 Jennings White?

11 A    Uh-huh, yes, sir.

12 Q    So it would be fair to say that because of the pressure

13 put upon you by the Whites, you actually took a position that

14 was opposite to Mr. Adams?

15      MR. SMITH:  Your Honor, that's a conclusion, not a

16 question.

17      THE COURT:  Sustained.  It's argument.

18 BY MR. BAYER:

19 Q    Was Mr. Adams on the opposite side based upon what you

20 understood?

21 A    Yes, sir.

22 Q    You said that during 2002, while your father was a judge,

23 a precinct was shut down?  Did I understand that correctly?

24 A    The absentee voting, yes, sir.

25 Q    What happened?

1  A    I can't remember.  But I know that — I remember my

2  father — I don't know if I was off that day or what, but that

3  day the Sheriff, I remember, had to shut it down.

4  Q    It was Sheriff Edd Jordan that shut it down?

5  A    Yes, sir.

6  Q    Did you have anything to do with that?

7  A    No, sir.

8  Q    And in 2004, the big race in Clay County in 2004 was what?

9  A    Tim Couch.

10 Q    Tim Couch.  He was running against who?

11 A    I think he was already — he was already state

12 representative.

13 Q    He had won in 2002?

14 A    Uh-huh.

15 Q    And Barbara White Colter was trying regain her seat in

16 '04; correct?

17 A    Yes, sir.

18 Q    And you said that you saw Mr. Adams and Tim Couch riding

19 together in '04?

20 A    Yes, I've seen them together.

21 Q    Mr. Adams was trying to prevent Barbara White Colter from

22 being re-elected?

23         MR. SMITH:  Your Honor, I'm going to object.

24         THE COURT:  Sustained.

25 BY MR. BAYER:

1  Q    As far as you know, Mr. Adams was supporting Tim Couch in

2  '04?

3  A    Yes, sir.

4  Q    Did Tim Couch get re-elected in '04?

5  A    Yes, sir.

6  Q    In 2002, was Barbara White Colter part of that Jennings

7  White slate?

8  A    Yes, sir, I'm sure she was.

9  Q    So when Jennings lost in 2002 and Barbara White Colter

10 lost in 2002, it was the beginning of the breakdown of that

11 White control over Clay County; correct?

12         MR. SMITH:  Objection.

13         THE COURT:  Sustained.

14         MR. BAYER:  If I could have just a moment, Judge?

15         THE COURT:  Yes, sir.

16 BY MR. BAYER:

17 Q    Mr. Bishop, you've indicated that you're a close family

18 friend with Mr. Adams.  In the 2002 primary, the clerk's race

19 that Mr. Adams was principally interested in, were you aware of

20 things going on in the Adams household that were motivating

21 factors for why he was trying to get Jennings White out of

22 office?

23         MR. SMITH:  Objection, Your Honor.

24         THE COURT:  Sustained.

25         MR. BAYER:  Judge, thank you, no further questions.

1          THE COURT:  The jury will be reminded that when the

2    Court sustains an objection to a question that the jury should

3    disregard the question.

4          Mr. White, you may proceed.

5          MR. WHITE:  Yes, Your Honor.  We have no questions.

6    Thank you, though.

7          THE COURT:  Thank you.

8          MR. ABELL:  Judge, I do have a few for Mr. Bishop.

9          THE COURT:  Yes, sir.  Mr. Abell.

10                    CROSS-EXAMINATION

11   BY MR. ABELL:

12   Q    Mr. Bishop, my name is Robert Abell, and I represent

13   William Stivers in this case.

14        Mr. Stivers, it's your recollection, was arrested at the

15   polls in 2002; correct?

16   A    Yes, he was.

17   Q    Do you recall if that was in May or in November, spring or

18   fall?

19   A    I can't remember.  I wasn't — I wasn't involved, I was at

20   the schools at that time.

21   Q    Do you remember if Mr. Stivers' arrest involved Todd

22   Roberts?

23   A    Yes, sir, it did.

24   Q    And was it the case, to your recollection, that Todd

25   Roberts caused Mr. Stivers to be arrested at the polls?

1   A    Yes, sir.

2   Q    But whether that was May or November, you're not sure?

3   A    No, sir.

4   Q    Do you recall if in the spring, or in May, that William

5   Hugh Bishop served as an election officer the first three days

6   of absentee voting and then after those first three days was

7   replaced by your father?

8   A    I think that's right, yes, sir.

9   Q    And in the fall, William Hugh, since his brother, Clay

10  Massey, was running for county attorney, couldn't serve at all;

11  is that correct?

12  A    Yes, sir.

13  Q    And in the fall your dad served as absentee election

14  officer the entire time that was going on; correct?

15  A    Yes, sir, I think.

16  Q    When was it -- It's unclear to me, notwithstanding your

17  testimony, so please clarify this for me.  When did you become

18  the interim police chief of Manchester?

19  A    I don't know.

20  Q    Was it in 2005?

21  A    No.  It would have been in 2007.

22  Q    2007?

23  A    Yes, sir.

24       MR. ABELL:  All right.  That's it, Judge.

25       THE COURT:  All right.  Thank you.

1          Mr. Baldani, we're going to take a break here in just

2     a moment.  Would you like to do that before you begin your

3     questions?

4               MR. BALDANI:  I'm ready to go if you want me to.

5               THE COURT:  All right.  Will your questions be more

6     than ten minutes?

7               MR. BALDANI:  I don't think so.

8               THE COURT:  All right.  Why don't you proceed.

9                         CROSS-EXAMINATION

10    BY MR. BALDANI:

11    Q    Good morning, Mr. Bishop.

12    A    Good morning.

13    Q    My name is Russ Baldani, I'm one of Freddy's lawyers.

14    A    Okay.

15    Q    I want to start out asking you a little bit about this --

16    You testified about your dad replacing William Hugh Bishop;

17    right?

18    A    Yes, sir.

19    Q    And my question is, if I heard you correctly, you said

20    that your dad was approached by Doug Adams and maybe Freddy

21    Thompson.  I think I heard you say "maybe Freddy Thompson."

22    Did I hear you correctly?

23    A    Yes, sir, I think.

24    Q    Okay.  So the bottom line is you're not sure whether

25    Freddy was involved in that or not?

MICHAEL R. BISHOP - CROSS - MR. BALDANI                87

1   A    I wasn't there, yes, sir.

2   Q    Oh, okay.  So when you were testifying, you're talking

3   about what your dad told you?

4   A    Yes, sir; what I had heard from him, I guess, but, no, I

5   wasn't there.

6   Q    I didn't get that.  So the bottom line is Bishop was not

7   able to serve because his brother was running and there needed

8   to be a replacement; right?

9   A    Yes, sir.

10  Q    And you don't know for sure whether Freddy Thompson had

11  anything to do with that or not; right?

12  A    Yes, sir.

13  Q    Okay.  All right.  I want to ask you now about the

14  occasion that you said some money was dropped off in an

15  envelope.

16  A    Uh-huh.

17  Q    You recall testifying about that, I think?

18  A    Yes, sir.

19  Q    And that was 2002?

20  A    Yes, sir.

21  Q    And that happened at whose home?

22  A    My home.

23  Q    Your home.  And you didn't live with your dad at that

24  time, did you?

25  A    No, sir.

1  Q    Okay.  Did the people that came to your home, were they

2  looking for your dad or were they looking for you?

3  A    My father.

4  Q    Okay.  So apparently they thought that your dad might be

5  at your house, was that the impression you got?

6  A    Could have been.  He wasn't at home and they were wanting

7  that to get to him.

8  Q    But in any event, you said Yancey White was driving his

9  father-in-law's vehicle; right?

