United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 8, 2010 |
| DOUGLAS C. ADAMS | ) 8:55 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 19-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.

On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:            MARTIN S. PINALES, ESQ.

On behalf of the Defendant         R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                  KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant         T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant         ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant         JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
Stanley Bowling:

1    Appearances of Counsel:

2    On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
3                                    Assistant U.S. Attorneys
                                     601 Meyers Baker Road
4                                    Suite 200
                                     London, Kentucky  40741
5

6    On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:         107 East First Street
7                                    Corbin, Kentucky  40701

8                                    MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
9                                    Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant      R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.
12                                   220 West Main Street
                                     Suite 1900
13                                   Louisville, Kentucky  40202

14
     On behalf of the Defendant      T. SCOTT WHITE, ESQ.
15   Charles Wayne Jones:            133 West Short Street
                                     Lexington, Kentucky  40507
16

17   On behalf of the Defendant      ROBERT L. ABELL, ESQ.
     William E. Stivers:             120 North Upper Street
18                                   Lexington, Kentucky  40507

19
     On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
20   Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.
                                     300 West Short Street
21                                   Lexington, Kentucky  40507

22
     On behalf of the Defendant      JERRY W. GILBERT, ESQ.
23   William B. Morris:              212 North Second Street
                                     Richmond, Kentucky  40475
24

25

```
 1   On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                  201 West Short Street
 2                                     Lexington, Kentucky   40507

 3
     On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:                  116 West Main Street
                                       Suite 2A
 5                                     Richmond, Kentucky   40475

 6
     Court Reporter:                   CYNTHIA A. OAKES, CRR
 7                                     Official Court Reporter
                                       United States District Court
 8                                     560 Athens Boonesboro Road
                                       Winchester, Kentucky   40391
 9                                     (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

1      (Whereupon, the following proceedings were had outside the

2 presence of the jury.)

3          THE COURT:  Thank you, and good morning everyone.

4          I understand there are a couple of issues to take up

5 this morning.  Let's see, first is I believe one of the

6 defendants is a little under the weather.

7          Mr. Baldani?

8          MR. BALDANI:  Yes, Your Honor.  Freddy called us

9 early this morning, he — I don't want to be graphic, but he's

10 literally thrown up numerous times this morning.  He wanted to

11 know about waiving his presence, and I've never had an

12 occasion — I didn't think so.  I've never had occasion to

13 research that.  But he's — when he's got to get sick, he's got

14 to get sick.  And he's got a trash can by him now.  I don't

15 know if it would be possible to have him sit towards the back

16 or how you want to deal with it, but he literally cannot make

17 it more than a few feet.  He hasn't thrown up in a while, so

18 hopefully he'll be able to make it through the day.  But I

19 didn't know how you wanted to deal with that as far as if we

20 should just stand up and try to interrupt or — he literally

21 may have to use the trash can over here.  If you would rather

22 him sit in the back, he would be in the courtroom, I don't know

23 if you want to do that or not, to where he could make a quick

24 getaway.  I thought I would at least let you know about it.

25          THE COURT:  He can sit in the back of the courtroom

 1  if he wishes to do so, but, of course, that does impair your

 2  ability to consult with him during the course of the

 3  proceedings.

 4          MR. BALDANI:  Right.  I don't think that's going to

 5  be a big issue this morning.  If I needed to, I'm sure the

 6  Court would give me an opportunity.

 7          Would you rather sit in the back?

 8          THE COURT:  Okay for now?

 9          MR. BALDANI:  Well, I'm sure the Court doesn't mind

10  if he took his coat off.

11          THE COURT:  That's fine.  That's fine.

12          So you want to stay there for now?

13          DEFENDANT THOMPSON:  Yeah.

14          MR. BALDANI:  Okay.

15          THE COURT:  If the situation changes, ask to come up

16  and we'll make whatever accommodations we need to make.

17          MR. BALDANI:  I appreciate that, Judge.

18          THE COURT:  All right.

19          And, Mr. Simons.

20          MR. SIMONS:  Your Honor, I have two witnesses

21  pursuant to subpoena here that I would like to have recognized.

22          THE COURT:  Yes, sir.

23          MR. SIMONS:  Mr. James Garrison and Mr. Joey Rader.

24          THE COURT:  Who is the second witness, Mr. Simons?

25          MR. SIMONS:  Joey Rader.

6

```
 1                THE COURT:  Rader.

 2                MR. SIMONS:  J-o-e-y R-a-d-e-r.

 3                THE COURT:  All right.  Let's see, you're

 4   Mr. Garrison; is that correct?

 5                MR. GARRISON:  Yes, sir.

 6                THE COURT:  And you're Mr. Rader?

 7            (No audible response.)

 8                THE COURT:  Gentlemen, you've both been subpoenaed to

 9   testify in the trial of this matter.  I do not anticipate that

10   the defendants will be presenting their case until sometime

11   later this week, beginning this week, and you may not be called

12   until next week.  What we'll do is we'll recognize you and

13   administer an oath for you to reappear.  If you fail to appear,

14   then you would be obligated in the penal sum of $500 for

15   failure to appear.  But rather than have you wait to be called,

16   we'll go ahead and recognize you as being present at this time.

17                Madam Clerk, if you could please administer the oath

18   to both witnesses.

19            (Whereupon, the Clerk administered the oath for their

20   appearance to Mr. James Garrison and Mr. Joey Rader, after

21   which the following proceedings continued in open court.)

22                THE COURT:  All right.  And you will be contacted by

23   Mr. Simons as we get closer to the presentation of his case;

24   all right?  Thank you.

25                Mr. Westberry.
```

1          MR. WESTBERRY:  Thank you.  Good morning again.

2          THE COURT:  Good morning.

3          MR. WESTBERRY:  Judge Reeves, over the weekend, we

4    looked at the OAG PR 83A, B, C through E.  As the Court will

5    recall from Friday afternoon, many of the -- much of the

6    information contained in those documents are anonymous

7    complaints for various elections from '02 through '06 or '07,

8    as I recall.  You know our position from last week, I don't

9    want to revisit that again.

10         THE COURT:  Yes, sir.

11         MR. WESTBERRY:  One in particular, and I'll refer to

12   it as Bates 0785, is what we consider to be an anonymous

13   complaint from Mr. Ike.  We don't think Mr. Ike is a real name,

14   but it mentions our client Mr. Adams and it says he sticks his

15   nose in everything, and then it also says that Mr. Adams has

16   been convicted in the past for election fraud.

17         You may recall your earlier ruling before the trial

18   started regarding an older charge against Mr. Adams for -- it

19   was a voter intimidation charge, for lack of a better

20   description.  You ruled that inadmissible, it did not result in

21   conviction.  I was simply going to suggest that that particular

22   item 0785 be redacted before it goes back to the jury.  And it

23   would not be a very difficult thing to do, but we wanted to

24   make that point to the Court --

25         THE COURT:  All right.

8

1              MR. WESTBERRY:  — in addition to the other

2      objections that we raised.

3              THE COURT:  All right.  Thank you.

4              What's the Government's position with respect to

5      redacting that one section that refers to a conviction for

6      election fraud?

7              MR. SMITH:  We have no objection.

8              THE COURT:  All right.  I do believe that is subject

9      to my prior ruling, and so that will be redacted before it goes

10     back to the jury.  As I think you'll recall, I'm allowing these

11     documents, these complaints, to go back.  I've instructed the

12     jury that the information, the anonymous complaints and other

13     complaints, would not be admissible for the truth of what's

14     being asserted, but the information is relevant to show

15     knowledge, especially in light of the fact that the Attorney

16     General's Office would have notified the Clerk's office of

17     these complaints being received, and there has been quite a bit

18     of testimony about actions that were taken during these

19     elections, especially in '02, to move to different locations to

20     pay voters, and that does certainly support the United States'

21     theory of the case that after these complaints were received

22     that other actions were taken by the defendants.  And so it's

23     highly relevant in the case.  I have determined that it's not

24     more prejudicial than probative, it's not unduly prejudicial in

25     light of the relevance in the case, and so I previously ruled

9

1   on those -- on that issue, but I will remove this one section

2   that you have referenced.

3           Any other procedural or other issues with witnesses

4   that we can take up before the jury comes in?

5           MR. BALDANI:  Judge, on the issue you just discussed,

6   I'm a little at a loss as to how we can, you know, properly

7   cross-examine and refer to these later on down the road.  Just

8   for example, I think amongst the complaints were -- in '02 was

9   quite a few of them where people complained that there weren't

10  enough voting machines.  And so what's happened is the

11  investigator has been able to say, well, we had "X" number of

12  complaints and this is way more than Fayette County or

13  Jefferson County.  But I think it would be appropriate for us

14  to be able to say, well, isn't it true that ten of these were

15  just saying that there weren't enough machines?  And so what

16  I -- I mean, it seems to me that that would be addressing them

17  for the truth of what's asserted, which is what you said --

18          THE COURT:  You would be getting to the meat of

19  what's contained in those complaints, and once you do that, of

20  course, you open it up for the United States to then go into

21  some of these other complaints.  Now, I'm not telling you how

22  to cross-examine witnesses, but this witness may be able to

23  testify to the general nature of complaints that are contained

24  on these forms, but, again, if you get into the specifics of

25  these various complaints, then the United States -- it's fair

1  game at that point for the United States to show some other

2  type of complaints that were being raised, so you really do

3  that at your peril.

4          MS. HUGHES:  For the record, we object to that, just

5  so that is on the record and we don't have to stand up and do

6  it in the middle of the trial, but we do object to that.

7          THE COURT:  All right.

8          MR. BALDANI:  Object to us asking —

9          MS. HUGHES:  I object to you asking about the details

10 of the complaint of which this gentleman has no personal

11 knowledge.

12         MR. BALDANI:  Then I guess the other thing I wanted

13 to mention, Judge, is included in these documents is

14 discussions by the investigator regarding Mr. Thompson, you

15 know, what responses he took to the complaints, and so it seems

16 to me if part of the rationale in allowing them is to show that

17 complaints were made and perhaps nothing was done, well,

18 there's things in here that show that perhaps the appropriate

19 actions were taken.

20         THE COURT:  I don't think that's what I indicated.  I

21 was — I indicated knowledge, that I think they're highly

22 relevant to prove knowledge that complaints were being made.

23 Whether the complaints were true or not, if individuals — if

24 defendants were notified that there were these complaints that

25 were made, that's highly relevant to the issues in the case.

1          MR. BALDANI:  So by cross-examining as to, well, this

2    document indicates that a complaint was made and Freddy

3    Thompson took Step A, B, C, and D, that would be opening the

4    door?

5          THE COURT:  If you did that and Ms. Hughes objected

6    to that, as she's just objected and said she would, I would

7    sustain the objection because you're getting into the merits of

8    these complaints.  So if you do that, other than just generally

9    what type of complaints would you generally receive in an

10   election, then if there is an objection, and I -- I would --

11         You would need to object, because I don't know what

12   he's going to ask.

13         But if there is an objection, I'll likely sustain the

14   objection to the merits of these specific complaints.

15         MR. BALDANI:  Okay.  But a general question for --

16   along the lines of, you mentioned there was "X" number of

17   complaints in '02, now, some of those were simply having to do

18   with not enough voting machines, something generic like that?

19   I'm not trying to be difficult with you, Judge, I'm just not

20   really sure --

21         THE COURT:  If you get into some of those, you're

22   referring to specific complaints, then I'll sustain the

23   objection to that.  If you get -- if you ask this particular

24   witness about the nature of the complaints that his office

25   receives, that's -- I think that's appropriate, because that's

1 general information that this particular witness has.  If get

2 into some of the complaints, a specific complaint, things of

3 that nature, then you are going beyond what I've indicated and

4 I would sustain the objection to that line of inquiry.

5          MR. BALDANI:  Okay, I think I understand.

6          THE COURT:  Mr. Abell, I think you had an issue to

7 take up?

8          MR. ABELL:  Judge, I noticed among these records, and

9 this is page 597 of this rather long group of exhibits, it's a

10 memorandum dated May 13, 2004, from Secretary Grayson's office

11 to the County Board of Elections members, and it reports a

12 ruling by the Sixth Circuit, and the memorandum refers to the

13 case, but the citation is 356 F.3d 651.  And I read it

14 yesterday, an opinion by Judge Batchelder.

15          The upshot of it, among other things, the Sixth

16 Circuit declared unconstitutional the 500-foot electioneering

17 ban, and this memorandum advises the County Board of Elections

18 of that decision, it says basically that doesn't apply to these

19 elections.

20          And then I find a complaint reported regarding my

21 client, Mr. Stivers, which appears -- which states in effect

22 that he's near the polls electioneering for then-Senate

23 Candidate Mongiardo.  And in this case it says that it was

24 referred to special prosecutions, which I don't understand why

25 that was done at the time since it's reported and appears to be

1  perfectly lawful in view of the Court's position of

2  constitutional activity.

3          I guess my point is some of these reports imply

4  wrongdoing and are unfounded in that implication.  And I guess

5  the Court's ruling that they're not admitted for the truth of

6  what they're alleging obviates my objection, but that is a

7  concern that we would bring to your attention.

8          THE COURT:  All right.  If you would like, again, at

9  the end of this witness's testimony, I can — I can again

10 instruct the jury that the information that's contained that

11 would have gone to the Attorney General's Office is not being

12 admitted for the truth of the matter asserted.  I can go beyond

13 that, but if I go beyond that, of course, there's that two-edge

14 sword if I talk specifically about references to legal rulings,

15 that may highlight something that's not even an issue in the

16 case.  But if you want me to do that, I can do that as well.

17         MR. ABELL:  I would prefer of those two choices the

18 general admonition you gave Friday.

19         THE COURT:  All right.  I'll do that again at the

20 conclusion of this witness's testimony.

21         MR. ABELL:  Thank you.

22         THE COURT:  All right.  Thank you.

23         Mr. Westberry.

24         MR. WESTBERRY:  One last question.  I have no

25 intention of asking this witness, Mr. Sutherland, about any of

1   the contents of the so-called anonymous complaints.  I would

2   ask, Judge, and I know you don't want to tell me how to cross,

3   but within these 900-plus pages of documents, there are

4   numerous internal OAG memorandums from investigators to heads

5   of special prosecution units that describe their observation in

6   various precincts on the various election days.  It does not

7   seem to me that that is within the scope of what we've been

8   talking about a moment ago, but I wanted — I'm contemplating

9   asking some questions about those observations, at least to

10  Mr. Sutherland, to acknowledge these are internal OAG

11  memorandums and here are the observations that were made by the

12  investigators, and particularly during the May '02 primary,

13  when they went to a particular precinct.

14          THE COURT:  So this would be, in essence, a business

15  record, it would be a report, an internal report, recording an

16  employee's observations?

17          MR. WESTBERRY:  Yes, sir.  Yes, sir.

18          THE COURT:  Essentially a present recollection

19  recorded?

20          MR. WESTBERRY:  Yes.

21          THE COURT:  It would be part of a business record.

22          MR. WESTBERRY:  I was looking at it as a business

23  record.  Exception to the hearsay rule.  And they appear to be

24  the kinds of things that are generated in the regular course

25  of —

1           THE COURT:  Give me an example of one since I haven't
2   looked at each of these documents.
3           MR. WESTBERRY:  Sure.  0182, it's a memo in June
4   of '02 from a Mr. Hall and Mr. Jones, who were investigators.
5   It's sent to Karen Timmel at the Attorney General's Office.
6   Ms. Timmel has been there a long time.  And it says that on
7   May 28 of '02 Mr. Jones and I — this is Hall writing and I'm
8   paraphrasing, Jones and I notified Jennings White, County
9   Clerk, that we would be monitoring the individual precincts.
10  And they go on to list six different precincts that they
11  apparently went through during the day, including Burning
12  Springs appears to be the first precinct that they went to at
13  about 8:45 in the morning, and they identified who the precinct
14  officials were, for example, in Burning Springs, and then they
15  go on to indicate their observations.
16          THE COURT:  Tell me the nature of the observations.
17  I guess that's what we're getting to.
18          MR. WESTBERRY:  All areas of the printed election day
19  monitoring checklist were completed with no irregularities.
20  That's the first.
21          The second and the final one that I'm most interested
22  in, a complaint was received from the County Clerk that vote
23  buying was taking place at Burning Springs.  Upon our arrival,
24  there was no evidence of vote buying and election officials had
25  noticed no suspicious activity.

1          THE COURT:  All right.

2          MR. WESTBERRY:  I'm really not too concerned about

3    the other five or six -- five precincts that are listed, but I

4    was most concerned, of course, about Burning Springs.

5          THE COURT:  Their observations, I believe, would be

6    proper subject of cross-examination -- well, that inquiry as to

7    that -- as to their observation would be appropriate, but with

8    respect to what election officers would have said to them, I

9    think falls within this other area that we're -- that we're

10   talking about.

11         MR. WESTBERRY:  And I had not intended to ask --

12   there's no mention, in any event, in the memorandum what an

13   election officer would have said other than they identified who

14   the election officers were, but nothing -- no content.

15         THE COURT:  All right.

16         MR. WESTBERRY:  Thank you.

17         THE COURT:  Yes, sir.

18         Mr. Hoskins, I believe, jumped up first.

19         MR. WHITE:  Sorry, Your Honor.

20         THE COURT:  He just got you just by a little bit.

21         MR. HOSKINS:  I wanted to call to the United States'

22   attention and the Court's attention, we have an issue, and I

23   guess to preface this, what I'm going to be asking is that the

24   government and the Court will waive separation of witnesses as

25   to one witness.

1             In the courtroom right now is Tom Marshall from the

2    Attorney General's office.  He's told us he is here to see his

3    colleague, Mr. Sutherland, testify.  We have not subpoenaed

4    Mr. Marshall, but he is on our list of potential witnesses,

5    probably depending on how the government might cross-examine

6    Mr. Maricle if he testifies.

7             The subject matter that Mr. Marshall would testify if

8    we called upon him is totally unrelated to any election

9    activity, it's totally unrelated to Mr. Sutherland's testimony

10   as I understand it.

11            THE COURT:  All right.

12            Mr. Smith, what's the position of the United States?

13            MR. SMITH:  Your Honor, I've not had an opportunity

14   to speak with the witness and I don't know how vital his

15   interest is in seeing his colleague testify this morning, but

16   based on the representations that he's not sure that he would

17   be called by Maricle at this point at all and if he is it's on

18   a totally different subject matter, we don't have any

19   objection.

20            THE COURT:  All right.

21            MR. HOSKINS:  Thank you.

22            THE COURT:  Now, Mr. White.

23            MR. WHITE:  Thank you, Your Honor.  Good morning.

24            THE COURT:  Morning.

25            MR. WHITE:  Scott White on behalf of Defendant Jones.

1    I just need to place an objection in the record, I don't need

2    to be heard, but this specific document I just wanted to raise

3    it.  It's actually Bates stamped 811 of the David Sutherland

4    exhibit, and it is an OAG Election Inquiry Form No. 06-P-186.

5    It's a -- the person taking the complaint was Tina Cummins.  It

6    dealt directly with my client, Mr. Jones.  The matter was

7    referred to the Kentucky Bureau of Investigation, which my

8    recollection is that became a new division of the Attorney

9    General's Office under Attorney General Stumbo, and then it was

10   sent to KSP.  And I would just simply say my argument is it's

11   neither relevant, if relevant, more prejudicial, but I don't

12   know need to be heard beyond that.

13           THE COURT:  All right.  You believe that my previous

14   ruling on that would cover that?

15           MR. WHITE:  Yes, sir.

16           THE COURT:  All right.  Thank you.

17           Anything else?

18       (No response.)

19           THE COURT:  All members of the jury present?

20           THE MARSHAL:  Yes, sir.

21           THE COURT:  All right.  If you could bring the jury

22   in, please.

23           Who will be cross-examining, Mr. Hoskins or

24   Mr. Pinales?

25           MR. PINALES:  There will be no questions, so I guess

 1  the response is neither one, Your Honor.

 2              THE COURT:  All right.  Thank you.

 3              The Clerk advises me that the newspaper article we've

 4  talked about has been removed from that exhibit.

 5          (Whereupon, the jury entered the courtroom, after which

 6  the following proceedings were had in open court.)

 7              THE COURT:  Thank you, and please be seated.  And

 8  good morning, ladies and gentlemen.

 9              The record will reflect that all jurors are present.

10  The parties and counsel are also present.

11              Before the witness is brought in, I want to advise

12  you that one or more of our — the parties in the case are not

13  feeling real well today.  So, again, if we need to take a

14  break, I just wanted to alert you if someone does become ill,

15  I'll advise you and let you take a break as well; okay?

16              Let's see, I believe the witness was testifying,

17  Mr. Whitehead — Sutherland, I'm sorry.

18              Mr. Sutherland, if he could be brought back in,

19  please.

20          (Whereupon, the witness returned to the witness stand,

21  after which the following proceedings were had in open court.)

22              THE COURT:  Good morning.  Please be seated.

23              THE WITNESS:  Thank you.

24              THE COURT:  Mr. Sutherland, before we begin, I will

25  remind you that you're still under oath.

