United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
|   vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 9, 2010 |
| DOUGLAS C. ADAMS | ) 9:00 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 20-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                       JASON D. PARMAN, ESQ.

On behalf of the Defendant     DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:       MARTIN S. PINALES, ESQ.

On behalf of the Defendant     R. KENT WESTBERRY, ESQ.
Douglas C. Adams:             KRISTEN N. LOGAN ESQ.

On behalf of the Defendant     T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant     ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant     RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:         R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant     JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant     ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant     DANIEL A. SIMONS, ESQ.
Stanley Bowling:

2

```
 1    Appearances of Counsel:

 2    On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                      JASON D. PARMAN, ESQ.
 3                                    Assistant U.S. Attorneys
                                      601 Meyers Baker Road
 4                                    Suite 200
                                      London, Kentucky  40741
 5

 6    On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
      Russell Cletus Miracle:         107 East First Street
 7                                     Corbin, Kentucky  40701

 8                                     MARTIN S. PINALES, ESQ.
                                       150 East Fourth Street
 9                                     Federal Reserve Building
                                       Cincinnati, Ohio  45202
10

11    On Behalf of the Defendant      R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.
12                                     220 West Main Street
                                       Suite 1900
13                                     Louisville, Kentucky  40202

14
      On behalf of the Defendant      T. SCOTT WHITE, ESQ.
15    Charles Wayne Jones:            133 West Short Street
                                       Lexington, Kentucky  40507
16

17    On behalf of the Defendant      ROBERT L. ABELL, ESQ.
      William E. Stivers:             120 North Upper Street
18                                     Lexington, Kentucky  40507

19
      On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
20    Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.
                                       300 West Short Street
21                                     Lexington, Kentucky  40507

22

23    On behalf of the Defendant      JERRY W. GILBERT, ESQ.
      William B. Morris:              212 North Second Street
24                                     Richmond, Kentucky  40475

25
```

```
 1   On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                  201 West Short Street
 2                                     Lexington, Kentucky   40507

 3
     On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:                  116 West Main Street
                                       Suite 2A
 5                                     Richmond, Kentucky   40475

 6
     Court Reporter:                   CYNTHIA A. OAKES, CRR
 7                                     Official Court Reporter
                                       United States District Court
 8                                     560 Athens Boonesboro Road
                                       Winchester, Kentucky   40391
 9                                     (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

JEFF SAGRECY - DIRECT - MR. SMITH                    4

1          (Whereupon, the jury entered the courtroom, after which

2    the following proceedings were had in open court.)

3               THE COURT:  Thank you.  Good morning, everyone.

4               The record will reflect that all members of the jury

5    are present.  The parties and counsel are also present.

6               Let's see, I believe we had finished the — Agent

7    Blair yesterday afternoon with cross-examination.

8               Mr. Smith, you may call your next witness.

9               MR. SMITH:  Agent Jeff Sagrecy, please.

10              THE COURT:  Thank you.

11                          JEFF SAGRECY,

12   having been first duly placed under oath, was examined and

13   testified as follows:

14              THE COURT:  Please proceed.

15                       DIRECT EXAMINATION

16   BY MR. SMITH:

17   Q    State your name, please.

18   A    Jeff Sagrecy.  The last name is spelled S-a-g-r-e-c-y.

19   Q    And how are you employed?

20   A    I'm a special agent with the Internal Revenue Service,

21   Criminal Investigation Division.

22   Q    And if you could, tell us a little bit about that

23   employment.  How long have you been employed there?

24   A    Since March of 2002.  I began in March of 2002.  At that

25   time, I went to the National Training Academy, which is in

JEFF SAGRECO DIRECT - MR. SMITH                    5

 1   Brunswick, Georgia.  It's approximately 27 weeks in length.
 2   The first 12 weeks of the training is a basic criminal
 3   investigator training program.  During that training, you learn
 4   the ins and outs of conducting a basic criminal investigation.
 5   You also become proficient with firearms, driving vehicles,
 6   defensive tactics, and there is some PT involved there.  Once
 7   you complete that, I moved into the agency specific training
 8   for the Internal Revenue Service.  That's approximately another
 9   15 weeks.  And during that training, you really emphasize how
10   to work financial investigations.  And during that, you
11   continue your defensive tactics and firearms training as well.
12   Q    Let's talk about financial investigations.  Have you had
13   experience in financial investigations?
14   A    Yes.  Since I've graduated the academy, which was August
15   2002, I have worked multiple investigations, including tax
16   evasion, tax fraud, false tax returns.  However, in the past
17   five years, I really began to focus in on financial crimes,
18   including money laundering and structuring.
19   Q    And as part of your experience, sir, have you had
20   occasions when you've been called to testify in court on these
21   matters regarding financial investigations and money
22   laundering?
23   A    I have.
24   Q    Have you in those instances been qualified to give opinion
25   testimony in federal court?

1   A    Yes, I have.

2   Q    What did you do before becoming an IRS agent, sir?

3   A    I was an auditor for the State of Kentucky.  I did audit

4   pass-through entities, partnerships, S corporations.

5   Q    Have you furthered your education and training since

6   becoming an agent in the areas of financial investigations and

7   money laundering?

8   A    Yes.  We had continuing professional education courses, if

9   not every year, every two years.  And they also offer through

10  the agency and other outside agencies additional training you

11  can take, and I have attended additional training in money

12  laundering, financial crimes, and the schemes in which are used

13  to accomplish those tasks.

14  Q    How are those trainings put on?

15  A    Some are put on by my own agency, the IRS, and some are

16  put on by outside agencies, such as the United States

17  Attorney's Office, and there are also some training classes put

18  on by outside contractors, people that maybe used to be money

19  laundering investigators and experts that come back to help

20  train current investigators.

21  Q    What was your undergraduate studies?

22  A    I have a degree in accounting from the University of

23  Kentucky.

24  Q    Have you participated in the investigation surrounding the

25  charges that are on trial in this matter?

1  A    I have.

2  Q    And tell us how you got involved in that, Agent Sagrecy.

3  A    I was approached by the FBI in late 2008.  At that time,

4  they told me they had a case that may involve —

5       MR. PINALES:  Objection to the conversation, Your

6  Honor.

7       THE COURT:  All right.  Sustained.

8  BY MR. SMITH:

9  Q    When you were asked to get involved by the FBI, what did

10 you do?

11 A    I began to look at financial records, request financial

12 records from outside organizations, like the City of

13 Manchester, Clay County Fiscal Court, other employers of the

14 defendants, and analyze those records for payments made.

15 Q    And in doing a financial investigation in money

16 laundering, why is that important, sir?

17 A    You want to see what the financial picture is for a

18 certain period of time and find what the benefit of

19 participating in a crime would be.

20 Q    And in this case, finding out what the motivation or the

21 benefit for committing the crime was important to you in

22 looking at financial records?

23 A    Yes.

24       MR. SMITH:  I would like to hand to the witness — I

25 would request from the Clerk a series of exhibits, Your Honor,

 1   M1 through M4, M8 through M12, M13 and M14.

 2              THE COURT:  Yes, sir.

 3              MR. RICHARDSON:  Excuse me, could I hear those again

 4   real quick?

 5              THE COURT:  One through four, eight through 12 and 13

 6   and 14, I believe.

 7              MR. WESTBERRY:  "M" as in Nancy?

 8              MR. SMITH:  "M" as in "Mary," one through four, M8

 9   through 14.

10   BY MR. SMITH:

11   Q    Agent Sagrecy, in your investigation, did you identify

12   entities which were benefactors of contracts that were revealed

13   in the -- in the records that you obtained?

14   A    Yes, I did.

15   Q    And describe for us generally what prompted you in that

16   direction.

17   A    To look for these documents?

18   Q    What documents did you seek out and for what entities?

19   A    I sought out payments from the City of Manchester to B&B

20   Excavating, also payments from Clay County to B&B Excavating,

21   payments from City of Manchester to B & J Transfer and payments

22   from Clay County to B & J Transfer.

23   Q    As part of your investigative efforts, sir, did you seek

24   to review all those records that are before you now and attempt

25   to summarize those for the Court and the jury in your testimony

1    here today?

2    A    I did.

3          MR. SMITH:  I would like to hand the witness what's

4    marked as Government's Exhibit M16.

5          THE COURT:  Yes, sir.

6    BY MR. SMITH:

7    Q    Can you identify M16, sir?

8    A    M16 is a summary of payments to B&B Excavating from Clay

9    County and the City of Manchester.

10   Q    And B&B Excavating, could you tell us what type of entity

11   that is, sir?

12   A    It's a construction-type company that does water lines,

13   sewer lines, it's owned by Stanley Bowling.

14   Q    And is it a corporation?

15   A    Yes.

16   Q    The records that you sought to summarize, could you

17   identify those for the record, please, that relate to B&B?

18   A    Well, the first would be Exhibit M1 and M2.  These are

19   payments from the City of Manchester to B&B Excavating.  And

20   there also is M10, which would be payments from the Clay County

21   Fiscal Court to B&B Excavating.

22   Q    And you have summarized each of those records in what's

23   identified as M16?

24   A    Correct.

25          MR. SMITH:  I would move for the introduction of M16

 1   at this time.

 2             THE COURT:  Any objection?

 3             MR. SIMONS:  No.

 4             THE COURT:  Exhibit M16 will be admitted.

 5             MR. SMITH:  I ask that it be published at this time.

 6             THE COURT:  Yes, sir.

 7             MR. SMITH:  Thank you.

 8   BY MR. SMITH:

 9   Q    Mr. Sagrecy, if you could, explain to us exactly what

10   we're looking at, a summary of payments.

11   A    Correct.  Of course, the very first line is the actual

12   exhibit number of this exhibit, which is Exhibit M16.  Then the

13   title, Summary of Payments to B&B Excavating from Clay County

14   and the City of Manchester.  Down the left side are the years,

15   2002 through 2006.  Across the top would be the column headers

16   for City of Manchester and Clay County, and then the total.

17   For example, if you look at the 2003 year, you will see that

18   under Clay County there was $2,720.  The total for that year

19   paid to B&B was $2,720.

20             2004, you have $175,810 from the City of Manchester

21   paid to B&B Excavating, and 4,000 from the Clay County.  The

22   total of those two together is $179,810.

23             The same for 2005, you have $712,014.45 from the City

24   of Manchester, Clay County is $24,000.  The total for the year

25   from both would be $736,014.45.

1        2006, City of Manchester paid to B&B $133,616.29.

2   Clay County paid B&B 12,000.  Total of those are $145,616.29.

3        And then I totaled each column.  The total from the

4   City of Manchester, $1,021,440.74, the total from Clay County,

5   $42,720.  The combined total for all years, $1,064,160.74.

6   Q    In the course of your investigation, did — were you able

7   to determine if these were contracts that were approved by

8   political boards or entities?

9   A    For the City of Manchester, yes.

10  Q    And what would be that entity that had to approve those —

11  awarding those contracts?

12  A    The city council.

13  Q    Okay.  And for Clay County?

14  A    Clay County, my investigation showed that the bulk of that

15  $40,000 was for a bulldozer that Clay County bought from

16  Mr. Bowling.

17  Q    And was Mr. Bowling, during the period of 2002 through

18  2006, a member of the governing authority that would have voted

19  on the purchase of those bulldozers?

20  A    He was a magistrate.

21  Q    And as a magistrate, is he a member of the fiscal court

22  that has to approve the purchase —

23  A    Yes.

24  Q    — of items such as bulldozers?

25  A    Yes.

JEFF SAGRECO DIRECT - MR. SMITH                    12

1  Q    Now, as your investigation proceeded, did you look for

2  federal money that was involved in these contracts that B&B

3  Excavating worked for the City of Manchester?

4  A    I did.

5  Q    And what did your investigation reveal?

6  A    I identified two sources of federal funds.  One was a

7  Pride Grant.  The Pride Grant is — the best way to describe

8  it, it's a grant given to certain communities to help clean up

9  the community for cleaner water, cleaner environment, and help

