United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09-16-S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 10, 2010 |
| DOUGLAS C. ADAMS | ) 9:00 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 21-A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:    STEPHEN C. SMITH, ESQ.
                                   JASON D. PARMAN, ESQ.

On behalf of the Defendant         DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:            MARTIN S. PINALES, ESQ.

On behalf of the Defendant         R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                  KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant         T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant         ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant         RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:                R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant         JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant         ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant         DANIEL A. SIMONS, ESQ.
Stanley Bowling:

2

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                      JASON D. PARMAN, ESQ.
 3                                    Assistant U.S. Attorneys
                                      601 Meyers Baker Road
 4                                    Suite 200
                                      London, Kentucky  40741
 5

 6   On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:         107 East First Street
 7                                    Corbin, Kentucky  40701

 8                                    MARTIN S. PINALES, ESQ.
                                      150 East Fourth Street
 9                                    Federal Reserve Building
                                      Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant      R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.
12                                    220 West Main Street
                                      Suite 1900
13                                    Louisville, Kentucky  40202

14
     On behalf of the Defendant      T. SCOTT WHITE, ESQ.
15   Charles Wayne Jones:            133 West Short Street
                                      Lexington, Kentucky  40507
16

17   On behalf of the Defendant      ROBERT L. ABELL, ESQ.
     William E. Stivers:             120 North Upper Street
18                                    Lexington, Kentucky  40507

19
     On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
20   Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.
                                      300 West Short Street
21                                    Lexington, Kentucky  40507

22
     On behalf of the Defendant      JERRY W. GILBERT, ESQ.
23   William B. Morris:              212 North Second Street
                                      Richmond, Kentucky  40475
24

25
```

```
 1   On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                  201 West Short Street
 2                                      Lexington, Kentucky   40507

 3
     On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:                  116 West Main Street
                                        Suite 2A
 5                                      Richmond, Kentucky   40475

 6
     Court Reporter:                   CYNTHIA A. OAKES, CRR
 7                                      Official Court Reporter
                                        United States District Court
 8                                      560 Athens Boonesboro Road
                                        Winchester, Kentucky   40391
 9                                      (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

1          (Whereupon, the jury entered the courtroom, after which

2    the following proceedings were had in open court.)

3               THE COURT:  Thank you.  The record will reflect that

4    all members of the jury are present.  The parties and counsel

5    are also present.

6               Mr. Briggs, you're still under oath.

7               THE WITNESS:  Yes, sir.

8               THE COURT:  Mr. Pinales, are you ready to proceed?

9               MR. PINALES:  I am.  Thank you, Your Honor.

10              THE COURT:  Yes, sir.

11                           CROSS-EXAMINATION

12   BY MR. PINALES:

13   Q    Good morning.

14   A    Good morning.

15   Q    For the record, I'm Marty Pinales, and I represent Cletus

16   Maricle.

17   A    Yes, sir.

18   Q    I have some questions about some of the things we chatted

19   about yesterday with the jury.

20   A    Yes, sir.

21   Q    First, let me go back.  You are a special agent with the

22   FBI?

23   A    Yes, sir, that's correct.

24   Q    And you're assigned to the London Division?

25   A    London Resident Agency out of the Louisville Division.

1  Q    Oh, okay.

2  A    Yes, sir.

3  Q    Now, the — And how long have you been with the FBI?

4  A    Thirteen years.

5  Q    And with the special training that you've had that you've

6  discussed, you used the term "our intelligence" several times

7  yesterday during the direct questioning.

8  A    Yes, sir.

9  Q    That's information gathering?

10 A    Correct, it is.

11 Q    And that information gathering comes from many sources?

12 A    That's correct.

13 Q    And some of those sources are — pan out to be good and

14 some don't; correct?

15 A    Well, the intelligence I'm discussing has been

16 corroborated by a number of means.

17 Q    Sure.  You mentioned that — in the direct testimony when

18 you were talking about Wanda White that she was wearing a wire,

19 a tape.

20 A    Audio recording device, yes, sir.

21 Q    Right.  I'm from the old school, I still call it a tape.

22 And you mentioned one of the recordings that was done in your

23 direct testimony yesterday.  Do you recall that?

24 A    Yes, I recall mentioning conversations from the

25 recordings.

1  Q    How many recordings total were done approximately, to the

2  best of your ability?

3  A    You know, I meant to count those.  I believe there are

4  probably -- I know there's 20 to 30 tapes.

5  Q    And with those 20 to 30 tapes, how long in hours did they

6  go?

7  A    Each individual recording?

8  Q    Combined.

9  A    Combined?

10  Q    Combined, approximately.

11  A    It's difficult.  Some went 10 or 15 -- only 10 or 15

12  minutes, some went two hours.  So I'm going to say -- let's say

13  if we have 20 tapes, it may have gone 25 to 30 hours of actual

14  audio recording.

15  Q    And I believe also yesterday you talked about that this

16  enterprise had a way of putting relatives in public offices as

17  employees.  Do you remember your testimony there?

18  A    Yes, in a quid pro quo kind of favor, you scratch my back,

19  I'll scratch your back --

20  Q    And is this --

21  A    -- type of deal.

22  Q    I'm sorry.  Are you finished?

23  A    I'm finished, yes, sir.

24  Q    And specifically you mentioned Cletus Maricle's grandson,

25  Brandon.  Do you recall that?

```
 1  A    Yes, sir.

 2  Q    He was working at City Hall?

 3  A    Correct.

 4  Q    And he was actually working at City Hall as a co-op

 5  student from Clay County High School; isn't that correct?

 6  A    I don't know that, sir.

 7  Q    Your intelligence didn't show that?

 8  A    No, sir.

 9  Q    Okay.  And did you know whether he was getting credits for

10  working at City Hall, you know, school credits?

11  A    I don't know that, sir.

12  Q    Okay.  You mentioned that there was a search in this case?

13  A    Correct, three searches.

14  Q    And you mentioned that there were, I believe, four going

15  on all at the same time?

16  A    Three going on all at the same time.

17  Q    Three all going on at the same time.  And you said Cletus

18  Maricle's house; right?

19  A    Yes, correct.

20  Q    Al Man Stivers' house?

21  A    Correct.

22  Q    And the folks over there?

23  A    Correct.

24  Q    And there was a fourth going to a safety deposit box; do

25  you recall that?
```

1   A    Later —

2   Q    Later; okay.

3   A    — a safety deposit box was searched.

4   Q    So these were simultaneous, but you were still the agent

5   in charge, were you not?

6   A    I was.

7   Q    And as I understand your testimony, you had teams going to

8   the various locations?

9   A    Correct.

10  Q    And can you tell me, as best as you remember, how many

11  folks went to Mr. Maricle's house, approximately?

12  A    I think initially probably eight or so, but the other

13  teams finished up and then traveled, I think, to that location

14  to assist in the completion of Mr. Maricle's search.

15  Q    So at the most, can you give us your best estimate?

16  A    Probably 15, I guess.

17  Q    Now, also yesterday you mentioned that you had gone to the

18  house that you believed to be Cletus Maricle's?

19  A    That's correct.

20  Q    And you had gone to the house earlier and left a business

21  card?

22  A    Yes, sometime earlier, probably late '06 or sometime in

23  '07.

24  Q    And how long were you involved as the agent in charge in

25  this case in your investigation approximately?

TIMOTHY BRIGGS - CROSS - MR. PINALES                9

1  A    I was the fourth agent to have the case.  I don't recall

2  the exact date that it was assigned and transferred to me, but

3  I'm going to say it was 2006, 2007, somewhere in there when the

4  last agent that had the case was transferred out of our

5  division.

6  Q    And certainly you had the benefit of the intelligence from

7  the previous agents who had the case; correct?

8  A    Yes, sir.

9  Q    You didn't come in cold?

10  A    No, sir.

11  Q    Okay.

12  A    And I actually assisted them in their endeavors when they

13  had the case, so --

14  Q    So you've been working on it longer than you were the

15  agent in charge?

16  A    Yes, sir, we have -- we're in a small office, we only have

17  five agents currently, so we all help each other on all of our

18  cases.  There's rarely a case that's handled by an agent that

19  the rest of the office doesn't assist with, so --

20  Q    And you left a business card on the door.  Did you

21  personally do that?

22  A    Yes, I did.

23  Q    And what did the card say?

24  A    Sir, I don't recall.  I think I put a notation on the back

25  advising I needed to speak with Linsey.

1  Q    And your phone number was there?

2  A    My phone number would have been on the face of the

3  business card, yes, sir.

4  Q    But you just didn't leave a card, you wrote out why you

5  were leaving the card; correct?

6  A    It's been quite some time ago.  I believe I put a notation

7  on the back of the card, but I cannot be absolutely certain of

8  that.  I typically do, because a home will sometimes occupy

9  several people and, you know, you want to identify for the

10 parties living at the residence who, you know, you would like

11 to speak with.  That's my standard procedure.

12 Q    And your intelligence in this case led you to believe who

13 was living in that house?

14 A    Cletus Maricle.

15 Q    And who else?  You knew he was married, did you not?

16 A    Correct, yes.

17 Q    And you knew he was married and living with his wife,

18 Judy?

19 A    Correct, yes, sir.

20 Q    And you knew that Linsey was living with him?

21 A    I knew she had at times.  I wasn't -- I believed that she

22 was at the time according to what everyone told me in the

23 community, she was living with him at that time, yes, sir.

24 Q    And through your intelligence, that's why you left the

25 card on what you believed to be Cletus Maricle's house?

1   A    That's correct.

2   Q    And with your FBI intelligence, you executed that search

3   warrant on the wrong house; isn't that correct?

4   A    Correct, I made a mistake.

5   Q    Okay.  And then when you went to the house, you gathered

6   some documents, and those documents we talked about yesterday?

7   A    If you're referring to the evidence here, sir —

8   Q    Yes.

9   A    — yes, sir.  This is a sampling of the evidence or what

10  we picked out of the evidence that was retrieved.

11  Q    And I want you to look, if we can, at D59.  And if you

12  could pull that out.  Do you have that?

13  A    Yes, sir, it's a five — I believe five-page handwritten

14  notes of names; is that correct?

15  Q    And I'm not going to ask you to count them now, but

16  there's approximately 25 names on each page, is there not?

17  A    I would say roughly, yes, sir.

18  Q    Some have more and some have less?

19  A    Yes, sir.

20  Q    And from my counting, I counted a total on all five pages

21  of 118 names; does that sound correct?

22  A    Again, sir, I did not count them, so I can't —

23  Q    Okay.

24  A    I would be happy to if you would like me to, but —

25  Q    It looks like — No, let's not waste the time.

1   A    Okay.

2   Q    It looks like there's about 25 per page?

3   A    Yes, sir.

4   Q    And there are five pages?

5   A    Yes, sir.

6   Q    And when you were looking at that list, you marked — you

7   had it highlighted, oh, this person my intelligence shows this,

8   and this person my intelligence shows that.  Do you recall your

9   testimony yesterday?

10  A    Yes, sir.

11  Q    There were a lot of names not highlighted; right?

12  A    Yes, sir.  Our intelligence showed that all these

13  individuals were involved in the election fraud schemes, but I

14  cannot — I mean, it's a voluminous case going over eight

15  years, we've interviewed 250 individuals, I can't remember in

16  detail what each one of their involvements were, but I picked

17  out the names I recognized.

18  Q    Well, down on page one there's Richard Farmer.  Do you see

19  that, right about the middle?

20  A    Richard/Virginia Farmer; correct.  Yes, sir.

21  Q    And Richard and Virginia Farmer have a son, Richie Farmer,

22  a basketball player?

23  A    Yes, sir.  Well, I don't know that, sir, but —

24  Q    Okay.  What's their involvement?

25  A    Sir, I don't recall off the top of my head.

1  Q    Okay.  And if we could go to page two, there are more

2  names not highlighted than highlighted; correct?

3  A    Yes, sir.  And something I forgot to point out yesterday,

4  Anthony Combs, next to it, it has 18-20, in parentheses, votes.

5  Q    Okay.  But I'm saying —

6  A    And that's below Clifton and Joanne Johnson.  So, again,

7  our intelligence would indicate that he is, you know, involved

8  in the voter fraud scheme as well.  But I cannot recall all

9  these names off the top of my head and what their involvement

10  was.

11  Q    But you're saying each and every person on this list, from

12  your intelligence, was involved in voter activity?

13  A    In some way, shape, or form; correct.

14  Q    They may have just been voters; isn't that fair?

15  A    No, our intelligence reveals that they were involved in

16  the fraudulent scheme in some way, shape, or form.

17  Q    But you can't share what that intelligence was with this

18  jury?

19  A    Well, many of these people have been interviewed and there

20  are FD-302s, which is what we produce in the FBI to document

21  investigations, whether it be searches, arrests, interviews and

22  so forth.  If I had the ability to look at those, I could

23  probably pinpoint what their involvement was if they were

24  interviewed.  And it's possible they weren't interviewed, but

25  someone else we interviewed mentioned their name, so —

 1  Q    And so if somebody mentioned your name, you're putting

 2  them into the same column; correct?

 3  A    I'm sorry, what's the question?

 4  Q    If somebody mentioned Richard Farmer's name, I voted, saw

 5  him in line, or something like that, his name would -- that

 6  would fit into your intelligence, correct, just the mention of

 7  a person's name?

 8  A    Not the mention of the person's name being involved in the

 9  voting process as a legal means, but if they were alleged to

10  have been involved in some behavior which it furthered the

11  scheme.

12  Q    And also at the top of this page, and the top of every

13  page, it says, "From the desk of" and has a series of dots,

14  "Judy Maricle."  Do you see that?

15  A    Yes, that's the preprinted heading on the top of each

16  page, yes, sir.

17  Q    And do you know whose handwriting that is?

18  A    No, sir, I don't.

19  Q    The FBI has the ability of comparing handwriting, does it

20  not?

21  A    Yes, sir.

22  Q    You didn't bother to do that?

23  A    No, sir.

24  Q    Okay.  But it does say, "From the desk of Judy Maricle"?

25  A    Yes, sir.

1  Q    And it says that on the top of each and every page; right?

2  A    Yes, sir.

3  Q    Okay.  Now we go -- You said the name Terry Davidson was

4  on there.  He was at the top of one of the lists.

5  A    Page three appears to be potentially -- you know, I

6  couldn't, again, verify exactly, but -- based upon the

7  handwriting, it appears as though it may be Terry Davidson,

8  who's a former magistrate.

9  Q    And Terry Davidson was a defendant, was he not?

10  A    He was.

11  Q    Not involved in voter fraud, was he?  He was actually

12  convicted, was he not, of driving a truck with a changed VIN

13  number; is that correct?

14  A    He was --

15  Q    Do you know that?

16  A    I know that.  That was my case.  He was convicted

17  ultimately of the vehicle theft charge, but we do have

18  intelligence he was involved in election fraud.

19  Q    Okay.  Now, I want to go to D60, if we may.  Do you have

20  that in front of you?

21  A    Give me a moment to find it, sir.

22       Yes, sir, I have it.

23  Q    Handwritten about real estate?

24  A    Yes, sir.

25  Q    Did you check the handwriting on that?

1  A    No, sir.

2  Q    Okay.  Let me ask you a question.  We established already

3  that Judy Maricle lived at that home?

4  A    Correct.

5  Q    She was the wife of Cletus Maricle?

6  A    Yes, sir.

7  Q    Did your intelligence tell you that she was a real estate

8  broker?

9  A    Yes, sir, it did.

10 Q    Had her own business, a Re/Max agency?

11 A    She had her own business in the past, and I want to say

12 that she closed that and began working for someone else, but

13 she was a realtor.

14 Q    And at -- all of these items involve real estate, do they

15 not?

16 A    It very much appears to be the case, yes, sir.  It talks

17 about buying property --

18 Q    I'm sorry.

19 A    It talks about buying positive cash flow properties,

20 estimate maintenance costs, figure out how to bring down, and

21 gross rent multiplier and so forth, raw land timber, getting

22 copies of deeds, concentrate on older people, and it goes on

23 for a few pages.

24 Q    And they do involve the general topic on a few pages of

25 real estate, do they not?

1    A    They do.

2    Q    Then I would like you to look at D61.

3         THE COURT:  It's the Rolodex, I believe.

4         THE WITNESS:  Yes, it is.

5    BY MR. PINALES:

6    Q    D61 is a photocopy of the Rolodex.

7    A    I've got the Rolodex and I've got the photocopy, so I've

8    got either one, sir.

9    Q    Okay.  And when we flashed that on the screen the other

10   day, this was the card that came up; correct?  You saw that in

11   court?

12   A    Yes, sir.

13   Q    And Doug Adams and his phone number is there?

14   A    Yes, sir.

15   Q    And do you remember, I believe a question was asked of you

16   by the prosecutor that, "Do you see Wanda and Kennon's name in

17   here," and your response was, "Yes," and you went through the

18   numbers.

19   A    Yes, sir.

20   Q    And you went through actually two of those Rolodex cards?

21   A    You're meaning this one and the white one?

22   Q    Yes, yesterday in court?

23   A    Yes, sir.

24   Q    Okay.  Now, just an estimate, there's a lot of cards

25   there, do you have any idea of the amount?

1   A    I don't know, sir.  I have not counted the cards.

2   Q    Okay.  I want you just to reach your hand in and pick a

3   card, any card.

4   A    (Witness complies with request of counsel.)

5   Q    That's good.  What does that say?

6   A    Senator Robert Stivers, who I know lives in Manchester,

7   and he's a Kentucky State Senator.

8   Q    Okay.  Put that aside.  Pick another card.

9   A    (Witness complies with request of counsel.)

10   Q    What does that say?

11   A    Donna Montgomery.  And at the bottom it says, "Jim's

12   office," and Donna Montgomery is typed out and then Jim's

13   office is handwritten in there.

14   Q    Okay.  Do you have any indication about a Donna

15   Montgomery?

16   A    No, sir, not that I can recall.

17   Q    And if you just go through the A's after we flip through

18   that one, the next, on the preprint, says an ambulance, and

19   that's listed under the A's, right, with a phone number?

