United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09–16–S |
| vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 11, 2010 |
| DOUGLAS C. ADAMS | ) 9:00 a.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 22–A |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:  STEPHEN C. SMITH, ESQ.
JASON D. PARMAN, ESQ.

On behalf of the Defendant  DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:  MARTIN S. PINALES, ESQ.

On behalf of the Defendant  R. KENT WESTBERRY, ESQ.
Douglas C. Adams:  KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant  T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant  ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant  RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:  R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant  JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant  ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant  DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
1   Appearances of Counsel:

2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                    JASON D. PARMAN, ESQ.
3                                   Assistant U.S. Attorneys
                                    601 Meyers Baker Road
4                                   Suite 200
                                    London, Kentucky  40741
5

6   On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
    Russell Cletus Miracle:          107 East First Street
7                                    Corbin, Kentucky  40701

8                                    MARTIN S. PINALES, ESQ.
                                     150 East Fourth Street
9                                    Federal Reserve Building
                                     Cincinnati, Ohio  45202
10

11  On Behalf of the Defendant       R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.
12                                   220 West Main Street
                                     Suite 1900
13                                   Louisville, Kentucky  40202

14
    On behalf of the Defendant       T. SCOTT WHITE, ESQ.
15  Charles Wayne Jones:             133 West Short Street
                                     Lexington, Kentucky  40507
16

17  On behalf of the Defendant       ROBERT L. ABELL, ESQ.
    William E. Stivers:              120 North Upper Street
18                                   Lexington, Kentucky  40507

19
    On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
20  Freddy W. Thompson:              R. TUCKER RICHARDSON III, ESQ.
                                     300 West Short Street
21                                   Lexington, Kentucky  40507

22
    On behalf of the Defendant       JERRY W. GILBERT, ESQ.
23  William B. Morris:               212 North Second Street
                                     Richmond, Kentucky  40475
24

25
```

```
 1   On behalf of the Defendant      ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                201 West Short Street
 2                                   Lexington, Kentucky  40507

 3
     On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
 4   Stanley Bowling:                116 West Main Street
                                     Suite 2A
 5                                   Richmond, Kentucky  40475

 6
     Court Reporter:                 CYNTHIA A. OAKES, CRR
 7                                   Official Court Reporter
                                     United States District Court
 8                                   560 Athens Boonesboro Road
                                     Winchester, Kentucky  40391
 9                                   (859) 983-4346

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

1    (Whereupon, the following proceedings were had outside the

2  presence of the jury.)

3           THE COURT:  Thank you.

4           The record will reflect the jury is not present at

5  this time.

6           Mr. Smith, I wanted to start early today.  I

7  anticipated there would be some issues on handwriting exemplars

8  and the need to have subpoenas issued.  Is that correct or —

9           MR. SMITH:  Your Honor, I have been advised that the

10  turnaround is expected in about one week.  So if we can have

11  Mrs. Maricle — I'll have to get that scheduled, of course,

12  with the FBI, and I think that can be done today at some point

13  during the break.  So we'll get that set up.  But we have had

14  an opportunity — as Mr. Hoskins and Mr. Pinales did make the

15  documents available yesterday, we have had those in our

16  possession, and now I feel prepared — in order to avoid delay

17  of this trial, we're certainly prepared to go forward this

18  morning.

19           THE COURT:  All right.

20           Mr. Hoskins or Mr. Pinales, will Mrs. Maricle be

21  resisting providing handwriting exemplars?

22           MR. HOSKINS:  We don't represent her, Your Honor, but

23  absolutely not, I'm sure she'll be happy to do that.

24           THE COURT:  All right.  Well, if there is an issue

25  with that, I need to take it up immediately, and if she has

1    separate counsel on that matter, then I'll —

2                MR. HOSKINS:  May I consult with her now, Judge?

3                THE COURT:  Yes, sir, you may.

4                MR. PINALES:  Your Honor?

5                THE COURT:  Yes, sir.

6                MR. PINALES:  In this lull, with the Court's

7    permission, I would like — I have said that I was finished

8    with the court reporter yesterday.

9                THE COURT:  Yes, sir.

10                MR. PINALES:  I thought of two more things if I may

11   be able to today before the government — it will be very

12   brief.

13                THE COURT:  Your questions may be brief.  I'm not

14   sure what kind of follow-up will be necessary on that.  The key

15   today is I want to be able to get to this witness who says he's

16   leaving this afternoon.  If you delay it too much, I'm not

17   going to release him.  So you understand that?

18                MR. PINALES:  I do, Your Honor.  I absolutely do.

19                THE COURT:  All right.  Thank you.

20                Mr. Hoskins.

21                MR. HOSKINS:  Your Honor, I can confirm that

22   Mrs. Maricle has no issues whatsoever with providing

23   handwriting exemplars.

24                THE COURT:  All right.  Thank you.

25                MR. SMITH:  And I just assume that Mr. Maricle would

1    be available for that if the examiner requests?  I assume

2    that's okay as well?

3              THE COURT:  All right.

4              MR. PINALES:  Absolutely.

5              THE COURT:  I'm anticipating there may be additional

6    individuals, Mr. Smith, but we'll take that up at the

7    appropriate time.

8              MR. SMITH:  I understand.  Thank you.

9              THE COURT:  All right.  We're not going to bring the

10   jury in until 9:00.  Let me see if there's any other issues

11   that need to be taken up outside the presence of the jury.

12             Mr. White.  Yes, sir.

13             MR. WHITE:  Good morning, Your Honor, Scott White on

14   behalf of Charles Jones.  I just wanted two quick things.  One,

15   my law clerk, Sarah Sharon, is in the courtroom.  Since I'm

16   third up and I'm a CJA, so I don't have extra help here, I was

17   wondering if the Court would allow her to go in and out as my

18   evidence gets closer to arrange for my witnesses, because

19   they'll also be coming up from Manchester.

20             THE COURT:  Yes, sir.

21             MR. WHITE:  The second thing I wanted to alert the

22   Court to, one of the two experts that I identified pretrial is

23   Katy Gabhart, she's the general counsel at the Board of

24   Elections.  I do anticipate still needing to call her, not for

25   very much –– not for a lot, I don't think her testimony will

7

1  take long.  What I found out two days ago is she took her kids
2  sledding and suffered a torn ACL.  She's had surgery, she
3  returned to work yesterday.  Her problem is that she's got to
4  keep her leg propped up and she can be here in 20 minutes, and
5  given the sequestration of witnesses, I was hoping that we
6  could just let her stay over there at the Board of Elections, I
7  can give her the 20-minute notice and get her down here.

8              THE COURT:  That will be fine.

9              MR. WHITE:  Thank you, Your Honor, that's all I have.

10             THE COURT:  Yes, sir.  All right.

11             I believe Mr. Abell beat you.

12             MR. ABELL:  Judge, there's just a matter I wanted to
13  bring to the Court's attention.  Last week, if the Court will
14  recall, I was granted leave to issue a subpoena to the
15  Manchester Police Chief, Jeff Culver.

16             THE COURT:  Yes, sir.

17             MR. ABELL:  And in fact served him in Mr. Smith's
18  presence and told him we would be in touch with him when he
19  needed to be reappear.

20             THE COURT:  Yes, sir.

21             MR. ABELL:  And I have since talked to him a couple
22  of times in trying to guess when it would be appropriate for
23  him to come and not to interfere with his duties to the extent
24  it's possible.  It would be helpful perhaps if sometime today
25  we might discuss scheduling and how we're moving along so I

```
 1   might be able to report to that witness when it would be best
 2   to come.
 3            THE COURT:  All right.  Why don't you remind me of
 4   that at the end of the day and I can certainly take that up
 5   with counsel for the other defendants.
 6            MR. ABELL:  Thank you, sir.
 7            THE COURT:  All right.  Yes, sir.
 8            Mr. Westberry.
 9            MR. WESTBERRY:  Judge, that's really the same issue
10   that Mr. Abell raised that I was going to inform the Court.  We
11   have our witness -- the first series of our witnesses are
12   coming in this morning at about 11-ish, 11:15.
13            THE COURT:  All right.
14            MR. WESTBERRY:  The first three are from Manchester,
15   there are a couple that are closer by.  I don't have a real
16   good feeling, Your Honor, on what today's schedule would be
17   like, but I wanted to let you know we're trying to avoid delay.
18            THE COURT:  I appreciate that, but you probably --
19   you don't have a good feel for it, you probably have a better
20   feel for it than I do inasmuch as you're seated next to counsel
21   that has probably a better idea as to how long their case will
22   take.  I anticipate we'll have, of course, this one witness
23   this morning and I anticipate he'll take about an hour perhaps.
24   I'm not sure who will be called after that for Defendant
25   Maricle, but I'll try to check at the break and see how we're
```

9

 1   proceeding.

 2           MR. WESTBERRY:  I will not be without witnesses today

 3   if it gets to the point where we're required to move forward.

 4           THE COURT:  All right.  I appreciate that.  Thank

 5   you.

 6           Anything else?

 7           MR. WHITE:  Your Honor, I'm sorry.

 8           THE COURT:  Yes, sir, Mr. White.

 9           MR. WHITE:  Also I think it's unlikely, but I have my

10   first witnesses coming tomorrow morning.  Would you like me to

11   go ahead and have one or two available at the end of the day?

12           THE COURT:  Mr. Pinales, how long do you anticipate

13   your case will take at this point?

14           MR. PINALES:  Nothing has gone on schedule so far

15   yet, Your Honor.  I would anticipate being finished tomorrow by

16   10:00.

17           THE COURT:  All right.  I think that will help other

18   counsel.

19           MR. PINALES:  We have one witness that is unavailable

20   until tomorrow morning, so —— and it's not that long of a

21   witness.  So I'm saying 10:00, Judge.

22           THE COURT:  All right.  I appreciate that.

23           MR. PINALES:  If the Court won't hold me to it too

24   much.

25           THE COURT:  Well, this is more for the benefit of ——

1           MR. PINALES:  I understand.

2           THE COURT:  -- counsel for the other defendants than

3 it is for me.

4           MR. PINALES:  Thank you, Your Honor.

5           MR. WHITE:  Thank you, Your Honor.

6           THE COURT:  Anything else of the other defendants?

7       (No response.)

8           THE COURT:  Anything else on behalf of the United

9 States?

10          MR. SMITH:  No, thank you.

11          THE COURT:  We'll take a brief recess and we'll

12 resume at 9:00.

13       (Whereupon, a recess was had, after which the jury entered

14 the courtroom, and the following proceedings were had in open

15 court.)

16          THE COURT:  Thank you, and good morning everyone.

17          The record will reflect that all members of the jury

18 are present.  The parties and counsel are also present.  The

19 witness has returned to the witness stand.

20          You're still under oath.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Mr. Pinales, I think you had a couple of

23 additional questions.

24          MR. PINALES:  Yes, I did.  Could the court officer

25 give me M4, I believe it was?

1          And with the Court's permission, can I put it in?

2    We've ——

3          THE COURT:  Yes, sir.

4          MR. PINALES:  —— set it up so it would start

5    hopefully.

6          THE COURT:  Yes, sir, you may.

7                    MARILYN ROBERTS,

8    being previously duly sworn, was examined and testified further

9    as follows:

10              CONTINUED DIRECT EXAMINATION

11   BY MR. PINALES:

12   Q    Good morning.

13   A    Good morning.

14   Q    Yesterday, we ended at 4:30 and we were watching this

15   video, which is marked for identification purposes Maricle 4.

16   Do you recall that?

17   A    Yes, I do.

18   Q    And that was the proceeding from October the 30th, 2006,

19   Commonwealth v. John Downey?

20   A    Yes.

21          MR. PINALES:  Okay.

22          May I, Your Honor?

23          THE COURT:  Yes, sir.

24          MR. PINALES:  Thank you.

25   BY MR. PINALES:

1  Q    And I believe we stopped at 10:42.

2  A    I don't recall.

3       (Whereupon, Defendant Maricle Exhibit No. 4 was played to

4  the Court and jury, after which the following proceedings were

5  had in open court.)

6            MR. PINALES:  I think we can stop at this point.

7  BY MR. PINALES:

8  Q    Let me ask you a couple of questions about that.  Now,

9  during the course of this proceeding --

10 A    Yes.

11 Q    -- the Judge accepted the agreement that was supported by

12 the Commonwealth Attorney and the defense attorney?

13 A    Yes, he did.

14 Q    And then went through the discussion making sure it was

15 free and voluntary.  Is that normal?

16 A    Yes.

17 Q    And then released him from jail after serving a period of

18 time?

19 A    Yes.

20 Q    And then set a sentencing for a later date?

21 A    Correct.

22 Q    And we're not going to play it, but did you bring the

23 sentencing tape as well?

24 A    I did.

25 Q    And is that kept in the normal course of your court?

MARILYN ROBERTS - CONTINUED DIRECT - MR. PINALES    13

1 A    Yes.

2 Q    And that is kept, I believe, five years as part of your

3 obligation as the court reporter?

4 A    Yes.

5 Q    And do you have that with you?

6 A    I do.

7        MR. PINALES:  Your Honor, may I have that retrieved

8 and marked?  I think it may be 6.

9        THE COURT:  Maricle Exhibit —

10        MR. PINALES:  Maricle 6; is that correct?

11        THE CLERK:  Yes.

12 BY MR. PINALES:

13 Q    Again, I'm not going to be playing it, but I'm going to

14 ask you, was Mr. Downey, according to the official court

15 record, actually sentenced at a later date?

16 A    Yes, he was sentenced.

17 Q    And he did receive the agreement that was made?

18 A    Yes.

19 Q    And he received it from which judge?

20 A    Judge Lewis.

21 Q    Now, finally, Judge Lewis was mentioning that he was

22 coming back, and I believe you mentioned yesterday that he was

23 on senior judge status?

24 A    Yes.

25 Q    How does that program work?

MARILYN ROBERTS - CONTINUED DIRECT - MR. PINALES      14

1   A     I don't think the program is existing any longer.  At that

2   time, when a judge retired, he could apply to be a senior judge

3   and work for — I think it's like three years or so many days

4   and it increased their pay.

5   Q     And as a senior judge, who assigns him to Clay County?

6   A     The Chief Justice.

7   Q     The Chief Justice of?

8   A     Kentucky.

9   Q     Supreme Court?

10  A     Entered the order, yes.

11  Q     Okay.  So Judge Lewis is selected not by Judge Cletus

12  Maricle but by the Chief Justice of the Kentucky Supreme Court?

13  A     Correct.

14            MR. PINALES:  And I thank you.

15            THE WITNESS:  You're welcome.

16            MR. PINALES:  I have nothing further.  I'll retrieve

17  that, Your Honor.

18            THE COURT:  Yes, sir.

19            MR. PINALES:  I'm sorry, I was reminded, I would like

20  to move admission of M6, the sentencing of the same case.

21            THE COURT:  Let's see if there's any objection to its

22  admission.

23            MR. SMITH:  No, Your Honor.

24            MR. PINALES:  Thank you, Your Honor.

25            THE COURT:  Maricle Exhibit No. 6 will be admitted as

1    well.

2            Mr. Smith.

3            MR. SMITH:  Thank you.

4                        CROSS-EXAMINATION

5    BY MR. SMITH:

6    Q    Good morning.

7    A    Good morning.

8    Q    Ms. Roberts, I'm Steve Smith, and I represent the United

9    States, and I would like to ask you a couple of questions.

10           If I understand -- understood your testimony yesterday,

11   you are the court reporter and have been since 1967 in the Clay

12   Circuit?

13   A    Yes, sir.

14   Q    You've not worked in other circuits during that time?

15   A    I worked Clay, Jackson, and Leslie normally.  I have gone

16   when Judge Maricle would get a special judge appointment, like

17   Harlan or Laurel County, I have gone there.

18   Q    You-all worked pretty closely together over the years?

19   A    Well, while he was judge, I worked in under him, he was my

20   supervisor.  You know, when court was in session, I tried to be

21   there.

22   Q    And he's been a judge since about September about 24th of

23   1990?

24   A    Correct.  Yeah, I believe that's when he --

25   Q    And he's now retired?

1    A    Yes, he is.

2    Q    And you worked for him that whole time that he was judge?

3    A    I did.

4    Q    And you also know the Commonwealth Attorney down in Clay

5    County is Gary Gregory; right?

6    A    I do.

7    Q    And how long has Gary Gregory been the Commonwealth

8    Attorney down there working with Cletus Maricle in this same

9    circuit of Clay, Leslie, and Jackson counties, to your

10   knowledge, ma'am?

11   A    To my knowledge, I'm not positive.  I think he's either on

12   his second or third term.  His terms are six years.

13   Q    And second or third term, that would be 12 to 18 years

14   he's served as Commonwealth Attorney down there?

15   A    I don't think it's 18, excuse me.  But it's been a long

16   time.

17   Q    It's been a long time.  And the other gentleman that was

18   appearing in this court proceeding that represented the

19   Commonwealth Attorney's Office is Gary Gregory's assistant who

20   worked under Gary Gregory, and his name was, I believe you

21   said, Richie Couch?

