United States District Court
Eastern District of Kentucky
Southern Division at London

UNITED STATES OF AMERICA          )   London Criminal
                                  )   Action No. 09–16–S
 vs.                              )
                                  )   Frankfort, Kentucky
RUSSELL CLETUS MARICLE            )   March 23, 2010
DOUGLAS C. ADAMS                  )   8:27 a.m.
CHARLES WAYNE JONES               )
WILLIAM E. STIVERS                )
FREDDY W. THOMPSON                )
WILLIAM B. MORRIS                 )
DEBRA L. MORRIS                   )   VOLUME 30–A
STANLEY BOWLING                   )

TRANSCRIPT OF CLOSING ARGUMENTS
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:  STEPHEN C. SMITH, ESQ.
                                 JASON D. PARMAN, ESQ.

On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
Russell Cletus Miracle:          MARTIN S. PINALES, ESQ.
                                 CANDACE C. CROUSE, ESQ.

On behalf of the Defendant       R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant       T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant       ROBERT L. ABELL, ESQ.
William R. Stivers:

On behalf of the Defendant       RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:              R. TUCKER RICHARDSON, III, ESQ.

On behalf of the Defendant       JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant       ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
Stanley Bowling:

```
 1   Appearances of Counsel:

 2   On behalf of the United States: STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, Kentucky  40741
 5

 6   On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
     Russell Cletus Miracle:         107 East First Street
 7                                   Corbin, Kentucky  40701

 8                                   MARTIN S. PINALES, ESQ.
                                     CANDACE C. CROUSE, ESQ.
 9                                   150 East Fourth Street
                                     Federal Reserve Building
10                                   Cincinnati, Ohio  45202

11

12   On Behalf of the Defendant      R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.
13                                   220 West Main Street
                                     Suite 1900
14                                   Louisville, Kentucky  40202

15   On behalf of the Defendant      T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:            133 West Short Street
16                                   Lexington, Kentucky  40507

17

18   On behalf of the Defendant      ROBERT L. ABELL, ESQ.
     William E. Stivers:             120 North Upper Street
19                                   Lexington, Kentucky  40507

20   On behalf of the Defendant      RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:             R. TUCKER RICHARDSON III, ESQ.
21                                   300 West Short Street
                                     Lexington, Kentucky  40507
22

23   On behalf of the Defendant      JERRY W. GILBERT, ESQ.
     William B. Morris:              212 North Second Street
24                                   Richmond, Kentucky  40475

25
```

```
 1
 2   On behalf of the Defendant       ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                 201 West Short Street
 3                                    Lexington, Kentucky   40507

 4   On behalf of the Defendant       DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                 116 West Main Street
 5                                    Suite 2A
                                      Richmond, Kentucky   40475
 6

 7   Court Reporter:                  CYNTHIA A. OAKES, CRR
                                      Official Court Reporter
 8                                    United States District Court
                                      560 Athens Boonesboro Road
 9                                    Winchester, Kentucky   40391
                                      (859) 983-4346
10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

1    (Whereupon, the jury entered the courtroom, after which the

2  following proceedings were had in open court.)

3          THE COURT:  Thank you.  Good morning, everyone.

4          The record will reflect that all parties and counsel

5  are present and all members of the jury are present.

6          Ladies and gentlemen, we're going to continue with the

7  closing arguments in just a moment.  Before we do that, I want

8  to give you just a brief outline of the schedule for the day.

9          I do anticipate that we'll be having two arguments by

10  defendants' counsel before we take our morning recess around

11  10:00.  We'll take about a 15-minute recess at that time.  Now,

12  between arguments, we'll stay in session this morning but

13  counsel may need to exchange some of their laptops and other

14  materials, so we may take just a brief break and we'll stand up

15  and stretch if you want to do that at that time.  But we'll

16  proceed with two arguments this mornings.  We'll have at least

17  two and perhaps part of a third argument after we take our break

18  this morning before we take — I'm sorry, before we take our

19  lunch break, and then we'll continue on with the arguments this

20  afternoon.  I do anticipate that we'll complete most, if not

21  all, of the defendants' arguments today and perhaps get into

22  some of the rebuttal argument by the United States this

23  afternoon as well.  So that will be our schedule for the day.

24          At this time, we will continue with the arguments.

25  We'll begin with arguments on behalf of Defendant Russell Cletus

1   Maricle.

2          Mr. Pinales, I believe you'll be making the argument?

3          MR. PINALES:  Thank you, Your Honor.

4          THE COURT:  You may proceed.

5          MR. PINALES:  May it please the Court.

6          THE COURT:  Mr. Pinales.

7          MR. PINALES:  Mr. Smith, Mr. Parman, Counsel.

8          MR. SMITH:  Mr. Pinales.

9          MR. PINALES:  Cletus Maricle is not guilty.  You know,

10  we heard about Cletus Maricle, we heard from Cletus Maricle, and

11  we heard that he was born in Clay County and came back and

12  practiced in Clay County, and one of the top criminal defense

13  lawyers in Clay County, one of about a dozen.  Now, Cletus

14  Maricle, and the Judge will tell you, is on trial only for the

15  crimes charged in this indictment and not any other acts.  Now,

16  this indictment is for the years 2002 through 2007.

17         I am not going to go witness by witness with you.  You

18  will remember and I trust each and every one of you will

19  remember without any help from me about what each witness said.

20  I am not going to go through the law that Judge Reeves is going

21  to tell you, that's his job.  And I trust that you will listen

22  and you will follow the law.

23         You know, yesterday Mr. Smith said - he used the term

24  twice - Cletus Maricle gave a confession on Inside Edition.

25  Now, you will remember that tape being played.  And Inside

CLOSING ARGUMENT - MR. PINALES                                6

1   Edition, he is talking.  There's no confession there, he's
2   saying that Clay County is drugs and voter buying.  He's talking
3   about that in 1989.  But Cletus Maricle got on that witness
4   stand and was candid with you and said, you know, I was involved
5   in the mid '80s, and then I stopped.  Cletus Maricle is on trial
6   only for the crimes charged in this indictment and not any other
7   acts.  Cletus Maricle testified and was questioned by Mr. Smith,
8   like he was trying to hide something because he didn't list his
9   home, the home that he was arrested at.  And we'll talk about
10  that a little later.

11          You know, the government had two star witnesses, Wanda
12  White and Kennon White.  You know, there's an expression on your
13  computers about garbage in and garbage out.  The FBI listened to
14  what Kennon and Wanda had to say and they based FBI
15  intelligence — as Agent Briggs said many times, FBI
16  intelligence.  I want you to think about credibility and motive
17  for testifying when you think about Wanda and Kennon White.

18          Kennon White was convicted.  He hasn't been sentenced
19  yet and he hasn't been charged with voter fraud, but really with
20  a shakedown.  And Wanda is not being charged at all.  You have,
21  as the trier of the facts, the ability to believe all, part, or
22  none of any witness.  You judge their credibility, you judge
23  their motive, why they are testifying a certain way.

24          Now, Kennon and Wanda were wearing a wire, we heard
25  that.  We heard that there is over 50 hours of tape.  Over 50

CLOSING ARGUMENT — MR. PINALES    7

1    hours of tape.  The FBI told them topics to talk about, but

2    Kennon and Wanda each wrote their own script and talked about

3    what they wanted to talk about.

4         Now, Kennon knew that he was wearing a wire, Wanda

5    knew that she was wearing a wire.  So what's important is what

6    is not said on those tapes.  What is not said?  You know, the

7    government has said over and over again that Wanda was promised

8    a job in drug court.  Wanda knew she was wearing a wire, so why

9    didn't she say to Cletus, you know, I helped you in the 2006

10   election and you didn't give me that job that you promised me in

11   drug court.  That's not on the tape.

12        What is on the tape?  We heard and we watched as the

13   transcript went on a lot of Kennon talking to Wanda and Wanda

14   talking back to Kennon.  On one of those tapes, you heard Cletus

15   saying how distraught he was about his daughter, and they keep

16   talking about voters.  I mean, there were ships passing in the

17   night that were not even connected.  And the prosecutor

18   yesterday talked about McDougal and when that was put up and he

19   was talking about those tapes, it was Kennon White who said,

20   remember the Clinton person, and they couldn't remember the

21   name.  It was all brought up by Kennon because he knew he was

22   wired.

