1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                            -  -  -

3
   UNITED STATES OF AMERICA,    :  Docket No. CR 09-16-S
4                               :
                    Plaintiff, :  **Frankfort, Kentucky**
5                               :  Wednesday, February 24, 2010
        versus                  :  1:00 p.m.
6                               :
   RUSSELL CLETUS MARICLE,      :
7  DOUGLAS C. ADAMS             :
   CHARLES WAYNE JONES          :
8  WILLIAM R. STIVERS           :
   FREDDY W. THOMPSON           :      **Trial Day 12B**
9  WILLIAM B. MORRIS            :
   DEBRA L. MORRIS              :
10 STANLEY BOWLING,             :
                                :
11                  Defendants.:

12

13                          -  -  -
                     TRANSCRIPT OF TRIAL
14                 BEFORE DANNY C. REEVES
          UNITED STATES DISTRICT COURT JUDGE and a jury
15                          -  -  -

16 APPEARANCES:

17 For the United States:      STEPHEN C. SMITH
                               JASON D. PARMAN, ESQ.
18                             Assistant U.S. Attorney
                               601 Meyers Baker Road
19                             Suite 200
                               London, KY 40741
20
   For the Defendant           MARTIN S. PINALES, ESQ.
21 Russell Cletus Maricle:     Strauss & Troy
                               150 E. Fourth Street
22                             Fourth Floor
                               Cincinnati,OH  45202
23
                               DAVID S. HOSKINS, ESQ.
24                             107 E. First Street
                               Corbin, KY  40701
25

2

```
 1    For the Defendant              R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:              KRISTIN N. LOGAN, ESQ.
 2                                   Landrum & Shouse, LLP
                                     220 West Main Street
 3                                   Suite 1900
                                     Louisville, KY 40202
 4
                                     BENNETT E. BAYER, ESQ.
 5                                   Landrum & Shouse, LLP
                                     106 West Vine Street
 6                                   Suite 800
                                     Lexington, KY  40507
 7

 8    For the Defendant              T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:           Morgan & Pottinger, P.S.C.
 9                                   133 West Short Street
                                     Lexington, KY  40507
10

11    For the Defendant              ROBERT L. ABELL, ESQ.
      William R. Stivers:            120 North Upper Street
12                                   Lexington, KY  40507

13
      For the Defendant              RUSSELL JAMES BALDANI, ESQ.
14    Freddy W. Thompson:            R. TUCKER RICHARDSON, ESQ.
                                     Baldani, Rowland & Richardson
15                                   300 West Short Street
                                     Lexington, KY  40507
16

17    For the Defendant              JERRY W. GILBERT, ESQ.
      William B. Morris:             Coy, Gilbert & Gilbert
18                                   212 North Second Street
                                     Richmond, KY 40475
19

20    For the Defendant              ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:               Gess, Mattingly & Atchison, PSC
21                                   201 West Short Street
                                     Lexington,KY40507
22

23    For the Defendant              DANIEL A. SIMONS, ESQ.
      Stanley Bowling:               Thompson, Simons, Dunlop & Fore
24                                   116 West Main Street
                                     Suite 2A
25                                   Richmond, KY 40476
```

3

1    Court Reporter:            LISA REED WIESMAN, RDR-CRR
                                Official Court Reporter
2                               35 W. Fifth Street
                                P.O. Box 1073
3                               Covington, KY  41012
                                (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
    transcript produced with computer.
6

*W. WHITE - Cross (Mr. Hoskins)*                                    4

1          (The jury entered the courtroom at 1:00 p.m.)

2          THE COURT:  Thank you.  The record will reflect that

3    all members of the jury are present.  All parties and counsel

4    are accounted for.

5          Miss White, you're still under oath, ma'am.

6          Mr. Hoskins, I believe you were examining the witness

7    before we took our lunch break.  You may continue.

8                          CROSS-EXAMINATION

9    BY MR. HOSKINS:

10   Q.  Miss White, before we stopped for lunch, I was asking you

11   about Corky and when he got in trouble, and you told us that

12   you were sort of the one in the family that people came to

13   when they were in trouble.

14   A.  Yes.

15   Q.  And when Corky got in trouble, he contacted you, didn't

16   he?

17   A.  Actually, I contacted him.

18   Q.  Okay.  Had he already run off to Texas by then?

19   A.  I'm sorry, what?

20   Q.  Had Corky already run to Texas when you contacted him?

21   A.  He was in Texas.  I don't know about run off to Texas,

22   but he was in Texas.

23   Q.  Well, back to talking about what happened, that was April

24   of 2005?

25   A.  Yes.

1  Q.   In the early part of the year -- or the early part of

2  April, rather, some other guys -- now, nobody ever said

3  Corky's the one who cut this girl's throat.  It was some other

4  people who did that, right?

5  A.   To my understanding, yes.

6  Q.   Okay.  And it's your understanding that what Corky pled

7  guilty to was having been with that girl through the night and

8  delivering her to these three guys, knowing that they meant to

9  do her harm.

10  A.   What's your question?

11  Q.   That's your understanding?

12  A.   My understanding is that he pleaded guilty to assault.

13  Q.   Okay.  All right.  We'll leave it there.  You contacted

14  Corky, and he was in Texas?

15  A.   One of the times I contacted him, yes.

16  Q.   Okay.  Well, Corky's name had come up very quickly when

17  this girl was found, left to die?

18  A.   Her parents brought his name up, that she had been with

19  him the night before.

20  Q.   Okay.

21  A.   They had in the past been boyfriend and girlfriend.

22  Q.   Okay.  And Corky had been with her the night before?

23  A.   The night before, yes.

24  Q.   Okay.  And when Corky found out that his name had come

25  up, he went to Texas?

*W. WHITE - Cross (Mr. Hoskins)*                                        6

1   A.   No.  He went to -- directly to the police department.

2   Q.   Okay.  What did he go to Texas for?

3   A.   That's where our parents lived.

4   Q.   That's not where he lived, was it?

5   A.   No, it wasn't where he lived, no.

6   Q.   He lived in Clay County?

7   A.   Um-hmm.

8   Q.   Corky came back to Clay County from Texas?

9   A.   He did.

10  Q.   And before the end of the month of April, he had made a

11  deal?

12  A.   That's the time frame, yes.

13  Q.   Okay.  And the deal that he made with the Commonwealth's

14  attorney, Gary Gregory, was that he would plead guilty to

15  assault, as you said?

16  A.   Yes.

17  Q.   And that he would testify against the three guys who

18  actually did cut this girl's throat?

19  A.   Yes.

20  Q.   Okay.  The girl's name was Tish Saylor?

21  A.   Yes.

22  Q.   Got her throat cut?

23  A.   Yes.

24  Q.   And she was the granddaughter of Charles Marcum, who was

25  the Clay County jailer?

*W. WHITE - Cross (Mr. Hoskins)*                                    7

1    A.   Yes.

2    Q.   For that reason, when Corky was arrested and put in jail,

3    they didn't make him go to the Clay County Jail, did they?

4    A.   For what reason?

5    Q.   Because Charles Marcum, whose granddaughter was the

6    victim here, was the jailer.

7    A.   We requested that, yes.

8    Q.   Right.  I mean, for Corky's safety?

9    A.   Yes, we requested that, yes.

10   Q.   And the reason was, again, that Charles Marcum was the

11   jailer, and he ought not have the keep of somebody accused of

12   hurting somebody in his family, right?

13   A.   Well, I don't know if I'm gonna agree with that

14   statement, but we requested he be transferred somewhere else

15   or not held there.

16   Q.   Okay.  The reason you requested that he be transferred

17   somewhere else was so that Charles Marcum wouldn't --

18   A.   Sir, we didn't know the whole circumstances of everything

19   at that time.

20   Q.   Was that part of the reason you didn't want Charles

21   Marcum --

22        MR. SMITH:  Your Honor, I believe it's been answered

23   and answered.

24        THE COURT:  Sustained.

25   Q.   Corky came back from Texas, and he made a deal with Gary

*W. WHITE - Cross (Mr. Hoskins)*                                    8

1    Gregory to testify against these other three people, right?

2    A.   Yeah.

3    Q.   And the deal that he made with Gary Gregory was to get

4    out on bond and to get a probated sentence, right?

5    A.   If that's what the deal says.

6    Q.   Is that your understanding?

7    A.   That's my understanding.

8    Q.   Okay.  That's what I'm asking, your understanding.  When

9    Corky came back, he was supposed to get --

10   A.   Yes.

11   Q.   -- out on bond right away.  And then in the end, after he

12   testified, he was supposed to get a probated sentence.  That's

13   your understanding?

14   A.   I don't -- I don't know anything about him getting out of

15   jail right away.  My understanding was he was supposed to get

16   a five-year probation sentence.

17   Q.   Okay.  And not have to spend a lot of time in jail?

18   A.   Not have to spend any time in jail.

19   Q.   Not have to spend any time in jail at all; is that right?

20   A.   Yes.

21   Q.   Okay.  But Judge Maricle wouldn't let him out of jail

22   that day, would he?

23   A.   I don't know, sir.

24   Q.   Did he get out of jail?

25   A.   I can't recall.  I'll have to refer back to the police

1   records.  I don't know.

2   Q.   Well, maybe we can -- you can refer back to the

3   recordings we heard yesterday from 2007.  You were asking for

4   Corky to get out of jail.  That's what you were asking on

5   those recordings, wasn't it?

6   A.   After the trial was over.  But you're asking me -- you're

7   not asking me about that.  You're asking me right now about

8   when he went in and made his deal with Gary Gregory.  That's

9   what you're asking me right now.  You're going from A to B way

10  up here.  So, I mean, I'm trying to follow you, but it's --

11  you're not asking me that.

12  Q.   Okay.  You know that he went to jail when he came back

13  from Texas?

14  A.   Yes.

15  Q.   And that was April of 2005.  We've established that,

16  right?

17  A.   Yes.

18  Q.   Okay.  The tape recording that we heard yesterday was

19  from May of 2007, wasn't it?

20  A.   Yes.

21  Q.   And on that tape recording, you're asking about Corky

22  getting out of jail?

23  A.   Yes.

24  Q.   All right.  From April of 2005 to May of 2007, did Corky

25  ever get out of jail?

*W. WHITE - Cross (Mr. Hoskins)*                                      10

1    A.   He was incarcerated, yes.

2    Q.   Well, that means he never did get out of jail that whole

3    time, did he?

4    A.   He didn't, no.

5    Q.   Okay.

6    A.   But it was also my understanding he was going to be in

7    there.  To that whole point, we never thought that he'd be out

8    of jail until he was sentenced.

9    Q.   And Corky did testify?

10   A.   He did.

11   Q.   And those three guys were found guilty?

12   A.   They were.

13   Q.   And then Corky was sentenced?

14   A.   About a year later, yes.

15   Q.   After the trial?

16   A.   After the trial and after the election, yes.

17   Q.   After he'd been sentenced -- after the other guys had

18   been sentenced?

19   A.   Yes.

20   Q.   Okay.  He was sentenced by Judge Maricle?

21   A.   Yes.

22   Q.   And this was just a couple of weeks, maybe, after the

23   May, 2006 primary?

24   A.   I think it was.

25   Q.   Okay.  And you were expecting that Corky would get a

*W. WHITE - Cross (Mr. Hoskins)*                                          11

1   probated sentence?

2   A.   I was expecting that, yes, but I knew it was up in the

3   air.

4   Q.   But he did not get a probated sentence, did he?

5   A.   He got a very light sentence.

6   Q.   He got a five-year sentence, didn't he?

7   A.   He got a five-year sentence, but he was -- he got out in

8   around three years.  It was a very light sentence compared to

9   what the others got.

10  Q.   Did he get a probated sentence?

11  A.   No, he didn't, but he didn't also go by the script they

12  told him to go by either.

13  Q.   Were you in court the day Corky pled guilty?

14  A.   I can't recall if I was or not.

15  Q.   Let's back up a little bit to 2006.  Doug White was

16  running for mayor, for reelection, against Carmen Lewis.  Do

17  you recall that?

18  A.   Yes.

19  Q.   Now, Doug White had been mayor of Manchester for as long

20  as you could remember at that point, hadn't he?

21  A.   He had.

22  Q.   He had never lost an election that you know of?

23  A.   That I know of.

24  Q.   In fact, no Whites, nobody in the White family had lost

25  an election that you know of till 2002, had they?

*W. WHITE - Cross (Mr. Hoskins)*                                    12

1   A.  I have no idea of that.

2   Q.  I'm asking you, do you know of any that they ever lost?

3   A.  Jennings White lost an election.

4   Q.  In 2002?

5   A.  Yes.

6   Q.  Kennon White lost an election in 2002?

7   A.  Yes.

8   Q.  Barbara Jo Colter White lost an election in 2002?

9   A.  (Nodding affirmatively).

10  Q.  Other than those, do you know of any time that any of the

11  Whites ever lost an election?

12  A.  I don't, I don't remember.  I wasn't in politics before

13  that, so I don't know.

14  Q.  So you don't know of any?

15  A.  I really don't know.

16  Q.  As that mayor's race was -- the election day in the fall

17  of 2006 was drawing closer, to your understanding, was it a

18  hot race?

19  A.  Yes, it was a hot race, to my understanding.

20  Q.  It looked like, to you, that Carmen Lewis was going to

21  give Doug White a run for his money?

22  A.  Yes.

23  Q.  Okay.  And you talked, of course, you were active in

24  Doug's campaign?

25  A.  I was.

*W. WHITE - Cross (Mr. Hoskins)*                                    13

1   Q.   And you knew what he thought about the race, Doug White?

2   A.   What are you asking me?

3   Q.   Did you know that he thought it was going to be a

4   contested race too?

5   A.   Did I know that Doug thought it was going to be a

6   contested -- well, he had competition, so obviously it was a

7   contested race.

8   Q.   And it was -- there were things that were happening that

9   were making it look bad for Doug White, weren't there?

10  A.   As in what?  The FBI had come in late October, if that's

11  what you're referring to.

12  Q.   The FBI came in to --

13  A.   City Hall.

14  Q.   City Hall in Manchester in late October of 2006?

15  A.   I believe that's right, yes.

16  Q.   Just a couple of weeks, roughly, before that election?

17  A.   Yes.

18  Q.   Okay.  And they carried out a bunch of documents, didn't

19  they?

20  A.   I believe they did, yes.

21  Q.   Were you there?  You were working for the City then,

22  weren't you?

23  A.   I was in parts of the building that day.

24  Q.   So you knew as that was happening, you knew what was

25  going on?

*W. WHITE - Cross (Mr. Hoskins)* 14

1  A.  I knew that they were carrying documents out of City Hall

2  that day.

3  Q.  And you knew it was the FBI, because they told

4  everybody --

5  A.  They identified themselves as FBI.

6  Q.  And so you knew that?

7  A.  Yes.

8  Q.  City Hall is in the middle of Manchester?

9  A.  Um-hmm, it is.

10  Q.  This happened in the middle of the day?

11  A.  I don't recall what time of day it was.  It was during

12  working hours.

13  Q.  Okay.  Fair enough.  It was during working hours.  Lots

14  of people saw it happening?

15  A.  The people that worked there saw it happening.

16  Q.  People that passed by see it happening?

17  A.  Sir, I couldn't tell you who come by.

18  Q.  I didn't ask you that.  Anybody passing by would see the

19  FBI --

20  A.  If anybody was passing by -- well, no, I mean, they don't

21  have identifiable vehicles.

22  Q.  Was it in the newspapers?

23  A.  I'm sure it was.

24  Q.  Okay.  So it was public knowledge that the FBI had raided

25  City Hall in Manchester?

*W. WHITE - Cross (Mr. Hoskins)*                                          15

1    A.   Yes.

2    Q.   Okay.  That was not a good thing for Doug White's

3    reelection, was it?

4    A.   No, it wasn't.

5    Q.   There was also a federal grand jury investigation of Doug

6    White going on at that time?

7    A.   You're telling me that.  Are you asking me that?

8    Q.   Yes.

9    A.   I'm assuming there is.  I don't know.  I don't know when

10   that was.

11   Q.   Well, you have talked about Doug White's -- we heard on

12   the recording, I guess, that Doug White himself had gone

13   before the federal grand jury, and you were talking about

14   that?

15   A.   We were.  I don't know what time period that was.

16   Q.   Okay.  Well, it was -- the tapes were made in 2007 that

17   we heard, right?

18   A.   Yeah, it was prior to that.

19   Q.   Okay.  And it was while Doug White was mayor?

20   A.   It was, yes.

21   Q.   Okay.  And Doug White was indicted in early 2007, not

22   long after --

23   A.   I think --

24   Q.   -- he lost the election?

25   A.   I think that's probably right.

*W. WHITE - Cross (Mr. Hoskins)*                                    16

1    Q.   Okay.  You had talked with Doug White about his

2    appearance before the grand jury, right?

3    A.   I can't recall that I had.

4    Q.   Well, you recall talking about Doug going in and putting

5    on some kind of show, and the grand jury applauded for him and

6    he thought that was a good thing?

7    A.   I had not discussed that with Doug White.

8    Q.   Okay.  Who did you hear that from?

9    A.   I discussed that with my husband.  My husband shared that

10   with me.  I wasn't present during Doug's grand jury testimony.

11   Also, Mr. Maricle had heard the same thing so we were

12   discussing that.

13   Q.   Okay.  So other people knew that Doug White had been

14   hauled in front of a federal grand jury?

15   A.   They did, yes.

16   Q.   That didn't help Doug White's reelection campaign, did

17   it?

18   A.   I'm assuming it probably didn't.

19   Q.   Okay.  Now, you and Kennon had been in the mobile home

20   business?

21   A.   Yes.

22   Q.   And that business had failed?

23   A.   We closed the business, yes.

24   Q.   Because it wasn't making enough money?

25   A.   Because it wasn't making enough money.

*W. WHITE - Cross (Mr. Hoskins)*                                    17

1   Q.   Both of you came back to Manchester, where Doug White

2   gave you both jobs at the City?

3   A.   Vernon Hacker gave me a job at the City.

4   Q.   Okay.  Doug White didn't have anything to do with it?

5   A.   No.

6   Q.   Okay.  Doug White had something to do with Kennon getting

7   his job, right?

8   A.   Yes, he did.  He did.

9   Q.   Created a brand new job for Kennon?

10  A.   To my knowledge, he did.

11  Q.   When it looked bad for Doug's reelection, you and Kennon

12  realized it looked bad for you all continuing to have your

13  jobs, didn't you?

14  A.   Well, sure.  If Doug wasn't there, we wouldn't have a

15  job.

16  Q.   And, in fact, that played out when Carmen Webb Lewis beat

17  Doug White.  It wasn't long before Kennon got canned and then

18  you did too?

