```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   SOUTHERN DIVISION at LONDON
                              - - -
 3
     UNITED STATES OF AMERICA,    :  Docket No. CR 09-16-S
 4                                :
                 Plaintiff,       :  Frankfort, Kentucky
 5                                :  Thursday, February 25, 2010
          versus                  :  1:00 p.m.
 6                                :
     RUSSELL CLETUS MARICLE,      :
 7   DOUGLAS C. ADAMS             :
     CHARLES WAYNE JONES          :
 8   WILLIAM R. STIVERS           :
     FREDDY W. THOMPSON           :      Trial Day 13B
 9   WILLIAM B. MORRIS            :
     DEBRA L. MORRIS              :
10   STANLEY BOWLING,             :
                                  :
11              Defendants.       :


12


13                            - - -
                     TRANSCRIPT OF TRIAL
14                BEFORE DANNY C. REEVES
          UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16   APPEARANCES:

17   For the United States:      STEPHEN C. SMITH, ESQ.
                                 JASON D. PARMAN, ESQ.
18                               Assistant U.S. Attorney
                                 601 Meyers Baker Road
19                               Suite 200
                                 London, KY 40741
20
     For the Defendant
21   Russell Cletus Maricle:     CANDACE C. CROUSE, ESQ.
                                 Strauss & Troy
22                               150 E. Fourth Street
                                 Fourth Floor
23                               Cincinnati,OH  45202

24                               DAVID S. HOSKINS, ESQ.
                                 107 E. First Street
25                               Corbin, KY  40701
```

2

```
 1    For the Defendant              R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:              KRISTIN N. LOGAN, ESQ.
 2                                   Landrum & Shouse, LLP
                                     220 West Main Street
 3                                   Suite 1900
                                     Louisville, KY 40202
 4

 5    For the Defendant              T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:           Morgan & Pottinger, P.S.C.
 6                                   133 West Short Street
                                     Lexington, KY  40507
 7

 8    For the Defendant              ROBERT L. ABELL, ESQ.
      William R. Stivers:            120 North Upper Street
 9                                   Lexington, KY  40507

10
      For the Defendant              RUSSELL JAMES BALDANI, ESQ.
11    Freddy W. Thompson:            R. TUCKER RICHARDSON, ESQ.
                                     Baldani, Rowland & Richardson
12                                   300 West Short Street
                                     Lexington, KY  40507
13

14    For the Defendant              JERRY W. GILBERT, ESQ.
      William B. Morris:             Coy, Gilbert & Gilbert
15                                   212 North Second Street
                                     Richmond, KY 40475
16

17    For the Defendant              ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:               Gess, Mattingly & Atchison, PSC
18                                   201 West Short Street
                                     Lexington,KY40507
19

20    For the Defendant              DANIEL A. SIMONS, ESQ.
      Stanley Bowling:               Thompson, Simons, Dunlop & Fore
21                                   116 West Main Street
                                     Suite 2A
22                                   Richmond, KY 40476

23

24

25
```

3

```
1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
2                                 35 W. Fifth Street
                                  P.O. Box 1073
3                                 Covington, KY  41012
                                  (859) 291-4410
4

5         Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6
```

*W. WHITE - Cross (Mr. Baldani)*                                          4

1            (The jury entered the courtroom at 12:58 p.m.)

2            THE COURT:  Thank you.  The record will reflect that

3    all members of the jury are present.  Parties and counsel are

4    present.

5            Again, Miss White, you're still under oath.

6            THE WITNESS:  Okay.

7            THE COURT:  Mr. Baldani, you may continue.

8            MR. BALDANI:  Thank you, Judge.

9                        CROSS-EXAMINATION

10   BY MR. BALDANI:

11   Q.   Miss White, you've had a long time to read over all those

12   pages of handwritten notes.  Once again, those notes are a

13   chronology of or a summary of vote fraud activity from 2002 to

14   2006; is that fair to say?

15   A.   Some of it, yes.

16   Q.   All right.  And it's everything that you felt was

17   important, I suppose; is that fair to say?

18   A.   Yes.

19   Q.   And my question before we broke was I really want to

20   narrow it down, be very specific.  I'm talking about what I

21   refer to as these two schooling sessions, and my question is,

22   simply, in anywhere in those handwritten notes, did you

23   document your claim that Freddy Thompson engaged you in two

24   schooling sessions on how to manipulate the machine?

25   A.   No.

1    Q.   Now, you testified first at the grand jury on May 3rd of
2    '07, correct?
3    A.   Yes.
4    Q.   And other people have already asked you, you know, were
5    you under oath, and obviously you were under oath at the grand
6    jury, right?
7    A.   Yes.
8    Q.   And isn't it true, Miss White, that when questioned about
9    vote fraud at the May 3rd, '07 grand jury, you still failed to
10   mention these two schooling sessions by Freddy Thompson?
11   A.   I answered the questions that they asked me, yes.
12   Q.   Okay.  Is your answer yes?  My question was that you
13   still failed to mention Freddy Thompson's two schooling
14   sessions.  Were you agreeing with me that you did fail to
15   mention that, or that you're saying that you weren't asked?
16   A.   I don't know if I was asked.
17           MR. BALDANI:  Judge, could I present her with the
18   grand jury testimony?
19           THE COURT:  If there's a place in there where it
20   shows she was asked the question, you can show it to her.
21   Otherwise, she's answered the question.
22           MR. BALDANI:  Okay.  There is.  Pass this up, please?
23           THE COURT:  Yes, sir.
24   Q.   Page 23 of the May 3rd grand jury, line 2.  And actually,
25   look just a little bit before line 2.

*W. WHITE - Cross (Mr. Baldani)*                                    6

1    A.    I'm sorry, what?

2    Q.    Are you on -- start on the very bottom of page 22.

3    A.    Okay.

4    Q.    Okay.  You see your very last answer on that page?

5    A.    Yes.

6    Q.    Basically, you say, you can steal people's votes.

7    A.    Yes.

8    Q.    Right?

9    A.    Yeah.

10   Q.    Okay.  Read the jury the next question asked to you.

11   A.    "Did someone direct you and show you how you could do

12   that?"

13   Q.    Still didn't mention Freddy Thompson?

14   A.    I'm sorry?

15   Q.    You still didn't mention Freddy Thompson, did you?

16   A.    I answered the question that was asked.

17              THE COURT:  I'm sorry.  What was your answer to the

18   question?  You read the question.  What was your answer to the

19   question?

20              THE WITNESS:  What was my question, Your Honor?

21              THE COURT:  You were asked to read a portion of your

22   grand jury testimony.  You read the question.

23              THE WITNESS:  My answer to that was "Wayne Jones

24   did."

25              THE COURT:  "Wayne Jones did"?

*W. WHITE - Cross (Mr. Gilbert)*                                    7

1              THE WITNESS:  Yes.

2              THE COURT:  All right.  If you need to further

3    explain, you may do so.

4    Q.   So my last question is, you were asked about who schooled

5    you to steal votes at the grand jury on May 3rd, 2007, and you

6    still failed to mention Freddy Thompson.  True or false?

7    A.   True.

8              MR. BALDANI:  Thank you, Your Honor.  That's all I've

9    got.

10             THE COURT:  Mr. Gilbert.

11             THE WITNESS:  Does he need this back?

12             THE COURT:  Yes, he does.

13             THE WITNESS:  It don't have a label on it.

14             THE COURT:  Give that to the security officer,

15   please.

16                         CROSS-EXAMINATION

17   BY MR. GILBERT:

18   Q.   Miss White, my name's Jerry Gilbert, and I represent Bart

19   Morris.

20   A.   Okay.

21   Q.   There are just a few things I'd like to go over with you,

22   if I may.  You and your husband consulted with various

23   political people in Clay County before he made the decision to

24   run for jailer in 2002?

25   A.   Yes.

*W. WHITE - Cross (Mr. Gilbert)*                                        8

1   Q.   Jennings White, you spoke with him?

2   A.   Yes.

3   Q.   And his advice to you was not to run -- or to Kennon?

4   A.   I think so.

5   Q.   Okay.  In fact, he was irate at Kennon for --

6   A.   He felt like it gave him competition, yes.

7   Q.   He felt like it would set him up, would give competition

8   to his ally, Charles Marcum?

9   A.   What?

10  Q.   It would make him choose between supporting Kennon and

11  Charles Marcum?

12  A.   Yes.

13  Q.   And you also went to Yancey White, who is a lawyer there

14  in Manchester?

15  A.   Yes.

16  Q.   And he was not supportive?

17  A.   No.

18  Q.   James Phillips, who is an office holder, circuit court

19  clerk, you and Kennon went to him to seek his advice, and he

20  was not supportive?

21  A.   Yes.

22  Q.   In fact, he refused to sign his election filing papers?

23  A.   Yes.

24  Q.   And Kennon's aunt, Barbara Jo Colter, was not supportive

25  of his seeking election for jailer, was she?

*W. WHITE - Cross (Mr. Gilbert)*                                        9

1    A.   She supported him.

2    Q.   But initially --

3    A.   Initially, she had competition too.

4    Q.   And Jennings White supported, but he initially --

5    A.   Yes.

6    Q.   -- was against it?

7    A.   Yes.

8    Q.   And you also testified Cletus Maricle, you went to talk

9    to him?

10   A.   Yes.

11   Q.   And although he encouraged you or your husband to run, he

12   said it would be hard race; did he not?

13   A.   Yes.

14   Q.   Was there anyone else that you talked to prior to Kennon

15   filing?

16   A.   I'm sure there was people.

17   Q.   Now, you also testified in that election, in the 2002

18   primary, during the early voting period that there were

19   meetings at Bart Morris's residence after the day?

20   A.   Yes.

21   Q.   And were those held daily?

22   A.   They were held daily with different people, yes.

23   Q.   Okay.  And the people that you said were there were Bart

24   and Debbie Morris?

25   A.   Yes.  Generally, yes.

*W. WHITE - Cross (Ms. Hughes)*                                        10

1    Q.   Vernon Hacker, Darnell Hipsher?

2    A.   Yes.

3    Q.   Jennings White?

4    A.   Yes.

5    Q.   Your father-in-law, Doug White?

6    A.   Yes.

7    Q.   Your husband and yourself?

8    A.   Yes.

9    Q.   And you also testified that William Stivers and Doug

10   Adams were there?

11   A.   Yes.

12   Q.   And at these meetings, were they strategy meetings?

13   A.   Yes.

14   Q.   And voters were identified as to people that would sell

15   their votes?

16   A.   Yes.

17   Q.   Let me ask you this, Ms. White.  How did Jennings White

18   and Doug Adams get along?

19   A.   I'm -- to my knowledge, they didn't speak.

20           MR. GILBERT:  That's all.

21           THE COURT:  Thank you, Mr. Gilbert.  Miss Hughes.

22           MS. HUGHES:  Thank you, Your Honor.

23                        CROSS-EXAMINATION

24   BY MS. HUGHES:

25   Q.   Mrs. White, I'm Elizabeth Hughes.  I represent

*W. WHITE - Cross (Ms. Hughes)*                                          11

1    Mrs. Morris.  As I understand your description of the vote

2    buying scheme, I think was your word, that did not involve,

3    did it, people voting more than once?  That wasn't part of the

4    plan, was it?

5    A.   No.

6    Q.   Okay.  You would agree with me that the procedures in

7    place at the polling place, the registration and the sign-in,

8    that that prohibits people from voting two times?

9    A.   Yes.

10   Q.   Okay.  As I also understand the scheme, a vote hauler

11   would go to a location to pick up vote sellers, people who

12   sold their vote?

13   A.   Yes.

14   Q.   Okay.  And in 2002, 2004 you acted as a vote hauler?

15   A.   Yes.

16   Q.   So you would go somewhere, I think you identified the

17   lane next to Barbara Jo Colter's home and your home as a place

18   you'd pick up --

19   A.   Two of the places, yes.

20   Q.   Sure.  And then the vote hauler would drive the vote

21   sellers to the polling place; is that correct?

22   A.   In some of the circumstances, yes.

23   Q.   Okay.  And then the vote hauler would watch the vote

24   seller, the voter go inside and be turned over, essentially,

25   to a corrupt election official that was inside the premises,

*W. WHITE - Cross (Ms. Hughes)*                                        12

1    right?

2    A.   In some of the instances.  I never went in.

3    Q.   But you would see the people that you hauled go inside,

4    right?

5    A.   I would, but I wouldn't take them inside.

6    Q.   Right.  But some people did take them inside, but you

7    would drop yours off and you would watch them go inside?

8    A.   Yes.

9    Q.   And then the corrupt election official who was inside --

10   and in 2006 that would be you, for example, you and Mr.

11   Weaver?

12   A.   Yes.

13   Q.   Would vote the person as they were supposed to vote,

14   correct?

15   A.   Yes.

16   Q.   And then the corrupt election official on the inside

17   would give a nod or a mark or a ticket or something like that

18   to the voter?

19   A.   Yes.

20   Q.   And then the voter would go back out to the vote hauler,

21   correct?

22   A.   Yes.

23   Q.   Because that's the voter's ride to and from the polling

24   place?

25   A.   Right, yes.

*W. WHITE - Cross (Ms. Hughes)*                                          13

1    Q.   And then the vote hauler would haul the person over to

2    the payment place; for example, according to your testimony,

3    Bart Morris's house on Green Street?

4    A.   Exactly, yes.

5    Q.   Under those circumstances, there's really no opportunity

6    for a voter to be paid twice, is there?

7    A.   Yes.  If they come in and say Debbie, I've not voted, and

8    there becomes an altercation and there's a question, then yes,

9    you have to find -- you have to have a journal to who actually

10   did.

11   Q.   If you as the vote hauler picked up someone who claimed

12   they had not voted and you hauled the voter down to the

13   precinct, when the corrupt election official on the inside

14   brought that -- sent that person back out, the vote hauler

15   would never get the nod, there would never be the mark, there

16   would never be the ticket, because that person couldn't vote,

17   right?

18   A.   Yes.

19   Q.   As I understood your testimony last week, I believe it

20   was on Friday, you testified that you saw, personally, Debbie

21   Morris buy votes and keep a list?

22   A.   Yes.

23   Q.   And you saw that on election day in both the primary and

24   the general in 2002; is that correct?

25   A.   In 2002?

*W. WHITE - Cross (Ms. Hughes)*                                    14

1   Q.   Yes, ma'am.

2   A.   Yes.

3   Q.   And you testified that you saw Debbie Morris buying votes

4   and marking the list on both election day primary and general

5   in 2004, correct?

6   A.   Yes.

7   Q.   And you testified that you saw Debbie Morris on election

8   day for both the primary and the general in 2006; is that

9   correct?

10  A.   I saw Debbie prior -- the days before buying votes.  I

11  saw Debbie during the absentee process of 2006 buying votes.

12  When I left from my polling place where I worked, I then went

13  to the home of Bart and Debbie Morris and spoke with them both

14  there on election day.

15  Q.   And that would be both the primary and the general?

16  A.   Yes.

17  Q.   Of 2006?

18  A.   Yes.

19  Q.   Both elections?

20  A.   Yes.

21  Q.   You testified about Debbie Morris's son, Chris Duff.  You

22  mentioned him in your testimony; do you recall?

23  A.   I think did, yes.

24  Q.   Would you agree with me that Chris Duff is -- trying to

25  think of the best words to use.  A drug addicted knucklehead?

*W. WHITE - Cross (Mr. Simons)*                                              15

1    A.   I would agree that he's probably a drug addict.

2    Q.   Would you agree that he can definitely act fool?

3    A.   That's your opinion.  I mean --

4    Q.   I'm asking you if you would agree with that opinion.

5    A.   No, I don't agree with that.

6    Q.   Would you characterize him as upstanding?

7              MR. SMITH:  Your Honor, I'm going to object.

8              THE COURT:  Sustained.

9              MS. HUGHES:  That's all I have.  Thank you.

10             THE COURT:  Thank you.  Mr. Simons.

11             MR. SIMONS:  Thank you.

12                         CROSS-EXAMINATION

13   BY MR. SIMONS:

14   Q.   Good afternoon, Miss White.  My name's Dan Simons.  I

15   represent Stan Bowling here today.

16   A.   Good afternoon.

17   Q.   Back a few days ago, when you first started testifying,

18   you were talking about your husband's decision to run for

19   sheriff in 2002, and it seemed to me that the two of you

20   made --

21   A.   Jailer.

22   Q.   I'm sorry, jailer.  I misspoke.  My apologies.  And the

23   decision to run for jailer was made jointly by the two of you

24   as a team; is that fair to say?

25   A.   Yes.

*W. WHITE - Cross (Mr. Simons)*                                        16

1    Q.   And I think you said, told the jury that what you -- the

2    reason you made that decision was because you wanted to make a

3    change or to make a difference in the community?

4    A.   Yes.

5    Q.   Tell the jury, please, and me what the nature of that

6    change was that you wished to make.

7    A.   Of why he chose to run for jailer?

8    Q.   Yes, ma'am.

9    A.   Well, there was rumors there was drug activity in jail,

10   and we are definitely against drug activity.  That was the

11   greatest extent of it.

12   Q.   Okay.  Was the only illegal activity that you were

13   looking to avoid drug activity, or was it -- was there --

14   A.   Well, you asked me why that we were -- our interest was.

15   Q.   Okay.

16   A.   And the county was flooded with drugs.  And when they got

17   in jail to be detoxed, they were still on drugs.

18   Q.   Okay.  Now, you sought the assistance and advice of a

19   number of people, some fairly close family members, in

20   deciding whether or not to make this effort to have Kennon

21   elected jailer.  And Mr. Gilbert's gone over those with you?

22   A.   Yes.

23   Q.   Fair enough.

24   A.   Yes.

25   Q.   Okay.  And your effort was -- your team effort and

*W. WHITE - Cross (Mr. Simons)*                                      17

1    Kennon's election didn't go well?

2    A.   No.

3    Q.   Matter of fact, Kennon was beat almost 2-to-1 in a

4    fairly -- in a landslide, as it's been described?

5    A.   There was three candidates, yes.

6    Q.   Yes, I understand, but -- okay.  Then after that defeat,

7    you reconsulted with a number of people to determine why the

8    effort turned out so poorly.  Fair enough?

9    A.   Yes.

10   Q.   All right.  And one of the people you consulted with was

11   Jennings White, and he said he lost his election officers; is

12   that fair?

13   A.   He never told me that.

14   Q.   Okay.  What did Mr. White tell you about losing his

15   election?

16   A.   Based -- his excuse to me was he'd just been

17   double-crossed.  He didn't elaborate to me.

18   Q.   Okay, that's fine.  And did you also learn or become

19   suspicious that Jennings White, in fact, had double-crossed

20   Kennon?

21   A.   Were we suspicious, or do we, in fact, know that?

22   Q.   Well, first, let's start with did you, in fact, know

23   that?

24   A.   Yes, yes.

25   Q.   Okay.  And you also learned that Charles Marcum was well

*W. WHITE - Cross (Mr. Simons)*                                    18

1    established in the position already, and he was a difficult

2    candidate to set aside?

3    A.   Yes.

4    Q.   And did you also learn that you didn't have enough

5    influence in the county precincts and decide then to move

6    Kennon's political future to the city?

7    A.   Yes.

8    Q.   Okay.  Now, you told the jury just a few minutes ago that

9    you were -- you and Kennon are smart, sensible people, right?

10   A.   I hope so.

11   Q.   Okay.  Did anybody that you consulted with after he got

12   beat 2-to-1 in the election look at you and say, Kennon's

13   future is --

14         MR. SMITH:  Objection to the hearsay.

15         THE COURT:  Sustained.

16   Q.   Being a smart, sensible person, did it ever dawn on you

17   that Kennon probably didn't have a political future because

18   he'd been soundly defeated in an election which he

19   acknowledged he spent a lot of money in and made every effort

20   to -- and you hauled votes for him?

21         MR. SMITH:  Argument.  Object.

22         THE COURT:  Overruled.  You can answer, if you

23   understand the question.

24   A.   I think he's asking for my opinion on that, and my

25   opinion of that is every office holder or every office in

*W. WHITE - Cross (Mr. Simons)*                                        19

1    Manchester, in my opinion, is a bought position.  So that's my

2    answer.

3    Q.  And I don't know that that answered my question or not --

4    A.  I tried to answer it for you.

5    Q.  I know you did, and I appreciate that.  Thank you.  Let's

6    talk about after that failed effort.  I think what you told

7    the jury was a repeat effort was out of the question.  You

8    just had enough of it.  Is that fair enough?

9    A.  That was my -- how I felt, yes.

10   Q.  And did Kennon share that opinion with you through at

11   least the fall election of 2002, the November election?

12   Neither one of you participated in that, did you?

13   A.  I'm sorry, what?

14   Q.  Neither of you participated in the fall election of 2002?

15   A.  Not that -- no.

16   Q.  That's correct, is it not?  Neither of you --

17   A.  To the best of my knowledge.

18   Q.  Thank you.  Now, I want to talk to you about a couple

19   things that I think I heard you say to the jury, and I want to

20   start with May of 2002, and you said that the absentee voting

21   was very important in that.

22   A.  Yes.

23   Q.  And you were involved in hauling voters for the absentee

24   portion of the 2002 primary ballot?

