1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF KENTUCKY
2              SOUTHERN DIVISION at LONDON
                        - - -
3

UNITED STATES OF AMERICA,        :   Docket No. CR 09-16-S
4                                :
                    Plaintiff,   :   **Frankfort, Kentucky**
5                                :   Friday, February 26, 2010
        versus                   :   9:00 a.m.
6                                :
RUSSELL CLETUS MARICLE,          :
7   DOUGLAS C. ADAMS             :
    CHARLES WAYNE JONES          :
8   WILLIAM R. STIVERS           :
    FREDDY W. THOMPSON           :        **Trial Day 14A**
9   WILLIAM B. MORRIS            :
    DEBRA L. MORRIS              :
10  STANLEY BOWLING,             :
                                 :
11                  Defendants.  :

12

13                      - - -
                TRANSCRIPT OF TRIAL
14            BEFORE DANNY C. REEVES
        UNITED STATES DISTRICT COURT JUDGE and a jury
15                      - - -

16  APPEARANCES:

17  For the United States:      STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.
18                              Assistant U.S. Attorney
                                601 Meyers Baker Road
19                              Suite 200
                                London, KY 40741
20
    For the Defendant           CANDACE C. CROUSE, ESQ.
21  Russell Cletus Maricle:     Strauss & Troy
                                150 E. Fourth Street
22                              Fourth Floor
                                Cincinnati,OH  45202
23
                                DAVID S. HOSKINS, ESQ.
24                              107 E. First Street
                                Corbin, KY  40701
25

2

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                               Landrum & Shouse, LLP
                                 220 West Main Street
 3                               Suite 1900
                                 Louisville, KY 40202
 4

 5    For the Defendant          T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
 6                               133 West Short Street
                                 Lexington, KY  40507
 7

 8    For the Defendant          ROBERT L. ABELL, ESQ.
      William R. Stivers:        120 North Upper Street
 9                               Lexington, KY  40507

10

      For the Defendant          RUSSELL JAMES BALDANI, ESQ.
11    Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
                                 Baldani, Rowland & Richardson
12                               300 West Short Street
                                 Lexington, KY  40507
13

14    For the Defendant          JERRY W. GILBERT, ESQ.
      William B. Morris:         Coy, Gilbert & Gilbert
15                               212 North Second Street
                                 Richmond, KY 40475
16

17    For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:           Gess, Mattingly & Atchison, PSC
18                               201 West Short Street
                                 Lexington,KY40507
19

20    For the Defendant          DANIEL A. SIMONS, ESQ.
      Stanley Bowling:           Thompson, Simons, Dunlop & Fore
21                               116 West Main Street
                                 Suite 2A
22                               Richmond, KY 40476

