1

1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
2               SOUTHERN DIVISION at LONDON
                          - - -
3

UNITED STATES OF AMERICA,        :  Docket No. CR 09-16-S
4                                :
                    Plaintiff,   :  **Frankfort, Kentucky**
5                                :  Tuesday, March 2, 2010
        versus                   :  12:45 p.m.
6                                :
RUSSELL CLETUS MARICLE           :
7   DOUGLAS C. ADAMS             :
    CHARLES WAYNE JONES          :
8   WILLIAM R. STIVERS           :
    FREDDY W. THOMPSON           :        **Trial Day 16B**
9   WILLIAM B. MORRIS            :
    DEBRA L. MORRIS              :
10  STANLEY BOWLING,             :
                                 :
11                  Defendants.  :

12

13                        - - -
                 TRANSCRIPT OF TRIAL
14              BEFORE DANNY C. REEVES
        UNITED STATES DISTRICT COURT JUDGE and a jury
15                        - - -

16  APPEARANCES:

17  For the United States:      STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.
18                              Assistant U.S. Attorney
                                601 Meyers Baker Road
19                              Suite 200
                                London, KY 40741
20
    For the Defendant           MARTIN S. PINALES, ESQ.
21  Russell Cletus Maricle:     Strauss & Troy
                                150 E. Fourth Street
22                              Fourth Floor
                                Cincinnati,OH  45202
23
                                DAVID S. HOSKINS, ESQ.
24                              107 E. First Street
                                Corbin, KY  40701
25

2

```
 1      For the Defendant          R. KENT WESTBERRY, ESQ.
        Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                                 Landrum & Shouse, LLP
                                   220 West Main Street
 3                                 Suite 1900
                                   Louisville, KY 40202
 4

 5
        For the Defendant          T. SCOTT WHITE, ESQ.
 6      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
                                   133 West Short Street
 7                                 Lexington, KY  40507

 8
        For the Defendant          ROBERT L. ABELL, ESQ.
 9      William R. Stivers:        120 North Upper Street
                                   Lexington, KY  40507
10

11      For the Defendant          R. TUCKER RICHARDSON, ESQ.
        Freddy W. Thompson:        Baldani, Rowland & Richardson
12                                 300 West Short Street
                                   Lexington, KY  40507
13

14      For the Defendant          JERRY W. GILBERT, ESQ.
        William B. Morris:         Coy, Gilbert & Gilbert
15                                 212 North Second Street
                                   Richmond, KY 40475
16

17      For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
        Debra L. Morris:           Gess, Mattingly & Atchison, PSC
18                                 201 West Short Street
                                   Lexington,KY40507
19

20      For the Defendant          DANIEL A. SIMONS, ESQ.
        Stanley Bowling:           Thompson, Simons, Dunlop & Fore
21                                 116 West Main Street
                                   Suite 2A
22                                 Richmond, KY 40476

23

24

25
```

3

1    Court Reporter:                LISA REED WIESMAN, RDR-CRR
                                    Official Court Reporter
2                                   35 W. Fifth Street
                                    P.O. Box 1073
3                                   Covington, KY  41012
                                    (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*ROBERTS - Direct (Mr. Parman)*                                               4

1                   (The jury entered the courtroom at 12:45 p.m.)

2              THE COURT:  Thank you.  The record will reflect that

3     all members of the jury are present, all parties and counsel

4     are present.  Mr. Parman, will you be calling the next

5     witness?

6              MR. PARMAN:  Yes, Your Honor.

7              THE COURT:  You may proceed.

8              MR. PARMAN:  Thank you, Your Honor.  The United

9     States calls Mary Gail Roberts.  Your Honor, also for the

10    record, previous witness may be excused.

11             THE COURT:  All right.  Thank you.

12         MARY GAIL ROBERTS, GOVERNMENT'S WITNESS, SWORN

13             THE COURT:  Thank you.  Mr. Parman, you may proceed.

14             MR. PARMAN:  Thank you, Your Honor.

15                          DIRECT EXAMINATION

16    BY MR. PARMAN:

17    Q.  Good afternoon, ma'am.

18    A.  Good afternoon.

19    Q.  You may want to take that microphone and move it down

20    towards your face.  There you go.  Make sure you try to speak

21    into it so everybody can hear you.

22    A.  Okay.

23    Q.  Could you state your name, please?

24    A.  Mary Gail Roberts.

25    Q.  That's doing good.  Where are you from, Miss Roberts?

1    A.   Manchester, Kentucky.

2    Q.   How long have you lived over there in Manchester?

3    A.   All my life in Manchester, except for probably when I was

4    real young, about two years, I think, my mom and stepdad moved

5    us to Indianapolis a couple times.

6    Q.   Do you have any kids?

7    A.   Yes, I do.

8    Q.   What are their names?

9    A.   Tanya Kay Davidson and Billie Jean Roberts.

10   Q.   Are you married?

11   A.   No, I'm divorced.

12   Q.   Ma'am, have you participated in elections in Clay County?

13   A.   Yes, sir, I have.

14   Q.   Did you participate in the election between Jennings

15   White and Freddy Thompson?

16   A.   Yes, I did.

17   Q.   Would that election be back in 2002?

18   A.   I don't really know the date.  I'm not good on dates, and

19   I don't remember the date exactly.  I just know that I was

20   involved in -- I hauled voters in that election.

21   Q.   In the Jennings White versus Freddy Thompson?

22   A.   Yes.

23   Q.   Who asked you to haul voters in that election?

24   A.   I was approached by -- I don't know if it was both of

25   them together or what, but Bart Morris and Stanley Bowling

1    pretty much asked me about, you know, the hauling voters in

2    the elections.

3    Q.   You said you don't know if it was both of them together

4    or what.  Did they approach you together?  Explain your

5    answer.

6    A.   There was, seemed like, several of us around.  I don't

7    really remember all of it.  I just knowed that I was asked

8    would I haul voters that year.

9    Q.   And you believe you were asked by Mr. Bowling and Mr.

10   Morris?

11   A.   Yes.

12   Q.   Where were you hauling voters from?

13   A.   In the area where my mother lives, Beech Creek.

14   Q.   And where were you hauling them to?

15   A.   Harts Branch precinct.  I don't remember that year if

16   they voted at the middle school or at the swimming pool.

17   Q.   After the voters had voted, where did you then take them?

18   A.   I took them to Bart Morris's house.  It's -- I don't know

19   the name of the street, but it's behind, at the time it was

20   behind SuperAmerica, where he used to live.

21   Q.   What did you do at Bart Morris's house then?

22   A.   I walked into the garage part of the home, and they

23   checked off who I had in the car and give me money to take

24   back out to the people that was in the car that I had took to

25   vote.

ROBERTS - Direct (Mr. Parman)                                    7

1    Q.   You said they checked off the people.  Who is "they"?

2    A.   His wife, Debbie Morris.

3    Q.   And was Mr. Morris present as well?

4    A.   No.  I didn't see him.

5    Q.   But the person that give you the money and did the

6    checking off was his wife?

7    A.   Yes.

8    Q.   Debbie Morris?

9    A.   Yes.

10   Q.   What was she checking them off from?  Was there a list,

11   or did you see that?

12   A.   Yes.  It was just a list, I guess, of everybody that

13   voted.  I had a list like it.

14   Q.   Who give you the list that you had?

15   A.   They give it to me.

16   Q.   Who's "they"?

17   A.   I don't remember if it was Bart or Stanley, but I did get

18   a list that had everybody that voted in Harts Branch precinct.

19   Q.   So the precinct list of all the registered voters is what

20   you had?

21   A.   Yes, yes.

22   Q.   And it was either Bart or Stanley that give you that?

23   A.   Yes.

24   Q.   And was that before you started hauling voters?

25   A.   Yes.

1    Q.   And did that appear to be the same list that Debbie

2    Morris had?

3    A.   Yes.

4    Q.   And when you would bring the voters into the house, then

5    she would mark them off?

6    A.   Yeah, with a black -- can't remember what you call those

7    pens that you mark through, and it's yellow.

8    Q.   Would that be a highlighter?

9    A.   Highlighter.

10   Q.   How much was she giving you for each of the voters?

11   A.   I'm not positive exactly how much they paid, if it was 30

12   or -- 25 or 30.  To my recollection, it was 30 dollars.

13   Q.   How many voters did you haul there in 2002?

14   A.   I'd say I took at least 20, 25 people.

15   Q.   Now, did you stop by and pick up voters from the Beech

16   Creek apartment area?

17   A.   Yes, sir, I did.

18   Q.   Was there somebody there that was gathering up all those

19   voters?

20   A.   Yes.

21   Q.   Who was that?

22   A.   Carl Curry.

23   Q.   Now, did one of your daughters also haul voters that day,

24   to your knowledge?

25   A.   She did one time, but I don't know if it was that day or

ROBERTS - Direct (Mr. Parman)                                    9

1    if she was just riding with me.  I can't remember if it was

2    that election or the election before.  I know once, she just

3    rode with me.

4    Q.   Okay.  And then another time, she did on her own?

5    A.   Yeah, me and her both was hauling, but she was using

6    somebody's vehicle.

7    Q.   Which daughter was that, ma'am?

8    A.   Tanya Kay Davidson.

9    Q.   Now, was there also an election where you hauled voters

10   up to the Y Holler?

11   A.   Yes.  I'm not -- I think -- I'm not positive, now, like I

12   said.  My memory's not real good right now, but I think it was

13   the same year that Freddy and Jennings and them run against

14   each other, because they said we were being watched by the FBI

15   across the street from Bart's house at the car wash.  They

16   took the Winnebago and went to Y Holler, and that's where they

17   told us to go to.

18   Q.   So what it was was the FBI was watching Bart Morris's

19   house?

20   A.   Yes.

21   Q.   And so then the operation moved to the Y Holler?

22   A.   Yes.

23   Q.   So did you then transport voters up there to be paid at

24   the Y Holler?

25   A.   Yes, I did.

ROBERTS - Direct (Mr. Parman)                                    10

1    Q.   And were they then paid?

2    A.   Yes.

3    Q.   And this is part of the same scheme?

4    A.   Yes.

5    Q.   Do you recall who was handing out money from the

6    Winnebago up at the Y Hollow?

7    A.   I don't remember exactly which one of them was giving me

8    the money, because there were several people in the Winnebago.

9    Trying -- I'm not positive.  I just know that it was Vernon

10   Hacker, I know he was in there, and I think Stanley, maybe

11   Bart was in there.  I'm trying to think which one of them was

12   giving me the money.  I can't remember who was handing me the

13   money in there.

14   Q.   Let's first of all start with who you're confident was

15   actually in the Winnebago in the Y Holler.  Are you sure that

16   Stanley Bowling was there?

17   A.   Yes, I'm pretty sure he was there at that time.

18   Q.   What about Bart Morris?

19   A.   I also think he was in there at that time.  He might not

20   have been, because that was -- I don't remember if it was at

21   the same time or not, because there was some trouble over at

22   the apartments when I drove by Beech Creek Apartments that

23   occurred between Bobby Sams and Bart.  But I didn't see it.

24   Q.   What kind of trouble occurred?

25        MR. GILBERT:  Objection, Your Honor.

ROBERTS - Direct (Mr. Parman)                                    11

1    A.  As soon as I pulled up --

2            THE COURT:  Overruled.  You can testify to your

3    observations.

4            MR. GILBERT:  She said he didn't see it.

5            THE COURT:  Did you see anything, ma'am?

6            THE WITNESS:  No, I didn't see it.  Just everybody

7    was over --

8            THE COURT:  Sustain the objection to what third

9    parties may have said.

10   Q.  How many loads of voters did you take into the Y Holler?

11   A.  I don't remember, sir.

12   Q.  More than one?

13   A.  Yes.

14   Q.  More than five?

15   A.  Yes.

16   Q.  In those trips, on any of them, did you see Bart Morris

17   in the Y Holler at the Winnebago?

18   A.  Yes, I know he was in the Winnebago at one time or the

19   other.

20   Q.  To your knowledge, whose Winnebago is that?

21   A.  To my understanding, it was his, because it was at his

22   home.

23   Q.  Now, while you were testifying, you said something about

24   your memory.  Is it the dates that you're concerned about?

25   A.  Yes.

*ROBERTS - Direct (Mr. Parman)*                                    12

1    Q.   What you've testified here to this jury today, though, as

2    far as who did what related to the election fraud, is your

3    memory fuzzy about that?

4    A.   Just a little bit about who handed me money.  I mean, I

5    do know that when I were -- that year, I was called in to --

6    it was either that year or the year before, I was called into

7    the bedroom, and I was paid because the -- my payment was

8    handed to me by Mr. Stanley Bowling, because he said here's

9    this.

10   Q.   You were paid for working in the election?

11   A.   Yes.

12   Q.   And Stanley Bowling paid you for your participation?

13   A.   Yes.

14   Q.   And how much did he pay you?

15   A.   I'm not positive how much was in it, if it was -- it was

16   between 250 and 275.

17   Q.   Are you positive as to where you took the voters?

18   A.   Pardon?

19   Q.   Are you positive as to where you took the voters?

20   A.   Yes, I am.

21   Q.   And where was that?

22   A.   I took them to his home -- you mean when --

23   Q.   At the beginning of the day, before the Y Hollow.  Let's

24   start there.

25   A.   Okay.  I took them to the garage at Bart's house.

ROBERTS - Direct (Mr. Parman)                                    13

 1   Q.   And your memory to that isn't fuzzy, is it?

 2   A.   No.

 3   Q.   And who paid you -- who give you money to then give to

 4   the voters, are you unclear about that?

 5   A.   No.

 6   Q.   Who did that?

 7   A.   Debbie Morris, Bart's wife.

 8   Q.   And the list that was given to you by Stanley Bowling and

 9   Bart Morris that had the list of the registered voters, are

10   you unclear about that in any way?

11   A.   Just I'm not really positive which one of them gave it to

12   me.  I just know I had a copy of it.

13   Q.   But you know for a fact you had the list?

14   A.   Oh, yes.

15   Q.   And that was the same list that Miss Debbie Morris had

16   when you was paying the voters?

17   A.   One identical to it.

18              MR. PARMAN:  May I have just a moment, Your Honor?

19              THE COURT:  Yes, sir, you may.

20   Q.   Ma'am, you had mentioned an altercation before.  I don't

21   want you to tell me what somebody else told you.  But then

22   after the election, did you have an occasion to go to Jennings

23   White's garage?

24   A.   Well, the polls hadn't shut down yet.  And yes, I stopped

25   in the garage, me and my daughter was together, Tanya Kay

ROBERTS - Direct (Mr. Parman)                                    14

1   Davidson.  And when we went in there, they was vehicles pulled
2   out in front of the garage.  And they told us to step back
3   because whoever was driving the vehicle -- they was calling
4   him Al Man.  I have no clue who that was.  They said, what I
5   was told later --
6           MR. ABELL:  Objection.
7   A.  But anyway --
8           MR. ABELL:  Objection, Judge.
9           THE COURT:  All right.  Sustain the objections to who
10  you were told was driving.
11  Q.  If you could, ma'am, as to relating the incident there in
12  the garage, only as to what you personally observed, not to
13  what somebody else told you.  Did you observe anything there?
14  A.  I didn't see any guns.  I just wanted out of the garage
15  because I told them, I said, just show me how to get out,
16  because I'm not dying over no election.
17  Q.  Did you see anybody in the garage?
18  A.  They was me and my daughter and Bill White and Bart was
19  still there, because I reckon it was right after the trouble.
20  We pulled up right after the trouble was supposed to happened
21  that I did not see.
22  Q.  But when you say Bart was still there, are you referring
23  to Bart Morris?
24  A.  Yes.
25  Q.  Okay.  Did you see anybody else there?

*ROBERTS - Cross (Mr. Gilbert)*                                          15

1    A.   They was a couple more people in there, but I could not

2    tell you who they were.

3              MR. PARMAN:  One more moment, Your Honor.

4              THE COURT:  Yes, sir.

5              MR. PARMAN:  That's all I have, Your Honor.  Thank

6    you.

7              THE COURT:  Thank you.

8              MR. PINALES:  No questions on behalf Mr. Maricle.

9              MR. WESTBERRY:  No.

10             MR. WHITE:  No questions, Your Honor.

11             MR. ABELL:  I don't have any questions of Miss

12   Roberts, Judge.

13             THE COURT:  Mr. Richardson.

14             MR. RICHARDSON:  No, Your Honor.

15             THE COURT:  Mr. Gilbert.

16             MR. GILBERT:  Just a few.

17                        CROSS-EXAMINATION

18   BY MR. GILBERT:

19   Q.   Miss Roberts, I'm Jerry Gilbert.  I represent Bart

20   Morris.  You were just involved in the '02 election; is that

21   correct?

22   A.   No.  I hauled voters for them before that.

23   Q.   Pardon?

24   A.   I hauled voters for them before that too.

25   Q.   Before that, but not after that?

ROBERTS - Cross (Mr. Gilbert)                                    16

1   A.   I don't know if I ever hauled any voters after that, to

2   be honest.

3   Q.   The events that you testified here today happened some

4   eight years ago, is that right, in the primary election where

5   Jennings White was running against Freddy Thompson; is that

6   correct?

7   A.   Yes.

8   Q.   And everything you've testified today happened at that --

9   during that election?

10  A.   I'm not positive about everything I said today happened

11  in that very election, but I knowed there was -- the incident

12  at the garage, that happened in between the election between

13  Jennings White and Freddy Thompson.

14  Q.   Okay.

15  A.   And I do know that for a fact.  But I can't remember if

16  it was that election where they had to move the Winnebago up

17  to Y Holler.

18  Q.   You're not positive about that?

19  A.   I know that happened.  I don't know if it was in 2002.

20  I'm not sure about the year.

21  Q.   And you're not positive you ever saw Bart Morris there at

22  the Winnebago?

