1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                              - - -
3
     UNITED STATES OF AMERICA,        :   Docket No. CR 09-16-S
4                                     :
                    Plaintiff,        :   **Frankfort, Kentucky**
5                                     :   Thursday, March 4, 2010
          versus                      :   8:45 a.m.
6                                     :
     RUSSELL CLETUS MARICLE,          :
7    DOUGLAS C. ADAMS                 :
     CHARLES WAYNE JONES              :
8    WILLIAM R. STIVERS               :
     FREDDY W. THOMPSON               :        **Trial Day 18A**
9    WILLIAM B. MORRIS                :
     DEBRA L. MORRIS                  :
10   STANLEY BOWLING,                 :
                                      :
11                  Defendants.       :

12

13                            - - -
                       TRANSCRIPT OF TRIAL
14                   BEFORE DANNY C. REEVES
            UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16   APPEARANCES:

17   For the United States:      STEPHEN C. SMITH, ESQ.
                                 JASON D. PARMAN, ESQ.
18                               Assistant U.S. Attorney
                                 601 Meyers Baker Road
19                               Suite 200
                                 London, KY 40741
20
     For the Defendant           MARTIN S. PINALES, ESQ.
21   Russell Cletus Maricle:     Strauss & Troy
                                 150 E. Fourth Street
22                               Fourth Floor
                                 Cincinnati,OH  45202
23
                                 DAVID S. HOSKINS, ESQ.
24                               107 E. First Street
                                 Corbin, KY  40701
25

2

```
 1   For the Defendant              R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:              KRISTIN N. LOGAN, ESQ.
 2                                  Landrum & Shouse, LLP
                                    220 West Main Street
 3                                  Suite 1900
                                    Louisville, KY 40202
 4

 5   For the Defendant              T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:           Morgan & Pottinger, P.S.C.
 6                                  133 West Short Street
                                    Lexington, KY  40507
 7

 8   For the Defendant              ROBERT L. ABELL, ESQ.
     William R. Stivers:            120 North Upper Street
 9                                  Lexington, KY  40507

10

     For the Defendant              RUSSELL JAMES BALDANI, ESQ.
11   Freddy W. Thompson:            R. TUCKER RICHARDSON, ESQ.
                                    Baldani, Rowland & Richardson
12                                  300 West Short Street
                                    Lexington, KY  40507
13

14   For the Defendant              JERRY W. GILBERT, ESQ.
     William B. Morris:             Coy, Gilbert & Gilbert
15                                  212 North Second Street
                                    Richmond, KY 40475
16

17   For the Defendant              ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:               Gess, Mattingly & Atchison, PSC
18                                  201 West Short Street
                                    Lexington, KY 40507
19

20   For the Defendant              DANIEL A. SIMONS, ESQ.
     Stanley Bowling:               Thompson, Simons, Dunlop & Fore
21                                  116 West Main Street
                                    Suite 2A
22                                  Richmond, KY 40476

23

24

25
```

3

1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
2                                 35 W. Fifth Street
                                  P.O. Box 1073
3                                 Covington, KY  41012
                                  (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          (Proceedings commenced at 8:48 a.m.)

2          THE COURT:  Thank you.  The record will reflect the

3    jury's not present at this time.  Mr. Abell, I understand that

4    you had an issue that you wanted to take up?

5          MR. ABELL:  Yes, sir.  May it please the Court.  It

6    concerns, I understand that Brian and Angela Lewis will

7    testify sometime today.  They are the two witnesses, husband

8    and wife, that testified at Mr. Stivers' revocation hearing

9    back in December.  And I expect and anticipate that their

10   testimony at this trial would, for all material purposes, be

11   what they testified to at the revocation hearing.  And I know

12   that the Court has reviewed that testimony.

13         I will make a motion to exclude their testimony

14   pursuant to Rule 403.  Arguably, there is some probative value

15   as to consciousness of guilt or an act in furtherance of the

16   charge of conspiracy.

17         I would suggest that its probative value is minimal.

18   Their conversations they testified with Mr. Stivers related to

19   an Ouchie Jackson, who hasn't testified yet.  He may still yet

20   testify.  I think we all know by now is a many time candidate

21   for city council and, well, the record regarding Mr. Jackson

22   is what it is.

23         Mr. Stivers mentioned him and also some discussions

24   as to whether federal agents or the Feds had been to speak

25   with him.  But there was no discussion of substantive

5

1    testimony beyond the fact of would you testify that Ouchie
2    was, to put it bluntly, Judge, high on drugs at a time a few
3    years earlier when he and Mr. Lewis got into an altercation.
4    But beyond that, in terms of who can testify about involvement
5    with a political campaign, with politics, with the Board of
6    Elections, with regard to any of the other charged defendants,
7    with regard to any of the charges in this case against Mr.
8    Stivers, there is no suggestion or reference to that.
9         I'll grant that it's at least arguable that his
10    contacts do portray, constitute consciousness of guilt
11    evidence.  Very minimal.  However, the prejudicial, the unduly
12    prejudicial effect pursuant to 403 I think requires its
13    exclusion.
14         With regard to furtherance of the conspiracy,
15    conspiracy is charged to terminate in summer of 2007, and I
16    understand the testimony of the Lewises to be the contacts
17    with them, the first one apparently was with Mr. Lewis at some
18    point in the summer of 2009, more than two years after the
19    conspiracy's charged to have terminated.
20      I would respectfully represent -- I know the Court cited
21    U.S. v. Pizzonia on a similar issue the other day.  The
22    two-year time span takes this case beyond the scope the rule
23    the Courts rely on from Pizzonia.  So for those reasons, I
24    respectfully request a ruling from the Court excluding the
25    testimony of Brian and Angela Lewis.

6

1          THE COURT:  Mr. Parman?

2          MR. PARMAN:  Yes, Your Honor.  Mr. Abell's

3     characterization is accurate as to what Mr. and Miss Lewis

4     would testify to.  It would be consistent with what they had

5     testified to in Mr. Stivers' revocation hearing.

6          The issue with Mr. Ouchie Jackson, his name has been

7     brought up, it's been referenced multiple times here in court.

8     He is certainly an unindicted co-conspirator in this

9     conspiracy.  Essentially, what Mr. Stivers was attempting to

10    do was to suborn perjury from Mr. Lewis and then when Mr.

11    Lewis refused, then Mr. Stivers engaged in a course of

12    retaliatory action against the Lewises in order to try to

13    protect himself and the enterprise.

14         Certainly, those actions are probative of this

15    offense, as it shows an attempt to try to protect both himself

16    and the enterprise as to creating issues to destroy the

17    credibility of the witnesses that the United States would

18    intend to introduce.  It does also show a consciousness of

19    guilt on his part, because he essentially engages in a pattern

20    of telling these witnesses that the Feds are coming to get

21    them after they would not go along with his attempt to try to

22    get them to lie, essentially, as to whether or not Mr. Ouchie

23    Jackson was a drug addict.

24         So the probative value is very high here, Your Honor.

25    Certainly, the actions that Mr. Stivers took did show his

7

1    consciousness of guilt, and it also showed an attempt to try

2    to protect and insulate the enterprise from the upcoming trial

3    in this action.

4            THE COURT:  All right.  Well, the issue is first one

5    of relevancy.  And then if the Court finds the testimony to be

6    relevant, then the issue is whether it would be unduly

7    prejudicial under a 403 analysis.

8            I do believe that the testimony would be relevant on

9    issues of consciousness of guilt, as has been acknowledged.

10   In this particular case, the time in which the activity

11   occurred was approximately two years after the last date

12   charged in the indictment.  But in this case, of course,

13   parties can take actions knowingly and intentionally outside

14   the time period which would indicate a consciousness of guilt

15   of the matters that are charged within the scope of the

16   indictment.

17           Question becomes is it unduly prejudicial in light of

18   its probative value.  In this particular case, I believe that

19   it would not be unduly prejudicial and that its probative

20   value would outweigh any prejudicial effect in the case.  So

21   the oral motion to exclude that testimony will be denied at

22   this time.  Considering all of the evidence in the case and

23   the activities of the parties, the defendants, this would be

24   an act that would be consistent with the manner in which this

25   particular defendant has acted in the past.  The Court will

8

1    overrule the oral motion.

2          Mr. Hoskins?

3          MR. HOSKINS:  Your Honor, I would join in objecting

4    to that testimony on behalf of my client, who clearly was not

5    involved in that.  If the Court overrules that objection, I

6    would ask for an instruction that this evidence is only

7    admissible against Mr. Stivers.  It happened so long after

8    there was any contact between these defendants, because the

9    Court has ordered them not to have any contact.  I think it

10   would be -- should not be considered as having any probative

11   value against my client.

12         THE COURT:  All right.

13         MR. BALDANI:  Judge, we'd like to be deemed joined in

14   that as well, please.

15         THE COURT:  Before everyone jumps up to join in, Mr.

16   Parman, will the United States be offering this evidence as a

17   further act, an act in furtherance of the conspiracy under the

18   authority I cited previously or as consciousness of guilt?

19         MR. PARMAN:  I believe as both, Your Honor.

20         THE COURT:  I believe it's more of an indication of

21   consciousness of guilt under the particular facts that are

22   presented here.  So I will give a limiting -- I will give a

23   limiting instruction that the evidence should be considered

24   only with respect to Defendant Stivers in the case.

25         So the request that's been made by Mr. Hoskins will

9

1    be sustained and, therefore, it will render moot requests on

2    behalf of other defendants who I assume would be joining in

3    with that.

4          Also, there have been -- while we're here outside the

5    presence of the jury, there have been several issues that have

6    been raised in the course of this proceeding about objecting

7    under 801(d)(2)(E), statements of co-conspirators in

8    furtherance of the conspiracy.

9          As the parties are aware, of course, I made some

10   pretrial rulings with respect to many statements that would

11   fall within that particular rule as they related to

12   transcripts, the transcriptions and statements that were

13   contained upon those transcripts.

14         As other conversations come up in the course of trial

15   that may fall within that section, of course, those

16   conversations would not necessarily be covered by the Court's

17   pretrial rulings, and I would anticipate or would expect the

18   parties to make appropriate objections, if you wish to do so,

19   to those other conversations, other out-of-court statements.

20         At the conclusion of the government's proof, I will

21   be making findings, final determinations with respect to those

22   pretrial matters that were addressed, primarily dealing with

23   the transcripts.

24         If the parties would like the Court to make

25   additional findings with respect to those other conversations

10

1    that were not covered in pretrial rulings, I will ask you at

2    that time, at the conclusion of the United States' case, to

3    specifically identify the particular conversation which you

4    believe would not be covered under 801(d)(2)(E), and I will

5    make findings as to those matters.  But going forward, of

6    course, if there are additional matters, conversations or

7    testimony that would relate to out-of-court statements of

8    defendants, then, of course, you'll need to make an objection.

9    I'll make a ruling at that time or will defer ruling until the

10   conclusion of the United States' case if it does fall within

11   801(d)(2)(E).

12            Do we have all of our jurors present?

13            COURT SECURITY OFFICER:  I believe so, sir.

14            THE COURT:  Mr. White?

15            MR. WHITE:  Yes, Your Honor.  The only thing I wanted

16   to ask you is we had talked three or four weeks ago about my

17   expert witnesses from the Leslie County clerk and the State

18   Board of Elections.

19            THE COURT:  Yes, sir.

20            MR. WHITE:  I'm going to go ahead and file, given --

21   it appears the United States is going to be closing early next

22   week, maybe even today.  I'm going to go ahead and file our --

23   I'm just going to title it a memorandum of law, if that's

24   appropriate, on that issue that you raised about the scope of

25   an expert to talk about legal issues.

*WEBB - Direct (Mr. Smith)*                                                        11

1             THE COURT:  All right.

2             MR. WHITE:  Would that be the appropriate way to do

3     that?

4             THE COURT:  You can do that, if you wish.  I'm not

5     certain of the issue that you want to raise, but file it, I'll

6     look at it.

7             MR. WHITE:  I'll go back and review my notes, Your

8     Honor.

9             THE COURT:  All right.  Anything else?

10            Bring the jury in.

11            (The jury entered the courtroom at 9:01 a.m.)

12            THE COURT:  The record will reflect that all members

13    of the jury are present.  Parties and counsel are also

14    present.  I believe when we finished yesterday afternoon, we

15    completed the last witness called.  Are you ready to call the

16    next witness, Mr. Smith?

17            MR. SMITH:  Thank you, Your Honor.  The United States

18    would call Roger Webb.

19            THE COURT:  Thank you.

20            ROGER WEBB, GOVERNMENT'S WITNESS, SWORN

21                      DIRECT EXAMINATION

22    BY MR. SMITH:

23    Q.  State your name, please.

24    A.  Roger Webb.

25    Q.  Mr. Webb, where do you live?

WEBB - Direct (Mr. Smith)                                           12

1    A.   In Manchester, Kentucky.

2    Q.   How long have you lived in that area?

3    A.   Forty-nine years.

4    Q.   And sir, what kind of jobs have you held?

5    A.   I've been -- I've worked for the school board.  I've

6    worked for White Mobile Homes.  I drove a truck for a power

7    company in Hazard.  That's pretty much it.

8    Q.   And what are you currently doing?

9    A.   Right now, I'm semi-retired right now.

10   Q.   And are you married?

11   A.   Yes.

12   Q.   And do you have children?

13   A.   Yeah.

14   Q.   How many children do you have?

15   A.   I have two girls.

16   Q.   What part of Clay County do you live in, sir?

17   A.   I live in the Beech Creek area.

18   Q.   Okay.  And the Beech Creek area, do you know the voting

19   precinct, the polling place?

20   A.   Yeah.

21   Q.   What's the name of that?

22   A.   Harts Branch.

23   Q.   Have you been in politics over the last few years, sir?

24   A.   I ran in '06 was the first time I was ever had anything

25   to do with it directly.

WEBB - Direct (Mr. Smith)                                          13

1   Q.   And what office did you seek in '06, sir?

2   A.   Magistrate.

3   Q.   And what district would that have been?

4   A.   District 2.

5   Q.   And do you know who the office holder was at the time you

6   sought the office?

7   A.   Stanley Bowling.

8   Q.   You say you've never been involved in politics before?

9   A.   No, just other than just, I mean, you know, I've seen it

10  go on for years, but I never was involved as far as running or

11  anything like that.

12  Q.   What attracted to you run for the office in 2006?

13  A.   I was just -- they was just several people approached me

14  and asked me, you know, told me I ought to run and that I

15  would do good at it, and they thought that I would be a good

16  person for the job, you know.  And I said -- well, I thought

17  about it and thought about it and decided to do it.

18  Q.   Had you been urged to do it in earlier elections?

19  A.   No, I hadn't.  I hadn't really even ever considered it in

20  other elections.

21  Q.   Why had you not considered it before?

22  A.   Well, just people had said, you know, this is going to

23  be -- it's going to be honest, it's going to be straight, and

24  they, you know, said it's going to be a person that's best

25  qualified for the job or that people feels like would do a

1   good job.  I said, well, I'll take a shot at it.

2   Q.   What kind of campaign did -- campaigning did you do

3   during that election, sir?

4   A.   I just done a lot of walking and talking.

5   Q.   Door to door?

6   A.   Yeah.

7   Q.   And about how large a precinct is it that you had to

8   cover there in that district?

9   A.   Well, there's three different areas in it that's

10  probably -- all totaled, probably I guess 20 mile, you know.

11  It's in like three different, three separate areas of Clay

12  County.

13  Q.   And what precinct polling places are in that district?

14  A.   Big Creek and Greenbriar and Harts Branch.

15  Q.   And were you able to make any observations on election

16  day in the May primary of 2006 at any of these polling places?

17  A.   Yeah, I was at the Harts Branch precinct.  It's where I

18  was at.

19  Q.   And what were you doing at Harts Branch, sir?

20  A.   I was just kind of setting, watching the voters and stuff

21  was coming and a-goin', seeing what was going on or how many

22  was coming or whatever.

23  Q.   How long did you take to make observations there at the

24  polling place?

25  A.   Well, it wasn't, it wasn't no big long time.  I just, I

*WEBB - Direct (Mr. Smith)*                                          15

1    seen a lot of people coming and a-goin' that kind of, you

2    know, raised my concern about what was going on as far as

3    voters being hauled, you know.

4    Q.   Where were you situated as far as a vantage point from

5    the polling place?

6    A.   I was setting right straight like right here, and the

7    voting polls is probably here at an angle of this.

8            MR. SMITH:  Hand the witness what's marked as P31.

9    A.   Yeah.  I was setting --

10   Q.   Let me ask you this, Mr. Webb, before you refer to that.

11   Does that picture there fairly and accurately depict the

12   general location where you were situated?

13   A.   Yes.

14           MR. SMITH:  I'd move for its introduction at this

15   time.

16           THE COURT:  Any objection?  P31 will be admitted.

17                   (Government Exhibit No. P31

18                   was admitted into evidence.)

