1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                              - - -
3

UNITED STATES OF AMERICA,         :   Docket No. CR 09-16-S
4                                 :
                 Plaintiff,       :   **Frankfort, Kentucky**
5                                 :   Wednesday, March 10, 2010
        versus                    :   12:55 p.m.
6                                 :
RUSSELL CLETUS MARICLE,           :
7   DOUGLAS C. ADAMS              :
    CHARLES WAYNE JONES            :
8   WILLIAM R. STIVERS            :
    FREDDY W. THOMPSON             :       **Trial Day 21B**
9   WILLIAM B. MORRIS             :
    DEBRA L. MORRIS                :
10  STANLEY BOWLING,              :
                                  :
11               Defendants.       :

12

13                            - - -
                     TRANSCRIPT OF TRIAL
14               BEFORE DANNY C. REEVES
           UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16  APPEARANCES:

17  For the United States:     STEPHEN C. SMITH, ESQ.
                               JASON D. PARMAN, ESQ.
18                             Assistant U.S. Attorney
                               601 Meyers Baker Road
19                             Suite 200
                               London, KY 40741
20
    For the Defendant          MARTIN S. PINALES, ESQ.
21  Russell Cletus Maricle:    CANDACE C. CROUSE, ESQ.
                               Strauss & Troy
22                             150 E. Fourth Street
                               Fourth Floor
23                             Cincinnati, OH  45202

24                             DAVID S. HOSKINS, ESQ.
                               107 E. First Street
25                             Corbin, KY  40701

```
 1      For the Defendant              R. KENT WESTBERRY, ESQ.
        Douglas C. Adams:              KRISTIN N. LOGAN, ESQ.
 2                                     Landrum & Shouse, LLP
                                       220 West Main Street
 3                                     Suite 1900
                                       Louisville, KY 40202
 4

 5
        For the Defendant              T. SCOTT WHITE, ESQ.
 6      Charles Wayne Jones:           Morgan & Pottinger, P.S.C.
                                       133 West Short Street
 7                                     Lexington, KY  40507

 8
        For the Defendant              ROBERT L. ABELL, ESQ.
 9      William R. Stivers:            120 North Upper Street
                                       Lexington, KY  40507
10

11      For the Defendant              RUSSELL JAMES BALDANI, ESQ.
        Freddy W. Thompson:            R. TUCKER RICHARDSON, ESQ.
12                                     Baldani, Rowland & Richardson
                                       300 West Short Street
13                                     Lexington, KY  40507

14
        For the Defendant              JERRY W. GILBERT, ESQ.
15      William B. Morris:             Coy, Gilbert & Gilbert
                                       212 North Second Street
16                                     Richmond, KY 40475

17
        For the Defendant              ELIZABETH SNOW HUGHES, ESQ.
18      Debra L. Morris:               Gess, Mattingly & Atchison, PSC
                                       201 West Short Street
19                                     Lexington, KY 40507

20
        For the Defendant              DANIEL A. SIMONS, ESQ.
21      Stanley Bowling:               Thompson, Simons, Dunlop & Fore
                                       116 West Main Street
22                                     Suite 2A
                                       Richmond, KY 40476
23

24

25
```

3

Court Reporter:                LISA REED WIESMAN, RDR-CRR
                               Official Court Reporter
                               35 W. Fifth Street
                               P.O. Box 1073
                               Covington, KY  41012
                               (859) 291-4410


     Proceedings recorded by mechanical stenography,
transcript produced with computer.

*BRIGGS - Redirect (Mr. Smith)*                                        4

1          (The jury entered the courtroom at 12:57 p.m.)

2          THE COURT:  Thank you.  The record will reflect that

3    all members of the jury are present.  Parties and counsel are

4    also present.  Special Agent Briggs, you're still under oath.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Mr. Simons, I believe we're up to you.

7          MR. SIMONS:  Your Honor, I don't have any questions

8    for Agent Briggs.  Thank you.

9          THE COURT:  All right.  Thank you.  Any redirect of

10   the witness?

11         MR. SMITH:  Yes, please.

12                        REDIRECT EXAMINATION

13   BY MR. SMITH

14   Q.  Agent Briggs, you had answered questions regarding the

15   execution of the search warrant on the Maricle residence?

16   A.  Yes, sir, that's --

17   Q.  And could you explain, did you actually execute the

18   search warrant on a mistaken residence?  Could you explain

19   that?

20   A.  No, sir.  Based upon my previous statements about

21   believing that Mr. Maricle was living in the house, the

22   sources were afraid to go down the dead-end street with us for

23   fear they'd be seen with us, put them in danger and also

24   jeopardize the integrity of the investigation.  So I clearly

25   made a mistake.

*BRIGGS - Redirect (Mr. Smith)*                                        5

1      As they were traveling to the residence -- well, the

2  morning of the search warrant, we met with a group of local

3  Manchester Police Department officers, sent them, one with

4  each team.  We do that for two reasons.  Number one, so we

5  have a uniformed presence so the occupants of the residence

6  can see there's a uniformed law enforcement officer in a

7  marked police vehicle.  The second reason is that so you don't

8  mistakenly go to the wrong location.

9      As they're traveling to the residence that I had

10 photographed, I had the proper address, proper directions and

11 the proper GPS location, because both driveways were at the

12 same point of a dead-end street.  The Manchester officer

13 either turned up to the left, to the correct house, or he told

14 the officers on the way to the door and the agents that Mr.

15 Maricle lives in that residence, the one next to it.

16     So they approached the residence with more caution, and

17 they knocked on the door.  The lady answered the door.  They

18 advised they had a search warrant for Mr. Maricle.  She said

19 he lives in this next house, and she invited them to come in.

20 They came in, verified through a piece of mail that he didn't

21 live there, and then they went to Mr. Maricle's residence.

22 Q.  One of the occupants, I believe, that you were asked to

23 identify who was in the residence at the Maricle residence at

24 the time of the search, and I believe you listed the name

25 Jonah Gregory?

*BRIGGS - Redirect (Mr. Smith)*                                              6

1   A.   Yes, sir, that's correct.

2   Q.   And you, I think, related him to Gary Gregory?

3   A.   That is Mr. Gary Gregory's son.

4   Q.   Is he been a target of your investigation involving

5   election schemes in this same case?

6   A.   Gary Gregory?

7   Q.   Yes, sir.

8   A.   Yes, sir.

9   Q.   You were further asked, I believe, by counsel for Mr.

10  Jones about the employment of his son and I believe suggested

11  that he may have obtained employment sometime in the '90s.

12  And based on your investigation, are you aware of whether or

13  not Wayne Jones was involved in the enterprise in the

14  formative years, dating back before 2002?

15  A.   Yes, sir.

16  Q.   During the course of your examination, you were also

17  questioned about legal documents that were found in possession

18  of Mr. Stivers.  Do you recall those questions?

19  A.   Yes, sir, I do.

20  Q.   And in the course of your investigation, you found, I

21  believe, documents that you were shown relating to Charles

22  "Dobber" Weaver?

23  A.   Yes, sir, that's correct.

24  Q.   Based on your investigation, have you asserted an

25  allegation against Mr. Stivers that he's somehow illegally

*BRIGGS - Redirect (Mr. Smith)*                                          7

1    obtained that document in some form?

2    A.   No, sir.

3    Q.   What significance did it have, in fact, that William

4    Stivers was possessing legal documents regarding one of your

5    cooperators, Charles "Dobber" Weaver?

6    A.   I'm sorry, what was the question, sir?

7    Q.   Based on your investigation, did you place a significance

8    on the fact that he had legal documents relating to one of

9    your cooperators, Charles "Dobber" Weaver, in his possession?

10   A.   Yes.  Any time that someone is under arrest or indictment

11   and a defendant or a member of a criminal enterprise is aware

12   of the fact this person's been arrested or indicted and are

13   under charges, you know, that somewhat, you know, jeopardizes

14   the integrity of the investigation with regard to having that

15   person try to proactively cooperate and go to these

16   individuals and get them to talk about the case or the

17   criminal acts.  So it is a barrier to the investigation is

18   what I'm trying to say.

19   Q.   Based on your training and experience as an FBI agent, in

20   investigating numerous other enterprises in the past, is that

21   a common practice that you've seen in criminal organizations?

22   A.   Absolutely.  Anyone involved in a criminal enterprise, a

23   criminal organization, they always want to keep track of both

24   state and federal court records to find out if anyone in the

25   organization or anyone close to those in the organization have

BRIGGS - Redirect (Mr. Smith)                                         8

1    been arrested, indicted, or under -- are under law enforcement

2    scrutiny of any kind.

3    Q.   I believe in questions by Mr. Thompson's attorneys that

4    you had been referenced, I believe, back to the grand jury

5    testimony of Mr. Thompson, I believe, on July the 17th.

6    A.   Yes, sir.

7    Q.   Do you recall those questions?

8    A.   I'm sorry.  July 12?

9    Q.   July 12, 2007, I'm sorry.

10   A.   Yes, sir.

11   Q.   And I believe you were also shown A10A, I believe,

12   referencing the recording that was made by cooperator Kennon

13   White?

14   A.   Yes, sir.

15   Q.   Let me first get a clarification, if we could, on A10A,

16   and if I could request the transcript from the clerk to -- I'd

17   like to show that to the witness as I ask these questions,

18   Your Honor.

19           THE COURT:  I believe he may have it.

20           THE WITNESS:  I've got a copy here, sir.

21           THE COURT:  I believe he has A10A.

22           MR. SMITH:  I was hoping to put that on display with

23   the projector.  But if the Court prefers that I keep it with

24   the witness, I can.  I would ask that, if possible, if I could

25   put it on the projector so everyone can see it.

1      THE COURT:  Yes, that's fine.

2   Q.   Agent Briggs, I believe in cross-examination, you were

3   asked to refer to this as it regarded to production, I

4   believe, or question of the voter assistance forms.  And I

5   believe you were asked to refer to page 7, so I'm going to put

6   that in front of you at this time.

7      Just want to have you read some additional information

8   there.  I believe that you were asked about whether Kennon

9   White had brought up this topic of voter assistance forms in

10  that recording.  I believe if you pick up there with the

11  question, headed Kennon --

12  A.   Yes, sir.  "What about voter assistance forms?  What did

13  you guys, what did you guys do with them?"

14  Q.   Okay.  And it goes on to read that Thompson says,

15  "they're right back there in a box.  Got to store them back

16  there 22 months."  Kennon says, "22 months?"  And Thompson

17  says, "I done took one bunch to the grand jury up here."

18  Kennon said, "Did you?"  Thompson said, "They's routine.

19  Well, it's law, it's not routine, it's law.  And after the

20  general primary election, the next time the grand jury meets,

21  you have to take the stuff over there.  Like all the voters

22  and voter assistance and all that stuff, sheriff's reports,

23  you know.  I have to get up there and admit stuff.  It wasn't

24  very shortly, it was like a week after the election sometime,

25  I took them up there."  And Kennon says, "To Gary?"  "Yeah,

*BRIGGS - Redirect (Mr. Smith)*                                    10

1    it's law, I have to do that.  Since Wayne is --" and then he

2    interjects, "Well, buddy."

3        Do you know who, based on your investigation, who he's

4    referring to as Gary?

5    A.   I think that's Gary Gregory.

6    Q.   And what title does Gary hold at that time?

7    A.   Commonwealth attorney.

8    Q.   So he wasn't referencing a federal grand jury at all to

9    Kennon during that conversation?

10   A.   No.

11   Q.   Further down here, he says, "all those they brought

12   here."  Kennon says, "yeah, they brought 'em here so they

13   wasn't, you know --" Thompson says, "anything that was brought

14   here is right back there, locked up in a box."

15       Do you recall whether or not Freddy Thompson told the

16   federal grand jury that he had a lock on his box?

17   A.   No, he said they were not under lock.  They were in the

18   deed room but not locked.

19   Q.   Now, in questions from Mr. Morris's attorney, I believe

20   there was a question about Bart Morris's activities in the

21   enterprise, and particularly as it related to items found at

22   the residence.  Based on your investigation, are you aware

23   whether Bart Morris's involvement with the enterprise predated

24   2002 in its formative years?

25   A.   Yes.

*BRIGGS - Recross (Mr. Pinales)*                                      11

1    Q.   During the course of questioning, you were also asked

2    about the names George Duff, the name George Duff?

3    A.   Yes, sir.

4    Q.   And whether it be George Duff, Sr. -- well, let me ask

5    you this.  Does the FBI, based on your knowledge of the name

6    George Duff, Sr., and/or George Duff, Jr. -- let me strike

7    that.  George Duff, Sr., does the FBI have intelligence of a

8    criminal nature that he was involved in criminal activity?

9    A.   Yes, we do.

10   Q.   What about George Duff, Jr.?

11   A.   Yes, sir.  George Duff, Jr., as well.

12   Q.   Whether it be George Duff, Sr., or George Duff, Jr., your

13   answer would be the same, that you have investigative criminal

14   intelligence on both of these individuals?

15   A.   Yes, that's correct.

16            MR. SMITH:  Pass the witness.

17            THE COURT:  Mr. Pinales.

18            MR. PINALES:  Yes, Your Honor, just a couple.

19            THE COURT:  Yes, sir.

20            MR. PINALES:  Thank you.

21                           RECROSS-EXAMINATION

22   BY MR. PINALES:

23   Q.   You were just asked a couple questions, and your response

24   was by GPS?

25   A.   Yes, sir.

BRIGGS - Recross (Mr. Pinales)                                    12

1    Q.   Can you tell me the GPS on Mr. Maricle's home?

2    A.   I don't have it committed to memory, sir.

3    Q.   Can you tell me the GPS on the neighbor's home?

4    A.   I didn't go to the actual residence, like stand beside

5    the residence and took it.  I took it at the dead end of

6    Circle Drive, where both driveways cut off.  We always take it

7    at the end of driveway on a public roadway at the end of the

8    driveway, where both driveways begin.

9    Q.   And you're saying both of those, although you can't

10   remember what it is, were the same?

11   A.   Well, I didn't take two readings.  They were both one

12   driveway -- Circle Drive dead ends.  One driveway goes

13   straight, one driveway goes immediately to the left at the

14   same location.  So we utilized GPS in our vehicle at the

15   entrance to the driveway, which would have been the same

16   location of both.

17   Q.   So the crossroads of where the two came together, the two

18   driveways, you say?

19   A.   Where the two driveways began, where Circle Drive ended.

20   Q.   And the two driveways came together?

21   A.   Yes.  One went straight, one went to the left.

22   Q.   Okay.  In response to a question that I believe was asked

23   from my right over here, you were asked to define a 302?

24   A.   Yes, sir.

25   Q.   You recall those questions?

*BRIGGS - Recross (Mr. Pinales)*                                    13

1    A.   Yes, sir, I do.

2    Q.   And you said that you met with both Kennon and Wanda,

3    both before and after they had worn their wire?  Do you recall

4    that?

5    A.   You're saying on each occasion or before they began

6    cooperating and after they finished their cooperation?

7    Q.   My question is, is it on each occasion or is it on some

8    of the occasions?  That's my question.

9    A.   On each individual recording?

10   Q.   Yes, sir.

11   A.   We always discussed with them the individuals they were

12   to go to get, you know, to have conversations with prior to

13   their doing that.  It wasn't always immediately before they

14   went to that location.

15   Q.   And then when they came back, did they tell you what

16   happened?

17   A.   Generally speaking, yes, sir.

18   Q.   Okay.  And as I understand your testimony, you didn't

19   generate, you didn't cause a 302 to be written up on the

20   before because that was the planning stages?  Is that your

21   testimony?

22   A.   Yes, generally speaking, we're attempting to gain

23   evidence, and they've already told us about their involvement

24   with the individuals that they were going to make recordings

25   with.  So there was no reason to put the planning of what they

BRIGGS - Recross (Mr. Pinales)                              14

1    might or might not happen during the recordings.  So we didn't

2    document that.  If it -- if what we discussed came out on the

3    tape, the tape will speak for itself.

4    Q.  And then, however, afterwards, not before, not the

5    planning, but afterwards when they came back and reported to

6    you, did that generate a 302?

7    A.  Not usually, no.  Typically what happened was some of

8    these recordings were lengthy, up to two hours.  If I take a

9    five- or ten-minute conversation with them as to who was

10   present, what generally was discussed, it would not be an

11   accurate representation of a recording.  So we let the

12   recording stand on its own.  In other words, the evidence was

13   the recording itself, as opposed to trying to summarize it in

14   a report and have inaccuracies or, you know, it would not be

15   complete.

16   Q.  So the answer to my question, as I understand it, you did

17   not generate a 302 when they met with you after they made a

18   recording and gave you information about the recording?  You

19   let the recording speak for itself?

20   A.  Correct.

21   Q.  Is that correct?

22   A.  Yes, sir, that's correct.

23          MR. PINALES:  I have nothing further.  Thank you.

24          THE COURT:  Mr. Westberry.

25          MR. WESTBERRY:  Thank you, Judge Reeves.

1                          RECROSS-EXAMINATION

2       BY MR. WESTBERRY:

3       Q.   Good afternoon again, Mr. Briggs.

4       A.   Yes, sir, good afternoon.

5       Q.   Got just a few questions for you.  You testified earlier

6       this morning, under some cross-examination by Mr. Abell, about

7       some of the candidates that these various individuals here at

8       the -- defendants at the table would either support or be

9       against.  Do you remember that general line of questioning?

