1

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF KENTUCKY
2           SOUTHERN DIVISION at LONDON
                    - - -
3

UNITED STATES OF AMERICA,        :   Docket No. CR 09-16-S
4                                :
                 Plaintiff,      :   **Frankfort, Kentucky**
5                                :   Thursday, March 11, 2010
       versus                    :   1:05 p.m.
6                                :
RUSSELL CLETUS MARICLE,          :
7  DOUGLAS C. ADAMS                :
   CHARLES WAYNE JONES            :
8  WILLIAM R. STIVERS             :
   FREDDY W. THOMPSON             :        **Trial Day 22B**
9  WILLIAM B. MORRIS              :
   DEBRA L. MORRIS                :
10 STANLEY BOWLING,               :
                                 :
11               Defendants.      :

12

13                  - - -
            TRANSCRIPT OF TRIAL
14        BEFORE DANNY C. REEVES
      UNITED STATES DISTRICT COURT JUDGE and a jury
15                  - - -

16  APPEARANCES:

17  For the United States:     STEPHEN C. SMITH, ESQ.
                               JASON D. PARMAN, ESQ.
18                             Assistant U.S. Attorney
                               601 Meyers Baker Road
19                             Suite 200
                               London, KY 40741
20
    For the Defendant          MARTIN S. PINALES, ESQ.
21  Russell Cletus Maricle:    CANDACE C. CROUSE, ESQ.
                               Strauss & Troy
22                             150 E. Fourth Street
                               Fourth Floor
23                             Cincinnati,OH  45202

24                             DAVID S. HOSKINS, ESQ.
                               107 E. First Street
25                             Corbin, KY  40701

```
1    For the Defendant          R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
2                               Landrum & Shouse, LLP
                                220 West Main Street
3                               Suite 1900
                                Louisville, KY 40202
4

5    For the Defendant          T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
6                               133 West Short Street
                                Lexington, KY  40507
7

8    For the Defendant          ROBERT L. ABELL, ESQ.
     William R. Stivers:        120 North Upper Street
9                               Lexington, KY  40507

10

11   For the Defendant          R. TUCKER RICHARDSON, ESQ.
     Freddy W. Thompson:        Baldani, Rowland & Richardson
12                              300 West Short Street
                                Lexington, KY  40507
13

14   For the Defendant          JERRY W. GILBERT, ESQ.
     William B. Morris:         Coy, Gilbert & Gilbert
15                              212 North Second Street
                                Richmond, KY 40475
16

17   For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:           Gess, Mattingly & Atchison, PSC
18                              201 West Short Street
                                Lexington, KY 40507
19

20   For the Defendant          DANIEL A. SIMONS, ESQ.
     Stanley Bowling:           Thompson, Simons, Dunlop & Fore
21                              116 West Main Street
                                Suite 2A
22                              Richmond, KY 40476

23

24

25
```

3

1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
2                                 35 W. Fifth Street
                                  P.O. Box 1073
3                                 Covington, KY  41012
                                  (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

*MARICLE - Direct (Mr. Hoskins)*                                              4

1              (The jury entered the courtroom at 1:14 p.m.)

2              THE COURT:  Thank you.  All members of the jury are

3      present.  Parties and counsel are also present.

4              Mr. Hoskins or Mr. Pinales, you may call your next

5      witness.

6              MR. HOSKINS:  Call Cletus Maricle.

7              THE COURT:  Thank you.

8                    R. CLETUS MARICLE, DEFENDANT, SWORN

9                          DIRECT EXAMINATION

10     BY MR. HOSKINS:

11     Q.  Tell the jury your name, please.

12     A.  Russell Cletus Maricle.  I usually just use R., and

13     everybody calls me Cletus, including Mr. Briggs.

14     Q.  Where do you live, Mr. Maricle?

15     A.  Manchester, Kentucky, 393 Circle Drive.

16     Q.  That's in Clay County, Kentucky?

17     A.  Yes, it is.

18     Q.  How long have you lived in Clay County, Kentucky?

19     A.  Except for the time that I was away in college and law

20     school and one year that I spent in Owensboro, I've lived

21     there all my life, which at this point in time is 67 -- will

22     be 67 in July.

23     Q.  What part of Clay County were you born in?

24     A.  Between Burning Springs and Fogertown.

25     Q.  How close is that to the City of Manchester?

*MARICLE - Direct (Mr. Hoskins)*                                    5

1    A.    Approximately 12 miles.

2    Q.    Is that a rural part of the county then?

3    A.    Very much so, yes, sir.

4    Q.    And tell us about your family growing up, your parents.

5    A.    My father passed away when I was a year old.  My mother

6    raised me.  We lived with my maternal grandparents, and my

7    grandfather passed away, and then we continued to live with my

8    maternal grandmother.  She never remarried.  I had no brothers

9    and sisters.

10   Q.    What did your mother do for a living?

11   A.    She was a teacher.

12   Q.    And did she teach in the Clay County schools?

13   A.    She taught most often in the sixth grade at the Burning

14   Springs Elementary School.

15   Q.    I'm sorry, I didn't hear that.

16   A.    She taught most often sixth grade at the Burning Springs

17   Elementary School.

18   Q.    Where were you educated as a child?

19   A.    Well, I went to a one-room school known as Murray for

20   about six years.  My mother was the teacher there for that

21   period of time.  Then I graduated from Burning Springs

22   elementary, and then I went to Clay County High School,

23   college was at Georgetown College in Georgetown, Kentucky.

24   And then I went to the University of Kentucky Law School in

25   Lexington.

*MARICLE - Direct (Mr. Hoskins)*                                         6

1    Q.   What year did you graduate from college?

2    A.   1964.

3    Q.   And what degree did you have?

4    A.   Had a B.A. degree.

5    Q.   What kind of grades did you make in college?

6    A.   Mostly As.

7    Q.   And did you go straight from college to law school then?

8    A.   Well, actually, at that time, you could count part of

9    your law program towards your college degree.  So I, I had a

10   year that was pretty much combined.  I graduated from college

11   in '64, law school in '65.  But some of the hours in law

12   school at that time counted towards your college degree.

13   They'd give you credit on that.

14   Q.   What kind of activities were you involved with in high

15   school and college?

16   A.   Well, in high school, I never had any athletic ability so

17   I wasn't involved in sports.  I liked to go to the games all

18   right, but wasn't involved in sports, either one of those.

19   But studying anything history, political science,

20   international relations, any of those type of clubs I was in,

21   and then I was in a fraternity.

22   Q.   Mr. Maricle, at what point in your life did you first

23   become interested in politics?

24   A.   High school.

25   Q.   Do you remember when you registered to vote?

MARICLE - Direct (Mr. Hoskins)                                      7

1    A.   I would have registered when I was 18.  That would have

2    been 1961.

3    Q.   And did you register as a Democrat or a Republican then?

4    A.   I've always been a Democrat.  I registered as a Democrat

5    at that time because I was a Kennedy fan, but the Democrat

6    party sort of left a lot of the Kentucky Democrats.

7    Q.   What do you mean by that?

8    A.   Well, as opposed to what Judge Lewis said, being a

9    bright-eyed liberal, I'm pretty much an arch conservative.

10   Q.   How did your choice to register as a Democrat stand with

11   what most people in Clay County were at that point?

12   A.   Most people in Clay County at that point were Republicans

13   and still are.  I guess when I went away to law school and

14   registered Democrat, I really didn't think I'd ever come back

15   to Clay County, but home called me back.

16   Q.   When you left, you graduated from law school in 1965?

17   A.   1965, yes, sir.

18   Q.   And when did you take the bar exam?

19   A.   February of '66.

20   Q.   Did you pass the first time you took it?

21   A.   Yes, I did.

22   Q.   So when were you admitted to practice as a lawyer in the

23   Commonwealth of Kentucky?

24   A.   May of 1966.

25   Q.   Where did you first work as a lawyer?

*MARICLE - Direct (Mr. Hoskins)*                                              8

1    A.   I went to Owensboro, Kentucky, with a firm down there,

2    Neal & Diehl.  Worked there for just a little over a year, and

3    couple months in Frankfort.  Then I went back to Manchester.

4    Q.   And what led to your decision to go back to Manchester?

5    A.   It was home.

6    Q.   Did you have family there?

7    A.   Yes.  My mother was there.

8    Q.   Mother was still living in Clay County?

9    A.   Yes, she was, yes.

10   Q.   Now, is your mother living now?

11   A.   No, sir, she passed away in the year 2000.

12   Q.   When you went back to Clay County to start your practice

13   there, what did you do as far as an office?

14   A.   I practiced for about a year and a half with an attorney

15   there, Neville Smith.  Then I practiced two or three years

16   with Dale Mitchell, Lester Burns for a short time, and then

17   practiced on my own.

18   Q.   When did you start practicing on your own?

19   A.   Probably 1970, I guess, 1970 probably.

20   Q.   Now, what type of practice did you have when you first

21   started as a young lawyer?

22   A.   Workers' compensation was basically what we had at that

23   time.  There was a lot of black lung cases.  They'd just

24   passed the Federal Coal Mine Health and Safety Act, and it was

25   a good field to get into at that time, and I was very

1    fortunate that I got into that and did.  Of course, after a

2    few years, you had to go into something else, because, you

3    know, everybody got their black lung or they weren't -- or if

4    they hadn't got it, they weren't going to get it, I suppose,

5    is the best way of saying that.

6    Q.   So that was a new law that was passed that opened up a

7    field of practice?

8    A.   It did.

9    Q.   And just so we're clear about that, what kind of people

10   would have been your clients back then?

11   A.   Coal miners.  Exclusively coal miners.

12   Q.   Now, as a young attorney, were you politically active in

13   any way?

14   A.   Sometimes, yes.

15   Q.   Tell us a little bit about when you started to get active

16   in politics.

17   A.   Well, I'd been active since high school and up till I

18   became judge.

19   Q.   When did you become judge?

20   A.   1990.

21   Q.   And how did you first become judge?

22   A.   Well, the previous judge was Clay M. Bishop, and he

23   became sick in early 1990.  He stayed on until August of 1990,

24   and it was obvious he was not going to be able to go back to

25   practice.  He had cancer, and it was terminal.  Back to being,

MARICLE - Direct (Mr. Hoskins)                                    10

1    you know, getting on the Bench, not back to practice.

2        So I -- we had, at that point in time, we had like four,

3    five days to file.  If there's a vacancy, you have to file by

4    August 4th or 5th or something like that.  So I filed to run

5    that fall, and I also received the appointment September, I

6    think 24th was the date they said.  September 24th of that

7    year.  And then fortunate enough to win the election.

8    Q.  So Judge Clay M. Bishop had been your predecessor as

9    judge of the circuit court?

10   A.  For 20 years, 20 or 21 years he'd been there.

11   Q.  And what again is the circuit that that would include?

12   What counties are involved there?

13   A.  It's the 41st judicial circuit.  That includes Leslie

14   County, which is Hyden, Kentucky; Jackson County, which is

15   McKee, Kentucky; and my home county of Clay County, which is

16   Manchester, Kentucky.

17   Q.  So there's a courthouse in each of those counties?

18   A.  Yes, there is.

19   Q.  And you would go --

20   A.  New one in two of them right now.

21   Q.  You would go from county to county and conduct court in

22   each of those counties?

23   A.  That is correct.  Set down to go the first week of the

24   month, Jackson County one day, Leslie County one day, and Clay

25   County one day and set cases and go where you had to the rest

*MARICLE - Direct (Mr. Hoskins)*                                    11

1    of the time.

2    Q.   When you became judge back in 1990, was there already a

3    person serving as the court reporter for Judge Bishop?

4    A.   Marilyn Roberts was the court reporter under Judge Dixon,

5    Judge Bishop, myself and now Judge House.

6    Q.   So she's still the court reporter?

7    A.   She's the boss.

8    Q.   And she testified yesterday and today?

9    A.   Yes, she testified yesterday afternoon and this morning.

10   Q.   And she's a friend of yours, you would say?

11   A.   Yes, she is.

12   Q.   Let me step back a little bit.  You told us you went into

13   practice by yourself around 1970.  Did you stay in as a solo

14   practitioner until you became judge?

15   A.   No.  I had a couple of people that I became partners

16   with, Scott Madden and Gayle House.  We practiced together as

17   a partnership for a few years.  I don't know how long, I don't

18   remember exactly.  Not that long.  And then Mr. House became

19   county attorney, and that left me and Mr. Madden.  And

20   eventually, I had a fella worked for me name of David Carroll,

21   and then became partners with Ricky Bailey.

22   Q.   Scott Madden still practices in Clay County?

23   A.   Yes, he does.

24   Q.   And so how long were you and Mr. Madden partners, would

25   you say?

*MARICLE - Direct (Mr. Hoskins)*                                      12

1    A.   They got out of law school after I did.  They probably

2    practiced a couple years before we teamed up.  I would say

3    three or four years at the most.

4    Q.   When you say they got out of law school, who do you mean?

5    A.   Scott and Gayle.  Scott Madden and Gayle House.  They had

6    gone to law school together.  And Mr. House was from London,

7    Mr. Madden was from Manchester.  And so they were friends in

8    law school.  When they got out of law school, they opened

9    offices in London and in Manchester.

10   Q.   And then a short time after that, you joined up with

11   them?

12   A.   That's correct.

13   Q.   What type of practice did you have when you were partners

14   with Mr. Madden and Mr. House?

15   A.   Basically, we were still doing a lot of workers'

16   compensation at that time and did some, some criminal work and

17   other trial work, you know.  At that time, whatever came in is

18   what you took.  Not like it is now, where even in a small

19   town, the lawyers will more or less be specialized.  Like in

20   Manchester, Stephen Charles specializes in criminal law, and

21   Annette Morgan for a while just did all the divorce work.  So

22   the day of you take whatever comes in the door doesn't really

23   fit anymore in practice.

24   Q.   What type of practice would you say Mr. Madden has at

25   this point?

*MARICLE - Direct (Mr. Hoskins)*                                      13

1    A.   Mostly personal injury work.

2    Q.   And Mr. House was your partner for a short time, and then

3    he ran for office?

4    A.   He ran for county attorney.

5    Q.   Do you remember what year he would have been elected

6    county attorney, approximately?

7    A.   1977, I believe.  He may have actually been appointed and

8    served a short time before that.  I don't know.  But his first

9    election was 1977.

10   Q.   Okay.  And how long did he serve as county attorney; do

11   you know?

12   A.   Until he became district judge, which was probably two or

13   three years before he became district judge.  Because of the

14   docket, the legislature created another district judgeship.

15   Q.   Let's talk a little bit about that.  How many judges are

16   there in the circuit court that you served in?  How many

17   circuit judges are there?

18   A.   There are two at the present time, but one of them

19   strictly does family court.  There was only one when I

20   started.  And then they started with family judges, and we had

21   enough of a caseload to justify another judge, and Justice

22   Lambert wanted to put it as a family court judge.

23        Since I didn't like being family court judge and

24   basically had not been because I had domestic relations

25   commissioners, he and I were in agreement that the next judge

*MARICLE - Direct (Mr. Hoskins)*                                        14

1    ought to be family court, and we had someone who was very

2    interested in that and was very capable.

3    Q.   Okay.  Let's talk about when you first became circuit

4    judge.  What were the types of cases that you would hear as

5    circuit judge?

6    A.   As circuit judge, you would hear felony cases in the

7    criminal branch.  That would be anything where you could get a

8    year or more in jail, from theft, to unlawful taking, up to

9    murder, whatever felonies were.  And then civil cases which

10   amounted to anything, I believe at that time was over $4,000.

11   That's been some time.  It might have actually been $2,500,

12   but it was anything over that that was in controversy, we did.

13   And, of course, all of the divorce work, divorce cases were

14   also filed in circuit court.  And some appellate work from

15   administrative branches, such as workers' compensation for a

16   while, unemployment, insurance, those things would be cases

17   which there would be an appeal from, most often a fruitless

18   appeal.  But there would be an appeal.  You were stuck with

19   whatever the findings of fact were.

20   Q.   Let's talk about what your typical caseload was back

21   then.  You were covering all those cases for all three

22   counties?

23   A.   Yes, sir.  Probably, at that time, 16, 17 hundred -- 15

24   to 17 hundred new cases were filed per year.  And had a

25   backlog, when I took over, of probably 26 or 27 hundred.

*MARICLE - Direct (Mr. Hoskins)*                                    15

1    Q.   And that's all three counties together?

2    A.   That would include Leslie County, Clay County, and

3    Jackson County, all three counties.

4    Q.   So when you say there was a backlog, I mean, cases that

5    were --

6    A.   Cases that had not been disposed of.  Judge Bishop

7    was a little bit behind because of the number of cases we had,

8    and then when he became ill, and we had special judges for

9    probably seven or eight months.  Cases just didn't move along

10   as quickly as everyone would like for them to.  Just got a,

11   you know, a pretty good backlog.

12   Q.   So tell us a little how that was dealt with.  There was a

13   backlog, and you said something about special judges.  What

14   was the process for those people?

15   A.   Well, I, of course, I had a number of cases that I was in

16   when I became circuit judge that I had to disqualify.  Those

17   were assigned out to special judges.  There were a good number

18   of those.  I really don't at this time have any idea how many

19   there were.

20        As far as what was left, I did it, and we worked day and

21   night and sometimes on Saturday.

22   Q.   Well, you, at the time that you became judge, you said

23   you had -- you were partners with another lawyer?

24   A.   Mr. Ricky Bailey, yes, sir.

25   Q.   Is he still living?

*MARICLE - Direct (Mr. Hoskins)*                                        16

1    A.   No, he died -- he was killed in an accident in July of

2    2000.

3    Q.   And you were on the Bench at that point?  You were a

4    judge?

5    A.   Yes, I was.

6    Q.   When you and Mr. Bailey practiced together and a case

7    came into the office, would it normally be both of you

8    handling that case, or sometimes you, sometimes him?

9    A.   No, generally someone come in, they would ask for who

10   they wanted, and that's, you know, who they would get.

11   Probably at first, because I had good number of cases, I got

12   people to, you know -- Ricky to work on those cases.  But

13   basically, came to me, I did the work.  Came to Ricky, he did

14   the work.

15        Sometimes we had to cover for each other in court or a

16   deposition, we'd cover the cases.  But basically, the primary

17   responsibility for the case would rest with the person that

18   the individual came to see.  That's what the client wanted.

19   That's who they liked to get.

20   Q.   And what type of practice did Mr. Bailey have, and what

21   type of practice did you have around the time you first became

22   judge?

23   A.   By that time, I had turned to pretty much criminal work

24   about all of the time.  He did other work.  He did some

25   divorce work, because I generally did not take divorces.  I

*MARICLE - Direct (Mr. Hoskins)*                                    17

1    just didn't have the temperament for divorce cases.  So I

2    generally avoided those.  Only time I ever took any divorce

3    cases was when it was a client, and I had to -- a regular

4    client and I had to.  He did some divorce work, and then, you

5    know, whatever else came in.  He did some, I think he did some

6    title work too.

7    Q.  So the cases that you had as active cases that were your

8    cases when you were a lawyer, what happened to them when you

9    became a judge?

10   A.  Well, it didn't matter whether they were my cases or Mr.

11   Bailey's cases.  When I became judge, because we were a

12   partnership, I had to disqualify in all of those cases.  So it

13   wasn't just my cases.  It was his cases also.

