1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF KENTUCKY
2    SOUTHERN DIVISION at LONDON
                - - -

3
     UNITED STATES OF AMERICA,        :   Docket No. CR 09-16-S
4                                     :
                    Plaintiff,        :   **Frankfort, Kentucky**
5                                     :   Friday, March 12, 2010
          versus                      :   9:00 a.m.
6                                     :
     RUSSELL CLETUS MARICLE,          :
7    DOUGLAS C. ADAMS                 :
     CHARLES WAYNE JONES              :
8    WILLIAM R. STIVERS               :
     FREDDY W. THOMPSON               :        **Trial Day 23A**
9    WILLIAM B. MORRIS                :
     DEBRA L. MORRIS                  :
10   STANLEY BOWLING,                 :
                                      :
11                  Defendants.       :

12

13                       - - -
                TRANSCRIPT OF TRIAL
14           BEFORE DANNY C. REEVES
     UNITED STATES DISTRICT COURT JUDGE and a jury
15                       - - -

16   APPEARANCES:

17   For the United States:       STEPHEN C. SMITH, ESQ.
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
     For the Defendant            MARTIN S. PINALES, ESQ.
21   Russell Cletus Maricle:      CANDACE C. CROUSE, ESQ.
                                  Strauss & Troy
22                                150 E. Fourth Street
                                  Fourth Floor
23                                Cincinnati,OH  45202

24                                DAVID S. HOSKINS, ESQ.
                                  107 E. First Street
25                                Corbin, KY  40701

2

```
1     For the Defendant           R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:           KRISTIN N. LOGAN, ESQ.
2                                 Landrum & Shouse, LLP
                                  220 West Main Street
3                                 Suite 1900
                                  Louisville, KY 40202
4

5
      For the Defendant           T. SCOTT WHITE, ESQ.
6     Charles Wayne Jones:        Morgan & Pottinger, P.S.C.
                                  133 West Short Street
7                                 Lexington, KY  40507

8
      For the Defendant           ROBERT L. ABELL, ESQ.
9     William R. Stivers:         120 North Upper Street
                                  Lexington, KY  40507
10

11    For the Defendant           RUSSELL JAMES BALDANI, ESQ.
      Freddy W. Thompson:         Baldani, Rowland & Richardson
12                                300 West Short Street
                                  Lexington, KY  40507
13

14    For the Defendant           JERRY W. GILBERT, ESQ.
      William B. Morris:          Coy, Gilbert & Gilbert
15                                212 North Second Street
                                  Richmond, KY 40475
16

17    For the Defendant           ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:            Gess, Mattingly & Atchison, PSC
18                                201 West Short Street
                                  Lexington, KY 40507
19

20    For the Defendant           DANIEL A. SIMONS, ESQ.
      Stanley Bowling:            Thompson, Simons, Dunlop & Fore
21                                116 West Main Street
                                  Suite 2A
22                                Richmond, KY 40476

23

24

25
```

3

| | |
|---|---|
| 1 | Court Reporter: |
| 2 | |
| 3 | |
| 4 | |

Court Reporter:                    LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
                                   35 W. Fifth Street
                                   P.O. Box 1073
                                   Covington, KY  41012
                                   (859) 291-4410


        Proceedings recorded by mechanical stenography,
transcript produced with computer.

1                (The jury entered the courtroom at 8:56 a.m.)

2           THE COURT:  Thank you.  Good morning, everyone.  The

3    record will reflect that all members of the jury are present.

4    Parties and counsel are also present.

5           Mr. Maricle was testifying on direct, I believe, when

6    we finished yesterday.  He's still under oath.

7           Mr. Hoskins, you may continue.

8           MR. HOSKINS:  Thank you, Your Honor.

9                DIRECT EXAMINATION (continued)

10   BY MR. HOSKINS:

11   Q.  Mr. Maricle, when we stopped yesterday afternoon, we were

12   talking about a murder case that had been tried in your court.

13   The defendant was a man named Steve Yapp?

14   A.  Yes, sir.

15   Q.  And when we listened to the recordings in this case, we

16   heard other people talking about how the jury was picked in

17   that case.

18   A.  Yes, sir.

19   Q.  Would you tell the jury how jury selection was conducted

20   in that case?

21   A.  All right, sir.  The state court, they call around, just

22   like they do in federal court, a certain number of jurors.

23   Each of the attorneys has an opportunity to what we call *voir*

24   *dire* them, ask them questions.  If it happens to be a case

25   that has some particular aspect to it that you wouldn't want

*MARICLE - Direct (Mr. Hoskins)*                                          5

1    people to answer in front of other jurors, you do what is

2    called individual *voir dire*.  And to do that, we would go back

3    in chambers.  And in chambers, we would have the defendant.

4    He has a right to be there.  The defendant would be there, the

5    prosecutor would be there, the court reporter would be there,

6    and the potential juror that's being *voir dired*.  So if you

7    had, out of, say, 32 people, you had, you know, you go through

8    each one of them and just ask them that question.

9         Particularly this case, because of some racial overtones,

10   that's what you would find.  And we found a number of people

11   that -- both ways that didn't think they could be fair.  But

12   after going through the panel, we did get a number to try the

13   case.

14   Q.  Let me ask you just one question about that.  Were you

15   aware of any conversations with jurors or potential jurors

16   other than with all of the attorneys present?

17   A.  No, sir.

18   Q.  Now, you mentioned yesterday that the defense attorneys

19   in that case wanted to present a defense of self-defense.

20   A.  That's correct.

21   Q.  Did you allow them to do that?

22   A.  No, sir, I didn't.

23   Q.  Did you say anything about self-defense when you gave the

24   jury instructions at the end of the trial?

25   A.  I instructed the jury that because he was violating an

1  order of the Court in being where he was, that he was not

2  entitled to the defense of self-defense.

3  Q.  Now, the outcome of that case was what?

4  A.  The outcome of that case was he was found not guilty.

5  Q.  Were you pleased with that outcome?

6  A.  No, sir, I wasn't.

7  Q.  Do you know what became of the home, the house that Steve

8  Yapp owned in Manchester after that --

9  A.  The house -- he left Manchester.  The house was left

10  vacant.  Apparently didn't make the payments, and it went

11  through foreclosure and sold at the courthouse steps in a

12  master commission sale a year or two after the case.

13  Q.  So the house was sold at a foreclosure sale?

14  A.  That's correct.  And the company that had the mortgage

15  bought it back, which is so often true of foreclosures.

16  Q.  You didn't buy the house?

17  A.  Not at that time, no, sir.

18  Q.  You weren't given that house?

19  A.  No, sir.

20  Q.  But you did buy it later from the company that had bought

21  it?

22  A.  Yes, we did.

23  Q.  Moving on, there was another case that we heard some

24  testimony about involving a guy named Daniel Boone Shoupe?

25  A.  Yes, sir.

1   Q.   Now, did you know Daniel Boone Shoupe yourself?

2   A.   I've known, known him for years.  I don't know how long.

3   I don't remember the first time I ever seen him or anything,

4   but I'm familiar with the family.  I've known him for 20

5   years, probably, or more.

6   Q.   Did you have any connections with any members of his

7   family?

8   A.   No connections to any member of his family, except that

9   his sister, for a while, set right in front of me at church

10   and his nephew, which would be her daughter [sic], I sentenced

11   to the penitentiary.

12   Q.   Now, we heard some testimony that Mr. Shoupe had his bond

13   reduced and was let out of jail.  Do you recall that?

14   A.   I think there would be an order in there that I signed

15   changing his bond first to 2,500 cash, I believe, or maybe

16   2,500 full secured, which would be cash or property.  I'd have

17   to see which I put down.  Didn't make that, and I allowed his

18   sister to sign a surety bond.

19   Q.   How long had he been sitting in jail at that time?

20   A.   I'd have to check the record.  I don't know.  It's been

21   some time.  He's a rather pitiful individual.

