1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                               - - -
3

UNITED STATES OF AMERICA,          :   Docket No. CR 09-16-S
4                                  :
                    Plaintiff,     :   **Frankfort, Kentucky**
5                                  :   Tuesday, March 16, 2010
        versus                     :   1:00 p.m.
6                                  :
RUSSELL CLETUS MARICLE,            :
7   DOUGLAS C. ADAMS               :
    CHARLES WAYNE JONES            :
8   WILLIAM R. STIVERS             :
    FREDDY W. THOMPSON             :        **Trial Day 25B**
9   WILLIAM B. MORRIS              :
    DEBRA L. MORRIS                :
10  STANLEY BOWLING,               :
                                   :
11                  Defendants.    :

12

13                           - - -
                     TRANSCRIPT OF TRIAL
14                 BEFORE DANNY C. REEVES
           UNITED STATES DISTRICT COURT JUDGE and a jury
15                           - - -

16  APPEARANCES:

17  For the United States:        STEPHEN C. SMITH, ESQ.
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
    For the Defendant            MARTIN S. PINALES, ESQ.
21  Russell Cletus Maricle:      Strauss & Troy
                                  150 E. Fourth Street
22                                Fourth Floor
                                  Cincinnati, OH  45202
23
                                  DAVID S. HOSKINS, ESQ.
24                                107 E. First Street
                                  Corbin, KY  40701
25

2

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                               Landrum & Shouse, LLP
                                 220 West Main Street
 3                               Suite 1900
                                 Louisville, KY 40202
 4

 5    For the Defendant          T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
 6                               133 West Short Street
                                 Lexington, KY  40507
 7

 8    For the Defendant          ROBERT L. ABELL, ESQ.
      William R. Stivers:        120 North Upper Street
 9                               Lexington, KY  40507

10

      For the Defendant          RUSSELL JAMES BALDANI, ESQ.
11    Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
                                 Baldani, Rowland & Richardson
12                               300 West Short Street
                                 Lexington, KY  40507
13

14    For the Defendant          JERRY W. GILBERT, ESQ.
      William B. Morris:         Coy, Gilbert & Gilbert
15                               212 North Second Street
                                 Richmond, KY 40475
16

17    For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:           Gess, Mattingly & Atchison, PSC
18                               201 West Short Street
                                 Lexington, KY 40507
19

20    For the Defendant          DANIEL A. SIMONS, ESQ.
      Stanley Bowling:           Thompson, Simons, Dunlop & Fore
21                               116 West Main Street
                                 Suite 2A
22                               Richmond, KY 40476

