1

| | |
|---|---|

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
2              SOUTHERN DIVISION at LONDON
                        - - -

3
   UNITED STATES OF AMERICA,      :  Docket No. CR 09-16-S
4                                 :
                  Plaintiff,      :  **Frankfort, Kentucky**
5                                 :  Thursday, March 18, 2010
      versus                      :  1:00 p.m.
6                                 :
   RUSSELL CLETUS MARICLE,        :
7  DOUGLAS C. ADAMS               :
   CHARLES WAYNE JONES            :
8  WILLIAM R. STIVERS             :
   FREDDY W. THOMPSON             :     **Trial Day 27B**
9  WILLIAM B. MORRIS              :
   DEBRA L. MORRIS                :
10 STANLEY BOWLING,               :
                                  :
11                Defendants.     :

12

13                      - - -
                TRANSCRIPT OF JURY
14            BEFORE DANNY C. REEVES
       UNITED STATES DISTRICT COURT JUDGE and a jury
15                      - - -

16  APPEARANCES:

17  For the United States:      STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.
18                              Assistant U.S. Attorney
                                601 Meyers Baker Road
19                              Suite 200
                                London, KY 40741
20
    For the Defendant           MARTIN S. PINALES, ESQ.
21  Russell Cletus Maricle:     Strauss & Troy
                                150 E. Fourth Street
22                              Fourth Floor
                                Cincinnati, OH  45202
23
                                DAVID S. HOSKINS, ESQ.
24                              107 E. First Street
                                Corbin, KY  40701
25

2

```
 1     For the Defendant          R. KENT WESTBERRY, ESQ.
       Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                                Landrum & Shouse, LLP
                                  220 West Main Street
 3                                Suite 1900
                                  Louisville, KY 40202
 4

 5     For the Defendant          T. SCOTT WHITE, ESQ.
       Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
 6                                133 West Short Street
                                  Lexington, KY  40507
 7

 8     For the Defendant          ROBERT L. ABELL, ESQ.
       William R. Stivers:        120 North Upper Street
 9                                Lexington, KY  40507

10

11     For the Defendant          RUSSELL JAMES BALDANI, ESQ.
       Freddy W. Thompson:        Baldani, Rowland & Richardson
12                                300 West Short Street
                                  Lexington, KY  40507
13

14     For the Defendant          JERRY W. GILBERT, ESQ.
       William B. Morris:         Coy, Gilbert & Gilbert
15                                212 North Second Street
                                  Richmond, KY 40475
16

17     For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
       Debra L. Morris:           Gess, Mattingly & Atchison, PSC
18                                201 West Short Street
                                  Lexington, KY 40507
19

20     For the Defendant          DANIEL A. SIMONS, ESQ.
       Stanley Bowling:           Thompson, Simons, Dunlop & Fore
21                                116 West Main Street
                                  Suite 2A
22                                Richmond, KY 40476

23

24

25
```

3

Court Reporter:                 LISA REED WIESMAN, RDR-CRR
                                Official Court Reporter
                                35 W. Fifth Street
                                P.O. Box 1073
                                Covington, KY  41012
                                (859) 291-4410


     Proceedings recorded by mechanical stenography,
transcript produced with computer.

*CHARLES - Direct (Ms. Hughes)*                                    4

1              (The jury entered the courtroom at 1:02 p.m.)

2         THE COURT:  Thank you.  The record will reflect that

3    all members of the jury are present.  Parties and counsel are

4    also present.

5         Miss Hughes, I think we're ready for you to call your

6    next witness.

7         MS. HUGHES:  Stephan Charles.

8              STEPHAN CHARLES, DEFENSE WITNESS, SWORN

9         THE COURT:  Thank you.  You may proceed.

10        MS. HUGHES:  Thank you, Your Honor.

11                      DIRECT EXAMINATION

12   BY MS. HUGHES:

13   Q.  Sir, could you tell the jury your name, please?

14   A.  Stephan Charles.

15   Q.  And where do you reside?

16   A.  Manchester, Kentucky.

17   Q.  And what is your profession?

18   A.  I'm an attorney.

19   Q.  And do you practice that profession in Manchester?

20   A.  Well, my office is in Manchester.  I practice in most of

21   southeastern Kentucky.

22   Q.  And in the course of performing your professional duties,

23   have you drafted a prenuptial agreement for Bart Morris and

24   Debi Morris?

25   A.  I did.

CHARLES - Direct (Ms. Hughes)                                          5

1    Q.   And did you bring a copy of that document with you today?

2    A.   I did.

3    Q.   And as a course of your normal business, do you maintain

4    in your law offices files, copies of documents and agreements

5    that you draft for clients?

6    A.   Yes.

7    Q.   And in looking at the document that you've brought for

8    us, do you recognize Mr. Morris's signature on that?

9    A.   I do.

10   Q.   And Mrs. Morris's signature?

11   A.   Yes, she signed it, Debi Smith.

12   Q.   And then are those signatures notarized?

13   A.   They're both notarized by my secretary, Mickey Brant, who

14   has been with me since 1998 -- or 1988, I believe.

15   Q.   Do you recognize her signature as a notary public?

16   A.   Yeah.

17   Q.   Is this a true and accurate copy of the prenuptial

18   agreement between Mr. and Mrs. Morris?

19   A.   It is.

20        MS. HUGHES:  Your Honor, I would ask to mark that as

21   Debra Morris Exhibit 9 and move its introduction.

22        THE COURT:  All right.  Any objection to the

23   introduction of Exhibit Number 9?

24        MR. SMITH:  No, Your Honor.

25        THE COURT:  Debra Morris Exhibit Number 9 will be

*CHARLES - Cross (Mr. Smith)*                                              6

1    admitted.

2                          (Debra Morris Exhibit No. 9

3                          was admitted into evidence.)

4          MS. HUGHES:  I pass the witness.

5          THE COURT:  Thank you.

6          THE WITNESS:  Do you need to mark this?

7          THE COURT:  Mr. Smith?

8          MR. SMITH:  Your Honor, I misplaced my copy.  Could I

9    ask to see the copy?

10          THE COURT:  Yes, if you could.  Why don't you have

11   the clerk mark that first.

12                          CROSS-EXAMINATION

13   BY MR. SMITH:

14   Q.  Mr. Charles, I'm looking now at Defense Exhibit Number 9

15   here.  Does it have on here a preparation certificate,

16   certifying who prepared this document, sir?

17   A.  Does not.

18   Q.  Does it certify who represented the parties in the

19   matter?

20   A.  It does not.

21   Q.  Who did you represent in the matter?

22   A.  Initially, Bart Morris came to me and asked me to prepare

23   the document.  I met with both Bart Morris and Debra Smith at

24   the time, discussed what they had in mind, prepared the

25   document, explained its consequences.

*BRIGGS - Direct (Ms. Hughes)* 7

1      I suggested to Miss Morris, Debra Smith at the time that

2   she might want to seek advice from independent counsel, and

3   gave them a copy of the draft to review --

4          THE COURT:  If you could pull that microphone down a

5   little bit, please.

6   A.   And consult with other counsel if she wanted to.

7   Q.   Did you confirm that she had an attorney in this matter,

8   sir?

9   A.   I have no idea.

10         MR. SMITH:  That's all the questions I have.

11         THE COURT:  All right.  See if anyone else has any

12   questions of this witness.  No?  All right.  Thank you.  You

13   may step down.  You're excused.  Mr. Smith, do you have the

14   exhibit?  Is it still at the witness stand?

15         MR. SMITH:  I'm sorry.  I left it at the podium.

16         THE COURT:  Return that to the clerk.  Thank you.

17         Miss Hughes, you may call your next witness.

18         MS. HUGHES:  Special Agent Briggs.

19         THE COURT:  Thank you.

20          TIMOTHY S. BRIGGS, DEFENSE WITNESS, SWORN

21                    DIRECT EXAMINATION

22   BY MS. HUGHES:

23   Q.   Special Agent Briggs, you have testified previously in

24   this case; have you not?

25   A.   Yes, I have.

BRIGGS - Direct (Ms. Hughes)                                    8

1    Q.   And I asked you to come back and testify again in order

2    to bring some things.  Can you tell the jury what you brought

3    with you?

4    A.   Yes.  You subpoenaed me.  And the disk of photographs

5    that we took during the search, you pulled certain pictures

6    off of that and gave it to me on this disk.

7    Q.   Okay.  Are those, in fact, the photographs that were

8    taken at the search of the Morris' residence on March

9    the 19th, 2009?

10   A.   Yes, they are.

11   Q.   And you are, of course, the agent in charge, correct?

12   A.   That's correct.

13   Q.   And it's part of your duties, of course, to maintain the

14   files and to be familiar with the photographs therein?

15   A.   Yes, it is.

16           MS. HUGHES:  Your Honor, I move the introduction of

17   this disk of photographs as Debra Morris Exhibit 10.

18           THE COURT:  All right.  See if there's any objection

19   to its introduction.  Mr. Smith?

20           MR. SMITH:  No, Your Honor.

21           THE COURT:  All right.  Debra Morris Exhibit

22   Number 10 will be admitted.

23                     (Debra Morris Exhibit No. 10

24                      was admitted into evidence.)

25           MS. HUGHES:  That's all I have for this witness.

*BRIGGS - Cross (Mr. Smith)*                                                        9

1    Thank you.

2            THE COURT:  All right.  Thank you.  Agent Briggs, do

3    you have the disk?

4            THE WITNESS:  Yes, sir, right here.

5            THE COURT:  Let me see if there's any

6    cross-examination first before we mark that document.  Mr.

7    Smith, any questions?

8            MR. SMITH:  Yes, Your Honor.

9                         CROSS-EXAMINATION

10   BY MR. SMITH:

11   Q.  Agent Briggs, the disk that you have introduced there,

12   does that have all the photographs that was taken by your

13   agents at the scene --

14   A.  No, sir, it's select --

15           MS. HUGHES:  Your Honor, objection.  Could we

16   approach?

17           THE COURT:  Yes.

18                   (A sidebar conference was held out of the

19                    hearing of the jury):

20           THE COURT:  As I understand, you'd already asked him

21   if those were select photographs that were taken from the

22   larger disk.

23           MS. HUGHES:  That is correct.  I removed a few that

24   were just duplicative, and I have no problem with questions

25   about that.  But just the general question leads to the

*BRIGGS - Cross (Mr. Smith)*                                    10

1   impression I'm hiding something when, in fact, I removed the

2   photographs of the safe and the contents of the safe.  Those

3   were the primary ones I deleted.

4         I don't think it's a fair question, since I made it

5   clear on direct they were not all of the photographs.  I think

6   it's perfectly fair if Mr. Smith wants to ask him about

7   additional photographs.  There were probably 15, I think, I

8   took off of there.

9         THE COURT:  Mr. Smith?

10        MR. SMITH:  It leaves the jury with the impression

11  that the safe was not there, that he didn't take a photograph

12  of it, that, you know, there was limited evidence that was

13  found, and that was addressed in his direct examination.  What

14  was important was to confirm, as witnesses described, where he

15  was storing at the time that these elections were ongoing, and

16  there was a safe there.

17        Miss Hughes took that safe out of those photos.  We

18  talked about it, and I thought we had an agreement going into

19  this witness that the safe would be in there, but not the

20  contents, because there is an exclusion as to the letter that

21  was in the safe.

22        THE COURT:  Just the picture of the outside of the

23  safe?

24        MR. SMITH:  Right.

25        MS. HUGHES:  There is one of those, and I can put

*BRIGGS - Cross (Mr. Smith)*                                                  11

1    that back on.  I just was trying -- I just did not -- I was

2    being very careful.  I think it's favorable to me that the

3    safe was there.  It's not my intention to --

4           THE COURT:  So your question will be whether there

5    was additional photographs and whether one of the photographs

6    included the safe --

7           MR. SMITH:  Right.

8           THE COURT:  -- there's been testimony about?

9           MS. HUGHES:  And if you would lead him so that he

10   wouldn't volunteer about the letter again, it would be

11   helpful.

12          THE COURT:  I assume you're not going to ask him

13   about that.

14          MR. SMITH:  Certainly not.

15          THE COURT:  Unless one of the other parties bring it

16   up.  I know you've been whipsawed on this issue.

17          MS. HUGHES:  Not by me.

18          THE COURT:  No, you just smile about it.

19          MS. HUGHES:  I know.

20          THE COURT:  Mr. Smith, if you want to clarify that,

21   you may do so.

22          MR. SMITH:  Okay.  Only other issue, Your Honor, is

23   whether or not, you know, again, I intend on reserving the

24   ability to recall this witness, obviously, for our rebuttal

25   and am operating under the impression that by announcing this

*BRIGGS - Cross (Mr. Smith)*                                             12

1    is the end of my questions at this point would not preclude me

2    from recalling him if necessary.

3            THE COURT:  He's the case agent.  He's here.  He's

4    not like some of these other witnesses that we're having to

5    bring back several times.  So you would not be precluded from

6    recalling the witness in any rebuttal that you thought was

7    necessary.

8            MS. HUGHES:  Thank you.

9            THE COURT:  Thank you.

10               (Sidebar conference concluded.)

11           THE COURT:  Thank you.  Mr. Smith, you may continue.

12   BY MR. SMITH:

13   Q.   Agent Briggs, if I understand, these are select photos

14   that have been presented on that disk; is that correct?

15   A.   Yes, sir, that's correct.

16   Q.   Does it include a photograph of the safe which you found

17   at the house?

18   A.   There were actually two safes found at the house.  It

19   includes one of them.

20   Q.   And the photograph of the second safe is not in there; is

21   that correct?

22   A.   That's correct.

23   Q.   All right.  Now, at the time that you conducted your

24   search, were you surprised to find little evidence when you

25   searched Bart and Debra Morris' residence there on Green

1   Street?

2   A.   No, sir, we weren't, because they had largely changed

3   their methodology in 2006 from buying votes to stealing a good

4   portion of votes.  Also, two of Mr. Morris's employees and his

5   stepson were subpoenaed to the federal grand jury to testify

6   about this investigation.  And thirdly, one of the sources,

7   Kennon White, spoke with Bart Morris about the investigation,

8   which was captured on audio tape.

9   Q.   And did this also search occur subsequent to your search

10  of City Hall in Manchester?

11  A.   Yes.

12  Q.   And what date was that search, sir?

13  A.   We searched City Hall October 31st, 2006, and this didn't

14  occur until March 19, 2009.

15  Q.   Now, as you have described the essence of evidence there

16  at the residence, were you surprised that defendants in this

17  case were absent on election day?

18  A.   Not at all.

19          MR. BALDANI:  Objection, Your Honor.

20          THE COURT:  I'll sustain the objection.

21          MR. SMITH:  May we approach, Your Honor?

22          THE COURT:  Yes, sir.

23              (A sidebar conference was held out of the

24              hearing of the jury):

25          MR. SMITH:  I just want to understand the Court's

*BRIGGS - Cross (Mr. Smith)*                                      14

1    ruling, and I assume it's because it's outside the scope?

2          THE COURT:  Yes, sir.  This would appear to be

3    something that I assume you want to go into in rebuttal.

4          MR. SMITH:  I understand, and I can recall him.

5          THE COURT:  I hate to do that, but inasmuch as there

6    has been an issue raised about that, I'll limit your scope of

7    examination to these matters that are relevant.  Obviously,

8    I'll sustain anything else outside the scope.

9          MR. BALDANI:  That was really only a small reason why

10   I objected.  I don't think there's any evidence that Freddy

11   Thompson was absent, so I think it was kind of unfairly

12   characterizing the evidence.  Plus, asking for his state of

13   mind.  So I figured, I mean, I don't want to be the cause of

14   him having to bring back a witness simply if you thought I was

15   objecting it was outside the scope.

16         THE COURT:  Well, I'm assuming, and I could be wrong

17   in this, but I'm assuming that there may be other testimony

18   about the Morrises not being present on certain election days,

19   and that following that testimony, there would be a need to

20   recall this witness in any event.  So rather than go through

21   this two times with the witness, we'll just save it, and you

22   can raise the issue later, when it comes up on rebuttal.  But

23   that's my anticipation at this time.

24         MR. BALDANI:  Thank you, Your Honor.

25                    (Sidebar conference concluded.)

*J. MORRIS - Direct (Ms. Hughes)*                                      15

1              MR. SMITH:  No further questions.  Thank you.

2              THE COURT:  Thank you.  Let me see if any of the

3      other parties have questions of Special Agent Briggs.

4              MR. SIMONS:  No.

5              THE COURT:  Let me start back with Mr. Hoskins.

6              MR. HOSKINS:  No, sir.

7              THE COURT:  Anyone?  All right.  Thank you, Agent

8      Briggs.  You can step down.  If you could pass that disk to

9      me.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Thank you.

12             Miss Hughes, you may call your next witness.

13             MS. HUGHES:  Jessica Morris.

14             THE COURT:  Jessica Morris.

15              JESSICA MORRIS, DEFENSE WITNESS, SWORN

16             THE COURT:  Thank you.  You may proceed.

17             MS. HUGHES:  Thank you, Your Honor.

18                          DIRECT EXAMINATION

19     BY MS. HUGHES:

20     Q.  Can you tell the jury your name, please?

21     A.  Jessica Renee Morris.

22     Q.  And have you previously gone by another name?

23     A.  Sis.

24     Q.  Well, your married name?

25     A.  Oh, Bowling.  Yes, Bowling.

*J. MORRIS - Direct (Ms. Hughes)*                                          16

1   Q.   Are you related to Stanley Bowling?

2   A.   No.

3   Q.   But you are related to someone in this case.  Can you

4   tell me who?

5   A.   Yes.  Bart Morris is my father, and Debra Morris is my

6   stepmother.

7   Q.   All right.  How old are you?

8   A.   Twenty-three.

9   Q.   And are you currently employed?

10  A.   Yes.  I'm part-time.

11  Q.   All right.  What do you do?

12  A.   I work as a waitress at Shiloh's Roadhouse.

13  Q.   Do you also go to school?

14  A.   Yes, I'm full-time in school.

15  Q.   Where do you go to school?

16  A.   Eastern Kentucky University.

17  Q.   Which location, which campus?

18  A.   In Richmond.

19  Q.   And do you have children?

20  A.   Yes, I have one.

21  Q.   And what's your child's name?

22  A.   Jocelyn Bowling.

23  Q.   And how old is she?

24  A.   She's five.

25  Q.   All right.  I assume that your parents, Mr. Morris and

*J. MORRIS - Direct (Ms. Hughes)*                                    17

1   your mother, were divorced; is that right?

2   A.  Yes, that's correct.

3   Q.  How old were you when that happened?

4   A.  I was in fourth grade.  I'm not quite sure of the age,

5   but it was somewhere between eight and ten.

6   Q.  And when they divorced, with whom did you reside?

7   A.  With my mother.

8   Q.  And was that in Manchester?

9   A.  No, ma'am.  It was in Augusta, Georgia.

10  Q.  And how long did you live in Georgia?

11  A.  Until '05.  It was quite some time.  Then I came back up

12  here.

13  Q.  So you returned -- by up here, do you mean to Kentucky,

14  Manchester?

15  A.  Yes, Manchester.

16  Q.  And what year was that?

17  A.  That was in '05.

18  Q.  All right.  And what was the reason for you returning to

19  Manchester?

20  A.  My husband at the time and I decided to come back up

21  here.  My father was giving us a place to stay.

22  Q.  And where was the place to stay?

23  A.  It was at my stepmother's house on Town Branch.

24  Q.  Is the little turnoff called Singleton Road?

25  A.  That's correct.

1   Q.   Can you tell the jury what kind of driveway is there on

2   Singleton Road?

3   A.   Gravel.

4   Q.   How long did you live in your stepmother's house?

5   A.   For about a year.

6   Q.   All right.  And then I take it you went to live somewhere

7   else.  Where did you go live?

8   A.   After my husband and I got divorced, I went back and

9   lived with my family on Green Street.

10  Q.   And by your family, do you mean Bart and Debi Morris?

11  A.   Yes, that's correct.

12  Q.   What about Jocelyn?

13  A.   She went along as well.

14  Q.   All right.  So would I be correct that you would have no

15  information to share with the jury about what was going on in

16  Manchester prior to your return to Clay County in 2005?

17  A.   No.

18  Q.   All right.  I want to ask you about a trip to Gatlinburg.

19  A.   Okay.

20  Q.   Okay?  Can you tell the jury about a trip that your

21  family made to Gatlinburg in 2006?

