```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                              - - -
 3
      UNITED STATES OF AMERICA,        :  Docket No. CR 09-16-S
 4                                      :
                         Plaintiff,     :  Frankfort, Kentucky
 5                                      :  Monday, March 22, 2010
          versus                        :  3:10 p.m.
 6                                      :
      RUSSELL CLETUS MARICLE,           :
 7    DOUGLAS C. ADAMS                  :
      CHARLES WAYNE JONES               :
 8    WILLIAM R. STIVERS                :
      FREDDY W. THOMPSON                :     Trial Day 29B
 9    WILLIAM B. MORRIS                 :
      DEBRA L. MORRIS                   :
10    STANLEY BOWLING,                  :
                                        :
11                       Defendants.    :


12


13                            - - -
        TRANSCRIPT OF CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT
14                      BEFORE DANNY C. REEVES
            UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16    APPEARANCES:

17    For the United States:      STEPHEN C. SMITH, ESQ.
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
      For the Defendant           MARTIN S. PINALES, ESQ.
21    Russell Cletus Maricle:     CANDACE C. CROUSE, ESQ.
                                  Strauss & Troy
22                                150 E. Fourth Street
                                  Fourth Floor
23                                Cincinnati, OH  45202

24                                DAVID S. HOSKINS, ESQ.
                                  107 E. First Street
25                                Corbin, KY  40701
```

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                               Landrum & Shouse, LLP
                                 220 West Main Street
 3                               Suite 1900
                                 Louisville, KY 40202
 4

 5
      For the Defendant          T. SCOTT WHITE, ESQ.
 6    Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
                                 133 West Short Street
 7                               Lexington, KY  40507

 8
      For the Defendant          ROBERT L. ABELL, ESQ.
 9    William R. Stivers:        120 North Upper Street
                                 Lexington, KY  40507
10

11    For the Defendant          RUSSELL JAMES BALDANI, ESQ.
      Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
12                               Baldani, Rowland & Richardson
                                 300 West Short Street
13                               Lexington, KY  40507

14
      For the Defendant          JERRY W. GILBERT, ESQ.
15    William B. Morris:         Coy, Gilbert & Gilbert
                                 212 North Second Street
16                               Richmond, KY 40475

17
      For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
18    Debra L. Morris:           Gess, Mattingly & Atchison, PSC
                                 201 West Short Street
19                               Lexington, KY 40507

20
      For the Defendant          DANIEL A. SIMONS, ESQ.
21    Stanley Bowling:           Thompson, Simons, Dunlop & Fore
                                 116 West Main Street
22                               Suite 2A
                                 Richmond, KY 40476
23

24

25
```

3

```
1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
2                                 35 W. Fifth Street
                                  P.O. Box 1073
3                                 Covington, KY  41012
                                  (859) 291-4410
4

5         Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                    (The jury entered the courtroom at 3:11 p.m.)

2              THE COURT:  Thank you.  Parties and counsel and all

3         members of the jury are present.

4              Mr. Smith, you may continue with your argument.

5              MR. SMITH:  Thank you.

6              We stopped for our break, we were discussing,

7         finishing up, I believe, the honest services.  And now if I

8         can talk to you about Count 8 and 9, which are, again,

9         obstruction as defined by 18 U.S.C. 1503.  The law makes it a

10        crime for anyone to corruptly endeavor to influence, obstruct,

11        or impede the due administration of justice in connection with

12        a pending judicial proceeding.

13             To find a defendant guilty of this crime, you must be

14        convinced that the United States has proven each of the

15        following beyond a reasonable doubt.  First, that there was a

16        proceeding pending before a federal grand jury.

17             I submit to you that it will be uncontroverted that

18        on the dates alleged in the indictment of May and July, 2007,

19        that there was, in fact, a judicial proceeding of the federal

20        grand jury meeting in Lexington, Kentucky.  And at that time,

21        this would qualify as a proceeding under 1503.

22             Second, that the defendant knew of the pending

23        judicial proceeding and endeavored to influence, obstruct or

24        impede the due administration of justice in that proceeding.

25             Well, in this case, again, I believe that there,

1   based on the recordings -- because there's going to be two

2   main methods of proof for these two counts.  The first, the

3   Stivers and Maricle charge, we have the recordings.

4          As you all recall, in the May recordings of Wanda

5   White and Kennon White, when they went to the residence of

6   Cletus Maricle, there was a long discussion on May the 4th.

7   And there were discussions on other dates, but I want to

8   highlight to you some things that occurred on that May the

9   4th.  And that was, again, in those conversations, there was

10  conversations that Wanda White, you're going to the grand

11  jury.  And then there was the conversation Wanda White, you're

12  going to get immunity.

13         So those are all going to be considered part and

14  parcel of this offense, and that is that she was -- whether or

15  not she had the immunity or not was not first discussed.  She

16  was first just interviewed at the FBI office.  Second, then,

17  she was told she was going to be a grand jury witness.  And

18  then third, she was told, you're not going to be able to take

19  the Fifth.  You're going to get immunity, and then that

20  occurred later.

21         If you recall, as this progressed, these meetings

22  were recorded both with Maricle and Stivers on, finally, May

23  the 17th.  And on May the 17th, we're going to go into that

24  one as well.  The details that were shared in that meeting,

25  the question is, did the defendants know of the pending

1    judicial proceeding and endeavor to influence, obstruct or

2    impede?  Well, again, the fact is it's uncontroverted there

3    was a proceeding.  It's uncontroverted that the defendants

4    knew there was a proceeding.  So what we've got to focus on is

5    whether or not they endeavored to influence.  Influence.  Did

6    they endeavor to influence?

7         See, you don't have to endeavor to obstruct.  You can

8    endeavor to influence or obstruct or impede the due

9    administration of justice in that proceeding.

10        Third, that the defendants' acts were done corruptly.

11   That is, the defendant acted knowingly and dishonestly with

12   the specific intent to subvert or undermine the due

13   administration of justice.

14        Third, the defendant's act was done corruptly.  That

15   is, it was -- the defendant acted knowingly and dishonestly

16   with the specific intent to subvert or undermine the due

17   administration of justice, which we just read.  And then

18   finally, the statute would be violated if the defendant

19   advises with corrupt motive that a witness should assert his

20   or her Fifth Amendment right to remain silent before a grand

21   jury.

22        And I would submit to you that there are, again, in

23   that conversation and those series of conversations with Wanda

24   White, it was again, as Kennon White described Cletus Maricle,

25   Cletus Maricle was someone who, in conversation, you were able

1    to hear in those conversations that he would talk out of both

2    sides of his mouth.

3         You know, he'd start out saying, now, y'all just need

4    to do the right thing.  Then on the other hand, well, now, you

5    know that Susan McDougal, you know, that came up in that

6    conversation.  And what was the thing about Susan McDougal?

7    Susan McDougal took the Fifth, stayed in jail, wouldn't tell.

8         And you say, well, now, he never told her exactly in

9    those words.  He didn't say, Wanda White, you go in there and

10   you take the Fifth.  Wanda White, after you've given the

11   Fifth, you take this -- when they give you immunity, you

12   refuse to testify and you go to jail.  I mean, he didn't use

13   those words.  And if you're looking for those on the tape,

14   they won't be there.

15        The question you've got to ask, though, is whether or

16   not the evidence establishes that the defendant, Cletus

17   Maricle, in Count 8 and William E. Stivers, working together,

18   did they act knowingly and dishonestly with the specific

19   intent to subvert, undermine the due administration of

20   justice.  Did they endeavor to influence, obstruct or impede

21   the due administration of justice?

22        If we go to Exhibit A15A, obviously, the law's going

23   to instruct you that the audio tape is the evidence.  But the

24   transcript'S there to assist you.  On page 39 of Exhibit A15A,

25   we see here again, discussion comes up in conversation about

1    who worked for Clinton, and they forgot her name.  And Maricle

2    said yeah, stayed there for a year and a half or something,

3    but she refused to testify.  What was her name?  The wife was

4    in business, she was younger, married to an older man.  What

5    was her name?  Susan McDougal.  Yeah, that's who it was,

6    Kennon replies.  Maricle says, Susan McDougal.

7         Page 40.  What did she do now?  Why did she get put

8    in jail, Wanda asks.  She refused to testify.  Refused to

9    testify against -- they let her set in jail for a year and a

10   half?  Yeah, she set her time, Maricle said.  Clinton couldn't

11   even pardon her because she was in there, Kennon adds.  Wanda

12   says, would you sit that long for somebody?  Maricle says yes.

13   You would?  Yes, sir, yes, ma'am.  That's a long time, Wanda

14   says, would you sit that long for me?  That's right.  Okay.

15   Absolutely, Maricle says, absolutely.  All right.

16        Now here, if you stop the conversation there, okay,

17   maybe.  But let's read on.  I'll be very honest with you,

18   Maricle says.  Okay, Wanda says.  I would not if I've seen

19   somebody shoot somebody.  I would not if I've seen somebody

20   should somebody.  I would not testify in front of a grand

21   jury.  I would submit to you that's what is being said here.

22   He's attempting to influence her.  He's attempting to

23   obstruct.  He's attempting to persuade her not to testify by

24   using this word, unless I've seen somebody shoot somebody.

25   Right.  But as far as, he says, but as far as far as these

9

1    other things, no.  What do you mean as far as these other

2    things?  As far as election schemes go, no.

3          Shooting somebody, yes.  Election fraud schemes, no.

4    You're going to have this evidence, along with lots of other

5    evidence, to consider what was the intent.  Was it to subvert

6    the due administration of justice?

7          Let's read on.  If y'all recall, Cletus Maricle gets

8    very suspicious in this recording.  He talks about there's 40

9    FBI agents out there.  He talks about those listening devices.

10   He talks about you all have been following people.  He talks

11   about Wanda, you're talking too much.  You've been down there

12   at that grand jury and Stephan Charles, my son-in-law's

13   lawyer, has been telling me you've been talking too much.

