1

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                              - - -
3
    UNITED STATES OF AMERICA,        :  Docket No. CR 09-16-S
4                                    :
                      Plaintiff,     :  Frankfort, Kentucky
5                                    :  Tuesday, March 23, 2010
          versus                     :  9:00 a.m.
6                                    :
    RUSSELL CLETUS MARICLE,          :
7   DOUGLAS C. ADAMS                 :
    CHARLES WAYNE JONES              :
8   WILLIAM R. STIVERS               :
    FREDDY W. THOMPSON               :       Trial Day 30B
9   WILLIAM B. MORRIS                :
    DEBRA L. MORRIS                  :
10  STANLEY BOWLING,                 :
                                     :
11                    Defendants.    :

12

13                            - - -
                  TRANSCRIPT OF CLOSING ARGUMENTS
14                  BEFORE DANNY C. REEVES
          UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16  APPEARANCES:

17  For the United States:      STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.
18                              Assistant U.S. Attorney
                                601 Meyers Baker Road
19                              Suite 200
                                London, KY 40741
20
    For the Defendant           MARTIN S. PINALES, ESQ.
21  Russell Cletus Maricle:     CANDACE C. CROUSE, ESQ.
                                Strauss & Troy
22                              150 E. Fourth Street
                                Fourth Floor
23                              Cincinnati, OH  45202

24                              DAVID S. HOSKINS, ESQ.
                                107 E. First Street
25                              Corbin, KY  40701
```

2

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                               Landrum & Shouse, LLP
                                 220 West Main Street
 3                               Suite 1900
                                 Louisville, KY 40202
 4
      For the Defendant          T. SCOTT WHITE, ESQ.
 5    Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
                                 133 West Short Street
 6                               Lexington, KY  40507

 7
      For the Defendant          ROBERT L. ABELL, ESQ.
 8    William R. Stivers:        120 North Upper Street
                                 Lexington, KY  40507
 9

10    For the Defendant          RUSSELL JAMES BALDANI, ESQ.
      Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
11                               Baldani, Rowland & Richardson
                                 300 West Short Street
12                               Lexington, KY  40507

13
      For the Defendant          JERRY W. GILBERT, ESQ.
14    William B. Morris:         Coy, Gilbert & Gilbert
                                 212 North Second Street
15                               Richmond, KY 40475

16
      For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
17    Debra L. Morris:           Gess, Mattingly & Atchison, PSC
                                 201 West Short Street
18                               Lexington, KY 40507

19
      For the Defendant          DANIEL A. SIMONS, ESQ.
20    Stanley Bowling:           Thompson, Simons, Dunlop & Fore
                                 116 West Main Street
21                               Suite 2A
                                 Richmond, KY 40476
22

23

24

25
```

3

1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                  Official Court Reporter
2                                 35 W. Fifth Street
                                  P.O. Box 1073
3                                 Covington, KY  41012
                                  (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CLOSING ARGUMENT BY MR. WHITE*                                      4

1          (The jury entered the courtroom at 10:11 a.m.)

2          THE COURT:  Thank you.  All members of the jury are

3    present.  Parties and counsel are also present.

4          We will continue at this time with the closing

5    argument on behalf of defendant Charles Wayne Jones.  Mr.

6    White, you may proceed.

7          MR. WHITE:  Thank you, Your Honor.

8          THE COURT:  Mr. White.

9          MR. WHITE:  Mr. Smith, Mr. Parman, Miss Poynter,

10   Agent Blair, Agent Sagrecy and Agent Briggs.  My colleagues on

11   the defense.  And good morning.  I think it's still morning.

12         I want to pick up on something that Mr. Westberry

13   ended with.  This is not about winning or losing.  This is a

14   criminal case.  It's not a civil case.  This case is about

15   justice, and your job is to find justice in this case, and

16   that's what I want to talk to you about today.

17         I expect that Judge Reeves is going to instruct you

18   that when you took the oath, that you would decide this case

19   based on the evidence that Judge Reeves admitted and the law

20   that he will give you and then apply those to the decisions

21   you have to make in this case.  That's what we are expecting

22   you to do, and that's what I think you all know you're going

23   to do.

24         And when I talk about justice, that's exactly what

25   I'm talking about.

1        I don't need to go through all the instructions about

2   what the definition of beyond a reasonable doubt is.  I don't

3   need to go through the instructions on the United States'

4   burden of proof.  I don't have to go through the instructions

5   that my client, Wayne Jones, is presumed innocent.  You've

6   already seen that already.

7        And so what I want to do, and I'm conscious that I'm

8   kind of in the middle of the line going through, that you're

9   going to have a long day today.  So I want to focus on just a

10  few things that you haven't heard anything about yet, maybe

11  expand on a little bit, but try to be very concise.

12       Before I do that, I want to say one very important

13  thing.  We go to seminars and whatnot about how to give

14  closing arguments, and for those of us here who seem to have

15  more gray in our hair than anything, we've done this a lot.

16  And a lot of people say don't thank the jury, just get on, you

17  got a limited amount of time, go on, da-do, da-do, da-do.  I

18  do want to thank you.

19       The last time I spoke with you was on February 3rd, I

20  think.  We started jury selection on the 2nd.  I think I told

21  you in my opening statement, we are going to have a long eight

22  weeks.  And it has been.  I'm tired.  Mr. Westberry mentioned

23  he's tired.  I'd be surprised if no one was not tired,

24  including you all.  So thank you.  We're almost there.  So

25  just hang in there.

*CLOSING ARGUMENT BY MR. WHITE*                                        6

1          The other thing I mentioned at the end of my

2   closing [sic], and Mr. Smith showed you at the beginning of

3   his opening statement was this whole notion of common sense.

4   If you'll recall from my opening, if that's possible, eight

5   weeks ago, I asked you to bring your common sense.  And think

6   about the government's evidence, our evidence in the context

7   of does it make common sense?

8          With that as a background, the first thing I want to

9   talk to you about is the RICO charge, Count 1.  Judge Reeves

10  is going to tell you about the elements, and I want to focus

11  on the one that the United States must prove, that there was

12  an overall agreement to achieve a common goal.  You'll have to

13  assess this in many ways based upon circumstantial or indirect

14  evidence, because I believe as Mr. Smith said, there's no

15  written agreement where everybody came in and just signed and

16  dated.  In other words, you've got to look at the totality of

17  the circumstances.

18         Here are some things that I want to point out that

19  specifically deal with Mr. Jones in making that assessment.

20  First, Wayne Jones received not a dime from any of the City or

21  county contracts that you've heard a lot of testimony about

22  and that was discussed on that big chart that the United

23  States had.

24         In fact, Mr. Jones for 2002 through 2006 received

25  $2,900 as his statutory payment as the Democratic commissioner

*CLOSING ARGUMENT BY MR. WHITE*                                                7

1    on the Board of Elections.  The county didn't appoint him to

2    that.  The City didn't appoint him to that.  We've been

3    through the process of how the Clay County Democratic party

4    selects five names, sends them to the State Board of

5    Elections, and then the State Board selects the Democratic

6    commissioner.  And that's what happened here.

7         Wayne Jones, as I just noted, didn't get a job.  He

8    never went to work for anybody.  Wayne Jones' family didn't

9    receive a job from the City or the County or any of these

10   other folks.  Wayne Jones received no favors, no scratches on

11   the back.

12        Wayne Jones supported candidates different from other

13   folks.  We've heard tons of testimony about the 2002 election.

14   Mr. Jones supported his son-in-law, Freddy Thompson.  Others

15   supported Jennings White, who was the incumbent.  In 2006, Mr.

16   Jones supported candidates that others did not in the

17   county-wide races for sheriff and county judge executive.

18        At the beginning of this, the RICO conspiracy is

19   charged from 2002 through 2007.  In his opening yesterday, Mr.

20   Smith -- and if my recollection is different from yours, go

21   with your recollection.  I recall the United States saying

22   that Charles Wayne Jones and Al Man Stivers were sitting there

23   in the Board of Elections in 2002 controlling Clay County

24   Board of Elections.

25        That's not accurate.  In 2002, Jennings White was the

1    county clerk.  Edd Jordan was the sheriff, the county sheriff.

2    William Hugh Bishop was the Republican commissioner and Wayne

3    Jones was the Democrat commissioner.  Wayne Jones had no

4    ability to control the Clay County Board of Elections in 2002

5    whatsoever.  He had one vote.  We've heard the testimony was

6    that Jennings White controlled that, and we heard that from

7    William Hugh Bishop, who was the Republican commissioner.

8    We've heard that from other witnesses.

9         Jennings White testified that, in trying to give the

10   impression that somehow Mr. Jones exercised control over the

11   Board, he said, well, Wayne had to go along with the choice of

12   having the sheriff on the County Board, Mr. Jordan.  That's

13   not accurate at all.  That's a statutory appointment.

14        And I believe that the judge will instruct you in the

15   law, there will be some instructions on Kentucky election law.

16   And one of those instructions will be who can sit on the Board

17   of Elections and who automatically sits, and one of those is

18   the county sheriff.

19        So Wayne Jones didn't have to go along at all with

20   Jennings White.  It was automatic.

21        And speaking of Jennings White's testimony, we asked

22   him -- he was asked I think by me but maybe someone else,

23   during the 2002 election, did you see any vote buying?  And he

24   gave one example.  And this is where I get to talk about my

25   first witness.  He said, I saw Wayne Jones give Elijah Gross's

1    wife money, cash money.

2        Well if you recall, Mrs. Gross came in to testify.

3    Doris Gross is Elijah Gross's wife, and she testified she

4    never received money or sold her vote.  That was what her

5    testimony was.  Unlike Jennings White, who is a convicted

6    felon and has ample motive to testify to what he thinks would

7    help him.

8        That leads me to talk about the appointment of

9    precinct election officers.  Again, if you recall from my

10   opening statement, I tried to spend some time on that process

11   to kind of demystify it for you.  I think I used that phrase.

12       And we talked about that, and we had witnesses come

13   in, a number of witnesses came in, and I think everyone

14   essentially agreed on that process.  Again, one of the

15   instructions you're going to get is going to describe that.

