1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF KENTUCKY
2          SOUTHERN DIVISION at LONDON
                     - - -
3

UNITED STATES OF AMERICA,          :  Docket No. CR 09-16-S
4                                  :
                    Plaintiff,     :  **Frankfort, Kentucky**
5                                  :  Tuesday, March 23, 2010
      versus                       :  9:00 a.m.
6                                  :
RUSSELL CLETUS MARICLE,            :
7  DOUGLAS C. ADAMS                :
   CHARLES WAYNE JONES             :
8  WILLIAM R. STIVERS              :
   FREDDY W. THOMPSON              :      **Trial Day 30B**
9  WILLIAM B. MORRIS               :
   DEBRA L. MORRIS                 :      **Excerpted Transcript**
10 STANLEY BOWLING,                :      **Closing by Mr. White**
                                   :
11                 Defendants.     :

12

13                   - - -
           TRANSCRIPT OF CLOSING ARGUMENTS
14           BEFORE DANNY C. REEVES
      UNITED STATES DISTRICT COURT JUDGE and a jury
15                   - - -

16  APPEARANCES:

17  For the United States:      STEPHEN C. SMITH, ESQ.
                                JASON D. PARMAN, ESQ.
18                              Assistant U.S. Attorney
                                601 Meyers Baker Road
19                              Suite 200
                                London, KY 40741
20
    For the Defendant           MARTIN S. PINALES, ESQ.
21  Russell Cletus Maricle:     CANDACE C. CROUSE, ESQ.
                                Strauss & Troy
22                              150 E. Fourth Street
                                Fourth Floor
23                              Cincinnati, OH  45202

24                              DAVID S. HOSKINS, ESQ.
                                107 E. First Street
25                              Corbin, KY  40701

2

```
1    For the Defendant          R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
2                               Landrum & Shouse, LLP
                                220 West Main Street
3                               Suite 1900
                                Louisville, KY 40202
4
     For the Defendant          T. SCOTT WHITE, ESQ.
5    Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
                                133 West Short Street
6                               Lexington, KY  40507

7
     For the Defendant          ROBERT L. ABELL, ESQ.
8    William R. Stivers:        120 North Upper Street
                                Lexington, KY  40507
9

10   For the Defendant          RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
11                              Baldani, Rowland & Richardson
                                300 West Short Street
12                              Lexington, KY  40507

13
     For the Defendant          JERRY W. GILBERT, ESQ.
14   William B. Morris:         Coy, Gilbert & Gilbert
                                212 North Second Street
15                              Richmond, KY 40475

16
     For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
17   Debra L. Morris:           Gess, Mattingly & Atchison, PSC
                                201 West Short Street
18                              Lexington, KY 40507

19
     For the Defendant          DANIEL A. SIMONS, ESQ.
20   Stanley Bowling:           Thompson, Simons, Dunlop & Fore
                                116 West Main Street
21                              Suite 2A
                                Richmond, KY 40476
22

23

24

25
```

3

1    Court Reporter:                  LISA REED WIESMAN, RDR-CRR
                                      Official Court Reporter
2                                     35 W. Fifth Street
                                      P.O. Box 1073
3                                     Covington, KY  41012
                                      (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CLOSING ARGUMENT BY MR. WHITE*                                                4

1          (The jury entered the courtroom at 10:11 a.m.)

2          THE COURT:  Thank you.  All members of the jury are

3     present.  Parties and counsel are also present.

4          We will continue at this time with the closing

5     argument on behalf of defendant Charles Wayne Jones.  Mr.

6     White, you may proceed.

7          MR. WHITE:  Thank you, Your Honor.

8          THE COURT:  Mr. White.

9          MR. WHITE:  Mr. Smith, Mr. Parman, Miss Poynter,

10    Agent Blair, Agent Sagrecy and Agent Briggs.  My colleagues on

11    the defense.  And good morning.  I think it's still morning.

12         I want to pick up on something that Mr. Westberry

13    ended with.  This is not about winning or losing.  This is a

14    criminal case.  It's not a civil case.  This case is about

15    justice, and your job is to find justice in this case, and

16    that's what I want to talk to you about today.

