1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                              - - -
 3
      UNITED STATES OF AMERICA,       :  Docket No. CR 09-16-S
 4                                     :
                         Plaintiff,    :  Frankfort, Kentucky
 5                                     :  Monday, March 1, 2010
           versus                      :  12:50 p.m.
 6                                     :
      RUSSELL CLETUS MARICLE,          :
 7    DOUGLAS C. ADAMS                 :
      CHARLES WAYNE JONES              :
 8    WILLIAM R. STIVERS               :
      FREDDY W. THOMPSON               :     Trial Day 15B
 9    WILLIAM B. MORRIS                :
      DEBRA L. MORRIS                  :     EXCERPTED TRANSCRIPT
10    STANLEY BOWLING,                 : TESTIMONY OF MANSELL BAKER
                                       :
11                       Defendants.   :

12

13                            - - -
                      TRANSCRIPT OF TRIAL
14                BEFORE DANNY C. REEVES
           UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16    APPEARANCES:

17    For the United States:      STEPHEN C. SMITH, ESQ.
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
      For the Defendant          MARTIN S. PINALES, ESQ.
21    Russell Cletus Maricle:    Strauss & Troy
                                  150 E. Fourth Street
22                                Fourth Floor
                                  Cincinnati,OH  45202
23
                                  DAVID S. HOSKINS, ESQ.
24                                107 E. First Street
                                  Corbin, KY  40701
25
```

2

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                               Landrum & Shouse, LLP
                                 220 West Main Street
 3                               Suite 1900
                                 Louisville, KY 40202
 4
                                 BENNETT E. BAYER, ESQ.
 5                               Landrum & Shouse, LLP
                                 106 West Vine Street
 6                               Suite 800
                                 Lexington, KY  40507
 7

 8    For the Defendant          T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
 9                               133 West Short Street
                                 Lexington, KY  40507
10

11    For the Defendant          ROBERT L. ABELL, ESQ.
      William R. Stivers:        120 North Upper Street
12                               Lexington, KY  40507

13
      For the Defendant          RUSSELL JAMES BALDANI, ESQ.
14    Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
                                 Baldani, Rowland & Richardson
15                               300 West Short Street
                                 Lexington, KY  40507
16

17    For the Defendant          JERRY W. GILBERT, ESQ.
      William B. Morris:         Coy, Gilbert & Gilbert
18                               212 North Second Street
                                 Richmond, KY 40475
19

20    For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:           Gess, Mattingly & Atchison, PSC
21                               201 West Short Street
                                 Lexington,KY40507
22

23    For the Defendant          DANIEL A. SIMONS, ESQ.
      Stanley Bowling:           Thompson, Simons, Dunlop & Fore
24                               116 West Main Street
                                 Suite 2A
25                               Richmond, KY 40476
```

3

```
 1    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
 2                                 35 W. Fifth Street
                                   P.O. Box 1073
 3                                 Covington, KY  41012
                                   (859) 291-4410
 4

 5         Proceedings recorded by mechanical stenography,
      transcript produced with computer.
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                              * * *

2           MR. SMITH:  While they're doing that, I'll call the

3    witness, Mansell Baker.

4           MR. SIMONS:  Your Honor, while they're gone, could we

5    approach for a second?

6           THE COURT:  Yes.  Come on up.  That will be fine.

7                   (A sidebar conference was held out of the

8                   hearing of the jury):

9           THE COURT:  Mr. Simons?

10          MR. SIMONS:  There's two matters I want to bring up

11   with respect to this witness before he testifies.  The first

12   is that there was an order entered before the trial being had

13   prohibiting cross-examination about crimes which were not --

14   did not result in convictions.  And the language is fairly

15   clear, but this witness is in an unusual posture.  He is now

16   facing four state felonies and a PFO charge, and he is in

17   jail.  I do intend to cross-examine him about that.  I think

18   that's fair.  I wanted to make sure that wasn't on the wrong

19   side of the Court.

20          THE COURT:  You would be on the wrong side of the

21   Court for a charge that hasn't resulted in a conviction.

22          MR. SIMONS:  Even though it's pending and he's yet to

23   be tried on it?

24          THE COURT:  Right.  It's not a conviction.

25          MR. SIMONS:  I understand that.

5

1          THE COURT:  Well, let's see what the rule is that

2     would support that.

3          MR. SIMONS:  Specifically, the source of the

4     interrogation would be that his efforts here, he has been

5     interviewed by the FBI on multiple occasions.  Each time he

6     gets in a different bit of trouble, he gives additional

7     information which is damaging.

8          He is the only government witness -- which leads into

9     my second thing -- that has any potential evidence of my

10    client, Stanley Bowling, being involved in any way, shape or

11    form with drug activity.

12         That was first disclosed in a 302 which surfaced in

13    late January of 2010.  It also surfaced when he was in the

14    Clark County -- excuse me, the Clay County Detention Center.

15    He was arrested late last year, is awaiting trial on that

16    matter, and it seems to me it's quite not only relevant but

17    compelling reason to add on to his previous testimony.

18         THE COURT:  Okay.  Not admissible under 609.  The

19    request to interrogate on that issue would be denied.  The

20    Court's pretrial ruling would be in effect.

21         MR. SIMONS:  The second topic that I would like to

22    bring up is that I would like to move in limine that he not be

23    permitted to talk about the marijuana involvement that he had

24    with my client or that he alleges that he had with my client,

25    which is vehemently denied.  The 302 that I have doesn't state

1   the relevant time frame.  I would view it -- I was not

2   notified, and I do not believe it would be admissible as

3   background evidence in this instance.

4           THE COURT:  Okay.  Mr. Smith, do you plan to go into

5   any marijuana use involving Mr. Bowling through this witness,

6   Mr. Baker?

7           MR. SMITH:  I've asked for that file, Your Honor.  I

8   apologize.  My memory's a little bit in need of refreshing in

9   the context of that.  As the Court's aware, this Mansell Baker

10  has been talked about by many witnesses, including Eugene

11  Lewis and Denver Sizemore, as being in partnership in the

12  marijuana growing business that started with Wayne Jones back

13  in, I guess, the '89, '90 period.

14          I apologize for being slow to get my notes.  I'm not

15  complaining.  I'm glad we're moving along.  Again, just give

16  me another minute so I know the 302 that Mr. Simons is

17  referring to here, and I want to make sure I get that in front

18  of me.

19          That is correct, that he recalled raising marijuana

20  in Henry County in the late, mid '80s.  He said the farm was

21  leased from an old woman by individuals in Clay County to deer

22  hunt on.  He said he was in partnership with Charles Wayne

23  Jones and Denver Sizemore and Eugene Lewis.  Those are matters

24  I do intend to go into, because I do believe those were

25  noticed sufficiently for the parties to know that this

1    partnership is going to be discussed as background evidence.

2          He further goes on to state that Stanley Bowling

3    approached him about moving his brother's marijuana, Ronny

4    "Buzzard" Hacker, and that Hacker -- Baker would make trips to

5    deliver marijuana.  He said that Bowling was actually making

6    trips to deliver marijuana and that it was three to five

7    pounds.  He says that Ronny Hacker got arrested in Northern

8    Kentucky and his drugs taken.  Baker said that him and Bowling

9    was actually fronting Hacker with the marijuana that he got

10   caught with, and he was paying them afterward, after he made

11   the sale.

