UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

\- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | : Docket No. CR 09-16-S |
| | : |
| Plaintiff, | : **Frankfort, Kentucky** |
| | : Thursday, February 4, 2010 |
| versus | : 1:15 p.m. |
| | : |
| RUSSELL CLETUS MARICLE, | : |
| DOUGLAS C. ADAMS | : |
| CHARLES WAYNE JONES | : |
| WILLIAM R. STIVERS | : |
| FREDDY W. THOMPSON | : **Trial Day 3B** |
| WILLIAM B. MORRIS | : |
| DEBRA L. MORRIS | : **EXCERPTED TRANSCRIPT** |
| STANLEY BOWLING, | : |
| | : **Examination by Mr. Bayer** |
| Defendants. | : |

\- - -

TRANSCRIPT OF TRIAL
BEFORE DANNY C. REEVES
UNITED STATES DISTRICT COURT JUDGE and a jury

\- - -

APPEARANCES:

For the United States: STEPHEN C. SMITH
JASON D. PARMAN, ESQ.
Assistant U.S. Attorney
601 Meyers Baker Road
Suite 200
London, KY 40741

For the Defendant Russell Cletus Maricle: MARTIN S. PINALES, ESQ.
Strauss & Troy
150 E. Fourth Street
Fourth Floor
Cincinnati,OH 45202

DAVID S. HOSKINS, ESQ.
107 E. First Street
Corbin, KY 40701

| | |
|---|---|
| For the Defendant Douglas C. Adams: | R. KENT WESTBERRY, ESQ.<br>KRISTIN N. LOGAN, ESQ.<br>Landrum & Shouse, LLP<br>220 West Main Street<br>Suite 1900<br>Louisville, KY 40202 |
| | BENNETT E. BAYER, ESQ.<br>Landrum & Shouse, LLP<br>106 West Vine Street<br>Suite 800<br>Lexington, KY 40507 |
| For the Defendant Charles Wayne Jones: | T. SCOTT WHITE, ESQ.<br>Morgan & Pottinger, P.S.C.<br>133 West Short Street<br>Lexington, KY 40507 |
| For the Defendant William R. Stivers: | ROBERT L. ABELL, ESQ.<br>120 North Upper Street<br>Lexington, KY 40507 |
| For the Defendant Freddy W. Thompson: | RUSSELL JAMES BALDANI, ESQ.<br>R. TUCKER RICHARDSON, ESQ.<br>Baldani, Rowland & Richardson<br>300 West Short Street<br>Lexington, KY 40507 |
| For the Defendant William B. Morris: | JERRY W. GILBERT, ESQ.<br>Coy, Gilbert & Gilbert<br>212 North Second Street<br>Richmond, KY 40475 |
| For the Defendant Debra L. Morris: | ELIZABETH SNOW HUGHES, ESQ.<br>Gess, Mattingly & Atchison, PSC<br>201 West Short Street<br>Lexington,KY40507 |
| For the Defendant Stanley Bowling: | DANIEL A. SIMONS, ESQ.<br>Thompson, Simons, Dunlop & Fore<br>116 West Main Street<br>Suite 2A<br>Richmond, KY 40476 |

Court Reporter: LISA REED WIESMAN, RDR-CRR
Official Court Reporter
35 W. Fifth Street
P.O. Box 1073
Covington, KY 41012
(859) 291-4410

Proceedings recorded by mechanical stenography, transcript produced with computer.

* * *

RECROSS-EXAMINATION

BY MR. BAYER:

Q. Mr. Day, under direct examination by Mr. Smith, you indicated, if I understand this correctly, and I may be wrong, and correct me if I am, you were advised that every time you testified, you were under a threat of perjury if you didn't tell the truth?

A. Now, ask me that again, now.

Q. I'm trying to understand what your answer was. You were advised by the United States that you had to come in to court and be truthful why?

A. Because I'd get a charge of perjury and that I wouldn't have no chance of getting no sentence reduction.

Q. So knowing that there's a chance for new charges to be brought against you compels you to do the right thing?

A. That is right.

Q. Well, you got out of prison in 2002, correct?

A. '01.

Q. '01. You were on what was called supervised release?

A. That is right.

Q. And supervised release is where you're responsible to the Court to make sure that you never break the law again, right?

A. For five years, that's right.

Q. And during that period of supervised release, what

happens to you if you break the law again?

A. Go back to jail.

Q. So you knew that there was a problem with you being sent back to jail if you broke the law again, right?

A. That is right.

Q. But you broke the law again, didn't you?

A. Sure did.

Q. Because that was what you wanted to do, right?

A. You know, I don't know if I want to say it like that, but I did. I broke the law. May not been what I wanted to do, but I did.

Q. So the mere fact that you knew that there was a problem that if you did something wrong you were going to go back to prison, that didn't stop you, did it?

A. Not once I got on the drugs, it didn't stop me.

MR. BAYER: If I could have just a moment, Judge. I'm looking for something specific.

