1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                               - - -
3
     UNITED STATES OF AMERICA,    :  Docket No. CR 09-16-S
4                                 :
                 Plaintiff,       :  **Frankfort, Kentucky**
5                                 :  Thursday, February 25, 2010
          versus                  :  Friday, February 26, 2010
6                                 :
     RUSSELL CLETUS MARICLE,      :
7    DOUGLAS C. ADAMS             :  **Trial Days 13B and 14A**
     CHARLES WAYNE JONES          :
8    WILLIAM R. STIVERS           :
     FREDDY W. THOMPSON           :     **Excerpted Transcript**
9    WILLIAM B. MORRIS            :  **Testimony of Charles Weaver**
     DEBRA L. MORRIS              :
10   STANLEY BOWLING,             :
                                  :
11               Defendants.      :

12

13                             - - -
                     TRANSCRIPT OF TRIAL
14                 BEFORE DANNY C. REEVES
           UNITED STATES DISTRICT COURT JUDGE and a jury
15                             - - -

16   APPEARANCES:

17   For the United States:       STEPHEN C. SMITH, ESQ.
                                  JASON D. PARMAN, ESQ.
18                                Assistant U.S. Attorney
                                  601 Meyers Baker Road
19                                Suite 200
                                  London, KY 40741
20
     For the Defendant
21   Russell Cletus Maricle:      CANDACE C. CROUSE, ESQ.
                                  Strauss & Troy
22                                150 E. Fourth Street
                                  Fourth Floor
23                                Cincinnati,OH  45202

24                                DAVID S. HOSKINS, ESQ.
                                  107 E. First Street
25                                Corbin, KY  40701

2

```
 1    For the Defendant          R. KENT WESTBERRY, ESQ.
      Douglas C. Adams:          KRISTIN N. LOGAN, ESQ.
 2                               Landrum & Shouse, LLP
                                 220 West Main Street
 3                               Suite 1900
                                 Louisville, KY 40202
 4

 5    For the Defendant          T. SCOTT WHITE, ESQ.
      Charles Wayne Jones:       Morgan & Pottinger, P.S.C.
 6                               133 West Short Street
                                 Lexington, KY  40507
 7

 8    For the Defendant          ROBERT L. ABELL, ESQ.
      William R. Stivers:        120 North Upper Street
 9                               Lexington, KY  40507

10

      For the Defendant          RUSSELL JAMES BALDANI, ESQ.
11    Freddy W. Thompson:        R. TUCKER RICHARDSON, ESQ.
                                 Baldani, Rowland & Richardson
12                               300 West Short Street
                                 Lexington, KY  40507
13

14    For the Defendant          JERRY W. GILBERT, ESQ.
      William B. Morris:         Coy, Gilbert & Gilbert
15                               212 North Second Street
                                 Richmond, KY 40475
16

17    For the Defendant          ELIZABETH SNOW HUGHES, ESQ.
      Debra L. Morris:           Gess, Mattingly & Atchison, PSC
18                               201 West Short Street
                                 Lexington,KY40507
19

20    For the Defendant          DANIEL A. SIMONS, ESQ.
      Stanley Bowling:           Thompson, Simons, Dunlop & Fore
21                               116 West Main Street
                                 Suite 2A
22                               Richmond, KY 40476

23

24

25
```

3

Court Reporter:                 LISA REED WIESMAN, RDR-CRR
                                Official Court Reporter
                                35 W. Fifth Street
                                P.O. Box 1073
                                Covington, KY  41012
                                (859) 291-4410


    Proceedings recorded by mechanical stenography,
transcript produced with computer.

1                              * * *

2                    CHARLES WEAVER, GOVERNMENT'S WITNESS, SWORN

3                  THE COURT:  Thank you.  Mr. Parman, you may proceed.

4                  MR. PARMAN:  Thank you, Your Honor.

5                              DIRECT EXAMINATION

6    BY MR. PARMAN:

7    Q.  Sir, before we begin, you may want to lift that

8    microphone up a little bit.  Could you state your name for the

9    record?

10   A.  Charles Newton Weaver.

11   Q.  Mr. Weaver, do you go by a nickname?

12   A.  Yes.  Dobber.

13   Q.  Dobber?

14   A.  Dobber, yes.

15   Q.  If you could share with the jury how you got that

16   nickname.

17   A.  My dad was jailer, and I got it from inmates over the

18   years while he was a jailer.

19   Q.  What was your dad's name?

20   A.  Homer Weaver.

21   Q.  Where was he jailer?

22   A.  Clay County.

23   Q.  Sir, how old are you?

24   A.  I'm 38.

25   Q.  Are you married?

*WEAVER - Direct (Mr. Parman)* 5

1  A.  Yes.

2  Q.  Do you have any kids?

3  A.  Yes.  I have three kids.

4  Q.  Where do you live?

5  A.  Manchester.

6  Q.  What county is Manchester in?

7  A.  Clay County.

8  Q.  How long have you lived in Clay County?

9  A.  All my life.

10  Q.  Could you share with the jury your employment history?

11  A.  I had 17, almost 17 years with the Department of

12  Transportation, and then I was emergency management

13  coordinator for Clay County, and I was a football coach there

14  as a part-time thing also.

15  Q.  When were you emergency management coordinator for Clay

16  County?

17  A.  2007.

18  Q.  What did you do for the Department of Transportation?

19  A.  Heavy equipment operator.

20  Q.  And what years did you act as a football coach?

21  A.  I want to think around 2003 to about 2007.  Four years

22  football coach.

23  Q.  What are the ages of your children?

24  A.  Second grade to sixth grade.

25  Q.  Sir, when did you first become involved in the election

*WEAVER - Direct (Mr. Parman)*                                                              6

1   process in Clay County?

2   A.   2002.

3   Q.   Did you have prior experience with elections in Clay

4   County by dealing with your father?

5   A.   Yes.

6   Q.   Share with the jury what that experience was.

7   A.   I just been around politics in Clay County all my life.

8   My father was elected jailer in 1969, like two years before I

9   was born.  So, you know, I just grew up in politics.

10  Q.   How many years did he serve as jailer?

11  A.   Twenty-one years.

12  Q.   And in 2002, did you become personally involved in the

13  election process in Clay County?

14  A.   Yes, I did.

15  Q.   How so?

16  A.   I ran for school board in the November election.

17  Q.   And what district in Clay County did you run for school

18  board?

19  A.   District 1.

20  Q.   Does that district encompass the City of Manchester?

21  A.   Yes.  The City of Manchester, Harts Branch and Little

22  Goose area.

23  Q.   When you decided to run for school board, did you ask

24  anyone to help you in the election?

25  A.   Yes.

*WEAVER - Direct (Mr. Parman)*                                              7

1    Q.   Who did you ask for help?

2    A.   I asked Jennings White.  He was the county clerk at that

3    time.

4    Q.   And what did he say that he could do for you?

5    A.   Basically, he said that, you know, the thing that we was

6    most concerned about was the absentee votings, because there

7    was a high number of absentees in that May election.  And I

8    asked him what could he do to help me in that one, and he said

9    basically he could hire my mom and dad as clerks for the

10   absentee voting period, and they could actually be in the

11   clerk's office where the machine was during the voting time.

12   Q.   Why was there a concern about the absentee voting?

13   A.   Well, it was just a high number.  And actually, Al Man

14   Stivers was one of the election officers that was going to be

15   running the machines, and Bill Henson, which was a school

16   board employee at the time.

17   Q.   Who were you running against in the 2002 election?

18   A.   Charles Keith.

19   Q.   And how long had he held that position?

20   A.   Not sure.  He's been there a long time.  He's like the

21   chairman of the school board.

22   Q.   To your knowledge, was the school board supporting Mr.

23   Keith in his reelection bid?

24   A.   Yes.

25   Q.   I believe you stated a couple of the officers, election

*WEAVER - Direct (Mr. Parman)* 8

1    officers in Manchester precinct, do you know what positions

2    they held?

3    A.    They was actually, during the absentees, they was just

4    like two of them that was there to handle the absentee voting

5    during that period.

6    Q.    Who was those two people?

7    A.    Al Man Stivers and Bill Henson.

8    Q.    Do you know Al Man Stivers by his full name, his real

9    name?

10   A.    Yes.

11   Q.    What is that?

12   A.    William.

13   Q.    Do you see Mr. Stivers in the courtroom here today?

14   A.    Yes, I do.

15   Q.    Could you point him out?

16   A.    He's wearing the peach shirt there, standing up.  He

17   stood up.

18         THE COURT:  Record will reflect that the witness has

19   identified the defendant, William Stivers.

20   Q.    Did Mr. White then appoint your parents to work there

21   during the absentee process?

22   A.    Yes, he did.

23   Q.    And explain to the jury again, so we're all clear, what

24   their purpose was during the absentee voting.

25   A.    Their purpose was just trying to slow down the absentees,

WEAVER - Direct (Mr. Parman)                                         9

1    because like in May, they was, like, a high number of

2    absentees that voted.  And, you know, we felt that with Mr.

3    Stivers and the school board employee there that, you know, I

4    didn't have a chance; that it was, you know, run away with it.

5    And so he said that he thought it would slow it down if we had

6    somebody there.  Basically, that was the only way to slow it

7    down.

8    Q.   Sir, do you know Bart Morris?

9    A.   Yes, sir.

10   Q.   Do you see him here in the courtroom here today?

11   A.   Yes, I do.

12   Q.   Could you point him out?

13   A.   He's right under the thing there.  Got a black shirt on.

14   Right there, yes.

15          THE COURT:  Record will reflect that the witness has

16   identified the defendant, Mr. Morris.

17   Q.   Did you enlist Mr. Morris's assistance in your 2002

18   campaign?

19   A.   I tried to, yes.

20   Q.   Explain to the jury how you tried to.

21   A.   We was actually -- I was actually with Jennings White the

22   night before the election.  We was at Dairy Queen in

23   Manchester.  And I was actually in a vehicle with Jennings,

24   and Mr. Morris and Vernon Hacker pulled up, and they blowed

25   the horn and asked Jennings to come and talk to them.  So he

*WEAVER - Direct (Mr. Parman)*                                              10

1    got out and went and talked to them.

2         And when he returned, he said they was wanting money for

3    the election.  And he told, he told Mr. Morris that the only

4    way he would give them money if they included me on the

5    ticket.

6    Q.   Who, to your knowledge, did they want money for?

7    A.   They was wanting money for Stanley Bowling in the

8    district and the city council race.

9    Q.   Do you know how much money they requested?

10   A.   I think $3,000 is what he said they asked for.

11   Q.   And then Mr. White said the only way he would do that is

12   if they then supported you?

13   A.   Yes, if they included me on the ticket.

14   Q.   Did Mr. Morris express any concern about openly being in

15   support of you?

16   A.   Yes.  The first time when he came back, Jennings got in

17   the vehicle, he said -- he explained to me what they wanted.

18   And he said they didn't -- he didn't want to do it, because

19   that Bart didn't want to make Doug Adams mad.

20   Q.   To your knowledge, why would that make Doug Adams mad?

21   A.   Because I was running in a school board race.

22   Q.   What was Doug Adams' position at that time?

23   A.   Superintendent.

24   Q.   Of the schools?

25   A.   Yes.

*WEAVER - Direct (Mr. Parman)*                                        11

1  Q.  Sir, do you know Debbie Morris?

2  A.  Yes.

3  Q.  Do you see her here in the courtroom?

4  A.  Yes, barely can see her right here behind this gentleman.

5  Yes, that's her right there.

6       THE COURT:  Record will reflect that the witness has

7  identified the defendant, Debra Morris.

8  Q.  Do you know her to be the wife of Bart Morris?

9  A.  Yes, sir.

10 Q.  How long have you known Mr. and Mrs. Morris to be

11 together as a couple?

12 A.  Probably mid '90s.  Somewhere in the '90s.  I took over

13 as fire chief in Manchester in '94.  I want to say somewhere

14 in the mid '90s, I know they was a couple then.

15 Q.  Why do you know they was a couple then?

16 A.  Because I actually, you know, seen them all the time,

17 because he would come to city council meetings and stuff like

18 that.

19 Q.  And you were serving as fire chief at that time?

20 A.  Yes.

21 Q.  Sir, to your understanding, when Mr. White, Mr. Morris

22 are discussing money for elections, what do you understand

23 that money was going to be used for?

24 A.  To buy votes.

25 Q.  Sir, did you personally buy any votes in the 2002

*WEAVER - Direct (Mr. Parman)*                                                12

1    election?

2    A.   Yes.

3    Q.   How many votes would you estimate that you bought?

4    A.   Probably myself around 20, 25 votes, somewhere in there.

5    Q.   Did others participate in your scheme to buy votes?

6    A.   In 2004?

7    Q.   2002, sir.

8    A.   2002, yes.

9    Q.   Who would that have been?

10   A.   It was the city council members that was running and the

11   magistrate race, which would have been in District 6, the

12   Beech Creek magistrate.

13   Q.   Do you recall the names of any of those city council

14   members?

15   A.   In 2002, I can't recall all of them in 2002, no.

16   Q.   When you were buying these votes, were you also hauling

17   voters to the polling place?

18   A.   Yes.

19   Q.   Where would you haul voters to once they had voted?

20   A.   When -- depending on what precinct they voted in.  If

21   they was in the Beech Creek area, after we took and voted

22   them, we would take them to Bill White and Jennings' garage

23   area.  And then if they was in Manchester, we would take them

24   to Bart's house, in front of Bart 's house.

25   Q.   And were they then paid at Bart's house?

*WEAVER - Direct (Mr. Parman)*                                          13

1   A.   Yes.

2   Q.   And when you're referring to Bart, you're referring to

3   Bart Morris?

4   A.   Yes.

5   Q.   Now, when you were hauling these voters, were they told

6   who to vote for when they went in?

7   A.   Yes.

8   Q.   Who told them who to vote for?

9   A.   The ones that I took in, you know, I would go in and vote

10  'em myself.

11  Q.   So you personally took them?

12  A.   I personally took them in, yes.

13  Q.   Then when they voted as you had directed, you took them

14  to Bart Morris?

15  A.   Yes.

16  Q.   And then Bart Morris would pay them?

17  A.   Yes.  Or if we was in Manchester, we went to, you know,

18  Vernon Hacker, who was at Bart's house that day.

19  Q.   Now, in 2002, were there other candidates that asked for

20  your paid voters to be voted for them as well?

