1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    SOUTHERN DIVISION at LONDON
                              - - -
3
     UNITED STATES OF AMERICA,        :  Docket No. CR 09-16-S
4                                     :
                    Plaintiff,        :  **Frankfort, Kentucky**
5                                     :  Wednesday, March 3, 2010
          versus                      :  1:00 p.m.
6                                     :
     RUSSELL CLETUS MARICLE           :
7    DOUGLAS C. ADAMS                 :        **Trial Day 17B**
     CHARLES WAYNE JONES              :
8    WILLIAM R. STIVERS               :
     FREDDY W. THOMPSON               :
9    WILLIAM B. MORRIS                :
     DEBRA L. MORRIS                  :     **EXCERPTED TRANSCRIPT**
10   STANLEY BOWLING,                 :        **Testimony of**
                                      :   **William Michael White**
11                  Defendants.       :     **Pamela K. Mathis**

12

13                            - - -
                     TRANSCRIPT OF TRIAL
14               BEFORE DANNY C. REEVES
          UNITED STATES DISTRICT COURT JUDGE and a jury
15                            - - -

16   APPEARANCES:

17   For the United States:      STEPHEN C. SMITH, ESQ.
                                 JASON D. PARMAN, ESQ.
18                               Assistant U.S. Attorney
                                 601 Meyers Baker Road
19                               Suite 200
                                 London, KY 40741
20
     For the Defendant           MARTIN S. PINALES, ESQ.
21   Russell Cletus Maricle:     CANDACE C. CROUSE, ESQ.
                                 Strauss & Troy
22                               150 E. Fourth Street
                                 Fourth Floor
23                               Cincinnati,OH  45202

24                               DAVID S. HOSKINS, ESQ.
                                 107 E. First Street
25                               Corbin, KY  40701

```
 1   For the Defendant        R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:        KRISTIN N. LOGAN, ESQ.
 2                            Landrum & Shouse, LLP
                              220 West Main Street
 3                            Suite 1900
                              Louisville, KY 40202
 4

 5   For the Defendant        T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:     Morgan & Pottinger, P.S.C.
 6                            133 West Short Street
                              Lexington, KY  40507
 7

 8   For the Defendant        ROBERT L. ABELL, ESQ.
     William R. Stivers:      120 North Upper Street
 9                            Lexington, KY  40507

10

11   For the Defendant        RUSSELL JAMES BALDANI, ESQ.
     Freddy W. Thompson:      R. TUCKER RICHARDSON, ESQ.
     Baldani, Rowland & Richardson
12                            300 West Short Street
                              Lexington, KY  40507
13

14   For the Defendant        JERRY W. GILBERT, ESQ.
     William B. Morris:       Coy, Gilbert & Gilbert
15                            212 North Second Street
                              Richmond, KY 40475
16

17   For the Defendant        ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:         Gess, Mattingly & Atchison, PSC
18                            201 West Short Street
                              Lexington,KY40507
19

20   For the Defendant        DANIEL A. SIMONS, ESQ.
     Stanley Bowling:         Thompson, Simons, Dunlop & Fore
21                            116 West Main Street
                              Suite 2A
22                            Richmond, KY 40476

23

24

25
```

3

1    Court Reporter:                LISA REED WIESMAN, RDR-CRR
                                    Official Court Reporter
2                                   35 W. Fifth Street
                                    P.O. Box 1073
3                                   Covington, KY  41012
                                    (859) 291-4410
4

5        Proceedings recorded by mechanical stenography,
     transcript produced with computer.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            * * *

