```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF KENTUCKY
 2              SOUTHERN DIVISION AT LONDON

 3 UNITED STATES OF AMERICA    .    Docket No. CR 09-16-S
                               .
 4     vs.                     .    Frankfort, Kentucky
                               .    February 8, 2010
 5 RUSSELL CLETUS MARICLE      .    1:02 p.m.
   DOUGLAS C. ADAMS            .
 6 CHARLES WAYNE JONES         .    Trial
   WILLIAM R. STIVERS          .
 7 FREDDY W. THOMPSON          .    VOLUME 5-B
   WILLIAM B. MORRIS           .
 8 DEBRA L. MORRIS             .
   STANLEY BOWLING             .
 9
                    TRANSCRIPT OF TRIAL
10         BEFORE THE HONORABLE DANNY C. REEVES
               UNITED STATES DISTRICT JUDGE
11 APPEARANCES:
   On behalf of the Plaintiff:  STEPHEN C. SMITH, ESQ.
12                              JASON D. PARMAN, ESQ.

13 On behalf of the Defendant   DAVID S. HOSKINS, ESQ.
   Russell Cletus Maricle:      MARTIN S. PINALES, ESQ.
14
   On behalf of the Defendant   R. KENT WESTBERRY, ESQ.
15 Douglas C. Adams:            BENNETT E. BAYER, ESQ.
                                KRISTEN N. LOGAN, ESQ.
16
   On behalf of the Defendant   T. SCOTT WHITE, ESQ.
17 Charles Wayne Jones:

18 On behalf of the Defendant   ROBERT L. ABELL, ESQ.
   William R. Stivers:
19
   On behalf of the Defendant   RUSSELL BALDANI, ESQ.
20 Freddy W. Thompson:          TUCKER RICHARDSON III

21 On behalf of the Defendant   JERRY W. GILBERT, ESQ.
   William B. Morris:
22
   On behalf of the Defendant   ELIZABETH HUGHES, ESQ.
23 Debra L. Morris:

24 On behalf of the Defendant   DANIEL A. SIMONS, ESQ.
   Stanley Bowling:
25
   Court Reporter:              K. ANN BANTA, RPR, CRR
```

```
 1  Appearances of Counsel:

 2  On behalf of the Plaintiff:     STEPHEN C. SMITH, ESQ.
                                    JASON D. PARMAN, ESQ.
 3                                  Assistant U.S. Attorneys
                                    601 Meyers Baker Road
 4                                  Suite 200
                                    London, KY 40741
 5
    On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
 6  Russell Cletus Maricle:         107 East First Street
                                    Corbin, KY 40701
 7
                                    MARTIN S. PINALES, ESQ.
 8                                  150 East Fourth Street
                                    Federal Reserve Building
 9                                  Cincinnati, OH 45202

10  On behalf of the Defendant      R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:               KRISTEN N. LOGAN, ESQ.
11                                  220 West Main Street
                                    Suite 1900
12                                  Louisville, KY 40202

13                                  BENNETT E. BAYER, ESQ.
                                    106 West Vine Street
14                                  Suite 800
                                    Lexington, KY 40507
15
    On behalf of the Defendant      T. SCOTT WHITE, ESQ.
16  Charles Wayne Jones:            133 West Short Street
                                    Lexington, KY 40507
17
    On behalf of the Defendant      ROBERT L. ABELL, ESQ.
18  William R. Stivers:             120 North Upper Street
                                    Lexington, KY 40507
19
    On behalf of the Defendant      RUSSELL JAMES BALDANI,
20  Freddy W. Thompson:                ESQ.
                                    R. TUCKER RICHARDSON
21                                     III, ESQ.
                                    300 West Short Street
22                                  Lexington, KY 40507

23  On behalf of the defendant      JERRY W. GILBERT, ESQ.
    William B. Morris:              212 North Second Street
24                                  Richmond, KY 40475

25
```

1 Appearances of Counsel (Continued):

2 On behalf of the Defendant          ELIZABETH SNOW HUGHES,
  Debra L. Morris:                         ESQ.
3                                     201 West Short Street
                                      Lexington, KY 40507
4
  On behalf of the Defendant          DANIEL A. SIMONS, ESQ.
5 Stanley Bowling:                     116 West Main Street
                                      Suite 2A
6                                     Richmond, KY 40476

7 Court Reporter:                      K. ANN BANTA, RPR, CRR
                                      Official Court Reporter
8                                     United States District
                                           Court
9                                     101 Barr
                                      Lexington, KY 40507
10                                    (502) 545-1090

11 Proceedings recorded by mechanical stenography,
   transcript produced by computer-aided transcription.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        Monday afternoon session,

2                   February 8, 2010, 1:02 p.m.

3                             - - -

4            (The following proceedings were had in open

5   court out of the presence and hearing of the jury.)

6             THE COURT:  Thank you.  I understand someone

7   has an issue to take up before the jury's brought in.

8   Mr. Smith?

9             MR. SMITH:  Yes, Your Honor, I have -- over

10  the lunch break, I was approached immediately after

11  finishing examination of Mr. Hacker and asked about

12  Jencks material by Miss Hughes.

13            I sought through that material just to double

14  check, and I found none.

15            I did, out of an abundance of caution, in

16  order to prevent further delay of this afternoon's

17  session, copied my notes which were, as I could see,

18  no verbatim quotes exist within this document that I

19  prepared myself in preparing this witness to testify.

20            I would like the court to look at these notes

21  and determine whether they should be treated by

22  counsel as the statement of this witness.

23            Our argument to the court on this issue is

24  that it is not.

25            It is out of an abundance of caution and in

1 an effort to expedite this matter that I have

2 furnished this.

3          So I do have a copy here for the court.  I

4 would like to see if there is going to be an issue

5 about whether or not this is going to be treated as

6 such.

7          THE COURT:  All right.  Mr. Smith, I'll --

8 I'll need to take a recess to read these notes.

9 Handwriting's a little bit like mine so --

10          MS. HUGHES:  When Mr. Smith gave those to me

11 he did say good luck, and so we will wish that to you,

12 too.

13          I would just like to, for the record, before

14 you go back there, the issue is Mr. Hacker was

15 interviewed by my count 1, 2, 3, 4, 5, 6, 7 times and

16 we were given the six 302s.

17          And never during any of those interviews did

18 he mention Bart or Debbie Morris.

19          So obviously he had subsequently been

20 interviewed by someone or else Mr. Smith would not

21 have known to ask the questions.

22          Obviously Mr. Smith interviewed him himself,

23 and Mr. Smith told me -- you can correct me if I am

24 wrong -- in between, during the lunch break that he

25 and Mr. Parman and an agent, he can't remember which

1 agent interviewed Mr. Hacker on this particular date.

2        The FBI has been very good about doing 302s

3 for all of their meetings and interviews.

4        I do understand this is trial preparation,

5 but given the fact that the information was so vastly

6 different, I do find it surprising that there is no

7 other information for us.

8        And so I do want to make a record and make

9 sure that the government has -- and I know you have

10 during the lunch break -- but I do want to make sure

11 that they have looked as diligently as possible, given

12 the Jencks Act issues that we have had at the

13 beginning of the case.

14        THE COURT:  Okay, I will go back and look at

15 these notes.

16        I have never required counsel to turn over

17 their notes as 3500 material.

18        But I'll look at these and see if there would

19 be something that would change that practice.

20        So we'll take -- we'll take a brief recess

21 while I do that.

22        (Recess taken from 1:05 p.m. until 1:10 p.m.)

23        (After recess.)

24        THE COURT:  All right, thank you.  The record

25 will reflect the jury is not present at this time.

1          Mr. Smith, I have reviewed the notes that you

2  have provided.

3          I don't believe they constitute Rule 35 or

4  Jencks Act material or materials that you would be

5  required to disclose to opposing counsel at this time.

6          Out of an abundance of caution I'll -- since

7  I have reviewed these, I'll have these placed in the

8  file under seal.

9          Any other issues to take up with respect to

10 this matter?  Mr. Hoskins?

11         MR. HOSKINS:  Your Honor, it's not with

12 respect to this, but you had given me until today to

13 provide you with certificates of the people who had

14 looked at the jury list with me.

15         I am having trouble getting one of those

16 returned to me.

17         I went by that lawyer's office at lunch.  It

18 was locked and nobody there, so --

19         THE COURT:  He can come in tomorrow morning

20 then.

21         If he can't be available, he can come in here

22 tomorrow morning at 8:30 and make that certification

23 to the court in person.

24         MR. HOSKINS:  I'll pass that on.

25         MR. WESTBERRY:  Thank you, briefly, not on

1  that subject, Judge, but we understand the next

2  witness that the government will call is Kennon

3  White.

4           And I say that because the government has

5  given us some new Jencks Act material on Kennon White.

6           It's quite voluminous, Judge.  I haven't, and

7  I doubt really anybody here at the table has had a

8  chance to study it.

9           It appears to be a series of handwritten

10  notes, three or four or five separate binders, if you

11  will.

12           Again, it looks to be a different

13  handwriting, we think, in each instance.

14           I wanted to let the court know we haven't

15  seen it.

16           It's going to take some time to get through

17  before we are in a position to cross examine that

18  witness.

19           THE COURT:  All right.  We'll -- Mr. Smith,

20  are you able to state whether Mr. White will be the

21  next witness?

22           MR. SMITH:  At this point our plans are, yes,

23  to proceed with him.

24           And I think it will take probably about three

25  or four days for me to do my direct on him.

1            So counsel will have hopefully ample time to

2   look over what's right here in my hand, Your Honor.

3            I would let the court evaluate the number of

4   pages, but it doesn't seem to be that voluminous to

5   us.

6            MR. WESTBERRY:  Three or four days, I think

7   that's a whole different perspective.

8            And I would agree we would probably have an

9   evening or two to do that.

10           I didn't anticipate he would be that kind of

11  time period.

12           THE COURT:  All right, Mr. Abell?

13           MR. ABELL:  Your Honor, in relationship to

14  Mr. White last Monday, we discussed text messages,

15  specifically what cooperating witnesses they were sent

16  to or from.

17           My inference was that Kennon White was one of

18  those cooperating witnesses with Wanda White being the

19  other.

20           The United States represented that it's going

21  to require further time in terms of its ability to

22  produce those, so I am bringing that up.

23           THE COURT:  Why don't you remind me of that

24  at the end of the day, if you could, and we will take

25  that up.

```
 1          Maybe with the weather situation, we will
 2  have a couple of hours in the morning to perhaps
 3  discuss some of these issues in more detail, rather
 4  than keep the jury waiting.
 5          Since that would not come up until after
 6  Mr. White has testified, that would have to be finally
 7  resolved.
 8          But I do want to inquire further as to that
 9  issue, we can certainly take that up at the end of the
10  day.
11          MR. ABELL:  Very well, Judge, thank you.
12          THE COURT:  Any other issue before bringing
13  the jury back in?
14          (The jury resumed their places in the jury
15  box.)
16          THE COURT:  Thank you, please be seated.  The
17  record will reflect that all members of the jury are
18  present.  Parties and counsel are also present.
19          Let's see, I believe we ended before the
20  lunch break with the direct testimony.  Mr. Hoskins,
21  are you prepared for cross?
22          MR. HOSKINS:  Thank you, Your Honor.
23                              - - -
24
25
```

Vernon Hacker – Cross Examination

1  VERNON HACKER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

2                    CROSS EXAMINATION

3 BY MR. HOSKINS:

4 Q.  Mr. Hacker, you talked briefly before lunch about

5 Wanda White.

6      And I would like to ask you some questions about

7 her and what you saw her doing as far as vote-buying.

8      I believe the first date that you mentioned Wanda

9 White was back in 2002; is that right?

10 A.  Yes, sir.

11 Q.  That's the year that Wanda's husband, Kennon

12 White, ran for jailer.

13 A.  Yes, he did.

14 Q.  And again, Kennon is Doug White's son?

15 A.  Yes.

16 Q.  Doug was the long-time mayor of the City of

17 Manchester?

18 A.  Yes, sir.

19 Q.  And he put Kennon in as a city manager or city

20 supervisor, didn't he, a few years ago?

21 A.  Yes.

22 Q.  And Kennon and Wanda have been married a number

23 of years, as far as you know?

24 A.  As far as I know, they have got a teenage

25 daughter, probably about a nineteen-year-old.

Vernon Hacker – Cross Examination

1  Q.    Thank you.  Tell us back in 2002, I think what

2  you said was that Wanda was hauling votes for Kennon?

3  A.    Yes.

4  Q.    Tell us what you saw in that regard.

5  A.    Well, Wanda just brought a lot of voters, you

6  know, to us, that's all I can say.

7  Q.    Okay.

8  A.    And they were paid to vote.

9  Q.    Did you pay voters for --

10  A.    I paid some of them.

11  Q.    -- for Kennon?

12  A.    Yes, I did.

13  Q.    And was that during the absentee ballot?

14  A.    That was during the primary and the absentee

15  balloting.

16  Q.    Okay, so it was in the days leading up to the

17  primary?

18  A.    Yes.

19  Q.    You saw Wanda there?

20  A.    Yes.

21  Q.    And you saw her there repeatedly during the days

22  before the primary?

23  A.    Various times.

24  Q.    And then you saw her again on the day of the

25  primary?

Vernon Hacker – Cross Examination

1  A.   Yes.

2  Q.   And she looked to you like she knew what she was

3  doing?

4  A.   Yes.

5  Q.   Then you talked about the 2004 election and you

6  said Wanda was involved in that election as well,

7  wasn't she?

8  A.   Yes, sir.

9  Q.   In illegal activity?

10  A.   She was an election officer, if I am not

11  mistaken.

12  Q.   And was that at the Manchester precinct?

13  A.   That was the Manchester precinct.

14  Q.   And what did you see Wanda doing in 2004?

15  A.   She assisted some of the voters.

16  Q.   And by "assisted," you mean she took them into

17  the voting booth and voted for them?

18  A.   Yes, sir.  It wasn't a booth at that time, it was

19  the computerized machines.

20  Q.   Well, tell us a little bit more about that.  It

21  wasn't a booth, computerized, how did they keep the

22  voter in private?

23  A.   Well, the old machines, as you entered into the

24  old machines there was a switch at the top that closed

25  the curtain.

Vernon Hacker - Cross Examination

1    You were enclosed in like an enclosed upright

2 box, for example.

3    But on the new machines you -- they were on a

4 small table similar to this.

5    And you could see a body.  As far as being, you

6 know, hid from the general public, you weren't.

7 Q.   Okay.  So you saw Wanda go into the -- in behind

8 the curtain or whatever it was with the voter?

9 A.   I seen her there, yes, sir, assisting.

10 Q.   Were those people she was going in there with,

11 were they blind, were they disabled in any way that

12 you could tell?

13 A.   That I really can't say.  They would have had to

14 have filled out an assistance form.

15 Q.   Did they fill out an assistance form for

16 everybody who went in?

17 A.   I have no idea.  I wasn't there to see that.  We

18 would take them to the door, and that's as far as we

19 would go.

20 Q.   Okay.  Mr. Hacker, you were on the city council

21 for about twelve to thirteen years?

22 A.   From 1993 to 2006.

23 Q.   And the city council would meet one time each

24 month?

25 A.   Once a month.

Vernon Hacker – Cross Examination

1  Q.   Twelve times a year?

2  A.   Yes, sir.

3  Q.   So that's about 150 or so meetings in the time

4  you were on the board, on the council?

5  A.   Four times -- 4 times 13, 52 meetings, or I don't

6  know, whatever it comes up to be.

7  Q.   Well, there was a meeting once a month?

8  A.   Yes.

9  Q.   And once a month for the thirteen years that you

10  were on?

11  A.   Yeah.

12  Q.   Okay.  Those meetings are, of course, open to the

13  public?

14  A.   Yes, they are.

15  Q.   Did you ever see Cletus Maricle at any of those

16  meetings?

17  A.   Never did.

18  Q.   At most of those meetings, the council would be

19  called upon to vote on a number of issues, wouldn't

20  they?

21  A.   Yes, sir.

22  Q.   Cletus Maricle never tried to tell you how to

23  vote on any of those, did he?

24  A.   No, sir, he did not.

25        MR. HOSKINS:  That's all, thank you.

Vernon Hacker – Cross Examination

1          THE COURT:  Thank you, Mr. Hoskins.

2          Mr. Bayer?

3          MR. BAYER:  Thank you, Judge.

4                    – – –

5                CROSS EXAMINATION

6  BY MR. BAYER:

7  Q.  Mr. Hacker, I am Bennett Bayer.  I am one of Doug

8  Adams's attorneys.

9  A.  Yes, sir.

10 Q.  The jury has heard a lot of information, a lot of

11 testimony so far about Jennings White.

12      I would like for you to kind of explain to the

13 jury who was Jennings White in Clay County up until

14 recently.

15 A.  Jennings White was the former county court

16 clerk.

17      He was over all your deeds, and where his office

18 was and various things, that's where you went to have

19 your vehicles licensed and get your license plates.

20 Q.  In 2002, was it pretty well common knowledge in

21 Clay County that Jennings White was also a drug

22 dealer?

23 A.  I was not aware of that.

24 Q.  Well, Jennings White has since gone to prison,

25 correct?

Vernon Hacker – Cross Examination

1  A.   He is in prison.

2  Q.   And he has gone to prison for drug dealings,

3  correct?

4  A.   I am really not familiar with his case but, yes,

5  I know he is in prison.

6  Q.   Okay, you indicated that you were a close friend

7  with Jennings?

8  A.   Yes, I was.

9  Q.   And you are telling us today that you had no idea

10 that Mr. White was involved in any illegal activity?

11 A.   I never did see Jennings White involved in

12 drugs.  I am just speaking for myself.

13 Q.   Did anybody ever tell you or did you ever hear

14 people talking, say, like in 2002 about Mr. White

15 being in drugs or involved in --

16         MR. SMITH:  Objection, hearsay.

17         THE COURT:  Sustained.

18 BY MR. BAYER:

19 Q.   Was it your understanding in 2002 that Mr. White

20 might have been involved in drug dealing?

21 A.   Yes.

22 Q.   So if anyone came to you in 2002 and said that

23 they didn't want you to support Jennings White, they

24 would have been saying, "We don't want you to support

25 a drug dealer," right?

Vernon Hacker – Cross Examination

1          MR. SMITH:  Objection, Your Honor, again,

2 hearsay.

3          THE COURT:  Sustain the objection.

4 BY MR. BAYER:

5 Q.  The net effect in 2002 for you being asked not to

6 support Jennings White would be that you were being

7 asked to not support a drug dealer.

8 A.  I don't think at the time that I was asked not to

9 support Jennings White had anything to do with drugs.

10     It was a power struggle in the county.  Then it

11 was nothing there was drug-related.

12 Q.  And people wanted Jennings White out of office?

13 A.  Some did.

14 Q.  You became a school bus driver?

15 A.  Yes, I did.

16 Q.  And you were hired by Charles White?

17 A.  Yes.

18 Q.  What is his relation to Jennings White?

19 A.  I am really not sure, but I think they may be

20 very distant cousins.

21 Q.  And then you were involved in a pawn shop

22 business with Mr. Phillips?

23 A.  James Phillips.

24 Q.  And he is related to the Whites?

25 A.  Yes, he is.

Vernon Hacker – Cross Examination

1  Q.   And if I understood you correctly on direct

2  examination in 2002, you were specifically hired by

3  Mr. Jennings White to work in the county clerk's

4  office during the early voting?

5  A.   Yes, I was.

6  Q.   What was it that you were understanding was going

7  to be your role, being -- let me back up, let me state

8  this first.

9      Were you hired at that point in time as a

10  government employee?

11  A.   Yes, I was hired through the clerk's office.

12  Q.   And what did you understand was going to be your

13  job?  What were you going to be doing as this clerk?

14  A.   To assist voters.

15  Q.   Which voters?

16  A.   Voters that needed assistance.

17  Q.   But Mr. Jennings White also wanted you to help

18  pay for his voters?

19  A.   He never did ask me to pay for a voter.  Never.

20  Q.   I'm sorry, go ahead.

21  A.   He paid for them himself.  I never did pay for a

22  voter.

23  Q.   But you helped identify the voters to be paid for

24  Mr. White?

25  A.   Yes, I did.

Vernon Hacker – Cross Examination

1  Q.   You would give a nod or something?

2  A.   Yes.

3  Q.   So you were hired by Mr. Jennings White to work

4  in his county clerk's office as a government employee,

5  and then he would have you nod to him to indicate a

6  voter to be paid for voting for him?

7  A.   Sometimes.

8  Q.   And this was a hotly contested race in 2002?

9  A.   Yes, it was.

10 Q.   And he lost the primary, didn't he?

11 A.   Yes, he did.

12 Q.   The voters of Clay County voted him out, didn't

13 they?

14 A.   Yes.

15 Q.   You have used the term "slate" pretty often.

16 What does that mean?

17 A.   That means that a number of candidates that's

18 running is on one ticket.  If you vote for one, you

19 vote for them all.

20 Q.   So basically it's a ticket, correct?

21 A.   Yes.

22 Q.   It might be the Democratic ticket, it might be

23 the Republican ticket?

24 A.   It was Republican primary, so it was all

25 Republicans.

Vernon Hacker – Cross Examination

1 Q.   So when you are talking about slate, you are

2 talking about the candidates listed running for

3 office?

4 A.   Yes, sir.

5 Q.   We have already heard testimony from a couple of

6 witnesses about the 2002 early elections and what was

7 going on.

