```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF KENTUCKY
 2                 SOUTHERN DIVISION AT LONDON

 3 UNITED STATES OF AMERICA    .      Docket No. CR 09-16-S
                               .
 4      vs.                    .      Frankfort, Kentucky
                               .      February 11, 2010
 5 RUSSELL CLETUS MARICLE      .      1:05 p.m.
   DOUGLAS C. ADAMS            .
 6 CHARLES WAYNE JONES         .      Trial
   WILLIAM R. STIVERS          .
 7 FREDDY W. THOMPSON          .      VOLUME 6-B
   WILLIAM B. MORRIS           .
 8 DEBRA L. MORRIS             .
   STANLEY BOWLING             .
 9
                      TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE DANNY C. REEVES
                 UNITED STATES DISTRICT JUDGE
11 APPEARANCES:
   On behalf of the Plaintiff:   STEPHEN C. SMITH, ESQ.
12                               JASON D. PARMAN, ESQ.

13 On behalf of the Defendant    DAVID S. HOSKINS, ESQ.
   Russell Cletus Maricle:       MARTIN S. PINALES, ESQ.
14
   On behalf of the Defendant    R. KENT WESTBERRY, ESQ.
15 Douglas C. Adams:             KRISTEN N. LOGAN, ESQ.

16 On behalf of the Defendant    T. SCOTT WHITE, ESQ.
   Charles Wayne Jones:
17
   On behalf of the Defendant    ROBERT L. ABELL, ESQ.
18 William R. Stivers:

19 On behalf of the Defendant    RUSSELL BALDANI, ESQ.
   Freddy W. Thompson:           TUCKER RICHARDSON III
20
   On behalf of the Defendant    JERRY W. GILBERT, ESQ.
21 William B. Morris:

22 On behalf of the Defendant    ELIZABETH HUGHES, ESQ.
   Debra L. Morris:
23
   On behalf of the Defendant    DANIEL A. SIMONS, ESQ.
24 Stanley Bowling:

25 Court Reporter:               K. ANN BANTA, RPR, CRR
```

```
 1  Appearances of Counsel:

 2  On behalf of the Plaintiff:      STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, KY 40741
 5
    On behalf of the Defendant       DAVID S. HOSKINS, ESQ.
 6  Russell Cletus Maricle:          107 East First Street
                                     Corbin, KY 40701
 7
                                     MARTIN S. PINALES, ESQ.
 8                                   150 East Fourth Street
                                     Federal Reserve Building
 9                                   Cincinnati, OH 45202

10  On behalf of the Defendant       R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:                KRISTEN N. LOGAN, ESQ.
11                                   220 West Main Street
                                     Suite 1900
12                                   Louisville, KY 40202

13  On behalf of the Defendant       T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:             133 West Short Street
14                                   Lexington, KY 40507

15  On behalf of the Defendant       ROBERT L. ABELL, ESQ.
    William R. Stivers:              120 North Upper Street
16                                   Lexington, KY 40507

17  On behalf of the Defendant       RUSSELL JAMES BALDANI,
    Freddy W. Thompson:                ESQ.
18                                   R. TUCKER RICHARDSON
                                       III, ESQ.
19                                   300 West Short Street
                                     Lexington, KY 40507
20
    On behalf of the defendant       JERRY W. GILBERT, ESQ.
21  William B. Morris:               212 North Second Street
                                     Richmond, KY 40475
22

23  On behalf of the Defendant       ELIZABETH SNOW HUGHES,
    Debra L. Morris:                   ESQ.
24                                   201 West Short Street
                                     Lexington, KY 40507
25
```

```
1   Appearances of Counsel (Continued):

2   On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
    Stanley Bowling:                  116 West Main Street
3                                     Suite 2A
                                      Richmond, KY 40476
4
    Court Reporter:                   K. ANN BANTA, RPR, CRR
5                                     Official Court Reporter
                                      United States District
6                                        Court
                                      101 Barr
7                                     Lexington, KY 40507
                                      (502) 545-1090
8
    Proceedings recorded by mechanical stenography,
9   transcript produced by computer-aided transcription.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    Thursday afternoon session,

 2              February 11, 2010, 1:05 p.m.

 3              - - -

 4         (The following proceedings were had out of

 5  the presence and hearing of the jury in open court.)

 6         THE COURT:  Thank you, the record will

 7  reflect the jury is not present at this time.

 8         I understand one of the attorneys has an

 9  issue to take up before we begin?

10         Mr. Smith?

11         MR. SMITH:  Yes, Your Honor, at our break, I

12  was advised from an agent who was in the area today in

13  Manchester who indicated that the local paper there

14  has apparently processed a printing and publishing

15  transcripts from these proceedings, including the

16  testimony of witnesses.

17         And I wanted to bring that to the court's

18  attention, understanding that there is an order

19  preventing witnesses, both for the United States and

20  for the defense, from participating in our hearings

21  And now being alerted that the transcript of these

22  proceedings are published in today's paper of

23  Manchester.

24         THE COURT:  All right.  Let me first ask if

25  the parties are all in agreement that there is a
```

1   potential for impacting the case with the continued

2   publication of those articles.  Does anyone disagree

3   with that statement summary?

4           MR. RICHARDSON:  No.

5           MR. WESTBERRY:  No.

6           MR. PINALES:  I am, Your Honor.  Just

7   philosophically I'm against anything against the First

8   Amendment.

9           THE COURT:  You are against the First -- you

10  say you are against the First Amendment?

11          MR. PINALES:  No, I am against anything that

12  is against the First Amendment.  That's Yankee talk,

13  Your Honor, sorry about that.

14          THE COURT:  All right.  We will proceed as

15  follows.

16          Counsel has ordered daily transcript.  They

17  may obtain daily transcript.

18          But without further orders of the court may

19  not provide daily transcript to any third parties.

20          If any third parties request daily

21  transcript, they will need to make a motion with the

22  court, the court will take that up.

23          The court reporters will be directed that

24  unless and until such order has been entered by the

25  court following a hearing that they are not to provide

1 daily transcript to any third parties for publication.

2          I don't believe -- obviously, it's a

3 problem.  There are reporters here, they are reporting

4 on the case.

5          But they are not doing it word by word and,

6 therefore, the articles don't -- would not appear to

7 have the potential for creating a problem either for

8 future witnesses for the United States or for the

9 defendants in the case.

10          So that's the way we will proceed at this

11 time.

12          The reporters will be directed unless a

13 motion is made by a particular newspaper for daily

14 transcript, that that's not to be -- not to be

15 provided for the obvious dangers that that presents

16 with publication of daily copy.

17          Let's see, with respect to scheduling, a

18 couple matters I do want to take up.

19          Mr. White, I know that you had a hearing that

20 was scheduled for tomorrow before Judge Coffman --

21 Judge Caldwell.

22          MR. WHITE:  And, Judge, I cancelled that.  I

23 called Miss Chrisman, and I filed a motion.

24          THE COURT:  I have advised Judge Caldwell

25 that there is a potential conflict with respect to

1  Mr. Westberry on the 22nd.

2          MR. WESTBERRY:  Or Judge Van Tatenhove?

3          THE COURT:  I'm sorry.

4          MR. WESTBERRY:  No, that's fine.

5          THE COURT:  So what I would plan to do is

6  give the parties the day off on the 22nd.

7          And Judge Caldwell, I believe, will be

8  scheduling -- rescheduling your hearing, Mr. White, on

9  that day.

10          And Mr. Westberry, I understand that's still

11  the date with Judge Van Tatenhove.

12          MR. WESTBERRY:  That's still on, as we

13  understand it, that's correct.

14          MR. WHITE:  Thank you, Your Honor, I

15  appreciate that.

16          THE COURT:  So we will proceed on the 15th,

17  but we will not be going on the 22nd.

18          And that will give -- Mr. Westberry, that

19  will give you that weekend if you have to do any

20  preparation, that's a Monday, so if you need that.

21          MR. WESTBERRY:  That's fine.

22          THE COURT:  The other two dates that I know

23  we have conflicts at this time, March the 5th which we

24  talked about earlier, that counsel has a matter

25  scheduled at Sixth Circuit on that date.

1            And I have another matter scheduled on the
2  19th of March.

3            So those are the three dates that I am aware
4  of at this time.

5            Hopefully we won't have any other weather --
6  weather delays.

7            But just want to let you know that, and I
8  will be advising the jury before I excuse them this
9  afternoon of those three dates that they will not need
10 to be present here in court.

11           All right, are there other matters that need
12 to be taken up in the case before the jury is brought
13 in?  No?  Bring the witness back in first, please.

14           (Witness brought in the courtroom at this
15 time.)

16           THE COURT:  And you can bring in the jury,
17 please.

18           THE MARSHAL:  Please rise for the jury.

19           (Jury resumed their places in the jury box.)

