D. Kennon White – Direct Examination

 1          (Jury resumed their places in the jury box,

 2  and the following proceedings were had in open court.)

 3          THE COURT:  Thank you.  The record will

 4  reflect that all members of the jury are present.  The

 5  parties and counsel are also present.

 6          Mr. White, you are still under oath.

 7          Mr. Smith, you may continue.

 8          MR. SMITH:  Thank you, Your Honor.  I believe

 9  as we had broke we finished one clip, and I would ask

10  now to publish our next clip.

11          THE COURT:  Yes, sir, you may.

12          MR. SMITH:  Thank you.

13          (Audio played.)

14  BY MR. SMITH:

15  Q.  Mr. White, in this clip, we had Mr. Stivers

16  making initial comments, something to the effect that,

17  "They are not worried about no election."

18      To your understanding, who is he referring to,

19  "they"?

20  A.  He is -- he is referring to the FBI doing the

21  investigation.

22  Q.  Further in the conversation, there is some

23  mention by his wife Mary about Gary wouldn't get them

24  indicted.

25      Who is, to your understanding, is his wife

D. Kennon White – Direct Examination

1  referring to as Gary?

2  A.   Gary Gregory, the Commonwealth Attorney.

3  Q.   Now, Commonwealth Attorney, is that the

4  prosecutor for the -- for the county, Clay County?

5  A.   Yes.

6  Q.   And he works under the judge who would be --

7  A.   Cletus Maricle.

8  Q.   And he was -- he was the judge at the time these

9  recordings were going on?

10 A.   Yes.

11 Q.   Circuit judge?

12 A.   Yes.

13 Q.   Now, further she references a fellow by the name

14 of Clarency, she said Clarency outsmarted them.  To

15 your understanding, who is she referring to?

16 A.   I think she is referring to Gary, and Clarency is

17 a nickname is the only thing I can figure.

18 Q.   And to your understanding in this conversation,

19 how was she explaining that the Commonwealth Attorney

20 had outsmarted them?

21 A.   That they had beat the federal government to the

22 indictment and had made an indictment against Joe

23 Swafford so that the other people that was included in

24 this thing wouldn't be indicted, so they indicted Joe

25 Swafford before the Feds could pick it up.

D. Kennon White – Direct Examination

1  Q.   Now, who is Joe Swafford, to your understanding?

2  A.   He was the Chamber of Commerce -- the person who

3  was over the Chamber of Commerce.

4  Q.   And what was the allegations placed against him

5  at that time?

6  A.   He was coordinating the PRIDE grants that was

7  coming into Clay County, and he -- like you get a

8  grant, federal grant.

9  Q.   And to your understanding, Joe Swafford had some

10 authority over who got to do the PRIDE work?

11 A.   That's -- from what I understand, that's correct.

12 Q.   Now, as the conversation developed, you go on to

13 say something, "He says he gets $15,000 a year out of

14 the city, he is getting 15,000 out of the county," who

15 are you referring to there?

16 A.   I was referring to what that Stanley had told me

17 that he had came to me over Joe Swafford kicking and

18 throwing out their bids.

19      And he was upset, and he was telling me that Joe

20 received 15 -- that the county, the city and the

21 chamber, all three paid him a set amount.

22      He gets money, I think, from all three

23 organizations.

24      And he had come to me making that statement, that

25 that's what Joe made.

D. Kennon White - Direct Examination

1  Q.   And what was the purpose -- when did he come to

2  you, was that before this recording?

3  A.   It was before this recording, yeah, he came -- he

4  came after that the first time that him and Bart had

5  entered a bid and Joe had thrown the bid out because

6  there wasn't anyone else or wasn't enough people that

7  had bid on it.

8       And he felt that Joe could have helped him some

9  way.

10      And he wanted -- he told me that he was going to

11 use his influence as magistrate to get Joe's job done

12 away with at the county, the money they was paying

13 him.

14      And he wanted me and my dad and the council on

15 board of getting rid of him at the city and taking the

16 15,000 from him because that he was going to have to

17 either help him or he was going to lose his job, that

18 he wanted me to go tell him that.

19 Q.   And Joe was going to have to help him do what?

20 A.   Get those bids, not give him any trouble with

21 them.

22 Q.   So Joe was employed by both the city and the

23 county?

24 A.   Yes, and the chamber.

25 Q.   And the chamber.  Further in the conversation

D. Kennon White – Direct Examination

1 there is a name Ed Worley brought up.

2     Who were they referring to, to your

3 understanding, Ed Worley?

4 A.   To my understanding that is a representative or a

5 senator from Richmond's brother or either a senator

6 hisself.  I don't remember in the text exactly who he

7 was.

8 Q.   And to your understanding, what did Ed Worley

9 have to do with Stanley Bowling in this conversation?

10 A.   There was another PRIDE grant or some other type

11 of clean-up grant that had came through.

12     And -- and he had said that Robert Stivers had

13 came to his house.

14 Q.   And who is Robert Stivers?

15 A.   Robert Stivers is a senator, state senator.

16 Q.   Okay, and Robert Stivers had come to his house

17 and what?

