```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
 2                  SOUTHERN DIVISION AT LONDON

 3  UNITED STATES OF AMERICA    .      Docket No. CR 09-16-S
                                .
 4       vs.                    .      Frankfort, Kentucky
                                .      February 12, 2010
 5  RUSSELL CLETUS MARICLE      .      1:05 p.m.
    DOUGLAS C. ADAMS            .
 6  CHARLES WAYNE JONES         .      Trial
    WILLIAM R. STIVERS          .
 7  FREDDY W. THOMPSON          .      VOLUME 7-B
    WILLIAM B. MORRIS           .
 8  DEBRA L. MORRIS             .
    STANLEY BOWLING             .
 9
                       TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE DANNY C. REEVES
                  UNITED STATES DISTRICT JUDGE
11  APPEARANCES:
    On behalf of the Plaintiff:   STEPHEN C. SMITH, ESQ.
12                                JASON D. PARMAN, ESQ.

13  On behalf of the Defendant    DAVID S. HOSKINS, ESQ.
    Russell Cletus Maricle:       MARTIN S. PINALES, ESQ.
14
    On behalf of the Defendant    R. KENT WESTBERRY, ESQ.
15  Douglas C. Adams:             KRISTEN N. LOGAN

16  On behalf of the Defendant    T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:
17
    On behalf of the Defendant    ROBERT L. ABELL, ESQ.
18  William R. Stivers:

19  On behalf of the Defendant    RUSSELL BALDANI, ESQ.
    Freddy W. Thompson:           TUCKER RICHARDSON III
20
    On behalf of the Defendant    JERRY W. GILBERT, ESQ.
21  William B. Morris:

22  On behalf of the Defendant    ELIZABETH HUGHES, ESQ.
    Debra L. Morris:
23
    On behalf of the Defendant    DANIEL A. SIMONS, ESQ.
24  Stanley Bowling:

25  Court Reporter:               K. ANN BANTA, RPR, CRR
```

```
 1  Appearances of Counsel:

 2  On behalf of the Plaintiff:      STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, KY 40741
 5
     On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
 6   Russell Cletus Maricle:         107 East First Street
                                     Corbin, KY 40701
 7
                                     MARTIN S. PINALES, ESQ.
 8                                   150 East Fourth Street
                                     Federal Reserve Building
 9                                   Cincinnati, OH 45202

10  On behalf of the Defendant       R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:               KRISTEN N. LOGAN
11                                   220 West Main Street
                                     Suite 1900
12                                   Louisville, KY 40202

13  On behalf of the Defendant       T. SCOTT WHITE, ESQ.
     Charles Wayne Jones:            133 West Short Street
14                                   Lexington, KY 40507

15  On behalf of the Defendant       ROBERT L. ABELL, ESQ.
     William R. Stivers:             120 North Upper Street
16                                   Lexington, KY 40507

17  On behalf of the Defendant       RUSSELL JAMES BALDANI,
     Freddy W. Thompson:               ESQ.
18                                   R. TUCKER RICHARDSON
                                       III, ESQ.
19                                   300 West Short Street
                                     Lexington, KY 40507
20
     On behalf of the defendant      JERRY W. GILBERT, ESQ.
21   William B. Morris:              212 North Second Street
                                     Richmond, KY 40475
22

23  On behalf of the Defendant       ELIZABETH SNOW HUGHES,
     Debra L. Morris:                  ESQ.
24                                   201 West Short Street
                                     Lexington, KY 40507
25
```

```
 1  Appearances of Counsel (Continued):

 2  On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
    Stanley Bowling:                116 West Main Street
 3                                  Suite 2A
                                    Richmond, KY 40476
 4
    Court Reporter:                 K. ANN BANTA, RPR, CRR
 5                                  Official Court Reporter
                                    United States District
 6                                    Court
                                    101 Barr
 7                                  Lexington, KY 40507
                                    (502) 545-1090
 8
    Proceedings recorded by mechanical stenography,
 9  transcript produced by computer-aided transcription.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

D. Kennon White – Direct Examination

 1                     Friday afternoon session,

 2                     February 12, 2010, 1:04 p.m.

 3                           - - -

 4          (Jury resumed their places in the jury box,

 5  and the following proceedings were had in open court.)

 6          THE COURT:  Thank you.  The record will

 7  reflect that all members of the jury are present.  The

 8  parties and counsel are all present.

 9          Mr. White has returned to the witness stand.

10  I'll remind him he is still under oath.

11          Mr. Smith, you may proceed.

12          MR. SMITH:  Thank you, Your Honor.  I would

13  like to hand the witness now what has been marked as

14  Government's Exhibit A8 and A8A.

15          THE COURT:  This is A8?

16          MR. SMITH:  8, yes, Your Honor.

17                           - - -

18           D. KENNON WHITE, PLAINTIFF'S WITNESS,

19  PREVIOUSLY SWORN

20               DIRECT EXAMINATION (Resumed)

21  BY MR. SMITH:

22  Q.  Do you have a disk in front of you there,

23  Mr. White?

24  A.  Yes, I do.

25  Q.  Should be marked Government's Exhibit A8?

D. Kennon White – Direct Examination

1  A.  That's correct.

2  Q.  Can you identify that?

3  A.  That's a disk of a recording that I made with

4  some of the defendants and one other person, couple --

5  Q.  Okay, do you recall the date this recording was

6  made?

7  A.  It was April 30th, 2007.

8  Q.  Okay, and were you, again, a participant in this

9  conversation?

10  A.  Yes, I was.

11  Q.  And have you had an opportunity before testifying

12  to review that recording?

13  A.  Yes, I have.

14  Q.  And is that a fair and accurate copy or depiction

15  of a conversation in which you participated?

16  A.  Yes, it is.

17  Q.  Do you also have in front of you a transcript

18  identified I believe as Government's Exhibit A8A?  Do

19  you see that in front of you?

20  A.  That's -- yes, I do.

21  Q.  And have you also had an opportunity to review

22  that before testifying here today?

23  A.  Several times.

24  Q.  And Mr. White, have you compared that with the

25  audio recording that you have just been referred to?

D. Kennon White – Direct Examination

1  A.   I have.

2  Q.   And is it a fair and accurate transcription of

3  that recording?

4  A.   Yes, it is.

5          MR. SMITH:  I would move for the introduction

6  of Government's Exhibits A8 and A8A, Your Honor.

7          THE COURT:  Any objection other than those

8  previously stated?  Those exhibits will be admitted at

9  this time.

10          (GOVERNMENT EXHIBIT NOS. A8 AND A8A ADMITTED

11  INTO EVIDENCE)

12          MR. SMITH:  Would ask for permission to

13  publish, Your Honor.

14          THE COURT:  Yes, sir.

15          MR. SMITH:  Thank you.

16          (Audio played.)

17  BY MR. SMITH:

18  Q.   Mr. White, could you identify for the court and

19  jury the speakers of the conversation?

20  A.   That is myself and Cletus Maricle.

21  Q.   And where is this conversation being recorded at?

22  A.   It's taking place at the home of Cletus Maricle.

23  Q.   Okay.  And you reference the name Wanda,

24  "subpoenaed Wanda to the grand jury."  Who are you

25  referring to?

D. Kennon White – Direct Examination

1  A.   My wife, Wanda White.

2  Q.   And were you cooperating at this time again with

3  the FBI?

4  A.   Yes, I was.

5  Q.   And who told you to report to Cletus Maricle this

6  circumstance that she had been subpoenaed to the grand

7  jury?

8  A.   The FBI agents.

9  Q.   Okay.

10           MR. SMITH:  Continue to play at this time.

11           (Audio played.)

12  BY MR. SMITH:

13  Q.   Mr. White, there is a third subject that's

14  entered the conversation.  Can you identify that

15  voice?

16  A.   Yes, that's Phillip Mobley.

17  Q.   And Phillip Mobley, is that the same Phillip

18  Mobley you have identified as the son-in-law of Cletus

19  Maricle?

20  A.   Yes, it is.

21           MR. SMITH:  Okay, continue.

22           (Audio played.)

