74

D. Kennon White - Cross Examination

1          MR. RICHARDSON:  Thank you, Judge.

2  BY MR. RICHARDSON:

3  Q.  We were discussing when we broke about giving

4  money to all these various individuals.  Do you

5  recall that?

6  A.  Yes.

7  Q.  And basically I think what you are telling the

8  jury is that everyone had their own ticket in one

9  precinct; is that correct?

10  A.  What I was telling the jury is there was people

11  that took care of individual precincts even though

12  they may all have been on one ticket.

13      Sometimes there is a variance in who they are for

14  according to -- you know, according to maybe a family

15  member or something that may be related or some kind

16  of job connection.

17      But the majority of those precincts, the people,

18  there is one person to two people, maybe a few more in

19  each precinct that kind of handled these matters.

20  Q.  So basically you had to go to every precinct and

21  get somebody in that precinct to go for you, right?

22  A.  I had to deliver money to the people that took

23  care of the vote buying in those precincts.

24  Q.  So there really wasn't any top down

25  organizational level here.

D. Kennon White - Cross Examination

1       You basically had to go to the worker bees to get
2   what you wanted done?
3   A.   There was -- there was -- yes, there was, there
4   was -- it started with Jennings had sent me to these
5   people to take this money to.
6       They were just the ones that handled it in these
7   precincts.
8       I guess it was just like a corporation.  They had
9   different branches.
10      I mean, you know, you may have a Wal-Mart that's
11  got a corporate office and then Wal-Mart is located in
12  different places, but that's kind of like what it was.
13  Q.   All right, do you recall talking to Mr. Smith on
14  the 11th, February 11th?
15  A.   Okay.  I --
16  Q.   You testified here on direct.  Do you recall
17  that?
18  A.   Yeah, I mean, I don't recall --
19  Q.   Uh-huh.
20  A.   -- exactly what you are talking about but --
21  Q.   Well, he asked you -- you learned in Clay County
22  that there was -- you had to be open in dropping in
23  and dropping out when you came -- when you came to
24  meet with these candidates on a slate.  Do you recall
25  that --

D. Kennon White - Cross Examination

1  A.    Yes.

2  Q.    -- him asking you that?

3  A.    Uh-huh.

4  Q.    And do you recall your answer, "When you go meet

5  with them, there would be certain precincts they would

6  be able to help you in and certain precincts they

7  wouldn't.  They would tie with whatever would be best

8  to benefit the candidate.  In other words, someone

9  might be for you in one precinct, maybe against you in

10  another."

11        MR. SMITH:  Your Honor, I am going to --

12  BY MR. RICHARDSON:

13  Q.   Do you recall that answer?

14        MR. SMITH:  -- place the same objection as

15  earlier as to the form.

16        THE COURT:  I am going to sustain the

17  objection.

18        I think it's not an inconsistent statement

19  with what he's given.

20        He's testified, he's answered your question;

21  so I'll sustain your objection.

22  BY MR. RICHARDSON:

23  Q.   So -- well, let me phrase it another way.  So in

24  one precinct they would be for you and you would be on

25  the slate, and in another precinct you wouldn't be on

D. Kennon White - Cross Examination

1 the slate, correct?

2 A.   Okay, can I -- let me explain that answer, if I

3 could.

4      What would happen is usually there were one, two

5 or three candidates that would virtually be on every

6 precinct, okay?  Those was the leading candidates on

7 the slate.

8      Sometimes you could not get as candidate on every

9 single slate in every precinct.

10      But -- but the vast majority, if you become a

11 winner.

12 Q.   Okay.  You -- I am going to go back to D14 again.

13 A.   Okay.

14 Q.   You had -- for Burning Springs you had a

15 gentleman by the name of James Craft, correct?

16 A.   Uh-huh.

17 Q.   And he is somebody in Burning Springs, and I

18 think in Pin Hook who -- no, Burning Springs who you

19 would go to to purchase votes?

20 A.   Okay, yeah, James Craft, he was a bus driver

21 close to Doug Adams.

22 Q.   James Craft was someone in Burning Springs you

23 would go to to buy votes?

24 A.   Yes, he would buy votes out of Burning Springs

25 precinct.

D. Kennon White - Cross Examination

1 Q.   And this list is from the early '90s, mid-'90s?

2 A.   Uh-huh.

3 Q.   And by 2002 his son Randy was running over there,

4 too, wasn't he?

5 A.   I don't recall Randy running for an office.  He

6 is --

7 Q.   No, running -- Randy was working as election

8 officer over there.

9 A.   He was working as election officer.  He was law

10 enforcement officer, and he does buy votes.

11 Q.   He does?

12 A.   He does buy votes.

13 Q.   I want to talk about November '02, all right?

14 A.   Okay.

15 Q.   In November '02 Freddy didn't have any

16 opposition, did he?

17 A.   I don't recall.

18 Q.   He won the Republican primary in May of '02?

19 A.   Okay.  I remember he won the Republican primary.

20 I just don't remember whether he ran against a

21 Democrat or not after that.

22 Q.   But that's really a formality in heavily

23 Republican Clay County, correct?

24 A.   In some cases.

25 Q.   Basically November '02 was the school board and

D. Kennon White - Cross Examination

1  city council?

2  A.   I don't remember whether it was -- yeah, yeah, I

3  think that's correct.

4  Q.   And you went to some election meetings about

5  getting people elected?

6  A.   Yes.

7  Q.   Freddy Thompson wasn't at any of those meetings,

8  was he?

9  A.   In '02 right after he won, no.

10 Q.   Uh-huh.  I want to talk about May of '04.

11 A.   Okay.

12 Q.   Once again, May of '04, Freddy Thompson wasn't

13 running.

14 A.   I don't think so, no.

15 Q.   And you had went to some meetings in May of '04.

16 A.   Yes.

17 Q.   Freddy Thompson wasn't at any of those meetings,

18 was he?

19 A.   I talked to Freddy Thompson.  As far as being in

20 a political meeting, no, he did not meet in a -- in a

21 political meeting, but did I talk to him one-on-one.

22 Q.   So my question was you had meetings in May of

23 '04?

24 A.   Yes, there were some.

25 Q.   Freddy Thompson wasn't at those meetings, was he?

D. Kennon White - Cross Examination

1  A.   No.

2  Q.   The big race at that point was Barbara White

3  Colter?

4  A.   Uh-huh.

5  Q.   Aunt Barbara --

6  A.   Yes.

7  Q.   -- versus Tim Couch?

8  A.   That's correct.

9  Q.   You took $5,000 from Barbara Colter, Aunt

10 Barbara?

11 A.   Yes.  I mean, you are leading to what you are

12 saying, but yeah, I am listening to you, so what do

13 you want --

14 Q.   You took $5,000 from Barbara Colter, correct?

15 A.   For what?

16 Q.   To buy votes with.

17 A.   For where?

18 Q.   You gave it to Vernon Hacker --

19 A.   That's correct.

20 Q.   -- to buy votes for Aunt Barbara?

21 A.   That's correct.

22 Q.   Now, you never went wired on Aunt Barbara, did

23 you?

24 A.   What do you mean "went wired on Aunt Barbara?"

25 Q.   Made a secret recording of -- with Aunt Barbara.

D. Kennon White - Cross Examination

1          MR. SMITH:  Your Honor, I am going to object

2   to counsel's question.

3          THE COURT:  Sustain.

4   BY MR. RICHARDSON:

5   Q.  Aunt Barbara hasn't been prosecuted, has she?

6          MR. SMITH:  Objection, Your Honor.

7          THE COURT:  Sustain.

8   BY MR. RICHARDSON:

9   Q.  November -- I want to talk about November '04,

10  all right?

11      Freddy Thompson wasn't running in November of

12  '04.

13  A.  Not to my knowledge.

14  Q.  It was a City Council race in November of '04.

15  A.  Yes.

16  Q.  And there were various political meetings.

17  A.  The council, Jamie Mills, told me that he met at

18  the clerk's office with Al Man and Freddy Thompson and

19  others that was there and that they put in $1,000 at

20  the clerk's office, I mean, you know --

21  Q.  All right, well, my question to you was --

22  A.  Okay, all right.

23  Q.  -- were there political meetings, did you go to

24  any political meetings about the elections in '04?

25  A.  Yes.

D. Kennon White - Cross Examination

1 Q.   Was Freddy Thompson at any of those meetings with

2 you?

3 A.   He was not at the meeting with me.

4 Q.   Thank you.  Then after the election in November

5 of '04, the big news came up that Jennings White --

6 Jennings White got indicted in late '05?

7 A.   I don't know the exact day, that's --

8 Q.   About that time?

9 A.   Somewhere in that range probably.

10 Q.   And that shook people up a little bit in that

11 town, didn't it?

12 A.   Yeah, it was pretty big talk.

13 Q.   So you come to the May '06 election.

14 A.   Uh-huh.

15 Q.   Freddy Thompson didn't have any opposition in May

16 of '06?

17 A.   They disqualified the person that was going to

18 run against him.

19      They had taken and they kicked her off the

20 ballot.

21 Q.   So Freddy Thompson didn't have any opposition in

22 May of '06, correct?

23 A.   Yes.

24 Q.   And that was a big election, wasn't it?

25 A.   Pretty big.

83

D. Kennon White - Cross Examination

1  Q.   You had the PVA?

2  A.   Uh-huh.

3  Q.   And the jailer race?

4  A.   Yes.

5  Q.   The sheriff race?

6  A.   Yes.

7  Q.   And the county judge executive?

8  A.   Yes.

9  Q.   Now, in this election, they had some new machines

10 come in?

11 A.   That is correct.

12 Q.   And I am going to refer to them as a two-button

13 machine, correct?

14 A.   Yeah, there was two steps to finalize your vote.

15 Q.   So in order to cast your vote in May of '06, the

16 machine was different than it was the last time it was

17 used in '05?

18 A.   I don't know.

19 Q.   There was new machines brought in in May of '06?

20 A.   There was -- there was new machines.  I don't

21 know exactly when they arrived, but I think that that

22 was May of '06.

