```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
 2               SOUTHERN DIVISION AT LONDON

 3  UNITED STATES OF AMERICA,    .     Docket No. CR 09-16-S
                                 .
 4       vs.                     .     Frankfort, Kentucky
                                 .     March 4, 2010
 5  RUSSELL CLETUS MARICLE       .     1:00 p.m.
    DOUGLAS C. ADAMS             .
 6  CHARLES WAYNE JONES          .     Trial
    WILLIAM R. STIVERS           .
 7  FREDDY W. THOMPSON           .     VOLUME 18-B
    WILLIAM B. MORRIS            .
 8  DEBRA L. MORRIS              .
    STANLEY BOWLING              .
 9                     TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE DANNY C. REEVES
                UNITED STATES DISTRICT JUDGE
11  APPEARANCES:
    On behalf of the Plaintiff: STEPHEN C. SMITH, ESQ.
12                              JASON D. PARMAN, ESQ.

13  On behalf of the Defendant  DAVID S. HOSKINS, ESQ.
    Russell Cletus Maricle:     MARTIN S. PINALES, ESQ.
14
    On behalf of the Defendant  R. KENT WESTBERRY, ESQ.
15  Douglas C. Adams:           KRISTEN N. LOGAN

16  On behalf of the Defendant  T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:
17
    On behalf of the Defendant  ROBERT L. ABELL, ESQ.
18  William R. Stivers:

19  On behalf of the Defendant  RUSSELL JAMES BALDANI
    Freddy W. Thompson:         R. TUCKER RICHARDSON III
20
    On behalf of the Defendant  JERRY W. GILBERT, ESQ.
21  William B. Morris:

22  On behalf of the Defendant  ELIZABETH SNOW HUGHES
    Debra L. Morris:
23
    On behalf of the Defendant  DANIEL A. SIMONS, ESQ.
24  Stanley Bowling:

25  Court Reporter:             K. ANN BANTA, RPR, CRR
```

```
 1  Appearances of Counsel:

 2  On behalf of the Plaintiff:      STEPHEN C. SMITH, ESQ.
                                     JASON D. PARMAN, ESQ.
 3                                   Assistant U.S. Attorneys
                                     601 Meyers Baker Road
 4                                   Suite 200
                                     London, KY 40741
 5
    On behalf of the Defendant      DAVID S. HOSKINS, ESQ.
 6  Russell Cletus Maricle:         107 East First Street
                                    Corbin, KY 40701
 7
                                    MARTIN S. PINALES, ESQ.
 8                                  150 East Fourth Street
                                    Federal Reserve Building
 9                                  Cincinnati, OH 45202

10  On behalf of the Defendant      R. KENT WESTBERRY, ESQ.
    Douglas C. Adams:               KRISTEN N. LOGAN
11                                  220 West Main Street
                                    Suite 1900
12                                  Louisville, KY 40202

13  On behalf of the Defendant      T. SCOTT WHITE, ESQ.
    Charles Wayne Jones:            133 West Short Street
14                                  Lexington, KY 40507

15  On behalf of the Defendant      ROBERT L. ABELL, ESQ.
    William R. Stivers:             120 North Upper Street
16                                  Lexington, KY 40507

17  On behalf of the Defendant      RUSSELL JAMES BALDANI
    Freddy W. Thompson:             R. TUCKER RICHARDSON III
18                                  300 West Short Street
                                    Lexington, KY 40507
19
    On behalf of the defendant      JERRY W. GILBERT, ESQ.
20  William B. Morris:              212 North Second Street
                                    Richmond, KY 40475
21
    On behalf of the Defendant      ELIZABETH SNOW HUGHES
22  Debra L. Morris:                201 West Short Street
                                    Lexington, KY 40507
23
    On behalf of the Defendant      DANIEL A. SIMONS, ESQ.
24  Stanley Bowling:                116 West Main Street
                                    Suite 2A
25                                  Richmond, KY 40476
```

1  Appearances (Continued):

2  Court Reporter:                K. ANN BANTA, RPR, CRR
                                  Official Court Reporter
3                                 United States District
                                      Court
4                                 101 Barr
                                  Lexington, KY 40507
5                                 (502) 545-1090

6  Proceedings recorded by mechanical stenography,
   transcript produced by computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        Thursday afternoon session,

2                        March 4, 2010, 1:00 p.m.

3                              - - -

4            (The following proceedings were had out of

5    the presence and hearing of the jury and in open

6    court.)

7            THE COURT:  Thank you.  The record will

8    reflect the jury is not present.

9            I understand Mr. Pinales has an issue to take

10   up?

11           MR. PINALES:  Yes, Your Honor, this is the

12   issue that I brought up before.

13           But over the lunch break I was able to find

14   in the discovery supplied by the United States, the

15   plea, the finding and the sentencing to probation of

16   John Downey, which is Case No. 05CR69 in the Circuit

17   Court of Clay County.

18           This was all supplied to us from -- from the

19   discovery of the government, all signed and done in

20   front of the Judge Thomas R. Lewis, not Judge Cletus

21   Maricle.

22           And the basis of my concern, and -- of the

23   motion I will be making now is that from the witness

24   of Mr. Downey's brother, there was an inference that

25   Mr. Maricle let him out; and that is simply not the

1 case.

2        And before the prosecutor even asked that

3 question, he obviously had this material because he

4 gave it to us.  So I would move for a mistrial at this

5 point.

6        THE COURT:  All right, thank you.

7        Mr. Smith, do you want to respond?

8        MR. SMITH:  Your Honor, I would like to hand

9 to the court part of that record so that we can, I

10 think, discuss this issue, if the court will allow.

11        THE COURT:  Yes, sir, certainly.  Yes, sir,

12 Mr. Smith.

13        MR. SMITH:  First of all, Your Honor, we

14 could argue about what the record was and what my

15 questions were.

16        But my recollection is I did not specify the

17 judge in my questions to the witness, number one.

18        But I think the record does support that this

19 indictment for trafficking in first degree, which is a

20 Class C felony, was one in which was presented by

21 Cletus Maricle in his court.

22        And the reason I believe that's accurate,

23 Your Honor, is because of the orders and -- in the

24 file which show I believe that in fact he initially

25 arraigned this subject and also made orders relating

1 to bond.

2          Obviously if counsel has evidence that he

3 wants to present in his case, you know, that goes --

4 not necessarily may go to the weight of it, but the

5 admissibility of it.

6          And I believe the questions that I asked were

7 proper.

8          I believe there was a good faith basis for

9 it, and I stand on my questions.

10          And I -- I, at this point, see no merit to

11 this motion.

12          MR. PINALES:  Your Honor, I did not deny that

13 the grand jury returned its indictment before Judge

14 Maricle.

15          I did not deny that an initial appearance was

16 before Judge Maricle.

17          A bond was set before Judge Maricle.  He was

18 locked up by Judge Maricle.

19          And then Judge Lewis came into Clay County as

20 he apparently does on a regular basis, and -- and this

21 was one of the cases that he handled from that point

22 on and in fact took the change of plea, the -- the --

23 accepted the plea and apparently the sentencing

24 sometime later and let him out on bond and probated

25 him.

1          THE COURT:  I will deny the motion for

2    mistrial for several reasons.

3          One, I don't think the questions that were

4    posed to the witnesses were improper in any way.

5          Number two, there has been a significant

6    amount of evidence and testimony that's been presented

7    here that a reasonable person could conclude that the

8    circuit court as well as the district court is subject

9    to abuse.

10          Regardless of the judge that actually signs

11    the order, there is indications that -- that

12    Mr. Maricle acts through other individuals in

13    accomplishing his goals and pursuing improper

14    conduct.

15          So for those reasons, the motion will be

16    denied.

17          Mr. Smith, would you like to have these

18    documents placed into the record as a court exhibit?

19          MR. SMITH:  I would.

20          THE COURT:  All right, Madam Clerk, this will

21    be the next numbered court exhibit not to be provided

22    to the jury.

23          THE CLERK:  No. 4.

24          (COURT EXHIBIT NO. 4 MARKED AND PLACED INTO

25    THE RECORD AS A COURT EXHIBIT NOT PROVIDED TO THE

1  JURY)

2          MR. PINALES:  And if next week I could print

3  this out, Your Honor, and supply the balance of the

4  paperwork.

5          THE COURT:  Print, I am not sure I am

6  following you, print what out?

7          MR. PINALES:  I believe that --

8          MR. SMITH:  Here's a full copy of the record,

9  I do have that.

10          MR. PINALES:  Oh, okay.

11          MR. SMITH:  I'll be glad to supply that.  If

12  he wants to request the additional portions --

13          THE COURT:  Yes, sir, that will be fine.

14          MR. SMITH:  -- I have no objection.

15          MR. PINALES:  Thank you.

16          THE COURT:  That will be included as part of

17  collective Court Exhibit No. 4.

18          MR. PINALES:  Thank you, Your Honor.

19          THE COURT:  All right, thank you.  And you

20  can bring the jury in.

21          (The jury resumed their places in the jury

22  box, and the following proceedings were had in open

23  court.)

24          THE COURT:  Thank you, and please be seated.

25  The record will reflect that all members of the jury

Bobby Sams – Direct Examination

1 are present.  Parties and counsel are also present.

2          Let's see, Mr. Parman or Mr. Smith, you may

3 call your next witness.

4          MR. SMITH:  The United States would call

5 Bobby Sams.

6          THE MARSHAL:  Bobby Sams.

7          THE CLERK:  Please raise your right hand.

8          (Witness sworn.)

9          THE CLERK:  Thank you.

10                        –  –  –

11          BOBBY SAMS, PLAINTIFF'S WITNESS, SWORN

12                  DIRECT EXAMINATION

13 BY MR. SMITH:

14 Q.   Good afternoon.

15 A.   Good afternoon.

16 Q.   State your name, please.

17 A.   Bobby Sams.

18 Q.   And Mr. Sams, do you go by any other names?

19 A.   Bobby Red.

20 Q.   And where did you get your nickname "Red"?

21 A.   I used to have red hair.

22 Q.   How old are you?

23 A.   Forty-two.

24 Q.   And where do you currently reside?

25 A.   Manchester, Kentucky.

Bobby Sams – Direct Examination

 1  Q.   And how long have you lived in the Clay County
 2  area?
 3  A.   I have lived there forty-two years.
 4  Q.   Do you have family there?
 5  A.   I do.
 6  Q.   Are you married?
 7  A.   I am.
 8  Q.   Tell us a little bit about yourself, Mr. Sams.
 9  Where did you go to school?
10  A.   I went to Clay County High, and right after that
11  I started working at the Stivers Chevron.
12  Q.   And is that a business that is locally owned?
13  A.   It is.
14  Q.   And who owned it at the time you worked for them?
15  A.   Charles Stivers.
16  Q.   So you worked there for about five years?
17  A.   Yes.
18  Q.   And did you graduate from high school?
19  A.   I did.
20  Q.   What -- what kind of job did you do for them?
21  A.   Pumped gas, washed cars and --
22  Q.   Where did you go for employment after there?
23  A.   P and R Roofing.
24  Q.   And is that -- is that a local company?
25  A.   No, that was in Lexington, Kentucky.

Bobby Sams - Direct Examination

1  Q.   And what did that company do?

2  A.   We done roofing.

3  Q.   And did you travel around the state or other

4  areas?

5  A.   Yes, we did.

6  Q.   How long did you work for them?

7  A.   About two years.

8  Q.   And where did you go from there, sir?

9  A.   I am thinking I went to D.W. Wilkins

10 Construction.

11 Q.   Okay, and where is that company?

12 A.   It's in Lexington.

13 Q.   And what did you do for them?

14 A.   I helped build the Manchester federal prison.

15 Q.   Okay, and was that a lengthy project?

16 A.   Yes, it was.

17 Q.   How long did you work on it?

18 A.   About three years.

19 Q.   Where did you go from there?

20 A.   I think I went to Randall's Homes.

21 Q.   And what kind of business is that?

22 A.   That's a mobile home lot.

23 Q.   And what did you do for them?

24 A.   I pulled mobile homes in and out of the state.

25 Q.   And when you say you pulled them, you drove the

Bobby Sams – Direct Examination

1  truck that tows them?

