```
 1            MR. SMITH:  I think it would be a good time

 2  for a break, Your Honor --

 3            THE COURT:  All right.

 4            MR. SMITH:  -- if the court please.

 5            THE COURT:  Okay, we took a long break this

 6  morning, so we will take a little bit shorter break,

 7  about a fifteen-minutes recess, ladies and gentlemen.

 8            Please go ahead, be ready to come back in

 9  fifteen minutes.

10            And remember the admonitions given to you

11  previously.  The jury will be excused for fifteen

12  minutes.

13            THE MARSHAL:  Please rise for the jury.

14            (Jury excused from the courtroom for

15  afternoon recess.)

16            (The following proceedings were had in open

17  court out of the presence and hearing of the jury.)

18            THE COURT:  Anything to take up, counsel?  We

19  will be in recess for fifteen minutes.

20            (Thereupon, a recess was taken from 2:30 to

21  2:45 p.m.)

22            (After recess.)

23            (The jury resumed their places in the jury

24  box, and the following proceedings were had in open

25  court.)
```

1          THE COURT:  Thank you.  The record will

2   reflect that all members of the jury are present,

3   parties and counsel are also present.  The witness, of

4   course, is still under oath.

5          Mr. Smith, you may continue with this

6   witness.

7          MR. SMITH:  Thank you.

8   BY MR. SMITH:

9   Q.  Mr. Maricle, I remember earlier we were talking

10  about the Stevie Collins family.

11      I believe I saw you just at the break actually

12  talking to Stevie Collins, Jr.; was that -- is that

13  true?

14  A.  Yes, you did, he spoke to me.

15  Q.  He is here in the courtroom I guess observing

16  this proceeding today; is that a fact?

17  A.  I think he has been here several days, Mr. Smith.

18  Q.  Okay, and as we were about to take a break there,

19  I believe you indicated that, as I recall, you talked

20  about some of your corrections, I think, that you

21  wanted to make to this record --

22  A.  I did.

23  Q.  -- and I believe you went through several places

24  of the transcripts, and you pointed out things that

25  you wanted to explain.  Do you recall that?

1  A.   Well, I don't know what to explain, but there

2  were several things that certainly were incomplete or

3  incorrect.

4  Q.   And let's go, if we could, to A1A.

5  A.   Now, which -- if you don't mind, Mr. Smith --

6  Q.   We will --

7  A.   -- tell me the date because I have a date rather

8  than an exhibit.

9  Q.   All right.  It's March 27th, first time you were

10 recorded I believe by the Whites.  Do you recall that

11 day?

12      You testified, I believe, earlier about -- about

13 that particular transcript, I believe, on page --

14 well, I am going to direct you to page 6.

15      And I believe you would agree with me, sir, that

16 the context of the conversation between you and Kennon

17 White, although interrupted briefly from different

18 diversions along in that conversation, he starts out

19 the conversation concerned about Stanley Bowling.

20 Would you -- would you agree with me?

21 A.   Now, you are looking at page 6?

22 Q.   Well, I am leading up to that, but I am actually

23 trying to get the context here if you could -- if you

24 would agree with me that this was on page 1, we'll

25 direct you there first.

1  A.  That was not the start of the conversation.

2  Q.  I understand that the clip starts there, but do

3  you agree --

4  A.  The clip starts there, but we had already spoken,

5  talked for an hour and nine minutes.

6  Q.  Sir, let me try to get you in the context, if you

7  can agree with me.

8      If not, that's okay, you can disagree with me,

9  okay?

10 A.  Yes, sir.

11 Q.  I would like for you to look there on page 1 as

12 the clip begins.

13     And I believe it says, "I hope they ain't got

14 Stanley on this election.  I am afraid they will get

15 on me."

16     Do you recall that in the tape that was dated

17 March the 27th, 2007?

18     That would have been attributed to Kennon White.

19 Do you agree that Kennon made that statement to you,

20 sir?

21 A.  Yes, sir, I'll agree that that part is correct,

22 sir.

23 Q.  And I believe that the transcript reads that,

24 "His big problem," you say, "was a conspiracy."

25 A.  I do not say that, and I would like --

1  Q.   That's --

2  A.   Just -- just a second, please.  If we are going

3  to go over this, I would like for the jury to hear it,

4  let them make a determination of what's said and not

5  said.  Is that unfair?

6  Q.   Well, we are not here to debate, sir, we are here

7  to answer questions.

8       And I believe your testimony was based on the

9  transcript.

10      And I am trying to ask you on an equal basis

11  about the transcript.

12      If you don't like that, I am sure your attorneys

13  will allow you to put on more evidence if you choose

14  to, okay?

15      But for my questions at this point, and I'll ask

16  the judge to help us along the way, I need to be able

17  to ask you questions about a transcript in which you

18  have given comments here already for this court and

19  this jury.

20  A.   Okay, but the transcript --

21          MR. SMITH:  Your Honor, do I need to ask for

22  further permission from the court or -- but at this

23  point, I would ask the court to direct the witness to

24  answer the question.

25          THE WITNESS:  I'll answer the question.

 1          THE COURT:  You will be directed to answer

 2 his question.

 3          THE WITNESS:  Oh.

 4          THE COURT:  If you need to explain --

 5          THE WITNESS:  Okay.

 6          THE COURT:  If you need to explain, you may.

 7          THE WITNESS:  Okay.

 8          THE COURT:  But you need to answer his

 9 questions first.

10          THE WITNESS:  All right.  All right, what's

11 the question?

12          Repeat the question again, and I will answer

13 you.

14 BY MR. SMITH:

15 Q.  Well, we are looking at page 1, Mr. Maricle.

16 A.  All right, sir.

17 Q.  And it says here, "The only thing here that

18 bothers me, I hope they ain't got Stanley on this

19 election.  I am afraid they will get it -- they will

20 get on me."  Do you recall that part of the

21 transcript?

22 A.  I recall that part, the first three lines there,

23 I don't have any disagreement with those.

24 Q.  Page 6 where I believe that you had testified

25 from, sir, there is further conversation at the top of

1  the page, it says, "It would be a shame to get beat to

2  the punch," Kennon White says.

3      And you say, "Huh?"

4      And he said, "It would be a shame to get beat to

5  the punch, though, wouldn't it?"

6      Now, he is talking about getting beat to the

7  punch about who is going to go cooperate with the

8  government; isn't that a fact, sir?

9  A.   I would assume that is correct, yes, sir.

10 Q.   And in fact, he says, "It would be a shame to get

11 beat to the punch, wouldn't it?  You don't feel like

12 that's going to happen though, do you really?"

13     And your answer is, "I don't think we will with

14 the election.  I may be dead wrong.  I just don't

15 think the election's going to be -- I just don't think

16 that's where they will go."

17     He says, "You don't think Stanley would go over

18 there and say something about me?"

19     And he -- your reply is, "Well, I don't know

20 about that.  I'll try to find out if they have been

21 talking to him or not."

22 A.   That is what you all have it translated.  The

23 word "I'll" is actually "I'd."

24 Q.   Okay, sir.

25 A.   Which makes a difference in the context.

1  Q.   So your testimony, if my understanding is, is

2  that there shouldn't be an apostrophe LL there, it

3  should be an apostrophe D.

4  A.   I apostrophe D.

5  Q.   Okay, and that is your testimony?

6  A.   That is what I think.

7  Q.   That is your testimony; is that correct?

8  A.   That's what I think, yes, sir.

9  Q.   And then on page 8 there, talking about Kennon

10 White's appeal on his unemployment claim, wouldn't you

11 agree?

12 A.   Page 8?  Yes, sir.

13 Q.   And on top of page -- or at the bottom of page 8,

14 it says -- you say, "Well, you have got an appeal past

15 that."

16      And Kennon says, "That's right."

17      "Yeah, that's right, you have got an appeal past

18 that."

19      And you say, "Yeah, you have got a -- no, you

20 have got an appeal to Circuit Court."

21 A.   That's correct.

22 Q.   And you don't disagree that's what you said, is

23 that --

24 A.   Oh, I agree that's what I said.

25 Q.   You agree that's what you said.  And then on top

1  of page 9, it says -- Wanda says, "Where do you get

2  them?  I mean, where places, file it at Frankfort or

3  do you file it in hometown or file and -- or you

4  file," and you say, "I think filed here, I'll take

5  care of it."

6  A.   "I'll take care of it" is not on that tape.  It

7  says, "I think they are filed here."  You can listen,

8  it is not there.

9  Q.   So let me just make sure I understand what you

10 say the tape should say, or if we listen to it again

11 it should say, "I think it will file here?"

12 A.   "I think they are filed here," is what I think it

13 says.  It's what I know it says.

14 Q.   Now, Mr. Maricle, you would agree with me that

15 talking to Kennon White under this -- this first

16 meeting, you discussed it with them, a federal

17 investigation; isn't that true?

18 A.   I think that's what he is referring to, yes, sir.

19 Q.   And you would agree with me, sir, that that would

20 be improper for a judge to be talking to someone about

21 a federal investigation about what's going on; isn't

22 that true?

23 A.   No, sir, I would not agree with you on that.

24 Q.   And isn't it also true, sir --

25 A.   Let me explain my -- let me explain my answer,

1  please.

2  Q.   Well, I'll ask the judge to intervene again.  I

3  need you to answer my question.

4  A.   Well, I answered.  I would like to explain it.

5          THE COURT:  He said he didn't think it was

6  improper.  He may explain why.

7          THE WITNESS:  The reason is it's not improper

8  in Kentucky.

9          We recognize the principal that if it's a

10  member of your family, you can be qualified, you can

11  talk to them.  However, it is not privileged.

12          Anything they tell you, they can call you to

13  testify against, that is the situation.

14  BY MR. SMITH:

15  Q.   So your opinion, sir, is that talking with a

16  potential subject of a federal investigation about

17  whether or not he should cooperate is okay as a

18  circuit judge, sitting circuit judge?

19  A.   If he is relation to me, as he was, yes, sir, it

20  is.

21  Q.   And it says here in canon number one, "You should

22  avoid the impropriety and appearance of impropriety."

23      Is it your testimony, sir, that you conducting

24  this conversation with Kennon White would not give a

25  reasonable person a reason to question your

1  impropriety as a circuit judge?

2  A.   Since he was talking to me in my home, it wasn't

3  in a public place, I would not think that would be,

4  no, sir.

5  Q.   Well, you go on in that conversation to talk to

6  him about a pending workers unemployment case that

7  would be appealed into your Circuit Court; isn't that

8  a fact?

9  A.   Yes, I do.

10 Q.   And would you agree with me that the canon number

11 one has a commentary that says, "A judge shall not

12 lend the prestige of the judicial office to advance

13 the private interest of the judge or others, nor shall

14 a judge convey or permit others to convey the

15 impression that they are in a special position to

16 influence the judge."

17     You would agree with me that that's part of the

18 commentary to canon one of the Supreme Court of

19 Kentucky's Judicial Canon of Ethics?

20 A.   Yes, sir, I would agree with you on that.  I

21 don't think this is improper.

22 Q.   Let's move on to A2A.

23 A.   That is what date, Mr. Smith?

24 Q.   March 31st.

25 A.   Oh, March 31st -- I don't have March 31st, so I

1  will have to look here.

2      I don't believe I am on March 31st, but I'll look

3  here and see.

4  Q.  We will put it up there for you.

5  A.  Okay.

6  Q.  Now, during the course of your relationship with

7  Mr. Stivers and Mr. Jones, sir, isn't it a fact that

8  you all discussed frequently the ongoing business of

9  political activity in Clay County?

10 A.  It was sometimes discussed, yes, sir.

11 Q.  And in fact your friends had the impression that

12 you had the ability to influence who got appointed

13 election officers; isn't that true?

14 A.  They got that impression, they got the wrong

15 impression, because I didn't.

16 Q.  But you would agree with me, sir, they had that

17 impression that you --

18 A.  I don't know --

19 Q.  You had the ability to influence who was going to

20 be the election officer in Clay County; isn't that a

21 fact?

22 A.  I don't know what their impression was,

23 Mr. Smith.

24 Q.  Okay, let's look then at page 1.  Can you follow

25 me there down to about the middle of the page?

1 A.   All right, I think I am on there, okay.

2 Q.   Wanda comes in and says, first of all, line 2,

3 "Oh, I am madder than fire over that."

4     Stivers says, "My buddy, I want to tell you what

5 happened."

6     Wanda says, "No, they put David there, too."

7     Kennon says, "They put David and Darnell."

8     Wanda says, "Oh, God, I -- it made me so mad."

9     Kennon said, "That's where they got me good the

10 last time."

11     "I think it is," Wanda says, "I tried to tell you

12 that."

13     Kennon says, "You can see it's just like the

14 writing on the wall."

15     Stivers says, "I am going to tell you who was the

16 daddy of that.  I am going to -- I am asking you, you

17 and Kennon."

18     And Wanda says, "Bart"?

19     Stivers says, "No, Cletus."

20 A.   That's what it says, but I wasn't present there;

21 but that is what it says.

22 Q.   And you would agree with me that your close

23 friend, Al Stivers, had the impression that you had

24 the influence on the selection of the election

25 officers as it pertained to Wanda White?

1  A.   No, sir, I would not agree with you on that.

2  Sounds to me like he is trying to put something off on

3  me.

4  Q.   Well, let me just pin down a couple of other

5  things that I think you would agree with me on, sir.

6       This Clay County Board of Elections process in

7  lobbying election officers, that would be considered

8  political activity, would it not, sir?

9  A.   The appointment of election officers?

10 Q.   Yes, sir.

11 A.   I think that would be a legal activity.  I don't

12 take --

13 Q.   Well, political activity, isn't that a fact,

14 sir?

15 A.   I don't agree that the appointment was political,

16 no, sir.

17 Q.   So the description that we have heard from

18 numerous witnesses in this case would be inaccurate if

19 the Republican party and the Democratic party each are

20 involved in the selection of who is to serve as

21 election officer in each of the elections in Kentucky,

22 that would be inaccurate; is that your testimony?

23 A.   That is established by statute.  That's the way

24 it is that makes it legal.

25      I guess in a sense you could say it had a

1  political nature to it, yes, sir; but it's legal stuff

2  that has to be done.

3  Q.   So what is it, Mr. Maricle?  Is it political?

4  You would agree with me?

5  A.   It is legal, but it certainly has political

6  implications, I would agree with you on that.

7  Q.   And it's obvious from this conversation that your

8  close friend, William Al Man Stivers, had the

9  impression that you were influencing the appointment

10 of election officers in this election; isn't that a

11 fact?

