UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

Eastern District of Kentucky
**FILED**

MAR - 7 2011

AT FRANKFORT
LESLIE G. WHITMER
CLERK: U.S. DISTRICT COURT

CRIMINAL NO. 09-16-S-DCR

UNITED STATES OF AMERICA                                      PLAINTIFF


V.    MEMORANDUM IN SUPPORT OF OBJECTION TO SENTENCING
      ON BASIS OF DEMONSTRATED JUDICIAL BIAS, PREJUDICE AND
                          PARTIALITY

RUSSELL CLETUS MARICLE,                                      DEFENDANT.

### Basis of Objection

In the case of <u>Anderson v. Shepherd</u>, 856 F.2d 741 (6th Circ. 1988) succinctly captured

the holding of <u>Knapp v. Kinsey</u>, 232 F.2d 458 (6th Cir. 1956)

> One of the fundamental rights of a litigant under our judicial system is that he
> is entitled to a fair trial in a fair tribunal, and that fairness requires an absence of
> actual bias or prejudice in the trial of the case. If this basic principle is violated,
> the judgment must be reversed.
>
> Bias or prejudice on the part of a judge may exhibit itself prior to the trial by acts
> or statements on his part. Or it may appear during the trial by reason of the actions
> of the judge in the conduct of the trial.
>
> ... The judge should exercise self-restraint and preserve an atmosphere of
> impartiality. When the remarks of the judge during the course of a trial, or his
> manner of handling the trial, clearly indicate a hostility to one of the parties, or
> an alignment on the part of the Court with one of the parties for the purpose of
> furthering or supporting the contentions of such party, the judge indicates,
> whether consciously or not, a personal bias and prejudice which renders invalid
> any resulting judgment in favor of the party so favored... "[T]he tribunals of
> [this country] shall not only be impartial in the controversies submitted to them
> but shall give assurance that they are impartial, free ... from any 'bias or prejudice'
> that might disturb the normal course of impartial judgment."

Knapp v. Kinsey, 232 F.2d 58,465-67(6th Cir.), cert. denied, 352 U.S.892, 77 S.Ct.131,
1 L.Ed.2d 86 (1956) (citations omitted and emphasis supplied).

Justice Black writing in the case of In Re Murchison, 349 U.S. 133, 75 S.Ct.623, 99

L.Ed.942 (1955) stated very succinctly:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of
> course requires an absence of actual bias in the trial of the cases. But our system
> has always endeavored to prevent even the probability of unfairness. To this end
> no man can be a judge in his own case and no man is permitted to try cases where
> he has an interest in the outcome. That interest cannot be defined with precision.
> Circumstances an relationships must be considered.
> In Re Murchison at 136.

Quoting from Tumey v. State of Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927

"Every procedure which would hold a possible temptation to the average man as a judge … not

to hold the balance nice, clear and true between the State and the accused denies the latter due

process of law."

As Justice Brennan pointed out in his concurring opinion in the case of Aetna Life

Insurance Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed. 2d 823 (1986), "nonpecuniary

interests, for example, have been found to require recusal as a matter of due process" citing In Re

Murchison, supra. In Aetna Life Insurance Co. v. Lavoie, the interest of the judge was affected

by the case in which he was one of the justices because the ruling would be precedent for another

case in which he was a party plaintiff. Such was sufficient to establish a direct and personal

interest.

Fairness requires the absence of actual bias; however, it is not the burden of the moving

party to show actual bias. Seldom do you have an acknowledgment of such because no man

wants to admit his shortcomings. The ordinary means of discovery are not available in situations

where a party is challenging the impartiality of a judge because of the prohibition against calling

him as a witness, a proposition that Maricle does not question. It may well be impossible to

2

show actual bias, but in fact under the tests that have been established it is not necessary that

actual bias exists. Objective standards are used in determining the "probability of actual bias,"

"impartiality might reasonably be questioned," and "preserving the appearance of justice"

standards. These standards and rules "…may sometimes bar trial by judges who have no actual

bias and would do their very best to weigh the scales of justice between the contending parties."

In Re Murchison at 136.

