## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION
## LONDON

**CRIMINAL NO. 09-16-S-DCR**

**UNITED STATES OF AMERICA**                                          **PLAINTIFF**

**V**           **NOTICE OF PRO SE FILING OF AFFIDAVIT IN SUPPORT OF**
**OBJECTION TO SENTENCING ON BASIS OF DEMONSTRATED**
**JUDICIAL BIAS, PREJUDICE AND PARTIALITY**

**RUSSELL CLETUS MARICLE,**                                          **DEFENDANT.**

Notice is hereby given that Russell Cletus Maricle objects to any sentencing of the defendant Maricle by District Judge Danny C. Reeves due to judicial bias, prejudice, and partiality of the presiding judge. In support hereof he attaches an affidavit. The length of the affidavit is necessitated by the demonstrated acts of bias, prejudice and partiality in denying hearings, cutting off reply times, aborting hearings, creating false findings, abusing counsel, and other improper acts by the presiding Judge.

This ___7___ day of March, 2011.

_R Cletus Maricle_

Russell Cletus Maricle, Pro Se
Franklin County Regional Jail
PO Box 4068
Frankfort, KY 40604

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL NO. 09-16-S-DCR

UNITED STATES OF AMERICA                                    PLAINTIFF

V.    AFFIDAVIT IN SUPPORT OF OBJECTION TO SENTENCING ON
      BASIS OF DEMONSTRATED JUDICIAL BIAS, PREJUDICE AND
                          PARTIALITY

RUSSELL CLETUS MARICLE,                                    DEFENDANT.

TANGENTS, RAMPAGES AND RANTS

". . . I think you understand that sometimes when this court goes off on a tangent, some
would call it a rampage but we'll say a tangent. . ." and ". . . rants that you hear coming from the
Court. . ." are words of self description coming from the mouth and pen of District Judge Danny
C. Reeves. [Memorandum Opinion and Order R. 435, p.28 citing May 8, 2009, Transcript 54-55]
At a hearing in this case Judge Reeves spoke these words which he adopted and ratified in his
Memorandum Opinion and Order.

Webster's New World Dictionary defines going off on a tangent as "to change suddenly
to another line of action," rampage as "to rush about wildly, rage, an outbreak of violent, raging
behavior," and rant as "to talk or say in a loud, wild extravagant way, loud wild speech." These
traits are not mere idiosyncrasies but are the antithesis of judicial, impartial, and fair. Certainly
the standards set out in Liteky v. United States, 510 U.S. 540,555(1994) that impatience,
dissatisfaction, annoyance or even anger do not in and of themselves establish bias or prejudice
are far exceeded.    Impatience means restlessly eager to do something.    Dissatisfaction is
displeasure.    Annoyance is irritated or bothered.    Anger is a feeling of displeasure and hostility

2

that a person has because of being injured, mistreated or opposed. Neither rises to the level of going off on a tangent, rampaging or ranting that displayed a deep seated antagonism towards the defendants, and deference to the United States so permeating the judicial process as to deny a fair trial or impartial judgment.

While the defendant will not attempt to enumerate all of the acts or words fitting under the Court's self-description, he will reference a few examples of the type of actions that clearly demonstrate bias, prejudice and partiality against the defendant and a predisposition to assist AUSA Steven Smith and the United States. This is not meant to be a dissertation on judicial errors in a particular situation but to show a hostile court environment directed at the defendant or defendants. These are subjective symptoms that demonstrate to any objective observer prejudice or bias manifesting irresistible impulses on the part of the perpetrator.

**THE WORDS, ACTS, AND DEEDS OF U.S. DISTRICT JUDGE DANNY C. REEVES, HIS SISTER, SANDRA REEVES, AND HIS WIFE, CINDY REEVES, CLEARLY DEMONSTRATE THE BASIS FOR A HOSTILE COURT ENVIRONMENT AND REQUIRE THE DISQUALIFICATION OF HON. DANNY C. REEVES AS A MATTER OF LAW FROM ANY FURTHER PROCEEDINGS IN THIS ACTION.**

Sandra Reeves

Sandra Reeves is a practicing attorney in Corbin, Kentucky, and based upon information furnished to the defendant, he is of the opinion that Sandra Reeves is a sister to Hon. Danny C. Reeves. She has on occasion practiced in the 41st Judicial Circuit before the defendant Maricle when he was the presiding judge.

One such case in which Sandra Reeves appeared as counsel was the case of Terry Evan Coomer vs. Sheila Moniz vs. Bill Dobbs and Betty Dobbs, Clay Circuit Court, Civil Action No. 01-CI-00410 wherein Sandra Reeves represented Shelia Moniz in a child custody and visitation proceeding. Moniz was the natural mother of the infant child. The other parties to the

3

proceeding were the natural father, Terry Evan Coomer, and the paternal grandparents, Bill and Betty Dobbs.

Upon entering the case Ms. Reeves filed a motion to recuse Maricle as the presiding judge citing as a reason an alleged political connection between Maricle and Bill and Betty Dobbs. A copy of said motion to recuse is attached hereto as Exhibit A. The motion was overruled and Ms. Reeves eventually withdrew as counsel. It was obvious that Ms. Reeves was dissatisfied with the Court's decision as to whether the legal test for custody was the fitness of the natural mother or the best interests of the child.

The affiant has reason to believe that Ms. Reeves has made the statement during the course of those proceedings or thereafter that her brother, referring to Judge Reeves, was going to clean up Clay County, which the defendant takes as a reference to the Court system and in particular this defendant.

The FBI has interviewed Bill Dobbs and Betty Dobbs, and Robert F. Moniz II, the present husband of Shelia Moniz. In particular the FBI questioned Robert F. Moniz, II, about the lawsuit during which interview he is alleged to have made the statement that Mr. and Mrs. Dobbs were represented by Robert Stivers and Cletus Maricle. A copy of the witness interview of Robert F. Moniz, II, will be submitted under seal as Exhibit B.

The above referenced statement was furnished the defendant as part of the Jencks material a few days before the trial. The defendant being made aware of that, did in fact have a subpoena prepared for Sandra Reeves, and a person present in Corbin, Kentucky to serve her. However, the attorney for Maricle, Hon David Hoskins, told the server and Maricle's wife that he would serve the subpoena. In fact, it was never served, for reasons unknown to Maricle but

4

which he has assumed was due to the proximity in time to the beginning of the trial, which all parties were interested in getting under way.

In fact, Sandra Reeves was a material witness and remains such at this time. Further, in light of the position that the United States has taken as to Maricle's performance as judge, Ms. Reeves would be deemed to have a client who was a victim and/or would consider herself to be a victim.

It is respectfully submitted Judge Reeves is automatically disqualified and such disqualification is non waivable.

Cindy Reeves

Shortly after August 2, 2010, the affiant fortuitously learned circumstances relative to Cindy Reeves that has led him to believe that he cannot get a fair hearing before Judge Reeves. The affiant has been informed that Cindy Reeves is the wife of U.S. District Judge Danny Reeves and has made certain statements and taken certain actions that would cause Maricle to be justified in believing that he cannot get a fair hearing before Judge Reeves and that in fact Judge Reeves is biased and prejudiced against the defendant.

According to the source, who was employed at Model School in Richmond, Kentucky, during the 06-07 school year, she met, during the course of her employment a lady by the name of Cindy Reeves whose husband was Judge Danny C. Reeves. The source understood that Judge Danny Reeves was a Federal Judge in London, Kentucky, but he and his wife lived in Lexington, Kentucky. He drove to London to handle cases there.

The source also reported that Mrs. Reeves talked a lot about the Whites and Cletus Maricle. She also indicated to the source that she knew one of Jack White's daughters during her

5

college days. In fact, she may have stated that she was a roommate of one of them. Jack White is an uncle of Kennon White, one of the chief witnesses in this case.

The source said Mrs. Reeves also left school one day to get her concealed deadly weapon's permit. The source did not say whether she actually got the permit or not.

The source also stated that Mrs. Reeves told her "what was coming," but the source did not specify exactly what that was. The source got the impression that Mrs. Reeves felt threatened.

Maricle has confirmed some of the above related material but due to the highly sensitive nature, he has confined himself to city of residence and employment. Regardless of what Judge Reeves may think of the defendant, Maricle is very sensitive to inquiry about a member of a Judge's family. The defendant would like to inquire further and call Mrs. Reeves and the source as witnesses.