10 A    Yes, sir.

11 Q    And to be clear, it's your testimony that Doug Adams

12 handed you the envelope; right?

13 A    Yes, sir.

14 Q    Okay.  Freddy Thompson didn't hand you that envelope, did

15 he?

16 A    Freddy was in the middle.

17 Q    He was in the vehicle?

18 A    In the middle of the vehicle, yes, sir.

19 Q    Okay.  So he didn't even get out of the car, then, did he?

20 A    Nobody got out.

21 Q    When you say he was in the middle, does that mean he's in

22 the backseat in the middle?

23 A    Yes, sir.

24 Q    All right.  And nobody got out of the vehicle at all,

25 then; right?

1   A    No, sir.

2   Q    But Adams is the one who handed you the money from the

3   window in the backseat?

4   A    Yes, sir.

5   Q    All right.  Now, I want to talk to you about the meeting

6   at your dad's building; okay?

7   A    Okay.

8   Q    And you described that building a little bit; right?

9   A    Uh-huh.

10  Q    And in all fairness, that building was sort of a gathering

11  place, wasn't it?

12  A    Yes, sir.

13  Q    Okay.  A lot of people, friends of your dad's, friends of

14  yours, people came there, hung out; right?

15  A    We had fish fries and things of that nature, yes, sir.

16  Q    Okay.  And there was a lot of social gatherings and

17  meetings that didn't have anything to do with any vote buying;

18  isn't that true?

19  A    Not meetings, no, sir.

20  Q    Well, get-togethers, fish fries, I mean —

21  A    Yeah.  Yeah.

22  Q    So there was gatherings —

23  A    Yes, sir.

24  Q    — I should say maybe rather than meetings.  There were

25  plenty of gatherings that had a perfectly legal purpose; right?

1    A    Yes, sir.

2    Q    Was Freddy at some of those fish fries and stuff?

3    A    Yes, sir.

4    Q    Because he was a friend of yours; right?

5    A    Yes, sir.

6    Q    All right.  Now, to be clear, you did not see any money

7    pooled at that meeting, did you?

8    A    No, sir.

9    Q    So basically what you have to tell the jury about the

10   money being pooled at that meeting is strictly from what your

11   dad told you; right?

12   A    And others, yes, sir.

13   Q    Okay.  Was Randy -- Do you know Randy Craft?

14   A    Yes, sir.

15   Q    He wasn't at that meeting, was he?

16   A    I don't know if he was or not.  He seems to think he might

17   have been.

18   Q    Well, I'm talking about what you recall seeing.

19   A    I didn't see him, no, sir.

20   Q    All right.  And as far as you know, the people that were

21   at the meeting, they were -- had all gathered at the point you

22   left; right?

23   A    They were coming in, yes, sir.

24   Q    All right.  Now, you talked about a conversation you had

25   with Freddy Thompson.  When did that conversation take place?

 1  A    Sometime after he had won and he was clerk, yes, sir.

 2  Q    After the election?

 3  A    Yes, sir.

 4  Q    So, I mean, can you say it was a week, two weeks, a month,

 5  what's the best timeframe you can put on it?

 6  A    I would say three or four months after he was clerk.

 7  Q    So it was three or four months afterwards?

 8  A    Yes, sir.

 9  Q    All right.  And your question was how much did it cost or

10  what did you spend; right?

11  A    Yes, sir.

12  Q    You didn't specifically say, how much money did you put

13  down at the table at my Dad's, you said, how much did you

14  spend; right?

15  A    Yes, sir.

16  Q    So those are two different things; right?

17  A    Yes, sir.

18  Q    And we've heard lots about vote buying in this trial

19  obviously, but the question was simply how much did you spend,

20  it wasn't how much did you put in to buy votes; right?

21  A    Yes, sir.

22  Q    All right.  And Mr. Smith asked you about a guy named Roy

23  Morgan and asked you whether he was a man of substance or the

24  type of guy that would be able to put up $90,000.  Do you

25  recall that question?

1   A    Yes, sir.

2   Q    To your knowledge, when Freddy ran for county clerk in

3   '02, what was his profession?

4   A    He owned his own business.

5   Q    Okay.  He worked —

6   A    Are you talking about Freddy?

7   Q    Yeah, hardware —

8   A    The hardware store, yes, sir.

9   Q    Didn't he work at a hardware store?

10  A    Yes, sir.

11  Q    Was he working for his dad at that time?

12  A    I don't know.  I don't know if it was his.  I never seen

13  Ralph, his father, there.

14  Q    Okay.  I want to talk to you about your — the prosecutor

15  asked you about your deal.  I want to talk to you about your

16  prior meetings with the FBI.  And you've had several of them;

17  haven't you?

18  A    Yes, sir.

19  Q    How many do you think you've had?  I'm talking about

20  meetings with the FBI to answer questions about the vote fraud

21  allegations.  How many meetings do you think you've had?

22  A    Three or four.

23  Q    Do you recall when they were?

24  A    The first time was about — close to two years ago.

25  Q    Yeah.  The first time, does April 14th of 2008, does that

1  sound familiar?  That would have been about two years ago.

2  A    That would be close, yes, sir.

3  Q    Do you have a pretty good memory of the first time that

4  you were questioned about this stuff?

5  A    Yes, sir.

6  Q    Because you were still a police officer at that time?

7  A    No, sir.

8  Q    No, you weren't.  But, still, you knew that you were being

9  questioned about illegal activity by the FBI; right?

10 A    Yes, sir.

11 Q    And you decided to tell them your involvement; right?

12 A    I wanted to be honest, yes, sir.

13 Q    Okay.  And do you recall that your dad went and met with

14 the FBI the very next day?

15 A    Yes, sir.

16 Q    Okay.  So he was aware that you were meeting with the FBI

17 to be honest; right?

18         MR. SMITH:  Your Honor, I'm going to object.

19         THE COURT:  Sustained.

20 BY MR. BALDANI:

21 Q    And you spoke with them again on May 18th of '09, does

22 that sound about it?

23 A    I don't know.  Yeah, I guess, yes, sir.

24 Q    Let me ask you this:  Did you ever -- You talked about

25 your relationship with Todd Roberts and you-all were not

1    friends by any means; right?

2    A    No, sir.

3    Q    Did you ever tell Todd Roberts about the pooling meeting

4    at your dad's building?  Did you tell him what you knew about

5    it?

6    A    I can't remember if I did.

7    Q    You don't have any specific memory of doing that, do you?

8    A    No, sir, I don't.

9    Q    I mean, knowing your relationship with Todd Roberts, do

10   you think —

11          MR. SMITH:  Your Honor, I'm going to object to

12   argument.

13          THE COURT:  Sustained.

14   BY MR. BALDANI:

15   Q    So the bottom line is you have no recollection of telling

16   him that; right?

17   A    No.

18   Q    Now, you're aware your dad entered a plea agreement in

19   this case; right?

20   A    Yes, sir.

21   Q    And was part of his plea agreement that the government

22   wouldn't prosecute you?

23   A    I think so, yes.

24   Q    All right.  So your dad was trying to protect you?

25          MR. SMITH:  Your Honor, I object.

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Sustained.

3   BY MR. BALDANI:

4   Q    How old is your dad, Mr. Bishop?

5   A    Dad was born in '48, so —

6   Q    Sixty-two?

7   A    Sixty-two.

8   Q    And does your dad have problems?

9          MR. SMITH:  Objection, Your Honor.

10         THE COURT:  Sustained.

11         MR. BALDANI:  Judge, could I either approach or just

12  ask the questions —

13         THE COURT:  You can approach.  Come on up.

14      (Whereupon, the following discussion was had between the

15  Court and counsel at the bench, out of the hearing of the

16  jury.)