```
 1              THE WITNESS:  Yes, sir.
 2              THE COURT:  I believe the documents that you were
 3   shown should be on the table there in front of you.
 4              And let's see, ready for cross-examination?
 5              MR. PINALES:  No questions, Your Honor.
 6              THE COURT:  Mr. Pinales doesn't have any questions.
 7              Mr. Westberry.
 8              MR. WESTBERRY:  Just a few, please.  Thank you.
 9              THE COURT:  Yes, sir.
10                        DAVID SUTHERLAND,
11   being previously duly sworn, was examined and testified further
12   as follows:
13                        CROSS-EXAMINATION
14   BY MR. WESTBERRY:
15   Q    Good morning.
16   A    Good morning.
17   Q    Mr. Sutherland, I'm Kent Westberry, I'm one of the
18   attorneys for Doug Adams.
19              MR. WESTBERRY:  Judge, with your permission, may the
20   CSO hand up to Mr. Sutherland something I would like him to
21   look at?  It's what we discussed a moment ago.
22              THE COURT:  Yes, sir.  You can show that to Mr. Smith
23   first.
24              MR. WESTBERRY:  May I from here, Your Honor?
25              THE COURT:  Yes, that will be fine.
```

1          MR. WESTBERRY:  Thank you.

2   BY MR. WESTBERRY:

3   Q    Mr. Sutherland, as you look at what I've just handed you,

4   I would like to ask you to take a look at that, please.  It

5   appears to be a two-page -- three-page memorandum.  It was

6   taken from the exhibits that you identified last Friday

7   afternoon.  We've been referring to them as PR83.  Take just a

8   second to look through that, Mr. Sutherland, and as you're

9   doing that, I would ask you if you could agree that that

10  appears to be a memorandum -- an internal memorandum generated

11  within the Office of the Attorney General?

12  A    It appears so, yes, sir.

13  Q    Okay.  And it appears to be from two fellows named John

14  Hall and Bob Jones, and it's sent to Karen Timmell, who's the

15  Director of Special Prosecutions at the Office of the Attorney

16  General; is that correct, sir?

17  A    Yes, sir, it is.

18  Q    It's actually signed by John Hall on the third page; is

19  that correct?

20  A    That's correct.

21  Q    Is this the kind of memorandum that you have seen before?

22  Have you seen this kind of memorandum before, Mr. Sutherland?

23  A    Yes, sir, I have.

24  Q    It's the kind of document that's regularly kept in the

25  course of business over at the Attorney General's Office?

1  A    Yes, sir, it is.

2  Q    Thank you.  Now, again, it's been introduced as one of

3  many pages in PR83, but I would like you to look at that first

4  paragraph that begins, "On Tuesday, May 28th, 2002."  Do you

5  see that, Mr. Sutherland?

6  A    Yes, sir, I do.

7  Q    It says that Bob Jones — this is Mr. Hall's writing, and

8  he and Mr. Jones are investigators with the Office of the

9  Attorney General; is that correct?

10 A    Yes, sir, that's correct.

11 Q    It says that he and Mr. Jones were assigned to Clay County

12 for election day monitoring of the Clay County precincts.  Do

13 you see that first sentence there, Mr. Sutherland?

14 A    Yes, sir, I do.

15 Q    It goes on to say that Jones and he notified Jennings

16 White, the County Court Clerk, that they would be monitoring

17 individual precincts; correct?

18 A    Yes, sir.

19 Q    Now, it goes on to list over the next few pages about six

20 separate precincts that were investigated on that primary day

21 in 2002.  Have I counted the right number of precincts,

22 Mr. Sutherland?  I said six.

23 A    It looks like that's correct, yes, sir.

24 Q    The first precinct that they identify that they visited

25 was the Burning Springs precinct.  Do you see that,

1  Mr. Sutherland?

2  A    I do.

3  Q    And they said they were there at 8:45 a.m.; is that

4  correct?

5  A    Yes, sir.

6  Q    Now, he goes on — the two of them go on to identify who

7  the precinct officials were at Burning Springs, Charles

8  Davidson, a Roy Allen, a Darrell Reynolds, and a Larry

9  Sizemore.  Have I read those right?

10  A    That's correct.

11  Q    Now, the next sentence says, "All areas of the printed

12  election day monitoring checklist were completed with no

13  irregularities."  Have I read that right, sir?

14  A    Yes, sir.

15  Q    Just what is a monitoring checklist?  What is that, if you

16  know?

17  A    I've kind of forgotten, really.  I mean, it — it's a

18  form, but it's been a while, so I'm —

19  Q    We've never talked before and I didn't —

20  A    Huh-uh.

21  Q    — know whether you knew or not.  But he noted no

22  irregularities on the monitoring checklist; correct?

23  A    Right.  Yes, sir.  Uh-huh.

24  Q    The last paragraph says, "A complaint was received from

25  the County Clerk, Mr. White, that vote buying was taking place

1   at the Burning Springs precinct.  Upon our arrival, there was

2   no evidence of vote buying and election officials had noticed

3   no suspicious activity."  Did I read that correct as well, sir?

4   A    I think you mentioned Mr. White's name.  I don't see that

5   in the paragraph.

6   Q    Okay.  That is correct.  But look back at the very top

7   paragraph, it says, "Bob Jones and I were assigned to Clay

8   County for election day."

9   A    Yes.

10  Q    It goes on to read, "Jones and I notified Jennings White."

11  A    That's correct.  Yes.

12  Q    So that indicated that Jennings White, at least at the

13  time, was the Clay County Court Clerk; correct?

14  A    That is correct.

15  Q    And, again, these two investigators were there at

16  8:45 a.m. the morning hours of that May primary, is that

17  correct, according to what you read there?

18  A    According to this, that is correct.

19  Q    Mr. Sutherland, anonymous complaints, do they present

20  challenges for the Attorney General in terms of how to respond?

21  A    Yes, sir.

22  Q    Why is that?

23  A    There is published a 1-800 number to report irregularities

24  in the voting process, and as part of the Attorney General's

25  responsibility, he collects those complaints and reviews them,

1  ascertains the illegal or legal aspects of it and then tries to

2  act on them.

3  Q    It's tough to act on an anonymous complaint; is that —

4  would you agree with that statement?

5  A    Very few of the complaints were anonymous.  Some of them

6  are, but most of them are named, the person will name

7  themselves.

8  Q    But there are anonymous complaints contained in this

9  information; correct?

10  A    There are.

11  Q    And we're talking about 900 pages worth of documents there

12  in front of you?

13  A    I haven't counted them.

14         MR. WESTBERRY:  Just one second, please.

15         Thank you, sir.  Appreciate that.

16         THE COURT:  Thank you.

17         Mr. White.

18         MR. WHITE:  Thank you, Your Honor.  Just a question

19  or two.

20                        CROSS-EXAMINATION

21  BY MR. WHITE:

22  Q    My name is Scott White, I represent Defendant Mr. Jones.

23  I just want to ask you a quick question, because we were just

24  talking about the election day monitoring checklist.  Could you

25  go to page 907 of that exhibit?

DAVID SUTHERLAND CROSS - MR. RICHARDSON          26

1   A    907?

2   Q    Yes, sir.  It's Bates stamped on the bottom right.  It's

3   CC underscore 0907.

4   A    I have it.

5   Q    Great.  I don't want to ask you about any of the substance

6   on there.  I just want to ask you, is that the form that the

7   Attorney General investigators were working off of in terms of

8   their election day monitoring checklist that you just testified

9   about in response to Mr. Westberry's questions?

10  A    Yes, sir, that's one of them.

11          MR. WHITE:  That's all the questions I have, Your

12  Honor.  Thank you.

13          THE COURT:  All right.

14          MR. WHITE:  Thank you, Mr. Sutherland.

15          THE COURT:  Thank you.

16          THE WITNESS:  Yes, sir.

17          MR. ABELL:  No questions for Mr. Sutherland.

18          MR. RICHARDSON:  Briefly, Your Honor.

19          THE COURT:  Mr. Richardson.

20                    CROSS-EXAMINATION

21  BY MR. RICHARDSON:

22  Q    Mr. Sutherland, my name is Tucker Richardson, I'm one of

23  the attorneys representing Freddy Thompson here today.

24  A    Good morning.

25  Q    Good morning, sir.  You testified on Thursday, and I'm

1  referring to page 177 and 178 in the exhibit that was

2  introduced on Thursday.  If you could please get that document.

3  A    Okay, I'm there.

4  Q    Page 177, that basically is a complaint call list by

5  counties?

6  A    Yes, sir.

7  Q    And that's from May of 2002?

8  A    That would be correct.

9  Q    And Clay County — your testimony was Clay County had 63

10  calls?

11  A    Yes, sir.

12  Q    Now, I would like to direct you to number 178, the next

13  page.

14  A    Okay.

15  Q    And basically, although there was 63 calls, only 36 of

16  them were what your office deemed to be criminal activity?

17  A    Yes, sir.

18  Q    So a lot of those calls didn't have anything to do with

19  allegations of vote buying or anything like that?

20  A    That would be right.

21  Q    Thank you, sir.

22       Next I would like to take you to page 734 — 733, 734.

23  A    Okay.  Just give me a second.

24       I'm on page 733.

25  Q    Thank you.  If you'll look on page 736, this is also —

1  A    736?

2  Q    Yes, sir.

3  A    Okay.

4  Q    Who is William Stewart?

5  A    I don't know.

6  Q    So you're not sure of Mr. Stewart's identity?  Would you

7  go back to page 733?

8  A    Okay, he was an investigator I had forgotten.  But, yes,

9  Bill, I believe, was what I called him.  But, yes, now I

10 recall, I'm sorry.

11 Q    Basically, what 733 through 736 is his report of precincts

12 and counties that he had visited in November of '04?

13 A    Yes, sir, it looks like that is correct.

14 Q    And if you'll go to page 734.

15 A    Okay.

16 Q    It appears that page indicates that he visited Clay County

17 in November of '04?

18 A    That is correct.

19 Q    And he had visited the Oneida precinct at the top of the

20 page?

21 A    Yes, sir.

22 Q    And his last sentence there he also reported "No

23 suspicious activity or disturbances"?

24 A    That is correct.

25 Q    And then they also visited Whites Branch precinct?

1    A    Yes, sir.

2    Q    And the final line says, "The officers reported no

3    suspicious activity or disturbances"?

4    A    That is correct.  But if I may clarify, usually when those

5    agents came around, not much did happen.

6    Q    How about the Pigeon Roost precinct?

7    A    That's the same thing, yes, sir.

8    Q    And the officers again reported no suspicious activity or

9    disturbances?

10   A    That's right.

11   Q    So I think what you're — what you're saying is that when

12   the authorities showed up, like turn on the lights, the

13   cockroaches scatter?

14   A    That's exactly right.

15   Q    So it's hard to — as an election official, it's hard to

16   catch them right in the act, isn't it?

17   A    Yes, sir, it is.

18   Q    Now, I would like to turn your attention to the 2006

19   information, and you reported that there were 104 complaints?

20   A    I believe that's what I counted, yes, sir.

21   Q    Do you know where that is in that list of documents?

22   A    I counted them just —

23   Q    Just with your hands?

24   A    With my hands prior to coming in here, yes, sir.

25   Q    Now, in other — 2002, there were 63, and there was a list

1  of other counties?

2  A    Right.

3  Q    And you were able to compare county to county?

4  A    Yes, sir.

5  Q    And in 2004 there was, I think, seven is what you

6  testified to in 2004?

7  A    Yes, sir, I believe that's correct.

8  Q    And that would be — if you would like to check, page 571.

9  I don't think we need to go there.  There was seven, I believe,

10  you testified to.  But you were able to compare county by

11  county?

12  A    Yes, sir.  Right.

13  Q    Now, in 2006, when you testified there was 104, you

14  counted — you hand-counted those?

15  A    That's correct.

16  Q    But there is no county-by-county comparison?

17  A    I did not find one, no, sir.

18  Q    So we don't know what the other counties, what their

19  complaint rate was in 2006?

20  A    That would be right, because they only pulled out Clay

21  County.

22  Q    And would you agree that in 2006 with the new machines the

23  complaints spiked?

24  A    I can't answer that, I don't know.

25       MR. RICHARDSON:  Thank you, Mr. Sutherland.

1          THE WITNESS:  Yes, sir.

2          THE COURT:  All right.  Mr. Gilbert?

3          MR. GILBERT:  I have no questions.

4          THE COURT:  Ms. Hughes?

5          MS. HUGHES:  No, thank you, Your Honor.

6          THE COURT:  Mr. Simons?

7          MR. SIMONS:  I have none, thank you.

8          THE COURT:  All right.  Thank you.

9          Any redirect?

10                    REDIRECT EXAMINATION

11  BY MR. SMITH:

12  Q    Mr. Sutherland, you were asked, I believe, about a memo of

13  the Attorney General's Office I believe there on 182.  Do you

14  still have that in front of you?

15  A    No, but I'll get it.  Just a second, please.

16  Q    Sure, take your time.

17  A    I have it in front of me.

18  Q    First of all, Mr. Sutherland, you were asked to highlight

19  the findings in some of those precincts.  Looking through your

20  memo that you've been asked to look at there prepared by John

21  Hall, would there be a similar finding in each of the visits

22  that he made to all precincts in Clay County, that is that he

23  noticed no suspicious activity?

24  A    I don't know if he would, but according to this, that's

25  what he noted, that there was no suspicious activity.

1  Q    So in all the precincts that he visited, according to the

2  memo, no suspicious activity was noted in this memo?

3  A    In this memo, that's correct.

4  Q    Is that uncommon, sir, in your experience dealing with

5  election day complaints, sending two people in a county where

6  there are 20 precincts, they show up — Are they in marked

7  cars, are they in government cars, or what kind of vehicles do

8  they normally drive?

9  A    They are in unmarked vehicles.

10 Q    Okay.

11 A    With unofficial — I mean, tags that do not reflect

12 they're official.

13 Q    Do they seek to go in in an undercover capacity?

14 A    No, sir, they do not.

15 Q    So they're carrying credentials presenting their

16 identities to investigate?

17 A    That's exactly right, yes, sir.

18 Q    And as I understand it, in 2002, they, in fact, had called

19 the County Clerk's Office and talked to the County Clerk and

20 told them that they were coming to Clay County to monitor the

21 precincts.

22 A    That's correct.

23 Q    Is that common?

24 A    That was our instructions.  We would call every county

25 clerk of every county we would work, and sometime we worked

DAVID SUTHERLAND REDIRECT - MR. SMITH                33

1   more than one.  In this case, I don't know how many other

2   counties they may have worked, but we always contacted the

3   Clerk's Office to tell them we were coming.

4   Q    And would that hold true for 2004, 2006?

5   A    That was normally the policy, yes, sir.

6   Q    In your experience, sir, does that present a challenge for

7   an investigator for the Attorney General's Office, to handle

8   complaints in this pre-announced fashion?

9   A    I'm sorry, would you repeat the question?

10  Q    Did that present to you, as an investigator, any specific