10 educate people on the benefits of having a cleaner environment.

11      There was also a Rural Development Grant, which comes

12 through the USDA.  The Rural Development Grant does several

13 things; helps to improve water systems, sewer systems, it can

14 also be used to help improve housing and utilities.

15 Q    And in your opinion, are those contracts affecting

16 interstate commerce as there are federal funds involved in each

17 of these contracts?

18 A    Yes.

19 Q    In your investigation, did you reveal that there was

20 competitive open bidding in the awarding of these contracts to

21 B&B?

22 A    No.

23 Q    Should there have been?

24 A    Yes.

25 Q    And typically, how would a competitive bidding from a

 1  municipality such as the City of Manchester operate in your

 2  experience and training?

 3          MR. SIMONS:  Objection, Your Honor.

 4          THE COURT:  Overruled.

 5          THE WITNESS:  My experience is that the bidding

 6  process are usually announced to the public through various

 7  medias and they're open to anyone, usually the lowest bidder

 8  gets the project, and they're usually documents reflecting all

 9  the bids when you review the records.

10  BY MR. SMITH:

11  Q    Now, when you say that usually municipalities offer these

12  contracts up through different medias, give me some examples of

13  medias you are referring to.

14  A    Newspaper, print, and sometimes I know even -- they're

15  even on local channels, sometimes, you know, a city will have a

16  local channel that will air their city council meetings and

17  stuff like that, they'll even advertise it on there.

18  Q    And in your experience and training, when biddings for

19  municipalities are opened up in the newspaper, does that open

20  it up for out-of-state companies to bid?

21  A    Yes, it does.

22  Q    And does that generally benefit the taxpayer in getting a

23  better bang for their buck?

24  A    Yes, the more bids, the more competition, usually you'll

25  get a better bid.

1    Q    You've identified monies paid through Clay County Fiscal
2    Court as well.  Were there contracts that you were able to find
3    in your investigation in regards to the bulldozer that was sold
4    by Stanley Bowling to the county of Clay County?
5    A    I was not given any contracts.
6    Q    Was there any evidence that that was open to competitive
7    bidding?
8    A    No.
9    Q    In your experience and training, do counties and
10   municipalities normally open up for bidding if they have a need
11   for a piece of equipment?
12   A    Yes.
13   Q    And in your experience and training, does that benefit the
14   taxpayer?
15   A    Yes.
16   Q    And how is that?
17   A    Again, the bidding process usually results in lower prices
18   from competition.
19   Q    Let's move on to M17.  I would like to direct your
20   attention to M17.
21           MR. SMITH:  If you could hand this to the witness.
22   BY MR. SMITH:
23   Q    Can you identify M17, sir?
24   A    Exhibit M17 is a schedule of payments that I prepared from
25   the City of Manchester in Clay County to B & J Transfer for the

1  period 2002 through 2009.

2  Q    And what records did you use to prepare this summary from,

3  sir?

4  A    That is, again, payments from there the City of Manchester

5  and a payment schedule from Clay County.

6  Q    Could you give us the exhibits number for the record, I'm

7  sorry, that you looked at to summarize, please?

8  A    M3, M4, and M11.

9         MR. SMITH:  I would move for the introduction of

10  Government's Exhibit M17.

11         THE COURT:  Any objection?

12         MR. GILBERT:  No objection.

13         THE COURT:  Exhibit M17 will be admitted.

14         MR. SMITH:  I would ask for permission to publish at

15  this time.

16         THE COURT:  Yes, sir, you may.

17  BY MR. SMITH:

18  Q    I direct your attention to page one.  If you could, Agent

19  Sagrecy, walk us through M17, please.

20  A    Again, the heading is Exhibit M17, the title, "Total of

21  payments to B & J Transfer from the City of Manchester and Clay

22  County."  Again, down the left column, we have the years, 2002

23  through 2009.  And the column headers across the top signify

24  the City of Manchester, Clay County, and the total per year.

25         For 2002, the City of Manchester paid to B & J Transfer

1  $68,724.  Clay County paid to B & J Transfer $34,276.25 for a

2  total for the year of $103,000.25.

3      2003, the City of Manchester paid to B & J Transfer

4  $142,437.43, Clay County paid $23,168.06, for a total of

5  payments to B & J Transfer of $165,605.49.

6      2004, B & J Transfer — excuse me, City of Manchester paid

7  to B & J Transfer $133,942.78, Clay County paid to B & J

8  Transfer $82,877.45, for a total for the year of $216,820.23.

9      2005, City of Manchester paid to B & J Transfer

10  $137,422.55, Clay County paid to B & J Transfer $59,045.53, for

11  a total for the year of $196,468.08.

12      2006, City of Manchester paid to B & J Transfer

13  $148,760.52, Clay County paid to B & J Transfer $10,517.74, for

14  a total for the year of $159,278.26.

15      2007, City of Manchester paid to B & J Transfer

16  $125,226.35, Clay County paid to B & J Transfer $6,603.92, for

17  a total for the year of $131,830.27.

18      2008, City of Manchester paid to B & J Transfer

19  $74,645.18, Clay County paid to B & J Transfer $590.49, for a

20  total of $75,235.67.

21      2009, there were no payments documented for B & J Transfer

22  from the City of Manchester.  Clay County paid to B & J

23  Transfer $129.10, for a total of that year of $129.10.

24      During this period, the City of Manchester paid to B & J

25  Transfer $831,158.81.  Clay County paid to B & J Transfer

1   $217,208.54.  The combined total for all the years from both

2   the City of Manchester and Clay County is $1,048,367.35.

3   Q    Agent Sagrecy, in your investigation, did you seek to

4   learn the sources of, for instance, the B & J Transfer itself?

5   Is that an entity that is incorporated or can you explain what

6   you learned in your investigation?

7   A    It is an S corporation, and S corporation acts as a

8   corporation and the income flows through to the individual

9   owners.

10  Q    And who is the record showing to be the owner of B & J

11  Transfer?

12  A    William Bart Morris.

13  Q    And as you conducted your investigation, did you seek to

14  find out the source of these monies coming from the City of

15  Manchester?

16  A    Yes.

17  Q    And what did you learn?

18  A    It was the removal of trash.  B & J Transfer would haul

19  the trash from Clay County to the dump sites.

20  Q    Were you able to learn in your investigation that there

21  was a contract?

22  A    Yes.

23  Q    And based upon your investigation, was that contract open

24  to competitive bidding before awarded to B & J?

25  A    It should have been, but I did not see any other

1  contracts, opposing contracts, that were submitted to the City

2  of Manchester.

3  Q    When you say "opposing contracts," you're talking about

4  open for bidding?

5  A    Yes.

6  Q    And in your training and experience, do municipalities who

7  award contracts on garbage normally open that up to competitive

8  bidding?

9  A    They do.

10  Q    And in your experience, does that open — when they're

11  opening up the bidding for garbage transportation, is that

12  generally done through media?

13  A    The same way, yes, through media.

14  Q    And when you say "the same way," could you explain?

15  A    The same as it would have been for B&B Excavating.

16  Q    And in your opinion, would that also open it up for the

17  taxpayers to get a better bargain potentially if people outside

18  of the county or outside of the state are offered the

19  opportunity to provide that service?

20  A    Yes.

21  Q    Did you, in your investigation, also seek to determine

22  whether there were federal dollars involved in these payments

23  to B & J Transfer from the City of Manchester?

24  A    Yes, I did.  And there is one exhibit, which is — it's

25  M4.  M4 is Pride payments to B & J Transfer for cleanup work

1  done in the county.

2              MR. SMITH:  I would ask that that be published.

3              THE COURT:  Yes, sir.

4              MR. SMITH:  M4.

5              THE COURT:  Yes, sir.

6              MR. SMITH:  Previously introduced.

7  BY MR. SMITH:

8  Q    How were you able to determine from M4, sir, that there

9  was Pride money?

10 A    First, you had the check here to B & J Transfer.  There's

11 also the second page of this exhibit, is a Pride invoice.

12 Q    Okay.

13 A    And for the funds to be reimbursed, it shows the 22,5,

14 that's $22,500, which corresponds to the first page, which was

15 the check for $22,500.  The third page is a second check in the

16 amount of 2250, $2,250, and the fourth page was the

17 reimbursement request from Pride for that.

18 Q    Did you find other examples of Pride money being involved

19 in payments to B & J Transfer?

20 A    I believe these were the only two that I was given by the

21 City.

22 Q    And as other monies are involved, did you learn in your

23 investigation where they come from?

24 A    For the other -- I'm not understanding your question.  I'm

25 sorry.

1  Q    Let me restate the question.  There's potentially $831,000

2  that's been paid by the City of Manchester to this company,

3  some of which is made up of federal dollars.  Did you find out

4  the source of where the other dollars were coming from?

5  A    From the City of Manchester.

6  Q    Now, I direct your attention to — back to M17.  I would

7  ask the same of you, Agent Sagrecy, as to Clay County.  Did you

8  find the source of those dollars?

9  A    I did not find the contract, no.

10  Q    What were these dollars representing based on your

11  investigation, sir?

12  A    The removal of garbage.

13  Q    And there's a total of $217,208.54 that was paid out by

14  the Clay County Fiscal Court, I assume; is that right?

15  A    Yes.

16  Q    And did you find any evidence of competitive bidding as it

17  pertains to the contracts awarded by the county to B & J

18  Transfer?

19  A    No, the county did not furnish me with any contracts.

20  Q    And, again, for clarification, who would have to approve

21  B & J Transfer receiving the award of contracts by the county?

22  A    Well, that would go through the Clay County Fiscal Court.

23  Q    And the fiscal court is made up of elected officials?

24  A    Yes, that's correct.

25  Q    Would that include the judge executive and the city

 1  magistrates in each of the magisterial districts in the county?

 2  A    Yes.

 3  Q    And, again, the question as to Clay County, did you find

 4  any evidence in your investigation that they had opened it up

 5  for competitive bidding?

 6  A    No.

 7  Q    Let's move on — I would like to direct your attention now

 8  to M15.  Can you identify M15, sir?

 9  A    Yes, M15 is a summary of the total payments to the

10  defendants and related businesses.

11  Q    And did you, for the record, summarize exhibits previously

12  introduced into evidence here?

13  A    Yes.

14  Q    Could you list those for the record, please?

15  A    Exhibits M14, M13, M8, M9, M12, the Exhibits M16 and M17,

16  which we just discussed.

17          MR. SMITH:  I would move for the introduction of

18  Government's Exhibit M15 at this time.

19          THE COURT:  Any objection?

20       (No response.)

21          THE COURT:  Exhibit M15 will be admitted.

22          MR. SMITH:  We'll start with page two of M15 and ask

23  that that be published.

24          THE COURT:  Yes, sir.

25  BY MR. SMITH:

1   Q    If you could, explain page two.

2   A    Page two, again, is Exhibit — part of Exhibit M15, and

3   this would have been the salary per year for Russell Cletus

4   Maricle.  The columns across the top are labeled "year."  Down

5   the left side you have the period of 2002 through 2007.  The

6   next column is salary, which represents the salaries for those

7   years.  The last column is the exhibit number.  The exhibit

8   number, in this case M14, that represents the exhibit where

9   this information was taken from.

10  Q    And where do those records come from?

11  A    The Administrative Office of the Courts.

12  Q    Okay.

13  A    And in 2002 Mr. Maricle received a salary of $111,653.04;

14  2003, Mr. Maricle received a salary of $113,761.08; 2004,

15  Mr. Maricle received a salary of $115,133.46; 2005, Mr. Maricle

16  received a salary of $119,354; 2006, Mr. Maricle received a

17  salary of $121,531; 2007, Mr. Maricle received a salary of

18  $57,647.73, for a total for this period of $639,080.31.

19  Q    Agent Sagrecy, from your investigation, were you able to

20  determine why the amount was considerably less in 2007 for

21  Mr. Maricle?

22  A    I believe it was in 2007 when Mr. Maricle entered senior

23  status as a judge, which basically was retirement.

24  Q    Let's move on to page three.

25  A    Page three, again, is part of Exhibit M15, salary for year

1  for Douglas C. Adams.  The supporting exhibit is M13.

2  Q    And where did those records come from, sir?

3  A    Clay County Board of Education.

4       This page summarizes a salary that Mr. Adams received

5  beginning in 2002 through 2009, and this is actually divided up

6  by school year.  The Clay County Board of Education, the pay

7  began in July of 2002 and went through June of 2003.  And

8  that's how the year runs on each of these.  So we see the split

9  year, it begins in July and ends in June the following year.

10      So for the period of July 2002 through June of 2003,

11 Mr. Adams received a salary of $86,720; the period of July '03

12 through June 2004, Mr. Adams received a salary of $87,080; for

13 the period of July 2004 through June 2005, Mr. Adams received a

14 salary of $89,266; for the period of July 2005 through

15 June 2006, he received a salary of $91,944; for the period of

16 July 2006 through June 2007, Mr. Adams received a salary of

17 $103,195; for the period July 2007 through June 2008, Mr. Adams

18 received a salary of $107,143.84; for the period of July 2008

19 through June 2009, Mr. Adams received a salary of $139,387.29.

20 The total for the period is $704,736.13.

21 Q    I direct your attention now to page four.

22 A    Again, this page is a part of Exhibit M15.  M15 is a

23 summary of the salary per year for Freddy W. Thompson.  This