20   A    It's got ambulance — the next page, yes, ambulance,

21   Martha Adams in the upper left, upper right is ambulance, lower

22   left is — looks — Frankie Allen, and then the lower right is

23   address 9-1-1.

24   Q    And these are actually photocopies of multi cards as you

25   would roll them?

1    A    Yes, sir.

2    Q    They look like that?

3    A    Which I have here in my hand, yes, sir.

4    Q    Go to the next page.  They're about the Administrative

5    Offices of the Court; correct?

6    A    The top two are, and the bottom left, and then —

7    Q    And then you have a telephone company?

8    A    Yes.

9    Q    Go to the next page.  We start to leave the A's and we

10   start with a few others; right?

11   A    Yes, Allen Arlene and Chester — or I believe it's Arlene

12   and Chester Allen, John Aubrey, who's an attorney, and then it

13   looks like a Canon photocopier printer-type business card.

14   Q    And then let's go to the next page.  Top is a medical

15   center; right?

16   A    Yes, sir.

17   Q    And then we have some other writing?

18   A    Yes, sir.

19   Q    And another name?

20   A    Yes, sir, Lisa Arnett.

21   Q    And the next page, please.  You have a real estate

22   appraiser on the top and a business card?

23   A    Yes, sir.

24   Q    And then an appraiser underneath that?

25   A    Yes, sir.

 1  Q    And then Aljet telephone?

 2  A    Yes, sir.

 3  Q    And we are not going to go A through Z, I promise you

 4  that.

 5  A    Thank you.

 6  Q    But by now, I hope it's clear, is it not, that this is a

 7  really packed Rolodex; is that correct?

 8  A    Yes, it's fairly full.

 9  Q    And it has names, some addresses, some business cards, and

10  some phone numbers?

11  A    Yes, sir.

12  Q    And the mere fact that Doug Adams' card appeared at the

13  beginning was because that was the first page of this and it

14  was the A's that were photocopied; correct?

15  A    Yes.

16  Q    And so as you go through the alphabet you'll find names,

17  phone numbers of a lot of people that have nothing to do with

18  anything, they're just contacts; right?

19  A    Yes, I would agree with that.

20  Q    Okay.  Clay County is a smaller county in the

21  Commonwealth, 24,000, I believe, or thereabouts?

22  A    It's between 24- and 25,000, yes, sir, somewhere in there.

23  Q    And from the previous testimonies that have occurred with

24  other witnesses, and you've been in the courtroom the whole

25  time, it just seems that everybody seems to know everybody

1    else; does it not?

2            MR. SMITH:  Your Honor, I'm going to --

3    BY MR. PINALES:

4    Q    Isn't that right?

5            MR. SMITH:  I'm going to object as to the relevance.

6            THE COURT:  I'll sustain the -- I'll sustain the

7    objection.

8    BY MR. PINALES:

9    Q    Well, let me ask it this way:  There are several prominent

10   families in the Clay County area; correct?

11   A    The way I would answer that is there are several prominent

12   families probably within a lot of the different precincts.  I

13   don't know that --

14   Q    In Clay County?

15   A    I don't know that particularly one family has necessarily

16   countywide notoriety, you know, but there are typically

17   families in each voting precinct that are well known.

18   Q    And there are large families that live in Clay County?  We

19   heard about the Whites, we heard about the Houses, and there

20   are large families --

21   A    There are --

22   Q    -- correct?

23   A    There are a lot of individuals.  I mean, you can go

24   through the voter sign-in sheet, there are a lot of individuals

25   with the same last name.  Sizemore is a popular name.  There

1   are other popular names.  Now, can I say that all those

2   Sizemores are related?  I can't say that, no.

3   Q    Sure.  From your intelligence, was it apparent to you that

4   a lot of people knew a lot of people who lived in Clay County?

5   A    I think with respect to, you know, the election fraud

6   schemes, yeah, there were chains of people that were the go-to

7   people in each area, and they knew a lot of people, yes, sir.

8   Q    I'm not asking that.  It's a very simple question.  Clay

9   County is a small county, we've established that.  It's a

10  home -- you know, small environment.  People know each other in

11  that small environment, don't they, from your intelligence?

12  Yes or no?  If you don't know, that's okay, too.

13  A    Well, I mean, in the immediate area they may know their

14  neighbors, but you can have a voting precinct or community in

15  one end of the county and then one in the other end.  And I

16  can't say that -- you know, I can't make a blanket statement

17  that everyone knows everyone in Clay County.

18  Q    Let's move on.  If you'd look at D64.

19  A    Yes, sir.

20  Q    Do you have that in front of you?

21  A    Yes, I do.

22  Q    Okay.  And this was -- I believe you described it as a

23  black spiral?

24  A    Yes.

25  Q    And we are looking at pages, and they're not very clear in

1  the whole part.

2          MR. PINALES:  But I would ask, Ms. Poynter, if we

3  could just blow up the left-hand section?

4          THE COURT:  Counsel, I've allowed this to go on a

5  bit, but if you're going to show documents, you need to show

6  your own documents as opposed to giving the U.S. instructions

7  on what to do.

8          MR. PINALES:  Okay.

9          THE COURT:  So you can look at the original, you can

10  put that up on the machine.

11          MR. PINALES:  Okay.  It's like the --

12          THE COURT:  Mr. Briggs, can you give that notebook to

13  Mr. Pinales and pass that over to him?

14          MR. PINALES:  Thank you, Judge.

15          THE COURT:  Yes, sir.

16  BY MR. PINALES:

17  Q    Mr. Briggs, I'm holding up, am I not, D64?

18  A    Yes, that's correct.

19  Q    The small black spiral?

20  A    Yes, sir.

21  Q    And, again, did you ever check handwriting on any of

22  these?

23  A    No, we did not, sir.

24  Q    Okay.  Can you see that now?  You have a monitor.  I don't

25  know which would be easier for you to read.

1  A    I can, and if the Court would allow, I have my own copy.

2  It may be easier to look at a paper copy for myself as a

3  witness.

4          THE COURT:  Can you get that from —

5          THE WITNESS:  It's in the book back there on the cart

6  on the right-hand side, I believe.

7          THE COURT:  Check the monitor first and see if you

8  can make out what he's asking.

9          THE WITNESS:  Okay.  I'm sorry.

10          THE COURT:  If you can't, you can get your notes.

11  BY MR. PINALES:

12  Q    You discussed this notebook yesterday, you recall that?

13  A    Yes, sir, I do recall that.

14  Q    Okay.  Now, on — this is the first page, is it not, that

15  we're displaying for the jury?

16  A    It is, sir.

17  Q    And if you notice, it says, "Cletus, Confederate Blue,"

18  and some numbers underneath it, and "Trim Winter Sky" and some

19  numbers underneath it; do you see that?

20  A    Yes, I do see that.

21  Q    And did your intelligence show you that that was the color

22  painted in Judge Maricle's first office in 1990?

23  A    I would have no way of knowing that, sir.

24  Q    Okay.  And then underneath it, it looks like a formula to

25  make perfume with vodka?

1    A    Yes, sir, it does appear that's the case.

2    Q    Okay.  Do either of these have anything to do with this

3    enterprise?

4    A    No, sir.

5    Q    Okay.  And I've turned one page, and it's on the

6    right-hand side, do you see that?

7    A    Yes, sir.

8    Q    And it says, "Started Provera March 5."  Can you read that

9    from your monitor?

10   A    It appeared to be Provera, yes, sir.

11   Q    And did your intelligence tell you that that's a female

12   hormone?  Do you know what Provera is?

13   A    No, sir, I didn't —

14   Q    Hormone replacement?

15   A    I don't know that, sir.

16   Q    Okay.  And then I believe further on in the spiral — and

17   the copies that we have don't follow the same order.  I believe

18   this was shown to you.  Do you recall that yesterday?

19   A    Yes, that's one of the pages we discussed, yes, sir.

20   Q    And, again, that's one of the pages you discussed.  Did

21   you — did the FBI intelligence interview these people?

22         MR. SMITH:  Your Honor, I'm going to object as to

23   whether FBI intelligence interview people.

24         MR. PINALES:  I'm sorry.  It's a clumsy question, let

25   me withdraw it.

1          THE COURT:  Before we get to that, so the record is

2    clear what page we're referring to, if you could just make some

3    reference to perhaps the top name or some number that's on that

4    page?

5          MR. PINALES:  Your Honor, I can say on the disk that

6    was provided to us, it's page three, but it says at the top of

7    the checkmark through it 309, "Dora Rader," and I can't read

8    what's underneath.

9          THE COURT:  That's fine.

10          MR. PINALES:  Let me re-ask the question, because I

11    know that was a clumsy question.

12    BY MR. PINALES:

13    Q    Did the FBI intelligence reveal that anyone from the FBI

14    had talked to any of these folks?  Let's just take the top

15    name, Dora Rader.

16    A    Sir, I don't recall.  Some of these names look familiar,

17    but, again, we've interviewed well over 250 people and I can't

18    recall everyone that's been interviewed.

19    Q    Did the FBI intelligence reveal that these folks lived at

20    a retirement home?

21    A    Some lived in -- what I referred to as the highrise

22    yesterday, which is Manchester Heights, which is an

23    apartment -- I believe it's an apartment building that

24    primarily houses the elderly.

25    Q    And in this highrise that primarily houses the elderly,

1  did your intelligence reveal that everybody is dead and has

2  been for 20 years or so on this list?  Do you know that?

3  A    No.  I show some of these people voting in 2006, though.

4  Q    Do you -- I didn't ask that.  I asked whether or not you

5  know if these folks are alive or dead?

6  A    Well, that would indicate to me that either, A, they're

7  not dead, or, B, someone voted in their name.

8  Q    Okay.  Do you have any idea when this list was made?

9  A    No, sir, I don't.

10  Q    So you don't know who made it and when it was made?

11  A    No, sir.

12  Q    You know, as a special agent for the FBI, that there can

13  be tests on ink to kind of give it an approximate age?  Do you

14  know that?

15  A    There are a number of tests you can do with regard to

16  notes, but we didn't feel it to be relevant with regard to this

17  investigation.

18  Q    Okay.  I can't find the page exactly --

19  A    There was also a notation next to one of the names that

20  said, "votes absentee, won't use machine."

21  Q    But you don't know when that was?

22  A    Which would indicate, again, that person is a voter or

23  that's discussing their voting activity.

24  Q    I don't see the page, but do you recall in this D64 a

25  notation of Herbert and Jewell Couch?

1   A    I would have to look at the book again, sir.

2   Q    Do you recall a notation "Pauline's mother makes cream

3   candy?

4   A    I don't recall that, sir.

5   Q    And it's page 13 in the items that were supplied to us,

6   but it's in this book.  Do you recall seeing that page?

7   A    The page heading "Lemon chicken breasts," it looks like?

8   Q    Yes.  Do you recall seeing that?

9   A    Yes.  Uh-huh.  Yes, sir.

10  Q    That's a recipe for lemon chicken breasts, isn't it, with

11  all the ingredients and how to make it?

12  A    It appears to be.

13  Q    And on another page in this book titled "October 16th" --

14  Do you see that page?

15  A    Yes, sir.

16  Q    -- (continuing) it talks about cleaning, does it not?

17  A    Yes, sir, it appears to be a —

18  Q    That's a cleaning list?

19  A    — laundry list of items that need to be cleaned, yes,

20  sir.

21  Q    How does that fit into the enterprise?  Does it?

22  A    No, sir, I'm not suggesting every documentation in that

23  book ties into the enterprise.

24  Q    So I understand correctly, with the documents that I have

25  shown you, D64; D61, the Rolodex; D60, the real estate listing,

1  and D59, you don't know whose documents those are; correct?

2  A    All these documents were recovered from the Maricle

3  residence.

4  Q    And we've established, I believe, that several adults

5  lived in that house?

6  A    Mr. Maricle, Mr. Cletus Maricle, his wife, Judy Maricle,

7  their daughter, Linsey.

8  Q    Her boyfriend?

9  A    Jonah Gregory, the son of Commonwealth Attorney Gary

10 Gregory, is her boyfriend.  He was there the morning of the

11 search when it was executed, yes, sir.  I mean, I know he was

12 there that morning.

13 Q    That morning at least?

14 A    Correct.  I don't know that he lives there or stays there

15 routinely.

16 Q    So let me go move it back.  My question was, in document

17 D59, 60, 61, and 64, you don't know who generated those

18 writings; is that correct?

19 A    Only that they were recovered from the Maricle residence.

20 Q    So the answer is no, you don't know who generated them?

21 A    I don't know who generated those, no.

22 Q    You don't know when they were generated; yes or no?

23 A    I don't know the date they were generated, no, sir.

24 Q    And you've never had any of the documents checked for

25 handwriting so that you could know?

1    A    No, sir.

2    Q    And you've never had any of those documents checked for

3    age?

4    A    No, sir, but our investigation revealed that they were

5    routine election fraud meetings at the residence where notes

6    such as this were produced by Mr. Maricle.

7    Q    My question was, you've never had this checked as to age?

8    A    No, sir.

9    Q    Okay.  Thank you.

10   A    Some of them may be dated and have dates which would

11   indicate, you know, when they were produced or something

12   significant that happened or an appointment.  For example,

13   there was a doctor's appointment on such and such date, so, I

14   mean, that kind of -- that kind of dates it to a degree.

15   Q    Well, like the one we saw, October 16th, cleaning list, we

16   know that that was dated October 16th, but there's an

17   October 16th in every year, isn't there?

18   A    Correct, but I would have to look through the documents

19   again to see if, in fact, any of those notations have a year

20   assigned to them.

21   Q    My question, though, today, you don't know, as you're

22   talking to this jury, when they were generated and you never

23   did any tests to see?

24   A    No, sir, we didn't do any testing.

25            MR. PINALES:  Thank you.

1          Can I have a moment?

2          THE COURT:  Yes, sir.

3          MR. PINALES:  I have nothing further.

4          THE COURT:  All right.  Thank you, Mr. Pinales.

5          Mr. Westberry.

6          MR. WESTBERRY:  Thank you.  Thank you, Judge.

7                    CROSS-EXAMINATION

8   BY MR. WESTBERRY:

9   Q    Mr. Briggs, I'll let you get organized up there.

10  A    Okay.  Thank you, sir.

11  Q    Frankly, I'm not going to ask you to look at any of those

12  documents.

13  A    Okay.

14  Q    Good morning again.  For the record, Kent Westberry for

15  Doug Adams, and I've got a few questions for you, Agent Briggs.

16  A    Yes, sir, I'm sorry.

17  Q    No, take your time, you're fine.

18       You testified yesterday, Agent Briggs, that there were

19  about 900 employees in the Clay County School System.  I

20  believe we heard you say that; correct?

21  A    At the time I checked the number of employees, that was

22  the number, yes, sir.

23  Q    Where specifically did you get that number, Agent Briggs?

24  A    I believe I utilized a State database for specific region,

25  which tells who would be paying taxes through their employer.

1  You know, there are databases which track —— in other words, if

2  you work at a grocery store or a bank or wherever, it's

3  going —— you can run that —— you can run the employer and then

4  it will tell you how many people are paying taxes through that

5  employer.

6  Q    Was there a database or document that specifically listed

7  900 or something very close to that that you specifically

8  looked at?

9  A    Again ——

10 Q    —— for Clay County School Board employees?

11 A    Yes, sir, again, I believe it was the State database that

12 I reviewed, which is, you know —— if that answers your

13 question.  In other words, it shows who's paying —— how many

14 people are paying taxes through a specific employer.

15 Q    Right.

16 A    At that given time.

17 Q    What year did you look for?

18 A    It was during the course of the investigation.

19 Q    What specific year?

20 A    Well, the best estimate I can give you, sir, is I believe

21 I got the case in, as I said I think earlier, '06 or '07.  It

22 was during the timeframe that I was assigned the investigation.

23 So it was relatively recent, towards the end of the conspiracy

24 period.

25 Q    How many employees were there in 2002 specifically, if you

1  know?

2  A    I don't know that, sir.

3  Q    Regardless of what the number is, Agent Briggs, how many

4  of those employees would have been teachers, if you know?

5  A    Sir, again, I don't know that.  That database encompassed

6  anyone paying taxes through, so it would include bus drivers,

7  janitors, maintenance workers, counselors, administrators,

8  teachers, guidance counselors, just across the gambit.

9  Q    You don't know — it doesn't sound to me like you know how

10  many were teachers?

11  A    No, sir, I do not know that.

12  Q    How many were bus drivers within that number, if you know?

13  A    I do not know that either.  I can't break down the

14  percentage of each — or numbers of each segment of employee

15  population.

16  Q    And can we assume you don't know how many within that

17  number would have been maintenance or custodial employees as

18  well?

19  A    That is correct, sir.

20  Q    Are you familiar with something called the site-based

21  council as part of your investigation?

22  A    No, sir, I am not.

23  Q    Well, then you wouldn't know how the site-based council

24  worked in Clay County with regard to employment matters in the

25  school system; would that be fair as well?

1   A    Yes, sir, I have no knowledge of the program.

2   Q    Shifting gears, Agent Briggs, just a little bit.  You were

3   asked questions by the prosecutor yesterday afternoon about

4   Melanda Adams having been employed in the County Court --

5   County Clerk's Office in Clay County for a period of time.  Do

6   you recall those questions?

7   A    Yes, sir, I do.

8   Q    Do you know the period of time that Melanda Adams worked

9   in the County Court -- worked with the Clerk of the County

10  Court?

11  A    Sir, I don't recall the hire date off the top of my head

12  and I'm pretty certain it was during the timeframe of the three

13  elections within the conspiracy, but I believe we have an

14  exhibit which identifies the actual date that she was hired.

15  Q    Let me ask you this:  You know that Freddy Thompson was

16  elected Clerk in November of 2002; correct?

17  A    Elected and began serving in January of 2003; correct.

18  Q    Right.

19  A    Yes, sir.

20  Q    Thank you.

21  A    Yes, sir.

22  Q    Do you know, as part of your investigation, if Melanda

23  Adams actually began to work at the Clerk's Office in 2005,

24  some two years later?