22   A    Yes, at that time he was his assistant.

23   Q    And he works under Gary Gregory, who is the Commonwealth

24   Attorney who's elected by the people?

25   A    Yes.

MARILYN ROBERTS - CROSS - MR. SMITH                17

1  Q    And during the time period I believe that this proceeding

2  took place, you recognized this fellow to be John or Johnny

3  Downey?

4  A    I did.

5  Q    And you indicated that you knew him.  Do you know that he

6  also is brother to Raleigh Downey?

7  A    No, I don't know Raleigh Downey.

8  Q    You don't know his brother?

9  A    No, sir.

10  Q    Okay.  You just know him from your court proceeding there

11  that you just showed us through your video?

12  A    I don't think that we've ever had Raleigh in our court.

13  Q    And I believe that you would agree, ma'am, that in the

14  course of this proceeding that we've watched that this was a

15  great deal for this defendant to get, a trafficking in

16  controlled substance, a Class C felony, probated?

17  A    Yes.

18  Q    In fact, I believe it was referred to by the Judge as a

19  great deal —

20  A    Yeah.

21  Q    — if I heard him correctly?

22  A    Correct.

23  Q    And I believe there was some lighthearted joking toward

24  the end about his hair, his hair being a little bit long, he

25  ought to get it cut?

1  A     Uh-huh.

2  Q     Because he said, you can leave here today and I believe go

3  out there and get you a job or you should do that, something to

4  that effect?

5  A     Correct.

6  Q     And the Judge kind of made light of that and said that

7  while his hair was different, I believe he said, he was a wild

8  and crazy liberal himself?

9  A     He's said that on several occasions when he was in our

10 courtroom.

11 Q     He's a wide and crazy liberal, I understand that.

12       And I believe, ma'am, you would agree with me that this

13 man got put in prison, according to this proceeding, about May

14 the 5th of 2005, and just before the election, about a week

15 before, which occurred on November the 7th, he got set free?

16 A     By Judge Lewis, yes, he did.

17          MR. SMITH:  Thank you.  That's all I have.

18          THE COURT:  Let's see if any of the other counsel for

19 the other defendants have any questions.

20    (No response.)

21          THE COURT:  No?  All right.

22       Mr. Pinales, any redirect?

23                    REDIRECT EXAMINATION

24 BY MR. PINALES:

25 Q     As we saw the tape, he was -- he, I'm sorry, Mr. Downey

1   was represented by an attorney?

2   A    Yes, the public defender's office.

3   Q    And the public defender stated to the Judge that

4   Mr. Downey had already served 18 months?

5   A    Yes, he had never filled bond that Judge Maricle had set.

6           MR. PINALES:  Nothing further.  Thank you.

7           THE COURT:  Anything else of this witness?

8           MR. SMITH:  No, thank you.

9           THE COURT:  All right.  Thank you, ma'am.  You may

10  step down.

11          THE WITNESS:  May I be excused?

12          THE COURT:  Any objection to the witness being

13  excused?

14          MR. SMITH:  No, Your Honor.

15          THE COURT:  You may.

16          You may call your next witness.

17          MR. HOSKINS:  I call Steven Slyter.

18          THE COURT:  Thank you.

19          MR. HOSKINS:  Again, Your Honor, we would ask for one

20  of the easels to be brought over.

21          THE COURT:  If you could administer the oath, please.

22                      STEVEN SLYTER,

23  having been first duly placed under oath, was examined and

24  testified as follows:

25                    DIRECT EXAMINATION

1   BY MR. HOSKINS:

2   Q    Would you tell the jury your name, please?

3   A    My name is Steven Slyter, Steven is with a "v" and Slyter

4   is spelled S-l-y-t-e-r.

5   Q    Mr. Slyter, what is your professional address?

6   A    3606 Fallen Timber Drive in Louisville.

7   Q    And what is your profession?

8   A    I'm a document examiner, often referred to as a

9   handwriting expert, although the work involves much more than

10  handwriting.

11  Q    Would that be the same as a forensic document examiner?

12  A    Yes.

13  Q    What kind of training did you have to allow you to do this

14  kind of work?

15  A    I started my studies in 1970, trained under the guidance

16  of three examiners who were in full-time practice at that time.

17  That process went on, they mentored my studies and helped me

18  study for about three-and-a-half years.

19  Q    In the last 36 years, how many times approximately have

20  you testified in courts?

21  A    I don't have an exact number for that.  I'll testify

22  anywhere from five or six times a year up to as many as 15

23  times a year.  That's been true for about 20 years or more.

24  Q    When you're hired to work on something, does it always end

25  up in testimony?

1   A    Very small percentage of my cases end up in testimony.

2   Q    Have you been recognized as an expert witness and

3   presented testimony in any states?

4   A    Yes, across Kentucky in state courts, similarly across

5   Tennessee, in Ohio, and Indiana.

6   Q    How about any federal courts, have you ever been an expert

7   in any of those?

8   A    Federal courts in, again, Kentucky, Tennessee, Indiana.  I

9   don't remember right now being in a federal court in Ohio.

10  Q    Now, do you always work for defense lawyers like me?

11  A    No, sir.

12  Q    Do you ever work for the government?

13  A    On a per case or a contract basis I work for several

14  government agencies from time to time.  In criminal cases, I've

15  worked with the Commonwealth Attorney's Office in Jefferson

16  County, in Oldham County.  In Jefferson County, one or two

17  cases a year has been about the situation there.  I also do

18  work with the U.S. Attorney's Office, particularly in the

19  Western District of Kentucky.

20  Q    Who are some of the attorneys in the United States

21  Attorney's Office that you've worked with?

22  A    In the Western District?  Most recently Bryan Calhoun on a

23  case involving identity theft.  That was in combination with

24  agents from the Homeland Security Office there.  I've done a

25  number of cases with Jim Lesousky, Mike Bennett, Marisa Ford,

1  Tom Dyke.

2  Q    And all of those were federal prosecutors?

3  A    Yes.

4  Q    And you've testified for the government in federal courts?

5  A    Yes.

6  Q    Now, Mr. Slyter, you do this for a living; right?

7  A    Correct.

8  Q    And so you charge a fee —

9  A    Yes, I do.

10 Q    — to work for somebody?

11 A    Yes.

12 Q    And you've been paid a fee to do what I've asked you to do

13 in this case, haven't you?

14 A    Yes.

15 Q    Have you published any books or articles on the subject of

16 forensic document examination?

17 A    Yes.

18 Q    What are those?

19 A    I've published a — in 1995, a book on the subject of

20 signature examination was published by Charles Thomas

21 Publishing in Springfield, Illinois.  Also, in '95, I had been

22 asked — it was about four years earlier, I was asked to

23 produce an article or a chapter for *American Jurisprudence*

24 *Proof of Fact*.  That's kind of encyclopedic book or a series of

25 books that discuss different types of evidence.  That chapter

1    that I produced was published in their third series, also in

2    the middle '90s.  A number of articles.  I served a time as

3    editor -- technical editor for the Journal of Forensic --

4    *Journal of Questioned Document Examination* that's published by

5    the Association of Forensic Document Examiners and participated

6    in those articles and contributed some articles of my own

7    there.

8    Q    Have you been certified by any professional groups that

9    offer testing for forensic document examiners?

10   A    Yes.

11   Q    And what are those?

12   A    I'm now certified by the Board of Forensic Document

13   Examiners, and that certification is valuable to me because it

14   is a program — a certification program that's accredited by

15   the Forensic Specialties Accreditation Board.  I'm also

16   certified be the Association of Forensic Document Examiners.

17   Q    Have you served as an officer of any professional groups

18   like that?

19   A    The two groups I've just named, I have served as treasurer

20   and president of the Association of Forensic Document

21   Examiners.  I've served as vice president and now serve as

22   president of the Board of Forensic Document Examiners.

23   Q    In the past 36 years, has any court ever — anywhere ever

24   refused to recognize you as an expert?

25   A    No, I was first recognized in 1973 and have never been

1  refused.

2          MR. HOSKINS:  Your Honor, I would tender Mr. Slyter

3  as an expert witness.

4          THE COURT:  You may ask him opinion questions at this

5  point.

6          MR. HOSKINS:  Thank you, Your Honor.  I would also

7  ask that Mr. Slider be shown the exhibit that's already been

8  admitted, D16, it's the Government's Exhibit.

9          THE COURT:  Yes, sir.

10  BY MR. HOSKINS:

11  Q    Mr. Slyter, what were you asked to do in connection with

12  this trial?

13  A    I was asked to examine what I have in front of me now

14  marked as D16, to examine this document in combination with

15  handwriting samples for Cletus Maricle and his wife, Judy, in

16  an attempt to determine whether either of them was the writer

17  of D16.

18  Q    How did you go about conducting that test?

19  A    I met with the Maricles and took handwriting samples from

20  them, the writings that they produced in front of me at my

21  request, and also obtained from them a number of pages that

22  they acknowledged contained both of their writings.  Those are

23  the foundation for the comparison process.  And then once I had

24  all of those materials, I compared the writing on D16 to the

25  writing habits defined by the known materials for Mr. and

1  Mrs. Maricle.

2  Q    So when you talk about known materials, you're talking

3  about things that you know Mr. Maricle and Mrs. Maricle wrote?

4  A    Yes.

5  Q    Some of that was written in your presence?

6  A    Yes.

7  Q    And some of it was documents that you asked them to

8  provide that they had written in the past in the ordinary

9  course of living their lives?

10 A    Yes.

11 Q    Would you look around the courtroom and see if you

12 recognize Mr. Maricle?

13 A    I see Mr. Maricle sitting behind you, standing now.

14 Q    Okay.  And that's the man that you took handwriting

15 samples from?

16 A    Yes, it is.

17 Q    Okay.  Would you also look around the courtroom and see if

18 you see Judy Maricle?

19 A    I see her behind him at the back wall in a red sweater,

20 standing.

21 Q    Okay.  Is that the lady that you took handwriting samples

22 from?

23 A    Yes.

24 Q    Mr. Slyter, when you took those handwriting samples, both

25 the ones in your presence and the ones that you collected from

1  the past from Mr. and Mrs. Maricle, did you do that in the same

2  way you would have if you were working for the government?

3  A    Yes.

4  Q    Were the materials and the time that you had to do this

5  adequate, based on your training and experience, for you to

6  come to an opinion about the authorship of that document?

7  A    Yes.

8  Q    Okay.  As to Cletus Maricle, what is that opinion?

9  A    My opinion is that D16 was not written by Mr. Maricle.

10 Q    As to Judy Maricle, what is your opinion?

11 A    My opinion is, again, also, that D16 was not written by

12 Judy Maricle.

13        MR. HOSKINS:  Your Honor, I would like to put

14 Exhibit D16 on the overhead if I may.

15        THE COURT:  Yes, sir, you may.

16 BY MR. HOSKINS:

17 Q    Mr. Slyter, you have prepared an exhibit to assist in

18 explaining the work that you've done in this case, haven't you?

19 A    Yes, I did.

20        MR. HOSKINS:  Your Honor, I would ask permission to

21 use the demonstrative chart that we talked about yesterday?

22        THE COURT:  Yes, sir, you may.

23 BY MR. HOSKINS:

24 Q    Mr. Slyter, you recognize the document that's on the

25 screen there?

1   A    Yes.

2   Q    That's the document you were checking out; right?

3   A    Yes.

4            MR. HOSKINS:  Okay.

5            Your Honor, may the witness come around?

6            THE COURT:  No, you'll need to move the easel around

7   over here, and he will be able to see it, the jury will be able

8   to see it.  Move it back here on the other side.

9            Let's make sure all the jurors can see the document.

10           UNIDENTIFIED JUROR:  I can't.

11           THE COURT:  All right.  Will it need to be in front

12  for you to be able to see it?

13           If you could, put it over here in front of —

14           THE WITNESS:  Your Honor, there's a smaller version

15  of that we can put on the Elmo.

16           THE COURT:  Let me make sure all the jurors can see

17  it.

18           All right.  Proceed.  Yes, sir.

19  BY MR. HOSKINS:

20  Q    Mr. Slyter, this board on the easel here is something that

21  you prepared to assist us all in understanding how you came to

22  your conclusion; is that correct?

23  A    Yes.

24           MR. HOSKINS:  Okay.

25           Your Honor, may the witness step down to refer to

1  that?

2          THE COURT:  He can step down.

3          Make sure you don't stand in front of the document.

4          THE WITNESS:  I understand.

5          THE COURT:  Yes, sir.

6  BY MR. HOSKINS:

7  Q    Mr. Slyter, the exhibit you have prepared has three

8  columns of names; correct?

9  A    Correct.

10 Q    Okay.  Would you tell the jury the names in the first

11 column on the left-hand side of the page, where did those come

12 from?

13 A    These are some of the names, not all of the names, from

14 what, in my vernacular, I refer to as the subject document.  It

15 is now D16.

16 Q    It's the one that's up on the screen?

17 A    Yes, these names come from the list that's on the screen.

18 Q    Now, what you have there is not the only comparison you've

19 made, but it is the comparison you think will be helpful to us

20 understanding; is that correct?

21 A    That is correct.  This was prepared just to illustrate the

22 process, not the complete major of the work.

23 Q    Thank you.  The middle column of names there, what is

24 that?

25 A    These are writings, the known writings of Cletus Maricle.

1   These are the names –– some of the names that he wrote at my

2   request and in my presence.

3   Q    Can you explain to the jury what that chart shows as far

4   as how you came to your opinions?

5   A    The chart shows –– illustrates the handwriting habits that

6   I'm looking at in conducting this comparison.  The process is

7   to identify –– it goes in a series of steps.  The first step is

8   to look at the nature of the writing in D16 and try to

9   determine whether this is someone's natural handwriting; not

10   contrived or altered, but their own natural writing.  That is

11   assessed by primarily looking at whether the writing is done

12   quickly.  To write in an unnatural way slows down the process,

13   you're thinking about how to do an A, how to do a B, how to do

14   a C.  When the writing shows the indications of natural pen

15   speed, fast writing, then we can believe that we're looking at

16   that individual's habitual force of habit way of writing.

17       That was the first consideration that I gave to the

18   writing in the document in question, D16.  It does show the

19   features that are associated with fast natural writing.

20   There's places where the pen is in motion before it touches the

21   paper, so you get those little tapered strokes as the pen comes

22   down onto the paper and you get those little strokes feathering

23   away as the pen leaves the paper as moving quickly rather than

24   in a drawn way.

25       And curved strokes in the writing have a smooth part to

1   them.  If the pen is moving quickly, you can draw a smooth

2   cycle.  If it's moving very slowly, the circle becomes a series

3   of flat movements and a little bit of tremor that's always

4   there.  It shows up significantly if you're going very slowly.

5       So I was satisfied in my examination that D16 is someone's

6   natural writing and shows their habitual way of writing.

7       I witnessed the other writings, I witnessed the writings

8   for Mr. Maricle, and that was done very quickly, very fast.

9   And in taking the request writings that he produced and then

10  later in looking at the request writings and the normal-course-

11  of-business writings that he acknowledged to me, I was

12  satisfied that this writing sample, again, is his habitual way

13  of printing.

14      When I compared these two, more so in printing than in

15  cursive writing, it's very easy to find similarities.  The way

16  that I look at handwriting comparison or handwriting

17  identification very much parallels what you do in

18  identifying -- in physically identifying a person.  There's a

19  lot of features that are in common, we expect to see printing

20  that looks like other printing.  And it's in the details that

21  you can separate one from another.

22      Just like you may encounter somebody who looks just like

23  who you know, in the details it's clear that it is not.  The

24  details makes the difference.

25      In the process of making my comparison of the writings on

1  D16 to the known writings of Mr. Maricle, the details showed

2  significant differences.  One that is already marked, a couple

3  of them are already marked up here, Cletus Maricle makes a

4  lower case M and it's consistent through his writing, it has

5  three rounds, three rounded tops.  You see it here, you see it

6  in James, down here in Carmen, and it's where there's an

7  "M" —— I'm sorry, that's not his writing up there, his habit is

8  to make this M in three sections.

9       The writer of D16 makes a very different M.  It's here in

10  William, James, Carmen here, it's two rounds and they're

11  more —— the proportions are different, they're angularly made.

12       Also in —— I spent a good bit of time looking at the

13  relative proportions.  Proportioning in characters is very

14  habitual.  Even in disguised writings you find that the

15  proportions fall pretty close to the person's habit.  One

16  difference, starting right at the top, in the letter W, this

17  writer brings the center part of the W up very slightly in the

18  bottom; very different than the habit that I see in

19  Mr. Maricle's writing.  There were other examples of

20  differences in proportion throughout the examination.

21       The habit that's already noted on this board, and I'll

22  show you what it's about, this writer's habit on the unknown

23  writing in making the —— when the letter S is the last letter

24  in the name, as it is in Stivers, Phillips, Lewis, the S is

25  enrolled at the bottom, it comes down, makes an enrolling

STEVEN SLYTER - DIRECT - MR. HOSKINS          32

1  stroke and finishes with the pen moving to the right.  The S is

2  also fairly narrow and quite tall compared to its width.  And

3  when we go to look at that same letter in lower case context at

4  the end of Stivers, Phillips, and Lewis, Cletus Maricle makes

5  that letter very differently, it's made very fast and it shows

6  a difference of writing habits.