23        How many times on those tapes did we hear Cletus

24   Maricle say, you got a good lawyer, listen to what your lawyer

25   says, follow your lawyer's advice.  You know, the U.S. Attorney

CLOSING ARGUMENT — MR. PINALES                    8

1    wants you to believe part of what's on the tapes and disbelieve

2    part of what's on the tapes.  You can't have it both ways.  What

3    is said on the tapes is said on the tapes.

4            What is evidence?  It's the testimony that we've

5    heard.  Again, you judge the credibility, you can believe all,

6    part, or none of any witness, it's the documents, and you'll

7    have lots of documents back in the jury room with you.

8            Rumors are not evidence.  The Judge will tell you

9    circumstantial evidence is permissible, but rumors are not.

10   You're not allowed to speculate.  FBI intelligence is not

11   evidence.  FBI intelligence is what is used to gain evidence,

12   but yet when Mr. Briggs was on the stand over and over again, he

13   was questioned, he said, well, that's FBI intelligence.

14           Let's talk about Corky Price for a few minutes.  Corky

15   Price, Wanda's brother, was charged with a regular assault.  We

16   heard over and over again, and by now you understand how plea

17   agreements are reached.  A plea agreement is reached when the

18   prosecutor and a defense attorney get together, they resolve the

19   case, they put it in writing and they submit it to the Judge.

20   The Judge can accept or he can reject it, but he has no part in

21   making it.

22           Corky Price delivered a witness to some folks that

23   would probably be killed, and this young woman had her throat

24   slit and was left to die.  And the prosecutor needed Corky's

25   help in order to gain a conviction on the perpetrators.

CLOSING ARGUMENT — MR. PINALES                    9

1   So he reached a plea agreement with Corky and Corky's lawyer.

2   And that plea agreement was for a five-year sentence to be

3   probated, to be given probation.  That plea agreement was to

4   have Corky plead to an information, be released out on bond and

5   not be sentenced.

6          Well, that was submitted.  Wanda's good friend, Judge

7   Maricle, had that case, and that case was submitted to him and

8   he said, I can't go along with this.  Corky Price, I'm not

9   letting you out of jail.  I'll go along with this plea

10  agreement, I'll go along with the reduced charge, I'll go along

11  with the five-year sentence, but I'm not letting you out of

12  jail.  Corky testified.  And the Judge said, I can't give you

13  probation, not for what you did; not for what you did, Corky.

14  You're going to prison for five years.  And, again, Wanda went

15  to her friend, Judge Maricle, and said let Corky out.  The

16  reality is Corky never got out.

17         Now, the government's theory is it was being held over

18  Wanda's head for her to help in the 2006 election.  When were

19  these tapes made?  In 2007.  One year later after the election,

20  Corky is still in jail and Judge Maricle wasn't letting him out

21  for those offenses.

22         Wanda said, you know, Judge Maricle, you promised me a

23  job in drug court.  That's not what happened, and that's not

24  what you heard on the tape.  The tape is silent about that.  The

25  tape does say, what about that job in drug court?  And the

1   testimony that you've heard is that Wanda was talking about the

2   fact that she lost her job.  She lost her job, her husband lost

3   his job when the new mayor came in.  And Judge Maricle said,

4   Wanda, what about real estate?  You know, my wife's in real

5   estate, you could work with her, all you need to do is take some

6   courses and take your license.  What about going back and

7   getting your beautician's license renewed?  What about a job in

8   drug court?  What about calling and going down to Frankfort and

9   seeing what jobs are available in the State?  Drug court was one

10  of many things, but not anywhere on that tape – and, remember,

11  Wanda knew she was wired – did Wanda say, you promised me a job.

12  And this is one year later when those tapes are made, one year

13  later after the 2006 election that Wanda is still saying, what

14  about the job in drug court?

15          Now, we have the rest of the Price family.  We got

16  Stephanie.  Stephanie had a case in the lower court, in the

17  district court, was paying a fine, and apparently didn't show up

18  to pay her fine and was going to get some type of license and

19  that showed up.  It showed up and she had to take care of it.

20  What big favor did Judge Maricle do?  Judge Maricle had it put

21  back on the docket so she could continue paying her fine and get

22  her beautician license.

23          We have Sarah.  Sarah is Wanda's mother.  The

24  government says, hey, a favor was done, a favor was done for

25  Sarah because her charges were dismissed.  But let's look at the

1  facts.  The facts are that Wanda's brother, Steven, worked a

2  plea agreement to have his mother released and he would go to

3  prison.  And he, his lawyer, and the prosecutor came to that

4  agreement and Judge Maricle said okay.  Sarah's case was

5  dismissed and Steven went to prison.

6           Another fascinating issue with these tapes is that

7  Wanda's brother, Travis, had a DUI, remember, about the same

8  time that these tapes were being made.  Nowhere on those tapes

9  did Wanda say, hey, Judge, can you help out in the district

10  court with Travis's DUI?  It's not there, and that's what's

11  important about not being on those tapes.

12           The young man with the aluminum, Bobby "Red" Sams.  He

13  worked a plea agreement, again not with the Judge, with his

14  attorney, with the prosecuting attorney, that he would get a

15  sentence to a reduced charge of six months.  That six-month

16  sentence was to be served either in jail or under house arrest.

17  We heard from the probation officers who said it was

18  Judge Maricle's responsibility and his practice when somebody

19  came into court and they're about to be released or about to be

20  sentenced for Judge Maricle to say, I want a drug test.

21           Now, we know that Judge Maricle is very hard on drugs

22  and we've heard some of the reasons as to why.  He wants a drug

23  test.  Well, Bobby "Red" Sams took a drug test, he failed a drug

24  test, he was put in jail for ten more days, but in reality had

25  served his total sentence of the six months.

CLOSING ARGUMENT — MR. PINALES                    12

1          That brings us to John Downey.  We had John Downey's

2     brother on the stand who testified.  He wasn't even in court.

3     But he said Cletus Maricle was the Judge who let my brother,

4     John, out in order to work in the election.

5          Agent Briggs got on the stand and was holding the

6     file.  He was holding the file and he said over and over and

7     over again that Judge Maricle let John Downey out in order to

8     work in the election.  You were here, I was here.  I said there

9     was another judge, and he said, yeah, but Judge Maricle was the

10    main person.  Judge Maricle was the one who accepted that plea

11    agreement.  Judge Maricle was the one who let him out in order

12    to go work in the election.

13          What are the facts?  When you looked at the file, when

14    you were a fly on the wall in the circuit court in Clay County,

15    you were able not only to know what happened but to see what

16    happened.  There was a plea agreement, again with the

17    prosecuting attorney and again with the defense attorney.  Now,

18    we saw that.  We saw and heard that Judge Maricle was the one

19    who put Downey in jail, didn't make bond, and he — after 18

20    months, his case was set for trial.  When was his case set for

21    trial?  On October the 30th.  Where was the case set for trial?

22    In the circuit court of Clay County.  And before what judge?

23    Not Judge Maricle, but Judge Lewis.  We saw it on the tape.  And

24    Judge Lewis is talking to Downey's attorney and says, you know,

25    you've been in jail 18 months, have you learned your lesson?

CLOSING ARGUMENT — MR. PINALES                    13

1    I'm going to give you that five-year probated sentence, I'm

2    going to get a presentence report, but I'm going to give you

3    that sentence.  I think you maybe ought to cut your hair, but,

4    you know, I want you to stay away drugs.  But it was Judge

5    Lewis, not Judge Maricle in the Downey case.  And it happened to

6    be set for trial on October the 30th.  And the agent is saying,

7    well, it was before the election.  Yes, October the 30th was

8    before the election.