19  A.   If that's the word you choose to use, canned, yes.

20  Q.   Fired, laid off.

21  A.   I was laid off, yes.

22  Q.   And you knew you were laid off because you were Doug

23  White's daughter-in-law, right?

24  A.   She told me I was being laid off.

25  Q.   In your heart, you knew it was because you were Doug

*W. WHITE - Cross (Mr. Hoskins)*                                18

1   White's daughter-in-law, didn't you?

2   A.   In my heart, I knew that --

3           MR. SMITH:  Your Honor, I'm going to object to

4   argument with the witness.  I believe she's answered his

5   question.

6           THE COURT:  You can answer what you believed at the

7   time, ma'am.

8   Q.   You believed it was because you were Doug White's

9   daughter-in-law?

10  A.   I believed that.

11  Q.   Okay.  Thank you.  Kennon's dad had helped him get set up

12  in that mobile home business, hadn't he?

13  A.   Set up?

14  Q.   Helped him get it started?

15  A.   He helped him fund it, is that what you're saying?

16  Financially, yes.

17  Q.   Okay.  So before Kennon worked at the mobile home lot, he

18  had worked for his dad's and his uncle's car dealership?

19  A.   He did, yes.

20  Q.   So at the end of Doug's -- Doug White's term as mayor,

21  Kennon had never had a job that his daddy hadn't set him up

22  in, had he?

23  A.   What's your question?  He had worked for his father since

24  he -- he and I got married, if that's the question you're

25  asking me.

*W. WHITE - Cross (Mr. Hoskins)*                                    19

1   Q.   He had never worked anywhere else, had he?

2   A.   Not up until that point.

3   Q.   He didn't have a college education?

4   A.   No.

5   Q.   So in that election where we heard -- we've been talking

6   about, Doug White finally lost?

7   A.   Yes.

8   Q.   Shortly after that, Doug White was indicted by the

9   federal government?

10  A.   I don't know when Doug was indicted.

11  Q.   Well, by the time you started cooperating, he had been

12  indicted, hadn't he?

13  A.   I don't know when Doug was indicted.

14  Q.   Can you say when it was in relation to when you started

15  cooperating?

16  A.   I have no idea when Doug was actually indicted.

17  Q.   But in early 2007, you had been laid off, Kennon had lost

18  his job at the City?

19  A.   Yes.

20  Q.   Both of you were unemployed?

21  A.   Yes.

22  Q.   Doug White had lost his office as mayor?

23  A.   Yes.

24  Q.   Mobile home lot, gone out of business?

25  A.   Mobile home lot was years before, yes.

*W. WHITE - Cross (Mr. Hoskins)*                                    20

1    Q.   I mean, it was gone at that point?

2    A.   It was gone.

3    Q.   And fairly speaking, it was a pretty hard time for you

4    and your family, wasn't it?

5    A.   In what manner?  Financially?

6    Q.   Financially, embarrassment.  Was there some embarrassment

7    that went along with that election and indictment?

8    A.   I had no reason to be embarrassed.

9    Q.   You didn't feel embarrassed by that.  Did Kennon?

10   A.   I had nothing to be embarrassed about what Doug did.

11   Q.   Did Kennon seem like he was embarrassed?

12   A.   You'd have to ask him that.

13   Q.   I'm asking you if he seemed to be embarrassed by it.

14   A.   I don't know how to answer that question.  I can tell you

15   that I feel like he had nothing to be embarrassed about.

16   Q.   Okay.  You would agree that times were hard for you and

17   Kennon --

18   A.   I've seen harder times, sir.

19   Q.   And they were hard at that time, weren't they?

20   A.   They were hard.

21   Q.   You all had gone from living in a really nice house to an

22   old house that had been sitting empty for 25 years.  Is there

23   a change in life style there?

24   A.   Not really, no.

25   Q.   Okay.

*W. WHITE - Cross (Mr. Hoskins)*                                    21

1  A.  It was his grandmother's home.  We were quite content in

2  his grandmother's home.

3  Q.  It wasn't worth near the money of the house that you had

4  moved out of?

5  A.  No, but I couldn't afford the home I moved out of either.

6  Q.  That was the house that you lived in for about five

7  years, the one that you --

8  A.  And we sold that home, yes.

9  Q.  Right.  But you could no longer afford that nice house?

10  A.  I could no longer afford that nice home, yes.

11  Q.  Now, through all that, you were still friends with Cletus

12  Maricle and Judy Maricle?

13  A.  Yes.

14  Q.  You were still going to their home two or three times a

15  week?

16  A.  Yes.

17  Q.  And still having them come to your home?

18  A.  Yes.

19  Q.  Cletus and Judy didn't turn their back on you or Kennon

20  when Doug lost the election, did they?

21  A.  I had moved to London.  You're confusing me on your time

22  frames.  You're still assuming that I lived in Manchester at

23  this time.  I moved to London shortly after losing my position

24  at the City.

25  Q.  Well --

*W. WHITE - Cross (Mr. Hoskins)*                                        22

1    A.   So --

2    Q.   When you lost -- when Doug White lost his election, that

3    was November of 2006?

4    A.   I moved in March, a few months later.

5    Q.   Let's focus, then, just on November of 2006.

6    A.   Okay.  You give me a time frame, okay.

7    Q.   From the election to when you moved away from Manchester.

8    A.   Okay.

9    Q.   You were still, during that time period, seeing Cletus

10   and Judy on a regular basis?

11   A.   Not as regular as we had before, but yes.  We had saw

12   them.

13   Q.   Not as regular, because you were in the process of

14   relocating?

15   A.   Exactly, yes.

16   Q.   Okay.  It wasn't because Cletus and Judy turned their

17   backs on you in any way, was it?

18   A.   I don't know what you're referring to.

19   Q.   Well, you were still welcome at their home whenever you

20   dropped in, weren't you?

21   A.   Why wouldn't I have been?

22   Q.   You weren't -- I mean, you were still welcome, weren't

23   you?

24   A.   To my knowledge, I was, yes.

25   Q.   I mean, we heard on one of those tapes yesterday you were

*W. WHITE - Cross (Mr. Hoskins)*                                    23

1   at their house until 10:30 at night.

2   A.   Yes.  I was directed to be there at that time, yes.

3   Q.   Well, you were directed by the agents to be there at that

4   time?

5   A.   Yes.

6   Q.   Okay.  If Cletus and Judy had not answered the door, you

7   couldn't have forced your way in.  I mean, you were welcome

8   there until 10:30, right?

9   A.   Yes.

10  Q.   Okay.  We heard on that -- I mean, Judy must have been

11  acted like she was tired, because you asked her, "do you need

12  to go to bed," right?

13  A.   I did, yes.

14  Q.   So it was getting kind of late in the evening.  Judy left

15  and started getting ready for bed, and you all said, "sorry to

16  keep you up so late," and Cletus said, "don't worry.  That's

17  what friends are for"?

18  A.   That's what he said, yes.

19  Q.   So through all those troubles that you went through,

20  losing your job, losing the election, Doug being indicted,

21  Cletus Maricle and Judy Maricle never closed their door to the

22  Whites, did they?

23  A.   Sir, people lose their jobs every day.  I didn't consider

24  it too big of a trouble.

25  Q.   Okay.  You were always -- my question is through all

*W. WHITE - Cross (Mr. Hoskins)*                                    24

1   that, their door was always open for you and Kennon, wasn't

2   it?

3   A.   To my knowledge, it was, yes.

4   Q.   You were never treated rudely by them?

5   A.   And neither were they by me.

6   Q.   Because you all were friends?  You knew each other well?

7   A.   Well, you know, they say don't ever do a wrong thing to

8   make a friend or keep a friend.  So --

9   Q.   Let me talk, ask you a few questions now about the scheme

10  that you have described --

11  A.   Okay.

12  Q.   -- to buy votes and steal votes.  You have said there

13  were a lot of meetings?

14  A.   Yes.

15  Q.   And at these meetings, they would go over voter lists?

16  A.   Yes.

17  Q.   You had a couple -- what you're saying was being talked

18  about at these meetings was whose vote could be bought, whose

19  vote could we buy, right?

20  A.   Mostly, yes.

21  Q.   Because it was important for you to know, have an idea

22  who would be coming in that was bought --

23  A.   Yes.

24  Q.   -- right?  So through all those meetings, you became

25  familiar with at least the names and something about these

*W. WHITE - Cross (Mr. Hoskins)*                                    25

1   people that would be coming in as bought voters, right?

2   A.   Majority of them, yes.

3   Q.   Some of the ones that you might not know by name, you

4   would know a little bit of description of who they might be

5   with, what they would look like?

6   A.   Within the city limits, I would probably be familiar with

7   them.

8   Q.   Okay.  And that's one of the things that was talked

9   about, I guess, at these meetings that you had, right?

10  A.   It was.

11  Q.   Okay.  You said that about 150 votes were bought in May,

12  2006 at that precinct?

13  A.   Around that or more, yes.

14  Q.   Who were those 150 people?

15  A.   Well, you know, give me a list of the voter sheets and

16  I'll go -- don't care a bit to go over them with you.

17  Q.   Do you remember any of them?

18  A.   I don't remember 150 of them.

19  Q.   Do you remember any of them?

20  A.   I remember.

21  Q.   Tell us who you remember.

22  A.   Bill Sester, Antwan Henson, Deshae Henson, Ralph Bowling,

23  Amy Abner.  That's all I can recall right now.

24  Q.   You told us that you stole about a hundred votes, you and

25  Dobber together.

*W. WHITE - Cross (Mr. Hoskins)*                                    26

1    A.   Yes.

2    Q.   Whose votes did you steal?

3    A.   I can't remember.

4    Q.   Do you remember a single one?

5    A.   No.

6    Q.   Not a single person?

7    A.   No.

8    Q.   You talked about voter assistance forms?

9    A.   Yes.

10   Q.   You filled some of those out?

11   A.   I filled quite a few of those out.

12   Q.   Who did you fill those out for?

13   A.   Well, I filled one out for Sarah Price and Ralph Bowling,

14   a lady last name Hacker.  Those are some that I can recall.  I

15   can't recall all of them.

16   Q.   Sarah Price, your mother?

17   A.   Yes.

18   Q.   You filled one out for your mother-in-law, didn't you?

19   A.   I can't recall.

20   Q.   Her name is Gail White?

21   A.   Yes, it is.

22   Q.   She able to see okay?

23   A.   No, she isn't.

24   Q.   Does she drive?

25   A.   She drives.

*W. WHITE - Cross (Mr. Hoskins)*                                      27

1   Q.   Do you remember --

2   A.   That would be an opinion on if she's able to drive.

3   Q.   Do you remember anybody else that you filled out one of

4   those voter forms for besides those three names that you gave

5   us?

6   A.   I don't.

7   Q.   Do you remember anybody who wouldn't let you fill out a

8   voter assistance form?

9   A.   No, I don't remember that.

10  Q.   Do you -- you do remember telling that there were people

11  who wouldn't let you fill one out?

12  A.   There was.

13  Q.   But you don't remember --

14  A.   I don't recall.

15  Q.   Not a single one?

16  A.   No.

17  Q.   How much money were you making at that City job at the

18  end, right when you were laid off?

19  A.   Around 11 or 12 dollars an hour.

20  Q.   Had you taken a pay cut?

21  A.   I'm sorry?

22  Q.   Had you taken a pay cut when you went from the police

23  department to City Hall?

24  A.   I don't think I had, no.

25  Q.   Okay.

*W. WHITE - Cross (Mr. Hoskins)*                                      28

1   A.   I don't know.

2   Q.   Would you -- do you still have Exhibit D2 up there?

3   A.   Um-hmm, I do.

4   Q.   And that's the application from 2005?

5   A.   Yes.

6   Q.   For drug court?

7   A.   Yes.

8   Q.   It shows on there what your current salary is.

9   A.   I don't have a current salary.

10  Q.   Well, it shows on that application what your salary was

11  at the time you filled out the application.

12  A.   Yes, it does.

13  Q.   And it shows that you were working at the Manchester

14  Police Department at that time?

15  A.   Yes.

16  Q.   And that your salary was $26,900?

17  A.   That's what it shows, yes.

18  Q.   Okay.  You didn't -- did you lie on that application, or

19  was that what you made?

20  A.   The application says $26,900.

21  Q.   Were you telling the truth when you wrote that?

22  A.   I just told you a few minutes ago I didn't know whether I

23  took a pay increase, and I don't know right now whether I did.

24  Q.   Do you know whether you told the truth or not on the

25  application?

*W. WHITE - Cross (Mr. Hoskins)*                                          29

1    A.   I'm sure I did.

2    Q.   Okay.  So that means that you were making $26,900 when

3    you went to work -- while you were working --

4    A.   That's what it says, yes.

5    Q.   -- at the police department?  And you're sure you were

6    telling the truth so we can rely on that, can't we?

7    A.   Yes.

8    Q.   Okay.  And you didn't take a pay cut when you went over

9    to City Hall?

10   A.   I don't know, sir.  I mean, do you have a calculator to

11   tell me if I did?

12   Q.   Well, I do, but I guess I'm just asking you if you

13   recall?

14   A.   My answer is I don't know.

15   Q.   Was it your choice to move, change jobs?

16   A.   I asked to be moved, yes.

17   Q.   Something you did voluntarily?

18   A.   I asked to be moved.

19   Q.   Okay.  And while you were working at the police

20   department and while you were working at City Hall, you had

21   health insurance, didn't you?

22   A.   I did.

23   Q.   And retirement?

24   A.   Yes.

25   Q.   So in the early part of 2007, do you remember a specific

*W. WHITE - Cross (Mr. Hoskins)*                                    30

1    date that you lost your job at City Hall, that you were laid

2    off?

3    A.   I don't remember specific date.  I would say it would be

4    around the month of March.

5    Q.   Okay.  And the month of March was when you began

6    cooperating with the agents?

7    A.   I don't know that.

8    Q.   Okay.  You know when you made the first recording?  Do

9    you know that?

10   A.   I can look back to the first recording.

11   Q.   Okay.  Did you make the first recording right at the

12   beginning of your cooperation?

13   A.   Yes.

14   Q.   Okay.  Do you have something there to look at?

15   A.   Well, I have lots of things here to look at.  What do you

16   want me to look at?

17   Q.   I thought maybe you had something that would refresh your

18   memory.

19           MR. HOSKINS:  Your Honor, I would ask the witness be

20   shown Exhibit A1A.

21           THE COURT:  Yes, she may.

22   Q.   Miss White, would you take a minute to look at that?

23   A.   I have.

24   Q.   Okay.  Does that refresh your recollection as to when you

25   made the first recording?

*W. WHITE - Cross (Mr. Hoskins)*                                    31

1    A.   March 27th, 2007.

2    Q.   Okay.  So clearly, then, March 27th you were cooperating?

3    A.   Yes.

4    Q.   And you testified the other day that when you first went

5    to cooperate, you didn't know you were personally a target,

6    did you?

7    A.   I've never been told I was a target.

8    Q.   Okay.  You knew, of course, that you had stolen the

9    votes?

10   A.   Of course.

11   Q.   You knew bad things that you had done?

12   A.   I knew that I had stolen votes.

13   Q.   You knew that you had bought votes?

14   A.   I'm sorry?

15   Q.   You knew that you had been involved in buying votes?

16   A.   Yes.

17   Q.   You just didn't know that the FBI was on to you; is that

18   right?

19   A.   I don't know if the FBI was on to me, if that's your

20   question.

21   Q.   When you started to cooperate, tell us how the recordings

22   were made.  Tell us about that first recording, March 27th.

23   Did you have a tape recorder or some type of recorder on you

24   personally?

25   A.   I did.

*W. WHITE - Cross (Mr. Hoskins)*                                    32

1    Q.   Okay.  And that had been given to you by one of the

2    agents?

3    A.   Yes.

4    Q.   Okay.  And were you given instructions then?

5    A.   What type of instructions?

6    Q.   Were you given any instructions then?

7    A.   I can't answer that.  I don't know where you're going

8    with that.

9    Q.   Well --

10   A.   Instructions what?

11   Q.   Were you given any --

12   A.   Instructions to go to Clay County?  Instructions of how

13   to wear the recorder?  Instructions, I mean --

14   Q.   All that.

15   A.   Which one?

16   Q.   All of it.  What instructions were you given when you

17   began to cooperate that first day?

18           THE WITNESS:  Your Honor, I'm not understanding his

19   question.

20           THE COURT:  I'm not sure I am either, Mr. Hoskins.  I

21   think you need to be more specific.

22           MR. HOSKINS:  Your Honor, I apologize to the Court

23   and the witness.

24   Q.   You had a conversation with the agents when they gave you

25   the recording device?

*W. WHITE - Cross (Mr. Hoskins)*                                    33

1    A.   I did, yes.

2    Q.   They told you what they wanted you to do with that

3    recording device?

4    A.   Yes.

5    Q.   They told you where to go or made suggestions about where

6    to go?

7    A.   They made suggestions and knew where we were going, yes.

8    Q.   All right.  Tell us what they said about what your

9    instructions were about what to do with the recorder and where

10   to go.

11   A.   Well, it says on the tape, it says we are now placing the

12   recording device with Kennon and Wanda White.  And I wore the

13   recording device here.  And I'm very loud by nature anyway,

14   because I work in a hair salon, and I speak over hair dryers

15   and such.  But it was here.  And Kennon also had one.  And we

16   were instructed to go to Cletus Maricle's home, and we would

17   meet them afterwards.

18   Q.   Okay.  Were you instructed as to what to talk about that

19   night?

20   A.   We were, yes.

21   Q.   Okay.  And what were those instructions?

22   A.   Basically, engage in conversation about the election,

23   anything leading up to the election, and just let him lead the

24   conversation and go with whatever.

25   Q.   You met them again, met the agents again when you left

*W. WHITE - Cross (Mr. Hoskins)*                                    34

1   Cletus Maricle's home that night?

2   A.   Yes.

3   Q.   And had a conversation with them then as well, the

4   agents?

5   A.   Yes.

6   Q.   During that conversation, did you talk about what you

7   thought had happened that was important when you were talking

8   with Cletus Maricle?

9   A.   We did.

10  Q.   And the agents followed that up with other questions,

11  didn't they?

12  A.   Yes.

13  Q.   Did you talk about things that might not have shown up on

14  a tape recording, things other than sound?

15  A.   What?  I don't understand.

16  Q.   Facial expressions.  If something significant happened

17  that wouldn't have been recorded sound-wise --

18  A.   We did, yes.  I understand you now.  Yes.

19  Q.   And the agents were especially careful to ask you about

20  that, weren't they?  They would also ask you about gestures or

21  facial expressions or anything else, wouldn't they?

22  A.   What now?  What's your question?

23  Q.   When you talked to the agents, after you made these

24  recordings, they would ask you about non-verbal things that

25  happened, non --

*W. WHITE - Cross (Mr. Hoskins)*                                    35

1    A.   I would tell them about non-verbal things.

2    Q.   And they would always make sure that you did, wouldn't

3    they?