25   A.  Yes.

*W. WHITE - Cross (Mr. Simons)*                                            20

1    Q.   Okay.  And you said that with respect to my client,

2    Stanley Bowling, you picked people up at his garage and hauled

3    them to various precincts; is that true?

4    A.   Yes.

5    Q.   Okay.  And this is during the absentee period in 2002?

6    A.   Yes.

7    Q.   But Ms. White, that can't be so, can it?  Because

8    everybody voted at the same place in the absentee period.

9    A.   Yes.

10   Q.   You didn't go to various precincts in 2002.

11   A.   The absentee poll is for various places.  Everyone,

12   county-wide, votes absentee at the same place.

13   Q.   I understand that.  But what I understood you to say was

14   you hauled the voters to various precincts.

15   A.   From various precincts.  You took one word and twisted

16   it.  From and for.

17   Q.   All right.  Now, you talked about the 2004 election.

18   Stanley Bowling was not a candidate.  Kennon was not a

19   candidate in either election, correct?

20   A.   Right.

21   Q.   But in 2004, you were involved in vote hauling, vote

22   buying both, correct?

23   A.   Yes.

24   Q.   And that was on behalf of Kennon's aunt, Barbara Jo?

25   A.   Yes.

*W. WHITE - Cross (Mr. Simons)*                                    21

Q.   And there has been some confusion.  I think you testified originally that you were also assisting Dobber Weaver at that time in '04?

A.   Yes.

Q.   Okay.  I want to move ahead to the 2006 election.

A.   Okay.

Q.   Now, in the 2006 election, on election day, you were in Manchester precinct; and according to you, you stole a lot of votes.

A.   Yes.

Q.   All right.  But in that primary in May of 2006, you did not see any money pool or change hands; is that correct?

A.   I was inside the polls working the May.

Q.   That's right.  You didn't see any money change hands?

A.   On election day, no.

Q.   Thank you.  Now, you never hauled any votes?

A.   On election day, no.

Q.   You were busy --

A.   Yes.

Q.   -- manipulating the machines and stealing votes; is that fair?

A.   Yes.

Q.   You never visited any county precinct anywhere on election day?

A.   On election day.

*W. WHITE - Cross (Mr. Simons)*                                     22

1    Q.   And then let's go to November of '06.

2    A.   Okay.

3    Q.   Same things are all true for the November election; are

4    they not?

5    A.   Yes.

6    Q.   Okay.  Now, we've tried to pin down when you first began

7    cooperating with the FBI, with the agents.  And it was, I

8    think we've established it was just a little bit before you

9    first wore the tape recording device in March of 2007.

10   A.   Yes.

11   Q.   Is that correct?

12   A.   Yes.

13   Q.   Okay.  Now --

14          MR. SIMONS:  Your Honor please, I would like to have

15   the witness look at an exhibit.

16          THE COURT:  Yes, sir.

17   Q.   You just look at that for a second.

18   A.   All the pages?

19   Q.   You can thumb through them.  I think you'll recognize

20   pretty quickly what it is.  Is that your handwriting?

21   A.   It's my handwriting, yes.

22   Q.   You recognize that as a list that you compiled during the

23   time that you were cooperating with the FBI; is that fair

24   enough?

25   A.   It's a listing that my husband and I compiled.

*W. WHITE - Cross (Mr. Simons)*                                          23

1   Q.   Okay.  Together, and you recorded it --

2   A.   I'm sorry?

3   Q.   You did that together, and this is your record of it; is

4   that correct?

5   A.   Yes.

6   Q.   Now, at the top of that, it says received 5/25/07?

7   A.   It does, yes.

8   Q.   Okay.  Is that about the time that you compiled the list,

9   ma'am?

10  A.   Yes.

11  Q.   Okay.  Do you remember doing this with your husband?

12  A.   I do.

13  Q.   And does it -- it is, in fairness, it is a list of all of

14  the bought votes and vote haulers that you can recall in Clay

15  County?

16  A.   No, not at all.

17  Q.   Okay.  What is it, then?

18  A.   It's a small list of the voters.

19  Q.   Okay.  Do they have a common element that it's the ones

20  that you can remember had some involvement in vote hauling or

21  vote -- or had their votes --

22  A.   Some form, yes.

23  Q.   Okay.  And this list you did at this time, correct?

24  A.   Yes.

25          MR. SIMONS:  Your Honor, this exhibit has been marked

*W. WHITE - Cross (Mr. Simons)*                                             24

1   as D13.  It was not introduced by the government, but I would

2   move that we introduce it at this time.

3           THE COURT:  All right.  Any objection?

4           MR. SMITH:  No.  I would ask that the original be

5   used, if we could.

6           THE COURT:  That will be fine.  You can substitute

7   the original in the record, D13.

8           THE WITNESS:  Do you want me to keep this?

9           THE COURT:  You can hang on to that for now.  D13

10  will be admitted.

11                      (Government Exhibit No. D13

12                          was admitted into evidence.)

13          THE WITNESS:  Do you want me to refer to this list,

14  Your Honor?

15          THE COURT:  If he has questions.

16  Q.  I don't have any more questions about that, ma'am.

17  A.  Okay.

18  Q.  I'm going to move on, okay?

19  A.  Okay.

20  Q.  Now, when you began cooperating with the FBI, you were

21  aware that Stephen Bowling had been subpoenaed to the grand

22  jury; were you not?

23  A.  No, I wasn't.

24  Q.  You were not?

25  A.  No, I wasn't.

*W. WHITE - Cross (Mr. Simons)*                                    25

1    Q.   Did you visit my client's home on Thanksgiving day and

2    take some dessert to Stanley and his wife, Sarah, to talk

3    about Stephen's appearance before the grand jury?

4    A.   I visited him on Thanksgiving, but I never talked to him

5    about Stephen.  No, that's not true.

6    Q.   Okay.  Now, we've been through and through the hours of

7    taped recordings, and you've talked about -- we've all heard

8    some of them, and some of them haven't been heard.  And would

9    you agree with me that you never wore a recording device,

10   ever, in an interview with my client, Stanley Bowling?

11   A.   Yes.

12   Q.   You're agreeing with me on that?

13   A.   Yes.

14   Q.   Now, would it be fair to say that the last time that you

15   ever visited with or spoke with Stanley Bowling was that

16   Thanksgiving day in 2006?

17   A.   I don't think I could agree with you on that.  I don't

18   remember when, but I don't remember that was the last time

19   either.

20   Q.   Okay.  Do you remember a time since then that you spoke

21   with Mr. Bowling and/or his wife?

22   A.   I've seen Sarah at the hospital since I've moved to

23   London.  So yeah, I would have spoken to her.

24   Q.   Okay.  You remember the substance of any conversation you

25   might have with --

*W. WHITE - Redirect (Mr. Smith)*                                    26

1   A.   No, no.

2            MR. SIMONS:  Your Honor, if I could have just a

3   minute.

4            THE COURT:  Yes, sir, you may.

5            MR. SIMONS:  I don't have any more questions, thank

6   you.

7            THE COURT:  Thank you, Mr. Simons.

8            THE WITNESS:  Thank you.

9            THE COURT:  Let's see if there are any questions on

10  redirect.  Mr. Smith?

11           MR. SMITH:  Yes, I have several, Your Honor.

12           THE COURT:  All right.  You can proceed.

13           MR. SMITH:  I'd like to request of the clerk what was

14  marked earlier as Defendant's Exhibit 1.

15           THE COURT:  Yes, sir.

16           MR. SMITH:  I'd like to have that on the projector.

17           THE COURT:  Let me have that document first.  You can

18  return those exhibits to the clerk.  She can put those in the

19  proper order, and if you could give Exhibit 1 to Mr. Smith.

20  What document is this?

21           MR. SIMONS:  That's a copy of D13.

22           THE COURT:  The original's been admitted.

23                        REDIRECT EXAMINATION

24  BY MR. SMITH:

25  Q.   Miss White, you should have in front of you -- I don't

*W. WHITE - Redirect (Mr. Smith)*                                27

1   know if your screen is showing that in front of you or if you

2   have to look at the --

3   A.   There's nothing on it.  I can see that, I think, though.

4   Q.   Mr. Maricle's attorney, he sought to introduce this

5   earlier, and I believe it has been introduced as your change

6   of your voter registration.  This first page of this document,

7   is that, in fact, your change of registration?

8   A.   Yes.

9   Q.   Okay.  If you could follow along with me, I'm going to

10  direct your attention to this document up here at the top.

11  It's got your name, your Social Security number and your

12  precinct name up here; is that correct?

13  A.   Yes.

14  Q.   And it gives your party affiliation here as what?

15  A.   Republican.

16  Q.   Okay.  And it's signed by you?

17  A.   Yes.

18  Q.   And witnessed by Gail White?

19  A.   Yes.

20  Q.   And this appears to have been signed on October the 3rd

21  of 1990.  Is that when you changed your registration to

22  Democrat, ma'am?

23  A.   No.

24  Q.   Okay.  Would this have been the date when you registered

25  to vote?

*W. WHITE - Redirect (Mr. Smith)*                                    28

1    A.   Yes.

2    Q.   And do you know approximately how old you were in 1990?

3    I shouldn't ask that question.

4    A.   No.

5    Q.   I'll move on.  It's got your date of birth as 7/14/71.

6    We can do the math.  Is that your date of birth?

7    A.   Yes.

8    Q.   All right.  And in the -- again, this is page 2 of this

9    exhibit.  It has here what looks to be a check for an address

10   change.  Do you see that?

11   A.   Yes.

12   Q.   And what date did you change your address for your voter

13   registration, ma'am?

14   A.   July 7, '03.

15   Q.   Okay.  So 2003 was not the date which you changed your

16   registration from Republican to Democrat.  Is that what you're

17   saying?

18   A.   Yes.

19   Q.   Page 3 of this exhibit has in front of you again another

20   registration filing in the court records, and it appears here

21   that you have indicated that I believe the date on this is

22   June 7, 2004; is that correct?

23   A.   Yes, it is.

24   Q.   And I believe this is, in fact, saying in the check mark

25   up here in this box that this is a party change.

*W. WHITE - Redirect (Mr. Smith)* 29

1  A.  Yes.

2  Q.  And you changed your party, according to this, to

3  Democrat?

4  A.  Yes.

5  Q.  And this would have been, in fact, June of 2004,

6  following the spring election of 2004?

7  A.  Yes.

8  Q.  Okay.  Now, Miss White, you have also been shown

9  Exhibit D16.  Do you have that in front of you?

10  A.  No.

11        MR. SMITH:  Court please, I'll publish that.

12        THE COURT:  That's fine.  It has been introduced.

13  Q.  I think I have the complete document in front of you.  Do

14  you see that, ma'am?

15  A.  I do, yes.

16  Q.  Do you recall earlier having questions by counsel about

17  these list of names that is presented here in D16?

18  A.  Yes.

19  Q.  You previously testified that that was a list that Cletus

20  Maricle delivered to you?

21  A.  Yes.

22  Q.  And he represented to you that these people had testified

23  in front of the grand jury?

24  A.  Yes.

25  Q.  And you were asked to look at this list for people who

*W. WHITE - Redirect (Mr. Smith)*                                    30

1   were working for the City of Manchester.  Do you remember

2   those questions?

3   A.   Yes.

4   Q.   Doug Adams here at the top, does he work for the City of

5   Manchester?

6   A.   No.  He was a school board superintendent.

7   Q.   All right.  And in the course of again looking over these

8   names, you listed many of these people who we've heard

9   testimony of already.  For instance, James Phillips.

10  A.   Yes.

11  Q.   And he was a circuit clerk.  He wasn't employed by the

12  City of Manchester, was he?

13  A.   No.

14  Q.   And to your knowledge, ma'am, it was again suggested that

15  these were just grand jury witnesses that were giving

16  testimony against your father-in-law.  To your knowledge, at

17  this point, do you know if Doug Adams ever gave testimony

18  against your father-in-law?

19          MR. WESTBERRY:  Objection.

20          THE COURT:  Overruled.

21  A.   I don't know.  I don't think so.

22  Q.   Also, James Phillips, the circuit clerk, to your

23  knowledge, did James Phillips present himself as a witness

24  against your father-in-law?

25  A.   No.

*W. WHITE - Redirect (Mr. Smith)*                                              31

1    Q.  To your knowledge, ma'am, was James Phillips and Doug

2    Adams intimately involved in this voter fraud scheme that you

3    were a part of?

4    A.  Yes.

5    Q.  Okay.  Now, to your knowledge, ma'am, are grand jury

6    witnesses a secret thing as far as who testifies in front of a

7    grand jury?

8    A.  Yeah, I think so.

9    Q.  You don't read about federal -- you haven't read about

10   federal grand jury witnesses that testified in this

11   investigation in Clay County in any of your newspapers in Clay

12   County, have you?

13   A.  I haven't.

14   Q.  And to your knowledge, that's a secret matter; is that

15   your understanding?

16   A.  I guess.  I mean, yes.

17   Q.  All right.  And when Mr. Maricle gave this to you, were

18   you all discussing the investigation relating to the election,

19   or were you discussing the investigation relating to your

20   father-in-law?

21   A.  Both.  A little bit of both.

22   Q.  Okay.  When he gave this to you, did he represent to you

23   as to who these particular people he believed had testified in

24   front of the grand jury and in which investigation?  Did he

25   specify to you?

*W. WHITE - Redirect (Mr. Smith)*                                    32

1    A.   I can't recall.

2    Q.   During your testimony, ma'am, you were asked to recite

3    for counsel at different times the list of people that you

4    assisted to vote or that you stole their vote.  Do you recall

5    those questions?

6    A.   Yes.

7    Q.   Now, this is approaching March of 2010, and it's

8    approaching four years, I believe, from the date which you

9    first served as an election officer for your very first time;

10   is that right?

11   A.   It's been a long time.

12   Q.   Okay.  Now, you were also asked about your grand jury

13   testimony?

14   A.   Yeah.

15   Q.   And when you gave your grand jury testimony, did you get

16   an opportunity to review the voter sign-in sheet, and did you

17   explain to the federal grand jury the people who you -- after

18   looking at that list -- recalled that you had either bought

19   their vote or had assisted them in their vote?

20   A.   Yes, that's how I was able to remember.

21   Q.   And, in fact, ma'am, if we go to page 27 through page 50

22   of your July, 2007 testimony, we can find that whole list of

23   people that you gave the grand jury the information as to all

24   the names of the people that you had known were either selling

25   their vote or you were assisting their vote pursuant to this

*W. WHITE - Redirect (Mr. Smith)*                                    33

1    scheme?

2    A.   Right, yes.

3    Q.   Okay.  Now, D13, which has been introduced, if I could

4    have that from the clerk, please, to publish on the overhead

5    projector.

6              THE COURT:  D13?

7              MR. SMITH:  Yes, Your Honor.  D13.  I'm sorry.

8    Q.   In fact, it's already been pointed out, ma'am, I believe

9    that D13 is a list that you made; is that right?

10   A.   Yes.

11   Q.   And that's a list that you made on May the 27th of 2007,

12   listing people that you recalled at that time, people who had

13   sold their votes?

14   A.   Yes.

15   Q.   And at the top, in fact, you've got a listing saying --

16   what does that say?

17   A.   It says Bart's organized bought vote.  Darnell's bought

18   vote.

19   Q.   And when it says Bart, who is that referring to?

20   A.   Bart Morris.

21   Q.   And Darnell, who is that referring to?

22   A.   Darnell Hipsher.

23   Q.   And was he a city councilman at that time?

24   A.   Yes.

25   Q.   And was he also the person you've mentioned many times in

*W. WHITE - Redirect (Mr. Smith)*                                    34

1    your testimony as Darnell assisting in the scheme you were

2    involved in?

3    A.   The same person, yes.

4    Q.   Now, in this list, again this was given May the 25th,

5    2007, approximately one year after you had been involved for

6    the first time as an election officer?

7    A.   Yes.

8    Q.   Okay.  And this list goes on for several pages, as I see;

9    is that correct?

10   A.   Yes.

11   Q.   And these are again names that you passed on to the

12   federal grand jury and to the FBI?

13   A.   Yes.

14   Q.   Now, during this time period you were, again, your first

15   experience as an election officer asked to, as you've

16   described, in part, steal votes?

17   A.   Yes.

18   Q.   And then you were asked about the necessity for having, I

19   guess, Debbie Morris offering the assistance of checking off

20   voters to make sure they didn't vote twice?

21   A.   Right.

22   Q.   Is it fair -- well, let me ask you this.  Were there

23   multiple vote haulers that you were having to recognize

24   throughout the day of election day?

25   A.   There was numerous vote haulers, yes.

*W. WHITE - Redirect (Mr. Smith)*                                          35

1    Q.   And was it hard to keep up with who was bringing who?

2    A.   Very hard, yes.

3    Q.   So was it an assistance and a help to you to have Debbie

4    Morris making sure that they were checking off, you didn't

5    have to worry about that?

6    A.   Yes, that's everybody's request.

7    Q.   Now, before we broke for lunch, you were given multiple

8    things to look at, but you were left with just this one

9    packet; is that correct?

10   A.   Yeah.

11   Q.   Are these all the notes you made in this case?

12   A.   Not even close to all the notes.

13   Q.   You were asked by counsel for Mr. Thompson just to look

14   at these?

15   A.   Yeah, and a majority of those were my husband's notes.

16   Q.   When you say it was your husband's notes, was that notes

17   you were being the scribner?

18   A.   Yes.

19   Q.   Or you were writing it for him?

20   A.   Yes.

21   Q.   So all these notes here, the notes that you got an

22   opportunity to review during our lunch hour wasn't all your

23   notes?

24   A.   The notes that he chose were not even close to all of my

25   notes, and what he chose was mostly my husband's notes.

*W. WHITE - Redirect (Mr. Smith)*                                    36

1    Q.   In fact, ma'am, when you testified in front of the grand

2    jury, you had an opportunity to explain Freddy Thompson's

3    assisting you and teaching you how to cheat votes?

4    A.   Yes.

5    Q.   In fact, on page 4 of your testimony --

6                MR. BALDANI:  Objection, Your Honor.

7    Q.   -- it says clearly --

8                MR. BALDANI:  Objection, Your Honor.

9                THE COURT:  Overruled.

10               MR. BALDANI:  May we approach?

11               THE COURT:  You can approach, yes.

12                    (A sidebar conference was held out of the

13                    hearing of the jury):

14               THE COURT:  Mr. Smith, is this a prior consistent

15   statement being offered to rebut the charge of recent

16   fabrication?

17               MR. SMITH:  It is, Your Honor.

18               MR. BALDANI:  My objection, Your Honor, is I think a

19   prior consistent statement offered to rebut a recent charge,

20   it also has to establish that the motive to fabricate predated

21   and the motive to fabricate has been there all along.  So the

22   fact that she made a consistent statement at the July, '07

23   that Freddy Thompson did, I don't think falls under the prior

24   consistent statement exception, because her motive to

25   fabricate and motive to implicate Mr. Thompson has existed all

*W. WHITE - Redirect (Mr. Smith)*                                    37

1   along, since the beginning of her cooperation.

2          THE COURT:  You asked her during her

3   cross-examination whether she mentioned Freddy Thompson.

4          MR. BALDANI:  Right.

5          THE COURT:  During grand jury.  And you stopped her

6   after she said Mr. Jones.  Now, I don't know what this

7   particular part of the grand jury testimony is, Mr. Smith, but

8   I'm assuming it implicates Mr. Thompson?

9          MR. BALDANI:  She does say it --

10         THE COURT:  It's admissible.  Go ahead, Mr. Smith.

11         MR. SMITH:  I said, are you saying Freddy Thompson

12  was in on the scheme to change votes?  He showed me how to

13  manipulate the machine outside his office door.  He had one of

14  these set up in the clerk's office that stayed there 30 days

15  prior to the vote elections.

16         THE COURT:  You're reading from the grand jury

17  testimony.  I've determined that it's admissible, Mr. Smith.

18  You may proceed.  Objection is overruled.

19         MR. SMITH:  Thank you, Your Honor.

20               (Sidebar conference concluded.)

21         THE COURT:  Thank you, counsel.  Objection is

22  overruled.  Mr. Smith, you may review a portion of the grand

23  jury testimony.

24  Q.  Miss White, on page 4 of your testimony, you were asked:

25  Who was present when you had this meeting explaining to you

*W. WHITE - Redirect (Mr. Smith)*                                      38

1   how to cheat the voters?

2      Answer:  We were at the clerk's office.  Freddy

3   Thompson's office.

4      Question:  Are you saying Freddy Thompson was in on the

5   scheme to change votes?

6      Answer:  He showed me how to manipulate the machine

7   outside his office door.  He had one of these set up in the

8   clerk's office that stayed there 30 days prior to the vote

9   elections.

10  A.  Yes.

11  Q.  Is that your answer to the grand jury?

12  A.  Yes.

13          MR. SMITH:  That's all the questions I have, Your

14  Honor.

15          THE COURT:  All right.  Thank you.  Mr. Hoskins, you

16  need just a moment?

17          MR. HOSKINS:  Could I have just a minute, Your Honor?

18          THE COURT:  I'm going to remind counsel I'm going to

19  allow limited redirect on matters covered by other counsel

20  that you didn't have a chance to ask about or that was just

21  asked by Mr. Smith.  Not to replow ground we've already

22  covered.  Thank you.