23

24

25
```

3

1    Court Reporter:                LISA REED WIESMAN, RDR-CRR
                                    Official Court Reporter
2                                   35 W. Fifth Street
                                    P.O. Box 1073
3                                   Covington, KY  41012
                                    (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WEAVER - Cross (Mr. Gilbert)                                          4

1            (The jury entered the courtroom at 8:56 a.m.)

2            THE COURT:  Thank you.  The record will reflect that

3    all members of the jury are present.  Parties and counsel are

4    also present.  Mr. Weaver, let me remind you you're still

5    under oath.

6            THE WITNESS:  Okay.

7            THE COURT:  Let's see.  Mr. Gilbert, I believe Mr.

8    Baldani has completed his questions.

9            MR. GILBERT:  Okay, thank you.

10           MR. BALDANI:  I don't have any other questions of the

11   witness, Your Honor.  Appreciate it.

12           THE COURT:  All right.

13                        CROSS-EXAMINATION

14   BY MR. GILBERT:

15   Q.   Good morning, Mr. Weaver.

16   A.   Good morning.

17   Q.   My name is Jerry Gilbert.  I'm from Richmond, and I'm

18   representing Bart Morris.

19   A.   Yes, sir.

20   Q.   In the 2002 May primary, you supported Jennings White; is

21   that correct?

22   A.   Yes.

23   Q.   In fact, you and you family always supported the Whites?

24   A.   No, sir.

25   Q.   How about Jennings White?

*WEAVER - Cross (Mr. Gilbert)*                                          5

1    A.   I don't know about always.

2    Q.   Okay.  In the 2002 November election, you ran on the

3    school board ticket?

4    A.   Yes, sir.

5    Q.   And your opponent was Charles Keith; is that correct?

6    A.   Yes, sir.

7    Q.   He was the chairman of the school board?

8    A.   Yes, sir.

9    Q.   It's a fact, Mr. Weaver, that Jennings White asked you to

10   run for that position?

11   A.   No, sir.

12   Q.   That's not true?

13   A.   That's not true.

14   Q.   When did you seek Mr. Jennings White's advice with

15   respect to running for that position?

16   A.   When I worked for the state, the only job that I could

17   run for was something nonpartisan, and that was one of them.

18   And with the thing in 2002, the school board, the clerk's race

19   in 2002, I figure it's a good time to take advantage of a

20   little support from Jennings White.

21   Q.   And so you did seek his support?

22   A.   Yes, sir.

23   Q.   And he did support you in that run; did he not?

24   A.   Yes, sir.

25   Q.   Now, in the November general election, when you arrived

*WEAVER - Cross (Mr. Gilbert)*                                    6

1    there at the poll that morning, I believe you stated that --

2    A.   What year?

3    Q.   2004.

4    A.   2004.

5    Q.   I believe you stated that William Stivers was there?

6    A.   When I arrived, I was the first one there that morning.

7    Q.   Okay.  And did Mr. Stivers come later?

8    A.   Yes.

9    Q.   And then Mr. Rowland came?

10   A.   Yes.

11   Q.   And they had a dispute between themselves?

12   A.   Yes, sir.

13   Q.   And they called, and Wayne Jones came?

14   A.   Yes, sir.

15   Q.   And then later, Freddy Thompson was called?

16   A.   I'm not sure about that.

17   Q.   Okay.  In the 2006 primary, you were asked by James

18   Phillips, who was the circuit court clerk, to be an election

19   officer in the Manchester precinct; is that correct?

20   A.   Yes, sir.

21   Q.   The other judge at that precinct was Wanda White?

22   A.   Yes, sir.

23   Q.   And you were friends with Kennon and Wanda White?

24   A.   Yes, sir.

25   Q.   Had been for a long time?

*WEAVER - Cross (Mr. Gilbert)*                                      7

1    A.   Yes, sir.

2    Q.   And during that period of time, you've testified that you

3    met with Wanda for training?

4    A.   Yes, sir.

5    Q.   Now, it was Kennon who was paying the voters during that

6    election; was it not?

7    A.   2006, yes.

8    Q.   And he was assisted by his brother, Travis Price?

9    A.   Brother-in-law.

10   Q.   Brother-in-law, I'm sorry.  That's Wanda's brother?

11   A.   Yes, sir.

12   Q.   Now, you had good reasons to support the Whites; did you

13   not?

14   A.   Yes, sir.

15   Q.   All right.  Kennon's father had been very good to you;

16   had he not?

17   A.   Yes, sir.

18   Q.   He appointed you fire chief?

19   A.   Yes, sir.

20   Q.   And some of the benefits of that job was that you got a

21   vehicle provided for you?

22   A.   Yes, sir.

23   Q.   They supplied your gas?

24   A.   Yes, sir.

25   Q.   And you got housing too; did you not?

WEAVER - Cross (Mr. Gilbert)                                    8

1    A.   No, I had a home -- well, I've got a mortgage on my

2    house.  The property, I had a lease on the property.

3    Q.   Okay.  And that was virtually rent-free; was it not?

4    A.   Yes, it come through the city council.

5    Q.   And did you get free utilities as a result of that?

6    A.   I had free gas.

7    Q.   All right.  Now, you testified that the last time that

8    you spoke to Wanda and Kennon would be in the summer of 2007?

9    A.   It would have been right before we went to meet with the

10   FBI, yes.

11   Q.   Okay.  And did they come to your home?

12   A.   Yes, sir, they did.

13   Q.   Were you aware at that time that they were wired and were

14   recording your conversation?

15   A.   No, sir.

16   Q.   Now, in the 2006 November general election, Bart Morris

17   supported James Garrison for county judge executive; did he

18   not?

19   A.   November?

20   Q.   Yes, sir.

21   A.   No, it would have been the May election.

22   Q.   It would have been the May election?

23   A.   Yes, sir.

24            MR. GILBERT:  Thank you, that's all I have.

25            THE COURT:  Thank you, Mr. Gilbert.  Miss Hughes?

*WEAVER - Redirect (Mr. Parman)*                                        9

1          MS. HUGHES:  I don't have any questions, thank you.

2          THE COURT:  All right.  Thank you.  Mr. Simons?

3          MR. SIMONS:  Your Honor, I don't have any questions

4    of this witness.

5          THE COURT:  All right, thank you.  Any redirect, Mr.

6    Parman?

7          MR. PARMAN:  Yes, Your Honor.

8                       REDIRECT EXAMINATION

9    BY MR. PARMAN:

10   Q.   Good morning, Mr. Weaver.

11   A.   Good morning.

12   Q.   Sir, I just have a couple follow-up questions for you.

13   Sir, you were asked about a training letter that you received

14   when you were going to serve as an election officer.  Do you

15   recall that line of questioning, a letter asking you to come

16   and --

17   A.   Yes.

18   Q.   -- do some training?

19   A.   Yes, sir.

20   Q.   And that's a standard letter that every election officer

21   receives to get the mandatory training?

22   A.   Yes, sir.

23   Q.   I just want to make sure that we clarify the difference

24   between the mandatory training that all election officers

25   receive and the special training that you received.

*WEAVER - Redirect (Mr. Parman)*                                   10

1    A.   Yes, sir.

2    Q.   Explain to the jury again when the extra training that

3    you received occurred.

4    A.   The extra training, it was after we had done been

5    upstairs and had the initial training on the machines

6    upstairs.

7    Q.   And that was the training that everybody received?

8    A.   Everybody received the one that was upstairs, yes.

9    Q.   Okay.  And on the same day, then, you received this

10   additional training?

11   A.   Yes, sir.

12   Q.   And who was present when that occurred?

13   A.   Wanda White, Wayne Jones and Freddy Thompson.

14   Q.   You were also asked several questions about conversations

15   you had with the FBI?

16   A.   Yes.

17   Q.   Do you recall that line of questioning?

18   A.   Yes.

19   Q.   And you were asked whether or not you initially told the

20   FBI about whether or not Freddy Thompson was involved in the

21   scheme?

22   A.   Yes.

23   Q.   But just to be -- just to clarify the situation, I

24   believe you also testified that you didn't say anything about

25   your involvement at all with the elections initially; is that

*WEAVER - Redirect (Mr. Parman)*                                              11

1    accurate?

2    A.   That's true.

3    Q.   Sir, during the course of this investigation, did you

4    have an opportunity to testify before a federal grand jury?

5    A.   Yes, sir, I did.

6    Q.   Do you recall the date of that?

7    A.   No, sir.

8    Q.   Would February 6, 2008, does that sound about accurate?

9    A.   Probably, yes.

10   Q.   Do you recall whether or not you were asked about your --

11   about Freddy Thompson and Wayne Jones' involvement in teaching

12   you how to use these election machines?

13   A.   Yes, I did.

14   Q.   And did you not tell them that Freddy Thompson and Wayne

15   Jones both were the individuals who assisted you and showed

16   you how to manipulate these voting machines?

17   A.   Yes, sir, I did.

18   Q.   And did you not also tell them that they showed you on an

19   actual machine how to manipulate the machine?

20   A.   Yes, sir.

21   Q.   You were also asked about your relationship with Cletus

22   Maricle.  Do you recall that line of questioning?

23   A.   Yes, sir.

24   Q.   And asked about anything that you had to do with him

25   regarding elections?

*WEAVER – Redirect (Mr. Parman)*                                           12

1    A.   Yes, sir.

2              MR. HOSKINS:  Your Honor, could we approach?

3              THE COURT:  Yes.

4                   (A sidebar conference was held out of the

5                   hearing of the jury):

6              THE COURT:  Yes, sir, Mr. Hoskins?

7              MR. HOSKINS:  Your Honor, having reviewed Mr.

8    Weaver's grand jury testimony, I believe that what the

9    government is preparing to go into is a brief conversation

10   that Mr. Weaver and Mr. Maricle had before the election, when

11   Mr. Maricle asked Mr. Weaver how he thought the election was

12   looking.  And Mr. Weaver thought to himself, as I understand

13   it, that was unusual, because he thought that Judge Maricle

14   was involved in what was going on.  And I think that's

15   speculation on his part, would be inappropriate.

16             THE COURT:  Okay.  I'm not sure where we're going.

17             MR. PARMAN:  Your Honor, Mr. Hoskins is right, that

18   it was his impression, based upon the context of the

19   conversation that was had, that it was peculiar that Mr.

20   Maricle was actually asking about it the day before the

21   election, about what his role would be as to his son-in-law's

22   election.

23             THE COURT:  How is it relevant to matters that were

24   brought up on cross-examination?

25             MR. PARMAN:  He specifically asked about --

*WEAVER - Redirect (Mr. Parman)*                                    13

1           THE COURT:  Mr. Hoskins did?

2           MR. PARMAN:  Yes, Your Honor, about Mr. Maricle and

3    Mr. Weaver's role in elections and what he had to do with

4    elections, and this is directly related to an election.  His

5    son-in-law's election, Phillip Mobley.

6           MR. HOSKINS:  I asked if he'd ever been asked to do

7    anything illegal.  He said no.

8           MR. ABELL:  I recall Mr. Hoskins' questions related

9    to Judge Maricle's initial run for office in the early '90s.

10   Mr. Weaver hung signs for him at a number of locations,

11   apparently in all three counties.

12          THE COURT:  1990 or thereabouts.

13          MR. ABELL:  Whenever he ran in the early '90s.

14          MR. PARMAN:  That's accurate.  He went on to state

15   further and asked if he had any other actions or activities

16   related to elections at later times.  This was a later time he

17   approached him and talked to him about election related

18   activity.

19          MR. HOSKINS:  Nothing illegal was his testimony.

20          THE COURT:  I'll overrule the objection.  You can ask

21   it.

22              (Sidebar conference concluded.)

23          THE COURT:  Thank you, counsel.  Mr. Parman, you may

24   continue.

25          MR. PARMAN:  Thank you, Your Honor.

*WEAVER – Redirect (Mr. Parman)*                                    14

BY MR. PARMAN:

Q.   Mr. Weaver, I was asking you about a lot of questions where you were asked about your relationship with Cletus Maricle and your relationship with respect to elections.  Do you recall that?

A.   Yes, sir.

Q.   Sir, in May of 2006, do you recall that election?

A.   Yes.

Q.   Did you have any discussions with Cletus Maricle related to the election?

A.   Actually, I just talked to him one time.  It was -- I was coming out of Speedway, SuperAmerica at Manchester, and Al Man Stivers was driving a pickup, and we crossed paths at the entrance.  And basically, Al Man pulled up, we rolled our windows down, had a conversation.

     And Cletus was sitting on the passenger side reading the newspaper.  And the only thing he said to me, he looked around and he said, he said, "Dobber, how do you think Phillip's going to do?"

Q.   And what did you understand that to mean?

A.   He was asking me how Phillip was going to do in the election.

Q.   And the timing of this election, when was it related to the May primary?

A.   It was probably a week before the primary.

*WEAVER - Redirect (Mr. Parman)*                                          15

1    Q.   To your knowledge, did he know you were going to be

2    working in the polls?

3    A.   He probably did.

4    Q.   And when you say Phillip, who do you think he was

5    referring to?

6    A.   Phillip Mobley.

7    Q.   Was Mr. Mobley running for something in the May '06

8    election?

9    A.   Yes.

10   Q.   What was he running for?

11   A.   PVA.

12   Q.   And was he on your slate of candidates?

13   A.   Yes, sir.

14   Q.   You also testified about your expectations as to what you

15   would receive from participating in this scheme.  Do you

16   recall that?

17   A.   Yes, sir.

18   Q.   And I believe you also testified that Wanda White

19   participated in this scheme with you?

20   A.   Yes, sir.

21   Q.   Did she, during the course of participating in this

22   scheme with you, tell you what she expected in return for

23   being involved?

24   A.   She said something about going to work for drug court.

25   Q.   Did she tell you who was going to get her the job in drug

1    court?

2    A.   No.  She just told me she was going to work for drug

3    court.

4    Q.   I believe you also testified that Kennon White

5    participated in this scheme in '06?

6    A.   Yes, sir.

7    Q.   To your understanding, what was he going to receive from

8    his participation?

9    A.   He was going to receive help for his dad in November.

10   Q.   And how was he going to get help for his dad in November?

11   A.   By supporting a group of candidates that was going to

12   support his dad in November.

13   Q.   Did he tell you if you supported one candidate, that he

14   expected to get support for his father in November?

15   A.   He said, the one he referred to, he said, "we have got to

16   help Phillip," he said, "because Clete is going to help dad in

17   November."

18   Q.   And when he was referring to Clete, who was he referring

19   to?

20   A.   Cletus Maricle.

21   Q.   Finally, Mr. Weaver, you were asked questions about the

22   White political family and in '02, whether or not that was the

23   end of their powerful dynasty, or something to that extent?

24   Do you remember that line of questioning?

25   A.   Yes, sir.

*WEAVER - Recross (Mr. Westberry)*                                    17

1   Q.   And I believe you testified you couldn't necessarily

2   agree with that statement?

3   A.   Yes, sir.

4   Q.   Sir, based on your knowledge of the political environment

5   in Clay County, who was the most powerful person or group of

6   persons in 2002?

7   A.   It would have been the school board and Doug Adams, the

8   superintendent.

9   Q.   Thank you.

10          MR. PARMAN:  That's all I have, Your Honor.  Thank

11   you.

12          THE COURT:  Recross.  Mr. Hoskins, do you need a

13   moment?  Yes, sir.

14          MR. HOSKINS:  No questions, Your Honor.

15          MR. WESTBERRY:  Could I have just one quick second?

16          THE COURT:  Certainly.

17          MR. WHITE:  I'm sorry, Your Honor.  No questions.

18          THE COURT:  Mr. Westberry.

19          MR. WHITE:  I misheard.  My apologies.

20          THE COURT:  Mr. Westberry.

21                       RECROSS-EXAMINATION

22   BY MR. WESTBERRY:

23   Q.   Good morning again, Mr. Weaver.  Just one question.  You

24   said you've known Doug Adams for pretty much all of your life,

25   at least all of your adult life; is that correct?

*WEAVER - Recross (Mr. Baldani)*                                        18

1    A.   Yes, sir.

2    Q.   Has he always been fair by you?

3    A.   Yes, sir, to me he has.

4    Q.   Good to your family too?

5    A.   Yes.

6         MR. WESTBERRY:  Thank you.  That's all I have.  Thank

7    you, sir.

8         THE COURT:  Thank you.  Now, Mr. White?

9         MR. WHITE:  I'm sorry, Your Honor.  No further

10   questions.

11        THE COURT:  That's fine.

12        MR. ABELL:  Judge, I don't have any additional

13   questions either.

14        THE COURT:  Thank you.  Mr. Baldani?

15        MR. BALDANI:  I just have a handful if I could do

16   them from here, Judge.

17        THE COURT:  That's fine.

18                    RECROSS-EXAMINATION

19   BY MR. BALDANI:

20   Q.   Mr. Weaver, when Mr. Parman asked you about the prior

21   statements to the FBI we talked about yesterday, correct?

22   A.   Yes, sir.

23   Q.   You didn't mention Freddy on May the 1st of '07, but you

24   didn't acknowledge any vote fraud activity that first time,

25   right?

*WEAVER - Recross (Mr. Baldani)*                                    19

1   A.   What date now?

2   Q.   The first time you talked to them, you didn't acknowledge

3   any vote fraud activity by yourself?

4   A.   No, sir.

5   Q.   But the second time is -- you did acknowledge a good bit

6   of vote fraud activity, right?

7   A.   Yes, sir.

8   Q.   Remember, that's the big, long one that took you a while

9   to read yesterday?

10  A.   Yes, sir.

11  Q.   And that's the one that you agreed that you didn't

12  mention Freddy Thompson's illicit schooling, right?

13  A.   Yes, sir.

14  Q.   So the second time you met with them, you did come clean

15  about a whole lot of the vote fraud activity but didn't

16  mention the illicit schooling, right?

17  A.   Yes, sir.