23  A.   He was there at some time or the other.  I just don't

24  remember exactly when.

25  Q.   Okay.  And it's eight years ago, and you do have some

1    memory problems about that election; do you not?

2    A.   Yes, I do, sir.

3    Q.   Did you say that your daughter, Tanya Davidson, rode with

4    you while you were hauling votes?

5    A.   She rode with me one year, but I don't remember exactly

6    which year.  I know that she was with me.  I don't know if she

7    was in the car with me or if she was in another vehicle when

8    we went into the garage.

9    Q.   Okay.  Could have been this election?

10   A.   It could have been that election, yes, sir.

11           MR. GILBERT:  That's all.

12           THE COURT:  All right.  Thank you.  Miss Hughes?

13                      CROSS-EXAMINATION

14   BY MS. HUGHES:

15   Q.   Hi, Miss Roberts.  My name's Elizabeth Hughes.  I

16   represent Debbie Morris.  It's true, isn't it, you've never

17   sold your vote?

18   A.   Well, they always give me money.

19   Q.   For hauling.  You've hauled votes for money, right?

20   A.   Right.

21   Q.   But you haven't sold your vote for money?

22   A.   Well, I guess the way I always figured it up, they was

23   paying me for mine too.

24   Q.   All right.  When you did haul votes, you only hauled

25   votes for the Harts Branch precinct, right?

ROBERTS - Cross (Mr. Simons)                                18

1    A.   Well, yes, because I was asked, you know, about something

2    to the extent about, you know, if in the city limits, I could

3    take them to vote.

4    Q.   You didn't haul for the Manchester precinct, did you?

5    A.   Manchester?  No, pretty much the only voters I hauled was

6    from Harts Branch, because I pretty much knew everybody in

7    that area, because my mother has a piece of land that she

8    bought and has lived on there for 30 some years.

9         MS. HUGHES:  That's all I have, Judge.  Thank you.

10        THE COURT:  Mr. Simons.

11        MR. SIMONS:  Judge, I do have one or two.

12                       CROSS-EXAMINATION

13   BY MR. SIMONS:

14   Q.   Can you hear me, ma'am?

15   A.   Yes, sir.

16   Q.   My name is Dan Simons.  I represent Stanley Bowling.

17   I've been listening to you, what you've had to say.  It seems

18   that you're unsure about a lot of things here today.  Is that

19   fair?

20   A.   It's not that I'm unsure about a lot of things.  It's

21   just the years that --

22   Q.   Okay.  Well, you're uncertain who gave you the list.

23   You're uncertain when the trailer was at Y Hollow, right?  Is

24   that right?

25   A.   I'm not gonna say I'm positive.  I'm pretty sure the

ROBERTS - Cross (Mr. Simons)                                    19

1    trailer went to Y Holler the same year that Jennings and

2    Freddy Thompson ran against each other.

3    Q.   All right.  That would be 2002.  You're uncertain how

4    much money you said you were given, right?

5    A.   Yes.

6    Q.   You were uncertain as to whether the Harts Branch

7    precinct was at the school or downtown.  You don't remember

8    that; is that correct?

9    A.   Well, I know what -- the last few years I hauled was

10   pretty much at the swimming pool.

11   Q.   In 2002, the year you're talking about, can you tell me

12   where the precinct was that you say you took voters to?

13   A.   I'm almost positive it was at the swimming pool.

14   Q.   All right.  And the swimming pool would not be downtown,

15   right?

16   A.   Right.

17   Q.   Okay.  And you're almost positive that in 2002, that's

18   where you took the voters?

19   A.   Yes.  Because I've got two elections kind of mixed up.

20   Q.   I understand.  That's the 2002 election and some election

21   back before that, isn't it?

22   A.   Yes.

23   Q.   Okay.  And you're uncertain as to whether in 2002 your

24   daughter, Tanya Davidson, rode with you?

25   A.   I think she rode with me that year.  I think she worked

*ROBERTS - Cross (Mr. Simons)*                                      20

1    the year before.

2    Q.   So you think she rode with you in 2002?

3    A.   Yeah.

4    Q.   Is that right?  Is that your best memory right now?

5    A.   That's my best memory right now.

6    Q.   Okay.  Did you testify in Lexington in front of a grand

7    jury?

8    A.   Yes, sir.

9    Q.   Okay.  Do you remember when that was?

10   A.   Pardon?

11   Q.   Do you remember when you did that, ma'am?

12   A.   No, not exactly.

13   Q.   Okay.  If I told you it was July 12, 2007, would that

14   sound about right?

15   A.   Yeah.  Sound about right.

16   Q.   And did you meet with the agents of the FBI just prior to

17   that?

18   A.   Yes, I did.

19   Q.   And just a week or two before, ma'am?

20   A.   Yeah.  Because it's 2007, first time I met with the

21   agents.

22   Q.   The first time you met with them was just shortly before

23   your grand jury testimony on July 12; is that fair?

24   A.   That's fair.

25            MR. SIMONS:  That's all the questions I have, Your

*ROBERTS - Redirect (Mr. Parman)*                                          21

1    Honor.

2            THE COURT:  All right.  Thank you.  Any redirect, Mr.

3    Parman?

4            MR. PARMAN:  Briefly, Your Honor.

5            THE COURT:  Yes, sir.

6                        REDIRECT EXAMINATION

7    BY MR. PARMAN:

8    Q.  Ma'am, this list that you've been asked questions about,

9    are you certain that the list was given to you by either

10   Stanley Bowling or Bart Morris?

11   A.  Yes, I am.

12   Q.  It didn't come from nowhere else?

13   A.  No, it did not.

14   Q.  And you've been asked questions about hauling voters?

15   A.  Yes.

16   Q.  You hauled voters for Bart Morris for multiple elections.

17   Is that an accurate statement?

18   A.  Yes, I have.

19   Q.  But what you've relayed to us about transporting voters

20   to the polling place and then to be paid at Bart Morris's

21   house, do you know for a fact you did that in the election

22   between Jennings White and Freddy Thompson?  That's perhaps a

23   poor question.  Let me rephrase it for you.

24       In the election between Jennings White and Freddy

25   Thompson, are you positive that you hauled voters that were

ROBERTS - Recross (Mr. Simons)                                    22

1    then paid at Bart Morris's house?

2    A.   Yes.

3              MR. PARMAN:  No further questions, Your Honor.

4              THE COURT:  Thank you.  Anything else?

5              MR. SIMONS:  I do have.

6              THE COURT:  Mr. Simons.

7                          RECROSS-EXAMINATION

8    BY MR. SIMONS:

9    Q.   You don't have the list now, do you, that Mr. Parman was

10   talking to you about?

11   A.   No, I didn't find it.  I did find it after I was visited

12   by the FBI agent, and -- because I even told him I thought I

13   still might have it throwed in some boxes, because I just

14   boxed all my stuff up.

15   Q.   But you don't have it now?

16   A.   No.  I didn't find it before I came down here today.

17             MR. SIMONS:  Thank you.

18             THE COURT:  Anything else of the witness?  Thank you,

19   ma'am.  You may step down.  Witness will be finally excused.

20             Mr. Smith or Mr. Parman?  Mr. Smith.

21             MR. SMITH:  Thank you, Your Honor.  United States

22   would call Billie Jean Berry, B-e-r-r-y.

23             BILLIE JEAN BERRY, GOVERNMENT'S WITNESS, SWORN

24   ///

25   ///

BERRY - Direct (Mr. Smith)                                          23

1                        DIRECT EXAMINATION

2    BY MR. SMITH:

3    Q.   Good afternoon.  I'm going to ask you to speak into that

4    microphone, ma'am.  Would you state your name, please?

5    A.   My name's Billie Jean Berry.

6    Q.   Miss Berry, where do you live?

7    A.   I live in Manchester, Kentucky.

8    Q.   How long have you lived in that area?

9    A.   Just about all my life.

10   Q.   And do you have family there?

11   A.   Yes.

12   Q.   You have brothers and sisters?

13   A.   Yes.

14   Q.   And tell us who your sisters are.

15   A.   I have two sisters, Mary Gail Roberts and Patricia Jones.

16   Q.   Okay.  And did Mary Gail Roberts just testify here just

17   before you?

18   A.   Yes, sir.

19   Q.   And that's your sister?

20   A.   Yes, sir.

21   Q.   Do you have children?

22   A.   Yes, sir.

23   Q.   How many children do you have?

24   A.   I have three children.

25   Q.   What are their ages?

*BERRY - Direct (Mr. Smith)*                                                24

1    A.   My oldest daughter will be 40 in July, and my son will be

2    39 in December, and my baby girl's 35.

3    Q.   Okay.  Miss Berry, are you residing in a specific

4    neighborhood over there in the Beech Creek area currently?

5    A.   Yes, sir.  I live in a housing project.

6    Q.   And does that go by Beech Creek Apartments?

7    A.   Yes, sir.

8    Q.   Okay.  And how long have you lived at the Beech Creek

9    Apartments, ma'am?

10   A.   I lived in Beech Creek Apartments now for three years.

11   Q.   Okay.  And that would take us back to 2007.  Where did

12   you live prior to 2007, ma'am?

13   A.   I lived just under the hill from there.

14   Q.   Okay.

15   A.   I bought that place in 1984.

16   Q.   And you lived in that same area or that same residence

17   from 1984 till you moved into the Beech Creek Apartments?

18   A.   Yes, sir.  I lived at Burning Springs for maybe six

19   months.  I bought a home down there, but I gave it up.

20   Q.   Okay.  While in the Beech Creek area there, ma'am, were

21   you asked to work the election in 2002 when Jennings White ran

22   against Freddy Thompson?

23   A.   Yes, sir.

24   Q.   And do you recall who approached you, ma'am?

25   A.   Debbie Morris, Bart Morris and Stanley Bowling.

*BERRY - Direct (Mr. Smith)*                                        25

1   Q.   And do you remember where that meeting occurred?

2   A.   We talked about it at Debbie's beauty shop, and we also

3   talked about it at Debbie and Bart's home.

4   Q.   Okay.  And back in those -- in that time period, where

5   did they live, ma'am?

6   A.   I think the name of the street's Green Street.  It's

7   right behind SuperAmerica.

8   Q.   Okay.  And did they explain to you how you could help

9   them in this election in 2002?

10  A.   Yes, sir.  They gave us a piece of paper with everybody's

11  name on it that was in the Harts Branch area, and also we had

12  a piece of paper that had Manchester on it, because I knew

13  several people that lived there.

14  Q.   Now, this piece of paper, did you recognize it as being a

15  list of names?

16  A.   It was a list of everybody that was registered to vote.

17  Q.   Okay.  And who gave you the list, ma'am?

18  A.   Like I said, they was all three there.  Debbie probably

19  reached it to me.

20  Q.   And did you keep a copy with you during the election?

21  A.   Yes, sir.

22  Q.   And what was the purpose of this list that you had,

23  ma'am?  What did you do with the list?

24  A.   I looked over at the list.  And the people that I knew, I

25  would go and talk to them into voting.

BERRY - Direct (Mr. Smith)                                    26

1    Q.  Okay.  Now, when you had this meeting with Bart and

2    Debbie and this other person here -- what was their name?

3    A.  Bart Morris and Debbie Morris and Stanley Bowling.

4    Q.  Did you, in that conversation, learn who they wanted you

5    to have these voters vote for?

6    A.  Yes, sir.

7    Q.  And do you recall if there were more than one candidate

8    that they listed for you?

9    A.  Sometimes.

10   Q.  Okay.  Explain your answer, please.  Sometimes.

11   A.  Okay.  Jennings White and there were James Phillips.  I'm

12   not really sure.  I don't know how to answer that.

13   Q.  Did you understand Stanley Bowling was running for office

14   in 2002?

15   A.  Yes, sir.

16   Q.  And what was he seeking office?

17   A.  Pardon me?

18   Q.  Do you know what office he was seeking, ma'am?

19   A.  I think it was the magistrate.

20   Q.  Okay.  And was he included on that list of candidates

21   that you were to ask these voters to vote for?

22   A.  Yes, sir.

23   Q.  Okay.  And so you had this list, and then were you also

24   advised on how much money they were willing to pay these

25   voters?

*BERRY - Direct (Mr. Smith)*                                                27

1   A.   Usually, it was 20 dollars.

2   Q.   Okay.  And did you have the money yourself?

3   A.   No, sir.

4   Q.   Who handled the money during the 2002 election, ma'am?

5   A.   After the voters voted, I would take them to Bart

6   Morris's home, and Debbie usually gave me the money and would

7   mark their name out, and I would take the money back out to

8   the car to them and take them home.

9   Q.   Now, this list that you had, did they do anything with

10  the list as you were bringing voters in?

11  A.   I don't understand.

12  Q.   You said you had a list of the voters.  Did you take it

13  back to Bart and Debbie's house when you brought the voters

14  in?

15  A.   Yes, sir.

16  Q.   You had the list with you?

17  A.   Yes, sir.

18  Q.   And did they make any marks or do anything with the list?

19  A.   They also had a list, but I had a list too.  They would

20  draw a yellow line in it and put my initials on it.

21  Q.   Okay.  Did you get paid at some point for doing this for

22  them during the election?

23  A.   I got ten dollars for every person I got to vote.

24  Q.   Okay.  Were there other people doing this same job that

25  you were for the Morrises and Mr. Bowling?

*BERRY - Direct (Mr. Smith)*                                      28

1    A.   Yes, sir.

2    Q.   And could you name some of those people that you recall?

3    A.   David Hacker, Eddie Ray Heard, my sister Mary Gail

4    Roberts, and I think her daughter Tanya Davidson helped her

5    with one.

6    Q.   Now, how many voters do you recall taking back there to

7    the Morrises to be paid that day?

8    A.   Usually, anywhere from 10, 20, 25 voters.

9    Q.   Okay.  And when was it that you got paid that day, ma'am,

10   if you recall?

11   A.   At the end of the day.

12   Q.   And where did you go to get your payment?

13   A.   Debbie Morris's.

14   Q.   Okay.  And how much money did you receive for your day's

15   work there, if you recall?

16   A.   Ten dollars a head for each person I hauled.

17   Q.   And do you remember the grand total that came up to at

18   the end of the day?

19   A.   It varied.

20   Q.   Okay.  And you don't specifically recall the number of

21   dollars you got that day?

22   A.   No, sir.

23   Q.   All right.  Had you done this before, ma'am, in other

24   elections?

25   A.   I done it a couple times.

*BERRY - Direct (Mr. Smith)*                                    29

1   Q.   Okay.  Do you recall having traveled over to a place that

2   others have referred to as the Jennings White garage?

3   A.   Yes, sir.

4   Q.   And did you make a trip over there yourself that day at

5   some point?

6   A.   Yes, sir.

7   Q.   Okay.  And tell us, ma'am, what did you see when you got

8   there?

9   A.   We went there to get paid for -- to pay a voter, to get

10  the money to pay a voter.  And when we got there, Al Man

11  Stivers and Charles Stivers pulled up in a white truck, and

12  Bart Morris walked out and was talking to them, and they were

13  into it.  Bart had a gun.  They had guns.  And then they

14  pulled guns out, two guys did in the garage, and we hit the

15  floor.

16  Q.   "We hit the floor."  Who was with you, ma'am?

17  A.   Myself, my sister, and I think maybe my niece was there

18  too also that day.

19  Q.   What did you do then?

20  A.   We laid in the floor till it was over.

21  Q.   Did you witness any shots fired at that point?

22  A.   No, sir.  There was no shots.

23  Q.   Okay.  Were you able to leave safely?

24  A.   When they left, yeah.  We got outta there.

25  Q.   Now, the time that you were hauling these voters for Bart

*BERRY - Direct (Mr. Smith)*                                          30

1   Morris and Stanley Bowling, which poll did you take your

2   voters to, ma'am, if you recall?

3   A.   I don't understand.

4   Q.   Okay.  Did you take them to a place where they voted

5   people called the poll?

6   A.   Yes, sir.  Harts Branch district.

7   Q.   And when you got them there, did they see somebody inside

8   the poll?

9   A.   We would walk in with them, and usually Marty Young was

10  there, usually the one, and she would go in with them and push

11  the buttons for them, the ones they wanted that was for

12  voting.

13  Q.   And was she, at that time, associated closely with either

14  Bart Morris or Stanley Bowling, to your knowledge?

15  A.   Yes, sir.  We partied together at Bart Morris's.  They

16  were all friends.

17  Q.   How was she a friend of them, if you know?

18  A.   Her and her husband was friends.

19  Q.   What's her husband's name?

20  A.   Larry Young.  I don't think they're married now, but they

21  was at the time.

22  Q.   Do you recall if there was a Crystal Bowling that also

23  worked there at the poll?

24  A.   Yes, sir.

25  Q.   And do you know how she's related to either Mr. Bowling

*BERRY - Direct (Mr. Smith)*                                           31

1    or Mr. Morris?

2    A.   It's Stanley's daughter-in-law.

3              MR. SMITH:  If I could have just a moment.

4              THE COURT:  Yes, sir.

5    Q.   Do you know a fella by the name of Chris Duff?

6    A.   Pardon?

7    Q.   Chris Duff?

8    A.   Yes.

9    Q.   And did he in any way participate, to your knowledge?

10   A.   Yes, sometimes he would be at the polls.

11   Q.   And what was his job at the polls, to your knowledge?

12   A.   He was used to make sure that they did what they was

13   told.

14   Q.   Did they signal to you in some way to confirm that

15   they'd, in fact, voted the way they were supposed to?

16   A.   Yes, sir.

17   Q.   And what signal did they use, to your knowledge?

18   A.   (Nodding affirmatively).

19   Q.   You'll have to tell me what --

20   A.   They would shake their head.

21   Q.   So it was a nod?

22   A.   Yes.

23             MR. SMITH:  Okay.  That's all.  Thank you, Miss

24   Berry.

25             MR. ABELL:  Your Honor, before we get into any

*BERRY - Cross (Mr. Abell)*                                          32

1    cross-examination, I'd ask if there's any additional Jencks

2    material for this witness.