19   Q.   And I would ask permission to publish from the projector.

20           THE COURT:  Yes, sir, you may.

21           MR. SMITH:  I'll have to ask court security to

22   retrieve that.  I'll put it on the projector here for Mr.

23   Webb.

24   Q.   Do you have a monitor there in front of you, Mr. Webb?

25   A.   Yeah.

WEBB - Direct (Mr. Smith)                                    16

1   Q.   If you could demonstrate for the Court and the jury where
2   you were situated.
3   A.   I was back in right here in the -- this little area right
4   here behind this little red car.  Just setting right here.
5   Q.   That little drive area next to this building, `do you
6   know whose building that is?
7   A.   Yeah, that belongs to my brother.
8   Q.   What kind of building is that, to your knowledge?
9   A.   It's an apartment, there's like four apartments in it.
10  Q.   And how far is the polling place from where you were?
11  Estimate, if you can.
12  A.   Probably three, four hundred yards, I guess.  Somewhere
13  in that area.  It's not real --
14  Q.   And did this cause you some concern, based on what you
15  were seeing there at the polling place that day?
16  A.   Yeah, at the time it did, yeah.
17  Q.   And what did you do?
18  A.   I called Freddy Thompson's office.
19  Q.   And who did you talk to there?
20  A.   I talked to Freddy.
21  Q.   And what did you tell him?
22  A.   I just told him that, that they was stuff going on here
23  that didn't look right.  I said, there's a lot of voters being
24  hauled and coming in.  I said, just hauling them in one after
25  the other.

*WEBB - Direct (Mr. Smith)*                                           17

1   Q.   Do you remember exactly what you told him, how you

2   described it to him?

3   A.   My exact words was "they're hauling them in there just

4   like stock."

5   Q.   What did you mean by hauling them in there like stock?

6   A.   Well, they were just coming in, taking them in and

7   bringing them out one after the other.

8   Q.   Did you recognize any of the people who were hauling

9   these voters in and out like stock?

10  A.   Yeah, I recognized Bobby Sams and Mary Gail Davidson that

11  I know her by.  She was married to a Roberts.  I don't know.

12  Her name may be Roberts.

13  Q.   Does she have a daughter that you know of?

14  A.   Yeah, she's got a daughter.

15  Q.   Do you know her daughter's name?

16  A.   I know it, but I can't, I can't --

17  Q.   Does she have a sister?

18  A.   Yeah.

19  Q.   Do you know her name?

20  A.   I know it, but I can't think of her name.

21  Q.   You recognized her as Mary Gail?

22  A.   Um-hmm.

23  Q.   What's she look like?

24  A.   She's real slim, tall, probably -- not real tall, but

25  real slim, probably 51, 52 year old or something.

1   Q.   What did Freddy Thompson say he'd do about the matter?

2   A.   He said he would take care of it.  He said he would

3   call -- he said he would call and see what was going on.

4   Q.   And what did you see happen next?

5   A.   Wayne Jones left the voting place, and he stayed gone

6   probably 10, 15 minutes.  And he come back, and I was still

7   sitting right where I was sitting, and he stopped and assured

8   me that they was doing me no wrong and that there was nothing

9   going on wrong.  Said, we're not doing anything wrong here in

10  any way.

11  Q.   Do you know what he was doing there at Harts Branch that

12  day?

13  A.   I think he was one of the judges or officers or

14  something.  I don't -- not really, I don't.

15  Q.   Do you know, is he related to Freddy Thompson?

16  A.   Yeah, I think he's Freddy's father-in-law.  Yeah, he is.

17  He's Freddy's father-in-law.

18  Q.   So you say how soon after you called Freddy did you see

19  Wayne leave Harts Branch and travel from that place?

20  A.   Probably 10 minutes.  Just guessing, I'm going to say ten

21  minutes.

22  Q.   And then how long was it that you estimate it was before

23  he returned and gave you the assurance that everything's okay?

24  A.   Probably 15 minutes.

25  Q.   Prior to the election there in 2006, Mr. Webb, were you

*WEBB - Direct (Mr. Smith)*                                              19

1    approached by anyone to try to get you to come off as

2    magistrate?

3    A.   Yeah, I was.

4    Q.   If you would, tell the ladies and gentlemen of the jury

5    and the Court about that, please.

6    A.   Kennon White, I worked for him in the mobile home

7    business, and he come, he come to the house and he first asked

8    me why -- what I was mad at Stanley over.  I said, I'm not mad

9    at Stanley at all.  Don't have no hard feelings at him at all.

10   And he said, well, you know, said why are you running against

11   him for?  Why are you doing it?  I said, I'm just doing it

12   because I've been asked.  And I said, just exercising the only

13   right that I've got is to run and vote how I want to vote.

14        And he went on to say something about me coming off.  And

15   I said, I said, I ain't gonna do it.  I said, I'm not gonna.

16   And he said, he said, what would it, what would it take for

17   you to come off the ticket?  And I said, I said, go back and

18   tell him I'm not for sale, that I'm not coming off.

19             MR. SMITH:  Pass the witness.

20             THE COURT:  Thank you.

21             MR. PINALES:  No questions.  Thank you, Judge.

22             THE COURT:  Mr. Westberry?

23             MR. WESTBERRY:  No questions, Your Honor.

24             MR. WHITE:  Just a moment, Your Honor.

25             MR. SMITH:  If it's okay, I'll turn that off.

20

1          THE COURT:  Yes, sir, that will be fine.

2          MR. WHITE:  Your Honor, the first thing I would ask

3    is if there's any Jencks material.

4          THE COURT:  Any additional materials?

5          MR. SMITH:  You have this, right?

6          MR. WHITE:  No.

7          MR. SMITH:  I'm going to have to check, Your Honor.

8    I'm sure that there is at least one report I need to get

9    confirmation that they've gotten it.

10          THE COURT:  Why don't we take a short break while you

11   copy that, if that's necessary.  We'll give counsel just a few

12   moments.  Ladies and gentlemen, I'll excuse you for a few

13   moments.  Expect to call you back within ten minutes.  Please

14   keep in mind the admonitions you were given previously.  Jury

15   will be excused for approximately ten minutes.

16          (The jury left the courtroom at 9:15 a.m.)

17          THE COURT:  Thank you.  We'll be in recess for ten

18   minutes.

19          (Recess from 9:16 a.m. until 9:26 a.m.)

20          (The jury entered the courtroom at 9:26 a.m.)

21          THE COURT:  Thank you.  All members of the jury are

22   present.  Parties and counsel are also present.  Mr. White,

23   you may proceed.

24          MR. WHITE:  Thank you, Your Honor.  I just have one

25   or two questions, if I could just ask from here, please.

*WEBB - Cross (Mr. White)*                                              21

1          THE COURT:  That will be fine.

2                        CROSS-EXAMINATION

3    BY MR. WHITE:

4    Q.   Good morning Mr. Webb.  My name is Scott White.  I

5    represent Mr. Jones.  Just one or two questions.  One, did you

6    testify on direct that it was your understanding that Mr.

7    Jones was an election officer at the Harts Branch precinct

8    that morning?

9    A.   I don't know the office that he held.  I just know he was

10   there.  He was at the election.

11   Q.   I see.

12   A.   Um-hmm.

13   Q.   Do you know -- are you a Democrat or a Republican?

14   A.   Republican.

15   Q.   Do you know if Mr. Jones was the election commissioner --

16   or, I'm sorry, the Democrat commissioner on the Clay County

17   Board of Elections in 2006?

18   A.   I think he was.  I don't know for sure, but I know -- I'm

19   not a hundred percent sure of what part that he, that he --

20   what office he held or whatever, but --

21   Q.   Was it your testimony that you saw Mary Gail Roberts

22   hauling voters there?

23   A.   Mary Gail and just, just two or three different people

24   that didn't -- that, like I was saying, when you live in a

25   place like you live, you know the ones that's kind of up in

*WEBB - Cross (Mr. Baldani)*                                    22

1    the air or whatever.  And it just didn't look to suit me what

2    was going on, I mean, you know.

3    Q.   But my question was, at least one of the people that you

4    can identify that hauled votes in the -- and this was the

5    primary of 2006, the May '06 election?

6    A.   Um-hmm.

7    Q.   That at least one of the folks you can identify was Mary

8    Gail Roberts; is that correct?

9    A.   Right.

10            MR. WHITE:  Thank you, Your Honor.  Those are all the

11   questions I have.

12            THE COURT:  Thank you.

13            MR. ABELL:  No questions for Mr. Webb.

14            THE COURT:  Mr. Baldani?

15            MR. BALDANI:  Thank you, Your Honor.

16                         CROSS-EXAMINATION

17   BY MR. BALDANI:

18   Q.   Good morning, Mr. Webb.  My name is Russ Baldani.  I'm

19   one of Freddy's lawyers.  Just got a few questions for you.

20   How long do you think you observed the activity that day?

21   A.   I was probably there 45 minutes or hour or so.

22   Q.   Okay.  So that's the extent of how long you watched, and

23   your concern was that people were being hauled in to --

24   apparently being hauled in to vote, right?

25   A.   Right.

*WEBB - Cross (Mr. Baldani)*                                            23

1    Q.   Now, just to be clear, you didn't see anybody get paid to

2    vote, did you?

3    A.   No, sure didn't.

4    Q.   And you called Freddy Thompson at the clerk's office?

5    A.   Um-hmm.

6    Q.   You know Freddy, don't you?

7    A.   Yeah.

8    Q.   You knew him to be the county clerk?

9    A.   Right.

10   Q.   Did you know him, you know, on a personal, social,

11   professional level?

12   A.   I know him personal, yeah.  Grew up with him.

13   Q.   Did you?

14   A.   Yeah.

15   Q.   So you called him and told him about your concern of

16   those people being hauled in to vote at that precinct?

17   A.   Right.

18   Q.   Did you get the impression he listened to you?

19   A.   Yeah.

20   Q.   And seemed to be concerned about what you were talking

21   about?

22   A.   Sure was.

23   Q.   And so a little while later, you saw his father-in-law

24   leave for a few minutes and then come back?

25   A.   Right.

1    Q.   And then Wayne came up and told you everything was okay?

2    A.   He stopped along the road where I was sitting, he stopped

3    along the road and he said, he said, everything -- he said,

4    there's nobody doing you anything wrong.  Everything's going

5    straight.  I said okay.  That's all I ask.

6    Q.   So you got the impression that Freddy must have called

7    the precinct in response to your complaint.  Is that fair to

8    say?

9    A.   Um-hmm.  Yeah.

10   Q.   And was it your belief at the time that vote hauling was

11   illegal?

12   A.   Well, no, not really.  I've always heard that hauling

13   voters, that you could haul voters was not illegal, yeah.

14   Um-hmm.

15   Q.   Obviously, you can't pay them?

16   A.   Right, yeah.

17   Q.   But you didn't see anybody being paid?

18   A.   No, sure didn't.

19   Q.   All right.  Have you talked to the FBI about what you saw

20   and observed?  You talked -- I mean, have you been interviewed

21   by an agent?

22   A.   Yeah, um-hmm.

23   Q.   And was that on February 22nd of this year?

24   A.   Could be.  I'm not for sure what the date was.  It's --

25   Q.   Well, let me put it this way.  Was it within the last

*WEBB - Cross (Mr. Simons)*                                                    25

1    week or ten days?

2    A.   Yeah, probably 10, 15 days, yeah, um-hmm.

3    Q.   And that was the first time you talked to them, right?

4    A.   Right.

5    Q.   First and only time, I suppose, right?

6    A.   Yeah.

7         MR. BALDANI:  That's all I've got, Your Honor.

8         THE COURT:  All right.  Thank you.  Mr. Gilbert.

9         MR. GILBERT:  No questions, Your Honor.

10        THE COURT:  Miss Hughes?

11        MS. HUGHES:  No, sir.

12        THE COURT:  Mr. Simons?

13        MR. SIMONS:  I do.

14        THE COURT:  Thank you.  Mr. Simons.

15                      CROSS-EXAMINATION

16   BY MR. SIMONS:

17   Q.   Good morning, Mr. Webb.

18   A.   Morning.

19   Q.   You and I have met before, once?

20   A.   Yeah.

21   Q.   And you were gracious enough to let me in your house here

22   a few days ago.  In the May election of 2006, that's what

23   we're talking about.  While you were parked there at any time

24   that day, you didn't see Stanley Bowling, did you?

25   A.   I didn't see Stanley.  I didn't see Stanley, period, that

1  day, all day long.

2  Q.  Okay.  And you didn't see anybody get paid for their vote

3  at all?

4  A.  No, sir.

5  Q.  Okay.  And you saw some people being hauled to the polls,

6  but your understanding is that can be done legally, correct?

7  A.  Right.

8  Q.  Now, you said that Kennon White approached you about

9  coming off the ticket before the election?

10  A.  Yes, sir.

11  Q.  Is that right?

12  A.  Yeah.

13  Q.  Stanley Bowling didn't come and try to talk you off the

14  ticket, did he?

15  A.  No, sir.

16  Q.  It was strictly Kennon White?

17  A.  Yeah.

18  Q.  Is that right?

19  A.  Yeah.

20  Q.  All right.  And you didn't have any hard feelings toward

21  Stanley Bowling before the race, did you?

22  A.  Not at all.

23  Q.  And you don't have any hard feelings towards Stanley

24  Bowling now?

25          MR. SMITH:  Your Honor, I'm going to object.

*WEBB - Redirect (Mr. Smith)*                                        27

1    Relevance.

2              THE COURT:  Sustained.

3              MR. SIMONS:  That's all, Your Honor.

4              THE COURT:  All right.  Thank you.  Any redirect of

5    the witness?

6              MR. SMITH:  Briefly.

7                        REDIRECT EXAMINATION

8    BY MR. SMITH:

9    Q.  Mr. Webb, if you could clarify one point for me, please.

10   You had been asked about your impressions after observing this

11   activity, and you made one statement in your direct

12   examination that -- or during your cross-examination that you

13   thought that there's a couple of people you named, Bobby "Red"

14   Sams and Mary Gail Roberts and some of these other people you

15   saw hauling in like stock maybe might not be on the up and up?

16   A.  Yes, sir.

17   Q.  And what gave you that impression?

18   A.  Well, it's just, it's like I said, when you, when you

19   live in a county that tight, you know the ones that can be for

20   vote and the ones that can be led astray, I guess you could

21   say.  And --

22   Q.  Are you talking about illegal activity?

23   A.  Well, those that always seem like they're into something

24   they don't need to be into.

25   Q.  I understand.

1    A.   I don't want to make no wrong statement but, I mean,

2    they're people, like I said, that you know can be led astray.

3    And at a time like that, you just kind of look for, you look

4    for everything that -- I mean, you know what I'm saying?  You

5    see things, you say it don't look right.  So that's what I,

6    that's what I done and that's why I called Freddy.

7              MR. SMITH:  Thank you.

8              THE COURT:  Any other questions?

9              MR. BALDANI:  I do, Judge.  I'll just ask from here.

10             THE COURT:  All right.

11                           RECROSS-EXAMINATION

12   BY MR. BALDANI:

13   Q.   So is what I hear you saying, when you saw it was Bobby

14   "Red" Sams, you knew he wasn't hauling for you, right?

15   A.   Yeah, um-hmm.

16   Q.   And when you said, when you answered what Mr. Smith just

17   asked, I guess what you're saying is when you saw Bobby "Red"

18   Sams, you figured he was up to no good, based on what you know

19   about him?

20   A.   Right.

21             MR. BALDANI:  That's all.

22             THE COURT:  Thank you.  Anything else?

23             MR. SIMONS:  I don't have anything else.

24             THE COURT:  Mr. Simons, I'm going to reverse myself

25   on that last ruling.  I'm going to allow you to ask that

*WEBB - Recross (Mr. Simons)*                                          29

1    question, whether he had any hard feelings toward your client

2    before or after the election.

3              MR. SIMONS:  Thank you, Your Honor.  I can do that

4    from here.

5                        RECROSS-EXAMINATION

6    BY MR. SIMONS:

7    Q.   Mr. Webb, can you see me okay?

8    A.   Yeah.

9    Q.   You didn't have any hard feelings toward Stanley Bowling

10   before the election at all, did you?

11   A.   No, sir.

12   Q.   And you don't have any hard feelings toward Stanley right

13   now?

14   A.   No, sir.

15   Q.   And, in fact, you go ride horses with him from time to

16   time, and you consider him a friend; is that correct?

17   A.   Probably better now than anytime before.

18             MR. SIMONS:  Thank you.

19             THE COURT:  Thank you.  Anything else?  Thank you.

20   You may step down.

21             United States may call its next witness.

22             MR. SMITH:  Tommy Slone.

23             TOMMY SLONE, GOVERNMENT'S WITNESS, SWORN

24   ///

25   ///

*SLONE - Direct (Mr. Smith)*                                                    30

1                            DIRECT EXAMINATION

2    BY MR. SMITH:

3    Q.   State your name, please.

4    A.   Tommy Slone.

5    Q.   Mr. Slone, could you tell us where you reside?

6    A.   Jackson County.

7    Q.   And how long have you been a resident of Jackson County?

8    A.   Since 1972.

9    Q.   And are you married?

10   A.   Yes, sir.

11   Q.   Have children?

12   A.   Yes, sir.

13   Q.   How many children do you have?

14   A.   Two.

15   Q.   What kind of jobs have you held, sir?

16   A.   I'm retired from the Kentucky State Police and then

17   served two terms as judge executive in Jackson County.