10      A.   Yes, sir, I do.

11      Q.   I believe you also testified that these defendants,

12      individuals did not always agree on a particular candidate to

13      support in a particular race, correct?

14      A.   Yes.  We looked at a number of elections, including those

15      in the time frame of the conspiracy or indictment, some

16      before, some even after that.  So you're talking a number

17      of -- three, four, five, six elections.  And again, some

18      co-conspirators, they were all in line with some candidates

19      and other candidates they were not.

20      Q.   Talking about the 2002 race for Clerk of Courts, some of

21      the individuals here at the table supported Jennings White,

22      others supported Freddy Thompson, correct?

23      A.   Yes.  Most of them on the Doug Adams side supported

24      Freddy Thompson.

25      Q.   Now, in addition to the clerk's race, there were also

BRIGGS - Recross (Mr. Westberry)                                    16

1    races for sheriff, county judge, jailer, and state
2    representative that year, correct?
3    A.    On which year?
4    Q.    In '02, the May primary of '02.
5    A.    What were the candidates you said were on the ballot
6    again?
7    Q.    I said them quickly.  Not intended to be a trick
8    question.  Sheriff, do you recall there was a --
9    A.    I agree with that.
10   Q.    County judge executive?
11          MR. SMITH:  Your Honor, I'm going to object.  This
12   has been a matter which has, I think, been thoroughly examined
13   and --
14          MR. WESTBERRY:  It's leading to a question.  I'm just
15   trying --
16          THE COURT:  Lead to it a little quicker, if you
17   could.
18          MR. WESTBERRY:  Absolutely.
19   Q.    Judge and jailer.  I'll get to my question, Agent Briggs.
20   Can you name a candidate in the May, 2002 primary that all
21   eight of these individual defendants actually supported?
22   A.    I would like to look at a ballot of all the candidates.
23   Off the top of my head, I cannot think of one.  I know there
24   was some division that year between, of course, the county
25   judge -- I'm sorry, the county clerk and the jailer in 2002.

BRIGGS - Recross (Mr. Westberry)                                    17

1    Q.   All eight of the individual defendants here at the table,

2    one candidate that they all would have supported in the May,

3    2002 primary, if you can do that.

4    A.   I don't know that I would be able to do it if I looked at

5    the ballot sheet.  If I looked at the ballot of candidates, I

6    might be able to pick a candidate.

7    Q.   I think we heard you say you have been lead case agent, I

8    believe, since 2006; is that correct?

9    A.   Yes.  Around 2006.  Sometime in that time frame, the

10   third agent in line that had the case was transferred out of

11   the division, and I was named the case agent of the case.  But

12   I worked on the case with the previous agents.

13   Q.   You've worked on the case for a number of years, correct?

14   A.   Yes, sir.

15   Q.   And, of course, you've told us that you have been

16   present, if not for all of it, a significant amount of

17   testimony and evidence that's been introduced in this trial

18   over the past several weeks, correct?

19   A.   Most of it, sir, yes.

20   Q.   And again, I would just ask you, based on the years that

21   you've worked this case, particularly as lead case agent,

22   including taking into account the evidence that you've heard

23   while you've been in the courtroom, can you name one candidate

24   in the May '02 primary that all eight of these individual

25   defendants actually supported?

BRIGGS - Recross (Mr. Westberry)                                    18

1            MR. SMITH:  Your Honor, I object.  He's again asking

2      the witness to comment on evidence here in the trial.

3            THE COURT:  Sustained.

4      Q.   What other document would you need -- let me rephrase.

5      Take out the portion of the question about the evidence and

6      limit my question just to the years that you've worked this

7      case as lead case agent.  Three and a half, approximately,

8      years.  Can you name one candidate in the May, 2002 primary

9      that each of these individual defendants together would have

10     actually supported?

11     A.   I cannot think of one off the top of my head.  If there

12     were one that they all supported -- I know there was a great

13     deal of division because the White entity was still in power

14     at that time, as well as the other faction you see here.  So

15     it's very possible there was not one candidate that every

16     single one of them supported, if that's what you're asking.

17     That's possible, yes, sir.

18          But, I mean, you know, we've interviewed a great deal of

19     people in this case.  The people that came here to testify,

20     they lived the case, they experienced it, you know.  I would

21     refer to the testimony that the jury recalls of the witnesses

22     that came here.

23           MR. WESTBERRY:  Thank you, sir.  I appreciate your

24     candor.

25           THE WITNESS:  Thank you.

BRIGGS - Recross (Mr. Abell)                                    19

1          THE COURT:  Mr. White?

2          MR. WHITE:  No questions, Your Honor.  Thank you.

3          THE COURT:  Thank you.  Mr. Abell.

4                    RECROSS-EXAMINATION

5    BY MR. ABELL:

6    Q.  Mr. Briggs, do you know if, in 2008, there were any

7    stories in the local newspaper pertaining to Charles Weaver

8    having pleaded guilty in federal court?

9    A.  We cut all the newspaper articles out and put it in the

10   case file for various reasons to keep track of what the public

11   is aware of.  There were newspaper articles in the local paper

12   about that, but I don't recall the date of when those

13   appeared, sir.

14   Q.  Yesterday afternoon, you testified that the documents

15   that you got from my client's house on March 19, 2009 were

16   not, as of that date, publicly accessible.  Do you now retract

17   that testimony?

18   A.  Sir, I don't think I testified to that.  I think I

19   testified I was not sure as to when they were public.

20          MR. ABELL:  Nothing further, Judge.

21          THE COURT:  I'm sorry?

22          MR. ABELL:  I have no further questions, but I'd ask

23   the Court to take judicial notice regarding the matter we

24   discussed earlier this morning.

25          THE COURT:  The Court will take judicial notice of

20

1    the filing of certain documents in the case United States v.

2    Charles Newton Weaver, London Criminal Action Number 08-22.

3    The Court's taking judicial notice of the fact that the

4    document charging Mr. Weaver with a certain offense was filed

5    in the record on March 18, 2008.  And also on that day, the

6    order setting conditions of release was also filed in the

7    record.  It's March 18, 2008.

8              When the Court takes judicial notice of a fact, that

9    means the jury may accept that fact as proven without any

10   further proof being offered, but you're not required to do so.

11             Thank you.  Mr. Baldani?

12             MR. BALDANI:  I don't have any other questions,

13   Judge.  Thank you.

14             THE COURT:  See if anyone else has questions.

15             MR. GILBERT:  No questions, Your Honor.

16             MS. HUGHES:  No, sir.

17             MR. SIMONS:  No.

18             THE COURT:  Counsel if you could approach, please.

19                  (A sidebar conference was held out of the

20                  hearing of the jury):

21             THE COURT:  Mr. Smith, through questions of the

22   defendants, the impression's been given to the jury that in

23   order to sustain a conviction, it's necessary to establish

24   that the defendants all supported the same candidates in the

25   elections.  I do understand that that's not what's been

1    charged in the indictment.  If you wish the Court to give the

2    jury a cautionary instruction as to the purposes charged in

3    the indictment as set forth in paragraph 11 of the indictment,

4    I will do so at this time.

5         MR. SMITH:  Can I refresh my memory on that, please?

6    (Reviewing document).  Thank you.  United States would so

7    request.

8         THE COURT:  Mr. Westberry?

9         MR. WESTBERRY:  Respectfully, I would object to the

10   cautionary instruction just proposed by the Court.  Speaking

11   for Doug Adams, he has been charged in two counts relating

12   to -- for the reporter, Kent Westberry again on behalf of Doug

13   Adams.  I would object to the cautionary or limiting

14   instruction that the Court has just proposed.

15        The basis for my objection is as follows.  Doug Adams

16   has been charged in Counts 1 and 2 of the indictment with

17   conspiracies both to commit violations of RICO and money

18   laundering.

19        I believe the line of questioning that I posed to

20   Agent Briggs just a few moments ago was relevant to show a

21   lack of conspiratorial effort among not only Mr. Adams, but

22   with the other alleged co-conspirators.  My fear and my

23   concern with the cautionary instruction that has just been

24   proposed by the Court is that it goes too far, that it would

25   place us at a disadvantage from advancing the argument that

22

1    there was not a conspiracy among all of these defendants.

2              I've stated the basis for why I believe that was

3    relevant.  So I've given the best explanation I can in the

4    time period I've been allotted.  I would respectfully disagree

5    with the proposed instruction.

6              THE COURT:  All right.  On behalf of Mr. Stivers, I

7    know you take that same position.  I assume you agree with Mr.

8    Westberry?

9              MR. ABELL:  I do agree with Mr. Westberry, Judge, and

10   I'll add that Agent Briggs yesterday was asked questions

11   regarding the methods of this enterprise.  His testimony near

12   the conclusion of yesterday's -- of his testimony yesterday

13   was that the method was that the members of this enterprise

14   would line up in support of candidates identified by the

15   powers that be.

16             THE COURT:  Certain candidates, I think, was the term

17   that was used.

18             MR. ABELL:  And the government advanced in its

19   opening statement and identified Mr. Maricle and Mr. Adams --

20   the phrases used to describe them were king maker, the boss.

21   And testimony yesterday was that the method -- that they would

22   therefore be the powers that be that would anoint the chosen

23   candidate, and the members of this enterprise, therefore, it

24   must follow they'd line up in support of that candidate for a

25   particular race that this enterprise was going to support and

23

1    yield the benefits; contracts, et cetera, et cetera, that the

2    government claims were the benefits.

3         I think the government has presented evidence and

4    argument that their case is king makers and bosses identified

5    the candidate, and the rest of these folks, including my

6    client, lined up in support and went out and did various --

7    regarding Mr. Stivers, vote buying, et cetera, et cetera.  So

8    I would object for the reasons Mr. Westberry has stated and

9    for those reasons.

10        THE COURT:  All right.  Mr. Baldani wants to join in

11   the objection and perhaps add some additional comments.

12        MR. BALDANI:  I want to join on behalf of Freddy

13   Thompson in the objections of both previous co-counsel and

14   simply add that we didn't pursue that questioning, at least

15   with this witness, as an additional reason, Your Honor.

16        THE COURT:  You do acknowledge that one or more

17   defendants in the case have made the argument through their

18   questions that in order to sustain a conviction, that all of

19   these individuals would have to line up behind identified

20   candidates.

21        It's never been the government's position that that

22   was what they would prove, and that's not what's been alleged,

23   but that's certainly been the position that's been taken by

24   several defendants in the case, and it would be improper to

25   give that impression to the jury through questions or

24

1    arguments.

2         MR. BALDANI:  Judge, in response to that inquiry, I

3    would not acknowledge that we've stated that that's what it

4    takes to sustain a conviction.  I think we have properly

5    maintained that there is substantial evidence that these

6    individuals didn't conspire with each other, but I don't think

7    that you can take the leap from making that perfectly proper

8    point to saying that it's necessary to sustain a conviction.

9    I mean, your jury instructions are going to set out the law.

10   So I wouldn't agree that we have done that, and I would

11   object.

12         THE COURT:  I do not want the jury to be confused on

13   this point.  And based on the questions that have been asked

14   throughout the course of this trial and recently, I do think

15   that's the impression that has been given, so I am going to

16   give the cautionary instruction and advise that the charged

17   purpose of the defendants is set forth in the indictment.

18         Mr. Pinales?

19         MR. PINALES:  Your Honor, without any argument, I

20   just want the record to reflect we also agree with Mr. Abell's

21   position.

22         THE COURT:  I assume everybody --

23         MR. WHITE:  Same thing, yes, Your Honor.

24         THE COURT:  -- would join in this objection?

25         MR. SMITH:  While we're here, see if there's going to

25

1   be objections to taking judicial notice that Clay County is in

2   the Eastern District of Kentucky.

3           MR. WESTBERRY:  Well, I certainly have no objection

4   to taking notice that Clay County -- I'm speaking only for Mr.

5   Adams.  It's never been an issue to me.

6           THE COURT:  Let's see who has objections to that.

7   Anyone?  All right.

8           MR. PINALES:  I have a lot of objections, but not to

9   that, Your Honor.

10          THE COURT:  I'm sure there will be by the end of the

11  day.

12                      (Sidebar conference concluded.)

13          THE COURT:  Thank you.  Ladies and gentlemen, at this

14  time, I will give you further instruction that in order to

15  sustain its burden as to the first count, first charge of the

16  indictment charging a violation of the RICO statute, the

17  United States is not required to prove that all of the

18  defendants supported the same candidates in these elections.

19          It's alleged in paragraph 11 of the indictment that

20  the purposes of the defendants were to obtain, solidify,

21  preserve and expand for the defendants and their associates

22  political power and control within the county and personally

23  enrich for themselves and their associates, through the use

24  and misuse of the authority and power of the Board and the

25  offices of the circuit judge, superintendent of schools and

26

1    county clerk and the positions of election officers.

2            You are so instructed.

3            Let's see.  I believe we were up to -- anyone else

4    have questions of the agent?  Anything else, Mr. Smith?

5            MR. SMITH:  Not of this witness, Your Honor.  Thank

6    you.

7            THE COURT:  Thank you.  Special Agent Briggs, you may

8    step down at this time.

9            THE WITNESS:  Thank you.

10           THE COURT:  Mr. Smith, you may call your next

11   witness.

12           MR. SMITH:  Your Honor, the United States would

13   request of the Court to take judicial notice that Clay County,

14   Kentucky, is situated in the Eastern District of Kentucky.

15           THE COURT:  All right.  The Court at this time will

16   take judicial notice of the fact that Clay County is located

17   in within the Eastern District of Kentucky.

18           Again, whenever the Court takes judicial notice of a

19   fact, the jury may accept that fact as proven without any

20   further proof being offered, but you're not required to do so.

21   Thank you.

22           Mr. Smith?

23           MR. SMITH:  Your Honor, with that, the United States

24   would announce close of its case-in-chief.

25           THE COURT:  All right.  United States having

27

1    announced close, we will take a brief recess, ladies and

2    gentlemen.  We'll take approximately a 15-minute recess.

3    Please keep in mind the admonitions you've been given

4    previously not to discuss the case among yourselves while we

5    are in recess.  The jury will be excused for approximately 15

6    minutes.

7                    (The jury left the courtroom at 1:33 p.m.)

8            THE COURT:  Before we get to any motions under

9    Rule 29 of the Federal Rules of Criminal Procedure, I do want

10   to make some findings with respect to some of the statements

11   that have been admitted under 801(d)(2)(E).

12           The Court can accept conditionally testimony

13   concerning out-of-court statements of a member of the

14   conspiracy if it's established that, in fact, there was a

15   conspiracy, that the declarant was a member of the conspiracy,

16   that statements were made in furtherance of the conspiracy,

17   and the statement was made during the course of the

18   conspiracy.  Of course, the Court evaluates this testimony

19   under a preponderance of the evidence standard.

20           Prior to the trial beginning, there were a number of

21   motions in limine that were made to exclude several statements

22   of co-defendants, defendants in the case, and the Court issued

23   rulings with respect to those matters.

24           The Court finds that with respect to those

25   statements, the United States has established by the requisite

28

1    burden that a conspiracy was, in fact, in existence, that the

2    declarants made the statements that the Court accepted, the

3    declarants being the defendants, primarily, were members of

4    the conspiracy.  There were other members of the conspiracy,

5    and I'm going to identify some of those here in just a moment.

6         But the declarants on the tapes that the Court

7    admitted for the purposes of the truthfulness of the

8    statements were members of the conspiracy.  The Court again

9    finds that the statements were made in furtherance and during

10   the course of the conspiracy, and therefore the statements are

11   certainly admissible.

12        There were a number of other statements that were

13   brought out during the course of the trial that were not the

14   subject to pretrial rulings and were not the subject of

15   objections that were made, but the Court finds that these

16   statements as well, these out-of-court statements by members

17   of the conspiracy made in furtherance and during the course of

18   the conspiracy are also admissible.

19        They include meetings of vote buyers and vote haulers

20   with others that were conspiring with the defendants and

21   others to corrupt the elections in 2002, 2004 and 2006 by

22   either stealing votes, hauling votes, or buying votes.

23        That also includes a number of meetings that were

24   held in connection with these elections; meetings, for

25   example, at Paul Bishop's garage and various meetings at the

29

1    defendants' residences and garages as well.

2           There are a number of other statements that were made

3    that were admitted, and those statements were made outside the

4    scope of those various meetings but were made in the presence

5    of individuals that were being solicited to purchase votes.

6    The Court finds that those meetings, of course, include the

7    defendants, and they would be admissible under 801(d)(2)(E) as

8    well.

9           Approaching various candidates in order to extort

10   money from them would also be admissible.  And specifically,

11   statements or matters that were discussed between defendants

12   and the current mayor of Manchester would fall within the

13   scope of the Court's ruling.

14          Now, other members of the conspiracy that have been

15   identified and have been established by a preponderance of the

16   evidence that would have been making some of these statements

17   would include Yancey White, Charles Marcum, Judy Maricle,

18   Chris Duff, the various vote haulers and vote buyers that have

19   testified in the course of this proceeding and have been

20   identified in the course of this proceeding, Daugh White,

21   Anthony Short, Roy Morgan, Phillip Mobley, Jennings White,

22   Vernon Hacker, Darnell Hipsher, Barbara Colter White, Tim

23   Couch, Carl "Crawdad" Sizemore, Todd Roberts, Paul Bishop,

24   Mike Bishop, Bobby "Red" Sams, Ricky Whitehead, Edd Jordan,

25   Gary "Ouchie" Jackson, Deshae Henson, Earl Pennington, Charles

1    Stivers, Minnie Weaver, Crystal Bowling, Mary Gail Roberts,

2    Ella Wagers, Lucy Marcum, Anthony Gilbert, Robyn Pennington,

3    Oscar Gayle House, Raleigh Downey and Gary Gregory.

4            That's a partial list of individuals that the Court

5    finds were involved in the conspiracy that has been alleged in

6    the various elections.  The United States has established that

7    to the Court's satisfaction by the requisite standard,

8    preponderance of the evidence.