14   Q.  And there were a lot of those cases or a few?

15   A.  A lot.

16   Q.  We've heard about one case that your firm was involved in

17   for a fella name of Gary Runion?

18   A.  Yes, sir.

19   Q.  Do you remember that case?

20   A.  Yes, sir.

21   Q.  Do you remember which of the attorneys in the -- your

22   firm was handling that case for Mr. Runion?

23   A.  I think basically, Mr. Bailey was the one that was

24   handling it, but I would have to check and see if I signed any

25   pleadings.  It's entirely possible I might have signed some

1    pleadings.  Had something dictated left to sign, and it didn't

2    go out, and he was somewhere else or vice versa, anyone could

3    sign the pleadings.  So I'd have to look at the file to be

4    100% sure of whether or not I signed any pleadings.  But it

5    was his primary responsibility.

6    Q.   So because you were partners, either one of you could

7    have signed any papers that needed to be mailed out or filed?

8    A.   Oh, sure.  The signature of either one of us under the

9    firm name was binding on all of us, yes, sir.

10   Q.   If it was a pretrial kind of thing, would it be common or

11   uncommon for you guys to cover for each other?

12   A.   That would be fairly common to do that.  It really made

13   no sense, unless you had something really technical that you

14   needed to argue, for both of you be at motion hour to get, you

15   know, cases assigned for trial.  Anyone could do it.  Of

16   course, if there was a particular legal issue that was being

17   argued that one was familiar with and the other wasn't, then

18   that person would be there.  But we would cover for each

19   other.

20   Q.   So some of the things that would come up in a case as it

21   progresses are very routine?

22   A.   Yes, sir.  Motions to sign for trial are routine.

23   Usually at the beginning of the case, there will be a couple

24   of motions to dismiss, just to stall for time.  A lot of those

25   things were pretty much routine.

*MARICLE - Direct (Mr. Hoskins)*                                        19

1    Q.   Those kinds of things, it really doesn't matter who --

2    A.   Doesn't matter, as long as somebody's there to cover.

3    That's all it takes, somebody to cover.

4    Q.   If it was something that was fairly significant in that

5    case, which lawyer would handle that?

6    A.   Whoever was handling that case, was familiar with that

7    particular issue would be the one that would have to handle

8    that.

9    Q.   You talked earlier about your former partner, Oscar Gayle

10   House?

11   A.   Yes, sir.

12   Q.   He was county attorney for what county?

13   A.   Clay County.

14   Q.   So he practiced in Clay County the whole time he was a

15   lawyer before he became judge?

16   A.   Well, they had -- when him and Mr. Madden started, they

17   had offices in London and Manchester.  Then he became county

18   attorney, and the office of Manchester, I think it was -- I

19   mean London was already gone by that time.  Became county

20   attorney, and then he became district judge in a matter of two

21   or three years, something like that.

22   Q.   What kind of relationship did you have with Mr. House,

23   Oscar Gayle House, when you and he no longer were law

24   partners?

25   A.   We were still friends.

*MARICLE - Direct (Mr. Hoskins)*                                     20

1    Q.   Did you do things together outside of the law practice
2    back then?
3    A.   Not, not that much, no.  We might occasionally go to
4    dinner or maybe every once in a while a ball game.  But you
5    know, socially, we weren't together that much because, well,
6    one, I was very busy, and I'm sure he was.  And by that time,
7    of course, he became district judge, he was covering two other
8    counties, and so he'd be out of county a lot of times.  He was
9    a little bit younger than I was too.  Made some difference.
10   Q.   Mr. Maricle, are you married?
11   A.   Yes, sir.
12   Q.   And what is your wife's name?
13   A.   Judy.
14   Q.   Is she here today?
15   A.   Yes, she's sitting back there in the red sweater.
16   Q.   How long have you and Judy been married?
17   A.   Thirty-nine years.  Going on 39 years.  39 or 40 years.
18   Q.   So do you all have children?
19   A.   Four.
20   Q.   Who are your children?
21   A.   Donna Leah, Rusty, Meredith, and Linsey.
22   Q.   Donna Leah is your daughter?
23   A.   Yes, she's the one that's married to Phillip Mobley
24   they've been talking about.
25   Q.   Phillip Mobley is now the PVA?

*MARICLE - Direct (Mr. Hoskins)*                                    21

1    A.   He's now the PVA, yes, he is.

2    Q.   Your daughter Meredith, is she married?

3    A.   Yes, sir.  She's married to Aaron Mobley.  They're

4    sisters married to brothers.

5    Q.   And Aaron and Phillip are brothers?

6    A.   That's correct.

7    Q.   Married to your two daughters?

8    A.   That's correct.

9    Q.   And you have a son, Rusty?

10   A.   Yes, sir.

11   Q.   What was his full name?

12   A.   Junior.  Same as mine.

13   Q.   Okay.  And is he still living?

14   A.   No, sir.

15   Q.   I'm sorry to have to ask you about this, but when did

16   your son pass away?

17   A.   January 30th, 2009.

18   Q.   Had he been ill before he passed away?

19   A.   No, sir.

20   Q.   Would there be any reason to expect his death?

21   A.   No, sir.  I was out of state at the time, didn't expect

22   it.

23   Q.   Where were you when your son passed away?

24   A.   I was in Florida.

25   Q.   Was your wife with you?

*MARICLE - Direct (Mr. Hoskins)*                                          22

1    A.   Yes, she was.

2    Q.   How did you happen to be in Florida?  What was the reason

3    for going there?

4    A.   Went there fishing.

5    Q.   Fishing one of your hobbies?

6    A.   Well, it has been since '96 or '97.  Before that, I

7    didn't have any hobbies.  But starting in about '96, we began

8    to -- I say we, because Judy enjoyed fishing too.  So I didn't

9    get to fish to get away from her.  We had to go fishing

10   together.  But we both enjoyed it and did go extensively.

11   Q.   You have daughter, Linsey?

12   A.   I have a daughter Linsey, yes, sir.

13   Q.   How old is Linsey?

14   A.   She's 29.

15   Q.   And where does Linsey live now?

16   A.   She lives in Manchester.

17   Q.   Does she live in your home at this point?

18   A.   No, sir.  She moved in the home that Rusty lived in.

19   Q.   Before she moved into the home that Rusty had lived in,

20   where did she live?

21   A.   She lived basically with me.

22   Q.   Now, has --

23   A.   And Judy.

24   Q.   Has Linsey had a drug problem?

25   A.   Yes, sir.

*MARICLE - Direct (Mr. Hoskins)*                                    23

1   Q.   Again, I hate to have to ask you about this, but let me

2   ask you, when did you first realize that your daughter had a

3   drug problem?

4   A.   I suppose when she was a senior in high school, we

5   realized she had a problem, and we took her out of Clay County

6   High School and went to a Seventh Day Adventist private school

7   named Cumberland Academy down in Calhoun, Georgia.  She went

8   to school there for one semester.  We let her come back her

9   senior year and finish at Clay County High.

10  Q.   And what was your reason for sending her to Georgia for

11  school?

12  A.   It was a shock to her system, to shock her into that.

13  Because to be taken from a -- and I don't mean this in any way

14  to offend anybody's religion, because I don't know what

15  anybody's religion is.  But when you're used to wearing

16  jewelry, eating whatever you want, drinking Coca-Cola, coffee,

17  and all those things, to put you in a private school where the

18  religion prohibits -- controls what you wear, controls what

19  you -- certain things you can't eat and can't drink, it gives

20  you a -- you know, our thoughts were it would be a shock to

21  her system and something she might to come to appreciate, and

22  she did for a while.

23  Q.   So did that completely solve Linsey's drug problem?

24  A.   No, sir.

25  Q.   How did it progress from that point?

*MARICLE - Direct (Mr. Hoskins)*                                    24

1    A.   Well, it just continued to -- she started college at

2    Eastern and made pretty good grades.  Then, you know, I'm sure

3    that during all of that time there was some use of it.  But

4    obviously, some use becomes excessive use.  Any use is

5    excessive use, but some use really becomes really bad for you.

6    And sort of an in and out thing.

7         She did some, you know, as addicts do, they tend to take

8    from people the stuff that they don't own and, particularly,

9    they tend to take from their family.  And she took some checks

10   and cashed those of her mother's and some that were mine and

11   some other things that we found at the pawn shop.  So we had

12   to deal with that.

13   Q.   Let me ask you to back up a minute.  You first found out

14   that Linsey had a problem with drugs when she was still in

15   high school?

16   A.   That's correct.

17   Q.   Now, were you at that point a judge or were you still --

18   A.   I was a judge at that time.

19   Q.   So you were the circuit judge at that point?

20   A.   Yes, sir.

21   Q.   She left Clay County for a semester and then came back?

22   A.   Came back and graduated from Clay County High.  Allowed

23   her to come back to graduate with her class.

24   Q.   And at some point after that, the drug issue reappeared?

25   A.   That's correct.  It's a thing that goes in cycles, you

*MARICLE - Direct (Mr. Hoskins)*                                    25

1    know.  There will be down low, and you'll get them

2    straightened out, and they'll go good for a while, and then

3    they just, they go off again.  I guess they never completely

4    get over it a hundred percent.  But it just takes they have to

5    have their mind set to do it.  They have to have support to do

6    it too.

7    Q.   During the time that you were serving as a judge for Clay

8    County, did Linsey ever get in trouble with the law?

9    A.   Yes, sir.  Some were cases where we, either her mother

10   and I got warrants for her for checks, generally, was what it

11   was.  And take a check and go, you know -- she took a check on

12   me and she'd go out in the county, probably go cash it, and

13   I'm going to make it good for her, you know.  I'm not going to

14   have people out there thinking some way I cheated them out of

15   it.  So, you know, I always had to make them good.

16        We did try to bring her under control by putting her in

17   jail.  Also went to rehab on several occasions, and then there

18   were two occasions that she was caught for things that we did

19   not have warrants for.  One was the event that Mr. Roberts

20   testified about, and the other one who testified about it was

21   that Bobby Joe Curry's, where I'd issued a search warrant.  I

22   don't remember which witness testified about that.  I'm sure

23   one of them did.

24   Q.   Let's talk about that.  There were times when you

25   actually swore out a warrant against your daughter?

*MARICLE - Direct (Mr. Hoskins)*                                    26

1    A.   Yes, sir.

2    Q.   And how were things handled in the court system when you

3    were the person who had your daughter charged?

4    A.   I think they were handled the same way that would have

5    been handled on anybody.  And, of course, when you've got a

6    warrant for your child for doing something, it's tough, it's

7    hard.  And I think that the prosecutors treated me the same

8    way that they treated everybody else.  I think the judges

9    treated me the same way they treated everybody else, and their

10   first, first interest they have is try to help that person.  I

11   think they were consistent in that.

12   Q.   Did you try in any way to conceal Linsey's drug problem?

13   A.   No.  It was, it was well known.  There was no conceal.  I

14   always, I acknowledged it up front.  Her mother acknowledged

15   it up front.  The family acknowledged it up front.  We never

16   tried to conceal that in any way.  Sometimes I wish maybe I

17   had, but I never did, and it's there, and it will be there

18   with her for, for her life, really.

19   Q.   When these warrants were sworn out, was she arrested?

20   A.   Yes, she was.

21   Q.   Then what happened to her?

22   A.   She was taken to jail.

23   Q.   Did she ever spend much time in jail?

24   A.   She spent, on two or three occasions, several days each

25   time.  I don't think she was ever in for maybe longer than a

1    month or so.  Usually would wind up getting her into rehab

2    somewhere.  We went to Joshua's Dream, which was in Perry

3    County one time.  A place down at Corbin one time.  And then

4    our pastor, our former pastor and his wife, Patty and Scotty

5    Sumner, had opened up a private place, religiously oriented,

6    in London.  And she, I believe, was the first person to live

7    with them, and she lived with them five, six, seven months, I

8    guess.

9    Q.   Now, was your daughter ever taken into your court on any

10   of her cases?

11   A.   No, no.  That would have been impossible.  Would have

12   been impossible, me being the judge.  Just say it that way.

13   It would have been impossible.  If she'd have been in circuit

14   court, it would have been some other judge.

15   Q.   You talked about an event that Mr. Roberts talked about.

16   Who is Mr. Roberts?

17   A.   Todd Roberts testified here that was the city policeman.

18   Q.   Okay.  And Todd Roberts, for a period of time, was the

19   assistant police chief?

20   A.   That's correct.

21   Q.   Manchester City Police Department?

22   A.   That's correct.  At night, as I remember.

23   Q.   And tell us your involvement in that situation.

24   A.   I was at home, and he called me and said that he'd

25   stopped a car.  I assumed that whoever stopped it for was DUI.

1    I don't know whether that was the charge.  And that Linsey was

2    there, and did I want to come and get her or take her to jail?

3    And I said, well, I'll come down and check her out.

4        I went down to check her out.  In my opinion, she was

5    under the influence, and I told Mr. Roberts to take her to

6    jail.  That was -- I think that's the first time I ever had

7    her taken to jail.

8    Q.   Do you recall about how old she was at that point?

9    A.   Probably early 20s.  I can't give you an exact year.

10   Probably early 20s, 20 or 21, maybe 22.

11   Q.   And what position did you hold at that point?

12   A.   I was circuit judge at that time.

13   Q.   You talked about another incident with a man named Bobby

14   Joe Curry.  Tell us your involvement in that situation.

15   A.   I was at home one night.  Mr. Patrick Robinson, and there

16   was another officer with him.  I'm not sure who it was.  But

17   Patrick came to the house and --

18   Q.   And what kind of job did he have?

19   A.   He was a city policeman.  I don't know whether he was

20   actually with Unite at that time or just a city policeman.

21   Even if there was Unite, they're city policemen, but it's a

22   different sort of program.  So I'm not sure what he was that

23   particular time.  I know he was a city policeman.  Whether or

24   not he was working with Unite, I do not know at this time.

25   Q.   He was a police officer?

*MARICLE - Direct (Mr. Hoskins)*                                    29

1    A.   He was a police officer, yes, sir.

2    Q.   And the man who was with him, what was he?

3    A.   He was a police officer also, but I don't remember who it

4    was.

5    Q.   Okay.

6    A.   It wasn't Todd Roberts.  I remember that, because that

7    was the reason for their getting the warrant.  They didn't

8    want him to know.

9    Q.   You're saying getting a warrant?

10   A.   It was a search warrant is what it was.  Search warrant,

11   search the premises of Bobby Joe Curry.

12   Q.   And police officers came to your home for that?

13   A.   That was not unusual.  I've had them call me two, three

14   o'clock in the morning, and I got up to do that.

15   Q.   That's part of the job?

16   A.   That's part of the job.  You get paid 24/7.  You're

17   always considered to be on duty, 24 hours a day.

18   Q.   Okay.  So police officers came to your house, and you

19   issued a search warrant?

20   A.   That's correct.

21   Q.   What happened after that?

22   A.   Probably been maybe an hour or so, and phone rang.  It

23   was Mr. Robinson informing me that she was up --

24        MR. SMITH:  Your Honor, I'm going to object to

25   hearsay.

*MARICLE - Direct (Mr. Hoskins)*                                    30

1           THE COURT:  Sustained.

2    A.  I learned that she was at the premises, and she should

3    also go to jail same as everybody else.

4    Q.  Is that what happened that night?

5    A.  Yes, sir.

6    Q.  Now, what is Linsey's status right now?

7    A.  Linsey's status right now is she's -- she did finish her

8    degree.  She has two children.  She has been doing, since --

9    let's see.  The baby was born I guess a year ago today.

10   March 11.  Is that today?  March 11.  Born a year ago today,

11   and she's been clean during the time of her pregnancy and

12   since then as far as I know.  And even when she had the first

13   child -- this is her second child -- during her pregnancy, she

14   stayed clean.  Went back afterwards.

15   Q.  So she has two children that are your grandchildren?

16   A.  That's correct.

17   Q.  What are their names?

18   A.  Blake is the oldest and Mary Jo is the baby.

19   Q.  How old is Blake?

20   A.  He'll be nine July the 29th.

21   Q.  Mary Jo, you said, turns one today?

22   A.  She's one today.

23   Q.  When Linsey lived with you, where did her children live?

24   A.  Her children lived with me also, but when she didn't live

25   with me, Blake stayed with us most of the time.  You heard him

*MARICLE - Direct (Mr. Hoskins)*                                31

1    on the tapes.  That's who that was.

2    Q.   The little child's voice we heard on a lot of these

3    tapes?

4    A.   That's Blake, yes.

5    Q.   Was your grandson, Blake?

6    A.   Yes.

7    Q.   Blake go to school?

8    A.   Yes, he does.  He's third grade this year.

9    Q.   Where has he gone to school over the last --

10   A.   Manchester Elementary.

11   Q.   Who usually takes him to school and picks him up?

12   A.   Until this came up, I did.

13   Q.   So you were there on a regular basis?

14   A.   I was there every morning and every evening, except maybe

15   if I was out of town, like we was gone fishing.  But I was,

16   90% of the time, I was the one that took him in, picked him up

17   in the afternoon.  Sometimes when I was out of town, like in

18   Jackson County or Leslie County and hadn't made it back,

19   somebody else would get him.  But in the morning, pretty much

20   consistent all the time.

21   Q.   Your home is right in the City of Manchester?

22   A.   393 Circle Drive.  Yes, sir.

23   Q.   And that's within the city limits?

24   A.   Yes, sir.

25   Q.   The Manchester Police Department knew where it was?

*MARICLE - Direct (Mr. Hoskins)*                                    32

1    A.   Oh, absolutely.  Been there many times.  Probably once a

2    week.

3    Q.   And you worked at the three courthouses that you've

4    talked about?

5    A.   Yes, sir.  My primary office was Manchester.  I only went

6    to Jackson County and to Leslie County when I had business to

7    do there.  But my office, the state considered my office to be

8    there in the county, which was Manchester.

9    Q.   And you were working full-time as a circuit judge until

10   you retired?

11   A.   That's correct.

12   Q.   There's been a suggestion that you tried to avoid the FBI

13   or tried to avoid people.  Were you ever hard to find?

14   A.   No, sir.  I don't think so.

15   Q.   Talked about Linsey's children.  Do you have other

16   grandchildren?

17   A.   Got eight more.

18   Q.   How many children does Donna Leah have?

19   A.   She has two, Brandon and Casey.

20   Q.   We've heard a little bit about Brandon in this case,

21   haven't we?

22   A.   Yes, we have.

23   Q.   How old is Brandon?

24   A.   Brandon is -- he'll be 22 on October 2nd.

25   Q.   What does he do now?

*MARICLE - Direct (Mr. Hoskins)*                                    33

1    A.   He's going -- he goes to Eastern Kentucky University.

2    Q.   So he's a college student?

3    A.   He's in college, but he's going there at the center in

4    Manchester.  They have a center at Manchester, EKU does, just

5    built a new building.

6    Q.   During the time period that we heard these recordings

7    were made, was he in college then or doing something else?

8    A.   I believe he graduated from high school in May or June of

9    2007.

10   Q.   So the school year of 2006-2007, he was a senior?

11   A.   That was his senior year at Clay County High School in

12   Manchester.

13   Q.   Was he working for the City of Manchester during some of

14   that time?

15   A.   He was on a program that the school has, they call it the

16   co-op program, that they get people in town, employers to take

17   the person, say, from -- take the student from 1:00 to 4:00,

18   1:00 to 5:00 and let them work, and they get credit for that

19   at the high school, and they also get paid for that, whatever

20   minimum wage is, generally speaking.