22   Q.   Who asked you to reduce his bond?

23   A.   There was a motion filed to reduce his bond and was

24   heard, I think, around the first of May or motion hour,

25   criminal motion hour.  I think I signed it -- because I

1    remember, I wanted to make sure to look at the record, but as

2    I remember, I signed the bond then.  It was obvious he wasn't

3    going to make it, and I changed it to a surety bond at

4    nobody's request.

5    Q.   Did Mr. Stivers ask you to do that?

6    A.   No, sir, he did not.

7    Q.   Did his bond reduction have anything to do with elections

8    or voting?

9    A.   Not to my knowledge, no, sir.

10   Q.   We heard some evidence from a man named Bobby "Red" Sams.

11   A.   Yes, sir.

12   Q.   Said he was let out of jail to work in an election.

13   A.   That is not correct.

14   Q.   Do you recall Mr. Sams' case?

15   A.   I recall Mr. Sams's case, I certainly do.

16   Q.   What were the circumstances under which he got out of

17   jail?

18   A.   Well, he first stayed a little while in jail, and then he

19   was on electronic monitoring.  Got moved to probably April or

20   something of that nature.  Then he was let off of electronic

21   monitoring, was to come back and be sentenced because he'd

22   served about all of his time at that time.  And he came back

23   for sentencing on October -- the motion hour in October, which

24   is the Monday before the first Tuesday of every month.

25        He came back for sentencing on that day and I did have

1   him drug tested, and as a result of that drug test, which was

2   positive, I did put him back in jail because I do not try a

3   case if somebody's positive for illegal drugs.  I don't take a

4   plea if they're positive for illegal drugs, and I don't

5   sentence them if they're positive, because I want them to be

6   at their selves when that happens.

7   Q.  Now, Mr. Sams was then released before his next court

8   date.  Why was that?

9   A.  He was released to go to work at Cornett Chevrolet.  I

10  was advised they had a job for him.

11  Q.  Was he released early?

12  A.  No.  Actually, he'd served his time.  He'd served his

13  time.

14  Q.  So when he finally did get sentenced, he didn't have to

15  go back and serve?

16  A.  No, he didn't.  He had time served.  I gave him credit

17  for time served, and he'd served every day he was supposed to.

18  Q.  Did his release have anything to do with elections or

19  voting?

20  A.  No, sir, it didn't.

21  Q.  There was also some testimony about a young woman named

22  Melanda Adams.

23  A.  Yes, I know Melanda.

24  Q.  You know who she is?

25  A.  I sure do.

1    Q.   And she is related to one of the people in this case,

2    isn't she?

3    A.   She is Mr. Adams's daughter.

4    Q.   Now, was Melanda Adams ever in your court at all?

5    A.   Melanda Adams was never in circuit court before me.

6    Never.

7    Q.   You never had her in any court proceeding?

8    A.   I never had Melanda Adams in any court proceeding at any

9    time.

10   Q.   Did you ever intervene on her behalf in any other court?

11   A.   I never intervened on her behalf at any time.

12   Q.   Well, let's talk about the other defendants in this case,

13   the other folks.  A couple of these guys are your friends,

14   aren't they?

15   A.   Well, I hope all of them are.

16   Q.   Well, I mean close friends.

17   A.   Yes.

18   Q.   Who are they?

19   A.   Well, quite frankly, I would consider all of them fairly

20   close.  Probably closer to Mr. Stivers and Mr. Jones than any

21   of them.  And then the others, because of the generational

22   gap, I don't know Mr. Thompson, Mr. and Mrs. Morris as well as

23   I would the others.

24   Q.   You know -- did you socialize on a regular basis with

25   anybody besides Mr. Jones and Mr. Stivers?

1    A.   No.  Now, I might have eaten a couple times at Stanley's

2    aunt, and we had a -- my wife had a retirement party for her

3    when she got out of -- retired from Wal-Mart at our house, and

4    he was invited to that party.  It wasn't a party.  It was a

5    dinner.  It wasn't a party, as such.  We call it a party, but

6    it was just dinner was all we had for her.

7    Q.   Had you ever been to the home of Bart and Debi Morris?

8    A.   I was there the day they got married, and that's the only

9    time I've been there.  I've been in the house, yes, sir.

10   Q.   Have you ever been in the garage?

11   A.   No, I don't think I've ever been in their garage.

12   Q.   Have you ever been there for anything at all related to

13   an election?

14   A.   No, sir.

15   Q.   Another name that's come up a time or two is a man named

16   Richie Asher.

17   A.   Yes, sir.

18   Q.   Tell the jury about your relationship with Mr. Asher.

19   A.   Mr. Asher and my son were very good friends, had been, I

20   think, since high school, along with another group of boys.

21   They were good friends.  He was divorced, and he was a real

22   good friend, help any time that he could around the house.

23       My son was divorced the last year or so of his life so he

24   helped him with that.  He helped me work.  He did a lot of

25   work for us, handyman type work, and I worked right along with

1    him.  We put insulation under a floor and other things that we

2    did.

3    Q.   Does Richie Asher have a career?

4    A.   Right now, he's going to school.  He does have a license

5    for private investigator, private detective.  I never employed

6    him in that position at any time.

7    Q.   Did he ever have an ongoing business as an investigator?

8    A.   Not really.  Not really.

9    Q.   How old a fella is he?

10   A.   Probably late 30s, early 40s.  We'll say around 40.

11   Q.   And he's in school now?

12   A.   Yes.  I expect he probably may not be 40, since he's gone

13   to school with my son.  He may be more like 38, 37 or 8.

14   Q.   He was around your house a lot, though?

15   A.   He had a key to my house.  He could come and go as he

16   wanted to, and the refrigerator door was open.

17   Q.   Did you ever ask him to find out where any of the agents

18   lived?

19   A.   Never.

20   Q.   Did you ever ask anybody?

21   A.   No, sir, I didn't.

22   Q.   There's also been testimony about a lady named Jo or

23   Josephine Davidson.

24   A.   Yes, sir.

25   Q.   You talked about her yesterday?

1    A.   Yes, sir.

2    Q.   Said you and she were close friends?

3    A.   Yes, sir.  She's worked for me on and off in the '80s

4    when I was an attorney and then in the '90s part of the time

5    as my secretary.  And we've been close friends to her and her

6    husband since the '80s.  We even go to family reunions that

7    they have.

8    Q.   Do y'all take trips together?

9    A.   Yes, sir, we go fishing together.

10   Q.   Who goes on those fishing trips?

11   A.   Just Raymond and Jo and Judy and I.  Sometimes we might

12   take Blake with us if he wasn't in school.

13   Q.   Raymond would be who?

14   A.   Raymond Davidson, that would be her husband.

15   Q.   Now, has she ever run for office?

16   A.   Yes, she did.

17   Q.   When did she run?

18   A.   2006.

19   Q.   And what did she run for?

20   A.   She ran for jailer.

21   Q.   And she's in the electronic monitoring home incarceration

22   business?

23   A.   Yes, sir.  She's had an interest in that since the days

24   as pretrial officer.

25   Q.   Was she successful in her run for office?

1   A.   No, sir, she wasn't.

2   Q.   Mr. Maricle, we already talked about the allegation of

3   jury tampering in the Kenny Day/Runion case.

4   A.   Yes, sir.

5   Q.   Were you ever involved in any jury tampering?

6   A.   No, sir.

7   Q.   Were you concerned about that happening in your court?

8   A.   Yes, sir.

9   Q.   How did you try to deal with that?

10  A.   Well, the first thing that I did was in criminal cases,

11  I at night would sequester the jury if it went more than one

12  day.  You cannot sequester a jury in a civil case, but you can

13  in a criminal case.  Ran into two problems with that.  One was

14  expense.  The state didn't care a whole lot about the expense

15  that was incurred by doing that.

16          The second thing, you would have a group that would

17  be together and got bailiffs there who gets maybe six dollars

18  an hour, and that didn't work very well.