23

24

25
```

3

1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
2                                 35 W. Fifth Street
                                  P.O. Box 1073
3                                 Covington, KY  41012
                                  (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*C.M. BISHOP - Direct (Mr. Baldani)*                                    4

1          (The jury entered the courtroom at 1:01 p.m.)

2          THE COURT:  Thank you.  The record will reflect that

3    all members of the jury are present.  Parties and counsel are

4    all present.

5          Witness is reminded that he's still under oath.

6          Mr. Baldani, I think we were still in your, what

7    amounts to your direct examination, since you had this witness

8    under subpoena.

9          MR. BALDANI:  Thank you, Your Honor.

10          THE COURT:  You may proceed.

11                    DIRECT EXAMINATION (continued)

12    BY MR. BALDANI:

13    Q.  Mr. Bishop, when we broke for lunch, I was asking you

14    about Larry Henson.  Do you know Larry Henson?

15    A.  I don't believe I do.

16    Q.  Okay.  But I showed you some minutes from the Board of

17    Elections in '04.  You recall that?

18    A.  Oh, yeah.  I remember looking at it.

19    Q.  Do you recall a motion being made regarding Larry

20    Henson's absence in '04?

21    A.  No, I couldn't.  I can't recall.

22          MR. BALDANI:  Judge, if I could show the witness

23    PR16M, please.

24          THE COURT:  Yes, sir, you may.

25    Q.  And Mr. Bishop, I'm going to ask you to read the first

*C.M. BISHOP - Direct (Mr. Baldani)*                                5

1    three or four paragraphs of this, not out loud, but just to

2    yourself to see, and then I'll ask you if that refreshes your

3    recollection regarding this fella, Larry Henson, I've been

4    asking you about.

5    A.   Okay.

6    Q.   Mr. Bishop, as a member of the Board of Elections, did

7    you ever become familiar with a precinct election officials

8    absence report?  Do you know what that is?

9    A.   Yes, sir.

10   Q.   What is that?

11   A.   Well, if an election officer fails to report for duty

12   that they promise to participate in, then you have to fill out

13   a form.

14   Q.   Okay.  And after reviewing that government exhibit, does

15   that refresh your recollection regarding Mr. Henson in 2004?

16   A.   Yes, it does.

17   Q.   Do you recall a motion being made regarding his absence?

18   A.   Yes.

19   Q.   Or his failure to show up to serve?

20   A.   Yes.

21   Q.   And what was that motion, if you recall now?

22   A.   It was a motion to put his name on the County Board of

23   Elections officials absence report, which is form SB -- SCB54B

24   due to the fact that he didn't show up for duty.

25   Q.   Okay.  Do you recall, I'm not asking you to read from

*C.M. BISHOP - Direct (Mr. Baldani)*                                      6

1   this document.  I'm asking you, do you recall seconding that

2   motion and it being granted?

3   A.   No, but the motion was granted.

4   Q.   During Mr. Smith's cross-examination, he showed you

5   PR42 -- I'm done with that.

6   A.   Oh, okay.

7   Q.   He showed you PR42, which was a photograph of various

8   people in Washington, D.C.  Do you recall that?

9   A.   Yes, sir.

10  Q.   All right.  And you were asked about a whole bunch of

11  different people whose picture -- or who appeared in those

12  pictures, right?

13  A.   Yes, sir.

14  Q.   Do you recall Freddy Thompson being in that picture or

15  any of those pictures?

16  A.   No, sir.

17  Q.   He wasn't at that meeting or on that trip, was he?

18  A.   There was a whole bunch of people, but I don't think he

19  was.  Whoever's in that picture was.  Whoever wasn't, wasn't.

20           MR. BALDANI:  That's all the questions I have, Your

21  Honor.

22           THE COURT:  Thank you.

23           MR. GILBERT:  No questions.

24           MS. HUGHES:  No, sir.

25           MR. SIMONS:  I have none, Your Honor.

*C.M. BISHOP - Redirect (Mr. Westberry)*                                    7

1          THE COURT:  We're back to redirect of the witness.

2          MR. WESTBERRY:  Yes.  Thank you.

3                        REDIRECT EXAMINATION

4     BY MR. WESTBERRY:

5     Q.   Good afternoon again, Mr. Bishop.  Kent Westberry for

6     Doug Adams.  I've got some questions that I'd like to ask you

7     that are in response to matters that were raised by Mr. Smith

8     on behalf of the government.  You were asked, Mr. Bishop,

9     about some meetings that you may have attended, or perhaps the

10    better way to describe it is occasions where you may have been

11    present at Paul Bishop's garage or his barn.  Do you recall

12    those lines of questioning?

13    A.   Yes.

14    Q.   And I'm not sure that I heard, but could you tell us

15    again, your best recollection, how many times were you

16    actually at Paul Bishop's garage or his barn or however you

17    want to characterize it?

18    A.   Three times.  I was there initially the first time I ever

19    knew there was such a place, which is just down the hill from

20    his house, which is hidden from the road.  But they had a fish

21    fry, a community fish fry.  And my brother and I were invited,

22    and I remember it was some time ago because he was holding

23    hands with his soon-to-be wife, who he's married to now.  So I

24    remember that.

25    Q.   When you say some time ago, can you ballpark, best you

*C.M. BISHOP - Redirect (Mr. Westberry)*                                    8

1    can, how long ago was that fish fry?

2    A.   I can't remember when he got married, but it was prior to

3    2000 -- probably about, let's see.  Hard to figure.  Probably

4    prior to 2000.  May have been somewhere after, shortly after.

5    But it was a while back.

6    Q.   What was the purpose?  Did the fish fry have a stated

7    purpose, or was it just a gathering?

8    A.   Just a gathering, sort of like a potluck fish fry.  Some

9    of the guys were frying fish, and then the ladies brought

10   beans and coleslaw and all the things that went with it.  And

11   we had a big -- everybody ate too much.

12   Q.   Do you have a recollection of politics being discussed at

13   this fish fry, if you recall?

14   A.   No.  No.

15   Q.   And you think this, from the best of your memory, this

16   occurred sometime in 2000, correct?

17   A.   Well, it was a long time ago.  It was a long time ago.

18   That's the first time I'd ever been there.

19   Q.   How many people were there, just again ballpark?

20   A.   Oh, Lord.  There would have been 40 or 50 people or more,

21   maybe.  Some, you know, came through and ate and left, and

22   others sort of hung around.  They had the bluegrass singers

23   there, you know, and they had them again in 2006 or 7.  Can't

24   remember exactly when that was.  But they had them back again,

25   and I know most of -- well, I know all those guys, actually.

1    They pick and sing in the bluegrass band.  Some of them go to

2    church with me.

3    Q.   Right.  Was it a social occasion, Mr. Bishop?

4    A.   Yes, yes, absolutely.  Yeah, just another -- they were --

5    it was a kind of a celebration that Carl Jackson had been

6    elected magistrate, and anytime Clay County people get

7    together, they eat.  That's, you know -- they eat a lot.  So

8    we had a big fish fry and, you know, it was, again, it was a

9    potluck dinner and that was essentially it, you know.

10   Q.   Do you have any recollection if Doug Adams and his wife

11   would have been present at that fish fry, if you know?

12   A.   I don't think they were.  I can't remember Doug being

13   there.  It's possible, because there were a lot of people

14   there, but I don't recall.  I say that because I think if he

15   had been there, I would have talked to him, and I don't

16   remember talking to him on that occasion.

17   Q.   What was the next time that you're at Mr. Bishop's garage

18   or his barn?

19   A.   That would actually fall in between.  That would have

20   been just prior to the May, 2002 election.  I had been

21   approached by several candidates with a list of potential

22   challengers.  And as chairman of the Republican party, it's my

23   duty to appoint or turn in a list of challengers.  And

24   Jennings White had turned in a list of challengers for the

25   Democrat party, even though he was running as a Republican.

1    So that had some of the candidates, of which I was a candidate

2    myself, but it didn't bother me.

3        I have found that challengers are essentially worthless.

4    Q.   What do challengers do again, just real quickly, so we

5    know?

6    A.   They are allowed to be at the polling place, inside the

7    polling place on the day of election.  And if, if they think

8    that somebody is trying to vote in that precinct who doesn't

9    live there, they can challenge that person's credentials,

10   essentially.  And that's about all they have authority to do

11   is say, you know, we don't think you live here.

12   Q.   When you say your experience indicates the concept of

13   challengers are kind of useless, why do you say that?

14   A.   Just I've never seen the purpose in it.  It's just

15   overkill.  These people get -- you know, some of these people

16   running for elections, they don't really have any idea how the

17   process works, quite frankly.  They go around and say, you

18   know, I'm running for magistrate or constable or jailer, would

19   you vote for me.  Of course, everybody says yes, and they

20   believe that everybody's gonna vote for them.  So when they

21   lose, it's like, why, you know, somebody stole this election.

22       That's just the common, common denominator with

23   elections, that everybody thinks that because, you know, that

24   people assure them that they'll vote for them, that that's

25   going to happen.  And doesn't work that way.  I mean, you

*C.M. BISHOP - Redirect (Mr. Westberry)*                                11

1    know, people -- some people will promise you and vote for you,

2    and obviously some don't.

3    Q.   Sure.

4    A.   But challengers are there, and I have appointed them in

5    the past.  Always reluctantly.  I don't find it to be

6    beneficial.  And I was looking for guidance and counsel from

7    Doug as to -- because I didn't -- some of these people get mad

8    when you turn in their names, and I didn't know if some of

9    them -- you know, I didn't want them getting mad at me.  I had

10   some of these other candidates saying please turn in this

11   list.

12       You know, it wasn't that big a deal at all, because it

13   ended up I turned it in a day late.

14   Q.   And what happened when you turned it in a day late?

15   A.   Jennings White said, "I don't have to accept that," and I

16   said, "I didn't say you did."  And he bounced it off my chest,

17   and he said something else about he didn't have to accept

18   that.  And I said, "I'm not here to argue.  I've done my job.

19   Have a nice day."  And I walked away.

20   Q.   That second meeting, Mr. Bishop, at the garage that we've

21   been talking about, who all was present at that garage?

22   A.   Doug Adams and myself.

23   Q.   Anybody else?

24   A.   No.

25   Q.   And who called the meeting again?  I call it a meeting.

*C.M. BISHOP - Redirect (Mr. Westberry)*                              12

1    It's just two people.

2    A.   Yeah, it wasn't much of a meeting.  I asked Doug if he

3    had time, could he stop by and look at this list, see if he

4    had anything, you know.  If he thought these people might get

5    mad at me.  I didn't want to turn it in, but I had to.

6    Actually, it was more of a -- I hadn't seen much of him, and

7    we're friends, and we asked each other how things were going,

8    and it was more of just a chitchat than anything.

9         And we didn't do anything with the list.  We didn't make

10   any changes.  We just looked at them, said whatever,

11   essentially.  And so the next day, I turned it in, and when it

12   was rejected, I, you know, I thought that I had done it

13   correctly.  I called the State Board of Elections and I said,

14   you know, he's refused to accept these list of challengers, so

15   now these other candidates are mad at me, saying that I

16   intentionally delayed turning it in, which was not the case at

17   all.

18        And they said, well, you have to read the calendar in the

19   front of the book.  So that's --

20   Q.   How long did that little gathering or the meeting between

21   you and Mr. Adams, how long did it last that evening?

22   A.   Less than an hour.

23   Q.   Yes.  And it was before the May, '02 primary; is that

24   correct?

25   A.   That's correct.

*C.M. BISHOP - Redirect (Mr. Westberry)*                                    13

1   Q.   Was there ever any discussion at that meeting about vote

2   buying?

3   A.   No.

4   Q.   Was there ever any discussion at that meeting about

5   pooling sums of money?

6   A.   No.

7   Q.   Now, I think, Mr. Bishop, you told us a little while ago

8   that was there a third time that you recall that you were at

9   Paul Bishop's garage or barn?

10  A.   That would have been the one that I mentioned a while

11  ago, it was in 2006 or 2007 when Carl Jackson had been elected

12  to replace Terry Davidson's slot.  I think it's District 3 as

13  a magistrate.  And he and Paul Bishop are big buddies.  Of

14  course, Carl's well liked all over the area.  He's a good guy.

15       And it was just another excuse for them to have a fish

16  fry, essentially.

17  Q.   How many people were at that occasion?

18  A.   Well, the barn or garage or whatever you want to call it,

19  it's a big, big place.  Probably about as big as this room.

20  It was full.  I mean, people eating and, of course, the band

21  was playing on top of a flatbed trailer, you know, like you

22  haul tobacco and things on.  The band was up there playing.

23  It's not really a band.  It's just a bunch of guys that get

24  together and play bluegrass, and they're really good.

25  Q.   And when, again, is your best recollection as to when

*C.M. BISHOP - Redirect (Mr. Westberry)*                          14

1    that final time that you were at the Bishop garage or barn

2    occurred?

3    A.   It was 2006 or 2007, and it could have even been 2008.  I

4    just can't remember things like that much.  But the records

5    would show that it was when Carl Jackson was elected to fill

6    the vacancy that had occurred because of Terry Davidson's

7    conviction for whatever he was convicted for.

8    Q.   At that or any of those other instances that you told us

9    about, the other two that you're at the garage, had you ever

10   been there when there was discussion about pooling substantial

11   sums of money for helping somebody's election campaign?

12   A.   No.  No.

13   Q.   Do you recall if Doug Adams or his wife were at that

14   final --

15   A.   I don't believe they were.  No, sir.

16   Q.   If someone had said, Mr. Bishop, that you were present at

17   a meeting at the Bishop garage or barn --

18        MR. SMITH:  Your Honor, I'm going to object.  He's

19   asking him to comment on the evidence in the case.

20        THE COURT:  Sustained.

21   Q.   You were asked some questions, Mr. Bishop, about whether

22   or not there was something improper in you and your office

23   prosecuting either a close friend or the child of a close

24   friend.  Do you recall that line of questioning earlier this

25   morning?

*C.M. BISHOP - Redirect (Mr. Westberry)*                              15

1    A.   Yes, sir.

2    Q.   And again, Mr. Bishop, how long have you been a county

3    attorney?

4    A.   I'm in my 25th year.

5    Q.   Have you been recognized for outstanding service on any

6    occasion?

7    A.   I've been, yes, sir.  I've been named outstanding county

8    attorney for the Commonwealth on two occasions, 1995 and 2006.

9    Five or six.  Can't recall the last one.  But twice, yes, sir.

10   Q.   And what office makes that or gives that recognition out?

11   A.   It's the office of the attorney general and the

12   Prosecutor's Advisory Council.

13   Q.   Is that made up of prosecutors of different political

14   parties?

15   A.   Yes, sir.  The Prosecutor's Advisory Council is made up

16   of the executive director, who is a deputy attorney general

17   for the state of Kentucky.  It's made up of three

18   Commonwealth's attorneys who are appointed by the governor.

19   It's made up of three county attorneys that are appointed by

20   the governor, and it's made up of two citizen at large

21   members, and I have also served on that Prosecutor's Advisory

22   Council under two different governors.  I was named to that

23   board by Brereton Jones and again by Governor Paul Patton.  So

24   I've served on that body as well twice.

25   Q.   And Jones and Patton, are they members of a different

*C.M. BISHOP - Redirect (Mr. Westberry)*                    16

1    political party than the one you're affiliated with?

2    A.   Yes, they are.

3    Q.   Are you aware, Mr. Bishop, of any rule, any law or

4    statute that would prohibit you or your office from

5    prosecuting either someone you know, a friend or perhaps a

6    family member of a friend?

7    A.   No.  If I were prohibited from prosecuting people who are

8    friends to me or I'm friends with their parents or someone in

9    their family, I mean, I would have nothing to do, which would

10   be lovely, but that's not the way it works.  I don't get to

11   pick and choose.  If the evidence is there and they're not kin

12   to me, then I don't -- you know, I don't have any reason to

13   recuse.  And I've never -- if someone has shown a reason, I

14   always say that's fine.  I don't want to have to do another

15   case if I don't, you know, have to.

16        I've never done anything -- and in that hearing, I said

17   if anybody can show me why I need to recuse, I'm outta here.

18   But otherwise, you know, it's -- we were just doing our jobs.

19   And when the evidence is there, I prosecute.  And if it's not

20   there, I have the same responsibility to seek justice.  And if

21   the evidence is not there, I have an obligation to see that

22   that case is not prosecuted.  That's my role, to seek justice.

23   Q.   You were asked questions about whether or not Melanda

24   Adams had come through your court and had been prosecuted by

25   your office; is that correct?

*C.M. BISHOP - Redirect (Mr. Westberry)*                                17

1    A.   That's correct.

2    Q.   Have you prosecuted children of other friends and

3    acquaintances of yours in Clay County over the years?

4    A.   Many.  Yes, unfortunately.

5    Q.   And is that anything out of the ordinary for a community

6    or a county the size of Clay?

7    A.   No, sir.  It happened just last week.

8    Q.   You were asked about an older criminal case from the late

9    1980s involving some criminal prosecution against Doug Adams

10   for something election related.  Do you recall that question?

11   A.   Yes.

12   Q.   Do you recall the questions from the prosecutor, from the

13   government about that older conviction in the late 1980s or,

14   excuse me, the older prosecution in the late 1980s earlier

15   today?

16   A.   Yes, he mentioned something about it, yeah.

17   Q.   Do you know whether or not it ever resulted in a

18   conviction?

19   A.   To my knowledge, they were all indicted, and I don't know

20   what happened from there, because it was from the

21   Commonwealth's attorney's office, not mine.

22   Q.   Do you have any personal knowledge about what led up to

23   that?

24   A.   No, I do not.  The grand jury in Clay County is run

25   primarily by the Commonwealth's attorney and now exclusively

*C.M. BISHOP - Redirect (Mr. Westberry)*                    18

1   by Commonwealth's attorney.  When I first became county

2   attorney in 1986, the clerk of the court, the court reporter,

3   called me and said the grand jury wants you here now.

4       And I did handle grand jury proceedings when Gillis

5   Colson was the Commonwealth's attorney for a brief, short

6   period of time.  Since then, it's been handled by the

7   Commonwealth's attorney's office, and that's the way it is

8   everywhere, as far as I know.  I don't do the grand jury.

9       So they were -- those indictments came from the Clay

10  County grand jury, and that was from the Commonwealth's

11  attorneys office, not my office.  I don't recall ever having a

12  complaint about an election, election problem.  Those

13  complaints usually go -- because the grand jury has the duty

14  to look over all of the records that are submitted to them,

15  which must be submitted after every single election.  They

16  have to look at all the stuff.  And the grand jury is the one

17  who makes that decision as to whether or not people are

18  indicted or not.

19  Q.   Okay.

20  A.   Not me.

21  Q.   You were shown an exhibit that the government identified

22  as P42.  It was a newspaper article from several years ago

23  there in Manchester, and it had a picture of a lot of people

24  with an elected Congressional official.  Do you remember that

25  being shown to you a little earlier today?

*C.M. BISHOP - Redirect (Mr. Westberry)*                                    19

1    A.   Yes, sir, I do.

2    Q.   Do you have P42 --

3            MR. WESTBERRY:  May I ask that the witness be shown

4    P42?

5            THE COURT:  Yes.

6    A.   Yes, sir.

7    Q.   I believe you've said that you have recollection of

8    making that trip to Washington, D.C. area; is that correct?

9    A.   That is correct.  I was there to participate in a

10   domestic violence conference.  I'm almost positive -- could

11   have been child support, but I think it was domestic violence.

12   Q.   From your personal knowledge, what was the purpose,

13   though, of the larger group making that trip to the D.C. area

14   to meet with what appears to be Senator Bunning?

15   A.   Senator Robert Stivers put that together.

16   Q.   And what was the purpose of that meeting?

17   A.   It was to go and -- I don't really know.  It was to go

18   and meet with -- they also met with Senator McConnell later

19   that day.  I did not, because I had to go back to my

20   conference.  But I did introduce all of these folks except one

21   young man.  I didn't know him at the time.  It was Jamey

22   Mills, but, you know, that's the only one I did not know.  And

23   I introduced them all to Senator Bunning.

24        The purpose was to try and tell the delegation in

25   Washington that Clay County was in need of whatever they could

*C.M. BISHOP - Redirect (Mr. Westberry)*                    20

1    do to help us with infrastructure, anything.  Any federal

2    monies that could be of benefit for the county.  That's what I

3    took it to be, because you had the leaders of the community

4    and the elected officials, Chamber of Commerce, that sort of

5    thing.

6        So it was just a community effort to try and explain to

7    the Washington delegation that we needed help.

8    Q.   Looking at that picture, the number of individuals that

9    are contained on P42, are you able to identify some on that

10   picture who were connected at the time to the City of

11   Manchester in Manchester city government?

12   A.   Yes, sir.

13   Q.   Just what's the date on that newspaper article again,

14   please?

15   A.   That is Thursday, February the 5th, 2004.

16   Q.   Okay.  Roughly six years ago, correct?

17   A.   Yes, sir.

18   Q.   Now, can you identify some faces on that photograph of

19   folks that were connected with city government in Manchester

20   at that time?

21   A.   Yes, sir.  Starting from this side over here with Mr.

22   Todd Roberts.

23   Q.   What was he again, please?

24   A.   He was the assistant chief of police of Manchester.

25   Q.   Okay.  Who else, Mr. Bishop?

*C.M. BISHOP - Redirect (Mr. Westberry)*                    21

1    A.   The next one with city government would have been Penny

2    Robinson.  She was an elected city councilwoman.

3    Q.   Okay.

4    A.   And next to her, Ouchie Jackson.  I think his name is

5    Gary.

6    Q.   Yes, sir.  What was he at the time?

7    A.   City councilman.  Sherrie House, city councilwoman.

8    Behind her, I believe, is former mayor Daugh K. White.  And

9    then there's Kennon White, but I'm not sure if he held any

10   position at that time or not.

11   Q.   Had he previously held a position with the City?