22  A.   Yes.

23            MR. SMITH:  Object to leading.

24            THE COURT:  Overruled.

25  A.   Yes.  We left that Sunday of '06 in May.

*J. MORRIS - Direct (Ms. Hughes)*                                  19

1    Q.   Tell me which Sunday it was, how you know which Sunday it

2    was.

3    A.   It was Mother's Day.

4    Q.   And so whatever the calendar would show that date was?

5    A.   Yes, ma'am.

6    Q.   All right.  Keep going.  Was there some occasion?

7    A.   Oh.  Well, it was Mother's Day, and then my stepbrother

8    was just getting off drugs, and my stepmother wanted all of us

9    to get together for a trip for Mother's Day.

10   Q.   Your stepbrother's name is?

11   A.   Chris Duff.

12   Q.   All right.  So when you say all of us, who went on this

13   trip together?

14   A.   It was my father, my stepmother, my brother, my

15   stepbrother, my daughter, her friend Sophie, and Candace,

16   April, which is my brother's -- was my brother's girlfriend at

17   the time.

18   Q.   Let's just go through those in a little bit slower way.

19   A.   Okay.

20   Q.   You said your brother, what's his name?

21   A.   Bartley Morris.

22   Q.   And he's your -- he has the same mother and father that

23   you do, right?

24   A.   That's correct.

25   Q.   Then your stepbrother, that is Chris Duff?

1    A.   Yes.

2    Q.   Then you said April and Candace.  Who were they?

3    A.   April was my brother's girlfriend at the time, and

4    Candace is April's sister.

5    Q.   Can you remember either of their last names?

6    A.   No.

7    Q.   Okay.

8    A.   I don't.

9    Q.   All right.  I think that was all.  Did I cover everybody

10   that was there on the trip?

11   A.   Yes, ma'am, you did.

12   Q.   You left on a Sunday.  How did you get to Gatlinburg?

13   A.   We traveled by car.  I traveled in my car.  I'm pretty

14   sure it was Candace and April and my brother and my

15   stepbrother and I went in my car, but I'm not quite sure if

16   that's the correct way, but I know we just took two cars.

17   Q.   I know we said Sophie also.  I didn't --

18   A.   Oh, yeah, Sophie.

19   Q.   Who is Sophie, would you tell the jury?

20   A.   Sophie is my stepmother's brother's daughter.

21   Q.   And what age is she?

22   A.   She's like a couple years older than Jocelyn.

23   Q.   All right.  At the time that you took this trip to

24   Gatlinburg in May of 2006, by that time, had you already moved

25   from Singleton Road, or did you move to Green Street?  Does

J. MORRIS - Direct (Ms. Hughes)                                    21

1    that help you put it in the a time frame?

2    A.   I had already moved back to Green Street with my parents.

3    Q.   All right.  If you left on a Sunday, can you tell me when

4    you returned to Manchester?

5    A.   Chris Duff and I returned on that Tuesday.

6    Q.   And do you know whether there was anything significant

7    about that particular Tuesday?

8    A.   It was election, because I had filed absentee the week

9    before.

10   Q.   Let me ask you about that.  Do you specifically recall

11   going to absentee vote?

12   A.   Yes, I do.

13   Q.   All right.  And where does one go in Manchester to

14   absentee vote?

15   A.   To the county clerk's office.

16   Q.   And when did you do that prior to the trip?

17   A.   I mean, it was the week before.  I'm not quite sure what

18   day it was on, but I know it was just the week before.

19   Q.   Now, you said that you and your stepbrother came home on

20   Tuesday.  What do you know about the rest of the folks that

21   you've identified who were on the trip?

22   A.   They stayed back, because Stanley and Sarah had came up.

23   Q.   Let me stop you for a second.  Who are Stanley and Sarah?

24   A.   Friends of the family.

25   Q.   Okay.  Bowling?

*J. MORRIS - Direct (Ms. Hughes)*                                    22

1    A.    Yes.

2    Q.    Okay.  But not related to your ex-husband?

3    A.    No, ma'am.

4    Q.    All right.  When did Sarah and Stanley Bowling join your

5    family?

6    A.    We went to a couple shops through the day on Tuesday --

7    Q.    Which -- on Tuesday?

8    A.    Tuesday, yes.  Then that night we ate at Hard Rock, and

9    then we all -- Stanley and Sarah met us there, and we all ate

10   dinner together.

11   Q.    Where did you stay in Gatlinburg?

12   A.    We stayed in a chalet.  It was at the top of Gatlinburg.

13   I'm not quite sure.  On the mountain.

14   Q.    So the group you originally identified, you all stayed in

15   one --

16   A.    Yes, there was enough room for all of us to stay in one.

17   Q.    Do you know, after you left, where -- did everyone stay

18   at the chalet or did they go elsewhere?

19   A.    We all left on Tuesday, and that was when we went to the

20   shops in Gatlinburg.  And then later that night, well, after

21   we got finished eating, the people that were staying back

22   decided to get hotels.

23   Q.    And did you go to the hotel?  Did you just go back home?

24   A.    I went to the hotel, because Jocelyn was in the car with

25   me when we drove to the hotel.  So I dropped her off, because

*J. MORRIS - Direct (Ms. Hughes)*                                        23

1    I had class the next day, and she stayed with my parents.

2    Q.   Okay.  And do you recall when your parents would have

3    come back with your daughter?

4    A.   They came back the following day, on Wednesday.

5    Q.   All right.  Do you recall about what time of day it was

6    that you all had your meal at the Hard Rock on Tuesday?

7    A.   It was probably 3:00 or 4:00, dinner time.

8    Q.   3:00 or 4:00 in the afternoon?

9    A.   Yes, ma'am.

10   Q.   When I say -- Hard Rock is a restaurant?

11   A.   Yes.

12   Q.   Based upon your observation and your participation in

13   this trip in May of 2006, were both your father and your

14   stepmother around you during the time you were in Gatlinburg?

15   A.   Yes, the whole entire time.

16   Q.   All right.  So what time of day would you have left on

17   Tuesday?

18   A.   It was after we ate and we went to the hotel.  It was

19   late afternoon.

20   Q.   And how long did it take you to drive back?

21   A.   Probably around three hours.

22   Q.   Now, I'd like for you to think forward to election day,

23   the general election in November of 2006.

24   A.   Okay.

25   Q.   Do you, Jessica, have a memory of that day, voting on

1    that day?

2    A.   Yes, I do.

3    Q.   Why don't you tell the jury what you recall about voting

4    on election day in November of 2006.

5    A.   In the morning, I had to work until about 12:00.  Once I

6    got off work, I went straight to the house.

7    Q.   And by the house, which house do you mean?

8    A.   Green Street.

9    Q.   Where was your daughter at this time?

10   A.   She was at the baby-sitter's, because I had to work that

11   morning.

12   Q.   Did you pick her up on the way home or --

13   A.   No, I did not.

14   Q.   All right.  When you arrived at the house on Green

15   Street, had you voted yet?

16   A.   No.

17   Q.   Was anyone else at the house?

18   A.   No.  I was the only one there.

19   Q.   All right.  At some point, did you see either your

20   parents, your father, your stepmother?

21   A.   Later that afternoon, I seen my father.  He came back to

22   the house and picked up my car to go get my daughter from the

23   baby-sitter.

24   Q.   All right.  And then after that, what happened?

25   A.   He came back and picked me up and then we went to vote.

*J. MORRIS - Direct (Ms. Hughes)*                                    25

1    Q.   And which precinct do you all vote in?

2    A.   The Clay County Middle School.

3    Q.   All right.  And, of course, did you -- well, did you

4    recognize any of the election officers?

5    A.   Yes.  Dobber was the one who helped me when I voted.

6    Q.   Well, when you say helped you, what do you mean by helped

7    you?

8    A.   Well, he just said if there was any questions that I had

9    when I voted, just to let him know.

10   Q.   And did you have any questions about voting?

11   A.   No.  I had actually voted on those machines once before

12   in Georgia.

13   Q.   Do you recall seeing your father vote on that day?

14   A.   I don't recall, but he was there with us, because he was

15   holding Jocelyn while I voted.

16   Q.   What was the crowd like?

17   A.   It was packed.

18   Q.   Can you recall about what time of day it was?

19   A.   I'd say probably 5:00 or 6:00.

20           MS. HUGHES:  Your Honor, with the Court's permission,

21   I would like to publish to the witness and the jury the

22   photographs that are on the Exhibit 10 that was just

23   introduced.

24           THE COURT:  Yes, ma'am.

25           MS. HUGHES:  Thank you.  Your Honor, may I question

*J. MORRIS - Direct (Ms. Hughes)*                                26

1    from here so I can operate the computer?

2         THE COURT:  Yes.

3    Q.   Jessica, can you tell the jury what this is a photograph

4    of?

5    A.   This is a photograph of our house on Green Street.

6    Q.   Let me ask you, were you present when the FBI searched

7    your parents' residence?

8    A.   Yes, my daughter and I were.

9    Q.   All right.  So -- well, I'll ask you that in a second.

10   Let me go to the next one.  And this is?

11   A.   The front door of the house.

12   Q.   Why don't you tell the jury what this is a photograph of.

13   A.   This is the living room of the house.

14   Q.   And is this a fair and accurate photograph of what the

15   home looked like on the day of the search?

16   A.   Yes.

17   Q.   All right.  What is this?

18   A.   This is like the dining room/living area.

19   Q.   And this?

20   A.   The kitchen.  The laundry room.  The master bedroom.  The

21   bathroom.  Bedroom.  My bedroom.

22   Q.   Your bedroom?

23   A.   Yes.  Yeah.

24   Q.   What is this room?

25   A.   This is the office.

*J. MORRIS - Direct (Ms. Hughes)*                                    27

1    Q.   It looks like your daughter may play in the office.

2    A.   Yes, it's -- we use it as a play room too.

3    Q.   Okay.  And who uses the office?

4    A.   It's for the business, for B&J.  Deb normally does all

5    the business, and dad makes the decisions and stuff.

6    Q.   What about this room, what room is this?

7    A.   That would be upstairs, and that was my brother's room at

8    the time.

9    Q.   And this?

10   A.   This would be the bathroom upstairs.

11   Q.   What is this place?

12   A.   This is the garage.

13   Q.   What are all -- are these tools or --

14   A.   Yes.  Dad was always working on something in the garage.

15   Q.   What kind of something?

16   A.   Race car, any other things that he needed.  There was

17   always enough things there for him to work.

18   Q.   Why don't you identify that for the jury.

19   A.   That is the race car.

20   Q.   What is this photograph a photograph of?

21   A.   This is a photograph of the deck.  The rest of the deck.

22   Q.   Whose car is that, if you know?

23   A.   That's my brother's truck.

24   Q.   This again is the garage?

25   A.   Yes, ma'am.

*J. MORRIS - Direct (Ms. Hughes)*                                   28

1    Q.   Again upstairs?

2    A.   Yes.

3    Q.   And is this the same office?

4    A.   Yes, it is.

5    Q.   And again the master bedroom?

6    A.   Yes.

7    Q.   What room is this?

8    A.   The laundry room.

9    Q.   And what room is this?

10   A.   The kitchen.  Dining room.  The living room.

11   Q.   Where is this?

12   A.   This is on the bar.

13   Q.   Is that in the kitchen?

14   A.   Yes.

15   Q.   And again the front door?

16   A.   Yes.

17   Q.   And do all those pictures fairly represent the contents

18   and view of the home on the day that the FBI executed this

19   search?

20   A.   Yes.

21   Q.   Where were your parents on that day?

22   A.   They were at the house that they were building.

23   Q.   And where is that house?

24   A.   It's in London, Kentucky.

25   Q.   Would you periodically go visit the progress of the house

*J. MORRIS - Direct (Ms. Hughes)*                                    29

1   they were building?

2   A.   Yes, I would.

3   Q.   At the time the FBI came to the residence on Green

4   Street, was the house in London complete?

5   A.   No, it wasn't.

6   Q.   Did your parents periodically stay there?

7   A.   Yes, they stayed in the motor home that was parked

8   outside of the house.

9   Q.   Did they stay there for long periods of time?

10  A.   No, normally it was just a couple of days.

11  Q.   Had they begun packing their personal effects?

12  A.   No, we had not been packing anything.

13  Q.   Had anything been moved, to your knowledge?

14  A.   No.

15  Q.   Was there any furniture at the new place?

16  A.   No.

17  Q.   Jessica, I would like to ask you about -- and I know you

18  can only speak to 2006 on, but could you describe for the jury

19  what sort of activity went on at your dad's garage?

20  A.   I would occasionally come up for Clay County Days, and

21  that was always something very big for us.

22  Q.   That was before 2006?

23  A.   Yes, before 2006.

24  Q.   All right.

25  A.   And if the garage door was open, normally there was tons

*J. MORRIS - Direct (Ms. Hughes)*                                    30

1   of people at our house.  There wasn't many times I wouldn't

2   walk downstairs and somebody be in the house.

3   Q.  And would that be true after you moved in in 2006?

4   A.  Yes.

5   Q.  Let me ask you this question.  Do you know Cletus

6   Maricle?

7   A.  I know of him.

8   Q.  What about Doug Adams.  Do you know Doug Adams?

9   A.  No, I do not.

10  Q.  Do you know Wayne Jones?

11  A.  No.

12  Q.  What about a gentleman named William or Al Man Stivers?

13  A.  No, ma'am.

14  Q.  Do you know Freddy Thompson?

15  A.  I know of him.

16  Q.  Have you ever seen Mr. Maricle at your parents' home on

17  Green Street?

18  A.  No, ma'am.

19  Q.  And have you ever seen Freddy Thompson at your parents'

20  home on Green Street?

21  A.  No.

22          MS. HUGHES:  Pass the witness, Your Honor.

23          THE COURT:  Thank you.

24          MS. HUGHES:  And I will return this to the clerk.

25          THE COURT:  Mr. Smith, you may cross-examine the

*J. MORRIS - Cross (Mr. Smith)* 31

1   witness.

2           MR. SMITH:  Thank you.

3                       CROSS-EXAMINATION

4   BY MR. SMITH:

5   Q.   Good afternoon.

6   A.   Good afternoon.

7   Q.   My name is Steve Smith, and I represent the United

8   States.  I have a few questions for you, ma'am.

9   A.   Okay.

10  Q.   You say that you were visiting, I guess, while you were

11  down in Georgia, back home at Clay County Days?

12  A.   Yes, sir.

13  Q.   And that's a festival where basically people from Clay

14  County, it's kind of like a homecoming; is that fair?

15  A.   Yes, that's correct.

16  Q.   And you all have concerts and organized things?

17  A.   Yes, sir, that's correct.

18  Q.   That occur in the downtown area?

19  A.   Yes.

20  Q.   And your stepmother and your father's home on Green

21  Street at that time would have been located near that downtown

22  area of Manchester on Green Street; is that correct?

23  A.   Yes, sir, it was within walking distance.

24  Q.   And right next to the SuperAmerica there or near it?

25  A.   Yes, sir.  It's near.

1    Q.   And you indicated that that was a place where you were

2    staying.   How long did you stay there, ma'am?

3    A.   I just stayed there, I start -- I came back up here in

4    '06.

5    Q.   How long did you stay there in '06?

6    A.   Until we moved to the new house in London.

7    Q.   Okay.  And you moved into the new house with your stepmom

8    and your father?

9    A.   Yes, sir, that's correct.

10   Q.   You still live there now?

11   A.   Yes, sir.

12   Q.   I'd like to hand you a photograph marked Government's

13   Exhibit P36.

14           MR. SMITH:  Y'all have seen that.  Hand the witness

15   P36.

16   Q.   Can you identify P36, ma'am?

17   A.   That is our house in London.

18   Q.   Okay.  And that's the place where you indicated that at

19   the time that this search occurred, that your parents were

20   living in a camper at different times?

21   A.   They were living outside of the camper -- or living in

22   the camper outside the house, yes, sir.

23           MR. SMITH:  I'd move for its introduction at this

24   time, Your Honor.

25           THE COURT:  Any objection?  P36 will be admitted at

*J. MORRIS - Cross (Mr. Smith)*                                          33

1    this time.

2                         (Government Exhibit No. P36

3                          was admitted into evidence.)

4             MR. SMITH:  I'd ask that that be published, and I

5    want to ask a few more questions of the witness.

6             THE COURT:  Yes, sir, you may.  Eric, would you

7    retrieve that, provide it to Mr. Smith and it can be

8    published.

9    Q.   About how many acres are on this property that this

10   home's built on?

11   A.   I'm not very sure.  I know there's quite a few acres,

12   though.

13   Q.   Would you estimate 10, 20 acres?

14   A.   Maybe.

15   Q.   Or something less?

16   A.   Maybe 10.  I'm not really sure, though.

17   Q.   And that's in Laurel County?

18   A.   Yes, sir, that's correct.

19   Q.   And where was it that they had the RV camper located on

20   the property, if you recall?

21   A.   It was parked on the other side of the house, in the

22   driveway.

23   Q.   Okay.  Looking at the photo at the monitor, would it be

24   to the left or to the right of the home?

25   A.   It would be to the right, directly behind the house.

*J. MORRIS - Cross (Mr. Smith)*                                    34

1   Q.   And when did your stepmom and your dad build this home?

2   A.   They started building it -- wow.  Really not sure of the

3   dates, but I know it was sometime starting in '09.

4   Q.   So at the time that the search warrant was executed, if

5   the record shows was March 19th, 2009, would you recall as to

6   how far along they were in the building of the home at that

7   point, ma'am?

8   A.   They were still putting everything together.  The siding

9   on the house wasn't even up.

10  Q.   And you said that there was a camper which they both were

11  staying at at the time of the search?

12  A.   Yes, sir, that's correct.

13  Q.   I believe your testimony was they only stayed there a

14  couple days a week?

15  A.   Yes, sir.  They would take enough clothing from the house

16  to stay a couple days, and then they would come back and stay

17  at the house.

18  Q.   And what was the reason for them going there to stay at

19  the house, ma'am?

20  A.   Most of the time, it was so that my father could help

21  build on the house, because my father built the house.  And

22  also to watch at night sometimes.

23  Q.   So they were watching after the construction of the

24  property to make sure nobody stole things?

25  A.   That's correct.

*J. MORRIS - Cross (Mr. Smith)*                                       35

1   Q.   And I believe you indicated that when the agents arrived

2   there, you -- did you advise them of the fact that your

3   parents were living elsewhere in this camper at that time?

4   A.   I told them that that's where they were staying was at

5   the camper, yes.

6   Q.   Now, you indicated, I believe, ma'am, that you were on a

7   trip on Mother's Day of 2006?

8   A.   That's correct, sir.

9   Q.   And you said that you all drove separately?

10  A.   Yes.

11  Q.   What did you drive?

12  A.   I drove my '06 Grand Am.

13  Q.   And what did your father drive?

14  A.   It was a Blazer.

15  Q.   What type Blazer?

16  A.   It was a red Chevrolet Blazer.  I think that's what it

17  is.

18  Q.   Does he have a maroon Chevrolet Blazer?

19  A.   Maroon, yes.

20  Q.   Do you know him to loan that to a man named Vernon

21  Hacker?

22  A.   No.

23  Q.   You've never known Vernon Hacker?

24  A.   I know of Vernon Hacker, but I don't really know him.

25  Q.   Have you seen him drive your father's maroon Blazer

*J. MORRIS - Cross (Mr. Smith)*                                    36

1    truck?

2    A.   No, sir.

3    Q.   Now, you indicated, I believe, that the copper colored

4    Chevy truck was your brother's?

5    A.   That's correct.

6    Q.   And what's your brother's name?

7    A.   Bartley Morris.

8    Q.   And I believe that you indicated that there in the house

9    were photos that you were shown.  You would agree with me that

10   there were two safes in the home?

11   A.   Yes.

12   Q.   And also, I believe, if I understood your testimony, that

13   this trip that you took on Mother's Day, I think you said that

14   you all had stopped at a couple of shops on Tuesday and maybe

15   ate at the Hard Rock cafe?

16   A.   That's correct.

17   Q.   And you said that Stanley and Sarah Bowling were joining

18   you for dinner?

19   A.   That's correct.

20   Q.   Had you not seen them before dinner?

21   A.   They could have been at the shops, but I really don't

22   recall.  I mean, it was a while ago.  It's kind of hard to put

23   it all together.

24   Q.   You don't remember whether they were shopping with you or

25   not?