14         You remember how upset it seemed that the members of

15   this group got when they learned that she had told them that

16   Vernon Hacker and Jennings White had been involved in buying

17   votes?  Brought great alarm to them.  Because when you're

18   living in a house of cards, you flip one out, and the whole

19   house comes down.  They didn't want to hear her talking about

20   vote buying.  Absolutely not.  Because they were upset of her

21   mentioning anybody involved, even if it was Vernon Hacker and

22   Jennings White.  They didn't want her talking.  Didn't want

23   her talking to Dobber Weaver.  Didn't want her talking to Edd

24   Jordan.  Didn't want her talking to anybody.  You go to the

25   house, you stay there.  You talk to no one.

1          Then he tells her at the end, persuades her that

2     maybe they shouldn't be talking.  The final, he tells her, you

3     know, they've got Bath County case up there, you know, they

4     actually traced and found out who was calling who, and they

5     probably know your phone number.  They probably know my phone

6     number.  But he says, listen, we'll communicate.

7          And you remember Kennon White said there were many

8     instances when Cletus Maricle would communicate with him in a

9     non-verbal way.  Remember?  On cross-examination, Mr. Pinales

10    had him explain that, and he did.  He said, you know, at one

11    point Cletus Maricle was mad at a fella, and he said, you

12    know, wouldn't bother me a bit if that right there didn't

13    happen to him.

14         Time and time again in those recordings, you've got

15    them, you'll have an opportunity, if you choose, to listen to

16    those in the courtroom, I would expect.  But you'll hear many

17    times, and the transcripts prove it out themselves, Kennon

18    will ask a question, and they'll be answered by a nod, because

19    you'll see in the answer.  It will show up in the answer.

20         So in the course of this, Kennon White begins to

21    further explain that when this meeting occurred and

22    everything, when the crunch came on, they knew that Wanda, you

23    know, they were proud of her when she's gone down there and

24    told them she's taken the Fifth.

25         Now we're more concerned now that she's going to go

1    under this grant of immunity.  So what do they do?  Send her

2    to Al Man.  You don't hear Al Man on the recording, but you

3    recall Kennon White's testimony was when they left Cletus's,

4    he said [whispering] Al Man.  He tells him here, we'll

5    communicate.  And he sends them to Al Man.

6         Now, that was May the 17th.  We go to Al Man.  What

7    happens at Al Man's on May the 17th?  Well, you recall in

8    evidence, Wanda had been given a list of questions.  Kennon

9    had gone over to Cletus a couple times and talked to him about

10   it, and Cletus again would talk out of both sides of his

11   mouth.  He said well, now, you probably need to talk to

12   somebody.  Talk to your lawyer.  But then when it got down to

13   this point, when they found out that she's really going, he's

14   like, well, unless you see somebody shoot somebody, you don't

15   go in there and testify.  That's what I'd do.

16        She said, what about Phillip?  Remember she asked

17   about Phillip?  He said he's not going to go down there and

18   talk.  You don't need to talk.  You're talking to much, you're

19   talking about Vernon and Jennings.  You shouldn't do that.

20   Stephan Charles told me you were down there admitting to

21   violating the law while you were down in the waiting room, in

22   the lobby, and Stephan Charles said you were even talking out

23   loud in there.  He said, you know the government has those

24   listening devices down there in the courthouse.  Why, they've

25   heard all the stuff you've talked about, including that you

1    were on the internet shopping on eBay.

2         He wasn't concerned about eBay, I submit to you.  He

3    was concerned about her telling on this enterprise.  That's

4    what he was concerned about.

5         So he goes up as far as he can go, and then he tells

6    them, you go see Al Man.  Because he was not going to go over

7    those questions with him.  He was going to let Al Man do it.

8    Sop he puts him up to his dirty work.  Is there evidence in

9    this case to support that Al Man does his dirty work?  I would

10   submit to you, absolutely.  Overwhelming evidence that Al Man

11   was his right-hand man.

12        And when something needed to be done, had to roll up

13   your sleeves and maybe get a little dirt on you, the puppet

14   master doesn't do it himself.  No, he's not going to do it.

15   He's going to send you to Al Man.  He's the one that's got the

16   brass to do it.  We'll let him do it.  So what does he do?  He

17   sends them to Al Man.  And Al Man blatantly coaches this

18   witness, blatantly tells her what to say.

19        I'll give you a couple examples.  Page 6.  I don't

20   know what she did down there.  You didn't witness any

21   irregularities that you know of votin'.  Did you change

22   anyone's vote without their consent nor with their consent.

23   Now, that was questions on the list.  Did you change one of

24   the voters' vote with their consent or without their consent?

25        What's Al Man tell her to say?  She says, what?

1    Laughing.  He says, you didn't change nobody's vote, period.

2    Now, folks, evidence in this case, the attorney general's

3    office had over 100 complaints in 2002, over 60 complaints in

4    the 2006 election.  You've got those complaints that are

5    numbered.  You've got those complaints that are in evidence.

6    We have evidence that Wanda White was literally seen -- and

7    reported to Freddy Thompson himself in 2006 -- looking over

8    changing people's vote, and reported to him, and he didn't

9    even tell the grand jury that.  We'll get to that in a minute.

10           But again, nobody changed their vote?  I mean, the

11    evidence is overwhelming.  That is, I submit to you, the

12    evidence in the case, and he tells her to tell them a lie.  He

13    said no, you didn't change nobody's vote, period.

14           Further examples.  She reads, have you seen Cletus

15    Maricle or any other public official exchange money during

16    '02, '04 and '06?  No.  Stivers says, ain't seen a thing, have

17    you.  Ain't seen a thing, have you.

18           Did Cletus Maricle promise you anything to support

19    Phillip Mobley, such as money or any other favors?  Well,

20    there's no way they can trace that, Kennon says.  And Stivers

21    says no.  Wanda says, that's a flat no, right?  Stivers says,

22    that's a flat no.

23           Again, did you change anyone's vote, page 26, without

24    their consent?  Stivers says why, no.  He says, you don't

25    admit to nothing, Wanda.  You don't admit to nothing, Wanda.

1    Did Charles "Dobber" Weaver change anyone's vote without their
2    consent?  Stivers, not to your knowledge, Wanda.  Not to your
3    knowledge.
4         Dobber Weaver came in here and testified, as he pled
5    guilty to, absolutely he did.  It was part of the conspiracy.
6    Recruited by the enterprise.  Taught by the enterprise, Freddy
7    Thompson, Charles Wayne Jones, coaching him how to steal the
8    votes.
9         Page 32.  Do you think this is how Cletus would want
10   me to answer? Stivers says yes.  Okay.  He said, just think
11   before you answer.
12        So again, the question is on Count 8, as to Russell
13   Cletus Maricle, William Stivers, did the defendant act
14   knowingly, dishonestly, with specific intent to subvert or
15   undermine the due administration of justice?  Are there
16   instances in which the defendant was advised with corrupt
17   motive that she should assert her Fifth Amendment right to
18   remain silent before a grand jury?  You all will decide that.
19   I submit to you that there is evidence to support that she, in
20   fact, was.
21        And again, the Pinkerton theory of liability.  Again,
22   Cletus Maricle did not have to be there on May the 17th to
23   specifically coach her in exact detail on how to answer those
24   questions.  If he and William "Al Man" Stivers were in part of
25   a conspiracy and it was a reasonable, a reasonable expectation

1    and reasonably foreseeable within the scope of that conspiracy

2    that that was going to happen, then he is liable for the acts

3    of Al Man Stivers.  And again, you look at the evidence, you

4    listen to the audios, and you determine from that whether or

5    not there's evidence to support that he had a reasonable

6    foreseeability that this act was going to occur.  Based on the

7    circumstances, I would submit to you that absolutely he did.

8         And again, those elements again, that the defendant

9    was a member of the conspiracy charged, that after he joined

10   the conspiracy and while still a member, one of the members

11   committed the crime of obstruction, that the crime was

12   helped -- was committed to help advance the conspiracy.  And

13   fourth, that the crime was a reasonably foreseeable scope of

14   the unlawful project.

15         Go back to Count 9.  Freddy Thompson.  Freddy

16   Thompson's alleged to have, on his July federal grand jury

17   date, 2007, to obstructed under 1503.  Again, those same

18   elements apply.  Was there a proceeding?  Yes.  Did the

19   defendant know of the proceeding?  He was there.  Did he

20   endeavor to influence, obstruct or impede the due

21   administration of justice?

22         Well, let's look at that quickly.  His testimony is

23   in D84.  That is a transcript of what he told the grand jury,

24   and let's look at just a couple of things that he said.  First

25   of all, on page 4, are these the complete and total records

1    that are kept by Kentucky and federal law?  Yes.  And are

2    these required to be kept for 24 months -- 22 months, I

3    understand?  22 months.

4         Now, as you all recall, again, the testimony, the

5    testimony was that Wanda White, Dobber Weaver were put in the

6    position as described and defined by the members of the

7    organization.  They were going to go in there in 2006 and

8    because the heat was on, they knew on election day that the

9    open buying of votes in lines was going to draw too much

10   attention.

11        But they had another opportunity that surfaced, and

12   that was the new voting machines.  And we're going to take

13   advantage of these voters, and when they press the button the

14   first time, which is vote, we're going to distract them or

15   confuse them or direct them to leave, that they've finished

16   and then we're going to go back, change their vote and then

17   cast the ballot.  It's a two-step process.

18        Well, the other part of this process was that Wanda

19   had said that she had been told by William "Al Man" Stivers

20   and Charles Wayne Jones in her training at the Stivers

21   residence that she should not be using the voter assistance

22   forms, because that would draw attention as well.

23        We know that the attorney general's office tracks the

24   number of voter assisted voters.  And you know, 2002, there

25   were hundreds of them.  William "Al Man" Stivers' name was on

1    over a hundred of them, and we had the FBI pull those people

2    in who said they were disabled, couldn't see, and they all

3    showed up with driver's licenses, driving their vehicles.  But

4    almost 70 out of a hundred and something that were brought in,

5    they didn't have any problems.

6          So they knew the FBI was on to them.  So they told

7    the election officers, you don't want to do that in 2006.  You

8    don't want to fill out the forms.  Wanda and Dobber Weaver --

9    Wanda, of course, she'd never been election officer before.

10   She's a woman who in this situation had felt the pressure to

11   get the thing done, to do the job that she was required to do.