16   That essentially, the Republican and the Democratic party go

17   through their own process, come up with a list of names for

18   each precinct, I think four or five names.  Those names are

19   then given to the County Board of Elections.  And from those

20   lists, you appoint four officers.  Two judges, one Democrat,

21   one Republican, a clerk, and a sheriff.  One has to be a

22   Republican, one has to be a Democrat.  That's what the law

23   says.

24       Beginning in 2004, the evidence will be that a motion

25   was made by William Hugh Bishop, who was the Republican

*CLOSING ARGUMENT BY MR. WHITE*                                        10

1      commissioner on the Clay County Board of Elections, that we

2      are going to take the top two names on each list, and those

3      are going to be the two folks per precinct.

4            In other words, we've got five names from the

5      Republican party for Harts Branch precinct.  We've got five

6      names from the Democratic party for Harts Branch precinct.

7      We're going to appoint the top two for the Democrats and the

8      top two for the Republicans.  They're going to be the election

9      officers.  That's how it happened.  Unless I'm mistaken, and

10     again go with your recollection over mine, but William Hugh

11     Bishop is not an unindicted co-conspirator.

12           The second thing I want to talk about, and again this

13     is in the context again of Count 1, the RICO conspiracy.  And

14     then kind of attached to that, I think, is Count 2, the money

15     laundering.  So I'm kind of talking about these two, is that

16     the United States has argued that Wayne Jones had a

17     relationship with, quote, known drug dealers, end quote.

18           And I believe the implication of that is that they

19     then became a funding source for this enterprise in return for

20     protection.  I want to unpack that for you.  First of all, the

21     only evidence that you have heard relating to Wayne Jones is

22     evidence from Eugene Lewis, Mansell Baker and Denver Sizemore

23     that they went in with Wayne Jones and bought a farm up in

24     Henry County and grew marijuana and that Wayne did it for a

25     couple years and sold out to another gentleman.  Of course,

1    they're all convicted felons.  Mr. Lewis and Mr. Baker are

2    obviously incarcerated.  That's their evidence.

3           But I don't want you just to rely on the fact that

4    they've got a dog in this fight to get their sentences

5    reduced.  Let me show you an exhibit we marked as CWJ-2 and

6    was introduced into evidence.  It was the mortgage.  If you'll

7    remember, Eugene Lewis testified that they bought -- they

8    bought this property from this lady's heirs.  That she died so

9    when the property became available, he and Wayne Jones and

10   either Denver Sizemore or Mansell Baker went to the

11   Manchester -- the Bank of Manchester and borrowed the money to

12   buy the property.  And he said that Wayne Jones was one of

13   them that went to the bank and signed the mortgage.

14          So we got the mortgage, and we brought it in, and we

15   showed it to Mr. Lewis.  And if you'll notice, Mr. Jones' name

16   isn't on there at all.  He had a hard time explaining that.

17   That's the evidence that Wayne Jones -- that they want to

18   extrapolate out, except there's one other thing that they

19   pointed to, and that's Kenny Day.

20          Kenny Day, again, he was the very first witness, I

21   recall.  He's a felon.  He's in prison.  Before he got to

22   prison, when he was a drug dealer in Clay County, he was a

23   daily user of crystal methamphetamine.  And as I recall his

24   testimony was several times a day for -- you go with your

25   recollection, but my recollection is it was for several years.

1          And he trafficked in thousands of pounds of

2     marijuana, and his testimony was I got this really, really

3     good customer up in Dayton who really likes fine, fine stuff.

4     So his testimony was he bought several ounces of marijuana

5     from Wayne Jones in the early '90s.  That is the totality of

6     the evidence as to Wayne Jones.

7          Two words.  Common sense.  Does that make sense?

8          I would also submit that the only protection that

9     these drug dealers received were the protection afforded to

10    them by Todd Roberts, who changed clothes to come in and talk

11    to you.  He's in prison.  Convicted felon.  Vernon Hacker,

12    Bobby Joe Curry.  They burned down that building.  Doug White.

13    Doug White didn't come testify.  That's where the protection

14    came from.  It did not come from the Clay County Board of

15    Elections or Mr. Jones serving as the Democratic commissioner

16    on that Board.  That's the evidence, folks.

17         The next thing I want to talk to you about briefly is

18    the extortion charge, which is Count 4.  The elements, you'll

19    again receive the elements in writing from the judge.  I want

20    to address two things.  One, the United States has to prove

21    that under two -- they said they had two theories.  Under

22    color of official right, meaning that Wayne Jones used his

23    office as the Democratic commissioner to do something or put

24    the fear into her of doing something -- Carmen Webb Lewis --

25    in order to get a thousand dollars.

*CLOSING ARGUMENT BY MR. WHITE*                                    13

1          If you look -- if you listen to the evidence that was

2     adduced, there was nothing said I can or cannot do for you as

3     the county commissioner, so they haven't met that element.

4     And in terms of the fear, the judge will instruct you that the

5     fear has to be of economic harm.  She was running for city

6     council.  It's an unpaid position.  There's no evidence that

7     she would have had any fear of economic loss.  And those are

8     the elements.  The government has just simply failed to meet

9     those elements.

10         The next thing I want to talk to you about are the

11    mail fraud counts, which are the conspiracy counts in which

12    mail fraud is the underlying offense, and those are Counts 3,

13    5, 6 and 7.  The U.S. argues that Wayne Jones knew the vote

14    totals that were reported by the precincts were false and so

15    that when he signed the minutes of the Board of Elections that

16    were then mailed to the State Board of Elections, that that

17    was vote fraud.

18         But again, let's pick that apart.  First, the

19    absentee voting in 2006.  You recall the testimony from Deputy

20    County Clerk Gray, and she talked about during the absentee

21    voting period in the spring primary of '06 and the fall

22    general election that the judges were almost always there,

23    which would have been Hugh Bishop and Wayne Jones.  Hugh

24    Bishop testified that he was there most of the time with Mr.

25    Jones.  Again, they were, as the county commissioner -- or the

*CLOSING ARGUMENT BY MR. WHITE*                                    14

1    party commissioners on the Board of Elections, they were the

2    two judges during absentee voting.

3           Mr. Bishop testified, William Hugh Bishop testified

4    he saw nothing inappropriate, but he also talked about the

5    location of the machine.  And that's where we've got -- we

6    used what I marked as Charles Wayne Jones Exhibit 4, which is

7    the diagram of the office.

8           And you basically go into the county clerk's office.

9    Here's Freddy Thompson's office down here.  It's got a glass

10   door.  There's a big L-shaped counter, if you will, like a lot

11   of folks have in their kitchens.  And Kennon White thought --

12   his recollection was the voting machine was back here.

13          Paul [sic] Bishop said it was here, but that it was

14   in a room that was fully glassed.  In other words, you could

15   see into it.  You have all this business going on.

16          So this notion of the secretive absentee process in

17   which folks are manipulating machines and manipulating votes

18   just doesn't stand up when you look at where it was going on,

19   that you have all these deputy clerks doing their job during

20   the regular course of business.  Just doesn't make any sense.

21   Again, common sense.

22          The next point I want to make deals with the machine

23   manipulation.  The first point I want to make is that the

24   State Board of Elections gave the county certain machines they

25   could use.  Those are the machines that they were required to

*CLOSING ARGUMENT BY MR. WHITE*                                             15

1    purchase, and we talked about that with the Help America Vote

2    Act with Sarah Ball Johnson.  Those were approved.  The county

3    purchased them.  Those are the ones that came in.

4         Of course, their argument is that in the '06

5    elections, these new machines come in, and they go from buying

6    votes to stealing votes because they've learned how to

7    manipulate these machines that have the Vote and the Cast

8    Ballot buttons.

9         The evidence has been from a young woman who came

10   in -- this is where I get to talk about my second witness.

11   Selena Smith, young woman, she wanted -- she agreed to be an

12   election officer so she could make the $75 a day, I think.

13   She had just graduated from EKU, looking for a job.

14        She went to the training that was given to her at the

15   county clerk's office, and they trained her as to what to do

16   if somebody walked away.  And you recall her testimony.  You

17   know, that did happen two or three times in both the primary

18   and the general election, and she did what she was trained to

19   do.  She got the other judge -- she was the Republican judge.

20   And this is the Garrard precinct.  This isn't the Manchester

21   precinct.  She got the other judge, and they went back to the

22   machine and they cast the ballot.  If they were able to

23   determine, in fact, that was what the voter intended to do,

24   they cast the ballot.  They didn't manipulate it or anything

25   like that.  That's what they were trained to do.

*CLOSING ARGUMENT BY MR. WHITE*                                    16

1      Now, here's what's interesting.  Wayne Jones said the

2    same thing in this trial.  You'll remember one of the last

3    recordings you got to hear was Wayne Jones on June 7th, 2007.

4    When Kennon White came over, he'd been gardening.  Mr. White

5    said that they were in this little kind of shack, kind of

6    garden shed in his back yard.  I think you all agree when you

7    listen to it, there's a lot of walking around, moving around.

8      Kennon White recorded this conversation.  And again,

9    on cross-examination, I asked the questions, and both Mr.

10   White and Mrs. White agreed they knew they were recording.

11   Mr. Jones had not a clue he was being recorded.  I'm going to

12   show you Government's Exhibit A21A, which is the transcript of

13   that recording.

14      And I'm skipping to page 7, and the first thing I

15   want to do is apologize for some of the language.  The F word

16   is used.  That's just the way it is.  That's why I asked Mr.

17   White, were there any women around.  He said no.  Sometimes

18   men use language that they otherwise wouldn't if women were

19   around.

20      At any rate, this is what he said.  Kennon White.

21   Let me start on page 6.  No, I don't doubt it.  Now let me

22   tell you something, boys.  I tell you what I believe.  I

23   believe that they've had, from what I see and what questions

24   that Wanda was asked down there, now I tell you what I think

25   they've done.  I think they've got to the point that they have

*CLOSING ARGUMENT BY MR. WHITE*                                    17

1    problems all over this country, they have them machines that

2    have that -- two steps.  I think that's where they're going to

3    have, I think that's, I think they.

4          Kennon White has brought up the subject of the voting

5    machines, okay?  He's introduced that subject.  This is his

6    big chance.