17         I expect that Judge Reeves is going to instruct you

18    that when you took the oath, that you would decide this case

19    based on the evidence that Judge Reeves admitted and the law

20    that he will give you and then apply those to the decisions

21    you have to make in this case.  That's what we are expecting

22    you to do, and that's what I think you all know you're going

23    to do.

24         And when I talk about justice, that's exactly what

25    I'm talking about.

1        I don't need to go through all the instructions about

2   what the definition of beyond a reasonable doubt is.  I don't

3   need to go through the instructions on the United States'

4   burden of proof.  I don't have to go through the instructions

5   that my client, Wayne Jones, is presumed innocent.  You've

6   already seen that already.

7        And so what I want to do, and I'm conscious that I'm

8   kind of in the middle of the line going through, that you're

9   going to have a long day today.  So I want to focus on just a

10  few things that you haven't heard anything about yet, maybe

11  expand on a little bit, but try to be very concise.

12       Before I do that, I want to say one very important

13  thing.  We go to seminars and whatnot about how to give

14  closing arguments, and for those of us here who seem to have

15  more gray in our hair than anything, we've done this a lot.

16  And a lot of people say don't thank the jury, just get on, you

17  got a limited amount of time, go on, da-do, da-do, da-do.  I

18  do want to thank you.

19       The last time I spoke with you was on February 3rd, I

20  think.  We started jury selection on the 2nd.  I think I told

21  you in my opening statement, we are going to have a long eight

22  weeks.  And it has been.  I'm tired.  Mr. Westberry mentioned

23  he's tired.  I'd be surprised if no one was not tired,

24  including you all.  So thank you.  We're almost there.  So

25  just hang in there.

1          The other thing I mentioned at the end of my

2    closing [sic], and Mr. Smith showed you at the beginning of

3    his opening statement was this whole notion of common sense.

4    If you'll recall from my opening, if that's possible, eight

5    weeks ago, I asked you to bring your common sense.  And think

6    about the government's evidence, our evidence in the context

7    of does it make common sense?

8          With that as a background, the first thing I want to

9    talk to you about is the RICO charge, Count 1.  Judge Reeves

10   is going to tell you about the elements, and I want to focus

11   on the one that the United States must prove, that there was

12   an overall agreement to achieve a common goal.  You'll have to

13   assess this in many ways based upon circumstantial or indirect

14   evidence, because I believe as Mr. Smith said, there's no

15   written agreement where everybody came in and just signed and

16   dated.  In other words, you've got to look at the totality of

17   the circumstances.

18         Here are some things that I want to point out that

19   specifically deal with Mr. Jones in making that assessment.

20   First, Wayne Jones received not a dime from any of the City or

21   county contracts that you've heard a lot of testimony about

22   and that was discussed on that big chart that the United

23   States had.

24         In fact, Mr. Jones for 2002 through 2006 received

25   $2,900 as his statutory payment as the Democratic commissioner

*CLOSING ARGUMENT BY MR. WHITE*                                             7

1    on the Board of Elections.  The county didn't appoint him to

2    that.  The City didn't appoint him to that.  We've been

3    through the process of how the Clay County Democratic party

4    selects five names, sends them to the State Board of

5    Elections, and then the State Board selects the Democratic

6    commissioner.  And that's what happened here.

7         Wayne Jones, as I just noted, didn't get a job.  He

8    never went to work for anybody.  Wayne Jones' family didn't

9    receive a job from the City or the County or any of these

10   other folks.  Wayne Jones received no favors, no scratches on

11   the back.

12        Wayne Jones supported candidates different from other

13   folks.  We've heard tons of testimony about the 2002 election.

14   Mr. Jones supported his son-in-law, Freddy Thompson.  Others

15   supported Jennings White, who was the incumbent.  In 2006, Mr.

16   Jones supported candidates that others did not in the

17   county-wide races for sheriff and county judge executive.

18        At the beginning of this, the RICO conspiracy is

19   charged from 2002 through 2007.  In his opening yesterday, Mr.