12         He said on one occasion Hacker unknowingly paid him

13   and Stanley $1,800 too much for the marijuana, and he and

14   Bowling split the money without telling Denver Sizemore or

15   Eugene Lewis.  That time frame seems to tie back into the

16   partnership with the Henry County farm.  And again, that was

17   evidence that's already, at least I believe been noticed and

18   brought into play.

19         I will state that my recollection is this was given

20   to Mr. Bowling before we had the 404(b) hearing, and I think

21   this is something that could have been raised at the hearing,

22   had he had an objection to going into this area for reasons

23   that he thought.  But I don't have the date in which that was

24   delivered to you, Mr. Simons.  If you've got a different

25   date --

8

1          MR. SIMONS:  What date was the 404(b) hearing?

2          MR. SMITH:  What was the date?

3          THE COURT:  January 18 was the date.

4          MR. SIMONS:  The date of the transcription here is

5    January 26, Your Honor, so it was not in my possession.  I

6    knew nothing about it.  In fact, I made a motion in limine to

7    the Court to exclude.  And in it, I put -- in the motion to

8    the Court I put that nobody would testify that my client was

9    involved with drugs.  Within five days, probably, I got this

10   302 which was taken from Mansell Baker by an undercover agent

11   for Unite, a drug task force in Clay County, who was arrested

12   at that point and was in the Clay County Detention Center

13   facing what I would say is five felonies right now.

14          I think it's brutally unfair to my client not to be

15   able to address the current charges over his head and the

16   position that he's in with respect to Mr. Baker when he comes

17   up with this statement that is undocumented from anybody else

18   in the case to this point.

19          MR. SMITH:  Your Honor, I have to go on his

20   representation.  I thought we had that issue come up again

21   before the trial on the 2nd or the 1st, but maybe he's right.

22   Maybe it was all dealt with on the 18th.  This does go into a

23   lot of detail that Bowling was actually a silent partner with

24   Baker on that Sizemore/Lewis partnership.  And if that

25   wasn't -- again, if it wasn't background evidence, which

1    that's what I recall it being, as opposed to being 404(b),

2    then I'm -- Mr. Simons has found me here without an answer.

3    But I thought it was background evidence, and I believe the

4    rules do not require a pretrial notice and hearing on that.

5    And if I was wrong on that, I apologize to the Court.

6              THE COURT:  I ruled at the hearing that this would

7    come in.  The only thing that I held was 404(b) evidence was

8    the videotape.  Everything else I held to be background

9    evidence that did not require prior notice being given.  This

10   302, of course, would be -- this is Jencks material.  It would

11   not be required to be provided until the witness has

12   testified.  This is not a statement that this witness read and

13   affirmed as his statement.  This is a 302.  It is just a

14   recording made by an agent after an interview, essentially.

15             MR. SMITH:  That's my complete understanding of it,

16   Your Honor.

17             THE COURT:  All right.  I'll overrule the objection,

18   but if counsel needs a few moments to review any materials

19   prior to cross-examination, I'll give those to him.

20             MR. SIMONS:  Are there additional matters that have

21   not been produced with respect to Mr. Baker?

22             MR. SMITH:  I'll have to ask at the table there.  I

23   don't see anything that's not been produced.

24             THE COURT:  Grand jury testimony?

25             MR. SIMONS:  I have the grand jury testimony, unless

1   he's testified more than once.

2          MR. SMITH:  No, sir.

3          THE COURT:  All right.

4          MR. ABELL:  Judge, while we're here, in this 302 that

5   I believe was produced January 30th, there's indication that

6   this witness said that he was told by Mary Gail Roberts or

7   Mary Lou Roberts that she paid my client, William Stivers, 10,

8   15 thousand dollars.  And as a result of that, the upshot of

9   it was an OxyContin charge or drug charge pending against her

10  went away.

11         THE COURT:  Who is Miss Roberts again?  Refresh my

12  memory.

13         MR. ABELL:  I think Mary Lou Roberts has previously

14  been identified as a vote hauler.

15         MR. SMITH:  There's a Mary Gail and there's a Mary

16  Lou.  I believe they're two different people.  But it has been

17  mentioned that -- Mary Roberts has been mentioned.

18         MR. ABELL:  Well, in any event, I'm concerned about

19  the admission of this testimony.

20         THE COURT:  Again, I don't have the -- go over this

21  with me once again.  This witness that's about to testify,

22  Mansell Baker --

23         MR. ABELL:  Baker reports in his 302 that he was told

24  by Mary Lou Roberts that she paid William Stivers 10 to 15

25  thousand dollars and as a result of that payment, a pending

1    OxyContin trafficking charge against her was dismissed or

2    otherwise disposed of in a favorable manner.  And that was the

3    first disclosure to me of that.  It's not clear to me when

4    Roberts claims this happened or when she told it to Baker, but

5    obviously it's before January 22, 2010, when he disclosed it.

6         It was not disclosed as part of 404(b).  If this is

7    not the Roberts that was a vote hauler -- I would assume the

8    Roberts that would be a vote hauler would be considered a

9    co-conspirator.

10        THE COURT:  Right.

11        MR. ABELL:  But I'm led to believe now that that's

12   not correct.  If it is -- if she is the co-conspirator, it

13   seems to me to be a boasting statement in terms of looking at

14   what I got accomplished and not a statement in furtherance of

15   the purposes of the conspiracy.  And I have a case to discuss

16   with Your Honor on whether or not boasting is a statement in

17   furtherance of the conspiracy.  But I bring this up now, since

18   we were here, and this testimony may or may not be

19   forthcoming.  It is obviously of concern for me on behalf of

20   my client.

21        THE COURT:  All right.  Well, I think what we need to

22   do is before we go into these areas, I need to excuse the jury

23   for their break, and I'm going to keep you all in here and

24   we'll talk about this further.

25                  (Sidebar conference concluded.)

1          THE COURT:  Thank you.  Ladies and gentlemen, I'm

2     going to go ahead and send you on to your break while I

3     discuss these matters with counsel.  We'll give you about a

4     20-minute recess.  Please keep in mind the admonition you were

5     given previously not to discuss the case among yourselves

6     while we are in recess.  You'll be excused for 20 minutes.

7               (The jury left the courtroom at 2:19 p.m.)

8          THE COURT:  Mr. Abell, you wanted to be heard further

9     on the issue of an out of court statement that is maybe the

10    subject of the upcoming witness's testimony?

11         MR. ABELL:  Yes, Judge.  I'm concerned about

12    testimony from Mansell Baker to the effect that a Mary Lou

13    Roberts at an indeterminate point in the past, prior to, I

14    think, January 22, 2010, but I don't know when -- and I say

15    January 22, 2010, because that's the date of the interview,

16    although it was transcribed January 26, 2010.  It was

17    disclosed to me, I believe, January 30, 2010.

18         The testimony regards Mary Lou Roberts relating to

19    Mansell Baker that my client, William Stivers, that she had

20    paid William Stivers 10 or 15 thousand dollars for help with

21    regard to a pending OxyContin charge that then had a favorable

22    disposition.

23         The implication, obviously, being that Mr. Stivers

24    used his influence in some manner.  And I would think in the

25    context of this case, the inference would be to discuss with

13

1    prosecuting authorities and/or, more likely, to be blunt,

2    Cletus Maricle, the judge in Clay Circuit Court, to have

3    something done favorable to Ms. Roberts.