THE COURT: Yes, sir. Certainly.

Q. In the cross-examination by Mr. White regarding Barbara White, if you remember in my cross-examination, I specifically asked you whether or not you had done anything with Barbara White to get some money back and charges dropped. You told me no.

A. Do what now? What did you say now? Ask me again.

Q. When I was cross-examining you, I asked you specifically

about the issue that Mr. White asked you when he showed you the 302, and you told me it never happened. And then when Mr. White showed it to you, your memory was refreshed and then you said it happened.

A. What I remember you asking me is if I had a meeting with Barbara Colter, and I told you I did not have no meeting with her. That's what I understand that you asked me.

Q. But I also asked you whether or not you had anything to do with helping to get the money back and the charges dropped.

A. I did not.

Q. Did you ever talk with Barbara Colter White?

A. Absolutely not.

Q. But when Mr. White showed you that section from out of your summary, you agreed with the summary.

A. But I didn't talk to Barbara Jo Colter.

Q. Who did you speak with?

A. I didn't speak to nobody.

Q. Well, then, how do you know about that meeting?

A. Jennings White told me about the meeting.

Q. What did Jennings tell you?

A. You know, it's been so long that I don't recollect it, exactly what all went down, but Jennings told me about it. I didn't ever speak to Barbara Jo and I never did speak to Kennon, or I never did speak to Doug about none of it.

Q. Is it your understanding that Jennings, when he told you

about this meeting in which Barbara White Colter or Colter White, whatever her name is, was involved, do you believe Jennings?

MR. SMITH: Your Honor, I'm going to object.

THE COURT: Sustained.

MR. BAYER: I don't have any other further questions. Thank you, Judge.

* * *

CROSS-EXAMINATION

BY MR. BAYER:

Q. Mr. Lewis?

A. Yes.

Q. Do you need to take a break, sir?

A. Pardon?

Q. Are you okay? Do you need to take a break?

A. No, I'm all right.

Q. I just want to follow up quickly right now on some of the questions that Mr. Hoskins was asking you. What was it that the government told you they would do for you if you came in and testified?

A. Nothing.

Q. Well, then, why is it you're testifying?

A. Sir, on August the 24th, and I would say something to that to reiterate what you said, but the Court probably wouldn't want me to say that. On August the 24th of 2009,

where I'm in a prison camp in Ashland, Kentucky, at 4:00 every day they have a call out sheet, what people supposed to do, go and so on.

On August the 25th of 2009, they called me to R&D to pack out. I had no idea where I was going to. The Carter County Sheriff's Department picked me up, brought me to Carter County. I stayed there six hours, about roughly six hours. About six hours later, the Grayson County Detention Center, where a lot of federal holdovers is down there, keep a lot of people. They took me a three hour drive from Carter County to Grayson County.

I stayed there approximately two or three weeks. On sometime in September, you've got the date there, I don't remember, they transported me to the federal courthouse in London, Kentucky. I had no idea where I was going. No federal agent had talked to me at that time. And I met an agent, a gentleman he's setting back there, Buddy Blair. And he questioned me, asked me some questions.

I had no idea that I was coming to -- leaving prison camp, coming back to Grayson County and to London. I had no idea. Nobody had informed me in no way, and they questioned me about some of this that's going on.

And approximately two months later, I set in -- I was called back to London again, and they was four guys that asked me some questions.

Q. Who were those four guys?
A. Sir, back there sets Mr. Smith, U.S. attorney. And I think Mr. -- other guy's a U.S. attorney, and FBI Agent Timothy Briggs and his agent with him, Buddy Blair.
Q. Well, then, why is it that you're under the impression that you think it will do you benefit if you testify?
A. I don't want to get caught up in something. I thought it might have been something they was charging me for too, and I wanted to tell the truth.
Q. Do you remember talking to the FBI back in August of '04?
A. Yes.
Q. Do you remember talking to the FBI back in November of '04?
A. I may have. I'm not for sure, sir.
Q. Do you remember talking to the FBI in June of '05?
A. June of '05?
Q. Yes, sir.
A. Now just a minute --
Q. They did an interview with you in June of '05?
A. They could have, but I can't recollect.
Q. So, I mean, this is not just out of the clear blue that somebody just came up to you just recently and said I want to talk to you about all that's going on in Clay County?
A. They -- it could be.
Q. I mean, this has been going on with you for years, right?