21  A.   In 2002?  Only thing I can remember is the school board

22  race and the city council race.

23  Q.   Do you recall if anybody running for magistrate, for

24  instance, had asked you to support them while the voters were

25  being paid?

WEAVER – Direct (Mr. Parman)                                    14

1    A.   Not in 2002, I can't remember.

2    Q.   What was the outcome of your election, sir?

3    A.   As far as mine, I lost it.  I think around a hundred some

4    votes.

5    Q.   Are you aware of the activities of your opposition during

6    the election?  Did you see any type of election activity?

7    A.   I just seen a group of individuals out.  You know, I

8    thought that's what they was doing, you know, was out, you

9    know, trying to get votes as far as, you know, from the school

10   board side, yes.

11   Q.   Who was that group of individuals?

12   A.   I seen Charles Keith, he was the chairman of the board.

13   Willie Sizemore, he was the ex-superintendent, and Jimmy

14   Little, he was a former Board employee, and Mr. Doug Adams.

15   Q.   Did you observe any of the actions of William "Al Man"

16   Stivers during the 2002 election at the Manchester precinct?

17   A.   No, not 2002.

18   Q.   Okay.  We'll move forward to the 2004 election.

19   A.   Okay.

20   Q.   Did you participate in that election?

21   A.   Yes, sir, I did.

22   Q.   What part did you play in the 2004 election?

23   A.   I was an election officer in November.

24   Q.   So you did not participate in the May primary?

25   A.   No, sir.

WEAVER - Direct (Mr. Parman)                                        15

1    Q.   Only the November general election?

2    A.   November.

3    Q.   And just so the jury's clear, in 2002, your election, was

4    that in the May or the November?

5    A.   It was in November in 2002, my election was.

6    Q.   So school board doesn't have a primary?

7    A.   No.

8    Q.   What position did you hold in 2004?

9    A.   I was the Republican election officer in Manchester.

10   Q.   Who asked you to serve in that capacity?

11   A.   Actually, I got a phone call Monday night.  It was

12   sometime later on Monday night, and they asked me could I come

13   by Bart Morris's house.  And when I went by Bart's house --

14   Q.   Let me stop you.  You say they asked you.

15   A.   Yes.

16   Q.   Do you recall specifically who called you?

17   A.   I think it was Vernon Hacker or Todd Roberts, one did

18   call my cell phone.  It was one of the two.  I can't remember

19   which one for sure.

20   Q.   So you then went to Bart Morris's house?

21   A.   Yes.

22   Q.   Do you know where that house is located?

23   A.   Yes, sir.

24   Q.   Can you share with the jury where that's at?

25   A.   It's located on Green Street.  It's on the road right

*WEAVER - Direct (Mr. Parman)*                                      16

1   behind the SuperAmerica there, the Speedway in Manchester.

2   Q.   Go ahead.  So you arrived at Mr. Morris's house?

3   A.   Yes.

4   Q.   From there?

5   A.   When I arrived there, Vernon Hacker was there, Darnell

6   Hipsher was there, Bart Morris was there, Kennon White was

7   there, Todd Roberts was there.  And Jamey Mills was with me at

8   that time.

9        And when I got there, Bart asked me did I want to serve

10  as election officer for the Manchester precinct.

11  Q.   Was Debbie Morris present in the house?

12  A.   Yes, she was there.

13  Q.   So Mr. Morris asked you if you wanted to serve as an

14  election officer?

15  A.   Yes.

16  Q.   And what did you tell him?

17  A.   I said yes.

18  Q.   What were you then told to do?

19  A.   Mr. Morris instructed me if I was there early that

20  morning, that the first election officer that was at the

21  polling place would get to serve, because whoever the election

22  officer was at the time told them that they was not going to

23  be there.  And he said if, you know, if you get over there

24  early, you're the first in line, you can serve as election

25  officer.

*WEAVER - Direct (Mr. Parman)*                                    17

1       And that's exactly what I did.  And, you know, we had a

2   slate of candidates he was for.  And he told me that Mr.

3   Stivers was going to be over there also, Mr. Al Man Stivers

4   was going to be there serving as the other judge.

5   Q.   When you say the other judge, what position was he going

6   to hold?

7   A.   He was going to hold the Democrat judge.

8   Q.   So you were going to be the Republican judge, and Mr.

9   Stivers was going to be the Democratic judge?

10  A.   Yes.

11  Q.   And what were you two supposed to do?

12  A.   We was supposed to vote for a certain group of

13  candidates.

14  Q.   Do you recall who was on that slate of candidates?

15  A.   Yes.

16  Q.   Share that with the jury, please.

17  A.   In 2004, the election in November was city council race.

18  It was all the city, county -- there's city council members at

19  the time, and Mr. Stivers, he picked up another candidate.  I

20  picked up somebody different than he did on one of them.  I

21  picked up the same eight was in there.  He wouldn't carry the

22  same eight because him and one of the individuals that was

23  running for council had had a fight a couple, two, three weeks

24  before that.

25  Q.   Who was that individual?

*WEAVER - Direct (Mr. Parman)*                                      18

1    A.   Ouchie Jackson.

2    Q.   And what was Mr. Stivers and Mr. Jackson's problem?

3    A.   Mr. Ouchie Jackson and Darnell Hipsher went to Mr.

4    Stivers' house sometime, couple weeks before that, somewhere

5    in there.  And they had a confrontation, you know.  Mr.

6    Stivers and Mr. Jackson fit and, you know, that morning he

7    would not carry Ouchie on the ticket.  He carried the seven --

8    he actually carried eight, but he carried the seven that was

9    in, not counting Ouchie.

10   Q.   So you all were in agreement as to seven --

11   A.   Yes.

12   Q.   -- and disagreed as to one because of Mr. Stivers'

13   personal disagreement.

14   A.   Yes.

15   Q.   Is that accurate?

16   A.   Yes.  I mean, if he took some in, if we went in, if he

17   was running the machine, he would vote eight.  And when I went

18   in, I'd vote my eight.

19   Q.   Now, when we talk about this slate of candidates and

20   voting the voters, share with the jury what that encompassed.

21   A.   Repeat your question.

22   Q.   Well, we're talking about a slate of candidates, and you

23   said when you voted your voters, you'd do a certain thing.

24   And then when he voted his voters, he would vote his eight?

25   A.   Yes.

WEAVER - Direct (Mr. Parman)                                    19

1    Q.   What does that entail, voting a voter?  Share with the
2    jury what you did.
3    A.   Okay.  We was there.  The people out on the street would
4    actually send the people in to us.  And when, you know, they
5    would pay them or whatever outside, they would bring them to
6    the precinct.  They would say, you know, see Dobber or Al Man.
7    And when they would came -- they came in and asked for us, we
8    would take them in and vote them the way that, you know, they
9    was being paid to vote.
10   Q.   Let me stop you.  When you say you would take them in and
11   vote them, would you personally push the button on the voting
12   machine?
13   A.   Yes.
14   Q.   Or would you tell them what to do?
15   A.   Me or him one would actually push the button.
16   Q.   So you would do the voting yourself?
17   A.   We would do the voting for them.
18   Q.   Were the voters then given something to show that they
19   had done as they were told to do?
20   A.   Yes.
21   Q.   What were they given?
22   A.   They was given a, like a raffle ticket.
23   Q.   Are you aware of some individuals that hauled voters to
24   you and Al Man Stivers in 2004?
25   A.   Yes.

WEAVER - Direct (Mr. Parman)                                          20

1    Q.   Could you share those names with the jury?

2    A.   In 2004, Antwan Henson, he hauled some voters.  Vernon

3    Hacker hauled some voters to us, and Kennon White had hauled

4    some voters to us.

5    Q.   Now, this slate of candidates, who told you who was going

6    to be on that slate?

7    A.   That night, Bart did.

8    Q.   Bart Morris?

9    A.   Yeah.  Bart was, he was interested in the council members

10   we had at the time.

11   Q.   When you say that night, are you saying the night before

12   the election?

13   A.   Yes, the Monday night when he asked me to serve as

14   election officer.

15   Q.   Sir, the jury's heard a lot about voting and how the

16   voting process works.  Are you familiar with voter assistance

17   forms?

18   A.   Yes, I am.

19   Q.   And are you aware that voter assistance forms are

20   normally filled out, have to be filled out if you actually

21   accompanied somebody to vote?

22   A.   Yes.

23   Q.   Was there a discussion at this meeting about voter

24   assistance forms?

25   A.   Yes, sir.

WEAVER - Direct (Mr. Parman)                                    21

1    Q.   And what did that discussion entail?

2    A.   Bart actually told us that night there, he said, try not

3    to fill the paperwork out.  If you do, try to do away with it.

4    Q.   And did he tell you why that needed to happen?

5    A.   Just so you don't leave a paper trail.

6    Q.   Sir, are you aware that in the 2004 election, whether Al

7    Man Stivers was supposed to be the Democrat election judge on

8    that morning?

9    A.   No.  When I went to the -- when I went to the meeting

10   that night, Bart told me that he was going to be there.  And

11   when I arrived that morning, I want to say it was 5:15, 5:30,

12   because I got there early so I could be the first person in

13   line, so I could be the judge.  And when the rest of the

14   election officers showed up, they was actually another

15   election officer showed up to be a judge there.  Glenn Rowland

16   showed up.  He was supposed to be the election officer there.

17   Q.   And what transpired between Mr. Rowland and Mr. Stivers?

18   A.   They actually had some words of who was going to serve as

19   the judge there that day.  And Mr. Rowland was a Democrat

20   also, and they had some words.  And I think Mr. Rowland went

21   and called the courthouse, and then Mr. Wayne Jones came down

22   to the precinct where we was at.

23   Q.   Are you familiar with Mr. Wayne Jones?

24   A.   Yes, sir.

25   Q.   Do you know what his full name is?

WEAVER - Direct (Mr. Parman)                                    22

1    A.   His full name?

2    Q.   Yes.  Do you know if he's known by anything other than

3    Wayne Jones?

4    A.   That's all I know him by.

5    Q.   Do you recognize Wayne Jones in the courtroom here today?

6    A.   Yes, I do.

7    Q.   Could you point him out to the jury?

8    A.   He's sitting straight to -- there.

9         THE COURT:  Record will reflect the witness has

10   identified the defendant, Charles Wayne Jones.

11   Q.   Are you aware of what Mr. Jones' position was regarding

12   elections in 2004?

13   A.   He was election commissioner.

14   Q.   For a certain party?

15   A.   Democrat party.

16   Q.   So he was the Democratic election commissioner?

17   A.   Yes, sir.

18   Q.   And to your knowledge, did he have the ability to

19   determine who would serve as an election officer that day?

20   A.   I thought, you know, if they was a problem that day, that

21   he could do that, yes.

22   Q.   What did Mr. Jones do when he arrived?

23   A.   He told Mr. Rowland that he was not serving there today,

24   that he was the election commissioner, and that Mr. Stivers

25   was going to serve.

*WEAVER - Direct (Mr. Parman)*                                               23

1    Q.   Did Mr. Rowland act like that he was the person that was

2    supposed to be there?

3    A.   Yes.  He said that he had paperwork to be there.

4    Q.   So was it with his opposition that he was forced to

5    leave?

6    A.   Yes.

7    Q.   Now, November, 2004, sir, if you could estimate how many

8    voters came in and asked to be voted by you and Mr. Stivers.

9    A.   I'd say 75 to a hundred.

10   Q.   And of those 75 to a hundred, were they all given the

11   ticket as the plan was?

12   A.   Majority of them was given the ticket.  Sometimes, like

13   if Vernon Hacker walked some into the door or something, you

14   know, we wouldn't give tickets.  And at one time during the

15   day, we had run out of tickets.

16   Q.   So what did you do then to signify that the voters did as

17   expected?

18   A.   We would just come out, we would walk out with them.  We

19   would shake our heads to the person that brought them in.

20   Q.   To the vote haulers?

21   A.   Yes.

22   Q.   Sir, in 2004, did you fill out any voter assistance

23   forms?

24   A.   Yes.

25   Q.   How many do you think you filled out?

*WEAVER - Direct (Mr. Parman)*                                    24

1    A.   Probably, myself, probably 10 or 15, 20.

2    Q.   Did you see Mr. Stivers fill out any?

3    A.   I don't recall.

4    Q.   Did you see what happened to some of those forms?

5    A.   Yes.

6    Q.   What happened to them?

7    A.   At the end of the day, the clerk would actually throw

8    some of them away.

9    Q.   And when you're talking about the clerk, what position

10   did the clerk hold there in the election process?

11   A.   He was the bookkeeper.  Took care all of the paperwork,

12   you know, signing people in to vote.  And if they had -- if

13   they needed assistance, he'd, you know, give them the proper

14   forms to fill out, stuff like that.

15   Q.   And who was the election clerk there in 2004?

16   A.   Anthony Short.

17   Q.   And you witnessed him destroying the voter assistance

18   forms?

19   A.   Yes, sir.

20   Q.   Next I want to turn your attention to the 2006 election.

21   Are you familiar with that election?

22   A.   Yes, sir.

23   Q.   Did you serve in any capacity in that election?

24   A.   Yes.  I served as election officer.

25   Q.   Republican election officer?

*WEAVER - Direct (Mr. Parman)*                                        25

1    A.   Yes.

2    Q.   Who asked you to serve in that capacity?

3    A.   James Phillips.

4    Q.   What position did James Phillips hold at that time?

5    A.   He was the precinct chairman in Manchester.

6    Q.   Did he hold an elected office as well?

7    A.   Yes, sir.

8    Q.   What elected office did he hold?

9    A.   Circuit court clerk.

10   Q.   Circuit court clerk?

11   A.   Yes.

12   Q.   Were there any meetings held leading up to you serving in

13   that capacity?

14   A.   Actually, yes.

15   Q.   Share with the jury what those meetings were.

16   A.   We was at the -- we was at the courthouse for election

17   training, and we actually had a meeting with -- me and Wanda

18   had a meeting with Wayne Jones.