 2        WILLIAM MICHAEL WHITE, GOVERNMENT'S WITNESS, SWORN

 3              THE COURT:  You may proceed.

 4              MR. PARMAN:  Thank you, Your Honor.

 5                         DIRECT EXAMINATION

 6   BY MR. PARMAN:

 7   Q.  Good afternoon, sir.

 8   A.  Good afternoon.

 9   Q.  Could you state your name for the record?

10   A.  William Michael White.

11   Q.  Sir, how old are you?

12   A.  Forty-four.

13   Q.  Where do you live?

14   A.  Manchester.

15   Q.  What county is Manchester in?

16   A.  Clay County.

17   Q.  How long have you lived there in Manchester?

18   A.  All my life.

19   Q.  Are you married?

20   A.  Yes.

21   Q.  Do you have any kids?

22   A.  Yes.

23   Q.  How many kids have you got?

24   A.  Three.

25   Q.  Sir, where do you work?
```

1    A.   City of Manchester.

2    Q.   What do you do for the City of Manchester?

3    A.   General supervisor.

4    Q.   What role does the general supervisor play for the City

5    of Manchester?

6    A.   Oversee all the water, sewer and garbage and city

7    streets.

8    Q.   How long have you worked in that capacity?

9    A.   Going on eight years.

10   Q.   Sir, while working in that capacity, did you become aware

11   that private driveways were being paved there in the City of

12   Manchester?

13   A.   Yes.

14   Q.   Could you share with the jury the circumstances

15   surrounding the paving of those private driveways?

16   A.   I don't understand your question.

17   Q.   Well, let me rephrase.  You said you became aware that

18   private driveways are being paved?

19   A.   Yes.

20   Q.   Were those private driveways being paved with City money?

21   A.   Yes.

22   Q.   How many of those driveways were being paved in such a

23   manner?

24   A.   I think there was 14 to 16, somewhere in that number.

25   Q.   Are you familiar with private driveway leading up to the

1   house of Ella Wagers?

2   A.   Yes.

3   Q.   Was that private driveway paved with City money?

4   A.   Yes.

5   Q.   Who was in charge of seeing that these private driveways

6   were paved with City money?

7   A.   I couldn't hear you.

8   Q.   Who was it that led the effort to have these private

9   driveways paved with City money?

10  A.   Darnell Hipsher.

11  Q.   What position did Darnell Hipsher hold at the time?

12  A.   He was a city council member.

13  Q.   Was there anybody else there within the City of

14  Manchester that helped Mr. Hipsher in those efforts?

15  A.   Kennon White and the mayor at the time, Doug White.

16  Q.   So Kennon White, Doug White and Darnell Hipsher were all

17  involved?

18  A.   Yes.

19  Q.   Are you aware of whether or not this scheme to pave the

20  private driveways was found out or that others outside of the

21  City became aware of it?

22  A.   I couldn't hear you.

23  Q.   Were you aware of whether or not the scheme to pave

24  private driveways was learned of by state officials or anybody

25  else?

*WHITE - Direct (Mr. Parman)*                                               7

1    A.   Yes.

2    Q.   Explain or share with the jury what you found out.

3    A.   The state auditors come in and started doing the audit,

4    and they got to questioning about the driveways.

5    Q.   What happened then?

6    A.   The people that got the driveways blacktopped was sent a

7    bill for the blacktop.

8    Q.   What was the bill amount?  Was the bill amount for the

9    full value of the blacktop?

10   A.   No.

11   Q.   Based on your job, what percentage, in your estimation of

12   the value of the actual blacktop, was actually billed to the

13   people who had their driveways paved?

14   A.   Less than half.

15   Q.   Sir, to your knowledge, why was the driveways of these

16   individuals being paved?

17   A.   Best of my knowledge?

18   Q.   Yes, sir.

19   A.   Favoritism.

20   Q.   Do you know what favoritism they were doing it for?

21   A.   To get the people to vote for them.

22   Q.   Are you aware of how many people live in the house of

23   Ella Wagers?  Is that a large family up there on that land?

24   A.   Yes, there's quite a few people live there.  I think

25   there was -- I'd heard there's about 14 people live there.

WHITE - Direct (Mr. Parman)                                          8

1    Q.   Now, sir, also by virtue of your employment there at the

2    City of Manchester, do you oversee private contracts that are

3    awarded to individuals or businesses working for the City?

4    A.   Yes.

5    Q.   Have you overseen contracts that have been awarded to B&B

6    Excavating?

7    A.   Yes.

8    Q.   And who owns B&B Excavating?

9    A.   Stanley Bowling.

10   Q.   What are some of the contracts that B&B Excavating has

11   been awarded since you've been working there, supervising in

12   the City?

13   A.   They've done water line jobs, sewer line jobs and pump

14   station replacement.

15   Q.   Now, on the sewer line job that you're referencing, was

16   there an emergency declared when that bid was awarded?

17   A.   On one of them, yes, sir.

18   Q.   Now, when emergencies are declared, who declares these

19   emergencies?

20   A.   The mayor.

21   Q.   And when there is an emergency declared, does the normal

22   bidding process occur?

23   A.   No.

24   Q.   What happens?

25   A.   They find somebody to do the job, and they go do it.

*WHITE - Direct (Mr. Parman)*                                         9

1   Q.   Now, on this sewer line job that B&B Excavating did, I

2   believe you testified an emergency was declared; is that

3   right?

4   A.   Yes.

5   Q.   In your mind, was there actually an emergency that caused

6   that?

7   A.   No.

8   Q.   Why?

9   A.   Because they had the same problem out there for the last

10   two or three years, a little while longer.

11   Q.   What was the problem with the sewer line?

12   A.   Sewer line kept stopping up and running over.

13   Q.   And it had been doing that for a long period of time?

14        MR. SIMONS:  Your Honor please, I can't hear.

15        THE COURT:  You'll need to adjust that microphone a

16   little bit closer to you, if you could.  You can pull it in.

17   Thank you.

18   Q.   Sir, if you could, maybe move a little forward and speak

19   into the microphone so everybody can hear you.

20   A.   Okay.

21   Q.   We were talking about the sewer line project that was

22   performed by Stanley Bowling through B&B Excavating?

23   A.   Yes.

24   Q.   And you were answering whether or not you thought it was

25   an emergency.  If you could answer?

*WHITE - Direct (Mr. Parman)*                                          10

1    A.   The sewer line had been running over for two or three

2    years on and off.  They probably could have waited a little

3    longer, my opinion.

4    Q.   So it wasn't a situation where you had a sudden breakage

5    or anything like that?

6    A.   No.

7    Q.   Now, on the contracts through B&B Excavating, did you

8    ever notice an incident where B&B Excavating was using City

9    equipment on the B&B Excavating job?

10   A.   Yes.

11   Q.   And what instance was that?

12   A.   It was on a sewer line project.

13   Q.   On what, sir?

14   A.   Sewer line project.

15   Q.   And what equipment was B&B Excavating using that was the

16   City's equipment?

17   A.   Excavator.

18   Q.   And what was the excavator doing in the project?

19   A.   It was hammering rock.

20   Q.   Now, is it normal for a private contractor to use City

21   equipment on a job?

22   A.   No.

23   Q.   Have you ever seen a private company or a private

24   individual use City equipment on a job they were performing?

25   A.   Not that I remember.

1   Q.   Now, you oversaw other projects that was done by B&B

2   Excavating; is that accurate?