8      Do you remember Todd Roberts being there during

9 the early voting period for the 2002 primary?

10 A.   Todd was there a lot through the whole election.

11 Q.   How well did you know Todd Roberts?

12 A.   Knowed him well.

13 Q.   Why is it that you knew him well?

14 A.   I have known Todd since he was just a small

15 child.

16 Q.   Did you know him when he was a deputy sheriff?

17 A.   I knew -- knew him.  As far as you know, having a

18 relationship, as far as doing things together,

19 anything like that, no, I didn't.

20 Q.   Did you know when he was fired as a deputy

21 sheriff?

22 A.   I don't recall that.

23 Q.   Okay.  Was Mr. Roberts there watching while you

24 were paying -- I'm sorry, when you were pointing out

25 voters for Mr. White to pay?

Vernon Hacker — Cross Examination

1  A.   No, not when I was there.

2  Q.   Was Mr. Roberts a Jennings White supporter as you

3  understood it?

4  A.   I don't think he was because he was a registered

5  independent.

6  Q.   So if he testified to the jury that he was a

7  Jennings supporter, you didn't know it?

8  A.   Oh, I don't know.

9  Q.   Did he do anything during the course of this

10  absentee voting process to try to stop any of the vote

11  buying?

12  A.   I know we had an incident there one day, but I

13  was not there.

14  Q.   And other than that, you don't know anything

15  about him doing anything to stop any of the problems?

16  A.   No, not really.

17  Q.   Now, you did mention that Sheriff Edd Jordan at

18  one point in time your understanding was he came in

19  and shut down the voting?

20  A.   Yes, sir.

21  Q.   Because the voting got real heavy, didn't it?

22  A.   Yes, sir, I think that was maybe like the first

23  day or the second day of the voting.

24  Q.   And they were really worried about the voters

25  turning out against Jennings White, weren't they?

Vernon Hacker – Cross Examination

1  A.    That I can't say.    I was not there that day when

2  all this occurred.

3  Q.    Now, you also testified that both sides had vote

4  haulers.    What is a vote hauler?

5  A.    Someone that's working for the person going out

6  and getting people that's registered to vote and bring

7  them.

8  Q.    There is nothing illegal about being a vote

9  hauler, is there?

10  A.    Not that I know of.

11  Q.    It's done all the time all over the place, isn't

12  it?

13  A.    Yes, it is.

14  Q.    It's merely helping people get to the voting

15  place and transporting them, correct?

16  A.    Vote hauler, yes, sir.

17  Q.    And that's different from vote buying?

18  A.    Yes, sir.

19  Q.    So all of the photographs that might have been

20  shown about people coming in with vote hauling, that's

21  not illegal, is it?

22  A.    No.

23  Q.    Several times during the course of your direct

24  examination you mentioned that you were very committed

25  to Jennings White?

Vernon Hacker – Cross Examination

1  A.   Yes, sir.

2  Q.   Tell us why.

3  A.   I was just a Jennings White supporter.

4  Q.   Was there any limit to what you would have done

5  to help support Mr. White?

6  A.   I was going to do what I thought was the right

7  thing to do.

8       I mean, in my sight, as far as being a supporter

9  for him.  I don't know what you are referring to as a

10 limit.

11 Q.   Well, what I am getting at is some people, you

12 testified that Mr. Adams came to you and said, "I

13 would like for you to not vote for -- for Jennings

14 White."  Isn't that what you testified?

15      MR. SMITH:  I am going to object.  He's

16 mischaracterizing the testimony.

17      THE COURT:  I'll sustain the objection.

18 BY MR. BAYER:

19 Q.   What was it that you said that Mr. Adams asked

20 you regarding voting for or helping Jennings White?

21 A.   He asked me if I would drop Jennings and help him

22 with Freddy, and I declined to do so.

23 Q.   So in 2002 when this heated race was -- when the

24 people of Clay County voted Jennings White out, this

25 known drug dealer, and Mr. Adams came to you and asked

Vernon Hacker – Cross Examination

1  if you would stop supporting Jennings White, correct?

2  A.   Yes.

3         MR. SMITH:  Your Honor, I am going to object,

4  again, to mischaracterizing the evidence.

5         THE COURT:  I'll sustain the objection.  The

6  testimony has not been in the case that Mr. Jennings

7  White was a known drug dealer.

8  BY MR. BAYER:

9  Q.   And you indicated that you were not going to

10 switch your allegiance from Mr. White?

11 A.   I did.

12 Q.   You also indicated that at one point in time that

13 you went to a meeting, that Darnell Hipsher called you

14 at a meeting.

15     If I understand you correctly, that it was a

16 meeting regarding the -- the state senate race?

17 A.   No, sir, it was state representative race.

18 Q.   I'm sorry, state representative race.  And that

19 they were there supporting Mr. Couch?

20 A.   Yes, sir.

21 Q.   Did you indicate that Senator Stivers was there?

22 A.   Yes, he was.

23 Q.   Wasn't Senator Stivers a big Barbara White Colter

24 supporter?

25 A.   Evidently not.

Vernon Hacker – Cross Examination

1  Q.   Let me switch gears for a moment.  I want to go

2  into some other matters with you.  Tell me about --

3  who is Frank Marcum?

4  A.   He is my brother-in-law.

5  Q.   And who was he dating at one point in time?

6           MR. SMITH:  Your Honor, I'll object to the

7  relevance.

8           MR. BAYER:  Judge, I can approach and

9  explain.

10           THE COURT:  That would be fine.  Come on up.

11           (Thereupon, a discussion was had at the bench

12  between the Court and counsel and out of the hearing

13  of the jury.)

14           THE COURT:  Let's wait for everybody.

15           MR. BAYER:  I am.

16           THE COURT:  All right.  What is the relevance

17  of his relationship with Frank Marcum, his wife's

18  brother-in-law in this case?

19           MR. BAYER:  Dating the granddaughter, I

20  believe, of Barbara White Colter.

21           So it's going to show another relationship

22  with Miss Colter.

23           And I am trying to link this as all part of

24  this same kind of network of people and what would be

25  his ties to Barbara White Colter.

Vernon Hacker – Cross Examination

 1           I expect that she will be testifying later on

 2    in the trial, and this will also be laying some of the

 3    foundation to the cross that might occur for her.

 4           THE COURT:  All right, Mr. Smith?

 5           MR. SMITH:  Your Honor, I am trying to follow

 6    this.

 7           Vernon Hacker either knows somebody, his

 8    wife's related to someone who is dating someone who is

 9    related to Barbara Colter, it's not relevant.  I don't

10    see the relevance, Your Honor.

11           If he wants to recall Mr. Hacker and bring

12    this up after it comes up somewhere in his cross, he

13    says it's going to be relevant.

14           I fail to see how this tends to prove any

15    matter at issue before the court, credibility or

16    otherwise.

17           MR. BAYER:  Again, I am just putting the

18    links together for all the people.

19           THE COURT:  I don't see the relevance here.

20    It may become relevant later but --

21           MR. BAYER:  okay.

22           THE COURT:  -- this is pretty far afield, so

23    I'll sustain the objection as to relevance.

24           MR. BAYER:  Okay.

25           (End of bench conference.)

Vernon Hacker – Cross Examination

1              THE COURT:  Thank you.  The objection will be

2  sustained.

3              You may continue.

4  BY MR. BAYER:

5  Q.   When you were handing out money -- let me back up

6  just to make sure.

7       Did you at any point in time hand out money

8  yourself during any elections in Clay County?

9  A.   Yes, I did.

10  Q.   Who all did you do that with?  Did you do it with

11  Todd Roberts?

12  A.   No.

13  Q.   Was he ever with you when you were handing out

14  money?

15  A.   No, sir.

16  Q.   There was some discussions regarding when

17  Mr. Roberts was at a convention in Las Vegas, and to

18  kind of preface this, as 911 director, what

19  accessibility did you have to the evidence room to the

20  Manchester Police Department?

21  A.   I had none whatsoever.

22  Q.   Were you aware of an issue regarding missing

23  money when Mr. Roberts came back from the Las Vegas

24  convention?

25  A.   Yes, I was.

Vernon Hacker – Cross Examination

1  Q.   Tell us about what you know, please.

2  A.   They were doing an audit, and they said some

3  money was missing.

4       And that's all I can say about the money missing,

5  but while they were doing the audit, I did find some

6  money in a trash can.

7  Q.   Do you know how the money got there?

8  A.   Officer Chris Fultz I think or maybe Officer

9  Patrick Robinson, one, they were different officers

10 there, accidentally threw it in the trash there with

11 some -- in a folder of evidence.

12 Q.   There was a pretty shoddy manner in which they

13 were keeping the evidence in the Manchester Police

14 Department, wasn't it?

15 A.   It was.

16 Q.   Mr. Roberts also testified that at one point in

17 time he pulled money out of the seized money account

18 and used it to defray some expenses that he had.

19      Were you aware of that being routine within the

20 Manchester Police Department?

21 A.   I really don't know what went on within the

22 police department.  I had no knowledge of everything

23 going on there.

24 Q.   But you did spend some time with Mr. Roberts,

25 correct?

Vernon Hacker - Cross Examination

1  A.   Yes, I did.

2  Q.   How would you describe the relationship?  Were

3  you pretty close friends with Todd Roberts?

4  A.   Yes, I was his friend.

5  Q.   And in fact you all traveled together pretty

6  regularly, didn't you?

7  A.   We traveled places together.

8  Q.   Did you ever travel with Todd and -- well, let me

9  back up for a moment.

10     And among other things, not only was he an

11 assistant chief of police and sheriff's deputy and so

12 forth and so on, he also owned limousines, too, didn't

13 he?

14 A.   I think he may have had an old limousine or

15 something, yeah.

16 Q.   And you would ride around in his limousine with

17 him?

18 A.   I have been on a trip in the limousine, yes, sir.

19 Q.   Tell us about the trip that you would travel with

20 Mr. Roberts?

21 A.   Which trip?

22 Q.   Well, tell us about the ones you went on.  My

23 understanding is you went down to Tennessee on a trip,

24 you went to Louisville.  Tell us about those trips.

25          MR. SMITH:  Your Honor, again, I am going to

Vernon Hacker – Cross Examination

1 object as to relevance.

2          THE COURT:  Sustain.

3          MR. BAYER:  Could I approach for a moment as

4 well?

5          THE COURT:  No, sustain the objection.

6 BY MR. BAYER:

7 Q.  What do you know about Bobby Joe Curry?

8 A.  I know Bobby Joe Curry.

9 Q.  How do you know Bobby Joe?

10 A.  How do I know him?

11 Q.  Yes, sir.

12 A.  I have known him since I was probably about

13 twelve year old.

14 Q.  And what kind of business was Bobby Joe Curry in?

15 A.  Bobby Joe Curry was a drug dealer.

16 Q.  And he also sold guns?

17 A.  Sold guns?

18 Q.  Yes, sir.

19 A.  I never did know of him being a gun dealer.

20 Q.  Well, did you ever buy guns from Bobby Joe Curry?

21 A.  He said I did.

22 Q.  But you did not?

23 A.  He said I did.  I admitted to it that I did.

24 Q.  And did Todd Roberts also buy guns from Bobby Joe

25 Curry?

Vernon Hacker – Cross Examination

1  A.   I never did see Todd Roberts buy guns from Bobby

2  Joe Curry.

3  Q.   At one point in time, are you aware of the fact

4  that Todd Roberts had tipped off Bobby Joe Curry prior

5  to the execution of the search warrant of Bobby Joe

6  Curry's residence?

7  A.   I am aware of the accusation.

8  Q.   How are you aware of that?

9  A.   I am in prison right now for a case that that was

10 brought up in.

11 Q.   I want to talk about you went into some

12 discussions about your school bus.

13      If I understand you correctly, you said in 2002

14 you stopped working for awhile?

15 A.   I didn't understand your question, please.

16 Q.   In 2002, did you stop working as a school bus

17 driver?

18 A.   In May of 2002, during the May primary, and the

19 absentee voting, that's when I –– my school bus was

20 taken away from me.

21      School was released that year, I think it was in

22 early June, first week in June.

23      And I quit driving from that point in time until

24 the following school year.

25 Q.   Well, you had had a problem with Ronnie Hacker

Vernon Hacker – Cross Examination

1 about your school bus route, hadn't you?

2 A.  No, I hadn't had a problem with my school bus

3 route.

4 Q.  Well, did you have a problem in which you were

5 having an altercation with any of the students on your

6 bus or their families?

7 A.  No, sir.

8 Q.  You were also a deputy sheriff?

9 A.  Yes, sir.

10 Q.  Did you carry a gun all the time?

11 A.  I carried a gun with me most of the time.

12 Q.  Did you carry a gun while you were school bus

13 driving?

14 A.  No, sir.

15 Q.  So at no point in time did you go up into

16 anybody's apartment, a parent of a school bus child,

17 and threaten to arrest her?

18         MR. SMITH:  Your Honor, I am going to object,

19 ask to approach.

20         THE COURT:  Come on up.

21         (Thereupon, a discussion was had between the

22 Court and counsel at the bench and out of the hearing

23 of the jury.)

24         MR. SMITH:  Your Honor, we have carefully

25 reviewed all the discovery 302s in this case, and I

Vernon Hacker - Cross Examination

1  fail to recall any instance where this allegation

2  that's being now propositioned in cross examination

3  occurred in any 302.

4         And I believe that counsel has a duty, of

5  course, in making questions that they be made on a

6  good faith basis that the information that he is

7  basing this on; and I have no recollection of that

8  existing.

9         THE COURT:  That will be the first issue I'll

10 ask Mr. Bayer to address.

11        The second one is relevancy.  This is

12 essentially an impeachment, attempt of use of other

13 bad acts, not convictions, but allegations made by

14 third parties, best I can tell.

15        First, what's the good faith basis, and

16 second, how is it relevant and being offered under the

17 Rules of Evidence?

18        MR. BAYER:  First, the good faith basis, I

19 was told the reason there was an alteration in his bus

20 schedule route was because they were actually having

21 problems with him as a bus driver.

22        And this will come from the witnesses who

23 will testify from the school system, his immediate

24 boss and so forth at the school system.

25        I believe that they will testify that he

Vernon Hacker – Cross Examination

1  actually was having problems there with the students,

2  and because of that, they had to make some changes in

3  his route schedule.

4          The reason why it is relevant is because on

5  direct examination he specifically testified that

6  there was a change in his bus schedule due to his

7  support for Jennings's wife, and in fact that's not

8  true.

9          The reason there was a change in his bus

10 schedule and his bus assignment was because they had

11 to change his route for a variety of reasons one of

12 the least of which is because he was having a problem

13 with his students.

14         And, second, because they had to do a

15 demographic reallocation of the routes in Clay County,

16 and I was getting ready to walk into that next.

17         THE COURT:  I am going to sustain the

18 objection.

19         He's denied the question, denied the

20 assertion it was due to this other event, so I'll

21 sustain the objection.

22         (End of bench conference.)

23         THE COURT:  Thank you, counsel, the objection

24 will be sustained.  You may continue.

25 BY MR. BAYER:

Vernon Hacker – Cross Examination

1 Q.   At what point in time did you actually quit

2 driving your school bus?

3 A.   Yes, I refused to drive the route there in 2002,

4 and I just stated I didn't come back until the

5 following school year.

6            MR. BAYER:  Judge --

7            THE COURT:  Yes, sir.

8            MR. BAYER:  -- I have marked as Adams's

9 Exhibit 1 a document that was provided to us by the

10 United States.

11            And if the CSO would allow the witness to

12 review it, please.

13            THE COURT:  All right, show it to Mr. Smith

14 first.

15            MR. BAYER:  I have, sir.

16 BY MR. BAYER:

17 Q.   Mr. Hacker, if you would take a look at that,

18 please.

19 A.   Yes, sir.

20 Q.   Do you recognize that, sir?

21 A.   Yes, sir.

22 Q.   What is that?

23 A.   That is where I resigned as school bus driver.

24 Q.   And that was actually in September of '02, wasn't

25 it?

Vernon Hacker - Cross Examination

1  A.   Yes, sir.

2  Q.   And the May primary, if I understand you

3  correctly, is where the office for all practical

4  purposes on the Republican side is decided?

5  A.   Pardon?

6  Q.   It was in May of 2002 during the Republican

7  primary where for all practical purposes, the office

8  for county clerk, in other words the race between

9  Jennings's wife and Freddy Thompson was decided in

10 May?

11 A.   Yes, sir.

12 Q.   This was September.

13 A.   Yes, sir.

14 Q.   Would you please read out loud what you wrote?

15 Well, let me back up.  Did you type this out?

16 A.   Yes, sir.

17 Q.   So this was prepared by you.

18 A.   Yes, it was.

19 Q.   If you would read it out loud, please.

20 A.   It says, "I, Vernon Hacker, on this date,

21 9-11-02, do hereby resign effectively as this letter

22 is received in your office.

23      My resignation is due to the reason that my

24 regular bus run which was in the Littleton area was

25 never given back to me, and I was not able to do any

Vernon Hacker - Cross Examination

other bus routes due to work scheduling.

I am resigning without ill feelings or anger toward anyone involved in this matter.

I thank the board for the employment they allowed me to have and deeply respect them.

I will always appreciate the opportunity given to me by Mr. Charles White, and superintendent Mr. Douglas Adams to be employed by the Clay County Board. Sincerely yours, Vernon R. Hacker, 9-11-02."

Q. Thank you, Mr. Hacker.

MR. BAYER: At this point in time I would like to move to introduce Adams's Exhibit 1, please.

THE COURT: All right.

THE WITNESS: Can I also explain this?

THE COURT: Wait just a second. Is there any objection to Adams Exhibit 1 being admitted?

MR. SMITH: No, Your Honor.

THE COURT: All right, Adams Exhibit 1 will be admitted at this time.

(ADAMS EXHIBIT NO. 1 ADMITTED INTO EVIDENCE WITH NO OBJECTION)

THE COURT: Now you may explain your answer.

THE WITNESS: At the time that I wrote this resignation, that's when Mr. White -- or Mr. Adams agreed to give me a new school bus and give me the

Vernon Hacker - Cross Examination

1 run.

2            I did drive up to this point.  I was going to

3 leave.

4            I turned this in as a resignation, but I

5 never did resign.  It was never completed.

6            He gave me a new school bus, made promises to

7 me, he gave me back my run in Littleton; and I

8 continued on as a bus driver.

9            You asked me had I ever quit.  I never -- the

10 only time that I ever quit driving a school bus was,

11 as I said, from May until the following school year.

12            I came back as a bus driver, and he put me on

13 another run.

14            I continued that run, and then I resigned;

15 but I never did go through with it.

16 BY MR. BAYER:

17 Q.   Well, I would like to ask you, what -- what bus

18 run did you have in 1999 to 2000?  What was it

19 described as?

20 A.   I drove -- when I first was hired in as a bus

21 driver, I started driving on a program, I think it was

22 School to Work Program.

23       It was hauling kids that was in high school that

24 went out into the work field to do jobs, and then I

25 would take them to their jobs and pick them back up.

Vernon Hacker – Cross Examination

1  Q.   Did you start off in Oneida Elementary?

2  A.   As a part-time driver some down there and then

3  also at the -- as a driver there at the School to Work

4  Program.

5  Q.   In the next school year, '98, '99 school year,

6  what did you do, what route did you have?

7  A.   I think it was Oneida.

8  Q.   Okay, and do you remember what kind of bus you

9  were driving back then?

10 A.   Yeah, I was driving a 65-passenger automatic bus.

11 Q.   1992?

12 A.   I am really not sure what model it was.

13 Q.   What did you have for the next year?

14 A.   I got a newer bus.

15 Q.   Well, let's stick with the 1999, 2000 school

16 year.  You were driving Manchester Elementary,

17 correct?

18 A.   Yes, sir.

19 Q.   Do you remember the school bus you had?

20 A.   No, sir, I really don't.

21 Q.   A 1993, does that sound correct?

22 A.   I really don't know what the model was.  Good-

23 shaped bus.

24 Q.   Older bus?

25 A.   Yes, sir, when I first started.

Vernon Hacker – Cross Examination

1  Q.   And then the 2000, 2001 school year, you were

2  still at Manchester Elementary?

3  A.   Yes, sir.

4  Q.   Still driving the same 1993 bus?

5  A.   I am not quite sure.  I got -- I had three

6  different buses while I had that route.

7       MR. SMITH:  Your Honor, I am going to object

8  as to relevance.

9       THE COURT:  I am going to allow it.

10      MR. BAYER:  Thank you, Judge.

11 BY MR. BAYER:

12 Q.   In the 2001, 2002 school year, you were still

13 driving Manchester Elementary?

14 A.   Yes, sir.

15 Q.   And I believe it was that school year, the '01,

16 '02 when you actually received your new school bus,

17 wasn't it?

18 A.   One of the old ones -- one of the new ones, I had

19 two new ones.

20 Q.   So in 2001 is when you actually got your first

21 new school bus long before --

22 A.   No, it was not a new school bus.

23 Q.   Well, it was a 2001.

24 A.   It could have been, I am not sure.

25 Q.   And this is for the 2001, 2002 school year, and

Vernon Hacker – Cross Examination

1  they gave you a 2001 school bus.

2  A.   I got it when I came back in 2002 after the

3  primary.

4  Q.   Well, for the school year -- let me understand

5  this correctly.