20           THE COURT:  Thank you, and please be seated.
21 All members of the jury are present, all parties and
22 counsel are present.

23           Mr. White has returned to the witness stand.
24 Of course, he is still under oath.

25           Mr. Smith, you were questioning the witness,

D. Kennon White – Direct Examination

1   and you may continue.

2                             - - -

3          D. KENNON WHITE, PLAINTIFF'S WITNESS,

4   PREVIOUSLY SWORN

5               DIRECT EXAMINATION (Resumed)

6   BY MR. SMITH:

7   Q.   Mr. White, when I believe we broke, you were

8   detailing for us the primary 2006 election.

9        And I believe we had left off at the point where

10  you were describing the accumulation of mail in

11  ballots at the Morris residence.

12  A.   Yeah, they had -- on the absentee ballots, they

13  were mailing them in, they were getting them from the

14  people, would send into the clerk's office and get

15  them, either with their assistance or by theirselves.

16       And then when the ballots would come back, they

17  would get those from those people.

18       And in most cases they would pay them for that

19  and then they would have them sign it and then they

20  would just cast the -- cast the vote for them, who

21  they wanted to vote for, who that was on the slate of

22  the count --

23            MR. ABELL:  Excuse me, Judge, may we have the

24  witness pull the microphone closer?

25            THE COURT:  If you could pull that down a

D. Kennon White – Direct Examination

1 little bit closer to you.

2          THE WITNESS:  Is that better?

3          THE COURT:  Pull it down a little bit

4 further.

5          If you can speak up, please, so everyone can

6 hear you.

7          THE WITNESS:  Okay.

8 BY MR. SMITH:

9 Q.   At this election, did you participate in getting

10 money to any of the vote haulers?

11 A.   I give -- in the primary, I give $500 to Ella

12 Wagers to haul votes.

13 Q.   Okay.  And who is Ella Wagers?

14 A.   She is -- she is a lady that lived beside Bart

15 Morris.

16 Q.   Okay, and what was the plan that she was to make

17 use of this money?

18 A.   She was to haul votes for Crawdad Sizemore and

19 Edd Jordan and Phillip Mobley.

20 Q.   And who is Phillip Mobley?

21 A.   That is Cletus Maricle's son-in-law.

22 Q.   And she was to haul voters to what place for

23 purposes of having them pay for the vote?

24 A.   Manchester precinct.

25 Q.   And where was she going to get her voters paid?

11

D. Kennon White – Direct Examination

1  A.    She was paying them herself.

2  Q.    And these were voters in the precinct of

3  Manchester?

4  A.    Yes.

5  Q.    And was she given any instructions about which

6  election officer she was to see or to send her voters

7  to?

8  A.    Yeah, I told them to send them to my wife.  If my

9  wife happened to be busy or something, send them to

10 Dobber.

11 Q.    Okay, and did you know -- when did you know that

12 Dobber Weaver was a complicit or in agreement with

13 this plan?

14 A.    We had talked when he -- when this first came up.

15 Q.    You talked when what first came up?

16 A.    Whenever we were chosen to be election officers,

17 actually a little bit before when me and him was

18 chosen to be election officers.

19 Q.    And who suggested that you go talk to Dobber

20 Weaver to make sure he was complicit or going to go

21 along with this plan?

22        MR. WHITE:  Objection, leading, Your Honor.

23        THE COURT:  Overrule.

24        THE WITNESS:  Charles Wayne Jones and Cletus

25 Maricle.

D. Kennon White – Direct Examination

1  BY MR. SMITH:

2  Q.   And tell us about that discussion.

3  A.   I went to Dobber and asked him, you know, who he

4  was for.

5       He was willing to be for whoever, as long as

6  Crawdad Sizemore was taken care of, that was his

7  primary concern.

8  Q.   And what was he running for?

9  A.   He was running for county judge.

10  Q.   And did Weaver say why he was so personally

11  vested with Mr. Sizemore?

12  A.   He said Crawdad had promised him a job at the

13  ambulance service when this was over.

14  Q.   And was -- did you report his statements back to

15  Cletus Maricle and Wayne Jones?

16  A.   Yes.

17  Q.   And what did you all decide to do when you

18  reported back?

19  A.   They said it was fine, that that was fine.

20  Q.   So when you took the money to Ella Wagers, you

21  told her she could -- she would be okay to send her

22  voters in to either your wife who was a Democrat?

23  A.   Uh-huh.

24  Q.   Or Mr. Weaver?

25  A.   Yes.

Case: 6:09-cr-00016-KKC    Doc #: 925    Filed: 04/16/10    Page: 13 of 68 - Page ID#: 11691

13

D. Kennon White – Direct Examination

1  Q.   And he was the Republican?

2  A.   Yes.

3  Q.   So the scheme at this 2006 election had both

4  parties covered at the Manchester precinct?

5  A.   That's correct.

6  Q.   Was that talked about by the group before you all

7  actually executed the plan?

8  A.   Yes, we talked in terms of who was one of the --

9  the only thing that was in question was the first race

10 with my wife and with Dobber, they didn't really want

11 to be for Kevin Johnson.

12 Q.   Okay, so with the exception of Edd Jordan and

13 Kevin Johnson who were running for sheriff and Crawdad

14 Sizemore who was running for judge, the Manchester

15 precinct was in complete agreement as to who the slate

16 was going to be made up of?

17 A.   Yes.

18 Q.   Now, you talked previously about these lists.

19 Did you have any lists that were circulated among the

20 members during this primary election?

21 A.   I had seen a list that was circulated that had

22 the list of candidates on it.

23 Q.   And where did that list originate from?

24 A.   It originated from the clerk's office.

25 Q.   Okay, and where did you see it?

D. Kennon White - Direct Examination

1  A.   My wife had it.

2  Q.   Okay, and where did she get it?

3  A.   You would have to ask her, but she is in the

4  clerk's office.

5  Q.   Any other lists that were reviewed on a daily

6  basis or by the group?

7  A.   Yes, there was a list that I received from Wayne

8  Jones and from Lester Harmon that -- and Freddy

9  Thompson also a time or two that they would bring a

10  list of the people that had sent out -- now, this is

11  in the general election, for -- for absentee ballots.

12       And there were some that was not bought vote,

13  just some older people.

14       And there was some that was bought vote, and also

15  there was a list of those voters that I would show

16  to -- that we would pay for absentee that was voting

17  on the machine that I would show to Cletus Maricle,

18  Wayne Jones and Al Man, Bart Morris, Darnell.

19  Q.   And you have indicated that this primarily took

20  place in the fall?

21  A.   Yes, on what -- well, yes, when my dad run as far

22  as what I did on the absentee machine.

23  Q.   Okay, but about this list that you say that was

24  -- was looked at and reviewed and came from Freddy

25  Thompson, when did you get that list?

D. Kennon White - Direct Examination

1  A.    That came in the primary.

2  Q.    That came in the primary?

3  A.    Uh-huh.

4  Q.    And how did your group utilize the list that

5  Freddy Thompson furnished?

6  A.    Well, it was a list -- it was a list of the

7  voters and it would have the actual ballots on them.

8       And then it had who was marked on as a ballot on

9  the ballot of who they were for.

10      So the list that my wife got was actually a list

11  that had the exact copy of the ballot with a check

12  mark or X or whatever in the box for the person that

13  was on the slate.

14  Q.    Okay.  Now, are you talking about an absentee

15  ballot?

16  A.    No, I am not talking about absentee ballot.  At

17  that time I am talking about --

18  Q.    You are talking about a sample ballot?

19  A.    I am talking about a sample ballot that was

20  given.

21  Q.    And what was the purpose of Freddy Thompson

22  giving your wife a sample ballot with check marks as

23  to whose candidate's selected?

24  A.    That was for who they were going to be for.

25  Q.    Okay.  So your wife didn't know exactly in all

D. Kennon White - Direct Examination

1 races in all aspects of the county who to vote for, so

2 she gave her a sample ballot?

3 A.   That's right, she got a sample ballot because

4 really the only ones we had discussed was basically

5 Cletus's son-in-law, Phillip, Crawdad and Edd Jordan

6 and the magistrate's race, which was Tommy Harmon.

7     And the rest of those races, you know, they had

8 people they wanted voted for also.

9 Q.   And she got that list from whom?

10 A.   She got it from the clerk's office is what she

11 told me, you know, I think that's what she said.

12 Q.   And that clerk's office was Freddy Thompson's

13 clerk's office?

14 A.   That's correct.

15 Q.   Did she share that with Dobber Weaver?

16 A.   He got one, too.

17 Q.   All right, and where did he get his, if you know?

18 A.   Same place.

19 Q.   Any other money that you are aware of that was

20 delivered to voters in the primary, May '06 election?