18 A.   Had told Bart and Stanley to back off bidding on

19 some of these -- some of these projects because that

20 Worley was wanting to get some of them and that there

21 were plenty enough of them to go around, but that they

22 needed to back off some particular ones that he was

23 wanting to bid on.

24 Q.   Stivers made some mention about seeing Bart and

25 Stanley around town and said, "they leave the house in

D. Kennon White – Direct Examination

1  the floorboard."

2      What was your understanding was he referring to

3  when he said left the house in the floorboard?

4  A.   He was referring to that they did not want to be

5  seen together because they did not want the federal

6  government to be alerted that they were in businesses

7  together and that close and so that they were meeting

8  under situations that one of them would hide and meet

9  late at night and maybe right out of there on the

10  floorboard to where they could not see that they were

11  there so they could speak and talk.

12  Q.   Toward the end of that conversation, you talk

13  about Jamie and Judy and whether she would

14  understand.

15      What -- to your understanding, who were you

16  referring to?

17  A.   We were looking at buying a house because we had

18  moved from Clay County.  We were in the process of

19  moving, and Judy had always --

20  Q.   And who is Judy?

21  A.    Judy Maricle, which is Cletus Maricle's wife.

22  She had been a real estate agent and had always sold

23  our -- sold us whatever property we bought or what we

24  sold she had the listing on.

25          MR. SMITH:  Let's move on now to the next

D. Kennon White – Direct Examination

1  clip if we could, Your Honor.

2          THE COURT:  Yes, sir.

3          (Audio played.)

4  BY MR. SMITH:

5  Q.   Mr. White, as we finish that clip, at the

6  beginning there it mentions the name -- Mr. Stivers

7  mentions the name Wayne.  Who, to your understanding,

8  was he referring to?

9  A.   Wayne Jones.

10 Q.   And then Wanda referenced, "You know I signed a

11 bunch of them papers.  Do you think he took care of

12 them for me?"

13      What to your understanding -- what, to your

14 understanding, was she referring to?

15 A.   When you assist a voter, you have to sign what's

16 called a voter assistant form.

17      And they had -- she had had to sign them.  There

18 was a lot of people down there kind of watching the

19 polls, and she signed a lot of voter's assistance

20 forms.

21      And she was -- Wayne and Al Man had promised her

22 that would be taken care of, that they would get rid

23 of them before they made it to the clerk's office or

24 when they got to the clerk's office so there wouldn't

25 be a record of them; and that's what she was referring

D. Kennon White – Direct Examination

1  to.

2  Q.   And Stivers made the comment, "Him and Freddy

3  took care of it."  To your understanding, who was he

4  referring to?

5  A.   He was referring to Wayne Jones and Freddy

6  Thompson.

7  Q.   Took care of what?

8  A.   The voter assistance forms.

9  Q.   And to your understanding why was that

10  important?

11  A.   Because that's a paper trail that they can go

12  back and find the people that you assisted voting and

13  build a case against you if you paid those people for

14  those votes.

15  Q.   Now, Stivers made the comment there also, said

16  that, "We thought we were doing it for your good."

17      To your understanding, what was he referring to

18  there?

19  A.   Not putting Wanda back in as election officer.

20  Q.   Further in that conversation, Stivers made the

21  comment, "They are going to go after the county, I

22  think the city, I think they are going to get Darnell,

23  Mike, that girl and could get Penny."

24      To your understanding, who was he referring to in

25  that statement?

D. Kennon White – Direct Examination

1  A.   I think he was referring to Darnell Hipsher, Mike

2  White, Pam Mathis and Penny Robinson.

3  Q.   And Mike White and Pam Mathis, would you tell us

4  who they are?

5  A.   Mike White was the -- is the general supervisor

6  at the city, and Pam Mathis was the one that helped

7  coordinate the grants at the City of Manchester.

8         MR. WESTBERRY:  Excuse me.  May we approach?

9         THE COURT:  Yes, sir.

10         (Mr. Westberry and Mr. Smith conferring.)

11         MR. SMITH:  Sure, that will speed us along.

12  BY MR. SMITH:

13  Q.   Mr. White, there was also reference to the name

14  Doug in that conversation.  To your understanding, who

15  were they referring to?

16  A.   I'll have to go back and look through them, if

17  you will give me just a moment.

18      Doug, I think they were referring to my dad, Doug

19  White.

20  Q.   And to your understanding, what was the context

21  which your father's name was mentioned there in that

22  conversation?

23  A.   Oh, where that he had made an unsuccessful

24  attempt to become mayor.

25         THE COURT:  I'm sorry, I couldn't hear your

D. Kennon White - Direct Examination

 1 answer.

 2        THE WITNESS:  He had made an unsuccessful

 3 attempt to become mayor, it was used in that context.

 4 BY MR. SMITH:

 5 Q.  And when you and Wanda were inquiring about who

 6 was with you and supporting whom, who were you

 7 referring to?

 8 A.  I was referring to the people that had helped us,

 9 Wanda, to get into election officer, whenever -- which

10 is Cletus Maricle, Wayne Jones, Al Man.