23  BY MR. SMITH:

24  Q.   Mr. White, in this portion of the clip, there was

25  conversation between you and appears to be

D. Kennon White - Direct Examination

1  Mr. Maricle.

2      And you announced -- right after you announced

3  that Wanda had been subpoenaed, Mr. Maricle said,

4  "Well, hell, really?  Careful."

5      To your understanding, what was that referring

6  to?

7  A.  That was just his -- his way of saying be careful

8  about what you talk about, what you say and that sort

9  of thing.

10 Q.  Had you talked to Cletus Maricle on many

11 occasions prior to this?

12 A.  Yes.

13 Q.  And did he have a way of communicating with you

14 that was maybe different than other people you

15 associated with?

16 A.  Yes.

17 Q.  Could you describe that generally for the court

18 and jury how he would generally communicate with you?

19 A.  Sometimes he would make eye gestures or hand

20 gestures.

21      Or he would explain a scenario that -- of the way

22 something similar to the situation was.

23      Or he would state a fact of how he would want

24 something to be stated by stating -- stating the way

25 that he wanted to present it to you and expect you to

D. Kennon White – Direct Examination

1  pick up on it.  That's the way he did it.

2  Q.  So it wasn't always direct communications, A, B,

3  C?

4  A.  No.

5  Q.  You sometimes had to read into it?

6  A.  Yes.

7  Q.  So when he says, "Careful," your understanding

8  was what?

9  A.  Be careful because they may be -- someone may be

10  listening to this conversation.

11  Q.  And you announced to him, "Well, buddy, they got

12  Dobber," who were you referring to?

13  A.  Charles Dobber Weaver.

14  Q.  And then you said, "I heard they got Clinton

15  Johnson."  who were you referring to?

16  A.  Clinton Johnson, who was a magistrate at that

17  time.

18  Q.  Following that exchange, Phillip says, "It would

19  have to be this last one because I wasn't in the one

20  before that."  What was he referring to?

21  A.  The election of 2006.

22  Q.  Your understanding.

23  A.  To my understanding, he was referring to the

24  election of 2006 because he did not run in 2002.

25      So it would have to be -- concerning him, it

D. Kennon White – Direct Examination

1 would have to do with 2006 because he hadn't run prior

2 to that date.

3 Q.   Mr. Maricle says, "Well, you think they are

4 harassing people?"

5      To your understanding, who was he referring to

6 "they" harassing people?

7 A.   He is referring to the -- to the FBI.

8 Q.   And at the end of that clip that we just heard,

9 Mr. Maricle said something to the effect, "Get

10 somebody for something, and they don't care whether

11 they did or not."

12     Again, to your understanding, who was he

13 referring to?

14 A.   He was referring to the FBI.

15          MR. SMITH:  Go on and play the next clip.

16          (Audio played.)

17 BY MR. SMITH:

18 Q.   Mr. White, there at the end of that clip you

19 mentioned the name Johnny, Johnny Poss.

20 A.   Yes.

21 Q.   To your understanding, who were they referring

22 to?

23 A.   Johnny Poss Gregory, he had been a former

24 magistrate.

25 Q.   And you made a statement, "Al Man always liked

D. Kennon White – Direct Examination

1 Johnny."  What were you referring to?

2 A.   He was always for Johnny Poss most of the time.

3 Q.   And when you say he was for him, what did you

4 mean by that?

5 A.   In elections.

6 Q.   And how did he show his support for him, to your

7 knowledge?

8 A.   He would help him however that he could when it

9 came to trying to talk to people into being for him

10 and assist him.

11     He tried to -- he would talk to my wife about

12 wanting her to help at the election polls and help

13 steal votes for him and that sort of thing.  He is --

14 he is related to Johnny Poss.

15 Q.   Who is related to Johnny Poss?

16 A.   Al Man, through his wife, I guess.

17 Q.   At the beginning of that clip, you were making a

18 statement, something that, "You know, if he wants to

19 get there and tell, that's one thing.  It can go the

20 other way then."  What were you referring to?

21 A.   I was -- I was referring to Charles Weaver, that

22 he might tell what had went on at the Manchester

23 precinct when they had stolen the votes and had bought

24 votes.

25             THE COURT:  I'm sorry, you are tailing off

D. Kennon White - Direct Examination

1 toward the end.  If you could keep your voice up when

2 you answer.

3          THE WITNESS:  Okay, I apologize.

4          THE COURT:  Thank you.

5          MR. SMITH:  Okay, you can proceed, thank you.

6          (Audio played.)

7 BY MR. SMITH:

8 Q.  Mr. White, refer you to the earlier part of this

9 clip.

10     It indicated at the initial part of this clip,

11 sounds as though you were speaking in a very low

12 voice.  Can you explain that?

13 A.  Yeah, whenever you are talking with -- with

14 Cletus, he will -- he will respond when you are

15 talking in a lower voice by talking back lower with

16 you.

17     And sometimes that he would want -- it makes him

18 feel comfortable where he will talk more.

19 Q.  And he made a practice of whispering to you in

20 the past?

21 A.  Yes.

22 Q.  And were there certain times you noticed that he

23 wanted to whisper and other times when he didn't want

24 to whisper?

25 A.  He would want to whisper when it was anything to

D. Kennon White - Direct Examination

1  do with anything that you would cause him any trouble.

2  Q.   Now, while you all were whispering, you asked a

3  question, "What's he going to do -- is he going to --

4  tomorrow and talk?"  Who were you referring to,

5  Mr. White?

6  A.   I was referring to Phillip Mobley, his son-in-

7  law.

8  Q.   And Maricle's response was, "Oh, no, hell no."

9  What was he referring to, to your understanding?

10 A.   He was referring to Phillip Mobley, he was not

11 going to talk or cooperate with the federal

12 investigation.

13 Q.   And he completed that thought saying, "They are

14 not God."

15      To your understanding, who was he referring to?

16 A.   He was referring to the FBI.

17 Q.   Further in the conversation, Mr. Maricle said,

18 "Well, that's his word versus hers."  To your

19 understanding, what was he referring to?

20 A.   If Dobber, if Charles Dobber Weaver told anything

21 about them stealing votes together there at the

22 Manchester precinct, that Wanda could dispute it

23 because it would be his -- her word against his.

24 Q.   Shortly after he made that comment, I heard a

25 third party interrupt the conversation shortly, and

D. Kennon White - Direct Examination

1  then I didn't hear there was any more.  Can you

2  explain that?

3  A.    There was someone had called -- had called

4  Phillip out of the room.

5  Q.    Following that interruption, Mr. Maricle made

6  some comment to the effect, "Ever since I represented

7  a couple people in Federal Court," then he goes on to

8  say, "Every time somebody's going to Federal Court, do

9  you know about me."  To your understanding, what was

10 he referring to?

11 A.    He was referring to people that had been in front

12 of the federal grand jury or had been questioned by

13 the FBI, that they would always ask questions about

14 him.

15 Q.    Further in that conversation, you made a comment,

16 something to the effect, "Well, what -- now, Wanda's

17 got this on her mind.  She said, 'Now, what about Ken,

18 how can I tell -- what can I tell him when he asks me

19 how to be an election officer?'"  What were you

20 referring to?

21 A.    How that she had got appointed to election

22 officer, how my wife had become appointed to election

23 officer.

24 Q.    And why was that a concern of yours at that time?

25 A.    Because Cletus was the one that got her appointed

D. Kennon White – Direct Examination

1  to election officer.

2  Q.   You asked the question following that, "Do you

3  think they know the process that well?"  What were you

4  referring to?

5  A.   I was talking about the election process of how

6  people got appointed to election officers and how that

7  the machines was manipulated to steal votes.

8  Q.   Mr. Maricle responded, "You know, I doubt it."

9  Then he goes on to say, "Don't say nobody is

10 subpoenaed down there."  What was he referring to

11 there --

12 A.   Not to say that anyone --

13 Q.   -- to your understanding?

14 A.   To my understanding, he was saying not to say

15 that we had talked to anybody else that was

16 subpoenaed.

17 Q.   Then he says, "If they can intimidate you, they

18 will."

19     To your understanding, what was he referring to

20 there?