23 Q.   May of '06.  And in order to cast your ballot in

24 May of '06, you had to punch in the people you wanted?

25 A.   Uh-huh.

D. Kennon White - Cross Examination

1  Q.  Right?

2  A.  Yes.

3  Q.  Press a button up here that said vote?

4  A.  Uh-huh.

5  Q.  And then a screen would come up that said review

6  ballot?

7  A.  I think that's correct.

8  Q.  And then you had to press another button that

9  said cast ballot?

10  A.  To my recollection, that's how the process

11  worked.

12  Q.  And there was a lot of confusion about these

13  machines, as it turned out?

14  A.  They knew there was going to be confusion.

15  Q.  Okay, but there was a lot of confusion about

16  these machines?

17  A.  There were.

18  Q.  Now, you testified here to the jury that the

19  slate was Phillip Moberley (sic), Edd Jordan, Crawfish

20  Sizemore -- Crawdad Sizemore and Tommy Harmon.  Do you

21  recall that?

22  A.  That was one -- on what slate are you -- are you

23  referring to?

24  Q.  Well --

25  A.  I did give a lady to buy votes money, but it was

D. Kennon White - Cross Examination

1  a side -- what they call a sideline slate that did

2  have Edd Jordan's name on it.

3  Q.   Well, we talked about --

4  A.   But the actual slate for that precinct, if you

5  are referring to the Manchester precinct, is that the

6  precinct to which you are referring?

7  Q.   Well, supposedly there was a sample ballot that

8  had Phillip Moberley, Crawdad Sizemore, Edd Jordan and

9  Tommy Harmon, that's what you testified to.

10 A.   I don't believe that I testified that Edd Jordan

11 was on there.

12 Q.   Well --

13 A.   I think I testified that there was a ballot like

14 that.

15      But it had Kevin Johnson.  It didn't have Edd

16 Jordan on it, I don't think.

17 Q.   All right, well, let's leave Edd Jordan out.  But

18 you -- you recall talking to the FBI back in March of

19 '07?

20 A.   I don't recall the exact conversation, but I was

21 speaking to them a lot back then.

22 Q.   Did you tell them that the slate was Edd Jordan,

23 Crawdad Sizemore and Kenny Price?

24 A.   Where at?

25 Q.   Did -- do you recall telling them that?

D. Kennon White - Cross Examination

1  A.   I don't remember.

2          MR. RICHARDSON:  Your Honor, may I refresh,

3  Your Honor?

4          THE COURT:  Yes, show him a document, see if

5  it refreshes his memory.

6  BY MR. RICHARDSON:

7  Q.   I marked it in red there.

8  A.   There was one slate that that was that way, but

9  there were two different slates at two different

10 times.

11     The one that you are referring to that this is

12 talking about, yes, he was on -- he was on the one

13 that I give $500 to.

14 Q.   All right, does that refresh your memory?

15 A.   Yes, I mean, I am reading it now.

16 Q.   Okay, so in March of '07, you told the FBI the

17 slate was Edd Jordan, Crawdad Sizemore --

18          MR. SMITH:  I am going to object.

19          THE COURT:  Yes, sir, Mr. Smith?

20          MR. RICHARDSON:  I'm sorry?

21          MR. SMITH:  I believe that we are having

22 hearsay, again, trying to interject out-of-court

23 statements.

24          He can ask the witness now, he said his

25 memory is refreshed.

D. Kennon White - Cross Examination

1          THE COURT:  Mr. White, when you are given a

2   document to refresh your memory, you don't testify

3   from the document.

4          It's what you remember.  It either refreshes

5   your memory or it doesn't refresh your memory.

6          Then you can answer questions that he asked

7   you based on that, but you don't need to read the

8   document, okay?

9          THE WITNESS:  Okay, thank you, Your Honor.

10          THE COURT:  All right.

11   BY MR. RICHARDSON:

12   Q.   Do you recall telling the FBI that that was the

13   slate back in '07?

14   A.   There was one slate that was that way.

15   Q.   Did you -- do you recall telling the FBI back in

16   March of '07 that the slate was Edd Jordan --

17   A.   I didn't -- did I not answer your question?

18   Q.   I don't believe you did.

19   A.   I said that there was one slate that that was

20   that way, and yes, I did tell them that.

21   Q.   You did tell them that?

22   A.   That there was one slate that way, I did.

23   Q.   You didn't mention Phillip Moberley, did you?

24          MR. SMITH:  Your Honor, I am going to object

25   to arguing with the witness.

D. Kennon White - Cross Examination

 1              THE COURT:  Sustain.

 2    BY MR. RICHARDSON:

 3    Q.   Did you mention Phillip Moberley?

 4              MR. SMITH:  Same objection.

 5              MR. RICHARDSON:  I am not.  Sorry.

 6              THE COURT:  You can answer his question, if

 7    you remember.

 8              THE WITNESS:  I don't recall.

 9    BY MR. RICHARDSON:

10    Q.   You don't recall?  Now in, May of '06 you had,

11    once again, meetings prior to the election, in May of

12    '06?

13    A.   Yes, we did.

14    Q.   To discuss the upcoming election?

15    A.   Uh-huh.

16    Q.   Freddy Thompson wasn't in any of those meetings,

17    was he?

18    A.   At the -- no, he wasn't at the actual meeting.

19    Q.   Freddy Thompson wasn't in any of those meetings?

20    A.   He was possibly at a few of them, but he wasn't

21    at all of them.

22    Q.   Was he at a meeting with you?

23    A.   I -- yeah, he was at a meeting with me.  I mean,

24    he has been around meetings with me, I mean, and I

25    mean --

89

D. Kennon White - Cross Examination

1 Q.   And -- and there was political talk, and he was

2 actually at a meeting.  Where was this meeting?

3 A.   I met with him at the clerk's office.  I talked

4 with him at the clerk's office.

5      There was a time or two that he stopped by Bart

6 Morris's at a meeting.

7 Q.   But did you ever tell anybody about this, about

8 him being at meetings?

9 A.   I don't remember.  There was so much information

10 given.  I do not remember that.

11 Q.   Do you recall if you told the FBI about any

12 meetings or --

13 A.   I don't --

14      MR. SMITH:  Your Honor --

15      THE COURT:  I'll sustain the objection, asked

16 and answered.  Sustain.

17 BY MR. RICHARDSON:

18 Q.   Now, you told the jury about Bart Morris and

19 Darnell Hipsher getting people to request absentee

20 ballots.  Do you recall that?

21 A.   Yes.

22 Q.   And you said that they would -- they would call

23 -- had the individual call down to the clerk's office

24 and order an absentee ballot?

25 A.   Darnell Hipsher would call Evelyn Dezarn and get

D. Kennon White - Cross Examination

1  her to send those out a lot of times is what he told

2  me.

3       They had to call the clerk's office to do that.

4  Sometimes they would have the person call the clerk's

5  office.

6  Q.   So Darnell Hipsher might have called sometimes

7  now?

8  A.   He called some of the time, yes, he did.  He

9  called a clerk or deputy clerk or whatever they are

10 considered that work for Freddy Thompson.

11 Q.   Did you ever hear him make these calls?

12 A.   I never heard him make those calls, but he come

13 and wanted a job for some of his family at the city to

14 repay her for what she was -- not questioning him when

15 he ordered absentee ballots.

16 Q.   So you don't have any direct knowledge of him

17 calling --

18 A.   Other than what he told me.

19 Q.   And they would wait until the ballot actually got

20 to them?

21 A.   Uh-huh.

22 Q.   And then they would fill them out, Bart or --

23 A.   The way it would work --

24 Q.   -- Bart and Darnell?

25 A.   Here's what I know, is they would have -- they

D. Kennon White - Cross Examination

1 would tell me how it worked.

2     They would have these things signed by the

3 people, by the people that were -- that they had

4 requested these ballots.

5     They would get the ballot, they would sign them

6 and then they will just fill in who that they wanted

7 to vote.

8     It was a big joke with them.  They would say,

9 "well, you want to vote one for your daddy?"  Which I

10 never did that.

11     But I watched them vote several, and they were,

12 "I am going to vote this one for this council member.

13 I am going to vote this one for that one."

14     And I mean, because they had an open ballot there

15 that someone had signed and they had paid for it, and

16 they could put whatever they wanted to on that.

17          MR. RICHARDSON:  Your Honor, I would move to

18 strike the answer as nonresponsive to my question.

19          THE COURT:  Motion is denied.

20 BY MR. RICHARDSON:

21 Q.  My question was, they were getting people to

22 request some ballots, correct?

23 A.  Yeah, that's how they had to do it.

24 Q.  And then they would fill out the ballots,

25 correct?

D. Kennon White - Cross Examination

1  A.    They would fill them out, that's correct.

2  Q.    And then they would mail them in.

3  A.    Yes.

4  Q.    But they didn't go directly to Freddy Thompson,

5  who is a co-conspirator, and get them from him

6  directly, did they?

7  A.    Here's what Freddy Thompson -- Freddy Thompson

8  would give us the list, and he would give them to

9  Wayne, and he would give them of the people that had

10 requested these absentee ballots.

11      Freddy was kept up to date.  I talked with Freddy

12 in his office.

13      We talked about the process that was going on

14 several times when Gayle Stevens was running in the

15 absentee voters.

16      We talked about the process whenever Bart and

17 Darnell were doing the mail-in absentees.

18      So he was well aware of what was going on, if

19 that's what you are asking, sir.

20          MR. RICHARDSON:  Your Honor, can I -- I move

21 to strike that answer as not responsive to the

22 question.

23          THE COURT:  Your request is denied.  I think

24 he is attempting to answer the question that you are

25 asking.

D. Kennon White - Cross Examination

1 BY MR. RICHARDSON:

2 Q.   My question to you was did he -- why didn't they

3 go -- did they ever go directly to Freddy Thompson and

4 pick up an absentee ballot from Freddy Thompson?  Did

5 anyone ever tell you that?

6 A.   No, no one ever told me that.

7 Q.   And are you aware that an absentee ballot list is

8 an open records?  Are you aware of that?