2  A.    Yes, sir.

3  Q.    How long did you work for them?

4  A.    Five years.

5  Q.    Where did you go from there?

6  A.    Aisin Automotive.

7  Q.    And where -- where is that company located?

8  A.    Lily, Kentucky.

9  Q.    And is that in Clay County?

10 A.    No, that's in -- in between Corbin and London.

11 Q.    And what kind of business are they engaged in?

12 A.    That's a Toyota factory.

13 Q.    They make parts for Toyota cars?

14 A.    They do.

15 Q.    And how long did you work for them?

16 A.    Two -- two years, I think.

17 Q.    Did you have other jobs after that?

18 A.    I went back to Chevron in Manchester.

19 Q.    Okay, and was that still owned by the Stiverses?

20 A.    It was.

21 Q.    Did you stay there for very long?

22 A.    About two years.

23 Q.    Then where did you go?

24 A.    Oh, Cornett Chevrolet.

25 Q.    And where is that company?

Bobby Sams – Direct Examination

1  A.    That's in Manchester.

2  Q.    How long did you work for them?

3  A.    About a year to two years.

4  Q.    You still working for them now?

5  A.    I am not.

6  Q.    Where are you working at now?

7  A.    I am not employed right now.

8  Q.    Where were you last employed?

9  A.    I was last employed at J. Frank Publishing.

10 Q.    And what kind of company is that?

11 A.    That's an enterprise makes newspapers.

12 Q.    Okay, and do they do newspapers for one or more
13 cities or areas?

14 A.    Yes, they do.

15 Q.    What did you do for them?

16 A.    I run a press.

17 Q.    Are you currently seeking a job?

18 A.    I am.

19 Q.    How long have you been unemployed?

20 A.    For about a month.

21 Q.    Mr. Sams, did you recall getting involved in the
22 election over in Clay County back in 2002?

23 A.    I do.

24 Q.    And if you could share with the court and jury
25 how it was that you first got involved, if you recall.

Bobby Sams - Direct Examination

1  A.   Well, I -- Jennings White had done me dirty a

2  little bit, and I was going to get back at him.

3       And I went to Charles Stivers's and talked to him

4  about helping Freddy Thompson to win the -- for the

5  clerk, and I was going to haul votes.

6  Q.   Were you working at that time?

7  A.   I was.

8  Q.   And where were you working?

9  A.   Aisin Automotive.

10  Q.   Okay.  So you talked first to Charles Stivers?

11  A.   Yes.

12  Q.   And is he related, to your knowledge, to William

13  Al Man Stivers?

14  A.   Yeah.

15  Q.   How are they related?

16  A.   He -- they are brothers.

17  Q.   Okay.  So what happened next?

18  A.   We talked, and I started -- we got together, and

19  I started hauling absentee voters.

20  Q.   Now, who suggested that you would be best suited

21  to do the hauling for them?

22  A.   Well, Wayne Jones.  Me and Wayne was good

23  friends.

24  Q.   Okay.  How long had you known Wayne Jones?

25  A.   I known Wayne all my life.

Bobby Sams – Direct Examination

1  Q.   And were you all pretty close?

2  A.   Yes, we was.

3  Q.   Now, how old were you when you first remember

4  getting to know Wayne Jones?

5  A.   Oh, I was probably sixteen, seventeen-year-old.

6  Q.   And what kind of relationship did you and Wayne

7  Jones develop at that age?

8  A.   We was probably friends, and then we got to be

9  real good friends when I got eighteen years old and

10 got registered to vote.

11 Q.   And what kind of ideas did -- did you and Wayne

12 Jones form at those early years?

13 A.   We just -- we just -- I hauled voters for him,

14 and they always paid me to haul voters.

15 Q.   Do you recall when you first did that job for

16 Wayne Jones?

17 A.   Yeah.

18 Q.   When was that?

19 A.   It was probably in '85, maybe '86, for Billy

20 Jones for magistrate.

21 Q.   And was Billy Jones related to Charles Wayne

22 Jones?

23 A.   Yes, they are brothers.

24 Q.   So in 2002, what was Wayne Jones interested in

25 when he talked to you?

Bobby Sams - Direct Examination

1  A.   Freddy Thompson.

2  Q.   And did you all have a plan as to how you were

3  going to help him?

4  A.   Well, we was going to absentee most the ones that

5  we could.

6  Q.   When you say absentee most of them that you

7  could, what do you mean by that?

8  A.   Well, you would go around the town and talk to

9  people that you know and ones that you thought you

10 could get to go your way, and you would offer them

11 something to come go vote that day.

12 Q.   Now, you call this the absentee.  Is this the

13 time period when the machine was available for early

14 voting?

15 A.   Yeah, that's when it was open to it.

16 Q.   And whose idea was it that this was the time to

17 work most of your bought voters?

18 A.   Well, what happened, Jennings and them had

19 started doing it.

20      And then we said we would just start doing it,

21 too.

22 Q.   Okay, and where was the early voting taking

23 place, at what precinct or area?

24 A.   It was at the -- it's where the county clerk's

25 office was, it was downtown Manchester.

Bobby Sams – Direct Examination

1 Q.   And do you recall who was operating inside the

2 polls as an officer?

3 A.   One we sent them to was Al Man.

4 Q.   Okay, and did you all plan that before you took

5 them, who you were going to send them to?

6 A.   Yes.

7 Q.   And what was he going to do once you sent them to

8 Al Man?

9 A.   He was going to vote them.

10 Q.   Okay, now, were there other candidates that you

11 were told needed to be voted for in addition to

12 Thompson?

13 A.   Yes, there was.

14 Q.   And do you recall who those candidates were that

15 you were to have voters vote for?

16 A.   Roy Morgan for judge and Stanley Bowling for

17 magistrate and District 2 –– no, I take that back, I

18 am wrong, Billy Jones for magistrate in District 2.

19      And Freddy Thompson for county clerk, Charles

20 Marcum for jailer, Edd Jordan for sheriff; that's

21 about all I know.

22 Q.   Now, Billy Jones, is he a Democrat or Republican?

23 A.   He was a Democrat.

24 Q.   Now, these other fellows, were they Democrats or

25 Republicans?

Bobby Sams – Direct Examination

1  A.    I think they was Republicans.

2  Q.    Okay, was Stanley Bowling a Democrat or

3  Republican?

4  A.    He was a Republican.  He was against us in 2002.

5  Q.    And was he aligned with the other side to your

6  knowledge?

7  A.    Yes, he was.

8  Q.    And who was organizing for the other side to your

9  knowledge?

10  A.    Bart Morris.

11  Q.    And were they for Freddy Thompson?

12  A.    No, sir.

13  Q.    And who were they for?

14  A.    Jennings White.

15  Q.    Was there a state representative candidate that

16  you all had in there, too?

17  A.    Yeah, we was for Tim Couch.

18  Q.    And what were you paying the voters in this 2002

19  early voting?

20  A.    $100 a vote.

21  Q.    How many voters did you haul on a daily basis?

22  To your estimation.

23  A.    Twenty, twenty-five.

24  Q.    And how many days did you haul 20 to 25 voters?

25  A.    I don't know, quite a few days.  I don't know,

Bobby Sams – Direct Examination

1 probably eight to ten.

2        MR. SMITH:  I would like to direct the

3 witness's attention to P27, Your Honor, P28.

4 BY MR. SMITH:

5 Q.  First direct your attention to P28.

6        MR. SMITH:  If I may publish that on the

7 projector.

8        THE COURT:  Has that already been admitted?

9        MR. SMITH:  Yes, P28 has.

10        THE COURT:  All right, you may.

11        MR. SMITH:  P28.

12 BY MR. SMITH:

13 Q.  Mr. Sams, have you ever seen this photograph

14 before?

15 A.  No, I have not.

16 Q.  Do you recognize anybody in that photograph?

17 A.  Yes, I do.

18 Q.  Tell us who you recognize.

19 A.  That's me.

20 Q.  And if you could describe where you are in the

21 photograph?

22 A.  I am the one with the Kevin Harvick shirt on.

23 Q.  Okay, and there is also a young lady there next

24 to you?

25 A.  Yes.

Bobby Sams – Direct Examination

1  Q.   Do you recognize her?

2  A.   I know her, but I don't know her name.

3  Q.   This automobile here, do you recognize that?

4  A.   That was one that she came in.

5  Q.   I would like to hand to you now -- or actually

6  put before you now P27.  Do you recognize that

7  photograph?

8  A.   I don't recognize none of the vehicles, no.  I

9  know the van.

10 Q.   All right, what do you know about the van?

11 A.   Big D Reid was driving it.

12 Q.   And who is Big D Reid?

13 A.   He was running for sheriff, Clay County, at the

14 time.

15 Q.   Okay, and was he operating in cooperation with

16 other people?

17 A.   He was trying to get tied in with on Freddy's

18 side and never could get connected.

19 Q.   Okay, what was the van then used for the day that

20 you saw it?

21 A.   He was hauling voters.

22 Q.   And when you say he couldn't get connected with

23 Freddy Thompson, what do you mean by that, Mr. Sams?

24 A.   Well, I mean, he was wanting to be on the same

25 team with not just Freddy, it was a team of Roy Morgan

Bobby Sams – Direct Examination

1 and Freddy Thompson and that team.

2     And he just didn't have the ability to get the

3 votes.

4 Q.  I would like to show -- no, that's P28, that's

5 what I put up there.

6     I may have to ask the clerk.  I am not sure we

7 have got all the exhibits.

8         MR. SMITH:  Photo exhibits are P exhibits,

9 and if I could have those from the clerk, I believe

10 that that will speed things along.

11         THE COURT:  Yes, sir.

12 BY MR. SMITH:

13 Q.  During the time that you were there doing the

14 early voting, were there other people that were doing

15 the same thing for the Freddy Thompson side?

16 A.  Yes, they was.

17 Q.  Who all did you -- do you recall helping with

18 this early voting?

19 A.  There was quite a few of us.  There was some that

20 helped for Charles Marcum, his family, his whole

21 family helped, Gino Carpenter, Jeff Farmer.  There was

22 -- there was quite a few.

23         MR. SMITH:  I would like to put before the

24 witness now P1.

25 BY MR. SMITH:

Bobby Sams - Direct Examination

1  Q.   Do you recognize anyone in that photo, sir?

2  A.   Well, I know one that's in the blue and white

3  shirt is Charles Marcum.

4       And the boy that's back's to us, that's his son,

5  that's Charles Wayne; and the one sitting down is Al

6  Man.

7  Q.   Okay.  And I am going to move it over just a

8  little bit.

9       There is a lady, I am not sure you will be able

10  to identify her.  Do you see her?

11  A.   I don't know her.

12  Q.   Okay.  Could you describe for us how Charles

13  Marcum, he and his family were operating around this

14  polling place that day or those days of the early

15  voting?

16  A.   Explain -- I don't understand.

17  Q.   Well, you said they were helping you --

18  A.   Oh, yeah.

19  Q.   -- in this effort.  How were they helping you I

20  guess is what I --

21  A.   They was getting voters in to and hauling voters

22  from the Horse Creek area while I hauled from the East

23  Manchester and Manchester and Harts Branch area.

24  Q.   Okay, now, during the early voting period, does

25  everybody haul 20 precincts?  Can they all vote at the

Bobby Sams – Direct Examination

 1  same place?

 2  A.  Yes, if they are going to be out of town the day

 3  of the election, yes, they can.

 4  Q.  So you only have to have one election officer in

 5  there helping you in the early voting?

 6  A.  No, they have got to be one -- I think they have

 7  to be two.

 8  Q.  But for your effort in this effort, you had

 9  Mr. Stivers.

 10      Did you have another election officer?  Who was

 11  on the other Republican -- was he a Republican or

 12  Democrat judge?

 13  A.  I don't -- I don't remember for sure.  I am

 14  just --

 15  Q.  Do you know who the other judge was?

 16  A.  No, because Jennings was the clerk, and I was

 17  afraid to get around him too much because he had his

 18  blood boiling.

 19  Q.  So how would you stay away from Jennings?

 20  A.  I would drop them off as much as I could, and

 21  then I would stay around the corner of the clerk's

 22  office.

 23  Q.  Okay, and when you say -- is that very far from

 24  the polling entrance?

 25  A.  Yeah, it's about 25, 30 foot.

Bobby Sams – Direct Examination

1  Q.   And what did you tell your voters when you would

2  drop them off?

3  A.   I would tell them to see Al Man.

4  Q.   Were you looking for a job other than the one you

5  had?

6  A.   Yes, I was promised if I could get out the votes

7  that I said I could, that I would go to work for the

8  school board.

9  Q.   And when was that promise made to you, Mr. Sams?

10 A.   It was made during the voting time I was hauling

11 voters, the absentee time.

12 Q.   And who did you talk to when you had that promise

13 made to you?

14 A.   Doug Adams.

15 Q.   And do you recall that meeting that you had with

16 him?

17 A.   Yes, I went to the school board.

18 Q.   And tell us exactly, best you recall, what he

19 told you.

20 A.   He told me if I could get the votes out, that

21 Darnell was against us, Darnell Hipsher was against us

22 and I could have Darnell's job.