12 A.   No, sir, that is not a fact.

13 Q.   But you would agree with me, would you not,

14 Mr. Maricle, that under canon number five -- you are

15 bound by these canons, correct?

16 A.   Yes, sir.

17 Q.   As a judge?

18 A.   Yes, sir.

19 Q.   And you know as a judge under canon number five,

20 "A judge or candidate for election as judge shall not

21 act as a leader in any political organization."

22      And that's defined further in the commentary,

23 quote, "Shall not engage in any other political

24 activity except on behalf of measures to improve the

25 law, the legal system or the administration of justice

1  provided by canons 2B and 2C."  Isn't that what the

2  canons say, sir?

3  A.   They say that, but that is not the complete

4  story, Mr. Smith.

5       A judge is considered to be a candidate for

6  reelection at all times while he is in office, so he

7  can attend political events.

8       You cannot hold an office in a political

9  organization or anything of that nature, but you are

10 authorized to attend political events.

11 Q.   Let's move on to A3A.

12 A.   Okay, now, what date is that, Mr. Smith?

13 Q.   April the 6th, 2007.

14 A.   Okay, I don't think I have that one either.  I --

15 Q.   It's on the monitor in front of you, sir.

16 A.   Okay, all right, sir.

17 Q.   And I would like to ask you again, Mr. Maricle,

18 as we have heard your testimony in this case, I think

19 you -- you would agree with me that you are definitely

20 against anybody fixing juries; isn't that true?

21 A.   Yes, sir, I am.

22 Q.   And you have never promised Wanda White any help

23 with -- with Cork in any way; isn't that your

24 testimony?

25 A.   That is my testimony.

1  Q.   And as we look at this transcript, sir, I believe

2  we can look there on page 1.

3       And I believe it is entered there about the

4  middle of the page, let's see, Jones's question for

5  White.

6       And White says, "You know, about three years."

7       And Stivers said, "Did you tell what it was?

8  Anthony never got them papers is what it was, and she

9  wanted me to ask."

10      Wanda said, "What did he want?"

11      Stivers says, "The order, the transport order,

12  on -- on" --

13      Wanda says, "He didn't know anything of that, did

14  he?"

15      "No, I asked Cletus."

16      "And what did he say?"  Wanda asked.

17      Stivers said, "He said, 'Hell,' he said, 'I can't

18  get Anthony to do the transport order on him.'"  Do

19  you recall that conversation, sir?

20  A.   No, I wasn't present.  I don't believe if I

21  was --

22  Q.   Do you recall hearing it here in court?  You have

23  been through all of this court proceeding, and you

24  have listened to all the testimony or heard all the

25  tapes that have been played in front of the jury, have

1  you not?

2  A.   I have, I have heard that; and I have read that

3  here.

4       I don't think I was present when that was made,

5  was I?

6  Q.   I understand that, sir.

7  A.   Okay, I wasn't present.

8  Q.   Do you recall hearing that, sir?

9  A.   Oh, yes, sir.  Yes, sir.

10 Q.   So this was -- it would be fair to say, again,

11 that it was the impression of your close friend

12 Stivers, and he related this on to Miss Wanda that the

13 only thing that was holding up this case on Cork was

14 the papers.

15      Isn't that what he was relating to her at this

16 point, you would agree?

17 A.   Let me explain that.  A transport order is what

18 is prepared for you to sign, for the judge to sign to

19 bring someone from the penitentiary or from another

20 penal institution to court.

21      It is required that you sign that before they

22 will transport them from wherever they are to court.

23      And on this, there had been no transport order

24 that had been prepared.

25      And that's why it was, as I said a while ago, it

1 was passed for a couple times because Anthony didn't

2 get a transport order.  The action taken would have

3 been the same.

4 Q.  Let me ask you this, Mr. Maricle.  You would

5 agree with me, would you not, sir, that Corky Price

6 had already been sentenced and sent to the

7 penitentiary, isn't that true, at the time this

8 recording was made?

9 A.  Let's see, I believe so, yes, sir.

10 Q.  And there would have been no reason for you to

11 have transported him back to Clay County unless you

12 were going to adjust his sentence downward in the

13 course of a reduction of sentence; isn't that a fact?

14 A.  No, that is not correct.

15 Q.  So would you explain to the court and the jury

16 why you were directing that Corky Price's attorney

17 prepare a transport order?

18 A.  He would have to file a motion and then prepare a

19 transport order.

20     If there was a pending motion filed, he would

21 have to prepare the transport order.

22     I don't know whether one was filed or not.  We

23 would have to check the record on that.

24 Q.  So your friend, Mr. Stivers, was -- was

25 apparently privy to what was going on in your court

1  system; isn't that fair?

2  A.   That would be public record.  I am sure that he

3  knew that, yes, sir.

4  Q.   So you mean public record -- Mr. Stivers did

5  spend a lot of time in your office, didn't he?

6  A.   No, sir, he didn't.

7  Q.   Was he ever in your office, sir?

8  A.   A couple times, yes, sir, but he did not spend a

9  lot of time in my office.

10 Q.   So you don't know how he got this information.

11 You didn't tell him about this?

12 A.   Well, I am not saying that.  If he asked if he

13 was on the docket, I would have said no, he hadn't

14 been transported.

15      I am not going to say did or didn't, but I

16 certainly would have said that; but there would be

17 nothing improper about that.

18 Q.   Let's move on then to page 12.  I'm sorry, page

19 13.

20      You were also close friends with Mr. Jones, were

21 you not, Mr. Maricle?

22 A.   Yes, I was.

23 Q.   And he also came to your office on occasion as I

24 understand it; isn't that correct?

25 A.   Some occasions, yes, sir.

1  Q.   In fact it was related on this conversation that

2  he and Al Man were in your office at one time; isn't

3  that a fact?

4  A.   As to this particular situation you are looking

5  at here, yes, apparently the Phelps boys were, too.

6  Q.   And it says -- I believe Jones makes the comment,

7  says, "Yeah" -- I think there was some question

8  whether they liked him or not.

9       And he says, "Yeah, they liked him, them

10 bastards.  Yeah, they -- whenever they find -- they

11 found me and Al Man went back there and helped them

12 pick a jury and brought that shotgun and sat it down

13 in the corner of Cletus's office.  I said, 'If we ever

14 get that shotgun, we'll flush it down the commode, you

15 know, just acting foolish.'"

16 A.   Yeah, I don't remember any shotgun being in my

17 office.

18      It says, "Brought that shotgun."  I checked back

19 on that, that might have been the Phelps boys.

20      Otherwise, you wouldn't have had a shotgun in my

21 office.

22      They might have had one if it was evidence in a

23 trial.

24      As far as selection of a jury, that's done in

25 state court just like it is in Federal Court.

1      And anybody can go -- each one's given a separate
2  room, and they can have whoever they want to in there
3  to consult them.
4      So they did not pick a jury in my office, if
5  that's the question.
6  Q.   Were they in your office, Mr. Maricle?
7  A.   They may have been in my office.  Phelps boys may
8  have been in my office.  I mean, my office has an open
9  door.
10 Q.   And you would not agree that they were there to
11 pick a jury?
12 A.   I really don't know what they were there for.
13 They may well have been.
14 Q.   And --
15 A.   But I mean, they can help select people in
16 selection of a jury just like I am sure everybody here
17 had called people to find out about jurors going to
18 try this case.
19 Q.   So you found there was nothing wrong with this
20 comment your two close friends to Miss White that they
21 had been involved in picking a jury in your -- and had
22 in fact contemplated and apparently or said something
23 to the effect they were going to get rid of some
24 evidence including a shotgun.
25      That did not appear to you to be something out of

1 order at all in your office?

2 A.   Wait just a minute, you have got the wrong

3 interpretation of that.

4      It says, "Brought that shotgun and sit it down in

5 the corner there, unintelligible, Cletus's office, I

6 said, 'If we ever get that shotgun, we'll flush it

7 down the commode.'"

8      That obviously has to be joking.  You can't flush

9 a shotgun down the commode.

10 Q.   Right.

11 A.   So that obviously was not something that was

12 going to happen.

13 Q.   But picking a jury you say is something that

14 happens in your courtroom.

15      And Mr. Jones and Mr. Stivers, you would agree,

16 were involved in picking juries in your courtroom; is

17 that a fact?

18 A.   Not -- in the courtroom?

19 Q.   Juries that are in your court, sir, were -- if

20 I --

21 A.   Every --

22 Q.   -- understand your testimony, it would not have

23 been unusual for Mr. Stivers and Mr. Jones to be

24 involved in picking juries in your courtroom; isn't

25 that true?

1  A.  I would not say that it was usual but that they

2  might be there along with other people from time to

3  time depending on the case.

4      I mean, in any case, federal or state, they pick

5  a jury.  That's how we got these people.

6  Q.  So in the course of your conversations with Wanda

7  White, if you gave her the impression that you were

8  going to do something for -- for Corky, that's not

9  true?

10 A.  I did not make any specific statement that I

11 would do anything for her.

12      I handled it the same way I handled anybody

13 else.

14      If somebody comes and asks something, you try to

15 say something to get away from it and not make any

16 commitment, yes or no.

17 Q.  So you were trying to give her the impression

18 that you were helping her but you weren't; is that

19 your testimony?

20 A.  You just try to get away from them when people

21 ask you a question.

22      You don't want to make them mad, you don't want

23 to commit yourself either for or against them.

24      And that is ordinarily the way I talk, the way I

25 talk to everybody.

1  Q.   But is it reasonable to believe that she could

2  have operated under the impression that you were

3  actually going to help her brother at some point in

4  time, is that a possibility?

5  A.   She might have thought that.   I don't know what

6  her thoughts were.

7  Q.   It would have been reasonable, based on these

8  conversations that we have heard, for her to have that

9  impression; wouldn't you agree?

10 A.   It would be possible, yes, sir.

11 Q.   And in fact that would be a violation of canon

12 number 5, would it not --

13 A.   No, sir.

14 Q.   -- Mr. Maricle?

15 A.   No, sir.

16 Q.   It says, "A judge shall not intentionally make a

17 statement that a reasonable person would perceive as

18 committing the judge to rule a certain way on a case

19 of controversy or an issue that is likely to come

20 before the court."

21 A.   Well, if --

22 Q.   That would be a violation, would it not --

23 A.   No, sir.

24 Q.   -- Mr. Maricle?

25 A.   No, sir.   If she got the impression, I didn't

1  mean to give her that impression.

2      But if she got it, she got it; I can't help

3  that.

4      Looks to me like she was looking for that

5  impression is what it looks to me like.

6  Q.   Would it be fair to say, Mr. Maricle, that during

7  the time period that you were involved with

8  Mr. Stivers that -- that you went along with him on

9  rides sometimes to -- to alert or to consider checking

10 out what was going on with your daughter?

11 A.   Yes, sir, that would be fair.

12 Q.   And you all think --

13 A.   I appreciated him doing it.

14 Q.   Do you remember the incident at the Shane Rogers

15 residence?  Do you recall that?

16 A.   I most certainly do recall it.

17 Q.   And Mr. Stivers, when he reported to Wanda White

18 that he had you along with him in his Jeep that night

19 that he went up there, you would agree that occurred?

20 A.   That he what now?

21 Q.   That he had you along with him in his Jeep when

22 he went up there to confront Shane Rogers.

23 A.   First of all, it wouldn't have been his Jeep, it

24 would have been my Jeep.  And it wasn't at night, it

25 was in the afternoon.

1  Q.   Okay.

2  A.   And we had called the police, and we got there

3  before the Sheriff's Office got there.

4  Q.   And that was again a situation where your

5  daughter was thought to be present; isn't that right?

6  A.   Oh, she was there, yes, sir.

7  Q.   Right, and I believe that Mr. Stivers --

8  A.   That was the reason to go get her because she was

9  on bond, and I gave her up on her bond.

10      I found out that's where she was, I went and got

11  her and that's why the police got her.

12  Q.   And how did you find out that's where she was,

13  sir?

14  A.   I don't remember how I found out.  I really don't

15  on that.

16  Q.   Do you recall when it was?

17  A.   I think I found out probably the day I went to

18  get her.

19  Q.   Well, I am asking you do you recall what year it

20  was that this happened?

21  A.   No, I really don't, Mr. Smith, I don't recall

22  what year it was.

23  Q.   Do you recall who the police officers were?

24  A.   It may have been Jeff Couch.  I am not 100

25  percent sure, but --

1  Q.   Is he with which department, sir?

2  A.   He has been with the city police some, he has

3  been with the Sheriff's Department.

4      And I believe it was the Sheriff's Department,

5  and I think it was Mr. Couch.

6  Q.   You don't recall which year that occurred?

7  A.   No, I don't.  I do not.

8  Q.   Mr. Stivers related that this individual, Shane

9  Rogers, was caught with 8 or 9 grams of

10 methamphetamine.  Do you recall that statement you

11 made?

12 A.   I recall him making that statement, but I don't

13 recall him being caught with anything because once

14 they got her, I left.

15 Q.   And you left after what, sir?

16 A.   Once the police were there and got her, I left.

17 Q.   And would you agree with your good friend,

18 Mr. Stivers, that Shane Rogers, while having 8 or 9

19 grams of meth on him, did not serve any time?

20 A.   I don't know what would have happened to

21 Mr. Rogers because I would not have any contact with

22 the case if he were indicted.

23     I don't know what happened to it, whether they

24 did or not.

25     I don't even know that they got that meth, but I

1  don't know how much time he served, if any, or if he

2  was indicted.

3  Q.   Let's move on to A5A.

4  A.   Okay, what's the date, please, sir?

5  Q.   Ask you to look at the monitor, sir, it's April

6  the 10th.

7  A.   There is no tape for April the 10th.  That is

8  incorrect, Mr. Smith.

9  Q.   I am referring to the transcript.

10 A.   Yeah, and I am telling you --

11 Q.   I am not referring to the audio recording, I am

12 referring to the transcript.

13      Do you see the transcript dated April the 10th,

14 Mr. Maricle?

15 A.   I see a transcript dated April the 10th, but

16 there was no tape of April the 10th to be transcribed.

17 Q.   Okay.  Well, I am asking you to look at one

18 that's referenced April the 10th.  Do you see that?

19 A.   I see that, yes, sir.

20 Q.   Okay.  And, again, I am just asking if you see

21 that -- okay, you do.  I am going to ask, if we could,

22 to --

23 A.   The tape was undated, the recording was.

24 Q.   Okay, that wasn't my question, but I appreciate

25 your clarification.