Justice Kennedy in delivering the opinion of the Court in Caperton v. A.T. Massey Coal

Co., Inc. _____ U.S. _____, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009) wrote:

> The difficulties of inquiring into actual bias, and the fact that the inquiry is often a
> private one, simply underscores the need for objective rules. Otherwise, there
> may be no adequate protection against a judge who simply misreads or
> misapprehends the real motives at work in deciding the case. The judge's own
> inquiry into actual bias, then, is not one the law can easily superintend or review,
> though actual bias, if disclosed, no doubt would be grounds for appropriate relief.
> In lieu of exclusive reliance on that personal inquiry, or an appellate review of the
> judge's determination respecting actual bias, the Due Process Clause has been
> implemented by objective standards that do not require proof of actual bias
> (Citations omitted) In defining these standards the Court has asked whether,
> "under a realistic appraisal of psychological tendencies and human weakness," the
> interest "poses such a risk of actual bias or prejudgment that the practice must be
> forbidden if the guarantee of due process is to be adequately implemented."
> Withrow, 421 U.S. at 47, 955 Ct. 1456.

The test of whether or not there has been a violation of due process is whether experience

teaches that the probability of actual bias is too high to be constitutionally tolerable.

Justice Kennedy concluded:

> "The Due Process Clause demarks only the outer boundaries of judicial
> disqualifications. Congress and the states, of course, remain free to impose more
> rigorous standards for judicial disqualification than those we mandated here
> today." Lavoie, supra at 828, 1065 Ct. 1580. Because the codes of judicial
> conduct provide more protection than due process requires, most disputes over
> disqualification will be resolved without resort to Constitution application of the
> constitutional standard implicated in this case will thus be confined to rare
> instances.

In fact, there are other statutory provisions, case law, and the Code of Conduct for United States Judges that do in fact impose more rigorous standards requiring the disqualification of Judge Reeves that will be discussed in this memorandum. One may question why pursue the due process argument. The answer is simple: Judge Reeves' actions pose such a risk of bias and prejudice making it necessary to forbid what he has done in order to guarantee that due process is adequately implemented.

Caperton v. A.T. Massey recognizes that cases dealing with a violation of the Due Process Clause in circumstances of judicial disqualification are exceptional cases dealing with extreme facts. Such is the case of United States v. Maricle. There are numerous instances where the acts of the presiding judge demonstrate a bias against the defendant so extreme as to violate due process.

(1)     The presiding judge parroted the pleading of the United States (R.581) in his memorandum opinion and order (R.671) thereby adding erroneous unsupported contradicted information to justify a finding to allow the introduction of background information.

(2)     In ex parte fashion, the presiding judge determined the accuracy of transcripts of recorded conversations between cooperating witnesses and Maricle using only the unattested copies of the United States made by the cooperating witnesses and refusing to compare to the submitted transcripts of Maricle. This was done in chambers outside the presence of the parties or their counsel.

(3)     The presiding judge ruled that the recorded conversations between the cooperating witnesses and Maricle not offered by the United States were inadmissible and burdensome without even listening to them or reading the transcripts submitted by Maricle pursuant to the Court's order of December 3, 2009. (R.549) The transcripts of the United States

4

made by Kennon and Wanda White were submitted to the jury during deliberations but Maricle's request to submit his version was denied even though Maricle testified and was subject to cross examination.

(4)     A requested evidentiary hearing on Maricle's motion to disqualify AUSA Stephen C. Smith, because of his kinship to Clay County Sheriff Ed Jordan, and the improper contact between Sheriff Jordan and Preston Smith, the father of AUSA Smith, was denied with a finding that no evidentiary hearing had been requested and without allowing a reply to be filed to the response of the government. (R.337) This was done by Magistrate Judge Wier, and an objection was filed by Maricle. (R.383) The presiding judge never acted on the objection. Sheriff Jordan was a political opponent of most of the defendants, was a member of the Clay County Board of Elections during the relevant time period, and was never indicted, even though the investigation showed numerous illegal acts including bribery and obstruction of justice.

(5)     A motion to disqualify the presiding judge was denied without a hearing and without allowing a reply to the response filed by the United States. A hearing was scheduled upon filing of the motion to disqualify but was cancelled and a thirty five-page memorandum opinion and order entered one day after the date of cancellation. The Court's decision cited authorities used by the United States that the defendant thought were inapplicable, but he never got a chance to show why.

## BACKGROUND EVIDENCE

The actions of Judge Reeves in parroting AUSA Smith's statements and thereby adding erroneous, and unsupported, findings without any factual basis, and that were in fact contradicted by the testimony of the background witnesses, is constitutionally intolerable. The use of false

information, upon which a finding in favor of admissibility of events of twelve and nineteen

years ago is one judicial precedent.