<u>Judge Danny C. Reeves</u>

The opinion held by Judge Reeves of defendant Maricle came through loud and clear on March 3, 2010, when Judge Reeves in admonishing Jennings White stated as follows:

> The Court: Yes sir. I want to advise you of a pretrial ruling that I made in the case so there's no questions or no testimony offered about that. Before trial I determined that an issue involving a shooting involving Cletus Maricle, defendant Cletus Maricle 1971 shooting incident which he shot someone in Clay County could not be asked about during the course of this trial. So the attorneys aren't going to ask you about that and by same token, you can't volunteer that information in response to a question unless I determine that its relevant in this case.
> (R.877, Trial Vol. 17B, pp 27-28)

If there ever was a classic Freudian slip, this is one. Judge Reeves clearly reveals that he believes that the defendant shot someone in 1971. There certainly was no evidence of that in this case, and Judge Reeves was aware or should have been aware that

6

two people were indicted and tried for the incident in 1971. At trial self defense was asserted and a jury in Madison County, Kentucky acquitted the two defendants. Maricle was never indicted.

This statement standing alone and made during the course of these proceedings clearly shows that the defendant has an insurmountable obstacle to overcome that would deny him a fair sentencing before Judge Reeves. It is obvious that the Court believes that Maricle shot someone in 1971, which is absolutely false.

Judge Reeves at the sentencing of Kennon White on April 19th, 2010. stated that the election fraud case had ties to drug trafficking, that arrogance was on full display during the trial, and that the people convicted in that trial won't get the same breaks as those sentenced on April 19, 2010. (Lexington Herald-Leader (KY) April 20, 2010, Final Edition, Section City/Region, A3, Exhibit C)

**THE COURT IN REACHING ITS DECISION ON THE ADMISSIBILITY OF BACKGROUND EVIDENCE DEMONSTRATED ITS HOSTILITY AND PRE-CONCEIVED OPINIONS BY PARROTING AUSA SMITH'S ARGUMENTS INSTEAD OF RELYING ON THE EVIDENCE**

On December 30, 2009 AUSA Smith filed a NOTICE/MEMORANDUM IN SUPPORT OF ADMISSION OF INEXTRICABLY INTERTWINED BACKGROUND EVIDENCE. (R.581) A hearing was conducted on January 19, 2010 at which time Kenneth Day, Eugene Lewis, J. C. Lawson and SA Briggs testified. (R.679) Two days later District Judge Danny C. Reeves entered a MEMORANDUM OPINION AND ORDER (R.671) supposedly based on the testimony at the January 19, 2010 hearing.

The United States made numerous assertions in its Notice/Memorandum that were essential to its attempt to introduce background evidence at Maricle's trial which were parroted in the Court's Memorandum Opinion and Order. These assertions and parrottings are not

7

supported by the testimony of either Day, Lewis or Lawson. In fact, they are contradicted by their testimony.

In his Notice/Memorandum in Support of Admission of Inextricably Intertwined Background Evidence, AUSA Smith wrote:

> The evidence is not being offered to show "criminal propensity," as marijuana dealing and the conduct alleged in the indictment are very distinct behaviors. However, one activity fueled the other, and the drug trade in Clay County created the need for the racketeering enterprise that is alleged in the indictment, and provided for a mutually beneficial relationship between the two entities. (R.581 p.9)

In fact Smith realized that he had a weak if not non-existent case against Maricle. In order to be successful he had to dig deep into the archives to find three drug dealers all of whom had multiple drug convictions – Day-2, Lewis-3, and Lawson-3. Going back twelve and nineteen years before the date of the alleged conspiracy and nineteen and twenty six years before the date of the indictment, he found three prisoners serving long sentences and hungry for the good life.

The United States by this hearing was trying to have its cake and eat it too. AUSA Smith conceded in his memorandum and his opening statement at trial that this is not a drug conspiracy case. The evidence would not and did not support a drug conspiracy but by using the background witnesses, who were all major drug dealers, AUSA Smith tried to show a nexus between drug dealers and the alleged election fraud in order to prejudice the jury and for no other purposes.

Defendant has prepared a series of charts that visually demonstrate what has happened in this case. The allegation made by the United States will be set forth followed by the hearing testimony after which the Judges finding will appear. Comparison will show that the two matches are the United States and the Judge with the witness being the odd man out. In addition the charts will contain the trial testimony of the witness on point. Even if that testimony could

8

be related back, it would not support AUSA Smith or Judge Reeves. The hearing and trial testimony are consistent with each other but not AUSA Smith or Judge Reeves allegations or findings, which are consistent only with each other.

However, the story does not stop there. On January 19, 2010, Judge Reeves stated at Kennon White's sentencing that the election fraud case had ties to drug trafficking. (The Lexington Herald-Leader, April 20, 2010, Final Edition, Section-City/Region, page A3) And in what is one of the most important documents in the defendant's case, Senior Probation Office Diane C. Bowling adopted the writings of AUSA Smith and Judge Reeves. (PSR, February 17, 2011)

Charts have also been prepared based upon the testimony that show no political contact between Maricle and any of the defendants after they became drug dealers. This is direct contravention of Smith's allegations and Reeves' findings.

Kenneth Day

The first witness called on January 19, 2010, was drug lord Kenneth Day. Charts 1 and 2 are applicable to his testimony and political contacts with Maricle.

### Chart 1

| | |
|---|---|
| AUSA Smith wrote<br>Record 581, December 30,<br>2009 p.4 | In 1988, Cletus Maricle and Roy Morgan secured Kenneth Day the appointment as Republican Election Commissioner for Clay County Board Of Elections. |
| Kenneth Day testified<br>Record 679, January 19,<br>2010 p.17 | Q. Now you indicated that you were selected at some point to be the election commissioner, I believe you said sometime in the 80's?<br>A. Yes, I was<br>Q. How did you – who approached you?<br>A. Roy Morgan |
| Pp 47-48 | Q. And Roy Morgan was the one who approached You to be the commissioner? |

9

| | |
|---|---|
| Judge Reeves parroted Record 671, January 21, 2010 p.4 | A. Yes he did<br>Q. And you became elected to commissioner? According to Day, in 1988, Maricle and Roy Morgan secured for Day the appointment as Republican Election Commissioner for the Clay County Board of Elections. |
| Kenneth Day testified Record 835, Trial Vol. 3A February 4, 2010 p.33 | Q. Who is that first approached you becoming Clay County's Republican Commissioner?<br>A. Roy Morgan<br>Q. And Roy Morgan, was he a friend, associate, how did you know him?<br>A. I had knowed Roy for several years. I'm acquainted with him. |
| Judge Reeves quoted in the Lexington Herald-Leader on April 20, 2010, Final Edition, Section City/Region A3 regarding Maricle's trial | Arrogance was on full display.<br><br>Election fraud had ties to drug trafficking<br><br>People convicted in that trial won't get the same breaks as those sentenced Monday |
| Senior Probation Officer Diane C. Bowling in PSR February 17, 2011 p.18 #44 recorded | In 1988 Maricle secured Day's appointment as the Republican Election Commissioner for the Board of Elections |

## Chart 2

| | |
|---|---|
| 1990 | Day supported Maricle for Circuit Judge. This was the last political contact between the two. |
| '93, '94, '95 | Day started dealing drugs. (R.679 p.25 lines 4-7, R.835, Trial Vol. 3A, p.8 lines 11-13) |
| '95, '96, '97 | Somewhere during this time Day started using methamphetamine, his drug of choice, (R.835 Trial Vol. 3A, pp. 61-62 lines 23-25, lines 1-5) |
| 1997 | Caught with drugs in Florida and was imprisoned (R.679, pp. 53-54) |
| 2001 | Released from prison on 5 years conditional release subject to random drug tests and random visits by probation officer and under protection of Sheriff Ed Jordan. He began his drug operations immediately |

| | |
|---|---|
| | using drug contacts made while in prison. (R.835, Trial Vol. 3A p.89, R.869 Trial Vol. 3B p.37) |
| 2003 or 2004 | Attempted to give Maricle $20,000.00 and a box of cigars. Maricle refused to accept it. (R.835, Trial Vol. 3A, pp. 82-83, lines 4-25, lines 1-3) |
| February 4, 2010 | Testified there was no connection between his election activities in the early 80's and drugs. (R.835, Trial Vol. 3A, pp.92-93 lines 10-25, line 1) |
| Judge Reeves quoted in The Lexington Herald-Leader On April 20, 2010 regarding Maricle's trial | Arrogance was on full display (A3) |
| | Election fraud had ties to drug trafficking (A3) |
| | People convicted in that trial won't get the same breaks as those sentenced Monday (A3) |

The first cursory reading of Chart 1 shows the obvious disparity between the proof on one hand and AUSA Smiths pronouncement and Judge Reeves' finding on the other. The fact is Maricle had nothing to do with Day's appointment as election commissioner. The government's linchpin was broken by the testimony of its own star witness. He spoke only the name Roy Morgan.