17         MR. BALDANI:  Judge, Mr. Bishop has relayed what his

18  father told him about things that happened in a meeting, and

19  what I was getting ready to ask was simply whether his father

20  has issues with his memory, which we know to be an issue in

21  this case, and like the psychological reports, so I think

22  that — you know, I understand that you allowed Mike Bishop to

23  testify about what his father said over our objection because

24  it's a co-conspirator statement, but I think it's fair game for

25  him to testify if he has personal knowledge that his father has

1  issues with his memory.

2          THE COURT:  As a result of a stroke that's occurred

3  since the meeting that you're talking about?

4          MR. BALDANI:  No, Your Honor.

5          THE COURT:  That's my understanding.

6          Mr. Smith, what will the government's proof on this

7  be?

8          MR. SMITH:  Well, the timing issue I think is

9  crucial, because I think this conversation with his dad was in

10  '02.  And now, you know, eight years later, Dad is now 62 and

11  has health issues that he didn't have when he told Mike this.

12  And so basically what we're doing is we're opening up a

13  collateral matter on an issue here that I believe doesn't have

14  anything to reflect on this witness's credibility.  And on that

15  basis, we object.

16          MR. BALDANI:  Judge, I don't — I could look at that

17  report, but it was done in connection with an old Social

18  Security case.  And I'm not going after Mike Bishop, but if

19  Mike Bishop has been allowed to relate what Paul Bishop said —

20  and I don't even know what he's going to say.  I'm simply going

21  to ask — I mean, if he knows that his dad can't remember what

22  he had for dinner the day before, I think that's relevant and

23  fair game.

24          THE COURT:  I'll sustain the objection.  It is a

25  collateral matter.  Thank you.  We'll talk our break at this

1  time as well.

2          (Whereupon, the following proceedings continued in open

3  court.)

4          THE COURT:  All right.  Thank you, ladies and

5  gentlemen.  We will take our morning break at this time.  We'll

6  take a 20-minute recess.  Please keep in mind the admonition

7  that you were given previously not to discuss the case among

8  yourselves while we are in recess and the jury will be excused

9  until 11:00 this morning.

10          (Whereupon, the jury retired from the courtroom, after

11  which the following proceedings were had in open court.)

12          THE COURT:  And, Mr. Bishop, you may step down until

13  11:00, sir.

14          Any matters to take up outside the presence of the

15  jury?

16      (No response.)

17          THE COURT:  We'll be in recess until 11:00.

18      (Whereupon, a short recess was had, after which the

19  following proceedings were had outside the presence of the

20  jury.)

21          THE COURT:  Thank you.  The record will reflect the

22  jury is not present.

23          Let's see, someone has an issue.

24          MR. BALDANI:  Yes, Your Honor.

25          THE COURT:  Yes, sir.

1          MR. BALDANI:  We need to follow up a little bit what

2    we were talking about at the bench, and I understand you made

3    your ruling, but I —

4          THE COURT:  Yes, sir.

5          MR. BALDANI:  — did want to point out that the

6    evaluation was done in '02 and that Mike Bishop was present

7    during that evaluation, and if that doesn't change what you

8    ruled, I —

9          THE COURT:  It doesn't change my ruling.  As

10   Mr. Smith correctly pointed out, of course, you're attempting

11   to attack the character of one witness through another witness.

12   The question here is not, of course, what he doesn't know but

13   what he was able to recall and what he repeated at the time

14   that this conversation took place, and so it doesn't affect my

15   ruling.

16         MR. BALDANI:  Well, I wanted to let you know I felt

17   like I needed to at least put it in by avowal.

18         THE COURT:  Well, you've noted your objection to the

19   question, I've sustained the objection.  I guess you want to

20   bring the witness in and ask the witness the question; is

21   that —

22         MR. BALDANI:  Yes, Your Honor.

23         THE COURT:  All right.  Let's bring the witness in.

24      (Whereupon, the witness resumed the witness stand.)

25         THE COURT:  Mr. Bishop, Mr. Baldani has a couple of

1  additional questions he would like to ask you outside the

2  presence of the jury.  So I'm going to let him proceed at this

3  time with his questions.

4          THE WITNESS:  Okay.

5          MR. BALDANI:  Thank you, Your Honor.

6  BY MR. BALDANI:

7  Q    Mr. Bishop as far as the pooling of the money, you're

8  relating what your father told you back in 2002; correct?

9  A    The pooling of the money?

10 Q    Yeah, at the meeting.  You weren't there, so you're

11 relating what your father told you; correct?

12 A    Yes, sir.

13 Q    And back in '02, your father -- And your father has some

14 issues with his memory, doesn't he?

15 A    Yes, sir.  He's kindly sick, Dad is, yes, sir.

16 Q    Do you remember taking him to a psychological evaluation

17 back in 2002 wearing your police uniform and taking your dad

18 for a meeting with a psychologist --

19 A    Yes, sir, I do.

20 Q    All right.  And you were present during the psychological

21 evaluation of your dad; right?

22 A    No, not -- I came in and checked on him.

23 Q    Okay.  So you were in and out during that?

24 A    Yeah, I wasn't allowed to stay in there.

25 Q    And I understand that your dad is not in the greatest

 1  health now, but even in '02, he had some serious issues with

 2  his short-term memory that you noticed yourself; is that fair

 3  to say?

 4  A    Yes, sir.

 5  Q    And would it be fair to say if he had it in '02, it's

 6  gotten worse to the present?

 7  A    Yeah, I'm sure it has gotten worse.

 8  Q    And that's something that you personally witnessed back in

 9  '02 up to this day; right?

10  A    Yes, sir.

11        MR. BALDANI:  That's what I wanted to ask, Your

12  Honor.

13        THE COURT:  All right.  Thank you.  Any other issues

14  before we bring the jury back in?

15        MR. BALDANI:  No, Your Honor, but in light of your

16  ruling, that was really the last thing I was getting ready to

17  ask him about, so I suppose I'm done.

18        THE COURT:  Well, you can announce that in front of

19  the jury.

20        MR. BALDANI:  Okay.

21        THE COURT:  Bring the jury in.

22     (Whereupon, the jury returned to the courtroom, after

23  which the following proceedings were had in open court.)

24        THE COURT:  Thank you, and please be seated.

25        Once again, the record will reflect that all members

1   of the jury are present.  Parties and counsel are also present.

2   Mr. Bishop has returned to the witness stand.

3            And, sir, you're still under oath, of course.

4            Mr. Baldani, have you completed your questions?

5            MR. BALDANI:  I have, Your Honor.  I don't have any

6   other questions.

7            THE COURT:  All right.  Thank you.

8            Mr. Gilbert?

9            MR. GILBERT:  I have no other questions.

10           THE COURT:  Ms. Hughes?

11           MS. HUGHES:  No, sir.

12           THE COURT:  Mr. Simons?

13           MR. SIMONS:  No.

14           THE COURT:  All right.  Any redirect of the witness?

15           MR. SMITH:  Briefly, Your Honor.

16           THE COURT:  You may proceed.

17                      REDIRECT EXAMINATION

18  BY MR. SMITH:

19  Q    Mr. Bishop, you were asked about the promotion that you

20  got putting you in as eventually chief of police?

21  A    Yes, sir.

22  Q    And I believe that you said at that meeting at your farm

23  that there was -- while Doug Adams didn't say a whole lot, he

24  did give, I believe you said, the impression.  What do you mean

25  when you say that he gave the Whites the impression that he was

1   going to agree with them and give him his political support?

2   A    Why do I —

3   Q    What gave you that impression, sir?

4   A    Because he nodded.

5   Q    And when you say "nodded," you mean shaking your head yes?

6   A    Yes, sir.

7   Q    And the Whites left there and later confirmed with you

8   that they had the understanding that Doug Adams was in complete

9   agreement that he was going to put his political support behind

10  them in the next election?