11  challenges by operating in a pre-announced -- say you call

12  ahead to the Clerk's Office, the county knows you're coming --

13  A    Okay.

14  Q    -- bringing two investigators into town to check out

15  complaints, did that present challenges to you specifically?

16  A    Yes, sir, it would, because they would normally have

17  forewarning, and to be able to catch somebody doing something

18  illegally in the act would be difficult once we were announced.

19  Q    Do you also, at the conclusion of the election day and

20  following the specific receipts of complaints, notify the

21  Commonwealth Attorney?

22  A    Yes, sir, we do.

23  Q    As a matter of practice?

24  A    That's correct.

25  Q    So the Commonwealth Attorney in Clay County, Gary Gregory,

1  he would be the chief law enforcement person in the district in

2  which Clay County is situated which would be notified of these

3  criminal complaints?

4  A     Normally, after an election, we would sum up the

5  activities of that county and send a copy to the Commonwealth

6  Attorney; that is correct, yes, sir.

7  Q     And you were asked to dissect the 63 complaints that came

8  in to Clay County as to, I believe, one of the memos that you

9  referenced, I believe on 177 and 175, indicating that there

10 were 36 criminal in nature and the remaining of the 63, one

11 would assume were noncriminal in nature?

12 A     That's what it appears to be, yes, sir.

13 Q     And 36 being criminal complaints, how does that compare to

14 the other counties in the State of Kentucky as far as

15 percentage of overall complaints being criminal in nature?

16 A     I would be, I think, remiss in trying to answer exactly

17 the percentage.  But you did have in each county a percentage

18 of them that would be of a fraudulent nature, and then you

19 would have some that would be like, for instance, somebody —

20 we would have a complaint that they couldn't get their

21 wheelchair into a precinct because of the steps or something,

22 and we considered those to be noncriminal in nature, so —

23 Q     Looking at 177, sir, 63 being the overall total

24 complaints, and 36, I believe you said, were criminal in

25 nature, would that still exceed the number of total complaints

1   in the closest county in the State of Kentucky?

2   A    Yes, sir, it would.

3             MR. SMITH:  That's all I have.  Thank you.

4             THE COURT:  All right.  Let's see if there's any

5   further recross.

6             Mr. Westberry?

7             MR. WESTBERRY:  I just have one.

8             THE COURT:  Yes, sir.

9                        RECROSS-EXAMINATION

10  BY MR. WESTBERRY:

11  Q    The investigators that you've been talking about that go

12  out and monitor, they're not uniformed typically, are they?

13  A    No, sir, they're not.

14            MR. WESTBERRY:  Thank you.

15            THE COURT:  Mr. White.

16            MR. WHITE:  I have some follow-up, Your Honor.

17                       RECROSS-EXAMINATION

18  BY MR. WHITE:

19  Q    Mr. Sutherland, again, Scott White on behalf of Mr. Jones.

20  Which -- Is the Attorney General's Office divided up into

21  divisions?

22  A    Yes, sir, it is.

23  Q    And which division were you employed in?

24  A    Special Prosecutions Division.

25  Q    Is that the unit of the Attorney General's Office that

1  effectively functions like a Commonwealth's Attorney's Office,

2  it actually does criminal prosecutions?

3  A    That is correct.

4  Q    Is there any other investigative division within the

5  Office of Attorney General during these years that you've

6  testified about, '02 through '06?

7  A    Yes, sir, there were.

8  Q    And what were those; do you recall?

9  A    Yes, sir, I do.  There was the Special Investigations

10 Division, there was a Public Corruption Division, there was a

11 Medicaid Fraud Division, and there's probably one I'm not

12 thinking of, but there were several divisions that did criminal

13 investigations.

14 Q    Were many of these investigators sworn peace officers?

15 A    Yes, sir, they were.

16 Q    Does that mean they can carry a gun and a badge and have

17 arrest authority?

18 A    Yes, sir, that's correct.

19 Q    Do you yourself have that authority ——

20 A    I did.

21 Q    —— or did you at that time?

22 A    Yes, sir, I did.

23 Q    And to your recollection, in '02 —— in the elections

24 you've testified about, '02, '03, '04, and '06, were you an

25 employee of the Special Prosecutions Division during all those

DAVID SUTHERLAND - RECROSS - MR. WHITE                37

1  years?

2  A    Yes, sir, I was.

3  Q    And in those years, when you worked elections, did you

4  take phone calls that came into the office or did you go out in

5  the field in any of these, if you recall?

6  A    Prior to the election, I would take phone calls on a

7  regular basis when I was in the office and not on another

8  assignment.  On election day itself, I was given a geographical

9  area to do the same thing these agents did but in a different

10 part of the state.

11 Q    And so there would be -- in each of these elections, would

12 it be fair to say that there were several counties amongst the

13 120 in our Commonwealth that were selected for investigators to

14 go and spend time there during election day?

15 A    Yes, sir, that's correct.

16 Q    At the times that -- Did you receive specific training as

17 an investigator to go out and monitor election polling areas?

18 A    Yes, sir, I did.

19 Q    Was that done in conjunction with the State Board of

20 Elections?

21 A    Yes, sir, it was.

22 Q    And, of course, speaking just for yourself, you would have

23 also drawn upon your own training and experience in observing

24 and detecting crime; is that correct?

25 A    Yes, sir, that's right.

1  Q    Did you testify in response to Mr. Smith that there

2  were -- that it was the policy of the Attorney General's Office

3  at that time to inform the County Clerk that there would be

4  nonuniformed Attorney General investigators in the county?

5  A    I'm sorry, repeat that question, please.

6  Q    I apologize.  Did you testify on redirect examination that

7  the County Clerk was informed if the Attorney General's Office

8  was going in?

9  A    Yes, sir, they were.

10 Q    Based on your review of these records, as well as your own

11 experience in going -- You never went to Clay County, did you?

12 A    Yes, sir, I did.

13 Q    Oh, you did?  Okay.  In the counties that you went to, did

14 you yourself ever have occasion to call the County Clerk's

15 Office?

16 A    Yes, sir, I always did to the counties I was going to.

17 Q    Was one of the reasons for that, based on your training,

18 that the County Clerk's Office also had a role in monitoring

19 and enforcing election rules?

20 A    I don't know if they -- I do know they had a roll to play

21 in the process.  And it was an effort to coordinate that role

22 with us in our office with them.

23 Q    Would you agree with me, Mr. Sutherland, that there is

24 some value in letting the County Clerk know that the Attorney

25 General's Office is in the county on election day from a

1  preventive standpoint?

2  A    I'm sure that was possibly part of it, but it was also to

3  give him the — give him the awareness that we would be

4  available to him if he had some problems.

5  Q    Would you agree with me that, just as I believe

6  Mr. Thompson's attorney pointed out, that it is sometimes

7  difficult to detect election fraud when the investigator shows

8  up, that it could also be that there was no election fraud

9  activity going on when the investigator showed up, that there

10 was nothing to detect, that's why they didn't see anything?

11 A    Yes, sir, that's possible.

12        MR. WHITE:  Mr. Sutherland, those are all the

13 questions I have, thank you.

14        Thank you, Your Honor.

15        THE COURT:  Yes, sir.

16        Mr. Abell?

17        MR. RICHARDSON:  Briefly, Your Honor.

18        THE COURT:  Mr. Richardson, yes, sir.

19                    RECROSS–EXAMINATION

20 BY MR. RICHARDSON:

21 Q    I want to go back to the 733, 736, the report of

22 Mr. Williams or Bill Stewart.

23 A    Okay.

24 Q    And on page 733, in Jackson County Mr. Stewart met with

25 the Jackson County Clerk at 7:30 a.m., the first sentence

DAVID SUTHERLAND - CROSS - MR. RICHARDSON          40

1   there?

2   A    I see it.

3   Q    And then he went and visited two precincts in Jackson

4   County, McKee 1 and 2?

5   A    Okay.

6   Q    And he visited McKee 1 at 7:40 a.m., the first sentence

7   there?

8   A    I'm with you, yes, sir.

9   Q    And then he was at the McKee No. 2, Precinct No. 2, at

10  7:50 a.m.?

11  A    Yes, sir.

12  Q    So he met with the County Clerk at 7:30 and then 7:40 and

13  7:50?

14  A    Yes, sir.

15  Q    Then we go to Owsley County, which is on page 733?

16  A    Yes, sir.

17  Q    He met with the Clerk at 8:50 at his office?

18  A    Yes, sir.

19  Q    And then he went to two precincts in Owsley County ——

20  A    Yes, sir.

21  Q    —— 9:10 a.m. ——

22  A    Yes, sir.

23  Q    —— and 9:40 a.m.?

24  A    That's correct.

25  Q    So he met with the Clerk prior to going to those

DAVID SUTHERLAND - CROSS - MR. RICHARDSON          41

1  precincts?

2  A    That's right.

3  Q    And go to the next page, Clay County.

4  A    Yes.

5  Q    Indicates he went to the Oneida precinct at 10:05 a.m?

6  A    Yes, sir.

7  Q    And 11:00 a.m. at Whites Branch?

8  A    Yes, sir.

9  Q    And then 11:15 a.m. at Pigeon Roost?

10  A    That is correct, sir.

11  Q    And then he went and met with Freddy Thompson at

12  11:30 a.m.?

13  A    Yes, sir.

14  Q    So he didn't see Freddy Thompson until after he had been

15  to the three precincts?

16  A    Yes, sir, that's correct.

17  Q    And Mr. Thompson was cooperative with Mr. Stewart, was he

18  not?

19  A    Yes, sir, it indicates that.

20  Q    He indicates he's very appreciative to the Office of the

21  Attorney General for the personal visit and offer of

22  assistance, doesn't he?

23  A    That's what it says.

24          MR. RICHARDSON:  Thank you, sir.

25          THE COURT:  Anything else?

1    (No response.)

2        THE COURT:  All right.  Anything else of this

3   witness?

4        MR. SMITH:  Yes, Your Honor.

5            FURTHER REDIRECT EXAMINATION

6   BY MR. SMITH:

7   Q    There on 734, Mr. Sutherland?

8   A    Okay.  I'm there.

9   Q    Mr. Thompson told these investigators that everything was

10  going fine and there were no problems in the county?

11  A    That's what it says, yes, sir.

12  Q    That's what he said?

13  A    Yes, sir.

14  Q    And by this memo, this doesn't mean that they didn't get a

15  phone call to Freddy Thompson before they made their visits to

16  Clay County that day, does it?

17  A    Okay.  They would have called Mr. Thompson before they

18  went down there, yes, sir.  But —

19  Q    Okay.

20  A    — you say on that day?

21  Q    Yes, sir.

22  A    They probably didn't call him that day, but somebody else

23  might have.

24  Q    Okay.  But the policy, in your past experience, is despite

25  the fact that they didn't meet with him until later in the

DAVID SUTHERLAND – FURTHER RECROSS – MR. RICHARDSON   43

1  morning, he received a phone call before they left for their

2  visit that day?

3  A    That is correct, yes, sir.  That's right.

4  Q    He got advance warning?

5  A    He sure did.  He would have known they would be there.

6              MR. SMITH:  Okay.  Thank you.

7              THE COURT:  Anything else on this line of inquiry?

8              MR. WHITE:  No, Your Honor.  Thank you.

9              THE COURT:  Mr. Richardson.  On this question, yes,

10  sir.

11                   FURTHER RECROSS—EXAMINATION

12  BY MR. RICHARDSON:

13  Q    You don't know who called him, if they did, in fact, call

14  him?

15  A    It was the — it was the responsibility of the

16  investigator assigned to that county to have called him before

17  the — before the election day.

18  Q    So sometime prior to election day Mr. Stewart was supposed

19  to call Mr. Thompson?

20  A    That is correct, yes, sir.

21  Q    And you don't know when he did that?

22  A    I have no idea, no, sir.

23  Q    And you don't know if he did that?

24  A    Not personally, no, sir.

25              MR. RICHARDSON:  Thank you, sir.

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Anything else of Mr. Sutherland?

3          MR. SMITH:  No, thank you.

4          THE COURT:  All right.  Thank you.  You can leave

5    those there.

6          THE WITNESS:  Okay.  Can I put it back together?

7          THE COURT:  That would be great.  I'm sure our Clerk

8    would appreciate that.

9          THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  Mr. Smith, you may call your next

11    witness.

12          MR. ABELL:  Judge?

13          THE COURT:  I'm sorry.  Mr. Abell?

14          MR. ABELL:  Your Honor, may we approach very quickly?

15          THE COURT:  Yes, sir.  Yes.

16      (Whereupon, the following discussion was had between the

17    Court and counsel at the bench, out of the hearing of the

18    jury.)

19          THE COURT:  Would you like just a general cautionary

20    instruction?

21          MR. ABELL:  Yes, sir, that's what I wanted to remind

22    you.

23          THE COURT:  Just the same one I gave before?

24          MR. ABELL:  Yes, sir.

25          THE COURT:  All right, I appreciate that.  Thank you.

1        Mr. Smith, do you have your next witness ready to go?

2   Well, I'll give the instruction first.

3        (Whereupon, the following proceedings continued in open

4   court.)

5        THE COURT:  Ladies and gentlemen, I want to again

6   remind you of the instruction I had given you to last week

7   before we broke on these documents contained in this last

8   exhibit.  The contents of the documents, to the extent that

9   they include any type of complaints, call-in complaints,

10  whether they're anonymous or whether the person identifies

11  themselves, those statements are not being admitted for the

12  truth of what's being said, and you're so instructed.  So

13  they're not admitted for the truth.

14        Mr. Smith, you may call your next witness.

15        MR. SMITH:  Rebecca Mobley.

16        THE COURT:  Thank you.

17        MR. SMITH:  Your Honor, just for our purposes, we've

18  had a records custodian from the Clerk's Office call in and she

19  is ill this morning.  We have a replacement.  I'm trying to

20  find out the name of the replacement, so I apologize.

21        THE COURT:  All right.  Well, you can take just a

22  moment, that's fine.

23        MR. SMITH:  Crystal Goins.

24                    CRYSTAL GOINS,

25  having been first duly placed under oath, was examined and

1    testified as follows:

2                         DIRECT EXAMINATION

3    BY MR. SMITH:

4    Q    Good morning.

5    A    Good morning.

6    Q    State your name, please.

7    A    Crystal Goins.

8    Q    Tell us how you're employed.

9    A    I work for the Circuit Clerk's Office in Manchester,

10   Kentucky.

11   Q    And what position do you hold?

12   A    Deputy Clerk.

13   Q    And who is the Circuit Clerk for Clay County?

14   A    James S. Phillips.

15   Q    And how long have you been employed there, ma'am?

16   A    Almost five years.

17   Q    And as part of your duties, do you have responsibility to

18   certify and to save, keep the records of the Office of the

19   Circuit Clerk?

20   A    Yes.

21            MR. SMITH:  I would like to hand to this witness,