24 information was taken from Exhibit M8.  That's shown in the far

25 right column.

1  Q    And where did those records come from, sir?

2  A    The Clay County Clerk's Office.

3       Again, the period — the year —- the period runs from 2003

4  through 2009.  You have a salary, there's also an expense

5  allowance that Mr. Thompson received yearly, and there was an

6  incentive.  The incentive was from attending training courses.

7  So for 2003, Mr. Thompson received in salary $61,476.05;

8  expense allowance of $3,600 and incentive of $758.96, for a

9  total of $65,835.01.

10      2004, Mr. Thompson received a salary of $65,340.96.;

11 again, an expense allowance of $3,600, and incentive of

12 $1,546.48, for a total of $70,487.44.

13      2005, Mr. Thompson received a salary of $69,465.97, an

14 expense allowance of $3,600, incentive of $2,395.35, for a

15 total of $75,461.32.

16      2006, Mr. Thompson received a salary of $74,294.12,

17 expense allowance of $3,600, incentive of $3,301.96, for a

18 total of $81,196.08.

19      2007, Mr. Thompson received a salary of $76,197.48,

20 expense allowance of $3,600, incentive of $3,386.52, for a

21 total of $83,184.

22      In 2008, Mr. Thompson received a salary of $79,307.65,

23 expense allowance of $3,600, incentive of $3,524.72, for a

24 total of $86,432.37.

25      In 2009 — this is only a partial year from the records I

1    got through the investigation –– Mr. Thompson received a salary

2    of $32,471.75, expense of allowance of $2,031.81, incentive of

3    $2,237.21, for a total of $36,740.77.

4         The total of all years combined Mr. Thompson received

5    $499,336.99.

6    Q    I direct your attention now to page five.

7    A    Page five is, again, part of Exhibit 15, M15.  These

8    represent the summary of election official wages for Charles

9    Wayne Jones.

10   Q    What position does the record show based on your

11   investigation that he was holding during these years?

12   A    He was part of the Board of Elections.

13   Q    And M9 were records obtained from what entity?

14   A    The Clay County Clerk.  And these records are –– it's

15   actually a record of the proceedings of minutes, and the way

16   this was provided to me is on the minutes they had handwritten

17   the individuals on the Board and how much they were paid.

18        And for 2003, Mr. Jones received $600; 2004, Mr. Jones

19   received $550; 2005, Mr. Jones received $150; 2006, Mr. Jones

20   received $750; 2007, Mr. Jones received $350; 2008, Mr. Jones

21   received $500, for a total of $2,900.

22   Q    And based on your investigation, who approved the payment

23   of those funds to Charles Wayne Jones?

24   A    Based on my investigation, the Clay County Clerk's Office

25   approved those, and I believe those funds were paid by the,

1  again, Clay County Fiscal Court.

2  Q    I direct your attention now to page six.

3  A    Again, page six is part of Exhibit M15.  This summarizes

4  the salary per year for Stanley Bowling as a magistrate.  The

5  exhibit this information was taken from was Exhibit M12.

6  Q    Where did you obtain those records from?

7  A    The Clay County Fiscal Court.

8       For 2003, Mr. Bowling received $20,807.42; 2004,

9  Mr. Bowling received $20,387.22; 2005, Mr. Bowling received

10 $20,804.46; for 2006, Mr. Bowling received $21,356.28; for 2007

11 Mr. Bowling received $21,641.76; 2008, Mr. Bowling received

12 $21,641.76; and 2009, again, is a partial year when I received

13 the records, he had received at that time $9,017.40, for a

14 total of $135,656.30.

15 Q    I direct your attention now to page seven.

16 A    Page seven, again, is a part of Exhibit M15, and this

17 summarizes the payments to B & J Transfer by the City of

18 Manchester in Clay County.  This is the —— a summary of M17,

19 which we went through earlier.

20 Q    Okay.  Let's move on to page eight.

21 A    Again, this is part of Exhibit M15, this summarizes

22 payments to B&B Excavating by the City of Manchester and Clay

23 County.  Again, this was the Exhibit M16 that we reviewed

24 earlier.

25 Q    Now, I direct your attention to page one.

1    A    Page one is a summary page of all the salaries and

2    contracts paid out.  At the top, the defendant, Russell Cletus

3    Maricle, and his total salary of $639,080.31; Douglas C. Adams,

4    $704,736.13; Freddy Thompson, $499,336.99; Charles Wayne Jones,

5    $2,900; Stanley Bowling, $135,656.30, for a total of payments

6    to individuals of $1,981,709.73.

7         Following that, you have payments to the businesses, B & J

8    Transfer, $1,048,367.35; B&B Excavating, $1,064,160.74, for

9    total payments to businesses of $2,112,528.09.  Grand total of

10   all payments, $4,094,237.82.

11   Q    Agent Sagrecy, as you conducted your investigation, did

12   you find or did you seek out information regarding William

13   "Al Man" Stivers?

14   A    Yes, I did.

15   Q    And what did your investigation reveal?

16   A    Mr. Stivers did receive some fees as an election officer,

17   and I believe those fees to be in the range of 150 to $200.  He

18   normally served as an alternate, and there were a couple of

19   times I do believe he had to step in and serve as an election

20   officer on election day.  However, I was told that if you serve

21   as an election officer during absentee voting there were no

22   payments.

23   Q    In the course of investigations of financial institutions

24   or financial crimes, including acts of money laundering, is it

25   important to you as an investigator to know dollar amounts that

1    have been paid out?

2    A    Yes.

3    Q    And in this case, the total amount of 4,094,000-and-

4    some-odd dollars was the total amount paid out to these

5    individuals?

6    A    Yes.

7    Q    Did you seek, in your investigation, to determine whether

8    or not there was an unlawful proceed element that was involved

9    in the accumulation of these payments?

10   A    Yes.

11   Q    And could you express to us what you found in your

12   investigation?

13             MR. PINALES:  Your Honor, objection.  May I approach?

14             THE COURT:  Yes, you may.

15      (Whereupon, the following discussion was had between The

16   Court and counsel at the bench, out of the hearing of the

17   jury.)

18             MR. PINALES:  Martin Pinales on behalf of Cletus

19   Maricle, Your Honor.  There's an objection to the term

20   "unlawfulness" and his analysis of that.  That is a legal

21   conclusion that is for the trier of the facts, not for this

22   particular witness.

23             THE COURT:  All right.

24             MR. BALDANI:  We would join in that, Your Honor.

25             THE COURT:  Mr. Smith?

1          MR. SMITH:  Your Honor, I believe that we have —
2    under the rules of evidence — plus, it goes to the state of
3    mind of the acting of the defendant.  It is not an
4    impermissible area of evidence for the government to elicit
5    answers to questions that call for an opinion witness to state
6    his opinion as to, again, the sources of these funds.  It has
7    been laid out in our discovery notice to parties that bribery,
8    extortion, was involved in the accumulating of these funds and
9    that in this witness's opinion, these are common methods and
10   practices of criminal organizations to utilize means, as he
11   will describe, to launder those sources of money.
12          THE COURT:  All right.  I agree, the objection is
13   overruled.
14       (Whereupon, the following proceedings continued in open
15   court.)
16          THE COURT:  Thank you.  The objection will be
17   overruled.
18          Mr. Smith, you may proceed.
19   BY MR. SMITH:
20   Q    Do you need me to restate the question?
21   A    Please.
22   Q    Okay.  We have — you have learned in your investigation
23   of over $4 million was realized by these individuals listed in
24   this schedule; correct?
25   A    Correct.

1  Q    Did you, in your investigation, seek to find out whether

2  there was unlawful proceeds that were involved in the

3  accumulation of these monies?

4  A    Yes.

5  Q    And if you could, explain.

6  A    Those lump proceeds were from the extortion and bribery.

7  Q    And if you could, explain further.

8  A    Okay.  The proceeds were the direct result of the money

9  being extorted from candidates to pay to play.  Also, the money

10 that was put in willingly to buy votes, these salaries, and

11 contracts are the direct result of that money, of that illegal

12 money from the extortion and the bribery.  Once the candidates

13 were elected, they got an office and a salary, they also then

14 returned the favors through ways of contracts.

15 Q    And as you have been trained, in your experience in money

16 laundering investigations, have you found in your experience

17 and training that organizations often utilize financial

18 transactions to conceal or promote their unlawful activities?

19 A    Yes.

20 Q    And in this case, did you see evidence that there were

21 financial transactions that were involved which were used to

22 promote or conceal the activity?

23 A    Yes.  The financial transactions through the salary and

24 the contracts, they appear to be legitimate contracts and

25 salaries.  But this actually means a concealing the extortion

1  and the bribery.  If it were not for those two, the extortion

2  and bribery, the chances of receiving salaries are very slim.

3  And the same with the contracts.  It appears to be legitimate.

4  That's why people launder money.  You want to take dirty money

5  and make it appear clean.

6  Q    Could you explain how did it also promote?

7  A    Well, it's a continuing scheme.  The next election to get

8  re-elected to get the officials back in office and for city

9  council and to public offices to help you get the contracts

10  again.

11  Q    In your investigation, did you find that Bart Morris and

12  Debbie Morris were seeking a political office in any fashion?

13  A    No.

14  Q    Was that important and significant to you, to see that

15  there was not a political aspect to their involvement?

16  A    There was a political aspect.  Just because they weren't

17  seeking office doesn't mean they weren't politically active.

18  Their activity in election was to help guarantee certain

19  members were elected, especially within the city council.  That

20  would help to guarantee the contracts for their financial

21  well-being.

22  Q    How does that compare with B&B and their contracts?

23  A    It'd be the same way.  If you have favorable people

24  working as the politicians on the councils, you're more likely

25  to get the contracts.

1  Q    In your investigation, have you sought to number how many

2  acts of bribery occurred by the members of the enterprise

3  during the indictment period?

4  A    It's numerous.  Numerous.

5  Q    Did you, in your investigation, seek to find out how much

6  monies were pooled together by the candidates to initiate what

7  would follow and result in salaries and contracts?

8  A    We did.  And there was a range there.  During the

9  investigation on multiple times, we learned that there could

10 have been as much as half a million dollars.

11 Q    Are you familiar with factions resulting in criminal

12 enterprises?

13 A    Yes.

14 Q    How did that affect your analysis in determining whether

15 these proceeds were illegal or not?

16 A    Well, it would be comparable to organized crime families.

17 There are factions within, everybody wants to be at the top and

18 there's a power struggle in these families, organized crime

19 families.  They're committing — the most common would be the

20 organized crime families' extortion of garbage waste removal

21 contracts.  If you pay — you know, an example would be, if you

22 want the contracts from the City, you pay up front in organized

23 crime families and make sure that you get the contracts in the

24 end.  That's how you get your money back, you put up the

25 extortion money in the front and in the end you get the

1  contracts and get the money back out and it looks clean.

2  Q    And in this case, in your investigation, did you find out

3  that -- did you find the source of these monies that were

4  pooled together?

5  A    Well, it was through candidates and individuals that were

6  extorted.

7  Q    Did you, in your investigation, look for other reasons

8  that would motivate people to put hundreds of thousands of

9  dollars in an election in a small county such as Clay County?

10 A    I found several reasons.  One is the money.  The second

11 thing is power.  In a small community like Clay County, it's

12 poverty stricken, jobs are hard to come by.  If you control the

13 county and control the jobs, that's pretty powerful, pretty

14 powerful.

15 Q    In your investigation, were you able to find if members of

16 this enterprise had control over a large employment base?

17 A    Yes.

18 Q    And could you describe what you found in your

19 investigation?

20 A    Mr. Adams is the superintendent of the county schools or

21 was the superintendent, the largest employer in Clay County.

22 Q    And were you able to find out in your investigation if

23 there was a number provided to you as far as a range of numbers

24 of people that were employed by the school board during the

25 relevant time periods?

1  A    There was -- and the number escapes me right now, I can't

2  recall.  For some reason, 900 pops into my head, but that

3  could -- that could be wrong.

4            MR. WESTBERRY:  Objection as to speculation, Your

5  Honor.

6            THE COURT:  I'll sustain as to speculation.

7            MR. SMITH:  Thank you.  I'll pass the witness.

8            THE COURT:  Thank you.

9            Mr. Pinales.

10           MR. PINALES:  Thank you, Your Honor.

11           THE COURT:  Yes, sir.

12                      CROSS-EXAMINATION

13 BY MR. PINALES:

14 Q    Good morning, Mr. Sagrecy.

15 A    Good morning, Mr. Pinales.

16 Q    As you know, I'm Marty Pinales, and I represent Cletus

17 Maricle.

18 A    Yes, sir.

19 Q    I have just a few questions for you.  You know that you

20 were talking about Clay County here today, and there are 120

21 counties in the Commonwealth; correct?

22 A    That's correct.

23 Q    And there are a number of circuit judges within the

24 Commonwealth; correct?

25 A    That's correct.

JEFF SAGREC CROSS - MR. PINALES                                    35