25  A    Two years after --

1   Q    After Freddy Thompson — and I'm using approximate dates,

2   but I will represent to you that's fairly accurate.  Has your

3   investigation revealed that she began to work in Mr. Thompson's

4   office about two years after he was sworn in?

5   A    Yes, sir, I recall — I believe it was 2005, and it was

6   either right before one of the elections in question or right

7   after one of the elections in question.  But we have, again, an

8   exhibit somewhere which specifies the date.

9   Q    What election was in '05, sir?  It wasn't Clerk, was it?

10  A    No, sir.

11  Q    Do you know what election was in '05?

12  A    I can't remember all the candidates that ran each year.  I

13  would have to look at the ballot to see who was running.

14  Q    Sure.  The job that she took in 2005, do you know if it

15  was listed or advertised, if you know?

16  A    Sir, I don't know if the job was listed or advertised.  I

17  have no idea of that.

18  Q    The job that she took in the office, do you know if it was

19  a newly created position or if she took someone else's place?

20  If you know.

21  A    We've had that discussed here at the trial during

22  testimony, and I cannot recall.

23  Q    You do know that she left the Clerk's Office after having

24  worked there for a number of years; correct?

25  A    I know that she left.  I don't know how long she worked

1   there off the top of my head.

2   Q    Did your investigation reveal just what kind of job she

3   did as an employee in the Clerk's Office during the period of

4   time she worked?

5   A    No, sir.

6   Q    Do you know what she's doing now?

7   A    I believe she's running a convenient store, a gas

8   station-type business.

9   Q    Correct.

10  A    I'm not sure who owns it.  I don't think she owns it, I

11  think she operates it.

12  Q    Do you know if she owns that business yourself?  If you

13  know.

14  A    I thought -- I think Mr. Adams owns it or --

15  Q    You think?

16  A    I think so, yes, sir.

17  Q    Do you know?

18       MR. SMITH:  Your Honor, I'm going to object as to the

19  relevance of this further inquiry.

20       THE COURT:  Well, he's already answered the question

21  a couple of times and you keep asking him the same question, so

22  I'll sustain it as being repetitive.

23       MR. WESTBERRY:  Thank you.

24  BY MR. WESTBERRY:

25  Q    There was no search warrant that was served on Doug Adams'

1   house; correct?

2   A    That is correct.  We focused our searches on areas where

3   election fraud meetings occurred and various sources and

4   witnesses saw documentation being produced or past elections

5   records being kept, sort of to keep score.  That's where we

6   focused our energy and that's where we had probable cause to

7   execute search warrants.

8   Q    And you would agree, Agent Briggs, that in the 2002

9   primary Doug Adams strongly opposed Jennings White; correct?

10  A    Strongly opposed Jennings White and strongly supported

11  Freddy Thompson.

12              MR. WESTBERRY:  May I have one second, please?

13              THE COURT:  Yes, sir.

14              MR. WESTBERRY:  That's all I have.  Thank you, sir.

15              THE WITNESS:  Thank you.

16              THE COURT:  Mr. White.

17              MR. WHITE:  Thank you, Your Honor.

18                        CROSS−EXAMINATION

19  BY MR. WHITE:

20  Q    Good morning, Agent Briggs.

21  A    Good morning.

22  Q    For the record, my name is Scott White, I'm a lawyer, I

23  represent Charles Jones.  I've just got a few questions for

24  you.

25  A    Yes, sir.

1  Q    You testified yesterday that members of this so-called
2  scheme did favors for each other as one of the ways that they
3  operated.  Do you recall that testimony?
4  A    A lot of that testimony, graveling driveways, paving
5  driveways, drain tiles, jobs, getting out of, you know,
6  criminal charges, getting out of jail.  I'm not sure what
7  you're referring to, though.
8  Q    What I'm referring to is that you — in your testimony, do
9  you recall talking about that favors were done and then
10 specifically talked about that certain people got jobs or their
11 relatives got jobs.  Do you recall that testimony?
12 A    Yes, sir, I do.
13 Q    And do you recall testifying in that context that Wayne
14 Jones's son is currently employed by the Kentucky
15 Transportation Cabinet?
16 A    Yes.  Well, at some point was, yes, sir.
17 Q    Do you know what he does there?
18 A    No, sir, I don't.
19 Q    Do you know — did your investigation reveal that he was
20 employed by the Cabinet in the 1990s?
21 A    I can't recall his timeframe of employment, sir.
22 Q    Has your investigation revealed which member of the
23 so-called enterprise is employed by the Kentucky Transportation
24 Cabinet so as to do a favor?
25 A    I'm sorry, sir, what was the question again?

1  Q     Has your investigation revealed which member of this

2  enterprise is employed by the Kentucky Transportation Cabinet

3  so as to do this favor?

4  A     No, but Richard Brian Hubbard was -- Mr. Jones got Richard

5  Brian Hubbard and Mr. Stivers got Richard Brian Hubbard

6  involved in the elections as a youth chairman and then

7  ultimately an election officer and were attempting to help him

8  get a job with the Highway Department.  So apparently there was

9  some matter of influence there or some connection potentially.

10  Q     But your investigation didn't discover or identify any of

11  that influence, did it?

12  A     In other words, who was he planning to go to to get this

13  individual a job?

14  Q     Precisely.

15  A     No, I don't -- I don't know that, sir.

16  Q     You were here -- were you here for Mr. Brian Hubbard's

17  testimony?

18  A     Yes, I believe I was.  I've been in and out and I've

19  missed some of it, but I believe I was here for Mr. Hubbard's

20  testimony.

21            MR. WHITE:  Give me just a moment, Your Honor.

22            THE COURT:  Yes, sir.

23            MR. WHITE:  That's all I have, Agent Briggs.

24            THE WITNESS:  Thank you.

25            THE COURT:  Mr. Abell.

1                          CROSS-EXAMINATION

2    BY MR. ABELL:

3    Q    Good morning, Mr. Briggs, my name is Robert Abell, and I

4    represent William Stivers in this case.

5    A    Good morning.

6    Q    The first thing I want to talk to you about is

7    Exhibit D47.

8              MR. ABELL:  Perhaps it would be helpful if that was

9    passed up to him.

10   BY MR. ABELL:

11   Q    That is a handwritten list of names.  Do you have that?

12   A    I'm sorry, "D" as in "David" 47?

13   Q    Yes, sir.

14   A    No, sir.

15             MR. ABELL:  Could we ask that D47 —

16             THE WITNESS:  This is — I have D47, sir, but it's

17   not a handwritten list of names.  Is that correct, D47?

18   BY MR. ABELL:

19   Q    D51, I'm sorry.  My mistake.  Keep D47, I want to talk to

20   you about that, too.

21   A    Okay.  "D" as in "David" 51; correct, sir?

22   Q    And it is a handwritten list?

23   A    It is, sir, on white notebook paper.

24   Q    And D51 was taken from my client's house on March 19th,

25   2009; correct?

1  A    Yes, sir, that is correct.

2  Q    And as far as when it was created, you do not know;

3  correct?

4  A    No, sir, I see no notation of a date on here.

5  Q    And as far as the purpose for which it was created, you do

6  not know; is that correct?

7  A    Well, I think, as we pointed out yesterday, a number of

8  these individuals were involved in the election fraud scheme

9  and some of the co-defendants here are on this list, and at the

10  top it's titled "Call list," so —

11  Q    We all heard your testimony, but as far as the purpose for

12  which it was created, you do not know; is that correct?

13  A    I believe it was involving the election fraud scheme.

14  Q    But that's speculation on your behalf, a conclusion you're

15  reaching on your own?

16        MR. SMITH:  Your Honor, I believe that's an argument,

17  I would object.  It's based on his intelligence investigation.

18        THE COURT:  Overruled.  You can ask him and he'll be

19  able to answer.

20        THE WITNESS:  I'm sorry, sir?

21  BY MR. ABELL:

22  Q    That's the conclusion you're reaching just based on the

23  presence of some names; is that fair?

24  A    Well, it's not just the names, it's the intelligence we've

25  gathered throughout the investigation, what sources have

1  advised us of, you know, what our intelligence and

2  investigation has revealed.  Many of these individuals were

3  involved directly in the election fraud scheme.

4  Q    All right.  I asked you about D47.

5  A    Yes, sir.

6  Q    D47 is a copy of an information pertaining to a Charles

7  Weaver; is that correct?

8  A    That is correct.

9  Q    Now, is it your testimony — And it was — D47 was also

10  taken from my client's home on March 19, 2009; correct?

11  A    That is correct.

12  Q    Now, is it your testimony that the court record in the

13  Weaver case was sealed as of March 19, 2009, and that document

14  was not publicly accessible?

15  A    The United States Attorney's Office is the entity that

16  seals documents to protect them from the public.  I cannot

17  specifically state when this document was unsealed.  I believe

18  we sealed all the documents because when we arrested

19  individuals in Clay County and then they were convicted, we

20  didn't want the general public to have knowledge of them being

21  arrested or convicted so that if they cooperate, people would

22  not be suspicious of them.  But I cannot answer the question as

23  to when the document was sealed or unsealed.

24  Q    Okay.  As far as you know, the court record in the Weaver

25  case could have been unsealed and was completely publicly

TIMOTHY BRIDGES CROSS - MR. ABELL                    43

1  accessible for more than a year prior to March 19, 2009?

2  A    I can't recall that, sir.  I'm sorry.

3  Q    Okay.  But you're not sure –– to clarify, not to try to

4  beat it too much, but you're not sure whether or not the Weaver

5  record was publicly accessible in March 19, 2009 or not; is

6  that fair?

7  A    I know that we tried to keep them sealed as long as

8  possible because there were attorneys that were close with the

9  members of the criminal enterprise that could surf the publicly

10  available database of the federal court system and find out

11  who's been arrested, who's been charged and so forth and so on.

12  So we try to keep this stuff, these type of documents, sealed

13  as long as possible.  But I cannot specify when that would have

14  occurred.

15  Q    Okay.  You've mentioned the federal court publicly

16  accessible database.  Let me ask you a couple of questions

17  about that.

18      Do you –– first of all, do you understand how the

19  electronic records from the federal court system works?

20  A    No, sir, I don't.  When I say publicly available, maybe I

21  misspoke.  I know it's available to attorneys that at least

22  practice in federal court, but I don't know the specifics of

23  that.

24  Q    Okay.  And you don't know whether a private citizen can

25  access those records if they wish to?

 1  A    I don't know that, sir.

 2  Q    Okay.  The conspiracy in this case is charged to have

 3  formed in the early part of 2002; is that correct?

 4  A    Yes, sir.

 5  Q    Prior to the May primary in 2002?

 6  A    Yes, sir.

 7  Q    In the May primary of 2002, would you agree that the

 8  leading and most hotly contested race was for Clay County

 9  Clerk?

10  A    Yes, sir.

11  Q    The opponents in that race were Jennings White against

12  Freddy Thompson?

13  A    Yes, sir.

14  Q    And you've already testified today that your understanding

15  based on your investigation was that Doug Adams very strongly

16  supported Mr. Thompson against Mr. White; correct?

17  A    Doug Adams supported Freddy Thompson?

18  Q    Yes, sir.

19  A    Yes, that's correct.

20  Q    And did your — the FBI intelligence with which you're

21  familiar indicate to you that my client, William Stivers,

22  supported Mr. Thompson against Jennings White?

23  A    I believe so, yes, sir.

24  Q    And did the FBI intelligence with which you're familiar

25  indicate to you that Wayne Jones supported Freddy Thompson

1  against Jennings White?

2  A    I believe so.

3  Q    Did the FBI intelligence with which you're familiar

4  indicate to you that Bart Morris, on the other hand, supported

5  Jennings White against Freddy Thompson?

6  A    I believe that's correct.  Yeah, there were some

7  candidates in various elections where the individuals — the

8  criminal enterprise here today was divided on who they were

9  supporting.  They didn't always agree on all the same

10  candidates, in other words.

11  Q    Right now I want to talk some more about the clerk's race

12  in 2002.  Did the FBI intelligence with which you're familiar

13  indicate, to your understanding, that Debbie Morris also

14  supported Jennings White against Freddy Thompson in the clerk's

15  race of May of 2002?

16  A    Yes, I believe they both supported Jennings White.

17  Q    Did the FBI intelligence with which you're familiar also

18  indicate to you that Stanley Bowling supported Jennings White

19  against Freddy Thompson in that race?

20  A    I believe so, yes.

21  Q    Also in the May 2002 race, we've touched on some other

22  races going on, there was a sheriff's race; correct?

23  A    Yes.

24  Q    A primary contested that year between Edd Jordan, who was

25  the incumbent; is that correct?

1  A    Yes, that's correct.

2  Q    And Edd Jordan's opponent was Danny Reid, do you recall

3  that to be correct?

4  A    I know Danny Reid ran for sheriff.  I cannot recall

5  specifically which election.  If I were able to see the ballot

6  for that year of the candidates, I could more appropriately

7  answer that question.  But I know he ran in the past against

8  Edd Jordan.

9  Q    All right.  Well, I'll represent — Let's talk about the

10  2006 race, because that will help you frame it.  The sheriff

11  candidates in 2006, if you recall from the FBI intelligence

12  that you're familiar with, was Edd Jordan against Kevin

13  Johnson; does that seem correct?

14  A    That is correct, yes, sir.

15  Q    Does that then make you comfortable that Edd Jordan's

16  opponent in 2002 was Danny Reid?

17  A    You know, frequently, sir, in the elections, there were

18  multiple candidates other than just one or two.  So, again,

19  that doesn't help me.

20  Q    That is true.  That is true.  Some races there were more

21  than two candidates.

22  A    There would be multiple candidates for sheriff and other

23  races.

24  Q    Okay.  Well, let me reframe the question.  Are you

25  comfortable that an opponent of Edd Jordan in 2002 was Danny

1  Reid?

2  A    I believe that's the same question, sir, and, again,

3  without looking at the list of candidates or ballot, I can't

4  specifically say it was that year.

5  Q    Okay.  All right.  But you are comfortable it sounds

6  like -- Tell us if this correct:  Sometime during this charged

7  conspiracy, which runs from early 2002 to the middle of 2007,

8  that Danny Reid was a candidate for sheriff against Edd Jordan;

9  is that fair?

10 A    Again, sir, I recall Danny Reid running in the past.

11 There were only two sheriff races during the conspiracy, '04

12 and '06.  It could have been prior to that timeframe, I guess.

13 Q    Okay.  So as far as you know today, you don't feel

14 comfortable talking about who the opponents were in the

15 sheriff's primary in May of 2002; is that fair?

16 A    If I had the documentation, I would be happy to discuss

17 that, but I can't recall, sir, I'm sorry.

18 Q    All right.  I understand.  Let's move on to the jailer's

19 race in May 2002.  You are familiar, based on the FBI

20 intelligence, that in May 2002 there was a race for Clay County

21 Jailer?

22 A    Correct, and that was discussed a great deal here at --

23 during this trial, during the course of the trial.

24 Q    The two principal candidates, two leading candidates, one

25 was the incumbent, Charles Marcum?

1   A    Correct.

2   Q    And his leading opponent was Kennon White?

3   A    Correct, those two were in the race, and potentially

4   others that I do not recall, but I know those two were in the

5   jailer's race in 2002.

6   Q    Okay.  Do you know, from the FBI intelligence with which

7   you're familiar, that Freddy Thompson supported Charles Marcum

8   in that race?

9   A    I believe that's correct, but I would — I mean, we've

10  heard testimony on that here in trial as well.

11  Q    Do you know, from the FBI intelligence, that in that

12  jailer's race in 2002 that Doug Adams also supported Charles

13  Marcum?

14  A    Yes, I do know that.

15  Q    And is it your understanding based on your familiarity

16  with the FBI intelligence in this case that my client, William

17  Stivers, also supported Mr. Marcum in that 2002 jailer's race?

18  A    Yeah, I believe most of the people in this conspiracy went

19  against the Kennon White faction, as we refer to it, as being a

20  "White Out."

21  Q    Well, is it your understanding, based on the FBI

22  intelligence that you're familiar with, that Bart Morris

23  supported Kennon White in that May 2002 jailer's race?

24  A    I can't recall that, sir.

25  Q    Is it your understanding, based on the FBI intelligence

1  that you're familiar with, that Stanley Bowling supported

2  Kennon White in the jailer 2002 race?

3  A    Yes, because I believe they went and delivered money to an

4  individual or requested their assistance during the -- during

5  his campaign efforts.

6  Q    Is it your understanding, based on the FBI intelligence

7  that you're familiar with, that Debbie Morris was a supporter

8  of Kennon White for jailer in 2002?

9  A    Again, I think that potentially what occurred in this and

10 many other situations in the elections is individuals running

11 for office, candidates may have given money to these

12 individuals in the belief that they would support them.

13 Sometimes they supported them, sometimes they double-crossed

14 them and took their money and used it for the other side.

15 Q    Well, we've heard that testimony.  But my question is,

16 based on your understanding of the FBI intelligence that you've

17 told us you're familiar with, do you know whether Debbie Morris

18 was a supporter of Kennon White for jailer in 2002?

19 A    I believe the Morrises supported the White family, because

20 at that time Daugh White was the Mayor, Kennon White, of

21 course, is his son, and they wanted to stay in good, so to

22 speak, with the White family to continue to get the City

23 contracts.  So I would say that's true.

24 Q    Okay.  And I guess to backtrack just a little, it would

25 also be your testimony that your understanding was that Bart

 1  Morris supported Kennon White for jailer in May of 2002?

 2  A    I believe that would be correct, yes, sir.

 3  Q    Is it your understanding, based on your familiarity with

 4  the FBI intelligence, that Wayne Jones supported Kennon White

 5  for jailer in May of 2002?

 6  A    I can't recall that, sir.

 7  Q    Do you recall that in May 2002, during the primary

 8  election, there was a race for county judge executive of Clay

 9  County?

10  A    In 2002?

11  Q    Yes, sir.

12  A    Yes, I believe that's correct.

13  Q    The incumbent running for county judge executive in Clay

14  County, do you recall that to be James Garrison?

15  A    He ran during the timeframe, sir, I can't recall what year

16  it was.