7       Another observation was that the writer of D16 frequently

8  uses a capital letter character design in the middle of a name.

9  He uses a capital letter in a lower case context.  He uses a

10 capital A in William.  The T is hard to know whether that's a

11 capital or not, that letter doesn't change much.  Here's a

12 capital R in Stivers, capital E in —— you can debate whether

13 those are capital letters in the Es.  Here is the R in Crystal,

14 the capital L in Crystal, capital B in Abner.  This is an oddly

15 made capital D at the end of the name David.  That letter

16 appears, again, as a capital D in the middle of Rader.

17      When I look at the request writings and the normal-course-

18 of-business writings for Cletus Maricle, I do not see those

19 letters made as capitals out of context.  It's a different set

20 of writing habits.

21      There were other differences of proportion.  The height of

22 the capital, like writing the name Crystal, the different

23 proportion value there.

24      As I proceeded through this examination, bear in mind

25 differences are telling us more than similarities.  We expect

1   to see similarities.  There's a D made here in the lower case

2   way.  It's not an unusual construction, we see a similar D over

3   here.  We expect to see some similarities.  The letters are

4   designed to be able to communicate as writings, so there's a

5   convention to how things are done.  But the differences, in my

6   opinion, point very strongly to D16 being a different writer

7   than what we see in the exemplars for Mr. Maricle.

8   Q    And is the same true as far as the writings that you got

9   from Mrs. Maricle?

10  A    Yes, the same — the same process was carried out in the

11  examination of the second set of the exemplar or known writings

12  with some of the same differences.  The writing style in D16 is

13  made distinctive by some of these features that I talked about,

14  that identifies a distinctive, somewhat unusual set of writing

15  habits, and when we compare D16 to the known writings of Judy

16  Maricle, we see that it also is different and in many of the

17  same ways.  The S is not enrolled at the bottom as it is on the

18  D16.  Differences in proportion are seen through this writing.

19  She makes an M with two rises to it, but different proportions

20  and different shape to the characters than we see in D16.  Her

21  habit is to use this design, the single rounded movement for

22  the N.  I think I found one — it's not on this board, I think

23  I found one example in her writing where she used a triangular

24  N, one like we see here.  I think it was in the name Nancy, she

25  used it at the beginning of the name and it came up again in

1   the second place where the N was made triangularly as we see

2   over here.  The writer of D16, through the list where there's

3   Ns, they're made in this triangular fashion.

4       I failed to mention this difference in the capital G.

5   This D16 ends with a capital G, it's almost made like the

6   letter six, it just comes down and turns back.  Both Mr. and

7   Mrs. Maricle extend the G to the right with another set of

8   strokes following a capital G.

9       Progressing through this D16 to Judy Maricle, again, I

10  keep finding significant differences, and it leads me to

11  believe she is not the writer of D16.

12  Q    Mr. Slyter, does a document examiner such as yourself have

13  to be on guard for efforts by the people who are being examined

14  to maybe fabricate something or change something?

15  A    Of course, yes.

16  Q    What kind of safeguards do you use in your process to

17  catch those things?

18  A    The first safeguard, the first observation, first defense

19  against being given a disguised or contrived writing sample is

20  the speed of the writing.  To write in an atypical hand, to try

21  and divorce yourself from all the habits of your handwriting,

22  really slows down the process, not slowing it down just to the

23  speed of how do I spell this name, but slowing it down another

24  couple of steps to how do I design an A, how do I design a C,

25  how do I design a B.  So disguised writing is much slower, it

1  frequently — disguised writing will frequently look juvenile.

2  It will be like a reversion back to when we were learning to

3  write.  There's characteristics that — let my say it this way:

4  I've never encountered a disguised writing that was more

5  skillful than a person's daily writing.  It doesn't go up, it

6  always comes down.

7        And I want to say while we're on that that the writing

8  skill — from my perspective, the writing skill of both Cletus

9  and Judy Maricle is higher than the writing skill of — seen in

10  D16.  The proportions are more even, there's less variation in

11  size, the spacing is more even.  They don't misuse capital

12  forms.

13  Q    So the speed in which the people write is important?

14  A    Yes.

15  Q    And that's one of the reasons that you sat and watched

16  them write that out for you; is that right?

17  A    Yes.

18  Q    Would the possibility that Cletus Maricle and Judy Maricle

19  had seen D16 for some time in the past have any bearing on your

20  opinion?

21  A    No.

22  Q    It would seem like that might have given them the

23  opportunity to practice.

24  A    The literature — and I've been critically looking at

25  handwriting for 40 years and I've never seen someone who could

STEVEN SLYTER - DIRECT - MR. HOSKINS                    36
ID#: 7211

1    change their handwriting habits to that degree.  It would take

2    an extraordinary amount of practice and effort and it would

3    still be a slower process.

4    Q    Is there another way that you guard against that in the

5    samples that you look at?

6    A    Well, that was the purpose of getting normal course-of-

7    business writing samples, if they're trying — if someone is

8    trying to change the writing that they produce at my request

9    and it's clearly different than what they produced in the

10   ordinary course of business, then that raises a serious

11   question.

12   Q    So you're also comparing the handwriting they do right in

13   front of you with documents they say, we wrote this sometime in

14   the last — in the past?

15   A    Sure.

16   Q    And what did you look at as the past writing?  Do you

17   remember what that was?

18   A    It was a collection of entries from a Rolodex.

19            MR. HOSKINS:  Your Honor, may I have just a minute?

20            THE COURT:  Yes, sir.  I'll ask the witness to return

21   back to the witness stand, if you would, please.

22            MR. HOSKINS:  Your Honor, could the witness be shown

23   Exhibit D61A?

24            THE COURT:  Yes, sir.

25            THE WITNESS:  Could I get a little bit of water?

1          THE COURT:  Yes, sir, we'll get that for you here in

2    just one second.

3          THE WITNESS:  Thank you.

4    BY MR. HOSKINS:

5    Q    Mr. Slyter, would you take a minute to look at what's in

6    that envelope?

7    A    (Witness complies with request of counsel.)

8    Q    Does that look familiar to you?

9    A    These look like pages of the normal course-of-business

10   pages that I looked at, yes.

11   Q    That's the same thing that you looked at for the samples

12   of Cletus and Judy Maricle's writing from in the past; is that

13   right?

14   A    Yes.

15          MR. HOSKINS:  That's all, thank you.

16          THE COURT:  Thank you.  Mr. Hoskins, I'll let you

17   retrieve the board.

18          MR. HOSKINS:  Thank you.

19          Thank you.  Mr. Smith.

20                    CROSS-EXAMINATION

21   BY MR. SMITH:

22   Q    Good morning.

23   A    Good morning, sir.

24   Q    I'm Steve Smith, and I represent the United States.  I

25   have a few questions for you, sir.

1       Explain to us a little bit again about your background,

2   sir.  What exactly is your title?

3   A    Forensic document examiner.

4   Q    Okay.  And I believe you identified that there was a board

5   with which you were associated.  What was the name of that

6   board, sir?

7   A    Board of Forensic Document Examiners.

8   Q    And do you consider yourself a certified document

9   examiner?

10  A    Yes.

11  Q    Have you ever heard of the terminology "graphologist"?

12  A    Yes.

13  Q    Do you know there's a difference between a graphologist

14  and a document examiner?

15  A    Oh, yes.

16  Q    Okay.  And you don't consider yourself to be a

17  graphologist, I assume?

18  A    I do not.

19  Q    Are you familiar with the American Society of Document

20  Examiners?

21  A    Yes.

22  Q    Are you a member?

23  A    No.

24  Q    Could you be?

25  A    Probably not.

1  Q    What would disqualify you, sir, from being a member of the

2  American Society of Document Examiners?

3  A    Not having been a document examiner in a government

4  laboratory.

5  Q    And there's such things as minimum two-year requirements I

6  believe.  Under the ASTM, Section 23.88 requires at least two

7  years, I believe, of work in a laboratory setting; is that not

8  true?

9  A    Since its adoption, which is in the last few years, yes.

10  Q    So you could not be a member of the American Society.  How

11  about the American Academy of Forensic Scientists, are you a

12  member of that society?

13  A    No, sir.

14  Q    And could you be?

15  A    No.

16  Q    Are you familiar with the NABE?

17  A    Yes.

18  Q    Are you a member of that society, sir?

19  A    No, I'm not.

20  Q    Could you be?

21  A    I don't know; possibly.

22  Q    During the course, I believe, of your testimony here, you

23  explained that you performed certain tests, I believe, in

24  reaching your opinion?

25  A    Yes.

1  Q    Let me ask you this:  In the course of your work, sir, do

2  you generally have reviews of your work before you render a

3  final opinion?

4  A    No.

5  Q    Are you familiar with terminology such as "technical

6  review"?

7  A    Yes.

8  Q    And a technical review was not done in this examination;

9  is that true?

10 A    That's true.

11 Q    Are you also familiar with the term "a blind review"?

12 A    Yes.

13 Q    And a blind review was not conducted in this examination?

14 A    That is correct.

15 Q    Do you know what the criteria is for a blind verification?

16 A    I would want to look that up.

17 Q    Would you agree with me, sir, that it would be helpful in

18 reaching final opinions on handwriting comparisons to have

19 someone else look over your work?

20 A    In some cases I feel the need for that and I'll consult

21 with a peer, but not in every case.

22 Q    In some instances you have limited information, limited

23 time, and that might necessitate maybe some further review,

24 would you agree?

25 A    That's not been my experience as the cause for wanting

1  someone else to take a look at a case.  It's been more —

2  Q    What if you — Okay, finish your answer, I'm sorry.

3  A    I'm sorry.  When I've requested additional eyes to look at

4  a case, it's when it's a very close call, there's reason to

5  be — to seek a second opinion or a fresh look at it.  That

6  isn't true in every case.

7  Q    But in your practice and procedure, you don't utilize a

8  technical review nor a blind review, if I understand your

9  testimony?

10  A    That's — that would be correct.  I may — I may in some

11  cases ask for someone to look at it and give me their thoughts

12  on it, but it's not in the rigid criteria that you're talking

13  about.

14  Q    And you didn't have that done in this case; right?

15  A    I did not.

16  Q    In fact, as I understand, sir, you just met the Maricles

17  last Friday and spent about an hour with them down in Lexington

18  at one of their places of residence there?

19  A    Correct.

20  Q    And if I understand, sir, you spent that time with them

21  gathering this information that you've shown to the jury as

22  exemplars from them?

23  A    Correct.

24  Q    And if I understand it, sir, you did this in — they did

25  this in your presence?

1   A    Yes.

2   Q    And they were together when they did this?

3   A    Yes.

4   Q    In the same room?

5   A    Yes.

6   Q    And did it at the same time in front of you?

7   A    Yes.

8   Q    And, again, that -- just so I understand it, that's normal

9   procedure for you?

10  A    Yes.

11  Q    And you've indicated that it's also normal for you to do

12  government work, I believe you said you did work for the United

13  States Attorney's Office and other agencies such as the IRS and

14  the FBI?

15  A    I do, yes, sir.

16  Q    And I'm sure if you do work for the IRS and the FBI,

17  you're familiar with their procedures, aren't you, sir?

18  A    Yes, I think so.

19  Q    And isn't it a fact, sir, that in normal procedures with

20  the FBI and the IRS, that to go through an exemplar, for one of

21  them it takes between four to six hours normally for a person

22  to give a valid exemplar to the IRS and the FBI when they're

23  actually taking exemplars?

24  A    When I do cases for them, I have that work done by the

25  agent.  I don't know how long it takes them.

1  Q    Are you familiar with the guidelines of the IRS and the

2  FBI, sir?

3  A    I believe I'm familiar with them.  I can't quote them to

4  you.

5  Q    Okay.  Well, then you would also be aware, then, of their

6  specifications of what is required in order to have a valid

7  exemplar; correct?

8  A    Yes.

9  Q    And you would agree with me, sir, that all these years

10 that you've been doing this you've never asked how long it took

11 for them to complete the requirements for an FBI or IRS

12 exemplar?

13 A    I have talked with them about that, yes.

14 Q    And you would agree with me that it takes between four to

15 six hours for them to actually follow the IRS and FBI

16 guidelines as to how to take an exemplar from someone?

17 A    Yes.

18 Q    Now, there are -- as I understand it, in your review of

19 the Maricles' exemplars, there was an opportunity for them to

20 sit down together in the same room within an hour and write for

21 you some exemplars, which you allowed them to do on their own

22 free will as to how they wanted to do the writing; is that

23 correct?

24 A    Yes.  Yes.

25 Q    And you did not ask for them to do printing with

1  capitalization, if I understand you correct?

2  A    That is correct.

3  Q    And you would agree, sir, that in the Form 6540 that's

4  used by the IRS and the FBI, that's one of the primary things

5  that's required, and that is that if you have a known specimen,

6  it must be in the same handwriting style?  For instance, if the

7  questioned entries are hand-printed, you should get them

8  hand-printed; correct?

9  A    Yes.

10 Q    And if the questioned entries are upper case, hand-

11 printed, then you should get your exemplars upper case and

12 hand-printed, you would agree with that, too, wouldn't you,

13 sir?

14 A    Yes.

15 Q    But you did not do that in this case, if I understand your

16 testimony, isn't that true?

17 A    That is true.

18 Q    Now, I believe that as you gave your testimony here this

19 morning, you indicated that there were a number of similarities

20 that brought you to this conclusion that this is not the

21 writing of Judy Maricle or Cletus Maricle; is that correct?

22 A    I believe -- I believe you misspoke.  If you mean a number

23 of dissimilarities, you're correct, yes.

24 Q    Okay.  Dissimilarities, exactly.  Thank you for correcting

25 me.

1  A    That's all right.

2  Q    I guess my point is, you didn't make us a chart of the

3  similarities, is that true?  Is that a fair statement?

4  A    I pointed out some similarities on the same chart, they

5  are there, yes.

6  Q    Now, I believe that you indicated that they brought with

7  them some documents for you to examine as being known writings

8  of them in the past; is that fair?

9  A    No.  I asked for that from them.  They were not at their

10 own home.  Mr. Maricle found the documents that are in this

11 envelope here in some material he had, I think, through

12 discovery.

13 Q    Okay.  And I believe that that's what was represented to

14 you to be their past writings that you could use to -- I

15 believe you said it was very important that you use this to

16 check to make sure that you didn't have somebody that might be

17 feigning or scheming as to this -- you know, faking their

18 writing, making it look like it's not the comparable that you

19 were comparing it to, you wanted to look at historical

20 writings; correct?

21 A    Yes.

22 Q    So this is kind of a check and balance to make sure that

23 everybody is playing fair, level on the board; right?

24 A    Yes.

25 Q    And so they brought to you -- I believe that's

1  Exhibit 61A; is that correct?

2  A    Yes.

3  Q    And you would agree with me that, sir, first of all, that

4  appears to be copies from a Rolodex?  Would you agree with me

5  on that?

6  A    Yes.

7  Q    And second of all, sir, you would agree with me that they

8  brought you what appears to be a copy of a copy of a Rolodex,

9  would you agree?

10  A    That could well be, yes.

11  Q    It could well be?

12  A    I don't know what generation this is.

13  Q    You don't know how many generation of copies, but it's a

14  copy, you would agree with me on that?

15  A    Yes.

16  Q    Okay.  No doubt about that.  And were there other

17  documents that they brought you other than this one, because

18  that's the one you've identified for the jury.  Were there any

19  others?

20  A    I believe this is that collected set, yes.

21  Q    So that was it.  And so that's very voluminous, there's a

22  number of pages on there, if I recall —

23  A    There are.

24  Q    — is that fair?

25  A    Uh-huh.

1  Q    And so as you got Judy Maricle and Cletus Maricle seated

2  there I guess in that apartment, you had them, I guess,

3  identify cards or copies of those cards that they represented

4  to you at that time was their writing; is that how that worked?

5  A    They both looked through this collection and acknowledged

6  to me that this contained examples of both of their writings.

7  I didn't identify from them which was which in this collection.

8  Q    So they represented to you that if there was handwriting

9  on the Rolodex, it was either Judy's or Cletus's, is that the

10 way they represented to you?  They didn't identify for you,

11 this is my card, I know I wrote this out, and this is her card?

12 A    We did not go through there card by card and identify

13 that; you're correct.

14 Q    So you just took that as an example of historical writings

15 that they had prepared in the past, and I believe you said you

16 wanted to make sure you had examples of them using their normal

17 flow and speed in their writing so that you would use that in

18 your comparison to double-check and make sure that they had not

19 faked in their exemplars in front of you; is that correct?

20 A    That's correct.

21 Q    Now, you would agree with me, sir, that writing on a

22 Rolodex card might not be the most preferred historical writing

23 that you could have presented to you; would that be a fair

24 statement?

25 A    I'm not sure I would agree with you on that.

STEVEN SLONE CROSS - MR. SMITH                    48

1   Q    Well, I was just looking at your website, sir.  It just

2   seemed to me that in your website —— You do have a website;

3   correct?