9            Judge Lewis said Judge Maricle normally isn't even in

10   the courthouse when he's there because it only has one

11   courtroom.  Judge Maricle has three counties he's got to go to,

12   and when Judge Lewis come to Clay County, Judge Maricle is off

13   in another county.  In fact, Judge Lewis said in all the times

14   he's been in Clay County, he and Judge Maricle went to lunch

15   once and Judge Maricle never told him what to do and how to do

16   it.  It happened to be October the 30th, it happened to be the

17   date the case was set for trial, it had nothing to do with

18   before the election.

19           The Yap case, we heard about that.  Mr. Yap was a

20   young man accused of killing a black man in Clay County who he

21   believed was his wife's lover.  A jury found him not guilty and

22   he left town.  And the prosecutor tried to make a big thing

23   about Maricle buying his house.  You heard the testimony.  The

24   bank foreclosed on the house and four years later Judge Maricle

25   bought the house from the bank.

CLOSING ARGUMENT — MR. PINALES                    14

1          FBI intelligence.  It's not evidence.  It's not to be

2   considered by you as evidence.  They couldn't even get the right

3   house with FBI intelligence.  They went to the wrong house.  And

4   when asked why, what's the situation, FBI intelligence didn't

5   bother to open the phone book and look up an address?  They left

6   a business card on a door, they left it on the wrong door, and

7   they said Judge Maricle came in with his daughter into the FBI

8   headquarters.  Well, it must be the right address.  That's the

9   FBI intelligence.

10         If the FBI left a business card on your door about

11  your neighbor, wanting to talk to your neighbor, you would call

12  your neighbor.  And that message would be delivered.  If Cletus

13  was a person that was being watched for years, if Cletus was the

14  puppeteer, the man who controls everything — and this

15  investigation, as Mr. Briggs has testified, has gone on for

16  years, he's the third agent in charge of this case, but he's

17  worked on it with other agents.  If he was the man in charge, if

18  he was the man pulling the strings, you think that the FBI

19  intelligence would know the right house to go to.

20         In the search of the house, when they finally got to

21  the right house, they found a Rolodex.  The prosecutor

22  introduced it, put up on the board the first card to show some

23  kind of terrible, terrible plot or enterprise because of this

24  Rolodex.  And it had Mr. Adams' name.  And then the prosecutor

25  said, turn to the Ws, do you see Wanda and Kennon's name in

1    there?  And he found it and he found a cell phone number and he

2    found a house number.  You'll have that Rolodex in the jury room

3    with you.  Turn it, look it up.  Look at the plumber, look at

4    the doctors, look at the ambulance drivers, look at the funeral

5    home.  You have cards that are just jammed packed in there.

6           There were four pages that they found, and you'll have

7    that back in the jury room, which was a plan to buy used, invest

8    in real estate.  And one of the parts of that was to look at

9    retired people to buy houses when they go into a retirement

10   home.  That's in that plan.  You can read it, you can see it,

11   you can touch it.  But yet, when they talk about this little

12   black spiral book and they find the names of some people, they

13   say, oh, these are people with precincts and these are people --

14   and I asked the question, I said, do you know that they are

15   retired people in a retirement home and all dead?  Oh, but one

16   voted in 2006.  Which one?  We don't know.  FBI intelligence, we

17   don't have that evidence.  And in that spiral book, this very,

18   very important spiral book that the government believes is the,

19   "be with all" and "where with all", there are the names of the

20   retired people.  There's information about a female hormone

21   replacement, there's a dry cleaning list, there's a recipe for

22   lemon chicken, and there's a recipe for whatever value it may

23   have for a Vodka perfume.  This is what everyday people keep

24   around their houses for their everyday lives.

25           You know, Kenny Day testified.  Kenny Day testified

CLOSING ARGUMENT — MR. PINALES                16

1  that he had a bag, and I believe he said it was $20,000 in that

2  bag and a box of Cuban cigars, and he went up to Judge Maricle's

3  house and he tried to give Judge Maricle the $20,000, and

4  Judge Maricle said no.  He tried to give Judge Maricle a box of

5  Cuban cigars and Judge Maricle said no.  He said Judge Maricle

6  smoked cigars.  I said, did he take one cigar?  He said, no, he

7  wouldn't take any.  And that was the testimony you heard.

8        Let's talk about Judge Maricle's first race.

9  Remember, he was appointed in 1990, actually the end of '89,

10  shortly after that Inside Edition was made.  And he was

11  appointed by the Governor and he served a term, a very short

12  term, but had to run in the next election.  So in 1990, he runs

13  for the circuit judge.  Who does he run against?  It's the only

14  contested race he has.  He runs against his friend, Oscar Gayle

15  House.  He runs against his former law partner, Oscar Gayle

16  House.  He runs against the person who actually he supported

17  over Judge Bishop a term before.

18        You heard Judge Maricle say that was a clean election.

19  He was my friend, he was my former law partner, that was a clean

20  election on both sides.  Judge Maricle didn't have any

21  competition after that.

22        Now, let's talk about Clay County.  Clay County is a

23  county that we've heard is about — total size about 24,000

24  people.  We've heard that there is a county seat in Clay County,

25  Manchester.  And we've heard that Manchester is about 1500

1  people.  Let's say three-quarters of each are voters.  We don't

2  know the exact number of voters, but let's just say three-

3  quarters of each are voters.  Judge Maricle was running for a

4  countywide seat.  You don't need Manchester, it's just a drop in

5  the bucket with voters.  It's a countywide seat.  And what do we

6  hear the most about in this courtroom, in this evidence?  We

7  heard about the two Manchester precincts, the city precincts.

8  Manchester had about a dozen or so attorneys.  Manchester seemed

9  to be that everybody knew everybody.  It's a small county.

10 People are born in Clay County, people are raised in Clay

11 County, and people stay and move back to Clay County.  People

12 know everybody in Clay County.

13         Judge Maricle didn't have another election that was

14 contested ever.  And the Judge is going to tell you when he

15 talks about the law, and I'm not going to put them on the board

16 and I'm not going to go into it, that's his job, he's going to

17 tell you that Cletus Maricle is on trial only for the period of

18 time charged in the indictment, and that's 2002 to 2007.

19         The prosecutor spent a lot of time on Kentucky

20 evidence for judges and for lawyers.  The Judge is going to tell

21 you about that.  He's going to tell you that a violation —— And

22 I'm not saying there was a violation, because he's going to tell

23 you that a judge, a sitting judge, can give legal advice to a

24 relative as long as he doesn't charge for it.  The Judge will

25 tell you that.  But even if there was an ethical violation, it

CLOSING ARGUMENT — MR. PINALES                18

1    doesn't equate to a criminal charge.

2         We heard a lot about drug court in this case.  What is

3    drug court?  We now know that Judge Maricle believes strongly in

4    drug court.  He believed very strongly because it's the right

5    thing to do, it's the economic thing to do on behalf of the

6    county, and in his heart, in his homelife, in his own personal

7    life, he believed in drug court because it saves lives.  How

8    does drug court work?

9         The prosecuting attorney holds the key to drug court.

10   We heard that from the person who testified about drug court.

11   The prosecuting attorney says, okay, I think you'll qualify for

12   drug court.  Then the person enters drug court, the person

13   complies with all of the requirements, and some of those

14   requirements are perhaps to go to jail for a little bit and dry

15   out and then go to treatment.  And at the end, if you're

16   successful, the charges against you get dismissed.  You don't

17   have the burden of having a conviction for drugs on your record.

18   You've gone through treatment.  We have heard that the state

19   average in Kentucky is a success rate of 67 percent through drug

20   courts all across Kentucky.  We also heard that in Clay County,

21   where Judge Maricle takes a personal interest in drug court for

22   personal reasons, the success rate is even higher.  The

23   prosecutor is trying to make something bad about drug court,

24   trying to make something nasty about drug court.  Drug court is

25   successful; and if it is successful, a life is saved.

1          Another thing the prosecutors tried to make nasty,

2    trying to make evil, is the home detention.  The ankle bracelet.