4    A.   I would tell them.

5    Q.   And they would -- would they follow up and ask more

6    questions about that?

7    A.   I'm not so sure about that.  I can tell you that I would

8    tell them about expressions.

9    Q.   Were the agents writing down things that you were telling

10   them?

11   A.   Yes.

12   Q.   I think you told us there were in the neighborhood of 20,

13   maybe, of these recordings that you made?

14   A.   Yes.

15   Q.   Would you meet with the agents each time before and after

16   the recordings were made?

17   A.   Yes.  Most of the time, yes.

18   Q.   And the same procedure was followed each of those times?

19   A.   Yes.

20   Q.   Were they giving you, I guess -- I was using the word

21   instructions, and I guess maybe I wasn't clear about that.

22   When you would meet with the agents before you would go to

23   make a recording, you all would have conversations about what

24   to say to Cletus Maricle or somebody else, wouldn't you?

25   A.   Yes.

*W. WHITE - Cross (Mr. Hoskins)*                                    36

1   Q.   The agents didn't write out a script for you when they

2   did that?  They just said talk to them about this point, talk

3   to them about that point?

4   A.   That's right.

5   Q.   Tell them you've been subpoenaed to the grand jury, tell

6   them this or that.  They would tell you things to plant in the

7   conversation?

8   A.   Whatever we discussed beforehand on these tapes was what

9   was -- what we had went over with them.  Each tape, each time.

10  Q.   You did your best to follow the instructions that the

11  agents gave you?

12  A.   I did my best to follow the instructions of the agents.

13  Q.   One of the things that you talked about quite a bit, you

14  and your husband, was your attorney.  And all through those

15  recordings when we heard the name Brent --

16  A.   Yes.

17  Q.   -- we're talking, that was a reference to your attorney,

18  Brent Caldwell, right?

19  A.   Yes, it was.

20  Q.   He was representing both you and your husband?

21  A.   Yes.

22  Q.   And what you were saying and what your husband was saying

23  to Cletus Maricle was, we're not pleased with Brent.

24  A.   Yes.

25  Q.   The agents instructed you to do that, didn't they?

*W. WHITE - Cross (Mr. Hoskins)*                                          37

1    A.   Yes.

2    Q.   The agents wanted you to try to get Cletus Maricle to

3    send you to another lawyer, didn't they?

4    A.   No, they never indicated that.

5    Q.   They never said anything about -- what else did they say

6    to you about what to say about your lawyer?

7    A.   That was it.

8    Q.   You're not happy with your lawyer?

9    A.   Displeased with the attorney, yes.

10   Q.   On that transcript, when you say, "we should have got a

11   local lawyer.  We should get a local lawyer," was that the

12   agent's instructions too?

13   A.   No, it wasn't.

14   Q.   You made that up?

15   A.   I went with -- they told me to go with the conversation.

16   Q.   Okay.  So sometimes when you were saying these things,

17   you were saying what the agents had instructed you to say.

18   You were also building on that yourself as the conversation --

19   A.   Sir, I can give you an example.  I don't think that the

20   agents could tell me this much to say.

21   Q.   Right.

22   A.   So there had to be little fill-in point along the way.

23   Q.   There had to be --

24   A.   Anything that was of significance, yes, they would

25   instruct me.

*W. WHITE - Cross (Mr. Hoskins)* 38

1    Q.   Okay.  But there had to be a lot of filling in by you?

2    You had to kind of play it by ear as you were going through

3    that, didn't you?

4    A.   When the dog jumps up on you and you say "get down dog,"

5    yeah, there are circumstances that you have to fill in in

6    conversation.

7    Q.   Of course, if the dog runs through or a grandson comes in

8    and is making a mess or something like that --

9    A.   Exactly, yes.

10   Q.   But I'm not talking about that.  I'm asking you about the

11   other things.  Like we should have gotten a local lawyer.

12   That was your creation?  That was your idea, right?

13   A.   Yes.

14   Q.   When you were telling Cletus Maricle that you weren't

15   happy with Brent, your lawyer, that really wasn't true, was

16   it?

17   A.   I'm very pleased with Brent, yes.

18   Q.   So that was not the truth, what you said to Cletus?

19   A.   That was something that the agents had instructed me to

20   say.

21   Q.   I understand that, but it was not the truth, was it?

22   A.   No, it wasn't.

23   Q.   The meetings that you talked about, going over the

24   voters' lists, those were for the voters at the Manchester

25   precinct, right?

*W. WHITE - Cross (Mr. Hoskins)*                                    39

1    A.   They weren't counted by the precincts.

2    Q.   You worked at the Manchester precinct?

3    A.   You asked me at the meetings, the voter lists we were

4    going over were for all precincts.

5    Q.   My next question is, you worked at the Manchester

6    precinct?

7    A.   I did, yes.

8    Q.   And that's in the city?

9    A.   It is, yes.

10   Q.   Let me ask you a few questions about this job topic, the

11   job situation.  As far as you recollect, that February 15th,

12   2005 was the only time that you really and truly applied to

13   be -- to get a job at the drug court; is that right?

14   A.   Yes.

15   Q.   Okay.  So on these tapes in 2007, when you're talking

16   about drug court jobs, that was something that the agents told

17   you to talk about?

18   A.   Yes.

19   Q.   Okay.  You didn't really have any intention of actually

20   filling out an application?  Did you ever fill one out, for

21   that matter?

22   A.   I filled one out February 15th.

23   Q.   Of 2005?

24   A.   Yes.

25   Q.   I'm talking about 2007, when you were --

*W. WHITE - Cross (Mr. Hoskins)*                                          40

1   A.   There was no need to fill another one out.

2   Q.   Okay.  As you didn't really intend to do that?

3   A.   Oh, I don't know.  I may have took the job.

4   Q.   In 2007?

5   A.   I may have.

6   Q.   You said something the other day, yesterday I think, that

7   Judge Maricle had given you a job once before in the court

8   system.  You were talking about being some type of appraiser,

9   right?

10  A.   Yes.

11  Q.   Was that in the '90s?

12  A.   Yes, it was.

13  Q.   Okay.  And those were for -- those appraisals were for

14  what's called condemnation cases?

15  A.   I think so, yes.

16  Q.   Where the government is going to take somebody's property

17  for some type of government project, a road or a prison or

18  whatever?

19  A.   Yes.

20  Q.   Whether the owner wants to sell it or not, the government

21  can take it.  And your job, what you got was to be one of the

22  people who would put a value on that piece of property that

23  the government wanted to take?

24  A.   Yes.

25  Q.   Now, this wasn't like a 9:00 to 5:00 job, where you had

*W. WHITE - Cross (Mr. Hoskins)*                                    41

1   an office or anything at all like that, was it?

2   A.   No, it wasn't, no.

3   Q.   What that was was when one of these cases got filed, you

4   might get requested to go put a value on that piece of

5   property?

6   A.   Yes.

7   Q.   And that's what you did?

8   A.   Yes.

9   Q.   About how many times would you say you did that?

10  A.   I can't recall.

11  Q.   Well, a hundred?

12  A.   No.

13  Q.   A whole lot less than that, right?

14  A.   Yes.

15  Q.   So this wasn't like a full-time job by any means, was it?

16  A.   Not by any means, no.

17  Q.   And you had all the legal requirements to be one of those

18  appraisers, right?

19  A.   Which were what?

20  Q.   Well, let me ask it this way.  Are you aware of anybody

21  ever objecting, any of the lawyers in any of these cases ever

22  objecting to you serving as an appraiser?

23          THE WITNESS:  I don't understand the question.

24          THE COURT:  When you were acting as an appraiser back

25  in the '90s, to your knowledge, did any person ever object to

1    you acting in the capacity as an appraiser?

2    A.   I don't -- I was in my 20s.  I don't ever remember having

3    any other contact with anybody other than Cletus Maricle.  I

4    worked with Kenny Day and Granville Sizemore.  So I guess I

5    was as qualified, if you're putting it that way, as they were.

6    Is that what you're asking me?

7    Q.   Nobody ever gave you any flack?  You don't remember --

8    A.   No, I just had to sign a paper.  I don't know -- the

9    amount was already set.  All I had to do was sign my name.

10   Q.   You told us on this application that you filled out in

11   February, 2005, you told us that you gave that to a lady named

12   Ellen Nicholson?

13   A.   I gave what, this paper?

14   Q.   Yes.

15   A.   She did this electronically and ran this copy off for me.

16   And me sitting on the other side of her desk, I wrote it down.

17   Q.   Okay.  The lady that you did that with was Ellen

18   Nicholson?

19   A.   Yes, yes.

20   Q.   Was she involved with drug court then?

21   A.   Yes.

22   Q.   What did drug court pay?

23   A.   I have no idea.

24   Q.   Did you know then?

25   A.   I do not know what Ellen Nicholson makes, no.

*W. WHITE - Cross (Mr. Hoskins)*                                    43

1   Q.   No, I'm not asking what -- let me ask you this way.  The

2   job that you were applying for, what did it pay?

3   A.   I don't know.

4   Q.   Do you remember the first time that you went before the

5   federal grand jury?

6   A.   I do remember, yes.

7   Q.   And that was May the 3rd of 2007?

8   A.   If that's what it says, yes.

9   Q.   That was in Lexington, Kentucky?

10   A.   Yes.

11   Q.   At the federal building?

12   A.   Yes.

13   Q.   You went into the grand jury room?

14   A.   I did.

15   Q.   Mr. Smith was there?

16   A.   Yes.

17   Q.   You took an oath?

18   A.   Yes.

19   Q.   You stood in front of the grand jury, or you sat in front

20   of the grand jury?

21   A.   Yes, yes.

22   Q.   Mr. Smith asked you questions?

23   A.   Yes.

24   Q.   Under oath, you answered those questions?

25   A.   I did.

*W. WHITE - Cross (Mr. Hoskins)*                                    44

1  Q.   Mr. Smith asked you "did he," meaning Cletus Maricle,

2  "mention anything else he was going to do for you in this

3  initial meeting?"  Your answer was, "well, yeah, I was

4  promised a job in drug court."  Do you remember that?

5  A.   I do.

6  Q.   Mr. Smith followed that up by saying, "it sounds like at

7  the time you were gainfully employed by the City of

8  Manchester."  Do you remember that?

9  A.   I do.

10 Q.   Do you remember you answered, "because he knew that was

11 going to cause some problems.  I was frustrated.  Drug court

12 is a better job."

13 A.   Yes.

14 Q.   "Than what I had"?

15 A.   Yes.

16 Q.   "A better paying job"?

17 A.   And your question is what?

18 Q.   You said that to the grand jury?

19 A.   If it's what I said.  But I'm telling you under oath

20 today, I don't know.

21 Q.   You were under oath that day too, weren't you?

22 A.   I was, yes.

23 Q.   You certainly led the grand jury to believe that you knew

24 what the drug court paid?

25 A.   I didn't state I knew what they paid.

*W. WHITE - Cross (Mr. Hoskins)*                                          45

1    Q.   You knew it was a better paying job than the $26,900 job
2    you had?
3    A.   I did not state I knew what it paid.
4    Q.   You knew that -- you did state that it was a better
5    paying job than your City job, didn't you?
6    A.   But you're asking me if I know today what it pays.  I
7    don't know.  I do not know.
8    Q.   I'm asking you about back then.
9    A.   I did not state what it paid.  Does it say on that paper
10   what it pays?
11   Q.   It says that drug court was a better paying job.
12   A.   That doesn't mean I know what it paid.
13   Q.   Okay.  Because you had no idea what it paid.  Is that
14   what you're telling us now?
15   A.   I don't know what drug court pays, no.
16   Q.   Never had any idea?
17   A.   I'm going on what he told me.  He told me it was a better
18   paying job.
19   Q.   When you brought up this job with drug court, Judge
20   Maricle would say, well, we'd have to have a whole lot more
21   people in drug court before there would even be a job opening?
22   A.   Yes.
23   Q.   And he suggested calling over to Laurel County, see if
24   maybe you know -- somebody knows somebody at the Laurel County
25   Board of Education that maybe you can get a job?

*W. WHITE - Cross (Mr. Hoskins)*                                    46

1    A.   I don't think he suggested that to me.

2    Q.   Somebody suggested it.

3    A.   He suggested that to Judy, yes.  It's a big difference in

4    telling me to call and her to call.

5    Q.   Right.  Because maybe Judy, because she's his wife, has

6    some influence with those people, right?

7    A.   Yes.

8    Q.   So they were doing you a favor, trying to get you a job

9    with the Laurel County Board of Education?

10   A.   I don't know that.  I'd have to review the conversation.

11   Q.   Well, is that your understanding of the purpose of that

12   phone call to Laurel --

13   A.   Yes.

14   Q.   Okay.  Miss White, do you still have Exhibit D16 up

15   there?

16   A.   What was it?

17   Q.   D, as in --

18   A.   Got the D.

19   Q.   16?

20   A.   I do.

21   Q.   Okay.  And that's a list of names?

22   A.   Yes.

23   Q.   Whose handwriting is that?

24   A.   I believe it to be Judy's handwriting.

25   Q.   Okay.  Did you see her write that?

*W. WHITE - Cross (Mr. Hoskins)*                                   47

1   A.   I believe it to be her handwriting.  I didn't see her

2   write it.

3   Q.   It's supposed to be names of people who were grand jury

4   witnesses?

5   A.   It's supposed to be, yes.

6   Q.   Now, there was, we've already agreed, a grand jury

7   investigation of Doug White, wasn't there?

8   A.   Yes.

9   Q.   Resulted in an indictment?

10  A.   Yes.

11  Q.   So there was interest in your family about people who

12  would be going before the federal grand jury?

13  A.   No, there wasn't.

14  Q.   Wasn't any interest at all?

15  A.   I had no interest.

16  Q.   Well, in your family --

17  A.   I can't speak for them.

18  Q.   You didn't hear it talked about?

19  A.   No, I didn't.

20  Q.   Do you see some names on that list that have connections

21  to Doug White that you know of?

22  A.   I do.

23  Q.   Who were those people?

24  A.   William Stivers is his cousin.

25  Q.   He was a City employee too?

*W. WHITE - Cross (Mr. Hoskins)*                                    48

1   A.   He was, yes.

2   Q.   Until Carmen Lewis laid him off?

3   A.   No, he's still there.

4   Q.   Oh, okay.  Wasn't there a recording where it seemed like

5   maybe he had been laid off?

6   A.   That was according to the people on the recording.

7   Q.   Okay.  So they were mistaken?

8   A.   He's still there.  I mean, I don't -- I mean, to my

9   knowledge, he's still employed at the City of Manchester.

10  Q.   Okay.

11  A.   Are you wanting me to keep going?

12  Q.   Yes, please.

13  A.   Darnell Hipsher, Jeff Deaton and Carmen Lewis, Penny

14  Robinson, Laura House and Sherrie House were council people.

15  Q.   Those are all City people, right?

16  A.   Um-hmm, they are.

17  Q.   Anybody else?

18  A.   Scott Robinson, if it's the same Scott Robinson that I'm

19  thinking of, works for the City.  Jamey Mills and Mike Bishop.

20  Q.   Anybody else?

21  A.   James Phillips.  I know every person on this.  But, I

22  mean, how are you wanting me to --

23  Q.   I'm asking if those people have a connection to Doug

24  White or the City.

25  A.   Well, I told you the ones that were employed by the City

*W. WHITE - Cross (Mr. Hoskins)*                                49

1    and council people.

2    Q.  Well, Amy Abner's on that list?

3    A.  She is.

4    Q.  She has a connection to Doug White, right?

5    A.  To the best -- from what the paper says, she does, yes.

6    Q.  I'm asking if you know about that.

7    A.  Do I know about Amy Abner?

8    Q.  Yes.

9    A.  I know what come out in the trial.

10   Q.  I'm asking if you know a connection between Amy Abner and

11   Doug White.

12        MR. SMITH:  Your Honor, I believe the witness has

13   attempted to answer this question and I would object.

14        THE COURT:  Sustained.

15   Q.  Okay.  Something came out in the trial.  Which trial are

16   you talking about?

17   A.  When Doug was indicted.

18   Q.  Okay.  When Doug White got in trouble, indicted by the

19   federal government, something came out about Amy Abner?

20   A.  What he's wanting me to say is Amy Abner --

21        MR. SMITH:  Your Honor, I'm going to object.

22        THE COURT:  Hold on a second.  Counsel come up,

23   please.

24                    (A sidebar conference was held out of the

25                     hearing of the jury):

*W. WHITE - Cross (Mr. Hoskins)*                                    50

1          THE COURT:  Who is Amy Abner?

2          MR. HOSKINS:  Amy Abner is a woman who was one of

3    Doug White's girlfriends.

4          THE COURT:  So this would be an attempt to impeach

5    not this witness, but Daugh White, his character under 608,

6    other bad acts.

7          MR. HOSKINS:  No, Your Honor, that's not the purpose

8    I'm offering it for.  I'm offering it for the purpose to

9    suggest that this list was made in connection with the Doug

10   White grand jury investigation, not an investigation related

11   to this case.  I wasn't going to pursue -- I'm not going to go

12   into what their relationship was.

13         THE COURT:  That's what you're attempting to elicit,

14   Mr. Hoskins.

15         MR. HOSKINS:  No, I was trying to ask a yes or no

16   question, Judge, despite -- the witness doesn't want to give

17   me those answers.

18         THE COURT:  She doesn't have direct knowledge.  She's

19   trying to -- or her testimony to this point has been based on

20   what she heard in a court proceeding.

21         MR. HOSKINS:  I suspect she does have direct

22   knowledge, Judge.

23         MR. SMITH:  Judge, I would just say this.  Miss

24   Abner -- it was reported in the hearings and she's read it in

25   the paper -- when she was underage as a child, she had a

*W. WHITE - Cross (Mr. Hoskins)*                                       51

1    relationship with the mayor.  And I think it challenges common

2    sense to think that the daughter-in-law of the mayor knew

3    about these illicit sexual relationships with the mayor.

4            Counsel has asked the question.  The witness said she

5    didn't know, and now the witness feels compelled now to

6    expound on what's in the newspaper she's read.  And I think,

7    clearly, it's hearsay.

8            Clearly, I believe that counsel got the answer that

9    the witness has, and he's not satisfied with it because he

10   wants to use this as character evidence and not as what he now

11   tries to argue otherwise.  I choose to differ with his

12   characterization, his motives.

13           MR. HOSKINS:  Mr. Smith is simply incorrect.  If she

14   had said yes, there was a connection between Doug White and

15   Amy Abner, that would be my last question.  I would like for

16   her to be able to answer that question.

17           THE COURT:  I sustained the objection.  I think it's

18   being offered or solicited for an improper purpose.  Objection

19   sustained.

20           MR. HOSKINS:  Your Honor, I would like to get that

21   evidence in by avowal at some point before the witness leaves

22   then.