23          MR. SMITH:  Your Honor, while they're taking a

24  conference, may I shut this down and hand the clerk her

25  exhibit?

*W. WHITE - Recross (Mr. Hoskins)*                                    39

1        THE COURT:  Yes, you may.  You can do that Mr. Smith.

2   Thank you.  Mr. Hoskins, you may proceed.

3        MR. HOSKINS:  Thank you, Your Honor.

4                    RECROSS-EXAMINATION

5   BY MR. HOSKINS:

6   Q.  Miss White, real quick, back to Exhibit D16.

7   A.  I don't have anything up here.

8   Q.  It's the list of names that were supposed to be witnesses

9   before the grand jury.

10  A.  Yes.

11  Q.  So you know what I'm talking about?

12  A.  Yes, I do.

13        THE COURT:  Here we go.

14        THE WITNESS:  Thank you.

15  Q.  You've testified that Cletus Maricle gave you that list,

16  but that it's not in his handwriting?

17  A.  Yes.

18  Q.  Okay.  And you testified that he gave you this list once

19  you had already started cooperating, right?

20  A.  I don't know if I testified to that or not.

21  Q.  Well, was it after you started cooperating or before?

22  A.  You have to refer back to when I turned it over to them.

23  I can't give you a date of when he gave it to me.

24  Q.  You don't remember?

25  A.  I can't give you a date when he gave it to me.

1    Q.   Well, without giving us a date, can you relate it to a

2    day and time?

3    A.   No, I can't.

4    Q.   You have no idea, then, when that list was given to you?

5    A.   No, there's -- I mean, no.

6    Q.   Okay.  That list is never discussed on any of the

7    recordings that you made, is it?

8    A.   I don't recall that it has been.

9    Q.   Okay.  Who else was present when you were given that

10   list?

11   A.   My husband.

12   Q.   Anybody else at all?

13   A.   Not that I recall.

14   Q.   Where were you?

15   A.   In his home.

16   Q.   And why did he give you that list?

17   A.   Turn around and ask him that.  I have no idea.

18   Q.   I'm asking you what you understand.

19   A.   I don't know.  I don't know.

20   Q.   Did he talk about it as he gave it to you, or did he just

21   kind of pass it to you, wink?

22   A.   He gave it to my husband and said, this is who has been

23   down -- this is the grand jurors that we know -- or the

24   witnesses been to the grand jury.

25   Q.   Okay.

1    A.   I didn't go in in-depth conversation about it, if that's

2    what you're asking me.

3    Q.   I'm asking -- I was trying to ask you if you had any idea

4    when this happened, and you're telling us that you don't.

5    A.   I don't.

6    Q.   Did you give it to the agents as soon as you got it?

7    A.   They would have that date down when I gave it to them.  I

8    don't know when I gave it to them.

9    Q.   Did you hold on to it for a while?

10   A.   No.

11   Q.   So you did give it to them as soon as you got it?

12   A.   Yes.

13   Q.   Okay.  So if you gave it to them as soon as you got it,

14   it must have been when you were cooperating, right?

15   A.   It must have been.

16   Q.   Okay.  Thank you.  And there is no recording of that, is

17   there?

18   A.   Not that I know of.

19   Q.   Okay.  Mr. Smith asked you a minute ago about pages.  I

20   think he said 27 to 50 of your grand jury testimony of

21   July the 12th, 2007.  Do you have a copy of that up there with

22   you?

23   A.   I don't, no.

24   Q.   Okay.  But he asked you if you looked at that, that would

25   be where you listed all these people that were bought and had

*W. WHITE - Recross (Mr. Hoskins)*                                    42

1   their votes stolen from, right?

2   A.   Can I have a copy of it, because I'm not following you

3   real well.

4   Q.   Well, I'm going to ask you about if you recall what he

5   asked you just a few minutes ago.

6   A.   Okay.  Ask me again.

7   Q.   All those pages that he referred to in your grand jury

8   testimony, what did you understand him to be asking you about?

9   A.   I don't understand what you're asking me that he asked

10  me.  I'm sorry.

11        MR. SMITH:  I think the question is confusing.  I'm

12  going to object to the question.

13        THE COURT:  All right.  If you can rephrase the

14  question.

15        MR. HOSKINS:  I'll try to simplify this, Judge.  I'm

16  sorry.

17  Q.   Mr. Smith first asked you if you had been able to

18  remember the names of the people whose votes you bought or you

19  helped to buy?

20  A.   Yes.

21  Q.   And when I asked you that question yesterday, you came up

22  with five names.

23  A.   Yes.

24  Q.   Right?  And when I asked you yesterday how many votes or

25  whose votes you could remember stealing, you couldn't come up

*W. WHITE - Recross (Mr. Hoskins)*                                    43

1   with a single one, right?

2   A.   Um-hmm.

3   Q.   And when I asked you yesterday how many absentee voters

4   you had helped that were bought voters, you couldn't remember

5   any?

6   A.   Yes.

7   Q.   And when I asked you about who had filled out voter --

8           MR. SMITH:   I'm going to object as being outside the

9   scope of what I believe was redirect, and I'm not sure, but

10  this has been asked and answered twice already.

11          THE COURT:   Sustained.

12  Q.   Mr. Smith asked you about that, and then he asked you

13  about your grand jury testimony in July of 2007.

14  A.   Yes.

15  Q.   Okay.  And he referred to certain pages in your grand

16  jury testimony, didn't he?

17  A.   Yes.

18  Q.   But you didn't have that to look at, did you?

19  A.   No.

20  Q.   Okay.  You haven't looked at it today or yesterday, have

21  you?

22  A.   No.

23  Q.   Do you remember giving names to the grand jury of people

24  that you bought --

25  A.   I can remember several now, because he just flipped

*W. WHITE - Recross (Mr. Hoskins)*                                    44

1    through three pages on this screen.

2    Q.   Do you remember giving -- telling the grand jury those

3    names?

4    A.   Yes.

5    Q.   All right.

6         MR. HOSKINS:  Your Honor, I'm going to ask that the

7    witness be shown a transcript of her grand jury testimony.

8         THE COURT:  All right.

9         MR. SMITH:  Which transcript, and what page?

10        MR. HOSKINS:  July 12, 2007.

11        MR. SMITH:  Your Honor, I believe that this is again

12   covering the same ground that's previously been covered by

13   counsel's questions earlier in the week and also outside the

14   scope of recross at this time.  I will object.

15        MR. HOSKINS:  Your Honor, if I could respond.

16        THE COURT:  To save time, why don't you all come up

17   here.

18                   (A sidebar conference was held out of the

19                   hearing of the jury):

20        THE COURT:  Okay.

21        MR. HOSKINS:  I believe the jury might mistakenly

22   infer from Mr. Smith's question that 23 pages of this lady's

23   grand jury testimony were a list of names of bought and stolen

24   votes, and that's not accurate.

25        THE COURT:  Do the pages reflect her testimony about

*W. WHITE - Recross (Mr. Hoskins)*                                    45

1    individuals --

2              MR. HOSKINS:  Yes.

3              THE COURT:  -- that were engaged in buying or selling

4    votes?

5              MR. HOSKINS:  Some, they do.

6              THE COURT:  But it's contained in those sections of

7    the transcript?

8              MR. HOSKINS:  Essentially, yes.

9              THE COURT:  Are you now intending to go through and

10   identify each of those people from those 23 pages?

11             MR. HOSKINS:  I'm going to ask her -- I want to ask

12   her to go through those and point out that on many of these

13   pages, there are no names listed whatsoever; that there are

14   not, in fact, 23 pages worth of names.

15             THE COURT:  Well, recross would be the issue of

16   whether she identified individuals at a time and point where

17   she had a better memory.  The inference or gist of your

18   cross-examination earlier was she wasn't able to identify

19   anyone subject to the scheme.  Mr. Smith then showed us that

20   there were individuals that she did identify after being shown

21   the voter rolls or whatever she was shown, and she did

22   identify those individuals.

23             So the question is whether that is correct or

24   incorrect, that she did or she did not know that at the time.

25   So that is the issue for recross.

*W. WHITE - Recross (Mr. Hoskins)*                                46

1         MR. HOSKINS:  I think I should also be allowed to

2    clarify that this is not a 23-page list of names, because that

3    could quite conceivably be the 250 people that she talks

4    about.

5         THE COURT:  You can ask her if names are listed on

6    those pages, but not on every page.  If you want to do it that

7    way.  We start going into picking out specific people, then it

8    does go beyond the scope of redirect.

9         MR. HOSKINS:  Okay.

10        THE COURT:  Okay?  Anything else while we're here?

11        MR. SMITH:  Well, Your Honor, I think the witness's

12   testimony, D13 was, in fact, a list that she made out and gave

13   contemporaneous with this grand jury investigation.  That's

14   been put on the projector, and I believe that again to go

15   through here and go over these names individually --

16        THE COURT:  I've already indicated we're not going to

17   do that.

18        MR. SMITH:  He says that's not where he's going.

19        THE COURT:  Since she wasn't shown the grand jury

20   transcript when you were examining her, I am going to allow

21   him -- or allow Mr. Hoskins to show her that, see if, in fact,

22   there are names that were mentioned before the grand jury.

23   But we're not going to go through each page.  We're not going

24   to go through 23 pages and then pick out --

25        MR. HOSKINS:  We won't have to, Judge, because a lot

*W. WHITE - Recross (Mr. Hoskins)*                                      47

1    of those pages don't have any names.

2            THE COURT:  And then if he wants to ask about this

3    other exhibit, he can ask about the other exhibit that was

4    covered on redirect.  So --

5            MR. HOSKINS:  And I do want to ask a couple questions

6    about that, because I think that is a list of people who

7    hauled votes.  It's a list of different things.  It is not a

8    list of, as I understand it, it is not a list of votes that

9    she bought or stole.

10           THE COURT:  I understand.  I'm giving you a shovel

11   with a little bit longer handle.  Dig away.

12           MR. HOSKINS:  Thank you, Judge.

13           MS. HUGHES:  This is Elizabeth.  It is my intention

14   to take that deeper when it gets to be my turn, if y'all would

15   speed it up, and ask her to review D13 and identify any of

16   those persons that she saw Debbie Morris pay.  That wouldn't

17   be beyond --

18           THE COURT:  That's fine.

19           MS. HUGHES:  Just wanted to make sure so we wouldn't

20   have to come back up here.

21           THE COURT:  I've got notes of four areas that Mr.

22   Smith covered.  I'm not prohibiting you from asking questions

23   about questions from co-defendants if they said something that

24   affected your client, but not everything in general.

25   Otherwise, we'll be here forever.

*W. WHITE - Recross (Mr. Hoskins)*                                        48

1          MR. WHITE:  Your Honor, can I ask a quick question

2     about that, to make sure I don't run afoul?  I have one area

3     of recross that I think does affect my client in terms of the

4     credibility of this witness, and that has to do with the house

5     that she purchased.

6          She testified that she bought a house from her

7     relatives when she moved into Manchester from Greenbriar.  She

8     gave testimony about that to Mr. Baldani on cross.  That was

9     the only area I was going to ask anything in.

10          I have a deed on that particular document that I've

11     produced to the United States, and I'd like to ask some

12     questions about that, because that deed will show that her

13     testimony is inconsistent, and she did not --

14          THE COURT:  In what way?

15          MR. WHITE:  My recollection, she testified -- I'm

16     sorry.  This is Scott White.  I represent Mr. Jones.  What

17     I've written down in my notes with my memory of her testimony

18     is that she said when she moved from Greenbriar into

19     Manchester, that she and her husband bought an historic house

20     that was owned by his grandmother for a couple hundred

21     thousand dollars.

22          The deed that I've got shows that the property was a

23     gift, and that it had a fair market value of 5,000, and her

24     and Kennon's name both signed it and their notarized

25     signatures.  So I believe that's a prior inconsistent

*W. WHITE - Recross (Mr. Hoskins)*                                    49

1   statement that I can use to impeach, and I think it goes to

2   her credibility.

3           THE COURT:  It's not relevant.  I don't think it goes

4   to credibility.  That would be beyond the scope.

5           MR. WHITE:  Thank you, Your Honor.

6                   (Sidebar conference concluded.)

7           THE COURT:  Give the attorneys a moment to get back

8   to their chairs.  Thank you.  Mr. Hoskins, I believe you

9   wanted to ask about the grand jury testimony and wanted to

10  show her the transcript then ask any questions that are

11  relevant.

12          MR. HOSKINS:  Thank you.

13  Q.  Miss White, have you had a chance to look through that as

14  we've been --

15  A.  No, I didn't look at it.

16          THE COURT:  I think you have it.

17          MR. HOSKINS:  She has it.

18          THE COURT:  Okay.

19  A.  What do you want me to look at?

20  Q.  Mr. Smith asked you about pages 27 through 50.

21  A.  27?

22  Q.  Start with 27 through page 50.

23  A.  50?

24  Q.  Yes, ma'am.  At the bottom of page 27, you're asked about

25  Bonnie Barnes?

*W. WHITE - Recross (Mr. Hoskins)*                                    50

1    A.   Yes.

2    Q.   And you said that you had -- her vote had been bought?

3    A.   Yes.

4    Q.   And that you voted her at the precinct?

5    A.   Do you want me to read it?

6    Q.   Well, is that accurate?  You voted her because her vote

7    was bought?

8    A.   Yes.

9    Q.   Okay.  And you talked about household -- you talked about

10   Lynn Spencer Gilbert and Victor Gilbert?

11   A.   What page are you on now?

12   Q.   On page 28.

13            THE COURT:  I'm sorry, Mr. Hoskins, but we discussed

14   at the Bench how you can use this to refresh her memory as to

15   whether she, in fact, identified individuals between pages 27

16   and 50, and the Court instructed you that we were not going to

17   go through each person listed.  But you are allowed to ask as

18   a follow-up to Mr. Smith's questions if, in fact, she

19   identified individuals at those pages of that grand jury

20   transcript.

21            MR. HOSKINS:  I'm sorry, Your Honor.  I'll withdraw

22   that question.

23   Q.   You identified some names on some of those pages,

24   correct?

25   A.   Yes.

*W. WHITE - Recross (Mr. Hoskins)*                                    51

1  Q.   Okay.  Look through those pages.  That's not a big,

2  long -- those pages do not consist of just a list of names of

3  bought voters and stolen votes, do they?

4  A.   No.

5  Q.   Okay.  There are not 250 names on those pages, are there?

6  A.   No, I don't think so.

7  Q.   Far short of that.  Would you take a minute and look and

8  see?

9  A.   Well, there's only one name on page 29.  Is that what

10  you're wanting me to refer to?

11  Q.   There are some pages where there are no names?

12  A.   There is, yes.

13  Q.   You were being asked questions for quite a long time?

14  A.   I was, yes.

15  Q.   And you would agree that that's not just a 23-page list

16  of names, right?

17  A.   Yes.

18  Q.   Okay.

19         MR. HOSKINS:  Your Honor, I'd ask that the witness be

20  shown Exhibit D13 once more.

21         THE COURT:  Yes, sir.

22  Q.   Do you recognize that now?

23  A.   I do.

24  Q.   Just real quick, that is a list that you made, right?

25  A.   Yes.  My husband and I, yes.

*W. WHITE - Recross (Mr. Baldani)*                                      52

1   Q.   It's a list of a lot of different people that were

2   involved in vote hauling and other things, correct?

3   A.   Yes.

4   Q.   Okay.  That, just to be clear, that is not a list of

5   votes that you -- people that you voted, that you bought,

6   right?

7   A.   Right.

8             MR. HOSKINS:  That's all.  Thank you.

9             MR. WESTBERRY:  We have no additional questions, Your

10  Honor.

11            THE COURT:  Thank you.  Mr. White?

12            MR. WHITE:  No questions, Your Honor, thank you.

13            THE COURT:  Let's go around the table.

14            MR. ABELL:  Judge, I don't have any questions either.

15            THE COURT:  Thank you, Mr. Abell.  Mr. Baldani?

16            MR. BALDANI:  Hopefully very brief, Judge.

17            THE COURT:  Yes, sir.

18                        RECROSS-EXAMINATION

19  BY MR. BALDANI:

20  Q.   Just want to touch on a couple things the prosecutor

21  brought up.

22  A.   Okay.

23  Q.   We kind of belabored this, but -- and we've talked

24  about -- I'm waving something.  This is the summary that we

25  talked about and the chronology, right?

*W. WHITE - Recross (Mr. Baldani)* 53

1   A.   Yes.

2   Q.   Now, when Mr. Smith asked you questions, you mentioned

3   that some of this is things that you wrote down in your

4   handwriting but things told to you by your husband, Kennon?

5   A.   Yes.

6   Q.   Right?

7   A.   Yes.

8   Q.   So in a sense, it's kind of a chronology that you -- and

9   a summary that you all jointly prepared, right?

10  A.   I did the handwriting, yes.  I wrote it.

11  Q.   Okay.  Well, some of the entries are things that you did

12  yourself.  Let me give you an example, okay?

13  A.   Okay.

14  Q.   And I'm going to pinpoint right to this issue that I

15  brought out about the manipulation.

16  A.   Okay.

17  Q.   Okay?  Do you remember reading in there, "Cletus advised

18  me to get with Wayne Jones so I would know how to manipulate

19  the machine"?

20  A.   Yes.

21  Q.   So to me that, obviously, would be you?

22  A.   Yes.

23  Q.   So that's you writing in your own voice, not Kennon's?

24  A.   Yes.

25  Q.   And that's a specific reference in here to machine

*W. WHITE - Recross (Mr. Baldani)*                                    54

1   manipulation?

2   A.   Yes.

3   Q.   And then a little bit later, "Cletus placed me as an

4   election officer, advised me who to see, promised me favors,

5   instructed me to see Wayne Jones on how to manipulate the

6   machine."  So that, obviously, is yourself talking there?

7   A.   That's what Cletus instructed me to do.

8   Q.   Right.

9   A.   That doesn't mean that I didn't meet with Freddy

10  Thompson.

11  Q.   I'm asking you a question.  This is --

12  A.   Yes.

13  Q.   -- you talking about your own role --

14  A.   There's very few entries in that that are referring to

15  me, but that is one of them.

16  Q.   Well, those are two of them?

17  A.   Two of them.

18  Q.   And those are two specific entries relating to machine

19  manipulation?

20  A.   Yes.

21  Q.   And you've already agreed with me that nowhere in here

22  does it say that Freddy taught you to manipulate the machine?

23  A.   In that --

24  Q.   Okay.

25  A.   -- what you showed me.  In what you showed me, yes.

*W. WHITE - Recross (Mr. Baldani)*                                55

1    Q.   That's what I'm getting to next.  Mr. Smith asked you

2    about that this isn't all of your handwritten documents?

3    A.   No, that's not all of them.

4    Q.   Well, I'm going to ask you a simple question.  Are you

5    telling the jury that in some of these other handwritten

6    documents, it's documented that Freddy did this schooling that

7    we're talking about?  Is that what you're saying?

8    A.   I'm telling the jury that, that I don't know.  I'd have

9    to review.  My answer to you is I don't know.

10   Q.   So if there were, you could review and always tell us

11   about it, couldn't --

12   A.   I could.

13             MR. SMITH:  Your Honor, I'm going to object.  I

14   believe the question has been asked several different ways.

15             THE COURT:  Sustained.

16   Q.   Now, the only other thing I want to ask you about, Miss

17   White, is we established that in the May 3rd grand jury

18   testimony, you were asked about stealing votes and who taught

19   you, and you didn't mention Freddy Thompson?

20   A.   Yes.

21   Q.   All right.  You testified again on July 12th, '07, at the

22   grand jury.  That's your two times, right?

23   A.   Yes.

24   Q.   And the second time is the one the prosecutor asked you

25   about?

*W. WHITE - Recross (Mr. Baldani)*                                    56

1   A.   Yes.

2   Q.   And that would be roughly, there's roughly nine weeks in

3   between, right?  May 3rd --

4   A.   Yeah.

5   Q.   -- to July 12th?  I mean, give or take a couple days,

6   roughly nine weeks?

7   A.   Yeah.

8   Q.   Did you meet with any FBI agents in between May 3rd of

9   '07 and 7/12/07?

10  A.   I have no idea.

11  Q.   You don't know?

12  A.   I would think they'd have it document -- this is 2010.  I

13  can't -- I have no idea.

14  Q.   Okay.  So you started to say you would think if you did,

15  it would be documented?

16  A.   I don't have documentation of that.

17  Q.   What happened between May 3rd of '07 and July 12th of '07

18  that caused you to remember --

19          MR. SMITH:  Your Honor, I'm going to object.  That's

20  misleading.

21          THE COURT:  Sustained.

22  Q.   Do you have an explanation why you didn't mention that on

23  May 3rd?

24          MR. SMITH:  Same objection.

25          THE COURT:  Sustained.

*W. WHITE - Recross (Ms. Hughes)*                                    57

1    Q.   Bottom line is, you acknowledge you didn't mention it

2    May 3rd and didn't -- July 12th, your grand jury testimony, is

3    that the first time that you mentioned this Freddy Thompson

4    schooling?