18  Q.   Okay.  And then we established yesterday that it was only

19  at the third that you told the FBI about this, right?

20  A.   Yes, sir.

21  Q.   And that was October 10th, '07, or thereabouts.  You

22  agreed with me yesterday, right?

23  A.   Yes.

24  Q.   And then Mr. Parman asked you about mentioning the

25  illicit schooling at your grand jury testimony.

*WEAVER - Recross (Mr. Baldani)*                                    20

1    A.   Yes, sir.

2    Q.   And you said that you did?

3    A.   Yes, sir.

4    Q.   The truth of the matter is that was February 6th of '08,

5    so that was a year after or, actually, not quite a year.  That

6    was several months after your third meeting with the FBI,

7    right?

8    A.   Yes, sir.

9              MR. BALDANI:  That's all, Your Honor.

10             THE COURT:  All right.  Thank you.  Mr. Gilbert, any

11   further questions?

12             MR. GILBERT:  No further questions.

13             MS. HUGHES:  None.

14             THE COURT:  Mr. Simons?

15             MR. SIMONS:  No.

16             THE COURT:  All right.  Thank you.  Anything else?

17             MR. PARMAN:  No, Your Honor, thank you.

18             THE COURT:  Thank you.  Mr. Weaver, do you have any

19   exhibits or documents there?  If you can give those to the

20   security officer.  Sir, you may step down.  Thank you.

21             Mr. Parman or Mr. Smith, you may call your next

22   witness.

23             MR. SMITH:  Thank you, Your Honor.  The United States

24   would call Glenn Rowland.

25             THE COURT:  Thank you.

ROWLAND - Direct (Mr. Smith)                                        21

1              GLENN ROWLAND, GOVERNMENT'S WITNESS, SWORN

2                         DIRECT EXAMINATION

3    BY MR. SMITH:

4    Q.   State your name, please.

5    A.   Glenn Rowland.

6    Q.   Mr. Rowland, where do you live?

7    A.   Manchester, Kentucky.

8    Q.   And how long have you lived in the Clay County area?

9    A.   All my life.

10   Q.   And are you married?

11   A.   Yes, I am.

12   Q.   And how many children do you have?

13   A.   Two.

14   Q.   Are you a grandparent at this point?

15   A.   Yes, I am.

16   Q.   How many grandchildren do you have?

17   A.   I have one.

18   Q.   Mr. Rowland, what kind of jobs have you held?

19   A.   At present, I'm a maintenance worker at Manchester

20   Elementary.  Before that, I was a bus driver for a year.  And

21   before that, I was in the police academy at Richmond for seven

22   weeks, and I flunked out.  And before that I was at Rudd

23   Equipment in Corbin as a shipping and receiving clerk.  And

24   before that, I was a heating and air technician with Smith

25   Services in London for six months.  And before that, I was --

ROWLAND - Direct (Mr. Smith)                                    22

 1   went retraining to Corbin Vocational School to get my heating
 2   and air license.  Before that, I was laid off from Interstate
 3   Coal.  I was a warehouse supervisor for ten years.
 4   Q.  Interstate Coal, is that a pretty large company?
 5   A.  It was.
 6   Q.  It's no longer in existence?
 7   A.  No, James River owns it now.
 8   Q.  Was that company located in Clay County at the time you
 9   worked for them for ten years?
10   A.  No, it was in London on 194 bypass.
11   Q.  And prior to that job, what did you do?
12   A.  Prior to that, I was -- worked at Manchester Wholesale
13   Grocery.  And before that, I was with the highway department
14   and was laid off when John Y. Brown got elected.  And before
15   that, I was -- worked at Caron Spinning Company in London.
16   No, excuse me, Jock Coal in Manchester.  And before that,
17   Caron Spinning Company.  And before that I was in the United
18   States Army from February, 1972 to February, 1975.
19   Q.  Okay.  And did you have an overseas duty in the military?
20   A.  Panama Canal.
21   Q.  Okay.  Are you related to a fella by the name of Richard
22   Todd Roberts?
23   A.  Yes, I am.  He's my nephew by marriage.
24   Q.  All right.  And you say you tried it as a police officer
25   one time and flunked out in the school.  What made you flunk

ROWLAND - Direct (Mr. Smith)                                    23

1    out; do you know?

2    A.   It was a really intense course, and I wasn't the youngest

3    person there.  I was probably the oldest one in my class.  It

4    was divided up then into four blocks, and you retest -- you

5    could retest each time, I think, twice in each block.  And I'd

6    retested already one time in one block.  And then the time

7    before, my weapon jammed, and that was the end of that.

8    Q.   Mr. Rowland, while living in Clay County, have you been

9    asked at points in time to serve as an election officer by the

10   Board of Elections in Clay County?

11   A.   Yes, I have.

12   Q.   And what years have you served as an election officer,

13   Mr. Rowland, that you recall?

14   A.   '02 and '04.

15   Q.   Okay.  Now, when you first served in '02, what precinct

16   were you asked to serve in?

17   A.   Manchester precinct, located at the middle school.

18   Q.   Okay.  And the Manchester precinct, has it always been

19   located there, to your knowledge, at the middle school?

20   A.   No.  I think at one time, it was at the old ambulance

21   building, and then before that maybe at the courthouse.  Old

22   courthouse.

23   Q.   Now, when you served as an election officer, did you also

24   have to serve that early voting, those 12 days called the

25   absentee voting, early voting period?

ROWLAND - Direct (Mr. Smith)                                    24

1   A.   No, sir.

2   Q.   So when you served in the '02, you were just called for

3   duty on the day of election?

4   A.   Yes.

5   Q.   And what position did you serve in 2002, sir?

6   A.   Sheriff.

7   Q.   And as sheriff, do you recall who you served with there

8   at the Manchester precinct in 2002?

9   A.   Lucy Marcum, Anthony Short, Chris Duff, maybe Larry

10  Henson, I think.

11  Q.   All right.

12  A.   The first of '02.

13  Q.   That would have been the primary of 2002?

14  A.   Yes.

15  Q.   And was that a heavy turnout for an election, to your

16  recollection?

17  A.   Yes.

18  Q.   Okay.  And during that time period, did you observe

19  activities which caused you as sheriff to have to make reports

20  to -- as sheriff, you were required by duty if you had a

21  disturbance or an issue on the grounds.  Did you have a duty

22  as sheriff to fill out a report?

23  A.   I did make -- filled out on the sheriff's log one time in

24  '02.

25  Q.   Okay.  And do you recall who was involved in the incident

ROWLAND - Direct (Mr. Smith)                                    25

1    that you had to write up?

2    A.   Wayne Jones, Anthony Short and Chris Duff.  I mentioned

3    their names.  And I didn't know the other two ladies' names,

4    though.  One of them was related to Wayne.

5    Q.   Okay.

6    A.   And she had brought a voter in, but I didn't know who she

7    was.

8    Q.   During that day, did you have occasion to see a man named

9    Bart Morris on election grounds?

10   A.   Yes.

11   Q.   And did you know Bart Morris prior to that day of

12   election day?

13   A.   Yes, I did.

14   Q.   If you would, please, sir, take a look in the courtroom

15   over to my -- to your left, my right, and see if you see Mr.

16   Bart Morris in the courtroom.

17   A.   Yeah, he's got the striped shirt, pullover shirt back

18   against the wall.

19            THE COURT:  The record will reflect the witness has

20   identified the defendant, William Morris.

21   Q.   And at the 2002 primary day election, what was the

22   circumstances which you saw Mr. Morris that day, sir?

23   A.   What was the circumstances?

24   Q.   Yeah.  Well, let me restate the question.  Did you see

25   him more than once that day?

*ROWLAND - Direct (Mr. Smith)*                                          26

1    A.   Yes.

2    Q.   And could you tell us what was the nature of his visit,

3    to your knowledge?

4    A.   I don't know what his -- what the nature was.

5    Q.   Okay.  How often did you see him show up there that day?

6    A.   He was there several times.

7    Q.   Okay.  And did he communicate any with this Chris Duff?

8    A.   He did when I asked him to leave.

9    Q.   Okay.

10   A.   He told him to shut it down, and he said, "you read the

11   book."

12   Q.   Now, is Chris Duff a relative of Bart Morris's?

13   A.   He's his stepson.

14   Q.   And you say -- who called for the polls to be shut down?

15   A.   He didn't say to shut the polls down.  He just said,

16   "Shut it down.  You read the book."

17   Q.   Okay.

18   A.   I'm assuming he meant the polls.

19   Q.   And did you ask Mr. Morris to leave?

20   A.   I asked him prior to that.

21   Q.   Prior to that --

22   A.   Yes.

23   Q.   -- to leave?  And he returned after you asked him to

24   leave?

25   A.   I don't remember seeing him if he did.

ROWLAND - Direct (Mr. Smith)                                    27

1    Q.   All right.  So when he made that appearance, you asked

2    him to leave.  And before he left, he gave those instructions

3    to Chris Duff?

4    A.   Yes.

5    Q.   Had you seen people showing up in vans at any point in

6    time during election day in the primary of 2002?

7    A.   Yes, yes, I did.

8    Q.   Did you see more than one van showing up there at the

9    polls?

10   A.   I don't recall how many vans.  I went and looked inside

11   one van that I can recall.

12   Q.   And when you say you went and looked inside, did you make

13   observations of what was inside the van?

14   A.   Yeah, there was several people in it.

15   Q.   Do you know who was operating these vans?

16   A.   Hawkeye Pennington was the driver.  I don't know who was

17   the occupants.

18   Q.   Do you recall anybody else that were hauling people?

19   A.   Bobby "Red" Sams was there several times.  I don't recall

20   what he was driving.  Dobber Weaver was there several times.

21   I don't recall what he was driving either.

22   Q.   Now, you, as election officer chosen in the spring of

23   2002, were you also asked to serve in the fall of 2002?

24   A.   Yes.

25   Q.   And likewise, in 2004, were you asked to serve in that

ROWLAND - Direct (Mr. Smith)                                        28

1   election?

2   A.   Yes, I was.

3   Q.   And at the 2004 election, did you serve in the primary of

4   2004?

5   A.   Best of my knowledge, I did.

6   Q.   Okay.  Do you know who you served with in the primary in

7   2004?

8   A.   I'm thinking it was Vernon Hacker was there, I believe.

9   Lucy Marcum.  I can't recall the other ones.

10  Q.   Okay.  What about the fall of 2004.  Did you serve in the

11  fall of 2004?

12  A.   The best of my recollection, I was, partial time.

13  Q.   You were chosen to serve?

14  A.   Yes.

15  Q.   And could you tell us what happened when you showed up on

16  the election day, November, 2004?

17  A.   Well, I think I was the first one there.  Then I think I

18  seen Dobber outside later on that morning.  And Lucy Marcum, I

19  think, showed up.  And then around maybe 20 till 6:00 or 15

20  till 6:00, there was several people come in.  Wayne Jones, Al

21  Man Stivers, Vernon Hacker.  I'm thinking Bart Morris came in.

22  And Wayne asked me what I was doing there, and I told him I

23  was judge.  And he said, "No, you're not.  I appointed Al Man

24  as judge."

25       So I told him I'd make a phone call.  I called Freddy

1    Thompson and told him what the situation was.

2    Q.   And what was his response?

3    A.   He made the gesture of "Shoo, this is a mess."  I said,

4    "Freddy, I don't want to be here.  I'll just go home."  He

5    said, "Okay.  I'll pay you the rest of the day."  I went home.

6    I was probably home by ten till 6:00.

7    Q.   Now, you get paid for services as an election officer for

8    a day's service?

9    A.   Yes.

10   Q.   What is that?

11   A.   I don't recall.  It's not enough, I know that.

12   Q.   Did you serve in 2006, sir?

13   A.   No, I did not.

14   Q.   Have you been asked to serve again?

15   A.   No, I haven't.

16   Q.   Nobody's called you or asked you to serve in any

17   position?

18   A.   No, sir.

19   Q.   Did Stivers say anything to you while you were trying to

20   work out the details of who was going to get to serve that

21   morning?

22   A.   He said, "Don't blame me.  It wasn't me."  And I said,

23   "I'm not blaming you.  I don't want to be here anyway."  I

24   think that's the only thing we talked about.

25           MR. SMITH:  Have just a moment, Your Honor?

*ROWLAND - Cross (Mr. White)*                                         30

1          THE COURT:  Yes.

2          MR. SMITH:  Pass the witness, Your Honor.

3          THE COURT:  All right.  Thank you.  Mr. Hoskins.

4                          CROSS-EXAMINATION

5    BY MR. HOSKINS:

6    Q.  Mr. Rowland, do you know -- I'm David Hoskins.  I

7    represent Judge Maricle.  Do you know Judge Maricle?

8    A.  Yes, I do.

9    Q.  Have you ever had any political contact with him at all?

10   A.  No, I haven't.

11   Q.  He's never asked you to serve as an officer or talked to

12   you about that at all?

13   A.  No, he hasn't.

14         MR. HOSKINS:  That's all.  Thank you.

15         THE COURT:  Thank you.  Mr. Westberry?

16         MR. WESTBERRY:  Thank you.  No questions.

17         THE COURT:  All right.  Thank you.  Mr. White?

18         MR. WHITE:  Yes, Your Honor.  I have just a few,

19   please.

20                          CROSS-EXAMINATION

21   BY MR. WHITE:

22   Q.  Good morning, Mr. Rowland.

23   A.  Good morning.

24   Q.  My name is Scott White.  I represent Wayne Jones.  You

25   recognize Wayne?

*ROWLAND - Cross (Mr. White)*                                                    31

1   A.   Yes, I do.

2   Q.   Very good.  I've just got a few questions.  I want to ask

3   you about the general election of 2004, what you were just

4   asked about in terms of when you went there to become a

5   precinct officer.  Is it accurate to state that the person who

6   asked you to serve -- well, let me go back.  Are you a

7   Democrat or a Republican?

8   A.   A Democrat.

9   Q.   So you were going there expecting to be the Democrat

10  judge for that --

11  A.   In '04, yes.

12  Q.   Right.  And there were four election officers per

13  precinct.  The Democrat and Republican judge, a sheriff, and a

14  clerk?

15  A.   Yes.

16  Q.   In '02, and I'm sorry, which precinct was this again?

17  Was it Burning Springs, did you say?

18  A.   Manchester.

19  Q.   Oh, I'm sorry.  In '02, you had been the sheriff,

20  correct?

21  A.   Correct.

22  Q.   And then in '04, the primary, did you say you had been

23  the judge?

24  A.   The primary --

25  Q.   Of '04.

*ROWLAND - Cross (Mr. White)*                                    32

1    A.   '04, I'm thinking I was the sheriff.  I'm thinking I got

2    relieved in the fall of '04.

3    Q.   So the fall of '04 would have been the first time that

4    you would have served in the role of judge?

5    A.   Yes.

6    Q.   And that was as the Democrat judge?

7    A.   Yes.

8    Q.   And was it -- is it accurate to state that Don Nolan

9    asked you to be the Democrat judge for that Manchester

10   precinct?

11   A.   Yes, he did.

12   Q.   And Don Nolan, at that time, was he -- did he hold any

13   role in the Clay County Democratic party?

14   A.   I don't know exactly what his title was, yeah, but he's

15   always, to my knowledge, been in the election committee.

16   Q.   Okay.  And was it your testimony that you were the first

17   one there at the polls?

18   A.   Yes.

19   Q.   And you were there, and you were actually setting up the

20   machines?

21   A.   I was waiting on somebody else to come help me set up the

22   machines.

23   Q.   But the machines were already there?

24   A.   Yes.

25   Q.   They're brought in, I guess, the night before and y'all

*ROWLAND - Cross (Mr. White)*                                        33

1    get there, it's unlocked, you kind of set up the precinct?

2    A.   Um-hmm.

3    Q.   In doing that, those would have been what I'm going to

4    refer to as -- did you vote in '06?

5    A.   Yes, I did.

6    Q.   So you know that the machines changed from '04 to '06?

7    A.   Yes, they did.

8    Q.   When you got there -- was there a reason you got there

9    first?

10   A.   No reason.

11   Q.   Just an early riser?

12   A.   Yes, I am.

13   Q.   And what time do the polls open?

14   A.   6:00.

15   Q.   So you definitely had to be there before 6:00?

16   A.   Yes.

17   Q.   Is it your testimony that while you were there, that Mr.

18   Jones came into the precinct with Mr. Stivers?

19   A.   Yes.

20   Q.   Did you have any -- in the 2006 election, did you vote in

21   the Manchester precinct?

22   A.   Yes, I did.

23           MR. WHITE:  Your Honor, may we approach for just a

24   quick question?

25           THE COURT:  Yes, sir.

*ROWLAND - Cross (Mr. White)*                                              34

1           MR. WHITE:  Thank you.

2                  (A sidebar conference was held out of the

3                  hearing of the jury):

4           MR. WHITE:  Good morning, Your Honor.  Scott White.

5    I'm on behalf of Charles Wayne Jones.  My notes do not

6    indicate that you asked anything about the '06 election, other

7    than whether he'd been asked to be a judge.

8           I had planned to ask him, based on his 302, he

9    provided assistance to his daughter.  I was going to ask him

10   about that.  So that's beyond the scope of the direct.  And

11   before I went into that, I wanted to see if Your Honor would

12   allow me to do that, your discretion, or if -- that's it.  If

13   so, I don't have any other questions.

14          THE COURT:  Is there an objection?

15          MR. SMITH:  You're going to ask him if he helped his

16   daughter --

17          MR. WHITE:  Yes.

18          MR. SMITH:  -- vote?

19          MR. WHITE:  Yes, in the '06.  In his 302 --

20          THE COURT:  Why don't you explain the relevance to me

21   first.  Let's see if it's a relevant area.

22          MR. WHITE:  The reason I think it's relevant, Your

23   Honor, is there was a lot of testimony from Wanda and Kennon

24   White or, primarily, Wanda White about the assistance that she

25   provided in the Manchester city precinct.

*ROWLAND - Cross (Mr. White)*                                        35

1        As I recall my cross-examination in terms of dealing

2   with the voter assistance forms, she admitted that she didn't

3   fill out the forms.  She only signed them, and that it was

4   either the judge or the sheriff that filled it out.

5        And in his testimony, or in his interview with the