3              THE COURT:  Mr. Smith?

4              MR. SMITH:  No, Your Honor.

5              THE COURT:  Thank you.  Let's see.  Mr. Hoskins?

6              MR. HOSKINS:  No questions, Your Honor.

7              MR. WESTBERRY:  None, Your Honor.

8              MR. WHITE:  No questions, Your Honor.

9              MR. ABELL:  I do have a few questions.

10             THE COURT:  Okay.

11                         CROSS-EXAMINATION

12   BY MR. ABELL:

13   Q.  Miss Berry, my name is Robert Abell, and I represent

14   William Stivers in this case.  The incident at Jennings

15   White's garage took place in 2002?

16   A.  Yes, sir, I think so.

17   Q.  And you said you saw my client, William Stivers, there?

18   A.  He and Al Man was in a white truck.

19   Q.  Okay.

20   A.  They came back in and said Al Man and William, they had

21   guns, and they were ready to do something about their problem.

22   Q.  Were they having -- as far as you understood, Stivers was

23   having a disagreement with Mr. Morris?

24   A.  I didn't hear what they said, but you could tell it was a

25   disagreement, rather loud.

*BERRY - Cross (Mr. Gilbert)*                                    33

1  Q.  Was it your understanding or your perception that the

2  disagreement between Morris and Stivers regarded that 2002

3  election?

4  A.  Pardon me.  I didn't understand that.

5  Q.  Okay.  Did you think at the time that the disagreement

6  between Stivers and Bart Morris regarded the 2002 election

7  involving Jennings White?

8  A.  That was my understanding.

9         MR. ABELL:  Thank you.

10         MR. RICHARDSON:  No questions, Judge.

11         THE COURT:  Thank you.  Mr. Gilbert?

12         MR. GILBERT:  Thank you, Your Honor.

13                      CROSS-EXAMINATION

14  BY MR. GILBERT:

15  Q.  Miss Berry, I'm Jerry Gilbert, and I represent Bart

16  Morris.

17  A.  Hi.

18  Q.  At the time of the 2002 election, you testified that you

19  lived at the Beech Creek Apartments; is that correct?

20  A.  No, sir.  I lived under the hill in a trailer.

21  Q.  Okay.  I'm sorry.  I must have written that down.  Your

22  sister lived there?

23  A.  I think so.  Either there or she lived down Coal Holler,

24  one.

25  Q.  Now, you haven't hauled any voters in any election past

*BERRY - Cross (Mr. Gilbert)*                                          34

1    2002, have you?

2    A.   I don't think so.  That scared me.

3    Q.   And you say at the end of the day, you were paid for the

4    number of voters that you had taken to the polls?

5    A.   Yes, sir.

6    Q.   Isn't it a fact that you were paid by David Hacker and

7    Darnell Hipsher?

8    A.   Yes, sir.  David brought some money out there to me at

9    that time, and it was because I worked hard that day, and I

10   did more voters.  And Bart and them was in the bedroom, and I

11   went in there and told them, so they told Darnell to give me

12   the rest of the money.

13   Q.   Now, Jennings White's garage is not located in the same

14   area as Bart Morris's house, is it?

15   A.   No, sir.

16   Q.   It's on top of the hill, towards the hospital?

17   A.   Actually, it's across the street from Beech Creek

18   Apartments.

19   Q.   Now, this incident that you say happened there at

20   Jennings White's garage, were there a number of people up

21   there at the time?

22   A.   That were inside, Bill White, another guy I didn't know,

23   didn't recognize, and myself, my sister, and I think my niece

24   was there too.  And I don't know if there was anybody else

25   there or not.  It's a big garage.

*BERRY - Cross (Ms. Hughes)*                                                    35

1    Q.   Okay.  And it was during the election?

2    A.   Yes, sir.

3    Q.   Was Jennings White there?

4    A.   No, sir.

5    Q.   And how far away were you from the truck that was driven

6    by the Stivers?

7    A.   They were parked outside and we were inside.

8    Q.   And this disagreement that they had, you couldn't tell

9    what they were saying?

10   A.   No, sir.

11   Q.   And there were no shots fired?

12   A.   No, sir.

13            MR. GILBERT:  That's all.

14            THE COURT:  Thank you.  Miss Hughes?

15            MS. HUGHES:  Thank you, Your Honor.

16                         CROSS-EXAMINATION

17   BY MS. HUGHES:

18   Q.   Miss Berry, my name's Elizabeth Hughes.  I represent

19   Debbie Morris.

20   A.   Hi.

21   Q.   Do you know when Bart and Debbie Morris were married?

22   A.   Yes, sir.  Yes, ma'am.  Sorry.

23   Q.   Only woman on this table.  And when was that?

24   A.   I'm not sure of the date, but I remember, because I had

25   cleaned their house for a week before they got married.

*BERRY - Cross (Ms. Hughes)*                                          36

1   Q.   All right.  Was it before or after this -- the 2002

2   election?

3   A.   I'm not sure.

4   Q.   Now, are you sure that it was Debbie Morris that gave you

5   this list of voters?

6   A.   Like I said, they were all there.  They reached me a list

7   of all Harts Branch voters that were registered to vote.

8   Q.   So the only list you had would have been for Harts

9   Branch?

10  A.   Yes, ma'am.  That's where I lived.

11  Q.   Okay.  Now, do you recall giving testimony to the grand

12  jury in this case back on July 12, 2007?

13  A.   I gave testimony, yes, ma'am.

14  Q.   And you were under oath at the time; were you not?

15  A.   Yes, ma'am.

16  Q.   And at that time, you brought with you a voters list,

17  didn't you?

18  A.   I'm not sure.

19  Q.   Do you recall bringing a voters list with you for Goose

20  Creek?  I believe it was your sister's.  You didn't have one

21  of your own.

22  A.   I don't think I would have had one of Goose Creek.  I

23  don't know where that is.

24  Q.   Well, do you recall being asked this question --

25            MR. SMITH:  What page are we on?

*BERRY - Cross (Ms. Hughes)*                                                   37

1          MS. HUGHES:  Sorry, Mr. Smith.  Page 6, line 17.

2    Q.   You were asked the question:  Okay, now, let me see what

3    you brought here, if you don't mind.  And you answered:  That

4    belongs to my sister that you get at the poll.

5          Do you recall that?

6    A.   If it's on there, I probably said it.

7    Q.   And you continued.  The next question was:  This says

8    '02, May 28, '02 primary election.  Answer:  That's the only

9    one I could find.  I have mine at home, but I have been having

10   to move a lot, and, uh, the -- they're there somewhere.

11         Do you recall that?

12   A.   Yes, ma'am.

13   Q.   All right.

14   A.   Probably said that.

15   Q.   Then the next question was:  So Bart Morris would produce

16   this for you and say -- and then you interrupted and said:

17   These are the people you need to see.

18         Do you remember that?

19   A.   Yes.

20   Q.   Question:  Or would he be keeping something like this

21   himself?  And the answer was:  He would give us, he would make

22   copies of these papers which is -- which this is Goose Rock,

23   excuse me, is not ours on Harts Branch and, uh, East

24   Manchester.

25         Do you recall that?

*BERRY - Cross (Ms. Hughes)*                                        38

1   A.   I don't recall it.  But if it's on there, I probably said

2   it.

3   Q.   So you would agree with me that at the time of your grand

4   jury testimony, when you were asked about who gave you the

5   list, you referred to a male gender, he.

6   A.   They were there together.

7   Q.   In 2002, where did you -- where was the precinct?  Where

8   did you take these voters to?  Where was the polling place?

9   A.   I had Harts Branch, and sometimes I had a list of East

10  Manchester.

11  Q.   Okay.  Where did you take them to vote?

12  A.   Harts Branch.

13  Q.   Right.  Where was that located?

14  A.   At the middle school downstairs, and the East Manchester

15  was upstairs.

16  Q.   Now, you have said you saw Chris Duff at the polling

17  place.  Did you see him at Harts Branch?

18  A.   He hung around all of them, yes.

19  Q.   By all of them, which ones do you mean?

20  A.   The only ones I went to, middle school and Harts Branch.

21  Q.   The only polling place that you went to was at the middle

22  school, Harts Branch, correct?

23  A.   Yes.

24  Q.   All right.  You didn't go anywhere else; to the

25  Manchester precinct, for example?

*BERRY - Cross (Ms. Hughes)*                                              39

1   A.   If the Manchester is East Manchester, it was upstairs.  I

2   took voters up there, yes, ma'am.

3   Q.   Manchester and East Manchester are separate precincts;

4   are they not?

5   A.   I'm not sure.

6   Q.   Okay.  But your testimony is you saw Chris Duff at all

7   the precincts that you went to?

8   A.   Not every time.

9   Q.   Now, you've never sold your own vote, have you?

10  A.   Yes, ma'am, I have.

11  Q.   Well, let me -- let's again go back to your grand jury

12  testimony, okay?  I'm on page 4, line 22.  You were asked the

13  question:  But you've indicated that in '06 when you voted

14  that it didn't happen.  And you answered:  No, it did not,

15  because I did not sell my vote at that time.

16       Do you remember that?

17  A.   When I hauled voters, I did not sell my vote.  But in the

18  past, yes, ma'am, I have.

19  Q.   All right.  Well, let me continue on then.  The next

20  question you were asked, at line 25:  Okay.  Did you haul

21  voters?  And your answer was:  No, and I done -- I have never

22  sold my vote, but I have hauled voters, and they expect to go

23  in there with you to push the buttons the way they want you to

24  vote.

25  A.   Yes, ma'am.  That's true.

*BERRY - Cross (Mr. Simons)*                                        40

1           MS. HUGHES:  One moment, Your Honor.  That's all,

2   Your Honor.  Thank you.

3           THE COURT:  Thank you, Miss Hughes.  Mr. Simons.

4           MR. SIMONS:  Your Honor, I just have one or two.

5                     CROSS-EXAMINATION

6   BY MR. SIMONS:

7   Q.   Ma'am, my name is Dan Simons.  I represent Stanley

8   Bowling.  The only election that you were ever involved in

9   where my client was a candidate was the May election in 2002;

10  is that correct?

11  A.   I'm not sure of the dates, but I participated.

12  Q.   Jennings White/Freddy Thompson race?

13  A.   Yes.

14  Q.   That's it, correct?

15  A.   Yes.

16  Q.   Okay.  Now, and you've -- the only place he would have

17  been running that's been mentioned in your testimony is Harts

18  Branch?

19  A.   There was --

20  Q.   Is that fair, or do you know?  You may not know.

21  A.   I don't know how many race precincts he ran in, but I

22  know that is the one that I lived in.

23  Q.   And he was running as a magistrate involving the Harts

24  Branch precinct?

25  A.   Yes.

BERRY - Cross (Mr. Simons)                                    41

1    Q.   Now, where did you say you took the voters at Harts

2    Branch?

3    A.   If I took Harts Branch, downstairs at the middle school.

4    And if I took ones from East Manchester, I took them upstairs.

5    Q.   You had East Manchester and Manchester and Harts Branch

6    that you hauled for?

7    A.   There's only two that I used.

8    Q.   Okay.  East Manchester and Manchester are two different

9    precincts.  Which one did you take them to?

10   A.   Whichever one is upstairs from the middle school.

11   Q.   And you mentioned -- did you actually walk into the poll

12   with the people that you took?  Did you wait outside?

13   A.   Sometimes I walked in, sometimes I waited outside.

14   Q.   And you mentioned a lady named Marty Young?

15   A.   Yes.

16   Q.   Okay.  Do you know her?

17   A.   Yes.

18   Q.   And she was there, and that's who you took the voters to?

19   A.   Yes.

20   Q.   Now, Miss Hughes asked you a couple of questions about

21   your grand jury testimony.  Do you remember giving that

22   testimony in Lexington?

23   A.   Yes.

24   Q.   All right.  And that was July the 12th of 2007, correct?

25   Do you know?

*BERRY - Redirect (Mr. Smith)*                                        42

1   A.   I think so.

2   Q.   And when is the first time you talked to any agents about

3   this case?  Would it have been just before that?

4   A.   I'm not sure of the day.  But they contacted me.

5   Q.   Would it have been just shortly before you went before

6   the grand jury, ma'am?

7   A.   I think it was a little bit before, yes.

8   Q.   Okay.  Within a week or two?

9   A.   I'm not sure.

10   Q.   Certainly within a month of the grand jury testimony?

11   A.   I'm not sure.

12        MR. SIMONS:  Your Honor, I think that's all.

13        THE COURT:  All right.  Thank you.  Mr. Smith, any

14   further questions?

15        MR. SMITH:  Couple, Your Honor, if I could.

16                      REDIRECT EXAMINATION

17   BY MR. SMITH:

18   Q.   Miss Berry, the East Manchester and Manchester precincts,

19   are they generally voting those people in the same building,

20   to your knowledge?

21   A.   Yes, there's an upstairs -- downstairs is Harts Branch,

22   and the one upstairs is where you take the East Manchester

23   people.

24   Q.   And you were only concentrating on East Manchester and

25   Harts Branch?

*BERRY - Redirect (Mr. Smith)*                                                43

1   A.   Yes, sir.

2   Q.   Okay.  Now, when you came to the grand jury, you were

3   asked some questions about a list.  Did you actually have the

4   list that you referred to as the one given to you by either

5   Bart or Debbie Morris?

6   A.   Yes, sir, they gave us all a list of everybody that --

7   Q.   Were you able to find that list and bring it to the grand

8   jury the day you testified, to your knowledge?

9   A.   I'm not sure.

10  Q.   But you were shown a list, according to the question that

11  was read to you, and you said that that wasn't your list.

12  That that was something your sister had brought, but that

13  wasn't the one.  Do you recall that?

14  A.   I think so.  I'm really not sure.

15  Q.   You don't know what the list looked like that you were

16  shown at the grand jury, but it wasn't your list.  Is that

17  what you're saying?

18  A.   Yes.

19  Q.   Okay.  And you're sure that list came from Bart or Debbie

20  Morris?

21  A.   Yes.

22            MR. SMITH:  Thank you.

23            THE COURT:  Any further cross of the witness?  All

24  right.  Thank you, ma'am.  You may step down.

25            THE WITNESS:  Thank you, sir.

*A. SMITH - Direct (Mr. Smith)*                                    44

1            THE COURT:  Witness will be finally excused.

2            Mr. Smith, you may call your next witness.

3            MR. SMITH:  Yes, Your Honor.  United States will call

4    Amanda Smith.

5            THE COURT:  Thank you.

6              AMANDA SMITH, GOVERNMENT'S WITNESS, SWORN

7            THE COURT:  You may proceed.

8                         DIRECT EXAMINATION

9    BY MR. SMITH:

10   Q.  State your name, please.

11   A.  Amanda Smith.

12   Q.  And where do you live, Miss Smith?

13   A.  In Clay County.

14   Q.  And are you married?

15   A.  Yes.

16   Q.  How long have you been married?

17   A.  For probably about three years.

18   Q.  Okay.  And do you all have a home, or do you rent a

19   place, or what's your living situation there?

20   A.  We're renting.

21   Q.  Okay.  And do you recall voting in this past election in

22   2006 where there was a contest between Daugh K. White and

23   Carmen Webb Lewis?

24   A.  Yes.

25   Q.  And where were you living when you voted in that

*A. SMITH - Direct (Mr. Smith)*                                          45

1  election, if you recall?

2  A.   On Horse Creek.

3  Q.   Okay.  And at the time that you voted in that election,

4  did someone approach you to get you to take money for your

5  vote, ma'am?

6  A.   Yes.

7  Q.   And who approached you?

8  A.   Well, my husband came and got me, and the guy approached

9  him, but it was Raleigh Downey.

10  Q.   Okay.  Raleigh, and the last name?  I'm sorry.  I didn't

11  get that.

12  A.   Downey.

13  Q.   Downey, okay.  And did you and your husband know Raleigh

14  before this day on the election of November, 2006?

15  A.   My husband did.

16  Q.   Okay.  And what happened when -- you say he came, talked

17  with your husband.  What happened then?

18  A.   Well, I guess it was maybe Ouchie Jackson, he, he was the

19  one wanting us to go vote, and he wanted Raleigh to take us

20  and go with us.

21  Q.   Okay.  And what happened then?

22  A.   We got in the car with him, and we went down there, and

23  we went and voted, and then he took us back to our car

24  afterwards.

25  Q.   Okay.  And when you say we went and voted, who was with

*A. SMITH - Direct (Mr. Smith)*                                    46

1    you, ma'am?

2    A.   It was me and my husband.

3    Q.   Okay.  And did you all get some money?

4    A.   Yes.

5    Q.   And who gave you the money?

6    A.   Raleigh.

7    Q.   And when did he give you the money?

8    A.   Whenever we come out of the voting at the school, we got

9    in the car, and it was laying in the seat, and he had it

10   laying there for us.

11   Q.   Okay.  What kind of car was he in?

12   A.   I'm not good on cars, but I know it was white.

13   Q.   Do you know whose car it was?

14   A.   It was his.

15   Q.   And you say that he didn't hand you the money, but it was

16   laying in the seat?

17   A.   Yes.

18   Q.   And did he have money for both you and your husband laid

19   out on the seat?

20   A.   Yes.

21   Q.   Did anyone approach you later and ask you to haul voters

22   for them?

23   A.   No.

24   Q.   Okay.  When you were approached to sell your vote, ma'am,

25   did they give you a list of candidates that you were expected

*A. SMITH - Cross (Mr. Hoskins)*                                    47

1   to vote for to get that money?