18   Q.   And Jackson County, is that county situated adjacent to

19   Clay County, Kentucky?

20   A.   Yes, sir.

21   Q.   And during the time, most recent years from 2002 to

22   present, has that county also been included in the circuit

23   served by the same circuit judge as Clay County?

24   A.   Yes, sir.

25   Q.   And up until 2006, who was the circuit judge for both

*SLONE - Direct (Mr. Smith)*                                    31

1    Jackson and Clay County, sir?

2    A.   Cletus Maricle.

3    Q.   Do you know how long he served as circuit judge in

4    Jackson County?

5    A.   No, sir, I don't.  About as long as I can remember.

6    Q.   Have you, over the course of running for office yourself

7    as judge executive, learned who the political active people

8    are in Jackson County?

9    A.   Yes, sir.

10   Q.   And how big is Jackson County as far as population, sir?

11   A.   I think the census has us at about thirteen-five.

12   Q.   And what's the county seat?

13   A.   McKee.

14   Q.   And about how many people live in the city of McKee?

15   A.   Probably a thousand.

16   Q.   Is that the largest town in Jackson County?

17   A.   Yes, sir.

18   Q.   And over the course of these years, have you also learned

19   of a fella by the name of Charles "Poodle" Marcum?

20   A.   Yes, sir.

21   Q.   And if you could, tell us who Charles "Poodle" Marcum is.

22   A.   He's a businessman in McKee, runs an appliance store

23   directly across from the courthouse.

24   Q.   And is he someone in the past that's considered to be

25   politically active in Jackson County?

SLONE - Direct (Mr. Smith)                                          32

1    A.   Yes, sir.

2    Q.   And as you have gotten to know the politics over there in

3    Jackson County, have you also seen, during the years, people

4    aligning themselves together over the political episodes of

5    election after election?

6    A.   Yes, sir.

7    Q.   And could you state for us, as it pertains to Cletus

8    Maricle, the circuit judge, how do you see Charles "Poodle"

9    Marcum and Mr. Maricle?

10   A.   Well, it's, it's common knowledge they've been associates

11   for years.

12   Q.   And does that include business dealings as well?

13   A.   As far as I know.

14   Q.   Do you also know who the school board superintendent is

15   at Jackson County?

16   A.   Yes, sir, I do.  It's Ralph Hoskins.

17   Q.   And where is Ralph Hoskins from?

18   A.   Clay County.

19   Q.   And how long has he served there as the superintendent of

20   schools in Jackson County?

21   A.   I'd say approximately 12 to 14 years.

22   Q.   And ask you the same question about him.  Has he been

23   politically active?

24   A.   Yes, sir.

25   Q.   And do you know him to be aligning himself politically

SLONE - Direct (Mr. Smith)                                33

1    with Cletus Maricle?

2    A.   That's what I've heard, yes, sir.

3         MR. PINALES:  Objection to what he's heard, Judge.

4         THE COURT:  Overruled.

5    Q.   During your time period of, again, serving in politics

6    there in Jackson County, have you observed the school board

7    being very significant in political campaigns?

8    A.   Yes, sir.

9    Q.   And to your experience at the Jackson County politics and

10   the elections that have been going on over there while you've

11   been involved, is Charles "Poodle" Marcum also associated with

12   the school board?

13   A.   Yes, sir.

14   Q.   Are you familiar with master commissioner sales?

15   A.   I'm familiar with what they are.

16   Q.   Would you tell us generally your understanding of what a

17   master commissioner sale involves?

18   A.   It's the sale of a piece of property by the master

19   commissioner, which is an appointed position, usually done out

20   in front of the courthouse by whomever's there.

21   Q.   And to your understanding, is that usually pursuant to a

22   court order?

23   A.   Yes, sir, I think so.

24   Q.   And over the course of years, have you observed Charles

25   "Poodle" Marcum active in purchasing properties that are sold

*SLONE - Direct (Mr. Smith)*                                           34

1    pursuant to court orders?

2    A.    I've noticed him at a lot of these sales.

3    Q.    And is he a large land holder in the Jackson County?

4    A.    I think so, yes.

5    Q.    And what judge, to your knowledge, would be ordering

6    these properties to be sold normally in Jackson County?

7    A.    I'm assuming circuit and district judges.

8    Q.    You were formerly a state trooper?

9    A.    Yes, sir.

10   Q.    And did you serve Jackson County?

11   A.    Yes, sir.

12   Q.    And over the course of years, did you have knowledge of

13   Poodle Marcum's legal problems?

14              MR. HOSKINS:  Object, Your Honor.

15              THE COURT:  Do you need to be heard on that?

16              MR. HOSKINS:  Yes.

17              THE COURT:  Come on up.

18                    (A sidebar conference was held out of the

19                     hearing of the gallery):

20              THE COURT:  All right.  Mr. Hoskins?

21              MR. HOSKINS:  Thank you, Your Honor.  We're aware

22   that this Charles "Poodle" Marcum had a conviction in federal

23   court somewhere along the line.  Mr. Maricle was not his

24   attorney.  This witness was not involved in that prosecution

25   as far as we know.  I don't think his legal problems have any

SLONE - Direct (Mr. Smith)                                    35

1    relevance to this case.

2         THE COURT:  Okay.  I wasn't sure where we were going

3    with that.  I think he was also charged in a murder within the

4    last few years as well.

5         MR. HOSKINS:  That's possible.  I'm not aware of

6    that, but it's possible.

7         THE COURT:  Mr. Smith, what is the relevancy?

8         MR. SMITH:  Well, Your Honor, I think that given the

9    opportunity, we're going to be able to show that while Cletus

10   Maricle was in jail, he did not disclose partnerships in

11   properties that he had with Charles "Poodle" Marcum, and he

12   had his wife calling him, and they were making directions

13   through the jail, and they were selling property to pay

14   lawyers, they said.  And these properties weren't in Cletus'

15   name that they were liquidating, and I believe it's important

16   again to show that also ties in to prior testimony that we

17   had.  I believe documents have shown that have already been

18   introduced that the Maricles were interchanging property with

19   Charles Marcum.

20        And counsel was pointing out it wasn't the situation,

21   and I wanted to put some context in this relationship, and I

22   do believe that it is relevant as to whether or not this

23   witness had knowledge of what Mr. Hoskins is suggesting.

24        THE COURT:  You aren't going there with the prior

25   conviction of Mr. --

*SLONE - Direct (Mr. Smith)*                                      36

1          MR. SMITH:  He's a convicted felon.  I just wanted to

2    ask him if he knew he's a convicted felon.

3          THE COURT:  You're not going to go beyond that, just

4    whether he is a convicted felon or not, whether Marcum --

5          MR. SMITH:  Right.  I'm not going to ask him about

6    the underlying offense.  I just want to establish that he's a

7    convicted felon, and we know that these two are -- did not

8    disclose or are hiding these assets from the probation office

9    in federal court, and I think there's a reason for that, and

10   this obviously shows motivation.

11         MR. HOSKINS:  Judge, we deny that there was any

12   hiding of any assets.

13         MR. SMITH:  Oh, really?

14         MR. HOSKINS:  Yes, really.  And would also point out

15   that the conviction that Mr. Maricle -- Mr. Marcum had was, I

16   think, '70s or '80s.  I mean, it's a long time ago and it's

17   just not -- I think that he's a convicted felon just is not

18   relevant in this case.

19         If somebody wants to -- Mr. Marcum gets on the

20   witness stand and they want to impeach him by showing he's a

21   convicted felon, that's permissible.  But not through this

22   witness.  It's impeaching the character, impugning the

23   character of somebody else through this witness.

24         THE COURT:  Well, that is correct, and I have allowed

25   the defendants to do that throughout the course of this entire

*SLONE - Direct (Mr. Smith)*                                                37

1    proceeding, impugning the reputation of other witnesses

2    through those that are testifying.  But you are correct on the

3    point.  I'll sustain the objection as to this question about

4    whether he knows that he's a convicted felon.

5              MR. HOSKINS:  Thank you, Judge.

6              THE COURT:  Sustain the objection.

7                    (Sidebar conference concluded.)

8              THE COURT:  Thank you, counsel.  You may proceed.

9    BY MR. SMITH:

10   Q.   Mr. Slone, during your time serving as judge executive

11   and running for these elections, you indicated that there was

12   an active component in politics involving the school board in

13   Jackson County?

14   A.   You mean an opponent to me?

15   Q.   To your knowledge, is the school board an active

16   component in the politics --

17   A.   Yes, yes.

18   Q.   And is also money, to your knowledge, used in these

19   elections?

20             MR. WESTBERRY:  Objection, Your Honor.

21             THE COURT:  Overruled.

22   A.   It's common knowledge, but I don't, I can't really point

23   you to any one incident.

24   Q.   It's common knowledge?

25   A.   I mean, it's, it's always talked that there's --

*SLONE - Direct (Mr. Smith)*                                            38

1    Q.   Could you explain your answer, please?

2    A.   Pardon?

3    Q.   Could you explain your answer a little further for us?

4    A.   Well, you know, we all know or feel like there's always

5    money changed hands in the elections, but I don't know of any

6    particular instance that I could swear to.

7            MR. WESTBERRY:  Objection again, Your Honor.

8    Foundation.

9            THE COURT:  Overruled.

10   Q.   Have you talked to Cletus Maricle in regards to money

11   being used in school board elections?

12   A.   No, sir.

13   Q.   Have you talked to Ralph Hoskins about money being used

14   in school board elections?

15   A.   No, sir.

16   Q.   Have you talked to Poodle Marcum about money being used

17   in school board elections?

18   A.   No, sir.

19   Q.   Are you seeking reelection at this time?

20   A.   Yes, sir.

21   Q.   And what office are you seeking at this time?

22   A.   Judge executive.

23           MR. SMITH:  Thank you, sir.

24           THE COURT:  Mr. Hoskins.

25           MR. HOSKINS:  Thank you, Your Honor.

*SLONE - Cross (Mr. Hoskins)*                                      39

1                        CROSS-EXAMINATION

2    BY MR. HOSKINS:

3    Q.   Good morning, Mr. Slone.  My name's David Hoskins.  No

4    relation to Ralph Hoskins.  I represent Cletus Maricle.  Just

5    want to ask you a few questions about these commissioner

6    sales.  Those sales are advertised in the local paper for

7    several weeks before they happen?

8    A.   Yes, sir, as far as I know.  Yes.

9    Q.   And they happen in the middle of the day out in front of

10   the courthouse?

11   A.   Yes, sir.

12   Q.   And anybody who knows about it can come make a bid on a

13   property there?

14   A.   Yes, sir.

15   Q.   And whoever bids the highest gets the property?

16   A.   I assume so, yes.

17   Q.   And they have to pay for it?

18   A.   Yes.

19   Q.   And the seller wants the highest price he can get, I

20   guess?

21   A.   I would.

22            MR. HOSKINS:  Could I have just a minute, Judge?

23            THE COURT:  Yes, sir.

24            MR. HOSKINS:  That's all.  Thank you.

25            THE COURT:  See if anyone else -- Mr. Westberry?

PENNINGTON - Direct (Mr. Smith)                                    40

1                         CROSS-EXAMINATION

2       BY MR. WESTBERRY:

3       Q.   Good morning, Mr. Slone.  Kent Westberry.  I'm one of the

4       attorneys for Doug Adams.  The information that you've been

5       providing us this morning in response to the government's

6       questioning, that's been limited to Jackson County, correct?

7       Whatever you know is limited to Jackson County?

8       A.   Pretty much, yes, sir.

9                MR. WESTBERRY:  Okay.  Thank you.

10               MR. WHITE:  No questions.

11               THE COURT:  Anyone else?

12               MR. ABELL:  No questions, Judge.

13               MR. BALDANI:  Nor from us, Your Honor.

14               MR. GILBERT:  No questions, Your Honor.

15               MS. HUGHES:  No.

16               MR. SIMONS:  No questions.

17               THE COURT:  Thank you.  Any redirect?

18               MR. SMITH:  No.

19               THE COURT:  Thank you, sir.  You may step down.

20               Call your next witness.

21               MR. SMITH:  Robyn Combs Pennington.

22          ROBYN COMBS PENNINGTON, GOVERNMENT'S WITNESS, SWORN

23                        DIRECT EXAMINATION

24      BY MR. SMITH:

25      Q.   State your name, please.

PENNINGTON - *Direct (Mr. Smith)*                                    41

1    A.    Robyn Combs Pennington.

2    Q.    And where do you live, ma'am?

3    A.    301 Mill Pond Drive, Manchester, Kentucky.

4    Q.    And how long have you lived in Clay County, Kentucky?

5    A.    Eighteen years.

6    Q.    Where did you live prior to that?

7    A.    Hazard, Kentucky.

8    Q.    And ma'am, are you married?

9    A.    Yes.

10   Q.    How long have you been married?

11   A.    Sixteen years.

12   Q.    Do you have any children?

13   A.    Yes.

14   Q.    How many children do you have?

15   A.    I have two sons, one that's just 8.

16   Q.    Are you currently employed?

17   A.    No.

18   Q.    What's your current status?  Are you seeking employment

19   or --

20   A.    Oh, yes.

21   Q.    Or educating yourself?

22   A.    Well, I was planning on going to college, but I just lost

23   my father so I had to stop that for the moment.

24   Q.    I'm sorry about that.  When did you lose your father?

25   A.    A little over a week ago.

PENNINGTON - *Direct (Mr. Smith)*                                    42

1    Q.   Miss Pennington, have you been a voter in the elections

2    of Clay County in the years of 2002 and following?

3    A.   Yes.

4    Q.   What precinct would you normally vote in, ma'am?

5    A.   The Manchester Middle School.

6    Q.   And during the time that you voted there, do you recall

7    who worked as election officers?

8    A.   Yes.

9    Q.   Who were they?

10   A.   Anthony Short, Lucy Marcum.  I think that's about the

11   only two I remember I seen.

12   Q.   Lucy Marcum and Anthony Short are the only two you

13   remember.  Were there others that were present while you

14   voted?

15   A.   Yes, there's two that's --

16   Q.   Do you know what they look like?

17   A.   Yes, there's usually two that stand along behind you when

18   you vote.

19   Q.   Do you know their names?

20   A.   Wanda White and Dobber Weaver.

21   Q.   Have you sold your vote, ma'am?

22   A.   Pardon?

23   Q.   Have you sold your vote?

24   A.   One time.

25   Q.   And who paid you for your vote?

PENNINGTON - Direct (Mr. Smith)                                    43

1    A.    Kennon White.

2    Q.    And when you voted, do you recall whether or not there

3    were election officers with you when you voted?  You mentioned

4    that there were election officers present?

5    A.    Oh, yes.

6    Q.    Were they present when you voted after you sold your

7    vote?

8    A.    Yes.

9    Q.    And did they -- did you observe them doing anything?

10   A.    Well, they stand right over you.

11   Q.    And what do you mean by that, ma'am?

12   A.    Very close over your shoulder.

13   Q.    And do you know why they were doing that?

14   A.    I assume to see who you were voting for.

15   Q.    Where did you go to get your money from Kennon White?

16   A.    At Bart Morris's.

17   Q.    And where was Bart Morris living at that time?

18   A.    On Green Street.

19         MR. SMITH:  Pass the witness.

20         THE COURT:  Thank you.

21         MR. PINALES:  No questions.  Thank you.

22         MR. WESTBERRY:  No questions.

23         THE COURT:  Mr. White.

24         MR. WHITE:  No questions.

25         THE COURT:  Mr. Baldani.

*PENNINGTON - Cross (Mr. Baldani)*                                    44

1                          CROSS-EXAMINATION

2     BY MR. BALDANI:

3     Q.   Miss Pennington, maybe you said it and I didn't hear it.

4     The one time you sold your vote, that was '02, correct?

5     A.   Yes.

6     Q.   And Kennon White got you to -- he's the one that

7     approached you, right?

8     A.   No.

9     Q.   He's not -- who approached you?

10    A.   Darnell Hipsher.

11    Q.   Okay.  But you were paid to vote for Jennings White,

12    correct?

13    A.   No.

14    Q.   Who were you paid to vote for?

15    A.   Kennon.

16    Q.   In '02?

17    A.   Um-hmm.

18    Q.   Okay.  And do you know Freddy Thompson?

19    A.   Yes.

20    Q.   No one tried to pay you to vote for Freddy Thompson, did

21    they?

22    A.   I have never been approached for anybody trying to buy my

23    vote for Freddy.  Never.

24    Q.   And in '02, you didn't see him personally doing anything

25    improper, did you?