9            If the individual defendants wish the Court to make

10   more specific findings with respect to conversations that have

11   been testified to but for which an objection was not made

12   during the course of their testimony, I'll entertain your

13   objections at this time if you can identify the specific

14   conversations to which you would object.

15           Mr. Hoskins, start with you.

16           MR. HOSKINS:  Nothing specific, Your Honor.

17           THE COURT:  Thank you.

18           MR. WESTBERRY:  None that I can recall at the moment.

19   We had previously briefed this by limine motion, as the Court

20   knows.

21           THE COURT:  Yes, sir.

22           MR. WESTBERRY:  We tried to be, I think the Court

23   would recall, very specific in what we briefed to the Court.

24   I don't want to reargue that, but if I could make my record on

25   the previous motion.

31

1          THE COURT:  Yes, sir.

2          MR. WESTBERRY:  Thank you.

3          THE COURT:  Mr. White.

4          MR. WHITE:  Nothing more specific than what we've

5     already filed.  Thank you, Your Honor.

6          THE COURT:  Mr. Abell.

7          MR. ABELL:  Judge, I don't have any issue to raise on

8     that point at this time.

9          THE COURT:  Thank you.  Mr. Baldani.

10          MR. BALDANI:  Nothing to add to our pretrial motions,

11     objections, Bench conferences.

12          THE COURT:  Thank you.

13          MR. GILBERT:  No other specific objection.

14          THE COURT:  Miss Hughes.

15          MS. HUGHES:  Nor I.

16          MR. SIMONS:  None for me.

17          THE COURT:  Does the United States wish the Court to

18     make any further specific findings with respect to

19     out-of-court statements with regard to Rule 801(d)(2)(E)?

20          MR. SMITH:  No, Your Honor.

21          THE COURT:  Thank you.  If not, we'll move to any

22     motions the parties wish to make under Rule 29 of the Federal

23     Rules of Criminal Procedure.

24          Mr. Hoskins or Mr. Pinales.

25          MR. HOSKINS:  Thank you, Your Honor.  On behalf of

32

1    the defendant, Russell Cletus Maricle, we'd move for judgment

2    of acquittal under Federal Rule of Criminal Procedure 29.

3            As to Count 1, on the grounds that the enterprise

4    that the government has attempted to prove does not

5    sufficiently affect interstate commerce so as to meet the

6    statutory requirement.

7            THE COURT:  All right.  Mr. Smith, would you like to

8    respond to that issue?

9            MR. SMITH:  Your Honor, I believe that the United

10   States has set out, as to the issue of interstate commerce

11   being affected by this enterprise, numerous, numerous ways

12   which it has.  For instance, there have been showings that

13   these contracts that were a part and portion of the fruits of

14   the crime, where basically monies were being pooled and

15   ultimately materialized in contracts, that these contracts

16   were made up in part with federal funded programs such as the

17   rural development program, the PRIDE program, and these monies

18   made up both the garbage contracts and the construction of

19   sewer and water lines in the county and City of Manchester.

20           There's additional aspects of this case.  Of course,

21   interstate nexus is an element which there is a lesser and

22   lower showing required, by my understanding of the law on this

23   particular element.  Threshold, of course, as far as the

24   impact and the gravity of the impact of interstate commerce is

25   one which I believe we've shown, and I believe it's sufficient

33

1    to satisfy our burden going forward to the jury.

2         THE COURT:  I agree, Mr. Smith.  There has been more

3    than sufficient evidence presented with respect to interstate

4    nexus required under Count 1.  Therefore, the Court will

5    overrule Defendant Maricle's motion under Rule 29 of the

6    Federal Rules of Criminal Procedure.  Court believes that when

7    viewing the evidence in the light most favorable to the United

8    States that the Court could not conclude that no rational

9    trier of fact would agree with the defense with respect to

10   this issue.  So therefore, the motion will be denied.

11        Mr. Westberry?

12        MR. WESTBERRY:  Thank you, Judge.  Pursuant to

13   Rule 29 of the Federal Rules of Criminal Procedure, on behalf

14   of Doug Adams, I would move for a judgment of acquittal as to

15   both Counts 1 and 2 of that indictment.  Of course, it would

16   be premature to argue the forfeiture count at this point.

17        I would move to adopt and incorporate the arguments

18   just made by Mr. Hoskins on behalf of Mr. Maricle.  I would

19   say additionally, Your Honor, and briefly, of course, that we

20   think there's been an insufficiency of proof that would link

21   Mr. Adams' employment as superintendent of the Clay County

22   School Systems and maintaining of that employment to any

23   conduct on his part between the link to the alleged

24   criminal enterprise, the Board of Elections.

25        Excuse me.  I'm reading from notes.  Forgive me, Your

1    Honor.  I'm trying to say it as succinctly as I can.

2    Additionally, Your Honor, we don't think there's been

3    sufficient evidence to indicate that the funds that Mr. Adams

4    received as compensation during the years mentioned in the

5    indictment which, of course, were the years, partial years

6    that he served as superintendent of Clay County School Systems

7    constitute money laundering as laid out under the statutes and

8    the jurisdictional requirements of that.

9            Of course, the Court has already allowed us to state

10   our objections to 801(d)(2)(E), the hearsay issues that were

11   raised.

12           We would additionally object to much of the testimony

13   that was elicited as background evidence as previously argued

14   before the Court, and I think part of that was made in motions

15   in limine.

16           Again, the government has failed to establish that

17   Mr. Adams got and kept his job due to political influence as

18   has been specifically alleged in the indictment.  So that's a

19   failure of the sufficiency of proof argument.

20           If I may have just one second?

21           THE COURT:  Yes, sir, you may.

22           MR. WESTBERRY:  Additionally and finally, Judge

23   Reeves, with regard to Count 1 of the indictment, we would

24   move for a judgment of acquittal on that count based on

25   failure of proof by the government that would indicate Mr.

1    Adams maintained or attempted to influence either the Board of

2    Elections or any of the election officers in any of the

3    various elections that would fall within the time frame

4    mentioned in the indictment and outside.

5         I believe I've covered everything that we would

6    intend to cover in this motion.   Thank you, Judge.

7         THE COURT:   Thank you.   Mr. Smith?

8         MR. SMITH:   Your Honor, I believe that as to Count 1,

9    the government has, in fact, proven that there was a

10   conspiracy among members, including Douglas Adams, to utilize

11   what is otherwise a legal entity, the Clay County Board of

12   Elections, for an illegal purpose; that is, to accomplish

13   their scheme which included the acts enumerated in the

14   indictment of extortion.

15        We had numerous witnesses that testified as

16   candidates for, for example, city council who were told by

17   Doug Adams that to play -- or to win office in this city race,

18   you got to pay.   And they would testify about leaving cash

19   money in his desk drawer at the superintendent's office.

20        We had employees who testified that they were

21   employed by the school board and were told to get in line by

22   Doug Adams.   Line up with the way I tell you to vote, who I

23   tell you to support in this enterprise.   And when they didn't,

24   he exacted retribution by punishing them in their position

25   within the school board.

36

1          I believe that the indictment is clear and I think

2     our evidence is clear, Your Honor, that Douglas Adams does not

3     have to be employed by the Clay County Board of Elections to

4     be guilty of the offense of conspiring to commit racketeering

5     offenses under the charge.  He is associated.  He is a

6     political boss.  Those aspects which he utilized within the

7     confines of the trial evidence in this case clearly show that

8     we have met our burden of proof establishing that he is, as

9     alleged in the indictment, associated -- not employed by, but

10    associated with that enterprise to accomplish the illegal

11    purposes that we've enumerated.

12         As far as the issue of the money laundering, we heard

13    argument now that we have not satisfied our burden there.

14    This is a conspiracy count.  This is not a 1956 substantive

15    count.  It's a conspiracy count.  The question is, has the

16    government shown that members of this organization, including

17    Douglas Adams, came together and conspired, reached a mutual

18    understanding about why all this money -- why would hundreds

19    of thousand of dollars be put on the table in an election?

20         And obviously, our theory of the case, and I believe

21    the proof will substantiate that, is that it was put in there

22    for the purpose of promoting and concealing this unlawful

23    activity and ultimately resulting in not necessarily -- I

24    don't agree that the United States has to prove Douglas Adams

25    got his job as superintendent but for his occupation and

37

1    involvement in the enterprise, but he certainly sustained it.

2         He was a king maker.  He was a man in position of

3    power, and he utilized that to solidify and to preserve his

4    position as superintendent of schools, which, as we've shown,

5    is supported by vote of an elected body called the Clay County

6    Board of Education.  And he was involved intimately in making

7    sure that the Board chairman fought off the attempt of Dobber

8    Weaver, his challenge, and utilized the enterprise to

9    accomplish that.

10        So again, I believe that we have shown clearly that

11   the enterprise was active and that Douglas Adams was as well

12   active in utilizing it to accomplish his illegal purposes and

13   following acts that furthered this conspiracy as alleged.  So

14   as to 1956(h) and the RICO count, the government would argue,

15   Your Honor, that we have fully satisfied our burden and would

16   ask the Court to deny the motion.

17        THE COURT:  Thank you.  Considering all the testimony

18   that has been presented, including but not limited to the

19   testimony of witnesses such as Vernon Hacker, Denver Sizemore

20   and Jeff Deaton, it is clear that the United States has met

21   its burden of showing racketeering activity on behalf of

22   Defendant Adams.

23        Not only did he solicit money from individuals to

24   support candidates and applied pressure to obtain the support

25   of candidates, but he also accompanied other individuals as

38

1    they were distributing money to be used to pay voters in

2    various elections.  And it's clear to the Court that the

3    United States has offered sufficient proof that he utilized

4    his position, a position of power within the county, in order

5    to further the scheme and the goal of the -- what's been

6    alleged, the conspiracy and ultimately the enterprise itself.

7          With respect to the money laundering count, Count 2,

8    the Court believes that the United States has offered

9    sufficient proof to establish a conspiracy to launder money in

10   the manner which the United States has outlined in its

11   response.  And therefore, the motion, the Rule 29 as to

12   Counts 1 and 2 on behalf of Defendant Adams will be denied at

13   this time.

14         Mr. White.

15         MR. WHITE:  Thank you, Your Honor.  Scott White on

16   behalf of Defendant Jones.  I would just like to move pursuant

17   to Federal Rule of Criminal Procedure 29 as to Counts 1 and

18   Count 4.  Count 1, I don't need to be heard on.  I've already

19   set out our basis in terms of our motion to dismiss, which the

20   Court denied pretrial.

21         Just for the record would state that the applicable

22   test as to whether interstate commerce has been affected by

23   the enterprise is has the enterprise involved itself in

24   interstate commerce.  Our position would be it is not.  It is

25   essentially an intrastate entity.  And do the activities of

39

the enterprise itself affect interstate commerce.  Other than

the federal election, which is a federal election within

Kentucky, our position is, again, it's all intrastate.

As to Count 4, Your Honor, though, that count deals

with 18 U.S.C. Section 1951, interference with commerce by

threats or violence.  The statute goes on.  As I understand

the indictment, the indictment doesn't allege threats of

violence but rather relies upon the statutory term of art,

extortion, which is defined in the statute.  And I'm not going

to read it to the Court.  The Court has it there in front of

it.

I would just simply say that the evidence, viewed in

the light most favorable to the United States, is that my

client approached Mrs. Lewis on -- I believe my count is three

separate, distinct occasions and essentially asked for a

thousand dollars, and that that money was going to be used to

go into a pool to either buy votes or to illegally -- or to

haul votes in an illegal fashion and that if she didn't

participate, she couldn't win.

There were no threats of violence, and there was no

evidence that Mr. Jones used his position as the appointed

commissioner, Democrat commissioner on the Board of Elections.

So our position would be is that the United States

has failed to adduce sufficient evidence to satisfy the

definition of extortion under that statute.  And that's all I

40

1    would have, Your Honor.

2         THE COURT:  All right.  Thank you.  Mr. Smith, would

3    you like to respond with respect to Count 4?

4         MR. SMITH:  Yes, Your Honor.  I do again believe that

5    we have fully satisfied our burden under Rule 29.  As to the

6    issue of interstate commerce, of course, again, the affect on

7    interstate commerce is a diminimus effect.  In other words,

8    some analysis.

9         But I believe that we've had showing upon showing

10   that this candidate was applying as a candidate for a position

11   with city council.  And city council, through the Board

12   meetings, through the testimony in this case and the minutes

13   of the Board meetings, we have shown, I think, instance after

14   instance where they're approving contracts with federal funds

15   involved.

16        And obviously, the issue about the 1951 extortion,

17   simply put, Charles Wayne Jones was the Democrat commissioner

18   on the Board of Elections, and one of the election officers at

19   the time was William E. Stivers.  They were acting at the time

20   these threats were made under official titles.  And they

21   weren't just, oh, Miss Carmen Webb Lewis, would you mind

22   giving us a thousand dollars?  It wasn't that.  It was a

23   threat.  It was basically, you pay us or you will not win.

24        And there were other candidates who came forward and

25   said one or more of these defendants did the same thing to

41

them.  But I think that clearly, this was a threat.  And I
don't think that it is necessary that there be a gun pulled,
but I think the fact that they're in a position under color of
official right.  They demand this money, it's a pay to play
kind of scheme.

        And I believe that the evidence was clear, there were
at least three occasions with this one candidate, Carmen Webb
Lewis, as she testified, I believe, and that her testimony
alone is sufficient to satisfy our burden, and we would argue
that the motion should be denied.

        THE COURT:  Thank you.  With respect to the issue of
affecting interstate commerce, I do believe that, again, that
there is sufficient evidence in the record to more than
sustain the United States' burden with respect to that issue.

        The second issue, and that is whether Miss Lewis was
either threatened or there was a threat of the use of economic
harm or other force or whether she was placed in fear by
virtue of the statements that were made, is a jury issue.  And
there is sufficient evidence for this matter to go to the
jury, but ultimately that is the jury question that's
presented, and the Court doesn't resolve those issues under
Rule 29.

        So therefore, that is a matter that will be submitted
to the jury.  The motion for judgment of acquittal as to
Counts 1 and 4 as to Mr. Jones will be denied as well.

42

1          MR. WHITE:  Thank you, Your Honor.

2          THE COURT:  Thank you.  Mr. Abell.

3          MR. ABELL:  Judge, pursuant to Federal Rule of

4    Criminal Procedure 29, on behalf of my client, William E.

5    Stivers, I move for a judgment of acquittal as to Counts 1 and

6    2 and 4 of the superseding indictment.

7          Briefly, with regard to Count 1, I want to elaborate

8    just a little bit on the arguments that have previously been

9    made to make my record clear.

10          THE COURT:  Yes, sir.

11          MR. ABELL:  If this enterprise consists and ends

12    based on control of Clay County Board of Elections, it is a

13    non-economic, non-commercial entity.  And if that's the

14    enterprise, it's effects on interstate commerce, the evidence

15    cannot sustain the interstate commerce element.

16          Now, I understand the arguments to be that we need to

17    extend basically two steps beyond that to reach interstate

18    commerce effect, which, given its non-commercial nature, must

19    be substantial.

20          Those two steps are, A, control of the Board of

21    Elections produces the election of an appointed candidate.

22    And with regard to the testimony yesterday by the case agent,

23    Mr. Briggs, it was that the method of this enterprise was for

24    the powers that be, who have been identified previously as

25    Cletus Maricle and Douglas Adams, the enterprise then

43

1   consisting of those folks, my client and I suppose the rest of

2   the defendants would be to line up in support of the candidate

3   identified by the powers that be.

4       That candidate then, the second step, is elected.

5   And then, according to what I'm hearing, the effects of the

6   interstate commerce occur by way of contracts, et cetera, et

7   cetera, et cetera.

8       The evidence, I respectfully submit to the Court,

9   regarding my client's participation in the conspiracy to reach

10  that interstate commerce effect that's necessary to sustain

11  the burden of proof is insufficient.

12      Let me turn to Count 4.  I respectfully disagree with

13  Mr. Smith's comments that at the time of the discussion

14  between Mr. Stivers and Miss Lewis that he was a public

15  official.  I don't believe the evidence shows that he was.

16  And to the extent that an election officer is a public

17  official and capable of exercising public powers, that occurs

18  between 6:00 a.m. and 6:00 p.m. on election day.  Not before

19  and not after.

20      These discussions that she testified about took place

21  well before election day or at a time when Mr. Stivers was

22  capable of exercising any official power, the powers of any

23  office.

24      1951 can be violated in two ways.  One is by threat

25  of force.  Two is by offering to use or not to use official

44

1    power.

2              Now, the threat can take place, you can have bodily

3    harm or be concerned about your ability to compete in an

4    economic marketplace.  If I don't pay these people this money,

5    my business will suffer.  But 1951 is not met by concern of an

6    inability to compete in a non-economic marketplace; more

7    specifically, a political race.  So the evidence must fail on

8    that point.