21   Q.   So your grandson, Brandon, had had that job through the

22   school system?

23   A.   That is -- yeah, it was a school program.  I mean,

24   actually the City paid the salary, the employer paid whatever

25   was due, but they still got credit for it.  The school didn't

*MARICLE - Direct (Mr. Hoskins)*                                    34

1    pay them for being there, naturally.

2    Q.   Did he get to keep that job all through the school year?

3    A.   No, he didn't.

4    Q.   How did he lose his job?

5    A.   When there was a change of administration, he was the

6    first one to be let go.

7    Q.   Okay.  That was when Doug White lost his election?

8    A.   Yeah, when Miss Lewis took over.

9    Q.   Had you been a supporter of Miss Lewis or Mr. White in

10   that election?

11   A.   Miss Lewis had come to my home when she was running for

12   mayor, and I was very frank with her up front, that I had to

13   vote for Mr. White, mainly because there was a -- partially

14   because there was a relationship to his wife, and the other

15   reason being that Manchester, for a small town, was

16   exceedingly financially well off.  They had money in the bank.

17   That's not usual.

18   Q.   How did the fact that the City of Manchester had money

19   affect your choice for who you'd support as mayor?

20   A.   Well, if they can run a government and have money to

21   operate the, you know, the government with and still some left

22   over, that's doing pretty good, in my opinion.

23   Q.   So you thought Mr. White had done a good job?

24   A.   I thought he did.  He had some personal problems.  I

25   thought as far as being mayor, as far as I knew at that time,

*MARICLE - Direct (Mr. Hoskins)*                                35

1    he had done a good job.

2    Q.   You also mentioned that there was some kind of family

3    connection to -- that you had with Doug White?

4    A.   Yes.  With his wife.

5    Q.   Tell us exactly what that family connection is.

6    A.   His wife's mother and my mother were double first

7    cousins.  They were like my two daughters and two son-in-laws.

8    They were as close as you can get and not be a brother or

9    sister.

10   Q.   Over the years, were you -- did you have a friendship

11   with Doug White?

12   A.   We got along all right.  I didn't -- we weren't socially

13   together.  But, you know, yeah, we got along all right.

14   Q.   When Brandon, your grandson got that co-op job with the

15   City, do you know how he got that job?

16   A.   Sir?

17   Q.   When your grandson, Brandon, got the co-op job with the

18   City, do you know how he got that job?

19   A.   It would have been through the City and through the

20   school.  At that time, he was very close friends with

21   Kendilynn, who was the daughter of Wanda and Kennon White.

22   Q.   Did they know Brandon was your grandson?

23   A.   I'm sure they did, yes.

24   Q.   By they, I mean the Whites?

25   A.   Yes, I'm sure they did.

*MARICLE - Direct (Mr. Hoskins)*                                          36

1   Q.   Kendilynn is the daughter of Wanda --

2   A.   She's Wanda and Kennon's daughter.  That's why they call

3   her Kendilynn.

4   Q.   Is she the same age as Brandon?

5   A.   Maybe just a little bit older, but basically the same

6   age.

7   Q.   Did you pull strings to get Brandon that job?

8   A.   No, sir.  I didn't know he had that job till he had it.

9   Q.   Of course, people knew you were his grandfather?

10  A.   Most people, yes, sir.

11  Q.   And Brandon is Donna Leah's son?

12  A.   That's correct.

13  Q.   Does she have another child?

14  A.   Casey.

15  Q.   Casey a boy or girl?

16  A.   It's a girl, all girl.

17  Q.   How old is Casey?

18  A.   Fourteen.  February the 6th, I think she was 14.

19  Q.   And Meredith, does she have children?

20  A.   She has three children.

21  Q.   What are their names and ages?

22  A.   Corey will be 15 August 25th.  Matthew will be 10 on

23  September the 13th, and Jacob will be 6 or 7 on June 9th.

24  Q.   Did Rusty have children?

25  A.   He had three.

*MARICLE - Direct (Mr. Hoskins)*                                    37

1    Q.   What are Rusty's children's names?

2    A.   Allison, and she'll be 18 in December, December 28th.

3    Rusty will be 14, Rusty, Jr., will be 14 October 2nd.  Sarah

4    will be nine September the 23rd.

5    Q.   Now, you're Russell Cletus Maricle, Junior, yourself,

6    aren't you?

7    A.   No, I'm Russell Cletus Maricle, period.  And then junior

8    was my son, and then Russell Cletus Maricle the Third.

9    Q.   So your grandson has the same name as you?

10   A.   My grandson has the same name, yes.

11   Q.   Where do Rusty's children live now?

12   A.   One of them is living with their maternal grandmother.

13   She's been pretty much put out, I guess, at this point in

14   time.  The other two right now are with their mother, but one

15   of them stays with us a good portion of the time, and on the

16   weekends we have them.

17   Q.   We've talked a little bit about Doug White.  We've heard

18   different testimony through the course of this trial about the

19   White family.

20   A.   Yes, sir.

21   Q.   But let me ask you, in your words, to describe briefly

22   the role the White family has played in Clay County.

23   A.   Well, from probably 1800s, they've been the dominant

24   family in Clay County up until just the last four, five, six

25   years.  So there might be periods of time in there when they

*MARICLE - Direct (Mr. Hoskins)*                                    38

1   would maybe not be as influential or hold as many offices as

2   they might at other times, but they generally had one to three

3   to four people who were in office.

4        And I really don't remember a time that there wasn't

5   somebody named White that wasn't county judge or on the

6   Supreme Court of Kentucky, as one of them was, or mayor.  I

7   don't -- county attorney.  I don't really remember any time

8   during my lifetime that there hasn't been at least somebody

9   named White that was there.

10       There's a lot of feuds back in the late 1800s, early

11  1900s, and the other side was the Baker side, and I'm not

12  related to either side.

13  Q.   So your relationship to Doug White is through Doug

14  White's wife; is that right?

15  A.   Right, that's correct.

16  Q.   Well, since I mentioned him in my opening statement, let

17  me ask you about the White who was on the Supreme Court of

18  Kentucky.  What was his name?

19  A.   John D. White, J.D. White.  He was a Presbyterian

20  minister and an attorney.

21  Q.   When he was an attorney, where did he practice law?

22  A.   Well, he actually was a minister and an attorney, and he

23  was actually served as Presbyterian minister without

24  practicing law in various places throughout the country.  And

25  then he came back, I think he retired from the ministry, came

*MARICLE - Direct (Mr. Hoskins)*                                    39

1    back, got to be county attorney, then became judge on the

2    Court of Appeals and judge on the Supreme Court of Kentucky.

3    Q.   So was he county attorney for Clay County?

4    A.   For a short period of time, yes, sir.

5    Q.   And ended up on the Supreme Court of the Commonwealth?

6    A.   That's correct.

7    Q.   There have been some other members of the White family in

8    recent years that have been -- held political office?

9    A.   There's always been somebody in political office named

10   White as long as I can remember, up until now.  I don't know

11   of anybody by that name that is now.

12   Q.   One of those people was a man named Jennings White?

13   A.   Yes, sir.

14   Q.   And what office did he have?

15   A.   He was county court clerk.

16   Q.   Now, he was county court clerk during the same time

17   period that you were circuit judge; is that right?

18   A.   I became circuit judge before he was county court clerk.

19   And then when he got defeated in 2003, I remained as -- I was

20   still circuit judge until I retired in 2007.

21   Q.   Do you remember what he did before he was the county

22   court clerk?

23   A.   Basically, Wal-Mart.  He started out teaching, and then

24   he got hooked in some way with Wal-Mart, these machines that

25   you see in the front of the Wal-Mart store where you put coins

*MARICLE - Direct (Mr. Hoskins)*                                        40

1    in, the kids play or they get a token or a gift if the thing

2    drops down and picks up the baby that's in there or whatever.

3    And he did that, and I'm assuming continued to do that

4    afterwards also.  It was lucrative.

5    Q.   Now, some of the people that we've talked about, Todd

6    Roberts, Doug White, Jennings White are in prison now.

7    A.   Yes, sir.

8    Q.   Before those men were arrested and charged with their

9    crimes, did you have any knowledge that they were involved in

10   criminal activity?

11   A.   I would have bet the home place that Jennings White was

12   not involved in any type of drug activity.  He didn't even

13   drink a beer.

14   Q.   How about Doug White?

15   A.   Doug had a problem with women.  Other than that, no.

16   Q.   Well, that's not what put him in prison, though?

17   A.   Well, yes and no.

18   Q.   Okay.  Let me ask you this.  There was a fire on a piece

19   of property close to the City building in Manchester.

20   A.   Yes, sir.

21   Q.   Turns out that Todd Roberts and Doug White had something

22   to do with that.

23   A.   That's what I've heard here, yes, sir.

24   Q.   Had you heard anything about that before they were

25   charged with those crimes?

*MARICLE - Direct (Mr. Hoskins)*                                    41

1   A.   Before the events started and the investigation, no, sir,

2   I had not.  I have tried to place that house in my mind still,

3   and I cannot place that house in my mind.  I don't know where

4   it is.  I would have -- Todd Roberts, if they'd have said he

5   went in somebody's house and arrested them for drinking a

6   beer, I'd have said yes, he did that.  I'm shocked otherwise.

7   Q.   When did you step down as circuit judge?

8   A.   June the 1st, 2007, which was exactly 40 years to the

9   date I started in Manchester.  June 1, 1967 to June 1, 2007.

10  Q.   Now, when you stepped down, was there a program in place

11  that you started into then?

12  A.   They had the senior judges program, which really was the

13  reason that I stopped that, you know, stepped down.  There

14  were a lot of other reasons, but that was the chief thing.  It

15  was financial, and the legislature had not approved an

16  extension of the program.  There was some question about

17  whether it actually ended June 30th 2007 or January 31st,

18  2007.

19      By retiring on June 1st, 2007, I was able to get a 3%

20  increase insofar as retirement is concerned that judges were

21  getting.  So it was profitable for me, more money in my pocket

22  if I retired than it was for me to stay on as judge.  Couple

23  three --

24  Q.   I'm sorry?

25  A.   A couple three hundred dollars a month difference.

*MARICLE - Direct (Mr. Hoskins)*                                    42

1   Q.   What was the senior judge program you talked about?

2   A.   Well, few years ago, we had tremendously overloaded

3   dockets in Kentucky.  And this was a program that was pushed

4   by first, I think, started with justice -- Chief Justice

5   Stevens.  And then when Justice Lambert became chief justice,

6   he pursued it also.

7        Under that program, when you retired, you would get for

8   each year that you had worked, 5% of your retirement if you

9   entered a program.  Five percent per year.  For instance, if

10  you worked ten years, you'd get 50%.  You worked 15 years, you

11  got 75% of whatever you were making, which was your

12  retirement.

13       When you considered that and then take out the fact that

14  on your retirement, you don't have to pay state taxes, it soon

15  got to the point, I think that about 80%, if you continued to

16  work past 18 years, you were losing money.

17       Now, the purpose of it was to help with the overload, and

18  you were required to work a total of 600 days of service,

19  serve as a special judge wherever they sent you in the state,

20  like Judge Lewis was.  You had to work those 600 days.  You

21  needed to work at least or supposed to work at least 60 days a

22  year.  They really wanted you to work 120 days a year.  I had

23  almost, this time last year, I suppose I had 398 or something

24  of my days done.

25  Q.   So that was for the rest of your life, you had to put in

*MARICLE - Direct (Mr. Hoskins)*                                    43

1    the 600 days?

2    A.   Well, you had to do it up to 600 days.  When 601 come,

3    you stopped.  You didn't go any further than that.

4    Q.   You had a number of years to do that, to get your years

5    in?

6    A.   They wanted -- five was what they set as the minimum

7    number.  Ten was the maximum number.

8    Q.   Now, when you say they set that, and they sent you, who

9    was it that set that program up?

10   A.   Well, it was the legislature that adopted the program,

11   and it had a sunset in it.  That meant the program was set to

12   end at a certain time.  It was extended a couple times, and

13   the legislature in 2007 did not extend the time beyond the

14   then expiration date, which there's some question as to

15   interpretation of the legislation when that was, June 30th or

16   January 31, 2007.

17   Q.   In any event, you retired before the program ended, so

18   you could participate?

19   A.   I didn't have any choice but to do that.

20   Q.   Why did you not have any choice?

21   A.   Well, financially, if I'd continued to work and then the

22   program did expire, sunset provision would end, then I were to

23   retire, I'd be making less money or having less money coming

24   in than I would under the program.

25   Q.   So you had a choice, it was just that --

*MARICLE - Direct (Mr. Hoskins)*                                    44

1   A.   Well, yeah, I had a choice.  It was a fist with a golden

2   glove, you know, about what it amounted to.  I had a choice,

3   but I really didn't have a choice.

4   Q.   You weren't forced out?

5   A.   No.

6   Q.   You could have continued and be serving right now?

7   A.   Sorry.

8   Q.   You could continue to be serving right now?

9   A.   I could be, yes.

10  Q.   And when was the last time that you had been elected

11  judge?

12  A.   2006.

13  Q.   So when would your term have expired, had you not

14  retired?

15  A.   2014.  I served five months.  I think everybody pretty

16  much knew I was going to retire.

17  Q.   Now, again you said they would send you.  Who told you

18  where to go as a senior judge?

19  A.   Okay.  As a senior judge, we would have another senior

20  judge who was over the program that would do the assignments.

21  It was not done by the chief justice.  It was done by whoever

22  they had over the program.  The first one that we had or at

23  least the one I started was Judge Bill Weir from up in

24  Northern Kentucky.  I don't know whether it's -- Covington, I

25  believe, that he's from.  It's those places I always think of

*MARICLE - Direct (Mr. Hoskins)*                                    45

1    them together.  Campbell, Boone and Kenton.  He was from that

2    area.  And then when he served his time, by that time, Chief

3    Justice Lambert was in the situation that I was in or had been

4    in, and so he retired, and with Weir moving out, then Chief

5    Justice Lambert became the senior judge in his office down in

6    Mt. Vernon.

7    Q.   So that was the office that sent the judges to the

8    different places?

9    A.   That was the ones that would assign you to the different

10   places, yes, sir.

11   Q.   You mentioned a Judge Lewis.  Who is that?

12   A.   Tom Lewis, the judge that we saw here on the video

13   earlier this morning.

14   Q.   He had also been a circuit judge who had retired?

15   A.   Yes, he'd been a former commonwealth attorney in Warren

16   County and then circuit judge and had retired and was doing

17   his senior judge days at the time that he conducted that John

18   Downey matter.

19   Q.   So he was from Warren County?

20   A.   Warren County, Bowling Green, yes, sir.

21   Q.   How did he come to be assigned to Clay County?  Do you

22   know?

23   A.   Well, he was serving a lot over in Owsley County, Estill

24   County and those counties.  I had called one time needing

25   somebody, and he was in that area so they put him in Clay

*MARICLE - Direct (Mr. Hoskins)*                                    46

1    County.  And I had a pretty large docket and was quite frankly

2    not wanting to leave my successor in the same situation that I

3    came in, and he was pretty much assigned permanently there on

4    a month-to-month basis, pretty much for the last year, year

5    and a half that he served.  I think he had other counties he

6    went to also, I think the last day he -- service he did was a

7    case from Clay County he transferred to Bowling Green and

8    tried.

9    Q.   Did you have any say in him being the judge that came to

10   help you out?

11   A.   No, no, no.

12   Q.   You didn't request that he be your helper?

13   A.   No, no.

14   Q.   Did you have any close connection to him before he came

15   to work in your area?

16   A.   No close connection to him.  But now, I do want to say

17   this.  I had no -- as far as him coming there, that was

18   decided by somebody else.  But once he'd come a month or two,

19   that was pretty much, you know, they was gonna send him every

20   month, you know.  Nobody would necessarily request it or

21   anything of that nature.  Just that's who was going to be

22   there.  That's who I expected would be there.

23   Q.   He became accustomed to the people there, and they became

24   accustomed to him?

25   A.   Yes.

1    Q.   How many courtrooms are there, circuit courtrooms are

2    there in the Clay County courthouse?

3    A.   In the new courthouse, which we completed and dedicated

4    in 2005, we have the circuit courtroom, which is on the third

5    level.  We have another courtroom, which is a smaller

6    courtroom that is used for district -- not district, but

7    family court, and then the district courtroom is on the second

8    level.

9    Q.   So does that mean there are a total of three courtrooms

10   in the whole building?

11   A.   There are a total of three courtrooms.  Two large

12   courtrooms and one not so large.

13   Q.   Okay.  You have, in Clay County, you've already said

14   there's a family court and a family court judge?

15   A.   Yes, sir.

16   Q.   What's his name?

17   A.   Gene Clark.

18   Q.   And is he generally the one using the family courtroom?

19   A.   I think that the only people that really go in there are

20   family cases.  I don't think any of the other judges would use

21   that room.  I did on a couple of domestic cases that were

22   assigned to me as special judge.  He would disqualify, and I

23   used his.  It was strictly set out for family court.

24   Q.   Is that a full-sized courtroom?

25   A.   No.  It's probably from Mr. Smith up to Judge Reeves that

*MARICLE - Direct (Mr. Hoskins)*                                    48

1   way.

2   Q.   Is it set up for a jury box to have jury trials in?

3   A.   No.

4   Q.   So would it be suitable for circuit court trials?

5   A.   No.  Would not be big enough.

6   Q.   The other big courtroom is the district courtroom?

7   A.   That's correct.

8   Q.   And that's where the district judges hold court?

9   A.   Yes.  Judge House and Judge Muncy.  Not Judge House now,

10  but Judge Bailey and Judge Muncy.

11  Q.   Judge House was the district judge when you were circuit

12  judge?

13  A.   Yeah, that's correct.

14  Q.   But he's now the circuit judge?

15  A.   He's now circuit judge.

16  Q.   I guess what I'm getting at is would you and Judge Lewis

17  have been working there at the Clay County courthouse at the

18  same time very often?

19  A.   Not likely, no.

20  Q.   Would there be room for two circuit judges to be

21  operating at the same time?

22  A.   No, not unless you went to the district court and used

23  that room, there would not be.

24  Q.   District court get heavy use by the district court?

25  A.   Yes.  And the district court is on a different system

*MARICLE - Direct (Mr. Hoskins)*                                          49

1    than we are insofar as the, you know, keeping a -- making a

2    record is concerned.  Our record is strictly video, as you saw

3    here this morning or yesterday afternoon.  District court is

4    done, unless they've changed, is done strictly audio tapes.

5    Q.   So the official recording procedure is different in

6    those --

7    A.   The official recording proceeding for district court and

8    circuit court are different, yes.

9    Q.   You mentioned that we saw Judge Lewis on the video

10   involving the Downey case?

11   A.   Yes.

12   Q.   Do you remember the Downey case?

13   A.   No, I don't.

14   Q.   Do you recall having anything to do with the Downey case?

15   A.   Only from looking at the record, it was apparently that I

16   was the judge in the case when he was indicted, and when I did

17   see it there on the screen, I did recognize him, because I

18   think he may have had an earlier court appearance years ago.

19   Q.   Okay.

20   A.   I'm not a hundred percent sure of that.  There's one

21   named John Downey and one named Johnny Downey, and they're

22   brothers.  That's sort of unusual, but they are.