19  Q.   So you were concerned about the bailiff trying to --

20  A.   I was concerned about that, and I tried a couple of other

21  things.  I've tried denying the use of juror qualification

22  forms so they wouldn't know who they were until the day of the

23  trial.  That worked fine for the first day or two or for the

24  first trial or two.  But then after that, you know, everybody

25  already knew unless it was somebody coming in from out of

1  town, in which case they would be at an extreme disadvantage.

2  So that didn't, didn't work either.

3         I also cut down on *voir dire*.  Instead of letting

4  attorneys do the *voir dire*, I did the *voir dire* myself, and

5  that kept attorneys from asking a question, Well, Joe, do you

6  live up on Cotton -- up at Cottingam or something like that,

7  or do you know my friend or uncle up there?  Are you all

8  related?  Tried to cut that down.

9      The part that you could not control, because all courts

10  are public, anybody could come and go.  People would come in

11  and they'd sit down behind whoever they were interested in

12  and, you know, if they had somebody was on the jury was their

13  friend, I mean, it was an indirect attempt -- never any

14  contact between them, but it was certainly an indirect

15  attempt, which quite frankly is a violation of the law in

16  Kentucky insofar as jury tampering is concerned, because it's

17  any attempt, direct or indirect.  However, how do you prove

18  that?  Reasonably, you can't make it.

19  Q.  So --

20  A.  I'm sorry, go ahead.

21  Q.  So you did what you could to stop that?

22  A.  Yes, sir, I did.  And it not only happened in civil

23  cases, and it not only happened for defendants.  It happened

24  for the Commonwealth from time to time.

25  Q.  Mr. Maricle, I want to move on to some of the documents

1   that have been introduced in evidence, in particularly some of

2   the things that were in your home when the search was

3   conducted.

4   A.   Yes, um-hmm.

5   Q.   One of the things I want to ask you about is I think it's

6   a five-page list of names, and up at the top it says From the

7   Desk of Judy Maricle.

8   A.   Um-hmm.

9   Q.   She is your wife?

10  A.   Right.

11  Q.   That's in her handwriting?

12  A.   Yes, sir.

13  Q.   What was the purpose of that document?

14  A.   That list had to be made before 2004, because certain

15  names on that list had died in 2004 or subsequent to that.

16  I'm sure that was contacts that were to be made or influential

17  people that would be at each precinct.  So I'm guessing it was

18  probably 1999, it was made.

19      There are names on it I'm sure that have done things in

20  elections that shouldn't.  But there's a lot -- contrary to

21  Mr. Briggs's FBI intelligence, there's a lot of names on there

22  that did not.

23  Q.   Well, now, you still held public office during that time?

24  A.   Oh, yes.

25  Q.   Did you have any guarantee that nobody was going to run

1    against you in the future?

2    A.   In '99, no, I had no guarantee.  In 2006, I had no

3    guarantee, but I thought it was highly unlikely in 2006

4    because, you know, everybody knew my situation on retirement.

5    That was written up in the papers, and everybody knew that.

6    Q.   We saw an exhibit, it was D64, and it was a little black

7    spiral notebook.  I think it had a recipe for perfume in it

8    and some --

9    A.   I don't use perfume, but had a recipe.

10   Q.   It had some other things had nothing to do with this

11   stuff, but it did have a list of names and what looked like

12   apartment numbers, something like that?

13   A.   Yes, sir.

14   Q.   Now, did you recognize that?

15   A.   I recognized that book, yes, sir.

16   Q.   Tell the jury what that was and, in particular, what that

17   list was.

18   A.   All right.  The three pages that were referred to were

19   people that lived in the Highrise apartment in Manchester in

20   1990.  Not 2006.  They lived there in 1990, and my wife's

21   mother had lived there in the past, before she passed away.

22   My wife's aunt had lived there in the past, before she passed

23   away.  My wife always got along good with at that time what we

24   would have called elderly people, now our age, and I'm sure

25   she went in there and campaigned with them, but we didn't buy

1    any of those votes, and I don't really know that you could

2    have bought any of those votes.  But we certainly campaigned

3    with them.  This FBI intelligence that shows that it was --

4    these people were involved in something in 2006, I'm having

5    the names counted that might still be alive.

6    Q.  So that list would have been prepared in what year?

7    A.  That was 1990.  That was her notes from 1990.  If you'll

8    look at the rest of that exhibit, I believe they did put all

9    pages in, 15 pages of the exhibit; is that correct?  If they

10   didn't, we would want to.  You'll see a lot of other notes

11   where she had campaigned and talked to people.

12       Most of those will be from Leslie County, because that's

13   where she went door to door a lot of places over there, and

14   she wrote their names down, and we would try to make contact

15   either by phone, or if she got their address, write them a

16   letter.  Nice to have met you, nice to have talked with you.

17   It was part of the 1990 campaign.

18       And if you'll look at the names of some of the post

19   offices there, Essie is in Lester County, Smilax is in Leslie

20   County, Yeaddis is in Leslie County, Thousandsticks is in

21   Leslie County.  On most of that, with the exception of those

22   three pages, it's Leslie County.  There might be a few pages

23   that were Clay County.  Mostly, she worked Leslie County for

24   us.

25   Q.  1990 was the year you ran a race against your friend,

1    Oscar Gayle House?

2    A.   That is correct.

3    Q.   We have talked a lot about another document.  It was

4    introduced as D16, and it's a handwritten list of names.  When

5    did you first see that document?

6    A.   The first time I ever saw that document was when it was

7    provided to us in discovery.  And first time I actually saw

8    it, even though it had been provided to us last year, was

9    in -- after the first of January.  I never saw that document

10   before.  Did not prepare that document, and they did not get

11   that document from me.  I can say that without any question.

12   Q.   Did it signify anything to you when you did see it?

13   A.   Not particularly.  By the time your court date's set, it

14   would be for maybe the wrong date, I assume.  Maybe it had.  I

15   don't know.

16   Q.   Did you give that document to Kennon or Wanda White?

17   A.   I did not give that document to Kennon and Wanda White.

18   Where it came from between the time I last saw them and when

19   they turned it over in October of '08, you know, between

20   the -- between June of '07, and I believe Mr. Briggs said

21   October of '08, I never saw them.  I did see them, I did see

22   Wanda on February the 2nd, 2009.

23   Q.   Let me ask you a couple more questions about Wanda White.

24   We talked about whether or not you had promised her a drug

25   court job.  Did you talk to her about other jobs?

1    A.   Sure.  I talked to her about a lot of jobs.  Quite

2    frankly, I don't think she would have ever qualified for drug

3    court, because that generally required a degree.  But I talked

4    to her about a lot of jobs.  I tried to assist her if I could,

5    I mean.

6    Q.   There was a job that you knew she was qualified for,

7    wasn't there?

8    A.   She could be a beautician, yes.  Cosmetologist, whatever

9    you want to call it.

10   Q.   Did you and your wife encourage her to do that?

11   A.   Yes, particularly my wife did.  Sure did.  We also

12   encouraged her to go back to real estate school and get her

13   license to practice real estate.  She had gone to school

14   earlier but had not passed the test back a few years ago.

15   Q.   Were any of the conversations that you had about her and

16   a job related to elections or voting in any way?

17   A.   They were not related to the elections or voting in any

18   way or in exchange for anything in any manner or proceeding,

19   grand jury or anything.

20   Q.   Mr. Maricle, we heard some evidence about Wanda's sister,

21   Stephanie Price.

22   A.   Yes, sir.

23   Q.   And some fines that she had.  Do you recall being

24   involved with that?

25   A.   No, I really don't recall being involved with that.  But

*MARICLE - Direct (Mr. Hoskins)*                                    21

1     I would like to see the exhibit, if we could, on the monitor.

2              MR. SMITH:  Your Honor, I believe the witness has

3     said he doesn't recall that event, and at this point the

4     document speaks for itself, and I would object to further

5     comment.

6              THE WITNESS:  I could have an interpretation --

7     sorry.