12   A.   He did at some point in time.  He was -- I forgot what

13   they call him.  City -- I don't -- he held some position.  But

14   quite frankly, I forget what his title was, if there was a

15   title.  Next to him is the gentleman I didn't know at the time

16   I made the introductions, and I was embarrassed, but I know

17   him now to be then city councilman Jamey Mills.

18   Q.   Okay.

19   A.   He's no longer on the city council.  Well, I don't know

20   if he is or not.  He's running for coroner this time.  So I

21   don't know.

22   Q.   Just kind of move through it.  I'm just trying to get a

23   flavor of all of the city officials that would have been

24   there.  Then I have a question for you.

25   A.   Okay.  Then there's over here, just beside Senator

*C.M. BISHOP - Redirect (Mr. Westberry)*                    22

1    Bunning, there's Vernon Hacker, just behind Senator Stivers.

2    Vernon Hacker was a city councilman, I do believe, at that

3    time.  And then Darnell Hipsher was a city councilman.  And

4    that's it for the city, as far as I can tell.

5    Q.   Thank you.

6    A.   Yes, sir.

7    Q.   Do you now know, years later, after, of course, the

8    photograph's been taken, Mr. Bishop, that a number of those

9    city officials that you identified have been convicted in

10   federal court of felony crimes?

11   A.   Yes, sir.

12   Q.   Okay.  Would that involve former assistant police chief

13   Roberts?

14   A.   Yes.  Yes.

15   Q.   Would that involve former Manchester mayor Daugh White?

16   A.   Yes.

17   Q.   Would that involve his son and former city official in

18   some capacity Kennon White?

19   A.   Yeah, I'm not sure of his status, but I think he's pled

20   guilty.  I think.

21   Q.   How about Vernon Hacker?

22   A.   Yes.

23   Q.   How about Darnell Hipsher?

24   A.   Yes.

25   Q.   At the time that you were traveling with the other group

*C.M. BISHOP - Redirect (Mr. Westberry)*                    23

1    to D.C. on that meeting with your senators, did you have

2    personal knowledge yourself that, for example, Kennon White

3    had been involved in a kickback scheme?

4    A.   No, sir.

5    Q.   Did you have personal knowledge yourself that Daugh White

6    had also been involved in a kickback scheme?

7    A.   No, sir.

8    Q.   Would you agree that simply having your picture in a

9    newspaper, a local newspaper article by itself is not --

10           MR. SMITH:   Object.   That's going to be argument,

11   Your Honor.

12           THE COURT:   Sustained.

13   Q.   You do see Senator Bunning in that picture; do you not?

14   A.   Oh, yes, sir.   He and I were the first ones at the

15   meeting.   We visited for about 15, 20 minutes before anybody

16   else showed up.   And he said, are you it?   I said, I hope not.

17   But again, I was there by myself, essentially, until the rest

18   of them showed up.   I was there anyway.

19   Q.   No one's alleged he did anything wrong that you are aware

20   of, correct?

21   A.   Senator Bunning?

22   Q.   Yes, sir.

23   A.   Not that I'm aware of.

24   Q.   You were asked some questions by Mr. Smith on behalf of

25   the government about your brother, William Hugh Smith [sic],

*C.M. BISHOP - Redirect (Mr. Westberry)*                    24

1    and jobs he's held in the school system?

2    A.   William Hugh Bishop, um-hmm.

3    Q.   Excuse me, I'm sorry.  At about the time that you were

4    asked about those jobs, do you have personal recollection if

5    your brother was having health problems at that time?

6    A.   Yes, sir.

7    Q.   Can you tell us what you recall?

8    A.   Yes, sir.  He had a very serious cancer, and he had --

9         MR. SMITH:  Your Honor, I'm going to object to the

10   relevance.

11        THE COURT:  I'll overrule.  You can ask some limited

12   questions on this.

13        MR. WESTBERRY:  Sure.

14   Q.   What is your recollection about his cancer, please?

15   A.   Went to see him in the hospital.  He had a large mass in

16   his intestines.  They were able to remove that --

17        MR. SMITH:  Your Honor, I'm going to object again, as

18   to being --

19        THE COURT:  I will sustain any details as to this.

20        MR. WESTBERRY:  We can move on.

21   Q.   Do you have any personal knowledge if any job or position

22   that your brother, William Hugh, held in the school system was

23   ever obtained on the basis of politics?

24   A.   No.  No, sir.

25   Q.   Do you have any knowledge, and I know you may not, but

*C.M. BISHOP - Recross (Mr. Smith)*                                      25

1    did any change in job that he may have had within the school

2    system, from your personal knowledge, would it have been in

3    account of any health concerns that he had at the time?

4    A.   Yes.

5    Q.   And why do you say that?  I'm not asking you to get into

6    all the details of his cancer --

7                 MR. SMITH:  I'm going to object.  This is outside the

8    witness's knowledge.  It would be hearsay if his brother told

9    him.  It would be hearsay if the school told him.

10                THE COURT:  Sustained.

11                MR. WESTBERRY:  May I have just one second, please?

12                THE COURT:  Yes, sir.

13                MR. WESTBERRY:  Thank you, Mr. Bishop, for your

14   courtesy.  Judge Reeves, we pass the witness.

15                THE COURT:  All right.  Thank you.  See if there's

16   any additional cross-examination.  Mr. Smith?

17                MR. SMITH:  Yes, sir.

18                          RECROSS-EXAMINATION

19   BY MR. SMITH:

20   Q.   Mr. Bishop, I'd like to clear up just a couple things in

21   your testimony, if we could.  You've testified in front of

22   this jury that you were personally aware that Jennings White

23   interjected himself in the selection of election officers.  Is

24   that a fair statement?  You agree with that?

25   A.   Yes.

*C.M. BISHOP - Recross (Mr. Smith)*                              26

1    Q.   Okay.  And you state that based on the fact that you were

2    part of the Board of Elections?  That's how you based your

3    testimony; is that a fact?

4    A.   I saw it.

5    Q.   All right.  And it's your testimony, in front of this

6    Court and this jury, that you were part of the Board of

7    Elections at the time that election officers were selected by

8    Jennings White?  Is that your testimony?

9    A.   Yes, I was.

10   Q.   All right.  Now, Mr. Bishop, you all keep records with

11   your Board meetings; isn't that a fact?

12   A.   The secretary or the deputy clerk does, yes.

13   Q.   By law, it's required; isn't that a fact?

14   A.   Absolutely.

15   Q.   And do you have any reason to believe that this person

16   who would keep the minutes of those meetings would be

17   dishonest or would fail to report accurately what's happened

18   in your meetings?

19   A.   I hope not, but I don't know.

20   Q.   It's never been brought to your attention before, has it?

21   A.   No, sir.

22   Q.   Mr. Bishop, isn't it a fact, sir, that you were not part

23   of the Board of Elections at any time election officers were

24   selected by Jennings White?

25   A.   Well, I -- yeah, I was.

*C.M. BISHOP - Recross (Mr. Smith)*                                27

1   Q.   That's your testimony.  Isn't it a fact, sir, that the

2   June 7, 2000 meeting, it reflected that that was the time

3   which you were first appointed as the Republican commissioner.

4   Isn't that true?

5   A.   I'd have to check.  I don't remember.

6           MR. SMITH:  Your Honor, I think in order to proceed

7   with this witness, I'm going to request Exhibits PR16I, PR16J,

8   PR16K, and PR16L.

9           THE COURT:  Yes, sir.

10  Q.   Could you read there on page 2 of PR16I, I believe it

11  says there in the middle of the page, July, no meeting.  New

12  board member.  Do you see that?

13  A.   16J.

14  Q.   Page 2, 16I.

15  A.   16J?

16  Q.   16I.

17  A.   I?

18  Q.   Yes, sir.

19  A.   This is 16I.  That was March, 2000?

20  Q.   May 5th, 2000.

21  A.   Okay.  May the 5th, 2000.  I don't see that one here.

22  Let me find it.

23  Q.   You may have to remove them from the sleeve there.  I'm

24  not sure that you're seeing the whole document.

25  A.   5 May, 2000?

*C.M. BISHOP - Recross (Mr. Smith)*                                      28

1    Q.   Look at the middle of the page.  July, no meeting.  Do

2    you see that line?  New board member, Clay M. Bishop, filled

3    bond for Republican commissioner August 2nd, 2000.

4    A.   That the May 5?  I'm sorry.

5    Q.   Yes, sir.

6    A.   Okay.

7    Q.   Exact middle of the page.

8    A.   Right in the middle of the page.  July, no meeting.  New

9    board -- yes.  Yes, I see that.

10   Q.   Does that refresh your memory, sir, on when you actually

11   became the new member of the Clay County Board of Elections?

12   A.   I guess it does, yeah.

13   Q.   And would you agree with me, sir, that there was no

14   election in which you were selecting election officers in the

15   fall of 2000?  Would you agree with me with that?

16   A.   I couldn't remember.  Again, that's too far back.  I

17   can't remember stuff like that.

18   Q.   You just don't remember?

19   A.   No, I don't.

20   Q.   Do you remember an election in 2001?  There was no

21   election in 2001, was there, Mr. Bishop?

22   A.   I don't know.  Used to have them every year, and then

23   after 2000, I think it was every two years.  But it used to be

24   an every year thing.

25   Q.   Check PR16J, refresh your memory as to whether or not

*C.M. BISHOP - Recross (Mr. Smith)*                                    29

1    there were any election officers chosen in 2001.

2    A.   16J would that be dated September, 2001?  September 18?

3    Q.   That would be correct.

4    A.   Okay.  What was your question again?

5    Q.   Isn't it true, Mr. Bishop, there were no election

6    officers selected by your board for 2001?

7    A.   Well, I can't really tell.

8    Q.   Isn't it a fact, sir, that you were not a part of the

9    Board in 2002, because you were a candidate for public office

10   and you had your brother, William Hugh Bishop, serve in your

11   stead?  Isn't that a fact?

12   A.   It was a fact that I did not serve.

13   Q.   So if you're not serving on the Board, then you don't

14   choose election officers; is that fair?

15   A.   For 2000 -- for that time, yes.

16   Q.   2002, you did not participate in the selection of

17   election officers because you were not a part of the Board.

18   Isn't that true?

19        MR. WESTBERRY:  Judge, I would object.  I think the

20   witness -- I sense he's trying to finish an answer, and Mr.

21   Smith --

22        MR. SMITH:  That's fair.  Mr. Bishop, please answer

23   my question, and I'll give you as much time as you need.

24   A.   I did not participate in the selection of election

25   officers during the election year for 2002 as a member of the

*C.M. BISHOP - Recross (Mr. Smith)*                                30

1    Board of Elections.  I was still chairman of the Republican

2    party.  But no, I didn't sit on the Board of Elections once it

3    was told to me that I had to resign or whatever it is that

4    they do.

5    Q.  And yet, your testimony in front of this Court and this

6    jury is that you personally witnessed Jennings White directing

7    and controlling the election officer selection, and that's not

8    true, is it, Mr. Bishop?

9    A.  No, I didn't say for 2002.  I saw him do it at other

10   times.

11   Q.  Well, you just admitted with me that you just got

12   appointed in 2000, sir.  Isn't that a fact?

13   A.  That's what the record shows.

14   Q.  And you're agreeing me that there was not an election

15   that you recall in 2001.  Isn't that a fact, sir?

16   A.  Yes.

17   Q.  And you're a candidate in 2002, and you removed yourself

18   from the Board; isn't that a fact?

19   A.  I think so.

20   Q.  And so now, you want to still remain with your testimony

21   to this Court and this jury that you have observed Jennings

22   White, because you would agree with me, would you not, sir,

23   that Jennings White was defeated as a county clerk in 2002?

24   Isn't that a fact?

25   A.  Yes, sir.

*C.M. BISHOP - Recross (Mr. Smith)*                                        31

1    Q.   So you explain to this Court and this jury right now, Mr.

2    Bishop, how you could have witnessed this if you were not a

3    member until 2000?  He's defeated in 2002.  Would you explain

4    that, please?

5                MR. WESTBERRY:  Objection, Your Honor.  The tone.

6                THE COURT:  Overruled.

7    A.   There were times when -- the Board of Elections is an

8    open meeting.  There are times when you can observe whatever

9    they do.  And I, if I happened to be there and saw what he did

10   and was complained about what he did by other people, why they

11   were election officers in Whites Branch for all these years

12   and suddenly they're not, and they were blaming me.  I said

13   hey, it wasn't me.

14   Q.   Mr. Bishop, again, isn't it a fact that there are minutes

15   that are prepared for each of these meetings?

16   A.   There's supposed to be.

17   Q.   And if there's persons present, isn't it a fact that it's

18   noted in the record?

19   A.   Supposed to be.

20   Q.   I'd like for you now to look over the record, and you

21   show me where it shows that you were present not as a Board

22   member, but as an observer, where these things that you tell

23   this Court and this jury occurred.

24   A.   Oh, no, it doesn't show who might be present as a

25   visitor.

*C.M. BISHOP - Recross (Mr. Smith)*                                    32

1    Q.  Oh, it doesn't?

2    A.  No.

3    Q.  You're sure about that?

4    A.  Yeah.

5    Q.  I can show you parts there where it says Don Nolan was

6    present and observing.

7            MR. WESTBERRY:  Objection as to form.

8    Q.  Don Nolan is not a member of the Board of Elections.

9            THE COURT:  Sustained.  You can rephrase the

10   question.

11   Q.  Isn't it true, Mr. Bishop, that Don Nolan was not a

12   member of the Board of Elections in 2002?

13   A.  I don't know.  I don't think he was.

14   Q.  You testified already you had personal knowledge of who

15   was a member, and you've listed him as Jennings White as the

16   county clerk, Edd Jordan as the sheriff, you as the

17   Republican, later replaced by your brother before the election

18   and Charles Wayne Jones as the Democrat.

19   A.  Okay.

20   Q.  Would you agree with me, sir, that Don Nolan is not a

21   member of the Board?

22   A.  At that time -- I don't think he ever has been.

23   Q.  And his name's noted in there --

24   A.  Okay.

25   Q.  -- as being present.  You want an opportunity to look for

*C.M. BISHOP - Redirect (Mr. Baldani)*                              33

1    your name in there, sir, being present?

2    A.   No.

3    Q.   Because it's not in there, is it, sir?

4    A.   I don't know.  I might look through it all if you want me

5    to.  I can.

6              MR. SMITH:  That's all the questions I have.

7              THE COURT:  First, let me go with the other

8    defendants.

9              MR. HOSKINS:  No questions.

10             MR. WHITE:  No questions.

11             MR. ABELL:  No questions.

12             MR. BALDANI:  I do, Judge.  I'll ask from here.

13             THE COURT:  Keep your voice up, please.

14             MR. BALDANI:  I will.

15                        REDIRECT EXAMINATION

16   BY MR. BALDANI:

17   Q.   Mr. Bishop, do you have personal knowledge of a lawsuit

18   being filed against Jennings White in '02 regarding his

19   manipulation of election officers?

20   A.   Can't say as I do.

21   Q.   Don't have any recollection of that?

22   A.   No, sir.

23             MR. BALDANI:  That's all, Your Honor.

24             THE COURT:  All right.  Anyone else?  Mr. Westberry

25   just a moment if you need to confer.

*C.M. BISHOP - Further Direct (Mr. Westberry)*                    34

1          MR. WESTBERRY:  No, I'm ready to proceed.  Thank you.

2          THE COURT:  Please proceed.

3          MR. WESTBERRY:  Thank you, Judge.  May I from here,

4    Judge Reeves?

5          THE COURT:  You may want to pull the microphone a

6    little closer, make sure everybody can hear.

7                      FURTHER DIRECT EXAMINATION

8    BY MR. WESTBERRY:

9    Q.  Hello again, Mr. Bishop.  Mr. Smith on behalf of the

10   government asked you about some of the minutes from some of

11   the older Board of Elections meetings from years past.  Do you

12   remember that line of questioning just a few moments ago, sir?

13   A.  Yes, sir.

14   Q.  From your experience as having been a past member of the

15   Board, can you say whether or not -- do those minutes always

16   reflect everybody who may have been in attendance at a Board

17   of Elections meeting?

18   A.  I seriously doubt it.

19   Q.  Why do you say that, sir?

20   A.  Well, because people come and go sometimes.  Candidates

21   sometimes come and go.  When there's a tally of the absentee

22   votes, some candidates like to be there to see, or some

23   candidates send somebody to be there to watch us count them.

24   So people come and go, and I don't think that they, you know,

25   keep them all.  I don't know.  It's not my job to keep them

*C.M. BISHOP - Further Direct (Mr. Westberry)*                    35

1    down.  So, you know, I just try to not meddle in other

2    people's affairs any more than I have to.  It's just not my

3    job, and it's -- it's against my religion, quite frankly, to

4    be a busybody.

5    Q.   You were asked questions by Mr. Smith about Jennings

6    White and whether or not he had attempted to manipulate the

7    appointment of election officers in years past.  Do you recall

8    that line of questioning?

9    A.   Yes.

10   Q.   Just to be clear, to the best of your recollection, what

11   time frame were you referring to when you mentioned Jennings

12   White trying to influence the selection of election officers?

13   A.   Must have been in 2000.

14   Q.   Why do you say that, sir?

15   A.   Well, because I remember getting dressed down pretty good

16   by a lady who had served as the judge at Whites Branch

17   precinct for many years.  And she was very upset because she

18   didn't understand why she was not the judge for that period of

19   time.

20          MR. SMITH:  Your Honor, I'm going to object to the

21   hearsay.

22          THE COURT:  Sustained.

23   Q.   You were shown a -- one of the exhibits, I believe it was

24   16I, the May 5, 2000.  It looked to me, I think I understood

25   it to be some minutes from the Board of Election, and I think

*C.M. BISHOP - Further Direct (Mr. Westberry)*                    36

1    it referenced you being a new member of the Board.  Do you

2    recall that one, Mr. Bishop?

3    A.   I think I'm looking at it right now.

4    Q.   My question really is this.  Do you have any personal

5    knowledge whether that referenced a reappointment to the Board

6    of Elections by you?

7    A.   May 5 of 2000?

8    Q.   Yes, sir, May 5 of 2000.  16I.

9             MR. SMITH:  Your Honor, I'm going to object to the

10   leading.

11            THE COURT:  Overruled.

12   Q.   Perhaps the better way to ask the question, from your

13   experience, do people in the past get reappointed to the Board

14   of Elections, if you know?

15   A.   Yes.

16   Q.   Do you have any knowledge if that is what is being

17   referenced there?

18   A.   I think it is.

19   Q.   And why do you say that, sir?

20   A.   Well, that's just, that's the only thing that makes sense

21   to me.  These are not great notes.  But that's the only way

22   that I can make sense of it.

23   Q.   Sure.

24            MR. WESTBERRY:  Please, Your Honor, just one second.

25   Q.   Mr. Bishop, I believe you indicated earlier today that

*C.M. BISHOP - Further Direct (Mr. Westberry)*                    37

1   you know an individual named Kenny Day, correct?

2   A.   Yes, sir, I do.

3   Q.   And do you know that Kenny Day has been convicted for

4   drug activity?

5   A.   Yes.

6   Q.   Do you know, do you recall that Kenny Day was convicted

7   of drug activity back in about --

8           MR. SMITH:  Your Honor, I'm going to object as to the

9   leading.

10          THE COURT:  Yes, sustained.

11  Q.   Do you have any recollection as to when Kenny Day would

12  have first been convicted of drug activity?

13  A.   Sometime in the late -- mid to late '90s.

14  Q.   And had Kenny Day been a member of the Board of Elections

15  at some time?

16  A.   Yes, he had.

17  Q.   Does this refresh your memory now?

18  A.   Yes.

19  Q.   What did you recall, did you take Kenny Day's place as a

20  member of the Board of Elections?

21  A.   As far as I know, I was the first one to fill that seat.

22  As far as I know.  Yes.  Kenny Day was put on the bottom of

23  the list of five by the former chairman of the party that was

24  sent to Frankfort.  I advised him not to do that.  He did it

25  anyway.  And sure enough, even though he was at the bottom of

*C.M. BISHOP - Further Direct (Mr. Westberry)*                    38

1    the list of five, they picked him.

2    Q.   Every time a new election commissioner takes place, from

3    your personal knowledge, is it necessary that a new bond be

4    posted?

5    A.   I think that's required.

6    Q.   And as party chairman, even though you may not at that

7    time have been on the actual Board of Election, as party

8    chairman, would you have been aware of activity on the Board

9    of Elections from time to time?

10   A.   Absolutely.  I was -- yes, absolutely.  I was the

11   chairman, I guess council, you know.  I mean, he -- I was with

12   him whenever he made decisions about things, and he made a bad

13   decision when he did that.

14   Q.   Did what?

15   A.   Put Kenny Day's name on that list.

16        MR. WESTBERRY:  May I have one second, please?

17        THE COURT:  Yes, sir.

18   Q.   One last question.  From your personal knowledge, even if

19   you had previously served as a member of the Board of

20   Elections, if you get reappointed, do you know if it is

21   necessary for a new bond to be posted?

22        MR. SMITH:  Object, Your Honor.  He's asking this

23   witness now to speculate.

24        THE COURT:  Overruled.  He's asking him based on his

25   own personal knowledge.

*C.M. BISHOP – Further Cross (Mr. Smith)*                    39

1    A.   As far as I know, to the best of my knowledge, yes.   It

2    is.

3              THE COURT:  All right.  Thank you.

4              MR. WESTBERRY:  Thank you, Mr. Bishop.  Judge, we

5    pass the witness.

6              THE COURT:  See if there's any further examination of

7    the witness.  Mr. Smith.

8                      FURTHER CROSS-EXAMINATION

9    BY MR. SMITH:

10   Q.   Mr. Bishop, if I understand your testimony now, you're

11   telling this Court and this jury that you were serving prior

12   to 2000 when it says you were the new board member appointed

13   August 2nd, 2000.  Is that your testimony now?

14   A.   No, sir.  I don't know if I was or not.  I can't

15   remember.  Looks as though it was 2000 when I took over, but I

16   really don't remember it.  The records would have to say.

17   Q.   So I'm sorry.  I thought you were agreeing that you took

18   over when Kenny Day was convicted.  Am I mistaken in my

19   recollection of your answer, because I need to get that really

20   firmed up here.

21   A.   You seem to be mistaken by a lot of what I say, but

22   that's all right.

23             MR. SMITH:  I want to ask the judge to strike that

24   from the record, because it's unresponsive, number one, to my

25   question.  And I will make that motion at this time.

*C.M. BISHOP - Further Cross (Mr. Smith)*                          40

1        THE COURT:  I will sustain the motion.  The jury will

2   disregard this witness's last comment as a non-responsive

3   answer.

4   Q.   Now do you want to answer the question?  Do you need me

5   to restate the question, sir?

6   A.   Yeah.

7   Q.   I need it cleared up for the court and the jury whether

8   or not your testimony here today is that you are stating to

9   this Court and this jury today that you were the next

10  Republican -- that you took over at the time Kenny Day was

11  arrested in Florida for his cocaine trafficking charges down

12  there.  Is that your testimony?

13  A.   No, I don't think that's accurate.  Here's how I remember

14  it.  I had, as chairman of the party, I had to write his wife,