*J. MORRIS - Cross (Mr. Smith)*                                       37

1    A.   I don't remember, no, because there was a bunch of us.

2    We were going in and out of shops.

3    Q.   But you are sure they came to dinner with you?

4    A.   Yes, I'm very sure.

5    Q.   And you indicated that your child was left with one of

6    the Morrises?

7    A.   Yes.

8    Q.   And you went on back to work?

9    A.   No.  I had school the next day.

10   Q.   Where were you working at that time, ma'am?

11   A.   The clerk's office.

12   Q.   And who is the clerk that you worked for at that time,

13   ma'am?

14   A.   James Phillips.

15   Q.   James Phillips?

16   A.   Yes, sir.

17   Q.   Okay.  How long did you work for the circuit clerk there

18   in Clay County, ma'am?

19   A.   I guess it was probably about a year and a half.

20   Q.   And what position did you have with them?

21   A.   I was part-time.  I was deputy clerk.

22   Q.   And you said you were married to a Bowling?

23   A.   That's correct.

24   Q.   Are you still married?

25   A.   No.

*J. MORRIS - Cross (Mr. Smith)*                                        38

1   Q.   What was his name?

2   A.   Billy Bowling.

3   Q.   And where did he work, ma'am?

4   A.   At that time, I think he was helping my father out.

5   Q.   At what time?

6   A.   During '06.

7   Q.   Is that during the year you were married?

8   A.   Yes, before I was divorced.

9   Q.   Did he work anywhere else?

10  A.   He worked for the City.

11  Q.   And which city did he work for, ma'am?

12  A.   The water plant.

13  Q.   In which city, ma'am?

14  A.   Oh, Manchester, I'm sorry.

15  Q.   Thank you.  How long did he work for the City of

16  Manchester, ma'am?

17  A.   I'm really not sure, because we were divorced then.

18  Q.   Do you recall when you voted there in November of 2006

19  that you -- you recall, I believe, that you had an encounter

20  with Charles "Dobber" Weaver?

21  A.   Yes.

22  Q.   Did you see any other election officers there that day?

23  A.   Wanda was there.

24  Q.   Wanda who?

25  A.   White.

*J. MORRIS - Cross (Mr. Smith)*                                      39

1    Q.   And what was she doing there, ma'am?  Was she an election

2    officer?

3    A.   Yes, sir.

4    Q.   Now, you indicated that in one of the photographs that a

5    desk there that was shown in one of the photographs had some

6    paper, you said that's where your stepmom did transact some of

7    the business for B&J?

8    A.   That's correct.

9    Q.   And do you know her to sign checks for the business as

10   well?

11   A.   Yes.

12   Q.   Okay.  And did you work for the business in any way,

13   ma'am?

14   A.   I would help out.

15   Q.   In what way did you help out in the business, ma'am?

16   A.   I would deliver checks on Fridays.  And if the employees

17   needed anything, I would go and give it to them.

18   Q.   Now, if I understand your testimony, you were present the

19   week before the election in May of 2006?

20   A.   That's correct.

21   Q.   And you were working at that time and going to school?

22   A.   Yes.

23   Q.   And where were you working at that time, the week before

24   the election?

25   A.   James Phillips' office.

*J. MORRIS - Cross (Mr. Smith)*                                        40

1    Q.   And what hours were you working, ma'am?

2    A.   It was part-time.  Sometimes it would change, depending

3    upon how much homework or if I had exams or not.  Normally, it

4    was only two days a week.

5    Q.   Were you on a flexible schedule?  Did you announce your

6    schedule for the clerk, or did he set your schedule?

7    A.   I let him know of my school hours.

8    Q.   Do you know your school hours at that time, ma'am?

9    A.   No, sir.  Well, I know it was Monday, Wednesdays and

10   Fridays.  I can't really remember --

11   Q.   And how many hours were you in class on those days,

12   ma'am?

13   A.   From early morning till late afternoon.

14   Q.   So you put in a pretty full day those Monday, Wednesday,

15   Fridays?

16   A.   Yes, at the time I was taking 13 hours.

17   Q.   And did you work at the clerk's office on those days as

18   well?

19   A.   No, sir.

20   Q.   So you limited your work to the clerk's office to

21   Tuesdays and Thursdays?

22   A.   Yes, sir.

23   Q.   And the days that you worked at the clerk's office, would

24   you work full days or just part days?

25   A.   Sometimes I would work full days, sometimes I would work

*J. MORRIS - Cross (Mr. Smith)*                                          41

1    part days.

2    Q.   How many hours did you average working for the clerk's

3    office, ma'am, per week?

4    A.   Maybe 15 to 20.  Probably not even that.

5    Q.   And how much were you making per hour?

6    A.   I think it was 9 something.

7    Q.   Nine?

8    A.   Nine, yeah, in between nine and ten dollars.

9    Q.   Per hour?

10   A.   Per hour, yes, sir.

11   Q.   Where were you working in November, 2006, ma'am?

12   A.   I was working in the clerk's office.

13   Q.   And what was your schedule at that time, ma'am?

14   A.   That time, it was -- it could have been anytime because I

15   was not in school at that time.

16   Q.   So how many hours did you work per week in the fall,

17   November, 2006?

18   A.   Probably 25 to 30.

19   Q.   25 to 30 hours?

20   A.   Yes.

21   Q.   Were there occasions when you might work 40?

22   A.   No.

23   Q.   You were pretty much capped out at 30 hours?

24   A.   Yes.

25   Q.   Did you work on Saturdays?

*J. MORRIS - Cross (Ms. Logan)*                                          42

1    A.   No, sir.

2    Q.   Just on Monday through Friday?

3    A.   Yes, sir.

4    Q.   And you did not attend classes in the fall of 2006?

5    A.   No, sir, I did not.

6    Q.   Did you have any other jobs?

7    A.   No, sir.

8    Q.   Did you work for B&J in any capacity?

9    A.   No.

10            MR. SMITH:  Just a moment, please.

11            THE COURT:  Yes.

12            MR. SMITH:  I pass the witness, Your Honor.  Thank

13   you.

14            THE COURT:  Start with Mr. Simons, see if anyone else

15   has any questions.

16            MR. SIMONS:  No, Your Honor.

17            MR. PINALES:  No, Your Honor.

18            MS. LOGAN:  Just a few.

19            THE COURT:  All right.

20                        CROSS-EXAMINATION

21   BY MS. LOGAN:

22   Q.   Good afternoon, Jessica.  My name is Kristin Logan, I'm

23   one of Doug Adams' attorneys.  I just have a few quick

24   questions for you.  I believe you testified when Miss Hughes

25   was questioning you that you were at the Green Street house

*J. MORRIS - Redirect (Ms. Hughes)* 43

1   for part of the day on November, '06 election day?

2   A.   That's correct.

3   Q.   And I think you said you got off work at noon?

4   A.   Yes, ma'am.

5   Q.   Okay.  And you went to vote around 5:00 or 6:00?

6   A.   Yes, ma'am.

7   Q.   Did you go back home to Green Street after you voted?

8   A.   Yes, ma'am, I did.

9   Q.   Okay.  And I believe you also said you didn't know who

10   Doug Adams was?

11   A.   No, ma'am.

12   Q.   Have you ever seen that man at your parents' house on

13   Green Street?

14   A.   No, ma'am.

15   Q.   Not on election day, '06?

16   A.   No, ma'am.

17   Q.   Any other time?

18   A.   No, ma'am.

19        MS. LOGAN:  No further questions.  Pass the witness.

20        THE COURT:  Thank you.  Any redirect?  Yes, ma'am,

21   you may proceed.

22                    REDIRECT EXAMINATION

23   BY MS. HUGHES:

24   Q.   It's almost over.  This house, when you say that your

25   father helped build that house, I'd like for you to tell the

*J. MORRIS - Redirect (Ms. Hughes)*                                           44

1    jury what you mean.

2    A.   He built it with his hands, with his bare hands.

3    Q.   He didn't have a general contractor?

4    A.   No.  He did everything, the blue prints and everything.

5    Q.   You mean like hammering logs?

6    A.   Yes.

7    Q.   And did people come assist him?

8    A.   Yes.

9    Q.   How did you get the job at James Phillips' office?

10   A.   When I came back to Kentucky, I went and filled out

11   applications at quite a few different places, and James

12   Phillips called me back.

13   Q.   And did he do that that very afternoon or the next day?

14   A.   No, it took about a month.

15          MS. HUGHES:  That's all I have.

16          THE COURT:  All right.  Any further questions of the

17   witness, Mr. Smith?

18          MR. SMITH:  No, thank you.

19          THE COURT:  Anyone else?  Thank you, ma'am.  You may

20   step down.  You're excused.  Any objection to the witness

21   being finally excused?

22          MS. HUGHES:  No.

23          THE COURT:  Thank you.  Miss Hughes, you may call

24   your next witness.

25          MS. HUGHES:  Bartley Morris.

*B. MORRIS - Direct (Ms. Hughes)*                                45

1          WILLIAM BARTLEY MORRIS, II, DEFENSE WITNESS, SWORN

2              THE COURT:  Thank you.  Miss Hughes, you may proceed.

3                          DIRECT EXAMINATION

4    BY MS. HUGHES:

5    Q.   Sir, can you tell the jury your name, please?

6    A.   William Bartley Morris the Second.

7    Q.   All right.  And how old are you?

8    A.   Twenty-eight.

9    Q.   And are you related to any of the parties in this action?

10   A.   Debi Morris is my stepmother, and Bart Morris is my

11   father.

12   Q.   All right.  Where do you reside?

13   A.   Right now, I live in Richmond, Kentucky, and commute back

14   and forth to Frankfort.

15   Q.   Are you employed?

16   A.   Yes, I am.  I work here in Frankfort for the Cabinet of

17   Health and Family Services.

18   Q.   And what do you do for the Cabinet For Health and Family

19   Services?

20   A.   I'm a medical reviewer.

21   Q.   What does that mean?

22   A.   I look over medical records and deem if people are

23   disabled through Social Security's office.

24   Q.   Are you also in school?

25   A.   Yes, I am.

*B. MORRIS - Direct (Ms. Hughes)*                                     46

1    Q.   All right.  Why don't you tell me about your -- well,

2    tell me about where you're going to school now.

3    A.   Right now, I'm going to school at Indiana Wesleyan

4    University, working on my Master's in business administration.

5    Q.   And do you have an undergraduate degree?

6    A.   Yes, I do, ma'am.

7    Q.   And where did you get your undergraduate degree?

8    A.   The University of Kentucky.

9    Q.   And what was your degree in?

10   A.   Agriculture biotechnology.

11   Q.   When do you expect to have your MBA?

12   A.   In December of 2011.

13   Q.   So you're doing that part-time?

14   A.   Yes, I am.

15   Q.   Now, your parents are divorced?

16   A.   Yes, ma'am.

17   Q.   How old were you when your parents divorced?

18   A.   I'm not sure.  I was a young teenager at the time.

19   Q.   With whom did you reside after your parents divorced?

20   A.   When they first got divorced, I chose to live with my

21   mother.

22   Q.   All right.  And was she living in Manchester?

23   A.   No.  She lived in Augusta, Georgia.

24   Q.   All right.  And so you moved to Augusta, Georgia?

25   A.   Yes.

*B. MORRIS - Direct (Ms. Hughes)*                                    47

1    Q.   And do you remember what school year that was?

2    A.   '96, I think, yeah.

3    Q.   Why don't you tell me, probably easier for you to

4    remember, what grade were you in?

5    A.   I was a freshman in high school.

6    Q.   All right.  And how long did you stay in Georgia?

7    A.   Half of the school year, my freshman year.

8    Q.   All right.  So at that time, what happened?

9    A.   I really didn't like it down there.  You know, my friends

10   were up here, and, you know, Clay County and stuff.  And I had

11   roots there, and I wanted to go back and be with my father.

12   So I chose to come back to Clay County to finish my degree.

13   Q.   And when was that that you moved back to Clay County?

14   A.   Well, it would have been the '96-'97 school year.  So I

15   think maybe '97.

16   Q.   And you were a freshman?

17   A.   Yes, ma'am.

18   Q.   At Clay County High School?

19   A.   Yes, ma'am.

20   Q.   When did you graduate from Clay County High School, if

21   you could?

22   A.   2000.  May of 2000.

23   Q.   When you moved back, did you meet Debi -- did you meet

24   Debi Morris, now Morris soon thereafter?

25   A.   Not soon after.  It was actually a little while before I

*B. MORRIS - Direct (Ms. Hughes)*                                          48

1   come back before I actually met my stepmother.

2   Q.   And after you graduated from high school, what did you

3   do?  Did you go to school?  Did you go get a job, did you sit

4   around, watch TV?

5   A.   No, when I got out, I immediately went to work in

6   laboring for a construction company called Parsons

7   Construction in London, Kentucky.

8   Q.   What kind of construction does Parsons Construction

9   company do?

10  A.   We install water lines on scale jobs.

11  Q.   How long -- well, what was your job for Parsons?

12  A.   I was a ditch man.  I dug ditches and put the pipe

13  together.

14  Q.   How did you like that?

15  A.   Not -- it wasn't good at all.

16  Q.   All right.  So how long did you do that?

17  A.   Done it for two years.

18  Q.   Okay.  And why just two years?  What did you do at the

19  end of the two years?

20  A.   Well, it got to it, and I realized I really didn't want

21  to be a hard laborer all my life, and I was thinking about

22  going to school.  And then my dad and mom -- stepmom.

23  Q.   Let me interrupt you there.  What do you refer to your

24  stepmother as?

25  A.   My mother.

*B. MORRIS - Direct (Ms. Hughes)*                                    49

1    Q.   So your parents, dad and mom?

2    A.   Yeah.  They pushed me to go to school.  It was like,

3    well, you're better off if you do.  So --

4    Q.   So where and when did you enroll?

5    A.   It was spring of 2002 is when I enrolled to U.K.

6    Q.   When you say spring, do you mean beginning of the spring

7    semester?

8    A.   It was January.  That's the spring school semester, when

9    it starts.

10   Q.   Would it be safe to say, then, that you were not in

11   Manchester for election day, 2002?

12   A.   Correct.

13   Q.   All right.  In the spring election, in any event, do you

14   recall voting?

15   A.   Yes.

16   Q.   All right.  Tell me about your voting after you started

17   school.

18   A.   Most of the time, when I chose to vote, I would always

19   vote absentee, because I didn't know where I'd be.  I'd most

20   likely be at school, so I always voted absentee ballot.

21   Q.   In fact, can you remember casting a ballot --

22   A.   Yes.

23   Q.   -- on election day?

24   A.   Well, not on election day, no.

25   Q.   So are you familiar or do you have any information about

*B. MORRIS - Direct (Ms. Hughes)*                                    50

1    the election between Jennings White and Freddy Thompson?

2    A.   I know it was going on.  That was about it.

3    Q.   When you say you know what was going on, you knew there

4    was a race, or --

5    A.   Yeah, I just, I knew there was a race between them.  But

6    specifics, I didn't know anything about it.

7    Q.   Well, did you know Jennings White?

8    A.   Yes, I did.

9    Q.   And how did you know Mr. White?

10   A.   Mainly through clerk and getting my car title and stuff

11   like that.  That's how I knew him.

12   Q.   He was visible?

13   A.   Yeah, he was just there.  I didn't know him personally,

14   but I knew of him.

15   Q.   What about the November general election in 2002.  Do you

16   have anything, any insight, anything to offer us on that date?

17           MR. SMITH:  Objection, Your Honor.  Calls for --

18           THE COURT:  Sustained to the form of the question.

19           MS. HUGHES:  Sorry.

20   Q.   Do you recall whether or not you were in town for the

21   general election in 2002?

22   A.   In November?

23   Q.   Yes.

24   A.   No.

25   Q.   No, you don't recall; or no, you weren't there?

*B. MORRIS - Direct (Ms. Hughes)*                                    51

1   A.   No, I don't recall where I was, but I know I wasn't in

2   Clay County.

3   Q.   All right.

4           MS. HUGHES:  With the Court's permission, I would

5   like to show this witness a document.

6           MR. SMITH:  Can we approach?

7           THE COURT:  Yes, sir.

8                   (A sidebar conference was held out of the

9                   hearing of the jury):

10          THE COURT:  What do we have here?  A receipt from

11  Best Buy dated May 18, 2004 that appears to be 4:11 in the

12  afternoon for a personal computer, it appears.

13          MS. HUGHES:  It's a jump drive, CD-ROM, or a --

14          THE COURT:  Thumb drive?

15          MS. HUGHES:  Yeah, whatever the witness says.

16          THE COURT:  Expensive thumb drive, $99, 256 megs.

17          MS. HUGHES:  Maybe a hard drive.  I don't know.  I'm

18  going to ask him about it.

19          THE COURT:  How is it relevant?

20          MS. HUGHES:  It was election day, and he's going to

21  testify he was with his parents in Best Buy in Lexington and

22  they came to visit him the night before, spent the night, took

23  him out to dinner, went to Best Buy.  He recalls going to

24  Friday's when he was -- this was purchased for him for his

25  school.

*B. MORRIS - Direct (Ms. Hughes)*                                          52

1          MR. SMITH:  He knows all that, can testify to it,

2     we'll get to this.  There's no foundation.  I object.  There's

3     no foundation to be bringing documents.  He doesn't have a

4     memory problem.  Can't be used to refresh, and this document's

5     not relevant.

6          MS. HUGHES:  I think that the document is relevant.

7     I ask him if he can identify that document, and he's going to

8     say, yes, this is the receipt for the CD, whatever it is that

9     he --

10          THE COURT:  Putting the cart before the horse, to

11     show him the document to refresh his memory before there's an

12     indication that he doesn't have a memory of the events.  I'll

13     sustain the objection.

14                    (Sidebar conference concluded.)

15          THE COURT:  Thank you.  Counsel, you may proceed.

16          MS. HUGHES:  Thank you, Your Honor.

17     Q.  Bartley, do you recall -- let me ask you -- let me start

18     this way.  When you started school at U.K., did your parents

19     come visit you on occasion?

20     A.  Yes.

21     Q.  How frequently would they come visit you?

22     A.  Probably, I would say, twice, maybe three times a month.

23     Q.  What about you going to visit them?  Did you go back to

24     Manchester on occasion?

25     A.  Yes, I did.

*B. MORRIS - Direct (Ms. Hughes)*                                    53

1    Q.   Do you recall whether or not your parents visited you in

2    May of 2004?

3    A.   Yeah, they did come up.

4    Q.   All right.  And why don't you tell me what you remember

5    about this particular trip up to visit you.

6    A.   On election day of May?

7    Q.   Um-hmm.

8    A.   I remember them coming up the night before, and we went

9    out and eat, because whenever they was up town, we'd always --

10   they'd always call me, go out to eat.  And talked a little bit

11   about what was going on in school, and they went to a hotel

12   that night.  We was supposed to meet up the next day and meet

13   for lunch and stuff, and we was just going to go shopping.

14   Q.   Did you, in fact, do any shopping?

15   A.   Yes, we did.

16   Q.   And what did you purchase, if you recall?

17   A.   I needed a, I needed a jump drive for school.

18   Q.   All right.  And where did you all purchase that?

19   A.   I think Best Buy.

20   Q.   And would Best Buy be in what city?

21   A.   Lexington.

22   Q.   And then did you -- what did you all do after you had

23   gone to Best Buy?

24   A.   We went and eat.

25   Q.   And do you recall where you went to eat?

*B. MORRIS - Direct (Ms. Hughes)*                                    54

1    A.   If I wasn't mistaken, because we was right next to Best

2    Buy, we went to Friday's, because that's one of mom's favorite

3    restaurants in Lexington.

4    Q.   And do you recall the date of this, of this trip?

5    A.   That would be in Tuesday --

6    Q.   I mean, do you recall the date?  There were several

7    Tuesdays in May.

8    A.   I'm wanting to say somewhere around -- it was in middle

9    of the month, around, I guess, the 18th, maybe the 19th,

10   somewhere.

11   Q.   All right.  Now, I want to go forward to the fall of

12   2004.  Do you have a recollection of being in Manchester on

13   election day in the fall of 2004?

14   A.   I think.  I can't remember back.

15   Q.   Did you watch a video with me this weekend?

16   A.   Yes.

17   Q.   All right.  Did you see yourself on that video?

18   A.   Yes.

19   Q.   What were you doing in that video?

20   A.   I was pulling out in my Camaro and driving off.

21   Q.   All right.  And that would be a black --

22   A.   Black Z-28 Camaro, 1990 model.

23   Q.   Whose vehicle is that?

24   A.   That's mine.

25   Q.   Do you still own it?

*B. MORRIS - Direct (Ms. Hughes)*                                       55

1    A.   No, I don't.

2    Q.   In whose name was it titled?

3    A.   Mine.

4    Q.   Having watched that video, do you have an independent

5    recollection of being present that day?