12   But she got intimidated.  She started filling out the forms,

13   and Dobber Weaver did too.  She said, well, there's important

14   people in line, and I was afraid I was going to get in trouble

15   if I didn't fill those out.  So she started signing them.

16         Then on the tapes, if y'all recall, in the taped

17   conversations, one of the first things she asked Al Man and

18   Wayne Jones is, you know -- or Al Man when she's there is she

19   said, I'm worried about those voter assistance forms.  He

20   said, don't worry about it.  She said why?  I'm concerned.  He

21   said, you don't need to worry about that.  He said, Freddy and

22   Wayne took care of it.  Freddy and Wayne took care of it.

23         Freddy gets in front of the grand jury, and he gives

24   the grand jury the impression that basically, everything was

25   okay.  You all get a chance to read it, and you all make a

1   decision.  I submit to you that he basically portrayed this

2   election to this grand jury with yes, all the records are

3   here, and all the records that -- of the voter assistance

4   forms will be kept for 22 months.

5          Now, they're going to argue to you, well, now, there

6   was that Carl Anthony Short, you know, the lawyer that the

7   Morrises used and was throughout as important because if you

8   remember, when Wayne Jones met with Kennon and Wanda, they're

9   setting up this scheme as to who was going to be in there, he

10  said Wanda, I'm okay with you serving as long as Carl Anthony

11  Short serves.  See, he'd served before.  He'd been proven.

12  They knew there wasn't going to be an issue of this sheriff

13  calling any police when they started stealing votes and buying

14  votes.  He was okay.

15         They're going to argue to you he was the one that

16  stole those and that it wasn't Freddy's office that took that.

17  Again, the instructions I submit to you is whether or not it

18  was reasonably foreseeable under the Pinkerton theory of

19  liability, was it reasonably foreseeable, as Freddy was a part

20  of this, he's teaching Wanda and Dobber Weaver on how to steal

21  votes.  Was it reasonably foreseeable to him that his

22  father-in-law, Wayne Jones, had lined up Carl Anthony Short to

23  do the dirty work and take care of the voter assistance forms?

24  I submit to you the evidence is there to support that.

25         And again, the question is, what was he doing in

1    front of the grand jury?  Was he attempting to influence or

2    obstruct this federal grand jury?  Let's read on.  Let's read

3    on.  Page 10.  Mr. Thompson, did you have any complaints

4    during the May, '06 primary?  Election day or after election

5    or what?  Anytime.  Anytime.  Regarding the process of voting,

6    the machine, allegations that poll workers might have been

7    manipulating things.  Well, I had one guy in there from

8    Garrard.  Demanded I shut the precinct down.  He demands I

9    throw all four election officers out.  He said all these

10   folks.  But yet in the evening, he carried that precinct.  Who

11   was this?  Blaine Smith.

12         You say, well, did it go further?  Read on.  Page 11.

13   When did he bring that complaint time to you?  Right around

14   dinner time, but he carried.  Before the results?  Yes.

15   Really, really, the only complaints we had was losing

16   candidates and their families.  Really and truly.  Really and

17   truly.

18         Did he have the intent to subvert, to undermine this

19   federal grand jury in trying to find out what was going on?  I

20   mean complaints, over 63 complaints that the State Board of

21   Elections had in 2006.  They ranked Clay County in 2002 as

22   number one in complaints of 120 counties.  In 2006, still up

23   in the top of the state.

24         And the county clerk comes to the federal grand jury

25   and says, really and truly, only losing candidates and their

1    families.

2         And by law, you're required to have a form filled out

3    on those individuals?  Yes, it should be right there.  Talking

4    about the voter assistance forms.  Is that the same for your

5    place?  Yes.  Just the girls that work here had access to it.

6    Yes.  Let me ask you this, are you aware of anybody coming to

7    look at these records that were not part of your staff?  No.

8    Nobody's ever asked.  No.  We've never seen nobody look at

9    them.  Has anybody removed these?  No, sir.  Has anyone seen

10   anybody attempt to destroy these forms?  No, I've not.

11        Then, of course, the final -- then there's several

12   others.  But again, you're going to have the whole transcript

13   to review.  But if y'all recall, both Dobber Weaver and Wanda

14   White described how that the county clerk and his

15   father-in-law, Charles Wayne Jones, arranged for that

16   after-hours training.  You know, when all the election

17   officers are finished, we'll take our corrupt ones over here

18   to the side and teach them how they can steal these votes.

19   And both of them described for you consistently how that

20   happened.

21        And when he was asked did Wayne Jones have access to

22   these voting machine demonstrators, demos prior to the

23   election?  No.  No.  I had it in my office all day.  He was

24   with me all the time.  I was the only one that took it out and

25   demoed it.  And then again, he goes to the fire departments

1    and school functions and all.

2         Let's move on to Count 10.  Count 10 alleges that the

3    defendants Russell Cletus Maricle, Charles Wayne Jones,

4    William E. Stivers and Freddy W. Thompson conspired to deprive

5    persons of their civil rights.  That is, did they enter into a

6    conspiracy to injure or oppress one or more victims; intend by

7    the conspiracy to hinder, prevent or interfere with the

8    victims' enjoyment of a right secured by the constitution of

9    the laws of Kentucky.  The indictment charges the defendants

10   conspired to deprive the victims of their right to vote.

11        Again, Count 10 is part of the May, 2006, November,

12   2006.  In those two elections, there was a concerted effort, a

13   plan -- and we have talked about that plan.  Dobber Weaver and

14   Wanda White were specifically coached at the direction of the

15   Cletus Maricle, he set it up.  He made sure that Wanda changed

16   her registration to Democrat.  He made sure that she made the

17   slate up that Phillip Mobley was included on.  He made sure

18   that when they got together, they met with Charles Wayne Jones

19   and Al Man Stivers.  He made sure that when Dobber Weaver came

20   on board that he was okay with this.  When they came on board,

21   they were coached by Freddy Thompson and Charles Wayne Jones

22   in the after-hours training.  Again, what was the effort, what

23   was the intent?  The intent was to steal votes.  A

24   constitutional right, a constitutional right and one which

25   they sought in this conspiracy to prevent people from

1    enjoying.

2            And how was that?  They were going to steal it.  Tell

3    them they've voted, then you review their ballot, you change

4    it the way we want it, and then you cast their vote.

5            Again, the basic elements of the conspiracy remain

6    the same.  Two or more persons conspired or agreed to deprive

7    a person of his or her right to vote.  Second, the defendant

8    knowingly and voluntarily joined the conspiracy.

9            Count 11.  Count 11 is simply, again, the allegation

10    that Russell Cletus Maricle, Charles Wayne Jones, and William

11    E. Stivers, Freddy Thompson, William Bart Morris, Debra L.

12    Morris conspired to commit vote buying in 2006.

13            And again, the same elements.  Were there two or more

14    persons conspired or agreed to commit the crime of vote

15    buying.

16            Multiple witnesses told us on the witness stand about

17    how the vote buying was going to occur in 2006.  If y'all

18    recall Bobby "Red" Sams, his involvement occurred early in the

19    2006.  Stanley Bowling had an interest in seeing that -- he

20    said, now, it's going to be important, Bobby Red, that I have

21    the same vote totals now that I had in 2002, because you know

22    the attorney general's office might be suspect if my vote

23    totals aren't up so I want you to do just like you did in

24    2002.

25            He did.  He went to those apartments.  He went to

1    those places that he'd always been able to rely upon and

2    hauled those voters in and he promised them -- what did he

3    promise them?  Some of them got paid, we know, from the

4    testimony of some of the vote haulers at the Morrises.  Some

5    of them did not get paid, if y'all recall.  Bobby "Red" Sams

6    said well, they were promised.  They were promised they were

7    going to go gravel and tile and they never did get it.

8            Well, the question is, is a promise enough?  Because,

9    you know, if you choose not to believe the vote haulers who

10   said they are down there combing the apartments to send them

11   down there, such as Carl Curry and some of the others that

12   were gathering them up and sending them down, then you have

13   Bobby "Red" Sams who said in 2006 we've got those promises.

14           Are those promises going to be sufficient?  Again, we

15   have to look at the instructions to determine whether or not,

16   again, that these defendants had violated the law by

17   promising.  Apologize.

18           For one, the instructions say that the United States

19   does not have to prove that payment or offer of payment was

20   specifically made.  Now, there's further explanation of that

21   that under Title 42 that there must be a federal candidate on

22   the ballot.  An offer to pay or payment, a promise to give

23   anything of value, I submit the jury instructions will tell

24   you is sufficient to violate the vote buying statute under

25   Title 14 and a conspiracy to violate the vote buying statute.

1          The vote buying statute has a federal hook when there

2     is a federal candidate on the ballot.  Now, you'll have all of

3     the ballots in the records of the county clerk that we've

4     introduced.  But I will submit to you that in each of those

5     elections -- and this, of course, is only the 2006 election

6     that's in issue here, that Congressman Harold Rogers was on

7     the ballot.  There was a competitor, a Democrat runoff in the

8     spring by a fella by the name of Kenneth Stepp.  And in the

9     fall, they ran off in against Harold Rogers.  So the

10    requirement by law is that there have to be at least a federal

11    candidate.  The defendant does not have to have the specific

12    intent to influence a federal race.

13         So under Title 42, if you're conspiring to buy votes;

14    first, that there was an election that was held solely or in

15    part for the purpose of selecting a member or a candidate for

16    the United States -- I think your version will say Congress.

17    Second, that someone paid or offered to pay that person for

18    voting in the election.  And third, that the person acted

19    knowingly and willfully.

20         Now, again, there's not a requirement that they

21    intend to influence that federal candidate's race.  It's only

22    that the federal candidate be on the ballot, according to

23    these instructions, I submit to you.  And in each of these

24    races, there has been testimony and evidence that there was a

25    federal candidate on the ballot in 2006.

1           There is also evidence, I recall, and you all will

2    recall what the evidence is, that the election officer, a

3    couple of them described how Charles Wayne Jones specifically

4    told them when you're in there, you turn every one you can

5    against Harold Rogers, Hal Rogers.  He didn't like Hal Rogers,

6    and he told those who were stealing votes and those preparing

7    to buy votes and vote those who had bribed and paid for their

8    vote, you turn that against Hal Rogers.  But that's not

9    required.  It's only required that they have their name on the

10   ballot, according to the law.