7          Jones:  Now, tell you about the machines.  Kennon:

8    They're not there no more, are they?  Jones:  They've got all

9    the same steps.  Jones:  If you can read and write now,

10   Kennon, there's no way that anybody can steal your -- vote.

11   Kennon:  I'd say after two or three times, you're right.

12   Jones:  No, no, if you can read if you can write, there's no

13   way that nobody can steal your vote.  I know, I mean,

14   there's -- now, if a fella can't read and write too good --

15         Kennon:  Or, you know, a lot of times, people get in

16   a hurry and walk off.

17         Jones:  That's, that's --

18         Kennon:  They walk and they leave it, and they leave

19   it, and then, and then --

20         Here's what Wayne Jones said when he didn't know he

21   was being recorded, talking to the guy whose wife claims that

22   he taught her how to use the machine, steal votes.  This is

23   what Wayne Jones says.  No, no -- I'm sorry.  Well, got two

24   choices then.  They can either cancel his vote or vote his.  I

25   mean, that's -- I mean, the way he votes, you know.

1          Is that what the law is?

2          Jones:  That's the law.  The two judges can cancel it

3    or agree to the vote.  Ready to vote, you know, hit that final

4    thing, vote the machine.

5          There is nothing, nothing inconsistent between what

6    Selena Smith testified to and what Wayne Jones in June, 2007

7    told Kennon White.  Why wouldn't there have been a whole

8    discussion on there -- I'm sorry, gone blind again.  Why

9    wouldn't Kennon White have gotten Wayne Jones into a whole

10   discussion about how they manipulated the machines?  He

11   introduced the topic to the conversation.

12         Again, common sense.  Use your common sense.

13         I'm running out of time so I want to hit just a

14   couple more quick points for you.  Harts Branch in 2006.

15   There was a lot -- not a lot.  There was some discussion about

16   how Mr. Jones had gone and served as the election officer, as

17   the Democratic judge at the Harts Branch precinct.

18         The first thing I want to tell you is one of the

19   instructions I believe that you're going to receive is

20   instruction number 41.  Service as election officer by a

21   member of a County Board of Elections.  Number two states,

22   Kentucky statutes do not prohibit a member of the County Board

23   of Elections from serving as a precinct election officer.  You

24   don't have to get at what the law is or let anybody else tell

25   you other than Judge Reeves.  That's what the law of Kentucky

1    is.

2            What Wayne Jones did was not illegal, improper.  They

3    just simply want to say the mere reason he was there.  That's

4    not accurate.

5            There's two other things to bear that out.  One is

6    you recall Roger Webb came in to testify.  He was running for

7    magistrate.  Harts Branch precinct does not vote in city

8    elections.  It only votes in county and statewide and national

9    elections.  It's not a city precinct.

10           Roger Webb was running for magistrate.  He was

11   sitting there, and they showed you a picture of where he was

12   sitting, and he talked about he had some problems.  He thought

13   some folks were running some folks down there.  So he called

14   the Board of Elections, the Clay County Board of Elections.

15   Next thing he knows, Wayne Jones leaves, is gone about 15

16   minutes, he comes back and says, essentially, we've looked

17   into it.  Don't have anything to worry about.

18           Mr. Webb, after a little while, left.  He didn't have

19   any more concerns.

20           The second thing, again, William Hugh Bishop, an

21   unindicted -- who is not an unindicted co-conspirator, talks

22   about in the primary election of '06 that complaints were

23   called in to the Clay County Board of Elections; specifically,

24   complaints about the Manchester precinct where Kennon and

25   Wanda White -- where Wanda White and Dobber Weaver were

1   working.  What he testified to was that Wayne Jones and

2   himself got into the car and drove down to Manchester and

3   addressed those complaints.  That was the testimony of William

4   Hugh Bishop.

5          So again, we would submit that when Wayne Jones

6   signed those Board of Elections minutes, he had -- he

7   absolutely believed that there was nothing -- that those were

8   not fraudulent results when they got mailed in.  And when you

9   look at the holes in their -- that we've been able to just

10  show just in these few minutes on the mail fraud, they have

11  not satisfied their burden.

12         I've got just a couple of minutes here.  The United

13  States -- there's two things I mentioned at the end of my

14  opening statement that I ask you to bear in mind.  Mr.

15  Westberry has very nicely touched on both of them.  One was

16  that the United States will rely heavily on convicted felons

17  or persons who received promises of no prosecution or are in

18  prison hoping to get a reduction in their sentence.  I think

19  that's been borne out from what you've seen from this witness

20  stand.

21         And just a quick word on Kennon and Wanda White.  Not

22  only are they hoping with their testimony to either not get

23  prosecuted -- Wanda White; or get a substantial reduction in

24  the sentence that they face -- Kennon White, but they also had

25  a huge stake in the '06 election.  Just themselves.  They had

1    a failed business.  They moved into Manchester.  They got jobs

2    with the City, and their jobs depended upon Doug White's being

3    mayor and winning that election.

4            I would submit to you that that's what this case is

5    really about.  It's Kennon and Wanda White trying to create a

6    whole 'nother thing based on what they've said.  Based, as Mr.

7    Pinales says, garbage in, garbage out.  They came up with a

8    theory.  Wanda White had all these pages that you saw and the

9    evidence just doesn't bear it out.

10           The last thing I said in my opening was I mentioned

11   Paul Bishop.  And I talked about that Mr. Bishop was going to

12   come testify, based on what the United States said in their

13   opening, and that Mr. Bishop's son, who basically was -- my

14   view, he was trying to save his son, who is not being

15   prosecuted.

16           And my point was -- I didn't expect to make this

17   point.  I expected that was going to be my argument in

18   closing, was that his motive for testifying about this

19   so-called meeting in the spring of 2002 was to save his son.

20   I didn't think I'd be coming up here and saying, where is Paul

21   Bishop?  Hundreds of thousands of dollars piled on a table.

22   Can you imagine what that would look like?  There's no

23   evidence.  Paul Bishop never came in here.

24           The only evidence is Mike Bishop, his son.  He wasn't

25   there.  He's just telling what his daddy told him.  That's

1   what they're relying on.  I suggest to you that in making

2   significant life decisions, that's a reasonable doubt.

3            I told you on day one that if you apply common

4   sense -- day one, that if you apply common sense to the

5   government's theory that you would acquit Wayne Jones of every

6   count against him.  That's what justice dictates in this case.

7   An acquittal.  They have not met their burden.  There is way

8   too much reasonable doubt.

9            Next time we see you, I look forward to hearing your

10  verdict.  And again, thank you all.  It's tough.  It's a tough

11  job.  We appreciate it.  Thank you.

12           Thank you, Your Honor.

13           THE COURT:  All right.  Thank you, Mr. White.

14           MR. WHITE:  If you can give me a moment, I need to

15  gather a couple of exhibits.

16           THE COURT:  Yes, sir.

17           MR. RICHARDSON:  Your Honor, may I approach the

18  clerk?  I want to give her some stuff I'm going to need for my

19  close.  Trying to save some time.

20           THE COURT:  Yes, sir.  Thank you.  Mr. Abell, you may

21  proceed on behalf of Mr. Stivers.

22           MR. ABELL:  Please the Court, ladies and gentlemen of

23  the jury.

24           THE COURT:  Mr. Abell.

25           MR. ABELL:  And all the folks here today.  We heard

1    over the course of 26 days from 108 witnesses, the vast

2    majority of which I didn't ask any questions, but I do have a

3    few points that I want to make about the charges against my

4    client, William Stivers.  And, of course, I want to begin with

5    the first two charges, which are the racketeering conspiracy

6    and the money laundering conspiracy that truly, in fact, go

7    hand in hand with one another.

8           The key to the first count, I suggest to you, is the

9    idea that Mr. Stivers and the other defendants, whether or not

10   they agreed to engage in a racketeering conspiracy where they

11   knew and agreed to join in that enterprise, is whether they

12   agreed and knew that they were going to engage in a common

13   course of conduct to serve a common purpose.

14          And I say this because I expect that the instructions

15   that Judge Reeves will read probably in the morning, but

16   perhaps this afternoon, will have language that's pretty much

17   about what's here in paragraph 2.

18          A group or association of people can be an enterprise

19   if these individuals have joined together for the purpose of

20   engaging in a common course of conduct.  This group of people,

21   in addition to having a common purpose, must have personnel

22   who function as a continuing unit.

23          Now, a couple of people have already mentioned this

24   morning that there's no written or explicit agreement by any

25   of these folks to do that.  And that, of course, is obviously

1   true.  And what y'all are going to be called upon to do is

2   assess the circumstances.  There will be a jury instruction, I

3   expect it's pretty much like paragraph 5 there, that says the

4   agreement may be inferred from all the circumstances and

5   conduct of the alleged participants.

6           Not only can the agreement be inferred, the absence

7   or lack of an agreement can be inferred from the actions,

8   conduct and statements of these alleged participants.

9           Ultimately, I think this count, these charges are

10  going to require you to assess whether, beyond a reasonable

11  doubt, these folks agreed and acted with a common purpose.  Do

12  the circumstances indicate that.

13          I suggest to you that there are two sets of

14  circumstances, so to speak, that are most relevant.  One --

15  and we deal with a time period here, 2002 to 2006.  I've asked

16  a number of questions of those witnesses that I asked

17  questions of about who supported who.

18          This conspiracy is charged to have begun in March of

19  2002, in advance of the May 2002 clerk's race.  That pitted in

20  opposition, Freddy Thompson, who is charged in the case,

21  against the incumbent, Jennings White.  We've all heard a lot

22  of testimony about the opposing slates, who supported who, and

23  who supported the opposition.

24          Kennon White, you'll recall, during his testimony

25  referred to the Freddy Thompson supporters and other

*CLOSING ARGUMENT BY MR. ABELL*                                              25

1    candidates as the other side.  So there are really two sides

2    here.

3           And the evidence indicates that the circumstances

4    regarding the support in that race broke down pretty much as

5    follows.  Supporting Freddy Thompson and his folks were my

6    client, Mr. Stivers, Wayne Jones, Doug Adams, and, of course,

7    Freddy Thompson himself.  On the other hand, supporting the

8    other side and the group of folks who were on that side, that

9    include jailers and judge executives and sheriffs and whatnot,

10   on the Jennings White side were Bart Morris, Debi Morris, and

11   Stanley Bowling.

12          The next significant race, I suggest, during this

13   time period is in 2004, in May again there was a primary.  The

14   candidates were Tim Couch, who, we learned, won in 2002,

15   beating Barbara White Colter, and he was opposed again in 2004

16   by Barbara White Colter who was seeking to gain her seat back.