20   Smith -- and if my recollection is different from yours, go

21   with your recollection.  I recall the United States saying

22   that Charles Wayne Jones and Al Man Stivers were sitting there

23   in the Board of Elections in 2002 controlling Clay County

24   Board of Elections.

25        That's not accurate.  In 2002, Jennings White was the

*CLOSING ARGUMENT BY MR. WHITE*                                        8

1    county clerk.  Edd Jordan was the sheriff, the county sheriff.

2    William Hugh Bishop was the Republican commissioner and Wayne

3    Jones was the Democrat commissioner.  Wayne Jones had no

4    ability to control the Clay County Board of Elections in 2002

5    whatsoever.  He had one vote.  We've heard the testimony was

6    that Jennings White controlled that, and we heard that from

7    William Hugh Bishop, who was the Republican commissioner.

8    We've heard that from other witnesses.

9          Jennings White testified that, in trying to give the

10   impression that somehow Mr. Jones exercised control over the

11   Board, he said, well, Wayne had to go along with the choice of

12   having the sheriff on the County Board, Mr. Jordan.  That's

13   not accurate at all.  That's a statutory appointment.

14         And I believe that the judge will instruct you in the

15   law, there will be some instructions on Kentucky election law.

16   And one of those instructions will be who can sit on the Board

17   of Elections and who automatically sits, and one of those is

18   the county sheriff.

19         So Wayne Jones didn't have to go along at all with

20   Jennings White.  It was automatic.

21         And speaking of Jennings White 's testimony, we asked

22   him -- he was asked I think by me but maybe someone else,

23   during the 2002 election, did you see any vote buying?  And he

24   gave one example.  And this is where I get to talk about my

25   first witness.  He said, I saw Wayne Jones give Elijah Gross's

*CLOSING ARGUMENT BY MR. WHITE*                                                    9

1   wife money, cash money.

2          Well if you recall, Mrs. Gross came in to testify.

3   Doris Gross is Elijah Gross's wife, and she testified she

4   never received money or sold her vote.  That was what her

5   testimony was.  Unlike Jennings White, who is a convicted

6   felon and has ample motive to testify to what he thinks would

7   help him.

8          That leads me to talk about the appointment of

9   precinct election officers.  Again, if you recall from my

10  opening statement, I tried to spend some time on that process

11  to kind of demystify it for you.  I think I used that phrase.

12         And we talked about that, and we had witnesses come

13  in, a number of witnesses came in, and I think everyone

14  essentially agreed on that process.  Again, one of the

15  instructions you're going to get is going to describe that.

16  That essentially, the Republican and the Democratic party go

17  through their own process, come up with a list of names for

18  each precinct, I think four or five names.  Those names are

19  then given to the County Board of Elections.  And from those

20  lists, you appoint four officers.  Two judges, one Democrat,

21  one Republican, a clerk, and a sheriff.  One has to be a

22  Republican, one has to be a Democrat.  That's what the law

23  says.

24         Beginning in 2004, the evidence will be that a motion

25  was made by William Hugh Bishop, who was the Republican

*CLOSING ARGUMENT BY MR. WHITE*                                          10

1  commissioner on the Clay County Board of Elections, that we

2  are going to take the top two names on each list, and those

3  are going to be the two folks per precinct.

4        In other words, we've got five names from the

5  Republican party for Harts Branch precinct.  We've got five

6  names from the Democratic party for Harts Branch precinct.

7  We're going to appoint the top two for the Democrats and the

8  top two for the Republicans.  They're going to be the election

9  officers.  That's how it happened.  Unless I'm mistaken, and

10 again go with your recollection over mine, but William Hugh

11 Bishop is not an unindicted co-conspirator.

12       The second thing I want to talk about, and again this

13 is in the context again of Count 1, the RICO conspiracy.  And

14 then kind of attached to that, I think, is Count 2, the money

15 laundering.  So I'm kind of talking about these two, is that

16 the United States has argued that Wayne Jones had a

17 relationship with, quote, known drug dealers, end quote.