4         And it is, as I indicated at the Bench, unclear to me

5    whether this Miss Roberts has previously been identified as a

6    vote hauler.  If she had been identified as a vote hauler,

7    arguably she would be a co-conspirator, and 801(d)(2)(E) could

8    be applicable.  However, a statement of this nature which is

9    boasting to somebody about something you've done in the past

10   is not a statement in furtherance of the conspiracy.

11        And I would, in that regard, refer the Court to

12   United States v. Conrad, 507 F.3d 424.

13             THE COURT:  That's a Sixth Circuit case?

14             MR. ABELL:  Yes, sir, it is.  November 2007 is the

15   date of the decision.

16             THE COURT:  All right.

17             MR. ABELL:  And it discusses the issue of what are

18   statements in furtherance of the conspiracy.  And aside from

19   all other ambiguities about whether or not this person is

20   involved and any discussion that took place, in assuming that

21   she is a co-conspirator, it is a boast about something I did

22   in the future that does not advance --

23             THE COURT:  In the past.  Something that was done in

24   the past, right?

25             MR. ABELL:  Yes.  So I bring that issue to the

1    Court's attention, because I don't believe that Mr. Baker

2    should be permitted to testify regarding it.

3            THE COURT:  All right.  Let's see.  Mr. Smith, would

4    you like to respond?

5            MR. SMITH:  Well, Your Honor, it's hard for me to

6    respond because, number one, this is a 302.  This is not a

7    statement of the witness.  It is a report by an agent.  And

8    obviously, there are several questions here.  If it is, as

9    represented by Mr. Abell, that it was not in furtherance of

10   the conspiracy, not a statement that was made in context of

11   what we define relevant to the conspiracy, then I see issues.

12           The problem is, the 302 doesn't say who said that.

13   It could have been -- the 302, it could just as well have been

14   Stivers tells Mansell Baker that he took 10 to 15 thousand

15   dollars to Cletus Maricle to get the charges dismissed.  And

16   if that's the scenario, then I think the analysis somewhat

17   turns differently than if it is Mary Lou Roberts that made the

18   statement to Mr. Baker.

19           I do think that we've heard a lot of talking on these

20   tapes about making money on cases in front of Judge Maricle by

21   William Stivers, and I think it is highly probative.  But the

22   question I don't have -- or answer I don't have for the Court

23   is based on this 302, whether or not this is a statement that

24   could qualify.  And I apologize for lack of information.  This

25   is something that certainly, if the Court would like, I will

1    be glad to question the witness outside the presence of the

2    jury and we can get a ruling on that now.  Or if the Court

3    wants to have me question the witness outside here and find

4    out, then I can represent to you what he's going to say.

5              But at this point, I can't really do that.

6              THE COURT:  Well, I am going to ask the witness to be

7    brought in.  I'm going to allow limited *voir dire* on that

8    particular issue.  We're not going to get into all other

9    issues in the case, but just on that one limited issue.  Bring

10   in the witness, Eric.  The witness, Mr. Baker.  Mansell Baker.

11             MANSELL BAKER, GOVERNMENT'S WITNESS, SWORN

12             THE COURT:  You are Mansell Baker; is that correct?

13             THE WITNESS:  Yes, it is.

14             THE COURT:  Mr. Baker, two of the attorneys are going

15   to be asking you just a few questions while the jury is not

16   present.  If you would, please respond to their questions.

17   Mr. Smith?

                         DIRECT EXAMINATION

19   BY MR. SMITH:

20   Q.   Good afternoon.  Mr. Baker, did you have a relationship

21   with Al Man Stivers back at a time when you were also selling

22   OxyContin or involved in that aspect of drugs over in Clay

23   County?

24   A.   No, I did not.

25   Q.   Did you have a relationship with Mr. Stivers at some

*M. BAKER - Voir Dire by Mr. Smith*                                          16

1   point in the past?

2   A.   No, I have not.

3   Q.   Did you ever have a conversation with him about drugs

4   that Mary Lou Roberts was selling?

5   A.   No, I have not.

6   Q.   Did you ever have a conversation with him about her

7   paying him money to get to Cletus Maricle to dismiss charges

8   against her?

9   A.   There -- I've not had the conversation.  You know, there

10  was a conversation with a woman.

11  Q.   With who?

12  A.   With Mary Lou.

13  Q.   Okay.  That you had?

14  A.   That I overheared.

15  Q.   Oh, that you overheard?

16  A.   Yeah.

17  Q.   And who was she talking with, if you don't mind telling

18  us?

19  A.   Her sister.

20  Q.   What is her name?

21  A.   Bertha.

22  Q.   Okay.  And is that where this information came about,

23  money going to Cletus Maricle to dismiss drug charges?

24  A.   Yeah.  She had ended up going to jail.  She caught

25  another trafficking charge and ended up going to jail, and she

*M. BAKER – Voir Dire by Mr. Smith*                                    17

1    was mad over doing the time.

2    Q.   Okay.  Now, this selling of OxyContin, did she also tell

3    you she was selling OxyContin for William Stivers?

4    A.   No, she didn't.

5    Q.   Okay.

6    A.   He was delivering stuff, and I think she was buying from

7    him.

8    Q.   Okay.  How do you know that?

9    A.   Just word of mouth.  Her statement.

10   Q.   From whose mouth?

11   A.   Mary Lou, you know, talking to somebody else.  Same

12   person.

13   Q.   So basically, you never had any conversations with

14   William Stivers about either one of these topics?

15   A.   No.

16   Q.   All right.

17             MR. SMITH:  Your Honor, I think based on that, we

18   have no reason to pursue that with this witness.

19             THE COURT:  All right.

20             MR. ABELL:  And my arguments, therefore, are rendered

21   moot.

22             THE COURT:  Your objection to that line of

23   questioning will be sustained.

24             MR. ABELL:  Thank you, Judge.

25             THE COURT:  Thank you.  Now, Mr. Baker, we're going

*M. BAKER - Direct (Mr. Smith)*                                        18

1    to take a break here in just a couple of moments.  I'm going

2    to give the attorneys a chance to take a restroom break.

3    We'll start back in about ten minutes, and the clerk will need

4    to administer the oath to you again when the jury's brought

5    in.  So we'll begin in approximately ten minutes.  We'll be in

6    recess until that time.

7                    (Recess from 2:30 p.m. until 2:43 p.m.)

8                    (The jury entered the courtroom at 2:43 p.m.)

9              THE COURT:  Thank you.  The record will reflect that

10   all members of the jury are present.  Parties and counsel are

11   present as well.  Mr. Smith, you may proceed, but the witness

12   will need to be sworn to answer questions.

13             MANSELL BAKER, GOVERNMENT'S WITNESS, SWORN

14             THE COURT:  Mr. Smith, you may proceed.

15                         DIRECT EXAMINATION

16   BY MR. SMITH:

17   Q.   State your name, please.

18   A.   Mansell Baker.

19   Q.   And Mr. Baker, tell me your age.

20   A.   Forty-seven.

21   Q.   And where were you born and raised?

22   A.   Clay County, Kentucky.

23   Q.   Are you married?

24   A.   No.

25   Q.   Do you have any children?

1    A.   Yeah, I got one girl.

2    Q.   And how old is she?

3    A.   Nineteen.

4    Q.   How far did you go in school?

5    A.   Graduated high school.

6    Q.   And where did you graduate from?

7    A.   Clay County High School.

8    Q.   Did you pursue any further education?

9    A.   I've got a diploma from the vocational tech.

10   Q.   Okay.  And what was the vocational degree that you got?

11   A.   Mechanics.

12   Q.   Have you worked in the past?

13   A.   Yes, I have.

14   Q.   What kind of jobs have you held, Mr. Baker?

15   A.   Construction work.

16   Q.   Okay.  And did you have a particular line of construction

17   work that you were good at?