A. I can't say that.
Q. You can't deny it, though, can you?
A. I could say that I was asked a few questions. Yes, sir.
Q. And you think that by testifying here today, you're going to be able to get out of prison a little bit earlier?
A. I would hope so, but possibly not.
Q. Well, then, who was it that told you if you committed perjury you'd go to prison for a longer period of time?
A. Mr. Smith.
Q. When did Mr. Smith tell you that?
A. Mr. Smith told me that, he said today too, today, I mean.
Q. Before today, when did he tell that to you?
A. Probably when I was interviewed a couple months ago.
Q. Okay. So they've talked to you about what they're expecting you to testify to at trial?
A. Very little.
Q. But they've talked to you?
A. Yes, they have.
Q. Thank you. And that was how you came to the concept that it would help you if you testified, that it might get you out of prison?
A. There's a slight possibility, sir.
Q. Do you know who is Kenny Day?
A. Yes.
Q. Tell me how you know Kenny Day, because the jury's

already met Mr. Day.
A. About 40 years worth, 45.
Q. How did you meet him?
A. How did I meet him?
Q. Yes, sir.
A. Kenny was a service manager for White's Chevrolet Pontiac for many years, and I've known Kenny. His wife and my wife went to church together. I've probably seen Kenny in a church house just before this happened, deal came down at a revival of all places. But I've knowed Kenny for many years. His dad and my dad were big fox hunters. I knowed him several years. Never no kind of dealings with him. Just personal friends.
Q. No drug dealings?
A. No, sir.
Q. But you would consider yourself personal friends with Kenny Day?
A. We're friends. I don't know how close that would be. We're friends, I'd say. I'll be friends with you.
Q. We'll see. Maybe after the trial. Mr. Lewis?
A. Yes, sir.
Q. Did you know Kenny Day was in drugs?
A. No, sir.
Q. You actually spent some time in a jail cell with Kenny Day, though, didn't you?
A. Yes, I did.

Q. Tell the jury about that.

A. When I got charged, they took me to April the 27th of 2005; is that right?

Q. Yes, sir, I think that might be right.

A. I got arrested. I came in, I was riding one of my Peterbilt trucks with a dozer on the back, and they was a lot of people at my house. I got arrested. They took about everything I had, but I went to -- let me back up.

When the state police got me, the FBI gave me to the state police, they put me in the back of a cruiser. And they left one of my pieces of property, go down U.S. 421, goes right through Frankfort, goes to Manchester. And I said, why you going this away? He said, you'll see.

I thought they'd go down by the parkway to London to put me in the jailhouse. Well, Kenny's shop was approximately six, seven, eight miles from where I turn out.

Q. Mr. Lewis, let me interrupt you for a second. Could you move your microphone, because you're not speaking into the microphone.

A. Sorry.

Q. That's all right. Thank you, sir.

A. Kenny's shop was approximately seven, eight miles where I came out. And when the state police gets there, I look, U.S. 421 is blocked, seems like there's ten million police officers. They take me in the back of his shop, and the FBI

agent from London photos me and, you know, I guess fingerprints and all that stuff. And I didn't stay there very long. Then the state police takes me to London, Kentucky jail. But in the meantime, that next morning or something, I seen or I heared that Kenny and them was in jail too. He was at another pod.

Approximately, what, a week later, they come and packed me up and took me to Somerset, Kentucky, me and Kenny Day.

Q. To the Pulaski County jail?

A. Sorry, Pulaski County jail. And we stayed there approximately April to -- sometime in July, sir. And they took me to Grayson County. So I stayed over there with him probably couple months or somewhere in that vicinity, and they took me to Grayson County. And I haven't seen Kenny for a long time.

Q. Now, when you were in jail with Kenny Day, did he tell you about the drugs that he had coming in from Canada?

A. Not that I knowed of.

Q. You don't remember that discussion?

A. No.

MR. BAYER: Judge, I would like to allow the witness to look at something and perhaps it will refresh his memory. Would that be okay?

THE COURT: Yes. Show him documents and ask him if it refreshes his memory on questions pending.

Q. Mr. Lewis, when you get that, don't read it out loud, but read to yourself the portion that is highlighted in yellow.

A. (Reviewing document). Okay.

Q. Do you remember in June of 2005 meeting with FBI Special Agent Timothy Briggs?

A. I met with him if that's the date, you know. I don't know about the date's correct.

Q. Do you remember him interviewing you?

A. Yes, sir.

Q. You've now had an opportunity to read that portion which I highlighted in yellow. Does that help you remember anything now?

A. It seems like I can remember some of this, a little bit.

Q. All right. Do you remember now Mr. Kenny Day telling you that he had marijuana that was coming in to the United States from Canada, concealed in a milk truck?

A. He might have, sir. But now you know, you can't believe everything you hear.

Q. Well, I understand that. That's part of the problem. And then do you remember Kenny Day telling you that he had information and that he intended to help the law enforcement with information regarding several people? Do you remember having discussions with Kenny Day about that?

MR. SMITH: Your Honor, I'm going to object as to the relevance of these out-of-court statements.

THE COURT: Sustained.

MR. BAYER: Judge, can we --

THE COURT: Yes, you can come to the Bench.

(A sidebar conference was held out of the hearing of the jury.)

* * *

C E R T I F I C A T E

I, LISA REED WIESMAN RDR-CRR, certify that the foregoing is a correct, excerpted transcript from the record of proceedings in the above-entitled case.

\s\ Lisa Reed Wiesman
LISA REED WIESMAN, RDR-CRR
Official Court Reporter

February 9, 2010
Date of Certification