19   Q.   Let me stop you.  You said me and Wanda.

20   A.   Yes.

21   Q.   When you say Wanda, who are you referring to?

22   A.   Me and Wanda White.

23   Q.   You and Wanda White had a meeting with who?

24   A.   Freddy Thompson and Wayne Jones.

25   Q.   Do you see Freddy Thompson in the courtroom today?

WEAVER - *Direct (Mr. Parman)*                                    26

1    A.   Yes, I do.

2    Q.   Could you point him out for the jury?

3    A.   He's straight up there, yes.

4         THE COURT:  The record will reflect that the witness

5    has identified the defendant, Freddy Thompson.

6    Q.   Sir, are you aware of what position Freddy Thompson held

7    in 2006?

8    A.   He was the county clerk.

9    Q.   County clerk.  And are you aware of what role the county

10   clerk plays in the election process?

11   A.   Actually, in charge of just about everything with the

12   election as far as the machines and the paperwork, voter

13   registration.  Stuff like that goes to that office.

14   Q.   You were saying that you and Miss White were going to

15   have a meeting with Freddy Thompson and Mr. Jones?

16   A.   Yes.

17   Q.   Where did that meeting occur?

18   A.   We was actually at the courthouse or the administrative

19   building for the training, and we had a meeting with them in

20   the clerk's office.

21   Q.   Now, was regular training going on on that day?

22   A.   Yes.

23   Q.   And when I say regular training, is there a certain

24   mandatory training for anybody that serves as an election

25   officer?

*WEAVER - Direct (Mr. Parman)*                                    27

1    A.   Yes.

2    Q.   Share with the jury what that is.

3    A.   They go over basically the new laws, you know, all the

4    laws of the election, if anything's changed or anything in

5    that nature.

6    Q.   Now, this meeting that you had with Wanda, Freddy

7    Thompson and Wayne Jones, was that part of that training?

8    A.   No, sir.

9    Q.   Was there anybody else present when that training

10   occurred?

11   A.   No, sir.

12   Q.   So this was separate?

13   A.   Separate.

14   Q.   What occurred during this meeting?

15   A.   Basically, they had a new machine out, you know, new

16   voting machine out at that time, and it was a computer

17   machine, and Mr. Thompson and Mr. Jones actually showed us how

18   to operate it and, you know, to manipulate votes from the

19   machine.

20   Q.   So they instructed you as to how to manipulate votes from

21   the machine?

22   A.   Yes.

23   Q.   What did they tell you?

24   A.   They said that the new machine, the way it was set up,

25   that it would confuse people, and it actually had like a

*WEAVER - Direct (Mr. Parman)*                                    28

1  two-step process that actually led to the final --
2          MR. BALDANI:  Excuse me.  I'm going to object.  My
3  objection is he's saying "they," and I'd like to ask that he
4  specify who is speaking.
5          THE COURT:  All right.  I think he did, but you can
6  repeat who you're referring to when you say they.
7  A.  Mr. Thompson and Mr. Jones.
8  Q.  Continue, sir.
9  A.  They said the machine was set up that it would -- like a
10 two-step process.  And a lot of people would think they had
11 voted, and they hadn't voted, because it was like a two-stage
12 deal.  And that when people would walk away thinking they had
13 voted, they said if they don't vote the way we want them to,
14 you can go in and change it.
15 Q.  Now, this two-step process, can you share with the jury
16 how that occurred?  Was there a Vote button and a Cast Ballot
17 button?  How did that work?
18 A.  Yes, they was -- once you went through and voted, it
19 brought up the vote, and then one of them was cast vote.  I
20 can't remember exactly which one at the time.  There was a
21 cast vote and a vote.  And you had to do all the process or
22 your ballot wouldn't be cast.  One of them actually let you
23 review it.
24 Q.  So the first step, it was a vote, and then the second one
25 is when you actually cast your ballot.

*WEAVER - Direct (Mr. Parman)*                                    29

1   A.   Yes.

2   Q.   Is that your recollection?

3   A.   Yes.

4   Q.   And you were told then by Mr. Thompson and Mr. Jones it

5   was in that stage where voters could be confused?

6   A.   Yes.  You know, that they would think they had voted and

7   they hadn't, and we could go in, either could look at the

8   votes and change them, you know, if they needed changing, vote

9   them the way we wanted to.

10  Q.   Did Mr. Thompson and Mr. Jones then demonstrate to you on

11  the actual machine how to do that?

12  A.   Yes, sir, they did.

13  Q.   With an actual new machine?

14  A.   Yes, sir.

15  Q.   Was Wanda White present as well?

16  A.   Yes.

17  Q.   You said they said you could vote them the way we wanted

18  to.  Was there a slate of candidates in 2006?

19  A.   Yes.

20  Q.   Could you share with the jury what the slate was?

21  A.   2006, county judge, it was Sizemore.

22  Q.   When you say Sizemore, could you share with the jury if

23  you know Sizemore's full name?

24  A.   Carl Sizemore was the county judge.

25  Q.   Is he also known by a nickname?

WEAVER - Direct (Mr. Parman)                                    30

1    A.    Crawdad.   And PVA was Phillip Mobley.   Tommy Harmon was

2    the magistrate candidate, and Gary Gregory, James Phillips.

3    Q.    What was James Phillips running for?

4    A.    Circuit clerk.

5    Q.    And that was the slate that had been decided?

6    A.    Yes.

7    Q.    Sir, to your knowledge, is Phillip Mobley of any relation

8    to Cletus Maricle?

9    A.    Yes.

10   Q.    What is that relationship?

11   A.    Son-in-law.

12   Q.    Now, in the May primary -- to be clear, did you

13   participate in both the May and the November elections in

14   2006?

15   A.    Yes, I did.

16   Q.    Okay.   Start with the May primary.   How many people's

17   votes did you and Wanda White steal in the May primary?

18   A.    I'm going to say 65, 75, somewhere in there.

19   Q.    And what was Wanda White's position during the 2006 May

20   primary?

21   A.    She was the Democrat election officer.

22   Q.    And what were you again?

23   A.    The Republican judge.

24   Q.    And did you two work together?

25   A.    Yes, sir, we did.

*WEAVER - Direct (Mr. Parman)*                                        31

1    Q.   How did you work together to steal votes?

2    A.   Actually, Wanda would try to encourage them to leave the

3    machine early; and if they did, I would go change the votes,

4    and vice versa.

5    Q.   I'm sorry.  Go ahead.

6    A.   And sometimes I would get them to leave, and she would

7    change the votes.  And sometimes they would just naturally

8    leave by their self.

9    Q.   Was there a reason why you needed to get them to leave

10   the machine in a fairly quick manner?

11   A.   Yeah, because it started making a noise.  The machine had

12   some kind of tone after so long, start chirping.

13   Q.   Would it time out?

14   A.   Yes, it would time out and you had to put a key in to

15   unlock it.

16   Q.   In order to change the votes, you had to do it within a

17   short period of time?

18   A.   Yes.

19   Q.   Now, were the people whose votes -- I'm going to refer to

20   as stolen.  They wasn't aware that this was going on, were

21   they?

22   A.   No.

23   Q.   Are you aware of individuals in the May primary that

24   actually sold their vote?

25   A.   Yes.

WEAVER - Direct (Mr. Parman)                                          32

1    Q.   Do you know the names of some of those individuals?

2    A.   Yes.

3    Q.   Could you share those with the jury?

4    A.   James Baker and Maryann Baker, Antwan Henson, Deshae

5    Henson, Frank and Sarah Smith.  That, you know, comes to my

6    mind right now.

7    Q.   Do you know who was paying for these voters?

8    A.   Yes.

9    Q.   Who?

10   A.   Kennon White.

11   Q.   Do you know if Kennon White was working with anybody

12   else?

13   A.   Not sure of.  I know his brother-in-law was supposed to

14   help him.

15   Q.   Who is his brother-in-law?

16   A.   Travis Price.

17   Q.   Now, when you were going back into the voting machines,

18   were you filling out voter assistance forms in 2006?

19   A.   2006, if -- normally, what they would do, if they was a

20   crowd of people waiting in line, the clerk, he would have them

21   to fill out the paperwork.  If, you know, if they was like a

22   bunch of people standing in line watching, you know, what was

23   going on, he would have them fill the paperwork out.

24   Q.   And who was the clerk in May of 2006?

25   A.   Anthony Short.

1   Q.   And if you know, why would he have them fill out the

2   forms if there were people in line?

3   A.   Just to make it look good, like he was going through all

4   the procedures with it.

5   Q.   How many forms do you recall filling out in May of '06?

6   A.   Probably 15 to 20.

7   Q.   If you could, give me an at least number that you're

8   certain you filled out at least that many.

9   A.   Ten.

10   Q.   I want to show you what's collectively been previously

11   marked as PR17.  Sir, if you could take a moment and look

12   through all those forms.  Feel free to pull them out of there.

13   A.   (Reviewing document).

14   Q.   Have you had an opportunity to look through those

15   documents?

16   A.   Yes, sir.

17   Q.   What do you recognize those documents to be?

18   A.   Voter assistance forms.

19   Q.   Are those the same type of voter assistance forms that

20   you filled out in 2006?

21   A.   Yes, sir.

22   Q.   How many of those forms bear your signature?

23   A.   One.

24   Q.   Do you see any other ones that bore your signature?

25   A.   I just seen that one.

*WEAVER - Direct (Mr. Parman)*                                        34

1   Q.   Sir, in this election, you mentioned James Phillips.

2   Could you reiterate again what position he was running for?

3   A.   Circuit court clerk.

4   Q.   What about Gary Gregory?

5   A.   Commonwealth attorney.

6   Q.   To your knowledge, how long has Mr. Gregory been

7   commonwealth attorney in Clay County?

8   A.   Probably over ten years.

9   Q.   Sir, in 2006, May primary, did you see what happened to

10  any of these voter assistance forms?

11  A.   Yes, sir.

12  Q.   What happened to them?

13  A.   At the end of the day, the clerk destroyed them.

14  Q.   Did you see him destroy all of them or just some of them?

15  A.   He destroyed some of them.

16  Q.   And you personally witnessed that?

17  A.   Yes, sir.

18  Q.   And who was the clerk on that day?

19  A.   Anthony Short.

20  Q.   Did you see anything else peculiar out of Mr. Short on

21  that date?

22  A.   Earlier in the day, yes, we thought we seen him snorting

23  something up his nose.

24  Q.   Who is "we"?

25  A.   Me and Wanda White.

*WEAVER - Direct (Mr. Parman)*                                              35

1   Q.   Where did you see him doing that?

2   A.   It was in the hallway right in front of the office of the

3   Clay County Middle School is where the voting precinct was

4   held.

5   Q.   Did he appear to be intoxicated to you during the day?

6   A.   Yes.

7   Q.   Now, I want to move forward to the November, '06

8   election.  That would be the general election, correct?

9   A.   Yes.

10  Q.   Did you incorporate this same scheme in the November

11  election?

12  A.   Yes.

13  Q.   Did you serve as an election officer?

14  A.   Yes, sir.

15  Q.   What position did you serve in?

16  A.   Republican judge.

17  Q.   Did Wanda White serve?

18  A.   Yes, sir.

19  Q.   In what capacity?

20  A.   Democrat judge.

21  Q.   Did you and Miss White continue the same scheme in

22  stealing votes?

23  A.   Yes, sir, somewhat.

24  Q.   When you say somewhat, what do you mean?

25  A.   In November, a lot of people was aware of what had

1    happened in May.  They was more aware of it, and we actually

2    got scared.  I actually got scared that day.

3    Q.    When you say a lot of people was aware of it, what are

4    you basing that on?

5    A.    They was aware of the -- what had happened in the May

6    election.  They was a lot of talk about it.

7    Q.    Community perception?

8    A.    Yes.

9    Q.    That votes had been stolen?

10   A.    Yes.

11   Q.    But you and Miss White continued that to some extent?

12   A.    Yes.

13   Q.    Could you estimate how many votes you and Miss White

14   stole in the general election?

15   A.    Is this one November?

16   Q.    November, yes, sir.  I apologize.

17   A.    I want to say 20, 25.  Because like I said, I got scared

18   that morning and, you know, sort of backed off of everything.

19   Q.    Was there a slate of candidates in November that you were

20   supporting?

21   A.    Yes.

22   Q.    Who was that slate of candidates?

23   A.    It was the mayor, Daugh White, and the city council

24   members.

25   Q.    Was there anybody else on the slate?

*WEAVER - Direct (Mr. Parman)*                                    37

1    A.   November, that was the two main ones.

2    Q.   What about the PVA job?

3    A.   PVA race, I don't think he had a race in November.   I

4    think it was in May.

5    Q.   Okay.   Now, of the 20 to 25 voters that you stole, did

6    you fill out voter assistance forms for any of those?

7    A.   No.

8    Q.   Were any voter assistance forms filled out?

9    A.   They should have been some, yes, filled out for sure.

10   Q.   Did you personally fill out any?

11   A.   I don't think so.

12   Q.   Sir, did you have an expectation that you would receive

13   something in exchange for your participation in this scheme?

14   A.   Yes, in a way I did.

15   Q.   Explain to the jury what you mean by that.

16   A.   Kenny Price, he was the emergency management coordinator

17   for the county there, and he was running for jailer.   And, you

18   know, I thought if Kenny won the jailer's job, that, you know,

19   that job's available, and I thought I had a pretty good chance

20   of getting it with my qualifications.

21   Q.   Did anybody that was involved in this scheme tell you

22   that that would be a possibility if you worked in this?

23   A.   Actually, they was a couple different people from

24   different sides, yes.

25   Q.   Explain to the jury what was told to you.

WEAVER - Direct (Mr. Parman)                                    38

1    A.   One of them, Mr. -- we was actually at a fire scene.  Mr.

2    Earl Pinkton's house had caught fire one morning, and we was

3    there.  And Darnell Hipsher came up, he said somebody wants to

4    talk to you on the phone, and he handed me the phone.  It was

5    Bart Morris.  And Bart said, "Dobber, if you can, I'd like for

6    you to try to help James.  If not, don't be too hard on him."

7    Q.   Who is he referring to when he said I'd like for you to

8    help James?

9    A.   James Garrison.

10   Q.   And what was James Garrison running for?

11   A.   He was running for county judge executive.

12   Q.   Who was he running against?

13   A.   He was running against Carl "Crawdad" Sizemore and a

14   couple more.

15   Q.   And who were you supporting?

16   A.   I was supporting Carl Sizemore.

17   Q.   So what did you understand it to mean not to hurt him too

18   bad?