3   A.   Yes.

4   Q.   Are you also then familiar with change orders?

5   A.   Yes.

6   Q.   What is a change order, sir?

7   A.   Change order is when you have a project and need to add

8   something to the project, you have to do a change order to do

9   that.

10  Q.   And does change orders entail asking for more money?

11  A.   Yes, it's the same thing.  Just doing more work for more

12  money.

13  Q.   And when a private company that's doing work for the City

14  is requesting more money for the project, then they -- that's

15  accomplished through a change order?

16  A.   Yes.

17  Q.   Was it common on jobs performed by B&B Excavating for

18  change orders to be requested?

19  A.   On sewer line -- sewer pump station repairs, they done

20  some change orders on them.

21  Q.   Were there a lot of change orders?

22  A.   Three.  Three different pump stations.

23  Q.   Is change orders a common occurrence on all contracts?

24  A.   No.  Less change orders you have, the better the job

25  goes.

WHITE - Direct (Mr. Parman)                                    12

1    Q.   Through your employment at the City of Manchester, have

2    you seen any company that had more change orders than B&B

3    Excavating?

4    A.   More?

5    Q.   Yes.  That requested more change orders than B&B

6    Excavating.

7    A.   Not that I remember.  Sometimes you have a lot, sometimes

8    you don't.

9    Q.   But did you find that in contracts that were being

10   performed by B&B Excavating that there was, in your opinion,

11   an uncommon amount of change orders that were requested?

12   A.   They done three on that one job.

13   Q.   And were they all approved?

14   A.   Yes.

15   Q.   Through who?

16   A.   I can't hear you.

17   Q.   Who approved them?

18   A.   Who approved the change orders?

19   Q.   Yes, sir.

20   A.   I would say the mayor and probably me.

21        MR. SIMONS:  Your Honor, I'm sorry.  I still couldn't

22   hear the last answer.

23        THE COURT:  If you could repeat that, please.

24        THE WITNESS:  Repeat what I said?

25        THE COURT:  Yes.

*WHITE - Direct (Mr. Parman)*                                       13

1    A.   Me and the mayor probably approved it.

2    Q.   Sir, are you aware of an incident where City equipment

3    was retrieved from the residence of Doug Adams?

4    A.   Yes.

5    Q.   What type of equipment was retrieved from his residence?

6    A.   Bulldozer.

7    Q.   And why was it retrieved from his residence?

8    A.   Go get it worked on.

9    Q.   Do you know how it got there to begin with?

10   A.   Yes.  We took it.

11   Q.   The City?

12   A.   Yes, the City.

13   Q.   Do you know what purpose it was going to be used for?

14   A.   I don't know.  Only thing what I heard, make deer roads

15   or something.

16   Q.   Now, was the diesel and the repairs -- start with the

17   diesel.  The fuel that was in the bulldozer, who provided

18   that?

19   A.   When we took it down there, it was filled up by the City.

20   Q.   And there were repairs that were necessary after you

21   picked it up?

22   A.   Yes.

23   Q.   Who paid for the repairs?

24   A.   The City of Manchester.

25   Q.   Do you know who authorized it to be taken down there to

1    begin with?

2    A.   Down to --

3    Q.   Doug Adams.

4    A.   Kennon White called and told me to have it sent down

5    there.

6    Q.   To your knowledge, do you know why that was done?

7    A.   No.

8    Q.   In the course of your employment, did you also oversee a

9    contract for garbage collection?

10   A.   Yes.

11   Q.   And who collected the garbage for the City of Manchester?

12   A.   We collected garbage and took it to B&J Transfer.

13   Q.   Do you know who owns B&J Transfer?

14   A.   Bart Morris.

15   Q.   Has the City recently changed the method by which they

16   dispose of their garbage?

17   A.   We take it all to London now.

18   Q.   Sir, are you aware of savings that has occurred since the

19   City of Manchester now directly hauls their garbage to London?

20   A.   Yes.

21   Q.   How much does the City save annually?

22   A.   60 to 65 thousand.

23   Q.   Do you know how much per ton B&J Transfer was charging

24   for the collection of garbage and to transfer it?

25   A.   Yeah, it was around $50.

*WHITE - Direct (Mr. Parman)*                                              15

1    Q.   Fifty dollars a ton?

2    A.   Yes.

3    Q.   And how much does London charge once you take it there?

4    A.   It's between 26 and 27 dollars.

5    Q.   Now, you said the savings was 60 to 65 thousand dollars.

6    Does that also take into consideration the wear and the tear

7    on your garbage trucks, driving to London?

8    A.   No.

9    Q.   How much wear and tear -- what's the value of the wear

10   and tear that occurs on your vehicles from directly

11   transporting the garbage to London?

12        MR. GILBERT:  Objection, Your Honor.

13        THE COURT:  Counsel, I'll sustain the objection, but

14   you'll be precluding cross-examination on the issue.  So

15   sustained.

16   Q.   How far is it from the city to the landfill in London?

17   A.   It's less than 20 miles one way.

18   Q.   And by your estimation, the City saves $65,000 per year

19   by doing the new method?

20   A.   Yes, that's average savings.

21        MR. PARMAN:  Your Honor, may I have just a moment?

22        THE COURT:  Yes.

23   Q.   Sir, one further question.  While you were employed there

24   with the City, did you oftentimes see Kennon White with

25   Stanley Bowling?

1   A.   Yes.

2   Q.   And did you see Kennon White and Stanley Bowling together

3   while Mr. Bowling was bidding for -- or not rather bidding

4   for, but was performing contracts for the City?

5   A.   Yes.

6           MR. PARMAN:   That's all I have, Your Honor.   Thank

7   you.

8           THE COURT:   All right.   Thank you.   Mr. Hoskins?

9           MR. HOSKINS:   No questions, Your Honor.

10          THE COURT:   Mr. Westberry?

11          MR. WESTBERRY:   Just a couple from here, if I may.

12          THE COURT:   Yes.

13                        CROSS-EXAMINATION

14  BY MR. WESTBERRY:

15  Q.   Good afternoon, Mr. White.   I'm Kent Westberry.   I'm one

16  of the attorneys for Doug Adams.

17  A.   Yes.

18  Q.   I want to ask you some questions about the bulldozer that

19  you were talking about just a minute ago.   Mr. White, is it

20  your understanding that the bulldozer that you took out to Mr.

21  Adams' farm, that was a privately owned dozer owned by Daugh

22  White?

23  A.   Yes.

24  Q.   It wasn't a City-owned dozer; is that correct?

25  A.   No, the City didn't own it, no.

*WHITE - Cross (Mr. Westberry)*                                        17

1    Q.  Were the tracks on that dozer fairly worn before they got

2    out to Mr. Adams' farm?

3    A.  Yes.

4    Q.  Okay.  Do you know whether Mr. Adams had to make some

5    repair work on his own?

6    A.  I don't know.

7    Q.  After the dozer was used at the Adams farm, is it your

8    understanding that it was taken then to Mike Bishop's place?

9    Do you know?

10   A.  I don't know.

11   Q.  Do you know if it was taken to Brad Stephens' place, to

12   his farm or property to do some dozer work as well?

13   A.  I don't know.

14   Q.  Did you say that it was Kennon White, did I hear that

15   right, it was Kennon that sent the dozer out to the Adams

16   farm?

17   A.  Yes, sir.

18   Q.  Do you know if Mr. Adams ever asked that that dozer be

19   brought out there anyway, or do you know?

20   A.  I don't know.

21           MR. WESTBERRY:  Thank you, sir.  Appreciate it.

22           MR. WHITE:  No questions, Your Honor.

23           THE COURT:  Thank you.

24           ABELL:  No questions, Judge.