6       So after the primary, when you told them that you

7  were going to help them, you got a new school bus?

8  A.   Yes, sir.

9  Q.   You took two weeks off during May, when the

10 primary was held?

11 A.   I don't know how many weeks it was.

12 Q.   And you are saying right there at the very end of

13 the school year, they then gave you a new school bus?

14 A.   When I came back in 2002, I did get a bus; but I

15 had another bus prior to this.

16      That's what I am saying, when I turned this

17 resignation in in September of '02, I was given

18 another school bus.

19 Q.   For the 2002, 2003 school year, what route did

20 you drive?

21 A.   I drove Goose Rock Elementary.

22 Q.   And --

23 A.   And also the Littleton, I got my route back.

24 Q.   They had done a realignment of all the bus routes

25 in Clay County, hadn't they?

Vernon Hacker – Cross Examination

1  A.   I think some people may have got a realignment.

2  Q.   And that was due to the dwindling population of

3  the Clay County schools, wasn't it?

4  A.   No, it was due to who didn't do what the school

5  board asked them to do in the election.

6  Q.   Then in 2003, 2004 school year what school did

7  you drive?

8  A.   Manchester Elementary.

9  Q.   And you had a 2000 -- a year 2000 school bus that

10 year?

11 A.   I really don't know what the model was.  My last

12 year driving there I drove Clay County Vocational

13 School and Manchester Elementary.

14 Q.   So you had different types of school buses the

15 entire time you were being a school bus driver?

16 A.   Yes, I did.

17 Q.   And at one point in time you were the one

18 responsible for driving the basketball team, weren't

19 you?

20 A.   Yes, I was.

21 Q.   Driving the basketball team, you had to have a

22 new bus, didn't you?

23 A.   No, I didn't get a new bus for that.

24 Q.   You didn't even get a new bus for when you drove

25 the high school basketball team?

Vernon Hacker – Cross Examination

1 A.   A lot of times I would drive someone else's bus

2 until I did get a new bus.

3 Q.   But as you stated, throughout the time you were a

4 school bus driver you had all sorts of different types

5 of buses?

6 A.   Yes, sir.

7 Q.   If I understand your plea agreement, Mr. Smith

8 went into it a little bit.

9     Do you remember exactly -- do you have a copy of

10 your plea agreement there with you?

11 A.   No, sir, I don't.

12 Q.   Do you remember specifically what you pled guilty

13 to?

14 A.   I plead guilty to conspiracy to possess and

15 distribute 5 kilos of cocaine and also possession to

16 distribute Oxycontin, I think, and maybe Methadone.

17 Q.   What else did you also plead guilty to?

18 A.   That's what I pled guilty to.

19         THE COURT:  He is asking you to show --

20 BY MR. BAYER:

21 Q.   Did you also -- when you made the representation

22 to the court about your involvement in criminal

23 activity, did you also make a representation of the

24 fact that you were involved when Todd Roberts, Bobby

25 Joe Curry burned down the house?

Vernon Hacker – Cross Examination

1   A.   Yes, sir.

2   Q.   Tell us what was your role in that activity?

3   A.   I played a part in that with them.

4   Q.   Please tell us what it was.

5   A.   I assisted them.

6   Q.   How?

7   A.   We picked Mr. Curry up, took him to the house.

8   Q.   When you say "we" picked him up, who is "we"?

9   A.   Me and Todd Roberts.

10  Q.   What role did Todd Roberts play in all this?

11  A.   He drove him there.

12  Q.   Who gave the instructions that evening as far as
13  what was going to happen?

14  A.   Well, I would want to say that both of us did.

15  Q.   So Todd Roberts knew exactly what was going to
16  happen that evening?

17  A.   I am sure he did.

18  Q.   And what did you all tell Bobby Joe Curry that
19  evening?

20  A.   Just told him to burn the house.

21  Q.   How well did it go right at the beginning there,
22  Mr. Hacker?

23  A.   I don't think it went too good.

24  Q.   Well, what happened?

25  A.   The fire went out.

Vernon Hacker – Cross Examination

1  Q.   So what happened then to make sure that the house

2  got burned?

3  A.   Started a fire back up again.

4  Q.   How was that accomplished?

5  A.   Well, I really don't know, but I would say that

6  he just lit it up again.

7  Q.   Well, did you not come back with Mr. Roberts and

8  instruct Curry, Bobby Joe Curry to break out the

9  windows of the house?

10 A.   I happened to come after the fire had started

11 back.

12 Q.   And who gave Mr. Curry the instruction to break

13 the windows out, was it you or Mr. Hacker?

14 A.   I'll be honest, I can't recall.

15 Q.   Could have been Mr. Hacker?

16 A.   I am Mr. Hacker.

17 Q.   I'm sorry, could have been Mr. Roberts?

18 A.   Could have been.

19 Q.   And then as the fire department pulled up, what

20 did you all tell the fire chief had happened that you

21 knew about?

22 A.   Well, when the fire chief pulled up, I wasn't

23 there.

24 Q.   You were gone?

25 A.   I left and come back.

Vernon Hacker – Cross Examination

1  Q.   And were you there when Mr. Roberts smelled the

2  gasoline on Bobby Joe Curry and told him to leave?

3  A.   No, sir.

4  Q.   How was Bobby Joe Curry paid for all of this

5  work?

6  A.   I think he was paid for with cocaine.

7  Q.   From whom?

8  A.   At that time Arkus Hibbard.

9  Q.   And who is Arkus Hibbard?

10 A.   He was employed through the City of Manchester,

11 just cleaning up over there, doing some -- on the

12 grant money that they got through the state.

13 Q.   So on behalf of Daugh White, Arkus Hibbard

14 delivered 22 grams of cocaine to Bobby Joe Curry?

15 A.   I really don't know how much.

16 Q.   Did you ever ride with Vernon Roberts while he

17 was out on parole -- on patrol?

18 A.   Vernon Roberts?

19 Q.   Yes, sir, I'm sorry.

20 A.   I don't know that gentleman.

21 Q.   Todd Roberts.

22 A.   Yes.

23 Q.   Tell us what you all would do when you were out

24 riding around on patrol.

25        MR. SMITH:  Your Honor, I am going to object

Vernon Hacker – Cross Examination

1  as to relevance.

2        MR. BAYER:  Judge, it's in the plea

3  agreement, and it's regarding Mr. Roberts's testimony.

4        THE COURT:  That would make it relevant.

5  I'll sustain the objection.

6  BY MR. BAYER:

7  Q.  Did you make frequent trips to Bobby Joe Curry to

8  buy guns from him?

9  A.  No, sir.

10  Q.  In your plea agreement, I would like to read you

11  something and ask you if you remember that this

12  statement was included.

13        MR. SMITH:  Your Honor, I am going to object

14  as to the foundation of the question.

15        THE COURT:  Counsel, come up again, please.

16        (Thereupon, a discussion was had at the bench

17  between the Court and counsel and out of the hearing

18  of the jury.)

19        THE COURT:  What's the exhibit number?

20        MR. BAYER:  14.

21        THE COURT:  Kaye, can I have it?  What are we

22  reading?

23        MR. BAYER:  B.

24        THE COURT:  Okay, what do you want him to

25  read, the entire paragraph?

Vernon Hacker – Cross Examination

1          MR. BAYER:  Either that or I can have him

2 read it and I'll just ask him questions, whatever's

3 quickest.

4          I was trying to just move us along through

5 it.  I thought it would be faster if I just read it.

6          THE COURT:  All right, Mr. Smith?

7          MR. SMITH:  Well, Your Honor, first of all,

8 the court ruled that this inquiry about riding around

9 with Mr. Roberts, that my objection was not relevant.

10          Now he seeks to read that he did take trips

11 out of town with Todd Roberts.

12          And obviously there has not been an

13 inconsistent statement here.

14          The question hasn't been asked and answered.

15 Now he is seeking to impeach him.

16          I don't see this is impeachment.  I see this

17 is attempt to read the plea agreement.

18          MR. BAYER:  First off, the plea agreement has

19 already been entered into as evidence, so I have the

20 right to read from it.  Secondly --

21          THE COURT:  Let's talk about that for a

22 second.

23          There are a lot of documents admitted into

24 evidence.

25          But just because something's admitted into

Vernon Hacker – Cross Examination

1  evidence doesn't mean that everything that's written

2  in the document is therefore relevant to read to the

3  jury.

4          You have asked him about his relationship

5  with Mr. Roberts.

6          You have asked him about his relationship

7  with Mr. Curry.

8          MR. BAYER:  If I remember correctly, the

9  court sustained the objection as it related to rides

10  around in the limousine.

11          I am dealing with a different topic.  This is

12  specifically where they were engaged in criminal

13  conduct together and doing things as it relates to

14  background for some other things that I want to

15  address.

16          THE COURT:  What is it -- without reading the

17  document, what is it that you want to ask him about?

18          MR. BAYER:  Specifically I can ask him about

19  Mr. Roberts's involvement in buying the drugs, buying

20  the guns, whether or not he was there, involved.

21          THE COURT:  You have already asked him that.

22          MR. BAYER:  The time frame of when this

23  occurs I think is important for some other things.

24          THE COURT:  Well, you haven't asked him when

25  he was riding around.

Vernon Hacker - Cross Examination

1          That time is not set forth here, so it

2 doesn't get you to the time frame.

3          MR. BAYER:  Correct, and I can ask if we can

4 do that.

5          THE COURT:  I'll sustain the objection to

6 reading this paragraph to the witness.

7          MR. BAYER:  May I then just ask questions

8 about the content without reading it?

9          THE COURT:  Mr. Bayer, I suspect what you

10 will do is you will ask him about every single

11 sentence, and we will be back where we were -- we'll

12 be back up here again in the next couple of minutes.

13          Let's see, his relationship with other

14 witnesses is relevant in the case.

15          You asked him about whether he took trips

16 with Mr. Roberts.

17          You asked him about whether he was present

18 during the -- when the fire was started.

19          You asked him about gun transactions, what

20 else, what factual information do you want to ask him

21 other than what you have asked him previously --

22          MR. BAYER:  Specifically --

23          THE COURT:  -- that relates to this

24 paragraph?

25          MR. BAYER:  Specifically, I want to ask if

Vernon Hacker – Cross Examination

1  Mr. Robert was there during the drug transactions,

2  then I can move away from that paragraph.

3           THE COURT:  All right, you can ask him if

4  Mr. Roberts was present during any drug transactions.

5           MR. BAYER:  Then I would like to ask him

6  questions about what's in paragraph F, finish with

7  paragraph F.

8           THE COURT:  So in paragraph F you would want

9  to ask him if he was present when someone within the

10 police department was directed to return money to

11 Curry; is that correct?

12          MR. BAYER:  Yes, sir, and also the time

13 because if you notice that's May 1, '03, and the fire

14 was in '99.

15          THE COURT:  All right.

16          MR. BAYER:  And then we get the last sentence

17 here where it's Assistant Chief Roberts ordering

18 Officer Stuart to go to the evidence room and return

19 the money.

20          THE COURT:  Well, we don't know that he is

21 present.

22          The statement that we would attribute to him,

23 the information we would attribute to him is that he

24 is present.

25          Roberts would have to call Officer Stuart

Vernon Hacker - Cross Examination

 1  into the office with Curry.

 2          Was he present whenever the -- any directions

 3  were given to Stuart.

 4          MR. BAYER:  I can ask him that.

 5          THE COURT:  You can ask him about that.  If

 6  he denies it, then you can show him the document

 7  because at that point this is a plea agreement that he

 8  signed.

 9          Some of this information relates to other

10  defendants obviously.

11          But you can show him the document at that

12  point, if he gives an inconsistent statement.

13          MR. BAYER:  Thank you, Judge.

14          MR. BALDANI:  Judge, can I weigh in to ask

15  about something while we are here?

16          I just want to -- I intended to ask

17  Mr. Hacker -- okay, sorry about that, sorry about

18  that.

19          I intended to ask Mr. Hacker about three

20  discrete things in paragraph D basically that I think

21  contradict to what Mr. Roberts testified.

22          I was going to ask him, he says that he was

23  -- you know, that he personally witnessed quite a few

24  firearms being bought by Mr. Roberts which Mr. Roberts

25  denied that, so I intended to ask that.

Vernon Hacker – Cross Examination

1   I also intended to ask did he personally

2 witness Bobby Joe Curry riding in Mr. Roberts's

3 cruiser on numerous occasions because I believe

4 Roberts denied that.

5   And then I was going to ask him just

6 generally was he present when basically these drug-

7 using females put on, you know, strip acts for

8 Mr. Roberts because he more or less denied that.

9   So that's along the same lines, I wanted to

10 bring it back up to sure; is that fair?

11   THE COURT:  That's fair.  Let me just remind

12 you, counsel, once the rule on witnesses has been

13 invoked, it's improper for counsel to then

14 characterize what a prior witness's testimony has

15 been.

16   We have excluded witnesses.  I am not saying

17 you did that.

18   MR. BALDANI:  I didn't think I had.

19   THE COURT:  No, Mr. Bayer has done it quite a

20 bit.

21   Since you are coming up with your cross

22 examination, I just wanted to remind you.

23   Whenever the court invokes the rule on

24 witnesses, that prevents anyone from relaying directly

25 or indirectly what another witness has said.

Vernon Hacker – Cross Examination

1          So if, in the course of examining a witness,

2   the attorney then says Mr. So-and-so has testified as

3   follows in this proceeding, that's violating the rule

4   on witnesses.

5          So I just wanted to alert everyone to that

6   before we had an issue coming up with further cross

7   examination.

8          MR. WHITE:  Your Honor, can I ask you --

9   since we are up here and since I am up next.

10          THE COURT:  Yes.

11          MR. WHITE:  I was going to -- I feel

12   comfortable what I am going to do is fine, but I want

13   to double check because it deals with 302.

14          In one of the 302s, Mr. Hacker was in the

15   police department when a guy name Nolan came in,

16   demanded some of his money back from a safe or from

17   the evidence room.

18          The money was handed over.  Todd Roberts was

19   there when that happened.

20          And Hacker, based on 302, is going to say

21   that he -- the reason he gave -- when the money got

22   given back that he was no longer going to give

23   Mr. Curry any protection for his drug business.

24          I think that's relevant because Mr. Roberts

25   has already testified that he didn't get any

Vernon Hacker – Cross Examination

1 protection, that he was an informant.

2          And I am only going to ask him, A, about

3 that.  I am not going to ask him anything specific

4 unless he remembers it.

5          If he doesn't remember what effect that had

6 on Mr. Roberts, then I am going to give him the 302 to

7 refresh and then obviously live with his answer.

8          But because of the nature of that, I wanted

9 to make sure that I didn't surprise the United States

10 or create any kind of a hick-hack.

11          THE COURT:  I am not sure I follow that.

12          MR. WHITE:  I'm sorry, Judge.

13          THE COURT:  Keep in mind, the court's not

14 having read the 302s.

15          So I am not sure what's contained in the

16 302s, but it is the same incident that was testified

17 about earlier.  If it's a different incident --

18          MR. WHITE:  I believe it's a different

19 incident.

20          What I can do is just go real slow, that way

21 if you wanted me to come up, I can do that before I

22 get into it.

23          THE COURT:  I don't know that I can give you

24 a real answer --

25          MR. WHITE:  I understand.

Vernon Hacker – Cross Examination

 1          THE COURT:  I just don't understand the

 2  connection between the two at this point.

 3          MR. WHITE:  Thank you, Your Honor.

 4          THE COURT:  Thank you.

 5          (End of bench conference.)

 6          THE COURT:  All right, thank you, ladies and

 7  gentlemen, I apologize for the delay.  But you may

 8  continue.

 9          MR. BAYER:  Thank you, Judge.

10  BY MR. BAYER:

11  Q.   Mr. Hacker, going back to the provision that was

12  talked about in your plea agreement, were you ever

13  present at any point in time when Mr. Roberts would

14  have been at Bobby Joe Curry's and that drug customers

15  would go into back rooms at Bobby Joe Curry's and that

16  the two of you would be back there, you and

17  Mr. Roberts?

18  A.   I have never been in a back room during any time

19  that any drug activity was going on as far as I know.

20  I could have possibly been there.

21  Q.   Would Mr. Roberts have been there possibly as

22  well?

23  A.   Could have been.

24  Q.   At the time that all of this was going on as far

25  as the fire and so forth, that was in 1999, correct?

Vernon Hacker – Cross Examination

1    A.   I think so.

2    Q.   And later on, this matter came up again in about

3    2003, I believe that at some point in time during

4    2003, were you there when Bobby Joe Curry came in

5    demanding money to be returned from out of evidence at

6    Manchester Police Department?

7    A.   I was called there.

8    Q.   Tell us what you know about all of that.

9    A.   Well, we came there, they had done a raid on his

10   home.

11       And I think they had confiscated some cash, and

12   he came in there and asking for it.

13   Q.   Who else was there?

14   A.   I know Todd Roberts was there, and I am not sure,

15   I think maybe George Stuart, Officer George Stuart.

16       I am not sure, I think that's who the officer

17   was.

18   Q.   And what did Todd Roberts do after Mr. Stuart

19   demanded his money back?

20   A.   He gave it back to him.

21   Q.   How did he do that?

22   A.   That I don't know.  I don't know the procedure.

23   Q.   So in 2003, long after that primary election in

24   2002 here in the police department, Bobby Joe Curry

25   comes in, demands money back that was seized from him

Vernon Hacker – Cross Examination

1 and Ray; and Todd Roberts hands him back the money?

2 A.   I didn't see him give him back the money, but he

3 did get his money back.

4 Q.   Do you know how much we are talking about?

5 A.   No, I don't.

6 Q.   And if I understand you correctly, you have

7 talked with Doug Adams on a couple, three occasions?

8 A.   Yes, sir.

9 Q.   And one time he said to you he would like for you

10 to support Freddy Thompson?

11 A.   Yes, sir.

12 Q.   And another time he said to you that, "I would

13 like for you to do what you can in the election

14 regarding Tim Couch, Barbara Colter"?

15 A.   Yes, sir.

16 Q.   Did he say something to you like, "I would like

17 for you to see" –– how did you rephrase that –– how

18 did you phrase that?

19    You were saying what you could do to keep it even

20 or fair or something, I don't remember how you said

21 it.

22 A.   Well, at the time he asked me at Darnell

23 Hipsher's home, Darnell was evidently going to support

24 Tim Couch.  I was for Barbara Colter.

25    And he asked me if I would try to help him, help

Vernon Hacker – Cross Examination

1 him some.

2     Manchester was Barbara's home precinct.  That was

3 her stronghold.

4     He said he just didn't want to see Tim get beat

5 to death, that that's what I was referring to.

6 Q.   Now, did Mr. Adams know that you would be buying

7 votes for Barbara Colter?

8 A.   Yeah.

9 Q.   So basically he was saying to kind of keep it

10 fair?

11 A.   He was wanting me to buy votes for Tim Couch.

12 Q.   He didn't say that though.

13 A.   Yeah, well, he said that.  I may not have

14 expressed it in my testimony relating back, I was

15 referring to what I said.

16     When he asked me to keep it close my –– the

17 reason that he called me there was to ask me to buy

18 votes for Barbara Colter or for Tim Couch.

19 Q.   You told him no.

20 A.   I told him no.

21 Q.   So we had these two factions going.  We have this

22 White faction and this other faction?

23 A.   Yes, sir.

24 Q.   Then if I understand you correctly during the

25 2002 primary, when you were dealing with the Jennings

Vernon Hacker - Cross Examination

1 faction and the people that you talked about that you

2 would go to their houses and you would work with them,

3 that was all against Freddy Thompson, correct?

4 A.   I am not going to say everyone was against Freddy

5 Thompson, no, I can't say that.

6 Q.   What I am saying is that in that 2002 county

7 clerk race when you were working for Jennings White --

8 A.   Yes, sir.

9 Q.   -- that was against Freddy Thompson; isn't that

10 true?

11 A.   Yes, sir, that's true.

12 Q.   And Mr. Adams asked you to support Freddy

13 Thompson?

14 A.   Yes, he did.

15 Q.   And you told him no.

16 A.   Yes, I did.

17 Q.   Mr. Adams, you were saying to this court, was

18 supporting Freddy Thompson against Jennings White?

19 A.   Yes.

20 Q.   And you are saying that Mr. Adams came to you and

21 said that he was supporting Tim Couch against Barbara

22 White?

23 A.   Yes.

24 Q.   Those are the two candidates he talked to you

25 about, right?

Vernon Hacker - Cross Examination

1  A.   That's the ones he asked me for help for, yes.

2          MR. BAYER:  That's it.  No further questions.

3          THE COURT:  Thank you.

4          Mr. White.

5          MR. WHITE:  Thank you, Your Honor.

6                        - - -

7                  CROSS EXAMINATION

8  BY MR. WHITE:

9  Q.   Good afternoon, sir.

10  A.   Good afternoon.

11  Q.   My name is Scott White.  Let me ask you just a

12  few questions.

13      I think I am going to be able to avoid being

14  repetitive, but when you are third in sometimes, but

15  I'll do my best.

16      First of all, in the 2002 primary election, which

17  would have been the spring --

18  A.   Yes, sir.

19  Q.   -- which would have been when the county clerk's

20  office is essentially being run because it was a

21  Republican primary, correct?

22  A.   Yes, sir.

23  Q.   Now, was the jailer's race involving Kennon White

24  and Mr. Marcum also going to be decided in the

25  Republican primary?

Vernon Hacker - Cross Examination

1  A.   Yes, it was.

2  Q.   And it's your testimony is that Dobber Weaver was

3  working with Wanda White in helping Kennon White in

4  that jail; is that correct?