21 A.   Yes, Crawdad brought Dobber money over to City

22 Hall, and Edd Jordan brought money over to City Hall.

23 Q.   Okay, and how did you come to know this?

24 A.   I was there and set there, and he told me what

25 they were coming for; and they came and brought the

D. Kennon White – Direct Examination

1  money.

2  Q.   Do you know how much money they brought to him?

3  A.   No, they walked off to the side.  I think he said

4  Crawdad brought him around $700.

5  Q.   Do you know a lady by the name of Gayle Stevens?

6  A.   I sure do.

7  Q.   And how do you know her?

8  A.   She was the person that hauled the voters and

9  gathered up the voters and my wife's –– I mean, in my

10 father's election for mayor and that was voted on the

11 absentee machine.

12 Q.   And is that when you –– did you get her involved

13 in the 2006 election?

14 A.   Yes, I did.

15 Q.   And was it in the fall that you got her involved?

16 A.   Yes, it was.

17 Q.   And who was your father's competition in the

18 fall?

19 A.   Carmen Lewis.

20 Q.   And had she been a prior office holder?

21 A.   Yes, she was a council member prior to that.

22 Q.   Okay, and was there also other races that were in

23 contest that fall?

24 A.   The council race.

25 Q.   Okay, now, Phillip Mobley the son-in-law of

D. Kennon White – Direct Examination

1  Cletus Maricle, was he in a contest in the fall?

2  A.    To the best of my recollection, he was on the

3  polls.

4  Q.    Now, what was the agreement you had with Cletus

5  Maricle as far as his involvement in getting you all

6  to serve as election officer or your wife to serve as

7  election officer?  What was he to do for you in the

8  fall?

9  A.    He was to make some calls, he was supposed to

10  make sure that Wayne Jones was going to be on their

11  side and that he was going to take care of the -- of

12  the absentee voters, that Wayne was going to take care

13  of the ones that was brought to the clerk's office to

14  vote absentee.

15  Q.    And did this prove to be true when you got

16  involved in the fall to help your father?

17  A.    It did for the elect -- for what went on as the

18  absentee voters did.

19  Q.    And tell us how that happened?

20  A.    Okay, what happen is we would -- Gayle would find

21  people that were willing to sell their vote in the

22  city.

23       I would go and give her several hundred dollars

24  every morning, sometimes more, and she would get a

25  list of the people that she was taking to the clerk's

D. Kennon White – Direct Examination

1 office.

2      She would mark them off as she took them.  They

3 would go in, and some of them would put an X on their

4 hand.  She would X –– put an X on their hand to mark

5 them.

6      Some people didn't like to be marked, so they

7 would just go in and see Wayne Jones.

8      But Gayle was really –– really knew these people

9 well, and they would tell her how that, you know, that

10 they went in there and voted and she trusted them; and

11 the ones she didn't she X'd them.

12 Q.  Now, who was working inside the poll as election

13 officer?

14 A.  Wayne Jones.

15 Q.  And did you talk to Wayne before you sent the

16 voters in to make sure he was okay with the plan?

17 A.  Yeah, we started out from the word –– from the

18 time that the absentee started, they wanted to start

19 out slow.  They wanted to start out with so many a

20 day.

21 Q.  And why was that?

22 A.  Because they didn't want to draw attention to the

23 process that was going on from the state or any kind

24 of authorities.

25      So they wanted to start out slow, and then any

D. Kennon White — Direct Examination

1  build-up they wanted to do last two or three days so

2  that it would be closing, you know, and there wouldn't

3  be as much heat on the thing that was going on.

4      They -- he was concerned because Bart and Darnell

5  was also paying people to come in and vote on the

6  absentee machines.

7      And along with me and the other people, he just

8  didn't -- he wanted to try not to send over I think he

9  said 40 a day through the bought votes.

10 Q.   And you said you also had concerns of Bart and

11 Darnell, is that Bart Morris?

12 A.   Yes.

13 Q.   And Darnell Hipsher?

14 A.   They were also doing the same thing.

15 Q.   And were they in agreement with you about who

16 they were supporting and the slate that you were --

17 A.   They were for my dad and for Darnell.  They was

18 the council members that they were for.

19      What they were doing, they just basically said we

20 are going to be for who we want to be for, but we will

21 be for your dad, and we will be for Darnell.

22      And leave the rest of it to what we do with us,

23 and just give us the money; and we'll take care of it

24 from there.

25 Q.   Now, Bart Morris, what was his involvement?  Was

D. Kennon White – Direct Examination

1 he a candidate for office?

2 A.   No.

3 Q.   What interest did he have in getting involved in

4 this city council and mayoral race in Manchester?

5 A.   He had a transfer station that he transferred

6 garbage from the city and county, and that was where

7 that he made his living from.

8 Q.   Now, what does this transfer station and the City

9 of Manchester got to do with the city council?

10 A.   Well, there is -- the garbage is taken there

11 that's picked up on the garbage trucks for the City of

12 Manchester.

13      And it's delivered to his transfer station, and

14 he is paid an amount of money to get rid of the trash

15 and under contract.

16      So his -- his benefit from it was that he wanted

17 to keep his contract in place as well as be able to

18 dictate the prices that the city paid.

19      And that was how he done it was by controlling

20 the elections for the city council and Maricle.

21 Q.   Now, you indicated that he dictated the prices

22 and spent times, how would he do that?

23 A.   He would either call me.  There was occasions

24 when he would take and, for example, the garbage truck

25 was getting filled up he said too much, that they were

D. Kennon White – Direct Examination

1 bringing too much garbage up.

2      They got a different compactor there at the city,

3 and he said that the weight was too heavy on -- that

4 we were bringing to the transfer station.

5      So he wanted me to have the drivers cut back on

6 how much garbage they would bring and dump per truck

7 because it was costing him more money to dump a

8 heavier load.

9           Another thing he did is he got Vernon and

10 Darnell and my dad, I talked with my dad about it and

11 other people to help him to raise his contract price

12 that he was getting for this.

13           He wanted the contract raised so he could

14 make more money.

15              And he done that by getting Vernon

16 Hacker and some other ones to go along with that in

17 the council meeting, and that's how they done that to

18 control the rates.

19 Q.   Now, was there an issue at all between you and

20 Bart about who was going to be supported in this slate

21 of money for the judge candidate?

22 A.   He -- he had always before supported James

23 Garrison, and he wanted to support James Garrison at

24 the start of the primary.

25      But he ended up, Stanley told me that he was

D. Kennon White – Direct Examination

1  going to talk with him because Stanley was in support

2  of Crawdad Sizemore –– I am referring to Stanley

3  Bowling –– and that he could get Bart to do whatever

4  he needed him to do.

5      And he did talk to Bart and get Bart to back off

6  on being for James Garrison and to be for Crawdad.

7  Q.   Did Bart share with you why he wanted Garrison?

8  A.   Because Garrison had always worked with him and

9  been good to him when it came to his garbage

10 contracts.

11     And he had been able to borrow money from the

12 county and several other things that he needed, you

13 know, while he was there.

14 Q.   Now, what kind of contracts did Bart Morris have

15 with the county?

16 A.   I am not really familiar other than that is why

17 he did have a county contract with the garbage.

18 Q.   And do you know how that was funded, by a grant

19 or otherwise?

20 A.   I know that –– I don't know exactly how that was

21 funded.

22     I know that did he do some clean-ups or he had

23 bid on some clean-ups before through a PRIDE grant,

24 and ––

25 Q.   And is that a federal grant?

D. Kennon White – Direct Examination

 1 A.    Yes.  I think that also that they had taken and

 2 they was part of a day that they bought trash from the

 3 city and other places that was paid for by PRIDE,

 4 also.

 5 Q.    Now, during this general election of 2006, you

 6 indicated that Gayle Stevens was hauling your voters?

 7 A.    Uh-huh.

 8 Q.    And that there was an X that was marked on some

 9 that were okay with it after they were voted.

10       And did Wayne Jones run that operation himself or

11 did he have any help?

12 A.    Actually --

13          MR. WHITE:  Objection as to the form.

14 Mischaracterization or prior testimony.

15          THE COURT:  All right, I'll sustain the

16 objection.  You can rephrase it.

17 BY MR. SMITH:

18 Q.    You indicated that the person inside the polls

19 for the early voting was Wayne Jones?

20 A.    That's correct.

21 Q.    Did he have any help throughout those days in the

22 early voting?

23 A.    There was one day that Gayle Stevens called me

24 and told me that there was somebody in there named

25 William Stivers or Al Man Stivers and asking if it

D. Kennon White - Direct Examination

1 would be okay to send votes in to him, and I told her

2 yes.

3     Also there was another election officer named

4 William Hudson -- or not William Hudson, William

5 Bishop I think's his name, it was Clay Massey Bishop's

6 brother, William Hugh Bishop.

7 Q.   And was he a part of the scheme himself,

8 Mr. Bishop?

9 A.   I never did have any knowledge of him being part

10 of it.