11 Q.  All right.

12        MR. SMITH:  I would like to direct the

13 witness's attention to our next exhibit, Your Honor,

14 A3.

15        THE COURT:  Yes, sir.

16        MR. SMITH:  If I could have that delivered to

17 the witness, please.

18 BY MR. SMITH:

19 Q.  Do you have before you now Government's Exhibit

20 A3, Mr. White?

21 A.  Yes, I do.

22 Q.  And could you identify it?

23 A.  Yes, it's a transcript that we made of THE

24 recording that -- of some of the defendants.

25 Q.  Okay, do you also have a copy of the recording?

D. Kennon White – Direct Examination

1  A.   Yes.

2  Q.   Is that not identified as Government's Exhibit

3  A3?

4  A.   Yes, it is.

5  Q.   And have you reviewed that recording?

6  A.   Yes, I have.

7  Q.   Were you a participant in that recording?

8  A.   Yes, I was.

9  Q.   And when was that recording made?

10  A.   April the 6th, 2007.

11  Q.   And you reviewed that before your testimony --

12  testimony here today?

13  A.   Yes.

14  Q.   Is that a fair and accurate recording depicting

15  what was said in that conversation?

16  A.   Yes, it is.

17  Q.   And this transcript that you have marked as

18  Government's Exhibit A3A, have you also had an

19  opportunity to read that transcript?

20  A.   Yes, I have, several times.

21  Q.   And is that a fair and accurate transcript of the

22  words that were spoken and the conversation in which

23  you were a participant?

24  A.   Yes, it is.

25          MR. SMITH:  I would move at this time to

D. Kennon White – Direct Examination

 1 introduce Government's Exhibits A3 and A3A,

 2 Your Honor.

 3          THE COURT:  Any objection other than those

 4 previously stated?

 5          If not, Exhibits A3 and A3A will be admitted

 6 and may be displayed.

 7          MR. SMITH:  Thank you, Your Honor.

 8          (GOVERNMENT EXHIBIT NO. A3 AND A3A ADMITTED

 9 INTO EVIDENCE)

10          (Audio played.)

11 BY MR. SMITH:

12 Q.  Mr. White, in this portion of the clip, it

13 introduces the name Anthony.

14      I think Mr. Stivers said, "What it was, Anthony

15 never got them papers is what it was."

16      To your understanding, what was this conversation

17 referring to?

18 A.  It was referring to a transport order that -- to

19 get my brother-in-law in front of Judge Maricle at the

20 time.

21 Q.  And why was that an important thing to you and

22 Wanda at that time?

23 A.  Because that he was -- he was wanting to -- he

24 was supposed to help him and let him out.

25 Q.  When did he make that promise to you?

D. Kennon White - Direct Examination

1  A.    He made that promise before the race -- before

2  his -- Wanda went in as election officer.

3  Q.    And before what race?

4  A.    His son-in-law's race.

5  Q.    And what's his name?

6  A.    Phillip Mobley.

7  Q.    So she had a brother that was in trouble?

8  A.    Yes.

9  Q.    Do you know what kind of charges he had against

10 him?

11 A.    I don't know the exact charges, but I think

12 assault was one.

13 Q.    Now, who is Anthony?

14 A.    Anthony is a local attorney from Clay County.

15 Q.    And what's his name?

16 A.    Anthony Short.

17 Q.    And Stivers tells you that, "Anthony never got

18 them papers."

19     And he calls it a transport order.  What, to your

20 understanding, was he referring to?

21 A.    He was supposed to have some type of order to

22 bring Cork in front of -- which is my brother-in-law's

23 name -- in front of Judge Maricle and that Anthony had

24 failed to get the proper paperwork to the judge to

25 have that done.

D. Kennon White - Direct Examination

1  Q.   And what was your brother-in-law's name?

2  A.   Eugene Corky Price.

3  Q.   Were you all expecting him to be down in Clay

4  County before Judge Maricle?

5  A.   Yes.

6  Q.   And why were you expecting him to be back in Clay

7  County in front of Judge Maricle?

8  A.   Because Judge Maricle was going to -- had told us

9  that he was going to help him to get out.

10 Q.   Had he already been sentenced?

11 A.   Yes.

12 Q.   You made a statement that, "Anthony's on them

13 drugs."  Who were you referring to?

14 A.   Anthony Short.

15 Q.   Had you seen Anthony use drugs?

16 A.   I have seen Anthony use drugs in the past, you

17 know, many years ago.

18 Q.   Okay, and why did you make that statement at that

19 time to the --

20 A.   Because that my wife had told me that he had used

21 drugs at the election poll.

22      Him and -- her and Dobber both had told me that

23 Anthony had used drugs while he was election officer

24 at the polls.