21 A.   That if -- that they could -- that they could

22 tear you up or that if they find out information that

23 they would -- that you would be scared into testifying

24 about what you knew.

25 Q.   To your understanding, who was he referring to

D. Kennon White – Direct Examination

1 when he uses the word "they"?

2 A.    He was talking about the FBI.

3 Q.    Finally, there were a couple more names

4 mentioned.

5     He says, "I think Todd's going to fight it."  To

6 your understanding, who is he referring to?

7 A.    Todd Roberts.

8 Q.    And then you threw out the name Ross Harris.  Who

9 were you referring to?

10 A.    That was a gentleman that I had seen that was

11 supposed to have been a wealthy man on TV that had

12 been convicted in Federal Court of some crimes.

13 Q.    Finally, before we took that break, there was a

14 -- remarks made by you saying, "She ain't got TV, she

15 doesn't have anything over there.  We have moved

16 out."

17     And then Maricle says, "While there ain't nobody

18 here."  To your understanding, what was he referring

19 to?

20 A.    He was -- while there wasn't anybody here that he

21 was going to talk to me.

22 Q.    In prior discussion with him, was that a problem

23 talking to you in the presence of other people in the

24 past?

25 A.    In most -- in most circumstances, yes.

D. Kennon White – Direct Examination

1  Q.    Could you explain to us who you were bringing

2  over to talk to him at that point?

3  A.    My wife, Wanda.

4         MR. SMITH:  Okay, if we could continue.

5         (Mr. Westberry conferring with Mr. Smith.)

6  BY MR. SMITH:

7  Q.    When she made a comment, something to the effect,

8  "I was there to help Doug," do you recall who she was

9  referring to?

10 A.    She was there to help my father, Doug.

11 Q.    Thank you.

12        (Audio played.)

13 BY MR. SMITH:

14 Q.    Mr. White, as that clip ended, there was some

15 whispering at the end.  Who was making those comments

16 at the end?

17 A.    That was Cletus Maricle.

18 Q.    And to your understanding, what was he saying?

19 A.    He was telling me to calm Wanda down, she didn't

20 have nothing to worry about it.

21 Q.    Before that there was an interruption, and

22 somebody said something about somebody being killed?

23 A.    That was -- if I am not mistaken, his wife had

24 said that Antuan Henson had killed hisself; and that

25 was a mistake.  Later they found out that wasn't the

D. Kennon White – Direct Examination

1 case.

2 Q.   And Antuan Henson, to your knowledge is he

3 somewhat of a family friend of the Maricles?

4 A.   Yeah, he is a family friend.  He is also Darnell

5 Hipsher, who is council member's nephew.

6 Q.   And there was some lengthy explanation by Maricle

7 about his involvement with the person by the name of

8 Linsey and Jamie.

9 A.   Uh-huh.

10 Q.   To your understanding, who was he referring to in

11 that conversation?

12 A.   He was referring to Linsey Maricle and Jamie

13 Finley.

14 Q.   And Linsey being a relative of his?

15 A.   That's his daughter.

16 Q.   Now, direct your attention to Government's

17 Exhibit A9.

18       MR. SMITH:  If I could have this delivered to

19 the witness, please.

20 BY MR. SMITH:

21 Q.   Do you recognize the disk there in front of you

22 marked as Government's Exhibit A9?

23 A.   I do.

24 Q.   And could you tell the court and jury if you

25 could identify that?

D. Kennon White – Direct Examination

1  A.   It's a disk and recording that I participated in

2  making with some of the defendants.

3  Q.   Okay, I am going to need you to speak, again,

4  into the microphone.

5  A.   Okay, I'm sorry.  It's a disk with a recording

6  that I made with some of the defendants as well as

7  some other people.

8  Q.   What was the date of this recording, Mr. White?

9  A.   April 30th, 2007.

10 Q.   And you say that you were a participant in this

11 conversation?

12 A.   Yes, I was.

13 Q.   And at the time that this was recorded, were you

14 cooperating with the FBI?

15 A.   Yes, I was.

16 Q.   And where was this recording made?

17 A.   This recording was made in several different

18 locations of I think Cletus Maricle's house and some

19 other locations.

20 Q.   Okay.

21 A.   Excuse me just a minute.

22 Q.   And before testifying, have you had an

23 opportunity to review this?

24 A.   Yes, I have.

25 Q.   And is it a fair and accurate recording of the

D. Kennon White - Direct Examination

1 conversation in which you participated in?

2 A.   Yes, it is.

3 Q.   Have you also had an opportunity to look at

4 Government's Exhibit A9A?

5 A.   Uh-huh.

6 Q.   And is that a transcript of that recording?

7 A.   Yes, it is.

8 Q.   Have you had an opportunity to compare that

9 transcript with the recording?

10 A.   Several times.

11 Q.   And based on that comparison, can you state

12 that's a true and accurate transcription of the

13 conversation in which you were a participant?

14 A.   That's an accurate representation, yes, it is.

15      MR. SMITH:  I would like to move now to

16 introduce Government's Exhibits A9 and A9A,

17 Your Honor.

18      THE COURT:  Any objection other than those

19 previously stated?  These exhibits will be admitted.

20      (GOVERNMENT EXHIBIT NOS. A9 AND A9A ADMITTED

21 INTO EVIDENCE)

22 BY MR. SMITH:

23 Q.   Mr. White, can you identify the voices in the

24 conversation at this point?

25 A.   It's my wife, Wanda, and Cletus Maricle.

D. Kennon White - Direct Examination

1  Q.   And where are you all when you are making this

2  recording?

3  A.   We are on his back porch, deck, around his pool.

4  Q.   Now, we earlier heard a conversation recorded on

5  April 30th, and we heard you parting ways with

6  Mr. Maricle.  Did you return later that day?

7  A.   Yes.

8  Q.   And who was in your company when you returned to

9  Mr. Maricle's house?

10  A.   My wife, Wanda.

11  Q.   And were you being -- was Wanda expected to

12  return back to the Maricles' residence after you had

13  that conversation?

14  A.   Yes.

15  Q.   Now, in opening this conversation, she says, "I

16  know what they look like," and she mentions Buddy

17  Blair and Tim Briggs.  To your understanding, who was

18  she referring to?

19  A.   She was referring to Agent Buddy Blair and Agent

20  Tim Briggs.

21  Q.   And they are agents that were involved with your

22  cooperation as well?

23  A.   That's correct.

24  Q.   And they work for the FBI?

25  A.   That's correct.

D. Kennon White – Direct Examination

1  Q.   And she says, "Let me tell you one about Tim

2  Briggs.  He is dating, he is getting a divorce."  To

3  your understanding, what was she referring to?

4  A.   We were directed by Agent Blair and Agent Briggs

5  to tell him that because he had previously had

6  requested trying to find out information of where

7  these agents lived.

8      And Agent Briggs did not want him to know where

9  his family lived at this time.

10 Q.   Now, you said he had previously been asking where

11 the agents lived.

12     Was that in a recorded conversation or an

13 unrecorded conversation?

14 A.   To the best of my recollection, it was in a

15 recorded conversation.

16 Q.   And at the time that he made that statement, did

17 you relay that to the FBI agents immediately?

18 A.   Yes, I did.

19 Q.   And when you say you were directed or your wife

20 was directed to make these statements about Tim

21 Briggs, was that in response to this concern?

22 A.   Yes, it was.

23 Q.   Okay.

24         MR. SMITH:  Continue to play.  Thank you.

25         (Audio played.)

D. Kennon White – Direct Examination

1  BY MR. SMITH:

2  Q.   Mr. White, in this portion of the clip which we

3  just heard, Mr. Maricle makes reference, what that --

4  what that would do to Tim Briggs's credibility.  To

5  your understanding, what was he referring to?

6  A.   He was referring to the fact that Tim Briggs had

7  a girlfriend, that it would destroy his credibility

8  with the jury if something came up.

9  Q.   Thank you.

10          MR. SMITH:  We will move on.

11          (Audio played.)