9 A.   I am not aware of that.

10 Q.   That anybody can go into the clerk's office in

11 any county in this state and request an absentee

12 ballot, a list of absentee ballots?

13         MR. SMITH:  That has been asked and

14 answered.  He says he is not aware of it.

15         THE COURT:  Sustain.

16 BY MR. RICHARDSON:

17 Q.   You told this jury that Doug Adams wanted Kevin

18 Johnson for sheriff, correct?

19 A.   That is correct.

20 Q.   I want to ask you about this sample ballot that

21 you all talked about.

22     In your -- in your direct examination, there was

23 a sample ballot that supposedly Wanda had gotten,

24 correct?

25 A.   Yes, there was a sample ballot that she had

D. Kennon White - Cross Examination

1 gotten.

2 Q.  Uh-huh, and she got it from the clerk's office,

3 didn't she?

4 A.  She got it from -- yes, from the clerk's office.

5 Who, I don't know.

6 Q.  Who you don't know?

7 A.  I don't know.  You would have to ask her.  Let me

8 rephrase it, you would have to ask her.

9 Q.  So you don't have any knowledge that she got it

10 from Freddy Thompson?

11 A.  They give it out at the clerk's office, whoever

12 is clerk.

13 Q.  Uh-huh.

14 A.  And she ended up giving her copy to Chris Reid --

15 Q.  Okay.

16 A.  -- which took it to Edd Jordan to show him that

17 he wasn't on the -- the ballot that they did.

18 Q.  So you don't have any personal knowledge if she

19 got it from Freddy Thompson?

20 A.  No, I don't have any personal knowledge if she

21 got it from Freddy.

22 Q.  And she didn't tell you she got it from Freddy?

23 A.  She told me she got it at the clerk's office.

24 Q.  Thank you.  Now, after the election in May of

25 '06, there was a victory party at Phillip Moberley's

95

D. Kennon White - Cross Examination

1 house?

2 A.   Yes.

3 Q.   And you went there?

4 A.   Yes, I did.

5 Q.   And Wanda White went there?

6 A.   Yes.

7 Q.   Freddy Thompson wasn't there?

8 A.   I didn't -- I didn't see him there, but I was

9 there and I left, you know, before he could have been

10 there, but I did not see him there.

11 Q.   Did not see Freddy Thompson there.  Freddy

12 Thompson -- I'll strike that.

13     Now we come to November '06, all right?  We'll

14 talk about that.

15 A.   All right.

16 Q.   But right before the election on Halloween day, a

17 search warrant was executed at City Hall.

18 A.   Sometime around that time frame.

19 Q.   And that kind of shook people up again, didn't

20 it?

21 A.   Yes, it shook people up.

22 Q.   People were running a little scared.

23 A.   Yes.

24 Q.   There had been a big brouhaha about this two-vote

25 machine already?

D. Kennon White – Cross Examination

1  A.   Yes.

2  Q.   Once again, November of '06, Freddy is not

3  running.

4  A.   Not to my knowledge he is not.

5  Q.   And there were several political meetings prior

6  to this November '06, and Freddy Thompson wasn't at

7  any of those political meetings, was he?

8  A.   Freddy let Wayne Jones come to a lot of what went

9  on there.   That's his father-in-law.

10 Q.   Freddy Thompson wasn't at any of these political

11 meetings, was he?

12 A.   I didn't see him at any of the ones right before

13 the council race, no.

14 Q.   In November '06 it was a mayor's race?

15 A.   Yes.

16 Q.   With your dad?

17 A.   Yes.

18 Q.   City council race?

19 A.   Yes.

20 Q.   And the school board?

21 A.   Yeah, I guess, I don't --

22 Q.   And there was, like I said, a big stink after the

23 '06, the May primary, about the two-button machine?

24 A.   Yeah, that was an issue that we talked about.

25 Q.   And people were running scared during the

D. Kennon White - Cross Examination

1  November '06 election?

2  A.    People were running scared that were -- that was

3  involved in election corruption.

4  Q.    Uh-huh.

5  A.    Sure enough.

6  Q.    Some people left town, right?

7  A.    Some people give the appearance they left town.

8  Q.    Uh-huh.  And in fact you told Wanda White to

9  limit herself --

10         MR. SMITH:  Your Honor, I am going to object

11  again.

12         Counsel continues to testify by interjecting

13  his comments.

14         THE COURT:  His comments --

15         MR. RICHARDSON:  I'm sorry, Judge, it's a

16  nervous habit.

17         THE COURT:  Come up, come up.

18         (Thereupon, a bench conference was had

19  between the Court and counsel and out of the hearing

20  of the jury.)

21         THE COURT:  You were warned, weren't you?

22         MR. RICHARDSON:  Yeah.

23         THE COURT:  You went ahead and did it anyway,

24  didn't you?

25         MR. RICHARDSON:  I didn't mean to, Judge.

D. Kennon White - Cross Examination

1  It's not like I --

2         THE COURT:  You didn't mean to.

3  Mr. Baldani --

4         MR. BALDANI:  Yes, Your Honor.

5         THE COURT:  Are you ready to take over for

6  your co-counsel?

7         MR. BALDANI:  Not really.

8         THE COURT:  Be ready tomorrow.  Be ready

9  tomorrow.

10         MR. BALDANI:  Can I say something here,

11  Judge?

12         THE COURT:  You can.  You can.

13         MR. BALDANI:  I told Tucker before he started

14  his cross, he has a habit of saying, okay, uh-huh,

15  okay, uh-huh.

16         And I can tell you that, in all good faith, I

17  told him before it even got brought up, Judge.

18         I said, "You have got an annoying habit of

19  saying okay, uh-huh."

20         And I'll be honest with you, he -- he went a

21  half an hour without doing it, and -- well, maybe not,

22  but --

23         THE COURT:  Since I warned him not to do

24  it.

25         MR. BALDANI:  I agree you warned him, Judge,

D. Kennon White - Cross Examination

 1 | I agree.

 2 |         But I can tell you, knowing him all these
 3 | years, it's an annoying habit.

 4 |         And I really don't believe it was an
 5 | intentional flouting of your rule.

 6 |         THE COURT:  No, you are way outside what I
 7 | typically will allow in a case, Mr. Richardson.

 8 |         I am going to sustain your objection,
 9 | Mr. Smith.

10 |         The next time this happens, I am going to
11 | admonish counsel in front of the jury that his
12 | questions are improper, his comments are improper and
13 | they are to disregard it.

14 |         Now, we have covered this area about the '06
15 | election.

16 |         You have already covered it once, you have
17 | asked about the races, that he was running in November
18 | of '06.  You are on a short leash at this point.

19 |         If you want to ask questions properly, you
20 | can continue.

21 |         MR. RICHARDSON:  Yes, sir.

22 |         THE COURT:  If you are toying with me --

23 |         MR. RICHARDSON:  I am not --

24 |         THE COURT:  -- if you think that I will not
25 | hold you in contempt --

D. Kennon White - Cross Examination

1          MR. RICHARDSON:  I am not toying with you,

2  Judge.

3          THE COURT:  Don't talk until I finish.

4          MR. RICHARDSON:  Yes, sir.

5          THE COURT:  Not another word until I tell you

6  to.

7          If you think that I will not hold you in

8  contempt and put you in jail, you have got another

9  thing coming to you.  You believe me about that.

10          Now, I have already warned a couple of

11  attorneys, and they have acted appropriately in this

12  case; but you haven't.

13          The next time it happens, I am telling you, I

14  am telling you what's going to happen.

15          MR. RICHARDSON:  I will try not to, Judge.

16  That's all I can promise you.  I am human.  I make

17  mistakes.

18          THE COURT:  You have made a bunch of them to

19  this point, and I don't want you to make any more.

20          MR. RICHARDSON:  I am going to try my best.

21          THE COURT:  You better.  You better try your

22  best.

23          MR. RICHARDSON:  Yes, sir.

24          THE COURT:  Mr. Baldani, you better be ready

25  to take over tomorrow.

D. Kennon White - Cross Examination

1              MR. BALDANI:  I will, Your Honor, but I want

2    to tell you, as an officer of the court, and I feel I

3    have dealt with you in candor.

4              I know Tucker, and it's a nervous habit,

5    Your Honor.

6              I mean, he is not going to do something

7    that's going to hurt our client.

8              THE COURT:  He is hurting your client and

9    he's hurting everyone else's client the way he is

10   conducting his cross examination.  Not the government,

11   the other defendants --

12             MR. BALDANI:  I am just --

13             THE COURT:  -- that's my concern.

14             MR. BALDANI:  I am just speaking to the

15   uh-huh.

16             You know, I am telling you, Judge, it's not

17   -- that's all I have got to say.  You know what I am

18   saying.

19             THE COURT:  You know what I am saying, too.

20             MR. BALDANI:  I do, Your Honor.

21             THE COURT:  All right.

22             MR. BALDANI:  Thanks, Judge.

23             (End of bench conference.)

24             THE COURT:  Thank you.  Ladies and gentlemen,

25   I am going to sustain the objection.

D. Kennon White - Cross Examination

1          To the extent that counsel makes comments

2    that are not questions, you are to disregard those

3    comments that are made.

4          You may continue.

5          MR. RICHARDSON:  Thank you, Judge.

6    BY MR. RICHARDSON:

7    Q.   We were -- I asked you that in fact people were

8    running scared in November of '06?

9    A.   Okay.

10   Q.   And in fact you told Wanda to limit herself in

11   November of '06?

12   A.   I did.

13   Q.   Now, you said that Wayne Jones was for Crawdad

14   Sizemore?

15   A.   That's 100 percent right.

16   Q.   And that there was an instance when Jeremy Vega

17   was bringing in votes for Edd Jordan?

18   A.   There was an instance.  He was -- he was hauling

19   them in for Edd.