23 Q.   Do you know what job Darnell Hipsher had with the

24 school board?

25 A.   He was like the -- he hauled supplies around to

Bobby Sams - Direct Examination

1 the schools.

2 Q.   Did he tell you when you were going to get the

3 job or --

4 A.   No, he didn't tell me, he just said that I --

5 Q.   Did he indicate to you it would be before the

6 election or after the election?

7 A.   After the election.

8 Q.   Did you ever get the job?

9 A.   I never.

10 Q.   What were you getting paid for hauling all these

11 voters for the Thompson slate?

12 A.   I was supposed to be given $10 a head.

13 Q.   And when you say you were supposed to, does that

14 mean that you didn't get paid?

15 A.   Well, when we got paid, Wayne took me to the bank

16 and helped me get me a car.  And then he paid for --

17 paid it off for me.

18 Q.   What kind of car are you talking about?

19 A.   A Grand Prix.

20 Q.   Was this a new car or used car?

21 A.   Oh, it was a used car.

22 Q.   How much was that car going to cost you?

23 A.   $2,500.

24 Q.   And you say you didn't have to pay for it?

25 A.   I paid some for it, yeah, I paid some; and he

Bobby Sams - Direct Examination

1 paid the rest of it.

2 Q.   You had to get a bank loan?

3 A.   Yes.

4 Q.   Did he pay for it in monthly installments, or did

5 he pay it off at one time?

6 A.   I think he paid -- what happened is I got behind,

7 and he went and paid it off, said he would take care

8 of it for me.

9 Q.   Did he indicate to you that that was going to be

10 your pay for what they owed you in the election?

11 A.   I didn't ask, but I thought it was to myself

12 because I never had got paid.

13 Q.   Now, were there times during that election that

14 you had observed people using signals from inside the

15 polls, some kind of given a ticket or some kind of

16 symbol?

17 A.   Yeah, it said I voted, a little sticker says I

18 voted.

19      And then I would take them to the other place and

20 get them paid.

21 Q.   And where did you take them to get them paid?

22 A.   I took them to Seil's Produce, it was an old

23 building in East Manchester.

24      And there was a man over there named Ronnie

25 Hacker that was paying them.

Bobby Sams – Direct Examination

1  Q.   Now, Ronnie Hacker, did he work for the school

2  board at that time?

3  A.   I guess he did.  He does now.

4  Q.   And you say he was in a -- in a truck parked near

5  this produce building?

6  A.   Yes.

7  Q.   And for them to get paid, they had to have one of

8  these stickers?

9  A.   Yes.

10  Q.   Were there any other signals or symbols or ways

11  in which they signified the way they were supposed to

12  they used that day that you recall?

13  A.   Well, not -- I mean, it was different days.

14  Sometimes they gave candy, pieces of strawberry candy.

15  Q.   And did they change the method on each day or try

16  to mix it up?

17  A.   Yeah, they would have to because they had people

18  that get caught onto it and --

19  Q.   Did you all have people go out and buy the candy?

20  A.   Yeah.

21  Q.   You did?  How long did you work on this, you say

22  eight to ten days?

23  A.   On the absentees?

24  Q.   Yes, sir.

25  A.   I worked on it from the time they opened it to

Bobby Sams – Direct Examination

1 the time they -- the day before, whenever they shut --

2 shut it down before the election, day before the

3 election.

4 Q.   Okay, did you also work on election day?

5 A.   I did.

6 Q.   And tell us what you did on election day.

7 A.   I hauled voters from the Harts Branch area until

8 about, oh, 10:30.

9     And that's when Bart Morris beat me up pretty

10 good.

11     And I went home and took a shower and cleaned up

12 and come back and hauled four voters and got arrested.

13 Q.   Okay.  Let me back you up just a little bit

14 because I want to have you explain a little bit more

15 to us about the -- about this incident with Bart

16 Morris.

17     About -- you say that occurred sometime up in the

18 morning?

19 A.   10:30, 11:00, somewhere like that, yeah.

20 Q.   And what was the cause of this conflict that you

21 ended up with with Bart Morris?

22 A.   Me and Jennings's brother was having a little

23 argument over a girl that was -- that they had already

24 paid to vote.

25     And I went and got her to go with me to vote, and

Bobby Sams - Direct Examination

1 when I came out of the -- I told her to get in my car
2 and I would be right back.
3      And I went to get another little girl to go, and
4 when I came back they was -- Bill was pulling her out
5 of the car.
6      And I said, "You ain't supposed to be doing
7 that."
8      And about that time Bart Morris comes across the
9 parking lot and hit me in the ear.
10 Q.   And how many times did he hit you?
11 A.   I don't know.  He just worked me over pretty
12 good.
13 Q.   You say he hit you in the ear?
14 A.   Hit me in the ear, in the nose and eyes.  He
15 just -- he wore me out pretty good.
16 Q.   Were there any words said before he hit you?
17 A.   He said something about, "This is the way you
18 play the game," or something.
19      I don't know, I don't remember because I mean, he
20 pretty good -- he hit me pretty good.
21 Q.   And where was this fight?
22 A.   It was Beach Creek Apartments.  It was the Harts
23 Branch district.
24 Q.   And at that time you said you went home and took
25 a shower?

Bobby Sams – Direct Examination

1  A.   Yes, I did.

2  Q.   And did you talk to anyone?

3  A.   Yeah, I called -- called Becky Stivers, and she

4  told me she would call Wayne.

5       And they called me back and said don't let them

6  get the bluff on me and go back and finish my job.

7       Well, I did.  When I went back, I got four more

8  voters to go and took two of them in to vote, come

9  back and Scotty Sandlin arrested me.

10  Q.   Okay, now, you said you went back to get four

11  more voters.  Did you back to the same place?

12  A.   I did.

13  Q.   And you said -- did you take them to the polls?

14  A.   I did.

15  Q.   And when did this arrest occur?

16  A.   At the polls.

17  Q.   And what was said to you at the time of your

18  arrest?

19  A.   That Todd Roberts told me they was to arrest me

20  for menacing Tonya Davidson.

21  Q.   Did they take you to jail?

22  A.   Yeah, and he said assault, too, but they never

23  charged me with assault.

24  Q.   So what happened when they took you to jail?

25  A.   I stayed up there for about three hours, then

Bobby Sams – Direct Examination

1 Wayne came and put $100 bond up and got me out.

2 Q.   Wayne who?

3 A.   Wayne Jones.

4 Q.   Did you have trouble getting a bond posted by the

5 judge?

6 A.   Really the bond was on the bottom of the paper,

7 but the people at the jail didn't see it.

8      And the judge called up there and told them to

9 release me.

10 Q.   Who was the jailer at that time?

11 A.   Charles Morgan.

12 Q.   Wasn't he on your slate?

13 A.   He was.

14 Q.   Was he not there that day?

15 A.   He was not.

16 Q.   Now, Becky Stivers, who is she?

17 A.   She is Charles Stivers's wife.

18 Q.   So after you got released from jail, what

19 happened?

20 A.   I went back to hauling voters.

21 Q.   And why did you go back to hauling voters

22 after --

23 A.   Because I was crazy.

24 Q.   Okay.  And tell us what you did as far as the

25 rest of the day was concerned.

Bobby Sams - Direct Examination

1  A.   I hauled voters until 5:30 that evening.

2  Q.   And during this election day, do you know how it

3  worked inside the polls, who was the person helping

4  you?

5  A.   Yeah, let's see, at Harts Branch it was Jackie

6  Jones, that's --

7  Q.   Okay, and Jackie Jones, is he related to Wayne

8  Jones?

9  A.   Yeah.

10  Q.   How is he related to Wayne Jones?

11  A.   He is his nephew.

12  Q.   Okay, anybody else, do you recall?

13  A.   I voted -- signed a paper to vote some in the

14  East Manchester Precinct.

15  Q.   In the East Manchester Precinct, when you said

16  you signed the form, what kind of form was it?

17  A.   That said they couldn't -- that they wasn't able

18  to read or write or --

19  Q.   Were you discouraged by anyone not to use those

20  at any time?

21  A.   Well, we was using them at Harts Branch, and

22  Stanley and them said -- well, not Stanley, but they

23  said -- well, it was Stanley's side that said to tear

24  them up and we wouldn't sign no papers.

25  Q.   Were they doing the same thing?

Bobby Sams – Direct Examination

1  A.    Yes.

2  Q.    And so there was an agreement reached that they

3  would just tear up everybody's?

4  A.    Yes.

5  Q.    Who did Stanley have inside the election poll

6  working for his side?

7  A.    He had a lady named Marty Young.

8  Q.    And were they friends with Stanley Bowling to

9  your knowledge?

10  A.    Yes.

11  Q.    On election day there in 2002, did you have

12  others doing vote hauling?

13  A.    Yeah, there was all kinds of people hauling

14  voters.

15  Q.    And do you recall any additional names?  I know

16  you have mentioned some earlier.

17       Do you know any additional names that worked on

18  election day?

19  A.    I can't remember any.

20  Q.    Did the other side have vote haulers?

21  A.    Oh, yes.

22  Q.    And do you recall who they had on the other side?

23  A.    They had all kinds.  There was about 20 when I

24  pulled in that morning.

25       I called Wayne, I said, "They have got a team

Bobby Sams - Direct Examination

1 over here."

2 And he said, "Just don't let them" -- he said,

3 "Just go do your job."

4 Q.  Now, do you remember any of the names of any of

5 the people that worked on the other side vote hauling?

6 A.   Bill White, and there was a boy named Ray

7 Bowling, David Hacker, Mary Gail Davidson.

8 There was a lot for them.  Billie Jean Berry.

9 They had a lot.

10 Q.  Now, did you get involved in the fall 2002

11 election?

12 A.   I don't -- I don't remember who --

13 Q.  Do you recall having any involvement in the race

14 that may have featured school board race between

15 Dobber Weaver and Charles Keith?

16 A.   Oh, yeah, we was against Dobber.

17 Q.  And who was "we"?

18 A.   Freddy's -- Freddy and them's team.

19 Q.  And did you all organize any effort?

20 A.   Yeah, they wanted to haul voters for Steven

21 Keith.

22 Q.  And did you do that?

23 A.   I did.

24 Q.  And did you all use a similar method of operating

25 in the fall of 2002?

Bobby Sams - Direct Examination

1  A.   I don't think we did the absentee as much.

2  Q.   Okay.

3  A.   But I don't -- I don't remember if they was -- I

4  mean, I don't know about the pay -- I believe it might

5  have been one time I let Al Man set up in my apartment

6  and pay voters.

7       And I think that might have been the -- the --

8  the time.

9  Q.   And where did you have an apartment at that time?

10 A.   Beach Creek Apartments.

11 Q.   And what was the arrangement that you had with Al

12 Man as far as using that in the election?

13 A.   He just -- they was needing a place to pay

14 voters.

15      And I -- I agreed because I thought they was my

16 friends, and I agreed to let them use my apartment.

17 Q.   So what was -- what was the way that -- why did

18 you all change the method of operation on this -- this

19 election?

20      Why not do it the same way that you did it in the

21 spring?

22 A.   It wasn't that heated, I guess you could say.

23 Q.   Okay, and did you haul as many voters in the fall

24 or less voters?

25 A.   Less.

Bobby Sams - Direct Examination

1  Q.   Were they paid as well?

2  A.   Yes -- no, not as well, no.

3  Q.   Was the price less?

4  A.   Yes, it was.

5  Q.   Do you know what the price was?

6  A.   It was either 20 or 25.

7  Q.   Did you work in the '04 election?

8  A.   I guess I did.  If there was an election, I

9  worked in it.

10  Q.   Okay, do you remember the election involving

11  Barbara White Colter and Tim Couch?

12  A.   Yes, I do.

13  Q.   And did you get involved in that election?

14  A.   Yeah, a little bit, yes, I did, I did that.

15  Q.   And how did you get involved in that election?

16  A.   We was for Tim Couch.

17  Q.   And what did you do to help in that effort?

18  A.   I hauled voters.

19  Q.   And were they also paid?

20  A.   Yes.

21  Q.   And do you recall who you had inside the polls

22  working in that primary election?

23  A.   I don't.  I don't.

24  Q.   Do you recall that you had some help inside but

25  you don't recall --

Bobby Sams - Direct Examination

1  A.   Oh, yeah, we had help.  We always sent them to

2  someone.

3  Q.   What about the fall of 2004, did you get involved

4  in that election?

5  A.   Like I said, if there was an election, yeah, I

6  was involved; but I don't remember.

7  Q.   Do you recall there being a city council race in

8  the fall of 2004?