1  A.   I just wanted to let you know.

2  Q.   Because we again have talked previously about

3  your -- your friends, Mr. Stivers and Mr. Jones.

4       I believe that you indicated that there was,

5  again, that relationship that was ongoing during the

6  time period of these recordings you still remained

7  friends with them during that time period; isn't that

8  fair?

9  A.   With Mr. Jones and Mr. Stivers?

10 Q.   Yeah.

11 A.   Yes, sir.

12 Q.   And in fact I think on this date you show up at

13 some point in the conversation visiting at the

14 Stiverses.  Do you recall that?

15 A.   Not on April the 10th, I didn't.  But as to the

16 date this is the transcription from, I did.

17 Q.   Let's look then at page 18.  Again, this is a

18 conversation with Wanda and your friend, Mr. Stivers.

19      And I believe Mr. Jones was present at that point

20 sometime here.

21      But at this point it's between Mr. Stivers and

22 you and Miss Wanda White.

23      And again, sir, it says that, "Well, who all went

24 to jail today?"  Do you see that?  "You had 32,"

25 Stivers says.

1  A.   Yes, I see that.

2  Q.   It says, "They don't all show up."

3  A.   That's correct.

4  Q.   "Out of the first 13, I recall 13 went to jail."

5  A.   That's correct.

6  Q.   And Wanda White asks, "Well, did Cork show UP for

7  court today?"

8       And you said, "No, they didn't have him here

9  again."

10 A.   That's correct.

11 Q.   She says, "Well, Mom, I have got a message on my

12 answering machine, Mom cussed me all to pieces.  Said

13 Anthony didn't show up.  That's why they didn't bring

14 him."

15      And, again, your answer there says, "No, he was

16 there.  Cork wasn't there."

17      And Wanda says, "Well, I wonder what the deal

18 was."  And Stivers says, "Anthony never got the

19 order."

20 A.   That's correct.

21 Q.   And, again, sir, you would agree with me that

22 that would be reasonable for Miss Wanda White to have

23 the impression that you were going to help do

24 something for her brother, Corky Price, based on this

25 conversation?

1  A.   No, sir, I would think that would be an unfair

2  impression.   The impression should be --

3  Q.   During the conversation --

4  A.   -- should be to have court.

5  Q.   I'm sorry, I didn't --

6  A.   I'm sorry, the impression would be that you were

7  going to have court, that, you know, he should have

8  been there.

9  Q.   So the impression was that you were going to have

10  court there?

11  A.   That was a regular motion hour, I believe, and

12  did -- yeah, I would agree with that.

13  Q.   At this time you would agree, Mr. Maricle, that

14  Cork was in the penitentiary, he had been sentenced,

15  he had pled, he had been sentenced, he was sent off to

16  the penitentiary.

17      And you are saying that Miss Wanda White, it

18  would have been unreasonable for her to have any

19  belief that you were going to help her brother by

20  making this statement that he wasn't there, Cork

21  wasn't there, Anthony never got the order.

22      That to you would not give her reasonable

23  expectation at all that she should expect that

24  something was going to happen to benefit her brother;

25  is that your testimony?

1  A.   There are -- there are post trial -- no, that is

2  not necessarily my testimony.

3       But I do not think it was reasonable to expect

4  that because you have several motions that can be

5  filed post sentencing that would require the defendant

6  to be there and have a hearing, 1142, motion for shock

7  probation, all those things.

8  Q.   I think the conversation continues, Mr. Stivers

9  says, "No, I didn't -- I mean, didn't show up," at the

10 bottom of 18.   "Do you pay anything to go get them?"

11      Wanda says, "Yeah, for real."

12      And laughing, Wayne says, "Me and" -- Stivers

13 says, "Me and Wayne need to make a little extra

14 money."

15 A.   Yes, sir, I see that.   I am glad you are going to

16 ask about that.

17 Q.   And Wanda says, "I have been there, too."   And

18 you said, "You are the next one up.   There is just a

19 real good chance they are going to go."

20      Again, sir, you would agree with me that this is

21 a statement of Mr. Stivers, "Me and Wayne need to make

22 a little extra money"?

23 A.   Yes, sir, that's referring to the fact some

24 people did not show up, and they could become bounty

25 hunters, I think more of a joke.

1       I doubt if they'd ever been a bounty hunter, but

2  that's exactly what that refers to, Mr. Smith, nothing

3  else.

4  Q.   And you didn't need him to clarify that for you

5  at all obviously because you didn't ask for any

6  clarification on that at all, did you?

7  A.   If you read it, you don't need any

8  clarification.  It's obvious what they are talking

9  about.

10       If you didn't show up, there was plenty of money

11  to make, bounty hunters -- Dog the bounty hunter makes

12  lots of money.  Lots of people do.

13  Q.   Do you know any bounty hunters in the State of

14  Kentucky?

15  A.   Do I know any?  No, I don't know any.

16  Q.   Have you ever heard of one in your county?

17  A.   No, and I haven't.

18  Q.   Let's move on to page 26.

19  A.   All right, sir.

20  Q.   Mr. Maricle, at the top of the page, Kennon White

21  says, "Same thing on Tila T, what they are going to

22  do, boys, they are going to come rolling here on the

23  '02 election and bring smoke, you wait and see if they

24  don't."

25       You would agree with me, sir, that Kennon White

1  was referring to the federal investigation about this

2  election fraud scheme in your county; isn't that true?

3  A.   Yes, sir.

4  Q.   And you said -- in answer, you said, "No."  And

5  Kennon said, "Okay."

6       Stivers says, "Oh, hell, we will all be then."

7  And you say, "What makes you think that"?

8       And Kennon says, "Because I think that's the only

9  thing that Vernon can give them."  Do you see that,

10 sir?

11 A.   Yes, sir, I do.

12 Q.   And in fact that's talking about, again, the

13 federal investigation; isn't that true?

14 A.   That's talking about the '02 election and an

15 investigation, yes, sir.

16 Q.   And it's obvious here that when your friend

17 Stivers says, "We will all be in trouble then," you

18 didn't make any correction whatsoever of that

19 statement, did you, sir?

20 A.   No, I didn't really make any answer to that.  I

21 didn't see any reason to.  I hadn't been involved in

22 '02.

23 Q.   But it appears from that conversation that he

24 included you in it; isn't that fair?

25 A.   No, I don't think that's a fair interpretation,

1  but if you think it is, that's fine.

2  Q.   How do you interpret the word "we," sir?

3  A.   Well, I don't -- I did not think he was

4  referencing to me there.

5      But "we" would be interpreted as being who is

6  present.

7      I would have to agree with you on that,

8  Mr. Smith.

9  Q.   Let's move on to page 27.  Take you down to the

10 bottom of 26, "If Jennings White knows a thing, it's a

11 problem.  Don't worry, no matter who you are" --

12 A.   Just a second, we have not got there.

13 Q.   Okay, I'm sorry.

14 A.   They are not up there yet.

15 Q.   Okay, I'm sorry, bottom of page 26, Kennon White

16 says, "If Jennings White knows a thing on you, it's a

17 problem.  Don't worry, no matter who you are, it's

18 told."

19     Mary says, "You got it"?  Wanda said, "Do they

20 sure enough have him in London?"  And you said, "Yep.

21 Yeah."

22     Kennon said, "See, Doug Adams told me that a

23 month ago."

24     And you say, "Yeah, he was in London last week,

25 and the week before that he was in Lexington."  Who

1  were you referring to there, Mr. Maricle?

2  A.   I was referring to Jennings White, and I was

3  saying that to aggravate them.

4       I had no idea where he was, but that was a joke

5  because they cared so little about him, I -- I said

6  that.

7  Q.   You were just joking with them?

8  A.   I was just joking on there, yes, sir, Mr. Smith.

9  Q.   You didn't really care where Jennings White was

10 at that time; is that your testimony?

11 A.   No, not really, I didn't care where he was.

12 Q.   He wasn't any concern of yours at that time?

13 A.   No, sir.

14 Q.   And, again, your friend Stivers says, "He is the

15 SOB that started it all."

16 A.   Is that the same page?

17 Q.   Page 27 there, yeah.

18 A.   Okay, I see where you are at, yes, sir.  Thank

19 you.

20 Q.   And, again, this is a conversation regarding a

21 federal investigation, is it not, sir?

22 A.   I would assume that's what he is referring to.  I

23 think that would be a fair impression.

24 Q.   And you are, again, in the presence of this

25 conversation, you are there, aren't you, sir?

1 A.   It would appear that I probably am still there.

2 I left sometime during this.

3      But looking up at the top of the page, it has

4 Maricle there.

5      So I'm assuming that I probably am still there,

6 but I did leave during the course of the conversation.

7 Q.   Let's look here at page 37 then as we wrap up

8 this quickly.

9      You were also noted to be present there in this

10 portion of the conversation, were you not,

11 Mr. Maricle?

12 A.   That's my -- yeah, I am there, and I say that.

13 So I would have been there at the time of the other

14 one, Mr. Smith.

15 Q.   And I believe, again, we have got Dobber Weaver

16 being mentioned in this conversation following your --

17 your joking with the Whites about the location of

18 Jennings White, where he was in the federal prison

19 system.

20      You also pick up in the conversation about Dobber

21 Weaver; isn't that true?

22 A.   He had lost his vehicle.  The -- with the fire

23 department, I think that's what we were referring to,

24 yes, sir.

25 Q.   And your friend Stivers says, "Dobber said he got

1 five grand."

2      You didn't seem to have any loss of what was

3 going on in that conversation.

4      Did you know what they were talking about there,

5 Mr. Maricle?

6 A.  I knew what they were -- they were saying, but I

7 didn't give any credence to it at all.

8 Q.  You knew that was $5,000 in money that was going

9 to be used to bribe voters, didn't you?

10 A.  I don't think he had ever got $5,000, but that's

11 what they were saying.

12      But I don't think that was really -- really did,

13 quite frankly.

14 Q.  And, again, it would be your -- your testimony,

15 sir, that that would not give a reasonable person a

16 reason to question that you were giving the appearance

17 of impropriety by being in the midst of a conversation

18 where it's talking about a federal investigation,

19 money being paid to buy -- bribe voters, that would

20 not be a situation in which you would believe it would

21 be a reason to question you as being violating the

22 canon of ethics?

23 A.   I really think to say that Dobber got $5,000 is

24 just an off-the-wall statement, and I don't think

25 there was any credence or credibility to it.

1  Q.   Because as a sitting circuit judge, you are a law

2  and order person.

3       You are required to report to the law enforcement

4  people if you know about crimes; isn't that true?

5  A.   I have some question whether you are supposed to

6  or not.

7       I -- I generally think that you should, but I --

8  sometimes maybe a judge shouldn't get too involved in

9  that.  I think you probably should, yes, sir.

10 Q.   But this obviously didn't rise to that level in

11 your judgment?

12 A.   I don't think -- I don't think it happened.  No,

13 sir, it didn't.

14 Q.   Let's move on to A6A.

15 A.   Which date is this now?

16 Q.   I don't have a date.  I will have to refer you to

17 the transcript.

18 A.   Okay.  April 11?  All right.  I don't have that

19 one.

20 Q.   Again, sir, you would agree with me that

21 Mr. Stivers and Mr. Jones would be considered one of

22 your two closest friends during this time period;

23 isn't that true?

24 A.   They were two of my friends, yes, sir.

25 Q.   And we have here a conversation with two of your

1  closest friends are talking about your Circuit Court

2  on page 13, I believe; isn't that true?

3  A.   Well, I don't have page 13 --

4  Q.   Okay.

5  A.   -- before me, I don't believe.

6  Q.   I'm sorry, let's put that on, I apologize.

7  A.   All right.

8  Q.   We have there I believe Mary Betty saying

9  something about jury duty.

10      Kennon says, "Jury duty."  Stivers says, "We'll

11 make a killing, damn it."

12      And Kennon starts laughing, and Wanda says, "I

13 don't never get asked for jury duty."

14      And your friend, Mr. Jones, says, "Well, we'll

15 fix it, if it's Circuit."

16      Is he referring to Circuit Court there,

17 Mr. Maricle?

18 A.   I would assume so, yes, sir.

19 Q.   And Mary says, "It's Circuit."  And Mr. Stivers

20 goes on to say, "We'll make a killing."

21 A.   Yes, sir.

22 Q.   Now, Mr. Maricle, are you telling this court and

23 this jury that Mr. Stivers and Mr. Jones were just

24 telling something not true here?

25 A.   I don't know whether they were or not insofar as

1    I know.

2        They could have been referring to what you get

3    paid per day for jury service.  I don't know what they

4    meant.

5    Q.  So your interpretation is that the jury service

6    payment in your court would be considered a killing in

7    Clay County; is that your testimony?

8    A.  $12.50 a day is what they get, so that's not

9    quite a killing.

10       Everybody jokes about that.  I don't know what

11   they are referring to there.

12   Q.  You don't have any idea?

13   A.  You can interpret it several ways.

14   Q.  Well, what's your interpretation, Mr. Maricle?

15   A.  My interpretation would be referring to $12.50 a

16   day.

17   Q.  Okay.  Page 14, middle of the page, Stivers again

18   says, "Well, hon, we will make a killing on that,

19   really."

20       I believe they are talking about Mary Betty being

21   possibly sitting on one of your juries there in

22   Circuit Court, but you don't agree with that, sir?

23   A.  No, I don't agree with that because as I read

24   this -- let me make sure that everybody knows I wasn't

25   present when these conversations were happening.

1       But as I remember, she was going to be going to

2   banking school for a period of time and wasn't even

3   going to be there.

4   Q.   Well, let me ask you this.   Mr. William Al Man

5   Stivers is not a lawyer, never been a lawyer.   Would

6   you agree with that?

7   A.   Been a lot of lawyers in his family, but he's

8   never been one.

9   Q.   And also I think you would agree with me

10  Mr. Charles Wayne Jones has never been a lawyer?

11  A.   No, sir.   I mean, I agree with you, yes, sir,

12  he's never been.

13  Q.   And so can you explain to this court and this

14  jury what reason they would have and how they could

15  possibly make money on a jury trial in your Circuit

16  Court other than the $12.50 a day as a juror?

17  A.   Well, they wouldn't get $12.50 a day as a juror.

18  The person that would get the $12.50 would be Mary

19  Betty.

20       That's what I think they are joking about.   I

21  don't think they would have taken money and done

22  anything with any jury.