In McGhie Land Title Company v. Kitt, 549 F.2d 1358 (10th Cir. 1977) the presiding

judge was disqualified by reason of granting a summary judgment not having read the

depositions in the case or having allowed counsel for the opponent of the motion to be heard.

The actions of the presiding judge in Maricle's case are far more extreme. Evidence was

invented and then used to justify introduction of extremely prejudicial evidence at trial.

The determination in Edwards v. Balisok, 520 U.S. 421 __ S.Ct. __, __ L.Ed.2d __

(1997) that dishonestly suppressing evidence of innocence is a violation of due process pales in

comparison to the act of creationism as follows:

(1)     Day's testimony that Roy Morgan approached him about becoming
        Republican Election Commissioner became Cletus Maricle and Roy
        Morgan securing Day's appointment. (Day's testimony, R. 679 p.17;
        R.679 pp.47-48, lines 22-25, 1-6) (Smith's memo R.581 p.4) (Judges
        Order R.671 p.4)
(2)     Lewis' testimony that Freddy Thompson didn't come to him for help in
        the 2002 election became: (a) Maricle and Thompson brought Roy
        Morgan and Freddy Thompson to Lewis with money to purchase votes;
        (b) Thompson's role in enterprise established because Maricle and Jones
        brought him to Lewis with money to purchase votes; (c) The personal
        relationship of Maricle, Jones and Thompson is established which led to
        the alleged RICO conspiracy and to their individual roles in the
        conspiracy. (Lewis testimony R.679 p.106) (Smith's memo R.581 p.6)
        (Judges Order R.671 p.12; R.671 p.13; R.671 p.10)
(3)     Lawson's testimony that he gave money to Alan Roberts for Maricle's and
        House's circuit judge campaigns but he didn't know whether they got it or
        not became the Court's "Maricle had Roberts solicit Lawson" for money
        for campaign. The Court fails to explain how Lawson gave Roberts
        money while in the penitentiary. (R.671 p.16)

In addition, the presiding judge failed to find an absence of any contact between Maricle and

Day, Lewis or Lawson after each became drug dealers, or that Maricle even knew they were

dealing drugs. Judge Reeves refused to follow the evidence, which was:

6

(1)     The last demonstrated political contact between Day and Maricle was 1990. Day did not start dealing drugs or using drugs until after 1993 (R. 679 p.25 lines 4-17) Day attempted to give Maricle $20,000.00 and a box of cigars in 2003 or 2004, which Maricle refused to accept. (R.869, Trial Vol. 3B, pp.36-37)

(2)     Lewis gave a $2,000.00 contribution to Maricle in 1990 but he did not tell Maricle it was drug money and Maricle probably had no way of knowing it was drug money. Lewis was employed as a mine inspector at the time. (R.679)

(3)     Lawson testified he never had any conversations with Maricle about his (Lawson's) drug business, that he never had any conversations with Maricle about elections, politics or vote buying, and that the official that he was interested in having access to was the sheriff, and that he never had anything to do with judges or anything like that. (R.679)

The finding by the Court that twelve years and nineteen years was sufficient to establish a close "casual, temporal or spatial" connection in order to allow the admission of background evidence is arbitrary, capricious and characterized by abuse of discretion.

This state of mind carried over into the sentencing of Kennon White at which time Judge Reeves stated the election fraud case had ties to drug trafficking, that arrogance was on full display, and that the people convicted in that trial wouldn't get the same breaks as those sentenced on April 19, 2010. (Lexington Herald-Leader, April 20, 2010, Final Edition, Section-City/Region, Page A3).

The erroneous findings also made their way into the presentence report (PSR February 17, 2011 p. 18 #44, #45)

## AUDIO RECORDINGS AND TRANSCRIPTS

On August 17, 2009, both the defendant Maricle and the United States filed somewhat similar motions requesting a hearing relative to the audio recordings made by the United States through its cooperating witnesses. The government moved "that issues related to the admissibility of transcripts/translations of audio recording evidence be resolved before trial." (R.377 p.1) Maricle moved "the Court to conduct an EVIDENTIARY HEARING (Emphasis

7

added) to determine the authenticity, accuracy, and trustworthiness of audio recordings provided to the defense in discovery." (R.380 p.1)  Both motions were granted (R.436).  A status conference was held on December 2, 2009, at which time a two-day hearing was scheduled for resolution of audio recordings/transcript issues.  The hearing was scheduled for December 22, 2009, and December 23, 2009, with back up dates of December 24, 2009 and December 25, 2009 (Christmas Eve and Christmas Day).  The order further provided:

> (2)   The United States shall provide the Court with copies of the audio recordings and transcripts it proposes to use no later than 5:00 P.M. on Monday, December 14, 2009.
>
> (3)   The defendants shall provide the Court with a copy of the transcripts they would propose to use no later than 5:00 P.M. on Monday, December 14, 2009.  If the defendants disagree on a particular transcript and intend to submit for the Court's consideration more than one version of a transcript relating to a specific recording they shall identify the defendants favoring each version. (R.549)

Maricle complied with the order.