Even if you could adopt a relation back theory making Day's trial testimony applicable, which you cannot, the result is the same. Roy Morgan was the person that approached him after he and Morgan had worked together supporting Ed Jordan for Sheriff. (R.835 Trial Vol. 3A, p.33) This in fact confirms Day's testimony of January 19, 2010 that Roy Morgan approached him about being election commissioner and he was elected to the position by the Republican precinct captains, co-captains and youth captains. (R.679 p.17, R.679 pp. 47-48) Maricle's name was not mentioned. In fact Roy Morgan was the person who told him who to use as election officers. (R.679 pp. 39-40)

The evil this portended for Maricle in his sentencing in fact has been manifested by Judge Reeves statement on April 20, 2010, that election fraud had ties to drug trafficking and that the

11

people convicted in the trial of this case would not get the same breaks. (The Lexington Herald-Leader, Final Edition, City/Region Section, A3)  A further manifestation occurred on February 17, 2011, when Senior Probation Officer Diane C. Bowling adopted the statements of the prosecutor and Judge Reeves for Maricle's PSR, which is a very important document for sentencings and other proceedings thereafter.

The testimony in this case as demonstrated by Chart 2 shows no political contact between Day and Maricle after 1990 and in particular after Day started dealing drugs in '93, '94, or '95 and using methamphetamine, his drug of choice, in '95, '96, or '97.  It does show Day attempting to give Maricle $20,000.00 and a box of cigars in 2003 or 2004, which was refused. There was no connection between drugs and Maricle, Adams and Day's election activities in the early '80's. (R.835, Trial Vol. 3A pp. 92-93)

Eugene Lewis

With Lewis the errors of the Court grew exponentially.  AUSA Smith's pronouncement was turned into three different findings by the Court completely unsupported by the evidence produced by the United States as shown in Chart 3 and further demonstrated in Chart 4.

### Chart 3

| AUSA Smith wrote Record 581, December 30, 2009 p.6 | Maricle and Jones brought candidates to Lewis prior to elections including Roy Morgan and Freddy Thompson with money to purchase votes. |
|---|---|
| Eugene Lewis testified Record 679, January 19, 2010 p.106 | Q. And this business about you said Wayne Jones came to you in '02 when you were on parole and asked you about helping Freddy.  Freddy wasn't involved in that conversation?  He wasn't present. <br> A. No sir <br> Q. So you don't even know whether he had anything to do with Wayne coming to you on his behalf right? <br> A. No |

Judge Reeves parroted
Record 671, January 27,
2010 p.10, p.12, p.13

According to Lewis, Defendants Maricle and Jones brought candidates to him (including Roy Morgan and Freddy Thompson) prior to elections with money to purchase votes.

The testimony also shows Defendant Thompson's role in the enterprise because Maricle and Jones allegedly brought him to Lewis with money to purchase votes.

In addition, the testimony concerning Defendants Maricle, Jones and Thompson is relevant to establish their personal relationship with one another that led to the alleged RICO conspiracy, as well as their individual roles in the enterprise.

Eugene Lewis testified
Record 870, February 5,
2010 p.30

Q. Okay. Now, you talked about Wayne Jones coming to you in '02 and asking you to help his son-in-law, Freddy Thompson, who was running against Jennings White for County Clerk, right?
A. Yes
Q. And I want to make it perfectly clear. Freddy Thompson wasn't with his father-in-law when he approached you, was he?
A. No sir
Q. Freddy Thompson never personally approached you, did he?
A. No, sir
Q. And you don't have any reason to tell this jury that Freddy Thompson even knew his father-in-law approached you, do you?
A. That's true.

Judge Reeves quoted in The
Lexington Herald-Leader on
April 20, 2010, Final Edition,
Section City/Region A3
Regarding Maricle's trial

Arrogance was on full display

Election fraud had ties to drug trafficking

People convicted in that trial won't get the same breaks as those sentenced Monday

Senior Probation Officer
Diane C. Bowling in PSR
February 17, 2011 reported

Maricle and Jones brought candidates to Lewis, prior to the election, including Roy Morgan and Thompson with money to purchase votes.

13

p. 18 #45

## Chart 4

| | |
|---|---|
| '60's, '70's, and '80 | Started working in elections and became an election officer around '80 at which time he had not started dealing drugs (R. 869, Trial Vol. 3B p.72) |
| Approximately 1988 (late 80's) | Buys a farm in Henry County (over 160 miles from Clay County) and starts growing marijuana (R.869, Trial Vol. 3B, pp.50-51) |
| 1994 | Retires as mine inspector (R.869, Trial Vol. 3B, p.49 |
| 1995 | 1st drug conviction (R.869, Trial Vol. 3B, p.49) |
| Testimony of January 19, 2010 – Eugene Lewis | Testifies he made a $2,000.00 contribution to Maricle's campaign in 1990 at which time he was a federal coal mine inspector (R. 679 p.66, R.869, Trial Vol. 3B p.60) |
| Testimony of January 19, 2010 – Eugene Lewis | Also testified that he tried to keep his drug dealing secret, that he didn't tell everybody he ran into about it, that he didn't want everybody in the world to know he was growing and selling marijuana, that he was keeping his cocaine business secret, and that it was best to keep anybody from knowing about it. (R.679 p.83) |
| Testimony of January 19, 2010 – Eugene Lewis | Further testified that he did not tell Maricle that the contribution was drug money and that Maricle probably had no way of knowing it. (R.679 p.84) |
| Testimony of January 19, 2010 – Eugene Lewis | States under oath that he never asked Maricle for help in Court, that he never had any conversation about drugs with Maricle, that there were no conversations between the two about any criminal activity Lewis was involved in and that when he got in trouble he did not call Maricle (R. 679 p.84) |
| Judge Reeves quoted in the Lexington Herald-Leader on April 20, 2010, Final Edition, Section City/Region A3 | Arrogance was on full display<br><br>Election fraud had ties to drug trafficking |

| | |
|---|---|
| Regarding Maricle's trial | People convicted in that trial won't get the same Breaks as those sentenced Monday |
| Testimony of February 4, 2010 February 5, 2010 – Eugene Lewis | Testified that he tried to keep his drug business under wraps, that he didn't make a big production About it, that he wanted to keep it secret because that's the way "little bitty fellas like me" operate, that he didn't want anybody to know that he was doing something that could send him to prison, didn't want Cletus Maricle to know he was a drug dealer, never said anything to Cletus Maricle about being involved in drugs, never said anything to Cletus Maricle about any of his illegal activities, that when he got caught the first time who knew about it were the people he was buying and selling drugs with, and that he didn't think Cletus Maricle suspected he was dealing drugs (R.869, Trial Vol. 3B pp. 72-74) |

Smith wrote that "Maricle and Jones brought candidates to Lewis prior to election including Roy Morgan and Freddy Thompson with money to produce votes." (R.581 p.6) Judge Reeves parroted this statement and made two other findings. One was that this statement showed the role of Thompson in the enterprise. Secondly he found that it was relevant to establish the personal relationship among Maricle Jones and Thompson that led to the alleged RICO conspiracy.

Lewis testimony on January 19, 2010 dispels all three findings of Judge Reeves as well as Smith's pronouncement. Lewis had no contact with Freddy Thompson. (R.679 p.106) Nor would the trial testimony of Lewis save the day for Smith and Judge Reeves if it could be related back. Lewis testified that Thompson was not with Jones when Jones approached him, that Thompson never personally approached him, and that he had no reason to believe that Thompson even knew Jones had approached him. (R.870, Vol. 4A p.30)

And, as in the case of Kenneth Day, when the avalanche started downhill, it got bigger and bigger. Senior Probation Officer, Diane C. Bowling wrote "Maricle and Jones brought

15

candidates to Lewis prior to the election, including Roy Morgan and Thompson with money to purchase votes." (PSR February 17, 2011) Not true.

The time line of Eugene Lewis that is contained in Chart 4 shows Lewis becoming politically active in the '60's and '70's, started serving as election officer in '80, begin growing marijuana in Henry County (not Clay County) in 1988, making a contribution to Maricle for Circuit Judge in 1990 within the legal campaign limit at the time, stating that Maricle had no way of knowing it was drug money that he contributed, testifying that he never talked with Maricle about his drug or illegal activity, swearing that he never sought or asked Maricle for help in Court, and stating that Maricle would not have had any reason to suspect he was dealing drugs.