11          MR. BAYER:  Objection, leading the witness, Judge.

12          THE COURT:  Overruled.

13          THE WITNESS:  Yes, sir.

14  BY MR. SMITH:

15  Q    Now, at the time that you and Freddy Thompson had the

16  conversation about how much money he put in, you said somebody

17  came up and he said hush?

18  A    No, we just hushed when someone approached, I remember

19  that.

20  Q    Okay.  And this is the same Freddy Thompson that had

21  delivered you money to be used to buy votes earlier in the

22  election?

23  A    Yes, sir.

24          MR. SMITH:  Thank you.

25          THE COURT:  Let's see, Mr. Bayer.

1    MR. BAYER:  Thank you, Judge.  If it would be all

2    right, I'll do it from right here, Judge, it's only a couple of

3    questions.

4    THE COURT:  That'll be fine.

5    RECROSS-EXAMINATION

6    BY MR. BAYER:

7    Q    Mr. Bishop, upon cross-examination from Mr. Baldani, if I

8    understand you correctly, you on direct examination had said

9    that there was a meeting when your father was cutting straw and

10   supposedly Doug Adams and Freddy Thompson wanted you to become

11   a judge for the early voting?

12   A    No, sir.

13   Q    Explain what you were talking about, then.

14   A    My father.

15   Q    But you weren't at that meeting?

16   A    No, sir.

17   Q    So you didn't hear this?

18   A    No, sir.

19   Q    So when Mr. Baldani asked you that you didn't hear Freddy

20   Thompson say anything, you never heard Doug Adams say anything

21   either, did you?

22   A    No.

23   Q    Mr. Smith just asked you some questions about that meeting

24   where Daugh White and Kennon came to, and you said that at the

25   meeting Doug Adams nodded his head.  They left with an

MICHAEL R. BISHOP - RECROSS - MR. BAYER          104

1   impression; correct?

2   A    Yes, sir.

3   Q    Did Doug Adams do anything later on to nuture that

4   impression?

5   A    No, sir, not that I'm aware of.  I don't know.

6   Q    They were there trying to get his support so that you

7   would get a promotion; correct?

8   A    Yes, sir.

9   Q    He didn't do anything to try to stop your promotion, did

10  he?

11  A    No.

12  Q    And he didn't do anything to help the Whites, did he?

13  A    No.

14  Q    So whatever impression they left with is irrelevant;

15  correct?

16              MR. SMITH:  Your Honor, I'm going to object to that.

17              THE COURT:  Sustained.

18              MR. BAYER:  Nothing further.  Thank you, Judge.

19              THE COURT:  All right.

20         Mr. Baldani?

21              MR. BALDANI:  A couple of questions, Judge.

22              THE COURT:  Yes, sir.

23                        RECROSS-EXAMINATION

24  BY MR. BALDANI:

25  Q    Mr. Bishop, the last question the prosecutor asked you was

1   that's the same Freddy Thompson who delivered you money.  But

2   we've already established Freddy Thompson was in a vehicle when

3   some money was delivered to you; correct?

4   A    Yes, sir.

5   Q    Now, he did not hand you any money himself, did he?

6        MR. SMITH:  Your Honor, that's been asked and

7   answered.

8        THE COURT:  Sustained, it has been.

9   BY MR. BALDANI:

10  Q    When there was a refund given after the election, that

11  refund, you testified, was given to Roy Morgan; correct?

12  A    Yes, sir.

13  Q    And Roy Morgan was in the car when that money was

14  delivered, wasn't he?

15  A    Yes, sir.

16  Q    All right.  So the refund went to Roy Morgan, not to

17  Freddy Thompson, not to Doug Adams; right?

18        MR. SMITH:  Same, asked and answered.

19        THE COURT:  Sustained.

20  BY MR. BALDANI:

21  Q    Who did the refund go to?

22        MR. SMITH:  Asked and answered.

23        THE COURT:  Sustained.

24        MR. BALDANI:  I don't have any other questions,

25  Judge.

1            THE COURT:  All right.  Thank you.

2            Anything else of the witness?

3            Thank you, Mr. Bishop.  You may step down, sir.

4   Thank you.

5            Mr. Parman, you may call your next witness.

6            MR. PARMAN:  Yes, Your Honor.  The United States

7   calls Jeff Culver.

8            THE COURT:  Thank you.

9            MR. WHITE:  Your Honor?

10           THE COURT:  Yes, sir.

11           MR. WHITE:  I just need to fetch —

12           THE COURT:  Yes, sir, that's fine.

13                        JEFF CULVER,

14  having been first duly placed under oath, was examined and

15  testified as follows:

16                     DIRECT EXAMINATION

17  BY MR. PARMAN:

18  Q    Sir, could you state your name for the record?

19  A    Jeff Culver.

20  Q    How are you employed?

21  A    Manchester Police Department.

22  Q    How long have you been employed in that capacity?

23  A    I've been employed since June of 1989.

24  Q    Okay.  What's your current position within the Manchester

25  Police Department?

ID#: 6515

1  A    Chief of police.

2  Q    How long have you been chief of police?

3  A    Since August of 2007.

4  Q    Do you live there in Clay County?

5  A    Yes, sir.

6  Q    How long have you lived in Clay County?

7  A    About 35 years.

8  Q    Did you grow up there?

9  A    Yes.

10 Q    Are you married?

11 A    Excuse me?

12 Q    Are you married?

13 A    Yes, sir.

14 Q    Do you have any kids?

15 A    I have two.

16 Q    What's their ages?

17 A    Twenty-one and 17.

18 Q    Sir, in March of 2009, were you asked to assist the FBI in

19 an arrest operation there in Clay County?

20 A    Yes, sir.

21 Q    And was that by virtue of your position as chief of

22 police?

23 A    Yes, sir.

24 Q    Explain to the jury what the duties of yourself and the

25 Manchester Police Department was during that arrest operation.

JEFF CULVER - DIRECT - MR. PARMAN                    108

1   A    We were asked to provide security at the arrest scenes and

2   search scenes, along with the transportation of arrestees or

3   detainees from the — both scenes to the place where they were

4   going to be processed.

5   Q    Where were they going to be processed?

6   A    At the complex at the federal prison in Manchester.

7   Q    Sir, during this operation, who were you asked to

8   participate in the arrest of?

9   A    Mr. Doug Adams.

10  Q    Do you see Mr. Adams here in the courtroom today?

11  A    Yes, sir.

12  Q    Can you point him out?

13  A    (Pointing.)

14  Q    Audibly?

15  A    Yes, that's Mr. Adams.

16  Q    Do you see him?

17  A    Yeah.

18  Q    Describe what he's wearing.

19  A    He is — a dark jacket with a gold-colored shirt and tie

20  with glasses.

21        THE COURT:  The record will reflect the witness has

22  identified the defendant, Douglas Adams.

23  BY MR. PARMAN:

24  Q    Sir, where was he arrested at?

25  A    The Clay County Board of Education.

1  Q    Where was he then taken?

2  A    Taken from there to the Manchester FCI complex.

3  Q    While at the FCI complex, did Mr. Adams make any comments

4  to you?

5  A    Yes, sir.

6  Q    First of all, explain where he made the comment.

7  A    He made the comment at the complex but just outside of it

8  in a smoking area.

9  Q    Had he asked to go out and smoke?

10  A    Yes, sir.

11  Q    And who took him?

12  A    I did.

13  Q    What did he say to you?

14  A    He said that he had thought the 2002 election was behind

15  him, but he did what he had to do.

16  Q    In what context did he make that comment?  I mean, what

17  was the — was there a conversation going on or did he say that

18  out of the blue?  Explain to the jury.