22   Your Honor, multiple exhibits, and if I could list those for

23   the record, D67, "D" as in "Darrell," D70, D71, D77, D78, D80,

24   D82, D83, and PR81.

25            THE COURT:  Yes, sir.

1  BY MR. SMITH:

2  Q    If you would, ma'am, take a look at each one of those

3  individual exhibits if you could.  Can you identify each of

4  those, ma'am, as records kept in the ordinary course of

5  business at the Circuit Court Clerk's Office in Clay County,

6  Kentucky?

7  A    Yes.

8  Q    And are those certified with a certification from one

9  member of that office?

10 A    Yes.

11         MR. SMITH:  I would move for the introduction of

12 those exhibits at this time, Your Honor.

13         THE COURT:  All right.  Any objection?

14     (No response.)

15         THE COURT:  Exhibits D67, 70, 71, 77, 78, 80, 82, 83,

16 and PR81 will be admitted.

17         MR. SMITH:  Thank you, Your Honor.  I pass the

18 witness.

19         THE COURT:  Any questions of the witness?

20         MR. HOSKINS:  No questions.

21         MR. WESTBERRY:  No questions.

22         MR. WHITE:  No questions.

23         MR. ABELL:  No.

24         MR. RICHARDSON:  No.

25         THE COURT:  No?

1           All right.  Thank you, ma'am, you may step down.

2           THE WITNESS:  Thank you.

3           THE COURT:  You can leave those documents there.

4           THE WITNESS:  Okay.

5           THE COURT:  Thank you.

6           Mr. Smith?

7           MR. SMITH:  I call Diana Reid.

8                         DIANA REID,

9    having been first duly placed under oath, was examined and

10   testified as follows:

11                      DIRECT EXAMINATION

12   BY MR. SMITH:

13   Q    Good morning.

14   A    Good morning.

15   Q    State your name, please.

16   A    Diana Reid.

17   Q    And how are you employed?

18   A    Through the Clay County Board of Education.

19   Q    And what position do you hold, ma'am?

20   A    Finance officer with Human Resources, personnel.

21   Q    How long have you been employed?

22   A    Since '84.

23   Q    As part of your job duties, ma'am, do you have a

24   requirement that you keep in custody -- in your custody certain

25   financial records?

1  A    Yes.

2  Q    As well as employment records?

3  A    Yes.

4  Q    I would like to hand to you what's marked as Government's

5  Exhibits M13, M18, M19, M20, 21, 22, 23, and 24.  If you would,

6  take a moment, ma'am, and look at each one of those, please.

7       Ma'am, my question is, are each of these exhibits that now

8  are before you previously identified records kept in the

9  ordinary course of business at the Clay County Board of

10  Education?

11  A    Yes.

12  Q    And can you state that those are, in fact, copies of your

13  records?

14  A    Yes.

15       MR. SMITH:  I would move for their introduction at

16  this time, Your Honor.

17       THE COURT:  Any objection?

18     (No response.)

19       THE COURT:  Exhibits M13, 18, 19, 20, 21, 22, 23, and

20  24 will be admitted.

21  BY MR. SMITH:

22  Q    If I could, ma'am, ask you to look at M13.

23  A    Uh-huh.

24  Q    Tell us generally what that is, ma'am.

25  A    These are the detailed check history records for Douglas

DIANA REID - DIRECT - MR. SMITH                     50

1   Adams.

2   Q     And what years are represented by these records, ma'am?

3   A     School year 2002-03 through '08-'09 school year.

4   Q     2008 and 2009 school year?

5   A     Yes.

6   Q     And would this be a complete history of the monies in

7   which he has earned as Superintendent of Schools through those

8   years represented by these records?

9   A     Yes.

10  Q     Okay.  Now, I direct your attention to M18.  Could you

11  identify that, please?

12  A     These are the Board records showing the Superintendent's

13  contract agreement.

14  Q     And do these include contracts for various years or just

15  one?

16  A     Various.  It includes contracts for Mr. Adams' tenure as

17  superintendent.

18  Q     And contracts for superintendents, are they required to be

19  approved by a political board called the Board of Elections --

20  I'm sorry, the Clay County Board?

21  A     The contracts -- the contracts are approved by the Clay

22  County Board of Education.

23  Q     And these would be the contracts that have been approved

24  over the years by the Board of Education as it pertains to

25  Douglas Adams?

DIANA REID - DIRECT - MR. SMITH                    51

1   A     Yes.

2   Q     M19, ma'am, could you identify that, please?

3   A     This is a letter of resignation from an employee, Vernon

4   Hacker.

5   Q     And what's the date of that letter, ma'am?

6   A     It's dated September 11, 2002.

7   Q     And what position was he resigning from?

8   A     Bus driver.

9   Q     And did that resignation take effect, ma'am?

10  A     It did not.

11  Q     And do you know why the resignation never took effect?

12  A     I don't know the reason why.

13  Q     But as custodian of the records, the records will show if

14  he, in fact, did resign, and they do not show that he did, in

15  fact, resign?

16  A     There was a two-week period that he did not work prior to

17  this letter.

18  Q     Is there any explanation in the records why he did not

19  work for those two other than what's referenced in the letter

20  of resignation?

21  A     No.

22  Q     I direct your attention now to M20.  Can you identify that

23  record for us, please?

24  A     This is a mileage report that each bus driver will

25  complete on each school year.  It only — it just shows the

1   number of miles that they travel per day.

2   Q    And is this pertaining to just one bus driver?

3   A    Yes, it is.

4   Q    And who is the bus driver that these reports refer to?

5   A    Vernon Hacker.

6   Q    Are these a report that's compiled at the end of the year

7   or are they daily or —

8   A    No, it's at the end of the year, or toward the end of the

9   school year.

10  Q    Does it also describe the bus model and make which he's

11  assigned for those years that he drove?

12  A    Yes.

13  Q    And M21, ma'am, I direct your attention to that exhibit,

14  please.  Could you identify those records for the jury, please?

15  A    It's a classified staff salary calculation.  It's a sheet

16  that we use to just document the number of days worked, when

17  they turn in their time sheets and also their daily rate, the

18  number of days that they're paid, the number of paychecks that

19  will be disbursed and the dollar amount, the gross dollar

20  amount, for each paycheck.

21  Q    And are these the earnings for, again, Vernon Hacker?

22  A    Yes.

23  Q    I direct your attention now to M22.  Could you identify

24  that for the jury, please, and the Court?

25  A    These are the detailed check history records of Vernon

1  Hacker.

2  Q    Okay.  And what years are represented, ma'am?

3  A    School year '97-'98 through 2006-07.

4  Q    Thank you.  Now, I direct your attention to M23.  Do you

5  have that in front of you?

6  A    Yes, I do.

7  Q    Can you identify that for the Court and jury, please?

8  A    These are Vernon Hacker contracts.

9  Q    For what position, ma'am?

10 A    Bus driver.

11 Q    And, again, do these cover -- what years, ma'am?

12 A    It starts with the '07-'08 school year and goes through

13 '02-'03.  The '03-'04 is missing.  Then it starts with '04-'05

14 and goes through '06-'07.

15 Q    Do you have the 1997-1998 year initial contract?

16 A    Yes.

17 Q    '98-'99?

18 A    Yes.

19 Q    '99-2000?

20 A    Yes.

21 Q    2000-2001?

22 A    Yes.

23 Q    2001-2002?

24 A    Yes.

25 Q    And 2004?

1   A     Yes.

2   Q     2005?

3   A     Yes.

4   Q     2006?

5   A     Yes.

6   Q     Okay.  And those are for Vernon Hacker as a bus driver?

7   A     That's correct.

8   Q     Now, 24, ma'am, can you identify those, please?

9   A     These are time sheets turned in by Vernon Hacker.

10  Q     And do they usually require his supervisor to sign off on

11  those?

12  A     Yes.

13  Q     And was Ronnie Hacker a supervisor of Vernon Hacker at

14  some point in time, according to these records?

15  A     Yes.  Yes.

16  Q     Do you know what position Ronnie Hacker held with the Clay

17  County Board of -- Board of Education?

18  A     I think it was Assistant Transportation Director.  I could

19  be mistaken.

20  Q     These are actually daily time sheets that are certified by

21  the supervisor of the bus driver?

22  A     They turned in biweekly.

23  Q     Oscar Hubbard is also signing off on these as supervisor.

24  Do you know what position he held, Oscar Hubbard?

25  A     Director of Transportation.

1        MR. SMITH:  I pass the witness.  Thank you.

2        THE COURT:  Thank you.

3        Mr. Pinales?

4        MR. PINALES:  Just a couple, Your Honor.

5        THE COURT:  Yes, sir.

6                        CROSS-EXAMINATION

7   BY MR. PINALES:

8   Q    Ms. Reid, I'm Martin Pinales, and I represent Cletus

9   Maricle.

10  A    Yes.

11  Q    I have just a couple of questions.  As finance officer and

12  Human Resource and personnel employee, was part of your

13  function not only to keep the records but to attend board

14  meetings?

15  A    No, it was not.

16  Q    Did you attend board meetings?

17  A    I did not.

18        MR. PINALES:  Nothing further.  Thank you.

19        THE COURT:  Thank you.

20        Mr. Westberry?

21        MR. WESTBERRY:  If I may from here, just a few

22  questions?

23        THE COURT:  Yes, sir.  That's fine.

24        MR. WESTBERRY:  Thank you.

25                        CROSS-EXAMINATION

 1  BY MR. WESTBERRY:

 2  Q    Good morning, Ms. Reid.  I'm Kent Westberry, I'm one of

 3  the attorneys for Doug Adams.

 4  A    Good morning.

 5  Q    Do employees, folks who work in the Clay County School

 6  System, do they accrue or accumulate sick leave?

 7  A    They do.

 8  Q    When a person leaves employment or retires, are they paid

 9  for any unused accumulated sick leave as part of their

10  retirement or termination, however you want to call it?

11  A    If they leave the system, no; if they retire, yes.

12  Q    And that was my next question.  Do you know if Doug Adams

13  when he retired — Let me back up.

14       You know that Doug Adams recently retired as

15  Superintendent of the Clay County Schools; correct?

16  A    Yes.

17  Q    I think he served from about 1999 to 2009?

18  A    Yes.

19  Q    Is that right?

20  A    That's correct.

21  Q    Do you know if as part of his retirement package he was

22  paid for any unused or accrued sick leave?

23  A    He was.

24  Q    And if someone were looking at a pay scale over the number

25  of years and it showed a larger than normal final paycheck for

DIANA REID CROSS - MR. WESTBERRY                    57

1  '09, would that be on account of the unused sick leave that he

2  was paid?

3  A    Yes.

4  Q    Okay.  And sick leave is accrued the same for all

5  employees in the Clay County School System regardless of

6  whether they drive a bus or are superintendent of the schools

7  or a teacher or whatever; would that be fair?

8  A    Yes.

9  Q    Do all employees of the Clay County School System, are

10 they eligible for annual raises in their salaries?

11 A    Yes.

12 Q    Would that include the superintendent of schools as well?

13 A    Yes.

14 Q    Ms. Reid, is that — is that a set percentage each year,

15 does it vary, if you —

16 A    It varies.

17 Q    Does the superintendent get the same percentage raise that

18 other employees get?

19 A    The same.

20 Q    No more, no less; the same?

21 A    The same.

22 Q    Do you have knowledge, Ms. Reid, of how Doug Adams' salary

23 was set when he originally was hired as the superintendent of

24 schools?

25 A    The salary is established by the Board of Education.

1  Q    If you know, was the initial salary set based on an

2  average of superintendents in neighboring or surrounding

3  counties?

4  A    The first contract?

5  Q    Yes, ma'am, way back in '99.

6  A    I don't know about the first contract.

7  Q    What do you know about the subsequent contracts?

8  A    The second one, I also do not know.  The last contract the

9  Board asked that surrounding counties be questioned as to how

10 much their superintendents made and to get an average on the

11 surrounding counties.

12 Q    To your knowledge, was Mr. Adams' salary comparable to

13 those superintendents in surrounding counties as you've

14 described?

15 A    No.

16 Q    Okay.  How was it?  How would you compare it?

17 A    He was under most districts in surrounding counties.

18 Q    You were asked some questions about a Mr. Vernon Hacker,

19 who had at one time worked as a bus driver in the Clay County

20 School System.  Do you recall those questions from Mr. Smith

21 just a few moments ago?

22 A    Yes.

23 Q    I believe the government also asked you about a two-week

24 period when Mr. Hacker did not work.

25 A    Uh-huh.

1  Q    Do you recall those questions?

2  A    Yes.

3  Q    Do you -- if you know, did he take -- was there an actual

4  break in employment or did he take sick leave?

5  A    He did not take sick leave.

6  Q    Compiling the mileage records, you were asked some

7  questions a moment ago by the government.  Compiling mileage

8  records for the drivers of buses.  If you know, ma'am, is that

9  something that's done by the Transportation Director in the

10 school systems?

11 A    The information is used for the Transportation Department.

12 We may, in Finance, help him send these letters out to the

13 employee, then they come back to us.

14 Q    But the superintendent doesn't have anything to do with

15 compiling --

16 A    No, he does not.

17 Q    -- these records?  Thank you.

18      And that's done for all bus drivers in the county school

19 system?

20 A    Yes, all that are full time -- that have routes, full-time

21 routes.  It would not include any sub driver.

22 Q    Right.  Mr. Hacker had a full-time route; is that your

23 recollection, ma'am?

24 A    Yes.

25      MR. WESTBERRY:  Excuse me just one second.

DIANA REID - CROSS - MR. WHITE                    60

1            THE COURT:  Yes, sir.
2    BY MR. WESTBERRY:
3    Q    One last question about hiring within the school system.
4    Jobs like teachers are typically hired at the beginning or the
5    start of the school year; would that be fair?
6    A    Yes.
7    Q    Other jobs, though, are typically hired throughout the
8    year, such as cooks, maintenance, and jobs like that; would
9    that be fair?
10   A    Yes.
11           MR. WESTBERRY:  Thank you, ma'am, appreciate it.
12           THE WITNESS:  You're welcome.
13           THE COURT:  Anyone else?
14           MR. WHITE:  Your Honor, I have one to clarify
15   something on direct, if I could?
16           THE COURT:  Yes, sir.
17                      CROSS-EXAMINATION
18   BY MR. WHITE:
19   Q    Good morning.  My name is Scott White, and I represent
20   Charles Jones.  I just wanted to ask you a quick point of
21   clarification from my notes.  Let me refer you to Exhibit M18.
22   Do you have that in front of you?
23   A    Yes.
24   Q    These were all contracts between -- that involved the Clay
25   County Board of Education; correct?

1  A    That's correct.

2  Q    Not the Clay County Board of Elections; is that correct?

3  A    That's correct.

4         MR. WHITE:  Thank you, that's all I have.

5         THE COURT:  Anyone else?

6         MR. ABELL:  No questions from me.

7         MR. RICHARDSON:  No.

8         THE COURT:  Anyone?

9         MR. GILBERT:  No questions.

10        THE COURT:  All right.  Thank you.