```
 1   Q    And Judge Maricle is a circuit judge from and in Clay
 2   County; correct?
 3   A    Correct.
 4   Q    And Leslie County; correct?
 5   A    I believe that's right.  I was thinking there was three
 6   counties.
 7   Q    And Jackson County?
 8   A    That's correct.
 9   Q    And the number of judges per county or per number of
10   counties is based on a caseload; is that correct?
11   A    I don't know the answer to that.
12   Q    Okay.  The salary — And I'm directing your attention to
13   M15.  If you would look at that right now.  And look at page
14   two.  Are you there?
15   A    Yes.
16   Q    Okay.  And when we saw that up on the board, in the dollar
17   section, the first line says 2002; correct?
18   A    Correct.
19   Q    And that's the year.  And a salary of $111,653.04.  Do you
20   see that?
21   A    Yes, I do.
22   Q    That salary is set by the Legislature, isn't it?
23   A    Again, I can't comment on how the salary is set.
24   Q    Do you know that every judge throughout the Commonwealth
25   has the same salary?
```

1    A    I do not know that.

2    Q    And I assume your answer would be the same for 2003, '04,

3    '05, '06, and '07?

4    A    That I do not know the salaries ––

5    Q    That you do not know?

6    A    The salaries for other judges?

7    Q    No, that it's set by the Legislature uniformly across the

8    Commonwealth.

9    A    I'm not familiar with how the salaries are set.

10   Q    In your investigation, looking at financials, you didn't

11   check that out?

12   A    There's no need to.

13   Q    Okay.  In your investigation for those years that I have

14   mentioned, do you know which years Judge Maricle ran unopposed?

15   A    I know 2006.

16   Q    You know he ran unopposed in 2006.

17        In your looking at financials and numbers through your

18   background and all, did you come across something in Clay

19   County called the "fine docket" or "the dollar docket"?

20   A    No.

21            MR. PINALES:  May I have just a moment, Your Honor?

22            THE COURT:  Yes, sir.

23            MR. PINALES:  Nothing further.  Thank you, Your

24   Honor.  Pass the witness.

25            THE COURT:  Thank you.  Yes, sir.

1           Mr. Westberry?

2           MR. WESTBERRY:  Thank you.

3                      CROSS-EXAMINATION

4   BY MR. WESTBERRY:

5   Q    Good morning, Mr. Sagrecy, Kent Westberry for Doug Adams,

6   and I've got just a couple of questions for you, sir.

7        You would agree that it is the School Board that hires and

8   retains a school superintendent, including a county such as

9   Clay; correct?

10  A    I will say that a school board has to approve the

11  superintendent.

12  Q    They also make the decision whether to retain or extend a

13  contract for superintendent as well; correct?

14  A    I believe that's correct.

15  Q    Now, you would agree that Doug Adams was hired as school

16  superintendent in 1999; correct?

17  A    The first contract that I have is from 1999.

18  Q    And that was actually three years before the timeframe

19  mentioned in the exhibits that we've been talking about this

20  morning; correct?

21  A    1999 would have been three years prior.

22  Q    As part of your investigation, Mr. Sagrecy, have you

23  personally interviewed any school board members to determine

24  some of the factors and criteria, not only to initially hire

25  Mr. Adams but to renew his contract as well?

1  A    I'm trying to recall if I personally interviewed or if I

2  reviewed the interview from the FBI.

3  Q    Did you personally yourself?

4  A    An actual school board member?

5  Q    Yes, sir.  Do you have any recollection of you

6  personally —

7  A    I do not believe I did.

8  Q    Do you have any knowledge, Mr. Sagrecy, of Mr. Adams' job

9  performance during the years that he served as superintendent

10 of schools?

11 A    You mean like evaluations?

12 Q    Yes, sir, whether he did a good job, bad job, mediocre

13 job, how did you — do you have any personal knowledge?

14 A    No.

15 Q    You indicated a moment ago that — through questioning of

16 the government that the Clay County School System is the —

17 perhaps the largest employer —

18 A    Correct.

19 Q    — in the county.

20      Do you know if the superintendent is the sole — the one

21 and only person who makes all of the hiring decisions?

22 A    He has the ability to if he wants.

23 Q    Are you sure about that?

24 A    My understanding is that the superintendent —

25           MR. SMITH:  I'm going to object, Your Honor, to the

JEFF SAGRECY - CROSS - MR. WESTBERRY                    39

 1  question.  Argumentative.

 2  BY MR. WESTBERRY:

 3  Q    Are you familiar --

 4          THE COURT:  I'll sustain the objection.

 5          MR. WESTBERRY:  Oh, excuse me, Judge.  I'll move on.

 6  BY MR. WESTBERRY:

 7  Q    Are you familiar with something in the Clay County School

 8  System called the "site-based council"?

 9  A    I'm not familiar with the Clay County site-based council.

10  I am familiar with a site-based council, but not the one in

11  Clay County.

12          MR. WESTBERRY:  Could I ask the government, if they

13  could, please, if they could put up on the board maybe M15,

14  Steve, page three, M15, page three.  It was the salary of

15  Mr. Adams.  It would help, if that's okay, Judge?

16          THE COURT:  That will be fine.  Either that, or you

17  can use the actual exhibit, if you prefer.

18          MR. WESTBERRY:  It might be better if everyone could

19  look at it.

20          THE COURT:  All right.  That's fine.

21          MR. WESTBERRY:  Thank you.

22  BY MR. WESTBERRY:

23  Q    See that?  Can you see that okay, Mr. Sagrecy?

24  A    Yes, sir.

25  Q    That, of course, is the salary for Doug Adams from 2002

1    through 2009; correct?

2    A    Correct.

3    Q    And, of course, he had retired in 2009?

4    A    Correct.

5    Q    Now, do you have knowledge that back in 2006 Mr. Adams had

6    his contract renewed and that the new salary was based on an

7    average among several surrounding counties?  Do you have

8    knowledge of that?

9    A    I had knowledge that it was in a contract.  As far as the

10   exact year, I would have to refer to the exhibit.

11   Q    Does 2006 sound about right, to the best of your

12   recollection?

13   A    Again, I would have to refer to the exhibit.

14   Q    Were you in the court yesterday when Diana Reid — I can't

15   remember.  Were you in the courtroom?

16   A    I have not been in the court at all.

17   Q    Excuse me.

18        Now, the last year of the June—July period, Mr. Adams term

19   when he served as superintendent, of course, was 2008 through

20   2009 at the bottom down there.  Do you see that?

21   A    Yes, sir.

22   Q    And that, of course, is the year that he received the

23   largest compensation, about $139,000 and a few extra dollars;

24   correct?

25   A    Yes, sir.

1  Q    Do you have knowledge about the policy in the Clay County

2  School System where employees, including the superintendents,

3  can be paid for unused or accrued sick leave?

4  A    I do not know the policy.

5  Q    So you would not know whether that larger amount paid in

6  his last year was a result of unused accrued sick leave or not?

7  A    I do believe that part of that payment was sick leave, and

8  if you want I can review the document.  I think the summary of

9  his payments from the Board of Education shows that he did

10 receive some money from sick leave, but I'm not familiar with

11 the actual policy.

12           MR. WESTBERRY:  Thank you.

13           May I have just one second?

14           THE COURT:  Yes, sir.

15 BY MR. WESTBERRY:

16 Q    One last question, Mr. Sagrecy.  Do you have knowledge

17 that Mr. Adams' salary comes only from — did come only from

18 state funds and not any federal funding, if you know?

19 A    I can't comment, I don't know.

20           MR. WESTBERRY:  Thank you very much.  I appreciate

21 that.

22           I pass the witness.

23           THE COURT:  Thank you.

24           Mr. White.

25           MR. WHITE:  Thank you, Your Honor.

1                           CROSS-EXAMINATION

2    BY MR. WHITE:

3    Q     Good morning, sir.

4    A     Good morning.

5    Q     My name is Scott White, I'm an attorney, I represent

6    Mr. Jones.  I've got just a few questions as well, not many.

7              MR. WHITE:  Could you -- Ms. Poynter, could you put

8    up M15, please, this section on Mr. Jones?

9    BY MR. WHITE:

10   Q     Where was that?

11   A     It's page five.

12   Q     Do you know -- Let me ask you:  This is the document that

13   shows how much Mr. Jones received due to his service on the

14   Clay County Board of Elections; is that correct?

15   A     Yes.

16   Q     Do you know -- in other words, for 2003, for example, he

17   received $600 for the year.  Do you know how that number was

18   derived?

19   A     No.

20   Q     So you would have no information as to whether or not

21   payments to County Board of Election members is uniform through

22   the state?

23   A     No.  The only document I got, again, is the minutes with

24   the handwritten notes that stated what Mr. Jones was paid.

25   Q     Did you testify on direct examination that you did conduct

1  some interviews in doing your analysis?

2  A    Yes.

3  Q    Did you interview anyone from the State Board of Elections

4  on the issue as to how people -- how County Board of Election

5  members are paid?

6  A    That question was not asked.

7  Q    Did it not include -- Do you know when Mr. Jones first

8  went on the Clay County Board of Elections as the Democratic

9  Commissioner?

10  A    It would be pure speculation, I'm not —

11  Q    Don't do that.  Do you know if he was on the Board of

12  Elections in 2002; if you know?

13  A    I believe that he was.  My memory, the document itself, as

14  far as the payments, the reason I didn't include it, the

15  document is not clear.  If you study it, you kind of assume

16  what the salary -- what he may have been paid, but since I

17  wasn't sure, I didn't include it.

18  Q    Is there a reason you picked 2003?  Was that just the

19  first document you had?

20  A    No, I had '02.  But, again, the '02 salary, or the

21  payment, it wasn't legible, so that's why it's not included.

22  Q    So you weren't sure —

23  A    Excuse me?

24  Q    I'm sorry.  So you weren't sure if it was for '02 or '03?

25  A    No, it was '02.  '03 is legible.  The '02 is not legible.

1   Q    I see, and that's why —

2   A    It's not on there.

3   Q    — the '02 was not included?

4   A    That's correct.

5   Q    All right.  Thank you.

6        Now, in your testimony, you stated that — based on your

7   opinion and analysis that there was approximately $4 million

8   generated by this enterprise, if you will.  And that's an

9   approximation, that 4.0 million?

10  A    Almost 4.1 that was documented.

11  Q    4.1 documented?  Of that, Mr. Jones received $2900?

12  A    Correct.

13  Q    And in your analysis and review of all these records,

14  would you agree that Mr. Jones did not receive any contracts

15  from the City of Manchester or of the County — or of Clay

16  County other than the payments he received as a member of the

17  Clay County Board of Elections?

18  A    I was not provided by either the City or County with any

19  additional contracts or payments.

20  Q    But you certainly looked — Strike that.

21       Did you look — in looking at Mr. Jones specifically, did

22  you look to see if there were any other payments that he may or

23  may not have received?

24  A    I did not identify any other payments.

25            MR. WHITE:  If I could have just a moment, Your

1  Honor?

2           THE COURT:  Yes, sir.

3           MR. WHITE:  That's all I have.  Thank you, Agent

4  Sagrecy.

5           THE COURT:  Thank you.

6           Mr. Abell.

7                      CROSS-EXAMINATION

8  BY MR. ABELL:

9  Q    Mr. Sagrecy, I'm Robert Abell, and I represent William

10 Stivers in this case.

11      To be clear, Exhibit M15 summarizes, in your opinion, the

12 total payments to the defendants that are at issue in this

13 case; is that correct?

14 A    Well, I do believe there are some payments to your client.

15 Q    Well, why don't you answer my questions?  Does M15

16 summarize the payments that you think are at issue in this case

17 or not?

18 A    These are the ones that are identified and documented.

19 I'm not sure — I think your question is kind of open-ended.

20 If I understood your question, you said does it identify all

21 the payments to defendants, and I clarified by saying I believe

22 there are some payments to your defendant that are not in here.

23 Q    All right.  So when M15 says a summary of the total to

24 defendants and related businesses, you're saying it doesn't

25 really mean that, you're saying there's something else?

JEFF SAGRECY CROSS- MR. RICHARDSON                    46

1  A    That's not what I'm saying.

2          MR. ABELL:  Nothing further.

3          THE COURT:  All right.  Thank you.

4          Mr. Richardson.

5          MR. RICHARDSON:  Your Honor, if I could, may I see

6  Exhibit M8, please?

7          THE COURT:  Yes, sir.

8          THE WITNESS:  I have it.

9                      CROSS-EXAMINATION

10 BY MR. RICHARDSON:

11 Q    Oh, okay.  I would like you to take a look at M8, please.

12 This is a letter that was introduced earlier.

13 A    Yes.

14 Q    And it indicates that the County Clerk's salary is set by

15 a legislative act?

16 A    Yes.

17 Q    Based upon the census of the county?  Let me withdraw

18 that.  Yes, excuse me.  The population of the county in which

19 he or she serves, and that's paragraph three, first line?

20 A    It's one of the factors.

21 Q    One of the factors.  And then the number of years of

22 experience?

23 A    That's the second factor listed, yes.

24 Q    Thank you.

25      And this is the County Clerk's maximum salary

1    authorization for 2003.  Do you see that?