17  Q    Do you recall that Roy Morgan at one point ran for Clay

18  County Judge Executive?

19  A    Roy Morgan ran at one point, yes, sir.

20  Q    Do you recall if that was in May of 2002?

21  A    No, sir, I don't.

22  Q    Okay.  So to be fair — All right.  You can't recall who

23  the candidates were for Clay County Judge Executive in the

24  May 2002 primary; is that fair?

25  A    Sir, we've looked at a lot of elections and a lot of

1  candidates, a lot of them ran multiple times, a lot of them

2  have ran in the past and lost and ran again.  I mean, it's just

3  very difficult without looking at the documents.

4  Q    I understand.  I'm not being critical.  I just want to

5  make sure I understand what you're capable of testifying to.

6  And my question is simply, is it the case that you're not sure

7  who the candidates were for Clay County Judge Executive in May

8  of 2002?

9  A    Without looking at the documents that have been entered as

10  exhibits, no, sir, I couldn't say that.

11  Q    Do you recall, from your familiarity with the FBI

12  investigation, that there was, in May of 2004, a primary race

13  for state representative?

14  A    In May '04, I think that the two primary, as I recall —

15  or the two races I recall being on that ballot was, I think,

16  city council and the Kentucky state representatives in '04.

17  Q    For Kentucky state representative, do you recall that the

18  candidates were Tim Couch and Barbara White Colter?

19  A    Yes.

20  Q    In terms of — Is it your understanding, based on your

21  familiarity with the FBI intelligence, that Doug Adams was a

22  supporter of Tim Couch in 2004 against Barbara White Colter?

23  A    Yes.

24  Q    Is it your understanding, based on your familiarity with

25  the FBI intelligence, that supporting Barbara White Colter

1  against Tim Couch in 2004 included Bart Morris?

2  A    I can't recall that, sir.

3  Q    Is it your understanding, based on your familiarity with

4  the FBI intelligence, that Debbie Morris supported Barbara

5  White Colter against Tim Couch in May of 2004?

6  A    I can't remember who all supported who during which

7  election.  It would be helpful if I had the 302s and documents

8  to refresh my memory as to who supported who and so forth in

9  all these elections with the various candidates over the

10  various elections.

11  Q    Do you recall, based on your familiarity with the FBI

12  intelligence pertaining to this case, that Stanley Bowling

13  supported Barbara White Colter in the May 2004 primary?

14  A    I don't recall that, sir.

15  Q    Let's move then to 2006.  Do you recall that there was a

16  primary election in May of 2006?

17  A    Yes, sir.

18  Q    Do you recall that one of the races in May 2006 was Clay

19  County Judge Executive?

20  A    Yes.

21  Q    Do you recall that one of the leading candidates in that

22  May 2006 primary for Clay County Judge Executive was a Carl

23  Sizemore, a man commonly known as "Crawdad"?

24  A    Yes, I believe that's correct, but, again, if we're going

25  to go through the candidates of the election, I would like to

1   see the ballot to verify.

2   Q    Well, I —

3   A    I mean, a lot of these races we haven't discussed much in

4   this — in this proceeding, so —

5   Q    I'll represent to you and there's been testimony in this

6   case that the three leading candidates in the May 2006 primary

7   for Clay County Judge Executive were the incumbent, James

8   Garrison, Crawdad Sizemore, and the third leading candidate was

9   Johnny "Poss" Gregory.  Does that seem right to you?

10  A    That's possible, sir, but I can't give a definitive answer

11  to that without looking at the list of candidates or ballot.

12  Q    And you're not prepared to rely upon my representation to

13  you?

14  A    No, sir.

15  Q    All right.  Do you recall if there was a sheriff's race in

16  May 2006?

17  A    Yes, sir.

18  Q    Do you recall who those candidates were?

19  A    2006, Kevin Johnson.

20  Q    Kevin Johnson, in fact, is the present Clay County

21  Sheriff, as I understand.

22  A    Correct.

23  Q    And it was the case that he defeated in May of 2006 the

24  incumbent, Edd Jordan?

25  A    Correct.

1  Q    Is it your understanding, based on the FBI intelligence

2  with which you're familiar, that in that sheriff's race in

3  May 2006 that my client, William Stivers, supported Kevin

4  Johnson?

5  A    I think most — Again, I can't — I can't state with any

6  certainty.

7  Q    You don't know?

8  A    I'm trying to recall the testimony that has been provided

9  and information that we have.  I think most of the individuals

10  in the conspiracy here, the co-defendants, supported Kevin

11  Johnson against Edd Jordan.

12  Q    Is it your understanding, based on the FBI intelligence,

13  that Bart Morris supported Edd Jordan against Kevin Johnson?

14  A    I don't recall that, sir.  That's not a race that we've

15  discussed a lot in this trial, so —

16  Q    Is it your understanding, based on the FBI intelligence

17  that you're familiar with, that Charles Jones supported Edd

18  Jordan for sheriff against Kevin Johnson in 2006?

19  A    I can't recall specifically, sir, no.

20            MR. ABELL:  Nothing further, Judge.

21            THE COURT:  Thank you, Mr. Abell.

22            Let's see, Mr. Baldani.

23            MR. BALDANI:  Thank you, Your Honor.

24                      CROSS-EXAMINATION

25  BY MR. BALDANI:

1   Q    Good morning, Agent Briggs.

2   A    Good morning.

3   Q    We've met.  I'm Russ Baldani, one of Freddy's attorneys.

4   A    Yes, sir.

5   Q    I want to start off by asking you, I think Mr. Pinales

6   mentioned something about 302s, and I think the jury has

7   probably heard about 302s.  Could you just tell us in a

8   nutshell what a 302 is?

9   A    An FD-302 is a document we produce to memorialize any of

10  our activities, such as search warrants, arrest warrants,

11  interviews, seizure of property, and so forth.

12  Q    Okay.  And when should one be prepared?  When you're

13  documenting anything of importance to a case; is that kind of

14  the bottom line?

15  A    Yes.  Yes, sir.

16  Q    Okay.

17  A    That's correct.

18  Q    And you generally don't record interviews with suspects or

19  witnesses, do you?

20  A    No, that is against our policy.  We have to get special

21  permission from the special agent in charge of the division,

22  which would be in Louisville, to get permission to record an

23  interview, so —

24  Q    Okay.  So would it be fair to say that the purpose of a

25  302 is to memorialize what a witness or a suspect tells you so

1  you've got an accurate record of it, especially since you don't

2  record?

3  A    Yes, sir, that's correct.

4  Q    All right.  Now, I want to go through a timeline of some

5  things that will put a few of my questions in context, and I

6  don't want to -- I'm going to ask you on or about, if that

7  sounds right to you.  I'm not trying to pin you down to a

8  specific date on certain things; okay?

9       Now, yesterday you talked in response to Mr. Smith's

10 questions about the importance of gaining, obviously, the

11 cooperation of Kennon and Wanda White; correct?

12 A    And other witnesses, yes, sir.

13 Q    Right.

14 A    Uh-huh.

15 Q    And that was around March of '07 that you gained the

16 cooperation of Kennon and Wanda; does that sound right?

17 A    Yes, sir, March of 2007.

18 Q    And Kennon's dad had already been indicted at that point;

19 correct?

20 A    I can't recall the date that he was indicted, sir.  No,

21 sir.

22 Q    Well, I'm not asking you the date, but is it your

23 recollection that when Kennon and Wanda got on board Daugh

24 White had already been indicted?

25 A    I would want to see the document.  It was around that

1   timeframe.  It could have been before, it could have been

2   after, I can't specifically recall.

3   Q    Okay.  So if it wasn't before, it was around that time.

4        And Kennon came in and gave you an interview on or about

5   March 21st of '07; does that sound about right?

6   A    Kennon?

7   Q    Yes.

8   A    It was March of 2007.

9   Q    Right.  And a few days later Wanda came in and gave you a

10  pretty detailed statement; right?

11  A    A short time later, within a matter of days; correct.

12  Q    Does March 27th, '07, does that ring a bell?

13  A    That sounds about right.

14  Q    Because don't -- do you recall that the day that she came

15  in, that generated a pretty lengthy 302, about 14 pages; right?

16  A    That's about correct, yes, sir.

17  Q    And wasn't that the date that the first undercover

18  recording was made?  Does that sound right to you?

19  A    Yes, that's -- the first recording was made March 27th,

20  2007.

21  Q    And that was the day that Wanda gave you a pretty lengthy

22  statement?

23  A    Again, I believe that to be the right date, sir.

24  Q    Okay.  And those recordings were made from that date

25  through some date in June of '07; right?

1   A    And beyond that, yes, sir.

2   Q    Okay.  And then around April '07, Kennon White entered his

3   guilty plea; does that sound right to you?

4   A    I don't recall the dates, the date he entered the plea.

5   Q    And, of course, you mentioned other people got on board,

6   but obviously Dobber Weaver was one of them; right?

7   A    At some point; correct, yes, sir.

8   Q    Does May 1st of '07 sound correct as on or about the first

9   day that he was interviewed by the FBI?

10  A    I don't recall the dates, sir.

11  Q    Does it sound about right?

12  A    I was sometime after the Whites, but, again, I don't

13  recall the date.

14  Q    Well, you do recall he was questioned three times by the

15  FBI; right?

16  A    I believe it was two to three times.

17  Q    Okay.  And Wanda White testified at the grand jury two

18  times; correct?

19  A    Yes.

20  Q    The first time was May 3rd of '07; does that sound right

21  to you?

22  A    I don't recall the date, sir.

23  Q    Does it sound on or -- does it sound close?

24  A    What's the date?

25  Q    May 3rd of '07.

1  A    That's in the ballpark.

2  Q    Because you remember the first time was when she was going

3  to some of the defendants and letting them know she was going

4  to be testifying at the grand jury, sort of a ruse -- Well, she

5  was going to be testifying at the grand jury; right?

6  A    Correct.

7  Q    Okay.  So May 3rd sounds about right?

8  A    Sounds about right.

9  Q    And at that time, at that grand jury appearance, she

10 didn't mention Freddy Thompson providing any after-hours

11 illicit training, did she?

12       MR. SMITH:  Your Honor, I'm going to object to asking

13 a witness to testify about what happened in a grand jury

14 proceeding where he wasn't present.  I believe that's --

15       THE COURT:  Sustained.

16 BY MR. BALDANI:

17 Q    Okay.  Were you generally present when witnesses testified

18 at the grand jury like you were present here at this trial?

19 A    Excuse me?

20 Q    Were you generally present when witnesses testified at the

21 grand jury?

22 A    Yes, but I was not in the grand jury room.  We're not

23 allowed to be in the grand jury room.  So I was present at the

24 courthouse, but --

25 Q    Okay.  So you weren't in --

 1  A    I would see the witnesses go in and come out, yes, sir.

 2  Q    All right.  Well, you know she testified two times; right?

 3  A    Yes, sir.

 4  Q    And you agreed that the first time was on or about May 3rd

 5  of '07.  And during the time that they were cooperating, making

 6  these recordings and Wanda testifying at the grand jury, they

 7  turned over a great deal of information in the form of notes,

 8  summaries, lists, that kind of thing; right?

 9  A    Yes, some they produced, some they had received from

10  others such as Mr. Maricle.  But, yes, they handed things over.

11  Q    And that comprised a lot of pages, didn't it?

12  A    Yes, sir, it did.

13  Q    Could I assume that as agent in charge you went through

14  all of that stuff?

15  A    Yes.  At some point, not recently, but, yeah, I've gone

16  through it.

17  Q    Would you agree with me that Freddy Thompson providing

18  after-hours illicit training was not mentioned anywhere in

19  those documents?

20  A    I can't recall that specifically, sir.

21  Q    Do you recall her being asked that while you were in the

22  courtroom?

23  A    Yes, I believe —

24        MR. SMITH:  Your Honor, I'm going to object to asking

25  the witness to comment on evidence in the courtroom.

1              THE COURT:  That's improper, the objection is

2    sustained.

3    BY MR. BALDANI:

4    Q    But the bottom line is you do not recall her mentioning —

5    and I'm going to call it illicit training; okay?  You know what

6    I'm talking about when I say that; right?

7         Well, let me put it this way —

8    A    Private training on how to steal votes?

9    Q    Right.  Because there's been testimony about regular

10   mandated election training; right?

11   A    Correct.

12   Q    And then there's been testimony about what you just said,

13   private training to teach how to steal votes; right?

14   A    Correct.

15   Q    That's how you just referred to it.  So what I'm asking

16   you is, in my questions, would you — can I call that illicit

17   training and you know what I'm talking about?

18   A    Yes, sir, that's fine.

19   Q    Okay.  That's all I'm trying to get at.

20   A    Okay.

21   Q    Now, the second time — And so my question was, you cannot

22   pinpoint anywhere in any of those handwritten notes, documents,

23   summaries, lists, where she mentioned that Freddy Thompson

24   provided her illicit training?

25              MR. SMITH:  It's been asked and answered, Your Honor.

 1  Object.

 2           THE COURT:  Sustained.

 3  BY MR. BALDANI:

 4  Q    Wanda White testified a second time at the grand jury on

 5  July 7th of '07; does that sound about right?

 6  A    She testified a second time.  I can't recall the date.

 7  Q    Do you have any 302s that you prepared documenting

 8  meetings or discussions with Wanda White in between her two

 9  grand jury testimonies?

10  A    Sir, she was interviewed on multiple times.  I can't — I

11  can't — without looking at the documents, I can't tell

12  whether —

13  Q    Do you have your 302s handy and readily available?

14  A    They're either in the courtroom or our office, yes.

15  Q    So you can't tell us without looking at them whether there

16  was — Well, let me ask this:  Did you have interview sessions

17  with Wanda White in between her two grand jury appearances?

18  A    I believe that's the same question I just answered, sir,

19  and without looking at the 302s, I can't comment on the date as

20  to when they occurred.  There were multiple — multiple

21  interview dates, and I can't — I did not commit all of them to

22  memory.

23  Q    Actually, my first questions were whether you had the

24  302s.  My second one was did you recall having the meetings

25  where you questioned her in between.  And your answer is you

 1   don't recall?

 2   A    I don't recall that.

 3   Q    All right.  Now, I'm kind of going through my timeline.

 4   You recall that Dobber Weaver was interviewed approximately

 5   three times; right?  You agreed to that?

 6   A    He was interviewed more than once.

 7   Q    And do you believe the second time was on or about

 8   October 2nd of '07?

 9   A    Sir, I'm not going to be able to answer any of those date

10   questions as to when 302s or interviews occurred.  I apologize,

11   no.  I don't know.

12   Q    What about when Mike Bishop came to see you, do you recall

13   when that was?

14   A    No, sir.

15   Q    Do you recall this:  Mike Bishop came and gave you a

16   statement, and his father came the very next day.

17   A    No, we went to Mike Bishop and interviewed Mike Bishop.

18   The following day, his father showed up, Paul Bishop, to the

19   FBI office to be interviewed.

20   Q    So regardless of what exact date it was, you will agree,

21   then, that — or you do recall that Paul Bishop came to you the

22   day after you—all interrogated his son?

23   A    I believe it was the very next day.

24   Q    Okay.  Now, during direct examination, Mr. Smith asked you

25   about using felons in this investigation.  Do you recall those

1  questions?

2  A    Yes, sir.

3  Q    And the fact of the matter is whether you're investigating

4  drugs, public corruption, vote fraud, an FBI agent has to rely

5  on felons, people with checkered pasts, people with motive to

6  fabricate; is that true?

7          MR. SMITH:  Your Honor, I'm going to object.

8          THE COURT:  Sustain as to the form of the question.

9  BY MR. BALDANI:

10 Q    Is it true that regardless of the type of investigation

11 that in the normal course of things you have to use, question,

12 and rely upon people that have committed crimes?

13 A    In some cases, that is correct, but during the course of

14 the investigation, if we determine that they're lying or

15 untruthful or anything along those lines, we will, you know —

16 we will document that, report it to the Court, report it to the

17 jury, or report it at any court appearance we have if we deem

18 that they're unreliable or lying or telling, you know,

19 something that is not true.

20 Q    Okay.

21 A    But, yes, we — to answer —

22 Q    I understand that.

23 A    We do utilize convicted felons and people that are under

24 charges and have committed crimes to gather intelligence on

25 criminal activity; that's correct.

1    Q    And I'm not criticizing that, I'm merely wanting to ask

2    you if you would agree that when you use people like that it's

3    especially important for the reasons that you just said, it's

4    especially important to try to corroborate what they tell

5    you —

6    A    Yes.

7    Q    — right?

8    A    Yes.

9    Q    Because if they tell you something wrong, you want to —

10   that to be a part of the — tell you something that's untrue,

11   you want that to be part of the record as well; right?

12   A    Yes, we document any intelligence we gather, whether it

13   helps the case or hurts the case, we just — we document — we

14   investigate and document the facts as the evidence appears.

15   Q    Now, Mr. Smith asked you several questions about what is

16   the alleged enterprise in this case, the Clay County Board of

17   Elections; right?

18   A    Yes, sir.

19   Q    All right.  During 2002 to 2007, who made up the Board of

20   Elections?

21   A    During 2002 to 2007?

22   Q    Yes.

23   A    Okay.  That would be, of course, your Republican

24   Commissioner, your Democrat Commissioner, your Sheriff, and

25   your Clerk.

1   Q    Okay.

2   A    So you're saying 2002.  2002, Jennings White was still the

3   Clerk, was beaten, and then after that date Freddy Thompson

4   would have been the County Clerk.

5   Q    Of course.

6   A    Wayne Jones was a Democrat Election Commissioner appointed

7   in 2000 to present, so he would have been the Democrat.  I

8   believe William Hugh Bishop was the Republican Election

9   Commissioner I believe for that –– during that entire

10  timeframe.  And in 2006, it would have been Edd Jordan as the

11  Sheriff.  He was defeated, so in 2007, when that started, it

12  would have been –– or after that point it would have been Kevin

13  Johnson, the current Sheriff.

14  Q    And at one point when Edd Jordan was the Sheriff and he

15  was running, do you recall that his wife, Edith, had to stand

16  in his place since he was an actual candidate; does that sound

17  right to you?