4   A    Yes.

5   Q    And let me make sure that I have the right website first.

6             MR. SMITH:  Could I show this to the witness?

7             THE COURT:  Yes, sir, you may.  Show it to

8   Mr. Hoskins first before you do.

9             MR. SMITH:  Sure.

10  BY MR. SMITH:

11  Q    Would you agree with me, sir, that may not be a color

12  copy, but that appears to be —— would you agree with me that

13  appears to be part of your website that you have on the

14  Internet?

15  A    I recognize the text.  The downloading process is kind

16  of ——

17  Q    I couldn't cure that this morning, I apologize.

18  A    I can't cure that when I want to do it either.

19  Q    As it is, could you still identify that as part of your

20  website?

21  A    Yes, sir.

22  Q    And you would agree with me, sir, that in there you list

23  the type of things that you should consider to be normal

24  historical things that you would use, and I believe as I look

25  through that list I saw things like cancelled checks, things

1  that people would use in personal journals on a daily basis,

2  but I fail to see anywhere on there that you recommended

3  Rolodex cards as a preferred historical example to be used in a

4  comparison; would that be fair?

5  A    I'm sure that's true, yes.

6  Q    And, in fact, I believe that on your website you have a

7  FAQ section, and I got to go through a couple of sections of

8  that.  Do you recall that?

9  A    Yes.

10  Q    Frequently asked questions section?

11  A    Yes.

12  Q    And, in fact, I think you had addressed some issues that I

13  believe you would agree with me, sir, that working with copies

14  is really not a preferred way to operate and engage in this

15  type of analysis either; would you agree?

16  A    As I was saying in my direct testimony, the identification

17  of writing and, I believe, certainly in signatures, the details

18  are quite important.  And, yeah, the original is always

19  preferred to a copy.

20  Q    In fact, you would agree with me, sir, that in a machine

21  copy, really what you're looking at is toner; is that a fair

22  statement?

23  A    Yes.

24  Q    You're not actually looking at ink on paper, are you?

25  A    Correct.

1  Q    And that's an important detail in your business, would you

2  agree, details, that's important in your line of work?

3  A    Yes, of course.

4  Q    And so that's another reason that you don't prefer to use

5  machine copies, because you're actually looking at toner as

6  supposed to ink on paper; would you agree with me?

7  A    Yes.

8  Q    And looking at toner, you're actually — I assume as a

9  document examiner, you use a microscope to do these examination

10  comparisons; would that be fair?

11  A    Sometimes.  It's not as often as you might assume.

12  Q    The preferred way of doing an examination would be having

13  an original, having ink on paper, and that way you could assess

14  the line quality; would that be a fair statement?

15  A    Yes.

16  Q    And also if you have ink on paper and you had the ability

17  to look at that closely in detail, you could also see for

18  breaks or tremors that you talked about, you could see tremors

19  or breaks much better and with much more clarity on ink on

20  paper than you could with toner?

21  A    Yes.

22  Q    And, in fact, the reason that that's so important is it's

23  also a way to rule out tracing; isn't that true?

24  A    Yes, I'm sorry.

25  Q    And also indentations where a pen might stop, if you have

1  the ink on paper, you could see where that ink might stop a

2  little better than you could with toner produced by a machine

3  copy; is that true?

4  A    Yes.

5  Q    But in this case, you agree with me, sir, you didn't have

6  historical writings that were ink on paper; isn't that true?

7  A    That's true.

8  Q    You had Rolodex cards that were produced and you don't

9  know how many copies of generated copies of toner that was

10 produced to you as their historical writings, do you?

11 A    Correct.

12 Q    And would your state, sir, that your opinion -- Let's ask

13 it this way:  The level of certainty that you would have in

14 giving an opinion that this is not the Maricles' writing, would

15 you agree with me, sir, that the level of certainty would have

16 to be affected in cases where you did not have an original and

17 you were looking at machine copies and toner as opposed to ink

18 on paper?

19 A    What you say is accurate, Mr. Smith, when you're coming to

20 the opinion that two things are by the same writer.  If you're

21 reaching an opinion of identification, then each detail that

22 you can test is an important detail.  But it doesn't quite work

23 the same way when the evidence is pointing to elimination or

24 that the writings are different.  As I've said this morning,

25 differences are more important than similarities.  If I'm

1  saying that Writing A is the same person as Writing B, to have

2  a high level of certainty for that opinion, I need to be able

3  to demonstrate that I've looked at everything I could possibly

4  look at, and I want — that calls for originals, microscopes,

5  looking at every feature in the line of writing to be able to

6  say that right down to — in the analogy I used earlier of

7  physical identification, right down to birthmark, scars, and

8  tattoos.  Everything I can look at shows this to be the same.

9      When, as in this case, I see differences that are

10 significant and are accurately communicated in those things I

11 can test like the number of rounds on the letter M and the

12 enrollment in the letter S and the gross proportions of the

13 characters, the differences give me a solid sense of certainty

14 in the opinion that it does not come from the same hand.

15     So it's different in the context of eliminating someone —

16 it's much easier to eliminate someone and say this is not the

17 same than it is to be confident in saying that it is the same.

18 Thank you for enduring a long answer.

19 Q    Well, my question is, sir, using a copy does not affect

20 the level of certainty which you expressed your opinion here

21 today, is that your answer?

22 A    In this case it does not.

23 Q    I went on your website this morning and I found it

24 interesting, though, and I think you can find it there in the

25 FAQ section, it says that, quote — these are your words —

1  A    Uh-huh.

2  Q    -- the question was "Can an expert work with copies?"  And

3  I believe you would agree with me, sir, that you stated in your

4  website that opinions reached from copies cannot be expressed

5  with the same level of certainty as those reached through an

6  examination of the original.  Do you want to take back those

7  words, sir, that you've got on your website?

8  A    No.  No, I do not.

9  Q    So you've stated that in the past, that you can't have the

10 same level of certainty and express the same level of certainty

11 with your opinions when you're using machine copies as you can

12 with the original; isn't that fair, sir?

13 A    I'm sorry, I lost -- I was looking at this and lost track

14 of your question, I apologize.  I didn't get the question.

15 Q    The question is, you've made the statement in the past on

16 your website, isn't it true, that your opinions reached with

17 copies cannot be given the same level of certainty as those

18 when used with examination of an original?

19 A    That is what it says here.

20 Q    And that's your statement, isn't it, sir?

21 A    Yes.

22 Q    In fact, sir, you go on to say, quote, examination of

23 copies cannot be as thorough as examination of originals.

24 That's a statement you've made in the past as well; isn't that

25 true?

1   A    Yes.

2          MR. SMITH:  If I could approach the projector, Your

3   Honor, I would like to ask the witness some questions about his

4   demonstrative piece that he —

5          THE COURT:  Yes, sir, you may.  Why don't we take a

6   recess a little bit —

7          THE CLERK:  It's coming up.

8          THE COURT:  Is it coming up?  All right. Thank you.

9   BY MR. SMITH:

10  Q    Sir, can you see that from your monitor?  I apologize.

11  A    I can see it here.

12  Q    I thought it might be a little helpful if we can put it on

13  the projector.  Does that help you see that now?

14  A    I can see it here pretty well, yes.

15  Q    Okay, good.  And just, again, as I understand your

16  testimony, you said you were looking for things that were

17  different as you examined D16, which was given to you as a —

18  as the subject — I believe you referred to that as the

19  subject; is that correct?

20  A    I do.

21  Q    And that was that list of 20-some names that were D16, and

22  you picked some of those names to use in this demonstrative

23  aid; is that right?

24  A    Yes.

25  Q    That's the subject.  The next one would be known by Cletus

1 Maricle and known from Judy Maricle?

2 A    Yes.

3 Q    And these would have, I assume, been actually done there

4 in that hour's time that you were there at the apartment and

5 had them perform that in front of you; is that right?

6 A    Yes.

7 Q    So these are the ones they performed in front of you; is

8 that right?

9 A    Yes.

10 Q    And I believe, sir, as I understand your testimony, that

11 it makes no difference to you whether or not they had D16 days

12 before, would that make any difference to you if they had it

13 days before they sat down with you to look at?  Would that have

14 made any difference in your opinion to you, sir?

15 A    I think not.  I explained the difficulty of making those

16 kind of alterations.

17 Q    One of the things — if I understood your testimony, sir,

18 it was important that when you do this observation that you

19 notice the speed.  Do you recall that testimony?

20 A    Yes.

21 Q    And you found that very important to determine whether a

22 person was faking and actually had practiced and had somehow

23 altered their writing to make it, in this case, dissimilar to

24 the comparable.  You found that important to see the speed in

25 which they go; is that accurate?

1   A    Yes.

2   Q    And yet you have said that it did not matter to you in

3   your opinion how long they had had D16 in their possession,

4   you've stated that?

5   A    That's right.

6   Q    You stand by that?

7   A    Yes.

8   Q    Let me ask you this, sir:  Is it fair to state, then, that

9   the speed, having been very important, could be affected by the

10  length of time a person might have to study?  You would agree

11  with me that that could affect the level of proficiency and

12  speed in which I could write if I had an opportunity to study

13  and make it different than the one you're going to compare me

14  to?  Is that a fair statement?

15  A    Yes, I'll go along — I think I understand your question.

16  Q    So if I had six days or six months, I might be able to

17  make my writing more different and practice it more different,

18  have longer time to practice and actually have proficiency and

19  speed in doing it different if I had the opportunity to do

20  that; right?  That could affect my speed; you would agree with

21  me, right?

22  A    Yes, you would speed up.

23  Q    I believe in this case that you said that there were some

24  significant things that you pointed out with these arrows;

25  correct?

1   A    Yes.

2   Q    And you have red arrows and you have blue arrows, and

3   could you again, just for my benefit, tell me what the red

4   arrow and blue arrow difference is?

5   A    Here I am pointing to things that are different between

6   the subject writing and the respective writings of Cletus and

7   Judy Maricle.  The red arrows refer to the comparison to the

8   writings of Cletus Maricle, the blue arrows refer to the

9   comparison to the writings of Judy Maricle.

10  Q    And I believe that you said that one of the key — not the

11  sole key, but one of the keys, is that you noticed in the

12  natural way in which Cletus Maricle did his exemplar for you

13  there in the apartment that he did not use capitalization.  Do

14  you remember that?

15  A    Yes.

16  Q    And I think capitalization in an irregular way of using

17  the proper use of capitalization, is what you testified to?

18  A    Yes.

19  Q    And yet, sir, would you agree with me that the very first

20  entry that Mr. Maricle wrote for you, he did capitalize his T

21  and that would be an improper or out of the normal way of

22  capitalization in the T in the word Stivers?

23  A    I mentioned that in my direct testimony, and that is a

24  function of proportion, that the T may or may not be taken to

25  be a capital in that context.  It's not a different design.

1  Q    Now, from historical writings that you do list on your

2  website, I believe that you do reference to certain tax

3  documents, cancelled checks, and those things.  You didn't

4  mention Rolodex; is that right?

5  A    Correct.

6  Q    But you would look for somebody to look at such things as

7  personal journals, possible cancelled checks, tax returns,

8  things of those nature?

9  A    Ordinary business.

10  Q    Through the course of writing that you would normally look

11  at; correct?

12  A    Yes.

13  Q    And you weren't shown, then, I assume, then, in the course

14  of your examination this document, were you?

15  A    I can't see this, I'm sorry.

16  Q    Okay.

17  A    I do not recognize this document.

18  Q    Had you had an opportunity to see that, does that appear

19  to be R. Cletus Maricle being the preparer of this document,

20  sir?

21              MR. HOSKINS:  Object, Your Honor.

22              THE COURT:  Overruled.

23  BY MR. SMITH:

24  Q    You did have him sign each of those exemplars, didn't you?

25  That's standard practice; right?

1  A    Yes.

2  Q    You know his signature.  Look down at the bottom of that

3  page.  Can you tell me, sir, is that R. Cletus Maricle's

4  signature?

5  A    I believe it is, yes.

6  Q    All right.  And you would agree with me, sir, that this

7  being what appears to be a Kentucky Registry of Election

8  Finance would be kind of an ordinary or some type of tax

9  document or cancelled check, but historically it looks like it

10 was prepared in 1999.  You would agree with me there, sir?

11 A    Yes.

12 Q    And in that document, sir, it looks as though there is an

13 opportunity to observe printing of this person, would you

14 agree?

15        MR. HOSKINS:  Objection, Your Honor, that's assuming

16 that Mr. Maricle did the printing.

17        THE COURT:  Overruled.

18 BY MR. SMITH:

19 Q    Would you agree with me, sir, that this is an example

20 which you could look at for purposes of identifying a person's

21 printing?

22 A    I would agree.  I don't know that the document is printed

23 by the same person who signed it.  That's my hesitation.

24 Q    That's not my question.  We're not there yet.

25 A    Okay.

1  Q    My question is, you would agree with me that that would be

2  a sample of a historical writing of an individual and it would

3  be an example of their printing?

4  A    Yes.

5  Q    And that would be one in which you would be very

6  interested in looking at, I assume, if you were going to make a

7  comparison, would be to look at a historical document in the

8  normal course and the normal way in which they write or print

9  if you were going to have to look at a printed document to

10 compare and determine whether they wrote it or not; you would

11 agree?

12 A    Yes.

13 Q    You would also agree with me, would you not, sir, that

14 this person appears to make use of capitalization in abnormal

15 places and ways in their normal printing, would you not?

16 A    I would agree.

17 Q    Thank you.  I believe in your testimony, sir --

18         MR. HOSKINS:  Could we have that document identified

19 for the record?

20         MR. SMITH:  D62, Your Honor.

21         THE COURT:  D62.  Thank you.

22 BY MR. SMITH:

23 Q    I believe, if I further understood your testimony, sir,

24 that there were consonants in which you were concentrating on

25 in your analysis.

1          MR. SMITH:  Let me put that back up for the benefit

2    of the witness.

3    BY MR. SMITH:

4    Q    And I believe that you were focusing on some of the

5    consonant S, if I recall?

6    A    Yes, we talked about the S, uh-huh.

7    Q    And I believe it was the manner in which you described it

8    as having specifically the known D16 you noticed there was a

9    little curly at the end of the S; is that accurate?

10   A    Yes, it's enrolled at the bottom.

11   Q    And you noticed that both Maricles did not use the curly q

12   in that hour time that you stayed there in the apartment, they

13   didn't make that curly S in front of you?

14   A    Correct.

15   Q    And then I believe you also said that the C was another

16   letter which you focused on as being different; is that right?

17   A    In proportion, there's a difference, yes.

18   Q    And I think also in the structure of it as well, you

19   called attention to that as well?

20   A    I don't recall that in the C, I'm sorry.

21   Q    You don't recall noticing that there's a loop in the C on

22   the known D16 and that wasn't something you keyed on?

23   A    No, sir.

24   Q    Just the size of the C?

25   A    Yes.

1  Q    And you found that it was, in the course of your

2  examination, different in proportion, smaller or bigger in

3  proportion, sir?

4  A    If you look at the names Crystal and Carmen, you'll see

5  that the capital C is the same size as the other letters of the

6  name, where in the exemplars for the two Maricle writings it's

7  larger.

8  Q    But, again, sir, unlike what IRS and FBI required, you did

9  not ask the Maricles to do all capitalization of an exemplar

10 for you, did you?

11 A    No.

12 Q    So you're comparing apples and oranges basically, aren't

13 you?  If you don't compare upper case to upper case, you really

14 don't have a good comparison; isn't that a fair statement, sir?

15 A    I had upper case letters in the other sample in

16 capitalization and throughout the other samples.  I was looking

17 for a comparison of natural handwriting to natural handwriting.

18 Q    I believe that one of the distinguishing factors that you

19 found is both Maricles did not loop their Ss?

20 A    I did not find an example of the same S, yes.

21 Q    Let me direct your attention to D61.  You have D61 there

22 in front of you, I believe.

23        MR. SMITH:  I'm going to put a couple of pages up

24 here if the Court would allow.

25        THE COURT:  Yes, sir.

1  BY MR. SMITH:

2  Q    Sir, you would agree with me that that's a page of the

3  Rolodex that you looked at?

4  A    Yes.

5  Q    And you would agree with me also, sir, that these are Ss,

6  Bob Stafford up at the top that's highlighted, that's an S;

7  correct?

8  A    Capital S, yes.

9  Q    And down here, Singleton, there's another S; correct?

10 A    Yes.

11 Q    You would also agree with me there's loops on both those

12 Ss?

13 A    Yes.

14 Q    Again, sir, part of that same exhibit, there's another

15 card with an S on Shirley.  Do you see that?

16 A    Yes.

17 Q    That also has a loop on it?

18 A    It does.

19 Q    One more just to look at there.  That's again a printed S

20 and it looks like the word "slick" in parentheses, does it not?

21 A    Yes.

22 Q    And that also has a loop on it, doesn't it?

23 A    Yes.

24 Q    Sir, as I understand it, you were hired by — for the

25 Maricles to come here and testify today.

1  A    That's correct.

2  Q    And you attach, I think as part of your website, a fee

3  schedule; isn't that true?