3    We heard about that in this case, we heard about it from the

4    person here in Frankfort talking about how that works.  Well, it

5    saves resources.  We heard that a person placed on home

6    incarceration doesn't have to go to jail, doesn't have to be

7    fed, doesn't have to be medicated, doesn't have to be cared for

8    in the county jail.  In a county jail that's already overcrowded

9    and in a county jail that costs the taxpayers of Clay County

10   about 40, 50 bucks a day.  They go and they're in their home,

11   and it is monitored not in Clay County even, it's monitored out

12   of state, and that's the system set up in the Commonwealth of

13   Kentucky and there are approved providers for the ankle

14   bracelet.  The person is confined to their homes, the person is

15   allowed to work, the person is allowed to be with his family,

16   the person pays for their own upkeep, not costing the county.

17   The person can go to work, be a productive citizen while

18   awaiting trial or sentencing.

19          The prosecutors say, wait a minute, Al Man Stivers was

20   one of the providers.  Yeah, so what?  He was approved by the

21   State.  They said that the judge's secretary, Ms. Davidson, was

22   one of the providers.  One of the providers, of course, approved

23   by the State, and it's the former secretary of the Judge, she

24   was not the secretary at any time that she's providing the ankle

25   bracelets.  And she's still providing it and still approved by

CLOSING ARGUMENT — MR. PINALES                    20

1  the State.  And there is a list of approved providers, and the

2  State checks them out and the State is the one who decides who

3  can and cannot be.

4         This case is a lot of cases all at the same time, lots

5  of people, lots of charges.  The Judge is going to tell you that

6  each person sitting at this table is to be judged separately.

7         You know, the prosecutor, back to that Inside Edition,

8  has tried to call it a confession, and the Judge is going to

9  tell you knowing that something is going on, being present while

10  something is going on, as long as you're not participating in

11  that something, does not equate to guilt.  Each person, each

12  defendant, Cletus Maricle is to be judged separately and judged

13  from 2002 to 2007.

14         It is your duty separately to consider the evidence

15  against each defendant on each charge and return a separate

16  verdict for each one of them.  It's a long and difficult task,

17  but you have to be able to separate each person and each charge.

18  And your decision on any one defendant or any one charge,

19  whether it is guilty or not guilty, should not influence your

20  decision upon any of the other defendants or any of the other

21  charges, and the Judge will tell you that.  For each one, you

22  must decide whether the government has presented proof beyond a

23  reasonable doubt that a particular defendant is guilty of a

24  particular charge.

25         The Judge is going to define what is proof beyond a

CLOSING ARGUMENT - MR. PINALES                     21

1  reasonable doubt.  That is the burden of the prosecuting

2  attorney.  Proof beyond a reasonable doubt means proof which is

3  so convincing that you would not hesitate to rely and act on it

4  in making the most important decisions of your life.

5          We go back to the credibility of Wanda and Kennon.

6  You judge the credibility of each and every witness from that

7  witness stand, what each has to gain, what motive they may have

8  for testifying a certain way.  You have the duty to decide

9  whether or not the testimony of the two star witnesses would be

10  something that you would rely on in the most important of your

11  events of your life.

12          The Judge, before I stood up here, said, "I want to

13  give you a schedule."  And in giving you the schedule, he told

14  you that each person is going to have a final argument, which is

15  what I'm doing now.  But at the very end, Mr. Smith gets to

16  stand up here and have the last word.  And he has the last word

17  because of proof beyond a reasonable doubt is his requirement.

18  But, unfortunately, I don't get the chance to come back and talk

19  to you again and say, you know, Mr. Smith talked about this and

20  Mr. Smith talked about that and give you the answers.

21          So I'm going to ask each one of you to just think what

22  would I say, what would Marty Pinales say to you after Steven

23  Smith gives his final argument, because I don't get that

24  opportunity.

25          I leave you with one thought.  Cletus Maricle is not

1  guilty of each and every charge.  Thank you.

2          THE COURT:  Thank you, Mr. Pinales.

3          Mr. Westberry, I'm going to give you a moment if you

4  need to set up your laptop.

5          MR. WESTBERRY:  Just a couple of moments, please.

6          THE COURT:  All right.

7          Ladies and gentlemen, I'm going to stand up and

8  stretch my legs and get a drink of water, and if you would like,

9  you can do the same.

10         MR. WESTBERRY:  Can I have a one-minute recess myself?

11         THE COURT:  Yes, sir.

12         MR. WESTBERRY:  It just takes a minute for him to —

13         THE COURT:  Whenever you're ready.  You can just give

14  me a signal.

15         MR. WESTBERRY:  Judge, thank you.  We're ready to

16  proceed.

17         THE COURT:  Mr. Westberry on behalf of defendant,

18  Douglas Adams, you may present your closing argument at this

19  time.

20         MR. WESTBERRY:  Thank you.  May it please the Court.

21         THE COURT:  Mr. Westberry.

22         MR. WESTBERRY:  Mr. Smith, Mr. Parman, agents for the

23  government.

24         MR. SMITH:  Mr. Westberry.

25         MR. WESTBERRY:  And my colleagues at the table.

CLOSING ARGUMENT — MR. WESTBERRY                    23

1              Members of the jury, good morning.  I apologize for

2    the delay just a moment ago.  I'm not a master of technology and

3    I need some help from our assistant in setting the computers up.

4              This is the closing argument we would like to present

5    on behalf of Doug Adams for your consideration.

6              Thinking about yesterday, members of the jury, and the

7    argument that we heard on behalf of the government, they spent a

8    lot of time on things that supposedly happened back in the late

9    1980s, but Doug Adams is not on trial for anything that happened

10   in the 1980s.  As the Court will tell us, as Mr. Pinales said

11   just a moment ago, what Doug Adams is on trial for is something

12   that the government calls a conspiracy.  It's actually a

13   conspiracy under the government's theory to control politics in

14   Clay County through the Board of Elections, and we'll talk about

15   that in just a moment, and the time frame, again, is 2002

16   through 2007.

17             It is important and it's worth repeating that Doug

18   Adams is only named in two counts.  The first count is RICO

19   conspiracy, the racketeering conspiracy as it's frequently been

20   called, and Count 2, the money laundering conspiracy.  What I

21   would like to do for the portion of the time that I have this

22   morning to speak with you is to talk with you about why the

23   government has failed to prove the elements of the crime in both

24   the racketeering conspiracy, Count 1, and Count 2, the money

25   laundering conspiracy as well.

CLOSING ARGUMENT — MR. WESTBERRY                    24

1          The indictment, in particular Paragraph No. 11, is
2    sort of, for lack of a better way of saying it, maybe the engine
3    that drives the government's theory.  That paragraph also,
4    members of the jury, mirrors what is contained in
5    Instruction 12E that we anticipate Judge Reeves will give when
6    he's giving the instructions — when the instructions are given
7    to you later in the process of this trial.

8          The whole idea under the government's theory is that
9    the purposes of all of the defendants, including Mr. Adams, was
10   essentially to preserve and expand, and I'm paraphrasing, their
11   political power and control, and in some instances involving
12   other's personal enrichment for themselves through the use and
13   misuse of the authority and power of the Board.  And the Board,
14   again, we're talking about is the Board of Elections and the
15   offices of judge, superintendent, clerk, and the positions of
16   election officers.

17         Again, members of the jury, in order for the
18   government to meet its burden of proof with regard to Count 1,
19   the racketeering conspiracy, they have to have the enterprise.
20   The government has chosen as its enterprise the Board of
21   Elections.  And, again, the theory under the government's case
22   is that Doug Adams and others tried to control, use, or misuse
23   the authority of the Board of Elections in order to maintain
24   control of politics in Clay County.  It didn't happen, and
25   that's what I would like to speak with you-all about in the

CLOSING ARGUMENT — MR. WESTBERRY                    25

1   remaining time of our opening statement —— or closing arguments,

2   excuse me.

3          Just briefly, the indictment also alleged that Doug

4   used his influence to appoint corrupt members to the Board of

5   Elections and caused election officers to commit those following

6   acts.  The indictment also alleged and claimed that he recruited

7   persons to run for these county offices on what we call a

8   slate – and we'll speak to that in just a moment – that would

9   benefit the collective efforts of the so—called members of the

10  conspiracy and the enterprise.  It didn't happen.  We will speak

11  to that in just a moment.  But we wanted to touch on these.