23           THE COURT:  All right.  We'll take a break right now.

24                   (Sidebar conference concluded.)

25           THE COURT:  Ladies and gentlemen, I'm going to excuse

1   you for a few moments.  I will call you back here within ten

2   minutes so please be prepared to come back in at that time.

3   Please keep in mind the admonition you were given

4   previously.

5                    (The jury left the courtroom at 2:04 p.m.)

6              THE COURT:  The record will reflect the jury's not

7   present at this time.  Court has ruled inadmissible a line of

8   questions of this witness.  Counsel has requested to place

9   this information in the record by avowal.  Mr. Hoskins, you

10  may follow up with your questions at this time.

11             MR. HOSKINS:  Thank you, Your Honor.

12  BY MR. HOSKINS:

13  Q.  Miss White, you recognize the name Amy Abner on that

14  list?

15  A.  I know Amy Abner, yes.

16  Q.  You know who she was before you heard about her in court,

17  didn't you?

18  A.  What are you asking any?

19  Q.  Did you know who Amy Abner was before --

20  A.  I know who Amy Abner is, yes.

21  Q.  You knew before you heard about her in court?

22  A.  I know what you're getting at.  I had heard rumors, yes.

23  Q.  You had heard rumors that she had had a personal

24  relationship with Doug White?

25  A.  Yes.

*W. WHITE - Cross (Mr. Hoskins)*                                        53

1              MR. HOSKINS:  That's all.

2              THE COURT:  Mr. Smith, do you wish to follow up with

3     the witness on this point?

4              MR. SMITH:  No, Your Honor.

5              THE COURT:  All right.  Thank you.  See if anyone

6     needs to take a very short break while the jury's out.  I told

7     them they can have ten minutes.

8              MR. PINALES:  At my age, it's always helpful.

9              THE COURT:  We're not going to take more than ten

10    minutes.

11             MR. PINALES:  I'll run fast.

12             THE COURT:  We're all going to run fast.  For eight

13    minutes, we'll be in recess.

14                  (Recess from 2:06 p.m. until 2:17 p.m.)

15                  (The jury entered the courtroom at 2:17 p.m.)

16             THE COURT:  Thank you.  I had sustained the objection

17    to the last question.  Mr. Hoskins, you may continue.

18             MR. HOSKINS:  Thank you, Your Honor.

19    BY MR. HOSKINS:

20    Q.   Miss White, we were talking about a grand jury

21    investigation of Doug White.  Do you recall my questions about

22    that topic?

23    A.   I do.

24    Q.   Okay.  Did you tell us a little bit earlier, when I was

25    asking you those questions, I asked if you had talked about

*W. WHITE - Cross (Mr. Hoskins)*                                    54

1   Doug White's grand jury testimony and whether or not you were

2   interested --

3   A.   Are you asking me if I answered your question, I think I

4   did.

5   Q.   Were you interested in the testimony at all when Doug

6   White was going to the grand jury?

7   A.   If you can give me a definition what you're talking

8   about.

9   Q.   Did you care about Doug White going to the grand jury?

10  A.   Of course I cared, yes.

11  Q.   You wanted to know --

12  A.   I had no interest of this list.

13  Q.   Well, I'm not talking about the list now.

14  A.   But that's what you were talking about.

15  Q.   Well, okay.  Now we're just talking about Doug White's

16  grand jury testimony and when Doug White went into the grand

17  jury, okay?

18  A.   Okay.

19  Q.   You were very interested in that, weren't you?

20  A.   I love Doug White, yes.

21  Q.   And you were interested in what happened in the grand

22  jury room, what his testimony was?

23  A.   Yes.

24  Q.   You talked, you had conversations about it with other

25  people in the family and out of the family, right?

*W. WHITE - Cross (Mr. Hoskins)*                                        55

1   A.   I'm assuming I did.

2   Q.   And that was because you cared about Doug White?

3   A.   I care about Doug White, yes.

4   Q.   Okay.  Thanks.  Let me just ask you one question about

5   your sister, Stephanie, that you talked about earlier.  You

6   said you ran into Rusty Maricle at the courthouse, right?

7   A.   Um-hmm, yes.

8   Q.   Was that before or after he became a lawyer?

9   A.   After.

10  Q.   Okay.  Do you have Exhibits D11 and D12?

11  A.   Yeah, I do.

12  Q.   We talked about those before lunch, I think.  Those were

13  election records from 2002 and 2004, right?

14  A.   Yes.

15  Q.   Those are only on the city races, aren't they, and the

16  school board?

17  A.   No.

18  Q.   What do you see that different from that?

19  A.   Well, I see Manchester, Garrity, Manchester, Big Creek,

20  Harts Branch, Greenbriar, Allen, Oneida, South Fork, Flat

21  Creek, Goose Rock, Bright Shade, Pigeon Roost, Portersburg,

22  Whites Branch, Fogertown, Vernon Springs, Pin Hook, Sexton's

23  Creek, and the same that's on this one.

24  Q.   I should have asked you about the offices that you see

25  referenced on there, the races.

*W. WHITE - Cross (Mr. Hoskins)*                                        56

1    A.   George Bush, John Kerry, Edwards, Michael Anthony

2    Peroutka, Chuck Baldwin, Ralph Nader.  Do you want me to keep

3    going?

4    Q.   Those are people running for president, I guess?

5    A.   Yes.  Hal Rogers.

6    Q.   Are there any county-wide things on there?

7    A.   Tim Couch.

8    Q.   He's a state representative?

9    A.   That -- every county wide is voted in the presidential

10   election.  Tim Couch.

11   Q.   I'm talking about county officers.  Let's just talk about

12   people who were running for county office.

13   A.   Board of Education members.

14   Q.   They have districts, don't they, or do they run

15   county-wide?

16   A.   The districts are in the county.

17   Q.   Okay.  So nobody who's on the school board is running a

18   county-wide race, I think.  They're all running just for their

19   district?

20   A.   Within their district, yes.

21   Q.   Okay.

22   A.   Yes.

23   Q.   So mainly that's what's there.  You've got national

24   races, you've got the things on there that people in the city

25   could vote for, right?

*W. WHITE - Cross (Mr. Hoskins)*                                        57

1    A.   Sir, would you want to put it up on the screen?

2    Q.   Well, I'm asking --

3    A.   I mean, there's figures all over the page.

4    Q.   I'm asking you, though, we've talked about school board

5    races that were only for a district.  We've talked about

6    national, federal elections that everybody gets to vote in,

7    and then we have the city council and the mayor?

8    A.   The city council and the mayor are on this, yes.

9    Q.   I want to ask you another question about one of those

10   recordings we heard yesterday.  There was a discussion on May

11   the 2nd about whether or not Carmen Webb Lewis actually lived

12   in the city limits.  Right?

13   A.   Yes, I remember, yes.

14   Q.   And that could have been important if she didn't, because

15   if she didn't, she wouldn't be qualified to be mayor of

16   Manchester, right?

17   A.   If she didn't, yes.

18   Q.   So that conversation was about whether or not she was

19   legally qualified to be the mayor?

20   A.   Yeah.  Living in Manchester would make one of those

21   qualifications, yes.

22   Q.   I mean, that's an absolute?

23   A.   That's an absolute, I think so, yes.

24   Q.   So if that had become an issue before the election, she

25   might have got knocked out of running and wouldn't have beat

*W. WHITE - Cross (Mr. Hoskins)*                                    58

1   Doug, right?  Wouldn't have beat Doug White if it could have

2   been proven before the election that she wasn't qualified; is

3   that true?

4   A.   I'm assuming it is, yes.

5   Q.   And that's what Cletus Maricle was talking about when he

6   said, well, how did you let that slip by us, or something like

7   that?

8   A.   You could perceive it as that.  I perceived it another

9   way.  Would you like me to explain it?

10  Q.   I don't think I would.

11  A.   Okay.

12       MR. SMITH:  Your Honor, I would ask the witness be

13  allowed to explain her answer.

14       THE COURT:  The question's been withdrawn.

15  Q.   Back to the list of those names.  Do you have that?

16  A.   Which one now?

17  Q.   The one with --

18  A.   The City employees on it?

19  Q.   Yes, ma'am.

20  A.   Okay.

21  Q.   You said that that was given to you by Cletus Maricle?

22  A.   Yes.

23  Q.   You believe it's in Judy's handwriting?

24  A.   I believe it is.

25  Q.   Okay.  It's not in Cletus' handwriting, is it?

*W. WHITE - Cross (Mr. Hoskins)*                                           59

1    A.   No, I don't believe it is.

2    Q.   I mean, you're familiar with --

3    A.   I'm familiar with both of their writing, yes.

4    Q.   Was that given to you after you started cooperating?

5    A.   I can't answer that.

6    Q.   You don't know?

7    A.   I don't know.

8    Q.   Okay.  There's nothing on any of the recordings about

9    that list, is there?

10   A.   There's a lot of recordings.  We can review them, but I

11   don't recall.

12   Q.   You don't remember anything --

13   A.   I don't recall, no.

14   Q.   Okay.  Thank you.

15   A.   Actually, I don't remember going over a lot of this stuff

16   on the recordings.

17   Q.   Let me ask you to look at that Exhibit D15.  Do you have

18   that in front of you?

19   A.   D15A?

20   Q.   I think it's just D15.  It's the list of -- D, the list

21   of questions that the agents --

22   A.   Yeah, I've got that.

23   Q.   And I may be mistaken --

24   A.   It's D15.

25   Q.   Thank you.  And again, what we're talking about here is a

*W. WHITE - Cross (Mr. Hoskins)*                                    60

1    list of questions that the agents helped you put together.

2    You wrote it down, right?

3    A.   Yes.

4    Q.   And it was given to you, you wrote it out for the purpose

5    of going to Cletus Maricle to try to get him to tell you what

6    to say to the grand jury?

7    A.   How to answer the questions.

8    Q.   Right.  And it was your testimony, I believe, that those

9    were questions -- you said, I tried to write down what they

10   asked me the day I went to the grand jury, right?

11   A.   Yes.

12   Q.   And that was all by the instructions of the agents --

13   A.   Yes.

14   Q.   -- to do that?  So following their instructions, you went

15   to Cletus's house and showed him that piece of paper?

16   A.   Yes.

17   Q.   We heard that on that recording yesterday, right?

18   A.   Yes.

19   Q.   Okay.  And that's the only time you showed him that list

20   of questions, isn't it?

21   A.   That's the only time I recall.

22   Q.   Okay.  You offered to let Cletus Maricle keep that list,

23   didn't you?

24   A.   If it was on the tape, I did.

25   Q.   Okay.  Well, you remember that's what we heard yesterday?

*W. WHITE - Cross (Mr. Hoskins)*                                61

1    A.   I don't remember saying that.

2    Q.   Was that part of the instructions from the agents, see if

3    he'll keep it?

4    A.   No.

5    Q.   Okay.  That was something you thought of?

6    A.   If I said it, it's something that I said.

7    Q.   But he didn't keep it?

8    A.   No.

9    Q.   He didn't copy it?

10   A.   No, not that I know of.

11   Q.   Well, he didn't have a copying machine --

12   A.   He has a copy machine there, I think.

13   Q.   Did he go to it?

14   A.   Not that I remember, no.

15   Q.   The agents had already made a copy of that for

16   themselves, hadn't they?

17   A.   Yes.

18   Q.   Okay.  As you were leaving Cletus's house that day, you

19   said, well, should I destroy this?  Should I do away with it?

20   A.   I don't recall that.

21   Q.   Well, would you take a minute and look at that --

22   A.   I will.

23   Q.   Okay.

24   A.   What do you want me to refer to?

25   Q.   The transcript where you were talking with Cletus about

*W. WHITE - Cross (Mr. Hoskins)*                                    62

1   that.  If you give me a minute, I'll figure out which one that

2   was.

3   A.   Okay.

4   Q.   I believe it's A15A.  Miss White, would you look at

5   page 15?  At the very top of page 15, do you see where we are?

6   A.   I do, yes.

7   Q.   It says, "Wanda:  You want me to keep that, do you want

8   me to throw it away?"

9   A.   Well, you made in your statement that you asked me, you

10  said I suggested that.  I was asking him if he wanted me to do

11  that.

12  Q.   Right.  You were asking Cletus --

13  A.   But that wasn't your question you asked me.

14  Q.   I'm sorry.  I didn't ask the question very well.  So

15  let's just look at this right here and see if we can everybody

16  get clear about it.

17  A.   All right.

18  Q.   You were talking about that list of questions there,

19  right, when you said, "do you want me to keep that, you want

20  me to throw it away," you were talking about that list of

21  questions?

22  A.   I'm not going to say I don't trust you, but let me follow

23  back on the page before to make sure --

24  Q.   Please do.

25  A.   -- that we're -- (reviewing document).  I'm afraid I

*W. WHITE - Cross (Mr. Hoskins)*                                        63

1    can't answer your question, because I don't see anywhere it's

2    speaking about this list.  I'd have to review more of it to --

3    Q.   Well, would you review the first few pages?

4    A.   I'm saying it says, "do you want me to keep that, do you

5    want me to throw it away?"  So I was asking him a question.

6    Q.   His answer is "no.  No."

7    A.   "You keep it or throw it away" is what my reply to that

8    was.

9    Q.   Your reply is "you can keep it or throw it away."  Right?

10   A.   That's what this says, yes, but I'm not so sure what the

11   topic is I'm talking about.

12   Q.   You think it might be something else you were talking

13   about throwing away?

14   A.   Well, I don't know.

15   Q.   Can you please take a minute and look at that, see if you

16   can come up with something else?

17   A.   But regardless, I was asking if he wanted to throw it

18   away.

19   Q.   And he said no, didn't he?

20   A.   And what are we -- I don't see what the holdup is.  Did I

21   not answer the question?

22   Q.   Miss White, you asked Cletus Maricle did you want for

23   something to be thrown away or for him to keep something,

24   right?

25   A.   That's what this transcript says, but that's not --

*W. WHITE - Cross (Mr. Hoskins)*                                    64

1    you're not asking me -- I mean, you're telling me what it

2    says, and it clearly says that.  So what is your question?

3    Q.  Do you agree that you asked him that?

4    A.  I agree that the transcript says "do you want me to throw

5    it away."

6    Q.  And you've also already said you think the transcripts

7    are accurate, right?

8    A.  Yes.

9    Q.  Okay.  He didn't want you to throw it away.  He didn't

10   tell you to throw it away, did he?

11   A.  Going by this transcript, and what it says next is you

12   throw it away.

13   Q.  Who said you throw it away?

14   A.  "Do you want me to keep that, do you want me to throw it

15   away?"  "No.  No."  "You keep it or throw it away."

16   Q.  Who said "you keep it or throw it away"?

17   A.  I was saying it back to him.

18   Q.  You said it, right?

19   A.  Yes.

20   Q.  Cletus Maricle never said to throw it away, did he?  Did

21   he?

22   A.  Is that your -- have we finally established a question?

23   Q.  Yes.

24   A.  Okay.

25   Q.  Did Cletus Maricle ever suggest that you throw that away?

*W. WHITE - Cross (Mr. Hoskins)*                                        65

1    A.   No.

2    Q.   Thank you.  Did Cletus Maricle try to keep that list?

3    A.   I don't think he did, no.

4    Q.   Well, you have it in your hand right now, don't you,

5    right in front of you?

6    A.   Well, I have it somewhere here, yes, but I didn't -- the

7    agents kept it afterwards.

8    Q.   Okay.  Cletus Maricle didn't keep it.  Miss White, I'd

9    like to ask you some questions, if I can, about some dates.

10   A.   Okay.

11   Q.   And I want to be as specific as we can, and I know that's

12   hard.  But you remember testifying yesterday in the courtroom

13   here?

14   A.   Yes.

15   Q.   Actually, you remember testifying back on Friday?

16   A.   Yes, I do.

17   Q.   That was the first day you testified, wasn't it?  Am I

18   right?  I may be wrong about that.  You testified Friday,

19   February 18?

20   A.   Yes.

21   Q.   All right.  And Mr. Smith asked you, "okay, now,

22   following your involvement in the spring and fall of 2004,

23   when was it that Cletus Maricle approached you to help him

24   with his son-in-law's race?"  Do you remember Mr. Smith asking

25   you that question?

*W. WHITE - Cross (Mr. Hoskins)*                                    66

1    A.    I do, yes.

2    Q.    And you said, "not long after the election was over."

3    Right?

4    A.    I don't know that I said that.

5    Q.    Okay.

6    A.    If you want to show me that.

7              MR. HOSKINS:  Your Honor, I have a copy of Miss

8    White's testimony, if she could be shown that.

9              THE COURT:  Yes, sir.

10             MR. SMITH:  Would you mind giving us a reference?

11             MR. HOSKINS:  It is page 25.

12   Q.    Do you see that?

13   A.    I do.

14   Q.    Okay.  So your answer was "not long after the election

15   was over"?

16   A.    Yes.

17   Q.    Mr. Smith said, "months, years or do you recall?"  And

18   you said, "weeks after."

19   A.    Yes.

20   Q.    Turn on to page 28.

21             MR. SMITH:  I'm going to object unless --

22   A.    I don't think these pages are numbered.

23   Q.    They're numbered up at the top.

24             THE COURT:  What's the objection, Mr. Smith?

25             MR. SMITH:  I believe that proper foundation has been

*W. WHITE - Cross (Mr. Hoskins)*                                         67

1    laid now to ask the question, and now we're moving on to

2    another subject that I believe that the witness -- he is

3    seeking to impeach her with a prior statement.  She should be

4    able to give an answer --

5              THE COURT:  Counsel, if you could come up and bring

6    the transcript, we'll see where we are.

7                        (A sidebar conference was held out of the

8                        hearing of the jury):

9              MR. HOSKINS:  First question was about page 25.

10             THE COURT:  And that was the question about when

11   Maricle approached her to help with son-in-law's race.  She

12   couldn't remember.  You showed the transcript.  The transcript

13   indicates it was weeks after the election.  Okay.

14             MR. HOSKINS:  Next questions are about page 28.

15             THE COURT:  Change parties.  Okay.

16             MR. HOSKINS:  The final question --

17             THE COURT:  I guess the objection here is that you're

18   now jumping from refreshing her memory to showing her

19   transcript on the matter that you haven't asked her about yet.

20             MR. HOSKINS:  I'm sorry.

21             THE COURT:  I assume that's the objection?

22             MR. SMITH:  Well, and Your Honor, since we're dealing

23   with six elections, for him to refer generically to an

24   election I think is unfair to the witness if he doesn't set a,

25   you know -- he, in this situation, is giving a statement that

*W. WHITE - Cross (Mr. Hoskins)*                                    68

1   was made in response to a question generically referring to

2   "the election."