5    A.   I can't answer that, but I can tell you that Freddy

6    Thompson showed me how to use the machine.  I can tell you

7    today that.

8    Q.   I understand that's your testimony.  My question is, is

9    there any note --

10   A.   I don't have anything, sir.  I turned everything that I

11   had over.  I have nothing.

12   Q.   Listen to my question.  Do you believe you can produce

13   any note, any statement, any transcript to show --

14            MR. SMITH:  Your Honor, I'm going to object.  I

15   believe that this has been asked and answered.

16            THE COURT:  Sustained.

17            MR. BALDANI:  I'll sit down, Judge.  Thanks.

18            THE COURT:  All right.  Thank you.  Mr. Gilbert, do

19   you have any follow-up?

20            MR. GILBERT:  No questions.

21            THE COURT:  Miss Hughes, you have a few.

22            MS. HUGHES:  I do, thank you.

23                          RECROSS-EXAMINATION

24   BY MS. HUGHES:

25   Q.   Mrs. White, could you pick up Exhibit D13?  It was not

*W. WHITE - Recross (Ms. Hughes)*                                    58

1    introduced when I asked you questions last time, so that's why

2    I'm back.

3    A.   I have it.

4    Q.   All right.  Thank you.  Could you look at the first page

5    of that document?  I'm not as efficient as Mr. Smith.  I can't

6    post it.  I don't know how to work that machine.

7    A.   I see it, yes.

8    Q.   All right.  Could you tell me, look at that list of names

9    and tell me, did you see Debbie Morris pay money to any of

10   those people on the first page?

11   A.   Absolutely.

12   Q.   All right.  Tell me who it was.

13   A.   Deshae Henson.

14   Q.   You saw her pay money to him for his vote?

15   A.   Absolutely.

16   Q.   All right.  Keep going.

17   A.   What do you mean keep going?  Keep reading?

18   Q.   I want you to tell me everyone on that first page that

19   you saw personally Debbie Morris pay money to.

20   A.   Antwan Henson.  This is over a period of all the

21   elections.  Is that what you're -- which specific election?

22   Q.   Thank you, because I was going to come back and ask you

23   those things.  But if you want to start with Deshae Henson,

24   you saw her pay money to Deshae Henson?

25   A.   Deshae Henson.

*W. WHITE - Recross (Ms. Hughes)*                                    59

1   Q.   And which election would that have been?

2   A.   I couldn't tell you that.  That's why I asked you if you

3   was going to try to --

4   Q.   All right.  If you know which election --

5   A.   Okay.

6   Q.   -- as you name someone, then you can volunteer that for

7   me.  If you don't know the election, the jury and I will

8   assume you don't know the year.

9   A.   Okay.  Ella Wagers.

10  Q.   All right.

11  A.   The next one's her daughter, Bill Sester, Antwan Henson.

12  Q.   Well, now, I think you've gotten away -- oh, no, that's

13  on that list, okay.

14  A.   Stacey Perkins.

15  Q.   Um-hmm.

16  A.   James Goins and Chris Duff.

17  Q.   She paid her son?

18  A.   She paid her son, yes.

19  Q.   Let's go to the next page.

20  A.   Ralph Bowling, Marianne Smith, Anthony "Pepper" Gilbert,

21  Vic Gilbert, Saffey Hipsher, Sophie Sizemore.

22          THE COURT:  Slow down just a little bit.

23  A.   Amy Abner, Mary Gail Roberts, Lisa Buttery, Sam Buttery,

24  Sarah Gilbert, Tim Pennington.

25  Q.   I don't see Tim Pennington.  Have you gone on to page 3?

*W. WHITE - Recross (Ms. Hughes)*                                    60

1    A.   Yes.

2    Q.   All right.

3    A.   Eddie Davidson.

4    Q.   Are you on page 4?

5    A.   Yes.

6    Q.   Thank you.

7    A.   Gail Roberts, it says Gail Roberts' daughter, Carol

8    Hacker.

9    Q.   Do you know Gail Roberts' daughter's name?

10   A.   No.

11   Q.   But she lives at Beech Creek, if I'm --

12   A.   She did at that time, yes.

13   Q.   I'm sorry.  Keep going.

14   A.   Christina Hacker Riley, Carol Hacker.

15   Q.   Hold on.  You're faster than I am.  I see Carol Hacker,

16   okay.

17   A.   That's the end of the list.

18   Q.   And so it's your testimony that you witnessed Debbie

19   Morris pay money for their vote to each of those people that

20   you just identified for the jury?

21   A.   I have seen her, yes.

22   Q.   So if asked, you believe that those people would testify

23   that they received money --

24   A.   I believe they would.

25        MR. SMITH:  Your Honor, I'm going to object.

*W. WHITE - Recross (Ms. Hughes)*                                      61

1          THE COURT:  Sustained to what they may or may not

2     testify.

3          MS. HUGHES:  I understand.  Thank you.

4          THE COURT:  Mr. Simons, any additional questions?

5          MR. SIMONS:  No further questions.

6          THE COURT:  All right.  Thank you.  I've given back

7     all those exhibits.

8          THE WITNESS:  I've given it to him, yes.

9          THE COURT:  You may step down at this time.

10         THE WITNESS:  Thank you.

11         MR. HOSKINS:  Your Honor, could we approach briefly?

12         THE COURT:  Yes, sir.

13              (A sidebar conference was held out of the

14              hearing of the jury):

15         THE COURT:  Yes, sir, Mr. Hoskins.

16         MR. HOSKINS:  Your Honor, just briefly wanted to ask

17    the Court not to excuse this witness finally.  We may, may

18    make a request to recall her.  We may also make a request to

19    make a motion for a handwriting exemplar from this witness.

20         THE COURT:  Should have raised that before she left

21    the courtroom.  Unless you have her under subpoena, she's had

22    an opportunity to answer questions for several days, including

23    about these recent text messages which amounted to nothing.

24    So I'm not going to retain her.  If you need to subpoena her

25    and bring her back in, you can do that in your case-in-chief.

1              MR. HOSKINS:  All right.

2              THE COURT:  Are we about ready to call the next

3    witness, Mr. Smith?  We'll take a break before we do that.

4              MR. SMITH:  We're ready.

5              THE COURT:  Take about a 15-minute break.  I just

6    wanted to make sure the next witness was here.  I'll give the

7    admonition or the instruction to the jury.  I told the parties

8    this morning I would give it at the conclusion of her

9    testimony.

10                    (Sidebar conference concluded.)

11              THE COURT:  Thank you, counsel.  Ladies and

12   gentlemen, let me give you just a reminder before the next

13   witness is called.  And before that happens, we're going to

14   take our afternoon recess.  But, of course, again, you've

15   heard the testimony given by a witness which includes her

16   interpretation of what other people meant by what they said.

17   Again, you're reminded that this testimony represents the

18   witness's understanding of what was meant by the statements

19   and has been admitted to put these statements and the parties'

20   conversations in context.

21              Also, you've heard the testimony that the witness

22   provided incorrect or misleading information to one or more

23   defendants during the course of the federal investigation.  In

24   evaluating this testimony, you may consider whether the

25   witness was acting pursuant to directions given by

63

1    investigators in making incorrect or misleading statements.

2    You are so advised.

3         We will take a 20-minute recess at this time, ladies

4    and gentlemen.  Again, please keep in mind the admonitions

5    that you've been given previously not to discuss the case

6    among yourselves while we are in recess.  The jury will be

7    excused until 2:40 this afternoon.

8                   (The jury left the courtroom at 2:18 p.m.)

9         THE COURT:  Thank you.  We'll be in recess for 20

10   minutes.

11                  (Recess from 2:19 p.m. until 2:36 p.m.)

12        THE COURT:  Thank you.  The record will reflect the

13   jury's not present at this time.  I understand that one of the

14   parties has an issue to take up?

15        MR. RICHARDSON:  Yes, Your Honor.  I'm going to have

16   to leave about five till 4:00, and I didn't know if I could

17   stay here at the defense table and then leave from here, or do

18   you want me back in the audience?

19        THE COURT:  It's your preference.

20        MR. RICHARDSON:  Thank you.

21        THE COURT:  It's your preference.  Anything else,

22   counsel?  Before the jury's brought back in, there is one

23   matter I do want to mention to the parties.  There's a motion

24   filed to quash the subpoena on Mr. Marcum.  I'll need to set

25   that for a hearing.  So when you have an opportunity, please

64

1   check your calendars.  I think the subpoena is returnable on

2   Monday.  I don't think the United States will be finished with

3   its case on Monday.  We do have Friday open next week without

4   the jury.  Of course, Mr. Pinales won't be here on Friday or

5   Miss Crouse because of the obligation at the Sixth Circuit.  I

6   do want you to check your calendars.  We can talk about that

7   at the end of the day.  I mention it now so you can be

8   thinking about it.

9         MR. BALDANI:  You want to talk about that at the end

10  of the day?

11        THE COURT:  End of the day.  Thank you.  You can

12  bring the jury back in.

13        MR. SMITH:  Your Honor, could we have a name again?

14  You said Charles Marcum.  I know that was filed.  I haven't

15  seen -- there's two Charles Marcums.  That's why I'm asking.

16        THE COURT:  I'll need to get that.  I don't have it

17  here in the courtroom.  I'll get that at the end of the day

18  and we'll have further conversations.

19              (The jury entered the courtroom at 2:38 p.m.)

20        THE COURT:  Record will reflect that all members of

21  the jury are present.  Parties and counsel are also present.

22  Mr. Smith, Mr. Parman, are you ready to call your next

23  witness?

24        MR. PARMAN:  Yes, Your Honor.  Charles Weaver.

25           CHARLES WEAVER, GOVERNMENT'S WITNESS, SWORN

*WEAVER – Direct (Mr. Parman)*                                          65

1          THE COURT:  Thank you.  Mr. Parman, you may proceed.

2          MR. PARMAN:  Thank you, Your Honor.

3                         DIRECT EXAMINATION

4    BY MR. PARMAN:

5    Q.   Sir, before we begin, you may want to lift that

6    microphone up a little bit.  Could you state your name for the

7    record?

8    A.   Charles Newton Weaver.

9    Q.   Mr. Weaver, do you go by a nickname?

10   A.   Yes.  Dobber.

11   Q.   Dobber?

12   A.   Dobber, yes.

13   Q.   If you could share with the jury how you got that

14   nickname.

15   A.   My dad was jailer, and I got it from inmates over the

16   years while he was a jailer.

17   Q.   What was your dad's name?

18   A.   Homer Weaver.

19   Q.   Where was he jailer?

20   A.   Clay County.

21   Q.   Sir, how old are you?

22   A.   I'm 38.

23   Q.   Are you married?

24   A.   Yes.

25   Q.   Do you have any kids?

*WEAVER - Direct (Mr. Parman)*                                    66

1    A.   Yes.  I have three kids.

2    Q.   Where do you live?

3    A.   Manchester.

4    Q.   What county is Manchester in?

5    A.   Clay County.

6    Q.   How long have you lived in Clay County?

7    A.   All my life.

8    Q.   Could you share with the jury your employment history?

9    A.   I had 17, almost 17 years with the Department of

10   Transportation, and then I was emergency management

11   coordinator for Clay County, and I was a football coach there

12   as a part-time thing also.

13   Q.   When were you emergency management coordinator for Clay

14   County?

15   A.   2007.

16   Q.   What did you do for the Department of Transportation?

17   A.   Heavy equipment operator.

18   Q.   And what years did you act as a football coach?

19   A.   I want to think around 2003 to about 2007.  Four years

20   football coach.

21   Q.   What are the ages of your children?

22   A.   Second grade to sixth grade.

23   Q.   Sir, when did you first become involved in the election

24   process in Clay County?

25   A.   2002.

WEAVER - Direct (Mr. Parman)                                    67

1   Q.   Did you have prior experience with elections in Clay

2   County by dealing with your father?

3   A.   Yes.

4   Q.   Share with the jury what that experience was.

5   A.   I just been around politics in Clay County all my life.

6   My father was elected jailer in 1969, like two years before I

7   was born.  So, you know, I just grew up in politics.

8   Q.   How many years did he serve as jailer?

9   A.   Twenty-one years.

10  Q.   And in 2002, did you become personally involved in the

11  election process in Clay County?

12  A.   Yes, I did.

13  Q.   How so?

14  A.   I ran for school board in the November election.

15  Q.   And what district in Clay County did you run for school

16  board?

17  A.   District 1.

18  Q.   Does that district encompass the City of Manchester?

19  A.   Yes.  The City of Manchester, Harts Branch and Little

20  Goose area.

21  Q.   When you decided to run for school board, did you ask

22  anyone to help you in the election?

23  A.   Yes.

24  Q.   Who did you ask for help?

25  A.   I asked Jennings White.  He was the county clerk at that

*WEAVER - Direct (Mr. Parman)*                                          68

1   time.

2   Q.   And what did he say that he could do for you?

3   A.   Basically, he said that, you know, the thing that we was

4   most concerned about was the absentee votings, because there

5   was a high number of absentees in that May election.  And I

6   asked him what could he do to help me in that one, and he said

7   basically he could hire my mom and dad as clerks for the

8   absentee voting period, and they could actually be in the

9   clerk's office where the machine was during the voting time.

10  Q.   Why was there a concern about the absentee voting?

11  A.   Well, it was just a high number.  And actually, Al Man

12  Stivers was one of the election officers that was going to be

13  running the machines, and Bill Henson, which was a school

14  board employee at the time.

15  Q.   Who were you running against in the 2002 election?

16  A.   Charles Keith.

17  Q.   And how long had he held that position?

18  A.   Not sure.  He's been there a long time.  He's like the

19  chairman of the school board.

20  Q.   To your knowledge, was the school board supporting Mr.

21  Keith in his reelection bid?

22  A.   Yes.

23  Q.   I believe you stated a couple of the officers, election

24  officers in Manchester precinct, do you know what positions

25  they held?

WEAVER - Direct (Mr. Parman)                                    69

1    A.   They was actually, during the absentees, they was just

2    like two of them that was there to handle the absentee voting

3    during that period.

4    Q.   Who was those two people?

5    A.   Al Man Stivers and Bill Henson.

6    Q.   Do you know Al Man Stivers by his full name, his real

7    name?

8    A.   Yes.

9    Q.   What is that?

10   A.   William.

11   Q.   Do you see Mr. Stivers in the courtroom here today?

12   A.   Yes, I do.

13   Q.   Could you point him out?

14   A.   He's wearing the peach shirt there, standing up.  He

15   stood up.

16            THE COURT:  Record will reflect that the witness has

17   identified the defendant, William Stivers.

18   Q.   Did Mr. White then appoint your parents to work there

19   during the absentee process?

20   A.   Yes, he did.

21   Q.   And explain to the jury again, so we're all clear, what

22   their purpose was during the absentee voting.

23   A.   Their purpose was just trying to slow down the absentees,

24   because like in May, they was, like, a high number of

25   absentees that voted.  And, you know, we felt that with Mr.

WEAVER - Direct (Mr. Parman)                                      70

1    Stivers and the school board employee there that, you know, I
2    didn't have a chance; that it was, you know, run away with it.
3    And so he said that he thought it would slow it down if we had
4    somebody there.  Basically, that was the only way to slow it
5    down.
6    Q.  Sir, do you know Bart Morris?
7    A.  Yes, sir.
8    Q.  Do you see him here in the courtroom here today?
9    A.  Yes, I do.
10   Q.  Could you point him out?
11   A.  He's right under the thing there.  Got a black shirt on.
12   Right there, yes.
13        THE COURT:  Record will reflect that the witness has
14   identified the defendant, Mr. Morris.
15   Q.  Did you enlist Mr. Morris's assistance in your 2002
16   campaign?
17   A.  I tried to, yes.
18   Q.  Explain to the jury how you tried to.
19   A.  We was actually -- I was actually with Jennings White the
20   night before the election.  We was at Dairy Queen in
21   Manchester.  And I was actually in a vehicle with Jennings,
22   and Mr. Morris and Vernon Hacker pulled up, and they blowed
23   the horn and asked Jennings to come and talk to them.  So he
24   got out and went and talked to them.
25        And when he returned, he said they was wanting money for

WEAVER - Direct (Mr. Parman)                                    71

1    the election.  And he told, he told Mr. Morris that the only

2    way he would give them money if they included me on the

3    ticket.

4    Q.   Who, to your knowledge, did they want money for?

5    A.   They was wanting money for Stanley Bowling in the

6    district and the city council race.

7    Q.   Do you know how much money they requested?

8    A.   I think $3,000 is what he said they asked for.

9    Q.   And then Mr. White said the only way he would do that is

10   if they then supported you?

11   A.   Yes, if they included me on the ticket.

12   Q.   Did Mr. Morris express any concern about openly being in

13   support of you?

14   A.   Yes.  The first time when he came back, Jennings got in

15   the vehicle, he said -- he explained to me what they wanted.

16   And he said they didn't -- he didn't want to do it, because

17   that Bart didn't want to make Doug Adams mad.

18   Q.   To your knowledge, why would that make Doug Adams mad?

19   A.   Because I was running in a school board race.

20   Q.   What was Doug Adams' position at that time?

21   A.   Superintendent.

22   Q.   Of the schools?

23   A.   Yes.

24   Q.   Sir, do you know Debbie Morris?

25   A.   Yes.

*WEAVER - Direct (Mr. Parman)*                                    72

1    Q.   Do you see her here in the courtroom?

2    A.   Yes, barely can see her right here behind this gentleman.

3    Yes, that's her right there.

4              THE COURT:   Record will reflect that the witness has

5    identified the defendant, Debra Morris.

6    Q.   Do you know her to be the wife of Bart Morris?

7    A.   Yes, sir.

8    Q.   How long have you known Mr. and Mrs. Morris to be

9    together as a couple?

10   A.   Probably mid '90s.  Somewhere in the '90s.  I took over

11   as fire chief in Manchester in '94.  I want to say somewhere

12   in the mid '90s, I know they was a couple then.

13   Q.   Why do you know they was a couple then?

14   A.   Because I actually, you know, seen them all the time,

15   because he would come to city council meetings and stuff like

16   that.

17   Q.   And you were serving as fire chief at that time?

18   A.   Yes.

19   Q.   Sir, to your understanding, when Mr. White, Mr. Morris

20   are discussing money for elections, what do you understand

21   that money was going to be used for?

22   A.   To buy votes.

23   Q.   Sir, did you personally buy any votes in the 2002

24   election?

25   A.   Yes.

WEAVER - Direct (Mr. Parman)                                    73

1    Q.   How many votes would you estimate that you bought?

2    A.   Probably myself around 20, 25 votes, somewhere in there.

3    Q.   Did others participate in your scheme to buy votes?

4    A.   In 2004?

5    Q.   2002, sir.

6    A.   2002, yes.

7    Q.   Who would that have been?

8    A.   It was the city council members that was running and the

9    magistrate race, which would have been in District 6, the

10   Beech Creek magistrate.

11   Q.   Do you recall the names of any of those city council

12   members?

13   A.   In 2002, I can't recall all of them in 2002, no.

14   Q.   When you were buying these votes, were you also hauling

15   voters to the polling place?

16   A.   Yes.

17   Q.   Where would you haul voters to once they had voted?

18   A.   When -- depending on what precinct they voted in.  If

19   they was in the Beech Creek area, after we took and voted

20   them, we would take them to Bill White and Jennings' garage

21   area.  And then if they was in Manchester, we would take them

22   to Bart's house, in front of Bart's house.

23   Q.   And were they then paid at Bart's house?

24   A.   Yes.

25   Q.   And when you're referring to Bart, you're referring to

*WEAVER - Direct (Mr. Parman)*                                    74

1    Bart Morris?

2    A.    Yes.

3    Q.    Now, when you were hauling these voters, were they told

4    who to vote for when they went in?

5    A.    Yes.

6    Q.    Who told them who to vote for?

7    A.    The ones that I took in, you know, I would go in and vote

8    'em myself.

9    Q.    So you personally took them?

10   A.    I personally took them in, yes.

11   Q.    Then when they voted as you had directed, you took them

12   to Bart Morris?

13   A.    Yes.

14   Q.    And then Bart Morris would pay them?

15   A.    Yes.  Or if we was in Manchester, we went to, you know,

16   Vernon Hacker, who was at Bart's house that day.

17   Q.    Now, in 2002, were there other candidates that asked for

18   your paid voters to be voted for them as well?

19   A.    In 2002?  Only thing I can remember is the school board

20   race and the city council race.

21   Q.    Do you recall if anybody running for magistrate, for

22   instance, had asked you to support them while the voters were

23   being paid?

24   A.    Not in 2002, I can't remember.

25   Q.    What was the outcome of your election, sir?

*WEAVER - Direct (Mr. Parman)*                                    75

1   A.   As far as mine, I lost it.  I think around a hundred some

2   votes.

3   Q.   Are you aware of the activities of your opposition during

4   the election?  Did you see any type of election activity?

5   A.   I just seen a group of individuals out.  You know, I

6   thought that's what they was doing, you know, was out, you

7   know, trying to get votes as far as, you know, from the school

8   board side, yes.