6   FBI and the 302, he said he went there to assist his daughter

7   with the voting machine, and White laughingly told him he

8   needed to fill out a voter assistance form, but he said he

9   never did fill out a form.  And I was just going to ask him,

10  did you fill out a form when you assisted your daughter?  Were

11  you directed not to, or did it just not come up?  Just curious

12  what he has to say about it.

13       I think that's relevant to how Miss White performed

14  at her duties at that particular precinct.

15       THE COURT:  All right.  I'll allow some limited

16  questions, but he either recalls or he doesn't.  This is

17  clearly a collateral matter.  I don't think that it's in any

18  way impeaching as to what Miss White had to say.  I don't see

19  the relevance, but I'm going to give you a little bit of

20  leeway to go into it to speed this case along.  We're not

21  going to review 302s with this witness.

22       MR. WHITE:  I understand.

23       THE COURT:  He either remembers it or he doesn't

24  remember it, and we need to move on.

25       MR. WHITE:  Thank you, Your Honor.

ROWLAND - Cross (Mr. White)                                        36

1               (Sidebar conference concluded.)

2    BY MR. WHITE:

3    Q.   Mr. Rowland, just another question or two.  When you

4    voted in '06, you voted in the Manchester precinct?

5    A.   Yes.

6    Q.   And in the general -- I'm sorry.  In either the general

7    or the primary, did you take your daughter with you to vote

8    and provide her assistance?

9    A.   Yes, I did.

10   Q.   And was that in both elections or just one, if you

11   remember?

12   A.   I don't recall, but if she voted, it was probably in both

13   elections.

14   Q.   Okay.  And you did provide assistance to her?

15   A.   Yes, I did.

16   Q.   Do you recall, was a form filled out, the voter

17   assistance form?

18   A.   No, there was not.

19   Q.   You were familiar, having been a sheriff prior, that

20   voter assistance forms are typically filled out if assistance

21   is needed?

22   A.   Yes.

23   Q.   Is there a reason you didn't fill out a voter assistance

24   form?

25   A.   Wanda White asked me, when I told her I was there to help

*ROWLAND - Cross (Mr. Baldani)*                                    37

1   my daughter vote on the machines, she asked me, she said

2   you'll have to fill out a voter assistance form, and I said,

3   yeah, sure.  She walked off, and I walked on over to help her.

4   Q.  To help her, you mean your daughter?

5   A.  Yes.

6           MR. WHITE:  Those are all my questions.  Thank you,

7   sir.  Thank you, Your Honor.

8           THE COURT:  All right.  Thank you.  Mr. Abell?

9           MR. ABELL:  Judge, I don't have any questions for Mr.

10  Rowland.  Thank you.

11          THE COURT:  Mr. Baldani or Mr. Richardson?

12          MR. BALDANI:  I've got a couple, Judge.

                            CROSS-EXAMINATION

14  BY MR. BALDANI:

15  Q.  When Miss White made a comment about the voter assistance

16  forms, did she say it laughingly or seriously, or do you

17  recall?

18  A.  Well, she just said -- just normally talking.  She didn't

19  make any smile or no gestures whatsoever.

20  Q.  Now, this, the election where you say you made the phone

21  call to Freddy Thompson?

22  A.  Yes.

23  Q.  That was, are you pretty certain that was fall of '04?

24  A.  I'm not real certain on that.  It was in '04, though.  I

25  am certain of that.

ROWLAND - Cross (Mr. Baldani)                                    38

1   Q.   Certain it's '04.  And you testified that you were the

2   Democrat judge, but weren't you actually supposed to be the

3   alternate Democrat judge?

4   A.   I'm just going by what Don Nolan told me.  He asked me

5   would I serve and I said yes.  And he said as judge.  Prior to

6   that, he asked me would I serve as sheriff.

7   Q.   And what's your relationship with Don Nolan?

8   A.   His son is married to my daughter.

9   Q.   Okay.  You don't recall that it was actually Larry Henson

10  that was the Democrat judge and then you were supposed to

11  serve as alternate?

12  A.   In what year?

13  Q.   The year we're talking about, '04.

14  A.   I don't recall.

15  Q.   Is that a possibility?

16  A.   I assume.  I don't know.

17  Q.   Okay.  Do you have any knowledge of Larry Henson failing

18  to appear -- failing to show up for his duties?

19  A.   No.  I did serve with Larry Henson once, I remember.  I'm

20  thinking it was in the primary of '02.

21  Q.   Right, you mentioned serving with Larry Henson.  Really,

22  what I'm trying to get at is, is it possible that in '04, your

23  role was actually as an alternate Democrat judge as opposed to

24  the Democrat judge?

25  A.   It's possible.

*ROWLAND - Cross (Mr. Baldani)*                                          39

1    Q.   Okay.  And it's possible that Larry Henson was supposed

2    to be the Democrat judge?

3    A.   Possible.

4    Q.   And do you know that if the actual judge doesn't show,

5    whose responsibility it is to send an alternate in his place?

6    A.   Would you ask me that again?

7    Q.   Do you know -- you've been through election officer

8    training, right?

9    A.   Yes.

10   Q.   Do you know that if the actual officer who is supposed to

11   serve doesn't show, who it is that calls the alternate or

12   tells the alternate you need to fill in?

13   A.   I'm assuming it would be Freddy.

14   Q.   Okay.  But in any event, you told the jury about Wayne

15   showing up and Al Man, and Al Man saying, hey, I'm going to be

16   Democrat judge.  And your reaction was, I better call Freddy

17   Thompson?

18   A.   Al Man didn't say that.  Wayne said that.

19   Q.   But in any event, your reaction was I better call Freddy?

20   A.   Yes.

21   Q.   Because you know Freddy, right?

22   A.   Yes.

23   Q.   And when you called him, he said, shoo, this is a mess?

24   A.   Yes.

25   Q.   He expressed frustration --

*ROWLAND - Cross (Mr. Gilbert)*                                           40

1    A.   Yes.

2    Q.   -- with the situation?  He didn't give you the impression

3    that he was trying to get Al Man --

4    A.   No.

5    Q.   -- to serve.  And you volunteered to go on home?

6    A.   Yes, I did.

7    Q.   Because you agreed it was a mess?

8    A.   Yeah.  I didn't want to be there.

9    Q.   Being election officer, is that a coveted position that

10   people are vying for, in your opinion?

11   A.   Not to my knowledge.

12   Q.   Hard to get people to be election officers?

13   A.   I would say, especially after this.

14           MR. BALDANI:  That's all, Judge.

15           THE COURT:  Mr. Gilbert?

16           MR. GILBERT:  Just have a few questions, Your Honor.

17   May I ask from here?

18           THE COURT:  Yes.

19                      CROSS-EXAMINATION

20   BY MR. GILBERT:

21   Q.   You served both elections in '02; did you not?

22   A.   Yes, I did.

23   Q.   And you served primary election in '04?

24   A.   The best I recall.

25   Q.   Okay.  Now, in '04, you're not certain as to whether you

ROWLAND - Cross (Mr. Gilbert)                          41

1   were an actual election officer or an alternate?

2   A.   No, I'm not sure.

3   Q.   And the records would show that; would they not?

4   A.   Should, yes.

5   Q.   Now, when you served those three elections, did anyone

6   ask you to participate in a vote buying scheme?

7   A.   No, sir.

8   Q.   And obviously, then, you did not participate in a vote

9   buying scheme?

10  A.   No, I did not.

11  Q.   In the fall election, when Mr. Stivers and Mr. Jones and

12  Mr. Weaver were there early in the morning, you said you were

13  thinking maybe Bart Morris was there?

14  A.   I'm thinking that, yeah.  I'm not really for sure.

15  Q.   You're not sure?

16  A.   Could be bleeding over my memory from '02.

17  Q.   But you're not sure about that?

18  A.   I'm not sure.

19          MR. GILBERT:  That's all.

20          THE COURT:  Thank you.  Miss Hughes?

21          MS. HUGHES:  No, sir.

22          THE COURT:  Mr. Simons?

23          MR. SIMONS:  No, thank you.

24          THE COURT:  All right.  Thank you.  Mr. Smith, any

25  redirect?

ROWLAND - Redirect (Mr. Smith)                                    42

1              MR. SMITH:  A couple things.

2              THE COURT:  Yes, sir.

3                          REDIRECT EXAMINATION

4    BY MR. SMITH:

5    Q.   Mr. Rowland, that early morning, 2004 election day that

6    you showed up to serve as judge, when you were told those

7    things by Wayne Jones that you spoke of, did he make any

8    explanation to you that you were mixed up and you were an

9    alternate, you shouldn't be there?

10   A.   Only thing he said was, he asked me what I was doing

11   there, and I told him I was judge.  He said, "No, you're not.

12   I appointed Al Man as judge."  He said he was election -- I

13   want to think commissioner or something like that.  I didn't

14   have any clue he was even on the committee.  That's the reason

15   I made the phone call.

16   Q.   And when you talked to Freddy on the phone, did he say

17   anything about what had been done the night before --

18   A.   No.

19   Q.   -- in discussing it?

20             MR. SMITH:  That's all.  Thank you.

21             THE COURT:  All right.  Thank you.  Anyone else have

22   any questions of the witness?  All right.  Thank you, sir.

23   You may step down.

24             Mr. Smith, you may call your next witness.

25             MR. SMITH:  Yes, Your Honor.  Denver Sizemore.

*SIZEMORE - Direct (Mr. Smith)*                                      43

1        MR. WHITE:  Your Honor, I need to retrieve something

2    behind me.  Is that okay?

3        THE COURT:  That's fine.

4        DENVER SIZEMORE, GOVERNMENT'S WITNESS, SWORN

5        THE COURT:  Thank you.  Mr. Smith, you may proceed.

6        MR. SMITH:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8    BY MR. SMITH:

9    Q.  State your name, please.

10   A.  Denver Sizemore.

11   Q.  Okay.  Mr. Sizemore, where are you from?

12   A.  Originally from Clay County.

13   Q.  Okay.  Born and raised in Clay County?

14   A.  Yes.

15   Q.  And are you currently married?

16   A.  Yes.

17   Q.  Do you have children?

18   A.  Yes.

19   Q.  How many children do you have?

20   A.  Three.

21   Q.  And what are their ages?

22   A.  44, 39 and 38.

23   Q.  Okay.  And during the time period that you lived in

24   Manchester, Mr. Sizemore, where did you live in proximity to

25   the county and City of Manchester?

SIZEMORE - Direct (Mr. Smith)                                    44

1    A.   In East Bernstadt -- I mean Burning Springs.

2    Q.   You currently live in East Bernstadt?

3    A.   Yes.

4    Q.   When you lived in Manchester, you lived in Burning

5    Springs area?

6    A.   Yes, sir.

7    Q.   Now, Mr. Sizemore, the time period that you lived over

8    there in Manchester, did you have occasion when the FBI

9    arrested you and prosecuted you for drug charges?

10   A.   Yes.

11   Q.   And do you recall when that was?

12   A.   2004.

13   Q.   Hand to you now what's marked as PA13.  Do you recognize

14   PA13, Mr. Sizemore?

15   A.   Yes.

16   Q.   And what is that?  Does that appear to be your plea

17   agreement to the drug charges that you entered a plea of

18   guilty to in United States District Court in London?

19   A.   Yes.

20   Q.   What judge took your plea; do you recall?

21   A.   I believe it was Judge Reeves.

22   Q.   Okay.  And at the time that you entered your plea, you

23   had an agreement with the United States to cooperate; is that

24   right?

25   A.   Yes.

*SIZEMORE - Direct (Mr. Smith)*                                          45

1    Q.   And what did you receive as a sentence?

2    A.   Four years.

3    Q.   Okay.  And at the time that your sentence was given at

4    that time, had you cooperated with the government on other

5    matters?

6    A.   Yes.

7    Q.   And have you served that sentence out at this time, Mr.

8    Sizemore?

9    A.   Yes.

10   Q.   Are you currently on any kind of supervision at this

11   time?

12   A.   Supervision, yes.

13   Q.   Okay.  How much supervision do you have to continue under

14   the federal court system, to your knowledge?

15   A.   I have four years.

16   Q.   And you have no other prison sentence to serve at this

17   time?

18   A.   No.

19   Q.   You're back at home?

20   A.   Yes.

21   Q.   And have you been holding jobs in the past?

22   A.   No, I'm actually on a disability.  I had a stroke

23   recently.

24   Q.   Okay.

25   A.   I've not been able to work.

SIZEMORE - Direct (Mr. Smith)                                    46

1    Q.   This stroke, how did it affect you, Mr. Sizemore?   In

2    what way as far as physically?   Could you describe that to us?

3    A.   Affected my right leg and arm, right arm, and my speech a

4    little bit.

5    Q.   Okay.   And how long ago was it, Mr. Sizemore, that you

6    had the stroke?

7    A.   September 13.

8    Q.   Of what year?

9    A.   Last year.

10   Q.   2009?

11   A.   Yes.

12   Q.   And were you at home when that happened?

13   A.   Yes.

14   Q.   Now, when you entered this agreement with the United

15   States, you agreed that if you were called to testify in

16   matters later, that you would testify truthfully; is that

17   correct?

18   A.   Yes, sir.

19   Q.   And what's your understanding would happen if you were to

20   testify here today to some false statement or say something

21   that's not true?

22   A.   I'd get in trouble.

23   Q.   Mr. Sizemore, has the government made you any promises to

24   get you to come in here today to testify?

25   A.   No.

SIZEMORE - Direct (Mr. Smith)                                      47

1    Q.   Have they made any promises to try to help you in some

2    way with your supervision that's remaining?

3    A.   No.

4    Q.   You were subpoenaed here today; is that correct?

5    A.   Yes, sir.

6    Q.   Okay.  Now, Mr. Sizemore, did you, in the time that you

7    were living in Clay County, have a relationship with a fella

8    by the name of Jennings White?

9    A.   Yes, I did.

10   Q.   Okay.  And in that relationship, was he involved in your

11   drug business in any way?

12   A.   No.

13   Q.   You were selling drugs; is that correct?

14   A.   Yes.

15   Q.   Is that a fair statement?

16   A.   Yes.

17   Q.   But Jennings White wasn't helping you in your drug

18   business?

19   A.   No.

20   Q.   Was he supplying you any drugs?

21   A.   No.

22   Q.   Was he laundering any of your money?

23   A.   No.

24   Q.   Okay.  Now, at the time that you had this relationship,

25   did you get involved in politics in any way?

SIZEMORE - Direct (Mr. Smith)                              48

1   A.   Yes.

2   Q.   Do you recall the 2002 election when Jennings White ran

3   against a fella by the name of Freddy Thompson?

4   A.   Yes, I do.

5   Q.   And were you asked in any way to help Jennings White in

6   that election?

7   A.   Yeah, I was asked to ride around with him.

8   Q.   Okay.  And when you say ride around with him, what do you

9   understand that to mean?

10           MR. ABELL:  Judge, excuse me.  If the witness could

11   pull the microphone closer.

12           THE COURT:  You can bend that microphone down a

13   little bit closer to you.

14   Q.   Do you need me to repeat that question?

15   A.   Yeah.

16   Q.   What did you understand it to mean when Jennings asked

17   you to ride around with him during the election?

18   A.   Well, the night before election, we -- well, actually, we

19   went up to his house and picked up Edd Jordan.

20   Q.   And who was Edd Jordan at that time?

21   A.   He was the sheriff of Clay County.

22   Q.   So when you picked up Edd Jordan, what do you recall you

23   fellas doing that evening before the election?

24   A.   Well, when we picked up Edd, he brought a box about this

25   big.

SIZEMORE - Direct (Mr. Smith)                                    49

1    Q.   Okay.  Just for the record, that looks like almost 18 to

2    24 inches long?

3    A.   About 18 inches.

4    Q.   Okay.  And do you -- what happened with that box that

5    night?

6    A.   It was setting in the middle of the floorboard.

7    Q.   And what were you fellas operating, driving around in?

8    A.   He was driving a van.

9    Q.   And do you know whose van it was?

10   A.   It was Jennings's.

11   Q.   Okay.  And so what did you all do with this box that was

12   picked up?

13   A.   We went to, we went to five, about six or seven places.

14   Q.   Okay.

15   A.   And every time, it got smaller.

16   Q.   What was in the box?

17   A.   Envelopes.

18   Q.   And did anyone tell you what was in the envelopes?

19   A.   No, they didn't tell me, but I knew.  I knew what was in

20   them.

21   Q.   And who was removing the envelopes during your ride

22   around the night before the election in 2002?

23   A.   Jennings would remove some and Edd would remove some at

24   different places.

25   Q.   Now, these places that you all were stopping, do you

*SIZEMORE - Direct (Mr. Smith)*                                    50

1   recall any of the folks that you visited that night?

2   A.   Yeah.  A few of them, yeah.

3   Q.   The ones that you can recall, would you mind telling us

4   who they were?

5   A.   One was Leyman Messer.

6   Q.   You're going to have to speak that for the court reporter

7   again.  I'm sorry.

8   A.   Leyman Messer.

9   Q.   Leyman Messer, okay.  And who else do you recall?

10  A.   I think we went to -- I can't, I can't --

11  Q.   Let me ask you this.  Do you know a fella by the name of

12  Roger "Bud" Smith?

13  A.   Yeah.  Went to his place too.

14  Q.   And was Roger "Bud" Smith in the same line of work that

15  you were at certain points in time over in Clay County?

16  A.   Yeah.

17  Q.   And what was that?

18  A.   I can't think.

19  Q.   Okay.  You said he was in the same line of work as you at

20  one point in time.  You agreed with that.  Was Roger "Bud"

21  somebody that you all delivered an envelope to?

22  A.   We delivered several.

23  Q.   Several envelopes to him?

24  A.   Yeah, at his place, yeah.

25  Q.   Okay.  So he got more than one envelope?

SIZEMORE - Direct (Mr. Smith)                                51

1    A.   Yeah.

2    Q.   Anybody else that you recall that night visiting?

3    A.   We went, we went to Bart Morris's house.

4    Q.   Okay.  And Bart Morris, was that a fella that you had

5    known previous to the night before the election in the 2002

6    election?

7    A.   Yes.

8    Q.   And do you see him anywhere here in the courtroom here

9    this morning?  If you look over to your left along this wall

10   and see.

11   A.   I -- back wall back there.