2   A.   Well, he told us the names to vote for.

3   Q.   Were there more than one?

4   A.   Yes.

5   Q.   And do you recall any of the names that he gave you at

6   that time?

7   A.   It was his self, which was Ouchie Jackson, and for Doug

8   White and Darnell Hipsher, and I believe -- I believe that was

9   it.

10  Q.   Has anyone approached you since then?

11  A.   No.

12  Q.   Were you ever approached before then?

13  A.   No.

14  Q.   How long have you lived in Clay County?

15  A.   All of my life.

16  Q.   When did you register to vote?

17  A.   It was that election.

18  Q.   In 2006?

19  A.   Yes.

20          MR. SMITH:  Thank you.

21          THE COURT:  Mr. Hoskins?

22          MR. HOSKINS:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. HOSKINS:

25  Q.   Hi, my name is David Hoskins, and I represent Cletus

*A. SMITH - Cross (Mr. Hoskins)*                                    48

1    Maricle.  Doug White was one of the people Ouchie Jackson

2    asked you to vote for?

3    A.   Um-hmm.

4    Q.   And Doug White was running for mayor --

5    A.   Um-hmm.

6    Q.   -- of the City of Manchester?

7    A.   Yes.

8    Q.   Darnell Hipsher was one of the other people that Ouchie

9    Jackson asked you to vote for?

10   A.   Yes.

11   Q.   And Darnell was running for city council in the City of

12   Manchester?

13   A.   Um-hmm.

14   Q.   And then the last name that you could remember was

15   Ouchie?

16   A.   Um-hmm.

17   Q.   And Ouchie was running for city council --

18   A.   Yes.

19   Q.   -- for the City of Manchester?  And you weren't asked to

20   vote for anybody else that you remember?

21   A.   Not that I can remember, no.

22            MR. HOSKINS:  That's all.  Thank you.

23            THE WITNESS:  Okay.

24            MR. WESTBERRY:  Nothing, Your Honor.

25            MR. WHITE:  No questions.

*D. SMITH - Direct (Mr. Smith)*                                          49

1           MR. ABELL:  No questions.

2           MR. RICHARDSON:  No questions.

3           MR. GILBERT:  No questions, Your Honor.

4           THE COURT:  All right.  Thank you.  Anything else,

5    Mr. Smith, of this witness?

6           MR. SMITH:  No.  Thank you.

7           THE COURT:  Thank you, ma'am.  You may step down.

8    Mr. Smith?

9           MR. SMITH:  Call Darren Smith.

10          THE COURT:  Thank you.

11          DARREN SMITH, GOVERNMENT'S WITNESS, SWORN

12                      DIRECT EXAMINATION

13   BY MR. SMITH:

14   Q.  Good afternoon.  State your name, please.

15   A.  Darren Smith.

16   Q.  And Darren, where do you live?

17   A.  Manchester.

18   Q.  And I'm going to ask you, if you could, adjust that

19   microphone just a little bit closer to you, if you could.  How

20   long have you lived in the Manchester area, Mr. Smith?

21   A.  I guess pretty much all my life.  I lived in London

22   probably maybe two months, I guess, we moved back to

23   Manchester.

24   Q.  Okay.  Are you married?

25   A.  Yes.

*D. SMITH - Direct (Mr. Smith)*                                          50

1    Q.   And who are you married to?

2    A.   Amanda Smith.

3    Q.   How long have you all been married?

4    A.   I'd say four years, I guess.

5    Q.   Did you vote back in the 2002 election, Mr. Smith?

6    A.   Yes, pretty sure, my best knowing memory.

7    Q.   Do you recall selling your vote in 2002?

8    A.   Yes.

9    Q.   And tell us how that happened.

10   A.   Well, a guy named Chris Duff, he come up to my house.  I

11   can't remember for sure where it was at, and he told me to

12   meet his, I believe, uncle, cousin.  I forget.  It's been so

13   long.  You know, he was hauling voters, and he would give

14   me --

15   Q.   Who was hauling voters, to your understanding?

16   A.   Chris was hauling voters.

17   Q.   Okay.  And what was -- you said that you got approached

18   to sell your vote.  Who approached you to sell your vote?

19   A.   Chris Duff.

20   Q.   And did he talk about what he wanted you to do for the

21   money?

22   A.   He wanted me to vote for, I believe it was Barbara White

23   Colter and -- I'll think of his name here in a minute.  It

24   was --

25              MR. ABELL:  Excuse me, Your Honor.  May we have the

*D. SMITH - Direct (Mr. Smith)*                                          51

1    witness pull the microphone closer to him?

2         THE COURT:  Just move that down a little bit.  Just

3    keep your voice up, if you could.

4         THE WITNESS:  Okay.

5    A.   It was, let's see here.  It was Barbara White Colter and

6    Mr. White.  I can't think of his name.

7    Q.   What race was he running for?  Do you know what office?

8    A.   He was running for jailer.  I can remember that much.

9    Q.   Another White running for jailer.  Anybody else you were

10   asked to vote for?

11   A.   Well, I just can't remember for sure.

12   Q.   Were there others you think, but you don't remember?

13   A.   There was some more.  I can't remember for sure.

14   Q.   How much money was he offering you or willing to pay you

15   to get you to vote this way?

16   A.   I'm not 100% sure.  It was in the 50, maybe 40, 50

17   dollars.  I don't know.  I'm just saying.

18   Q.   Okay.  And did you take him up on his offer?

19   A.   Yes, I did.

20   Q.   And how did you get paid, if you remember?

21   A.   It was cash.

22   Q.   And who paid you?

23   A.   It was the White, Mr. White, I believe.

24   Q.   Mr. White, the one that you referred to as the jailer

25   candidate?

*D. SMITH - Direct (Mr. Smith)*                                        52

1   A.   Jailer, yes.

2   Q.   Now, in 2006, did you also get approached to sell your

3   vote in 2006?

4   A.   Yes, I did.

5   Q.   And who approached you in 2006?

6   A.   Ouchie Jackson.

7   Q.   Okay.  And do you recall what he was offering and what he

8   wanted you to do?

9   A.   He wanted me to help his -- he gave me 20 dollars to vote

10  for him, Darnell Hipsher, Doug White and I believe maybe it

11  was Penny Robertson.  I ain't 100% sure.  I ain't gonna say,

12  you know, for sure.  I think maybe it was Penny Robertson too.

13  Q.   Did you at some point learn from Ouchie Jackson where he

14  was getting his money?

15  A.   Yeah, I guess.

16  Q.   Did he tell you?

17  A.   Well, he was talking to -- think of his name here in a

18  minute.  I believe he said it -- I can't remember for sure.

19  Q.   Let me hand you a document here, if I could, see if this

20  refreshes your memory as to that conversation.

21  A.   I'm not real good with memory.

22  Q.   I'm going to put a star here by this paragraph and ask if

23  you take a look at that and see if that refreshes your memory.

24           MS. HUGHES:  Can we see what it is first?

25           MR. SMITH:  Certainly.  I believe you all have a

*D. SMITH - Direct (Mr. Smith)*                                          53

1    copy.

2          MS. HUGHES:  I'm not saying I don't have it.  Could I

3    see it for one second?  Thank you.

4          THE COURT:  You can show it to the witness.

5    Q.   I don't want you to read that document out loud, but just

6    read it to yourself; and when you're finished, let me know.

7    A.   Okay.

8    Q.   And again, I highlighted that one paragraph, if you want

9    to just read that.

10   A.   Yeah, I ain't real good with reading.

11   Q.   Some of us need reading glasses, and that's okay if you

12   forgot yours.  I don't have mine with me this afternoon

13   either.  Take your time.

14   A.   Well, see --

15   Q.   Again, just before we get started back here, Mr. Smith, I

16   just want to ask you, has that refreshed your memory at all?

17   It either has or it hasn't.  Just ask you to answer yes or no.

18   A.   Yes, it's helped.  I mean, I'm not real good of a reader,

19   you know.

20   Q.   I understand.  Now, again, I don't want you reading the

21   document to us, all right, but I want you to tell me what you

22   recall.  Again, my question was -- I'm going to go back and

23   restate it.  Question was, did you learn where Mr. Jackson was

24   getting his money the day that he paid voters for voting?

25   A.   Well, he told me -- I was standing there while Bart

*D. SMITH - Direct (Mr. Smith)*                                              54

1    Morris, he pulled up at that time.  I was standing there

2    talking to Ouchie, and I kind of walked off, and they -- I

3    mean, this is my memory now.  And he held -- he handed -- Bart

4    Morris handed Ouchie it was either an envelope or I ain't know

5    for sure if it was money or what it was.  But, you know, he

6    said if he needed more money, he could get more, you know,

7    money off of people.

8    Q.   Who told you that?

9    A.   Ouchie.

10   Q.   Okay.

11   A.   Jackson.

12   Q.   And after he got the envelope, was he able to pay you

13   then?

14   A.   Yes.  I mean, well, he -- you know, he paid us.  That was

15   right when -- Raleigh is the one that paid us with Ouchie.

16   Q.   Okay.  So Raleigh paid you?

17   A.   Yeah.

18   Q.   Did anybody ask you to help haul voters for them that

19   day?

20   A.   Yes.

21   Q.   Who asked you?

22   A.   Ouchie Jackson.

23   Q.   Okay.  And what did you tell him?

24   A.   I told him -- he told me that he's -- well, we left that

25   day, and then we come back, and I used to live up there, and

*D. SMITH - Direct (Mr. Smith)*                                        55

1    we rode by, and he said that he didn't lack much.  That's what

2    he got told, you know, that he didn't have, and he said that

3    he needs a few more voters to haul some voters.

4    Q.  Okay.  Did you make an answer to him as to whether or not

5    you would do it or not?

6    A.  I told him I would if I could, you know.

7    Q.  Okay.  Did you do it?

8    A.  Best of my memory, no.  I don't think I did, just other

9    than me and my wife.

10   Q.  That's the only ones that you took?

11   A.  As best I can remember.

12   Q.  All right.

13   A.  Ain't saying for sure.  Pretty sure that was.

14   Q.  Okay.  Now, this is a conversation that you had with

15   Jackson.  You said it was in the evening.  Was this on the day

16   that you voted or was this the days before you voted?

17   A.  Now, we went back that evening and he told me -- Ouchie,

18   he was across the road.  There was, you know, a house.  And he

19   walked across the road to Tiny and Phil, I guess was his name.

20   Q.  Okay.

21   A.  He was hiding, and I guess --

22   Q.  Who was hiding?

23   A.  Ouchie.  And he said that he got word that the Feds was

24   watching him.  That's what he said.  I remember that much.

25   Q.  Okay.

*D. SMITH - Cross (Mr. Gilbert)*                                          56

1    A.   And he told me if I could haul some more voters, he

2    didn't have much, you know, he didn't lack much of having it

3    won.  I mean, he needed some more voters, you know.

4    Q.   Okay.

5    A.   He was getting close.  He really, he needs some voters.

6    Q.   And this all occurred on the election day?

7    A.   Yeah.

8              MR. SMITH:  Okay.  Pass the witness.

9              MR. PINALES:  No questions.

10             MR. WESTBERRY:  None.

11             MR. WHITE:  No questions, Your Honor.

12             MR. ABELL:  None, Judge, thank you.

13             MR. RICHARDSON:  No.

14             MR. GILBERT:  I just have a few, Your Honor.

15             THE COURT:  Yes, sir.

16                           CROSS-EXAMINATION

17   BY MR. GILBERT:

18   Q.   Mr. Smith, my name is Jerry Gilbert, and I represent Bart

19   Morris.  In 2002 election, you said that Chris Duff was

20   hauling voters; is that --

21   A.   In the what now?

22   Q.   In 2002, the election, you testified that Chris Duff was

23   hauling voters?

24   A.   Well, I guess, yeah, that would be hauling voters, you

25   know.  That's what he told me that day, yeah.

*D. SMITH - Cross (Mr. Gilbert)*                                        57

1    Q.   And what precinct were you voting in in 2002?

2    A.   In 2002, I couldn't -- I don't remember for sure.

3    Q.   You testified that you were paid by Mr. Kennon White for

4    your vote?

5    A.   Yes, best I can remember, I told him, yes.

6    Q.   And he was running for jailer; is that correct?

7    A.   Yes.

8    Q.   Do you remember any other voters that you were instructed

9    to vote for by Mr. Kennon White?

10   A.   I believe it was Barbara White Colter was one of them, I

11   believe now.  I'm not for sure.  I mean, it was -- just not

12   for sure.  I ain't real good with the memory.

13   Q.   But you remember Barbara Jo Colter and Mr. Kennon White?

14   A.   Yes.

15   Q.   And you can't recall any of the others that you were

16   instructed to vote for?

17   A.   I mean, I'm just -- seemed like Barbara White's, you

18   know, name, he told me to vote for.  I'm pretty sure it's

19   Barbara White Colter, yeah.

20   Q.   But those are the only two that you can recall?

21   A.   Yes.

22   Q.   Now, in 2006, do you remember if your testimony related

23   to the May primary or the November general election?

24   A.   Run that by me again there?  I couldn't -- I didn't

25   understand.

*D. SMITH - Cross (Mr. Gilbert)*                                    58

1    Q.   Okay.   There are two elections in 2006, one that occurs

2    in the spring, May, the primary election and another election

3    in the fall, in November, the general election.   Which

4    election does your testimony refer to?

5    A.   In the 2006?

6    Q.   Yes, sir.

7    A.   November, I believe.

8    Q.   All right.

9    A.   Best I can remember.

10   Q.   And you were paid by Ouchie Jackson; is that correct?

11   A.   No.   I was paid --

12   Q.   Where did he pay you at?

13   A.   I wasn't paid --

14        MR. SMITH:   Your Honor, I ask that the witness be

15   allowed to answer.

16        THE COURT:   He said that wasn't who paid him.

17        MR. GILBERT:   I'm sorry.   I'm having trouble hearing

18   him.

19        THE COURT:   Is that what you said, that that wasn't

20   who paid you?

21        THE WITNESS:   No, it wasn't who paid me.   That's what

22   I said.

23        THE COURT:   All right.

24   Q.   Raleigh Downey paid you?

25   A.   Um-hmm.

*D. SMITH - Cross (Mr. Gilbert)*                                          59

1    Q.   And he left it in the car?

2    A.   Um-hmm.

3    Q.   What precinct were you voting in in that election?

4    A.   I guess -- I get 'em mixed up.  It was either -- I don't

5    know.  Pigeon Roost or Horse Creek.  I don't know for sure.

6    Q.   But you're uncertain as to which precinct polling place

7    that you cast your vote in November of 2006?

8    A.   Do what now?

9    Q.   You're unsure as to which polling precinct you cast your

10   vote in 2006?

11   A.   Well, I --

12   Q.   It would be Pigeon Roost, or did you say Goose Rock?

13   A.   Horse Creek.

14   Q.   Horse Creek, I'm sorry.

15   A.   It was either Horse Creek or Pigeon Roost.  I'm not for

16   sure.  The way they got it set up, it's really hard to tell

17   there.

18   Q.   All right.

19   A.   I mean, I know where it was at if I was there today, but

20   I couldn't remember the name.

21   Q.   You have some memory problems; do you not --

22   A.   Yes.

23   Q.   -- Mr. Smith?

24   A.   Yes.

25   Q.   And, in fact, you couldn't initially remember where Mr.

*D. SMITH - Cross (Mr. Gilbert)*                                    60

1    Jackson said he got the money from?

2    A.    No.  I mean, it's -- I don't know for sure, no.

3              MR. GILBERT:  That's all.

4              THE COURT:  Miss Hughes?

5              MS. HUGHES:  May we approach for a moment?

6              THE COURT:  Yes, you may approach.

7                      (A sidebar conference was held out of the

8                      hearing of the jury):

9              THE COURT:  Yes, ma'am?

10             MS. HUGHES:  It's Elizabeth Hughes.  I believe that

11   this witness appears to me to be under the influence of

12   something, and I'd like to ask him that question.

13   Specifically, whether or not he's under the influence of any

14   drugs or alcohol or medication today.  I did not, however,

15   want to do that without asking the Court's permission first,

16   because my good faith basis for asking that question is simply

17   his demeanor.  So I just thought that discretion is the better

18   part of valor, and I ought to run that by the Court first.

19             THE COURT:  All right.  We may have a failure to

20   communicate here.  There's a problem with dialect.  I

21   understand.  What we'll do is I'm going to give the jury their

22   break, take a 15-minute break, and I'll let you voir dire him

23   on those issues outside of the presence of the jury.  If there

24   does appear to be a problem, you can ask him when the jury's

25   brought back in.

*D. SMITH - Cross (Mr. Gilbert)*                                61

1              MS. HUGHES:  That's perfect.  Thank you.

2              THE COURT:  We'll take a 15-minute recess for the

3      jury, but we'll remain in session.

4              MR. SMITH:  I have something I'd like to bring up

5      with you.  I have asked that 17 witnesses be here today, and I

6      went through about 12 or 14 of them at this point.  We've not

7      called all of them.  I need a little extra time in the

8      afternoon break, because I'd like to keep this going this

9      afternoon, if I can.

10             Without an additional break, at least 30 minutes, I'm

11     not going to be sure that I can have a full list of witnesses

12     available.  You understand I'm bringing them from Clay County

13     to Frankfort, and they don't all have the best of

14     transportation.

15             THE COURT:  Would you like to take a longer break now

16     or take a second break later?

17             MR. SMITH:  Like to have a break now.

18             THE COURT:  Longer break now, all right.  20, 25

19     minutes be sufficient?

20             MR. SMITH:  Sure.

21             THE COURT:  I'd rather spend that time now than

22     recess early.  So we'll tell the jury we'll be in recess for

23     20 minutes or so, and that will give us time to go through

24     this issue with this witness and give you all the usual

25     20-minute break.  Thank you.