*WAGERS - Direct (Mr. Smith)*                                    45

1   A.  No.  As a matter of fact, really shocked me when his name

2   came up.

3            MR. BALDANI:  That's all, Your Honor.

4            MR. GILBERT:  I have no questions.

5            THE COURT:  Anyone else?

6            MS. HUGHES:  No.

7            MR. SIMONS:  None.

8            THE COURT:  Any redirect of the witness?

9            MR. SMITH:  No.  Thank you.

10           THE COURT:  All right.  Thank you, ma'am.  You may

11  step down.

12           Mr. Smith, you may call your next witness.

13           MR. SMITH:  Ella Wagers.

14           THE COURT:  Thank you.

15           ELLA WAGERS, GOVERNMENT'S WITNESS, SWORN

16                    DIRECT EXAMINATION

17  BY MR. SMITH:

18  Q.  Good morning.

19  A.  Good morning.

20  Q.  State your name, please.

21  A.  It's Ella M. Wagers.

22  Q.  And where do you live, ma'am?

23  A.  8549 North Highway 421, Manchester, Kentucky.

24  Q.  And how long have you lived at that address, ma'am?

25  A.  About two and a half years.

WAGERS - Direct (Mr. Smith)                                          46

1    Q.   Where did you live prior to that?

2    A.   103 1/2 Green Street.

3    Q.   And tell us a little bit about that place on Green

4    Street.  Was it a house or complex, or could you explain how

5    it was situated?

6    A.   It's a house when I bought it.

7    Q.   Okay.

8    A.   And then it had a whole full basement, and I turned it

9    into like an apartment.

10   Q.   Okay.  How many apartments did you have there at the

11   place?

12   A.   It was one.

13   Q.   And did you have residents that you rented to there?

14   A.   Off and on.

15   Q.   Were you also neighbors to Bart and Debbie Morris?

16   A.   Yes, I was.

17   Q.   And about how far is your home from the Morrises?

18   A.   I couldn't tell you directly, but maybe 150, 200 foot at

19   the back.

20   Q.   In the 2002 election, were you approached by anyone to

21   haul voters?

22   A.   I'm pretty bad on my count.  2002.  This is '10.  When I

23   first started hauling voters was when Freddy Thompson first

24   run.

25   Q.   Okay.  And who approached you to haul voters, ma'am?

WAGERS - Direct (Mr. Smith)                                        47

1    A.   It was Freddy asked me to work for him, and Randy Craft.

2    Q.   Freddy Thompson and Randy Craft?

3    A.   Yes, it was more or less Randy.

4    Q.   Were they together when they asked you?

5    A.   No, they wasn't.

6    Q.   Did you talk to both of them?

7    A.   Yeah.

8    Q.   And what was your understanding they needed you to do?

9    A.   Well, just haul voters and --

10   Q.   Where were you to take them, ma'am?

11   A.   Where was I to take them to at that given time?

12   Q.   Yes, ma'am.

13   A.   When I got a few, I don't know the name of the road.

14   Freddy's place was a hardware store.

15   Q.   Yes, ma'am.

16   A.   And it was down a street from there.

17   Q.   And what did you do this on election day or early

18   absentee voting, or do you recall?

19   A.   I have done no absentee voting.

20   Q.   Have you done it more than one day?

21   A.   Just on election day.

22   Q.   Just on election day?

23   A.   Yeah.

24   Q.   And you would haul them to the place near the hardware

25   store?

WAGERS - Direct (Mr. Smith)                                        48

1   A.   Yeah.

2   Q.   And what would you do when you got to this place near the

3   hardware store?

4   A.   There was a truck there, and they would go -- I guess pay

5   them.  I don't know.  I need to explain to you, I didn't get

6   paid for it.  Randy Craft -- I had a daughter in prison.

7   Q.   Okay.

8   A.   Her name's Amanda Wright.  And they asked me, you know,

9   they said -- Randy told me that he might be able to help me.

10  My daughter was coming up for parole.  That he might be able

11  to help me get her out on parole.

12  Q.   Okay.

13  A.   And I liked Freddy.  So I just worked, you know.  I did a

14  little work for him.

15  Q.   How many do you estimate you hauled on election day, Miss

16  Wagers?

17  A.   I'd say maybe -- oh, goodness.  It was a bad election

18  that year.  Oh, 10, 15, somewhere in there.

19  Q.   Did you also see Roy Morgan set up there somewhere?

20  A.   Yes, I did.

21  Q.   Where did you see him set up?

22  A.   I call it rest pit stop at Garrard.

23  Q.   And what was he doing that you could see?

24  A.   I saw Roy walking around.

25  Q.   What else did you see?

WAGERS - Direct (Mr. Smith)                                           49

1    A.   Just a bunch of people.

2    Q.   Okay.  You saw a bunch of people and Roy Morgan walking

3    around these bunch of people?

4    A.   Well, he was outside, you know, outside the building.

5    Q.   Did you visit him at any time that day?

6    A.   Yeah, I did.

7    Q.   Did you all speak?

8    A.   Yeah.

9    Q.   What did you all talk about?

10   A.   Well, I had a voter in with me.  So I told him, you know,

11   I guess she's unpaid.

12   Q.   You told who?

13   A.   Roy.

14   Q.   And how did you know to take this voter to him to get

15   paid?

16   A.   It's just -- I don't know.  Just, you know, people know

17   to go, go there.

18   Q.   Okay.  So what happened when you told him this lady

19   needed paid?

20   A.   Said he had no money.

21   Q.   Okay.  Had she been to vote?

22   A.   Yes.

23   Q.   And who did she vote for?

24   A.   I don't know.

25   Q.   Did you give the voters instructions who to vote for?

*WAGERS - Direct (Mr. Smith)*                                      50

1   A.   If they told me who to vote, like, okay, I'd say Freddy

2   Thompson.  You know, I'd say I'd like for you to vote for

3   Freddy.  And that was about it, you know.

4   Q.   Now when you were taking them to Freddy's hardware store,

5   was there somebody there, you say, set up to pay them?

6   A.   In a truck.

7   Q.   Did you get a good eye -- did you get a good observation

8   of who that person was?

9   A.   No, I didn't.

10  Q.   You don't know what they looked like?

11  A.   Just like a man.  No, I don't.

12  Q.   Do you know what kind of truck he was in?

13  A.   Best of my knowledge, I'm not that good, but I think it

14  was black.

15  Q.   Were you ever approached after 2002, ma'am, to work in

16  the elections?

17  A.   I worked on city -- for a city council.

18  Q.   Who approached you, ma'am?

19  A.   That would been Vernon -- I have forgot his -- Vernon

20  Hacker.

21  Q.   What did he ask you to do, ma'am?

22  A.   Haul voters.

23  Q.   And did you agree to do that for him?

24  A.   Yeah.

25  Q.   And where did you haul them this time?

*WAGERS - Direct (Mr. Smith)*                                           51

1    A.   I took them to Bart Morris.

2    Q.   And where was Bart Morris living when you took the voters

3    to Bart Morris?  Where was he living?

4    A.   At his home.

5    Q.   What was the location of the home at that time?

6    A.   On Green Street.

7    Q.   Thank you.  Have you ever noticed during the time that

8    you've worked these elections tickets being issued?

9    A.   Yeah.

10   Q.   And what was the purpose of a ticket, ma'am?

11   A.   I guess while they's in the poll, they give him a half of

12   a ticket.

13   Q.   Okay.  And what did they usually do with that half a

14   ticket?

15   A.   They had to turn it in.

16   Q.   And who did you normally turn that in to, ma'am?

17   A.   To the ones that would give them their money.

18   Q.   And who was that that would normally give them the money

19   after they gave them the ticket?

20   A.   It was at Bart Morris' home.

21        MR. SMITH:  Okay.  Pass the witness.

22        THE COURT:  Mr. Hoskins?

23        MR. HOSKINS:  No questions, Your Honor.

24        MR. WESTBERRY:  None, Your Honor.

25        MR. WHITE:  No questions, Your Honor.

*WAGERS - Cross (Mr. Baldani)*                                52

1       MR. ABELL:  No questions, Judge.

2       THE COURT:  Mr. Baldani.

3                    CROSS-EXAMINATION

4   BY MR. BALDANI:

5   Q.  Good morning, Miss Wagers.

6   A.  Good morning.

7   Q.  My name is Russ Baldani.  I'm one of Freddy's lawyers.

8   A.  Yes.

9   Q.  You've known Freddy Thompson a long time, haven't you?

10  A.  I have.

11  Q.  How long?

12  A.  Twenty-five.

13  Q.  Twenty-five years?

14  A.  Um-hmm.  If not longer.

15  Q.  And you used to go into his hardware store in Clay

16  County, didn't you?

17  A.  Yes, I did.

18  Q.  And so in '02, you became aware that he was running

19  against Jennings White for county clerk --

20  A.  Yes, I did.

21  Q.  -- right?  And Miss Wagers, you've got a pretty big

22  family, don't you?

23  A.  Yes, I do.

24  Q.  Whenever there's an election, people approach Miss

25  Wagers, because they know she has a large family.  Would you

*WAGERS - Cross (Mr. Baldani)*                                    53

1   say that's true?

2   A.   That's true.

3   Q.   And when you'd go into Freddy's hardware store, sometimes

4   you'd talk to him, wouldn't you?

5   A.   Yes.

6   Q.   All right.  And in 2002, Freddy Thompson asked you for

7   your vote, didn't he?

8   A.   Yes, he did.

9        MR. SMITH:  Your Honor, I'm going to object to

10  hearsay.

11       THE COURT:  Sustained.

12  Q.   Did Freddy Thompson approach you about voting for him in

13  '02?

14       MR. SMITH:  Same objection.

15       MR. BALDANI:  Can we approach, Your Honor?

16       THE COURT:  Yes, you can approach.

17            (A sidebar conference was held out of the

18            hearing of the jury):

19       THE COURT:  It's an out-of-court statement offered to

20  prove the truth of the matter asserted, not an admission.

21  Subject to the hearsay rule.

22       MR. BALDANI:  I don't think it is an out-of-court

23  statement offered for the truth.  It's a question, and it's

24  relevant just for the fact that he asked.  I mean, she was

25  approached and asked to vote.  I mean, that's not a statement

WAGERS - Cross (Mr. Baldani)                                    54

1    by Freddy Thompson.  That's an act by Freddy Thompson

2    requesting her legal assistance.

3              THE COURT:  Unless he used a smoke signal, it would

4    be an out-of-court statement.

5              MR. BALDANI:  But I don't think a question is a

6    statement, Judge.

7              THE COURT:  I disagree with you.  I sustained the

8    objection.

9              MR. BALDANI:  Okay.

10                  (Sidebar conference concluded.)

11   BY MR. BALDANI:

12   Q.  Miss Wagers, do you recall Randy Craft coming to your

13   house in 2002 before the election?

14   A.  Yes.

15   Q.  And he came by himself, didn't he?

16   A.  Yes.

17   Q.  Okay.  Freddy Thompson was not with him?

18   A.  No.

19   Q.  And that is the time when Randy Craft asked you to haul

20   voters for Freddy Thompson --

21   A.  Yes.

22   Q.  -- right?  So Freddy wasn't in on that?

23   A.  No.

24   Q.  And Freddy didn't ask you to haul voters for him?

25   A.  No, he did not.

*WAGERS - Cross (Mr. Baldani)*                                        55

1    Q.   That was -- I think when the prosecutor was asking you

2    questions, you said it was more or less Randy Craft.

3    A.   Yes.

4    Q.   Well, it was more, not less, right?

5    A.   Yes.

6    Q.   Is that right?

7    A.   (Nodding affirmatively).

8    Q.   So Randy came to your house by himself, asked you to haul

9    voters for Freddy and you agreed, right?

10   A.   Yes.

11   Q.   And you only hauled about ten or so for him?

12   A.   Yes.

13   Q.   And after they voted, you saw them getting paid at a

14   truck that was -- we're not talking about in the parking lot

15   of Freddy's hardware store, are we?

16   A.   No, we're not.

17   Q.   Where is it in relation to Freddy's hardware store?

18   A.   It's -- it's not real long piece from the hardware store,

19   but it's back like off the road.

20   Q.   Okay.

21   A.   You know.

22   Q.   But it's definitely not his hardware store parking lot?

23   A.   No.

24   Q.   And when you saw that truck, you didn't see Freddy

25   Thompson in that truck?

WAGERS - Cross (Mr. Gilbert)                                56

1  A.  No, I didn't.

2  Q.  Didn't see Freddy Thompson paying anybody?

3  A.  No, I didn't.

4  Q.  Didn't see Freddy Thompson --

5          MR. SMITH:  Your Honor, I'm going to object.

6          THE COURT:  Overruled.

7          MR. BALDANI:  Thank you, Your Honor.

8  Q.  You didn't see Freddy Thompson do anything illegal in

9  '02, did you, Miss Wagers?

10 A.  No, I didn't.

11         MR. BALDANI:  That's all, Your Honor.

12         THE COURT:  Thank you.

13         MR. GILBERT:  I just have a few questions.

14         THE COURT:  Yes.

15                     CROSS-EXAMINATION

16 BY MR. GILBERT:

17 Q.  Miss Wagers, I'm Jerry Gilbert, and I represent Bart

18 Morris.  On the second election that you talked about, when

19 was that?

20 A.  It was the city council election.

21 Q.  And do you know what year?

22 A.  It was the last city council election.  I don't know what

23 year.  I haven't voted since.

24 Q.  And would that be the year in which --

25 A.  It was the year that Darnell and Vernon Hacker runned.

*WAGERS - Cross (Mr. Gilbert)*                                          57

1    Q.   Okay.  And would it be the year that Doug White ran

2    against Carmen Lewis for mayor?

3    A.   Yes, um-hmm.

4    Q.   And that would have been November of '06?

5    A.   Okay.

6    Q.   Would that fit with your recollection?

7    A.   Six.  Six?  It was the year -- no, just a second.  This

8    was a city council's race by itself, all I knew about.

9    Q.   Was there a race for mayor, if you --

10   A.   I recall there was a race for mayor, but not at -- not at

11   that time.

12   Q.   Okay.  I don't understand.

13   A.   It wasn't in November of '06.  It was in, like, a

14   primary.

15   Q.   So your testimony would be it was a city race in the

16   primary?

17   A.   It was in the summertime like.  It was a -- just for the

18   city council.

19   Q.   Okay.

20   A.   I don't know how often they run, but Vernon asked me to

21   work for him.

22   Q.   And that's who you were working for?

23   A.   Yes, it was.

24   Q.   And it was some primary election, and you're not sure of

25   the date?

*DOWNEY - Direct (Mr. Smith)*                                              58

1    A.   No, I'm not.

2              MR. GILBERT:  That's all.

3              THE COURT:  Anything else?

4              MS. HUGHES:  No, sir.

5              MR. SIMONS:  No.

6              THE COURT:  All right.  Any redirect of the witness?

7              MR. SMITH:  No questions.

8              THE COURT:  All right.  Thank you, Mr. Smith.  Miss

9    Wagers, you may step down.

10             Mr. Smith, you may call your next witness.

11             MR. SMITH:  Raleigh Downey.

12             RALEIGH DOWNEY, GOVERNMENT'S WITNESS, SWORN

13                       DIRECT EXAMINATION

14   BY MR. SMITH:

15   Q.   Good morning.

16   A.   Morning.

17   Q.   State your name, please.

18   A.   Raleigh Downey.

19   Q.   And where do you live, sir?

20   A.   113 Wayne Street, Manchester.

21   Q.   How long have you lived in Clay County, Kentucky?

22   A.   All my life.  Fifty year.

23   Q.   And are you currently employed?

24   A.   Yeah.

25   Q.   And how are you employed, sir?

*DOWNEY - Direct (Mr. Smith)*                                          59

1    A.   Isaac's Roofing.

2    Q.   And how long have you been working for them?

3    A.   Eight, seven or eight months for this company.

4    Q.   What kind of jobs have you held in the past, sir?

5    A.   All roofing.

6    Q.   Roofing?

7    A.   Yeah.

8    Q.   And is that a local company that services just the local

9    area of Clay County, or where all do you work?

10   A.   Well, I worked out of Richmond, Lexington, Clay County.

11   Just --

12   Q.   You're required to travel quite a bit with your job?

13   A.   Yeah.

14   Q.   Are you married?

15   A.   Yeah.

16   Q.   Do you have children?

17   A.   Two girls.

18   Q.   How old are they?

19   A.   Fifteen and seventeen.

20   Q.   Mr. Downey, do you have other family down in Clay County?

21   A.   Yeah.

22   Q.   Is your father still living?

23   A.   Yeah.

24   Q.   What's his name?

25   A.   Charles Douglas Downey.

DOWNEY - Direct (Mr. Smith)                                          60

1    Q.   And do you have a brother?

2    A.   Yeah.

3    Q.   What's his name?

4    A.   John Downey.

5    Q.   How old is your brother?

6    A.   He's 43, 44.  Actually, no, I got it -- I got two

7    brothers by that name.  I got a Johnny and I got a John.