9              Secondly, if the evidence were that he is suggesting

10   or offering to use or not use his official power, the money,

11   as the proposal according to the testimony is that the money

12   not be paid to Mr. Stivers or even to Mr. Jones, but that it

13   be given to a third party, Vernon Hacker, who then would

14   distribute it to voters that Mr. Hacker would distribute.

15             Now, I grant that Mr. Hacker was a city councilman

16   and an office holder.  But the actions it was suggested

17   according to the evidence that he take did not include use of

18   his official powers.  He may have been an officer, but he

19   wasn't using his office to do what he was supposed to be

20   doing.  They weren't giving money to a public official who was

21   then going to use or not use his official powers.

22             For those reasons, I respectfully submit the evidence

23   as to Mr. Stivers as to Count 4 fails.

24             I also mentioned Count 2.

25             THE COURT:  Money laundering count?

45

1          MR. ABELL:  Money laundering.

2          THE COURT:  Conspiracy.

3          MR. ABELL:  I incorporate the same points with regard

4    to Count 1, and M15 showed that Mr. Stivers alone had a zero.

5    He wasn't mentioned in M15, which recited the total of

6    payments to the defendants.  And I therefore submit that the

7    evidence as to him, as to money laundering fails.

8          THE COURT:  Of course, you do understand the United

9    States' position that Count 2 is a conspiracy to launder

10   money?

11         MR. ABELL:  I do.

12         THE COURT:  All right.  Thank you.  Mr. Smith, would

13   you like to briefly respond to the additional arguments?  You

14   can respond to all of them, but specifically to the additional

15   arguments that Mr. Stivers was not acting in an official

16   capacity at the time that he approached Mayor Lewis to attempt

17   to obtain a thousand dollars to be used for vote buying.

18         MR. SMITH:  Your Honor, I would cite to the Court,

19   obviously, there's examples in the Sixth Circuit.  I recall

20   the Collins case being one in which the spouse of a governor

21   had been brought into issue, and I think there was a question

22   about whether or not he had official position, and I believe

23   the Court said it wasn't required in 51.

24         I believe we have a situation here where obviously,

25   William Stivers has been an election officer in and out of

1    these elections from 2002 through and past this 2004 date,

2    which he extorted the money or attempted to extort the money

3    from the candidate, Carmen Webb Lewis.

4         The fact is she was under a perceived threat.  It was

5    one which this organization had carried out time and time

6    before.  They had shown if you didn't get in line with them,

7    you were going to be a whiteout.  You were going to be a

8    whiteout.  You pay to play.  That was the threat.  That was

9    what was communicated.  He was acting under color of official

10   right.

11        There is no requirement that he had to have, the day

12   of September date uncertain of 2004, the certification from

13   the Board of Elections that he was acting for them on that

14   day.  He came, representing again with Charles Wayne Jones,

15   the commissioner, which that's not disputed.  He was the

16   Democrat election commissioner for the county.  And these two

17   men come in tandem to this candidate three times, and you pay

18   to play.

19        And I believe that there's no more that the

20   government is required to show that it have to be under the

21   color of official right.  And I believe that the fact that he

22   came as the circumstances have been portrayed by the witnesses

23   and evidence in this case, it's clearly sufficient under 51 to

24   meet those elements.

25        I stand on a position that the interstate commerce

47

1    element has been shown to be clearly addressed not only as I

2    mentioned through the contracts, but we have federal elections

3    on each of these 2002, 2004 and 2006 federal candidates that

4    were affected.  Specifically, Hal Rogers was called out by

5    Wayne Jones and told, in testimony in the case, you do

6    everything you can to vote one against Hal Rogers.

7         So I think there are multiple instances in this case

8    where this scheme affected federal candidate seats, federal

9    dollars, and also the ability for contractors in other areas

10   of the state and outside the commonwealth to even participate

11   in a bidding process in Clay County, Manchester, which was

12   totally controlled by the powers of this enterprise.

13        And so I think that in totality, Your Honor, again,

14   these arguments, while again trying to make a distinction

15   which I believe is without a difference in each of these

16   elements, the government has proven not only the interstate

17   element, but the elements under 51.

18        THE COURT:  All right.  Again, with respect to

19   Count 1, RICO charge, I do believe there is sufficient

20   evidence of interstate nexus for the reasons stated and also

21   for the reasons that Mr. Smith has just highlighted.

22        Likewise, the Court believes that it's not necessary

23   to establish that Mr. Stivers received financial benefit under

24   Count 2 to establish the conspiracy that's been alleged in

25   Count 2.  His total may be zero, but the United States may

48

1     still be able to sustain a conviction based on the evidence

2     that has been presented.

3          With respect to Count 4, it is alleged that the

4     defendant acted under color of official right, and Mr. Smith

5     is correct in the cases that he's cited.  Therefore, the Court

6     believes that sufficient evidence has been presented with

7     respect to those three counts that are subject to the motion

8     under Rule 29.  Therefore, the Defendant Stivers' motion to

9     dismiss those counts will be denied at this time.

10         Move on to Defendant Thompson.

11         MR. BALDANI:  Thank you, Your Honor.  Pursuant to

12    Rule 29, Mr. Thompson would move for directed -- for a

13    judgment of acquittal as to Counts 1, 2, 3, 5, 6, 7, 9, and

14    11.  I would join the motions, not waste the Court's time,

15    reiterating interstate commerce arguments and the arguments

16    that have previously been raised and rejected.

17         With regard to RICO, I would add additional grounds,

18    Your Honor, that I don't believe that the government's made a

19    sufficient showing of an enterprise or a pattern of activity.

20         Mr. Thompson stands charged in several counts that

21    the others aren't, and they all have to do with -- or several

22    of them have to do with mailing in what's alleged to be

23    fraudulent returns in May and fall of '04 and '06.  Regarding

24    those counts, I'll speak to them as a group.  I hope that's

25    okay.  Basically -- because my argument is the same, Your

1    Honor.

2            And that would be Mr. Thompson didn't have any

3    interest in those -- I don't think he had any personal

4    interest in those elections of '04 and '06.  And most

5    importantly, Your Honor, I don't think that a rational trier

6    of fact would conclude that he knowingly and with intent

7    submitted fraudulent returns, mailed in fraudulent returns.

8            With respect to the obstruction of justice Count 9,

9    Your Honor, I don't believe that the testimony that was

10   elicited from the July, '07 grand jury that we found out was

11   the government's basis of that count, I don't think that any

12   rational trier of fact could conclude that Mr. Thompson

13   intentionally obstructed justice or even lied to the grand

14   jury.  There was an issue of voter assistance forms, Your

15   Honor.  The government's own witness testified he saw Anthony

16   Short throwing them away.

17           THE COURT:  Well, didn't Wanda White also testify

18   that she was assured by Mr. Jones that Mr. Thompson had taken

19   care of those forms and so there is some proof that, if the

20   jury believes it, certainly could support a conviction as to

21   that count.

22           MR. BALDANI:  Right.  And then there was the

23   recording on which Al Man Stivers said, referring to Jones and

24   Thompson, said they took care of it.  So there was those two

25   things, Your Honor.  I would agree to that.  But I don't think

50

1    those would overcome the proof that I feel we've elicited

2    through the government's case to the contrary.

3           Also, Your Honor, one thing I'd like to ask, you read

4    part of the indictment to the jury before they were -- before

5    they left, and I would ask that you follow up with reiterating

6    the fact that the indictment is not evidence of guilt.  Of

7    course, this doesn't have anything to do with Rule 29, but

8    that whole issue came upon us kind of quickly.  I think since

9    you read a portion of the indictment, I would move on behalf

10   of Mr. Thompson that you again advise the jury about the

11   presumption of innocence and the fact that the indictment is

12   not evidence of guilt.

13          THE COURT:  I will include that in the final

14   instructions that are given to the jury at the conclusion of

15   the case.  Of course, at the time I read the indictment

16   originally in the case, I advised them that the indictment was

17   not evidence and so I will do so again at the conclusion of

18   the case.

19          MR. BALDANI:  That's all I have to say regarding

20   Rule 29, Your Honor, reserving the right obviously to renew it

21   at the end of all proof.

22          THE COURT:  Thank you.  Mr. Smith, do you wish to

23   make additional comments with respect to the arguments made on

24   behalf of Mr. Thompson?

25          MR. SMITH:  Your Honor, the United States would just

51

again state that as to Count 9, I believe that there were

multiple aspects of untruthfulness that Freddy Thompson showed

to the federal grand jury, including his statement about voter

assistance forms.  But also, his statement that Wayne Jones

didn't have anything to do with machines and that essentially,

I believe if the jury believes our evidence, that Wanda White

and Dobber Weaver both testified as election officers that

they were taken aside and trained specifically by Freddy

Thompson and Charles Wayne Jones on how to steal these votes.

There is also the overall impression that Freddy

Thompson gave in his testimony that really there were no

problems in Clay County election in 2006.  Yet, we have state

officials who enumerated over 100 complaints came from Clay

County alone regarding these machines and specifically

contacting Freddy Thompson and telling him about it.

He portrayed to the grand jury that really, there

were just a couple of disgruntled candidates and that's

basically it.  And really, that's it.  Really.  And I think

that a jury can find, based on that evidence and other

evidence that we have presented in this case, that he had a

corrupt motive to influence, also obstruct and impede the due

administration of justice by testifying falsely to the federal

grand jury.

And I would also state that as to the money, I guess

the mail fraud counts, the Court may help me recall his

52

1    specific argument there in regard to the mail fraud, but --

2         THE COURT:  I believe part of the argument was that

3    Mr. Thompson wasn't running in some of the elections in which

4    he allegedly engaged in.

5         MR. SMITH:  Certainly.  He was brought into the

6    enterprise as a county clerk, and he was called into action.

7    He's a member of the Board of Elections.  He's the chairman of

8    the Board.  He's the person who is in charge as chairman of

9    the Board presiding over these meetings where these corrupt

10   election officers were endorsed by this enterprise.  He was

11   part of the enterprise which, again, taught election officers

12   how to steal votes.  Personally involved in that.

13        There is sufficient evidence, I believe, Your Honor,

14   to show that Freddy Thompson was an integral part of the

15   success of this enterprise.  And as part of that, it had to

16   again involve these honest services mail fraud counts, which

17   again, I think we've established that in order for this to

18   succeed, the candidates had to not only get the votes, but had

19   to be certified.  And to be certified, they had to mail these

20   results that were corrupted by their scheme in the mail.

21        So I believe that, again, that's a red herring.

22   Whether or not Freddy Thompson is on the ballot really has

23   nothing to do with him being an operative of the enterprise as

24   the county clerk and, again, in these multiple acts of mail

25   fraud.

53

1          THE COURT:  All right.  Thank you.  Well, there is

2     sufficient evidence that Mr. Thompson became involved in the

3     enterprise, in the conspiracy prior to the 2002 election,

4     which he ran for the county clerk against Jennings White.

5     He's charged in Count 1, which is the RICO charge, Count 2,

6     which is the money laundering charge, and then in several

7     counts involving 1341 and 1346.  The evidence is sufficient,

8     under Sixth Circuit authority, to sustain a conviction as to

9     Counts 3, 5, 6, and 7, which alleges theft of honest services

10    under those statutes that I've just mentioned in various

11    elections.

12         He may have had less of a motive to engage in illegal

13    activities in the elections in which he was not running.  That

14    doesn't mean he did not have a motive, and there is certainly

15    evidence to support that his conduct was illegal as alleged in

16    the statutes.  So there is sufficient evidence under those

17    counts.  Also, there is sufficient evidence to support the

18    obstruction charge contained in Count 9 and also the other

19    charges under Title 18, Section 241 in Count 10 and the vote

20    buying charge in Count 11.

21         There is evidence that Mr. Thompson not only

22    participated in the activities prior to the 2002 election, but

23    he continued in those activities in conjunction with Mr. Jones

24    in directing others to steal votes, for example, in the 2006

25    election as was testified by Charles Weaver and, also, Wanda

1    White.

2            There is also sufficient evidence from other

3    witnesses that he engaged in illegal activities which have

4    been alleged in those counts.  Therefore, the motion under

5    Rule 29 will be denied as to Freddy Thompson.

6            Next, we come to William Morris.

7            MR. GILBERT:  Your Honor please, on behalf of

8    William B. Morris, we move the Court under Federal Rule of

9    Criminal Procedure 29 for a judgment of acquittal and would

10   simply join the prior arguments that the government has

11   produced insufficient evidence with respect to the nexus,

12   sufficient nexus for interstate commerce.

13           THE COURT:  All right.  The Court will again adopt

14   the position, the statements that were made earlier with

15   respect to the other defendants as to the interstate nexus

16   issue.

17           Considering the testimony presented against Mr.

18   William Morris, that would include the testimony of witnesses

19   such as Todd Roberts, Vernon Hacker, Kennon White, Wanda

20   White, Dobber Weaver, William Goins, James Douglas Coleman,

21   Carl Curry, Bobby Sams, there's sufficient evidence to sustain

22   a conviction as to the RICO count and, also, as to the money

23   laundering count and the Count 11 vote buying charge involving

24   the 2006 election.  So the motion will be denied as to

25   defendant William Morris.

55

1          Next, on behalf of Debra Morris.

2          MS. HUGHES:  Thank you, Your Honor.  I would simply

3    adopt -- I will move for judgment of acquittal on Counts 1, 2

4    and 11, which are the three counts against Miss Morris.  I

5    would simply -- I do not want to re-debate issues that have

6    already been debated and would adopt the legal arguments with

7    respect to Counts 1 and 2 that have been previously discussed.

8          I would move for a judgment of acquittal in addition

9    on the general basis of the insufficiency of the evidence as

10   it relates to Mrs. Morris.  Thank you.

11         THE COURT:  All right.  Thank you.  Again, the

12   Court's ruling would be the same with respect to Miss Morris.

13   There is evidence that she was the person that not only

14   handled the money in the variation elections, she paid out the

15   money to the vote haulers and vote buyers, but she also kept

16   the books and she maintained a list of those that had already

17   voted and had been paid for their votes to avoid any double

18   payments, and there is certainly sufficient evidence that she

19   involved herself in the activities that are alleged in Count

20   1, as well as Count 2 and Count 11.  Therefore, the motion

21   will be denied as to defendant Debi Morris.

22         Finally, defendant Stanley Morris, who I believe is

23   identified in two counts, Counts 1 and 2, the RICO count and

24   the conspiracy to launder money in Count 2.

25         MR. SIMONS:  Yes, Your Honor.  It's Stanley Bowling.

56

1    I think you said Stanley Morris.

2            THE COURT:  I'm sorry.  I apologize.

3            MR. SIMONS:  I would move on behalf of Stanley

4    Bowling under Rule 29 for a verdict of acquittal, please, and

5    adopt the arguments of my colleagues around the table with

6    respect to most matters and point out two additional features.

7            As I've addressed with the Court many times before

8    and there's been additional proof taken in this case that was

9    not available earlier junctures in the proceedings, I would

10   submit to the Court that Stanley Bowling's grand jury

11   testimony was used, in fact, by the government in the

12   development of both of the counts in which he stands charged,

13   Count 1 and 2.  That his testimony was in January of '07, and

14   Agent Briggs yesterday testified that after that testimony, he

15   confronted Kennon White and gained his cooperation and that of

16   his wife.

17           All of the evidence was developed thereafter.  In

18   fact, Ms. White, I think it speaks well of the exhibit, made a

19   list of folks that was turned over to the FBI and from that

20   list, all of the witnesses who offered testimony against my

21   client were generated.  And those were done after or as a

22   direct or indirect use of Mr. Bowling's grand jury testimony.

23           Second thing that I would -- three things I would

24   like to posit to the Court.  Secondly, the evidence of

25   election practices with Mr. Bowling ends, it seems like

57

1    there's no substantial evidence of any involvement in 2004,

2    2006 on his behalf.  I would point that out as the defeat of

3    the RICO conspiracy.

4         Lastly, with respect to the Count 2 money laundering

5    charge, specifically, the government has failed to show a

6    nexus between Mr. Bowling's position as management and the

7    contracts he generated through the City.  Thank you.

8         THE COURT:  All right.  Thank you.  As to the first

9    issue of whether immunized testimony was used, the Court has

10   made a number of rulings with respect to that issue.  And

11   nothing that has been presented in the form of testimony and

12   evidence in this case in any way alters the Court's previous

13   determinations that immunized testimony was used, and the

14   Court finds that argument to be without any basis whatsoever

15   and would not require a response from the United States.

16        Mr. Smith, however, if you want to respond to the

17   additional arguments, you may certainly do so.  The Court

18   believes that there is sufficient evidence to sustain a

19   conviction as to both Counts 1 and 2.

20        The money laundering count, there is specifically

21   sufficient evidence that the defendant used his position and

22   engaged in vote buying activities throughout the time period

23   that's charged, time of the conspiracy that has been alleged.

24   If you'd like to respond further, you may do so.

25        MR. SMITH:  Your Honor, I just would recall that

58

1    there were numerous witnesses who specifically pointed to

2    Stanley Bowling's operation again with the enterprise,

3    injecting money, handling money, buying votes, opening up his

4    garage as a point of operation, and there were also subsequent

5    testimony that Mr. Bowling and Mr. Morris, while initially in

6    2002 were divided in their loyalties, they came completely on

7    board with the other members of the Doug Adams faction later

8    in 2004 and 6 and became ultimately essential in continuing

9    the success of that enterprise.