23   Q.   In 2006, were you involved with either John Downey or

24   Johnny Downey?

25   A.   No.

*MARICLE - Direct (Mr. Hoskins)*                                          50

1   Q.   Did you talk -- did you know Raleigh Downey?

2   A.   I did not know Raleigh Downey.  The first time I ever saw

3   Raleigh Downey is when he walked through that door there.

4   Q.   Did you ever get involved in any way with how John

5   Downey's case was handled?

6   A.   No, I did not.  There were a couple of bond motions made

7   which I denied.  Other than that, I looked at the record and I

8   was not involved.  And certainly was not involved in the

9   proceedings that took place in October in any form, direct or

10  indirect.

11  Q.   Judge Maricle, we've heard some talk about the role of a

12  judge or the rules that cover when a judge should step aside

13  from a case.  Are you familiar with those rules?

14  A.   Yes, I am.

15  Q.   Who enforces those rules?

16  A.   Well, it would be, if there was a, you know, a complaint

17  filed or something, it would be the judicial conduct

18  commission that would enforce the rules.  As far as the way

19  it's handled in terms of disqualifications, they can file a

20  motion with the judge and he can disqualify, or they can file

21  a motion with the Supreme Court, and the Supreme Court will

22  decide -- the chief justice of the Supreme Court will decide

23  whether or not he is to disqualify.

24  Q.   Let me go back to my question.

25  A.   I'm sorry.  I didn't mean to get ahead of you, Mr.

*MARICLE - Direct (Mr. Hoskins)*                                    51

1    Hoskins.

2    Q.   I'd like you to tell the jury who enforces the rules

3    about when a judge should be in a case or not be in a case.

4    And you told us a commission, I think.

5    A.   Well, if you stayed in a case when you shouldn't and I

6    guess really, the chief justice is going to be the person

7    makes the last decision on it.  But if there's some type of

8    proceeding against you, because you done acted

9    inappropriately, that would be with the Judicial Conduct

10   Commission.  That's made up of a circuit judge, a Court of

11   Appeals judge, private citizens.  It's, I think, about equally

12   divided between judges and citizens, I believe.  There might

13   be just a lawyer on it or two.  I'm sure there is a lawyer on

14   it that is not a judge also.

15   Q.   So is that a statewide board, a statewide commission?

16   A.   Yeah, it's statewide, and it's over, it's over the entire

17   judiciary from the Supreme Court, Court of Appeals, circuit

18   court, district court.  All four branches of the judiciary are

19   under the Judicial Conduct Commission.

20   Q.   Is there anybody from Clay County on that commission that

21   you know of?

22   A.   No.  I don't think there ever has been.

23   Q.   Do you have any close friends on that commission?

24   A.   At this point in time, I'm not sure who's on the

25   commission.  I'm not sure which judges are on it, what lawyer.

MARICLE - Direct (Mr. Hoskins)                                    52

1    I certainly don't know the private citizens.  But I probably

2    know a name or two, but I really don't know who's on the

3    commission now.

4    Q.   Who's allowed to make a complaint to that commission?

5    A.   Any person state of Kentucky that wants to.

6    Q.   They don't have to be a lawyer?

7    A.   No.  If they feel they're aggrieved, they are the

8    people -- anybody can do it.  And most often, that is -- it's

9    parties.  It very seldom would be a lawyer that would file a

10   complaint against a judge.  Sometimes it happens, but most

11   often they're going to be persons who you know, feel that

12   they're aggrieved.  Some complaints are justified and some

13   aren't justified, as in any other case.

14   Q.   Well, then, you got a little ahead of me, but I want to

15   ask you about the way somebody would question whether or not

16   you should be sitting on a particular case.

17           MR. SMITH:  Your Honor, I'm going to object and ask

18   to approach.

19           THE COURT:  All right.  Come on up here.

20                 (A sidebar conference was held out of the

21                 hearing of the jury):

22           THE COURT:  Mr. Smith?

23           MR. SMITH:  Your Honor, I believe that at this point,

24   we're seeking to qualify, I guess, the judge as a legal expert

25   on all matters, everything.  In fact, we've asked him about

*MARICLE - Direct (Mr. Hoskins)*                                      53

1   architecture in the courthouse, we've talked about sizes of

2   courtrooms, and now we're off on to educating this jury on

3   really what the law is.  And I think that it's irrelevant and

4   I think that it's not -- there's not a foundation, and I would

5   object.

6           MR. HOSKINS:  Well, it's certainly relevant, Judge,

7   since they have suggested that Judge Maricle sat on cases that

8   he shouldn't have.  And --

9           THE COURT:  You listed him in as an expert witness in

10  your disclosures?

11          MR. HOSKINS:  I'm asking him about his personal --

12          THE COURT:  You're asking beyond that.  I'm going to

13  sustain the objection.  You're asking general legal matters,

14  legal questions.  I'll sustain the objection.  We're going to

15  take our afternoon break at this time as well.

16                  (Sidebar conference concluded.)

17          THE COURT:  Ladies and gentlemen, we will take our

18  afternoon break at this time.  We'll take a 20-minute recess.

19  Please keep in mind the admonition you've been given

20  previously not to discuss the case among yourselves while we

21  are in recess.  The jury will be excused until 2:50 this

22  afternoon.

23                  (The jury left the courtroom at 2:26 p.m.)

24          THE COURT:  Any additional matters to take up

25  outside -- Mr. Westberry, yes.  Please be seated.

1           MR. WESTBERRY:  Thank you.  Very briefly.  I have the

2   witnesses that I identified earlier this morning, there are

3   about three or four back in the witness room.  Doesn't seem to

4   me like -- I don't think that we're going to get to them

5   today.  Judge Reeves, these people come a considerable

6   distance.  I was going to ask the Court if I could feel

7   comfortable releasing them for the afternoon so they can get

8   home.

9           THE COURT:  Let me ask Mr. Pinales and Mr. Hoskins if

10  Mr. Maricle will be the last witness for the -- for his

11  defense.

12          MR. HOSKINS:  Probably not.

13          THE COURT:  Probably not?  All right.  If you have an

14  additional witness, approximately how long do you think that

15  witness will take?

16          MR. HOSKINS:  We have one witness scheduled tomorrow

17  morning, I think will probably not be on more than 15 minutes.

18          THE COURT:  Will that be the witness after Mr.

19  Maricle?

20          MR. HOSKINS:  Yes, Your Honor.

21          THE COURT:  All right.  Mr. Westberry, I think it's

22  fair to assume that you can go ahead and release your

23  witnesses for today.

24          MR. WESTBERRY:  They came this morning at about

25  10:00 a.m.  Again, they come from some distance.  I've talked

1     a little bit with Mr. Pinales and Mr. Hoskins.  I had the

2     impression, I certainly don't want to ask you all to commit to

3     anything that's beyond your control, you seem to think

4     mid-morning at possibly the earliest you might wrap up your

5     proof, and the only reason I'm asking is just for scheduling

6     purposes.

7              THE COURT:  All right.

8              MR. PINALES:  To play it safe, Your Honor, I'd say

9     9:30, just to play it safe.

10             THE COURT:  All right.  Approximately how much

11    additional direct examination do you have of this witness?

12             MR. HOSKINS:  A substantial amount.  I would say

13    probably another hour at least.

14             THE COURT:  All right.  Best we can do, Mr.

15    Westberry, I'm sorry.

16             MR. WESTBERRY:  I've been there before.  Thank you.

17             THE COURT:  Thank you.  We'll be in recess until

18    2:50.

19                  (Recess from 2:29 p.m. until 2:48 p.m.)

20             THE COURT:  Thank you.  The record will reflect the

21    jury is not present at this time.  I understand Mr. Hoskins

22    has an issue to take up?

23             MR. HOSKINS:  Judge, just a minor point.  I thought I

24    should correct as quick as I could that I said we only had one

25    more witness, but we actually will have two more.  Both will

1    be very brief.  The person after that is just a records

2    person.

3              THE COURT:  The issue came up in terms of when Mr.

4    Adams would start his case.  I don't think it affects that

5    original calculation.

6              MR. WESTBERRY:  They know to be back here just as

7    close to 9:30.

8              MR. WHITE:  Your Honor, would I be safe, I'm going to

9    have all my people here tomorrow at 1:00.  Do you think that

10   would be appropriate to have my witnesses here at 1:00?

11             THE COURT:  Mr. Westberry is nodding that he thinks

12   his case will take about half a day.

13             MR. WESTBERRY:  Yes, sir.

14             MR. WHITE:  If I get started tomorrow, I should be

15   able to get done by tomorrow as well.

16             THE COURT:  All right.  Thank you.  Appreciate that

17   update.  Anything else before the jury is brought back in?

18   Mr. Smith, any issues?

19             MR. SMITH:  No, Your Honor.

20             THE COURT:  Thank you.  You can bring the jury in.

21             (The jury entered the courtroom at 2:50 p.m.)

22             THE COURT:  The record will again reflect that all

23   members of the jury are present.  Defendant Maricle has

24   returned to the witness stand.  Of course, he's still under

25   oath.

*MARICLE - Direct (Mr. Hoskins)*                                    57

1          Mr. Hoskins, you were in your direct examination.

2    You may continue.

3          MR. HOSKINS:  Thank you, Your Honor.

4    BY MR. HOSKINS:

5    Q.  Mr. Maricle, we've heard some talk throughout this trial

6    about something called home incarceration.

7    A.  Yes, sir.

8    Q.  Tell the jury how that worked in your court.

9    A.  In my court?

10   Q.  Yes, sir.

11   A.  All right.  If you had someone that you were -- well,

12   first of all, we had a real problem as far as the jail is

13   concerned in the sense of overcrowding.  The jail would hold

14   about 180 people.  They also took state prisoners and

15   oftentimes we'd have 215, 220.  Actually, they'd take

16   prisoners from other counties.  I remember Knox County one

17   time had some problems, and they took some of those prisoners

18   for a while.  They're paid.  They got overcrowded.

19        If you had a day when a bunch of people got arrested, you

20   had to have something to do with them.  And so my idea was to

21   put them on electronic monitoring.  That way, you know where

22   they are at all times.  Also, as a part of that program, we

23   encouraged that -- encouraged them to work.  They would be

24   allowed to go to work.  They're also allowed to go to church.

25   They would have certain hours that would be set aside that

*MARICLE - Direct (Mr. Hoskins)*                                    58

1    they could work, certain hours that they could set aside to

2    take and go to church.  Some, because of some personal

3    problems they might have, doctors, if that were necessary of

4    that nature.

5        They paid for that program themselves, which was, I

6    suppose, 10 or 11 dollars a day, which would be about what the

7    cost would be of buying cigarettes, pop and candy if you were

8    at the jail and you had to buy from the jail, because they

9    wouldn't let you bring it in.  So as far as cost to them, it

10   was about the same.  But they would work.  And oftentimes,

11   obviously, they couldn't get jobs because of the economy we

12   live in.  We had one particular employer, though, Begley

13   Lumber Company from London that hired a lot of our people, and

14   then Job Start through Daniel Boone got a lot of people to

15   work also.

16       So the purpose was to have some form of restriction on

17   them so you could keep check on them to a certain extent.  Not

18   perfect.  It wasn't perfect, by any stretch of the

19   imagination, but that you could have some check on them.  Some

20   days, you know, like one day we had 30, 40 people that got

21   arrested.  They've got to be somewhere.

22       So it was the economic thing to do, and it was also, I

23   thought, the thing to do as far as the people was concerned,

24   and electronic monitoring is not new in either federal or

25   state court.

1    Q.   Well, Mr. Maricle, how would a person be placed on home

2    incarceration?  You said you'd have 30 or 40 people that would

3    be -- what kind of event would cause you to have 30 or 40

4    people --

5    A.   Well, if you had a massive drug roundup or if it was

6    right after a grand jury had returned a number of indictments

7    because sometimes, you know, the grand jury wouldn't meet a

8    couple, three months, and then you'd be backed up, and you'd

9    have 30 or 40 people that would be arrested, and you'd have to

10   do something with them.

11       If you sent them to another county, going to cost you

12   probably 50 or 60 dollars a day to just keep someone in.  If

13   you send them to another county, you're going to have to pay

14   at least 25 or 30.  The county is going to have to pay that,

15   because jails were, you know, were financed by the county.

16   They were responsible not only for keeping those prisoners in

17   there, but they're also responsible for the medical bills that

18   people might incur.

19       That oftentimes was a problem also, because somebody gets

20   sick, they've got a lot of bills, doesn't take long to roll up

21   a tremendous hospital bill.  If people got sick, I would have

22   an inclination, if they were really ill, to let them out on

23   electronic monitoring.

24   Q.   Well, let's talk about that.  When there was a drug

25   roundup or when there was a bunch of grand jury indictments

*MARICLE - Direct (Mr. Hoskins)*                                        60

1    for people that were going to be in circuit court, who had to

2    deal with that decision at the beginning?

3    A.   I did.  Obviously, you know, one had to deal with the

4    situation as far as the jail was concerned, and it was a

5    worrisome thing to do.

6    Q.   Did you keep up with how many beds were available in the

7    Clay County Jail?  Did you know that kind of information?

8    A.   Probably once a week, when Mr. Marcum, most often on

9    Monday, would bring the people, bring the bonds for that week

10   down that had been posted -- or not that week, for that

11   weekend, because the jail was authorized to take bonds.  And

12   usually, I'd say how many have you got, you know, how many did

13   you get this weekend.  I had a pretty good steady count of how

14   many people were in.

15        If you're a circuit judge in a rural county, I don't know

16   about the urban counties, that's something you're going to

17   have to keep up with.

18   Q.   So these people would be coming into the court system,

19   and you would have to make a determination as to what their

20   bond would be set at, whether they would even get a bond,

21   whether or not they would be allowed on home incarceration; is

22   that right?

23   A.   Well, I made home incarceration on a lot of them a

24   condition of the bond.  That way, you had a check on them.

25   And they couldn't put up a lot of money, you had a check on

*MARICLE - Direct (Mr. Hoskins)*                                          61

1    them, and something they could afford.

2    Q.   Well, I want to ask you some questions focusing on how

3    people get in to home incarceration, who makes those decisions

4    and that sort of thing.  So what I'm asking about is you have

5    a number of people who are arrested, and you're the person as

6    circuit judge who has to decide on bonds; is that right?

7    A.   Well, I would be the only one in circuit court that could

8    make a judgment as to whether or not a person was put on

9    electronic monitoring.  Of course, district court, they did

10   also and they could also.  It was not as acute a problem in

11   district court as it was with circuit court because the

12   gravity of offenses in circuit court were far greater than

13   those in district court.

14   Q.   That leads me to one of the questions I wanted to ask

15   you.  What kind of things would you look at in deciding

16   whether or not a person got to be on home incarceration or if

17   they were just going to have to stay in jail?

18   A.   Well, you would look at their family situation.  You

19   would look at where they're going to be, whether or not

20   they've got a job, how serious the crime was, if they were --

21   you know, if they were a repeat offender likely to, you know,

22   leave.  All of those matters would be a consideration to keep

23   them under -- under some type of restraint or control.  Of

24   course, also, there were occasions in which we sentenced

25   people to electronic monitoring also.

1    Q.   Okay.  Would each --

2    A.   And we have to call it electronic monitoring, because if

3    you call it home incarceration if they're drawing Social

4    Security or anything, they would lose it.  They'd lose their

5    Social Security.  If you call it electronic monitoring, they

6    didn't.  No difference, but that's the way it was.

7    Q.   Let's talk about, then, the electronic monitoring part of

8    that.  What exactly does that mean?  How does that work?

9    A.   All right.  They put a bracelet on them, which is around

10   their ankle.  Can be on their arm, but usually on their ankle.

11   It's hooked up to the phone system.  They're monitored out of,

12   I believe, the one that we had was monitored out of Hamlet --

13   Hammond.  Oh, Anderson, Indiana.  Anderson, Indiana.  That's

14   where the monitoring is.  It's by telephone.  If they go out

15   of range, an alert goes out to the monitoring center, and the

16   monitoring center calls whose ever working home incarceration

17   at that particular time and they get in touch with the jail,

18   and there was hookup directly with -- not the jail, but with

19   the 911 center.  City police and county police or sheriff's

20   office.

21   Q.   So electronic monitoring is something that allows a

22   person to be watched electronically from a remote location?

23   A.   That's correct.

24   Q.   And keeps up with where that person is?

25   A.   Well, not -- it tells you whether or not that person is

*MARICLE - Direct (Mr. Hoskins)*                                    63

1    within the range of the system that he's on.  Within the range

2    of his telephone.  If he's not, then it doesn't tell them

3    where he has gone to.  He will be a fugitive at that point in

4    time.

5    Q.   Okay.  So that system would be designed to let whoever's

6    monitoring know if that person leaves the area --

7    A.   Yeah, an alert goes off to the center in wherever the

8    center is.  At that time, it was Anderson, Indiana.  I don't

9    know where it is now.  And then they would call back to the

10   electronic monitoring people and tell them and, of course, get

11   in contact with the local police.

12   Q.   Do you recall about when that started being used in Clay

13   County?

14   A.   I tried it on four different occasions.  The first three

15   times it failed.  The fourth time, it succeeded.

16   Q.   Let's talk about the first time.  About when was that?

17   A.   That was early on, '91, '92.

18   Q.   Do you remember the name of the person who did it then?

19   A.   His name was Ed Philpot.  He's now deceased.  He went in

20   the service, was killed in the service.

21   Q.   Okay.  Did you have any personal connection with Mr.

22   Philpot?

23   A.   No, none.

24   Q.   Was he working for you as an employee when he was doing

25   the home incarceration?

*MARICLE - Direct (Mr. Hoskins)*                                        64

1    A.   No.

2    Q.   Who did he work for?

3    A.   Him and his company, whatever it was.

4    Q.   So he worked for a private company?

5    A.   That's correct.

6    Q.   Who had to pay the cost of being on home -- of somebody

7    being on home incarceration, electronic monitoring?

8    A.   Well, the person that had to pay it, first of all, would

9    be the person who was on electronic monitoring.  If they were

10   indigent, they would be a situation where they would, you

11   know, be reduced fee.

12        Also had an understanding with the county that they would

13   pay for some of those in order to attempt to save money, but

14   the only time they ever wanted to really do that was when

15   somebody was costing them five or six thousand dollars a day

16   in the hospital.  Then they was more than anxious to pay the

17   $10 a day as opposed to a few thousand dollars a day to keep

18   them in the hospital.

19   Q.   Because if a person at the county jail gets sick and has

20   to go to the hospital, the county jail has to --

21   A.   County pays for it.  The county pays for it.  I

22   understand even if they have a medical card, the county pays

23   for it.  They have to get out of jail before their card kicks

24   in.  At least that was my understanding of it.

25   Q.   Okay.  So the first person you talked about, this Mr.

MARICLE - Direct (Mr. Hoskins)                                    65

1    Philpot worked for some company.  Who did the money get paid

2    to for the cost of that?

3    A.   Well it would have gone to -- he would have collected the

4    money, and then he has to pay for the monitoring and the

5    equipment, if they've not purchased the equipment.  Most of

6    them don't purchase the equipment.  To whoever, BI or

7    whoever's equipment it is that's doing the monitoring.

8    Q.   Who is BI?

9    A.   That's the name of one of the companies that was in that

10   business that had the equipment that rented it, and I can't

11   remember exactly what BI stands for, but just called it BI.  I

12   think they do a lot or have done a lot in Kentucky.