8              THE COURT:  I'll sustain unless you have a follow-up

9     question on it.  If he doesn't recall it --

10             MR. HOSKINS:  Your Honor, could we approach briefly?

11             THE COURT:  Sure.

12                       (A sidebar conference was held out of the

13                        hearing of the jury):

14             MR. HOSKINS:  At this point, I would move to

15    introduce two of our exhibits that were authenticated by the

16    clerk who testified here, also certified copies, so I think

17    they've been doubly authenticated, and I have shown them to

18    Mr. Smith before court this morning.

19             THE COURT:  Objection?

20             MR. SMITH:  Well, Your Honor, my objection is that

21    Mr. Hoskins now has intentions of calling the expert Cletus

22    Maricle to tell us what these records are, and I object.  He's

23    never disclosed him as an expert witness.  We've got no notice

24    that he's got expert opinions about these issues.  He says he

25    doesn't recall the matter.  I don't object to the record

1   coming in itself, but I do object for the expert Cletus

2   Maricle to tell us what's in there.

3           THE COURT:  These are not cases he said he didn't

4   remember, that was Stephanie Price.

5           MR. SMITH:  I'm sorry.  I thought that said

6   Stephanie.

7           MR. HOSKINS:  Judge, there will be no questions about

8   John Downey.  I have no questions to ask.

9           THE COURT:  You just want to introduce these records?

10          MR. HOSKINS:  I do want to ask a question about the

11  Stephen Price case.  That's the case where he and his mother,

12  Sarah Price, were indicted together.  And I just want to ask

13  about the resolution of that case.

14          THE COURT:  Please avoid asking him any opinion

15  questions.  I will sustain Mr. Smith's objections to those.

16  If you just stick to facts, you can introduce those.

17          MR. HOSKINS:  Thank you, Judge.

18          THE COURT:  7 and 8?

19          MR. HOSKINS:  Yes.

20              (Sidebar conference concluded.)

21          THE COURT:  Thank you.  You may proceed.

22          MR. HOSKINS:  Thank you, Your Honor.  At this time, I

23  would move for the introduction of our exhibits Maricle 7 and

24  Maricle 8 that have been previously authenticated.

25          THE COURT:  All right.  Those exhibits, Maricle

1    Exhibits 7 and 8 will be admitted at this time.

2                    (Defendant Maricle Exhibit Nos. 7 and 8

3                    were admitted into evidence.)

4         MR. HOSKINS:  Thank you, Your Honor.  I would ask

5    that the witness be shown Maricle Exhibit 7, which is

6    Commonwealth versus Stephen Price, Jr.

7         THE COURT:  Yes, sir.

8    A.  (Reviewing document).  Yes, sir.

9    Q.  Mr. Maricle, were you the judge in that case?

10   A.  The part that was in circuit court, I was.  After the

11   indictment, it was first dismissed by the district judge for

12   failure to return an indictment within 60 days, but that

13   doesn't prohibit going ahead and indicting someone, which

14   happened in this case.  I was the judge in the criminal case.

15   Q.  The important question was, were you the judge in the

16   circuit court case?

17   A.  I was the judge in the circuit court case, yes, sir.

18   Q.  The name at the top of that is Stephen Price, but was

19   there another defendant in that case?

20   A.  His mother was a defendant in this case also.

21   Q.  All right.  What's her name?

22   A.  Sarah.

23   Q.  And what is the relationship of Sarah Price and Stephen

24   Price to Wanda White?

25   A.  Sarah would be her mother and Stephen would be her

*MARICLE - Direct (Mr. Hoskins)*                                        24

1    brother.

2    Q.   How was that case involving Stephen and Sarah finally

3    resolved?  What was the outcome?

4    A.   It was resolved by plea agreement between the

5    Commonwealth attorney and Mr. Price and whoever -- I guess

6    Miss Kristin Bailey was his attorney, Miss Bailey.

7    Q.   And that means it didn't go to trial?

8    A.   Did not go to trial, that's correct.

9    Q.   What sentence did Stephen Price get out of that case?

10   A.   He got one year, which was what was recommended by the

11   Commonwealth, which was their agreement.  He got credit for

12   254 days that he had served.

13   Q.   And Sarah's case was dismissed?

14   A.   That was the agreement, that her case would be dismissed

15   in exchange for him entering a plea of guilty.  That's not

16   uncommon.

17   Q.   Were you involved in the plea negotiations in that case?

18   A.   No, sir.

19   Q.   Did you take any steps on behalf of Sarah Price or

20   Stephen Price?

21   A.   No, sir.

22   Q.   And another brother of Wanda White is Corky Price.  We've

23   already talked a lot about him, but just want to ask you a

24   question or two about him now.

25   A.   All right.

1   Q.   Corky Price, you testified yesterday, entered his guilty

2   plea in April of 2005.

3   A.   Yes, sir.

4   Q.   The election that your son-in-law ran in was a year after

5   that?

6   A.   2006, yes, sir.

7   Q.   And that was around the time of sometime after that that

8   Corky got his sentence?

9   A.   Yes, sir.

10  Q.   Had Corky ever gotten out of jail during that time?

11  A.   No, sir.

12  Q.   Did he get out of jail the day you sentenced him?

13  A.   No, sir.

14  Q.   So a year after that sentencing, when those tapes were

15  made, was Corky still locked up?

16  A.   Yes, he was.

17  Q.   At that time, he'd been in for two years?

18  A.   He'd been in over two years, just over two years.

19  Q.   Staying with Wanda White and her family, let me ask you

20  something about another topic we've heard about.  You were

21  aware that Wanda White went to Lexington to testify before a

22  federal grand jury.  She'd told you that was going to happen?

23  A.   She told me she was going to, yes, sir.

24  Q.   And you had a conversation with her after that?

25  A.   I had a conversation before and after, yes, sir.

1    Q.   And part of the conversation was about her talking too

2    much?

3    A.   Yes, sir.  That was after she came back, yes, sir, I told

4    her that.

5    Q.   What were you referring to when she -- when you made

6    those comments?

7    A.   I was referring to the fact that while she wasn't in the

8    grand jury room, she had had conversations relative to using a

9    computer and going on eBay at work, and I told her that was

10   against the law.  A lot of people don't realize that, but

11   that's theft of services or theft of use of the computer.

12   Q.   Was that in any way related to the election stuff or

13   anything?

14   A.   That was not in any way related to the election stuff.

15   That was just a caution about what she was doing at work.

16   Q.   Now, there was some claim that you had tried to pat down

17   Wanda White and Kennon White, trying to see if they had any

18   recording.  Is that true?

19   A.   No, sir.  I listened to the tapes.  There's no indication

20   of that on the tapes.  It is not true.  The only time that

21   there's any sound is the day of my son's wake, when she came,

22   and I did pat her down that day and, of course, she -- I

23   didn't pat her down.  I patted on her, you know, because of

24   the circumstances.  I'd have never thought she'd have been

25   wired that day.

1    Q.   You never thought that Kennon and Wanda White were

2    recording you, did you?

3    A.   I never thought they'd record me.  Not that I really

4    cared, except the day of my son's wake.

5    Q.   Were you ever worried about them doing that?  Did that

6    ever cross your mind?

7    A.   No, not really.

8    Q.   So did you ever try to search them for any type of

9    recording device?

10   A.   No.  I never tried to search them.  And from where they

11   had them, I certainly wouldn't have searched them.

12   Q.   There was a comment that you had said something about the

13   door stop in your office being bugged.  Is that true?

14   A.   I might have said that, but it would certainly have been

15   joking.  Of course, my office has a -- in the courthouse has

16   video and audio at all times.