15  Sonya, a letter saying that pursuant to the rules of the party

16  and the laws of the state that Kenny could no longer serve as

17  the Republican commissioner on the Board of Elections.

18       She was kind enough to write me a letter back and say

19  thank you.  I hereby, on behalf of my husband, resign, just

20  post as such.  And then whatever the process is that the State

21  Board of Elections makes the County Board of Elections go

22  through, that's what happened.  Whatever that was.  So I can't

23  remember all that stuff.

24       But did I immediately take over upon his conviction?  No.

25  It's not something -- it's not that easy.  You have to -- the

*C.M. BISHOP - Further Cross (Mr. Smith)*                    41

1   list has to be submitted, the State Board of Elections has to

2   approve everything, and they actually appoint from that list

3   that is submitted.

4   Q.   And isn't it a fact, sir, that you were not eventually --

5   you were not put in place until August the 2nd, 2000?  Isn't

6   that a fact?

7   A.   Again, I don't know for sure.  That's what this one thing

8   says that I was sworn in or whatever.  But that could have

9   been because I was -- it was time.  I just can't remember.

10  Q.   Well, if a four-year term would have preceded 2000, that

11  would have put us in '96; isn't that correct?

12  A.   I'm sorry?

13  Q.   If you were there for renewal, that's a four-year term.

14  You would have been renewing from your '96 appointment; isn't

15  that a fact?

16  A.   Well, I don't know, because I don't know if I was

17  appointed in '96.

18  Q.   Isn't it a fact, sir, that if you were on the Board,

19  19H -- I'm sorry, 16H, which is before you, your name would be

20  on there as signing off on these minutes in '99?

21  A.   16H?

22  Q.   PR16H.  Minutes for the 1999 year.

23  A.   I don't have 16H.

24  Q.   Well, I'll read for you the names that are listed on

25  January the 6th of 1999.  Jennings White, Edd Jordan and Billy

*C.M. BISHOP - Further Cross (Mr. Smith)*                    42

1    Jones.  Has no fourth member.  Your name's not on there, would
2    you agree with me?
3    A.   If you say.  I don't have that.
4    Q.   Billy Jones is, in fact, the brother of Charles Wayne
5    Jones, who served before Charles Wayne took over; isn't that a
6    fact?
7            MR. WHITE:  Objection, Your Honor.  Testimony.
8            THE COURT:  Overruled.
9    A.   He's the brother.
10   Q.   Okay.
11   A.   I don't know if he served.  I can't remember.  Seems like
12   I served with Billy, though.  Seems like I did.
13   Q.   Seems like --
14   A.   A long time ago.
15   Q.   Well, sir, do you not have 16H in front of you?
16   A.   No, I sure don't.
17           MR. SMITH:  Let's give the witness 16H.  I'm sorry,
18   Your Honor.
19           THE COURT:  Get the exhibits from the witness and
20   give those to Mr. Smith, let him review those, see if 16H is
21   included.  Kim, do you have 16H?
22           DEPUTY CLERK:  Yes, Your Honor.
23           THE COURT:  16H is here, Mr. Smith.  It's here at the
24   clerk's desk.
25           MR. SMITH:  If I could have that, please.  It may

*C.M. BISHOP - Further Cross (Mr. Smith)*                              43

1    speed it along if I can use the Elmo.

2              THE COURT:  It's been admitted.  You may display it.

3    Q.   All right, Mr. Bishop.  You should have in front of you

4    16H.  Do you see that?

5    A.   Yes, sir.

6    Q.   The top of that reads January 6, 1999.  Do you see your

7    name signing on as a board member in January of 1999, sir?

8    A.   No, sir.

9    Q.   Let's move down to February, 1999.  Do you see your name

10   signed on there as a board member in February, 1999, sir?

11   A.   No, sir.

12   Q.   Move on down to March of 1999.  Do you see your name

13   there in March of 1999, sir?

14   A.   No, sir.

15   Q.   Mr. Bishop, isn't it a fact that you were not appointed

16   to that board until August, 2000, sir?

17   A.   It's very possible.  I simply can't remember.

18   Q.   Your testimony further in front of this jury, I believe,

19   is that it was that August, 2000 meeting now that you recall

20   specifically where Jennings White controlled and dictated who

21   was going to be the election officers; is that your testimony?

22   A.   No.  That's not what I said.

23   Q.   You didn't testify to that?

24   A.   No, I said that I have been at meetings where Jennings

25   White did what he wanted to do.  And one particular

*C.M. BISHOP - Further Cross (Mr. Smith)* 44

1    instance -- one particular instance, I remember because

2    there's no way to forget something like that, when a good

3    friend of 30 years calls you and tells you why haven't I been

4    appointed as election officer in my precinct?

5    Q.   And I believe your testimony was that it was in 2000, at

6    the suggestion of counsel for Mr. Adams, it was 2000, you

7    believe that would have had to been the meeting when it

8    happened.  Is that not your testimony?

9             MR. WESTBERRY:  Objection.

10            THE COURT:  I'll overrule.  He can testify as to what

11   his recollection of his testimony was or what it is now.  So

12   he'll be able to answer the question.

13   A.   I can't remember any particular time of any particular

14   meeting when Jennings did what it was that he did.  Those

15   meeting were run haphazardly at best.  Jennings would appear

16   and then escape into his office and come back out.  It was, it

17   was not a Board of Elections meeting, essentially.

18   Q.   Well, I'm trying to understand your testimony, because I

19   think you would agree with me that you did not participate in

20   the selection of the 2002 election officers?

21   A.   I think that's absolutely correct.

22   Q.   And if you agree with me now that the record is right

23   that it was August 2nd, 2000, then the only other meeting that

24   would have been held to select election officers would have

25   been the one prior to the May, 2000 election; isn't that a

*C.M. BISHOP – Further Cross (Mr. Smith)*                          45

1    fair statement?

2    A.   The one prior to the May, 2000?

3    Q.   Yeah, because Board of Elections have to select their

4    members by a March date, the year before a primary and general

5    election is held in the state of Kentucky pursuant to the

6    Kentucky revised statute; isn't that a fact?

7    A.   The Board of Elections has to appoint new election

8    officers every single year in March.

9    Q.   And it has to be done in March?

10   A.   Yes.

11   Q.   My question is, Mr. Bishop, selection for the 2000

12   election would have had to have occurred in March; isn't that

13   a fact?

14   A.   Yes.

15   Q.   And in this exhibit that we've directed you before, going

16   to direct your attention to that March meeting, and I've

17   highlighted it, you see chairman Jennings White's absence

18   noted in the record, sir?

19   A.   Yes, sir, I do.

20   Q.   So whether or not you were a member of the Board or an

21   observer of the Board meeting, the fact is the record shows

22   Jennings White wasn't even present when the 2000 election

23   officers were selected; isn't that a fact?

24   A.   That's what it shows.

25            MR. SMITH:  Thank you.

*C.M. BISHOP – Further Direct  (Mr. Westberry)*                    46

1        THE COURT:  All right.  Let me see if there are any

2    questions about this particular issue.  We're going to narrow

3    it down just for this issue.  Mr. Westberry?

4        MR. SMITH:  Sorry, Your Honor.  I'll retrieve these

5    exhibits.

6        THE COURT:  That's fine.

7        MR. WESTBERRY:  One last question.

8                   FURTHER DIRECT EXAMINATION

9    BY MR. WESTBERRY:

10   Q.  Regardless of when you recall you were appointed to the

11   Board of Elections, did you regularly attend those meetings as

12   chair of the party?

13   A.  Yes, I did.  It's my duty to turn in those lists, as I

14   said, that were turned in yesterday by my secretary because I

15   was here.  And yes, I do.  Yeah, I went down there to see, to

16   see if things were going as they were supposed to go for the

17   Republican party, if our people got selected.

18   Q.  Regardless of when this incident with Jennings White

19   occurred, are you clear in your recollection about what you've

20   testified to?

21   A.  Yes.

22       MR. SMITH:  Your Honor, I'm going to object to

23   vouching for his own testimony here today.

24       THE COURT:  I'll sustain the objection.  I think

25   we've exhausted this issue.

*C.M. BISHOP – Further Direct  (Mr. Westberry)*          47

1              MR. WESTBERRY:  I think we have too.  Thank you,

2      Judge.

3              THE COURT:  All right.

4              MR. WESTBERRY:  Thank you, Mr. Bishop.

5              THE WITNESS:  You're very welcome.

6              THE COURT:  I'm going to excuse the witness at this

7      time, assuming there are no further questions of the witness.

8              MR. SMITH:  That's fine.

9              THE COURT:  Step down.  You're excused.  Before we

10     continue, I want to make sure we have the exhibits up here,

11     all the exhibits that have been admitted at this point.  Mr.

12     Smith, I believe D86 was not admitted as an exhibit; is that

13     correct?

14             MR. SMITH:  Yes, Your Honor, I did not move for its

15     introduction.  If the Court would allow, I can make that a

16     Court exhibit.  It was referenced in our examination.

17             THE COURT:  That will be fine.  It will be the next

18     numbered Court exhibit.  I'm not sure where we are in the

19     Court exhibits, but it would be the next numbered exhibit.

20                     (Court Exhibit No. 7

21                      was admitted into evidence.)

22             THE COURT:  Mr. Westberry, you may call your next

23     witness.

24             MR. WESTBERRY:  May I have a moment?

25             THE COURT:  You may have just a moment, yes, sir.

GROSS - Direct (Mr. White)                                    48

1         MR. WESTBERRY:  Thank you, Judge Reeves.  May it

2    please the Court, at this juncture of the trial, after

3    considering everything that we have, on behalf of Doug Adams,

4    we are announcing that we are prepared to close.

5         THE COURT:  All right.  Thank you.  Before we

6    proceed, let me make sure, Mr. White, are you ready to

7    proceed?

8         MR. WHITE:  I am, Your Honor.  I think I have two

9    witnesses, neither of which will take very long.

10        THE COURT:  You may proceed.  Who will be your first

11   witness?

12        MR. WHITE:  My first witness will be Doris Gross,

13   Your Honor.

14        THE COURT:  Doris --

15        MR. WHITE:  Doris Gross, G-r-o-s-s.

16             DORIS GROSS, DEFENSE WITNESS, SWORN

17        THE COURT:  Thank you, Mr. White.  You may proceed.

18        MR. WHITE:  Thank you, Your Honor.

19                      DIRECT EXAMINATION

20   BY MR. WHITE:

21   Q.  Good afternoon.  My name is Scott White.  I'm a lawyer.

22   I think we've met.  I represent Wayne Jones back here.  I've

23   got just a few questions for you, but let's introduce you a

24   little bit.  Tell me your name.

25   A.  Doris Gross.

*GROSS - Direct (Mr. White)*                                              49

1    Q.   And where do you live, Miss Gross?

2    A.   Manchester.

3    Q.   And are you married?

4    A.   Yes.

5    Q.   And what's your husband's name?

6    A.   Elijah Gross.

7    Q.   Is he still alive?

8    A.   Yes.

9    Q.   And are you employed?

10   A.   Yes.

11   Q.   Where do you work?

12   A.   At the -- well, I'm employed at the Board of Education.

13   I work at Paces Creek School.

14   Q.   What do you do there?

15   A.   Cook.

16   Q.   You're one of our cafeteria ladies?

17   A.   Right.

18   Q.   Yes, ma'am.  And are you a registered voter in Clay

19   County?

20   A.   Yes.

21   Q.   And what precinct do you vote --

22   A.   Horse Creek.

23   Q.   I'm sorry?

24   A.   Horse Creek.

25   Q.   And do you remember --

*GROSS - Direct (Mr. White)*                                        50

1    A.   Just this -- okay.  I just moved up to where I moved, so

2    last year I voted at Whites Branch.

3    Q.   I see.  Before voting at Whites Branch, though, had you

4    always -- did you -- is the precinct Horse Branch or Horse

5    Creek where you voted, had you voted there for a number of

6    elections?

7    A.   Yes.  All my life, just about.

8    Q.   And do you recall, do you recall the 2002 election, the

9    primary election, and that would have been, if I can refresh a

10   little bit, that was the election involving Jennings White and

11   Freddy Thompson?  Does that ring a bell for you at all?

12   A.   Well, I vote there, so I mean, you know, I guess Jennings

13   was there.

14   Q.   Well, my --

15   A.   What do you mean?

16   Q.   What my question is, do you recall voting in the 2002

17   election?

18   A.   Yeah, I guess.

19   Q.   Okay.

20   A.   As far as I can remember.

21   Q.   Do you recall at that election, did anyone give you any

22   money?

23   A.   No.

24   Q.   Did anyone buy your vote?

25   A.   No.

*GROSS - Cross (Mr. Smith)*                                          51

1   Q.   Have you ever sold your vote?

2   A.   No.

3         MR. WHITE:   Those are all the questions I have, Your

4   Honor.   Thank you.

5         THE COURT:   All right.   Thank you.   Mr. Smith?

6                      CROSS-EXAMINATION

7   BY MR. SMITH:

8   Q.   Miss Gross, how long have you and your husband been

9   married, ma'am?

10  A.   Fifty years.

11  Q.   Congratulations.

12  A.   Thank you.   About two months ago, we had our 50th

13  anniversary.

14  Q.   That's great.   How long have you worked at the school

15  board, ma'am?

16  A.   Oh, I worked, I guess, well, I'd say 40 something years

17  off and on.

18  Q.   Do you know Doug Adams?

19  A.   Yes.

20  Q.   And would he have been the superintendent for some years

21  while you worked there?

22  A.   Yes.

23  Q.   And you said you voted at Horse Creek, ma'am?

24  A.   Um-hmm.   That's right.   I've always voted.

25  Q.   Do you recall, you seem to be a little bit unsure about

GROSS - Cross (Mr. Smith)                                              52

1    the years in which you voted.  Do you recall voting every year

2    of every election over the last ten years?

3    A.   Now, I really can't answer that because I really -- they

4    might have been, you know, a time I didn't vote.

5    Q.   Okay.  Well, let me ask you this.  There was an incident

6    that occurred out there by a young man by the name of Jeff

7    Farmer at that Horse Creek precinct in May of 2002 which you

8    were asked about.  Do you remember an incident in which there

9    was a sheriff and maybe some police cars showed up and there

10   was a young man by the name of Jeff Farmer that was involved

11   in that.  Do you recall that, ma'am?

12   A.   No, I don't.

13   Q.   Would that be common to have some kind of a police force

14   show up and remove people --

15        MR. WESTBERRY:  Objection.

16   Q.   -- from their polling place there at Horse Creek?

17        MR. WESTBERRY:  Objection.

18        THE COURT:  Overruled.

19   A.   I don't get what you're saying.

20   Q.   Well, let me restate it, because it might not have been

21   asked very clearly, and I apologize, ma'am.

22        Do you have any recollection of police officers showing

23   up and removing somebody from inside the polling place while

24   you were there voting at the Horse Creek precinct, ma'am?

25   A.   No.

*GROSS - Cross (Mr. Smith)*                                              53

1    Q.   Okay.  Are you aware that there's a problem with vote

2    buying in Horse Creek, ma'am?

3    A.   No, I didn't know anything.

4    Q.   You just don't know anything about it; is that fair?

5    A.   That's right, yes.

6              MR. SMITH:  Thank you.

7              THE COURT:  Let's see if anyone else has any

8    questions first.  Mr. Westberry, do you have any questions?

9              MR. WESTBERRY:  No.

10             THE COURT:  Mr. White, back to you.

11             MR. WHITE:  I do not, Your Honor, but I would ask

12   Miss Gross, if she can possibly be released now and I can get

13   back in her good graces.

14             THE COURT:  I assume there's no objection to this

15   witnesses being released?

16             MR. SMITH:  No.

17             THE COURT:  Thank you, ma'am.  You're released at

18   this time.

19             THE WITNESS:  Thank you.

20             MR. WHITE:  May I call my next witness, Your Honor?

21             THE COURT:  Yes, sir.

22             MR. WHITE:  Mr. Jones would call Selena Smith,

23   S-m-i-t-h, Your Honor.

24                  SELENA SMITH, DEFENSE WITNESS, SWORN

25             THE COURT:  You may proceed.

*SMITH - Direct (Mr. White)*                                          54

1             MR. WHITE:  Thank you, Your Honor.

2                        DIRECT EXAMINATION

3    BY MR. WHITE:

4    Q.   Good afternoon.

5    A.   Hi.

6    Q.   My name is Scott White.  I'm a lawyer.  I represent Wayne

7    Jones, the gentleman kind of sitting towards the end over

8    there.  I'm going to ask you some questions.

9         First of all, are you here under subpoena?

10   A.   Yes.

11   Q.   And was that a subpoena that Mr. Jones had arranged to be

12   served on you, if you know?

13   A.   I have no idea.

14   Q.   That's all right.  Tell us your name, where you live and

15   what you do.

16   A.   My name is Selena Smith.  I live in Manchester, Kentucky.

17   I work at IGA.  I just graduated from Eastern Kentucky

18   University with a degree in math.

19   Q.   And are you from Clay County?

20   A.   Yes.

21   Q.   Were you raised up there?

22   A.   I was raised in Clay County, yes.

23   Q.   And do you recall, in 2006, were you an election officer

24   during the spring and the fall elections?

25   A.   Yes, I believe so.

*SMITH - Direct (Mr. White)*                                        55

1   Q.   And you say you believe so.  Do you remember --

2   A.   I was election officer, yes.

3   Q.   And do you recall being appointed to that and actually

4   receiving a certificate?

5   A.   I was appointed, yes.

6   Q.   And did you go to any election officer training?

7   A.   Yes.

8   Q.   And let me ask you this.  When you were appointed

9   election officer, which precinct were you assigned to?

10  A.   Garrard.

11  Q.   Is that where you usually voted, or was that a different

12  precinct?

13  A.   No, it was my first year of voting.  Yes, that's where I

14  voted.

15  Q.   And at that precinct, what was your job as the election

16  officer?  In other words, what title did you have?

17  A.   I was the Republican judge.

18  Q.   And do you recall where the -- I'm going to skip back now

19  on you.  Do you recall where the election officer training

20  took place?

21  A.   Upstairs in Freddy Thompson's office where his office is.

22  Q.   Upstairs, is that the new county building?

23  A.   I guess so, yeah.

24  Q.   Is the room that you all were in kind of a big room,

25  maybe not quite as big as this courtroom, but a large room?

1    A.   Yeah.

2    Q.   Do you recall who did the training?  Was it -- when I say

3    who, do you know who they worked for, is probably a better

4    question?

5    A.   No, sir.

6    Q.   But there were people that were familiar, and they told

7    you basically what you needed to do?

8    A.   Yes.

9    Q.   Was there an election -- was there a voting machine there

10   that you all were shown how to operate?

11   A.   Yes.

12   Q.   And if you had any questions about that, were you able to

13   ask those questions and have those answered?

14   A.   Yes, sir.

15   Q.   Did you feel comfortable at the conclusion of your

16   training that you were capable to perform your job as an

17   election officer?

18   A.   Absolutely.

19   Q.   Let me ask you now, in the spring -- when I say -- let me

20   ask it better than that.  In the primary election, do you

21   recall any issues coming up with the voting machine?

22   A.   There were a couple instances that the machines went off

23   when the people did walk away.

24   Q.   Can you estimate how many times that occurred?

25   A.   Two or three at the most.

*SMITH - Direct (Mr. White)*                                        57

1   Q.   And when that occurred, what did you do as the Republican
2   judge?
3   A.   Both of the judges went behind the machine and pressed
4   Vote and cast their ballot.
5   Q.   When you say both judges, it was -- you were one of them.
6   Who was the other judge?
7   A.   Millard Wagers.
8   Q.   And before you hit the button to cast the vote, did you
9   check anything to make sure that that was, in fact, the vote
10  that the voter intended?
11  A.   No, sir.
12  Q.   Did you look at the screen?
13  A.   No, sir.
14  Q.   Then did anyone at that precinct in the primary election
15  make any complaints to you about anything that was occurring
16  during the voting?
17  A.   No.
18  Q.   Did you, yourself, observe anything that you thought was
19  inappropriate based on the training you had received?
20  A.   No.
21  Q.   You testified, you just testified -- or did you just
22  testify that if someone had walked away without pushing the
23  last button, you and the other judge went behind the machine
24  and cast the ballot?
25  A.   If we couldn't catch that person, yes.

*SMITH - Direct (Mr. White)*                                                     58

1    Q.   How did you decide to do it that way?  Was that something

2    you and Mr. Wagers decided at that moment, or was that

3    something you had been trained to do?

4    A.   We had been train -- I'm pretty sure they told us in

5    training school to cast a ballot.

6    Q.   And that was the training that you took with -- let me

7    ask you this.  When you had your training, how many people

8    were there?

9    A.   I don't know.  Maybe 40, 30.  I really don't know.

10   Q.   So when that training was given as to what to do in case

11   somebody walked away without pressing the last button, that

12   occurred with everybody in the room?

13   A.   Yes.

14   Q.   Then let me bring you up to the fall of 2006, the general

15   election.  Were there any similar problems that you had in the

16   fall of 2006?

17   A.   Yeah.

18   Q.   How many times did that occur?

19   A.   Maybe two, three.

20   Q.   And did you and the Democrat judge do the same thing

21   together?

22   A.   Yes, sir.

23   Q.   And were you making any attempt to hide or conceal that,

24   or is that what you believed was the right thing to do?

25   A.   We believed that was the right thing to do.

*SMITH - Cross (Mr. Smith)* 59

1  Q.  Did you alter the votes on the screen at all, or did you

2  just simply cast them?

3  A.  We just cast it.

4  Q.  The time that you were there in the general of 2006,

5  again in the Garrard precinct, was there anything that you

6  noticed or saw yourself that you felt was inappropriate, based

7  on the training that you had received?

8  A.  No, sir.

9          MR. WHITE:  If I can be given just a moment, Your

10  Honor.

11          THE COURT:  Yes, sir.

12          MR. WHITE:  Those are all the questions I have at

13  this time, Your Honor.  Thank you.  I pass the witness.

14          THE COURT:  All right.  Thank you.  Mr. Smith.

15          MR. SMITH:  Thank you.

16                      CROSS-EXAMINATION

17  BY MR. SMITH:

18  Q.  Hi, Miss Smith.

19  A.  Hello.

20  Q.  If I understood your testimony, you got promoted to

21  election officer your first year as a voter?

22  A.  Yes, sir.

23  Q.  Okay.  Had you had any training other than what you had

24  gotten at the election officer training in 2006?

25  A.  No.

SMITH - Cross (Mr. Smith)                                        60

1    Q.   And was there a Democrat or a Republican party that had

2    taken your name from a list, or do you know how you got

3    selected?

4    A.   Tommy Harmon asked me to be -- asked me if I wanted to be

5    an election officer, yes.

6    Q.   Tommy Harmon?

7    A.   Yes.

8    Q.   And is that the same Tommy Harmon related to Lester

9    Harmon?

10   A.   Yes, sir.

11   Q.   And I believe one of those was a magistrate at one time.

12   Was it Tommy Harmon a magistrate there?

13   A.   Yes, sir.

14   Q.   And he just asked you, and you said okay?

15   A.   I was in school.  He said that they paid 75 dollars.  I

16   really needed the extra cash, so yeah.

17   Q.   I can understand that.  Now, if I understand your

18   testimony, ma'am, in the spring of '06, you said you served