6    A.   I didn't even know I was there until I did see that

7    video.

8    Q.   All right.  What reasons would you have to go to

9    Manchester on a Tuesday?

10          MR. SMITH:  Your Honor, I'm going to object as to the

11   relevance of reasons he would go to Manchester on a Tuesday.

12          THE COURT:  All right.  I'll sustain.

13   Q.   What reasons did you travel back -- you testified earlier

14   that you had traveled to Manchester, you know, couple times a

15   month or something?

16   A.   Yes.

17   Q.   Why would you return to Manchester?

18   A.   Mainly just, you know, to get money because broke college

19   student.  You know, get money.  My eye doctor, dentist,

20   everyone's down in Manchester.  I still go to my eye doctor

21   down there.  You know, drop laundry off to mom, you know, is

22   always nice.  And just to come see family.

23   Q.   If you were there in the middle of -- well, did you have

24   school?

25   A.   Not in '04.  It was a federal election, so school was off

*B. MORRIS - Direct (Ms. Hughes)*                                    56

1    that day.

2    Q.   In the video, you did see a number of cars at Green

3    Street?

4    A.   Yes, ma'am.

5    Q.   At that house.  Realizing that you don't have a specific

6    recollection, but could you tell me how you would describe

7    that number of cars being at the house at Green Street?

8            MR. SMITH:  Your Honor, I'm going to object.  I'm not

9    real sure what video she's referring to, so I'm going to

10   object to the relevance.

11           THE COURT:  Sustained.

12           MS. HUGHES:  All right.  I can certainly show it, and

13   I can do that.  I don't know what the timing is or how the

14   Court would like me to proceed.  My computer is hooked up, and

15   I think I can probably put it in and show it.

16           THE COURT:  That will be fine.  You can do that.

17           MS. HUGHES:  I need Debra Morris Number 1.

18           MR. SMITH:  Your Honor, may we approach?  Another

19   issue I want to bring up.

20           THE COURT:  Why don't you all come up.

21                   (A sidebar conference was held out of the

22                   hearing of the jury):

23           MR. SMITH:  I think I know the video now.  She's

24   going to reference now the election video that the mayor

25   introduced.

*B. MORRIS - Direct (Ms. Hughes)*                                    57

1          MS. HUGHES:  That's right.

2          MR. SMITH:  And the witness has already said that he

3     has no recollection of being there, what was going on that

4     day.  That all he can say is that that was him in the car.

5          THE COURT:  All right.

6          MR. SMITH:  Now she's asking him to identify what

7     these other people are doing coming and going.

8          THE COURT:  I think the question was whether this

9     type of activity would be unusual based upon the times that

10    he's been there.  That's what I understood the question to be.

11         MR. SMITH:  I didn't understand that to be the

12    question.

13         MS. HUGHES:  That is, and I don't -- I am not going

14    to walk him through the video and say who is that, who is

15    that.  My only questions about the video were the level of

16    traffic and the level of parking.  So I'll play the video if

17    you want me to.  I would actually just go up to a certain

18    point and stop it where there is -- where you can see the

19    Green Street house with the cars and whatnot, or I was just

20    trying to be expeditious.  I wasn't trying to sneak anything

21    by you.  However you'd like to proceed.

22         MR. SMITH:  Well, I mean, I think the record needs to

23    be accurate about what video we're talking about.  If you're

24    referencing a video and testimony, I think it ought to be the

25    exhibit you're referencing and not some anonymous video over

*B. MORRIS - Direct (Ms. Hughes)*                                    58

1      the weekend you and the witness saw.

2             MS. HUGHES:  "Saw 3."

3             MR. SMITH:  So you have --

4             MS. HUGHES:  I was making a joke about a movie.

5      "Saw 3" or "Saw 4," the horror movies.

6             MR. SMITH:  I'm sorry.  I don't keep up with movies.

7             THE COURT:  At this stage, the witness is going to

8      review a sufficient portion of the video to be able to

9      authenticate that that was a video that he had watched over

10     the weekend.  And your question would be, having watched the

11     video, if that level of activity was unusual based upon the

12     times that he was there.

13            MS. HUGHES:  That's right.

14            THE COURT:  Okay.

15            MR. ABELL:  Have you all cured the sound issue with

16     this CD and video that we discussed earlier?

17            MS. HUGHES:  Oh, no.

18            THE COURT:  I'm assuming it's without sound.

19            MS. HUGHES:  I don't have the sound on on my

20     computer, because it's been in the courtroom.

21            THE COURT:  Okay.

22            MS. HUGHES:  I'm happy to take five minutes and make

23     sure I get it right, but I'm also happy to --

24            THE COURT:  Appreciate that.

25            MS. HUGHES:  Thank goodness he said that, but it is

*B. MORRIS - Direct (Ms. Hughes)*                              59

1    off.

2              THE COURT:  Thank you.

3                    (Sidebar conference concluded.)

4                    (A portion of Debra Morris Exhibit 1

5                    was played in open court.)

6    Q.  Mr. Morris, can you identify what we're looking at here

7    on the screen, please?

8    A.  You're looking at our house on 107 Green Street in

9    Manchester.

10   Q.  All right.  Can you describe for the jury, I mean, there

11   are cars parked across the front.  Can you describe the

12   layout?

13   A.  As you can see where that maroon Blazer is, there's a

14   little strip of blacktop right there, and then we have another

15   one that's a concrete strip where that little four door sedan

16   is that goes into our garage, and then next to it is a little

17   place where we can park, there's gravel and stuff on it.

18   Q.  How many cars can park there in front of Green Street at

19   one time?

20   A.  Park there and get out?  I'd say anywhere between six to

21   eight that can get out and come and go as they please.

22   Q.  You mean not be blocked in?

23   A.  Yes.

24   Q.  Would you consider it to be -- well, can you tell me in

25   this video, is this the video that you watched with me?

1   A.   Yes, ma'am.

2   Q.   All right.  Is the level of activity and traffic that you

3   saw in the video, would you consider that to be unusual --

4   A.   No.

5   Q.   -- in comparison to what you're used to seeing there?

6   A.   I'd say it would be low to average.

7   Q.   All right.  Why don't you describe for the jury the

8   comings and goings, the level of activity you're used to at

9   the Green Street house.

10  A.   There would always be someone, somebody at our house.  It

11  wouldn't be unusual at all for me to come in and there to be

12  people there and us not there.  There's -- we just have a lot

13  of foot traffic.  People coming in, hanging out quite often.

14  And it's not unheard of for us to have, you know, small, you

15  know, little get-together between friends and family and there

16  be 20, 30 people there.

17  Q.   What about the garage?

18  A.   We usually stayed out in the garage, you know, tinkering

19  on our race car and stuff.  It was something me and dad did

20  quite a lot.  When we'd open that garage door, it was an open

21  invitation.  Everyone loved that race car.  They all wanted to

22  come in, check it out, see what's happening, see what we're

23  doing to it and all that good stuff.

24  Q.   What about Green Street and the traffic on Green Street.

25  Would you -- why don't you just describe it for the jury in

*B. MORRIS - Direct (Ms. Hughes)*                                    61

1    reference to downtown.

2    A.   Green Street, you actually get to two parts of Manchester

3    through Green Street.  So depending on where you was going, a

4    lot of people would use Green Street as a way over, going over

5    Radio Hill or something out from Mill Pond and that area back

6    in there that's in the main back.  So they'd come out that way

7    too.  So there was actually a lot of traffic on a regular

8    occasion, quite a bit of traffic running back and forth.

9    Q.   All right.  Now, I'd like to skip forward.

10   A.   Okay.

11   Q.   And talk about the trip to Gatlinburg in 2006, May.  Do

12   you recall?

13   A.   Yes, I do.

14   Q.   All right.  Would you please tell the jury about -- let's

15   start with what is your understanding of the reason for the

16   trip?

17   A.   Well, we was actually trying to get, you know, my

18   stepbrother, you know, he had some issues with drugs, and it

19   was Mother's Day, and last Mother's Day wasn't that great.  So

20   we was actually trying to get the family back together, and we

21   all went on a family trip down there for Mother's Day.

22   Q.   And do you recall what day of the week you left?

23   A.   We left on that Sunday.

24   Q.   And how long did you stay?

25   A.   I stayed till Wednesday.

*B. MORRIS - Direct (Ms. Hughes)*                                      62

1   Q.   Would you tell the jury who went on that trip?

2   A.   Well, when we went down on Sunday, it was my dad, my mom,

3   Jocelyn, Sophie, my sister, my stepbrother, my girlfriend at

4   the present time --

5   Q.   At the present time?

6   A.   Yeah, at the present time.

7   Q.   At the current time?

8   A.   Yeah.

9   Q.   Used to be your girlfriend?

10  A.   Yeah.

11  Q.   Do you recall who drove in what cars?

12  A.   We took two separate cars down there.  And dad, mom,

13  Sophie, Jocelyn, they went in one car, and then the kids took

14  another car.

15  Q.   All right.  And did you qualify as a kid?

16  A.   Yeah, yeah.

17  Q.   Okay.  Do you remember which cars you all were driving?

18  A.   Not -- I think dad and mom's Blazer and my sister's car.

19  Q.   All right.  How long did it take to get to Gatlinburg, if

20  you recall?

21  A.   Three, three and a half hours.

22  Q.   Okay.  And do you recall -- well, did you do the driving

23  all in one day?  Did you arrive on Sunday?

24  A.   Yes, yes, we did.

25  Q.   And where did you all stay?

*B. MORRIS - Direct (Ms. Hughes)*                                    63

1    A.   We stayed in a -- at first, we stayed in a chalet.  We

2    rented a chalet for a few nights that's right there at the

3    base of the hill in Gatlinburg.  You have a couple different

4    areas.  Right there at the base, we stayed in a chalet then.

5    Q.   And how long did you stay in the chalets?

6    A.   We stayed till Tuesday.

7    Q.   Did you check out of the chalets?

8    A.   Yes, we did.

9    Q.   What did you do on Tuesday?

10   A.   We decided we was gonna leave later that evening so we --

11   we was hanging out, doing some shopping, and then Stanley and

12   Sarah met us down there and we chose to stay another night.

13   Q.   All right.  And where did you all decide to stay another

14   night?

15   A.   It was -- I couldn't even remember.  It was a little

16   hotel that was next to Ripley's Aquarium.

17   Q.   Okay.  So did you actually see Sarah and Stanley Bowling

18   in Gatlinburg?

19   A.   Yes.

20   Q.   Where did you see them?

21   A.   On the strip.

22   Q.   And what day would that have been?

23   A.   Tuesday.

24   Q.   And did you just see them on the strip, or did you do

25   anything with them, or was that the only time you saw them?

*B. MORRIS - Direct (Ms. Hughes)*                                    64

1    A.   No, when we actually, we met up -- when we saw them and

2    we met up with them, we went to go eat.  We went to eat at the

3    Hard Rock cafe later that evening.

4    Q.   How many times when you were down there did you eat at

5    the Hard Rock Cafe?

6    A.   We ate there a couple times.

7    Q.   How many times did you eat there with Sarah and Stanley?

8    A.   I think, I think once.

9    Q.   And then when did you all leave Gatlinburg?

10   A.   We left on Wednesday.

11   Q.   All right.  Who left early?

12   A.   My sister and stepbrother.

13   Q.   All right.  Other than when your sister and stepbrother

14   left on Tuesday, did anybody else in your group that you've

15   identified for the jury, did anyone else leave at any time

16   during the trip?

17   A.   No.

18   Q.   And let me ask you this question.  Do you know Cletus

19   Maricle?

20   A.   I know of him.

21   Q.   Okay.  What about Doug Adams?

22   A.   I know of him.

23   Q.   How do you know Mr. Doug Adams?

24   A.   He's the -- he was the superintendent of my school.

25   Q.   Okay.  What about a gentleman named William or Al Man

*B. MORRIS - Direct (Ms. Hughes)*                                          65

1    Stivers?

2    A.   No.

3    Q.   What about Wayne Jones?

4    A.   No.

5    Q.   What about Freddy Thompson?

6    A.   I know of him.

7    Q.   All right.

8              MS. HUGHES:  Your Honor, may we approach?  I'm almost

9    finished.  I've got one question.

10             THE COURT:  Yes.

11                        (A sidebar conference was held out of the

12                        hearing of the jury):

13             MS. HUGHES:  I just didn't want to come out -- after

14   I laid the foundation, I did want to show him the receipt and

15   ask him if this was the receipt of the purchase, because he

16   was there when his parents paid for it.

17             THE COURT:  So this is a receipt from his parents?

18             MS. HUGHES:  Correct.

19             THE COURT:  That would be improper.  I would sustain

20   the objection to that.

21             MS. HUGHES:  I thought I better come up here and ask

22   first.

23             THE COURT:  Thank you.

24                        (Sidebar conference concluded.)

25             MS. HUGHES:  I'll pass the witness, Your Honor.

*B. MORRIS - Cross (Mr. Smith)*                                    66

1            THE COURT:  Thank you.  Counsel, we'll take our

2     evening recess before we continue with questions for this

3     witness.  Ladies and gentlemen, again, please keep in mind the

4     admonition that you were given previously.  The jury will be

5     excused until 2:50 this afternoon.  Twenty-minute recess.

6                  (The jury left the courtroom at 2:30 p.m.)

7            THE COURT:  See if there are any matters to take up

8     outside the presence of the jury?  Be in recess for 20

9     minutes.

10                 (Recess from 2:31 p.m. until 2:51 p.m.)

11                 (The jury entered the courtroom at 2:51 p.m.)

12           THE COURT:  Thank you.  The record will reflect that

13    all members of the jury are present.  Parties and counsel are

14    also present.  Witness has returned to the witness stand.  He

15    is still under oath.

16           Mr. Smith, you may proceed with your questions.

17           MR. SMITH:  Thank you.

18                            CROSS-EXAMINATION

19    BY MR. SMITH:

20    Q.  Mr. Morris, I'm Steve Smith.  I represent the United

21    States.  I have a few questions for you.

22    A.  Okay.

23    Q.  As I understand your testimony, you are son of Bart

24    Morris?

25    A.  Um-hmm.

*B. MORRIS - Cross (Mr. Smith)* 67

1   Q.   William Bart Morris, his name, or Bartley?

2   A.   My father's name is William Bartley Morris.

3   Q.   And your mother is Deb or Debra?

4   A.   No, my real mother is -- was Bonnie Ann Morris.  Now

5   she's -- I don't know what her new married name is.

6   Q.   Does your stepmom go by any other names that you know of?

7   A.   Debi.

8   Q.   How does she spell that?

9   A.   D-e-b-i.

10  Q.   All right.  And Debra, how does she spell that?

11  A.   D-e-b-r-a.

12  Q.   And Mr. Morris, you indicated that, I believe, that you

13  graduated high school in 2000 from Clay County High School; is

14  that right?

15  A.   Yes, sir.

16  Q.   And if I understood your testimony, you met Debra Morris

17  a little while before you came back to Clay County; is that

18  your testimony?

19  A.   Say that again?  I'm sorry.

20  Q.   I recall your testimony that you met Debra Morris a

21  little while before you came back?

22  A.   No, I met her after I came back.  It was a little while

23  after I actually come back to Clay County.

24  Q.   And that was in 2000?

25  A.   I didn't meet her in 2000.  It might have been a little

*B. MORRIS - Cross (Mr. Smith)* 68

1    before, but it was around that time.

2    Q.   Well, you moved back, I believe you said, in the middle

3    of the semester in your freshman year in high school; is that

4    your testimony?

5    A.   Yes, sir.

6    Q.   And that would have been around December of '96, January

7    of '97?

8    A.   Yes, sir.

9    Q.   So you would have met Miss Morris at some time after

10   that?

11   A.   Yes.

12   Q.   But before 2000, when you were a high school graduate?

13   A.   Yes.

14   Q.   And was she seeing your father at that time?

15   A.   They were -- they were started seeing each other around

16   that time, around 2000.

17   Q.   Around 2000?

18   A.   Yeah, it was a little bit later.  I did not know --

19   Q.   A little bit later than what, sir?

20   A.   Like it was around 2000 when they started dating.  I

21   don't remember the exact time, but they started dating

22   officially around that time.

23   Q.   Officially?

24   A.   Yeah.  Like --

25   Q.   They made it known to the family?

*B. MORRIS - Cross (Mr. Smith)*                                        69

1   A.   Yes.

2   Q.   You don't know how long they'd been seeing each other

3   before then, but officially they told you around 2000?

4   A.   Right.

5   Q.   And I believe that you indicated that you graduated high

6   school and that you all had chosen to -- or you had chosen to

7   go to work for a construction company for about two years?

8   A.   Yes, sir.

9   Q.   And then you were encouraged to go to school in the

10  spring of '02?

11  A.   Yes.

12  Q.   Did you start in the January of '02?

13  A.   Yes.

14  Q.   Okay.  And I believe you said that that was both Bart and

15  Debi had encouraged you to do that?

16  A.   Yes.

17  Q.   Now, did you happen to go to their wedding?

18  A.   Yes, sir.

19  Q.   And who married them?

20  A.   Stanley Bowling.

21  Q.   And is that the same Stanley Bowling as here in the

22  courtroom today?

23  A.   Yes, sir.

24  Q.   Okay.  And where was this ceremony held, sir?

25  A.   In 107 Green Street.

*B. MORRIS - Cross (Mr. Smith)*                                    70

1   Q.   I believe you said you were not in or around Clay County

2   in November, '02 time period.

3   A.   Correct.

4   Q.   But you think that you were in the company of your

5   parents in May of '04; is that your testimony?

6   A.   Yes, sir.

7   Q.   I believe you said that you recall that they came up, I

8   believe you said, on the 18th or 19th.  You're not sure which

9   day that was?

10  A.   It's a while, but it was somewhere around there.  Yeah.

11  Q.   And the reason that you recall that's because they had

12  come up to meet you to buy a --

13  A.   Jump drive.

14  Q.   A jump drive.  And what was the jump drive for?

15  A.   I had to have it for school, like what it is actually

16  does is you can download files on it, and I needed a new one

17  to -- for my school.

18  Q.   And you recall that day is the day where you visited, I

19  believe, a restaurant named Friday's?

20  A.   Yes, sir.

21  Q.   And you ate dinner there at that same time with both Bart

22  and Debi?

23  A.   Yes, sir.

24  Q.   And do you recall that being a day in which, again, you

25  bought this jump drive for your school at the May of 2004; is

1    that right?

2    A.   Yes, sir.

3    Q.   Now, where were you enrolled in school in 2004, sir?

4    A.   The University of Kentucky.

5    Q.   And what classes were you enrolled in in 2004?

6    A.   I'm not sure, but -- let me think.  I'm not sure.  I know

7    I had a chemistry class all the time so it usually -- it would

8    have probably been chemistry, physics.

9    Q.   Did you take summer classes?

10   A.   Yes, I did, sir.

11   Q.   And you said that this was an occasion where you ate, are

12   you saying lunch or are you saying supper with them that day?

13   A.   We ate dinner there.

14   Q.   And some people call dinner lunch and some people call

15   dinner supper.  What do you use it for?

16   A.   Late evening.

17   Q.   Late evening?

18   A.   Yes, sir.

19   Q.   So after 5:00 or 6:00 p.m., you had had --

20   A.   Yes, sir.

21   Q.   And did you go to the store to buy this jump drive before

22   you went to eat or after you went to eat?

23   A.   Before.

24   Q.   And what were they driving at that time?

25   A.   I really -- I'm not 100% sure on that.  I'm wanting to

*B. MORRIS - Cross (Mr. Smith)*                                      72

1    say the Blazer, but I'm not 100% sure.

2    Q.   They had a maroon Blazer at that time, in 2004?

3    A.   We had two Blazers.  I don't know which one it was.

4    Q.   You saw the video earlier.  There was a maroon Blazer and

5    you identified that as the maroon Blazer.  Is that the one

6    that your father owned at the time?

7    A.   I do not know.

8    Q.   You did see the video, right?

9    A.   Yes, I did see the video.

10   Q.   You do recall seeing the maroon Blazer?

11   A.   Yes, sir.

12   Q.   But you don't know if that's your dad's maroon Blazer or

13   not?