11          You might be asking, well, in some of those instances

12   you've been referring to, what did the defendants intend?

13   What was their intent?  You haven't proven what their intent

14   was by showing us exactly what was on their mind.

15          Well, the instruction -- there's no way that a

16   defendant's state of mind can be proved directly, okay?

17   Because no one can read another person's mind and tell what

18   that person is thinking.  Again, you use your common sense,

19   you look at the circumstances, and you say, but it can be

20   proved indirectly from those surrounding circumstances.

21          This includes looking at things like what the

22   defendant said, what the defendant did, how the defendant

23   acted, and other facts and circumstances in evidence that show

24   what was in the defendant's mind.

25          I submit to you that those will be the things that

1    will guide you as you look at the state of mind of the

2    defendants.

3         What is bribery?  That goes back to Count 1.  What is

4    the bribery offense?  It's a state law offense under

5    KRS 119.205.  And again, a racketeering enterprise that

6    includes racketeering acts of bribery must show the defendant

7    makes or offers to make an expenditure to a potential voter

8    with the intent to influence the voter to vote or withhold his

9    vote or to vote for or against any candidate at an election.

10        An expenditure, okay, means any of the following,

11   including payment or consideration for voting or withholding a

12   vote, it can be a payment, a distribution, a loan, an advance,

13   or anything of value.  It can be a promise, express or

14   implied, whether or not legally enforceable to make a payment,

15   distribution, loan, advance or gift or anything of value.

16        So again, we're reminded of the multiple, multiple

17   acts of racketeering as required under the racketeering

18   conspiracy.  It's only required there be two.  Whether it be

19   acts of mail fraud, extortion, or bribery.  And those will be

20   the requirements that you'll have to determine at the

21   conclusion of the case of whether or not they're satisfied.

22        One of the things that I also want to try to do

23   quickly is to talk with you all about some of these events

24   that you've heard about during this trial.  Y'all recall that

25   Kenneth Day testified for the United States, a cooperating

 1    defendant who is serving an 18-year prison sentence.

 2            He was engaged in drug distribution in Clay County at

 3    the Burning Springs pawn shop location where he was ultimately

 4    arrested, searched and convicted in April, 2005.  He testified

 5    that he had, pursuant to his plea agreement, he had agreed to

 6    cooperate, testify truthfully.  In fact, he admitted to

 7    testifying in five other hearings for the United States, and

 8    he understood that if his sentence is to be reduced, it will

 9    be reduced by the judge, Danny C. Reeves.  He also

10    acknowledged that he was subject to the penalty of perjury.

11            And based on his testimony, we heard a lot about the

12    formation of this enterprise and how it began and how Kenneth

13    Day became who he ultimately was, which was a successful drug

14    dealer for many years who had never been caught, never been

15    arrested, never had any trouble with the Clay County

16    authorities.

17            And he talked about his vote buying started when he

18    was 18 or 19 years old.  He went to Pin Hook and Burning

19    Springs and he said it was often lines of people that would be

20    lined up to sell their votes.  He talked about the 1983 race,

21    House versus Bishop.  And you all recall that the documents in

22    record, the Clay County election, Board of Election minutes

23    and some of those documents relating to the Clay County

24    clerk's office in fact establish that there was this judge's

25    race between Oscar Gayle House, who was supported by Cletus

1    Maricle, and a fella by the name of Clay Bishop, father of

2    Clay M. Bishop, Jr., the county attorney.

3         And they talked about -- Kenneth Day talked about how

4    it was auction-like atmosphere, and he talked about how they

5    got into a bidding war that day, and it was Adams and Maricle

6    were working the grounds, and that Adams, in fact, had set up

7    Neville Smith and went out to Burning Creek, and they had

8    $30,000 to spend that day and that Kenneth Day was going to be

9    actually handling the money, but Doug Adams was going to

10   negotiate with the voters to how much was going to be paid.

11        If you recall in his testimony, he talked about,

12   yeah, on that day, he believed there was one instance where

13   Cletus Maricle and Doug Adams went back and forth and himself,

14   and the voter was actually paid $800 for his vote.  It was

15   under that kind of setting that, again, set up this early

16   formative stages of this enterprise.  Because the two

17   puppeteers, the men who would pull the strings in 2002 and

18   2006, they had worked themselves up the ranks as well.  They

19   didn't start out that way.  They had to work themselves up.

20   Doug Adams at that time was still -- he wasn't superintendent,

21   he was still working as a teacher, later as a principal.

22   Cletus Maricle was a lawyer.

23        And Kenneth Day talked about that, the fact that this

24   is how they got their start.  And then in '85, y'all recall

25   again, Kenneth Day's testimony corroborated by the record.

1    This is a fella who's been in prison.  He's been in prison

2    since 2005.  That's five years the man's been in prison.  He

3    comes up here and testifies to you.  You all judge his

4    credibility, but look for corroboration.

5           1985, in the records, it's in there.  Who was it?  He

6    said the Hooker/McKeehan race.  Hooker/McKeehan race.  Kenneth

7    Day talked about that.  Again, what was going on there?  He

8    said, well, Cletus Maricle was given $10,000 from J.E.

9    Hensley.  And there was a double-cross.  Double-cross that

10   day, and Kenneth Day explained what happened.

11          Doug Adams and Cletus Maricle were working opposite

12   sides.  Democrat Maricle, Republican Adams.  Means nothing in

13   Clay County.  Just like Eugene Lewis said, Miss Piggy could

14   get elected if you got the Clay County Board of Elections

15   behind you.  Doesn't matter what your name was because what

16   they're going to do is checks and balances doesn't work.  You

17   got Cletus Maricle on one side, Doug Adams on the other and

18   Kenneth Day out there paying the voters.

19          The double-cross occurred, as Kenneth Day recalled,

20   because they had taken the money from Hensley with the

21   expectation it would be spent for McKeehan.  But instead, they

22   bought the votes for the cousin of Doug Adams, Mr. Hooker.

23   And by the end of the day, they were afraid that violence was

24   going to break out.  See, violence breaks out in this.  You

25   all remember Jennings White and Denver Sizemore going around

1    with automatic weapons and Bobby "Red" Sams getting beat up by

2    Bart Morris and all these things.  See, this is a violent

3    situation over there at election time.  And it started that

4    way.  It didn't just happen in 2002.  In the formative years,

5    it was violent.  There was concern.

6          So they made a double-cross.  They were buying votes

7    for Hooker instead of McKeehan.  They switched Maricle over.

8    And later, if y'all recall, when Kennon White was explaining

9    after he lost his jailer's race, he said he went and met with

10   Cletus Maricle.  He and Wanda did.  Wanda said Cletus said

11   yeah, that sometimes happens.  Sometimes you get

12   double-crossed.  Jennings went with Marcum.  You know, I

13   worked the grounds one time, and I know what that's like.

14   See, Kenneth Day told about that double-cross.  Corroboration.

15   Wanda White, she's not in prison.  She's not been talking

16   about Kenneth Day.  Kenneth Day comes up and tells you about

17   the double-cross.  The double-cross was right there, Cletus

18   Maricle part of it.

19          And again, what happened was they told the voters the

20   opposite results.  They report McKeehan wins.  So Corky

21   McKeehan, his brother, everybody's okay, because that's what

22   they expected.  They paid all that money up.  There weren't

23   going to be any violence.  Kenneth Day goes off.  Doug and

24   Cletus Maricle then go to the clerk's office with the actual

25   results.  Hooker wins.

1          Then we talk about again Kenneth Day recalls the

2     Harold Sizemore versus Edd Jordan.  He again recalls Maricle

3     again election officer.  The records are there to show who

4     served.  Lo and behold, the records show Cletus Maricle was

5     election officer, Doug Adams election officer.  Y'all got them

6     in evidence.  You can look at them.  Just like Kenneth Day

7     described.

8          Further, he talks about the day that he was there, he

9     was told by Maricle that he was for Sizemore, and Kenneth Day

10    was for Edd Jordan.  Why was he for Edd Jordan?  You know, Edd

11    Jordan was one of his main protectors.  You got to have a

12    sheriff.  Edd Jordan was the sheriff, but he was trying to get

13    him elected against Harold Sizemore.

14         Maricle slowed down the day and told him that he was

15    making him fill out those forms.  Kenny said that was slowing

16    me down too much.  My operation slowed down so I gave him

17    Harold Sizemore, and we went on that day.

18         These kinds of activities served Kenneth Day well,

19    because he went not from being -- never was an election

20    officer, never served a day as an election officer, but in

21    1988, he was appointed the Republican election commissioner

22    for Clay County.  Roy Morgan, one of those unindicted

23    co-conspirators that showed up at Doug Adams' meeting there at

24    Paul Bishop's with money, was there to introduce Kenneth Day

25    as the Republican election commissioner.  And Kenneth Day was,

1     in fact, the records show, appointed in 1988.

2           And one of his first official acts of duty was to

3     make sure that he did what Roy Morgan wanted.  One of the

4     things Roy Morgan wanted, he wanted him to go to Cletus

5     Maricle and give him the list of election officers and let him

6     determine who's gonna serve, because Cletus Maricle was

7     anticipating that the older Judge Bishop was going to be

8     retiring and, in fact, did retire that year of 1990, it later

9     proved to be.  And in that year, Cletus Maricle had a race.

10    Kenneth Day recalled that he was given the list of election

11    officers.  He got to make those selections.  What's unusual

12    about that?  That's not the way the law requires it to be

13    done, but that's the way it was in the formative stages of

14    this conspiracy.  That's the method they adopted later on.

15    And that is Cletus Maricle was going to be the puppet master.

16    He's going to pull the strings and tell who's gonna be on

17    there.  In fact, Kenneth Day described when he went to the

18    Board of Elections meeting, there were no objections.  The

19    election officers that Cletus selected were passed on and were

20    approved.