17          The testimony came from Agent Briggs that supporting

18   Mr. Couch for reelection was Mr. Adams.  The testimony also

19   from Mr. Briggs was supporting Barbara White Colter was

20   Stanley Bowling and Wayne Jones.  Kennon White testified that

21   Bart Morris and Debi Morris also supported Barbara White

22   Colter.

23          Now, at the end of this, the next election cycle is

24   2006.  And I asked a number of questions about the county

25   judge race in May.  You'll recall there's three leading

1    candidates, Johnny "Poss" Gregory, Carl, whom we know is

2    referred to as Crawdad Sizemore, and the incumbent, James

3    Garrison, who testified here last week, I believe.

4         And according to Kennon White, among these three

5    candidates, the support broke down roughly as follows.  My

6    client, Mr. Stivers, supported Mr. Gregory, who is his uncle.

7    Supporting Mr. Sizemore, Stanley Bowling and Wayne Jones.

8    Supporting Mr. Garrison, Bart Morris and Debi Morris.  Now, I

9    haven't mentioned every defendant with regard to every race.

10   It appears that some of these folks were indifferent or

11   whatever their support was is unknown.  There hadn't been

12   testimony about it in any event.

13        But my suggestion to you is that when there is

14   competition, there is not a common purpose.  We know in our

15   state this year, we have a U.S. Senate race.  Republicans are

16   running a man named Rand Paul and Trey Grayson.  Democrats are

17   running Danny Mongiardo and Jack Conway.  Now, each of those

18   candidates in a general sense has a common purpose.  They all

19   want to get elected to the United States Senate, and they all

20   want you to vote for them.  But in no sense, no one in their

21   right mind would call those competitors co-conspirators

22   working for a common purpose or plan.

23        Similarly, here, when you have support for opposing

24   candidates, and the idea is to gain political power, and you

25   get jobs and contracts and whatnot.  When you're in

1    competition, common sense tells you that there is not the

2    common purpose and plan that you're required to find under

3    Count 1.

4          The second set of circumstances was yesterday, Mr.

5    Smith said that the point was the control of the Board of

6    Elections.  And he made two comments in the course of his

7    remarks yesterday that show how the government's theory is

8    flawed and truly in conflict with itself.

9          He mentioned that -- or he asserted in 2002 that my

10   client, Mr. Stivers, and Wayne Jones had control of the Board

11   of Elections.  Now, we know in 2002 that Jennings White was

12   the clerk still.  He continued to serve through that year.  We

13   know that he was allied with Edd Jordan, the sheriff, also on

14   the Board of Elections.

15         Later in his remarks yesterday, Mr. Smith said that

16   in 2004, the so-called enterprise had control of the Board of

17   Elections because Freddy Thompson was the clerk, had two

18   votes, a tie-breaking vote if necessary, and Wayne Jones also

19   served on the Board so he could win anything he wanted, 3-2.

20   Now, if that's true, if you have the clerk and an ally and you

21   have control, as Mr. Smith told you all yesterday is the case

22   in 2004 for these folks, then the opposite is true in 2002

23   when you have Jennings White, the clerk, with his ally Edd

24   Jordan, the sheriff, or his wife serving in his stead.  You

25   have the three votes and you have the control.

*CLOSING ARGUMENT BY MR. ABELL*                                        28

1              Interestingly, in 2004, when this so-called

2       enterprise is supposed to have control over the Board of

3       Elections and, therefore, the capacity to dictate whomever and

4       whatever it wanted to serve as election officers, they took

5       action as reflected in the Board minutes.  It's Exhibit 16M,

6       that gave the selection authority to the local parties, the

7       Republican and Democratic party, and I'll show you what I

8       mean.

9              What we have here, these are minutes from the Board

10      of Elections, March 19, 2004.  It's Exhibit 16M, which you'll

11      be able to look at if you wish.  What the Board decided that

12      day was that a motion was made to pick the number one and

13      number two people submitted by the party list as the election

14      officers for the various precincts.

15             Now, if this enterprise served to get a stranglehold

16      on the selection of precinct officers and election officers,

17      what they would be doing would be centralizing that selection

18      authority.  But instead, here on Exhibit 16M, you see the

19      selection authority being decentralized.  We'll let the

20      parties submit lists.  Whoever's number one and number two,

21      we'll make a selection just based off that.

22             Somebody else, somebody else from these parties,

23      whoever those persons may be, the Clay Bishops or the precinct

24      captains for the Republicans will know who those folks are.

25      But the selection authority, in fact, here in 2004, at the

*CLOSING ARGUMENT BY MR. ABELL*                                        29

1      point where this enterprise is supposed to have a stranglehold

2      on the selection process, is divested and decentralized from

3      the Board of Elections to the local parties.

4              Because of the competition going on between these

5      varying competing candidates and the decentralization of the

6      selection authority that's set forth here in Exhibit M, my

7      suggestion to you is that the evidence does not establish the

8      common purpose, a unit of people functioning as a continuing

9      unit to gain a stranglehold over the Board of Elections.  It

10     indicates people supporting candidates they prefer for

11     whatever reasons, but not the conspiracy that you're required

12     to find under Count 1, the RICO charge in this indictment.

13              Now, going hand in hand --

14              THE COURT:  Mr. Abell, could you speak up a little

15     bit?  I think some of the jurors are having a hard time.

16              MR. ABELL:  I sound loud to me.  Excuse me.  Thank

17     you, Judge.

18              Going hand in hand with Count 1 is the money

19     laundering Count 2.  I've already explained why I don't

20     believe that you can find that there was a conspiracy that my

21     client or, frankly, any of these other people participated in

22     as to Count 1, and those same reasons apply to Count 2, the

23     money laundering, but there's a couple of additional points I

24     want to make on Mr. Stivers' behalf.

25              Mr. Smith spoke yesterday about the need to make an

*CLOSING ARGUMENT BY MR. ABELL*                                    30

1    investment and the yield of return.  There's been no evidence

2    of any sort that Mr. Stivers made any type of monetary

3    investment in this so-called enterprise.  Exhibit M15 was

4    introduced through Agent Sagrecy.  It was titled Summary of

5    Total Payments to Defendants and Related Businesses and came

6    up to $4 million.  Conspicuous by his absence from that list

7    was my client, Mr. Stivers, and there's no allegation either

8    that he made, as Mr. Smith put it yesterday, any investment,

9    and certainly the proof is there was no monetary return.

10          There was not a conspiracy amongst these people to

11   engage in any common course of conduct to control the Board of

12   Elections.  Given the support for the competing candidates,

13   given the decentralization of the selection authority, there

14   was no investment by Mr. Stivers in any money laundering

15   scheme, and certainly there was no return.

16          So for those reasons and those reasons alone, I

17   suggest to you that the proper verdict and the really the only

18   verdict as to Mr. Stivers on Counts 1 and 2 is not guilty.

19          Count 4 is important to Mr. Stivers.  It charges

20   extortion.  This evidence comes almost exclusively, if not

21   exclusively, from Carmen Webb Lewis.  She testified, in

22   essence, that it was suggested to her by Mr. Stivers that she

23   give Vernon Hacker a thousand dollars and that although she

24   would allow it was not said, she testified that she understood

25   that thousand dollars she was to give to Vernon Hacker would,

CLOSING ARGUMENT BY MR. ABELL                                          31

1    in turn, be distributed to unknown voters of some sort out

2    there.

3           Now, I'm going to ask you, with regard to Count 4, to

4    engage in a reasoned and deliberative process regarding that

5    charge.  Mr. White touched on it some, and I frankly just have

6    to repeat a little bit of what he said, so bear with me.

7           You'll find in the instructions that there's two ways

8    to consider that or for the government to prove that charge.

9    One regards a color of official right.  Basically, that means

10   that money is sought in return for the taking or withholding

11   or influencing of official action.

12          Now, even if it were assumed that Mr. Stivers were a

13   public official, there's no evidence that anyone was going to

14   take or not take action in their official capacity.  Meaning,

15   for instance, think of an example where a building permit --

16   for a thousand bucks, we'll see that your building permit is

17   approved.  That would be an example of taking official action.

18   Or alternatively, a thousand bucks will see that your

19   competitor's building permit is not approved.  That would be

20   withholding of official action.

21          Now, I'll grant that Vernon Hacker was at the time a

22   city councilman.  But the action that, according to the

23   evidence, that he was supposed to take wasn't as a city

24   councilman.  It wasn't him to vote on an ordinance or any type

25   of application with a city agency.  It was an action,

*CLOSING ARGUMENT BY MR. ABELL*                                    32

1   according to the evidence, that he was to take on an

2   individual basis.

3          There is no evidence that either Mr. Stivers or Mr.

4   Jones were proposing or suggesting that they would do anything

5   in any office, election officer or otherwise, that they held.

6   So the proof is simply not there as to that way to prove

7   extortion.

8          The other way regards fear.  And not just any kind of

9   fear, a particular and specific kind of fear.  Fear of

10  economic harm.  You'll get a jury charge much like that.  And

11  it tells you there's three -- gives you three examples of fear

12  of economic harm.  One is a direct loss of money.  There's no

13  evidence that Miss Lewis feared that she would lose money if

14  she didn't pay this thousand dollars to Vernon Hacker.

15         Another example is damage to future business or

16  business operations.  And there's no evidence that Miss Lewis

17  feared that any business she was operating, its operations

18  might be hampered in the future if she failed to give this

19  thousand dollars to Vernon Hacker.

20         And the final example regards the loss of ability to

21  compete in the economic marketplace in the future.  And again,

22  there's no evidence that she feared a loss of her company or

23  any business she was affiliated with would be compromised if

24  she did not give this thousand dollars to Vernon Hacker.