18       And I believe the implication of that is that they

19 then became a funding source for this enterprise in return for

20 protection.  I want to unpack that for you.  First of all, the

21 only evidence that you have heard relating to Wayne Jones is

22 evidence from Eugene Lewis, Mansell Baker and Denver Sizemore

23 that they went in with Wayne Jones and bought a farm up in

24 Henry County and grew marijuana and that Wayne did it for a

25 couple years and sold out to another gentleman.  Of course,

*CLOSING ARGUMENT BY MR. WHITE*                                                    11

1     they're all convicted felons.  Mr. Lewis and Mr. Baker are

2     obviously incarcerated.  That's their evidence.

3          But I don't want you just to rely on the fact that

4     they've got a dog in this fight to get their sentences

5     reduced.  Let me show you an exhibit we marked as CWJ-2 and

6     was introduced into evidence.  It was the mortgage.  If you'll

7     remember, Eugene Lewis testified that they bought -- they

8     bought this property from this lady's heirs.  That she died so

9     when the property became available, he and Wayne Jones and

10    either Denver Sizemore or Mansell Baker went to the

11    Manchester -- the Bank of Manchester and borrowed the money to

12    buy the property.  And he said that Wayne Jones was one of

13    them that went to the bank and signed the mortgage.

14         So we got the mortgage, and we brought it in, and we

15    showed it to Mr. Lewis.  And if you'll notice, Mr. Jones' name

16    isn't on there at all.  He had a hard time explaining that.

17    That's the evidence that Wayne Jones -- that they want to

18    extrapolate out, except there's one other thing that they

19    pointed to, and that's Kenny Day.

20         Kenny Day, again, he was the very first witness, I

21    recall.  He's a felon.  He's in prison.  Before he got to

22    prison, when he was a drug dealer in Clay County, he was a

23    daily user of crystal methamphetamine.  And as I recall his

24    testimony was several times a day for -- you go with your

25    recollection, but my recollection is it was for several years.

*CLOSING ARGUMENT BY MR. WHITE*                                    12

1    And he trafficked in thousands of pounds of

2    marijuana, and his testimony was I got this really, really

3    good customer up in Dayton who really likes fine, fine stuff.

4    So his testimony was he bought several ounces of marijuana

5    from Wayne Jones in the early '90s.  That is the totality of

6    the evidence as to Wayne Jones.

7    Two words.  Common sense.  Does that make sense?

8    I would also submit that the only protection that

9    these drug dealers received were the protection afforded to

10   them by Todd Roberts, who changed clothes to come in and talk

11   to you.  He's in prison.  Convicted felon.  Vernon Hacker,

12   Bobby Joe Curry.  They burned down that building.  Doug White.

13   Doug White didn't come testify.  That's where the protection

14   came from.  It did not come from the Clay County Board of

15   Elections or Mr. Jones serving as the Democratic commissioner

16   on that Board.  That's the evidence, folks.

17   The next thing I want to talk to you about briefly is

18   the extortion charge, which is Count 4.  The elements, you'll

19   again receive the elements in writing from the judge.  I want

20   to address two things.  One, the United States has to prove

21   that under two -- they said they had two theories.  Under

22   color of official right, meaning that Wayne Jones used his

23   office as the Democratic commissioner to do something or put

24   the fear into her of doing something -- Carmen Webb Lewis --

25   in order to get a thousand dollars.

1      If you look -- if you listen to the evidence that was

2  adduced, there was nothing said I can or cannot do for you as

3  the county commissioner, so they haven't met that element.

4  And in terms of the fear, the judge will instruct you that the

5  fear has to be of economic harm.  She was running for city

6  council.  It's an unpaid position.  There's no evidence that

7  she would have had any fear of economic loss.  And those are

8  the elements.  The government has just simply failed to meet

9  those elements.

10      The next thing I want to talk to you about are the

11  mail fraud counts, which are the conspiracy counts in which

12  mail fraud is the underlying offense, and those are Counts 3,

13  5, 6 and 7.  The U.S. argues that Wayne Jones knew the vote

14  totals that were reported by the precincts were false and so

15  that when he signed the minutes of the Board of Elections that

16  were then mailed to the State Board of Elections, that that

17  was vote fraud.