18   A.   Worked on coal companies and pipelines and stuff.

19   Q.   Were you an equipment operator as well?

20   A.   Yes.

21   Q.   And what was your most recent job that you had, Mr.

22   Baker?

23   A.   B&B Excavation.

24   Q.   Okay.  And is that a local company?

25   A.   Yes, it is.

*M. BAKER - Direct (Mr. Smith)*                                        20

1    Q.   Who owns the company?

2    A.   Stanley Bowling.

3    Q.   Okay.  And is there a time period there that you worked

4    for him?

5    A.   Yeah, I worked around four years.

6    Q.   Four years.  And when did you leave that employment, if

7    you know?

8    A.   Probably four years ago.

9    Q.   Okay.  So about 2006, you believe, would be an estimate?

10   A.   Somewhere in there.

11   Q.   And where were you living at the time that you worked for

12   Mr. Bowling?

13   A.   In Mr. Bowling's garage.

14   Q.   Okay.  Does he have living quarters there in his garage?

15   A.   We made a little section there in the garage.

16   Q.   And when you say you made a little section, was that like

17   an efficiency apartment or something?

18   A.   I put a bed and stuff in.  We already had the sink, stove

19   and everything where we cooked and stuff.

20   Q.   Okay.  And how long were you living there on the

21   property?

22   A.   Repeat that, please?

23   Q.   How long were you living there on the property?

24   A.   The whole time, four years.

25   Q.   The four years you worked there?  Now, did he have other

*M. BAKER - Direct (Mr. Smith)*                                           21

1    employees that you worked alongside with?

2    A.   On and off, just temporary help.

3    Q.   Who did most of the labor for him?

4    A.   Me.

5    Q.   Now, did you have -- you said other construction

6    employment.  Did you ever work in the City of Manchester?

7    A.   It's been a long time ago, yeah.

8    Q.   And what did you do for the City of Manchester?

9    A.   Labor.

10   Q.   And how long did you work for them?

11   A.   One year.

12   Q.   Okay.  Now, over the course of years, Mr. Baker, have you

13   also been involved with growing marijuana?

14   A.   Yes, I have.

15   Q.   And when did you first get involved in growing marijuana,

16   Mr. Baker?

17   A.   In the eighth grade.

18   Q.   In the eighth grade?

19   A.   Yeah.

20   Q.   And was that a venture that you took upon yourself, or

21   did you have others?

22   A.   Stayed by myself till I graduated high school.  '83.

23   Q.   And were you growing the marijuana in Clay County?

24   A.   At that time, I was.

25   Q.   Did you ever have interest in a property over in Henry

1    County?

2    A.   Yes, we did.

3    Q.   Tell us about that.

4    A.   We'd been hunting, a large group of us been hunting,

5    about 30 from Clay County.  And me and Denver Sizemore, Wayne

6    Jones, Eugene Lewis proceeded to grow marijuana there.  And

7    eventually, the woman died and we bought the land and kept

8    growing.

9    Q.   Now, how did that land ownership -- to your recollection,

10   did you all go in partnerships on that?

11   A.   Yes, we did.

12   Q.   And do you know who was on the deeds at that time?

13   A.   At that time, me, Denver and Eugene was on the deed and

14   our women.

15   Q.   Okay.  And your women, you mean your wives?

16   A.   Our wives.

17   Q.   Okay.  And you mentioned Wayne Jones as being a partner.

18   Was he not on the deeds?

19   A.   He wasn't on the deed.  He said he didn't want no part of

20   the deed or nothing like that.

21   Q.   Okay.  How long did you fellas grow marijuana in Henry

22   County on that property?

23   A.   Wayne was a partner for two years.  And then the rest of

24   us kept growing, probably, for five years.

25   Q.   Okay.  And you said the rest of you.  Who was that?  Who

1    would that be?

2    A.   That was me, Denver, Eugene Lewis, and we took Denver's

3    son on as a partner, Todd.

4    Q.   Okay.  And when you say you were growing marijuana, was

5    there a large quantity or small quantities that you all were

6    growing?

7    A.   Large quantity.

8    Q.   And when the marijuana was harvested, what did you all do

9    with the marijuana?

10   A.   Dried some there, brought some to the houses, to our

11   houses.  And once we got it dried and cleaned, you know, we

12   started selling stuff.  And we had to go to other people to

13   distribute.

14   Q.   Okay.  Now, was it split four ways initially?

15   A.   Yes.

16   Q.   And that marijuana that you got, did you sell it

17   yourself?

18   A.   Yes.

19   Q.   And who did you sell your marijuana to?

20   A.   I went through Mr. Bowling a few times, to his brother.

21   He had a half brother that dealt in marijuana.

22   Q.   Mr. Bowling being which Mr. Bowling?

23   A.   Stanley Bowling.

24   Q.   And you say you went through him to his brother.  What

25   was his brother's name?

M. BAKER - Direct (Mr. Smith)                                      24

1    A.   We called him Buzzard.  Can't, I can't tell you his real

2    name at this time.  Ronny Hacker.

3    Q.   Ronny Hacker?

4    A.   Ronny Hacker.

5    Q.   And he had a nickname, Buzzard?

6    A.   Yeah.

7    Q.   And you say that you went -- explain that to us, how you

8    went through Stanley Bowling to get to him.

9    A.   At the time, I didn't know Mr. Hacker.  And Stanley, you

10   know, we had cookouts and stuff with people.  And Stanley said

11   he could move some through his brother.  And me and him, well,

12   we bagged it at Eugene's house, and me and Stanley went up to

13   his brother's and sold it up there.  He helped me get rid of

14   it.

15   Q.   Now, did you pay Stanley any money for doing this for

16   you?

17   A.   Seemed like he got two, two or three hundred dollars a

18   pound.

19   Q.   And how much were you getting a pound for your marijuana

20   at that time?

21   A.   At the time, 13.

22   Q.   Okay.  And did you get cash on delivery or was there

23   credit involved when you dealt with Stanley and his brother,

24   Buzzard?

25   A.   The first little while it was cash.  Then after that, he

*M. BAKER - Direct (Mr. Smith)*                                          25

1    started -- we had to start delivering, and he'd pay us later.

2    Q.   Okay.  How long did you have this relationship with

3    Stanley and his brother when it pertained to this marijuana?

4    A.   Me and Stanley, one season.  Me and Buzzard, like three.

5    Q.   Okay.  What happened to the Henry County farm?

6    A.   It was eventually -- the U.S. marshal seized one farm,

7    and we eventually split the other one up.

8    Q.   Okay.  Did you have more than one farm?

9    A.   At the time, Todd and Denver had bought a farm.

10   Q.   And do you know where it was?

11   A.   On the back side, it adjoins.  There was about a thousand

12   yards between the two farms, on the rough range.