19   A.   Not to hurt him, not to steal too many votes from him.

20   Q.   So what did he say if you wouldn't do that?

21   A.   He said, because I might be -- he said, "I know what

22   you're interested in.  And if James wins, I might be able to

23   help you with that."

24   Q.   To your understanding, what was he referring to?

25   A.   He was referring to the emergency management job that

*WEAVER - Direct (Mr. Parman)*                                          39

1    Kenny Price had.

2    Q.   That was a job you would like to have?

3    A.   Yes, sir.

4    Q.   What was told to you by the other side?

5    A.   The other side, actually, I was at the circuit clerk's

6    office one day, and James Phillips, he asked me, said, "I need

7    to talk to you."  He said, "got a problem with you serving as

8    judge."  And I said, "what's that?"  He said, "Charles Marcum

9    don't want you to serve as election officer."  And he said,

10   "he don't think you would support Kenny."  And I said, "I'm

11   for Kenny."  He said, "You don't have no problem with Kenny?"

12   I said, "No, you know, I hope Kenny wins, you know, because I

13   want his job."

14   Q.   Why did he think that there would have been a problem

15   with you supporting Kenny?

16   A.   He thought -- well, Charles beat my dad in '89, and we

17   had never been on the same sides.

18   Q.   For what position?

19   A.   Jailer.

20   Q.   So your father was jailer up until '89?

21   A.   Yes.

22   Q.   Then Mr. Marcum was jailer?

23   A.   Yes.

24   Q.   And that was a concern for Mr. Phillips that there would

25   be a rift there?

*WEAVER - Direct (Mr. Parman)*                                             40

1    A.   Yes.

2    Q.   And you might double-cross him?

3    A.   That I might not support Mr. Price, who was running for

4    jailer and Mr. Marcum was supporting.

5    Q.   When you refer to support, what do you mean?

6    A.   Backing in the race, you know, for it.

7    Q.   And by the scheme, what does backing mean?

8    A.   It means you're on the ticket.

9    Q.   Does that mean you're buying votes?

10   A.   That means you're buying votes for 'em.

11   Q.   So what did Mr. Phillips tell you about this job?

12   A.   He said, he said, "I understand that you -- I know what

13   you're interested in, and I might be able to help you with

14   that also."

15   Q.   Did Mr. Phillips win the election?

16   A.   Yes, sir.

17   Q.   And what position did he win?

18   A.   Circuit court clerk.

19   Q.   And to your knowledge, does the circuit court clerk have

20   the ability to control hiring decisions for that position?

21   A.   No, sir.

22   Q.   Who does?

23   A.   The county judge.

24   Q.   Okay.  After the election was over, were you offered that

25   job?

*WEAVER - Direct (Mr. Parman)*                                      41

1    A.   Yes, sir.

2    Q.   By who?

3    A.   The county judge.

4    Q.   And who is the county judge?

5    A.   Carl Sizemore.

6    Q.   Was Mr. Sizemore and Mr. Phillips on the same ticket?

7    A.   At their precinct they was, yes.

8    Q.   Did you take that job?

9    A.   Yes.

10   Q.   Did you stay in the job for long?

11   A.   Yes.

12   Q.   Sir, did you ultimately admit responsibility for your

13   actions in the '06 election?

14   A.   No.  Not at first, I did not.

15   Q.   But did you ultimately?

16   A.   Yes.

17   Q.   I want to show you what's been marked as PA10.

18   Government's Exhibit PA10.  Take a moment and look through

19   that document.

20   A.   (Reviewing document).

21            THE COURT:  10 or 9, Mr. Parman?

22            MR. PARMAN:  10, Your Honor.

23   Q.   Sir, do you recognize that document?

24   A.   Yes, sir.

25   Q.   What do you recognize that document to be?

WEAVER - Direct (Mr. Parman)                                        42

1    A.   It's a plea agreement.

2    Q.   Is that your plea agreement?

3    A.   Yes, sir.

4    Q.   What is your understanding of the agreement between

5    yourself and the United States?

6    A.   To testify in any ongoing investigation truthfully.

7    Q.   What's your understanding would happen to you if you were

8    to come in here and lie to this jury?

9    A.   Could be another charge.

10   Q.   Would you receive any credit for any testimony you've

11   given if you had provided untruthful testimony?

12   A.   No, sir.

13   Q.   Has any promises been made to you by the --

14   A.   No, sir.

15   Q.   To your understanding, who would be the person to

16   determine your ultimate sentence?

17   A.   Judge Reeves.

18   Q.   And in this plea agreement, did you, without getting into

19   legal details, plead guilty to your actions regarding the 2006

20   election?

21   A.   Yes, sir, I did.

22           MR. PARMAN:  Your Honor, I'd move for the

23   introduction of Government's Exhibit PA10.

24           THE COURT:  Any objection?  That exhibit will be

25   admitted.  Mr. Hoskins, did you have any?

WEAVER - Direct (Mr. Parman)                                  43

1        MR. HOSKINS:  No.

2        THE COURT:  Thank you.  It's admitted.

3                    (Government Exhibit No. PA10

4                    was admitted into evidence.)

5   Q.   Now, when I first asked you about your plea agreement,

6   you said not initially?

7   A.   Yes.

8   Q.   I want to give you an opportunity to explain that to the

9   jury.  When law enforcement initially came to you and asked

10  you about your involvement in election fraud, what did you do?

11  A.   I was scared, had never been involved in nothing in my

12  life, and I just basically lied to them.

13  Q.   Do you have any criminal history, sir?

14  A.   No, sir.  Never had a speeding ticket.

15  Q.   So when the FBI -- was it the FBI that approached you?

16  A.   Yes, sir.

17  Q.   And did they start asking you about election fraud?

18  A.   Yes, sir.

19  Q.   And you didn't tell them your involvement?

20  A.   No.

21  Q.   Why did you ultimately come clean, sir?

22  A.   Well, it was time to move on.  I had kids.  Tried to put

23  it behind me.  Just want to get it behind me.

24  Q.   Sir, when we were going over your employment history, I

25  believe you mentioned that you worked as fire chief; is that

*WEAVER - Direct (Mr. Parman)*                                        44

1   correct?

2   A.   Yes.

3   Q.   Do you recall an incident where the residence of a Terry

4   Smith was burning?

5   A.   No, sir.

6   Q.   If I could, I'd like to show you what's been marked as

7   Government's Exhibit D74.  Sir, take a moment and look at that

8   document and see if that refreshes your memory.

9   A.   I don't remember this, no.

10  Q.   Okay.  Also like to go back on your employment to a time

11  when I believe you said you worked for the State Highway

12  Department; is that correct?

13  A.   Yes, sir.

14  Q.   The Department of Transportation?

15  A.   Yes, sir.

16  Q.   Did you receive any assistance in obtaining that job?

17  A.   Yes, sir.

18  Q.   Who helped you get that job?

19  A.   Cletus Maricle.

20  Q.   Why did he help you get that job?

21  A.   Actually, I was working in Laurel County at Ambulance,

22  Incorporated, and my dad called and said that he talked to

23  Cletus, and they could get me on at the state.

24  Q.   Did you and your father help Mr. Maricle in his bid for

25  circuit judge?

*WEAVER - Direct (Mr. Parman)*                                          45

1    A.   I did.

2    Q.   How did you help him?

3    A.   Actually, he asked me to help hang some signs for him,

4    and him and his wife and I actually hung his 4 by 8 signs in

5    three different counties.

6              MR. PARMAN:  Can I have one moment, Your Honor?

7              THE COURT:  Yes, sir.

8    Q.   Sir, one follow-up on the document I've previously given

9    you.  I believe at the top of that document, it has a date of

10   2002.

11   A.   Yes, sir.

12   Q.   Were you fire chief in 2002?

13   A.   Yes, sir.

14   Q.   And in the course of your duties as fire chief, are you

15   responsible for keeping records of fire incident reports?

16   A.   Yes, sir.

17   Q.   And does that appear to be a fire incident report?

18   A.   Yes, sir.

19   Q.   And is that a fire incident report in your department?

20   A.   Yes, sir.

21             MR. PARMAN:  Your Honor, I'd move for the

22   introduction of that exhibit at this time.

23             MR. GILBERT:  Objection, Your Honor.

24             MR. SIMONS:  Objection.

25             THE COURT:  All right.  You all need to approach.

*WEAVER – Direct (Mr. Parman)*                                    46

1          MS. HUGHES:  Can we see it too?

2                  (A sidebar conference was held out of the

3                  hearing of the jury):

4          MS. HUGHES:  2002?

5          THE COURT:  He may have misspoken.

6          MR. GILBERT:  Yes, 2007.

7          THE COURT:  It goes to foundation.  Unless it's

8    cleared up, unless the date's established -- unless the date's

9    established, it couldn't be admitted through this witness.

10         MS. HUGHES:  And I would also say that he is not the

11   records custodian now.  So I don't think -- if you are trying

12   to get this document in because he's the records custodian,

13   since he's not the current records custodian and didn't bring

14   it, he can't certify that this is a true and proper copy of a

15   record of the fire department.

16         THE COURT:  He would be able to authenticate it if he

17   was able to testify that he recalled preparing it at or about

18   the time of the event.  He didn't say that.  So it will need a

19   custodian, but there is a problem with the date.

20         MR. PARMAN:  Yes, Your Honor.  That was my mistake,

21   Your Honor.

22         MS. HUGHES:  And then I have an objection to general

23   relevance.  It goes back to the objections and issues that we

24   discussed, of course, yesterday.

25         THE COURT:  All right.  The Court has made a

*WEAVER - Direct (Mr. Parman)*                                          47

1    determination that this incident would be relevant.  It's

2    substantive evidence of a further act in furtherance of the

3    conspiracy to threaten, intimidate a witness in the case;

4    actually, two witnesses in the case.  And so with respect to

5    relevancy, objection will be overruled.  Thank you.

6                      (Sidebar conference concluded.)

7    BY MR. PARMAN:

8    Q.  Sir, I apologize.  I didn't correctly read the top of

9    that form.  Would you look again at the date on the top of

10   that document?

11   A.  9/14/02.

12   Q.  Does that appear to be '02, or does it appear to be '07?

13   A.  Could be '02 or '07.

14   Q.  Were you acting as fire chief in '02 and '07?

15   A.  Yes, sir.

16   Q.  Once again, does that appear to be a document --

17   A.  Yes, sir.

18   Q.  -- that would have been prepared by your agency when you

19   was acting as fire chief?

20   A.  Yes, sir.

21   Q.  After knowing that information, does that refresh your

22   memory as to that document?

23   A.  I know it belonged to Kennon and Wanda, but that's -- you

24   know, I wasn't there.  It don't show me there.

25   Q.  But looking at the style of the document, the way it's

*WEAVER - Direct (Mr. Parman)*                                           48

1    set up, you prepared fire incident reports during your term

2    as --

3    A.   Yes, sir.

4    Q.   -- fire chief?

5    A.   Yes, sir.

6    Q.   Is that the same form that was used?

7    A.   Yes, same form.

8    Q.   Same procedure that was incorporated?

9    A.   Yes, sir.

10            MR. PARMAN:  Your Honor, may I have just a moment?

11            THE COURT:  Yes, you may.

12   Q.   Sir, as we've discussed, does that appear to be the same

13   documents that you keep in the ordinary course of business as

14   a fire chief?

15   A.   Yes, sir, it does.

16   Q.   And do you have someone there in Clay County that keeps

17   these type of records, that keeps these?

18   A.   Yes, sir.

19   Q.   And keeps them in a spot, in a location there within the

20   fire department?

21   A.   Yes, they're kept at Manchester Fire Department.

22   Q.   Okay.  And they maintain these records in their care,

23   custody and control?

24   A.   Yes.

25            MR. PARMAN:  Your Honor, I'd move for introduction of

*WEAVER - Cross (Mr. Hoskins)*                                    49

1    this exhibit at this time.

2              THE COURT:  All right.  I'll sustain the objection to

3    its introduction at this time, based on foundation.

4              MR. PARMAN:  Yes, Your Honor.  That's all I have,

5    Your Honor.  Thank you.

6              THE COURT:  All right.  Thank you.  Let's see if

7    there's any additional material to produce before we begin

8    cross-examination.

9              Mr. Smith, any additional materials to produce at

10   this time, or Mr. Parman?

11             MR. PARMAN:  Not that I'm aware of, Your Honor.

12             THE COURT:  All right.  Thank you.  Mr. Hoskins, you

13   may proceed.

14                         CROSS-EXAMINATION

15   BY MR. HOSKINS:

16   Q.   Hello, Mr. Weaver.  My name's David Hoskins, and I

17   represent Cletus Maricle.  Just a couple of questions.  The

18   election that you talked about doing signs for Judge Maricle

19   in was 1990; is that right?

20   A.   Yes, sir.

21   Q.   And when you got your job with the highway department, it

22   wasn't in exchange for you helping him in an election, was it?

23   A.   No, sir.

24   Q.   Mr. Maricle never asked you to do anything illegal back

25   in that 1990 election, did he?

*WEAVER - Cross (Mr. Westberry)* 50

1   A.   No, sir.

2   Q.   Or any time after that, did he?

3   A.   No, sir.

4        MR. HOSKINS:  Thank you.

5        THE COURT:  Mr. Westberry?

6        MR. WESTBERRY:  Thank you, Judge.

7                       CROSS-EXAMINATION

8   BY MR. WESTBERRY:

9   Q.   Mr. Weaver, good afternoon.  I'm Kent Westberry.  I'm

10  here for Doug Adams, and I've got just a couple questions for

11  you.  You've known Doug Adams, I guess, pretty much all your

12  life; would that be fair?

13  A.   Yes, sir.

14  Q.   I think you told us, correct me if I'm wrong, you were

15  born and raised in Clay County; is that correct?

16  A.   Yes, sir.

17  Q.   Your dad, Homer Weaver, served for a good number of years

18  as jailer there in Clay County; is that correct?

19  A.   Yes, sir.

20  Q.   Now, did you attend Clay County school system?

21  A.   Yes, sir.

22  Q.   Did you know Doug when he both taught and acted as

23  superintendent of the Clay County school system?