25           MR. RICHARDSON:  No questions.

1          THE COURT:  Thank you.  Mr. Gilbert?

2          MR. GILBERT:  Just a few, Your Honor.

3                        CROSS-EXAMINATION

4     BY MR. GILBERT:

5     Q.  Mr. White, I'm Jerry Gilbert.  I represent Bart Morris.

6     You testified that the price paid B&J Transfer was $50 a ton?

7     A.  Yes.

8     Q.  Are you sure about that?  Is it $46 a ton?

9     A.  Last one I figured for was right around 50 dollars, 49 or

10    50 dollars.

11    Q.  How long has it been $50 a ton?

12    A.  We ain't took any over since May of last year.

13    Q.  How long was it $50 a ton before the City stopped taking

14    the trash to the transfer station?

15    A.  I don't know for sure.

16    Q.  As far as you know, it's always been $50 a ton?

17    A.  I think original contract started out as 46, like you

18    said, but it goes up so much after that.

19    Q.  But that would be reflected in the records; would it not?

20    A.  Yes.

21    Q.  Have you reviewed the records before you came and

22    testified here today?

23    A.  Not since last year, I haven't.

24    Q.  Does the $27 that's charged by the landfill include the

25    state fee?

*WHITE - Cross (Ms. Hughes)*                                              19

1     A.   Yes.

2     Q.   Are you aware of any cost benefit analysis that's been

3     undertaken by the City with respect to the savings that you

4     testified here today?

5     A.   Excuse me?

6     Q.   Are you aware of any cost benefit analysis that's been

7     done by the City with respect to the savings that you've

8     testified here today?

9     A.   I don't understand your question.

10    Q.   Well, are you aware of any study that's been done to

11    compare the cost of using the trucks or using the transfer

12    station to haul the garbage to the landfill?

13    A.   Saving $65,000 a year.

14    Q.   And was there a study done or an analysis done by anyone

15    to arrive at that?

16    A.   No.  You can subtract it and figure it out.  I figured it

17    out on the paper, the bills.

18             MR. GILBERT:  Thank you.

19             THE COURT:  Miss Hughes?

20             MS. HUGHES:  Thank you, Your Honor.

21                           CROSS-EXAMINATION

22    BY MS. HUGHES:

23    Q.   Mr. White, you testified when you first were asked

24    questions about paving.  Do you recall that?

25    A.   Yes.

1  Q.   Are you familiar with the people whose driveways were
2  paved in addition to Miss Wagers?
3  A.   Yes.
4  Q.   Are you familiar with Mr. Rader and the people on
5  Singleton Road having their driveways paved?
6  A.   Yes.
7  Q.   All right.  Do you know my client, Debbie Morris?
8  A.   Yeah, I know her when I see her.
9  Q.   Are you aware that she also has a home on Singleton Road,
10 Town Branch area?
11 A.   Yeah, I think she has a rental house there.
12 Q.   And are you aware she has the only house on Singleton
13 Road whose driveway is not paved?
14 A.   She's probably right about that.
15          MS. HUGHES:  Thank you.
16          THE COURT:  Mr. Simons?
17          MR. SIMONS:  Your Honor please, I'm going to use the
18 podium.
19          THE COURT:  Yes, sir, that's fine.
20                    CROSS-EXAMINATION
21 BY MR. SIMONS:
22 Q.   Afternoon, Mr. White.  My name is Dan Simons.  I
23 represent Stanley Bowling.  You know Stanley --
24 A.   Yeah.
25 Q.   -- correct?  Your job title now is city supervisor?

1    A.   Yes.

2    Q.   And you've held that position since what year, '02?

3    A.   Yes.

4    Q.   And just prior to your holding that position, it was held

5    by Wes Hacker --

6    A.   Yes.

7    Q.   -- is that correct?  And is it a fair statement to say

8    that Kennon White kind of leap-frogged ahead of you into a

9    city manager job?

10   A.   Yes.

11   Q.   Okay.  Did you consider Kennon White to be your boss?

12   A.   I had to.

13   Q.   Understood.  If he told you to do something, you had to

14   do it?

15   A.   Yes.

16   Q.   Is that fair enough?  And you didn't feel any freedom to

17   deviate from what he told you to do --

18   A.   No.

19   Q.   -- as a City employee, did you?

20   A.   No.

21   Q.   Okay.  Now, I want to talk for just a second about the

22   sewer line that was declared an emergency.  Okay?

23   A.   Okay.

24   Q.   Now, you said that the plan -- do you know who did the

25   plans for that job?

1   A.   Sewer line job?

2   Q.   Yes, sir.

3   A.   One on the river?

4   Q.   Yes, sir, the one that was declared an emergency.  Do you

5   know who did the engineering plans?

6   A.   I can't remember.  I think it was Larry Cann.

7   Q.   I think that's correct.  That was done --

8           MR. SMITH:  Object.

9           THE COURT:  Sustained.

10  Q.   Do you know when the plans were done?

11  A.   No.

12  Q.   You know it was a substantial time, though, before the

13  work was actually done by B&B Excavating; was it not?

14  A.   I don't know when the plans were done.

15  Q.   I'm sorry.

16  A.   I don't know when the plans was actually drawed up.

17  Q.   Do you know the nature of the problem on Goose Creek

18  River?

19  A.   With the sewer line?

20  Q.   Yes.

21  A.   Yes.

22  Q.   What was it?  Tell the jury what the problem was.

23  A.   It would stop up, run over, run into the river.

24  Q.   And raw sewage ran directly into the river; did it not?

25  A.   Right.

*WHITE - Cross (Mr. Simons)*                                                    23

1    Q.   In fact, you took pictures of that; did you not?

2    A.   Someone did.

3    Q.   Do you know where those pictures are?

4    A.   Do I know where they are?

5    Q.   Yes, sir.

6    A.   No, I don't.

7    Q.   Is it not true that the raw sewage rolls right into the

8    river, and just downriver the City's intake is for city water?

9    A.   Yes.

10   Q.   So raw sewage was dumping out into the river, flowing

11   shortly downstream and being sucked into the intake for people

12   to cook with, wash their clothes with, take their baths out,

13   right?

14   A.   When the pumps were on, yes.

15   Q.   I'm sorry?

16   A.   When the river pumps were on, yes.

17   Q.   And that happened frequently, didn't it?

18   A.   Line run over?

19   Q.   Yes, sir.

20   A.   Yes.

21   Q.   Now, would you not consider that an emergency?

22   A.   It's based on how many times it runs over during a period

23   of time.

24   Q.   Would you agree with me that it's reasonable that some

25   people might consider that an emergency?

1   A.   Yes, some people would, yes.

2   Q.   Thank you.  Now, during the years 2004 to 2006, you were

3   the city supervisor at all times; were you not?

4   A.   Yes.

5   Q.   Okay.  And you retain that position today?

6   A.   Yes.

7   Q.   Okay.  Now, between 2004 and 2006, B&B Excavating was not

8   the only contractor in the city doing sewer line and water

9   line work, were they?

10  A.   No.

11  Q.   Okay.  Who else did some?

12  A.   Simon Construction did some.

13  Q.   Did Laurel Construction do some?

14  A.   They done water line.

15  Q.   How about Clay Pipeline?

16  A.   Water line.

17  Q.   Okay.  But there were multiple contractors working for

18  the City, correct?

19  A.   Yes.

20  Q.   Now, when you first became the city manager in 2002 --

21  city supervisor, I'm sorry.  That's the wrong title.  City

22  supervisor.  You were in charge of water, sewer, streets,

23  garbage also?

24  A.   Yes.

25  Q.   Okay.  And you didn't have anything to do with the

WHITE - Cross (Mr. Simons)                                        25

1   police, right?

2   A.   No.

3   Q.   And still don't?

4   A.   No.

5   Q.   Okay.  Now, you were new to that job.  Did you have