5  A.   No, sir.

6  Q.   I wrote that down wrong.

7  A.   That was in 2004.

8  Q.   In 2004.

9  A.   The jailer's race was in 2002, but when Wanda was

10  working with Charles Weaver it was in the 2004

11  election.

12  Q.   Thank you for clearing that up for us.  Now, you

13  testified, did you not, on direct that Charles -- now,

14  Charles Stivers is different than Mr. Stivers here,

15  correct?

16  A.   Yes, sir.

17  Q.   Is Charles, Mr. Stivers -- is Charles Stivers --

18  this is Mr. Stivers's brother?

19  A.   Yes, sir.

20  Q.   And did you testify on direct that you gave $500

21  to Charles Stivers and Charles Wayne Jones, my client,

22  to buy votes?

23  A.   No, sir, I gave the money to Wayne Jones and

24  William Stivers.

25  Q.   And it was just the three of you there.

Vernon Hacker - Cross Examination

1  A.   Yes.

2  Q.   Who did you give it to?  Did you give it to

3  Mr. Stivers or to Mr. Jones?

4  A.   I gave it to both parties.

5  Q.   So you gave one 250 and the other 250?

6  A.   No, as they got to Boulders there, I gave them

7  the money, they split the money between the two of

8  them.

9  Q.   I see.  And was this in the -- what election was

10 this, in the spring or the fall?

11 A.   This was in the November election during which

12 time Daniel Mongiardo was running for state senate and

13 Jim Bunning was running for -- or not state senate but

14 U.S. Senate, and we also had our council race.

15 Q.   Okay, and so as you testified earlier, council

16 votes -- council race votes went for $20 a vote,

17 right?

18 A.   Right.

19 Q.   So this $500 was going to be used to buy 25

20 votes, correct?

21 A.   I don't think I made the statement of $500 to

22 those gentlemen because it was more money than that

23 that was give to them.

24 Q.   Well, the jury can recall your testimony.

25 A.   Okay.

Vernon Hacker - Cross Examination

1 Q.   Now, Mr. Bayer just asked you some questions

2 about witnessing Bobby Joe Curry come in -- let me ask

3 you this.

4     Where was your office -- you may have already

5 testified to this.  If you did, I apologize.

6     But where did you say your office -- when you

7 became 911 director for Clay County --

8 A.   Yes, sir.

9 Q.   -- where was your office located?

10 A.   In the 911 building, police department.  It's all

11 together.

12 Q.   It's all together.

13 A.   In the same building.

14 Q.   Is it a multi-story building?

15 A.   No, it's a one-story.

16 Q.   Okay, and if I am in the 911 part of the

17 building, am I essentially right next to the police

18 department?

19 A.   Yes, it's adjacent, 911's on one end, and the

20 police department was on the other.

21 Q.   Now, as the 911 director, did you happen to be

22 there -- I want to ask you about an event in which a

23 Henry Nolan came into the -- the police department.

24     First of all, let me ask you this, who is Henry

25 Nolan?  Do you know a man by that name?

Vernon Hacker - Cross Examination

1  A.   I think I do.

2  Q.   And --

3  A.   Don't know him personally, but I think I know the

4  name.

5  Q.   You would know him if you saw him?

6  A.   Yes, sir.

7  Q.   Does he live in Clay County?

8  A.   As far as I know.

9  Q.   And were you in the Manchester Police Department

10  on the day when Mr. Nolan came into the police

11  department and wanted to make -- ask some questions

12  about some evidence that had been seized?

13  A.   I am not familiar.  I don't recall that.

14       MR. WHITE:  Your Honor, I would like to hand

15  something to the CSO, see if that could refresh his

16  recollection.

17       THE COURT:  Yes, sir, you may.

18       MR. WHITE:  Thank you, sir.

19  BY MR. WHITE:

20  Q.   Now, Mr. Hacker, Officer Bostrom is about to give

21  you a document I would like you to read to yourself.

22       Please do not read it out loud, the highlighted

23  section.  Have you got it there in front of you?

24  A.   Okay.

25  Q.   Sir, does that document that I have given you to

Vernon Hacker - Cross Examination

1  read, does that refresh your memory about what --

2  about Mr. Nolan coming into the Manchester Police

3  Department in '04 or '05?

4  A.   I could have been there, sir, but I can't say for

5  sure; but I could have been there.

6  Q.   Does that -- does that refresh your memory at all

7  as to those events?

8  A.   I am familiar with some of it, yes, sir.

9        MR. WHITE:  May we approach, Your Honor?

10        THE COURT:  Yes, you can approach.

11        MR. WHITE:  Thank you, Judge.  Well, that's

12  okay, I'm sorry.

13  BY MR. WHITE:

14  Q.   Does that -- tell me what that -- what that

15  refreshes your memory about?

16  A.   I do recall the deal with Terry Baker, but --

17  Q.   What -- what was that deal?

18        MR. SMITH:  Your Honor, I -- that is

19  unresponsive to the question.

20        THE COURT:  All right.

21        MR. SMITH:  The question was about Henry

22  Nolan, and there is other subjects listed throughout

23  this.

24        THE COURT:  Does that document refresh your

25  memory as to the question that was asked previously

Vernon Hacker – Cross Examination

1  about Mr. Nolan?

2          THE WITNESS:  I think I may recall something

3  to this.  I am not sure.

4          I just didn't recall what he was going --

5  where he was going with the question, I couldn't

6  recall.

7          But I might know a little bit of something

8  about it, but I just don't recall the fact that I may

9  have been there when this occurred, I really don't.

10          I know the situation, but I don't know if I

11  was there.

12          MR. WHITE:  Do you want me to approach, Your

13  Honor?

14          THE COURT:  No, I'll tell you what I am going

15  to do.

16          I am going to let the jury take their evening

17  break.  We'll take this up outside the presence of the

18  jury.

19          Please keep in mind the admonition previously

20  given to you.  The jury will be in recess for twenty

21  minutes.

22          THE MARSHAL:  Please rise for the jury.

23          (Jury excused from the courtroom at this time

24  for afternoon recess.)

25          (The following proceedings were had in open

Vernon Hacker - Cross Examination

1  court out of the presence and hearing of the jury.)

2           THE COURT:  Thank you, please be seated.

3  Please be seated.

4           Mr. Hacker, do you have direct knowledge of

5  the events that you have been asked about pertaining

6  to Mr. Nolan?

7           Do you have direct knowledge, or do you just

8  have hearsay information about him?

9           THE WITNESS:  I remember when they seized --

10 raided Henry and seized his property, but he was

11 asking if I was there when Henry came --

12          THE COURT:  Right.

13          THE WITNESS:  -- to get his stuff back, and I

14 do not recall that I was there.

15          THE COURT:  All right, so you weren't there

16 when he came to get something back at the police

17 station.

18          THE WITNESS:  Right.  If I was, I just can't

19 -- I can't remember if I was there or not.

20          THE COURT:  All right.

21          THE WITNESS:  That's all --

22          THE COURT:  That's what I suspected the

23 answer was going to be.

24          So I don't think this witness can answer

25 those particular questions, counsel.

Vernon Hacker – Voir Dire Examination

1          MR. WHITE:  Your Honor, can I just explore

2   one thing?

3          THE COURT:  Yes, sir.

4          MR. WHITE:  The only thing I would ask is

5   there was a statement at the very end that discusses

6   the effect that that event had on the Assistant Chief

7   Roberts and if -- if Assistant Chief Roberts, if he is

8   aware of what that effect was and the basis that on

9   his own personal knowledge, I would like to be able to

10  ask about that.

11         THE COURT:  Why don't you voir dire him at

12  this point.

13         MR. WHITE:  Thank you.

14                   – – –

15               VOIR DIRE EXAMINATION

16  BY MR. WHITE:

17  Q.  Mr. Hacker, have you got that in front of you?

18  A.  Yes, sir.

19  Q.  The very last -- I want to focus you towards the

20  very end of that paragraph.

21      There is a statement written there which

22  basically states the effect of having to return the

23  evidence to Mr. Nolan had on Mr. Roberts.  Do you see

24  that?

25  A.  In the same paragraph?

Vernon Hacker – Voir Dire Examination

1  Q.   Yes, sir.

2  A.   Yes, sir.

3  Q.   Is your knowledge of that based on something

4  Assistant Chief Roberts told you or is that something

5  that you are speculating about or is that something

6  somebody else told you Mr. Roberts said?

7  A.   That would have been I think based upon what

8  Mr. Roberts told me.

9  Q.   Okay.

10        MR. WHITE:  Based on that, Your Honor, I

11  think he should be allowed to testify about that.

12        THE COURT:  What was the statement that he

13  made to you?

14        THE WITNESS:  About -- I hope I am

15  understanding what he is saying.

16        I am reading here in reference to Terry

17  Baker, is that what you are referring to?

18  BY MR. WHITE:

19  Q.   Yes, sir.

20  A.   About his being his cousin and trading stuff to

21  Mr. Curry?

22  Q.   Uh-huh.

23  A.   Yeah, I am just -- all I know about that is what

24  Todd told me.

25  Q.   And at the very end it says what Todd did in

Vernon Hacker – Voir Dire Examination

1  relation to Terry Baker trading some of his stuff.

2  A.   Along with Mr. Curry?

3  Q.   Yes.

4  A.   Yes.

5  Q.   And did Mr. Roberts tell you that?

6  A.   Oh, no.  I thought you was referring to --

7  Q.   Okay.

8  A.   -- with Terry, I knew about -- I mean, that's how

9  I knew about --

10  Q.   So the stuff about -- the stuff about providing

11  services, if you will, to Mr. Curry?

12  A.   No, he never did, he never did say nothing like

13  that to me.

14  Q.   You are just surmising that?

15  A.   Yes.

16        MR. WHITE:  All right, I will not go into

17  that, Your Honor, then.

18        THE COURT:  All right, counsel, anything to

19  take up outside the presence of the jury before we

20  give you your break?

21        I think we have about fifteen minutes left on

22  our break?

23        We will be in recess for the remainder of the

24  -- remainder of the time.

25        (Recess taken from 2:30 p.m. until 2:45 p.m.)

Vernon Hacker – Voir Dire Examination

1         (After recess.)

2         (The following proceedings were had out of

3  the presence and hearing of the jury.)

4         THE COURT:  Thank you.  The record will

5  reflect the jury is not present at this time.

6         I understand one of the attorneys had an

7  issue to bring up, Mr. Smith?

8         MR. SMITH:  Your Honor, I have had several

9  attorneys ask me about the next witness, what exhibits

10 we are going to be bringing.

11        And I don't know how long cross examination

12 is going to take of this last witness.

13        But if we do go this afternoon and go until

14 an hour, I was just going to inquire of the court

15 about how long we go because I do plan on starting

16 playing tapes and transcripts and those things with

17 the next witness.

18        And to get set up for that, Your Honor, it

19 will take between thirty minutes or plus to get

20 everything set up.

21        THE COURT:  I am hopeful we will go until

22 4:30 this afternoon.

23        I don't know of any weather problems we will

24 have before the end of the day today.

25        So I would like to go until at least that

Vernon Hacker – Voir Dire Examination

1  time this afternoon.

2          MR. SMITH:  Okay.

3          THE COURT:  I don't know how much longer this

4  witness will be on cross examination.

5          I suspect it will go a little while longer,

6  but if we need to take a break to set up any

7  equipment, we will certainly give you time to do that.

8          MR. SMITH:  There is significant background

9  such that I will need to get to that point.

10          So I appreciate the court's indulgence if we

11  do get there.

12          THE COURT:  You can just let me know at a

13  point that you want to take a break to do that, and we

14  will take that recess.

15          All right, let's see, Mr. White, I think we

16  were still with your questions?

17          MR. WHITE:  We were, and I still have a few

18  more.

19          THE COURT:  All right, why don't we have the

20  witness brought in first before the jury comes in, and

21  we will be ready to go.

22          Mr. Baldani, will you be questioning on

23  behalf of --

24          MR. BALDANI:  I will, yes.

25          THE COURT:  I will remind counsel before the

Vernon Hacker – Voir Dire Examination

1  jury comes in, if the attorneys could remember to

2  introduce themselves to the witnesses and who you

3  represent so the jury will know who -- where everyone

4  fits together in this.

5          MR. BALDANI:  Glad to, Judge.

6          THE COURT:  I'll try, I may forget to do

7  that.

8          From time to time, I will certainly recognize

9  you as representing various parties in the case.

10          But if I forget to do that, you may want to

11  do that yourself.

12          MR. BALDANI:  Thank you.

13          (Witness brought in the courtroom and took

14  the witness stand.)

15          THE COURT:  Need some water?  Sure.  Will you

16  get that?

17          THE MARSHAL:  Yes, sir.  Thank you, sir.

18          THE COURT:  You can bring the jury in.

19          (The jury resumed their places in the jury

20  box, and the following proceedings were had in open

21  court.)

22          THE COURT:  Thank you, and please be seated.

23  The record will once again reflect that all members of

24  the jury are present.  Parties and counsel are

25  present.

Vernon Hacker – Cross Examination

1         Mr. Hacker has returned to the witness stand,

2 and he is still under oath.

3         Let's see, Mr. White, you may continue your

4 questions on behalf of Mr. Jones.

5         MR. WHITE:  Yes, Your Honor.  Yes, sir, thank

6 you.

7                     – – –

8               CROSS EXAMINATION (Resumed)

9 BY MR. WHITE:

10 Q.  Mr. Hacker, I believe it's already in evidence as

11 PA14, your plea agreement.

12     I don't think you are going to need to refer to

13 it other than it appears that it was filed on November

14 20th, 2007; is that correct?

15 A.  Yes, sir.

16 Q.  And (sneezed) –– excuse me, I'm sorry about

17 that.

18     At any rate, as you testified on direct

19 examination, you pled to two counts of conspiracy to

20 distribute cocaine and to distribute Oxycodone or

21 Methadone which are Schedule II substances.

22     And cocaine, I believe, was 5 kilograms; is that

23 correct?

24 A.  Yes, sir.

25 Q.  And who were your co-conspirators that were ––

Vernon Hacker – Cross Examination

1 that you were also convicted with?

2 A.   Well, I know Mr. Todd Roberts was one of them,

3 Bobby Joe Curry.

4 Q.   Okay.

5 A.   And --

6 Q.   That's what I show on here.  And then how long

7 were you sentenced to, do you recall?

8 A.   One hundred twenty months.

9 Q.   And what's your serve-out date?

10 A.   June the 15th, 2015.

11 Q.   Thank you, sir.

12        MR. WHITE:  Your Honor, those are all the

13 questions I have.

14        THE COURT:  All right, thank you.

15        Let's see, Mr. Abell, on behalf of

16 Mr. Stivers.

17        MR. ABELL:  Thank you.

18                  - - -

19              CROSS EXAMINATION

20 BY MR. ABELL:

21 Q.   Mr. Hacker, my name's Robert Abell, and I

22 represent Bill Stivers in this case.

23 A.   Yes, sir.

24 Q.   In the 2002 clerk's race, you were very much a

25 supporter of Jennings White?

Vernon Hacker – Cross Examination

1  A.   Yes, sir.

2  Q.   Mr. Stivers, on the other hand, was very much a

3  supporter of his opponent, Freddy Thompson?

4  A.   Yes, sir.

5  Q.   It would be fair to say that the supporters of

6  Mr. Thompson and the supporters of Mr. White were very

7  much at cross purposes?

8  A.   I didn't hear what you said there.

9  Q.   The White supporters and the Thompson supporters

10 were very much at cross purposes in the 2002 election.

11 A.   I really don't agree with that because I

12 continued to be friends with his brother, associated

13 with his brother on a daily basis; and various people

14 know we weren't at odds with one another or anything

15 like that.

16 Q.   One question, the supporters of Mr. Thompson were

17 trying to get him elected and get Jennings White out

18 of office, correct?

19 A.   I can agree with that, yes, sir.

20          MR. ABELL:  Thank you.

21          THE COURT:  Thank you.

22          Mr. Baldani.

23          MR. BALDANI:  Thanks, Judge.

24                    – – –

25

Vernon Hacker – Cross Examination

1                    CROSS EXAMINATION

2  BY MR. BALDANI:

3  Q.   Mr. Hacker, I am Russ Baldani, and I am one of

4  Freddy Thompson's attorneys.  We have never spoken,

5  have we?

6  A.   No, sir.

7  Q.   I want to ask you just a handful of questions

8  about Todd Roberts, and then I'll move on, okay?

9  A.   Okay.

10 Q.   Did it appear to you from watching Mr. Roberts

11 and Bobby Joe Curry interact, did they appear to be

12 friends?

13 A.   When they were around one another, they would

14 speak, yes, and they was friends, I would have to say

15 that.

16 Q.   And it would be fair to say that Bobby Joe Curry

17 frequently rode around with Todd Roberts in Officer

18 Roberts's police cruiser, wouldn't it?

19 A.   I do know of a few incidents that he did.

20 Q.   And Bobby Joe Curry, who we have all acknowledged

21 or who has been acknowledged as a pretty notorious

22 drug dealer, he arranged for some of his drug-using

23 female clients, if you will, to perform like strip

24 acts for Officer Roberts, didn't he?

25 A.   I know of one incident.

Vernon Hacker – Cross Examination

1 Q.   You know of at least one?

2 A.   Yes, sir.

3 Q.   And we are talking about young girls that were

4 probably hooked on drugs that were buying drugs from

5 Curry, right?  From Curry.

6 A.   That I really can't say what they were doing, but

7 I know of an incident where they stripped.

8 Q.   Okay, and did you get the impression Curry was

9 giving them drugs to dance for Officer Roberts?

10 A.   I would have to say so.

11 Q.   You were present on several occasions in which

12 Curry sold guns to Officer Roberts, right?

13 A.   I know of one.

14 Q.   Okay, and you have your plea agreement up there,

15 don't you?

16 A.   No, sir, I don't.

17 Q.   You don't have it any more?

18       MR. BALDANI:  Judge, could we get PA14 to the

19 witness?

20       THE COURT:  Yes, sir.

21 BY MR. BALDANI:

22 Q.   Mr. Hacker, I am not trying to trip you up.  I

23 just want to refer you to your plea agreement.

24     If you could look over at page 3 of 7, if you

25 would, please.  Are you with me on page 3?

Vernon Hacker – Cross Examination

1 A.   Yes, sir.

2 Q.   And if you would look down at the bottom of D,

3 paragraph D.

4      And first of all, this is your agreement that you

5 signed when you pled guilty, right?

6 A.   Yes, sir.

7 Q.   And when you go into court and plead guilty, the

8 judge asks you something to the effect of have you

9 read it and is it true, right?

10 A.   Yes, sir.

11 Q.   Something like that.

12 A.   Uh-huh.

13 Q.   And basically in your plea agreement it says that

14 approximately 25 to 30 firearms were sold to Hacker

15 and Roberts by Curry, right?

16 A.   Yes, sir.

17 Q.   Did that happen?

18 A.   Yes, sir, I signed this plea agreement, yes, sir.

19 Q.   Well, I know you signed it, but I mean, did that

20 happen?

21      Twenty-five or 30 guns were sold by the drug

22 dealer to either Roberts or yourself?

23 A.   I would say if it's in there, that was correct; I

24 signed it.

25 Q.   All right.  And to your knowledge, Mr. Hacker,

Vernon Hacker – Cross Examination

1 did Todd Roberts ever tip off Curry that there was

2 about to be a raid at his place?

3 A.   I can't say for sure that he did.  I know the

4 accusation was made and he, I think, as far as I know,

5 he may have admitted to it, I don't know.

6 Q.   Okay, I am mainly asking you what or what you

7 know of from your observation, because you were pretty

8 close to Todd and you worked -- you knew him since he

9 was a kid, and you worked side by side with him,

10 right?

11 A.   Yes, sir.

12 Q.   Did you get the impression that Officer Roberts

13 was protecting Curry?

14 A.   I think when the incident there, he had

15 threatened Todd and he threatened me too, I mean,

16 about -- because, you know, after the burning of the

17 house.

18     But I would say that he could have done some

19 things that wasn't appropriate.

20 Q.   Yeah, so what you were talking about is Curry

21 threatened you guys, "Hey" -- or threatened Roberts,

22 "Hey, if you don't give me protection, I have got the

23 goods on you about burning down this house and I'll go

24 to the FBI with this."

25 A.   Could have been -- yes, sir.

Vernon Hacker – Cross Examination

1  Q.   Is that the gist of it?

2  A.   Yes, sir.

3  Q.   Enough about Roberts.  I want to shift over to

4  this '02 election, okay?

5  A.   Okay.

6  Q.   Just so we are clear, the big race in May of '02

7  obviously is Freddy Thompson versus Jennings White,

8  right?

9  A.   Yes, sir.

10  Q.   And we have already kind of talked about who is

11  on each side, correct?

12  A.   Yes, sir.

13  Q.   On the White side, it's Jennings White, Edd

14  Jordan, Barbara Jo Colter, Kennon White, Wanda White;

15  is that fair to say?

16  A.   Wanda White wasn't running for no office, but her

17  husband was.

18  Q.   But her husband was?

19  A.   Yes.

20  Q.   So obviously she would support her husband.

21  A.   Okay.

22  Q.   And Jennings White put up 75 grand in this

23  election.  Did you see that happen?