11 Q.   Now, why is it that you were okay with William

12 Stivers?  Had you talked to him?

13 A.   Because we would meet almost every evening and go

14 over the voters.

15     They wanted to know who that Gayle was paying to

16 bring in there.

17     And then Bart wanted to know and they wanted to

18 know because Wayne was also arranging votes to be

19 brought in.

20     He told me that he had collected $500 from Penny

21 Robinson to help -- to help buy absentee votes, and he

22 was also doing it.

23     So they wanted to keep a list together to make

24 sure the voters wasn't getting paid twice.

25     So I would stop by and give the list of names to

D. Kennon White – Direct Examination

1  Bart and Darnell at his garage, then I would go to

2  William Al Man Stivers's house in the evening, and I

3  would give them the list there.

4      And then I would periodically stop at Cletus

5  Maricle's and show him what was going on.

6  Q.  Now, Cletus Maricle you said earlier that you had

7  met with him on various occasions in the primary.

8      Did you vote -- did you also meet with him in the

9  fall?

10  A.  Yes.

11  Q.  And what were the nature of those visits?

12  A.  The natures of the visit was -- was to make sure

13  he -- he was becoming concerned about my father's

14  reelection campaign on account of the federal

15  investigation that was going on.

16      And he was wanting to be careful on what -- how

17  we did things.

18      And it was -- that was more what the meetings was

19  about at that time and about the absentee voting.

20  Q.  What had the federal investigation done publicly

21  that you knew about leading up to your dad's election?

22  A.  Okay, they had came in and seized records at City

23  Hall, like I think it was around seven to ten days

24  prior to the general election.

25      And they had came in and seized records and

D. Kennon White – Direct Examination

1 things of that nature.

2 Q.   And did that cause your group concern?

3 A.   Yes.

4 Q.   Did you supply members of the group any other

5 monies during the fall election?

6 A.   Yes, I took -- I took Bart Morris close to

7 probably around or about $5,000.

8     And I spent around $3,500 on votes with Gayle

9 Stevens that she hauled absentee voters in.

10 Q.   Following the FBI's seizure of records there as

11 you said seven days or so before the election, did you

12 and Cletus Maricle and Wayne Jones and Al Man Stivers

13 meet to talk about election day?

14 A.   We talked about -- about election day, and we

15 talked about it in the nature that we -- it was -- it

16 was close to that date.

17     I don't know the exact date, but we got into --

18 we talked basically just about -- about how to handle

19 election day, not to be -- you know, they was wanting

20 to make sure no one got in trouble.

21     They got -- kind of got concerned about how much

22 we were going to do with my father at that time

23 because of the heat being on in the federal

24 investigation and that they really needed to be

25 careful with what my wife done down there and other

D. Kennon White - Direct Examination

1  things that went on because they did not want to get

2  in trouble.

3  Q.   Now, you talked about early in the primary that

4  the group plan that your wife would actually steal

5  votes.

6  A.   Uh-huh.

7  Q.   And Weaver was okay with doing that himself?

8  A.   Yes, that's correct.

9  Q.   And what about in the fall?  Did you all continue

10 to plan for your wife to steal votes in the fall?

11 A.   Yes, for her and Dobber both.

12 Q.   And did you use the same method and with the same

13 machine?

14 A.   We were -- we were going to use the same -- same

15 method.

16      However, my wife, I told her to be very careful

17 and not to -- not to get involved, that it wasn't

18 worth going to jail over and getting in trouble over.

19      So she lended herself to what she done in the

20 next election.

21 Q.   Now, on election day, did -- did -- did this

22 cause any of the group to leave down?

23 A.   They -- Stanley and Bowling, Bart Morris told me

24 that they were leaving town to give -- that they were

25 going to Gatlinburg is what they told me and getting

D. Kennon White - Direct Examination

1  the room, that they were making arrangements and that

2  I needed to be on board with making the arrangements

3  for what went on in the city precincts before election

4  day, that they were afraid to do like they had did in

5  the past and just be wide open at Bart's house or

6  anywhere like that, that they wanted to arrange the

7  vote buying the night before.

8  Q.   And were you able to accomplish that?

9  A.   Bart and myself went to see James Goins and a

10  couple of other people who I don't remember.

11       But Bart was arranging that, and we did deliver

12  money to Stacey Perkins and -- and to -- and he had

13  lined up James Goins which worked for him to arrange

14  some vote hauling, to go on and to haul people that

15  were selling their votes in while he was gone.

16       And Bart came back that evening probably about

17  3:30 or 4:00, I was back down at his garage and he was

18  checking on things and he was keeping coordinated by

19  phone.

20       Darnell was supposed to have left town, but I

21  don't think he did.

22       Pepper Gilbert also hauled votes, and Bart and

23  myself had went down there and talked with Pepper

24  Gilbert maybe to shake him some.

25  Q.   And when you say they were hauling votes again,

D. Kennon White – Direct Examination

1 was that with the same method of operation that had

2 occurred at the prior elections?

3 A.   Yes, they were hauling votes for people that were

4 selling their votes.

5      They were giving them a ride to the polls, and

6 then they would pay them after they voted.

7 Q.   And were they also going to be met by one of the

8 election officers complicit in the scheme?

9 A.   Yes.

10 Q.   And who was it that was going to be planned that

11 they were going to meet on that day?

12 A.   They wanted to meet Dobber Weaver on election day

13 simply because there was so much controversy over my

14 wife being the daughter-in-law of the sitting mayor

15 that they thought it would be better for Dobber to

16 handle the votes that day that were getting bought.

17 Q.   Now, you mentioned that the FBI had done seizure

18 of records.

19      Was there anything else that the federal

20 investigation had -- had uncovered or was public to

21 your knowledge leading up to this November election?

22 A.   Okay, they had had a -- an investigation going on

23 into -- in which Vernon Hacker and Todd Roberts were

24 arrested.

25 Q.   And was your dad later indicted with that group?

D. Kennon White – Direct Examination

1  A.   Yeah, I think -- I think -- I don't know when he

2  was indicted, but I think he was served with an

3  indictment on February of 2007, sometime February,

4  early February.

5  Q.   When did you first learn about a federal grand

6  jury investigation?

7  A.   There was two.  First, I went to one concerning

8  Todd Roberts and Vernon Hacker.

9      And I think that may have been actually in '0--

10 '06.

11     And then later on in '07, around in '06, later on

12 in '06, about November, there was another grand jury.

13 Q.   Now, you indicated that in the fall election that

14 Stanley Bowling and Bart Morris were helping you with

15 your dad's reelection?

16 A.   That's correct.

17 Q.   Was Stanley Bowling a candidate on the ballot in

18 the fall election?

19 A.   I -- he was a candidate on the ballot.  I don't

20 know whether he had -- if he was running unopposed or

21 not.

22     But if he was, he wasn't worried about whoever

23 the competition was.

24 Q.   So if he had no political interest in this race,

25 did he have any personal interest in seeing your dad

D. Kennon White – Direct Examination

1  being reelected as mayor?

2  A.   He had –– he had an interest in seeing that

3  because he had worked with my dad for thirty some

4  years, plus he was getting ––

5              MR. SIMONS:  Your Honor, I am going to

6  object.

7              He hasn't made a basis for that line of

8  questioning.

9              MR. SMITH:  I'm sorry, I couldn't hear his

10 objection, Your Honor.

11             MR. SIMONS:  I am saying there is speculation

12 on behalf of the witness, Your Honor.

13             THE COURT:  All right, the witness will be

14 instructed not to speculate.

15             But if you have reason to know there was a

16 relationship, you may testify to that.

17             THE WITNESS:  Okay, I know there was a

18 relationship because my ––

19 BY MR. SMITH:

20 Q.   Let me ask you, if you could, so we can get

21 through this area, Mr. White.

22 A.   Okay.

23 Q.   Mr. Bowling was not a candidate seeking –– he

24 didn't have a race in the fall; is that correct?

25 A.   To the best of my knowledge, he didn't have any

D. Kennon White – Direct Examination

1 competition.

2 Q.   Okay, so he -- his -- his nomination was secure,

3 and he had helped you with your dad's race in that

4 fall election?

5 A.   Yes.

6 Q.   And had he benefited, either through a business

7 of his or personally from being associated with you

8 and your dad?

9 A.   Yes, he had received contracts that -- yeah, he

10 had been showed favoritism, received contracts for

11 federal --

12 Q.   What contracts were these, what type of contracts

13 were these?

14 A.   They were usually to do with water line or sewer

15 line being laid.

16 Q.   And these contracts were made or let out to

17 himself personally or did he go under the business

18 name of a company?

19 A.   He went under the business name of his company.

20 Q.   And what was the name of that?

21 A.   To the best of my knowledge, it was B&B.

22 Q.   Okay, and did you discuss with Stanley Bowling

23 about possible public scrutiny that might come about

24 for him being a contractor and doing business with the

25 city?