25 Q.   What did they tell you they saw?

D. Kennon White – Direct Examination

1  A.   They said that he snorted something off the book
2  down there.
3  Q.   And he was serving with your wife as an election
4  officer on that day in May 2006?
5  A.   That's correct, yeah, that's correct.
6  Q.   And then Stivers said, "Give her that to type up
7  the transport order."  Who was he referring to, to
8  your understanding?
9  A.   Okay, let me look.  His mother.
10  Q.   Whose mother?
11  A.   Anthony's mother, who was his secretary, also.
12  Q.   And then he said, "Cletus had it."  What -- who
13  was he referring to there?
14  A.   Cletus Maricle.
15  Q.   And to your understanding what was he meaning
16  when he said "Cletus had it"?
17  A.   Had the -- had the paperwork that he needed to
18  file with the court.
19  Q.   The paperwork to do what, to your understanding?
20  A.   To release my brother-in-law.
21           MR. SMITH:  If we could now play the second
22  clip.
23           (Audio played.)
24  BY MR. SMITH:
25  Q.   Now, in this segment we hear again another softer

D. Kennon White – Direct Examination

1 male voice that's engaged in this conversation.  Can

2 you identify that softer male voice?

3 A.   That's Wayne Jones.

4 Q.   And when you reference "Bart," who are you

5 referring to there?

6 A.   Bart Morris.

7 Q.   Finally, there was mentioned about Stan or

8 Stanley.  Who were you referring to there as partners?

9 A.   Stanley Bowling.

10 Q.   And partners with whom?

11 A.   Bart Morris.

12 Q.   And then attributed to Jones, says, "They are

13 partners in every damn thing."  To your understanding,

14 who was he referring to?

15 A.   Bart Morris and Stanley Bowling.

16        MR. SMITH:  I want to move on to the next

17 segment, please.

18        (Audio played.)

19 BY MR. SMITH:

20 Q.   Mr. White, as that conversation began, it

21 referenced Stivers describing the incident with Denver

22 Dean you mentioned was handcuffed.

23      Who, to your understanding, was he referring to

24 was Denver Dean?

25 A.   Denver Dean Jones.

D. Kennon White – Direct Examination

1  Q.   And who was Denver Dean Jones?

2  A.   He was a person that was convicted of drug

3  dealing in Manchester.

4  Q.   Now, in this conversation, there was reference to

5  something that occurred down at the City Hall or old

6  City Hall.

7  A.   Yes, that's what he was saying.

8  Q.   And to your understanding, what was this incident

9  about?

10  A.   From what he had said, he was trying to smoke a

11  cigarette, and there was a police officer there, state

12  policeman that took him in.

13       And the police officer had smacked the cigarette

14  out of his mouth and that they had had an altercation

15  and some verbal exchanges.

16  Q.   Okay, and when Stivers makes reference, that he

17  says, "I said, 'If you smack me, I am going to kill

18  you.'"

19       Who, to your understanding, was he was referring

20  to in that statement?

21  A.   The state policeman.

22  Q.   And he goes on to say, "He said, 'You threatening

23  me?'"

24       And he said, "I said, 'No.'  I said, 'I am making

25  you a Goddamn promise.'"

D. Kennon White - Direct Examination

1    To your understanding what was he referring to
2  there?
3  A.   He was talking about backing up the threat that
4  he had made to the state trooper.
5          MR. SMITH:  Move on now with the next clip,
6  please.
7          (Audio played.)
8  BY MR. SMITH:
9  Q.   Mr. White?
10 A.   Yes.
11 Q.   In this segment, there was a couple names thrown
12 out about the first section there, Don Rowland and
13 Billy Don?
14 A.   Uh-huh.
15 Q.   To your understanding, who is that being
16 referenced to?
17 A.   Billy Don is Bill Rowland Phillip's son, and Don
18 Rowland is his nephew.
19 Q.   Now, Billy Rowland Phillips, have you introduced
20 us to him previously?
21 A.   Yes, he was the one that was shot during the
22 election.
23 Q.   Of 2002?
24 A.   Yes.
25 Q.   And Don Rowland's related to him?

D. Kennon White - Direct Examination

1  A.   I think that's his nephew, if I am not mistaken.

2  Q.   And Stivers says, "We have been trying to get Don

3  Rowland out forever."

4       To your understanding, what was he referring to

5  about getting Don Rowland out?

6  A.   From what I understand, Don Rowland was convicted

7  of several murders, or at least two from what I

8  understand.

9       And they were wanting to get him out so that he

10 would do what they wanted him to do, if they needed

11 him.

12 Q.   Now, there was a further description of a violent

13 act and referred to someone cutting their pot down.

14      Do you understand what were they referring to

15 when they said "they cut their pot down"?

16 A.   They had been raising pot, from what Al Man had

17 said, up above this man's house.

18      And he had went up there and had found this pot

19 growing, and he had cut it down because it was on his

20 property; and they killed him over that.

21 Q.   Now, this Billy Rowland and his relative, Don,

22 were further mentioned.

23      And Stivers says, "I told Bill up there, 'The

24 next time,' I said, 'I am going to blow his fucking

25 brains out.'"

D. Kennon White - Direct Examination

1  A.   I think it was --

2  Q.   To your understanding, what was he referencing

3  there?

4  A.   He had been into it with Don Rowland, or Billy

5  Don, I would have to look back to see which one he is

6  referring to.

7       I think he was talking about Don Rowland, if my

8  memory serves me right.

9  Q.   And this was the person who he had also said that

10 he was going to get -- been trying to get out of

11 prison?