12  BY MR. SMITH:

13  Q.   Mr. White, there was another male voice that was

14  introduced in this conversation.  Who was that?

15  A.   That's Richie Asher.

16  Q.   And who is Richie Asher?

17  A.   He's worked for drug court, and also he was a

18  private investigator; and he helped Cletus around his

19  home and other matters.

20  Q.   Now, Mr. Maricle said something in response to

21  your wife's statement about who served with the

22  subpoena, and he said, "You know what I think of Buddy

23  Blair."

24      To your understanding, what did Maricle think of

25  Buddy Blair?

D. Kennon White – Direct Examination

1  A.   He never was too high on Buddy Blair.  He just

2  didn't like Buddy Blair.

3  Q.   And he told you that on previous occasions?

4  A.   Yes.

5           MR. SMITH:  Okay, proceed.

6           (Audio played.)

7  BY MR. SMITH:

8  Q.   Mr. White, your wife refers to Carmen.  To your

9  understanding, who was she referring to?

10 A.   The new mayor at that time, Carmen Lewis.

11 Q.   And she says, "I thought, well, what's your deal,

12 buddy, you always want to talk about Carmen."  To your

13 understanding, who was she was referring to?

14 A.   She was referring to Darnell.

15 Q.   Darnell who?

16 A.   Hipsher.

17 Q.   Mr. Maricle says, "They ain't going to do

18 anything about this or is there anybody in a position

19 where they can," to your understanding what was he

20 referring to?

21 A.   He is referring about filing the lawsuit to

22 remove Carmen as mayor.

23           MR. SMITH:  Can you play the next clip?

24 Thank you.

25           (Audio played.)

D. Kennon White – Direct Examination

1  BY MR. SMITH:

2  Q.   Mr. White?

3  A.   Yes.

4  Q.   On the last clip that we just reviewed with you,

5  there appears to be a comment made again about Tim

6  Briggs having a girlfriend.  It was brought up by

7  Mr. Maricle.

8      And he says, "I think that's the most important

9  thing you know."  To your understanding, what was he

10 meaning?

11 A.   He was -- he was meaning that we could hold that

12 over his head.

13 Q.   Further in the conversation, it was referenced I

14 believe by Wanda, your wife, that she was intimidated

15 by Mr. Briggs and said, "He is mean.  I'll fall

16 apart."

17     And Maricle made the statement, "I thought you

18 were a strong person, Wanda."  To your understanding,

19 what was he referring to?

20 A.   He was referring to the fact that Wanda, he

21 wanted her to be strong when they asked the questions

22 and not give in to what they were questioning her

23 about and tell what happened.  That's what I -- my

24 understanding.

25 Q.   And finally in that conversation, there was some

D. Kennon White – Direct Examination

1 reference about maybe your wife making a call to the

2 girlfriend.

3     And I believe you made a statement, "If she does,

4 he won't be with her long."

5     And Maricle agrees and says, "That's right."  To

6 your understanding, what was that referring to?

7 A.   That was referring that if he was with a woman,

8 then she told his business, what was going on with the

9 FBI, that he wouldn't be with her long.

10 Q.   To your understanding, would that displease

11 Mr. Maricle if that relationship had broken up at that

12 time?

13 A.   Yes.

14 Q.   And to your understanding, why would that

15 displease him?

16 A.   Because he wouldn't have anything to hold over

17 Tim -- Agent Tim Briggs's head.

18          MR. SMITH:  Your Honor, this is the

19 conclusion of Exhibit A9.

20     And we are beginning another exhibit, A10, if the

21 court would like to evaluate the break.

22          THE COURT:  All right.  Let me proceed with

23 the first clip then.

24          MR. SMITH:  If I could hand the witness now

25 what's marked as Government Exhibit A10 and A10A.

D. Kennon White – Direct Examination

1    Your Honor, I am advised that this has a

2  continuous conversation about twenty minutes.

3    THE COURT:  Oh, is it that long?  All right,

4  well, why don't you lay the foundation, if you would,

5  then we will stop at that point.

6    MR. SMITH:  Certainly.

7  BY MR. SMITH:

8  Q.   Mr. White, you should have now before you

9  Government's Exhibit A10 and A10A.

10  A.   I do.

11  Q.   Do you have a disk marked A10, Mr. White?

12  A.   Yes, I do.

13  Q.   And what is that, for the record?

14  A.   That's a disk of a recording that I made with one

15  of the defendants.

16  Q.   And what date did you make this recording,

17  Mr. White?

18  A.   May 1st, 2007.

19  Q.   And was this, again, pursuant to cooperation?

20  A.   It was.

21  Q.   And were you a participant of this conversation?

22  A.   Yes, I was.

23  Q.   And have you had an opportunity to review the

24  conversation?

25  A.   I have several times.

D. Kennon White – Direct Examination

1  Q.  And is the recording that you have marked as

2  Government's Exhibit A10 a fair and accurate copy or

3  depiction of that conversation?

4  A.  It is.

5  Q.  Likewise, A10A is a transcript.  Do you have that

6  in front of you?

7  A.  I do.

8  Q.  And have you reviewed that?

9  A.  Yes, I have, several times.

10 Q.  Compared that with the actual recording in which

11 you were a participant?

12 A.  Yes.

13 Q.  And is that a fair and accurate transcription of

14 that conversation in which you were a participant?

15 A.  Yes, it is.

16        MR. SMITH:  I would move at this time,

17 Your Honor, to move -- or to introduce Government's

18 Exhibit A10 and A10A.

19        THE COURT:  All right, any objection other

20 than those previously raised?

21        Exhibits A10 and A10A will be admitted at

22 this time.

23        And we will take our break before you begin

24 playing those portions.

25        MR. SMITH:  Yes, Your Honor.

D. Kennon White – Direct Examination

1            (GOVERNMENT EXHIBIT NOS. A10 AND A10A
2  ADMITTED INTO EVIDENCE)
3            THE COURT:  Ladies and gentlemen, we will
4  take a recess at this time of approximately twenty
5  minutes.
6            Please keep in mind the admonition that you
7  were given previously not to discuss the case amongst
8  yourselves.
9            We are in recess.  You will be excused for
10 twenty minutes.
11            (Jury excused from the courtroom at this time
12 for afternoon recess.)
13            (The following proceedings were had in open
14 court and out of the presence and hearing of the
15 jury.)
16            THE COURT:  Any matters to take up, counsel?
17            MR. ABELL:  Yes, sir.  There is one matter.
18            THE COURT:  Please proceed.
19            MR. ABELL:  If we could excuse Mr. White,
20 please.
21            THE COURT:  Mr. White, you can step down.
22            THE WITNESS:  Thank you, Your Honor.
23            (The witness left the courtroom at this
24 time.)
25            THE COURT:  Yes, sir, Mr. Abell.

D. Kennon White - Direct Examination

1          MR. ABELL:  Judge, I would like to -- I guess

2  a clarification.

3          With regard to following these clips,

4  Mr. White is giving testimony that I would

5  characterize as editorial comment regarding the

6  comments that had just been played.

7          But with regard to his understanding of

8  Cletus Maricle, William Stivers or any other person's

9  exchange with a third person, for instance, Cletus

10  Maricle's statements to Wanda.

11          I guess I need clarification regarding the

12  court's ruling that his understanding of Maricle's

13  statements is relevant and proper testimony, and

14  that's within the scope of our earlier objection.

15          THE COURT:  Mr. White did participate in the

16  conversation.

17          But the section that you are referring to,

18  those last questions, were between Wanda White and

19  Cletus Maricle.

20          And I think that if there is further

21  testimony along these lines, it would be improper for

22  the witness to characterize his understanding of that

23  part of the conversation, that would be for Wanda

24  White.

25          She had an understanding that was necessary

D. Kennon White – Direct Examination

1  to respond in order to put this in the proper

2  context.

3          She may be able to testify about what she

4  understood was being said.

5          But with respect to Mr. White, that would not

6  be proper going forward at this point.

7          MR. ABELL:  Well, I mean, the conversations

8  are fluid.