20   Q.   And Wayne Jones -- and he wouldn't let Wayne

21   Jones vote him, would he?

22   A.   I think that's the way it went, yes.

23   Q.   Because they weren't going to vote for Crawdad

24   Sizemore?

25   A.   To my understanding, that's correct.

D. Kennon White – Cross Examination

1 Q.   And you wanted to know who was going to pay those

2 voters, didn't you?

3 A.   I don't remember, but it's a possibility.

4 Q.   And you found out later that Bart Morris was

5 going to pay those voters.  Do you recall that?

6 A.   Yes, now that you said that, yes, I do.

7 Q.   So Bart Morris and Wayne Jones were on different

8 sides in that election?

9 A.   No, because they were still getting the votes for

10 Crawdad.

11      They worked out a deal for Crawdad to get those

12 votes.

13 Q.   Jeremy Vega is being paid by Bart Morris, and

14 they are not voting Crawdad --

15 A.   They are voting Crawdad, that's how that they

16 worked this thing out.

17 Q.   Okay.

18 A.   What I was told.

19 Q.   Election is over in '06, and your dad lost the

20 election, right?

21 A.   Yes, uh-huh.

22 Q.   And you knew you were going to lose your job?

23 A.   I had a good idea.

24 Q.   And Wanda White was going to lose her job?

25 A.   It was possible.

D. Kennon White - Cross Examination

1  Q.   And then I guess your dad got indicted in

2  February of '07?

3  A.   I think that's correct.

4  Q.   Right after you all lost your job?

5  A.   Something -- yeah, it was around that time.

6  Q.   So Wanda went and spoke with the FBI?

7  A.   Sometime after that.

8  Q.   I think that was in March of '06?

9  A.   I don't know the exact date.

10 Q.   And a couple days later you went and spoke with

11 the FBI?

12 A.   I don't remember exactly how that it -- that it

13 worked, but I had spoke with the FBI before she did.

14 Q.   And basically the FBI, you talked about Todd

15 Roberts a lot?

16 A.   I -- I don't remember all the context of the

17 first conversation I had.

18 Q.   But they didn't touch on -- they didn't touch on

19 any of your bad deeds.

20     I guess this was back in '06, this is August of

21 '06.

22 A.   I had went to the grand jury in '06.

23 Q.   I'm sorry, I got confused there.  It's August of

24 '06 that you all talked to the FBI.

25 A.   That who?

D. Kennon White - Cross Examination

1  Q.    You and Wanda.

2  A.    She didn't talk with them then.  I went in front

3  of the grand jury and spoke with them in '06.

4  Q.    Okay, and this was before your dad was indicted

5  in February of '07?

6  A.    That's correct.  He also went and spoke with them

7  and went in front of the grand jury.

8  Q.    And basically your grand jury is about Todd

9  Roberts?

10  A.    Todd Roberts and Vernon Hacker.

11  Q.    But they didn't -- you talked about the missing

12  money and the evidence locker?

13  A.    That was discussed.

14  Q.    Talked about Todd Roberts riding around with

15  Bobby Joe Curry in his vehicle?

16  A.    I don't have a copy of exactly -- I mean, I would

17  have to have a copy of that testimony to know exactly

18  what I talked about, but those things was addressed, I

19  think.

20  Q.    But they didn't ask you about any of your bad

21  deeds --

22          MR. SMITH:  Objection to the hearsay,

23  Your Honor.

24          THE COURT:  Sustain.

25  BY MR. RICHARDSON:

D. Kennon White – Cross Examination

1  Q.   And then your dad was arrested in February of

2  '02?

3  A.   In '02?

4  Q.   February of '07?

5  A.   No, he wasn't arrested in '02.

6  Q.   February of '07?

7  A.   He was arrested in February of '07.

8  Q.   And you kept that list, D14 that's introduced,

9  right?

10  A.   Yes, I have kept that list for awhile.

11  Q.   And that's incriminating evidence?

12       MR. SMITH:  Your Honor, again, I am going to

13  object to counsel's characterization.

14       THE COURT:  Sustain, mischaracterization of

15  the document.  Sustained.

16  BY MR. RICHARDSON:

17  Q.   That evidence, that document shows a list of

18  people who were involved in election fraud?

19  A.   A lot of them, that's correct.

20  Q.   And you had it on your person or in your

21  possession?

22  A.   I had it locked away, yes.

23  Q.   So in February of '02 you kind of figured the

24  writing was on the wall?

25       MR. SMITH:  Objection, Your Honor.

D. Kennon White - Cross Examination

1          THE WITNESS:  February of '02?

2   BY MR. RICHARDSON:

3   Q.   I mean February of '07.  Excuse me.

4          THE COURT:  Sustain.

5   BY MR. RICHARDSON:

6   Q.   I keep saying February of '02?

7   A.   You will have to kind of tell me what you are

8   wanting.

9   Q.   Well, you figured that the Feds were getting

10  close to your dad and you and Wanda about what was

11  going on.

12  A.   I figured it was a good possibility that my dad

13  could have some problems.

14  Q.   You didn't think that you would have any

15  problems?

16  A.   Did not, didn't -- didn't really know at that

17  time.

18  Q.   In March of '07, you went and met with the FBI?

19  A.   Sometime around there.

20  Q.   And that was with same day as your dad went and

21  met with the FBI?

22  A.   We met with them the same day, that's correct.

23  Q.   And you had your attorney with you?

24  A.   Yes.

25  Q.   And Mr. Smith was there?

D. Kennon White - Cross Examination

1  A.   I think so.

2  Q.   And you made basically a deal?

3  A.   Didn't make a deal that day, no.

4  Q.   There was an information filed and a guilty plea

5  entered on April 27th, '07.

6  A.   That sounds about right.

7  Q.   And you are currently awaiting sentencing on

8  that?

9  A.   Correct.

10  Q.   And you are hoping not to go to jail, yes?

11  A.   I hope for a lenient sentence.

12  Q.   Now, Manchester's a small town.

13  A.   It is.

14  Q.   Everybody knows everybody, correct?

15          MR. SMITH:  Your Honor, that's calling for a

16  mass speculation.

17          THE COURT:   Sustain.

18  BY MR. RICHARDSON:

19  Q.   Well, a lot of people, know a lot of people in

20  that town?

21  A.   Yeah, I mean, it's a small community.

22  Q.   Walk down the street, say hello to Joe Bob and

23  Bill Bob and all those.

24          MR. SMITH:  Your Honor, I am going to object

25  to counsel's referencing people in Clay County as Joe

D. Kennon White – Cross Examination

1  Bob and Bill Bob.  I think that's objectionable.

2          THE COURT:  Sustain.

3  BY MR. RICHARDSON:

4  Q.  You know a lot of people when you walk down the

5  street?

6  A.  You run in to some you know.

7  Q.  You say hello?

8  A.  A lot of times.

9  Q.  Like any other small town though, everybody knows

10 your business, don't they?

11          MR. SMITH:  Again, it calls for speculation.

12          THE COURT:  Sustain.

13 BY MR. RICHARDSON:

14 Q.  Is there a lot of gossip that goes around in Clay

15 County?

16          MR. SMITH:  Relevance, Your Honor, object.

17          THE COURT:  Sustain.

18 BY MR. RICHARDSON:

19 Q.  Do you find that people will talk about local

20 events a lot?

21 A.  Sometimes.

22 Q.  And who is dating who.

23 A.  Occasionally.

24 Q.  And who's got in trouble.

25 A.  Sometimes.

D. Kennon White - Cross Examination

1  Q.   Now, in early to mid-February, you and Wanda

2  White, your wife, right?

3  A.   Yes.

4  Q.   Went out to Judge Maricle's house, and this was

5  right before they went to Florida.

6       And they were going to take the dogs to the

7  groomer's.  Do you recall that?

8  A.   And when was this?

9  Q.   About mid- to early February in '07.

10 A.   There was a time that I went there, it was just

11 -- are you referring to a recording?

12 Q.   No, this is not a recording.

13 A.   Okay.

14 Q.   This is you guys going out to -- to visit the

15 judge, they are getting ready to go to Florida.

16 A.   Uh-huh.

17 Q.   And Wanda was going to go to the groomer's with

18 the dog in London, I guess, with your wife.

19 A.   Wanda is my wife.

20 Q.   Wanda and Judy Maricle.

21 A.   Yes.

22 Q.   Do you recall that?

23 A.   I kind of recall something like that.

24 Q.   And you and the judge were discussing this

25 investigation?

D. Kennon White - Cross Examination

1  A.   Yes.

2  Q.   And the possible indictments?

3  A.   Yes.

4  Q.   And then you told the judge you might want to

5  cooperate?

6  A.   I did.

7  Q.   So you didn't make a deal on March 21st, is that

8  what you are telling the jury?

9  A.   Now what?

10 Q.   When you met with the FBI on March 21st of '07,

11 you didn't make a deal that day?

12 A.   I don't know the exact day.  I made a deal when I

13 walked in there and I pled guilty is when I --

14 Q.   Well, did you make a deal with the FBI prior to

15 being recorded, to going out and secretly recording

16 these people?

17 A.   What now?

18 Q.   You had a deal in place when you went out and

19 started recording these people, didn't you?

20 A.   I don't remember.

21 Q.   It wasn't official set in stone, but you had

22 talked to the FBI and kind of got your deal set in

23 place, didn't you?

24 A.   I have never had --

25         MR. SMITH:  Your Honor, he's answered the

D. Kennon White - Cross Examination

 1 question he does not know, now counsel is arguing with

 2 him.

 3         THE COURT:  Sustain.

 4 BY MR. RICHARDSON:

 5 Q.  Well, you went out and made your first recording

 6 on March 27th, '07?

 7 A.  That's around about that time, yeah.

 8 Q.  And so you decide you would go to the judge's

 9 home and secretly record him?

10 A.  I had agreed to cooperate, yes.

11 Q.  And you went to -- decided to go to Al Man's

12 house and secretly record him.

13 A.  Yes.

14         MR. SMITH:  Your Honor, I am going to object

15 and ask to approach.

16         THE COURT:  Come on up.

17         (Thereupon, a bench conference was had

18 between the Court and counsel at this time.)