9  A.   Oh, yes, I do.

10  Q.   And do you recall who?

11  A.   Yes, Penny Robinson, Jeff Deaton and Sherry House

12  was the main --

13  Q.   And who told you that this was who you were going

14  to be for in this election?

15  A.   Charles and Wayne.

16  Q.   Charles being Charles who?

17  A.   Charles Stivers and Wayne Jones.

18  Q.   Okay, and did you have somebody working inside

19  the polls in that fall of 2004 election?

20  A.   I am sure they did, yeah, I just --

21  Q.   Do you remember who it was?

22  A.   I don't -- I think Al Man might have been.

23  Q.   Okay.  What about the 2006 primary election, do

24  you recall that election?

25  A.   Yes, I do.

Bobby Sams – Direct Examination

1  Q.   And did anyone approach you for that election?

2  A.   Well, yes, Wayne and Stanley.  Stanley wanted me

3  to get some voters out to him.

4      He said if he didn't get them out like he did in

5  2002 that it would look bad on him.

6  Q.   And "Stanley" being Stanley whom?

7  A.   Stanley Bowling.

8  Q.   And did -- what did you understand him to mean by

9  that comment, that he needed them to come out like he

10 did in 2002?

11 A.   Because they got a lot out in 2002 when he was on

12 Jennings's side, I mean, he killed Billy Jones in

13 2002.

14 Q.   Now, you had explained earlier that Stanley

15 Bowling was on the opposite side of your

16 organization.

17 A.   Right.

18 Q.   And can you explain how he got back in?

19 A.   Him and Wayne had made up within a couple years

20 there, and whatever Wayne asked me to do, I would do.

21 Q.   So how did the effort get organized for you to

22 help in getting them out in 2006 like you did in 2002?

23 A.   Just come to me and said -- well, they didn't --

24 they didn't say, you know, they just said to get out

25 and work, work the election for Stanley Bowling and

Bobby Sams - Direct Examination

1 Phillip Mobley.

2 Q.   Phillip Mobley, was he any relationship to Cletus
3 Maricle?

4 A.   Oh, yes, he is.

5 Q.   Do you know how they are related?

6 A.   He married his daughter.  He is his son-in-law.

7 Q.   Did Stanley Bowling explain to you any further
8 why he was concerned about his votes not being as high
9 in '06?

10 A.   He said it would look bad for the Attorney
11 General's office maybe, I guess because --

12 Q.   The Attorney General's office, what about that?

13 A.   Yeah, they had been called on us in 2002, and he
14 was just -- he wanted a bunch of votes out to make it
15 look like that everybody was for him no matter what, I
16 guess.

17 Q.   Who was the election officer that helped you in
18 that May of 2006 election?

19 A.   Wayne Jones was in Harts Branch.

20 Q.   And did he work the polls that election day?

21 A.   He did.

22 Q.   Did you have any helpers with you on that day,
23 May 2006 at Harts Branch?

24 A.   Yeah, there was some other ones that was
25 working.  They worked harder than I did.

Bobby Sams - Direct Examination

1    I had been incarcerated for awhile there, and --

2 and I hadn't been able to got out as much as the other

3 ones had.

4 Q.   Do you recall any of their names?

5 A.   Mansell Baker and Mary Gail Davidson was on that

6 -- for him that day.

7 Q.   She was for what team?

8 A.   For Stanley Bowling's team.

9 Q.   Okay.  Anyone else you recall?

10 A.   Her sister and her daughter, Billie Jean Berry

11 and Tonya Davidson.

12    I think her brother, Ed Davidson, was hauling

13 them.  That's about it.

14 Q.   What were you all paying the voters in 2006?

15 A.   Well, I wasn't told that we was paying them

16 anything.

17    I was told that I would tell them that we would

18 give them gravels and -- or railroad -- or bridge

19 tile.

20 Q.   Who told you to tell them that?

21 A.   Stanley and Wayne.

22 Q.   And Stanley and Wayne, was Stanley the

23 magistrate?

24 A.   He was.

25 Q.   And did he have the ability to send people

Bobby Sams – Direct Examination

1 gravels and tile as the magistrate?

2 A.  He did.

3 Q.  And did you represent that to people who would

4 agree to vote this -- this way?

5 A.  Yes, I did.

6 Q.  Were you offered money?

7 A.  I was offered $10 a head.  I had hauled about 29,

8 27, 29 people.

9 Q.  Do you know why that they changed from using cash

10 to gravels in this 2006 as a way to bribe people to

11 vote a certain way?

12 A.  I don't.

13 Q.  Who else was on the ticket besides Stanley

14 Bowling and Phillip Mobley?

15 A.  Oh, let's see, Kenny Price was for jailer and

16 Crawdad Sizemore for judge.  That's all they said to

17 worry about mostly.

18 Q.  You said you were incarcerated just before the

19 election in the May primary?

20 A.  I was -- no, I was incarcerated in August,

21 August.

22 Q.  Okay, and August of what year?  Would that have

23 been the 2006 election year?  Would that have been

24 another year?

25 A.  That would have been 2006, yeah.

Bobby Sams - Direct Examination

1  Q.   And what was the reason that you got

2  incarcerated, Mr. Sams?

3  A.   Receiving stolen property.

4  Q.   And were you placed in jail there in Clay County?

5  A.   I was.

6  Q.   And did you ever get a bond or any form of

7  release?

8  A.   They put a $50,000 cash bond on me, and I stayed

9  62 days, and Cletus let me out on house arrest.

10 Q.   Okay.  So you went in in August.

11 A.   I did.

12 Q.   Now, was this charge -- you said it was receiving

13 stolen property.  What was the -- what was the matter?

14 A.   A boy had stoled some aluminum from a company

15 that he had worked for --

16          THE COURT REPORTER:  Pardon me, had stolen

17 some what?

18          THE WITNESS:  Aluminum.  Aluminum.  Aluminum.

19 She's got me tongue-tied now.

20 BY MR. SMITH:

21 Q.   Form of metal?

22 A.   Yes.

23 Q.   All right.  Continue.

24 A.   Okay, and he brought it to my house, and he

25 throwed -- well, I was living with my mother.

Bobby Sams - Direct Examination

1     And he throwed it down in the yard, and he said
2  he would be back to get it.
3     It laid there for three days, and she was raising
4  cain.
5     And I called him, told him to come get it, and he
6  walked to my house to get it.
7     And I said, "You can't pack that on your back."
8     And he said, "We'll take it in your truck and
9  I'll get rid of it, and I'll give you half of it."
10     And supposedly they owed him for working, but he
11  had stolen it.
12     And he went down there and got a check.  Instead
13  of getting it in his name, he got it in my name.
14     And we took it and cashed it, and the next
15  morning I was arrested.
16  Q.   And who arrested you?
17  A.   Jeff Culver.
18  Q.   Is that the Manchester Police Department?
19  A.   It was.
20  Q.   And what happened to the other fellow that was
21  bringing that metal to your house?
22  A.   He stayed four -- he came in about six days
23  later, stayed four days and was gone.
24  Q.   Okay, and did he have any connections?
25  A.   Yeah, his mother worked at the clerk's office

Bobby Sams – Direct Examination

1 there in Manchester.

2 Q.   So he stayed four days, and did he have the same

3 charge on him that you did?

4 A.   He did, he did.

5 Q.   And what was his bond set, did you ever know?

6 A.   Well, we went to first court appearance, and

7 Cletus set 50,000 on both of us.

8       Then -- then a couple days he come by, and he

9 said he was getting out on a property bond or that

10 they had lowered his bond.

11 Q.   Okay, while you were in jail, did somebody come

12 to approach you and ask you to help in the election in

13 the fall?

14 A.   Wayne come, wanted me to help in the election.

15 Q.   And what did he want you to do if you recall?

16 A.   Help Doug White.

17 Q.   And what was Doug White running for?

18 A.   Mayor.

19 Q.   And what was your response at first?

20 A.   I didn't want to help him, but I did.

21 Q.   Okay.  What did you tell him at first?

22 A.   I just said, "It wasn't right."  And then --

23 Q.   Why were you not for Daugh White or Doug White?

24 A.   He pulled a pistol on me.

25 Q.   And did you express that you didn't want to go

Bobby Sams - Direct Examination

1 that way?

2 A.   I did.

3 Q.   And what happened to you?

4 A.   I got -- I went and got out of jail.

5 Q.   Well, how did you go about getting out of jail?

6 A.   Well, what happened was I went back on to be done

7 away with on the -- and -- and Judge Maricle give me a

8 drug test and said I failed the drug test.

9     And I wanted a urine -- a lab work done on it,

10 and he denied it and told them to give me 35 days to

11 think about my lab work.

12 Q.   Now, had you agreed to help Doug White at that

13 point?

14 A.   I hadn't.

15 Q.   So your first response to Wayne Jones was no, you

16 weren't --

17 A.   Well, I was out on -- when he first come to me

18 and told me I was on house arrest, he first come there

19 to talk to me; and I told him I didn't want to help.

20 Q.   You told him no?

21 A.   Yeah, then when he came back, I went up there and

22 I had got a job.

23     And I said, "I have to get off this house

24 arrest."  And I said, "I'll help you.  I'll help

25 Doug."

Bobby Sams - Direct Examination

1  Q.   And can you put in between that point and the

2  other point when this drug test came about?

3  A.   Drug test come on October the 2nd.

4  Q.   Okay.  Were you on home arrest at that time?

5  A.   I was.

6  Q.   And --

7  A.   No, I just had been cut off of it about two

8  weeks.

9  Q.   And what happened?

10 A.   Then I went back to court, and Judge Maricle give

11 me a drug test --

12 Q.   Okay.

13 A.   -- and said I failed it, and I told my lawyer

14 that I wanted lab work done on it.

15     And he said, "Bailiff, take him into custody and

16 give him 35 days to think about lab work."

17 Q.   An who told you that?

18 A.   Judge Maricle.

19 Q.   Okay, now, did you have a lawyer at that time?

20 A.   I did.

21 Q.   And how did you have the funds to employ a lawyer

22 at this point in your life?

23 A.   I didn't.

24 Q.   Was it court appointed lawyer?

25 A.   No.

Bobby Sams - Direct Examination

1  Q.   Who was the lawyer?

2  A.   Scott Madden.

3  Q.   And how did you manage to get his services?

4  A.   Wayne helped me.

5  Q.   And was Scott Madden and Wayne Jones both friends

6  or associates to your knowledge?

7  A.   Yeah, Wayne said he owed him a favor.

8  Q.   Okay, so then what happened?

9  A.   So I went to jail.

10  Q.   Okay.

11  A.   And I stayed eighteen days, and they called over

12  there, "Come," said, "Bobby Red, get your stuff, you

13  are out of here."

14      And I said, "No, ain't no way."

15      They said, "Yeah, go on and get your stuff."

16      A few minutes they come, opened the door and let

17  me go; and I went up front and met with Mr. Jones.

18  Q.   Where did you meet Mr. Jones?

19  A.   He was in the -- where the booking was.

20  Q.   And then what happened?  Where did he take you?

21  A.   We went home.  I went home and cleaned up.  Then

22  we -- then I went to his house.

23      Then we went and met with -- then Mr. Maricle

24  come by.

25  Q.   Talking about Cletus Maricle --

Bobby Sams – Direct Examination

1  A.    Yes.

2  Q.    -- came by?  Where did he come by to?

3  A.    To Wayne's, he stopped at Wayne's house.

4  Q.    And then what happened?

5  A.    He told me to get the votes out for Doug, like he

6  -- like I did in the earlier times, said he owed him a

7  favor.

8  Q.    Did he mention anything about your jail sentence

9  and how you got out of jail?

10  A.    Wayne just said he helped me, that's it.

11  Q.    Had you talked to Wayne during that 63 days in

12  jail about trying to get you out?

13  A.    I did.  I called him on his -- at his house.  He

14  told me to hang tight, and he would get me out when

15  the time was right, that Cletus was a little mad.

16  Q.    This drug test that they gave you, were -- were

17  you with another person when that drug test was given

18  to you?

19  A.    I was, I was with J.C. Lawson.

20  Q.    Were you all in the same room when that drug test

21  was taken?

22  A.    We was.

23  Q.    Did J.C. Lawson get put in jail that day?

24  A.    He sure never.  He said, "Ain't no use me taking

25  no drug test because I am dirty."

Bobby Sams - Direct Examination

1    And Morris House said, "Just go ahead and take

2  it, and I'll talk to the judge" --

3         MR. HOSKINS:  Objection, hearsay.

4         MR. BALDANI:  Objection.

5         THE COURT:  Excuse me, I am going to sustain

6  the objection to that statement.