23       But quite frankly, if someone hired them to come

24  and help them with a jury, that would be perfectly

25  legal.

1      We have jury consultants all over the country.
2  There wouldn't be anything wrong with that as long as
3  they don't contact the jury.
4  Q.    Do they do that in your county?  Charles Wayne
5  Jones and William Stivers, do they have a business?
6  A.    No, they don't have a business, no.
7  Q.    Have they carried on such a business, to your
8  knowledge?
9  A.    No, no.
10 Q.    Have they ever hired themselves out, to your
11 knowledge?
12 A.    No, not to my knowledge.
13 Q.    Now, during the course of your conversations with
14 Wanda White, you have admitted that you learned that
15 she was going to be a federal grand jury witness,
16 didn't you?
17 A.    Yes, sir, they told me that.
18 Q.    In fact you admit that during the time period
19 that -- that you met with her you had in fact gave her
20 some suggestions along the way.
21 A.    What do you mean "suggestions"?
22 Q.    Well, you suggested to her that she should do
23 certain things; isn't that fair?
24 A.    You are going to have to be specific.  You ask me
25 if I suggested she do a particular thing, I'll tell

1  you whether or not I did.

2  Q.   You don't recall anything you suggested to her?

3  A.   There is a lot of conversation here where she

4  asked questions about what she can do insofar as take

5  the Fifth Amendment.

6        And I tell her if it is something that would tend

7  to incriminate her that she could.

8        They made the statement everybody is telling them

9  to take the Fifth Amendment.   I have said, "Well, I've

10 not said that."

11 Q.   But you never tried to influence her to take the

12 Fifth Amendment, is that your testimony?

13 A.   My testimony is that on many occasions, and if

14 you will be -- transcript is replete here with do what

15 your lawyer says, do what your lawyer says.

16       They acted like they were dissatisfied with their

17 lawyer.

18       I told them Brent Caldwell was a very intelligent

19 person, he was a good lawyer, that they should listen

20 to what their lawyer says.   That's throughout the

21 conversation.

22 Q.   Page 8, look at this, and you can answer some

23 more questions for me.   I'm sorry --

24 A.   What day are we on now, Mr. Smith, May --

25 Q.   A8A.

1  A.   What's the date, please, sir?  What's the date on

2  it?

3  Q.   Should have a transcript there in front of you.

4  A.   Well, I want to look at my transcript.  I don't

5  want to go by yours.

6      I shouldn't say yours, I am not going to go by

7  Kennon's.  April 30th?  All right, I have April 30th.

8  Q.   And you would agree with me, Mr. Maricle, that as

9  a sitting circuit judge, it would be inappropriate for

10 you to represent a person in any matter in court;

11 isn't that true?

12 A.   As a sitting circuit judge, I can't represent

13 anybody in court.

14 Q.   And you are not to give legal advice to people,

15 either, are you?

16 A.   If they are family you can.

17 Q.   Okay, and where do you get that authority?

18 A.   It's in the canons, it's in the rules.

19 Q.   So you --

20 A.   I have read it, I can't give you the specific

21 place, but I have read it.

22 Q.   But you would agree with me, Mr. Maricle, it

23 would be inappropriate for you to influence somebody

24 in their decision about whether or not to testify in

25 front of a federal grand jury.

1       That would be inappropriate if it were not a

2  family member?

3  A.  As to what to -- repeat it one more time, please,

4  sir.

5  Q.  You would agree with me, Mr. Maricle, it would be

6  inappropriate for you, as a judge, to influence

7  somebody or attempt to influence somebody on whether

8  or not to testify in front of a federal grand jury if

9  they were not a family member, you would agree with

10  that?

11  A.  It would be inappropriate for me to tell them

12  what to do or say to a federal grand jury.

13  Q.  It would be inappropriate for you to attempt to

14  influence them in their decision; isn't that true?

15  A.  Yeah, that would be true.

16  Q.  Okay.  Now, let's look here at page 8, if we

17  could.

18      I'll direct you there to the middle of the page,

19  it says, "Hell, I told him to say nothing, I mean, he

20  said -- I know it, you can't tell him a damn thing.

21  Of course, I don't know everything, but I told him not

22  to say nothing about it.  That's why I covered that

23  with him."

24      You are referring to your son-in-law there, are

25  you not?

1  A.   My son-in-law, yes, sir.

2  Q.   And you don't think there is anything wrong

3  ethically with you giving your son-in-law legal

4  advice?

5  A.   There is nothing wrong with it, Mr. Smith.

6  Q.   But you had also testified, I believe, that he

7  had his own lawyer, Steven Charles; is that right?

8  A.   Mr. Charles, yes.

9  Q.   But in this conversation it appears that you

10 also, you would admit, were giving your son-in-law

11 advice?

12 A.   What page is that now again?

13 Q.   We just read it, page 8.

14 A.   I will be happy to go into that if you want to,

15 but I have got several corrections made to what you

16 have here on it, but I will be happy to go into it

17 with you.

18 Q.   Well, the question is, Mr. Maricle, do you recall

19 this statement, and are you going to agree with me

20 that that's what's said, yes or no?

21 A.   I did not make the statement as it appears on

22 Mr. Kennon White or Miss Wanda White's transcript.

23     They are the ones that certified that, and that

24 statement is wrong.

25 Q.   Well --

1  A.   I would be happy --

2  Q.   -- if you want to supply us, Mr. Maricle, with

3  your version, go ahead, please.

4  A.   All right, Maricle, "That's why I covered it like

5  I did.  Hell, he did nothing, I mean didn't do a damn

6  thing that I know of.  Of course I don't know

7  everything."  That's what it says.

8  Q.   Didn't say anything about, "That's why I covered

9  that with you"?

10 A.   I read that to you.  "That's why I covered that

11 like I did.  Hell, he did nothing.  I mean, didn't do

12 a damn thing all that I know of.  Of course, I don't

13 know everything."

14 Q.   Read on to your version, if you could there,

15 Mr. Maricle.

16 A.   Okay, "What is he going to do?  Is he going

17 tomorrow and talk?"

18      I say, "No, hell no."

19      Kennon says, "Take the Fifth Amendment?"

20      I say, "No, I don't even know.  Ain't going to

21 take the Fifth."

22      I say no, he ain't going to take the Fifth.

23 That's the entire conversation there.

24 Q.   You further say, "You know where you have to go

25 and just have to do -- they are not God."  You

1   disagree you didn't make that statement?

2   A.   Oh, yeah, that's on my -- yes, sir.

3   Q.   You are referring to the FBI and federal

4   investigation, the grand jury at that point, were you

5   not?

6   A.   I think that was the general content of the

7   conversation, yes, sir.

8   Q.   And your testimony is that this is not anytime --

9   any type of intent to influence Wanda White's decision

10  on whether or not she was to testify in front of this

11  grand jury; is that your testimony, sir?

12  A.   There was absolutely no way you could interpret

13  it that way, Mr. Smith.

14          (Mr. Smith conferring with Mr. Parman at this

15  time.)

16  BY MR. SMITH:

17  Q.   Mr. Maricle, you -- do you recall at the time

18  that I believe through your testimony you testified

19  about your properties that you owned over the years.

20  A.   Yes, sir.

21  Q.   And it's -- it's been your testimony, I believe,

22  that you live at Circle Drive?

23  A.   393 Circle Drive, Manchester, Kentucky.

24  Q.   And that was the place which was the subject of

25  the search warrant?

1  A.   Same place, went to the wrong place, but that's

2  where I live.

3  Q.   On March the 19th, 2009; isn't that true?

4  A.   Let me apologize for talking while you were

5  talking and apologize particularly to her.  Yes, sir,

6  that's where I lived.

7             MR. SMITH:  If we could pull up P34.

8             MS. WOOLUMS:  Steve, it's not scanned.

9             MR. SMITH:  Your Honor, if the court would

10 allow, ask to retrieve P34.

11            THE COURT:  Yes, sir.

12            Show Mr. Smith first and make sure it's the

13 right document.

14            MR. SMITH:  Should be a photograph, it's P.

15 This is PR.  I may have misspoken, P as in Paul, 34.

16            THE CLERK:  These are all PR's.

17 BY MR. SMITH:

18 Q.   Can you identify P34?

19 A.   That's where I live.

20 Q.   And Mr. Maricle, during the course of this --

21 this case, you were -- you were required, and I am

22 sure you are familiar with that, being a judge, that

23 when a person is brought into court to have to give

24 the court disclosure of all their assets, and I am

25 sure you disclosed that asset to the court, did you

1  not?

2  A.   I think I did.  I think so.

3  Q.   And you understood that when you were interviewed

4  by the probation office, the federal probation officer

5  that you were required to make full disclosure about

6  your assets?

7  A.   Let me say this, on that particular day, I had

8  been to the doctor the day before.

9      I -- for the past six weeks before that, I was

10  just not in good shape.

11      If I didn't disclose that, I should have.  I

12  think I probably would have disclosed my home.

13  Q.   And you were also asked for purposes of again

14  identifying your financial resources you were to

15  assess the value of your properties as well as the

16  type of properties that you owned.  Do you recall

17  that?

18  A.   I don't recall it, but I am sure I did, if I gave

19  it.

20  Q.   And you grossly underestimated the value of this

21  home, wouldn't you agree, sir?

22  A.   I don't know what I estimated it at.

23  Q.   Well, if I told you that you reported to the

24  federal probation officer in London at the time of

25  your arrest that this residence was valued at $50,000,

1  that would be a gross underestimate of the value of

2  this home, wouldn't you agree?

3  A.   I would never have said $50,000.  That is not to

4  this house.  I will tell you right up front, it's not.

5  Q.   Did you have more than one residence at the time

6  you were arrested and questioned by the federal

7  probation officer?

8  A.   It was the only residence I had.  I owned a

9  couple other houses.

10      And I had one that probably was worth 50,000, but

11  I certainly did not value that house at $50,000.  150

12  would be more like it.

13      If it weren't in Clay County, it might be more

14  than that; but it's in Clay County.

15  Q.   So if the federal probation officer reported

16  that, they were just wrong.

17  A.   If they reported that, that I put that house at

18  $50,000, there was an error somewhere, yes, sir.

19  Q.   It's not your error, though, is what you are

20  saying.

21  A.   I am not saying --

22  Q.   You didn't make the mistake, is that what you are

23  testifying --

24  A.   I am not saying that I did or didn't make a

25  mistake.  I would never put that house at $50,000.

1  Q.    Now, you also --

2  A.    There may have been a misunderstanding, but that

3  doesn't mean anybody was intentionally doing anything

4  wrong.

5  Q.    You were -- you were given -- again, do you

6  recall your responsibilities to tell the Federal Court

7  your assets, were you not?

8  A.    They went through that that day, yes, sir.

9  Q.    And that was your responsibility to be truthful

10 with them; isn't that correct?

11 A.    Yes, sir.

12 Q.    And you would agree with me that if you reported

13 to them $50,000 for that residence, that would grossly

14 underestimate the value of that home; isn't that true?

15 A.    Oh, I would agree with you, Mr. Smith, I would

16 never have said that house is worth $50,000.  I just

17 would not have done that.

18      I -- you know, I was in bad condition at the time

19 because of my loss, but --

20 Q.    Let's move on, Mr. Maricle.  You, again, would

21 further agree with me that you failed to disclose your

22 Florida properties that you owned?

23 A.    I don't own any in Florida.

24 Q.    You are not aware of property in Florida that you

25 own?

1  A.    I own no property in Florida.  I have a rental

2  owned property in Florida that I bought with the

3  intention of making a transfer with Mr. Madden as a

4  result of some joint property we owned there at the

5  parking lot.

6  Q.    So you do own property in Florida?

7  A.    No, I don't.

8  Q.    But --

9  A.    But I have the option once he finds a place he

10 wants to trade it to, I would certainly do that; and

11 that was our intent.

12 Q.    Is that one of those recorded transfers of real

13 estate or unrecorded transfers of real estate?

14 A.    Well, there is no transfer at this point in time.

15 Q.    Is there an agreement, though, an option to

16 record --

17 A.    It's just a gentleman's agreement, just a

18 gentleman's agreement.

19 Q.    So you all have kind of a verbal agreement.

20 A.    Yes, sir.

21 Q.    It's not in writing.

22 A.    Yes, sir.

23 Q.    Explain to us again what that agreement is,

24 Mr. Maricle.

25 A.    All right, let me go back to the property that I

1 purchased in 1976, and then I sold part of it to

2 Scott's Daddy, B.W. Madden.

3      He purchased a half interest in it, and then we

4 divided off two lots, one of which was made to me and

5 Scott.  He purchased a half of that.

6      But then the other lot was strictly in

7 Dr. Madden's name, and that was his lot and that was

8 the parking lot number two that you questioned about

9 earlier.

10      In 2002 or '3, somewhere along there, this

11 property had been vacant and never used except for

12 parking lot and never any money reaped from the

13 parking lot even though the county on several

14 occasions wanted us to, but we didn't.

15      It was owned by Dr. Madden and I.  Dr. Madden is

16 Scott's father.

17      I basically considered Scott as having the

18 property and dealt with him on that.

19      It was going to be his when -- I don't know

20 whether his daddy was dead at that time or he died

21 shortly thereafter, if he wasn't.

22      And I talked with some people about a transfer,

23 tax free transfer.

24      And I was looking for a place on the -- down in

25 Florida to fish.

1      And he bought that, and we were going to have the

2 transfer because of the tax basis that I had in the

3 lot was already gone.

4      It wasn't any basis, it was all income at that

5 point in time.

6 Q.   What's the value of that property, to your

7 knowledge?

8 A.   In Florida?

9 Q.   Yes, sir.

10 A.   Probably right now I could not give you the value

11 as of this day because of the real estate market.

12      I paid over I believe it was one hundred thirty,

13 one hundred thirty-five thousand.

14 Q.   And did you report that to the United States

15 federal probation officer in London, Kentucky?

16 A.   That was not a reportable item.  It was not -- I

17 had nothing but a monthly rental at that point in

18 time, no, sir, I didn't own it.

19 Q.   You were also required to report your expenses to

20 the federal probation officer.  Did you report that as

21 one of your expenses?

22 A.   I don't really know what I put down as expenses.

23 I think they said monthly expenses or something,

24 whatever they said there.

25 Q.   Is your testimony that you did report this to the

1  U.S. probation office as an expense?

2  A.   I honestly don't remember what I reported as my

3  expenses that day.

4     My condition was not such that -- and not because

5  of this, but because of my son that I really wasn't

6  very capable of doing much of anything, Mr. Smith.