    Maricle arrived for the two-day hearing on December 22, 2009 fully expecting the Court and the parties to have an evidentiary hearing regarding the audio recordings/transcripts.  The Courtroom was prepared for a hearing with the proper equipment including headphones for all parties and all counsel.  Maricle's expectation went unrealized and the evidentiary hearing was short-circuited with no recordings being listened too.  Court began at 9:35 a.m. and concluded at 11:15 a.m. with a break of more than thirty (30) minutes)

    The Court had already listened to the clips that the United States had submitted as being the ones it intended to use as evidence.  It compared these recordings to the unattested transcripts of Kennon White and Wanda White, the two cooperating witnesses, and determined the accuracy based on that and that alone.  The Court did not compare any of the transcripts submitted by Maricle to the audio recordings furnished by the United States.  Nor did the Court listen to the

8

audio recordings or read the transcripts that the defendant wanted to use in addition to those

designated by the United States. (R.721 pp.8-9, p.12, p.21, p.22, p.31, pp. 46-47)

The Court tried valiantly on December 22, 2009 to establish that Maricle had not

submitted transcripts of the tapes that he wanted to use at trial. This is demonstrated as follows:

> Mr. Hoskins: one other question that I have in regards to the transcripts, and I
> realize the government has identified parts that they intend to introduce in their
> case in chief. There are additional parts that the defense I'm sure will want to
> introduce and I don't think it's the sole of the province of the government to be
> able to prepare transcripts for the Court's consideration.
>
> The Court: And that's the reason that I asked you to get together and do all that
> and submit to me by Monday. Last Monday, actually
>
> Mr. Hoskins: We submitted everything by Monday, Judge.
>
> The Court: I've been getting drips and drabs in all week Mr. Hoskins, I think
> maybe from your office
>
> Mr. Hoskins: You have gotten –
>
> The Court: So you didn't do it by Monday then, did you?
>
> Mr. Hoskins; Well, we submitted a transcript that had all the things on it we
> wanted by Monday of last week, and we did clean those up some in the hopes of
> making it easier for everybody to interpret what we had prepared
>
> The Court: So at this point – let me see if I understand what you're asking. At
> this point, there may be additional portions of transcripts that you haven't
> identified that you're wondering how to handle in terms of – or additional
> audiotapes that you want to introduce, but you don't have transcripts prepared, so
> there's nothing really for the Court to review at this point, is that correct?
>
> Mr. Hoskins: I don't believe so your Honor. I believe we have submitted
> transcripts of everything we want to use. (R.721 pp.19-20)

The dialogue continues thereafter with Hoskins stating that he wants to play all the tapes

that are not objectionable in order to put things in context (R.721 p.21). The Court continued to

try to refute what Hoskins said (R.721 p.22) but in the end allowed Maricle's submitted

transcripts to be placed in the record under seal (R.721 pp. 46-47)

The transcripts submitted by the United States had not been verified in accordance with

United States v. Robinson, 707 F.2d 872 (6th Cir. 1983). The Court made its changes and then

directed the United States to prepare a certification of the truth and accuracy of the tape. (R.721

p.35) Kennon White and Wanda White verified accepting all the changes of Judge Reeves.

The audio recordings and transcripts Maricle submitted and wanted went unheard and

unread by Judge Reeves, who determined that the part Maricle wanted was "inadmissible". At

trial, the Court stated:

> The Court has listened to the audiotapes that the United States proposes to play in
> the case and has made a number of rulings concerning the admissibility of the
> information contained in the transcripts and the tapes as well. ...[T]he court has
> reviewed each and every one of those transcripts in connection with the audio
> recordings.... (R.    Trial Vol. 6A pp. 74-75)

> One of the things that the court has done in this case, first of all, was to deny Mr.
> Hoskins request that all the tapes be played which would probably lengthen the
> course of the trial by a couple of weeks, I imagine.