## J. C. Lawson

To find a somewhat different twist to the background evidence and how it was treated we can look to J. C. Lawson and Chart 5.

### Chart 5

| AUSA Smith wrote Record 581, December 30, 2009 p.5 | In the 1980's Lawson contributed heavily to the campaign of Maricle and Oscar Gaye House. Lawson advised that Alan Roberts would pick up Between $8,000.00 and $10,000.00 at a time to be used in the election to buy votes. |
| --- | --- |
| J. C. Lawson testified Record 679, January 19, 2010 pp. 124-125, lines 23-25, lines 1-13 | Q. Okay. And did you ever give any money that you knew to be going into the hands of Cletus Maricle? <br> A. I give some money, Alan Roberts and Gayle House, Alan Roberts gave him 8 or 9 thousand, Which I can't say for sure they got it, but it went to him. <br> Q. You delivered it to Alan Roberts <br> A. to Alan Roberts, 8 or 9 thousand to Gayle House and Cletus. I am not sure the money made it to their hands because I never asked <br> Q. So you weren't invited over to Judge Maricle's house to deliver the money <br> A. No sir |

| January 19, 2010<br>pp. 125-126, 132 | Testified that this occurred after the article in the Lexington Herald Leader which was September 13, 1987. |
|---|---|
| Judge Reeves embellished<br>Record 671, p.16 | In other words, the assertion that Maricle had Roberts solicit money from Lawson after the Newspaper article appeared in the Lexington Herald Leader is allegedly relevant to show Maricle's willingness to enlist the help of know drug dealers in exchange for the protection and assistance he could provide. |
| J. C. Lawson testified<br>Record 870, Trial Vol. 4A | The money (eight or nine thousand dollars) was to help Oscar Gayle House in his election for Judge (p.54) SA Briggs testified that he had interviewed Oscar Gayle House and that he admitted being Involved in the late 1980's in the schemes Lawson had described. (R.679, p.167) |
| J. C. Lawson's<br>Imprisonment | Q. You started serving your time in '88?<br>A. I think '89'88, 89, somewhere along there (R. 679, p.130)<br>Q. And how long did you stay in prison, Mr. Lawson?<br>A. I got 36 months, and I think I stayed 24 or Something like that (R. 870, Trial Vol. 4A p. 49) |
| July 11, 1989 | Date of article in USA Today at which time J. C. Lawson had not yet been sent to prison. 24 months From that date would be July 11, 1991. |
| January 6, 2011 | Senior Probation Officer has docket number for the Above case as 6:89-3 |
| Conclusion: | J. C. Lawson was apparently in the federal Penitentiary during the 1990 election between R. Cletus Maricle and Oscar Gayle House for Circuit Judge. |

According to AUSA Smith, J. C. Lawson contributed heavily to the campaigns of

Maricle and Oscar Gayle House and Alan Roberts would pick up between $8,000.00 and

17

$10,000.00 at a time. This statement in and of itself is an exaggeration but Judge Reeves added to the statement to say that Maricle had Roberts solicit money from Lawson.

Lawson testified that he gave 8 or 9 thousand to Alan Roberts and Gayle House. He restates it a bit differently in the same context saying Alan Roberts 8 or 9 thousand to Gayle House and Cletus Maricle. At no point did he say nor did anyone say that Maricle had Roberts solicit money from Lawson. He did say this was after the article in The Lexington Herald Leader on September 13, 1987. (R. 679, pp. 124-126, 132)

He did tell a different story at trial, but if related back it further derails the contentions and findings of AUSA Smith and Judge Reeves. He stated that it was to help Oscar Gayle House in his election for Judge, which would have been against Maricle in 1990 (R. 870, Trial Vol. 4A, p.54) SA Briggs testified that Oscar Gayle House admitted to being involved in the schemes (R. 679, p.197)

All of this testimony is refuted by Lawson's testimony and introduced exhibits D68 and D69 which would put J. C. Lawson in federal prison during the 1990 election cycle for Circuit Judge – August 1990 – Nov. 6, 1990. And the judicial race was between Maricle and House.

Lawson detailed his knowledge of Maricle in testifying that he never had any conversations with Maricle about elections, politics or vote buying, and that the official that he was interested in having access to was the County Sheriff, whose wife he had given a lot of money, jewelry and things of that nature. He never had anything to do with judges or anything like that. (R. 679, pp.130-131) He said he had known Maricle for a long time but had had no dealings with him over the years except that he might have had him as a lawyer at one time in a divorce case. Further, he had attempted to talk with Maricle at one time about getting his son out

18

of jail but Maricle refused to talk to him. (R.870, Trial Vol. 4A pp.61-62) As a result he wrote a

letter to the editor uncomplimentary of Maricle (R. 870, Trial Vol. 4A, p.67)

### THE COURT CREATED A HOSTILE COURT ENVIRONMENT WITH ITS CONSISTENT AND REPEATED INTERFERENCE WITH AND ABUSE OF DEFENSE COUNSEL

**I**

The defendant submits that the afternoon of March 10, 2010, was prime time for

rampages, rants and tangential expeditions precipitated by the Court's perception that the case

for the United States was jeopardized by the cross examination of SA Briggs. Upon summoning

counsel to the bench on its own volition, the Court stated:

> The Court:    Mr. Smith, through questions of the defendants, the impression's been given to the jury that in order to sustain a conviction, it's necessary to establish that the defendants all supported the same candidates in the elections. I do understand that that's not what's been charged in the indictment. If you wish the Court to give the jury cautionary instruction as to the purposes charged in the indictment as set forth in paragraph 11 of the indictment, I will do so at this time. (R.899, p.4 Excerpted Trial Transcript Vol. 21B)

Mr. Smith responded with "Can I refresh my memory on that please? (Reviewing

document) Thank you, United States would so request." These were the first, last and only

words spoken at the sidebar conference on this issue by AUSA Smith.

However, the Court continued in its exchange with counsel in pursuit of its agenda as

follows:

> The Court:    You do acknowledge that one or more defendants in the case have made the argument through their questions that in order to sustain a conviction, that all of these individuals would have to line up behind identified candidates. It's never been the government's position that that was what they would prove and that's not what's been alleged, but that's certainly been the position that's been taken by several defendants in the case, and it would be improper to give that impression to the jury through questions or arguments. (Ibid pp.6-7)

Whereupon the Court over unanimous objections admonished the jury as follows:

> The Court:    Thank you ladies and gentlemen, at this time, I will give you further instructions that in order to sustain its burden as to the first count, first charge of the indictment charging a violation of the RICO statute, the United

19

States is not required to prove that all of the defendants supported the same candidates in these elections.

It's alleged in paragraph 11 of the indictment that the purposes of the defendants were to obtain, solidify, preserve and expand for the defendants and their associates political power and control within the county and personally enrich for themselves and their associates, through the use and misuse of the authority and power of the Board and the offices of the circuit judge, superintendent of schools and county clerk and the positions of election officers.

You are so instructed (Id pp.8-9)

This action or instruction was not taken by Judge Reeves in response to any objection by AUSA Smith or any defense counsel. It was only requested by the United States after the Court indicated it desired to give the instruction. Respectfully submitted, the Court interjected itself into the proceedings in a manner that would be advantageous to the United States upon its impression that trouble was brewing for the United States.

The witness SA Briggs had demonstrated a lack of knowledge of the elections and candidates that he had investigated for years. He was beyond the point of being rehabilitated by the United States, and the only way that could be accomplished was by judicial interference and fiat.

The instruction was based on paragraph eleven (11) of Count 1 which sets forth the purposes of the defendants. The Court ignored paragraphs 12(a), (b), (c), (d), (e) and (f), which clearly references a "slate" or their "slate." (Quotation marks appear in the indictment.) According to the indictment, Count 1, 12(a) Maricle and Adams recruited persons to run for county offices on a "slate," 12(b) Charles Wayne Jones instructed on how to elect their "slate," 12(c) William E. Stivers acted in furtherance of the scheme to elect their "slate" of candidates, 12(d) Freddy W. Thompson used his position to elect their "slate" of candidates, 12(e) William

B. Morris and Debra L. Morris bought votes for the "slate," and 12(f) Stanley Bowling distributed money for the "slate." (R. 272 pp. 4-6)

All of the above is incorporated into Counts ten (10) and eleven (11) of the indictment in paragraph 1 of each count which states that the allegations contained in paragraph 1-12 of Count 1 are restated and incorporated herein by reference. Furthermore, "the slate" (quotations in indictment) is referred to eight times in Count 11 at paragraphs 5, 6, 7, 8, 11, 12, and 13.