19  A    No.  Again, him and others had asked to be able to smoke.

20  So we had sought the approval of the Bureau and the prison and

21  escorted Mr. Adams out, and while I was out there with him, I

22  made the comment that I would rather be out frog-gigging than

23  to be here under these circumstances.  And that's when

24  Mr. Adams made the comment that he thought that the 2002

25  election was behind him, but he did what he had to do.

JEFF CULVER - DIRECT - MR. PARMAN                110

1  Q    Sir, you had been frog-gigging with Mr. Adams in the past?

2  A    I think a couple of occasions, yes.

3  Q    So you had some prior relationship with him?

4  A    Yeah.

5  Q    How would you describe that relationship?

6  A    Mainly on a professional basis.  I would see him through

7  my job.  We have school resource officers that are bonded

8  through the Manchester Police Department, I would attend

9  meetings at the school board in response to that position; and

10  through mutual friends, maybe go meet somewhere to eat on

11  occasion or -- just basically on a professional level.

12  Q    So when you had asked him -- made the frog-gigging comment

13  to him, was that to pass the time or break the tension or what

14  was --

15  A    Yes, sort of pass time away while he was smoking.

16          MR. PARMAN:  Could I have just a moment, Your Honor?

17          THE COURT:  Yes, sir.

18          MR. PARMAN:  No further questions.

19          THE COURT:  All right.  Thank you.

20          MR. PINALES:  No questions, thank you, Your Honor.

21          THE COURT:  All right.

22          Mr. Bayer.

23          MR. BAYER:  Thank you, Judge.

24                    CROSS-EXAMINATION

25  BY MR. BAYER:

1  Q    Good to see you again, Chief.  I want to ask you some

2  questions specifically regarding Doug Adams and the encounter

3  in March of last year.  You were the one who transported

4  Mr. Adams to the FCI?

5  A    Correct.

6  Q    Yes, sir.  During the course of the transportation, you

7  talked with Mr. Adams a little bit while he was in your

8  cruiser?

9  A    There was some conversation, yes.

10 Q    You had known him for a long time; correct?

11 A    I've known of him for a long time, yeah.

12 Q    And it was a little —— I think you even made the comment

13 it was a little bit awkward for you to have —— to have to

14 transport him to the FCI under the circumstances?

15 A    Correct.

16 Q    And there were probably a couple of different times either

17 in the cruiser or there at the FCI in Manchester in which you

18 were trying to break the ice and just engage in smalltalk with

19 Mr. Adams?

20 A    While transporting him —— Are you asking me —— could you

21 rephrase the question?  While —— I'm sorry.

22 Q    Yes, sir.  Let me try it again.

23 A    Okay.

24 Q    Either during the time when you were either transporting

25 Mr. Adams or even at the arrest when you were there arresting

1  him at the school or transporting him to FCI, or while you were

2  there at the FCI, there were occasions when you were talking to

3  Mr. Adams and you would say something to try to break the ice

4  and talk about something else other than the events of the day;

5  right?

6  A    Yes.

7  Q    And I think that's how the conversation came up about the

8  frog-gigging?

9  A    Yes.

10  Q    You had been frog-gigging in the past with Mr. Adams?

11  A    Yes.

12  Q    You went outside into a smoking area outside of the area

13  that everyone was being held at FCI in Manchester; correct?

14  A    Correct.

15  Q    It was my understanding that you may have gone up to

16  Mr. Adams and said, "Would you like to go outside and get a

17  smoke?"

18  A    I can't fully recall how that actually happened, because

19  there was several — there was, at that time, eight or nine

20  detainees there and several of them was requesting to smoke,

21  and I don't really remember exactly how that played out as far

22  as me being the one to escort Mr. Adams outside.

23  Q    But nonetheless, you were the one who went outside with

24  him?

25  A    Yes.

1  Q    And the two of you were basically just standing there by

2  yourselves away from everybody else; correct?

3  A    Correct.

4  Q    You mentioned that over the years that for whatever reason

5  Mr. Adams and you had had some sort of at least professional

6  relationship in which, for some reason or another, you would

7  interact as it related to you in your function with the police

8  department?

9  A    Correct.

10  Q    Tell us about some of the things Mr. Adams would come to

11  you and talk to you about while you were with the police

12  department.

13        MR. PARMAN:  Your Honor, I'm going to object.  I

14  believe this question does call for hearsay.

15        MR. BAYER:  I was asking about the topics that they

16  were talking about, Judge.

17        THE COURT:  Sustained.

18  BY MR. BAYER:

19  Q    Let me rephrase that.  Were there reasons that the two of

20  you met regarding, say, drug problems in Clay County?

21  A    Not actually meet.  We never did really meet in any

22  particular place to discuss that.  It had been mentioned

23  before.  Yes, it had, but as far as me —

24  Q    So Mr. Adams had come to the police department to talk

25  about problems regarding the drug problems in Clay County, you

1   were aware of those meetings?

2   A    Yes.  Yes.  Yes.

3   Q    Were you aware of meetings that involved Mr. Adams coming

4   to the police department, again, on a professional basis,

5   regarding problems with his daughter, Melanda?

6              MR. PARMAN:  Objection, Your Honor.

7              THE COURT:  Sustained.

8   BY MR. BAYER:

9   Q    So when the two of you were outside talking, you were

10  aware of different things that had gone on with Mr. Adams and

11  the two of you were kind of just talking about things unrelated

12  to the arrest of that day, the frog-gigging came up?

13  A    Correct.

14  Q    When he made that comment to you, did it seem like it just

15  came out of the clear blue?

16  A    Yeah.

17  Q    When he made that comment to you, he knew he had been

18  arrested?

19  A    Your question?

20  Q    He knew he had been arrested?

21  A    Yes.

22  Q    And he makes the comment that "I had thought I had the

23  2002 elections behind me"; correct?

24  A    Correct.

25  Q    And he just volunteered that to you, didn't he?

1  A    He did make that statement, yes.

2  Q    And so that was the only thing he ever said to you about

3  what had happened in the past; right?

4  A    I really didn't know what he was there for.  I hadn't seen

5  any charges or didn't really know the circumstances in which

6  they were there for.  I mean, I was — but that's the only

7  comment that he made to that — in relation to that, yes.

8  Q    At that point in time, you changed the topic of discussion

9  with him?

10  A    Yes.

11  Q    What did you then talk about?

12  A    I can't fully remember everything, other than I think I

13  may have mentioned about my son was going to graduate from

14  college here in the near future and maybe some talk about that.

15  By then, he had got his cigarette smoked and we had walked back

16  in.

17  Q    And the two of you, you were carrying on a conversation

18  privately between the two of you, and you mentioned about your

19  son graduating from college?

20  A    Yes.

21  Q    Mr. Adams was still superintendent of the Board of

22  Education — I mean, Superintendent of Education; correct?

23  A    Correct.

24  Q    What kind of degree had your son graduated with?

25          MR. PARMAN:  Objection, Your Honor.

1              THE COURT:  Sustained.

2    BY MR. BAYER:

3    Q    You trusted Mr. Adams enough to share that information

4    with him about your son graduating?

5    A    Correct.

6    Q    And then after the two of you finished that discussion,

7    the two of you went inside?

8    A    Correct.

9              MR. BAYER:  I don't have any other questions.  Thank

10   you.

11             THE COURT:  Let's see if any other counsel wish to

12   ask —

13             MR. WHITE:  No, thank you, Your Honor.

14             THE COURT:  No?  All right.

15             Any redirect, Mr. Parman?

16             MR. PARMAN:  No, Your Honor.

17             THE COURT:  All right.  Thank you, sir.

18             MR. ABELL:  Excuse me, Judge.  May we approach before

19   Chief Culver is dismissed?

20             THE COURT:  Yes, you may come up.

21        (Whereupon, the following discussion was had between the

22   Court and counsel at the bench, out of the hearing of the

23   jury.).