11        Any redirect of the witness?

12        MR. SMITH:  Yes, Your Honor.

13        THE COURT:  Yes, sir.

14                    REDIRECT EXAMINATION

15 BY MR. SMITH:

16 Q    Ms. Reid, you were asked about these contracts with the

17 Superintendent.  How much was Mr. Adams making according to

18 this contract when he last worked there?

19 A    The last contract?

20 Q    Yes, ma'am.

21 A    I'm sorry, I'm having problems finding it on the actual

22 contract.

23 Q    If I may direct your attention, then, to M18.  Are you at

24 Exhibit M18?

25 A    Yes.

1  Q    M18?

2  A    Yes.

3  Q    The second contract reference appears to be dated February

4  '06 and it's for a term of employment from July 1, 2006,

5  through July 30th, 2010.

6  A    Yes.

7  Q    Would that have been his last contract?

8  A    Yes.

9  Q    And that would have been where I believe counsel for

10  Mr. Adams pointed out that the agreement was that he was to get

11  an average of the local superintendents within the area.

12  A    Yes.  And I do have -- I do see that calculation.

13  Q    And do you know what his total salary package was based on

14  the calculations?

15  A    The average was 101,172, but there was a two percent

16  increase for the '06-'07 school year which he would have also

17  received, which was -- which made that 103,195.

18  Q    And would it be fair to say, ma'am, that Clay County is

19  one of the smaller area counties of population in Southeastern

20  Kentucky?  For instance, if you were comparing it to Laurel

21  County, Laurel County is considerably a larger population of

22  people than Clay County; correct?

23  A    That's correct.

24  Q    And that was used in the comparison, was it not?

25  A    It was the surrounding counties, yes.

DIANA REID - DIRECT - MR. SMITH                    63

1  Q    And, likewise, Knox County is a larger county in

2  population than Clay County, considerably?

3  A    I don't know the population of the other counties.

4  Q    Perry County, Hazard and Perry County would be a larger

5  county; is that accurate?

6  A    I don't know the population.

7  Q    Okay.  All you know is, is that basically, based on the

8  contract, he was making $103,195 based his negotiated contract

9  with the Board of Education?

10 A    Yes.

11 Q    And who was the chairman of the Board at the time that

12 these salaries were approved, if you know?

13 A    Charles Keith.

14 Q    And you've also have been asked about these annual raises,

15 the sick leave; is that —

16 A    Yes.

17 Q    You made a statement that everybody gets the same.  And I

18 guess I just want a little bit of clarification on that.  If

19 the superintendent makes over a hundred thousand dollars a

20 year, are you saying that the value of his sick leave is the

21 same as the value of a bus driver?

22 A    It's based on the number of sick leave days that you have.

23 You would receive 30 percent of your daily rate.

24 Q    Okay.  So it's a percentage of your earnings.  So a

25 superintendent making over a hundred thousand, the value of his

1   sick leave would cash out at a greater value than the value of

2   a bus driver?

3   A    Of course.

4   Q    And, likewise, for annual raises –– And just for

5   clarification again, you said everybody got the same annual

6   raise; correct?

7   A    Percentage.

8   Q    Percentage, though, just like I said?

9   A    Uh-huh.

10          MR. SMITH:  Okay.  That's all, thank you.

11          THE COURT:  Anything else, Mr. Westberry?

12                    RECROSS-EXAMINATION

13  BY MR. WESTBERRY:

14  Q    The government, Ms. Reid, asked you about some of the

15  counties that were included in the survey, and I think they

16  mentioned Laurel County being one of them.  Was Owsley County

17  also listed?

18  A    Yes, it was.

19  Q    That's a pretty small community, is it not, ma'am?

20  A    I'm sorry, I don't know the population of the counties.

21  Q    Booneville, do you know Booneville is the county seat in

22  Owsley County?

23  A    Uh-huh.

24  Q    Leslie County, was that listed as well?

25  A    Yes, it was.

1    Q    And it's a neighboring county, Hyden, just one county

2    over?

3    A    Yes, as well as Jackson County.

4    Q    And Jackson County was listed as well?

5    A    Yes.

6    Q    I know you don't know the populations, but would you agree

7    that Boone — or Owsley, Jackson, and Leslie are considerably

8    smaller than, say, Laurel County?

9    A    Yes.

10        MR. SMITH:  Your Honor, I'm going to object, as I

11   believe this witness has indicated she doesn't know the

12   populations, and it would call for her, I think, to speculate

13   if she was to agree with Mr. Westberry.

14        MR. WESTBERRY:  He opened the door.

15        THE COURT:  I believe this is speculation from this

16   witness at this point, so I'll sustain the objection.

17   BY MR. WESTBERRY:

18   Q    One last question, Ms. Reid.  Regardless of a person's

19   salary who works within the county school system, everybody

20   still accrues sick leave the same way; correct?

21   A    Yes.

22   Q    And there was nothing unusual that you know of about the

23   way in which Doug Adams accrued and was paid his sick leave

24   when he retired last year as Superintendent of Schools;

25   correct?

1  A    I'm sorry, repeat.

2  Q    Anything unusual about the way —

3  A    No.

4            MR. WESTBERRY:  Thank you, ma'am.

5            THE COURT:  Anything else of Ms. Reid?

6            MR. SMITH:  No, thank you.

7            THE COURT:  All right.  Thank you, ma'am.  You may

8  step down.  You can leave those documents there.

9            Mr. Smith.

10           MR. SMITH:  Mary Sue Helm.

11           THE COURT:  Thank you.

12           MR. WHITE:  Your Honor?

13           THE COURT:  Yes, sir.

14           MR. WHITE:  Can I get something?

15           THE COURT:  Yes, sir.

16                     MARY SUE HELM,

17  having been first duly placed under oath, was examined and

18  testified as follows:

19                   DIRECT EXAMINATION

20  BY MR. SMITH:

21  Q    State your name, please.

22  A    My name is Mary Sue Helm.

23  Q    How are you employed, ma'am?

24  A    I am with the Kentucky Secretary of State's Office.

25  Q    And what position do you hold?

MARY SUE HOWARD - DIRECT - MR. SMITH          67

1  A    I hold the position of Special Assistant in the Election

2  Division.

3  Q    And how long have you been so employed?

4  A    I have been employed with the Secretary of State's Office

5  since 1988, retired in 2008, and came back to work in October

6  of 2008 with the same office.

7  Q    As a part of your duties, ma'am, are you required to keep

8  in your custody and control records regarding elections that

9  are held in counties in Kentucky?

10 A    Yes, I am.

11 Q    I would like to hand to you what's marked as Government's

12 Exhibits PR87, 88, 89, 90 and 91 and 92; 87 through 92.

13         MR. RICHARDSON:  Your Honor?

14         THE COURT:  Yes, sir.

15         MR. RICHARDSON:  We don't have these exhibits.

16 They're not on the disk or anything.  I'm not sure exactly

17 what --

18         THE COURT:  Why don't you let Mr. Richardson look at

19 those before you show those to the witness.

20         MR. SMITH:  (Complies with request of The Court.)

21         MR. RICHARDSON:  Thank you, Judge.  I'm sorry.

22         THE COURT:  Any issues to take up on these documents?

23         MR. RICHARDSON:  No, I wasn't sure what they were.

24         THE COURT:  Okay.  Thank you.

25 BY MR. SMITH:

MARY SUE HOLT - DIRECT - MR. SMITH                68

1   Q    Can you identify those, ma'am, as being records kept in

2   the ordinary course of business?

3   A    They are.

4         MR. SMITH:  I would move for their introduction at

5   this time, Your Honor.

6         THE COURT:  Any objection?

7         MR. WHITE:  No objection, if I can get the numbers

8   again, please.

9         THE COURT:  I'll call those off.  Exhibits PR87, 88,

10  89, 90, 91, and 92 will be admitted.

11  BY MR. SMITH:

12  Q    I direct your attention to the election year of 2004, both

13  May and November of 2004.  Are those represented in these

14  records, ma'am?

15  A    They are.

16  Q    And are these certified by the County Board of Elections?

17  A    They are.

18  Q    And to your knowledge, would that include the County

19  Clerk?

20  A    Yes.

21  Q    And also the Chairman of -- the Democratic Commissioner,

22  rather, the Democratic Election Commissioner, would that also

23  include the Democratic Election Commissioner?

24  A    The Democratic County Board Member?

25  Q    Yes, ma'am.

1   A    Yes.

2   Q    So on each of those elections in 2004, both your County

3   Clerk — Can you tell us who the County Clerk was who certified

4   those, ma'am?

5   A    The County Clerk's name is Freddy Thompson.

6   Q    Okay.  Do you see Charles Wayne Jones also signing off

7   certifying these as well as a member?

8   A    Yes, his signature appears there.

9   Q    And they would have certified both your May and November

10  elections to the Secretary of State's Office?

11  A    That is correct.

12  Q    And how are they normally received in your office, ma'am?

13  A    Normally the Secretary of State sends the blank forms to

14  the chairman of the County Board of Elections with a self-

15  addressed envelope for the returns to be submitted back to the

16  Secretary of State by a specific date.

17  Q    And is that done by mail, ma'am?

18  A    Yes.

19  Q    In the course of looking at these two exhibits, I believe

20  PR87, that would be your November '04 election; is that

21  correct?

22  A    Correct.

23  Q    Does that also certify the number of absentee ballots both

24  by machine and by mail-in?

25  A    Not ballots, but absentee votes.

MARY SUE HENDRICKSON - DIRECT - MR. SMITH                    70

1   Q    And absentee votes are accounted for and certified by the

2   County Board of Elections to the Secretary of State in these

3   documents?

4   A    That is correct.

5   Q    Do they also certify both federal and state-elected

6   offices to you as well?

7   A    They do.

8   Q    And does that also certify the number of votes that are

9   supposed to be valid —— validly cast as to each of these

10  elections?

11  A    That is correct.

12  Q    PR88, what year is represented there, ma'am?

13  A    May 18th, 2004.

14  Q    PR89, what years are accounted for there, ma'am?

15  A    November 5th, 2002.

16  Q    PR90, what year is accounted for there?

17  A    May 28th, 2002.

18  Q    PR91?

19  A    November 7th, 2006.

20  Q    And does that include a member of the United States House

21  of Representatives, Hal Rogers versus Kenneth Stepp being

22  candidates for federal office on November 7th, 2006?

23  A    It does.

24  Q    PR92, ma'am, what year is represented there?

25  A    May 16th, 2006.

MARY SUE HOWARD - DIRECT - MR. SMITH            71

1   Q    Does that likewise contain a race for member of the United

2   States House of Representatives?

3   A    Yes.

4   Q    A race between Kenneth Stepp and James Tapley?

5   A    Correct.

6   Q    And also the race of Commonwealth Attorneys Gary Gregory

7   and Kenneth Witt?

8   A    Yes.

9   Q    Likewise, does Freddy W. Thompson and Charles W. Jones

10  sign on each of those for both your May and your November 2006

11  elections?

12  A    Yes.

13            MR. SMITH:  I pass the witness.

14            MR. WHITE:  Your Honor, may we approach just briefly?

15            THE COURT:  Yes, sir, come on up.

16       (Whereupon, the following discussion was had between the

17  Court and counsel at the bench, out of the hearing of the

18  jury.)

19            THE COURT:  Mr. White.

20            MR. WHITE:  Yes, sir, Your Honor, Scott White

21  representing Defendant Jones.  I just wanted to ask Your Honor

22  for the Rule of Evidence 611(b).  I had some questions of the

23  State Board of Elections regarding the purchase of the voting

24  machines.  Obviously Mr. Smith did not go into that with this

25  witness.  If there's going -- if he's not going to call anyone

1  else from the State Board, I was going to ask you for your —

2  if in your discretion I could ask her about how the machines

3  are purchased by the counties.  The reason being is I think it

4  will make it more efficient.  That would obviate my need to

5  bring somebody from the State Board in my case.  But I'm happy

6  to do whatever anyone wants.  I just saw this as an

7  opportunity.

8            THE COURT:  All right.  Any objection?

9            MR. SMITH:  No.

10           THE COURT:  You can go ahead and cover it at this

11 point.

12           MR. WHITE:  Thank you, Your Honor.

13           THE COURT:  All right.  Thank you.

14      (Whereupon, the following proceedings continued in open

15 court.)

16           THE COURT:  Thank you.

17           Mr. Pinales?

18           MR. PINALES:  Yes.  Thank you, Your Honor.

19           THE COURT:  Yes, sir.

20                      CROSS-EXAMINATION

21 BY MR. PINALES:

22 Q    Ms. Helm, I'm Marty Pinales, I represent Cletus Maricle.

23 A    Good morning.

24 Q    I have just a couple of questions for you.  You have

25 records that have been certified from the 2002, 2004, and 2006

MARY SUE HISCROSS - MR. PINALES                73

1  elections; correct?

2  A    Correct, yes.

3  Q    And they include the elections from the primary, as well

4  as the general election; correct?

5  A    Yes.

6  Q    And each of those records reflect different candidates

7  running for different offices?

8  A    That is correct.

9  Q    And you mentioned in response to one of the questions

10 asked of you earlier, do they reflect absentee ballots that

11 were cast?

12 A    That is correct.

13 Q    And the number of absentee ballots that are cast from

14 election to election varies, do they not?

15 A    They do.

16 Q    And they vary by interest in that particular race at that

17 particular time?

18 A    Yes.

19 Q    Not just for Clay County, but all over the Commonwealth?

20 A    That is correct.

21        MR. PINALES:  Nothing further.  Thank you, Your

22 Honor.

23        THE COURT:  Yes, sir.

24        Mr. Westberry?

25        MR. WESTBERRY:  No questions.

1              THE COURT:  Mr. White?

2              MR. WHITE:  Thank you, Your Honor.

3                        CROSS-EXAMINATION

4    BY MR. WHITE:

5    Q    Good morning, Ms. Helm.  My name is Scott White, I'm an

6    attorney, I represent Mr. Jones.  Let me ask you a few

7    questions first about the exhibits that were given to you by

8    the United States.  They were PR87 through, I believe, 92; is

9    that correct?

10   A    That's correct.

11   Q    And you were asked some questions about who signed certain

12   election reports from Clay County; is that correct?

13   A    That is correct.

14   Q    And you testified that Mr. Thompson and Mr. Jones signed

15   those.  Did anyone else sign those?

16   A    Yes.

17   Q    If you could just say the year and then who signed it?

18   A    In 2002, the November 2nd, '04, election, it was signed by

19   Clay Bishop, Charles Jones, Edward Jordan, and Freddy Thompson.

20        In the May 18th, 2004, the documents were signed by Clay

21   Bishop, Edward Jordan, Charles Jones, Freddy Thompson.

22        The November 5th, 2002, by Charles Jones, William H.

23   Bishop, Edith Jordan, and Jennings White.

24        The May 28th of 2002, W.K. Bishop, Charles Jones, Edith

25   Jordan, Jennings White.

1        The November 7, 2006, Charles Jones, W.H. -- I'm sorry, I