2    A    Yes.

3    Q    And you'll see that Clay County has a population of

4    approximately 24,000 people?

5    A    That's what the document says, yes.

6    Q    I'm sorry?

7    A    That's what the document says, yes.

8    Q    And he's got a salary set by that?

9    A    Correct.

10   Q    I'm going to page three of that exhibit.  It talks about

11   the incentive payment, does it not?

12   A    Yes.

13   Q    And the incentive payment is for educational —— continuing

14   education for the county clerks to make them more aware and

15   better county clerks?

16   A    The incentive program is for the —— it's training for the

17   officials.  That's my knowledge of it.

18   Q    And you didn't find any contracts or any other sources of

19   income for Mr. Thompson during this period other than his

20   salary, his incentive payments, and his expenses, did you?

21   A    I was only able to document the salary, expenses, and

22   incentive payments.

23            MR. RICHARDSON:  Thank you.

24                      CROSS—EXAMINATION

25   BY MR. GILBERT:

1  Q    Mr. Sagrecy, I'm Jerry Gilbert, and I represent Bart

2  Morris.

3       In the course of your investigation, did you determine

4  when B & J Transfer, Incorporated, first obtained the contract

5  for transfer of trash from Clay County to the Laurel landfill?

6  A    It was in the '90s.

7  Q    Pardon?

8  A    It was in the 1990s.

9       MR. GILBERT:  Okay.

10       If the witness could be shown Government's Exhibit

11  M6, please.  And I'll also be requesting that he see later M7.

12  BY MR. GILBERT:

13  Q    Do you have M6 before you, Mr. Sagrecy?

14  A    I do.

15  Q    And what does that exhibit represent in the course of your

16  investigation?

17  A    The first part is a Proposal for Efficient Cost-Effective

18  Disposal of City Solid Waste from Bart Morris.  It says,

19  "Proposal to install a new transfer station in Clay County,"

20  and his proposal of the cost per yard and the savings

21  estimates.

22  Q    All right.  And that proposal is under date of September

23  the 19th, 1994, is it not?

24  A    Yes, it is.

25  Q    Okay.  And does that proposal also contain information

1  with respect to what the City was paying at that time for

2  transfer without a contract?

3  A    It's what he says they're paying.

4  Q    Okay.  Do you have any information that that information

5  is not correct?

6  A    I could not obtain records back that far.

7  Q    And, in fact, while we're talking about that, your

8  experience with the recordkeeping of the City of Manchester

9  would be that there are records missing?

10  A    There were some missing, some missing.

11  Q    It's not exemplary, their recordkeeping process; is that a

12  fair statement?

13  A    It's not bad.  They have records back from the '80s.

14  Q    And they had these back in 1994?

15  A    Yeah, that's pretty good for a lot of businesses.

16  Q    All right.  Now, M6 also contains a — Now, the proposal

17  that was made on September 19th, 1994, to the city council by

18  Bart Morris was competitive in that it made a bid against an

19  existing practice and payment by the City, did it not?

20  A    I can't say it was competitive because I did not see any

21  other bids that came in.

22  Q    Okay.  But there was, as recited in that proposal, which

23  you have no information otherwise, that the City was currently

24  paying $12.50 per pressed cubic yard for the transfer of trash

25  from Clay County to the landfill?

1   A    That's what the proposal says, yes.

2   Q    And Mr. Morris's bid proposal at that time was for less

3   than that amount; was it not?

4   A    $12 per yard with an increase of $1.25 per yard each year

5   thereafter starting in June of '95.

6   Q    All right.  And although your investigation throughout the

7   course of these contracts did not reveal any competitive bids,

8   however, the minutes of the city council meetings do indicate a

9   bid process?

10  A    In the minutes, they would say let's open bids for a job

11  or the contracts.

12  Q    Okay.  So at least there was a bidding process, just no

13  one else submitted a competing bid; is that a fair statement?

14  A    I wouldn't say it was a bidding process.

15  Q    Okay.

16  A    In order for them to accept a bid from Bart Morris, they

17  would have to make it official to say, okay, let's accept bids

18  for garbage transfer.  It doesn't mean they open it up to

19  everyone else in surrounding counties and states to bid on that

20  project.

21  Q    All right.  If you can look at M6, please?  I mean, I'm

22  sorry, M7.

23  A    Okay.

24  Q    And what would that exhibit be, Mr. Sagrecy?

25  A    This is some of the minutes from the council meetings.

1  Q    Some of the minutes, it's not all of the minutes.

2  A    Well, I said it's the minutes, I — it's hard to tell if

3  it's all the minutes, because there were some months where they

4  didn't have meetings, so there wouldn't be a document.

5  Q    And there may be some months when they had a meeting that

6  it wasn't recorded?

7  A    I don't know that.  I was never told that there was

8  meetings that weren't recorded.

9  Q    All right.  And I apologize because these minutes aren't

10 numbered in pages.

11 A    That's okay.

12 Q    But they start January the 24th, 1994, do they not?

13 A    That's the top page, yes.

14 Q    Okay.  And if you would look at March 11th, 1996.

15 A    Okay.

16 Q    And on page two of those minutes, do the minutes reflect

17 that a motion was made by Laura House and seconded by Sherrie

18 House to advertise for bids for solid waste disposal and

19 recycling services for the City of Manchester, motion carried?

20 A    Yes.

21 Q    And that would be evidence of an advertised bidding

22 process, would it not?

23 A    It would be evidence that they made the motion to

24 advertise, it's not evidence that they actually advertised it.

25 Q    Okay.  Did you investigate whether or not there were any

1 | advertisements in any publications or on an open channel during

2 | that period of time?

3 | A    I wouldn't have been there in '96 and I could not find any

4 | advertisements in periodicals or anything.

5 | Q    And the next meeting on April the 8th, 1996 —

6 | A    Yes.

7 | Q    — do you see that?

8 | A    I do.

9 | Q    And at the concluding paragraph it says — does it reflect

10 | a motion was made by John Ed Pennington and seconded by Vernon

11 | Hacker to approve the bid submitted by B & J Transfer and

12 | authorize Mayor White to sign the contract of B & J Transfer

13 | for all solid waste for purposes of transfer to the landfill?

14 | A    That's correct.

15 | Q    Motion carried?

16 | A    That's correct.

17 |         THE COURT:  I'm sorry, what was the date of that —

18 |         MR. GILBERT:  April the 8th, 1996.

19 |         THE COURT:  Thank you.

20 | BY MR. GILBERT:

21 | Q    And did you find in the records a contract that was signed

22 | by Mayor White around that same timeframe?

23 | A    Yes.  I'm sorry, I was looking for the contract.

24 | Q    It's in M6, is it not?

25 | A    Yes, it is.  It appears to be the second agreement.

JEFF SAGRECY - CROSS - MR. GILBERT                    53

1    Q    Now, I'll refer you to the minutes of October 16th, 2000.

2    A    Okay.

3    Q    On page two of those minutes, about halfway down the page,

4    Mr. Sagrecy, do the minutes reflect a motion was made by Vernon

5    Hacker, accepted by Ronnie Hacker, to approve the extension of

6    the contract with B & J Transfer?

7    A    Yes.

8    Q    Now, that does not appear to have any bid language in it,

9    does it?

10   A    Excuse me?

11   Q    It does not appear to have any bid language in it?

12   A    I don't see any.

13   Q    Okay.  And, again, that was October of 2000; is that

14   correct?

15   A    Correct.

16   Q    If I can refer you to January the -- the minutes of

17   January 21st, 2000, also in M7.

18   A    What was that date again, I'm sorry?

19   Q    January 21st, 2002.

20   A    2002?

21   Q    Yes, sir.

22   A    Oh, I'm sorry, I was in 2000.

23   Q    I'm sorry, I apologize.

24   A    That's okay.  Okay.

25   Q    And the next-to-the-last paragraph on that, do the minutes

JEFF SAGRECY - CROSS - MR. GILBERT                54

1    reflect that Bart Morris with B & J Transfer came before the

2    council and requested the rights to pick up the roll-off

3    garbage?

4    A    Correct.

5    Q    And further, that the City is to take bids on the roll-off

6    garbage?

7    A    Correct.

8    Q    Did you find any evidence of advertising for that

9    particular bid?

10   A    I didn't, no.

11   Q    Did you look?

12   A    I asked the City for their advertisements.

13   Q    February the — the next council meeting would be February

14   the 27th, 2002?

15   A    Correct.

16   Q    I believe the second paragraph of that, does it reflect

17   that the purpose of this meeting is to approve the second

18   reading of the amended garbage ordinance and to open a bid?

19   A    Correct.

20   Q    Further, that a motion was made by Vernon Hacker and

21   seconded by Ronnie Hacker to approve the second reading of the

22   amended garbage ordinance, motion carried, and a motion was

23   made by Vernon Hacker and seconded by Ronnie Hacker to approve

24   the bid submitted by B & J Transfer for roll-off garbage?

25   A    Correct.

1  Q    That would indicate a bidding process, would it not?

2  A    It would indicate a bid by B & J.

3  Q    Now, in the course of your investigation, those original

4  contracts called for payment by the cubic compressed yard, did

5  it not?

6  A    Yes.

7  Q    And in the course of your investigation, did you come to

8  learn that the State of Kentucky imposed a tipping fee at the

9  landfill based upon tonnage in 2002?

10  A    No.

11  Q    Did your investigation reveal what the City was last

12  paying B & J Transfer for the transfer of trash from Clay

13  County to Laurel County?

14  A    It should be in the contract.

15  Q    Are you aware of any contracts after 1996?

16  A    If I can have a minute to review the contracts.

17  Q    Yes.

18  A    There does appear to be a contract dated October 16th of

19  2000.

20  Q    Okay.

21  A    That would have ended on December 31st, 2008.  And that is

22  the last one in this exhibit.

23  Q    Now, your investigation would be limited to the records

24  that were had by the City Clerk?

25  A    These records actually came from the City of Manchester.

1    Q    Yes, sir.

2    A    Yes.

3    Q    Did you make an examination of any other source for the

4    location of the contracts, any other contract?

5    A    No, I asked the City for their contracts.

6    Q    And that's what they provided you pursuant to that

7    request?

8    A    Yes.

9    Q    Did you come to learn that the rate of payment changed

10   from cubic yards after the State imposed the tipping fee to

11   tonnage?

12   A    I came to learn that the rate changed, not the reason why,

13   but it did change from yard to ton.

14   Q    And do you know about the time that that happened?

15   A    I believe it's in the minutes.

16   Q    I've got it tabbed here.  It would be August the 16th,

17   2004.

18   A    There is a motion.

19   Q    Okay.  And that would be a motion made by Vernon Hacker

20   and seconded by Darnell Hipsher to pay B & J Contractors $46

21   per ton for dumping fees for the period of time left on his

22   present contract?  And the motion carried?

23   A    That's correct.

24   Q    And did your investigation reveal that after that date the

25   payment was made upon tonnage rather than compressed cubic

1  yards?

2  A    That was my understanding.

3  Q    Now, if I can refer you to Exhibit M17.

4         MR. GILBERT:  And perhaps if we could display that.

5  BY MR. GILBERT:

6  Q    That would be the total payments to B & J Transfer from

7  the City of Manchester and Clay County.  M17.  As I understand

8  it, this is the total payments to B & J Transfer from the City

9  of Manchester and Clay County, is it not?

10 A    Yes.

11 Q    All right.  And you have listed the number of years from

12 2002 through 2009, have you not?

13 A    Correct.

14 Q    And in -- if we look at the City of Manchester payments,

15 as I understand your testimony, those payments would be

16 primarily the monthly fees that are charged for the transfer of

17 trash from Clay County to the landfill?

18 A    That's my understanding, too.

19 Q    And there was one exception to that, as I understand your

20 testimony, would be in 2006, when the Pride countywide cleanup,

21 which was formerly handled by the County, was handled through

22 the City that year?

23 A    The money was paid through the City's garbage fund.

24 Q    Yes, sir.  And that was for the countywide cleanup?

25 A    For Pride, yes.

1  Q    Yes, sir.  So if we're looking at those payments in 2003,

2  and at that time the City was being charged by the cubic yard,

3  which changed over in August of 2004 to tonnage, the fees

4  charged for 2005, 2006, and 2007 remained comparably stable,

5  did they not?

6  A    There's not — there's not a large variance.  Is that the

7  question you're asking?

8  Q    Yes, sir.  And the only variance would be in 2006, which

9  contained that 24,750-dollar Pride payment, which would be

10 outside the monthly charges or would be in addition to the

11 monthly charges?

12 A    It would be in addition to.  What was the amount of that?

13 You said 24,000?

14 Q    $24,750.

15 A    Okay.

16 Q    That would be reflected on page two, 2006 payments, 22,500

17 was paid on May the 2nd of 2006 and $2,250 was paid on

18 June 5th?

19 A    That's correct.

20 Q    Now, normally Pride money for the cleanup was handled

21 through the County; is that your understanding?

22 A    I'm not — I can't say.

23         MR. GILBERT:  Just a minute, Your Honor.

24         THE COURT:  Yes, sir.

25         MR. GILBERT:  I think that's all I have.

59