18  A    Yes.  If the Sheriff is running as a candidate on that

19  given election year, they cannot serve.  So they can put a

20  designee on, such as their wife, chief deputy, someone along

21  those lines.

22  Q    Okay.  So my question to you is, did you or another agent

23  interview William Hugh Bishop, the Republican Commissioner, and

24  member of the Board of Elections?

25  A    I cannot recall.  I know we interviewed his brother, who

1   was the County Attorney.

2   Q    Clay Massey?

3   A    Clay Massey Bishop.  I do not recall if we —

4   Q    You have no specific recollection of whether you or any

5   other agent interviewed William Hugh Bishop, who was on the

6   Board of Elections; right?

7   A    You know, we — multiple agents have, you know, conducted

8   250-plus interviews and documented on 302s, I cannot recall

9   that.

10  Q    All right.  And the same question with Edd Jordan, did you

11  interview Edd Jordan?

12  A    Yes, we did.

13  Q    Do you recall when?

14  A    No, sir, I can't tell you the dates.

15  Q    Did you interview Edith Jordan, who was on the Board of

16  Elections, at least while her husband ran?

17  A    Again, sir, I can't — I don't recall that, no.

18  Q    Okay.  Now, you testified, obviously, about gaining the

19  cooperation of Wanda White and Dobber Weaver, and they were two

20  of the Manchester precinct officers in May of '06; right?

21  A    Yes.

22  Q    And the other two would have been Anthony Short and Lucy

23  Marcum; right?

24  A    Anthony Short, Lucy Marcum, Wanda White, Charles Weaver,

25  and I believe one of them was replaced by Minnie Weaver in the

1  November election.

2  Q    I'm asking about May now.

3  A    May, yes.

4  Q    So we agree on who was there in May?

5  A    Correct.

6  Q    Did you yourself interview Anthony Short?

7  A    No, sir.

8  Q    All right.  And you didn't interview Lucy Marcum either,

9  did you?

10 A    I don't recall if she was interviewed.  I don't recall

11 that happening.

12 Q    Now, would you agree that the FBI during the course of the

13 investigation obtained probably thousands of pages of documents

14 from the Clay County Clerk's Office?

15 A    Yes, that's correct.

16 Q    All right.  And, in fact, when they were brought to the

17 grand jury, wasn't there seven pretty large boxes of documents

18 that were obtained from the Clay County Clerk's Office; do you

19 recall that?

20 A    Initially Mr. Freddy Thompson brought seven boxes and

21 later brought additional records that he did not bring to the

22 grand jury.

23 Q    To the grand jury.  And he testified at the grand jury two

24 times; right?

25 A    He did.

1  Q    I want to ask you a little bit about some search warrant

2  documentations that have already been gone over on direct and

3  through cross.  But specifically, you recall the call list that

4  was found at Al man Stivers' house; right?  That's D51.

5  A    Yes, sir.

6  Q    All right.  And on there, there is a name F-r-e-d-y;

7  right?

8  A    Correct.

9  Q    Okay.  And you made the assumption that's Freddy Thompson?

10  A    Yes, based upon our investigative efforts, the group that

11  was involved in the election fraud scheme, Freddy Thompson was

12  heavily involved and his name is listed on this list.

13  Q    You know that there was -- that Al Man Stivers supported

14  Freddy Thompson obviously in '02, you've already agreed with

15  that when Mr. Stivers asked you the question; right?

16  A    I'm sorry.  Now, what was the question?

17  Q    Well, let me ask it this -- let me just ask this:  You

18  don't know how many Freddy's that Al Man Stivers knows, do you?

19  A    No, sir, I don't know that.

20  Q    D59 was a long list of names seized from the Maricle

21  residence; right?

22  A    Yes, sir, the five-page handwritten notes?

23  Q    Right.  I'm not going to belabor that other than to ask

24  you, would you agree that Freddy Thompson's name is not on that

25  list?

1  A    I would have to look at it, sir.

2       No, I don't see it, sir.

3  Q    Okay.  And the same question with respect to the Rolodex.

4  Freddy Thompson's name, phone number, neither his personal nor

5  the County Clerk's was in that Rolodex, was it?

6  A    I'll have to check.

7       Clay County Clerk's is in here.

8  Q    What's the phone number?

9  A    598-4047.

10 Q    Does it say 598-4047?

11 A    Yes, sir.

12 Q    Does it say Freddy Thompson?

13 A    It says Clay County Clerk's number.

14 Q    Okay.  It doesn't say Freddy Thompson, does it?

15 A    No.

16 Q    Okay.  Look under the "T"s.  I guess that's what you're

17 doing now?

18 A    Actually I'm looking under the F's to make sure it wasn't

19 listed under the first name.

20      MR. BALDANI:  Judge, while he's doing that, I need to

21 consult my co-counsel.

22      THE COURT:  That's fine.

23      THE WITNESS:  Again, there's a County Clerk listing

24 here.  It says County Clerk-Jennings White, it's got Jennings

25 White listed, and it's got two numbers.

1  BY MR. BALDANI:

2  Q    What are those numbers?

3  A    598-2544 and 598-2580.

4  Q    So it has Freddy Thompson's predecessor's number, but not

5  Freddy Thompson by name; would you agree with that, under

6  either F or T?

7  A    Yes, sir.

8  Q    Okay.  And with regard to that first number you said was

9  Clay County Clerk, that very well may be the Circuit Clerk;

10 correct?

11 A    No, I think it just said County Clerk.  I think the

12 Circuit Clerk was on the -- I found the Circuit Clerk in

13 several areas, and it clearly lists Circuit Clerk, this said

14 County Clerk.

15 Q    All right.  Well, the numbers that you read was different

16 from either of those two numbers for the Jennings White entry;

17 right?

18 A    I believe it's a fax number, sir.

19 Q    Which number, please?

20 A    The 598-4047.

21 Q    And what exactly does it say on that card?

22 A    This card is listed under the F, its fax number is at the

23 top and it lists Clay County Clerk's and it's got a number,

24 so --

25 Q    You can't tell the jury whether that is the County Clerk

 1  or the Circuit Clerk, can you?

 2  A    It says Clay County Clerk's.

 3  Q    Okay.  I want to ask you about a couple of the -- follow

 4  up on a couple of the questions that was asked about jobs.

 5  Melanda Adams worked for a period at Freddy Thompson's

 6  office --

 7  A    Correct.

 8  Q    -- we've established that?

 9  A    Yes.

10  Q    Do you know whether she was the lowest paid employee in

11  the office?

12  A    I have no idea.

13  Q    Do you know what she was paid?

14  A    No, sir, I don't.

15  Q    Okay.  You mentioned Chad Thompson working at the 9-1-1

16  center?

17  A    Yes.

18  Q    Are you aware that he was a janitor there?

19  A    I was not aware of that, but I heard that during the

20  testimony, that he was -- he cleaned the building, yes, sir.

21  Q    Do you know what he was paid or how long he worked there?

22  A    No, sir, I don't.

23  Q    Now, I believe I may have already asked you, Freddy

24  Thompson testified to the grand jury two times; correct?

25  A    Two that I'm aware of, yes, sir.

1  Q    All right.  And the prosecutor obviously asked you about

2  Freddy's grand jury testimony during your direct yesterday;

3  correct?

4  A    Yes.

5  Q    All right.  And the first — both times he testified was

6  at the Lexington grand jury; right?

7  A    I believe that's correct, yes.

8  Q    You were there both times, weren't you, at the courthouse?

9  A    I believe I was, yes.

10  Q    And the first time was on or about August 24th of '06?

11  A    I can't recall the date.

12        MR. BALDANI:  Judge, if I could hand him the

13  transcript, I'm not trying to introduce it, but just for the

14  purpose of the date, please.

15        THE COURT:  Yes, sir, you may.

16        THE WITNESS:  Thank you.

17        Proceedings Thursday, August 24th, 2006, Freddy

18  Thompson.

19  BY MR. BALDANI:

20  Q    And he brought a voting machine with him to the grand

21  jury, didn't he?

22  A    He did.  I believe it was on this occasion.

23  Q    And he didn't have an attorney with him when he came, did

24  he?

25        MR. SMITH:  Your Honor, I'm going to object and ask

1 to approach.

2        THE COURT:  Come on up.

3        (Whereupon, the following discussion was had between the

4 Court and counsel at the bench, out of the hearing of the

5 jury.)

6        MR. SMITH:  Your Honor, I believe that what counsel

7 has now done is basically the indictment alleges the false

8 statements made on July the 12th, 2007, testimony, I believe by

9 now introducing to the jury the fact that he was there and now

10 arguing by inference, I believe, through his questions now that

11 somehow that was a better testimony than he got in the other

12 one, I think it's going to force us now to delve into the

13 intricacies again, the same false statements were made, they're

14 very consistent.  He says there are only two complaints and

15 everything else was just hunky-dory in Clay County, and

16 Mr. Baldani now seems to be intent upon building this jury up

17 to think that there's something that we're hiding and that

18 there's something that's missing in this case, and so I just

19 want to pose, again, at this point, my argument for the United

20 States is, Your Honor, that while prior consistent statements

21 are not necessarily admissible, I think he has now opened that

22 door, and I would object to his attempt to get exculpatory

23 statements in evidence in this case.  I know that his question,

24 at this point, has called for him to state what Freddy Thompson

25 may have made an exculpatory statement to these agents, but I

1  do intend to certainly object if that's the direction the

2  questions are going now.

3          THE COURT:  All right.

4          MR. BALDANI:  Can I state my purpose and my

5  intentions, Judge?

6          THE COURT:  Yes, sir.

7          MR. BALDANI:  Your Honor, as I made the Court and the

8  parties aware yesterday, I intended to get into specifics of

9  the 8-24-06 grand jury.  Mr. Thompson is alleged to have

10 obstructed justice by giving untruthful testimony in the grand

11 jury.  As you recall, I filed pretrial motions stating that I

12 don't know, at that time, what the untruthful statements were.

13 I believe his testimony before the 8-24-06 grand jury are

14 truthful and that it shows that he didn't have an intent to

15 obstruct justice, whether at that grand jury or at a later

16 grand jury.  Mr. Smith, on direct examination, asked questions

17 about Mr. Thompson didn't tell you that there were complaints

18 in 2006 except by some perhaps disgruntled candidates, and, in

19 fact, he testified in August of '06 that the State Board of

20 Elections contacted him, that his phone was ringing off the

21 hook, and so I intend to -- and I think it's perfectly proper,

22 I let everybody know that I was going to do that, and, you

23 know, if the United States feels that opens the door and that

24 they, therefore, want to go into 8-24-06, that's perfectly fine

25 with me.  If they want to introduce the whole transcript,

1   that's perfectly fine with me.  But it's extremely important

2   and relevant to our defense to the obstruction of justice

3   charge to show that he had —— he made statements acknowledging

4   these complaints at both of his grand jury appearances.

5          MR. SMITH:  I would disagree.  This is a substantive

6   crime that occurred on July 12th.  Let's assume —— I disagree

7   with his characterization of August.  But let's assume he came

8   in and he told them a different story, but he came in in August

9   of '06, this is Ken Taylor investigating a different case than

10  the one which we were investigating in July of '07, totally

11  different case.  They were looking at a precinct of officers

12  out in the county, one isolated precinct, called 15, 20

13  witnesses in, and this clerk was called to bring in the

14  machine.

15         Now, in a separate inquiry, with the focus of the

16  grand jury on this enterprise, he comes in, and that's what

17  he's charged with obstructing, is this investigation that

18  occurred on July the 12th.  If he made umpteen other innocent,

19  good-faith-type attempts to maybe do something else in some

20  other investigation, what relevance does that have in

21  establishing whether the elements are met on July the 12th?

22  And I would submit to the Court that it is not relevant, it

23  should not be brought in before the jury, and I make this

24  sub-argument as a fallback position, I think I'm forced to

25  basically try two cases in a situation here where I'm really, I

1    don't think, required to by law, because this defendant is

2    charged with obstructing this grand jury's investigation on

3    this date.  And for counsel now to try to interject

4    exculpatory —— if he wants to argue statements in August of '06

5    before a different investigative body on a different

6    investigative issue, I fail to see how that's relevant.

7            MR. BALDANI:  Can I make a couple of comments in

8    response, Your Honor?

9            THE COURT:  Yes.

10           MR. BALDANI:  Okay.  I don't believe the first grand

11   jury was about a separate unrelated matter.  You know, I can

12   show you the transcript, I don't think that that's borne out.

13   Mr. Smith said Mr. Taylor asked questions, but he asked

14   questions at both grand juries and you asked questions I

15   believe —— Mr. Smith asked questions at the 8-24 grand jury as

16   well.  We can get the transcript.

17           MR. SMITH:  That's not my recollection, Your Honor.

18           MR. BALDANI:  And, Judge, that's why I brought it up

19   yesterday.  I understand why you didn't want to give an advance

20   ruling, but I felt like it was fair game, that's why I told

21   everybody.  And Mr. Smith didn't object yesterday.  And, you

22   know, I've stated my position.

23           And one other thing I want to add, Judge.  If you

24   remember, like I said, we objected to the lack of notice as to

25   what the false statements were.  In Mr. Smith's opening

1  statement, he said Freddy Thompson obstructed justice by not

2  bringing documents to the grand jury.  And if you remember,

3  that's when I filed a motion to reconsider, because I said it

4  appeared to us that the government had changed its theory from

5  he had testified falsely to he failed to bring documents.

6          So my point is, it has not been crystal clear to us

7  at any point until yesterday what this obstruction of justice

8  was.  So, I mean, that's my final answer to that.  But I would

9  be glad to show you the transcript as far as who participated

10 and you can look and see what the subject matter —

11         THE COURT:  You can show it to me.  I'm going to

12 excuse the jury for their morning break, and you can show me

13 the transcript, but I'm not inclined to allow you to follow up

14 on this line of inquiry for a different grand jury.  I am

15 inclined to sustain the objection of the United States, but I'm

16 going to excuse the jury first.

17         MR. BALDANI:  Okay.

18     (Whereupon, the following proceedings continued in open

19 court.)

20         THE COURT:  Ladies and gentlemen, I'm going to excuse

21 you while I continue to discuss an issue with counsel.  We'll

22 take our morning break at this time.  Twenty minutes.  Please

23 keep in mind the admonitions that you've been given previously

24 not to discuss the case among yourselves while we are in

25 recess.  The jury will be excused for 20 minutes.

1      (Whereupon, the jury retired from the courtroom, after

2  which the following proceedings were had in open court.)

3          THE COURT:  Thank you.  Please be seated.

4          MR. BALDANI:  Judge, the 8-24 transcript is there.  I

5  don't know if you want to see it or if you want me to use it

6  and kind of explain to you or show it to Mr. Smith.

7          THE COURT:  Well, Agent Briggs, if you could return

8  that transcript back to Mr. Baldani.

9          It's the position of the United States that the

10  August '06 grand jury was not directly related to the matters

11  that are charged in this case but that Mr. Thompson delivered a

12  voting machine on that date and was asked some questions by

13  Mr. Taylor.  Mr. Baldani, I believe, takes the position that,

14  no, that the July grand jury appearance was a follow-up to the

15  earlier grand jury appearance and concerned the same subject

16  matter.  Have I correctly characterized the parties' positions?

17          MR. BALDANI:  Yes, Your Honor, but I think I misspoke

18  on one thing, I think Mr. Smith was correct.  Ken Taylor

19  participated with him at the second one, and from looking

20  through it, I don't see that Steve Smith asked questions.  So

21  he was correct, and I was wrong on that point, Judge.

22          THE COURT:  All right.

23          MR. BALDANI:  But you correctly stated the position,

24  I do think it was about the same matter, the same type of

25  questions were asked.  I could give you specific quotes if you

1    wish, but I was wrong about Steve Smith being there apparently.

2              THE COURT:  All right.

3              Mr. Smith?

4              MR. SMITH:  Your Honor, I think the government's

5    position on this is, number one, that the count to which this

6    defendant has been indicted was making false -- obstructing a

7    federal grand jury on the July 2007 date.  And I believe that

8    what we have here is a separate appearance before another

9    attorney in our office inquiring about a separate precinct in

10   Clay County.

11             Now, Mr. Thompson's attorneys are correct in that it

12   did involve the same 2006 election.  And my argument to the

13   Court is that let's assume for the sake of argument that they

14   asked the same questions I did, exactly, verbatim, in August of

15   '06.  It is not relevant for counsel to bring that in this

16   matter because what we're charging is that he made a false

17   statement in July of 2007.  If he made a hundred other truthful

18   statements, but on the day he was sworn and taking an oath

19   before that grand jury he lied, we prove it, that's what

20   relevant.  Whether he made a hundred truthful statements

21   before, again, I believe the rules of evidence say -- I would

22   just argue that that's not relevant and that it would be

23   hearsay if he intends to offer it as an exculpatory statement,

24   and, therefore, our position is it should not be admitted in

25   this matter.

1          MR. BALDANI:  Could I have a brief response, Judge?

2          THE COURT:  Yes, sir, you may.

3          MR. BALDANI:  All right.  For example, Judge, on

4    page 18 of the transcript we're talking about, Mr. Taylor asked

5    if Freddy Thompson got calls from the State Board of Election

6    on the May 6th date.  And his answer was yes, he got calls,

7    that he sent people out there.  So Mr. Smith directly asked –

8    it was brought up yesterday – about complaints, and we all know

9    about the evidence of complaints that have come in.  So my

10   argument, Your Honor, would be if Freddy Thompson is asked

11   about the same type thing on July 12th, the issue –– there's an

12   issue of intent as to his intent –– his intent to testify

13   falsely, his intent to obstruct justice.  If Freddy Thompson in

14   his head thinks, I've told them about this, you know, I've told

15   them the State Board of Elections called, I sent somebody out

16   there, et cetera ––

17         THE COURT:  Well, he didn't tell the grand jury on

18   July 12th of '07 that, he told them something different, so

19   this would be proof that he lied on July 12th.  It may go to ––

20   if it goes to intent, it's a later exculpatory statement, which

21   would not be admissible, it would be inadmissible hearsay at

22   that point.  So I'm going to sustain the objection of the

23   United States to questions about his testimony before the grand

24   jury in August of –– August 24th of 2006 –– I'm sorry, 2007.