4  A    It is on the website.

5  Q    And how much did you get paid for your appearance here

6  today, sir?

7  A    My fee for testimony is a thousand dollars.

8  Q    And how about prep work, what do you charge?

9  A    200 an hour.

10 Q    And have you submitted a final bill in this case at this

11 point?

12 A    No, I have not.

13 Q    How many court appearances have you had so far?

14 A    In this case?

15 Q    Yes, sir.

16 A    Two, but I would consider that a continuation.

17           MR. SMITH:  Thank you.

18           THE COURT:  Let's see if any of the other defendants

19 have questions before I ask for redirect?

20           MR. WESTBERRY:  No.

21           MR. WHITE:  No.

22           THE COURT:  Any redirect?

23           MR. HOSKINS:  Thank you, Your Honor.

24                      REDIRECT EXAMINATION

25 BY MR. HOSKINS:

1   Q    Mr. Slyter, you see D16 there in front of you, do you

2   still have that exhibit?

3   A    No, I don't.

4   Q    That D16 there is the actual original document, isn't it?

5   A    It is.

6   Q    And you had some type of photocopy or some type of printed

7   copy of that document?

8   A    Yes.

9   Q    Do you have the one you worked with with you as well?

10  A    No, I don't.

11  Q    Looking at that document, that original document, do you

12  see anything that in your professional opinion, based on your

13  training and years of experience, which would cause you to

14  change the opinion that you've given to us in any way?

15  A    No.

16  Q    Now, I want to clear up something I think Mr. Smith, when

17  he was asking you questions, he referred to the place you met

18  with Cletus and Judy Maricle as one of their residences.  Was

19  that your understanding of where you met with them?

20  A    I understood it to be the residence of Mrs. Maricle's

21  sister.

22  Q    So did you ask them for other historical-type documents

23  when you got to that place?

24  A    When we got -- when I asked for normal course-of-business

25  documents, there was some discussion of their not being at

1   their own home and not having access to things that were at

2   their home, and the material that -- the Rolodex material was

3   what Mr. Maricle had available at the time.

4   Q    And you've testified that while in some cases it may be

5   preferred to have the original document, you can give a

6   qualified opinion, you can give an expert opinion based on a

7   copy; is that correct?

8   A    Yes, uh-huh.

9   Q    And the better the copy, the better the opinion that you

10  can give?

11  A    Yes.  And I hope I was clear in the difference between an

12  identification opinion and an opinion of dissimilarity.

13  Q    Looking at document D16, are there any significant

14  differences between the original and the copy that you worked

15  with?

16  A    No, I don't see any significant differences there.

17  Q    You were shown just a few minutes ago some cards from the

18  Rolodex that you had looked at.

19  A    Uh-huh.

20  Q    Were any of those particular cards identified by either

21  Mr. Maricle or Mrs. Maricle as being their writing, any of the

22  ones Mr. Smith asked you about?

23  A    As I said, we didn't go through there card by card and

24  identify that.

25  Q    You were asked some questions about the time involved in

1  doing your examination.  The hour and 15 minutes that you

2  talked about was just the time that you spent with Mr. and

3  Mrs. Maricle collecting their handwriting samples; is that

4  correct?

5  A    That is correct.

6  Q    It doesn't include the time that you spent later on in

7  your office doing your examination of those documents, does it?

8  A    That's correct.

9  Q    And the methodology that you used in this case, is that

10 the same that you use when you're working for any other entity

11 that hires you?

12 A    Yes.

13 Q    And nothing we've talked about today changes your

14 opinions?

15         MR. SMITH:  It's been asked and answered, Your Honor,

16 I'm going to object.

17         THE COURT:  Sustained.

18         MR. HOSKINS:  Thank you.

19         THE COURT:  Any recross of the witness?

20                 RECROSS-EXAMINATION

21 BY MR. SMITH:

22 Q    Sir, you were asked to look, I believe, at D16?

23 A    Yes.

24 Q    That's the first time you've seen it, has been here on

25 your redirect examination, is that fair, you've not seen that

1    before today?

2    A     No, I saw this yesterday.

3    Q     While you were in court testifying?

4    A     Yes.

5    Q     Okay.  So you saw it while you were on the witness stand

6    yesterday and you saw it on the witness stand today?

7    A     Yes.

8    Q     And you're able to now make an opinion that there's no

9    difference between that and the copy that you were furnished by

10   the Maricles?

11   A     I see no significant difference between this and the copy

12   that I'm familiar with.

13   Q     You don't need any equipment or anything like that to look

14   at that better?

15   A     No.

16   Q     You don't even need to take it out of that plastic, I

17   assume, to even look at it better?

18   A     No, I can see this fine, thank you.

19          MR. SMITH:  Okay, fine.

20          THE COURT:  Anything else?

21       (No response.)

22          THE COURT:  Ladies and gentlemen, I'm going to give

23   you your morning recess at this time.  We'll take approximately

24   a 15-minute recess.  Please keep in mind the admonitions that

25   you have been given previously not to discuss the case among

1    yourselves while we are in recess.  The jury will be excused

2    for 15 minutes.

3          (Whereupon, the jury retired from the courtroom, after

4    which the following proceedings were had in open court.)

5                THE COURT:  Thank you.  Please be seated.

6                Mr. Smith, what is the position of the United States

7    with respect to releasing this witness at this time?

8                MR. SMITH:  No objection.

9                THE COURT:  All right.  The witness will be excused

10   at this time, and we'll be recess for 15 minutes.

11         (Whereupon, a short recess was had, after which the jury

12   returned to the courtroom and the following proceedings were

13   had in open court.)

14               THE COURT:  Thank you.

15               The record will reflect that all members of the jury

16   are present.  The parties and counsel are also present.

17               Mr. Pinales, you may call your next witness.

18               MR. PINALES:  Thank you.  Morris House.

19               THE COURT:  Thank you.

20                           MORRIS HOUSE,

21   having been first duly placed under oath, was examined and

22   testified as follows:

23                        DIRECT EXAMINATION

24   BY MR. PINALES:

25   Q    Would you state your name and spell —

1   A    Morris House.

2   Q    Okay.  And spell your last name, please.

3   A    H-o-u-s-e.

4   Q    Mr. House, are you employed?

5   A    Yes, I'm a probation and parole officer for the 41st

6   Judicial District.

7   Q    Would you explain to us what the 41st Judicial District

8   is?

9   A    That consists of Clay, Leslie, and Jackson County.

10  Q    And how long have you been so employed?

11  A    Almost 24 years now.

12  Q    Okay.  Can you share your educational and work background?

13  A    Okay.  I got a B.S. degree from Cumberland College and

14  then I've been a probation and parole officer, like I said, for

15  the last 24 years.

16  Q    And 24 years within the 41st District?

17  A    Yes, that's correct.

18  Q    Do you know Cletus Maricle?

19  A    Yes, I do.

20  Q    And can you see him in the courtroom?

21  A    Yes, I can.  Yes, sir.

22  Q    Could you point him out?

23  A    Yes, I see him right there, yes.

24  Q    And when you say "right there," is that the gentleman?

25  A    Yes, that is the gentleman, yes.

1              THE COURT:  The record will reflect the witness has

2    identified the defendant, Cletus Maricle.

3              MR. PINALES:  Thank you, Judge.

4    BY MR. PINALES:

5    Q    As a probation officer, can you explain to us what your

6    duties are and how you perform those duties?

7    A    Okay.  Basically I supervise clients that have been placed

8    under supervision or been placed under parole by the Department

9    of Corrections.  I do a lot of presentence investigation

10   reports for the court.

11   Q    And do you work with the court?

12   A    Yes, I do.

13   Q    And specifically, do you work with the Judge?

14   A    Yes.

15   Q    And I'll share with you that we had a video played which

16   was an official court record before.

17   A    Okay.

18   Q    And a person was —— there was an agreement for a sentence

19   between the Commonwealth Attorney and the defense attorney.  Is

20   that a normal procedure?

21   A    Yes, that's normal procedure.

22   Q    And then what happens?

23   A    Well, when the —— after they're being sentenced, there's a

24   couple of things can happen.  If he's convicted of a felony,

25   for example, he can either be sentenced to prison at that time

1  or he be given probation and placed under supervision at that

2  time.

3  Q    And if they're given supervision, then that is where you

4  would get involved?

5  A    Yeah.  Well, I'm usually involved a little bit before

6  that, because a lot of times I've done the presentence

7  investigation report on them.

8  Q    And what does a presentence investigation report

9  consist —

10 A    That's more or —

11 Q    — consist of?

12 A    That's more or less doing their social history of them,

13 doing the criminal background of them, and things like that,

14 and then I present that to the Court, and the Judge — I give

15 to it the Judge and that's consideration for probation or

16 whatever.

17 Q    Have you ever seen drug testing in the court?

18 A    Yes, I have.

19 Q    Tell us how that operates.  How does that work?

20 A    The Judge will order us to give a drug test of a certain

21 individual and we give that drug test to that individual and we

22 report the results back to the Judge.

23 Q    And what kind of drug tests do you give?

24 A    Well, they're basically — we give different ones.

25 They're tested — usually the standards are like for marijuana,

1  cocaine, barbiturates, amphetamines, and different ones like

2  that.  They're usually stick tests, field tests.  Sometimes if

3  they're positive, we'll end up sending them to the lab for

4  verification.

5  Q    So that if a person -- Let me back up.

6  A    Okay.

7  Q    That is what you're testing for?

8  A    Yeah.

9  Q    But how do you test them?

10 A    Okay.  We take a urine sample.  I'm sorry, sir.

11 Q    Okay.  And then, as I understand, you just said that if

12 it's positive you get a double-check?

13 A    Sometimes, yes.  Most times if we give a field test, a lot

14 of times they'll admit that they have been positive for that

15 test and they'll go ahead and admit to it, and then in that

16 case we don't need to send it to the lab for verification.

17 Q    During your period of time as a probation officer in the

18 41st Judicial District, has Judge Maricle ever tried to

19 influence you in any way?

20 A    No, he has not.

21 Q    Has he ever tried to tell you how to do your job in any

22 way?

23 A    No, he has not.

24            MR. PINALES:  Can I have a moment, Your Honor?

25            THE COURT:  Yes, sir, you may.

1  BY MR. PINALES:

2  Q    Calling your attention to the drug tests.

3  A    Yes.

4  Q    Is it common for a judge or for this Judge to do a drug

5  test when somebody is to be given probation or about to be

6  sentenced?

7  A    Yes, it is, very common.

8  Q    And when you say it's common, it's done before they are

9  released?

10 A    Yes, it's done before that he does the judgment usually.

11 He wants to know -- like we would go to court that day and the

12 individual would be going to court, and before he would

13 sentence him, he would want to know if he's clean or not, if he

14 was drug free or not.

15 Q    And that is fairly standard with this Judge?

16 A    That is -- that's correct.

17 Q    And I asked you whether or not you were ever -- there was

18 ever any attempt to influence you in your job by Judge Maricle.

19 I want to ask if there was ever any attempt to influence you in

20 your politics by Judge Maricle?

21 A    No.

22           MR. PINALES:  One moment.

23           I think that's it.  I'll pass the witness.  Thank

24 you, Judge.

25           THE COURT:  All right.  Thank you.

1           Mr. Smith or Mr. Parman.

2           MR. SMITH:  No questions.

3           THE COURT:  All right.  Anything else on behalf of

4   the other defendants?

5           MR. WHITE:  No.

6           THE COURT:  Thank you.  You may step down.

7           You may call your next witness.

8           MR. PINALES:  Doug Hopkins, Your Honor.

9           THE COURT:  I'm sorry?

10          MR. PINALES:  Doug Hopkins.

11                          DOUG HOPKINS,

12  having been first duly placed under oath, was examined and

13  testified as follows:

14                      DIRECT EXAMINATION

15  BY MR. PINALES:

16  Q    Would you state your name and spell your last name,

17  please?

18  A    Doug Hopkins, H-o-p-k-i-n-s.

19  Q    Mr. Hopkins, are you employed?

20  A    Employed with the Department of Corrections, Probation and

21  Parole officer in the 41st Judicial District.

22  Q    And in the 41st Judicial District, does that consist of

23  Clay, Leslie, and Jackson County?

24  A    Yes, sir, it does.

25  Q    And how are you employed, in what capacity?

1    A    Probation and parole officer.

2    Q    And what is that?  Tell us.

3    A    Basically we have two functions.  We supervise individuals

4    who are probated out of the local court system, the circuit

5    court system primarily.  We also supervise individuals who are

6    paroled out of our state institutions.

7    Q    And how long have you been so employed?

8    A    Next month, April 16, will be my 14th year.

9    Q    And during your course as a probation and parole officer,

10   do you know a person by the name of Cletus Maricle?

11   A    Yes, I do.

12   Q    And would you look around the courtroom to see if you see

13   him here?

14   A    I believe he's to your left there standing up.

15          THE COURT:  The record will reflect the witness has

16   identified the defendant, Russell Cletus Maricle.

17          MR. PINALES:  Thank you.

18   BY MR. PINALES:

19   Q    And how do you know him?

20   A    He swore me in as a parole officer when I first took this

21   position.  I worked his court exclusively for the time that he

22   was on the bench.  Small town, I knew of him before I became a

23   parole officer.

24   Q    And during your course of time as a parole officer, have

25   you ever encountered any situations of drug testing?

1   A    Quite frequently, yes, sir.

2   Q    And under what circumstances and when does that come up?

3   A    Different reasons.  We would almost assuredly, if an

4   individual were there for sentencing purposes or to offer a

5   plea, enter a plea, that subject at any time reflected on his

6   arrest record he may have at one time been involved with drugs,

7   the Judge would almost always request that that individual be

8   drug tested there on the spot before a plea was entered.  We

9   would drug test after people were placed on probation under our

10  guidance.  So we did that quite frequently.

11  Q    And when somebody was in court, either to enter a plea or

12  to be sentenced, you said Judge Maricle routinely did a drug

13  test.  Did he –– was that the standard operating procedure of

14  Judge Maricle?

15  A    That was my experience.  I didn't work that many other

16  courts to have –– to compare with, but it's pretty standard

17  that we would drug test a great number of people.

18  Q    And drug test at the orders of Judge Maricle?

19  A    Yes.

20  Q    During your 14 years as a probation and parole officer,

21  did Judge Maricle ever try and influence you in any of the

22  decisions as a parole officer?

23  A    Never.

24  Q    In your 14 years' experience working with Judge Maricle

25  and in the courts, did he ever try and influence you

1  politically?

2  A    Never.

3              MR. PINALES:  Nothing further.

4              THE COURT:  All right.  Thank you.

5              Any cross-examination of this witness?

6              MR. SMITH:  No, thank you, Your Honor.

7              THE COURT:  All right.  Thank you, Mr. Hopkins.  You

8  may step down.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  You may call your next witness.

11             MR. HOSKINS:  Your Honor, we would call Jim Norris.

12             THE COURT:  Thank you.

13                          JIM NORRIS,

14 having been first duly placed under oath, was examined and

15 testified as follows:

16                      DIRECT EXAMINATION

17 BY MR. HOSKINS:

18 Q    Could you tell us your name, please?

19 A    Jim Norris.

20 Q    And spell your last name, please.

21 A    N-o-r-r-i-s.

22 Q    Mr. Norris, where do you live now?

23 A    In Hebron.

24 Q    Is that in Northern Kentucky?

25 A    Yeah, I live near the airport.

1  Q    Okay.  How long have you lived up there?

2  A    Since the fall of 2003.

3  Q    Is that where you're from originally?

4  A    From Cincinnati.

5  Q    Okay.  What -- are you employed now?

6  A    I'm retired from the public defender's office.

7  Q    Which public defender's office did you work for?

8  A    Well, we all worked for the State, but for 16 years I was

9  assigned in the London office.  We covered five counties, and I

10  primarily went to Clay County.

11  Q    And what was your job as a public defender?  Were you an

12  attorney?

13  A    Attorney, all kinds of criminal defense from public

14  intoxication to juvenile court up to death penalty cases.

15  Q    You're still licensed to practice law?

16  A    Yes.

17  Q    But you retired from the State Public Defender's Office?

18  A    Yes.

19  Q    And moved back to the area close by where you grew up?

20  A    Yeah.  I worked up there for about five years before I

21  retired.

22  Q    So you worked for the public defender up there in Northern

23  Kentucky as well?

24  A    Yes, in Covington and Newport.

25  Q    So how long have you been retired?

1   A     Fourteen months.

2   Q     When you were working out of the London, Kentucky, office,

3   did you have many occasions to appear before Judge Cletus

4   Maricle?

5   A     Yes, Clay County was the court I was regularly assigned

6   to.  You know, over time, I would get cases in all the courts

7   because we have to fill in for each other.  Once I got

8   experience, then I'd have to help younger attorneys on murder

9   cases in other counties.  But I was the primary public defender

10  for Clay County.  So once he became judge, I handled all the

11  public defender felony cases other than ones that were conflict

12  cases.