12         The indictment again, again it alleges the conspiracy

13  occurred in that time frame; not the 1980s, members of the jury,

14  that time frame.  And it alleged that he used the Board of

15  Elections again.  You know, the Board is the enterprise, the

16  Board is the vehicle that the government has chosen in this

17  indictment.  It is —— in a way, it's the engine that drives

18  their theory of the case, and that part of the indictment makes

19  that allegation as well.  It did not happen.

20         Think back in and around the first week of February.

21  Lord knows this has been a long time, I know this has been a

22  long trial.  I've been at this business for almost 30 years, I

23  can't remember that I personally have been involved in one

24  that's lasted this length of time.  Do you remember the opening

25  statement that the government gave?  They indicated —— And,

1    excuse me, I do have some notes I would like to follow along as

2    well.

3            They indicated that Paul Bishop would tell you about a

4    meeting that was held in his garage in 2002 where it was claimed

5    that hundreds of thousands of dollars were pooled to buy votes.

6    Do you remember the theory, the testimony offered by the

7    government?  A lot of cash money was placed on a table, perhaps

8    not as big as the ones Mr. Parman and Mr. Smith were sitting at.

9    About a hundred thousand plus was actually placed on the table

10   at this meeting that was supposed to have occurred at Bishop's

11   garage and was supposed to have included the topics that the

12   government advances.

13           Also, in the opening statement, way back six weeks or

14   thereabouts ago, the government said that Doug Adams was pulling

15   the strings of the Clay County Board of Elections and decided

16   who was going to serve as election officers.  And it was also

17   stated by the government in their opening statement that

18   Mr. Adams, Doug Adams, had control of 900 employees in the Clay

19   County School System; of course, with the implication that the

20   superintendent controls those jobs and, therefore, controls

21   politics in Clay County.

22           Listening yesterday to the argument advanced by the

23   government, we came away when we were preparing this last night

24   with this thought:  What -- from listening yesterday to what the

25   government said, what seemed to be the most significant event

1   that they claimed that Doug participated in in order to control

2   or to begin to control this enterprise called the Board of

3   Elections?  The meeting at Paul Bishop's garage.  Again, the one

4   we talked about just a moment ago.  The meeting at Paul Bishop's

5   garage where, you know, again, a whole lot of money, cash money,

6   supposedly placed on a table with the idea that it could be

7   doled out in the 2002 primary race, primarily, of course,

8   involving Jennings White and Mr. Thompson.

9          The question is this:  Why wasn't Paul Bishop called

10  to testify?  That's significant, members of the jury.  In the

11  government's opening statement, in the government's opening

12  statement, they indicated that they would call Paul Bishop to

13  testify as a witness in this trial.  During that meeting, it was

14  said, Paul Bishop will tell you that hundreds of thousands of

15  dollars were brought into that meeting.  Now, perhaps they will

16  say, well, Paul Bishop was a friend of Mr. Adams, maybe that

17  would color, you know, his testimony, the Adams family and the

18  Bishop family have been friends for many years.  Members of the

19  jury, that's not in dispute.  What is significant, though, was

20  that the Government knew when it made its opening statement,

21  when it said that Paul Bishop would be called to testify as a

22  witness in this trial, they knew then, as I anticipate they

23  should argue now, that the Bishop family and the Adams family

24  have been friends for a long period of time.  It's not — it's

25  not — there's no dispute, Paul Bishop's wife was the secretary

1    for Mr. Adams in the Office of Superintendent during the years

2    that he was employed as Superintendent of Schools.

3            Now, let's talk just a little bit more about the

4    meeting at Bishop's house.  You know, the time frame of the

5    meeting is unclear, at least from what we've been able to listen

6    and understand the proof.  Likewise, the people that were

7    present, purportedly present at the meeting, is a little unclear

8    as well.  The government seems to be offering the proof either

9    through a Randy Craft or — we'll talk about Mike Bishop, Paul

10   Bishop's son, in just a moment.  This, again, is the meeting

11   where the cash money was supposedly placed on the table.  Paul

12   Bishop, Mr. Adams, Mr. Thompson, Randy Craft, Dick Woods,

13   Charles Marcum, who supposedly made some comment about, you

14   know, I'm a poor man, or something to that effect, purportedly

15   he was there, he was not called as a witness, Roy Morgan and

16   Mr. William Stivers.

17           Dick Woods was at that meeting.  Who was the one

18   witness that was actually at that meeting that offered any

19   testimony at all regarding whether or not large sums of cash

20   money were placed on the table at that particular meeting?  It

21   was Dick Woods.  He was called by the government in their case

22   in chief.  Dick Woods was there, from our recollection, at least

23   30, 40 minutes, possibly more, for the duration of the meeting

24   or the largest part of the meeting.  Dick Woods also testified,

25   based on his recollection, there were other people at this

CLOSING ARGUMENT — MR. WESTBERRY                    29

1    meeting as well.  Do you remember there were a couple of guys

2    working on a boat that had absolutely nothing to do with

3    politics, Clay County, or anything to do with the Board of

4    Elections?  Dick Woods testified that during the entire time

5    that he was there he never saw any money placed on that table.

6    Again, Mr. Woods, he's a long-time, now retired, employee of the

7    Clay County School System.  He was called by the government in

8    its case in chief; no money was shown.  No money was discussed

9    at that meeting.

10          The one witness who said that money was discussed was

11   Mike Bishop, but Mike Bishop wasn't there at the meeting.  Mike

12   Bishop, again, is only saying what his father told him, what

13   supposedly was seen or said and discussed at that meeting.  And,

14   again, father Paul Bishop, was not called as a witness by the

15   government in this trial, despite the fact that they said in

16   their opening statement that they would call him.  What does it

17   mean?  I mean, what's the significance of all this?

18          Members of the jury, it strongly suggests that, you

19   know, the government doesn't have it right; that there's just a

20   misunderstanding about what was said, what was discussed at that

21   meeting.  That garage — And we'll talk about Clay Bishop in

22   just a moment.  That garage, the evidence has shown, has

23   historically — it's not any different from any other community,

24   it's a gathering place.  There have been fish fries, there have

25   been wedding celebrations, there have been meetings, guys

1  working on boats in that garage.  But the one person who

2  reportedly supposedly said that large sums of cash money in

3  support of this idea that Doug Adams was bringing people

4  together to control the Board of Elections and, therefore,

5  control politics in Clay County, the one person, Paul Bishop,

6  who said he would be called by the government in its opening

7  statement, he wasn't called.  The only person who was called by

8  the government to testify that had actual knowledge about what

9  was discussed at that meeting, Dick Woods, said he didn't see

10  anything.

11          Members of the jury, the Board of Elections, again,

12  this is the engine, it's the best term —— the best word that I

13  can think to describe the government's theory of the case.

14  These are the members of the Board of Elections during the

15  relevant time in the indictment, starting up there with Jennings

16  White.  Now, the idea is, under the government's theory, to

17  reduce it to its basics, is that Doug Adams, and really every

18  other defendant, but Doug Adams was somehow conspiring with

19  others to control the affairs of the Board of Elections, to use

20  and misuse the power of the Board in order to keep political

21  control in Clay County.

22          Let's talk about what the witnesses that were called

23  to testify actually said.  Yeah, Jennings White, yes, sir,

24  Jennings White was called as a witness to testify.  Who can

25  forget Jennings White?  We'll talk more about him in a moment.

1    I mean, if we can all agree on one thing in this case, I think

2    our friends from the government and us can agree upon, there's

3    no way that Doug Adams could have had any influence on Jennings

4    White whatsoever.  I mean, they're political adversaries, and

5    that's perhaps too kind a word.