3            MR. HOSKINS:  I prefaced it with the first part of

4   your question was following your involvement with the spring

5   and fall 2004.  And she later says that she, she sealed the

6   deal right after Christmas, 2004.  I'm just trying to --

7            THE COURT:  So then the question becomes, when did

8   you change political parties.  Is that where you're --

9            MR. HOSKINS:  Yes.

10            THE COURT:  Okay.  Well, again, you can certainly ask

11   her those questions, but you need to ask her the questions

12   before you refresh her memory on some other point.  We do need

13   to make sure we're specific on elections that we're dealing

14   with.  Your issue is a different issue.  For future reference,

15   if we could be totally clear on that.

16            Mr. Smith, it may be that you'll need to address this

17   matter on redirect, but it is a proper matter for

18   cross-examination.

19            MR. HOSKINS:  Thank you, Judge.

20                   (Sidebar conference concluded.)

21            THE COURT:  Thank you, counsel.  Mr. Hoskins, you may

22   proceed.

23            MR. HOSKINS:  Thank you, Your Honor.

24   Q.   Okay.  Miss White, you agree that the first question was

25   does that refresh your recollection that you answered it was

1    weeks after the 2004 fall election, right?

2    A.   Yes.

3    Q.   Okay.  Mr. Smith also asked you, "when it was laid out to

4    you initially, you were going to change parties, help Phillip

5    Mobley.  You were going to be an election officer."  Do you

6    remember that question?

7    A.   Yes.

8    Q.   And do you remember your answer to that question?

9    A.   Yes.

10   Q.   You answered yes, right?

11   A.   Yes.

12   Q.   So when Mr. Maricle came to you after the 2004 fall

13   election, that's what he asked you?  Would you change parties?

14   A.   We discussed it, yes.

15   Q.   Okay.  Shortly after that, Mr. Smith asked you, "when is

16   it that you actually agreed with Cletus Maricle to do this?"

17   Do you remember that question?

18   A.   Well, the next question is not that question.  Is that

19   what you're --

20   Q.   No, I'm saying that shortly after that, Mr. Smith asked

21   you a question, and I'm asking if you remember him asking you

22   "when is it that you actually agreed with Cletus Maricle to do

23   this?"

24   A.   I don't remember that, no.

25   Q.   Okay.  Turn to the middle of page 30 and see if that

*W. WHITE - Cross (Mr. Hoskins)*                                    70

1   refreshes your recollection about your testimony.

2   A.   Okay.

3   Q.   Does that refresh your recollection?

4   A.   Yes.

5   Q.   And you remember now that Mr. Smith asked you "when is it

6   that you actually agreed with Cletus Maricle to do this?"  And

7   your answer was what?

8   A.   "Right after Christmas."

9   Q.   Mr. Smith then asked you, "okay.  After Christmas of '04,

10  '05?"  What was your answer?

11  A.   "'04."

12  Q.   Okay.  Miss White, the truth is that you changed from the

13  Republican to Democrat in July of 2003, isn't it?

14  A.   If that's what the records show.

15  Q.   Okay.  Is that your recollection?

16  A.   If that's -- I mean, the answer is if that's what the

17  records show.

18          MR. HOSKINS:  Your Honor, I would ask that the

19  witness be shown what we've marked Defendant's Exhibit Maricle

20  Number 1.

21          MR. SMITH:  Your Honor, may we approach?

22          THE COURT:  Yes, you may.

23              (A sidebar conference was held out of the

24              hearing of the jury):

25          THE COURT:  Okay.

*W. WHITE - Cross (Mr. Hoskins)*                                    71

1          MR. SMITH:  Your Honor, if I recall, Mr. Hoskins

2     questioned the witness, he suggested that isn't it true that

3     you changed your party's registration in July of '03.  I

4     believe that's the question that he just made to the witness.

5          My objection is, Your Honor, I had given them

6     complete copies of election files, which included other things

7     like changes of address, like original registration, and like

8     party change.  And obviously, Mr. Hoskins didn't reference the

9     witness to the party change, because it's June of '04, and I

10    think he's misrepresenting, number one, the record; and number

11    two is I think it's unfair to this witness to show her an

12    address change as opposed to a party change.

13         So I'm going to object to the question and ask that

14    if he's going to produce this document to the witness, at

15    least he give her the correct form.

16         MR. HOSKINS:  And that's fair enough.  That was my

17    mistake, Judge.  I looked at page 2 instead of page 3.  The

18    address change is July of 2003.  But obviously, I wasn't

19    trying to deceive anybody.  I was getting ready to show her

20    this and ask her to look at it and see, and I was going to try

21    to get her to lay the foundation to admit this.

22         THE COURT:  All right.  I will sustain the objection

23    to the question but allow you to correct the record by

24    referencing the last page of the document, and you can follow

25    up with whatever the other pages are, to the extent that

*W. WHITE - Cross (Mr. Hoskins)*                                    72

1   they're relevant.  But we will need to correct the record on

2   that.

3              MR. HOSKINS:  Certainly.

4              THE COURT:  Thank you.

5                          (Sidebar conference concluded.)

6              THE COURT:  Thank you, counsel.  I will sustain the

7   objection to the last question.  But Mr. Hoskins, you can

8   rephrase your question.

9              MR. HOSKINS:  Thank you, Your Honor.

10  BY MR. HOSKINS:

11  Q.   Actually, Miss White, you moved to the Langdon Avenue

12  address at least before July of 2003, correct?  That's when

13  you moved into the city?

14  A.   I moved into the city in 2003.

15  Q.   And actually, you changed from Republican to Democrat in

16  June of 2004; is that right?

17  A.   If that's what the record shows.

18             MR. HOSKINS:  Your Honor, I would now ask that the

19  witness be shown what's been marked as Defendant's Exhibit

20  Maricle Number 1, consisting of three pages.

21             THE COURT:  You may show it.

22             THE WITNESS:  Do you want this back?

23             THE COURT:  You can leave it there.

24             THE WITNESS:  Okay.

25  Q.   Miss White, take a minute to look through those three

1    pages, and when you are finished let me know, please.

2    A.   (Reviewing document).  Okay.

3    Q.   Do you recognize those documents?

4    A.   I do.

5    Q.   The first page there is your voter registration form when

6    you first registered to vote, right?

7    A.   Yes.

8    Q.   And I think that was in 1990?

9    A.   Yes.

10   Q.   You registered as a Republican?

11   A.   Yes.

12   Q.   The second page is when you changed precincts because you

13   had moved into the house on Langdon Avenue in the City of

14   Manchester, correct?

15   A.   Yes.

16   Q.   And then the third page is when you changed your party

17   affiliation from Republican to Democrat?

18   A.   Yes.

19   Q.   And that's June of 2004?

20   A.   Yes.

21   Q.   Okay.  You recognize those documents as being filled out

22   in your handwriting?

23   A.   I recognize these documents to have been signed by me.

24   Q.   Okay.

25            MR. HOSKINS:  Your Honor, I would move that that

*W. WHITE - Cross (Mr. Hoskins)*                                    74

1    three-page exhibit be admitted as our Exhibit Number 1.

2            THE COURT:  Any objection?

3            MR. SMITH:  No, Your Honor.

4            THE COURT:  Maricle Defendant's Exhibit Number 1 will

5    be admitted.

6                    (Defendant's Exhibit Miracle No. 1

7                    was admitted into evidence.)

8    Q.  Miss White, I'd like to ask you a couple more questions

9    about your grand jury testimony --

10   A.  Okay.

11   Q.  -- in May of 2007.  Do you recall talking in front of the

12   grand jury under oath about Judge Maricle, Cletus Maricle?

13   A.  Yes.

14   Q.  You recall being asked, "how did the judge," meaning

15   Judge Maricle, "get involved in prior elections?"  And you

16   answered, "well, he gave my husband money, supported him in

17   the jailer's race in '02."  And you've told us about that

18   today, right?

19   A.  Yes.

20   Q.  And that was your testimony before the grand jury?

21   A.  That was one example, yes.

22   Q.  Okay.  Shortly after that, Mr. Smith asked you, "any

23   other elections that he was involved in that you know?"  And

24   your answer was, "not that I know personally, no."  Right?

25   A.  That was my answer.

*W. WHITE - Cross (Mr. Hoskins)*                                    75

1    Q.   And this is in May of 2007, after you've started

2    cooperating and making recordings, right?

3    A.   If that's when it was, if that's what the grand jury

4    testimony -- grand jury met.

5             MR. SMITH:  What page?

6             MR. HOSKINS:  Page 19.

7    A.   Is this it also?

8    Q.   No, that's your trial testimony.

9             MR. HOSKINS:  Your Honor, I do have a copy of her

10   grand jury testimony, if I could show that in an attempt to

11   refresh her recollection.

12            THE COURT:  All right.

13   Q.   Miss White, again, that's May 3rd of 2007?

14   A.   That's what this says, yes.

15   Q.   And that's the day that you went before the federal grand

16   jury in Lexington, Kentucky?

17   A.   Yes.

18   Q.   And you went into the room, and you swore an oath to tell

19   the truth?

20   A.   Yes.

21   Q.   And when you were asked about other elections that Cletus

22   Maricle was involved in, you said not that you know

23   personally, correct?

24   A.   My understanding of that question was prior to 2002.

25   Q.   Turn to page 45.  You remember being asked about other --

*W. WHITE - Cross (Mr. Hoskins)*                                      76

1   about your involvement in prior elections where money was

2   pooled and collected?  Do you remember being asked that

3   question?

4   A.   I don't remember.

5   Q.   Would it refresh your recollection to look at the grand

6   jury testimony on that point?

7   A.   On page 45?

8   Q.   Yes, ma'am, at the bottom of the page.

9   A.   Okay.

10  Q.   You were asked, were you -- you were asked by Mr. Smith,

11  "were you involved in prior elections where money was pooled

12  and collected?"  And your answer was what?

13  A.   "Not in the '06 election."

14       MR. SMITH:  Your Honor, I'm going to object again to

15  the procedure which counsel is using again.  I believe that

16  the witness is entitled to give an answer first before reading

17  into the record this statement.

18       THE COURT:  All right.  Going forward, Mr. Hoskins --

19  I'm going to overrule the objection for purposes of this

20  question, but going forward, if you could --

21       MR. HOSKINS:  Thank you, Your Honor.

22  Q.   Miss White, does the grand jury, the page that you're

23  looking at there, does that refresh your recollection as to

24  the questions that were asked of you and the questions that

25  you gave?

*W. WHITE - Cross (Mr. Hoskins)*                                        77

1    A.   I'm reading it.  I wouldn't necessarily say that it

2    refreshes my memory.

3    Q.   So you don't remember that?  Is that your testimony?

4    A.   I don't remember that.

5    Q.   Do you remember being asked "was Judge Maricle involved

6    in any of those meetings where money was pooled?"

7    A.   I don't remember that, no.

8    Q.   Okay.  Look at that grand jury transcript --

9    A.   I'm looking.  You're asking if I remember.  I don't

10   remember.

11   Q.   Now I'm asking you to look at that transcript and see if

12   that refreshes your recollection about the questions Mr. Smith

13   asked you and the answers that you gave.

14   A.   My answer is I don't remember.

15   Q.   Okay.  And I'm asking you now, would you read through

16   that and see if that refreshes your recollection?

17   A.   I did, sir.  I read it.

18   Q.   Does it refresh your recollection?

19   A.   No, it doesn't.

20   Q.   You have no memory whatsoever of those questions and

21   answers?

22   A.   I do not remember these questions.

23   Q.   While you were making these recordings of Cletus Maricle

24   and other people, you said to Cletus Maricle and these other

25   people lots and lots of things that were not true, right?

*W. WHITE - Cross (Mr. Hoskins)*                                      78

1    A.   Under the direction of the agents.

2    Q.   But you were saying things that were not true?

3    A.   Yes.

4    Q.   You were lying to Cletus Maricle?

5    A.   Under the direction of the agents.

6    Q.   It was still a lie, wasn't it?

7    A.   It was still under the direction of the agents.

8    Q.   Was it a lie, or was it the truth?

9    A.   I answered your question.

10   Q.   Was it a lie, or was it the truth?

11   A.   I said yes, under the direction of the agents.

12   Q.   Yes, it was a lie?

13            THE WITNESS:  Your Honor --

14            THE COURT:  Yes, ma'am?

15            THE WITNESS:  I feel like that I'm answering his

16   questions with an answer and my perception of the answer.

17            THE COURT:  All right.  I'm going to allow him to ask

18   the question again.  What he's asking you is if the

19   information that you were providing was truthful information.

20   And you're saying that no, it was not truthful information;

21   that you were doing so at the direction of the agents?

22            THE WITNESS:  Exactly.

23            THE COURT:  Is that correct?

24            THE WITNESS:  Yes, that's my answer.

25            THE COURT:  All right.  Thank you.

*W. WHITE - Cross (Mr. Hoskins)*                                    79

1    Q.   Do you have A15A in front of you, the transcript?

2    A.   I do, yes.

3    Q.   Okay.  On page 2, in the middle of the page, it says,

4    "Wanda:  Let me tell you, I went in there at 5:55 and didn't

5    get out until seven, ten after seven."  That was not true, was

6    it?

7    A.   I don't know what time I got in and out of there.  I

8    can't answer that.

9    Q.   You know what you're talking about there?  You're talking

10   about the grand jury testimony.

11   A.   Yes, that's what I'm talking about.

12   Q.   But had you really had problems at the grand jury that

13   day?

14   A.   No.

15   Q.   Okay.  Middle of page 4, you said, "he --" you were

16   talking about --

17   A.   I'm sorry, what?

18   Q.   Middle of page 4, it says, "Wanda:  He slammed down the

19   binder on the desk and it popped like a gun."

20   A.   Yes.

21   Q.   You were talking about Mr. Smith --

22   A.   Yes.

23   Q.   -- doing that?  But that wasn't true, was it?

24   A.   That was not true.

25   Q.   Okay.  Middle of page 7, Wanda says, "he tried to leave

*W. WHITE - Cross (Mr. Hoskins)*                                    80

1    and get, get a judge, and he come back and told me about 35

2    minutes later, come back and said I will see you Monday

3    morning." That's not true either, was it?

4         THE WITNESS: Your Honor, I could answer that

5    question if I could give an explanation.

6         THE COURT: All right. If you can answer his

7    question, you'll need to do that, and you may explain.

8    A.   The answer is no, he didn't do that, but I was directed

9    to say that.

10   Q.   Okay. And what you said was not true?

11   A.   I answered the question.

12   Q.   Around the middle of page 8, says "Wanda: If I seen any

13   money exchanged in the '02, '04, '06 elections. Hit me all

14   the way back to '02. Sent me for a loop, and I pled the Fifth

15   on that." Was that the truth?

16        THE WITNESS: Again, Your Honor, I can answer but

17   I'll need to explain it.

18        MR. SMITH: Your Honor, I'm going to object to the

19   question.

20        THE COURT: You can again -- my instructions will be

21   the same. You can answer his question and then you can

22   explain your answer.

23   Q.   Was that the truth?

24   A.   I was told by the agents and instructed to tell him that.

25   Q.   Was it the truth?

*W. WHITE - Cross (Mr. Hoskins)*                                          81

1    A.   No, it wasn't the truth.

2    Q.   Thank you.  Middle of page 11.

3    A.   11?

4    Q.   Yes, ma'am.  You're talking to Judge Maricle and says

5    "Wanda:  Well, you know I wouldn't lie to you."  Do you see

6    that?

7    A.   I see that.

8    Q.   Was that the truth?

9    A.   Generally, majority of the time, he knew I wouldn't lie

10   to him, but I was under the direction of the agents to do so.

11   Q.   So he was wrong if he thought you wouldn't lie to him,

12   wasn't he?

13   A.   He didn't think so.

14   Q.   Miss White, we could go through all these transcripts of

15   these recordings for days and point out things like that that

16   you said to Cletus Maricle or any of these other people that

17   you recorded that were not true?

18            MR. SMITH:  Your Honor, I'm going to object.

19            THE COURT:  I will give the jury an admonition once

20   again on the use of statements of Mr. and Mrs. White at the

21   conclusion of the testimony, Mr. Smith, but I'll overrule the

22   objection at this point.

23   Q.   Miss White, particularly with Cletus Maricle, the person

24   that you were talking to was somebody that knew you very well,

25   that you were very close to, right?

*W. WHITE - Cross (Mr. Hoskins)*                                      82

1    A.  He knew me very well, yes.

2    Q.  And he believed those untrue things that you were saying

3    to him, didn't he?

4    A.  I don't know.  You'll have to ask him that.

5            MR. HOSKINS:  Your Honor, could I have just a minute?

6            THE COURT:  Yes, sir, you may.

7    Q.  One more question, Miss White.  You testified about

8    taking some people to do absentee voting in 2006, both May and

9    November elections.  Right?

10   A.  Whatever the records show.

11   Q.  Do you remember --

12   A.  I remember taking people to vote absentee.

13   Q.  Okay.  Who did you take to vote absentee?

14   A.  I don't recall.

15   Q.  Not a single one?

16   A.  Not a single one.

17           MR. HOSKINS:  Thank you, that's all.

18           THE COURT:  All right.  I'm going to be taking a

19   break in about 15 minutes, but it may be that counsel -- Mr.

20   Bayer, I think, is handling the witness?

21           MR. WESTBERRY:  I'll do this one.

22           THE COURT:  Would you like to break now so I don't

23   interrupt your concentration?

24           MR. WESTBERRY:  Probably just a short -- whatever the

25   Court and jury would like.

1    THE COURT:  Why don't we do that.  We've been about

2    an hour.  I don't want to interrupt your cross-examination.

3    Ladies and gentlemen, we'll take a 15-minute recess at this

4    time.  Please remember the admonition you were given

5    previously about not to discuss the case while we're in

6    recess.  The jury will be excused.

7              (The jury left the courtroom at 3:06 p.m.)

8    THE COURT:  Counsel, before we take our break, I want

9    to give the parties additional authority for the Court's

10   ruling this morning on the matter that was taken up pretrial.

11   The case, according to the Court's determination, is

12   United States v. Pizzonia, Second Circuit case.  The case

13   number is 07-4314, criminal matter.  It's a RICO case.  I

14   don't have a better citation than that, but I do want to give

15   you that additional authority.  We'll be in recess.

16             MR. ABELL:  Excuse me, Judge.  07-4314?

17   THE COURT:  Yes, sir.  It's a Second Circuit case.

18   That's the case number.  We'll be in recess for 15 minutes.

19             MR. HOSKINS:  Your Honor, I just want to see if I can

20   get the documents that I had shown for recollection

21   refreshing.

22   THE COURT:  As soon as we take our break, you can

23   come up and pick up those documents that were not introduced.

24   Thank you.

25             (Recess from 3:08 p.m. until 3:23 p.m.)

*W. WHITE - Cross (Mr. Westberry)*                                      84

1          (The jury entered the courtroom at 3:23 p.m.)