9   Q.   Who was that group of individuals?

10  A.   I seen Charles Keith, he was the chairman of the board.

11  Willie Sizemore, he was the ex-superintendent, and Jimmy

12  Little, he was a former Board employee, and Mr. Doug Adams.

13  Q.   Did you observe any of the actions of William "Al Man"

14  Stivers during the 2002 election at the Manchester precinct?

15  A.   No, not 2002.

16  Q.   Okay.  We'll move forward to the 2004 election.

17  A.   Okay.

18  Q.   Did you participate in that election?

19  A.   Yes, sir, I did.

20  Q.   What part did you play in the 2004 election?

21  A.   I was an election officer in November.

22  Q.   So you did not participate in the May primary?

23  A.   No, sir.

24  Q.   Only the November general election?

25  A.   November.

WEAVER - Direct (Mr. Parman)                                    76

1    Q.   And just so the jury's clear, in 2002, your election, was

2    that in the May or the November?

3    A.   It was in November in 2002, my election was.

4    Q.   So school board doesn't have a primary?

5    A.   No.

6    Q.   What position did you hold in 2004?

7    A.   I was the Republican election officer in Manchester.

8    Q.   Who asked you to serve in that capacity?

9    A.   Actually, I got a phone call Monday night.  It was

10   sometime later on Monday night, and they asked me could I come

11   by Bart Morris's house.  And when I went by Bart's house --

12   Q.   Let me stop you.  You say they asked you.

13   A.   Yes.

14   Q.   Do you recall specifically who called you?

15   A.   I think it was Vernon Hacker or Todd Roberts, one did

16   call my cell phone.  It was one of the two.  I can't remember

17   which one for sure.

18   Q.   So you then went to Bart Morris's house?

19   A.   Yes.

20   Q.   Do you know where that house is located?

21   A.   Yes, sir.

22   Q.   Can you share with the jury where that's at?

23   A.   It's located on Green Street.  It's on the road right

24   behind the SuperAmerica there, the Speedway in Manchester.

25   Q.   Go ahead.  So you arrived at Mr. Morris's house?

*WEAVER - Direct (Mr. Parman)*                                      77

1    A.   Yes.

2    Q.   From there?

3    A.   When I arrived there, Vernon Hacker was there, Darnell

4    Hipsher was there, Bart Morris was there, Kennon White was

5    there, Todd Roberts was there.  And Jamey Mills was with me at

6    that time.

7         And when I got there, Bart asked me did I want to serve

8    as election officer for the Manchester precinct.

9    Q.   Was Debbie Morris present in the house?

10   A.   Yes, she was there.

11   Q.   So Mr. Morris asked you if you wanted to serve as an

12   election officer?

13   A.   Yes.

14   Q.   And what did you tell him?

15   A.   I said yes.

16   Q.   What were you then told to do?

17   A.   Mr. Morris instructed me if I was there early that

18   morning, that the first election officer that was at the

19   polling place would get to serve, because whoever the election

20   officer was at the time told them that they was not going to

21   be there.  And he said if, you know, if you get over there

22   early, you're the first in line, you can serve as election

23   officer.

24        And that's exactly what I did.  And, you know, we had a

25   slate of candidates he was for.  And he told me that Mr.

*WEAVER - Direct (Mr. Parman)*                                      78

1    Stivers was going to be over there also, Mr. Al Man Stivers
2    was going to be there serving as the other judge.
3    Q.   When you say the other judge, what position was he going
4    to hold?
5    A.   He was going to hold the Democrat judge.
6    Q.   So you were going to be the Republican judge, and Mr.
7    Stivers was going to be the Democratic judge?
8    A.   Yes.
9    Q.   And what were you two supposed to do?
10   A.   We was supposed to vote for a certain group of
11   candidates.
12   Q.   Do you recall who was on that slate of candidates?
13   A.   Yes.
14   Q.   Share that with the jury, please.
15   A.   In 2004, the election in November was city council race.
16   It was all the city, county -- there's city council members at
17   the time, and Mr. Stivers, he picked up another candidate.  I
18   picked up somebody different than he did on one of them.  I
19   picked up the same eight was in there.  He wouldn't carry the
20   same eight because him and one of the individuals that was
21   running for council had had a fight a couple, two, three weeks
22   before that.
23   Q.   Who was that individual?
24   A.   Ouchie Jackson.
25   Q.   And what was Mr. Stivers and Mr. Jackson's problem?

1    A.   Mr. Ouchie Jackson and Darnell Hipsher went to Mr.

2    Stivers' house sometime, couple weeks before that, somewhere

3    in there.  And they had a confrontation, you know.  Mr.

4    Stivers and Mr. Jackson fit and, you know, that morning he

5    would not carry Ouchie on the ticket.  He carried the seven --

6    he actually carried eight, but he carried the seven that was

7    in, not counting Ouchie.

8    Q.   So you all were in agreement as to seven --

9    A.   Yes.

10   Q.   -- and disagreed as to one because of Mr. Stivers'

11   personal disagreement.

12   A.   Yes.

13   Q.   Is that accurate?

14   A.   Yes.  I mean, if he took some in, if we went in, if he

15   was running the machine, he would vote eight.  And when I went

16   in, I'd vote my eight.

17   Q.   Now, when we talk about this slate of candidates and

18   voting the voters, share with the jury what that encompassed.

19   A.   Repeat your question.

20   Q.   Well, we're talking about a slate of candidates, and you

21   said when you voted your voters, you'd do a certain thing.

22   And then when he voted his voters, he would vote his eight?

23   A.   Yes.

24   Q.   What does that entail, voting a voter?  Share with the

25   jury what you did.

WEAVER - Direct (Mr. Parman)                          80

1   A.   Okay.  We was there.  The people out on the street would

2   actually send the people in to us.  And when, you know, they

3   would pay them or whatever outside, they would bring them to

4   the precinct.  They would say, you know, see Dobber or Al Man.

5   And when they would came -- they came in and asked for us, we

6   would take them in and vote them the way that, you know, they

7   was being paid to vote.

8   Q.   Let me stop you.  When you say you would take them in and

9   vote them, would you personally push the button on the voting

10  machine?

11  A.   Yes.

12  Q.   Or would you tell them what to do?

13  A.   Me or him one would actually push the button.

14  Q.   So you would do the voting yourself?

15  A.   We would do the voting for them.

16  Q.   Were the voters then given something to show that they

17  had done as they were told to do?

18  A.   Yes.

19  Q.   What were they given?

20  A.   They was given a, like a raffle ticket.

21  Q.   Are you aware of some individuals that hauled voters to

22  you and Al Man Stivers in 2004?

23  A.   Yes.

24  Q.   Could you share those names with the jury?

25  A.   In 2004, Antwan Henson, he hauled some voters.  Vernon

WEAVER - Direct (Mr. Parman)                                    81

1   Hacker hauled some voters to us, and Kennon White had hauled

2   some voters to us.

3   Q.   Now, this slate of candidates, who told you who was going

4   to be on that slate?

5   A.   That night, Bart did.

6   Q.   Bart Morris?

7   A.   Yeah.  Bart was, he was interested in the council members

8   we had at the time.

9   Q.   When you say that night, are you saying the night before

10  the election?

11  A.   Yes, the Monday night when he asked me to serve as

12  election officer.

13  Q.   Sir, the jury's heard a lot about voting and how the

14  voting process works.  Are you familiar with voter assistance

15  forms?

16  A.   Yes, I am.

17  Q.   And are you aware that voter assistance forms are

18  normally filled out, have to be filled out if you actually

19  accompanied somebody to vote?

20  A.   Yes.

21  Q.   Was there a discussion at this meeting about voter

22  assistance forms?

23  A.   Yes, sir.

24  Q.   And what did that discussion entail?

25  A.   Bart actually told us that night there, he said, try not

WEAVER - Direct (Mr. Parman)                                      82

1    to fill the paperwork out.  If you do, try to do away with it.

2    Q.   And did he tell you why that needed to happen?

3    A.   Just so you don't leave a paper trail.

4    Q.   Sir, are you aware that in the 2004 election, whether Al

5    Man Stivers was supposed to be the Democrat election judge on

6    that morning?

7    A.   No.  When I went to the -- when I went to the meeting

8    that night, Bart told me that he was going to be there.  And

9    when I arrived that morning, I want to say it was 5:15, 5:30,

10   because I got there early so I could be the first person in

11   line, so I could be the judge.  And when the rest of the

12   election officers showed up, they was actually another

13   election officer showed up to be a judge there.  Glenn Rowland

14   showed up.  He was supposed to be the election officer there.

15   Q.   And what transpired between Mr. Rowland and Mr. Stivers?

16   A.   They actually had some words of who was going to serve as

17   the judge there that day.  And Mr. Rowland was a Democrat

18   also, and they had some words.  And I think Mr. Rowland went

19   and called the courthouse, and then Mr. Wayne Jones came down

20   to the precinct where we was at.

21   Q.   Are you familiar with Mr. Wayne Jones?

22   A.   Yes, sir.

23   Q.   Do you know what his full name is?

24   A.   His full name?

25   Q.   Yes.  Do you know if he's known by anything other than

*WEAVER - Direct (Mr. Parman)*                                            83

1    Wayne Jones?

2    A.   That's all I know him by.

3    Q.   Do you recognize Wayne Jones in the courtroom here today?

4    A.   Yes, I do.

5    Q.   Could you point him out to the jury?

6    A.   He's sitting straight to -- there.

7          THE COURT:   Record will reflect the witness has

8    identified the defendant, Charles Wayne Jones.

9    Q.   Are you aware of what Mr. Jones' position was regarding

10   elections in 2004?

11   A.   He was election commissioner.

12   Q.   For a certain party?

13   A.   Democrat party.

14   Q.   So he was the Democratic election commissioner?

15   A.   Yes, sir.

16   Q.   And to your knowledge, did he have the ability to

17   determine who would serve as an election officer that day?

18   A.   I thought, you know, if they was a problem that day, that

19   he could do that, yes.

20   Q.   What did Mr. Jones do when he arrived?

21   A.   He told Mr. Rowland that he was not serving there today,

22   that he was the election commissioner, and that Mr. Stivers

23   was going to serve.

24   Q.   Did Mr. Rowland act like that he was the person that was

25   supposed to be there?

*WEAVER - Direct (Mr. Parman)*                                              84

1   A.   Yes.  He said that he had paperwork to be there.

2   Q.   So was it with his opposition that he was forced to

3   leave?

4   A.   Yes.

5   Q.   Now, November, 2004, sir, if you could estimate how many

6   voters came in and asked to be voted by you and Mr. Stivers.

7   A.   I'd say 75 to a hundred.

8   Q.   And of those 75 to a hundred, were they all given the

9   ticket as the plan was?

10  A.   Majority of them was given the ticket.  Sometimes, like

11  if Vernon Hacker walked some into the door or something, you

12  know, we wouldn't give tickets.  And at one time during the

13  day, we had run out of tickets.

14  Q.   So what did you do then to signify that the voters did as

15  expected?

16  A.   We would just come out, we would walk out with them.  We

17  would shake our heads to the person that brought them in.

18  Q.   To the vote haulers?

19  A.   Yes.

20  Q.   Sir, in 2004, did you fill out any voter assistance

21  forms?

22  A.   Yes.

23  Q.   How many do you think you filled out?

24  A.   Probably, myself, probably 10 or 15, 20.

25  Q.   Did you see Mr. Stivers fill out any?

1   A.   I don't recall.

2   Q.   Did you see what happened to some of those forms?

3   A.   Yes.

4   Q.   What happened to them?

5   A.   At the end of the day, the clerk would actually throw

6   some of them away.

7   Q.   And when you're talking about the clerk, what position

8   did the clerk hold there in the election process?

9   A.   He was the bookkeeper.  Took care all of the paperwork,

10   you know, signing people in to vote.  And if they had -- if

11   they needed assistance, he'd, you know, give them the proper

12   forms to fill out, stuff like that.

13   Q.   And who was the election clerk there in 2004?

14   A.   Anthony Short.

15   Q.   And you witnessed him destroying the voter assistance

16   forms?

17   A.   Yes, sir.

18   Q.   Next I want to turn your attention to the 2006 election.

19   Are you familiar with that election?

20   A.   Yes, sir.

21   Q.   Did you serve in any capacity in that election?

22   A.   Yes.  I served as election officer.

23   Q.   Republican election officer?

24   A.   Yes.

25   Q.   Who asked you to serve in that capacity?

*WEAVER - Direct (Mr. Parman)*                                              86

1    A.   James Phillips.

2    Q.   What position did James Phillips hold at that time?

3    A.   He was the precinct chairman in Manchester.

4    Q.   Did he hold an elected office as well?

5    A.   Yes, sir.

6    Q.   What elected office did he hold?

7    A.   Circuit court clerk.

8    Q.   Circuit court clerk?

9    A.   Yes.

10   Q.   Were there any meetings held leading up to you serving in

11   that capacity?

12   A.   Actually, yes.

13   Q.   Share with the jury what those meetings were.

14   A.   We was at the -- we was at the courthouse for election

15   training, and we actually had a meeting with -- me and Wanda

16   had a meeting with Wayne Jones.

17   Q.   Let me stop you.  You said me and Wanda.

18   A.   Yes.

19   Q.   When you say Wanda, who are you referring to?

20   A.   Me and Wanda White.

21   Q.   You and Wanda White had a meeting with who?

22   A.   Freddy Thompson and Wayne Jones.

23   Q.   Do you see Freddy Thompson in the courtroom today?

24   A.   Yes, I do.

25   Q.   Could you point him out for the jury?

1    A.   He's straight up there, yes.

2         THE COURT:   The record will reflect that the witness

3    has identified the defendant, Freddy Thompson.

4    Q.   Sir, are you aware of what position Freddy Thompson held

5    in 2006?

6    A.   He was the county clerk.

7    Q.   County clerk.  And are you aware of what role the county

8    clerk plays in the election process?

9    A.   Actually, in charge of just about everything with the

10   election as far as the machines and the paperwork, voter

11   registration.  Stuff like that goes to that office.

12   Q.   You were saying that you and Miss White were going to

13   have a meeting with Freddy Thompson and Mr. Jones?

14   A.   Yes.

15   Q.   Where did that meeting occur?

16   A.   We was actually at the courthouse or the administrative

17   building for the training, and we had a meeting with them in

18   the clerk's office.

19   Q.   Now, was regular training going on on that day?

20   A.   Yes.

21   Q.   And when I say regular training, is there a certain

22   mandatory training for anybody that serves as an election

23   officer?

24   A.   Yes.

25   Q.   Share with the jury what that is.

WEAVER - Direct (Mr. Parman)                                          88

1    A.   They go over basically the new laws, you know, all the

2    laws of the election, if anything's changed or anything in

3    that nature.

4    Q.   Now, this meeting that you had with Wanda, Freddy

5    Thompson and Wayne Jones, was that part of that training?

6    A.   No, sir.

7    Q.   Was there anybody else present when that training

8    occurred?

9    A.   No, sir.

10   Q.   So this was separate?

11   A.   Separate.

12   Q.   What occurred during this meeting?

13   A.   Basically, they had a new machine out, you know, new

14   voting machine out at that time, and it was a computer

15   machine, and Mr. Thompson and Mr. Jones actually showed us how

16   to operate it and, you know, to manipulate votes from the

17   machine.

18   Q.   So they instructed you as to how to manipulate votes from

19   the machine?

20   A.   Yes.

21   Q.   What did they tell you?

22   A.   They said that the new machine, the way it was set up,

23   that it would confuse people, and it actually had like a

24   two-step process that actually led to the final --

25            MR. BALDANI:  Excuse me.  I'm going to object.  My

WEAVER - Direct (Mr. Parman)                                    89

1    objection is he's saying "they," and I'd like to ask that he

2    specify who is speaking.

3         THE COURT:  All right.  I think he did, but you can

4    repeat who you're referring to when you say they.

5    A.  Mr. Thompson and Mr. Jones.

6    Q.  Continue, sir.

7    A.  They said the machine was set up that it would -- like a

8    two-step process.  And a lot of people would think they had

9    voted, and they hadn't voted, because it was like a two-stage

10   deal.  And that when people would walk away thinking they had

11   voted, they said if they don't vote the way we want them to,

12   you can go in and change it.

13   Q.  Now, this two-step process, can you share with the jury

14   how that occurred?  Was there a Vote button and a Cast Ballot

15   button?  How did that work?

16   A.  Yes, they was -- once you went through and voted, it

17   brought up the vote, and then one of them was cast vote.  I

18   can't remember exactly which one at the time.  There was a

19   cast vote and a vote.  And you had to do all the process or

20   your ballot wouldn't be cast.  One of them actually let you

21   review it.

22   Q.  So the first step, it was a vote, and then the second one

23   is when you actually cast your ballot.

24   A.  Yes.

25   Q.  Is that your recollection?

*WEAVER - Direct (Mr. Parman)*                                            90

1   A.   Yes.

2   Q.   And you were told then by Mr. Thompson and Mr. Jones it

3   was in that stage where voters could be confused?

4   A.   Yes.  You know, that they would think they had voted and

5   they hadn't, and we could go in, either could look at the

6   votes and change them, you know, if they needed changing, vote

7   them the way we wanted to.

8   Q.   Did Mr. Thompson and Mr. Jones then demonstrate to you on

9   the actual machine how to do that?

10  A.   Yes, sir, they did.

11  Q.   With an actual new machine?

12  A.   Yes, sir.

13  Q.   Was Wanda White present as well?

14  A.   Yes.

15  Q.   You said they said you could vote them the way we wanted

16  to.  Was there a slate of candidates in 2006?

17  A.   Yes.

18  Q.   Could you share with the jury what the slate was?

19  A.   2006, county judge, it was Sizemore.

20  Q.   When you say Sizemore, could you share with the jury if

21  you know Sizemore's full name?

22  A.   Carl Sizemore was the county judge.

23  Q.   Is he also known by a nickname?

24  A.   Crawdad.  And PVA was Phillip Mobley.  Tommy Harmon was

25  the magistrate candidate, and Gary Gregory, James Phillips.

WEAVER - Direct (Mr. Parman)                                        91

1    Q.   What was James Phillips running for?

2    A.   Circuit clerk.

3    Q.   And that was the slate that had been decided?

4    A.   Yes.

5    Q.   Sir, to your knowledge, is Phillip Mobley of any relation

6    to Cletus Maricle?

7    A.   Yes.

8    Q.   What is that relationship?

9    A.   Son-in-law.

10   Q.   Now, in the May primary -- to be clear, did you

11   participate in both the May and the November elections in

12   2006?

13   A.   Yes, I did.

14   Q.   Okay.  Start with the May primary.  How many people's

15   votes did you and Wanda White steal in the May primary?

16   A.   I'm going to say 65, 75, somewhere in there.

17   Q.   And what was Wanda White's position during the 2006 May

18   primary?

19   A.   She was the Democrat election officer.

20   Q.   And what were you again?

21   A.   The Republican judge.

22   Q.   And did you two work together?

23   A.   Yes, sir, we did.

24   Q.   How did you work together to steal votes?

25   A.   Actually, Wanda would try to encourage them to leave the

*WEAVER - Direct (Mr. Parman)*                                          92

1    machine early; and if they did, I would go change the votes,

2    and vice versa.

3    Q.   I'm sorry.  Go ahead.

4    A.   And sometimes I would get them to leave, and she would

5    change the votes.  And sometimes they would just naturally

6    leave by their self.

7    Q.   Was there a reason why you needed to get them to leave

8    the machine in a fairly quick manner?

9    A.   Yeah, because it started making a noise.  The machine had

10   some kind of tone after so long, start chirping.

11   Q.   Would it time out?

12   A.   Yes, it would time out and you had to put a key in to

13   unlock it.

14   Q.   In order to change the votes, you had to do it within a

15   short period of time?

16   A.   Yes.

17   Q.   Now, were the people whose votes -- I'm going to refer to

18   as stolen.  They wasn't aware that this was going on, were

19   they?

20   A.   No.

21   Q.   Are you aware of individuals in the May primary that

22   actually sold their vote?

23   A.   Yes.

24   Q.   Do you know the names of some of those individuals?

25   A.   Yes.

*WEAVER - Direct (Mr. Parman)*                                            93

1    Q.   Could you share those with the jury?

2    A.   James Baker and Maryann Baker, Antwan Henson, Deshae

3    Henson, Frank and Sarah Smith.  That, you know, comes to my

4    mind right now.

5    Q.   Do you know who was paying for these voters?

6    A.   Yes.

7    Q.   Who?

8    A.   Kennon White.

9    Q.   Do you know if Kennon White was working with anybody

10   else?

11   A.   Not sure of.  I know his brother-in-law was supposed to

12   help him.

13   Q.   Who is his brother-in-law?

14   A.   Travis Price.

15   Q.   Now, when you were going back into the voting machines,

16   were you filling out voter assistance forms in 2006?

17   A.   2006, if -- normally, what they would do, if they was a

18   crowd of people waiting in line, the clerk, he would have them

19   to fill out the paperwork.  If, you know, if they was like a

20   bunch of people standing in line watching, you know, what was

21   going on, he would have them fill the paperwork out.

22   Q.   And who was the clerk in May of 2006?

23   A.   Anthony Short.

24   Q.   And if you know, why would he have them fill out the

25   forms if there were people in line?

*WEAVER - Direct (Mr. Parman)*                                          94

1    A.    Just to make it look good, like he was going through all

2    the procedures with it.