12   Q.   Could you describe generally what kind of shirt he's got

13   on?

14   A.   He's got on a blue sweater.

15   Q.   Okay.

16            THE COURT:  Record will reflect the witness has

17   identified the defendant, William Morris.

18   Q.   And when you say you all went to visit him, do you know

19   where he was living in that area?

20   A.   I believe it was Green Street.

21   Q.   Is that Green Street in downtown Manchester area?

22   A.   Yes, yes.

23   Q.   Near the SuperAmerica?

24   A.   Yes.

25   Q.   Okay.  And when you met there at the Morris's, could you

SIZEMORE - Direct (Mr. Smith)                                    52

1   tell us what you saw?

2   A.   Well, saw him and Jennings got out, but I didn't get out.

3   And Cletus was there.

4   Q.   Cletus who?

5   A.   Maricle.

6   Q.   And did you know Cletus Maricle before that night?

7   A.   Yes.

8   Q.   Did you know him before that night?

9   A.   Yeah, yes.

10  Q.   Where did you see Cletus Maricle that night?  Where was

11  he when you say you saw him at Bart Morris's?

12  A.   He was getting out of a vehicle.

13  Q.   Okay.  And anybody else that you recall seeing showing up

14  at Morris's that night?

15  A.   I don't recall.

16  Q.   Okay.  You say Jennings White was with you at that time,

17  and he got out and went in?

18  A.   Yes.

19  Q.   And you stayed in the vehicle?

20  A.   Yeah.

21  Q.   Okay.  And how long did you all stay there at the

22  Morris's that evening?

23  A.   Not long.  Probably ten minutes or something like that.

24  Q.   Okay.  Did Jennings have any envelopes that he took with

25  him when he left the truck or the van?

SIZEMORE - Direct (Mr. Smith)                                    53

1    A.   I don't think, I don't think he did.

2    Q.   Okay.  Was that the only time you went by the Morris's

3    that night?

4    A.   I went back out another time.

5    Q.   Were there others gathered there at that time that you

6    recall?

7    A.   There was more vehicles.

8    Q.   Okay.

9    A.   I didn't go in.

10   Q.   Did you see anyone going in while you were sitting out in

11   your vehicle the second time you went by there?

12   A.   Cletus was there.

13   Q.   I'm sorry?

14   A.   Cletus Maricle was there.

15   Q.   Cletus Maricle?

16   A.   Yeah.

17   Q.   And would you again, for the purposes of the record, look

18   here in this area to my right and see if you recognize Cletus

19   Maricle here this morning?  If you need to stand up, I think

20   the Court would allow you to stand up, Mr. Sizemore.

21            THE COURT:  Yes, sir, you may.

22   A.   I can't see.  He's back there in the back.

23   Q.   And just for the record, Mr. Sizemore, can you tell us

24   what he's wearing?

25   A.   I can't see.  A blue or black suit, one.

SIZEMORE - Direct (Mr. Smith)                                54

1            THE COURT:  The record will reflect that he's

2    identified the defendant, Russell Cletus Maricle.

3    Q.   Now, Mr. Sizemore, did you have any chance to observe any

4    of the activity going on on election day yourself?

5    A.   No.  We went to different precincts and all like that.

6    Q.   You went to different precincts on election day?

7    A.   Yeah.

8    Q.   And who were you with on election day?

9    A.   Jennings.

10   Q.   And had Jennings asked you to go be with him on that day

11   too?

12   A.   Yeah, I was with him all day that day.

13   Q.   And you say you went to different precincts.  Is that in

14   Clay County?

15   A.   Yeah.

16   Q.   And precincts, is that the place where these people were

17   casting their votes, polling places?

18   A.   Yes.

19   Q.   And did you, during that day, have an opportunity to

20   observe a fella by the name of Wayne Jones?

21   A.   Yeah, he was at the Horse Creek precinct.

22   Q.   Okay.  And what did you see Wayne Jones doing at the

23   Horse Creek precinct, Mr. Sizemore?

24   A.   He was at the door buying votes.

25   Q.   And when you say he was at the door, what kind of place

1   was this?

2   A.   School.

3   Q.   School building?

4   A.   Yeah.

5   Q.   And at that time, did you recognize who he was buying

6   votes for?

7   A.   He was buying for Freddy.

8   Q.   Okay.  And did Jennings have anyone working for him at

9   that same precinct that you know doing the same thing, buying

10  votes for him?

11  A.   I'd say so, yeah.

12  Q.   Do you recall who he had working the other side at the

13  Horse Creek precinct?

14  A.   I believe it was his brother.

15  Q.   Okay.  Do you remember his name?

16  A.   Bill.

17  Q.   Bill White, okay.  Who else do you recall seeing that day

18  buying votes, Mr. Sizemore?

19  A.   Charles Stivers was there too.

20  Q.   Charles Stivers, is he any relation to William "Al Man"

21  Stivers?

22  A.   I think they're cousins.

23  Q.   Okay.  And you say you saw him at which precinct?

24  A.   He was at Horse Creek.

25  Q.   And was he there with Wayne Jones at the same time?

*SIZEMORE - Direct (Mr. Smith)*                                    56

1   A.   Yes.

2   Q.   Anybody else you recall, Mr. Sizemore, that you saw that

3   day buying votes?

4   A.   Jeff Farmer was there too.

5   Q.   Jeff Farmer?

6   A.   Yes.

7   Q.   And Jeff Farmer, did you know who he was buying votes for

8   that day?

9   A.   He was helping Freddy, yeah.

10  Q.   Okay.  And Freddy being Freddy who?

11  A.   Thompson.

12  Q.   Okay.  And when you say he was helping him, what was he

13  doing?

14  A.   He was going to people, going to try to get their vote.

15  Q.   Okay.  Now, did you observe any conflict or altercations

16  or any kind of issues that developed that day while you were

17  working with Jennings White going around these polls?

18  A.   Yeah.  Me and Charles, we almost got into it.

19  Q.   You and who?

20  A.   Charles Stivers.

21  Q.   And how did you two almost get into it?  Could you

22  explain that?

23  A.   Well, Jennings said -- he told them they wasn't supposed

24  to be over on the precinct buying votes like that.  And

25  Charles, he smarted off or something.

*SIZEMORE - Direct (Mr. Smith)*                                         57

1    Q.   All right.  And did you all exchange words there?

2    A.   Yeah.

3    Q.   Was there any call for authorities to come in and kind of

4    settle things down that day?

5    A.   Yeah, they's about 10 or 15 police, city police came up

6    there.

7    Q.   Okay.  And where did this altercation happen at, which

8    precinct; do you recall?

9    A.   Horse Creek precinct.

10   Q.   Now, during that 2002 election, did you become aware that

11   Jennings White had had an issue in that election, somebody

12   shooting at a van or something happening in a shootout?

13   A.   Yeah.  I knew about that happening.  It was two or three

14   nights before the election.

15   Q.   And did Freddy Thompson also report a shooting in his

16   place?

17   A.   I heared about somebody shot at his house, yeah.

18   Q.   So there were two shooting incidents that were reported

19   that you know of?

20   A.   Yes.

21   Q.   Okay.  Now, Jennings White and yourself, how long did you

22   all spend together that day on election day?

23   A.   I was up at his house about 6:00 that morning till, till

24   about 5 or 5:30 that evening.

25   Q.   And when you went with him riding around, did he expect

*SIZEMORE - Direct (Mr. Smith)*                                        58

1    that you'd show up kind of packing something, like firearms on

2    your side?

3    A.   Yeah.

4    Q.   Did you?

5    A.   Yeah.

6    Q.   Pack a firearm that day?

7    A.   Yes, I did.

8    Q.   How many firearms did y'all have with you that day?

9    A.   I had one, and Jennings had two.

10   Q.   What kind of firearms did he have?

11   A.   He had a .45 and a mini 14.

12   Q.   And a mini 14, is that one of these semi-automatics that

13   can shoot a lot of bullets?

14   A.   Shoot 30 rounds.

15   Q.   How many?

16   A.   Thirty.

17   Q.   Thirty round clips.  And when you all showed up at these

18   polls to check on things, were y'all armed?

19   A.   Yeah, we had them with us, yes.

20   Q.   And were there other people that you saw that you

21   confronted, were there any of those people that had arms on

22   them that you could see?

23   A.   I'd say they did, yeah.

24   Q.   Do you recall any specific instance where you actually

25   saw a gun from somebody else other than you and Jennings that

*SIZEMORE - Direct (Mr. Smith)*                                          59

1    day?

2    A.   No, I didn't see one that day.

3    Q.   Do you know Doug Adams?

4    A.   Yeah.

5    Q.   Did you see Doug Adams on election day?

6    A.   Yeah, I saw him.  He was at Burning Springs.

7    Q.   At Burning Springs, and that's the place where you go to

8    vote?

9    A.   Yeah, that's where I voted at that year.

10   Q.   And you did go there to vote on election day?

11   A.   Well, that was early that morning, still with Jennings.

12   We were just down there looking things over.

13   Q.   And you saw Doug Adams at the Burning Springs polling

14   place?

15   A.   Yes.

16   Q.   What was he doing?

17   A.   Well, there was a big line there, and he was going along

18   the line -- not everybody, but he was taking money and putting

19   it in certain people's pockets.

20   Q.   Okay.  And you were able to see that yourself?

21   A.   Yeah, me and Jennings did.

22   Q.   Okay.  And Doug Adams, do you know what position he held

23   in the county at that time?

24   A.   He was superintendent of the school, school board.

25   Q.   Okay.  And again, Mr. Sizemore, you may have to stand up

*SIZEMORE - Direct (Mr. Smith)*                                    60

1    and take a look around here, but if you could attempt to

2    identify him here in the courtroom this morning.  Again,

3    looking in this same general area that I pointed out to you.

4    If you need to stand up, that's fine.

5    A.   I believe that's him back there by Wayne.

6    Q.   Could you describe generally what color tie or suit he's

7    got on, if you can?  What he's wearing.

8    A.   Blue jacket.

9    Q.   Okay.

10            THE COURT:  The record will reflect that he has

11   identified the defendant, Doug Adams.

12   Q.   Now, after the election day there, did you understand

13   Jennings got beat?

14   A.   Yes, yes.

15   Q.   And after his defeat there, did he ever approach you to

16   try to get you maybe to get back at some people he thought

17   might have done him wrong in the election?

18   A.   Yeah, he approached me on doing some things.

19   Q.   Okay.  Could you describe generally what he told you that

20   he wanted you to do?

21   A.   Well, he actually, actually wanted me to kill Billy

22   Rowland Phillips.

23   Q.   He wanted you to kill Billy Rowland Phillips.  Did he

24   explain why he wanted you to kill him?

25   A.   Billy Rowland had dug up some previous stuff on him

SIZEMORE - Direct (Mr. Smith)                                    61

1   for -- in another state, he had raped a girl and got her

2   pregnant, and that came out in the election.

3   Q.   And did he offer you some kind of reward for killing him?

4   A.   Yeah.  Twenty-five thousand.

5   Q.   And did you go through with it?

6   A.   No.

7   Q.   Do you know a fella by the name of Eugene Lewis?

8   A.   Yes, I do.

9   Q.   Were you ever in a partnership with him and some other

10  fellas over in Henry County in growing marijuana?

11  A.   Yes.

12  Q.   Do you know who the partners were that you had at that

13  time in the growing marijuana in Henry County?

14  A.   Well, they was -- the partners on the property was Eugene

15  and Mansell Baker.

16  Q.   Okay.  And who was in partnership with growing the

17  marijuana when you joined it?

18  A.   Wayne.  Wayne was in on it too.

19  Q.   Wayne who?

20  A.   Jones.

21  Q.   And what kind of, what kind of partnership did you all

22  have as far as was it growing marijuana, selling marijuana?

23  What was the object --

24  A.   Growing.

25  Q.   -- of the partnership?

*SIZEMORE - Direct (Mr. Smith)*                                      62

1    A.   Growing it, processing it and selling it.

2    Q.   And did you all sell it back in Clay County when you

3    processed it?

4    A.   I'd say most of it sold back in there, yeah.

5    Q.   Okay.  And was it an equal partnership when you joined

6    it?

7    A.   Yes.

8    Q.   Okay.  How long were you fellas partners together in this

9    marijuana growing and selling business?

10   A.   I'd say about two year.

11   Q.   Okay.  Do you know what year, approximately, that would

12   have been, how long ago that was that you fellas were in that

13   partnership?

14   A.   I believe it was somewhere around '90.

15   Q.   You say it was with Wayne Jones.  Again, I'm going to ask

16   you to take a look back here around the courtroom.  Do you see

17   him here this morning?

18   A.   Yeah.  Right back there.

19   Q.   Could you describe where he's seated and what he's

20   wearing, please, for the record?

21   A.   He's got on a gray jacket.

22   Q.   A gray jacket?

23   A.   Gray suit coat.

24        THE COURT:  Record will reflect that the witness has

25   identified the defendant, Charles Wayne Jones.

*SIZEMORE - Direct (Mr. Smith)*                                    63

1   Q.   Did you fellas -- you say you ended that partnership

2   after a year or two?

3   A.   Yeah.  I sold my part out to Eugene Lewis.

4   Q.   And how big a farm was it that you fellas had -- you say

5   y'all bought a farm over in Henry County?

6   A.   It was 145 acres.

7   Q.   Growing marijuana, did y'all have a place that y'all used

8   on the farm to grow the marijuana?

9   A.   Well, they was probably five or six places.

10  Q.   Did y'all grow quite a bit of marijuana those year or two

11  that y'all worked it together?

12  A.   Yeah, they growed quite a bit, yeah.

13  Q.   Did you ever keep count of how many plants you all grew

14  out there?

15  A.   No, I didn't.

16  Q.   What was marijuana selling for per pound back in those

17  days, Mr. Sizemore?

18  A.   It was probably 1,500 a pound, 2,000, something around in

19  there.

20          MR. SMITH:  If I could have just a moment, Your

21  Honor.

22          THE COURT:  Yes, sir.

23  Q.   Mr. Sizemore, what happened to your house over in

24  Manchester, Clay County?

25  A.   I don't know.  I don't really know what happened to it.

*SIZEMORE - Direct (Mr. Smith)*                                    64

1    I found out it had been burned while I was in prison.

2    Q.    Okay.  And you don't live over in Manchester any longer?

3    A.    No, I live in Laurel County.

4    Q.    Okay.

5          MR. SMITH:  Your Honor, I'd move to introduce

6    Government's Exhibit PA13.

7          THE COURT:  All right.  That's the plea agreement.

8    Any objection?  Exhibit PA13 will be admitted.

9                  (Government Exhibit No. PA13

10                     was admitted into evidence.)

11         MR. SMITH:  Pass the witness at this time.

12         THE COURT:  All right.  Thank you.  Mr. Hoskins, do

13   you need a moment?

14         MR. HOSKINS:  Your Honor.  I do, I'd also like to

15   make sure we've received all the Jencks material.  Your Honor,

16   could we approach?

17         THE COURT:  Yes, come up.

18                  (A sidebar conference was held out of the

19                     hearing of the jury):

20         MR. HOSKINS:  Your Honor, I'm just going to ask if we

21   can take our morning break now.  There are a number of 302s

22   that evidently I've overlooked, and I need a minute to --

23         MS. HUGHES:  We just got the one from 2005.

24         MR. WESTBERRY:  That's all we have as well.

25         MR. HOSKINS:  Mr. Smith told me there are about 25 of

*SIZEMORE - Direct (Mr. Smith)*                                        65

1    them.

2         MR. SMITH:  Well, we reviewed those, Your Honor, and

3    under the Jencks Act, it specifically specifies that it has,

4    of course, issues of whether or not it's a Jencks Act

5    statement to this witness, as to whether or not it's a Jencks

6    Act statement to an agent that testifies later related to the

7    subject matter of his testimony, and I believe that I can

8    confirm with Mr. Hoskins that, you know, these are -- there

9    were multiple drug buys that were done on Mr. Sizemore when he

10   was being investigated, and I'm sure that's what these are

11   related to.  And 302s that I have given them are those that I

12   believe are covered within the breadth and scope of the Jencks

13   Act, and I will confirm that they have received them.  Mr.

14   Hoskins says he has none.

15        MR. HOSKINS:  I said I hadn't found any.  It's quite

16   possible I've overlooked --

17        THE COURT:  Let me ask this question.  How long do

18   you need, 20 minutes?

19        MR. HOSKINS:  Please.

20        THE COURT:  All right.

21        MR. HOSKINS:  Thank you, Judge.

22             (Sidebar conference concluded.)

23        THE COURT:  Thank you.  Ladies and gentlemen, I'm

24   going to give the attorneys a few moments before they begin

25   cross-examination of the witness.  This will be a good time

*SIZEMORE - Direct (Mr. Smith)*                                66

1    for us to take a morning break.  We'll take approximately a

2    20-minute recess at this time.  Of course, keep in mind the

3    admonition you've been given several times not to discuss the

4    case among yourselves while we are in recess.  The jury will

5    be excused for approximately 20 minutes.

6                    (The jury left the courtroom at 10:14 a.m.)

7         THE COURT:  Mr. Sizemore, you can leave whatever

8    materials you have there.  We'll be in recess for 20 minutes

9    and you can step down.  Thank you.

10        Just one matter before we take our recess.  There's a

11   document that was introduced yesterday that has a Social

12   Security number on it.  It's the voter information form for

13   Miss White.  The original will be submitted as an exhibit, but

14   in terms of the copy that would be available for review to the

15   public, I'm going to direct the clerk to white out or mark out

16   the Social Security number and other identifying information

17   which is required before documents are placed in the permanent

18   record.  I wanted to make sure the attorneys are aware of

19   that.

20        We'll be in recess for 20 minutes.

21                    (Recess from 10:16 a.m. until 10:57 a.m.)

22        THE COURT:  Thank you.  I understand the attorneys

23   have a matter to take up outside the presence of the jury.

24   Mr. Hoskins?

25        MR. HOSKINS:  Yes, Your Honor.  We have been given

*SIZEMORE - Direct (Mr. Smith)*                                         67