*D. SMITH - Voir Dire by Ms. Hughes*                                    62

1              (Sidebar conference concluded.)

2          THE COURT:  Ladies and gentlemen, we started a little

3    bit earlier after our lunch break, so we're going to go ahead

4    and take our afternoon break at this time.  We may take

5    another later in the day, but we'll take at least a 20-minute

6    recess at this time, maybe a few minutes longer.  At this

7    time, we'll be in recess for 20 minutes.  Please keep in mind

8    the admonition you were given previously.  Jury will be

9    excused for 20 minutes.

10             (The jury left the courtroom at 2:12 p.m.)

11         THE COURT:  The record will reflect the jury is not

12   present at this time.  Before we take our recess, Miss Hughes,

13   I believe you have a few questions of the witness before we

14   break.

15         MS. HUGHES:  I do.  I'm going to use the podium so I

16   can see him better.

17         THE COURT:  Yes, ma'am.

18                            EXAMINATION

19   BY MS. HUGHES:

20   Q.  Mr. Smith, my name is Elizabeth Hughes.  I represent

21   Debbie Morris.  I wanted to ask you, do you take any

22   medication?

23   A.  Yes.

24   Q.  What kind of medication do you take?

25   A.  I take Saboxin 8.2, I believe it is and Lyrica 200

1    milligrams, phenobarbital, but I ain't took it in a month or

2    so.  I take three blood pressure pills, stomach pill.

3    Q.  The Saboxin, what do you take that for?

4            MR. SMITH:  Your Honor, I don't know that the witness

5    was completely finished with his list.  I want to make sure he

6    is.

7            MS. HUGHES:  I apologize.

8    A.  Saboxin and a stomach pill, and there's a couple more in

9    there.  Sleeping pill, it's for my nerves, help me sleep.

10   Can't think of the name of it for sure.  And I take Lunesta.

11   I ain't took it in a while.

12   Q.  Is that all?

13   A.  I'm pretty sure that's all, yes.  It's enough.

14   Q.  Okay.  The Saboxin, what do you take that for?

15   A.  I take it for getting off pain pills and that stuff.

16   Q.  How long have you been taking the Saboxin?

17   A.  Probably three and a half years, I guess.

18   Q.  And have you stayed off the pain pills?

19   A.  Yes, I done a real good job.

20   Q.  And the Saboxin, does it make you a little hazy?  Does it

21   affect you in any way?

22   A.  Yeah.

23   Q.  Yeah.  And did you take that before you came today?

24   A.  I took it about 3:00 this morning, yes.

25   Q.  Is that when you usually take it?

*D. SMITH - Voir Dire by Ms. Hughes*                                      64

1   A.   Well, no, I usually take it early in the morning, but,

2   you know, I don't sleep well, and I just, I've been up since

3   3:00.

4   Q.   Okay.  What about the nerve pill.  Have you taken that

5   today?

6   A.   No, no.

7   Q.   Do you think that any of the drugs that you've taken have

8   affected your ability to remember or to testify accurately

9   today?

10  A.   Yes.  I mean, yes.

11  Q.   All right.  Have you taken anything else?

12  A.   No.

13  Q.   Okay.

14  A.   I mean --

15  Q.   I'm sorry to ask that.

16  A.   Well, it was this morning I took my Lyrica, but I've only

17  took one.

18  Q.   What's the Lyrica for?

19  A.   It's for like muscle cramps and -- I know the name.  I

20  can't think of the name.  My wife knows.  It's just from more

21  or less pain like in the legs and everything.

22  Q.   All right.

23  A.   My back.

24  Q.   So that's a muscle relaxer pain medicine?

25  A.   Yeah, well, it's got like seven different kinds of

*D. SMITH – Voir Dire by Ms. Hughes*                                        65

1    medicine in it.

2    Q.   And you took that today, I guess?

3    A.   Yeah, it was at about 3:00 this morning.

4    Q.   At the same time that you took the Saboxin?

5    A.   Yes.

6    Q.   All right.  Have you taken any of your medications since

7    you got here today?  What time did you get here today?

8    A.   It was about 9:00.

9    Q.   This morning?

10   A.   Yeah.

11   Q.   And so you didn't bring any of your meds with you?

12   A.   No.

13   Q.   All right.

14   A.   I ain't took my blood pressure pill or nothing like that.

15   Q.   You probably should have taken that one.  This place will

16   do it to you.

17             MS. HUGHES:  Thank you, Your Honor.  That's it.

18             THE COURT:  Thank you, Miss Hughes.  Mr. Smith, you

19   can step down.  We're going to take about a 20-minute recess,

20   and there may be some additional questions when you come back.

21             THE WITNESS:  Okay.

22             THE COURT:  I'm sorry, Mr. Smith.  Did you want to

23   ask me questions on what Miss Hughes just inquired about?

24             MR. SMITH:  I do have, if the Court will give me a

25   little time.

*D. SMITH - Voir Dire by Mr. Smith*                               66

1            THE COURT:  We'll go ahead and do that now.  Why

2     don't you proceed.

3                              EXAMINATION

4     BY MR. SMITH:

5     Q.   Mr. Smith, are these medicines that the doctors

6     prescribed for you?

7     A.   Do what now?

8     Q.   These lists of drugs, medicines that you listed for this

9     attorney, are they medicines that the doctor's prescribed for

10    you?

11    A.   Yes.

12    Q.   Do you take them as the doctor ordered?

13    A.   Yes, I do.

14    Q.   Okay.  And how long have you been taking this group of

15    pills?

16    A.   Well, anywhere from probably, on and off, it's been three

17    and a half years.

18    Q.   Okay.  And you were asked questions about your memory.

19    A.   Um-hmm.

20    Q.   And do you understand the questions that you're being

21    asked today?  Have you understood my questions?

22    A.   Well, no, I mean, some of them.  Some of them no.

23    Q.   Well, I can confuse anybody, so I'll admit that.  But let

24    me ask it this way.  Are these drugs causing you problems to

25    where you can't understand what's going on here today?

*D. SMITH - Voir Dire by Mr. Smith*                                67

1    A.   Yes.

2    Q.   They are?

3    A.   Yes.

4    Q.   In what way?  Can you explain that to me?

5    A.   Well, that Saboxin, you know, it's -- it makes you drowsy

6    and, you know, you know, it makes me hard to remember.

7    Q.   Let me ask you this.  The things that you've recalled for

8    me today, are you saying that that's not accurate?  The things

9    you've told us today, is there something that you've told us

10   today that you don't believe is accurate?

11   A.   Something you asked of me?  Is that what you're saying?

12   Q.   What you've testified to here today, is there anything

13   that you've said here today that you believe is not accurate?

14   A.   Yes -- no.

15   Q.   You understand you're under oath?

16   A.   What's that?

17   Q.   You understand that you swore to tell the truth?

18   A.   Yeah, yes.

19   Q.   And everything you've told us today, to your knowledge,

20   is accurate?

21   A.   Yes, best I can remember, yeah.

22   Q.   Okay.  And the things that you don't remember today, that

23   you've admitted to us that you don't remember, you believe

24   it's because -- it may be because of the drugs that you've had

25   to take pursuant to your doctor's orders?

1    A.   Yes.

2              MR. SMITH:  Okay.  I think that's all I have.

3              THE COURT:  Thank you, Mr. Smith.  You can step down.

4    Again, we'll be in recess for about 20 minutes.  We'll need to

5    call you back at that time.

6                   (The witness left the courtroom.)

7              THE COURT:  Thank you.  Miss Hughes, you'll be

8    allowed to examine the witness based on any medications that

9    he's currently taking and the length of time which he's taken

10   those medications.  Also, if he's taking those as prescribed.

11             While it does affect the weight to be given to the

12   testimony being offered, I don't think that he's incompetent

13   such that he could not testify so I'm not going to strike any

14   testimony but will allow you to ask questions about

15   medications that he's taking and the effects that he claims

16   that it has on him.

17             MS. HUGHES:  Thank you.

18             THE COURT:  Any other issues with respect to this

19   witness that we need to take up?  All right.  We'll take about

20   a 20-minute recess.  Mr. Smith, if you need a little more time

21   than that to line up additional witnesses, you can just send

22   word to me.  If we need to take a longer break, we can do

23   that.  We'll be in recess for at least 20 minutes.

24                   (Recess from 2:20 p.m. until 2:54 p.m.)

25                   (The jury entered the courtroom at 2:54 p.m.)

*D. SMITH - Cross (Ms. Hughes)*                                      69

1          THE COURT:  The record will reflect that all members

2     of the jury are present.  Parties and counsel are also

3     present.  Mr. Smith, you're still under oath, of course.  Miss

4     Hughes, you may question the witness.

5          MS. HUGHES:  Thank you, Your Honor.

6                         CROSS-EXAMINATION

7     BY MS. HUGHES:

8     Q.  Hi, Mr. Smith.

9     A.  Howdy.

10    Q.  My name's Elizabeth Hughes.  I represent Debbie Morris.

11    Let me apologize in advance and ask you a couple of personal

12    questions, okay?

13    A.  All right.

14    Q.  All right.  Have you taken any medication today?

15    A.  Yes, probably, I guess, 3 a.m. this morning.

16    Q.  All right.  And this is medication that's prescribed to

17    you by a physician?

18    A.  Yes.

19    Q.  All right.  Can you tell the jury what medications you're

20    taking?

21    A.  Saboxin, blood pressure pill, sleeping pill, it's -- I

22    don't know the name for sure, Lunesta and a stomach pill, and

23    there's a couple more, but I don't really know the names of

24    them.

25    Q.  And Lyrica, are you taking Lyrica?

1    A.   Yeah, Lyrica.  I'm sorry.

2    Q.   Don't be sorry.  Don't be sorry.  Now, the Saboxin,

3    what's the purpose of that drug, if you know?

4    A.   It's to get off pain pills.

5    Q.   And that drug has side effects, doesn't it?

6    A.   Yes.

7    Q.   And does it affect your memory?

8    A.   I guess, yeah.  Yes.

9    Q.   I don't need you to guess.  I mean, does it make you

10   sleepy?

11   A.   Yes.

12   Q.   Does it -- well, do you believe that it has affected your

13   ability to testify here?

14   A.   Yes.

15   Q.   And has it affected your ability to understand some of

16   the questions?

17   A.   Yes.

18   Q.   All right.  I know you're doing the best you can.

19             MS. HUGHES:  I think that's all I have.  Thank you.

20             THE COURT:  Thank you, Miss Hughes.  Mr. Simons?

21             MR. SIMONS:  I do not have questions, Your Honor.

22             THE COURT:  Thank you.  Any redirect?

23             MR. SMITH:  Please.

24             THE COURT:  Yes, sir.

25             MR. SMITH:  Thank you.

*D. SMITH - Redirect (Mr. Smith)*                                    71

                            REDIRECT EXAMINATION

1

2  BY MR. SMITH:

3  Q.   Mr. Smith?

4  A.   Yes.

5  Q.   That Saboxin a doctor prescribed for you, how many times

6  a day are you supposed to take that medicine?

7  A.   Two to three a day, you know.

8  Q.   Do you usually take it in the morning, at night?  When do

9  you usually take it?

10 A.   It's usually morning.

11 Q.   Morning?  And you said you took it at 3:00 a.m., and it's

12 3:00 in the afternoon.  That's about 12 hours ago, my count.

13 Is that accurate?

14 A.   Yes.

15 Q.   So you've not had that medication in 12 hours?

16 A.   No.

17 Q.   Okay.  And you are recovering from an addiction to pain

18 pills; is that right?

19 A.   Yes.

20 Q.   And how long have you been off pain pills?

21 A.   I've been off pain pills for anywhere from three to three

22 and a half years.

23 Q.   And is this Saboxin helping you do that?

24 A.   Yes.

25 Q.   Okay.  And all these medicines that you described to us

*WINKFIELD - Direct (Mr. Smith)*                                    72

1    that you're taking currently, these are all medicines that a

2    doctor prescribed to you; is that correct?

3    A.   Yes.

4    Q.   None of these are illegal drugs that you're on today?

5    A.   No.

6    Q.   Have you taken any illegal drugs?

7    A.   No.  No, sir.

8          MR. SMITH:  That's all I have.  Thank you.

9          THE COURT:  Thank you.  See if we have any further

10   questions of the witness.  No.  All right.  Thank you, Mr.

11   Smith.  You may step down and you're excused.

12         Mr. Smith, you may proceed.

13         MR. SMITH:  Yes, Your Honor.  We'll call Robin

14   Winkfield.

15         THE COURT:  Thank you.

16         MR. WHITE:  Mr. Smith, could you repeat the name,

17   please?

18         MR. SMITH:  Robin Winkfield.

19         ROBIN WINKFIELD, GOVERNMENT'S WITNESS, SWORN

20                     DIRECT EXAMINATION

21   BY MR. SMITH:

22   Q.   Good afternoon.

23   A.   Good afternoon.

24   Q.   State your name, please.

25   A.   Robin A. Winkfield.

WINKFIELD - Direct (Mr. Smith)                                73

1   Q.   And how are you employed?

2   A.   With the Kentucky Administrative Office of the Courts.

3   Q.   And what position do you hold?

4   A.   Human resources administrator.

5   Q.   And as part of your duties in the human resources area,

6   do you have records that you are custodian over at the

7   Administrative Office of the Courts?

8   A.   Yes.

9   Q.   I'd like to hand to you now what's marked as Government's

10  Exhibit M14.  Let me ask you, Miss Winkfield, at the

11  Administrative Office of the Courts, do you all keep records

12  of salary and earnings of court personnel throughout the state

13  of Kentucky?

14  A.   Yes, we do.

15  Q.   And as part of the court personnel that you all keep

16  records for, does that include the office of the circuit

17  judges within the state of Kentucky?

18  A.   Yes.

19  Q.   Like to ask you now, if you would please, ma'am, take a

20  look at the document marked before you M14.  M as in Mary.

21  It's a document that has several pages, I believe.

22  A.   Yes.

23  Q.   Do you recognize that document?

24  A.   I do.

25  Q.   Could you identify for the Court and the jury exactly

*WINKFIELD - Direct (Mr. Smith)*                                    74

1   what this document represents, ma'am?

2   A.   Basically, it's a program that we use at the

3   Administrative Office of the Courts by the name of Document

4   Direct.   And it's pretty much a printout of salaries for

5   employees for justice employees.

6   Q.   Did you receive a subpoena in regard to this matter

7   that's tried before the United States District Court here at

8   the Frankfort location here today?

9   A.   Yes, I did.

10   Q.   And as part of that, were you requested to bring

11   financial information regarding a specific circuit judge at

12   the time by the name of Russell Cletus Maricle, M-a-r-i-c-l-e?

13   A.   Yes.

14   Q.   And if you could tell us, is that the information that is

15   contained within document marked M14?

16   A.   Yes, that's correct.

17   Q.   And can you state, ma'am, as part of your duties at the

18   office of the Administrative Office of the Courts, are those

19   records that you are keeping in the ordinary course of

20   business as you all operate it today known as the

21   Administrative Office of the Courts?

22   A.   Yes.

23   Q.   And likewise, ma'am, can you tell us that those records

24   that are before you are, in fact, records from your office?

25   A.   Yes.

WINKFIELD - Direct (Mr. Smith)                                    75

1          MR. SMITH:  At this time, I would move for the

2     introduction of Government's Exhibit M14.

3          THE COURT:  Any objection?  Exhibit M14 will be

4     admitted.

5                    (Government Exhibit No. M14

6                     was admitted into evidence.)

7     Q.  Miss Winkfield, at the beginning of that document, does

8     it have a time period, a year that it begins?

9     A.  Yes.

10    Q.  What year did this record begin?

11    A.  2001.

12    Q.  Okay.  I may be looking at the wrong page.  Are we on

13    page 1?

14    A.  Um-hmm.

15    Q.  And I have -- okay.  I see where you're reading from.

16    That's 12/31/01?

17    A.  That's correct.

18    Q.  Okay, I'm sorry.  And that goes through the year 2002.

19    And the ending date of this particular record would be for

20    what year, ma'am?

21    A.  On the current page or --

22    Q.  Would be at the end of the document.  I'm trying to just

23    get a range of what this document represents, the years.  What

24    year does it end on?

25    A.  2007.

WINKFIELD - Cross (Mr. Pinales)                                76

1          MR. SMITH:  Thank you, ma'am.  I'll pass the witness,

2   Your Honor.

3          THE COURT:  All right.  Thank you.  Mr. Pinales?

4          MR. PINALES:  Thank you, Your Honor.

5          THE COURT:  Yes, sir.

6                          CROSS-EXAMINATION

7   BY MR. PINALES:

8   Q.  Good afternoon.

9   A.  Good afternoon.

10  Q.  Just a couple of questions, if you know the answers.

11  A.  Sure.

12  Q.  The records that you have brought before you is the

13  salary of Judge Russell Cletus Maricle?

14  A.  Yes.  That's correct.

15  Q.  And that's salary for the years that those records

16  reflect are set by the legislature; are they not?

17  A.  To my understanding, yes.

18          MR. PINALES:  Nothing further, Your Honor.  Thank

19  you.

20          THE COURT:  See if anyone else has any questions.

21  All right.  Thank you.  Mr. Smith, anything else of Miss

22  Winkfield?

23          MR. SMITH:  No, thank you.

24          THE COURT:  Thank you, ma'am.  You may step down.

25  You can leave those documents there.

*LANG - Direct (Mr. Smith)*                                              77

1          Thank you.  Mr. Smith?

2          MR. SMITH:  Sorry, Your Honor.  The United States

3   would like to now call Lisa Lang.

4          THE COURT:  L-a-n-g?

5          MR. SMITH:  L-a-n-g, yes, Your Honor.

6          LISA LANG, GOVERNMENT'S WITNESS, SWORN

7                        DIRECT EXAMINATION

8   BY MR. SMITH:

9   Q.  Good afternoon.

10  A.  Hello.

11  Q.  State your name, please.

12  A.  My name is Lisa Lang.

13  Q.  And Miss Lang, if you could, tell us how you're employed.

14  A.  I work for the attorney general's office as an assistant

15  attorney general.