8    Q.   How old is Johnny?

9    A.   He's 39, something like that.

10   Q.   During the time period that you lived in Clay County,

11   have you ever worked for Bart Morris or Stanley Bowling?

12   A.   Yeah.

13   Q.   What kind of work have you done for them?

14   A.   We cleaned PRIDE, that PRIDE site garbage dumps.  We

15   cleaned them up, and I put a roof on for Bart Morris, put one

16   on his house.

17   Q.   Okay.  Now, this PRIDE cleanup project, who were you

18   working for?

19   A.   I was working for Bart and Stanley, I think.  Actually

20   don't know.

21   Q.   Did they pay you by the week or by the day, or do you

22   recall?

23   A.   I got paid by the week.

24   Q.   And this was a cleanup project.  Where was the cleanup

25   project?  Was it in Clay County?

DOWNEY - Direct (Mr. Smith)                                    61

1    A.   Jackson County, Clay County.

2    Q.   Do you know what years it would have been that you were

3    doing these cleanup projects for Bart Morris and Stanley

4    Bowling?

5    A.   No, sir, I don't.

6    Q.   Would it have been within the last five years?

7    A.   More likely, yeah.

8    Q.   Okay.  And you said you were, you were paid by the week?

9    A.   Yeah.

10   Q.   Did they pay you with check or electronic deposit, or how

11   did you get your money?

12   A.   I believe it's cash money.

13   Q.   How long did you work for Bart Morris and Stanley Bowling

14   there doing that PRIDE cleanup?

15   A.   A couple months at the most.

16   Q.   Do you know a fella that works for Bart Morris by the

17   name of James Goins?

18   A.   Yep.

19   Q.   How long has he worked for Bart Morris?

20   A.   Long time.  I couldn't tell you.  I actually don't know.

21   Q.   You say you did some roofing work for Bart Morris?

22   A.   Yeah, I put a roof on his house, correct.

23   Q.   Was that his house down on Green Street?

24   A.   No.  It's up in the Laurel County area.

25   Q.   When was that that you put a roof on his house?

DOWNEY - Direct (Mr. Smith)                                              62

1    A.   A couple year back.  Last year, year and a half,

2    something like that.

3    Q.   How big a house is that?

4    A.   Big house.  That's all I can tell you about it.  I

5    actually don't know how big it was.  It was just a big house.

6    Q.   Did you put -- what kind of roofing material did you put

7    on that house?

8    A.   A metal roof.

9    Q.   Do you know a fella by the name of Gary "Ouchie" Jackson?

10   A.   Yeah, I worked for him for probably about 12 years.

11   Q.   What kind of work did you do for Gary "Ouchie" Jackson?

12   A.   Roofing.

13   Q.   Did he have a roofing company?

14   A.   Yeah.

15   Q.   He ever ask you to help him in an election?

16   A.   Yep.

17   Q.   Do you recall when that was?

18   A.   '06, I guess.

19   Q.   And what did he ask you to do?

20   A.   He asked me to haul voters for him.

21   Q.   And tell us what you did.

22   A.   He'd send, he'd send the voters to me, I'd take them to

23   vote, they would go in and vote, they'd come back out, I'd

24   throw the money on the floor board of the pickup truck,

25   company truck.  When they got in, I'd tell them they knocked

DOWNEY - Direct (Mr. Smith)                                    63

1    their money in the truck, and I'd take them back.  That was

2    it.

3    Q.   Now, give us a little better description of where you

4    were hauling them to and from, if you --

5    A.   Hauling them to -- from the Pennington Hill, that's where

6    I --

7    Q.   Is that a residential area where people live?

8    A.   Yeah, that's where the office is at too, yeah.

9    Q.   Okay.

10   A.   And hauled to the school house or where they was voting

11   in the city limits.

12   Q.   What were these voters being paid to vote, if you recall?

13   Do you know how much they were getting?

14   A.   Forty or fifty.

15   Q.   And where did they get their money?  From you?

16   A.   They got their money from me.

17   Q.   And where did you get the money to pay them?

18   A.   From Ouchie.

19   Q.   Did you run out of money at any time that day?

20   A.   Yep.

21   Q.   And what happened?

22   A.   I got more money from Ouchie.

23   Q.   And do you know how he got more money to you?  Do you

24   remember?

25   A.   No.  He -- just by hearsay, that's about all I can --

DOWNEY - Direct (Mr. Smith)                                              64

1    Q.   Did he tell you where he got the money?

2    A.   Yep.

3    Q.   Where did he say he got the money?

4    A.   Kennon White.

5    Q.   Did he have more money that he kept, or did he give you

6    all of it?

7    A.   No, he kept -- he didn't give me all of it.

8    Q.   Did you see other people hauling voters that day?

9    A.   Yeah.

10   Q.   Were they hauling for the same people that you were?

11   A.   Yeah.

12   Q.   Do you recall any of their names?

13   A.   Stacey Perkins.

14   Q.   Did you vote on election day?

15   A.   Yeah.

16   Q.   Did you have an election officer go in there and vote

17   with you?

18   A.   Yep.

19   Q.   Do you know who that election officer was?

20   A.   No.

21   Q.   Can you describe what they looked like?

22   A.   Just, just some guy up there.  He was tall.

23   Q.   Tall?

24   A.   I don't have no education, so just tall, you know, medium

25   build.

DOWNEY - Direct (Mr. Smith)                                          65

1    Q.   Where did you vote?

2    A.   At the City Hall.

3    Q.   What precinct is that?

4    A.   I don't know.

5    Q.   Are you in the city?

6    A.   Yeah.

7    Q.   Do you recall one of your brothers, John or Johnny, being

8    charged in circuit court, Cletus Maricle's court?

9    A.   I remember John being in jail, yeah.

10   Q.   Did you try to get him some help?

11   A.   Yep.

12   Q.   And tell us how you went about trying to get him some

13   help.

14   A.   Well, Kennon White approached me to vote for him, and I

15   said, well, see what you can do about getting my brother out

16   of jail, then I'll vote for you.

17   Q.   And what happened when you made that request of Mr.

18   White?

19   A.   Well, I didn't know if he was going to go through or not

20   until the election was over with, my brother got out.

21   Q.   Do you have other family members that you were offering

22   to include in that deal for Mr. White?

23   A.   No, I'm the only one that lives in the city limits.  All

24   my family lives outside the city limits.

25   Q.   Did this happen before you began hauling votes in that

DOWNEY - *Cross (Mr. Pinales)*                                    66

1   election for Mr. Jackson?

2   A.   This was during that --

3   Q.   During that time period?

4   A.   Yeah, during that time period.

5   Q.   Do you know if these voters were given a list of

6   candidates to vote for?  You don't know?

7   A.   Uh-uh.

8   Q.   You didn't give them any instructions on who the

9   candidates were they were to vote for?

10  A.   Yeah.  They was to vote for Ouchie Jackson and Darnell

11  Hipsher, Doug White and Kennon White.

12  Q.   Best of your recollection, that would have been that '06

13  election?

14  A.   Yeah.

15        MR. SMITH:  Pass the witness.

16        THE COURT:  Mr. Pinales.

17        MR. PINALES:  If I may, Your Honor.  Thank you.

18                    CROSS-EXAMINATION

19  BY MR. PINALES:

20  Q.   Good morning.

21  A.   Morning.

22  Q.   I'm Marty Pinales, and I represent Cletus Maricle.  Have

23  a few questions to ask.  You talked about your brother being

24  in trouble.

25  A.   Yeah.

DOWNEY - Cross (Mr. Pinales)                                    67

1   Q.   And your brother is John or Johnny?

2   A.   John.

3   Q.   John?

4   A.   Yeah.

5   Q.   And when John was in trouble, he went into court, circuit

6   court, right?

7   A.   Yeah.

8   Q.   You have to answer.  You can't nod your head.

9   A.   I said yeah.

10  Q.   Okay.  And if you keep your voice up so I can hear and

11  the whole jury can hear.  And he appeared in court, and it was

12  set for trial, and he entered a plea of guilty, correct?

13  A.   I guess.  I don't know whether -- I wasn't there so I

14  couldn't tell you.

15  Q.   Well, isn't it a fact that he appeared in the Clay County

16  Circuit Court before a Judge Tom Lewis?

17  A.   I don't know.  I wasn't there.  I can't --

18  Q.   Do you know that Judge Tom Lewis is --

19       MR. SMITH:  Your Honor, I'm going to object.  He's

20  asked and answered the question.  He said he wasn't there.

21       THE COURT:  He did answer he did not know.

22  Q.   Your brother appeared October the 30th, didn't he?

23  A.   Don't know that neither.

24  Q.   It was before the election, wasn't it?

25  A.   I, I don't know.  I mean, I don't know when he went to

*DOWNEY - Cross (Mr. Pinales)*                                    68

1    court.  All I know is Kennon approached me, and that was it.

2    I mean, I don't know if he went to court, when he went to

3    court.

4    Q.   When did Kennon approach you?

5    A.   It was before the election.

6    Q.   Just before the election?

7    A.   Yeah.

8    Q.   And it was the fall election?

9    A.   Just the election.  That's all I can tell you.

10   Q.   Just an election.

11   A.   Yeah.

12        MR. PINALES:  Could I have a moment, Your Honor?

13        THE COURT:  Yes.

14   Q.   Final question.  The folks that you mentioned that you

15   were supporting the ticket, they were all running for the City

16   election, correct?

17   A.   Yeah.

18        MR. PINALES:  Nothing further.  Thank you.

19        MR. WESTBERRY:  No questions.

20        MR. WHITE:  No questions.

21        THE COURT:  Mr. Abell?

22        MR. ABELL:  No questions, Judge.  Thank you.

23        MR. BALDANI:  Nor from us.

24        THE COURT:  Mr. Gilbert?

25        MR. GILBERT:  Just a few, Your Honor.

DOWNEY - Cross (Mr. Gilbert)                                    69

1                          CROSS-EXAMINATION

2    BY MR. GILBERT:

3    Q.   Mr. Downey, I'm Jerry Gilbert, and I represent Bart

4    Morris.  How many sites, cleanup sites did you work on; do you

5    know?

6    A.   One.

7    Q.   One?

8    A.   Yeah.

9         MR. GILBERT:  Excuse me.  I hope I can talk now.

10        THE COURT:  Mr. Gilbert, if you'd like, I'll see if

11   someone else has questions.

12        MR. SIMONS:  I wish I did, but I don't.

13        THE COURT:  We're going to take -- we took a short

14   break earlier.  If you like, we can take another ten-minute

15   recess at this time.

16        MR. GILBERT:  I think I'll be all right.

17        THE COURT:  All right.

18   Q.   One site?

19   A.   One site.

20   Q.   And where was that at, Mr. Downey?

21   A.   Actually, I believe it was in Jackson County area.

22   Q.   And how long was the job?  How long did it take?

23   A.   Couple weeks, three weeks, something like that.

24   Q.   Big site?

25   A.   Pretty good sized site.

*DOWNEY - Cross (Mr. Gilbert)*                                    70

1    Q.   Garbage where people had just --

2    A.   Just throwed it on the mountain.

3    Q.   Throw it down a holler, over side of a hill?

4    A.   Throwed it over the hill and drive off, yeah.

5    Q.   And you got to get every piece of garbage out of there,

6    don't you?

7    A.   Yeah.

8    Q.   That's hard work, isn't it?

9    A.   Hard work.

10           MR. GILBERT:  Thank you.

11           THE COURT:  Anything else of this witness?

12           MR. SMITH:  No, Your Honor.

13           THE COURT:  Thank you, sir.  You may step down.  Let

14   me see if any of our jurors need to take a break before we

15   call our next witness.

16           Proceed, then, Mr. Smith or Mr. Parman.

17           MR. SMITH:  Just a second.

18           THE COURT:  Yes, sir.

19           MR. SMITH:  Your Honor, I do have additional records,

20   and I hate to announce that to everyone, but I'm going to need

21   a moment to get those in line here for the next witness.

22           THE COURT:  All right.  We'll take a short recess.  I

23   probably could use one in any event, ladies and gentlemen, 10

24   to 15 minutes.  Please keep in mind the admonition you were

25   given previously not to discuss the case among yourselves, and

1    we'll be in recess at this time.

2              (The jury left the courtroom at 10:33 a.m.)

3              (Recess from 10:33 a.m. until 10:49 a.m.)

4         THE COURT:  Thank you.  I understand we have an issue

5    to take up before the jury comes in?

6         MR. PARMAN:  Yes, Your Honor.  We had intended to put

7    on witnesses that would introduce records.  However, we've

8    learned that one of our other witnesses has an issue with his

9    family, so we're going to jump him up in the order so we can

10   get him out of here.  It's an emergency.

11        THE COURT:  Okay.  That will be fine.  I know that

12   you were setting some things up to introduce some documents.

13   Will we need to take another break to finish that process?

14        MR. SMITH:  No, we'll wait until after lunch.  I

15   think we can work our witnesses without having to take another

16   interruption.  I apologize.

17        THE COURT:  That will be fine.  Anything else?

18        MR. PINALES:  Your Honor, we are looking for a

19   document which we believe was supplied to us in the

20   government's discovery on John, brother John's case, which was

21   a judgment entry signed by Judge Lewis.  As soon as we find

22   that, Your Honor, I would like to revisit this issue in light

23   of the prosecutor's questioning, and I would have a motion at

24   that time.

25        THE COURT:  In light of the prosecutor's questioning?

72

1          MR. PINALES:  Yes, because I think the questioning to

2     this witness left an inference that Judge Maricle, you know,

3     was the judge on his brother's case.  And if the government

4     did have that material and asked that question to paint that

5     picture, I think it's totally improper.

6          THE COURT:  All right.

7          MR. PINALES:  I have to find it --

8          MR. SMITH:  Your Honor, Mr. Pinales is welcome to

9     bring his evidence.  I'd certainly welcome that.  And I do

10    have the records to show that Cletus Maricle was the judge

11    when this man was indicted, when his bond was set, and I'm

12    very confident in my questions, and I will certainly welcome

13    his evidence.

14         MR. PINALES:  Your Honor, we have the videotape of

15    the plea in front of Judge Lewis that I've just supplied to

16    the prosecutor.

17         MR. SMITH:  Then that would indicate it was in his

18    possession and not the government's; and therein, I believe

19    this is a frivolous motion.  In other words --

20         MR. PINALES:  Your Honor --

21         THE COURT:  Well, there's not a motion at this point.

22         MR. PINALES:  There is not, but I just want to tell

23    the Court, I don't want time to pass without saying we are

24    looking for the document.

25         THE COURT:  We don't want time to pass in this case

1    without a motion being made, that's true.

2              MR. PINALES:  Yes, Your Honor.  Thank you.

3              THE COURT:  All right.  Anything else before -- yes,

4    Miss Hughes?

5              MS. HUGHES:  I'm sorry.  Earlier this morning, there

6    was a photograph that was not a big deal at all that was

7    introduced into evidence, but we had not seen that in advance.

8    So I was wondering if there are going to be additional

9    documents that have not been supplied to us.  That one didn't

10   make any difference, but flashing it to Mr. Hoskins and not

11   letting everybody see it doesn't always help.  So I just

12   thought if there was some way the government could help us to

13   move more efficiently with exhibits we have not previously

14   seen, it would be helpful.

15             THE COURT:  All right.  Thank you.  Anything else?

16             MR. PARMAN:  Your Honor, to that extent, I do have a

17   picture that I will intend to introduce through this next

18   witness, and I'm not sure if defense counsel has it, but I

19   have copies for everybody.

20             THE COURT:  Why don't you go ahead and hand those out

21   now.  Bring the jury in.  I'm sorry, wait a minute.

22             MR. WHITE:  I wanted to make sure, this the same

23   picture from the MySpace page that's already in evidence?

24             MR. PARMAN:  That is the same picture.

25             MR. WHITE:  Just wanted to make sure it's the same

HUBBARD - Direct (Mr. Parman)                                74

1    thing, Your Honor.

2              (The jury entered the courtroom at 10:54 a.m.)

3              THE COURT:  The record will reflect that all members

4    of the jury are present.  Parties and counsel are also

5    present.

6              Mr. Parman, will you be calling the next witness?

7              MR. PARMAN:  Yes, Your Honor.

8              THE COURT:  Thank you.  You can proceed, I'm sorry.

9              MR. PARMAN:  Thank you, Your Honor.  United States

10   intended to call a witness to put in certain records, but

11   we're going to move the order based on an issue with a

12   witness.

13             THE COURT:  Yes, sir.

14             MR. PARMAN:  So at this point, the United States will

15   call Richard Brian Hubbard.