10        I would argue that even if there was no evidence in

11   2004 or 6, Mr. Bowling was involved.  The conspiracy alleges

12   that members go back to 2002.  Even if he were only -- and I

13   don't agree that he was, but even if he was only a part of the

14   scheme in 2002, it's still sufficient to carry our burden.

15        And again, for purposes of the record, his role was a

16   dual purpose.  Here is a magisterial office holder, as

17   magistrate, and also seeking election in 2002, reelection in

18   2006, and then obviously benefitting from the contracts which

19   the city council was awarding him or condoning instances where

20   there was no bidding required.

21        Mayor White, his son complicit in that, again

22   approving that he gets this.  And again, I believe that that's

23   fruits from his participation in the enterprise and further

24   substantiates both Counts 1 and 2.

25        THE COURT:  For the reason previously stated, and Mr.

59

1    Smith, I do agree with your analysis of the evidence against

2    Mr. Bowling, but for the reasons previously stated, I will

3    deny the motion under Rule 29 as to Defendant Stanley Bowling.

4         We'll take a ten-minute recess before the jury comes

5    back in for the opening statement of Debra Morris.  We'll ask

6    the security officers to move the podium around, if Miss

7    Hughes would like to use the podium for the opening statement.

8    I understand you'll take about 30 minutes for the opening?

9         MS. HUGHES:  Hopefully a little less.

10        THE COURT:  All right.  We'll take approximately a

11   ten-minute recess.  You can advise the jury we'll be ready in

12   about 10 minutes.  I told them 15 minutes, but I was wrong

13   again.  Thank you.

14             (Recess from 2:26 p.m. until 2:38 p.m.)

15             (The jury entered the courtroom at 2:38 p.m.)

16        THE COURT:  Thank you.  The record will reflect that

17   all members of the jury are present.  Parties and counsel are

18   also present.

19        Ladies and gentlemen, as you will recall, Miss Hughes

20   on behalf of Debra Morris reserved her opening statement at

21   the beginning of the case, so she'll present her opening

22   statement to you at this time and then we'll continue with

23   presentation of proof by the defendants.

24        Miss Hughes.

25        MS. HUGHES:  Thank you, Your Honor.  May it please

60

1    the Court.

2              THE COURT:  Miss Hughes.

3              MS. HUGHES:  Counsel, ladies and gentlemen of the

4    jury.  It is quite strange that we're having an opening

5    statement on what I calculate to the day after our fifth

6    anniversary together, but I did reserve my opening statement

7    so I could have the opportunity to speak with you for a few

8    moments now.

9              That being said, I'm painfully aware that everyone in

10   this courtroom wants to avoid delay if at all possible, and we

11   all want to move along with the presentation of evidence, as

12   efficiently as possible.

13             As Judge Reeves told you at the beginning in the

14   preliminary instructions, what I have to say is not evidence.

15   And so by standing here, I understand that I am, in fact,

16   delaying the presentation of evidence.

17             So as I outline what I wanted to say in my opening, I

18   thought primarily, I don't want to waste anyone's time; not

19   yours, not mine, not the Court's.  And I hope that I am able

20   to talk about the evidence and the charges in a manner that is

21   helpful to us all, because it is a rather unique opportunity

22   to take a break at this point -- a brief break, I promise --

23   at this point in the trial and take a look at where we are now

24   that you've had the benefit and the context of the proof

25   you've heard thus far.

61

1          And in trying to figure out what would be helpful, I

2     hate to say it, but I thought that I would revisit something

3     that the government prepared and showed you at the beginning.

4     Mr. Smith prepared this poster.  I had it reproduced.  I

5     completely stole his work product, I'll admit it, but I

6     thought it was accurate, and I thought it was helpful, and I

7     thought it would be helpful to us now because it's been, as I

8     said, more than five weeks ago that the Court read the

9     indictment to you and more than five weeks ago that Mr. Smith

10    went over this chart with you.

11         I, of course, am not worried about most of the chart.

12    I'm worried about this column, Debra L. Morris.  And as you

13    will see, these are the different counts against each of the

14    defendants.  Mrs. Morris is charged in Count 1, along with her

15    husband.  They're charged identically, in Counts 1, 2 and 11.

16         Count 1 is -- since this is my copy, I'm going to

17    write on it.  Count 1 is the RICO count.  That's Racketeering

18    Influenced Corrupt Organizations Act.  This is a conspiracy

19    charge that alleges that all eight of the defendants conspired

20    to violate RICO.

21         Count 2 -- well, and let me also say there are some

22    dates in the indictment that don't appear on here.  The dates

23    of the alleged conspiracy, according to the indictment, to

24    violate RICO are March, 2002 through July 17, '07.

25         Count 2 is the money laundering count.  And again,

62

1    that is a conspiracy count.  It involves all eight defendants,

2    an allegation that all eight conspired together to commit the

3    offense of money laundering.  I'll write "ML" there.  And

4    again, it's the same dates, 2002 through a specific date in

5    2007.

6         Then I'm going to jump through all these others and

7    go down to Count 11, which is again a conspiracy count.  It is

8    a charge that not all eight -- Mr. Adams and Mr. Bowling are

9    not charged in Count 11, but it is an allegation that the

10    remaining defendants conspired to violate the federal voting

11    rights act and, in its simplest form, the Court's going to

12    instruct you to follow what the instructions say, not what I

13    say.  But in its simplest form, this is an allegation of vote

14    buying; that you pay someone for their vote.  And this is

15    2006.

16         So those are the three charges that I'm concerned

17    about addressing today in my opening statement.

18         Because it relates to just one year, I'm going to

19    start at the bottom and talk to you for a moment about this

20    allegation in Count 11, a conspiracy to buy votes in 2006 by

21    the identified defendants.  And in doing that, I've prepared a

22    chart of my own.  You'll see that it's not nearly as good as

23    the government's.  It is black and white and has no color and

24    no graphics, but I think it is helpful to us to talk about

25    dates and keep the elections in order.

63

1          The folks at my table are calling me the date lady

2     because I ask questions about the dates.  And as you can see,

3     for these reasons, we are concerned about the dates and when

4     things happened, and a lot of times you put things into a time

5     frame by what the elections were.

6          So I thought it would be helpful for us to talk about

7     the dates.  I've tried to put the 2002 election right here,

8     spring and fall, primary, general.  2004, the same.  And 2006,

9     the same here.

10         I've made reference to the exhibits.  These are

11    exhibits that have already been introduced into evidence.

12    These are the spread sheets where each of these elections are

13    tallied up.  I personally have found these exhibits to be very

14    helpful, and I'm sure that you will as well to go back and see

15    who's on the ballot at a certain time, what precincts voted

16    how and it also sets out the absentee ballots.

17         May 28th, 2002, that's the biggie, of course.  That

18    is the Republican primary between Jennings White and Freddy

19    Thompson, where Mr. Thompson prevails.  This is also the

20    election where Kennon White decided that he would run for

21    jailer against Mr. Marcum, and Mr. Marcum won.  And this is

22    the election where Barbara Colter, who was the incumbent, was

23    being challenged by Tim Couch, again in the Republican

24    primary, and Mr. Couch prevailed.

25              In November, on November 5, 2002, this is the general

1    election in 2002.  Let me stop for a minute and point out,

2    these are not the only elections that were on the ballot on

3    these particular dates.  These are simply the ones there's

4    been evidence about more than others for example.  In 2004,

5    there is a presidential election, but I haven't put it on the

6    chart.

7         2002, the general election, this is when Mr. Bowling

8    was running for magistrate for the first time against Mr.

9    Jones' brother.  We've heard testimony, this is where Mr.

10   Weaver, Dobber Weaver, was running against Mr. Keith for the

11   school board, and there was a city council race.

12        The proof has been, I believe, that the city council

13   runs every two years, and you'll find those elections in the

14   fall, because although they file prior to the primary, if

15   there aren't a certain number of candidates, then they don't

16   have to be on the ballot in the primary.  They'll just appear

17   in the fall.

18        All right.  May 18, 2004, this is the 2004 primary.

19   And the only race that there been a lot of discussion about or

20   any discussion about, really, in this race is the Barbara

21   Colter versus Tim Couch.  Again, a Republican primary.  This

22   is where Ms. Colter decides that she wants to try to retake

23   her spot.  She was not successful in doing so.

24        This is the election where Mr. Hacker, Vernon Hacker,

25   you heard testify.  He testified that he was positive that he

65

1    saw my client, Debi Morris, participating in the vote buying

2    at Green Street.  The proof will be, and we intend to

3    introduce proof that Bart and Debi Morris were, in fact, in

4    Lexington on election day and on the day before.

5         November 2nd, 2004, this is the general election in

6    the fall.  This is a city council race.  Again, there was a

7    presidential race, but that's not particularly relevant to

8    what we're here about.  So this was the city council race.

9    This is the video.  This is the time when Mayor Lewis

10   testified that she made the video.  This was when Mayor Lewis

11   was not mayor yet and decided as her first foray into

12   politics, she would run for city council.  That was in this

13   election.

14        The proof will be with respect to the fall of 2004,

15   that my client, as shown on the video, was coming home from

16   work later in the day.  She's a beautician.  She was carrying

17   her styling supplies.  The proof will be that Bart Morris was,

18   in fact, not at his home on Green Street but was working a job

19   with Mr. Bowling as well in Jackson County, a garbage cleanup

20   that day.  Of course, the video did show Mr. Morris arriving

21   later in the day and going to vote by himself.

22        All right.  Here we are, May 16 and November 7, 2006.

23   This is, of course, the column that I'm concerned about with

24   respect to Count 11, which is the vote buying in 2006.  This

25   is the race where there were really three primary candidates

66

1    for county judge executive.  Mr. Garrison, Crawdad Sizemore

2    and Johnny "Poss" Gregory.  This is the election between Mr.

3    Mobley and Urshell Smith.  I think I've got that right.

4         This is the election between the sheriff, Edd Jordan,

5    who was defeated by Kevin Johnson.  And this is the election

6    between Mr. Bowling.  And we heard, I think, there were a

7    couple other candidates, but Mr. Webb came and testified here

8    as the opposition.  I've got city council on there.  That's

9    probably wrong.

10        The proof will be, with respect to May of 2006, that

11   Bart and Debi Morris were in Gatlinburg.  Now, already

12   introduced into evidence are the absentee ballots, where Mr.

13   Morris and Mrs. Morris voted absentee and indicated that they

14   would, in fact, be in Gatlinburg.

15        The proof will be that the Sunday preceding this

16   primary election, it was Mother's Day, and that the family had

17   been struggling with some drug problems of Debi's son, Chris

18   Duff.  You've heard about him.  He's 26 years old.  He had

19   re-entered some treatment, and things seemed to be on track,

20   and Debi wanted to take a family vacation.

21        The proof will be that they were accompanied that

22   Sunday to Gatlinburg by Chris Duff, who, it's already been

23   entered into evidence that he also voted absentee and

24   indicated Gatlinburg.  Also, Bart Morris's two grown children,

25   Bartley and Jessica were with them.  Also, Jessica's two small

1    children, and Bartley's girlfriend April and April's sister.

2    And these folks all went to Gatlinburg the Sunday preceding

3    the election.

4            On election day, the proof will be they were joined

5    in Gatlinburg with their good friends Stanley and Sarah

6    Bowling, who voted early, the proof will be, in their

7    precinct, which I believe is Harts Branch, and then they drove

8    to Gatlinburg, where they sort of had a couples, you know,

9    retreat, I guess, and stayed overnight and then came back the

10   following Wednesday after the election.

11           With respect to the general election in 2006 -- can't

12   remember what that was.  Oh, of course, this is the mayor's

13   election between Daugh White and Carmen Webb Lewis.  That's

14   going on at that time, and Stanley Bowling, I just point out,

15   has no opposition at this point in time, and the city council

16   is again on the ballot.

17           The proof will be, with respect to 2006, that Debi

18   Morris was working.  The proof will be that she was working at

19   her salon, Debi's Cutting Crew in downtown Manchester.  That

20   Mr. Morris was working on a job out of county, and the proof

21   will be that the day preceding the election, they were, in

22   fact, in Lexington and not, as has been testified to by Wanda

23   White, I believe, the frantic activity the day before the

24   election.

25           I will point out the proof has been, and I believe it

68

1    will continue to be, that the only person who puts my client,

2    Debi Morris, in the 2006 elections is, in fact, Wanda White.

3            All right.  I want to leave 2006 for the moment and

4    talk about the other two remaining charges, which are what I

5    call the big conspiracy charges, because they're very big in

6    time, 2002 through 2007, and because, as you can see, they

7    involve all of the defendants.

8            I want to talk to them -- talk about them together,

9    but before I do that, I want to just address briefly a couple

10   of issues that touch upon the money laundering issue because,

11   as I understand the government's case, the B&J Transfer

12   contracts are an integral part of that allegation.

13           The proof will be that Debi and Bart Morris married

14   in 2003, which, of course, would be after the beginning date.

15   They were certainly dating prior to that time.  But they both,

16   at the time they married, they're not spring chickens back

17   there, they were already working adults.  They already each

18   had their own business.  Bart, the proof has been, began his

19   business in 1994, B&J Transfer.  And Debi was already working

20   as a beautician with her own shop, Debi's Cutting Crew, in

21   Manchester.

22           Debi's Cutting Crew is not a corporation.  It is

23   self-employed, I think is what Agent Sagrecy said, and her

24   receipts and expenses are paid through her own checking

25   account.

1          The proof will be that Bart and Debi, during this

2    time period, did not maintain a joint checking account.

3          The proof will be that Debi -- I think there's been a

4    bit of proof about this already, that Debi owned her own home

5    prior to their marriage on Town Branch Singleton Road, the

6    only house on Singleton Road that has not been paved.  Doesn't

7    have a paved driveway.  And that Bart already owned the house

8    on Green Street that we've heard so much about.  Neither one

9    of them, the proof will be, has been on the deed of the other

10   person's house.

11         The proof will be that, as I said, B&J Transfer was

12   begun long ago and that when Bart Morris divorced his previous

13   wife in 1997, the ownership of B&J Transfer -- B&J standing

14   for Bartley and Jessica, who are the B and J of B&J, that this

15   company was specifically addressed in the divorce decree in

16   order to really ensure that the children and not any future

17   spouse would get the benefit of the company.

18         And as I believe Mr. Gilbert referenced in his

19   opening statement lo those many weeks ago, when the parties

20   married, as older folks when they get married sometimes do,

21   they entered into a prenuptial agreement so they could ensure

22   separate ownership of their property.

23         All right.  With that being said, I want to talk

24   about Counts 1 and 2 in terms of a conspiracy.  Both of those

25   counts are conspiracy counts.  The government does not have to

1      prove that each person around this table actually committed a

2      racketeering violation or a money laundering violation, but

3      the government will, I believe the judge will instruct you,

4      the Court will instruct you at the end, they do have to prove

5      a conspiracy.  And that is an agreement.

6              The agreement does not have to be express.  It can be

7      a tacit understanding, but there does have to be an

8      understanding and an agreement between the parties.

9              Now, in that regard, there has been a lot of evidence

10     with respect to 2002.  I could spend the rest of the

11     afternoon, and I know you do not want me to, talking about

12     what occurred and what the evidence has been with respect to

13     2002.

14             But as you can see from Mr. Smith's chart here, the

15     issue -- there's no charge that is a vote buying conspiracy in

16     2002.  You will be charged to view the evidence more

17     expansively than that, more broadly than that.

18             The evidence that you've heard and will hear with

19     respect to 2002 needs to be put into context of these two

20     conspiracies, which span the time frame when they began as

21     March of 2002, which is just preceding this 2002 time frame.

22             The proof has been and I believe the proof will

23     continue to be that in 2002, there were two very distinct

24     groups.  There was the group that supported Jennings White,

25     and there was the group that supported Freddy Thompson.

71

1            The proof has been and I believe the proof will

2    continue to be that these two distinct groups never worked

3    together.  There was not overlap, and they worked at cross

4    purposes for the election of different candidates.  Certainly,

5    they did so in 2002.

6            MR. SMITH:  Your Honor, I'm going to object to the

7    argument.

8            THE COURT:  Sustained.

9            MS. HUGHES:  I apologize.

10           THE COURT:  Legal issue.

11           MS. HUGHES:  I apologize.  I'm trying not to do that.

12   The proof will be -- the proof has been that with the

13   exception of Wanda and Kennon White, who have testified --

14   Wanda White did testify she saw everybody together at a

15   meeting, Jennings White and Freddy Thompson and Doug Adams and

16   I believe my client and her husband and some others in a

17   strategy meeting together.  But the rest of the proof will be,

18   I believe, that these two groups never reached an agreement of

19   any kind.

20           The proof has been, I believe, and will continue to

21   be that there is no agreement to let the other side operate.

22   Jennings White testified that he stole votes after he believed

23   they had already been paid for by the other side.

24           MR. SMITH:  Your Honor, I'm going to object again.

25   We're doing summation, as opposed to telling this jury what

72

1   her evidence will be.  I'm going to object.