13   Q.   Was that a local company?

14   A.   No, no.  BI was not local.

15   Q.   It was a corporation that made this equipment and would

16   rent it out to the people who run these businesses?

17   A.   That's right.

18   Q.   Okay.  Did you have any financial interest at all in Mr.

19   Philpot's company?

20   A.   None.

21   Q.   When somebody got put on home incarceration, did any

22   payments go through you?

23   A.   No, sir.

24   Q.   Did you profit personally in any way by that home

25   incarceration?

*MARICLE - Direct (Mr. Hoskins)*                                          66

1   A.   No, sir.

2   Q.   After Mr. Philpot, who did the home incarceration,

3   electronic monitoring in Clay County?

4   A.   Dan Gilbert.

5   Q.   How long was Mr. Gilbert in that business?

6   A.   About two weeks.

7   Q.   That didn't work out too well?

8   A.   No.  He had a problem with female participants.

9   Q.   Okay.  After Mr. Philpot, who ran the home incarceration

10  business in Clay County?

11  A.   Mr. Stivers.

12       THE COURT:  I'm sorry.  You meant after Mr. Gilbert?

13       MR. HOSKINS:  Yes, sir.  Thank you.

14  Q.   After Mr. Gilbert --

15  A.   Mr. Gilbert, okay.

16  Q.   After Mr. Gilbert, it was --

17  A.   Mr. Stivers.

18  Q.   When you say Mr. Stivers, you're talking about William

19  "Al Man" Stivers?

20  A.   I'm talking about William "Al Man" Stivers, seated right

21  over there.

22  Q.   He was a friend of yours?

23  A.   Yes, he was.

24  Q.   Back then?

25  A.   Yes, sir.

*MARICLE - Direct (Mr. Hoskins)*                                    67

1    Q.   He is today?

2    A.   Yes, sir.

3    Q.   When Mr. Stivers ran that electronic monitoring business,

4    did you have any financial interest in it?

5    A.   No, sir, sure didn't.

6    Q.   Did you profit in any way from that?

7    A.   No.  If I'd have had any connection with the business,

8    I'd have lost money, because he lost money in it.  He didn't

9    have the ability to collect.  That may not sound typical of

10   him, but he did not have the ability to collect his money.

11   Q.   Mr. Stivers didn't have the ability to collect his money?

12   A.   No.  When you let somebody get behind two or three, four

13   months, you've lost it.

14   Q.   In other words, if a person, a person is on that

15   electronic monitoring, they're supposed to make regular

16   payments?

17   A.   That's correct.

18   Q.   Is there anybody else to look to if that person doesn't

19   make the payment?

20   A.   No.  Now, a lot of times the family would, you know,

21   would pay for it.

22   Q.   But nobody would be required to pay for it but that

23   person?

24   A.   No, no.

25   Q.   So Mr. Stivers' attempt at that was not successful?

*MARICLE - Direct (Mr. Hoskins)*                                    68

1    A.    Not successful.

2    Q.    How long did his attempt run?

3    A.    Probably a year, year and a half, maybe two years.

4    Q.    Okay.  After Mr. Stivers failed at trying to run the

5    program, who took over or who got involved with it at that

6    point?

7    A.    Josephine Davidson.

8    Q.    Does she normally go by the name Jo Davidson?

9    A.    Jo, that's correct.

10   Q.    Now, she's a close friend of yours, isn't she?

11   A.    Has been for -- since 19 -- early 1980s, when she first

12   went to work for me.

13   Q.    She first went to work for you in what way?

14   A.    She was secretary for Ricky Bailey and myself.

15   Q.    When you were a lawyer, before you were judge?

16   A.    That's correct.

17   Q.    How long did Jo Davidson stay on as your secretary?

18   A.    Until I became judge.

19   Q.    When you became judge, did she work for you as secretary?

20   A.    No.  Not for two or three years.  She worked at pretrial.

21   Q.    So she went, when you became judge, she went to pretrial

22   services?

23   A.    She went to pretrial services.

24   Q.    Quickly, tell us what pretrial services is.

25   A.    Pretrial services is the people who are in charge of

*MARICLE - Direct (Mr. Hoskins)*                                     69

1    going and interviewing people at the jail once they're

2    arrested.  They do an interview for them, find references for

3    them, whether or not they work, they fill out their interview

4    sheet, and then they contact -- they must do that daily.  They

5    contact the judge for the purpose of setting a bond.

6         They're in court when you have motion hours to --

7    basically, if you've got a lot of trials, to be there to see

8    what happens to people, whether or not maybe they've been in

9    jail, and me or one of the judges changes their mind and

10   reduces their bond.  But that's basically what they do.  And

11   then, of course, they have five or six services in Kentucky

12   that are approved for electronic monitoring, which that's

13   become more so in the last three or four years than it was.

14   Q.  Okay.  Let's back up a little bit.

15   A.  Okay.

16   Q.  Pretrial services are people that work locally in the

17   court system?

18   A.  Yes.

19   Q.  And they interview people that get arrested?

20   A.  Yes.

21   Q.  So when you became circuit judge, Jo Davidson went to

22   work at pretrial?

23   A.  That's correct.

24   Q.  Okay.  Was she working for you at that point?

25   A.  No, sir.  That's a job that's state employment.

*MARICLE - Direct (Mr. Hoskins)*                                    70

1    Q.   Okay.  Who's her supervisor?  Who's her boss?

2    A.   I believe Melinda Weaver may have been at that time.  I'm

3    pretty sure it was Melinda.

4    Q.   Would that be somebody local?

5    A.   No, no.  That was somebody here in Frankfort.  She was

6    over pretrial for a while and then she eventually became

7    director AOC.

8    Q.   Okay.  When did Jo Davidson get involved in the

9    electronic monitoring program?

10   A.   Well, now, after she was pretrial for a couple three

11   years, the person I had working for me left, and so I lured

12   her away from pretrial to come back to work for me.  And she

13   worked for me --

14   Q.   Well, just if we could, just she was working for you at

15   that point in what capacity?

16   A.   Oh, as judicial secretary.

17   Q.   You were circuit judge at that point?

18   A.   That's correct, I was circuit judge at that time.

19   Q.   She was secretary in your office?

20   A.   That's correct.

21   Q.   All right.  How long did she continue in that job?

22   A.   Up till she did the electronic monitoring, and I think

23   that started '01, '02, somewhere along there.  I'm not really

24   100% sure.

25   Q.   Did you let her continue to work for you as a secretary

*MARICLE - Direct (Mr. Hoskins)*                                    71

1   once she started electronic monitoring?

2   A.   No, no, that wouldn't be permissible.  No.

3   Q.   Why not?

4   A.   It would be a conflict, as I see it.  You can't be out

5   working two jobs, for one thing.  And really, I don't think

6   the judicial secretary should be in anything where she's

7   getting private -- you know, making money from a private

8   business.

9   Q.   So you were one of the people who decided who got into

10  the home incarceration program?

11  A.   That's correct.  Any judge there could put them on and

12  from other areas sometimes, they would call also, particularly

13  now with pretrial and, you know, just the ones that are

14  approved statewide, and they are approved.  She is.

15  Q.   So it's fair to say that the judges are the ones that

16  provide these companies with their customers, aren't they?

17  A.   That would be fair, yes.  I don't know anybody else that

18  could put them in jail.  So that would be a fair statement,

19  sir.

20  Q.   Did you ever put people on home incarceration as a favor

21  to Jo Davidson?

22  A.   No, sir.

23  Q.   Did you ever do it to make money for Jo Davidson?

24  A.   No, sir.

25  Q.   Did you ever have any personal interest in Jo Davidson's

MARICLE - Direct (Mr. Hoskins)                                72

1    business?

2    A.   No, sir.

3    Q.   Never profited in any way from that?

4    A.   No, sir.

5    Q.   Now, we mentioned Mr. Stivers for a period of time tried

6    to make a go of that business?

7    A.   That's correct.

8    Q.   We've also heard about Mr. Stivers having a lawsuit that

9    was in your court.

10   A.   Yes, sir.

11   Q.   Now, do you remember that lawsuit?

12   A.   I know of the lawsuit.

13   Q.   Okay.  Who was on the other side of that case from Mr.

14   Stivers?

15   A.   Todd Roberts and the City of Manchester.

16   Q.   And --

17   A.   I don't think there were any other defendants.  I don't

18   believe Mr. Culver was sued, I don't believe.

19   Q.   Was Todd Roberts somebody that you had a relationship

20   with at that time?

21   A.   Yes, sir.

22   Q.   And who was the mayor of the City of Manchester at that

23   time?

24   A.   Daugh K. White.

25   Q.   Was he somebody you had a connection to?

*MARICLE - Direct (Mr. Hoskins)*                                73

1    A.  I knew Doug.  Probably Todd and Bill, I was around them

2    more than I would have been around Doug.

3    Q.  Todd Roberts had worked some for your wife, hadn't he?

4    A.  Yes, yes.

5    Q.  Tell us a little about that.  What type of work has Judy

6    done?

7    A.  Well, she had a real estate business and she had an

8    auction company.  Todd had auctioned -- apprentice auctioneer,

9    I guess.  You have to work under a principal auctioneer for a

10   number of hours or a number of auctions or something, I'm not

11   sure what.  So he had his license with her and assisted her in

12   doing some auctions.

13   Q.  So you had a connection with people on both sides of that

14   case?

15   A.  Sure.  Probably no case in Clay County that I don't

16   have -- very few cases in Clay County I would have some

17   knowledge or know one or both of the parties.

18   Q.  So would it have been practical for you to step out of

19   all those cases?

20   A.  No.  No.

21   Q.  What would happen --

22   A.  That issue was raised, and the Supreme Court said I

23   didn't have to.

24   Q.  Was it raised in that case?

25   A.  No, no.  It was raised in a case of Crawford versus City

*MARICLE - Direct (Mr. Hoskins)*                                        74

1   of Somerset out of Leslie County.

2   Q.   So it was never raised in the case Bill Stivers

3   against --

4   A.   Nobody made a motion to disqualify, no, sir.

5   Q.   But either side could have?

6   A.   Either side could have.  They could either filed it with

7   me, or they could have filed it with the chief justice.   In

8   either event -- but I really don't think I took much of any

9   action on that case.  And had it come to trial, I probably

10  would have disqualified.

11  Q.   Okay.  If you had disqualified, then another judge would

12  have come in --

13  A.   Yes, sir.

14  Q.   -- to handle the case?  Did you try to do favors for

15  either side in that case?

16  A.   No, sir.  I sent it to mediation, which was something

17  that I did quite often, and I was very, very fortunate that

18  many of the cases I sent to mediation were settled.  Probably

19  85% of them were settled.

20  Q.   What exactly is mediation?

21  A.   Well, the parties, they've sued each other.  Most often,

22  this is going to be a civil action, where somebody has sued

23  somebody as a result of a wreck, sometimes it may get into

24  other things.  But that's generally what it will be, and there

25  are several people that were mediators in Kentucky.

1    And the parties would go meet with the mediator, and he'd
2    talk to one side a while, and he'd talk to the other side a
3    while and try to, you know, reach an agreement.  It was not
4    arbitration.  They were not forced to agree.  An arbitrator
5    can force you to agree.  A mediator can't.  It had to be a
6    mutual agreement, and it saved a lot of expenses of
7    litigation, quite frankly.
8    Q.   And in the case of Bill Stivers against Todd Roberts, it
9    got the case settled?
10   A.   Got the case settled.  I don't remember who mediated it,
11   whether it was somebody I appointed or somebody they agreed
12   upon.
13   Q.   You mentioned that your wife, Judy, had been in the real
14   estate business?
15   A.   Yes, sir.
16   Q.   And you testified a little earlier until you started
17   fishing that you didn't really have much in the way of
18   hobbies.  Were you involved with real estate?
19   A.   I was not an agent or anything of that nature, but I
20   have, since 19 -- early 1970s, bought and sold real estate.  I
21   never was much for rentals.  That's too much trouble.  Too
22   many problems.  But only time I would agree to be in the
23   rental business, if somebody -- you get a place and it didn't
24   sell, you don't let it set there empty.
25   Q.   When you would buy property starting back in the '70s,

1    did you buy it by yourself, or you and your wife, or how did

2    you normally do that?

3    A.   Well, sometimes I would buy it by myself, sometimes me

4    and my wife, sometimes I would have partners.  I remember on

5    the one piece of property there, I was partners with Robert

6    Futress [phonetic], Gayle House, Scott Madden, and then

7    eventually a coal company.  And then eventually we sold that

8    to Bureau of Prisons, and that's where the Federal

9    Correctional Institution is in Manchester now.  So I had

10   partners with that.  And sometimes I did, sometimes I didn't.

11   Q.   Did you ever buy pieces of property with a house on it?

12   A.   Oh, sure.

13   Q.   What type of properties would you be interested in?

14   A.   You wouldn't want to get in too expensive a house.  You'd

15   try to stay in the low to moderate range, because if you

16   get -- you know, it's easier for somebody to buy a 30 or 40

17   thousand dollar house than it is a $150,000 house.  You try to

18   stay where your market's going to be the greatest, where there

19   will be the most people that would be at that particular

20   range.

21       So buy those.  Sometimes they'd be fixer-uppers, and I

22   would work on the weekends fixing them up with maybe my

23   partners.  Partners with Mr. Charles Marcum from Jackson

24   County, not the one from Clay County.  We worked on Saturdays

25   and Sundays, mostly Sundays.  I was, I guess you would call a

*MARICLE - Direct (Mr. Hoskins)*                                    77

1    assist -- I wasn't an electrician, but an electrician

2    assistant or a plumber assistant.  I didn't have any of those

3    licenses, but, you know, I could carry brick or paint.

4    Q.  You would go and do some work on weekends fixing up old

5    houses?

6    A.  Yes, sir.

7    Q.  Is that something you enjoyed?

8    A.  I enjoyed doing it.  I made some money at it.  Maybe a

9    couple times I lost.  But made some money at it.

10   Q.  Doing that kind of work is a lot different than

11   practicing law?

12   A.  Yeah, a lot more fun.  At least to me.

13   Q.  Mr. Maricle, you just alluded to Charles Marcum from Clay

14   County and Charles Marcum from Jackson County.

15   A.  That's correct.

16   Q.  All right.  We've heard a whole lot about one of those

17   Charles Marcums in this case, haven't we?

18   A.  Yes, sir.

19   Q.  Which one is that?

20   A.  The one that was a jailer in Clay County.

21   Q.  Were you ever in business with him?

22   A.  I've never been in business with Charles Marcum from Clay

23   County.  Anytime that it says Charles Marcum to me, that's the

24   Charles Marcum, Post Office Box 1, McKee, Kentucky.

25   Q.  That the Jackson County Charles Marcum?

*MARICLE - Direct (Mr. Hoskins)*                    78

1    A.   That is the Jackson County.

2    Q.   Does he go by the name Charles, or does he have a

3    nickname?

4    A.   Most people know him as Poodle.

5    Q.   Poodle Marcum.  And you and Poodle Marcum would buy

6    properties together; is that right?

7    A.   We bought some together, yes, and sold them.

8    Q.   And the properties that you bought together, did you do

9    the fixing up that you talked about with him?

10   A.   Yes, sir.

11   Q.   Over the years, have you had many or few pieces of real

12   estate that you bought to try and make money on them?

13   A.   Well, I don't know what you mean by many or few.  I know

14   I had, from Clay County, I had the deeds, mortgages and

15   everything copied.  I think there were 80 of those, but most

16   of those were mortgages, not deeds.  And those would be deeds

17   to me and deeds from me.

18   Q.   Mr. Maricle, let me ask you about your involvement in

19   politics.

20   A.   All right.

21   Q.   On a local level.

22   A.   All right, sir.

23   Q.   We saw a video early in this trial where you were

24   described as being the county Democratic party chairman?

25   A.   At one time, I was.

*MARICLE - Direct (Mr. Hoskins)*                                    79

1   Q.   And that was you on that video, and that was your

2   position at that time?

3   A.   The video of me being --

4   Q.   The video, the television program, do you remember that

5   that we saw early in this trial?

6   A.   Oh, yes.  Yeah, I couldn't remember, yes, I was

7   Democratic chairman at that time.

8   Q.   When did you start to get active in politics on a local

9   level?

10  A.   I guess as soon as I went back to Manchester.

11  Q.   And how did you start out in politics?

12  A.   Like that, I guess.  I mean, just run for -- I ran for

13  county attorney, got beat.  And then was more active as far as

14  state politics.

15  Q.   More active in state politics?

16  A.   I mean, I never ran for state office, nothing like that.

17  Q.   What were you active -- when you say you were in state

18  politics, tell us what you did at that level.

19  A.   Well, I was more interested in who was governor than I

20  would be with county judge.  Just one of those things.  That's

21  just my interest.

22  Q.   Would it be more likely somebody from your party would be

23  governor than it would be they'd be county judge of Clay

24  County?

25  A.   Whole lot more likely.

1    Q.   When did you start taking a role in the actual Democratic

2    party in the county?

3    A.   I became chairman when John Y. Brown, Jr., was governor.

4    Before that, Bige Hensley was the chairman, and he pretty much

5    retired.  He became from the bank, he was president of First

6    State Bank and he retired.

7    Q.   Do you remember about when that was that you took over

8    that?

9    A.   '77, '78.  I just remember that John Y. Brown, Jr., was

10   the governor, and I think he was governor -- probably '79, I

11   think, is when he became governor, succeeded Carroll.

12   Q.   Had you served as an election officer at any of the

13   precincts during the '70s?

14   A.   I might have in the late '70s.  Whatever, whatever they

15   showed there on those.

16   Q.   We've seen the records.

17   A.   I think I served all of those times, or might have been

18   one that something happened I didn't.  But I served those

19   times that they showed that my name was down there.  I always

20   felt if you say you'll do something, you ought to do it.

21   Q.   Mr. Maricle, you heard early in this trial Kenny Day

22   testify about being at a polling place with you and --

23   A.   1983?  Is that the year?  '81 or '83, yeah.

24   Q.   Do you recall seeing Mr. Day there at the polling place?

25   A.   Yes, sir.

*MARICLE - Direct (Mr. Hoskins)*                                  81

1    Q.   You heard Mr. Day's testimony about buying votes out

2    there.

3    A.   Yes, sir.

4    Q.   I'm going to ask you, were you involved in buying votes

5    that day?

6    A.   Yes, sir.  I didn't get too many, because I didn't have

7    much money.  But I -- yeah, I don't deny I did.

8    Q.   Okay.  You heard testimony about a judge's race involving

9    Oscar Gayle House and Clay Bishop.

10   A.   Yes, that was, that was a contest at the time.

11   Q.   Is that the one that, when that -- this deal with Kenny

12   Day took place?

13   A.   Yes, sir.

14   Q.   Okay.  Now, was any of the other stuff Kenny Day said

15   about you true?

16   A.   Well, as far as the -- I can't remember everything he

17   said, so I don't want to give a general denial.  But the thing

18   about the tampering with the jury was certainly untrue.  It

19   was true I went with him to Jackson County, and we ate a lot

20   of meals in Jackson County, because once there's salt between

21   you, people tend to vote for you.

22   Q.   So you're saying that Kenny Day did help you campaign

23   some in Jackson County?

24   A.   Yes.

25   Q.   But he also claimed that you were involved in fixing a

*MARICLE - Direct (Mr. Hoskins)*                                      82

1  jury that involved his sister-in-law who had been killed.