17   Q.   That's part of the courthouse security system?

18   A.   That's part of our sound system.

19   Q.   There was another comment that you made to Wanda White

20   regarding her grand jury testimony and said something about

21   wild statements or something about Jennings and Vernon.  Did

22   you talk to her about saying anything about Jennings and

23   Vernon?

24   A.   When she mentioned that to me, she laughed, and I thought

25   she had done that just as a joke, and I thought that was very

1    serious if she had.  She told them something that she didn't

2    know, and I didn't really believe that she would -- anybody

3    had that kind of contact with her.

4    Q.   Did you believe that she had any information about

5    Jennings White and Vernon Hacker and vote buying?

6    A.   No, sir.

7    Q.   So were you telling her to tell the truth, or were you

8    trying to get her to tell a lie?

9    A.   Tell the truth.

10            MR. HOSKINS:  Your Honor, could I have just a minute?

11            THE COURT:  Yes, sir.

12            MR. HOSKINS:  Your Honor, may we approach briefly?

13            THE COURT:  Yes, sir.

14                 (A sidebar conference was held out of the

15                  hearing of the jury):

16            THE COURT:  Yes, sir?

17            MR. HOSKINS:  With the exception of just a few

18    closing questions, there's only one more area that I want to

19    go into with Mr. Maricle, and that would involve the

20    transcripts that have been prepared and have been admitted.  I

21    don't want to go back into playing any of the recordings, but

22    I would like the opportunity to get those and go through a

23    couple of them with him, and I'm just, I guess, asking for --

24    if anybody had any objections to me doing that or any guidance

25    the Court thought should be --

1          THE COURT:  These are the transcripts already

2     admitted?

3          MR. HOSKINS:  Yes.

4          THE COURT:  You can certainly go through those.

5          MR. SMITH:  The only thing that I'm aware of is that

6     if the Court recalls, we had unredacted copies that got put in

7     the record in the initial days of the transcripts, and I had

8     an e-mail last night from my office saying that that had not

9     been rectified, and I don't know, that may be my lapse, and I

10    apologize.  I do have redacted copies which counsel's all been

11    provided and also have hard copies this morning, because I do

12    intend on questioning, using that.  So I just want to bring

13    that to the Court's attention that --

14         MR. HOSKINS:  Could we take a short break and get

15    those transcripts straightened out?

16         THE COURT:  What I'd like for you to do is compare

17    whatever version that you want to use with whatever Mr. Smith

18    has to make sure that we're not going to have any problems

19    with this, because there were, I think, a couple of hiccups

20    originally with those transcripts, and I'd indicated that

21    would need to be cleaned up before it goes back to the jury.

22    I don't want to create a problem now with this witness with

23    transcripts that should have been redacted but weren't.

24         So we'll take a break and you can go through those.

25    How many of those are you going to need to look at?

1          MR. HOSKINS:  There are really just a couple that I

2     would spend any significant time on.  We may need to look at

3     each of them, but just a couple that would be -- and even

4     those won't take a long time.

5          THE COURT:  How long do you think you need for a

6     break in order to do that is the question.

7          MR. HOSKINS:  Twenty minutes, maybe.

8          THE COURT:  That will be fine.

9          MR. HOSKINS:  Judge, let me also let the Court and

10    the government aware of another issue I see regarding this.  I

11    would submit that when Mr. Maricle is here to testify and be

12    cross-examined, that the portions of the recordings and the

13    transcripts that have been redacted would now be admissible.

14         THE COURT:  An exculpatory statement made outside the

15    presence of the jury is still an exculpatory statement that's

16    inadmissible under 801, I believe.  So I would overrule the

17    request to reconsider that issue.

18         MR. HOSKINS:  Okay.  Then I just -- I won't go

19    anywhere near that in examining Mr. Maricle.

20         THE COURT:  The statements that -- my previous

21    rulings were based upon out-of-court statements.  Admissions

22    that are contained on those transcripts and remain on the

23    audiotapes, to the extent the jury deems those to be

24    admissions, they can certainly be construed as such,

25    especially in light of the testimony presented by the other

1    witnesses.

2          But with respect to exculpatory statements, that is

3    still an out-of-court statement, and it would still be

4    inadmissible under the Rules of Evidence.  So that those

5    portions that were excised for that reason, the ruling still

6    stands as to that.

7          MR. HOSKINS:  Understand.

8          THE COURT:  All right.  Any other issues while we're

9    here together?

10          MR. SMITH:  Your Honor, there is one motion that I

11    wanted to bring to the Court's attention before I begin my

12    cross-examination on Mr. Maricle.  I filed it this morning.

13          THE COURT:  All right.

14          MR. SMITH:  With the clerk's office.  I don't know if

15    your chambers got that or not.

16          THE COURT:  It's an *ex parte* motion.  I've reviewed

17    it and signed the order.  It's rather routine.  I do

18    understand the issue.  We'll take it up here at the break if

19    you want briefly.

20          MR. SMITH:  That will give me a chance to follow up

21    if it's already, if it's already been signed.  Then I can go

22    ahead and get the information, then.

23          THE COURT:  All right.  We'll take a 20-minute recess

24    at this time.  If you feel that you need longer to look

25    through those transcripts, you can just alert me, and that way

1    we can prevent the jury from being brought in in 20 minutes.

2              MR. HOSKINS:  Thank you, Your Honor.

3                      (Sidebar conference concluded.)

4              THE COURT:  Ladies and gentlemen, we're going to take

5    a brief recess at this time.  I'm going to allow counsel to

6    review a couple of matters.  May take as much as 20 minutes.

7    So we'll give you a recess until approximately 10:00.  Of

8    course, please keep in mind the admonitions you've been given

9    previously not to discuss the case among yourselves while we

10   are in recess.  The jury will be excused until approximately

11   10:00.

12                 (The jury left the courtroom at 9:39 a.m.)

13             THE COURT:  Thank you.  Other than the matters we

14   took up at sidebar, any other issues we need to take up before

15   we take our break?  We'll be in recess for approximately 20

16   minutes.

17                 (Recess from 9:42 a.m. until 10:07 a.m.)

18                 (The jury entered the courtroom at 10:07 a.m.)

19             THE COURT:  Thank you.  The record will reflect all

20   members of the jury are present.  Parties and counsel are also

21   present.  Witness, of course, is still under oath.  Mr.

22   Hoskins, you may proceed.

23             MR. HOSKINS:  Thank you, Your Honor.

24   BY MR. HOSKINS:

25   Q.  Mr. Maricle, I know everybody in the courtroom is going

*MARICLE - Direct (Mr. Hoskins)*                                    33

1    to groan when I mention this word, but we're going to talk

2    about these transcripts now.

3    A.   Only for a short period of time.  We'll try to make it as

4    easy as we can.

5         MR. HOSKINS:  Your Honor, may I use the overhead?

6         THE COURT:  Yes, sir, you may.

7    Q.   Mr. Maricle, we listened to a whole lot of recordings and

8    saw some transcripts of those.  You heard Wanda and Kennon

9    White giving their interpretation of various things.  I want

10   to ask you first if on the March 27th transcript, if you would

11   look at that?

12   A.   Yes, sir.

13   Q.   Was there any particular point on there that you --

14   A.   Yes, sir.  On page 1, there are a couple of things that

15   are incorrect insofar as I'm concerned from my interpretation.

16   Where they have "last year, not been around him, his big

17   problem was conspiracy charge," I think it says "last year, I

18   don't remember ever being around him, his big problem was in

19   the state."

20        Next, they had Mr. White said "right, conspiracy charges,

21   they could hit him on that too."  Actually what Mr. White says

22   is "Stephen Charles represented him on that one too."

23        And then next it says "I don't know, I mean, I don't even

24   know, there's been three or four names thrown around.  Now,

25   whether or not it's all the same thing, I don't know."

MARICLE - Direct (Mr. Hoskins)                                        34

1              MR. SMITH:  Your Honor, I'm going to object and ask

2      if we could approach at this time.