19   with a fellow by the name of Millard --

20   A.   Yes, sir.

21   Q.   -- Wagers.  Did you know him prior to that day?

22   A.   Yes, sir.

23   Q.   Does he have a nickname?

24   A.   Frog.

25   Q.   Okay.  And so how did you know him before that day?

SMITH - Cross (Mr. Smith)                                          61

1   A.   He lives pretty close to me.

2   Q.   All right.  And is he maybe a generation or two older

3   than you, or do you know approximately how old he is?

4   A.   I have no idea how old he is.

5   Q.   Is he older than you or younger?

6   A.   I think he's older.

7   Q.   You just don't have a guess as to how much older?

8   A.   Maybe 34, 35.  I really don't know.

9   Q.   And which party did you serve for, ma'am?

10  A.   Republican.

11  Q.   Okay.  And then I assume that he served for the Democrat

12  party?

13  A.   Yes, sir.

14  Q.   And did you, during your service, also work with a fella

15  by the name of Randy Craft?

16  A.   Yes, sir.

17  Q.   And what did he do?

18  A.   He was the clerk.

19  Q.   And I believe your testimony was that the way you'd been

20  trained is that if a voter was to mistakenly only, I guess,

21  press the button for Vote and not Cast Ballot, there would be

22  an alarm that would go off; is that fair?

23  A.   Yes.

24  Q.   And if that alarm went off, then that alarmed everybody

25  as far as election officers and anybody in the presence of the

SMITH - Cross (Mr. Smith)                                62

1   sound of that that the voter had left early?  Is that fair?

2   A.  Yes.

3   Q.  And I believe you said that you had this happen two or

4   three times?

5   A.  Yeah, two or three times.

6   Q.  And you had that happen two or three times in the spring

7   and also in the fall, I believe you testified; is that right?

8   A.  I think so, yes.

9   Q.  And the times that you heard that alarm, you did just as

10  you were trained; that is, to go back in there and make sure

11  that that second button was pushed, which is Cast Ballot?

12  A.  If the person had left the building and they were nowhere

13  to be found, yes, we went ahead and pushed the vote button.

14  Q.  How much time would you have, ma'am, to find somebody

15  once that alarm went off?

16  A.  We just looked out the door.  Maybe ten seconds, five

17  maybe.  It was right by the door.

18  Q.  Did the training tell you how long you had when that

19  button on that alarm went off to make those decisions?

20  A.  I don't remember.

21  Q.  And I assume, ma'am, that when you all had something of

22  this nature that you all made a report of that somewhere?

23  A.  Yes, sir.  Every time the machine went off, it was

24  written in the sheriff's report.

25  Q.  And is that sheriff's report supposed to be taken to

*SMITH - Cross (Mr. Smith)*                                          63

1    Freddy Thompson, the county clerk?

2    A.   I believe so.

3    Q.   And that would have been done in both the May primary and

4    the fall of 2006?

5    A.   Yes.

6    Q.   You all would have written up reports of these issues,

7    and you would have processed the sheriff's report, and that

8    would have gone to Freddy Thompson?

9    A.   Yes.

10   Q.   Now, ma'am, based on your experience, ma'am, would it be

11   possible if there were people corrupt and they wanted to

12   control and possibly steal votes from people, that if you had

13   the Republican officer and the Democrat officer and they were

14   in agreement with each other that they were going to slip in

15   there and change the votes the way they wanted to, in your

16   experience and your training, ma'am, would that be possible on

17   this machine?

18   A.   No, sir.

19   Q.   Okay.  And in this case, your testimony would be that if

20   you and Mr. Wagers -- and I'm not saying you had -- had

21   decided to go back there and look at that ballot, you didn't

22   understand you could do that?

23   A.   I didn't do it, no.

24   Q.   We're not saying you did, ma'am.

25   A.   Right.

*SMITH - Cross (Mr. Smith)*                                        64

1    Q.  But I'm just trying to get you to express, based on your

2    experience, would it be possible, if the Republican and

3    Democrat officers were working together, that they could

4    actually change a vote.

5    A.  They could go back --

6            MR. WHITE:  Objection.  I was just going to say

7    objection, Your Honor.  Asked and answered.

8            THE COURT:  Overruled.  Did you understand his

9    question?

10           THE WITNESS:  Yes.

11           THE COURT:  You can explain if you need to.

12   A.  I believe that you could go back.

13   Q.  Now, you were trained, you said, at the big meeting room?

14   A.  Yes.

15   Q.  And did you have any side training off to the side after

16   hours with Mr. Charles Wayne Jones and Mr. Freddy Thompson?

17   A.  No, sir.

18           MR. SMITH:  Thank you.  That's all.

19           THE COURT:  All right.  Let me see if anyone else has

20   questions before we get back on redirect.  Mr. Hoskins, we'll

21   start --

22           MR. HOSKINS:  No questions.

23           MR. WESTBERRY:  No questions.

24           MR. ABELL:  No questions.

25           THE COURT:  Thank you.  Mr. Richardson.

*SMITH - Cross (Mr. Richardson)*                                          65

1              MR. RICHARDSON:  Briefly, Judge, thank you.

2                          CROSS-EXAMINATION

3     BY MR. RICHARDSON:

4     Q.   Miss Smith, my name is Tucker Richardson.  I'm one of

5     Freddy's attorneys.  You say that you were trained during the

6     training at Freddy's office that if the voter was to walk away

7     and made all of their selections, the two judges would go

8     together and cast the ballot?

9     A.   Yes, sir.

10    Q.   And two or three times in May and November, the voter

11    walked away and got away before you all could grab him?

12    A.   Yes, sir.

13    Q.   And you all did that, cast their ballot?

14    A.   Yes.

15    Q.   And it should have been noted in the sheriff's report?

16    A.   It was in the sheriff's report, yes.

17    Q.   Did you write it in the sheriff's report?

18    A.   No, but every time it went off, we did tell the sheriff

19    and she wrote it -- she was supposed to write it down.

20    Q.   She was supposed to write it down?

21    A.   Right.

22    Q.   But you don't know if she did or not?

23    A.   No.

24             MR. RICHARDSON:  Thank you.

25             THE COURT:  See if we have any other questions.  Mr.

66

1    White, anything else from this witness?

2              MR. WHITE:  None, Your Honor.

3              THE COURT:  Anything else based on these questions?

4              MR. WHITE:  I would ask if Miss Smith could be

5    excused with our thanks, Your Honor.

6              THE COURT:  Yes, she'll be excused at this time.

7    Thank you, ma'am.

8              MR. WHITE:  Your Honor, Mr. Jones rests.  Thank you

9    for the time.

10             THE COURT:  Thank you, Mr. White.  Before we

11   continue, ladies and gentlemen, we'll take our afternoon

12   recess.  Take a recess until 2:45 this afternoon.  Please, of

13   course, keep in mind the admonition that you've been given

14   numerous times throughout the course of this case.  Please

15   don't discuss the case among yourselves while we are in

16   recess.  The jury will be excused until 2:45.

17             (The jury left the courtroom at 2:27 p.m.)

18             THE COURT:  Thank you, please be seated.  One matter

19   I want to bring up.  Mr. Westberry, if you and Mr. White could

20   come up.  One issue.

21                   (A sidebar conference with Mr. Westberry

22                    and Mr. White was held out of the

23                    hearing of the jury):

24             THE COURT:  I didn't ask, Mr. Westberry, if you

25   wanted me to confer in any way with Mr. Adams about his right

1    to testify, if he wished to do so.  I can do that if you want.

2    I assume that you've spoken with him to his satisfaction.

3    He's chosen not to testify in the case.

4         MR. WESTBERRY:  I know some judges do that

5    differently.

6         THE COURT:  It's not required, but if counsel asks me

7    to do it, of course, I will.  Of course, you're experienced

8    counsel.  I wanted to double check with you before we took our

9    recess before we presented the next --

10        MR. WESTBERRY:  Can I have just a moment?

11        THE COURT:  If you want to do that, you can let me

12   know if you want to.  Mr. White, you can do the same thing.

13        MR. WHITE:  I will.  I've never had experience with

14   you.  Same as Kent, some judges have said --

15        THE COURT:  I usually don't do it in open court.

16   I'll do it at sidebar if you want me to do it.  If you don't,

17   you can tell me.

18        MR. WHITE:  You know, Judge --

19        THE COURT:  I know Mr. Jones has a prior conviction.

20   You've spoken with him about it?

21        MR. WHITE:  We have spoken at length.  He does not

22   want to be -- since I'm CJA, might not be a bad idea.  The

23   better course of action for me would be to let you do that at

24   sidebar.

25        THE COURT:  Why don't you bring him up, while you

1    talk to Mr. Adams.

2              (Sidebar conference with Mr. White and

3              Defendant Charles Wayne Jones):

4         THE COURT:  Mr. Jones, usually in a case, I will go

5    over with the defendant his or her right to testify or not to

6    testify.  Of course, I do expect that you've spoken with your

7    attorney extensively about whether you should or should not

8    testify, but I want to make sure that you understand that

9    that's a right you have.

10        DEFENDANT JONES:  Yes.

11        THE COURT:  You can certainly consult with counsel,

12   but ultimately the decision as to whether or not to testify is

13   your decision to make.  You do understand if you were to

14   testify, that the United States could ask you a number of

15   questions, including questions about a previous conviction?

16        DEFENDANT JONES:  Absolutely.

17        THE COURT:  And having conferred with counsel, you've

18   exercised your right not to testify?

19        DEFENDANT JONES:  That's correct, that's correct.

20        THE COURT:  All right.  And you don't have any

21   hesitancy or qualms about that decision?

22        DEFENDANT JONES:  No, none whatsoever.

23        THE COURT:  Again, this is standard procedure.  I

24   just wanted to make sure I spoke with you about it.  I don't

25   do it in open court in front of the parties.

1          DEFENDANT JONES:  Appreciate it.

2          THE COURT:  But I do it at sidebar.

3          MR. WHITE:  Thank you very much, Your Honor.

4          (Sidebar conference concluded.)

5          THE COURT:  Mr. Westberry?

6          MR. WESTBERRY:  Yes, thank you.  I've talked to Mr.

7   Adams about the matter we discussed at sidebar, talked with my

8   co-counsel, Miss Logan, and we do not believe there's any need

9   for the Court to give any additional right, advice on rights

10  or a discussion of law other than what we have had many times.

11         THE COURT:  All right.

12         MR. WESTBERRY:  With Mr. Adams.  Thank you.

13         THE COURT:  I appreciate that.  We'll not have

14  further conference.  I will advise counsel if at any point

15  during the trial you wish the Court to confer with respect to

16  a defendant's right to testify or not to testify, I can do

17  that with an individual defendant, and I can do that at

18  sidebar if it's requested.

19         We will take a recess at this time until -- we'll

20  take a recess until 2:45.  Before we do, Mr. Abell, you're up

21  next.  You have your witnesses here ready?

22         MR. ABELL:  I've seen them both, Judge.  We're

23  prepared to go forward.

24         THE COURT:  Thank you.  We'll be in recess until

25  2:45.

1          (Recess from 2:32 p.m. until 2:46 p.m.)

2          THE COURT:  Thank you.  The record will reflect the

3     jury's not present at this time.  Mr. Abell?

4          MR. ABELL:  Your Honor, as the Court is aware, I'm

5     appointed pursuant to the Criminal Justice Act, and I have

6     subpoenaed the next two witnesses.  My understanding is they

7     may be reimbursed for witness fee and their mileage upon

8     completion of their testimony.  I would like to ask the Court

9     that I'd expect them to be released today, and if the Court

10    would please advise them to report to the clerk's office

11    before they leave the courthouse, they can get that matter

12    taken care of.

13         THE COURT:  All right.

14         MR. ABELL:  That's the only thing I have.

15         THE COURT:  I'll do that as subtly as I possibly can.

16    Sometimes I'm not very good at that.  Yes, sir.  Anything else

17    before we bring the jury in?  If you could bring the jury in

18    at this time, please.

19              (The jury entered the courtroom at 2:48 p.m.)

20         THE COURT:  The record will again reflect that all

21    members of the jury are present.  Parties and counsel are also

22    present.

23         Proceed at this time with presentation of the

24    case-in-chief on behalf of Mr. Stivers.  Mr. Abell, are you

25    ready to call your first witness?

*EMOND - Direct (Mr. Abell)*                                        71

1              MR. ABELL:  Yes, Your Honor.  On behalf of William

2    Stivers, we call Greta Emond.

3              THE COURT:  Emond?

4              MR. ABELL:  E-m-o-n-d.

5                 GRETA EMOND, DEFENSE WITNESS, SWORN

6              THE COURT:  Thank you.  Please proceed.

7              MR. ABELL:  Thank you.

8                          CROSS-EXAMINATION

9    BY MR. ABELL:

10   Q.  Ma'am, I'm Robert Abell, and I represent William Stivers

11   in this case.

12   A.  Um-hmm.

13   Q.  Would you please state your name for us?

14   A.  Pardon me?

15   Q.  Would you please state your name?

16   A.  Greta Emond.

17   Q.  Miss Emond, were you subpoenaed to be here to testify

18   today?

19   A.  Yes, I was.

20   Q.  Where do you live?

21   A.  I live in Manchester, Kentucky.

22   Q.  How long have you lived there?

23   A.  I was born there, and I've lived there just about all my

24   life.  I lived in Michigan for about 14 years.  Rest of the

25   time, I've resided in Manchester.

*EMOND - Direct (Mr. Abell)*                                    72

1    Q.   Are you married?

2    A.   Yes.

3    Q.   Are you employed?

4    A.   Yes.

5    Q.   How are you employed?

6    A.   I manage an apartment complex.

7    Q.   What apartment complex do you manage?

8    A.   Beech Creek Apartments.

9    Q.   How long have you managed the Beech Creek Apartments?

10   A.   It will be 30 years in July.

11   Q.   About how big, how many units --

12   A.   Seventy-eight.

13   Q.   Do you know a fella in Manchester named Bobby "Red" Sams?

14   A.   Yes, I do.

15   Q.   Do you know him to recognize him?

16   A.   Yes.

17   Q.   If you saw him on the street, you'd recognize him?

18   A.   Yeah.

19   Q.   As part of your management duties, does that require you

20   to keep track of the people that have apartments at the

21   complex?

22   A.   Yes.  Yes.  I know who, yes.

23   Q.   Since the year 2000, can you tell us if Bobby "Red" Sams

24   has had an apartment at the Beech Creek apartment complex that

25   you manage?

*EMOND - Cross (Mr. Smith)*                                    73

1    A.   No, he hasn't.

2    Q.   How can you be sure about that?

3    A.   I was asked before by a detective if he lived there in

4    2000.  I looked at my security cards because I've had so many

5    tenants over the years.  He hasn't had one in 2000 absolutely.

6    Q.   What about since 2000?

7    A.   No.

8    Q.   To your knowledge, has he lived with somebody else who

9    had a lease or rented --

10   A.   I don't know.

11          MR. ABELL:  That's all I have for Miss Emond, Judge.

12          THE COURT:  All right.  Thank you.  Mr. Smith or Mr.

13   Parman?

14                      CROSS-EXAMINATION

15   BY MR. SMITH:

16   Q.   Good afternoon.

17   A.   Hi.

18   Q.   Miss Emond, I assume that you are basing your testimony

19   about who resides in this 78-unit complex based on the

20   records; would that be fair?

21   A.   Right, correct.

22   Q.   And in order to be a record lease holder or renter in

23   that complex, I assume there would be an application process,

24   and they have to fill it out, put it on record?

25   A.   Exactly.  We do an application, and then they sign lease.

*EMOND - Cross (Mr. Smith)*                                             74

1    Q.   Is this a government subsidized housing?

2    A.   Yes, sir, it is.  It's Section 8.

3    Q.   And as Section 8 housing, there's also requirements by

4    law as to who's eligible, who's not?

5    A.   Correct.

6    Q.   And in your testimony, I believe, ma'am, while you said

7    that the records did not show Mr. Sams having an apartment

8    there, you could not state definitively, that means

9    definitely, that he was not there with, say, a girlfriend at

10   the time?

11   A.   No, I don't know about that.

12   Q.   And likewise, if he was to open up his apartment for

13   purposes of someone to use it during election for a few days

14   before the election, that wouldn't show up on your records

15   either, would it?

16   A.   No, sir.  I mean, he -- in 2000, he didn't have an

17   apartment.  I mean, no.

18   Q.   But if --

19   A.   But if he was with a girlfriend, I don't know anything

20   about that.

21   Q.   But if he was living in one of those apartment complexes

22   with a girlfriend at the time, your records would not show

23   that; is that fair?

24   A.   No, they would not show that.

25             MR. SMITH:  That's all I have.  Thank you.

*CULVER - Direct (Mr. Abell)*                                          75

1        THE COURT:  Thank you.  See if any of the other

2   parties have any questions?

3        MR. WESTBERRY:  No, Your Honor.

4        MR. WHITE:  No, Your Honor.

5        MR. BALDANI:  No questions.

6        THE COURT:  Mr. Abell, any redirect of the witness?

7        MR. ABELL:  No redirect, Judge.  May she be excused?

8        THE COURT:  Ma'am, you may step down.  You'll be

9   excused.  If you could stop by the clerk's office before you

10   leave the building.  You know where the clerk's office is back

11   around the corner here?

12        THE WITNESS:  I'll find it.  Thank you.

13        THE COURT:  Thank you, ma'am.  Mr. Abell?

14        MR. ABELL:  Judge, at this time, we'd call Jeff

15   Culver.

16        THE COURT:  Thank you.  Jeff Culver.  I believe Mr.

17   Culver testified previously, but he'll be placed under oath

18   again.

19            JEFF CULVER, DEFENSE WITNESS, SWORN

20                  DIRECT EXAMINATION

21   BY MR. ABELL:

22   Q.  Good afternoon, Mr. Culver.  My name is Robert Abell, and

23   I represent William Stivers in this case.  I guess first,

24   please state your name for the record.

25   A.  Jeff Culver.

CULVER - Direct (Mr. Abell)                                76

1  Q.  Mr. Culver, were you subpoenaed by me to come back and
2  testify today?
3  A.  Yes, sir.
4  Q.  Tell us how you're employed.
5  A.  I'm the chief of police, Manchester Police Department.
6  Q.  How long have you worked for the Manchester Police
7  Department?
8  A.  Since June of 1989.
9  Q.  Do you know my client, William Stivers?
10  A.  Yes.  Sitting in the back.  Standing up there in the
11  light-colored, long-sleeved shirt.
12        THE COURT:  The record will reflect the witness, Mr.
13  Culver, has identified the defendant, William Stivers.
14  Q.  What was your position with the Manchester Police
15  Department in the fall of 2002?
16  A.  Patrolman.
17  Q.  Do you recall being involved with the arrest of Mr.
18  Stivers in the fall of 2002?
19  A.  Yes.
20  Q.  Do you remember where that arrest took place?
21  A.  Manchester, Kentucky.
22  Q.  What -- do you recall a more specific location in
23  Manchester, Kentucky, where the arrest took place?
24  A.  Town square.
25  Q.  Was it near the county clerk's office?

*CULVER - Direct (Mr. Abell)*                                    77

1   A.   Yes.

2   Q.   And who was the county clerk at the time?

3   A.   Jennings White.

4   Q.   Do you recall the date of that incident arrest?

5   A.   No.

6   Q.   Would October 18, 2002 seem about right?

7   A.   Do you have any records that I could see that reflect

8   that?

9   Q.   I don't, but does that seem generally right?

10  A.   Could have been.  Like I said, I cannot remember exactly

11  the date of that.

12  Q.   What caused you to -- did you get called to the clerk's

13  office?

14  A.   No, sir.

15  Q.   What led you to be there?

16  A.   The, I think the polls were opening up that day, and

17  expected a high volume of voters.  Just for, just to see if

18  there would be any trouble of any sorts.

19  Q.   Who was your immediate supervisor at the time?

20  A.   Dennis Rice.

21  Q.   Was there a fella named Todd Roberts working for the

22  Manchester Police Department at the time?

23  A.   Yes, he was.

24  Q.   What was his position?

25  A.   Assistant chief on third shift.

CULVER - Direct (Mr. Abell)                                    78

1   Q.   Was he your supervisor?

2   A.   He was assistant chief, but he was strictly out on third

3   shift so I mainly dealt with the chief.  I was always day

4   shift so I never did answer to Todd Roberts.

5   Q.   Maybe a better question would be in the fall of 2002, was

6   Todd Roberts a superior officer to you?

7   A.   Yes.

8   Q.   And as your superior officer, I guess you had to follow

9   his directions and orders; is that fair?

10  A.   Yes.

11  Q.   Okay.  Do you recall seeing Mr. Stivers that day that he

12  was arrested?

13  A.   Yes.

14  Q.   Do you recall when you first saw him that day?

15  A.   Yes.

16  Q.   And where was that?

17  A.   That was in town square, just outside the county clerk's

18  office.  More so in front of the First National Bank area.

19  Q.   Do you recall observing him in a conversation with Mr.

20  Roberts?

21  A.   Yes.

22  Q.   Do you recall how long that conversation was?

23  A.   A short period of time.  It wasn't maybe five to ten

24  minutes at the most.

25  Q.   Do you recall the subject matter of that conversation

CULVER - Direct (Mr. Abell)                              79

1   between Mr. Stivers and Mr. Roberts?

2   A.   Not entirely.  Something to do with elections.

3   Q.   During the time that you observed Mr. Stivers talking

4   with Mr. Roberts, did you smell any alcohol on Mr. Stivers?

5   A.   Not really.  I was -- really wasn't there -- I didn't

6   have a complaint on Mr. Stivers.  I really wasn't looking for

7   any indicators of -- didn't have any reason to try to observe

8   or smell any alcohol on him.  Like I say, I wasn't there on a

9   complaint at all, period.

10  Q.   To your observations of Mr. Stivers, did he appear under

11  the influence of any alcohol?

12  A.   The short period of time that I was in his company, I

13  really didn't pay much attention to Mr. Stivers while him and

14  Todd Roberts were having their conversation.  I was more or

15  less talking with Officer Kevin Johnson about other things.

16  Q.   Were you subsequently instructed later that day to arrest

17  Mr. Stivers?

18  A.   Yes.

19  Q.   And charge him with what offense?

20  A.   If my memory is correct, I think it was alcohol

21  intoxication and terroristic threatening.

22  Q.   At the time he was charged, to your observation did he

23  appear under the influence of alcohol?

24  A.   Well, there again, it goes I wasn't in his company to

25  give him any field sobriety tests or to look to see if he had

*CULVER - Direct (Mr. Abell)*                                                    80

1    been drinking or under the influence of drugs.  It really

2    wasn't fair to me to say if he was intoxicated or not, because

3    I wasn't with him but just a few moments.

4    Q.   During the few moments that you were with him, to your

5    observation, did he appear under the influence of alcohol?

6    A.   No.

7    Q.   But nonetheless, were you directed by Todd Roberts to

8    charge with him alcohol intoxication?

9    A.   Yes.

10   Q.   And did you follow the order of your superior officer and

11   charge him with that?

12   A.   Yes.

13   Q.   Would it be a fair statement that you did not believe

14   that Mr. Stivers at the time he was arrested was intoxicated?

15   A.   Again, I was put in a position where I shouldn't have

16   been the one to arrest him, because I didn't give him any