14   A.   No.

15   Q.   Did he have a Chevy Blazer, maroon in color, at that

16   time?

17   A.   I don't know.  He might have.  I don't know.

18   Q.   Well, you just testified that you thought that's what he

19   showed up with when he met you at the Friday's.

20   A.   I said it was in a Blazer.  I don't know if it was --

21   which one it was.

22   Q.   What color --

23   A.   We had two Blazers.

24   Q.   What colors were they?

25   A.   Green and maroon.

*B. MORRIS - Cross (Mr. Smith)*                                    73

1   Q.  So he did have a maroon Blazer?

2   A.  Yes.

3   Q.  At the time of 2004?

4   A.  I don't know.  I couldn't be -- I couldn't tell you if at

5   that time it was, if we did have that maroon Blazer then or if

6   it was later.

7   Q.  Does the one in the video resemble the maroon Blazer that

8   your dad owned?

9   A.  Yes.

10  Q.  Same color?

11  A.  Yes.

12  Q.  Same make?

13  A.  I'm not really sure on that.

14  Q.  Well, there's big Blazers and there's little Blazers.

15  This was a little Blazer.  Did your dad have a big Blazer or a

16  little Blazer?

17  A.  Mid-sized Blazer, yes.  Little Blazer.

18  Q.  So it would be the same make?

19  A.  I guess.

20  Q.  Now, you were sure that the car that was in the video was

21  your car?

22  A.  Yes, sir.

23  Q.  And that was the black car?

24  A.  Yes.

25  Q.  But you don't recall being there that day, if I

1    understood your testimony?

2    A.   I did not even know I was there till I saw the video,

3    sir.

4    Q.   You have no independent recollection of what was going on

5    at your parents' house that day?

6    A.   No, sir.

7    Q.   But you testified that when you did see the video, that

8    you could give this Court and this jury the assurance that

9    that was normal or, I believe you said, might be below normal

10   in traffic that's at your parents' house?

11   A.   Yes, sir.

12   Q.   Did you watch all the video?

13   A.   Yes, sir.

14   Q.   And what was the last thing you saw on the video?

15   A.   I think it was people going in to vote at the Clay County

16   Middle School.

17   Q.   Okay.  And did you recall seeing a man by the name of

18   Vernon Hacker in the video?

19   A.   Yes, sir.

20   Q.   Do you know Vernon Hacker?

21   A.   Yes, sir.

22   Q.   Did you see Darnell Hipsher in the video?

23   A.   I'm not sure.  I thought he may be.

24   Q.   Do you know Darnell Hipsher?

25   A.   Yes, I do.

*B. MORRIS - Cross (Mr. Smith)*                                          75

1    Q.    And you've seen those two fellas at your house before?

2    A.    Yes, sir.

3    Q.    And they were there on that day?

4    A.    I couldn't -- I couldn't be sure if they were there or

5    not.

6    Q.    All right.  They were in the video at least?  You will

7    agree with me there?

8    A.    Yeah.

9    Q.    Now, this day in which you were there, you don't know why

10   you were there?

11   A.    I could have been there for several things.

12   Q.    But you don't recall why you were there?

13   A.    No, sir.

14   Q.    Do you recall seeing that maroon Blazer being operated by

15   Vernon Hacker?

16   A.    I think.

17   Q.    Did Vernon Hacker drive your dad's vehicle before?

18   A.    Never drove my dad's vehicle.

19   Q.    That maroon Blazer had never been operated by Vernon

20   Hacker?

21   A.    I don't know if that maroon Blazer was dad's so I don't

22   know if Vernon was operating dad's Blazer or not.  I never

23   seen --

24   Q.    Do you know Vernon Hacker to have a maroon Blazer, sir?

25   A.    I'm not sure if he does or not.

*B. MORRIS - Cross (Mr. Smith)* 76

1    Q.   Do you know if Darnell Hipsher has a maroon Blazer?

2    A.   I'm not sure on that also.

3    Q.   If you saw the video, you did see Vernon Hacker in the

4    maroon Blazer?

5    A.   Yes.

6    Q.   But you don't recall that that was your dad's Blazer?

7    A.   I don't know if it was dad's Blazer.

8    Q.   But in any event, your testimony is you've never seen

9    Vernon Hacker in your dad's Blazer?

10   A.   Right.

11   Q.   Now, I believe you said that during the time period that

12   you had an opportunity to watch the video, did you notice a

13   fellow by the name of Deshae Henson there?

14   A.   Yes, I did.

15   Q.   Have you seen him at your dad's before?

16   A.   Yes, sir.

17   Q.   And I believe you said that the reason that people come

18   to your father's house is to see the race car?

19   A.   Yes.

20   Q.   Is that the only reason they come to your dad's place is

21   to see the race car?

22   A.   We've had Super Bowl parties and stuff like that, people

23   come for --

24   Q.   Do you all have election parties there too?

25   A.   A few people would congregate after polls would close

*B. MORRIS - Cross (Mr. Smith)* 77

1    sometimes.  I mean, when I was younger, I think.  But I

2    couldn't tell you yes or no, that we used to have them.

3    Q.  Used to congregate around election time after the

4    election?

5    A.  Yeah.

6    Q.  And there would be people there?

7    A.  Yeah.

8    Q.  But you don't know if that was a party or not?

9    A.  Well, I mean, it would be close friends, but I wouldn't

10   say it would be a party.  It's more of close friends just --

11   Q.  So other than these close friends getting together after

12   the election at your father's house and people there to see

13   the race car, what other reasons were people coming to the

14   house?

15   A.  During Clay County Days, people would come down.  Super

16   Bowl parties, we'd have cookouts from time to time and people

17   would just come down.

18   Q.  Now, your dad's not a politician, is he?

19   A.  No, he's not.

20   Q.  He's never run for public office?

21   A.  No, he hasn't.

22   Q.  Yet he hosts these election celebrations at his house

23   with his friends, you say?

24   A.  Yes.

25   Q.  Do you know why he was interested in hosting these

*B. MORRIS - Cross (Mr. Smith)*                              78

1    parties for his friends after the election?

2    A.   He --

3    Q.   If he's not a politician?

4    A.   People would come down for it.  Dad is -- has quite a few

5    friends, and, you know, people would just choose to come down,

6    because it's convenient where it's in right in the center of

7    town.

8    Q.   How many people would show up at these get-togethers

9    after election day?

10   A.   Ten, fifteen people maybe.

11   Q.   How many times have you seen these get-togethers at your

12   father's house after the election?

13   A.   Maybe once, maybe twice.

14   Q.   One to two times?

15   A.   Yeah.

16   Q.   Now, you indicated that in May of '06, you all made a

17   trip to Gatlinburg with your dad?

18   A.   Correct.

19   Q.   And you said it took three to three and a half hours to

20   get there?

21   A.   Yes.

22   Q.   Did y'all make any stops on the way?

23   A.   Yeah, we stopped once or twice.

24   Q.   Where did you stop?

25   A.   At -- we stopped real quick to get Jocelyn and Sophie

*B. MORRIS - Cross (Mr. Smith)*                                    79

1    something to eat, and then we continued on.

2    Q.   Where did you eat there?

3    A.   I can't tell you.  It was something quick like

4    McDonald's, something he could get for the kids and get right

5    back on the road.

6    Q.   You don't recall if it was McDonald's or Wendy's or

7    Burger King?  You don't know?

8    A.   No.  It was a fast food place.

9    Q.   Where else did you stop?

10   A.   I think that was about it.  We might have stopped for

11   gas, but I can't remember back that far.

12   Q.   You just don't remember?

13   A.   Yeah, I don't remember if we stopped again.  We might

14   have stopped once to get Sophie and Jocelyn something.

15   Q.   So it's your testimony that the drive from Manchester,

16   Kentucky, to Gatlinburg is a three and a half hour drive,

17   minus stopping through the drive-through and maybe getting

18   gas?

19   A.   Roughly, yes.

20   Q.   And you said you stayed in a chalet?

21   A.   Yes.

22   Q.   Did all of you stay in the same chalet?

23   A.   Yes.

24   Q.   Did they have more than one room for y'all to sleep in,

25   or how was it situated in rooms?

*B. MORRIS - Cross (Mr. Smith)*                                      80

1    A.   I think that chalet had three to four rooms, and we all

2    stayed in different rooms.

3    Q.   Where was it located in Gatlinburg?

4    A.   It's on the same peak that the skis, ski lifting stuff

5    is, where they have the -- I can't even remember that hill.

6    That mountain where they have the skiing, but it was on that

7    mountain.  It was at the bottom of it.

8    Q.   And you all went there to celebrate Mother's Day?

9    A.   Yes.

10   Q.   And the recovery of Chris Duff, I believe is your

11   testimony?

12   A.   Correct.

13   Q.   Where did y'all eat on Mother's Day?

14   A.   I want to say we ate in town at like the Hard Rock Cafe,

15   because we eat in there a couple times.  The family had.

16   Q.   So you ate at the Hard Rock Cafe with mother on Mother's

17   Day?

18   A.   Yes.

19   Q.   Where else did you eat that day?

20   A.   We mostly snacked.  There's a lot of eateries and stuff.

21   So we was getting fudge and stuff that day.

22   Q.   So you recall that during that stay, that you also saw

23   your friend Stanley Bowling?

24   A.   We saw him that Tuesday, yes.

25   Q.   That Tuesday?

*B. MORRIS - Cross (Mr. Smith)*                                        81

1    A.   Yes.

2    Q.   What time did you see him that day?

3    A.   It was early, it was around lunch time, because I want to

4    say around 12:00.

5    Q.   And what time did you eat with him?

6    A.   We didn't eat till later that evening.

7    Q.   And what did you do with him during the time lunch to the

8    evening?

9    A.   We just walked the strip, went to different shops, went

10   to the Ripley's Believe It Or Not thing, the aquarium.

11   There's two different types of Ripley's that are there.  We

12   just did random things with the kids and hung out together.

13   Q.   Just random things?  You don't recall specifically what

14   you did?

15   A.   No, not really.

16   Q.   But you do recall seeing Sarah and Stanley come down and

17   that you all did eat at the Hard Rock Cafe that day too?

18   A.   Yes.

19   Q.   And that you all ate an evening meal with them that day?

20   A.   Yes.

21   Q.   Do you know what time it was?

22   A.   It was, it was -- it was a little before sunset on that

23   day, because the sun was starting to set when we went in.

24   Q.   You all had a sunset then?

25   A.   Yeah.

*B. MORRIS - Cross (Mr. Smith)*                                          82

1   Q.   So at that dinner, you all had opportunity, I guess, to

2   sit at the same table with the Bowlings?

3   A.   Yes.

4   Q.   And you sat near them and your father and your

5   stepmother?

6   A.   Yes.

7   Q.   And during that time period, did y'all talk about the

8   election?

9   A.   No.

10  Q.   Didn't talk about the election?

11  A.   No.

12  Q.   Never did come up?

13  A.   No.

14  Q.   You sure it never did come up?

15  A.   No.

16  Q.   You never heard it spoken about?

17  A.   No.

18  Q.   And this is May of 2006, you're sure?

19  A.   Yes.

20  Q.   Are you sure?  May of 2006.

21  A.   The dates in my head get mixed up.  May of 2006.  Yes.

22  Q.   And you're sure about that?

23  A.   Yes.

24  Q.   And you're sure that they never talked about the

25  election?

*B. MORRIS - Cross (Ms. Logan)*                                          83

1   A.   Yes.

2   Q.   So I assume, sir, that Stanley Bowling didn't mention to

3   you that he had an opponent, Roger Webb, running against him

4   and he was just down celebrating the election before it was

5   even over.  Is that the way it was?

6   A.   Yes.  He never talked about anything --

7   Q.   Just came down to celebrate before the election results

8   were in that day.  Is that what happened?

9   A.   I don't know why he come down.  He just -- we just met

10  him there and went out to have dinner with us.

11          MR. SMITH:  That's all I'll have.

12          THE COURT:  All right.  Thank you.  See if counsel

13  for the other parties have any questions.  Mr. Simons, any

14  questions?

15          MR. SIMONS:  I don't have any.

16          THE COURT:  Start back around.  Mr. Hoskins.

17          MR. HOSKINS:  No questions.

18          MS. LOGAN:  Just a few.

19          THE COURT:  Yes, ma'am.

20                      CROSS-EXAMINATION

21  BY MS. LOGAN:

22  Q.   Good afternoon, Mr. Morris.  My name is Kristin Logan.

23  I'm one of Doug Adams' attorneys.  What years were you at

24  U.K.?

25  A.   Between the spring of '02 till, like, '08.

*B. MORRIS - Cross (Ms. Logan)*                                84

1    Q.   Okay.  And did you maintain at your parents' house on

2    Green Street, the time they lived there, did you have a

3    bedroom there?

4    A.   I had a bedroom there, and when I'd come home, that's

5    where I would stay, but I had a residence in Lexington.

6    Q.   And about how often did you go home when you were in

7    school to visit your parents on a monthly basis?  Just an

8    estimate?

9    A.   About twice, you know.

10   Q.   Okay.  And I believe you testified earlier that you have

11   heard of Doug Adams, know of him?

12   A.   Yeah.

13   Q.   But don't know him?

14   A.   I don't know him personally.  I know of him, though.

15   Q.   Okay.  The gentleman that's standing up right there, in

16   the times that you lived at your parents' house and the times

17   you were home visiting while you were at U.K., have you ever

18   seen him at your parents' residence?

19   A.   No.

20            MS. LOGAN:  Thank you very much.  Pass the witness.

21            MR. WHITE:  No questions, Your Honor.

22            THE COURT:  Anyone else have any questions of this

23   witness?

24            MR. BALDANI:  No.

25            THE COURT:  Back around to redirect.  Any questions

*B. MORRIS - Redirect (Ms. Hughes)*                                    85

1    on matters that were just raised?

2                         REDIRECT EXAMINATION

3    BY MS. HUGHES:

4    Q.   Bartley, you heard Mr. Smith ask you about election

5    parties.

6    A.   Yes.

7    Q.   Do you have any knowledge of election parties after you

8    left for college?

9    A.   No.

10   Q.   And what year was that?

11   A.   '02.

12   Q.   Now, Mr. Smith also asked you some questions about the

13   video and watching that?

14   A.   Yes.

15   Q.   Did any other people use the driveway in the paved area

16   in the house in front of Green Street?

17   A.   Yes.  My granny lives right next door, and she just has a

18   little small drive to fit one car.  So usually, my cousins or

19   my uncle or anything else would park in our area and then walk

20   over to my grandmother's.

21   Q.   Is this your granny on your dad's side?

22   A.   No, it's on my real -- my biological mother's side.

23            MS. HUGHES:  May we approach, Your Honor?

24            THE COURT:  Yes, you may.

25                         (A sidebar conference was held out of the

*B. MORRIS - Redirect (Ms. Hughes)*                                86

1                        hearing of the jury):

2              MS. HUGHES:  Making a record, because I know what the

3      judge's ruling is going to be.  But I do have a receipt.  Mr.

4      Smith seemed to imply with the witness that there was no

5      dinner that Sunday at Hard Rock Cafe and I do, in fact, have

6      the receipt from that.  And he could look at it, identify it

7      as representing -- brought to the table and whatnot.  This is

8      the Sunday before the election.  It was raised in Mr. Smith's

9      cross.

10             THE COURT:  This is not his receipt, correct?

11             MS. HUGHES:  That is correct.  He did not pay.

12             THE COURT:  So he can't authenticate this document as

13     being his receipt.

14             MS. HUGHES:  That's true.

15             THE COURT:  So how would you expect to introduce it

16     through him?

17             MS. HUGHES:  Well, the other one that we talked about

18     before, I mean, he would testify that is what was purchased

19     for me, and I was standing there when my parents received it.

20     This, I would just have to -- I mean, I don't know if he can

21     remember what people ate or anything else, but that has some

22     information about it.

23             THE COURT:  Assuming there's an objection, I'll

24     sustain the objection.  Can't come in through this witness.

25             MS. HUGHES:  Thank you.

*GEORGE - Direct (Ms. Hughes)*                                    87

1                    (Sidebar conference concluded.)

2            THE COURT:  Thank you.  Any further questions of this

3    witness?

4            MS. HUGHES:  No, sir.  Thank you.

5            THE COURT:  Thank you.  Any further cross-examination

6    for the witness, Mr. Smith?

7            MR. SMITH:  No further questions.

8            THE COURT:  All right.  Thank you, sir.  You may step

9    down.

10           Miss Hughes, you may call your next witness.

11           MS. HUGHES:  Candace George, please.

12              CANDACE GEORGE, DEFENSE WITNESS, SWORN

13           THE COURT:  You may proceed, thank you.

14           MS. HUGHES:  Thank you, Your Honor.

15                        DIRECT EXAMINATION

16   BY MS. HUGHES:

17   Q.   Miss George, can you state your full name for the jury,

18   please?

19   A.   Candace Rochelle George.

20   Q.   And where do you live?

21   A.   I live in Louisville currently.

22   Q.   All right.  How old are you?

23   A.   Twenty-two.

24   Q.   Are you employed?

25   A.   Yes.

*GEORGE - Direct (Ms. Hughes)*                                          88

1   Q.   And what do you do?

2   A.   I work at Walgreen's for a part-time job right now.

3   Q.   And do you go to school as well?

4   A.   I do.  I go to U of L Dental School.

5   Q.   Do you know the Morris family?

6   A.   Yes, I do.

7   Q.   How do you know the Morris family?

8   A.   My sister was dating Bartley, their son, and I met them

9   through her.

10  Q.   What is your sister's name?

11  A.   April George.

12  Q.   Did you ever go on a trip with Morris family?

13  A.   Yes, I did.

14  Q.   Where did you go?

15  A.   We went to Gatlinburg, Tennessee.

16  Q.   Do you recall approximately when that was?

17  A.   It was during the summer months, sometime during then.

18  Q.   Do you recall whether -- what year it was?

19  A.   I think it was 2006.  I'm pretty sure.

20  Q.   And do you recall what day of the week that you left?

21  A.   Not specifically, no.

22  Q.   Do you recall how long you all stayed?

23  A.   It was just for a couple of days.

24  Q.   And do you recall where you stayed?

25  A.   We stayed in a cabin for a couple of days, and then we

*GEORGE - Direct (Ms. Hughes)*                                      89

1   moved to a hotel later on during the trip.

2   Q.   All right.  Can you tell the jury who you recall being

3   present on the trip?

4   A.   There was myself, my sister April, Bartley, Bart and Deb,

5   Jessica, her daughter Jocelyn, and then there was another

6   other little girl that I remember.

7   Q.   And do you recall whether you met any other people in

8   Gatlinburg?

9   A.   Yeah, there was another couple that met up with us later.

10  I'm not for sure of their names, but there was another couple

11  that met with us later on in the week.

12          MS. HUGHES:  That's all I have.

13          THE COURT:  All right.  Thank you.  Any questions for

14  this witness, Mr. Smith?

15          MR. SMITH:  No, Your Honor.

16          THE COURT:  All right.  Anyone else?  Thank you,

17  ma'am, you may step down.  You may call your next witness.

18          MS. HUGHES:  Debra Morris announces close.

19          THE COURT:  Thank you.  Mr. Simons, do you need a

20  moment before you proceed with your case?

21          MR. SIMONS:  I'm ready to proceed, Your Honor.  I

22  might need a moment before I call my second witness.

23          THE COURT:  That will be fine.  You can proceed.

24          MR. SIMONS:  Your Honor, I would call Mary Sue

25  Hensley, please.

HENSLEY - Direct (Mr. Simons)                                    90

1           MARY SUE HENSLEY, DEFENSE WITNESS, SWORN

2           THE COURT:  Thank you.  Please proceed.

3                       DIRECT EXAMINATION

4    BY MR. SIMONS:

5    Q.  Good afternoon, Miss Hensley.

6    A.  Good afternoon.

7    Q.  My name is Dan Simons.  I'm an attorney from Richmond,

8    Kentucky, and I represent Stanley Bowling.  Okay?

9    A.  Yes.

10   Q.  Have some questions for you.  You know Mr. Bowling; do

11   you not?

12   A.  Yes.

13   Q.  Do you recognize him here in the courtroom?

14   A.  Yes.

15   Q.  Okay.  Would you please identify yourself for the jury,

16   please?  What's your name?

17   A.  My name is Mary Sue Hensley.

18   Q.  And where do you live, Miss Hensley?

19   A.  Manchester, Kentucky.

20   Q.  And do you live within the city, or do you live out in

21   the county?