21          He followed up and continued to, you know, talk about

22    this case that he had as administrator of the estate of

23    Loretta Day.  Y'all recall Kenneth Day said that in that case,

24    it was an interesting time period.  Because the time period

25    comes up here to 1990.  On September the 20th of 1990, the

1    records show that there was the Runion trial, and it was a
2    one-day trial.  Kenneth Day said in that trial, there was a
3    jury; and in that jury, there was a person on that jury that
4    Pres Henson knew, had lived with as a girlfriend or ex-wife.
5         So Cletus Maricle and Scott Madden, Kenneth Day and
6    Larry Roberts went to this Pres Henson, and they told Pres
7    Henson that this lady was on the jury, and that they wanted a
8    jury verdict to come back no less than 1 mill, according to
9    the testimony of Kenneth Day.
10        And what does the record show?  The record shows it
11    was a one-day trial and, in fact, that on that September 21st,
12    it was over a $3 million verdict.  Over $3 million verdict.
13    And Cletus Maricle was there speaking to Pres Henson in the
14    presence of Kenneth Day, and it was there that this juror was
15    approached.
16        And, again, is this something that continues to hear
17    about?  Do you hear about that continuing through this case?
18    I would submit to you, recall those recordings, recall those
19    conversations of Al Man and Charles Wayne Jones.  When Mary
20    Betty says she's going to be picked on the jury there in
21    Cletus's court, what was the reaction?  Al Man Stivers says I
22    don't know how many times, three or more times, we're going to
23    make a killing.  Really, we're going to make a killing.
24        There were other instances.  He and Wayne Jones
25    talked about yeah, remember the state trooper, the Phelps

1    brothers.  They don't like you, do they, Wayne?  No, no.  You
2    remember us going down there, me and you sitting in Cletus's
3    office, and we were picking a jury.  What are they doing
4    picking a jury?  These aren't lawyers.  What are they picking
5    a jury?  Like in the day of Kenneth Day, he said they picked
6    juries.  Happened all the time.  He talked about the Kenny
7    Price versus Honda Motors case, or Kennedy versus Honda case,
8    talked about the Ford motor case, a 30 or 40 million dollar
9    verdict, he recalled.  30 or 40 million dollar verdict in Clay
10   County, Kentucky.  Kenneth Day recalled that he was called
11   upon by members of this organization to go in there and to fix
12   a jury.  Fix the jury.

13           Other instances of jury tampering have been
14   throughout this case, and we've heard many times.  How did
15   politics help his drug business?  I mean, the relationships.
16   Look, so many overlaps and inter-laps.  Charles Wayne Jones
17   was ultimately in relationship with all of these drug dealers.
18   Say, well, now how does that happen?  You recall Kenneth Day,
19   he said in the '90s when he needed some really good marijuana,
20   he went to Charles Wayne Jones, and Charles Wayne Jones
21   supplied him the marijuana.

22           Now, is this organization aware that Kenneth Day is a
23   drug dealer?  I would submit to you absolutely.  How are they?
24   Well, the commissioner over the whole enterprise is a drug
25   dealer having a drug relationship with Kenneth Day, and his

1    knowledge is imparted to them all.

2            There is evidence that again, Eugene Lewis, what did

3    he say?  That Henry County farm he and Mansell Baker and

4    Denver Sizemore, all three of them testified Wayne Jones was a

5    partner to that.  Is there any way to know that Eugene Lewis

6    is a big drug dealer?  It wasn't in the newspaper.  It wasn't

7    in the newspaper.  He was a federal mine inspector selling

8    cocaine.  Again, the evidence showed that those politics and

9    that, you know, you scratch my back, I scratch yours.

10            How did it benefit Kenneth Day?  He talked about in

11   2004 when Unite came in, he was able to call up Jennings

12   White, go to the sheriff and say, am I being investigated.

13   How much is that worth to a drug dealer selling hundreds of

14   thousands of drugs a week or more?  How much is that worth?

15   How much is it worth?

16            You know, J.C. Lawson testified.  Here's a man on the

17   front page of the Herald Leader and USA Today and what's he

18   doing?  He's giving money to Cletus Maricle to go apply in

19   Oscar Gayle House race.

20            And again, what are the circumstances?  Is there

21   anybody in Clay County that doesn't know J.C. Lawson in 1987

22   is not a drug dealer?  He's giving money to the enterprise.

23   He's interjected 8 to 10 thousand dollars.

24            And then Stanley Bowling, of course, brings him in

25   in 2002.  Stanley says, well -- questions of Stanley's lawyers

1    well such that, well, he's up there trying to get his vote.

2    Well, he's a convicted felon three times in federal court.

3    He's a three-time federal convicted felon, and Stanley Bowling

4    is up there trying to get his vote? No.  J.C. Lawson said he

5    wasn't up there to get my vote.  He was up there to get me to

6    work for him in the election.  In fact, he paid me $500 at the

7    end of election night.  Brought it up there to my house.

8    That's the testimony.

9          Again, these drug dealers, they were working in this

10   situation because they knew that the enterprise had the

11   ability to protect them.

12         We saw the Gilbert Acciardo introduced the, you know,

13   the beginning of this organization's inception was actually

14   caught on tape.  Cletus Maricle confesses and admits right on

15   television, national television, "Inside Edition," that drugs

16   are the most important factor in our economy here in Clay

17   County.  And each election, you can buy 30% of the vote.

18   Thirty percent of the vote, he says, can be bought.

19         Todd Roberts, one who was, as you recall, a young

20   fella always dreamed to be a police officer, grew up in Clay

21   County.  He's now a convict.  Serving 87 months for

22   racketeering.  It included arson and obstruction of justice.

23   During his time period, he tried just like the rest of them,

24   just like the little Richard Brian Hubbards, you know, come

25   up, little Richard Brian Hubbard, 18 years old, and who does

1    he go to?  He goes to Wayne Jones, just like Bobby "Red" Sams.

2    18 years old, who does he go to?  The king makers.  We're

3    going to make something out of ourselves.  These young men

4    think they're going the right way.

5         And what happens?  You lay down with dogs and you get

6    fleas.  And Todd Roberts, good police work, he thought, in

7    2002.  He said he was trying to do it.  Taking photographs and

8    identified, again, corroboration.  They said there were

9    $100,000 or more put together and that Charles Marcum was

10   there putting money on the table.  He's in full color

11   photographs with William "Al Man" Stivers right at the place

12   where these people say, working the line in photographs that

13   the chief of police, assistant chief at that time, shared with

14   us.

15        Who did he say was working?  He said Charles Marcum,

16   William Stivers, Bobby "Red" Sams.  Corroboration.  Large

17   numbers of voters.  Fifteen passenger vans.  He said he even

18   called Cornett Chevrolet and found out when they found out

19   what it was being used for, got recalled.

20        Who did he say was set up that day?  Vernon Hacker,

21   Lester Harmon, William Stivers and Paul Bishop.  This is what

22   Vernon Hacker said, Bobby "Red" Sams.  Those testimonies are

23   corroborated through the testimony of Mr. Roberts.  Ricky

24   Whitehead, a county detective working for Clay Massey Bishop,

25   Jr., the county attorney.  What was he doing?  He was seen

1    buying votes and was also up there with Bart Morris at the

2    Y Holler.

3         You all recall the testimony of Mary Gail and some of

4    those other vote haulers, some of those folks that were

5    working.  They testified that there were times when they moved

6    around.  In fact, Todd Roberts said the attorney general's

7    office called to Frankfort, said we're going to take -- we

8    want to take a ride, and he actually took them up to the

9    Y Holler where the camper was.

10         Lots of cars.  James Goins, David Hacker, workers of

11    Morris.  Again, William Stivers, Paul Bishop, working there at

12    the clerk's office.  Doug Adams.  He was told by Vernon

13    Hacker, Doug Adams was pressuring me.  He was threatening my

14    job.  He said he got moved to the bus route and, lo and

15    behold, we get in the records from the county school board,

16    and what does it show?  In 2002, Vernon Hacker lost his

17    Manchester route and it was taken away and his bus went from a

18    2001 to a '97.  Corroboration again throughout the case.

19         What do we know further?  We know that again Jennings

20    White and Edd Jordan tried to get Todd Roberts' help with

21    influencing the drug dealers.  He's going to give him back

22    some of his money.  What was the purpose of that?  So he could

23    go buy votes for Jennings White and Edd Jordan.  What happened

24    with that case?  Again, it was dismissed by Oscar Gayle House.

25    Dismissed by Oscar Gayle House.  How many case have you heard

1        in this case where cases have been dismissed by these judges?

2                What did he say about the Mike Bishop?  Mike Bishop

3        was one of his coworkers; son of Paul, life-long friend of

4        Adams.  His mother the secretary at the board of -- school

5        board for Doug Adams.  He ultimately became police chief in

6        2005, used Doug Adams to get the promotion.

7                What were they doing?  The Whites lost out.  Kennon

8        White got beat in 2002 so if you can't beat 'em, you join 'em.

9        What did he do?  Todd Roberts described for you what they did.

10       They did whatever it took to get Doug Adams.  They sent

11       bulldozers out there right before the election time to go out

12       there and make roads for his deer hunting.  City employees,

13       city resources plowing bulldozer roads for Doug Adams' farm.

14               What else did they do?  Well, they were told that

15       Mike Bishop needed a promotion.  Bishop told Roberts it was

16       their turn.  It was their time, I believe is the word that he

17       used.  Adams told Roberts he needed to be promoted.

18               So during the course of this, there was a quick

19       promotion from sergeant, and ultimately it was promoted to

20       chief.  Who was on the city council?  Those people who Doug

21       Adams had worked with time and time again.  Vernon Hacker,

22       Penny Robinson, Sherrie House, Jeff Deaton, Darnell Hipsher.

23               Jeff Deaton, one of his own employees.  Jeff Deaton

24       wanted to be city council, put a thousand dollars in the desk.

25       Comes time for me to use my position, and I want to make

40

1     something happen, I'm going to come to this city council and

2     it's going to happen.  We're going to get promotions.

3           Promotion doesn't work, we'll go through Daugh White.

4     Daugh White didn't care whether the city council voted on it

5     or not.  He made an executive order, made him interim chief.