25         Suggest to you, ladies and gentlemen, that the

*CLOSING ARGUMENT BY MR. ABELL*                                          33

1    elements of this crime, under the law as defined to you, as

2    given to you by Judge Reeves, the government cannot and will

3    not be able to meet its burden of proof, and not guilty is the

4    verdict proper to return as to Count 4.

5           Now, Count 8 deals with obstruction of justice.  I

6    want to talk about the May 17th, 2007 recording.  I said in my

7    opening statement a few weeks ago that that recording is key

8    to that charge.  It is Exhibit 19A, I believe.  The transcript

9    is A19A.  Of course, the recording is the evidence, not the

10   transcript.  We'll use the transcript now, because it's

11   helpful.  I want to review just parts of it briefly.

12          Thirteen times during the course of about a 20-,

13   25-minute conversation, Mr. Stivers tells Wanda White, tell

14   them the truth, don't lie to them.  So let's look at that.

15          Page 4.  Stivers:  Tell them the truth.  That's the

16   only thing you can tell them.  Just watch how you tell it to

17   them.

18          Page 11, third time.  Answer truthfully.  Don't lie.

19          Page 12, again.

20          Page 15, two more times.  Up to seven.

21          Page 16, number eight.

22          Page 17, number nine.

23          Page 20, numbers 10 and 11.

24          Page 31, number 12.

25          Page 32, finally and once again, answer truthfully.

1    Now, it's a short conversation.  You heard enough of

2    those recordings to know that these folks are friendly.  The

3    Whites came to the Stivers' residence on frequent occasions,

4    had dinner.  You heard conversations where they gossip and

5    talk about different people in town and whatnot.  That day,

6    the 17th, if you recall from the recording, they're outside.

7    You can hear dogs barking, you can hear a rooster crowing in

8    the background.  You can hear machinery running as a ditch

9    gets dug, apparently.

10    But during about a 20- or 25-minute conversation, Mr.

11    Stivers, those 13 times -- and please listen to the recording.

12    That is the evidence.  Repeated over and over again, can't go

13    in there and lie to them.  You got to tell them the truth.

14    Ladies and gentlemen, couple of the other lawyers

15    have talked about reasonable doubt, and in these

16    circumstances, given that repeated directive over and over

17    again, "tell the truth, you can't lie to them," the

18    government -- the evidence does not establish beyond a

19    reasonable doubt that Mr. Stivers was endeavoring to influence

20    her testimony in an improper way.

21    He recognized this lady, he did not know he was being

22    taped.  He was in a difficult position, was having to

23    ultimately give her the advice that he knew she had to follow,

24    which was you just got to go in there and tell the truth.

25    At times, as Mr. Smith mentioned yesterday, there are

*CLOSING ARGUMENT BY MR. ABELL*                                     35

1    statements that cut the other way.  But still, the vast

2    majority of the statements, the great weight of the

3    instructions given there are to tell the truth and go in there

4    and do what you have to do, no matter how hard it might be.  I

5    suggest to you the only verdict you can return on Count 8 also

6    is not guilty.

7            Now, Mr. Stivers is charged in Counts 10 and 11,

8    which deal with 2006.  There's really not much for me to say,

9    because there's really not much evidence.  We know in 2006,

10   Mr. Stivers supported Johnny "Poss" Gregory for county judge

11   executive.  We know that he's supposed to be tied in some way

12   with Wanda stealing votes and Dobber Weaver stealing votes.

13   We know they supported Crawdad Sizemore, because Mr. Weaver

14   wanted to get a job if Mr. Sizemore won the election.

15           But in terms of what Mr. Stivers is supposed to have

16   done, he wasn't involved in any alleged coaching regarding

17   using the machines or anything like that.  It was a

18   county-wide race.  The Manchester precinct where she was

19   working had very little impact on a county-wide race.

20   Testimony was also that he was active and supported Phillip

21   Mobley, who, the evidence shows, won an overwhelming victory

22   for property valuation administrator.

23           Now, it goes hand in hand with 11, Count 11, which

24   also deals with 2006.  There's testimony from Kennon White

25   that Mr. Stivers, in the fall, had been in a four-wheel

1    accident and was laid up and unable to do anything.  11 links

2    Mr. Stivers in with Bart and Debi Morris, and the evidence

3    that he had anything to do with them or any interest in their

4    affairs has been as close to zero as you can get.  There's no

5    indication of any contacts.

6            Kennon White did make an allegation that a lady named

7    Stacey Perkins connected Mr. Stivers to the Morrises.  Stacey

8    Perkins didn't come in and testify and corroborate that.

9            What happened in 2006 is Wanda and Kennon realized

10   that Doug White faced a tough election for mayor in 2006.

11   They worked hard with Dobber to gain support, perhaps, for Mr.

12   Sizemore.

13            Mr. Weaver testified that Kennon came by his house

14   sometimes daily so they could make their precinct look good in

15   that May, 2006 election, presumably -- it makes logical

16   sense -- in the hopes of creating some type of goodwill and

17   extra support for Doug White in the mayor's race in the fall

18   of 2006, which, of course, didn't work out.

19            But the evidence regarding activities of Mr. Stivers

20   as it pertains to 2006 is practically nonexistent at best.

21   And therefore, I suggest to you the proper verdict on those

22   counts as well is not guilty.

23            Three other minor points.  We've talked about an

24   arrest and lawsuit.  Mr. Stivers got arrested in October of

25   2002 because he complained about Jennings White violating the

*CLOSING ARGUMENT BY MR. ABELL*                                    37

 1    law in appointing the Weavers to serve as election officers.

 2    He got charged with alcohol intoxication.

 3            The police officer, Jeff Culver, who arrested him at

 4    Todd Roberts' direction acknowledged that Mr. Stivers wasn't

 5    intoxicated at the time, didn't appear to be, even though the

 6    charge required that you be manifestly under the influence.

 7    It was a case of false arrest ordered by Todd Roberts at the

 8    direction of Jennings White.

 9            Resulted in a lawsuit, settlement of a lawsuit.  City

10    had an insurance policy.  Insurance company selected the

11    lawyers.  They assessed what had happened correctly, settled

12    the case.  No secrets about it.  Among the instructions,

13    you'll find settlement of a civil lawsuit with a municipality

14    is subject to disclosure under Kentucky's open records law.

15    So there's no sneaky business in Clay Circuit Court about

16    that.  That was just a bad decision by a police officer who

17    did something he shouldn't have done at Jennings White's

18    direction.  And it's hard to think, when you're a victim of an

19    unlawful abuse of power by the police, you're an instigator.

20    There's nothing unusual about that.

21            On the recording of 4/9/07, this was referenced

22    yesterday in regard to jury tampering.  Please listen to that.

23    Please listen to part of that recording that is supposed to

24    touch on that topic.  You'll find in that part of the

25    recording laughter, cutting up, exaggeration.  It's not a

*CLOSING ARGUMENT BY MR. RICHARDSON*                                38

1    credible suggestion that anybody intends to tamper with any

2    jury.  It's people setting around the supper table cutting up

3    is what it is, not evidence of anything wrong.

4          Those are the remarks I have for you today.  I ask

5    you, as to Counts 1, 2, 4, 8, 10 and 11, to return a verdict

6    of not guilty for my client, William Stivers.  Thank you.

7          THE COURT:  Thank you, Mr. Abell.

8          Thank you, Mr. Richardson, you may present your

9    argument on behalf of defendant Freddy Thompson.

10          MR. RICHARDSON:  Thank you, Your Honor.  I'm going to

11    use a moment to set up.

12          MR. BALDANI:  Judge, would it be okay if my legal

13    assistant sits here to help operate the PowerPoint?

14          THE COURT:  Yes.

15          MR. RICHARDSON:  I want to move this over, if I may.

16          THE COURT:  You'll need to have the court security

17    officer assist you.

18          MR. RICHARDSON:  Thank you.

19          THE COURT:  You may proceed.

20          MR. RICHARDSON:  Thank you, Judge.  Ladies and

21    gentlemen, colleagues, ladies and gentlemen of the jury.

22    Every day in life, we make decisions.  From the moment we get

23    up in the morning, decide what we're going to wear that day,

24    to what we're going to have for lunch, to whether we're going

25    to stop at Cheers on the way home and have a drink with our

*CLOSING ARGUMENT BY MR. RICHARDSON*                                    39

1    friends.  Every day, we make little decisions as we go through

2    life.

3          Sometimes, you have to make those major decisions in

4    life.  Am I going to take the job here?  Am I going to get

5    married?  Am I going to have a family?  Decisions that affect

6    not only you, but those around you.  And soon, you're going to

7    have to make a decision that affects Freddy Thompson's life.

8          And my concern here today, and has been the whole

9    time we've been here, is Freddy Thompson.

10         Freddy deserves your independent consideration.  An

11   independent decision.  Even though he's tried with the other

12   people during this trial, the other seven defendants, he

13   deserves that independent consideration.  And that's because

14   Freddy stands apart from the other seven defendants.

15         There's been testimony that several of them had been

16   involved in politics for several years.  Not so with Freddy.

17   He was involved in politics in 2002 as a candidate and then,

18   basically, very limited testimony that he was ever involved

19   after that.

20         There have been allegations -- and I'm not saying

21   that they're true, but there have been allegations of drugs

22   and drug dealers and association with.  Not so with Freddy.

23   The only allegation that Freddy had with any of the people who

24   got up there and admitted they were dealing drugs was he was

25   on Eugene "Mutton" Lewis's baseball team when he was a little

*CLOSING ARGUMENT BY MR. RICHARDSON*                              40

1    kid.  And I tell you what, drug dealers in a small community

2    like Clay County, they know their clientele.  They know who's

3    playing the game, who's out there getting high.  Not Freddy.

4           There's a lot of testimony of other bad acts,

5    indiscretions, crimes in the past.  Not saying it's true.

6    Testimony about witness tampering, jury tampering, marijuana

7    cultivation.  Not against Freddy.

8           None of that was linked to Freddy Thompson.  There

9    was no evidence of any bad acts, indiscretion, or other crimes

10   other than what is charged in this indictment.

11          You got to think about that.  You've got a parade of

12   drug dealers, miscreants, felons who got up here and said

13   whatever they wanted to say to try to get their sentence

14   reduced, try to help themselves get out of prison, get that

15   free pass.  And in spite of that, they didn't have anything

16   bad to say about Freddy.