18      But again, let's pick that apart.  First, the

19  absentee voting in 2006.  You recall the testimony from Deputy

20  County Clerk Gray, and she talked about during the absentee

21  voting period in the spring primary of '06 and the fall

22  general election that the judges were almost always there,

23  which would have been Hugh Bishop and Wayne Jones.  Hugh

24  Bishop testified that he was there most of the time with Mr.

25  Jones.  Again, they were, as the county commissioner -- or the

1    party commissioners on the Board of Elections, they were the

2    two judges during absentee voting.

3           Mr. Bishop testified, William Hugh Bishop testified

4    he saw nothing inappropriate, but he also talked about the

5    location of the machine.  And that's where we've got -- we

6    used what I marked as Charles Wayne Jones Exhibit 4, which is

7    the diagram of the office.

8           And you basically go into the county clerk's office.

9    Here's Freddy Thompson's office down here.  It's got a glass

10   door.  There's a big L-shaped counter, if you will, like a lot

11   of folks have in their kitchens.  And Kennon White thought --

12   his recollection was the voting machine was back here.

13          Paul [sic] Bishop said it was here, but that it was

14   in a room that was fully glassed.  In other words, you could

15   see into it.  You have all this business going on.

16          So this notion of the secretive absentee process in

17   which folks are manipulating machines and manipulating votes

18   just doesn't stand up when you look at where it was going on,

19   that you have all these deputy clerks doing their job during

20   the regular course of business.  Just doesn't make any sense.

21   Again, common sense.

22          The next point I want to make deals with the machine

23   manipulation.  The first point I want to make is that the

24   State Board of Elections gave the county certain machines they

25   could use.  Those are the machines that they were required to

*CLOSING ARGUMENT BY MR. WHITE*                                          15

1    purchase, and we talked about that with the Help America Vote

2    Act with Sarah Ball Johnson.  Those were approved.  The county

3    purchased them.  Those are the ones that came in.

4         Of course, their argument is that in the '06

5    elections, these new machines come in, and they go from buying

6    votes to stealing votes because they've learned how to

7    manipulate these machines that have the Vote and the Cast

8    Ballot buttons.

9         The evidence has been from a young woman who came

10   in -- this is where I get to talk about my second witness.

11   Selena Smith, young woman, she wanted -- she agreed to be an

12   election officer so she could make the $75 a day, I think.

13   She had just graduated from EKU, looking for a job.

14        She went to the training that was given to her at the

15   county clerk's office, and they trained her as to what to do

16   if somebody walked away.  And you recall her testimony.  You

17   know, that did happen two or three times in both the primary

18   and the general election, and she did what she was trained to

19   do.  She got the other judge -- she was the Republican judge.

20   And this is the Garrard precinct.  This isn't the Manchester

21   precinct.  She got the other judge, and they went back to the

22   machine and they cast the ballot.  If they were able to

23   determine, in fact, that was what the voter intended to do,

24   they cast the ballot.  They didn't manipulate it or anything

25   like that.  That's what they were trained to do.

1      Now, here's what's interesting.  Wayne Jones said the

2  same thing in this trial.  You'll remember one of the last

3  recordings you got to hear was Wayne Jones on June 7th, 2007.

4  When Kennon White came over, he'd been gardening.  Mr. White

5  said that they were in this little kind of shack, kind of

6  garden shed in his back yard.  I think you all agree when you

7  listen to it, there's a lot of walking around, moving around.

8      Kennon White recorded this conversation.  And again,

9  on cross-examination, I asked the questions, and both Mr.

10  White and Mrs. White agreed they knew they were recording.

11  Mr. Jones had not a clue he was being recorded.  I'm going to

12  show you Government's Exhibit A21A, which is the transcript of

13  that recording.

14      And I'm skipping to page 7, and the first thing I

15  want to do is apologize for some of the language.  The F word

16  is used.  That's just the way it is.  That's why I asked Mr.