13   Q.   Okay.  Now, you said that you were working for Stanley

14   Bowling in his construction company.

15   A.   Yes, sir.

16   Q.   And where was Stanley living at the time?

17   A.   There within the house side of the garage where I lived.

18   Q.   And this property that he owns, is it nearby the City

19   property?

20   A.   Yeah, City owns all the way around.

21   Q.   And how is it that the City managed to obtain all the

22   property around Stanley's place?

23          MR. SIMONS:  I'm going to object, Your Honor.  Lack

24   of personal knowledge.

25          THE COURT:  Sustained unless you can establish he has

1    knowledge of that.

2    Q.   Were you able, while working with Stanley, to talk with

3    him about how the City came to own the property around him?

4    A.   No, I wasn't.

5    Q.   Okay.  Did you come to knowledge about how he -- how the

6    City got the property around him?

7    A.   I don't know on the front part.  But on the back, in the

8    holler up through there, there was some people that owned the

9    land, like the mayor at that time and a coal company that

10   bought the land and stripped part of the coal sold it back to

11   the City.

12   Q.   Okay.  And the mayor being who?

13   A.   Doug White.

14   Q.   And you don't know about the front part?

15   A.   No, don't know about the front part.

16   Q.   Okay.  During the time that you were working for Stanley,

17   did he get any property from the City?

18   A.   Yes, he did.

19   Q.   And what property did he get from the City?

20   A.   It adjoin his property in the back, back of it.

21   Q.   And was there some reason why he had an interest in

22   buying the property?

23        MR. SIMONS:  Objection, Your Honor.  Again, lack of

24   personal knowledge.

25        THE COURT:  Objection sustained unless you can lay a

M. BAKER - Direct (Mr. Smith)                                     27

1    foundation as to how he would know.

2    Q.   Did you speak with Stanley about his interest in buying

3    the property from the City?

4    A.   No, no, I did not.

5    Q.   Okay.  This property that you say, did you know the

6    location of the property --

7    A.   Yes.

8    Q.   -- he was able to get from the City?

9    A.   Yes.

10   Q.   And tell us where it was in relation to his garage and

11   his home.

12   A.   You would go right in behind the garage, you know, beside

13   his land or through his part of his land at that time and go

14   back into a big barn.

15   Q.   Do you know when he got the property?

16   A.   Six year ago.

17        MR. SIMONS:  Objection, Your Honor.  Move to strike.

18        THE COURT:  Overruled.

19   Q.   Do you know what was paid for the property?

20   A.   No, I do not.

21   Q.   Is the City now land locked by the fact that Stanley

22   Bowling owns this piece of property?

23   A.   To a sense.

24   Q.   I'm sorry?

25   A.   To a sense, they are.

1    Q.   Okay.  Do you have -- were you working with Stanley

2    Bowling when he did the Laurel Branch project for the City of

3    Manchester?

4    A.   Yes, I was.

5    Q.   And did you know he had standing contracts with the City

6    of Manchester?

7    A.   Yes.

8    Q.   And this being one of them, during the time period that

9    you worked for him, was there occasion when you all cut

10   corners on the projects to save money?

11   A.   A few times.

12   Q.   And could you describe for us what you mean by that few

13   times?

14   A.   Some of the contracts got, you know, going up creeks,

15   beside of cliffs and stuff like that.  We come back through

16   blacktop roads and lay water line through it.

17   Q.   Okay.  These blacktop roads, were they county or state

18   maintained properties?

19   A.   County maintained.

20   Q.   Okay.  And could you describe for us how that would save

21   money if you ran it through the road as opposed to through the

22   creek as contracted?

23   A.   Well, you'd have to cross a creek, a holler, come up

24   another side over there, make a road with a dozer and then

25   still come out at the top.  Where if you'd have went with the

*M. BAKER - Direct (Mr. Smith)*                                    29

1    blacktop, you'd have been there anyway and been quicker.

2    Q.   And how did you go back -- how did he go about repairing

3    the road once he tore it up to lay a line in the road, if you

4    know?

5    A.   At one point, the county's trucks brought gravel.  And

6    eventually, I think the county come back -- they had it

7    advised for blacktop.  And when we got through, they did

8    blacktop it back.

9    Q.   Okay.  Did you also work on the Rocky Branch project?

10   A.   Yes, I did.

11   Q.   And were there occasions during that project -- again,

12   was that a project that was contracted with the City?

13   A.   Yes, it was.

14   Q.   And B&B Excavating, you were working for them at the

15   time?

16   A.   Yes.

17   Q.   During that time, did they cut corners on that project,

18   to your knowledge?

19   A.   Yes.

20   Q.   And could you explain?

21   A.   On the paper, on the drawings, they should have went up

22   beside the main highway.  There was rock even with the

23   blacktop so we come back down and went through a creek instead

24   of going up and over the little hill and laid pipe and stuff

25   in it and casing.

*M. BAKER - Direct (Mr. Smith)*                                    30

1    Q.   And could you explain how that would save money for the

2    company?

3    A.   We'd have had to chip about 30 inches of rock all the way

4    up the hill right there.  Pretty good ways.

5    Q.   And when you say chipping, how did you chip rock?

6    A.   You'd have to bring in an excavator with a hammer.

7    Q.   And in time, would that save time as well?

8    A.   Yeah, save a lot of time.

9    Q.   How much time, to your knowledge, Mr. Baker, did it save

10   the company on this project?

11   A.   I would say four weeks.

12   Q.   Were you living and working in Clay County during the

13   2002 election?

14   A.   Yes, I was.

15   Q.   Do you know a fella by the name of Bobby "Red" Sams?

16   A.   Yes, I do.

17   Q.   Did you witness him being involved in a scheme to haul

18   and buy votes during 2002 election?

19   A.   I seen him pick voters up, but I never seen him pay

20   nobody.

21   Q.   When you say you saw him picking voters up, could you

22   explain what you saw?

23   A.   He pulled into, you know, the projects and places and

24   asked people about going and voting and stuff and talked to

25   them.  I wasn't -- I was out from him.  I didn't hear what he

*M. BAKER - Direct (Mr. Smith)*                                          31

1    was saying at the time.  He would take them down to election

2    polls and then bring them back.

3    Q.   Do you know who he met at the voting polls with the

4    voters?

5    A.   No, I don't, because I was at the projects.

6    Q.   Did he at any point tell you who he was hauling voters

7    for?

8    A.   No, he did not.

9    Q.   You say it was from the projects.  Is there a project

10   area in Manchester you're familiar with?

11   A.   Yeah.  We've got a Beech Creek Apartments on the way to

12   Stanley's house.

13   Q.   Do you know a fella by the name of Gary "Ouchie" Jackson?

14   A.   Yes, I do.

15   Q.   Do you recall seeing him active in the 2002 or 2004

16   election involved in a similar type of scheme?

17   A.   Yes, I have.

18   Q.   Could you tell us what you saw Mr. Jackson involved in?

19   A.   He worked at Pennington Hill area.  It was part of the

20   city council which he was running for, and they brought voters

21   down.  He took them inside, and they would make a deal.  I

22   don't know what kind of deal.  And would go back, another guy

23   would take them and vote 'em and stuff, and they would come

24   back.  And at one point, he had to go to the bank and get

25   money on a credit card.