24  A.   Yes, sir.

25  Q.   Doug Adams, it's your understanding he's now retired as

WEAVER - Cross (Mr. Westberry)                                    51

1    superintendent of the schools?

2    A.   Yes, sir.

3    Q.   His wife, Laura, do you know his wife Laura?

4    A.   Yes.

5    Q.   Did she teach in the Clay County school system as well?

6    A.   I'm not for sure, no.

7    Q.   Okay.  You told us a little while ago that you ran for

8    school board back in 2002.  Is that correct?

9    A.   Yes, sir.

10   Q.   Ran against a fella named Charles Keith?

11   A.   Yes.

12   Q.   And Mr. Keith won?

13   A.   Yes.

14   Q.   You said that in that election, you went to some

15   organizational meetings from time to time at various housing

16   locations there in Clay County; is that correct?

17   A.   In 2002?

18   Q.   Did I not hear that right, sir?  I thought you said there

19   were some organizational meetings that you went to in '02.

20   A.   No, sir.

21   Q.   Was this in '04?

22   A.   That was '04.

23   Q.   Let me get to '04 real quick and just ask you one

24   question.  Those meetings that you attended in the locations

25   around Manchester or Clay County, you never saw Doug Adams at

*WEAVER - Cross (Mr. Westberry)*                                      52

1   any of those organizational meetings, did you, sir?

2   A.   No, sir.

3   Q.   Thank you.  After the 2002 election, you got hired on as

4   a football coach; is that right?

5   A.   Yes, sir.

6   Q.   How long after that was it?  I don't know, and I don't

7   know that I heard it.

8   A.   After the 2002?

9   Q.   Yes.

10  A.   I'm not sure.  It would probably been 2003.

11  Q.   Yes, okay.  And I think if I've got this right, correct

12  me if I'm wrong, you were hired on as football coach at the

13  Manchester Elementary School?

14  A.   Yes, sir.

15  Q.   Were you aware that the superintendent of the schools

16  makes the hiring decisions on coaches?

17  A.   At first, no, sir.

18  Q.   Are you aware of that now?

19  A.   Yes, sir.

20  Q.   Of course, back in 2003, Doug Adams would have been

21  superintendent of the schools when you got hired on as

22  football coach?

23  A.   Yes, sir.

24  Q.   Do you have a sister named Charlotte?

25  A.   Yes, sir.

*WEAVER - Cross (Mr. Westberry)*                                   53

1   Q.   Does she work at the Manchester Elementary School?

2   A.   Yes, sir.

3   Q.   How long has your sister, Charlotte, worked at the

4   Manchester Elementary School?

5   A.   At Manchester, she's probably been there four, five

6   years.

7   Q.   What does she do there at the elementary school?

8   A.   She's a secretary.

9   Q.   And who is she a secretary for?

10  A.   The principal.

11  Q.   And, of course, the principal works under the supervision

12  of the superintendent of schools?

13  A.   Yes, sir.

14  Q.   Did Charlotte at any time, if you're aware, ever get a

15  promotion of any kind while she worked at the elementary

16  school?

17  A.   I'm not sure.

18  Q.   I want to ask you, of course, it sounds like you grew up

19  in a household, your dad had been active in politics for a

20  good number of years; is that correct?

21  A.   Yes.

22  Q.   What years did he serve, did Homer Weaver serve as

23  jailer?  Your best estimate.

24  A.   '69 till -- actually went out the first of 1990.

25  Q.   Was it Charles Marcum that he lost to --

*WEAVER - Cross (Mr. Westberry)*                                    54

1   A.   Yes, sir.

2   Q.   -- in 1990?  Were you in high school then?

3   A.   Yes, sir.

4   Q.   Of course, Doug Adams had served as superintendent of the

5   schools from about '99 to 2009.  Does that sound about right

6   to you?

7   A.   Probably, yes.

8   Q.   Thank you.  The superintendent of schools in Clay County,

9   before Doug Adams, was a fella named Charles White?

10  A.   Yes, sir.

11  Q.   He served about ten years as well?

12  A.   I think so.

13  Q.   And you would agree that a number of his relatives served

14  in elected county offices during the time that he served as

15  superintendent of schools?

16  A.   Yes, sir.

17  Q.   James White, we've heard a lot about him.  He was county

18  court clerk?

19  A.   Yes, sir.

20  Q.   Correct.  James Phillips' mother was a White; is that

21  correct?

22  A.   I think so, yes.

23  Q.   He's the circuit court clerk, correct?

24  A.   Yes.

25  Q.   Daugh White, of course, was the mayor for a good long

WEAVER - Cross (Mr. Westberry)                                    55

1    time?

2    A.   Yes.

3    Q.   And he's related to Jennings White as well; is that

4    correct?

5    A.   Yes.

6    Q.   Barbara White Colter was a state representative for a

7    number of years?

8    A.   Yes.

9    Q.   Now, going back a little bit further from Charles White,

10   the time that he served as superintendent, was there a fella

11   named Willie Sizemore that served as superintendent of

12   schools?

13   A.   Yes, sir.

14   Q.   He served from the '70s up until about 1990, when Charles

15   White took over.  Does that sound about right?

16   A.   That sounds close.

17   Q.   Now, when Willie Sizemore was acting as superintendent of

18   schools -- I ask you this because you've told us you grew up

19   in a political household.

20   A.   Yes.

21   Q.   Were there a number of Sizemores that served in local

22   county offices during that period of time?

23   A.   Yes.

24   Q.   Daryl Sizemore, sheriff?

25   A.   Yes.

*WEAVER - Cross (Mr. Westberry)*                                    56

1   Q.   Crawdad Sizemore was county judge?

2   A.   Yes.

3   Q.   James Sizemore was PVA?

4   A.   Yes.

5   Q.   Thank you.  Would you agree that Doug Adams does not have

6   any family members that have served in elected offices in Clay

7   County?

8   A.   As I know of, no.

9   Q.   Okay.  So you would agree with that as best you know?

10  A.   Yes.

11  Q.   Thank you.  The 2002 election, Mr. Weaver, of course,

12  that's when Jennings White was defeated after having served

13  for many years as county court clerk, correct?

14  A.   Yes, sir.

15  Q.   Would you agree that his defeat served as sort of the

16  beginning of the end for the White family dominance in Clay

17  County?  Would that be fair?

18  A.   I don't know how you would look at that, no.

19  Q.   I understand.  You supported Jennings White back in 2002,

20  when he ran for reelection?

21  A.   Yes, sir.

22  Q.   And Mr. Adams and several others supported Freddy

23  Thompson, correct?

24  A.   Yes, sir.

25          MR. WESTBERRY:  One second, please, Judge.

WEAVER - Cross (Mr. White)                                    57

1           THE COURT:  Yes, sir.

2   Q.   Just a couple of follow-ups.  Are you aware of any

3   consequences that have ever happened to either you or your

4   family members, and I use your sister as an example, for you

5   having supported candidates other than those backed by Mr.

6   Adams?  Anybody ever tried to do anything to you that you're

7   aware of?

8   A.   No, sir.

9   Q.   Feel like you've been treated pretty straight up?

10  A.   I've not had no problem with them, no.

11          MR. WESTBERRY:  Thank you, sir.  I appreciate it.

12  That's all the questions I have, Judge.

13          THE COURT:  Thank you.  Mr. White.

14                      CROSS-EXAMINATION

15  BY MR. WHITE:

16  Q.   Good afternoon, Mr. Weaver.  My name is Scott White.  I

17  represent Charles Jones.  I've only got just a few questions.

18  The first thing I wanted to ask you -- actually, almost all my

19  questions are going to deal with your training as an election

20  officer in November of 2006 or, I'm sorry, May and November,

21  2006 so I can get you situated in time.

22      Did you go to the county clerk's office, which was in the

23  Clay County administration building, for that election officer

24  training before, just before the May, '06 primary?

25  A.   Yes.

WEAVER - Cross (Mr. White)                                    58

1   Q.   And you told us about the training that you say you

2   received along with Mrs. White from Mr. Thompson and Mr.

3   Jones, correct?

4   A.   Yes.

5   Q.   I want to ask you, did you receive any other training in

6   which other election officers were present?

7   A.   Yes.

8   Q.   And was that on the same day?

9   A.   Yes.

10  Q.   And where did that occur?

11  A.   On the second floor of the community room.

12  Q.   Okay.  And the community room is it like a big kind of a

13  about this size room, kind of like a -- there's tables and

14  chairs and whatnot?

15  A.   Probably about half the size of this room.

16  Q.   About half this size?  At that training, who was there

17  and who spoke at it in terms of the people doing the training?

18  A.   We was actually, we actually was there twice.  One

19  initial training was, one was on the new machines, and then

20  the other one just election laws.

21  Q.   And the one on the new machines, did that include you and

22  Mrs. White as well as the other proposed election officers?

23  A.   Yes.

24  Q.   And that was training on how to operate the new machines?

25  A.   Yes.

WEAVER - Cross (Mr. White)                                          59

1   Q.   And these were the machines that had not been used in

2   prior elections?

3   A.   No, sir.

4   Q.   I'm sorry.  Yes, sir, they hadn't been?  That was a bad

5   question.

6   A.   They hadn't been used in general elections, no.

7   Q.   Correct.  The machine that you received the training,

8   special training by Mr. Jones and Mr. Thompson, that machine

9   was also a new machine, correct?

10  A.   Yes.

11  Q.   And that was located where?

12  A.   It was in the clerk's office.

13  Q.   And in the clerk's office, we've already had a drawing

14  from someone else.  But just to get us oriented, do you know

15  where Freddy Thompson's office is in that room?

16  A.   Yes.

17  Q.   In conjunction with Mr. Thompson's office, where was this

18  machine located?

19  A.   It was -- when you go in the door, turn right, it was in

20  the -- it was right in Freddy's office.

21  Q.   Was it in his office or outside of his office?

22  A.   Well, his office is like when you come in the main door,

23  it was -- his office is like right here, and they had it set

24  up outside his office.

25  Q.   Okay.  And at the time that you were receiving the

*WEAVER - Cross (Mr. White)*                                    60

1    special training, were the other people, the other proposed

2    election officers, isn't it accurate to state they were still

3    in the building on the second floor?

4    A.   Yes.  Some of them probably was there.

5    Q.   Had you already, before you came to the training, did you

6    find out about the training through a letter you received?

7    A.   Yes.

8    Q.   And so you had already been named an election officer for

9    the Manchester city precinct before you went to the training;

10   is that accurate?

11   A.   Yes.

12   Q.   After you had been named an election officer for the

13   primary 2004 election, had you received visits from various

14   candidates at your house?

15   A.   You say 2004?

16   Q.   Yes.  I'm sorry, 2006.  Let me go back to make sure I'm

17   clear.  After the time you'd been named an election officer

18   for the primary 2006 election until the time -- between the

19   time you were named and the time you went to the training, had

20   you received visits from other candidates for office?

21   A.   Yes, I did.

22   Q.   I'm curious if you had -- if you're able to say, based on

23   your involvement in the election in '06, leading up to the

24   primary of '06, including various -- your own experience, your

25   own perception of what was going on in the community, if you

*WEAVER - Cross (Mr. White)*                                                    61

1    have knowledge of what the community perception -- if there

2    was a community perception as to those new voting machines.

3    A.    Prior to them being used the first time?

4    Q.    Yes, sir.

5    A.    People was scared of them.

6    Q.    Okay.

7    A.    A lot of people was, the older people was scared that

8    they couldn't operate them.

9    Q.    Is that because they were computerized or had a

10   computerized system rather than the mechanical system?

11   A.    Yes.  They kept telling them they was computer.

12              MR. WHITE:  Your Honor, could I be given just a

13   moment?

14              THE COURT:  Yes, sir.

15              MR. WHITE:  Thank you.

16   Q.    Just one or two more questions, if I could, and let me

17   bring you back.  I'm going to change topics on you, if I

18   could, Mr. Weaver.  I want to ask you about this event that

19   occurred in November of 2004 at the precinct in which you were

20   an election officer.  Was that also the Manchester precinct?

21   A.    Repeat your question again.

22   Q.    Yes, sir.  I want to switch now.  I want to go from 2006,

23   I want to go back to 2004 at the election in which you and Mr.

24   Stivers were election officers.

25   A.    Yes.

*WEAVER - Cross (Mr. Abell)*                                      62

1    Q.   Was that also at the Manchester city precinct?

2    A.   Yes.

3    Q.   Okay.  And you testified that Mr. Rowland --

4    A.   Yes.

5    Q.   -- had come as well to be an election officer, and there

6    was a disagreement as to whether it was him or Mr. Stivers

7    that should be the election officer.  Is that accurate?

8    A.   Yes.

9    Q.   And did you testify that my client, Mr. Jones, came and

10   basically resolved it and said that Mr. Stivers is to serve?

11   A.   Yes.  Mr. Jones said that "Mr. Rowland, you're not

12   serving here today.  Al Man's going to be the election officer

13   here today."

14   Q.   And did you testify on direct to Mr. Parman that it was

15   your perception that as the election commissioner, Mr. Jones

16   had the authority to do that?

17   A.   I assumed he did, yes.

18            MR. WHITE:  That's all the questions I have, Your

19   Honor.  Thank you, Mr. Weaver.

20            THE COURT:  Thank you.  Mr. Abell, you may proceed.

21                        CROSS-EXAMINATION

22   BY MR. ABELL:

23   Q.   Mr. Weaver, my name is Robert Abell, and I represent

24   William Stivers in this case.  I have a few questions.  First,

25   I want to start with your school board race in 2002.

WEAVER - Cross (Mr. Abell)                                        63

1   A.   Yes.

2   Q.   That came up for vote in the November election, right?

3   A.   Yes.

4   Q.   Kennon White and Wanda White supported and helped you in

5   that campaign?

6   A.   Yes.

7   Q.   You mentioned that Jennings White, who was still county

8   clerk, even though he had lost the primary back in May, he was

9   nonetheless still holding the office in the early absentee

10  voting for the November election, when you were running for

11  school board, right?

12  A.   Yes.

13  Q.   And he, if I followed you correctly, appointed your

14  mother and father to serve and to function as election

15  officers for the purposes of that absentee voting?

16  A.   Yes.

17  Q.   Do you recall that my client, William Stivers, protested

18  that being done?

19  A.   I know he was arrested that day, yes.

20  Q.   He protested that being done and was arrested that same

21  day?