6   experience in water lines and sewer lines and things like

7   that?

8   A.   I had background in survey.

9   Q.   Okay.  In surveying?

10  A.   Yeah, used to work for a coal company.

11  Q.   Did you find it, on occasion, necessary to consult

12  someone about problems that the City had with sewer and water

13  lines?

14  A.   Yes.

15  Q.   And did you call on Stanley Bowling for advice?

16  A.   Few times I did, yes.

17  Q.   Did he help you when you called and asked him to help

18  you?

19  A.   Yes, he did.

20  Q.   Was he responsive every time you needed help on fixing

21  the sewer --

22           MR. PARMAN:  Going to object, Your Honor.

23           THE COURT:  Sustained.

24  Q.   All right.  You talked about a little bit about change

25  orders.  You mentioned that on one job, that there was a

*WHITE - Cross (Mr. Simons)*                                    26

1    series of three change orders on a job, correct?

2    A.   Yes.

3    Q.   And I think you said that that required the approval of

4    the City or the mayor, and it also required your approval.

5    Did you say that?

6    A.   Yes.

7    Q.   And you approved every one of those; did you not?

8    A.   Yes.

9    Q.   Okay.  So Stanley Bowling and his company weren't doing

10   anything behind your back, certainly, correct?

11   A.   No.

12   Q.   Okay.  You mean I am correct, he was not doing

13   anything --

14   A.   Yes.

15   Q.   Now, you talked a little about change orders.  When a

16   change order is requested, doesn't the lending agent have to

17   approve it?

18   A.   Yes.

19   Q.   The City has to approve it.  You've told us that?

20   A.   Yes.

21   Q.   And also the engineering firm has to approve it; do they

22   not?

23   A.   Yes.

24   Q.   And that was done on every change order that B&B obtained

25   that we've talked about; was it not?

*WHITE - Cross (Mr. Simons)*                                                    27

1    A.   Yes, it was.

2    Q.   Okay.  Are you familiar with all of the jobs that B&B did

3    for the City between 2004 and 2006?

4    A.   Yes.

5    Q.   Okay.  Did B&B do good work?

6    A.   Couldn't hear you.

7    Q.   Did they do good work?

8    A.   Yes.

9    Q.   The pump stations that Stanley put in, are they still

10   there and working?

11   A.   Yes.

12   Q.   How about the manholes and the sewer lines, are they

13   still there and working?

14   A.   Yes.

15   Q.   If there's maintenance issues with those in the city,

16   you'd be the man responsible for taking care of them, wouldn't

17   you?

18   A.   Yes, sir.

19   Q.   And that's not been a problem for you, has it?

20   A.   No.

21           MR. SIMONS:  That's all I have.  Thank you.

22           THE COURT:  Thank you.  See if there's any redirect.

23           MR. PARMAN:  Yes, Your Honor.

24   ///

25   ///

                        REDIRECT EXAMINATION

BY MR. PARMAN:

Q.   Sir, I believe you were asked about the number of private

contractors that did work for the City.  You remember that

line of questioning?

A.   Yeah.

Q.   There are people or businesses other than Mr. Bowling's

that does work for the City?

A.   Yes.

Q.   Who, however, received the vast majority of the contracts

that were not bid out?  That didn't -- when the City had

contracts that needed to be done that didn't go through the

bidding process, who received those contracts?

A.   B&B.

Q.   Did they receive them every time, to your knowledge, when

it didn't go through a bidding process?

A.   Best I can remember they did, yeah.

          MR. PARMAN:  That's all I have, Your Honor.  Thank

you.

          THE COURT:  All right.  Thank you.  Anything else?

All right.  Thank you.  You can step down.  You're excused.

          Mr. Parman?

          MR. PARMAN:  Yes, Your Honor.  The United States

calls Pamela K. Mathis.

          THE COURT:  Yes, sir.

1          PAMELA K. MATHIS, GOVERNMENT'S WITNESS, SWORN

2              THE COURT:  Thank you.  Mr. Parman, you may proceed.

3              MR. PARMAN:  Thank you, Your Honor.

4                          DIRECT EXAMINATION

5   BY MR. PARMAN:

6   Q.   Good afternoon, ma'am.

7   A.   Good afternoon.

8   Q.   Would you state your name, please?

9   A.   Pamela K. Mathis.

10  Q.   Miss Mathis, where do you live?

11  A.   I live in Burning Springs, Manchester, Kentucky.

12  Q.   What county is that in?

13  A.   Clay.

14  Q.   How long have you lived there in Burning Springs?

15  A.   Thirty-two years.

16  Q.   How long have you lived in Clay County?

17  A.   I've lived in Clay County 32 years.

18  Q.   Thirty-two years, okay.  Are you married?

19  A.   No.  Divorced.

20  Q.   Do you have any kids?

21  A.   No.

22  Q.   What is your occupation?

23  A.   I'm deputy clerk for the City of Manchester.

24  Q.   How long have you worked in that capacity?

25  A.   I've been there 13 years.

MATHIS - Direct (Mr. Parman)                                30

1    Q.   What are some of your duties as deputy clerk for the City

2    of Manchester?

3    A.   I work with the projects that the City has.  I work with

4    the recycling.  I work with the PRIDE program now.

5    Q.   Let's talk about the PRIDE program.  What is the PRIDE

6    program?

7    A.   PRIDE program is a federal program.  Money's allocated by

8    the federal government, and that is for roadside cleanup and

9    dump site cleanup.

10   Q.   Now, you said you work for the recycling.  What goes on

11   now with the recycling?

12   A.   With the recycling now, we have 62 customers that, in the

13   city that recycles instead of disposing and going into the

14   garbage.

15   Q.   When did this program start?

16   A.   In 2007, when Mayor Lewis took office.

17   Q.   As part of your duties as deputy clerk, are you also

18   working with the water bills?

19   A.   Yes.

20   Q.   Prior to working for the City of Manchester, where did

21   you work?

22   A.   I worked at B&J Transfer for a while.  That's where the

23   garbage was taken to.

24   Q.   Who is the owner of B&J Transfer?

25   A.   Bart Morris.

*MATHIS - Direct (Mr. Parman)*                                          31

1    Q.   Ma'am, do you know Stanley Bowling?

2    A.   Yes, I do.

3    Q.   Do you know if Mr. Bowling operates a business?

4    A.   Yes, he does.

5    Q.   What is the name of that business?

6    A.   B&B Excavating.

7    Q.   Now, are you aware of the contracts that B&B Excavating

8    has with the City of Manchester?

9    A.   Yes.

10   Q.   What are some of those contracts?

11   A.   Those contracts were water line extension projects, sewer

12   line extension projects and pump station projects, which was

13   sewer as well.

14   Q.   Miss Mathis, what is a change order?

15   A.   A change order is where it changes the scope of work in

16   their original project.

17   Q.   Does a change order entail asking for additional money?

18   A.   Yes.

19   Q.   Did you notice a disproportionate amount of change orders

20   on contracts with B&B Excavating?

21   A.   Yes.

22   Q.   How so?

23   A.   During one project, we were given a change order in

24   regards to additional gravel for moving a line.

25   Q.   Is that the only incidents where you're aware of change

1    orders being asked for on contracts with B&B?

2    A.   No.  We had a change order regarding a project regarding

3    a sewer line.

4    Q.   Is it normal to receive change orders when contracts are

5    performed?

6    A.   No.  That's something you don't want, because that makes

7    your project exceed the amount that it came in for bid.

8    Q.   So if I understand a change order correctly, it's bid at

9    a certain amount.  And then if a change order comes in after a

10   company is awarded the contract, then that is extra money the

11   City has to pay out?