24  A.   Yes.  As far as seeing him put it in, the amount,

25  I didn't see that; I just know what he said.

Vernon Hacker – Cross Examination

1  Q.   Okay, and you and Jennings were pretty tight,

2  right?

3  A.   Oh, I was a friend of his, as far as being real

4  tight --

5  Q.   Well, that's what I meant.

6  A.   Yeah.

7  Q.   Friends for a long time?

8  A.   Yeah.

9  Q.   You don't know how much Edd Jordan put into that?

10 A.   No, sir, I don't.

11 Q.   But do you know that he put in money, right?

12 A.   Yes, he did.

13 Q.   And on top of putting in money to beat Freddy,

14 Jennings White, he also staged a shooting of his own

15 car, didn't he?

16 A.   That I don't know.  I know that his vehicle was

17 shot in.  I don't know who staged what.

18 Q.   So you don't know details?

19 A.   No, I don't.

20 Q.   I want to talk about the absentee voting that

21 went on in May of '02, okay?

22 A.   Okay.

23 Q.   And you were -- and the absentee voting takes

24 place at the county clerk's office, right?

25 A.   Yes, sir.

Vernon Hacker – Cross Examination

1  Q.   So obviously Jennings White's the county clerk at

2  that time, right?

3  A.   Yes.

4  Q.   So he is in there when all this absentee voting

5  was going on?

6  A.   Yes.

7  Q.   And of course, you know, Freddy Thompson isn't

8  the clerk yet, so he isn't anywhere around while that

9  absentee voting was going on, was he?

10  A.   No, Freddy wasn't there.

11  Q.   Not at all?

12  A.   I never did see Freddy there.

13  Q.   But of course that's in direct contrast to his

14  opponent, the clerk who works there, right?

15  A.   Yes.

16  Q.   All right, now I want to ask you about the actual

17  election of '02, not the absentee leading up but the

18  actual election.

19       You testified on direct about this setup,

20  basically an arrangement in which Bart Morris was

21  paying voters, right?

22  A.   Are you talking about in '02?

23  Q.   Yes.

24  A.   Yes, sir.

25  Q.   You told the jury about that during your direct

Vernon Hacker – Cross Examination

1 testimony?

2 A.   Uh-huh.

3 Q.   And just to be completely clear, Bart Morris,

4 according to you, was paying voters who had voted for

5 Jennings White, right?

6 A.   Are you speaking about in the May election?

7 Q.   Yes.

8 A.   Okay.

9 Q.   That's right?

10 A.   Yes.

11 Q.   So as far as you observed, as far as you know,

12 Bart Morris was not lying.  He was in direct

13 competition to Freddy Morris --

14 A.   Yes, he was.

15 Q.   I mean Freddy Thompson, right?

16 A.   As far as I know he was.

17 Q.   As far as you observed, you never saw him agree,

18 conspire, do anything with Freddy Thompson.  He is

19 opposed to him, correct?

20 A.   That's correct.

21 Q.   Okay, and you mentioned Bobby "Red" Sams.  He was

22 basically working both sides I think you said; is that

23 right?

24 A.   What I meant by that in November election, he

25 hauled voters in the city council race also.

Vernon Hacker - Cross Examination

1        He would bring voters from East Manchester

2  precinct.

3  Q.    So he would essentially go wherever the money

4  was, right?

5  A.    Well, he -- yeah, in other words.

6  Q.    Let me ask you about this meeting in '02 that you

7  said was at Charles Stivers's house.

8        You said present at that meeting, you testified

9  present was Charles Stivers, Al Man Stivers, Judge

10 Maricle; is that right?

11 A.    Yeah, in the -- in there where they were talking

12 to me, the people present in there was Charles

13 Stivers, Wayne Jones, William Stivers, myself and

14 Judge Maricle was in the kitchen --

15 Q.    Okay.

16 A.    -- setting at a bar island.  He was never in

17 there when we were.

18 Q.    That -- that kind of --

19 A.    And Freddy, Freddy Thompson was there.

20 Q.    Are you certain Freddy was there?

21 A.    Yes, Freddy was there.

22 Q.    I am glad you explained that about Judge Maricle

23 being in another room because I am going to ask you in

24 a previous statement you hadn't mentioned Judge

25 Maricle being present.

Vernon Hacker – Cross Examination

1    And I think now that you have given an

2 explanation, is that because he was in another room?

3 A.   He was in the kitchen area.

4 Q.   Okay.  But just to be perfectly clear, and you

5 told the jury how you feel --

6        MR. SMITH:  Your Honor, I am going to object

7 again to counsel referring to prior testimony in his

8 questioning of the witness.

9        THE COURT:  All right.  Sustain.

10        MR. BALDANI:  I didn't -- okay, that's fine,

11 Judge.

12 BY MR. BALDANI:

13 Q.   Just to be clear, at that meeting, when you were

14 asked to support Freddy Thompson, Freddy Thompson

15 didn't offer you any money to support him, did he,

16 Mr. Hacker?

17 A.   No, he didn't.

18 Q.   I mean, Freddy Thompson did not ask you to do

19 anything illegal or improper at that meeting, did he,

20 Mr. Hacker?

21 A.   No.  The only thing that was said to me at that

22 meeting was that if I didn't help Freddy, that I was

23 going to lose my bus driver's job.

24 Q.   That's what I was going to follow up with, but

25 Freddy is not the one who said that, did he?

Vernon Hacker - Cross Examination

1  A.   No, he didn't.

2  Q.   Freddy didn't threaten you.

3  A.   No, he didn't.

4  Q.   Didn't coerce you, right?

5  A.   No, he didn't.

6  Q.   I mean, you guys have known each other for years,

7  you basically --

8        MR. SMITH:  Your Honor, I am going to

9  object.  This has been asked and answered twice.

10        THE COURT:  All right, I'll let him finish

11  the question.

12  BY MR. BALDANI:

13  Q.   He essentially asked you as a friend to support

14  him, that's all he did at that meeting?

15  A.   Yes.

16  Q.   I am going to skip ahead.  Fall of '02 Freddy had

17  already won the primary, so he didn't -- the clerk's

18  race was a done deal by fall of '02, right?

19  A.   Yes, sir.

20  Q.   All right, Jennings's wife is still in the

21  clerk's office until probably the following January.

22      But Freddy Thompson wasn't involved in the fall

23  of '02, was he?

24  A.   No.

25  Q.   All right, and skipping ahead to '04.  Freddy was

Vernon Hacker – Cross Examination

1  unopposed in '04, wasn't he?

2  A.   Yes, sir.

3  Q.   So he wasn't in -- to your knowledge, you didn't

4  see him have any involvement in '04, did you?

5  A.   As far as involvement, no.

6  Q.   Okay.  And really the same in '06, I mean, you

7  testified about people getting scared, but Freddy was

8  unopposed in '06, true?  Isn't that true?

9  A.   In '06 I didn't have anything.

10  Q.   Yes, sir.

11  A.   I was not there during that election.

12  Q.   I forgot you said that.  But the bottom line is

13  in '02 you had a real dilemma because you had

14  supported Jennings White for all this time and you

15  were loyal to him, right?

16  A.   True.

17  Q.   But on the other hand, on the other hand, you had

18  nothing but positive feelings about Freddy Thompson,

19  right?

20  A.   None whatsoever.

21  Q.   Okay.  And I mean, in all fairness, Mr. Hacker,

22  you knew that Jennings, his dad and the people that

23  they were associated with were corrupt and dirty,

24  right?

25  A.   No, I am not going to say that.  I didn't know

Vernon Hacker - Cross Examination

1  that.

2  Q.   Well, I mean, you knew they were buying votes,

3  right?

4  A.   I know a lot of people buys votes, yeah.

5  Q.   Okay, you knew basically they were involved with

6  Edd Jordan and Todd Roberts who were protecting drug

7  dealers, right?

8  A.   I knew they were involved with them.

9  Q.   Okay.  And to your knowledge at that time, we are

10  talking '02, Freddy -- Freddy wasn't involved with any

11  drug dealers, was he?

12  A.   I never known of Freddy to be involved in any

13  drugs at all.

14  Q.   Never known him to smoke a joint or touch a drug,

15  right?

16  A.   I can't say that I have ever known him to do

17  anything like that.

18  Q.   Never known him to ride in limos or hang --

19         MR. SMITH:  Your Honor, I am going to

20  object.  This is not appropriate for this witness to

21  testify.

22         THE COURT:  Sustain.

23  BY MR. BALDANI:

24  Q.   Okay, let me ask it this way.  Leading into '02,

25  if -- Freddy wasn't from a politically powerful

Vernon Hacker – Cross Examination

1  family, right?

2  A.    No.

3  Q.    He was a guy whose dad had a hardware store in

4  town, right?

5  A.    Yeah, Freddy ran a hardware store.

6  Q.    Right.  And the truth is when he took on Jennings

7  White, Freddy Thompson at that time, he was the

8  cleanest candidate to hit Clay County in your

9  lifetime?

10          MR. SMITH:  Objection, again, vouching for

11  the testimony and also the character.

12          THE COURT:  Sustain.

13  BY MR. BALDANI:

14  Q.    Did you know -- when he took on Jennings White,

15  did you know of anything, any political dirt, anything

16  improper he had been involved in up to that time?

17  A.    No, sir.

18          MR. BALDANI:  That's all, Your Honor.

19          THE COURT:  All right, thank you.

20          Mr. Gilbert?

21                        - - -

22                  CROSS EXAMINATION

23  BY MR. GILBERT:

24  Q.    Mr. Hacker, I am Jerry Gilbert.  I represent Bart

25  Morris.

Vernon Hacker - Cross Examination

1   A.   Yes, sir.

2   Q.   In the May primary election of 2002, you were

3   appointed by Jennings White as a special deputy to run

4   the early voting; is that correct?

5   A.   Yes, I was hired into his office.

6   Q.   Okay, and that was two weeks, ten days prior to

7   the election; is that correct?

8   A.   It was during the absentee voting period.  I

9   really don't know exactly when -- what day I took --

10  you know, started there, but they had already been

11  voting a few days.

12  Q.   All right, did you hold any type of position

13  during -- on election day?  Were you an election

14  officer?

15  A.   No, sir.

16  Q.   Now, in the fall election of 2002, did you hold

17  any type of an official position then?

18  A.   No, sir.

19  Q.   In May of 2004, you were an election officer of

20  that year, were you not?

21  A.   No, sir.

22  Q.   Did you hold any position in the fall election of

23  2004 --

24  A.   No, sir.

25  Q.   -- on election day?

Vernon Hacker – Cross Examination

1  A.   I could hold no -- as far as being an election

2  officer, I couldn't do that because I held a political

3  office.

4  Q.   And you were a candidate?

5  A.   Yes, sir.

6  Q.   But it's your testimony in May of 2004 you didn't

7  work the polls as an election officer in Manchester

8  precinct?

9  A.   No, sir.

10 Q.   Where is the Old Boone Boy factory?

11 A.   It's there in Manchester.

12 Q.   Is it up on Radio Hill?

13 A.   Yes.

14 Q.   Did you and Darnell pay voters at the Old Boone

15 Boy factory in 2004?

16 A.   Yes, we did.

17 Q.   The garage on -- at Bart Morris's house on Green

18 Street, did you frequent that garage?

19 A.   Yes, I did.

20 Q.   And would other people come there during the time

21 that you were there?

22 A.   Oh, yeah.

23 Q.   So it was kind of a hangout?

24 A.   Yes, sir.

25 Q.   And you testified that Bart would be working on

Vernon Hacker – Cross Examination

1  his race cars?

2  A.   Yeah.

3  Q.   And that you all would gather up?

4  A.   Yes, sir.

5  Q.   And that didn't happen just during the

6  election --

7  A.   That happened year round.

8  Q.   -- that happened daily?  Now, Bart never put up

9  or pooled any money, did he?

10 A.   As far as Bart putting money in himself?

11 Q.   Yes, sir.

12 A.   I don't think so.

13 Q.   Didn't put up any at the meeting at the old

14 courthouse?

15 A.   No, sir.

16 Q.   And he didn't put up any for the city council?

17 A.   No, sir.

18 Q.   Now, at that meeting that you described in 2002

19 at the old courthouse, Kennon White was there, too,

20 wasn't he?

21 A.   I really can't recall if he was there or not.  I

22 don't remember.

23 Q.   After the 2002 election, you said that you didn't

24 go over to the other side in the school board race

25 with Dobber Weaver?

Vernon Hacker – Cross Examination

1  A.   I supported Dobber Weaver.

2  Q.   All right, in the 2004 Barbara Colter?

3  A.   I was for Barbara Colter.

4  Q.   Did you ever support any of Doug Adams's

5  candidates?

6  A.   I really can't say that I did.

7  Q.   Okay, and the same thing goes for Bart Morris,

8  too?

9  A.   I don't think he did.

10  Q.   Now, you had met with the FBI and representatives

11  of the United States Attorney's Office on several

12  occasions, haven't you, Mr. Hacker?

13  A.   Met with them one time.

14  Q.   Met with them one time?  And when was that?

15  A.   Approximately -- are you referring to since I

16  have been in prison?

17  Q.   No, sir.  Yes, after you were sentenced.

18  A.   After sentencing?

19  Q.   Yes.

20  A.   I met with them one time.

21  Q.   And when was that?

22  A.   It was I want to say in September.

23  Q.   All right.  Of this year, of last year?

24  A.   Of -- yes, sir.

25  Q.   Okay, and did you meet with them after you had

Vernon Hacker – Cross Examination

1 been -- entered a plea but not been sentenced in July

2 of '07?

3 A.   I could have, but I am not sure.   I --

4 Q.   Okay, and at that meeting, did you discuss the

5 elections?

6 A.   Yes.

7 Q.   And at that meeting, you didn't tell them about

8 any activities of Bart and Debbie Morris?

9 A.   I can't recall what was mentioned there at that

10 point in time, no basic details and questioning on

11 anything with me at that point in time.

12 Q.   Now, your plea agreement requires you to fully

13 cooperate with the government, doesn't it?

14 A.   Yes, it does.

15          MR. GILBERT:   That's all.

16          THE COURT:   Thank you, Mr. Gilbert.

17          Miss Hughes?

18                    - - -

19               CROSS EXAMINATION

20 BY MS. HUGHES:

21 Q.   Mr. Hacker, my name's Elizabeth Hughes, and I

22 represent Debbie Morris.

23     Isn't it true, sir, that Bart and Debbie Morris

24 weren't even married in 2002?

25 A.   I really don't know.

Vernon Hacker – Cross Examination

1  Q.   You made a reference during your testimony to

2  their employees, referring to Bart and Debbie's.

3       Isn't it true that you have no knowledge of who

4  owns that -- that business, B&J?

5  A.   Well, I just assumed that it's Bart's.  When I

6  said that, you know, I just knew they worked for

7  Bart.  I don't know who owns it.

8  Q.   You don't have any reason to believe Debbie owns

9  it?  She is just married to Bart, right?

10 A.   Yes.

11 Q.   And Bart owned that business a long time before

12 he married Debbie, didn't he?

13 A.   Oh, yes.

14 Q.   Do you know what Debbie does for a living?

15 A.   She is a beautician.

16 Q.   She has a shop in Manchester, right?

17 A.   Yes, she does.

18 Q.   And she had that shop a long time before she

19 married Bart, too, didn't she?

20 A.   I really don't know when they married, but I know

21 she's had her shop awhile.

22 Q.   Isn't it true, sir, Bart and Debbie Morris were

23 not even in town the day of the election in May of

24 2004?

25 A.   We worked out of Bart's house in 2004.

Vernon Hacker – Cross Examination

1  Q.   I understand that, but isn't it true that Bart

2  and Debbie were not there, may 2004?

3  A.   That I -- I think they were.  I think they were.

4  Q.   Okay.  But you are not sure.

5  A.   Yeah, I am sure they were.

6  Q.   Oh, you are positive?

7  A.   Well, I think so.

8  Q.   Okay.  Thank you.

9  A.   That's -- I think they were.

10  Q.   Thank you.

11  A.   All right.

12          THE COURT:  Mr. Simons?

13          MR. SIMONS:  I think I am going to use the

14  podium, Your Honor.

15          THE COURT:  That would be fine, yes, sir.

16                  - - -

17              CROSS EXAMINATION

18  BY MR. SIMONS:

19  Q.   Mr. Hacker, my name is Dan Simons, and I

20  represent Stanley Bowling.

21      I came up here to where I can see you a little

22  better, and I am going to try to be quite brief with

23  you, okay?

24  A.   Yes.

25  Q.   I think you said that in the '02 election the

Vernon Hacker - Cross Examination

1  Jennings White folks didn't use vote haulers, that

2  people just walked in off the street.  Is that what

3  you said in May of '02?

4  A.  No, I said in the -- at the courthouse there the

5  majority of them, they came into the clerk's office to

6  vote.

7  Q.  During the absentee period, is that what you are

8  saying?

9  A.  Yes, uh-huh.

10  Q.  Okay, and then on election day in May of '02, you

11  said Bobby "Red" Sams was bringing in voters and he

12  was doing that for the Freddy Thompson side?

13  A.  Yes.

14  Q.  Now, in May of '02 -- and then I am just going to

15  say also in the fall of '02 -- well, let me stick to

16  May, we'll just go one at a time.

17      Wanda White and Kennon White were right in the

18  thick of things, weren't they?

19  A.  Yes.

20  Q.  I mean, Wanda White was buying votes, hauling

21  voters in support of Kennon all along?

22  A.  As far as knowing that Wanda bought a vote, I

23  can't say that.

24  Q.  Okay.

25  A.  But I do know she hauled voters.

Vernon Hacker – Cross Examination

1  Q.   Okay.  Now, you mentioned some voter assistance

2  forms earlier.

3       And when people came in that had a disability or

4  that needed help, they could be assisted.

5       And a lot of people you said indicated that they

6  had trouble reading.

7  A.   Yes.

8  Q.   Okay.  Is -- is it true that in Clay County there

9  are a number of elderly voters who have trouble

10 reading?

11 A.   I would say so.

12 Q.   Okay, so it wouldn't be unusual that some people

13 would actually need and require assistance to place a

14 vote?

15 A.   Right.

16 Q.   Okay.  Now, I am concerned about my client,

17 Stanley Bowling, and he ran in '02.

18      He entered politics that year, and his first race

19 was May of '02.

20      And Stanley ran in what's called a district two,

21 and there are only three precincts there, there is

22 Harts Branch.

23 A.   Big Creek.

24 Q.   Big Creek and Greenbriar.

25 A.   And Greenbriar.

Vernon Hacker - Cross Examination

1  Q.   And you weren't at any of those, were you?

2  A.   No, sir.

3  Q.   You didn't see a dollar paid to anybody, did you?

4  A.   No, sir.

5  Q.   Didn't see anybody do anything tricky with the

6  machines or anything like that at any of those

7  precincts?

8  A.   No, sir.

9  Q.   Okay, fair enough.  Now, you mentioned a meeting

10  where I think at the old courthouse in Garrard --

11  Mr. Gilbert asked you about that meeting.

12      Stanley didn't put up any money at that meeting,

13  did he?

14  A.   I didn't see who put up what.  I just know that

15  the only person that I can say that I know I heard was

16  out of his mouth, yes.

17  Q.   Was Jennings White?

18  A.   And he just said he put in his and Judge

19  Garrison's.

20  Q.   My point is you didn't see Stanley put up any

21  money at that meeting, and you didn't see him leave

22  with any money, correct?

23  A.   No, I didn't.

24  Q.   You are agreeing with me you did not see any of

25  those two things?

Vernon Hacker – Cross Examination

1  A.   No, I did not.

2  Q.   Thank you.  Now, would you agree with me that --

3  I think you have already said this, I don't want to

4  repeat it.

5      But if you were for Jennings White in that

6  election, you weren't for the Freddy Thompson's side

7  of the election; would that not be true?

8  A.   There was people on Freddy Thompson's side that I

9  was for.

10  Q.   Okay.

11  A.   Only person that I ever said that I was not for

12  was Freddy, and I was for Jennings.

13  Q.   Okay.

14  A.   There was people, you know --

15  Q.   Okay.

16  A.   -- who I was for, I was for.

17  Q.   I understand.  So you voted independently,

18  correct?

19  A.   I voted the way I felt I wanted to vote.

20  Q.   Thank you.  Now, in the 2002 fall election,

21  Stanley won the primary in those three little

22  precincts, he was victorious?

23  A.   Yes, he was.

24  Q.   And he ran in the fall.  Do you know who his

25  opposition was in the fall?

Vernon Hacker – Redirect Examination

1  A.   I can't even remember.

2  Q.   Would it refresh your memory -- well, do you know

3  whether it was Wayne Jones's brother Brandon?

4  A.   I was thinking it was Wayne or his brother.  But

5  I wasn't sure, that's why I said it was one of them

6  two.

7  Q.   Okay.  Now, in 2004 Stanley didn't run for

8  anything, and he wasn't involved in any election

9  activity as far as you know; would that be a correct

10 statement?

11 A.   He didn't run for any office, yes, sir.

12 Q.   Okay, and in 2006 you don't know because you

13 weren't involved in the election?

14 A.   No, sir, I was not involved in the election.

15 Q.   So you don't know of anything Stanley Bowling

16 might have done in 2006; is that fair?