D. Kennon White – Direct Examination

1  A.    Yes.

2  Q.    And did he have a plan on how he was going to

3  maybe cure this?

4  A.    Yeah, he was going to switch everything into his

5  son's name over a period of time to where that it

6  would be arm's length away from him.

7  Q.    Now, as the election closed in the fall of 2000,

8  what was the result in your dad's race?

9  A.    He lost.

10 Q.    Okay, and what happened to your job after your

11 dad got defeated?

12 A.    I -- it ended, needless to say, around January

13 the 7th.

14 Q.    Oh, and that would have been of 2007?

15 A.    Yes.

16 Q.    And where was your wife employed?

17 A.    She was employed at the city.

18 Q.    And what happened to her job?

19 A.    She was later laid off like a month or so later.

20 Q.    At some point, Mr. White, you indicated earlier

21 that you were confronted and charged with federal

22 crimes?

23 A.    That's correct.

24 Q.    And as part of your plea agreement, you agreed to

25 cooperate?

D. Kennon White - Direct Examination

1  A.    That's true.

2  Q.    And were you asked as part of that cooperation to

3  make visits with some of the targeted defendants?

4  A.    Yes, I was.

5  Q.    And did you participate in that with others?

6  A.    Yes, I did.

7  Q.    And who helped you?

8  A.    My wife.

9  Q.    And remember what you asked to do in the -- at

10  the first with -- with the federal investigation that

11  you recall?

12  A.    I was asked to -- to record conversations between

13  me and some of the defendants.

14  Q.    Okay.

15        MR. SMITH:  If I could, Your Honor, I would

16  like to direct the witness's attention to Government's

17  Exhibit A1, and accompanying that is A1A.

18        If you could hand this to the witness,

19  please.

20  BY MR. SMITH:

21  Q.    First, direct your attention to Government's

22  Exhibit A1, Mr. White?

23  A.    Uh-huh.

24  Q.    Do you have that before you?

25  A.    Yes, I do.

D. Kennon White – Direct Examination

1  Q.   Okay, and what is that, Mr. White?

2  A.   That is a transcript of a recording that -- that

3  was made.

4  Q.   Okay, you have the recording in your hand?

5  A.   Yes, I do.

6  Q.   And is it marked A1?

7  A.   Yes, it is.

8  Q.   And prior to you testifying today, did you have

9  an opportunity to review that and initial that?

10  A.   Several times.

11  Q.   Okay, and were you a participant in this

12  conversation?

13  A.   Yes, I was.

14  Q.   Do you know the date in which this conversation

15  was recorded?

16  A.   March 27th.

17  Q.   Okay, and what year?

18  A.   2007.

19  Q.   Okay.  And could you state for the record,

20  Mr. White, after reviewing that, is that a fair and

21  accurate depiction or copy of what that conversation

22  consisted of that you were involved with?

23  A.   Yes.

24  Q.   Okay.  Now, you have also gotten before you A1A

25  which is, as you have identified, a transcript?

D. Kennon White – Direct Examination

1  A.    Uh-huh.

2  Q.    And have you had an opportunity to review that,

3  initial it?

4  A.    Yes, I have.

5  Q.    And have you had an opportunity to compare that

6  with the conversation that you participated in

7  yourself personally.

8  A.    Yes, I have.

9  Q.    And in -- after reviewing it and comparing it

10  with the transcript, can you state that is a

11  reasonable and accurate transcription of what was put

12  in the -- or actually recorded on that recording?

13  A.    Yes, it is.

14  Q.    Okay.

15          MR. SMITH:  I would move for the introduction

16  of Government's Exhibits's A1 and A1A, Your Honor.

17          THE COURT:  All right, those exhibits will

18  be --

19          MR. WESTBERRY:  Excuse me.

20          MS. HUGHES:  Your Honor, I'm sorry, I thought

21  that the transcripts were not going to be introduced.

22          THE COURT:  Transcripts will be admitted, but

23  I am going to instruct the jury that they are not

24  evidence in the case.

25          MS. HUGHES:  Thank you.

D. Kennon White - Direct Examination

1              THE COURT:  Of course, we previously
2    discussed these matters.

3              And at this time I will admit United States
4    Exhibits A1 and A1A.

5              Before any audio recordings are played, I
6    will advise the jury as to the use of transcripts in
7    the case.

8              MR. SMITH:  If you would at this time.

9              THE COURT:  Yes, ladies and gentlemen, you
10   will hear some tape recordings through the course of
11   this proceeding, and you will be shown some written
12   transcripts of the tape, of the tapes.

13             Please keep in mind the transcripts are not
14   evidence.

15             They are being admitted, but they are not
16   evidence in the case.

17             They are offered only to -- as a guide to
18   help you follow what is being said.  The tapes
19   themselves are the evidence.

20             If you notice any difference between what you
21   hear on the tapes and what you read in the
22   transcripts, you must rely on what you hear and not on
23   what you read.

24             And if you cannot hear or understand certain
25   parts of the tapes, you must ignore the transcripts as

D. Kennon White – Direct Examination

1 far as those parts are concerned.

2          MR. SMITH:  Your Honor, at this time the

3 United States would state its intention to publish

4 this to the jury, and for purposes of these

5 recordings, Your Honor, I would ask permission to sit

6 at counsel table during this part of our

7 interrogation.

8          THE COURT:  I'm sorry, your mic?

9          MR. SMITH:  I would ask permission to sit

10 during this part of the interrogation, if the court

11 will allow.

12          THE COURT:  Yes, sir, you may.

13          MR. SMITH:  Thank you.  I would ask if the

14 clerk would initiate the distribution of headsets for

15 our jurors.

16          THE COURT:  All right.  Do you have those

17 headsets?

18          THE CLERK:  There is an on and off button

19 right here.

20          You just slide it over onto on, and keep this

21 portion out this way (demonstrating).

22          (Clerk passing out headsets at this time.)

23          (Audio played.)

24          MR. PINALES:  Your Honor, may I approach?

25          THE COURT:  Yes, sir, you may.

D. Kennon White – Direct Examination

1              (Thereupon, a discussion was had at the bench

2    between the Court and counsel at this time.)

3              THE COURT:  Yes, sir.

4              MR. PINALES:  Martin Pinales on behalf of

5    Mr. Maricle.

6              Your Honor, I don't want to beat a dead horse

7    on these transcripts, but I do want to ride a new

8    horse; and that is the yellow highlighting of the

9    transcripts.

10             That adds further emphasis to the

11   transcript.

12             They will listen, the transcript, that is an

13   aid.

14             But the yellow highlight is a further

15   spotlight on the transcript.

16             THE COURT:  The yellow highlighting

17   essentially shows where we are on the transcript on

18   the particular page.

19             The objection will be noted but will be

20   overruled.  I think it's appropriate.

21             MR. PINALES:  Thank you.

22             THE COURT:  Mr. Smith, this is the March 27th

23   recording.

24             MR. SMITH:  First segment, Your Honor, we

25   have the recording with prestops built in.  So we will

D. Kennon White – Direct Examination

1  move on to the next clip.  I intend to ask a couple of

2  follow-up questions.

3            THE COURT:  That's what I was going to ask

4  you, if you were going to ask him, the parties about

5  the conversation you were about to --

6            MR. SMITH:  Yes.

7            THE COURT:  Objection will be overruled.

8            MR. PINALES:  Thank you, Your Honor.

9            (End of bench conference.)

10            THE COURT:  Okay, thank you, counsel.

11            Mr. Smith, you may proceed.

12  BY MR. SMITH:

13  Q.   Mr. White, could you tell us who those speakers

14  are at this point on the conversation?  Who are the

15  voices we are hearing?

16  A.   Cletus Maricle's, mine, my wife's, Judy and

17  Linsey.

18  Q.   And who is Judy and Linsey?

19  A.   Judy Maricle is his wife, and Linsey Maricle is

20  his daughter.

21  Q.   Okay, and as that conversation began, it began

22  mid-stream.

23            Had you all had some introductory comments that

24  were made prior to this recording picking up?  Did you

25  all have some discussion before this --

D. Kennon White – Direct Examination

1  A.   Yes.

2  Q.   -- recording picked up?  And at the time you

3  said, "I hope they ain't got Stanley on this

4  election."  Who were you referring to?

5  A.   Stanley Bowling.

6  Q.   Okay, and at that time, it was attributed to

7  Mr. Maricle.

8      He said his big problem was a conspiracy charge,

9  who was he referring to?

10 A.   Stanley.

11          MR. PINALES:  Objection, Your Honor.

12          THE COURT:  Overruled.

13 BY MR. SMITH:

14 Q.   Now, there was in the latter part of that segment

15 we heard mentioned about, what about the drug court

16 job; and I believe you asked that question?

17 A.   Yes, that was referring to the job that he had

18 promised my wife.