12 A.   Yes.

13 Q.   You mentioned that the only person you saw, "I

14 have only seen Jess Lewis afraid of was Don."  Who is

15 Jess Lewis that you are referring to?

16 A.   He was -- he is a relative of my wife.

17 Q.   And the only person you said he was afraid of was

18 Don, who were you referring to?

19 A.   Don Rowland Phillips.

20 Q.   And then there was some mention by Stivers that,

21 "Don's the one that killed him with an axe."

22      To your understanding, who was he referring to

23 there?

24 A.   I don't remember the man's name, but he was

25 talking about Christine Harris's husband.

D. Kennon White – Direct Examination

1  Q.   And who is the "Don" he is referring to?

2  A.   Don Rowland Phillips.

3          MR. SMITH:  Play the next segment, if we

4  could, Your Honor.

5          THE COURT:  Yes, sir.

6          (Audio played.)

7  BY MR. SMITH:

8  Q.   Mr. White, as we began that clip there was

9  mention of the Phelps boys.

10     To your understanding, who were they referencing

11  the Phelps boys?

12  A.   I think they were state policemen.  They were

13  state policemen.

14  Q.   And were they local state policemen in your

15  county?

16  A.   Actually they were from the neighboring county,

17  Laurel County.

18  Q.   Right.  And Jones mentioned something about he

19  and Al Man went back there to help him pick a jury.

20     Do you understand what he was talking about

21  picking a jury?

22  A.   That's referred to as helping to pick a jury

23  that's partial to letting people walk on crimes.

24  Q.   And then there was a conversation that says

25  further where Stivers mentions, "Did you ever take Sis

D. Kennon White – Direct Examination

1  back up there to see Roy?"  Do you understand who was

2  he referring to "Sis"?

3  A.   He was referring to my mother-in-law.

4  Q.   And does she go by "Sis"?

5  A.   Yeah, that's her nickname.

6  Q.   What's her actual name?

7  A.   Sarah Price.

8  Q.   And he says, "Do you ever take Sis back up to see

9  Roy?"  Who is he referring to?

10  A.   Roy Collins, an attorney.

11  Q.   And who is Roy Collins associated with, a firm or

12  he had his own office?

13  A.   Morgan, Madden, Collins and Beshear.

14  Q.   And who is the Madden in that firm?

15  A.   Scott.

16  Q.   Scott who?

17  A.   Madden.

18  Q.   And is that the same Scott Madden you introduced

19  us to earlier as the lawyer that was in the practice

20  with Cletus Maricle?

21  A.   Yes.

22  Q.   Further in the conversation, it says, "Do you

23  think she will get big money out of that," Wanda

24  asks.

25       Do you understand what she was referring to

D. Kennon White – Direct Examination

1 there?

2 A.   Yes, they was -- she was thinking about filing a

3 lawsuit.

4     She had been in the hospital and had had some

5 type of -- they had messed up on her surgery, and --

6 and her -- and something to do with her blood, when

7 they was giving her a blood transfusion, and he was

8 wanting us to file a lawsuit.

9 Q.   Okay.  Finally, he says, "It won't take it a

10 year," Stivers says.

11     What was he referring to there, to your

12 understanding?

13 A.   He was saying that it would be speeded along,

14 that Cletus would speed up the process to get the

15 money if we were to file the suit.

16 Q.   Now, in the previous exchange there, they are

17 mentioning the Phelps brothers in the case over in

18 court in front of which judge there?

19 A.   A different judge, a judge from Laurel County.

20 Q.   He refers to Cletus's office as being the place

21 where he had a shotgun that was within reach.

22 A.   Yeah.

23 Q.   To your understanding, where was he and what was

24 he referencing there?

25 A.   He was talking about when they were in there to

D. Kennon White – Direct Examination

1 help pick the jury, that they were in Cletus's

2 office.

3     And there was a shotgun in there, in Cletus's

4 office.

5 Q.  To your understanding, what did he mean,

6 Mr. Jones, when he said, "We will flush it down the

7 commode"?

8 A.  He was just showing that the Phelps boys was in

9 his -- was in his neck of the woods and that he was in

10 control of the situation, not them.

11 Q.  And to your understanding what was he talking

12 about flushing?

13 A.  He was -- he was just basically making fun of

14 them when he was talking about flushing the shotgun.

15          MR. SMITH:  If we could play the next

16 segment, Your Honor.

17          THE COURT:  Yes, sir.

18          (Audio played.)

19 BY MR. SMITH:

20 Q.  This segment, Wanda makes a statement, "Well,

21 Buddy, I hope poor old Cork gets out."  To your

22 understanding, who was she referring to?