9          You are going to have -- you have a three-way

10 conversation going on.

11         THE COURT:  Yes, sir.

12         MR. ABELL:  It shifts to a two-way

13 conversation.

14         And my point is with regard to a two-way back

15 and forth that does not include this witness, I am

16 objecting to him testifying about what he understood

17 they were saying.

18         THE COURT:  Yes, sir, and I am sustaining

19 your objection going forward as to that issue.

20         Mr. White was involved in part of these

21 conversations.

22         So going forward I -- you are correct, that

23 if -- if -- I'll wait for counsel to finish speaking

24 before I respond to him.

25         Going forward, if the conversation only

D. Kennon White - Direct Examination

1 involves two individuals, if it's clear the

2 conversation, for example, only involves Wanda White

3 and Cletus Maricle or some other defendant in the

4 case, then I think it would be improper for a witness

5 other than who was party to the conversation to

6 characterize the understanding of the conversation.

7 So I am agreeing with you on that point.

8          Some of these -- as you said, some of these

9 conversations are fluid, and they involve three people

10 at some point, two people at other times, and then

11 there is responses given by a person that is not

12 necessarily the direct speaker in the conversation.

13          So on those occasions, I am allowing some

14 questions about what the third party which, in this

15 case is Mr. Kennon White, what he understood in order

16 to respond to part of that conversation.

17          But again, and I am agreeing with you that if

18 there is only two people to a conversation, then it

19 would be improper for Kennon White, for example, to

20 give his interpretation of what the parties understood

21 was being discussed.

22          MR. ABELL:  Thank you.

23          THE COURT:  Mr. Pinales?

24          MR. PINALES:  Yes, Your Honor, just one short

25 matter.

D. Kennon White – Direct Examination

1         On tape No. A9 and looking at A9A, the

2    transcript that we have, it was my understanding that

3    the court had approved that transcript.

4         And the government seemed to have stopped

5    before some rather critical materials on there.

6         "Uh-huh, I am" -- this is Maricle -- "I am

7    just, I am just telling you like it is, you know, the

8    best I can."

9         And that's where I believe the transcript was

10   cut off.

11        And what they did cut off is, "You can't lie

12   to them.  You obey all court orders."

13        And I thought that that transcript had been

14   approved for playing.

15        THE COURT:  I -- I did indicate that -- and I

16   don't have that in the exhibit.

17        I have what the government played, so I don't

18   have the version perhaps that you have in front of

19   you.

20        But the court's pretrial ruling was that

21   those statements, was those affirmative statements

22   would not constitute hearsay and would be relevant and

23   should be included.

24        There were -- there were about three -- give

25   me one second.

D. Kennon White - Direct Examination

1        I denied the United States' motion to exclude

2  -- motion in limine to include from the chart of

3  exculpatory statements, statements made on -- were the

4  audio recording of April 30th, 2007, Maricle

5  transcript from Kennon no. 2, which I believe is the

6  one that we are talking about here.

7        Page 7, and I'm assuming that that's the

8  specific reference.

9        MR. PINALES:  That is correct, Your Honor,

10 it's at the bottom of page 7.

11       THE COURT:  All right, I did deny the motion

12 to exclude that portion of the -- of the audio tape.

13       MR. PINALES:  And under -- under 106, I would

14 ask that be the first thing in completeness that would

15 be contemporaneous as can be to that recording.

16       THE COURT:  All right.  Mr. Smith?

17       MR. SMITH:  Well, Your Honor, for the record,

18 my understanding is that is the exhibit which we are

19 now completing is A9 and beginning A10.

20       So counsel has raised this issue at this

21 point where we have established I believe our

22 foundation for A10 moving on to the next exhibit.

23       THE COURT:  Right.

24       MR. SMITH:  The transcript does have that

25 information in it.  It has been included in my copy --

D. Kennon White – Direct Examination

1          THE COURT:  Okay.

2          MR. SMITH:  -- at the bottom of page 7.  Is

3    there a copy that I am maybe looking at that

4    stopped --

5          THE COURT:  Well, Mr. Pinales had indicated

6    that that -- let's see, we just finished that April

7    30th recording.

8          At the end of the April 30th recording -- and

9    it should be at page 7 of the original transcript.

10          MR. PINALES:  And then on to page 8, Your

11    Honor.

12          THE COURT:  The reference in my order was to

13    page 7, and it may have carried over to page 8.

14          But that was the recording that had that

15    statement that the court had included.

16          Now, we are at 10, at this point, the 10 is

17    the May 1st, 2007 recording.

18          MR. SMITH:  Can the United States inquire of

19    the court's exhibit that has been tendered to the

20    witness and the court as to whether A9A, the last

21    sentence on page 7 includes the statement of Maricle,

22    "No, I am just telling you like it is, you know, the

23    best I can.  You can't lie to them.  You obey all

24    court orders."

25          THE COURT:  It does have that.

D. Kennon White – Direct Examination

1              MR. SMITH:  All right.

2              THE COURT:  But Mr. Pinales just told me that

3    wasn't included in the portion that was played to the

4    jury.

5              MR. SMITH:  Okay, I --

6              THE COURT:  So we will need to go back and

7    see if that was included in the portions played to the

8    jury.

9              MR. SMITH:  Okay.

10             THE COURT:  Are you able to pull that back

11   up?

12             (Mr. Smith and Ms. Poynter conferring.)

13             MR. SMITH:  Okay, I am advised, Your Honor,

14   that Mr. Pinales is correct, that while the transcript

15   has accomplished what the court's order I think

16   directed, the audio portion that was married up with

17   this in this Sanctions program apparently was not

18   equipped with that last statement.

19             So certainly we will replay that whole

20   exhibit if that's the request of counsel.  It's not --

21   it's not that long.

22             Or we can do the last -- I would suggest that

23   we use the last clip of that section to accomplish

24   essentially I think his request under 106.

25             THE COURT:  All right.  Mr. Pinales, what is

D. Kennon White – Direct Examination

1  your preference?

2          MR. PINALES:  I think the last quote would

3  be -- or the last clip would be fine.

4          But as I was watching the big screen, Your

5  Honor, and I guess Sanctions only pairs with the

6  spoken word.

7          So it wasn't -- even though it may have been

8  on the transcript, it wasn't displayed to the jury.

9          THE COURT:  Right.  Well, the question

10  becomes how far back do we want to go.  The entire

11  transcript itself is --

12          MR. PINALES:  Your Honor, I don't think we

13  have to go back that far.

14          Maybe a line or two just to put it in the

15  right context.

16          THE COURT:  I believe there is --

17          MR. PINALES:  There is a break --

18          THE COURT:  Well, let's do this.  Why don't

19  we go ahead and take a break, and you can talk with

20  Mr. Smith about where you would like that statement to

21  begin to put it in proper context.

22          And if the parties are in agreement as to

23  where to start, then we can start at that point.

24          When the jury comes back, you will need to

25  make reference to Exhibit 9 which was the exhibit

D. Kennon White – Direct Examination

1 previously played, play the last portion of that.

2           If you can't reach an agreement, let me know

3 before the jury comes back in.

4           And I'll come back out, and we will make a

5 decision as to where we should start.

6           I don't think it's necessary to play the

7 entire section, but it may be necessary to go back

8 perhaps a minute.

9           There is a reference in the transcript to

10 10207?

11           MR. PINALES:  That's what I was looking at.

12           THE COURT:  And that's 45 seconds or so

13 before.

14           So I think that might be sufficient to put it

15 in proper context under Rule 106.

16           But if you feel like you need to go back

17 further than that, talk with Mr. Smith.

18           And if there is a dispute, just let me know

19 before the jury comes back.

20           MR. PINALES:  Thank you, Your Honor, I

21 apologize for eating up the recess.

22           THE COURT:  That's fine.

23           MR. RICHARDSON:  One other issue, Judge.

24           THE COURT:  Yes, sir.

25           MR. RICHARDSON:  In my opening statement, I

D. Kennon White - Direct Examination

1  mentioned to the jury that they would hear a tape of

2  Freddy Thompson, and that tape would be a 23-minute

3  tape.