19         THE COURT:  Mr. Smith?

20         MR. SMITH:  I believe that we have -- I can't

21 see that we have gotten anywhere substantively with

22 examination for the last fifteen minutes, especially

23 on the last several series of questions where we are

24 going back and rehashing and rehashing.

25         I think we are wasting the jury's time.  I

D. Kennon White - Cross Examination

1  don't understand, these questions have been asked and

2  answered and asked and answered.

3          And I don't know, other than trying to

4  reemphasize, if that's deeming value to the jury and

5  to issues at hand.

6          I don't understand that we are repeating and

7  rehashing everything that we have heard already today.

8          MR. RICHARDSON:  My next question is but you

9  didn't go to Freddy Thompson's house and record him

10  because he is not friends with Freddy Thompson, and I

11  am going to go into that area.

12          You can't just -- kind of set the stage, and

13  that's what I am doing.

14          I have only asked those two questions about

15  the recordings.

16          You went to the judge's house, then you went

17  to Al Man's house, but you didn't go to Freddy's

18  house, that's where I am going with that.

19          THE COURT:  All right, let's get there then.

20          MR. RICHARDSON:  Yes, sir.

21          THE COURT:  The objection will be -- if you

22  don't get there, I am going to sustain the

23  objection --

24          MR. RICHARDSON:  I will get there.

25          THE COURT:  -- if you don't go someplace

D. Kennon White - Cross Examination

1 quick that hasn't been covered a dozen times.

2          MR. RICHARDSON:  Yes, sir.

3          (End of bench conference.)

4          THE COURT:  Thank you.

5 BY MR. RICHARDSON:

6 Q.  I was asking you about going to the judge's house

7 and recording him.

8 A.  Uh-huh.

9 Q.  And to Al Man's house and recording him.

10 A.  I recorded them.

11 Q.  But you didn't go to Freddy's house and record

12 him?

13 A.  No, I did not.

14 Q.  I want to talk about some of the tapes that we

15 did here.  Tape A1, and that was the first tape you

16 did.

17 A.  Okay, yeah, I don't have a copy of that in front

18 of me.  But if it would be okay, I would like to --

19          MR. RICHARDSON:  Your Honor, may we approach

20 again?  Sorry.

21          THE COURT:  Yes, come on up.

22          (Thereupon, a discussion was had at the bench

23 between the Court and counsel at this time.)

24          MR. RICHARDSON:  I have got A1 up here now.

25 I am also going to introduce portions of A2, A5, A12,

D. Kennon White - Cross Examination

1  A14, A20 and A21 and A10, I think.

2          I mean, let me go back and get my notes, I

3  have got several of them, A1, A2, A12, A14, A18, A20

4  and A21.

5          But they are very small portions of them,

6  Judge, and you know, I can put it on the ELMO and just

7  say, hey, this is what I want to get to.  It will be

8  quick and easy.

9          THE COURT:  Are any of the transcripts that

10 you plan to use, do they contain portions of the

11 court, either direct or redacted?

12         MR. RICHARDSON:  Judge, I am using what I

13 printed off from the trial exhibit list that I was

14 given by the government, and I understand those to be

15 correct copies.  So --

16         THE COURT:  All right, Mr. Smith, if

17 Mr. Richardson shows you the transcript before it's

18 placed on the ELMO, would you be able to determine

19 whether it's corrected or it has a portion that should

20 not be displayed to the jury?

21         MR. SMITH:  Sure.

22         THE COURT:  We will follow that procedure.

23 We will use the ELMO and show the transcripts to

24 Mr. Smith before it's placed up there.

25         And if anyone else wants to see it, of course

D. Kennon White - Cross Examination

1  you all are welcome to as well, make sure there are no

2  problems.  But this should get us through these --

3          MR. RICHARDSON:  I have put on the copy A1,

4  the date and who it is.  And I have got that on all of

5  them just to --

6          THE COURT:  You can advise the witness just

7  to ignore your handwritten comments.

8          MR. RICHARDSON:  Thank you, sir.

9          THE COURT:  Don't ask about him that, you're

10 just asking him about statements.  You can use the

11 tape to refresh his memory as to whatever it is you

12 want to ask him about.

13         MR. RICHARDSON:  Thank you, sir.

14         MR. SMITH:  Your Honor, I don't think this is

15 going to come up.

16         But for instance here, you know, before these

17 were redacted, several people might have peeped into

18 the conversation.

19         If you go to the heading, I was going to

20 propose those to be redacted before it goes to the

21 jury.

22         But if counsel would again -- the key at the

23 top of the page is over inconclusive because we have

24 agreed that this is the portions that are to be played

25 at this trial, so I don't assume they are going to

D. Kennon White - Cross Examination

 1  make it --

 2           THE COURT:  All right, just place the

 3  portion --

 4           MR. RICHARDSON:  I'll try.

 5           THE COURT:  This is the screen, place the

 6  portion you are going to be showing.

 7           MR. RICHARDSON:  Yeah, maybe that would be

 8  best, I don't really -- I'll try, I mean --

 9           MR. BALDANI:  Sticky note, would that work?

10           MR. RICHARDSON:  Sure, if I have got a big

11  sticky note I can do that.  Thank you, Judge.

12           THE COURT:  Just take that.

13           MR. RICHARDSON:  Yes, sir.

14           (End of bench conference.)

15  BY MR. RICHARDSON:

16  Q.  Mr. White, I want to direct your attention to

17  tape 1A, and I have put a portion of the transcript on

18  the ELMO.

19      This tape was made, the first tape you made on

20  3-27-07?

21  A.  Uh-huh.

22  Q.  And it was between Judge Maricle and yourself and

23  Wanda White?

24  A.  Yes.

25  Q.  And then this tape, you are basically acting like

D. Kennon White - Cross Examination

1 you all were concerned and scared that the FBI is

2 coming down about the election; is that correct?

3 A.   I guess you could say that.

4 Q.   And in fact you start out the conversation

5 basically where we cut in with that statement, "It

6 only bothers me, I hope they aren't -- I hope they

7 aren't got Stanley on this election, afraid it will

8 get on me, you know what I am saying?"  Correct?

9 A.   Yes.

10 Q.   So and that is a -- and then later on, you once

11 again bring the conversation back around to the

12 election, right?

13 A.   I am reading that.  Okay, yes.

14 Q.   And you say that everybody's acting funny around

15 me and you are getting worried?

16 A.   Uh-huh.

17 Q.   And that's what you want to portray to the judge,

18 correct?

19 A.   That was -- that's what I was doing.

20 Q.   So you made those statements, and basically the

21 idea of the statements was to get fear to say that you

22 were scared that they were coming after you and Wanda

23 about the election, right?

24 A.   I said that on that tape.

25 Q.   Uh-huh.

119

D. Kennon White - Cross Examination

1  A.   I talked with him prior to this about this before

2  the recordings was ever made.

3       And my concerns about -- you know, about wanting

4  to cooperate and he told me not to cooperate, that he

5  was going to Florida and for me not to cooperate.

6  Q.   Told you not cooperate?

7  A.   Told me not to do nothing until he got back from

8  Florida and talked with Steven Charles about what was

9  going on with Stanley.

10 Q.   So the next -- the next meeting you had was on

11 3-31-07, the next tape?

12 A.   I assume.

13 Q.   A2 is what was introduced?

14 A.   I would have to have those in front of me to

15 verify that, but that's --

16          MR. RICHARDSON:  Can we give him a copy?

17          THE WITNESS:  I think that's correct.

18          MR. RICHARDSON:  You might as well give him

19 A2, A10, A5, A12, 14, 18, 20 and 21.

20 BY MR. RICHARDSON:

21 Q.   Once again, the only portions I am going to be

22 concerned with you are going to be able to see on the

23 screen.  Do you want to read them?

24 A.   That's fine, if I can see them on the screen.

25 Q.   We want to go through as quickly as we can.  It

D. Kennon White - Cross Examination

1 was a conversation between you and Al Man and Wanda.

2    And once again, that's not very clear, Wanda

3 says, "You won't hear nothing on me unless they start

4 coming here in the election, and then I don't want --

5 know how they will."

6    And Mr. Stivers says, "They are not worried about

7 no election."  Do you recall that?

8 A.   Yes.

9        MR. SMITH:  Your Honor, I am going to object

10 to counsel -- this is not this witness's statement.

11        And he is asking him to comment upon his

12 understanding about what another person has said.

13        THE COURT:  All right, this --

14        MR. WHITE:  Your Honor, oh, I'm sorry, I

15 thought --

16        THE COURT:  Yes, sir.

17        MR. WHITE:  I was just going to ask if we

18 could approach.

19        THE COURT:  Is it on this issue?

20        MR. WHITE:  Yes.

21        THE COURT:  All right, come on up.

22        (Thereupon, a discussion was had at the bench

23 between the Court and counsel at this time.)

24        MR. WHITE:  Yes, Your Honor, Scott White, I

25 represent Charles Jones.

D. Kennon White - Cross Examination

1          I just wanted to come up and object to the

2     pulling certain things out that have been asked and

3     answered.  So I just need to enter that objection.

4          THE COURT:  All right.

5          MR. WHITE:  I don't need to be heard.

6          THE COURT:  All right, thank you.  Mr. White,

7     I am trying to give counsel a little bit of latitude.

8          I think all counsel today have covered some

9     things a few times, and hopefully we will make it to

10    the end of the day.

11         MR. WHITE:  I am as guilty as anybody,

12    Your Honor, and I understand.

13         THE COURT:  Mr. Smith, your position is that

14    this is a conversation that did not involve this

15    witness.

16         But he did authenticate A2A, I believe is the

17    transcript, and I believe he testified that he was

18    present --

19         MR. SMITH:  He did.

20         THE COURT:  -- when the conversation

21    occurred?

22         MR. SMITH:  He did, and I -- counsel objected

23    multiple time when I tried to have him talk about what

24    Wanda was saying.

25         And the court sustained those objections

D. Kennon White - Cross Examination

1 saying Mr. Kennon White is not in a position to be in

2 here testifying about what Wanda White has said.