7  BY MR. SMITH:

8  Q.  So you were in the same room with J.C. Lawson when

9  this drug test issue came up for you?

10  A.  Yes.

11  Q.  Did Cletus Maricle ever tell you why he was so

12  mad at you?

13  A.  No.

14  Q.  Was Cletus Maricle somebody that you had a lot of

15  contact with up to this point?

16  A.  Yeah, I looked up -- I had always -- like in 2002

17  when they started election, he was down at Al Man's

18  all the time, and I was there all the time.

19    He would tell me to go get the voters and vote

20  them and --

21  Q.  You all never had any problems in the past?

22  A.  No, sir.

23  Q.  Have you ever been around when they had these

24  secret meetings the night before the election?

25  A.  I never was around when the big -- big boys got

Bobby Sams – Direct Examination

1  together.

2  Q.    Were you not invited when they all got together

3  and pooled their money?

4  A.    No.

5  Q.    Did you have any other meetings that you were

6  invited to the night before the election that you

7  recall?

8  A.    I went to Stanley's house and went to his garage

9  where he done his cooking and met with him and Wayne

10  and Mansell Baker and a man named Darryll Collins one

11  time.

12  Q.    And was that the night before the election?

13  A.    Yes.

14  Q.    Okay, and what was discussed at that meeting if

15  you recall?

16  A.    To get out as many votes as I could.

17  Q.    Did the Stiverses have any meetings at their

18  places the night before the election?

19  A.    They always did at Al Man's.

20  Q.    Do you recall any individuals that you recall

21  were present at his meetings?

22  A.    Wayne and Charles and -- I don't know if Cletus

23  was there the night before the elections or not, but

24  he would be there sometimes.

25  Q.    Now, at that Harts Branch Precinct, did you ever

Bobby Sams – Direct Examination

1  run into a lady by the name of Crystal Bowling?

2  A.  I did.

3  Q.  And did she have a job there at the Harts Branch?

4  A.  She was election officer.

5  Q.  Okay.  Is she related to Stanley Bowling?

6  A.  Daughter-in-law.

7  Q.  And did she know what you were doing down there

8  at Harts Branch when you were bringing these voters in

9  and paying them to vote for this slate?

10  A.  Yes.

11  Q.  Did she cause you any trouble?

12  A.  Not when I was for Stanley, no.

13  Q.  Do you recall a fellow by the name of Ricky

14  Harris?

15  A.  Yes.

16  Q.  Did he have anything to do with the Harts Branch

17  Precinct?

18  A.  He was -- he was an officer, too.

19  Q.  Is he in any way related to Crystal Bowling?

20  A.  That's her brother.

21  Q.  Did he know what you were doing down there

22  hauling these voters and buying their votes?

23  A.  Yes.

24  Q.  Did he have any problem with that?

25  A.  No.

Bobby Sams – Direct Examination

1  Q.   What happened to that court case that you had

2  there pending in front of Judge Maricle?

3  A.   It was dismissed.

4           MR. SMITH:  Pass the witness.

5           MR. HOSKINS:  May I have just a minute,

6  please?

7           THE COURT:  Yes, sir, you may.

8           (Mr. Hoskins and Mr. Pinales conferring at

9  this time.)

10          MR. ABELL:  Judge?

11          THE COURT:  Yes, sir.

12          MR. ABELL:  Ask the United States if there is

13 any additional Jencks material.

14          THE COURT:  Yes, sir, Mr. Smith, any

15 additional Jencks material?

16          MR. SMITH:  Do you have this?  Do you have

17 one of these?

18          THE COURT:  All right.  Make sure all counsel

19 is aware of what was -- Miss Hughes, are you aware of

20 the documents he referred to?

21          MS. HUGHES:  (Nods head.)

22          THE COURT:  You are?  Thank you.

23          Mr. Hoskins, you may proceed.

24          MR. HOSKINS:  There are some exhibits here,

25 Judge.

Bobby Sams – Cross Examination

1          THE COURT:  Yeah, you can send those back up

2    to the clerk.  Thank you, Eric.  Thank you.

3                        –  –  –

4                   CROSS EXAMINATION

5    BY MR. HOSKINS:

6    Q.   Hello, Mr. Sams.  My name's David Hoskins, and I

7    represent Cletus Maricle.

8          First thing I want to try to get straight is the

9    circumstances when you were in court in front of Judge

10   Maricle.

11   A.   Yes, sir.

12   Q.   You were charged with receiving stolen property?

13   A.   Yes, sir.

14   Q.   And are you telling the jury that you didn't know

15   it was stolen or did you know that it was stolen?

16   A.   I didn't know it was stolen, no, sir.

17   Q.   Didn't know that you had done anything wrong?

18   A.   No, sir.  When I took it to the salvage yard, I

19   never.

20   Q.   Okay, so you thought your friend had just come up

21   with some aluminum, and he would give you half the

22   money on it.

23   A.   He told me that he had been working there and they

24   owed him for working, and that it was bad for not

25   paying and that he was –– that they had give him some

Bobby Sams - Cross Examination

1 aluminum.

2 Q.   Okay, so he was just going to be kind and give

3 you half the money for loading it in your truck and

4 taking it to the scrap yard?

5 A.   We just took it, and he got the check put in my

6 name.

7     And the check was started writing out in his

8 name, and they marked it out and put it in -- put his

9 name -- put my name.

10 Q.   But you were not doing anything wrong.

11 A.   I was not.

12 Q.   You were just going to put the check in your

13 name.

14     Okay, and then you got arrested, Jeff Culver

15 arrested you.

16 A.   I did.

17 Q.   And you went to court in front of Judge Maricle

18 because you had been indicted on a felony.

19 A.   Right.

20 Q.   And at first your bond was $50,000.

21 A.   It was.

22 Q.   Right?  Now, how long did you actually have to

23 stay in the Clay County Jail first time?

24 A.   Sixty-two days.

25 Q.   Okay, what happened after 62 days?

Bobby Sams - Cross Examination

1  A.   He reduced my bond to 2,500 and paid -- got on

2  house arrest.

3  Q.   Okay, so at that point you got out of jail and

4  you got put on house arrest?

5  A.   For six months.

6  Q.   And you weren't supposed to have to go back to

7  jail, were you?

8  A.   My understanding was once I got the six months

9  pulled, that I was through.

10  Q.   Okay, that was six months on house arrest?

11  A.   And 62 days in --

12  Q.   Plus the 62 days?

13  A.   Right.

14  Q.   So your understanding was you had a deal, you

15  pled guilty, didn't you?

16  A.   No.

17  Q.   Didn't plead guilty to anything, to nothing?

18  A.   I can't remember if I pled guilty.  I don't

19  remember if I -- what I pled guilty -- I don't think I

20  pled guilty.

21  Q.   Okay.

22  A.   I don't remember for sure.

23  Q.   You told the jury the case was dismissed?

24  A.   I think it was.

25  Q.   And that would mean that you didn't plead guilty

Bobby Sams - Cross Examination

1  to anything?

2  A.   I am not charged with no felony.

3  Q.   Did it get reduced to a misdemeanor maybe?

4  A.   I think it got dismissed.

5  Q.   Okay, so you are thinking that your case got

6  dismissed altogether, and you didn't get any criminal

7  conviction out of that.

8  A.   Right.

9  Q.   But you agreed to serve six months on house

10 arrest?

11 A.   I was trying to get out of jail.

12 Q.   Okay.  So you have made that agreement.

13 A.   Yes, sir.

14 Q.   And part of being on house arrest is they come

15 around or you have to go somewhere and take a drug

16 test every once in awhile?

17 A.   I did.

18 Q.   Okay, so your day to take a drug test came up,

19 and you flunked.

20 A.   No, sir.

21 Q.   Okay, so you --

22 A.   I already -- I already had been taken off drug --

23 off the house arrest.

24      And I was going back for final hearing -- the

25 final sentencing.

Bobby Sams - Cross Examination

1  Q.   Okay.

2  A.   And it was supposed to be dismissed.

3  Q.   Okay.

4  A.   And Judge Maricle said to give -- give Bobby Sams

5  and J.C. Lawson a drug test.

6  Q.   Okay, to make sure you hadn't been taking drugs.

7  A.   I guess so, but I had done -- yeah, you know,

8  right.

9  Q.   Right.  You were going back for your final

10 sentencing?

11 A.   Correct.

12 Q.   To make sure that you had done what you were

13 supposed to do and not violated the law.

14     Judge Maricle required you to take a drug test

15 that last day?

16 A.   That's correct.

17 Q.   And you didn't pass that drug test, did you?

18 A.   Yes, I did.

19 Q.   Okay, so you are saying that you didn't really

20 fail the drug test.

21 A.   Yes, sir, I asked for lab work.  I asked my

22 lawyer for -- to give me lab work and Cletus said,

23 "Bailiff, take him into custody.  Give him 35 days to

24 think about his lab work."

25 Q.   You had a lawyer though?

Bobby Sams - Cross Examination

1  A.   I did.

2  Q.   So you are telling the jury that you didn't take

3  any drugs?

4  A.   I didn't, not at that time, I had not, no, sir.

5  I had failed once, but at that time, I was free.

6  Q.   Okay.  How long had it been since you were taking

7  the drugs?

8  A.   Probably two months.

9  Q.   Oh, so you had taken some drugs while you were on

10 that --

11 A.   Yes, I had.

12 Q.   -- house arrest.  So you had violated the law?

13 A.   I guess so.

14 Q.   Well, what drug did you take?

15 A.   Lorcet Plus.

16 Q.   Did you have a prescription for Lorcet Plus?

17 A.   I did not.

18 Q.   Okay, so you admit that you had that drug

19 illegally?

20 A.   Yes.

21 Q.   And that you took it illegally?

22 A.   I guess, yeah.

23 Q.   Okay.  So you go back to court, you take the drug

24 test that you say you passed, that somebody else said

25 you failed, right?

Bobby Sams - Cross Examination

1  A.   Correct.

2  Q.   It was the person that gave you the test that

3  said you failed, correct?

4  A.   Correct.

5  Q.   It wasn't Judge Maricle that said you failed the

6  test, was it?

7  A.   No.

8  Q.   And when he was told that you had failed a drug

9  test --

10  A.   He said --

11  Q.   He sent you to jail?

12  A.   He did.

13  Q.   And then sometime after that you were released?

14  A.   Eighteen days later.

15  Q.   Okay.  Now, Mr. Sams, you had -- you had gotten

16  by with using drugs once and not got caught by the

17  drug test, right?

18  A.   I guess, yeah.

19  Q.   Well, there is no question about it.

20  A.   Yes, sir.

21  Q.   All right.

22  A.   Yes, sir.

23  Q.   All right.  And it was your understanding because

24  at this time you were working for -- working under a

25  man named Jerome Webb, weren't you?

Bobby Sams - Cross Examination

1  A.   I was.

2  Q.   And where did Mr. Webb work?

3  A.   Cornett Chevrolet.

4  Q.   Okay, what kind of work did you do for Mr. Webb?

5  A.   I detailed cars at Cornett's.

6  Q.   Okay, and it was your understanding that you got

7  out because Mr. Webb had asked for you to be able to

8  come back to work?

9  A.   At the time I did, yes, I did.

10  Q.   So you got out of jail that day after pulling

11  eighteen days?

12  A.   Yes, sir.

13  Q.   And you didn't have to go back to court any more,

14  did you?

15  A.   I think I went back and gave them another drug

16  test.

17  Q.   Okay, and you passed that?

18  A.   I did.

19  Q.   And that was the end of your case?

20  A.   That was it.

21  Q.   Okay, but you don't know for sure if you pled

22  guilty to anything or not?

23  A.   I don't think I did.

24  Q.   Okay.  Now, it's your understanding that nobody

25  got paid money in the 2006 election, right?

Bobby Sams - Cross Examination

1   A.   That's correct.

2           MR. HOSKINS:  Your Honor, could I have just a

3   minute, please?

4           THE COURT:  Yes, sir.

5           (Mr. Hoskins conferring with his client at

6   this time.)

7           (Mr. Hoskins conferring with Mr. Pinales at

8   this time.)

9   BY MR. HOSKINS:

10  Q.   Mr. Sams, just a couple more questions.

11  Mr. Webb, Jerome Webb that you worked for, he is kin

12  to Carmen Webb Lewis, isn't he?

13  A.   He is.

14  Q.   And in the November 2006 election, that's who you

15  worked for, wasn't it?

16  A.   It was.

17  Q.   Carmen Lewis against Doug White?

18  A.   Yes, it was.

19          MR. HOSKINS:  That's all, thank you.

20          MR. WESTBERRY:  May I?

21          THE COURT:  Mr. Westberry.

22          MR. WESTBERRY:  Thank you, Your Honor.  May I

23  from here?