7  Q.   And then I believe you also would agree with me

8  that the Jackson County property that Mr. Marcum was

9  holding a deed interest in and you an unrecorded deed

10 interest in was not reported either; isn't that a

11 fact?

12 A.   That was reported I believe.

13 Q.   You reported that you believe?

14 A.   I -- I think so.  Does there not say a property

15 there in Jackson County?

16 Q.   I believe that the record will show that you

17 reported on a rental property on Memorial Drive in

18 Manchester, Kentucky valued at approximately $50,000.

19 A.   All right --

20 Q.   And that's half-interest in an office building

21 for your son.

22     And I believe you reported that there was

23 investment property with another individual valued at

24 25,000, owing approximately 17,000.

25 A.   That would -- that would have been the Jackson

1  County property.  That would have been Gray Hawk, yes,

2  sir.

3  Q.  So that's Gray Hawk.  What about the Yapp

4  property, did you disclose that to the U.S. probation

5  officer?

6  A.  Basically that property is worthless at this

7  point in time.

8  Q.  Has no value.

9  A.  I wouldn't give $500 --

10  Q.  Does the city see it that way, Mr. Maricle?  Do

11  they not tax it?

12  A.  They see it, they tax it, and I pay the taxes.

13  But you could not put anything on the property because

14  of the size of the lot.  And mainly it's a burden,

15  quite frankly.

16  Q.  So you would agree with me that you didn't report

17  that to the probation?

18  A.  I don't know, whatever is on there.

19  Q.  And you also had at that time ownership of a

20  houseboat on Lake Cumberland?

21  A.  Yes, my wife and I owned a houseboat.

22  Q.  And that houseboat wasn't reported to the United

23  States probation officer either, was it?

24  A.  That was my understanding a few days later that

25  it was not on that list.

1      But the houseboat, everybody knows it's there,

2   it's registered with the federal government, U.S.

3   Coast Guard.

4   Q.  But you were required by -- by law to disclose to

5   the United States probation officer your assets at the

6   time that you were arrested.

7      And you failed to disclose the houseboat that

8   could have retailed up to $150,000 at that time; isn't

9   that a fact?

10  A.  I did what I did that day to the best of my

11  ability at that time, Mr. Smith, I'm sorry.

12  Q.  You would agree with me that you did not list

13  that as an asset?

14  A.  I would agree with you that that -- if you call a

15  houseboat an asset.

16     I guess you have to call it that, but it's

17  actually a hole in the water where you put money.  But

18  it was not on there, yes, sir.

19  Q.  Now, I believe as we heard from you earlier in

20  your testimony, Mr. Maricle, that you testified to

21  this court and this jury that really there is

22  absolutely nothing that you have done wrong and

23  nothing that would prevent you from being a judge if

24  you choose to be as of today?

25  A.  Because of this pending right now I can't be.

1 You can't be a judge while you are under indictment.

2 I couldn't today, other than that --

3 Q.    And if you -- if you gave testimony to the effect

4 that you didn't have anything interfering from you

5 being a judge at this point, that wouldn't be

6 accurate, would it?

7        You have been suspended, have you not,

8 Mr. Maricle?

9 A.    That is automatic, yeah, that you are suspended.

10 Other than this, there is no problem.

11 Q.    Well, I have got your suspension right here by

12 the Supreme Court.  Do you need to see it?

13 A.    I agree with that.  I agree.  I don't really

14 understand what you are getting at.

15       But yeah, I was suspended on March 19th or March

16 20th of last year.  That's automatic.

17            MR. SMITH:  Pass the witness.

18            THE COURT:  Go to the counsel for the other

19 defendants, Mr. Westberry?

20            MR. WESTBERRY:  No, thank you.

21            THE COURT:  Mr. White, any questions?

22            MR. ABELL:  No questions.

23            THE COURT:  Let me go to Mr. White first, I

24 didn't get his answer.

25            MR. WHITE:  I'm sorry, Your Honor, no

Russell Cletus Maricle - Cross Examination

1  questions.  I was just looking at my notes, sorry.

2          MR. BALDANI:  I have a couple.

3          THE COURT:  Mr. Baldani, you have a few?

4                        -  -  -

5                    CROSS EXAMINATION

6  BY MR. BALDANI:

7  Q.  Mr. Maricle, Mr. Smith asked you about who was

8  your friends, who was your close friends, etc.

9      Did you ever have any social type of relationship

10 with Freddy Thompson?

11 A.  No, I don't think so.  We went to church with his

12 parents, and as a child he may have been there; but

13 nothing other than that, no, sir.

14 Q.  Okay, and he didn't publicly support Phillip

15 Mobley in '06, did he?

16 A.  Not to my knowledge, no, sir.

17 Q.  And to your knowledge he didn't attend any

18 gatherings after Phillip won, did he?

19 A.  Not to my knowledge.

20 Q.  And as far as you know he had no interest

21 whatsoever who was PVA in '06, did he?

22 A.  Not that I know of.  It's not a job that creates

23 a lot of interest of anybody anyway.

24 Q.  As far as you know, he didn't have any interest

25 of any race in '06, did he?

Russell Cletus Maricle - Redirect Examination

1   A.   His was unopposed.

2         MR. BALDANI:  That's all I have, Your Honor.

3         MR. GILBERT:  No questions, Your Honor.

4         MS. HUGHES:  None, Your Honor.

5         MR. SIMONS:  None, Your Honor, thank you.

6         THE COURT:  Any redirect, Mr. Hoskins?

7         MR. HOSKINS:  Yes, sir.

8                           - - -

9                 REDIRECT EXAMINATION

10  BY MR. HOSKINS:

11  Q.  Mr. Maricle, you were asked some questions about

12  a nonprofit corporation that talked about the

13  Associated Court Extension Services.  Do you remember

14  anything about that?

15  A.  No, I don't.  It's obvious from it that it was

16  something --

17  Q.  Do you --

18  A.  -- by statute or something of that nature because

19  of --

20  Q.  Let me just ask you, do you remember it?

21  A.   No, I don't remember it.

22         MR. HOSKINS:  Your Honor, I would like to

23  show the witness something that may refresh his

24  recollection.

25         THE COURT:  Yes, sir, you may.  I need -- I

Russell Cletus Maricle – Redirect Examination

1 think I am going to need to know what it is that you

2 are going to show him before you show him something.

3 Is it a document or is it an Internet site?

4          MR. HOSKINS:  It's a document, essentially,

5 Judge, it's a Kentucky statute.

6          THE COURT:  Okay, come up, counsel.

7          (Thereupon, a discussion was had at the bench

8 between the Court and counsel and out of the hearing

9 of the jury.)

10          THE COURT:  All right, for the record,

11 Mr. Hoskins wants to show a web site, a statutory

12 statute from the website, KRS 196.

13          This doesn't relate to the document that's

14 being shown.

15          This is a statute, a statutory provision, and

16 that's not a proper basis to refresh recollection as

17 to his association or his membership on a board.

18          So no, I don't think you can use this to

19 refresh memory.

20          MR. HOSKINS:  Your Honor, just briefly, if I

21 could, the reason why I think it would be proper is

22 that it -- that document that Mr. Smith showed listed

23 a crime victim, a defense lawyer, Chief of Police,

24 social worker.

25          And the statute which, as the court may know,

Russell Cletus Maricle – Redirect Examination

1 is effective right around the time that those Articles

2 of Incorporation were prepared involves those very

3 same people.

4          THE COURT:  My ruling is the same.

5          MR. HOSKINS:  Thank you, Judge.

6          (End of bench conference.)

7 BY MR. HOSKINS:

8 Q.   Judge Maricle, just a few other questions.

9 A.   All right.

10 Q.   At one point we were -- you were having a

11 discussion and you answered questions something about

12 in your office, and you mentioned the Phelps boys.

13 Could you just tell us who the Phelps boys are?

14 A.   They were two State Policemen that after they

15 retired became deputy sheriffs along with Mr. Blair,

16 back there, with I believe Gene Holland was the

17 sheriff at that time.

18 Q.   So they were law enforcement officers?

19 A.   Well, some people called them that.  So I would

20 say yes.

21 Q.   Let me ask you a couple of questions about some

22 other things.

23 A.   All right.

24 Q.   Mr. Smith showed you a transcript that said April

25 10th, and you said there wasn't one from that date.

Russell Cletus Maricle – Redirect Examination

1    Would you explain what your point was there?  You

2  were talking about questioning whether the date, it

3  showed April 10th, 2009 on that transcript.

4  A.   That is an incorrect date.

5  Q.   Okay, so you don't deny that there was a

6  recording?

7  A.   Oh, I don't deny.  I would say the date of it was

8  April the 2nd, because it was -- for two reasons,

9  that's the day I had court when I put all the people

10 in.

11    And another thing is there is a reference,

12 although it's not on the transcript we have, in just

13 the body of the tape relative to the NCAA championship

14 which was Florida and Ohio State; and that was on

15 Monday night, April 2nd.

16 Q.   Mr. Maricle, you were asked some questions by

17 Mr. Smith just at the end there about whether or not

18 you listed all your assets when you talked to the

19 United States probation officer.

20 A.   Yes, sir.

21 Q.   And I want to make sure we put that in context.

22 What day were you arrested in this case?

23 A.   March 19th, 2009.

24 Q.   On March 19th, 2009, how long had your son been

25 dead?

Russell Cletus Maricle - Redirect Examination

1  A.   From January 30th to that date, six, seven

2  weeks.

3       And I had been to the doctor the day before to

4  try to get some help.

5  Q.   Were you suffering from some depression at that

6  point?

7  A.   Depression, grief, I don't know what you call it,

8  I mean, it was not good.

9  Q.   And the day that you talked to the probation

10 officer, was that the same day you were arrested?

11 A.   Yes -- let's see, no, I think it was the next

12 day, I believe.

13 Q.   And --

14 A.   The 19th, arrested the 19th, I believe it would

15 have been the 20th that I talked to them.

16       So when I said it was the day before I had been

17 to the doctor, actually it had been two days before

18 that I went to the doctor on the 18th.

19 Q.   Okay, so you went to see your doctor on March the

20 18th, you were arrested on March the 19th.

21 A.   Uh-huh.

22 Q.   Where did you spend the night that March 19th?

23 A.   In jail.  May I correct one thing?  Because I am

24 including -- in talking about the Phelps boys, and I

25 referenced Mr. Blair, and I understand he is with the

Russell Cletus Maricle - Recross Examination

1 Task Force and is just a deputy.

2      I did not mean that reference to apply to him.  I

3 meant it to apply only to them because of some actions

4 they had taken in my court against a fellow.

5 Q.  All right, just back to my question, the day that

6 you answered questions to the probation officer, did

7 you do your best to remember the assets that you had?

8 A.   Yes, I did.

9 Q.  Was it your intention to conceal anything?

10 A.   Not my intention to consider -- conceal

11 anything.  I was just absent-minded, I mean, I -- you

12 know --

13 Q.   Spent the night in jail.

14 A.   I did.

15 Q.   That's all, thank you.

16 A.   All right.

17         THE COURT:  Any recross of the witness on the

18 matters just covered?

19                         - - -

20                  RECROSS EXAMINATION

21 BY MR. SMITH:

22 Q.  Mr. Maricle, it would be a fair statement, would

23 it not, that you had the assistance of your wife and

24 an attorney present at the time that this interview

25 took place --

Russell Cletus Maricle - Recross Examination

1   A.   Mr. --

2   Q.   -- with the federal probation office?

3   A.   Mr. Wohlander was there on the side with me.  I

4   think she was -- may have been in the vicinity, but I

5   don't think she was within hearing distance.

6        I think she was on the other side.  It was not a

7   contact thing.

8   Q.  So all the information that they got came just

9   from you.

10       They didn't talk to her, is that your

11  understanding?

12  A.   Honestly I don't know, Mr. Smith.  I -- I can't

13  answer that question.

14  Q.   Well, I am asking to your recollection, do you

15  recall her giving any information at all?

16       MR. HOSKINS:  He's answered that question,

17  Judge.

18       THE COURT:  I think he is clarifying.  You

19  can clarify your answer, if you can.

20       THE WITNESS:  I couldn't say she did or she

21  didn't, Mr. Smith, I just -- I just don't know.

22  BY MR. SMITH:

23  Q.   When was it that you told probation office that

24  these figures were wrong, Mr. Maricle?

25  A.   On the boat, I don't think I ever did.  It came

Russell Cletus Maricle - Recross Examination

1  out that I was -- I think Mr. Briggs knew it because I

2  had it over at Lee's Ford, and I had my name on it,

3  Port of Manchester, Kentucky and things.

4      And you know, it came to my knowledge through you

5  all that I had failed to report that.

6  Q.   When -- when did you report it to the probation

7  officer that these figures were incorrect,

8  Mr. Maricle?

9  A.   I guess after it came out in court.  I assumed

10 they knew.  They were there in court.

11      I never had any other conversation with them

12 about that after -- after that.

13 Q.   So what circumstance are you referring to when

14 the value of your home was reported in open court

15 after -- after this interview with the probation

16 officer?

17 A.   I don't remember the value of my home being

18 reported.

19 Q.   It would be a fair statement that you never told

20 probation office that that was a mistake and that you

21 would like to correct it; isn't that fair?

22 A.   Until today, I did not realize that there was a

23 mistake.

24      Just your asking me questions is the first time

25 that I ever thought that there was -- it was put down

Russell Cletus Maricle – Recross Examination

1  for 50 instead of the 150.

2      The 50 obviously applies to a rental house that I

3  had.

4  Q.  Mr. Maricle, you have indicated in your redirect

5  that you had these State Policemen, the Phelpses in

6  your courtroom?

7  A.  Yes, sir.

8  Q.  I believe you said they were questionable as to

9  whether they were law enforcement, and I think you

10  said some people call them that.

11  A.  You want my explanation for that?  I'll be happy

12  to give it to you.

13  Q.  Well, my question is -- I am not so sure that you

14  need to explain.

15      When I asked the question, you may do so, as you

16  have.

17      But my question is, you have had circumstances

18  where, again, your activity as a judge has come in

19  conflict with the Kentucky State Police as an

20  organization, as a whole; isn't that a fact?

21  A.  With the Kentucky State Police as a whole?

22  Q.  Yes, sir.

23  A.  No.  No, not Kentucky State Police as a whole,

24  no, sir.

25  Q.  So your issue just limited according to your

Russell Cletus Maricle – Recross Examination

 1  testimony with the Phelps brothers?