> And that's in part the reason for that ruling because much of the information on
> the tape the Court determined was either unnecessary or a waste of time and
> would be unduly confusing to the jury.

> THE PORTIONS THAT REMAIN, THE PORTIONS I HAVE READ,
> (Emphasis Added) do appear to be relevant to – to the case (R.926 Trial Vol. 6B
> p.104)

When Maricle's counsel asked the Court if the defense was precluded from offering a

different interpretation of what is on the recording the Court replied:

> The Court:    you can certainly challenge that with a witness if you wish to do
> that. If you think – if you want to spend time with a witness saying that's not
> what you said or if you want to challenge something, that doesn't preclude you
> from challenging it. But in terms of introducing a competing version of the
> transcript, THE TRANSCRIPTS AREN'T GOING TO BE ADMITTED INTO
> EVIDENCE, (Emphasis added), so the Court can't see, at that time, allowing you
> to admit a competing version if the original isn't admitted. (R.721 pp. 18-19)

The United States had moved that the Court consider the issues related to "transcript/translations of audio recording evidence be resolved before trial." (R.379 p.1)  It would appear that the Court had ruled that the transcripts were not going to be admitted. However, that certainly was not what happened.  The unverified transcripts of Wanda White and Kennon White were approved ex parte, ordered to be verified and submitted to the jury for deliberations over Maricle's objections.

In its motion to resolve the pre-trial issues relative to the audio recordings and transcripts the United States referred to United States v. Onori but did not give the citation.  The Sixth Circuit in the case of United States v. Robinson 707 F.2d 872 (6th Cir. 1983) cited United States v. Onori as 535 F.2d 938 (6th Cir. 1976). Actually, it is a Fifth Circuit case, but since the Court of Appeals cited it as a Sixth Circuit case, it would be fair to assume that it did so approvingly: After reading United States v. Robinson, that would appear to be correct.

In Section IV USE OF TRANSCRIPTS, several principles are set forth that should be followed in the use of transcripts.

(1)    We believe the use of a transcript as a guide is analogous to the use of expert testimony as a device aiding a jury in understanding other types of real evidence.

(2)    It is therefore incorrect to think of transcripts as simply an "aid" as better lighting fixtures in the courtroom would be an "aid" to the jury's vision …They are evidence and, like other evidence, may be admitted for a limited purpose only.

(3)    We conclude that it is unnecessary for the trial court to decide whether a transcript is accurate before that transcript is given to the jury, so long as each side to the dispute is given an opportunity to submit a transcript containing its version of a conversation.

(4)    We have previously suggested that a prior judicial determination of accuracy is desirable before a transcript is used to "aid" the jury. (Citation omitted)  Other courts have also made this suggestion.  (Citation omitted) None of these cases, however, involves a situation in which the defendants alleged specific errors in the government's transcript.  Nor do these cases hold that a judicial determination of accuracy is a sine qua non of transcript use.

11

(5)     "…[T]he lawyers may stipulate that a particular transcript is correct just as any other relevant fact may be stipulated… .

(6)     In cases where the defense and prosecution disagree (on what is an accurate transcript of a recording) … the proper procedure is for the jury to receive transcripts of both sides "versions."

(7)     So the first efforts of the district court should be to devise a "stipulated" transcript, one to which all sides to the dispute can agree. If one transcript is to be used, as an "aid" or "evidence," there must be agreement about its accuracy, and a pretrial meeting in chambers may sometimes be necessary to determine if that is possible.

(8)     If no "official" transcript is developed, Carson and Chiarizio [referring to two cases] show that the jury is entitled to consider the divergence in two transcripts of the same conversation, with the recording of it, as a problem of fact to be resolved in the traditional manner.

The Court went on to point out three different ways to show the difference. One would be a transcript that contained both versions of the disputed transcripts. Another would be two complete transcripts. Yet another would be two transcripts and listen to recording twice, once with each transcript. In United States v. Robinson, 707 F.2d 872 (6th Cir. 1983) cited United States v. McMillan, 508 F.2d 101 (8th Cir. 1974); United States v. Vinson, 606 F.2d 149 (6th Cir.1979); United States v. Crane, 632 F.2d 663 (6th Cir.1980) and United States v. Smith 537 F.2d 862 (6th Cir. 1976) -- each of these was to the effect that transcripts should ordinarily not be admitted unless both sides stipulate to their accuracy.