Quite clearly the indictment alleges that Maricle and Adams recruited "a slate" (not slates) to run for county offices. The allegation is very specific that Maricle and Adams jointly selected a person to run for a particular office and did so as to more than one office thereby forming "a slate" (not slates). It further alleges Charles Wayne Jones instructed on how to elect "their slate" (not slates) and that William E. Stivers furthered the election of "their slate" (not slates), both of which are indicative of joining in agreement on the 'slate." (not slates). Supposedly Freddy W. Thompson used his position to elect "the slate" (not slates) for which Bart Morris and Debra L. Morris bought votes and Stanley Bowling distributed money.

A singular "slate" is all that can be gleaned from this indictment. Quotation marks in the indictment excludes slates. The Judge altered the indictment when informing defense counsel and AUSA Smith of the government's position creating a variance between the indictment and the proof. Such action was improper.

## II

The afternoon session of March 10, 2010 concluded as it had begun only this time the Court turned personal and unjustifiably, verbally disparaged Maricle's attorney with such statements as:

> . . . and the Court certainly recognizes that one of the tactics that Mr. Hoskins has used in this case when he commits an error or when he does something improper

21

is to attempt to attack someone else. That's his M.O. in this case. (R. 903, pp.9-10 Excerpted Transcript)

And

. . . Of course this concerns me. Many things have happened in this case concern me on behalf of the defendants' attorneys. Mr. Hoskins I don't find that this was in good faith in any way, your actions. I do think you're attempting to hide the ball in this case, and I think that your actions in attempting to challenge or attack someone else or complain about the proceedings, when you're given discovery and other things, are not well taken. (R.903,p.13 Excerpted Transcript)

This diatribe arose out of a series of events completely uncontrollable by the defense.

Wanda White testified that she had been given a list of grand jury witnesses (Exhibit D16) while

recording the defendant. This list was delivered to the FBI on October 20, 2008. Even though

the list was provided in discovery, it was not until Wanda White testified at trial that it was Judy

Maricle's handwriting that a handwriting expert became necessary. The defendant immediately

sought the services of a handwriting expert or questioned documents examiner.

The defendant through counsel sought the services of such an expert. The closest one to

Frankfort was Jane Underwood in Lexington. She was contacted but she was unable to do the

work because she was suffering from terminal cancer and has since passed away. She

recommended Mr. Slyter, who was available to perform the analysis, but had a vacation

scheduled in Australia. Relying upon the representations by the United States in Court as to the

anticipated completion date of its case, Mr. Slyter was employed. When the United States did

not finish as quickly as anticipated, time did become a factor.

There was absolutely no evidence of bad faith on the part of the defendant or his counsel.

The expert chosen was qualified and had been used extensively in the Western District of

Kentucky by the United States Attorney's office. In fact, he had been used by AUSA Kenneth

Taylor who has appeared as an attorney in this investigation in the Eastern District of Kentucky.

22

Again, the Court interjected itself into the proceedings before Mr. Smith could even speak stating, "Mr. Smith, I do want to hear from you on this point, I'm concerned about rebuttal, how you would need to rebut this testimony. . ." and then proceeds to impugn the integrity of Maricle's attorney without any justification.[1]

It is respectfully submitted that the Court cannot document or enumerate any of the tactics alleged by the Court to have been employed by Mr. Hoskins, and how Mr. Smith would rebut the testimony shouldn't have been any concern of the Courts.

III

Prior to Wanda White's testimony Mr. Hoskins objected because the defendant had not received all of the discovery relative to her testimony and which had been requested in writing. The discovery in question was a file of Commonwealth's Attorney, Gary Gregory on the Corky Price case, which the United States had denied having until the day Wanda White was to testify. Mr. Smith first asserted that Mr. Hoskins request had come the day before but later admitted there had been written request. (Trial Transcript Vol. 10A pp. 70-72)

Mr. Smith had had the documents in his possession since the detention hearing on April 20, 2009, when they were left with Mr. Smith by Commonwealth Attorney Gregory. He failed to comply with discovery, and ignored defendant's written request for production. And who did the Court belittle? Mr. Hoskins. And who did the Court defend? Mr. Smith. To-wit:

> . . . I'm not going to delay the proceedings based upon your dilatory actions Mr. Hoskins. This was your witness you subpoenaed. You could have gotten those records from the witness at that time, you chose not to do so. Mr. Smith has made a good faith effort to make these materials available to you and he can do so at lunch. (R.844, p.75 Trial Transcript Vol. 10A)

---

[1] Russell Cletus Maricle and Judy Maricle stood ready and willing to give handwriting exemplars. Mrs. Maricle did in fact attend court regularly for several days to be available to give handwriting exemplars without delay.

At the detention hearing Gary Gregory was subpoenaed by the defendant, but his records were not. As he exited the witness stand he gave a file to AUSA Stephen Smith not to the defendant. From that date forth AUSA Smith was in possession of file, never provided it in the ordinary course of discovery and ignored a written and oral request for the same. But according to Judge Reeves, AUSA Smith had made a good faith effort and Hoskins was derelict. Exactly the opposite was true as evidenced by a letter to AUSA Smith from Mr. Hoskins dated June _____

, 2009, a copy of which is attached hereto as Exhibit D.

## IV

In December of 2009 the United States disclosed that Kennon White worked at the same place as TFO Blair's wife but stated there was no evidence of preferential treatment to White in obtaining a job or while employed (R.843,p.74 Trial Transcript Vol. 9A) AUSA Smith argued that evidence of the employment was irrelevant because it was coincidental and Senture employed thousands of people. He further contended that there was no preferential treatment and that the prejudicial effect of inquiry about the employment would outweigh the probative value. In fact, Senture employed 130 people in London, Kentucky, and TFO Blair's' wife was the Human Resources Officer (R.843, pp.75-76 Trial Transcript Vol. 9A)

The Court in its ruling stated, "Well, in terms of relevance, it may have some very nominal relevance in the case. . . I'm going to allow you to go into it, but I'm not – if you start to dwell on it, then it becomes a different issue. . ." The Court went on to say:

> In terms of relevancy I will allow you to ask the question since it may somehow affect his credibility in the case. But if we get into it too much, then it does become a collateral issue and then it would be a waste of time under 403 and then I would cut off the examination at that point, so (R.843, pp 76-77 Trial Transcript Vol. 9A)

Kennon White described his job at Senture:

24

> There was different contracts, most of them was temporary, some of them was political contracts that they called and you read a script, a political script. Some of it was to do with the digital cable boxes that were issued. Some of it was to do with Cash for Clunkers. Some of it was to do with several different things there, Medicare -- (R.843, p.117 Trial Transcript Vol. 9A)

White did not disclose he was a convicted felon to his employer (R.843 p.121 Trial Transcript Vol. 9A)

The Court's minimizing the significance of the impeachment of Kennon White and declaring that it would ". . . become a collateral issue and then it would be a waste of time under 403 . . ." exemplifies the Court's predisposition to use Rule 403 to cut off potentially damaging evidence to the United States.

In fact, the evidence of potential bias of the witness Kennon White by this line of evidence was overwhelming. He, his wife, and his sister-in-law, Stephanie Price were all employed at Senture which had 130 employees in London, Kentucky. The person in charge of personnel was Vicki Blair, wife of TFO Edsel V. Blair, Jr. Mr. Blair has been working with the FBI for many years in a series of much publicized investigations particularly relative to the family name White.

Significantly, Vicki Blair is a resident of Laurel County, Kentucky, which borders Clay County and her brother-in-law is Lanny D. Greer, President of First National Financial Corporation. Greer's daily work is at First National Bank of Manchester, Kentucky, where his family has controlling interest. She also has significant contacts and family relations in Jackson County, Kentucky, also an adjoining county.

All of this plus the failure of White to disclose his felony conviction to an employer with government contracts demonstrate the Court's proclivity to abuse it's discretion under Rule 403 of the Federal Rules of Evidence.

25

**V**

Jeff Sagrecy is a special agent with the Internal Revenue Service, Criminal Investigation Division. He graduated the National Training Academy in 2002. For the past five years he has focused on financial crimes including money laundering and structuring. He has a degree in accounting from the University of Kentucky and was an auditor with the State of Kentucky before becoming an IRS agent. (R.854, pp 4-6 Trial Transcript Vol. 20A)

The witness was not shown to have either educational or practical experience in political science or the art of politics. He was not shown to possess any qualifications related to political polling, political consulting, or political analysis.