24             MR. ABELL:  Your Honor, Robert Abell for defendant

25   William Stivers.  I'd ask the Court that Chief Culver not be

1    released from his subpoena as we may wish to recall him later.

2              THE COURT:  All right.  I'll ask him to stay here

3    until we take our recess for the noon hour and if you wish to

4    subpoena him, you can do that at that time, serve him with a

5    subpoena.

6              MR. ABELL:  Okay.

7              THE COURT:  Let's see, how do we want to do this?

8    I'll advise him that he would be subject to recall and he'll

9    need to remain in the courthouse until the noon hour, is the

10   information I'll give him at this time in front of the jury.

11             MR. ABELL:  All right.

12             THE COURT:  Thank you.

13        (Whereupon, the following proceedings continued in open

14   court.)

15             THE COURT:  Officer Culver, if you could remain in

16   the courthouse until the noon hour.  You may be subject to

17   recall, but at that time I should be able to give you more

18   instructions on when you're released from the subpoena in the

19   case.

20             THE WITNESS:  Thank you, Your Honor.

21             THE COURT:  You can step down.

22             All right.  Thank you.

23             Mr. Smith, you may call the next witness.

24             MR. SMITH:  Your Honor, the United States would like

25   to call William Goins.

1              THE COURT:  Thank you.

2                          WILLIAM GOINS,

3    having been first duly placed under oath, was examined and

4    testified as follows:

5              THE COURT:  Thank you.

6              Mr. Smith, you may proceed.

7              MR. SMITH:  Thank you, Your Honor.

8                        DIRECT EXAMINATION

9    BY MR. SMITH:

10   Q    Good morning.

11   A    Good morning.

12   Q    If you need to adjust that microphone, you can pull it a

13   little closer to you.  State your name, please.

14   A    William Goins.

15   Q    And, Mr. Goins, tell us how you're employed.

16   A    I'm a police officer for Manchester Police Department.

17   Q    And how long have you been so employed?

18   A    Since August of 2004, I believe.

19   Q    Okay.  And what kind of jobs did you hold before becoming

20   a police officer, Mr. Goins?

21   A    I worked just with my father and with the City of

22   Manchester.

23   Q    Okay.  And what's your father's name?

24   A    Charles Goins.

25   Q    And what kind of work does he do?

1  A    He's in the plumbing and electrical business.

2  Q    Okay.  Are you a native of Clay County?

3  A    Yes, sir.

4  Q    And were you educated there as well?

5  A    Yes, I attended Clay County public school.

6  Q    Okay.  And are you a graduate of the public school system

7  there?

8  A    Yes.

9  Q    And did you further your education in other ways after

10 graduating?

11 A    Yes, I attended Eastern Kentucky University.

12 Q    And did you obtain a degree from that university?

13 A    Yes, I have a Bachelor of Science Degree.

14 Q    Okay.  What year did you graduate from Eastern Kentucky

15 University, Mr. Goins?

16 A    2003.

17 Q    Okay.  And when you began with the police department, what

18 position did you first hold?

19 A    I was a patrol officer.

20 Q    And as a patrol officer, did you have a certain shift

21 assigned to you, daytime, nighttime?

22 A    I primarily worked third shift, which is the late shift.

23 Q    Okay.  And currently, what position do you hold with the

24 department?

25 A    At this time, I still do patrol work.  I also do

1   investigation work as well.

2   Q    Okay.  Mr. Goins, during your time as a Manchester police

3   officer, were you involved in the arrest of an individual by

4   the name of James Goins?

5   A    Yes.

6   Q    And is he any relation to you, Mr. Goins?

7   A    Not that I'm aware of.

8   Q    Okay.  And at the time that you made that arrest, do you

9   remember what year that would have been in?

10  A    I don't remember exactly.  I hadn't been working there

11  long whenever -- it's been probably 2004 or '05.

12  Q    Okay.  Do you recall Kennon White coming on the City as an

13  employee?

14  A    Yes.

15  Q    And would this have been after Kennon White was hired on

16  with the City of Manchester?

17  A    It seems like it was, yes.

18  Q    Okay.  And at the time that you arrested Mr. Goins, what

19  was the nature of that arrest?

20  A    He was arrested for DUI, as well as other traffic

21  offenses, suspended license.

22  Q    Okay.  And a DUI offense and other operating without a

23  license?

24  A    Well, driving on suspended license, as well as other --

25  some other traffic offenses.

1  Q    Did that occur in the downtown Manchester area?

2  A    Actually, I think it was in the -- on the Town Branch

3  Muddy Gap area.

4  Q    In Clay County?

5  A    Yes, sir.

6  Q    And at the time that you made that arrest, did you

7  subsequent to that learn that he was an employee of Bart Morris

8  doing business as maybe B & J Transfer?

9  A    Yes, sir.

10 Q    Okay.  And how did you come to know that?

11 A    Well, I previously -- I already knew that he was -- he

12 worked for Bart, but --

13 Q    Okay.  Do you know what he did for Bart Morris?

14 A    I just -- I don't know what exactly, what his job title

15 was with them.

16 Q    Okay.  Now, Mr. Goins, when you make an arrest for a

17 charge such as DUI, is that something that you have to go to

18 court on?

19 A    Yes, sir.

20 Q    And were you the investigating officer and case officer

21 who would be required to be in court on that matter?

22 A    Yes, sir.

23 Q    Does your department get subpoenaed for those kind of

24 court appointments?

25 A    Yes.

1  Q    And is it a policy that you-all appear there at all given

2  court appointments?

3  A    Yes.

4  Q    Now, would this be a case that would go into the district

5  court level or the circuit court level, to your knowledge?

6  A    This type case generally would go to the district court

7  level.

8  Q    And did this case — this case develop a history, to your

9  recollection?

10 A    We had several court appearances on it.

11 Q    Okay.  We had several court appearances?

12 A    Well, I did.  I think there was a witness to it, another

13 officer as well.

14 Q    And so when you were going to court, you took your

15 co-officer with you?

16 A    I can't recall if he was there each time.

17 Q    How many times do you think you went to court on this

18 matter, Mr. Goins?

19 A    Maybe two or three, something like that.

20 Q    All right.  During the time that you were getting called

21 back and forth to court, was the matter getting continued?

22 A    Yes, sir.

23 Q    So it wasn't getting resolved when you were going to

24 court?

25 A    No, sir.

 1  Q    Do you know who was requesting that the case be continued?

 2  A    Well, to the best of my recollection, the defendant was.

 3  Q    Okay.  Did he have a lawyer?

 4  A    I didn't — I don't remember — I don't recall if he had

 5  one or not.

 6  Q    You just recall him requesting that it be continued

 7  several times?

 8  A    Yes, sir.

 9  Q    Now, were you approached by Kennon White about this

10  particular matter while it was pending in front of the Court?

11  A    Yes, sir.

12  Q    And tell us what you recall, Mr. Goins.

13  A    I was approached, like I said, several different times by

14  Mr. White, at which time he instructed me that I was not to

15  show up in court against this fellow for these charges so that

16  the matter would be dismissed.

17  Q    Did you ask him for an explanation as to why he wanted

18  this to happen?

19  A    No, I didn't.  He pretty much just told me that if I was

20  going to live and be a police officer in a small town that I

21  was going to have to succumb to small-town politics.

22  Q    And did he relate to you what made James Goins' case

23  politically significant?