2   can't make out the last name from this signature, Edith Jordan,

3   and Freddy Thompson.

4        And in the May 16, 2006, Charles Jones, W.H. Bishop, Edith

5   Jordan, and Freddy Thompson.

6   Q    Thank you.  I want to switch topics on you, if I could,

7   real quickly, Ms. Helm.  Are you familiar with the federal

8   statute, the Help America Vote Act?

9   A    Yes, I am.

10  Q    Did you receive training in that?

11  A    I did.

12  Q    As part of your duties at the Office of the Secretary of

13  State for the Commonwealth of Kentucky, did you work with

14  counties after the passage of the Help America Vote Act in

15  terms of buying new voting machines?

16  A    That was after my time in serving as Acting Director for

17  the State Board of Elections.  The Help America Vote Act was

18  just enacted while I was serving as Acting Director, but the

19  funding and the purchasing of the machines came down after I

20  left the Board of Elections and went back to the Secretary of

21  State's Office.

22  Q    Thank you.  Did Ms. Sarah Ball Johnson succeed you as the

23  Director of the State Board of Elections?

24  A    She did?

25  Q    I'm sorry, Executive Director of the State Board of

1   Elections?

2   A    Yes.

3   Q    To your understanding, was -- did you assist -- between

4   the time you were the Acting Director of the State Board of

5   Elections to the time that you retired and Ms. Ball Johnson

6   came on, did you help facilitate the -- or help devise a

7   process or a procedure for counties to use in purchasing new

8   voting machines?

9   A    There was --

10  Q    Or was that all after you left?

11  A    Well, there was some discussion while I was still there,

12  but the major pieces were put together after I left.

13          MR. WHITE:  I think I'll just save those questions,

14  then.  Thank you very much.

15          THE WITNESS:  Thank you.

16          MR. WHITE:  Those are all the questions I have.

17          THE COURT:  Thank you.

18          Anyone else?

19          MR. BALDANI:  Just real briefly.

20          THE COURT:  Mr. Baldani, yes, sir.

21                      CROSS-EXAMINATION

22  BY MR. BALDANI:

23  Q    Ms. Helm, I'm Russ Baldani, one of Freddy Thompson's

24  attorneys.

25          You've been asked about who signs off on these documents.

1    They're typically signed off by the County Clerk, the

2    Republican Commissioner, the Democrat Commissioner, and the

3    Sheriff; right?

4    A    That is correct.

5    Q    And that's what happens in every county in the State of

6    Kentucky, those are the people that certify and send them in to

7    the State; right?

8    A    Yes.

9            MR. BALDANI:  That's all, Your Honor.

10           THE COURT:  Anything else?

11           MR. GILBERT:  No questions, Your Honor.

12           MR. SIMONS:  No.

13           THE COURT:  Ms. Smith, anything else of Ms. Helm?

14           MR. SMITH:  No, thank you, Your Honor.

15           THE COURT:  All right.  Thank you, ma'am.  You may

16   step down.

17           Ladies and gentlemen, we're going to take our morning

18   recess before the next witness is called.  Please keep in mind

19   the admonition that you have been given several times not to

20   discuss the case among yourselves while we are in recess.  And

21   we'll take about a 15-minute recess this morning.  The jury

22   will be excused.

23           (Whereupon, the jury retired from the courtroom, after

24   which the following proceedings were had in open court.)

25           THE COURT:  Any matters to take up outside the

1  presence of the jury?

2       (No response.)

3            THE COURT:  No?  We'll be in recess for 15 minutes.

4       (Whereupon, a short recess was had, after which the jury

5  returned to the courtroom and the following proceedings were

6  had in open court.)

7            THE COURT:  The record will reflect that all members

8  of the jury are present.  The parties and counsel are also

9  present.

10           Mr. Smith or Mr. Parman, you may call your next

11 witness.

12           MR. SMITH:  Thank you, Your Honor.  Sarah Ball

13 Johnson.

14           THE COURT:  Thank you.

15                    SARAH BALL JOHNSON,

16 having been first duly placed under oath, was examined and

17 testified as follows:

18                     DIRECT EXAMINATION

19 BY MR. SMITH:

20 Q    State your name, please.

21 A    Sarah Ball Johnson.

22 Q    And how are you employed?

23 A    I'm the Executive Director of the State Board of

24 Elections.

25 Q    How long have you been so employed, ma'am?

1  A    I've been with the State Board of Elections almost 16
2  years and Executive Director for six.
3  Q    And during the course of your employment there, do you
4  also have assignments as part of your duties to be the
5  custodian of records?
6  A    Yes.
7  Q    And normally, ma'am, during election cycles that occur in
8  the State of Kentucky, are those records mailed to you from the
9  County Clerk's Office?
10  A    Yes.
11  Q    And is that pretty much standard procedure for all 120
12  counties?
13  A    Yes.
14  Q    I would like to hand to you now what's marked as
15  Government's Exhibits PR71 through 78.  PR71 through 78.  Would
16  you take a look at those, please?  Can you identify those as
17  records kept in the ordinary course of business?
18  A    Yes, they are.
19        MR. SMITH:  I would move for the introduction of
20  Government's Exhibits PR71 through 78.
21        THE COURT:  Any objection?
22      (No response.)
23        THE COURT:  Exhibits PR71 through 78 will be
24  admitted.
25        MR. SMITH:  If we could publish PR71, Your Honor?

1          THE COURT:  Yes, sir, you may.

2   BY MR. SMITH:

3   Q    You should have before you, ma'am, PR71?

4   A    Yes.

5   Q    Could you describe generally what this report is, please?

6   A    This is the County Board of Elections Post-Election

7   Statistical Report.  It's required by statute that each county

8   board fill out this particular form and send the pink copy

9   to — it's in triplicate form, they send the pink copy to our

10  office.  It details out the absentee votes per precinct along

11  with voter assistance, and it breaks down the absentee votes

12  into the type of absentee ballot that they are pursuant to the

13  statute.

14  Q    And what county submitted this report to you, please?

15  A    Clay County.

16  Q    And who certified this report to you?

17  A    Freddy Thompson, Chairman of the County Board of

18  Elections, and also the County Clerk.

19  Q    And what date was that submitted to you?

20  A    The date on the report is 11-17 of '06.

21  Q    And how was that received in your office?

22  A    This looks like it was mailed and faxed.

23  Q    Okay.  Now, I direct your attention to PR72.  Can you

24  identify that for us, please?

25  A    Yes, this is a County Board of Elections Post-Election

1  Statistical Report for the May primary from May 16th, 2006.

2  Q    And does this give you the same analysis and breakdown as

3  the previous exhibit, only particularly to the May primary 2006

4  election?

5  A    Yes.

6  Q    And who certified it in this case, ma'am?

7  A    Freddy Thompson, Chairman of the County Board of

8  Elections.

9  Q    And the date he certified this?

10  A    May 25th of '06.

11  Q    And was that, likewise, received by fax and mailed to your

12  office?

13  A    Yes.

14  Q    Now, I direct your attention to PR73.  Could you identify

15  this, please?

16  A    This is the County Board of Elections Post-Election

17  Statistical Report from Clay County for the November 2nd, 2004,

18  general election.

19  Q    And, again, who certified this, ma'am?

20  A    Freddy Thompson, Chairman of the County Board of

21  Elections.

22  Q    And was this also received by mail and faxed to your

23  office?

24  A    Yes.

25  Q    I direct your attention to PR74.  Could you identify that,

1   please?

2   A     This is the Post -- County Board of Elections Post-

3   Election Statistical Report for May 18th, 2004, primary

4   election in Clay County.

5   Q     And who certified that?

6   A     Freddy Thompson, Chairman of the County Board of

7   Elections.

8   Q     And was this also received by fax and mailed to your

9   office?

10  A     Yes.

11  Q     PR75, please?

12  A     It's the County Board of Elections Post-Election

13  Statistical Report for the 11 -- November 5th, 2002, general

14  election from Clay County.

15  Q     Okay.  And on this particular election, you say it's

16  November 2004 or 2002, I'm sorry?

17  A     Two.  Excuse me, 2002.

18  Q     And would this have been certified by Jennings White?

19  A     Yes.  He was Chair of the County Board at that time.

20  Q     PR76, ma'am?

21  A     It's the County Board of Elections Post-Election

22  Statistical Report for Clay County for the primary, May 28th,

23  2002, election.

24  Q     And who certified this?

25  A     Jennings White, Chairman of the County Board of Elections.

1   Q    I would like to direct your attention to PR77.  Do you
2   have that in front of you?
3   A    Yes.
4   Q    Could you identify this, please?
5   A    This is a certificate that the State Board issues for
6   appointment of a Democratic member to the Clay County Board of
7   Elections.  And this is showing that Mr. Jones was appointed by
8   the Board for a term expiring June 30th, 2008.
9   Q    It's a four-year term?
10  A    Yes, it is.
11  Q    I direct your attention now to PR78.
12  A    This is, again, a certificate of appointment for Mr. Jones
13  to be the Democratic Board member for the Clay County Board of
14  Elections for a term expiring June 30th of 2012.
15  Q    Ma'am, as part of your responsibilities as the Executive
16  Director of the State Board of Elections, are you familiar with
17  the laws of Kentucky and the duties which it imposes upon
18  members of the county — local county Boards of Elections?
19  A    Yes, I am.
20  Q    And could you state generally what your understanding is
21  as far as the County Board of Elections' role is in the —
22  would you consider it a board that has responsibilities in
23  policing the administration of the laws, both federal and
24  state, in these local elections?
25  A    Yes, they do.  They do oversee the elections on the county

SARAH BALL JOHNSON - DIRECT - MR. SMITH

1   level.

2   Q    And do they play a part in the process of enforcing the

3   laws?

4   A    Yes, they would.

5   Q    And could you tell us who makes up by statute the County

6   Board of Elections for each of the counties in the 120 counties

7   in Kentucky?

8   A    The County Board of Elections is comprised of the County

9   Clerk, as the elected -- elected county clerk.  The elected

10  county sheriff serves on that.  And then there are two members,

11  a Republican member and a Democrat member, who are appointed by

12  the State Board of Elections to serve on that four-member

13  board.  And the Republican and democratic member, those names

14  are submitted to the State Board of Elections pursuant to

15  statute by the local Republican/Democratic Party executive

16  committees, submit a list of five names, and those

17  individuals -- the person selected is coming from that list

18  from the local parties by our State Board of Elections.

19  Q    And that's required by law for it to operate in this

20  process that you've just listed?

21  A    Yes, statutes require that.

22  Q    When does the Board have to appoint elections officers

23  under the law currently, by what time of the year?

24  A    By March 20th of each year in which there are elections,

25  the board has to appoint four officers for each precinct in

1  each election.

2  Q    Does that include March 20th in which there's a primary

3  and a general election held?

4  A    Right.  When there are no elections held, as in last year,

5  there were no scheduled elections, no, there are no precinct

6  officers appointed.  Now, if there are special elections, they

7  appoint them then.

8  Q    Now, in the course of these previous exhibits that you

9  have listed to us, is it part of the responsibility of the

10 County Board of Elections to report vote totals, including the

11 absentee vote totals, for each of these elections?

12 A    Vote totals?  Those are submitted to the Secretary of

13 State's Office for official certification.  But we do receive

14 the post-election reports that do contain those totals, yes.

15 Q    And as part of your duties with the Board of Election, do

16 you also track the numbers of absentees?

17 A    We do.

18 Q    And do you do that for each of the 120 counties in the

19 state?

20 A    Yes, we do.

21      MR. SMITH:  I would like to hand to the witness now

22 what's marked as PR93, 94, 95, and 96.

23      THE COURT:  Yes, sir.

24      MR. RICHARDSON:  Once again, I'm not sure what you've

25 got here.  These aren't on the list.

1          THE COURT:  If you could have those documents shown

2   to counsel.

3          MR. SMITH:  If you would, hand those to the witness,

4   please.

5          THE COURT:  That's fine.

6   BY MR. SMITH:

7   Q    You've had a chance to look at those, ma'am.  Can you

8   identify those for us, please, 93 through 96?

9   A    These are spreadsheets that we compile based upon a County

10  Board of Elections Post-Election Report called a 33A report

11  that details who voted absentee and if they voted a mail-in

12  ballot or if they voted on the voting machine.

13  Q    And are those also records kept in the ordinary course of

14  business?

15  A    Yes, they are.

16         MR. SMITH:  I would move for their introduction at

17  this time, Your Honor.

18         THE COURT:  Any objection?

19      (No response.)

20         THE COURT:  Exhibits PR93, 94, 95, and 96 will be

21  admitted.

22  BY MR. SMITH:

23  Q    Generally, can you state, ma'am, whether these enumerate

24  the absentee totals for the counties in Kentucky for each of

25  the elections from 2002 through 2006?

1  A    Yes, they state it for the primary and for the general

2  election, and they break it down by the total number of

3  absentee ballots mailed out, the total number of absentee

4  ballots returned, and the number of individuals that voted on

5  the voting machine during that type of absentee voting in the

6  office for each primary and general.

7  Q    Now, do you have the numbers for Clay County in the

8  primary election of 2002, ma'am, about how many people voted

9  absentee?

10 A    It's over 800.

11 Q    Over 800.  Does that include the machine as well as the

12 mail-in ballots?

13 A    Yes, it's 209 absentee ballots, mail-in ballots returned,

14 and 695 on the voting machine.

15 Q    And, ma'am, based on your experience, how does this rank

16 as far as numbers of absentee voters in the smaller rural

17 counties in Kentucky?

18 A    This would be, in my opinion, a large number, particularly

19 voted on the voting machine.

20 Q    For comparison, Fayette County, what was the numbers

21 reported to your office in the May primary 2002 for persons

22 voting absentee?

23 A    They had a — let's see, about 700 — a little over 700.

24 I'm sorry, this doesn't have a total column on it.

25 Q    And, again, comparing that to Clay County, how many in

1  Clay County?

2  A     They had over 800.

3  Q     And do you know the population comparisons between Clay

4  County and Fayette County?

5  A     I don't know the exact figures, but I'm confident that

6  Fayette is quite a bit larger.

7  Q     Did you also track the numbers of the 2002 general

8  election in Clay County?

9  A     Yes, we did.