```
 1              THE COURT:  All right.  Thank you.

 2              Before we continue with cross-examination, we're

 3  going to take our morning break, ladies and gentlemen.  Please

 4  keep in mind the admonitions that you have been given

 5  previously and we'll take a break until 11:00 this morning.

 6  The jury will be excused until that time.

 7          (Whereupon, the jury retired from the courtroom, after

 8  which the following proceedings were had in open court.)

 9              THE COURT:  Any matters to take up outside the

10  presence of the jury?

11          (No response.)

12              THE COURT:  We'll be in recess until 11:00.

13          (Whereupon, a short recess was had, after which the jury

14  returned to the courtroom and the following proceedings were

15  had in open court.)

16              THE COURT:  Thank you.

17              All members of the jury are present.

18              Mr. Sagrecy, you're still under oath, of course.

19              Ms. Hughes.

20              MS. HUGHES:  Thank you.

21                          CROSS-EXAMINATION

22  BY MS. HUGHES:

23  Q    Sir, my name is Elizabeth Hughes, I represent Debbie

24  Morris.

25          When you first prepared your -- You prepared the exhibits
```

1  that Mr. Smith introduced into evidence, didn't you?

2  A     Yes.

3  Q     And when you first prepared those, you prepared them with

4  the incorrect name of Mr. Morris's company, didn't you?

5  A     The name that I've been told several times, that, yes, I

6  had B & J Transport.  It's actually B & J Transfer.

7  Q     And, in fact, the indictment, have you reviewed the

8  indictment?

9  A     Yes.

10 Q     It has the wrong name, too, does it not?

11 A     It says B & J Transport.

12 Q     Could it be that the reason you did not receive all of the

13 documents relative to B & J Transfer was because you were

14 asking for documents relating to B & J Transport?

15 A     No, that's not the reason why.

16 Q     But you did make your request for B & J Transport, did you

17 not?

18 A     I did, but they understood who — it was B & J Transport

19 and Bart and Debbie Morris, they understood what documents I

20 was asking for.

21 Q     Who is this "they" that understood you?

22 A     I'm sorry, the City and County.

23 Q     Well, let me ask you this question:  Did you subpoena

24 Mr. and Mrs. Morris's personal tax returns?

25 A     Yes.

JEFF SAGRECO - CROSS - MS. HUGHES                    61

1  Q     And you did that recently, in the last ten days or so,

2  correct, two weeks?

3  A     Two or three weeks probably.

4  Q     And did you review those?

5  A     Yes, I did.

6  Q     And based on your review of that and your investigation,

7  are you aware of what Debbie Morris does for a living?

8  A     Yes, I am.

9  Q     And what is that?

10 A     She is a beautician.

11 Q     What's the name or her business?

12 A     It escapes me.

13 Q     Debi's Cutting Crew?

14 A     That's it.

15 Q     What sort of business entity is that, if you know?

16 A     A Schedule C, self-employment.

17 Q     Based on your review of their tax returns, how does Debbie

18 Morris spell her name?

19 A     Is it Debra?  I can't recall.

20       MS. HUGHES:  Your Honor, if I could ask the court

21 security officer to show him the tax returns that -- my copy of

22 the tax returns that he subpoenaed.

23       THE COURT:  All right.  Yes, ma'am.

24 BY MS. HUGHES:

25 A     Her first name?

1    Q    Yes, sir.

2    A    D-e-b-i.

3    Q    So when you put her name on schedules as D-e-b-b-i-e,

4    that's incorrect?

5    A    No, I think it's been given to me that way before, too.

6    Q    And when say "given to me," you mean by the

7    government's —

8    A    Now, through my course of the investigation.

9    Q    All right.  Where did you see her name as D-e-b-b-i-e

10   through the course of your investigation?

11   A    I'm trying to recall.  Give me a second.  Normally, when I

12   interview people, I'll ask them for spellings if I'm not sure.

13   Sometimes her name was given to me as Debra, Deb, Debbie, so in

14   my memos I may have noted it as Debbie, D-e-b-b-i-e.  Let me

15   think where else.  There may have been some minutes, some City

16   Council minutes with her name in it when she was appointed to

17   the Ethics Committee.  And I would have to review the other

18   documents like deeds and mortgages and stuff for sure.  I know

19   there were several documents.

20   Q    That showed D-e-b-b-i-e?

21   A    Well, I'm sure —

22   Q    Documents that were not prepared by the government?

23   A    Excuse me?

24   Q    Documents that were not prepared by the prosecution in

25   this case?

JEFF SAGRECO - CROSS - MS. HUGHES                63

1    A    Yes.  Again, I would have to review those documents to

2    see.

3    Q    But sitting here today, you can't name what they are other

4    than what you've just speculated about?

5    A    Again, in my interviews, I generally ask about name

6    spellings.

7    Q    But you have reviewed those tax returns, have you not,

8    before today?

9    A    I have.  I have.

10   Q    Sir, what experience and training do you have with

11   municipal operations in cities of less than 2,000?

12   A    Just my investigative experience.

13   Q    Just your what?

14   A    My investigative experience.

15   Q    So nothing specific to municipal corporations of that size

16   and their own bidding processes?

17   A    If you're talking about in my training as an agent, no.

18   Q    And in your experience other than this case?

19   A    My experience is that bidding processes are open.

20   Q    Right, but I'm asking you if you have any experience other

21   than this case?

22   A    Yes, I do.

23   Q    All right.  What city?

24   A    That's ongoing investigations, I may need the direction --

25            MR. SMITH:  Your Honor, I'll object, as the witness

1  has indicated ongoing investigations and I believe that would

2  be not relevant to disclose in this matter.

3           MS. HUGHES:  All right.  I understand.  If I could

4  just —

5  BY MS. HUGHES:

6  Q    So there would be one ongoing investigation in which

7  you've involved of a municipality of less than 2,000 people?

8  A    No, there's — the investigation is involving activity in

9  several cities.  And they're mostly small Kentucky towns.

10 Q    Several, do you mean two, four?

11 A    Two or three.

12 Q    All right.  And those are ongoing currently?

13 A    Yes.

14 Q    Are they more recent investigations than this

15 investigation?

16 A    One is not and the other ones would be.

17 Q    All right.  But none of those have arrived at a court

18 proceeding?

19 A    One is preparing for trial.

20 Q    Well, is there a court proceeding?  I mean, I want to

21 respect confidentiality of ongoing investigations, but if it's

22 public record —

23 A    It is not public record.

24 Q    All right.  Are you familiar, for example, with the

25 prevailing wage law that affects governments and how they bid

1  on price contracts?

2  A    No.

3  Q    No?

4  A    No.

5  Q    I noticed in your chart, and we don't need to put it back

6  up again, that you went all the way through 2009 with respect

7  to your calculations on B & J Transfer; is that correct?

8  A    That's correct.

9  Q    But you will acknowledge, will you not, that the

10  conspiracy charged in the indictment ends on July the 17th,

11  2007; correct?

12  A    That's per the indictment, but those wages through 2009

13  are still fruits of the crime.

14  Q    You will acknowledge, will you not, that B & J Transfer

15  generates income from other sources besides the City and

16  County, City of Manchester and the county of Clay?

17  A    As part of my investigation, the only sources of income I

18  was able to document was from Manchester and Clay County.

19  Q    Well, I — What did you do in the course of your

20  investigation to determine whether or not B & J Transfer had no

21  other sources of income?

22  A    I did not investigate the full business of B & J Transfer.

23  Q    So —

24  A    My investigation was to locate the fruits of the crimes

25  that were committed.  The contracts and those monies paid out

1    were directly related to the criminal offenses.  That's what I

2    was trying to document.

3    Q    All right.  And I'm asking you did you investigate whether

4    these contracts that you say are improper with the City and

5    County, are those the only sources of income for B & J

6    Transfer, sir?

7    A    There may be more.  Those are the only ones that I was

8    concerned with documenting.

9    Q    So you do not know what percentage of B & J's business

10   these contracts are, do you?

11   A    No.

12   Q    And, in fact, those amounts that you put up on the screen,

13   those are gross amounts, correct, you have not tried to

14   calculate what the expenses are for B & J Transfer?

15           MR. SMITH:  Your Honor, I'm going to object as to

16   relevance.  It's not a matter in issue in this case.

17           THE COURT:  Sustained.

18   BY MS. HUGHES:

19   Q    Now, are you aware, sir, that there are two Pride funds in

20   Kentucky?

21   A    No.

22   Q    So the only Pride fund that you are aware of is the Pride

23   fund that disburses federal funds?

24   A    The Pride fund actually comes to a state -- if it's

25   federal money, to a state Pride program.  They then do the

1  reimbursements.

2  Q    Where do the — you are aware, are you not, that there is

3  a law that requires a tipping fee per ton of garbage?

4  A    I'm not aware of that.

5  Q    So you would not be aware of where those tipping — what

6  fund those tipping fees get paid into and how that money gets

7  paid out?

8  A    I'm not sure I understand your question.

9  Q    You're not aware of two separate Pride funds?

10 A    I'm only aware of one.

11 Q    Now, on M15 you have written down —

12        MS. HUGHES:  I guess I should put this up there.  Do

13 you mind?  Your Honor, may I have permission?

14        THE COURT:  Yes, ma'am.

15 BY MS. HUGHES:

16 Q    Now, next to B & J Transfer you have written out

17 William B. and Debbie, b-b-i-e, Morris; correct?

18 A    Uh-huh.  Correct.

19 Q    Now, I also heard you testify, however, that the owner of

20 B & J Transfer is William Bart Morris; correct?

21 A    On paper he's the owner.

22 Q    All right.  So on this paper, however, you have them both

23 as the owners.  Is that because Debbie Morris is married to

24 Bart Morris?

25 A    She also participated in the criminal activity.

1  Q    Do you have any information that she participated in the

2  business activities of B & J Transfer?

3  A    Yes.  Yes, I do.

4  Q    And what evidence is that?

5  A    I was told that she does some of the bookkeeping and that

6  B & J does some of their own payables.

7  Q    So she signed some checks?

8  A    That would be participation.

9  Q    Is that what you have?  Is that what you know?

10 A    She also -- her involvement in the bribery and extortion

11 was to help solidify these contracts.

12 Q    Who told you about her involvement in the bookkeeping and

13 the payroll?

14 A    Her accountant, her return preparer.

15 Q    Her what?

16 A    Her return preparer, tax return preparer.

17 Q    Who is that?

18 A    I think her name is Donna Gray.

19 Q    Do you know whether Bart and Debbie Morris were married in

20 2002 when your underlying chart begins?

21 A    I believe they were married in 2003.

22 Q    When you testify that the contracts that B & J Transfer

23 got were a direct result of the bribery and extortion, are you

24 telling this jury that the -- that B & J Transfer would not

25 have gotten those contracts but for the bribery and extortion?

1  A    I don't know if we'll ever know.  Because of the acts they

2  committed, they got the contracts.  If it was an open, fair

3  bidding process, who knows.

4  Q    Well, let me ask you about that open, fair bidding

5  process.  Who is the City of Manchester using now?

6  A    I'm not sure.  I know they changed, but I'm not sure.

7  Q    Have you — have you spoken with Mayor Lewis to determine

8  who the City is using now to haul their garbage?

9  A    Our conversation did not specifically — she did not

10  specifically state who was hauling the garbage.

11  Q    Well, let me ask you this question:  What is your

12  understanding of what B & J Transfer does exactly?

13  A    They transfer the solid waste.

14  Q    At a transfer station; correct?

15  A    Uh-huh.

16  Q    Yes?

17  A    Yes.  I'm sorry.

18  Q    And that is a — it's a facility, is it not, where City or

19  County garbage trucks come to deposit the waste; right?

20  A    That's correct.

21  Q    Have you been to the transfer station?

22  A    I have been by there.

23  Q    Did you — were you able to see the operation or you just

24  drove by on the road?

25  A    I drove by on the road.

1   Q    So you really couldn't see anything, could you?

2   A    There was no activity going on when I went by there.  And

3   I have been by there several times.

4   Q    You're not asserting that B & J Transfer picks up the

5   garbage from the different homes; right?

6   A    No.

7   Q    That's something that the City does for its own residents

8   and continues to do for its own residents; correct?

9   A    Yes.

10  Q    And, likewise, the County would be in charge of picking up

11  the garbage and delivering it to the transfer station; correct?

12  A    I believe so.

13  Q    All right.  So what we're talking about is a service of

14  taking the garbage from a center point at some location, here

15  the transfer station, and taking that to a dump; correct?

16  A    I believe so.

17  Q    And you're not aware of who the City is using for that

18  now?

19  A    I do not know the name of the company.

20  Q    Would it surprise you to learn that the City is, in fact,

21  taking its own garbage and is not using another company?

22  A    It wouldn't surprise me at all.

23  Q    Would it not surprise you because there is no other

24  company in the area that provides that service?

25  A    No, I know the reason why they changed is because the

JEFF SAGRECO - CROSS - MS. HUGHES                71