25         MR. BALDANI:  I understand, Your Honor.  One quick

82

1    question.  Could I submit this as a Court exhibit in lieu of an

2    avowal, Your Honor?  It's sworn testimony, just so that the

3    record is complete of what was asked and what was answered?

4              THE COURT:  You can submit it as a Court exhibit,

5    yes, sir.

6              Madam Clerk, it would be the next numbered Court

7    exhibit that has --

8              THE CLERK:  No. 5.

9              THE COURT:  No. 5, it would be Court Exhibit No. 5.

10   I believe some of those Court exhibits were later admitted, and

11   so there may not be actually a Court Exhibit 3, for example,

12   but this would be numbered as No. 5 for the record.

13             MR. BALDANI:  And, Judge, one other question.  When

14   Mr. Smith objected is when I asked the agent whether, in fact,

15   Freddy Thompson did not bring an attorney to the grand jury.

16   When we got to the bench, that wasn't what Mr. Smith was

17   objecting about, but I intend to ask that on the second one as

18   well.

19             THE COURT:  With respect to the second grand jury

20   appearance?

21             MR. BALDANI:  Yes, Your Honor.

22             THE COURT:  What's the relevance of whether he

23   brought an attorney before the grand jury for his second

24   appearance and the Court has already excluded his testimony in

25   the second appearance?

1          MR. BALDANI:  You excluded the first.  I was —— I

2    started asking about the first.  It's the second that Mr. Smith

3    went into.

4          THE COURT:  And what is the —— what's the relevancy

5    of whether he brought an attorney to the grand jury?

6          MR. BALDANI:  Whether he had an attorney?  A couple

7    of things, Your Honor.  If you remember, in the undercover

8    recording with Mr. White, Mr. Thompson asked, you know, they're

9    talking about people going to the grand jury, what's he need an

10   attorney for, that kind of thing.  So it shows —— to me it

11   shows, and I think there can be an inference, that he didn't

12   think he had done anything wrong.

13         Now, you know, I know that it's improper for the

14   government to comment on someone's exercising of their right to

15   an attorney, but that doesn't mean the flip side is improper.

16   And I don't know that the government is objecting to that.  But

17   I think it's relevant because there's been evidence as far as

18   his statement that was admitted, you know, what's this person

19   need an attorney for, number one; but, number two, these

20   statements that are the crux of the obstruction are really

21   quite vague as far as his untruthfulness.  His untruthfulness

22   has to do with if the jury believes Dobber Weaver that Anthony

23   Short threw the voter assistance forms away, then his statement

24   very well may not be considered to be untruthful.  And there's

25   been testimony, you know, about Mr. Maricle being a defense

1   attorney and being guarded and giving sort of veiled answers,

2   and the fact of the matter is, Your Honor, Mr. Thompson is the

3   exact opposite.  He's a naive individual.  I mean, what's —

4   he's talking to Kennon White, what's a guy need an attorney at

5   a grand jury for.  And I think it's relevant that he, when he

6   went into the grand jury, not represented, not coached,

7   prepared, he just went, he brought his machine, and he answered

8   the questions.  And, you know, it's not the — it's not the

9   biggest point in the world, but I think it's perfectly proper

10  and I think it's relevant.  And I'm not even sure if the

11  government is objecting to it.

12              THE COURT:  Well, let's see if they do.

13              Mr. Smith?

14              MR. SMITH:  We are objecting to it, Your Honor.

15  Again, it's irrelevant, it's an exculpatory nonverbal — well,

16  I'm not going to say it's nonverbal.  He is asking this —

17  number one, I do not — I do not know, at this point, whether

18  the witness could answer his question or not.  But what's the

19  relevance of an August 2006 meeting?  I believe that our

20  objection goes to that matter in total, including whether he

21  appeared there with a lawyer, without a lawyer, or whatever.

22  The fact of the matter is that's irrelevant as to whether or

23  not he obstructed justice on the July 2007 date.  And I believe

24  that, again, commenting about the legal representation of a

25  person before a grand jury, I do think that that has

1    implications, which counsel has acknowledged we can tie the

2    government's hands, but let us go ahead and try to make some

3    nefarious inference from the fact that there was not an

4    attorney there.  If we brought out that there was an attorney

5    there to try to show Mr. Thompson was guilty, of course, that

6    would be objected to and I think it would be rightfully

7    excluded.  Now he wants to open the door the reverse way and

8    try to bring it in not on the matter in issue in July of '07,

9    but to go back to August of '06 and bring it in that way, and I

10   think that that is irrelevant.

11              THE COURT:  I don't see the relevancy of it and I do

12   see some real problems with the inferences that can be drawn

13   from not having an attorney present versus having an attorney

14   present.  So I'm going to sustain the objection to that

15   question.

16              All right.  We're going to take —— I'm not sure how

17   much of our time we have left of our 20 minutes.

18              THE MARSHAL:  About eight minutes.

19              THE COURT:  We'll take an eight-minute recess.

20        (Whereupon, a short recess was had, after which the jury

21   returned to the courtroom and the following proceedings were

22   had in open court.)

23              THE COURT:  All members of the jury are present.  The

24   parties and counsel are present.

25              Special Agent Briggs, you're still under oath.

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Mr. Baldani, you may continue.

3          MR. BALDANI:  Thank you, Judge.

4    BY MR. BALDANI:

5    Q    Agent Briggs, Freddy Thompson was subpoenaed to a federal

6    grand jury on July 12th of '07; right?

7    A    Correct?

8    Q    And you're looking, I suppose, at D84, the transcript that

9    was introduced yesterday?

10   A    Yes, sir.  It's "D" as in "David" 84.  It's the Thursday,

11   July 12th, 2007, Freddy W. Thompson testimony in Lexington,

12   Kentucky, federal grand jury.

13   Q    All right.  And appearing for the U.S. was Steve Smith and

14   Ken Taylor; right?

15   A    That's correct, sir.

16   Q    And, again, you were there at the courthouse that day;

17   right?

18   A    I was there, yes.  I was there most days.  I'm recalling

19   being there on a day when he was there, yes, sir.

20   Q    And Freddy Thompson brought a voting machine with him that

21   day, didn't he?  Look over at page four, that will help you to

22   answer, I think.  Look at question line seven.  Freddy was

23   asked, "You were subpoenaed to produce a voting machine?"  And

24   he said, "Yes."

25   A    Yes, that's correct.

1  Q    So he did produce a voting machine; right?

2  A    He did, sir, yes.

3  Q    All right.  And yesterday Mr. Smith asked you some

4  questions about answers that Freddy Thompson made at that grand

5  jury; right?

6  A    Correct.

7  Q    And he prefaced those answers about the count in the

8  indictment charging Freddy Thompson with obstructing justice.

9  Do you remember that yesterday?

10 A    That was not discussed at the grand jury.

11 Q    No.  No.

12 A    You're saying "yesterday."

13 Q    When you were asked yesterday.  In other words, you were

14 asked about some of the questions and answers that Freddy

15 Thompson gave July 12th; right?

16 A    Correct, yes, sir.

17 Q    All right.  Some of the questions and answers.  I want to

18 talk to you about a couple that were asked about and a couple

19 that weren't asked about, if that's okay with you?

20 A    Yes, sir.

21 Q    Do you recall -- I'm just going to ask you generally at

22 first.  Freddy was asked several questions about complaints

23 about the machine during the May '06 primary; right?

24 A    Can you refer me to the page and the question, sir?

25 Q    Well, that's why I said I was going to ask you generally.

1  Do you recall that that was a topic of questions and answers at

2  the grand jury, questions and answers from your testimony

3  yesterday?

4  A    I was not in the grand jury when he testified.  I've read

5  two grand jury testimony statements from Mr. Thompson, again,

6  to refresh my memory on exactly what was asked.  I would like

7  to refer to those questions if we could.

8  Q    I'll pinpoint you to pages and lines in just a moment.

9  A    Okay.  Yes, sir.

10  Q    But I'm going to ask you first, from your memory, isn't it

11  true that Freddy Thompson did not deny that he received

12  complaints about votes being stolen in May of '06?

13  A    I believe he provided one name of an individual who was a

14  candidate that complained about they thought that they were --

15  their election was stolen from them or something along those

16  lines.

17  Q    Okay.  Just one name is your recollection?

18  A    There may have been two, but can you point me in the

19  direction, please?

20  Q    I'm going to.  I'm going to.  But the bottom line is, he

21  expressed his belief that most of the complaints about the

22  machine seemed to come from losing candidates or their

23  families, didn't he?

24          MR. SMITH:  Your Honor, I'm going to object to asking

25  the witness now to characterize testimony before a grand jury.

1           THE COURT:  And it's — I'll sustain.  If you want to

2   refer him to a specific part of the testimony, you can do so.

3           MR. BALDANI:  Okay.  Thank you, Your Honor.

4   BY MR. BALDANI:

5   Q    Let's see, let's look at page ten, line five.

6        Question:  Did you have any complaints during the May '06

7   primary?"  Right?  Are you with me?

8   A    "Mr. Thompson, did you have any complaints during the

9   May '06 primary?"  Yes, that's the correct question, sir.

10  Q    And his answer?

11  A    "The election day or after the election or what?"

12  Q    And then the question was followed up:  "Anytime."  Right?

13  A    "Anytime?  Regarding the process of voting, or the

14  machine, or allegations that poll workers might have been

15  manipulating things?"

16  Q    And this was the exact question and answer exchange that

17  the prosecutor had you read yesterday.  Do you recall him

18  reading this question and answer exchange yesterday?

19  A    Yeah, I think this is one of the areas we covered.

20  Q    I want you to look over at the next page, page 11.  And

21  Freddy Thompson is being questioned about complaints from a

22  candidate Blaine Smith, who ran for jailer; right?

23  A    Which line are you on, sir?

24  Q    Look down at the bottom of page ten for some context.

25  It's line 23.  It says, "Blaine Smith for jailer"; right?

 1  A    Question:  "Who?  I couldn't understand you."

 2       Answer:  "Blaine Smith for jailer."

 3  Q    Okay.  All right.  Let's look up here at line one.  "When

 4  did he bring that complaint to you?"  Okay?

 5  A    Yes, sir.

 6  Q    "Right around dinnertime."

 7  A    Answer:  "Right around dinnertime."

 8  Q    What's dinnertime mean to you?  Is that lunch or is that

 9  the evening meal?

10  A    That's the evening meal.

11  Q    Have you heard people call lunch dinner?

12  A    I've heard that.

13  Q    In any event, line five, he talks about the complaints

14  that he received.  What was that answer?  Read that, if you

15  would, line five.

16  A    Line five:  "Yes.  Yes, really the only complaints we had

17  was losing candidates and their families, really and truly."

18  Q    So he doesn't say complaints was just for one person or

19  two people, he says they're from losing candidates and their

20  families.  He doesn't specify how many people complained, does

21  he?

22  A    I believe he named two individuals and then made that

23  statement.

24  Q    There is two specific individuals' names, but that answer,

25  he doesn't state a number, does he?

1  A    No, he doesn't give an exact number, no, sir.  Candidates

2  and their family.

3  Q    And then line seven, question:  "You had complaints from

4  losing candidates other than Blaine Smith?"  Read that answer,

5  line seven.

6  A    "Just, yeah, just hearsay and, you know, people running

7  their mouth, yeah."

8  Q    Just hearsay.  So he doesn't specify who these hearsay

9  complaints were from, does he?

10      MR. SMITH:  Your Honor, I'm going to object.  I think

11  that the answer must stand for itself here and asking the

12  witness again to characterize the defendant's intentions by

13  that answer is improper.

14      THE COURT:  Sustained.

15  BY MR. BALDANI:

16  Q    All right.  He's asked any —— he had already mentioned

17  this Blaine Smith person.  Line 11, "Any that you can recall?"

18  Read the answer on line 12.

19  A    "Well, Terry Spurlock, he was saying that he was getting

20  cheated, which he runs in every election and he gets worse and

21  worse every time he runs, ah, well, I mean, I" ——

22  Q    Okay.  And then Question No. 15:  "Did they explain to you

23  how they thought they were being cheated?"  Right?

24  A    That was line 15, yes sir.

25  Q    So the question doesn't specify Blaine Smith, Terry

1   Spurlock, family members, or others, does it?

2            MR. SMITH:  Same objection, Your Honor.

3            THE COURT:  Sustained.

4   BY MR. BALDANI:

5   Q    All right.  And we've already established there was two

6   prosecutors that day, right, Mr. Smith and Mr. Taylor?

7   A    Yes, sir.

8   Q    And Mr. Taylor also asked some questions.  You've reviewed

9   this transcript; right?

10  A    Yes.

11  Q    Mr. Taylor asked some questions as well; right?

12  A    I believe so.  But, again, refer me to the area you're

13  referring to.

14  Q    All right.  Page 23.

15  A    Twenty-three?

16  Q    Yes.  Let me — let's look at line 16 — or line 15

17  indicates that the question is from Mr. Taylor.

18  A    By Ken Taylor, attorney, yes, sir.

19  Q    "Mr. Thompson, what were the allegations regarding how the

20  votes were being stolen?"  Right?

21  A    Yes, sir.

22  Q    And his answer is — read the answer.

23  A    "Well, that's like the Blaine Smith I was telling you a

24  minute ago said that like when the voter would — they thought

25  they had voted and walked away from the screen, said that the

1  election officers was going and like changing their votes, but

2  I asked several voters from the precinct and they —— nobody ——

3  nobody —— nobody never seen nothing that I talked to, and the

4  report —— I've got a report here somewhere that shows —— it

5  shows like in the ballots, in order that the ballots was cast

6  and they're all like in less than two minutes of each other.  I

7  mean, they're —— every ballot there is less than two minutes of

8  each other.  That's a real heavy precinct, they vote like 700

9  in that precinct.  They was probably lined out till 7:30, 8:00

10 that night still voting."

11 Q    Okay.  And after he mentioned that the complaints were

12 about people getting their votes changed, Mr. Taylor asks –

13 look at line 21 – "Changed to what?"  Read his answer.

14 A    Line 21, "Changed to what?"  That's the end of a question.

15 Q    Right.  That's the ——

16 A    That's the end of a —— yeah, of a longer question.

17 Q    Yeah.  Read Freddy's answer.

18 A    His answer on line 22, "Well, another candidate."

19 Q    Okay.  So the fact is Freddy Thompson did tell the grand

20 jury about these complaints about votes being changed?

21         MR. SMITH:  Your Honor, I'm going to object again,

22 asking him to characterize.

23         THE COURT:  Sustained.

24 BY MR. BALDANI:

25 Q    All right.  Freddy Thompson was also asked about voter

 1  assistance forms on July 12th of '07; right?  Do you recall

 2  that?

 3  A    Excuse me?

 4  Q    We'll get into specifics.  Do you recall that general

 5  topic, though?

 6  A    I'm sorry, what form and what date?

 7  Q    Voter assistance forms.

 8  A    On which date?

 9  Q    The date we're talking about, July 12th, the date that we

10  have on the transcript that was introduced as an exhibit.

11  A    What page are we on, sir?

12  Q    Let's see.  Go to page 13, line 21, and see if the

13  government exhibit indicates that he is being asked about voter

14  assistance forms.

15  A    Which line, sir?

16  Q    I'm talking about page 13, line 21.  "And by law you're

17  required to have a form filled out on those individuals."

18  Right?

19  A    Correct.

20  Q    And read his answer.

21  A    Line 23, answer:  "Yes, it should be there."

22  Q    Okay.  And then a little later in the transcript Freddy

23  was asked if anybody would have access to those voter

24  assistance forms that were kept in his office, wasn't he?

25  We're talking page 15, line 12, "So you've got no way of

1  verifying whether other people may have access to these records

2  other than your office?"  Right?

3  A    Yes, that's what it says.

4  Q    Read his answer at line 14.

5  A    Line 14, answer:  "No.  No, not really.  I mean, I

6  couldn't say nobody could have touched them.  No, I couldn't

7  say that."

8  Q    Okay.  And then the question about voter assistance forms

9  continue on the next page, page 16, and I'm referring up there

10  to the top, line four, he's asked about voter assistance forms.

11  "But as far as you know, this is a complete" —

12      And before I go to that, he had brought several boxes, I

13  think you — I already asked you that, he had brought several

14  boxes of documents to the grand jury; right?

15  A    Yes, sir, I believe this is the date where he brought

16  seven boxes.

17  Q    So, but as far as you know, this is a complete accurate

18  representation of every voter assistance form that was executed

19  by voters in Clay County in May and November of '06.  And read

20  his answer at line eight.

21  A    Line eight, answer:  "That's what was turned in by the

22  precinct workers to us."

23  Q    And you have become pretty familiar with election process

24  in this case and your previous election cases; right?

25  A    Yes, sir.

1  Q    And the precinct officers fill out voter assistance forms
2  and then they go to the election — they're supposed to go to
3  the election bag that's returned to the County Clerk; right?
4  A    The voter assistance forms that are filled out are
5  supposed to be returned to the County Clerk's Office and housed
6  at the County Clerk's Office.
7  Q    Okay.  So the County Clerk should only maintain and be
8  responsible for what's brought to him by the election officers;
9  would you agree with that?
10  A    That's correct.
11  Q    And the answer that he gave that I just asked about —
12  let's see, "I've got what was turned in by the precinct
13  workers," that's the same answer that he gave when he was
14  recorded by Kennon White, and that's Government's Exhibit A10A.
15  Do you recall — You reviewed the undercover recordings; right?
16  A    Yes, sir.
17  Q    And you remember Kennon White asking Freddy Thompson about
18  voter assistance forms; right?
19  A    I recall the general topic, sir, but I cannot recall the
20  specifics of the conversation without reviewing that
21  transcript.
22        MR. BALDANI:  Okay.  I believe it's A10A, Your Honor,
23  is the transcript of that recording.
24  BY MR. BALDANI:
25  Q    Have you got A10A there, Agent Briggs?