13  Q     Were there many public defender cases that you had to

14  handle in Clay County?

15  A     Yes.  You know, I haven't looked this up recently, but I

16  think I was probably averaging around 700 a year.  I know for a

17  few years I was highest in the state.

18  Q     What type of clients qualify to be represented by the

19  public defender?

20  A     Well, basically poor people, and they fill out some

21  paperwork and it's an affidavit that a judge reviews, and a

22  judge determines whether or not they qualify.  The public

23  defender's office doesn't decide, it's up to the judges.  But

24  those counties down there are pretty poor counties, so I think

25  Clay County was most likely one of the poorer counties in the

 1  state.  I would certainly have the majority of cases in

 2  district court or circuit court on any given day.

 3  Q     Would your cases be assigned to your own special day or

 4  would you be there with private attorneys as well?

 5  A     I never had a special day, I'd be — all the criminal

 6  cases would be on at the same time.

 7  Q     Let me ask you if you can tell us, is there something

 8  called Rule Day or Motion Day that is regularly conducted in

 9  court?

10  A     Yes.

11  Q     And what was that usually called in Clay County?

12  A     Clay County called them Rule Day.

13  Q     Tell us what Rule Day would be.

14  A     Well, most of the years I worked there, it was once a

15  month, and cases would be on the docket if they had pretrial

16  conferences or if you had filed a suppression motion.

17  Sometimes there would be sentencings or probation revocations,

18  about anything that might pop up that would be put on the

19  docket.  We eventually reached the point where a lot of months

20  had a second criminal day because there was so much to do or

21  there would be a second day that would be all the sentencings

22  because for a while we ended up being there till 9:00 or 10:00

23  at night sometimes there was such a high volume.  But when the

24  criminal stuff would go on, I would usually be there for the

25  entire docket.

1  Q    So you would see all the cases that came before the Judge

2  that day?

3  A    Yes.

4  Q    So these Rule Days would be different from a day cases

5  were set for trial?

6  A    Correct.

7  Q    Over the years that you've practiced in front of

8  Judge Maricle, did you see any difference in the way your

9  clients were treated and the way other attorneys' clients were

10 treated?

11 A    No, he treated everybody with respect.  It didn't matter.

12 But I thought -- other than my clients were poor, so a lot of

13 them sometimes couldn't make any bond, but I thought they were

14 treated pretty well on bond or probation or shock probation,

15 this type of things.

16 Q    Were you familiar with how the home incarceration program

17 worked in Clay County when you practiced there?

18 A    In general terms.

19 Q    Tell the jury how that worked in general terms.

20 A    Well, the Judge would decide who gets on home

21 incarceration.  I think they paid a hookup fee and they also

22 paid a monthly fee.

23 Q    Do you know who operated that system, who received those

24 fees?

25 A    Well, Jo Davidson was in charge of it.  I don't know

 1   anything about where the money went.  But she was the one

 2   running the program.

 3   Q    Jo Davidson?

 4   A    Yes.

 5   Q    Was that something that you're — what was a person

 6   allowed to do if they were on home incarceration?  How did that

 7   work?

 8   A    Well, for the most part, you stay home and you have to be

 9   within so many feet from a phone that can call your house.

10   Then you have to get to the phone in a certain amount of time

11   or it sets off an alarm somewhere.

12        Could I get some water, please?

13        Thank you.

14   Q    If —

15   A    But then it would be whatever conditions the Judge put on

16   it.  So if somebody had a job, they would usually have

17   permission to go to work.  Sometimes they would have permission

18   to go to church or go to the grocery store.  Probably what they

19   had permission to do probably depended on how trustworthy the

20   Judge thought somebody was.  Some of the people who had severe

21   drug problems would be very restricted and sometimes they

22   wouldn't be allowed to leave their house at all and sometimes

23   he would restrict even who could visit them because he wouldn't

24   want them around drugs.

25   Q    You're talking about Judge Maricle?

1   A    Yes.

2   Q    He would tell a person they're not allowed to have certain

3   visitors?

4            MR. SMITH:  I'm going to object to the hearsay.

5            THE COURT:  Sustained.

6   BY MR. HOSKINS:

7   Q    Now, Mr. Norris, was that something that your clients

8   preferred versus being in jail?

9   A    Yeah, obviously.

10  Q    Do you know what the cost was per person who was on home

11  incarceration?

12  A    I think it was around 10 or $12 a day.  I could be wrong

13  in that.  It probably changed sometime while I was there.

14  Q    Did the Clay County jail ever impose fees on people who

15  were in jail for their upkeep?

16  A    I don't believe they did.  If they did, they probably

17  never collected anything.  I mean, it probably cost them more

18  in paperwork if they would have.

19  Q    Do they sell things to the inmates in the Clay County

20  jail, legitimate things, food, cigarettes?

21           MR. SMITH:  Your Honor, I'm going to object to the

22  relevance.

23           THE COURT:  Sustained.

24           MR. HOSKINS:  Well, if we could approach, Your Honor,

25  I could explain why its relevant.

1        THE COURT:  Yes, you can approach.

2     (Whereupon, the following discussion was had between the

3  Court and counsel at the bench, out of the hearing of the

4  jury.)

5        THE COURT:  Yes, sir.  How is it relevant?

6        MR. HOSKINS:  I believe it's relevant because the

7  cost that a person would — the charges that a person would

8  have while they're in jail just for a candy bar and a bottle of

9  pop would be more — and a phone call would be more than the

10  home incarceration fee would be.

11        THE COURT:  So you're asking this witness, a public

12  defender, to speculate as to what the average person

13  incarcerated in the jail would spend on miscellaneous items

14  that wouldn't be spent were he at home.  I will sustain the

15  objection.  It's not relevant.

16     (Whereupon, the following proceedings continued in open

17  court.)

18  BY MR. HOSKINS:

19  Q    Mr. Norris, did you ever have occasion to deal with

20  visiting judges in Clay Circuit Court who practiced there?

21  A    Occasionally, yes.

22  Q    Do you recall who those judges would have been?

23  A    Ron Johnson, Judge Ron Johnson from Harlan County a couple

24  of times; once Robert Muncy, who is actually a former district

25  judge who was a special judge on a case; a couple of times one

1  of the Laurel County judges might get sent over, like Judge

2  Messer.

3  Q    What kind of things would lead to a special judge or a

4  visiting judge coming to Clay Circuit —

5  A    Usually if there was some reason a judge had to recuse, if

6  he knew some of the parties or — in a case.

7  Q    Now, Clay County is a relatively small county; isn't it?

8  A    Yes.

9  Q    Tell the jury how often it would be, in your experience,

10 that one of the parties, one of your clients, would be somebody

11 who knew the Judge or had some connection personally in any way

12 with the Judge or a prosecutor or any of the court personnel.

13 A    You mean knew them as far as being an acquaintance?

14 Q    Yes.

15 A    Extremely high percent.

16 Q    Because it's a small county?

17 A    Yes.  And everybody goes to church together and has played

18 little league and all that stuff.  I mean, it's probably over

19 90 percent.

20 Q    When you were practicing in Clay Circuit Court, how many

21 Clay County attorneys would you say regularly practiced

22 criminal law in that court?

23 A    Well, it would vary.  But probably 10 to 12, maybe

24 occasionally up to 15.  By the time I was leaving, he was going

25 to appoint — because a lot of attorneys my age started getting

1  older, some of them started having children that went to law

2  school coming back, the next generation was arriving.

3          MR. HOSKINS:  May I have just a moment, Your Honor?

4          THE COURT:  Yes, sir.

5  BY MR. HOSKINS:

6  Q    Mr. Norris, of the cases that you handled, did they all

7  end up going to trial by jury?

8  A    No, that's impossible.

9  Q    How were most cases handled and resolved in the Clay

10 Circuit Court?

11         MR. SMITH:  Your Honor, I'm going to object as to the

12 relevance.

13         THE COURT:  What is the relevance, the percentage of

14 cases that go to trial versus those that don't?

15         MR. HOSKINS:  I'm not talking about percentages, I

16 want to ask him questions about the process by which pleas were

17 arrived at.

18         THE COURT:  All right.  You may proceed.

19         MR. HOSKINS:  Thank you, Your Honor.

20 BY MR. HOSKINS:

21 Q    Mr. Norris, if I could ask you some questions about how

22 those cases were resolved that didn't go to trial.

23 A    Okay.

24 Q    In the typical case, tell us how that would work.

25 A    Well, most of the time all the negotiations would be

 1  between the defense counsel and the Commonwealth Attorney's

 2  Office.  Occasionally down there, since everybody knows

 3  everybody, sometimes I could start negotiations with the police

 4  officer involved with the case and the prosecutors were okay

 5  with doing it that way even though the prosecutor would have

 6  final say, because often when you talk to the prosecutor

 7  anyway, he'd say, well, my officer is going to have to agree to

 8  this.  So sometimes it could move things along by starting

 9  there, because there's so much — but it's generally between

10  the prosecutors and the defense attorneys and the defense

11  attorneys and their clients.

12  Q    Did the Judge get involved in that process?

13  A    Very rarely and only if it broke down.  Sometimes he

14  would, you know, basically say, come on, guys, can't you work

15  this out?  And sometimes he would say, you know, I think this

16  might be fair, what do you guys think?  I mean, he would never

17  force anybody to do anything, but he would sometimes make

18  suggestions.

19  Q    Did you ever see anything that you deemed improper from

20  the Judge in that regard?

21  A    No, never.

22  Q    There's some paperwork that goes along with a plea

23  bargaining process, isn't there?

24  A    Yeah.  Of course, like everything, a lot of paperwork.

25  There's a written AOC form called Motion to Enter a Guilty

1  Plea.  You see another form that has — that spells out what

2  the plea offer was so that there's not any disputes over that

3  later on, and so the defendant has to sign that when he pleads

4  guilty.  The Judge goes over the plea form and he goes over the

5  offer sheet, asks a number of questions to make sure the

6  defendant understands what he's doing so that six months down

7  the road if somebody says that's not what I agreed to or, you

8  know, I didn't understand.  So the Judge would ask numerous

9  questions on the court record to make sure that the person knew

10  what they were doing and that both sides understood what the

11  agreement was.

12  Q    And you mentioned a motion to enter a guilty plea and you

13  called that an AOC form.  What is an AOC form?

14  A    AOC is Administrative Office of the Courts, who run the

15  court system for state courts.

16  Q    Do you know where their headquarters are?

17  A    Here, I would assume, in Frankfort.

18  Q    And they print up forms that they send out to all the

19  counties?

20  A    Yes.

21  Q    And those are the forms that are used in this process?

22  A    Yes.

23  Q    The motion to enter a guilty plea, who prepares that?  Who

24  is responsible for that?

25  A    The defense attorney.

1  Q    Who signs that document?

2  A    Defense attorney and the defendant.

3  Q    The other document that you talked about is a

4  Commonwealth's Offer on a Plea of Guilty?

5  A    Yes.

6  Q    Who is responsible for filling that out?

7  A    Well, in theory, it's the Commonwealth Attorney, even

8  though quite often when you've got a docket that's out of

9  control, sometimes they ask the defense attorneys to do it for

10 them.  They'll say what the offer is, then they'll ask you to

11 fill it out.  But usually it's the prosecutor.

12 Q    So the prosecutor tells you here's the deal and you fill

13 out the paperwork?

14 A    Yeah, you've been negotiating, yes.

15 Q    But can you sign them for the prosecutor or does he still

16 have to sign off on them?

17 A    He has to sign on them.

18 Q    And those documents are submitted to the Judge before a

19 guilty plea is taken?

20 A    Yes.

21 Q    When you first started defending people in Clay County,

22 who was the Commonwealth's Attorney?

23 A    I never saw him in court, but I think it was actually this

24 older gentleman named Ellis Colson, who was probably in his 80s

25 near the end of his career, and some of his assistants went

1  there, and then shortly after I started, Bertrum Stivers won

2  the next election and him and some of his sons were assistants.

3  Q    Do you recall who Mr. Colson's assistants were?

4  A    That was a very brief time.  It might have been Don

5  Fulcher, I think Judge Maricle — before he was judge, I think

6  Judge Maricle was an assistant there some of the time.

7  Q    So Judge Maricle was a prosecutor at that point?

8  A    I think he was.  I'm not sure of when — when I very first

9  started there and Ellis Colson was there, I didn't have very

10  many circuit cases yet.

11  Q    Was that when you were just starting as an attorney?

12  A    Yes.  When I started getting most of the felony cases is

13  around when Bertrum Stivers won the election.

14  Q    And who were the assistants for Mr. Stivers?

15  A    Primary assistant was his son, Franklin, and then his

16  second son, Robert Stivers, is now Senator Stivers, when he got

17  out of law school, he worked there.

18  Q    After Mr. Stivers, who was the Commonwealth's attorney?

19  A    Gary Gregory.

20  Q    And who are Mr. Gregory's assistants?

21  A    Well, there were various ones over the years, but Sharon

22  Allen, Richie Couch, Larry Joe Roberts.

23  Q    Do you know who the Commonwealth Attorney is now in Clay?

24  A    I think it's still Gary Gregory.  I don't practice there

25  any more, but —

1   Q    In dealing with those Assistant Commonwealth Attorneys,

2   did they have authority to use their judgment to make those

3   offers to you?

4   A    The vast majority of the time.  Every now in then there

5   might be a more serious case where they would say, you know,

6   they have to take it back to Gary Gregory.  But the majority of

7   the time Gary Gregory —— or when Stivers were there, they would

8   have that permission.  But if not, they would tell you they had

9   to run it by the big boss.

10  Q    Did that happen frequently?

11  A    Most of the time they had their own authority.

12  Q    You talked about more serious cases.  Now, what does a

13  case ——

14  A    And also there could be times where, you know, if I

15  couldn't come to an agreement with an assistant, you know, I

16  would, you know, tell them, if you're okay with this, I'm going

17  to go talk to your boss and see if I can work it out with him,

18  you know, and they would agree to that.

19  Q    Well, all the cases that make it to circuit court are

20  indicted as felonies; is that correct?

21  A    Correct.

22  Q    And what is the definition of a felony in Kentucky law?

23  A    It carries time in the penitentiary.  The lowest ones are

24  one to five years.

25  Q    So even those lowest cases are serious cases?

1  A    Yeah, to the person doing the time, they are.

2  Q    The cases, though, that you would describe as the more

3  serious cases, could you tell us what those would be?

4  A    I would usually consider that to be felonies which are ten

5  to 20 years and A felonies, which are higher, 20 to life.  The

6  penalty ranges have changed some during the course of while

7  I've been doing this, but the kind of things that can carry

8  life sentences are — some of them are minimum of 20 years.

9  Q    Let me ask you, for example, about a first degree

10  trafficking case; drug trafficking.  What's your —

11  A    For most of the drugs, that would carry five to ten.

12  Q    Would that fall under the category of cases where the

13  assistant would have to go to the actual Commonwealth's

14  Attorney, in your experience?

15  A    Generally not, because amongst themselves they would —

16  they'd kind of work out their own system.  Sometimes it

17  might — if you're getting into areas where there's going to be

18  probation, that would be more apt rather than the actual

19  sentence.

20  Q    Was drug testing of your clients and other defendants a

21  common thing in Clay Circuit Court?

22  A    Yes, it's a condition of bond.

23  Q    Tell us what you mean by as a "condition of bond."  When

24  does that apply?

25  A    Well, generally you think of bond in terms of being money,

1  like you had to pay so much money to get out, but they can be a

2  property bond or it could be unsecured conditions, which means

3  you just sign and make promises you would pay.  You know,

4  there's a whole level, according to the seriousness of the

5  case.  But the Judge can impose conditions that he deems

6  reasonable.  Some people he might put a curfew on.  A pretty

7  common condition would be if there's a case with —— like an

8  assault case, which is a case with a victim, that there be no

9  contact with that victim.  There used to be a condition you

10  can't contact court personnel and harass them.  You know, you

11  can't call up the Judge, you can't call up the clerks and

12  bother them, or the prosecutors.  But Judge Maricle would often

13  put on a condition that they had to agree to drug testing.

14  Q    And then how would that drug testing be performed?

15          MR. SMITH:  I'm going to object to the relevance.

16          THE COURT:  To this witness, I'll sustain the

17  objection.

18  BY MR. HOSKINS:

19  Q    Well, as far as bond conditions, that would be for the

20  period of time before a person has —— their case has been

21  resolved; is that right?

22  A    Right.  And if you enter a guilty plea, you know, the way

23  that works, you have to come back at another time for final

24  sentencing.  But probation officers does a report on you.  If

25  you're still out, it applies during that time period also.

1  Q    During the time that you worked there in Clay Circuit

2  Court, did Judge Maricle ever try to tell you how to do your

3  job?

4          MR. SMITH:  Your Honor, I'm going to object to the

5  hearsay.

6          THE COURT:  Sustained.

7          MR. HOSKINS:  Judge, can we approach on that?

8          THE COURT:  Yes, you may.

9      (Whereupon, the following discussion was had between the

10  Court and counsel at the bench, out of the hearing of the

11  jury.)