6          Edd Jordan, during the same time period, was a

7    political ally of Jennings White.  He was the Sheriff in Clay

8    County during this period of time.  He had a seat on the Board

9    of Elections as well.  He had one vote.  The Clerk of the Court,

10   of course, Jennings White, served as Circuit Clerk of the Court

11   from about 1993 until 2002, one of the White family members that

12   had served in politics for a long time.  White and Jordan were

13   political allies.  During the 2002 race, Edith Jordan stepped in

14   for her husband Edd because, according to the law, when a person

15   is running for reelection for a post, they should not serve on

16   the Board of Elections.  Edith stepped in for her husband, Edd.

17   And neither Edith nor Edd Jordan testified.  Again, Edd Jordan

18   is an ally of Jennings White.  No proof whatsoever, is the point

19   I'm trying to make, that Doug Adams ever tried to influence any

20   one of those people in terms of their capacity or the positions

21   on the Board of Elections.

22   Clay Massey Bishop and William Hugh Bishop.  We'll talk more

23   about Clay Massey Bishop in just a moment, members of the jury.

24   He's the longtime county attorney in Clay County, he served, if

25   I recall, 20 years.  He also had a seat on the Board of

CLOSING ARGUMENT — MR. WESTBERRY                    32

1   Elections during the relevant timeframe in the indictment.  He

2   served sometime back in the '90s, we believe it was after Kenny

3   Day stepped aside because of the drug conviction.  He came back

4   on and off.  Because he had an opposition, an opponent, in the

5   2002 primary for county attorney, he had to step aside, similar

6   to Jordan, and his brother, William Hugh Bishop, testified he

7   stepped in and took his place.

8          The d important part, I would suggest the significant

9   part, of both William Hugh and Clay Massey Bishop testified as

10  this:  At no time did Doug Adams in all the years they've known

11  him ever attempt to influence them in any way regarding their

12  position as a Board of Election member.  At no time did Doug

13  Adams ever try to influence them with regard to the appointment

14  of election officers, and we'll talk some about that in just a

15  moment.  And at no time did anybody on Doug Adams' behalf ever

16  try to influence them in the way that we've just described.

17  Those were the only two Board of Election members that were

18  called as witnesses that testified to us.

19         Members of the jury, four members on the Board of

20  Elections.  Do you remember the number of precincts in Clay

21  County?  There are 20.  Four times 20, that is 80 election

22  officers throughout Clay County, and that doesn't really even

23  include the alternates.  You remember there was some testimony

24  that alternates would have to be -- and they occasionally were

25  used as well.

1            These are the election cycles, '02, '04, '06, that

2    were mentioned.  If you take 80 times three, that's 240, 240

3    election officers that would have — that would have served in

4    Clay County in those three elections.  Now, to be sure, I mean,

5    some people — I think Roy Allen testified to this, some people

6    and their families served as election officers in the precincts

7    from year to year.  I mean, we don't have an idea on how many

8    repeated their service or not, but it's a significant number of

9    election officers that served during that period of time.

10           Here's the point:  Wouldn't you think, wouldn't you

11   think, members of the jury, that if Doug Adams was pulling the

12   strings of the Clay County Board of Elections, at least — at

13   least one board member, one board member, would have come

14   forward to testify that he tried to influence them or somebody

15   on their behalf tried to influence them?  There is testimony of

16   none.  Wouldn't you think that 20 precincts times four, 80 times

17   three, 240, wouldn't you think that there would be a series of

18   election officers, with 20 precincts, let's just say five, pick

19   five precincts out of Clay County, pick ten if that's a number

20   you're more comfortable with, wouldn't you think that if this is

21   the widespread conspiracy to control the Board of Elections,

22   wouldn't you think there would be some — just some

23   representative number of election officers that would come

24   forward and say, you know, Mr. Adams or somebody on Mr. Adams'

25   behalf tried to influence them?  There have not been.  How many

CLOSING ARGUMENT — MR. WESTBERRY                    34

1    times did we ask the question, did Doug Adams ever try to

2    influence you politically in anything you did?  And how many

3    times did we get the answer, no?

4          The government also said, and I mentioned just a

5    moment ago, in their opening there were 900 School Board jobs in

6    Clay County.  It's the largest employer in the county.  No one

7    is disputing that.  You know, it's below the poverty level.

8    There are not a lot of jobs in Clay County.  These are valued

9    jobs.  No one is disputing that at all.  That testimony came,

10   incidentally, from the government in its opening statement.  It

11   came from Agent Sagrecy, as well as Agent Briggs.  But in

12   reality, as testified by Reecia Samples, the Superintendent, as

13   well as Leewood Cornett and Charles Keith, two School Board

14   members that I'll speak to you in just a moment, the figure is

15   really more in the neighborhood of 700 in reality.

16         Take it a step further, also in reality, members of

17   the jury, when you really figure the number of jobs that the

18   Superintendent of Schools has actual control over, it's closer

19   to that 100 figure.  You know, the number keeps dropping.  In

20   other words, perception and reality have collided here.  In

21   reality, from the people who actually know, the number is closer

22   to 100.  And remember how jobs worked in Clay County, the school

23   system?  We talked about the site-based council.  Each one of

24   the schools has its own council, they call it site-based, and

25   they make the bulk of the hiring decisions, the teachers, the

CLOSING ARGUMENT — MR. WESTBERRY                    35

1   maintenance custodians in the school.  Sure, the Superintendent

2   of Schools, as Ms. Samples said, can submit a list of names and

3   people that he or she would want to consider for a job in one of

4   the schools, but the site—based council and the individual

5   schools has the opportunity to send a list back.  That's the

6   law.  That's how it works.  Again, perception and reality.

7            I don't want to — Mr. Pinales mentioned just a moment

8   ago the burden of proof, and it can't be overemphasized.  It is

9   the government's obligation to prove every element of the crime

10  charged beyond a reasonable doubt.  This is the definition that

11  we borrowed from the instructions that we anticipate Judge

12  Reeves will give.  Proof beyond a reasonable doubt means proof

13  which is so convincing that you would not hesitate to rely and

14  act upon it in making the most important decisions in your own

15  lives.  The most important decisions in your own life.  What are

16  they?  Healthcare decisions, whether for a child or a parent;

17  the decision whether to change jobs; the decision whether to buy

18  a house or not; perhaps a smaller decision, but no less

19  significant, the kind of food that you put on your table.  The

20  most important decisions —— the most important that you would

21  not hesitate to rely and act on them in making the most

22  important decisions in your own lives.

23           No defendant has the burden of proof and is always

24  presumed innocent, and this means that a defendant has no

25  obligation to present any evidence at all or to prove to you in

1    any way that he or she is innocent.  That burden always stays

2    with the government.  That sentence was taken out of the

3    instructions that we anticipate Judge Reeves will give.

4           Why you must find Doug Adams not guilty of Count 1.

5    Members of the jury, there is no credible evidence to link Doug

6    to any conspiracy to control the Board of Elections.  Again, on

7    this count, Count 1, the government must prove — and we've

8    taken this — we've borrowed this, again, from the instructions

9    we anticipate that the Court will give, 12E, E as in "Edward," a

10   person — in order to get a guilty verdict, a person — you must

11   be shown a person participants in the operations of the affairs

12   of the enterprise if he or she has some part in directing the

13   enterprise's affairs.  And, again, what member of the Board of

14   Elections has been called to testify if anything even close to

15   that has happened?  There have been none.

16          These are just some representative examples of why

17   there is no credible proof as to the electioneering activity

18   that the government claims Doug Adams did.  Remember Jennings

19   White again.  You remember he claimed that Doug Adams was

20   wearing a Hawaiian shirt at the Burning Springs precinct on the

21   day of the 2002 primary election.  Jennings White said he was

22   running for reelection as clerk, hotly contested race.  That's

23   an understatement.  He said that he and Denver Sizemore were

24   driving together.  We'll talk about Denver Sizemore in just a

25   moment.  They had pistols, they were armed, they were riding the

precinct.  Jennings White claims that he drove by the Burning
Springs precinct, he wasn't clear, but he said he saw Doug Adams
working the poll lines wearing a Hawaiian shirt.  Denver
Sizemore again said that —— you know, he eventually testified
that he was riding with Jennings White.  He said he saw Doug
Adams stuffing money into people's pockets in the polling line.