2          THE COURT:  Thank you.  The record will reflect that

3    all members of the jury are present.  Parties and counsel are

4    all present.

5          Miss White, of course, you're still under oath.

6          Mr. Westberry, you may proceed.

7          MR. WESTBERRY:  Thank you, Judge Reeves.  May it

8    please the Court.

9                            CROSS-EXAMINATION

10   BY MR. WESTBERRY:

11   Q.   Miss White, good afternoon.

12   A.   Good afternoon.

13   Q.   I'm Kent Westberry.  I'm here for Doug Adams.

14   A.   Okay.

15   Q.   If at any time you can't hear what I ask you, I take no

16   offense if you'd ask me to rephrase the question, if that's

17   okay with you.

18   A.   Likewise.

19   Q.   Thank you.  Prior to 2002, would you agree that the White

20   family in Clay County were very prominent in terms of the

21   offices that they held?

22   A.   Prior to 2002?

23   Q.   Yes, ma'am.

24   A.   Well, actually, sir, I remember when I married Kennon,

25   the Sizemores were a prominent family.

*W. WHITE - Cross (Mr. Westberry)*                                    85

1    Q.   Right.  But you would agree that a number of the White

2    family, including those that you are related to by marriage,

3    held a fair number of offices in Clay County prior to 2002?

4    A.   I would agree, yes.

5    Q.   Now, would you also agree, Miss White, that in that same

6    time frame, in fact, including any time frame you want to

7    mention, Doug Adams did not have any family members who held

8    or occupied elected offices in Clay County?

9    A.   No.

10   Q.   You agree with that?

11   A.   I agree with that.

12   Q.   You said back last week, ma'am, when you first began to

13   testify, my best recollection it was Friday, but I could be

14   mistaken, you said that you and your husband Kennon decided

15   that he would run for jailer in 2002 because you didn't like

16   the way things were done and you wanted to make a change.  Is

17   that correct?

18   A.   That's correct.

19   Q.   Now, Kennon White ran for jailer in 2002 and did not win,

20   correct?

21   A.   Yes.

22   Q.   He lost the race to Mr. Marcum; is that correct?

23   A.   Yes.

24   Q.   Now, Mr. Adams and others supported Mr. Marcum in that

25   race, correct?

*W. WHITE - Cross (Mr. Westberry)*                                    86

1    A.   To my knowledge, yes.

2    Q.   Okay.  Now, about two years after that 2002 race, in

3    approximately 2004, your father-in-law, the then Manchester

4    mayor, Daugh White, created a position for Kennon as sort of a

5    city manager; is that correct?

6    A.   He created a position.

7    Q.   And I think that paid about $48,000 a year for Kennon,

8    his salary.  Is that your recollection?

9    A.   Somewhere around there, yes.

10   Q.   Now, when Kennon held the position as city manager during

11   that period of time, he accepted bribes or kickbacks from a

12   small business there in Clay County, correct?

13   A.   I'm sorry?

14   Q.   During the period of time that Kennon held the position

15   of city manager, the one that his father, Daugh or Doug White

16   had created, during that period of time, he accepted bribes or

17   kickbacks from a small business there in Manchester in Clay

18   County, correct?

19   A.   That was his charge.

20   Q.   That was his charge, and he -- you understand that he did

21   plead guilty to that, correct?

22   A.   Yes.

23   Q.   And he's not yet been sentenced, correct?

24   A.   Yes.

25   Q.   Now, the total number of bribes or kickbacks that he

*W. WHITE - Cross (Mr. Westberry)*                                    87

1    accepted was in the range of about $67,000; is that correct?

2    A.   I don't recall the amount.

3    Q.   Is that an approximate figure, or is that fairly close to

4    what you understand?

5    A.   That's what his plea agreement says, yes.

6    Q.   And you don't have any reason to believe that the plea

7    agreement would be incorrect, do you?

8    A.   No.

9    Q.   And that period of time that he took those bribes or

10   those kickbacks, that was over a several year period of time,

11   correct?

12   A.   I couldn't answer that.  You'll have to ask him that.

13   Q.   Okay.  Is your understanding that it did take place over

14   some period of time, not all in one payment?

15   A.   My understanding.

16        MR. SMITH:  I believe that the witness has -- the

17   question has been asked and been answered.

18        THE COURT:  I believe she said that was her

19   understanding.

20        MR. WESTBERRY:  That's fine, Judge.  I'm able to keep

21   moving.  Thank you, Judge.

22   Q.   Now, when you and your husband, Kennon, would decide who

23   you were going to support for a particular local office, would

24   you vote -- or would you support the straight party line, or

25   would you occasionally do that regardless of a person's party

*W. WHITE - Cross (Mr. Westberry)*                                    88

1   affiliation?

2   A.   I don't -- I don't recall.  They were discussing that

3   with him.  We generally supported who we thought was best for

4   the job.

5   Q.   Regardless of their party affiliation?

6   A.   No, generally that person was a Republican.

7   Q.   You talked -- we've talked for days, of course, Miss

8   White, about the tape recordings that you and your husband

9   Kennon made over a period of time?

10  A.   Yes.

11  Q.   And I seem to recall it was your best recollection that

12  you made about 20 hours, thereabouts, of tape recordings?

13  A.   No.  That wasn't what I said.

14  Q.   I'm sorry.  I don't want to mischaracterize, ma'am.  How

15  many hours do you think --

16  A.   I have no idea, but I would say more than 20 hours.  I

17  don't know.

18  Q.   Well, certainly.  I mean, it might even be closer --

19  A.   When you asked me that question, you said 20 hours.

20  Q.   And I apologize.

21  A.   Okay.

22  Q.   I don't want to mischaracterize the number of hours.

23  Quite frankly, I'm not even sure how many hours there are, but

24  I think would it be fair to say that the tape recordings that

25  you and your husband, Kennon, made were for many, many

*W. WHITE - Cross (Mr. Westberry)*                                      89

1    hours --

2    A.   Yes.

3    Q.   -- correct?  Would you also agree that Doug Adams' voice

4    is never heard on any of those tape recordings that were

5    made --

6    A.   Yes.

7    Q.   -- correct?  I'd like to ask you, ma'am, about some

8    support, some lineup that would have been given starting in

9    the 2002 race.  The May, '02, primary, of course, was the one

10   that involved the race for county court clerk between Mr.

11   Jennings White and Freddy Thompson, correct?

12   A.   Yes.

13   Q.   Now, seated here in the back row are many of the

14   individuals who are on trial in this court today, correct?

15   A.   Yes.

16   Q.   Now, going around the room, I think you would agree among

17   the people that are seated in this room -- the parties, that

18   is, is who I'm referring to -- some supported Jennings White,

19   others supported Freddy Thompson, correct?

20   A.   Yes.

21   Q.   It's fairly even split, in other words, correct, in that

22   race for county court clerk?

23   A.   I don't know about that.

24   Q.   Mr. and Mrs. Morris supported Jennings White, correct, to

25   the best of your knowledge?

*W. WHITE - Cross (Mr. Westberry)*                                  90

1   A.   To the best of my knowledge.

2   Q.   Mr. Bowling supported Mr. Jennings White, to the best of

3   your knowledge?

4   A.   Yes.

5   Q.   Going around the room, Mr. Adams, Mr. Stivers and Mr.

6   Jones supported Freddy Thompson.  Would you agree with that?

7   A.   Yes.

8   Q.   So would you agree that sort of represents, when you add

9   everybody up, a fairly even split around the room, correct?

10  A.   Yes.

11  Q.   Thank you.  Now, there was also a race, a primary that

12  year for sheriff as well.  Is that correct, ma'am?

13  A.   I'm sorry, what?

14  Q.   For sheriff, as well, in 2002?  Do you recall that?

15  A.   Yes.

16  Q.   Between Edd Jordan and Mr. Danny Reed?

17  A.   Yes.

18  Q.   Now, Edd Jordan won that race.  Is that your

19  recollection?

20  A.   Yes.

21  Q.   And he was a Jennings White supporter; is that correct?

22  A.   Yes.

23  Q.   Now, same question I asked you about the clerk's race

24  just a moment ago.  With the people that are seated in this

25  courtroom today, the parties, there was a fairly even split

*W. WHITE - Cross (Mr. Westberry)*                                91

1   among those in the room in terms of those who supported Danny

2   Reed and those who supported Sheriff Edd Jordan, correct?

3   A.   No, I don't know that.

4   Q.   You don't know that?  Do you know if Mr. and Mrs. Morris,

5   for example, supported Edd Jordan?

6   A.   I don't know that.

7   Q.   You don't know the lineup --

8   A.   Edd Jordan was on the ticket that we ran.

9   Q.   And that's what we also refer to as the Jennings White

10  ticket?

11  A.   Yes.

12  Q.   Thank you.  Some questions were asked by the government,

13  Ms. White, at the end of your examination this morning about

14  Melanda Adams.  Do you recall those questions?

15  A.   Yeah, I do.

16  Q.   And, of course, you know who Melanda Adams is, do you

17  not, ma'am?

18  A.   Yes, she worked in Freddy's office.  I know who she is.

19  Q.   More importantly, she's the daughter of Doug and Sissy

20  Adams.  Is that your understanding?

21  A.   Yes.

22  Q.   Now, you've testified that Melanda Adams had a problem

23  with drugs.

24  A.   Yeah, she's -- yes.

25  Q.   She was addicted to drugs, is that your understanding?

*W. WHITE - Cross (Mr. Westberry)*                                    92

1    A.   That's my understanding.

2    Q.   You also testified as to a conversation that you say

3    happened between you and Mr. Maricle where Mr. Maricle -- and

4    I'm going to paraphrase as best I can, and you correct me if

5    I'm wrong -- said Mr. Adams didn't want to cross him because

6    he, Mr. Maricle, had been lenient on Melanda with regard to

7    her drug problems.  Have I said that about right?

8    A.   He said he couldn't afford to cross him because Melanda

9    could have been in serious trouble, and she didn't get in

10   serious trouble.

11   Q.   Have you ever actually seen any court records that would

12   indicate that Melanda Adams was actually in Mr. Maricle's

13   court?

14   A.   I have no access to court records, no.

15   Q.   Let me ask -- maybe I didn't ask the question very well,

16   and forgive me and I'll try again.  Have you ever actually

17   seen yourself, with your own eyes, any court records that

18   would indicate that Melanda Adams was actually in Mr.

19   Maricle's court?

20   A.   No, and I don't recall making a statement that she was

21   actually in Mr. Maricle's court.

22   Q.   Okay.  So that was my next question.  You've never

23   actually been in Mr. Maricle's court when Melanda Adams was

24   present, correct?

25   A.   No.

*W. WHITE - Cross (Mr. Westberry)*                                      93

1    Q.   Do you know how Melanda Adams is doing now?

2    A.   I have no idea, no.

3             MR. WESTBERRY:  One second please, Your Honor.

4             THE COURT:  Yes, sir.

5    Q.   Do you have any knowledge, ma'am, if the drug charges

6    that you said that you were talking with Mr. Maricle about

7    were either in his court, which is circuit court, or in

8    another court called district court?

9             MR. SMITH:  Your Honor, I'm going to object.  Counsel

10   has asked.  The answer to the question --

11            MR. WESTBERRY:  That's a different question, Your

12   Honor.

13            THE COURT:  I'll allow the question, overrule the

14   objection.  You can answer.

15   A.   Again, I don't recall making a statement that it was in

16   either court.

17   Q.   Do you have knowledge that Doug Adams actually had to

18   take steps to go and have his daughter brought in by law

19   enforcement because her drug problem was that bad?

20   A.   No, sir.

21   Q.   You have no knowledge of that?

22   A.   I have no knowledge of that.

23            MR. WESTBERRY:  Thank you, Judge.  I believe that's

24   all I have.

25            THE COURT:  All right.

*W. WHITE - Cross (Mr. White)*                                    94

1              THE WITNESS:  Thank you.

2              THE COURT:  Mr. White, we'll give you a moment if you

3    need to set up your computer.

4              MR. WHITE:  Thank you, Your Honor.  Your Honor, I'm

5    almost ready.

6              THE COURT:  Yes, sir, that's fine.

7                          CROSS-EXAMINATION

8    BY MR. WHITE:

9    Q.   Good afternoon.  My name is Scott White.  We're not kin,

10   I don't think.  And my client is Charles Wayne Jones, whom

11   we've already identified.  And like Mr. Westberry said, if I

12   have asked a question that you don't understand, just tell me,

13   and I will do my best to do it to where we can communicate.

14             The other thing I wanted to mention to you, when you

15   get to be third, a lot of what I wanted to ask has been

16   covered so I'm going to try not to duplicate much.  I may a

17   little bit to try to lead in, give us some context.

18   A.   Okay.

19   Q.   So the first thing I want to ask you is just kind of some

20   introductory things.  Before you came to testify this week,

21   or, I'm sorry, last week, you would have testified on Friday,

22   have you reviewed anything to refresh your memory, to help

23   yourself get prepared, like grand jury testimony or witness

24   summaries, anything like that?

25   A.   No.

*W. WHITE - Cross (Mr. White)*                                        95

1   Q.   Okay.  Now, did you testify -- I want to talk about now

2   you've testified I believe to Mr. Hoskins that at no time did

3   you think you were a target, or no one had ever told you that

4   you were a target of the FBI.  Is that a correct statement?

5   A.   Yes.

6   Q.   The first time you met with the FBI, is it your

7   recollection was in the summer of 2006?  They came down, you

8   met with them, and they asked you about some financial things

9   about the office, what your job duties were in the mayor's

10  office, that kind of thing.  Do you remember that?

11  A.   I didn't say that, but yeah.  I remember that.

12  Q.   The topics that were discussed, is it your recollection

13  that when you first met with the FBI --

14  A.   That's my recollection.  However, I've not said that.

15  Q.   Okay.  Do you recall who you spoke to with the FBI when

16  they came and interviewed you?  If you don't remember, that's

17  fine.

18  A.   I don't remember.

19  Q.   But they identified themselves as FBI agents?

20  A.   Yes.

21  Q.   And at that time, were you aware, in the summer of 2006,

22  had you become aware that your husband had received kickbacks

23  from businesses in Clay County?

24  A.   It was in the fall, sir.

25  Q.   I understand that.  But when the FBI and --

*W. WHITE - Cross (Mr. White)*                                          96

1    A.   It was in the fall, not the summer.  The fall.

2    Q.   Just one moment.

3    A.   October is fall, right?

4         MR. WHITE:  Your Honor, I'd like to hand her a

5    document, see if it refreshes her memory as to the date she

6    first met with the FBI, as well as the agents whom she spoke

7    to.

8         THE COURT:  All right.

9         MR. WHITE:  I've already shown this to the

10   prosecution.

11        THE COURT:  All right.  Thank you.

12   A.   Well, what this is saying is when they come to City

13   Hall --

14   Q.   Ma'am, I'm sorry.

15        MR. WHITE:  Your Honor, I don't want to tell you what

16   to do, because that's not my job --

17        THE COURT:  I will remind the witness again --

18        MR. WHITE:  If you could -- thank you, Your Honor.

19        THE COURT:  Miss White, what you can do, you can look

20   at that document, see if it refreshes your memory.  If it

21   refreshes your memory, you can testify about what you recall.

22   But you don't read from the document.  It's only shown to you

23   to see if it refreshes your memory.  So those two issues he

24   was asking you about --

25        MR. WHITE:  Your Honor, if you could also, if I could

*W. WHITE - Cross (Mr. White)*                                              97

1   ask you to instruct her to let me ask a question before she

2   answers.

3            THE COURT:  All right.  I will ask the parties to

4   wait until one is finished before the other starts to speak,

5   and that way the record's clear.

6            THE WITNESS:  I'm attempting to answer your question

7   right now.

8            MR. WHITE:  I don't have a question on the floor,

9   Your Honor.

10           THE COURT:  Go ahead with your question.

11           MR. WHITE:  Thank you.

12  BY MR. WHITE:

13  Q.  I'm sorry.  I'm just trying to get us there.  Does that

14  document refresh your memory as to when you first met with

15  agents of the FBI?

16  A.  This document states when the FBI came to City Hall.

17  Your question was when I first talked with them, which was in

18  October.

19           MR. WHITE:  Could I have that back, please?

20  Q.  Would you read the next two paragraphs in full to

21  yourself if you need to --

22  A.  I will.

23  Q.  -- and see if that refreshes your recollection that you

24  were interviewed by the FBI in August of '06?

25  A.  (Reviewing document).  I'm finished.

*W. WHITE - Cross (Mr. White)*                                        98

Q.   Does that refresh your memory?

A.   It doesn't refresh my memory, but it states that I spoke with FBI agents --

THE COURT:  Hang on a second, ma'am.  Remind you again, the attorney's asking you to look at a document, see if it refreshes your memory.  Do you have a memory of meeting with the FBI on a certain date.  Then your answer is what you recall.  Not what you're reading, but what you recall, okay?

A.   I recall meeting with them.

Q.   In that meeting, did they ask you about what your job duties were there at the City?

A.   They did.

Q.   And did they ask you who dealt with the financial matters of the City, and did you identify a couple of other ladies?

A.   Yes, yes.

Q.   Okay.

A.   I would have, yes.

Q.   I don't want to ask you about the second paragraph.  Now, in that discussion that you had with the agents of the FBI, and looking at the very top paragraph, does that refresh your recollection that the gentlemen that were there were Agents Briggs and Agent Blair?

A.   Yes, and it says TFO Roger Cooper.

Q.   Okay.  Was that the first time that you had met these gentlemen?

*W. WHITE - Cross (Mr. White)*                                          99

1    A.   Yes.

2    Q.   Trying to get something to remind me about something.

3    During that conversation with Agents Briggs and Blair and TFO

4    Cooper, at that time, did you already know that your husband

5    had received kickbacks from businesses -- or companies doing

6    business with the City?

7        I'm sorry.  I confused you.  Let me try that again.  I

8    kind of got lost in my own words.

9        When you met with the FBI agents there in August of 2006,

10   did you already know that your husband had received kickbacks

11   from folks who had done business with the city?

12   A.   Did I know, or was he charged at that time?

13   Q.   Did you know?

14   A.   I knew.

15   Q.   Did you disclose that to the FBI that day?

16   A.   I don't recall being asked that.

17   Q.   Did you voluntarily disclose it?

18   A.   I doubt it.

19   Q.   Okay.  Now, when you went to meet -- the next time you

20   met with the FBI -- strike that.  Do you recall meeting with

21   agents of the FBI in the spring of 2007 after you had been

22   laid off from your job with the City?

23   A.   Yes.

24   Q.   And was that the first time that you met with the FBI

25   about issues regarding elections and your involvement in

*W. WHITE - Cross (Mr. White)*                                        100

1    elections?

2    A.   Yes.

3    Q.   And at that meeting, would it not be accurate to state

4    that you had your lawyer with you, Brent Caldwell?