3    Q.    How many forms do you recall filling out in May of '06?

4    A.    Probably 15 to 20.

5    Q.    If you could, give me an at least number that you're

6    certain you filled out at least that many.

7    A.    Ten.

8    Q.    I want to show you what's collectively been previously

9    marked as PR17.  Sir, if you could take a moment and look

10   through all those forms.  Feel free to pull them out of there.

11   A.    (Reviewing document).

12   Q.    Have you had an opportunity to look through those

13   documents?

14   A.    Yes, sir.

15   Q.    What do you recognize those documents to be?

16   A.    Voter assistance forms.

17   Q.    Are those the same type of voter assistance forms that

18   you filled out in 2006?

19   A.    Yes, sir.

20   Q.    How many of those forms bear your signature?

21   A.    One.

22   Q.    Do you see any other ones that bore your signature?

23   A.    I just seen that one.

24   Q.    Sir, in this election, you mentioned James Phillips.

25   Could you reiterate again what position he was running for?

*WEAVER - Direct (Mr. Parman)*                                    95

1    A.   Circuit court clerk.

2    Q.   What about Gary Gregory?

3    A.   Commonwealth attorney.

4    Q.   To your knowledge, how long has Mr. Gregory been

5    commonwealth attorney in Clay County?

6    A.   Probably over ten years.

7    Q.   Sir, in 2006, May primary, did you see what happened to

8    any of these voter assistance forms?

9    A.   Yes, sir.

10   Q.   What happened to them?

11   A.   At the end of the day, the clerk destroyed them.

12   Q.   Did you see him destroy all of them or just some of them?

13   A.   He destroyed some of them.

14   Q.   And you personally witnessed that?

15   A.   Yes, sir.

16   Q.   And who was the clerk on that day?

17   A.   Anthony Short.

18   Q.   Did you see anything else peculiar out of Mr. Short on

19   that date?

20   A.   Earlier in the day, yes, we thought we seen him snorting

21   something up his nose.

22   Q.   Who is "we"?

23   A.   Me and Wanda White.

24   Q.   Where did you see him doing that?

25   A.   It was in the hallway right in front of the office of the

WEAVER - Direct (Mr. Parman)                                96

1    Clay County Middle School is where the voting precinct was

2    held.

3    Q.   Did he appear to be intoxicated to you during the day?

4    A.   Yes.

5    Q.   Now, I want to move forward to the November, '06

6    election.  That would be the general election, correct?

7    A.   Yes.

8    Q.   Did you incorporate this same scheme in the November

9    election?

10   A.   Yes.

11   Q.   Did you serve as an election officer?

12   A.   Yes, sir.

13   Q.   What position did you serve in?

14   A.   Republican judge.

15   Q.   Did Wanda White serve?

16   A.   Yes, sir.

17   Q.   In what capacity?

18   A.   Democrat judge.

19   Q.   Did you and Miss White continue the same scheme in

20   stealing votes?

21   A.   Yes, sir, somewhat.

22   Q.   When you say somewhat, what do you mean?

23   A.   In November, a lot of people was aware of what had

24   happened in May.  They was more aware of it, and we actually

25   got scared.  I actually got scared that day.

WEAVER - Direct (Mr. Parman)                                    97

1    Q.   When you say a lot of people was aware of it, what are
2    you basing that on?
3    A.   They was aware of the -- what had happened in the May
4    election.  They was a lot of talk about it.
5    Q.   Community perception?
6    A.   Yes.
7    Q.   That votes had been stolen?
8    A.   Yes.
9    Q.   But you and Miss White continued that to some extent?
10   A.   Yes.
11   Q.   Could you estimate how many votes you and Miss White
12   stole in the general election?
13   A.   Is this one November?
14   Q.   November, yes, sir.  I apologize.
15   A.   I want to say 20, 25.  Because like I said, I got scared
16   that morning and, you know, sort of backed off of everything.
17   Q.   Was there a slate of candidates in November that you were
18   supporting?
19   A.   Yes.
20   Q.   Who was that slate of candidates?
21   A.   It was the mayor, Daugh White, and the city council
22   members.
23   Q.   Was there anybody else on the slate?
24   A.   November, that was the two main ones.
25   Q.   What about the PVA job?

*WEAVER - Direct (Mr. Parman)* 98

1   A.   PVA race, I don't think he had a race in November.   I

2   think it was in May.

3   Q.   Okay.  Now, of the 20 to 25 voters that you stole, did

4   you fill out voter assistance forms for any of those?

5   A.   No.

6   Q.   Were any voter assistance forms filled out?

7   A.   They should have been some, yes, filled out for sure.

8   Q.   Did you personally fill out any?

9   A.   I don't think so.

10  Q.   Sir, did you have an expectation that you would receive

11  something in exchange for your participation in this scheme?

12  A.   Yes, in a way I did.

13  Q.   Explain to the jury what you mean by that.

14  A.   Kenny Price, he was the emergency management coordinator

15  for the county there, and he was running for jailer.  And, you

16  know, I thought if Kenny won the jailer's job, that, you know,

17  that job's available, and I thought I had a pretty good chance

18  of getting it with my qualifications.

19  Q.   Did anybody that was involved in this scheme tell you

20  that that would be a possibility if you worked in this?

21  A.   Actually, they was a couple different people from

22  different sides, yes.

23  Q.   Explain to the jury what was told to you.

24  A.   One of them, Mr. -- we was actually at a fire scene.  Mr.

25  Earl Pinkton's house had caught fire one morning, and we was

*WEAVER - Direct (Mr. Parman)*                                     99

1    there.  And Darnell Hipsher came up, he said somebody wants to

2    talk to you on the phone, and he handed me the phone.  It was

3    Bart Morris.  And Bart said, "Dobber, if you can, I'd like for

4    you to try to help James.  If not, don't be too hard on him."

5    Q.    Who is he referring to when he said I'd like for you to

6    help James?

7    A.    James Garrison.

8    Q.    And what was James Garrison running for?

9    A.    He was running for county judge executive.

10   Q.    Who was he running against?

11   A.    He was running against Carl "Crawdad" Sizemore and a

12   couple more.

13   Q.    And who were you supporting?

14   A.    I was supporting Carl Sizemore.

15   Q.    So what did you understand it to mean not to hurt him too

16   bad?

17   A.    Not to hurt him, not to steal too many votes from him.

18   Q.    So what did he say if you wouldn't do that?

19   A.    He said, because I might be -- he said, "I know what

20   you're interested in.  And if James wins, I might be able to

21   help you with that."

22   Q.    To your understanding, what was he referring to?

23   A.    He was referring to the emergency management job that

24   Kenny Price had.

25   Q.    That was a job you would like to have?

*WEAVER - Direct (Mr. Parman)*                                    100

1    A.   Yes, sir.

2    Q.   What was told to you by the other side?

3    A.   The other side, actually, I was at the circuit clerk's

4    office one day, and James Phillips, he asked me, said, "I need

5    to talk to you."  He said, "got a problem with you serving as

6    judge."  And I said, "what's that?"  He said, "Charles Marcum

7    don't want you to serve as election officer."  And he said,

8    "he don't think you would support Kenny."  And I said, "I'm

9    for Kenny."  He said, "You don't have no problem with Kenny?"

10   I said, "No, you know, I hope Kenny wins, you know, because I

11   want his job."

12   Q.   Why did he think that there would have been a problem

13   with you supporting Kenny?

14   A.   He thought -- well, Charles beat my dad in '89, and we

15   had never been on the same sides.

16   Q.   For what position?

17   A.   Jailer.

18   Q.   So your father was jailer up until '89?

19   A.   Yes.

20   Q.   Then Mr. Marcum was jailer?

21   A.   Yes.

22   Q.   And that was a concern for Mr. Phillips that there would

23   be a rift there?

24   A.   Yes.

25   Q.   And you might double-cross him?

WEAVER - Direct (Mr. Parman)                                           101

1    A.   That I might not support Mr. Price, who was running for

2    jailer and Mr. Marcum was supporting.

3    Q.   When you refer to support, what do you mean?

4    A.   Backing in the race, you know, for it.

5    Q.   And by the scheme, what does backing mean?

6    A.   It means you're on the ticket.

7    Q.   Does that mean you're buying votes?

8    A.   That means you're buying votes for 'em.

9    Q.   So what did Mr. Phillips tell you about this job?

10   A.   He said, he said, "I understand that you -- I know what

11   you're interested in, and I might be able to help you with

12   that also."

13   Q.   Did Mr. Phillips win the election?

14   A.   Yes, sir.

15   Q.   And what position did he win?

16   A.   Circuit court clerk.

17   Q.   And to your knowledge, does the circuit court clerk have

18   the ability to control hiring decisions for that position?

19   A.   No, sir.

20   Q.   Who does?

21   A.   The county judge.

22   Q.   Okay.  After the election was over, were you offered that

23   job?

24   A.   Yes, sir.

25   Q.   By who?

*WEAVER - Direct (Mr. Parman)*                                102

1   A.   The county judge.

2   Q.   And who is the county judge?

3   A.   Carl Sizemore.

4   Q.   Was Mr. Sizemore and Mr. Phillips on the same ticket?

5   A.   At their precinct they was, yes.

6   Q.   Did you take that job?

7   A.   Yes.

8   Q.   Did you stay in the job for long?

9   A.   Yes.

10  Q.   Sir, did you ultimately admit responsibility for your

11  actions in the '06 election?

12  A.   No.  Not at first, I did not.

13  Q.   But did you ultimately?

14  A.   Yes.

15  Q.   I want to show you what's been marked as PA10.

16  Government's Exhibit PA10.  Take a moment and look through

17  that document.

18  A.   (Reviewing document).

19          THE COURT:  10 or 9, Mr. Parman?

20          MR. PARMAN:  10, Your Honor.

21  Q.   Sir, do you recognize that document?

22  A.   Yes, sir.

23  Q.   What do you recognize that document to be?

24  A.   It's a plea agreement.

25  Q.   Is that your plea agreement?

1   A.   Yes, sir.

2   Q.   What is your understanding of the agreement between

3   yourself and the United States?

4   A.   To testify in any ongoing investigation truthfully.

5   Q.   What's your understanding would happen to you if you were

6   to come in here and lie to this jury?

7   A.   Could be another charge.

8   Q.   Would you receive any credit for any testimony you've

9   given if you had provided untruthful testimony?

10  A.   No, sir.

11  Q.   Has any promises been made to you by the --

12  A.   No, sir.

13  Q.   To your understanding, who would be the person to

14  determine your ultimate sentence?

15  A.   Judge Reeves.

16  Q.   And in this plea agreement, did you, without getting into

17  legal details, plead guilty to your actions regarding the 2006

18  election?

19  A.   Yes, sir, I did.

20         MR. PARMAN:  Your Honor, I'd move for the

21  introduction of Government's Exhibit PA10.

22         THE COURT:  Any objection?  That exhibit will be

23  admitted.  Mr. Hoskins, did you have any?

24         MR. HOSKINS:  No.

25         THE COURT:  Thank you.  It's admitted.

WEAVER - Direct (Mr. Parman)                                        104

1                    (Government Exhibit No. PA10

2                    was admitted into evidence.)

3    Q.   Now, when I first asked you about your plea agreement,

4    you said not initially?

5    A.   Yes.

6    Q.   I want to give you an opportunity to explain that to the

7    jury.  When law enforcement initially came to you and asked

8    you about your involvement in election fraud, what did you do?

9    A.   I was scared, had never been involved in nothing in my

10   life, and I just basically lied to them.

11   Q.   Do you have any criminal history, sir?

12   A.   No, sir.  Never had a speeding ticket.

13   Q.   So when the FBI -- was it the FBI that approached you?

14   A.   Yes, sir.

15   Q.   And did they start asking you about election fraud?

16   A.   Yes, sir.

17   Q.   And you didn't tell them your involvement?

18   A.   No.

19   Q.   Why did you ultimately come clean, sir?

20   A.   Well, it was time to move on.  I had kids.  Tried to put

21   it behind me.  Just want to get it behind me.

22   Q.   Sir, when we were going over your employment history, I

23   believe you mentioned that you worked as fire chief; is that

24   correct?

25   A.   Yes.

WEAVER - Direct (Mr. Parman)                                    105

1   Q.   Do you recall an incident where the residence of a Terry

2   Smith was burning?

3   A.   No, sir.

4   Q.   If I could, I'd like to show you what's been marked as

5   Government's Exhibit D74.  Sir, take a moment and look at that

6   document and see if that refreshes your memory.

7   A.   I don't remember this, no.

8   Q.   Okay.  Also like to go back on your employment to a time

9   when I believe you said you worked for the State Highway

10  Department; is that correct?

11  A.   Yes, sir.

12  Q.   The Department of Transportation?

13  A.   Yes, sir.

14  Q.   Did you receive any assistance in obtaining that job?

15  A.   Yes, sir.

16  Q.   Who helped you get that job?

17  A.   Cletus Maricle.

18  Q.   Why did he help you get that job?

19  A.   Actually, I was working in Laurel County at Ambulance,

20  Incorporated, and my dad called and said that he talked to

21  Cletus, and they could get me on at the state.

22  Q.   Did you and your father help Mr. Maricle in his bid for

23  circuit judge?

24  A.   I did.

25  Q.   How did you help him?

WEAVER - *Direct (Mr. Parman)*                                    106

1    A.   Actually, he asked me to help hang some signs for him,

2    and him and his wife and I actually hung his 4 by 8 signs in

3    three different counties.

4            MR. PARMAN:  Can I have one moment, Your Honor?

5            THE COURT:  Yes, sir.

6    Q.   Sir, one follow-up on the document I've previously given

7    you.  I believe at the top of that document, it has a date of

8    2002.

9    A.   Yes, sir.

10   Q.   Were you fire chief in 2002?

11   A.   Yes, sir.

12   Q.   And in the course of your duties as fire chief, are you

13   responsible for keeping records of fire incident reports?

14   A.   Yes, sir.

15   Q.   And does that appear to be a fire incident report?

16   A.   Yes, sir.

17   Q.   And is that a fire incident report in your department?

18   A.   Yes, sir.

19           MR. PARMAN:  Your Honor, I'd move for the

20   introduction of that exhibit at this time.

21           MR. GILBERT:  Objection, Your Honor.

22           MR. SIMONS:  Objection.

23           THE COURT:  All right.  You all need to approach.

24           MS. HUGHES:  Can we see it too?

25                     (A sidebar conference was held out of the

*WEAVER - Direct (Mr. Parman)*                                           107

1                      hearing of the jury):

2          MS. HUGHES:  2002?

3          THE COURT:  He may have misspoken.

4          MR. GILBERT:  Yes, 2007.

5          THE COURT:  It goes to foundation.  Unless it's

6   cleared up, unless the date's established -- unless the date's

7   established, it couldn't be admitted through this witness.

8          MS. HUGHES:  And I would also say that he is not the

9   records custodian now.  So I don't think -- if you are trying

10  to get this document in because he's the records custodian,

11  since he's not the current records custodian and didn't bring

12  it, he can't certify that this is a true and proper copy of a

13  record of the fire department.

14         THE COURT:  He would be able to authenticate it if he

15  was able to testify that he recalled preparing it at or about

16  the time of the event.  He didn't say that.  So it will need a

17  custodian, but there is a problem with the date.

18         MR. PARMAN:  Yes, Your Honor.  That was my mistake,

19  Your Honor.

20         MS. HUGHES:  And then I have an objection to general

21  relevance.  It goes back to the objections and issues that we

22  discussed, of course, yesterday.

23         THE COURT:  All right.  The Court has made a

24  determination that this incident would be relevant.  It's

25  substantive evidence of a further act in furtherance of the

*WEAVER - Direct (Mr. Parman)*                                          108

1    conspiracy to threaten, intimidate a witness in the case;

2    actually, two witnesses in the case.  And so with respect to

3    relevancy, objection will be overruled.  Thank you.

4                      (Sidebar conference concluded.)

5    BY MR. PARMAN:

6    Q.   Sir, I apologize.  I didn't correctly read the top of

7    that form.  Would you look again at the date on the top of

8    that document?

9    A.   9/14/02.

10   Q.   Does that appear to be '02, or does it appear to be '07?

11   A.   Could be '02 or '07.

12   Q.   Were you acting as fire chief in '02 and '07?

13   A.   Yes, sir.

14   Q.   Once again, does that appear to be a document --

15   A.   Yes, sir.

16   Q.   -- that would have been prepared by your agency when you

17   was acting as fire chief?

18   A.   Yes, sir.

19   Q.   After knowing that information, does that refresh your

20   memory as to that document?

21   A.   I know it belonged to Kennon and Wanda, but that's -- you

22   know, I wasn't there.  It don't show me there.

23   Q.   But looking at the style of the document, the way it's

24   set up, you prepared fire incident reports during your term

25   as --

*WEAVER - Direct (Mr. Parman)*                                              109

1   A.   Yes, sir.

2   Q.   -- fire chief?

3   A.   Yes, sir.

4   Q.   Is that the same form that was used?

5   A.   Yes, same form.

6   Q.   Same procedure that was incorporated?

7   A.   Yes, sir.

8          MR. PARMAN:  Your Honor, may I have just a moment?

9          THE COURT:  Yes, you may.

10  Q.   Sir, as we've discussed, does that appear to be the same

11  documents that you keep in the ordinary course of business as

12  a fire chief?

13  A.   Yes, sir, it does.

14  Q.   And do you have someone there in Clay County that keeps

15  these type of records, that keeps these?

16  A.   Yes, sir.

17  Q.   And keeps them in a spot, in a location there within the

18  fire department?

19  A.   Yes, they're kept at Manchester Fire Department.

20  Q.   Okay.  And they maintain these records in their care,

21  custody and control?

22  A.   Yes.

23         MR. PARMAN:  Your Honor, I'd move for introduction of

24  this exhibit at this time.

25         THE COURT:  All right.  I'll sustain the objection to

*WEAVER - Cross (Mr. Hoskins)*                                      110

1    its introduction at this time, based on foundation.

2          MR. PARMAN:  Yes, Your Honor.  That's all I have,

3    Your Honor.  Thank you.

4          THE COURT:  All right.  Thank you.  Let's see if

5    there's any additional material to produce before we begin

6    cross-examination.

7          Mr. Smith, any additional materials to produce at

8    this time, or Mr. Parman?

9          MR. PARMAN:  Not that I'm aware of, Your Honor.

10          THE COURT:  All right.  Thank you.  Mr. Hoskins, you

11    may proceed.

12                          CROSS-EXAMINATION

13    BY MR. HOSKINS:

14    Q.  Hello, Mr. Weaver.  My name's David Hoskins, and I

15    represent Cletus Maricle.  Just a couple of questions.  The

16    election that you talked about doing signs for Judge Maricle

17    in was 1990; is that right?

18    A.  Yes, sir.

19    Q.  And when you got your job with the highway department, it

20    wasn't in exchange for you helping him in an election, was it?

21    A.  No, sir.

22    Q.  Mr. Maricle never asked you to do anything illegal back

23    in that 1990 election, did he?

24    A.  No, sir.

25    Q.  Or any time after that, did he?

*WEAVER - Cross (Mr. Westberry)*                                        111

1    A.   No, sir.

2              MR. HOSKINS:  Thank you.

3              THE COURT:  Mr. Westberry?

4              MR. WESTBERRY:  Thank you, Judge.

5                        CROSS-EXAMINATION

6    BY MR. WESTBERRY:

7    Q.   Mr. Weaver, good afternoon.  I'm Kent Westberry.  I'm

8    here for Doug Adams, and I've got just a couple questions for

9    you.  You've known Doug Adams, I guess, pretty much all your

10   life; would that be fair?

11   A.   Yes, sir.

12   Q.   I think you told us, correct me if I'm wrong, you were

13   born and raised in Clay County; is that correct?

14   A.   Yes, sir.

15   Q.   Your dad, Homer Weaver, served for a good number of years

16   as jailer there in Clay County; is that correct?

17   A.   Yes, sir.

18   Q.   Now, did you attend Clay County school system?

19   A.   Yes, sir.

20   Q.   Did you know Doug when he both taught and acted as

21   superintendent of the Clay County school system?

22   A.   Yes, sir.

23   Q.   Doug Adams, it's your understanding he's now retired as

24   superintendent of the schools?

25   A.   Yes, sir.

*WEAVER - Cross (Mr. Westberry)*                                    112

1   Q.   His wife, Laura, do you know his wife Laura?

2   A.   Yes.

3   Q.   Did she teach in the Clay County school system as well?

4   A.   I'm not for sure, no.

5   Q.   Okay.  You told us a little while ago that you ran for

6   school board back in 2002.  Is that correct?

7   A.   Yes, sir.

8   Q.   Ran against a fella named Charles Keith?

9   A.   Yes.

10  Q.   And Mr. Keith won?

11  A.   Yes.

12  Q.   You said that in that election, you went to some

13  organizational meetings from time to time at various housing

14  locations there in Clay County; is that correct?

15  A.   In 2002?

16  Q.   Did I not hear that right, sir?  I thought you said there

17  were some organizational meetings that you went to in '02.