1    over six, thus far, 302s involving this witness.  One of them

2    talks about this witness accompanying agents to all the places

3    he went with Edd Jordan and Jennings White the night before

4    the election that he's testified about.  One of the agents was

5    taking video of this.  Very interested to see that video.

6    Don't know if it has any narration on it or not, but I think

7    it could be very significant in this case.

8            Specifically, I'd say significant to us because I

9    don't see any reference in any of the things that I've gotten

10   through thus far of seeing Mr. Maricle or even being at Mr.

11   Morris's house the night that he's testified today he was.

12           THE COURT:  Mr. Smith?

13           MR. SMITH:  Your Honor, we don't have a video, and

14   I've not seen a video.  It says in the 302 that a KSP

15   detective took video, and then the 302 says here's a narrative

16   of what was observed.  They have a narrative of what was

17   observed.  I believe his testimony was that, you know, he took

18   us to places where envelopes were delivered.  Agents had him

19   go with them and point out those places, and they did identify

20   coordinates, lat and long coordinates for these places.

21   That's what the 302 says.

22           There's no reason at this point, I believe, to delay

23   proceedings further.  This is not -- in my opinion, a video by

24   a detective of the Kentucky State Police is not Jencks as to

25   this witness.  I've been asked to review for other Jencks and

SIZEMORE - Direct (Mr. Smith)                          68

1   I found, as Mr. Hoskins said, several others that I thought
2   touched on some of the things he testified to here this
3   morning, and I've given those to them.
4         I do not have possession of this video.  I will
5   continue to look for this video, and if counsel finds -- if I
6   find the video, I'll certainly turn that over to them.  It's
7   never been requested before today, and obviously, they have
8   just gotten this 302, so I understand that.
9         But it seems to me that it would be not a reason to
10  delay further the cross-examination of this witness, because
11  it says clearly that Detective Pace took the video of the
12  locations identified.  And then it says, "all times indicated
13  below are approximations and the following observations were
14  made."  That's how the 302 reads.
15        That leads me to believe that if it is a Jencks
16  statement or if it would relate to -- if we called Detective
17  Pace, obviously, there could be an issue there where they
18  might want to bring out some inconsistencies, and certainly I
19  would be able to provide it, hopefully, if it exists.  This is
20  a 2005 matter, and I would assume that if the Kentucky State
21  Police kept it in their evidence, that it would still be
22  there.  But that's an assumption.
23        We don't have it.  I've asked the FBI.  They say they
24  don't have it.  So I cannot go forward with the request at
25  this moment until I have further opportunity to investigate if

1    there is a video still existing, whether or not it's been

2    purged.  I don't know.

3          MR. HOSKINS:  Your Honor, if I could respond to that.

4    The significance about the video, if there's narration, what

5    we have are 302s that are not statements of this witness.

6    This witness accompanied Travis Wayne, special agent of the

7    FBI, and Greg Pace, a task force investigator with this

8    investigation on this trip through Clay County.

9          If he's on there talking, that is a statement.  If

10   he's on there saying I did this, I saw this person at this

11   place, I saw this person at that place, that is a statement.

12   That could be much more powerful to use to cross-examine this

13   witness.

14         The investigation that this 302 is prepared for is

15   this very case and related cases.  There was no state

16   prosecution.  The Kentucky State Police did not bring any

17   charges in state court on this stuff.  This is all directly

18   related to this investigation and directly what this witness

19   testified about.

20         THE COURT:  Thank you, counsel.  We're going to

21   proceed with cross-examination at this time.  In the event the

22   United States is able to determine that there is a video,

23   we'll revisit the issue and may require that the witness be

24   recalled.  But at this point, other than the speculation that

25   has been outlined, there's really not a reason to delay this

*SIZEMORE - Cross (Mr. Hoskins)*                                    70

1    proceeding, which would take some time.  It would be a

2    significant delay.  So we'll proceed with cross-examination at

3    this point.

4            Any other issues to bring up before the jury comes

5    in?  Please bring the jury in.

6            MR. HOSKINS:  Your Honor, I would make one more

7    request based on this.

8            THE COURT:  You'll have to wait.

9                (The jury entered the courtroom at 11:04 a.m.)

10           THE COURT:  The record will reflect that all members

11   of the jury are present.  The parties and counsel are also

12   present.  Before the witness is brought in, Mr. Hoskins, you

13   just alerted me to another matter that needs to be taken up.

14   Do you need to do that at the Bench?

15           MR. HOSKINS:  Your Honor, I think we can go ahead.

16   At some point, I'll need to speak about it.

17           THE COURT:  We can take it up at the lunch hour.  You

18   can bring the witness back.

19           Thank you.  Mr. Sizemore has returned to the witness

20   stand.  Sir, you're still under oath.

21           Mr. Hoskins, you may proceed.

22           MR. HOSKINS:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24   BY MR. HOSKINS:

25   Q.  Hi, Mr. Sizemore.  I'm David Hoskins, and I represent

SIZEMORE - Cross (Mr. Hoskins)                                        71

1    Cletus Maricle.  I want to ask you to think back to August of

2    2004.  The 10th, the 11th of August, 2004.  Agents came to

3    your home and did a search of your home, didn't they?

4    A.  Yes.

5    Q.  And they found marijuana and cocaine?

6    A.  Yes.

7    Q.  And they found at least one gun?

8    A.  They found several guns.

9    Q.  Several guns.  What kind of guns did they find?

10   A.  Different kind.

11   Q.  Handguns?

12   A.  Yes.

13   Q.  Any of those semi-automatic type guns that they --

14   A.  I think one of them.

15   Q.  One of them was semi-automatic?  And they found drugs?

16   A.  Yes.

17   Q.  What kind of drugs did they find?

18   A.  They found pot and cocaine.

19   Q.  How much cocaine did they find that day?

20   A.  Probably, probably less than an ounce.  Probably 10 or 12

21   grams.

22   Q.  They could tie you to selling some cocaine to Eugene

23   "Mutton" Lewis right around that time, couldn't they?

24   A.  Yes.

25   Q.  That was about half a pound?

SIZEMORE - Cross (Mr. Hoskins)                                      72

1    A.   I don't know if it was that much or not.

2    Q.   You were dealing in pretty significant quantities of

3    cocaine at that point, weren't you?

4    A.   Not really.

5    Q.   Not really?

6    A.   No.

7    Q.   That plea agreement in front of you says 2.7 kilograms of

8    cocaine.  Is that not really much cocaine?

9    A.   Well, it's quite a bit, yeah.

10   Q.   And that's what you pled guilty to dealing in, 2.7

11   kilograms of cocaine, right?

12   A.   That was over a period of time, though.

13   Q.   Okay.  Took you a little while to move that much cocaine?

14   A.   Yeah.

15   Q.   And that's just the cocaine that the government can prove

16   on you, right?

17   A.   Yeah.

18   Q.   Okay.  So the agents come, search your place, search your

19   vehicle, and you're arrested.

20   A.   Yeah.

21   Q.   Taken to jail?

22   A.   Yes.

23   Q.   You were in pretty deep trouble at that point, weren't

24   you?

25   A.   Yes, I was.

*SIZEMORE - Cross (Mr. Hoskins)*                                    73

1   Q.   Because you knew the cocaine all by itself would send you

2   away for a lot of years?

3   A.   Yeah.

4   Q.   And you knew that that gun charge was another five years

5   automatic on top of the drugs?

6   A.   Yeah.

7        MR. SMITH:  Your Honor, I'm going to object.

8        THE COURT:  Overruled.

9   Q.   Another five years for the gun charge on top of whatever

10  you got for the drugs added at the end of it, right?

11  A.   Yeah.

12  Q.   So you knew that there was one thing and only one thing

13  that you could do at that point in your life to help yourself,

14  and that was to cooperate with the government, right?

15  A.   Yes.

16  Q.   And you proceeded to do that?

17  A.   Yeah, I did.

18  Q.   You told the government at that point about your buddy,

19  Jennings White?

20  A.   Yes.

21  Q.   Told them about his drug dealing, what you knew about it?

22  A.   Um-hmm.

23  Q.   And they were very interested in that?

24  A.   Why wouldn't they be?

25  Q.   Well, they were, weren't they?

*SIZEMORE - Cross (Mr. Hoskins)*                                    74

1    A.   Yes, they were.

2    Q.   And you also told them about what you knew about election

3    fraud in Clay County?

4    A.   Yeah, because it's been going on for 50 years.

5    Q.   Okay.  You told them everything you knew about it, didn't

6    you?

7    A.   More or less.

8    Q.   Okay.  You knew that it was important to give them

9    details about that; that the more you gave them, the more

10   credit you'd get from them in trying to get a lower sentence.

11   Is that right?

12   A.   Not necessarily.

13   Q.   No?  What part of that's not right?

14   A.   Well, the more I gave them, they didn't promise me

15   anything.

16   Q.   Okay.  I realize they didn't promise you anything.

17   A.   They didn't promise me anything about a reduction of

18   sentence.

19   Q.   But you got a big reduction of sentence, didn't you?

20   A.   Yeah, I did.

21   Q.   Okay.  I understand that they didn't promise you

22   anything.

23   A.   Um-hmm.

24   Q.   But you knew that you had to help them the best you could

25   to get out of that trouble, didn't you?

*SIZEMORE - Cross (Mr. Hoskins)*                                    75

1    A.   Yeah.

2    Q.   Okay.  And you did your very best to help them, didn't

3    you?

4    A.   Yeah, I did.

5    Q.   Okay.  You told them all about what you knew about the

6    election of 2002?

7    A.   Yeah.

8    Q.   Okay.  And you knew that they were very interested in

9    that election of 2002, didn't you?

10   A.   I didn't know it till later on.

11   Q.   Well, the day that you went with an FBI agent and state

12   police detective driving around, you knew that's what they

13   were interested in that day, right?

14   A.   Yeah.

15   Q.   Okay.  You knew that was important to them that day?

16   A.   Yeah.

17   Q.   And that day was July 28th of 2005, right?

18   A.   I can't remember the date.

19   Q.   Does that sound about right to you?

20   A.   That's probably about right.

21   Q.   Okay.  Because it was a while after you gotten arrested?

22   A.   Yes.

23   Q.   With all those drugs and guns?

24   A.   Yes.

25   Q.   But it was before you had been sentenced, before you

*SIZEMORE - Cross (Mr. Hoskins)*                              76

1    found out what your final sentence was going to be, right?

2    A.   Yeah.

3    Q.   Okay.  And you remember that day that you got in a

4    vehicle with an FBI agent and state police detective?

5    A.   Yeah, I can remember doing it, but I can't remember the

6    exact day.

7    Q.   Oh, I understand.  I didn't mean to make my question

8    sound that way.  You just, you do remember a day that you and

9    an FBI agent and a state police detective rode around Clay

10   County?

11   A.   Yeah.

12   Q.   And the reason that you rode around Clay County with that

13   FBI agent and state police detective was to show them the

14   locations that you had gone the night before the election with

15   Jennings White and Edd Jordan, right?

16   A.   Yes.

17   Q.   And you proceeded to take them to those places, didn't

18   you?

19   A.   Yes.

20   Q.   All right.  It was so important to these investigators

21   that one of them had a video camera, didn't he?

22   A.   I don't remember.

23   Q.   Okay.  The day that you drove around with them, the first

24   place you took them to was Leyman Messer's home on Kentucky

25   Highway 1524, right?

*SIZEMORE - Cross (Mr. Hoskins)*                                    77

1    A.   Yeah.

2    Q.   And you told them, you told the agents what happened the

3    night before the election, that Leyman Messer came out and

4    approached the van you were driving in and spoke with Edd

5    Jordan, who then gave Messer at least an envelope, right?  He

6    gave Messer an envelope that night?

7    A.   I don't know -- I don't remember how many.  I don't know

8    if it was one or whatever.

9    Q.   At least one, though, right?

10   A.   Yeah.

11   Q.   The next place that you went to or tried to take him to,

12   you said you couldn't find it, but it was an old long building

13   that would have had two or three different families living in

14   the same building, right?

15   A.   Yes.

16   Q.   Okay.  When you got there the night before the election,

17   you said a woman came out and said Beauford wasn't there.

18   A.   Yeah, I don't know who Beauford Hood was.  I didn't know

19   who he was.

20   Q.   A lady came out and said somebody's not there?

21   A.   Yeah.

22   Q.   You've forgotten some of the details about that night,

23   I'm sure, since it's been a number of years.

24   A.   Maybe.

25   Q.   Maybe?  Think not?

SIZEMORE - Cross (Mr. Hoskins)                                    78

1   A.   I don't know if I've got it or not.

2   Q.   Okay.  The next place you went to was yellow single story

3   home, right?

4   A.   I believe it was a white house.

5   Q.   Well, it was a place where a guy named Clevan Smith --

6   A.   We stopped another place before that.

7   Q.   But you did go to Clevan Smith's place?

8   A.   Yes.

9   Q.   Where was the place you went before you got to Clevan

10  Smith's?

11  A.   It was about half a mile before his place.

12  Q.   Where was Clevan Smith's place, what part of the county?

13  A.   Sand Hill.

14  Q.   So the other place was about a half a mile from Sand

15  Hill?

16  A.   No, about a half a mile back down the road.

17  Q.   So it was about a half mile from Clevan Smith's place at

18  Sand Hill?

19  A.   Yes.

20  Q.   And each time that you went to one of these places, the

21  agents that you were riding with would ask you details about

22  what you remembered from that night, correct?

23  A.   Yes.

24  Q.   They'd ask you who did you see there, and if you didn't

25  know a name, they'd say --

*SIZEMORE - Cross (Mr. Hoskins)*                              79

1          MR. SMITH:  Your Honor, I'm going to object to

2    hearsay.

3          THE COURT:  Sustained.

4    Q.  Did they ask you --

5          MR. SMITH:  Same objection.

6          THE COURT:  Sustained.

7    Q.  Did they ask you questions?

8          MR. SMITH:  Same objection.

9          THE COURT:  Sustained.

10   Q.  You told them who lived there by name if you knew, didn't

11   you?

12   A.  Yeah, I guess, yeah.

13   Q.  Okay.  If you didn't --

14   A.  I didn't know, I didn't know of them, some of 'em.

15   Q.  I'm sorry.  I didn't mean to cut you off.

16   A.  I didn't know some of 'em.

17   Q.  If there were people that you didn't know, you would

18   describe them, wouldn't you?

19   A.  Well, yeah.

20   Q.  Okay.  Because you were trying to give these guys as much

21   detail as you could?

22   A.  Yeah.

23   Q.  And you knew right what they were interested in when you

24   were doing this?

25   A.  Um-hmm.

SIZEMORE - Cross (Mr. Hoskins)                                          80

1   Q.   The next place you went to was where this other fella was

2   supposed to be; is that right?

3   A.   Yeah.

4   Q.   When you got there, there were 20 to 25 people there the

5   night before the election?

6   A.   Well, there wasn't that -- there was probably 15, 20.

7   Q.   Seven to ten four-wheelers there?

8   A.   There was several.

9   Q.   Next place you went to was a single story yellow

10  residence on Billy Branch.

11  A.   Yes.

12  Q.   And that's a place that a guy named Johnny Brumley owned?

13  A.   Yes.  I don't know whether he owned it or not, but he was

14  there.

15  Q.   Okay.  Johnny Brumley lived there, was there the night

16  before the election?

17  A.   He was there, yeah.

18  Q.   You gave agents the names of -- you gave them the name of

19  Jonathan Brumley and also a guy named Anthony Young?

20  A.   He was there.

21  Q.   Anthony Young was there?

22  A.   Yes.

23  Q.   So if there was somebody there that you knew, you told

24  them?

25  A.   Yeah.

SIZEMORE - Cross (Mr. Hoskins)                                    81

1   Q.   You even told them the detail that there were a couple of

2   girls there drinking?

3   A.   There was.

4   Q.   Okay.  So you were pretty careful to get all those

5   details that night, weren't you?

6   A.   Well, if I saw it, I told, yeah.

7   Q.   Okay.  And then you identified -- you took him to a

8   white, single story residence off Highway 421 as the sixth and

9   final stop; is that right?

10  A.   Yeah.

11  Q.   And you thought you might see a guy named Marty Hicks

12  there?

13  A.   I didn't know Marty Hicks.  I didn't know who lived

14  there.

15  Q.   You did tell them what you knew about that last place,

16  right?

17  A.   I told them where we went, yeah.

18  Q.   Okay.  Those are all the places that you took the agents

19  that day?

20  A.   Well, that's all I -- about all we went to.

21  Q.   So the day that you rode around with these agents was

22  before you were sentenced.  You were in deep trouble looking

23  at a lot of time in prison, but you never did tell them that

24  you saw Cletus Maricle that night, did you?

25  A.   I don't know if I did or not.

*SIZEMORE - Cross (Mr. Westberry)*                                82

1    Q.   You don't remember telling them that you saw Cletus

2    Maricle that night?

3    A.   I don't remember.  I don't remember telling them.

4    Q.   That would have been pretty important, wouldn't it,

5    because he was the judge?

6            MR. SMITH:  Your Honor, I'm going to object.

7            THE COURT:  Sustained, counsel's characterization.

8    Q.   Would that strike you as important?

9    A.   Yes, it would.

10   Q.   Okay.

11           MR. HOSKINS:  Could I have just a minute, Your Honor?

12           THE COURT:  Yes, sir.