16  Q.  And how long have you been so employed?

17  A.  I have worked for the attorney general since October of

18  2008.

19  Q.  As part of your duties with the office of the attorney

20  general for the state of Kentucky, do you -- does that include

21  the job of keeping records?

22  A.  It does.

23  Q.  Have you been subpoenaed by the United States to produce

24  records for the matter before this Court, United States of

25  America versus Maricle?

*LANG - Direct (Mr. Smith)*                                          78

1   A.   Yes.

2   Q.   And pursuant to that subpoena, did you, in fact, produce

3   documents from the office of the attorney general?

4   A.   I did.

5   Q.   I'd like to hand to you now what's marked as PR83A and

6   83B.  PR83A and 83B.  If you could, ma'am, take a look at

7   those for us, please.  Can you identify those records for us,

8   ma'am?

9   A.   Yes.  These are the records that we produced pursuant to

10  that subpoena.

11  Q.   And can you state that those are accurate records that

12  are kept in your office?

13  A.   I can state that these records are those records that

14  were maintained by our office with respect to the Clay County

15  election.

16  Q.   And for what years does these records represent,

17  generally, to your knowledge?

18  A.   We produced records specifically 2002, 2004, 2006, though

19  I do know that there are some records in there, I think,

20  regarding 2003 and 2005 intermingled in there.

21          MR. SMITH:  At this time, Your Honor, I would move

22  for the introduction of Government's Exhibit PR83A and 83B.

23          MS. HUGHES:  Objection.

24          MR. PINALES:  May we approach?

25          THE COURT:  Yes, you may.

*LANG - Direct (Mr. Smith)*                                    79

1                    (A sidebar conference was held out of the

2                    hearing of the jury):

3          MR. WHITE:  Your Honor, could we get those records?

4          MR. SMITH:  I do have a copy, if that helps.

5          MS. HUGHES:  We have them.

6          MR. WHITE:  This is Scott White on behalf of Wayne

7    Jones.  The only thing I was confused about, Steve, is I'd

8    also made a note of the records, and Lisa indicated to me this

9    was supposed to be everything Clay County and a bunch of other

10   counties --

11         THE COURT:  You say Lisa, are you referring to Miss

12   Lang?

13         MR. WHITE:  Yes, Your Honor.

14         THE COURT:  When you say Steve, you're referring to

15   Mr. Smith?

16         MR. WHITE:  I am, Your Honor.  My apologies.  I want

17   to make sure, did she say it was just Clay County?

18         MR. SMITH:  These are Bates stamped, Mr. White, and

19   you see there on the lower corner, they should match your

20   copies.

21         THE COURT:  Miss Hughes, you jumped up first.

22         MS. HUGHES:  I did.  Elizabeth Hughes on behalf of

23   Debra Morris.  We received those documents about ten days ago

24   from Mr. Smith so I do know what they are.  They are a

25   collection of complaints that have been phoned in, primarily,

*LANG - Direct (Mr. Smith)*                                              80

1    although I think there are a handful that are by e-mail.

2         So although she can certify the documents, we object

3    to the hearsay contained therein.  It is an enormous amount

4    of, numerous complaints, people calling in, saying I saw Wanda

5    White hauling voters.  Many, most all anonymous, but some do

6    have names.  And so we object to these records.

7              THE COURT:  All right.

8              MS. HUGHES:  I'm sure someone else could be more

9    articulate, but it's the hearsay problem that's my concern.

10             THE COURT:  I first want to know if there's

11   additional bases for the objection other than the hearsay

12   nature.

13             MR. PINALES:  Yes, Your Honor.  Martin Pinales on

14   behalf of Mr. Maricle.

15             THE COURT:  What additional reasons would you have?

16             MR. PINALES:  The additional reasons I have is it

17   deprives my client of cross-examination of the authors, the

18   writers of this -- Martin Pinales, Your Honor.  My additional

19   objection is it's a violation of the right of

20   cross-examination as to the authors, the writers, the

21   speakers.  Doesn't give us the opportunity to cross-examine

22   them as to what happened, if it happened.  Thank you.

23             THE COURT:  All right.  Mr. Westberry?

24             MR. WESTBERRY:  Kent Westberry for Douglas Adams.  It

25   was a confrontation concern that I raised, I was concerned

*LANG - Direct (Mr. Smith)*                                        81

1    about, and I think Mr. Pinales and Miss Hughes summarized our

2    position very nicely.  Thank you, Judge.

3              THE COURT:  All right.

4              MR. RICHARDSON:  We join in.  Tucker Richardson on

5    behalf of Freddy Thompson.  We join those motions.

6              THE COURT:  I assuming you're going to join in the

7    objection?

8              MR. SIMONS:  Yes, Your Honor.

9              THE COURT:  Mr. Smith, would you like to respond to

10   two issues?  One is hearsay and the other is a <u>Crawford v.</u>

11   <u>Washington</u> issue.

12             MR. SMITH:  Your Honor, I would differ on the

13   description of what these documents are.  I know Miss Hughes

14   had an opportunity to look at them, but I believe that they're

15   statistics that shows the number of absentee voters and the

16   individuals that received the actual complaint.  There are

17   calculations of numbers of absentee voters.  In fact, it does

18   explain absentee in relation to other counties.  And Clay

19   County, particularly, is highlighted in these reports for each

20   primary and each general election in the time period in which

21   this indictment is framed, the 2002, 2004 and 2006.

22             In addition, Your Honor, this has logs which have,

23   again, been filed, the number of complaints that have come

24   into Clay County.  And obviously, to be hearsay, the complaint

25   would have to be offered for the truth of the matter asserted,

*LANG - Direct (Mr. Smith)*                                              82

1    and that's not the purpose of these records.  These records

2    are to show the numbers of complaints that were phoned in to

3    the office of the attorney general and the Board of Elections

4    during these elections that are an issue and, also, to

5    tabulate and to compare those numbers of people that were

6    voting in that absentee voting for those elections represented

7    by the indictment.

8            So that's my understanding of what these records are.

9    They are written as described.  On occasion, you're going to

10   see an AG inquiry form which does attempt to identify a date,

11   a person or a -- many of these are anonymous complaints.

12           THE COURT:  All right.

13           MR. SMITH:  And so --

14           THE COURT:  All right.  I'm going to admit the

15   documents as a Court exhibit.  I'm going to allow the witness

16   to testify generally as to what the documents represent.  I'm

17   not going to allow the witness to testify to specific

18   complaints, but she can describe generally that these are

19   complaints, and I don't know if she's able to tabulate the

20   number of complaints that the office received.

21           Of course, she can testify that the office received a

22   number of complaints and that these documents represent either

23   the complaint or the other items that they purport to

24   represent, including number of absentee votes that were

25   submitted in relation to other counties which I believe you

*LANG - Direct (Mr. Smith)*                                                83

1    said is there's a chart that indicates.

2              So the attorney general's office maintains in the

3    regular course of business information concerning absentee

4    voting in all the counties.  These documents include a

5    tabulation of that absentee voting, and I'm assuming you're

6    offering this or wanting to get it into evidence to be able to

7    argue that there was a high percentage of absentee voting in

8    particular elections.  The office maintains those records, and

9    she would be able to testify to that.  This is the underlying

10   documentation to that.

11             The attorney general's office also receives

12   complaints as to elections and then responds to those

13   complaints.  It's part of their job.  It's part of their duty.

14   To the extent that complaints were made, that would be offered

15   for a non-hearsay purpose, and you would be able to question

16   her about the nature of the complaints that were received and

17   what their office did as a result of receiving those

18   complaints.

19             In terms of the specific nature of the complaints

20   that are outlined in these different reports, that presents

21   more of a problem, and that's why I'm only going to admit this

22   as a Court exhibit at this point.

23             MR. SMITH:  Would the Court allow us to revisit this

24   if it could be appropriately redacted at a later time and

25   introduced?

*LANG - Direct (Mr. Smith)*                                              84

1          THE COURT:  Yes.

2          MR. SMITH:  Subsequent to --

3          THE COURT:  At this point, she's the records

4  custodian, so I'm going to allow her to authenticate this, and

5  it will be marked as a Court exhibit at this time until I'm

6  able to satisfy myself as to the hearsay nature of the

7  specific complaints.

8          It wouldn't be -- can't go to the jury, and she

9  wouldn't be able to testify about the specific complaints that

10  were received.  Now, the general nature of the complaints and

11  what their office did as a result of that, okay?

12          MR. WESTBERRY:  We understand.  May I ask one

13  question of the Court?

14          THE COURT:  Yes, sir.

15          MR. WESTBERRY:  If the United States does attempt to

16  revisit this issue, I would suggest to the Court that she not

17  be released just yet, in event that there will be need for

18  additional cross-examination.  I'm not anticipating that, but

19  I thought if I bring that to the Court's attention now, it

20  will save a trip to the Bench.

21          THE COURT:  That will be fine.  All right.

22                   (Sidebar conference concluded.)

23          THE COURT:  Let's see.  Mr. Smith, there was a motion

24  to admit those documents.  I'm going to admit the documents at

25  this time as a Court exhibit until I have a chance to further

*LANG - Direct (Mr. Smith)*                                              85

1    review these matters.  But they'll be admitted, and you may

2    ask the general questions that we discussed at the Bench of

3    this witness.

4                    (Court Exhibit Nos. PR83A and PR83B

5                    were admitted into evidence.)

6    Q.  Miss Lang, as part of the duties of the office of the

7    attorney general, is it part of your practice to place in

8    records, and in these records particularly that are before you

9    now, PR83A and B, in these election cycles, do you all record

10   numbers of complaints that are phoned in to your office?

11   A.  I don't think that that's really something that I can

12   attest.  I'm just the record custodian for these records, and

13   these records are kept by a different division of our office,

14   and they are the ones that would actually be the ones to --

15   who would be more appropriate to ask that question to.

16   Q.  So analysis of these records is not something that you're

17   required to do as far as records custodians?

18   A.  That is correct.

19   Q.  I think I understand.

20            MR. SMITH:  That's all the questions I have.  Thank

21   you.

22            THE COURT:  All right.  Thank you.  Any questions of

23   this witness at this time?

24            MR. PINALES:  No, Your Honor.

25            MR. WHITE:  No, Your Honor.

1          THE COURT:  You'll be released at this time.  You may

2     be subject to being recalled after I've had a chance to

3     revisit the issue of the documents.

4          THE WITNESS:  All right.  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. SMITH:  Your Honor, I want to ask the Court to

7     give us a few moments.  It might be a point for a break.  I

8     have multiple exhibits for the next witness, and I'm going to

9     need some assistance in getting those before the Court here.

10          THE COURT:  All right.  How much time would you like,

11     Mr. Smith?

12          MR. SMITH:  Fifteen minutes, if we could, Your Honor.

13          THE COURT:  All right.  Thank you.  Ladies and

14     gentlemen, to speed things along, we're going to take a break.

15     We'll take about a 15-minute recess.  Please keep in mind the

16     admonition that you were given previously, and we'll call you

17     back just as soon as we're ready for you.  Thank you.

18              (The jury left the courtroom at 3:20 p.m.)

19          MR. SMITH:  Before we recess, Mr. Hoskins, if you

20     could come up for one moment, I need to speak with you.

21                  (A sidebar conference was held out of the

22                   hearing of the gallery):

23          THE COURT:  When we take breaks, if Mr. Maricle needs

24     to look at something, he doesn't need to come up to the

25     clerk's office and get it himself.  I don't like the parties

*GRAY - Direct (Mr. Smith)*                                         87

1    to come up and get exhibits.  If he needs to come up and get

2    something, he needs to do that through you.  I don't want to

3    embarrass anyone in Court.  I want to make sure you know where

4    I'm at.

5           MR. HOSKINS:  I was with him when he did --

6           THE COURT:  You understand?

7           MR. HOSKINS:  I certainly do.

8                   (Sidebar conference concluded.)

9           THE COURT:  We'll be in recess for 15 minutes.

10               (Recess from 3:21 p.m. until 3:37 p.m.)

11               (The jury entered the courtroom at 3:37 p.m.)

12          THE COURT:  Thank you.  Record will reflect that all

13   members of the jury are present.  Parties and counsel are also

14   present.

15          Mr. Smith, are you ready to call your next witness?

16          MR. SMITH:  Yes.  Appreciate the Court's patience.

17   Beverly Gray, please.

18           BEVERLY GRAY, GOVERNMENT'S WITNESS, SWORN

19          THE COURT:  Thank you.  Mr. Smith, you may proceed.

20                       DIRECT EXAMINATION

21   BY MR. SMITH:

22   Q.  State your name, please.

23   A.  Beverly Gray.

24   Q.  And Miss Gray, where do you live?

25   A.  Manchester.

*GRAY - Direct (Mr. Smith)*                                                88

1    Q.   And how long have you lived in the Manchester area?

2    A.   About 35 years.

3    Q.   Where were you originally born and raised?

4    A.   In Lake City, Tennessee.

5    Q.   And what caused you to move to Clay County 35 years ago?

6    A.   I got married and moved to Clay County.

7    Q.   Okay.  And who are you married to?

8    A.   Donnie Gray.

9    Q.   And is he previously employed as a coach over there at

10   the Clay County High School?

11   A.   Not at this time.  He retired about three years ago.

12   Q.   And how long did he coach when he was coaching for the

13   Clay County schools?

14   A.   I'm going to estimate 25 years.

15   Q.   Okay.  Had a few state championships, I hear, back there

16   a few years ago?

17   A.   We had one, yes.

18   Q.   Okay.  Miss Gray, how are you employed?

19   A.   As a deputy clerk in the Clay County clerk's office.

20   Q.   And how long have you been employed at the Clay County

21   court clerk's office, ma'am?

22   A.   Since 1977.  A little over 30 years.

23   Q.   And could you describe generally what your duties are

24   with the clerk's office at the current time?

25   A.   I'm a deputy clerk, and I do all the duties that everyone

*GRAY - Direct (Mr. Smith)*                                            89

1    else in the office does, with the exception I do the payroll

2    and I'm responsible for the bookkeeping duties.

3    Q.  Okay.  And do you also have duties assigned to you in

4    regards to matters of the Clay County Board of Elections?

5    A.  I act as secretary for that.  I keep the minutes and type

6    the minutes for them.

7    Q.  And when we're talking about minutes, are those things

8    that are required by law for the Clay County Board of

9    Elections to keep?

10   A.  Yes, it is.

11   Q.  And you're the person who keeps those?

12   A.  Yes, they're kept in our office.

13   Q.  Okay.  I'd like to hand to you some documents that I

14   believe you were subpoenaed to bring.  PR3.  Can you identify

15   PR3, ma'am?

16   A.  It is a list of the election officers that was chosen for

17   the year 2006 by the County Board of Elections.

18   Q.  And does that document bear the signatures of the members

19   of the Board of Elections on the last page?

20   A.  Yes, it does.

21   Q.  And for the Court and the jury's benefit, could you tell

22   us who was on the Board of Elections at the time that these

23   election officers were certified?

24   A.  Freddy Thompson's chairman, William Hugh Bishop is the

25   Republican commissioner, Wayne Jones is the Democrat

*GRAY - Direct (Mr. Smith)*                                    90

1   commissioner, and Edith Jordan was serving as replacement for

2   Sheriff Edd Jordan.

3   Q.   Now, on the front page there, we have a precinct list; is

4   that correct?

5   A.   That's correct.

6   Q.   And how many precincts are there currently in Manchester,

7   Clay County.  In Clay County, rather.

8   A.   Twenty.

9   Q.   There is, on the first page there, a listing of who

10  served as judges for the Manchester precinct.  Could you tell

11  us who that is?

12  A.   The judge was -- the Republican judge was Charles Weaver.

13  The Democrat judge was Wanda Price White.

14  Q.   And can you state, ma'am, that these are, in fact,

15  records kept in the ordinary course of business at the county

16  clerk's office?

17  A.   Yes, it is.

18  Q.   And are these, in fact, true and accurate copies of those

19  records kept in that office?

20  A.   Yes, it is.

21          MR. SMITH:  I'd move for the introduction of

22  Government's Exhibit PR3, Your Honor.

23          THE COURT:  Any objection?  Exhibit PR3 will be

24  admitted.

25

*GRAY - Direct (Mr. Smith)*                                        91

1              (Government Exhibit No. PR3

2              was admitted into evidence.)

3   Q.   Before we go to the next exhibit, ma'am, there at the

4   bottom of the page, it's got Harts Branch.  Who did the Board

5   of Elections certify to be serving as election officers for

6   Harts Branch?

7   A.   Republican judge Crystal Bowling, Democrat judge Charles

8   Wayne Jones, sheriff Ricky D. Harris and clerk Quentin Jones.

9   Q.   To your knowledge, ma'am, is this the same Charles Wayne

10  Jones that also served as the commissioner, the Democrat

11  commissioner for the Clay County Board of Elections?

12  A.   Yes, it is.

13  Q.   Is that normal in the course of your keeping minutes for

14  a commissioner to also serve as an election officer in a

15  precinct, ma'am?

16  A.   Sometimes it happens.

17  Q.   Question is, is it normal?

18            MR. WHITE:  Objection to the form.

19            THE COURT:  Objection overruled, but you can explain

20  what you understand that to mean, if something's normal or not

21  normal in the regular course of business.

22  A.   I can't say that it happens every election, but I'm sure

23  it happens some elections.  I'm just not sure which elections.

24  Q.   Okay.  Do you know of it occurring at any of the other

25  precincts other than this one, Harts Branch in 2006, ma'am?