16             THE COURT:  Thank you.

17        RICHARD BRIAN HUBBARD, GOVERNMENT'S WITNESS, SWORN

18             THE COURT:  Thank you.  You can proceed.

19             MR. PARMAN:  Thank you, Your Honor.

20                          DIRECT EXAMINATION

21   BY MR. PARMAN:

22   Q.   Good morning, sir.

23   A.   Good morning.

24   Q.   Would you state your name, please?

25   A.   Richard Brian Hubbard.

*HUBBARD - Direct (Mr. Parman)*                                    75

1    Q.   Mr. Hubbard, how old are you?

2    A.   Twenty-one.

3    Q.   Sir, are you married?

4    A.   Yes, sir.

5    Q.   How long have you been married?

6    A.   Been married four year.

7    Q.   For one year?

8    A.   Four.

9    Q.   Four years, I'm sorry.  Do you have kids?

10   A.   Yes, sir.

11   Q.   How old -- how many kids do you have?

12   A.   Have two.

13   Q.   What are their ages?

14   A.   Five and 11 months.

15   Q.   How far did you go in school, Mr. Hubbard?

16   A.   I went to the 10th grade in high school, and then I got

17   my GED, and I done some college online, some criminal justice

18   online.  Took some extra of it.

19   Q.   This criminal justice that you were doing online, what

20   were you trying to -- what was your ultimate destination?

21   What were you trying to do with your education?

22   A.   Be a police officer.

23   Q.   Is there a specific department that you wanted to work

24   in?

25   A.   Kentucky Vehicle Enforcement.

*HUBBARD - Direct (Mr. Parman)*                                    76

1    Q.   Did you attempt to fill out applications for that job or

2    for any state jobs?

3    A.   I filled out applications for the state highway.

4    Q.   Who did you go to to fill that application out?

5    A.   I went to the garage first, the state garage and filled

6    one out, and then me and Wayne Jones filled one out.

7    Q.   Where did you and Wayne Jones fill out an application?

8    A.   Al Man's house.

9    Q.   When you're saying Al Man, do you know Al Man's full

10   name?

11   A.   Al Man Stivers.

12   Q.   Why did you go to Wayne Jones to fill out an application?

13   A.   He's the one told me the position was available, that the

14   state was hiring for that job.

15   Q.   And did you think that by getting started with the state,

16   that could eventually get you to your goal of being an officer

17   with the Kentucky Vehicle Enforcement?

18   A.   Yes, sir.

19   Q.   Did Mr. Jones make any comments to you about filling the

20   application out at Al Man's house?

21   A.   He just told me Al Man had a computer, and I could use

22   his computer.

23   Q.   Did he tell you whether or not you should tell anybody

24   about filling it out there?

25   A.   Wayne Jones didn't tell me nothing like that.

*HUBBARD - Direct (Mr. Parman)*                                        77

1    Q.   Did Al Man?

2    A.   Al Man said you don't want to tell nobody you filled that

3    out at my house.

4    Q.   Did you ever work as an election officer in Clay County?

5    A.   Yes.

6    Q.   Have you lived in Clay County all your life?

7    A.   Yes.

8    Q.   When did you work as an election officer?

9    A.   I worked as election officer two year ago, about two year

10   ago.

11   Q.   Do you remember what position you held?

12   A.   I was, I was a sheriff in one election, and I don't

13   recall what the other position was.

14   Q.   How did you get started working in elections, generally?

15   A.   I seen Wayne Jones down at the house putting up signs,

16   and I asked him how I could be election officer.

17   Q.   Did he help you get appointed to some position then?

18   A.   He told me, yeah, that he could use me.

19   Q.   What did you then do?

20   A.   He said that he would call me if he needed me, and he

21   called me at my house and told me to meet him at the clerk's

22   office that morning.  So I went down to the clerk's office and

23   met with him, and he told me to go to the Manchester precinct.

24   Q.   Did you ever serve as a youth chairman?

25   A.   Yes, sir.

HUBBARD - Direct (Mr. Parman)                                          78

1   Q.   When did you serve as a youth chairman?

2   A.   About a year ago.

3   Q.   Who put you in that position?

4   A.   I was voted in at the Harts Branch, it's Beech Creek

5   Recreation Center.  Wayne Jones was there.  He's the one that

6   essentially told me about the position.

7   Q.   Told you where to be?

8   A.   Yeah.

9   Q.   Now, did you say you served in the spring of 2008?

10  A.   I think so.

11  Q.   And if you'd tell us what position it was that you held

12  then?

13  A.   For the election officer?

14  Q.   Yes.

15  A.   It was just the election officer.  I think it was, I

16  think I served as a sheriff in the election.  I'm not for

17  sure.

18  Q.   Did you receive any training before you served in that

19  position?

20  A.   The first time I served as election officer, I wasn't

21  trained.

22  Q.   Now, was this spring of '08 the first time you served?

23  A.   I think so.

24  Q.   Then did you serve again in the fall?

25  A.   Yes, sir.

*HUBBARD - Direct (Mr. Parman)*                                            79

1   Q.   Mr. Hubbard, at some point, did you learn that Wayne

2   Jones had been charged with certain federal offenses?

3   A.   Yes, sir.

4   Q.   Did you then visit him at some point after that?

5   A.   Yes, sir.

6   Q.   Did he tell you during that conversation -- or at his

7   house who had cooperated against him?

8   A.   Yes, sir.

9   Q.   What did he say?

10               THE WITNESS:  Your Honor?

11               THE COURT:  Yes, sir?

12               THE WITNESS:  Can I speak it?  It's cussin'.

13               THE COURT:  Yes, sir, you may say what he said.

14  A.   He said that certain people told lies on him.  He named

15  off Wanda White, Kennon White, Bobby "Red" Sams.  He said that

16  the -- he said, "that bitch Carmen Lewis told lies on me."  He

17  said, "I wouldn't have done nothing with her."  He said, "I

18  can't speak for Al Man on it, but I can speak for myself, that

19  I would never do nothing with Carmen Lewis."

20  Q.   Did he seem pretty upset about it?

21  A.   Yes, sir.

22  Q.   Now, after your meeting with Mr. Jones, did you then send

23  a threatening message to Wanda White?

24  A.   I sent a message to Wanda White saying "look what you've

25  caused by your lies.  Good job."  And my avatar had a picture

1    of me having a gun on it.

2    Q.   I want to show you what's been marked as Government's

3    Exhibit P32.  Is that your avatar?

4    A.   Yes, sir.

5    Q.   And is that the message that you sent to Wanda White?

6    A.   Yes, sir.

7    Q.   Now, for those of us that are not as computer literate,

8    explain what an avatar is.

9    A.   It's just a picture that you put up that everybody would

10   see when they click on your MySpace.

11   Q.   So you had a MySpace account?

12   A.   Yes, sir.

13   Q.   And did Wanda White have a MySpace account?

14   A.   Yes, sir.

15   Q.   And so you sent this message through MySpace

16   communication?

17   A.   Yes, sir.

18           MR. PARMAN:  Your Honor, I'd move for the

19   introduction of Government's Exhibit P32.

20           THE COURT:  Any objection?  Exhibit P32 will be

21   admitted.

22                     (Government Exhibit No. P32

23                      was admitted into evidence.)

24   Q.   How long after meeting with Mr. Jones did you send that

25   message?

HUBBARD - Direct (Mr. Parman)                                    81

1    A.   Around 12 hours maybe.  I met with him in the morning,

2    and then I sent it late at night.

3    Q.   So on the same day?

4    A.   Yes, sir.

5    Q.   After sending that message, did you then receive a visit

6    from the FBI?

7    A.   After sending the message, I'm not for sure if it was the

8    next morning or not, but I received a visit from Brian Jackson

9    with the Kentucky Vehicle Enforcement.  He was looking -- he

10   said he was looking for somebody, but I guess he was probably

11   investigating the complaint that was made.  And then the next

12   day after that, I received a visit from the FBI.

13   Q.   Were they asking you about that message that you'd sent?

14   A.   Yes, sir.

15   Q.   And did you lie to them?

16   A.   Yes, sir.

17   Q.   And did you lie to them about who had told you about the

18   cooperating source?

19   A.   Yes, sir.

20   Q.   And did you know at that time that individuals that were

21   cooperating in this investigation were confidential?

22   A.   I don't understand that.

23   Q.   Well, were you aware of the fact -- when the FBI was

24   asking you questions about where you found this information,

25   did you understand that that information was not common

1    knowledge to everybody?

2    A.   Yeah, yes.  I was aware of that.

3    Q.   And then when he asked you where you learned the identity

4    of Wanda White, you lied to them?

5    A.   Yes, sir.

6    Q.   Why did you lie to them?

7    A.   Well, when I lied to them, I didn't, I didn't really know

8    no better.  I didn't know what to do.  So when they put me in

9    jail, I got scared and I said, well, I really don't know

10   what's going to happen if I tell these guys that Wayne said

11   this.  I didn't want Wayne mad at me, because you never know

12   what can happen.

13   Q.   When you say you never know what can happen, what do you

14   mean by that?

15   A.   I don't know.  I just, it's just a scary situation to

16   deal with, and I really don't know what can happen.  That's

17   all I can say.

18   Q.   After having time to think about the situation, there --

19   so you were arrested, I assume?

20   A.   Yes, sir.

21   Q.   And while you were setting there, you became scared; is

22   that accurate?

23   A.   Yes, sir.

24   Q.   Were you scared of Mr. Jones and people he was associated

25   with?

*HUBBARD - Direct (Mr. Parman)*                                          83

1    A.   I wasn't scared of Mr. Jones in particular.  I wasn't

2    scared of really nobody in particular.  I was just scared of

3    the situation.  I didn't want nobody mad at me, and I was just

4    scared about the whole situation.

5         MR. PARMAN:  I want to show you what's been marked as

6    Government's Exhibit PA12.

7    Q.   Sir, take a moment, if you would, and look through that

8    document.

9    A.   Yes, sir.

10   Q.   Do you recognize that document?

11   A.   Yes, sir.

12   Q.   What do you recognize that document to be?

13   A.   Plea agreement, sir.

14   Q.   So you've pled guilty to your actions?

15   A.   Yes, sir.

16   Q.   And that is your plea agreement?

17   A.   Yes, sir.  Looks pretty much like it.

18   Q.   Well, I mean, is it?

19   A.   Yes, sir.

20        MR. PARMAN:  Your Honor, move for the introduction of

21   Government's Exhibit PA12.

22        THE COURT:  Any objection?  Exhibit PA12 will be

23   admitted.

24                  (Government Exhibit No. PA12

25                  was admitted into evidence.)

1    Q.   Mr. Hubbard, has the government made you any promises for

2    testifying today?

3    A.   No, sir.

4    Q.   What's your understanding of what will happen if you come

5    in here and testify truthfully?

6    A.   If I come in here and testify truthfully, I could get my

7    charges reduced maybe.  Maybe Judge Reeves will take a lighter

8    sentence on me.

9    Q.   What is your understanding of who will determine what

10   your ultimate sentence is?

11   A.   Judge Reeves.

12   Q.   What's your understanding of what would happen to you if

13   you would come in here and lie about what happened?

14   A.   I would be committing perjury.  I could be put in jail.

15   Q.   You testified already you've lied in the past?

16   A.   Yes, sir.

17   Q.   I think you've explained yourself.  Are you telling the

18   truth here today?

19   A.   Yes, sir.

20          MR. PARMAN:  Your Honor, could we show the defendant

21   Government's Exhibit P31?  I believe it's already been

22   introduced.

23          THE COURT:  P31?

24          MR. PARMAN:  Yes, Your Honor.

25          THE COURT:  Yes.

HUBBARD - Direct (Mr. Parman)                                      85

1    Q.   Sir, if you would take a moment and look at that.

2    A.   Yes, sir.

3    Q.   Do you recognize the picture or the building in that

4    picture?

5    A.   Yes, sir.

6    Q.   What is that?

7    A.   That's the apartment building where I lived at at the

8    time.

9    Q.   At what time?

10   A.   At the time the FBI arrested me.

11            MR. PARMAN:  Your Honor, may I have just a moment?

12            THE COURT:  Yes, sir.

13            MR. PARMAN:  Your Honor, with permission, we'd

14   publish P31 again for the jury's benefit.

15            THE COURT:  Yes, you may.

16   Q.   So Mr. Hubbard, this is the apartment you lived in when

17   you was arrested?

18   A.   Yes, sir.

19   Q.   Can you see which unit you lived in from the picture?

20   A.   Yes, sir.

21   Q.   Which one is it?

22   A.   It's the one closest to the red car, directly in front of

23   it on the bottom.

24   Q.   On the bottom right?

25   A.   Yes, sir.

HUBBARD - Direct (Mr. Parman)                                86

1        MR. PARMAN:  If I could have Government's Exhibit D73
2   as well, Your Honor.
3        THE COURT:  That's the one that was just admitted?
4        MR. PARMAN:  Yes, Your Honor.
5        THE COURT:  If you could give that to Mr. Parman.
6        MR. PARMAN:  If I could, with permission, publish
7   that as well, Your Honor.
8        THE COURT:  Yes.
9   Q.  Mr. Hubbard, is this the avatar that you were speaking
10  of?
11  A.  Yes, sir.
12  Q.  And it's a bit of a grainy image from this angle, but
13  what does that avatar depict?
14  A.  It's a picture of me holding a gun.
15  Q.  And are you pointing it in the direction of the person
16  who received of the message?
17  A.  It's pointing in the direction of the camera when the
18  picture was taken, sir.
19  Q.  And the message that was sent, what was that again?
20  A.  "Look what you caused by your lies.  Good job."
21       MR. PARMAN:  Thank you, Your Honor.  That's all I
22  have.
23       THE COURT:  Thank you.  Mr. Hoskins?
24       MR. HOSKINS:  No questions.
25       MR. WESTBERRY:  None.

*HUBBARD - Cross (Mr. White)*                                                87

1          THE COURT:  Mr. White?

2          MR. WHITE:  A few, Your Honor.

3          THE COURT:  Yes, sir.

4          MR. WHITE:  May I just ask from here, Judge?

5          THE COURT:  Yes, sir, that will be fine.

6                    CROSS-EXAMINATION

7     BY MR. WHITE:

8     Q.  Good morning, Mr. Hubbard.

9     A.  Morning.

10    Q.  My name is Scott White.  I'm a lawyer, and I represent

11    Wayne Jones.  I want to ask you a few questions.  First what I

12    want to do is go back, if I could.  I'm just going to kind of

13    give you subject areas.  I don't want to jump around on you.

14        The first thing I wanted to ask you about was your

15    appointment as an election officer.  That was in the -- did I

16    understand your testimony correctly that it was the spring,

17    2008 election at which you first worked as an election

18    officer?

19    A.  I think so, sir.

20    Q.  That would have been the primary?

21    A.  Primary, sir.

22    Q.  What precinct was that, do you recall?

23    A.  The first precinct -- well, both precincts I worked was

24    the Manchester precincts.

25    Q.  How close do you live to the Manchester precinct?

1  A.  I live probably five, six, seven minutes away from it at

2  the time.

3  Q.  It's not across the street from you or next to you?

4  A.  No.

5  Q.  Is there a precinct close to you?

6  A.  Yes, sir.

7  Q.  Is that the Harts Branch?

8  A.  Harts Branch precinct.

9  Q.  And in the fall of 2008, did you work an election then as

10 well?

11 A.  Yes, sir.

12 Q.  In other words, the primary was in the spring, did you

13 also work the general in the fall?

14 A.  Yes, sir.

15 Q.  Did you receive any training at that time?

16 A.  Yes, sir.

17 Q.  Did you receive that at the Clay County clerk's office?

18 A.  Yes, sir.

19 Q.  Did you receive that from employees of the Clay County

20 clerk's office?

21 A.  I don't know who it was done the training.  It was an

22 older man.

23 Q.  Were you the only one who received that training?

24 A.  There was several people there.

25 Q.  Now, when you were elected the youth chair of the -- and

*HUBBARD - Cross (Mr. White)*                                        89

1   that was at the Harts Branch precinct?

2   A.  Yes, sir.

3   Q.  Is that because you live in the Harts Branch precinct?

4   A.  Yes, sir.

5   Q.  Harts Branch precinct?

6   A.  Yes, sir.

7          MR. WHITE:  Give me just a second.

8   Q.  Do you recall at that meeting that occurred in Harts

9   Branch precinct that there were other folks elected to other

10  positions besides the youth officer?

11  A.  Yes, sir.

12  Q.  And were you elected by vote?

13  A.  By vote.

14  Q.  Ask you now about your job application.

15  A.  Yes, sir.

16  Q.  You testified that you went to the state highway garage

17  in -- what was the state highway garage for Clay County, and

18  you filled out an application?

19  A.  Yes, sir.

20  Q.  Was that a written application or an online --

21  A.  A written application.

22  Q.  And the application that you filled out later, the second

23  application you filled out in Mr. Stivers' home, that was on a

24  computer online?

25  A.  Yes, sir.

HUBBARD - Cross (Mr. White)                                    90

1   Q.   Did you ever get a job with the Transportation Cabinet?

2   A.   No, sir.

3   Q.   I want to ask you now, sir --

4          MR. WHITE:  Your Honor, I just want to use the Elmo.

5          THE COURT:  Yes, sir.

6          MR. WHITE:  Your Honor, actually, if I could ask the

7   clerk to give me exhibit -- may I speak with Mr. Parman real

8   quick?