2           THE COURT:  Sustained.

3           MS. HUGHES:  The testimony has been that people were

4   beating each other up.  That guns were drawn.  That there were

5   shootings.  That people were arrested and that lawsuits have

6   been filed.  There was evidence that people on one side or the

7   other attempted to lure folks from the other side over, but I

8   believe the proof will be that it was unsuccessful and that

9   there -- I believe the proof will be that there has been no

10  crossover.

11          Even Kennon White, I believe, testified that it was

12  impossible --

13          MR. SMITH:  Your Honor, I'm going to object again.

14  If she's going to make a summation about the evidence, that's

15  improper.

16          MS. HUGHES:  I'm trying not to comment, but just to

17  recap.

18          THE COURT:  Opening statements, you may present what

19  you believe the proof will be in the case, as opposed to

20  summary of testimony that's already been given in the matter.

21          MS. HUGHES:  All right.

22          THE COURT:  Sustained.

23          MS. HUGHES:  All right.  I'm going to bring this back

24  and try to wrap up quickly.  My primary area of concern,

25  obviously, is Debra Morris.  And setting aside the testimony

1    of Wanda White, which does, I acknowledge, put her in 2006

2    elections, the proof will be that she was not in town and not

3    involved in May and was at work and not involved in the fall.

4         There have been two people thus far -- Wanda White

5    testified, of course, about the people she was absolutely sure

6    she had seen Debi Morris pay.  The proof will be that those

7    folks, to the extent that we can find them, will deny that

8    allegation.  Two have already testified that were on that list

9    have already testified and denied it.

10        The proof will be that a lot of people came to Bart

11   Morris's house all the time, not only when an election was in

12   sight.  At all times.  On a daily basis.  But the proof will

13   be that Freddy Thompson has never been there, and the proof

14   will be that Doug Adams has never been there.  The proof will

15   be that Cletus Maricle has attended their wedding, but other

16   than that has not been in the Morris's home.

17        The proof will be that Wayne Jones and Al Man Stivers

18   have never been to the Morris's home and in all likelihood

19   would not have been welcome had he tried to go.

20        The proof will be that with respect to the money

21   laundering in particular, that no one else at this table has

22   reached an agreement with respect to that with Bart Morris,

23   Debi Morris or Stanley Bowling because no one else at the

24   table cares whether or not they have their contracts.

25        The proof will be that the 2002 election was a

74

1    violent and corrupt affair that created many hard and bitter

2    feelings that no one involved overcame, and the proof will be

3    that these folks sitting at this table, in particular,

4    obviously I'm concerned about Debi Morris, did not reach an

5    agreement or work with the others with respect to Counts 1 and

6    Counts 2.  Thank you very much for your time.

7              Thank you, Your Honor.

8              THE COURT:  Ladies and gentlemen, we'll proceed in

9    the same order of proof with the defendants as we did in the

10   cross-examination.  Mr. Hoskins or Mr. Pinales, you may call

11   the first witness on behalf of Defendant Maricle.

12             MR. HOSKINS:  Thank you, Your Honor.  Call Stephen

13   Slyter.

14             THE COURT:  Thank you.

15             MR. HOSKINS:  I will need one of those easels.

16             MR. SMITH:  Your Honor, may we approach while the

17   witness is coming in?

18             THE COURT:  Yes, you can come up.

19                       (A sidebar conference was held out of the

20                       hearing of the jury):

21             THE COURT:  Mr. Smith?

22             MR. SMITH:  Your Honor, the United States would like

23   to object to calling of this witness as an expert.  We

24   received yesterday for the first time a notice, I believe, in

25   the form of a CV, I think, and also orally Mr. Hoskins telling

75

me that a report was coming.  I think one did follow at some

point yesterday stating an opinion of this expert about one of

the exhibits that have been provided in discovery to the

defendants before this trial began, I believe, on December the

18th, and we had requested notice, of course, back in March of

2009 that the parties provide us reciprocal discovery on

matters including experts and never been given any notice.

Secondly, I fail to see how it's relevant.

THE COURT:  What's the --

MR. SMITH:  I can explain my understanding.  Mr.

Hoskins may chime in on that.  Essentially, I think it's

document 16 is a list of names that Wanda White and Kennon

White represented that were given to them by the Maricles.  I

believe that Wanda White testified that it wasn't Cletus'

handwriting.  She knew his handwriting, and it was, according

to her, Judy's possibly.

And I believe that expert did an analysis of Cletus

Maricle's signature or writing sample, exemplars, as well as

Judy Maricle's exemplars and has offered an opinion that

neither Judy nor Cletus had anything to do with writing this

list.  Notice today that Judy Maricle is in the courtroom so

I'll assume by that, during testimony, that she's not going to

be called as a witness, violating the rule of separation of

witnesses.

So essentially, what this expert is going to try to

1    do is come in here and introduce an out-of-court statement

2    without giving me an opportunity to cross-examine.  There will

3    be no evidence from Judy Maricle, obviously, that that is not

4    her writing that made that list.  And therefore, we're going

5    to have an expert then come in and say this is Judy Maricle's,

6    and that's not her writing on the document the government has

7    introduced.

8          And I believe that again, for two reasons, it's

9    prejudicial in that we've not been given proper notice.

10   Secondly, it should not be admissible under these

11   circumstances as the defense has shown they're not going to

12   call Judy Maricle to the witness stand and give us an

13   opportunity to cross-examine her.

14         THE COURT:  Mr. Hoskins?

15         MR. HOSKINS:  Your Honor, obviously, it's very

16   common, the government frequently will take or force a

17   defendant to give handwriting exemplars.  It's not a

18   statement.  That's clear.  The government's allowed to do

19   that, and they do that frequently.  We did not know -- we were

20   given this document, but we weren't given any explanation as

21   to where it supposedly came from until Wanda White testified

22   that it came from Judy and Cletus Maricle.  We didn't have any

23   reason to think that it was from Cletus or Judy Maricle.

24         As quickly as we could, we located an expert.  He's

25   well qualified.  The government has used him in the past.

77

1    He's simply going to testify that neither Mr. Maricle nor Miss

2    Maricle wrote this list out.  We gave -- we've given them

3    notice under the rule as quickly as we got it.

4            THE COURT:  As quickly as you got it?

5            MR. HOSKINS:  We paid this guy, we mailed him a check

6    last Thursday.  We got the CV yesterday morning.  We got his

7    report yesterday.  And as soon as I got it, I gave Mr. Smith a

8    copy of it.

9            THE COURT:  Has Miss Maricle been in the courtroom

10   since you determined that you would call an expert witness on

11   this handwriting?  I believe she has been.

12           MR. HOSKINS:  She came in during the --

13           THE COURT:  Several days.

14           MR. HOSKINS:  Oh, no, no, she's only been in here for

15   the opening statement by Miss Hughes.  She's not been in here

16   before that.

17           THE COURT:  Not here now?

18           MR. HOSKINS:  She is here now.  She's not heard any

19   testimony.

20           MR. SMITH:  She was here this morning, according to

21   witnesses at my table.

22           MR. HOSKINS:  She was not in the courtroom during any

23   of the testimony.  I may be mistaken, but I don't believe she

24   was.

25           MR. PINALES:  Your Honor, for the record, Marty

78

1    Pinales.  She was here in court, I believe came in during Mr.

2    Briggs' testimony, and I'm not sure exactly when, but she was

3    in the courtroom during the recess so I assume she came in

4    sometime before that, the first recess.

5          MR. HOSKINS:  Then I'm mistaken as to that point.  I

6    don't think that's germane as to whether or not this expert --

7          THE COURT:  Very germane.  She's been in the

8    courtroom.  She's heard any testimony.  It's very germane.

9    I'm going to take the issue under advisement.  I'm not going

10   to let you call him first.  You've got an hour and 15 minutes

11   before the end of the day.  You have other witnesses available

12   to call?

13         MR. HOSKINS:  I do, Judge.  We have a problem with

14   this witness, though.  He's leaving the country for three

15   weeks tomorrow.

16         THE COURT:  Then I'm going to sustain the United

17   States' objection to calling this witness, that proper notice

18   has not been given.

19         MR. HOSKINS:  Judge, we'd like to put him in by

20   avowal, then.

21         THE COURT:  You can do it at the end of the day,

22   4:30.

23         MR. SMITH:  Thank you.

24              (Sidebar conference concluded.)

25         THE COURT:  Thank you.  Mr. Slyter will not be called

*NICHOLSON - Direct (Mr. Pinales)*                                    79

1    at this time.  You may call your next witness.

2              MR. PINALES:  Yes, Your Honor.  With the Court's

3    permission, Ellen Nicholson.

4              PATRICIA ELLEN NICHOLSON, DEFENSE WITNESS, SWORN

5              MR. PINALES:  If you could pull that microphone down

6    in front of you.  Appreciate it.

7                            DIRECT EXAMINATION

8    BY MR. PINALES:

9    Q.  Would you state your name and spell your last name for

10   the record?

11   A.  My name is Patricia Ellen Nicholson, N-i-c-h-o-l-s-o-n.

12   Q.  Miss Nicholson, are you employed?

13   A.  Yes, I am.

14   Q.  And where are you employed now?

15   A.  I am employed with Bluegrass Regional Mental Health

16   Mental Retardation Center in Lexington.  I'm also employed

17   with Shoe Max in Hazard, Kentucky, and I do some private work

18   for myself, and I'm a student at the University of Kentucky.

19   Q.  And in what field?

20   A.  Education.

21   Q.  And let me ask whether or not there was ever a time that

22   you were employed in Clay County?

23   A.  Yes, I was employed with the Administrative Office of the

24   Courts in Clay County.

25   Q.  And could you share with us, in what position were you

*NICHOLSON - Direct (Mr. Pinales)*                                      80

1    employed?

2    A.    Initially, I was case manager for drug court.

3    Q.    And we've heard a lot in this courtroom about drug court.

4    Can you share with us, what is drug court?  How does it work?

5    A.    Drug court is an alternative program to incarceration for

6    people who have addiction.  And we had a circuit level drug

7    court in Clay County, and that was for people who were

8    involved in circuit court and were facing charges that were

9    related to drugs.  And the drug court itself is an alternative

10   to incarceration.

11   Q.    Now, when you say it is an alternative to incarceration,

12   what is the procedure?  If a person has a drug problem and is

13   charged in the circuit court with a drug offense, what is the

14   procedure that allows them or disallows them to go into the

15   drug court?

16   A.    It's a pretrial diversion program, the one that we had,

17   and it is -- the commonwealth attorney and the attorney for

18   the client agree that the drug court is an option -- or an

19   option to consider.  And the commonwealth attorney is the

20   gatekeeper for the program.  And if they --

21   Q.    Let me just stop you there.  When you say the gatekeeper,

22   what do you mean?  Explain to me --

23   A.    That's the initial step to get into the program.

24   Q.    So then does the judge have anything to do with it?

25   A.    Not initially.

NICHOLSON - Direct (Mr. Pinales)                              81

1   Q.   I see.  I'm sorry for interrupting.  Proceed.

2   A.   Okay.  And if they determine that the client is a

3   candidate --

4   Q.   And "they" being?

5   A.   The commonwealth attorney and the client's attorney.

6   Q.   Okay.

7   A.   When the agreement is made to pursue drug court, the next

8   step is they -- there's a legal procedure that is involved in

9   the court system, and they look at drug court as an

10  alternative, and then they are referred to the drug court

11  program.

12       At that point in time, there's a treatment coordinator in

13  the program that actually does an assessment.  And based on

14  that assessment, they determine if the person has addiction.

15  And if they, in fact, do have addiction and are eligible for

16  treatment, then it goes back to court and they are accepted

17  into the drug court program.

18  Q.   When you say it goes back to court, it goes back before

19  the circuit judge?

20  A.   Yes, sir.

21  Q.   And then what happens?  Do they plead guilty, not guilty?

22  A.   It's my understanding that there's the pretrial diversion

23  is at the onset of when they decide, the commonwealth attorney

24  and the client, at that point.  But then if, at the second

25  level, once they do the assessment and it's presented to the

NICHOLSON - Direct (Mr. Pinales)                                    82

1    Court, then they are referred to or they are accepted into the

2    drug court program as an alternative to incarceration.

3    Q.    And what does that program consist of?  What happens to

4    the client, to the defendant, to the patient?

5    A.    A client that is in the drug court program is assigned a

6    case manager, and the case manager actually sits down with the

7    client and does a plan of care.  And in the plan of care, they

8    look at what type of work the individual is going to be doing,

9    because there's several things in the Court or in the program

10   that are requirements.

11        A client that's in drug court has to work or go to school

12   or do volunteer work.  They have to be tested initially

13   several times a week, and then they have to appear in court

14   every week.  They have to be drug tested, and they attend NA,

15   AA meetings.  It's a very holistic approach to working out

16   issues in a person's life with addiction to help them get back

17   and to be rehabilitated.

18   Q.    And when you say they have to attend meetings, what were

19   those meetings?

20   A.    NA, AA meetings.

21   Q.    What is that?

22   A.    Narcotics Anonymous and Alcohol Anonymous, and those are

23   self-help support group meetings that they are required to

24   attend.  And I may also add that drug court is a phase type

25   program.

1  Q.  Which is?

2  A.  There are three phases in the program.  There's the

3  initial phase, and that is the phase to help an individual

4  with addiction to become addiction -- excuse me, to become

5  drug-free.  And then there's a maintenance phase -- an

6  education phase and a maintenance phase.  Three phases and

7  then after care after they have successfully completed the

8  phases.  So initially, in phase one, the requirements are very

9  stringent, and there's a lot of expectation for the client.

10      As they progress and get stable, it lessens a little bit,

11  but they're still under supervision of the Court on a regular

12  basis.

13  Q.  Now, I believe you testified that there are these three

14  phases.  At the conclusion of the third phase, what happens?

15  A.  At the conclusion of the third phase, there's a six-month

16  after care phase.  Once they successfully complete after care,

17  they graduate from their program.  Once that -- that is a

18  celebration or a ceremony, actually a formal ceremony that

19  they go through.  And then once they do that, they're under

20  probation or -- and I'm not legal, so during the time that

21  they're in drug court, they're still under the supervision of

22  probation and parole.

23  Q.  Now, you said you were not legal.  Would you give us your

24  educational background?

25  A.  My background is in education and mental health, and I

have a Bachelor's in elementary education. I have a Master's in elementary education, and I have a six-year graduate program in educational administration, and I currently have completed my doctoral work at the University of Kentucky, and I'm working on my dissertation at the present time.

And in addition to my educational background, I have extensive training towards substance abuse, mental health, mental retardation and developmental disabilities. And I have worked extensively with people with disabilities since 1995.

Q. You mentioned what your function was when you began working at drug court. During the course of your employment, did you progress in your employment?

A. Yes, sir, I did.

Q. And to what?

A. I started out part-time as a case manager. I went full-time as a case manager. From that, I went to treatment coordinator. And then for a period of time, I was interim regional supervisor when my regional supervisor was on sick leave. And then my last position was treatment coordinator.

Q. Now, you said that this program is a three-phase program and at the conclusion, someone graduates. First of all, are you familiar with whether drug courts are throughout the commonwealth?

A. Yes, they are.

Q. And familiar with whether or not they're throughout the

*NICHOLSON - Direct (Mr. Pinales)*                                    85

1  country?

2  A.   They're throughout the nation, yes.

3  Q.   And these alternative courts, what is the purpose of it?

4  A.   First of all, it's two-phase.  One is to help the

5  individual get treatment so that they are not repeat

6  offenders.  Secondly, it's more cost effective than

7  incarceration.

8  Q.   And are you familiar with how Clay County stacked up

9  against the national average?

10  A.   We did extremely well.

11  Q.   And do you have any statistics when you were there?

12  A.   Yes.  The national average is somewhere around 67%; that

13  is, a person who completes drug court is 67% more likely to be

14  successful and not be reincarcerated than someone who does not

15  complete drug court.  And when I was involved with the court

16  system in Clay County and the drug court program, our success

17  rate was -- exceeded 67%, and there was times that we were

18  probably around 80, 85 percent.

19  Q.   You mentioned the times that you were with the court.

20  Can you give us specifically the time you were with the court?

21  A.   I began, and I don't know the specific date, but it was

22  in January or the winter of 2004, and I left my position in

23  August of 2007.

24  Q.   Now, if somebody is not successful, what happens to them?

25  A.   The drug court has a team of professionals that meet with

1    the judge on a regular basis to discuss the progress or lack

2    of progress of clients.  That team is made up of the judge,

3    the commonwealth attorney, probation and parole, legal folks

4    such as an attorney that is a public defender or someone that

5    is looking out for the rights of the individual and treatment

6    folks such as, in their case, it was the folks from mental

7    health, mental retardation, and the local comp care center.

8        And a person, each time that they appear in court, the

9    team is given a report by a case manager.  The case manager

10   presents the information to the team prior to the actual court

11   proceedings, and during that time, the team discusses the

12   progress or lack of progress and the consequences for or the

13   reward for whatever that they are looking at, and the team

14   decides and it's the majority rules.

15       And so once the decision is made, when they appear in

16   court, the judge is actually presiding over the court

17   proceedings, but it's a team decision as to what the

18   consequence or reward might be for the individual.

19   Q.   And if a person fails, are they kicked out of drug court?

20   Are they --

21   A.   They can be, yes.

22   Q.   If a person fails, can they be continued with tighter

23   regimentation?

24   A.   Once they are terminated from drug court, then they go

25   back into court and back to circuit court on the docket and

NICHOLSON - Direct (Mr. Pinales)                                87

1   proceed with whatever the pretrial diversion agreement was.