2  A.  No, sir, I did not --

3  Q.  Were you involved in that in any way?

4  A.  No, sir.

5  Q.  Were you the judge in that case?

6  A.  No, sir.  He said I was at first, but I wasn't.

7  Q.  The first time you saw Mr. Day in court, he came in to

8  court and said you were the judge of that case, didn't he?

9       MR. SMITH:  Your Honor, I'm going to object.  That

10 would be hearsay, I believe, out-of-court statement.

11      THE COURT:  Sustained.

12      MR. HOSKINS:  It's not offered to prove the truth of

13 the matter asserted, Judge.

14      THE COURT:  Mr. Hoskins, do you want to come up and

15 we'll discuss it at sidebar?

16           (A sidebar conference was held out of the

17            hearing of the jury):

18      THE COURT:  Mr. Hoskins, if you want to argue with me

19 about a ruling after I make it, you do it up here, and you

20 don't do it in front of the jury.  Do I make myself perfectly

21 clear to you?

22      MR. HOSKINS:  Yes.

23      THE COURT:  I don't want to see you do that again.  I

24 will hold you in contempt if you do it one more time.

25 Understood?

*MARICLE - Direct (Mr. Hoskins)*                                         83

1          MR. HOSKINS:  Yes.

2          THE COURT:  And you will be fined $500 for the first

3    offense.  You'll be placed in jail for the second offense.

4    Just so we're clear.  You know what the penalties are going to

5    be when you do it the next time.

6          MR. HOSKINS:  Understand, Your Honor.

7          THE COURT:  All right.

8                    (Sidebar conference concluded.)

9    BY MR. HOSKINS:

10   Q.  Mr. Maricle, were you the judge in the trial of the

11   estate of the Day lady against Gary Runion?

12   A.  No, sir.

13   Q.  Did you go with Kenny Day to contact anybody to contact a

14   juror?

15   A.  No, sir.

16   Q.  Did you know that that had even taken place?

17   A.  No, sir.

18   Q.  Kenny Day also accused you of being involved with a

19   double-cross involving a magistrate's race, Corky McKeehan and

20   Mike Hooker.  He said that you took money from a J.E. Hensley.

21   Is that true?

22   A.  No.  The persons that took the money from J.E. Hensley

23   was Mr. Day.  He worked at the time at White Chevrolet, and

24   that's where J.E. Hensley was most of the time.  I didn't take

25   any money from J.E. Hensley.

MARICLE - Direct (Mr. Hoskins)                                    84

1   Q.   Did you double-cross anybody that day?

2   A.   No, sir.  The only -- he said I was interested in Harold

3   Sizemore, and that's correct.  Harold Sizemore now works for

4   the forest services marijuana eradication.

5   Q.   Mr. Maricle, let me ask you about your race, when you ran

6   for circuit judge.

7   A.   Yes, sir.

8   Q.   Who was your opponent?

9   A.   Oscar Gayle House.

10  Q.   Was he a friend of yours at that time?

11  A.   Yes, he was.

12  Q.   Was that a clean election?

13  A.   As far as I know, it was a clean election.

14  Q.   Did you buy any votes in that --

15  A.   I didn't buy any votes, did not spend any money on that.

16  If anybody did, they did it without my permission.

17  Q.   Did you talk to anybody about trying to get anybody to

18  buy votes for you?

19  A.   No, sir.

20  Q.   Did you ever hear that Mr. House had bought votes against

21  you?

22  A.   In that election?

23  Q.   Yes.

24  A.   No, sir.

25  Q.   Did you have an agreement with him about that?

1   A.   Yes, sir.  I approached that election in a different

2   manner than I ever have before.

3   Q.   Okay.  When you say you approached that election in --

4   what year was that?

5   A.   That was 1990.

6   Q.   When you approached it in a different manner, what do you

7   mean?

8   A.   I was probably the first person in Clay County that hired

9   a political consultant.  Doris Peterchef originally worked for

10  Timothy Carter and Representative Rogers.  She got in the

11  political consulting business, and I hired her to be a

12  consultant and basically run the campaign.  She wrote the ad.

13  She decided what, you know, issues were, polling or whatever.

14  She did the work, and we handled it in a manner different than

15  had ever been handled.

16       We did an extensive letter writing campaign.  Judy and I

17  would work all day, and we'd come in at 11:00 at night and

18  write letters till 2:00 in the morning, and I insisted on

19  signing every letter personally.

20  Q.   Did you do anything illegal to win that election?

21  A.   No, sir.

22  Q.   When you were elected in 1990, how long was your first

23  term?

24  A.   I ran for the unexpired term of Judge Bishop, and meant

25  that I was in a race immediately in 1991.  The election was in

*MARICLE - Direct (Mr. Hoskins)*                                          86

1    November.  I was elected November 2nd.  By the end of January,
2    we had to file again.
3    Q.   So you had to -- you had one race in 1990?
4    A.   That's correct.
5    Q.   And that was against Mr. House?
6    A.   That's correct.
7    Q.   Did you have opposition in 1991?
8    A.   I had no opponent in 1991.
9    Q.   Did you ever have an opponent in any election after your
10   first election?
11   A.   No, sir.  I ran again in 1999.  I had no opposition.  I
12   ran again in 2006, and I had no opposition.  It's not unusual
13   for incumbent judges.
14   Q.   Mr. Maricle, what was your attitude towards politics when
15   you ran that race in 1990?
16   A.   I was pretty much, in 1990, had reached a situation, I'd
17   been practicing law for, what, 20, 25 years at that point in
18   time.  I don't know exactly what you refer to it as, as far as
19   a man was concerned, but it was time to change from what I'd
20   been doing.  I was tired of practicing law, I was really tired
21   of politics in the sense of, you know, getting out and working
22   it.
23       Opportunity came available at that time for when Judge
24   Bishop resigned because of health, and I saw that as an
25   opportunity for me to get out of the law practice and get into

*MARICLE - Direct (Mr. Hoskins)*                                    87

1    something that I would enjoy as much, and also that I didn't

2    have a lot as far as retirement was concerned saved up because

3    when you got a large family you don't save up much, and the

4    judicial retirement, quite frankly, is one of the better

5    retirement systems.

6    Q.   Did your interest in local politics continue as it had

7    been?

8    A.   No, sir.

9    Q.   Did you get involved in the local races like you had in

10   the '80s --

11   A.   No, sir.  No, sir.

12   Q.   We've heard a lot of testimony about the 2002 primary for

13   the Clay County court clerk.

14   A.   Um-hmm.

15   Q.   Do you remember the candidates in that race?

16   A.   The candidates in that race were Jennings White and

17   Freddy Thompson.

18   Q.   Now, they were both Republicans?

19   A.   Both Republicans, yes, sir.

20   Q.   So they ran in the May primary, and that was the big

21   contest for that office, wasn't it?

22   A.   That was the contest for that office, because there was

23   no one that had filed as a Democrat.  The only way that you

24   could file after that would have been, you know, would have

25   been a write-in, I believe.  I think even at that time,

*MARICLE - Direct (Mr. Hoskins)*                                          88

1    independents had to file before the primary.

2    Q.   As a Democrat, were you able to vote a Republican

3    primary?

4    A.   No, sir.

5    Q.   Who did you support in that election?

6    A.   I did not support either one of the candidates.

7    Q.   If you could have voted, which one would you have voted

8    for?

9    A.   Would have been a tough decision.  Probably Mr. White,

10   but I would have -- it would have not been a question of good

11   and worse, but a question of, you know, having known of them.

12   I thought both of them were well qualified to hold the office.

13   I'd gone to church with Freddy's mother and daddy.  I knew Mr.

14   Jones, his father-in-law.

15        On the other hand, Jennings White's father had been one

16   of my best friends.  Would have been a tough decision.  But

17   fortunately, I didn't have to make that decision, yes.

18   Q.   Historically, have you been a supporter of the White

19   family?

20   A.   I don't really want to say that I supported any family

21   because of the family name.  I was not that way.  If a name

22   was White, the name was White.  If the name was Sizemore, the

23   name was Sizemore.  If the name was Morgan, the name was

24   Morgan.  I did not necessarily think that a name ought to be

25   the reason that you were for somebody.

*MARICLE - Direct (Mr. Hoskins)*                                      89

1    I probably was not -- I was not always for, you know,

2    Whites, but there was probably most of the time I was.  That

3    went back to when I got out of law school, and there was an

4    elderly gentleman that was county judge at the time who didn't

5    come to work till about 10:00 in the morning, and he stayed

6    till about 7:00 at night.  After work, I'd usually go over and

7    sit around with him, and he gave me a lot of good advice.

8         Now, he was county judge.  At that time, they had

9    judicial powers.  He gave me a lot of good advice on what to

10   do and what not to do, pointed me to a couple of boards that

11   got me some contacts.  The administrative area development

12   district was just getting started at that time, and, you know,

13   he was very good to me.  And I, I liked the man.  He was a

14   fine gentleman.  Of course, Eugene Lewis's daddy -- his uncle.

15   His uncle beat him.

16   Q.   What was your involvement, if any, in the 2002 elections?

17   A.   Other than the lawsuit was filed, none.  There was a

18   lawsuit filed which nobody, incidentally, made a motion for me

19   to disqualify that I decided relative to election officers on

20   the Friday or Saturday before the election.  But I had a judge

21   prepared to at that time to stand by in case there was an

22   appeal.

23   Q.   Let's back up and talk about that a little bit.

24   A.   All right, sir.

25   Q.   Before -- you're saying there was a lawsuit filed

*MARICLE - Direct (Mr. Hoskins)*                                    90

1   regarding the election in 2002?

2   A.   Yes, sir.

3   Q.   Was that before one of the elections?

4   A.   It was before the primary.

5   Q.   Okay.  Who were the parties in that lawsuit?  Who were

6   the people on each side?

7   A.   I don't remember for sure the name of the plaintiff.  It

8   seems like it was Fultz was the name of one of them, and may

9   have been more than one.  It was people that felt aggrieved by

10  some decision that had been made relative to election officers

11  versus the County Board of Elections.

12  Q.   So the defendant in the case was the County Board of

13  Elections?

14  A.   I believe that was the named defendant, yes, sir.

15  Q.   And at that point, it would have been the sitting county

16  court clerk, Jennings White?

17  A.   Yes.

18  Q.   It would have been the sitting sheriff, Edd Jordan?

19  A.   That's correct.

20  Q.   And it would have been the Republican county

21  commissioner, who was William Hugh Bishop?

22  A.   I'm not sure that he was the Republican county

23  commissioner at that that time.  I can't say that for sure.  I

24  think his brother, Clay Massey, served for a time as both

25  Republican chairman and election commissioner that I think

1    they had to separate that so I'm not, I'm not really sure

2    which one of those two was there.

3    Q.   Okay.  Now, you said there was a fella named Fultz that

4    was the named plaintiff?

5    A.   I don't remember his first name, but I believe his last

6    name was Fultz.

7    Q.   Were there other people who were actually backing him in

8    that lawsuit?

9    A.   Yes, sir.

10   Q.   Did you know who those people were?

11   A.   That would have basically been the supporters of Roy

12   Morgan and Freddy Thompson.  I assume Roy Morgan, because

13   Yancey White represented them.

14   Q.   Yancey White was the lawyer trying to --

15   A.   Yancey White represented Fultz.

16   Q.   What was the purpose of that lawsuit?  What were they

17   asking you as the judge to order?

18   A.   Well, they were asking that -- exactly what the prayer

19   for relief was, I really don't know that I can say exactly.

20   If I had a copy, I could tell you.  But it basically was maybe

21   to require some either replacement of officers or something to

22   do with training.  I'm not really sure.  It was a -- it was

23   a -- they sought a mandatory injunction or action against the

24   Board of Elections to require the Board of Elections to do

25   certain things.

*MARICLE - Direct (Mr. Hoskins)*                                        92

1    Q.   And what was your ruling in that case, ultimately?

2    A.   My ruling in that case was that I had the authority to

3    tell the Board of Elections that they should do their job, but

4    that I had no authority to tell them how to do their job.

5    It's just like if you -- if there's $2 million appropriated to

6    the county to build roads and they're sitting there with the

7    $2 million and someone's filed suits, I can say you got to

8    build roads with it, but I can't say that you have to do

9    U.S. 60 from here to Shelbyville or 127 to Lawrenceburg.

10   Q.   So did you give Yancey White and Roy Morgan what they

11   wanted in that case?

12   A.   I ordered the Board to meet.  That was what they were

13   supposed to do.  That's all I could do.  I don't think the

14   Board met.  I don't know whether they did or not.  There was

15   no appeal.  I don't imagine either side was very happy with

16   it, but that was my decision.

17   Q.   You didn't make either side happy in that case?

18   A.   Probably not.

19   Q.   Did you have any other involvement in the 2002 primary?

20   A.   No, sir.

21   Q.   There was a convicted felon on the witness stand, I think

22   it was Denver Sizemore, if I'm remembering the name right, who

23   said he saw you the night before that election.

24   A.   There could only be one word for what he said.  It's lie.

25   Q.   Were you involved in the 2002 fall election?

*MARICLE - Direct (Mr. Hoskins)*                                            93

1    A.   No, sir.

2    Q.   Were you involved in any vote buying or --

3    A.   No, sir.

4    Q.   -- anything like that in 2002?

5    A.   No, sir.  No, sir.

6    Q.   Either election?

7    A.   No, sir.  Not in either election.

8    Q.   Were you involved in the 2004 elections in any way?

9    A.   No, sir.

10   Q.   In 2006 --

11   A.   Yes, sir.

12   Q.   Did you have an interest in the primary election?

13   A.   My son-in-law ran for property valuation administrator

14   against Urshell Smith.  There had become a vacancy in the

15   office, and he and Urshell ran for it.  Urshell ran for it

16   twice before in the office, and my son-in-law worked there at

17   one time.

18   Q.   Your son-in-law worked in the PVA office?

19   A.   Yes, he had.

20   Q.   And what is your son-in-law's name?

21   A.   Phillip Mobley.

22   Q.   Were you interested in seeing Phillip win that election?

23   A.   Why sure.

24   Q.   What did you do to try to help Phillip win that election?

25   A.   I didn't do anything illegal.  I was very careful not to

*MARICLE - Direct (Mr. Hoskins)*                                    94

1    do anything.  I was very careful as to the people I talked to.

2    I talked to very, very few people.  If it wasn't a family

3    member or a real, real close friend, I didn't get involved

4    beyond that.  There was a lot of reasons.  One as a judge, I

5    shouldn't.  And the other reason is a lot of people probably

6    were not satisfied that had family members in jail, and it was

7    not the wise thing to do, quite frankly.

8    Q.   You say that you shouldn't because you were judge.  Are

9    there any rules that cover judges?

10   A.   Yeah, you can, you can say that you're for somebody.  You

11   can't get out and campaign for somebody.  You can go to a

12   political event for anybody.  You are considered, if you are a

13   sitting judge, to be a candidate at all times for reelection

14   and, of course, the purpose of that is so that you can go to

15   any political event you want to, whatever political party it

16   may be, Republican or Democrat.  And I tried to go to both if

17   I could.

18   Q.   You know Kennon and Wanda White?

19   A.   I do.

20   Q.   Tell us how you first came to get to know those folks.

21   A.   Well, I knew who Kennon was by virtue of relationship.

22   But, you know, there being the generational difference, I

23   really didn't know him that much.  The first contact I

24   remember was when his father sought my help in getting him

25   into a rehab program because of the addiction he had, and I

1    made some calls on that.  At the time it was known as Charter

2    Ridge.  I think now they just call it The Ridge.

3        I believe he testified that there were a couple of times

4    he'd gone in, and whichever, you know, it was Charter Ridge.

5    I don't know which time it was or whatever.

6    Q.   Okay.  So you said because of the connection.  Tell us

7    again what connection you're talking about.

8    A.   Well, you know, his mother.  I mean, I knew the relation.

9    I knew they had kids.  As far as really knowing them, you

10   know, maybe, you know, if you see them, but you don't, you

11   know, go around and go into high school events with them.

12   Q.   Well, at that time, was Kennon White a regular visitor to

13   your home?

14   A.   At the time I got him into or helped with Charter Ridge?

15   Q.   Yes, sir.

16   A.   No, he was not a regular visitor at that time.

17   Q.   How about Wanda White?

18   A.   No, I only knew Wanda after she married Kennon.

19   Q.   When did you -- we've heard from these tapes and

20   testimony that you and your wife and your family became fairly

21   good friends with Kennon and Wanda White.

22   A.   Yes, we did.

23   Q.   Tell us how that developed over the years.

24   A.   A lot of -- I think that Judy sold -- either sold them a

25   house or sold a house for them.  Probably -- I'm not sure she

*MARICLE - Direct (Mr. Hoskins)*                                96

1    sold it.  She listed one for them probably mid '90s sometime.

2    My daughter Donna Leah was needing a home, and she wanted to

3    buy a mobile home, and Mr. White was in the mobile home

4    business.  I went to there and purchased a mobile home from

5    him and, you know, was very satisfied with the work.  And, you

6    know, we just, you know, sometimes I'd stop in there to the

7    mobile home business for just a second, not long or not often.

8        They started coming to the house visiting a little bit.

9    My son -- my grandson, Brandon, and their daughter, Kendilynn

10   were friends.  My son-in-law, Aaron, was the pastor at the

11   Great Fork Baptist Church.  They were going to church at the

12   Great Fork Baptist Church.  They had some church picnics.

13   They had them at their house, because they had a really large

14   house at that time.

15       Just, you know, those things.  You just start talking to

16   people and, you know, who knows why you become friends with

17   people.  You just, you know, you just do.  I don't know

18   whether it's chemistry or what.  But you just, we just became

19   friends.

20       Wanda had came from a family that had had some problems,

21   and she, though, had not had any problems.  I never knew her

22   to have any drug problems or anything of that nature.  And I

23   liked her.  Thought they liked me.

24   Q.   Did you come to be, consider yourself to be pretty close

25   friends with Kennon and Wanda White?

*MARICLE - Direct (Mr. Hoskins)*                                    97

1    A.   Yes.  They came to our house two, three, four times a

2    week for the last -- well, up until 2007, probably six, seven

3    years before that.  Became more frequent, but they were

4    frequent visitors to our house and occasionally we went to

5    their house, but most of the time they came to ours.

6         We always had a 4th of July picnic, and they came to the

7    4th of July picnic, and my grandson's Blake's birthday was the

8    29th of July.  We always had something for him, and they liked

9    him because he was struck to death on Kendilynn.

10   Q.   Mr. Maricle, did you consider yourself a confidant of the

11   Whites?

12   A.   Yes, I would say so.

13   Q.   What types of things would you talk about with them?

14   A.   Whatever was going on in your life.  I asked them, as the

15   jury has heard, had some other personal conversations with

16   them about my daughter.  Linsey was good friends of Wanda's.

17   Yes, I would have to say we were confidants, yes.

18   Q.   When the things were going on at City Hall, the election

19   in 2006, would the Whites talk to you about that stuff?

20   A.   Some, yes.

21   Q.   Do you remember when the -- there was a raid on the City

22   Hall building before that election?

23   A.   I think it was on Wednesday or Thursday before the

24   election.  I do.  I remember that.