3              THE COURT:  Yes, sir.

4                       (A sidebar conference was held out of the

5                        hearing of the jury):

6              MR. SMITH:  These are the transcripts that Mr.

7      Hoskins gave the government notice that he was going to use.

8      He started out with Exhibit 1A, which is one that is not

9      redacted, and so he's displaying that in front of the jury.  I

10     wasn't aware he was going to use that one, and --

11             MR. HOSKINS:  I see at the top, you have 5/27 and I

12     may have said that.  What I meant to say was 3/27, if I said

13     five.

14             MR. SMITH:  Well, you have an unredacted copy in

15     front of the jury at this point.

16             MR. HOSKINS:  Do you have a redacted copy we can

17     substitute?

18             MR. SMITH:  We do, we do.

19             MR. HOSKINS:  I apologize.

20             THE COURT:  Anything else?

21             MR. SMITH:  Well, I'm concerned with the fact that

22     this witness has multiple legal pads that he's brought now to

23     the witness stand with him, and obviously that was something

24     that's been done in recess, wasn't there when he was on the

25     witness stand, and I see him referring to those.  And

1    obviously, I'm going to have to draw attention to that in my

2    cross-examination.

3           But I know that the Court has -- at least at this

4    point, we have a witness who seems to be reading from those

5    and interpreting, I guess, or giving testimony on those, and I

6    would object to that.  I believe that that is inappropriate.

7    There's been no establishment that he needs his memory

8    refreshed.  We're now reading into the record from what

9    appears to be legal pads, which I would state to this Court

10   again has not been identified, and I would object to him being

11   able to read from them.

12          THE COURT:  All right.  I understand.  This is Mr.

13   Hoskins' attempt to get in his versions of the transcripts

14   that were not admitted previously in the case.

15          The witness can challenge or testify that what was

16   said on the tape is different than the transcript.  He can

17   challenge that.  You're entitled to look at his documents that

18   he's referring to, and I'll give you opportunity to do that

19   when he finishes testifying.  It is clear he's referring to

20   materials that he's just brought to the witness stand with

21   him.  I'll allow him to continue to do that, but with respect

22   to this transcript, I was hopeful that the recess that we took

23   would take care of this issue of redacted versus unredacted

24   transcripts, but I suppose it didn't.  So you'll need to use

25   the correct version with the witness.

1    MR. HOSKINS:  Yes, sir.

2                 (Sidebar conference concluded.)

3    BY MR. HOSKINS:

4    Q.   Mr. Maricle, if you could, let's go a little bit slower.

5    A.   I'm sorry.  I apologize, trying to get through as quick

6    as I can.  All right.  Do you want me to start completely

7    over, or how do you want me to do it?

8    Q.   No, are we finished with page one?

9    A.   Basically, yes.

10   Q.   Now, you were present when these recordings were made,

11   even though --

12   A.   Yes, on many of these that I'm testifying about, I was

13   present.  I didn't do any where there were other people, other

14   defendants that might have been present.

15   Q.   What is the next section that you believe recording was

16   incorrect?

17   A.   On page 2, down the transcript at 1:20:49.  Mr. White

18   says, "you don't think they're going to fool with this

19   election stuff?"  They have my response as being UI,

20   unintelligible.  The answer was no.  They have Kennon saying

21   the word right.  The proper word is why.

22   Q.   Now, Mr. Maricle have you had an opportunity to listen to

23   those recordings?

24   A.   Too many times to count, quite frankly.

25   Q.   You listened to them before we came to court?

1    A.  Yes, many times.

2    Q.  Next section of that?

3    A.  On page 4, at the very top line, I believe mine

4    corresponds with yours.  Linsey says, "I know, but I knew that

5    Stacey said."  That's what they have her saying.  She actually

6    said, "I know, but I knew that she said she was going to."

7    Q.  Next section.

8    A.  On page 5, three lines up from 1:24:45, the time, my

9    interpretation of that would be, "you'd know more than I

10   would, but they might, I mean, I don't know."  I did not say

11   "they might on you."

12        On page 6, there's one.  Where it says "well, I don't

13   know about that."  Then it has unintelligible.  "I'll try to

14   find out if they've been talking to him or not."  They have it

15   translated, "I'll" which means different than I'd try to find

16   out if there had been talking.  I'd try to find out if there

17   had been talking would be interpreted as if you were the

18   person who ought to do it.

19   Q.  What did you actually say that day?

20   A.  I actually said "I'd try to find out if they've been

21   talking."  Then page 7 at seven lines down, she says, now --

22   they have it saying "now, I agree with you, I agree with you,

23   it's certified I don't like her."  It really says, "I really,

24   I really, it's certified I don't like her."  Changing from her

25   agreeing with me.  She's saying it is.

1     At the bottom, it has Digger Phelps, and it's really

2  Billy Phelps.

3     And there's only one other one on that one, and this is

4  page 9, when we're talking about unemployment and where you

5  file it.  They have it to be saying, "I think filed here.

6  I'll take care of it."  The words "I'll take care of it" are

7  not on there.  There's not even enough words and syllables for

8  it to be on there.  The response is, "no, I think they're

9  filed here," referring to where an unemployment case or an

10  unemployment appeal would be filed.  I did not say I'll take

11  care of it.

12  Q.  Let me ask you a couple quick questions about that.

13  Kennon White was talking to you about his unemployment claim?

14  A.  Constantly, yes, sir.

15  Q.  Did you ever tell him that you, as judge, would take care

16  of it in a sense of ruling?  Did you ever tell him you'd take

17  care of it in any way?

18  A.  No, sir.  Read that, and it's obvious that I didn't.

19  Q.  That's all for that --

20  A.  That's all on that one, yes, sir.

21  Q.  The next one we want to talk about is April 30th; is that

22  correct?

23  A.  Yes, sir.  There are two April 30th.  There's only one

24  that I made any -- well, there are several changes throughout

25  here, but I'm just going through the ones that are substantial

1    and have any meaning to it.  On page 7, midway down, it has

2    Phillip talking.

3    Q.   Who is Phillip?

4    A.   Phillip was my son-in-law.  Or is my son-in-law still.

5    And they have that translated, midway down, "it is pretty

6    f'ing -- I'm sorry."  Actually, the translation is, "it is

7    absolutely.  I'm sorry."

8    Q.   Does Phillip use that kind of language?

9    A.   Not that much around me.  I don't know about not around

10   me or not.

11        MR. SMITH:  Mr. Hoskins, I failed to hear your

12   exhibit number.

13        MR. HOSKINS:  It's April 30th.  I'm sorry.  It's A8A.

14   A.   On page 8, there are some changes, but I don't think that

15   they're anything that substantial worth just going into at

16   this time.

17   Q.   So we're done with that one?

18   A.   We're done with that one, yes, sir.

19   Q.   Next one is May 2nd, which is A13A.  It's already been

20   admitted.

21   A.   All right.  May 2nd.  On page 43, down middle of the

22   page.  At that point, we're talking about her going over to

23   Dobber's and me telling her I didn't see any reason to.  And

24   middle of the page, I read, "you know what they're going to do

25   tomorrow.  Wanda come and talk to you last night?"  Wanda:

1    "Will they ask him that?"  And the correction will be made in

2    the next sentence, "well, sure, and you will have to tell

3    them.  And they'll ask you, did you go over to Dobber's last

4    night," telling them that she's going to have to tell the

5    whoever if, in fact, she does.

6        I believe that is all of those that's significant on May

7    the 2nd.

8    Q.  Next we have May the 4th, which is Exhibit A15A.

9    A.  We're talking about on page 9 the number of people that

10   were going to -- that they say had been subpoenaed by the

11   grand jury.  They say at the top of the page, "the court clerk

12   told them they had 22 people from Clay County down there the

13   day before yesterday, and that's why it was late, because they

14   told him to just keep calling back, and he, he told him to

15   come on."  Next they say "and that's a lot of people not to

16   know they was going down there."  That's what Kennon says.

17   And then I respond, and this is a little bit different, "yeah,

18   and not to have heard something about it."  Then Kennon says,

19   "yes, I would say."  And then I say, "I just wonder about

20   their figure," referring to the 22 people that they've talked

21   about in their conversation, talking about how many people was

22   there, and I tell them that I wonder about their figure about

23   that.