17   field sobriety tests.  I didn't take a blood test.  I couldn't

18   swear that it was his blood that was tested.  So, you know, I

19   couldn't base anything that I seen as him being intoxicated,

20   because I wasn't there with him enough to make that

21   determination.

22   Q.   But it would be fair that you did have a chance to be

23   very close to him; is that true?

24   A.   Yes.

25   Q.   And be in his company for some period of time?

*CULVER - Cross (Mr. Smith)*                                         81

1    A.   After the arrest, yes.

2    Q.   And during that period of time, did Mr. Stivers appear to

3    be under the influence of alcohol?

4    A.   I could not make that opinion after the arrest, because

5    he was so irate mad and very argumentative with Todd Roberts

6    and I think maybe Officer Johnson when he came back into my

7    presence.

8    Q.   Okay.  Was he drunk?

9    A.   I couldn't tell that.

10           MR. ABELL:  Thank you.  Nothing further, Judge.

11           THE COURT:  Thank you, Mr. Abell.  Mr. Smith or Mr.

12   Parman.

13                       CROSS-EXAMINATION

14   BY MR. SMITH:

15   Q.   Good afternoon, Mr. Culver.  As you know, I'm Steve

16   Smith, and I represent the United States.  Have a few

17   questions for you.  At the end of the day there, the case got

18   dismissed against Mr. Stivers; is that fair?

19   A.   Yes.

20   Q.   County attorney didn't object, judge didn't -- judge

21   ruled the case dismissed both on the alcohol charge and the

22   threatening charge?

23   A.   Correct.

24   Q.   And then as I understand it, Mr. Culver, he hired a

25   lawyer, Yancey White, who's the son-in-law of Roy Morgan, to

*CULVER - Cross (Mr. Smith)*                                              82

1   represent him in a lawsuit against your police department?

2   A.   Correct.

3   Q.   And he sued because, I believe, he said he was wrongfully

4   arrested.  Is that a fair statement?

5   A.   Correct.

6   Q.   And then you all eventually had to pay out a settlement

7   on that?

8   A.   Yes.

9   Q.   Do you recall, in the course of this episode that

10  occurred there in the county clerk's office, who was it

11  insisted that he be arrested, to your recollection?

12  A.   My recollect, inside the county clerk's office.

13  Q.   Yeah, isn't it true that when you were told to cite Mr.

14  Stivers for this alcohol charge and for the threatening charge

15  that he made certain statements about you're going to have to

16  arrest me?

17  A.   Yes.  "If I have to leave here," something to that

18  effect, "if I have to leave here, you're going to have to

19  arrest me," or something to that effect.

20  Q.   So it was his demand that you arrest him; is that fair?

21  A.   Correct.

22  Q.   You all did not intend to arrest him at that point

23  otherwise?

24  A.   I did not.

25  Q.   It was only after he demanded that you all arrest him

CULVER - Cross (Mr. Smith)                                              83

1   that you arrested Mr. Stivers?

2   A.   Correct.

3   Q.   Now, your county attorney is Clay M. Bishop, Jr.; is that

4   right?

5   A.   Yes, sir.

6   Q.   He was the attorney who dismissed this case against Mr.

7   Stivers; is that fair?

8   A.   Best of my -- that I can remember, yes.

9   Q.   And based on your experience there with the county

10  attorney, has your department had instances where he's

11  dismissed your cases since this Stivers case?

12  A.   Yes.

13  Q.   And have you had issues with the county attorney about

14  dismissing your cases recently?

15  A.   There have been several issues where case the officer's

16  showed up, appeared in court or appeared in district court

17  repeatedly and the cases would be dismissed.

18  Q.   What do you mean by that, Mr. Culver, that your officers

19  would show up to court repeatedly and then the case would get

20  dismissed?  Can you describe what you're referring to?

21  A.   Well, the officers would receive a subpoena to show up

22  for a certain court date, they would --

23          MR. WESTBERRY:  Objection.

24  A.   They would appear in court --

25          THE COURT:  I'll overrule.

CULVER - Cross (Mr. Smith)                                              84

1    A.   They would appear in court.  On several instances, cases

2    would be continued for reasons of the defense.  Officers would

3    have to show back up for court, and for some reason if that

4    officer could not make it on that court appearance for some

5    reason, those cases would be dismissed rather than give

6    another court date for that.

7    Q.   Have you ever personally confronted him yourself about

8    matters such as that?

9    A.   Yes.

10   Q.   And what was his response?

11        MR. WESTBERRY:  Objection.

12        THE COURT:  I'll sustain the objection.

13   A.   That --

14        MR. SMITH:  He sustained the objection.

15        THE WITNESS:  I'm sorry.

16   Q.   Has that been an activity that's continued even up and to

17   the current day?

18   A.   Yes.

19   Q.   When's the last time you had an incident such as this

20   occur?

21   A.   I can't recall the exact date, but should have been maybe

22   no more than a couple months ago, we had a drug case.  One of

23   our officers arrested a young lady on a drug possession charge

24   and it was a misdemeanor, which kept it in Clay District

25   Court.  Our officer received seven subpoenas for different

1    dates.  He kept coming to court for this court case.  And each

2    time, it was continued seven different times.  And on the

3    eighth time --

4              MR. WESTBERRY:  Same objection.

5    A.    -- we were there for a trial, and it was dismissed.

6              THE COURT:  Overrule the objection.

7    Q.    And that case was dismissed just within the past couple

8    months?

9    A.    Yes, and we were there for court ready for trial.

10   Q.    And that was after seven or eight continuances?

11   A.    Made the eighth trip.  Our eighth time.

12             MR. SMITH:  Thank you.  That's all I have.

13             THE COURT:  All right.  Let me again start with Mr.

14   Hoskins first, see if there are any questions?

15                        CROSS-EXAMINATION

16   BY MR. HOSKINS:

17   Q.    Mr. Culver, I'm David Hoskins.  I represent Cletus

18   Maricle.  This case that you're talking about was not in Mr.

19   Maricle's court, was it?

20   A.    No, sir.

21             MR. HOSKINS:  Thank you.

22             THE COURT:  All right.  Thank you.  Mr. Westberry?

23             MR. WESTBERRY:  May I approach just a moment?

24             THE COURT:  Yes, sir.

25                        (A sidebar conference was held out of the

1                    hearing of the jury):

2              THE COURT:  Mr. Westberry?

3              MR. WESTBERRY:  Thank you, Judge.  Kent Westberry for

4    Doug Adams.  We're surprised.  I don't know if the term

5    blindsided is a little too severe for this line of

6    cross-examination.  I objected on relevance, because it does,

7    in addition to relevance, it seems to be far outside the scope

8    of anything that was elicited by anyone --

9              THE COURT:  It was outside the scope of the direct

10   examination of Mr. Abell, but here's where we are on that.

11   This is a witness that's appeared on two occasions now.  He's

12   a police officer in the city.  Of course, I required Mr. Abell

13   to bring him back for the second appearance.  He's now here

14   the second time, and if I don't exercise some discretion to

15   allow Mr. Smith to go outside the scope, then we bring him

16   back a third time on rebuttal to talk about Mr. Bishop's

17   activities, and so I did allow Mr. Smith to go outside the

18   scope --

19             MR. WESTBERRY:  Sure.

20             THE COURT:  -- of the direct examination.  But I did

21   it, exercising Court's discretion to avoid bringing him back

22   for a third time.

23             MR. WESTBERRY:  I understand.  Here's where I'm going

24   with my request to come to sidebar.  This is the first I've

25   heard of an accusation by someone from the Manchester Police

CULVER - Cross (Mr. Hoskins)                                        87

1    Department essentially accusing the county attorney's office

2    of improperly dismissing cases.

3            What I'm requesting -- I do know that Mr. Clay M.

4    Bishop is still here.  I believe one of the parties has

5    subpoenaed his wife to testify at some portion during these

6    proceedings, and he stayed this afternoon, even though he's

7    been released.

8            A couple of questions.  First, ask the Court

9    permission to reopen proof on behalf of Doug Adams for the

10   limited purpose to question Mr. Clay M. Bishop regarding any

11   response that he would have to this line of cross-examination

12   by the government for the reasons I've already stated.  And

13   also, if I could have an opportunity to talk to Mr. Bishop

14   just so I can learn about these accusations, which I have not

15   yet heard before.  Those are my requests, Your Honor.

16           THE COURT:  All right.  Well, at this point, we are

17   into Mr. Abell's case.  And rather than disrupt presentation

18   of the case by the other parties who may have witnesses who

19   have been waiting as well, if you want to bring Mr. Bishop

20   back, you can bring him back in what would be sur-rebuttal.

21   And even if the United States doesn't present any rebuttal

22   testimony or evidence, inasmuch as I've allowed this to come

23   in as essentially rebuttal, you can call him at that time.

24           In terms of questioning him about this, I don't

25   believe it would be appropriate to discuss with a witness,

*CULVER - Cross (Mr. Hoskins)*                                        88

1    although he's been released.  You can recall him if you don't

2    have conversations with him about testimony.

3            MR. WESTBERRY:  Sure.

4            THE COURT:  So I wouldn't allow you to do that in

5    terms of talking about testimony with respect to the

6    witnesses.  If you want to recall him in the case, you

7    probably need to remind him that he may be subject to recall

8    and the exclusion of witness rule is still in effect, Rule 615

9    is still in effect.

10           MR. WESTBERRY:  I haven't had this before, and I'm

11   still a little rusty, but I understand the Court's ruling.  So

12   I don't -- I'm going to make a determination as the next day

13   or two unfolds as to whether I would anticipate.  If we do,

14   we'll probably do it at the close of all defendants.  I think

15   if you agree, that makes the most sense from an orderly

16   fashion.

17           THE COURT:  I believe that it would.  But I don't

18   want to interrupt the other --

19           MR. WESTBERRY:  I understand.

20           THE COURT:  -- parties' presentation of proof.  But

21   you can recall him if you want to do that on this point.

22           MR. WESTBERRY:  Thank you.  That's all I have.

23           THE COURT:  Where are we in terms of the examination?

24           MR. WESTBERRY:  I may have a question or two.  Mr.

25   Hoskins had just finished.  I doubt that I'll have much with

*CULVER - Cross (Mr. Westberry)*                                      89

1    Chief Culver.

2             THE COURT:  All right.  That's fine.  We'll continue

3    on.

4                     (Sidebar conference concluded.)

5             THE COURT:  Thank you.  Mr. Westberry, you may

6    proceed.

7                         CROSS-EXAMINATION

8    BY MR. WESTBERRY:

9    Q.   Chief Culver, good afternoon.  I'm Kent Westberry.  I

10   think we met weeks ago when you testified earlier in this

11   trial.  I'm one of the attorneys for Doug Adams.

12        I believe that you said several weeks ago that when this

13   charge that brings us into court was first returned, I believe

14   you indicated that you testified that you were the officer

15   that actually went and served the papers on Doug Adams and

16   brought him in for processing; is that correct?

17   A.   No, sir.

18   Q.   That's not correct?  You did not bring Doug Adams in for

19   processing?

20            MR. SMITH:  Your Honor, I'm going to object.  This is

21   outside the witness's --

22            THE COURT:  I'll give you some latitude on this.  Did

23   you say --

24   Q.   Transported him for processing.

25   A.   Yes, sir.

*CULVER - Cross (Mr. Westberry)*                                    90

1   Q.   Okay.  You were one of the officers that did that,
2   correct?
3   A.   Yes.
4   Q.   And I believe you were working with some officers and
5   agents in connection with the federal government, correct?
6   A.   Yes, sir.
7   Q.   You were asked some questions a moment ago, Chief Culver,
8   about the office of county attorney and some cases that were
9   dismissed.  Do you recall that line of questioning?
10  A.   Yes, sir.
11  Q.   Are you saying that the office of the county attorney in
12  Clay County does not do its job properly?
13  A.   Yes, sir.
14  Q.   That's your opinion?
15  A.   Yes, sir.
16  Q.   Would you agree that some people might disagree with
17  that?
18          MR. SMITH:  Your Honor, I'm going to object as to the
19  argument.
20          THE COURT:  Overruled.  He can answer.
21  Q.   Would you agree that some people would disagree with
22  that, Mr. Culver?
23  A.   Yes, sir.
24          MR. WESTBERRY:  One moment, please.
25          THE COURT:  Yes, sir.

*CULVER - Redirect (Mr. Abell)*                                      91

1            MR. WESTBERRY:  Thank you, sir.  That's all I have,

2    Your Honor.

3            THE COURT:  Thank you.  Mr. White?

4            MR. WHITE:  No questions, Your Honor.  Thank you.

5            THE COURT:  Mr. Abell, I'm going to skip over you --

6            MR. BALDANI:  None from us.

7            THE COURT:  -- see if anyone else has any questions.

8            MR. GILBERT:  No questions.

9            THE COURT:  We're back with redirect, Mr. Abell.

10                      REDIRECT EXAMINATION

11   BY MR. ABELL:

12   Q.  Chief Culver, did Todd Roberts or yourself make the

13   decision to arrest Mr. Stivers back in the fall of 2002?

14   A.  Todd Roberts.

15   Q.  You were asked about proceedings in the Clay District

16   Court.  Do you recall that line of questioning from Mr. Smith?

17   A.  Yes.

18   Q.  You, in fact, testified at a hearing?

19   A.  Yes.

20   Q.  Testified under oath, same as today?

21   A.  Yes.

22   Q.  Do you recall being asked a question, did Mr. Stivers

23   appear to be under the influence that morning to you?

24   A.  Correct.

25   Q.  Do you recall your answer?

CULVER - Redirect (Mr. Abell)                                    92

1    A.   Yes.  I said no.

2    Q.   And do you recall being asked a question, so it would be

3    a fair statement to say that you did not believe that he was

4    intoxicated?  Do you recall that question at the hearing?

5    A.   Yes.

6    Q.   And do you recall your answer?

7    A.   I said no, I did not believe that.

8             MR. ABELL:  Nothing further, Judge.

9             THE COURT:  All right.  See if there's any recross on

10   matters that were just covered.

11            MR. SMITH:  None.

12            THE COURT:  All right.  Anything else from any of the

13   attorneys?  All right.  Thank you.  You may step down.  You're

14   excused at this time.

15            THE WITNESS:  May I be excused?

16            THE COURT:  Yes, sir.  Thank you.  Mr. Abell?

17            MR. ABELL:  Judge, Mr. Stivers would announce close

18   at this point.

19            THE COURT:  All right.  Thank you, Mr. Abell.  Make

20   sure that counsel's ready to proceed.

21            MR. BALDANI:  We're ready, Judge.  I'm not sure if

22   our witnesses are in that room or that room, but they're here

23   and ready to go.

24            THE COURT:  Who will your first witness be?

25            MR. BALDANI:  We would call Shirley Bishop first,

CULVER - Redirect (Mr. Abell)                              93

1    please, Judge.

2              THE COURT:  You can check to see if she's here.

3              MR. SMITH:  Your Honor, I do have an issue if we

4    could take up while this witness is coming in.

5              THE COURT:  Mr. Baldani, I believe we're locating a

6    witness.  If you all would like to come up, and we'll have a

7    Bench conference as she's being located.

8                        (A sidebar conference was held out of the

9                        hearing of the jury):

10             MR. SMITH:  Your Honor, as an officer of the court, I

11   respect the Court's rule on separation of witnesses, and

12   members of my team have witnessed this witness, obviously,

13   having conversations with her husband at breaks today, and I

14   just want to bring that to the Court's attention, that we have

15   concerns that those conversations may -- I don't have any idea

16   what she's going to testify to.  I don't know how -- if it's

17   relevant to our case, but --

18             THE COURT:  Let me ask this.  Shirley Bishop is

19   married to --

20             MR. BALDANI:  Clay Bishop, Your Honor.

21             THE COURT:  Clay Bishop, okay.  We have more than one

22   Bishop here.

23             MR. BALDANI:  Let me just tell you, it's very

24   straightforward and simple.  She is involved with the Women's

25   Republican Club, and she asked Freddy to bring a machine there

*CULVER - Redirect (Mr. Abell)*                                    94

1   to the club to demonstrate it.  That's the only issue I'm

2   going to ask her about.  I mean, she hasn't been in the

3   courtroom.  If he wants to ask if she's discussed -- I mean,

4   I'm 99% sure she hasn't discussed any testimony, but it's her

5   husband, you know.  They rode up together, I suppose.  Maybe.

6   I don't even know that, Judge.

7            THE COURT:  What we'll do, Mr. Smith, if you request,

8   after she testifies on direct examination, if she testifies to

9   matters other than that, if you want to *voir dire* her outside

10  the presence of the jury, we'll take a short recess, allow you

11  to do that.  That should satisfy any concerns.  But if her

12  testimony is only that a voting machine was taken, that would

13  be historical information.

14           MR. SMITH:  Certainly.

15           THE COURT:  I don't think you would have a need to

16  talk with her outside the presence of the jury.

17           MR. BALDANI:  Sorry, Judge.  I did plan to ask her

18  are you married to Clay Bishop, just by way of introduction.

19           THE COURT:  All right.  While we're here together,

20  how long do you anticipate your witnesses will be so we can

21  make sure that the Morrises are --

22           MR. BALDANI:  Judge, we really hope to do this this

23  afternoon, but it's looking pretty doubtful.  I mean, I've got

24  about four witnesses on the machine, but I don't see any

25  reason any one of them should be more than two minutes on

*CULVER - Redirect (Mr. Abell)*                                    95

1      direct.  We have two or three others that could take a little

2      bit longer.  Mr. Smith's cross-examinations have been quite

3      thorough, so I doubt we could get through today.

4              THE COURT:  Okay.

5              MR. BALDANI:  If we don't get through today, Judge,

6      assuming Mr. Thompson does not testify, we should be able to

7      finish up first thing in the morning.  We definitely would --

8      we would try to get done today, though, if that helps.

9              MR. RICHARDSON:  Just so you know, we have a voting

10     machine here.  We want to have one of our witnesses go through

11     the voting machine and set it up.

12             THE COURT:  You're going to bring a voting machine

13     into the courtroom?

14             MR. RICHARDSON:  Yes, sir.

15             THE COURT:  Don't you think it would have been a good

16     idea to check with the Court before you did that?

17             MR. RICHARDSON:  I told Mr. Smith the other day we

18     were going to bring one in.

19             THE COURT:  Mr. Smith isn't the Court, sir.

20             MR. RICHARDSON:  Yes, sir.

21             THE COURT:  We'll need to take a recess before that

22     happens.  We'll proceed with your witnesses.  If you plan to

23     bring a voting machine into the courtroom, we'll have to take

24     a break before that occurs.

25             MR. BALDANI:  No problem.

*S. BISHOP - Direct (Mr. Baldani)* 96

1          (Sidebar conference concluded.)

2          THE COURT:  You can bring the next witness in.

3              SHIRLEY BISHOP, DEFENSE WITNESS, SWORN

4          THE COURT:  Thank you and please proceed.

5                      DIRECT EXAMINATION

6     BY MR. BALDANI:

7     Q.   Would you tell us your name, please?

8     A.   Shirley Bishop.

9     Q.   Miss Bishop, where do you live?

10    A.   Manchester, Kentucky.

11    Q.   How long have you lived there?

12    A.   Twenty years.

13    Q.   Are you married?

14    A.   Yes.

15    Q.   Who's your husband?

16    A.   Clay Bishop.

17    Q.   The Clay County attorney?

18    A.   Yes.

19    Q.   All right.  And what do you do for a living?

20    A.   I'm a nurse by profession, but I'm not practicing that

21    right now.  I'm working in the county attorney's office.

22    Q.   All right.  Are you a member of any organizations?

23    A.   Not currently.

24    Q.   Were you in 2006?

25    A.   Yes.

*S. BISHOP - Direct (Mr. Baldani)*                                97

1   Q.   What organizations were you a member of in 2006?

2   A.   I was the president of the Republican Women of Clay

3   County.

4   Q.   How many people are in that group?

5   A.   At the time, there was probably 40.

6   Q.   Did you all have regular meetings?

7   A.   Monthly.

8   Q.   In spring of '06, did you become aware there was going to

9   be a new voting machine used at the upcoming election?

10  A.   Yes, I did.

11  Q.   As the director of that group, did you take any steps to

12  educate your group about that machine?

13  A.   Yes, I did.

14  Q.   Tell the jury what you did, please.

15  A.   Either myself or somebody from our group got up with

16  Freddy Thompson and asked if he would show us how to use the

17  machine.

18  Q.   Do you recall if it was you, yourself that made the

19  request or not?

20  A.   I believe it was.

21  Q.   Did you contact Freddy?

22  A.   Yes.

23  Q.   What did you ask him?

24  A.   If he would bring a machine to our meeting and show the

25  ladies how to use it.

S. BISHOP - Direct (Mr. Baldani)                                   98

1   Q.   What did he say?

2   A.   Yes.

3   Q.   And did he do that?

4   A.   Yes.

5   Q.   Do you recall when that was?

6   A.   No.

7   Q.   But it was prior to the May '06 election?

8   A.   Yes.

9   Q.   And tell the jury, just in a nutshell, how that occurred.

10  A.   Well, he came to our meeting, and he brought the machine

11  up and set it up and then he showed us each individually that

12  wanted to see how it worked.  So we got to practice with it.

13  Q.   Did many of the ladies practice on it?

14  A.   Yes.

15  Q.   Do you recall that the machine involved a two-step

16  process where you had to push Vote and then also Cast Ballot?

17  A.   Yes.

18  Q.   Was that shown and explained?

19  A.   Yes.

20  Q.   How long was Freddy there?

21  A.   I believe he stayed for the entire meeting, which usually

22  lasted an hour.

23  Q.   Did he stay till everybody was done either looking at it

24  or asking questions about it?

25  A.   Yes.

*C. WHITE - Direct (Mr. Baldani)* 99

1          MR. BALDANI:  That's all, Your Honor.

2          THE COURT:  Thank you.  Mr. Smith?

3          MR. SMITH:  No questions.

4          THE COURT:  See if any of the other parties have

5  questions for this witness.

6          MR. WESTBERRY:  No.

7          MR. WHITE:  No, Your Honor.

8          THE COURT:  Thank you, ma'am.  You may step down.

9  And you may call your next witness.

10          MR. BALDANI:  Judge, we call Clay White.

11          MR. WESTBERRY:  Judge, may I be excused just one

12  minute?  Miss Logan is here.

13          THE COURT:  Yes, that's all right.

14               CLAY WHITE, DEFENSE WITNESS, SWORN

15          THE COURT:  Please proceed.

16          MR. BALDANI:  Thanks, Judge.

17                    DIRECT EXAMINATION

18  BY MR. BALDANI:

19  Q.  Tell us your name, please.

20  A.  My name is Clay White.

21  Q.  Where do you live, Mr. White?

22  A.  Oneida, out in Manchester.

23  Q.  Live in Clay County?

24  A.  Clay County, yeah.

25  Q.  What do you do for a living?

*C. WHITE - Direct (Mr. Baldani)*                                          100