22   A.  Out in the county.

23   Q.  And who lives there with you?

24   A.  My husband, my younger son and my granddaughter.

25   Q.  Okay.  And how long have you lived in Clay County,

*HENSLEY - Direct (Mr. Simons)*                                    91

1   Kentucky?

2   A.   Most of my life.

3   Q.   Okay.  And how old are you?

4   A.   I'll be 60 in August.  So I've been there for a while.

5   Q.   You're a young 60.  Do you work, ma'am?

6   A.   No.

7   Q.   And are you retired?

8   A.   Yes.

9   Q.   And from where did you retire?

10  A.   City of Manchester.

11  Q.   And when did you retire from the City of Manchester?

12  A.   In 2008.

13  Q.   At the time of your -- well, when did you start working

14  for the City of Manchester?

15  A.   In 1988.

16  Q.   My math's not great, but that's 20 years, it sounds like;

17  is that correct?

18  A.   Yes.

19  Q.   Okay.  And what did you do for the City when you started

20  in 1988?

21  A.   Worked with water department mostly, water and sewer.

22  Q.   Okay.  And did you work in the Water and Sewer Department

23  all the way up until 2008, when you retired?

24  A.   With the exception of the last year, and I was city clerk

25  for one year.

HENSLEY - Direct (Mr. Simons)                                    92

1    Q.   Okay.  So from 1988 through 2007, 19 years, you worked in

2    the Water and Sewer Department?

3    A.   Correct.

4    Q.   In the City of Manchester?

5    A.   Correct.

6    Q.   And when you started in 1998 -- or 1988, who would have

7    been the city supervisor?

8    A.   Stanley Bowling.

9    Q.   And would he have been your boss?

10   A.   Yes.

11   Q.   And you would have worked under his direct control?

12   A.   Correct.

13   Q.   And would that have remained true until he retired in

14   2000?

15   A.   Yes.

16   Q.   Okay.  Was Stanley a good boss to you?

17   A.   Yes, he was.

18            MR. SMITH:  Your Honor, I'm going to object to the

19   form.

20            THE COURT:  Overruled.

21   Q.   Was he a good man to work for?

22   A.   Yes.

23   Q.   Did he treat you fairly?

24   A.   Yes.

25   Q.   Did he treat you with dignity?

*HENSLEY - Direct (Mr. Simons)*                                      93

1    A.   Yes.

2    Q.   Did Mr. Bowling ever try to influence you to do anything

3    wrong?

4    A.   No.

5    Q.   From time to time, were you in charge of billing?

6    A.   Yes.

7    Q.   From time to time, was it necessary to adjust water bills

8    for people?

9    A.   Yes.

10   Q.   And why would that be true?

11   A.   Well, if they had a water line break, you know, and they

12   would have a very high consumption, Mr. Bowling would work

13   with them.  If they were in agreement to fix the water break,

14   he would help them with their water bill.

15   Q.   Okay.  And would you deem that to be a proper adjustment

16   in the event of a break?

17   A.   Yes.

18   Q.   Did Mr. Bowling ever ask you to adjust a bill for anyone

19   that didn't have a water line break?

20        MR. SMITH:  Your Honor, I'm going to object.

21        THE COURT:  I'm not sure this is within the time

22   period charged here so I'll sustain the objection.

23        MR. SIMONS:  Okay.

24   Q.   After Stanley Bowling retired in 2000, did he ever -- let

25   me ask you this, between the years 2002 and 2007, you still

*HENSLEY - Direct (Mr. Simons)*                                94

1   knew Mr. Bowling; did you not?

2   A.   Yes.

3   Q.   If you saw him, you would be on a friendly basis with

4   him; would you not?

5   A.   Yes.

6   Q.   If he called the city water department and wanted to

7   speak with you, you would have accepted a phone call; would

8   you not?

9   A.   Yes.

10  Q.   You probably would have been glad to hear from him,

11  wouldn't you?

12          MR. SMITH:  Your Honor, I'm going to object.

13          THE COURT:  Sustained.

14  Q.   Okay.  Did Mr. Bowling, between 2002 and 2007, ever try

15  to exercise any influence over a water bill or a sewer bill?

16          MR. SMITH:  Your Honor, I'm going to object, again

17  being outside the time period -- he left there in 2000.

18          THE COURT:  I'm going to sustain the objection.

19  Q.   After Mr. Bowling retired, who became your supervisor?

20  A.   Wes Hacker.

21  Q.   Okay.  And how long was Mr. Hacker your supervisor?

22  A.   A few years.  I'm not real sure how many years.

23  Q.   Okay.

24  A.   Not very many.

25  Q.   Well, let me ask you this first.  Was Stanley Bowling the

*HENSLEY - Direct (Mr. Simons)*                                    95

1    whole time he was supervisor in charge of both water and

2    sewer?

3    A.   Yes.

4    Q.   If a City crew worked on water and sewer, it would be him

5    in charge of that?

6    A.   Yes.

7    Q.   Do you know whether Mr. Hacker ever worked for Mr.

8    Bowling or not?

9    A.   Yes.

10   Q.   When Mr. Hacker took over, was he as experienced and

11   knowledgeable as Mr. Bowling?

12            MR. SMITH:  Your Honor, I'm going to object as to

13   relevance.

14            THE COURT:  Sustained.

15   Q.   I'll jump ahead a little bit, okay?  After Mr. Hacker,

16   who became the next city supervisor, do you recall, after Mr.

17   Hacker?

18   A.   Mike White.

19   Q.   Okay.  And did Mike White remain as a supervisor until

20   your retirement in 2008?

21   A.   Yes.

22   Q.   At some point, did someone else become ahead of Mr. White

23   in the City hierarchy?

24   A.   Yes.

25   Q.   And who would that person have been?

HENSLEY - Direct (Mr. Simons)                                    96

1    A.   Mayor Carmen Lewis.

2    Q.   Actually, was there ever a city manager?

3    A.   Yes.

4    Q.   Okay.  And who would that person have been?

5    A.   Kennon White.

6    Q.   Okay.  And do you recall when Kennon White became city

7    manager?

8    A.   I believe 2007.

9    Q.   Okay.

10   A.   It was shortly after the new election, whatever year that

11   was.

12   Q.   Okay.  There's been a lot of testimony in this case it

13   was 2004.

14   A.   Well, okay.  Might be.  I'm not sure.

15   Q.   When Kennon White became city manager, did he also become

16   your boss, your superior?

17   A.   Well, he thought so, yes.

18   Q.   Okay.  That's fair enough.  When Mr. White was the city

19   manager, did he request that you cut water bills?

20            MR. SMITH:  I'm going to object and ask to approach.

21            THE COURT:  All right.  Come on up.

22                 (A sidebar conference was held out of the

23                 hearing of the jury):

24            THE COURT:  Mr. Smith?

25            MR. SMITH:  I'm going to object under 608 as this is

*HENSLEY - Direct (Mr. Simons)*                                    97

1    an attempt to use extrinsic evidence of a specific instance of

2    misconduct that relates to the testimony of a prior witness.

3    I believe that under 608, specific instances of conduct may

4    only be inquired on cross-examination of the witness, may not

5    be proved by extrinsic evidence.  And it's only, it's only

6    probative on cross-examination if it relates to untruthfulness

7    or truthfulness of the witness.  That would be my reading of

8    the rule.

9          MR. SIMONS:  Your Honor, my response on behalf of Mr.

10   Bowling -- Dan Simons for defendant Stanley Bowling -- would

11   be that the primary witness in this case against Stanley

12   Bowling has been Kennon White, and this evidence would tend to

13   show motivation toward bias or untruthfulness in his

14   testimony, and the reason that he would offer false testimony

15   against Stanley Bowling.  That's the purpose of the

16   introduction.

17         THE COURT:  Okay.  The purpose that you're offering

18   it is to establish Mr. White's motivation to offer false

19   testimony --

20         MR. SIMONS:  Yes.

21         THE COURT:  -- against your client?

22         MR. SIMONS:  Yes.

23         THE COURT:  And you're attempting to show that while

24   your client didn't cut water bills, Mr. White did cut water

25   bills?

HENSLEY - Direct (Mr. Simons)                                98

1          MR. SIMONS:  Yes, Your Honor.

2          THE COURT:  And your client's not charged with

3     cutting water bills in any event.

4          MR. SIMONS:  Well, I think that from the -- there's

5     been many inferences in the case that Stanley Bowling had

6     developed, during his time as city supervisor, which has been

7     referred to sometimes as city manager, which he was not, which

8     is another thing I'd like to separate the two positions here.

9     Used that position and those contacts that he made apparently

10    to gain influence in ways that ultimately led to, I'm

11    assuming, contracts with the City.

12         And I just think it's proper to, in this case, to

13    show that Kennon White's misbehavior ultimately would lead to

14    a reason that he would manufacture testimony and events

15    against Stanley Bowling.

16         THE COURT:  If that's why you're offering it, it

17    would be excluded under 608(b), specific instances of conduct.

18    Mr. Smith is correct about that.  I'll sustain the objection.

19         MR. SIMONS:  Thank you, Your Honor.

20              (Sidebar conference concluded.)

21         THE COURT:  Thank you, counsel.  I'll sustain the

22    objection to the last question.

23    BY MR. SIMONS:

24    Q.  Miss Hensley, in the years, from your experience with the

25    City of Manchester and departments of water and sewers, in the

*HENSLEY - Cross (Mr. Smith)*                                          99

1    years 2004 to 2006, who in Clay County would have known the

2    most about the sewer and water systems in the county, in the

3    city?

4    A.   Well, it would have still been Stanley Bowling.  The

5    other people were learning.  They were not aware of where all

6    the water lines and everything was.

7    Q.   But between 2004 and 2006, specifically, Stanley Bowling

8    would have known the most about the sewer and water in the

9    county?

10   A.   That's my opinion, yes.

11           MR. SMITH:  Been asked and answered, I'll object.

12           THE COURT:  Overruled.

13           MR. SIMONS:  Thank you.  Pass the witness.

14           THE COURT:  Thank you.  Mr. Smith, any questions of

15   this witness?

16                        CROSS-EXAMINATION

17   BY MR. SMITH:

18   Q.   Good afternoon.

19   A.   Good afternoon.

20   Q.   I'm Stephen Smith, and I represent the United States.  I

21   have a few questions for you, ma'am.

22   A.   Okay.

23   Q.   As I understand your title, it was working with water and

24   sewer, but I wasn't real sure what position that was that you

25   held.

1    A.   Well, at that time, there was very few positions.  I

2    guess I don't know if you would consider me an office manager

3    or what, but I did not have a title.

4    Q.   Did you have a job description?

5    A.   Yes.

6    Q.   And what was your job description?

7    A.   Well, it was to answer complaints, help people if they

8    needed water connection, if they had a problem with their

9    water bill, if they needed new service, general things like

10   that.

11   Q.   And were those calls received by phone or in person or

12   both?

13   A.   Both.

14   Q.   Anybody else work in the office with you?

15   A.   At first, it was only me.  And then another lady, Pam

16   Mathis, started working.  But I'm not sure what year.

17   Q.   And what did she do?

18   A.   She would join in and help do the same thing.

19   Q.   And you said that Stanley Bowling was very knowledgeable

20   of the water, sewer in the county or in the city?

21   A.   Yes.

22   Q.   These projects that occurred, I assume, were very

23   dependent upon federal funding coming in for extension of

24   sewer projects in the county?

25   A.   Yes.

HENSLEY - Cross (Mr. Smith)                                          101

1   Q.   And also, occasionally water lines were expanded based on

2   grant money as well?

3   A.   Yes.

4   Q.   And most of that occurred in the time period of, say,

5   2002 through 2006?

6   A.   Yes.

7   Q.   And y'all had not had a whole lot of that before 2002,

8   would that be fair?

9   A.   Be fair.

10  Q.   And Stanley Bowling would have been in a position to know

11  about the coming of these contracts based on his interaction

12  with you and, I guess, answering questions and being in touch

13  with the people there at the City; would that be fair?

14  A.   Yes.

15  Q.   Did you see him and Kennon White together?

16  A.   No, sir.

17  Q.   All right.  And during the time period that you were

18  there, Mr. Bowling was not employed with the City; is that

19  fair?

20  A.   Yes, he was till 2000 when I was working.

21  Q.   Jumped ahead of you.  And I'm sorry.  But between 2002 --

22  or 2004, he was not working at the City?

23  A.   Correct.

24  Q.   And when Mr. White worked at the city, did he work in the

25  water department or was his office located somewhere else?

*HENSLEY - Redirect (Mr. Simons)*                                102

1    A.   Somewhere else.

2              MR. SMITH:  That's all.  Thank you.

3              THE COURT:  Thank you.  Mr. Hoskins, we'll start with

4    you and go around ask if there are any questions.  Any

5    redirect, Mr. Simons?

6              MR. SIMONS:  Yes, please.

7              THE COURT:  Yes, sir, you may proceed.

8                        REDIRECT EXAMINATION

9    BY MR. SIMONS:

10   Q.   Miss Hensley, Mr. Smith asked you about Stanley would

11   know about the jobs that might be needed and necessary in

12   Manchester and Clay County?

13   A.   Yes.

14   Q.   And those would be advertised; would they not?

15   A.   Yes.

16   Q.   And there were lots of other water and sewer contractors

17   that worked in the city; were there not?

18   A.   Yes.

19   Q.   Would Clay Pipeline, did they have a multimillion dollar

20   job while you were there?

21   A.   Yes.

22   Q.   And what about J&R Construction, I think it is?

23   A.   Yes.

24   Q.   Okay.  Laurel Construction?

25   A.   Yes.

1   Q.   Did all of those people do work for the City?

2   A.   Off and on.  Not --

3   Q.   Yes, ma'am, just like -- do you remember the name of

4   Stanley's company?

5   A.   B&B Construction, I believe.

6   Q.   B&B Excavating?

7   A.   Excavating, yes.

8           MR. SIMONS:  Thank you.  I think that's all I have.

9           THE COURT:  Thank you, Mr. Simons.

10          Anything else of this witness, Mr. Smith?

11          MR. SMITH:  One second.

12          THE COURT:  Yes, sir.

13          MR. SMITH:  No questions.

14          THE COURT:  Thank you.  Anyone else?  Thank you,

15   ma'am.  You may step down.

16          MR. SIMONS:  Your Honor, I do need a minute or two

17   before I call my next witness.

18          THE COURT:  I told you I would give you a minute

19   after this first witness.  We'll do that.  Ten minutes?

20          MR. SIMONS:  Ten minutes will be fine.

21          THE COURT:  Ladies and gentlemen, we'll take a short

22   recess at this time.  I do expect to call you back in the next

23   ten minutes.  Keep in mind the admonitions I've given to you.

24   The jury will be excused for approximately ten minutes.

25               (The jury left the courtroom at 3:37 p.m.)

*CANN - Direct (Mr. Simons)*                                         104

1          THE COURT:  Be in recess for ten minutes.

2                 (Recess from 3:38 p.m. until 3:50 p.m.)

3                 (The jury entered the courtroom at 3:50 p.m.)

4          THE COURT:  The record will reflect that all members

5    of the jury are present.  Parties and counsel are also

6    present, and I have been advised the air conditioning will be

7    fixed by tomorrow morning.

8          JUROR:  Ours is working good now.

9          THE COURT:  We're halfway there.  It will be fixed by

10   tomorrow morning.  I apologize.

11         Mr. Simons, you may call your next witness.

12         MR. SIMONS:  Thank you, Your Honor.  I will call

13   Larry Cann.

14              LARRY CANN, DEFENSE WITNESS, SWORN

15         THE COURT:  Thank you.  You may proceed.

16                      DIRECT EXAMINATION

17   BY MR. SIMONS:

18   Q.   Good afternoon, Mr. Cann.  My name is Dan Simons.  I

19   represent Stanley Bowling, who is one of the defendants in the

20   case.  Do you know Mr. Bowling?

21   A.   Yes, I do.

22   Q.   Can you see him in the courtroom somewhere?

23   A.   Yeah, right there.

24   Q.   Okay.  First of all, what's your name, please?

25   A.   Larry Cann.

*CANN - Direct (Mr. Simons)*                                          105

1    Q.   And Mr. Cann, what's your occupation?

2    A.   I'm actually the owner of a consulting, planning,

3    management engineering firm.

4    Q.   And what is the name of that planning management --

5    A.   Cann-Tech.

6    Q.   Cann-Tech?

7    A.   Um-hmm.

8    Q.   And what's the nature of the business?

9    A.   We're a civil/environmental engineering group,

10   specializing in water, sewer work for municipalities and water

11   districts.

12   Q.   And where is the home office of Cann-Tech?

13   A.   Lawrenceburg, Kentucky.

14   Q.   Okay.  How long have you been involved in the water,

15   sewer engineering craft?

16   A.   Twenty-six years.

17   Q.   Okay.  And how many folks work at Cann-Tech for you?

18   A.   Thirteen.

19   Q.   All right.  Do you do engineering services for water and

20   sewer for municipalities all over the state of Kentucky?

21   A.   Yes, we do.

22   Q.   Can you give the jury some examples of cities you might

23   have worked for in water and sewer projects or design plans?

24   A.   I want to say probably half the counties in the state

25   over the 25-, 26-year time span.  Currently, we're probably

*CANN - Direct (Mr. Simons)*                                              106

1   working in ten to twelve cities and/or counties in the state.

2   Q.  Okay.  And have you had the opportunity to work on

3   projects for the City of Manchester, Kentucky, in the past?

4   A.  Yes.

5   Q.  All right.  Now, before I get into the stuff about the

6   City of Manchester, I want the jury to understand what you do

7   as a consulting engineering firm in such a project as this.

8   Okay?  Or as these.  For instance, who would employ Cann-Tech?

9   A.  City governments, county governments, water districts,

10  water associations.

11  Q.  Okay.  So if you were doing work in Manchester, you would

12  actually be employed by the City?

13  A.  That's correct.

14  Q.  Is that fair?

15  A.  Yes.

16  Q.  And if they want you to design and coordinate a water

17  line, say, or let's say a sewer, installation of a sewer, what

18  do you do for the City?

19  A.  Well, we actually provide a full range of services.  I

20  mean, that can, you know, the full scope of the project may be

21  to initial consultation and advise them where funding sources

22  may be.  Proceeding on to the design phase through

23  construction, we do construction inspection, construction

24  management, assist with the funding, funding mechanisms of the

25  projects and kind of, kind of the full gamut.  We do

*CANN - Direct (Mr. Simons)*                                                107

1    everything but the construction work on the project,

2    basically.

3    Q.   Is it fair to say the City hires you, you lay out the

4    project, you oversee it, you inspect it, you do everything

5    except the installation and the digging and the laying of the

6    pipe.  Is that fair?

7    A.   Yes, that's correct.

8    Q.   Okay.  Now, let me just ask you some specific questions.

9    Do you do engineering plans?  You do the plans?

10   A.   Correct.

11   Q.   Do you provide something called an engineering estimate?

12   A.   Yes, we do.

13   Q.   Okay.  Would you tell the jury, please, what that is?

14   A.   Engineering estimate really is our best opinion on what a

15   project, once a project scope is identified, what the cost of

16   the project will be.

17   Q.   Okay.  And is that a secret document of some type?

18   A.   No.

19   Q.   All right.

20   A.   No, I don't think so.

21   Q.   Is that made available to contractors to get bid bonds?

22   A.   Quite often, yes.

23   Q.   Okay.  Do you -- when you do the plans, do you do all the

24   technical specifications of the job as well?

25   A.   Yes, we do.

*CANN - Direct (Mr. Simons)* 108

1   Q.   Do you recommend contractors from time to time to
2   municipalities?
3   A.   Yes, we do.
4   Q.   Do you coordinate with the lending institutions, wherever
5   the money comes from?
6   A.   Yes.
7   Q.   Do you actually draft the contracts for the City?
8   A.   We will prepare the contract documents for the City on
9   most of our projects.
10  Q.   Okay.  And provide that to the City for its execution; is
11  that fair enough?
12  A.   Yes.  We don't on all projects.  That's why I say, you
13  know, there's kind of a full scope of services, but, you know,
14  we do what our client wants us to do, basically.  But some
15  projects we don't prepare contract documents.  But our normal
16  course of projects, we do.
17  Q.   Do you draft bid advertisements for --
18  A.   Yes.
19  Q.   -- the City?
20  A.   Yes, we do.
21  Q.   And as the contractor is working, you inspect the jobs?
22  A.   Yes.
23  Q.   Or Cann-Tech does that?
24  A.   That's correct.
25  Q.   Have you inspected jobs before yourself?