6     So they could get this all sorted out.

7           November, 2002, again, Doug Adams ultimately involved

8     in, he said there was vote buying prevalent on election day.

9     The big race was Charles "Dobber" Weaver versus the school

10    board and the city council.

11          The Stivers altercation.  Y'all recall that?  Again,

12    what was going on?  William "Al Man" Stivers down at the

13    clerk's office.  He was suspected to have been drinking.  He

14    was arrested on alcohol intoxication, terroristic threatening.

15    What happened to the case?  Yancey White got the case.  Roy

16    Morgan's son-in-law.  Roy Morgan's son-in-law filed suit in

17    Cletus Maricle's court.  Todd Roberts objected to the

18    settlement.  They got $75,000 for a situation where William

19    "Al Man" Stivers tells the police officer -- Jeff Culver

20    testified.  He said if you're going to cite me, you're going

21    to arrest me.

22          Home incarceration.  Again, we've heard Todd Roberts

23    describe that Stivers was a long-time friend of Maricle, and

24    he operated it.  Records have confirmed it.  Other witnesses

25    have confirmed it.  Taken over by who?  Maricle's secretary,

41

1    Jo Davidson.  Widely used in Clay County, he said, and charged

2    these people about 300, 330 dollars a month.

3          Maricle called him on it, said he'd been going out

4    and giving press releases and didn't like it.  Called Todd

5    Roberts in his office and said it's time that you stop giving

6    the program a bad name.  And Todd Roberts said, I got the

7    message.  And I asked him to explain.  He said, well, you

8    understand, he is the circuit judge.  He's the highest power

9    in the county.

10          He said Stivers told him he was Maricle's bodyguard.

11    Is there any evidence in the record Stivers might be the kind

12    of man you'd want?  I don't know.  Y'all recall the

13    recordings.  You know how he talked about those state

14    troopers.  He said it took 25 of them to arrest him on that

15    one day.  He said, I looked at him, and he said he wanted me

16    to stop smoking, and I didn't want to do it.  He said, if you

17    don't believe me, he said, he made some kind of an oath and

18    threat to him, said he's gonna, basically, he was gonna kick

19    his butt.  Told that state trooper, said and that isn't a

20    threat, that's a promise.

21          He acted out on it.  You know, there's evidence of

22    that.  I mean, he took out, let's see, Ouchie Jackson.  Took

23    out Ouchie Jackson.  You heard testimony about that.  Beat him

24    up, beat him to a pulp.  You know, you talk a big game, you

25    beat up a little fella like Gary "Ouchie" Jackson, you go

1    around and act bodyguard for Cletus Maricle.  That's what Todd

2    Roberts said.  He carried a gun, and he was considered himself

3    his bodyguard, hanging out at his office.

4         And then there's, you know, the land deals.  We've

5    talked about those.  Todd Roberts described how he was the

6    building inspector and that Cletus Maricle was in partners

7    with a convicted felon, Charles "Poodle" Marcum of Jackson

8    County, and they had -- Cletus Maricle testified, of course,

9    he admitted that yeah, but he didn't want the record to show

10   him on it, so he didn't record his deed.

11        Again, constant throughout many of the testimonies

12   that you've heard were these ways of which we can feather our

13   own nest.  Ways we can put our family members down at the City

14   Hall.  We can put Robyn down at the county clerk's office at

15   Freddy's.  Melanda, she can work down there.  We can put the

16   kids down at City Hall.  Brandon, Linsey, we can put them all

17   to work.  Judy, she can be the legal secretary and we can work

18   all these -- see these jobs, we can feather our nest.  And

19   that's the motive.  You know, the motive, the power, the

20   money.  We got to keep that thing going.  We got to stay in

21   control in Clay County.  We got to use that enterprise.

22        Spring election, '04.  Again, Todd Roberts talks

23   about the Couch/Colter race.  Very important to Doug Adams

24   that Tim Couch remain the state representative.  Again,

25   instances in which this race established that politics were

43

1    being played, votes were being bought in 2004.

2          And then, of course, you heard William Goins and Todd

3    Roberts both talk about how powerful Bart Morris could be.

4    You remember little Officer William Goins that testified after

5    Jeff Culver.  He had arrested James Goins, one of the ultimate

6    vote haulers and employees of Bart Morris's.

7          What happened?  He was told if you don't want to be

8    picking up trash, picking up weeds rather than be a police

9    officer, you'll not show up for court.  Of course, that's

10   Kennon White reporting back to what Bart Morris wanted.  Bart

11   Morris didn't want him charged with DUI, and so this young

12   officer told about it.  Todd Roberts told about it.  He was

13   told not to show up many times.

14         And, again, Todd Roberts said, that's common.  That's

15   common for our officers down there in Clay court, Clay Bishop

16   and Oscar Gayle House and Renee Muncy and Cletus Maricle.  He

17   said, it's common in court for them to call these cases time,

18   time, time again and then dismiss them when an officer doesn't

19   show up on the eighth or tenth time.  Jeff Culver talked about

20   the same thing.

21         Vernon Hacker.  911 director.  Again, former partner

22   in the pawn shop with James Phillips, the circuit clerk.  The

23   one who got Charles "Dobber" Weaver to sign on as election

24   officer with Wanda White in 2006.  Convicted in a conspiracy

25   with Bobby Joe Curry, serving 120 months.  He's election

1    officer in the '80s, served as a deputy clerk for Jennings

2    White down there, trying to offset the Paul Bishop and William

3    "Al Man" Stivers contingency down at the early voting in 2002.

4        He described again the same kind of method of

5    operation.  Vote haulers, talked about the Morris

6    headquarters.  Described two to three hundred voters to be

7    paid there.  Fifty dollars a vote.  He talked about who worked

8    there.  He said James Goins, Gary "Ouchie" Jackson, who is

9    also a city council member, Chris Duff, stepson.

10        Deshae Henson.  You heard his testimony.  Deshae also

11    admitted to this same involvement.  Bart Morris, again, he was

12    there helping Stanley at the Harts Branch.  Vernon Hacker left

13    at the Morris residence to work with Darnell Hipsher, make

14    sure that everything kept going with the vote haulers and

15    paying off.

16        He also described the move to the Y Holler and the

17    factory due to the attorney general's trip.  Meetings.  He

18    talked about Bart Morris, Stanley Bowling, James Garrison,

19    Jennings White, Edd Jordan, Thomas Harmon, all these people

20    meeting at the courthouse.

21        Jennings White again putting 75 or a thousand or more

22    dollars together.  Doug Adams approaching Vernon Hacker at the

23    superintendent's office, asking him to support Freddy.  Vernon

24    says, well, I need to think about this, he told him.  Of

25    course, Ronnie Hacker, the director of transportation, comes

1    to him and

2    says -- while Vernon is visiting his mother, ill at the

3    hospital, Ronnie Hacker says you'll either support Thompson or

4    you'll park your bus.

5        Vernon Hacker said, I'll park my bus.  Remember,

6    wait, there's that resignation letter out there.  September

7    21st, put that letter out there.  Vernon Hacker said, wait a

8    minute.  I had sick days in May.  The record will show that.

9    I never resigned.  We put the officials at the school board,

10   what did they say?  Said he never resigned.  He never

11   resigned.  Corroboration right in the record.  You determine

12   the credibility of these witnesses, based on such things as

13   corroboration.

14       Again, talking about that Charles Stivers meeting.

15   Again, that important meeting where, again, for the last time,

16   Vernon Hacker's approached.  Charles Stivers, William Stivers

17   brother, Cletus Maricle's there, Freddy Thompson's there,

18   William Stivers and Wayne Jones.  They're all at Charles

19   Stivers'.  They call Vernon Hacker.  Maricle says, Vernon, the

20   tide has changed.  The tide had changed.  Vernon said he

21   didn't commit to them.  In two to three days, he testified his

22   bus was taken.

23       November, '02.  He talked about again those meetings

24   with Debra Morris, Bart Morris, Darnell Hipsher, vote haulers,

25   Gary Jackson, Deshae Henson, Earl Pennington, Darnell Hipsher,

1    Chris Duff, Charles Weaver on their ticket.  Adams organized
2    Charles Keith.  Paid the voters, Debra Morris.  Paid the
3    voters, Debra Morris.  Darnell, Bart, Vernon Hacker.  Who was
4    bringing money?  Oscar Gayle House, $2,000.  Laura House,
5    Penny Robinson.
6           Spring of '04.  Vernon Hacker again approached by
7    Doug Adams to support Couch for the state representative.
8    Then when Vernon wouldn't commit to him, he said, well, just
9    in Manchester, try and keep it close.
10          Fall of '04, Doug Adams again delivered $500 to
11   Vernon Hacker for Jeff Deaton.  Corroboration, Jeff Deaton on
12   the witness stand.  Again, he's not in jail, he's not down
13   there with Vernon Hacker.  He said he was told to put a
14   thousand dollars in the desk.  He said, I didn't have a
15   thousand dollars.  He said, all I had was 500.  What did
16   Vernon Hacker say?  Vernon Hacker said, $500.  He gave it.
17          Then what did Jeff Deaton say?  A few days later,
18   Darnell Hipsher came.  What does that tell you?  Doug Adams
19   and Darnell Hipsher were in close communication.  Darnell said
20   where's the rest of the money?  He said, all I had was 300.  I
21   tried to write a check.  He wouldn't take it.  Corroboration.
22          Kennon White, 2004, his daddy made him a job.  Didn't
23   have to have city council approval.  Manchester, James
24   Garrison said the laws is just too hard to follow down there
25   in Clay County.  It's impossible to follow all the laws.

1    Mayor White did the same thing.  Created him a job, 48, 49

2    thousand dollars a year.  Didn't need city council approval.

3         He pled guilty to taking part in an extortion

4    kickback scheme and mail fraud with private driveways.  Again,

5    testimony was replete.  Stanley Bowling and he had this

6    relationship where the contracts came from the City.  There

7    were eight of them during the course of that relationship.

8    Kickbacks were being paid to Kennon and to his father.

9    $67,000 he admitted on cross-examination was what had been

10   paid to get those contracts and to keep those contracts going.

11        What was going on?  Kennon White talked about his

12   first introduction.  His daddy ran against Homer Weaver.