17          Vernon Hacker said, I love Freddy Thompson.  I would

18   have been for him, but I just couldn't.  Robyn Pennington,

19   admitted vote buyer and vote hauler, got up here and said I

20   was shocked to hear that Freddy was drug into this.  There's

21   somebody who would know who's playing the game.  Not Freddy.

22          Freddy stands apart, and he deserves your independent

23   consideration.

24          Now, as I go through my closing argument, I'm going

25   to try to be organized, I'm going to try to be thorough, and

1    I'm going to try to be accurate, and I'm going to go into some

2    details.  I don't want to bore you and drag it out, but I'm

3    going to have to go into some details that I think are

4    important.

5              As I do that, as I review this testimony, I'm going

6    to be relying on my memory.  And if my memory differs from

7    your memory, then by all means, I want you to use your memory.

8              During the presentation, I'm going to remind you of

9    several -- a few things that the government said in their

10   opening statement that they were going to prove to you to show

11   that Freddy was guilty.  And I'm going to show you the

12   government failed what they promised you in their opening.

13             And a lot of times, they failed by their own

14   witnesses.  Their own witnesses are going to be what I'm going

15   to use to show you that they failed.

16             I want to talk to you about what we've termed the

17   government's smoking guns, the things that -- there's that

18   meeting in '02, this illicit training, the illegal training of

19   Wanda and Dobber.  These voter assistance forms.  This tape,

20   "I think I'm in trouble."  They're smoking guns, and how

21   they've been refuted.

22             I want to talk to you about some of the smoke screens

23   that the government put up.  Red herrings, if you will.

24   Issues interjected in here just to confuse you and mislead

25   you.  And when they're blown away, they don't support the

*CLOSING ARGUMENT BY MR. RICHARDSON*                                    42

1    government's case.

2           I'm going to finally show you, as to each individual

3    charge that Freddy's charged with, that the government has

4    failed to convince you beyond a reasonable doubt that Freddy

5    is guilty, and there's only one verdict, and that's not

6    guilty.

7           I remember years ago in law school, they said you got

8    the facts, argue the facts.  You don't have the facts, argue

9    the law.  The United States, in their opening, argued the law.

10          I want to start with smoking gun number one, meeting

11   in 2002 at Paul Bishop's garage.  There were three people who

12   testified from that witness stand that were actually at Paul

13   Bishop's garage that evening.  One of them was Mike Bishop,

14   the son of Paul Bishop.  And he said, I was there at the

15   start.  I wasn't there very long.  I left when Charles Marcum

16   showed up, because I was supporting Kennon, because I had to.

17   But while I was there, there was no mention of money, no

18   pooling of money, and no mention of vote buying.  So it was

19   just an ordinary meeting there.  Nothing sinister.

20          Randy Craft got on the stand, told you he was there

21   for about 30, 45 minutes.  No mention of money, no pooling of

22   money, no mention of vote buying.  Nothing sinister.

23          Woodrow "Dick" Woods got on the stand and told you

24   about that meeting.  There for about 45 minutes.  Freddy

25   Thompson was there at some point.  He doesn't know if he was

*CLOSING ARGUMENT BY MR. RICHARDSON*                                    43

1    there when he got there.  He doesn't know if he was there when

2    he left.  He just knows he was there at some point.  There

3    were some people sitting around a table, and there's a couple

4    guys over there working on a boat.

5            He'll tell you that there was the mention of money.

6    Charles Marcum said, I'm not a rich man or I'm a poor man.  I

7    think I can raise $10,000.  No pooling of money.  No

8    discussion of vote buying.  Just that one mention of money.

9            Two guys working on a boat.  You're going to have

10   this illegal meeting with all your power brokers and throw all

11   this money on the table, would you have two guys working on a

12   boat, and you're going to put 150 to 200 thousand dollars on

13   the table?  Common sense, folks.

14           Then we have Paul Bishop.  Did not testify, but

15   supposedly was there.  And he's the one, through Mike Bishop,

16   said yeah, dad told me there's 150 to 200 thousand dollars

17   pooled on that table there.  And he went like this, like

18   there's a big pile of money.  Think about that.  It's not like

19   it's a big poker game, and the money's mound up there.  People

20   are not just coming in, throwing big mounds of money.  Here's

21   a shoe box with 10,000 or whatever.  But they wouldn't be

22   piled up like this.  Doesn't make sense.

23           And you got to think about Paul Bishop and his

24   motive, because we know this about Paul Bishop.  His son, Mike

25   Bishop, went over there on April 14, 2008 and admitted to the

*CLOSING ARGUMENT BY MR. RICHARDSON*                                    44

1    FBI that he was involved in vote buying.  So what does Paul

2    Bishop do?  What any father would do.  He goes over to the FBI

3    and he says, let my son go.  I'll tell you, I'll tell you a

4    story.  And he tells them a story.  Tells them something they

5    want to hear.  And Mike Bishop gets immunity.  So I think you

6    have to take that testimony with a grain of salt.

7            And I want you to remember, political meetings,

8    they're not illegal.  In fact, you'd be crazy if you were to

9    run as a candidate, didn't have a political meeting, get my

10   supporters together, let's talk about who we need to see and

11   so forth.  So that's perfectly legit.  Having a slate of

12   candidates is perfectly legit.  I mean, that's what the

13   Democratic and Republican parties do every four years.  This

14   is our slate.

15           Raising money to achieve your legitimate goals is not

16   illegal, pooling money by candidates is not illegal, and vote

17   hauling is not illegal.  The only thing that's illegal, vote

18   buying.  Never mentioned at this meeting by anybody, including

19   what Mike Bishop supposedly his daddy told him.  He just said

20   there was a bunch of money there.

21           The government wants you to get this sinister idea of

22   this meeting, and the evidence does not support it.

23           I want to go to what I term smoking gun number two.

24   And that is this illicit training that happened in May of '06.

25   The only evidence of illicit training came from two witnesses,

1    Wanda White and Dobber Weaver.  And I want to talk about Wanda

2    White first.  Wanda White went to the government on

3    March 27th, 2007, had a meeting with the FBI and told them

4    everything she knew about election fraud.  Didn't mention

5    Freddy Thompson in this illicit training.

6            That night, she goes out, they make their first tape

7    recording.  Then she has a comprehensive, chronological

8    summary, a big, written -- she's a secretary, has a

9    secretarial position, said she wanted to be greatly in detail,

10   very thorough.  This chronological, comprehensive summary of

11   election fraud.

12           So we asked her the question, while she was on

13   cross-examination, Russ said, let's talk about this

14   comprehensive, chronological summary.  And in there, you

15   detailed everything?  Yes, I did.  Very thorough?  Yes, I did.

16   Secretarial?  Yes.  And in that, you did not mention that

17   Freddy Thompson gave you this illicit training.  Well, I don't

18   know, I don't know.  I can't remember.

19           So we took a lunch break while she set up there and

20   went through all that, okay?  Came back and got her to agree

21   that twice in there, she had mentioned the illicit training

22   and said that Wayne Jones had gave her the illicit training.

23           All right.  The government came back and said, well,

24   there was other notes and written material that you submitted,

25   and you didn't look through that?  No.  They made it act like

*CLOSING ARGUMENT BY MR. RICHARDSON*                                46

1    somewhere in these other notes and material that she had

2    written, that it was in there that Freddy Thompson had done

3    this machine, had showed her how to manipulate the machine.

4    Remember that, the questions they asked?  They never once

5    pulled out and said, all right, this note right here, there it

6    is.  Freddy Thompson told you.  Never did that, did they?

7    That's a smoking gun right there.

8            They wanted you to think that there was something in

9    those other notes and materials.  She had all lunch to look

10   through them all.  There wasn't nothing.

11           So then Wanda goes to the grand jury on May 3rd, 2007

12   and is asked specifically, did someone direct you -- and Russ

13   had to go through her grand jury testimony, and it came out in

14   the grand jury, did someone direct you and show you how you

15   could do that?  Talking about manipulating the machine.  And

16   her answer was Wayne Jones did.  Didn't say Freddy Thompson.

17           Lo and behold, they bring her back to the grand jury

18   nine weeks later.  July 12, 2007.  Page 4, it came up.

19   page 4.  So that means they got through the introductory, who

20   she is, da, da, da, da, da.  First substantial question, who

21   taught you how to manipulate that machine?  Wayne Jones and

22   Freddy Thompson taught me how.

23           Come on.  Fourth time she talked to them, asked the

24   same question.  She was asked nine weeks later, and her answer

25   changed.

1          Want to talk about Dobber Weaver.  Dobber Weaver goes

2     to the grand jury on May -- excuse me, talks to the FBI on

3     May 1st, 2007 and denies everything.  Don't know what you're

4     talking about, didn't do nothing, da, da, da, da.  Then comes

5     back on October 2nd, 2007, and he can tell -- I guarantee you,

6     he could tell the writing on the wall because at that point,

7     he admits, I stole people's vote.  I was for Crawdad Sizemore.

8     I did wrong, was in the vote buying.  Told all his sins but

9     failed to mention Freddy Thompson teaching him how to

10    manipulate the machine.

11         Comes back eight days later and they do another

12    interview with him, and lo and behold, Freddy Thompson and --

13    Wayne Jones and Freddy Thompson taught me how to manipulate

14    the machine.  So I submit to you, you have to review that

15    testimony very carefully.

16         And remember what Wanda White told you.  Wanda White

17    said Dobber Weaver's my friend.  We've been long time friends.