17  White, were there any women around.  He said no.  Sometimes

18  men use language that they otherwise wouldn't if women were

19  around.

20      At any rate, this is what he said.  Kennon White.

21  Let me start on page 6.  No, I don't doubt it.  Now let me

22  tell you something, boys.  I tell you what I believe.  I

23  believe that they've had, from what I see and what questions

24  that Wanda was asked down there, now I tell you what I think

25  they've done.  I think they've got to the point that they have

CLOSING ARGUMENT BY MR. WHITE                                       17

1    problems all over this country, they have them machines that

2    have that -- two steps.  I think that's where they're going to

3    have, I think that's, I think they.

4         Kennon White has brought up the subject of the voting

5    machines, okay?  He's introduced that subject.  This is his

6    big chance.

7         Jones:  Now, tell you about the machines.  Kennon:

8    They're not there no more, are they?  Jones:  They've got all

9    the same steps.  Jones:  If you can read and write now,

10   Kennon, there's no way that anybody can steal your -- vote.

11   Kennon:  I'd say after two or three times, you're right.

12   Jones:  No, no, if you can read if you can write, there's no

13   way that nobody can steal your vote.  I know, I mean,

14   there's -- now, if a fella can't read and write too good --

15        Kennon:  Or, you know, a lot of times, people get in

16   a hurry and walk off.

17        Jones:  That's, that's --

18        Kennon:  They walk and they leave it, and they leave

19   it, and then, and then --

20        Here's what Wayne Jones said when he didn't know he

21   was being recorded, talking to the guy whose wife claims that

22   he taught her how to use the machine, steal votes.  This is

23   what Wayne Jones says.  No, no -- I'm sorry.  Well, got two

24   choices then.  They can either cancel his vote or vote his.  I

25   mean, that's -- I mean, the way he votes, you know.

1          Is that what the law is?

2          Jones:  That's the law.  The two judges can cancel it

3   or agree to the vote.  Ready to vote, you know, hit that final

4   thing, vote the machine.

5          There is nothing, nothing inconsistent between what

6   Selena Smith testified to and what Wayne Jones in June, 2007

7   told Kennon White.  Why wouldn't there have been a whole

8   discussion on there -- I'm sorry, gone blind again.  Why

9   wouldn't Kennon White have gotten Wayne Jones into a whole

10  discussion about how they manipulated the machines?  He

11  introduced the topic to the conversation.

12         Again, common sense.  Use your common sense.

13         I'm running out of time so I want to hit just a

14  couple more quick points for you.  Harts Branch in 2006.

15  There was a lot -- not a lot.  There was some discussion about

16  how Mr. Jones had gone and served as the election officer, as

17  the Democratic judge at the Harts Branch precinct.

18         The first thing I want to tell you is one of the

19  instructions I believe that you're going to receive is

20  instruction number 41.  Service as election officer by a

21  member of a County Board of Elections.  Number two states,

22  Kentucky statutes do not prohibit a member of the County Board

23  of Elections from serving as a precinct election officer.  You

24  don't have to get at what the law is or let anybody else tell

25  you other than Judge Reeves.  That's what the law of Kentucky

1    is.

2          What Wayne Jones did was not illegal, improper.  They

3    just simply want to say the mere reason he was there.  That's

4    not accurate.

5          There's two other things to bear that out.  One is

6    you recall Roger Webb came in to testify.  He was running for

7    magistrate.  Harts Branch precinct does not vote in city

8    elections.  It only votes in county and statewide and national

9    elections.  It's not a city precinct.

10         Roger Webb was running for magistrate.  He was

11   sitting there, and they showed you a picture of where he was

12   sitting, and he talked about he had some problems.  He thought

13   some folks were running some folks down there.  So he called

14   the Board of Elections, the Clay County Board of Elections.

15   Next thing he knows, Wayne Jones leaves, is gone about 15

16   minutes, he comes back and says, essentially, we've looked

17   into it.  Don't have anything to worry about.

18         Mr. Webb, after a little while, left.  He didn't have

19   any more concerns.