*M. BAKER - Direct (Mr. Smith)*                                    32

1    Q.   When you say he went to the bank, are you talking about

2    Gary Jackson?

3    A.   Yes.

4    Q.   And do you know where he was hauling voters to and from?

5    A.   At that time, he was going to the Horse Creek precinct or

6    Whites Branch, it was called.

7    Q.   Were there other times during the day that you saw him

8    hauling from or to other places?

9    A.   No, just that one there.

10        THE COURT:  Mr. Smith, if you could, I believe you

11   haven't narrowed this to 2002 or 2004 election.

12   Q.   Do you recall which one of those elections it was?

13   A.   2002.

14   Q.   Okay.  Did he approach you during that time period at

15   all?

16   A.   No, he did not.  I worked for him at that time.

17   Q.   What did you do for Mr. Jackson at that time?

18   A.   I run a couple jobs and worked on them.

19   Q.   Did he ask you to help him in his effort to buy these

20   votes?

21   A.   He didn't ask me to help buy votes, but I was sent to

22   Pennington Hill, people I know to take to vote.

23   Q.   Okay.  But you weren't involved in the vote buying

24   scheme?

25   A.   I wasn't, no.

*M. BAKER - Cross (Mr. White)*                                      33

1    Q.    Where did you vote in the '02, '04 elections, to your

2    knowledge?

3    A.    One time, I voted at Whites Branch precinct.  The next

4    time, at the middle school.

5    Q.    Okay.  And that middle school being what precinct?

6    A.    I guess the Manchester precinct.

7              MR. SMITH:  Pass the witness.  Thank you.

8              THE COURT:  Thank you.

9              MR. PINALES:  No questions.

10             THE COURT:  All right.  Mr. Bayer?

11             MR. BAYER:  No questions, Your Honor.

12             THE COURT:  Thank you.

13             MR. WHITE:  Just a couple, Your Honor, if I may.

14             THE COURT:  Yes, sir, Mr. White.

15                        CROSS-EXAMINATION

16   BY MR. WHITE:

17   Q.    Good afternoon, Mr. Baker.  My name is Scott White.  I

18   represent Mr. Jones in this matter.  I wanted to ask you a few

19   questions about the Henry County property that you testified

20   about.

21   A.    Yes, sir.

22   Q.    Did you testify on direct that it was four of you and

23   your wives that purchased the property?  It was Mr. Sizemore,

24   Mr. Eugene Lewis -- or Denver Sizemore, Mr. Eugene Lewis, Mr.

25   Jones and yourself?

*M. BAKER - Cross (Mr. White)*                                    34

1    A.   Yes.

2    Q.   Do you recall that you all -- you testified on direct

3    about a deed.  Did you see that deed?

4    A.   Yes, I had a copy of the deed.

5    Q.   And on that deed, it had everyone's name except Mr.

6    Jones; is that correct?

7    A.   That's correct.

8    Q.   Was there a mortgage?  There was a mortgage also attached

9    to that deed; is that not right?

10   A.   That's right.

11   Q.   And that was a mortgage that you all took out at the

12   First State Bank of Manchester?

13   A.   That's right.

14        MR. WHITE:  Your Honor, if I could ask the CSO to

15   show him what I've marked as Defendant's Exhibit CWJ2.

16        THE COURT:  Yes.

17   Q.   Let me reference you to page 4, if I could, Mr. Baker, of

18   that document.  First, let me -- I apologize.  Let me go back.

19   Do you recognize that document?

20   A.   Yeah, somewhat.

21   Q.   Is that -- what is that document?

22   A.   This is a mortgage on a deed.  This is actually a deed

23   mortgage that we had borrowed money from this First State Bank

24   of Manchester, Kentucky.

25   Q.   Could you turn to page 4, please?

M. BAKER - Cross (Mr. White)                                              35

1   A.   Yes, sir.

2   Q.   Does your signature appear on that page?

3   A.   Yes, it does.

4   Q.   Does your wife's signature appear on that page?

5   A.   Yes, she does.

6   Q.   Is that the mortgage that you -- strike that.  If you'll

7   go to page 1, does that say who the other folks are that

8   borrowed the money from the First State Bank?

9   A.   Yes, it does.

10  Q.   And who are those?

11  A.   It will be Eugene Lewis and wife Burdette Lewis; Mansell

12  Baker and wife Diane Baker; and Denver Sizemore, a single man.

13  Q.   Mr. Jones' name, nor that of his wife, are on there; is

14  that correct?

15  A.   No, sir.  They're not.

16           MR. WHITE:  Those are all the questions I have, Your

17  Honor.  Thank you.  I would move admission of defense

18  exhibit --

19           THE COURT:  Jones Number 2?

20           MR. WHITE:  Yes, Your Honor.  I didn't move its

21  admission earlier.

22           THE COURT:  All right.  We'll see if there's an

23  objection to the admission of that document.

24           MR. SMITH:  No, Your Honor.

25           THE COURT:  That exhibit will be admitted at this

*M. BAKER - Cross (Mr. Simons)*                                    36

1    time.  Thank you.

2                    (Defense Exhibit Jones Number 2

3                     was admitted into evidence.)

4            MR. WHITE:  Thank you, Your Honor.  That's all I

5    have.  Pass the witness.

6            MR. ABELL:  No questions, Judge.

7            MR. BALDANI:  Nor from us.

8            MR. GILBERT:  No, sir.

9            MS. HUGHES:  None.

10           MR. SIMONS:  I have some.

11           THE COURT:  Yes, sir.

12                        CROSS-EXAMINATION

13   BY MR. SIMONS:

14   Q.  Afternoon, Mr. Baker.

15   A.  Afternoon.

16   Q.  My name is Dan Simons.  I represent Stanley Bowling.  You

17   know Mr. Bowling?

18   A.  Yes, sir, I do.

19   Q.  In fact, you lived in his garage for, you said, four

20   years?

21   A.  Yes, I did.

22   Q.  All right.  I want to talk about your relationship with

23   Stanley just a little bit.  Would you say he's been good to

24   you?

25   A.  Very good to me.

M. BAKER - Cross (Mr. Simons)                                    37

1   Q.  As a matter of fact, when you moved in his garage in

2   about 2002, you were essentially homeless, weren't you?

3   A.  Yes, I was.

4   Q.  And were you a drug addict at that time?

5   A.  Yes, I was.

6   Q.  And what drug was your addiction?

7   A.  Cocaine.

8   Q.  And how long had you been a cocaine addict at that time?

9   A.  Since '90.

10  Q.  Okay.  And did you have intermittent problems with

11  cocaine, repeated problems over many years?

12  A.  Yes, I have.

13  Q.  Okay.  Have you been charged with any cocaine crime?

14          MR. SMITH:  Objection, Your Honor.

15          THE COURT:  Sustained.

16  Q.  Have you been convicted of any crime involving cocaine?

17  A.  One possession.

18  Q.  Okay.  And that was a felony possession; was it not?

19  A.  It was amended down.

20  Q.  It was not a felony?

21  A.  No.

22  Q.  And when was that?

23  A.  That was back in the early '90s.

24  Q.  And you're telling this jury that it was not a felony

25  conviction when it finally was resolved?

*M. BAKER - Cross (Mr. Simons)*                                    38

1    A.   I stayed in Laurel --

2    Q.   That's what I asked you.  Are you telling the jury you

3    did not plead to a felony conviction?