22  A.   Yes.

23  Q.   Okay.  Glenn Rowland, is he Todd Roberts' uncle?

24  A.   Yes.  By marriage.

25  Q.   And Todd Roberts I'm referring to is the Todd Roberts who

*WEAVER - Cross (Mr. Abell)*                                            64

1    served as a police officer for Manchester?

2    A.   Yes, sir.

3    Q.   Okay.  Now I want to talk about 2006.

4    A.   Okay.

5    Q.   2006 county judge race, had a primary in May?

6    A.   Yes.

7    Q.   Three leading candidates were the incumbent, James

8    Garrison, Crawdad Sizemore?

9    A.   Yes.

10   Q.   And the third leading candidate was Johnny "Poss"

11   Gregory?

12   A.   Yes.

13   Q.   And I believe there were a couple other candidates as

14   well, but you agree those are the three leading ones?

15   A.   Yes.

16   Q.   Prior to the election -- well, let me back up.  At that

17   time, at least, you lived close to Kennon and Wanda White?

18   A.   Lived close to them?

19   Q.   Near to them?

20   A.   We lived, both lived in the city, but not real close.

21   Q.   Okay.

22   A.   Totally two different streets.

23   Q.   Okay.  Was it the case that Kennon White, in advance of

24   the May election, came to your house all the time?

25   A.   Yes, sir.

*WEAVER - Cross (Mr. Abell)*                                                65

1  Q.  And came to your house to discuss the upcoming May, 2006

2  election?

3  A.  Yes.

4  Q.  All the time, meaning almost daily, if not daily?

5  A.  Sometimes maybe twice a day, couple times a week.

6  Q.  At times, would see you mowing the grass in the yard and

7  stop and talk to you about things y'all needed to do in the

8  election?

9  A.  I never did do much mowing, but when he would see me, he

10 would stop.

11 Q.  And Kennon -- you were interested in that election.  I

12 think, as I understand it, you hoped if you supported Crawdad

13 Sizemore and he won, one of the things you might get as a

14 result of your support would be the emergency management job,

15 correct?

16 A.  Yes, sir.

17 Q.  And Kennon told you, among other things about the

18 election, that he was real interested in that precinct looking

19 good, right?

20 A.  Yes, sir.

21 Q.  And Kennon's interest was he wanted to create goodwill in

22 that spring election, the primary, so that when his dad ran

23 for reelection the following fall in November, 2006, some

24 goodwill would have been created in May that, in turn, would

25 help his father that fall.  Is that fair?

66

1    A.   I don't know if you could call it goodwill.  I mean, he

2    wanted to, he wanted it to run the way he wanted to, you know,

3    as far as that precinct.

4    Q.   The way Kennon wanted it to?

5    A.   Yes.

6    Q.   And, in fact, at one time he told you to make things look

7    good, I'm going to go out get 65, 75 votes?

8    A.   Yes, sir.

9            MR. ABELL:  That's all I have, Judge.  Thank you.

10           THE COURT:  Thank you, Mr. Abell.  Mr. Baldani.

11           MR. BALDANI:  Judge, I've got an issue I'd like to

12   discuss at the Bench real quick before I get started, if

13   that's okay.

14           THE COURT:  Come on up.

15               (A sidebar conference was held out of the

16                hearing of the jury):

17           MR. BALDANI:  Judge, I am going to attempt to elicit

18   the fact that it wasn't till his third meeting with the FBI

19   that he mentioned being schooled by Freddy Thompson, and I'm

20   certainly hoping it's going to go a lot quicker than it did

21   this morning.  The reason I asked to approach, Judge, is the

22   third discussion with the FBI came in the context of a

23   polygraph, and --

24           THE COURT:  I'm sorry, came in the context --

25           MR. BALDANI:  Following a polygraph, and so I don't

67

1    want, you know, I don't --

2              MR. SMITH:  I can't hear him, I'm sorry.

3              MR. BALDANI:  I'm trying to be quiet.

4              THE COURT:  Following a polygraph.

5              MR. BALDANI:  Yeah, and so the reason I approached,

6    Your Honor, is I'm going to ask him about this third

7    interrogation or third discussion, and, you know, I certainly

8    don't want to elicit anything about that.  I don't know if

9    he's been told not to, you know, volunteer it or if he needs

10   to be told.  I just thought it's something I ought to bring

11   up.  Because after he took it, that's kind of when he came

12   clean about certain things.  And I have to ask him about the

13   content of some of the things he discussed, but I don't want

14   him to inject that, and I don't know if he knows not to.  So

15   that's my purpose for coming up.

16             MR. SMITH:  I can't have any confidence, we've had no

17   reason to think the polygraph is going to come up since our

18   motion in limine was granted, and so I would have to ask for a

19   recess or at least have the Court --

20             THE COURT:  I'll need to.

21             MR. SMITH:  -- maybe admonish him.

22             THE COURT:  I'll have to admonish him outside the

23   presence of the jury.  I'll have to excuse the jury to do

24   that.

25             MR. BALDANI:  That was my concern, reason for coming

68

1    up.  I don't know how long I plan to go today.  I'm certainly

2    not going to be as long as I was with Miss White, Your Honor.

3    I don't know if that has any bearing on what you want to do in

4    that regard.  I do want to let you know, I wanted to avoid --

5            THE COURT:  I'll excuse the jury for ten minutes.

6    That will allow me to admonish the witness not to make any

7    references to that subject matter.  Does anyone need longer

8    than ten minutes?  We'll just keep moving.  We'll try to get

9    this witness finished this afternoon.

10           MR. BALDANI:  Thanks, Judge.

11               (Sidebar conference concluded.)

12           THE COURT:  Ladies and gentlemen, one matter I need

13    to take up outside your presence, and I will be very brief,

14    but I do need to excuse you for ten minutes.  Hopefully, we'll

15    be able to come back and finish the witness this afternoon

16    before I excuse you for the evening.  Please keep in mind the

17    admonitions you were given previously not to discuss the case

18    among yourselves while we are in recess.  Jury will be excused

19    for ten minutes.

20               (The jury left the courtroom at 4:06 p.m.)

21           THE COURT:  The record will reflect that the jury is

22    not present at this time.  Mr. Weaver, before we continue with

23    further questions, I do want to remind you of a previous

24    ruling that I made in this case, and that is that witnesses

25    are not allowed to refer to or mention, either directly or

*WEAVER - Cross (Mr. Baldani)*                                    69

1    indirectly, any polygraph examinations that have been taken.

2    If you're asked questions, you're not allowed to make any

3    references to such examination if one was conducted.  You do

4    understand that?

5              THE WITNESS:  Yes.

6              THE COURT:  All right.  We'll take a brief recess.

7    We'll be back in ten minutes.

8                   (Recess from 4:07 p.m. until 4:17 p.m.)

9                   (The jury entered the courtroom at 4:17 p.m.)

10             THE COURT:  Thank you.  Are you ready to proceed?

11             MR. BALDANI:  I am, Judge.

12             THE COURT:  All right.  Again, the record will

13   reflect all members of the jury are present.  Parties and

14   counsel are present.

15             Mr. Weaver, of course, you're still under oath, sir.

16             You may continue.

17             MR. BALDANI:  Thanks, Judge.

18                         CROSS-EXAMINATION

19   BY MR. BALDANI:

20   Q.  Mr. Weaver, my name is Russ Baldani.  I'm Freddy

21   Thompson's attorney.  We've never spoken, have we?

22   A.  No, sir.

23   Q.  All right.  I want to ask you several questions this

24   afternoon.  How long have you known Freddy?

25   A.  Probably since the '90s, 1990s.

*WEAVER - Cross (Mr. Baldani)*                                    70

1    Q.   Because he, like you, grew up in Clay County?

2    A.   Yes.

3    Q.   I want to ask you about -- I'm going to jump way forward

4    to the new machine, okay?  The new machine that was used for

5    the first time in May of '06.

6    A.   Yes.

7    Q.   Were you aware that that new machine sat in the front of

8    the county clerk's office for 30 days before the election?

9    A.   No.

10   Q.   You didn't know that?

11   A.   No.

12   Q.   Do you have -- were you aware that Freddy Thompson took

13   that machine around to, like, fire departments and schools

14   around the Manchester to let the public get acquainted with

15   it?

16   A.   Yes, I knew he took it to fire departments.

17   Q.   How is it that you know that?

18   A.   Because I was at a fish fry one day, and he was there.

19   Q.   Tell the jury about that.

20   A.   Basically, I just showed up to eat, and I know he was

21   there showing the machine.

22   Q.   Displaying the machine?

23   A.   Yes.

24   Q.   So basically letting people try it out or test it or

25   explain how it worked, that kind of thing?

*WEAVER - Cross (Mr. Baldani)*                                    71

1    A.   Yes, I'm assuming he was.

2    Q.   Because you said people were afraid of it, and I think,

3    well, did you mean that's because it's a computerized machine,

4    and sometimes people have the tendency to --

5    A.   A lot of the older people was afraid of it because, you

6    know, it was a computer.

7    Q.   And so you personally witnessed him on that one occasion,

8    or more than one occasion?

9    A.   I seen it there.  I know he was there with it.

10   Q.   And that was a fish fry sponsored by the fire department?

11   A.   Yes.  Burning Springs Fire Department's where I seen it

12   at.

13   Q.   Was there a lot of people there?

14   A.   There was probably 15 or 20 people there at the time I

15   was there.

16   Q.   Okay.  Personally aware of any other efforts that he did

17   in that regard?

18   A.   No, not right off.

19   Q.   Now, you kind of went through the machine and how it

20   works and how it can be -- you know, we've been calling it

21   manipulated, right?

22   A.   Yes.

23   Q.   You went through that already.  It's not a real

24   complicated machine, is it?

25   A.   Yes, in a way it is.

1   Q.   Well, maybe that was a bad question.  As far as how you

2   would manipulate it, there's not much to that, is there?  I

3   mean, okay, I'm sorry.  Let me just stop there.  There's not

4   much to that, is there?

5   A.   Actually, the first time, you know, when it says vote,

6   you know, a lot of people thinks their vote is done.

7   Q.   Exactly.

8   A.   And it's not.

9   Q.   Exactly.  But as far as what type or how much schooling

10  needs to be given somebody, I mean, that's pretty much it.

11  That the machine, that you hit one button and that a person

12  could unwittingly walk away and their vote is still left in

13  the ballots and can be changed, right?

14  A.   Yes, sir.

15  Q.   So it's not -- doesn't require any lengthy, in-depth

16  training to learn what we just talked about in 30 seconds,

17  does it?

18  A.   Well, it was, it was new to the people in our community.

19  Q.   Okay.

20  A.   It was new.

21  Q.   But there's really two different things we've been

22  talking about, and me and you have already talked about both

23  these.  We've talked about legitimate training people, this is

24  the new machine, this is how it's supposed to work.  And then

25  there's also this business and this talk about schooling, or

WEAVER - Cross (Mr. Baldani)                                    73

1   manipulating, right?

2   A.   Yes.

3   Q.   And so my question is, as far as being schooled or taught

4   to manipulate the machine, there's nothing complicated about

5   that, right?

6   A.   Well, it was different for us because, you know, we'd

7   been used to the old machines for so many years.

8   Q.   But once you see that you push a button and that some

9   people could think that they were done and walk away, that's

10  where the opportunity to manipulate comes in, right?

11  A.   Yes.  We was explained that.

12  Q.   Okay.  Now, during your direct testimony, you said

13  something like eventually, you came clean, right?

14  A.   Yes.

15  Q.   And you've talked with the FBI and been questioned about

16  voter fraud on at least -- on three occasions, at least?

17  A.   How many occasions?

18  Q.   Three.

19  A.   Probably.

20  Q.   Okay.  Did you review any of your prior testimony or any

21  of your statement summaries or anything like that prior to

22  testifying?

23  A.   Yes.

24  Q.   Okay.  When did you do that?

25  A.   When did I do what now?

*WEAVER - Cross (Mr. Baldani)*                                    74

1    Q.   When did you review your prior testimony and your

2    statement summaries, that kind of thing?

3    A.   I did that this morning.

4    Q.   Okay.  So you're pretty familiar with what you said to

5    who and when you said it, then?

6    A.   Pretty much.

7    Q.   All right.  Well, let me get right to it.  The first time

8    you talked to the FBI was May 1 of '07, correct?

9    A.   Sounds about right.

10   Q.   Okay.  And at that time, you were confronted about this

11   vote fraud and pretty much you lied and denied?

12   A.   Yes.

13   Q.   Okay.  And didn't admit to anything?

14   A.   No.

15   Q.   And were you aware at that time that lying to a federal

16   agent was a felony charge?

17   A.   No, sir.

18   Q.   Did you have an attorney with you --

19   A.   No, sir.

20   Q.   Okay.  The second time was about five months later, on

21   October 2nd of '07.  Right?  Does that sound roughly correct?

22   A.   Sounds about right, yes.

23   Q.   And at that time, you started telling some things and

24   opening up about what you had -- you and others had done,

25   right?

*WEAVER - Cross (Mr. Baldani)*                                    75

1    A.   Yes.

2    Q.   All right.  Now, you didn't mention Freddy Thompson

3    schooling you illicitly on the machine on October 2nd, did

4    you?

5    A.   I don't remember.

6    Q.   All right.  Well, I'm going to show you a summary of the

7    October 2nd and let you look through it and see if it

8    refreshes your memory.  Is that okay?

9    A.   That's fine.

10   Q.   Is that one of the things that you reviewed in

11   preparation to testify, Mr. Weaver?

12   A.   No, sir.

13   Q.   Well, take a look through it.  I think it's only two,

14   three, four pages.  See if that refreshes your memory about

15   whether you did or did not mention Freddy Thompson schooling

16   you.

17   A.   (Reviewing document).

18   Q.   Mr. Weaver, I'm not asking you to read out loud anything

19   from that report.  I simply want to ask you, having gone

20   through your report, does that refresh your recollection as to

21   whether you told the FBI on October 2nd about this illicit

22   schooling by Freddy Thompson?