12   A.   Yes.

13   Q.   When these contracts were being awarded, who was your

14   supervisor there at the City?

15   A.   I had two supervisors.

16   Q.   Who were they?

17   A.   I had a city manager was Kennon White, and William Mike

18   White.

19   Q.   What did Kennon White say or do in relation to these

20   contracts?

21   A.   He would come to me and tell me that Stanley needed the

22   work, that he needed the job.

23   Q.   Did Mr. White, Mr. Kennon White pressure you to push

24   these change orders through?

25   A.   Yes.

MATHIS - Direct (Mr. Parman)                                    33

1   Q.   How so?

2   A.   That I was to get it done.

3   Q.   To your knowledge, ma'am, do you know why Kennon White

4   wanted to push through these contracts for Stanley Bowling?

5            MR. SIMONS:  Judge, object.

6            THE COURT:  Objection overruled.  You can explain

7   what your understanding was and how you had that

8   understanding.

9   Q.   Proceed.  You can answer.

10  A.   Okay.  I do so believe that Kennon White was getting a

11  kickback --

12           MR. SIMONS:  Objection, Your Honor.  She's talking

13  about what she's believing.  She has no basis --

14           THE COURT:  What is the basis for your understanding,

15  ma'am?

16  A.   The basis for the understanding is these projects were --

17  the funding would come in, a contractor is supposed to get

18  their pay request and their payment within a 30-day period.

19  But sometimes monies would be -- when the funding come in,

20  electronic transfer, sometimes it might be two weeks,

21  sometimes it might be three weeks, and they can get their

22  check earlier.  But Kennon would come to me and want me to

23  rush it up and get the pay -- get his check quicker than those

24  30 days.

25  Q.   Did Kennon ever tell you why he wanted that to occur that

1   way, why he wanted to rush the payment up for Stanley?

2   A.   No.

3   Q.   Are you familiar with a business that's referred to as

4   Cann-Tech?

5   A.   Yes.

6   Q.   What is the full name of Cann-Tech?

7   A.   It is Cann-Tech.  And the owner of -- it's owned by Larry

8   Cann.  It's an engineering firm in Lawrenceburg, Kentucky.

9   Q.   What role does an engineering firm play as it pertains to

10   the awarding of contracts?

11   A.   They're the ones that puts together the plans and the

12   specs for the project that is going to go for bid, and they

13   also put together all bid documents and contracts documents.

14   Q.   Are you aware of whether or not Mr. Bowling had access to

15   these engineering plans before anybody else would have?

16   A.   Yes.

17   Q.   How so?

18   A.   We had a cost estimate to come in that was -- it came in

19   to my computer, and Kennon said that he was taking it to

20   Stanley Bowling so he could bid the job.

21   Q.   Why would it be beneficial -- please explain to the

22   jury -- for an individual that's bidding for a contract to

23   have this information.

24   A.   So they could get closer to the bid price.

25   Q.   Is that estimate that's provided by Cann-Tech designed or

MATHIS - Direct (Mr. Parman)                                   35

1    intended for the bidders to receive?

2    A.   I'm sorry?

3    Q.   Is the estimate that Cann-Tech provided to the City, is

4    that supposed to go to the private businesses that are bidding

5    it?

6    A.   No.  They can get a projected cost.

7    Q.   But not the actual --

8    A.   But not the actual cost, no.

9    Q.   Does the City use this engineering estimate as a tool to

10   compare the private bids?

11   A.   Yes.

12   Q.   Miss Mathis, are you also aware of how the City disposes

13   of its trash?

14   A.   Yes.

15   Q.   How does the City currently dispose of its trash?

16   A.   It's taken to the City of London for disposal.

17   Q.   When did the City start taking its trash to the city of

18   London?

19   A.   About a year ago.

20   Q.   Where did -- or how did the City dispose of its trash

21   before then?

22   A.   It was taken to B&J Transfer.

23   Q.   Are you aware, ma'am, of how much per ton the City was

24   charged by B&J Transfer?

25   A.   We was charged almost $50 a ton.

*MATHIS - Direct (Mr. Parman)* 36

1  Q.   How much are you being charged per ton to transport to
2  the city of London?
3  A.   It's somewhere around 22, 23, somewhere in there.
4  Q.   22 --
5  A.   22 to 23 dollars a ton.
6  Q.   Are you aware of how much the City of Manchester will
7  save by directly transporting their trash to London?
8  A.   The first year, we saved around $80,000.
9  Q.   Would that have been last year?
10 A.   Yes.
11 Q.   Have you ever been asked during the course of your
12 employment as deputy clerk to check the City's records for any
13 bids on sanitation services?
14 A.   Yes.
15 Q.   Could you find any records that any other sanitation
16 service had bid, rather than B&J?
17 A.   No.
18 Q.   Have you ever been present when Mr. Morris complained to
19 the City about a change in what he was going to receive for
20 collecting trash?
21 A.   Yes, it was at a council meeting.
22 Q.   Could you share with the jury what the complaint was at
23 the council meeting by Mr. Morris?
24 A.   The complaint was going from yardage to tonnage.  So --
25 Q.   What did Mr. Morris want?

*MATHIS - Direct (Mr. Parman)*                                           37

1    A.   He wanted it to go to tonnage.

2    Q.   And it was currently being billed by the yard?

3    A.   Yes.

4    Q.   Did he find support on the city council to get it

5    changed?

6    A.   Yes.

7    Q.   Where did he find his support?

8    A.   From Vernon Hacker and Darnell Hipsher.

9    Q.   Was the billing then changed to the tonnage?

10   A.   Yes.

11   Q.   Do you recall what year that would have been?

12   A.   2002, 2001, 2002.

13   Q.   Ma'am, did you ever check the rates in London to

14   determine whether you could actually have a benefit by taking

15   the trash somewhere other than B&J Transfer?

16   A.   Yes, I did.

17   Q.   Did somebody confront you because you did that?

18   A.   Yes.  Kennon White.

19   Q.   And what did Mr. White say to you?

20   A.   He was upset because I was calling someplace else to

21   check the rates.

22        MR. PARMAN:  May I have one moment, Your Honor?

23        THE COURT:  Yes, sir.

24   Q.   Miss Mathis, are you aware of the relationship between

25   the owner of Cann-Tech and Stanley Bowling?

MATHIS - Cross (Mr. Baldani)                                      38

1    A.   Yes, they're hunting buddies.

2    Q.   Have you seen them together on multiple occasions?

3    A.   Yes.

4    Q.   Did you ever become concerned about how much the City was

5    being billed per the weight of the garbage going to B&J

6    Transfer?

7    A.   Yes.

8    Q.   How so?

9    A.   We done a survey of taking in how much garbage we had

10   collected versus how much we was being charged.

11   Q.   Did you ever try to get the City garbage trucks weighed

12   before they went to B&J Transfer?

13   A.   Yes.

14   Q.   Did you find discrepancies then?

15   A.   Yes, there was some.

16           MR. PARMAN:  Thank you.

17           MR. PINALES:  No questions, thank you.

18           MR. WESTBERRY:  None, Your Honor.

19           MR. ABELL:  I don't have any questions for Miss

20   Mathis, Judge.

21           THE COURT:  Thank you.  Mr. Baldani?

22                         CROSS-EXAMINATION

23   BY MR. BALDANI:

24   Q.   Miss Mathis, do you know an individual named Marcus

25   McKissic?

1    A.    I know him when I see him.

2    Q.    Okay.  Do you know anything about him?  Where does he

3    live now, to your knowledge?

4           MR. PARMAN:  Your Honor, I'm going to object.  I