17 A.   That's fair.

18          MR. SIMONS:  Thank you, that's all.

19          THE COURT:  Thank you, Mr. Simons.

20          Mr. Smith, redirect?

21                       - - -

22              REDIRECT EXAMINATION

23 BY MR. SMITH:

24 Q.   Now, Mr. Hacker, you mentioned -- or it was

25 mentioned to you a meeting that was called together

Vernon Hacker - Redirect Examination

1 there where Bart Morris and Stanley Bowling and

2 Jennings White and James Garrison and Edd Jordan were

3 present; do you remember that?

4 A.   Yes, I do.

5 Q.   Was there any money handed out at that meeting?

6 A.   They was -- yes, there was money put together

7 there.

8 Q.   Okay, what --

9 A.   The people that was running for office went into

10 a room themselves.

11 Q.   All right.

12 A.   And the money was put together and then brought

13 out and distributed to different people there at that

14 precinct that came there that day to get the money.

15     And I was not there when everybody came.  The

16 only people I can vouch for was myself and Bart

17 Morris.

18 Q.   You mentioned Stanley Bowling, was he there?

19 A.   Yes, he was.

20 Q.   And were these two there when this money was

21 accumulated as you have just described?

22 A.   Yes, yes.

23 Q.   Okay, so they had full knowledge there was money

24 being pooled together?

25 A.   Oh, yes.

Vernon Hacker – Redirect Examination

1  Q.   Now, you were asked by Ms. Morris's counsel about

2  the presence or absence of the Morrises on election

3  day.  You talked about this being the headquarters.

4  A.   Yes.

5  Q.   And during the day on election day, was there

6  coming and going between you and others that were

7  there at headquarters?

8  A.   Yes, there was.

9  Q.   Were there times during election cycles when

10  headquarters decided that maybe there might be a need

11  to be more protective of what was going on and maybe

12  try to conceal some of the things that were going on

13  at headquarters?

14  A.   There was one particular time, there was an

15  unmarked car, I think it might have been someone from

16  the state, I am not sure; and everybody broke and ran.

17      Then we disbursed from there, and we did go to

18  Boone Boy factory.

19  Q.   Okay, and so this was a place that was a new

20  place that you hadn't used before.

21  A.   No, we hadn't used it.

22  Q.   Right.  Were there any other places that you

23  recall that headquarters had to move out when they

24  thought police were in town?

25  A.   Yes.

Vernon Hacker – Redirect Examination

1  Q.    Where was that?

2  A.    We went into the Y hollow.

3  Q.    And what's the Y hollow?

4  A.    It's an old coal temple.  Property.

5  Q.    Okay, and what do you recall about the old Y

6  hollow where the coal temple was?

7  A.    Well, we set up there and worked out of it.

8  Q.    What did you set up in?

9  A.    Motor home.

10  Q.    Whose motor home?

11  A.    Bart Morris's.

12  Q.    And you were also asked by counsel, I believe,

13  for Bart Morris about your interviews with the FBI.

14  Do you remember those questions?

15  A.    Yes.

16  Q.    And at the time that you were asked about that,

17  you were asked about whether or not you were

18  specifically mentioning the details of the election.

19  Do you remember those questions?

20  A.    Yes.

21  Q.    What was the FBI interested in learning at that

22  point to your recollection?

23            MR. WHITE:  Objection, speculation on motives

24  of the FBI, Your Honor.

25            MR. SMITH:  Let me rephrase the question.

Vernon Hacker - Redirect Examination

1          THE COURT:  Yes, I'll sustain it.  You can

2  rephrase it.

3  BY MR. SMITH:

4  Q.  Had your codefendants, Todd Roberts and others,

5  pled guilty at the time that you first talked with the

6  FBI?

7  A.  I think they had.

8  Q.  You think they had?  And had Mayor White been

9  convicted?

10  A.  I think so.

11  Q.  And were there other unindicted people that the

12  FBI were asking you about?

13  A.  Yes.

14  Q.  And did it involve, in your recollection, drugs

15  and corruption?

16  A.  Yes, it did.

17  Q.  And when you were later interviewed, that was,

18  you believe, September, this past year?

19  A.  Yeah, I couldn't remember the exact time, but I

20  was thinking that might have been when it was.  I

21  wasn't sure.

22  Q.  And your understanding at that point was the

23  interest was the discussing these elections in 2002,

24  '4, '6?

25  A.  Right.

Vernon Hacker - Redirect Examination

1  Q.   Now, you were asked about -- several things about

2  who was aligned with Mr. Adams.

3       And I think you had testified earlier on direct,

4  I believe, that he gave you $500 for Jeff Deaton?

5  A.   Yes.

6  Q.   So did you take that money and double cross him?

7  A.   Jeff Deaton?

8  Q.   Yes, sir.

9  A.   No, I was for Jeff Deaton.

10 Q.   So when you were helping Jeff Deaton you were

11 helping Doug Adams?

12 A.   Yes, sir, I was.

13 Q.   Okay.  And that wasn't in '02, was it, that was

14 in '04?

15 A.   That was in '04.

16 Q.   So the activities that began in '02 with Freddy

17 Thompson continued in '04 by Doug Adams with regard to

18 Jeff Deaton?

19 A.   Yes, sir.

20          MR. WHITE:  Objection, Your Honor.

21          THE COURT:  Overruled.

22 BY MR. SMITH:

23 Q.   You were also asked about these legitimate vote

24 haulers in Clay County.

25      Can you name me a legitimate vote hauler in Clay

Vernon Hacker – Redirect Examination

1 County who did not know the person they were picking

2 up were selling their vote?

3 A.   I'll be honest with you, I cannot.

4 Q.   All right.  And that would not be a legitimate

5 vote hauler, would it, Mr. Hacker?

6 A.   No, sir.  We paid the vote haulers $10 for every

7 voter, some five and some ten for every voter they

8 would bring.

9 Q.   That was paid out here at headquarters where Bart

10 and Debbie was operating?

11 A.   Yes, it was, we would pay them at the end of the

12 day.

13 Q.   Now, those strip acts that you were talking

14 about, that you were asked about, do you remember

15 those questions?

16 A.   Yes.

17 Q.   Let me ask you, these strip acts were asked about

18 Todd Roberts.

19     Were there other public officials there that this

20 was done for?

21 A.   Yes, there was.

22 Q.   Who were they?

23 A.   Mayor Daugh K. White, Johnny Poss Gregory, he was

24 a magistrate at that time, he was there, I was there.

25     And as far as I know, at that point in time that

Vernon Hacker - Redirect Examination

1  was it.  There was other people there.

2  Q.  You don't recall who they are?

3  A.  No.

4  Q.  Who all were there?

5  A.  No, there was a lot of people.

6  Q.  But public officials were there?

7  A.  Yes.

8  Q.  Where was this gathering held?

9  A.  It was there at Bobby Joe's car lot there in

10 town.

11 Q.  Downtown Manchester?

12 A.  Downtown Manchester.

13 Q.  Now, you were also asked, I believe, by counsel

14 for Mr. Adams about this Ronnie Hacker who was the

15 school bus transportation director?

16 A.  Yes.

17 Q.  Is he related to Doug Adams?

18 A.  I don't think he is.  He was a relative to Mr. --

19 Judge Maricle.

20 Q.  Okay, how is he related to Judge Maricle?

21 A.  I think they were maybe first cousins, I am not

22 sure.

23 Q.  Okay.

24       MR. SMITH:  If I may have one second,

25 Your Honor.

Vernon Hacker – Redirect Examination

1          THE COURT:  Yes, sir.

2          (Mr. Smith conferring with Mr. Parman.)

3          MR. SMITH:  Pass the witness.

4          THE COURT:  Thank you.  I will go around

5  again, see if anyone has any recross.

6          Mr. Hoskins?

7          MR. HOSKINS:  No further questions, Your

8  Honor.

9          THE COURT:  All right, thank you.

10          Mr. Bayer?

11          MR. BAYER:  Nothing further, Your Honor.

12          THE COURT:  All right, Mr. White?

13          MR. WHITE:  Nothing further, Your Honor.

14          THE COURT:  Mr. Abell?

15          MR. ABELL:  Nothing further, Judge.

16          THE COURT:  Anyone else, Mr. Baldani,

17  Mr. Gilbert, Miss Hughes, Mr. Simons?

18          MR. GILBERT:  No, Your Honor.

19          THE COURT:  All right.  Thank you, you may

20  step down.

21          MR. WHITE:  Your Honor?

22          THE COURT:  Yes, sir.

23          MR. WHITE:  Could we briefly approach while

24  they are working out the next witness?

25          THE COURT:  Yes, sir, you may come on up.

Vernon Hacker - Redirect Examination

1          (Thereupon, a discussion was had between the

2    Court and counsel at the bench and out of the hearing

3    of the jury.)

4          MR. WHITE:  Your Honor --

5          THE COURT:  Mr. White?

6          MR. WHITE:  Thank you, Your Honor.  The only

7    thing I wanted to ask is I am not sure what the

8    protocol is in terms of witnesses in custody that have

9    left.

10          I would like to keep him under perhaps

11   subpoena to allow me to make a motion to have the

12   transport order entered.

13          The only thing I would ask is that he had

14   indicated he had met with the FBI in September of

15   2009.  There is not a 302 for that.

16          The only thing I remembered from what

17   Mr. Smith said was that the November of 2009 notes,

18   which may well be he is confusing the dates.

19          But I understood those to be solely an

20   interview between Mr. Smith and this witness.

21          So in the event that a September '09 302

22   emerges when they are doing their Brady/Giglio/Jencks

23   re-review, if we could just bring him back.

24          THE COURT:  Well, let me see if it's been

25   completed with respect to Mr. Hacker first.

Vernon Hacker - Redirect Examination

1          Have you reviewed all files with respect to

2    Mr. Hacker for either 3500, 302, Brady or Giglio

3    follow-up review?

4          MR. SMITH:  Yes, I have, and I have advised

5    counsel -- I gave them copies of my notes and notes of

6    interviews occurring in November of '09.

7          This witness wasn't, of course, confronted on

8    that.  His recollection was it was in September.

9          I fail to see how that is an issue, but

10   obviously I will represent to the court that he is on

11   our writ; and I will not release him until this court

12   tells me to.

13         MR. WHITE:  That's fine.  The only reason I

14   brought it up was I understood you to say you

15   interviewed him in November, not the FBI.

16         MR. SMITH:  That is not correct.  I did say

17   that there was an agent present.  I did not remember

18   who the agent was.

19         MR. WHITE:  My misunderstanding.  I stand

20   corrected.  I'm sorry, Your Honor.

21         THE COURT:  It is my understanding that it's

22   the practice of AUSAs in the district not to interview

23   parties such as this without an agent present.

24         So I think we have pretty much exhausted this

25   issue, but he is not going to be released at this

Vernon Hacker – Redirect Examination

1    point.

2            MR. WHITE:  Thank you, Your Honor, I was

3    being overly cautious, Your Honor, I apologize.

4            THE COURT:  Mr. Smith, do you want to set up

5    before the next witness comes in or do you want to do

6    background questions?

7            MR. SMITH:  I am going to have probably

8    enough background to get us to --

9            THE COURT:  An hour?

10            MR. SMITH:  Probably.

11            THE COURT:  All right, what I will do is if

12    you get past 4:00, we will take a 30-minute break to

13    set up.  We will take a recess at 4:30.

14            MR. SMITH:  I really think we will be close

15    to 4:30 for me to get to that point, Your Honor --

16            THE COURT:  All right.

17            MR. SMITH:  -- based on the amount of

18    information I intend to cover with him.

19            THE COURT:  That will be fine.

20            MR. HOSKINS:  I learned at the break my

21    office had finally received that last certificate.

22            So I don't think I am going to need for

23    anything at 8:30.

24            THE COURT:  Well, I thought if I suggested

25    that counsel be here at 8:30 that might speed things

Vernon Hacker - Redirect Examination

1    along.  I thought so.

2            MR. HOSKINS:  Another thing, Your Honor, I am

3    a stranger in a strange land.

4            And it's my understanding we check the

5    Franklin County School closings, and if they are

6    closed we are on a two-hour delay?

7            THE COURT:  10:00 if they are closed, but the

8    clerk will have further -- if the weather is the way I

9    think it may be tomorrow, we may have longer than a

10   one-hour delay.

11           I think the current weather forecast is four

12   to six inches of snow between tonight and tomorrow

13   morning.

14           So the clerk will have further information in

15   the morning.

16           But we won't know that until we see what

17   tonight brings to us.

18           MR. RICHARDSON:  We are supposed to call the

19   jury line to find out --

20           THE COURT:  The clerk, I believe, has phone

21   numbers for everyone.

22           She has numbers for the jurors as well as the

23   attorneys, I have been told.

24           So we will check things early in the morning,

25   see how it looks.

D. Kennon White - Direct Examination

1            And if it's too bad, then we will have --
2    well, we will have further instructions.
3            We will just have to wait until tomorrow to
4    see how that turns out.  Thank you.
5            MR. PINALES:  Winter is here.
6            THE COURT:  Did you have anything further?
7            MR. PINALES:  No, thank you.
8            (End of bench conference.)
9            THE COURT:  All right, thank you, counsel.
10   And Mr. Smith, you may call your next witness.
11           MR. SMITH:  Thank you, Your Honor, United
12   States would call Kennon White.
13           THE CLERK:  Please raise your right hand.
14           (Witness sworn.)
15           THE CLERK:  Thank you.
16           THE COURT:  Thank you, Mr. Smith, you may
17   proceed.
18           MR. SMITH:  Thank you, Your Honor.
19                            - - -
20           D. KENNON WHITE, PLAINTIFF'S WITNESS, SWORN
21                   DIRECT EXAMINATION
22   BY MR. SMITH:
23   Q.  State your name, please.
24   A.  D. Kennon White.
25   Q.  And Mr. White, if you could, tell us where you

D. Kennon White – Direct Examination

1  were born.

2  A.   I was born in Lexington, Kentucky.

3  Q.   And where were you raised?

4  A.   Clay County.

5  Q.   When did you move to Clay County?

6  A.   All my life.  I have lived there from the time I

7  was born.

8  Q.   And who are your parents?

9  A.   Daugh K. White and Gayle C. White.

10 Q.   And does he sometimes answer to Doug White?

11 A.   Yes.

12 Q.   Are you married?

13 A.   Yes, I am.

14 Q.   And who are you married to?

15 A.   Wanda M. Craft's my wife.

16 Q.   And how long have you two been married?

17 A.   About twenty-three years.

18 Q.   You all have children?

19 A.   Yes, I do.

20 Q.   And how many children do you have?

21 A.   Two.

22 Q.   And what are their ages?

23 A.   Ages are twenty-three and sixteen.

24 Q.   Mr. White, where were you educated?

25 A.   At Clay County High School.

D. Kennon White - Direct Examination

1  Q.   And did you obtain a degree?

2  A.   Not a college degree, actually I have got a

3  G.E.D.

4  Q.   Okay.  And do you know about what year it was

5  that you left high school?

6  A.   Around 198-- late '86, beginning of '87.

7  Q.   And did you begin employment at someplace?

8  A.   Yes, I started work at White Chevrolet.

9  Q.   And if you could tell the members of the jury and

10 the court what the business of White Chevrolet was

11 involved in.

12 A.   It was the selling of new cars and used cars, and

13 I also had a parts department and a service

14 department.

15 Q.   And where is this business located?

16 A.   In Manchester, Kentucky.

17 Q.   And who owned the business?

18 A.   Daugh -- Doug White, my father and my uncle, Jack

19 White.

20 Q.   In what position did they employ you at first?

21 A.   Actually I started as -- working in cleaning up

22 the parts department and -- and washing cars some,

23 and --

24 Q.   How long did you serve in that position?

25 A.   Probably about a year.

D. Kennon White – Direct Examination

1 Q.   And then where did you go?

2 A.   I went to -- actually I started running parts

3 back and forth, and then I went into sales.

4 Q.   Okay.  Did you have a service manager while you

5 were working there?

6 A.   Yes.

7 Q.   And who was the service manager?

8 A.   Kenny Day.

9 Q.   And do you know how long he worked there?

10 A.   I don't know exactly, but he had been there many

11 years before I had started.

12 Q.   So how long did you work there at White Chevrolet

13 in sales?

14 A.   I worked in sales for around six years or better.

15 Q.   And were there many salespersons that were

16 employed by White Chevrolet?

17 A.   I think there was around maybe seven of us.

18 Q.   And did you move up in the organization at any

19 point beyond sales?

20 A.   Yeah, actually I went into -- I set in on

21 management meetings, and I worked in assistant sales

22 manager capacity for awhile.

23 Q.   And was that the last position that you held?

24 A.   Yes, it was.

25 Q.   Assistant sales manager?  And where did you go

D. Kennon White – Direct Examination

1  from there?

2  A.    I went and started my own business in White

3  Mobile Home in London, Kentucky.

4  Q.    And what was White Mobile Home engaged in?

5  A.    It was the selling of new manufactured homes.

6  Q.    Okay, and we are talking about manufactured

7  homes.  Are those commonly referred to as single-wide,

8  double-wides and --

9  A.    Yeah, single-wide, double-wides and used homes.

10  Q.    Okay, and where was this business located?

11  A.    It was located in London, Kentucky on 192, the

12  bypass.

13  Q.    About how far is London, Kentucky located from

14  Manchester, Mr. White?

15  A.    The lot was around I think 15, 16 miles,

16  something like that.

17        London's generally referred to as around 19 or 20

18  miles away.

19  Q.    And did you have a specific position such as

20  officer or manager that you held with the company?

21  A.    Yeah, I was president over the corporation for a

22  time.

23        My brother was also -- we kind of split that time

24  out.

25        He would take that position some, and I would

D. Kennon White – Direct Examination

1  take it some.

2  Q.   How many siblings do you have?

3  A.   I have three besides myself.

4  Q.   And you have mentioned a brother, is he younger

5  or older?

6  A.   He is younger.

7  Q.   And who are your other siblings?

8  A.   Pam Reecier and Karen Grubb.

9  Q.   And what are they involved in, businesswise?

10  A.   Okay, my sister runs a flooring -- she owns a

11  flooring business as interior decoration in London.

12  Q.   What's the name of that business?

13  A.   Reecier's.

14  Q.   Okay, and your other sister?

15  A.   She is a -- she teaches Home Ec.

16  Q.   And your other brother, what does he do?

17  A.   He is an attorney.

18  Q.   And where does he practice?

19  A.   In Manchester.

20  Q.   And you said he is younger than you?

21  A.   Yes.

22  Q.   How many years younger is he?

23  A.   Around five years.

24  Q.   So how long were you in business as White Mobile

25  Homes?

D. Kennon White - Direct Examination

1  A.   Around or about ten years.

2  Q.   Do you know about what year it was that that

3  business closed?

4  A.   We actually went out of business around 2004 to

5  the 2005 range.

6       We had some inventory, we closed the London

7  location, actually brought some inventory to

8  Manchester and sold it off there.

9  Q.   Did you have a business location in Manchester?

10 A.   No.

11 Q.   Okay.  And that was about 2004?

12 A.   Uh-huh.

13 Q.   Where did you seek employment next?

14 A.   I went to work for the City of Manchester.

15 Q.   And how did you or what position did you seek or

16 obtain there?

17 A.   My father hired me on as a city supervisor.

18 Q.   Okay, and was that a position that was existing

19 prior to the time you applied for it?

20 A.   Actually it was existing, but he -- he created

21 another one, another position.  He created the

22 position for me.

23 Q.   Okay.  And was there a resolution that was passed

24 among city council to endorse that position as a new

25 position within the city?

D. Kennon White – Direct Examination

1  A.   No.

2  Q.   How did your father accomplish that without

3  getting city council approval?

4  A.   He -- what I technically -- that was known as

5  city manager or city supervisor is what it was known

6  as.

7       Actually I was hired in that position, even

8  though that it was showing to be a regular position;

9  but that was the position it was referred to as.

10  Q.   So in other words he created a position?

11  A.   Yes, that's correct.

12  Q.   And this position was referring to you as what,

13  city manager or city supervisor?

14  A.   I have been referred to as both.

15  Q.   And what were your job duties?

16  A.   My job duties were to oversee the every day

17  run-ins of the City of Manchester and coordinate with

18  my father on a daily basis if possible to let him know

19  what was going on.

20  Q.   How long did you hold that position?

21  A.   I held that position to I think it was the first

22  of January in 2007.

23  Q.   And what happened in January of 2007?

24  A.   There was a new administration took over, and I

25  ended up leaving that job.

D. Kennon White – Direct Examination

1  Q.   And who defeated your father as mayor?

2  A.   Carmen Lewis.

3  Q.   And has that position that your father created

4  for you been refilled by the new mayor?

5  A.   Not to my knowledge.

6  Q.   What kind of jobs have you held since then?

7  A.   I work as a customer sales rep at Senture.

8  Q.   And what kind of business does Senture operate?

9  A.   They operate, they do different contracts, it's

10 basically a call center.  I am a customer service rep.

11 at a call center.

12 Q.   And how long have you been working at this call

13 center?

14 A.   I have been there several -- well, without being

15 laid off, I have been there about probably eighteen or

16 twenty months.  However, I have not worked a couple of

17 those months.

18 Q.   Now, we are moving on.  You had indicated that

19 you had left the City of Manchester there in '06.

20      Was there an investigation that began sometime

21 around that time that you would be aware of?

22 A.   Yes.

23 Q.   And were there some indictments of some people

24 that you are related to?