19 Q.   And when did he promise your wife a job?

20 A.   He promised her a job -- actually the first time

21 he had promised her the job was around -- before the

22 primary or when Phillip and Crawdad and all those

23 people were --

24 Q.   When Phillip who?

25 A.   Mobley.

D. Kennon White – Direct Examination

1  Q.   Okay.

2  A.   His son-in-law.

3  Q.   Okay, so prior to that election you had been

4  promised a job?

5  A.   Yes.

6  Q.   And what is the drug court job that you were

7  looking to -- for your wife to have, what kind of job

8  was that?

9  A.   It was a job where that she would work under

10  Cletus Maricle at drug court.

11  Q.   And he says something about, "Well, like when we

12  get another 30 people."  What was he talking about?

13  A.   Evidently there was -- well, from what I

14  understood him to say, there is plateaus of how many

15  people is hired according to how many people are in

16  drug court.

17      And he was needing 30 more people in drug court

18  before a new position would come open.

19  Q.   And who sentences people in drug court in Clay

20  County?

21  A.   Cletus Maricle.

22  Q.   All right.  And that would have been in his

23  capacity as judge?

24  A.   Yes.

25  Q.   Okay.

D. Kennon White - Direct Examination

1              MR. SMITH:  If we could go on.

2              (Audio played.)

3    BY MR. SMITH:

4    Q.   Mr. White, there was a mention of the name

5    Jennings, who were you all referring to?

6    A.   Jennings White.

7    Q.   And also the name Jennings White, what was the

8    significance of Jennings White?

9    A.   Jennings was former Clay County Clerk that had

10   been -- had gotten in trouble and was currently doing

11   time.

12        And he was saying that they would have to use

13   Jennings, that the United States would have to use

14   Jennings as a witness and that he wouldn't go over to

15   the -- he was basically saying that Jennings wouldn't

16   make a good witness.

17   Q.   Okay, and there was also the mention of Kenny

18   Day, and you made a similar comment.  What was he

19   talking about Kenny Day?

20   A.   I said, "Well, that's true, and Kenny Day

21   wouldn't either, would he?"

22        And then he -- yeah, that's what he was talking

23   about Kenny Day was saying --

24   Q.   As being a witness?

25   A.   Yes.

D. Kennon White - Direct Examination

1  Q.   Okay.  And finally, Mr. White, there was the name

2  Kenneth Stepp or Ken Stepp brought out.  Who is

3  Kenneth Stepp?

4  A.   To my knowledge he is an attorney in Manchester.

5  Q.   Okay, and was he a candidate for a federal office

6  there on the ballot?

7  A.   Yeah, I think he ran against -- yes, I think he

8  was for Congress.

9  Q.   And who was he running against at that time?

10 A.   Hal Rogers.

11 Q.   And that would have been United States House of

12 Representatives seat?

13 A.   Yes.

14          (Audio played.)

15 BY MR. SMITH:

16 Q.   In this conversation segment, Mr. White, it

17 mentions again, the name Jennings, is that Jennings

18 White?

19 A.   Yes.

20 Q.   And the name Vernon, who is that Vernon referring

21 to?

22 A.   Vernon Hacker.

23 Q.   Now, there is a conversation about records being

24 brought back.

25      What records were you all talking about being

D. Kennon White - Direct Examination

1 brought back?

2 A.    There was records that had been seized by the

3 government, and -- and those are the records that we

4 are talking about concerning the election.

5 Q.    And you learned from this conversation what had

6 happened to those records seized by the federal

7 government?

8 A.    That they had been brought back.

9 Q.    And brought back where?

10 A.    I guess to the clerk's office.

11 Q.    Okay.

12          (Audio played.)

13 BY MR. SMITH:

14 Q.    Mr. White, who were you talking to in this

15 segment, who was make the conversation?

16 A.    Okay, I was, I guess, talking a little bit to

17 everybody.

18 Q.    Okay, and the female voices that we heard, were

19 they --

20 A.    That was Judy Maricle, his wife -- Cletus

21 Maricle's wife, that was Linsey Maricle, Cletus

22 Maricle's daughter; and that was Wanda, my wife.

23 Q.    Now, there was a mention of a grandson, Brandon.

24 Did he have a job somewhere?

25 A.    Yes, we had hired him at the city.

D. Kennon White – Direct Examination

1  Q.   And what had happened to his job when the new

2  mayor took over?

3  A.   She had let him go.

4  Q.   And is that what you all were discussing here?

5  A.   Yes.

6  Q.   And it says he took a job somewhere else.  Where

7  were they referring to as Scott's office, who is that?

8  A.   I think that would be Scott Madden.

9  Q.   And who is Scott Madden?

10  A.   He is a local attorney from Manchester.

11  Q.   And is he a known associate of Cletus Maricle as

12  well?

13  A.   Yes.

14  Q.   And how far back do they go together?

15  A.   They -- from what I understand they used to be

16  partners years ago.

17  Q.   And the male person that you are talking to in

18  this conversation is who?

19  A.   The male person?  If I was talking to a male,

20  more than likely it would have been Cletus.

21          MR. SMITH:  We will move on.

22          (Audio played.)

23  BY MR. SMITH:

24  Q.   Again, the records are brought up.  What records

25  are you referring to?

D. Kennon White – Direct Examination

1  A.   The records at the clerk's, the election records.

2  Q.   Okay, and then you said something about, "Is it a

3  five-year statute," what were you referring to?

4  A.   Statute of limitation of how long you could be

5  charged for an election crime.

6  Q.   So these were 2002 records, and you were

7  referring to a five-year statute of limitations?

8  A.   Yes.

9  Q.   And lastly, you mentioned the name Stanley.  Who

10 were you referring to?

11 A.   Stanley Bowling.

12 Q.   Okay.

13         (Audio played.)

14 BY MR. SMITH:

15 Q.   Mr. White, you referred to how they are going to

16 act under this new deal down there.  What were you

17 referring to?

18 A.   About Crawdad being the new county judge.

19 Q.   Then you moved on to say something about, "See

20 what happens there and not move on anything.  Do you

21 think I ought to just wait and see and see what

22 happens over there and not move on anything," what

23 were you talking about not moving on?

24 A.   I was talking about maybe cooperating with the

25 government.

D. Kennon White – Direct Examination

1  Q.   Had you talked to Mr. Cletus Maricle about

2  cooperating with the government before this

3  conversation?

4  A.   Yes, I had.

5  Q.   And tell us about that.

6  A.   After my father had been arrested, I became

7  concerned that they -- that they were going to get --

8  you know, that I was going to be in trouble.

9      And I went up and talked with Cletus, to let him

10 advise me on what he thought I should do.

11     And I asked him if -- you know, I told him that I

12 was thinking about going and telling them what I knew

13 on Stanley and Bart and other people and to try to

14 keep from any trouble myself.

15     And he told me, "No, don't you do nothing."  He

16 says, "I am getting ready to go to Florida, but I'll

17 talk with Steve and Charles," which he was talking

18 about referring to Stanley's attorney and that -- for

19 me not to do nothing until he got back with me from

20 Florida.

21 Q.   Okay, you made a further comment about, "It's a

22 shame to get beat to the punch."

23     What were you talking about getting "beat to the

24 punch"?

25 A.   I was afraid that someone may tell on me before I

D. Kennon White – Direct Examination

1  told what I knew.

2  Q.   And then it says, Maricle says, "I don't think we

3  will, with the election."  What's he talking about,

4  "we will"?

5  A.   He was talking about that he didn't think that

6  they would -- would -- that we would be in trouble

7  over the election, that that wasn't where the

8  investigation was going.

9  Q.   And finally --

10          MR. PINALES:  Your Honor, I would object.

11          THE COURT:  I will instruct the jury that

12  this is this witness's interpretation of what was

13  being said to him and his understanding of what was

14  being said by the witness.  Thank you.

15  BY MR. SMITH:

16  Q.   Finally, Mr. White, there was a comment,

17  Mr. Maricle said, "I'll try to find out if they have

18  been talking to him or not."  Who was he referring to?

19  A.   Stanley Bowling.

20  Q.   And who would be talking to Stanley Bowling?  He

21  was referring to "they."  Who was he talking about as

22  to "they"?

23  A.   The FBI.

24          MR. SMITH:  Play the next segment.

25          (Audio played.)

D. Kennon White – Direct Examination

1  BY MR. SMITH:

2  Q.   Mr. White, there was mention there at the end

3  that he said, "78, kicked one out."  What was he

4  referring to?

5  A.   Kicking someone out of drug court.

6  Q.   And this mention of a job, what job was he

7  referring to?

8  A.   The one that he had promised my wife, if anything

9  happened, that he would give her.

10         MR. SMITH:  Move on to the next segment.

11         (Audio played.)

12  BY MR. SMITH:

13  Q.   Mr. White, there was mention in this segment that

14  -- some mention about something being filed as an

15  appeal.