23 A.  Her brother.

24 Q.  And getting out of what, to your understanding?

25 A.  Getting out of jail or prison.

D. Kennon White – Direct Examination

1 Q.   And Stivers begins to say something about his
2 friends.
3     And he said, "I have got two of them, Peanut and
4 still send Billy Rowland money every month."
5     To your understanding, who was he referring to as
6 "Peanut"?
7 A.   Peanut Abner.
8 Q.   And who is Peanut Abner?
9 A.   He is -- he is a gentleman, or he is a man that
10 lives on Town Branch in Clay County.  He has been in
11 trouble before.
12 Q.   And what was he in trouble for?
13 A.   What I seen was in the papers it was for
14 something to do with large amounts of money and drug
15 dealing.
16 Q.   And he says he was sending money to Bill
17 Rowland.  Do you understand who was that?
18 A.   That was Bill Rowland Phillips.
19 Q.   And finally there towards the end, he says, "I am
20 sitting here and I received a phone call," Mr. Stivers
21 did, and he made reference to someone on the phone,
22 "Sitting here talking to your clients or one of your
23 clients."
24     Who was he referring to there, to your
25 understanding?

D. Kennon White – Direct Examination

1  A.   Roy Collins.

2  Q.   And is that the same Roy Collins as the attorney?

3  A.   Yes.

4  Q.   I would like to now turn your attention to

5  Government's Exhibit A4.

6          MR. SMITH:  Deliver that to the witness,

7  please.

8  BY MR. SMITH:

9  Q.   Do you have before you now Government's Exhibit

10 A4?

11 A.   Yes, I do.

12 Q.   And can you identify that?

13 A.   Yes, it's a transcript of a recording I

14 participated in.

15 Q.   And what date was this recording?

16 A.   It was on April the 9th.

17 Q.   Of what year?

18 A.   2007.

19 Q.   And who was this conversation recorded with?

20 A.   My wife, Wanda White, myself, William Al Man

21 Stivers and Mary Betty Stivers.

22 Q.   And at the witness stand now you should have a

23 recording disk in front of you marked A4?

24 A.   Yes.

25 Q.   Have you previously reviewed that before your

D. Kennon White – Direct Examination

1  testimony today?

2  A.   Yes, I have.

3  Q.   And were you a participant in that conversation?

4  A.   Yes, I was.

5  Q.   And is that a fair and accurate recording of the

6  conversation in which you were a participant?

7  A.   Yes, it is.

8  Q.   And A4A is a transcript before you?

9  A.   Yes.

10 Q.   And did you review that and initial that before

11 your testimony here today?

12 A.   Yes, several times.

13 Q.   And at the time that you reviewed that, did you

14 compare that with the audio recording in which you

15 were a participant?

16 A.   Yes, I did.

17 Q.   And is that a fair and accurate transcription of

18 the recording and the conversation which you

19 participated?

20 A.   Yes, it is.

21          MR. SMITH:  Move now for the introduction of

22 Government's Exhibit A4 and A4A, Your Honor.

23          THE COURT:  Any objection other than what has

24 previously been stated?

25          Exhibits A4 and A4A will be admitted, and the

D. Kennon White – Direct Examination

1 audio tape may be played and the transcript may be

2 displayed.

3          MR. SMITH:  Thank you, Your Honor.

4          (GOVERNMENT'S EXHIBITS A4 AND A4A ADMITTED

5 INTO EVIDENCE)

6          (Audio played.)

7 BY MR. SMITH:

8 Q.   Mr. White, there was reference to Linsey and

9 Shane in this conversation.  To your understanding,

10 who was being referenced?

11 A.   Linsey Maricle.

12 Q.   And how is she related to Cletus Maricle?

13 A.   That's his daughter.

14 Q.   And who was Shane, to your understanding?

15 A.   Shane Rogers was a local person that's known,

16 drug dealer he has been arrested for.

17 Q.   And Stivers mentioned in that conversation he

18 gave Shane time.

19      To your understanding, what was he giving him

20 time, or to your understanding, what was he referring

21 to?

22 A.   He was giving him time to get rid of his drugs

23 because he knew that he had drugs on him.

24 Q.   And he said Cletus was with him.  Who was he

25 referring to there, to your understanding?

D. Kennon White – Direct Examination

1  A.    Cletus Maricle.

2  Q.    And at the end, he said that there were 8 or 9

3  grams of meth found on him.  To your understanding,

4  who was he referring to?

5  A.    Shane Rogers.

6  Q.    And he said, "He served no time over that."  To

7  your understanding, who was he referring to?

8  A.    Shane Rogers had served no time over that

9  incident.

10  Q.    And to your understanding, where did this

11  incident take place, in what county?

12  A.    Clay County.

13          MR. SMITH:  Move on to the next segment,

14  please.

15          (Audio played.)

16  BY MR. SMITH:

17  Q.    Now, Mr. White, there was reference in this

18  conversation to a fellow by the name of Harvey.

19  A.    Uh-huh.

20  Q.    To your understanding, who was that being

21  referenced?

22  A.    Harvey Hensley.  He is a current council member.

23  Q.    And there was discussion in there about Harvey

24  might become the mayor.

25          To your understanding, what was being debated or

D. Kennon White – Direct Examination

1  discussed about him becoming mayor?

2  A.   It was being discussed that Carmen Lewis may have

3  a problem statement.

4      Ordinance was never put on the books for her to

5  be living in the city and that they would throw out

6  her, her -- I guess her win for mayor because she

7  actually wasn't living in the city at the time

8  according to some people.