4         They would hear portions of it, and at about

5  the 18-minute mark they would hear that he made this

6  admission that he supposedly made.

7         And the United States, when they went to

8  Kennon White, they said well, this is a continuous

9  conversation with the defendant to last approximately

10 twenty minutes.

11        And that is not what it is, and I want that

12 clarified with the jury, Judge.

13        THE COURT:  All right.

14        MR. RICHARDSON:  That it's not a continuous

15 conversation.  It breaks.

16        THE COURT:  We are at A -- this point A10.

17        MR. RICHARDSON:  A10.

18        THE COURT:  And I believe what the United

19 States indicated was that there wasn't a stopping

20 point.

21        There was -- we go in the transcript of 4

22 minutes, 38 seconds, that's where it begins; and it

23 ends at 21 minutes and 44 seconds.

24        But there is not seventeen minutes of tape is

25 what you are -- what you are indicating.

D. Kennon White - Direct Examination

1      MR. RICHARDSON:  I told them they would hear

2 portions of the tape, and it's approximately 23

3 minutes long.

4      And when the United States got up and

5 characterized the tape, they said it's a continuous

6 conversation that lasts approximately twenty minutes.

7      So that's in direct contradiction to what I

8 told the jury in my opening statement, and it's not

9 exactly what it is.  It's not a continuous

10 conversation.

11      MR. SMITH:  Your Honor, Mr. Richardson has

12 got to help me understand that because if I have been

13 characterizing, I would be testifying.

14      And I don't believe that I have been

15 testifying here this afternoon, so if he can tell me

16 what he is talking about.

17      THE COURT:  I think -- but without getting in

18 a lot of back and forth argument, which we are not

19 going to get at -- but I believe what he is indicating

20 is that your last statement to me when I was trying to

21 decide where to take a break, I thought that there was

22 a section of this that we could stop; and you told me

23 that it was approximately a 20-minute segment.

24      MR. SMITH:  Okay.

25      THE COURT:  I believe he is indicating that

D. Kennon White - Direct Examination

1 means that this is a 20-minute tape without any breaks

2 in the middle or at other -- other places.  I don't

3 know.

4          I don't know if there is some portions of the

5 tape that has been taken out because the United States

6 doesn't plan to play that.

7          But you know, we made adjustment, for

8 example, 8 minutes, 20 seconds to 8 minutes, 36

9 seconds.

10          And I believe his position is, aha, it

11 wouldn't be a continuous tape for twenty minutes if

12 that's what's happening.

13          Again, I don't know that, and you may be able

14 to help me on that -- on that point.

15          MR. SMITH:  First of all, for the record, I

16 think we have provided all counsel the final exhibits

17 of both transcript and the audio, so this is not a

18 game surprise.

19          I think everyone's had an opportunity to look

20 at that.

21          I do understand that as we submitted these

22 for consideration by the court that they were in a

23 format which we were taking clips, and I expect that

24 in this tape, we have clips.  No?

25          (Mr. Smith conferring with Miss Poynter.)

D. Kennon White – Direct Examination

1       MR. SMITH:  Okay, apparently this is a
2  transcript obviously, Your Honor, that has recognized
3  the court's ruling on certain pretrial motions.

4       In that, there has been some words that were
5  redacted in preparing the transcript.

6       So if the court sees that as an objection, I
7  need to clarify that in front of the jury.  Obviously
8  I will be glad to do that.

9       THE COURT:  All right, well, I don't think
10 that you do.

11      But I am not quite sure I understand the
12 objection.

13      Counsel, what is it that you disagree with
14 that Mr. Smith has said?

15      MR. RICHARDSON:  He characterized the tape as
16 a continuous conversation, and that is not what they
17 are going to hear here.

18      THE COURT:  Okay.

19      MR. RICHARDSON:  They have got redacted out
20 of it whole sentences of stuff.

21      THE COURT:  Pursuant to the court's previous
22 rulings.

23      MR. RICHARDSON:  Pursuant to the court's
24 previous ruling, yes, sir.

25      THE COURT:  Okay.

D. Kennon White – Direct Examination

1          MR. RICHARDSON:  So but that's not a

2    continuous conversation, and my objection is that.

3          I told them in the opening that I was going

4    to -- they were going to play portions of his

5    statement, and that is correct.

6          Now they are saying, oh, no, we are going to

7    hear -- basically telling them you are going to hear

8    the whole conversation, and that is not correct.

9          And I want the jury to understand that,

10   Judge.

11         THE COURT:  Well, I certainly did not

12   understand Mr. Smith to be saying that when he

13   responded to me.

14         So to the extent that you have an objection,

15   it's overruled.

16         Let's see if we have any other issues before

17   we take a short break, what's remaining of our twenty

18   minutes.

19         Anyone else have an issue?  All right.  We

20   will be in recess at this time.

21         (Recess taken from 2:40 to 2:50 p.m.)

22         (After recess.)

23         (The jury resumed their places in the jury

24   box, and the following proceedings were had in open

25   court.)

D. Kennon White – Direct Examination

1          THE COURT:  All right, thank you.  The record

2 will reflect that all members of the jury are present,

3 parties and counsel are also present.

4          Mr. White, again, you are still under oath.

5          Mr. Smith, I believe there was a matter to

6 take up dealing with Exhibit 9 before we move on to

7 10?

8          MR. SMITH:  Yes, Your Honor, if the court

9 please, we would like to play the last portion of

10 that.

11          There was an omission at the end we would

12 like to catch up on at the end of Exhibit 9 with

13 Mr. White.  If we could play that last section,

14 please.

15          THE COURT:  Yes.

16          (Audio played.)

17 BY MR. SMITH:

18 Q.   Mr. White, I would now like to direct your

19 attention to Exhibit A10.

20 A.   Okay.

21          MR. SMITH:  Are we at a point where we can

22 play that, publish that?

23          With the court's permission, Your Honor, we

24 would publish A10 at this time.

25          THE COURT:  Yes, I believe it has been

D. Kennon White – Direct Examination

1  admitted.  You may publish it to the jury.

2          (Audio played.)

3  BY MR. SMITH:

4  Q.  Mr. White, did you identify the persons in the

5  conversation at this time?

6  A.  Yes, it is myself and Freddy Thompson, the county

7  court clerk.

8  Q.  And where was this conversation recorded,

9  Mr. White?

10 A.  At the county court clerk's office.

11 Q.  Is that in Manchester?

12 A.  Yes, it is.

13 Q.  Okay.

14         MR. SMITH:  Continue, please.

15         (Audio played.)

16 BY MR. SMITH:

17 Q.  Mr. White, in this conversation on May 1st, 2007,

18 you said this was at the clerk's office?

19 A.  Yes.

20 Q.  Did he have a private office in that clerk's

21 office?

22 A.  Yes, he did.

23 Q.  Did he shut the door in that clerk's office?

24 A.  Yes.

25 Q.  And when did he shut the door?

D. Kennon White - Direct Examination

1  A.    When I came in.

2  Q.    Just the two of you in there?

3  A.    Yes.

4  Q.    And when you started that conversation, you asked

5  him a question, "How did your campaign go yesterday,

6  buddy?"  What were you referring to?

7  A.    Him -- he had been to a different part of the

8  state with Clay Massey Bishop who was running for

9  appeals judge.

10  Q.    And who is Clay Massey Bishop?

11  A.    He is the Republican chairman and county

12  attorney.

13  Q.    Now, in the course of that conversation, you said

14  -- you made a question, you said, "Well, you heard

15  what they done down here yesterday, didn't you?"  What

16  were you referring to?

17  A.    Where that Wanda had got a federal subpoena.

18  Q.    And Mr. Thompson said, "Did Wanda get" -- to your

19  understanding what was he referring to Wanda getting?

20  A.    A subpoena.

21  Q.    All right.  And then he made a statement, "Well,

22  Phillip got one."

23          To your understanding, who was he referring

24  to as Phillip?