3          Now counsel seems to want to do this on cross

4 examination, and I am objecting.

5          MR. RICHARDSON:  That's not what Wanda said.

6 It's not what she said, it's the response of Al Man

7 Stivers, they are not worried about no election.

8          They are in there trying to get them all

9 worried about -- about that the FBI is coming down on

10 them, and they keep going back and Al Man keeps

11 saying, "No, no, don't worry about that, chill out."

12          Then she goes back one more time about these

13 voter assistance forms, and Al Man says don't worry,

14 him and Freddy took care of them.

15          He is trying to steady the ship is what he is

16 trying to do, and I need to show that.

17          That's a critical statement that comes in

18 against my client, and then Freddy took care of it.

19          And basically Al Man is saying don't worry,

20 they're not coming back about the election, trying to

21 steady exactly what the judge said, don't worry about

22 it, don't cooperate with the government; and I think I

23 am entitled to show that.

24          THE COURT:  You are -- as I understand, you

25 want to introduce a statement of Mr. Stivers that

D. Kennon White - Cross Examination

1 indicates that your client is guilty of taking care of

2 getting rid of these forms.

3         MR. RICHARDSON:  Yeah, I need to explain why

4 they are doing that, Judge, I mean, it came in as

5 evidence against my client.  These statements show why

6 Al Man said that.

7         Al Man is working for -- his folks say he is

8 the judge's right hand mind -- man.

9         They have already told the judge in February

10 they are thinking about cooperating.  They have been

11 to the judge's house four days before and said that,

12 you know, we are going to go -- you know, we are

13 thinking about cooperating and we are worried about

14 this election, we are scared.  They told him a lie.

15         THE COURT:  What's Mr. Stivers's position on

16 getting back into the statement that obviously does

17 not help him.

18         It doesn't help Mr. Thompson, but it also

19 doesn't help Mr. Stivers now.

20         MR. ABELL:  What did Mr. Stivers say --

21         THE COURT:  I'm sorry, Mr. Abell is speaking.

22         MR. ABELL:  Okay, excuse me, Robert Abell on

23 behalf of the defendant William Stivers.

24         First, Judge, I think Mr. Stivers's statement

25 is simply an acknowledgement of fact.

D. Kennon White - Cross Examination

1          It's a administerial duty of the clerk of

2    Clay County to process these ballots and send them

3    wherever they are appropriately to be sent.

4          THE COURT:  Go ahead.

5          MR. ABELL:  Inferences can be drawn, however,

6    from the statement given its context.

7          THE COURT:  That's what's going to happen --

8          MR. ABELL:  Its use as proposed seems to be

9    particularly adverse to Mr. Stivers.

10          And on that grounds and for those reasons, I

11    would object based on behalf of Mr. Stivers.

12          THE COURT:  And this is what's going to

13    happen, as soon as the statement's read and the

14    witness is going to be given an opportunity to explain

15    it, and he is going to dig a much deeper hole than has

16    already been dug in terms of taking care of these

17    forms.

18          MR. ABELL:  I agree.

19          THE COURT:  I am going to sustain the

20    objection as to this line of questioning.

21          I think it's going to be prejudicial at this

22    point to -- to the defendant, number one, to

23    reemphasize a point that's been covered previously in

24    a tape recording.

25          So I am going to sustain the objection to --

D. Kennon White - Cross Examination

1 to this line of questions about this particular

2 transcript.

3          MR. PINALES:  Only thing I was going to add,

4 Your Honor, I wish you would get your clock fixed.  It

5 seems to be going very slow this afternoon.

6          MR. WHITE:  Thank you, Your Honor.

7          THE COURT:  It may not be the clock.

8          MR. SMITH:  Your Honor, I have one other

9 issue.

10          THE COURT:  Yes, sir.

11          MR. SMITH:  Mr. Maricle is sometime animated,

12 and I understand he is very interested in this case.

13          But in the last exchange when I made the

14 objection, he spoke in such loud terms that I could

15 hear him.

16          And I can't say the jury heard him, but I

17 think that I want to bring that to the court's

18 attention and of course his counsel because I don't

19 think it helps his case that he is arguing objections

20 loud enough that I can hear it over where I am and

21 possibly have the jury to hear it.

22          And so I think Mr. Hoskins ought to put forth

23 a little bit of effort.

24          I am concerned about it for Mr. Maricle's own

25 defense.  It doesn't look good on him.

126

D. Kennon White - Cross Examination

1        MR. HOSKINS:  Judge, I heard it.  I am about

2 to speak to my client about that.

3        But I think it's equally inappropriate for

4 Mr. Smith to then say that Mr. Maricle has an

5 objection loud enough for the jury possibly to hear

6 that.

7        So I agree both of those comments were

8 inappropriate, and people should be told not to do --

9        THE COURT:  Well, thankfully I didn't hear

10 either one of them.

11        But when you talk with your client, you may

12 want to remind him, I think he is under home detention

13 right now, and there is only one way to go from there

14 if he disrupts the court proceeding.  You can draw

15 your own inference from that.

16        So let's attempt to make it to 4:30.  We'll

17 do our best to make it to 4:30 this afternoon.

18        So we are all clear on this one document, I

19 have ruled on that, I have sustained Mr. Stivers's

20 objection for the reasons that are stated.

21        So we'll move on to the next document, and

22 Mr. Hoskins, you can talk to Mr. Maricle at a

23 convenient time, you don't need to do it right now.

24        MR. HOSKINS:  I'm sorry?

25        THE COURT:  You can talk to Mr. Maricle at a

D. Kennon White - Cross Examination

1  convenient time.  You don't need to do it right now

2  that would emphasize anything in front of the jury.

3        MR. HOSKINS:  Thank you, Judge.

4        THE COURT:  Anyone else have anything?  No?

5  Thank you.

6        (End of bench conference.)

7  BY MR. RICHARDSON:

8  Q.   So I want to move on to -- to the relationship

9  between the judge and Freddy Thompson and Al Man.

10      Freddy Thompson didn't hang out at the judge's

11 house, did he?

12 A.   Didn't see him there.

13 Q.   And he didn't really hang out with the judge?

14 A.   I have seen him talking with him several times,

15 but I didn't see him -- he wasn't hanging out as much

16 with him as Al Man or Wayne.

17 Q.   Uh-huh.  And Freddy Thompson didn't hang out with

18 Al Man, did he?

19 A.   He -- he used to quite a bit.  He hasn't in a

20 little.

21 Q.   He didn't hang out at Al Man's house?

22 A.   I have seen him at Al Man's house sometimes.

23 Q.   Time or two?

24 A.   Few times.

25 Q.   And you didn't hang around with Freddy Thompson?

D. Kennon White - Cross Examination

1  A.   Not very much, no.

2  Q.   And you are not really friends with Freddy

3  Thompson?

4  A.   I -- I have known him for many years.

5  Q.   But you are not really friends?

6  A.   For this, I would have considered, yeah, we were

7  friends.

8  Q.   You didn't go to his home, did you?

9  A.   No.

10  Q.   And he didn't come to your house, did he?

11  A.   I have been to his home -- let me rephrase that,

12  I have been to his home, but no, he hasn't been to my

13  home.

14  Q.   So you decide you were going to stop by his

15  office and secretly record Freddy?

16  A.   Under the direction of the FBI.

17  Q.   And you did that on May 1st, 2007?

18  A.   Which -- what are you -- what Government's

19  Exhibit are you referring to?

20  Q.   I am talking about A10.

21  A.   Okay.  Uh-huh.

22  Q.   And Freddy Thompson talked to you that day?

23  A.   Yes, he did.

24  Q.   And Freddy Thompson was nice to you?

25  A.   Yeah, he was -- he was nice enough.

D. Kennon White - Cross Examination

1 Q.   Freddy Thompson is pretty nice to most people,

2 isn't he?

3 A.   I don't know --

4        MR. SMITH:   Your Honor, I would object again

5 as to the relevance as speculation as to how he treats

6 everybody.

7        THE COURT:   Sustain.

8 BY MR. RICHARDSON:

9 Q.   Now, the reason you went to Freddy Thompson's

10 office was to get him to hopefully confess to you?

11 A.   I went there under the direction of what the FBI

12 had me to do.

13 Q.   And you wanted him to confess to you?

14 A.   I don't know.  I don't -- I mean, what are you

15 speaking of wanting him to confess?

16 Q.   You wanted him to admit that he was part of this

17 conspiracy and destroying stuff and other things,

18 that's what the FBI told you, right?

19 A.   Okay, I wanted him to go -- under the direction

20 of the FBI went and recorded him.

21 Q.   You wanted him to admit that he had done bad

22 things?

23 A.   He's admitted them before.

24 Q.   You wanted him to admit bad things?

25 A.   Yes.

D. Kennon White - Cross Examination

1  Q.   And you all talked for about twenty-two minutes

2  there?

3  A.   Uh-huh.

4  Q.   I wanted to ask you about a couple things that

5  are on the -- on the tape, and I want to put them on

6  the ELMO here.

7           (Mr. Richardson conferring with Mr. Smith at

8  this time.)

9  BY MR. RICHARDSON:

10  Q.   At the very top there, Freddy's surprised when

11  you inform him that Phillip got a lawyer.

12  A.   He acts to be.

13   Q.  He -- he says -- I said, and he said, "Steven

14  Charles has got it."  I said, "What has he got it

15  for?"  And Phillip says, "He is my lawyer."  And I

16  said, "Why did you go get a lawyer," right?

17  A.   That's what he said.

18  Q.   Then you asked him directly about the voter

19  assistance forms, did you not?

20  A.   Yes, I did.

21  Q.   And your question, "What about voter assistance

22  forms, what did you guys, what did you guys do with

23  them?"

24       And Freddy told you, "They are right back there

25  in a box.  Got to store them back there for twenty-two

D. Kennon White - Cross Examination

1  months."  That's what he told you, isn't it?

2  A.    Uh-huh.

3  Q.    Twenty-two months, and he told you that's

4  routine, it's the law.  It's not routine, it's the

5  law.