24          THE COURT:  Yes, sir, that's fine.

25                              - - -

Bobby Sams - Cross Examination

1                           CROSS EXAMINATION

2  BY MR. WESTBERRY:

3  Q.   Good afternoon, Mr. Sams.  I am Kent Westberry.

4  I am here for Mr. Adams.  I have got a couple

5  questions for you.

6       I think you said a little while ago at the

7  beginning of your testimony that you decided to

8  support Freddy Thompson in the '02 election because

9  you said Jennings White had done you dirty or

10 something like that?

11 A.   Correct.

12 Q.   What did Jennings White do to you?

13 A.   Well, he had me -- we was having a little party

14 beside of his house where he had some apartment

15 buildings.

16      And his niece lived in one of the apartment

17 buildings, and her boyfriend busted her -- the window

18 out because she had had him locked out.

19      And he called the law and had everyone arrested,

20 and on the bottom of the warrant it said, "Do not

21 release until court date."

22      And I just had got -- I was working at a good

23 job, and I had to be at work on Monday morning at

24 5:00; and I was in jail.

25 Q.   So the idea that you got arrested over that

Bobby Sams - Cross Examination

1  incident that night?

2  A.   Yes, sir.

3  Q.   You said that you decided to support Freddy

4  Thompson in that race, correct, the '02 race?

5  A.   Yes, sir.

6  Q.   Now, if I heard you right, you said in addition

7  to Mr. Thompson there were several other people part

8  of something, I think you called it a slate that you

9  were asked to support as well; is that right?

10 A.   Right.

11 Q.   Mr. Morgan was one of them; is that fair?

12 A.   That's correct.

13 Q.   You also said that Edd Jordan was a part of that

14 slate?

15 A.   I am thinking he was.  I am not for sure.  I

16 don't know.

17      Maybe Big D Reid was for awhile there, I don't

18 know for sure.

19 Q.   I think you said Big D Reid tried to get on the

20 slate --

21 A.   He was trying to get on the slate and --

22 Q.   But couldn't, could not do it, is that what

23 you --

24 A.   Right, what they would do is they would trade

25 them off the night before the election.

Bobby Sams - Cross Examination

1  Q.   Do you know if Big D -- his name is Danny Reid;

2  is that correct?

3  A.   Yes, it was.

4  Q.   Of course he was running for sheriff against Edd

5  Jordan that year --

6  A.   Yes, he was.

7  Q.   -- is that correct?

8  A.   That's right.

9  Q.   Do you know if he is related to Big D or if Danny

10 Reid is related to Doug Adams in any way?

11 A.   I do not.

12 Q.   They are not related?

13 A.   I don't know.

14 Q.   You don't know.  You said, Mr. Sams, that you

15 went and talked to Doug Adams about your --

16 A.   Yes, me and Charles Stivers went once and I went

17 by myself once.

18 Q.   So there were two meetings you say that happened?

19 A.   There was.

20 Q.   Where specifically did these meetings take place,

21 Mr. Sams?

22 A.   They was in Doug Adams's office at the school

23 board.

24 Q.   Okay, at the first meeting who was present?

25 A.   Just me and him.

Bobby Sams – Cross Examination

1  Q.   You and Doug Adams?

2  A.   Me and him, yes, sir.

3  Q.   Just the two of you were in this first meeting?

4  A.   Yes, sir.

5  Q.   Did anyone send you over there or did you go on

6  your own?

7  A.   Charles told me to go over there and talk to

8  him.

9  Q.   Charles Stivers?

10  A.   Yes, sir, Charles Stivers.

11  Q.   Now, the idea is that Mr. Adams said that if you

12  helped in the election, the '02 election he would give

13  you Darnell Hipsher's job?  Did I hear that

14  correctly?

15  A.   That's correct.

16  Q.   Darnell Hipsher, of course, was supporting

17  Jennings White?

18  A.   That's correct.

19  Q.   Also there was a school board race going on at

20  that time, too; is that correct?

21  A.   I think it was in the November race.

22  Q.   Later on in the year.  The point though is of

23  course we all know Freddy Thompson went ahead and he

24  won that race, that primary in May against Jennings

25  White, correct?

Bobby Sams - Cross Examination

1  A.   He did.

2  Q.   Darnell Hipsher, who supported Jennings White,

3  did not get fired?

4  A.   He did not.

5  Q.   And you did not get the job?

6  A.   I did not.

7  Q.   The second meeting, this was one where you and

8  Charles Stivers, you were saying?

9  A.   Yes, sir.

10 Q.   And where was that meeting again, please?

11 A.   It was at Doug's office.

12 Q.   When specifically was that?

13 A.   It was after the election, and Charles told him

14 to just -- told me to just --

15 Q.   After which election?  Excuse me, which election

16 are we talking about?

17 A.   It was about two weeks after the May primary.

18 Q.   Two weeks after -- this was after Doug Adams had

19 been defeated?

20 A.   Right, or it might have been a little bit

21 longer.

22      Charles said, "Give him a little time and go back

23 and talk to him."

24      And we went back out there, and he said he

25 couldn't do nothing, his hands was tied.

Bobby Sams - Cross Examination

1     And Charles said, "Just forget it.  I'll give him

2  a job."

3  Q.   Charles Stivers said he would give you a job?

4  A.   He did.

5  Q.   And did Mr. Stivers give you a job?

6  A.   He did.

7  Q.   And what job was that, please?

8  A.   It was assistant manager at Hometown Chevron.

9  Q.   And to your knowledge, Mr. Hipsher never lost his

10 job despite the fact that he had supported Jennings

11 White?

12 A.   He didn't.

13 Q.   And he worked for the school board part time; is

14 that correct, Hipsher?

15 A.   He worked full time.

16 Q.   Yeah, excuse me, I misspoke, full time at the

17 school.

18 A.   Yes, he did.

19 Q.   Despite the fact that he had supported Jennings

20 White in that May primary and White lost, Mr. Hipsher

21 still kept his job, his full-time job at the school,

22 correct?

23 A.   Correct.

24          MR. SMITH:  I believe that's been asked and

25 answered.

Bobby Sams – Cross Examination

```
 1        MR. WESTBERRY:  One second, please.
 2        (Mr. Westberry conferring with his client at
 3 this time.)
 4 BY MR. WESTBERRY:
 5 Q.  One other question, Mr. Sams.  I want to ask you
 6 about the fall '02 election, the school board race.
 7 A.  Yes, sir.
 8 Q.  We talked about that just briefly just a second
 9 ago?
10 A.  Yes.
11 Q.  That was the race between Mr. Charles Keith and
12 Dobber Weaver, correct?
13 A.  Yes.
14 Q.  And Dobber Weaver was also a part of the other
15 side of the ticket there in that race, correct?
16 A.  Yes, he was.
17 Q.  It's late in the day, and I'm sorry.  The
18 question I forgot to ask you and I should have, and I
19 apologize.
20    Darnell Hipsher we have been talking about
21 supported Dobber Weaver in that fall school board
22 race, correct?
23 A.  He did.
24        (Mr. Westberry conferring with his client at
25 this time.)
```

Bobby Sams – Cross Examination

1 BY MR. WESTBERRY:

2 Q.   Darnell Hipsher didn't lose his job, correct?

3 A.   He never.

4 Q.   Thank you, that's all.

5        MR. WESTBERRY:  Pass the witness.  Thank you.

6        THE COURT:  Thank you.

7        Mr. White?

8        MR. WHITE:  Thank you, Your Honor.  May I ask

9 from here, please?

10        THE COURT:  Yes, you may.

11        MR. WHITE:  Thank you.

12                   – – –

13                CROSS EXAMINATION

14 BY MR. WHITE:

15 Q.   Good afternoon, Mr. Sams, my name is Scott

16 White.  I am a lawyer.  I represent Wayne Jones.

17    I have got some questions for you.  I am going to

18 try to stay by the topic and let you know where we are

19 at.

20    The first thing I wanted to ask you about was in

21 the absentee voting period in the primary for the May

22 '02 election.

23    Were you asked on direct who you saw helping

24 folks there?  Did you say Charles Marcum, Gino

25 Carpenter, Charles Wayne and Jeff Farmer?

Bobby Sams - Cross Examination

1  A.   No, sir, I never saw them helping -- that's who,

2  Gino Carpenter and Wayne Marcum and them, they was

3  getting voters in.

4  Q.   "Getting voters in," what do you mean?

5  A.   They was going like -- well, Wayne Marcum and

6  Gino was going across to the Horse Creek area while I

7  was going to Harts Branch and East Manchester and

8  Manchester area.

9  Q.   They were going to get voters and bring them in?

10 A.   Yes, they was.

11 Q.   And did you say Jeff Farmer was one of those

12 people?

13 A.   Jeff Farmer helped -- he was -- stayed with Wayne

14 a lot.  I don't know if he hauled any voters or not.

15 Q.   Then Gino -- when you say Wayne, you mean, at

16 least in this context it's Wayne Marcum --

17 A.   Yes, sir.

18 Q.   -- not Wayne Jones?

19 A.   Yes, sir.

20 Q.   Then in these -- at least in the '02 election,

21 you, yourself, did not -- you, yourself, did not pay

22 to buy any votes.  You hauled votes, right?  Or hauled

23 voters; is that correct?

24 A.   I might have handled some money, I mean, but what

25 I done is I would take it from one person's hand and

Bobby Sams - Cross Examination

1 give it to the person I hauled.

2    I never paid nobody direct, I mean, I never

3 handled no bunch of money.

4    Like maybe a few people that didn't want to fool

5 with the ones that was selling, paying for it.

6 Q. Let me bring you now to the year 2006. In the

7 spring '06 election, which would have been the

8 primary --

9 A. Yes, sir.

10 Q. -- did you testify on direct that you were asked

11 by Wayne Jones and Stanley Bowling to haul voters for

12 their ticket?

13 A. Excuse me, say it again?

14 Q. In the spring -- in the spring, did you testify

15 on direct that it was the -- during the spring 2006

16 election that the way you got into the election was

17 that Wayne Jones and Stanley Bowling came and asked

18 you to help haul voters?

19 A. Yes, sir.

20 Q. Is it not accurate to state that there was a

21 third person that you say was there, that being Bo

22 Sizemore?

23 A. Yeah, he was there. No, he was not there, no.

24 Bo Sizemore, I met Bo Sizemore by myself.

25 Q. Do you recall -- is it your testimony that Bo

Bobby Sams - Cross Examination

1 Sizemore was not with Wayne Jones and Stanley Bowling

2 in this meeting you say occurred?

3 A.   No, they was not.

4 Q.   Have you -- do you recall giving grand jury

5 testimony in this case?

6 A.   I do.

7 Q.   Did that occur on July 12th, 2007?

8 A.   The testimony?

9 Q.   Yes.

10 A.   Yes.  If it's said like that, it wasn't meant to

11 be that they was together because I went to Bo's house

12 and I met with him.

13     Then I met Stanley, he came to -- I was working

14 for a man and woman.

15     And he stopped by and asked me if I was going to

16 get the voters out for him.

17     And Wayne came by and asked me, he always wanted

18 me to help him.

19 Q.   But you do not now deny that's what you said at

20 the grand jury?

21 A.   Maybe I did, but it wasn't meant that way.

22 Q.   We have got the grand jury testimony.

23 A.   Yeah, I would like to see it.  It was probably

24 meant -- like I said, it wasn't meant, they was

25 altogether.

Bobby Sams - Cross Examination

1  Q.   Let me ask you about the day that you hauled

2  voters on election day, May '06.

3       Did you testify that you were hauling voters --

4  you were taking voters just to the Harts Branch

5  Precinct?

6  A.   I was, that day I did.  And --

7  Q.   And --

8  A.   No, no, let's see, I took some for let's say --

9  in the primary?

10 Q.   In the primary.

11 A.   Yes, sir.

12 Q.   In the primary of '06 you were taking voters to

13 Harts Branch, correct?

14 A.   Yes.

15 Q.   Did you do this all day?

16 A.   Part of the day.  I just took about 27 people.

17 Q.   When you say "part of the day," what part of the

18 day did you take --

19 A.   The earlier part.  That's when you get your

20 voters.

21 Q.   Did you take any there after lunch at all?

22 A.   No.

23 Q.   In response to I believe a question you were

24 asked by Mr. Hoskins, did you testify that in the

25 fall -- now I am talking about the fall 2006

Bobby Sams - Cross Examination

1  election -- that you worked for Carmen Webb Lewis?

2  A.   I did.

3  Q.   When you say you worked for her, did you haul

4  voters for them?