 2  A.   They were not State Police at the time.   They

 3  were deputy sheriffs, and they came to Clay County and

 4  indicted somebody for political reasons.

 5       And I refused to stay as judge in the case and

 6  withdrew.

 7  Q.   But you would agree with me that both the Phelps

 8  brothers were Kentucky State Police troopers?

 9  A.   Oh, I would agree with that, yes, sir, yes, sir.

10  Q.   And they represented the Kentucky State Police

11  for many years?

12  A.   Yes, sir, and as far as -- as State Police are

13  concerned, I have no -- no qualms with any actions

14  they take.

15       They have been in my court on occasions, but when

16  they became political, I thought that inappropriate.

17            MR. SMITH:  That's all I have.  Thank you.

18            THE COURT:  All right, anything else of this

19  witness?

20            All right, thank you, you may step down.

21            THE WITNESS:  All right, thank you, Your

22  Honor.

23            THE COURT:  Make sure we have all the

24  exhibits in order.

25            Did you retain some of those, Miss Woolum?

Thomas R. Lewis – Direct Examination

1  All right, if you could retrieve those exhibits.

2          THE CLERK:  Yes, sir, I need P34 as well.

3          THE COURT:  Is that the photograph?

4          THE CLERK:  Yes.

5          THE COURT:  It may be up here.  It's on top

6  there.

7          THE CLERK:  Okay, thank you.

8          THE COURT:  Is that everything over there?

9          THE MARSHAL:  Yes, sir.

10          THE COURT:  Okay, all right, thank you.

11          Mr. Pinales, you may call your next witness.

12          MR. PINALES:  Thank you, Judge, Thomas Lewis.

13          THE COURT:  Thank you.

14          THE CLERK:  Sir, can you raise your right

15  hand, please?

16              (Witness sworn.)

17          THE COURT:  Thank you.  Mr. Pinales, you may

18  proceed.

19          MR. PINALES:  Thank you, Your Honor.

20                           - - -

21          THOMAS R. LEWIS, DEFENDANT'S WITNESS, SWORN

22                    DIRECT EXAMINATION

23  BY MR. PINALES:

24  Q.  State your name and spell your last name,

25  please.

Thomas R. Lewis - Direct Examination

1  A.   Thomas R. Lewis, L-E-W-I-S.

2  Q.   Mr. Lewis, do you have a particular profession or

3  occupation?

4  A.   I am an attorney.

5  Q.   Before -- well, I guess during, were you ever a

6  judge in the Commonwealth of Kentucky?

7  A.   I was for twenty-four years.

8  Q.   And where?

9  A.   I was twenty years in Warren County, Bowling

10 Green, Kentucky and four years -- almost four and a

11 half years as a senior status judge, which means I was

12 all over the state.

13 Q.   And what type of a judge were you?

14 A.   I was any kind of judge that you would want.  I

15 was a district judge or a circuit judge or a Family

16 Court judge, just depending on what county I was in

17 and whatever assignment the Chief Justice had given

18 me.

19 Q.   And when you said for four years you were a judge

20 all over the state, can you explain to us under what

21 circumstances and how that can about?

22 A.   The senior status program was set up here in

23 Kentucky for the judges.

24      And it's no longer in existence now.  It started

25 while I was still a judge.

Thomas R. Lewis – Direct Examination

1       And it required that you do twenty years as an

2   active judge, and then you were allowed to enter the

3   senior status program.

4       And if you worked for 600 days, then -- and you

5   were on your own retirement, then that retirement

6   would continue the rest of your life.

7       And instead of it being a 65 percent of your

8   retirement, which it normally is, 65 percent of the

9   last five years, is what you get here in the State of

10  Kentucky, they gave me 100 percent of my pay that I

11  was making at the time for the rest of my life.

12  Q.   That was nothing special for just you, was it?

13  A.   No, no, there are lots of judges that are still

14  in the program.  I think there are still 47 that are

15  still in.

16  Q.   And could you tell what time frame did that

17  occur?

18  A.   I retired December -- excuse me, I retired -- let

19  me make sure I have got this right, June the 1st of

20  2003.

21      But then I worked six months in my own position

22  as a judge in Warren County.

23      So hypothetically I was working while I was on

24  retirement in my own position.

25      Then I left on November the 30th of 2003, and for

Thomas R. Lewis – Direct Examination

1 the remainder of the -- it gave me one hundred eighty

2 days out of the 600 days were already done.

3     And then the rest of them I had to work off in

4 individual courtrooms all over the State of Kentucky,

5 including here in Frankfort, I was judge here several

6 times.

7 Q.   And what counties were you in?

8 A.   Well, I probably -- there are 120 counties, and I

9 probably was in 50 or 60 of them.

10 Q.   How do you get assigned to a particular county?

11 A.   Sometimes the judges would call me, sometimes

12 they would call me from the Supreme Court, or AOC,

13 that's the Administrative Office of the Courts.

14     And they would call up and say, "Judge Lewis,

15 there is a need for a district judge in Mason County,

16 and you are needed on these particular days, Monday

17 and Tuesday," of whatever.

18     They would call me like today on Friday, and they

19 would say, "We need you next Monday and Tuesday in

20 Mason County."

21     And then I could say, "No, I am not driving all

22 the way to Mason County."

23     Or I would say -- of course, I always accepted.

24 They knew me.  I took every job that they could give

25 me.

Thomas R. Lewis – Direct Examination

1    And so I would say, "What time am I supposed to
2  be there?"
3    And they would say, "9:00," which meant 8:00
4  central time, which is where I live.
5    So I knew I had to go up there on Sunday night to
6  be there by 8:00 on Monday morning.
7  Q.   Did you ever serve in Clay County?
8  A.   I did a number of times.
9  Q.   Jackson County?
10  A.   I did.
11  Q.   And did you ever serve --
12  A.   And there is another adjoining county, and if you
13  will remind me of the name of it, I --
14  Q.   Does Leslie sound familiar?
15  A.   Leslie is the other county, yes, sir.
16  Q.   That would be the 41st Judicial Circuit?  If you
17  know.
18  A.   Is that Corbin, Leslie County?  I know I served
19  in Leslie County.
20  Q.   Okay.  Specifically did you ever serve in place
21  of or in addition to Judge Cletus Maricle?
22  A.   I did.
23  Q.   Could you share with us approximately the time
24  frame?
25  A.   I really can't -- I don't recall exactly when it

Thomas R. Lewis - Direct Examination

 1  was.

 2      It would have been back -- well, after 2002.  It

 3  had to be 2004 and '5 and '6, somewhere in there.

 4      I would say 2005, 2006 on and up, and I think in

 5  2007 I may have served several times.

 6  Q.  And when you would go into a county such as Clay

 7  County, did you get a docket in advance or did you

 8  just find out what you were going to be doing when you

 9  showed up at work?

10  A.  Sometimes both.  I was assigned to -- to --

11  sometimes to a specific case, and they would say, "You

12  are to handle this case, Johnson v. Smith," or

13  whatever it would be.

14      Or it would say, "You are to report on that" --

15  like I said, Monday and Tuesday and whatever comes

16  up.

17      That's -- you will take care of the business of

18  the court.

19  Q.  Why would you be assigned to a specific case, if

20  you know?

21  A.  Sometimes there was a -- well, they didn't share

22  that with me necessarily.

23      But I assumed and many times it was because the

24  judges were too busy to handle all the cases that they

25  had.

Thomas R. Lewis – Direct Examination

1      I did a number of cases in his Owsley County
2  which is north of Clay County in a little town called
3  Booneville.

4      And I was there, gosh, I don't know, probably 30
5  or 40 times handling all of their cases because the
6  judge was too occupied doing other things to do that.

7      So they were trying to get me to cut into that
8  workload and help that judge get rid of his cases.

9      But other times it was when the judge had some
10 knowledge of the case or some conflict with one of the
11 parties where they knew them, there was somebody that
12 was local, a kinsman, something like that.

13     It also could be where judges were sick.  I was
14 down in Williamsburg and handled a number of cases
15 where the judge was ill.

16     And so I would go there and be there a couple of
17 days.

18     And over in Monroe County, the judge was ill.  So
19 it all changed.

20     Sometimes the judge had -- one judge that I
21 replaced had gotten in trouble with the Supreme
22 Court.

23     And so they removed him from the bench for a
24 month, and so they just assigned me to take his
25 position for a month, which I did.

Thomas R. Lewis - Cross Examination

1  Q.   In the times either on an assignment of a

2  specific case or on a general assignment for any or

3  all cases in Clay County, did Judge Maricle ever try

4  and influence you?

5  A.   Not -- being how to handle the --

6  Q.   Yes, sir.

7  A.   To do something on the cases?  Not at all.

8         MR. PINALES:  Can I have a moment,

9  Your Honor?

10         THE COURT:  Yes, sir.

11         (Mr. Pinales and Mr. Hoskins conferring at

12  this time.)

13         MR. PINALES:  Pass the witness, Your Honor,

14  thank you.

15         THE COURT:  All right, Mr. Smith, any

16  questions of the witness?

17         MR. SMITH:  Yes.

18                          - - -

19                   CROSS EXAMINATION

20  BY MR. SMITH:

21  Q.   Mr. Lewis, if I understand your testimony -- I

22  apologize, I am Steve Smith for the United States.

23  A.   Yes, sir.

24  Q.   Your ability to do the senior status work was

25  generated through three sources, if I understand it.

Thomas R. Lewis - Cross Examination

1    You would get calls from judges, you would get

2  calls from the Supreme Court or AOC would call you?

3  A.   Yes, sir.

4  Q.   And that was --

5  A.   And Mr. Smith, sometimes while I was out all over

6  the state in different places, and I would ask, "Do

7  you need somebody?"

8    And I don't necessarily want to act like I was

9  totally soliciting, but I had 600 days that I needed

10 to serve.

11   So consequently, I would ask the different

12 people, the clerks or different people, around Fayette

13 County.

14   I served as judge in Fayette, of course, in

15 Jefferson County.  I tried a number of cases in

16 Jefferson County.

17   While I was still there, I would go to the other

18 judges, and I knew most of them, and I would say, "Do

19 you have any work that you need to get done?"

20   Because if they would tell me they had another

21 case they needed me to take care of, then I could tell

22 the people at the AOC and get me assigned to that case

23 once they checked in and there was a need, so then I

24 would have another place to go.

25 Q.   And I assume with dealing with hundreds of cases

Thomas R. Lewis - Cross Examination

1 in all parts of the state that it's hard to keep track

2 of your individual cases.

3 A.   It certainly is, yes, sir.

4 Q.   And I would assume if I asked you if you

5 remembered John Downey in Clay County, you probably

6 would not remember that; would that be fair?

7 A.   I have no clue, sorry.

8 Q.   And if I asked you who the prosecutor was down

9 there at the time when you served in Clay County,

10 would you remember who that was?

11 A.   Gary Gregory was the main -- he was the

12 Commonwealth Attorney.

13      And then he had three assistants, and if you

14 asked me to recall their names, I don't recall.

15      One of them went off to Iraq after he had been

16 there, he had been there a couple times, and he left.

17      And I was with him a lot, and I should remember

18 his name.

19      I have it written down in some book somewhere,

20 but -- and then the other two I was with when I was

21 not in Clay County.

22      When I was at one of the -- Jackson County, and I

23 don't think it was Leslie, I think there was another

24 county where the basketball player was from.

25 Q.   And having served down in Clay County in 2005,

Thomas R. Lewis - Cross Examination

1  2006 --

2  A.   Football player.

3  Q.   -- and maybe 2007 --

4  A.   Yes, sir.

5  Q.   -- I assume there were a lot of cases that you

6  covered down there as well; is that fair?

7  A.   Yes, sir.

8  Q.   And I would assume by that that during the course

9  of that that you might have actually corresponded or

10  spoken with Judge Maricle about a need that he might

11  have and offered to help him at times; is that a

12  possibility?

13  A.   I have talked to Judge Maricle in his office

14  because he was kind enough of course to show me where

15  the courtroom was and -- but I -- it may be, I don't

16  recall specifically talking to the judge about any

17  cases.

18      But I am sure I did, because I asked everybody.

19  I was always trying to see if anybody needed a judge

20  to fill in somewhere.

21  Q.   Thank you.

22  A.   Yes, sir.

23          MR. SMITH:  That's all I have.

24          THE COURT:  See if any of the other parties

25  have questions of the witness.  No?  Any redirect of

Thomas R. Lewis - Redirect Examination

1 the witness --

2           MR. PINALES:  Just --

3           THE COURT:  -- on those matters just covered?

4                   - - -

5                REDIRECT EXAMINATION

6 BY MR. PINALES:

7 Q.   In response to the questions that were just asked

8 of you, you said that you would go around and you

9 would talk to the different judges?

10 A.   Certainly.

11 Q.   You were seeking work?

12 A.   Yes, sir.

13 Q.   Okay, and once you did it, you couldn't just walk

14 into the courtroom.

15      You had to have an order from the Supreme Court;

16 is that correct?

17 A.   Yes, sir.

18 Q.   So it wasn't, "Okay, come on in today.  I am

19 going to go get a haircut"?

20 A.   No, no, it wasn't anything like that, no.  It had

21 to go through the Chief Justice.

22 Q.   Okay, thank you.

23           MR. PINALES:  One moment.

24           THE COURT:  Yes, sir.

25           (Mr. Pinales conferring with his client at

Thomas R. Lewis - Redirect Examination

1 this time.)

2 BY MR. PINALES:

3 Q.   And just a point of clarification, when you would

4 be asking Judge Maricle, specifically, you were

5 asking, "Do you need a judge?"  Not about any specific

6 cases; is that correct?

7 A.   Absolutely.

8 Q.   You wouldn't -- you did not talk to him about a

9 case, just, "I am here, I want to work"?

10 A.   I don't think I even went out to eat lunch with

11 him the whole time I was there.

12      I think I saw him a few times, and I tried a

13 civil case for him one time.

14      And I think I talked to him after the civil

15 case.

16      I might have had a discussion with him about what

17 the -- why I was there on that particular case.

18      But other than that, I don't think I discussed

19 any cases with him, criminal cases.

20      And I had several, but I don't think I ever

21 discussed any of them with him.

22          MR. PINALES:  Thank you, nothing further.

23          THE COURT:  Anything else of this witness,

24 Mr. Smith?

25          MR. SMITH:  No, thank you.

Tara Boh Klute – Direct Examination

1           THE COURT:  Anyone else?

2           All right, thank you, sir, you may step down.

3           THE WITNESS:  All right.

4           THE COURT:  The witness will be finally

5    excused.