        The Court handled the transcript issue in such a manner as to force on the jury his version of the transcript. He wrote, "So it will be necessary for the government to take my version, make the changes to the original transcripts if they wish to introduce those in the upcoming trial." (R.721 p. 9) This posed no big problem for the United States since their unattested transcripts were the only ones he read and compared to the audio recordings, and he had basically adopted its versions. He then ordered the United States to submit a written certification by the transcriber (R.721 p.35) which would and did coincide with the Court's translation. He did in fact acknowledge that these were the Court's transcripts. (R.721 p.17)

Any attempt to rely upon <u>United States v. Robinson</u> as authority for the above procedure is misplaced. In ruling that the transcripts were not to be used in that case, the Court held that the submission of the two versions were not to be used if the tape was significantly inaudible. The other concern of the Court was two transcripts were impractical where the defendant asserted his Fifth Amendment right to remain silent. In this case, Maricle had submitted transcripts of his volition and testified at trial.

The Court handled the transcripts in an ex parte fashion (one-sided) by reading and using only the unattested versions of the United States while disregarding those submitted by the defendant. Judge Reeves became a silent witness by forcing his version on the parties and subsequently submitting them to the jury after ruling that he was going to admit the tapes. Since he was not subject to cross-examination as judge, the defendant was denied his constitutional right of confrontation.

## DENIAL OF RIGHT TO BE HEARD ON JUDICIAL DISQUALIFICATION

The affidavit filed herein details the circumstances surrounding the filing of motions for judicial disqualification and actions taken thereon by Judge Reeves implicating LCrR 12.1(d), LCrR 12.1(h), Canon 2A, Canon 3A(3) and Canon 3A(4). A hearing previously scheduled was cancelled on one day and a 35-page memorandum opinion and order overruling defendants' motions entered the next. No time was allowed for a reply to the response.

One of our basic rights although, not stated specifically in the Constitution is the right to be heard, which is more often than not referred to as the right to one's day in Court. Without the right to our day in Court, our constitutional rights would be meaningless. Cutting short our right to be heard is an abridgment of our due process rights.

The Court entered an order two days after the filing of a motion for his disqualification and before the United States had filed his response setting a hearing on the disqualification motion for August 27, 2009. This impatience combined with the impatience shown in cancelling the hearing on one day and entering an order denying the motion on the next certainly raises questions about the motives. The defendant will not speculate at this time on the possible reasons but will instead allow the reasons to be gleaned from the totality of the facts and circumstances set forth in the affidavit and this memorandum.

The defendant was greatly prejudiced by the Court's denial of his right to a fair presentation of his position – Liteky v. United States, 510 U.S. 540 (1994) hereinafter referred to as Liteky supported the defendant's position not that of the United States. By denying a hearing or the filing of a reply, the Court denied itself the opportunity to be presented with the defendants' analysis of the Liteky case.

An analysis of Liteky vis-à-vis this case would have clearly demonstrated the Court was basing his comments in this case on an impermissible source. Liteky applied to this case required disqualification and did not provide a basis for the position of the United States or authority for the Court's decision.

A diagram of each case demonstrates the clear differences between Liteky and Maricle

### Liteky

| | |
|---|---|
| 1983 Trial Defendant Bourgeois<br>Subject matter and offenses arising<br>out of a political protest at<br>Ft. Benning Military Reservation | 1991 Trial Defendant Bourgeois<br>Subject matter and offenses arising<br>out of a political protest at<br>Ft. Benning Military Reservation |
| Day<br>Defendants – Day & Others<br>but none of the same defendants as in<br>Maricle case | Maricle<br>Defendants – Maricle & Others<br>but none of the same defendants as<br>in Day case |

14

Subject matter – buying and selling of illegal drugs
Offenses – Violation of various statutes relating to illegal drug activity

Subject matter – 2002, 2004 & 2006 elections
Offenses – Violation of various statutes relation to election offenses

In the Liteky case there was identity of parties, identity of subject matter and offenses. The Day and Maricle cases did not have identity of either.