Sagrecy was unaware that the legislature determined the salary of the Circuit Judge, that every Circuit Judge in Kentucky receives the same salary, and knew only that Maricle ran unopposed in 2006. (Id at pp. 34-36) He did not know the qualifications to be Circuit Judge. (Id Vol. 21A p. 12)

He further testified that the salaries were not illegal, only that criminal offenses were committed to obtain the salary. He stated that ". . . but for the illegal scheme to pool money to elect officials, there could not have been these salaries and contracts awarded to these individuals." (Id p.85)

Over objection by the defendant the Court allowed Sagrecy to testify that Maricle would not have been unopposed in 2006; therefore, he could include Maricle as a benefactor in a salary that he was receiving (Id pp 92-93). Thus allowing an unqualified person to testify to an opinion that would have been beyond the expertise of a combination of James Carville, Mary Matalin, Ed Rollins and Donna Brazille is incomprehensible especially when his testimony goes to the heart of the issue on trial.

The defendant Maricle asked counsel to request a Daubert hearing on Sagrecy but the reply was "He [meaning Judge] won't let us." Judge Reeves had stated that he had already determined Sagrecy to be qualified in another case, and didn't know that he would need to conduct a Daubert hearing with respect to Agent Sagrecy. (R.924, p.162 Trial Transcript Vol. 5B) This was a part of the pattern of intimidation of defense counsel.

### VI

Whether done in a humorous or a serious tone, the predisposition of the Court is best exemplified when David Hoskins brought the Court's attention to a sleeping juror and suggested to the Court if this became a continuing problem the Court might consider designating him as an alternate. The Court quipped that he had ". . . never had a defense counsel object to someone sleeping during the government's case. . ." While the Court may have stated he had never seen that before, it demonstrated insensitivity in that he thought the defendant would not want a juror to hear the government's case because it was so strong. (R.836 p. 94 Trial Transcript Vol. 4B)

### VII

Defense attorney Bennett Bayer was a target of a verbal assault during the cross examination of witness Eugene Lewis on February 4, 2010. Displeased by Bayer's questioning the Court repeatedly accused Bayer of violating the Court's order relative to use of a 302 and continued to orally berate Bayer despite his attempted explanation and repeated apologies. In the end the Court extended it's petulance to all counsel by saying "Counsel, I don't fall for a lot of cute tricks," and "I'm speaking to everyone, I don't fall for a lot of cute tricks in cases. Okay?" (R.869, pp. 93-98 Trial Transcript Vol. 3B)   A copy of pages 93-98 are attached hereto as Exhibit E.

27

## VIII

A missing video tape made by FBI SA Travis Wayne and TFO Greg Pace, with the assistance of witness Denver Sizemore, locating the places he and Jennings White visited on the night before the May 2002 primary election was lost, destroyed or misplaced by the FBI. AUSA Smith attempted to shift the responsibility to the Kentucky State Police even though the video was taken as a part of the FBI's investigation by a special agent of the FBI and a task force officer working with the FBI. There was no state prosecution.

Defendant contends that he was entitled to the video for three different reasons – discovery, exculpatory evidence, or Jencks Act material. The United States even indicated that the tape may have been purged creating a fourth reason why the location of the tape should have been pursued. (R.874, pp. 67-69 Trial Transcript Vol. 14A)

The Court's ruling "But at this point other than the speculation that has been outlined, there's really not a reason to delay this proceeding which would take some time. It could be a significant delay." (Id pp. 69-70) The Court thereby found that evidence that was lost, misplaced or destroyed that would have either confirmed or disproven the testimony of the witness Denver Sizemore was not worthy of discovery.

## IX

Wanda White testified that at the time of the making of the May 2, 2007 recording that she had already been to grand jury and had been advised not to tell Maricle. (R.845 Trial Transcript Vol. 11A p.7) She did not remember the date she had been to the grand jury. (Ibid) Wanda White also testified that her conversation with the agents when Dobber [Weaver] had gone also occurred days before the May 2 recording date (Id p.8) When Hoskins objected and approached the bench to raise the possibility that testimony from a grand jury proceeding had not

28

been furnished to defendant, the Court intervened to assist Mr. Smith and his witness with her

obvious credibility problem or the failure of the United States to provide Jencks material. The

Court in response to Hoskins stated, "I believe she wasn't sure, and I suppose that's what Mr.

Smith was getting to on his question is that correct." Mr. Smith on course replied "She's not just

sure of what day it was." (Id p.9) What the Court said was absolutely incorrect. She had not so

testified.

## X

On December 3, 2009, at a status conference held for the purpose of establishing a

hearing date on the authenticity or correctness of the recordings made by confidential witnesses

the Court threatened to have Court on Christmas Eve and Christmas Day if the eight attorneys

couldn't arrange their schedules for December 21, 22 and 23 to accommodate the Court. Court

document #549 to that effect is attached hereto as Exhibit F.

It was anticipating that the hearing would take 2 days but due to actions that will be

questioned in a separate pleading, the hearing lasted less than a half day. All of the attorneys met

the Court's demand no matter whom else or what else might be affected.

**THE JUDGE DENIED THE DEFENDANT AN OPPORTUNITY TO BE HEARD OR
OTHERWISE PRESENT HIS CASE FOR JUDICIAL DISQUALIFICATION BY CANCELING
A HEARING ON THE MOTION AND NOT ALLOWING DEFENDANT AN OPPORTUNITY
TO REPLY TO THE RESPONSE OF THE UNITED STATES IN VIOLATION OF LCrR 12.1(d)
and LCrR 12.1(h)**

The defendant on August 17, 2009 joined in a motion to disqualify Judge Reeves filed by

the defendants Thompson and Jones setting forth several grounds for disqualification. (R. 375,

R.381) On August 24, 2009 the United States filed a response. (R.424) A hearing was

scheduled for August 27, 2009 at 11:00 A.M. but a request was filed for the hearing to be

rescheduled. The hearing was canceled by order of August 26, 2009 subject to being

rescheduled by subsequent order. (R.425) Instead of being rescheduled, the Court almost

29

immediately entered a thirty five (35) page memorandum opinion and order overruling the

motion on the very next day, August 27, 2009 without a hearing, evidentiary or otherwise,

profiling his contempt for the defendants in this case. (R.435)

This order was entered in violation of LCrR 12.1(d) which allows a party fourteen (14)

days to file a reply to a response, i.e., Maricle had until September 7, 2009 to reply.  September

7, 2009 was eleven days after the Court had already entered its order denying relief to the

defendants' challenge to the qualifications of the Court.  LCrR 12.1(h) provides as follows:

> A motion is submitted to the Court for decision after completion of
> the hearing or oral argument – or if none – after the reply
> memorandum is filed, or the time for filing the reply has expired.

By subverting its own rules the Court denied the relief and referred to the motion of the

defendants as "…an ill founded attempt at judge shopping." (R. 435 p. 35)[2]

In the first paragraph of this affidavit it is noted that Judge Reeves in reference to himself

acknowledged that sometimes this Court (meaning himself) "goes off on a tangent."  As noted in

the second paragraph "going off on a tangent" means "to change suddenly to another line of

action."  No other words can better describe the actions of the trial judge with respect to the

motion for his disqualification than his own – "going off on a tangent" because of his sudden

changes to other lines of action.  The time line leaves no doubt.  There was truly a going off on a

tangent.  Consider as follows:

| Aug. 17, 2009 | Aug. 24, 2009 | Aug. 24, 2009 | Aug. 26, 2009 | Aug. 27, 2009 | Sept. 7, 2009 |
|---|---|---|---|---|---|
| Thompson, Jones & Maricle file motion to disqualify. | AUSA Smith files response to motion to disqualify. | Defendant Jones moves to change time from 11:00 AM to | Court canceled hearing subject to being rescheduled. | Date for which hearing was scheduled Court enters | Time in which reply could have been filed expires eleven (11) days after motion for |

---

[2] The effective date of the local rules that defendant has a copy of is December 1, 2009.  If there was a shorter time for a reply before December 1, 2009, the days would have to be adjusted accordingly. In any event Canon 2A requires a judge to respect and comply with the law at all times in a manner that promotes public confidence in the integrity and impartiality of the judge. It lists violations of court rules as an impropriety.

| | | 3:00 PM due to conflict. | | 35 page order denying motion to disqualify. | disqualification denied. |
|---|---|---|---|---|---|

The "going off on a tangent" was clearly evidenced by Judge Reeves suddenly changing to another line of action on three occasions during the course of events set forth in the above time line. After the filing of a response by the United States the defendant was entitled to fourteen days to file a reply pursuant to LCrR 12.1(d), which would have been September 7, 2009. Instead of following the rules as he is required to do, the Judge not only cut off the time for the defendant to reply but scheduled a hearing involving eight defendants with eight different attorneys, without respect to the schedule of any attorney or any degree of respect or comity for other judicial proceeding in which attorneys might be involved.