24  A    He didn't.  I mean, he just — you know, he told me that

25  Mr. Goins worked for Bart, and, I mean, that's — he said —

 1  just told me not to show up in court against him.

 2  Q    Was Bart Morris politically significant to you at that

 3  time?

 4  A    Well, I've never really been that much involved in

 5  politics, but, you know, from just what I hear in the

 6  community, he was.

 7  Q    Now, you said you appeared in court several times?

 8  A    Yes, sir.

 9  Q    And did you ever see Bart Morris in the courtroom on this

10  matter?

11  A    Yes, sir.

12  Q    How many times did you see Bart Morris in the courtroom on

13  this matter?

14  A    He would be there with Mr. Goins, James Goins, in the

15  courtroom.  I don't know, at least a couple times, maybe every

16  time.

17  Q    Did you ever have a conversation with Bart Morris?

18  A    No, I didn't.

19  Q    Did you have a candidate holding public office come to you

20  and talk to you, as well as Kennon White, about you maybe not

21  showing up for court on this matter?

22  A    What do you mean by like a candidate now, or someone else

23  on public office?

24  Q    Well, let's see, there's people who hold public office in

25  Clay County and in Manchester.  Did you have any other public

1  officeholders that came and talked to you about this case?

2  A    Well, I mean, the only other — there was — the only

3  other person that talked to me about it was — I mean, was

4  Mr. Bowling.  I mean, he —

5  Q    Do you know his first name?

6  A    Stanley Bowling.

7  Q    Okay.  And was that while the case was pending?

8  A    Yes, sir.

9  Q    And what would Mr. Stanley Bowling say to you?

10  A    He just — he just came up to me and, you know, just asked

11  me if there — if I could help this boy out that — you now,

12  that worked for Bart on this case, on this DUI.

13  Q    Was this after Kennon White had warned you that you had to

14  kinda play small-town politics in Clay County if you were going

15  to get along with everybody?

16  A    Seems like it was.

17  Q    Mr. Goins, did this cause you some personal concern?

18  A    Well, I mean, I became frustrated with my job, but, you

19  know — but, I wasn't, I mean —

20  Q    Did you report that to people in the department?

21  A    Yes, sir, I reported it to my supervisors.

22  Q    And after telling your supervisors what you had been —

23  how you had been approached on this matter, what did you do?

24  A    I just — I went and told them what was going on, and my

25  supervisor told me if I was subpoenaed to go to court

1  regardless of what was being said about it.

2  Q    And who was your supervisor at that time?

3  A    Dennis Rice.

4  Q    And what position did he told?

5  A    He was the Chief of Police at the time.

6  Q    Do you know what kind of business Bart Morris has in

7  Manchester or had in Manchester at the time that these court

8  appearances were going on?

9  A    At one time -- or I think at that time he had a -- like a

10 transfer station for garbage, where garbage trucks go empty

11 their trucks at.

12 Q    Who did he do that for?

13 A    Well, the City, the City garbage trucks would haul their

14 garbage there.

15 Q    And at the time that Kennon White approached you, did you

16 know that he had a contractual relationship with Bart Morris

17 regarding this garbage or the City of Manchester had a

18 contractual relationship with Bart Morris over the garbage at

19 that time?

20 A    Well, yeah, I knew that the City was hauling their garbage

21 there.

22 Q    When you were called to court down there, did you ever get

23 a request that you needed to call back to the police

24 department?

25 A    Yes, I did.

WILLIAM GOINS DIRECT - MR. SMITH

1  Q    And could you explain that?

2  A    I was like —— I was sitting in the courtroom, I had went

3  to court, like I said, as I was subpoenaed to be there, and the

4  Clerk would come in the courtroom and give me a note saying

5  that I needed to call the police department.  And so then I

6  would leave the courtroom as I was waiting on my cases to be

7  called, and when I would call the courtroom —— I mean, I'm

8  sorry, call the police department, I would speak with Dennis

9  Rice, and, I mean, he just —— you know, he never would —— it's

10  like he really didn't anything to say, you know, and he just

11  asked me like, you know, "Where are you at?"  And I said, "I'm

12  in court," and, "Well, okay."  And then the same —— then that

13  same thing happened again and basically the same thing was said

14  and ——

15  Q    Did you find that suspicious?

16            MR. GILBERT:  Objection.

17            THE COURT:  Sustained.

18  BY MR. SMITH:

19  Q    How many times did Kennon White confront you about this

20  court appearance on this Goins case that you recall?

21            MR. GILBERT:  Objection, asked and answered.

22            THE COURT:  Overruled.

23            THE WITNESS:  I can't recall exact number.  I mean,

24  there was several times.

25  BY MR. SMITH:

1  Q    I would like to ask you, Mr. Goins, if you would, look

2  around here in the courtroom this morning.  Do you see Bart

3  Morris?  If you do, please point out where he's seated and what

4  he's wearing for the record, please.

5  A    He's wearing a yellow shirt.

6        THE COURT:  The record will reflect the witness has

7  identified the defendant, Bart Morris.

8  BY MR. SMITH:

9  Q    Likewise, you mentioned Stanley Bowling.  Do you see him

10  here this morning?  If you could, point out where he's seated

11  and what he's wearing.

12  A    Yes, sir, that's Mr. Bowling with the gray shirt on.

13        THE COURT:  The witness has identified the defendant,

14  Stanley Bowling.

15  BY MR. SMITH:

16  Q    What happened to the Goins case, to your knowledge?

17  A    The best of my knowledge, it was dismissed.

18        MR. SMITH:  Thank you.

19        THE COURT:  Let's see if we have any questions before

20  we get to Mr. Gilbert.

21        Mr. Pinales.

22        MR. PINALES:  Briefly, Your Honor.

23        THE COURT:  Yes, sir.

24                    CROSS-EXAMINATION

25  BY MR. PINALES:

1  Q    I'm Martin Pinales, and I represent Cletus Maricle.

2  A    Yes.

3  Q    The prosecutor asked you -- This was in district court,

4  was it not?

5  A    Yes, sir.

6  Q    And not the circuit court?

7  A    No, sir.

8  Q    This was in front of either Judge House or Judge Muncy?

9  A    Yes, sir.

10  Q    Not Judge Maricle?

11  A    No, sir.

12        MR. PINALES:  Nothing further.  Thank you.

13        THE COURT:  Mr. Bayer.

14        MR. BAYER:  No questions, Your Honor.

15        MR. WHITE:  No questions, Your Honor.

16        THE COURT:  All right.

17        Mr. Abell?

18        MR. ABELL:  No questions, Judge.

19        THE COURT:  Mr. Baldani?

20        MR. BALDANI:  Judge, we don't have any.

21        THE COURT:  Mr. Gilbert.

22        MR. GILBERT:  I just have a few.

23        THE COURT:  Yes, sir.

24                     CROSS-EXAMINATION

25  BY MR. GILBERT:

1  Q    Officer Goins, I'm Jerry Gilbert, and I represent Bart

2  Morris.

3       Do you have any information about Kennon White having made

4  promises to Bart Morris about what was going to happen with

5  these charges?

6  A    No, sir.

7  Q    Did Bart Morris ever ask you not to do your job?

8  A    No, sir.

9  Q    And you responded to the subpoenas when they were issued

10 to you?

11 A    Yes, sir, I did.

12 Q    Okay.  Now, you're familiar with records in the district

13 court in Clay County, aren't you?

14 A    Yes, sir.

15 Q    And the disposition of a case would be noted -- is

16 generally noted on the case jacket, is it not?

17 A    To the best of my knowledge, it is.

18 Q    Do you recall the other officer that was involved in the

19 arrest?

20 A    To the best of my recollection, it seems like it may have

21 been Scotty Sandlin.