10 Q     And what was the number showing up for the May –– for the

11 November 2002 election in Clay County?

12 A     They had roughly 200.

13 Q     I direct your attention now to PR94.  Can you give us the

14 totals for Clay County in the 2004 primary –– 2003, rather,

15 primary?

16 A     I'm sorry, did you say 2003 primary?

17 Q     Yes, PR94.  Do you have the numbers for Clay County?

18 A     Clay County had basically 45.

19 Q     Did you also track the numbers for the general election in

20 2003 in Clay County?

21 A     They had 1100.  Excuse me, I'm reading the form

22 incorrectly.  Pardon me.  They had 599.

23 Q     PR95, would that give you the numbers for the 2004

24 elections for Clay County?

25 A     For which election?

1   Q    2004, ma'am.

2   A    General?

3   Q    General election, yes.

4   A    Okay.  Sorry.  They had around 482.

5   Q    PR89, does that give you the primary for 2004?

6   A    They had 83.

7   Q    PR96, primary 2006, what were the numbers in Clay County?

8   A    They had 490.

9   Q    Likewise, for the general election 2006, is that reflected

10  in PR96?

11  A    Yes, 599.

12  Q    Ma'am, as part of the policing duties of the County Board

13  of Elections, are they also required to send you these Post-

14  Election Statistical Reports enumerating the number of voters

15  who were assisted with disabilities?

16  A    Yes, that is part of the post-election report.

17  Q    And in that -- in the instance, ma'am, where these totals

18  are reported to you, they're to reflect a valid vote based upon

19  the information provided under the voter assistance form; is

20  that correct?

21  A    Yes, that is what the form is designed for.

22  Q    If, Ms. Johnson, there were circumstances in which

23  elections officers were instructed by members of the Board of

24  Elections to destroy voter assistance forms, would that affect

25  the accuracy of these reports and, therefore, make them

1  fraudulent if they returned to your office in the mail?

2  A    I mean, we take the form on face value, yes.

3  Q    Would it corrupt the numbers that you are receiving by law

4  to report as voter assistance votes?

5  A    Yes.

6  Q    These reports are also sent to the Secretary of State?

7  A    These actual post-election reports are not, they are

8  contained in our office.

9  Q    But the numbers of voters who have been voted as voter

10 assistance voters, that would also be reported to the Secretary

11 of State?

12 A    I'm sorry, I don't -- their form, the 4980 form that they

13 report voter totals, we don't deal with those forms on our

14 side, so I honestly don't remember right now if it's on the

15 form or not.  It's not our form.

16 Q    What numbers are sent to both your office and the

17 Secretary of State's Office, to your knowledge, ma'am?

18 A    To my knowledge, the vote totals that are certified by the

19 County Board are sent to the Secretary of State's Office, and,

20 yes, the Secretary of State's office then provides us with the

21 totals to certify the race.

22 Q    And in order for a candidate to be officially certified as

23 an elected officeholder, does it require under law that you-all

24 certify those?

25 A    Certify the candidates?

1  Q    Yes.

2  A    If they file with the Secretary of State's Office, then,

3  yes, our State Board of Elections certifies them and — as a

4  winner in that race.  If it's a local race, he files with the

5  County Clerk.  Those are certified by the local County Board of

6  Elections, not the State.

7  Q    Could you give us examples of those, who would be

8  certified by the County Clerk?

9  A    The County Clerk would include any person that runs in the

10 county; county clerk, county judge executive, county

11 magistrate, mayor, city council, school board, those type races

12 would be on a county level filed with the County Clerk and

13 certified by the County Board of Elections.

14 Q    And those that would be exclusive to your office would

15 include officers such as Commonwealth Attorney?

16 A    Commonwealth Attorney, if they run in multiple counties,

17 state senator, state representative, U.S. Congress, U.S.

18 Senate, President.

19 Q    What about circuit judge?

20 A    Yes, I'm sorry, circuit judge and district judges.

21      MR. SMITH:  If I could hand the witness now PR84.

22      THE COURT:  Yes, sir.

23      MR. RICHARDSON:  Once again, I'm not sure what PR84

24 was.  These were not included in our exhibit list disk.  May we

25 approach, Judge?

1                THE COURT:  Yes, sir.

2         (Whereupon, the following discussion was had between the

3    Court and counsel at the bench, out of the hearing of the

4    jury.)

5                MR. BALDANI:  Your Honor, Russ Baldani on behalf of

6    Freddy Thompson.  We would object to the admission of PR84.

7    These are basically complaints from various people regarding

8    things allegedly happening at the voting place, some of them

9    are from anonymous complainants and I believe that they would

10   be hearsay, and I don't think there's any exception to the

11   hearsay rule that would justify their admission.  I believe

12   that the admission of them would violate Mr. Thompson's right

13   to confrontation and would -- basically as stated in the

14   *Crawford* case, and so we would object to the introduction of

15   this exhibit.

16              THE COURT:  Your position is that these statements

17   would be testimonial in nature?

18              MR. BALDANI:  Yes, Your Honor.

19              THE COURT:  Do you have any authority for that?

20              MR. BALDANI:  Well, I don't have any specific

21   authority, Judge, but I believe that they are complaints to a

22   government office about illegalities and, you know, the subject

23   is calling in --

24              THE COURT:  Similar to what was taken up with the AG

25   materials?

1          MR. BALDANI:  Yeah, but I think that those were

2   admitted under a different rationale.  But there is a

3   similarity, yes, Your Honor.

4          THE COURT:  All right.  Let's see why they're being

5   offered.

6          Mr. Smith?

7          MR. SMITH:  Your Honor, I believe that these fall in

8   the same vein as the others, that this Board of Elections also

9   receives complaints and processes those back to the County

10  Clerk's Office to notify them of these issues.

11         THE COURT:  And the Board of Elections includes some

12  of the defendants that are on trial here who received notice of

13  these complaints; is that accurate?

14         MR. SMITH:  Yes.

15         THE COURT:  Mr. Westberry has a point to make as soon

16  as Mr. Baldani is finished.

17         Mr. Smith, anything else?

18         MR. SMITH:  Well, I would just state, you know, as

19  far as their relevance is concerned, I think they're extremely

20  relevant because Mr. Thompson represented to the grand jury in

21  his testimony that there were no problems in these elections

22  and he cited only one instance, and I believe that this, again,

23  goes to our obstruction as part of our proof to establish that

24  there was an attempt to obstruct the federal grand jury's

25  investigation.

1          THE COURT:  All right.  It does appear to be

2    extremely relevant.  Mr. Westberry wants to add something as

3    well.

4          MR. WESTBERRY:  Very brief, thank you, Judge.

5    Judge Reeves, it seems that at some point the cumulative nature

6    of these kinds of complaints that we've been hearing testimony

7    over the last few days, beginning, of course, with the Office

8    of the Attorney General and now moving to the Board of

9    Elections, calls into question the 403 analysis, where I

10   believe on behalf of Doug Adams the sure cumulative nature and

11   the prejudicial impact far outweighs any probative value that

12   the government may find or seek from this type of -- from this

13   type of document.  I don't know that the government necessarily

14   needs this much in terms of the shear volume of these kinds of

15   complaints that we've been hearing testimony about over the

16   last few days.  So that's the basis for my objection, Judge

17   Reeves.

18         THE COURT:  All right.  Well, anyone else for any

19   different reasons than those given?

20         MR. BALDANI:  Your Honor, I think --

21         THE COURT:  Mr. Baldani.

22         MR. BALDANI:  Let me get up here by the mic.  I think

23   that part of the rationale when you allowed the OAG records in

24   was that it contained information regarding the absentee

25   ballots, if I recall correctly, and I don't think this exhibit

1  does.

2         THE COURT:  No, it wasn't limited to absentee

3  ballots, but these documents are, in my opinion, very relevant

4  to the issues that have been raised by the United States,

5  specifically to show notice and knowledge and actions on behalf

6  of one or more defendants, including Mr. Thompson, especially

7  if he takes the position — and I don't know what his grand

8  jury testimony was, but if he takes the position that there

9  were no problems in elections that are represented by these

10 documents, then his knowledge of this information certainly is

11 relevant, and the Court will give the same cautionary

12 instruction as to the truth of the matters that are asserted in

13 the documents, but this seems to get to the very heart of the

14 United States' position with respect to Mr. Thompson.  So I'll

15 overrule the objection.

16         With respect to 403, these are separate complaints

17 other than those that were received by the Attorney General's

18 Office, but the complaints that were being received by both

19 entities is clearly relevant in the case.  It's not unduly

20 prejudicial.  The Court will give a limiting instruction, but,

21 again, this goes to a very central issue that the United States

22 is litigating in the case, and so the objections will be

23 overruled.

24         MR. ABELL:  Excuse me, Judge.  Robert Abell on behalf

25 of William Stivers.  The Court announced its ruling, but it's

1  taken into consideration on behalf of Mr. Stivers an objection,

2  the same as I raised with regard to the Attorney General's

3  records, and I also join Mr. Westberry's points brought up with

4  regard to this specific exhibit.

5          THE COURT:  403 analysis?

6          MR. ABELL:  Yes, sir.  Thank you.

7          MR. WHITE:  Your Honor?

8          THE COURT:  Mr. White would like to ––

9          MR. WHITE:  Scott White on behalf Mr. Jones.  Just

10  two quick points.  One, on behalf of Mr. Jones, I will join in

11  Mr. Westberry's objection, I do not need to be heard; No. 2, if

12  I heard Mr. Smith correctly, and I was having to read it off of

13  the monitor, if it's only being –– if these documents are only

14  being introduced with respect to Mr. Thompson, I would ask for

15  a limiting instruction that they're only coming in as to that

16  defendant and not the others.  If that's what he said, I just

17  couldn't tell.

18          THE COURT:  I don't believe that there's evidence in

19  the record that would indicate that Mr. Thompson kept these

20  complaints to himself when they were received, and so the jury

21  will have to make that determination.  So I'm not going to give

22  an instruction that would just limit this to Mr. Thompson.

23          MR. WHITE:  Thank you, Your Honor.

24          MR. BALDANI:  Judge, one last thing.  I don't know

25  how long the government's direct is going to be or the

1    co-defendants' cross-examinations, but this was not on our

2    exhibit disk for some reason or another, and I would ask if --

3    even if we're a little bit before noon, if we could take the

4    lunch hour to peruse these before cross-examination.

5    Hopefully, maybe it will work out timing-wise anyway, but if

6    not, I'd ask for your indulgence.

7                THE COURT:  Yes, sir, we can break early.

8                MR. BALDANI:  Thank you, Your Honor.

9                THE COURT:  Mr. Smith, anything else?

10               MR. SMITH:  Just for the record, the exhibit discs

11   were prepared before the trial began and some of these records

12   came and they were subpoenaed and I have provided copies to

13   these counsel, but I don't have any objection if he wants time

14   to look at them.

15               MR. BALDANI:  I'm not claiming that he didn't give

16   them to us, Judge.  We're just sort of relying on our exhibit

17   list to find things and when it's not on there, we have to ask

18   Mr. Smith what that is, because we can't reference it real

19   quickly on our exhibit list.  But I'm not suggesting that these

20   weren't given to us.

21               THE COURT:  We'll break early if we need to before

22   cross-examination.

23               MR. PINALES:  Mr. Pinales on behalf of Mr. Maricle.

24   Your Honor, in addition to Mr. Westberry's comment that they

25   are cumulative, I think they're duplicitous as well.  If you

1  look through some of these -- where it says response, referred

2  to AG, referred to Fraud Division, so some of these may be

3  inclusive, so they're not -- they may, in fact, be duplicitous

4  of the number of complaints.

5          THE COURT:  Duplicative, you mean?

6          MR. PINALES:  Duplicative, yes.  Multiple.  Thank

7  you.

8          THE COURT:  The Court's ruling will be the same, it

9  further shows communication and contact between the Attorney

10  General's Office and the Clerk's Office, and that would not

11  make it in admissible.

12          All right.  Mr. Smith.

13          MR. SMITH:  I do have one other issue I want to

14  engage with the witness, and if you want to address it while

15  we're at the bench, I'm ready to do that.

16          THE COURT:  That's fine.

17          MR. SMITH:  I think as a general matter, this witness

18  will be able to describe in general, not the specific

19  complaint, but I want to ask her in general, in the 2006

20  election, the majority of the complaints were that voters were

21  being told to leave the machine early.

22          THE COURT:  Is this statewide?

23          MR. SMITH:  This is in Clay County.  And she would

24  characterize that the majority of the complaints in 2006 were

25  of that nature.

1          THE COURT:  The general nature —

2          MR. SMITH:  Where election officers were instructing

3  voters to leave prematurely before their votes were cast.

4          THE COURT:  Are you going to ask her if she could

5  describe the general nature of the complaints that were

6  received?

7          MR. SMITH:  Yes.

8          MR. BALDANI:  Judge, if I could respond to that.  I

9  need to look these over a little more closely, but we would

10  object to that.  It gets into that same thing we talked about

11  this morning, and I think — well, first of all, I would object

12  to that.

13          THE COURT:  Well, this morning I told you that you

14  could — if you wanted to ask the general nature of complaints

15  without getting into specific documents, you could do that.  So

16  this would be certainly within the scope of that ruling.

17          MR. BALDANI:  Well, my point is if that general

18  inquiry is made and it's answered affirmatively, then I'm going

19  to feel obligated to get in — I don't know that I would — if

20  she says yes, that is a big part of the complaint, well, I'm

21  going to want to get into the substance of these.

22          THE COURT:  Well, you can bring that up with me if

23  you want to get into specific documents before we bring the

24  jury back after our lunch break, just as we did this morning,