```
 1   cost, it's a lot cheaper to do it —— it was a lot cheaper to
 2   change than to stay with B & J.
 3   Q    And in making that determination, you're relying on what
 4   the City has told you; correct?
 5   A    That's correct.
 6   Q    All right.  You have no made no independent analysis of
 7   how much wear and tear on the trucks is incurred when you
 8   transfer garbage from Manchester to London, have you?
 9   A    No.
10   Q    All right.  So could you tell me what other companies in
11   this area perform the same service that B & J Transfer
12   performs?
13   A    I can't.
14   Q    Did you investigate that in any way?
15   A    It wasn't required.
16   Q    By whom?
17   A    My job was to document the monies that B & J Transfer
18   received, and that's what I did.
19   Q    Would it affect your determination if there was no one
20   else in the community who could provide those services?
21           MR. SMITH:  Your Honor, I'm going to object.  The
22   question has been asked and answered.
23           THE COURT:  I'll allow him to answer whether it would
24   affect his determinations of the opinions he's rendered.
25           THE WITNESS:  No, it would not.
```

1  BY MS. HUGHES:

2  Q    And, of course, you haven't done any investigation of the

3  quality of work of B & J?

4  A    No.

5  Q    And you're not claiming that the work was not performed?

6  A    No.

7         MS. HUGHES:  That's all I have.  Thank you.

8         THE COURT:  All right.  Thank you.

9         Let's see, Mr. Simons.

10        MR. SIMONS:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12 BY MR. SIMONS:

13 Q    Agent Sagrecy, I'm Dan Simons, I think we have met before.

14 I represent Stanley Bowling, who is the owner of B&B

15 Excavating, Inc.; okay?

16 A    Yes, sir.

17 Q    I have a few questions for you, I'll try not to duplicate

18 my colleagues' efforts.

19        Your investigation has caused you to look into the

20 contracts that B&B had with the City and County — City of

21 Manchester and County of Clay?

22 A    My investigation, more specifically, was to document the

23 payments, the monies received.

24 Q    Okay.  Did you subpoena the records from the -- or did the

25 government subpoena the records from the City Clerk's Office in

JEFF SAGREC - CROSS - MR. SIMONS                          73

1   Manchester, which included the contracts that were awarded to

2   B&B Excavating?

3   A    We did get the contracts.

4   Q    Okay.  And did you examine those contracts with respect to

5   all eight jobs that were done by my client, B&B Excavating?

6   A    Again, I went -- I went through the file.  My job was to

7   document the payments for jobs.

8   Q    Are you saying that the only thing you were directed to

9   look for by the United States Attorney's Office was payments

10  made to my client?

11          MR. SMITH:  Your Honor, I'm going to object.  That's

12  not his testimony.

13          THE COURT:  All right.  I think he's explained what

14  he's done, but if you need further clarification, you can ask

15  him again.

16          MR. SIMONS:  Thank you, Your Honor.

17  BY MR. SIMONS:

18  Q    Was it your understanding that your mission was to

19  determine what payments were made to B&B Excavating by the two

20  entities I've mentioned, the City and the County?

21  A    Those were the two that I identified.

22  Q    Okay.  And is that the full job that you felt you had

23  before you?

24  A    Yes, to document the payments, the money that they

25  received.

1   Q    Okay.  You made no effort to determine whether my client

2   did good work or not?

3   A    It wasn't required.

4   Q    So I understood you to say that the contracts that were

5   awarded by the City was because he was the benefactor of some

6   bad activity?

7   A    Extortion and bribery.

8   Q    Okay.  So you didn't look to see if he might have gotten

9   that work because he did high-quality work?

10  A    Mr. Bowling worked for the City and upon retiring became a

11  magistrate and started his business in getting City contracts

12  right away.  I think it would have been hard to establish

13  himself as a quality construction company in such a short

14  period of time.

15  Q    When did he retire from the City, Agent Sagrecy?

16  A    2000.

17  Q    And when did he first do City work?

18  A    The first contracts I could get my hands on were around

19  2002, or first payments I could get my hands on were 2002.

20  Q    And what job was that?

21  A    The job he had at the City?

22  Q    Yes, sir.

23  A    Like a city manager or supervisor, I believe.

24  Q    No, no, no.

25  A    I'm sorry.

JEFF SAGRECO CROSS - MR. SIMONS                    75

1  Q    I'm saying what contract did he get in 2002 with the City

2  that you've seen?

3  A    I can't recall.

4  Q    Is it included on the exhibits that you have prepared?

5  A    Well, let's see.  It was -- 2003 was the first thing, it's

6  a County.

7  Q    That's from the County?

8  A    Yeah.

9  Q    I want to know the City contracts where he did almost

10 100 percent of his work, I want to know --

11 A    That began in 2004.

12 Q    It was in 2004?

13 A    Yes.

14 Q    So do you know when he started B&B Excavating as a

15 company, sir?

16 A    I can't recall off the top of my head, no.

17 Q    Well, did your investigation look into that?

18 A    Yes.

19 Q    Do you know that it was an established company by the year

20 2000 when he retired from City employment?

21 A    I don't recall that.

22 Q    Did you look into the quality of the work that he did as

23 city supervisor when he was in charge of sewers and water lines

24 with the City?

25 A    No, I did not.

JEFF SAGREC - CROSS - MR. SIMONS                    76

1  Q    No investigation into any of those matters?

2  A    Not required.

3  Q    Okay.  And then for four years he developed his company

4  and then he got a City contract; correct?

5  A    I'm not sure if he got City contracts before '04, it's

6  possible.  The first records I got were '04 only.

7  Q    Are you telling these ladies and gentlemen of this jury

8  that he didn't have sufficient time when he started his company

9  well before 2000 and had four years to develop it, that he

10 didn't have time to do quality work by 2004 when he bid City

11 contracts?

12 A    No, what I'm saying is, I think your question was did I

13 investigate whether he did quality work.

14 Q    And you said no.

15 A    And I didn't.  And then my reply, I think, was -- at the

16 time I said 2002, it was 2004 when he got the City contract, is

17 that you had to develop that business, it's not just an

18 overnight --

19 Q    But you don't know when he started the business; correct?

20 A    (Witness shakes head negatively.)

21 Q    And we've established that he at least had four years to

22 develop it before he did a City contract; isn't that fair?

23 A    The first contract that was documented.  There may have

24 been some before then that the City didn't maintain the file

25 for.

JEFF SAGREC - CROSS - MR. SIMONS                    77