1   A    Yes, I have Government Exhibit A10A.

2   Q    And does that appear from the cover to be the recording of

3   Kennon White made of Freddy Thompson on May 1st of '07?

4   A    Yes, sir.

5   Q    Okay.  Look over to page eight, if you would, please.

6   Look about halfway down where it says, "Are they all there or

7   did they give them?"  Do you see where I'm at, right before it

8   says transcript at 00:16?  Do you see where Kennon is asking

9   Freddy Thompson about the voter assistance forms?

10  A    Give me a moment to read it, sir.

11  Q    Okay.  Have you found what I'm getting at, Agent?

12  A    Yes, sir.

13  Q    What was Freddy Thompson's answer?

14  A    Well, he clarifies his answer by saying, "All those they

15  brought here, which means the ones that they brought here I

16  still have," meaning —

17  Q    All those that the election officers have brought here?

18  A    Yes, but he said — he didn't just say they're all here,

19  he says, "All those they brought here."

20  Q    Right.  That's what I just asked you about.  The County

21  Clerk can only be responsible for whatever voter assistance

22  forms are brought to him by the precinct officers, and you

23  agreed with me; right?  Right?

24  A    Yes.  But it sounds as though he's questioning in his own

25  mind whether all the forms were actually delivered to his

1  office, reading the context prior to and after that.

2  Q    Okay.  Let me just make sure I got this straight.  We

3  talked about how the voter assistance forms get from the

4  precinct to the County Clerk; right?  Didn't we just talk about

5  that?

6  A    Yes.  Yes.  The —

7  Q    Okay.

8  A    The election officers that serve in the precinct that day

9  are supposed to fill out those forms, those — any and all

10 documentation, sheriff's reports, voter assistance forms, and

11 so forth, are supposed to be transported to and stored at the

12 Clerk's Office.

13 Q    And I asked you about line eight up there, that's what was

14 turned in by the precinct workers; right?

15 A    Where are you at, sir?

16 Q    Line eight.

17 A    Page 16.

18 Q    He was asked about the voter assistance forms at the grand

19 jury, and his answer was, "That's what was turned in by the

20 precinct workers to us."  Right?

21 A    Yes, sir.

22 Q    All right.  And then I asked you if that's, in fact, what

23 he told Kennon White when Kennon White went in with a recording

24 device on him?  Are they all there or did they give them all

25 those they brought here?

1  A    Well, again, I think, sir, this could be open to

2  interpretation.  I mean, again, he's clarifying his answer by

3  saying "all those they brought here."

4  Q    Okay.

5  A    So, I mean — so I guess my point would be that he could

6  be — he could be advising that not all the forms were brought

7  to him.  I mean —

8  Q    Who brings them here?  Who would you figure "they" brought

9  here?  Who brings them here, the election officers; right?

10 A    Yes, sir.

11 Q    Okay.  So would a reasonable interpretation of that be

12 I've got everything that was brought here by the election

13 officers?

14         MR. SMITH:  Your Honor, I'm going to object as to the

15 form of that question.

16         THE COURT:  Sustained.  I think he's answered the

17 question to the best of his ability.

18 BY MR. BALDANI:

19 Q    If an election officer had thrown voter assistance forms

20 in the trash can, Freddy Thompson would not be able to produce

21 those to the FBI or the grand jury, would he?

22 A    No, sir.

23 Q    And you never interviewed Anthony Short, did you?

24 A    I don't recall that interview being conducted, sir.

25 Q    I want to ask you — the final topic, the grand jury

1   testimony, I want to ask you about what we've agreed to call

2   the illicit training; okay?  You testified on direct about

3   Freddy's grand jury answers about Wanda and Dobber Weaver

4   giving him after-hours training; right?

5   A    Yes.

6   Q    All right.  If you would go to page 26, line 13, who's

7   asking the question?  Go to line 12, who's identified as asking

8   the question?

9   A    Line 12 says by Ken Taylor, attorney.

10  Q    The question is:  "Mr. Thompson, I'm going to go back up a

11  little bit to follow up on a question I asked you earlier, but

12  I'm going to be more specific.  Did Wayne Jones have access to

13  the voting machine demonstrators, demos, prior to the

14  election?"

15       All right.  Read that answer.

16  A    Line 17, answer:  No, no, I had it in my office all day.

17  He was with me all the time.  I was the only one that took it

18  out and demoed it or demoed at like the fire departments and

19  school functions and all."

20  Q    Okay.  But Mr. Taylor kind of prefaces his questions, "I'm

21  going to go back to something I asked you about a little

22  earlier"; right?

23  A    Correct.

24  Q    So I'm going to go back a little earlier in the

25  transcript.  Would you turn over to page eight, please?

1   A    Yes, sir.

2   Q    Now, the question here —— this is before Ken Taylor gets

3   back in, but read the question at line —— well, the question at

4   line two, "When you implemented this change in Clay County, how

5   did you go about educating the voters in Clay County about how

6   to operate this new machine?"

7        Freddy answers:  "In '06?"

8        And the question is:  "Yes, sir."

9        Read the answer at line seven.

10  A    Line seven, answer:  "Well, you can see I had three copies

11  in The Manchester Enterprise, you know" ——

12  Q    Let me —— let me stop you there.  "You can see I had three

13  copies."  Did you see any advertisement in these documents or

14  in your investigation where Freddy Thompson ——

15            MR. SMITH:  Your Honor, objection to the relevance.

16            THE COURT:  I believe we're getting a little far off

17  track of your original question, so I'll sustain the objection.

18  You'll need to tie this in some way.

19  BY MR. BALDANI:

20  Q    Just read that answer, if you would, please.  Line seven.

21  A    Again, line seven, answer:  "Well, you can see I had three

22  copies in The Manchester Enterprise, you know, step by step.  I

23  took it to the fire departments like on fish fries for

24  candidates, whatever.  I took it to the senior citizens home to

25  demonstrate it.  I set it up at Wal-Mart's sidewalk the first

 1  of May.  The school system got a thing called 'Reading

 2  Celebration,' they was like 5,000 people there and I took it

 3  there.  I hauled it for a month around just everywhere I could

 4  haul it."

 5  Q    Okay.  Now, go to the very next page and look at line two.

 6  A    Page nine, line two?

 7  Q    Right.  And Ken Taylor, again, takes up the questioning;

 8  right?  Right?

 9  A    Line two, by Ken Taylor, attorney, correct.

10  Q    "Let me interrupt here if I could for just a moment.

11  Mr. Thompson, were any of those demos available to persons

12  besides yourself leading up to the May 2006 primary?"  That's

13  the question; right?

14  A    Yes.

15  Q    All right.  And then he's talking about Freddy -- the next

16  question:  "You said you carried one around for a while."  And

17  he's talking about the answer about carrying the election

18  machine around to those various places we just talked about.

19  A    Yes, line seven.

20  Q    Okay.  And then line 11, "Was anyone else doing that,"

21  carrying the machine around.  And read the answer.

22  A    "No, huh-uh.  There was no" -- "there was just one demo

23  machine."

24  Q    Okay.  So when the -- the first question I asked you about

25  was this page 26 when Mr. Taylor said, "I'm going to back up a

 1  little bit to follow up on a question I asked earlier"; right?

 2  A     Page 26.

 3  Q     Line 13, that's where we start.

 4  A     Line 13.

 5  Q     So when he says, "I'm going to back up," he backs -- he's

 6  backing up to questions about did anybody else take the demo

 7  machine around?

 8          MR. SMITH:  I'm going to object, it calls for

 9  speculation as to what the interrogator meant by that, and I

10  don't believe this witness can state that.

11          THE COURT:  Sustained.

12  BY MR. BALDANI:

13  Q     Now, the seven boxes, they were seized by the FBI at the

14  County Clerk's Office pursuant to a subpoena at some point in

15  the investigation, weren't they?

16  A     I believe they were delivered to the grand jury that day.

17  I would have to see the -- well, I'd have to look at the date

18  on the evidence.

19  Q     Okay.  You don't -- you think that maybe Freddy Thompson

20  just brought them for the first time to the grand jury or do

21  you think that the -- do you think some agent had already

22  gotten them from the County Clerk's Office?

23  A     I would have to look at the evidence sheet to determine

24  what date those were obtained.

25  Q     Okay.

1    A    But I do recall there were seven obtained — roughly seven

2    boxes on the first date, and then at a later date another — I

3    think another box or some additional documents were handed

4    over.

5    Q    You went through all those boxes, didn't you?

6    A    Yes, sir.

7    Q    Now, you talked about search warrants that were executed

8    in the course of this case.  You didn't execute a search

9    warrant on Freddy Thompson's home or his office or seek a

10   search warrant for either of those places, did you?

11   A    No, sir.

12   Q    Okay.  And Freddy was only on one undercover recording;

13   correct?

14   A    As I recall it was just one.

15   Q    And were you the one that would make the calls as to who

16   would go to who and when to go to who, as far as, Kennon, you

17   go to Freddy or, Wanda, you to go to Cletus?  I mean, are you

18   the one that's making that call, or are they free to do it

19   themselves?

20   A    No, we were directing them as to who to go to and speak

21   with.

22   Q    So you made the call to have Kennon White go to Freddy

23   Thompson; right?

24   A    Yes, sir.

25   Q    Okay.  And you never asked Wanda White to go to Freddy

1  Thompson and record him; right?

2  A    You know, I can't recall specifically.  I know that they

3  were cooperating at the time, we involved them in the

4  decision-making process.  We wanted to capture certain

5  individuals, you know, discussing this scheme.  In some cases,

6  it was whoever had the closest relationship with that person,

7  whoever knew them the best.  So I'm not saying we didn't ask

8  her to do that, but —

9  Q    Well, did she — did she go and talk to whoever you told

10 her to?

11 A    I mean, generally speaking, some individuals, you know,

12 she didn't have a close relationship with and she didn't think

13 they would talk to her.  And, of course, you know, her whole

14 family was under law enforcement scrutiny and some people were

15 afraid of her and had shunned her prior to us asking her to do

16 the recordings.  So some people she didn't feel comfortable and

17 safe in going to record.

18 Q    Let me just ask it this way, Agent:  Do you have any

19 recollection of ever asking Wanda White to go record Freddy

20 Thompson and ask him, see if you can get him to make some

21 statements about this illicit training?

22 A    Asking Wanda?

23 Q    Yeah, get Freddy to talk about this after-hours illicit

24 training.  You don't have any recollection of asking her to do

25 that, do you?

1  A    Again, sir, we had conversations and, again, some people

2  had started to shun the Whites based upon their family being

3  under investigation.  It's possible we asked her to do that and

4  she didn't feel comfortable or didn't feel safe in doing so,

5  but I can't recall specifically.

6  Q    Do you have a 302 that would document or even suggest that

7  you asked Wanda White to do that and she said no, I better not

8  do that?

9  A    No, this was — that's not evidence.  This was a planning

10 stages of — planning stages to gather evidence in the

11 investigation, so we wouldn't have not — we wouldn't have

12 recorded that.

13 Q    You do not have a specific recollection of Wanda White

14 saying no, I don't want to do that, I can't do that, do you?

15         MR. SMITH:  Your Honor, that's been asked and

16 answered, I believe.

17         THE COURT:  It's been asked and answered several

18 times.  I'm going to sustain the objection.

19 BY MR. BALDANI:

20 Q    Agent Briggs, the recording of Freddy Thompson was May 1st

21 of '07.

22 A    Correct, sir.

23 Q    And you couldn't have asked Wanda White to go ask Freddy

24 about the illicit training because she hadn't even told you

25 about it on that date, had she?

1  A    No, I wouldn't say that's true.  She told us a number of

2  things — well, she gave us a number of notes.  I believe you

3  had her review one set of notes here in the courtroom.

4  Q    Right.

5  A    But there were other additional notes that she had

6  documentation of people that she knew to be involved in the

7  scheme, in the election fraud process, within its criminal

8  enterprise.

9  Q    Right.

10 A    So it's very possible we — you know, we knew about that

11 because it was given over to us in previous notes that were

12 given to us prior to the one that you had her review here in

13 court.

14 Q    Okay.  I asked you earlier about all these notes and I

15 asked you whether anywhere it was documented about this illicit

16 training, and you said, "I don't know"; right?

17 A    I would have to review those notes again, sir, but the

18 fact of the matter is I was — we were aware of the fact that

19 he — that she had illicit training, as you call it, training

20 on how to steal votes during the election in 2006.

21 Q    When did you come into that — at what point did you come

22 into that information?

23 A    Sir, I can't recall that off the top of my head.

24 Q    So if it's in any of these notes, then you should be able

25 to go find those notes; right?

1  A    Yes, sir, or it likely could be in a 302 of an interview,

2  so —

3  Q    Well, if it's in a 302 prior to May 1st, you should be

4  able to find that; right?

5  A    Yes.

6  Q    And if it was mentioned for the first time at her grand

7  jury testimony in July, your file will reflect that fact as

8  well, won't it?

9  A    It should.  But, you know, when it comes to the grand

10  jury, typically we ask — of a cooperating witness we'll ask

11  questions we know the answer to.  So we knew about it ahead of

12  time before we brought this cooperator or witness to the grand

13  jury.

14  Q    So as we sit here now, you can't tell us when she told you

15  that?

16  A    I cannot tell you the specific date that we learned that

17  information, no, sir, I cannot.

18  Q    But if it's contained in any of those notes, you'll find

19  them?

20        MR. SMITH:  Your Honor, I'm going to object.  I don't

21  believe that that's a proper question to set in motion an

22  experiment or some kind of a —

23        THE COURT:  Sustained.

24        MR. BALDANI:  That's all the questions I have, Your

25  Honor.

1          THE COURT:  Let's see, Mr. Gilbert.

2          MR. GILBERT:  Thank you, Judge.

3                        CROSS-EXAMINATION

4    BY MR. GILBERT:

5    Q    Special Agent Briggs, my name is Jerry Gilbert, and I

6    represent Bart Morris.

7    A    Yes, sir.

8    Q    When you executed the search warrant on the Morris

9    residence on Green Street, I believe you said that was the date

10   of the arrest of the Morrises?

11   A    Yes.

12   Q    That would be March the 9th?

13   A    March 19th.

14   Q    Okay.  Thank you.  And they were either in custody or

15   somewhere else other than the residence when the search warrant

16   was executed?

17   A    No, when the search warrant was executed the home was

18   empty.  They were no longer appeared to be living there.  Most

19   of their personal effects had been moved out, and I believe —

20   they were not there, they were not arrested until after the

21   search had at least been initiated.

22   Q    Okay.  But they weren't there?

23   A    They were not there.

24   Q    And you found and located a safe in the residence?

25   A    Correct.

1    Q    And Mr. Morris was contacted and voluntarily provided the

2    combination of that safe?

3    A    Sir, I had a search team in place there to handle that.  I

4    had no involvement.  I was at the processing center

5    interviewing and reading the rights and fingerprinting and

6    photographing the subjects that were arrested.  So I have no

7    independent knowledge of how the safe was opened.  But that is

8    possible.

9    Q    Okay.  All right.  And the safe contained various

10   documents, personal and business related?

11   A    It had keys, a number of keys.  I know, in fact, two of

12   the keys were in envelopes with a State Board of Elections or

13   something on -- labeled on the key -- on the envelopes

14   containing the keys.  There was also a photocopy of a letter in

15   there, and that's what I recall being present.

16   Q    Okay.  That's not related to this investigation, though,

17   is it?

18   A    Well, yes, it is.  I mean, you had the envelopes with the

19   State Board of Election letterhead or I guess imprint on them,

20   and the letter itself I believe discussed corruption or

21   election fraud issues.  Without -- without --

22   Q    Back in the '80s?

23   A    Sometime back, yes, sir.  I don't know the --

24   Q    On a statewide race?

25   A    Excuse me?

```
 1   Q    On a statewide race?
 2   A    I believe it regarded a State Government candidate, yes,
 3   sir.
 4   Q    Greg Stumbo?
 5   A    I believe it was Mr. — it was a Stumbo, yes.
 6   Q    Okay.  Now, that safe was formerly state property, wasn't
 7   it?
 8   A    I don't know that, sir.
 9   Q    You don't know.  Was there also a knife collection found?
10   A    I don't know that, sir.
11   Q    No voter list?
12   A    No, they had moved all their personal belongings out of
13   the residence.
14   Q    Well, they didn't move personal belongings out of the
15   safe, had they?  There's still items of a personal nature in
16   the safe, were there not?
17   A    It had those two items that I recall, the two envelopes
18   which stated something about the —
19   Q    And also had his divorce decree?
20   A    That, I don't know.
21   Q    And a prenuptial agreement?
22   A    I can state what was seized out of the safe.  I don't know
23   what else — there were other items in there.
24   Q    Social Security numbers of his children?
25   A    I do not know that, sir.  I wasn't present at the search.
```

1   But, now, there should be search photographs that depict when

2   the safe was opened what was –– you know, how many documents

3   and the volume and contents of the safe.

4   Q    Okay.  All right.  But you're unable to testify as to

5   those items here today?

6   A    I can testify as to what was seized out of that safe.

7   Q    Now, D51 is a list that was seized from William Stivers'

8   residence on that same date?

9   A    "D" as in "David" 51 is a one–page handwritten list of

10  names on white notebook lined paper, yes, sir.

11  Q    Debbie Morris' or Bart Morris' name do not appear on it,

12  does it?

13  A    No, sir, they don't.

14  Q    And D61 is a Rolodex that was seized from Mr. Maricle's

15  residence?

16  A    Yes.

17  Q    Are you able to say whether Bart Morris, Debbie Morris, or

18  B & J Transfer ––

19  A    I'll have to check, sir.

20  Q    –– are not on any card?

21  A    Okay.  I've got two Morrises, but it doesn't say Bart or

22  Debbie.

23  Q    What are their names?

24  A    It's a Lou Morris and a Penny K. Morris.

25           MR. GILBERT:  That's all.

1           THE COURT:  Thank you.

2           Ms. Hughes, how long will your

3  cross-examination take?