12          MR. HOSKINS:  Judge, my position would be that I

13  expect the answer would be no, that he didn't, so there was no

14  statement.  So his answer would not be hearsay.

15          THE COURT:  You're asking him for hearsay and you're

16  relying upon what his answer would be to say that it's not.

17  The objection is to the question, I'll sustain the objection.

18      (Whereupon, the following proceedings continued in open

19  court.)

20  BY MR. HOSKINS:

21  Q    Mr. Norris, did Judge Maricle ever try to influence the

22  way you did your job?

23          MR. SMITH:  Same objection.

24          THE COURT:  Sustained.

25  BY MR. HOSKINS:

1  Q    Mr. Norris, did you ever detect if politics played any

2  role in how your clients were treated?

3  A    No.

4          MR. HOSKINS:  May I have just a minute, Your Honor?

5          THE COURT:  Yes, sir.

6          MR. HOSKINS:  That's all.  Thank you, Mr. Norris.

7          THE COURT:  Thank you.

8          Mr. Smith.

9          MR. SMITH:  Yes, Your Honor.  Thank you.

10                        CROSS-EXAMINATION

11 BY MR. SMITH:

12 Q    Good morning, Mr. Norris.  I'm Steve Smith, I think we've

13 met before.

14 A    Yeah, I believe we were adversaries at one time for a

15 brief period when you started out with Mr. Handy.

16 Q    I was a prosecutor then for the state, but now I'm with

17 the United States.  So I'm going to ask you some questions if

18 that's okay.

19 A    It is.

20 Q    I would like to pinpoint a little bit more definitely,

21 Mr. Norris, how long has it been since you've served Clay

22 County as a public defender?

23 A    I left in the fall of '03.

24 Q    Fall of '03?

25 A    And I had been there 16 years.

1  Q    These experiences that you've related over the course of

2  your time would have been fall of '03 prior in those 16 years

3  that you were there.  Do you recall Judge Maricle getting

4  appointed as circuit judge about September the 24th, 1990?

5  A    I couldn't tell you the date, but that sounds right.

6  Q    Okay.  And as I understand it, you have had lots of

7  opportunity to experience the caseload down in Clay County in

8  those years of '03 and prior, and I believe your testimony was,

9  is that at times you had over 700 cases a year, if I understood

10  correctly; is that right?

11  A    Right, that was the caseload.

12  Q    And, in fact, I believe you said that you were recognized

13  out of the 120 counties in the State of Kentucky, I guess

14  circuits don't make up necessarily counties, but at least you

15  were recognized at times as having the heaviest caseload in the

16  state?

17  A    With a public defender's office, yes.

18  Q    And would you —

19  A    Not recognized, I mean, there's no award for it or

20  anything, you know, it's — in fact, there's not even a pat on

21  the back.

22  Q    Your pay didn't get an increase?

23  A    No.

24  Q    You didn't get an increase in pay for that.

25  A    I'm the one lawyer who doesn't benefit from getting more

1  clients.

2  Q    And I think that, as I understood your description, one of

3  the reasons that you ended up with such a heavy caseload is

4  that Clay County happens to be one of the poorest counties in

5  the State of Kentucky?

6  A    Yes.

7  Q    And the people who come to you are the people who cannot

8  afford to hire a lawyer?

9  A    Correct.

10  Q    And I believe —

11  A    They're appointed through the Judge, but, yes.

12  Q    But there are lawyers in town down there that do practice

13  and do get paid per case by fee and they have private

14  practices; right?

15  A    Correct.

16  Q    And one of the attorneys, one of the leading attorneys, I

17  think you would agree, and one of the ones that might bring

18  most of the high fees, would be Scott Madden.  Would you agree?

19  A    I don't know about his fees.  Lawyers don't really discuss

20  that with other lawyers.  But Scott did a number of criminal

21  cases, yeah.  I agree with your point.

22  Q    Thank you, sir.  And there were also lawyers that are not

23  with us any longer, Ricky Bailey would have been one as well

24  down there that practiced frequently in that court; is that

25  fair?

1   A    Right, until he passed away.

2   Q    And Yancey White would be another one that practiced

3   frequently in that court as a private lawyer hiring himself out

4   to clients down there; would that be fair?

5   A    Yes, and his wife, Annette.

6   Q    And Annette Morgan, she's a lawyer as well and daughter of

7   Roy Morgan, I believe has been testified to here, she's also a

8   practicing attorney down there?

9   A    Yeah, when I left, yeah.

10  Q    And those lawyers not only handle criminal cases, but they

11  sue big companies, like Ford Motor Company or if there had been

12  a death in a car accident or something, they actually go to

13  trial and try to get a money judgment in cases in civil court;

14  is that fair?

15  A    I don't know the ins and outs of — I know that — they

16  did civil cases.  You know, I don't know who their clients were

17  and that sort of thing.

18  Q    But that's not something that you did, you just —

19  A    Right.

20  Q    — represent the poor people of Clay County that couldn't

21  afford to hire these hired lawyers; is that fair?

22  A    Right.  And also sometimes we get the poor people after

23  they hired the private attorney and couldn't pay the fee, then

24  the lawyer would withdraw, then I would have to pick up the

25  pieces.

1  Q    But in the State of Kentucky it's not common for — since
2  we have a public defender paid by the state tax dollar, it's
3  not common for private practitioners to necessarily go pro bono
4  and take cases in criminal court for free.  That's wouldn't be
5  common, would it, sir?
6  A    No, but it was more common when I first started, because
7  the public defender's office wasn't statewide at that point —
8  Q    Sure.
9  A    — and some of the conflict cases, which — Do you want me
10 to explain that?
11 Q    Well, I think I get the gist of your answer, I mean, as
12 far as what's normal —
13 A    Some attorneys would do conflict cases for free.  Like
14 Scott Madden did a couple for free when we couldn't find any
15 other attorneys.
16 Q    But that's been years ago; would that be fair?
17 A    Yes.  Yes.
18 Q    That's been years ago?
19 A    Correct.
20 Q    Since the funding has increased and the resources are
21 stretched as they are, it's very much unlikely that you're
22 going to have a private practitioner such as Scott Madden out
23 there representing poor folk for free in a criminal case.  Now,
24 I'm not saying that's always the case —
25 A    Right.  Obviously, he's a businessman.  Occasionally

1  sometimes something comes up in a spur of the moment and a

2  judge will ask a private attorney if he can just cover

3  something right then, and sometimes for one court appearance,

4  somebody does it more as a favor to a judge.

5  Q    The last year that you practiced there in Clay County, how

6  many cases would you estimate actually went to trial in a

7  criminal felony case, if you know, sir, how many that you tried

8  personally in Clay County, if you know?

9  A    I don't — I've probably done 175 jury trials over my

10 lifetime.

11 Q    Sure.

12 A    Most of them down there, and they go in spirts.  Sometimes

13 they average one a month.  Judge Maricle was kind of a

14 workaholic and there was one month where we did six felony

15 trials in a three-week period.

16 Q    I'm asking about the last year you were there, if you

17 know.  That's my question.

18 A    I don't remember the number.  We did do some trials,

19 because that was at a time period where we were located in a

20 temporary courthouse, because the new one was being --

21 Q    Okay.  Well, let me ask it this way:  You do 700 cases a

22 year.  You don't try over 700 cases; would that be fair?  They

23 don't all go to trial; is that a fair statement?  Seven hundred

24 cases a year, you don't try all those cases?

25 A    That's not remotely possible for anybody in the system.

1  Q    That's right.  And you did 100 trial cases, 125 over your

2  career, that would be only a fraction of the cases that

3  actually were handled and gone to trial?

4  A    You said 125.  I think I said more like 175.

5  Q    I'm sorry, 175.

6  A    And that's not —

7  Q    That would be a fraction over the course of your —

8  A    And that's not an exact count either.

9  Q    Seven hundred cases a year, your whole career you've done

10 175, that would be a fraction of the number of cases — total

11 number of cases that you've handled; would that be a fair

12 statement, sir?

13 A    Yes.

14 Q    Okay.  And I believe that you said that as part of your

15 experience down there in Clay County, that there were times

16 when the docket down there was so full that it was, I believe

17 you used the term, sometimes dockets get out of control and

18 plea agreements would sometimes flow more rapidly than other

19 times?

20 A    I never said that second part.  I said dockets get out of

21 control.  I don't think I said anything about plea agreements

22 flowing more rapidly.  I don't even know what you mean by that.

23 Q    Well, I may have misunderstood.  So let's get that clear.

24 It's my understanding from your testimony that Clay County is a

25 busy docket; is that fair?

1  A    Yes.

2  Q    And that it was also your testimony that plea agreements

3  were not unusual in Clay County; is that fair?

4  A    No, I believe they're common probably in every county.

5  Q    That's not my question, is it?  Would you answer about

6  Clay County?

7  A    What specifically is your question?

8  Q    My question, sir, is it a fair statement, based on your

9  testimony, to state that plea agreements were common in Clay

10 County?

11 A    Yes, I thought I already said that.

12 Q    And I believe that your testimony -- would it be fair to

13 say, according to your testimony, that plea agreements were

14 sometimes utilized to handle heavy dockets in a way in which

15 they would increase the number of cases that were pled, as the

16 case docket got heavy, sometimes the plea agreements were more

17 prevalent and less likely to go to trial just to move the

18 docket along; is that a fair statement of what your testimony

19 is today?

20 A    I would say when you have more cases there are more plea

21 agreements, but I don't know that cases are necessarily pled

22 out just because everybody is busy.  You know, there's still

23 certain type of cases that have to go to trial.

24 Q    You indicated that your experience in Clay County was that

25 you had -- I believe that would be up to 2003, you worked with

1    Gary Gregory as the Commonwealth Attorney?

2    A    Yes, after the Stivers family.

3    Q    And he's an elected official in Clay County?

4    A    Yes.

5    Q    And he is the person who is charge of the assistants that

6    were employed, and I believe you named two, Ms. Sharon Allen

7    and Mr. Richie Couch —

8    A    Yeah.

9    Q    — as two that you recalled.  He would be their boss; is

10   that fair to say?

11   A    Right.  And Larry Joe Roberts for a brief period.

12   Q    Larry Joe Roberts?

13   A    Yes.

14   Q    Okay.  And I believe you said that it was also common in

15   Clay County for your clients to have the option of home

16   incarceration; is that fair?

17   A    Yeah.

18   Q    And if I understand your testimony —

19   A    So was Scott Madden's clients, since you brought that up.

20   You know, that applied to everybody, not just public defender

21   clients.

22   Q    Okay.  That's your answer.  Okay.  So it was open to a lot

23   of people, not just the public defender, everybody, the private

24   hired attorneys got the same benefit of the home incarceration

25   program as your clients; is that fair?

1  A    Yes.

2  Q    Okay.  And that cost, I believe you said, 10, $12 a day,

3  that would be about maybe up to $350 a month; is that fair?

4  A    Yeah, but I'm not — to be fair here, I'm not positive

5  what the cost was, so that might be wrong.

6  Q    Was that not your testimony, 10 to $12 a day?

7  A    That was my best guess looking back over the years.

8  Q    Okay.  And I believe you said that that was operated by Jo

9  Davidson; is that not correct?

10  A    Yes.

11  Q    And Jo Davidson was, in fact, a private company that

12  oversees this home incarceration program, and, in fact, sir, it

13  has nothing to do with the Probation and Parole Office in Clay

14  County; isn't that a fair statement?

15  A    I assume that's correct.  I'm not involved in her company,

16  but —

17  Q    You're not aware that it's —

18  A    As far as I'm — as far as I'm aware, it has nothing to do

19  with Probation and Parole.

20  Q    It has nothing to do with the Department of Public

21  Advocacy either, does it?

22  A    Oh, no, no, no.

23  Q    It's a private company as far as you know?

24  A    Yes.

25  Q    Okay.  And you know Jo Davidson because, in fact, Jo

1   Davidson was a longtime secretary in Judge Maricle's office;

2   isn't that a fair statement?

3   A    Yeah.  He had a number of different secretaries while I

4   was down there, but she was one of them.

5   Q    And was there for many years; that would be fair, wouldn't

6   it, sir?

7   A    Yeah.

8   Q    Okay.  And at one point he had a home incarceration

9   business that was operated by a man by the name of William

10  "Al Man" Stivers.  Do you know Mr. Stivers?

11  A    I'm acquainted with him, yes.

12  Q    And you know him to have operated the home incarceration

13  business as well; isn't that true?

14  A    I'm not sure about that.

15  Q    You're just not sure?

16  A    Yes.

17  Q    But in any event, sir, I believe it would be a fair

18  statement that home incarceration was used in many of your

19  cases?

20  A    Yes.  Now, that program didn't exist all the time I was

21  down there, but yeah.

22  Q    If I understand the Department of Public Advocacy, the

23  fact that a person just wants a free lawyer is not necessarily

24  the case, they have to qualify, if my understanding is correct?

25  A    You are correct.

1  Q    And one of those qualifications for a person to get your

2  services, sir, is that they have to have not more assets and

3  resources that the state government says would qualify you; is

4  that a fair statement —

5  A    Yes.

6  Q    Okay.  And during, I believe you said, your experience

7  there that you found it common for special judges to be brought

8  in and out of Clay County; is that a fair statement?

9  A    I don't know what you mean by "common," but it definitely

10 happens.  It's normal.

11 Q    Okay.  And could you give us a little more idea about how

12 normal that is, sir?  Is that like a circuit judge having to

13 give over half of his docket in Clay County or are you talking

14 about 700 cases a year, would that mean he would give up 350,

15 500 cases a year, what's a number you would put on it, sir?

16 A    You're probably asking the wrong person, but I would say

17 it's a very small number.

18 Q    It's a very small number.  Okay.  And would you say that

19 it would be less than ten percent or around ten percent of the

20 cases that get put in the special judge's hands?

21 A    I was — criminal stuff, which is all I would know about,

22 I would say it's definitely under ten percent.

23 Q    Under ten percent?  And I believe —

24 A    Probably well under ten percent.

25 Q    If I understood your testimony, sir, that's because under

1  Kentucky law we're all bound by -- as attorneys we have the

2  Supreme Court, which puts rules upon all of us; is that a fair

3  statement?

4  A    Yes.

5  Q    And judges in particular have even more stringent rules

6  and different rules than we as attorneys have; would that be a

7  fair statement?

8  A    Yes.

9  Q    And one of the reasons that a special judge would be

10 required is because the Judicial Canon of Ethics promulgated by

11 the Supreme Court of Kentucky requires that a person who's

12 sitting as judge not give the appearance to anyone, especially

13 the public, of any kind of impropriety; would that be fair?

14 A    Yes.

15 Q    And one of the reasons it could be -- or appear to be an

16 impropriety is that if you had some close friend or family

17 member as a litigant in your court, that could give the public

18 the appearance of impropriety; would that be fair?

19 A    Yeah.  There was actually one time where Judge Maricle was

20 the victim in the case.  So obviously he needed a different

21 judge.

22 Q    Now, he was a victim.  What kind of case was that?

23 A    Somebody had run him and his father off the road.

24 Q    Okay.  Do you know how that case got resolved?  Isn't it a

25 fact there was a criminal case in that?

1  A    There was a criminal case.

2  Q    In fact, isn't it true, Mr. Norris, that it got dismissed?

3  A    I don't know how it got — I did not think it got

4  dismissed.  I didn't know —

5  Q    Isn't it true the reason it got dismissed is that there

6  was a payment of money given to the Maricles?

7         MR. HOSKINS:  Objection, Your Honor.

8         THE COURT:  Come up, please.

9     (Whereupon, the following discussion was had between the

10  Court and counsel at the bench, out of the hearing of the

11  jury.)

12         MR. HOSKINS:  Judge, I'm surprised that the

13  prosecutor is asking this question.  He's asking if

14  Judge Maricle was paid money for a case to be dismissed.  If

15  they had looked into that situation at all, they know the case

16  went to trial.

17         THE COURT:  All right.

18         MR. SMITH:  Well, I'm not sure what Mr. Hoskins is

19  referring to.  I have statements of witnesses that have given

20  information to the government and this witness made this

21  statement to this jury, not responsive to my questions.

22         THE COURT:  He volunteered, and there was no

23  objection to the question or to his initial answer.

24         MR. SMITH:  So he indicated he had knowledge of the

25  case and then I've asked him what his knowledge is and

1    cross-examined him.  I believe that's the second question since

2    he, unresponsive to my question, throws out gratuitously, I

3    believe, into this case that Judge Maricle has been a victim,

4    and I have witness statements that say that, in fact, the House

5    family paid him over a hundred thousand dollars in resolving

6    that case.  Whether it was dismissed or whether it was not,

7    Mr. Hoskins says he's got evidence of something else, obviously

8    he can bring that out.

9              THE COURT:  All right.

10             MR. HOSKINS:  I don't think there's a good-faith

11   basis to ask that question.  The witness who's saying this is

12   Wanda White, not somebody who was directly involved with that.

13             THE COURT:  Well, just because it may be Wanda White

14   doesn't mean that there's not a good-faith basis on behalf of

15   the United States for following up on information that was

16   volunteered by this witness.