He said nothing about a Hawaiian shirt.  Jennings White said
nothing about stuffing money into pockets, but both of them
plainly were driving by and witnessed either a Hawaiian shirt or
stuffing money into people's pockets.  You know, you remember
these two.

      Denver Sizemore also admitted under questioning from
Mr. Baldani that he took one-half of a 25,000-dollar payment to
shoot a political opponent of Jennings White.  Okay?  Jennings
White said, no, that didn't happen.  Members of the jury, it's
up to you, it truly is up to you, who to believe.  You're the
judge of the credibility of any witness called by us or the
government.  But I would say to you that one of those gentlemen
can't be telling the truth.  Whether or not you took about
$12,500 to shoot somebody as a down payment is not the kind of
thing that you forget.  One of them is not telling the truth.

      Do you remember in response to what Jennings White and
Denver Sizemore said, the testimony of Roy Allen.  He's a
director of the missions at the Booneville Baptist Church, 66,
67 years old, known Doug Adams all of his life, knows how Doug

1   was raised, how he grew up, knew that he drove a bus and taught

2   elementary school and knew that he worked his way up through the

3   Clay County School System.  Roy Allen was at the Burning Springs

4   precinct as one of the election officers all day.  He got there

5   between 5:00, 5:30 in the morning, stayed until almost 7:00 at

6   night.  Mr. Allen testified he never saw anybody wearing a

7   Hawaiian shirt that day.  He testified that he remembered

8   investigators from the Office of the Attorney General came by,

9   there's a report in one of the exhibits offered by the

10  government from the OAG that indicates there were no election

11  crimes.  Mr. Allen did not see any money changing hands, nobody

12  stuffing any pockets.  He had a brief recollection of what Doug

13  was wearing, it certainly was not a Hawaiian shirt.  Charles

14  Keith, and we'll talk about him in a little more detail in just

15  a moment, 24 years on the School Board, the current chair, the

16  schools were closed that day.  He and Doug Adams were riding

17  together in a car, he doesn't recall Doug Adams wearing a

18  Hawaiian shirt as well.

19          Melanda Adams, Doug Adams' daughter, testified she's

20  never seen her father wear a Hawaiian shirt.  And I would ask

21  you also to recall very briefly with regard to Melanda, the

22  argument offered by the government that somehow she got a job in

23  Mr. Thompson's office as a deputy clerk.  I mean, the

24  implication's that it's some kind of a reward, payback, if you

25  will, perhaps for Doug Adams supporting Mr. Thompson in the 2002

1    race for clerk. Remember what the proof actually shows. She

2    didn't take that job until two years after Mr. Thompson had been

3    elected. In other words, he was one-half of the way through,

4    you know, his first term in office. She testified that she got

5    the job on her own. And I would anticipate perhaps

6    Mr. Thompson's attorneys will address this as well. No

7    indication of any favoritism at all. She left the job. One of

8    the deputy clerks said she was a good worker, she did her job,

9    she's now got her own store in Clay County, she's doing well.

10   She's doing well.

11          What else? Members of the jury, you alone judge of

12   the credibility of Wanda White and Kennon White. They claimed

13   to have gone to Doug Adams' house where they say that he invited

14   Kennon to join a slate. Do you recall Kennon was running for

15   jailer in 2002 against Marcum? Their testimony goes like this:

16   That Doug was supposed to have said, if you run against Jennings

17   White instead, you know, we'll support you, we'll back you.

18   That doesn't make any sense. I mean, Kennon White is related to

19   Jennings White. That's where he got —— you know, the White

20   family connection is where they get the basis for their

21   political support. Essentially, that theory —— that testimony

22   offered by Wanda and Kennon has not been corroborated and it

23   doesn't make any sense.

24          There was a School Board race in 2002. And, you know,

25   this would have been between Dobber Weaver and Charles Keith.

1  You know, the theory goes that somehow that's another indication
2  of Mr. — Charles Keith, again, was the longtime chair of Clay
3  County School System.  Dobber Weaver actually testified that he
4  got into that race at the request of Jennings White.  But no one
5  has testified that there were any votes bought for Charles
6  Keith, who under the theory advanced by the government is the
7  person that Doug Adams would have been supporting.

8           General election in '04, Jeff Deaton testified, and it
9  goes a little like this:  He testified Darnell Hipsher came to
10 him and said, you go see Doug Adams, he wants to talk to you
11 about running for the city council race in 2004, and you got to
12 put money up.  The question is, what was supposed to have been
13 the slate in 2004?  The city council race would have been in the
14 fall election, it's a nonpartisan race.  If this story is true,
15 it's a nonpartisan race.  The only other race that had any
16 significance was the May primary race for state representative.
17 I know this is a lot of stuff, but the May primary race for
18 state representative between Barbara White Colter and Tim Couch.
19 But that was in May.  This would have been in November.  What is
20 the slate that is supposedly being advanced?  And, again, where
21 is Darnell Hipsher?  Where is he?  We know he's another
22 convicted felon.  We know at one time that he was employed by
23 the Clay County School System.  But like Paul Bishop, you know,
24 he hasn't been called to testify.

25          The '06 election, I think this is one that, quite

1    frankly, is kind of a mystery to us to the extent the government

2    is trying to argue that Mr. Adams tried to exert some control

3    over that.  There was some talk about a bulldozer.  Do you

4    remember a bulldozer being sent by Daugh White out to the Adams

5    farm and they're going to clear some deer trails?  What the

6    government didn't say yesterday in its closing remarks was that

7    that was a privately owned dozer.  That was established at

8    trial.  It was a privately owned dozer that Daugh White sent

9    over in and around the 2006 election period to Doug Adams' farm.

10   You know, it was clearly an attempt to curry favor with Doug

11   Adams.  Doug used it for a while to clear some trails.  The

12   testimony from the witness that was called by the government, it

13   was in fairly rough condition, Doug had to make some repairs to

14   the dozer before it was returned to Daugh White.

15           Doug Adams is not guilty of Count 1, the government

16   has failed to meet its burden of proof.  And since they couldn't

17   meet their burden of proof, they've tried to paint a picture of

18   Clay County as a place that is so corrupt that anyone who lives

19   there must be corrupt as well.

20           However, members of the jury, we would say this:  If

21   the government had the proof that Doug Adams actually tried to

22   control the affairs of the enterprise, the Board of Elections,

23   we would not have spent almost two weeks of this trial hearing

24   about how bad a place was, Clay County was.

25           Members of the jury, if the government had the proof

1    that he had exercised this kind of control that they're saying

2    over the Board of Elections, you wouldn't see an old TV show

3    about drugs in Clay County, you wouldn't see a lot of old

4    newspaper articles about a group of people traveling to

5    Washington to lobby one of their congressmen for some support in

6    Clay County.  You wouldn't see the government try, quite

7    frankly, to sully the reputation of Clay Bishop, a prosecutor

8    who has been twice recognized as an outstanding county attorney

9    in the Commonwealth under separate administrations.  You

10   wouldn't see that kind of effort to sully his reputation.  And,

11   quite frankly, members of the jury, you wouldn't — you

12   wouldn't — you wouldn't trot out at the very beginning of the

13   trial three old drug dealers, none of which, we would submit,

14   have any credibility at all.  If there were proof — they

15   can't — it's almost as if short of there being proof that Doug

16   Adams tried to control the Board of Elections, they're just

17   throwing it up there to see what sticks.

18           I simply ask you to keep your eye on the ball.  He's

19   not charged — it's never even been alleged that he had anything

20   to do with drugs.  He's not on trial for that, he's only on

21   trial with regards to the RICO conspiracy and the money

22   laundering conspiracy.