5    A.   I did, yes.

6    Q.   And Mr. Smith was there, correct?

7    A.   Yes.

8    Q.   And both Agents Briggs and Agent Blair were there?

9    A.   Yes.

10   Q.   And it's your testimony, I believe on direct and then to

11   Mr. Hoskins, that you did not think you were a target -- you

12   did not know you were a target.  Nobody had told you you were

13   a target?

14   A.   No.

15   Q.   But you knew you were in trouble; is that not right?

16   A.   No.

17   Q.   You didn't think you were in trouble?

18   A.   No.

19   Q.   You had, by your own admission on direct testimony,

20   you've testified that you carried money and bought votes for

21   your husband in 2002, correct?

22   A.   Yes.

23   Q.   You've testified that in 2004, you carried money and

24   bought votes for your aunt-in-law, Barbara White Colter; is

25   that correct?

*W. WHITE - Cross (Mr. White)* 101

1    A.   Yes.

2    Q.   And you've testified that by the spring of 2007, that you

3    were aware of your husband's kickback scheme; is that not

4    correct?

5    A.   Yes.

6    Q.   Okay.  And based on all that conduct that you did, it's

7    your testimony that you didn't think you might be in trouble

8    that day?

9    A.   It's my testimony that I went in with my attorney and

10   provided information to cooperate with an investigation under

11   the impression of what I was told I would not be in trouble.

12   Did I answer your question?

13   Q.   No.

14   A.   My answer is no, I didn't think I'd be in trouble.

15   Q.   I understand you've answered my -- you've attempted.

16   What I want to ask you is, is the reason that you went in and

17   talked to the FBI, did you think you needed to tell them

18   everything you knew?

19   A.   Trust me, they know everything about me, yes.

20   Q.   I appreciate that.

21   A.   Yes.  Yes.  My answer is yes.

22   Q.   Correct.  And then in that conversation, was it your

23   understanding that if you told them everything, that you

24   wouldn't be charged with any crimes, correct?

25   A.   If, after they investigated, found it to be what they

*W. WHITE - Cross (Mr. White)*                                    102

1    believed to be true, and I continued to cooperate, yes.

2    Q.   In other words, you wouldn't be charged with anything?

3    A.   Yes.

4    Q.   Did you also have a deal -- now, these were federal

5    prosecutors, correct?

6    A.   Yes.

7    Q.   You understand this is the federal government, correct?

8    A.   Yes.

9    Q.   Did you have a similar deal with the state government?

10   A.   No.

11   Q.   Okay.  Now, in all this conduct that you had engaged in

12   before you went in and met with the FBI in the spring of '07,

13   you understand as you sit here today, if you hadn't cut a

14   deal, you could have been charged and tried, correct?

15   A.   In state court?

16   Q.   In federal court.

17   A.   I'm sorry, what?

18   Q.   If you had not cut a deal with your attorney and the

19   United States, you know that you could have been charged for

20   all this conduct that you engaged in back in '02 and '04,

21   correct?

22   A.   I know that I have cut a deal.

23   Q.   And you cut the deal so you wouldn't be charged and sent

24   to jail?

25   A.   No.

*W. WHITE - Cross (Mr. White)*                                        103

Q.   You just cut a deal out of good conscience?

        MR. SMITH:  Your Honor, I'm going to object.

        MR. WHITE:  I'll withdraw, Your Honor.

        THE COURT:  I'll sustain the objection.  Jury may
disregard.

Q.   Now, you went to work for the FBI right away, after that
first meeting in the spring of '07 in terms of wearing a
recording device; is that correct?

A.   Yes.

Q.   And when you began making these recordings, would you
agree that the federal government's investigation in Clay
County was pretty well known in Clay County?

A.   Yes.

Q.   And there was a lot -- I mean, Clay County is a small
county, and Manchester's even a smaller town, correct?

A.   Yes.

Q.   Would you agree -- and there were two newspapers, the
Enterprise and then the Clay County Times?

A.   At that time, yes.

Q.   I think on one of the recordings, y'all were talking
about, laughing about one of the Clay County Times articles.
Would it be a fair statement, would you agree with me that
there was a lot of rumor and gossip about what the FBI was
doing, who was going to get indicted --

        MR. SMITH:  Your Honor, I'm going to object.

*W. WHITE - Cross (Mr. White)*                                          104

1          MR. WHITE:  If I can finish my question --

2          MR. SMITH:  May we approach?

3          THE COURT:  You can finish your question.  I'm going

4    to sustain the objection to it.

5          MR. WHITE:  May I approach, Your Honor?

6          THE COURT:  You may.

7          MR. WHITE:  Thank you.

8                    (A sidebar conference was held out of the

9                    hearing of the jury):

10         MR. WHITE:  Thank you, Your Honor.  This is Scott

11   White, I represent Charles Wayne Jones.  Your Honor, I'm just

12   trying to establish through this witness that there is a lot

13   of gossip and rumors running around about the federal

14   investigation, who was being brought up before the grand jury,

15   who was going to be indicted.  I think that's probative of the

16   issue as to a lot of these recordings --

17         THE COURT:  Rumor and gossip is not probative of any

18   issue.  Objection sustained as to that point.

19         Earlier in this trial, someone had asked to have Miss

20   White's attorney, Brent Caldwell, stand up and be identified,

21   point him out in the courtroom.  I sustained the objection

22   that that was improper.  You just turned around and pointed to

23   him.  You pointed to Mr. Caldwell as being her attorney with

24   your left hand.  You looked at Mr. Smith, and you pointed to

25   Mr. Caldwell.

1          MR. WHITE:  I'm sorry, Your Honor.  If I did that, I

2     did it.  I just don't remember doing it.

3          THE COURT:  You did it.

4          MR. WHITE:  I'm not disagreeing.

5          THE COURT:  Mr. Smith, any other matters on this

6     point?

7          MR. SMITH:  Well, Your Honor, I have concern.

8     Counsel has also -- a couple of these have gotten by, but

9     again trying to testify in front of this jury with openings

10    of, you know, this is why I'm doing this, and this is what --

11    those are all what I consider to be testimonial in nature and

12    not questions, and I know that at some point the Court

13    appreciates a little bit of context, but I think counsel has

14    at this point I think made an issue with the jury by pointing

15    out counsel.

16         And obviously, that's a situation where it concerns

17    the United States that, again, it causes us to have to try a

18    collateral issue or to bring -- to try to respond or rebut

19    something that I think is not fair because the jury's supposed

20    to decide this case on what comes from the witness stand, and

21    Mr. Caldwell's not on the witness stand, and to interject him

22    into this is inflammatory.  It's taking this case in a

23    direction outside of the rules.

24         The rules say the evidence is to come from the

25    witness stand, and I'm very concerned that counsel would make

*W. WHITE - Cross (Mr. White)*                                    106

1    this attempt, which I believe was very clear when I objected

2    the first time, and I will state that members of my table saw

3    the same thing, and I intended on bringing this up as the

4    Court has here already.  It was not just the Court saw this.

5    Other members at my table saw this.  And I would like to have

6    an opportunity at the next break to discuss the possibility of

7    how the jury might be instructed on it.  At this point, I'm

8    not asking for one, because I'm not sure it would be helpful.

9            But I do want an opportunity to readdress this, if

10   the Court would allow.

11           THE COURT:  You may.  And I'm going to reserve any

12   further action on this until later in the proceeding, but I

13   will make a finding at this point that Mr. White directly

14   violated an order of the Court that was previously given.

15           We're going to move on, Mr. Baldani.

16           MR. BALDANI:  I want to make sure I'm totally

17   straight.  I was going to ask a question or two about having

18   an attorney present at some interrogations.  I think the issue

19   is pointing him out in the courtroom here today, not did you

20   have him --

21           THE COURT:  That was the violation of my order,

22   correct.

23           MR. BALDANI:  I just want to make sure that it wasn't

24   any mention of her having him at the grand jury was totally

25   off limits.  It was him being here today.

*W. WHITE - Cross (Mr. White)*                                           107

1              THE COURT:  Pointing people out in the courtroom is a

2       subject of the Court's earlier order.  Very clear, explicit

3       instruction came up.  The Court has sustained the objection to

4       questions about rumors and suspicions in the community.  Let's

5       move on.

6              MR. WHITE:  Thank you, Your Honor.

7                    (Sidebar conference concluded.)

8              THE COURT:  I have sustained the objection to the

9       last question.  Counsel, you may continue.

10             MR. WHITE:  Thank you, Your Honor.

11      BY MR. WHITE:

12      Q.  Mrs. White, let me direct your attention, I want to ask

13      you now about the voter assistance forms that you testified to

14      over the last couple of days.  Now, did you testify that in

15      both the primary and the general elections in 2006, you filled

16      out voter assistance forms?  Is that right?

17      A.  Yes.

18      Q.  You were the Democratic judge in both the primary and the

19      general?

20      A.  Yes.

21      Q.  You were the -- I'm sorry.  Dobber Weaver, Charles Dobber

22      Weaver was the Republican judge in both the primary and the

23      general?

24      A.  Yes.

25      Q.  And Anthony Short was one of the other election officers,

*W. WHITE - Cross (Mr. White)*                                              108

1    I think the sheriff in the primary in 2006; is that correct?

2    A.   Yes.

3    Q.   And then in the fall, Minnie Weaver became the sheriff,

4    correct?

5    A.   Yes.

6    Q.   And Lucy Marcum was the clerk in both the primary and the

7    general?

8    A.   The best I recall, yes.

9    Q.   Those are the people that were -- those were the election

10   officers; is that correct?

11   A.   Yes.

12         MR. WHITE:  Now, if I could ask the clerk, Your

13   Honor, to provide the witness with Exhibits PR17 and PR25E.

14         THE COURT:  Not introduced.  They haven't been

15   introduced.  They were within the government's possession.

16   They haven't been introduced.

17         MR. WHITE:  Oh, okay.  Sorry.

18   Q.   Do you recall having those voter assistance forms in

19   front of you and discussing those with Mr. Smith in your

20   testimony, the voter assistance forms?

21   A.   Yes, yes.

22   Q.   And on those forms, there are certain blanks, and you're

23   required to fill out certain things; is that correct?

24   A.   I'm required to put my signature on it.

25   Q.   Right.  Would you agree with me that if a voter comes in

*W. WHITE - Cross (Mr. White)*                                    109

1    and the voter requests assistance in casting that vote, that

2    the person working at the table is who fills out part of the

3    form, that form is then given to you as the judge to go back

4    and cast the ballot.  Is that correct?

5    A.   Yes.

6    Q.   And then you come back up and sign it, you print your

7    name and then sign it; is that correct?

8    A.   I signed it before I took them back.

9    Q.   Okay.

10        MR. WHITE:  Just give me a moment, Your Honor.  I'm

11   trying to avoid duplication.

12   Q.   Now, Miss Smith --

13   A.   Miss White.

14   Q.   Oh, I'm sorry.  My apologies.  Miss White, do you recall

15   testifying on direct examination also to Mr. Hoskins that you

16   were first approached a few weeks after the fall 2004 election

17   to become an election officer in the 2006 election by Judge

18   Maricle?

19   A.   Yes.

20   Q.   Now, do you recall testifying before a grand jury in

21   which you gave -- I'm not talking about in the recordings

22   where you told people you were going to testify in front of

23   the grand jury, but actually going and giving testimony to a

24   grand jury.  Do you recall that?

25   A.   Yes.

*W. WHITE - Cross (Mr. White)*                                          110

1    Q.   Now, you knew that at the time that you gave the

2    testimony, it would have been similar to what we have here.

3    You went into a room, you took an oath, Mr. -- was Mr. Smith

4    there when you testified?

5    A.   Yes.

6    Q.   And then there were grand jury members?

7    A.   Yes.

8    Q.   Now, do you recall being asked in the grand jury in --

9    was it May?  Do you remember, was it May 3rd of 2007 when you

10   testified in front of a grand jury?

11   A.   I don't remember the exact date.

12   Q.   May 3rd of 2007, and I'll be happy to share with you --

13   A.   Okay.

14            MR. WHITE:  Your Honor, if I could ask the CSO to --

15            THE COURT:  All right.

16   Q.   And does the first page refresh your memory as to when

17   you went and gave grand jury testimony?

18   A.   It says May 3rd.

19   Q.   Okay.  And do you recall being asked at that grand jury

20   when you were first approached about becoming an election

21   officer?

22   A.   I recall something about it.

23   Q.   Could you look at -- could you turn to page 5, please,

24   ma'am?

25   A.   Okay.

*W. WHITE - Cross (Mr. White)*                                                111

1    Q.   And if you can look at bottom of that.  The very last

2    line, I think it's line 25.

3    A.   I see it, yes.

4    Q.   If you could read from there, continue on to the next

5    page, which is 6, and read to line 12.

6    A.   (Reviewing document).  Okay.

7    Q.   Does that refresh your memory as to what you said at the

8    grand jury as to when you were first approached?

9    A.   It does.

10   Q.   And when did you testify at the grand jury when you were

11   first approached by Judge Maricle to be an election officer?

12   A.   December, '05.

13   Q.   And then do you recall -- we just talked about the

14   interview that you had, the spring, 2007 interview you had

15   with the FBI at which you were first questioned about these

16   elections and whatnot.  Do you recall being asked in that

17   interview when you were first asked by Judge Maricle to become

18   involved in these election matters?

19   A.   You said -- I didn't get any of that.

20   Q.   I'm sorry.  Let me start over.  At the March -- or in the

21   spring, 2007 interview that you had with the FBI, the first

22   one at --

23   A.   And you're referring to this, right?

24   Q.   Yes.

25   A.   Okay.

*W. WHITE - Cross (Mr. White)*                                                112

1    Q.   Do you recall being asked in that interview by an FBI

2    agent whether or not you had been -- or when you had been

3    approached to get involved in elections and working in

4    elections?

5              MR. SMITH:  Your Honor, I'm going to object.  I

6    believe that the document that's been shown the witness is

7    August of '06, and he's asking her about a meeting in '07.

8              MR. WHITE:  Oh, I'm sorry.  When she held it up -- my

9    apology, Your Honor.  He's correct.

10             THE COURT:  Do you understand the question?

11             THE WITNESS:  No, not at all.

12             THE COURT:  Ask you to rephrase.

13             MR. WHITE:  Your Honor, could I have Court Exhibit

14   Number 1, please?  Your Honor, may I approach?

15             THE COURT:  Yes.

16             MR. WHITE:  Thank you.  I think this will just take a

17   second.

18                       (A sidebar conference was held out of the

19                        hearing of the jury):

20             MR. WHITE:  Your Honor, the section I wanted to

21   refresh her memory on -- and she's right.  When she held that

22   up, I thought she had the March, '07 one.  At any rate, this

23   is the paragraph I was going to use to refresh her memory.

24   And since it's already been identified as a Court exhibit, I

25   wanted to find out if there would be any objection to me using

*W. WHITE - Cross (Mr. White)*                                            113

1   this one, rather than me handing up my copy.

2           THE COURT:  You plan to ask her when the vote fraud

3   scheme that she testified began.  She doesn't know.  You want

4   to show her this document to refresh her memory as to the

5   date.  There was a discussion of a series of meetings and what

6   was discussed at those meetings.  If she's able to testify to

7   the date; and if so, to the meetings and what was discussed at

8   the meetings, then it wouldn't be necessary to refresh her

9   memory as to any of this.

10          If she doesn't recall and you do need to refresh her

11  memory, then we do need to do it correctly this time.  That

12  is, she can be shown the document.  She'll need to put the

13  document down and you can ask her questions about what her

14  memory is at that point.  I'm going to have to instruct her

15  once again that she should not say what the document says,

16  because that's not the proper testimony in the case.

17          And let me again remind counsel, of course, there is

18  a difference between refreshing memory and impeachment with

19  inconsistent statement.  I know that you're attempting to use

20  this to refresh memory.  And if she doesn't have a memory of

21  it, you can show her the document, refer her to the specific

22  paragraph, let her read it and then you can ask her questions.

23  If she starts to read from the document, I may take it away

24  from her, because that's not proper testimony.

25          MR. WHITE:  Thank you, Your Honor.

*W. WHITE - Cross (Mr. White)*                                          114

1          THE COURT:  Anything else while we're here?

2          MR. WHITE:  No, sir.

3          MR. SMITH:  Well, Your Honor, I fail to see how this

4    document's necessary.  I mean, he's asked the question.  Now,

5    if he wants to impeach her, he can impeach her.  But she has

6    testified that this election scheme began on a certain date.

7    He then gave her grand jury, and he's impeached her with that,

8    and now he's trying to give her a 302 and impeach her with

9    that, which is improper.  It's not her statement.  It's not

10   been acknowledged.  It's never been adopted as her statement.

11         He's not established the proper foundation.  And if

12   counsel is going to ask the questions and treat it that way,

13   we're going to continue to object because I see no -- at this

14   point, there is no memory to refresh.  She's testified.  He's

15   pinned her down, and he's impeached her, and now he wants to

16   impeach her again with a 302, which this Court has said is

17   impermissible.  This is not her statement.

18         THE COURT:  Are you asking essentially the same

19   question that you just gone over with her, or are you going

20   somewhere else on this?

21         MR. WHITE:  No, what I was --

22         THE COURT:  This paragraph talks about, the fourth

23   full paragraph of the 302 that's been marked as Court Exhibit

24   Number 1 talks about vote fraud scheme in January of '06 and a

25   series of meetings that were held.

1         MR. WHITE:  Right.

2         THE COURT:  And you're about to ask her about that,

3    those specific meetings that were held in that time period; is

4    that correct?

5         MR. WHITE:  I was going to ask her is that when she

6    first met the FBI on the election, which would have been the

7    3/27/07 meeting, and was she asked by the FBI in that meeting

8    when were you first approached by Judge Maricle.

9         THE COURT:  That's an out of court statement.  That

10   wouldn't -- no.  You need to ask her about her memory on this

11   particular event, and you can't use this document, then, to

12   backhandedly impeach her.  If that's what you're trying, I

13   will sustain the objection.

14        MR. WHITE:  Okay.  And Your Honor, I'm sorry, just so

15   everyone's aware, the last little area I'm going to go into is

16   I'm going to ask her about this sentence right here, just this

17   one that they've highlighted.

18        THE COURT:  That was the subject of direct

19   examination.

20        MR. WHITE:  Yes, right.

21        MR. SMITH:  I want to be heard, if I could, on that.

22        THE COURT:  Okay.

23        MR. SMITH:  Again, Your Honor, this is not her

24   statement.  It was given to her in direct, because I asked her

25   if she recalled Hal Rogers came in the city and this topic

*W. WHITE - Cross (Mr. White)*                                          116

1    coming up.  She looked at this and refreshed her memory and

2    testified from her memory, not the document.  For counsel to

3    read the document into the record, I would object, because I

4    believe it was used to refresh her memory.  It was not ever

5    established that this was her statement.