18  A.   No, sir.

19  Q.   Was this in '04?

20  A.   That was '04.

21  Q.   Let me get to '04 real quick and just ask you one

22  question.  Those meetings that you attended in the locations

23  around Manchester or Clay County, you never saw Doug Adams at

24  any of those organizational meetings, did you, sir?

25  A.   No, sir.

*WEAVER - Cross (Mr. Westberry)* 113

1  Q.   Thank you.  After the 2002 election, you got hired on as

2  a football coach; is that right?

3  A.   Yes, sir.

4  Q.   How long after that was it?  I don't know, and I don't

5  know that I heard it.

6  A.   After the 2002?

7  Q.   Yes.

8  A.   I'm not sure.  It would probably been 2003.

9  Q.   Yes, okay.  And I think if I've got this right, correct

10 me if I'm wrong, you were hired on as football coach at the

11 Manchester Elementary School?

12 A.   Yes, sir.

13 Q.   Were you aware that the superintendent of the schools

14 makes the hiring decisions on coaches?

15 A.   At first, no, sir.

16 Q.   Are you aware of that now?

17 A.   Yes, sir.

18 Q.   Of course, back in 2003, Doug Adams would have been

19 superintendent of the schools when you got hired on as

20 football coach?

21 A.   Yes, sir.

22 Q.   Do you have a sister named Charlotte?

23 A.   Yes, sir.

24 Q.   Does she work at the Manchester Elementary School?

25 A.   Yes, sir.

WEAVER - Cross (Mr. Westberry)                                114

1   Q.   How long has your sister, Charlotte, worked at the

2   Manchester Elementary School?

3   A.   At Manchester, she's probably been there four, five

4   years.

5   Q.   What does she do there at the elementary school?

6   A.   She's a secretary.

7   Q.   And who is she a secretary for?

8   A.   The principal.

9   Q.   And, of course, the principal works under the supervision

10  of the superintendent of schools?

11  A.   Yes, sir.

12  Q.   Did Charlotte at any time, if you're aware, ever get a

13  promotion of any kind while she worked at the elementary

14  school?

15  A.   I'm not sure.

16  Q.   I want to ask you, of course, it sounds like you grew up

17  in a household, your dad had been active in politics for a

18  good number of years; is that correct?

19  A.   Yes.

20  Q.   What years did he serve, did Homer Weaver serve as

21  jailer?  Your best estimate.

22  A.   '69 till -- actually went out the first of 1990.

23  Q.   Was it Charles Marcum that he lost to --

24  A.   Yes, sir.

25  Q.   -- in 1990?  Were you in high school then?

*WEAVER - Cross (Mr. Westberry)*                                      115

1  A.   Yes, sir.

2  Q.   Of course, Doug Adams had served as superintendent of the

3  schools from about '99 to 2009.  Does that sound about right

4  to you?

5  A.   Probably, yes.

6  Q.   Thank you.  The superintendent of schools in Clay County,

7  before Doug Adams, was a fella named Charles White?

8  A.   Yes, sir.

9  Q.   He served about ten years as well?

10  A.   I think so.

11  Q.   And you would agree that a number of his relatives served

12  in elected county offices during the time that he served as

13  superintendent of schools?

14  A.   Yes, sir.

15  Q.   James White, we've heard a lot about him.  He was county

16  court clerk?

17  A.   Yes, sir.

18  Q.   Correct.  James Phillips' mother was a White; is that

19  correct?

20  A.   I think so, yes.

21  Q.   He's the circuit court clerk, correct?

22  A.   Yes.

23  Q.   Daugh White, of course, was the mayor for a good long

24  time?

25  A.   Yes.

WEAVER - Cross (Mr. Westberry)                              116

1   Q.   And he's related to Jennings White as well; is that

2   correct?

3   A.   Yes.

4   Q.   Barbara White Colter was a state representative for a

5   number of years?

6   A.   Yes.

7   Q.   Now, going back a little bit further from Charles White,

8   the time that he served as superintendent, was there a fella

9   named Willie Sizemore that served as superintendent of

10  schools?

11  A.   Yes, sir.

12  Q.   He served from the '70s up until about 1990, when Charles

13  White took over.  Does that sound about right?

14  A.   That sounds close.

15  Q.   Now, when Willie Sizemore was acting as superintendent of

16  schools -- I ask you this because you've told us you grew up

17  in a political household.

18  A.   Yes.

19  Q.   Were there a number of Sizemores that served in local

20  county offices during that period of time?

21  A.   Yes.

22  Q.   Daryl Sizemore, sheriff?

23  A.   Yes.

24  Q.   Crawdad Sizemore was county judge?

25  A.   Yes.

*WEAVER - Cross (Mr. Westberry)*                                         117

1    Q.   James Sizemore was PVA?

2    A.   Yes.

3    Q.   Thank you.  Would you agree that Doug Adams does not have

4    any family members that have served in elected offices in Clay

5    County?

6    A.   As I know of, no.

7    Q.   Okay.  So you would agree with that as best you know?

8    A.   Yes.

9    Q.   Thank you.  The 2002 election, Mr. Weaver, of course,

10   that's when Jennings White was defeated after having served

11   for many years as county court clerk, correct?

12   A.   Yes, sir.

13   Q.   Would you agree that his defeat served as sort of the

14   beginning of the end for the White family dominance in Clay

15   County?  Would that be fair?

16   A.   I don't know how you would look at that, no.

17   Q.   I understand.  You supported Jennings White back in 2002,

18   when he ran for reelection?

19   A.   Yes, sir.

20   Q.   And Mr. Adams and several others supported Freddy

21   Thompson, correct?

22   A.   Yes, sir.

23            MR. WESTBERRY:  One second, please, Judge.

24            THE COURT:  Yes, sir.

25   Q.   Just a couple of follow-ups.  Are you aware of any

*WEAVER - Cross (Mr. White)*                                          118

1    consequences that have ever happened to either you or your

2    family members, and I use your sister as an example, for you

3    having supported candidates other than those backed by Mr.

4    Adams?  Anybody ever tried to do anything to you that you're

5    aware of?

6    A.   No, sir.

7    Q.   Feel like you've been treated pretty straight up?

8    A.   I've not had no problem with them, no.

9            MR. WESTBERRY:  Thank you, sir.  I appreciate it.

10   That's all the questions I have, Judge.

11           THE COURT:  Thank you.  Mr. White.

12                        CROSS-EXAMINATION

13   BY MR. WHITE:

14   Q.   Good afternoon, Mr. Weaver.  My name is Scott White.  I

15   represent Charles Jones.  I've only got just a few questions.

16   The first thing I wanted to ask you -- actually, almost all my

17   questions are going to deal with your training as an election

18   officer in November of 2006 or, I'm sorry, May and November,

19   2006 so I can get you situated in time.

20       Did you go to the county clerk's office, which was in the

21   Clay County administration building, for that election officer

22   training before, just before the May, '06 primary?

23   A.   Yes.

24   Q.   And you told us about the training that you say you

25   received along with Mrs. White from Mr. Thompson and Mr.

WEAVER - Cross (Mr. White)                                    119

1    Jones, correct?

2    A.    Yes.

3    Q.    I want to ask you, did you receive any other training in

4    which other election officers were present?

5    A.    Yes.

6    Q.    And was that on the same day?

7    A.    Yes.

8    Q.    And where did that occur?

9    A.    On the second floor of the community room.

10   Q.    Okay.  And the community room is it like a big kind of a

11   about this size room, kind of like a -- there's tables and

12   chairs and whatnot?

13   A.    Probably about half the size of this room.

14   Q.    About half this size?  At that training, who was there

15   and who spoke at it in terms of the people doing the training?

16   A.    We was actually, we actually was there twice.  One

17   initial training was, one was on the new machines, and then

18   the other one just election laws.

19   Q.    And the one on the new machines, did that include you and

20   Mrs. White as well as the other proposed election officers?

21   A.    Yes.

22   Q.    And that was training on how to operate the new machines?

23   A.    Yes.

24   Q.    And these were the machines that had not been used in

25   prior elections?

*WEAVER - Cross (Mr. White)*                                          120

1   A.   No, sir.

2   Q.   I'm sorry.  Yes, sir, they hadn't been?  That was a bad

3   question.

4   A.   They hadn't been used in general elections, no.

5   Q.   Correct.  The machine that you received the training,

6   special training by Mr. Jones and Mr. Thompson, that machine

7   was also a new machine, correct?

8   A.   Yes.

9   Q.   And that was located where?

10  A.   It was in the clerk's office.

11  Q.   And in the clerk's office, we've already had a drawing

12  from someone else.  But just to get us oriented, do you know

13  where Freddy Thompson's office is in that room?

14  A.   Yes.

15  Q.   In conjunction with Mr. Thompson's office, where was this

16  machine located?

17  A.   It was -- when you go in the door, turn right, it was in

18  the -- it was right in Freddy's office.

19  Q.   Was it in his office or outside of his office?

20  A.   Well, his office is like when you come in the main door,

21  it was -- his office is like right here, and they had it set

22  up outside his office.

23  Q.   Okay.  And at the time that you were receiving the

24  special training, were the other people, the other proposed

25  election officers, isn't it accurate to state they were still

WEAVER - Cross (Mr. White)                                      121

1    in the building on the second floor?

2    A.   Yes.  Some of them probably was there.

3    Q.   Had you already, before you came to the training, did you

4    find out about the training through a letter you received?

5    A.   Yes.

6    Q.   And so you had already been named an election officer for

7    the Manchester city precinct before you went to the training;

8    is that accurate?

9    A.   Yes.

10   Q.   After you had been named an election officer for the

11   primary 2004 election, had you received visits from various

12   candidates at your house?

13   A.   You say 2004?

14   Q.   Yes.  I'm sorry, 2006.  Let me go back to make sure I'm

15   clear.  After the time you'd been named an election officer

16   for the primary 2006 election until the time -- between the

17   time you were named and the time you went to the training, had

18   you received visits from other candidates for office?

19   A.   Yes, I did.

20   Q.   I'm curious if you had -- if you're able to say, based on

21   your involvement in the election in '06, leading up to the

22   primary of '06, including various -- your own experience, your

23   own perception of what was going on in the community, if you

24   have knowledge of what the community perception -- if there

25   was a community perception as to those new voting machines.

WEAVER - Cross (Mr. White)                                    122

1    A.   Prior to them being used the first time?

2    Q.   Yes, sir.

3    A.   People was scared of them.

4    Q.   Okay.

5    A.   A lot of people was, the older people was scared that

6    they couldn't operate them.

7    Q.   Is that because they were computerized or had a

8    computerized system rather than the mechanical system?

9    A.   Yes.  They kept telling them they was computer.

10             MR. WHITE:  Your Honor, could I be given just a

11   moment?

12             THE COURT:  Yes, sir.

13             MR. WHITE:  Thank you.

14   Q.   Just one or two more questions, if I could, and let me

15   bring you back.  I'm going to change topics on you, if I

16   could, Mr. Weaver.  I want to ask you about this event that

17   occurred in November of 2004 at the precinct in which you were

18   an election officer.  Was that also the Manchester precinct?

19   A.   Repeat your question again.

20   Q.   Yes, sir.  I want to switch now.  I want to go from 2006,

21   I want to go back to 2004 at the election in which you and Mr.

22   Stivers were election officers.

23   A.   Yes.

24   Q.   Was that also at the Manchester city precinct?

25   A.   Yes.

*WEAVER - Cross (Mr. Abell)*                                               123

1    Q.   Okay.  And you testified that Mr. Rowland --

2    A.   Yes.

3    Q.   -- had come as well to be an election officer, and there

4    was a disagreement as to whether it was him or Mr. Stivers

5    that should be the election officer.  Is that accurate?

6    A.   Yes.

7    Q.   And did you testify that my client, Mr. Jones, came and

8    basically resolved it and said that Mr. Stivers is to serve?

9    A.   Yes.  Mr. Jones said that "Mr. Rowland, you're not

10   serving here today.  Al Man's going to be the election officer

11   here today."

12   Q.   And did you testify on direct to Mr. Parman that it was

13   your perception that as the election commissioner, Mr. Jones

14   had the authority to do that?

15   A.   I assumed he did, yes.

16            MR. WHITE:  That's all the questions I have, Your

17   Honor.  Thank you, Mr. Weaver.

18            THE COURT:  Thank you.  Mr. Abell, you may proceed.

19                        CROSS-EXAMINATION

20   BY MR. ABELL:

21   Q.   Mr. Weaver, my name is Robert Abell, and I represent

22   William Stivers in this case.  I have a few questions.  First,

23   I want to start with your school board race in 2002.

24   A.   Yes.

25   Q.   That came up for vote in the November election, right?

*WEAVER - Cross (Mr. Abell)*                                          124

1    A.   Yes.

2    Q.   Kennon White and Wanda White supported and helped you in

3    that campaign?

4    A.   Yes.

5    Q.   You mentioned that Jennings White, who was still county

6    clerk, even though he had lost the primary back in May, he was

7    nonetheless still holding the office in the early absentee

8    voting for the November election, when you were running for

9    school board, right?

10   A.   Yes.

11   Q.   And he, if I followed you correctly, appointed your

12   mother and father to serve and to function as election

13   officers for the purposes of that absentee voting?

14   A.   Yes.

15   Q.   Do you recall that my client, William Stivers, protested

16   that being done?

17   A.   I know he was arrested that day, yes.

18   Q.   He protested that being done and was arrested that same

19   day?

20   A.   Yes.

21   Q.   Okay.  Glenn Rowland, is he Todd Roberts' uncle?

22   A.   Yes.  By marriage.

23   Q.   And Todd Roberts I'm referring to is the Todd Roberts who

24   served as a police officer for Manchester?

25   A.   Yes, sir.

1    Q.    Okay.  Now I want to talk about 2006.

2    A.    Okay.

3    Q.    2006 county judge race, had a primary in May?

4    A.    Yes.

5    Q.    Three leading candidates were the incumbent, James

6    Garrison, Crawdad Sizemore?

7    A.    Yes.

8    Q.    And the third leading candidate was Johnny "Poss"

9    Gregory?

10   A.    Yes.

11   Q.    And I believe there were a couple other candidates as

12   well, but you agree those are the three leading ones?

13   A.    Yes.

14   Q.    Prior to the election -- well, let me back up.  At that

15   time, at least, you lived close to Kennon and Wanda White?

16   A.    Lived close to them?

17   Q.    Near to them?

18   A.    We lived, both lived in the city, but not real close.

19   Q.    Okay.

20   A.    Totally two different streets.

21   Q.    Okay.  Was it the case that Kennon White, in advance of

22   the May election, came to your house all the time?

23   A.    Yes, sir.

24   Q.    And came to your house to discuss the upcoming May, 2006

25   election?

*WEAVER - Cross (Mr. Abell)*                                    126

1   A.   Yes.

2   Q.   All the time, meaning almost daily, if not daily?

3   A.   Sometimes maybe twice a day, couple times a week.

4   Q.   At times, would see you mowing the grass in the yard and

5   stop and talk to you about things y'all needed to do in the

6   election?

7   A.   I never did do much mowing, but when he would see me, he

8   would stop.

9   Q.   And Kennon -- you were interested in that election.  I

10  think, as I understand it, you hoped if you supported Crawdad

11  Sizemore and he won, one of the things you might get as a

12  result of your support would be the emergency management job,

13  correct?

14  A.   Yes, sir.

15  Q.   And Kennon told you, among other things about the

16  election, that he was real interested in that precinct looking

17  good, right?

18  A.   Yes, sir.

19  Q.   And Kennon's interest was he wanted to create goodwill in

20  that spring election, the primary, so that when his dad ran

21  for reelection the following fall in November, 2006, some

22  goodwill would have been created in May that, in turn, would

23  help his father that fall.  Is that fair?

24  A.   I don't know if you could call it goodwill.  I mean, he

25  wanted to, he wanted it to run the way he wanted to, you know,

1   as far as that precinct.

2   Q.   The way Kennon wanted it to?

3   A.   Yes.

4   Q.   And, in fact, at one time he told you to make things look

5   good, I'm going to go out get 65, 75 votes?

6   A.   Yes, sir.

7            MR. ABELL:  That's all I have, Judge.  Thank you.

8            THE COURT:  Thank you, Mr. Abell.  Mr. Baldani.

9            MR. BALDANI:  Judge, I've got an issue I'd like to

10   discuss at the Bench real quick before I get started, if

11   that's okay.

12            THE COURT:  Come on up.

13                     (A sidebar conference was held out of the

14                      hearing of the jury):

15            MR. BALDANI:  Judge, I am going to attempt to elicit

16   the fact that it wasn't till his third meeting with the FBI

17   that he mentioned being schooled by Freddy Thompson, and I'm

18   certainly hoping it's going to go a lot quicker than it did

19   this morning.  The reason I asked to approach, Judge, is the

20   third discussion with the FBI came in the context of a

21   polygraph, and --

22            THE COURT:  I'm sorry, came in the context --

23            MR. BALDANI:  Following a polygraph, and so I don't

24   want, you know, I don't --

25            MR. SMITH:  I can't hear him, I'm sorry.

128

1          MR. BALDANI:  I'm trying to be quiet.

2          THE COURT:  Following a polygraph.

3          MR. BALDANI:  Yeah, and so the reason I approached,

4   Your Honor, is I'm going to ask him about this third

5   interrogation or third discussion, and, you know, I certainly

6   don't want to elicit anything about that.  I don't know if

7   he's been told not to, you know, volunteer it or if he needs

8   to be told.  I just thought it's something I ought to bring

9   up.  Because after he took it, that's kind of when he came

10  clean about certain things.  And I have to ask him about the

11  content of some of the things he discussed, but I don't want

12  him to inject that, and I don't know if he knows not to.  So

13  that's my purpose for coming up.

14         MR. SMITH:  I can't have any confidence, we've had no

15  reason to think the polygraph is going to come up since our

16  motion in limine was granted, and so I would have to ask for a

17  recess or at least have the Court --

18         THE COURT:  I'll need to.

19         MR. SMITH:  -- maybe admonish him.

20         THE COURT:  I'll have to admonish him outside the

21  presence of the jury.  I'll have to excuse the jury to do

22  that.

23         MR. BALDANI:  That was my concern, reason for coming

24  up.  I don't know how long I plan to go today.  I'm certainly

25  not going to be as long as I was with Miss White, Your Honor.

1    I don't know if that has any bearing on what you want to do in

2    that regard.  I do want to let you know, I wanted to avoid --

3            THE COURT:  I'll excuse the jury for ten minutes.

4    That will allow me to admonish the witness not to make any

5    references to that subject matter.  Does anyone need longer

6    than ten minutes?  We'll just keep moving.  We'll try to get

7    this witness finished this afternoon.

8            MR. BALDANI:  Thanks, Judge.

9                (Sidebar conference concluded.)

10           THE COURT:  Ladies and gentlemen, one matter I need

11   to take up outside your presence, and I will be very brief,

12   but I do need to excuse you for ten minutes.  Hopefully, we'll

13   be able to come back and finish the witness this afternoon

14   before I excuse you for the evening.  Please keep in mind the

15   admonitions you were given previously not to discuss the case

16   among yourselves while we are in recess.  Jury will be excused

17   for ten minutes.

18               (The jury left the courtroom at 4:06 p.m.)

19           THE COURT:  The record will reflect that the jury is

20   not present at this time.  Mr. Weaver, before we continue with

21   further questions, I do want to remind you of a previous

22   ruling that I made in this case, and that is that witnesses

23   are not allowed to refer to or mention, either directly or

24   indirectly, any polygraph examinations that have been taken.

25   If you're asked questions, you're not allowed to make any

*WEAVER - Cross (Mr. Baldani)*                                      130

1    references to such examination if one was conducted.  You do

2    understand that?

3               THE WITNESS:  Yes.

4               THE COURT:  All right.  We'll take a brief recess.

5    We'll be back in ten minutes.

6                    (Recess from 4:07 p.m. until 4:17 p.m.)

7                    (The jury entered the courtroom at 4:17 p.m.)

8               THE COURT:  Thank you.  Are you ready to proceed?

9               MR. BALDANI:  I am, Judge.

10              THE COURT:  All right.  Again, the record will

11   reflect all members of the jury are present.  Parties and

12   counsel are present.

13              Mr. Weaver, of course, you're still under oath, sir.

14              You may continue.

15              MR. BALDANI:  Thanks, Judge.

16                         CROSS-EXAMINATION

17   BY MR. BALDANI:

18   Q.  Mr. Weaver, my name is Russ Baldani.  I'm Freddy

19   Thompson's attorney.  We've never spoken, have we?

20   A.  No, sir.

21   Q.  All right.  I want to ask you several questions this

22   afternoon.  How long have you known Freddy?

23   A.  Probably since the '90s, 1990s.

24   Q.  Because he, like you, grew up in Clay County?

25   A.  Yes.

WEAVER - Cross (Mr. Baldani)                                     131

1    Q.   I want to ask you about -- I'm going to jump way forward

2    to the new machine, okay?  The new machine that was used for

3    the first time in May of '06.

4    A.   Yes.

5    Q.   Were you aware that that new machine sat in the front of

6    the county clerk's office for 30 days before the election?

7    A.   No.

8    Q.   You didn't know that?

9    A.   No.

10   Q.   Do you have -- were you aware that Freddy Thompson took

11   that machine around to, like, fire departments and schools

12   around the Manchester to let the public get acquainted with

13   it?