13           MR. HOSKINS:  That's all.  Thank you.

14           THE COURT:  All right.  Thank you.  Mr. Westberry on

15   behalf of Mr. Adams.

16           MR. WESTBERRY:  Thank you.

17                         CROSS-EXAMINATION

18   BY MR. WESTBERRY:

19   Q.   Mr. Sizemore, good morning.  My name is Kent Westberry.

20   I represent Doug Adams.

21   A.   Um-hmm.

22   Q.   I want to take you back to 2002, the election that you

23   talked about earlier this morning under questioning from the

24   prosecution.  You said, Mr. Sizemore, that the morning of that

25   May, 2002 primary, you and Jennings White got in a vehicle and

*SIZEMORE - Cross (Mr. Westberry)*                                    83

1   began to drive around the county, the early morning hours,

2   correct?

3   A.   We drove to different precincts, yeah.

4   Q.   Early morning hours is when you all got started; is that

5   right?

6   A.   It was probably about 6:00.

7   Q.   Sure, that's right.  One of the precincts that you went

8   to is the one that you identified as Burning Springs?

9   A.   Yeah, we went to Burning Springs.

10  Q.   Now, at the time, you lived in the Burning Springs area;

11  did you not, sir?

12  A.   That's where I voted at.

13  Q.   Back in 2002, how long had you lived in the Burning

14  Springs area?

15  A.   Probably four, five year.

16  Q.   So mid, late '90s at least, you had lived in the Burning

17  Springs area before the 2002, does that sound about right?

18  A.   Yeah.

19  Q.   Thank you.  Did you have any other family at the time

20  that lived in the Burning Springs area?

21  A.   No.

22  Q.   No other family?  Did you have a brother that lived in

23  and around that area at that time?

24  A.   He lived in -- he married a girl from Burning Springs,

25  but he lives in Manchester.

*SIZEMORE - Cross (Mr. Westberry)*                                    84

1    Q.   He lived in town.  At the time that you lived there, did

2    you know your neighbors in the Burning Springs area?

3    A.   Most of them.

4    Q.   Now, you said again that you, you and Jennings White

5    pulled into the Burning Springs precinct at about what time of

6    day?  Was that about 6:00 a.m. too?

7    A.   No, it was about 10:00, 11:00 in morning.

8    Q.   Okay.  At the time you pulled in, how long was the voting

9    line?

10   A.   It was pretty long.  It was backed up all the way back

11   out around the wall.

12   Q.   How many people, roughly, would you say were in the

13   voting line?

14   A.   I'd say about 40.

15   Q.   About 40?  These, of course, are people that live in the

16   Burning Springs area, correct?

17   A.   They was in line to vote, yeah.

18   Q.   Now, you said you saw Mr. Adams handing money out?  Did I

19   hear that correctly?

20   A.   He was going like one person, he would take something in

21   his pocket and he would go to another one.  He done that to

22   about four or five until the attorney general come up and then

23   he quit.

24   Q.   Can you tell us some of the names of the people that you

25   saw?

*SIZEMORE - Cross (Mr. Westberry)*                                    85

1    A.   I don't remember.  I don't know all the people, my

2    neighbors.  I didn't know all the people down in that

3    precinct.

4    Q.   Can you describe any at all, Mr. Sizemore, any kind of

5    description of any of these people that you say Mr. Adams was

6    handing money out to?

7    A.   He wasn't handing it out.  He wasn't handing it out.  He

8    was sticking it in their pockets.

9    Q.   However you want to --

10   A.   That's how it was.

11   Q.   You don't know any of their names.  Is that your

12   testimony?

13   A.   I didn't pay any attention to it.

14        MR. ABELL:  Excuse me, Judge.  If the witness could

15   pull the microphone closer.

16        THE COURT:  All right.

17   Q.   Did Jennings White get along with Mr. Doug Adams?

18   A.   As far as I know, no.

19   Q.   They were on opposite sides of that particular race in

20   2002, correct?

21   A.   Yes.

22   Q.   You were a Jennings White supporter, of course, during

23   that time?

24   A.   Well, yeah, I voted for him.

25   Q.   For a long time?

*SIZEMORE - Cross (Mr. Westberry)*                                        86

1   A.   No, that was the first time I ever voted for him.

2   Q.   The first time you'd voted, but you had known him before

3   2002?

4   A.   Yeah, I growed up with him.

5   Q.   You also knew a fella named Kenny Day; did you not?

6   A.   Yeah, I knew Kenny Day.

7   Q.   Kenny Day was a drug dealer, correct?

8   A.   Yeah.

9   Q.   He's been convicted and is serving a pretty lengthy jail

10  sentence; is that your understanding?

11  A.   Yes.

12  Q.   You did drug business with Kenny Day, didn't you, Mr.

13  Sizemore?

14  A.   Yes, I did.

15  Q.   Did quite a bit of drug business with Mr. Day?

16  A.   No, not quite a bit.  Did some.

17  Q.   Did some.  Bought marijuana from him?

18  A.   A little bit.

19  Q.   Bought it at the KD Pawn Shop there in Manchester,

20  correct?

21  A.   Yes.

22  Q.   And you did it on at least one or two occasions, correct?

23  A.   Yes.

24  Q.   I want to ask you again about Jennings White.  During the

25  time that you knew Jennings White, did he ever ask you to do

*SIZEMORE - Cross (Mr. White)*                                         87

1    any bodily harm to anybody?

2    A.  Yes, he did.

3    Q.  Bill Rowland Phillips?

4    A.  Yes.

5    Q.  What was that all about?

6    A.  They didn't, they used to be buddies and fell out.

7    Q.  What did they fall out over?

8    A.  Something that Bill Rowland dug up on him in another

9    state.

10   Q.  When I ask you bodily harm, how serious is this bodily

11   harm Mr. White asked you to do?

12   A.  He asked me to kill him.

13          MR. WESTBERRY:  Could I have just one second, please?

14          THE COURT:  Yes.

15   Q.  Did Jennings White ever ask you to do any bodily harm to

16   a person names Charles Stivers?

17   A.  No.

18   Q.  Did not.  Would you agree that 2002 election that we've

19   been talking about, that was a very bitter race, correct?

20   A.  Yes, it was.

21          MR. WESTBERRY:  Thank you, Judge.

22          THE COURT:  Thank you, Mr. Westberry.  Mr. White.

23                      CROSS-EXAMINATION

24   BY MR. WHITE:

25   Q.  Good morning, Mr. Sizemore.

*SIZEMORE - Cross (Mr. White)*                                     88

1    A.   Good morning.

2    Q.   My name is Scott White.  I represent Wayne Jones in this

3    case.  I want to ask you some questions.  The first thing I

4    want to ask you about is you testified about a farm up in

5    Henry County that marijuana was grown on, and most of it was

6    sold back into Clay County, was that your testimony?

7    A.   Yes, it was.

8    Q.   Do you recall, did you have several meetings with agents

9    of the FBI regarding things that you knew about in terms of

10   drugs and that type of thing to help yourself with your own

11   criminal charges?

12   A.   I don't know.  A few.  Not many.

13   Q.   Um-hmm.  Do you recall when you were initially arrested?

14   A.   Yes.

15   Q.   And when was that?

16   A.   That was August 10th, '04.

17   Q.   Okay.  And at that meeting, or at that time of your

18   arrest, did you have a conversation with anyone with the FBI

19   about what you knew about drug activities?

20   A.   No.

21   Q.   You did not.  Do you recall, did you have a meeting or

22   have any discussions with representatives of the FBI the day

23   after your arrest in which drug discussions were -- your

24   knowledge of the drug activities in Clay County were

25   discussed?

*SIZEMORE - Cross (Mr. White)*                                      89

1    A.  I don't know if it was the day after or the next day.

2    Q.  A short time after?

3    A.  Yeah.

4    Q.  Okay.  To your recollection, in that meeting, did you say

5    anything about Wayne Jones in that meeting?

6    A.  His name was never mentioned.

7    Q.  Was it about a year later that you began having other

8    conversations -- additional conversations with members of the

9    FBI about things that you knew about both drug activities and

10   election activities?

11   A.  Yes.

12   Q.  And in the next meeting that you recall, did Wayne Jones'

13   name come up at all with respect to this Henry County farm?

14   A.  I don't remember if it did or not.

15   Q.  Now, this farm up in Henry County, did you all buy that

16   farm?

17   A.  Yes, we -- they growed dope on it the one year before,

18   and then we bought it the next year.

19   Q.  Um-hmm.

20            MR. SMITH:  Your Honor, I'm going to object.

21            THE COURT:  All right.  You'll need to come up.

22                 (A sidebar conference was held out of the

23                 hearing of the jury):

24            THE COURT:  All counsel are present, with the

25   exception of Miss Hughes and Mr. Simons.  They choose not to

*SIZEMORE - Cross (Mr. White)*                                    90

1     attend, I assume.  Go ahead.

2              MR. SMITH:  Your Honor, we've gone through this with

3     other counsel.  I feel compelled to object to Mr. White

4     continuing to want to testify, say um-hmm, um-hmm, and I've

5     counted at least two times in the last four questions where --

6     or five questions where he's doing this with the witness, and

7     I believe that --

8              THE COURT:  This has been argued before.

9              MR. SMITH:  I'm going to state the same objection.

10             MR. WHITE:  I apologize, Your Honor, if I was doing

11    it.  I didn't realize, but I won't.

12             THE COURT:  Anything else while we're here?

13             MR. SMITH:  Just that one objection, that's it.

14             THE COURT:  Objection will be sustained.

15             MR. WHITE:  Thank you.

16                  (Sidebar conference concluded.)

17             THE COURT:  Thank you, counsel.  Please proceed.

18             MR. WHITE:  Thank you, Your Honor.

19    BY MR. WHITE:

20    Q.  I'd like to hand you, sir -- I'm going to hand you, sir,

21    Defendant's Exhibit CWJ2, and I'm going to ask you to take a

22    look at that and see if you recognize that document.  I

23    believe either on page 2 or 3, there's a signature, and I'd

24    like you to look at that as well.

25    A.  (Reviewing document).

*SIZEMORE - Cross (Mr. White)*                                    91

1    Q.   Have you seen that document before today, sir?

2    A.   I don't know if I have or not.

3    Q.   Look at page 2.  Does that page have a line for your

4    signature?  Might be on page 3.

5    A.   I can't even read that page.

6    Q.   Let me ask you this.  Were you one of the people that

7    purchased the farm up in Henry County?

8    A.   Yeah, me and Eugene Lewis and Mansell Baker bought it.

9    Q.   And did you all borrow money from the Bank of Manchester

10   to buy that property?

11   A.   Yeah, we borrowed so much.

12          MR. WHITE:  Give me just a moment, Your Honor.

13          THE COURT:  Yes.

14   Q.   There at Horse Branch -- or Horse Creek, I'm sorry, at

15   that location, is that a school where the actual precinct is

16   located where you vote?

17   A.   That was a school, yeah.

18   Q.   Were there other precincts there, or was it just the

19   Horse Creek precinct?

20   A.   It was Horse Creek and Pigeon Roost.

21   Q.   Do you recall what time of day it was that you saw Mr.

22   Jones there?

23   A.   I'd say it was about 1:00.

24   Q.   Did you go back down there later after 1:00, after you

25   left?

*SIZEMORE - Cross (Mr. Abell)*                                    92

1   A.   Well, we actually saw him there several times.

2   Q.   After 1:00 or before 1:00?

3   A.   Well, the last time, I think they moved over to the

4   Chevron station and was working to buy votes and vote people

5   coming in.

6   Q.   Do you recall what time that was, about, the last time

7   you saw him?

8   A.   Probably about 12:30, 1:00, yeah.

9          MR. WHITE:  Give me just a moment, Your Honor.

10         THE COURT:  Yes.

11         MR. WHITE:  Your Honor, that's all I have.  Thank

12   you, sir.

13         THE COURT:  Thank you, Mr. White.

14         THE WITNESS:  Thank you.

15         THE COURT:  Mr. Abell.

16                   CROSS-EXAMINATION

17   BY MR. ABELL:

18   Q.   Mr. Sizemore, my name is Robert Abell.

19   A.   Um-hmm.

20   Q.   I represent William Stivers in this case.

21   A.   Um-hmm.

22   Q.   There's a fella in Clay County known as Uncle Bud?

23   A.   Yes.

24   Q.   Do you know him?

25   A.   I heared of him, yeah.

SIZEMORE - Cross (Mr. Abell)                                93

1   Q.   His real name is Roger Smith?

2   A.   Yeah, I think so.

3   Q.   And he was friends with Jennings White?

4   A.   Yeah.

5   Q.   A few days before the primary election in May of 2002,

6   Jennings White's van got shot up?

7   A.   Yeah, I heared about it.

8   Q.   Is it the case, to your understanding, that Jennings

9   White, in fact, had his buddy, Uncle Bud, Roger Smith, shoot

10  his own van up?

11  A.   I don't know anything about that.

12  Q.   All right.  On primary day 2002, you spent it riding

13  around with Jennings White?

14  A.   Yes.

15  Q.   At Horse Creek precinct, you saw Charles Jones and --

16  Wayne Jones and Charles Stivers?

17  A.   Yes.

18  Q.   You and Jennings White, as you've already told us, were

19  carrying a number of guns with you?

20  A.   Not a number.  We was carrying three.

21  Q.   Three.  Jennings White, in fact, had a .45 with him?

22  A.   Yes.

23  Q.   Did Jennings White hand his .45 to you and suggest that

24  you use it to shoot Charles Stivers that day?

25  A.   He wanted me to shoot him.

*SIZEMORE - Cross (Mr. Baldani)*                                    94

1   Q.   And you declined to do so?

2   A.   Well, Charles never -- he went to the truck.  I thought

3   he was going to get a gun, but he didn't.  He didn't show it.

4   Q.   During that day, during primary day 2002, did you hear

5   Jennings White call police officer Todd Roberts?

6   A.   Yes.

7   Q.   And he asked Todd Roberts to send police cruisers to

8   various precincts in the town?

9   A.   Yes.

10             MR. ABELL:  That's all I have, Judge.

11             THE COURT:  Thank you, Mr. Abell.  Mr. Baldani.

12             MR. BALDANI:  Thank you, Judge.

13                           CROSS-EXAMINATION

14  BY MR. BALDANI:

15  Q.   Mr. Sizemore, my name is Russ Baldani.  I'm one of Freddy

16  Thompson's lawyers.

17  A.   Um-hmm.

18  Q.   I may have missed it.  Could you tell me how long you and

19  Jennings White have been friends?

20  A.   Pardon?

21  Q.   Could you tell me how long you and Jennings White have

22  been friends?

23  A.   We growed up together.

24  Q.   And how old are you?

25  A.   Sixty-five.

*SIZEMORE - Cross (Mr. Baldani)*                                    95

1    Q.   Is he about your age?

2    A.   He's older.

3    Q.   Oh, is he?  So known him your whole life?

4    A.   Yeah.

5    Q.   You never had any friendship with Freddy Thompson, did

6    you?

7    A.   Pardon?  Repeat that.

8    Q.   You weren't friends with Freddy Thompson, were you?

9    A.   Yeah, I like Freddy Thompson.

10   Q.   You what?

11   A.   I like Freddy Thompson.

12   Q.   Oh, you like him, okay.

13   A.   Yeah, I used to work with his dad.

14   Q.   At the hardware store or the mining supply store?

15   A.   No.

16   Q.   Or somewhere else?

17   A.   Strip job.

18   Q.   I'm sorry?

19   A.   Strip job.

20   Q.   All right.  Now, I want to go over a couple of things.

21   The night, the day before the election is when you were riding

22   around with Jennings and Edd Jordan with the box of money; is

23   that correct?

24   A.   Yes.

25   Q.   And Edd Jordan was the sitting sheriff, and he was

SIZEMORE - Cross (Mr. Baldani)                                    96

1    actually wearing his uniform, right?

2    A.   No, he wasn't wearing a uniform.

3    Q.   Okay.  But he was the county sheriff at the time?

4    A.   Yes.

5    Q.   And so you were riding around with the county sheriff and

6    the sitting county clerk, right?

7    A.   Yes.

8    Q.   With a box full of money?

9    A.   Yes.

10   Q.   All right.  And it's the next day that you were riding

11   around with Jennings White when he had the handgun and the

12   machine gun, right?

13   A.   It wasn't a machine gun.

14   Q.   Well, automatic weapon?

15   A.   Yeah.

16   Q.   Okay.  But so that was the actual election day that

17   you're riding around with the clerk, who's got a handgun and

18   an automatic weapon?

19   A.   Yes.

20   Q.   And going to various precincts?

21   A.   Yes.

22   Q.   All right.  Now, you were asked about a fella named Billy

23   Rowland Phillips, right?

24   A.   Yes.

25   Q.   And he's called Heavy, is that his nickname?

SIZEMORE - Cross (Mr. Baldani)                                97

1   A.   Called what?

2   Q.   You ever heard him called Heavy?

3   A.   No.

4   Q.   We'll just call him Mr. Phillips, then.  You testified

5   that Jennings White offered you $25,000 to kill Mr. Phillips,

6   right?

7   A.   Yes.

8   Q.   And the reason that he wanted you to do that is because

9   Phillips had dug up information about Jennings White raping a

10  lady in Indiana?

11  A.   Yes.

12  Q.   And made that known before the '02 election when he ran

13  against Freddy Thompson, right?

14  A.   That's true.

15  Q.   So he -- and couple years later, Jennings offered you

16  25,000 to kill Phillips?

17  A.   It wasn't a couple years later.

18  Q.   When was it?

19  A.   About six months later.

20  Q.   Okay.  But the fact of the matter is you actually took

21  half the money up front?

22  A.   Yes, I did.

23  Q.   So Jennings White said, I'll give you half up front, and

24  I'll give you the other half when the job's done, right?

25  A.   Yes.

*SIZEMORE - Cross (Mr. Baldani)*                                    98

1    Q.   So he gives you half up front.  And then one day,

2    Jennings White calls you and says, hey, I've seen Billy

3    Rowland Phillips out drunk.  I'm going to call the police on

4    him, right?

5    A.   He was in jail.  Bill Rowland was in jail.

6    Q.   Billy Rowland got arrested for being drunk, and he was in

7    jail?

8    A.   Yes.

9    Q.   And Jennings White called you and told you that?

10   A.   Yes.

11   Q.   And he said he's getting ready to be released.  I know

12   where his truck is?

13   A.   I knowed where it was too.

14   Q.   And Jennings White said this would be a good time to take

15   care of things?

16   A.   That's right.

17   Q.   And this was about six months after Jennings White got

18   defeated by Freddy Thompson?

19   A.   Yeah, more or less.