*GRAY - Direct (Mr. Smith)* 92

1    A.   I can't recall.  I would just have to see the list.

2    Q.   Okay.  You have the list in front of you there.  Do you

3    want to take a minute to look at those 20 precincts and see if

4    there's any other commissioners serving as election officer in

5    2006 for us, please?

6    A.   (Reviewing document).  No, there are no others.

7    Q.   Thank you.  Like to hand to you now what's marked as

8    Government's Exhibit PR4.  Have you had an opportunity to see

9    that, ma'am?

10   A.   Yes.

11   Q.   Can you identify that for the record, please?

12   A.   Yes.  It is election officer training list that we typed

13   up and each election officer signed that they attended a

14   special training for machine training, and they also signed

15   that they attended the regular election officer training

16   school.

17   Q.   For what election year is that, ma'am?

18   A.   2006.

19          MS. HUGHES:  Our PR4 does not match your PR4.

20          MR. SMITH:  Thank you.

21   Q.   Ma'am, I believe we may need to retrieve that from you,

22   if we could, please.  Apologize.  I believe my last question

23   was asking you to describe the document, I believe you said it

24   was a sign-in sheet for training?

25   A.   It's a sign-in sheet for training the election officers.

*GRAY - Direct (Mr. Smith)*                                         93

1    We had a special training for the machines because they were

2    new so they had to sign their name for that, and then there

3    was another column that they signed when they attended regular

4    election officer training school.

5            MR. SMITH:  I'd move the introduction of Government's

6    Exhibit PR5, Your Honor.

7            THE COURT:  Any objection?  Exhibit PR5 will be

8    admitted.

9            MR. SMITH:  I'd like to hand to the witness -- did I

10   say PR5?  I apologize.  PR4, Your Honor.  I apologize.

11           THE COURT:  PR4.

12                   (Government Exhibit No. PR4

13                    was admitted into evidence.)

14           MR. SMITH:  Like to hand the witness now PR5, please.

15   Q.   Can you identify PR5, ma'am?

16   A.   It is a statement to the Clay County fiscal court from

17   the County Board of Elections.  It is for meetings that the

18   County Board of Elections members attended January through

19   November of '06.

20   Q.   It also says for election day services.  Does that

21   include what the election -- Clay County Board of Elections

22   members get paid for their services on election day?

23   A.   Yes, it does.

24           MR. SMITH:  Move at this time to introduce

25   Government's Exhibit PR5.

*GRAY - Direct (Mr. Smith)*                                              94

1          THE COURT:  Any objection?  PR5 will be admitted.

2                   (Government Exhibit No. PR5

3                   was admitted into evidence.)

4    Q.   If you could, ma'am, relate to the Court and the jury

5    what the members were paid for the 2006 year.

6    A.   Freddy Thompson, a thousand dollars.  Wayne Jones, $750.

7    William Hugh Bishop, $800.  Edith Jordan, $750.

8    Q.   Thank you, ma'am.  Like to hand to you now what's marked

9    as Government's Exhibit PR6.  Can you identify Government's

10   Exhibit PR6, ma'am?

11   A.   It is the list of voting precincts that are established

12   each year in Clay County.  It lists the name of the precinct

13   and the location where the polling place will be.

14   Q.   And was that for both the primary and the general

15   elections in 2006, ma'am?

16   A.   Yes, it is.

17          MR. SMITH:  I'd move for the introduction of

18   Government's Exhibit PR6.

19          THE COURT:  Any objection?  PR6 will be admitted.

20                   (Government Exhibit No. PR6

21                   was admitted into evidence.)

22   Q.   Ma'am, based on Government's Exhibit PR6, can you tell me

23   whether Horse Creek and Pigeon Roost voting precincts voted at

24   the same school building?

25   A.   Yes, they do.

*GRAY - Direct (Mr. Smith)*                                            95

1    Q.   And what was that school name?

2    A.   Horse Creek Elementary.

3    Q.   Thank you, ma'am.  Like to hand to you now what's marked

4    as Government's Exhibit PR7.  Do you recognize Government's

5    Exhibit PR7, ma'am?

6    A.   Yes.

7    Q.   And could you identify that for the court and the jury,

8    please?

9    A.   These are my handwritten notes that I had taken when they

10   would hold a Board meeting.  Some of the meetings were -- some

11   of them were taken also on November the 3rd, on election day.

12   Q.   Does the Board meet sometimes on election day, ma'am?

13   A.   Yes.

14   Q.   Does it always meet on election day?

15   A.   Yes, they're required to meet.

16   Q.   Are they required to stay in any particular open session

17   for a period of time, or do you know?

18   A.   They're required to stay in session from that morning,

19   when the polls open, to when the polls close in the evening

20   and all the supplies are brought back in.

21   Q.   Now, you said these notes are in your handwriting, ma'am?

22   A.   Yes.

23   Q.   And do you transfer these on to a typewritten minutes

24   sheet, or are these the way they're kept in the office of the

25   county clerk at Clay County?

*GRAY - Direct (Mr. Smith)*                                         96

1   A.   No, these are just in my handwriting, and then I type

2   them up and the Board members sign.

3   Q.   So this is one form, and they're also later typed in a

4   typewritten form?

5   A.   Yes.

6   Q.   And put in the minutes sheet in the public record of the

7   Clay County clerk's office?

8   A.   Yes.

9        MR. SMITH:   I'd move for the introduction of

10  Government's Exhibit PR7.

11       THE COURT:   Any objection?   PR7 will be admitted.

12                  (Government Exhibit No. PR7

13                  was admitted into evidence.)

14  Q.   Ma'am, on page 3 of Government's Exhibit PR7, could you

15  turn there for me, please?

16  A.   Yes.

17  Q.   About the fourth line down, could you read for the Court

18  and the jury what that entry says?

19  A.   "Received complaints from the attorney general's office."

20  Q.   Thank you.   If I can now hand you Government's Exhibit

21  PR8.   And just for the record again, PR7 covers the time

22  period of the days leading or near the date of the November,

23  2006 election; is that right?

24  A.   These minutes, these notes were taken on the actual

25  election day.

*GRAY - Direct (Mr. Smith)*                                        97

1    Q.   2006, November?

2    A.   2006.

3    Q.   What day was that, ma'am?

4    A.   November 7th, 2006.

5    Q.   And are you reading now from PR8?

6    A.   PR8.

7    Q.   Okay.  And just for the record, the prior exhibit, PR7,

8    was for that same time period; is that correct?

9    A.   Yes, and some of those minutes were taken at a meeting

10   before election day.

11   Q.   What date was that, ma'am, for the record please?

12   A.   November 20th, 2006.  I mean October 20th, I'm sorry.

13   Q.   Now, PR8, for the record, was November 7, 2006?

14   A.   Yes.

15   Q.   And could you again describe for us what the nature of

16   these records are, please?

17   A.   These are minutes that Melanda Adams took on election

18   day.  Like if someone called in and had a complaint about a

19   machine or some problem, they were in her handwriting.

20   Everyone in the office does that.

21   Q.   Okay.  And Melanda Adams, what was her job title?

22   A.   She was a deputy clerk.

23   Q.   And when was she hired on at Freddy Thompson's office as

24   deputy clerk, to your knowledge, ma'am?

25   A.   I'm not sure of the exact date.  I'm not sure if it

*GRAY - Direct (Mr. Smith)*                                          98

1    was -- it was in January, maybe, of 2005.  I'm not sure if

2    it's 4 or 5.  I'm not sure.

3    Q.  At the November, 2006 election, she was tasked to do this

4    duty of recording this information for the clerk's office?

5    A.  Yes.

6    Q.  And is she related in any way to Douglas C. Adams,

7    Douglas Adams?

8    A.  She's Doug Adams' daughter.

9    Q.  Okay.

10              MR. SMITH:  I'd move the introduction of Government's

11   Exhibit PR8, Your Honor.

12              THE COURT:  Any objection?  Exhibit PR8 will be

13   admitted.

14                   (Government's Exhibit No. PR8

15                   was admitted into evidence.)

16              MR. SMITH:  I'd like to hand the witness collectively

17   PR9, PR10, PR11, PR12, PR13 and PR14.

18              THE COURT:  Yes, sir.

19   Q.  Can you identify PR9 through PR14, ma'am?

20   A.  They're all minutes taken from different deputy clerks in

21   the office on that day.  When the phone rings, we have to

22   answer the phone and take care of any problems that come up as

23   far as addressing any issues, and everybody in the office just

24   takes their own notes.

25   Q.  And are those again records kept in the normal and

*GRAY - Direct (Mr. Smith)*                                      99

1    ordinary course of business at the Clay County court clerk's

2    office, ma'am?

3    A.   Yes.

4          MR. SMITH:  I'd move the introduction of Government's

5    Exhibit PR9 through PR14, Your Honor.

6          MR. RICHARDSON:  Your Honor, may we approach, please?

7    An objection.

8          THE COURT:  Yes, sir, come up.

9                (A sidebar conference was held out of the

10               hearing of the jury):

11         MR. RICHARDSON:  Your Honor, Tucker Richardson on

12   behalf of Freddy Thompson.  My objection basically is that

13   these are all kind of like the AOG's notes, and I haven't had

14   a chance to review them all.  I have reviewed them, and I have

15   made notes on them, but I'm afraid there's going to be some

16   hearsay stuff in here, along with confrontation stuff from

17   these notes.  And so that would be the basis of my objection.

18         THE COURT:  All right.  With respect to confrontation

19   cause issues under Crawford v. Washington, it would not appear

20   to the Court that these statements containing these records

21   are testimonial in nature, so therefore that objection will be

22   overruled.  To the extent that the records reflect calls

23   received in the ordinary course of business, again, it is the

24   duty of these clerks to record such complaints.  I believe

25   they're proper business records so therefore, they will be

*GRAY - Direct (Mr. Smith)*                                          100

1    admitted for that reason.

2          However, I will advise the jury that the specific

3    complaints that are contained in these records are not being

4    admitted for the truthfulness of the statements but that they

5    were received in the normal course of business, and the Court

6    would likely make the same ruling with respect to the other

7    documents that were tendered by the United States earlier.

8          MR. WHITE:  The attorney general documents, Your

9    Honor?

10         THE COURT:  Yes, sir.  Assuming that a person is able

11   to authenticate that those calls were received in the ordinary

12   course of business, Court would anticipate that the ruling

13   will be the same if such a witness is offered to authenticate

14   those documents.  Mr. Smith?

15         MR. SMITH:  They're very cryptic.  So I understand

16   the Court's ruling.

17         THE COURT:  Thank you.

18               (Sidebar conference concluded.)

19         THE COURT:  Thank you.  Ladies and gentlemen, I am

20   admitting the documents, PR9 through PR14 at this time as

21   business records.  There are some handwritten notations that

22   indicate recording complaints that are made.  The specific

23   complaints that are noted are not being admitted for the

24   truthfulness of the statements, but that the complaints were

25   made to the office and were received in the ordinary course of

*GRAY - Direct (Mr. Smith)*                                           101

1    business at the clerk's office.  You are so instructed.

2                    (Government Exhibit Nos. PR9 through PR14

3                    were admitted into evidence.)

4            MR. SMITH:  Hand the witness now, Your Honor, marked

5    Exhibits PR15A through PR15E.

6            THE COURT:  Yes, sir.

7    Q.  Ma'am, have you had an opportunity to review those

8    documents please?

9    A.  Yes.

10   Q.  And can you identify those as records kept in the

11   ordinary course of business at the Clay County court clerk's

12   office?

13   A.  Yes, it is.

14           MR. SMITH:  I'd move their introduction at this time,

15   Your Honor.

16           THE COURT:  Any objection to these documents?

17           MR. RICHARDSON:  Yes, sir.  Same.

18   Q.  Ma'am --

19           THE COURT:  I haven't ruled on this yet.

20           MR. SMITH:  I apologize, Your Honor.

21           THE COURT:  The exhibits will be admitted, PR15A

22   through E.  The jury will be given the same instruction with

23   respect to any handwritten notes that reflect complaints

24   received.  These documents are not being admitted for the

25   purpose of the truth of those assertions but that they were

*GRAY - Direct (Mr. Smith)*                                              102

1    received in the ordinary course of business of the clerk's

2    office.  You are so instructed.

3                     (Government Exhibit Nos. PR15A through

4                     PR15E were admitted into evidence.)

5         MR. SMITH:  Do you wish me to proceed?

6         THE COURT:  Yes.

7    Q.   15A, Miss Gray, could you identify that as a record

8    identifying the voting machines that were actually used at the

9    20 precincts in Clay County during the 2006 primary election?

10   A.   Yes, it is.

11   Q.   And was that, in fact, the new iVotronic machine that was

12   used?

13   A.   Yes, it is.

14   Q.   And does this document further state a certification for

15   purposes of your records?

16   A.   Yes.

17   Q.   And what does that further certify?

18   A.   It's a certification that they do a public inspection of

19   the voting machines to make sure they're all zero taped out,

20   and there's no votes on the machines before the machines are

21   used.

22   Q.   Is that required by law?

23   A.   It is required by law.

24   Q.   Now I'd like to draw your attention to the last of that

25   series of exhibits, I believe 15E.  Appears to be a

*GRAY - Direct (Mr. Smith)*                                    103

1  handwritten note.  Do you have that in front of you, ma'am?

2  A.  Yes.

3  Q.  Do you recognize the handwriting?

4  A.  15E, it's in different handwriting.

5  Q.  Okay.  I may be out of order.  I apologize.  To speed

6  things along, ma'am, can you see -- I believe you have one

7  that resembles this document.

8  A.  15D.

9  Q.  15B, okay.

10  A.  D as in dog.

11  Q.  D as in dog, okay.  Do you have that in front of you,

12  ma'am?

13  A.  Yes.

14  Q.  Do you recognize the handwriting?

15  A.  Yes, that's Freddy Thompson's.

16  Q.  And have you had opportunities to see his handwriting on

17  other occasions, ma'am?

18  A.  Yes.

19  Q.  Many or few times?

20  A.  Many times.

21  Q.  And does this appear to be stationery that was kept there

22  at the office of the county clerk during this 2006 election?

23  A.  Yes, it is.

24        MR. SMITH:  Your Honor, I have at this time

25  intentions of asking further questions about the content of

*GRAY - Direct (Mr. Smith)* 104

1    that writing, based on foundation that was laid.

2         THE COURT:  All right.  You may proceed.

3    Q.   Could you tell us, ma'am, what's written on the first

4    entry there?

5    A.   It says "Anthony Miller.  Called AG," which stands for

6    attorney general, "Delbert Roberts."

7    Q.   Do you know Delbert Roberts to have been an election

8    officer serving in one of the precincts in the Clay County

9    2006 election, ma'am?

10   A.   Yes.

11   Q.   Do you know which precinct he was serving in the 2006

12   election?

13   A.   I'm not sure if it's Horse Creek or Pigeon Roost.

14   Q.   Okay.  And those are the two that are located at the same

15   Horse Creek Elementary School?

16   A.   Yes.

17   Q.   The second entry, could you read that for the Court and

18   the jury, please?

19   A.   "Miller Wagers.  Garrard.  Changing ballot after voter

20   leaves."

21   Q.   And again, ma'am, both these entries appear to be written

22   by the same person?

23   A.   Yes.

24   Q.   And you recognize that to be whose signature -- or whose

25   writing?

*GRAY - Direct (Mr. Smith)* 105

1    A.   Freddy Thompson.

2    Q.   Thank you.

3         MR. SMITH:  Like to hand the witness now what's

4    marked as Government's Exhibit PR16.

5    Q.   Can you identify Government's Exhibit PR16?

6    A.   It is the list of the Democrat chairman and the

7    Republican chairman turned over to Freddy Thompson, the

8    chairman of the County Board of Elections, and this is the

9    list that they used to pick election officers from.

10   Q.   Okay.  And when you say it's the list that they use, who

11   is using this list to pick election officers?

12   A.   The County Board of Elections.

13   Q.   And at that time, it would include members including

14   Freddy Thompson and Charles Wayne Jones?

15   A.   Yes.

16   Q.   And this is also a record kept in the ordinary course of

17   business at the Clay County court clerk's office?

18   A.   It's not really kept in the county clerk's office.  It's

19   kept in the County Board of Elections.  It's their records.

20   Q.   And where do they keep their records, ma'am?

21   A.   Well, this is not just like of a public record.  It's a

22   record that like Freddy had in his office, because he's the

23   chairman of the Board.  But it's not just like a public

24   record.

25   Q.   And who would be the custodian of records for the Clay

*GRAY - Direct (Mr. Smith)*                                                  106

1    County Board of Elections, ma'am?

2    A.   Freddy.

3    Q.   And did you assist as secretary in managing or

4    maintaining those records as well?

5    A.   Yes.

6    Q.   And can you identify these as records from that Clay

7    County Board of Elections?

8    A.   Yes, they are.

9              MR. SMITH:  I'd move for their introduction at this

10   time, Your Honor, PR16.

11             THE COURT:  Any objection to PR16?

12             MR. RICHARDSON:  No.

13             THE COURT:  That exhibit will be admitted.

14                   (Government Exhibit No. PR16

15                   was admitted into evidence.)

16   Q.   Miss Gray, before you put that up, please, I have a

17   couple questions for you on that exhibit.  I'm sorry.

18   A.   Okay.

19   Q.   That first page, does it indicate who's going to be

20   serving, based on this form, who was listed to serve or slated

21   to serve the Manchester precinct, ma'am?

22   A.   Yes.  Do you want me to call the names off?

23   Q.   I probably need you to, because I'm going to ask you a

24   few questions to explain this.  I think it will help us all

25   understand this form.

*GRAY - Direct (Mr. Smith)*                                         107

1  A.   Okay.  There is a judge selected from the Democrat list

2  and a judge selected from the Republican list.