9          THE COURT:  Yes, sir.

10          MR. WHITE:  May I have D73?  I can get it from Mr.

11   Parman.  I'm sorry, Your Honor.  Just a second.  May I have

12   D73, Your Honor?

13          THE COURT:  The clerk has that.

14   Q.   Mr. Hubbard, I want to ask you about Government's

15   Exhibit D73.  Are you able to see it on that monitor over

16   there, sir?

17   A.   Yes, sir.

18   Q.   Have you seen this document before?

19   A.   Yes, sir.

20   Q.   Is that a screen shot of what you posted on Mrs. White's

21   MySpace page?

22   A.   Yes, sir.

23   Q.   This is the avatar that was shown as D73.  Is that

24   correct?

25   A.   Yes, sir.

*HUBBARD - Cross (Mr. White)*                                       91

1   Q.   Is that an avatar that you had -- is that a photograph

2   that you had taken that you then uploaded on to your computer?

3   A.   Yes, sir.

4   Q.   Had you used that avatar before in other MySpace pages,

5   or is this the only one that you did that with?

6   A.   That's the only MySpace account that I have that I used

7   that picture in particular with.

8   Q.   Let me reask the question.  Did you post on MySpace on

9   anybody else's accounts other than Mrs. White's a message that

10  also used that same avatar?

11  A.   Are you saying did I send other people messages that had

12  the same avatar?

13  Q.   Yes.

14  A.   Yes, sir.

15  Q.   You said it much better than me.  When you went to Mr.

16  Jones's home, this was after he'd already been charged with

17  the charges he's standing trial on now?

18  A.   Yes, sir.

19  Q.   Were you invited there by him?

20  A.   No, sir.

21  Q.   Had you gone there before and he wasn't there?

22  A.   Yes, sir.

23  Q.   Did you come back a second time?

24  A.   Yes, sir.

25  Q.   Were you invited the second time?

1   A.   No, sir.

2   Q.   After you spoke with him -- and it was your testimony

3   that he was upset?

4   A.   When I spoke to him, he seemed upset.

5   Q.   Other than the statements that you've already testified

6   to about the folks that he -- the names that he gave you and

7   what he said about those people, did he ask you to do

8   anything?

9   A.   No, sir.

10  Q.   Did he ask you to go make any threats against anybody?

11  A.   No, sir.

12          MR. WHITE:  Those are all the questions I have, Your

13  Honor.  Thank you, Mr. Hubbard.

14          THE COURT:  All right.  Mr. Abell?

15          MR. ABELL:  Thank you, Judge.

16                      CROSS-EXAMINATION

17  BY MR. ABELL:

18  Q.   Mr. Hubbard, my name is Robert Abell, and I represent

19  William Stivers in this case.  The Department of

20  Transportation job application that you submitted online, was

21  that about in the summer of 2008?

22  A.   Seems right.

23  Q.   So about two years -- we're not quite to summer yet, but

24  about two years ago; is that fair?

25  A.   Yes, sir.

*B. LEWIS - Direct (Mr. Parman)*                                    93

1   Q.   You haven't seen or spoken to Mr. Stivers since that day

2   up until probably today?

3   A.   I don't think so, sir.

4          MR. ABELL:  That's all.  Thank you.

5          MR. RICHARDSON:  No questions, Your Honor.

6          MR. GILBERT:  No questions.

7          THE COURT:  Any redirect, Mr. Parman?

8          MR. PARMAN:  No, Your Honor.  Thank you.

9          THE COURT:  Thank you, Mr. Hubbard.  You may step

10  down, sir.  You can leave those documents there.

11          You may call your next witness.

12          MR. PARMAN:  Yes, Your Honor.  The United States

13  calls Brian Lewis.

14            BRIAN LEWIS, GOVERNMENT'S WITNESS, SWORN

15          THE COURT:  Mr. Parman, you may proceed.

16          MR. PARMAN:  Thank you, Your Honor.

17                       DIRECT EXAMINATION

18  BY MR. PARMAN:

19  Q.   Good morning, sir.

20  A.   Good morning.

21  Q.   Could you state your name, please?

22  A.   Brian Lewis.

23  Q.   Mr. Lewis, where do you live?

24  A.   Manchester, Kentucky.

25  Q.   How long have you lived in Manchester?

*B. LEWIS - Direct (Mr. Parman)*                                    94

1    A.   My whole life.

2    Q.   Are you married, sir?

3    A.   Yes.

4    Q.   How long have you been married?

5    A.   Fifteen years.

6    Q.   What is your wife's name?

7    A.   Angie Lewis.

8    Q.   Do you two have children?

9    A.   No.

10   Q.   Sir, where do you work?

11   A.   At C&S Chevron.

12   Q.   Sorry?

13   A.   C&S Chevron.  It changed names.  It's different.

14   Q.   What was the prior name of the business?

15   A.   Hometown Chevron.

16   Q.   How long have you worked there for Chevron?

17   A.   Probably year and a half, maybe, something like that.

18   Q.   What position do you hold there at the Chevron?

19   A.   Like stock boy, take care of the floor works, stuff like

20   that, do orders.

21   Q.   Where is this business located in Manchester?

22   A.   It's right off the parkway.

23   Q.   Do you know William "Al Man" Stivers?

24   A.   Yeah.

25   Q.   Are you aware that Mr. Stivers has recently been charged

*B. LEWIS - Direct (Mr. Parman)*                                    95

1    with a federal offense?

2    A.   Yeah, just what I've heard and stuff, yeah.

3    Q.   Since becoming aware that Mr. Stivers was charged with a

4    federal offense, have you been approached by Mr. Stivers?

5    A.   Yeah.

6    Q.   What did Mr. Stivers say to you?

7    A.   Well, the very first time?

8    Q.   Yes, sir, start with the very first time.

9    A.   Well, he was wanting me to like go to court, testify

10   against Ouchie Jackson that he was like on drugs and stuff

11   when me and him got into it.

12   Q.   Let's talk about that for just a second.

13   A.   Okay.

14   Q.   You said he wanted you to testify that Ouchie was on

15   drugs when you and him got into it.

16   A.   Yeah.

17   Q.   Did you and Ouchie Jackson, in fact, get into it at one

18   point?

19   A.   Yes.

20   Q.   Did you guys get into a physical fight?

21   A.   Yeah.

22   Q.   Why?

23   A.   Well, because we come home one evening, coming back from

24   the grocery store, and he come up at me trying to fight.  He

25   was drunk or a little drunk, however.  But my woman basically

*B. LEWIS - Direct (Mr. Parman)*                                    96

1    walked up to him, just said, quit all this foolishness and

2    went over like this.  He just backhanded her in the face.

3    Q.   Backhanded your wife?

4    A.   Yeah.

5    Q.   So what did you do?

6    A.   I left him laying.

7    Q.   So after you left him laying, did that become fairly well

8    known that you had done that?

9    A.   Yeah.

10   Q.   And was that what Mr. Stivers was asking you about, that

11   incident?

12   A.   Yeah.  He just, every time I basically see him, he'd

13   bring that up, or something like that.

14   Q.   So he wanted you to come and testify that Ouchie Jackson

15   was on drugs when that happened?

16   A.   Yeah.

17   Q.   Did you agree to do that?

18   A.   No.  I told him I wouldn't do it.

19   Q.   You refused?

20   A.   Yeah.

21   Q.   Why?

22   A.   Because I told him he wasn't, and I said it was in the

23   past.  I said me and Ouchie, we made up.  He apologized.  It's

24   done and over with.

25   Q.   So he wasn't on drugs when that happened?

*B. LEWIS - Direct (Mr. Parman)*                          97

1   A.   No.  I've never known him to do no drugs or nothing like
2   that.
3   Q.   So that was the first incident that Mr. Stivers
4   approached you, correct?
5   A.   Yeah.
6   Q.   What happened the second time?
7   A.   Well, the next time when he seen me, he said, "Have they
8   come and got you yet?"  I just looked and said, "Who come got
9   me?"  He said, "The Feds."  I said, "They have no reason to
10  come get me.  I've not done anything."  That's basically what
11  he'd say every time he seen me.
12  Q.   Did he come to you again and say that?
13  A.   Yeah, he's come to me a couple times.
14  Q.   And basically asked you if the Feds have come to see you?
15  A.   Basically the same thing.
16  Q.   And if they'd come and got you yet?
17  A.   If they'd come and got me.
18  Q.   Did that concern you that he kept telling you that?
19  A.   It started to.  It started bothering me a little bit.  At
20  first I just kind of looked over it a little bit.
21  Q.   Did you feel intimidated in any way because he was coming
22  and telling you that?
23  A.   Yeah, because that's -- my opinion of it, the way I was
24  thinking, he could go and say I've done this and that and get
25  me in trouble for something.  I've not done nothing.

1    Q.  Sir, have you been involved in any election fraud?

2    A.  No, not whatsoever.

3    Q.  Have you had anything to do with elections?

4    A.  No.

5    Q.  At some point, did Mr. Stivers approach your wife?

6    A.  Yeah.

7    Q.  What happened then?

8    A.  He basically said the same thing like he was saying to me

9    to her.

10   Q.  What was that?

11   A.  That the Feds are gonna come get you, or have they come

12   and got you.

13   Q.  And what happened when he did that to your wife?

14   A.  Well, what happened to her or what happened?  What do you

15   mean?

16   Q.  What occurred after he approached your wife?

17   A.  Well, I was gone that time.

18   Q.  Excuse me?

19   A.  I was at another store.  I come, it already happened.

20   When he said it to her, he just turned around and he just

21   walked out.  She told him, she said, they got no reason.  Same

22   like I said, you know, she's not done nothing.  He says, "Yes,

23   you have, I seen you" like that.  She said, "I've not done

24   nothing, you know, like that."  I come in on it, and that's

25   when there was the city police and two FBI guys come down

*B. LEWIS - Cross (Mr. Abell)*                                         99

1    talked to us.

2    Q.   Was your wife scared about the statements that Mr.

3    Stivers was making to her?

4    A.   Oh, yeah, yeah.

5    Q.   Did she contact the police?

6    A.   Yeah.

7              MR. PARMAN:  Your Honor, may I have just one moment?

8              THE COURT:  Yes, sir, you may.

9              MR. PARMAN:  That's all I have.  Thank you.

10             THE COURT:  Thank you.  Let's see.  Mr. Hoskins

11   Mr. Westberry.

12             MR. PINALES:  Nothing, Your Honor.

13             THE COURT:  Mr. Abell.

14                        CROSS-EXAMINATION

15   BY MR. ABELL:

16   Q.   Mr. Lewis, my name is Robert Abell, and I represent

17   William Stivers in this case.  Now, you've never been involved

18   in politics in Clay County or anywhere else for that matter,

19   correct?

20   A.   No.

21   Q.   And you don't know anything about campaigns in Clay

22   County or anywhere else --

23   A.   No.

24   Q.   -- correct?  Would it be fair to say that prior to these

25   events you've talked about when Mr. Stivers spoke with you,

*B. LEWIS - Cross (Mr. Abell)*                                    100

1   had you and him always gotten along?

2   A.   Yeah.

3   Q.   And you'd agree this incident when Ouchie Jackson hit

4   your wife and then you whipped him, he was intoxicated but not

5   on drugs?

6   A.   No, he was just drunk.  He actually had a beer in his

7   hand when he was --

8   Q.   And before these events you talked about which occurred

9   last summer or last fall, right, Mr. Stivers had mentioned to

10  you on a number of prior occasions something about you

11  whipping Ouchie; is that true?

12  A.   Yeah.

13  Q.   And he had done that in a friendly --

14  A.   Yes.

15  Q.   -- encouraging way?

16  A.   Yeah.

17  Q.   During these events you've talked about today, other than

18  with regard to Ouchie, he didn't mention anything else about

19  this case; is that correct?

20  A.   No, nothing.

21  Q.   And didn't mention Cletus Maricle or Doug Adams?

22  A.   No.

23  Q.   Charles Jones?

24  A.   No.

25  Q.   Freddy Thompson?

*B. LEWIS - Redirect (Mr. Parman)*                                    101

1    A.   No.

2    Q.   Bart Morris?

3    A.   No.

4    Q.   Debbie Morris?

5    A.   No.

6    Q.   Or Stanley Bowling?

7    A.   No.

8    Q.   And didn't get into any specifics about anything he was

9    charged with?

10   A.   No.

11            MR. ABELL:   That's all, Judge.

12            THE COURT:   Thank you.   See if anyone else has any

13   questions?   Any redirect of Mr. Lewis?

14            MR. PARMAN:   Briefly, Your Honor, if I may from here.

15            THE COURT:   Yes.

16                        REDIRECT EXAMINATION

17   BY MR. PARMAN:

18   Q.   The first time Mr. Stivers brought up you testifying that

19   Mr. Jackson was on drugs was that first incident, right?

20   A.   That he asked me to go to court?

21   Q.   Yes, sir.

22   A.   Yeah, yeah.

23   Q.   And these other conversations that you had had with Mr.

24   Stivers, he never mentioned anything about drugs before, had

25   he?

*A.   LEWIS - Direct (Mr. Parman)*                                      102

1    A.   No.

2    Q.   So the first time he actually mentioned Ouchie being on

3    drugs was that first incident that you testified about?

4    A.   Yeah.

5    Q.   And then after that is when he started asking you whether

6    the Feds were coming for you?

7    A.   Correct.

8              MR. PARMAN:  That's all I have.

9              THE COURT:  Anything else?

10             MR. ABELL:  No.

11             THE COURT:  All right.  Thank you.  Mr. Lewis, you

12   may step down.

13             Before the next witness is called, I will advise the

14   jury that the testimony of Mr. Brian Lewis has been offered

15   with respect to the defendant, William Stivers, in the case as

16   opposed to against all defendants, and you're so advised.

17             Mr. Parman, you may call your next witness.

18             MR. PARMAN:  Angela Lewis, Your Honor.

19              ANGELA LEWIS, GOVERNMENT'S WITNESS, SWORN

20             THE COURT:  Thank you.  You may proceed.

21             MR. PARMAN:  Thank you, Your Honor.

22                           DIRECT EXAMINATION

23   BY MR. PARMAN:

24   Q.   Good morning.

25   A.   Morning.

*A. LEWIS - Direct (Mr. Parman)*                                        103

1    Q.   Could you state your name, please?

2    A.   Angela Lewis.

3    Q.   Miss Lewis, where are you from?

4    A.   Manchester.

5    Q.   How long have you lived in Manchester?

6    A.   All my life.  Thirty years.

7    Q.   Are you married?

8    A.   Yeah.

9    Q.   What's your husband's name?

10   A.   Brian Lewis.

11   Q.   How long have you and Brian been married?

12   A.   Fifteen years.

13   Q.   Where do you work, Miss Lewis?

14   A.   Chevron in Manchester.

15   Q.   How long have you worked at the Chevron?

16   A.   About three years.

17   Q.   Have you ever been approached by a William "Al Man"

18   Stivers there at the Chevron?

19   A.   Yes.

20   Q.   Share with the jury what happened when you were

21   approached by Mr. Stivers.

22   A.   Okay.  He had been talking to my husband a few times, and

23   so I didn't want him to say anything to me.  Well, I seen him

24   come in, and I went to the back to try to stay away.  And I

25   seen him open the door to go out, so I come back up front.

*A.  LEWIS - Direct (Mr. Parman)*                                    104

1    And when I was coming back up, he opened the door back up and

2    said, "Have they been to see you yet?"  I said, "No, who?"  He

3    said, "You know, the Feds."  And I said, "No.  They wouldn't

4    come and see me.  I've not done anything and I don't know

5    anything."  And he said, "Oh, yes, you have.  I've seen you"

6    and turned around and walked out.

7        So right then I thought I better tell somebody or I'm

8    going to be in trouble for nothing.

9    Q.   What did you do?

10   A.   William Goins come in the store.  And I asked him, I

11   said, "Is there any way I can keep him from coming in this

12   store?"  At that time, I didn't know he would go back to jail

13   or whatever.  But I said, "Is there any way you can keep him

14   from doing this."  He said, "I know somebody you need to talk

15   to."  And he brought Jeff down there.  Jeff Culver.

16   Q.   Who is Jeff Culver?

17   A.   Chief of police.  And Jeff brought two agents back and

18   they talked to me.

19   Q.   When Mr. Stivers came to you and said this, did that

20   scare you?

21   A.   Yeah, it did.

22   Q.   Were you intimidated by that?

23   A.   Yeah.

24   Q.   And I believe you testified that you went back to the

25   store to try to stay away from Mr. Stivers?

1   A.   Yeah, I went to the back of the building to try to stay

2   away because I just didn't want him to talk to me about that.

3   Q.   So you were aware that he'd been approaching your

4   husband?