2        But they, once they're terminated, they're no longer in

3   drug court.  But during the course of the time that they're in

4   drug court, sometimes they may have consequences that are less

5   than being terminated from drug court.

6   Q.   Okay.  So it's that team effort that makes that decision;

7   is that what you're saying?

8   A.   Absolutely.

9   Q.   I want to direct your attention to a woman by the name of

10  Wanda White.  Do you know a Wanda White?

11  A.   I know Wanda White, yes.

12  Q.   How do you know her?

13  A.   I just know her as -- she's a lady that lives in Clay

14  County.

15  Q.   Have you ever had any discussions with her about drug

16  court?

17  A.   I recall one discussion that Wanda and I had about drug

18  court.

19  Q.   And can you relate what that was?

20       MR. SMITH:  Objection.

21  A.   I don't recall the specific date and time.

22       THE COURT:  I'm going to sustain as to hearsay.

23       MR. PINALES:  Okay.  Thank you.

24  Q.   To be a counselor in drug court, is there any educational

25  requirements?

NICHOLSON - Cross (Mr. Smith)                                    88

1    A.   To be a counselor, yes, you have to have a background in

2    substance abuse or working with addiction to be a case

3    manager, which is the position that is at the level, the court

4    level.  You have to have a Bachelor's in a human service field

5    and experience working with people with addiction.

6              MR. PINALES:  Could I have a moment, Your Honor?

7              THE COURT:  Yes, sir, you may.

8    Q.   Without relating any conversations, with regard to Miss

9    Wanda White, did you ever do an online application with Wanda

10   White?

11   A.   No, sir.

12             MR. PINALES:  Nothing further.

13             THE COURT:  All right.  Thank you.  I believe this

14   testimony only relates to Defendant Maricle so we'll begin

15   cross-examination with Mr. Smith or Mr. Parman.

16                          CROSS-EXAMINATION

17   BY MR. SMITH:

18   Q.   Hi, Miss Nicholson.  I'm Steve Smith, and I'm

19   representing the United States.  I have a few questions for

20   you.  I failed to get the date which you were hired, ma'am.

21   A.   It was in the winter of '04.

22   Q.   And when is it that you say you got your Bachelor's

23   degree?

24   A.   1984.

25   Q.   And you said you began, I believe, your employment as a

NICHOLSON - Cross (Mr. Smith)                                    89

1    part-time case manager?

2    A.   That's correct.

3    Q.   How did you go about applying for that job, ma'am?

4    A.   I was seeking employment in Clay County, and I kept

5    looking at the website in different areas in the field of

6    substance abuse or anything that I might be eligible for.  And

7    that's -- I applied to an Administrative Office of the Courts

8    in Frankfort.

9    Q.   Did you do that online?

10   A.   No, sir.

11   Q.   Okay.  Did you go to Frankfort yourself?

12   A.   I filed an application myself and sent it to Frankfort.

13   Q.   And I believe you started as a part-time case manager?

14   A.   That's correct.

15   Q.   And I failed to get the job description for that job.

16   Could you give us the job description for the part-time case

17   manager, ma'am?

18   A.   A part-time case manager, at that time, was the same

19   position that it would be as a full-time, but the

20   responsibility of a case manager is to work directly with the

21   client in relationship to their plan of care and to report to

22   the Court the progress or the lack of progress on a regular

23   basis, depending on which phase their client is in.

24   Q.   You indicated that that was 2004 when you started working

25   there?

NICHOLSON - Cross (Mr. Smith)                                    90

1    A.   Yes.

2    Q.   Okay.  And as you progressed, I believe you said that you

3    actually became a treatment coordinator eventually.

4    A.   Yes, I did.

5    Q.   Okay.  Ma'am, your testimony about this drug court

6    program, this is not the same as home incarceration program,

7    is it?

8    A.   No, sir, it is not.

9    Q.   In fact, home incarceration has nothing to do with the

10   drug court program and neither does the drug court program

11   have any oversight over the home incarceration program?

12   A.   They may work collaboratively with the client, but it's

13   two separate programs.

14   Q.   It would be a coincidence if a person was in home

15   incarceration, in other words?

16   A.   I don't know that it would be a coincidence.  It could be

17   that they would be under both programs.

18   Q.   But they're different programs, you would agree, ma'am?

19   A.   Yes.

20   Q.   And they operate totally different?

21   A.   Yes.

22   Q.   And you don't have any supervision or control over the

23   home incarceration program in Clay County?

24   A.   I have no supervision over the home incarceration

25   program.

NICHOLSON - Redirect (Mr. Pinales)                                    91

1   Q.   And you said that your program was serviced by the

2   commonwealth attorney, as you call it, the gatekeeper?  Is

3   that your testimony?

4   A.   Initially, yes.

5   Q.   And the commonwealth attorney in Clay County during the

6   time period that you worked there was Gary Gregory; isn't that

7   true?

8   A.   That's correct.

9   Q.   And so he would be the gatekeeper for Clay County during

10  the time period that you worked there?

11  A.   Yes, sir.

12          MR. SMITH:  That's all my questions.

13          THE COURT:  Thank you.  Let me see if any of the

14  other defendants have questions first.  Anyone?  No.  All

15  right.  Mr. Pinales, any redirect?  Yes, sir.

16          MR. PINALES:  If I may from here.

17          THE COURT:  Yes.

18                       REDIRECT EXAMINATION

19  BY MR. PINALES:

20  Q.   You said you sent in your application.  That was sent in

21  by mail, not internet?

22  A.   That's correct.

23          MR. PINALES:  Nothing further.  Thank you.  May this

24  witness be excused, Your Honor?

25          THE COURT:  Yes.  Any objection?  She may step down,

92

1      she's excused.  Call your next witness.

2              MR. HOSKINS:  May we approach?

3              THE COURT:  Yes, sir, you may.

4                  (A sidebar conference was held out of the

5                  hearing of the jury):

6              THE COURT:  Yes, sir, Mr. Hoskins.

7              MR. HOSKINS:  Your Honor, the next witness that we

8      would call is deputy clerk from the clerk's office.  It's my

9      understanding the rule is that we can submit certified copies

10     of documents without necessarily having to do that through a

11     witness.  So what I'd like to do is put this lady on just for

12     a rather limited purpose.  She's brought these certified

13     copies up with her, and she's brought a whole lot.  Some are

14     of much more relevance than others.

15             And rather than introduce, try to introduce all of

16     those through her, what I would propose that we be allowed to

17     do is present only those certified copies that we think really

18     need to be presented in the morning, rather than putting them

19     on through her.  We have certified copies that would meet the

20     rule for authentication that she's brought up here today.

21             THE COURT:  I'm not sure what the documents are.  I

22     don't know that the government is going to have any objection,

23     if there's going to be an issue with respect to these

24     documents.  Mr. Smith, do you know what documents he's

25     referring to?

93

1          MR. SMITH:  We've not been provided any discovery,

2      Your Honor.

3          THE COURT:  All right.  Well, I'm not going to

4      guarantee you that the certified records will come in in the

5      morning.  I don't know what you're asking me to do.

6          MR. HOSKINS:  I'm asking for a ruling as to

7      authentication.

8          THE COURT:  Well, I'm not going to give you a ruling

9      until I see what the documents are that you're attempting to

10     introduce as being certified copies of court records.  So if

11     that's your question, your request will be denied until I see

12     the documents.  I can't rule on admissibility.

13         MR. HOSKINS:  Well, Your Honor, I have those here now

14     if the Court wants to look at them now.  I can do that.  The

15     other thing that I would -- these are not provided in

16     discovery, we knew that there would be various attempts by the

17     government to suggest that the Court system didn't work

18     properly in Clay County.

19         I did expressly advise Mr. Smith that we would be

20     calling -- we would be intending to present court records of

21     anything that came up during the trial.

22         THE COURT:  Well, let me ask you this.  Let me see if

23     I'm clear.  You've got a person from the clerk's office who is

24     able to authenticate documents, but you don't want to use that

25     person to authenticate documents.  Is that what you're telling

94

1    me?

2           MR. HOSKINS:  I think it would be quicker not to do

3    it that way, Judge.  We can do it that way.

4           THE COURT:  Why don't you do that.  It will clear up

5    any objections that might come up.

6           MR. PINALES:  Your Honor, while that is going on, if

7    I could be business excused, I'll be lining up other witnesses

8    to get them so we have a nice, smooth flow, Your Honor.

9           THE COURT:  That will be fine.

10          MR. PINALES:  They are here but scattered.

11          THE COURT:  Where is Mr. Bayer?  We haven't seen him

12   in a while.

13          MR. WESTBERRY:  His mother is near death.  She's in a

14   hospice bed at his house.

15          THE COURT:  I knew she was ill.  We'll talk about

16   this later.  Yes, sir, you may.

17          MR. PINALES:  I appreciate that.

18                 (Sidebar conference concluded.)

19          THE COURT:  Thank you, Mr. Hoskins, you may call your

20   next witness.

21          MR. HOSKINS:  Thank you, Your Honor.  We call Glenda

22   Sester.

23              GLENDA SESTER, DEFENSE WITNESS, SWORN

24          THE COURT:  Thank you.  You may proceed.

25          MR. HOSKINS:  Thank you, Your Honor.

*SESTER - Direct (Mr. Hoskins)*                                          95

1                          DIRECT EXAMINATION

2      BY MR. HOSKINS:

3      Q.   Hi, Miss Sester.

4      A.   Hi.

5      Q.   My name is David Hoskins, and I represent Cletus Maricle.

6      Would you tell the jury your name, please?

7      A.   My name is Glenda Sester.

8      Q.   And you live in Clay County, Kentucky?

9      A.   Yes, Manchester.

10     Q.   Where do you work?

11     A.   At the circuit clerk's office.

12     Q.   Who is the circuit clerk?

13     A.   James Phillips.

14     Q.   How long have you worked there?

15     A.   A little over 17 years.

16     Q.   Has Mr. Phillips been the clerk the whole time you've

17     worked there?

18     A.   No.

19     Q.   Who was before?

20     A.   Larry Joe Roberts was the clerk when I first started.

21     Q.   Okay.  One of the things that you do as the deputy clerk

22     is to be custodian of the records of the district and circuit

23     court; is that right?

24     A.   Yes.

25     Q.   And you have brought with you today a number of the

SESTER - Direct (Mr. Hoskins)                                    96

1    actual court files?

2    A.  Yes, sir.

3    Q.  And you've also brought with you today certified copies

4    of those court files, haven't you?

5    A.  Yes.

6    Q.  You also, as a deputy clerk, have some special duties,

7    don't you?

8    A.  Yes.

9    Q.  Would you tell the jury what you do that's maybe your

10   special role in the clerk's office?

11   A.  Okay.  I'm a bench clerk, and I go to court for the

12   district criminal.

13   Q.  So the bench clerk is the one that comes out and sits in

14   the courtroom while court's going on?

15   A.  That's correct.

16   Q.  As part of that job, do you have involvement with the

17   fine docket or unpaid fines?

18   A.  Yes.

19   Q.  Okay.  In district court, is it common for people who

20   plead guilty to something to get some type of fine or court

21   costs?

22   A.  Yes.

23   Q.  Are they generally able to pay it right then and there?

24   A.  No, they're not.

25   Q.  How does the court handle that?

*SESTER - Direct (Mr. Hoskins)*                                    97

1    A.   Okay.  We put them -- we have a fine day that we do every

2    three to four months, and I brought with me here today a fine

3    book which we had for December of '09.  If you come in to

4    court and you are given a fine and you can't pay your fine, we

5    will put you on an installment plan of $20 a month and set you

6    up for our next regular fine day, which is this book here.

7    Q.   So fine days come along every --

8    A.   Every three or four months.

9    Q.   Okay.

10   A.   Like the last one we had was December the 9th.  Our next

11   one is in April.

12   Q.   Do you get a lot of people who get fines of several

13   hundred dollars?

14   A.   Yes.

15   Q.   And if they're on a $20 a month payment plan, do they

16   generally have their fines paid by the first fine day that

17   comes up?

18   A.   Oh, no, no.

19   Q.   How is that handled?

20   A.   If you make your payments, your $20 a month payments, you

21   are continued till the next fine day.  If you do not make your

22   payments and you do not come in to court and ask for

23   additional time, then a bench warrant will issue.

24   Q.   And what happens when a bench warrant is issued?

25   A.   Bench warrant is issued, the judge signs it and it's sent

SESTER - Direct (Mr. Hoskins)                                          98

1    to the sheriff's department for service.

2    Q.   Now, does the sheriff's department run out and arrest,

3    round those people up every time there's a fine day?

4    A.   No.

5    Q.   Why not?

6    A.   Just be about impossible, I guess.

7    Q.   Those warrants kind of just sit there?

8    A.   Yeah.

9    Q.   Is the only way to deal with those warrants for the

10   person to be arrested?

11   A.   No.  They could be paid in full, and then I would be

12   allowed to recall a warrant, if it's paid in full.  And then

13   warrants are recalled for bench warrants on nonpayment of

14   fines, I won't say daily, but surely weekly.

15   Q.   So who would be some of the people that would request a

16   bench warrant to be withdrawn?

17   A.   The person themselves, an attorney.

18   Q.   And is that a frequent occurrence?

19   A.   Yes.

20   Q.   Okay.  You have in front of you there a big orange

21   binder; is that right?

22   A.   Yes.

23   Q.   And is that what you're saying the fine -- that's your

24   fine day docket?

25   A.   This was our fine day docket for December of last year.

*SESTER - Direct (Mr. Hoskins)*                                    99

1    Q.   About how many names would be in there?

2    A.   There is 466 in this book.

3    Q.   Now, what type of reason would a person have to give if

4    they came in and asked for their warrant to be recalled?

5             MR. SMITH:  Your Honor, I'm going to object.

6    Relevance.

7             THE COURT:  Yes, sir.  Mr. Hoskins?

8             MR. HOSKINS:  Your Honor, I think it's relevant to

9    show how commonplace this is, that it didn't take necessarily

10   a court appearance and a written motion.

11            THE COURT:  All right.  Overruled.

12            MR. HOSKINS:  Thank you, Judge.

13   Q.   What would be some of the reasons that a person comes in

14   and asks that be done?

15   A.   I've had persons come in and say they forgot their court

16   date, they were in the hospital, they were ill.  That type of

17   thing.

18   Q.   So the court system there is pretty forgiving when it

19   comes to that?

20   A.   Yes.

21            MR. HOSKINS:  Your Honor, I would ask that this box

22   of documents be shown to the witness.

23            THE COURT:  Yes, sir, you may.

24            MR. SMITH:  Your Honor, again, the United States has

25   not seen any of these records, and I apologize.

1          THE COURT:  We'll take a short recess to review those

2     documents.

3          MR. HOSKINS:  We have a couple they have seen, if we

4     can maybe go ahead and do those?

5          THE COURT:  No, we'll take a recess at this time.

6     We'll take a 15-minute recess, ladies and gentlemen.  Please

7     keep in mind the admonitions that you've been given previously

8     not to discuss the case among yourselves while we are in

9     recess.

10          Mr. Smith, if you need more than 15 minutes, if you

11     could advise me of that as you look through those documents.

12     The jury will be excused.  We'll be in recess for 15

13     minutes.

14               (The jury left the courtroom at 3:43 p.m.)

15               (Recess from 3:43 p.m. until 4:01 p.m.)

16               (The jury entered the courtroom at 4:01 p.m.)

17          THE COURT:  The record will reflect all members of

18     the jury are present.  Parties and counsel are also present.

19          Mr. Smith, have you had a chance to review the

20     documents?  Those documents can be provided to the witness at

21     this time for identification.

22     BY MR. HOSKINS:

23     Q.  Miss Sester, before we move on to those documents, just

24     one more question about that fine docket.  That's something

25     that you have control over; is that right?

*SESTER - Direct (Mr. Hoskins)*                                      101

1    A.   Yes.

2    Q.   So you make decisions about whether or not somebody gets

3    postponed or told to come back to the next fine day or whether

4    they'll be called?

5    A.   Yes.

6    Q.   Thank you.  I have provided you with two documents there

7    that are just single sheets of paper.  They have little blue

8    stickers on them.  I believe we're on number 2 for defendant

9    Maricle.  Do you recognize those documents?

10   A.   Yes.

11   Q.   Are those documents that came from your office?

12   A.   Yes, they are.

13   Q.   And are those documents that are kept in the normal

14   course of business?

15   A.   Yes.

16   Q.   In your office?

17        MR. HOSKINS:  Your Honor, I would move of the

18   introduction of those two documents at this point.

19        THE COURT:  It's one exhibit?

20        MR. HOSKINS:  Probably need to be Exhibit Number 2

21   and our Number 3.

22        THE COURT:  Any objection?

23        MR. SMITH:  No.

24        THE COURT:  Maricle exhibits 2 and 3 will be admitted

25   at this time.

*SESTER - Direct (Mr. Hoskins)*                                          102

1                        (Maricle Exhibit Nos. 2 and 3

2                        were admitted into evidence.)

3    Q.   Miss Sester, the box in front of you is a box that you

4    brought today to court?

5    A.   Yes.

6    Q.   You came here pursuant to a subpoena, didn't you?

7    A.   Yes.

8    Q.   And what is contained in that box there?

9    A.   Various court records from our office.

10   Q.   And have they been copied and certified by your office?

11   A.   Yes, they have.

12   Q.   Are each of those documents records that are normally

13   kept in your office?