25   Q.   Did you talk with them about that?

*MARICLE - Direct (Mr. Hoskins)*                                    98

1    A.   I don't remember the conversation, but I'm sure I did.

2    Q.   Was it apparent to you at that point that that mayor's

3    race in 2006 was going to be hot, difficult?

4    A.   The race was hot, but it was becoming evident that it

5    was -- that Mayor White was going to lose.  You can't force

6    people to do things.

7    Q.   When you say can't force people to do things, tell us

8    what you mean.

9    A.   Well, somebody's got a sign up in their yard for your

10   opponent, you don't go telling them they've got to take it

11   down or get somebody else to go to them and tell them to take

12   it down.  You know, if you want to go campaign with them and

13   say, you know, I'm seeing your sign the other way, but if you

14   see fit to change your mind, I'd appreciate it.  If you can't

15   be for me this time, maybe you will the next time.  You don't

16   force people.  I mean, that won't -- that just solidifies them

17   against you when you try to force them to do that.  You don't

18   do that.

19   Q.   Did you get involved in trying to help Doug White, Daugh

20   White keep that job?

21   A.   Keep what?

22   Q.   Keep the job as mayor.

23   A.   I voted for him.

24   Q.   Did you do anything else to try to get other people to

25   vote for him?

1    A.   I think at one time, strictly in a conversation that I

2    had with Roy Morgan, I might have mentioned it.  Mr. Morgan

3    has a business in London, between Somerset and London.  It's a

4    filling station, service station.  And if I was going that

5    direction or over there, I oftentimes would stop there and

6    fill up with gas.  When I did, I always talked to Roy.

7    Q.   And you think you asked Roy Morgan to vote for --

8    A.   I'm sure we talked about it.  And some of his family

9    members were not -- even though they worked with the City,

10   worked for him, they said they just aren't.  They just don't

11   like being forced to do things.

12   Q.   Well, now, you talked about Wanda White's family.  What

13   was her maiden name?

14   A.   Price.

15   Q.   And when you talk about her family, who are some of the

16   people that you think of?

17   A.   Well, her mother, they call her Sis, what her name is.

18   She's got a brother, Travis.  She's got a sister, Stephanie.

19   She had a brother, Corky.  His real name was Eugene.  For the

20   life of me, I can't remember what her dad's name was.  I'd

21   know if somebody told me, but I can't remember right now.

22   Q.   Well, you heard some talk about Sarah Price being charged

23   with some type of drug crime in your court.  Do you remember

24   that?

25   A.   Yes, I do.

*MARICLE - Direct (Mr. Hoskins)*                                        100

1   Q.   Now, do you remember if she had anybody who was charged

2   alongside her in that case?

3   A.   I believe her son was.

4   Q.   Was that Stephen or Corky?

5   A.   I think it was Stephen.

6   Q.   Now, do you remember how that case was resolved?

7   A.   By virtue of being here, I remember how it was resolved.

8   I believe that the case against her was dismissed, and I

9   believe he pled guilty.  I don't remember what the sentence

10  was.  Don't even remember for sure what they were charged with

11  or what they pled guilty to.  Oftentimes the commonwealth

12  attorney had a tendency to overcharge people.  So I don't --

13  you know, I don't remember.  Whatever the record shows is

14  what's right.

15  Q.   Did you play any role in trying to get those charges

16  dismissed against Sarah, Sis?

17  A.   No, sir.  No, sir.

18  Q.   Did you ask Gary Gregory to do that for you?

19  A.   No, sir.

20  Q.   Did Wanda White ask you to do that?

21  A.   No, sir.

22  Q.   We heard some talk about Corky Price.

23  A.   Yes, sir.

24  Q.   Corky appeared in your court?

25  A.   Yes, sir, he did, on more than one occasion.

*MARICLE - Direct (Mr. Hoskins)*                                    101

1   Q.   Well, it's one particular case that he was charged with

2   that seems to be important in this case, isn't it?

3   A.   That's correct.

4   Q.   And what was Corky accused of in your court?

5   A.   He was accused of getting a young lady who had been a

6   witness to a murder case and luring her, taking her to a place

7   where some -- which was Horse Creek Baptist Church, where her

8   throat was cut.  She was left to die on the cold ground.

9   Q.   Now, Corky wasn't accused of actually being the one to

10  cut her throat?

11  A.   No, no.

12  Q.   Do you remember the day that girl was found laying?

13  A.   Yeah, I remember.  Two people from the church, Horse

14  Creek Baptist Church that found her, the secretary and her

15  husband found her that morning.

16  Q.   And was that big news?

17  A.   Yes, because there had already been one person killed who

18  was a witness to the first murder.

19  Q.   So there had been a murder sometime before that?

20  A.   Yes, I think it was in October of '04, there was a murder

21  of Stevie Collins.

22  Q.   And there were supposed to be witnesses at that murder of

23  Stevie Collins?

24  A.   There were supposed to be three girls there, April, who

25  was married to Harold Wayne Collins.  Can't remember the

1  girl's name that was killed, and Tish Saylor.

2  Q.  So one of the three women who was actually there actually

3  turned up dead?

4  A.  Turned up dead.

5  Q.  And after that, Tish Saylor was found with her throat

6  cut, left to die?

7  A.  Left to die, yes, sir.

8  Q.  After Tish Saylor was found in that condition, when did

9  you first see or talk to Corky Price after that?

10  A.  First time I seen Corky Price would have been in court.

11  Q.  He came into your court?

12  A.  Came in to my court one afternoon.  The attorneys came by

13  and said they had a plea worked out on him, and he was going

14  to cooperate, and I took the plea that very afternoon.  Got a

15  case off the docket.

16  Q.  Do you recall if Corky went through the grand jury

17  process and was indicted, or did he --

18  A.  No, he was not indicted.  He had what you call an

19  information, and in Kentucky, an information can only be filed

20  if all the parties agree.  They've got an agreement worked out

21  and the defendant says I'm agreeable to, you know, you filing

22  an information against me rather than it going through the

23  process of going to a grand jury, evidence being heard before

24  the grand jury, grand jury returning an indictment.  Have an

25  information.  They appeared in court on the information.

MARICLE - Direct (Mr. Hoskins)                                    103

1   Q.   So Corky Price came in to your court on an information?

2   A.   Yes, he did.

3   Q.   He had a lawyer?

4   A.   Yes.

5   Q.   Was there somebody there from the Commonwealth attorney's

6   office?

7   A.   I believe Mr. Couch was there from the Commonwealth

8   attorney's office.  I don't think Mr. Gregory was there.

9   Whatever the video shows would be correct.

10  Q.   Now, when they brought Mr. Corky Price in to court, were

11  you --

12  A.   Sir?

13  Q.   When they brought Corky Price into court that day, what

14  took place?

15  A.   Well, they brought him in to enter a plea of guilty to a

16  charge of assault under extreme emotional disturbance, which

17  made it a Class D felony, one to five years, with the minimum

18  being one year, the maximum being five years.  And it was a

19  maximum of five years was the recommendation.

20       However, the Commonwealth also was recommending probation

21  and it was, I think, the position of the Commonwealth that

22  basically as far as a bond was concerned, pretty much let him

23  go, since he is going to testify.

24  Q.   All right.  Let's talk about that.  How did you find out

25  what the Commonwealth's recommendation was?

*MARICLE - Direct (Mr. Hoskins)*                                      104

1   A.   I believe Mr. Couch came by the office and said they had

2   a deal.   I don't know that I knew what the recommendation was

3   until I went into court.

4   Q.   Well, did you find that out by paperwork?

5   A.   Oh, by paperwork, yes, sir.

6   Q.   And we've heard testimony about this, but in this

7   particular case, how did you find out what the Commonwealth's

8   recommendation would be in the case against Corky Price?

9   A.   Well, you have two papers that have to be executed when

10  you're going to have a plea agreement.   One is the defendant

11  has to file a motion to enter a guilty plea to the

12  Commonwealth's offer, which sets out all of the things that

13  he's waived and say he either acknowledges his guilt or that

14  he admits they've got a strong case against him, but he

15  doesn't acknowledge his guilt, but it is sufficient to convict

16  him.   He signs that.

17       The attorney certifies -- his attorney, who will be

18  either the public defender or whomever he has employed, signs

19  under it a certification that they have talked with him,

20  advising him of his constitutional rights and he understands

21  his constitutional rights and understands that, you know, what

22  he's doing.

23  Q.   Kind of what we saw Judge Lewis go through with the

24  Downey man?

25  A.   You would also have a plea agreement, Commonwealth's

1    offer on plea of guilty, which will set out what the charge

2    is, what their recommendation is, and that will also be --

3    that would be signed by the Commonwealth attorney.

4    Q.   And in this case, you said the recommendation was five

5    years, but that it was to be probated?

6    A.   Recommendation was five years with a recommendation of

7    probation.  I would be bound -- I would not be bound by the

8    recommendation of probation.  I could have reduced the

9    sentence from five years.  I didn't, but I could have.  A

10   judge cannot raise a sentence in state court, but he can

11   decrease a sentence.  Five years was the maximum.

12        Recommendation of probation is not binding on the judge,

13   and I make that very clear at the time that we take the plea

14   that, in fact, that the Commonwealth may recommend probation.

15   Does not mean that they're going to give probation.  And if

16   they are of the opinion that the -- that I'm bound to do that,

17   that they should not enter a guilty plea because I may grant

18   it, and I may not.

19        I always want to look at the presentence report, see what

20   the presentence report says, and that's the presentence report

21   is what's prepared by the probation officers who testified

22   here today.  They get into the family background, what prior

23   records a person might have, what his job's been.  It's a

24   rather lengthy instrument that they prepare, and I want to see

25   that because early on, I learned that you better look at that,

*MARICLE - Direct (Mr. Hoskins)*                                              106

1    because sometimes you didn't know what all the person might

2    have done.

3    Q.   In this case, with Corky Price, the prosecutor was asking

4    you to let him out of jail that day?

5    A.   Yes, they indicated that, yes, sir.

6    Q.   Now, let's make sure we get the time frame right on this.

7    Tish Saylor was found laying on the ground with her throat

8    cut.  And how long after that did Corky Price come into your

9    court?

10   A.   It would have been several days.  I don't know exactly

11   how many days it would have been.  It would have been several

12   days before he came in, into my court.

13   Q.   So it wasn't months?

14   A.   Oh, no, no.  It was several, several days.  And they

15   had -- part of their investigation focusing in that direction.

16   That's what brought him about.

17   Q.   Who investigated that case?

18   A.   I knew you was going to ask that.  Can't remember the --

19   Gates?  Was it Detective Gates?  I believe it was Detective

20   Gates.  If I'm wrong, y'all can correct me, but that's who I

21   think it was.

22   Q.   More important than who the specific detective was, who

23   did he work for?  What agency?

24   A.   Commonwealth of Kentucky, the state police.

25   Q.   Okay.

*MARICLE - Direct (Mr. Hoskins)*                                           107

1    A.   He was a detective with the Kentucky State Police.

2    Q.   He wasn't a local Clay County sheriff's deputy or

3    sheriff?

4    A.   No, no.  As far as I know, he was not native to Clay

5    County, and I don't even think he lived there.

6    Q.   But he was a state police detective who worked Clay

7    County?

8    A.   Worked out of the London office of the state police, and

9    that's where -- that's the office for our area.

10   Q.   Do you remember the approximate date that this all

11   happened, the month and the year?

12   A.   I don't remember the date, but I'm thinking it was April.

13   I believe.  It was spring, because I believe Miss Saylor was

14   found, and it was spring, but she hadn't froze to death, but

15   it was, it was cool.  And I believe that may have been why she

16   lived.  I don't know.

17   Q.   What year was it?

18   A.   Two thousand -- it would have been the April after Mr.

19   Collins' death.  That would have been April of '05, I think.

20   Q.   So it was around a year before the May, 2006 primary?

21   A.   That's correct.

22   Q.   And it was about two years before these recordings that

23   we heard, wasn't it?

24   A.   That's correct.

25   Q.   Now, did you let Corky Price out of jail that day?

1    A.   No, sir, I didn't.  I think I set a bond for him.  Nobody

2    filled the bond.  I think the Commonwealth's position was let

3    him sign his own bond, but the family -- many of his family

4    were living in Texas at that time, and I thought it was a risk

5    to flee.

6    Q.   You thought it was a risk --

7    A.   I thought it was a risk of flight by virtue that he had

8    connections in Texas, and my understanding was he'd been to

9    Texas between the time the event happened and the date of the

10   arrest.

11   Q.   Now, was Corky Price sentenced right away?

12   A.   No, he wasn't.

13   Q.   Why not?

14   A.   Well, he was giving testimony against the other persons

15   who were involved in the assault, or I think it was attempted

16   murder.  They charged them with attempted murder so he

17   testified against them.

18   Q.   Do you remember when that trial actually took place?

19   A.   It was later in the year.  I'm thinking maybe late fall,

20   early winter of '05.  I think that's when it was.  I might be

21   corrected a month or two, but I think that's when it was, Mr.

22   Hoskins.

23   Q.   Was Corky Price then sentenced after the trial in which

24   he testified?

25   A.   At some time later, yes.

*MARICLE - Direct (Mr. Hoskins)*                                            109

1   Q.   Okay.  Judge Maricle, when you took his plea, Corky

2   Price's plea, did you ask him what he had done?

3   A.   I went through a factual situation with him in order that

4   I could accept the plea.

5   Q.   Tell us what you mean.  You went through a factual

6   situation.  What's that mean?

7   A.   Somebody walks into court and says I wanted to plead

8   guilty, you don't take that plea.  You can't do that, because

9   people plead guilty, you know, there's some people out there

10  plead guilty to anything going.  That's just something that

11  happens to people, and you want to make sure that there's a

12  factual basis, in fact, that the person did it.  Or in the

13  case of an Alford plea, that they've got a strong case.

14  Q.   Let's not talk about Alford pleas.

15  A.   Okay.  We won't get into Alford.  That's not involved

16  here.

17  Q.   What kind of plea was there in Corky Price's case?

18  A.   Just a plea of guilty to assault under extreme emotional

19  disturbance.

20  Q.   So he was admitting that he had been involved --

21       MR. SMITH:  Your Honor, I'm going to object to

22  calling for hearsay at this point.

23       THE COURT:  How much further do you plan to get into

24  this, Mr. Hoskins?

25       MR. HOSKINS:  I'm not going to get into details of

*MARICLE - Direct (Mr. Hoskins)*                                      110

1    what Mr. Price said.

2         THE COURT:  I'll overrule.

3    Q.   You asked Mr. Price about what he'd done to make him

4    guilty?

5    A.   Yes, sir.

6    Q.   Did he tell you?

7    A.   I'm sure there was a factual basis, yes, sir.

8    Q.   Did you accept his guilty plea that day?

9    A.   Yes, I did.

10   Q.   Did he then testify some months later in the trial?

11   A.   Yes, he did.

12   Q.   Now, Mr. Maricle, did you try in any way to influence

13   what Corky Price testified about, what he said at the trial?

14   A.   Absolutely not.

15   Q.   Would you have had any reason to do so?

16   A.   Absolutely not.

17   Q.   Did you do anything to get back at Corky for not

18   testifying in a certain way?

19   A.   No, sir.  I didn't.

20   Q.   Did Corky Price ultimately get sentenced in your court?

21   A.   Yes, he did.

22   Q.   Did he get probation?

23   A.   Did not.

24   Q.   What did you sentence him to?

25   A.   I sentenced him to the five years, which was the

1    recommendation of the Commonwealth and was the maximum that

2    could be given on a Class D felony, and I did not probate him.

3    Q.   Now, did you have the option to raise the charge that he

4    was pleading guilty to?

5    A.   Well, I would have had to rejected the plea before I

6    could have raised, you know, the charge.  I mean, I could

7    reject it, say I'm not accepting that.  They could have gone

8    to the grand jury and the grand jury could have indicted him

9    on whatever.  But I had no option, if I accepted that plea,

10   other than to go into the grand jury.  The grand jury might

11   indict him on that, might indict him on something else.  That

12   was not an option I had.

13   Q.   Why didn't you give Corky Price probation?

14   A.   Well, we got two dead people.  One girl was a witness;

15   and another one, throat stuck like a pig.  He didn't deserve

16   probation.  I don't regret it at this day.

17   Q.   Were there ever requests from anybody to let Corky out of

18   jail early?

19   A.   Well, yes.

20   Q.   Let me ask you this, Mr. Maricle.  As a judge in a small

21   town, was it easy for you to avoid running into people that

22   had cases in your court?

23   A.   Certainly was not easy.  You went out anywhere, you were

24   likely -- grocery store or to eat, whatever, you were likely

25   to run into people.  That's basically why, you know, in the

1    morning you've got a coffee crowd at different places.   I

2    didn't ever get into that, because they'd always wanting to be

3    talking about something.  I had other things I needed to do

4    too.

5    Q.   People try to come talk to you at your office in the

6    courthouse?

7    A.   Yes.

8    Q.   How did you deal with those people when they'd come

9    asking for favors?

10   A.   If it is a matter that is administrative in nature, there

11   is no problem.  You can talk to them, tell them, you know,

12   your case is set for trial March 29th.  There's absolutely no

13   violation in doing that.  If it's anything of that nature, you

14   can talk about it.  You do not get into the substance of the

15   case.  And that's the way it's supposed to be handled.

16        When I became judge, I followed the advice of Ed Jackson.

17   You don't -- you just try to talk around it.  We'll take a

18   look at it and see what we can do.  We'll try to help you.

19   We'll find out what we can do.  Have your lawyer file a

20   motion.  Something that doesn't commit you one way or the

21   other.

22   Q.   So you'd try to get those people to leave, but not --

23   A.   Otherwise, you know, I guess you'd have an easy job if

24   everybody came up, you disqualified, you probably wouldn't

25   have to -- probably get a paycheck for no work, which wouldn't

*MARICLE - Direct (Mr. Hoskins)*                                          113

1    be bad.

2    Q.   Who asked you to let Corky Price out of jail?

3    A.   I'm sure Wanda and Kennon mentioned it at some point in

4    time.

5    Q.   Did you ever promise to do that?

6    A.   Absolutely did not promise to do that.  On those tapes,

7    the statement is how long has he been in?  I'll try to help or

8    something of that nature.  I did not promise that he would get

9    out, and I certainly did not promise he'd get out in exchange

10   for anything of any political nature or anything else.

11   Q.   Was that something that Wanda talked to you about once or

12   more than once?

13   A.   Probably more than once.

14   Q.   Now, Wanda White also testified that you had promised her

15   a job.  Now, had you talked with Wanda White about employment

16   opportunities?

17   A.   Sure, I talked with Wanda about employment opportunities.

18   When Miss Lewis took over as mayor, they lost their jobs.  I

19   talked with her about employment opportunities.  I don't

20   remember ever talking with her about it before that, because

21   they had, they had jobs.  But when they lost their job,

22   certainly I talked to her about it, and I would -- yeah, I'd

23   try to help her get a job, same as I would anybody else, and

24   maybe more.  But I didn't promise her, in exchange for her

25   doing anything, I'd help her get a job.  If I could have

*MARICLE - Direct (Mr. Hoskins)*                                          114

1   helped her, I would, really.

2       I had a son that was getting ready to get out of law

3   school.  I even thought maybe if he passed the bar, went to

4   practice in September, October, if he passed the bar, that

5   that would be a potential opportunity for her.  We discussed a

6   whole lot of things about it, but I did not promise her a job

7   at any particular place for any particular thing.  But would I

8   have tried to help her get a job?  Absolutely.