24   Q.  What do you mean by wondering about their figure?

25   A.  I just didn't think there had been 22 people to grand

MARICLE - Direct (Mr. Hoskins)                                    41

1    jury.  At the top of the page, they have me saying, "if I do,

2    it's obstruction of justice, which would mean a criminal

3    offense on my part."

4    Q.   Which page are you on, Mr. Maricle?

5    A.   Page 11, I'm sorry.  Going too fast.  Ready?  Page 11,

6    the very top, they have me saying, "if I do, it's obstruction

7    of justice, which would mean a criminal offense on my part."

8    I agree that that is said, but it's also, at the end of it,

9    "it would be irresponsible to give you advice."

10        On page 21, we're talking about Darnell being up at my

11   house in the fall of 2006.

12   Q.   Darnell would be who?

13   A.   Darnell Hipsher that's been testified to about here.  And

14   Kennon, have Kennon saying, "you know what I'm thinking?  I

15   think Darnell told us something, because I can remember

16   Darnell coming up here when me and you, Cletus and everybody

17   else sitting on the floor."  Actually, it says "sitting on the

18   porch up there, but I don't think nothing's said."  They do

19   not have, in their translation, "I don't think nothing's

20   said."

21   Q.   Was Darnell Hipsher at your house?

22   A.   In the fall of '06, he came up there one time.  They --

23   Kennon and Wanda were there, and they called him to come up

24   there to go talk to somebody about taking -- his aunt about

25   taking a sign down out of her yard.

MARICLE - Direct (Mr. Hoskins)                                      42

1    Q.   Well, was Darnell Hipsher somebody that you had a
2    relationship with?
3    A.   Oh, I've known Darnell several years, and I've had to
4    move three or four times.  He would always be -- he'd be
5    somebody to get a crew together for me to move, whichever one
6    of my family was moving at the time, yes.  And then I loaned
7    him a van once to take some girls to ball tournament that they
8    were playing in.  So I knew Darnell pretty well.
9    Q.   Did you ever have anything to do with Darnell Hipsher as
10   far as any type of election fraud?
11   A.   No, sir.  Nothing with Darnell Hipsher.
12   Q.   And on page 43, again referring to the number of people
13   had been to the grand jury, they have it saying, "I don't
14   think anybody down there is dangerous."  What it really says,
15   "I don't think anybody down there but three," referring to the
16   number of people that have gone to the grand jury being Wanda
17   and Dobber and Phillip.
18        Basically, that's it for May the 4th.  There is one more
19   on May the 2nd, but I'm not going to read it.  It is about
20   five pages that makes some changes when we're talking about
21   the job, a few changes need to be made, but I think the intent
22   is there, shown.
23   Q.   The next one is May 9th; is that correct?
24   A.   May 9th, yes, sir.
25   Q.   And that would be Exhibit A9A?

1    A.   No need to put it up.  It says, has me saying, "I mean,

2    can't do nothing to her," in reference to immunity.  I have

3    two words before that that says, "that's great.  Means they

4    can't do nothing to her."  I don't see any reason to put that

5    up at this time.

6    Q.   So Wanda White had said something to you about being

7    given immunity?

8    A.   Yes, sir.

9    Q.   And what was your reaction to that?

10   A.   My response was that was great for her because there was

11   nothing they could do to her at this point in time, once

12   they've given her immunity.

13   Q.   And the final transcript we want to look at is A17A?

14   A.   Is that May 14th?  Yes, this is on page 4, May 14th,

15   comes down to where it says "did you tell her not to say

16   anything about Wayne" is what they have it saying, which Miss

17   White interpreted as meaning I was trying to find out what

18   they'd said about Wayne, or I told her not to say anything

19   about Wayne.

20        Actually, that does not translate that way at all.  The

21   response is "did they tell her not to say anything about what

22   she said," the question being did they tell her anything about

23   what she had said or not to say anything about it.

24   Q.   Anything else on that transcript?

25   A.   That's all.  Some minor other ones, but there's no reason

MARICLE - Direct (Mr. Hoskins)                                    44

1    to waste time going into them.

2              MR. HOSKINS:  Your Honor, I'd ask that the witness be

3    shown Exhibit D60.

4    A.   Yes, sir.

5    Q.   Mr. Maricle, do you recognize that?

6    A.   Yes, sir.  It was taken from, I believe from my bedroom.

7    Q.   Is that something that's in your handwriting?

8    A.   Yes, sir.

9    Q.   It's several pages of handwritten notes, isn't it?

10   A.   There are three pages of handwritten -- four pages of

11   handwritten notes.

12   Q.   Briefly, what's on the top of the first page?

13   A.   On top of the first page, it's a list of things that says

14   "buy positive cash flow properties only."  Below that, it says

15   estimate maintenance cost, and figure how to bring down."

16   Right under that, "gross rent multiplier."  All of this is

17   referring to real estate, trying to buy and sell real estate.

18        The question that you might want to ask about,

19   "concentrate on older people."  Older people getting into

20   situation where they want to either downsize, anxious to sell,

21   or sometimes needing to sell so they can move in with their

22   children or move to a nursing home.

23   Q.   What was the purpose of that document being written out?

24   Why did you write that down?

25   A.   Well, just, you know, these were things that I would

1    consider in my retirement trying to do is to, you know, go

2    ahead a little bit more with in real estate than I had.

3    Q.  So these were documents that were notes you had made in

4    connection with what you'd do with your time after you quit

5    being judge?

6    A.  That's correct.  The second page has a list of things on

7    it.  First two are the names of companies that I thought a

8    person might do business under.  There is no such company as

9    yet.  They were not incorporated.  There were not any

10   businesses such as that.  Suggest maybe getting a title

11   company going, because didn't have one in Manchester.  Thought

12   maybe Richie might be able to get into home inspections, which

13   he already had his detective agency, even though he wasn't

14   working it.

15        The next one I have particular interest in is alternative

16   sentencing.  Under that, I have four names, Richie, Ellen, Jo

17   and my name.  One of the things that I thought where we were

18   failing is maybe trying to use some alternatives to prison,

19   and I never got any real good plans while I was judge from

20   anybody suggesting an alternative to the sentencing.  So my

21   thinking was that be good to try to write up some programs for

22   people that might -- something might be important to them and

23   would help them rather than prison.

24        I'll give you an example.  There was a judge in Memphis,

25   instead of putting a fella in jail, made him go down to the

1    zoo and watch the lions go back and forth every day from 8:00

2    till 12:00.  Not that I would insist or do that.

3        The next two things deal with elderly and an addict to

4    try and assist them in their legal needs.  My son had taken a

5    course in elderly law, Social Security.  I got -- that's

6    something I could do in retirement.  I was not prohibited in

7    doing that in retirement.

8        PR companies, says take holler by holler.  Try to work,

9    you know, each county, each little place or each little holler

10   that you would have as a place to get my son's name out.  Open

11   an office for him in McKee.  Open an office in London.

12       The next one deals with "I buy property" cards.  And the

13   next one, Bill Trude.  I thought maybe about getting him to

14   open an office in McKee.  He'd been defeated as judge in

15   Estill, Lee and Owsley.  But he went to work for the state.

16   Q.  So Mr. Maricle, how did you envision you being involved

17   with your son's law practice?

18   A.  Well, my intentions were to promote him if I could, and

19   to do the best that I could to get him promoted and get him

20   into some areas that really nobody was really paying attention

21   to.

22       Nobody really seemed to be caring for, you know, give

23   a hoot about needs of elderly as far as legal aid is concerned

24   other than, I think, the Bennetts who are over in London had

25   somebody that was in that capacity.  But they have a lot of

1    needs, particularly when you get into figuring out what their

2    estate is going to be.  Didn't have a whole lot of big estate,

3    but some of them did.  Also, you would have an aspect of

4    whether they were in a nursing home, and sometimes they aren't

5    treated appropriately in the nursing home.  Similar to that of

6    the addict, also.