1   A.   I work for the Clay County attorney as a paralegal, and I

2   work at the Wal-Mart Stores, Incorporated.

3   Q.   Get a little closer to the microphone, if you would,

4   please.

5   A.   I work for the Clay County attorney as a paralegal, and I

6   work for Wal-Mart Stores, Incorporated, on the weekends.

7   Q.   In 2006, did you work at Wal-Mart?

8   A.   I worked full-time there then.

9   Q.   Full-time.  Do you know Freddy Thompson?

10  A.   Yes, sir.

11  Q.   Prior to the May, '06 election, did you become aware that

12  there was going to be a new voting machine used?

13  A.   Yes, sir.

14  Q.   Did you have any contact with Freddy Thompson about

15  displaying that machine?

16  A.   Yeah.  I worked at Wal-Mart, and I asked him if he would

17  bring them up and let people see them.

18  Q.   So you made the request of Freddy?

19  A.   Yeah.

20  Q.   Why did you do that?

21  A.   I was running for county judge, and I knew it was

22  something new for people, and I thought maybe it would be good

23  if they were familiar with it.  He agreed.

24  Q.   And did he do it?

25  A.   Yes, he did.

*C. WHITE - Direct (Mr. Baldani)*                                        101

1    Q.   Do you remember the exact date that he did it?

2    A.   No.

3    Q.   But you're sure that it was before the May '06 election?

4    A.   About three weeks or better, maybe a month.  I don't

5    know.

6    Q.   All right.  Did he bring his machine to Wal-Mart?

7    A.   I was actually working that Saturday, and I worked in the

8    lawn and garden then, and I can go outside.  You know, I can

9    go outside and load topsoil and back in.  So yeah, I saw

10   Freddy several times actually approaching people saying come

11   on, check these new machines out, you know, while we got 'em

12   up here.  I actually saw him displaying the machine outside,

13   you know.

14   Q.   So he brought it on a Saturday?

15   A.   Yeah.

16   Q.   How long was he there?

17   A.   I probably worked seven hours.  I remember him being

18   there at least four or five of them.

19   Q.   And you saw him actually approaching people?

20   A.   Yep.

21        MR. BALDANI:  That's all, Your Honor.

22        THE COURT:  Thank you.  Mr. Smith, any questions of

23   this witness?

24        MR. SMITH:  No.

25        THE COURT:  See if anyone else has any questions.

*SAMS - Direct (Mr. Baldani)*                                    102

1     Thank you.  You may step down.  You're excused.

2              THE WITNESS:  Thank you.

3              THE COURT:  Mr. Baldani.

4              MR. BALDANI:  Judge, James Sams would be our next

5     witness.

6              THE COURT:  Thank you.

7                  JAMES SAMS, DEFENSE WITNESS, SWORN

8              THE COURT:  Thank you.  Please proceed.

9                       DIRECT EXAMINATION

10    BY MR. BALDANI:

11    Q.  Mr. Sams, my name is Russ Baldani.  I'm one of Freddy

12    Thompson's attorneys.  Would you state your name for us,

13    please?

14    A.  James Sams.

15    Q.  Spell your last name, please.

16    A.  S-a-m-s.

17    Q.  Where do you live?

18    A.  Manchester, Kentucky.

19    Q.  How long have you lived there?

20    A.  Fifty years.

21    Q.  What do you do for a living?

22    A.  I build swimming pools.

23    Q.  Do you know Freddy Thompson?

24    A.  Yes, I do.

25    Q.  What did you do for a living back in 2006?

*SAMS - Direct (Mr. Baldani)*                                              103

1    A.   I was a chief of Burning Springs Fire Department back in

2    2006.

3    Q.   Chief of Burning Springs?

4    A.   Um-hmm.

5    Q.   And back, I'm talking about spring of '06, did you become

6    aware that there was going to be a new voting machine used at

7    the upcoming election?

8    A.   I was aware of it by one of the firemen advised me

9    earlier that we were having a fish fry, and one of the firemen

10   advised me earlier that week that Freddy said something about

11   wanting to bring the voting machine down to vote.

12   Q.   So is your understanding, it was his idea to bring it to

13   the fish fry?

14   A.   Yes, it was.

15   Q.   And did y'all have a fish fry?

16   A.   Yes, we did.

17   Q.   Are they a semi common event in Clay County, fish fries?

18   A.   That's a common thing for the fire department.  That's

19   the way they raise money.

20   Q.   And do you recall the specific date that y'all had this

21   fish fry?

22   A.   Not for sure, but I think it was the Saturday before the

23   election on Tuesday.

24   Q.   Did Freddy bring the machine?

25   A.   Yes, he did.

*SAMS - Direct (Mr. Baldani)*                                      104

1    Q.   And how many people were at your fish fry?

2    A.   Somewhere around 200, I would assume.

3    Q.   What did he do with the machine?

4    A.   It was sitting in the firehouse.  I was one of the fish

5    fryers.  I stayed outside and fried fish.  All I can say, that

6    it was there.  But mostly, I was outside frying fish, and I

7    did go in the firehouse occasionally.  I seen Freddy there

8    with the machine, and people were around him.  That's about

9    all I know about it.

10   Q.   Did you see him showing it to people?

11   A.   No, I didn't.  I just seen people standing there.

12   Q.   Did it appear they were looking at the machine?

13   A.   Yes.

14        MR. BALDANI:  That's all the questions I have, Your

15   Honor.

16        THE COURT:  All right.  Thank you.  Mr. Smith or Mr.

17   Parman, any questions?

18        MR. SMITH:  No, Your Honor.

19        THE COURT:  See if any of the other parties have

20   questions?  No.  All right.  Mr. Sams, thank you, sir.  You

21   may step down.

22        THE WITNESS:  Thank you.

23        THE COURT:  Mr. Baldani.

24        MR. BALDANI:  Karen Lawson, Your Honor.

25            KAREN LAWSON, DEFENSE WITNESS, SWORN

1              THE COURT:  Thank you and please proceed.

2                         DIRECT EXAMINATION

3    BY MR. BALDANI:

4    Q.  Would you tell us -- I'm sorry.  I'm Russ Baldani.  I'm

5    one of Freddy Thompson's attorneys.  Would you tell us your

6    name, please?

7    A.  Karen Lawson.

8    Q.  Try to lean a little closer.

9    A.  Karen Lawson.

10   Q.  Where do you live, Miss Lawson?

11   A.  Manchester.

12   Q.  How long have you lived there?

13   A.  For 43 years.

14   Q.  What do you do for a living?

15   A.  I'm the community education director for Clay County

16   Public Schools.

17   Q.  Just real brief, what is that?

18   A.  It's a program that works uniting the school district and

19   the community together on different projects.

20   Q.  Do you know Freddy Thompson?

21   A.  I do.

22   Q.  How long have you known him?

23   A.  Thirty years.

24   Q.  Was there an event back in May of '06 that you helped to

25   organize?

*LAWSON - Direct (Mr. Baldani)*                                      106

1    A.   Yes, there was.

2    Q.   What's the -- what was the event?

3    A.   It was the eighth annual Clay County reading celebration.

4    Q.   I know you'd like to talk a lot about it, but can you

5    tell us just in a nutshell what it is?

6    A.   It's an annual event that celebrates literacy and the

7    achievements of students within our school district.

8    Q.   And did you organize the event, or what was your role?

9    A.   I'm the event coordinator.

10   Q.   And did Freddy Thompson participate in that event?

11   A.   Yes, he did.

12   Q.   And how did that come about?

13   A.   We contact local community members and businesses to be a

14   part of that, to either distribute information or to

15   contribute financially to sponsor the event.

16   Q.   And where did the event take place?

17   A.   Big Creek Elementary.

18   Q.   Do you remember the specific date?

19   A.   May the 12th.

20   Q.   And what was it that you asked Freddy to do?

21   A.   We contacted him just to sponsor or to do whatever he

22   could possibly do, and he returned the call to me asking to

23   bring the voting machines to do a voter awareness program.

24   Q.   He asked you?

25   A.   Um-hmm.

*LAWSON - Direct (Mr. Baldani)*                                    107

1   Q.   What did you say?

2   A.   Told him that was perfectly fine.

3   Q.   And what happened on May 12th?

4   A.   He brought the machines to the school.  We had a

5   designated place for him to set up with the other community

6   people.

7   Q.   How many people do you estimate attended that event?

8   A.   Five to six thousand.

9   Q.   And what day of the week did it happen on?

10  A.   Friday evening.

11  Q.   How long was Freddy there?

12  A.   As far as I know, he was there for the duration of the

13  event.

14  Q.   And as organizer, did you make the rounds of the event?

15  A.   I did.

16  Q.   Did you see him display the voting machine?

17  A.   Yes, I did.

18  Q.   And did it appear that it was well received?

19  A.   Yes, it was.

20  Q.   What did you observe him doing?

21  A.   I saw him talking with people.  You know, I wasn't

22  actually at, you know, standing right at the machine.  But

23  there was people there with him looking at the machine.

24  Q.   Did he appear to be showing people how to use the

25  machine?

1    A.   Yes, he did.

2    Q.   And as organizer, did you appreciate his participation?

3    A.   Very much so.

4          MR. BALDANI:  That's all, Your Honor.

5          THE COURT:  Thank you.  Mr. Smith or Mr. Parman?

6          MR. SMITH:  Yes, Your Honor.

7                    CROSS-EXAMINATION

8    BY MR. SMITH:

9    Q.   Miss Lawson, sounds like this was a big gathering, five

10   or six thousand people in Clay County.  That's about a fourth

11   of the population over there; is that accurate?

12   A.   Probably so.

13   Q.   So how do you attract a fourth of the population of Clay

14   County to come down and see the county clerk?  How did you do

15   that?

16   A.   When you're recognizing 500 students for their reading

17   achievements and they are receiving awards, parents come,

18   grandparents come.  Secretary Trey Grayson was a keynote

19   speaker that year, as was Mark Kennedy Shriver.

20   Q.   Oh, so there were a lot of other activities planned for

21   the day other than the voting machine for election?

22   A.   Yes.

23   Q.   And was he given a spot on the program to speak with the

24   other keynote speakers, such as Trey Grayson?

25   A.   No, he was not.

*LAWSON - Cross (Mr. Smith)*                                     109

1    Q.   Okay.  Where did he set up his display?

2    A.   In the gymnasium.

3    Q.   Okay.  And would that have been Center Court, off to the

4    left, right?  Where in the gymnasium did he set up?

5    A.   He would have been along the back wall of the gymnasium,

6    along with several other vendors.  Everyone was in a row so

7    that the center part of the court was open for people to move

8    around.

9    Q.   What other kind of vendors were there, ma'am, that were

10   set up along the wall?

11   A.   Our local city police was there doing fingerprinting for

12   children.  Eastern Kentucky University was there.  Our local

13   Health Department, the AmeriCorps program.  A number of

14   different programs were there.

15   Q.   As I understand, you weren't able to physically visit all

16   these places, including Mr. Thompson's display, to know what

17   was being presented?  Is that fair?

18   A.   Yes.

19           MR. SMITH:  You're doing a good job, ma'am.  Keep up

20   the good work.  Thank you.

21           THE COURT:  Let's see if any of the other --

22           MS. LOGAN:  I have just two brief questions.

23           THE COURT:  Yes, ma'am.

24           MS. LOGAN:  If I could ask from here.

25           THE COURT:  Yes.

LAWSON - Cross (Ms. Logan)                                    110

1                              CROSS-EXAMINATION

2      BY MS. LOGAN:

3      Q.   My name is Kristin Logan.  I'm one of Doug Adams'

4      attorneys.  I have a couple of questions.  This annual reading

5      celebration, when did that start?

6      A.   I was not employed by the Board the first year it

7      started.  This will be the 12th year so whatever year that

8      was.

9      Q.   Okay, then.  My math's not the best either.  Let me go,

10     would you guess late '90s, '99, '98?

11     A.   Yes.

12     Q.   And was that done in conjunction with the Clay County

13     school systems?

14     A.   Yes, it was.

15               MS. LOGAN:  Thank you.

16               THE COURT:  Thank you.  See if we have anyone else

17     has any redirect of the witness.  Mr. Baldani?

18               MR. BALDANI:  No, Your Honor.

19               THE COURT:  Thank you, ma'am.  You may step down.

20     Thank you.

21               Mr. Richardson, will you be calling the next witness?

22               MR. RICHARDSON:  Yes, Your Honor.  If I may speak

23     with counsel, show him what I've got here, Judge.

24               THE COURT:  That will be fine.

25               MR. RICHARDSON:  Your Honor, if we could call Glenn

*GRAY - Direct (Mr. Richardson)*                                    111

1    Gray, please.

2                    GLENN GRAY, DEFENSE WITNESS, SWORN

3              THE COURT:  Thank you.  Please proceed.

4                         DIRECT EXAMINATION

5    BY MR. RICHARDSON:

6    Q.   Glenn Gray, my name is Tucker Richardson.  I'm one of

7    Freddy Thompson's attorneys.  State your name for the record.

8    A.   Glenn Gray.

9    Q.   Spell your last name.

10   A.   G-r-a-y.

11   Q.   What do you do, Mr. Gray?

12   A.   I'm the chief financial officer for the Manchester

13   Enterprise, or publisher.

14   Q.   How long have you done that?

15   A.   Since 1983.

16   Q.   And the Manchester Enterprise, what is that, exactly?

17   A.   It's the legal newspaper for Clay County.

18   Q.   And how often are you published?

19   A.   Weekly.

20   Q.   And you were in that capacity as chief bottle washer or

21   so back in 2006?

22   A.   Correct.

23   Q.   And I noticed you have some books there with you.  What

24   are those books?

25   A.   Those are copies of some voting booth --

*GRAY - Direct (Mr. Richardson)*                                       112

1    Q.   I'm talking about the big black books.

2    A.   Oh, I'm sorry.  Those are bound volumes of our newspaper

3    for the entire fiscal year for 2006, 2005.

4    Q.   And I asked you to bring some items with you specifically

5    in our request to have you come here today?

6    A.   Right.

7    Q.   And specifically --

8              MR. RICHARDSON:  I think we're on Freddy Thompson 2,

9    Exhibit 2.

10             DEPUTY CLERK:  Correct.

11             MR. RICHARDSON:  2, thank you.  If I could, Your

12   Honor, may I have the Court security officer show this to Mr.

13   Gray?

14             THE COURT:  Yes.  Mr. Smith, have you reviewed that?

15             MR. SMITH:  Yes.

16             THE COURT:  Everyone else seen it?  You can show it

17   to the witness.  Mr. Gilbert, did you want to look at that?

18             MR. GILBERT:  No, I'm fine, Your Honor.

19             THE COURT:  Thank you.

20   BY MR. RICHARDSON:

21   Q.   And what is that?

22   A.   This is a news item concerning the voters' machines and

23   how to properly use the voting machines.  Tells you the steps,

24   how to go through and, I guess, to vote.

25   Q.   And where did you get those instructions?

*GRAY - Direct (Mr. Richardson)*                                      113

1    A.   Where did we get them from?  Again, day-to-day operation,

2    I'm assuming they came from the county clerk's office.

3              MR. SMITH:  Your Honor, I'm going to object to

4    speculation.

5              THE COURT:  All right.  Witness will be advised that

6    he should testify based on personal knowledge and should not

7    speculate.

8    Q.   Would one of your reporters have gotten that information?

9    A.   Sure.  My general manager would have gotten it.

10   Q.   And that truly, that is a copy that I've asked you to

11   look at before, prior to coming here today?

12   A.   Yes, it is.

13   Q.   And does that truly and accurately represent what was

14   actually presented in your paper on May 4th, I think, 2006?

15   A.   Yes, it does.

16   Q.   And is kept in the regular course of your business?

17   A.   Right.

18             MR. RICHARDSON:  Move to introduce Freddy Thompson 2,

19   Your Honor.

20             THE COURT:  All right.  Any objection to the

21   admission of Exhibit Number 2?

22             MR. SMITH:  No objection.

23             THE COURT:  Thompson Exhibit Number 2 will be

24   admitted.

25             MR. RICHARDSON:  Thank you, Judge.

*GRAY - Direct (Mr. Richardson)*                                              114

1                        (Thompson Exhibit No. 2

2                        was admitted into evidence.)

3   Q.   Now, a couple things.  At the top of that page, that says

4   Voter's Cheat Sheet?

5   A.   Right.

6   Q.   Was that -- who made that?

7   A.   Definitely somebody in our design department came up with

8   the headline.

9   Q.   That's a news thing that came up?

10  A.   Yeah.

11  Q.   And the date on that paper is?

12  A.   Thursday, May 4, 2006.

13  Q.   And that would be before the election?

14  A.   Right.

15  Q.   Thank you.  I now want to --

16       MR. RICHARDSON:  Court security officer, if you

17  could, please.

18  Q.   Do you recognize that?

19  A.   Yes, I do.

20  Q.   And what is that?

21  A.   That's the repeat of the first one that's on May 11th,

22  which would have been the following week.

23  Q.   And once again, Voter's Cheat Sheet?

24  A.   Probably just repeat of the first one.  Sometime it saves

25  time.

*GRAY - Direct (Mr. Richardson)*                                      115

1  Q.   And I've asked you to look at that, and that is enclosed

2  in those bound volumes?

3  A.   Right.

4  Q.   And you keep those in the regular course of your

5  business?

6  A.   Correct.

7        MR. RICHARDSON:  Move to introduce Freddy Thompson

8  Number 4, please -- I mean 3, please.

9        THE COURT:  Any objection?

10        MR. SMITH:  No objection.

11        THE COURT:  Thompson Exhibit Number 3 will be

12  admitted.

13                    (Thompson Exhibit No. 3

14                    was admitted into evidence.)

15  Q.   And that was May 11th, is that what you said?

16  A.   Yes, sir.

17  Q.   And that was prior to the --

18  A.   Yes, sir.

19  Q.   I want to now -- do you recognize that, sir?

20  A.   Yes, I do.

21  Q.   And what is that?

22  A.   That is a repeat of the first two.

23  Q.   And what date is that?

24  A.   May 15th -- May 15th, 2006.

25  Q.   So that's a different --

*GRAY - Direct (Mr. Richardson)*                                    116

1    A.   It was a special edition that we -- that appeared before

2    the election.

3    Q.   And in that, once again, I asked you to bring your books,

4    and that's enclosed in there?

5    A.   Yes, it is.

6    Q.   And that's kept in the regular course of your business?

7    A.   Yes, it is.

8            MR. RICHARDSON:  I move to introduce at this time

9    Freddy Thompson Number 4, please.

10           THE COURT:  Any objection?

11           MR. SMITH:  No objection.

12           THE COURT:  Thompson Exhibit Number 4 will be

13   admitted.

14                    (Thompson Exhibit No. 4

15                        was admitted into evidence.)

16           MR. RICHARDSON:  One moment, Your Honor, please.

17           THE COURT:  Yes, sir.

18   Q.   How many papers, back in 2006, how many papers would you

19   print?

20   A.   For this edition?  6,000.

21   Q.   6,000?

22   A.   Um-hmm.

23   Q.   And are they sold or given away?

24   A.   They're sold.

25   Q.   All throughout Clay County?

*GRAY - Cross (Mr. Smith)*                                         117

1    A.   Yes, and the surrounding area.

2              MR. RICHARDSON:  Thank you.  No further questions,

3    Judge.  Thank you.

4              THE COURT:  All right.  Mr. Smith or Mr. Parman, any

5    questions for this witness?

6              MR. SMITH:  Yes, sir.

7              THE COURT:  Yes, sir, you may proceed.

8                        CROSS-EXAMINATION

9    BY MR. SMITH:

10   Q.   Mr. Gray, the circulation is 6,000.  You said Clay County

11   and surrounding areas.  Does that include cities such as

12   London?

13   A.   Yes, it would.

14   Q.   Do you know how many of your papers make it to London?

15   A.   Make it to or are sold?

16   Q.   Well, we're talking about the circulation.  Do you know

17   what the circulation is in Laurel County, which is a

18   considerably larger county, I'm told, than Clay County?

19   A.   I don't know the exact number, if that's what you're

20   asking me.  I can give you a, probably a rounded off number.

21   Maybe 700.

22   Q.   Okay.  What other surrounding areas do you circulate your

23   papers?

24   A.   We have newspapers that go to every state by mail.  But

25   as far as -- is that what you're asking me?

*GRAY - Cross (Mr. Smith)*                                                    118

1    Q.   What's the number on your mailing list in 2006 around

2    May, if you know?

3    A.   1,100.

4    Q.   Any other areas other than Laurel County and your mail

5    circulation?

6    A.   No.

7    Q.   It's about 1,800 out of your 6,000 goes elsewhere than

8    Clay County, would that be fair?

9    A.   No, sir.  In that 1,100 I gave you, that included 400

10   mail subscribers in the county.  Outside of Clay County would

11   be probably about 1,300, 1,400.

12   Q.   13 or 14 hundred?

13   A.   Right.

14   Q.   Okay.  And would it be fair to say that there are

15   incidences of adult illiteracy in Clay County?

16   A.   Well, I'm not an expert, but I'm sure there is.

17   Q.   And you don't know what that number would be, do you?

18   A.   No.

19   Q.   And you're not here to testify that everybody in Clay

20   County actually read your paper, are you, sir?

21   A.   No.

22            MR. SMITH:  Thank you.

23            THE COURT:  See if any of the other attorneys have

24   questions.  Mr. --

25            MR. GILBERT:  May we approach, Your Honor?

1          THE COURT:  Yes, sir.

2               (A sidebar conference was held out of the

3               hearing of the jury):

4          THE COURT:  Mr. Gilbert?

5          MR. GILBERT:  Yes, Your Honor.  I have this witness

6     under subpoena too.  He's here to testify, he's brought

7     copies, two editions on January 31st of '02 and March the 14th

8     of '96 in terms of presenting bids, advertisements for bids

9     involving contracts in the City of Manchester.

10         MR. SMITH:  Excuse me.  I was looking at those dates.

11    Those which are outside the conspiracy dates.  Is that fair?

12         MR. GILBERT:  That's fair.

13         THE COURT:  Have you shown this to Mr. Smith, I

14    guess, is the next question?

15         MR. GILBERT:  Yes, this is the '02 notice of bid.

16    The only thing he could send me, since this is in a book, the

17    only thing he could send me was a photograph.  I wasn't able

18    to copy it, the one that he sent to me.  So I will have to get

19    his book and make a photocopy at the clerk's office to make it

20    legible.

21         THE COURT:  Okay.  Tell me about that specific bid,

22    since it's outside the -- we have had some testimony that's

23    outside the time period charged in the indictment.  Tell me

24    what the bids are and how they're relevant to the claims in

25    the case.

1          MR. GILBERT:  The testimony has been from the City

2     employees, and there's been exhibits introduced in terms of

3     the proposal that was made in 1994 and then the original

4     contract that was entered into in 1994.

5          THE COURT:  Right.

6          MR. GILBERT:  There's also been, in the minutes of

7     the city, there has been entered a partial list of the minutes

8     of the city that's been introduced from 1994 I believe until

9     2007.  These advertised bids are mentioned in the city minutes

10    that have been introduced by the government.

11         THE COURT:  Is this the bid for the garbage contract?

12         MR. GILBERT:  Yes, Your Honor.

13         THE COURT:  Okay.  So we have one that would have

14    been --

15         MR. SMITH:  May I see that, Mr. Gilbert?  I'm sorry.

16    My copy didn't come through on the e-mail.  I couldn't read

17    it.

18         MR. GILBERT:  I don't think any of these are real

19    clear, but he has the books here.

20         THE COURT:  Why don't we do this.  Why don't we take

21    just a real brief recess to let you look at the original book,