1   A.   Yes, I have.

2   Q.   Okay.  And do you have inspectors now?

3   A.   Yes, I do.

4   Q.   Before you were at Cann-Tech and ran your place, did

5   you -- you were, you said 20 some years you've been in this.

6   When did you start Cann-Tech?

7   A.   Actually, Cann-Tech is in its eleventh -- we're in our

8   eleventh year of business as Cann-Tech.

9   Q.   Prior to that, did you work for someone else?

10   A.   Yes, I did.

11   Q.   And who was that?

12   A.   It was Hayworth, Meyer & Boleyn consulting engineering.

13   Q.   Spell Boleyn.

14   A.   B-o-l-e-y-n.

15   Q.   I just asked, because my client is Stanley Bowling.

16   About half the people call him Boleyn while we're here.  It's

17   not got anything to do with that name, correct?

18   A.   Correct.

19   Q.   Now, when you were with -- what was the name?

20   A.   Hayworth, Meyer & Boleyn.

21   Q.   Is it all right if I call it HMB?

22   A.   Yes.

23   Q.   Is that the name of the company, actually?

24   A.   Actually, it was.  That's what we were more often

25   referred to, HMB.

*CANN - Direct (Mr. Simons)* 110

1  Q.  Did that company do any work for the City of Manchester?

2  A.  Yes, they did.

3  Q.  Did you come into contact with the City of Manchester in

4  connection with any of their employment?

5  A.  Yes.  When I was employed with HMB?

6  Q.  Yes, sir.

7  A.  Yes, I did.

8  Q.  Would that be many or few times?

9  A.  Probably many.  Many times.  I don't know what the break

10  point is, but several times.

11  Q.  When you dealt with the City of Manchester, did you have

12  to deal with my client in any way, Stanley Bowling?

13  A.  Not directly.  I was probably a little bit, little bit

14  lower on the food chain.  We did, we did have some

15  interaction.  I was a technician at that time period, and --

16  Q.  Were you on the job sites from time to time in

17  Manchester?

18  A.  Yes, I was, yes.

19  Q.  Did you know what Stanley's title was at the time?

20  A.  Yes, I did.

21  Q.  And what would that have been?

22  A.  City supervisor is my understanding.

23  Q.  And what your understanding is, he would have been in

24  charge of sewer and water?

25  A.  That's correct.

*CANN - Direct (Mr. Simons)*                                                    111

1    Q.   Okay.  Now, did my client, Stanley Bowling, ever try to

2    get HMB or an inspector or anyone to cut any corners or do any

3    favors for him as city supervisor?

4              MR. SMITH:  Your Honor, I'm going to object.

5              THE COURT:  Do you need to approach on this?

6              MR. SMITH:  Yes.

7              MR. SIMONS:  I would, Your Honor, if I could.

8              THE COURT:  Come on up, please.

9                    (A sidebar conference was held out of the

10                   hearing of the jury):

11             MR. SMITH:  I would object.  This is improper, and

12   same thing as the, I think, the prior counsel for Mr. Morris

13   engaged in.  Let's talk about the 101 times he did it right,

14   not the times that he's charged with in the case.  I think the

15   rules specifically exclude character evidence such as that.

16   He can give an opinion if he wants to call him as a character

17   witness, but specific acts of good conduct are otherwise

18   excluded.

19             MR. SIMONS:  I guess, Your Honor, in the scheme of

20   things here, the government has alluded to background

21   evidence, and a number of different things have come in prior

22   to 2002 that affect my client.

23             And the inference is that he was engaged in all kinds

24   of activities which are challenged, and it's difficult to

25   challenge that or to show -- there's just been so much

*CANN - Direct (Mr. Simons)*                                                    112

1    background stuff come in, I feel like that it's fair to show

2    that in cases in which he was actually working and performing

3    his job, that he did so fairly and without pressuring anyone

4    to do anything wrong or to -- that's what he's accused of

5    doing here.

6              THE COURT:  All right.  I'll sustain the objection

7    again under Rule 608(b).  He's not being offered as a witness

8    to testify about general reputation for truthfulness and so

9    this will be a specific instance of good conduct that's not

10   charged in the case.  I'll sustain the objection.

11             MR. SIMONS:  Okay.

12                  (Sidebar conference concluded.)

13             THE COURT:  Thank you, counsel.  I will sustain the

14   objection to the last question.

15             MR. SIMONS:  Thank you, Your Honor.

16   BY MR. SIMONS:

17   Q.   Now, the jury's learned in this case that Mr. Bowling

18   retired as city supervisor in 2000, the year 2000.  You were

19   already Cann-Tech at that point, correct?

20   A.   That's correct.

21   Q.   Okay.  Have you served as a consultant or an engineering

22   firm on projects with the City of Manchester since the year

23   2000 that have involved my client's company, B&B Excavating,

24   Inc.?

25   A.   Yes, I have.

*CANN - Direct (Mr. Simons)*                                                                113

1    Q.   Can you remember specifically those projects as you sit

2    there today?

3    A.   Well, actually, I think there was, there was one project,

4    it was a sewer project.  It was kind of called an emergency

5    sewer line repair work.

6    Q.   Yes.

7    A.   Our only role with the City on that was technical

8    assistance.  We basically kind of told them what size sewer

9    line they need, and that was really our only involvement in

10   that.  I had, you know, had no idea that Mr. Bowling was

11   involved in that project at all.  We just helped them, helped

12   the City technically.

13   Q.   Okay.  There was also another project; was there not?

14   A.   Yes, there was another project.  There was a water line

15   extension project, and it was a project where there was a

16   funding source, and we provided the full, our full range of

17   services for that project.

18   Q.   Okay.  And you're here today pursuant to a subpoena that

19   I issued you; are you not?

20   A.   That's correct.

21   Q.   And the subpoena asked you to bring all the documents

22   that you had with respect to that job?

23   A.   Yes, sir.

24   Q.   I'm trying to keep the paperwork straight and all.

25   What -- did you have a name for that job?

*CANN - Direct (Mr. Simons)*                                          114

1   A.   It's called the Big Creek water line extension project.

2   Q.   And did you --

3        MR. SIMONS:  Your Honor, could I have the court

4   security officer --

5        THE COURT:  Yes, sir.  If you'd show that to opposing

6   counsel first.

7   Q.   Does that look like the documents that you prepared and

8   brought pursuant to my subpoena?

9   A.   Yes, it does.

10  Q.   Okay.  Mr. Cann, do you have a bound booklet in there

11  that says "Big Creek/water line extension contract documents"?

12  A.   Yes, sir, I do.

13  Q.   Would you pull it out, please?  Would you explain for the

14  jury, please, what that book is and how it came in to being

15  and what role it played in the Big Creek water line extension

16  project?

17  A.   Basically, this booklet outlines the scope of the

18  project, the technical specifications.  There's general

19  conditions, general compliance requirements with the contract

20  documents and also the technical specifications telling how

21  the project's got to be constructed.  There are performance

22  payment bonds in here that the contractor has to provide.

23  That kind of information.

24  Q.   Okay.  Is the actual contract signed by B&B in that

25  booklet?

*CANN - Direct (Mr. Simons)*                                          115

1   A.   Yes.  I may need to look to confirm that, but yes.

2   Q.   Would you do that for me, please?

3   A.   Sure.  Yes, sir, it is.

4   Q.   Is it paginated such that I could -- so that myself and

5   Mr. Smith can find it?

6   A.   Sorry?

7   Q.   Is there a page listing?

8   A.   I may have to go back in the room and get my glasses over

9   here.  They're on the table in there, actually.  I stepped out

10  without them.  Pretty sure it's CON-7, which stands for

11  contract 7.  Yes, sir, sheet CON-7 is the signature of Stanley

12  Bowling on the contract documents.

13  Q.   Okay.  Now, let me ask you this.  Did you do an

14  engineering estimate with respect to this job, sir?

15  A.   Yes.

16  Q.   And could you find that for me, please?  I'm not sure

17  it's in that book.  It may be in another document in your

18  file.

19  A.   It would be in another document.  Should be, there's a

20  form from the funding agency that has an estimate, not only

21  construction cost estimate, but project cost estimates as

22  well.

23  Q.   Could you hold that back up for me, please?  Does that

24  have an identifying number on that page?

25  A.   No.  It's just a standalone document that Kentucky

*CANN - Direct (Mr. Simons)*                                          116

1    Infrastructure Authority is the title.

2    Q.   All right.  And that is the engineering estimate that you

3    prepared for this job?

4    A.   Yes.

5    Q.   What is the amount of the estimate?

6    A.   For the construction?

7    Q.   Yes.

8    A.   $166,000.

9    Q.   Okay.  $166,951, does that sound right?

10   A.   952, looks like.

11   Q.   Well, let me just back up and try to do this more simply,

12   because I'm struggling getting through the paperwork.  For

13   this Big Creek water line extension, you prepared the

14   engineering estimate; is that correct?

15   A.   Yes, that's correct.

16   Q.   All right.  Were there bids let on this project?

17   A.   Yes, they were.

18   Q.   And did B&B Excavating get the bid for the project?

19   A.   Yes.  They were awarded the project.

20   Q.   Okay.  And what was the bid price of B&B?  Do you have

21   that in there?

22   A.   Actually, Dan, what I just showed you was a project

23   budget that was an after bid, as-bid project budget.

24   Q.   That's what I thought.

25   A.   It was an as-bid budget.  It wasn't a -- it was after

*CANN - Direct (Mr. Simons)*                                                117

1    these bids were taken.

2    Q.   Okay.

3    A.   But the bid for the project was 166,951.

4    Q.   That's what I thought.  And how did that compare to the

5    engineering estimate, if you could find that document?  Can

6    you put your hands on it?

7    A.   It may take me a minute to find that.  Typically what we

8    do, we may do an estimate two years before the project gets to

9    this point.  I don't know if it's in here or not, I can look

10   through this and see if there was a --

11   Q.   Well, let's do this.  Let me ask you this, please, Mr.

12   Cann.  The bound booklet of the contract documents, those were

13   prepared by you, and they're kept in your office in the

14   ordinary course of your business, correct?

15   A.   Correct.

16   Q.   And they are the official records of Cann-Tech, correct?

17   A.   That's correct.

18   Q.   The balance of the paperwork there is also of a similar

19   vein.  They're all business records kept in the ordinary

20   course of Cann-Tech's business, correct?

21   A.   Correct.

22   Q.   And all of those papers pertain to this Big Creek water

23   line extension; is that true?

24   A.   Yes.

25   Q.   Okay.

*CANN - Direct (Mr. Simons)*                                              118

1        MR. SIMONS:  Your Honor, what I'd like to do is mark

2    that Bowling Group Exhibit 2 at this time, if we could.

3        THE COURT:  All right.  Are you going to be moving

4    for the introduction of the entire file at some point?

5        MR. SIMONS:  I was going to, Your Honor, yes.  I

6    would also like -- I want to him identify, if I could, please,

7    first, the additional documents in the file.

8    Q.  Are the plans that you drew in the file, Mr. Cann?

9    A.  No, sir, I don't see them.  I think they were provided.

10   I do believe.

11       MR. SIMONS:  I think I may have them.  Your Honor

12   please, I'd like to present these documents to the witness,

13   please.

14       THE COURT:  You can show those to Mr. Smith first,

15   please.

16   Q.  Do you now have the plans?

17   A.  Pardon?

18   Q.  Do you have the plans there?

19   A.  Yes, I do.

20   Q.  Are those the plans that Cann-Tech designed and drew for

21   this Big Creek water line extension?

22   A.  Yes, sir.

23   Q.  And what is the date of those plans, please?

24   A.  The date on the plans?

25   Q.  Yes, the date --

*CANN - Direct (Mr. Simons)*                                          119

1    A.    May, 2006.

2    Q.    Okay.  Now, all of the documents that you currently have

3    before you, does that comprise the entire file of Cann-Tech

4    with respect to this single project?

5    A.    Yes.

6    Q.    Okay.  How was this particular project funded?

7    A.    It was funded through the -- our state government,

8    through an organization called Kentucky Infrastructure

9    Authority.

10   Q.    Okay.  And did you work with the lending agency also?

11   A.    I did work with the lending agency.  There was a grant

12   administrator on the project, but we assist them.  So yes, we

13   did work with the funding agency.

14   Q.    Okay.  Explain to the jury, please, how this worked.  You

15   were contacted by the City to draw the plans and prepare the

16   documents?

17   A.    That's correct.

18   Q.    And you prepared the advertisement for bids, correct?

19   A.    Correct.

20   Q.    And the bid was let, and Mr. Bowling's company was

21   awarded the contract?

22   A.    That's correct.

23   Q.    And then once that happens -- and the amount of the

24   contract was what?  166,000?

25   A.    Yes.

*CANN - Direct (Mr. Simons)*                                                    120

1    Q.   And after the contract is awarded, the contractor begins

2    work on the project; is that correct?

3    A.   Once the -- once you accept your low bidder, I mean, you

4    go through a process, making recommendations, the funding

5    agency reviews that, reviews that and has input on that, and

6    then contractor gets his performance payment bonds and

7    insurance certificates pulled together and then you set down,

8    execute the contract and start construction.

9    Q.   Okay.  So the bid is accepted and then the contractor has

10   to get what together, did you say?

11   A.   Performance payment bonds, insurance certificates.

12   Q.   Necessary things to undertake the work?

13   A.   That's correct.

14   Q.   And did all that happen in this case and is all that

15   documented in your file?

16   A.   Yes.

17   Q.   And then once the work has begun, how does the contractor

18   get paid and who's involved in it, approval process, and how

19   does that work?

20   A.   Well, we'll have, on this particular project, we have an

21   inspector on the job site.

22   Q.   Who was that?

23   A.   Well, actually, I had two.  There was a gentleman named

24   Mike Crawford was, started off inspecting it, and Nick Cann

25   was on the job inspecting as well.

*CANN - Direct (Mr. Simons)*                                          121

1    Q.   Cann, that sounds like a relative, perhaps.

2    A.   That is, that's correct.

3    Q.   And what's the job of the inspectors?

4    A.   To see that the pipeline is installed correctly and also

5    to measure the quantities and so forth that were put in the

6    ground.

7    Q.   Do they certify, as the job proceeds, what percentage is

8    complete and when the contractor's entitled to make a draw and

9    be paid?

10   A.   That's correct.  And that typically occurs once monthly.

11   We do that once monthly, and then we have a monthly progress

12   meeting, and we get together and discuss progress and discuss

13   the projects and make payments at that time.

14   Q.   The progress meeting would include who?  Who would be --

15   A.   Typically, our project manager, it would be me or an

16   engineer in my office, our inspector and the contractor,

17   superintendent and the owner, our client.

18   Q.   I'm sorry to ask you to repeat that, but who would it be?

19   A.   Our inspector, project manager, the -- usually someone

20   from the funding agency is there, the contractor,

21   superintendent, and the owner, the client.

22   Q.   In this case, the City?

23   A.   The City of Manchester.

24   Q.   So the City, the contractor, a lending agent and the

25   project manager?

*CANN - Direct (Mr. Simons)*                                                    122

1   A.   That's correct.

2   Q.   Who was the manager of this project?

3   A.   I think it was Matt Baker I do believe was our project

4   manager.

5   Q.   Okay.  Was this project successfully completed by B&B?

6   A.   Yes, it was.

7   Q.   And finally inspected?

8   A.   Yes.

9   Q.   All right.  Were there any problems with it disclosed in

10   the work that was done?

11   A.   No.

12   Q.   Okay.  Let me ask you this.  Could you explain for the

13   jury, please, what a change order is?

14   A.   A change order occurs generally as you're -- during

15   construction, as something arises that you need to make

16   changes or adjustments on the project.  But water and sewer

17   line extension project, particularly, they're unit price bid

18   contracts, if you understand --

19   Q.   You have to explain what that is.

20   A.   Literally, like the contractor has a bid price of so many

21   dollars per linear foot of pipe installed.  So you keep track.

22   It's not like he gives you a bid price of $100,000 and he does

23   the work and at the end of the job he gets paid for what work

24   he does.

25        The unit prices are established, and you keep track of

*CANN - Direct (Mr. Simons)*                                              123

1    how much pipe goes in the ground.  So on these projects, you

2    could have it, typically there will be a change order

3    adjusting quantities up or down.  You may, you know, just

4    depending upon what goes on in the field, you may have to move

5    the line and stuff like that.  So a change order on these

6    projects typically occurs adjusting your quantities that were

7    put in the ground.

8    Q.   Are change orders something that frequently occurs in

9    sewer and water projects?

10   A.   Yes.

11   Q.   Would it be rare that you had a job where you didn't have

12   change orders?

13   A.   Yes.

14   Q.   Okay.  Are there sometimes -- sometimes, are projects

15   funded in such a way that there's money left over at the end

16   of the project?

17   A.   They typically are.  Most, because these are unit price

18   contracts, it's generally accepted that you have 10% of your

19   funds in contingency, just to cover things that may arise.

20   So, you know, you're set up with some funding at the end, and

21   typically, if you get there and you have no change orders,

22   with everyone's blessing, you may add pipe to the project and

23   expend your remaining funds.

24   Q.   Just to be fair about it, does the lending agency want

25   the money back once they've loaned it out?

*CANN - Direct (Mr. Simons)*                                        124

1   A.   No, not typically.

2   Q.   So the money's there, and it's spent for something else

3   if it's appropriate?

4   A.   Most of the time.  With their approval.

5   Q.   I don't know when you've last reviewed those materials,

6   probably not for some time since you delivered them to me the

7   other day.  Is that fair?

8   A.   That's correct.

9   Q.   Okay.  Are you aware of whether there were any change

10  orders with regard to this Big Creek water line extension?

11  A.   There was a -- my recollection is there was an adjusting

12  or reconciliation change order just to square up the

13  quantities on the project.

14  Q.   Okay.  Were there any problems with the contractor, B&B

15  Excavating, with respect to this particular job?

16  A.   No, sir.

17  Q.   Okay.  And every -- when there is a change order, does it

18  require the approval of the City?

19  A.   The City, the contractor, us, and the funding agency

20  typically.

21  Q.   All four entities have to agree to the change order; is

22  that fair?

23  A.   That's correct.

24  Q.   Okay.

25         MR. SIMONS:  Your Honor, at this time, I would move

*CANN - Direct (Mr. Simons)*                                          125

1    for the admission of Bowling Group Exhibit 2.

2              THE COURT:  All right.  Any objection?

3              MR. SMITH:  No.

4              THE COURT:  It will be collective Exhibit Number 2

5    for Stanley Bowling will be admitted.

6                        (Bowling Exhibit No. 2

7                         was admitted into evidence.)

8    Q.  Now, Mr. Cann, I want to talk to you for a few minutes,

9    if I could, about the other project that you mentioned in

10   passing that you drew the plans for a sewer repair job along

11   the river.  Do you recall that?

12   A.  Yes, I do.  And we had very limited role in that.  We

13   just provided technical assistance.  There was a local

14   surveyor that identified the manhole locations and gave us

15   information and we just said, this is what size pipe you need

16   to be, and that was kind of our limit on that project.

17   Q.  Did you draw plans for that project?

18   A.  Yes, we did.

19             MR. SIMONS:  If I could get the Court security

20   officer --

21   Q.  Are those the plans, sir?

22   A.  Yes, sir.

23   Q.  Would you look at those plans, please, sir, and see what

24   date that they were done?

25   A.  If you'll notice, these plans actually, the surveyor

*CANN - Direct (Mr. Simons)*                                            126

1    there that was assisting on the project, you know, those plans

2    have his title block and so forth on there.  But the date is

3    fifth month of '03.

4    Q.   Okay.  And you were requested by the City to draw those

5    engineering plans; were you not?

6    A.   That's correct.

7    Q.   And it's my understanding, and you can correct me if I'm

8    wrong, that that was a job that the City was going to

9    undertake on its own?

10   A.   That was my understanding.

11   Q.   Okay.  You didn't provide oversight services on that

12   particular job at all?

13   A.   No, sir.

14   Q.   You didn't secure and coordinate between lenders or

15   anything else, did you?

16   A.   No, I did not.

17   Q.   Did you, at my request, prepare an engineering estimate

18   for that job?