13   There was Cletus Maricle, Penny Robinson, George Saylor and

14   others meeting at the White's motor vehicle sales, White's

15   Chevrolet, organizing the vote buying for the mayor's race.

16        What happened next?  Colter versus Stella House.  His

17   Aunt Barb got competition by Stella House.  70 to 80 thousand

18   dollars in money went together to buy the votes in the county

19   in that election.  They met with Kenny Day, Cletus Maricle,

20   Doug Adams.  Gave Doug Adams 5 to 6 thousand dollars to

21   distribute out of that 75,000 in that election.

22        What about 2002?  He went to Cletus Maricle first,

23   and he was told that he would need $120,000 to assure his

24   victory.  To accomplish the goal, he said you had to pay both

25   sides to get the Board of Elections in 2002.  Cletus explained

1    that to him.  You're going to have to pay both sides.

2         And so what did he do?  He said, well, if you want 60

3    to 80 -- Kennon said that's about what he had was 60.  He

4    said, you can make it close.  He said, you gotta have

5    Jennings, though, to win.  So he then goes to Jennings.

6    Before he says he goes, Cletus gives him $700 in cash, said

7    now don't report that.  Take that on.  Use that in your

8    campaign to buy these votes, in other words.

9         And then Jennings, of course, was irate, didn't want

10   Kennon in because he thought too many Whites were going to get

11   them beat.  And then, of course, he went to Doug Adams.  Doug

12   Adams said, well, now, look, if you want to be jailer, you

13   give me $60,000, and I'll make you jailer.  Get on my slate,

14   and we'll put the school board behind you, and you'll win.

15        Again, ultimately, Kennon White didn't go that way.

16   He stuck with his White distant cousin.  Never have been able

17   to figure out what degree cousin they are.  He can't say,

18   Jennings can't say.  It's fourth, fifth, we don't know how far

19   removed.  Nobody knows, but they've got the same last name,

20   and Kennon said because of the family connections, he couldn't

21   go against him.

22        And again, William Stivers was the last to come to

23   him for Doug Adams.  William Stivers came to him and he said,

24   you want to be on the ticket, bring 60,000.  And Kennon again,

25   he and Wanda both described they didn't go along with William

1    Stivers' offer.  They instead met with Stanley Bowling and

2    Bart Morris.  They set up 8 to 10 thousand dollars Morris

3    wanted for Manchester.  Bowling wanted 5,000 to run Harts

4    Branch.  They tried to figure out how to get Jennings'

5    support.

6            Jennings was compromised.  If you remember, Horse

7    Creek was Charles Marcum and his home ground.  He wanted

8    Charles Marcum on there so he could continue to control Horse

9    Creek.  Instead, Kennon comes on so he's got to figure out a

10   way how to I'm going to keep Kennon White happy and still stay

11   in graces with Charles Marcum.  They meet and decide to use

12   the magistrates.  Uncle Bud, convicted drug dealer, Randall

13   Wagers, Tommy Harmon, Clinton Johnson, convicted of election

14   fraud, and Jennings White all met with Kennon to discuss how

15   to include Kennon in the race.  Jennings eventually gives the

16   money to Marcum at Horse Creek, Kennon advises.

17           Kennon had to use 50 or 60 thousand.  He took part of

18   that money to Adams' group down in Oneida and South Fork.  He

19   took Mike and Paul Bishop part of his money.  He took John

20   Russell Brown another part of the money.  John Russell Brown,

21   principal down there in the Clay County School System.  John

22   Russell Brown was going to buy votes for him as well.  He

23   delivered, he said, 17 or 18 to Uncle Bud, 8 to Tommy Harmon,

24   10 to Clinton Johnson.  Stanley and he took 4,500 to Doug

25   Bowling.  Johnny Brumley, they took 5.  John Russell Brown

1    took $5,500.  Mike Bishop took 6,000, and Bart and Stanley

2    together were given $12,000.

3          Again, the early absentee voting, Bart, Debi Morris

4    and Vernon Hacker set up at Green Street, used the highlighted

5    list, had 175 to 180 voters in one day.  Jennings called and

6    said the attorney general's in town, you got to shut it down.

7    Edd Jordan stopped once to slow down the Adams faction.  Vote

8    haulers included James Goins, Pepper Gilbert, Mary Gail

9    Roberts, Billie Jean Berry, Deshae Henson and Antwan Henson.

10   Following election day, Jennings' van was shot up, Freddy's

11   house was shot inside, Billy Rowland Phillips was shot in the

12   back.  Stanley's garage and Morris's garage were used to be

13   the distribution points.

14          Obviously, he lost the election.  Doug Adams told him

15   if his money had been with him, he would be jailer.  He really

16   didn't like Charles Marcum and didn't like having to have him

17   on his ticket.

18          Maricle told him, during the time period that he and

19   Wanda went to visit him, that he thought it was time that they

20   moved to Manchester.  So, in fact, Kennon does move to

21   Manchester in June of '04, the records show.  Wanda was

22   switched over to Democrat.  Cletus said this was so she could

23   be the election officer in the upcoming race.

24          In 2004, Kennon took money again to Vernon Hacker in

25   the Barb Colter/Couch race, and they had the job situation.

1    Wanda moved into the police department, he moved over to the

2    city manager or whatever the city supervisor job that was made

3    by his father.

4         Cletus Maricle talks about how they can take over

5    control of the city.  He said you need to start appointing the

6    right people to these.  So Kennon White takes his advice and

7    he appoints Judy Maricle and Debra Morris as the ethics board,

8    among the members of the ethics board, including, I think, his

9    Aunt Barb.  And during the time period, Cletus also advised

10    the paving of private driveways should be something he should

11    get credit for so he should go along when they get pavement,

12    which Kennon does and eventually gets himself caught for that.

13         2005 and 2006, again you see Maricle meeting

14    consistently with Kennon and Wanda to discuss how to formulate

15    the slates for the Mobley race.  He wanted Wanda to serve as

16    election officer.  He agreed if Wanda would serve, he'd help

17    reelect Daugh White.

18         Again, there's corroboration for that.  Bobby "Red"

19    Sams said when he was let out of jail before the November

20    election, what was he told?  He was told to go to Wayne Jones.

21    He met Wayne Jones there.  When Wayne Jones was there, Cletus

22    Maricle was there, and he was told he was to get in there and

23    help reelect Daugh White.

24         Bobby said he didn't have anything for Daugh White,

25    because he'd had an incident with him.  But he was told

1    eventually, if he's going to get out of jail, that's what he

2    had to do, so he agreed to do it.

3           What else did he promise her?  He promised her,

4    according to Kennon, she would get a drug court job and help

5    with her brother's case.

6           Beginning of the meeting with Cletus, Wayne Jones and

7    Al Man Stivers, she discussed who was going to assist.  They

8    discussed Carl Anthony Short would be there with Wanda.  Doug

9    Adams also was contacted, Kennon says, and he agreed that

10   Wanda would be able to serve, although he thought Darnell

11   wanted Earl Pennington in.  Wayne Jones and Stivers discussed

12   how these election officers would be able to steal the votes

13   on the new machines and that basically brought birth to the

14   plan that ultimately was put in place by Wanda White and

15   Dobber Weaver.

16          Again, confirmation about how Doug Adams used Mike

17   Bishop.  He talked about, again, Kennon White admitted things

18   that Todd Roberts had advised, as well as Mike Bishop, that

19   they were trying to persuade the Whites, trying to get the

20   Adams influence.  So they met with him, sent bulldozers over

21   there, and again tried to get promotions for Mike Bishop in

22   order to gain favor with Doug Adams.

23          Ladies and gentlemen, the evidence in this case

24   continues to span over the time period.  I'm going to quickly

25   go through the rest of our timeline as it has been --

1    interesting thing about the Runion trial, again, there was the

2    verdict on September 21st.  On Monday, the 24th, Cletus

3    Maricle gets appointed circuit judge.  And then obviously,

4    September 25th is the date in which the judgment was signed.

5    The verdict actually was returned on the 21st.  And then

6    ultimately, Cletus Maricle defeats House.

7            Further things that were touched upon.  Kenny Day, of

8    course, was continuing to show appointment in '96.  He, of

9    course was arrested in Florida with seven kilos of cocaine in

10   1997.  2002, Paul Bishop is chosen to replace William Hugh

11   Bishop at the absentee booth.  Again, that's an important fact

12   because that gives Doug Adams complete control over that early

13   voting by having William "Al Man" Stivers and Mr. Bishop

14   there.

15           And again, the records reflect the date of that

16   occurrence was May the 13th.  Early voting was open from the

17   13th through the 25th.  Mike Bishop said Adams was in the

18   back, and I was cutting hay, and they came out and got him and

19   took him, and I had to end up getting up all the crop that

20   year.  He remembered it well.

21           What happened in '02?  Again, we know the primary was

22   May the 28th.  We know the November early voting period was in

23   this time period.  Wanda White said she changed registration

24   to Democrat.  The records show she did, in fact, in June,

25   2004.

1          What happened in January of '05?  Melanda Adams gets

2     hired by the Clay County clerk's office.  Wanda White applies

3     for the drug court job in February.  Melanda Adams, give you a

4     choice.  Two dates here, and I've made a mistake.  It's either

5     January 24 or February 24 of 2005, Melanda Adams was hired.

6          The other thing I want to touch on is this Eugene

7     Corky Price.  You know, she said ultimately -- through those

8     recordings we've heard, you know, there were two things that

9     you're gonna hear over and over again if you listen to those

10    tapes, if you want to listen to those again or read the

11    transcripts to assist you in that listening.  And that is

12    Wanda White is constantly saying -- Stivers is saying, well,

13    now look.  Cletus is up there, but you don't have the

14    paperwork in place.

15         There's confirmation time and time again, Corky Price

16    is in prison, he's waiting on this motion or this order, okay.

17    He's waiting on this reduction in his sentence so he could get

18    out.  That's what they were expecting.  That's what was

19    promised.  It was confirmed in the tapes.