18    Went to high school together.  Don't want to hurt Dobber

19    Weaver.

20         Well, after Dobber -- somehow, Dobber knew the

21    writing was on wall when he went back on October 2nd, 2007,

22    and I submit to you that Wanda White went to her friend and

23    said, Dobber, it's up.  You better get on board or you're

24    gonna get steamrolled.  And so Dobber got on board.  But she

25    forgot to tell him, tell them about Freddy Thompson

*CLOSING ARGUMENT BY MR. RICHARDSON*                                48

1    manipulating the machine, because we need to be -- our stories
2    need to be together.
3           Now, he'd already blown the voter assistance forms,
4    but they could still get Freddy and the manipulation of the
5    machine, Freddy and Wayne.  So I want you to look at that.
6           MR. SMITH:  Your Honor, I'm going to object to
7    counsel referring to this supposition as facts of this case.
8    I believe that that's a misstatement to say that that's
9    evidence.
10          THE COURT:  Sustained.
11          MR. RICHARDSON:  I agree, Judge.  Sorry about that.
12          THE COURT:  Sustained.  The jury will understand, of
13   course, that this is argument of counsel and not a summary of
14   facts.
15          MR. RICHARDSON:  And I think one of the things that
16   you're going to look at -- well, Wanda had a motive to lie.
17   So did Dobber.  Wanda was never charged in this case.  Her
18   sins were forgiven by the United States government.  Got
19   immunity.
20          And one of the instructions that I believe the Judge
21   will read you is instruction about immunity, witnesses with
22   immunity.  And it says that you can consider this testimony
23   with more caution.  Do not convict a defendant based upon the
24   unsupported testimony of a witness standing alone -- of such a
25   witness, immunity witness, standing alone unless you believe

*CLOSING ARGUMENT BY MR. RICHARDSON*                              49

1    his or her testimony beyond a reasonable doubt.  So the law

2    recognizes that people who get immunity, you have to view that

3    with caution.

4         Wanda White also has the additional motivation is to

5    keep Kennon out of jail.  You know, they went from living high

6    on the hog to her, you know, needing both those incomes.  So

7    she's got an additional motivation, to keep Kennon out of

8    jail.

9         Dobber Weaver, he's got a motivation.  He wants to

10   stay out of jail.  And Dobber Weaver told you, in

11   cross-examination, I want to put it behind me.  And, you know,

12   he did it because of my kids.  He did the deed while he had

13   his kids.  He did it for greed.  He did it because he wanted

14   that job with Crawdad Sizemore.  That's why he did it.  And he

15   didn't put it behind him.  He wanted to get out of trouble is

16   what he wanted, and that's his motivation.

17        And I want to note once again is brought out, so

18   you've got two election officers out of 80 who said this

19   illicit training went down.  Nobody else testified about that.

20   And you got to think, they had motivation of their own to be

21   election officers.  Wanda White was going to be -- Wanda

22   White, her whole family paycheck was on the line.  You got to

23   be election officer for all year.  So Wanda had her whole

24   family paycheck.  Dobber was coming up for the fight of his

25   life in November of '06.  So she needed to be on there in

1    November of '06.  Dobber wanted to be there in May of '06 so

2    he could get Crawdad in there so he could get that 911 job.

3          So they had their own reasons to be election

4    officers, not just being the puppets of the government's

5    conspiracy.

6          And think about this.  They had to have a teaching

7    session at the machine to learn how to manipulate the machine.

8    You go in there to the machine, you press your button, you hit

9    a Vote button.  And once the Vote button comes down, it says

10   review ballots.  Review your ballot so if you made a mistake,

11   you could go back and change it.  Go back and change it, and

12   then hit Cast Ballot.  How much teaching do you need to know

13   if they can just hit the Vote button and if it says review

14   ballot, if you can get them away from there, you can review

15   that ballot, go back, change it how you want it and hit Cast

16   Ballot.  They don't need a lot of education.  Guarantee you.

17         So going to go back to the illicit training again.

18   The Help America Vote Act, new voting machines fiscal court

19   purchased.  Only four approved machines in the state, and Clay

20   County was one of only five counties that had all new

21   machines.  Sarah Ball Johnson told you that with the County

22   State Board of Elections.

23         The evidence was that Freddy Thompson didn't design

24   that voting machine, didn't purchase that voting machine, and

25   didn't approve that voting machine.  In fact, you'll look at

1        his sheriff's report and that is Exhibit 16Q or, excuse me,

2        F1, which is Freddy Thompson 1.  And it says down there, you

3        can't really read, but it says change the program of the new

4        machine so that it makes the voter cast ballot after they hit

5        the vote button.  Change the program.  That's what Freddy put

6        down on his election report.  I want to change that thing.

7              Is that the only thing?  No.  This is an e-mail that

8        is Government Exhibit PR16Q.  It's an e-mail from the ES&S

9        people to Joe Bolton, who I don't know if it came up, but he's

10       with the Kentuckiana.

11             But it ends up in Freddy's office and basically the

12       e-mail says, hey, due to HAVA, we can't change that machine.

13       And that's dated a few days after the election, May 23rd,

14       2006.  So what does that tell you?  Freddy was looking after

15       the mess.  Freddy was looking to change the machine.  He

16       didn't approve it.

17             Next.  And the government in their opening said

18       nobody was familiar with that machine in town so they had a

19       duty to educate the people.  Unfortunately, they abused that

20       authority.  They begin to teach corrupt election officials on

21       how to steal votes.  That was their opening statement.

22             Now, number one, there was never a duty.  They didn't

23       introduce anything that said there was a duty for Freddy to

24       educate anybody.  But he took that duty upon himself.  Put the

25       machine outside his office for the 30 days leading up to the

*CLOSING ARGUMENT BY MR. RICHARDSON*                                      52

1    May primary.  Went to the newspaper.  Put in the newspaper on

2    May 4th, May 11th, May 15th, show you just one of them.  Put

3    that in the newspaper.  Unfortunately, it's titled Voter's

4    Cheat Sheet, but that wasn't our doing.  But he put that in

5    the paper.

6            And I want to go to number 10.  "After casting the

7    ballot, the screen will display a message verifying the vote

8    and thanking you for your vote.  Unless you see this screen,

9    your ballot has not been cast."

10           So he does that.  Fire departments.  We know from

11   Jason Sams and even Dobber Weaver, county fish fries, fire

12   departments have them for raising money.  Freddy is taking the

13   machine out there.  Senior citizen home, Carmen Webb Lewis,

14   taking it there.  Republican Women's Club, Shirley Bishop,

15   took it there.  Said hey, you want to bring it out there?  I'd

16   love to bring it out there, show you.  Wal-Mart, Clay White,

17   Wal-Mart.  Clay White was running for magistrate or something

18   in '06.  Hey, I want you to bring the machine out here on a

19   Saturday, your day off.  Said he was out there for four or

20   five hours, grabbing people.  Here, let me show you this

21   machine.

22           Karen Lawson, the reading celebration.  Clay County

23   Reading Celebration.  Sent him a flyer said hey, we're looking

24   for a donation.  Freddy calls her and says hey, can I bring

25   the machine out?  Can you get me some space so I can bring the

*CLOSING ARGUMENT BY MR. RICHARDSON*                               53

1    machine out, show people?  Five thousand people.  Freddy's out

2    there showing them the machine.

3         So now you got to think, Freddy Thompson conspired

4    with Wanda and Dobber?  If that's true, to steal these votes,

5    why did he go to such extraordinary lengths to show this

6    machine around town?  They're competing objectives.  Educate

7    the voter or steal his vote.  They don't logically reconcile

8    together, coincide together.  They're opposites.

9         So therefore, the question comes, who do you believe,

10   Wanda White and Dobber Weaver or Carmen Lewis, Shirley Bishop,

11   Jason Sams, Karen Lawson, Clay White.  And I note the last

12   thing that the United States said to Karen Lawson on that

13   stand is, keep up the good work.  That's the people that came

14   to testify for Freddy.

15        Smoking gun number three, voter assistance forms.

16   What are voter assistance forms?  Well, Wanda says they're

17   missing.  Blind, physical disability or can't read.  That's

18   it.  That's the only three times you can fill them out.

19        Election day setup.  Talked about that.  You've got

20   the clerk, who's got the sign-in roster sitting at the table.

21   Signs them in.  Sheriff takes care of the order of the place,

22   makes sure not too many people get in and keeps order in the

23   place.  The Democrat and Republican judge are back with the

24   machine, basically making sure the machine's set up right in

25   the primary, because there are Democratic primary and a

*CLOSING ARGUMENT BY MR. RICHARDSON* 54

1    Republican.  So they've got to put in the thing and set the

2    machine up for Democratic voter or set the machine up for a

3    Republican voter, so they're back by the machine.

4            The sign-in, all the voter assistance forms or all

5    the stuff to sign in is up there by these things, and you know

6    that because in their Exhibit PR17 and PR25E, we have the

7    voter assistance forms for Manchester precinct.  You look at

8    those forms and they're all signed by -- in May, Anthony Short

9    or Lucy Marcum.  And in November, they're signed by Minnie

10   Weaver and Lucy Marcum.  Okay?

11           So what that tells you is those forms are up there by

12   the front, and they're the ones signing in the voter

13   assistance forms.  Lucy Marcum -- the election officers in May

14   in the Manchester precinct were Wanda and Dobber, election

15   judges.  Lucy Marcum was the clerk, May and November.  And

16   Anthony Short was there in May and Minnie Weaver was there in

17   November.

18           And like I said, you look to those voter assistance

19   forms, they're all signed by the clerk and the sheriff.  So

20   what happens at the end of the day?  At the end of the day,

21   all of the material is gathered up, everybody's left.  The

22   polls are closed, you got to shut down the machine, you got to

23   print off the tape from the machine, gather up all the voter

24   assistance forms and all the other voter affirmation forms,

25   pencil, paper, all the paraphernalia, and you've got to sign

1    off on the ballot sheet and send it back to the clerk's

2    office.

3            So what did Wanda White tell you?  Wanda White says

4    her and Dobber Weaver were the judges.  They were back by the

5    machines.  You'd know a paid voter because he'd ask for you by

6    name.  And I submit that the testimony wasn't that the voter

7    came in and said "hey, Wanda, hey."  They're committing a

8    crime.  So they come back and go "hey, I'm supposed to ask for

9    you" so Wanda would know that they were a paid voter.  So when

10   they got back to the machine where she was, "hey, I'm supposed

11   to ask for you."  That was how it worked, and she'd vote them.

12           She was told not to complete any voter assistance

13   forms, because that would leave a paper trail.  And at this

14   point, she's committing a crime so she's not going to want to

15   commit a paper trail.

16           And her excuse was because there were lawyers in

17   line.  Well, we got her to admit there's one lawyer, Scott

18   Madden, at one point in line.  How long did it take him to

19   vote?  Said she filled out 20-plus in May and another 20-plus

20   in November.  And on cross-examination, she gave names of

21   people whose voter assistance forms were missing.  Not a one

22   of them took that stand there and said, yeah, Wanda White

23   filled out my voter assistance form, and it's not there, and I

24   think you need to look at that.