20         The second thing, again, William Hugh Bishop, an

21   unindicted -- who is not an unindicted co-conspirator, talks

22   about in the primary election of '06 that complaints were

23   called in to the Clay County Board of Elections; specifically,

24   complaints about the Manchester precinct where Kennon and

25   Wanda White -- where Wanda White and Dobber Weaver were

*CLOSING ARGUMENT BY MR. WHITE*                                    20

1    working.  What he testified to was that Wayne Jones and

2    himself got into the car and drove down to Manchester and

3    addressed those complaints.  That was the testimony of William

4    Hugh Bishop.

5        So again, we would submit that when Wayne Jones

6    signed those Board of Elections minutes, he had -- he

7    absolutely believed that there was nothing -- that those were

8    not fraudulent results when they got mailed in.  And when you

9    look at the holes in their -- that we've been able to just

10   show just in these few minutes on the mail fraud, they have

11   not satisfied their burden.

12       I've got just a couple of minutes here.  The United

13   States -- there's two things I mentioned at the end of my

14   opening statement that I ask you to bear in mind.  Mr.

15   Westberry has very nicely touched on both of them.  One was

16   that the United States will rely heavily on convicted felons

17   or persons who received promises of no prosecution or are in

18   prison hoping to get a reduction in their sentence.  I think

19   that's been borne out from what you've seen from this witness

20   stand.

21       And just a quick word on Kennon and Wanda White.  Not

22   only are they hoping with their testimony to either not get

23   prosecuted -- Wanda White; or get a substantial reduction in

24   the sentence that they face -- Kennon White, but they also had

25   a huge stake in the '06 election.  Just themselves.  They had

1    a failed business.  They moved into Manchester.  They got jobs

2    with the City, and their jobs depended upon Doug White's being

3    mayor and winning that election.

4          I would submit to you that that's what this case is

5    really about.  It's Kennon and Wanda White trying to create a

6    whole 'nother thing based on what they've said.  Based, as Mr.

7    Pinales says, garbage in, garbage out.  They came up with a

8    theory.  Wanda White had all these pages that you saw and the

9    evidence just doesn't bear it out.

10          The last thing I said in my opening was I mentioned

11   Paul Bishop.  And I talked about that Mr. Bishop was going to

12   come testify, based on what the United States said in their

13   opening, and that Mr. Bishop's son, who basically was -- my

14   view, he was trying to save his son, who is not being

15   prosecuted.

16          And my point was -- I didn't expect to make this

17   point.  I expected that was going to be my argument in

18   closing, was that his motive for testifying about this

19   so-called meeting in the spring of 2002 was to save his son.

20   I didn't think I'd be coming up here and saying, where is Paul

21   Bishop?  Hundreds of thousands of dollars piled on a table.

22   Can you imagine what that would look like?  There's no

23   evidence.  Paul Bishop never came in here.

24          The only evidence is Mike Bishop, his son.  He wasn't

25   there.  He's just telling what his daddy told him.  That's

*CLOSING ARGUMENT BY MR. WHITE*                                          22

1    what they're relying on.  I suggest to you that in making

2    significant life decisions, that's a reasonable doubt.

3               I told you on day one that if you apply common

4    sense -- day one, that if you apply common sense to the

5    government's theory that you would acquit Wayne Jones of every

6    count against him.  That's what justice dictates in this case.

7    An acquittal.  They have not met their burden.  There is way

8    too much reasonable doubt.

9               Next time we see you, I look forward to hearing your

10   verdict.  And again, thank you all.  It's tough.  It's a tough

11   job.  We appreciate it.  Thank you.

12              Thank you, Your Honor.

13              THE COURT:  All right.  Thank you, Mr. White.

14

15                              * * *

16                      C E R T I F I C A T E

17              I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct excerpted transcript from the record of
18   proceedings in the above-entitled case.

19

20    \s\ Lisa Reed Wiesman                March 23, 2010
     LISA REED WIESMAN, RDR-CRR            Date of Certification
21   Official Court Reporter

22

23

24

25