4    A.   The only thing I pled to was a possession of cocaine, a

5    misdemeanor, as far as my knowledge.

6    Q.   I wasn't aware that there was a misdemeanor cocaine

7    charge.

8         MR. SMITH:  Your Honor, I'm going to object.  Counsel

9    has asked, and he's I believe given him an answer.

10        THE COURT:  Sustained.

11   Q.   I'll move on.  Have you ever been convicted of any

12   felony?

13   A.   Yes, I have.

14   Q.   Okay.  What was that?  Tell the jury what that was.

15   A.   Theft over 300.

16   Q.   And what did you steal?

17   A.   A trailer from a church.

18   Q.   Seventh Day Adventist church trailer?

19   A.   Yes, I did.

20   Q.   And did that trailer have belongings in it?

21   A.   Yes.

22        MR. SMITH:  Your Honor, I'm going to object.

23        THE COURT:  Sustained.

24   Q.   When was that theft of the trailer from the church, Mr.

25   Baker?

1    A.   During the last six months I lived with Mr. Bowling.

2    Q.   Okay.  Let me back up.  Let's talk about your

3    relationship with Stanley Bowling and how you came to be at

4    his home, all right?  You had met Stanley some years back and

5    actually worked for the City while he was supervisor for a

6    year or so?

7    A.   Yeah.

8    Q.   Do you remember when that was?

9    A.   About '84.

10   Q.   Okay.

11   A.   '85.

12   Q.   Okay.  And that was where you met him?

13   A.   Yes.

14   Q.   All right.  And then you went in to a lot of drug

15   troubles?

16   A.   Yeah.

17   Q.   Became addicted to cocaine?

18   A.   Yeah.

19   Q.   And battled that for a lot of years?

20   A.   Yes.

21   Q.   All right.  And then did you move in with some people

22   named Smith?

23   A.   Yes, I did.

24   Q.   Okay.  Would you tell me, tell the jury, please, who

25   those people are?

*M. BAKER - Cross (Mr. Simons)*                                    40

1    A.    A Greg Smith, Greg and Melissa Smith.

2    Q.    Okay.  Did they also have cocaine troubles?

3    A.    Greg did.

4    Q.    Okay.  He was bad on cocaine?

5    A.    Yes.

6    Q.    And, in fact, they had numerous fights and --

7               MR. SMITH:  Your Honor, I object to the relevance.

8               THE COURT:  Sustained.  You'll need to come up and

9    explain the relevance to me.  I don't see it.  Thank you.

10                   (A sidebar conference was held out of the

11                    hearing of the jury):

12              MR. SIMONS:  I'm trying to explain -- have him

13   explain to the jury how he got to Stanley Bowling's residence.

14   The reason is because he got kicked out of this Smith place

15   and was homeless.  I was one question away from being there.

16              THE COURT:  How is that relevant to his testimony as

17   to why he got kicked out of someone else's house?

18              MR. SIMONS:  It will be relevant, Your Honor, when I

19   show why he left Stanley Bowling's, which was cocaine use.

20   Stanley kicked him out.  That's what the proof is going to be.

21              THE COURT:  Sustain the objection to the questions

22   about people he lived with previously.  Stanley may have

23   kicked him out for drug use.  I don't think he's denied that.

24   I don't see the relevance of this, where he lived previously.

25   So I've sustained the objection.

*M. BAKER - Cross (Mr. Simons)*                                              41

1           MR. SIMONS:  All right.

2           MR. PINALES:  Your Honor, Martin Pinales on behalf of

3    Mr. Maricle.  While we're here, just to save a little time,

4    I'm just renewing my objection and request for a separate

5    trial.  I think all this drug testimony is very relevant --

6           THE COURT:  I'll let you brief that issue and you can

7    file your brief by Friday morning at 9:00.

8           MR. PINALES:  Thank you, Your Honor.

9                (Sidebar conference concluded.)

10          THE COURT:  All right.  The objection is sustained.

11   The motion at sidebar is overruled.  You may proceed.

12          MR. SIMONS:  Thank you, Your Honor.

13   BY MR. SIMONS:

14   Q.  I think you said you moved into Stanley's garage in about

15   2002?

16   A.  Yes.

17   Q.  And he accommodated you with a place to live?

18   A.  Yes, he did.

19   Q.  Put a little refrigerator in there?

20   A.  Yes.

21   Q.  Did he give you a little stove to cook on?

22   A.  Yeah, we had a stove, full works.

23   Q.  Did he put groceries in there some of the time?

24   A.  Yes.

25   Q.  Did he give you a job?

*M. BAKER - Cross (Mr. Simons)*                                                    42

1    A.   Yes.

2    Q.   Okay.  Did his wife, Sarah, cook meals for you from time

3    to time?

4    A.   Yes, she did.

5    Q.   Did she do your laundry for you?

6    A.   Yes, she did.

7    Q.   And did they try to accommodate your every need while you

8    were there?

9    A.   Anything I needed.

10   Q.   Was it a rule of Stanley's for you that you not use drugs

11   and stay off drugs while you were in his garage?

12            MR. SMITH:  Your Honor, I'm going to object to the

13   hearsay.

14            THE COURT:  Sustained.

15   Q.   You were there for four years?

16   A.   Yes.

17   Q.   Did you redevelop your drug habit at the end of that

18   time?

19   A.   Yes, I have.  I did.

20   Q.   You did?

21   A.   Yeah.

22   Q.   And you did that just before Stanley made you depart his

23   premises; is that true?

24   A.   Pretty much, yes.

25   Q.   Okay.  And isn't it true that Stanley and his son,

*M. BAKER - Cross (Mr. Simons)*                                          43

1    Stephen -- you know Stephen?

2    A.   Yes.

3    Q.   Stephen works for his dad's company?

4    A.   Yes.

5    Q.   And at that time -- they're both hard working people; are

6    they not?

7    A.   Yes.

8            MR. SMITH:  Your Honor, I'm going to object.

9            THE COURT:  Sustained.

10   Q.   Did Stanley Bowling, my client, and/or his son Stephen

11   find evidence of cocaine use in the garage where you were

12   living?

13   A.   Yes, they did.

14   Q.   And did they confront you with that, about your use?

15   A.   Yes.

16   Q.   And did they, in fact, try to intervene and get you into

17   a rehab program?

18   A.   Yes.

19           MR. SMITH:  Your Honor, I'm going to object.

20           THE COURT:  Sustained.

21   Q.   Did you enter a rehab program?

22   A.   Not at that time.

23   Q.   In fact, you left the garage and no longer lived or

24   worked for Stanley Bowling or B&B; is that true?

25   A.   Yes.

*M. BAKER - Cross (Mr. Simons)*          44

1   Q.  I'm going to move on a little bit further now.  I'm going

2   to talk about -- I'm going to go backwards.  I want to talk to

3   you about a couple of jobs you mentioned in response to Mr.

4   Smith, okay?

5   A.  Yes.

6   Q.  The Laurel Branch job, you said Stanley took some sort of

7   short cut?

8   A.  Yes.

9   Q.  Could you tell me what that was?

10   A.  The original contract was to go around side of a hill,

11   and, you know, up ditch lines and stuff.  And we went through,

12   he got it revised from the people that drawed the plans up and

13   we went through the blacktop.

14   Q.  Hang on just a second.  The people that drew the plans

15   up, that was an engineering firm; was it not?