23   A.   No, sir.

24   Q.   Doesn't refresh your memory?

25   A.   I don't see it in there, no, sir.

WEAVER - Cross (Mr. Baldani)                          76

1          THE COURT:  Mr. Weaver, that's not the question.
2    Doesn't make any difference what's in there.  It's only
3    whether it refreshes your recollection that you actually
4    discussed that.  Having read it, the question is you either do
5    remember discussing it or don't remember discussing it.
6          THE WITNESS:  I don't remember discussing it.
7          MR. BALDANI:  Thank you, Your Honor.
8    Q.   All right.  Who is Beverly Craft?
9    A.   She's a deputy clerk.
10   Q.   And we've talked about different clerks.  We've talked
11   about Anthony Short, who was a clerk at the Manchester
12   precinct, right?
13   A.   Yes.
14   Q.   We've talked about James Phillips, who is the circuit
15   clerk, right?
16   A.   Yes.
17   Q.   And James Phillips is the one that asked you to be an
18   election officer, not any of these people?
19   A.   Yes.
20   Q.   Right?  And then there's the county clerk, and that, of
21   course, is Freddy Thompson?
22   A.   Yes.
23   Q.   Okay.  So Beverly Craft works at the county clerk's
24   office?
25   A.   Yes.

WEAVER - Cross (Mr. Baldani)                                77

1   Q.   Okay.  Did Miss Craft ever tell you that machine could be

2   manipulated or give you any --

3              MR. PARMAN:  Objection, Your Honor.

4              THE COURT:  Sustained.

5   Q.   Did you learn from anyone other than Freddy Thompson and

6   Wayne Jones about the fact that the machine could be

7   manipulated?

8              MR. PARMAN:  Objection, Your Honor.

9              THE COURT:  Sustained.

10  Q.   I'm going to -- I've asked you about May 1.  Now I've

11  asked you about October 2nd.  I'm going to ask you about you

12  did talk to the FBI one more time, about eight days later, on

13  October 10th, correct, of '07?

14  A.   Yes.

15  Q.   All right.  And would you agree with me that that's the

16  first time that you mention -- and when I talk about

17  schooling, I'm talking about the illicit manipulating machine

18  schooling.  Would you agree that on October 10th was the first

19  time you told the FBI about this illicit schooling by Freddy

20  Thompson?

21             MR. PARMAN:  Objection, Your Honor.

22             THE COURT:  Overruled.

23  A.   I'm not sure of the date.

24  Q.   Okay.

25  A.   I'm not sure of the date.

*WEAVER - Cross (Mr. Baldani)*                                      78

1   Q.   Let's do it this way.  You agreed that May 1st sounded

2   about right.  You agreed the second time was October 2nd of

3   '07.  That sounded about right.  And you agreed you did talk

4   to them a third time, correct?

5   A.   Yes.

6   Q.   Do you recall that being roughly a week later or eight

7   days later, something like that, roughly October 10th of '07?

8   A.   Not right off, I sure don't.

9   Q.   Do you have any reason to doubt that that's the correct

10  date?

11  A.   No, sir.  I don't have no doubt.

12  Q.   The point I'm making is would you agree with me that that

13  third interview was the first time you told the FBI, out of

14  your three interviews, about the illicit training?

15  A.   Yes.

16  Q.   Okay.  That's what I'm getting at.  Thank you.  I want to

17  ask you about voter assistance forms, all right?  You talked

18  about '04, when you were an election official and Anthony

19  Short was the clerk, right?

20  A.   In '04, yes.

21  Q.   And you personally saw him throwing away, destroying

22  voter assistance forms at the end of the day?

23  A.   Yes.

24  Q.   And you can't tell us out of the number of voter

25  assistance forms, you can't tell us how many of those forms he

*WEAVER - Cross (Mr. Baldani)*                                    79

1    threw away?

2    A.   No, sir, I can't.

3    Q.   All right.  And then again in '06, you saw him again in

4    '06, you saw Anthony Short throw voter assistance forms away?

5    A.   Yes.

6    Q.   All right.  So if voter assistance forms are missing,

7    it's possible that it's due to his discarding them, isn't it?

8    A.   Repeat your question?

9    Q.   If voter assistance forms that were filled out, whether

10   properly or improperly, are missing, it's very possible that

11   it's due to Anthony Short's act of discarding them in '04 and

12   '06, correct?

13   A.   Yes.

14   Q.   Okay.  And it was '06 that you saw him snorting drugs

15   while he's working as a clerk?

16   A.   Yes.

17   Q.   Right?  Do you know what he was snorting?

18   A.   No.  Just seen him snorting something off the top of his

19   hand.

20   Q.   Did you confront him about it?

21   A.   No, sir.

22   Q.   Did you report him for it?

23   A.   No, sir.

24   Q.   I want to ask you about your relationship with Wanda

25   White.

*WEAVER - Cross (Mr. Baldani)*                                      80

1    A.  Yes.

2    Q.  Wanda's a friend of yours, right?

3    A.  Yes.

4    Q.  Has been for a long time?

5    A.  Yes.

6    Q.  How long have you known her?

7    A.  Probably back we went to high school.

8    Q.  Y'all went to high school together.  And basically, you

9    were pretty much aligned with her as far as who you all each

10   supported throughout the years, right?

11   A.  Pretty much.

12   Q.  For the most part?

13   A.  Yes.

14   Q.  And in all fairness, for the most part, the people you

15   supported and were aligned with was in the opposite side of

16   Freddy Thompson, right?

17   A.  No, sir.  Not all the time.

18   Q.  I said for the most part.  Would you agree for the most

19   part?

20   A.  Yeah, sometimes we was different, yes.

21   Q.  Okay.  When is the last time you talked to Wanda?

22   A.  Wanda, it's probably sometime in '07.

23   Q.  All right.  After you both had begun cooperating?

24   A.  No.  It was before that.  I've not talked to her since, I

25   guess, the first time I met with the FBI.

*WEAVER - Cross (Mr. Baldani)*                                              81

1    Q.   Okay.  And we already established that was right at the

2    beginning of May was the first time.  Did you tell her you

3    were going in to the FBI or --

4    A.   No.

5    Q.   -- discuss the fact?

6    A.   She came to my house late the night before we was

7    supposed to go to meet with the FBI.

8    Q.   She knew you were meeting with them?

9    A.   Yes, she came and asked me did I have a subpoena.  We

10   actually had a subpoena to be before the federal grand jury, I

11   think it was on a Thursday, and she -- we was supposed to meet

12   with the FBI agents at London the next day, and she came and

13   asked me did I receive an invitation to the grand jury.

14   Q.   Okay.  So she talked to you the night before the first

15   time you talked to the FBI?

16   A.   Yes.

17   Q.   Okay.  And, of course, we've already established the

18   first time you talked to the FBI, you lied to them?  Right?

19   A.   Yes.

20   Q.   Did she encourage you to lie to them, or did you all

21   discuss that?

22   A.   I've not talked to her since that night.

23   Q.   No, I'm talking about the night before your first time

24   you went in there, did she say, hey, you know, I mean, was it

25   a kind of cover your tails kind of meeting?

*WEAVER - Cross (Mr. Baldani)*                                        82

1    A.   No, she just came basically and was talking about having

2    to go, and I was scared.  I didn't say much to her.

3    Q.   She didn't tell you to go and tell everything that we

4    did, though, did she?

5    A.   No, sir.

6    Q.   And, I mean, in all fairness, Mr. Weaver, you lied,

7    basically, at least the first time to protect yourself and to

8    protect your freedom, right?

9    A.   Yes.

10   Q.   Because you knew you'd committed serious crimes, right?

11   A.   Yes.

12   Q.   And you wound up entering your guilty plea around March

13   of '08, right?

14   A.   Yes.

15   Q.   Does that sound about right?

16   A.   Yes.

17   Q.   Almost two years ago?

18   A.   Yes.

19   Q.   And you have yet to be sentenced?

20   A.   Yes.

21   Q.   And you're hoping that your testimony and cooperation

22   helps you get a lenient sentence, aren't you?

23   A.   Yes, sir, I am.

24   Q.   Now, you were willing to break the law for your own

25   personal financial benefit, weren't you?

*WEAVER - Cross (Mr. Baldani)*                                      83

1    A.   Financial benefit?

2    Q.   Well, you said that the reason you participated in this

3    was for a job, and a job pays you money, right?

4    A.   Yes.

5    Q.   So you were willing to break the law for your financial

6    benefit, right?

7    A.   Yes, I guess you could say that.

8    Q.   All right.  And the truth of the matter is you didn't

9    finally come clean just to purge your soul, did you?

10   A.   Yes, I did.  I was ready to move on with my life.

11   Q.   I'm sorry.  If you thought you could have continued to

12   get away with it, would you still have done it?

13   A.   No, sir.  No.  I've had too many just rough days and

14   nights over this.  I wouldn't want no part of it again.

15   Q.   Well, I think you misunderstood.  My question was is part

16   of the reason you finally came clean, the so-called writing

17   was on the wall.  You knew that the jig was up?

18   A.   No, it's because of my kids.

19   Q.   So that had nothing to do with it?

20   A.   I was ready to move on for my kids.

21   Q.   Okay.  But, of course, you had the kids on May 1 of '07

22   when you lied, right?

23   A.   Yes, sir.

24   Q.   And you had the kids on October 2nd of '07, when you

25   didn't tell all?

*WEAVER - Cross (Mr. Gilbert)*                                      84

1    A.   Yes, sir.

2            MR. BALDANI:  I believe that's all, Judge.

3                            * * *

4    **Continuation of Charles Weaver Testimony**
     **Friday, February 26, 2010**
5    **9:00 a.m.**

6            THE COURT:  Let's see.  Mr. Gilbert, I believe Mr.

7    Baldani has completed his questions.

8            MR. GILBERT:  Okay, thank you.

9            MR. BALDANI:  I don't have any other questions of the

10   witness, Your Honor.  Appreciate it.

11           THE COURT:  All right.

12                          CROSS-EXAMINATION

13   BY MR. GILBERT:

14   Q.   Good morning, Mr. Weaver.

15   A.   Good morning.

16   Q.   My name is Jerry Gilbert.  I'm from Richmond, and I'm

17   representing Bart Morris.

18   A.   Yes, sir.

19   Q.   In the 2002 May primary, you supported Jennings White; is

20   that correct?

21   A.   Yes.

22   Q.   In fact, you and you family always supported the Whites?

23   A.   No, sir.

24   Q.   How about Jennings White?

25   A.   I don't know about always.

*WEAVER - Cross (Mr. Gilbert)*                                      85

1    Q.   Okay.  In the 2002 November election, you ran on the
2    school board ticket?
3    A.   Yes, sir.
4    Q.   And your opponent was Charles Keith; is that correct?
5    A.   Yes, sir.
6    Q.   He was the chairman of the school board?
7    A.   Yes, sir.
8    Q.   It's a fact, Mr. Weaver, that Jennings White asked you to
9    run for that position?
10   A.   No, sir.
11   Q.   That's not true?
12   A.   That's not true.
13   Q.   When did you seek Mr. Jennings White's advice with
14   respect to running for that position?
15   A.   When I worked for the state, the only job that I could
16   run for was something nonpartisan, and that was one of them.
17   And with the thing in 2002, the school board, the clerk's race
18   in 2002, I figure it's a good time to take advantage of a
19   little support from Jennings White.
20   Q.   And so you did seek his support?
21   A.   Yes, sir.
22   Q.   And he did support you in that run; did he not?
23   A.   Yes, sir.
24   Q.   Now, in the November general election, when you arrived
25   there at the poll that morning, I believe you stated that --

*WEAVER - Cross (Mr. Gilbert)*                                    86

1    A.   What year?

2    Q.   2004.

3    A.   2004.

4    Q.   I believe you stated that William Stivers was there?

5    A.   When I arrived, I was the first one there that morning.

6    Q.   Okay.  And did Mr. Stivers come later?

7    A.   Yes.

8    Q.   And then Mr. Rowland came?

9    A.   Yes.

10   Q.   And they had a dispute between themselves?

11   A.   Yes, sir.

12   Q.   And they called, and Wayne Jones came?

13   A.   Yes, sir.

14   Q.   And then later, Freddy Thompson was called?

15   A.   I'm not sure about that.

16   Q.   Okay.  In the 2006 primary, you were asked by James

17   Phillips, who was the circuit court clerk, to be an election

18   officer in the Manchester precinct; is that correct?

19   A.   Yes, sir.

20   Q.   The other judge at that precinct was Wanda White?

21   A.   Yes, sir.

22   Q.   And you were friends with Kennon and Wanda White?

23   A.   Yes, sir.

24   Q.   Had been for a long time?

25   A.   Yes, sir.

WEAVER - Cross (Mr. Gilbert)                                87

1   Q.   And during that period of time, you've testified that you

2   met with Wanda for training?

3   A.   Yes, sir.

4   Q.   Now, it was Kennon who was paying the voters during that

5   election; was it not?

6   A.   2006, yes.

7   Q.   And he was assisted by his brother, Travis Price?

8   A.   Brother-in-law.

9   Q.   Brother-in-law, I'm sorry.  That's Wanda's brother?

10  A.   Yes, sir.

11  Q.   Now, you had good reasons to support the Whites; did you

12  not?

13  A.   Yes, sir.

14  Q.   All right.  Kennon's father had been very good to you;

15  had he not?

16  A.   Yes, sir.

17  Q.   He appointed you fire chief?

18  A.   Yes, sir.

19  Q.   And some of the benefits of that job was that you got a

20  vehicle provided for you?

21  A.   Yes, sir.

22  Q.   They supplied your gas?

23  A.   Yes, sir.

24  Q.   And you got housing too; did you not?

25  A.   No, I had a home -- well, I've got a mortgage on my

*WEAVER - Cross (Mr. Gilbert)*                                    88

1    house.  The property, I had a lease on the property.

2    Q.   Okay.  And that was virtually rent-free; was it not?

3    A.   Yes, it come through the city council.

4    Q.   And did you get free utilities as a result of that?

5    A.   I had free gas.

6    Q.   All right.  Now, you testified that the last time that

7    you spoke to Wanda and Kennon would be in the summer of 2007?

8    A.   It would have been right before we went to meet with the

9    FBI, yes.

10   Q.   Okay.  And did they come to your home?

11   A.   Yes, sir, they did.

12   Q.   Were you aware at that time that they were wired and were

13   recording your conversation?

14   A.   No, sir.

15   Q.   Now, in the 2006 November general election, Bart Morris

16   supported James Garrison for county judge executive; did he

17   not?