5    believe this is outside the scope of direct.

6           MR. BALDANI:  Can we come up, Judge?

7           THE COURT:  You can come up, sure.

8                     (A sidebar conference was held out of the

9                     hearing of the gallery):

10          MR. BALDANI:  Judge --

11          THE COURT:  Mr. Baldani, I'm not sure how this is

12   relevant to anything brought up on direct.

13          MR. BALDANI:  Well, I mean, this issue about related

14   to the subject matter, I think it kind of -- to me, the

15   subject matter for direct is voter fraud, in a lawyer sense.

16          THE COURT:  No, no, no.  No, no, no.  Try again.  Try

17   something else.  That's not the subject of her --

18          MR. BALDANI:  All right.  Well, I mean, I felt it

19   was, but obviously you disagree.

20          THE COURT:  Tell me what she said about voter fraud

21   in her direct testimony.

22          MR. BALDANI:  Well, about --

23          THE COURT:  I've got the notes here.  She talked

24   about the PRIDE program, recycling, water billing, B&J

25   Transfer, Bart Morris, Stanley Bowling, contracts with B&B.

MATHIS - Cross (Mr. Baldani)                                40

1          MR. BALDANI:  Okay.  I think --

2          THE COURT:  Disproportionate charges, Kennon White

3   giving her instructions, checks to be issued more frequently,

4   the business with Cann-Tech, the relationship between

5   Cann-Tech and Mr. Bowling, trash disposal, per ton cost versus

6   yardage.  I don't think she mentioned voter fraud.

7          MR. BALDANI:  Well, I think that the whole idea about

8   the water billing is to curry favor, you know, and get votes.

9   I mean, the bottom line is, Judge, she's made a statement that

10  Marcus McKissic came back and voted himself, contrary to what

11  Marcus McKissic said.  I mean, if you say that's beyond the

12  scope of her direct, then we just call her in our

13  case-in-chief.

14         THE COURT:  Well, you'll have to do that.

15         MR. BALDANI:  Okay.

16         THE COURT:  Sustained.  Objection sustained.

17         MR. BALDANI:  Okay.  Thank you, Your Honor.

18                 (Sidebar conference concluded.)

19         MR. BALDANI:  Judge, I don't have any other

20  questions.

21         THE COURT:  All right.  Thank you.  Mr. Gilbert, you

22  need just a moment?

23         MR. GILBERT:  Yes, Your Honor.  Just a moment.

24         THE COURT:  Yes, sir.

25         MR. GILBERT:  Thank you.

1                              CROSS-EXAMINATION

2      BY MR. GILBERT:

3      Q.   Miss Mathis, my name is Jerry Gilbert, and I represent

4      Bart Morris.  Have you been deputy city clerk for 13 years; is

5      that correct?

6      A.   No, sir.

7      Q.   And during that period of time, B&J Transfer was where

8      the City's trash was taken to?

9      A.   Yes.

10     Q.   And as I understand it, a transfer station, the City has

11     compactor trucks?

12     A.   Yes.

13     Q.   And there's mandatory garbage pickup within the City of

14     Manchester?

15     A.   We have an ordinance.

16     Q.   Right.  And everybody gets their trash picked up?

17     A.   Yes.

18     Q.   And the City charges for that service?

19     A.   Yes.

20     Q.   And prior to last year, the compactor trucks would take

21     the garbage to the transfer station where it would be

22     unloaded.  Is that true?

23     A.   Yes.

24     Q.   And loaded into a long haul truck which B&J Transfer

25     owned and took the trash to the landfill in Laurel County?

MATHIS - Cross (Mr. Gilbert)                                    42

1    A.   Yes.

2    Q.   Now that's changed; has it not?

3    A.   Yes.

4    Q.   The compactor trucks no longer go the short distance

5    there in Clay County, but they go all the way to London?

6    A.   No, they don't go to B&J Transfer anymore.

7    Q.   That's the point.  They go -- the compactor trucks which

8    are used to pick up the trash in the city now travel out of

9    the county to London to dispose of the trash?

10   A.   Yes.

11   Q.   And that's 20 miles or so?

12   A.   Yes.  May I explain?

13           THE COURT:  Yes, ma'am.  If you need to explain your

14   answer, you may.

15   A.   The reason is, it's cheaper in London.  Even though we

16   are traveling 20 miles, and we do have wear and tear and

17   maintenance on the truck, versus 50, 48 to 50 dollars a ton,

18   versus 23, 22, 23 a ton, that's how we're saving.

19   Q.   And that's an immediate saving, not considering wear and

20   tear?

21   A.   That is considering wear and tear.

22   Q.   Now, well, have you had to replace any trucks?

23   A.   No.

24   Q.   Now, you are aware that surrounding counties employ

25   transfer stations, aren't you?

*MATHIS - Cross (Mr. Gilbert)*                                        43

1    A.   Yes.

2    Q.   Jackson County, Perry County, Leslie County, Rock Castle

3    County, Knox County, they all employ that type of a disposal

4    service; do they not?

5    A.   Yes.

6    Q.   Have you checked around in terms of what those rates

7    are --

8    A.   Yes, we have.

9    Q.   -- for those transfers?  Now, the change from compacted

10   yard to tonnage actually occurred in 2004?

11   A.   No.

12   Q.   You say 2002?

13   A.   It was 2002, 2003.  Yes.

14   Q.   All right.  The change would be reflected in the minutes

15   of the Board meeting, the commissioner's meeting; would it

16   not?

17   A.   Yes.

18   Q.   And whatever that is is when it was changed over?

19   A.   Well, whether it was recorded the way it was supposed to

20   or not.

21   Q.   If it's in there, that's when it was changed over?

22   A.   Yes.

23   Q.   And you say that Mr. Morris appeared at a council

24   meeting?

25   A.   Yes.

*MATHIS - Cross (Mr. Gilbert)*                                    44

1    Q.   And it was changed at that time; was it not?

2    A.   Yes, it was voted on.

3    Q.   And his complaints that he made about the compacted yard

4    versus the tonnage, those were made in an open meeting; were

5    they not?

6    A.   Yes.

7    Q.   They weren't made behind closed doors?  He made those in

8    A public meeting; did he not?

9    A.   Yes.

10   Q.   And the entire council voted on it; did they not?

11   A.   Yes.

12   Q.   Do you know these other counties that I mentioned, do you

13   know whether or not they charge by compacted yard or whether

14   they charge by tonnage?

15   A.   They charge by ton.

16   Q.   By tonnage?

17   A.   Yes.

18   Q.   Now, Mr. Morris, when he got these contracts, he

19   submitted a bid; did he not?

20   A.   I have seen no bids.

21   Q.   If it's in the minutes that there's a bid advertised, you

22   wouldn't dispute that, would you?

23   A.   Not if it was in the minutes.

24   Q.   Now, Mr. Morris's scales at his transfer station are

25   state certified; are they not?

*MATHIS - Cross (Mr. Simons)*                                    45

1    A.   I don't know that.

2    Q.   Well, when you operate a set of scales, doesn't the

3    Division of Weights and Measures come around and certify those

4    every year?

5    A.   I do not know that.

6            MR. GILBERT:  Just a minute, Your Honor.

7            THE COURT:  Yes, sir.

8    Q.   Do you know what the standard gate rate at the transfer

9    station at the city of London is?

10   A.   The gate rate?

11   Q.   Yes, ma'am.

12   A.   No, I don't.

13           MR. GILBERT:  That's all.

14           MS. HUGHES:  No, thank you.

15           THE COURT:  All right.  Thank you.  Mr. Simons?

16                      CROSS-EXAMINATION

17   BY MR. SIMONS:

18   Q.   Afternoon, Miss Mathis.  I have to come over here.  Just

19   couldn't see you from where I was.  My name is Dan Simons.  I