25 A.   Yes, there was.

D. Kennon White – Direct Examination

1  Q.   And can you describe generally who that was?

2  A.   It was my father.  He was the mayor there, Doug

3  White.

4  Q.   And do you remember when it was that he got

5  indicted in 2006?

6  A.   Okay, no, I really don't remember the exact date.

7  Q.   Okay.  And of course your involvement also came

8  under question.

9  A.   That's true.

10 Q.   And you were brought into Federal Court at some

11 point?

12 A.   Yes, that's correct.

13 Q.   And I would like to hand to you what's previously

14 been marked P81.

15          MR. WHITE:  What exhibit?

16          MR. SMITH:  P81.  Hand this to the witness,

17 please.

18 BY MR. SMITH:

19 Q.   Can you identify that, Mr. White?

20 A.   Yes, that's my plea agreement.

21 Q.   And I would like to refer you to page 6.  Do you

22 recognize your signature on page 6?

23 A.   I do.

24 Q.   What date did you sign that, Mr. White?

25 A.   On 4-27-07.

D. Kennon White – Direct Examination

1  Q.   4-27, 2007?

2  A.   Uh-huh.

3  Q.   What did you plead guilty to, Mr. White?

4  A.   I pled guilty to mail fraud and extortion.

5  Q.   And what judge did you take -- enter that plea in

6  front of?

7  A.   Judge Reeves.

8  Q.   And in the plea agreement itself, did you agree

9  to cooperate fully with the United States and testify

10 truthfully if called as a witness?

11 A.   I did.

12 Q.   And did the government make you any promises, a

13 certain sentence or benefit for your cooperation?

14 A.   No, not -- not --

15 Q.   If your sentence is to be reduced, whose -- to

16 your understanding, who is to make a decision as to

17 whether you get a reduction in your sentence?

18 A.   It would be the judge.

19 Q.   Have you been sentenced yet?

20 A.   No, I have not.

21 Q.   Do you know when your sentencing is scheduled?

22 A.   I don't know the exact date, I think it's in the

23 middle of March.

24 Q.   Of 2010?

25 A.   Yes.

D. Kennon White – Direct Examination

1  Q.   And can you explain to us why you have not been

2  sentenced before now?

3  A.   Because of my assistance in this investigation.

4  Q.   Now, Mr. White, what's your understanding under

5  the plea agreement would happen if you were to testify

6  untruthfully here today?

7  A.   That this plea agreement would be thrown out, and

8  I could be charged with other crimes as well as I

9  could get more time than I would be facing anyway.

10         MR. SMITH:   Move for the introduction of

11 Government's Exhibit P81, Your Honor.

12         THE COURT:   Any objection?

13         MR. WHITE:   No objection.

14         THE COURT:   This exhibit will be admitted.

15         (GOVERNMENT EXHIBIT NO. P81 ADMITTED INTO

16 EVIDENCE WITH NO OBJECTION)

17 BY MR. SMITH:

18 Q.   Now, Mr. White, growing up in Clay County, did

19 you get involved in -- in drugs in some way as a user

20 yourself?

21 A.   Yes, I did.

22 Q.   And could you explain to the court and the jury

23 how it was that you got involved in using drugs?

24 A.   I -- when I was growing up as a teenager is when

25 I first started using drugs.

D. Kennon White – Direct Examination

1    And -- and that carried on to a couple times I
2  had relapsed through the years.
3  Q.   What kinds of drugs were you using as a teenager,
4  Mr. White?
5  A.   I used -- started out using marijuana, and then I
6  used pills and cocaine.
7  Q.   And were you a daily user of drugs?
8  A.   Of marijuana, I was.
9  Q.   And you said there were a couple times when you
10  later relapsed?
11  A.   That's correct.
12  Q.   Explain to us what you mean by that?
13  A.   That means that I started using drugs again for a
14  brief period, well, for a period of a couple different
15  times.
16    Since that I turned around eighteen, I have used
17  -- used drugs probably a couple years, since that I
18  have turned eighteen.
19  Q.   Okay.  Well, did these occur in odd years apart
20  from each other, did they occur a couple years --
21  A.   They appeared two different times, one time
22  lasting around ten or twelve months; another time
23  lasting around the same.
24  Q.   Okay, let's talk about that.  The first time that
25  you say you got involved with drugs you say was about

D. Kennon White – Direct Examination

1 ten or twelve months.

2 A.   Uh-huh.

3 Q.   About how old were you?

4 A.   Around twenty-three.

5 Q.   Okay, and how old are you now?

6 A.   Forty-one.

7 Q.   So around twenty-three, what kind of drugs were

8 you using?

9 A.   Cocaine, marijuana.

10 Q.   And were these drugs you were using daily?

11 A.   I used them quite a bit.  I wouldn't say that I

12 used them daily.

13     But there would be times that I would use them

14 for three or four days consecutively.

15 Q.   And what quantities of that cocaine would you

16 use?

17 A.   I would use quite a bit.  When I would start, I

18 would probably use several hundred dollars' worth of

19 it before I stopped.

20 Q.   Do you know what quantity that several hundred

21 dollars would buy you during those time periods?

22 A.   Probably somewhere around anywhere from 4 to 7

23 grams.

24 Q.   Okay.  You said there was a second time that you

25 relapsed.  When was that?

D. Kennon White – Direct Examination

1  A.    Around twenty-nine, thirty.

2  Q.    Okay, and what drugs were you using at that time?

3  A.    I used cocaine.

4  Q.    And what quantities and frequency did you use

5  cocaine?

6  A.    About the same situation, I would use it maybe

7  three, four times a week.

8      Over the three- or four-day period, I would stay

9  on it four -- maybe three, four days at a time.

10  Q.    When was the last time you used drugs, Mr. White?

11  A.    It would have been whenever that I quit then,

12  around age thirty.

13  Q.    Okay, and how did you manage to stop using drugs

14  around the age of thirty?

15  A.    I went to drug counseling.

16  Q.    Where did you go to drug counseling?

17  A.    To Charter Ridge.

18  Q.    Now, the Whites -- your father was mayor, you

19  have explained.

20  A.    Uh-huh.

21  Q.    How long was your father mayor?

22  A.    I don't know the exact amount of years, but it

23  was over twenty-five.

24  Q.    And who was mayor before your father?

25  A.    My uncle.

D. Kennon White – Direct Examination

1 Q.   And what was your uncle's name?

2 A.   Jack Dale White.

3 Q.   And how long was he mayor?

4 A.   If memory serves me correctly, I think eight

5 years.

6 Q.   And who was mayor before him?

7 A.   I think Ernest Grise.

8 Q.   Okay.  So either your dad or your uncle have been

9 mayor of Manchester up until 2006, or over thirty

10 years.

11 A.   Yeah, my papaw was mayor for a period also.

12 Q.   Okay, and what was his name?

13 A.   Joe C. White.

14 Q.   And so he was mayor?

15 A.   Joe B. White, I'm sorry, excuse me, Joe B. White,

16 yes, sir.

17 Q.   And how long was he mayor of Manchester?

18 A.   I don't know.

19 Q.   Okay, but that would have been some years back?

20 A.   Yes, that was before my time.

21 Q.   Now, you are aware that vote buying goes on in

22 Clay County?

23 A.   Yes, I am.

24 Q.   When did you get involved in vote buying,

25 Mr. White?

D. Kennon White – Direct Examination

1  A.   First time I got involved in vote buying was –– I

2  had a relative running for state representative, and

3  one time prior to that, when my father had someone run

4  against him for mayor.  Homer Weaver ran against him

5  for mayor.

6  Q.   Okay, and do you remember about how many years

7  back that was, what year that occurred that you first

8  got involved?

9  A.   I think –– I don't know the exact year, but it

10  was I think in the late '80s when my dad had

11  competition for mayor, from Homer Weaver was the first

12  time.

13     And then the second time, first few times was

14  when I had a relative run.

15  Q.   Mr. White, I have got a little bit of a hearing

16  problem this afternoon, and I apologize.

17  A.   I'm sorry.

18  Q.   I am going to ask you to sit up just a little bit

19  closer to the mike.

20  A.   Okay, I apologize.

21  Q.   You were telling us about your first introduction

22  in the politics in Clay County being in the late '80s?

23  A.   Yes.

24  Q.   And who was running against your dad?

25  A.   Homer Weaver.

D. Kennon White – Direct Examination

1 Q.   Okay, and is he any relation to a fellow by the

2 name of Charles Dobber Weaver?

3 A.   Yes, that's his father.

4 Q.   Okay, and this was a race for what position?

5 A.   For mayor.

6 Q.   And tell us what you recall back in those days

7 that got you involved.

8 A.   Well, I -- there was some meetings held at White

9 Chevrolet.

10     And they were meetings between different

11 political people that arranged the vote buying in

12 those precincts, and there was money put up and it

13 organized there.

14 Q.   Okay, and do you recall any of the players,

15 persons that were involved?

16 A.   Yeah, I can remember Ralph Robinson, Penny

17 Robinson and George Saylor.

18     Of course there were several other people there,

19 I think Harvey Hensley was there.

20     And of course my uncle was there, Cletus was

21 there a time or two.

22 Q.   You are referring to Cletus, does he go by a last

23 name?

24 A.   Cletus Maricle.

25 Q.   Okay.  And do you see him here in the courtroom

D. Kennon White – Direct Examination

1 this afternoon?

2 A.  Yes, I do.

3 Q.  And would you point out where he is seated, what

4 he is wearing.

5 A.  He is seated -- yeah, he is seated right behind

6 the gentleman at the desk there.  Looks like he is the

7 second one over.

8          THE COURT:  The record will reflect the

9 witness has identified the defendant, Russell Cletus

10 Maricle.

11 BY MR. SMITH:

12 Q.  Now, you would have been relatively a young man

13 at this juncture, correct?

14 A.  Yes.

15 Q.  What was asked of you at that meeting or after

16 those meetings?

17 A.  Actually there wasn't a whole lot.  I put up

18 signs during that election.

19 Q.  Okay, and were you aware that they were

20 organizing for vote buying in that election?

21 A.  Yes, I was.

22 Q.  And how did you become aware that they were at

23 this stage in your life organizing for vote buying?

24 A.  Well, I didn't hear all the conversation, but I

25 knew that George Saylor had came back to the garage,

D. Kennon White – Direct Examination

1 which I call White Chevrolet the garage.

2    He had asked for 1,700 more dollars from my

3 father because he had -- had bought more votes and

4 owed people more money for their votes than what he

5 originally thought he was going to be able to buy.

6 Q.   Mr. White, when was the next election that you

7 got involved personally?

8 A.   I got involved when I had a relative run for

9 state representative.

10 Q.   And what was that relative's name?

11 A.   Barbara Colter.

12 Q.   And who was she running against?

13 A.   Stella House.

14 Q.   And was one of the other an incumbent at that

15 time?

16 A.   No.

17 Q.   So this was her first race --

18 A.   Yes.

19 Q.   -- for the office?  And tell us how it is that

20 you got involved in that particular election?

21 A.   At that time I worked, I just offered to help

22 her.

23    And Jennings White and myself helped to organize

24 that election and delivered money to numerous places

25 to buy votes with.

D. Kennon White – Direct Examination

1  Q.   When you say that you helped Jennings in

2  organizing, what do you mean?

3  A.   I mean we went to the people that distributed

4  money to the people that would sell their votes.

5       And he knew more about it, of course, than I did

6  at that time because I was new to the game.

7       But I rode along with him, and we delivered money

8  to a lot of different people that would buy votes.

9       A lot of times it was people that had family and

10 election booths that were officers, and they were just

11 the people that you had to take the money to to

12 purchase the votes.

13 Q.   So how many people did you and Jennings visit

14 during that election do you think to deliver money to

15 people who were in the election offices?

16 A.   We delivered money to probably at least 18 or 20

17 people.

18 Q.   And do you recall about how much money you were

19 giving to each?  Was it an equal amount or was it just

20 varied?

21 A.   He -- he knew the amount of votes that each

22 person could purchase.

23      And it was according to the amount of votes that

24 could be purchased from the person we was seeing.

25 Q.   What was the vote bringing?  In other words, what

D. Kennon White - Direct Examination

1 would it take to bribe a voter to vote in an election

2 back in that day?

3 A.   A lot of times $20 according to however fierce

4 the competition was.

5     It had some things to do with the magistrate

6 races at that time.

7     If there was heavy competition in one district,

8 votes may be bringing more in that particular

9 district, and you may have to put out $50.

10     You know, I have seen it go as high as $100 a

11 vote, and I have seen it bring as little as $20 a

12 vote.

13 Q.   What other organization did Jennings White reveal

14 to you in that first election that you were involved

15 in with Jennings White?

16 A.   Okay, he was the county court clerk at that

17 time.

18     He -- he revealed to me different political

19 players that, you know, as far as election officers,

20 different people in those precincts.

21     We met with Kenny Day and Cletus Maricle.  We

22 went and seen Doug Adams at the high school.  He was

23 principal at that time.

24     We went to Oneida and seen John Russell Brown

25 which was a school teacher at that time.

D. Kennon White - Direct Examination

1    We took money to Uncle -- his name was Uncle Bud

2  Smith, but I don't know what his real name is, maybe

3  Roger, I think.

4    We took money to -- there is a Bowling man on --

5  his name's slipping my mind at this time, his first

6  name.

7    But there is a Bowling that we took money to on

8  Big Creek.

9  Q.  Big Creek is a precinct, polling place as well?

10  A.  Yes, well, actually it's a precinct.  Doug

11  Bowling I think is who we delivered the money to over

12  there.

13  Q.  How much money did you take to Doug Adams?

14  A.  Around or about five to six thousand dollars.

15  Q.  Now, this election was you say between your aunt

16  and a lady by the name of Stella House?

17  A.  That's correct.

18  Q.  And what was the outcome of that election?

19  A.  My aunt won.

20  Q.  Now, for state representative, is it just for the

21  one county of Clay that the competition or the contest

22  that included?

23  A.  At that time, I don't remember what the exact

24  district, they redistricted that district several

25  times.

D. Kennon White - Direct Examination

1     And if I am not mistaken at that time, I think it

2 was part of Jackson County and Clay County.

3     And I don't remember whether Laurel County or

4 Lesley County was involved in that at the time.

5 Q.   Do you recall how much money was --

6          MR. WESTBERRY:  Judge, excuse me.  I

7 apologize for the interruption.

8          But an issue has come up, and may we be heard

9 at the side bar?

10          THE COURT:  Yes, sir.

11          MR. WESTBERRY:  We would just like to --

12          (Thereupon, a discussion was had at the bench

13 between the Court and counsel and out of the hearing

14 of the jury.)

15          THE COURT:  Yes, sir, Mr. Westberry.

16          MR. WESTBERRY:  Thank you, Judge.  Testimony

17 that was just elicited from Mr. Kennon White was that

18 in a time period, I'm assuming pre-1999, some five or

19 six thousand dollars was delivered by Jennings White

20 with this Mr. White present to Doug Adams.

21          We have looked at all of the Jencks, we have

22 looked at all of the Brady/Giglio disclosure that has

23 been given us to date.

24          In particular, we went back and refreshed our

25 memory on the 404(b) notice disclosure.

D. Kennon White - Direct Examination

1        I do not recall -- please correct me if I am
2  wrong -- any such testimony, information that has ever
3  been described in Jencks.

4        It certainly wouldn't be Brady/Giglio.  But
5  in particular any 404(b) disclosure, it caught us off
6  guard.

7        I think at best for -- for any evidentiary
8  purposes, it would have had to have been identified as
9  404(b).

10        THE COURT:  I admitted similar testimony, not
11  under 404(b) but as background evidence that was the
12  subject of the hearing that we had.

13        And because I considered it as background
14  evidence, there is not a requirement of notice that
15  you would -- that would be required under 404(b).

16        Of course, I don't know about whether this is
17  disclosed in discovery or not.

18        But that wouldn't prevent the United States
19  from introducing it as background evidence.

20        As a matter of fact, I just pulled out the
21  instruction that was given earlier in the case when
22  Mr. Day testified on background evidence.

23        I can give that same general instruction at
24  the end of the day before we break and before I excuse
25  the jury.

D. Kennon White – Direct Examination

1           At this point, the witness hasn't testified

2    about the time frame for that particular event --

3           MR. WESTBERRY:  Right.

4           THE COURT:  -- that he was describing.

5    Mr. Smith, would you like to respond briefly?

6           MR. SMITH:  I would just, again, considering

7    it is 404(b), I would argue to the court that

8    obviously the witness has explained the formation, his

9    entry into the conspiracy and how he got involved and

10   who was assisting him in his early involvement.

11          That is our position, Your Honor, that that's

12   background evidence.

13          That's not anything that would be subject to

14   the pretrial notice requirements of the 404(b).

15          And we would seek to further our questions

16   along this line.

17          THE COURT:  All right.  Go ahead,

18   Mr. Westberry.

19          MR. WESTBERRY:  I'm sorry, if I hear the

20   United States correctly, it sounds like an

21   acknowledgement that there has been no pretrial

22   disclosure regardless of how you characterize it as

23   404(b), res gestae, which of course is another way of

24   calling it background evidence or Jencks Act material,

25   I think -- if I am understanding that correctly from

D. Kennon White – Direct Examination

1 Mr. Smith, I think the question --

2          MR. SMITH:  Are you aware of the requirement

3 of me to give you background evidence?  Because I am

4 not aware of it.

5          MR. WESTBERRY:  We have an honest

6 disagreement as to whether it's res gestae.

7          And I respect the court's ruling, or whether

8 it would more properly be characterized as 404(b).

9          I say with great respect, I do think you have

10 to give us 404(b) disclosure in a timely fashion.

11          MR. SMITH:  Yes.

12          MR. WESTBERRY:  I am trying to make the best

13 record as quickly as I can.

14          THE COURT:  I understand.  Cut to the chase,

15 I think similar testimony was admissible what I have

16 referred to as background evidence, and I have given

17 several instructions to the jury at this point about

18 the use of background evidence.

19          Mr. Smith is correct that if the court

20 determines that it doesn't come in under 404(b).

21          If it is background evidence, then no notice

22 need be given.

23          The court conducted a hearing earlier in the

24 case out of an abundance of caution to make a

25 determination as to whether similar evidence was

D. Kennon White - Direct Examination

1  either background evidence or 404(b) evidence or both

2  or neither and made a determination that with the

3  exception of the videotape that was played earlier

4  that the type of testimony being offered would come

5  under background evidence and wouldn't be 404(b).

6          And the same ruling would apply to this

7  particular line of questions of the witness.

8          I can't answer the question about whether

9  this particular statement of this witness was included

10  in any Jencks material because obviously I haven't

11  reviewed any Jencks material in the case other than

12  what's come up at the various hearings.

13         So if requested, I will give the general

14  instruction on the use of background evidence at the

15  end of the day during the next twenty minutes before I

16  excuses the jury for the afternoon.

17         As to testimony that's been offered with

18  respect to Mr. Maricle and Mr. Adams, now,

19  Mr. Hoskins, if you and Mr. Pinales are requesting for

20  Mr. Maricle, I would only give it with respect to

21  Mr. Adams if he requested it.

22         So -- so we are clear, if you want me to give

23  that instruction, I'll certainly do that.

24         Would you like for me to review the general

25  instruction that I have given earlier on background

D. Kennon White - Direct Examination

1 evidence?

2          MR. WESTBERRY:  I would, Your Honor.

3          THE COURT:  I believe it's the first

4 paragraph.

5          It's not the lengthy instruction I gave the

6 first time it came up with respect to Mr. Day.

7          But it would be the first paragraph of the

8 instruction.

9          MR. WESTBERRY:  Right.  We will let you know.

10 We can nod or give you -- however you want to

11 proceed.

12          THE COURT:  All right.

13          MR. WESTBERRY:  I thought perhaps we could,

14 say, talk with each other to see how we want to handle

15 this.

16          THE COURT:  That will be fine.  You can just

17 let me know before we recess.

18          MR. PINALES:  Your Honor, we would join

19 Mr. Westberry in that motion.

20          I understand it's the court's ruling it's not

21 404(b).  Respectfully, Your Honor, I would disagree.

22          THE COURT:  It's noted for the record --

23          MR. PINALES:  Thank you, Your Honor.

24          THE COURT:  -- you would take the position it

25 is 404(b) as opposed to under Rule 106 background

D. Kennon White – Direct Examination

 1 | evidence.
 2 |        MR. PINALES:  Yes, Your Honor.
 3 |        THE COURT:  It's strictly intertwined.
 4 |        MR. WESTBERRY:  We used to call it res
 5 | gestae.  Thank you.
 6 |        THE COURT:  Anything else on this point?
 7 |        MR. WESTBERRY:  No, Your Honor.
 8 |        THE COURT:  Thank you.
 9 |        (End of bench conference.)
10 |        THE COURT:  All right, thank you, counsel.
11 |        Mr. Smith, do you need to have the last
12 | question re-read before our bench conference?
13 |        MR. SMITH:  Yes, please.
14 |        THE COURT:  All right.
15 |        (Last question read.)
16 |        MR. SMITH:  Let me further finish the
17 | question.
18 | BY MR. SMITH:
19 | Q.   Do you recall how much money was put together in
20 | your presence there by Jennings White and your aunt's
21 | race?
22 | A.   It was around seventy to eighty thousand dollars.
23 |        THE COURT:  Mr. Smith, if we could establish
24 | the general time period that we are dealing with here.
25 | BY MR. SMITH:

D. Kennon White - Direct Examination

1  Q.   When was this race that you are referring to that

2  you were involved with Jennings White on with your

3  aunt's race?