16  A.   Uh-huh.

17  Q.   What were you all talking about appealing?

18  A.   My ruling for unemployment.

19  Q.   And where were you going to be seeking

20  unemployment from at that time?

21  A.   The City of Manchester.

22  Q.   And had you had a dispute with the mayor of the

23  new administration about the unemployment?

24  A.   Yes, I had.

25  Q.   And Mr. Maricle said, "You have got an appeal

D. Kennon White - Direct Examination

1  past that."  What was he talking about?

2  A.   He was talking about appealing into Circuit Court

3  in front of him.

4  Q.   In front of him?

5  A.   Yeah.

6  Q.   As judge?

7  A.   Yes.

8  Q.   And he says, "I'll take care of it."  What was he

9  talking about?

10  A.   He was talking about taking care of my

11  unemployment, that if I got it in front of him that he

12  would take care of it.

13  Q.   At the last, there was some low whispering talk

14  between you and Mr. Maricle.

15       And you said something about, "Mark down what I

16  told you."

17       And Maricle says, "You think he is going to."

18  Who is he referring to?

19  A.   Stanley.

20            MR. PINALES:  Your Honor, may I approach?

21            THE COURT:  Yes, you may.

22            (Thereupon, a bench conference was had

23  between the Court and counsel out of the hearing of

24  the jury.)

25            THE COURT:  Yes, sir.

D. Kennon White - Direct Examination

1          MR. PINALES:  Martin Pinales on behalf of
2  Mr. Maricle.

3          Your Honor, I don't want to keep bopping up
4  and down.

5          But I think it's improper for Mr. Smith to
6  keep asking this witness what Mr. Maricle is referring
7  to.

8          I think he can properly ask him -- but I
9  don't want to tell him how to try his case -- what did
10  that mean to you?

11          But he is saying -- asking this witness
12  what's in the mind of my client.

13          THE COURT:  All right, I'll sustain the
14  objection.

15          Mr. Smith, if you could, in the future,
16  rephrase.  The witness can explain what he
17  understood --

18          MR. SMITH:  Sure.

19          THE COURT:  -- the statement to mean, to put
20  it in the proper context.

21          And also if requested, I will instruct the
22  jury that the statements of this witness are being
23  offered to put the defendant's statements in context.

24          Do you recall at this point he was wired, and
25  these are not admissions of a co-conspirator, but they

D. Kennon White - Direct Examination

1 were admitted by the court to put context to the

2 statements made by the defendant, may be unnecessary.

3          You may not want me to do that, but if

4 requested I will advise the jury for the context.

5          MR. PINALES:  I'm a slow thinker.  I'll let

6 the court note.

7          THE COURT:  You let me know.  Thank you.

8          MR. PINALES:  Thank you, I appreciate that.

9          MR. SMITH:  I'll rephrase the question.

10          THE COURT:  All right, thank you.

11          (End of bench conference.)

12          THE COURT:  All right, thank you, counsel,

13 you may proceed.

14 BY MR. SMITH:

15 Q.  What was your understanding Mr. Maricle meant

16 when he said, "You think he is going to"?

17 A.  My understanding was that he was asking if

18 Stanley was going to cooperate with the federal

19 government.

20 Q.  And then there was some mention, I believe he

21 asked a question about counterfeit money.

22      What was your understanding he was talking about

23 when he was referring to counterfeit money?

24 A.  We had been told that -- that the police had been

25 over there -- or the -- looking for counterfeit money,

D. Kennon White - Direct Examination

1 that a water bill had been paid with counterfeit money

2 and that he was concerned because his daughter had

3 worked there.

4 Q.   Now, his daughter had worked where?

5 A.   At the city.

6 Q.   And when did she stop working for the city?

7 A.   Either right before my father's administration

8 ended or his term, or right after.

9 Q.   So how many relatives did Judge Maricle have

10 working for the city at that time or at or about the

11 time your dad got defeated?

12 A.   He had two, he had his daughter and grandson.

13 Q.   Okay.  And you said it was the police, which

14 police was it?

15 A.   They had said that -- I had heard it was the

16 federal government had been in there looking, I

17 don't --

18 Q.   Following this recording, were you asked to also

19 meet again --

20 A.   Yes.

21 Q.   -- with the FBI again and wear a recorder?

22 A.   Uh-huh.

23       MR. SMITH:  I would like to hand the witness

24 Government's Exhibits A2 and A2A.

25       THE COURT:  Yes, sir.

D. Kennon White – Direct Examination

1  BY MR. SMITH:

2  Q.   Do you have before you the recording, A1,

3  Mr. White?

4  A.   Excuse me?

5  Q.   A2, I'm sorry.  Do you have Government's Exhibit

6  A2 before you?

7  A.   Yes, I do.

8  Q.   And can you identify what that is for the court

9  and jury?

10  A.   That's a recording that was made, that I made

11  with some -- some of the defendants.

12  Q.   And what was the date of the recording?

13  A.   March the 31st, 2007.

14  Q.   And what defendants do you recall meeting at this

15  time?

16  A.   Excuse me?

17  Q.   Who were the defendants that you say you met with

18  this time?

19  A.   Al Man Stivers and Mary Betty Stivers, his wife.

20  Q.   Okay, and was there anybody else in your company?

21  A.   My wife.

22  Q.   Okay, and her name is?

23  A.   Wanda.

24  Q.   And at the time that you had an opportunity --

25  that you had an opportunity before testifying today to

D. Kennon White – Direct Examination

1  review that recording?

2  A.    Several times.

3  Q.    And Mr. White, can you state for the record that

4  that's a fair and accurate depiction of the

5  conversation that you participated in?

6  A.    Yes, I can.

7  Q.    And do you also have in front of you A2A; is that

8  correct?

9  A.    Uh-huh.

10 Q.    And what is that?

11 A.    That's a transcript of the recording.

12 Q.    Okay, and have you had an opportunity to review

13 that transcript?

14 A.    Yes.

15 Q.    And compare that with the audio recording of the

16 conversation which you participated in?

17 A.    Yes, I have.

18 Q.    And can you state if that accurately reflects the

19 recording that you recorded at that time?

20 A.    Yes, that's an accurate representation.

21        MR. SMITH:  I would move for the admission of

22 Government's Exhibits A2 and A2A.

23        THE COURT:  All right, any objection other

24 than those previously raised?  If not, Exhibits A2 and

25 A2A will be admitted.

D. Kennon White – Direct Examination

1          (GOVERNMENT'S EXHIBITS A2 AND A2A ADMITTED
2 INTO EVIDENCE)
3          MR. SMITH:  Ask if they could be published to
4 the jury, Your Honor.
5          THE COURT:  Yes, sir.
6          (Audio played.)
7 BY MR. SMITH:
8 Q.   Would you identify that male voice for us?
9 A.   That is William Al Man Stivers.
10 Q.   Okay.
11          MR. SMITH:  Proceed.
12          (Audio played.)
13 BY MR. SMITH:
14 Q.   Mr. White, there were -- at the beginning of
15 that, you referenced the name Wayne.  Who were you
16 referring to?
17 A.   Wayne Jones.
18 Q.   And your wife, Wanda, mentions something about
19 she was mad.  What's your understanding she was mad
20 about?
21 A.   Over the election officers they had put there in
22 her place and Dobber's place.
23 Q.   So had there already been a selection of the
24 election officers for 2007 made at this time?
25 A.   Yes.

D. Kennon White – Direct Examination

1  Q.   And did it come to your knowledge that she wasn't
2  selected?
3  A.   Yes.
4  Q.   There was mention that the names David and
5  Darnell in her place.
6       Who, to your understanding, were they referring
7  to?
8  A.   They was referring to David Hensley and Darnell
9  Hipsher, which was former councilman -- or actually he
10 was councilman at that time.
11 Q.   And was he still a city councilman at this time?
12 A.   Yes.
13 Q.   Was he later prosecuted?
14 A.   Yes, he was.
15 Q.   But not at this time?
16 A.   But not at this time.
17 Q.   Now, what was your understanding Mr. Stivers was
18 referring to when he said, "Let me tell you who the
19 Daddy of that was."
20      What's your understanding that he was referring
21 to at that point?
22 A.   He was telling me who made the decision to do
23 that.
24 Q.   To do what?
25 A.   To not put Wanda back in as election officer.

D. Kennon White - Direct Examination

1  Q.    And in this conversation who, to your

2  understanding, was the "Daddy" of it all?

3  A.    Cletus Maricle.

4  Q.    Now, further in the conversation, it's brought up

5  again, I believe.

6       What's your understanding he refers to when he

7  says he wants Mr. Adams to see who serves, who is he

8  referring to?

9  A.    He is referring to Doug Adams.

10 Q.    And he says something about the name Clay.  Who

11 is he referring to, to your understanding?