9  Q.   Now, this was talked about.  Was it ever done,

10 was there ever a suit filed to try to get Carmen Lewis

11 disqualified from her win?

12 A.   Not -- not to my knowledge.

13 Q.   There was some mention about it going to Circuit

14 Court before Cletus.  Who was that referring to?

15 A.   Cletus Maricle.

16 Q.   And Maricle said that he would have to recuse,

17 and you said, "Because where Linsey and them worked

18 there."  What were you referring to?

19 A.   I was referring to where that Linsey and his

20 grandson had worked at the city.

21 Q.   And then, finally, there was mentioned by

22 Stivers, "I know about the many votes that she had for

23 almost two years."

24      To your understanding, who was he referring to

25 there at the end?

99

Colloquy

1  A.   He was referring to Carmen Lewis.

2  Q.   And Mary made some mention about, "knowing that

3  they had bought votes, as many as they had gotten

4  legal."  Do you understand what was she was referring

5  to?

6  A.   She was referring to Carmen Lewis and the new

7  counsel that went in.

8          MR. SMITH:  Your Honor, I believe that would

9  be a point of --

10          THE COURT:  All right.

11          MR. SMITH:  -- to stop.

12          THE COURT:  We will stop for the evening at

13  this point.

14          I do want to go over our schedule with the

15  jury before we recess for the evening.

16          Ladies and gentlemen, we will proceed

17  tomorrow at 9:00.

18          I do appreciate your efforts today.  I know

19  that some of you have had some difficulties with the

20  weather.

21          I do appreciate you being here and making

22  every effort to be here.

23          We are also going to proceed on Monday of

24  next week.

25          Monday's actually a federal holiday, but we

Colloquy

 1  will proceed with court on that day.

 2          However, we do have a conflict with a few of

 3  the attorneys in the case on the 22nd of February.

 4  That's a Monday.

 5          So we will not be in court on that Monday the

 6  22nd.

 7          So we will be here tomorrow and also on

 8  Monday the 15th, but we will not be in session on the

 9  22nd.

10          And as we have other changes in schedule in

11  the future, I'll certainly try to give you as much

12  notice as possible.

13          Before we recess for the evening, I do want

14  to again remind you of the use of transcripts.

15          I want to remind you that, again, the tapes

16  that you have been listening to are the evidence in

17  the case.

18          The transcripts are not evidence, but they

19  have been given to you to guide you and to help you

20  understand what's being said.

21          Again, if you noticed any difference between

22  what you heard on the tapes and what you read in the

23  transcripts, you must rely upon what you heard and not

24  what you read.

25          And if you could not hear any -- could not

Colloquy

1 hear or understand certain parts of the tapes, then

2 you must ignore the transcripts as far as those parts

3 are concerned.

4           Let me also, again, remind you of the

5 admonition that's been given to you previously as we

6 break for the evening.

7           Please remember that you should not discuss

8 the case with anyone, friends, family members or

9 anyone else.

10          And you should not allow anyone to approach

11 you and attempt to discuss the case.

12          If that should ever happen, pardon me, you

13 should report that to the court immediately.

14          Don't speak to any of the parties, the

15 lawyers or any witnesses involved in the case.

16          Don't read, watch or listen to anything about

17 the case if there should be any accounts of the

18 matter.

19          Don't attempt to do any type of research or

20 perform any investigation on your own.

21          And of course, ladies and gentlemen, don't

22 make up your mind about the case until it is finally

23 submitted to you.

24          You can leave those headsets there.  Those

25 will be collected.

Colloquy

 1           They will be available for you tomorrow when
 2  you come back.

 3           And of course you can leave your notes back
 4  in the jury room.

 5           With that admonition, the jury will be
 6  excused until 9:00 a.m. tomorrow morning.  They will
 7  be excused at this time.

 8           THE MARSHAL:  Please rise for the jury.

 9           (Jury excused from the courtroom at this time
10  for evening recess.)

11           (The following proceedings were had in open
12  court out of the presence and hearing of the jury.)

13           THE COURT:  Thank you.  Please be seated.
14  The witness may step down at this time.

15           THE WITNESS:  Thank you, Your Honor.

16           (The witness was excused from the courtroom
17  at this time.)

18           THE COURT:  Any matters to take up outside
19  the -- any matters to take up outside the presence of
20  the jury?

21           MR. BALDANI:  Judge, I have got something.

22           THE COURT:  Yes, sir.

23           MR. BALDANI:  I would like to move the court
24  to take maybe some type of limitation on the post
25  recording dissection of what was said.