25  A.    Phillip Mobley.

D. Kennon White – Direct Examination

1  Q.  And "got one," what was your understanding that

2  he was referring to as "one"?

3  A.  A subpoena to appear before the federal grand

4  jury.

5  Q.  Now, later in this conversation he said he went

6  over there back in August.  To your understanding,

7  what was he referring to?

8  A.  That he had went in front of the federal grand

9  jury in August.

10  Q.  And would that have been August of '06?

11  A.  I think that's correct.

12  Q.  You asked the question, "Did they subpoena Wayne

13  or Al Man?"  Who were you referring to?

14  A.  Wayne Jones or Al Man Stivers.

15  Q.  Mr. Thompson said, "No, if he was subpoenaed I

16  would know it."  To your understanding, what was he

17  referring to?

18  A.  He was referring that he would know.  Wayne Jones

19  is his father-in-law, and Al Man's a close friend.

20  Q.  Later in the conversation you asked him a

21  question.

22      I believe you said, "Have they got any of your

23  records over here?"  What were you referring to?

24  A.  His election records and assistance forms.

25          MR. WHITE:  Your Honor, if I could just

D. Kennon White - Direct Examination

 1  interrupt for a moment, not so much to lodge an

 2  objection.

 3          But if you could ask the United States to

 4  refer to the page number on the transcript that he is

 5  directing him to so that we could follow along maybe a

 6  little better, please?

 7          THE COURT:  Well, I am not going to direct

 8  the United States to do that.

 9          Mr. Smith, you may proceed.

10          MR. WHITE:  Thank you, Your Honor.

11  BY MR. SMITH:

12  Q.  Further in that conversation, you asked the

13  question, "What about the voter assistance forms?

14  What did you guys -- did you guys do with them?"  What

15  were you referring to, Mr. White?

16  A.  I was referring to the assistance forms that my

17  wife signed at the precinct when she assisted voters

18  which would be a paper trail where they could have

19  followed who she voted.

20      And I was referring to because Al Man had told my

21  wife that they had taken care of those assistance

22  forms and gotten rid of those.

23  Q.  Mr. Thompson asked you about questions that they

24  had made of Wanda.

25      Had -- to your understanding, what was he

D. Kennon White – Direct Examination

1 referring to?

2 A.   He was referring to questions about the --

3 anything that she had done where there -- when he was

4 referring to intimidating.

5     It was questions he was referring to as being

6 something that could get her in trouble or him or

7 anyone else involved.

8 Q.   Now, at this point you represented to

9 Mr. Thompson that she just received the subpoena?

10 A.   Yes.

11 Q.   So were you referencing questions of the grand

12 jury or some other questions?

13 A.   She had went to meet with the FBI is what I am

14 referring to.

15 Q.   So is that what you were referring to when --

16 A.   Yes.

17 Q.   -- you say "asking of her"?

18 A.   Uh-huh.

19 Q.   Mr. Thompson made a statement further in that

20 conversation saying, "Well, I can't relinquish them

21 for twenty-two months."

22     What, to your understanding, was he referring

23 to?

24 A.   The assistance forms.

25 Q.   Following your question about that, Mr. Thompson

D. Kennon White - Direct Examination

1 makes the comment, "I think I am in trouble, Kennon."

2 To your understanding what was he referring to?

3          MR. RICHARDSON:  Objection, Your Honor.

4          THE COURT:  I'll sustain the -- I'll sustain

5 the objection.

6          It does require an interpretation of the

7 evidence.

8 BY MR. SMITH:

9 Q.   Finally, in that conversation, Mr. White, you

10 made a comment toward the end.

11          I think you asked the question, "Didn't Al Man, I

12 mean, I am talking about did they ever subpoena him

13 for '02?"  What were you referring to?

14 A.   I was referring to the '02 election where they

15 had subpoenaed Al Man in front of the grand jury for

16 the '02 election.

17 Q.   Thank you.

18          MR. SMITH:  A11.  I would like to hand the

19 witness now what's marked as A11 and A11A,

20 Your Honor.  Thank you.

21 BY MR. SMITH:

22 Q.   Do you have before you now A11 which is a disk,

23 Mr. White?

24 A.   Yes, I do.

25 Q.   And, again, is that a recording that you have

D. Kennon White – Direct Examination

1  reviewed prior to testifying here today?

2  A.   Yes, it is.

3  Q.   And what date was this recording made, Mr. White?

4  A.   May 1st, 2007.

5  Q.   And was this again made as part of your

6  cooperation with the FBI?

7  A.   It was.

8  Q.   And have you had, prior to your testimony here

9  today, an opportunity to review that?

10 A.   I have.

11 Q.   Is that a fair and accurate copy of the

12 conversation in which you participated on May the 1st,

13 2007?

14 A.   Yes, it is.

15 Q.   I would like to also direct your attention to

16 Government's Exhibit A11A, transcript.  Do you have

17 that in front of you?

18 A.   I do.

19 Q.   And have you also had an opportunity to review

20 that and compare that with the recording of your

21 conversation?

22 A.   Yes, I have, several times.

23 Q.   Is that a fair and accurate transcript of the

24 conversation?

25 A.   It is.

D. Kennon White – Direct Examination

1          MR. SMITH:  I would move, Your Honor, for the

2 introduction of Government's Exhibits A11 and A11A.

3          THE COURT:  Any objection other than those

4 previously raised?  These two exhibits will be

5 admitted.

6          (GOVERNMENT EXHIBIT NOS. A11 AND A11A

7 ADMITTED INTO EVIDENCE)

8          MR. SMITH:  Ask at this time, Your Honor, if

9 we could publish this to the jury.

10          THE COURT:  Yes, you may.

11 BY MR. SMITH:

12 Q.  Mr. White, who was participating with you in this

13 conversation?

14 A.  Al Man Stivers at this point, Al Man and myself.

15 Q.  Okay.  And after you announced that they had

16 subpoenaed Wanda, Stivers made the comment, "Well,

17 then, they will subpoena me then, won't they?"  To

18 your understanding, what was he referring to?

19 A.  He was referring to where they had subpoenaed

20 Wanda and that we were connected, that they would

21 subpoena him.

22 Q.  Further as you talked with him, you said, "They

23 just asked for a bunch of stuff about the election."

24 What were you referring to?

25 A.  I was referring to election things like that went

D. Kennon White - Direct Examination

1  on with the election, irregularities and vote fraud

2  and vote stealing and vote buying and that sort of

3  thing.

4  Q.   And who were you referring to when you said,

5  "They just asked her"?

6  A.   The FBI.

7  Q.   You went on in conversation with us, "Mr. Stivers

8  and you revealed to him, you said she told them that

9  Jennings and Vernon was the only two that she had ever

10 seen."  What were you referring to, Mr. White?

11 A.   Referring to money and buying votes.

12 Q.   Jennings being a reference to whom?

13 A.   Jennings White.

14 Q.   And Vernon being a reference to who?

15 A.   Vernon Hacker.

16 Q.   Now, did you -- did you have this story made up

17 or where did you come up with that information?

18 A.   I was directed by the -- I was directed by the

19 agents to -- to say.

20 Q.   To say what?

21 A.   To say -- to talk about this -- to talk about the

22 election and --

23 Q.   And did they direct you in anyway about what to

24 say about Jennings and Vernon?

25 A.   I don't know whether they directed me to do that

D. Kennon White – Direct Examination

1  or not.

2  Q.   But had there actually been an interview with the

3  FBI where she told on Jennings and Vernon?

4  A.   No.

5  Q.   So that was made up?

6  A.   Yes.

7  Q.   And you were told to report this in this

8  conversation?

9  A.   Yes.

10  Q.   Now, you further said, "They have got their teeth

11  in Dobber's hind end pretty hard."

12  A.   Uh-huh.

13  Q.   What were you referring to?

14  A.   I was referring to the investigation that the FBI

15  had gotten Dobber to -- that they had their teeth in

16  Dobber.

17  Q.   And where did you get that information,

18  Mr. White?

19  A.   I -- the information I got was what I was

20  directed to talk to about the election.