6        Go to page 8, and you try to once again pull him

7  back to the voter assistance forms.

8        And you asked him, "It worries me about them

9  voter assistance forms because I think they will be

10 back after them.  Are they all there or did they give

11 them?"

12       And Freddy said, "All those they brought here,"

13 and you said, "Yeah, if they were brought here -- so

14 there wasn't, you know.  Anything that was brought

15 here is right back there locked in a box."

16       You ask him, "So everything, did you get rid

17 of -- did you get rid of them here?"

18       And he says, "Everything's back there."  And

19 that's what the statements were, correct?

20 A.    Yeah, what's on the -- what's on the tape.

21 Q.    Then I want to get to what happens next.  And you

22 asked him basically, you said, "Who brings the voter

23 assistance forms?"

24       And he says, "The precinct office.  I don't think

25 they are not numbered or counted or anything."

D. Kennon White - Cross Examination

1    And then supposedly he says, "I think I am in
2  trouble, Kennon, I sit right up there."  Right?
3  A.   Yes.
4  Q.   "I think I am in trouble."  That's exactly what
5  you are there for.
6  A.   He said, "I think I am in trouble, Kennon."
7  Q.   So that's what you are looking for, you are
8  wanting an opening to say, "Why?  Why do you think you
9  are in trouble?"
10 A.   Are you saying I missed my opening?
11 Q.   I am saying you missed your opening.
12 A.   Okay.
13 Q.   Would you agree?
14 A.   It's possible.
15 Q.   But look at the response.  "I think I am in
16 trouble, Kennon."
17       MR. SMITH:  Your Honor, I am going to
18 object.  I think this is not a question.
19       I believe it's a statement counsel continues
20 to make to this jury, it's not a question.
21       THE COURT:  Sustain.
22 BY MR. RICHARDSON:
23 Q.   Well, you responded --
24       MR. RICHARDSON:  Can I ask another question
25 Judge?  Rephrase it?

D. Kennon White - Cross Examination

1          THE COURT:  If you ask a question, you can.

2          MR. RICHARDSON:  YES.

3 BY MR. RICHARDSON:

4 Q.  Do you agree that, "I hope it's not," is not a

5 proper response to, "I think I am in trouble?"

6          MR. SMITH:  Your Honor --

7          THE COURT:  I'll sustain.

8          MR. SMITH:  -- he is asking --

9          THE COURT:  Sustain the objection.

10          MR. RICHARDSON:  I would like to approach,

11 Judge.

12          THE COURT:  You may approach.

13          (Thereupon, a discussion was had at the bench

14 between the Court and counsel at this time.)

15          THE COURT:  Yes.

16          MR. RICHARDSON:  Well, I think I should be

17 able to explain this, Judge.

18          The answer is not responsive to, "I think I

19 am in trouble."

20          I think it's more responsive to I think there

21 is going to be trouble, or I think there is trouble

22 and I want to ask him about that.

23          I mean, he is the one who says that's what he

24 said.  But the answer's not responsive.

25          THE COURT:  No, you are arguing with the

D. Kennon White - Cross Examination

1 witness.

2           You are arguing your case to the jury through

3 the witness.  You are not asking a question, so I'll

4 sustain the objection.

5           MR. RICHARDSON:  That's all I have.  All

6 right.  Thank you, Your Honor.

7           (End of bench conference.)

8 BY MR. RICHARDSON:

9 Q.  So that was the one and only time you went in and

10 talked to Freddy Thompson?

11 A.  The one and only time that I went in and recorded

12 him.

13      And I did not go around him after this to my

14 knowledge.

15 Q.  So Freddy Thompson is not on any other tapes.

16 A.  Not that I know of, I mean, you know, like I

17 said, I don't know -- not that I know of, not that I

18 have made.

19 Q.  No other tapes, all right.

20           (Mr. Richardson and Mr. Smith conferring at

21 this time.)

22 BY MR. RICHARDSON:

23 Q.  Talk about some other things, other things I got

24 on the tapes.

25      I want to take you back to A5, page 30 -- A5,

D. Kennon White - Cross Examination

1 page 33 between Judge Maricle and Wayne Jones and you

2 and Wanda White, okay?

3            MR. WHITE:  I'm sorry, what exhibit?

4            MR. RICHARDSON:  A5, page 33.  It was

5 recorded on April 10th, '07.

6 BY MR. RICHARDSON:

7 Q.    You are talking about election officers in the

8 Manchester precinct.  Are you with me?

9 A.    Yeah.

10 Q.    And you are talking about Anthony Short, correct?

11 A.    And where I refer to Anthony, that's referring to

12 Anthony Short; is that correct?

13 Q.    And Anthony Short was election officer with your

14 wife in Manchester.

15 A.    In the primary.

16 Q.    Of '06.

17 A.    Uh-huh.

18 Q.    And he is a Democrat?

19 A.    Yes, I think that's correct.

20 Q.    And he has been a long-term Democrat in Clay

21 County.

22 A.    He has served there for awhile.

23 Q.    And the judge is a Democrat, Judge Maricle?

24 A.    Yes, he is.

25 Q.    The judge doesn't know if Anthony is a Democrat

D. Kennon White - Cross Examination

1 or not.

2        MR. SMITH:  Your Honor, I am going to object

3 to --

4        MR. RICHARDSON:  All right, I'll rephrase.

5        THE COURT:  All right.  Sustain the

6 objection, but you may rephrase.

7 BY MR. RICHARDSON:

8 Q.   In this -- in this clip, let me pull out here,

9 you are talking about Anthony.  He is a Democrat.

10       And Judge Maricle asks, "Is he a Democrat or a

11 Republican?"

12 A.   He knew what he was.

13       MR. PINALES:  Your Honor, may I approach?

14       THE COURT:  I'm sorry?

15       MR. PINALES:  May I approach?

16       THE COURT:  Sure, come on up.

17       MR. PINALES:  Thank you, Your Honor.

18       (Thereupon, a discussion was had at the bench

19 between the Court and counsel at this time.)

20       THE COURT:  All right.

21       MR. PINALES:  Martin Pinales on behalf of

22 Mr. Maricle.

23       Your Honor, I do want to beat a dead horse

24 now.

25       This has been asked, it has been answered, it

D. Kennon White - Cross Examination

1  has been played, it has been viewed, and I think that

2  we -- it's admitted.

3          It's already in evidence, so I can't object

4  because it's irrelevant or a waste of time.

5          But I can object because it has been covered,

6  it has been recovered.

7          I have even objected to the court although

8  the court has not agreed with me that it's covered too

9  many times when it's heard and read.

10          And now we are hearing it and reading it,

11  commenting on it and then recommenting on it, hearing

12  it again and rehearing it again.

13          I think we are there, I think we have been

14  there for awhile, and I think it's time to say good-

15  bye to it.

16          THE COURT:  Let me see if counsel is going

17  somewhere with this that we haven't discovered or

18  haven't explored before.

19          MR. PINALES:  I think we have explored it

20  before on another tape, now we are on a new tape and I

21  think we are done with it.

22          THE COURT:  I want to see where we are going

23  with this and see if it's new ground or if the ground

24  has been plowed with regard to these issues.

25          MR. RICHARDSON:  I think it's important, he

D. Kennon White - Cross Examination

1 has asked questions about this, this judge is supposed
2 to be a godfather about these elections and controlled
3 all the election officers.

4          He doesn't even know if one of the long-term
5 election officers is Democratic or Republican.

6          It goes to the judge's knowledge, and I think
7 it's important that the jury understand that.

8          So I think it's terribly important.  I think
9 it helps the judge -- I don't know if he is a judge or
10 a Democrat.

11          MR. WHITE:  Your Honor --

12          THE COURT:  Mr. White, yes, sir.

13          MR. WHITE:  Scott White.  I represent Wayne
14 Jones.

15          I have great respect for Mr. Richardson.  I
16 have known him for a long time.

17          He is a very good lawyer, and I don't want to
18 speak for Mr. Pinales, but I am referring to Mr. Jones
19 again.

20          And I would just say that those are, quite
21 frankly, tactical decisions for me to make for my
22 client, not for Mr. Richardson to make on my behalf.

23          So for that reason, I think that is a valid
24 objection.

25          THE COURT:  The -- the issue is whether

D. Kennon White - Cross Examination

1  counsel can continue to question about the topic is

2  whether Mr. Maricle's statement indicates that he has

3  knowledge that Anthony Short was a Republican or

4  Democrat.

5       Mr. Maricle, on the tape, asks the question,

6  "Is he a Republican or a Democrat."

7       MR. SMITH:  I do have one other objection as

8  well before I --

9       THE COURT:  Go ahead, I'll hear all the

10  objections before I rule on this.

11       MR. SMITH:  What is now being done with the

12  transcript is we are taking out of context because I

13  believe that is talking about David Hensley and

14  Darnell Hipsher replacing her as election officer.

15       And Maricle asks who is David Hensley,

16  Stivers says he is Republican probably because

17  Darnell, they know, and now he is representing to this

18  jury and trying to get this witness to agree to his

19  interpretation.

20       I am going to have to go back and play the

21  audio so the jury can hear the context of this because

22  I disagree with the way he is trying to portray what

23  has been played -- as Mr. Pinales has said, what has

24  been -- and I think it's been taken out of context, so

25  I am going to object for those reasons as well.

D. Kennon White – Cross Examination

1        THE COURT:  All right.  Well, what I will do
2   is I am going to allow Mr. Richardson to play that
3   portion of the tape if he chooses to do that and --
4        MR. RICHARDSON:  I have made my point.
5        THE COURT:  And we have about 15 more minutes
6   before we take a break, so I suspect we will not
7   finish with his questions tonight.
8        MR. RICHARDSON:  I think I am about done.
9        THE COURT:  Okay, well, then you have the
10  option tonight of playing this portion of the tape if
11  you choose to do so.
12        Otherwise, I'll sustain the objection to the
13  use of the transcript inasmuch as it may
14  mischaracterize the tape itself, so I'll sustain the
15  objection.
16        Counsel has also made some very cogent
17  objections under 403 to essentially a waste of time by
18  continuing to go over the same matters.
19        So there are a whole host of reasons for
20  sustaining the objection, and the court will do so.
21        MR. PINALES:  While we are at the side bar,
22  Your Honor, when the court instructs the play, quote,
23  "this portion of the tape," unquote, what portion are
24  you talking about --
25        THE COURT:  It would be the portion that

D. Kennon White - Cross Examination

1  places this in context which would include after the

2  reference to laughter, Wanda makes a statement, "I was

3  driving down the road," although it may be necessary

4  to go back even further.