5  A.   I did.

6          MR. WHITE:  May we have a moment, Your Honor?

7          THE COURT:  Yes, sir.

8          (Mr. White conferring with his client and

9  Mr. Abell.)

10  BY MR. WHITE:

11  Q.   In the spring of 2006, let me take you back to

12  the primary 2006 election.

13  A.   Yes, sir.

14  Q.   I see, I wrote down something wrong.

15          MR. WHITE:  Your Honor, that's all I have.  I

16  apologize.  Thank you.

17          THE COURT:  Thank you.

18          MR. WHITE:  Thank you, Mr. Sams.

19          THE COURT:  Mr. Abell?

20                    - - -

21                CROSS EXAMINATION

22  BY MR. ABELL:

23  Q.   Mr. Sams, my name is Robert Abell, and I

24  represent William Stivers in this case.  All right?

25  A.   Yes, sir.

Bobby Sams - Cross Examination

1  Q.   On election day in 2002, you testified -- is it

2  correct that you were arrested by Todd Roberts for

3  menacing Tonya Davidson?

4  A.   No, I was arrested by Scotty Sandlin, but Todd

5  Roberts had sent to arrest me, told him to arrest me.

6       He was his Chief of Police.  He was the Chief of

7  Police.

8  Q.   So Todd Roberts had caused you to be arrested is

9  your understanding?

10 A.   Yes, sir.

11 Q.   Did you menace Tonya Davidson?

12 A.   I didn't.

13 Q.   To your understanding was Todd Roberts an ally

14 of Jennings White?

15 A.   Yes, he was.

16 Q.   To your understanding were you arrested because

17 you were working against Jennings White?

18 A.   Yes, sir.

19 Q.   In your receiving property -- or excuse me,

20 receiving stolen property case, who was your

21 codefendant?

22 A.   Wes Caudill.

23 Q.   Now, in the 2002 primary, you talked about the

24 side that you supported, and I want to try to get this

25 straight.

Bobby Sams – Cross Examination

1       There was Roy Morgan for judge, Freddy Thompson

2   for clerk, Charles Marcum for jailer, Tim Couch for

3   state representative.

4   A.   Yes, sir.

5   Q.   Now, with regard to sheriff, you are not sure

6   whether Danny Reid was on your side or not; is that

7   correct?

8   A.   He came to a couple meetings, and then all of a

9   sudden he didn't come back to no meetings.

10       And I don't remember exactly who we -- I think

11  they just said to vote whoever they wanted to on the

12  sheriff's race.

13  Q.   All right.  Also on your side supporting those

14  group of candidates in May 2002 was my client, William

15  Stivers?

16  A.   Yes, he was.

17  Q.   And also on your side supporting that group of

18  candidates in May 2002 was Wayne Jones?

19  A.   Yes, sir.

20  Q.   Also on your side supporting that group of

21  candidates in May 2002 was Doug Adams?

22  A.   Yes, sir.

23  Q.   Now, the other side in that election, the

24  opponents, tell me if this is correct, James Garrison

25  for judge?

Bobby Sams - Cross Examination

1  A.   Yes, sir.

2  Q.   Jennings White for clerk.

3  A.   Yes, sir.

4  Q.   Kennon White for jailer?

5  A.   Yes, sir.

6  Q.   And Barbara Colter for state representative?

7  A.   Yes.

8  Q.   Now, to your understanding, supporting that group

9  of candidates, Jennings White and that bunch, was Bart

10 Morris?

11 A.   Yes, sir.

12 Q.   Was it your understanding that Debbie Morris,

13 Bart's wife, was also supporting that group?

14 A.   I didn't know if she was or not.  I guess she

15 was.

16 Q.   All right, fair enough.  Was it your

17 understanding that Stanley Bowling was supporting the

18 Jennings White group of people?

19 A.   Yes, sir.

20 Q.   In 2006 there was a primary for county judge,

21 right?

22 A.   Yes.

23 Q.   You supported Carl "Crawdad" Sizemore?

24 A.   I did.

25 Q.   And is it correct that Mr. Jones also supported

Bobby Sams - Cross Examination

1  Crawdad Sizemore?

2  A.   He did.

3  Q.   Another candidate in the May 2006 primary for

4  county judge was a man named Johnny Poss Gregory; is

5  that correct?

6  A.   That's correct.

7  Q.   To your understanding, did Mr. Stivers support

8  Johnny Poss Gregory?

9  A.   He did not.

10  Q.   Same race, May 2006, to your understanding did

11  Stanley Bowling support Mr. Sizemore?

12  A.   He did.

13  Q.   A third candidate in the May 2006 county judge

14  primary was James Garrison; is that right?

15  A.   Yes, sir.

16  Q.   In fact Mr. Garrison was the incumbent, wasn't

17  he, at the time the office holder of county judge?

18  A.   That's correct.

19  Q.   To your understanding did Bart Morris support

20  Mr. Garrison?

21  A.   I don't know for sure.

22        MR. ABELL:  Nothing further, Judge.

23        THE COURT:  All right, thank you.

24        Mr. Baldani?

25                          - - -

Bobby Sams – Cross Examination

1                          CROSS EXAMINATION

2   BY MR. BALDANI:

3   Q.   Mr. Sams, my name is Russ Baldani.  I am one of

4   Freddy Thompson's attorneys.

5   A.   Yes, sir.

6   Q.   The codefendant on the receiving stolen property

7   case you just testified was Wes Caudill, correct?

8   A.   Yes, sir.

9   Q.   And his mom's name is Pat Caudill --

10  A.   Yes, sir.

11  Q.   -- right?

12  A.   Right.

13  Q.   And Pat Caudill works in the office of Circuit

14  Clerk, James Phillips, right?

15  A.   That's correct.

16  Q.   So when you testified a few minutes ago that Wes

17  Caudill got his bond reduced because his mother worked

18  in the clerk's office, you weren't talking about

19  Freddy Thompson's office, were you?

20  A.   No, sir.

21          MR. BALDANI:  That's all, Your Honor.

22          THE COURT:  Thank you.

23          Mr. Gilbert?

24                              -  -  -

25

Bobby Sams – Cross Examination

1                              CROSS EXAMINATION

2  BY MR. GILBERT:

3  Q.   Mr. Sams, my name is Jerry Gilbert, and I

4  represent Bart Morris.

5  A.   Yes, sir.

6  Q.   The incident that occurred that you testified

7  about, when did that happen?

8  A.   2002, May primary.

9  Q.   May primary.  And that happened up at Beach Creek

10  Apartments?

11  A.   It did.

12  Q.   Now, isn't it a fact that you came off the steps

13  and approached Bart Morris and initiated the

14  altercation?

15  A.   No, sir.  I was standing in the parking lot

16  beside of my car.

17       And me and Bill White was having a discussion

18  about him pulling the girl out of my car.

19       And he came from off of the steps and hit me in

20  the ear.

21  Q.   So it was just the opposite?

22  A.   Correct.

23  Q.   Now, what happened to the charges that were filed

24  against you?

25  A.   They was dismissed.  She never showed up.

Bobby Sams – Cross Examination

1  Q.   She didn't respond to the subpoena?

2  A.   No, they said that they done that because Bart

3  wanted her to get a warrant on me instead of getting

4  one on him.

5           MR. GILBERT:  That's all.

6           THE COURT:  Miss Hughes?

7           MS. HUGHES:  No, sir, thank you.

8           THE COURT:  Thank you.

9           Mr. Simons?

10          MR. SIMONS:  I do have a few, Your Honor.

11  Come around here where I can see you.

12          THE COURT:  Yes, sir.

13                      -  -  -

14                 CROSS EXAMINATION

15  BY MR. SIMONS:

16  Q.   Mr. Sams, my name is Dan Simons.  I represent

17  Stanley Bowling.

18  A.   Yes, sir.

19  Q.   You know Mr. Bowling, do you not?

20  A.   I do.

21  Q.   Okay, I want to just take a few minutes with you,

22  and I want to start in the '06 election, okay?

23  A.   Yes, sir.

24  Q.   At the end of Mr. Smith's questions, you

25  indicated that you were at Stanley Bowling's house and

Bobby Sams - Cross Examination

1  there was a meeting.

2  A.    It wasn't at his house.  It was his garage where

3  he meets.

4  Q.    I'll correct that -- that's right.

5  A.    Yes, sir.

6  Q.    On his property nonetheless?

7  A.    Yes, sir.

8  Q.    And you said there was a meeting with Mansell

9  Baker; is that right?

10  A.    Mansell was there.

11  Q.    And Wayne Jones was there?

12  A.    Yes.

13  Q.    And a Darryll Collins --

14  A.    Yes, sir.

15  Q.    -- is that correct?  And this was the night

16  before the November '06 election?

17  A.    I am thinking it was, yes, sir.

18  Q.    Okay.  Do you know who Stanley's opponent was in

19  the fall of '06?

20  A.    It maybe wasn't in the fall, it was in the May

21  primary.

22  Q.    I understood you earlier to say it was in the

23  fall.

24  A.    I'm sorry, it was in the May primary.  He was --

25  Q.    All right.

Bobby Sams - Cross Examination

1  A.   He didn't -- yeah.

2  Q.   Was it then the night before the primary

3  election?

4  A.   It was.

5  Q.   Is that what you are talking about?

6  A.   Yes, it was.

7  Q.   And did I name all the people that you said were

8  there that evening?

9  A.   Yes, sir.

10  Q.   All right.  And in that -- what -- at the

11  meeting, did you confirm that you were going to haul

12  votes for --

13  A.   Yeah, they told me to haul votes the next

14  morning, as many as I could get out.

15  Q.   Now, did you get those voters from the Beach

16  Creek Apartments that we are talking about where you

17  had the altercation?

18  A.   Some of them I did, but --

19  Q.   Is that where most of them came from?

20  A.   Yes, sir.

21  Q.   Now, were most of those people -- I think you

22  said you hauled 27 to 29?

23  A.   Yes, I did.

24  Q.   How many of them would come from the Beach Creek

25  Apartments?

Bobby Sams - Cross Examination

1  A.    Probably 18 to 20.

2  Q.    Most of them, the majority of them?

3  A.    Yes, sir.

4  Q.    Where did the rest come from?

5  A.    From the Littleton area.

6  Q.    And let me ask you about the Beach Creek

7  Apartments.  Is that a fairly sizable apartment

8  complex?

9  A.    It is.

10 Q.    Have an asphalt parking area there?

11 A.    Yes, sir.

12 Q.    None of those people would have any use for

13 gravel, would they?

14 A.    No, sir.

15 Q.    Okay.  Now, you know, and you have known for a

16 long time that my client, Stanley Bowling, and

17 Mr. Bart Morris are friends?

18 A.    Yes.

19 Q.    Okay.  And you had this altercation you talked

20 about with Bart Morris, when was that?

21 A.    2002.

22 Q.    And we have talked about that --

23 A.    Yes.

24 Q.    -- right?

25 A.    Yes.

Bobby Sams - Cross Examination

1  Q.   And you are telling the jury that after that

2  Stanley Bowling came and asked you to work an

3  election?

4  A.   He sure did.

5  Q.   Okay, now, do you remember the first time you

6  talked to any FBI agents about elections in Clay

7  County?

8  A.   It's been awhile.

9  Q.   Would you remember it being the summertime of

10 2007?  Would that be close enough?

11 A.   Probably right, yep.

12 Q.   Have you ever run for public office?

13 A.   I did one time.

14 Q.   And that was in the '02 election, wasn't it, in

15 the fall?

16 A.   No, sir.

17 Q.   When was it?

18 A.   I believe it was '98.

19 Q.   You got votes for city council in the fall of

20 2002?

21 A.   Oh, I forgot about the city council race.

22 Q.   Did you run for council in '02?

23 A.   I did, I was --

24 Q.   Did you haul votes -- did you haul votes --

25         MR. SMITH:  Your Honor, I am going to ask

Bobby Sams – Cross Examination

1 that the witness be allowed to finish his answer

2 before he asks the next question.

3          THE COURT:  Yes, please allow him to finish

4 his answer --

5          MR. SIMONS:  I'm sorry, Your Honor.

6          THE COURT:  -- before you ask the next

7 question the question before you ask the next.  Go

8 ahead.

9          THE WITNESS:  Yeah, I forgot about it, they

10 told me to be a write-in on city council, that's

11 right, I did.

12 BY MR. SIMONS:

13 Q.  Okay, and that's the same election you have

14 talked about hauling votes in, is it not?

15 A.  It is.

16 Q.  Do you know how many votes you got in that

17 election?

18 A.  One.

19 Q.  It was six.  That's all.

20          THE COURT:  Thank you.

21          Mr. Smith.  Any redirect?

22          (Mr. Smith conferring with Mr. Parman at this

23 time.)