6           Mr. Pinales, you may call your next witness.

7           MR. PINALES:  Yes, thank you, Miss Klute.

8           THE COURT:  I couldn't hear.

9           MR. PINALES:  Klute, K-L-U.

10          THE COURT:  Klute?  Thank you.

11          THE CLERK:  Raise your right hand, please.

12          (Witness sworn.)

13                              -  -  -

14          TARA BOH KLUTE, DEFENDANT'S WITNESS, SWORN

15                      DIRECT EXAMINATION

16   BY MR. PINALES:

17   Q.   State your name and spell your last name,

18   please.

19   A.   Tara Boh Klute, K-L-U-T-E.

20   Q.   Thank you, Miss Klute, are you employed?

21   A.   Yes, I am.

22   Q.   And with whom?

23   A.   The Kentucky Court of Justice, Administrative

24   Office of the Courts, Pretrial Services.

25   Q.   And do you have any specific function or

Tara Boh Klute - Direct Examination

1 responsibility within that department?

2 A.   Yes.

3 Q.   Would you share with us what that is?

4 A.   My title is Executive Officer.  I oversee entire

5 operations.

6 Q.   And are you familiar with the home incarceration

7 portion of the courts?

8 A.   Yes.

9 Q.   And let me ask just a few questions, some

10 background questions.  What is home incarceration?

11 A.   We refer to it as electronic monitoring.

12 Q.   Okay.

13 A.   Basically if the judge orders a condition of

14 release to be supervised by pretrial and they order

15 electronic monitoring, then we oversee and supervise

16 that the defendant does do that.

17 Q.   And is that specific to any particular county, or

18 is that authorized throughout the entire Commonwealth?

19 A.   Statewide.

20 Q.   And are there requirements for electronic

21 monitoring?

22 A.   There are requirements that -- for defendants

23 that are under our supervision that we maintain.

24 Q.   And are there requirements as to who can do

25 electronic monitoring?

Tara Boh Klute – Direct Examination

1  A.   For those clients that are under our supervision,

2  yes.

3  Q.   And what are those requirements?

4  A.   Basically that they be on our approved provider

5  list.

6  Q.   That's what I was getting at.  What is an

7  approved provider list?

8  A.   Basically if a defendant is referred to pretrial

9  services for supervision and the judge orders

10 electronic monitoring, we have best practices that

11 providers throughout the state have to adhere to to be

12 on our list.

13     When that particular defendant comes to our

14 office, we give them a list of providers, and they get

15 to choose which ones since they are the ones paying

16 for it.

17 Q.   And what is the advantage of a person on home

18 incarceration both to the individual and to the

19 Commonwealth?

20 A.   Well, they are released from jail.

21 Q.   That's the individual?

22 A.   Uh-huh.

23 Q.   Are there any advantages to the county?

24 A.   Well, there is, of course, the cost savings for

25 the person not being incarcerated.

Tara Boh Klute – Direct Examination

1      And also we feel that it helps with public safety

2  in that they are supervised and their whereabouts are

3  known.

4            MR. PINALES:  May I have a moment,

5  Your Honor?

6            THE COURT:  Yes, yes, sir.

7            (Mr. Pinales and Mr. Hoskins conferring at

8  this time.)

9  BY MR. PINALES:

10  Q.  Is Clay County one of the counties that have

11  approved provider?

12  A.  Yes, we have several.

13            (Mr. Pinales and Mr. Hoskins conferring at

14  this time.)

15  BY MR. PINALES:

16  Q.  Are you familiar with -- are you familiar with

17  something called the Community Corrections Board?

18  A.  Community Corrections Board?  No, I am not.

19  Q.  Okay.

20            (Mr. Pinales, his client and Mr. Hoskins

21  conferring at this time.)

22  BY MR. PINALES:

23  Q.  Final question, I promise.  Who are the approved

24  providers in Clay County, if you know?

25  A.  Okay, in Clay, well, we have several that offer

Tara Boh Klute – Cross Examination

1  statewide service.

2      I have got a list here.  Would you like me to

3  call them out?

4  Q.  Well, is there anyone in Clay County that is

5  approved?

6  A.  That's based in Clay County?

7  Q.  Yes, ma'am.

8  A.  Yes.  CARE, CCA, Communities Activity Resources

9  of Quality is the name of the company.

10  Q.  And how long -- do you have any idea how long

11  they have been involved in Clay County?

12  A.  I am not aware of how long they have been

13  involved in Clay County.

14      We started our provider list in the summer of

15  2006.

16      MR. PINALES:  I have nothing further.  Thank

17  you.  Pass the witness.

18      THE COURT:  All right.  Any questions of the

19  witness, Mr. Smith or Mr. Parman?

20      MR. SMITH:  Yes, thank you.

21                  - - -

22              CROSS EXAMINATION

23  BY MR. SMITH:

24  Q.  Good afternoon, I am Steve Smith, and I represent

25  the United States.  A few questions for you, ma'am.

Tara Boh Klute - Cross Examination

1      You have given testimony about the -- your

2 department I guess is Executive Officer of the

3 Kentucky Court of Justice Pretrial Services Program;

4 is that what I understood you to say?

5 A.   Yes, sir.

6 Q.   Okay, and I believe that you indicated that there

7 were a statewide number of home incarceration programs

8 that are participating currently?

9 A.   Yes.

10 Q.   And I believe that you said that there is only

11 one that's in Clay County currently; is that -- is

12 that right?

13 A.   One company that gives us an address of Clay

14 County.

15      There are several companies that offer statewide

16 services.

17 Q.   Okay, do you know how readily used other state

18 providers are in Clay County?

19 A.   I do not know that offhand, no.

20 Q.   So is it based on your information -- do you know

21 of any providers that were in Clay County during the

22 years of 2002 through 2007?

23 A.   From 2002 through 2005, pretrial services was not

24 involved in any type of supervision.

25      From 2005 to 2006 we did not have a list.  We

Tara Boh Klute - Cross Examination

1 started our list in 2006.

2 Q.   Okay.  So really you are not capable of speaking

3 about how many were in Clay County years prior to

4 '06 --

5 A.   No, sir.

6 Q.   -- is that fair?  Okay.  You only know about

7 what's going on from '06 to current.

8 A.   Yes, sir.

9 Q.   Okay.  And you are talking about the -- this

10 approved provider list.  When did that become enacted,

11 ma'am?

12 A.   We got approval from our General Counsel's office

13 on March the 1st, 2006.

14     And then we began sending letters out to all of

15 the known providers in the state, so our providers

16 started after March the 1st, 2006.

17 Q.   So prior to that there was not as much

18 involvement by the Kentucky Court of Justice in the

19 program at all; would that be fair?

20 A.   Yes.

21 Q.   And, again, I believe that, if I understand the

22 program, you said that currently now it is important

23 because I believe you said that the home incarceration

24 program gives the ability to know the whereabouts of

25 the subjects that are on monitoring?

Tara Boh Klute – Cross Examination

1  A.    Yes.

2  Q.    Does that mean that you all can track if they

3  leave their home and they go to another county, can

4  you follow along, track them with your -- with your

5  program?

6  A.    Pretrial services doesn't do the actual super--

7  the monitoring.

8       We get reports from the company that's doing the

9  monitoring, so they do provide us that, yes.

10 Q.    But you don't actually do the monitoring; is that

11 correct?

12 A.    That is correct.

13 Q.    You rely upon a private company to do that?

14 A.    Yes.

15 Q.    And if it's reported to you all, you are relying

16 upon that private company to do the reporting; is that

17 correct?

18 A.    Yes.

19 Q.    And your understanding is currently under the

20 program that you would be able, if the private company

21 let you know, you would be able to determine where the

22 whereabouts are of an individual even if they left the

23 county?

24      Say they left Clay County and they drove up to

25 Fayette County, you would actually be able to track

Tara Boh Klute – Cross Examination

1  their whereabouts?

2  A.   Yes.

3  Q.   And that is assuming that they had their

4  monitoring device on them?

5  A.   Correct.

6  Q.   But if the monitoring device is cut off, that

7  would disable the program and you couldn't really

8  locate them; would that be fair?

9  A.   That is correct.

10 Q.   Okay.  All right, thank you.

11        THE COURT:  See if any of the other parties

12 have questions?

13        Mr. Pinales, any followup?

14        MR. PINALES:  Yes, just one.

15        THE COURT:  Yes, sir.

16                    - - -

17              REDIRECT EXAMINATION

18 BY MR. PINALES:

19 Q.   The monitoring device, the ankle bracelet, if it

20 is cut, that goes -- that sets off an alarm, doesn't

21 it?

22 A.   Yes, sir.

23 Q.   A warning so that in response to Mr. Smith's

24 question, so somebody could drive up and not be

25 known.

Colloquy

1      You wouldn't know where they went, but you would

2  know that the ankle bracelet was tampered with or

3  severed or something like that; is that correct?

4  A.   Yes, that would cause an alert.

5          MR. PINALES:  Thank you, nothing further.

6          THE COURT:  Thank you, Mr. Smith, anything

7  else?

8          Ma'am, before you step down, if I could get

9  you to give your full name to the clerk.  I am not

10  sure we got that when you came in.

11          THE WITNESS:  Okay.

12          THE COURT:  Your full name, please.

13          THE WITNESS:  Tara Boh Klute.

14          THE COURT:  And spell your middle name.

15          THE WITNESS:  B-O-H.

16          THE COURT:  All right, thank you.  Thank

17  you.

18          Mr. Westberry?

19          MR. WESTBERRY:  Could we approach briefly

20  before -- I just wanted to ask as far as scheduling.

21          THE COURT:  All right, any issue about

22  excusing the witness first?

23          MR. WESTBERRY:  Oh, no, excuse me, I'm

24  sorry.

25          MR. PINALES:  No, sir.

Colloquy

 1          THE COURT:  Ma'am, thank you, you may step

 2  down.  You are excused.

 3          THE WITNESS:  Okay, thank you.

 4          THE COURT:  Before I ask you to come up, I

 5  want to see if there are any additional witnesses on

 6  behalf of defendant Maricle, Mr. Pinales?

 7          MR. PINALES:  That's one of the things I

 8  would like to approach on, Your Honor.  Thank you.

 9          THE COURT:  All right, come on up.

10          (Thereupon, a discussion was had at the bench

11  between the Court and counsel and out of the hearing

12  of the jury.)

13          THE COURT:  Yes, sir, Mr. Pinales?

14          MR. PINALES:  Yes, Your Honor, those were the

15  last two planned witnesses.

16          But in light of what came out today on that

17  Kentucky statute, I would like a even shorter witness,

18  if the court permits, on Monday to come in with either

19  a certified copy of that or what it is.

20          THE COURT:  The statute?

21          MR. PINALES:  The scrambling of what it is

22  and when it was and what it was for.

23          THE COURT:  There is two issues, there is the

24  document or his membership or position as an officer

25  in this entity, and then there is the statute.

Colloquy

1            If you are asking to present a witness on the
2  statute, I don't think that's relevant.
3            If you are asking for someone to identify the
4  entity itself --
5            MR. PINALES:  Yes.
6            THE COURT:  -- that's a different issue.
7            MR. PINALES:  Based on the statute, yes, Your
8  Honor.
9            But somebody to identify how that document
10 came into being and -- and why his name is on it.
11           THE COURT:  All right, then that would be
12 your last witness?
13           MR. PINALES:  Yes, Your Honor, and I would
14 assume a five-minute or --
15           THE COURT:  All right, and Mr. Westberry
16 would be able to --
17           MR. WESTBERRY:  Excuse me, I wanted to ask
18 you about that.
19           I have a series of witnesses from the last
20 few days, nothing that the court knows, I have got
21 about five or six back there.
22           They are almost exclusively from Manchester
23 in Clay County.  We have prepared them.
24           Regarding Monday, some of them are older,
25 many of them are; and they are retired.

Colloquy

```
 1          They can get up and be here by 9:00, and I
 2  think you know the area better than I do.
 3          I think it's about a two and a half hour
 4  drive roughly from Manchester.
 5          THE COURT:  Roughly, yeah.
 6          MR. WESTBERRY:  You know, I have had no
 7  trouble getting them here by 10:00.
 8          It's just when I have to have them here by
 9  9:00, I feel like because of their age sometimes --
10          THE COURT:  So you would prefer just to start
11  at 10:00, if we could?
12          MR. WESTBERRY:  Sure, I will have plenty of
13  people by 10:00, yes, sir.
14          THE COURT:  All right.
15          MR. WESTBERRY:  And I have one other matter.
16  We can do that after the jury has been discharged.
17          THE COURT:  All right, I will excuse the jury
18  until 10:00 on Monday --
19          MR. WESTBERRY:  Sure.
20          THE COURT:  -- when Mr. Pinales can start
21  with his one five-minute witness.
22          MR. PINALES:  That was good, it was not more
23  than fifteen minutes.
24          I want the record to reflect I was on time.
25  Thank you.  Pretty close.  Thank you.
```

Colloquy

1            THE COURT:  Anything else before I excuse the

2   jury?

3            MR. WHITE:  No, Your Honor, thank you.

4            MR. SMITH:  No, Your Honor.

5            (End of bench conference.)

6            THE COURT:  All right, thank you, ladies and

7   gentlemen, and I do appreciate your patience today.

8            I know we have had a few stops and starts,

9   and I sincerely appreciate your patience that you have

10  shown not only today but throughout the course of this

11  trial.

12           We are going to take a recess for the

13  evening.

14           Of course, we will recess until Monday

15  morning, and we will continue at that time.

16           Rather than start at 9:00, we are going to

17  start at 10:00 on Monday, so you all will be able to

18  sleep in.

19           So you will be ready to go at 10:00 when you

20  get here.

21           We will still have some pastries and some

22  other things for you, but we will start at 10:00.

23           So you don't need to get up quite as early as

24  you have been.

25           But again, I really do appreciate the fact

Colloquy

1  you have been here on time every single day throughout
2  the course of the winter.

3          We have been here for sometime now, and I do
4  certainly appreciate your -- your willingness to be
5  here as scheduled, but we will start at 10:00.

6          So if you do get here at 9:00, you will get
7  the first choice of the doughnuts, but everyone else
8  should be here at 10:00.

9          Now, as we break for the weekend, I do feel
10 like I should again remind you in some detail of the
11 admonition.

12         At this point you could probably repeat it
13 back to me.

14         But let me just remind you, when you go home,
15 of course, not only should you not talk with each
16 other about the case when you are here.