The analysis of the difference between the two Liteky cases and the Day and Maricle cases is important to the extent it shows that the actions of the Court in this case used its conclusion and opinion of a witness' credibility from a case that did not involve the same parties, same subject matter or same offenses. In doing so, it found the witness, Kenny Day, to be credible when it was irrefutable that the defendant had perjured himself at Maricle's detention hearing. In doing so, the Court concluded that it was necessary to respond to the issue of Day's credibility because Maricle's attorney brought it up (R.435 p. 1 and p.34)

Even if we accepted a conclusion that extrajudicial means contact or information received outside any judicial proceedings, it does not follow that because it is not extrajudicial that it is not disqualifying. The per se rule is the one specifically rejected by Justice Scalia. He recognized that opinions formed by judges on the basis of current or prior judicial proceedings as in the Liteky case form a bias or partiality challenge where they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

Judge Reeves attempted to have his cake and eat it too. He referred to the Day case, the Bobby Joe Curry case or the Hacker and Roberts case as related cases. (R.435 p.1) At the same time, he wrote that no defendant in the current litigation was identified directly or by inference in Day's plea agreement (R.435 p.3) nor directly or by implication in the Curry, Hacker and Roberts case. (R.435 p.31) He attempted to make the cases related to Maricle to justify his factual finding on the credibility of Day but at the same time emphasize no direct, inferential, or

15

imputable reference in an attempt to negate bias, prejudice, and partiality. To paraphrase

Churchill, it is an innuendo wrapped in an enigma sealed in a paradox.

The Court relied upon the decision of Judge Hood finding certain statements as

insufficient to support a motion to disqualify Judge Reeves in the case of United States v.

Roberts and Hacker, 6:06-cr-82-DCR (E.D.Ky. October 26, 2006). This is one of the arguments

set forth in the response of the United States to the defendants' motions to disqualify, and the

Court accepted the argument. However, it was the Court's denial of a hearing and cutting off the

defendants' time to file a reply, which prohibited the defendant from being allowed to reply or to

address the argument of the United States.

The denial of the defendant's rights to be heard prevented these arguments as well as the

following arguments relative to Hood's decision from being heard:

(1)    The decision in United States v. Todd Roberts and Vernon Hacker is not
       the law of this case.
(2)    The reasons argued in support of disqualification in this case are for
       different and greater than they were in United States v. Todd Roberts and
       Vernon Hacker.
(3)    Parts of the Day sentencing hearing were under seal and remain under lock
       and key, so to speak.
(4)    The case of Roberts and Hacker was in fact referred by Judge Reeves to
       another Judge.
(5)    The application of Liteky is paramount in this case and not in United
       States v. Roberts and Hacker.

## Questions Presented

Based on the enumerated factors set forth herein and the affidavit of Russell Cletus

Maricle filed herein, an answer of "yes" to any of the following requires the disqualification of

District Judge Danny C. Reeves.

(1)    Must Judge Reeves disqualify because on an objective basis there is a "probability

       of actual bias"?

(2)     Must Judge Reeves disqualify because on an objective basis his "impartiality might reasonably be questioned"?

(3)     Must Judge Reeves disqualify in order to "preserve the appearance of justice"?

(4)     Must Judge Reeves disqualify because of his relationship to Sandra Reeves?

(5)     In the event the answer is no to all of the above, is the defendant entitled to an evidentiary hearing before another judge in order that he may call Sandra Reeves and Cindy Reeves as witnesses?

Obviously, these arguments could have been made at a hearing or in a reply to the response of the United States. The Court eliminated both options by cancelling the hearing and almost simultaneously therewith entering an order overruling the motion to disqualify. It accepted carte blanche the arguments of the United States. This is much like what happened in McGhie Land Title v. Kitt, supra.

It is the Court's decision denying the defendant the right to be heard that violates the Due Process Clause. When the decisions in such circumstances are consistently adverse to the wanting to be heard, it further illuminates the bias.

## DENIAL OF RIGHT TO BE HEARD ON PROSECUTORIAL DISQUALIFICATION

The same "right to one's day in Court" is equally applicable to the motion for disqualification of AUSA Smith as it is to the motion for judicial disqualification. The requirement for a judge is to be fair, impartial, unbiased, and non-prejudicial. A prosecutor must act with honor and integrity to instill public confidence in the prosecutorial system. He must not knowingly present false evidence, withhold evidence that would exculpate the defendant, or destroy evidence. He must comply with the rules of discovery. The prosecutor is required to avoid prosecuting cases in which he might have a personal, economic or political interest. If he

prosecutes cases, in which he has such an interest he is likely to have great difficulty complying with the duties imposed upon him.

It was this type of situation that prompted the defendant to file a motion to disqualify AUSA Smith, because of the relationship of AUSA Smith; Preston Smith, the father of AUSA Smith; and Edward Jordan, Sheriff of Clay County, a cousin of Preston Smith and AUSA Smith. Since this was a case involving politics and the Clay County Board of Elections, of which Jordan was a member in the relevant period, the defendant's motion was justified particularly since Sheriff Jordan was unindicted. Sheriff Jordan was a political opponent of the defendants in this case.