When requested on August 26, 2009 to change the time for hearing from 11:00 AM until 3:00 PM,  the Court canceled the hearing by order of August 26, 2009, subject to being rescheduled. (R.425)  But instead of a hearing being rescheduled the Court suddenly changed to another line of action and within a matter of hours issued a thirty five page memorandum and order (R.435) denying the defendants motions.  This was eleven days before defendant's reply time expired and twelve days before the case was submitted under LCrR 12.1(h).

The Judge clearly failed to follow court rules thereby undermining public confidence in the integrity and impartiality of the judiciary.  The parties were not afforded full right to be heard but were

31

categorized as perpetrators of "an ill founded attempt of judge shopping," – a written rant.

(R.435, p. 35)

### AN ANALYSIS OF THE MEMORANDUM OPINION AND ORDER OF AUGUST 27, 2009 DEMONSTRATES HOSTILITY, BIAS AND PREJUDICE AGAINST THE DEFENDANT AND OTHER PERSONS FROM CLAY COUNTY

An analysis of the memorandum opinion and order will expose many fallacies and demonstrate actual bias and prejudice. Hostility, bias and prejudice can be gleaned from its very acknowledgments or lack thereof. Actions taken by the Court before and after August 27, 2009, are manifestations of the mind set that has denied the defendant a fair and impartial trial and will prevent a fair sentencing.

The charges against Kenny Day set forth in 05-CR-30-DCR are in no way the charges against any of the defendants in 09-16-S-DCR. Further, none of the defendants in 09-16-S-DCR were charged in 05-CR-30-DCR nor were any of the defendants in 05-CR-30-DCR charged in 09-16-S-DCR. The same can be said of 06-82-DCR. There is neither identity of parties, identity of offenses nor identity of subject matter.

The Court refers to charges against Jennifer Garrison, a Pretrial Services Officer which included

> "...participation in the conspiracy to distribute and to possess with intent to distribute marijuana, conspiracy to corruptly obstruct, influence, or impede an official proceeding, and obstruction of justice by a pretrial services officers." (R.435 p. 2)

The same charges are referenced in the plea agreement of Kenneth Day. But the Court fails to note that this matter wasn't in any way connected with any proceedings in Clay Circuit Court before Russell Cletus Maricle. The case involved the setting of a bond in Clay District Court.

At the October 14, 2005, hearing on revocation of Jennings White's bond the Court made the following factual finding:

32

> And likewise, I find that Mr. Day was a credible witness in the
> case. I have not been presented with any testimony or evidence to
> convince me otherwise, quite frankly. And so based on my view
> of his credibility at this time, I do believe that he was a credible
> person. (R.435 p. 6 citing The Day Case, Record No. 499)

This factual finding triggered Maricle's request for recusal because it was a basis the Court used

in making a decision in Maricle's bond case, and it is beyond the parameters of Maricle's case.

At the detention hearing Maricle's Attorney, David Hoskins, challenged the credibility of

Kenneth Day since he was a convicted felon and showed conclusively that Maricle was not the

Judge in the case Day referenced in an earlier detention hearing before Magistrate Judge Weir ,

and that Day had perjured himself in so testifying. One could hardly forget who the judge was in

a case where he received a seven digit verdict even if it was in a fiduciary capacity.

Instead Judge Reeves wrote as follows:

> While Kenneth Day did not appear before the undersigned during
> the April 20, 2009, hearing the Court does not write on a blank
> slate regarding his credibility as a witness. Mr. Day has appeared
> before the undersigned on several occasions in connection with his
> case as well as a witness in other proceedings. To date, the Court
> has found Day's testimony to be credible. [Record No. 215, p. 3,
> footnote 1]

Therein the transgression against impartiality occurred. At that time Kenneth Day had

never testified in this case before Judge Reeves. Judge Reeves made his decision on the

credibility of Day based upon proceedings in an entirely different case with entirely different

defendants and entirely different charges. Judge Reeves stated, ". . . as clearly indicated this

evaluation is based on testimony provided in other proceedings to date," (R.435 pp 19-20)  As

such the Judge crossed the demarcation line and made his decision on an impermissible source

insofar as 09-16-S-DCR is concerned..

33

Further, Judge Reeves revealed his real reason for making the favorable finding on Day's credibility. He (Reeves) had to be "...necessarily responsive to attorney Hoskins's arguments regarding the detention issue and Hoskins attempt to discredit the testimony offered by the United States." If he had done otherwise, his factual finding would have been the opposite. To achieve the desired result he abdicated his judicial responsibility and became an adversary for the United States. He found it necessary to respond to defense counsel, which is ordinarily reserved for opposing counsel.

The credibility of any witness should be determined in the proceedings in which he testifies not some prior judicial proceeding not involving the same charges and the same defendants. Reasons to fabricate vary from case to case and particularly with drug addicts.

At the sentencing hearing of Kenneth Day on February 13, 2006, Judge Reeves stated:

> And in looking at the nature and circumstances of this particular offense this is probably the most egregious case that I've had in a little over four years. It's a very large – it was a very large drug conspiracy case that was allowed to develop in a culture of corruption in Clay County. Mr. Day has acknowledged it...[T]he only way these types of conspiracies can exist is for those at the local level to turn their heads; and if you turn your head long enough, it becomes    so pervasive that sometimes the federal officials take notice and that's what happened here. [R.435 p. 9 citing The Day Case, Record No. 798 pp 35-37]

The word used by the Court is egregious, which means "remarkably bad or flagrant." Egregious amply describes the insensitivity to accuracy in Judge Reeves' statement. Kenneth Day was in fact a convicted federal felony drug offender, who was out on release and supposedly under supervision by federal probation and parole officers. He had developed a network to begin his drug operation while in federal custody and began his operation immediately upon his release from the institution. His romance with crystal meth ended in marriage to his drug of choice. [Kenneth Day testimony at Maricle trial]    This convicted federal drug offender's

34

entrepreneurial endeavors while in federal custody and supervision, which should include
random drug testing and unannounced visits, became international in scope.

The bias of the Court against Clay County officials is so pervasive that it fails to perceive
or acknowledge the branch of government that abdicated its responsibility – the federal
government. The people who became addicted because of Mr. Day, that committed crimes to
feed their addiction, and that lost their lives due to addiction because of Mr. Day's rapacious
conduct are primarily the responsibility of the United States of America and the failure of its
agents to perform their sworn duty.

The United States allowed corruption to fester under the protection of Sheriff Ed Jordan,
who received a valuable knife collection from Day the day before Day's arrest. Ed Jordan is a
cousin of AUSA Smith, was a member of the Clay County Board of Elections at all times during
the alleged conspiracy, remains unindicted and is apparently untouchable. Even the Court has
recognized Jordan's participation in vote buying and protection for Day. [R.435 pp 5-6 citing
Day Case, Record No. 499 pp 14-16]

In an attempt to cover himself Judge Reeves wrote

> "Again, while the Court referenced inaction at the state level, no
> defendant in the present case was referenced directly or indirectly."
> [R.435, p. 10]

Followed by

> "…at no time during the course of these proceedings did the Court
> make statements concerning the guilt, innocence or credibility of
> any defendant indicted in the present case." [R.435, p. 16]

While unsealed transcripts may not show Judge Reeves uttering the name Russell Cletus
Maricle, it is submitted by Maricle that the above statements are feeble attempts to obscure
reality – the bias and prejudice of Judge Reeves. Nor does Maricle concede that there is no

35

direct or indirect reference to him.  To be referenced one does not have to be specifically named.
It is the belief of this defendant that he was one of those persons that Judge Reeves thought
about, and any reasonable interpretation of his quotes about "culture of corruption and those at
the local level" by a reasonable non prejudicial person would reach the same conclusion.

In Maricle's motion to disqualify Judge Reeves, Maricle's Attorney, David Hoskins
wrote,

> "The Defendant would state in addition as the long-time Circuit
> Judge of Clay County, he is undoubtedly among those
> contemplated by Judge Reeves in his remark at the sentencing of
> Kenny Day concerning local officials "turn[ing] their heads."

Judge Reeves did not address that issue nor deny the same.