22 Q    Yes, sir.  And did he -- was he also subpoenaed on several

23 court appearances and appeared there with you?

24 A    I don't recall if he was there or subpoenaed.

25            MR. GILBERT:  If Your Honor please, I would like

1 to — I have certified records from the Clay District Court

2 with respect to this charge, and I would like to have them

3 marked as Bart Morris Exhibit No. 1.

4          THE COURT:  All right.

5          MR. GILBERT:  And if I could show these to the

6 witness.

7          MR. SMITH:  Your Honor, I'm going to object to

8 counsel building a foundation for this.  If there's not a

9 witness, I'm not sure it's going to be established or not.

10          THE COURT:  All right.  Why don't you-all come up to

11 the bench here.

12      (Whereupon, the following discussion was had between the

13 Court and counsel at the bench, out of the hearing of the

14 jury.).

15          THE COURT:  Why do we have?  I'm not sure this is the

16 witness to introduce these documents through.

17          MR. GILBERT:  He said he was familiar with —

18          THE COURT:  It doesn't make any — The records

19 custodian, just like the fellow that was on the police — or

20 the fire department didn't introduce the records of the fire

21 department the other day.

22          MR. SMITH:  We've not been provided with this in

23 discovery.  I don't know if he got those yesterday or when they

24 were received.  We've not been given discovery, that I know,

25 but this doesn't appear either to establish a disposition,

1  so —

2            THE COURT:  I've sustained the objection.

3       (Whereupon, the following proceedings continued in open

4  court.)

5            THE COURT:  Thank you.

6            Mr. Gilbert, you may continue.

7            MR. GILBERT:  That's all the questions I have.

8            THE COURT:  All right.  Thank you.

9            MR. SIMONS:  I do have one.

10           THE COURT:  Yes, sir.  Mr. Simons.

11                          CROSS-EXAMINATION

12  BY MR. SIMONS:

13  Q    Good morning, Officer Goins.  How are you?  My name is Dan

14  Simons, I represent Stanley Bowling, who you mentioned.

15  A    Yes, sir.

16  Q    You are familiar with Mr. Bowling, are you not?

17  A    Yes, sir.

18  Q    All right.  Have you known him for a long time?

19  A    Yes, sir, I have.

20  Q    Okay.  Have you known him since you've served on the

21  Manchester Police Department continually?

22  A    Yes.  Yes.

23  Q    And you said he said something to you about "Could you

24  help this Goins boy out," something like that?

25  A    Yes, sir.

1   Q   Where did that conversation take place?

2   A   The best of my recollection, at my father's business.

3   Q   Okay.  What does your father do?

4   A   He sells plumbing supplies.

5   Q   Okay.

6   A   Electrical supplies.

7   Q   And Stanley just happened to be there on occasion?

8   A   Yes, sir.

9   Q   He didn't ask you not to show up in court, did he?

10  A   No, sir.

11  Q   He didn't say —

12          MR. SMITH:  Your Honor, I'm going to object.  This is

13  hearsay, an exculpatory statement by —

14          THE COURT:  Yes.  Other than the statement has been

15  admitted, it would be hearsay, so the objection is sustained.

16  BY MR. SIMONS:

17  Q   Did he put any pressure on you at all to do anything with

18  the case?

19  A   I mean, like I say, that's all he said.

20  Q   Okay.  And he never talked to you about it again, he never

21  brought it up to you again; is that fair?

22  A   No, sir, he didn't.

23  Q   He did not?

24  A   No, he did not.

25          MR. SIMONS:  Okay.  Thank you.

WILLIAM GOINS - RECROSS - MR. SIMONS                134

1          THE COURT:  Thank you, Counsel.

2          Any further questions of this witness, Mr. Smith?

3          MR. SMITH:  Yes, I do.

4          THE COURT:  All right.  You may proceed.

5                    REDIRECT EXAMINATION

6  BY MR. SMITH:

7  Q    Mr. Goins, you say that Stanley Bowling came to your

8  father's business and talked to you about police business?

9  A    Yes, sir.

10 Q    He didn't come to the police department to talk to you

11 about this case?

12 A    No, sir.  He didn't.

13         MR. SMITH:  All right.  Thank you.

14         THE COURT:  Thank you.

15         Mr. Simons, any follow-up?

16         MR. SIMONS:  I'll ask from here.

17                   RECROSS-EXAMINATION

18 BY MR. SIMONS:

19 Q    Mr. Goins, did Stanley Bowling come to your father's place

20 a business a lot?

21 A    Yes, sir.

22 Q    He was a regular customer there?

23 A    Yes, sir.

24         MR. SIMONS:  Okay.  Thank you.  That's all.

25         THE COURT:  All right.  Thank you.

1          Anything else?

2       (No response.)

3          THE COURT:  Officer, you may step down.  You'll be

4    finally excused.

5          Ladies and gentlemen, we will take our lunch break at

6    this time.  We'll talk an hour, until ten minutes till 1:00.

7    Please keep in mind the admonition that you've been given

8    several times not to discuss the case among yourselves while we

9    are in recess, and, of course, don't allow anyone to approach

10   you to discuss the case.  The jury will be excused for one

11   hour.

12      (Whereupon, the jury retired from the courtroom, after

13   which the following proceedings were had in open court.)

14          THE COURT:  Thank you.

15          Mr. Abell, you would like to have a subpoena issued

16   for Mr. Culver's appearance in your case in chief.  If you

17   could do that over the lunch hour, and that way he'll be able

18   to leave as soon as that's completed.

19          MR. ABELL:  Your Honor, is it all right if I go ahead

20   and speak with him at this time, Judge?  I don't have the —

21          THE COURT:  No.  No.

22          MR. ABELL:  — capacity to do that.

23          THE COURT:  The Clerk will be able to assist you in

24   having the subpoena prepared and issued.

25          We'll be in recess until 12:50.

136

1    (Whereupon, a recess was had for the noon hour, after

2  which the proceedings continue uninterrupted to Volume 15–B.)

3               (Proceedings concluded at 11:50)

4

5

6                  C E R T I F I C A T E

7    I, Cynthia A. Oakes, certify that the foregoing is a

8  correct transcript from the record of proceedings in the

9  above–entitled matter.

10

11  3/4/2010                 s/CYNTHIA A. OAKES
      DATE                  CYNTHIA A. OAKES, RPR, RMR, CRR

12

13

14                   I N D E X

15                               PAGE

16  Testimony of JEFFREY DEATON:
        Direct Examination by Mr. Smith:       13

17        Cross-Examination by Mr. Bayer:        25
        Cross-Examination by Mr. Baldani:      29

18

19

20  Testimony of MICHAEL R. BISHOP:
        Direct Examination by Mr. Smith:       31
        Cross-Examination by Mr. Hoskins:      69

21        Cross-Examination by Mr. Bayer:        70
        Cross-Examination by Mr. Abell:        84

22        Cross-Examination by Mr. Baldani:      86
        Redirect Examination by Mr. Smith:    101

23        Recross-Examination by Mr. Bayer:     103
        Recross-Examination by Mr. Baldani:   104

24

25

INDEX (Cont'd)                                          PAGE

Testimony of JEFF CULVER:
    Direct Examination by Mr. Parman:          106
    Cross-Examination by Mr. Bayer:            111

Testimony of WILLIAM GOINS:
    Direct Examination by Mr. Smith:           118
    Cross-Examination by Mr. Pinales:          129
    Cross-Examination by Mr. Gilbert:          130
    Cross-Examination by Mr. Simons:           132
    Redirect Examination by Mr. Smith:         134
    Recross-Examination by Mr. Simons:         134


E X H I B I T S


| Defendant Bart Morris Exhibit No. | Identified | Page Admitted |
|---|---|---|
| 1 | 131 | |