25  and then we can talk about those specific documents.  Maybe

1   other counsel would have an objection to that once again.

2          All right.  Mr. Smith, you can inquire into that

3   area.

4          MR. SMITH:  Okay.

5          THE COURT:  Anybody else need to bring anything up

6   while we're here?

7          MR. WHITE:  No, Your Honor.

8          MR. PINALES:  Thank you for the direction.

9      (Whereupon, the following proceedings continued in open

10  court.)

11         THE COURT:  All right.  Thank you, Counsel.

12         And, Mr. Smith, you can continue.

13         MR. SMITH:  If Your Honor please, I would be prepared

14  to present PR84 to the witness at this time.

15         THE COURT:  Yes, sir.

16  BY MR. SMITH:

17  Q    Can you identify PR84, please?

18  A    PR84 is a election day complaint sheet.  We are in session

19  all day, the State Board of Elections, just like County Board

20  of Elections are in session 6:00 a.m. until the last votes come

21  in, and these are — we get calls throughout the day, and these

22  are forms we've developed that we call our election day

23  complaint sheets where we log in the phone calls we receive and

24  the date and the time, the State Board of Elections staffer

25  that is speaking to the person, the caller's name if they

SARAH BALL JOHNSON - DIRECT - MR. SMITH          101

1  provide it and the county they're calling from and any --

2  details of the call and details of any response or action that

3  we take as a result of the phone call.

4  Q    And are these records kept in the ordinary course of

5  business?

6  A    Yes, they are for primary and general elections.

7  Q    And what years are represented, ma'am?

8  A    2004 and 2006 — excuse me, 2004 primary election and 2006

9  primary election and 2006 general election.

10 Q    Are these just for the county of Clay?

11 A    Yes, they are.

12        MR. SMITH:  I would move for their introduction at

13 this time.

14        THE COURT:  Any objection other than those previously

15 stated?

16        MR. WESTBERRY:  Nothing, no.

17        THE COURT:  Exhibit PR84 will be admitted.

18 BY MR. SMITH:

19 Q    If you could, state for us the procedure which your office

20 follows in regard to handling complaints on election day from

21 counties in Kentucky.

22 A    When voters or individuals call our office, we take the

23 call, we log it on the complaint sheet, and if it is a call on

24 eligibility, are you eligible to vote, my name is not on the

25 list or an issue, I don't know where I vote, et cetera, we will

1  find that information out or explain as much as we can on our

2  end and then work in conjunction with the County Clerk if it's

3  an eligibility issue about the records via phone call.

4      If it is a complaint that is not something that our board

5  can handle in any way, we will do several things.  We'll call

6  the County Clerk to — as chair of the County Board of

7  Elections to advise them that we got this call with this

8  information, wanted to let you know, could you check that out

9  or research that.  And we also work very closely with the State

10  Attorney General's Office and their investigators that are out

11  in the counties on election day.  Of course, we're here in

12  Frankfort.  And we also work with the U.S. Attorney's Office on

13  phone calls, and they also — both entities, Attorney General

14  and U.S. Attorneys, have their own hotline calls, which we

15  communicate with them on those, too.

16  Q    Do you make a distinguishing — do you distinguish between

17  complaints that are illegal, criminal in nature, as opposed to

18  noncriminal in nature?

19  A    We do.  You can tell from the phone call if it's — if

20  it's an allegation of, you know, inhibiting someone's right to

21  vote or vote buying or something along those natures, we

22  immediately refer those to the Attorney General's Office.  Our

23  agency is not an investigative agency, we do not investigate

24  nor do we have investigators, so we pass that on to law

25  enforcement.

1  Q    During your examination of these records, have you been

2  able to — for purposes of my question, the 2006 election, you

3  do have those in PR84?

4  A    Yes.

5  Q    And the primary 2006 in Clay County?

6  A    Uh-huh.

7  Q    And have you had an opportunity to look over those

8  complaints prior to testifying and just examine the general

9  nature of those complaints?

10 A    Yes.

11 Q    And, again, my question is just as a general nature, could

12 you describe what kind of complaints were coming from Clay

13 County in the May primary of 2006?

14 A    The bulk of the calls that we received at our office were

15 from voters who went into the polling place, they had new

16 voting equipment and they were stating that they voted, they

17 hit the vote button, got the review summary screen, and then

18 they were told to leave and a precinct officer would go in

19 afterwards and then they would leave.  That was the bulk of the

20 complaints in the primary.

21 Q    And, in essence, if that were occurring, that would be a

22 situation where a voter could actually be experiencing a

23 situation where they had someone steal their vote?

24 A    That could be possible.

25 Q    Now, Ms. Johnson, I have a few questions to ask you

1  regarding the –– I guess the County Board of –– the

2  responsibilities of the County Board of Elections.  If we could

3  shift gears just a little bit.

4       The County Board of Elections, generally, is there, to

5  your knowledge, a requirement that they be open on election

6  day?

7  A    The County ––

8  Q    In session.

9  A    In session, yes.  They have the same requirement that our

10 State Board has, which is they must be in session 6:00 a.m.,

11 when the polls open, to 7:00 p.m. –– whenever votes cast.  So,

12 yes, all during election day they are to be in session to

13 handle any issues, complaints, or items that might go on in the

14 county.

15 Q    And do they owe a duty to the citizens of the county to

16 police on the local level, on the frontline, any issues that

17 occur, such as illegalities, vote buying, those kind of things

18 on the –– as a matter of law?

19 A    The statute requires that they be in session to oversee

20 the election process on election day.

21 Q    Does that include policing issues such as vote buying on

22 election day?

23 A    That would, in my opinion, be included in overseeing the

24 election.

25 Q    Do you know, based on the regulations and the statute in

1  place as to the county boards whether or not it's permissible

2  for a county board member to serve as a precinct officer?

3  A     A County Board of Elections member?

4  Q     Yes, ma'am.

5  A     No, they are not allowed to -- in my -- in the statutes,

6  they are not allowed to be a precinct officer because they are

7  in session all day, as one of the four board members, County

8  Board of Elections members.

9           MR. SMITH:  If I could have just a moment, Your

10 Honor?

11          THE COURT:  Yes, sir.

12 BY MR. SMITH:

13 Q     Ma'am, during the course of your duties on election day on

14 May the 16th, 2006, did you, in fact, receive some calls

15 yourself in the office and take those from Clay County?

16 A     Yes.

17 Q     And when you receive calls such as you described earlier,

18 the general nature of voters claiming that they had been

19 instructed to leave the booth prematurely, did you communicate

20 those complaints to the County Clerk's Office?

21 A     Yes.  We did call the County Clerk as chair of the County

22 Board to relay that information and to ask if, you know, they

23 had any calls on that issue that they were handling, did they

24 know about it.  It's part of our common communication on

25 election day with county clerks.

1           MR. SMITH:  Thank you.  I'll pass the witness.

2           THE COURT:  All right.  Thank you.

3           Before cross-examination begins, we'll take our lunch

4    break.  Before we do that, I want to again advise the jury that

5    with respect to any call-in complaints reflected in PR84, the

6    exhibit that's just been introduced, I've admitted that

7    document as an exhibit, but you should not accept the

8    complaints that are contained in that document for the truth of

9    those matters that are asserted or that are reflected in the

10   document.

11          The jury will be excused until 12:50 this afternoon.

12   I'll give you a little bit over an hour for your lunch break.

13   Please keep in mind the admonition that you've been given

14   several times not to discuss the case among yourselves while we

15   are in recess.  The jury will be excused at this time.

16       (Whereupon, the jury retired from the courtroom, after

17   which the following proceedings were had in open court.)

18          THE COURT:  Thank you, ma'am.  You may step down as

19   well.  You'll be excused.

20       (The witness complied with the request of The Court.)

21          THE COURT:  Any matters to take up outside the

22   presence of the jury?

23          Mr. Westberry?

24          Please be seated.

25          MR. WESTBERRY:  Yes, we have some witnesses to

1   recognize.

2           THE COURT:  All right.  We can do that —

3           MR. WESTBERRY:  If you recall, we had talked about

4   doing that.

5           THE COURT:  Yes, sir.  We can do that at this time if

6   you would like.

7           MR. WESTBERRY:  Sure.

8           THE COURT:  Please be seated.

9           MR. WESTBERRY:  If you give me a second, I'll go get

10  them.

11          THE COURT:  Yes, sir, that will be fine.

12          Mr. Westberry, I think they're on their way,

13  according to our security officer.

14          MR. WESTBERRY:  I think there are four of them at

15  present, Judge Reeves.

16          THE COURT:  All right.  If you could just come up to

17  the podium, the potential witnesses in the case.  That's fine,

18  you can just stop right there.

19          Ladies and gentlemen, what I'm going to ask you to

20  do, I understand that you're potential witnesses in this case

21  to be called on behalf of Defendant Douglas Adams.  The

22  defendant will not be presenting his case until the government

23  has completed its presentation and also after the first

24  defendant calls witnesses, so you may not be called as

25  witnesses in the case until later this week, probably toward

1   the end of this week.  So what we'll do is we'll go ahead and

2   have you recognized.  You'll need to tell me your name, have

3   you recognized, and then the Clerk will administer an oath to

4   you to return.  You'll be obligated should you fail to appear

5   in the penal sum of $500.  But you'll be able to be released at

6   this time; in other words, you won't need to stay around until

7   you're called as a witness, and the attorney for Mr. Adams will

8   contact you as to when he believes that you should be called in

9   the case.  So if I could have each of you state your name

10  please for the court reporter.

11          MS. SAMPLES:  Reecia Samples, R-e-e-c-i-a,

12  S-a-m-p-l-e-s.

13          THE COURT:  All right.  Thank you, Ms. Samples.

14          Yes, sir.

15          MR. WOODS:  Woodrow Woods.

16          THE COURT:  Yes, sir.  Mr. Woods, you previously

17  testified in the case, but you'll be called again on behalf of

18  one of the parties.

19          All right.  Yes, ma'am, you testified as well.

20          MS. REID:  Diana Reid.

21          THE COURT:  Thank you, Ms. Reid.

22          MR. REYNOLDS:  Darrell Reynolds, D-a-r-r-e-l-l

23  R-e-y-n-o-l-d-s.

24          THE COURT:  Yes, sir.

25          MR. ALLEN:  Roy D. Allen.

1              THE COURT:  All right.  If you could all please raise

2    your right hand, the Clerk will administer the oath to you.

3              (Whereupon, the Clerk administered the oath for the

4    potential witnesses to appear.)

5              THE COURT:  All right.  Thank you.

6              Again, one of the attorneys for Mr. Adams will be

7    contacting you as to when he expects to call you as a witness

8    in the case, and you do understand your obligations to appear

9    when you are called; correct?

10             All acknowledge that they do.

11             All right.  Thank you very much.

12        (Whereupon, the potential witnesses exited the courtroom,

13   after which the following proceedings were had in open court.)

14             THE COURT:  Do any of the other parties have

15   witnesses to recognize today?

16        (No response.)

17             THE COURT:  No?  All right.

18             Anything else that we can take up outside the

19   presence of the jury?

20        (No response.)

21             THE COURT:  All right.  Everybody feeling okay so

22   far?

23             We'll be in recess until 12:50 this afternoon.

24        (Whereupon, a recess was had for the noon hour, after

25   which the proceedings continue uninterrupted to Volume 19-B.)

1          (Proceedings concluded at 11:53 a.m.)

2                C E R T I F I C A T E

3          I, Cynthia A. Oakes, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7    3/13/2010                    s/CYNTHIA A. OAKES
          DATE                    CYNTHIA A. OAKES, RPR, RMR, CRR
8

9

10                  I N D E X

11                                              PAGE

12   Testimony of DAVID SUTHERLAND:
          Cross-Examination by Mr. Westberry:          20
13        Cross-Examination by Mr. White:              25
          Cross-Examination by Mr. Richardson:         26
14        Redirect Examination by Mr. Smith:           31
          Recross-Examination by Mr. Westberry         35
15        Recross-Examination by Mr.White:             35
          Recross-Examination by Mr. Richardson:       39
16        Further Redirect Examination by Mr. Smith:   42
          Further Recross-Examination by Mr. Richardson:  43
17
     Testimony of CRYSTAL GOINS:
18        Direct Examination by Mr. Smith:             46

19   Testimony of DIANA REID:
          Direct Examination by Mr. Smith:             48
20        Cross-Examination by Mr. Westberry:          56
          Cross-Examination by Mr. White:              60
21        Redirect Examination by Mr. Smith:           61
          Recross-Examination by Mr. Westberry:        64

22

23

24

25

INDEX (Cont'd)                                                    PAGE

Testimony of MARY SUE HELM:
     Direct Examination by Mr. Smith:              66
     Cross-Examination by Mr. Pinales:             72
     Cross-Examination by Mr. White:               74
     Cross-Examination by Mr. Baldani:             76

Testimony of SARAH BALL JOHNSON:
     Direct Examination by Mr. Smith:              78

E X H I B I T S

| Government's Exhibit No. | Identified | Page Admitted |
|---|---|---|
| D67 | 47 | 47 |
| D70 | 47 | 47 |
| D71 | 47 | 47 |
| D77 | 47 | 47 |
| D78 | 47 | 47 |
| D80 | 47 | 47 |
| D82 | 47 | 47 |
| D83 | 47 | 47 |
| M13 | 49 | 49 |
| M18 | 50 | 49 |
| M19 | 51 | 49 |
| M20 | 51 | 49 |
| M21 | 52 | 49 |
| M22 | 52 | 49 |
| M23 | 53 | 49 |
| M24 | 54 | 49 |
| PR71 | 80 | 79 |
| PR72 | 80 | 79 |
| PR73 | 81 | 79 |
| PR74 | 82 | 79 |
| PR75 | 82 | 79 |
| PR76 | 82 | 79 |
| PR77 | 83 | 79 |
| PR78 | 83 | 79 |
| PR81 | 47 | 47 |

1

| Government's Exhibit No. | Identified | Page Admitted |
|---|---|---|
| PR83 | 21 | |
| PR84 | 100 | 101 |
| PR87 | 69 | 68 |
| PR88 | 70 | 68 |
| PR89 | 70 | 68 |
| PR90 | 70 | 68 |
| PR91 | 70 | 68 |
| PR92 | 70 | 68 |
| PR93 | 86 | 86 |
| PR94 | 88 | 86 |
| PR95 | 88 | 86 |
| PR96 | 86 | 86 |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25