```
 1   Q    Okay.  Well, let's talk about this:  Did you look into the
 2   eight contracts that my client did with respect to whether they
 3   were bid or not?
 4   A    Yes.
 5   Q    Okay.  Were they bid?
 6   A    I don't recall seeing any other bids other than
 7   Mr. Bowling's.  Mr. Bowling's were bid, yes.
 8   Q    They were bid?
 9   A    By Mr. Bowling's company.
10   Q    Okay.  So Mr. Bowling bid the contract, and you don't know
11   whether anybody bid against him or not?
12   A    There were no opposing bids in the files.  And the City,
13   my investigation showed there were no other opposing bids.
14   Q    Well, did your investigation also show that other people
15   were awarded contracts that they bid on in the City during this
16   same timeframe, in 2004 to 2006?
17   A    There may have been a couple of contracts.
18   Q    There were other?
19   A    I recall it in our investigation, but I don't have those
20   records.
21   Q    You were the person looking into the awarding of City
22   contracts between 2004 and 2006 with respect to sewer work and
23   water work, were you not?
24   A    No, I was looking into the payments made to Stanley
25   Bowling and B&B Excavating.
```

1  Q    So that's the extent of your job as you see it; correct?

2  A    To document the financial transactions.

3  Q    And you're not in a position to advise the jury really

4  with respect to bidding or advertising for bids or whatnot, are

5  you?

6  A    I can — I can comment on what my investigation showed.

7  Q    Okay.  And it showed that the contracts Stanley bid and

8  was awarded, he was the only bidder; is that your testimony?

9  A    Yes.

10  Q    All right.  Now, I want to shift gears for a second and

11  talk about the County; okay?  You had two columns on your

12  chart, one was for City contracts and — Is that M17, please,

13  Mr. Sagrecy?

14  A    One second.  I think his was M16.

15  Q    M16?

16          MR. SIMONS:  If I could get that —

17          THE WITNESS:  M16.

18          MR. SIMONS:  — displayed.  If we could do that.

19          THE COURT:  If you can give Mr. Simons the exhibit.

20  BY MR. SIMONS:

21  Q    All right.  Agent Sagrecy, in looking at M16, the column

22  on the left displays the City contracts which I've been

23  discussing —

24  A    Correct.

25  Q    — is that right?

JEFF SAGRECO - CROSS - MR. SIMONS                    79

1    A    Correct.

2    Q    And that's just the grand total that was paid to B&B for

3    whatever work they did for the City, grand total?

4    A    Of the payments that were documented.

5    Q    I understand, sir.  I understand.

6    A    Okay.

7    Q    Now, the second column is the County; correct?

8    A    Correct.

9    Q    Now, in 2002 — Do you know Mr. Bowling was a magistrate,

10   a county magistrate; correct?

11   A    Yes.

12   Q    Do you know what district, magisterial district, that he

13   was from?

14   A    Two?

15   Q    I'm sorry?

16   A    Was it two?

17   Q    It was.  Thank you.  Do you know how many precincts that

18   there are that vote in that district?

19   A    I can't recall.

20   Q    Okay.  You don't know the number.  Do you know the names

21   of the precincts?

22        MR. SMITH:  Your Honor, I'm going to object, to the

23   relevance and it's outside the scope of the direct.

24        THE COURT:  You'll have to explain the relevance, if

25   you want to come up and do that.

JEFF SAGRECO - CROSS - MR. SIMONS                    80

1          MR. SIMONS:  That's okay.

2          THE COURT:  All right.  I'll sustain the objection.

3  BY MR. SIMONS:

4  Q    The payments that you've listed in 2004, 2005, and 2006

5  from the County, okay, do you know what they represent?

6  A    Payments, I'm sorry, for the County?

7  Q    Yes, sir.

8  A    A bulldozer.  I believe a piece of equipment.

9  Q    A piece of earth moving equipment; is that fair?

10  A    Yes.

11  Q    And does that represent the gross amount that was paid to

12  B&B for that piece of equipment?

13  A    Again, I never received an actual document or contract or

14  a sale receipt.  This was -- in my investigation, I was told

15  40,000.

16  Q    Okay.

17  A    And that would equal $40,000.

18  Q    All right.  And who provided that information to you?

19  A    The Clay County Fiscal Court.

20  Q    Okay.  And Mr. Bowling was a member of that court at that

21  time?

22  A    He was a magistrate.

23  Q    Okay.  Did you look at the Fiscal Court minutes of the

24  Fiscal Court meetings to see whether that was voted on by the

25  court or not?

1   A    I did not get those minutes.

2   Q    You didn't?  Did you ask for them?

3   A    I believe I did.  I asked for pretty much all records.

4   When I went into the offices I would ask for anything I could

5   get my hands on related to this transaction.

6   Q    Okay.  And you didn't find anything?

7   A    Well, I wasn't given them.  It doesn't mean I didn't find

8   them, I didn't go through — I did not physically go into their

9   record files and search.  This is — they presented the records

10  to me as, "Here's our records."

11  Q    Did you speak with anyone about this particular

12  transaction?

13  A    None other than the individual that gave me the printout

14  of the payments.

15  Q    Who was that?

16  A    I believe it was Debra Parks.

17  Q    Okay.  And she's testified in this case?

18  A    Correct.

19  Q    All right.  Did you — do you know when the payments began

20  and what — at what intervals they were made, and do you know

21  anything about the transaction itself?

22  A    You mean how — Yes.

23  Q    Okay.

24  A    You want me to review the records?

25  Q    Sure.

1  A    And actually, M — this is M16.  If you can flip to the

2  third page of M16, it will show the list of each payment and

3  when it was made.  You may want to double-check to make sure

4  the third page is the Clay County Fiscal Court evidence.

5  Q    I'll let this do for now and then I'll move it.  Obviously

6  I'm not too gifted with the Elmo.

7       It looks like payments started, to me, around November of

8  2004 and they're done on a monthly basis in the amounts of

9  $2,000 per month?

10 A    Correct.

11 Q    And it appears to me that that's the continuing — that

12 continues until the sum of $40,000 is paid.  Would you agree

13 with my characterization?

14 A    Yes.

15 Q    Okay.  You said this was a piece of equipment.  Do you

16 know what piece of equipment?

17 A    Not exactly.  Again, I didn't get a record.

18 Q    Do you know — you said a bulldozer?

19 A    That's what I recall.

20 Q    You're not sure about that at all, are you?

21 A    That's what I recall it being, a bulldozer.

22 Q    Do you know what attachment came with the piece of

23 equipment?

24 A    No.

25 Q    Do you know the make, model, or year of the equipment?

JEFF SAGRECO - CROSS - MR. SIMONS                83

1    A    No.

2           MR. SMITH:  Your Honor, I think that the witness has

3    answered the question and now he's seeking to argue the case.

4    BY MR. SIMONS:

5    Q    Did you —

6           THE COURT:  Sustained.

7           MR. SIMONS:  Yes, sir.  I'm moving on, Your Honor.

8           THE COURT:  All right.

9    BY MR. SIMONS:

10   Q    Did you speak with the county judge or any member of the

11   County about the need for the equipment by the County?

12   A    No.

13   Q    Okay.  Do you know whether the County still uses the

14   equipment or not?

15   A    I do not.

16          MR. SIMONS:  Your Honor, if I could have the court

17   security officer return this.

18          THE COURT:  Yes, sir.

19          MR. SIMONS:  I'll let someone else put that back in

20   there.

21   BY MR. SIMONS:

22   Q    Now, you also talked about my client's salary as a

23   magistrate; correct?

24   A    That's correct.

25   Q    Was he paid the same money as every other magistrate in

JEFF SAGRECY - CROSS - MR. SIMONS                84

1  Clay County?

2  A    I did not review the salaries of other magistrates.

3  Q    Do you know who sets the salaries?

4  A    No.

5  Q    The scope of your investigation with respect to B&B

6  Excavating was what gross sums did they realize and with

7  respect to Stanley Bowling, was what was his gross salary

8  during the years that you looked into it?

9  A    That's correct.

10 Q    Would you agree with me that Stanley Bowling, when he ran

11 for office, was elected to a County position?

12 A    Magistrate position.

13 Q    And that by far and away, the greatest money that he was

14 awarded by contracts was with the City?

15 A    Yes, that were documented.

16        MR. SIMONS:  That's all.  Thank you.

17        THE COURT:  All right.  Let's see if there's any

18 redirect of the witness.

19        Mr. Smith?

20        MR. SMITH:  Yes, Your Honor.  May I proceed?

21        THE COURT:  Yes, sir, you may.

22        MR. SMITH:  Thank you.

23                    REDIRECT EXAMINATION

24 BY MR. SMITH:

25 Q    Agent Sagrecy, you've been asked several ways and several

JEFF SAGRECY - REDIRECT - MR. SMITH                85

1   times about these salaries and contracts themselves, and I

2   guess if you could clarify for us whether the salaries

3   themselves and the way in which they were paid to these elected

4   officials, in your opinion, were they illegal?

5   A    No.  The way the salaries were set and the actual -- I

6   guess the actual salary is not illegal.  It's the means that

7   were used in criminal offenses that were committed to obtain

8   that salary.

9   Q    All right.

10  A    The salaries are just fruits of the crime.

11  Q    And the contracts, could you explain those?

12  A    That's the same.  Again, my job was to document the

13  payments made on contracts as in relation to the manner in

14  which they were obtained.

15  Q    So but for this illegal scheme to pool money to elect

16  officials, there could not have been these salaries and

17  contracts awarded to these individuals?

18  A    Correct.

19  Q    Now, as you have further been asked about the bidding,

20  particularly as it pertains to these two companies, B & J and

21  B&B, let's talk about B&B.  You were asked whether or not they

22  had actually bid in your investigation and whether it revealed

23  a bidding process.  Do you recall those questions?

24  A    Yes.

25  Q    Did your investigation reveal that many of the contracts

1    that B&B were engaged in were not bid?

2    A    Yes, there was some emergency instances where contracts

3    were just awarded.  I remember that.

4    Q    And in order for B&B to secure these contracts, in your

5    investigation, did you find that they paid money under the

6    table?

7    A    Yes.

8    Q    As in the form of kickbacks?

9    A    Yes.

10   Q    Why was the performance of those contracts not

11   particularly of interest to you to determine whether or not the

12   specifications of certain engineers were met by the B&B

13   performance?

14   A    Again, my focus was to document the amount of money that

15   B&B Excavating received in relation to the activity of the

16   extortion and bribery in the elections.  Whether or not it was

17   an actual job performed wasn't the focus, it was that he did

18   receive money and how much was received.

19   Q    As it pertains to B & J Transport, why was it not

20   important for you to determine how much of a percentage of

21   their total business was City business?

22   A    The same reason.  Again, my job was to document the

23   payments they received that would have been derived from the

24   extortion and bribery acts.

25   Q    Now, you were asked about the obtaining of these records.

 1  Did the City and County, were they subpoenaed to produce these

 2  records?

 3  A    Yes.

 4  Q    And in instances, for instance, where there was a

 5  misspelling of someone's name that's been called to everyone's

 6  attention here, did you follow-up with phone calls to these

 7  recipients of subpoenas to make sure there was no confusion?

 8  A    Whenever I picked the records up, I — usually when I —

 9  when I call — a couple of ways this would happen.  If I called

10  and talked to the individual on the phone and let them know

11  what I was looking for, and it was clear in the conversation

12  and plus the subpoena would say it, and whenever I would pick

13  the records up I would say, is this all that you have, for

14  example, for Debbie and Bart Morris and B & J.

15  Q    Now, you were asked about the financial gains of Charles

16  Wayne Jones and how those were documented.  Do you recall those

17  questions?

18  A    Yes.

19  Q    And I would ask you, in your investigation, did you learn

20  that in certain instances members of the enterprise actually

21  acted for the benefit of another family member to get them a

22  salary or a benefit?

23  A    Yes.

24  Q    And in the case of Charles Wayne Jones, was he closely

25  related to one of the co-defendants in this case?

1    A    He's the father-in-law of Freddy Thompson.

2    Q    And how much was the average salary that Freddy Thompson

3    realized as being a member of this enterprise?

4    A    The period that's about seven-and-a-half years -- or I'm

5    sorry, six-and-a-half years on the Exhibit M15, so if we say

6    seven years, and Freddy Thompson realized almost $500,000, so

7    you're looking at over $70,000 average per year.

8    Q    Now, in the course of your investigation, did you find

9    that members, while oftentimes prevented by law, by nepotism

10   laws, from hiring their child or close family member, exchanged

11   favors and had other members of the enterprise do that for them

12   and employ them in their offices?

13           MR. RICHARDSON:  Objection, Your Honor, outside the

14   scope of direct or cross.

15           THE COURT:  No, overruled.  It's relevant.

16           THE WITNESS:  I'm sorry, could you repeat that again?

17   BY MR. SMITH:

18   Q    You were asked about the monetary benefits of being a part

19   of the enterprise, and you enumerated that there were ways in

20   which family members benefited financially.  And my question

21   was, in your investigation, did you find that members of the

22   enterprise often exchanged favors and employed family members

23   who would otherwise be prohibited by nepotism?

24   A    Yes.

25   Q    And is that a benefit that you did not seek to calculate?

1  In the total amount of $4 million that was realized, you didn't

2  seek to calculate those figures in your analysis?

3  A    I did not.

4  Q    Now, you were asked about the contracts of the

5  Superintendent of Schools, and you were pointed that his first

6  contract was in 1999 before, I believe, the alleged enterprise

7  has been indicted for, periods of 2002 to 2007.  In your

8  investigation, are you aware that the formation of this

9  enterprise actually occurred in years prior to 2002?

10  A    Yes.

11  Q    And in your investigation, did it reveal to you that Doug

12  Adams was intimately a part of this enterprise before he got

13  his contract in 1999?

14  A    Yes.

15  Q    And could you describe an example generally?

16  A    He was an election officer, it was in the '80s, and was

17  buying votes at the precincts even as early as the 1980s.

18          MR. WESTBERRY:  Objection.

19          THE COURT:  Overruled.

20  BY MR. SMITH:

21  Q    Now, you've been asked about the contracts of the

22  Superintendent.  Those, I believe you stated, were approved by

23  the School Board.

24  A    Yes.

25  Q    And to your knowledge and in your investigation, did you

 1  determine that the School Board is an elected body in Clay

 2  County?

 3  A    It is.

 4  Q    And did you seek in your investigation to find out whether

 5  Doug Adams was active in seeking the re-election of members of

 6  that body?

 7  A    Yes.

 8  Q    As part of his activities with the enterprise, did you

 9  also find that he was involved in utilizing this same

10  enterprise to get these Board members elected?

11  A    Yes.

12  Q    Now, you were asked about whether or not he had the

13  unilateral authority to hire people in positions in the School

14  Board.  Do you remember those questions?

15  A    I do.

16  Q    And I believe your answer was --

17         MR. WESTBERRY:  Objection.  I don't believe I used

18  the word "unilateral."  I have an objection to that.

19         THE COURT:  I think it's a fair summary of the

20  question that was asked.  So I'll allow him to ask it.

21  BY MR. SMITH:

22  Q    What did you learn in your investigation that established

23  that he was acting unilaterally in hiring in certain positions?

24  A    Well, I was told that, for example, with the school bus --

25         MR. WESTBERRY:  Objection, hearsay.

1          THE COURT:  You'll need to identify the source of the

2    information.

3          THE WITNESS:  I interviewed the superintendent,

4    current superintendent, which was Reecia Samples and Reecia

5    told me that —

6          THE COURT:  All right.  I'm going to sustain the

7    objection to that question.  It would call for hearsay.

8    BY MR. SMITH:

9    Q    During the time period that you say you investigated this

10   enterprise for purposes of coming to your conclusions on the

11   money laundering counts, did you also determine that members of

12   the enterprise were being pressured by Superintendent Adams in

13   their position that they held with the School Board?

14   A    Yes.

15   Q    Can you give us an example of that, sir?

16   A    In the investigation with an individual named Jeffrey

17   Deaton.  It was a school employee named Jeffrey Deaton.

18   Q    Any others?

19   A    I can't recall.

20   Q    Do you recall Vernon Hacker being employed as a bus

21   driver?

22   A    I do, yes.

23   Q    And do you recall any instances where he was — pressure

24   was exerted against him —

25   A    Yes.

1  Q     -- upon him by Doug Adams?

2  A     Yes.

3  Q     Now, you were also asked about Cletus Maricle, I believe,

4  and the question was whether or not he was unopposed in 2006?

5  A     Correct.

6  Q     And how, in the course of your investigation, does a

7  person have no opposition in these races in Clay County as late

8  as 2006?

9  A     How does he not have any opposition?

10        MR. PINALES:  Objection, Your Honor.  I'm not sure I

11  understand the question.

12        THE COURT:  All right.  Do you understand the

13  question?

14        THE WITNESS:  Could you please ask it again?

15        THE COURT:  I'll allow Mr. Smith to rephrase the

16  question.

17  BY MR. SMITH:

18  Q     I'll ask it again because I managed to confuse two people.

19  My question is, do you recall being asked by Cletus Maricle

20  through his attorney about the fact that Cletus Maricle was

21  unopposed as a candidate in 2006?

22  A     Yes.

23  Q     Do you recall that?

24  A     Yes.

25  Q     Do you, in your investigation, have an explanation as to

JEFF SAGRECY - REDIRECT - MR. SMITH                    93

 1  how a man who's holding public office is unopposed in the

 2  position that Cletus Maricle held in 2006?

 3          MR. PINALES:  Objection, Your Honor.

 4          THE COURT:  Overruled.

 5          THE WITNESS:  Yes, Mr. Maricle was at the top of

 6  the — of the criminal enterprise, you know, of the individuals

 7  running the elections, putting people — saying who was going

 8  to be election officers, and, you know, he's at the top, nobody

 9  wants to run against him.

10  BY MR. SMITH:

11  Q    The fact that he did not have opposition, did that cut

12  against your ability to include him as a benefactor in a salary

13  that he was receiving?

14  A    No.

15  Q    Can you explain that?

16  A    Again, Mr. Maricle was making decisions on who election

17  officers would be, and also Mr. Maricle was hoping to get his

18  son-in-law elected.  He was very active in the scheme.

19  Q    And you didn't include in your analysis Phillip Mobley's

20  salary that he got for PVA?

21  A    No, I did not.

22  Q    I would like to direct your attention now to questions

23  that were asked of you regarding, I believe, the process that

24  B & J Transport engaged in during the time in which they were a

25  recipient of these contracts.  Do you remember those questions?

1  A    Yes.

2  Q    Now, I believe you were first directed to look at —

3            MR. SMITH:  If the Court would allow the projector?

4            THE COURT:  Yes, sir.

5  BY MR. SMITH:

6  Q    I believe that we have —

7            MS. HUGHES:  Excuse me, I object —

8            THE COURT:  Wait just a second.  We've got an

9  objection.  I'm not sure what it is.

10            MS. HUGHES:  Are you using the originals?  Are these

11  your markings or are these on the originals?  I object to

12  displaying to the jury a document that has markings that are

13  not on the original.

14            THE COURT:  All right.  Mr. Smith, we'll retrieve the

15  original that you're — What exhibit number is that?

16            MR. SMITH:  I was trying to speed things up.

17            THE COURT:  What was the exhibit number?

18            THE WITNESS:  M7.

19            THE COURT:  If you could return M7 to Mr. Smith.

20            MR. SMITH:  M7, yes.

21            THE COURT:  Yes, sir.

22            MR. SMITH:  It will take a few moments for me to

23  locate that, I apologize.

24            THE COURT:  That will be fine.

25            Mr. Smith, if you like, we can go ahead and take our

1   lunch break at this point.  It's a few minutes before noon, but

2   we can take a break now if you'd like to do that.

3            MR. SMITH:  I think that may speed things up if I

4   have a chance to locate those.

5            THE COURT:  All right.  That will be fine.

6            Ladies and gentlemen, we will take our lunch break at

7   this time.  We'll take an hour this afternoon.  So, please, if

8   you would be ready to go again at five minutes until 1:00.

9   Please keep in mind the admonition that you have been given

10  several times not to discuss the case among yourselves while we

11  are in recess.  The jury will be excused.

12           (Whereupon, the jury retired from the courtroom, after

13  which the following proceedings were had in open court.)

14           THE COURT:  Thank you.

15           Any matters to take up outside the presence of the

16  jury?

17      (No response.)

18           THE COURT:  We'll be in recess until 12:55.

19      (Whereupon, a recess was had for the noon hour, after

20  which the proceedings continue uninterrupted to Volume 20-B.)

21                  (Proceedings concluded at 11:55)

22

23

24            C E R T I F I C A T E

25      I, Cynthia A. Oakes, certify that the foregoing is a

1  correct transcript from the record of proceedings in the

2  above-entitled matter.

3

4  3/13/2010                    s/CYNTHIA A. OAKES
    DATE                       CYNTHIA A. OAKES, RPR, RMR, CRR

5

6

7

8

9                            I N D E X

10                                                        PAGE

11  Testimony of JEFF SAGRECY:
         Direct Examination by Mr. Smith:             4
12       Cross-Examination by Mr. Pinales:            34
         Cross-Examination by Mr. Westberry:          37
13       Cross-Examination by Mr. White:              42
         Cross-Examination by Mr. Abell:              45
14       Cross-Examination by Mr. Richardson:         46
         Cross-Examination by Mr. Gilbert:            48
15       Cross-Examination by Ms. Hughes:             59
         Cross-Examination by Mr. Sagrecy:            72
16       Redirect Examination by Mr. Smith:           85

17

18

19                        E X H I B I T S

20
    Government's                                        Page
21  Exhibit No.              Identified              Admitted

22     M15                      23                      21
       M16                       9                      10
23     M17                      14                      15

24

25