4           MS. HUGHES:  Not past noon.  Just a couple of

5  minutes.

6           THE COURT:  Yes, ma'am.  You may proceed.

7           MS. HUGHES:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9  BY MS. HUGHES:

10 Q    Special Agent Briggs, you mentioned George Duff as being

11 Chris Duff's father; is that right?

12 A    Yes.

13 Q    Are you aware that both Chris's father and grandfather are

14 named George Duff?

15 A    Yes.

16 Q    All right.  And the list didn't indicate whether it was

17 Jr. or Sr., did it?

18 A    Which list?

19 Q    Well, I think it was Exhibit 59 where we saw him.  If

20 you'll look at the third page of that, if you want to check me.

21 A    Ma'am, it just says Whites Branch under the Whites Branch

22 precinct, George Duff.  It doesn't specify Jr. or Sr.

23 Q    And, in fact, there's even a third George Duff in the

24 community, is there not, in that family?

25 A    I don't know that, ma'am.

1  Q    Now, you testified that Mr. and Mrs. Morris had already

2  moved to London at the time the search warrant was executed; is

3  that correct?

4  A    I believe their daughter was present, who had indicated

5  that they were in the process of moving out and the personal

6  belongings were pretty well out of the house.

7  Q    All right.  There were photographs taken that day of the

8  house; correct?

9  A    I believe there were, yes.

10 Q    And in the course of your investigation, did you review

11 those photographs?

12 A    I haven't for some time, but I did at some point.

13 Q    In general, would you agree with me that those photographs

14 reflected a fully furnished home?

15 A    I would have to look at the photographs again, but — to

16 answer that question.  I think they were — I think they were

17 relying on the statement of the daughter that they had moved,

18 they were in the process of building a home and were living in

19 a camper elsewhere at the time.

20 Q    Right.  A camper doesn't hold a lot of furniture, does it?

21 A    No.  No, ma'am.

22 Q    Am I correct that there was no effort made to secure a

23 search warrant for the London property or the camper?

24 A    No, we, at that point in time, didn't know where the new

25 home was or the camper.

1  Q    All right.  Now, the audiotapes you discussed with

2  Mr. Smith on your direct examination, more people than the

3  tapes that we heard, more people than just some of these

4  defendants were recorded; isn't that right?

5  A    I produced a 302 documenting the individuals that were

6  captured on tape, and there were at least one or —— one that I

7  recall that was not presented here at court, yes, ma'am.

8  Q    Whose recording was that that was recorded?

9          MR. SMITH:  Your Honor, I'm going to object as to the

10 relevance.

11         THE COURT:  Sustained.

12         MS. HUGHES:  All right.

13 BY MS. HUGHES:

14 Q    Are you aware that Bart and Debbie Morris were not married

15 until 2003?

16 A    I learned that through this —— the testimony of a fellow

17 agent that they believed that was the approximate date of the

18 marriage.

19 Q    So you learned that —— the date of their marriage during

20 the course of this trial?

21 A    Well, I won't say I didn't hear that before, but I was

22 reminded of that during the testimony here.  And I can't recall

23 the date, but what you're saying sounds about right.

24 Q    And do you know Ms. Morris's maiden name, the name she

25 would have gone by at the beginning of 2002, the beginning of

1   the alleged conspiracy?

2   A    Maiden name or previous married name?

3   Q    Either one.

4   A    That would be —— We gathered intelligence on all of the

5   individuals, to include, you know, criminal histories, which

6   would identify current names, past names, and so forth and so

7   on.  I don't recall that off the top of my head, no, ma'am.

8   Q    Are you aware of whether Ms. Morris has a brother-in-law

9   named Eddy Smith?

10  A    No, ma'am.

11  Q    All right.  So you would not have looked into what

12  happened to Mr. Smith when he applied for a job with the Board

13  of Education in 2006?

14  A    No, ma'am.

15          MS. HUGHES:  That's all I have.

16          THE COURT:  All right.  Thank you.

17          Mr. Simons.

18          MR. SIMONS:  Your Honor, I don't think that I will be

19  long, but regretfully I've got a matter to take up before I

20  begin my examination.  So we can do either way.

21          THE COURT:  We'll go ahead and take our lunch recess

22  at this time.

23          We'll excuse the jury until 1:00 this afternoon,

24  ladies and gentlemen.  Please keep in mind the admonition that

25  you have been given previously not to discuss the case among

1    yourselves, and, of course, don't allow anyone to approach you

2    to discuss the case.  The jury will be excused until 1:00 this

3    afternoon.

4            (Whereupon, the jury retired from the courtroom, after

5    which the following proceedings were had in open court.)

6            THE COURT:  Thank you.  Please be seated.

7            Agent Briggs, you can step down at this time.

8            Mr. Simons, before we get to this issue you want to

9    take up, Mr. Gilbert, I think — or I thought that I had an

10   order in place prohibiting the question about the contents of

11   this safe, a pretrial ruling motion in limine.  I'm going to go

12   back and check that at the lunch hour, but I think you may have

13   violated that order by asking this witness about the contents

14   of the safe in violation of the Court's order.  You don't

15   recall that being discussed at a bench conference yesterday?

16           MR. GILBERT:  Yes, Your Honor, but I didn't —

17           THE COURT:  And the parties were prohibited from

18   discussing that issue with the witness yesterday?  You don't

19   recall that being discussed?

20           MR. GILBERT:  Yes, Your Honor, in terms of the letter

21   that we had had a pretrial ruling on.

22           THE COURT:  In terms of the contents of the safe.

23           MR. GILBERT:  I didn't understand the order to be

24   that, Your Honor.  I apologize.

25           THE COURT:  All right.  I'm going to go back and look

1  at my pretrial order and make a determination as to your

2  violation of that order.

3              MR. GILBERT:  Yes, Your Honor.

4              THE COURT:  Ms. Hughes, did you have an issue to take

5  up?

6              MS. HUGHES:  I have a recollection of what the order

7  was.

8              THE COURT:  You had a recollection of the bench

9  conference also, didn't you, and that's why you were smiling,

10 wasn't it?

11             MS. HUGHES:  I wasn't -- I was not smiling.

12             THE COURT:  You weren't?

13             MS. HUGHES:  I was not intending any disrespect or

14 anything, I was concerned --

15             THE COURT:  Please be seated.  Please be seated.

16             MS. HUGHES:  Yes, Your Honor.

17             THE COURT:  Mr. Simons.  We'll take up your issue at

18 this time.

19             MR. SIMONS:  Your Honor, at the final pretrial

20 conference --

21             THE COURT:  Yes, sir.

22             MR. SIMONS:  -- I brought up that I may want to

23 explore my client's immunity that he was granted with this

24 witness.  The Court told me to bring that up at the time.

25 We've gotten to end of the government's case and this is the

1  witness that I anticipated it may come up before.

2          THE COURT:  All right.  You want to do that outside

3  the presence of the jury?

4          MR. SIMONS:  In any fashion that the Court would

5  allow me.

6          THE COURT:  We'll do it now.  Agent Briggs, where is

7  he?  Has he stepped out?

8          If you can retrieve Agent Briggs, we'll do that at

9  this time.

10          MR. SIMONS:  If Your Honor please, it would be my

11  intention to ask Agent Briggs in front of the jury about

12  Mr. Bowling's grand jury appearance and testimony but not of

13  his immunity.

14          THE COURT:  Agent Briggs.  Yes, sir.

15          Well, we'll go over these areas now.  I don't want to

16  waste the jury's time if you go on a line of questions that are

17  not relevant.

18          So, Agent Briggs, if you could be seated.  You're

19  still under oath.  I'm going to allow Mr. Simons to ask you

20  some questions outside the presence of the jury.

21          THE COURT:  Yes, sir.

22                    VOIR DIRE EXAMINATION

23  BY MR. SIMONS:

24  Q    Agent Briggs, Dan Simons, I represent Mr. Bowling.  You

25  understand that?

TIMOTHY BRIGGS - VOIR DIRE - MR. SIMONS          120

1   A    Yes, sir.

2   Q    You testified on direct examination for Mr. Smith that you

3   used a number of grand juries in pursuing these indictments

4   involved in this case.

5   A    Yes, sir.

6   Q    And my client, Stanley Bowling, testified in fact in front

7   of a grand jury in Covington on January 12th, 2007.  Do you

8   recall that?

9   A    Your client testified in Covington, but I don't recall the

10  date.

11  Q    Yes, sir.  Would you take my word for it it's July — or

12  January the 12th or would you like to see a copy?

13  A    I would like to see it, please.

14  Q    Does that recite his grand jury appearance on

15  January 12th, 2007?

16  A    Yes, January 12th, 2007, Stanley Bowling, federal grand

17  jury, Covington, Kentucky.  Yes, sir.

18  Q    Have you reviewed that testimony in connection with this

19  case?

20  A    I have some time ago, not recently.

21  Q    Is it a fair summary of the testimony that he gave that he

22  described all the City contracts that he got from the City of

23  Manchester from 2004 to 2006 and he laid out and explained the

24  extortion scheme and the money he paid to Kennon White in

25  connection with those contracts?

1    A    I know generally that's the topic that was discussed.  As

2    far as whether he discussed all projects and the monies

3    involved in each one, I'm not -- I can't be sure of.  If you

4    can point me in the direction of those -- to where those

5    contracts are discussed.

6    Q    I don't need to get into them right now, but generally

7    that was the subject of his testimony?

8    A    That was the subject matter that he was called -- he was

9    subpoenaed to testify about.

10   Q    In connection with his giving of testimony on that date,

11   did the government make him any promises?

12   A    With regard to?

13   Q    Was he granted immunity?

14   A    With regard to the kickback, the bribery extortion

15   kickback scheme.

16   Q    Okay.  Was he -- yes.  So he was granted immunity by the

17   government to testify on that occasion?

18   A    I would want to see the -- I know we have documents that

19   clarify that.  I would like to see those if I could to get the

20   exact language correct.

21          MR. SMITH:  Your Honor, I fail to see even in terms

22   of an avowal how asking an agent to comment upon grand jury

23   testimony that he wasn't present in the grand jury, and that's

24   been established, and now have counsel continue to -- what I

25   consider to be an issue that was extensively litigated pretrial

1    and now to try to depose a witness for a second or third time

2    on matters which we've already covered.

3           THE COURT:  Let me ask this question —— I agree with

4    you, Mr. Smith.

5           But, Mr. Simons, let me ask this question:  How is

6    this related to this witness's testimony on direct?

7           MR. SIMONS:  This issue is probably not, Your Honor.

8    If we could —— could I do this —— I really want to get to

9    Mr. Briggs' —— Agent Briggs' testimony in front of the grand

10   jury, and I can submit part of that which was under oath as a

11   Court exhibit by way of avowal.

12          THE COURT:  You can do that, but I still don't

13   understand the relevancy.  Tell me this:  How is the immunity

14   that may —— that was given to your client with respect to the

15   kickback scheme related to the issues in this proceeding and

16   this witness's testimony on direct examination?

17          MR. SIMONS:  Well, it's my understanding we've

18   introduced a tremendous amount of testimony about these

19   contracts.  It is the subject of forfeiture and money

20   laundering events with respect to my client.

21          THE COURT:  Well, what you're going to cause —— what

22   will happen if you follow this line of inquiry is I'm going to

23   be instructing the jury that if we get to this issue of

24   immunity, that that in no way affects the charges that are

25   brought in this case and they should not consider that in any

1   way.

2        MR. SIMONS:  Okay.

3        THE COURT:  Now, I'm not sure that's an instruction

4   that you want me to be giving this jury.

5        MR. SIMONS:  It's one that I do not want the Court to

6   give certainly.

7        THE COURT:  But the issue of immunity and the

8   kickback scheme involving the Whites is not relevant in this

9   proceeding.  And so I'm going to sustain the United States'

10  objection.  If you want to put in documents, including grand

11  jury testimony, by avowal, if you want to submit those

12  documents, you can do that.  But, again, there's an issue of

13  relevancy here, and I don't see any way that these issues are

14  relevant other than –– well, I –– not relevant for any

15  legitimate purpose, I'll state it that way.

16       MR. SIMONS:  Okay.  If Your Honor please, I would

17  like to put in four pages of Agent Briggs's testimony on

18  May 2nd, 2007.

19       THE COURT:  All right.

20       MR. SIMONS:  And a –– subsequent to that, my client

21  was interviewed by Agent Briggs and Agent Blair and presented

22  them with – Let me give a copy to Mr. Smith – a list of the

23  jobs that were done and the amounts that were involved in the

24  scheme.  So if I could put in by way of avowal the four pages

25  from the grand jury testimony of Agent Briggs, if Your Honor

1    please, it would be -- excuse me, five pages, pages 13 through

2    17, and the one list of jobs.

3            THE COURT:  Yes, sir, you may.  Give those to the

4    Clerk.

5            The Court has determined as a matter of law that

6    these issues are not relevant to this proceeding.  The Court

7    has previously on several occasions made determinations as to

8    other legal issues concerning immunity, and, of course, those

9    are still the Court's rulings.

10           All right.  Anything else to take up before we take

11   our lunch break?

12           Mr. Abell, anything else?

13           MR. ABELL:  Judge, there is a matter I wish to bring

14   up, and it pertains to the Dobber Weaver case.

15           THE COURT:  Yes, sir.

16           MR. ABELL:  There was testimony yesterday afternoon

17   that March 19th, 2009, when the seizure was affected at my

18   client's house, recovered and put into evidence yesterday were

19   three exhibits from that case.  I have reviewed the docket and

20   have a copy.  What I'm getting at --

21           THE COURT:  I'm familiar with the docket, I've

22   reviewed it as well.

23           MR. ABELL:  I would like the Court to take judicial

24   notice that it was electronically created and unsealed as of

25   March 17th, 2008, more than a year earlier.  And I would like

1    to — my motion is to request that the Court take judicial

2    notice of that and instruct the jury of that fact.

3           THE COURT:  I can do that during the presentation of

4    your case, or the Court can also — the Court can do that when

5    it's — if you have recross-examination of the witness.  We'll

6    go around again, you can either show him the docket sheet or

7    the Court can take judicial notice of it at that time.

8           MR. ABELL:  I think I would prefer that procedure.  I

9    have obviously touched on it in my cross-examination this

10   morning —

11          THE COURT:  Right.

12          MR. ABELL:  — but when we get back around —

13   actually, at the conclusion of his testimony would be fine, if

14   that would please the Court.

15          THE COURT:  All right.  I assume there's no objection

16   to the Court taking judicial notice of the fact?

17          MR. SMITH:  If Your Honor has checked, I do not have

18   that date in front of me, but I'll certainly take the Court's

19   representation and I'll agree with that.

20          THE COURT:  Mr. Smith, let me pass you a copy of the

21   docket sheet that I printed before coming out today.

22          MR. SMITH:  I apologize, what is the — I guess the

23   motion that's before the Court?

24          THE COURT:  I believe Mr. Abell would like the Court

25   to take judicial notice of the fact that — I believe it was an

1    information that was filed on March 17th of 2008 or

2    thereabouts.  I don't have it front of me, I'm just going by my

3    recollection.

4                MR. ABELL:  That is the correct date, Judge, along

5    with —— also made an exhibit was the order setting pretrial

6    release conditions, which was 3-17-2008.

7                THE COURT:  That's the date those documents would

8    have been available electronically.

9                MR. ABELL:  Openly accessible as of March 17th, 2008,

10   one year earlier.

11               THE COURT:  There's no indication that that

12   particular record was filed under seal, those documents were

13   filed under seal based on my review of the docket sheet.

14               MR. ABELL:  I see nothing indicating that they were

15   under seal and, granted, initially for about a week there were

16   some documents under seal, notice of intent to file

17   information, 3-10, and then unsealed and part of the Court's

18   docket as of March 17th, 2008.

19               MR. SMITH:  I can agree to that.

20               THE COURT:  All right.  At the conclusion of his

21   testimony, I can take judicial notice of that fact, or if we

22   get back to you before that I can do it at that time.  In other

23   words, when it's your turn again, I'll either do it then or

24   I'll do it at the conclusion of the witness's testimony.

25               MR. ABELL:  Okay, Judge.

1          THE COURT:  If you can retrieve that docket sheet for

2    me, please.

3          Let's see if there are any other issues to take up.

4      (No response.)

5          THE COURT:  All right.  Thank you.

6          Mr. Gilbert, I will tell you at this time, if I

7    conclude that you violated my order, I will hold you in

8    contempt for that.  This action —— there's been too many of

9    these things that have happened in this case.  The parties

10   should have known better than to continue to proceed in this

11   manner.  Enough's enough.

12         We'll be in recess until 1:00.

13     (Whereupon, a recess was had for the noon hour, after

14   which the proceedings continue uninterrupted to Volume 21–B.)

15                   (Proceedings concluded at 12:13 p.m.)

16               C E R T I F I C A T E

17     I, Cynthia A. Oakes, certify that the foregoing is a

18   correct transcript from the record of proceedings in the

19   above–entitled matter.

20

21   3/16/2010                    s/CYNTHIA A. OAKES
         DATE                     CYNTHIA A. OAKES, RPR, RMR, CRR
22

23

24

25

1

2                              I N D E X

3                                                      PAGE

4  Testimony of TIMOTHY BRIGGS:
          Cross-Examination by Mr. Pinales:            4
5          Cross-Examination by Mr. Westberry:          31
          Cross-Examination by Mr. White:             37
6          Cross-Examination by Mr. Abell:             40
          Cross-Examination by Mr. Baldani:           54
7          Cross-Examination by Mr. Gilbert:          109
          Cross-Examination by Ms. Hughes:           113
8          Voir Dire Examination by Mr. Simons:       119

9

10                          E X H I B I T S

11

12     Court                                          Page
     Exhibit No.              Identified            Admitted
13
          5                      81                   82
14

15

16

17

18

19

20

21

22

23

24

25