17             MR. HOSKINS:  I think something of this nature, they

18   should go further in their investigation.  It was a special

19   judge obviously that tried that case and it was tried to a

20   jury, and I don't know the exact resolution, but I know that it

21   was tried to a jury and there was a verdict.

22             THE COURT:  All right.  Well, the question is whether

23   there's a good-faith basis to follow up with a question in

24   response to information that was volunteered by the witness,

25   which the defendant did not originally object.  I'm going to

1   allow you ask the question, but he either knows or he doesn't

2   know and you can't get into any details.  It may be necessary

3   to present other evidence on this point later, but we'll get to

4   that at a later time in the case.  But you can follow up with a

5   question as to whether he knows or not.  Thank you.

6           MR. SMITH:  Thank you.

7           (Whereupon, the following proceedings continued in open

8   court.)

9   BY MR. SMITH:

10  Q    Would you like me to repeat the question, sir?

11  A    Yes.  Thanks.

12  Q    Do you know how that case was ultimately resolved, sir?

13  A    No.

14  Q    Now, as I understand it, sir, you had indicated that it

15  was about ten percent or less of the cases actually had been

16  transferred over to special judges during the time that you

17  were there and that I believe there were — during the time

18  period I believe that you worked down there, you had instances

19  in which you recalled on direct testimony about the resolution

20  of cases with the Commonwealth Attorney's Office, at that time,

21  I assume was Gary Gregory's office; is that fair?

22  A    Well, it was Gary Gregory's office and before that it was

23  Mr. Stivers.

24  Q    So in your answers to how things operate there, you didn't

25  make a distinction between Stivers and how he operated and

1    Gregory, they basically operated the same way?

2    A    Right.

3    Q    Is that your testimony?

4    A    Yeah.

5    Q    And, of course, I believe you indicated that one of the

6    assistants that worked under the Stivers administration was

7    Robert Stivers?

8    A    Yes.

9    Q    And given your experience there, I believe that you

10   testified that as to first degree trafficking in controlled

11   substance in cases, that you had experiences with those in that

12   Commonwealth Attorney's Office, in revolving those?

13   A    Yes.

14   Q    And if I understand your testimony, that generally your

15   experience was that they didn't have to go to the Commonwealth

16   Attorney to offer you a plea on a first degree trafficking

17   case?

18   A    The assistants had authority to settle them generally.

19   Q    And generally unless, I believe, if I understood your

20   testimony, there was probation involved, and then if I

21   understood your testimony, if probation was involved, then it

22   was customary for the assistant to have to go to the

23   Commonwealth Attorney?

24   A    That would be overstating a little bit.  A lot of times

25   they would have authority on probation, but there could be

 1  particular cases, you know, maybe if the defendant had more of

 2  a record or something like that, you know, if there's something

 3  peculiar about that case, then sometimes it would need to get

 4  approved higher up.  But generally the assistants would have

 5  for that also, you know, because —

 6  Q    So you're saying that it's common in Clay County for a

 7  people that's looking at five to ten years in prison to get

 8  probation for a Class C felony; is that your testimony, sir?

 9  A    No, I don't think that's what I said at all.

10  Q    That's not common?

11  A    I said if there was going to be a recommendation of

12  probation, it would have been — the assistants would have the

13  authority to make it.  I'm not saying that's what happened

14  every time.  We got to be — we got to be clear with

15  trafficking.  There's different drugs getting trafficked, and

16  that depends — because some of them are D felonies, you know.

17  Q    We're talking about trafficking in the first degree, which

18  is a C felony, which would be, I believe, controlled substances

19  under Schedule II; would that be fair?  That's trafficking in

20  the first degree; is that a fair statement?

21  A    Yes.

22  Q    And that doesn't change the fact that a first degree

23  trafficking offense is a five- to ten-year felony; is that

24  fair?

25  A    Yeah.

1  Q    And I believe now you've qualified your statement earlier

2  and I believe you said that probation is not common for those

3  type offenses; would that be fair?

4  A    It would be less common than — you would have a much

5  better change of getting probation if you were just charged

6  with possession.

7  Q    And in the course of your practice there, as far as with

8  the Commonwealth Attorney's Office, sir, you weren't a party to

9  the internal conversations that occurred in the Commonwealth

10  Attorney's Office before they come out with these plea deals to

11  the Judge, were you?

12  A    No, but they would bring the plea deals to me, not to the

13  Judge.

14  Q    After they've had their meeting in their own office with

15  their own Commonwealth Attorney, you're not — you weren't

16  present during those internal meetings, were you, sir?

17  A    Correct.

18  Q    And private conversations that a Commonwealth Attorney

19  would have with the Commonwealth — I'm sorry.  Private

20  conversations that a Commonwealth Attorney might have with a

21  sitting circuit judge, that's not something that you would have

22  been a party to either, would it?

23  A    Well, I don't think that would have been a private

24  conversation, then.

25  Q    It wouldn't have been private, then, if you had been

1   present, would it?

2   A    No.

3   Q    And if you were in a position, sir, let's assume that the

4   Commonwealth Attorney came out with a sweetheart deal for your

5   client which had been arranged before the case got called that

6   day, really there would be no reason for you, as a defense

7   attorney who's representing this person who's going to get that

8   sweetheart deal, there would be no reason for you to object to

9   that, would there, sir?

10  A    There would be if I thought I could win the case.  If I

11  thought the guy wasn't guilty, yeah.

12  Q    I'm talking about a sweetheart deal, Mr. Norris,

13  sweetheart deal.

14  A    Well, what's sweetheart is relative.  And it can be a very

15  good deal, but if you happen to be innocent, it's still a bad

16  deal, even though it would be the best deal in the world for a

17  guilty person.

18  Q    Well I'm talking about a sweetheart deal.

19  A    So am I.

20  Q    If you are guilty and you should —

21  A    Okay.

22  Q    — be in prison and you get let out free, that's a

23  sweetheart deal, isn't it; if you're guilty, that is?

24  A    If you're guilty.

25  Q    And you would agree with me, sir, that if you're getting a

JIM NORRIS - REDIRECT - MR. HOSKINS                116

1   sweetheart deal, you got no reason to get up there and object

2   to that judge sentencing your guy to probation when otherwise

3   he would be looking at five to ten years in the penitentiary,

4   would you, sir?

5   A    No, that would make no sense.

6           MR. SMITH:  Thank you.  That's all I have.

7           THE WITNESS:  But the Judge also rejects deals

8   sometimes when he thinks there's —

9           MR. SMITH:  Your Honor, I'm going to ask that the

10  witness, at this point, answer be stricken, because I don't

11  think that's responsive.

12          THE COURT:  All right.  It's nonresponsive.  The jury

13  will disregard the last portion of the statement.

14          Let's see, before we take our lunch break, let me see

15  if there's going to be any additional examination by other

16  defendants in the case.  Will there be any redirect of the

17  witness?

18          MR. HOSKINS:  Yes, Your Honor.

19          THE COURT:  Approximately how long?

20          MR. HOSKINS:  Five minutes maybe.

21          THE COURT:  Why don't you proceed at this point.

22                        REDIRECT EXAMINATION

23  BY MR. HOSKINS:

24  Q    Mr. Norris, do the judges always accept those agreements?

25  A    No.

1  Q    What would be reasons why the Judge might not accept the

2  agreement?

3          MR. SMITH:  Your Honor, I'm going to object.

4          MR. HOSKINS:  In your experience.

5          THE COURT:  Overruled.  You may ask that.

6          THE WITNESS:  Usually it would be because he thought

7  they were too lenient.

8  BY MR. HOSKINS:

9  Q    Some defendants are able to post bond and get out of jail

10 right away?

11 A    Yes.

12 Q    Some aren't.  What would be the procedure for those who

13 didn't get out right away?

14 A    The pretrial officer interviews them, I think it's

15 supposed to happen within 12 hours when they get arrested.

16 Then the pretrial person gives that information to a judge,

17 reviews the bond, who sets a bond.  Then when they make court

18 appearances, there's also an opportunity to ask the judge for a

19 review of the bond.  Then down the road, if they still haven't

20 got out, the defense attorney can file bond motions.

21 Q    So while the case is pending, while you're waiting for a

22 trial date, you could still come back and ask for a bond to be

23 changed?

24 A    Yeah, especially if you get any kind of changed

25 circumstance.  Like some judges will want to have, you know,

1 where the person is going to live, make sure that's, you know,

2 a decent place to be, that it's not going to be a bad

3 environment.  They might require that they find a job or

4 something like that or that -- you know, it's very common where

5 I was working now that sometimes they would have to complete

6 drug treatment first, you know.

7 Q    A person who had a drug problem might have to stay in for

8 a while to get dried out?

9 A    Yes.

10 Q    In your practice before Judge Maricle and other judges,

11 have you ever filed motions for bond reductions as a case went

12 along?

13 A    Thousands.

14 Q    And how were those motions treated by Judge --

15         MR. SMITH:  Your Honor, I'm going to object.

16         THE COURT:  Sustained.

17 BY MR. HOSKINS:

18 Q    Mr. Norris, you mentioned something a little earlier

19 called conflict cases.  Tell the jury what you meant by that,

20 what those are.

21 A    If there's some reason a public defender can't

22 represent -- the most common would be if two people are charged

23 with the same crime, that they're each entitled to their own

24 lawyer, you know, who has their best interest at heart.  That's

25 the most common one.  Sometimes it also can arise that we

JIM NORRIS - REDIRECT - MR. HOSKINS                    119

1   were -- we were representing a person on one case and a new

2   case comes along and that my first defendant ends up being the

3   complaining witness against a new defendant, then we couldn't

4   represent both of those.

5   Q    So you're talking about conflicts as far as your

6   representation --

7   A    Correct.

8   Q    -- of more than one person or of a particular defendant?

9   A    Yes.

10  Q    But, now, you also talked about -- you were also asked

11  about a situation where the judge had some connection to

12  somebody involved in the case.

13  A    Yes.

14  Q    Now, if you perceive that to be the case as a lawyer, do

15  you have any recourse?

16  A    Yeah, in Kentucky you have two choices.  You could file a

17  motion in front of that judge and tell him why and the judge

18  decides, or an affidavit can be filed with the Chief Justice.

19  So there's two separate procedures that can be followed.

20  Q    So you're telling the jury that if you had a client and

21  you thought the judge should not be the judge in that case, you

22  could say to that judge, whoever it is, I think you have a

23  conflict and we would like a different judge?

24  A    Yes.  Yeah, then the judge decides.  I mean, that

25  doesn't -- I don't get a new judge just because I ask.

1  Q    Then that judge has to make a decision as to whether or

2  not he thinks you have a good reason?

3  A    Yes.

4  Q    But there's a totally separate procedure that bypasses the

5  actual judge on the case, isn't there?

6  A    Yes.

7  Q    And who would make the decision in that case?

8  A    The Chief Justice of the Kentucky Supreme Court.

9  Q    And any lawyer in any case can file that request with the

10 Chief Justice?

11 A    Yes.  I'm not even sure if it has to be a lawyer.  It

12 might be able to be a party.  I'm not positive on that.

13 Q    Now, Mr. Norris, you have not practiced solely in Clay

14 County, have you?

15 A    No.

16 Q    Even when you were working out at the London office, you

17 said you handled cases in other counties?

18 A    Yes, Laurel County, Knox County, Whitley County, Jackson

19 County for a very brief time, and then later on Leslie County.

20 Q    And then after you left the London office and went to

21 Northern Kentucky, what counties did you practice in there?

22 A    Campbell County, which is Newport, and Kenton County,

23 which is Covington.  And over the years, I've done a few where

24 somebody else had a conflict and I would cover a case in

25 another county.

1   Q    And the procedures that you've talked about are the law in

2   all those counties, aren't they?

3   A    Yes.

4   Q    One final question.  In determining whether or not a

5   person got probation for a first degree trafficking, would it

6   make any difference if they had already been sitting in jail

7   for a year and a half?

8   A    Yes, because that —

9            MR. SMITH:  Your Honor, I'm going to object, as we

10  now are, I believe, outside the — and it's speculation as

11  regard to whether this witness can offer such an opinion.

12           THE COURT:  All right.

13           MR. HOSKINS:  I'm asking based on his experience,

14  Your Honor, which is extensive.

15           THE COURT:  You can answer the question, the last

16  question, yes or no.

17           THE WITNESS:  Yeah, it makes a big difference,

18  because if you've been sitting in jail for a year, a condition

19  of probation can include jail time, which sounds

20  counterintuitive, but you can get probation on the condition

21  that you serve up to 12 months in jail.  So a condition of

22  probation can include up to a year in jail as a condition.  So

23  even though it's probation, they would still serve jail time.

24  But, you know — and sometimes the prosecutor just wants

25  somebody to serve some jail time and they happen to do it on

1  the front end instead of on the back end.

2  Q    What do you mean by "the front end"?

3  A    From when they got arrested, because they never made bond.

4  Q    And they would get credit for that time either way; right?

5  A    Right, that's mandatory.

6        MR. HOSKINS:  That's all.  Thank you.

7        THE COURT:  Any further questions for this witness,

8  Mr. Smith?

9        MR. SMITH:  Just one brief question.

10       THE COURT:  Yes, sir.  That's fine.

11                    RECROSS-EXAMINATION

12 BY MR. SMITH:

13 Q    Mr. Norris, is it fair, sir, to say that ultimately who

14 decides whether a plea deal is accepted or rejected would be

15 the judge; isn't that fair?

16 A    Yes, once you get in front of a judge.

17 Q    The bottom line is it's the judge who approves it or

18 rejects it?

19 A    Yes.

20       MR. SMITH:  Thank you.

21       THE WITNESS:  And the parties before it got to the

22 judge.

23       THE COURT:  Anything else of this witness by any of

24 the parties?

25       MR. HOSKINS:  Your Honor, could I ask one more

1    question?

2            THE COURT:  If it's responsive directly to

3    Mr. Smith's last question and not the volunteered information

4    at the end.

5            MR. HOSKINS:  It is, Your Honor.

6                    FURTHER REDIRECT EXAMINATION

7    BY MR. HOSKINS:

8    Q    If the Judge doesn't accept the agreement, what happens

9    then?

10   A    If he doesn't accept the agreement, it can get set for

11   trial and you can have a trial or you can go back sometimes and

12   negotiate something that the Judge will accept.  So it can

13   either lead to more negotiations or it can lead to a trial.

14   Q    But the defendant has a right to back out if the Judge

15   doesn't accept it?

16   A    Yes.

17           MR. HOSKINS:  That's all.

18           THE COURT:  Anything else of this witness?

19           MR. SMITH:  (Shakes head negatively).

20           THE COURT:  All right.  Mr. Norris, you may step

21   down, sir.  Thank you.

22           THE WITNESS:  Your Honor, am I free to leave?

23           THE COURT:  Yes, unless you're under subpoena by

24   another party, you may be excused.  Thank you.

25           THE WITNESS:  Thank you.

1        THE COURT:  Ladies and gentlemen, we will take our

2    lunch recess at this time.  Please keep in mind the admonition

3    that you have been given several times not to discuss the case

4    among yourselves while we are in recess.  The jury will be

5    excused until 1:15 this afternoon.

6        (Whereupon, the jury retired from the courtroom, after

7    which the following proceedings were had in open court.)

8        THE COURT:  Any matters to take up outside the

9    presence of the jury?

10    (No response.)

11        THE COURT:  We'll be in recess until 1:15.

12        (Whereupon, a recess was had for the noon hour, after

13    which the proceedings continue uninterrupted to Volume 22-B.)

14                    (Proceedings concluded at 12:10)

15

16                    C E R T I F I C A T E

17    I, Cynthia A. Oakes, certify that the foregoing is a

18    correct transcript from the record of proceedings in the

19    above-entitled matter.

20

21    3/11/2010                    s/CYNTHIA A. OAKES
        DATE                       CYNTHIA A. OAKES, RPR, RMR, CRR

22

23

24                    I N D E X

25                                          PAGE

Testimony of MARILYN ROBERTS:
    Continued Direct Examination by Mr. Pinales:    11
    Cross-Examination by Mr. Smith:    15
    Redirect Examination by Mr. Pinales:    18

Testimony of STEVEN SLYTER:
    Direct Examination by Mr. Hoskins:    19
    Cross-Examination by Mr. Smith:    37
    Redirect Examination by Mr. Hoskins:    64
    Recross-Examination by Mr. Smith:    67

INDEX (Cont'd)    PAGE

Testimony of MORRIS HOUSE:
    Direct Examination by Mr. Pinales:    69

Testimony of DOUG HOPKINS:
    Direct Examination by Mr. Pinales:    75

Testimony of JIM NORRIS:
    Direct Examination by Mr. Hoskins:    78
    Cross-Examination by Mr. Smith:    96
    Redirect Examination by Mr. Hoskins:    116
    Recross-Examination by Mr. Smith:    122
    Further Redirect Examination by Mr. Hoskins:    123

E X H I B I T S

| Defendant Maricle Exhibit No. | Identified | Page Admitted |
| --- | --- | --- |
| 4 | 11 | |
| 6 | 13 | 14 |