23           Let's talk just very briefly about the government's

24   theory on money laundering.  But for all of this election

25   activity that the government claims is illegal, no one would

1  have kept their positions or their contracts.  But the evidence

2  actually showed, Agent Sagrecy admitted that he did not

3  interview any Board of Education member to find out why Doug

4  Adams was hired or retained.  He also testified that he was not

5  aware of any Board of Education member who was ever pressured

6  into hiring or retaining Doug Adams as superintendent of

7  schools.  Despite not having spoken to anyone regarding Doug

8  Adams hiring and retention, the government is claiming he only

9  got and kept his job because of politics.  The Board of

10 Education's decision to hire Doug Adams had nothing to do with

11 politics.

12         Again, the testimony of Charles Keith, 24 years on the

13 Board, he's been there from the time of Willy Sizemore, through

14 Charles White, and now Doug Adams and now Reecia Samples, as

15 well as Leewood Cornett that served on the board for 20 years.

16 They all said Doug Adams was the best Superintendent the school

17 system had had in their memory.  And what were some of the

18 examples?  Alternative schools that were set up.  Reecia Samples

19 also testified about the CATS scores, Commonwealth

20 Accountability of Testing.  In particular, with regard to three

21 elementary schools, they were in the top five percent of the

22 state.  Now, to be sure, the superintendent doesn't take the

23 entire credit for the success of this school system, but, I

24 mean, that rightfully belongs with the teachers and the people

25 that work in the school system.  But, again, this is an

1  economically — it's below the poverty level.  This is an

2  achievement perhaps that you would expect in a county that is

3  not as economically impoverished as Clay County, we all admit

4  has been — this is the testimony that served as the basis for

5  why he was initially hired, Mr. Cornett said they had problems

6  with Mr. White as superintendent.  This is the testimony — the

7  only testimony that's been offered in terms of why his contract

8  wasn't renewed.

9         The B&B and B & J Transfer contracts, to the extent

10  that you think they have anything to do with Mr. Adams, they do

11  not.  In fact, the Morris children testified that they couldn't

12  recognize Mr. Adams, he's never been over at their home.  He's

13  not guilty of Count 2.  He did a good job, he didn't keep it

14  because of politics, and he had absolutely nothing to do with

15  those contracts.

16         We cannot say it enough.  A person can only be

17  convicted on what he is charged with; controlling the Board of

18  Elections, money laundering because of the political activity.

19  Doug Adams is not responsible for the deeds of others, such as

20  Jennings White, Daugh White, and Kenny Day.  And he's not on

21  trial, members of the jury, for anything that happened back in

22  the 1980s.  Again, if they had the proof that these two charges

23  actually were committed, we say to you you would not have heard

24  anything about old allegations of Kenny Day that supposedly

25  happened back in the 1980s.

1          Members of the jury, that's a mighty slippery slope

2     when you try to rely on the allegations and testimony of

3     somebody like Kenny Day in order to sustain a conviction, in

4     particular when those allegations are not the ones on which a

5     defendant stands charged.

6          We're not asking you to find him not guilty just

7     because he did a good job, he did.  Or because he didn't like

8     drug dealers for personal reasons.  He did not.  The reason you

9     must find Doug Adams not guilty is because the government has

10    failed to prove the allegations in this indictment.

11         As Mr. Pinales mentioned in his closing remarks, as we

12    anticipate Judge Reeves will instruct at the conclusion of the

13    trial, again, you-all are the sole judge of credibility of

14    anybody that's testified in this trial.  You-all alone, no one

15    else.  We would simply say to you that when you're evaluating

16    the credibility of the proof, the testimony offered by the

17    government, perhaps in contrast with Roy Allen or Leewood

18    Cornett or Charles Keith or Reecia Samples, look at who was in

19    control, largely in control of Clay County during the 2000 —

20    beginning with the 2002 timeframe.  Look what they've done.

21    Jennings White, Kennon White, kickback scheme, later served in a

22    position created by his father, City Manager, paid about 48,000

23    a year.  Todd Roberts was the number two person on the police

24    department, later convicted of fraud and drug charges.  Kenny

25    Day, an associate, old Board of Election member from back in the

1   1980s, an associate and crony, if you will, of Jennings White.

2   Denver Sizemore, another crony and associate of Jennings White.

3   Wanda White, of course, the spouse, the wife, of Kennon White,

4   herself admitted election fraud.

5        The county is better they're gone.  That's to their

6   credit.  The county is better that they're gone.  That is to

7   their credit.  But that cannot serve as a basis or as a

8   justification for a failure of proof to show that Doug Adams

9   controlled the Board of Elections in a manner that has been

10  described in the indictment or that he got and kept his job for

11  reasons having to do with politics.

12       Vernon Hacker ——

13       Shawn, can you go back?  That's fine, thank you.

14       Let me say one thing.  The government made quite a bit

15  yesterday about Vernon Hacker losing his bus route.  The

16  argument they're making is that he didn't get on board with

17  Mr. Adams, a team politically, and he lost his bus, he lost his

18  bus route.  And that's somehow in retaliation politically.  Now,

19  Mr. Hacker is the only witness among all of the potential bus

20  drivers that ever said anything quite like that.  That —— we

21  would say that argument might have more strength, if you will,

22  if five or six or seven or eight or however many more bus

23  drivers actually came forward and said that, you know, there was

24  retaliation occurred.  Mr. Hacker only lost the bus and the

25  route for a short period of time.  Reecia Samples, Mr. Cornett,

 1  and Mr. Keith all testified that bus routes change frequently in

 2  the school system.  It's got to do with roads, the number of

 3  kids being transported, the size of the bus.  The pay did not

 4  essentially change.  He got the same bus and the same route back

 5  the next school year, and he kept it, of course, until he was

 6  convicted on drug charges.  So we say that only in response to

 7  Mr. Hacker.

 8          THE COURT:  Your time is about up.  You may want to

 9  summarize.

10          MR. WESTBERRY:  One minute would be enough.  Thank

11  you, Judge.

12          THE COURT:  Yes, sir.

13          MR. WESTBERRY:  We have worked over the last six or

14  seven weeks to prepare this case for your consideration.  I'm at

15  the end.  Our biggest fear is that —— the lawyers, that we've

16  worked through the night, worked all weekend, worked last night,

17  didn't get much sleep, that's not our biggest fear.  Our biggest

18  fear is that we've probably forgotten to say something that you

19  would think would be important.  Mr. Pinales touched on this

20  just a moment ago.  If that's the case, when you go back to

21  deliberate, I would simply ask that you not hold it against Doug

22  Adams.  That's my shortcoming on his behalf.  But that if you're

23  back deliberating amongst yourselves and you think of something

24  I should have said or should have argued, would you answer it

25  for me?  Sort of as if I were kind of the 13th juror.

1          Finally, I would say this:  The government never loses

2    when justice is done.  That may seem like a funny thing to say,

3    the government never loses when justice is done, but those very

4    words are described in a courtyard at the Department of Justice

5    in Washington, D.C.  I know it, I've sat in that chair.  And

6    what that means is the government never loses when justice is

7    done to one of its citizens.  Doug Adams is not on trial for

8    anything other than what he's been charged in the indictment.

9    He's not guilty of Counts 1 and 2.  We ask you to find him not

10   guilty of both of those counts, and we thank you very much.

11         THE COURT:  All right.  Thank you, Mr. Westberry.

12         And, ladies and gentlemen, at this time, we'll take a

13   morning recess of approximately ten minutes.  Please keep in

14   mind the admonitions that you have been given throughout the

15   course of the trial.  The jury and the court be excused at this

16   time.

17      (Whereupon, a short recess was had, after which the

18   proceedings continue uninterrupted to Volume 30–B.)

19               (Proceedings concluded at 10:30)

20               C E R T I F I C A T E

21      I, Cynthia A. Oakes, certify that the foregoing is a

22   correct transcript from the record of proceedings in the

23   above–entitled matter.

24

25   3/23/2010                    s/CYNTHIA A. OAKES
     DATE                         CYNTHIA A. OAKES, RPR, RMR, CRR

1                           I N D E X

2                                                        PAGE

3   Closing argument on behalf of Defendant Maricle
         By Mr Pinales:                                    5
4
    Closing argument on behalf of Defendant Adams
5        By Mr. Westberry:                                22

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25