6              THE COURT:  Well, here's my point on this.

7              MR. SMITH:  I would object to that.

8              THE COURT:  Here's my point on this.  I don't know if

9    she remembers what she was asked on direct examination.  If

10   she does, you're right, there's no need to again refresh her

11   memory.  If she can't remember that line of questions, it may

12   be necessary to show her that document to again jar her memory

13   that this is what she was asked, and you can question her on

14   that.  So it's a two-step process.

15             MR. SMITH:  I'm sorry, I may have been premature,

16   but --

17             THE COURT:  If she remembers the questions being

18   asked on direct, there's no need to show her the document.  If

19   she doesn't, then there may be a need to do that.  At this

20   point, we don't know.

21             MR. WHITE:  Well, what I was going to ask her, Your

22   Honor, was he asked her does this document refresh her memory.

23   He referred specifically to this highlighted sentence.  That's

24   the thing he had her read and then -- and I've had the

25   testimony sent to me.  I got that now.  He says does that

*W. WHITE - Cross (Mr. White)*                                        117

1   refresh your memory.  That's when she quoted saying, well,

2   Wayne Jones said we're going to beat his ass, Hal Rogers, and

3   voted as many as we could.  I'm going to ask her, and when you

4   testified on direct, you were given the document to refresh

5   your memory, and you said what you said about Wayne Jones's

6   quote?  Is that contained anywhere in --

7                THE COURT:  No, see, she was shown that document,

8   refreshed her memory, and then she testified what she recalled

9   Wayne Jones saying.  So that clearly shows that she's

10   recalling something other than what's contained in the 302,

11   which is what the FBI agent may have written down.  So --

12                MR. WHITE:  Okay.

13                THE COURT:  So no.  Objection sustained.

14                MR. WHITE:  Thank you, Your Honor.

15                     (Sidebar conference concluded.)

16                THE COURT:  Thank you, counsel.  You may continue.

17                MR. WHITE:  Thank you, Your Honor.  May I be given a

18   moment, Your Honor?

19                THE COURT:  Yes.

20                MR. WHITE:  Your Honor, those are all the questions I

21   have.  Thank you very much, Miss White.

22                THE WITNESS:  Thank you.

23                THE COURT:  Thank you.  Mr. Abell, you may proceed on

24   behalf of Mr. Stivers.

25                MR. ABELL:  Thank you.

*W. WHITE - Cross (Mr. Abell)*                                          118

                              CROSS-EXAMINATION

1

2    BY MR. ABELL:

3    Q.   Mrs. White, my name's Robert Abell, and I represent in

4    this case William Stivers.  I think you know him as Al Man.

5    A.   Yes.

6    Q.   I'm going to try to refer to him as Mr. Stivers today,

7    okay?

8    A.   Okay.

9    Q.   And I want to ask you first about the 2002 race.  Your

10   husband, of course, as we know, ran for jailer, correct?

11   A.   Yes.

12   Q.   Prior to the election, my client, Mr. Stivers, and his

13   brother, Charles, came by your home?

14   A.   Yes.

15   Q.   And I believe my client, Mr. Stivers, indicated that he

16   was upset, something having to do with his niece, Jody, not

17   being able to register and vote?

18   A.   That's what he said, yes.

19   Q.   You and your husband were both there when --

20   A.   Yes.

21   Q.   And among other things during that conversation, Mr.

22   Stivers indicated that he was supporting Freddy Thompson in

23   the clerk's race that was part of the 2002 election?

24   A.   Yes.

25   Q.   And Mr. Stivers invited your husband to join Freddy

*W. WHITE - Cross (Mr. Abell)*                                           119

1    Thompson's ticket during that 2002 primary?

2    A.   Yes, he did.

3    Q.   And ultimately, you all decided not to do that and to

4    stick, as you've said, with Jennings White's side, correct?

5    A.   Yes.

6    Q.   Okay.  Also in the primary of 2002, there were some other

7    races that we haven't talked about, and I want to ask you

8    about those county-wide races, okay?  For instance, there's a

9    county judge race, correct?

10   A.   Yes.

11   Q.   The candidates in 2002 were the incumbent, James

12   Garrison, and his main challenger, Roy Morgan.  Is that

13   correct?

14   A.   Yes.

15   Q.   Okay.  And the incumbent, James Garrison, was part of the

16   Jennings White ticket; is that fair?

17   A.   That's fair.

18   Q.   Okay.  And Roy Morgan was part of the Freddy Thompson

19   ticket?

20   A.   I believe that to be true, yes.

21   Q.   And in terms of supporters for the Jennings White ticket,

22   was it your understanding that that included, for instance,

23   among the people that are here today charged in this case,

24   Bart and Debbie Morris and Stanley Bowling?

25   A.   Yes.

*W. WHITE - Cross (Mr. Abell)*                                                120

1    Q.   And your understanding in terms of the supporters of the
2    Freddy Thompson ticket and, therefore, for Roy Morgan were my
3    client, Mr. Stivers, correct?
4    A.   My understanding was he supported the ticket.  He's never
5    expressed to me that he supported Roy Morgan.
6    Q.   Okay.  All right.  Let me back up just a tad.
7    A.   Okay.
8    Q.   You would agree that supporters of the Freddy Thompson
9    ticket in 2002, as far as you know, included my client,
10   William Stivers, correct?
11   A.   Yes.
12   Q.   Charles Wayne Jones, correct?
13   A.   Yes.
14   Q.   Doug Adams?
15   A.   Yes.
16   Q.   And, of course, Freddy Thompson himself, since he was the
17   candidate, correct?
18   A.   Since he was on the ticket, yes.
19   Q.   Okay.  Your husband's opponent for jailer was Charles
20   Marcum?
21   A.   Yes.
22   Q.   Charles Marcum was the long-time incumbent jailer?
23   A.   Yes.
24   Q.   And Charles Marcum was part of Freddy Thompson ticket; is
25   that correct?

*W. WHITE - Cross (Mr. Abell)*                                          121

1   A.  Yes.

2   Q.  Okay.  Let me back up.  I want to ask you a couple other

3   things about the time Mr. Stivers and his brother came to your

4   house, okay?  Couple things I want to follow up there.

5   A.  Okay.

6   Q.  Mr. Stivers, among other things that you all talked

7   about, suggested to you and your husband that it would be best

8   for your husband to join Freddy Thompson's side, because

9   ultimately, Jennings White would double-cross your husband

10  because he and Charles Marcum had been long-time political

11  allies?

12  A.  That's what he suggested, yes.

13  Q.  And didn't that, in fact, prove to be the case?  Did

14  you -- well, I'm sorry.  Let me ask some questions to get us

15  there.  Of course, as we know, your husband was unsuccessful

16  in that race --

17  A.  Yes.

18  Q.  -- correct?  And afterwards, you all tried to figure out

19  what had gone wrong, what hadn't worked out the way you

20  expected --

21  A.  Yes, yes.

22  Q.  -- correct?

23  A.  Yes.

24  Q.  And I think among other people, you spoke with Cletus

25  Maricle, and I believe you also spoke with Doug Adams as well,

*W. WHITE - Cross (Mr. Abell)*                                          122

1    correct?

2    A.   Yes.

3    Q.   And I'm sure other people whose opinions you respected,

4    correct?

5    A.   Yes.

6    Q.   And did you, in fact, conclude that it appeared that

7    Jennings White had, in fact, double-crossed you and not

8    supported Kennon as you expected?

9    A.   It appeared that way.

10   Q.   I believe that you met, just yourself, with Mr. Adams

11   sometime shortly after the 2002 primary election?

12   A.   Yes.

13   Q.   And I'm sure that also that you were very disappointed at

14   the outcome in the election?

15   A.   Of course.

16   Q.   And I believe that you testified that you just had your

17   fill of it, correct?

18   A.   Of politics.

19   Q.   Right.  That fall, in 2002, there was a school board

20   race; was there not?

21   A.   Yes.

22   Q.   And you all were active in it, correct?

23   A.   Yes.

24   Q.   Okay.  Active in it, because the candidate that you were

25   interested in supporting was Dobber Weaver?

*W. WHITE - Cross (Mr. Abell)*                                              123

1    A.   Yes.

2    Q.   And Dobber Weaver is someone, I believe you testified,

3    you went to school with and you'd known pretty much all your

4    life, sounds to me like, correct?

5    A.   Yes.

6    Q.   So notwithstanding what happened in May and your

7    disappointment and your feeling when you spoke with Mr. Adams

8    that you had your fill of politics, you did get right back

9    into it in the fall and actively support Mr. Weaver, correct?

10   A.   We supported Mr. Weaver, but my husband didn't run.

11   Q.   I'm sorry?  But your husband didn't run?

12   A.   My husband didn't run.

13   Q.   Okay.  And also following the election in 2002, was it

14   the case that it was determined that it appeared from the

15   election returns in your husband's race that his political

16   future, so to speak, lay best in the City of Manchester?

17   A.   Yes.

18   Q.   And, of course, that was a consideration that led you all

19   to move within the city limits because, I think we understand,

20   it's a qualification for him to run for a city race, correct?

21   A.   That was brought to our attention, yes.

22   Q.   And you all, of course, as we know, did that in 2003,

23   moved into Manchester, correct?

24   A.   Yes.

25   Q.   In 2004, Barbara Colter White again ran for state

*W. WHITE - Cross (Mr. Abell)*                                          124

1   representative, correct?

2   A.   She did.

3   Q.   And she, as we know, had lost in 2002 to Tim Couch and

4   was attempting to get her seat back, right?

5   A.   Yes.

6   Q.   And in that race, 2004, Couch versus Colter White, it's

7   your understanding that Doug Adams supported Mr. Couch; is

8   that correct?

9   A.   He did, yes.

10  Q.   Okay.  And is it your understanding that Bart and Debbie

11  Morris supported Miss Colter in that race against Mr. Couch?

12  A.   Yes.

13  Q.   And is it your understanding that Stanley Bowling

14  supported Colter White against Mr. Couch in the race?

15  A.   That's my understanding, yes.

16  Q.   Okay.  Now, I want to move on to 2006, okay?

17  A.   Okay.

18  Q.   Primary in 2006, there was a county judge race?

19  A.   Yes.

20  Q.   Now, I understand there were a number of candidates, but

21  the three leading candidates was James Garrison, incumbent,

22  correct?

23  A.   Yes.

24  Q.   Crawdad Sizemore?

25  A.   Yes.

*W. WHITE - Cross (Mr. Abell)*                                            125

1    Q.   And Johnny "Poss" Gregory?

2    A.   Yes.

3    Q.   Is it fair to say that those were the three leading

4    candidates in the county judge race in 2006?

5    A.   It would, yes.

6    Q.   Is it your understanding that my client, Mr. Stivers, in

7    that county judge race in May, 2006, supported Johnny "Poss"

8    Gregory?

9    A.   He expressed that he would support him.  That's his

10   uncle.

11   Q.   And is it your understanding that supporting James

12   Garrison in the county judge race in May, 2006 was Bart and

13   Debbie Morris?

14   A.   Initially, yes.

15   Q.   Okay.  And was it your understanding that supporting

16   Crawdad Sizemore in that May, 2006 primary included, among

17   others, Wayne Jones?

18   A.   Yes.

19   Q.   Stanley Bowling?

20   A.   Yes, initially.  In the end, they all supported Crawdad

21   Sizemore.

22   Q.   You made a number of recordings of my client, correct?

23   A.   Yes.

24   Q.   And I believe that all of them that we've played that

25   include my client, Mr. Stivers, were done at his residence?

*W. WHITE - Cross (Mr. Abell)*                                          126

1  A.   Yes.

2  Q.   And it would be fair to say that you and your husband

3  were frequent guests at his home?

4  A.   Yes.

5  Q.   And it sounds to me, and tell us if this is fair, from

6  your all's dialogue through the course of those tapes that you

7  all were friends?

8  A.   We were friends during the elections.  I'd never been to

9  his home before the elections.

10 Q.   Okay.  But we know at least in spring of 2007, you went

11 to his home a number of times?

12 A.   Yes.

13 Q.   I guess gradually, over time, you became friends; is that

14 fair?

15 A.   Yes.

16 Q.   And early part of 2007, were good enough friends to drop

17 by, it appears, fairly frequently unannounced; is that fair?

18 A.   We'd drop by to discuss elections, yes.

19 Q.   Okay.  And, of course, you all didn't just discuss

20 elections.  You discussed local gossip, for lack of a better

21 term, clothes sometimes you discussed with Mrs. Stivers and

22 things like that; is that fair?

23 A.   Election was our main discussion.

24 Q.   Okay.  In 2006, you worked as an election officer,

25 correct?

*W. WHITE - Cross (Mr. Abell)*                                        127

1    A.   Yes.

2    Q.   One of your coworkers as an election officer was Dobber

3    Weaver?

4    A.   Yes.

5    Q.   Okay.  Is it your testimony that in terms -- that in

6    advance of those primary and general elections that Mr.

7    Weaver's principal contact was with my client, Mr. Stivers?

8    A.   That's what he told me, yes.

9    Q.   That's what Dobber Weaver told you?

10   A.   Yes.

11   Q.   And you and your husband, is it your testimony, had a

12   little bit of contact but really not that much; is that fair?

13   A.   With?

14   Q.   Dobber Weaver.

15   A.   We had contact with Dobber Weaver.

16   Q.   A lot or a little?

17   A.   Well, I worked with him in the election so I had a lot of

18   contact with him during the election day.

19   Q.   Okay.  Prior to the election, either -- let's deal first

20   with the spring primary.  Prior to the spring primary election

21   in 2006, before election day, did you and your husband have a

22   lot of contact with Mr. Weaver, a lot of discussion with him

23   regarding the election?

24   A.   Not as often as we did with Mr. Stivers, but we talked

25   with him frequently.

*W. WHITE - Cross (Mr. Abell)*                                        128

1    Q.   Daily?

2    A.   No.

3    Q.   Okay.  Weekly?

4    A.   Weekly.

5    Q.   Several times a week?

6    A.   Some, sometimes.

7    Q.   All right.  Same questions regarding fall of 2006.  Was

8    your contact and communications with Mr. Weaver in advance of

9    election day in fall, 2006 about the same as it was in the

10   spring?

11   A.   About the same.

12          MR. ABELL:  Okay.  Nothing further, Judge.

13          THE COURT:  Thank you.  Mr. Baldani, we'll start with

14   you tomorrow morning.  We will take our break for the evening

15   at this time, ladies and gentlemen.

16          I do want to again remind you of the admonition

17   that's been given to you several times, of course, as we break

18   for the evening.  Please don't discuss the case among

19   yourselves or with any friends or family members.  Don't allow

20   anyone to approach you in an attempt to discuss the case.  If

21   that should ever happen, you should report that to the Court

22   promptly.  Don't read watch or listen to any accounts of the

23   case if there should be any.  Don't attempt to do any type of

24   research or do any investigation on your own.  Don't do any

25   type of communication through any electronic means.  And, of

1    course, don't make up your mind about the case until it is

2    finally submitted to you.

3              With that admonition, the jury will be excused until

4    9:00 a.m. tomorrow morning.

5                   (The jury left the courtroom at 4:30 p.m.)

6              THE COURT:  Miss White, you're reminded that you may

7    not speak with anyone about this case, of course, other than

8    your attorney.

9              THE WITNESS:  Thank you.

10             THE COURT:  You may step down.  You need to be back

11   at 9:00 tomorrow morning.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Any matters to take up outside the

14   presence of the jury?

15             MR. BALDANI:  I have a quick question, Judge.

16             THE COURT:  Everyone can be seated.

17             MR. BALDANI:  Your Honor, I wanted to get a ruling on

18   an issue that I think has been raised briefly or tangentially

19   to the Court.

20             Statute of limitations.  There's been quite a bit of

21   talk on the tape about a five-year statute of limitations, and

22   then Miss White testified today about her immunity deal

23   covered federal but not state.  I had intended, I think it was

24   proper for me to, because I recall when Mr. Smith was going

25   through after listening to the clip, he asked, to your

1    understanding, what's that refer to, statute of limitations?

2         I wanted to ask her about talking about statute of

3    limitations and her understanding that it's a federal statute

4    of limitations, not a state.  And I wanted to make sure that

5    that's, you know, not objectionable before I did it.

6         THE COURT:  Well, it really will depend upon the

7    context or the manner in which the question is asked.  Of

8    course, there are some matters on the tape that do refer to

9    statute of limitations and, of course, you may ask her about

10   those particular conversations.

11        She's testified already that she understands that she

12   would not be prosecuted federally if she provided full and

13   complete information.  I believe she indicated she did not

14   have any understanding with respect to any state issues.

15        At this point, I don't know that there's a good faith

16   basis to ask her about state, possible state issues, other

17   than to give an implied threat to her that somebody may be

18   coming after her at the state level if she testifies in this

19   proceeding.

20        Help me out.  Is there some other reason you'd be

21   asking this question?

22        MR. BALDANI:  Well, the statute of limitations issue

23   has been brought up.  It's no secret.  I was simply going to

24   ask her, to your knowledge, that was a reference to federal

25   statute of limitations.  Are you aware of whether there is a

1   state statute of limitations?

2        THE COURT:  It has been asked and answered.  And if

3   that's the scope of your question, then I believe it would be

4   fair for you to ask her that question, again to make sure that

5   there's not a misunderstanding on that.  But beyond that, if

6   she doesn't know, she doesn't know.

7        MR. BALDANI:  That's all I was --

8        THE COURT:  Of course, it's not a legal issue for the

9   jury to determine in any event, statute of limitations

10  questions.  But if you want to ask her about her understanding

11  of the scope of her agreement with the government, you can

12  certainly do that.

13       MR. BALDANI:  Okay.  Thanks, Judge.

14       THE COURT:  Any other issues that need to be taken

15  up?  Mr. Bayer?

16       MR. BAYER:  No, sir, just standing.

17       THE COURT:  We'll be in recess until 9:00 a.m.

18  tomorrow morning.

19            (Proceedings adjourned at 4:34 p.m.)

20                         - - -

21            C E R T I F I C A T E

22       I, LISA REED WIESMAN RDR-CRR, certify that the
    foregoing is a correct transcript from the record of
23  proceedings in the above-entitled case.

24

25   \s\ Lisa Reed Wiesman              March 1, 2010
    LISA REED WIESMAN, RDR-CRR          Date of Certification
    Official Court Reporter

132

1                                  INDEX

2    GOVERNMENT WITNESS

3    WANDA WHITE
     Cross-examination by Mr. Hoskins................. Page   4
4    Cross-examination by Mr. Westberry.............. Page  84
     Cross-examination by Mr. White.................. Page  94
5    Cross-examination by Mr. Abell.................. Page 118

6

7    DEFENSE EXHIBITS                                ADMITTED

8    Miracle Exhibit No. 1, W. White voter registration forms
     Admitted...................................... Page 74
9

10                               - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25