14   A.   Yes, I knew he took it to fire departments.

15   Q.   How is it that you know that?

16   A.   Because I was at a fish fry one day, and he was there.

17   Q.   Tell the jury about that.

18   A.   Basically, I just showed up to eat, and I know he was

19   there showing the machine.

20   Q.   Displaying the machine?

21   A.   Yes.

22   Q.   So basically letting people try it out or test it or

23   explain how it worked, that kind of thing?

24   A.   Yes, I'm assuming he was.

25   Q.   Because you said people were afraid of it, and I think,

1    well, did you mean that's because it's a computerized machine,

2    and sometimes people have the tendency to --

3    A.   A lot of the older people was afraid of it because, you

4    know, it was a computer.

5    Q.   And so you personally witnessed him on that one occasion,

6    or more than one occasion?

7    A.   I seen it there.  I know he was there with it.

8    Q.   And that was a fish fry sponsored by the fire department?

9    A.   Yes.  Burning Springs Fire Department's where I seen it

10   at.

11   Q.   Was there a lot of people there?

12   A.   There was probably 15 or 20 people there at the time I

13   was there.

14   Q.   Okay.  Personally aware of any other efforts that he did

15   in that regard?

16   A.   No, not right off.

17   Q.   Now, you kind of went through the machine and how it

18   works and how it can be -- you know, we've been calling it

19   manipulated, right?

20   A.   Yes.

21   Q.   You went through that already.  It's not a real

22   complicated machine, is it?

23   A.   Yes, in a way it is.

24   Q.   Well, maybe that was a bad question.  As far as how you

25   would manipulate it, there's not much to that, is there?  I

1    mean, okay, I'm sorry.  Let me just stop there.  There's not

2    much to that, is there?

3    A.   Actually, the first time, you know, when it says vote,

4    you know, a lot of people thinks their vote is done.

5    Q.   Exactly.

6    A.   And it's not.

7    Q.   Exactly.  But as far as what type or how much schooling

8    needs to be given somebody, I mean, that's pretty much it.

9    That the machine, that you hit one button and that a person

10   could unwittingly walk away and their vote is still left in

11   the ballots and can be changed, right?

12   A.   Yes, sir.

13   Q.   So it's not -- doesn't require any lengthy, in-depth

14   training to learn what we just talked about in 30 seconds,

15   does it?

16   A.   Well, it was, it was new to the people in our community.

17   Q.   Okay.

18   A.   It was new.

19   Q.   But there's really two different things we've been

20   talking about, and me and you have already talked about both

21   these.  We've talked about legitimate training people, this is

22   the new machine, this is how it's supposed to work.  And then

23   there's also this business and this talk about schooling, or

24   manipulating, right?

25   A.   Yes.

*WEAVER - Cross (Mr. Baldani)*                                    134

1   Q.   And so my question is, as far as being schooled or taught

2   to manipulate the machine, there's nothing complicated about

3   that, right?

4   A.   Well, it was different for us because, you know, we'd

5   been used to the old machines for so many years.

6   Q.   But once you see that you push a button and that some

7   people could think that they were done and walk away, that's

8   where the opportunity to manipulate comes in, right?

9   A.   Yes.  We was explained that.

10  Q.   Okay.  Now, during your direct testimony, you said

11  something like eventually, you came clean, right?

12  A.   Yes.

13  Q.   And you've talked with the FBI and been questioned about

14  voter fraud on at least -- on three occasions, at least?

15  A.   How many occasions?

16  Q.   Three.

17  A.   Probably.

18  Q.   Okay.  Did you review any of your prior testimony or any

19  of your statement summaries or anything like that prior to

20  testifying?

21  A.   Yes.

22  Q.   Okay.  When did you do that?

23  A.   When did I do what now?

24  Q.   When did you review your prior testimony and your

25  statement summaries, that kind of thing?

*WEAVER - Cross (Mr. Baldani)* 135

1    A.   I did that this morning.

2    Q.   Okay.  So you're pretty familiar with what you said to

3    who and when you said it, then?

4    A.   Pretty much.

5    Q.   All right.  Well, let me get right to it.  The first time

6    you talked to the FBI was May 1 of '07, correct?

7    A.   Sounds about right.

8    Q.   Okay.  And at that time, you were confronted about this

9    vote fraud and pretty much you lied and denied?

10   A.   Yes.

11   Q.   Okay.  And didn't admit to anything?

12   A.   No.

13   Q.   And were you aware at that time that lying to a federal

14   agent was a felony charge?

15   A.   No, sir.

16   Q.   Did you have an attorney with you --

17   A.   No, sir.

18   Q.   Okay.  The second time was about five months later, on

19   October 2nd of '07.  Right?  Does that sound roughly correct?

20   A.   Sounds about right, yes.

21   Q.   And at that time, you started telling some things and

22   opening up about what you had -- you and others had done,

23   right?

24   A.   Yes.

25   Q.   All right.  Now, you didn't mention Freddy Thompson

*WEAVER - Cross (Mr. Baldani)*                                        136

1    schooling you illicitly on the machine on October 2nd, did

2    you?

3    A.   I don't remember.

4    Q.   All right.  Well, I'm going to show you a summary of the

5    October 2nd and let you look through it and see if it

6    refreshes your memory.  Is that okay?

7    A.   That's fine.

8    Q.   Is that one of the things that you reviewed in

9    preparation to testify, Mr. Weaver?

10   A.   No, sir.

11   Q.   Well, take a look through it.  I think it's only two,

12   three, four pages.  See if that refreshes your memory about

13   whether you did or did not mention Freddy Thompson schooling

14   you.

15   A.   (Reviewing document).

16   Q.   Mr. Weaver, I'm not asking you to read out loud anything

17   from that report.  I simply want to ask you, having gone

18   through your report, does that refresh your recollection as to

19   whether you told the FBI on October 2nd about this illicit

20   schooling by Freddy Thompson?

21   A.   No, sir.

22   Q.   Doesn't refresh your memory?

23   A.   I don't see it in there, no, sir.

24          THE COURT:  Mr. Weaver, that's not the question.

25   Doesn't make any difference what's in there.  It's only

WEAVER - Cross (Mr. Baldani)                                    137

1    whether it refreshes your recollection that you actually

2    discussed that.  Having read it, the question is you either do

3    remember discussing it or don't remember discussing it.

4              THE WITNESS:  I don't remember discussing it.

5              MR. BALDANI:  Thank you, Your Honor.

6    Q.  All right.  Who is Beverly Craft?

7    A.  She's a deputy clerk.

8    Q.  And we've talked about different clerks.  We've talked

9    about Anthony Short, who was a clerk at the Manchester

10   precinct, right?

11   A.  Yes.

12   Q.  We've talked about James Phillips, who is the circuit

13   clerk, right?

14   A.  Yes.

15   Q.  And James Phillips is the one that asked you to be an

16   election officer, not any of these people?

17   A.  Yes.

18   Q.  Right?  And then there's the county clerk, and that, of

19   course, is Freddy Thompson?

20   A.  Yes.

21   Q.  Okay.  So Beverly Craft works at the county clerk's

22   office?

23   A.  Yes.

24   Q.  Okay.  Did Miss Craft ever tell you that machine could be

25   manipulated or give you any --

*WEAVER - Cross (Mr. Baldani)*                                    138

1          MR. PARMAN:  Objection, Your Honor.

2          THE COURT:  Sustained.

3    Q.   Did you learn from anyone other than Freddy Thompson and

4    Wayne Jones about the fact that the machine could be

5    manipulated?

6          MR. PARMAN:  Objection, Your Honor.

7          THE COURT:  Sustained.

8    Q.   I'm going to -- I've asked you about May 1.  Now I've

9    asked you about October 2nd.  I'm going to ask you about you

10   did talk to the FBI one more time, about eight days later, on

11   October 10th, correct, of '07?

12   A.   Yes.

13   Q.   All right.  And would you agree with me that that's the

14   first time that you mention -- and when I talk about

15   schooling, I'm talking about the illicit manipulating machine

16   schooling.  Would you agree that on October 10th was the first

17   time you told the FBI about this illicit schooling by Freddy

18   Thompson?

19         MR. PARMAN:  Objection, Your Honor.

20         THE COURT:  Overruled.

21   A.   I'm not sure of the date.

22   Q.   Okay.

23   A.   I'm not sure of the date.

24   Q.   Let's do it this way.  You agreed that May 1st sounded

25   about right.  You agreed the second time was October 2nd of

*WEAVER - Cross (Mr. Baldani)*                                      139

1    '07.  That sounded about right.  And you agreed you did talk

2    to them a third time, correct?

3    A.   Yes.

4    Q.   Do you recall that being roughly a week later or eight

5    days later, something like that, roughly October 10th of '07?

6    A.   Not right off, I sure don't.

7    Q.   Do you have any reason to doubt that that's the correct

8    date?

9    A.   No, sir.  I don't have no doubt.

10   Q.   The point I'm making is would you agree with me that that

11   third interview was the first time you told the FBI, out of

12   your three interviews, about the illicit training?

13   A.   Yes.

14   Q.   Okay.  That's what I'm getting at.  Thank you.  I want to

15   ask you about voter assistance forms, all right?  You talked

16   about '04, when you were an election official and Anthony

17   Short was the clerk, right?

18   A.   In '04, yes.

19   Q.   And you personally saw him throwing away, destroying

20   voter assistance forms at the end of the day?

21   A.   Yes.

22   Q.   And you can't tell us out of the number of voter

23   assistance forms, you can't tell us how many of those forms he

24   threw away?

25   A.   No, sir, I can't.

*WEAVER - Cross (Mr. Baldani)*                                    140

1    Q.   All right.  And then again in '06, you saw him again in

2    '06, you saw Anthony Short throw voter assistance forms away?

3    A.   Yes.

4    Q.   All right.  So if voter assistance forms are missing,

5    it's possible that it's due to his discarding them, isn't it?

6    A.   Repeat your question?

7    Q.   If voter assistance forms that were filled out, whether

8    properly or improperly, are missing, it's very possible that

9    it's due to Anthony Short's act of discarding them in '04 and

10   '06, correct?

11   A.   Yes.

12   Q.   Okay.  And it was '06 that you saw him snorting drugs

13   while he's working as a clerk?

14   A.   Yes.

15   Q.   Right?  Do you know what he was snorting?

16   A.   No.  Just seen him snorting something off the top of his

17   hand.

18   Q.   Did you confront him about it?

19   A.   No, sir.

20   Q.   Did you report him for it?

21   A.   No, sir.

22   Q.   I want to ask you about your relationship with Wanda

23   White.

24   A.   Yes.

25   Q.   Wanda's a friend of yours, right?

WEAVER - Cross (Mr. Baldani)                                    141

1   A.   Yes.

2   Q.   Has been for a long time?

3   A.   Yes.

4   Q.   How long have you known her?

5   A.   Probably back we went to high school.

6   Q.   Y'all went to high school together.  And basically, you

7   were pretty much aligned with her as far as who you all each

8   supported throughout the years, right?

9   A.   Pretty much.

10   Q.   For the most part?

11   A.   Yes.

12   Q.   And in all fairness, for the most part, the people you

13   supported and were aligned with was in the opposite side of

14   Freddy Thompson, right?

15   A.   No, sir.  Not all the time.

16   Q.   I said for the most part.  Would you agree for the most

17   part?

18   A.   Yeah, sometimes we was different, yes.

19   Q.   Okay.  When is the last time you talked to Wanda?

20   A.   Wanda, it's probably sometime in '07.

21   Q.   All right.  After you both had begun cooperating?

22   A.   No.  It was before that.  I've not talked to her since, I

23   guess, the first time I met with the FBI.

24   Q.   Okay.  And we already established that was right at the

25   beginning of May was the first time.  Did you tell her you

*WEAVER - Cross (Mr. Baldani)*                                    142

1   were going in to the FBI or --

2   A.   No.

3   Q.   -- discuss the fact?

4   A.   She came to my house late the night before we was

5   supposed to go to meet with the FBI.

6   Q.   She knew you were meeting with them?

7   A.   Yes, she came and asked me did I have a subpoena.  We

8   actually had a subpoena to be before the federal grand jury, I

9   think it was on a Thursday, and she -- we was supposed to meet

10  with the FBI agents at London the next day, and she came and

11  asked me did I receive an invitation to the grand jury.

12  Q.   Okay.  So she talked to you the night before the first

13  time you talked to the FBI?

14  A.   Yes.

15  Q.   Okay.  And, of course, we've already established the

16  first time you talked to the FBI, you lied to them?  Right?

17  A.   Yes.

18  Q.   Did she encourage you to lie to them, or did you all

19  discuss that?

20  A.   I've not talked to her since that night.

21  Q.   No, I'm talking about the night before your first time

22  you went in there, did she say, hey, you know, I mean, was it

23  a kind of cover your tails kind of meeting?

24  A.   No, she just came basically and was talking about having

25  to go, and I was scared.  I didn't say much to her.

*WEAVER - Cross (Mr. Baldani)*                                    143

1    Q.   She didn't tell you to go and tell everything that we

2    did, though, did she?

3    A.   No, sir.

4    Q.   And, I mean, in all fairness, Mr. Weaver, you lied,

5    basically, at least the first time to protect yourself and to

6    protect your freedom, right?

7    A.   Yes.

8    Q.   Because you knew you'd committed serious crimes, right?

9    A.   Yes.

10   Q.   And you wound up entering your guilty plea around March

11   of '08, right?

12   A.   Yes.

13   Q.   Does that sound about right?

14   A.   Yes.

15   Q.   Almost two years ago?

16   A.   Yes.

17   Q.   And you have yet to be sentenced?

18   A.   Yes.

19   Q.   And you're hoping that your testimony and cooperation

20   helps you get a lenient sentence, aren't you?

21   A.   Yes, sir, I am.

22   Q.   Now, you were willing to break the law for your own

23   personal financial benefit, weren't you?

24   A.   Financial benefit?

25   Q.   Well, you said that the reason you participated in this

*WEAVER - Cross (Mr. Baldani)*                                    144

1    was for a job, and a job pays you money, right?

2    A.   Yes.

3    Q.   So you were willing to break the law for your financial

4    benefit, right?

5    A.   Yes, I guess you could say that.

6    Q.   All right.  And the truth of the matter is you didn't

7    finally come clean just to purge your soul, did you?

8    A.   Yes, I did.  I was ready to move on with my life.

9    Q.   I'm sorry.  If you thought you could have continued to

10   get away with it, would you still have done it?

11   A.   No, sir.  No.  I've had too many just rough days and

12   nights over this.  I wouldn't want no part of it again.

13   Q.   Well, I think you misunderstood.  My question was is part

14   of the reason you finally came clean, the so-called writing

15   was on the wall.  You knew that the jig was up?

16   A.   No, it's because of my kids.

17   Q.   So that had nothing to do with it?

18   A.   I was ready to move on for my kids.

19   Q.   Okay.  But, of course, you had the kids on May 1 of '07

20   when you lied, right?

21   A.   Yes, sir.

22   Q.   And you had the kids on October 2nd of '07, when you

23   didn't tell all?

24   A.   Yes, sir.

25           MR. BALDANI:  I believe that's all, Judge.

1          THE COURT:  All right.  Thank you.  Rather than

2    continue this afternoon, we'll start again tomorrow morning at

3    9:00.  I was hoping we'd finish this afternoon, but I don't

4    think we'll be able to do that.

5          Ladies and gentlemen, as we break for the evening, I

6    want to remind you of the admonition given to you several

7    times not to discuss the case among yourselves or with friends

8    or family members during the recess.  Don't read, watch or

9    listen to any accounts of the case if there should be any.

10   Don't attempt to perform any type of research or do any

11   investigation.  Don't communicate in any way about the case

12   and, of course, don't make up your mind about this matter

13   until it is finally submitted.

14         We will start tomorrow at 9:00.  The jury will be

15   excused until that time.

16              (The jury left the courtroom at 4:42 p.m.)

17         THE COURT:  Thank you.  You can step down.  You need

18   to be present at 9:00 tomorrow.

19         Thank you.  Counsel, please be seated.  The motion to

20   quash which needs to be scheduled is for a subpoena issued on

21   behalf of Mr. Thompson.  Charles Marcum is the only name

22   listed in the motion.  I'm assuming the defendants will know

23   which Mr. Marcum that would be.

24         The potential witness has asserted his Fifth

25   Amendment rights not to testify in the case.  Mr. Smith, at

146

1    this point, when do you think the government would be

2    concluding its case?  It would seem to me we're still another

3    two weeks away.  Is that fair or not?

4              MR. SMITH:  It's fair.

5              THE COURT:  Not by Monday?

6              MR. SMITH:  No, Your Honor.

7              THE COURT:  All right.  The reason I mention that,

8    there is the one day we have next Friday.  Will all the

9    attorneys be available on Friday, the 5th, or is there anyone

10   that has scheduled something already?

11             MR. BALDANI:  Can I respond first since I subpoenaed

12   him, Judge?

13             THE COURT:  I'm sorry.

14             MR. BALDANI:  We're the ones that subpoenaed him.

15   Your Honor, in all honesty, I've continued every case I've got

16   till March 5th.

17             MS. HUGHES:  Me too.  Got a full day of motions that

18   day.

19             MR. WHITE:  Your Honor, not to misrepresent anything,

20   mine is a personal one.  When you gave us the 5th off, turned

21   out I could fly to Baton Rouge for our last cousin's wedding.

22             THE COURT:  All right.

23             MR. WHITE:  And there's going to be a lot of money

24   changing hands.

25             THE COURT:  All right.  Well, I'll either schedule

1    this for -- I'll schedule this for March the 3rd at 4:30. And

2    I will advise Mr. Storm, who represents the witness, that he

3    would not need to be present on the 1st, but he would need to

4    be present on the 3rd.

5            Anyone have a problem with that, the afternoon of the

6    3rd at 4:30. I know everyone will be here then. We'll set

7    that day.

8            MR. WHITE: Your Honor, we have contacted all of our

9    witnesses that we had under subpoena and advised them that

10   we'll contact them when it appears we're going to need them.

11   I may need for two of them, though, to come. Would the 3rd at

12   lunch be your preference day?

13           THE COURT: I get pretty grouchy when I don't have my

14   lunch, but that's fine.

15           MR. WHITE: How about at 8:45.

16           THE COURT: No, we can do it. It's just to recognize

17   their appearance. We can do it on the 3rd at noon.

18           MR. WHITE: That would be great. And I'll let Your

19   Honor know the day before. I'm hoping that that may encourage

20   them to -- but I understand. Thank you, sir.

21           THE COURT: All right. You can let me know on the

22   2nd or prior to the 3rd at noon time if that's not necessary.

23   Otherwise, the witnesses will be recognized on that day to

24   appear at a time -- we hopefully will have more certainty as

25   to when they'll need to be here. Mr. Baldani?

1        MR. BALDANI:  Basically, Your Honor, I had one area

2   that I overlooked that I wanted to ask this witness, and I

3   understand that I said I'm done.

4        THE COURT:  Are you going to ask him to look at a

5   long document and read it?

6        MR. BALDANI:  No, Your Honor.  I would tell everybody

7   what it is, but I mean, basically, I made a mistake in not

8   covering this and I'm asking if I can do it.

9        THE COURT:  Yes.  That will be fine.

10       MR. BALDANI:  Thanks, Judge.

11       THE COURT:  Any other issues we can take up?  All

12  right.  We'll start again tomorrow at 9:00 a.m.  we'll be in

13  recess until then.

14            (Proceedings adjourned at 4:48 p.m.)

15                       -  -  -

16

17            C E R T I F I C A T E

18       I, LISA REED WIESMAN RDR-CRR, certify that the
    foregoing is a correct transcript from the record of
19  proceedings in the above-entitled case.

20
     \s\ Lisa Reed Wiesman                March 3, 2010
21  LISA REED WIESMAN, RDR-CRR              Date of Certification
    Official Court Reporter
22

23

24

25

1                                    INDEX

2

GOVERNMENT'S WITNESS

3

WANDA WHITE
4    Cross-examination by Mr. Baldani................. Page  4
     Cross-examination by Mr. Gilbert................. Page  7
5    Cross-examination by Ms. Hughes.................. Page 10
     Cross-examination by Mr. Simons.................. Page 15
6    Redirect Examination by Mr. Smith............... Page 26
     Recross-examination by Mr. Hoskins.............. Page 39
7    Recross-examination by Mr. Baldani.............. Page 52
     Recross-examination by Ms. Hughes............... Page 57

8

CHARLES WEAVER
9    Direct Examination by Mr. Parman................. Page  65
     Cross-examination by Mr. Hoskins................. Page 110
10   Cross-examination by Mr. Westberry.............. Page 111
     Cross-examination by Mr. White.................. Page 118
11   Cross-examination by Mr. Abell.................. Page 123
     Cross-examination by Mr. Baldani................ Page 130

12

13   GOVERNMENT'S EXHIBITS                          ADMITTED

14   Exhibit No. D13, list of grand jury questions
     Admitted....................................... Page  24
15
     Exhibit No. PA10, Charles Weaver plea agreement
16   Admitted....................................... Page 104
                                 -  -  -
17

18

19

20

21

22

23

24

25