20   Q.   All right.  So you took the half payment up front, but

21   you didn't finish the job, basically?

22   A.   I didn't do the job.  Didn't have no intention of doing

23   it.

24   Q.   And that was all because Billy Rowland had let the cat

25   out of the bag about this rape allegation on Jennings White?

*SIZEMORE - Cross (Mr. Gilbert)*                              99

1   A.   Yes.

2           MR. BALDANI:  That's all, Your Honor.

3           THE COURT:  Thank you.  Mr. Gilbert?

4           MR. GILBERT:  Just have a few questions, Your Honor.

5   May I ask from here?

6           THE COURT:  Yes, sir, that will be fine.

7                        CROSS-EXAMINATION

8   BY MR. GILBERT:

9   Q.   Mr. Sizemore, I'm Jerry Gilbert, and I represent Bart

10  Morris.

11  A.   Yes.

12  Q.   You've gone over the trip that you made with the agents

13  from the FBI and the state police, retracing your route with

14  Jennings White the night before the election.

15  A.   Yes.

16  Q.   With Mr. Hoskins; did you not?

17  A.   Yes.

18  Q.   None of those locations were Bart Morris's residence,

19  were they?

20  A.   We was at Bart's twice that night.

21  Q.   Pardon?

22  A.   We was at Bart Morris's house twice that night.

23  Q.   But you didn't take the state police there when they had

24  the video camera?

25  A.   Maybe I didn't think of it.

*SIZEMORE - Redirect (Mr. Smith)*                                    100

1            MR. GILBERT:  That's all.

2            THE COURT:  Thank you.  Miss Hughes?

3            MS. HUGHES:  I have no questions.  Thank you, Your

4    Honor.

5            THE COURT:  All right.  Thank you.  Mr. Simons?

6            MR. SIMONS:  I have none.

7            THE COURT:  Thank you.  Mr. Smith, any redirect?

8            MR. SMITH:  Yes.

9                      REDIRECT EXAMINATION

10   BY MR. SMITH:

11   Q.  Mr. Sizemore, as I understand the meeting with the agents

12   that you've been questioned about, when you took them around

13   and showed them, you testified earlier that you recalled

14   Leyman Messer being a place where envelopes were dropped.  Do

15   you remember testifying to that?

16   A.  Yeah.

17   Q.  And when you met with the agents on that day, did you

18   understand that that was what they were wanting to know is the

19   places where the envelopes were dropped?

20           MR. HOSKINS:  Object to leading.

21           THE COURT:  Overruled.

22   A.  Yeah.

23   Q.  So that day, when you went with the agents, you took them

24   to those places where you recall that envelopes were dropped?

25   A.  Yes.

*SIZEMORE - Redirect (Mr. Smith)*                                        101

1    Q.   Have you ever told the agents that you dropped envelopes

2    at Bart Morris's?

3    A.   I can't remember.  I don't remember whether there was any

4    dropped there or not.

5    Q.   You haven't yet told us about it today, have you?

6    A.   No.

7    Q.   Now, you were testifying, I believe, on cross-examination

8    about the property in Henry County.  When is the last time you

9    talked to Eugene Lewis, Mr. Sizemore?

10   A.   When is the last time I talked to him?

11   Q.   To Eugene "Mutton" Lewis.

12   A.   Probably in '05.

13   Q.   About five years ago?

14   A.   Yeah.

15   Q.   Okay.  And what about Mansell Baker.  How long's it been

16   since you talked to Mansell Baker?

17   A.   I haven't talked to Mansell Baker in a long time.

18   Q.   Has it been longer than since you've talked to Mutton

19   Lewis?

20   A.   Yeah.

21   Q.   How much longer would you say, 5, 10, 15 years?

22   A.   Probably seven or eight years.

23   Q.   Okay.  Seven or eight years, all right.  Now, when you

24   were talking to agents about drug activity in Clay County,

25   were they interested in things that happened 15, 20 years ago,

*SIZEMORE - Redirect (Mr. Smith)*                                    102

1    or were they concentrating on things that happened about five

2    years or less, about the time you got your interview?

3    A.   I'd say five or less.

4    Q.   You know there's a statute of limitations on criminal

5    acts in federal law, don't you?

6             MR. WHITE:  Objection, Your Honor.

7             THE COURT:  Sustained.

8    Q.   Do you know that there is a statute of limitations on

9    criminal acts under federal law?

10            MR. WHITE:  Objection, Your Honor.

11            THE COURT:  Overruled.

12   Q.   You can answer, sir, if you know.

13   A.   Yeah, I think I do.

14   Q.   And what do you know, generally, to your knowledge,

15   what's that limitation?  How many years can they go back on

16   criminal activity on federal law?

17            MR. WHITE:  Same objection, Your Honor.

18            THE COURT:  Overruled.  Stating his understanding.

19   Q.   You can answer, sir.

20   A.   On federal?

21   Q.   Yes.

22   A.   I don't think there are any limits on it.

23   Q.   Okay.  But when you were interviewed by the agents, they

24   seemed to be more interested in things that were five years or

25   less years old?

*SIZEMORE - Redirect (Mr. Smith)*                                103

1   A.   Yeah.

2   Q.   In the years that you were in this partnership with this

3   marijuana growing in Henry County, that would have been -- in

4   what year time period would that have been?

5        MR. WHITE:  Objection.  Asked and answered, Your

6   Honor.

7        THE COURT:  Overruled.

8   A.   I'd say about around '89 or '90, somewhere in there.

9   Q.   So if you were interviewed in 2005, that would be going

10  back over 15 years prior to the time when you were interviewed

11  by the FBI?

12  A.   Yes.

13  Q.   Now, you were also questioned, I believe, about this

14  operation that was occurring at the Horse Creek school, and

15  you said there were two actual polling places in that school

16  house.  I believe you said Pigeon Roost and Horse Creek both

17  voted there?

18  A.   Yes.

19  Q.   And you said they moved it over to the Chevron?

20  A.   Well, the law came, and they made Wayne and -- they made

21  all of us leave the voting precinct.

22  Q.   When you say they made us, who was the law present?  Who

23  were they representing?

24  A.   They were city police and I believe a couple state police

25  there.

*SIZEMORE - Redirect (Mr. Smith)*                                        104

1    Q.   Okay.  And so when you say they moved to the Chevron

2    station, who were you referring to, Mr. Sizemore?

3    A.   Charles and Wayne and Jeff Farmer.  They moved over to

4    the Chevron station, which that was right -- drive right by it

5    into the school.

6    Q.   How far is the Chevron station from the school, Mr.

7    Sizemore?

8    A.   It's not very far.

9    Q.   Can you see one place from the other?

10   A.   Yes.

11   Q.   So you were within eye shot of the polling place if you

12   were at Chevron, Stivers Chevron?

13   A.   Yeah.

14   Q.   And you said earlier, I believe, in response to questions

15   by Mr. Adams' attorney that Adams was there putting money in

16   the pockets of people until the attorney general showed up?

17   A.   Yeah.  And he left.

18   Q.   Okay.  Did you see representatives of the attorney

19   general's office in other places that day, other than at the

20   Burning Springs?

21   A.   I think we saw them at Paces Creek.

22   Q.   Okay.  Now, just so we understand, Mr. Sizemore, your

23   current situation, you've already served your prison sentence

24   that was put down by Judge Reeves; is that right?

25   A.   Yes, yes.

*SIZEMORE - Recross (Mr. Hoskins)*                                                105

1  Q.   And is there any benefit whatsoever that you're expecting

2  to get from the government for testifying here today?

3  A.   No, nothing.  No.

4  Q.   So your sentence has already been done with and over

5  with?

6  A.   Yes, yeah.

7  Q.   And you're here today because you've been subpoenaed to

8  testify; is that right?

9  A.   That's right.

10  Q.   Okay.

11          MR. SMITH:  That's all, thank you.

12          THE COURT:  All right.  Thank you.  Mr. Hoskins.

13          MR. HOSKINS:  Briefly, Your Honor, if I can.

14                      RECROSS-EXAMINATION

15  BY MR. HOSKINS:

16  Q.   Mr. Sizemore, let's be real clear.  When you met with the

17  agents and you went on that road trip with the video, that was

18  less than five years after that election of 2002, wasn't it?

19  A.   I guess.

20  Q.   Is there any question in your mind?

21  A.   You mean it's been what now?

22  Q.   Well, you got arrested in 2004.

23  A.   Right.

24  Q.   In 2005, you went on this trip with the agents?

25  A.   Yes.

*SIZEMORE - Recross (Mr. Hoskins)*                                106

1    Q.   And went to these places.  So the 2002 election was very

2    clearly within five years, wasn't it?

3    A.   Yes, it was.

4    Q.   Okay.  You met with a couple agents that day, but there

5    were also several other days that you met with FBI agents,

6    right?

7    A.   Yeah.

8    Q.   And on several of those occasion, Mr. Briggs, Tim Briggs,

9    was the FBI agent who was there, right?

10   A.   He was there on some of them.

11   Q.   You knew they were interested in that election in 2002?

12   A.   I'd say so, yeah.

13   Q.   It's very clear that they were, isn't it?

14   A.   I guess they were.

15   Q.   And all those times that you met with those agents, you

16   never one time said, I saw Cletus Maricle the night before the

17   election or the day of the election, did you?

18   A.   Well, they never did ask me.

19   Q.   They did ask you who you saw and what you did those days,

20   didn't they?

21            MR. SMITH:  Your Honor, I'm going to object.

22            THE COURT:  Been asked and answered several times.

23            MR. HOSKINS:  The question's not hearsay, Judge.

24            THE COURT:  It's been asked and answered several

25   times.  It's repetitive so I'll sustain the objection,

*SIZEMORE - Recross (Mr. Westberry)*                              107

1           MR. HOSKINS:  That's all.

2           THE COURT:  Mr. Westberry.

3                           RECROSS-EXAMINATION

4    BY MR. WESTBERRY:

5    Q.  Mr. Sizemore, real quick.  Again, I'm here for Mr. Adams.

6    Back to the mid-morning at the Burning Springs precinct where

7    you say you saw this money being handed out, can you tell us

8    the names of the election officers that were there that

9    morning at the Burning Springs precinct?

10   A.  I don't even remember.  I don't even remember.  Why

11   should I remember that?

12   Q.  Was Mr. Adams doing what you said he was doing in the

13   presence of these election officers?

14   A.  He was doing it, a big long line.  He was going from

15   pocket to pocket.

16   Q.  And you saw that?

17   A.  Well, Jennings White saw it too.

18   Q.  Um-hmm, yeah.  And you don't remember the names of any of

19   the people that you saw you saw Mr. Adams doing --

20           MR. SMITH:  Your Honor, that's been asked and that's

21   been answered.

22           THE COURT:  It has been.  Sustained.

23           MR. WESTBERRY:  Thank you very much.

24           THE COURT:  Mr. White?

25           MR. WHITE:  Just a couple, Your Honor.  If I could

*SIZEMORE - Recross (Mr. White)*                                    108

1    just ask from here.

2              THE COURT:  Yes.

3                        RECROSS-EXAMINATION

4    BY MR. WHITE:

5    Q.  Mr. Sizemore, did you just testify to Mr. Smith that it

6    was your understanding that when you were meeting with the

7    FBI, you were only to tell them things about drug activities

8    within five years of that interview?

9    A.  We never discussed five years.

10   Q.  You didn't discuss it at all?

11   A.  No.

12   Q.  In fact, during those interviews -- well, did you tell

13   them, did you tell them about things that had occurred over

14   five years before?

15   A.  I can't remember -- I don't -- can't remember.

16   Q.  Is it possible?

17   A.  It could be.

18             MR. WHITE:  That's all I have, Your Honor.  Thank

19   you.

20             MR. ABELL:  Judge, I don't have any further questions

21   of Mr. Sizemore.

22             THE COURT:  Thank you, Mr. Abell.  Mr. Baldani?

23             MR. BALDANI:  Nothing further.

24             MR. GILBERT:  Nothing further, Your Honor.

25             MS. HUGHES:  No, sir.

1          MR. SIMONS:  No, sir.

2          THE COURT:  Okay.  Thank you.  Mr. Sizemore, you may

3    step down, sir.

4          Ladies and gentlemen, we will take our lunch break at

5    this time.  Please keep in mind the admonitions that you've

6    been given several times not to discuss the case among

7    yourselves and, of course, don't allow anyone to approach you

8    to discuss the case while we are in recess.

9          The jury will be excused until 1:00 p.m. this

10   afternoon.

11              (The jury left the courtroom at 11:58 a.m.)

12         THE COURT:  Thank you.  Please be seated.  Mr.

13   Hoskins, I believe you had one matter that you were about to

14   take up as the jury was just coming in the courtroom?

15         MR. HOSKINS:  I do, Your Honor, but I think that the

16   witness's testimony negated my need to raise that matter.  I

17   want to make sure that I'm correct in understanding that the

18   Court has not finally released this witness pending location

19   of this videotape?

20         THE COURT:  I don't understand how the videotape

21   would be related to this witness's testimony.  He's testified

22   as to his recollection of the areas that were visited.  He has

23   testified he went to certain locations where the money was

24   handed out.

25         There's no indication on the 302, to my

110

1    understanding, that's contrary to what he testified to.  The

2    United States does not have possession of any videotape,

3    either in its possession or in the agent's possession and

4    doesn't know that such a tape exists.

5         Is that incorrect?

6         MR. HOSKINS:  Well, Your Honor, I would say it

7    boggles my mind to consider that they did not maintain this

8    video or this tape of the witness in a very crucial event in a

9    case that was still active and ongoing.  The reason I think

10   it's related to this witness's testimony is it very well may

11   contain a prior inconsistent statement.

12        While the one 302 that talks about this trip doesn't

13   go into a lot of detail about other things, there are several

14   other 302s that we were given today that talk about other

15   things that this witness saw, other people he saw, and goes

16   into a great deal of detail as to who he saw where, who was

17   smoking a joint, who was drinking beer, what kind of beer they

18   were drinking.  Lots of detail there, Judge.

19        And I think it's quite possible that there could be

20   some -- I'm quite certain this video still exists and it's

21   quite possible it may very well have something significant.

22        THE COURT:  But your position is that if a video

23   exists, it is possible that it might contain inconsistent

24   statements of the witness.  And if such a videotape would be

25   discovered, and it had an inconsistency, then you would want

1    the government to recall the witness for the purpose of

2    cross-examining him on the inconsistent statement on the tape,

3    as opposed to you issuing a subpoena for him and calling him

4    yourself to testify in the matter?

5           MR. HOSKINS:  I think since he's here under subpoena,

6    he should not be released from subpoena, that I should not be

7    required to re-subpoena him while I'm here in Frankfort trying

8    a case.

9           THE COURT:  All right, Mr. Hoskins, I'll not release

10   him from the subpoena at this time.  Anything else?

11          MR. SMITH:  Your Honor, Miss White was released

12   yesterday.  I did not ask for her husband, Kennon, to be

13   released.

14          THE COURT:  Yes, he's released.  I failed to

15   acknowledge that, but yes, he'll be released as well.  The

16   only person that will remain under subpoena will be Mr.

17   Sizemore, based upon the assertions that Mr. Hoskins has made.

18          MR. SMITH:  Your Honor, let me ask you, in regards to

19   that, this is based upon two assumptions.  One assumption is

20   it can be found.  Second assumption is that it has something

21   audible on it, such as a vocal recording of this witness's

22   statements.

23          Should I be able or should I not be able to find

24   that, can we then revisit this issue about releasing the

25   witness.

112

1          THE COURT:  Yes, sir.  Absolutely.  Absolutely.

2          MR. SMITH:  Okay.

3          THE COURT:  We'll be in recess until 1:00.

4             (Proceedings concluded at 12:03 p.m.)

5                       - - -

6

7                C E R T I F I C A T E

8          I, LISA REED WIESMAN RDR-CRR, certify that the
   foregoing is a correct transcript from the record of
9   proceedings in the above-entitled case.

10

11    \s\ Lisa Reed Wiesman              March 4, 2010
   LISA REED WIESMAN, RDR-CRR          Date of Certification
12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

113

1                                INDEX

2

   <u>GOVERNMENT WITNESS</u>
3
   CHARLES WEAVER
4  Cross-examination by Mr. Gilbert................. Page  4
   Redirect Examination by Mr. Parman.............. Page  9
5  Recross-examination by Mr. Westberry............ Page 17
   Recross-examination by Mr. Baldani.............. Page 18
6

7  GLENN ROWLAND
   Direct Examination by Mr. Smith................. Page 20
8  Cross-examination by Mr. Hoskins................ Page 30
   Cross-examination by Mr. White.................. Page 30
9  Cross-examination by Mr. Baldani................ Page 37
   Cross-examination by Mr. Gilbert................ Page 40
10 Redirect Examination by Mr. Smith............... Page 42

11 DENVER SIZEMORE
   Direct Examination by Mr. Smith................. Page  43
12 Cross-examination by Mr. Hoskins................ Page  70
   Cross-examination by Mr. Westberry............. Page  82
13 Cross-examination by Mr. White................. Page  87
   Cross-examination by Mr. Abell................. Page  92
14 Cross-examination by Mr. Baldani............... Page  94
   Cross-examination by Mr. Gilbert............... Page  99
15 Redirect Examination by Mr. Smith.............. Page 100
   Recross-examination by Mr. Hoskins.............Page 105
16 Recross-examination by Mr. Westberry........... Page 107
   Recross-examination by Mr. White............... Page 108
17

18 <u>GOVERNMENT EXHIBITS</u>                          <u>ADMITTED</u>

19 Exhibit No. PA13, Denver Sizemore's plea agreement
   Admitted....................................... Page  64
20
                          - - -
21

22

23

24

25