3  Q.   Yes, ma'am.

4  A.   The judge selected from the Democrat list was Wanda Price

5  White.  Republican judge was Charles Weaver.  Then the County

6  Board of Elections alternates between clerk and sheriff as to

7  whether it be a Republican or Democrat.  In this case, the

8  sheriff was Anthony Carl Short as sheriff and Lucy Marcum as

9  clerk.

10 Q.   Okay.  Are you looking at page 1 of that document, ma'am,

11 PR16?

12 A.   Yes.

13 Q.   Okay.  I'm trying to get on the same page with you, and I

14 apologize again for this inconvenience, but I'm going to need

15 to try to get on the same page with you.  I have what's got

16 the name Charles Weaver at the top.  Is that the name you have

17 at the top of your document?

18 A.   Yes.

19 Q.   I also have Lucy Marcum, Christopher Duff and William

20 Marcum?

21 A.   Yes.

22 Q.   Is that on that same page that we're looking at?

23 A.   Yes, it is.

24 Q.   Okay.  Now, this form that we're -- page 1 would be as

25 you've defined it, the Republicans' choices for all four

*GRAY - Direct (Mr. Smith)*                                                      108

1    positions; is that correct?

2    A.   That was the Republicans' choice, and then they would

3    pick two of those people to serve on the Republican party.

4    Q.   So each party would submit a list of four names and only

5    two -- understanding that only two would be picked to serve?

6    A.   That's correct.

7    Q.   Each party gets a judge, and they alternate between clerk

8    and sheriff?

9    A.   That's correct.

10   Q.   And this would be, in fact, those forms that were

11   submitted by the Republican party?

12   A.   Yes.

13   Q.   Not the Democrat party?

14   A.   No.  Not --

15   Q.   We've not gotten to those yet.

16   A.   Okay, I'm sorry.

17   Q.   All right.  So PR16, I want you to look through it

18   closely, would be for the Republican party as the first --

19   just for the record here, so we get this page numbers correct,

20   because this is actually a collective exhibit, looks like 30

21   pages -- 20 pages.

22   A.   Should be 20.

23   Q.   Twenty pages in, we have Republican list of people they

24   have selected to serve in these positions?

25   A.   That's correct.

*GRAY - Direct (Mr. Smith)*                                              109

1   Q.   The next 20 pages would be the Democrat party selections,

2   if I understand.

3   A.   That's correct.

4   Q.   Would you look at those and identify those as the

5   Democrat party?

6   A.   Yes.

7   Q.   And normally, who is it that signs these and certifies

8   these as selections for the parties, ma'am?

9   A.   The captains of each precinct submit the list to the

10  Republican chairman or the Democrat chairman.

11  Q.   Okay.  And so when we see the first page here with the

12  Republican, it's got James Phillips, captain of Manchester.

13  And what would that signify to you, ma'am?

14  A.   He is the captain of that precinct, and he submits four

15  names to be turned in to serve as election officers, and those

16  four people have to sign saying they're willing to serve.

17  Q.   Okay.  And over here on -- six pages in, it has again a

18  list that is also certified by someone putting Crystal

19  Bowling, Ricky Harris, Eddie Davidson and Mansell Baker in.

20  Can you tell us who signed, certified that as the choices for

21  the Republican party?

22  A.   Stanley Bowling.

23  Q.   And then two more pages over, ma'am, we have again

24  choices for the Republican party listing Diane Hensley, Brenda

25  Bishop, Paul Bishop and John Howard.  Who certified that?

*GRAY - Direct (Mr. Smith)*                                    110

1    A.   Paul Bishop.

2    Q.   Now, at page 21, I believe, is beginning the Democrat

3    party.

4    A.   Yes.

5    Q.   And just for reference there, I have Wanda Price White at

6    the top of that page.  Is that the page you're on?

7    A.   Yes.

8    Q.   And could you give us the rest of the names that were

9    selected for this Manchester precinct by the Democrat party?

10   A.   Anthony Carl Short, Earl Pennington, Minnie Weaver.

11   Q.   And who signed the form?

12   A.   Donald Nolan, Senior.

13   Q.   And I want you to look through all the Democrat forms,

14   ma'am, and can you tell us if the same person signed all these

15   forms?

16   A.   Yes, he did.

17   Q.   And that would be Don Nolan?

18   A.   Don Nolan.

19   Q.   Thank you.  You can put that up now.  Thank you.

20        MR. SMITH:  Like to hand to the witness PR16A through

21   PR16P, as in Paul.

22   Q.   Had an opportunity to see those, ma'am?

23   A.   Yes.

24   Q.   Can you identify those for the Court and jury, please?

25   A.   These are the typewritten minutes from the County Board

*GRAY - Direct (Mr. Smith)*                                              111

1    of Elections meetings.  The first one is actually handwritten

2    because we didn't have a way of typing them in 1988.  Had to

3    be handwritten.

4    Q.  And do those appear to be records kept in the ordinary

5    course of business for the Clay County Board of Elections?

6    A.  Yes, they are.

7    Q.  And are those records also kept in the Clay County court

8    clerk's office in Manchester?

9    A.  Yes, they are.

10          MR. SMITH:  I'd move for their introduction at this

11   time, PR16A through P.

12          THE COURT:  Any objection?  Those documents, PR16A

13   through P will be admitted at this time.

14                    (Government Exhibit Nos. PR16A through PR16P

15                    were admitted into evidence.)

16   Q.  Ma'am, could you generally describe for the court and the

17   jury the years that this record ranges beginning and ending?

18   A.  Beginning in September, 1988 and ending in December,

19   2007.

20   Q.  If you could look on page 2 and tell us who was serving

21   on the Clay County Board of Elections when your records which

22   you were asked to bring here today began in September, 1988,

23   please.

24   A.  On page 2 the County Board of Elections members were

25   Kenneth Day, Cecil J. Craft, J. Harold Sizemore and Florence

*GRAY - Direct (Mr. Smith)*                                                112

1    Baker.

2    Q.   Thank you, ma'am.

3         MR. SMITH:  I'd like to hand to you Government's

4    Exhibit PR16Q.

5    Q.   Do you recognize PRQ, ma'am?

6    A.   Yes.

7    Q.   Could you identify that for the court and the jury,

8    please?

9    A.   This was an e-mail we received from Joe Bolton.  He

10   forwarded it on to us.

11   Q.   And what was the subject of the e-mail, ma'am?

12   A.   Concerning the iVotronic machines.

13   Q.   And was this also a record kept at the county clerk's

14   office?

15   A.   We just printed it off and kept it, yes.

16        MR. SMITH:  I'd move for the introduction of

17   Government's Exhibit PRQ.

18        THE COURT:  Any objection?  PR16Q will be admitted.

19        MR. SMITH:  PR16Q, I apologize.

20        THE COURT:  Yes, sir.

21              (Government Exhibit No. PR16Q

22               was admitted into evidence.)

23        MR. SMITH:  PR16R.

24   Q.   Are you able to identify that document for the Court and

25   the jury, please?

*GRAY - Direct (Mr. Smith)*                                                    113

1    A.   It is the precinct sheriff's post-election report for the

2    Manchester precinct for the election May of '06.

3    Q.   I'm sorry to interrupt you.  Go ahead and finish.

4    A.   It was for the May 16, '06 election.

5    Q.   And are those records kept in the normal course of

6    business there?

7    A.   Yes, they are.

8         MR. SMITH:  I'd move for the introduction of

9    Government's Exhibit PR16R.

10        THE COURT:  Any objection?  PR16R will be admitted.

11               (Government Exhibit No. PR16R

12               was admitted into evidence.)

13   Q.   Ma'am, could you identify further who was the sheriff who

14   made that report, ma'am?

15   A.   Carl Anthony Short the Second.

16   Q.   And were there more than one report that he made from the

17   Manchester precinct on that May primary election?

18   A.   Not to my knowledge.

19   Q.   Thank you.

20        MR. SMITH:  Like to hand the witness now Government's

21   Exhibit PR17.

22        THE COURT:  Yes, sir.

23   Q.   Can you identify Government's Exhibit PR17, ma'am?

24   A.   They're voter assistance forms used in the Manchester

25   precinct for the May 16, 2006 election.

*GRAY - Direct (Mr. Smith)*                                          114

1    Q.   And are those also records kept in the ordinary course of

2    business at the Clay County court clerk's office?

3    A.   Yes, they are.

4         MR. SMITH:  I'd move for their introduction at this

5    time, Your Honor.

6         THE COURT:  Any objection?  I previously withheld

7    ruling on this exhibit.  It will be admitted at this time.

8         MR. SMITH:  Thank you.

9              (Government Exhibit No. PR17

10             was admitted into evidence.)

11        MR. SMITH:  Like to hand to you now what's marked

12   PR18.

13   Q.   Can you identify PR18?

14   A.   It was a recanvass taken of election day in May of '06 in

15   the property valuation administrator contest between Ursula

16   Smith and Phillip Mobley.

17        MR. RICHARDSON:  We have a different PR18.

18        MR. WHITE:  Your Honor, actually, I think we've got

19   all the sub-parts.  We just don't have 18 itself.  It's I

20   think a mistake on the CD-R we were given.

21        THE COURT:  All right.  If you could return that back

22   to Mr. Smith.  Counsel, you can take a look at that -- just

23   18.

24        MR. SMITH:  I apologize Your Honor, again.  I'm

25   sorry.  May we approach, Your Honor?

1          THE COURT:  Yes.  Why don't you come up.  Bring that

2     document.

3                    (A sidebar conference was held out of the

4                    hearing of the jury):

5          MR. SMITH:  Your Honor, I've asked several of the

6     other attorneys, and they seem to recognize this, but Mr.

7     White does not.

8          THE COURT:  Why don't we break for the evening, and

9     we'll figure this out over the break, and we can start here

10    tomorrow.

11         MR. PINALES:  I think it's more a numbering issue.

12         THE COURT:  I don't have this in my notebook.  We'll

13    figure this out over the evening and we'll start with 18

14    tomorrow with the witness.  I don't think we're going to

15    finish with her tonight in any event.  It's 4:30 at this time.

16         MR. SMITH:  Okay.

17         MR. WHITE:  Thank you, Your Honor.

18                    (Sidebar conference concluded.)

19         THE COURT:  Thank you, counsel.  Ladies and

20    gentlemen, we're going to stop here for the evening.  We'll

21    pick up here tomorrow at 9:00.  As we break for the evening,

22    of course, please keep in mind the admonition that you have

23    been given several times.  I think you know what the

24    admonition is before I give it to you.

25         Don't discuss the case with anyone.  Don't allow

116

1    anyone to discuss the case.  Don't read, watch or listen to

2    any accounts of the case if there should be any.  Don't do any

3    type of investigation, any type of research, anything of that

4    nature.  Don't communicate electronically about the case and,

5    of course, don't make up your mind about the case until it is

6    finally submitted to you.  With that admonition, the jury will

7    be excused until 9:00 a.m. tomorrow morning.

8                 (The jury left the courtroom at 4:30 p.m.)

9           THE COURT:  Thank you, Miss Gray.  You may step down.

10   You're excused until 9:00 tomorrow morning.

11          Anything else to take up outside the presence of the

12   jury.

13          MS. HUGHES:  I wanted to give the Court another

14   update on the video that Miss Poynter and I are working on

15   still.  It's not been filed, but we're not being inattentive.

16   She's now got somebody in her office trying to convert it to

17   another program, because she thinks they might have the

18   capability of doing clips.  We're still working on it.  I feel

19   obligated to give the Court an update on a daily basis.  Thank

20   you.

21          THE COURT:  I appreciate that.  Thank you.  Anything

22   else?

23          MR. SMITH:  Your Honor, I do apologize for that.  The

24   United States has had other things to work on, and I've asked

25   Miss Poynter to give those priority.  So I may have caused

117

1    that delay and I apologize.

2         MS. HUGHES:  If I could have done it in the first

3    place, we wouldn't have been asking your staff to help.  Thank

4    you.

5         THE COURT:  That will be fine.  You can keep me

6    updated if it turns out to be a problem.  Anything else, Mr.

7    White?

8         MR. WHITE:  Yes, Your Honor, just real quickly.  I

9    could probably just announce to the Court that would resolve

10   the issue we just had.  Was that something you wanted us to

11   work with the United States on?

12        THE COURT:  We're going to take up Exhibit 18

13   tomorrow morning.  I don't have it in my notebook, so I wasn't

14   sure what you were referring to.  You all can sort that out

15   over the evening.  If there is an issue, we can take up in the

16   morning.  Otherwise, we'll just start with 18 and go forward

17   from there.

18        MR. WHITE:  I don't think we'll have an issue.

19        THE COURT:  Okay.  Anything else?

20        MR. SIMONS:  Your Honor, I have subpoenaed a witness

21   in the morning for 8:50.  I was going to ask the Court if we

22   could have him recognized.

23        THE COURT:  We can do that in a group as well, if

24   there's more than one witness that needs to be recognized, we

25   can do that.

118

1          MR. SIMONS:  I only have one tomorrow.

2          THE COURT:  All right.  If anyone else wants to bring

3    witnesses in, we can do that at 8:50 in the morning before we

4    start, okay?  We'll be in recess until 8:50 tomorrow morning.

5          (Proceedings adjourned at 4:33 p.m.)

6                          - - -

7

8                    C E R T I F I C A T E

9          I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
10    proceedings in the above-entitled case.

11

12    \s\ Lisa Reed Wiesman                March 7, 2010
     LISA REED WIESMAN, RDR-CRR              Date of Certification
13    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

GOVERNMENT'S WITNESS

MARY GAIL ROBERTS
Direct Examination by Mr. Parman.................. Page  4
Cross-examination by Mr. Gilbert................. Page 15
Cross-examination by Ms. Hughes.................. Page 17
Cross-examination by Mr. Simons................. Page 18
Redirect Examination by Mr. Parman.............. Page 21
Recross-examination by Mr. Simons............... Page 22

BILLIE JEAN BERRY
Direct Examination by Mr. Smith................. Page 23
Cross-examination by Mr. Abell.................. Page 32
Cross-examination by Mr. Gilbert................ Page 33
Cross-examination by Ms. Hughes................. Page 35
Cross-examination by Mr. Simons................. Page 40
Redirect Examination by Mr. Smith.............. Page 42

AMANDA SMITH
Direct Examination by Mr. Smith................. Page 44
Cross-examination by Mr. Hoskins............... Page 47

DARREN SMITH
Direct Examination by Mr. Smith................. Page 49
Cross-examination by Mr. Gilbert............... Page 56
Voir Dire Examination by Ms. Hughes............. Page 62
Voir Dire Examination by Mr. Smith.............. Page 66
Cross-examination by Ms. Hughes................. Page 69
Redirect Examination by Mr. Smith.............. Page 71

ROBIN WINKFIELD
Direct Examination by Mr. Smith................. Page 72
Cross-examination by Mr. Pinales............... Page 76

LISA LANG
Direct Examination by Mr. Smith................. Page 77

BEVERLY GRAY
Direct Examination by Mr. Smith................. Page 87


GOVERNMENT EXHIBITS                          ADMITTED

Exhibit No. M14, Summary of Maricle salary payments
Admitted........................................ Page 75

Exhibit No. PR3, May 2006 appointment of election officers
Admitted........................................ Page 91

1   <u>GOVERNMENT EXHIBITS</u> (continued)

2   Exhibit No. PR4, 2006 election officer training cert.
    Admitted....................................... Page 93
3
    Exhibit No. PR5, 2006 report to fiscal court
4   Admitted....................................... Page 94

5   Exhibit No. PR6, 2006 voting precincts
    Admitted....................................... Page 94
6
    Exhibit No. PR7, 2006 general election meeting notes
7   Admitted....................................... Page 96

8   Exhibit No. PR8, 11/7/06 M. Adams election meeting notes
    Admitted....................................... Page 98
9
    Exhibit No. PR9, 11/7/06 E. Dezarn election meeting notes
10  Admitted....................................... Page 101

11  Exhibit No. PR10, 11/7/06 B. Craft election meeting notes
    Admitted....................................... Page 101
12
    Exhibit No. PR11, 10/11/06 and 11/7/06 F. Thompson
13                    election meeting notes
    Admitted....................................... Page 101
14
    Exhibit No. PR12, 11/7/06 B. Gray election meeting notes
15  Admitted....................................... Page 101

16  Exhibit No. PR13, 11/7/06 M. Baker election meeting notes
    Admitted....................................... Page 101
17
    Exhibit No. PR14, 11/7/06 D. Edwards election meeting notes
18  Admitted....................................... Page 101

19  Exhibit No. PR15A, May 2006 inspection report, voting machines
    Admitted....................................... Page 102
20
    Exhibit No. PR15B, May 2006 primary election clerk notes
21  Admitted....................................... Page 102

22  Exhibit No. PR15C, List of election officers
    Admitted....................................... Page 102
23
    Exhibit No. PR15D, F. Thompson election complaint notes
24  Admitted....................................... Page 102

25

1    <u>GOVERNMENT EXHIBITS</u>(continued)

2    Exhibit No. PR15E, May 2006 primary election
                     clerk office notes
3    Admitted....................................... Page 102

4    Exhibit No. 16, List of appt. of precinct officers
     Admitted....................................... Page 106
5
     Exhibit No. PR16A through PR16P, Board of Elections
6                Commissioners record of proceedings from
                 1998 through 2007
7    Admitted....................................... Page 111

8    Exhibit No. PR16Q, 5/23/06 e-mail
     Admitted....................................... Page 112
9
     Exhibit No. PR16R, Post-election report
10   Admitted....................................... Page 113

11   Exhibit No. PR17, Manchester May 2006 voter assist. forms
     Admitted....................................... Page 114
12

13   <u>COURT EXHIBITS</u>

14   PR83A and PR83B, Attorney General's office records
     Admitted....................................... Page  85
15

16                           -  -  -

17

18

19

20

21

22

23

24

25