5   A.   My husband, yes.

6   Q.   You know what he was approaching your husband about?

7   A.   Along the same lines what he was saying to me.

8   Q.   Do you know an individual by the name of Ouchie Jackson?

9   A.   Yeah, I do.  I worked for him.

10  Q.   You used to work for him?

11  A.   Yes, I did.

12  Q.   Do you recall the time frame that you worked for him?

13  A.   Not really, I don't.  I worked for him maybe three years

14  maybe.  Two, two to three years.

15  Q.   Are you aware of an incident where your husband and Mr.

16  Jackson got into an altercation?

17  A.   Yes.

18  Q.   Share with the jury what that was.

19  A.   We went to the grocery store, and came back home that

20  night.  And as soon as we got out, he started, and they was

21  going back and forth.  And Ouchie had a sweatshirt on, and he

22  jerked it off like he was getting ready to fight, and I come

23  in between them and I said, "No, y'all can't do that.  This is

24  crazy."  About that time, he slapped me in the face, and then

25  my husband lost it and jumped on him and that was it.

*A.  LEWIS - Cross (Mr. Abell)*                                         106

1   Q.   Are you aware of whether or not Mr. Stivers' advances

2   towards your husband were related to that incident?

3   A.   The first time, yes, it was.  As soon as he left, my

4   husband came in and told me that.  I mean, I didn't hear him

5   say it, but my husband came in and told me that.

6   Q.   What was Mr. Stivers wanting you husband to do?

7   A.   To go to court and testify that he was on drugs when that

8   happened between us, and he wasn't.

9          MR. PARMAN:  May I have just a moment, Your Honor?

10          THE COURT:  Yes, sir.

11          MR. PARMAN:  Nothing further.

12          THE COURT:  Thank you.  Mr. Abell?

13                        CROSS-EXAMINATION

14   BY MR. ABELL:

15   Q.   Miss Lewis, I'm Robert Abell, and I represent William

16   Stivers in this case.  Previously, you've testified about an

17   event that took place last year when you saw Mr. Stivers at a

18   gas station?

19   A.   Um-hmm.

20   Q.   Prior to that time, you and him had been friendly toward

21   each other?

22   A.   Yeah.  That's why I couldn't understand why he would try

23   to pull us into this, when he knows we had nothing to do with

24   it.

25   Q.   And neither you nor your husband have ever been involved

*A. LEWIS - Cross (Mr. Abell)*                                          107

1    in Clay County politics?

2    A.   Not at all, no.

3    Q.   And as far as you know, and I know you're not familiar

4    with all the details in this case, you don't know anything

5    about the charges involved in this case; is that fair?

6    A.   No, uh-uh.

7    Q.   And Ouchie, to be clear, Mr. Jackson was intoxicated in

8    this incident where he hit you and then your husband whipped

9    him, correct?

10   A.   He had been drinking, but I don't know if -- you know, I

11   don't know if he was drunk or whatever, but I don't really

12   think he was on any drugs at that time.

13               MR. ABELL:  Nothing further.

14               THE COURT:  All right.  Thank you.  Anything else of

15   the witness?  Redirect?

16               MR. PARMAN:  No, Your Honor.

17               THE COURT:  Thank you, Miss Lewis.  You may step

18   down.

19               THE WITNESS:  Thank you.

20               THE COURT:  Would you like to call your next witness

21   now, or we can take an earlier lunch break if you prefer not

22   to break up the testimony.

23               MR. HOSKINS:  I'd ask for the admonition.

24               THE COURT:  I'll give the jury the same admonition

25   given with respect to Brian Lewis.  With respect to the

T. SMITH - Direct (Mr. Parman)                                    108

1    testimony of Angela Lewis, the testimony was admitted with

2    respect to the charges against William Stivers and not with

3    respect to the other defendants in the case.

4              MR. PARMAN:  Your Honor, this witness might be a bit

5    longer than the others, but probably not a lot.

6              THE COURT:  Let's proceed.  Why don't you call the

7    next witness.

8              MR. PARMAN:  Terry Smith.

9                TERRY SMITH, GOVERNMENT'S WITNESS, SWORN

10             THE COURT:  Thank you.  Mr. Parman, you may proceed.

11             MR. PARMAN:  Thank you, Your Honor.

12                            DIRECT EXAMINATION

13   BY MR. PARMAN:

14   Q.   Good morning, sir.

15   A.   Good morning.

16   Q.   Would you state your name, please?

17   A.   Terry Smith.

18   Q.   Mr. Smith, how old are you?

19   A.   Thirty-two.

20   Q.   Where do you live?

21   A.   I live in Manchester on Mill Pond.

22   Q.   Have you lived in Manchester all your life?

23   A.   Yes.

24   Q.   Do you work?

25   A.   Not anymore.

T. SMITH - Direct (Mr. Parman)                              109

1   Q.   What do you currently -- how do you currently receive
2   your income?
3   A.   Draw disability.
4   Q.   When was the last time that you worked?
5   A.   It's been a while.
6   Q.   Do you know Bart Morris?
7   A.   Yes.
8   Q.   Have you ever worked for Bart Morris?
9   A.   Yeah, I used to clean his garage and work on his race car
10  and just odd jobs for him.
11  Q.   What's the time frame that you would have done that, the
12  time frame that you worked for Mr. Morris?
13  A.   It's been a couple year ago.
14  Q.   Would it have been five years ago, ten years ago?
15  A.   It's probably been about five, at least.
16  Q.   Do you recall working there at Mr. Morris's garage on
17  election day?
18  A.   No, I worked the day before.
19  Q.   You worked -- you recall working the day before an
20  election?
21  A.   Yes.
22  Q.   And that would have been sometime four, five years ago?
23  A.   Yes.
24  Q.   Could you share with the jury the amount of traffic that
25  was coming in and out of Mr. Morris's garage there the day

*T. SMITH - Direct (Mr. Parman)*                                              110

1    before the election?

2    A.   It was probably five or ten people come.  People always

3    come and talk to Bart.

4    Q.   How long were you in the garage on that day?

5    A.   I was there a couple hours.

6    Q.   And in that time, you seen five to ten people?

7    A.   Yeah.

8    Q.   What did you see Mr. Morris do with those people?

9    A.   They would come there and talk to him.  They'd go in the

10   house with him.

11   Q.   Did he take anything with him when he went in the house?

12   A.   He had pieces of white paper.

13   Q.   Was it a stack of white paper?

14   A.   Yes.

15   Q.   Did you have a chance to see that piece of paper?

16   A.   Just blank, I seen.

17   Q.   Sir, are you able to read and write?

18   A.   No.

19   Q.   Could you tell on that paper whether it was a

20   computerized printout or handwritten words?

21   A.   It's computerized.

22   Q.   So when he would take the people back in the house, he'd

23   take that with him?

24   A.   Yes.

25   Q.   Have you testified before the grand jury in this matter?

*T. SMITH - Direct (Mr. Parman)*                                    111

1   A.   Yes.

2   Q.   And where was that testimony?

3   A.   Lexington.

4   Q.   When you testified before the grand jury, did you see a

5   gentleman by the name of Chris Duff?

6   A.   Yes.

7   Q.   Do you know if Chris Duff is related to Mr. Morris?

8   A.   It's his stepson.

9   Q.   So is he related to Debbie Morris as well?

10  A.   It's Debbie's son.

11  Q.   Did Mr. Duff make any comments to you there at the grand

12  jury?

13  A.   He just come up and said he was gonna say that he was so

14  high, can't remember what he was doing.

15  Q.   Did you understand that to be in reference to what he was

16  about to testify in front of the grand jury about?

17  A.   I guess that's what.

18  Q.   What happened to your vehicle as you left the grand jury?

19  A.   When I went to my car to leave, my tire was flattened.

20  Q.   Did it look like it was just a bad tire, or did it look

21  like it had been punctured?

22  A.   We put air in it and it stayed up and I drove it home.

23  Q.   At the time you testified in front of the grand jury,

24  where were you living?

25  A.   I was living on Forest Hill Road on Island Creek.

*T. SMITH - Direct (Mr. Parman)*                                    112

1    Q.   What kind of house was you living in there?

2    A.   I lived in a mobile home trailer.

3    Q.   Who owned that trailer?

4    A.   Kennon and Wanda White.

5    Q.   What happened to that trailer?

6    A.   It -- I was in process of moving to London, and I had to

7    leave home because they was aggravating the crap outta me,

8    wanting to know every time the FBI would come down there and

9    talk to me, they'd come and ask me what they was saying and

10   stuff.  So I had to leave home.  Wanting to know what they

11   said.  And I was moving to London with my mother-in-law, and I

12   had the electric and stuff cut off because I was moving over

13   there, and the trailer had got burnt down.

14   Q.   So when the trailer burned, the electricity had already

15   been cut off to it?

16   A.   Yes.

17   Q.   Did you still have all your belongings there in the

18   house?

19   A.   Yes.

20   Q.   And it was Kennon and Wanda White that owned the trailer?

21   A.   Yes.

22   Q.   And how long after you testified in front of the grand

23   jury was it that the building burned?

24   A.   Probably about a month.

25        MR. PARMAN:  May I have just a moment, Your Honor?

T. SMITH - Cross (Mr. Gilbert)                                      113

1              THE COURT:  Yes, sir, you may.

2    Q.  Mr. Smith, when did you lose your job with working with

3    Mr. Morris?

4    A.  I just -- after I went to grand jury, I never did work

5    for him that much.  I maybe worked for him one time after

6    that.

7    Q.  So that was the end of your employment with him?

8    A.  Yeah.

9              MR. PARMAN:  Thank you.

10             MR. PINALES:  No questions, thank you.

11             MR. WESTBERRY:  No.

12             MR. WHITE:  No.

13             MR. ABELL:  No.

14             THE COURT:  Mr. Gilbert?

15             MR. GILBERT:  Thank you, Your Honor.

16                          CROSS-EXAMINATION

17   BY MR. GILBERT:

18   Q.  Mr. Smith, my name is Jerry Gilbert, and I represent Bart

19   Morris.  This wasn't a public job that you had with Mr.

20   Morris, was it?

21   A.  No, I just doing odd jobs for him.

22   Q.  Just kind of hang out at the garage, and he would give

23   you tasks to do?

24   A.  Excuse me?

25   Q.  You'd just kind of hang out at the garage and he would

*T. SMITH - Cross (Mr. Gilbert)*                                        114

1    give you tasks to do, such as clean the garage?

2    A.   Yes.

3    Q.   And he had a race car there --

4    A.   Yes.

5    Q.   -- that he spent considerable time on?

6    A.   Yes.

7    Q.   And he let you help him with that?

8    A.   Yes.

9    Q.   Now, this wasn't a job you show up at 8:00 and stay there

10   till 5:00?

11   A.   No, no, no.  Sometimes I'd show up early and sometimes it

12   would be later in the day.

13   Q.   Okay.  And the garage is kind of a hangout for people,

14   wasn't it?

15   A.   Yes.

16   Q.   When you say people would come around, it wasn't just on

17   election day?  They'd come around every day, wouldn't they?

18   A.   Yep.

19   Q.   Including yourself?

20   A.   Yes.

21   Q.   And you'd consider yourself on good circumstances with

22   Bart and Debbie, wouldn't you?

23   A.   Yes, they was just like family to me.

24   Q.   And you still have that feeling about them today?

25   A.   I ain't got anything against them.

*T. SMITH - Cross (Mr. Gilbert)*                                    115

1   Q.   Okay.

2   A.   I practically stayed with them when I was growing up,

3   like I lived up the street, and he would always -- I'd go eat

4   with him when I was growing up and hung out with him.

5   Q.   Now, the tire, it wasn't cut, was it?

6   A.   No.

7   Q.   And, in fact, you had you a little electric pump that you

8   carried around in your car to pump it back up?

9   A.   I had a pump there, but the tire never did go down.  I

10  always kept a little, like a little tool kit and stuff in my

11  car.

12  Q.   Now, you say that Kennon and Wanda worried the crap outta

13  you?

14  A.   Yes.

15  Q.   And they were asking you about the FBI and what you told

16  them?

17  A.   Yes.

18  Q.   And they were concerned about it?

19  A.   Yes.

20  Q.   They're also concerned about -- they were worrying you

21  about something else, weren't they?  Getting the rent money?

22  A.   Yeah, they asked me.  I told them I was moving.

23          MR. GILBERT:  That's all.

24          THE COURT:  Thank you.  Miss Hughes?

25                      CROSS-EXAMINATION

116

1    BY MS. HUGHES:

2    Q.   Mr. Smith, do you recall giving your grand jury testimony

3    on July 12th, 2007?

4    A.   Yes.

5    Q.   Isn't it true that you stopped doing odd jobs for Bart

6    Morris prior to giving your testimony?

7    A.   I worked, I think, one time maybe cleaned the garage and

8    washed his trailer for the race car one time after that.

9    Q.   And isn't it true at that time that you told Mr. Morris

10   that you had gone to the grand jury?

11   A.   I think so, yeah.  Maybe.

12   Q.   Let me ask you this question, okay?  When you were at the

13   grand jury, you were asked who do you work for.  Do you

14   remember that?

15   A.   I think so, yeah.

16   Q.   Okay.  And your answer was, I used to work for Bart

17   Morris.  I'd clean his garage and stuff, but I don't work

18   there anymore.  Do you recall giving that answer to that

19   question?

20   A.   Not really.

21   Q.   Okay.

22        MS. HUGHES:  That's all I'll have.

23        THE COURT:  Anything else?

24        MR. SIMONS:  No questions.

25        MR. PARMAN:  Nothing further, Your Honor.

117

1           THE COURT:  All right.  Thank you.  You may step

2     down, sir.  Ladies and gentlemen, we will take our lunch break

3     at this time.  We'll take a recess until 1:00.  Of course,

4     please keep in mind the admonition that you were given

5     previously not to discuss the case among yourselves while we

6     are in recess.  Of course, don't allow anyone to approach you

7     to discuss the case as well as the other admonitions you've

8     been given.  The jury will be excused until 1:00.

9                   (The jury left the courtroom at 11:55 a.m.)

10          THE COURT:  Anything to take up outside the presence

11    of the jury?  We'll be in recess until 1:00.

12                  (Proceedings recessed at 11:55 a.m.)

13                          -  -  -

14                    C E R T I F I C A T E

15          I, LISA REED WIESMAN RDR-CRR, certify that the
      foregoing is a correct transcript from the record of
16    proceedings in the above-entitled case.

17

18     \s\ Lisa Reed Wiesman                March 10, 2010
      LISA REED WIESMAN, RDR-CRR            Date of Certification
19    Official Court Reporter

20

21

22

23

24

25

1                                INDEX

2

GOVERNMENT WITNESS

3

ROGER WEBB
4    Direct Examination by Mr. Smith................... Page 11
     Cross-examination by Mr. White................... Page 21
5    Cross-examination by Mr. Baldani................. Page 22
     Cross-examination by Mr. Simons.................. Page 25
6    Redirect Examination by Mr. Smith............... Page 27
     Recross-examination by Mr. Baldani.............. Page 28
7    Recross-examination by Mr. Simons............... Page 29

8

TOMMY SLONE
9    Direct Examination by Mr. Smith................... Page 30
     Cross-examination by Mr. Hoskins................. Page 39
10   Cross-examination by Mr. Westberry.............. Page 40

11   ROBYN COMBS PENNINGTON
     Direct Examination by Mr. Smith................... Page 40
12   Cross-examination by Mr. Baldani................. Page 44

13   ELLA WAGERS
     Direct Examination by Mr. Smith................... Page 45
14   Cross-examination by Mr. Baldani................. Page 52
     Cross-examination by Mr. Gilbert................ Page 56
15

RALEIGH DOWNEY
16   Direct Examination by Mr. Smith................... Page 58
     Cross-examination by Mr. Pinales................ Page 66
17   Cross-examination by Mr. Gilbert................ Page 69

18   RICHARD BRIAN HUBBARD
     Direct Examination by Mr. Parman................ Page 74
19   Cross-examination by Mr. White................... Page 87
     Cross-examination by Mr. Abell.................. Page 92
20

BRIAN LEWIS
21   Direct Examination by Mr. Parman................ Page  93
     Cross-examination by Mr. Abell.................. Page  99
22   Redirect by Mr. Parman.......................... Page 101

23   ANGELA LEWIS
     Direct Examination by Mr. Parman................ Page 102
24   Cross-examination by Mr. Abell.................. Page 106

25

1    GOVERNMENT'S WITNESS

2    TERRY SMITH
     Direct Examination by Mr. Parman................. Page 108
3    Cross-examination by Mr. Gilbert................. Page 113
     Cross-examination by Ms. Hughes.................. Page 116

4

5    GOVERNMENT EXHIBITS                              ADMITTED

6    Exhibit No. P31, photo
7    Admitted....................................... Page 15

8    Exhibit No. P32, MySpace page
     Admitted....................................... Page 80
9
     Exhibit No. PA12, Hubbard plea agreement
10   Admitted....................................... Page 83

11                          - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25