14   A.   Yes.

15   Q.   In the normal course of the clerk's business?

16   A.   Yes.

17            MR. HOSKINS:  Your Honor, that's all the questions I

18   have for this witness at this point.

19            THE COURT:  You move for their introduction at this

20   time?

21            MR. HOSKINS:  I'm not moving for their introduction

22   at this point, Your Honor.

23            THE COURT:  Just the foundation.

24            MR. HOSKINS:  Just that they've been authenticated.

25            THE COURT:  Very well.  Let's see.  Mr. Smith or Mr.

SESTER - Cross (Mr. Smith)                                        103

1    Parman?

2                          CROSS-EXAMINATION

3    BY MR. SMITH:

4    Q.   Good afternoon.

5    A.   Hi.

6    Q.   Miss Sester, as I understand it, you are deputy circuit

7    clerk?

8    A.   Yes.

9    Q.   And the way that most circuit clerks in Kentucky operate

10   is they have to service both the district court and also the

11   circuit court judges.  Is that the way it's operating in Clay

12   County?

13   A.   Yes.

14   Q.   And have you ever worked in other clerks' offices outside

15   of Clay County?

16   A.   No, I haven't.

17   Q.   So your time's been there in Clay County?

18   A.   Yes.

19   Q.   And you work with James Phillips?

20   A.   Yes.

21   Q.   And how long have you worked for James Phillips?

22   A.   I've worked as a deputy clerk for 17 years, but --

23   Q.   When did he get clerk; do you know?

24   A.   No, I don't.  When I first started working, Larry Joe

25   Roberts was the clerk.

SESTER - Cross (Mr. Smith)                                      104

1    Q.   Larry Joe Roberts?

2    A.   Uh-huh.

3    Q.   Was he also an attorney down there that practiced law in

4    Clay County?

5    A.   Yes.

6    Q.   Is that the same Larry Joe Roberts?

7    A.   Uh-huh.

8    Q.   He's deceased now?

9    A.   Yes, he is.

10   Q.   So you work in the district court?

11   A.   Yes.

12   Q.   And you work inside the courtroom for the district court

13   judge?

14   A.   Yes.

15   Q.   And up until the time when Cletus Maricle left the Bench

16   over there, that would have been Oscar Gayle House would have

17   been one of your district judges?

18   A.   Yes.

19   Q.   And Renee Muncy would have been the other one?

20   A.   Yes.

21   Q.   And those would be the two judges you work with

22   primarily?

23   A.   Yes.

24   Q.   Did you go upstairs and work circuit court?

25   A.   No, I did not.

SESTER - Cross (Mr. Smith)                                    105

1    Q.  That wasn't your job at all?

2    A.  No.

3    Q.  So you didn't have to service inside the circuit

4    courtroom where felony trials and those issues are taking

5    place?

6    A.  No.

7    Q.  I understand.  Thank you.  Ma'am, I have looked over

8    briefly that box of documents, and it appeared to me that

9    nearly all those files had a stamped and certified seal and

10   somebody signed it on behalf of the circuit clerk James

11   Phillips.  Is that accurate?

12   A.  Yes, it is.

13   Q.  And then when I looked at 2 and 3, I didn't see any

14   stamps on there.  Would that be accurate?  There's no stamps

15   on that, is there?

16   A.  On these two documents?

17   Q.  Yes, ma'am.

18   A.  No, there's not.

19   Q.  In fact, it also appeared to me that they were different

20   in that they had what looked to be -- and again, I can't

21   really make it out, but looks like evidence that maybe that

22   came through a fax at some point.  Does that look like what

23   you see on top of that?

24   A.  Yes, it does.

25   Q.  Have you seen the actual court document that you say that

SESTER - Cross (Mr. Smith)                                    106

1    that's a copy of in the district court file, ma'am?

2    A.   No, I haven't.

3    Q.   Okay.  And this actually pertains to a circuit court

4    issue, does it not, ma'am?

5    A.   Yes.

6    Q.   So that doesn't fall within your matters in district

7    court, does it?

8    A.   No, it doesn't.

9    Q.   Thank you.  Now, as I understand your testimony, you're

10   trying to explain your fine docket in Clay County.  And again,

11   that's a district court, right?

12   A.   Yes.

13   Q.   Not circuit court?  And if I understand your testimony,

14   the way that works is that folks who accumulate fines can get

15   bench warrants?

16   A.   Yes.

17   Q.   Issued by a judge?

18   A.   Yes.

19   Q.   And unless it's paid in full, as I understand your

20   testimony, only a judge can withdraw or recall, I believe you

21   used those words, a bench warrant on a person?

22   A.   That's correct.

23        MR. SMITH:  That's all the questions I have.  Thank

24   you.

25        THE COURT:  See if counsel for any of the other

*SESTER - Cross (Mr. Richardson)*                                        107

1    defendants have questions before I ask about redirect.  Mr.

2    Hoskins, any questions, further questions?

3               MR. HOSKINS:  Nothing further, Your Honor.

4               MR. RICHARDSON:  Your Honor, I did have one question.

5               THE COURT:  Yes, sir, you can ask it.

6                          CROSS-EXAMINATION

7    BY MR. RICHARDSON:

8    Q.   What's the circuit court fax number?

9    A.   598-4047.

10              MR. RICHARDSON:  Could I have Exhibit Number 64, the

11   Rolodex?

12              THE COURT:  61.

13              MR. RICHARDSON:  61.  Could I have with the witness

14   look at Item 61?

15   Q.   If you will look at the Cs, and I think there's a card in

16   there that says Clay County clerk.

17   A.   I take it they're not in order.

18   Q.   I don't know.  I haven't looked.

19   A.   I've got a card here that says courthouse fax.

20   Q.   Okay.  And what is that number?

21   A.   And then it's got an arrow pointed, and somebody's

22   written in red ink, circuit judge, 598-4113.

23   Q.   Yes, ma'am.  I think if you'll go through, you'll find

24   another one that says Clay County clerk.

25   A.   I'm sorry.  I don't see it.

*SESTER - Cross (Mr. Richardson)*                                    108

1    Q.   How about under F.  I'm told it might be under F.

2    A.   I've got a card here that says fax numbers.  It's got

3    Clay County clerk's number, 598-4047.

4    Q.   There you go.  And that is what -- is that the fax number

5    to James Phillips' office?

6    A.   Yes, it is.

7              MR. RICHARDSON:  Thank you very much.  No further

8    questions.  Thank you.

9              THE COURT:  Let's see if there are any other

10   questions of this witness.  Mr. Hoskins first.

11             MR. HOSKINS:  No, Your Honor.

12             THE COURT:  Mr. Smith, anything else?

13             MR. SMITH:  No.

14             THE COURT:  All right.  Thank you, ma'am.  You can

15   leave those documents there.  If you have brought documents

16   subject to subpoena that you've not been asked for, you may

17   take those back.  Let me see, make sure that there's no

18   objection to releasing the witness.

19             MR. HOSKINS:  We would ask that she be released.

20             THE COURT:  Anything else?

21             MR. SMITH:  No objection.

22             THE COURT:  Thank you, ma'am.

23             THE WITNESS:  Thank you.

24             THE COURT:  Thank you.  Mr. Pinales, you may call

25   your next witness.

*ROBERTS - Direct (Mr. Pinales)*                                    109

1          MR. PINALES:  Thank you, Your Honor.  Marilyn

2    Roberts.

3              MARILYN ROBERTS, DEFENSE WITNESS, SWORN

4                      DIRECT EXAMINATION

5    BY MR. PINALES:

6    Q.  I started to say good morning, but it's good afternoon.

7    I'm Marty Pinales.  I represent Cletus Maricle.  Would you

8    state your name for the record and spell your last name?

9    A.  Marilyn M. Roberts, R-o-b-e-r-t-s.

10   Q.  Miss Roberts, are you employed?

11   A.  Yes, sir.

12   Q.  Would you share with us how you are employed?

13   A.  I'm the official court reporter for Clay, Jackson and

14   Leslie Counties.

15   Q.  When you say the official court reporter, is that within

16   the circuit court?

17   A.  Yes, sir.

18   Q.  And as the, I believe you said, official court reporter,

19   how long have you been there?

20   A.  Since October, 1967.

21   Q.  And before I get into any specific records, share with

22   us, are you a court reporter like we see here today with the

23   stenotypy machine?

24   A.  No, sir.

25   Q.  How does the Clay County circuit court work?

*ROBERTS - Direct (Mr. Pinales)*                                    110

1    A.   Until '92, I took Gregg shorthand.  I wrote down

2    everything that everybody said in Clay County.  And in '92, we

3    went to video.  I keep a computer log.  And gradually, my

4    other two counties have gone to video.

5    Q.   And when you say video, how -- physically, how does that

6    work?

7    A.   There are cameras around the courtroom with microphones

8    at each counsel table, the Bench, the witness box, and they

9    are voice activated and everything that happens is videotape

10   reported.  Used to be on videotapes.  Now we've gone to DVDs.

11   Q.   And I want to call your attention to a record I asked you

12   to bring, October the 30th, Mr. Downey.

13   A.   Yes, sir.

14   Q.   Do you have that?

15   A.   I do.

16   Q.   Can you share with us -- that is a videotape.  Would you

17   share the date, how it is marked?

18   A.   It is marked Clay Circuit Court, Commonwealth versus John

19   Downey.  It's got two case numbers, 05-CR-0069 and 05-CR-148.

20   It has a date of October 30, 2006 and it has the judge listed

21   as Judge Lewis.

22   Q.   And are these records kept in the normal course of

23   business and required by law?

24   A.   Yes, I'm required to keep them at least five years.

25   Q.   And they are the normal course and this is the

*ROBERTS - Direct (Mr. Pinales)*                                    111

1    official -- this is the official?

2    A.   This is the official record.

3              MR. PINALES:  May I have that marked, Your Honor, as

4    M4?

5              THE COURT:  Maricle Exhibit Number 4.

6              MR. PINALES:  Thank you.  Your Honor, at this time, I

7    would offer that as an exhibit and ask that it be published.

8              THE COURT:  Admit it at this time?

9              MR. PINALES:  Yes.

10             THE COURT:  Any objection to its admission?

11             MR. SMITH:  No, Your Honor.

12             THE COURT:  All right.

13             MR. SMITH:  No objection.

14             THE COURT:  Exhibit 4 will be admitted at this time.

15                        (Maricle Exhibit No. 4

16                         was admitted into evidence.)

17             MR. PINALES:  Your Honor, we have at the break, the

18   clerk and I and Mr. Hoskins have figured out the old VHS

19   recorder in the machine.  And if we could, we'd like to

20   publish it at this time.

21             THE COURT:  All right.  What's the length of the

22   video before it's played?

23             THE WITNESS:  It's probably four to five minutes,

24   sir.

25             THE COURT:  You can proceed.

ROBERTS - Direct (Mr. Pinales)                                    112

1    Q.   Miss Roberts, I'm going to, when I hold up my hand, we'll

2    stop the tape, then you can identify certain people, and then

3    we'll start it again with your permission.

4    A.   That's fine.

5    Q.   Thank you.

6                  (A portion of Maricle Exhibit Number 4

7                  was played in open court.)

8          MR. PINALES:  Stop right there.

9    Q.   There was a judge that took his seat.  Do you recognize

10   that person?

11   A.   Yes, sir.  I do.

12   Q.   Who is that person?

13   A.   That was Senior Judge Tom Lewis from Bowling Green.

14   Q.   Now, you say Senior Judge Tom Lewis from Bowling Green.

15   How does a judge get from Bowling Green all the way over to

16   the other end of the state?

17   A.   The senior judge program, they assign the judges just to

18   different areas when a regular judge is going to be gone or in

19   court in another county.

20   Q.   And is this common, in your experience?

21   A.   Yes, sir.

22   Q.   Thank you.

23          MR. PINALES:  You can start again.

24                  (A portion of Maricle Exhibit 4

25                  was played in open court.)

*ROBERTS - Direct (Mr. Pinales)*                                    113

1              MR. PINALES:  Stop there.

2    Q.  And we just saw on that tape that there was a jury

3    sitting in the courtroom.  Is that normal procedure?

4    A.  Yes, sir.

5    Q.  And if there is a case that is scheduled and it is

6    resolved, is that the procedure that we just saw, where the

7    jury is then excused?

8    A.  Yes, sir, it is.

9    Q.  Thank you.  And the person that just approached the Bench

10   that we see his back, who is that?

11   A.  Richard Couch.

12   Q.  Who is he?  Does he have an official title?

13   A.  At that time, he was the assistant commonwealth attorney.

14   Q.  Okay.  Thank you.  Now, as you noticed in that tape, some

15   papers were handed up to the judge?

16   A.  Yes, sir.

17   Q.  And as was stated in there, we have two motions and two

18   agreements.

19   A.  Right.

20   Q.  And is that normal?

21   A.  Yes, there's always a commonwealth's offer and then a

22   motion to enter a guilty plea on each case.

23   Q.  When you say a commonwealth's offer, the prosecutor is

24   the commonwealth?

25   A.  Yes, sir.

ROBERTS - Direct (Mr. Pinales)                                    114

1    Q.   And when you say the offer, how does that --

2    A.   That is, they have plea negotiations, and that is what

3    the commonwealth agrees to offer.

4    Q.   And who is the "they" have plea negotiations?

5    A.   The defense attorney and the commonwealth attorney.

6    Q.   And when does the judge see that for the first time?

7    A.   Just like when Miss Craig handed it to him.

8    Q.   To the judge just now?

9    A.   To Judge Lewis, yes.

10   Q.   Thank you, appreciate it.  You may continue.

11                 (Maricle Exhibit No. 4 was played

12                 until 10:42:48.)

13             MR. PINALES:  Your Honor, it's now 4:30, and it just

14   goes on, and I think I've shown my point by having the tape

15   played to this point.

16             THE COURT:  Well, you want to stop it at this point,

17   that's fine.

18             MR. PINALES:  I don't think I need to go play the

19   entirety.

20             THE COURT:  That's fine.

21   Q.   The tape that you brought, however, is the entire plea

22   and sentencing; is it not?

23   A.   It's the entire plea.  He wasn't sentenced on that day.

24   Q.   But he said he was going to accept the recommendation of

25   the commonwealth attorney, the assistant commonwealth attorney

ROBERTS - Direct (Mr. Pinales)                                115

1    and the defense attorney for Mr. John Downey?

2    A.   Yes.

3    Q.   And he was sentenced at another date after a presentence

4    report was done?

5    A.   Correct.

6    Q.   And just for the purposes of the record, on the bottom,

7    there is a series of numbers.  And the first set of numbers,

8    10-30-06, that would be the date; would that be correct?

9    A.   Yes, sir.

10   Q.   And the second set of numbers, that's the time?

11   A.   Correct.

12          MR. PINALES:  I have nothing further.  Thank you.

13          THE COURT:  Thank you.  We'll stop this point this

14   evening, ladies and gentlemen, finish with the examination of

15   this witness tomorrow.  Please keep in mind the admonition

16   you've been given several times.

17          First, of course, not to discuss the case among

18   yourselves while we're in recess.  Don't allow anyone to

19   approach you to discuss the case.  If that should ever happen

20   in the course of the proceeding, you should report that to the

21   Court promptly and allow the Court to deal with that.

22          Don't read, watch or listen to any accounts of the

23   case if there should be any.  Don't attempt to do any type of

24   research or do any investigation on your own.  Don't visit any

25   of the locations you've heard testified to.  Of course, don't

116

1    communicate electronically as we've discussed previously.

2              Finally, don't make up your mind about the case until

3    it is finally submitted to you.

4        Jury will be excused until 9:00 a.m. tomorrow morning.

5

6              (Proceedings adjourned at 4:33 p.m.)

7                          - - -

8                  C E R T I F I C A T E

9              I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
10   proceedings in the above-entitled case.

11

12    \s\ Lisa Reed Wiesman                    March 17, 2010
     LISA REED WIESMAN, RDR-CRR              Date of Certification
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3    <u>GOVERNMENT WITNESS</u>

     TIMOTHY S. BRIGGS
4    Redirect Examination by Mr. Smith................. Page  4
     Recross-examination by Mr. Pinales............... Page 11
5    Recross-examination by Mr. Westberry............. Page 15
     Recross-examination by Mr. Abell................. Page 19
6

7    <u>DEFENSE WITNESSES</u>

8    PATRICIA ELLEN NICHOLSON
     Direct Examination by Mr. Pinales................ Page 78
9    Cross-examination by Mr. Smith................... Page 88
     Redirect examination by Mr. Pinales............. Page 91
10
     GLENDA SESTER
11   Direct Examination by Mr. Hoskins............... Page  95
     Cross-examination by Mr. Smith.................. Page 103
12   Cross-examination by Mr. Richardson............. Page 107

13   MARILYN M. ROBERTS
     Direct Examination by Mr. Hoskins............... Page 108
14

15

     <u>DEFENSE EXHIBITS</u>                            <u>ADMITTED</u>
16
     Maricle Exhibit No. 2, Order assigning special judge
17   Admitted........................................ Page 109

18   Maricle Exhibit No. 3, Faxed copy of Maricle Exhibit 2
     Admitted........................................ Page 102
19
     Maricle Exhibit No. 4, videotaped plea of John Downey
20   Admitted........................................ Page 111

21                            - - -

22

23

24

25