9   Q.   Why?

10  A.   Well, I'd help anybody get a job that was looking for a

11  job.  People ought to work.  That's part of it.  Everybody,

12  you know, ought to help people if they can get a job, and

13  I'm -- about everybody that's got a job -- won't say about

14  everybody, but a lot of people got a job got them because they

15  knew somebody, whether it would have been years ago in labor

16  unions or the government or whatever.  That's just the way it

17  works.  Anybody tries to say it doesn't work that way, they're

18  wrong.

19  Q.   Mr. Maricle, let's talk about your son again.  You said

20  you had a son who was getting ready to be a lawyer at that

21  time?

22  A.   Yes, sir.

23  Q.   That's Rusty?

24  A.   That's right.

25  Q.   Following your footsteps, he went to law school?

1   A.   That's correct.

2   Q.   When did he graduate from law school?

3   A.   He graduated in May of '07.

4   Q.   And when did he take the bar exam?

5   A.   I think they take them in July of '07 is when they took

6   the bar exam.  And then a couple months after that before they

7   actually get the results on their bar.  They're sworn in at a

8   meeting here at the state capitol, all on the same day.

9   Sometime in October.

10  Q.   So Rusty passed the bar exam the first time he took it,

11  just like you?

12  A.   He did.  He was a lot smarter than I was.  He did.

13  Q.   He started practicing law in Manchester?

14  A.   Yes, sir.  Opened his own office.

15  Q.   Do you remember the day he was sworn in as an attorney?

16  A.   Not the exact date.  It was October of '07, but for me to

17  tell you the exact date, I think it would have been probably

18  after the 15th, because they usually get the results at the

19  first of the month, and then it's about ten days or two weeks

20  before they actually have the ceremony over at the Supreme

21  Court.

22          MR. SMITH:  Your Honor, I'm going to object and ask

23  to approach at this time.

24          THE COURT:  All right.  Come on up.

25                  (A sidebar conference was held out of the

*MARICLE - Direct (Mr. Hoskins)*                                    116

1                          hearing of the jury):

2               THE COURT:  Yes, sir.

3               MR. SMITH:  I've been waiting for this moment.  I

4    think it's about to come back again.  I think we talked about

5    son dying, and now I think that we're going to talk about the

6    son at the wake.  Is that where we're headed?

7               MR. HOSKINS:  No.

8               THE COURT:  What's the relevance?

9               MR. HOSKINS:  That's not where I'm heading.  The

10   relevance is --

11              THE COURT:  I'm sorry.  Maybe I didn't make myself

12   clear.  What is the relevance of your question as to when the

13   swearing-in occurred in October of 2007?

14              MR. HOSKINS:  I'm sorry, Judge.  The relevance is

15   that Wanda White testified that she saw Rusty Maricle at the

16   courthouse when he was a lawyer and asked for this favor for

17   her sister.  That's what I was going to talk about, when that

18   would have been.

19              THE COURT:  What was the date she testified she saw

20   him at the courthouse?

21              MR. HOSKINS:  It was in, I believe, 2006 that she

22   said.  I don't believe that to be truthful.

23              THE COURT:  All right.  You've asked him when his son

24   was sworn in.  He said it was sometime in October of 2007.

25   And then the follow-up is --

*MARICLE - Direct (Mr. Hoskins)*                                   117

1          MR. HOSKINS:  I don't remember exactly what I said.

2     I think it was something like when did he open his office or

3     start practicing.

4          THE COURT:  All right.  If that's going to be the

5     next question, I'll overrule the objection.

6          MR. HOSKINS:  Thank you, Judge.

7               (Sidebar conference concluded.)

8          THE COURT:  Please proceed.

9          MR. HOSKINS:  Thank you, Your Honor.

10    BY MR. HOSKINS:

11    Q.  Mr. Maricle, last question about that, when did your son

12    start, open his office and start practicing in Manchester?

13    A.  Immediately.

14    Q.  Immediately after passing the bar exam?

15    A.  Yes, sir.

16    Q.  I want to ask you about another case that we've heard

17    testimony about in which you served as circuit judge in Clay

18    County.  And that was a case involving a man by the name of

19    Steve Yapp.

20    A.  Um-hmm.

21    Q.  Do you recall that case?

22    A.  Couldn't forget that one.

23    Q.  Why do you say that?

24    A.  Well, it was a tri-racial matter.  You had a person of

25    oriental or Asian descent accused of killing a black man.  The

1   oriental was married to a white woman, and allegedly the black

2   man was having an affair with her, and the oriental man, Mr.

3   Yapp, was under an EPO or domestic violence order to stay

4   away.

5   Q.   Now, you were the judge in that case?

6   A.   Yes, I was.

7   Q.   And did that case actually go to jury trial?

8   A.   Yes, it did.

9   Q.   And the person, the Asian person you're talking about,

10  was that Mr. Yapp?

11  A.   Yes, it was.

12  Q.   And he was accused of shooting a young black man?

13  A.   Yes, he was.

14  Q.   Who died?

15  A.   Yes, sir.

16  Q.   What type of defense did the lawyers try to raise for Mr.

17  Yapp?

18  A.   They tried to raise a self-defense issue.  They tried to

19  say he was acting in self-defense and should be acquitted on

20  the basis of self-defense is what they tried to argue.

21  Q.   Now, at the end of the case, the judge gives instructions

22  about the law in the case?

23  A.   Yes, I do.  Or yes, they do.

24  Q.   Did you in that case?

25  A.   I did.

1   Q.   Did you allow them to make that argument for

2   self-defense?

3   A.   No, I did not allow them to make the argument for

4   self-defense, because, you know, the whole thing is for

5   self-defense, you've got to be where you have a right to be,

6   doing what you have a right to do, and he wasn't where he had

7   a right to be.

8           MR. SMITH:  Your Honor, objection as to the

9   relevance.

10           THE COURT:  You need to come up again and explain to

11   me the relevance of this case.

12                   (A sidebar conference was held out of the

13                   hearing of the jury):

14           THE COURT:  Tell me how this case is related.

15           MR. HOSKINS:  Judge, I didn't think it was until the

16   government put on proof that indicated that Mr. Maricle

17   somehow was involved in that man being found not guilty in the

18   trial and ending up the owner of that man's house.  And that's

19   the clear signal that the government was trying to send to the

20   jury in this case, and it's simply not true, and I think we're

21   entitled to show the truth.

22           THE COURT:  I don't recall it coming up, and I'm

23   going to go back and look at the transcript and see how it

24   exactly came up.  Do you have the transcript?

25           MR. HOSKINS:  I don't believe I have that transcript.

1    My recollection is that Todd Roberts testified about that.

2            THE COURT:  I'm going to ask the defendants if any of

3    the defendants in this case has a transcript of Mr. Robert's

4    testimony.

5            MR. SIMONS:  I do not.

6            MR. RICHARDSON:  Do not.

7            MR. WESTBERRY:  I do remember that testimony.

8            THE COURT:  We're going to go ahead and take our

9    break for the evening.  I would like for someone to pull the

10    transcript and show me the section where that case is

11    discussed.

12            MR. SMITH:  I do know that our transcripts, when they

13    went to the Stivers, Mary Betty related in the conversation

14    that they were trying to pick her as a juror, and Yancey White

15    came to her house afterward and wanted to know why she

16    wouldn't stay on there for him, and they had a big laugh about

17    it.

18            I think that's again where we had some racial remarks

19    that we had to remove because there was a reference to one of

20    the -- the victim, and I do recall the Yapp case being spoken

21    in the transcript.

22            THE COURT:  He's saying Todd Roberts testified about

23    it.  I want to see that part of the transcript where that

24    conversation took place.  So I'll go ahead and excuse the jury

25    for the evening.  Counsel, as soon as you're able to locate

1    that part of the transcript where that's discussed, you can

2    advise me, and we'll resume our session.

3          Mr. Westberry, you think you can locate that?  You

4    have the transcripts?

5          MR. WESTBERRY:  Well, how did you know that, Judge?

6          THE COURT:  I thought you said you did.

7          MR. WESTBERRY:  I recall the testimony about the

8    house and Mr. Maricle owning it.  I'll take it -- I trust Mr.

9    Hoskins.  If it is Mr. Roberts, we think -- I do have Todd

10   Roberts' transcript.  I've got it down in the trunk of my car.

11   David, if you'd like to see it, I'd be happy to share it with

12   you or Steve or anybody.

13         THE COURT:  I'll go ahead and recess for the evening

14   and give you all a chance to find that.

15         MR. WESTBERRY:  Thank you, Judge.

16                    (Sidebar conference concluded.)

17         THE COURT:  Ladies and gentlemen, we are going to

18   take our evening recess at this time.  I will ask you to be

19   back tomorrow morning at 9:00.  We will resume at that time.

20   Of course, please keep in mind the admonition that you've been

21   given throughout the course of this trial.

22         You should not discuss the case in any way with any

23   friends or family members, should not allow anybody to

24   approach you in an attempt to discuss the case.  Of course,

25   you should not read, watch or listen to any accounts of the

1    case if there should be any.  You shouldn't attempt to perform

2    any type of research or do any investigation on your own.  You

3    shouldn't communicate electronically in any way about the case

4    and, of course, you should not make up your mind about the

5    case until it is finally submitted to you.

6            At this time, the jury will be excused until

7    9:00 a.m. tomorrow morning.

8                    (The jury left the courtroom at 4:22 p.m.)

9            THE COURT:  Thank you.  We'll be in recess, counsel,

10   until I'm advised you've found the transcript we discussed at

11   sidebar.  We'll be in recess at this time.

12                   (Recess from 4:23 p.m. until 4:41 p.m.)

13           THE COURT:  Thank you.  The record will reflect the

14   parties and counsel are present.  Mr. Hoskins, have you found

15   a place in the transcript that we were discussing earlier?

16           MR. HOSKINS:  Yes, Your Honor.  Once again, I was

17   mistaken as to the witness that offered that testimony.  It

18   was actually Kennon White.

19           THE COURT:  All right.  If you could summarize the

20   testimony for me.

21           MR. HOSKINS:  Yes, Your Honor.  This is from the

22   transcript Volume 7A, which is the morning of February 12th.

23   This was during the time that the audio recordings were being

24   played and it was being paused and there was commentary on the

25   recordings, the subject matter being given.

123

1           On page 43 of that testimony, top of the page,

2     they're talking about Yancey White, Annette Morgan

3     representing this fella.  Mr. Kennon White says, "They were

4     representing from my understanding the Yapp, who was the

5     defendant in the murder case."

6          On page 44, Mr. Smith asks, "Do you know what happened to

7     him after the verdict?"  This is line 1 on page 44.  Kennon

8     White says, "Yes.  He, from my understanding, he moved away

9     from Clay County.  He was acquitted of murder and he, his

10    house, he sold his house, and Cletus Maricle and Poodle Marcum

11    ended up being the owners of the house."

12          Mr. Smith's next question.  "So after the verdict of

13    innocent, he left town?"  Answer, "Yes."  "Did he move out of

14    state?"  "I don't know for sure."  "And he sold his property

15    to the judge, Cletus Maricle?"  Answer:  "He ended up with the

16    property."

17          THE COURT:  All right.

18          MR. HOSKINS:  I think that fairly implies what I

19    suggested.

20          THE COURT:  Now, as I understand, you want to ask Mr.

21    Maricle what happened in the case and then whether he and/or

22    Mr. Marcum acquired an interest in the property?

23          MR. HOSKINS:  That's correct, Judge.  There's a

24    little bit more in the transcript where Kennon White also says

25    that they were trying to make sure they found a jury who would

1    acquit this defendant.

2         THE COURT:  That Yancey White was doing that,

3    correct?

4         MR. HOSKINS:  Well, it was a little bit confusing on

5    that tape.  You know, from my perspective, I believe that what

6    Mary Betty Stivers was talking about would have been an

7    individual *voir dire* on the publicity, because this was a very

8    highly publicized event when it happened in Clay County.  And

9    so as often is the case, the jurors were being *voir dired*

10   individually as to issues of what publicity, what they knew

11   about the case before it being tried.

12        And she talked about it as if it was just Mr. Maricle

13   and Yancey White and Steve Yapp and the jurors.  I want to

14   address how that was done.  I want it to be made clear that it

15   was *voir dire* where the prosecutor was also present, and they

16   were doing this questioning of the jury.  And I want the judge

17   to be able to tell what he did in that case, what he thought

18   about the result in the case, and how he came to own that

19   property some years later.

20        THE COURT:  What he thought about the case is not

21   relevant here.

22        MR. HOSKINS:  Well, the implication, Judge, has been

23   that he wanted this man to be acquitted.

24        THE COURT:  You read the transcript to indicate -- I

25   thought you said the testimony was he was acquitted.

1          MR. HOSKINS:  He was acquitted.

2          THE COURT:  And then moved away from the area.

3          MR. HOSKINS:  Yes.

4          THE COURT:  Was he acquitted or was he not acquitted?

5          MR. HOSKINS:  He was acquitted.

6          THE COURT:  He was acquitted.

7          MR. HOSKINS:  What I'm saying is that the

8    government's testimony in this case from playing this

9    recording would indicate that Judge Maricle desired that this

10   man be acquitted so that -- for whatever improper reason.

11         THE COURT:  This would be the references by Mary

12   Betty Stivers that were not admitted for the truth of the

13   statements that were made.  So now we're getting into the

14   truth of those statements.  So we're --

15         MR. HOSKINS:  Well, I think it's ambiguous at this

16   point, Judge.  It's not necessarily saying the truth.  I think

17   that the jury needs to hear the rest of the story on that

18   point.

19         THE COURT:  All right.  Mr. Smith, what is your

20   position?

21         MR. SMITH:  Well, Your Honor, I made the objection at

22   the time I made the objection.  The question was seeking an

23   answer I believe of Mr. Maricle about jury instructions and

24   the facts and what jury instructions are required and what is

25   self-defense law in Kentucky and how much evidence do you have

126

1    to get that, whether or not that threshold had been met.  And

2    I simply still do not see how that's relevant.

3          If he wants to make his denials about being involved

4    with Yancey White and Annette Morgan and what Mary Betty says

5    was an attempt to get her to sit on this jury for whatever

6    reason, that is another issue.  And if the Court finds that

7    relevant, obviously, that's a separate issue.

8          But I think that the questions throughout the

9    testimony today have at times gone into this judge mode where

10   we're going to explain to the jury what a judge's role is and

11   how they're instructing the jury, and I think that that is not

12   relevant.  It's not appropriate.  It shouldn't be brought into

13   evidence in this case in that way.

14         If he wants to -- again, you know, I don't see how

15   necessarily that this offers what he says it's going to offer.

16   If his proffered evidence is that yes, there was acquittal;

17   yes, Cletus Maricle ended up with the property; and yes, he's

18   in partners with Poodle Marcum on it, then I fail to see how

19   that is a rehabilitation of the character or the evidence this

20   defendant seeks to offer.

21         THE COURT:  I understand what his argument is, is

22   that he wants to establish that Mr. Maricle didn't allow a

23   self-defense instruction, and that would be contrary to the

24   statement or the inference on the tape that he was in favor of

25   an acquittal of the case by virtue of not giving a

1    self-defense instruction.  I'm assuming.  Is that fair, Mr.

2    Hoskins?

3            MR. HOSKINS:  It is, Your Honor.  And I would point

4    out it goes one step beyond that, that Mr. Maricle instructed

5    that jury that self-defense was not an option in that case.  I

6    think it does refute any desire he had to see that man

7    acquitted.

8            MR. SMITH:  I guess the only thing I would ask, if

9    the Court's inclined to do that, give us an opportunity, I

10   think we can try that case pretty quickly.  We can show that

11   this young man had absolutely no weapons on him, that when he

12   tried to escape the house, he was shot down by this man, and

13   he was acquitted in Clay County in a case in which Annette

14   Morgan and Yancey White were his attorneys.  We can do that.

15           THE COURT:  Well, if counsel, Mr. Hoskins wants to

16   ask whether a self-defense instruction was given or not given

17   in the case, I'm going to allow him to do that.  I'm going to

18   allow you to follow up on these questions, Mr. Smith.  We've

19   been chasing rabbits for a while today, and I guess we'll do

20   that a little bit longer tomorrow.

21           All right.  Anything else that we can take up this

22   afternoon before we finish?

23           MR. ABELL:  Judge?

24           THE COURT:  Yes, sir.

25           MR. ABELL:  You did request that I remind you about

128

1    scheduling issues at the close of the day.

2         THE COURT:  I think we're probably not as far along

3    as we had hoped to be.  I don't know how much longer Mr.

4    Hoskins is going to be.  A little bit hesitant to even ask him

5    at this point on his direct.  I will predict that he will be

6    another 30 minutes would be my guess.  That would take us to

7    9:30.  I would predict or expect that the government now would

8    probably take at least a couple of hours on cross-examination.

9    Mr. Smith, is that in the ballpark?

10        MR. SMITH:  Couple days, did you say, or hours?

11   Somewhere in between there?

12        THE COURT:  Would I be closer if I said a couple of

13   hours or a couple of days?

14        MR. SMITH:  Well, I think we're going to be a while.

15   I think more half day would be closer to what I've got

16   planned.  I may choose to pare it down tonight.  I'll have

17   time to study it.

18        THE COURT:  Mr. Westberry, you're going to have a

19   witness ready at least in the morning.  It can be later in the

20   morning rather than earlier would be best estimate at this

21   point.

22        MR. WHITE:  I'm still going to have a couple ready,

23   Judge, just in case.

24        THE COURT:  I would appreciate that, if you can do

25   that.  Mr. Abell, I would say that your witnesses probably

1    don't need to be here probably until next Monday at the

2    earliest would be my guess.

3            MR. ABELL:  If I were to instruct them to report to

4    the Court at lunch time Monday, would that be safe?

5            THE COURT:  I think it will be.  But we can revisit

6    that at the end of the day tomorrow.  I think at this point,

7    that's probably a safe assumption.

8            MR. ABELL:  Okay.

9            THE COURT:  About as good as we can do.  I do

10   appreciate you --

11           MR. ABELL:  I understand.  I'm just trying to keep

12   them as happy as I can.  Thank you.

13           THE COURT:  Thank you.  Appreciate that.

14           MR. RICHARDSON:  One additional matter, Your Honor.

15   I have some family issues tomorrow.  I was planning on not

16   being here.  What's gone on today, we have no questions.  Mr.

17   Baldani might have some questions, what happens tomorrow

18   morning, but he'll be here to take care of that.  I'll give

19   him my notes.

20           THE COURT:  You'll confer with him tonight?

21           MR. RICHARDSON:  Yes, sir.

22           THE COURT:  All right.  Anything else?  No?  We'll be

23   in recess until 9:00 tomorrow morning.

24               (Proceedings adjourned at 4:52 p.m.)

25                       - - -

130

C E R T I F I C A T E

        I, LISA REED WIESMAN RDR-CRR, certify that the
foregoing is a correct transcript from the record of
proceedings in the above-entitled case.


 \s\ Lisa Reed Wiesman                    March 12, 2010
LISA REED WIESMAN, RDR-CRR            Date of Certification
Official Court Reporter

1                              INDEX

2    DEFENSE WITNESS

3    R. CLETUS MARICLE
     Direct Examination by Mr. Hoskins................ Page 4
4
                                - - -
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25