7        The next is a list of contacts, I have four, five, six --

8    eight or nine names on it.  Those were --

9    Q.   Let me just ask you quickly, does that list of names have

10   anything to do with elections or voting?

11   A.   No, no.

12   Q.   Okay.

13   A.   Not at all.  Those names on there were strictly contacts

14   I had written down as possible people that might help my son

15   as far as getting started.  Some of them were friends of his

16   from law school that he had already gotten in contact with.

17   That's Paul White, Chris Finley, Richie Asher, Brownlow

18   Arnett, a friend of mine.  His name's on there twice.  Lonnie

19   Owens is from Laurel County, and he'd been one of the people

20   that had talked to me when I was over there one day.

21       And then the last page says PR, that would be public

22   relations.  Work the clerk's office.  The best thing that a

23   young lawyer can do is be sure that you don't make the clerks

24   of the court mad and that you treat them good, because they

25   can give you a lot of hints sometimes, because when you come

1    out of law school, you may not know exactly what's what

2    insofar as pleadings and where they're filed and stuff.

3        And then take them lunch or take them out of dinner.  All

4    of that applied to the clerk's office.

5    Q.   Mr. Maricle, Kennon White came in court and testified

6    that you didn't speak to him but that you mouthed words about

7    go see Al Man.

8    A.   That is untrue.  That did not happen.

9    Q.   Did you ever direct anybody to say anything to Wanda

10   White about her grand jury testimony?

11   A.   No, sir.

12   Q.   Did you ever ask Wanda White to do anything untruthful in

13   connection with her grand jury testimony?

14   A.   No, sir.

15   Q.   Did you ever have any discussions with Mr. Stivers about

16   her grand jury testimony?

17   A.   No, sir.

18   Q.   Mr. Maricle, did you attend any type of political

19   meetings with Wanda White or Kennon White or any of the other

20   persons named in the connection with your son-in-law's

21   election?

22   A.   The only thing, that they would come up to the house

23   three or four times a week, and sometimes there was talk about

24   the election, but nothing like, like they said.  And it

25   certainly was not a planned meeting.  They'd just drop in.  I

1    did not ask them to do anything inappropriate or illegal at

2    all in that precinct or anywhere else.

3    Q.   Did you ever suggest to anyone that you would use your

4    office as circuit judge in any way to get your son-in-law

5    elected?

6    A.   Absolutely not.  I've had 20,000 cases, and I don't need

7    to do that.

8    Q.   Did you ever go over voter lists?

9    A.   No, sir.

10   Q.   Did you ever talk about vote haulers or vote buyers with

11   Wanda and Kennon White?

12   A.   No, sir.

13   Q.   Did you have any involvement at all in buying votes

14   during any of the years that we've heard about that are part

15   of this indictment?

16   A.   2002 to 2006, the answer is no, I didn't.  I didn't give

17   anybody any money.  Didn't receive any money.  Never pooled

18   any money with anybody.  Spent no money for buying votes or

19   vote hauling.  I said that two years ago, and I've not heard

20   anybody say different.

21           MR. HOSKINS:  Your Honor, may I have just a moment?

22           THE COURT:  Yes, sir.

23           MR. HOSKINS:  That's all.  Thank you.

24           THE COURT:  Mr. Smith, I know that the witness has

25   brought a number of materials up to the witness stand during

50

1    the last break, and you're entitled to review those before you

2    begin your cross-examination.  Would you like to do that at

3    this time?

4            MR. SMITH:  Yes, I would.

5            THE COURT:  All right.  Ladies and gentlemen, I'm

6    going to give you an extended lunch break today.  We're going

7    to take a recess until 1:00.  So you'll be able to, of course,

8    leave the building if you want to do that.  I do want to

9    remind you that as we take our break, of course, please keep

10   in mind the admonitions that you've been given.

11       Don't discuss the case among yourselves.  Don't allow

12   anyone to approach you to discuss the case, and if that should

13   happen, of course, you should report that to the Court

14   promptly.  Don't allow and don't speak with any witnesses,

15   attorneys or any parties in the case, any relatives or things

16   of that nature.  Of course, don't make up your mind about the

17   case until it is finally submitted to you.  Jury will be

18   excused until 1:00 this afternoon.

19            (The jury left the courtroom at 10:43 a.m.)

20            THE COURT:  Thank you.  Any matters to take up

21   outside the presence -- Mr. White.  Thank you.  Please be

22   seated.

23            MR. WHITE:  Your Honor, I'm sorry to be a broken

24   record on scheduling.  All my witnesses except one are coming

25   up from Manchester.  I've got one witness here who is Katie

1    Gabhart.  My expectation is assuming that United States

2    finishes their cross and then they were to get through their

3    two witnesses and Mr. Adams, I think at best I would have just

4    that one witness, and I would have him here.

5           I wanted to ask, at least, the Court if would be okay

6    if I let the folks in Manchester know they don't have to come

7    up today.

8           THE COURT:  Yes, sir, that would be fine.

9           MR. WHITE:  Thank you, Your Honor.

10          MR. PINALES:  Just for scheduling, let the Court

11   again know that the two witnesses we have at best are 15

12   minutes each, Your Honor.

13          MR. WESTBERRY:  I have, quite frankly, quite a bit

14   more, but I kind of think three is -- they're not particularly

15   long, but I just want to let you know.

16          THE COURT:  With cross-examination, I believe that

17   will probably take us through the end of the day, so I'm not

18   sure we'll get to other witnesses.

19          MR. WESTBERRY:  The Court thinks cross of Mr. -- did

20   you say you think the Court thinks cross from the United

21   States --

22          THE COURT:  With the cross from the United States,

23   which I expect will be at least a couple of hours of this

24   witness, then two additional witnesses, and then with your

25   witnesses, I don't -- what I'm saying is I don't think we'll

1    get to Mr. White's witnesses today.

2          MR. WESTBERRY:  I understand.  That's fine.

3          THE COURT:  Anything else we can take up before the

4    break?

5          MR. HOSKINS:  Just these transcripts, Your Honor.

6    The government gave me two redacted transcripts.  I do want to

7    go ahead and substitute those.

8          THE COURT:  I'm going to let you all confer about

9    that during the break.  I'm more interested at this point in

10   making sure that Mr. Smith has time to review whatever

11   additional documents have been brought up to the witness stand

12   by the witness.  Looks like there are a few to me, but I don't

13   know, but I want to give him time to do that.  So if you can't

14   resolve that issue before we resume at 1:00, let me know if I

15   need to take that up with the parties.  But if you're in

16   agreement, of course, you can substitute those with the clerk

17   as we talked about earlier.

18         MR. HOSKINS:  Thank you, Your Honor.

19         THE COURT:  If I don't hear from you, we'll be in

20   recess.  Mr. Abell, did you have something?

21         MR. ABELL:  No, just quick on the draw.

22         THE COURT:  Pretty quick too.  We'll be in recess

23   until 1:00.

24              (Proceedings recessed at 10:46 a.m.)

25                         - - -

53

1                          C E R T I F I C A T E

2              I, LISA REED WIESMAN RDR-CRR, certify that the
    foregoing is a correct transcript from the record of
3    proceedings in the above-entitled case.

4

5    \s\ Lisa Reed Wiesman                 March 13, 2010
    LISA REED WIESMAN, RDR-CRR          Date of Certification
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              INDEX
DEFENSE WITNESS

R. CLETUS MARICLE
Direct Examination (cont'd) by Mr. Hoskins....... Page 4


                            - - -


DEFENSE EXHIBITS                              ADMITTED

Maricle Exhibit No. 7, Case History,
                        Commonwealth -v- Stephen Price
Admitted...................................... Page 23

Maricle Exhibit No. 8, Case History,
                        Commonwealth -v- John Downey
Admitted...................................... Page 23

                            - - -