22    and then you can make a better copy for everyone, because I

23    don't think anybody's going to be able to read this.

24         MR. GILBERT:  I know.  That's what I would like to do

25    now.

1          THE COURT:  Okay.  Before you ask questions, we'll

2     take a brief recess and allow you to compare whatever original

3     he's brought with him with what you have, and then if

4     necessary, we can make copies back here on my machine for

5     everybody.  And then if there are issues about relevancy, we

6     can take those up outside the presence of the jury.  But we

7     need to see what it is first.

8          MR. GILBERT:  Yes, Your Honor.

9          THE COURT:  Before we go forward.  Thank you.

10              (Sidebar conference concluded.)

11          THE COURT:  Ladies and gentlemen, we're going to need

12    to make some little more legible copies of some documents

13    before we proceed.  So I'm going to excuse you for a few

14    moments, maybe ten minutes.  I'm not going to excuse you for

15    the day.  We do want to continue.  We will be in recess for

16    approximately ten minutes.  Please keep in mind the admonition

17    you've been given previously not to discuss the case among

18    yourselves.  The jury will be in recess for approximately ten

19    minutes.

20              (The jury left the courtroom at 3:54 p.m.)

21          THE COURT:  Mr. Gilbert, when we take our recess, if

22    you could locate the originals from the documents that this

23    witness brought.  Check with Mr. Smith.  And then if you want

24    to come back, you can make copies back in my office, enough

25    for everyone here.  If there are issues about admissibility,

*GRAY - Direct (Mr. Gilbert)*                                    122

1    we can take those up before the jury comes back in, but you

2    all need to let me know.  We'll be in recess for hopefully ten

3    minutes.

4                    (Recess from 3:55 p.m. until 4:13 p.m.)

5                    (The jury entered the courtroom at 4:13 p.m.)

6                    THE COURT:  All right.  Thank you.  Let's see.  Mr.

7    Gilbert, I believe we're up to you at this point.  You have

8    this witness under subpoena, so you'd like to ask questions as

9    if on direct.

10                   MR. GILBERT:  Thank you, Your Honor.

11                              DIRECT EXAMINATION

12   BY MR. GILBERT:

13   Q.   Mr. Gray, my name is Jerry Gilbert, and I represent Bart

14   Morris.  You're also responding here to a subpoena issued by

15   me for your appearance to bring certain editions of the

16   Manchester Enterprise?

17   A.   Correct.

18   Q.   And did you bring with you the edition of March the 14th,

19   1996?

20   A.   I did.

21   Q.   And does that edition, on page A11, contain a Notice of

22   Bid published by the City of Manchester?

23   A.   Yes, it does.

24                   MR. GILBERT:  If I could have the witness given a

25   copy of -- can we make this William B. Morris Exhibit 1, Your

*GRAY - Direct (Mr. Gilbert)*                                                    123

1    Honor?

2                THE COURT:  Yes.

3    Q.   Can you identify that document?

4    A.   Yes.

5    Q.   And is that the Notice of Bid from the City of

6    Manchester?

7    A.   Yes, it is.

8    Q.   All right.  And as you testified previously, you are the

9    custodian of the records of the Manchester Enterprise?

10   A.   Yes.

11   Q.   And is that a true and accurate copy that you have in

12   your hand, Exhibit Number 1, of the --

13   A.   It is.

14   Q.   -- advertisement of the bid that was published in March

15   of 1996?

16   A.   Correct.

17               MR. GILBERT:  I move for the introduction of Exhibit

18   Number 1.

19               THE COURT:  All right.  Any objection to admission of

20   William Morris Exhibit Number 1?

21               MR. SMITH:  No objection.

22               THE COURT:  All right.  That document will be

23   admitted.

24                        (William B. Morris Exhibit No. 1

25                         was admitted into evidence.)

*GRAY - Direct (Mr. Gilbert)*                                           124

1    Q.   And have you also been requested to bring the edition of

2    January the 31st, 2002 with you here today?

3    A.   I do.

4    Q.   And have you made a copy of, again, on page A11, of a

5    Notice of Bid published at the request of the City of

6    Manchester, Kentucky?

7    A.   Yes, I do.

8    Q.   And is that a true and accurate copy of the bid that was

9    published in your newspaper January the 31st, 2002?

10   A.   Yes, it is.

11        MR. GILBERT:  I move for the introduction of Exhibit

12   Number 2, Your Honor.

13        THE COURT:  Any objection?

14        MR. SMITH:  No.

15        THE COURT:  William Morris Exhibit Number 2 will be

16   admitted.

17              (William B. Morris Exhibit No. 2

18               was admitted into evidence.)

19   Q.   And finally, were you subpoenaed to bring the edition of

20   March the 7th, 2002 with you here today?

21   A.   Yes.

22   Q.   And I'll show you what will be marked as William B.

23   Morris Exhibit Number 3.  Ask you if that is an ordinance that

24   was published by the City of Manchester on page B2 of that

25   edition.

*GRAY - Direct (Mr. Gilbert)*                                                125

1    A.  Yes, it is.

2    Q.  And is that a true and accurate copy of that ordinance as

3    published in your newspaper on that date?

4    A.  Yes, sir.

5            MR. GILBERT:  Move for its introduction, Your Honor.

6            THE COURT:  Any objection?

7            MR. SMITH:  No.

8            THE COURT:  Exhibit 3 will be admitted.

9                    (William B. Morris Exhibit No. 3

10                    was admitted into evidence.)

11   Q.  Mr. Gray, you testified previously that the Manchester

12   Enterprise is the legal publication of Clay County?

13   A.  Yes.

14   Q.  Can you tell the jury what that means, please?

15   A.  It is the largest paid circulated newspaper in the county

16   that is authorized to print legal notices regarding the courts

17   and government.

18   Q.  And that's by state statute?

19   A.  State statute.

20           MR. GILBERT:  Thank you.

21           THE COURT:  Mr. Smith, let's see where we are first

22   before we get to you.

23           MS. HUGHES:  None, sir.

24           MR. SIMONS:  No.

25           THE COURT:  All right.  Let's see if there's any

*GRAY - Recross (Mr. Smith)*                                                126

1    cross-examination.  Mr. Smith?

2              MR. SMITH:  Yes, Your Honor.

3                        RECROSS-EXAMINATION

4    BY MR. SMITH:

5    Q.  Mr. Gray, this legal notice section in your paper, it

6    contains various things such as master commissioner sales and

7    descriptions and legal notices of all sorts of things; is that

8    accurate?

9    A.  Yes, it is.

10   Q.  And not just notices on bidding for properties of the

11   city or county?

12   A.  Correct.

13   Q.  I'd like for you to tell us, those notices, are they

14   prepared by the city and then sent over to your office?

15   A.  By the city attorney.

16   Q.  And you all don't have anything to do with the wording or

17   the language that's used?

18   A.  No, they're printed verbatim.

19   Q.  And I'd like to direct your attention to Exhibit Number 2

20   there.  Could you read for us that paragraph?  I think it's

21   identified as the Notice of Bid?  Can you read that for us?

22   A.  "City of Manchester Kentucky is hereby taking bids for

23   exclusive rights to operate within the city limits of the of

24   Manchester, Kentucky, pursuant to Article 3, Section 175.41-2

25   of Ordinance Number 81 of the City of Manchester, Kentucky.

*GRAY - Recross (Mr. Smith)*                                    127

1    Bids will be accepted until 19th day of February, 2002 at

2    9:00 a.m.  City of Manchester reserves the right to reject any

3    and all bids based on the best interest of the City of

4    Manchester, Kentucky, Daugh K. White, mayor, Manchester

5    1 of 2."

6    Q.  And you see anywhere there's a mention of garbage in that

7    notice?

8    A.  No, I don't.

9              MR. SMITH:  That's all I have.  Thank you.

10             THE COURT:  All right.  See if the parties have

11   anything else of this witness.  Mr. Richardson?

12             MR. RICHARDSON:  No, Your Honor.

13             THE COURT:  All right.  Any objection to this witness

14   being excused at this time?

15             MR. SMITH:  No.

16             THE COURT:  You can step down.  You're excused.

17             THE WITNESS:  These records --

18             THE COURT:  You can keep these with you.  Thank you.

19   Mr. Richardson or Mr. Baldani?

20             MR. BALDANI:  Could we have a brief sidebar, Judge?

21             THE COURT:  Yes, sir, you may.

22                  (A sidebar conference was held out of the

23                   hearing of the jury):

24             MR. BALDANI:  Judge, none of our remaining witnesses

25   have any hope of getting on in a few minutes, and in all

1    candor, we're talking about which, if any, to call.  And since

2    we're eight minutes away from 4:30, I wondered if we might go

3    ahead and break for the day.

4            THE COURT:  Okay.

5            MR. BALDANI:  Because we're having serious

6    discussions about who that we still want to call.  And even if

7    we did decide to, we'd barely get through introductions before

8    it's 4:30.  I thought I'd let you know.

9            THE COURT:  Before we break, I do want to get back to

10   this issue of setting up a voting machine in the courtroom.  I

11   do want to take some time to discuss that with counsel outside

12   the presence of the jury.  So I'm going to go ahead and excuse

13   the jury at this time.

14           One of our jurors has asked if we could start a

15   little bit later tomorrow so he can take care of some business

16   obligations that he has, but I want to see where we stand in

17   terms of schedule before I do that.  I don't want to delay

18   this proceeding unnecessarily, but seems like we made a little

19   bit of progress today.

20           Your best estimate as time, when did you anticipate

21   you'll be closing your case?

22           MR. BALDANI:  Judge, let me tell you this.  We

23   discussed the machine, and we're not going to do it.

24           THE COURT:  Okay.  Regardless of that decision, when

25   did you think you'll be closing your case?

1      MR. BALDANI:  Early tomorrow morning.  I mean, it's

2  within the realm of possibility we may not call another

3  witness, Judge.

4      THE COURT:  Okay.

5      MR. BALDANI:  So the co-defendants should be ready to

6  go, because we may announce close as soon as we get here, and

7  we have no intention of displaying the machine.

8      THE COURT:  Okay.  Mr. Gilbert, you'll be ready to go

9  first thing in the morning?

10      MR. GILBERT:  Yes, Your Honor.

11      THE COURT:  As matters stand now, how long would you

12  anticipate that your case would take?  It's anticipating

13  reasonable cross-examination.

14      MR. GILBERT:  I've got, I think, a total of seven

15  witnesses.  Six of them, I think, would be fairly classified

16  as Judge Hood witnesses.

17      THE COURT:  That's good to know.  That's very

18  helpful.  Appreciate that.

19      MR. GILBERT:  And the other witness is a CPA that

20  will give testimony that's consistent with Mr. Gravitt, who

21  testified.

22      THE COURT:  So you could possibly finish by shortly

23  after lunch?

24      MR. GILBERT:  Probably before, depending upon what

25  time we start.

1          THE COURT:  Okay.  Miss Hughes, you would be going

2     next.  Your best estimate.  I'm not going to hold you to it.

3          MS. HUGHES:  I think that I would take up the

4     afternoon.  I will say, you know, today's been -- gone

5     surprisingly fast so I do have a couple of witnesses -- I have

6     a number of witnesses for tomorrow, but I also have two that

7     are subpoenaed for Thursday, so I'm going to hopefully --

8          THE COURT:  Call those in?

9          MS. HUGHES:  Right, I'm going to see what I can do.

10          THE COURT:  We'll just go ahead, then, and we'll

11     break now.  I do want to talk about scheduling a little bit

12     more.  I haven't forgot about you.

13          MR. SIMONS:  I'll have a couple here tomorrow just in

14     case.

15          THE COURT:  I just want to make sure that we're

16     moving as rapidly as it appears that we are.  I'm going to ask

17     the jury to come in at 9:30 tomorrow, and that should keep us

18     on track, I think.  But I'll do that, I'll give our one juror

19     a little bit of leeway.  He needs to take care of some

20     business obligations that he's got.  I don't want to unduly

21     punish any member of the jury so I'm going to go ahead and

22     give him a little bit of extra time.  We can take up

23     scheduling.  I want to excuse the jury now.  If there are any

24     issues, we can take them up outside the presence.

25                    (Sidebar conference concluded.)

131

1        THE COURT:  All right.  Thank you, ladies and

2   gentlemen.  Before I excuse you for the evening, before the

3   next witness would be called, I do want to mention the

4   schedule for tomorrow.  I do understand that at least one of

5   our jurors has some business obligations to attend to.  So

6   rather than come in at 9:00, I'll ask you to come in at 9:30

7   tomorrow so it will give you at least 30 minutes extra, other

8   than what we ordinarily would give you.

9        So please be here tomorrow at 9:30.  As we break for

10  the evening, of course, I also want to remind you of the

11  admonition I've given to you several times.  Again, you know

12  what it is.  Don't discuss the case with anyone.  Don't allow

13  anyone to approach you to discuss the case.  If that should

14  ever occur during this case or any other case, of course, you

15  should report that to the Court promptly and allow the Court

16  to deal with that.

17       Don't read, watch or listen to any accounts of the

18  case if there should be any.  Don't attempt to perform any

19  type of research or do any investigation on your own or visit

20  any of the locations that you've heard about.  Don't

21  communicate about this case in any way electronically by any

22  means, and, of course, don't make up your mind about the case

23  until it is finally submitted to you.

24       The jury will be excused at this time until 9:30

25  tomorrow morning.

1          (The jury left the courtroom at 4:26 p.m.)

2          THE COURT:  I didn't want to cut anyone off at our

3     Bench conference, but I wanted to go ahead and excuse the jury

4     before we take up any further scheduling issues.  It does

5     appear that we're moving along fairly rapidly, and I would

6     anticipate that probably in two days, we could have proof in

7     for the defendants.  I think that's probably fair estimate.

8     And then if there's any rebuttal testimony, of course, that

9     would follow.  So I would anticipate that we'll be able to get

10    the proof completed in the case by the end of the week.

11         Anyone disagree with that assessment, based on what

12    you know at this time?

13         Mr. Smith, would you anticipate you'll be having a

14    lot of redirect at this time?

15         MR. SMITH:  Rebuttal, no.

16         THE COURT:  I'm sorry.  I apologize.

17         MR. SMITH:  I would say that the Court's estimate

18    would be fair, based on what I know at this point.

19         THE COURT:  All right.  Well, let me just remind

20    everyone that if you have tendered any jury instructions to

21    the Court for consideration, take a look at those and see that

22    they are what you want to tender to the Court, because I am

23    working on jury instructions now, as a matter of fact.  So if

24    there are instructions that you've tendered, please take a

25    look at those as you have an opportunity to do so.  Let me see

133

1   if there are any other scheduling or other matters that we can

2   take up before we recess for the evening.  Any of the

3   defendants have any issues?

4        MR. ABELL:  Judge, with respect to additional

5   supplemental jury instructions that seem at least to me to

6   have become applicable because of testimony in this case, when

7   would the Court like those?

8        THE COURT:  The sooner you can get those to me the

9   better.  I can take a look at whatever you submit.  Of course,

10  the government's required to submit their jury instructions

11  earlier, but you're not precluded from doing that before our

12  jury instructions conference.  So if you do have some that you

13  know that you want me to consider, you can go ahead and tender

14  those to me just as soon as you have an opportunity, really.

15       MR. ABELL:  Should those be filed in the record?

16       THE COURT:  It's not necessary that they be filed

17  into the record.  Thank you.  Mr. Westberry?

18       MR. WESTBERRY:  We submitted some at the beginning of

19  the trial on behalf of Douglas Adams.  I think the phrase that

20  I typically use is I'll submit an instruction pending on how

21  the proof or the evidence develops.  I'll look at them tonight

22  and start with an eye towards the end of the week to be able

23  to answer your question.

24       Regarding the sur-rebuttal, Judge, I think if I heard

25  the Court correctly, you think a couple of the days, all of

134

1      the defendants, it's anticipating, would have their proof, so

2      we'll know well in advance of that date whether we plan on

3      calling sur-rebuttal.

4                  THE COURT:  All right.  I appreciate that.  Mr.

5      White?

6                  MR. WHITE:  Yes, Your Honor.  Just so I'm clear, I

7      think I will have an instruction or two that I want to go

8      ahead and get to you before the weekend.  Do you want us to

9      handle that like we did earlier, which is e-mail the chambers

10     and bring a hard copy in?

11                 THE COURT:  That would be fine.  You can do that.

12     That would be fine.  Mr. Gilbert?

13                 MR. GILBERT:  Your Honor please, I'm going to be

14     meeting with my expert tonight, and in light of the discussion

15     about Rule 615, I would like to seek permission of the Court

16     to discuss testimony with him that's been introduced.

17                 THE COURT:  The Court typically will give parties

18     latitude with respect to expert witnesses.  Technically

19     experts, but the Sixth Circuit doesn't call them experts

20     anymore.  They're opinion witnesses.  But yes, I will give you

21     some latitude to discuss with your expert matters that

22     typically he would, he or she would consider in expressing an

23     opinion in the case.

24                 MR. GILBERT:  Yes, Your Honor.  Thank you.

25                 THE COURT:  So you would be allowed to do that

135

1    outside the scope of Rule 615.

2           All right.  Anything else?  Just one brief matter on

3    something we talked about earlier.  Doesn't concern all the

4    parties, but I would like to see Mr. Smith and Mr. Gilbert, if

5    you could come up to sidebar here just briefly, please.

6                        (A sidebar conference with Mr. Smith and

7                         Mr. Gilbert was held out of the

8                         hearing of the gallery):

9           THE COURT:  We had this issue come upper earlier in

10   the case about questions involving the contents of the safe.

11          MR. GILBERT:  Yes, Your Honor.

12          THE COURT:  And I put you on notice, and I was

13   considering issuing a show cause order.

14          MR. GILBERT:  Yes, Your Honor.

15          THE COURT:  I have decided, exercising my discretion,

16   not to do that.  Looking back at the testimony in the case, I

17   think that there's enough of a question here that I wouldn't

18   require you to respond to a show cause order.  I wanted to let

19   you know that now.  I didn't want that to be hanging over your

20   head.  I've looked at the testimony.  I believe, in exercising

21   the Court's discretion, it wouldn't be appropriate to issue a

22   show cause.  I wanted to let you know that at this time.

23          MR. GILBERT:  Thank you, Your Honor.

24          THE COURT:  Okay.  And I don't usually put this on

25   the record.  I don't see any reason to put this on the record

136

1    at this time.  It's not sealed, but I'm not going to announce

2    it in open court.

3            MR. GILBERT:  Thank you.

4                (Sidebar conference concluded.)

5            THE COURT:  All right.  Let me ask if there are any

6    other matters that we can take up before we recess.  Again,

7    we're not starting until 9:30 tomorrow.  If there are not any

8    other matters, we'll be in recess until that time.

9                (Proceedings adjourned at 4:32 p.m.)

10                        - - -

11

12                C E R T I F I C A T E

13            I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
14    proceedings in the above-entitled case.

15

16    \s\ Lisa Reed Wiesman                March 17, 2010
     LISA REED WIESMAN, RDR-CRR          Date of Certification
17    Official Court Reporter

18

19

20

21

22

23

24

25

1                                    INDEX

2      DEFENSE WITNESSES

3      CLAY M. BISHOP, JR.
       Direct Examination by Mr. Baldani................. Page  4
4      Redirect examination by Mr. Westberry............ Page  7
       Recross-examination by Mr. Smith................. Page 25
5      Redirect examination by Mr. Baldani.............. Page 33
       Further direct examination by Mr. Westberry...... Page 34
6      Further cross-examination by Mr. Smith........... Page 39
       Further direct examination by Mr. Westberry...... Page 46

7

8      DORIS GROSS
       Direct Examination by Mr. White.................. Page 48
       Cross-examination by Mr. Smith................... Page 51

9

10     SELENA SMITH
       Direct Examination by Mr. White.................. Page 54
       Cross-examination by Mr. Smith................... Page 59
11     Cross-examination by Mr. Richardson.............. Page 65

12     GRETA EMOND
       Direct Examination by Mr. Abell.................. Page 71
13     Cross-examination by Mr. Smith................... Page 73

14     JEFF CULVER
       Direct Examination by Mr. Abell.................. Page 75
15     Cross-examination by Mr. Smith................... Page 81
       Cross-examination by Mr. Hoskins................. Page 85
16     Cross-examination by Mr. Westberry.............. Page 89
       Cross-examination by Mr. Abell................... Page 91

17

18     SHIRLEY BISHOP
       Direct Examination by Mr. Smith.................. Page 96

19     CLAY WHITE
       Direct Examination by Mr. Smith.................. Page 99

20

21     JAMES SAMS
       Direct Examination by Mr. Smith.................. Page 102

22     KAREN LAWSON
       Direct Examination by Mr. Baldani................ Page 105
23     Cross-examination by Mr. Smith................... Page 108
       Cross-examination by Ms. Logan................... Page 110

24

25

138

DEFENSE WITNESSES (continued)

GLENN GRAY
Cross-examination by Mr. Richardson............. Page 111
Cross-examination by Mr. Smith.................. Page 117
Direct examination by Mr. Gilbert............... Page 122
Recross-examination by Mr. Smith................ Page 126


COURT EXHIBITS                                   ADMITTED

Exhibit No. 7, transcript of hearing
Admitted........................................ Page 47


DEFENSE EXHIBITS

Thompson Exhibit No. 2, 5/4/06 page from Manchester
                        Enterprise
Admitted........................................ Page 114

Thompson Exhibit No. 3, 5/11/06 page from Manchester
                        Enterprise
Admitted........................................ Page 115

Thompson Exhibit No. 4, 5/15/06 page from Manchester
                        Enterprise
Admitted........................................ Page 116

William B. Morris Exhibit No. 1, March, 1996 Notice of Bid
                        in Manchester Enterprise
Admitted........................................ Page 123

William B. Morris Exhibit No. 2, January, 2002 Notice of Bid
                        in Manchester Enterprise
Admitted........................................ Page 124

William B. Morris Exhibit No. 3, 3/7/02 ordinance published in
                        Manchester Enterprise
Admitted........................................ Page 125
                             - - -