19   A.   Yes, sir.

20   Q.   Okay.  Do you have it with you there?

21   A.   Yes.  Should be.

22             MR. SMITH:  Could we approach?

23             THE COURT:  Yes.

24                  (A sidebar conference was held out of the

25                   hearing of the jury):

1          THE COURT:  We're going to take our break here in

2    just a moment, but if it would be better, we can take this up

3    outside the presence of the jury, if you'd like.

4          MR. SMITH:  That's fine.  No telling how long Mr.

5    Simons will argue with me over this, Your Honor.

6          MR. SIMONS:  Maybe all night.

7          THE COURT:  Well, what I want to do while we're here

8    is I do want to get our schedule.  I'm going to tell the jury

9    tonight when we anticipate we'll be finishing proof in the

10   case.  I want to get an idea from Mr. Simons first as to when

11   he thinks he'll be closing.

12         MR. SIMONS:  Your Honor, I've floundered a little

13   more than normal with this witness to try to get him on today.

14   It was out of the order I expected to call him, because of his

15   schedule.  He can be back here in the morning and will be

16   here.  But I would have expected to be more efficient than

17   I've been, frankly, and that's why I needed the time before to

18   call him.

19         I would hope to be concluded sometime around lunch

20   tomorrow, certainly early afternoon.  Mr. Smith will have some

21   questions, I'm sure, for some of these people.  And I can't

22   anticipate that, but I don't think I'll be terribly long with

23   anyone.

24         THE COURT:  How many witnesses do you have after Mr.

25   Cann?

1      MR. SIMONS:  I have a total of -- it would be four in

2  addition to Mr. Cann.

3      THE COURT:  Four after he testifies?

4      MR. SIMONS:  Yes.

5      THE COURT:  Assuming we finish by noon tomorrow with

6  the defendant's proof, how much rebuttal testimony would you

7  anticipate?

8      MR. SMITH:  Probably got four witnesses right now.

9  Probably going to see if we can't pare those down.  I'd like

10 to get through tomorrow.

11     THE COURT:  You think we may be finished tomorrow,

12 and then we'll have a question of whether there will be any

13 sur-rebuttal.

14     MR. SMITH:  I'm not sure how long.  That may depend

15 on Mr. Westberry, because I think he got the Court's

16 permission to reserve recalling the county attorney again in

17 this case.  We'd certainly have a lot to say with him again if

18 he comes back.

19     THE COURT:  So we'll be into Monday, probably.

20     MS. LOGAN:  Your Honor, if I may, Kristin Logan for

21 Doug Adams.  That's something we actually want to take up with

22 the Court at the recess on that issue.  We do plan to call, it

23 would be just one, and we can take that up.

24     THE COURT:  So I anticipate we'll go into Monday,

25 then, with proof.  I'm going to excuse the jury, and I'm going

129

1   to tell them that I anticipate that proof will be finished on

2   Monday as the case stands now.  That once the proof is

3   completed, I'm going to give them probably half a day off so

4   we can talk about jury instructions.  I don't want to keep the

5   jury here while we do that.

6           So if we finish, say, at noon on Monday, I will give

7   them the afternoon off.  If we don't finish until the

8   afternoon on Monday, I'd give them Tuesday morning off so that

9   will give us time to discuss jury instructions.  But I don't

10  want to keep them in the dark on when we're going to complete

11  this case.  We've been here for a long time, and everyone has

12  a better idea than the jury does.  So I'll give them a little

13  better idea when I excuse them tonight.

14          We'll take up this issue of the admissibility of the

15  document after I've excused the jury, okay?  Thank you.

16                  (Sidebar conference concluded.)

17          THE COURT:  Thank you, counsel.  Ladies and

18  gentlemen, before I excuse you for the evening, I wanted to

19  get a little better idea as to when I might be able to tell

20  you that we'll be completing the proof in the case.

21          I am going to excuse you at this time for the

22  evening, and we will call you back tomorrow at 9:00.  And I

23  will make every effort to start at 9:00 tomorrow.  But again,

24  as I excuse you, I do want to remind you of the admonition

25  I've given to you.

1          Before I do that, I will tell you that at this time,

2     I anticipate that the proof would be completed, I believe,

3     probably on Monday in the case.

4          Now, once we complete all the proof, and that would

5     be proof with all the parties and then any rebuttal or

6     sur-rebuttal the parties would offer, the Court always has a

7     jury instructions conference with the attorneys and it

8     sometimes takes a little while.  If we finish in the morning

9     on Monday with proof, I would give you the afternoon off while

10    I have the instructions conference with the attorneys.  If we

11    finish in the afternoon, I'd give you half a day probably the

12    following day off so you wouldn't have to wait on me while I

13    work on things like jury instructions.  I wanted to give you a

14    little better idea of the schedule so you won't be in the dark

15    on some of these issues.

16         I do anticipate at this time, the proof in the case

17    should be completed hopefully on Monday of next week.

18         Now, I also mention that to you for another very

19    important reason.  And that is that you've been here for

20    several weeks now, and you've heard quite a bit of testimony

21    and evidence, but you haven't heard all the evidence.  Of

22    course, you're not to discuss the case or even begin to make

23    up your mind about any issue in the case until all the

24    testimony has been completed and you've been instructed and

25    arguments have been made so now is not the time to start

1    making decisions in the case.

2          I do want to again remind you, as I always do when we

3    recess for the evening, of course, you should avoid any

4    contact with anyone about the case.  You shouldn't discuss the

5    case.  You shouldn't read, watch or listen to any accounts of

6    the case if there should be any.  If anyone should approach

7    you, you should run from that person as if your hair's on

8    fire.  You should never, ever discuss the case while you're

9    sitting as a juror.

10          Likewise, don't attempt to do any type of research or

11   do any investigation on your own.  I will again remind you of

12   the other admonitions I've given to you and remind you that

13   you should follow all admonitions of the Court.  You'll be

14   excused at this time until 9:00 a.m. tomorrow morning.  Thank

15   you.

16          (The jury left the courtroom at 4:33 p.m.)

17          THE COURT:  Thank you.  Please be seated.  I'm going

18   to excuse the witness at this time, unless there's a reason

19   that he be here while we discuss the objection to the

20   document.

21          MR. SIMONS:  No.

22          THE COURT:  All right.  You can go ahead and step

23   down.  You can leave your documents.

24          All right.  Let's see, there was an objection to the

25   plans that this witness was just discussing, I believe dated

1    May 3rd of 2003.  Mr. Smith?

2            MR. SMITH:  Yes, Your Honor.  I tried to take notes

3    as this witness testified, and according to his testimony that

4    I have been able to recall, he had a very, very limited role,

5    as he used that term.  He only provided technical assistance,

6    and he offered these plans as what he did for the City, and I

7    believe the question was, have you prepared at my request an

8    estimate, an engineering estimate for the project.  He said

9    that he did.

10           I was given a copy of one dated January 1, 2010,

11   which I assume that's a copy of what's being offered.

12           MR. SIMONS:  That's correct.

13           MR. SMITH:  And I would object to it as being not

14   relevant as to the issues in this case.  And if it's offered

15   for some purpose outside of this case, I'm not sure what the

16   reason that we would be looking at his estimate of what it

17   should have cost in 2003, a 2010 estimate.  So I just, again,

18   fail to see the relevance.

19           THE COURT:  Is this the project that was performed

20   across the road and then the road was blacktopped?

21           MR. SIMONS:  No, Your Honor, it is not.  This is the

22   sewer project, called river bank.  It was down on the river.

23   It's a project that Mr. Cann used the plans for at the request

24   of the City in 2003, and the object was for the City to do it.

25   It wasn't done, and it's the project that's been talked about

1    as an emergency during the course of this proceeding.  And

2    it's the one that I've described that continued to worsen

3    throughout the two or three years till it got to the point

4    where we had raw sewage going into the river just up from the

5    intake.  That's why I had him do the estimate.

6              THE COURT:  The issue would become, why would this

7    witness's opinion about -- I guess it would be the

8    reasonableness of the work that was performed.  How would it

9    be relevant to an issue that's been raised in this proceeding?

10             MR. SIMONS:  The proffer of the engineering estimate

11   is to show work -- what the cost of the project should be or

12   would be and, in fact, it's substantially higher than what B&B

13   was paid for the project.  So that's clearly why we're

14   producing -- and it's a calculation that's made.

15             THE COURT:  I understand that.  I understand the gist

16   of what it is that you're seeking to present.  I'm just not

17   sure how it's relevant to an issue in the case.  There was an

18   emergency declared, contract was awarded to Mr. Bowling.  Work

19   was performed.  It's the position of the United States that

20   contracts that were awarded to your client are proceeds of

21   illegal activities.  We talked this morning about

22   profitability and whether that would be a relevant issue in

23   the case.  That's really not a question that's before the

24   jury.

25             How does the presentation of this particular evidence

1    prove or disprove some issue that's been raised in the

2    proceeding?  Because that's the issue of relevance.

3            MR. SIMONS:  Frankly, Your Honor, the Court's ruling

4    this morning, the Court hadn't made its ruling this morning

5    when the document was prepared.  I was talking to the witness

6    about it.  It was designed, of course, to show that Mr.

7    Bowling did the job and did it for --

8            MR. SMITH:  Your Honor, I'm having trouble hearing

9    counsel.  I apologize.  I do have allergies and I may --

10           MR. SIMONS:  Maybe I'm not speaking loud enough, Your

11   Honor.  I think I've said all I can say about the purpose of

12   the introduction of the document.

13           THE COURT:  Very well.  I'll sustain the objection

14   under Rule 401.  This does not appear to the Court at this

15   time to be relevant.  Relevant evidence is defined as evidence

16   that has a tendency to make existence of any fact that is of

17   consequence to the determination of the action more probable

18   or less probable than it would be without the evidence, and I

19   don't feel like it fits within that definition so I'll sustain

20   the objection.

21           Let's see.  Now, with respect to schedule, we talked

22   about that a little bit earlier.  I don't know if the Court's

23   ruling would in any way affect schedule we discussed, but I

24   would anticipate proof of Mr. Bowling would be completed by

25   lunch time.  We have the issue of the county attorney that's

135

1    going to be presented as sur-rebuttal testimony in the case.

2         MR. WESTBERRY:  And I have a question when you're

3    ready about that.

4         THE COURT:  May not get to that proof until Monday, I

5    anticipate, based on what the parties told me.  Miss Logan was

6    here at the last Bench conference, and I'm sure she spoke with

7    you about that.

8         MR. WESTBERRY:  She did.

9         THE COURT:  All right.  I would anticipate that with

10   rebuttal testimony that we're going to probably bump into

11   Monday.  And I expect that if Mr. Bishop is called in

12   sur-rebuttal, I don't know if anyone else will have witnesses

13   before we get to you, but if we do have sur-rebuttal from Mr.

14   Bishop, I think that may take a while, quite frankly, if he's

15   called again, based on what the parties were telling me here

16   at the Bench a moment ago.  I think it would probably be

17   Monday before we get to that.

18        MR. WESTBERRY:  That would be fine.  I had one other

19   question, if you're ready.

20        THE COURT:  Yes, sir, I am.

21        MR. WESTBERRY:  Of course, the issue for sur-rebuttal

22   involving the county attorney would be limited to the

23   statements of Chief Culver at the conclusion of his testimony

24   a couple of days ago.

25        My question, Judge Reeves, we have -- and forgive me.

1    Like Mr. Smith, I've got allergies too.

2          THE COURT:  I think we all do this time of year.

3    We'll try to bear with each other on this.

4          MR. WESTBERRY:  We have talked to one additional

5    witness, very preliminarily, who does have knowledge of this

6    issue.  I want to tell the Court exactly what we would --

7    we've not talked to Mr. Bishop about this matter since he left

8    a couple of days ago.

9          We asked the other witness, who is not under

10   subpoena, if that person is aware in general terms of a

11   dispute between the Manchester city police department and the

12   office of the Clay County attorney in terms of how they handle

13   cases.  The witness did -- I didn't talk with that person

14   myself.  Somebody from our office did.  But I am, based on

15   those representations, satisfied that this other potential

16   witness could answer all of the questions that the county

17   attorney could.

18         My question to the Court was, we don't want to do

19   two.  We're not asking that.  But could we use another witness

20   in lieu of the county attorney, and I will certainly follow

21   whatever the Court rules.

22         THE COURT:  Well, first, I don't know exactly what

23   any additional rebuttal may be, but if we're just talking

24   about the comments that were made by Officer Culver that he

25   had a problem, and I believe he described it is with the

1    county attorney's office.  I think the question was asked if

2    you had problems or concerns with the way the office handles

3    matters and he said, very frankly, yes.  He did.

4         MR. WESTBERRY:  Right.  Dismissing cases that should

5    not be dismissed, in his opinion, I think, is a fair

6    characterization.

7         THE COURT:  So I really can't answer that for you.

8    You can decide for yourself as to who you would like to call

9    on that issue.

10         MR. WESTBERRY:  Okay.  I didn't know if I was bound

11   by Mr. Bishop, or if we could use someone else that would

12   have, assuming I could lay a foundation that this person has

13   the requisite knowledge, and I think we can.

14         THE COURT:  Well, it had been mentioned to me about

15   whether he would be recalled again when he was here

16   previously.

17         MR. WESTBERRY:  Yes.

18         THE COURT:  I told you that you could recall him if

19   you wanted to as sur-rebuttal at the appropriate time.  But

20   that's really, that's up to you as to whether you want to call

21   him or some other witness to address a very discrete point

22   that's been raised.

23         MR. WESTBERRY:  Right.

24         THE COURT:  What I want to avoid when we get into

25   rebuttal and sur-rebuttal is trying all the issues all over

138

1    again.  It's nice to get in the last word.  We all can't have

2    the last word.

3              MR. WESTBERRY:  I know I violate that as much as

4    anyone.  You can hold my feet to the fire.  I'm anticipating a

5    five minute or less sur-rebuttal on direct.

6              THE COURT:  Thank you.  Mr. Smith?

7              MR. SMITH:  It really doesn't give me enough to argue

8    this issue.  Maybe the Court's not ready to hear argument

9    about it, but what I'm concerned as I'm hearing this is that,

10   you know, we're going to conduct a trial of the county

11   attorney, which is a collateral matter, not an issue in this

12   case.

13             And I certainly hope that's not the direction we get

14   into, because, you know, for purposes of evidence, we're

15   constrained by the rules, and I don't believe that extrinsic

16   evidence on specific instances of conduct are going to be

17   where the Court's going to allow us to go, and I'm not sure

18   where Mr. Westberry intends to take this, but I just want to

19   say, as a preliminary matter, that if that remains to be an

20   open question, my estimates cannot -- I just want to tell the

21   Court that I hope the Court would not hold me to my estimates

22   now, because obviously --

23             THE COURT:  No.

24             MR. SMITH:  I really don't know where we're going

25   with that.

1           THE COURT:  First, I'm not attempting to do that.  I

2      do like to be able to tell the jury, give them a general time

3      frame, because they've been here since February 2nd on this

4      case, and they know less about when we expect that we'll be

5      finishing than anyone else.  They just get to be excused at

6      the end of the day and wonder how many more times they're

7      going to be excused at the end of the day.

8           So they're entitled to have some idea as to when they

9      can go back to their normal activities.  And the Court also

10     has a rather busy docket, and I need to be able to schedule

11     matters as well.  Not just here in Frankfort, but in other

12     locations, and so it's good for me to be able to answer those

13     questions.

14          With respect to sur-rebuttal, correct, Mr. Smith,

15     that we're not going to have a case within a case in terms of

16     trying very discrete issues.  I believe, if I'm not mistaken,

17     and I may need to go back and check this, but I believe

18     counsel for one of the defendants actually raised the issue

19     with Mr. Culver about his problems with the county attorney's

20     office.  I need to go back and check the record on that.

21          MR. ABELL:  I believe that Mr. Westberry is the one

22     who objected to that testimony, much for the same reasons Mr.

23     Smith objects to the sur-rebuttal.

24          MR. WESTBERRY:  The way I remember it, I think Mr.

25     Abell, on behalf of his client, called Chief Culver to talk

140

1    about some circumstances surrounding Mr. Stivers' arrest.  In

2    the cross-examination from the government, they -- of course,

3    this followed after Mr. Clay Bishop had been released as a

4    witness.  They crossed him on does the county attorney's

5    office frequently dismiss cases that you think should not be

6    dismissed.  My argument at sidebar, I said they caught us off

7    guard.  It's outside the scope of direct.  Would you let me

8    call the sur-rebuttal to address it.  That's simply what we're

9    talking about.

10         THE COURT:  Again, it would be on the limited issue.

11   We can't try a case within a case.  If we get into details on

12   certain matters, then I would have to cut it off at that

13   point.

14         MR. WESTBERRY:  I understand.

15         THE COURT:  I did allow you to call the sur-rebuttal

16   witness on that one discrete issue.

17         All right.  Anything else we can take up now in

18   issues of scheduling ar other relevant questions about the

19   case?

20         MR. SIMONS:  I don't have a question.  I just didn't

21   want to marry myself to noon tomorrow.

22         THE COURT:  You're not.

23         MR. SIMONS:  Thank you.

24         THE COURT:  It's an estimate, the best one that you

25   can give me at this time.  I appreciate it.

141

1          MR. SIMONS:  I'll try to be as surgical as I can with

2     the presentation.

3          THE COURT:  I appreciate that.  Anything else?  All

4     right.  I will remind you if we do have issues that do come up

5     before tomorrow morning, call those to my attention at 8:30

6     tomorrow, because I am going to make every effort humanly

7     possible to have this jury here in the box at 9:00 and not

8     keep them setting in the room waiting on us.  So we'll start

9     tomorrow at 9:00, and if you do have issues to take up, let me

10    know that before 9:00.

11         MR. WHITE:  Your Honor, one thing just occurred to

12    me.  I had indicated -- I'm working on one instruction, and I

13    would kind of like to hear at least some of the rebuttal

14    before I provide it to the Court.  Would it be appropriate to

15    send that by e-mail to your chambers over the weekend if I

16    don't have it ready by tomorrow?  Would you prefer me to wait

17    till Monday?

18         THE COURT:  You can send it to my chambers.  I may or

19    may not see it before Monday.  I don't know if I'll be coming

20    in this weekend to work on jury instructions.  But you're

21    welcome to send it to the chambers e-mail address if you'd

22    like to do that.

23         MR. WHITE:  Thank you, Your Honor.

24         THE COURT:  All right.  Thank you, counsel.  I can't

25    promise you that I'm going to get you a draft of the jury

142

1    instructions by Friday, but I'll certainly try to do that by

2    Monday at some point during the day.  So we'll be in recess

3    until 9:00 tomorrow morning.

4

5              (Proceedings adjourned at 4:49 p.m.)

6                        - - -

7

8              C E R T I F I C A T E

9         I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
10   proceedings in the above-entitled case.

11

12    \s\ Lisa Reed Wiesman                March 19, 2010
     LISA REED WIESMAN, RDR-CRR              Date of Certification
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

DEFENSE WITNESSES
STEPHAN CHARLES
Direct Examination by Ms. Hughes................. Page   4
Cross-examination by Mr. Smith................... Page   6

TIMOTHY S. BRIGGS
Direct Examination by Ms. Hughes................. Page   7
Cross-examination by Mr. Smith................... Page   9

JESSICA MORRIS
Direct Examination by Ms. Hughes................. Page 15
Cross-examination by Mr. Smith................... Page 31
Cross-examination by Ms. Logan................... Page 42
Redirect examination by Ms. Hughes............... Page 43

WILLIAM BARTLEY MORRIS, II
Direct Examination by Ms. Hughes................. Page 45
Cross-examination by Mr. Smith................... Page 66
Cross-examination by Ms. Logan................... Page 83
Redirect examination by Ms. Hughes............... Page 85

CANDACE GEORGE
Direct Examination by Ms. Hughes................. Page 87

MARY SUE HENSLEY
Direct Examination by Mr. Simons................. Page  90
Cross-examination by Mr. Smith................... Page  99
Redirect Examination by Mr. Simons............... Page 102

LARRY CANN
Direct Examination by Mr. Simons................. Page 104


GOVERNMENT EXHIBITS                              ADMITTED
Exhibit No. P36, Photo
Admitted........................................ Page  33

DEFENSE EXHIBITS
Debra Morris Exhibit No. 9, prenuptial agreement
Admitted........................................ Page   6

Debra Morris Exhibit No. 10, CD with photos
Admitted........................................ Page   8

Stanley Bowling Exhibit No. 2, Cann-Tech file
Admitted........................................ Page 125

- - -