20         We learned he pled guilty on April 28, 2005 and that

21    the trial of his co-defendants was November 28th, 2005.  And

22    guess what happens?  Wanda White doesn't get what she thought

23    she was getting.  You see, Cletus Maricle had three people to

24    try to please in this deal.  He had Stevie Collins, okay, his

25    neighbor, Stevie Collins, Jr.  His daddy was killed.  His

1    daddy was killed, and the witness of one of the daddy's murder

2    was that Natasha Saylor who got her throat cut.

3         Eugene Corky Price was supposedly assisting in that,

4    and he pled guilty to a lesser offense of five years.

5    Supposed to been probation.  The others got 30 some years for

6    their kidnapping, in effect, of what happened.  He got a deal

7    through Gary Gregory.  He didn't get released.  Why didn't he

8    get released?  Well, Charles Marcum's granddaughter's the

9    victim.  He's part of this enterprise.  So we got to protect

10   him.  And then we got Stevie Collins, Jr., his daddy is --

11   basically, this is the second witness.  One was killed before,

12   and this is the second witness, her throat's cut.

13        So I've got Stevie Collins' family to worry about,

14   who is married to Doug Adams' daughter.  I've got Charles

15   Marcum to worry about, he's in the enterprise, and I've got

16   Wanda White.  You talk about a torn man.  What does he do?  He

17   puts the Corky trial -- he gives him his plea, which is what

18   the deal was, okay.  You'll get that lesser penalty of five

19   years, but I'm not gonna let you out of jail.

20        So what does he do?  He keeps putting Wanda off and

21   off.  Eventually, he gets what he wants out of her, which is

22   she's selected as election officer, does the dirty deed for

23   Phillip and all the people that they want in, and guess what

24   happens?  We'll wait till May the 24th, 2006 to sentence Corky

25   Price.

1        We'll wait till after the election.  And obviously,

2    when was the trial?  November 28th, 2005.  Put it off all the

3    way past of the election, and she's continuing to be strung

4    along on these tapes, saying well, now, if Anthony had showed

5    up today and got that order in place, Judge Maricle, he was

6    ready.  He was ready.  He was willing.  He's ready.  No, that

7    never happened.

8        What else?  She was applying for the drug court job

9    time and time again.  Cletus, Judy, all of them are talking

10   about we know, we're going to get you a job.  We're going to

11   get you a job.  Again, corroboration of what her testimony

12   was.  Corky trial.  New machines ordered in December, '05,

13   voting machines.  We start having meetings in January, Wanda

14   says, discussing how the scheme's gonna work.  We have her

15   selected in April.

16       ES&S attempts to conduct the training at the Clay

17   County clerk's office.  Got the letter, the training memo.

18   Talked about a maelstrom.  What a maelstrom.

19       They were wanting to basically reprogram these

20   machines so that they could do what they wanted to do.

21   Training officer said that's not the way these systems are

22   supposed to be set up.  They wanted to control it, and they

23   had a fuss.  Well, they had their election and then, of

24   course, we had to have a recanvass, which was a non-issue, and

25   then the November election in 2006 was November the 7th.

1           First recordings, Wanda and Kennon White.  Again,

2      these recordings were obviously in a situation where these

3      defendants -- number one, there was nobody in Clay County,

4      unless you were just totally out of it, that didn't know that

5      the federal government was investigating this case.

6           They had a federal grand jury in the summer of 2006

7      actually bring the precinct of Delbert Roberts and Sammy

8      Gregory and some of those folks over to actually testify.

9      They'd actually done a search warrant in October of 2006 and

10     had taken documents at Halloween at the City Hall.

11          And then we had, of course, Stanley Bowling, and it

12     was talked about the first thing that Cletus Maricle and

13     Kennon White, he says, well, what do you think Stanley's going

14     to do over there?  You think he's going to go cooperate?  And

15     Cletus and he begin to further discuss this.  Said, I don't

16     want to get beat to the punch.  What does Cletus tell him?  He

17     says, well, I'll try to find out.  I'll try to find out.

18          See, they know this investigation is going on and

19     then when they start recording them, of course, the

20     conversations begin in March of 2007 and May.  And then when

21     we get, of course, the grand jury first meeting on May

22     the 3rd, 2007.  And then, of course, those recordings that we

23     talked about on May the 4th, May the 17th were they're

24     coaching Wanda White.  They're basically trying to influence

25     her testimony in that grand jury proceeding.  And then

58

1      finally, the records show, of course, the grand jury testimony

2      of Freddy Thompson occurring in July of 2007.

3             Ladies and gentlemen, I know I've not done this

4      justice.  I really hoped I could give you all a good overview

5      of this case, and this is a point where I'm going to have to

6      break.  But I will explain to you that I have not discussed

7      the controversy, the challenges to my evidence.  I've shown

8      you the jury instructions, I've tried to explain how you can

9      apply those to the facts as I recall them.  You all will

10     recall the facts.

11            At a later point in this argument, I will get a

12     chance to address some of the arguments that are going to be

13     made and challenges to the evidence, and I look forward to

14     that time to spend with you as well, and I do thank you for

15     your time this afternoon.  And I hope that I've been some help

16     and at least touching on some of these issues.  Thank you all.

17            THE COURT:  Thank you, Mr. Smith.  Ladies and

18     gentlemen, we will break for the evening before we continue

19     with further arguments of counsel.  I do want to give you a

20     little bit of information about our schedule for tomorrow.  I

21     would like to start at 8:30, if everyone can be here at 8:30.

22     Is there anyone who will have a problem with that?  If not, we

23     plan to start at 8:30 tomorrow morning with the arguments.

24            We are taking breaks, of course, to switch out our

25     court reporters.  This is very difficult, of course, taking

1    all this down without any breaks.  So I do think you'll

2    understand and you'll bear with us as we do that.  We'll take

3    a break about every hour and a half, thereabouts.

4         When you come in tomorrow, hopefully we'll have menus

5    available for you, because what I plan to do is take about a

6    30-minute lunch break so your lunches will be ordered in the

7    morning, and they'll be here by 12:00 so we can shorten the

8    lunch break up a little bit.  You can have your lunch here and

9    then we'll resume after about a 30-minute recess.

10         Again, as we break for the evening, I do want you to

11    keep in mind the admonition that you have been given several

12    times in the case.  Of course, you've heard the testimony

13    that's been presented.  You've heard part of one of the

14    arguments, but, of course, you haven't heard from everyone yet

15    so you should not be discussing the case with anyone.  Of

16    course, you should not be beginning any deliberations or

17    thoughts about how you would decide the various counts in this

18    matter.

19         Please keep in mind all the other admonitions that

20    have been given to you previously about not communicating with

21    anyone at any time about this matter.  And the jury will be

22    excused until 8:30 tomorrow morning.

23              (The jury left the courtroom at 4:44 p.m.)

24         THE COURT:  Counsel, according to my notes, Mr.

25    Smith, you've used half of your time for your argument.  We'll

```
 1    continue tomorrow with the arguments of defendants in the

 2    order that we discussed previously.  Any matters to take up

 3    outside the presence of the jury?  Mr. Westberry?

 4            MR. WESTBERRY:  Just after we break today, would you

 5    mind if I set up my laptop to do a dry run for the PowerPoint?

 6            THE COURT:  That will be fine.

 7            MR. WESTBERRY:  One other question, Judge.  When I

 8    give the closing argument on behalf of Mr. Adams, I know we've

 9    had the podium right there.  Could I have it located where it

10    ordinarily was when we pushed it?

11            THE COURT:  Yes, sir.

12            MR. WESTBERRY:  I'm looking over my right shoulder.

13    Thank you.

14            THE COURT:  That will be fine.  The only issue I have

15    is not getting it too close to the jury box.

16            MR. WESTBERRY:  Right.

17            THE COURT:  And then getting in front of the jury

18    box.

19            MR. WESTBERRY:  Not going to do that.

20            THE COURT:  If we can avoid that, that would be a

21    problem.  You can try out your equipment as well.

22            MR. PINALES:  Your Honor, I've already tried out my

23    laptop, and it does work.  With the Court's permission, Mr.

24    Hoskins will be operating that so I can be wherever you want

25    me.
```

1          THE COURT:  All right.  Just, again, you can move

2     back and forth, of course, to the overhead, to the podium, or

3     to counsel table, but if you could just avoid getting within

4     more than an arm's reach in front of the podium, I'd

5     appreciate that.  Mr. White?

6          MR. WHITE:  Yes, Your Honor.  Will there be a break

7     between Mr. Westberry and me, because I will want -- I'm not

8     going to use audio visuals.  Just want to speak directly from

9     the podium where it's located there.  And I'm worried about

10     moving it myself.

11          THE COURT:  Based upon the estimates that were given

12     to me earlier, I would anticipate that we would not take a

13     break between Mr. Pinales and Mr. Westberry's argument.  We

14     would then take a break between his argument and your

15     argument, a short break.  That would be our morning break.

16          MR. WHITE:  That would be great, Your Honor.  I'm

17     running right at, the couple times I've done it, running

18     between 30 and 40 minutes.  I can pretty much guarantee I

19     won't go over 40.  And I'm hoping tonight to get it to 30.

20          THE COURT:  That will be fine.

21          MR. WHITE:  I may be adding a thing or two.

22          THE COURT:  If you go a little bit over, that will

23     not be an issue.

24          MR. WESTBERRY:  A couple of minutes between Mr.

25     Pinales and I to set up the laptop, maybe have help from the

62

1    CSO.  That's all I'm talking about.

2            THE COURT:  I'll advise the jury we'll stay in

3    session while we set up other things.  As you know, a

4    two-minute break, if we recess, turns into a ten-minute break

5    and so we'll stay in session.  But we'll certainly allow you

6    to move your equipment around.

7            MR. WESTBERRY:  Yes, sir.

8            THE COURT:  We'll be in recess until 8:30 tomorrow

9    morning.

10            (Proceedings adjourned at 4:47 p.m.)

11                       -  -  -

12

13                C E R T I F I C A T E

14            I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
15   proceedings in the above-entitled case.

16

17    \s\ Lisa Reed Wiesman              March 22, 2010
      LISA REED WIESMAN, RDR-CRR         Date of Certification
18    Official Court Reporter

19

20

21

22

23

24

25