25           Once again, this is uncorroborated testimony of Wanda

1    White.  So I want tell you the truth of the voter assistance

2    forms.  Number one, they do leave a paper trail for both Wanda

3    White, Dobber Weaver and the voter.  All of them are breaking

4    the law.  They don't want to get caught.  So when the voter

5    goes back and says, hey, I'm supposed to ask for you, Wanda

6    White's back there by the machine, says oh, let me go get a

7    voter assistance form and walk back up front?  That's going to

8    be more suspicious than just voting the guy.  Doesn't make

9    sense.

10         And she had complete privacy.  She didn't want to

11   admit that on the stand.  Russ said, well, you had complete

12   privacy.  Well, no, just between you and me.  He said, well,

13   let's get the grand jury testimony out where you said you had

14   complete privacy.  Oh, yeah, but they could hear.  Hey, Wanda,

15   you're supposed to vote me.  They're back in the back.  Nobody

16   can see them.  It doesn't make sense.  It's more suspicious if

17   you go fill out these voter assistance forms than it is if you

18   just vote the person.  Nobody can see you back there.

19         And then we get to Dobber Weaver.  Dobber Weaver says

20   Anthony Short, at the end of the day, just threw them in the

21   trash.  He just took the voter assistance forms and threw them

22   in the trash.  Did it in May of '06.  I think he did it in '04

23   too.

24         And another thing I thought was important was the

25   fact that Wanda White, when asked at the grand jury, here's

1   the voter assistance form, where do you sign this form?  And

2   she didn't know.  She'd filled out 40 of these forms and

3   didn't know where she was supposed to sign them.

4        Now, it's given that Freddy can only turn in what was

5   returned to him.  And I want to say, you know, I submit to you

6   that she didn't fill out all of these voter assistance forms

7   that she said she did.

8        But let's for sake of argument say yeah.  I'm sure

9   Dobber told her that he saw Anthony Short throw them away so

10  she knew that some of them were gone.

11       So the end of the day of November of '06, she once

12  again filled them out.  Again, 20-plus.  She's there with the

13  three other election officers.  She's just committed a crime.

14  And at this point, she didn't want to get caught, and she's

15  left this paper trail.

16       Nobody else there.  Why trust someone down the road

17  to throw away evidence of your crime?  You throw your own

18  evidence away is what you do.  You pitch them in the trash.

19  Clean up your own mess.  And that way, she would know that

20  voter assistance forms were missing, and she could blame

21  Freddy.

22       Freddy can only turn in what was turned in to him.

23  Voter assistance forms.  But we got one more.  Al Man on the

24  tape.  Freddy took care of it.  "Him and Freddy took care of

25  it," talking about Wayne Jones.  And I got two reasons why Al

*CLOSING ARGUMENT BY MR. RICHARDSON*                                    58

1    Man would say that.  Number one is at this point, Wanda and

2    Kennon are acting scared, going to the grand jury, and for

3    some reason

4    Al Man wants to keep -- oh, don't worry about that.  Just keep

5    the company line.  Don't worry about that.  You know, keep the

6    company line.

7           Or number two.  Take you back to tape A13A, the

8    transcript.  And on page 63, it's Judge, it's Judge Maricle,

9    Kennon and Wanda White, and they're laughing about Al Man.

10   And they're telling you that Al Man is what my daddy always

11   called a puffer.  And a puffer is somebody that if you tell a

12   story, he's got a better story.  If your fish is that big, his

13   fish is this big.  And he's always gotta one up you.  He's

14   always got to be the big man on campus.

15          And the judge is telling you, in his own words,

16   that's exactly what Al Man is.  He wants to envision himself

17   as being the center of every major thing that ever happened,

18   and he will sit there and tell stuff on his self that I know

19   he didn't do.  And that's just how Al Man is.

20          Not saying he's a bad guy.  He's probably a lot of

21   fun to be around.  But that's the kind of guy.  He's a puffer.

22   So their smoking gun number three, the voter assistance forms,

23   they haven't proven to you that Freddy destroyed those voter

24   assistance forms.  I submit to you they never were given in

25   the first place, and if they were, they were signed in the

1    first place, they were destroyed by Wanda and Anthony Short.

2            Smoking gun number four.  Freddy Thompson's

3    statement, "I think I'm in trouble."  Happened on May 1st,

4    2007.  Kennon White comes into Freddy Thompson's office and

5    they have a little discussion.  And they're not close friends,

6    folks.  Kennon said that.  We don't go to his house, but I

7    stopped by.  And 18 minutes into a 22-minute conversation,

8    supposedly, Freddy Thompson says, "I think I'm in trouble."

9    And what is his response?  "Well, I hope it's not."  Doesn't

10   make sense, folks.  "I hope it's not"?

11           I think I'm in trouble.  I think there's trouble.

12   Well, I hope not.  That makes sense.  I think I'm in trouble.

13   Well, I hope it's not.  Makes no sense.

14           And then I said to Kennon White on cross-examination,

15   I said, you didn't ask why?  He said, are you saying I missed

16   my opening?  Well, yeah!  You're there for one reason and one

17   reason only, and that's to get Freddy Thompson to admit his

18   bad deeds.  And if Freddy Thompson says I think I'm in

19   trouble, Kennon White's response would be why?  Why do you

20   think you're in trouble?  I hope it's not.  And then they go

21   on and talk albuterol inhaler for asthma.

22           So I submit to you that the rest of the tape, he

23   says, why does -- in talking about Phillip Mobley getting

24   subpoenaed to the grand jury, he says -- and he said, well,

25   Phillip's lawyer has the subpoena.  He said, what does Phillip

*CLOSING ARGUMENT BY MR. RICHARDSON*                                     60

1    need a lawyer for?

2            And remember in that jury instruction that the United

3    States went over, they said intent, inferring required mental

4    state.  And I anticipate this is what the judge is going to

5    give you.  There's no way the defendant's state of mind can be

6    proven directly because no one can read a person's mind and

7    tell you what that person was thinking.  But number three of

8    that says a defendant's state of mind can be proven indirectly

9    from the surrounding circumstances.  This includes things like

10   what the defendant said, what the defendant did, how the

11   defendant acted, and any other facts or circumstances in

12   evidence that show what was on the defendant's mind.

13           If Freddy Thompson's involved in this complex

14   conspiracy scheme with Phillip Mobley and the rest of them to

15   do all these votes and stuff, when he said, well, Phillip's

16   got a lawyer, and he said, what does Phillip need a lawyer

17   for, that shows you Freddy's state of mind.  There's nothing

18   going on.  I think that is evidence that shows that Freddy has

19   that innocent state of mind.

20           But let's go on down --

21           THE COURT:  We'll stop at this point for our lunch

22   break, if you're about to go to another point.

23           MR. RICHARDSON:  I'm going to finish up smoking gun

24   number four, which is "I think I'm in trouble," probably

25   another five or six minutes to finish this one.

1          THE COURT:  All right.

2          MR. RICHARDSON:  Thank you.  What else is in that

3    tape?  Two times, Kennon White mentions the voter assistance

4    forms.  What about the voter assistance forms?  What did you

5    guys do with them?  They're right back there.  Got to store

6    them in a box for 22 months.  That's it.  Then he goes back

7    again and goes, well, the only thing that worries me is them

8    assistance forms.  Are they all there?  All those that were

9    brought here.  Anything they brought here is right back there.

10          Here's Freddy, naive guy, doesn't expect that he's

11   being secretly recorded.  None of that duplicity stuff.  And

12   he's telling them, they're right back there.  If he's part of

13   this conspiracy and part of the deal and Kennon's part of the

14   deal, maybe he's saying, shoot, I hope they don't come back

15   for those.  Common sense.

16          So on the tape, Freddy answers those allegations

17   about the voter assistance forms.  Now, Kennon White didn't

18   ask him about that illicit training on that May 1st tape, and

19   they only did one tape.  They didn't send Wanda White in there

20   to say, hey, Freddy, I'm worried about this illicit training

21   you gave me.  Scared about that.  They're going to ask about

22   that.

23          Well, the reason is this taping started on March 27,

24   went to June 7, all right?  This tape happened on May 1st.

25   Ended on June 7th.  I submit to you on June 7th, she hadn't

*CLOSING ARGUMENT BY MR. RICHARDSON*                                    62

1    told them Freddy gave them the illicit training.  She didn't

2    tell them that till July of '07.  That's why there's no tape

3    from Wanda White going in there and saying I'm wondering about

4    this voter assistance, this illicit training.

5         So you're going to have two statements from Freddy

6    Thompson.  Number one is A10A, the transcript, and A10, which

7    is the tape of that secretly recorded meeting.  You'll have

8    his grand jury testimony of July 12th, 2007, and that's sworn

9    testimony before the grand jury.

10        And I submit to you, both of those statements support

11   Freddy Thompson's assertion of innocence in this case.

12        I'll break at this point, and we'll have a little

13   lunch.  Thank you.

14        THE COURT:  Ladies and gentlemen, we will take about

15   a 30-minute recess at this time for our lunch break.  I

16   believe the lunch has been delivered at this point.  Again,

17   please keep in mind the admonitions that you were given

18   previously.  The jury will be excused for 30 minutes.

19             (The jury left the courtroom at 12:06 p.m.)

20        THE COURT:  Thank you.  Mr. Richardson, you've used

21   45 minutes of the time you requested.  We'll resume at 12:35

22   this afternoon.

23             (Proceedings recessed at 12:07 p.m.)

24                      - - -

25

63

C E R T I F I C A T E

        I, LISA REED WIESMAN RDR-CRR, certify that the
foregoing is a correct transcript from the record of
proceedings in the above-entitled case.


 \s\ Lisa Reed Wiesman                 March 23, 2010
LISA REED WIESMAN, RDR-CRR          Date of Certification
Official Court Reporter

64

1                                        INDEX

2
Closing argument by Mr. White...................... Page 4

3
Closing argument by Mr. Abell...................... Page 22

4
Closing argument by Mr. Richardson................. Page 38

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25