16   A.  Yes, it was.

17   Q.  And they had to approve and the City had to approve any

18   deviations --

19        MR. SMITH:  Your Honor, I'm going to object.  It's

20   outside of this man's knowledge.  It's all speculation.

21        MR. SIMONS:  Your Honor, he testified to cutting

22   corners.

23        THE COURT:  I'll sustain the objection.

24   Q.  Was there, in fact, not a high pressure gas line right

25   where he was supposed to lay the pipe that he had to avoid?

M. BAKER - Cross (Mr. Simons)                                    45

1    A.   Yes, through the ditch line was.

2    Q.   So the place he was supposed to lay the pipe, it couldn't

3    be done because it might blow the place up.  Isn't that fair?

4    A.   Yes.

5    Q.   All right.  So in an effort to get around that, they cut

6    through the road and then refilled the road?  Is that fair?

7    A.   That's some of it, yes.

8    Q.   Okay.  Now, after you left Stanley's, did you take your

9    things with you that night when you left?

10   A.   No, I did not.

11   Q.   All right.  Did Stanley ever contact you again in any

12   way?

13   A.   Yes, he did.

14   Q.   Okay.  Did he bring your stuff to you later?

15   A.   He come and seen me a couple times, seen how I was doing.

16   And then, you know, eventually, he sent a guy down there with

17   them.

18   Q.   Okay.

19   A.   You know.

20   Q.   He continued to try to help you; did he not?

21   A.   Yes, he did.

22   Q.   And you never did work for him anymore after that?

23   A.   No, sir, I haven't.

24   Q.   Okay.  Now, there was some mention about the 2002

25   election, and you seeing Bobby "Red" Sams?

*M. BAKER - Cross (Mr. Simons)*                                            46

1    A.   Yes.

2    Q.   Is he a friend of yours?

3    A.   Actually, kin by marriage.

4    Q.   Okay.  And the jury's seen his picture earlier in this

5    trial, I think.  Was he -- did you say you knew who he was

6    hauling for?

7    A.   No, I did not say.

8    Q.   You know he wasn't hauling for Stanley Bowling --

9         MR. SMITH:  Your Honor, I'm going to object.  He said

10   he didn't know who he was hauling for.

11        MR. SIMONS:  I'll withdraw.

12        THE COURT:  I'm going to sustain the objection.  I'll

13   instruct the jury to disregard the question.

14   Q.   You say you voted in what precinct?

15   A.   I voted in the Harts Branch precinct.  See, in the 2002,

16   I voted in the Whites Branch precinct.  In the 2004, I should

17   have voted in the Manchester precinct.

18   Q.   How were you able to vote with a felony conviction on

19   your record?

20   A.   I still don't, you know, I don't think I was convicted of

21   a felony.

22   Q.   Well, you acknowledged to me that you were convicted of a

23   felony theft.

24        MR. SMITH:  Your Honor, I believe the witness has

25   stated that that was outside the time period of the elections

*M. BAKER - Redirect (Mr. Smith)*                                    47

1     he said he voted in.  I think it's mischaracterizing the

2     evidence.

3                  THE COURT:  Sustained.

4                  MR. SIMONS:  That's all I have for you, Mr. Baker.

5     Thank you.

6                  THE WITNESS:  Thank you.

7                  THE COURT:  Any redirect of the witness, Mr. Smith?

8                  MR. SMITH:  If I could have just one second.

9                  THE COURT:  Yes, sir.

10                        REDIRECT EXAMINATION

11    BY MR. SMITH:

12    Q.  Mr. Baker, you were given some bank mortgage documents

13    there to look at.  Do you remember that?

14    A.  Yes.

15    Q.  And you acknowledge that that had everybody's name on it

16    but Wayne Jones and his wife?

17    A.  Yes.

18    Q.  What was your understanding of the reason Wayne Jones'

19    name's not on there?

20    A.  He said at the time he didn't want his name on no kind of

21    documents and stuff.

22    Q.  Now, how long has it been since you talked to Eugene

23    Lewis, Mr. Baker?

24    A.  He's actually in the cell beside of me, but it's been 10,

25    15 years since I talked to Mr. Lewis.

*M. BAKER - Redirect (Mr. Smith)*                                    48

1    Q.   So how is it he's in the cell beside of you and you

2    fellas not get to talk?

3    A.   We left this place here with very bad feelings.

4    Q.   You and Mr. Lewis did?

5    A.   Yes.

6    Q.   Y'all have hard feelings?

7    A.   Yes.

8    Q.   And you haven't spoken to him in how long?

9    A.   Probably 10 or 15 years.

10   Q.   Okay.  And how long has it been since you spoke to Denver

11   Sizemore?

12   A.   The same amount.

13   Q.   You all not on speaking terms either?

14   A.   No.

15   Q.   Now, during the time period you were working for Stanley

16   Bowling, did you see him associating with Kennon White on the

17   job?

18   A.   Yes.

19   Q.   How often did you see Kennon White visiting Stanley

20   Bowling on the job?

21   A.   Every other day, sometimes, you know, day after day.

22   Q.   And to your knowledge, did Kennon White have something to

23   do with approving these contracts that Mr. Bowling was getting

24   modified?

25            MR. SIMONS:  Your Honor, may I object?  This is

1   outside the scope of cross-examination.

2           THE COURT:  No, I disagree.  I will overrule the

3   objection.

4   A.   Question again, Your Honor -- or sir?

5   Q.   To your knowledge, did Kennon White have something to do

6   with getting these contract modifications approved that you've

7   been questioned about?

8   A.   That is -- I'm not a hundred percent sure on that.

9           MR. SMITH:  That's all I have.

10          THE COURT:  All right.

11          MR. PINALES:  Nothing further, thank you, Judge.

12          THE COURT:  Mr. Simons, I think we're back -- Mr.

13  White, did you have any?

14          MR. WHITE:  None, Your Honor, I'm sorry.

15          THE COURT:  Mr. Simons, we're back around to you.

16                        RECROSS-EXAMINATION

17  BY MR. SIMONS:

18  Q.   Can you see me right here, Mr. Baker?

19  A.   Yes, I can.

20  Q.   Did you talk to Kennon White during the time you were

21  working for Mr. Bowling?

22  A.   Just say hello and stuff.

23  Q.   Well, did he ask you to do a job in town and tell you

24  that he needed money from you if you were to bid for it and

25  get it?

*M. BAKER - Recross (Mr. Simons)*                                      50

1    A.   Yes, he did.

2    Q.   Okay.  Did he also tell you that he was extorting money

3    from Jackie Jones and Scott Robinson?

4    A.   Jackie Jones and Scott had a disagreement with Kennon

5    over that.

6    Q.   Over him extorting money from them, correct?

7    A.   Yes.

8              MR. SIMONS:  That's all.  Thank you.

9              THE COURT:  Anything else of the witness?

10             MR. SMITH:  No, thank you, Your Honor.

11                              *  *  *

12                      C E R T I F I C A T E

13         I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct excerpted transcript from the record of
14   proceedings in the above-entitled case.

15

16    \s\ Lisa Reed Wiesman                    March 3, 2010
     LISA REED WIESMAN, RDR-CRR          Date of Certification
17   Official Court Reporter

18

19

20

21

22

23

24

25