18   A.   November?

19   Q.   Yes, sir.

20   A.   No, it would have been the May election.

21   Q.   It would have been the May election?

22   A.   Yes, sir.

23            MR. GILBERT:  Thank you, that's all I have.

24            THE COURT:  Thank you, Mr. Gilbert.  Miss Hughes?

25            MS. HUGHES:  I don't have any questions, thank you.

*WEAVER - Redirect (Mr. Parman)*                                            89

1           THE COURT:  All right.  Thank you.  Mr. Simons?

2           MR. SIMONS:  Your Honor, I don't have any questions

3     of this witness.

4           THE COURT:  All right, thank you.  Any redirect, Mr.

5     Parman?

6           MR. PARMAN:  Yes, Your Honor.

7                        REDIRECT EXAMINATION

8     BY MR. PARMAN:

9     Q.  Good morning, Mr. Weaver.

10    A.  Good morning.

11    Q.  Sir, I just have a couple follow-up questions for you.

12    Sir, you were asked about a training letter that you received

13    when you were going to serve as an election officer.  Do you

14    recall that line of questioning, a letter asking you to come

15    and --

16    A.  Yes.

17    Q.  -- do some training?

18    A.  Yes, sir.

19    Q.  And that's a standard letter that every election officer

20    receives to get the mandatory training?

21    A.  Yes, sir.

22    Q.  I just want to make sure that we clarify the difference

23    between the mandatory training that all election officers

24    receive and the special training that you received.

25    A.  Yes, sir.

WEAVER - Redirect (Mr. Parman)                                    90

1    Q.   Explain to the jury again when the extra training that

2    you received occurred.

3    A.   The extra training, it was after we had done been

4    upstairs and had the initial training on the machines

5    upstairs.

6    Q.   And that was the training that everybody received?

7    A.   Everybody received the one that was upstairs, yes.

8    Q.   Okay.  And on the same day, then, you received this

9    additional training?

10   A.   Yes, sir.

11   Q.   And who was present when that occurred?

12   A.   Wanda White, Wayne Jones and Freddy Thompson.

13   Q.   You were also asked several questions about conversations

14   you had with the FBI?

15   A.   Yes.

16   Q.   Do you recall that line of questioning?

17   A.   Yes.

18   Q.   And you were asked whether or not you initially told the

19   FBI about whether or not Freddy Thompson was involved in the

20   scheme?

21   A.   Yes.

22   Q.   But just to be -- just to clarify the situation, I

23   believe you also testified that you didn't say anything about

24   your involvement at all with the elections initially; is that

25   accurate?

*WEAVER - Redirect (Mr. Parman)*                                     91

1    A.   That's true.

2    Q.   Sir, during the course of this investigation, did you

3    have an opportunity to testify before a federal grand jury?

4    A.   Yes, sir, I did.

5    Q.   Do you recall the date of that?

6    A.   No, sir.

7    Q.   Would February 6, 2008, does that sound about accurate?

8    A.   Probably, yes.

9    Q.   Do you recall whether or not you were asked about your --

10   about Freddy Thompson and Wayne Jones' involvement in teaching

11   you how to use these election machines?

12   A.   Yes, I did.

13   Q.   And did you not tell them that Freddy Thompson and Wayne

14   Jones both were the individuals who assisted you and showed

15   you how to manipulate these voting machines?

16   A.   Yes, sir, I did.

17   Q.   And did you not also tell them that they showed you on an

18   actual machine how to manipulate the machine?

19   A.   Yes, sir.

20   Q.   You were also asked about your relationship with Cletus

21   Maricle.  Do you recall that line of questioning?

22   A.   Yes, sir.

23   Q.   And asked about anything that you had to do with him

24   regarding elections?

25   A.   Yes, sir.

*WEAVER - Redirect (Mr. Parman)*                                        92

1          MR. HOSKINS:  Your Honor, could we approach?

2          THE COURT:  Yes.

3                    (A sidebar conference was held out of the

4                    hearing of the jury):

5          THE COURT:  Yes, sir, Mr. Hoskins?

6          MR. HOSKINS:  Your Honor, having reviewed Mr.

7    Weaver's grand jury testimony, I believe that what the

8    government is preparing to go into is a brief conversation

9    that Mr. Weaver and Mr. Maricle had before the election, when

10   Mr. Maricle asked Mr. Weaver how he thought the election was

11   looking.  And Mr. Weaver thought to himself, as I understand

12   it, that was unusual, because he thought that Judge Maricle

13   was involved in what was going on.  And I think that's

14   speculation on his part, would be inappropriate.

15         THE COURT:  Okay.  I'm not sure where we're going.

16         MR. PARMAN:  Your Honor, Mr. Hoskins is right, that

17   it was his impression, based upon the context of the

18   conversation that was had, that it was peculiar that Mr.

19   Maricle was actually asking about it the day before the

20   election, about what his role would be as to his son-in-law's

21   election.

22         THE COURT:  How is it relevant to matters that were

23   brought up on cross-examination?

24         MR. PARMAN:  He specifically asked about --

25         THE COURT:  Mr. Hoskins did?

*WEAVER – Redirect (Mr. Parman)*                                    93

1          MR. PARMAN:  Yes, Your Honor, about Mr. Maricle and

2     Mr. Weaver's role in elections and what he had to do with

3     elections, and this is directly related to an election.  His

4     son-in-law's election, Phillip Mobley.

5          MR. HOSKINS:  I asked if he'd ever been asked to do

6     anything illegal.  He said no.

7          MR. ABELL:  I recall Mr. Hoskins' questions related

8     to Judge Maricle's initial run for office in the early '90s.

9     Mr. Weaver hung signs for him at a number of locations,

10    apparently in all three counties.

11         THE COURT:  1990 or thereabouts.

12         MR. ABELL:  Whenever he ran in the early '90s.

13         MR. PARMAN:  That's accurate.  He went on to state

14    further and asked if he had any other actions or activities

15    related to elections at later times.  This was a later time he

16    approached him and talked to him about election related

17    activity.

18         MR. HOSKINS:  Nothing illegal was his testimony.

19         THE COURT:  I'll overrule the objection.  You can ask

20    it.

21              (Sidebar conference concluded.)

22         THE COURT:  Thank you, counsel.  Mr. Parman, you may

23    continue.

24         MR. PARMAN:  Thank you, Your Honor.

25    BY MR. PARMAN:

WEAVER - Redirect (Mr. Parman)                                    94

1    Q.   Mr. Weaver, I was asking you about a lot of questions

2    where you were asked about your relationship with Cletus

3    Maricle and your relationship with respect to elections.  Do

4    you recall that?

5    A.   Yes, sir.

6    Q.   Sir, in May of 2006, do you recall that election?

7    A.   Yes.

8    Q.   Did you have any discussions with Cletus Maricle related

9    to the election?

10   A.   Actually, I just talked to him one time.  It was -- I was

11   coming out of Speedway, SuperAmerica at Manchester, and Al Man

12   Stivers was driving a pickup, and we crossed paths at the

13   entrance.  And basically, Al Man pulled up, we rolled our

14   windows down, had a conversation.

15        And Cletus was sitting on the passenger side reading

16   the newspaper.  And the only thing he said to me, he looked

17   around and he said, he said, "Dobber, how do you think

18   Phillip's going to do?"

19   Q.   And what did you understand that to mean?

20   A.   He was asking me how Phillip was going to do in the

21   election.

22   Q.   And the timing of this election, when was it related to

23   the May primary?

24   A.   It was probably a week before the primary.

25   Q.   To your knowledge, did he know you were going to be

WEAVER - Redirect (Mr. Parman)                                    95

1    working in the polls?

2    A.   He probably did.

3    Q.   And when you say Phillip, who do you think he was

4    referring to?

5    A.   Phillip Mobley.

6    Q.   Was Mr. Mobley running for something in the May '06

7    election?

8    A.   Yes.

9    Q.   What was he running for?

10   A.   PVA.

11   Q.   And was he on your slate of candidates?

12   A.   Yes, sir.

13   Q.   You also testified about your expectations as to what you

14   would receive from participating in this scheme.  Do you

15   recall that?

16   A.   Yes, sir.

17   Q.   And I believe you also testified that Wanda White

18   participated in this scheme with you?

19   A.   Yes, sir.

20   Q.   Did she, during the course of participating in this

21   scheme with you, tell you what she expected in return for

22   being involved?

23   A.   She said something about going to work for drug court.

24   Q.   Did she tell you who was going to get her the job in drug

25   court?

*WEAVER - Redirect (Mr. Parman)*                                        96

1    A.   No.  She just told me she was going to work for drug

2    court.

3    Q.   I believe you also testified that Kennon White

4    participated in this scheme in '06?

5    A.   Yes, sir.

6    Q.   To your understanding, what was he going to receive from

7    his participation?

8    A.   He was going to receive help for his dad in November.

9    Q.   And how was he going to get help for his dad in November?

10   A.   By supporting a group of candidates that was going to

11   support his dad in November.

12   Q.   Did he tell you if you supported one candidate, that he

13   expected to get support for his father in November?

14   A.   He said, the one he referred to, he said, "we have got to

15   help Phillip," he said, "because Clete is going to help dad in

16   November."

17   Q.   And when he was referring to Clete, who was he referring

18   to?

19   A.   Cletus Maricle.

20   Q.   Finally, Mr. Weaver, you were asked questions about the

21   White political family and in '02, whether or not that was the

22   end of their powerful dynasty, or something to that extent?

23   Do you remember that line of questioning?

24   A.   Yes, sir.

25   Q.   And I believe you testified you couldn't necessarily

*WEAVER - Recross (Mr. Westberry)*                     97

1   agree with that statement?

2   A.  Yes, sir.

3   Q.  Sir, based on your knowledge of the political environment

4   in Clay County, who was the most powerful person or group of

5   persons in 2002?

6   A.  It would have been the school board and Doug Adams, the

7   superintendent.

8   Q.  Thank you.

9         MR. PARMAN:  That's all I have, Your Honor.  Thank

10  you.

11        THE COURT:  Recross.  Mr. Hoskins, do you need a

12  moment?  Yes, sir.

13        MR. HOSKINS:  No questions, Your Honor.

14        MR. WESTBERRY:  Could I have just one quick second?

15        THE COURT:  Certainly.

16        MR. WHITE:  I'm sorry, Your Honor.  No questions.

17        THE COURT:  Mr. Westberry.

18        MR. WHITE:  I misheard.  My apologies.

19        THE COURT:  Mr. Westberry.

20                    RECROSS-EXAMINATION

21  BY MR. WESTBERRY:

22  Q.  Good morning again, Mr. Weaver.  Just one question.  You

23  said you've known Doug Adams for pretty much all of your life,

24  at least all of your adult life; is that correct?

25  A.  Yes, sir.

*WEAVER - Recross (Mr. Baldani)*                                    98

1   Q.   Has he always been fair by you?

2   A.   Yes, sir, to me he has.

3   Q.   Good to your family too?

4   A.   Yes.

5           MR. WESTBERRY:  Thank you.  That's all I have.  Thank

6   you, sir.

7           THE COURT:  Thank you.  Now, Mr. White?

8           MR. WHITE:  I'm sorry, Your Honor.  No further

9   questions.

10          THE COURT:  That's fine.

11          MR. ABELL:  Judge, I don't have any additional

12  questions either.

13          THE COURT:  Thank you.  Mr. Baldani?

14          MR. BALDANI:  I just have a handful if I could do

15  them from here, Judge.

16          THE COURT:  That's fine.

17                          RECROSS-EXAMINATION

18  BY MR. BALDANI:

19  Q.   Mr. Weaver, when Mr. Parman asked you about the prior

20  statements to the FBI we talked about yesterday, correct?

21  A.   Yes, sir.

22  Q.   You didn't mention Freddy on May the 1st of '07, but you

23  didn't acknowledge any vote fraud activity that first time,

24  right?

25  A.   What date now?

WEAVER - Recross (Mr. Baldani)                                    99

1   Q.   The first time you talked to them, you didn't acknowledge

2   any vote fraud activity by yourself?

3   A.   No, sir.

4   Q.   But the second time is -- you did acknowledge a good bit

5   of vote fraud activity, right?

6   A.   Yes, sir.

7   Q.   Remember, that's the big, long one that took you a while

8   to read yesterday?

9   A.   Yes, sir.

10  Q.   And that's the one that you agreed that you didn't

11  mention Freddy Thompson's illicit schooling, right?

12  A.   Yes, sir.

13  Q.   So the second time you met with them, you did come clean

14  about a whole lot of the vote fraud activity but didn't

15  mention the illicit schooling, right?

16  A.   Yes, sir.

17  Q.   Okay.  And then we established yesterday that it was only

18  at the third that you told the FBI about this, right?

19  A.   Yes, sir.

20  Q.   And that was October 10th, '07, or thereabouts.  You

21  agreed with me yesterday, right?

22  A.   Yes.

23  Q.   And then Mr. Parman asked you about mentioning the

24  illicit schooling at your grand jury testimony.

25  A.   Yes, sir.

*WEAVER - Recross (Mr. Baldani)*                                    100

1    Q.   And you said that you did?

2    A.   Yes, sir.

3    Q.   The truth of the matter is that was February 6th of '08,

4    so that was a year after or, actually, not quite a year.  That

5    was several months after your third meeting with the FBI,

6    right?

7    A.   Yes, sir.

8            MR. BALDANI:  That's all, Your Honor.

9            THE COURT:  All right.  Thank you.  Mr. Gilbert, any

10   further questions?

11           MR. GILBERT:  No further questions.

12           MS. HUGHES:  None.

13           THE COURT:  Mr. Simons?

14           MR. SIMONS:  No.

15           THE COURT:  All right.  Thank you.  Anything else?

16           MR. PARMAN:  No, Your Honor, thank you.

17           THE COURT:  Thank you.  Mr. Weaver, do you have any

18   exhibits or documents there?  If you can give those to the

19   security officer.  Sir, you may step down.  Thank you.

20                              * * *

21                      C E R T I F I C A T E

22           I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct excerpted transcript from the record of
23   proceedings in the above-entitled case.

24
      \s\ Lisa Reed Wiesman                    March 9, 2010
25   LISA REED WIESMAN, RDR-CRR              Date of Certification
     Official Court Reporter