20   represent Stanley Bowling.  I just have, I think, a very few

21   questions for you, okay?

22       The first thing I want to talk to you about is you

23   mentioned that some pressure was being applied to you in terms

24   of getting money in, paid, and approval of change orders,

25   correct?

*MATHIS - Cross (Mr. Simons)*                                          46

1   A.   Yes.

2   Q.   And the person that applied that was Kennon White?

3   A.   Yes.

4   Q.   Okay.  Stanley Bowling never applied any pressure to you

5   at all, did he?

6   A.   No.  If Stanley hadn't have gotten his check, Stanley

7   would have called.

8   Q.   Did Stanley Bowling ever put any pressure on you, ma'am?

9   A.   No.

10  Q.   Thank you.  Now, if I refer to a job as Mill Pond

11  Phase 2A, do you know what I'm talking about?

12  A.   Yes.

13  Q.   Okay.  Do you know what the engineering estimate for that

14  job was originally?

15  A.   No, I don't recall.

16  Q.   Okay.  I'll come back to that in a second.  Let me ask

17  you, when a contractor submits a bid for consideration, do you

18  know whether or not they have to have a bid bond?

19  A.   Yes, they do.

20  Q.   Okay.  And isn't the engineering estimate made available

21  to them for purposes of securing of that bid bond?

22  A.   I do not know that.

23  Q.   Okay.  But I thought you told this jury that that was a

24  secret and that you didn't let that out.

25  A.   No.  The secret is, is being able to provide a projected

1   cost, not an exact cost per foot.

2   Q.   So the engineering estimate, the one that is prepared by

3   the engineers hired by the City, is available to contractors

4   so that they can secure a bid bond; isn't that correct?

5   A.   It's supplied to the City but not to the contractor.

6   Q.   Well, the contractor is the person who has to get the bid

7   bond; is it not?

8   A.   They don't get the bid bond until they have actually

9   received that bid.  They have to turn in a copy.

10  Q.   Ma'am, is it your understanding that when you place a

11  bid, you don't have to have a bond with it?

12  A.   You have to have a bond.

13  Q.   Yes.  And to set the amount of the bond, you have to have

14  the engineering estimate; do you not?

15  A.   But most contractors are bonded up to a million dollars

16  anyway.

17  Q.   Okay.  I do want to talk with you for just a minute about

18  the Mill Pond job.

19  A.   Okay.

20  Q.   Do you remember a meeting with the FBI agents back in

21  November of '06?

22  A.   Yes.

23  Q.   Okay.

24           MR. SIMONS:  Your Honor, I'd like to show her a

25  document, see if it refreshes her memory about that bond.

1          THE COURT:  About --

2          MR. SIMONS:  About the engineering estimate.

3    Q.   Ma'am, do you remember what the engineering estimate was

4    for the Mill Pond job?

5    A.   No, I don't.

6          THE COURT:  All right.  You can show her a document,

7    see if that refreshes her memory.  Ma'am, when you're shown a

8    document to refresh memory, you can look at the document to

9    determine if it refreshes your memory.  If it does, then you

10   testify based on what you recall but not based on what you're

11   reading in the document.

12   Q.   Now, ma'am, I'd ask you to read that to yourself,

13   particularly the first full paragraph that's highlighted on

14   that page, please.  See if that refreshes your memory.

15   A.   Yes.

16   Q.   Okay.  Do you remember telling the agents what the

17   engineer's estimate was for the Mill Pond Phase 2 job?

18   A.   The estimated cost of $700,000 --

19   Q.   Okay.

20   A.   -- for the project.

21   Q.   Okay.

22   A.   But that was to do two areas.  That wasn't just one area.

23   Q.   Is it true, Miss Mathis, that my client, Stanley Bowling,

24   through his company, B&B Excavating, did that job and three

25   others for $622,000?

*MATHIS - Redirect (Mr. Parman)*                                    49

1    A.   I don't recall the amount.

2              MR. SIMONS:  Thank you.  Your Honor, that's all I

3    have.

4              THE COURT:  All right.  Thank you.  See if there's

5    any redirect.

6              MR. PARMAN:  Yes, Your Honor, if I may from here.

7              THE COURT:  Yes, sir.

8                        REDIRECT EXAMINATION

9    BY MR. PARMAN:

10   Q.   Miss Mathis, you was asked about the amount other

11   counties around Clay charged that had transfer stations.

12   A.   Yes.

13   Q.   And did you do research into what they paid their

14   transfer stations?

15   A.   Yes.

16   Q.   Was it more or was it less than what B&J Transfer was

17   charging City of Manchester?

18   A.   It was less.

19   Q.   Was it less in all instances?

20   A.   Yes.

21   Q.   Now, we talked about the wear and tear on the vehicles to

22   travel to London.  What was the savings that the City gets for

23   traveling to London to dump their trash?

24   A.   The first year was around almost $80,000.

25   Q.   Did that take into consideration the wear and tear on the

*MATHIS - Recross (Mr. Gilbert)*                                      50

1    vehicles?

2    A.   Yes, it did.

3              MR. PARMAN:  That's all I have, Your Honor.

4              THE COURT:  All right.  Anything else on these areas?

5    Mr. Gilbert, do you have anything?

6              MR. GILBERT:  Yes, Your Honor.

7                        RECROSS-EXAMINATION

8    BY MR. GILBERT:

9    Q.   What were the amounts of the other tonnage?

10   A.   The other tonnage?

11   Q.   Yes, ma'am.

12   A.   Laurel landfill, you can take it to the gate right now

13   for 46.

14   Q.   And --

15   A.   And the reason I know that is because we're putting in a

16   recycling facility, and we've had to check all the rates at

17   these transfer stations.

18   Q.   What about Leslie County?

19   A.   Leslie County is -- that is is dumped over there at Popp

20   Brothers, and it was somewhere probably, I think neighborhood

21   of 32.

22   Q.   What about Perry County?

23   A.   I don't recall.

24   Q.   Jackson County?

25   A.   Jackson County's is 28.

*MATHIS - Recross (Mr. Gilbert)*                                      51

1    Q.   And Rock Castle County?

2    A.   Don't recall that one.

3              MR. GILBERT:  That's all.

4              MR. SIMONS:  Nothing further.

5              THE COURT:  Thank you.  Anything else?

6              MR. PARMAN:  No, Your Honor.  Thank you.

7              THE COURT:  Thank you, ma'am.  You may step down.

8                              * * *

9                     C E R T I F I C A T E

10             I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
11   proceedings in the above-entitled case.

12

13    \s\ Lisa Reed Wiesman                  March 6, 2010
     LISA REED WIESMAN, RDR-CRR            Date of Certification
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

52

1                              INDEX

2

   GOVERNMENT WITNESS
3
   WILLIAM MICHAEL WHITE
4  Direct Examination by Mr. Parman................ Page  4
   Cross-examination by Mr. Westberry............. Page 16
5  Cross-examination by Mr. Gilbert.............. Page 18
   Cross-examination by Ms. Hughes............... Page 19
6  Cross-examination by Mr. Simons............... Page 20
   Redirect Examination by Mr. Parman............ Page 28
7

8  PAMELA K. MATHIS
   Direct Examination by Mr. Parman.............. Page 29
9  Cross-examination by Mr. Baldani.............. Page 38
   Cross-examination by Mr. Gilbert.............. Page 41
10 Cross-examination by Mr. Simons............... Page 45
   Redirect Examination by Mr. Parman............ Page 49
11 Recross-examination by Mr. Gilbert............ Page 50

12                           - - -

13

14

15

16

17

18

19

20

21

22

23

24

25