4  A.   It was the first time she ran for state

5  representative.  I don't know the exact year, but it

6  would have --

7  Q.   Okay, well, let me ask you this.  Would that have

8  occurred during the decade of the '90s?

9  A.   Yes.

10 Q.   Okay, and you indicated that Jennings White was

11 then the sitting clerk, county clerk?

12 A.   Yes.

13 Q.   So it occurred in the '90s after he had become

14 clerk?

15 A.   Yes.

16 Q.   And did your aunt run on the ticket at the same

17 time that Jennings White ran for county clerk or was

18 this an off-year election?

19 A.   It was an off year or an off election, I don't

20 remember which that it was.

21      But it was either a general election and not a

22 primary or either it was an off-year election.

23 Q.   Now, during this particular election, did -- did

24 you, yourself, seek to try to learn the ways of Clay

25 County politics?

D. Kennon White – Direct Examination

1   A.   Yes, I did.

2   Q.   And what did you do to preserve this knowledge?

3   A.   I had put it down on paper and tried to remember

4   to the best of my ability, you know, who that I talked

5   to and what I did.

6           (Mr. Smith conferring with defense counsel

7   concerning an exhibit.)

8           MR. SMITH:  Your Honor, I am positive that we

9   gave counsel digital copies of that.  I am sure that

10  they have it.

11          THE COURT:  That's fine.

12          MR. SMITH:  They have all got digital copies.

13          MR. WESTBERRY:  I'm sorry.

14          THE COURT:  We'll give them a chance to look

15  at that.

16          MR. SMITH:  We gave you digital copies.

17          I would like to hand this to the witness,

18  please.

19  BY MR. SMITH:

20  Q.   Do you recognize that, Mr. White?

21  A.   Yes, I do.

22  Q.   And what is that, Mr. White?

23  A.   That's a compiled list of the people that helped

24  out in those precincts.

25      Most of those are people that purchased votes.

D. Kennon White – Direct Examination

1 They might be a few on there that's connected with

2 like it says all fire departments.

3     But those are the people that you basically have

4 to have in each precinct to either -- majority to

5 purchase votes or to help you to get elected.

6 Q.   And where did you get these names from?

7 A.   I got these names from different people.  I got

8 these name from Jennings White, I got them from Cletus

9 Maricle, got them from Kenny Day, got them from

10 numerous different people, Stanley Bowling.

11          MR. WESTBERRY:  Objection, hearsay,

12 Your Honor.

13          THE COURT:  Overruled.

14 BY MR. SMITH:

15 Q.   And were you making notes of these names that you

16 were gathering as you were helping in this election

17 with your aunt?

18 A.   Yes.

19 Q.   And you took these down around that time period

20 that you were involved?

21 A.   Uh-huh.

22 Q.   And why were you taking these notes down,

23 Mr. White?

24 A.   Well, at this time, when I -- when I done, this I

25 really did not realize the extent of what you had to

D. Kennon White – Direct Examination

1  do to be elected in Clay County and how much there was

2  to it.

3      And to be quite frank with you, I was alarmed

4  that I might get in trouble sometime.

5      And I wanted to have a record of what happened as

6  well as if I ever want to run for political office

7  that I knew that I would have to have these people and

8  that this information would be valuable to knowing how

9  to carry out what I needed to do.

10 Q.  Had you ever been involved in a county-wide

11 election for Clay County?

12 A.  Not county-wide.

13 Q.  Now, your father would run for mayor, but that's

14 not county-wide?

15 A.  Right, that's what's in what they call the city

16 precincts.

17      MR. SMITH:  Move for the government's

18 introduction of Exhibit D14, Your Honor.

19      THE COURT:  Objection?

20      MR. HOSKINS:  Your Honor, may we approach the

21 bench?

22      THE COURT:  Yes, sir, you may.

23      (Thereupon, a discussion was had between the

24 Court and counsel at the bench and out of the hearing

25 of the jury.)

D. Kennon White - Direct Examination

1          MR. PINALES:  We still don't recall exactly

2    when this is except we have a decade of time, of

3    sometime in the '90s, and that's the extent of it.

4          THE COURT:  You are talking about after

5    Mr. Jennings's wife was elected as county clerk.

6          It was based on the question sometime in the

7    '90s.

8          Mr. Smith, what will the evidence be with

9    respect to the date of this particular event?

10          MR. SMITH:  All these are going to come in

11   later when public records have been subpoenaed from

12   the clerk's office, of course.

13          And I believe I am rather certain it's going

14   to be '94 --

15          THE COURT:  All right.

16          MR. SMITH:  -- when the election occurred.

17          THE COURT:  The witness, of course, is giving

18   his best -- it's being offered as recorded

19   recollection, 8035?  This information?

20          Is there an objection to the exhibit, is that

21   what we are arguing?

22          An objection to the admission of a document?

23   Mr. Hoskins asked to approach.

24          (Mr. Hoskins and Mr. Pinales conferring.)

25          MR. PINALES:  And we don't know the date that

D. Kennon White – Direct Examination

1 the actual document was prepared, before, during,

2 after.  Ground work.

3        THE COURT:  I got the impression it was

4 recorded contemporaneous, based on his answers.  It

5 obviously could be more clear.

6        But my impression was it was around the same

7 time period.

8        MR. ABELL:  Judge, a couple of sources were

9 identified, but some others, if there were others.

10        THE COURT:  There were about five, according

11 to my notes, individuals that were identified as

12 sources of the information, including defendant

13 Maricle and defendant Bowling.

14        He also identified Jennings White and Kenny

15 Day as providing some of this information.

16        First Mr. –– your objection relating to the

17 time period?

18        MR. PINALES:  Time period and whether it was

19 –– the time period of the election and then the time

20 period that the document was made.

21        THE COURT:  All right.  Mr. Westberry?

22        MR. WESTBERRY:  Thank you, quickly to join in

23 the objection stated by Mr. Pinales and with regard to

24 the issue we were up here just a few minutes ago

25 without waiving any of the positions that we took at

D. Kennon White – Direct Examination

1 the previous side bar regarding the real dispute as to

2 whether it's background or 404(b).

3          We would request that the limiting

4 instruction on the admonition, however you want to

5 characterize it, would be given.

6          MR. SIMONS:  We would join in that request.

7          THE COURT:  We are about to stop for the

8 evening.

9          This is Mr. Simons on behalf of Mr. Bowling

10 has joined in the objection who was also referenced in

11 the document or someone giving information concerning

12 the document.

13          MR. SIMONS:  That's correct.

14          THE COURT:  Mr. Smith, subject to you

15 clarifying this document was prepared

16 contemporaneously with the events, I am satisfied with

17 the general time period that I am considering this

18 background information in the mid-'90s.

19          If it turns out it was at some other point, I

20 may want to revisit that a little bit later.

21          But based upon the information that's been

22 provided, that this would have been sometime during

23 the mid-'90s, that the witness is able to testify that

24 the notes were prepared contemporaneously, at this

25 time, I would admit the document into evidence.

D. Kennon White – Direct Examination

1         MR. SMITH:  Okay, I will certainly clarify

2 that.

3         I made a question which I thought answered

4 that, but apparently I didn't.

5         THE COURT:  There may be some ambiguity about

6 it.

7         So after you do that, after you clarify that

8 issue, what we will do is we will stop at that point

9 for the evening, I'll give the instruction on the use

10 of background evidence.

11         And I also want to remind the jury about the

12 weather policy for tomorrow so they will know how to

13 do that, and then we will be finished for the day.

14         MR. PINALES:  How much snow are we going to

15 get?  Has anybody heard?

16         THE COURT:  Not as much as Washington.

17         MR. PINALES:  I leave one place and I come to

18 another, I bring it with me.  Not me.  Not me.

19         (End of bench conference.)

20         THE COURT:  All right, thank you, counsel.

21         And Mr. Smith, you may continue, please.

22 BY MR. SMITH:

23 Q.  Before we broke there, Mr. White, I believe we

24 were referring you to Government's Exhibit D14.

25 A.  Yes.

Colloquy

1 Q.   And did you make that at or about the time that

2 you were getting this information from these

3 individuals?

4 A.   Yes.

5 Q.   And did you record it at that time?

6 A.   Yes.

7 Q.   All right.

8        MR. SMITH:  I would move for the introduction

9 of Government's Exhibit D14.

10       THE COURT:  All right, I will admit United

11 States Exhibit D14 into evidence at this time.

12       (GOVERNMENT EXHIBIT NO. D14 ADMITTED INTO

13 EVIDENCE.)

14       THE COURT:  And Mr. Smith, are we at a --

15       MR. SMITH:  I understand, that's a good point

16 to break if the court would like.

17       THE COURT:  Yes, I would like to recess for

18 the evening at this time.

19       Before we do recess for the evening, ladies

20 and gentlemen, I do want to remind you of the use of

21 background evidence.

22       And I want to give you the same instruction

23 that you were given earlier with respect to items that

24 are subject to testimony prior to 2002, the first date

25 charged in the indictment.

Colloquy

```
 1              And this would relate to three of the
 2  defendants that have been the subject of some of the
 3  recent testimony, that would include the defendants
 4  Maricle, Adams and Mr. Bowling.
 5              And you are advised that the United States
 6  has introduced certain testimony into evidence which
 7  the court has admitted as background evidence.
 8              Of course background evidence includes an act
 9  or acts other than the specified acts charged in the
10  indictment which is intertwined with the offense or
11  offenses charged.
12              The introduction of background evidence is
13  offered to complete the story of the charged offense
14  or offenses.
15              Here the United States is offering this
16  evidence to show the origin of the enterprise, that is
17  the inception of the conspiracy that has been alleged
18  under the roles of the respective members of the
19  alleged enterprise, and you are so instructed.
20              Now, before I give you the admonition I have
21  given to you several times, I do want to remind you
22  what you should do if we do have bad weather tonight.
23              Of course, first of all, if the Franklin
24  County Schools are closed tomorrow, we would not start
25  until 10:00.  That would be the earliest that we would
```

Colloquy

 1   start.

 2         However, you should have the clerk's

 3   telephone numbers, and if there is further delays

 4   where we would start later than 10:00, of course you

 5   will be able to communicate with the clerk directly.

 6         So please keep in mind if we do have bad

 7   weather as we are expected, you should first check to

 8   see if the Franklin County Schools are closed.

 9         If they are not closed, then you should

10   assume you should be.

11         Here if they are closed, then you may need to

12   contact the clerk to determine if you should appear at

13   10:00 or sometime after 10:00.

14         And I'll make that determination in the

15   morning after I see what the roads look like in the

16   area, ladies and gentlemen.

17         Now, with respect to the admonition, let me

18   again remind you that as we take our break for the

19   evening, you should not discuss the case with anyone.

20         Likewise, you should not allow anyone to

21   approach you to discuss the case.

22         While we are in recess, you should not

23   discuss the case with anyone.

24         You should not read, watch or listen to any

25   accounts of the case if there should be any.

Colloquy

1          You should not attempt to perform any type of

2 research or do any type of investigation.

3          We have talked a few times about electronic

4 communications, that would include with Blackberries

5 or blogging or communicating on Twitter or any of

6 those type of -- those type of communication devices

7 such as Facebook or MySpace or whatever those other

8 things are called.

9          And of course, ladies and gentlemen, don't

10 make up your mind about the case until it is finally

11 submitted to you.

12          If we don't have bad weather, we will see you

13 at 9:00 tomorrow morning.

14          Otherwise, of course, you will either be here

15 at 10:00 or as otherwise instructed by the clerk.  The

16 jury will be excused at this time.

17          (Jury excused from the courtroom for evening

18 recess.)

19          (The following proceedings were had in open

20 court out of the presence and hearing of the jury.)

21          THE COURT:  Thank you, and please be seated.

22 Let me see if there are any other issues that need to

23 be taken up outside the presence of the jury.

24          Mr. Smith, do you have any issues?

25          MR. SMITH:  Your Honor, I do want to revisit

Colloquy

1 at some point maybe before the court -- when the court

2 expects maybe a decision on the 15th.

3          We are still trying to schedule witnesses for

4 that day.

5          THE COURT:  All right, I am going to excuse

6 Mr. White while we discuss those matters.  You can

7 step down, sir, thank you.

8          (Witness excused from the courtroom.)

9          THE COURT:  Mr. Smith, this is my plan at

10 this time as to those issues.

11          Of course, I think tomorrow morning everyone

12 should be able to advise me as to whether we are going

13 to need a hearing on expert witness issues.

14          I know I have received a couple of

15 supplemental statements that were given.

16          I believe, Mr. Simons, you filed one of

17 those.

18          And I believe there was one filed on behalf

19 of Mr. Thompson and Mr. Jones.

20          So I have received some supplemental

21 information.

22          But I will wait until tomorrow so you can

23 have a chance to digest that.

24          I think you have until 5:00 actually to

25 submit any supplemental information with respect to

Colloquy

 1  experts.

 2          I would like to avoid missing more than one

 3  day with the jury this week if that's at all

 4  possible.

 5          So if we miss tomorrow because of bad

 6  weather, my initial plan would be to take up any

 7  expert issues if we need to have a hearing on experts

 8  on the 15th and to proceed on the 12th with the jury.

 9          I want to wait and see how many witnesses I

10  am going to need to hear from as to that issue.

11          So at this point I do have approval to

12  proceed on the 15th if it's necessary to do so.

13          But I would like to wait until tomorrow in

14  order to make that final determination.

15          I apologize for not giving you a better

16  answer, but that's where we are at this point.

17          Let's see, Mr. Bayer, I think you may have

18  had an issue as well.

19          MR. BAYER:  Judge, I just wanted to check

20  with the court on what you wanted to do as far as the

21  Daubert hearing, you have already addressed that

22  issue.

23          In the morning, do you want us to do it

24  orally or in writing?

25          THE COURT:  Really what I need to know is if

Colloquy

1 we need to have a hearing.

2          Someone's going to request a hearing on one

3 or more potential experts that's been identified.

4          You just need to be able to tell me who it is

5 and how long you anticipate the hearing will take.

6          Once I know that, if we have one or two

7 people, and if it's only going to be thirty minutes

8 per witness, I can put that in.

9          We can fit that in in the evening when I

10 don't have sentencings or other matters scheduled, and

11 we wouldn't need to set aside an entire day for that

12 purpose.

13          So I'll wait to hear from you tomorrow to

14 make that decision.

15          I would like to keep going as best we can and

16 not lose a full day on Friday if we can avoid that.

17          MR. BAYER:  Would you like for us to come in

18 a little early tomorrow?

19          THE COURT:  Yes, if you could come in maybe,

20 again, if we start at 9:00, if you could be here

21 fifteen minutes early; if we start at 10:00, fifteen

22 minutes early.

23          And if we don't have a session tomorrow

24 because of extremely bad weather, I may try to

25 organize a telephone conference or arrange a telephone

Colloquy

1  conference so I can try to get to the bottom of this
2  issue.
3          We will get that worked out at some point
4  tomorrow if at all possible.
5          But otherwise, if you could appear fifteen
6  minutes in advance of the time we would be starting
7  court.
8          MR. BAYER:  But the oral request would be
9  sufficient.
10         THE COURT:  Yes, I will need to know from you
11 who it is.
12         And this is moving parts, so I don't know how
13 many folks are going to be asking for -- really the
14 United States will need to determine whether they want
15 to request a Daubert hearing with respect to all the
16 defendants' witnesses.
17         As I have told you earlier, I have heard from
18 Agent Sagrecy on similar issues in the past, and he
19 has been qualified as an expert.
20         So I don't know that I would need to conduct
21 a Daubert hearing with respect to Agent Sagrecy unless
22 there is an amendment of the notice of his testimony
23 that was given earlier.
24         MR. BAYER:  We were going to request a
25 Daubert on Agent Sagrecy.

Colloquy

1          THE COURT:  All right.

2          Mr. Abell?

3          MR. ABELL:  Judge, you asked me to mention at

4  this time the issue of text messages.

5          THE COURT:  All right, yes, I did want to

6  follow up with the United States with respect to the

7  issue of text messaging with cooperating witnesses and

8  whether you have been able to, number one, narrow down

9  the communications; and, number two, whether you have

10  been able to recover any of those communications,

11  Mr. Smith.

12          MR. SMITH:  Your Honor, I have relied upon

13  our criminal chief and the chief legal counsel for the

14  FBI to advise me as to these matters.

15          And I have been updated today through Agent

16  Briggs that the FBI has in fact suffered a computer

17  server which has crashed.

18          And there are, at this point, undeterminate

19  amount of time to -- an indeterminate amount of time

20  is needed at this point, based on what he is telling

21  me.

22          I am not sure, again, counsel seems to be

23  very confident that they have gotten these in prior

24  situations in legal cases.

25          I am not familiar with that as an

Colloquy

1  investigative aspect.

2          We have not been that successful in seeing

3  text messages preserved by private companies.

4          So there is a lot of communication that has

5  to happen outside the FBI with private companies to

6  determine if there is anything out there.

7          But I know the court wants an answer, and I

8  will press them as hard as I can this afternoon to

9  come up with an answer.

10          THE COURT:  All right.  Well, it doesn't look

11  like we can get to the bottom of it today.

12          But what I will do, Mr. Abell, is I am not

13  going to release the witness until I feel satisfied

14  that we do have an answer to the question, and maybe

15  one that not everybody's going to like or agree with.

16          But I do want to at least get an answer to

17  the question.

18          That's about the only way I know to handle it

19  at this point.

20          If Mr. Smith hasn't been able to recover

21  messages, they can't be produced.

22          But I would not release the witness until --

23  until I do have that -- that particular question

24  answered.

25          Mr. Bayer?

Colloquy

1           MR. BAYER:  I want to offer the court an

2  alternative as far as the Sagrecy issue.

3           If they can provide to us transcripts or

4  something of the previous hearings that you have

5  conducted, then we can maybe moot that issue and just

6  review those.

7           And it would make it much easier for us and

8  the court.

9           THE COURT:  I do recall that Mr. Sagrecy

10  testified in the Wayne Reid trial as an expert

11  witness, I believe some of that information was

12  produced earlier.

13           And I believe he might have testified in

14  other proceedings which he was qualified for, but I

15  don't have a memory of that, a specific memory.

16           I do recall him testifying in the Wayne Reid

17  case.  Mr. Smith, is that your memory as well?

18           MR. SMITH:  Yes, Your Honor, we have -- I

19  have actually briefed the case on Court of Appeals.

20           But I am not real sure whether all testimony

21  was transcribed.

22           I'll certainly take a look for Mr. Bayer's

23  benefit to see if it's in there.  If it is, we can get

24  that.

25           THE COURT:  All right, I know he's testified

Colloquy

1  in my court on a couple of occasions, and I am pretty

2  sure -- well, I know he testified as an expert, and I

3  am pretty sure it was in the Wayne Reid trial.

4          And there may have been another occasion

5  where he was qualified as an expert witness, but that

6  is the one that I specifically recall.

7          Any other issues?  Have we squeezed the juice

8  out of the orange for today, counsel?  I believe we

9  have.

10          MR. WHITE:  Absolutely, I think so.

11          THE COURT:  Again, we are going to have to

12  play it by ear tomorrow.

13          And as soon as we do have some information,

14  I'll be up early in the morning and I'll be

15  communicating with the clerk.

16          And she will either be in touch with you, or

17  you will be in touch with her.

18          I am not sure how that's going to work out,

19  but it will work out one way or another.

20          All right, thank you.  If there are no other

21  matters to take up this evening, I do want to remind

22  you that if we are in session tomorrow I do have a

23  sentencing late tomorrow afternoon.

24          And we will need to have a little space made

25  available for that particular defendant in this case,

Index

1  I believe it's a codefendant.

2          MS. HUGHES:  It is.  I want to stay and

3  watch.

4          THE COURT:  I thought you might.  Otherwise,

5  though, we will be in recess in this matter until

6  9:00 a.m.

7          (The further trial in this matter was

8  recessed at 4:43 p.m. until 9:00 a.m. February 11,

9  2010, due to weather.)

10                              _ _ _

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Index

EXAMINATION INDEX

Vernon Hacker

Cross by Mr. Hoskins . . . . . .    11

Cross by Mr. Bayer . . . . . . . .    16

Cross by Mr. White . . . . . . . .    62

Voir dire by Mr. White . . . . . .    70

Cross by Mr. White . . . . . . . .    76

Cross by Mr. Abell . . . . . . . .    77

Cross by Mr. Baldani . . . . . . .    79

Cross by Mr. Gilbert . . . . . . .    92

Cross by Ms. Hughes . . . . . . .    97

Cross by Mr. Simons . . . . . . .    99

Redirect by Mr. Smith . . . . . .   104

D. Kennon White

Direct by Mr. Smith . . . . . . .   117

              - - -

EXHIBIT INDEX

                                         MARKED/ADMITTED
Government's Exhibits:

P81   Plea Agreement                          128

D14   List of people that purchased votes     155


Defendant's Exhibits:
(Defendant Adams)

1 Letter                                       38


              - - -

Certificate

1                           CERTIFICATE

2            I certify that the foregoing is a correct

3  transcript from the record of proceedings in the

4  above-entitled matter.

5

6  s/  K. Ann Banta                    2-14-10
   K. Ann Banta, RPR, CRR            Date
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25