12 A.    Clay Massey Bishop.

13 Q.    And "see what happens," what was he meaning when

14 he said, your understanding, "see what happens."

15 A.    That he was putting Darnell in there and David

16 Hensley and to see whether they -- Clay Massey was

17 running for Court of Appeals.

18      And he was wanting to see if they did what they

19 needed to do while they were in there for Clay.

20 Q.    Now, was Cletus Maricle or Doug Adams on the

21 Board of Elections making those selections of election

22 officers at that time to your knowledge?

23 A.    Okay, can you repeat that question?  I'm sorry.

24 Q.    Was Cletus Maricle on the Board of Elections at

25 that time?

D. Kennon White - Direct Examination

1  A.  No.

2  Q.  Was Douglas Adams on the Board of Elections at

3  that time?

4  A.  No.

5           MR. SMITH:  Play the next clip, please.

6           (Audio played.)

7  BY MR. SMITH:

8  Q.  Mr. White, this conversation, again, continues

9  with -- with you, and who is the male voice we are

10 hearing?

11 A.  William Al Man Stivers.

12 Q.  And in that conversation he references, "The one

13 reason I told you Wayne," who, to your understanding,

14 is he referring to?

15 A.  Wayne Jones.

16 Q.  And he said, "Wayne put him in there."  Who is he

17 referring to Wayne putting in?

18 A.  Darnell.

19 Q.  And Darnell who?

20 A.  Hipsher.

21 Q.  And then there was a reference to, "They will

22 trust him, and what they will do is he will try to

23 produce for Doug Adams."

24      What's your understanding he was referring to

25 when he says to you, "What they will do is he will try

D. Kennon White – Direct Examination

1 to produce for Doug Adams"?

2 A.   They will try to steal as many votes and do what

3 he needs to do for Doug Adams that he can.

4 Q.   There was a mention, I believe, attributed to

5 Wanda by Dobber.

6     What -- what, to your understanding, is she

7 referring when she speaks the name Dobber?

8 A.   Charles Weaver, the person that served as

9 election officer with her in the primary.

10 Q.   And there is also the name "Superman"

11 referenced.

12     Who was that being referenced to, to your

13 understanding?

14 A.   Doug Adams.

15 Q.   And Mary Betty, who is Mary Betty?

16 A.   Mary Betty is William Al Man Stivers's wife.

17 Q.   And is she a part of this conversation segment?

18 A.   Yes, she is.

19 Q.   There is also the name "Minnie."  Who, to your

20 understanding, were they referring to when they

21 referred to "Minnie"?

22 A.   Minnie is Charles Weaver Dobber's wife that

23 served as a Democratic election officer in the general

24 election.

25 Q.   And what, to your understanding, was referred to

D. Kennon White – Direct Examination

1  when they said, "If they can hold that spot,"

2  referring, I believe, at some point there one of the

3  subjects said they were going to be out of town at

4  Baton Rouge.  Who was that, to your understanding?

5  A.   That was Mary Betty.  It's common practice for

6  them to put someone that's not going to show up as

7  election officer in that slot.

8      And they can pick who they want to send there the

9  morning of election.

10     So a lot of times they will have a spot held like

11 that even though they know the person's not going to

12 be there so they can put who they want in there.

13          MR. SMITH:  Let's move on to the next

14 segment.

15          (Audio played.)

16 BY MR. SMITH:

17 Q.   Mr. White, what is your understanding Mr. Stivers

18 was referring to when he said, "Five grand is what I

19 heard"?

20 A.   Five grand is what he was referring that Anthony

21 got to not show up as election officer.

22 Q.   Who are you referring to?  Anthony who?

23 A.   Short.

24 Q.   And did he have a job in town there?

25 A.   He is a local attorney.  He was sheriff at the

D. Kennon White – Direct Examination

1 precinct usually.

2 Q.   In which precinct?

3 A.   Manchester.

4 Q.   Same precinct your wife worked in?

5 A.   Yes, he served in the primary.

6 Q.   But he didn't serve in the fall?

7 A.   Right.

8 Q.   And his explanation to you that he didn't serve

9 was what?

10 A.   He just said that he wouldn't serve, but I had

11 heard his wife had told me that he had got money from

12 his mother.

13      And then Al Man had said that he had got $5,000

14 is what he had heard not to serve.

15 Q.   Now, further in the conversation, your wife joins

16 the conversation, and there is a reference to Penny.

17 A.   Okay.

18 Q.   Who, to your understanding, are they referring to

19 by the name Penny?

20 A.   That's Penny Robinson.  She is a council member.

21 Q.   It says, "She put John Ed in."  Who is that

22 referring to, to your understanding?

23 A.   John Ed Pennington who is also a council member.

24 Q.   And what did she put him in as, to your

25 understanding?

D. Kennon White - Direct Examination

1  A.    An election officer.

2  Q.    And then there was some reference by Mary Betty

3  saying, "Yeah, he said, 'Let them, damn you, not

4  people serve.'"

5       What was your understanding they referred to

6  there?

7  A.    He was -- my understanding was that they had

8  moved them to a different precinct, which was Penny's

9  daughter-in-law's.

10      And one of them worked for UNITE, and that they

11  put them where that they would want them at, in other

12  words maybe that they wasn't doing anything, or

13  something like that.

14  Q.   So what is he --- what is your understanding what

15  he means when he says he switched them?

16  A.    That he switched them to a different precinct

17  would be my understanding of how I interpreted -- how

18  I interpreted that.

19  Q.   And to your understanding what advantage would

20  that give Mr. Stivers in switching these UNITE people

21  to a different precinct?

22  A.    That they wouldn't be in the precinct of where

23  that they were buying votes, that they would put them

24  in a precinct that they thought where they may have

25  problems with the other side trying to do something,

D. Kennon White - Direct Examination

1 and it would scare them or either because that -- that

2 they would put them somewhere where nothing was going

3 on, you know, where --

4 Q.   What does UNITE stand for?

5 A.   I don't know what it stands for, but it's a drug

6 task force.

7 Q.   And was that something of concern by Stivers and

8 others that you talked to in this conversation?

9 A.   Yes.

10 Q.   There is a mention of the name of Randy.  Who, to

11 your understanding, were they referring to about

12 Randy?

13 A.   Randy Craft.

14 Q.   And some comment was made about never serving

15 again because you don't know the Federal Court in

16 London, to your understanding what was that

17 referencing?

18 A.   He had been subpoenaed into Federal Court in

19 London, Kentucky about a prior election.

20     And he had been making the statement that he

21 would never serve as election officer again.

22 Q.   There is the name Mike Bishop serving.  What, to

23 your understanding, was he referencing here about Mike

24 Bishop serving?

25 A.   Serving as election officer.

D. Kennon White - Direct Examination

1 Q.   Then there is mention of his sister Diane.  Who,
2 to your understanding, are they referencing there?
3 A.   Mike Bishop's sister, Diane Hensley.  I think at
4 the time her last name was Hensley.
5 Q.   And then it mentions Clay Massey's race.  What,
6 to your understanding, are they referring to Clay
7 Massey's race?
8 A.   My understanding was that the race where he was
9 running against -- for appeal, running for appeals
10 judge.
11 Q.   Appeals Judge.  Was that a judge race that was
12 going to occur in the upcoming election in '07?
13 A.   Yeah, I think so.
14 Q.   Finally, it says -- Mr. Stivers said something,
15 "I told them with Darnell in there, let Darnell do it
16 for Clay Massey and for Mr. Adams.  See what I am
17 getting at?"  What, to your understanding, was he
18 referring to?
19 A.   That he was -- that Mr. Adams would want -- would
20 want him to help Clay Massey and that let him get in
21 there and do it and take the chance because of the
22 heat that was on, to let Darnell take the heat and do
23 it if he wanted to do it.
24 Q.   To your understanding, did Mr. Stivers and his
25 wife Mary Betty know that this might upset you and

D. Kennon White – Direct Examination

1  your wife that Darnell was going to serve in her

2  place?

3  A.   Yes.

4          MR. SMITH:  Let's move on to the next clip.

5          THE COURT:  Before we do that, we will take a

6  break, Mr. Smith.

7          MR. SMITH:  Thank you.

8          THE COURT:  We have been in court a little

9  over an hour and a half in this session.

10         Ladies and gentlemen, we will take our

11  afternoon recess at this time.  We will take a twenty-

12  minute recess.

13         Please keep in mind the admonitions that you

14  have been given previously not to discuss the case

15  among yourself while we are in recess, but you will be

16  excused for twenty minutes.

17         (The jury was excused from the courtroom at

18  this time for afternoon recess.)

19         THE COURT:  Thank you.  Any matters to take

20  up outside the presence of the jury?  We will be in

21  recess for twenty minutes.

22         (Afternoon recess taken from 2:48 p.m. until

23  3:08 p.m.)

24         (After recess.)

25