Colloquy

1           And I do that under the -- under the rule
2 that allows you to exclude evidence on the grounds of
3 wasted time or actually confusion of the issues.
4           I am talking about, you know, this stuff
5 like, just, for example, the Peanut Abner, the Billy
6 Don and the Denver Deans.
7           I mean, I don't know how to object to each
8 little thing.
9           But I really think that some of the questions
10 and testimony elicited on these tangential issues
11 really, with all due respect, is a waste of time and
12 really, but more so, confuses the issues.
13          And -- and part of the problem that it
14 creates I think, Judge, is if the government's allowed
15 to go through each clip and go through all these
16 things -- and I understand some of it is necessary and
17 relevant.
18          But then we have got eight defendants, Judge,
19 that, you know, may have to go through each of these
20 things.
21          And I am not sure how to offer you guidance
22 on how to do it, but on behalf of Mr. Thompson, I
23 would move the court to take some action to limit the
24 -- the post audio dissection of what was just said.
25          THE COURT:  All right.  Well, with respect to

Colloquy

1  either the tapes or the testimony being a waste of --

2  a waste of time or being unduly confusing, that would

3  be an issue under Rule 403 under the federal Rules of

4  Evidence.

5           One of the things that the court has done in

6  this case, first of all, was to deny Mr. Hoskins's

7  request that all the tapes be played which would

8  probably lengthen the course of the trial by a couple

9  of weeks, I imagine.

10          And that's in part the reason for that ruling

11 because much of the information on the tape the court

12 determined was either unnecessary or a waste of time

13 and would be unduly confusing to the jury.

14          The portions that remain, the portions that I

15 have read, do appear to be relevant to -- to the

16 case.

17          And I also believe that it's relevant for the

18 jury to understand the relationship of the various

19 parties in the matter, some of the names that they

20 have heard about and some of the locations that they

21 have heard about.

22          And I think that Mr. Smith has been very

23 careful not to go back and to dissect every single

24 line on the tape but really to talk about specific

25 matters, subject matters that were discussed in those

Colloquy

 1 various sections.

 2          It may be that the parties are going to have

 3 to go back and to get into some of those issues.

 4          And of course you can replay those sections

 5 or you can refer to those references on the transcript

 6 if you choose to do that in cross examination.

 7          But at this point I believe that that's

 8 probably the best that we can do with what we have

 9 with these tapes.

10          So at this point, I wouldn't exclude

11 anything.

12          I wouldn't give further instructions to the

13 United States under Rule 403 because I think at this

14 point the issues have been -- or the sections have

15 been narrowed down to relevant areas, so I would deny

16 the request otherwise.

17          Any issues with respect to schedule before we

18 break at this time?

19          MS. LOGAN:  Your Honor, I just had one

20 issue --

21          THE COURT:  Yes, ma'am.

22          MS. LOGAN:  -- with scheduling, and this is

23 more of a reminder.

24          The court's already addressed this in an

25 earlier ruling.

Colloquy

1          When we moved to exclude portions of the

2    audio, we had moved to exclude references to a "Doug,"

3    specifically Doug White.

4          And I believe the U.S. offered to clarify

5    with the witness that it was Doug White not Doug Adams

6    that's being spoken about.

7          And I know the last clip, maybe the one

8    before last that was played, it mentioned "Doug," and

9    it was something shortly thereafter him being mayor,

10   so we didn't bring it up at that time because we

11   thought it was fairly clear it was Doug White being

12   referenced.

13         But we just wanted to ask the U.S. so that

14   way we don't have to get into it in our cross and go

15   so much longer and later.

16         So just in interest of making it a little bit

17   faster, if they could just do that whenever there is a

18   Doug that's not Doug Adams, clarify.

19         THE COURT:  I am sure and I do know that you

20   all conferred with counsel for the United States on

21   that one point which is certainly proper for you to

22   do.

23         There are references to Doug throughout these

24   tapes, and I believe so far that that issue has been

25   cleared up, but there seemed to have been some

Colloquy

1  confusion.

2          I am not going to require the United States

3  to do that.

4          But if they want to clear that up during the

5  direct examination of the witnesses, then that

6  certainly would seem to speed the case along a bit.

7          But if you do have an issue and you need to

8  speak with Mr. Smith --

9          MS. LOGAN:  Certainly.

10         THE COURT:  -- that may be the proper way of

11  dealing with it.  Thank you.

12         Any other matters about scheduling that we

13  can take up outside the presence of the jury?

14         I do have a hearing that was scheduled for

15  4:30, and I don't see counsel here.

16         It's a case I had to schedule from

17  Covington.

18         Can you check?  They are here?  All right, so

19  we will probably need that space, Mr. Hoskins, for the

20  rearraignment here in just a few moments.

21         MR. PINALES:  I'll clean house, Your Honor.

22         THE COURT:  We will give you a few moments

23  before the next matter is called.

24         But otherwise, this case will be in recess

25  until 9:00 a.m. tomorrow morning.

Colloquy

1              (The further trial in this matter was

2   recessed at 4:40 p.m. until the following morning,

3   February 12, 2010 at 9:00 a.m.)

4                        -  -  -

Index – Certificate

EXAMINATION INDEX

Plaintiff's Witnesses:

D. Kennon White

Direct by Mr. Smith . . . . . . . . . . . . 9

– – –

EXHIBIT INDEX

MARKED/ADMITTED

Plaintiff Exhibits:

A2   Audio                                55

A2A   Transcript of Audio                55

A3   Audio                                80

A3A   Transcript of Audio                80

A4   Audio                                96

A4A   Transcript of Audio                96

– – –

CERTIFICATE

        I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter.


s/  K. Ann Banta                     2-12-10
K. Ann Banta, RPR, CRR          Date