21  Q.   Okay, and who gave you those directions?

22  A.   The FBI.

23  Q.   Finally, in there you mention in conversation

24  with Mr. Stivers that, "Brent Caldwell called down

25  there and tried to sweet talk them."  Who were you

D. Kennon White – Direct Examination

1  referring to, Mr. White?

2  A.   Wanda's attorney, my attorney.

3       MR. SMITH:   Play the next clip.

4       (Audio played.)

5  BY MR. SMITH:

6  Q.   Mr. White, as we ended the clip there, there was

7  a female voice that was introduced.   Who was that?

8  A.   That was Mary Betty Stivers, Al Man's wife.

9  Q.   And there was another male speaking besides you

10 and Mr. Stivers in that conversation.   Who was that?

11 A.   Wayne Jones.

12 Q.   Now, in that conversation that -- toward the end

13 there, there was some talk about a statute.

14      And Mr. Jones said, "They have to do something

15 within five years."   To your understanding, what was

16 he referring to?

17 A.   He was talking about the statute of limitations

18 for election fraud.

19 Q.   And then he goes on to say, "You know, when they

20 indicted Peanut there, four or five days the statute

21 was up on him."   Do you understand what was he

22 referring to?

23 A.   He was referring to Peanut Abner, I think.

24 Q.   And have you previously introduced him to us?

25 A.   Yes.

D. Kennon White - Direct Examination

1  Q.   And who is he?

2  A.   He is a person that's been in trouble for drugs

3  and money and -- from Clay County, from the federal

4  level.

5  Q.   Previous to that, there was some talk about

6  wanting officials.

7       Mr. Jones said, "I think they are wanting the

8  judge."  To your understanding, who was he referring

9  to?

10 A.   Cletus Maricle.

11 Q.   You made a statement that, "I think they are

12 wanting Doug."  Who are you referring to?

13 A.   Doug Adams, the superintendent.

14 Q.   Prior to that, you were talking about Wanda being

15 subpoenaed, and I believe Mr. Jones said, "Get your

16 ass in front of the grand jury, that's the dangerous

17 part about it, commit perjury."  To your

18 understanding, what was he referring to?

19 A.   He was talking about that if you lie in front of

20 the grand jury that you could -- you would commit

21 perjury that he had referenced earlier about taking

22 the Fifth Amendment.

23         MR. WHITE:  Your Honor, I move to strike that

24 last as unresponsive.

25         THE COURT:  All right, I'll sustain the

D. Kennon White – Direct Examination

1  objection.  The jury will disregard the last comment.

2  BY MR. SMITH:

3  Q.   Early in the conversation you said, "I don't know

4  what she is going to do when she gets down to the

5  grand jury."

6      Mr. Jones says, "I know what I would do.  I would

7  hunt me a lawyer and I would take the Fifth, boy."  To

8  your understanding, what he was referring to?

9  A.   He was referring to getting a lawyer and taking

10 the Fifth Amendment.

11 Q.   Prior to that he says, "You are better off not to

12 talk to them unless she's got a lawyer."

13     To your understanding, who was he referring to as

14 "them"?

15 A.   The FBI or federal prosecutor.

16         MR. SMITH:  Could, Your Honor, we play the

17 continuation of the clip?

18         THE COURT:  Yes, sir.

19         (Audio played.)

20 BY MR. SMITH:

21 Q.   Mr. White, in this portion of the clip, you had

22 conversation with -- with Mr. Jones.

23     And you asked him a question, you said, "You talk

24 to him any?"  And he responded, "Yeah, I see him every

25 day."  That's on page 20.  Who were you referring to?

D. Kennon White - Direct Examination

1  A.    Stanley Bowling.

2          MR. SMITH:  Could, Your Honor, we move on to

3  the next clip?

4          THE COURT:  Yes.

5          (Audio played.)

6          MR. SMITH:  Your Honor, if we could play the

7  next clip.

8          THE COURT:  Yes, sir.

9          (Audio played.)

10         MR. SMITH:  Your Honor, I don't have any

11 questions of the witness about this exhibit, but I do

12 have another exhibit.  Obviously we are close to the

13 ending hour so --

14         THE COURT:  We are.  We will end at this time

15 for the day.

16         Ladies and gentlemen, before I remind you of

17 the admonition, I want to first remind you that we are

18 -- we made arrangements to be here on Monday.

19         Of course, that's dependent upon the weather,

20 and if the weather were to turn bad, as it may do this

21 weekend as we are expected to get another storm, then

22 the clerk will be contacting you.

23         If for some reason we don't have a session on

24 Monday, but at this time we are planning to start on

25 Monday at 9:00, weather permitting.

Colloquy

1          Now, as we break for the evening, I do want

2   to again remind you of the admonition that you have

3   been given several times.

4          First, as we take our breaks, I do want to

5   remind you that you should not talk about the case

6   with each other or with anyone else, and that would

7   include family and friends.

8          You shouldn't communicate about the case

9   using your cell phone, email, Blackberries, iPhones,

10  text messaging, Twitter, through any social networking

11  sites such as Facebook, MySpace, YouTube, any of those

12  matters.

13         Outside the courtroom, you should not let

14  anyone approach you in an attempt to discuss the

15  case.

16         And of course if that should ever happen, you

17  should report that to the court immediately.

18         Don't speak with any of the parties, the

19  lawyers or any witnesses involved in the case.

20         Don't read, watch or listen to any of the

21  accounts of the case if there should be any.

22         Don't attempt to perform any type of research

23  or do any investigation regarding this matter.

24         And finally, of course, don't make up your

25  mind about the case until it is finally submitted to

Colloquy

1  you.

2       And with that admonition, the jury will be

3  excused hopefully until 9:00 a.m. Monday morning.

4       THE MARSHAL:  Please rise for the jury.

5       (Jury excused from the courtroom at this time

6  for evening recess.)

7       THE COURT:  Thank you.  Please be seated.

8  See if there are any matters to take up outside the

9  presence of the jury.

10      Mr. Smith, do you have any matters on behalf

11 of the United States?

12      MR. SMITH:  No, Your Honor.

13      THE COURT:  All right, thank you.  Any of the

14 defendants?

15      MR. PINALES:  No, Your Honor, thank you.

16      MR. WHITE:  No, Your Honor.

17      MR. RICHARDSON:  No, Your Honor.

18      THE COURT:  All right.  I believe the clerk

19 has everyone's numbers, and if we do have bad weather

20 Sunday night and into Monday, you will be contacted.

21      But otherwise, we'll plan to start on Monday

22 at 9:00.

23      MR. RICHARDSON:  Your Honor, if Franklin

24 County is off, 10:00, unless we're here?

25      MR. PINALES:  I think they are off Monday, as

Colloquy

1  I --

2          MR. WESTBERRY:  It's a holiday, yeah, so they

3  wouldn't --

4          THE COURT:  It's a holiday.  They will be off

5  Monday, so it will be up to the call that you

6  receive.

7          So if you don't hear from the clerk, we will

8  start at 9:00.

9          MR. RICHARDSON:  Okay, thank you, Judge.

10          (The further trial in this matter was

11  recessed at 4:34 p.m. to resume Monday, February 15,

12  2010 at 9:00 a.m.)

13                          -  -  -

14

15

16

17

18

19

20

21

22

23

24

25

Index – Certificate

EXAMINATION INDEX

Plaintiff's Witnesses:

D. Kennon White

Direct by Mr. Smith . . . . .    4

                        –  –  –

EXHIBIT INDEX

                                        Marked/Admitted

Government Exhibits:

 A8    Audio                              6

A8A    Transcript of Audio               6

 A9    Audio                            20

A9A    Transcript of Audio              20

A10    Audio                            29

A10A   Transcript of Audio              29

 A11   Audio                            52

A11A   Transcript of Audio              52

                        –  –  –

CERTIFICATE

     I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter.

s/  K. Ann Banta                2-12-10
K. Ann Banta, RPR, CRR          Date