5          Let me get the transcript -- going back to

6  page 31 to put it in proper context on the

7  transcript.

8          And that would be the corresponding section

9  of the audio tape.

10          MR. PINALES:  And Your Honor, the last

11  response by the witness was, as best as I can quote,

12  "He knew he was a Democrat."

13          And I don't think, I would ask that that be

14  stricken because he couldn't tell what my client knew

15  or didn't know.

16          And we have been instructed to ask what the

17  perception of what was said --

18          THE COURT:  So as to the form of the

19  question?

20          MR. PINALES:  Yes, Your Honor.

21          THE COURT:  I will sustain.  I'll advise the

22  jury to disregard the last answer.

23          I don't think I can recall what the last

24  answer was.

25          But I'll sustain and tell the jury they can

D. Kennon White - Cross Examination

1  disregard the last response.

2          MR. PINALES:  Thank you, Your Honor.

3          MR. SMITH:  Your Honor, the United States

4  would request if instruction is going to be given to

5  the jury, we would request whether counsel for

6  defendant Thompson wants to play it or not.

7          We would request that that be played at this

8  point because I think to withdraw it now and then

9  instruct this jury to disregard the witness's

10  response, I think it again leaves the same impression

11  that was created by the question itself and will not

12  be rectified until it is put in context.

13          THE COURT:  Mr. Pinales?

14          MR. PINALES:  I feel better that now that I

15  disagree with Mr. Smith.

16          I was agreeing with him before, Your Honor,

17  but it's not that it's out of context.

18          It was his comment that what was in my

19  client's mind, what was in my client's mind not his

20  perception.  So it's commentary, not the transcript.

21          THE COURT:  All right, well, I will be able

22  to rectify that issue by the overall instruction that

23  will be given that we talked about earlier at the

24  conclusion of the witness's testimony.  I think that's

25  probably the appropriate way to handle it.

D. Kennon White - Cross Examination

1           MR. PINALES:  I would request it at this

2  point.

3           THE COURT:  Otherwise -- well, I  will when

4  we are finished with the witness.

5           MR. PINALES:  Okay.

6           THE COURT:  But otherwise, I would -- if I do

7  instruct the jury to disregard, I am going to allow

8  Mr. Smith to go back and put this in proper context.

9           And so rather than go through that procedure,

10  I'll just give the instruction that we talked about

11  earlier on the use or on the statements of Mr. and

12  Mrs. White that are contained on these tapes that we

13  talked about with Miss Hughes.

14           She is not here at this time, but she will

15  remember we talked about those if she decides to come

16  up to the next bench conference.

17           Well, we are wasting a lot of time, and I do

18  want to get on with this.

19           So everyone understands the ruling.  Sustain

20  the objection, but if you want to play portions

21  beginning at page 31.

22           MR. RICHARDSON:  Thank you, Your Honor.

23           (End of bench conference.)

24           THE COURT:  All right, thank you, counsel.

25           MR. RICHARDSON:  Thank you, Judge.

D. Kennon White - Cross Examination

1  BY MR. RICHARDSON:

2  Q.   Kennon, you met with the FBI prior to coming to

3  trial here?

4  A.   Yes.

5  Q.   And when was that?

6  A.   It was -- I mean, I met with them several times

7  before coming to the trial.

8  Q.   You all had a meeting right before testifying, a

9  few days before?

10  A.   Yes.

11  Q.   How many days ago, you think?

12  A.   I don't know for sure, probably seven or eight

13  days ago, somewhere --

14  Q.   And where was that meeting held?

15  A.   It was here.

16  Q.   So at this point it looks like you might be going

17  to prison, right?

18  A.   It's -- that's a possibility.

19  Q.   And you started at your daddy's car lot?

20  A.   Yes.

21  Q.   Moved up to assistant sales manager?

22  A.   I was assistant --

23          MR. SMITH:  Your Honor, I am going to object

24  again.  These questions have all been asked and

25  answered.

D. Kennon White - Cross Examination

 1          THE COURT:  They have, sustained.

 2  BY MR. RICHARDSON:

 3  Q.   So let me ask you this question.  When you were

 4  in with Freddy Thompson on May 1st, '07, do you recall

 5  that?

 6  A.   That's the one that we are -- have been talking

 7  about.

 8  Q.   The last thing that Freddy Thompson said to

 9  you --

10  A.   Okay, hold on just one moment.

11  Q.   Page 11.

12  A.   Go back to the one we were on before.  I have got

13  so many here -- what, which one is that, A --

14  Q.   A10.

15  A.   A10, give me one moment.  Okay.

16  Q.   All right, page 11.  The last thing that Freddy

17  Thompson said to you or second to last thing is,

18  "Well, come on back anytime you want to."

19  A.   The last thing he said is, "You, too, Kennon, if

20  you hear anything."

21  Q.   Second to the last thing he said was, "Come on

22  back anytime you want to," right?

23  A.   Yeah.

24  Q.   But you didn't come back?

25  A.   No.

Colloquy

1 Q.   All right.  Thank you.

2            THE COURT:  Mr. Gilbert, would you like to

3 start in the morning rather than at this point?

4            MR. GILBERT:  Yes, Your Honor, thank you.

5 Appreciate that.

6            THE COURT:  All right, thank you.  Ladies and

7 gentlemen, we will take our break for the evening at

8 this time.

9            Please -- as we are in recess, please keep in

10 mind the admonitions you have been given several times

11 throughout the course of the proceeding.

12            Of course I want to remind you that you can't

13 talk to anyone about the case, including any friends

14 or family members.

15            And of course you should not read, watch or

16 listen to any accounts of the case if there should be

17 any.

18            And you shouldn't attempt to do any type of

19 research or investigation on your own.

20            And of course, please don't make up your mind

21 about the case until it is finally submitted to you.

22            We will start tomorrow morning at 9:00, so

23 please -- and I appreciate you being prompt.

24            I know that all of you make an effort to be

25 here on time, and the court certainly does appreciate

Colloquy

 1  that.

 2          So we will start tomorrow morning at 9:00,

 3  and with that admonition, the jury will be excused.

 4          (Jury excused from the courtroom at this time

 5  for evening recess.)

 6          THE COURT:  Thank you, Mr. White, you can

 7  step down as well.

 8          THE WITNESS:  Thank you, Your Honor.

 9          THE COURT:  Counsel, please be seated.

10  Several times in the course of this proceeding I have

11  reminded counsel that if there are matters that need

12  to be taken up, then we will take those up at 8:30

13  before the jury comes in.

14          Mr. Smith had a matter that needed to be

15  taken up this morning, and we could not proceed

16  earlier because counsel was not here, two of the

17  parties, and the attorneys for those parties were not

18  present.

19          I am going to remind everyone that you need

20  to be present if we do have issues at 8:30.

21          If someone raises an issue with me at 8:30

22  and we don't have everyone here, we can't take it up

23  and so we have a problem.

24          So I do want to remind everyone of that.  If

25  you weren't here, you know who you were.

Colloquy

1          Please be present tomorrow morning, and if we

2    do have issues, of course we will take those up at

3    8:30.  Mr. Pinales?

4          MR. PINALES:  Your Honor, it was my

5    understanding -- if I understood it wrong -- I was

6    here, but it was my understanding that there was to be

7    a calling tree if there was a matter to be raised so

8    we knew to be here.

9          THE COURT:  I need to -- I need to know at

10   8:30.

11          And I'm assuming counsel will not wait until

12   ten minutes until 9:00 to be here as occurred this

13   morning.

14          I am just reminding everyone of that now so

15   you will know.

16          I am not going to start a calling tree to

17   make sure everyone knows to be here.

18          You need to be here early.  You need to be

19   here before 9:00.

20          If we start at 9:00, you should be here at

21   8:30 anyway.

22          So I am just reminding everyone of that at

23   this point.

24          Also, I do want to remind the parties that if

25   we have any disruptions in the course of this

Colloquy

1 proceeding, the court will take action.

2          And Mr. Hoskins, you are going to speak with

3 your client about that as soon as we recess; is that

4 correct?

5          MR. HOSKINS:  Your Honor, I already have.

6          THE COURT:  All right.

7          MR. HOSKINS:  And Mr. Maricle asked me to

8 express his apologies.

9          THE COURT:  All right, everyone's been

10 forewarned.

11          I do have a hearing on a supervised release

12 violation issue at 4:30, so we will need to clear

13 enough space for counsel in that case.

14          This matter will be in recess until 9:00.

15 Court will be in recess for five minutes.

16          (The further trial in this matter was

17 recessed at 4:27 p.m. to resume the following morning,

18 February 19, 2010 at 9:00 a.m.)

19                              - - -

20

21

22

23

24

25

Index – Certificate

```
 1                         WITNESS INDEX

 2  Government's Witnesses:

 3  D. Kennon White

 4  Cross by Mr. White . . . . . . . .   5

 5  Cross by Mr. Abell . . . . . . . .  42

 6  Cross by Mr. Richardson  . . . . .  52

 7                           – – –

 8                        EXHIBIT INDEX

 9                                      Marked/Admitted

10  Plaintiff's Exhibits:

11
    Defendants' Exhibits (Jones):
12
    CWJ4 – Sketch                       8        9
13                           – – –

14                         CERTIFICATE

15          I certify that the foregoing is a correct

16  transcript from the record of proceedings in the

17  above-entitled matter.

18

19
    s/  K. Ann Banta                2-24-10
20  K. Ann Banta, RPR, CRR          Date

21

22

23

24

25
```