24          MR. SMITH:  Your Honor, I just want to make

25 the record clear.

Bobby Sams - Redirect Examination

1           I believe that the witness said one, and I
2 believe that Mr. Simons, in his answer, offered six.
3           I would ask that that be stricken.  That was
4 not the testimony of the witness.  I believe that was
5 the testimony of the lawyer.
6           THE COURT:  I will direct the jury to
7 disregard counsel's last comment.
8           Of course, attorneys don't testify in cases,
9 witnesses do; and you are so instructed.
10                        - - -
11                REDIRECT EXAMINATION
12 BY MR. SMITH:
13 Q.  Mr. Sams, you said, "They told me to," I believe
14 your answer was about the city council, "to be a
15 write-in candidate."  Who is "they" that you were
16 referring to?
17 A.  It was just a joke, like it was Al Man and
18 Charles told me to go and be a write-in.
19 Q.  And who was this supposed to be a joke on,
20 Mr. Sams?
21 A.  Darnell Hipsher and Laurie House and them because
22 somehow they had messed their paperwork up or
23 something, and it was supposed to cause them a big
24 problem.
25 Q.  So when you were out here rounding up voters for

Bobby Sams - Redirect Examination

1 the slate, you didn't consider yourself a candidate?

2 A.   I sure didn't.  I was a write-in.  I mean, I

3 didn't even file -- I was -- I mean, it was just a

4 write-in, and nobody writes your name in.

5 Q.   All right.  Now, you were also asked questions

6 about who was supporting who.

7      And there was a question about I believe Al Man,

8 and what judge candidate he was going to support in

9 the race.

10 A.   Correct.

11 Q.   And you were asked specifically was he in fact

12 supporting Johnny Poss Gregory?

13 A.   That's correct.

14 Q.   Was it expected that he would?

15 A.   Yeah, he should have, because it was his uncle;

16 but he didn't.  He brought in and helped Wayne with

17 Crawdad.

18 Q.   Now, during this examination also you were asked

19 about the inclusion, I believe, of Carmen Webb Lewis

20 as one of the persons in the 2006 fall election?

21 A.   Yes, sir.

22 Q.   Who asked you to put her on there?

23 A.   I -- Jerome Webb asked me to help her, and I was

24 actually going to help Doug White.

25      But I was -- I was going to my work one day, and

Bobby Sams - Redirect Examination

1 the -- a parts truck had the lane blocked, and I had

2 to go around another way.

3     And when I did, he popped up over the hill with a

4 little woman, and he said I was stalking him and

5 pulled a pistol on me.

6     And the next -- that evening him and his son

7 Kennon came to my house where I live with my mother

8 and raised a big ruckus.

9     And I told him I wouldn't be -- I wouldn't be for

10 him no matter what.

11 Q.  Now, was this after you had promised Wayne and

12 Cletus that you were going to help him that this

13 incident occurred?

14 A.  Yes.

15 Q.  You said it was common during these elections for

16 them to trade them off the night before the election.

17 What did you mean by that comment?

18 A.  Well, one time, Mike Hooker was supposed to be a

19 shoe-in because he was Doug Adams's kin folk.

20     And they traded him off for Clinton Johnson the

21 night before and just -- it happens, I mean, they

22 would trade them off, if -- whoever had the most pull

23 or the most money, I guess.

24 Q.  And that was common?

25 A.  Yes.

Bobby Sams - Redirect Examination

1 Q.   But the means for you all to accomplish your

2 objective was always supported by an election officer

3 employed by the Clay County Board of Elections?

4 A.   Yes.

5 Q.   Now, this fight that broke out at the Beach Creek

6 Apartments, that was over buying a vote.

7 A.   Yes, it was.

8 Q.   And you had, I believe, in your testimony, you

9 wanted to correct something when it regarded who was

10 on the slate in the primary of 2002.

11     And I think if you could explain that, Stanley

12 Bowling was not running against Billy Jones in the

13 primary.  Can you explain that?

14 A.   See, I don't know who bid -- I mean, Stanley was

15 running against him in the primary.

16     But I know in the fall he was running against

17 Billy.  That was Wayne's brother.

18 Q.   And I'll ask you to state who was your magistrate

19 candidate in the primary, May 2002?

20 A.   There was none.

21 Q.   Okay.

22 A.   That was a new -- that was a new precinct brought

23 up.

24 Q.   So even though Stanley Bowling was in the race,

25 you all had picked him up in the primary?

Bobby Sams - Redirect Examination

1  A.   No, sir.

2  Q.   He was still working with the Jennings White

3  faction?

4  A.   He was.

5  Q.   And Bart Morris was with the Jennings White

6  faction?

7  A.   They was.

8  Q.   But when Stanley did come back into the fold in

9  2006, he told you something to the effect that he

10  wanted his numbers to stay up?

11  A.   Yes, he did, I was working for Russell Roberts's

12  girl, Jennifer and her husband.

13      And he stopped there and asked them if they was

14  going to vote for him.  And they said, you know, they

15  would.

16      And he told me, he said, "Haul the votes for me

17  and like you did in 2002."

18      But I never -- I never hauled votes for him in

19  2002.

20      But he meant like that I did, had for the

21  previous people.

22  Q.   Okay.  And was there a concern about the Attorney

23  General being in town?

24  A.   Yes, there was.  They was called several times.

25  Q.   Now, you were asked about the -- the means of

Bobby Sams - Redirect Examination

1  payment, and earlier you testified about the gravel?

2  A.   Yeah.

3  Q.   And then there was a question about people at

4  Beach Creek Apartments don't have gravel?

5  A.   Right, but the other --

6  Q.   Do you wish to explain that further to the jury?

7  A.   The other people that lived out in the Littleton

8  area, they know the ones that I am -- I mean, the ones

9  that I am talking about living in Higgs Holler that

10 needed gravels and that wanted the bridge ties and --

11 Q.   So are those the people that you targeted for

12 Stanley Bowling?

13 A.   Yes, I did.

14 Q.   And for Phillip Mobley?

15 A.   Phillip was already a shoe-in in the fall.

16 Q.   But he was on your slate?

17 A.   Yes.

18 Q.   Now, you were asked about your testimony at the

19 grand jury, I believe, back in July of 2007?  Do you

20 remember those questions?

21 A.   Yes, I do.

22 Q.   Did you see a fellow by the name of Chris Duff

23 there?

24 A.   I did.

25 Q.   Did he make any gestures towards you while you

Bobby Sams - Redirect Examination

1  were there or say anything to you?

2  A.   He just stuck his head in a couple times in the

3  doorway and let me know that he was there.

4       He never really said anything, he was just --

5  just kept walking by sticking his head in the door and

6  stuff, I don't know.

7  Q.   Was that in an attempt to intimidate someone?

8  A.   I guess it was to me, I guess, I don't know,

9  because he is Bart's nephew -- stepson.

10 Q.   You were also asked about your -- your sentence

11 and this issue that got you arrested back in the

12 election of 2006.

13 A.   Yes, sir.

14 Q.   You were on home -- I believe you called it home

15 arrest.

16 A.   Home incarceration.

17 Q.   Or home incarceration.  And is that -- was that

18 ordered by Judge Maricle?

19 A.   It was.

20 Q.   Did that cost you money?

21 A.   It did.

22 Q.   How much does that cost?

23 A.   $330 a month.

24 Q.   And who does Cletus Maricle use for that service

25 down there in Clay County?

Bobby Sams - Recross Examination

1  A.   Josephine Davidson.

2  Q.   And do you know her?

3  A.   Yes, I do.

4  Q.   She got any ties to Cletus Maricle going back

5  several years?

6  A.   They are big friends, her and him, his -- her

7  husband and Cletus, they fish together all the time

8  and stuff.

9  Q.   So you paid that for about six months?

10 A.   I did, and twice -- $40 twice for a drug test.

11 Q.   Is that a pretty popular thing down there in Clay

12 County, to put people on house arrest?

13 A.   Yes, sir.

14 Q.   Even before they are convicted?

15 A.   Yes, sir.

16          MR. SMITH:  That's all.

17          THE COURT:  Thank you.

18          (Mr. Hoskins conferring with his client at

19 this time.)

20          THE COURT:  Mr. Hoskins.

21                    - - -

22               RECROSS EXAMINATION

23 BY MR. HOSKINS:

24 Q.   Mr. Sams, would you have rather have been in jail

25 than been on house arrest?

Bobby Sams - Recross Examination

1  A.   No, sir.

2          MR. HOSKINS:  That's all.

3          THE COURT:  Mr. Westberry?

4                  - - -

5              RECROSS EXAMINATION

6  BY MR. WESTBERRY:

7  Q.   Mr. Sams, you mentioned Clinton Johnson who I

8  think ran for office back in '02, correct?

9  A.   Correct.

10 Q.   And I think you indicated that he ran against a

11 fellow named Mike Hooker; is that right?

12 A.   Yes.

13 Q.   Mike Hooker is a relative of Doug Adams, correct?

14 A.   At least I think so, yeah.  That's what they say.

15 Q.   Now, Clinton Johnson, that was a race for the

16 magistrate back in '02, correct?

17 A.   Right.

18 Q.   And Clinton Johnson won that race, correct?

19 A.   Yes.

20 Q.   Now, Clinton Johnson was a supporter of Jennings

21 White; is that correct?

22 A.   That's correct.

23 Q.   And you now understand that Clinton Johnson

24 served a sentence for vote buying for Jennings White,

25 correct?

Bobby Sams - Recross Examination

1  A.   He served a jail sentence, yes.

2            MR. WESTBERRY:   Thank you.

3            THE COURT:  Mr. White?

4             MR. WHITE:  Your Honor, just --

5                       - - -

6                 RECROSS EXAMINATION

7  BY MR. WHITE:

8  Q.   Mr. Sams, I am Scott White, again, for

9  Mr. Jones.

10      You testified on recross -- I'm sorry, on

11 redirect, questions to Mr. Smith, that you were

12 advised to tell folks in the 2006 primary that they

13 would be given gravel and -- or did you say railroad

14 ties?

15 A.   No, bridge tile, bridge tiles.

16 Q.   I'm sorry, bridge ties?

17 A.   Tiles.

18 Q.   Tiles, I'm sorry.

19 A.   Yes.

20 Q.   And we were a long way away, I apologize.  Did --

21 what about -- was it just bridge tiles or what about

22 gravel?

23 A.   And gravel, yes.

24 Q.   Can you tell us anyone else that you made that

25 promise to?

Bobby Sams – Recross Examination

1  A.   Yes, I can, Shelby Fulks and Ronnie Owens.

2  Q.   Do they still live up there?

3  A.   Shelby does, I don't know about Ronnie.

4  Q.   Did they ever get their gravel?

5  A.   They didn't.  They come back on me.

6  Q.   Did you get them some gravel?

7  A.   I did not.

8        MR. WHITE:  That's all I have, Your Honor,

9  thank you.

10        THE COURT:  Thank you.

11        MR. ABELL:  Judge, I don't have anything

12  further of this witness, thank you.

13        THE COURT:  All right, thank you.

14        Mr. Baldani, any other questions?

15        MR. BALDANI:  We don't have any other

16  questions, Judge.

17        THE COURT:  Mr. Gilbert, Miss Hughes,

18  Mr. Simons?

19        MR. SIMONS:  I am going to ask from here.

20                    – – –

21                RECROSS EXAMINATION

22  BY MR. SIMONS:

23  Q.   Can you see me, Mr. Sams?

24  A.   Yes, sir.

25  Q.   All right.  Now, what you told the jury, as I

Bobby Sams - Recross Examination

1  understand it, is that in 2002 you worked as hard as

2  you could to get votes, buy votes for the candidates

3  that Stanley Bowling was not for; is that correct?

4  A.   That's correct.

5  Q.   And in that same election, you got in a

6  altercation with one of his best friends, Bart Morris,

7  in the parking lot --

8  A.   I did.

9  Q.   -- is that right?

10 A.   Yes.

11 Q.   And Stanley Bowling ran against Wayne Jones's

12 brother in the fall of that year, correct?

13 A.   That is correct.

14 Q.   And you are telling the jury that after all that,

15 Stanley Bowling came to you in '06 and asked for your

16 help?

17 A.   Yes, sir.  I want to tell you that Wayne Jones

18 and Stanley Bowling became best friends after that,

19 and then I became friends with him through Wayne.

20         MR. SIMONS:  That's all.

21         THE COURT:  Anything else of the witness?

22         MR. SMITH:  No, Your Honor, thank you.

23         THE COURT:  All right, thank you, sir, you

24 may step down.  The witness will be excused.

25         Ladies and gentlemen, we will take our