17         But when you go home, you can't talk with
18 your friends or family members about the case.  You
19 know that.

20         And you can't allow anyone to approach you to
21 discuss the case.

22         You can't read, watch or listen to any
23 accounts of the case.

24         You can't do any type of research or
25 investigation.

Colloquy

1          You can't communicate electronically about
2 the case.

3          And, of course, you cannot make up your mind
4 about the case.

5          You should not make up your mind about the
6 case until it is finally submitted to you.

7          Again, we have been here for several weeks
8 now.

9          You have heard a good bit of testimony, but
10 you haven't heard all the testimony.

11          And so you should not be thinking about a
12 decision in the case until it is finally submitted to
13 you.

14          So we will see you back bright and early at
15 10:00 on Monday, and you will be excused until that
16 time.  Thank you.

17          THE MARSHAL:  Please rise for the jury.

18          A JUROR:  Remember to set your clocks up.

19          A JUROR:  Yeah, Judge, we are going forward
20 this weekend, the clocks.  Spring forward.

21          THE COURT:  Oh, that's right, everyone
22 remember, spring forward this weekend.

23          So really it's about the same time that we
24 have been starting.

25          A JUROR:  Just lost that hour, didn't we?

Colloquy

 1          (Jury excused from the courtroom at this
 2 time.)
 3          THE COURT:  Mr. Westberry, the good news is
 4 you can have an extra hour.
 5          If you want the bad news is, the jury won't
 6 be here so --
 7          MR. WESTBERRY:  Thank you, Your Honor, that
 8 helps.
 9          THE COURT:  Couple of other -- you all have a
10 seat.
11          A couple other scheduling issues before we
12 recess for the weekend.  I do have a hearing at 4:30,
13 by the way.
14          Mr. Westberry, do you have any other
15 scheduling issues?
16          MR. WESTBERRY:  It's not a scheduling, it's
17 a -- if you will recall back at the beginning of
18 trial, we gave our expert disclosures and we all
19 supplemented and we did it in a timely fashion.
20          We have supplemented ours regarding
21 Mr. Gravitt further.
22          And I am not asking you to make any relevancy
23 argument or any determination --
24          THE COURT:  All right.
25          MR. WESTBERRY:  -- about timing.  Gravitt is

Colloquy

1  an -- he is an accountant by trade.

2          But he's done a comparison study of salaries,

3  of school superintendents not only for Clay County for

4  salaries but in the counties we have heard some

5  testimony about earlier to be used for comparison

6  purposes.

7          What we had not done -- and he had reached

8  some conclusions, and that was disclosed in the

9  original report.

10          Yesterday he supplemented his report to

11  contain populations in those -- those comparable

12  counties, you will remember Jackson, Leslie, Owsley,

13  comparing them, Knox.

14          THE COURT:  All right.

15          MR. WESTBERRY:  And I just gave a copy of

16  that to Mr. Smith.

17          And I am not asking to be heard on that right

18  now.

19          I would not anticipate he would be called

20  among the beginning of the witnesses anyway.  That's

21  all.

22          THE COURT:  All right, based on the schedule

23  at this time, Mr. Pinales is representing he just has

24  one brief witness, and then you will be starting your

25  case.

Colloquy

1          Based on what we know now, when would you

2    anticipate that you would be closing your case so

3    Mr. White can be prepared with his case?

4          MR. WESTBERRY:  I will tell you, we have

5    approximately eight witnesses.

6          I do not -- I think I can do this easily in a

7    day.

8          THE COURT:  All right.

9          MR. WESTBERRY:  These are not protracted

10   witnesses.  They will be on cross examination.

11         THE COURT:  All right.  You think they

12   will -- all right, you think they will be Judge Hood

13   witnesses?

14         MR. WESTBERRY:  You didn't know Judge

15   Johnstone.  Maybe you did.

16         THE COURT:  Oh, yes, very well.

17         MR. WESTBERRY:  Yeah, I think there is a

18   somewhat comparable comparison.

19         Well, no, Judge Johnstone, they would be all

20   day.

21         If you could make -- I am not saying it on

22   the record.

23         THE COURT:  All right, that's fine, I am not

24   asking you to.

25         But you believe that you will be able to

Colloquy

1 finish --

2        MR. WESTBERRY:  Yes, sir, that's my

3 intention.

4        THE COURT:  -- on Monday.  And then

5 Mr. White, you will have at least one or two witnesses

6 ready to go in case --

7        MR. WHITE:  Actually just to be on the safe

8 side, Your Honor, it's been my experience the defense

9 witnesses are a little more specific, they go

10 quicker.

11        I am going to go ahead and have everyone that

12 I am going to call here by -- at lunch.

13        THE COURT:  Okay.

14        MR. WHITE:  Because I learned yesterday that

15 two of the witnesses I plan to call also are on

16 Mr. Westberry's list.

17        THE COURT:  Okay.

18        MR. WHITE:  So when they finish, I may end up

19 just asking the court if I can have -- if I can expand

20 the scope of cross.

21        THE COURT:  All right.

22        MR. WHITE:  Do them then.  Even if we don't,

23 at least they will be handy, and I can do them right

24 away.

25        THE COURT:  That's fine.

Colloquy

1          MR. WHITE:  So it's my -- if I get a couple

2  hours, I might be able to get my case done on Monday

3  as well.

4          THE COURT:  All right, okay.  Mr. Abell, I

5  doubt if you will start on Monday, but probably maybe

6  Tuesday morning at the -- at the earliest.

7          MR. ABELL:  May I then instruct the witnesses

8  to be here on Tuesday morning?

9          THE COURT:  Yes, yes, sir.

10          MR. ABELL:  Okay, thank you.

11          THE COURT:  I think that would be fine.  I

12  think that would be fine.

13          MR. BALDANI:  I think I know where that

14  leaves me.

15          But I did have one other brief issue to ask

16  you about.

17          THE COURT:  Yes, sir.

18          MR. BALDANI:  We did not know Paul Bishop

19  would be called by the government.

20          And we had intended to get into that

21  psychological report as far as his memory.

22          And if you recall, I tried to do that some

23  with his son, you disallowed it; and I understand

24  that.

25          THE COURT:  Right.

Colloquy

1          MR. BALDANI:  It would be my -- my position

2     that since his statements came in, we should be able

3     to challenge his memory and credibility as if he were

4     testifying.

5          And the reason I bring this up, Your Honor,

6     is I don't want to subpoena the mental health person

7     that did his report, drag them here if you are ruling

8     that you ruled as far as his son would apply to the

9     mental health expert as well.  So that's --

10          THE COURT:  You would be seeking to call

11    Mr. Bishop's mental health provider as opposed to

12    Mr. Bishop, then we are going to have the mental

13    health provider assert a claim of privilege based on

14    medical issues.

15          MR. BALDANI:  Probably so, Your Honor.

16          THE COURT:  So it would appear that perhaps

17    if you want to call a witness, Mr. Bishop would be the

18    person -- if you want to ask about his memory, I'm

19    assuming that's who you would be calling.

20          Otherwise, we are going to end up with a

21    mental health provider who is not going to answer your

22    questions based on privacy concerns.

23          MR. BALDANI:  Well, but at that point it

24    would be my position that my client's constitutional

25    rights take precedence over Mr. Bishop's HIPAA rights,

Colloquy

 1  or whatever they would be.

 2          And I think it would be up to us as to

 3  whether we wanted to call Mr. Bishop to talk about his

 4  lack of memory or the person we did before.

 5          THE COURT:  All right, let's do this.  I am

 6  not going to tell you who to call or who not to call.

 7          But if you have authority on that issue, it

 8  would be better for you to give it to me on Monday.

 9          You can look at the issue, and that will give

10  me an opportunity to review your authority and give a

11  more reasoned response to your question rather than

12  shooting from the hip at this point because, quite

13  frankly, I haven't had this issue come up with a

14  witness who may assert the rights of a patient not to

15  disclose medical records.

16          MR. BALDANI:  All right.

17          THE COURT:  So --

18          MR. BALDANI:  I understand, Your Honor.  I'll

19  see what I can find.

20          THE COURT:  If you have authority on that,

21  that would probably be the better practice, if you

22  could get that to me, any authority on the issue on

23  Monday before the witness would be called then later

24  in the week.

25          And I don't know what the government's

Colloquy

1  position on that would be, but I certainly would want

2  to have at least the -- any authorities that you would

3  have.

4          MR. BALDANI:  I understand.  Thank you,

5  Judge.

6          THE COURT:  All right, anyone else have any

7  issues before we recess?

8          MR. WHITE:  Your Honor --

9          THE COURT:  Mr. White.

10          MR. WHITE:  -- I know everybody's in a

11  hurry.

12          But one thing, as you have probably become

13  aware, I have never tried a case in front of you

14  before.

15          I am curious what your preference is.  Given

16  how we are moving fairly quickly now, I will probably

17  begin preparing my closing argument over the weekend.

18          Do you have certain guidelines in terms of

19  time, that type of thing that it would be good for us

20  to be aware of?

21          If that's not a fair question, I can ask some

22  of the lawyers.

23          THE COURT:  No, I am not sure exactly what

24  you are asking.

25          But let me -- let me give you some

Colloquy

1 information, maybe that will be helpful to you.

2          When the defendant closes, I suspect that

3 there may be some rebuttal testimony presented.

4          But after all the proof has been presented,

5 we will have time for renewal of any motions under

6 Rule 29, obviously, and then we will have our

7 instructions conference.

8          Now, one of the things that I try to do is I

9 anticipate at the close of a case is provide you with

10 at least a draft, my draft jury instructions.

11          Now, they are not always complete because I

12 don't know who is going to testify and who is not

13 going to testify.

14          But I do try to start working on those jury

15 instructions so we don't keep the jury waiting for a

16 day while we argue about what instructions will be

17 given.

18          And sometimes I will actually give those to

19 you if I think that you are -- that all parties are

20 going to close on Wednesday, let's say, I will try to

21 get those to you on Tuesday so you can look at those

22 in advance.

23          But we will have our instructions

24 conference.

25          I'll find out from you at that time how much

Colloquy

1  time you believe that you are going to want to argue

2  the case.

3          Generally, I will give the United States, if

4  we have two defendants in a case and each one wants an

5  hour, I will usually give the United States two hours,

6  a total of whatever the defendants ask for to argue

7  their case.

8          I doubt I am going to do that in this case.

9  If everyone asks -- if all the defendants ask for an

10  hour, I doubt if I am going to give the United States

11  eight hours.

12          But of course they will need more time than

13  each individual defendant will.

14          So be thinking about that, and if you want to

15  give me an indication -- it doesn't have to be a final

16  decision.

17          But if you want to give me an indication how

18  long that you think that you are going to need to

19  argue in closing, you can give that to me next week,

20  and I can be thinking about it and try to come up with

21  a little bit better schedule.

22          I do anticipate the parties will be closing

23  next week, the defendants.  I may be wrong on that.

24          I have been wrong on scheduling pretty much

25  throughout the course of the trial.

Colloquy

1          But does that seem fair, we are going to be
2    closing the case with the proof next week?
3          So next week we need to be thinking about
4    those issues as we get closer to the last defendant in
5    closing.
6          I generally instruct last.  The government,
7    by rule of course, is entitled to argue first and
8    argue last.  Everyone knows that's the procedure.
9          But then I will -- I will instruct last
10   before the jury begins their deliberations.
11         Generally I will allow the jury to take all
12   the exhibits that have been introduced back into the
13   jury room.
14         But if we have tapes, I don't send a tape
15   recorder or computer or anything of that nature back
16   to listen to these -- to these audio tapes.
17         If they want to listen to a tape, they will
18   need to come out into court to do that.
19         Now, my initial impression, my initial
20   indication, I wasn't sure that I was going to send
21   these transcripts back.
22         But based upon all the testimony that's been
23   offered about specific transcripts, I will be sending
24   the transcripts back to the jury to consider.
25         That is discretionary with the court, and I

Colloquy

1 do at this point intend to do that.

2        So the jury will get the exhibits, they will

3 -- there is not any contraband in the case, there are

4 no firearms, ammunition, drugs in the case; and so

5 they will be able to get all those exhibits.

6        But one of the things that I ask the

7 attorneys to do before the exhibits go back is to

8 review everything and make sure that what you have

9 marked to be admitted, that it has been admitted and

10 that it all is going back.

11        I want to make sure that everything that has

12 been admitted is here with the clerk.

13        There have been a lot of witnesses that have

14 looked at documents.

15        And of course the clerk has all the exhibits,

16 but I do always ask the attorneys to check those, and

17 of course you can do that before the trial is over.

18        You can check those exhibits, the attorneys

19 can check those exhibit.  Does that help you,

20 Mr. White?

21        MR. WHITE:  It does a lot, Your Honor,

22 thanks.  It just gives me a good idea of timing.

23        THE COURT:  All right, any other issues that

24 we can take up?

25        All right, as I said, I do have a hearing on

Index – Certificate

1  a supervised release violation scheduled for 4:30.

2          But I'll take that up in approximately five

3  minutes to give you a chance to move some of the

4  materials around.  We will be in recess.

5          MR. WHITE:  Your Honor, I may loiter around a

6  little bit so I can clean up.

7          THE COURT:  That would be fine.  Thank you.

8  We will be in recess for five minutes.

9          (The further trial in this matter was

10 recessed at 4:45 p.m. to resume at 10:00 a.m. Monday,

11 March 15, 2010.)

12                              -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25

Index – Certificate

1                        EXAMINATION INDEX

2  Defendant's Witnesses:

3  Russell Cletus Maricle

4  Cross by Mr. Smith     . . . . . . . .     4

5  Cross by Mr. Baldani  . . . . . . . .   150

6  Redirect by Mr. Hoskins . . . . . .   151

7  Recross by Mr. Smith  . . . . . . .   156

8  Thomas R. Lewis

9  Direct by Mr. Pinales . . . . . . .   161

10  Cross by Mr. Smith   . . . . . . .   168

11  Redirect by Mr. Pinales . . . . . .   172

12  Tara Boh Klute

13  Direct by Mr. Pinales . . . . . . .   174

14  Cross by Mr. Smith  . . . . . . . .   178

15  Redirect by Mr. Pinales . . . . . .   182

16                        –  –  –

17                      CERTIFICATE

18        I certify that the foregoing is a correct

19  transcript from the record of proceedings in the

20  above-entitled matter.

21

22  s/  K. Ann Banta                    3-13-10
    K. Ann Banta, RPR, CRR              Date
23

24

25