As was true in the case of judicial disqualification, the defendant was again short circuited by the judiciary. The motion for disqualification (R.296) requested an evidentiary hearing on its face but upon an unverified response by AUSA Smith being filed (R.326) Magistrate Judge Wier entered an order finding that no evidentiary hearing was requested before the defendant's time to reply expired. (R.337) The defendant objected to the order (R.383) but the District Judge failed to rule on it thereby letting the ruling stand. This was in violation of LCrR 12.1(d), LCrR 12.1(h), Canon 3A(3) and Canon 3A(4).

A review of the misconduct in initiation of the proceeding and misconduct in the detention hearing shows what had already happened before the defendant was denied his right to be heard.

(1)   Misconduct in Initiation of Proceedings

This matter is addressed extensively in Exhibit G attached to the affidavit that is filed in support of this motion. A summary of the affidavit and Exhibit G establishes as follows:

18

(a)     A review of this case beginning with the grand jury investigation, the indictment,

the search warrants, trial testimony and court conclusions demonstrates this is a case of election

related offenses. It is perceived as that by everyone including the press.

(b)     The United States gave misleading advice to the grand jury in disregarding

what they knew to be controlling case law in the case of United States v. Turner, 465 F.3d 667

(6th Cir. 2006), a case that had been argued and lost by one of the AUSA's appearing in this

case. United States v. Turner held that honest services mail fraud could not be used in election

cases and that salaries of elected officials could not be used to prove that money or property was

fraudulently obtained. Even in Turner, the Court of Appeals noted that the U. S. Attorney's

office for the Eastern District of Kentucky had proceeded in the Turner case in violation of

procedures, regulations, and policies of the United States Department of Justice.

(c)     In spite of this rebuke, AUSA Smith proceeded against these defendants

without first obtaining the required approval of the Public Integrity Section, Election Crimes

Branch of the Department of Justice, which recognizes the binding authority of United States v.

Turner and does not recognize the use of RICO in the prosecution of election offenses.

In circumventing the Election Crimes Branch, he was able to avoid, the agency, which is

charged with ensuring national standards for the federal prosecution of election offenses,

respecting the State's primary responsibility in the electoral process and guaranteeing

prosecutors detached from local political interests. This allowed him to avoid the consultation

required, with the Public Integrity Section, before expanding on election fraud investigation

beyond the preliminary stage, before interviewing individual voters during the pre-election

period, before issuing subpoenas or search warrants in connection with election fraud, before

19

presenting evidence to the grand jury and before filing a criminal charge or presenting an

indictment. AUSA Smith did all of these without the required consultation.

(2)     Misconduct in Detention Proceedings

In its efforts to detain Maricle pre-trial SA Briggs, TFO Blair and AUSA Smith produced

false and misleading testimony for the purpose of impairing Maricle's ability to defend himself.

This is outlined in Exhibit H attached to defendant's affidavit filed in support of this motion.

However, a brief example will be shared here.

(a)     During the pretrial interview, after his arrest, Maricle had mentioned New

Mexico; at the detention hearing AUSA Smith and Briggs changed it to Mexico to try to show

that Maricle was a flight risk and would go to Mexico. Maricle had no passport and could speak

no Spanish.

The right to be heard was again abridged and an adverse ruling to the defendant was

entered. The Due Process Clause was violated one more time.


                                        Respectfully submitted,




                                        R. Cletus Maricle, Pro Se
                                        Franklin County Regional Jail
                                        400 Coffeetree Road
                                        P.O. Box 4068
                                        Frankfort, KY 40604

## CERTIFICATE OF SERVICE

I hereby certify that I have had sent by a third party a copy of this notice with affidavit to all counsel of record, David S. Hoskins, Candace C. Crouse, Martin S. Pinales, R. Kent Wesberry, T. Scott White, Robert L. Abell, Russell James Baldani, Jerry W. Gilbert, Elizabeth Snow Hughes, Daniel A. Simons and AUSA Stephen Craig Smith,  via email or by required mail through the United States Post Office, which is the best service I can accomplish under the conditions of my incarceration.

This ___7___ day of March, 2011.


Russell Cletus Maricle, Pro Se
Franklin County Regional Jail
PO Box 4068
Frankfort, KY 40604

21