Maricle was elected Circuit Judge in 1990 and served continuously until June of 2007,
and had many cases in the 41st Circuit removed to United States District Court before Judge
Reeves, some of which were remanded.  Judge Reeves does not make any contention that he did
not know who Maricle was or was unaware of his name.  Court records are to the contrary.

It is not necessary that oral expressions be made in order for bias or prejudice to exist.
Unspoken bias and prejudice are more insidious and invidious.  They are more likely to manifest
into actual injury than oral communication.

On August 27, 2009, the Court noted that

> "...a portion of the sentencing transcript remains under seal but the
> Court was required to evaluate the nature and extent of Day's
> cooperation and the SPECIFIC INFORMATION (Emphasis added
> by Maricle) provided in determining an appropriate sentence."
> AND "...address specific arguments of counsel for the government
> and the Defendant." [R.435 p. 7]

In a footnote on page 8 the Court states as follows:

> The United States' statements regarding the factors to be
> considered in imposing an appropriate sentence as contained in the
> sealed portion of the sentencing transcript. [ID. Record No. 799]

> Until such time as the United States moves the Court to unseal this
> portion of the transcript, it will remain sealed and will not be
> subject of specific comments by the Court. However, the Court
> comments in the unsealed portion of the transcript of the Day
> sentencing hearing relate to all arguments of counsel made during
> the sentencing hearing as required by 18 U.S.C. §3553 and
> relevant post – Booker case law. [R.435 p. 8 ftn 3]

Judge Reeves acknowledges the sealed transcript was used by him in the sentencing and

that his comments were formulated from it to address specific arguments. There is absolutely no

reason for the transcript to remain unsealed and hidden. Failure to unseal it under these

circumstances can only raise a presumption against Judge Reeves and casts a shadow longer than

the evening sun. Honesty, fairness, integrity, transparency and justice move for the opening of

the transcript.

The diatribes against citizens of Clay County, the defendants and defense counsel

completely eradicated any semblance of fairness or impartiality. One such statement was as

follows:

> "My concern is, and it's a concern that this Court has had in many
> cases that have originated from Clay County, the defendants
> coming from Clay County don't seem to understand that once
> they're under bond conditions of this Court that these are pretty
> serious conditions." [May 8 2009, Transcript Record 396 pp. 44-45
> quoted Document 435 p. 26]

For one moment let's consider these substitutions in the above.

> ...my concern is, and it's a concern that this Court has had in many
> cases that have originated from black neighborhoods, the
> defendants coming from black neighborhoods don't seem to
> understand that once they're under bond conditions of this Court
> that these are pretty serious conditions.

> Or

> ...my concern is, and it's a concern that this Court has had in many
> cases that have originated from Jewish communities, the
> defendants coming from Jewish communities don't seem to

37

understand that once they're under bond conditions of this Court that these are pretty serious conditions.

Or

...my concern is, and it's a concern that this Court has had in many cases that have originated from Frankfort, the defendants coming from Frankfort don't seem to understand that once they're under bond conditions of this Court that these are pretty serious conditions.

This is expressed bias, and has continued up to and including the present as exemplified by the statement,

"There are good people in Clay County." [Lexington Herald Leader, April 20, 2010, A3]

This type of condescending statement appears in such statements as "There are good black people.", "There are good Jews.", "There are good Hispanics.", and "There are good Catholics."

Racist, anti-semite, ethnic bigot, and religious zealot would be the buzz words in every newspaper, radio or television talk show, or blog for such comments. These words spoken by District Judge Danny C. Reeves on April 19, 2010, profile his bias, prejudice and contempt for the defendants.[3] They cannot be dismissed as merely politically incorrect.

**THE DEFENDANT FILED A MOTION TO DISQUALIFY AUSA SMITH DUE TO CONFLICT AND REQUESTED AN EVIDENTIARY HEARING ON THE FACE OF THE MOTION. MAGISTRATE JUDGE WIER OVERRULED DEFENDANT'S MOTION STATING THERE HAD BEEN NO REQUEST FOR A HEARING AND VIOLATED LCrR 12.1(d) and LCrR 12.1(h) BY OVERRULING THE MOTION BEFORE DEFENDANT'S TIME TO REPLY HAD EXPIRED. DEFENDANT OBJECTED TO THE RULING BUT CAN FIND NO ORDER OF DISPOSITION ENTERED BY THE COURT**

This unique technique of no hearing and no reply allowed was employed by Judge Reeves' surrogate, Magistrate Judge Robert Weir, in ruling on the defendant's motion to disqualify AUSA Steven C. Smith

---

[3] The commentary on Canon 3A (3) states that it is the duty of the judge ".. to be respectful of all others include the responsibility to avoid comment or behavior that can reasonably be interpreted as manifesting prejudice or bias towards another on the basis of personal characteristics like race, sex, religion or national origin."

(R.296), filed on July 15, 2009, and requesting an evidentiary hearing. The response of the

United States (R.326) was filed on August 4, 2009, which would have made the defendant's

reply due August 18, 2009. On August 7, 2009, eleven (11) days before defendant's reply was

due, Magistrate Judge Weir overruled the motion and made a further finding that no party

requested a hearing. (R.337, p. 1) In fact, a request for evidentiary hearing was on the very front

page of defendant's motion. (R.296 p. 1)

Objections to Magistrate Judge Weir's order were filed August 17, 2009 (R.383) and

responded to on August 24, 2009 (R.422). As of this date the defendant has neither received nor

can he locate any ruling by Judge Reeves on the objection even though we are post-trial.

Counsel  has informed him that no ruling was ever made.[4]

This premature preparation and entry of orders denying relief without affording the

defendants a fair opportunity to be heard, manifest an extreme indifference to the procedural and

substantive rights of the defendant. It occurred in both the motion to disqualify AUSA Smith

and U.S. District Judge Reeves.

Both of these actions were arbitrary, capricious and opprobrious. The premature

preparation and entry of orders denying defendant's relief insulated two public officials, AUSA

Smith and District Judge Reeves from public hearings that would have been embarrassing and

possibly devastating. The denial of the defendants' fair opportunity to be heard by both the

spoken word and/or the written page manifested an extreme indifference to the rights of

defendants. Due to the absence of ignorance on the part of the perpetrators one must assume the

actions were arbitrary, capricious, and abusive of discretion and the results of rampaging,

ranting, and going off on a tangent.

---

[4] Canon 3A (3) requires a judge and those under his control to hear all proceedings fairly. Canon 3A (4) provides for full right to be heard according to law.

Attached hereto is Exhibit G, which deals with the prosecutorial actions in the initiation

of these proceedings in this case that could have been developed at a hearing if one had

been allowed. This is supplemented by Exhibit H, dealing with detention hearings.

**THE RECORDINGS AND TRANSCRIPTS OF KENNON WHITE, WANDA WHITE AND RUSSELL CLETUS MARICLE WHERE THE ONLY DEFENDANT PRESENT WAS MARICLE WERE MATERIALLY ALTERED AND DISTORTED BY JUDICIAL FINDINGS AND RULINGS THROUGH THE PROCESSES OF DELETION EXCLUSION, ALTERATION, ADDITION OR A COMBINATION THEREOF OVER 100 TIMES COMPLETELY CHANGING THE CONTENT AND MEANING THEREOF.**

Attached hereto in its entirety is Exhibit I, which is an objection to obstruction of justice

adjustment submitted by the defendant to his counsel for use in objecting to the PSR. This

supports the defendant's above set forth caption.


### VERIFICATION

Russell Cletus Maricle, after first being duly sworn states and deposes that he has read

the foregoing and that it is true and correct as he verily believes.

This _3rd_ day of March, 2011.


_____
Russell Cletus Maricle
Franklin County Regional Jail
PO Box 4068
Frankfort, KY 40604


STATE OF KENTUCKY,
COUNTY OF _Frankfort_

Subscribed and sworn to before me by Russell Cletus Maricle on this _3rd_ day of March, 2011.

_____
NOTARY PUBLIC

My Commission Expires: _June 4, 2013_

40

**CERTIFICATE OF SERVICE**

I hereby certify that I have had sent by a third party a copy of this notice with affidavit to all counsel of record, David S. Hoskins, Candace C. Crouse, Martin S. Pinales, R. Kent Wesberry, T. Scott White, Robert L. Abell, Russell James Baldani, Jerry W. Gilbert, Elizabeth Snow Hughes, Daniel A. Simons and AUSA Stephen Craig Smith,  via email or by required mail through the United States Post Office, which is the best service I can accomplish under the conditions of my incarceration.

This _____ day of March, 2011.


Russell Cletus Maricle, Pro Se
Franklin County Regional Jail
PO Box 4068
Frankfort, KY 40604