*EXHIBIT A*

## COMMONWEALTH OF KENTUCKY
### 41ST JUDICIAL CURCIUT
### CLAY CIRCUIT COURT
### CIVIL ACTION NO: 01-CI-0041Ø
### (BEFORE HON. CLETUS MARICLE)

TERRY EVAN COOMER,                                    **PETITIONER**

VS.

SHEILA RENEE MONIZ (formerly Coomer),                 **RESPONDENT**

VS.

BILL DOBBS, and
BETY DOBBS,                                           **THIRD PARTY PETITIONERS**

---

### RESPONDENT'S MOTION TO RECUSE

---

Comes now the Respondent, Sheila Renee Coomer Moniz, by and through Counsel, and respectfully MOVES this Court, pursuant to KRS 26A.015(2)(e) to disqualify himself in this proceeding, due to the fact that his impartiality may reasonably be brought into question due to the fact that during 1987, while in civil practice the Hon. Cletus Maricle, was the Third Party Petitioner's own private counsel. The Third Party Petitioner, Bill Dobbs, was charged with Murder and Wanton Endangerment, in case 87 – CR-0090, Commonwealth of Kentucky v. Bill Dobbs:, where Dobbs was charged with the murder of Larry Callihan, and wanton endangerment and assault of Robert Callihan. In that case, the Hon. Maricle, took up Mr. Dobbs defense, and served as his private counsel until such time as the Hon. Maricle assumed his current position on the bench.

At that time, it was determined that the Hon. Judge Maricle could not represent Mr. Dobbs, with the Hon. William Trude appointed special case, due to Maricle's prior

Page 1 of 5

personal association with Mr. Dobbs. Furthermore, it appears that the Third Party Petitioner may have worked or supported the Hon. Maricle in his reelections and campaigned for him since the time that the Hon. Maricle was Mr. Dobbs criminal defense attorney.

In further support of her Motion to Recuse, the Respondent, in reliance on Kentucky case law and other applicable statute and cannons would state further:

"A judge should disqualify himself when his impartiality might reasonably be questioned." Lovett v. Commonweath, 858 S.W.2d 205 (Ky. App. 1993). The Respondent herein does not bring into question the actual integrity of this Court, or its actual ability to maintain objectivity. However, it must be recognized that members of the general public may bring into question the Court's impartiality, given the relationship between the Court and the Third Party Petitioner, Bill Dobbs. And it is a well recognized rule among Kentucky Courts that "The appearance of impartiality of a judge is next in importance, only to the fact of impartiality." Wells v. Walters, 501 S.W.2d 259 (Ky. 1973). Kentucky courts also adhere to the rule that when there exits any substantial grounds for suspicion on the part of the public, the judicial officer should recuse if for no other reason to avoid such distrust by the public. Ledford v. Hubbard, 33 S.W.2d 345 (Ky. 1930).

A Court's actual ability to maintain objectivity in these proceedings is not at issue, as that is not the standard in determining whether the Court should disqualify. Rather, the standard to be applied in determining whether the judge should be disqualified is an objective, reasonable person standard, rather than a subjective standard involving the Judge's own opinion of whether he can maintain his own impartiality. 28

U.S.C.A. § 144, 455. Black v. American Mut. Ins. Co., 503 F. Supp (E.D. Ky. 1980). That is, it is held that disqualification is appropriate when an objective, disinterested observer would entertain significant doubt that justice can be done.  In re Big Rivers Elec. Corp., 213 B.R. 962 (Bkrtcy. W.D. Ky. 1997).

Furthermore, even in those cases where there may not have been a widely held perception on the part of the general public that the Court may not be able to maintain objectivity and impartiality, but where it was only family members of one of the parties involved who brought into question the judge's impartiality, it has been deemed proper for the judge to recuse himself from the case. Jacobs v. Commonwealth, 947 S.W.2d 416 (Ky. App. 197) relying on KRS 26A.015(2)(e) as well as Sup. Ct. Rules, Rule 4.300, Code of Judicial Conduct, Canon 3, Subd. C(1).

The undersigned Counsel would also rely on the Kentucky Code of Judicial Conduct, Canon 2 which states, "A judge shall avoid impropriety and the appearance of impropriety in all the judge's activities." Comment to the Canon states further: "A judge must expect to be subject to constant public scrutiny.  A judge must therefore accept restrictions on the Judge's conduct that might be viewed as burdensome by the ordinary citizen, and should do so freely and willingly."

And under Commentary D to Cannon 2, "A judge shall not allow family, social, **political or other relationships** to impair the judge's objectivity.  Nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge."

WHEREFORE, the Respondent respectfully requests an Order of this Court consistent with the Motion to Recuse.

Respectfully submitted,

SANDRA J. REEVES
The Reeves Law Office, PLLC
211 South Main Street
P.O. Box 1341
Corbin, Kentucky 40702
Telephone 606 528-4376
Fax 606 528-4438
COUNSEL FOR THE RESPONDENT

## NOTICE

Please take notice that the foregoing Motion to Recuse will be brought on for hearing before the Hon. Cletus Maricle, on December 4, 2003 at the hour of 1:00 p.m. or as soon thereafter as counsel may be heard.

## CERTIFICATE OF SERVICE

I hereby certify that the original of the foregoing motion and true copies have been served upon the following via U.S. Mail, postage prepaid, on this the 26th day of November, 2003.

ORIGINAL TO:

James S. Phillips  Also sent via fax transmission on the same day
Clay Circuit Court Clerk
79 HWY 80
Manchester, Kentucky 40962

COPIES TO:

Hon. Robert Stivers  Also sent via fax transmission on the same day
207 Main Street
Manchester, Kentucky 40962

Page 4 of 5

Mr. Terry Evan Commer
P.O. Box 570
Manchester, Kentucky 40962

Hon. Cletus Maricle
Circuit Judge
79 HWY 80, Suite 1
Manchester, Kentucky 40962

SANDRA J. REEVES

Page 5 of 5



Subscriber Services



LEXINGTON HERALD-LEADER

HeraldLeader.com | News | Business | Sports | Entertainment | Living | Classifieds | Jobs | Cars | Homes |

## Lexington Herald-Leader (KY)
2010-04-20
**Section:** City/Region
**Edition:** Final
**Page:** A3

### Vote fraud sentencing begins
#### Judge says 3 deserve break others won't get
*BILL ESTEP BESTEP@HERALD-LEADER.COM*

LONDON - A judge gave sentencing breaks Monday to three men who helped in an investigation of vote-buying in Clay County but made clear that some prominent people convicted in the case can't expect the same. U.S. District Judge Danny C. Reeves denounced vote fraud. Eastern Kentucky has economic and other problems and doesn't need the added burden of public corruption, Reeves said.

"This type of activity cannot continue in Eastern Kentucky," he said.

Reeves also pointed out that in the Clay County case, the election fraud had ties to drug trafficking.

Reeves said people who buy and sell votes should be ashamed, but some aren't. He pointed to the recent trial of public officials who denied scheming to buy votes but were convicted.

"Arrogance was on full display" during the trial, Reeves said.

People convicted in that trial won't get the same breaks as those sentenced Monday, Reeves said.

Those convicted were former Circuit Judge R. Cletus Maricle; former school Superintendent Douglas Adams; county Clerk Freddy W. Thompson; Magistrate Stanley Bowling; Charles Wayne Jones, a former Democratic election commissioner; William Stivers, a former election official; and William Bart Morris and his wife, Debra Morris.

They allegedly conspired to buy and steal votes so they could get power, jobs and contracts.

All eight plan to appeal. They are scheduled to be sentenced in August.

Reeves said that there are good people in Clay County but that others preyed on them, and that too many people came to see nothing wrong with buying and selling votes.

"That mind-set's going to have to stop," he said.

Those sentenced Monday were D. Kennon White, Paul Bishop and Charles "Dobber" Weaver.

White, 41, admitted that after his father, longtime Manchester Mayor Daugh White, created a job for him as city manager in 2004, he extorted $67,000 in kickbacks on city contracts to Bowling's company.

White also took part in a scheme to pave private driveways, using public funds, in order to win votes for his father in 2006.

http://nl.newsbank.com/nl-search/we/Archives?p_action=doc&p_docid=12F3860FC62EB...    4/22/2010

After he got caught, White and his wife, Wanda, helped the FBI task force investigating vote fraud.

They made secret tape-recordings of Maricle and others and testified extensively for prosecutors at the trial.

In urging probation for Kennon White, his attorney, Brent L. Caldwell, said the Whites put themselves at great risk to help investigators and have been threatened and intimidated.

They have moved out of **Clay County** and might have to move again, Caldwell said.

"He has been through a living nightmare the last three years, but he has done the right thing," Caldwell said.

Reeves said he doesn't often give breaks, but said White had earned one with assistance to the government.

The advisory sentencing range for White was 57 to 71 months. Reeves sentenced him to five years on probation, with six months of that on home detention. He must also repay the city $30,000 for the illegal paving work.

The guideline range for Bishop, a former school employee, was 97 to 121 months. Reeves sentenced him to 36 months.

Reeves credited Bishop, 61, for his cooperation with the government and reduced his potential sentence because of his age, poor health and other factors. But Reeves said he couldn't give Bishop less time because he was part of a very serious offense.

Bishop admitted he allowed Adams to use his garage for a meeting where vote-buying was discussed.

At that meeting before the May 2002 primary election, candidates pooled at least $150,000 to be used to buy votes, Bishop said in his plea.

Bishop also said he served as an election officer in the early, absentee voting in May 2002, working inside the polling place to make sure people who had sold their votes cast ballots for the people they'd been paid to support.

Reeves sentenced Weaver, the former fire chief of Manchester, to be on probation for three years, with five months of home detention.

The guideline range for Weaver was 10 to 16 months, but, as with White and Bishop, prosecutors recommended a lesser sentence because of Weaver's cooperation.

Weaver wept as he told Reeves he had tried to do good in his community but let others persuade him to get involved in vote fraud.

Weaver admitted he took part in a scheme to steal votes in the May 2006 primary, in which he and Wanda White were precinct officers.

The **county** had new voting machines that year that required people to push two buttons to vote: one to review their choices and the second to record them.

That created opportunity for a scam in which corrupt precinct officers duped people into thinking they

had voted after pressing the first button, then switched the votes, according to trial testimony.

Weaver and Wanda White testified they both took part in that scheme, stealing numerous votes.

Weaver hoped to get a **county** job by participating.

Wanda White, who was not charged in the case, said Maricle recruited her to work that election to help his son-in-law, who was running for property valuation administrator.

[x] Visit other Real Cities Sites

News | Business | Sports | Entertainment | Living | Shop Local | Classifieds | Jobs | Cars | Real Estate
About HeraldLeader.com | About the Real Cities Network | About the McClatchy Company
Terms of Use | Privacy Policy | Copyright

**DAVID S. HOSKINS**
Attorney at Law
107 East First Street
Corbin, Kentucky 40701

Telephone: (606) 526-9009
E-Mail: davidhoskins@bellsouth.net

Fax: (606) 526-1021

June 19, 2009

Hon. Stephen C. Smith
Assistant United States Attorney
601 Meyers Baker Road
London, Kentucky  40741-3035

Re:  United States v. Russell Cletus Maricle
     USDC, Case No. 09-16-DCR

Dear Steve:

   I would like to obtain a copy of all of the documents Gary Gregory provided to you.  I understand he gave you his entire file on Corky Price.

   Also, I would like to schedule a time to view the items seized from the Maricles' residence.  I would like my client to be present, as well.  Please let me know when we can meet for that purpose.

                              Sincerely

                              David S. Hoskins

DSH/rge

93

1        THE COURT: All right. Mr. Bayer, you're doing

2    exactly what I told counsel earlier that you couldn't do, read

3    the 302 into evidence and then ask him if he agrees with it.

4        MR. BAYER: I wasn't --

5        THE COURT: I've sustained the objection as to

6    relevancy, but you have violated my order.

7        MR. BAYER: I'm sorry, Judge. I did not read it.

8        THE COURT: You didn't read it?

9        MR. BAYER: I don't think I read it, no, sir, I was

10   asking --

11       THE COURT: We're going to take a break, and I'm

12   going to ask the reporter to go back, and we'll go over that

13   and see if you read that.

14       MR. BAYER: Just a moment. I would never, ever

15   violate a direct order of the Court.

16       THE COURT: You just did.

17       MR. BAYER: If the Court thinks I did, I want to

18   apologize.

19       THE COURT: We're going to find out if you did,

20   because I'm going to get the 302, and I'll ask the reporter to

21   read back your last question, and I'll see if you read it or

22   not.

23       MR. BAYER: If I violated your order, Judge, I had no

24   intention of doing it. That's number one. Please believe me,

25   I would never, ever do that. The point I'm trying to make

95

1   document to refresh his memory. The question is then what he

2   remembers, not for you to read the document. Now, I'm going

3   to take a break for the evening, and we're going to go back

4   and we're going to read this.

5       MR. BAYER: Okay. That would be fine. Thank you,

6   Judge. Again, Judge, I apologize.

7               (Sidebar conference concluded.)

8       THE COURT: Thank you, counsel. Ladies and

9   gentlemen, I do have a hearing this afternoon at 4:30 so we're

10  going to break a little bit earlier today. We'll break at

11  this time. I do want to remind you of the admonition given to

12  you previously not to discuss the case among yourselves while

13  we are in recess. Also, don't let anyone else attempt to

14  approach you to discuss the case. Don't read, watch or listen

15  to any accounts of the case if there should be any. Don't try

16  to perform any type of research or investigation and, of

17  course, don't make up your mind about the case until it is

18  finally submitted to you. We'll ask the jury to be back and

19  ready to go tomorrow morning at 9:00. Jury will be excused.

20              (The jury left the courtroom at 3:54 p.m.)

21      THE COURT: Thank you and please be seated. When the

22  jury has left, you can take Mr. Lewis. We'll wait for that.

23  Mr. Smith, do you have a copy of the 302?

24      MR. SMITH: Yes, Your Honor. Your Honor, just for

25  the record, this is an unredacted copy.

1          THE COURT:  Mr. Bayer, your actions have

2     consequences.  You need to understand that.

3          MR. BAYER:  Yes, sir.  I do.

4          THE COURT:  When we resume tomorrow morning, just so

5     we're clear, when you show a witness a document to refresh the

6     witness's memory that's not his document, not something that

7     he prepared, you can show a witness a document.  You can show

8     a witness anything to refresh memory.  A cup may refresh

9     someone's memory.  Once their memory is refreshed, their

10    testimony is what they recall.  It's not what you then read

11    from a document to them.  Because what you're attempting to do

12    is you're trying to get into evidence something that's not his

13    statement, something that's recorded by a third party, and I

14    believe it's improper when you do that.

15         Now, I've instructed the attorneys on this procedure

16    previously in the case, and if you violate my order again,

17    there will be serious consequences.

18         MR. BAYER:  I understand.

19         THE COURT:  Do you understand?

20         MR. BAYER:  Very much so.  I would say, Judge, when I

21    asked him after he read that, I said do you remember making

22    those statements.  He said, I remember some of this, as I

23    remember him testifying, and that was when I read that

24    specifically to him to see if that was what he remembered.  I

25    tried to go through the process.  If I did it wrong, I



EXHIBIT F
ID#: 14319

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON
CRIMINAL MINUTES-GENERAL

Case No: 6:09-CR-16-S-DCR          At: LONDON          Date: December 3, 2009

PRESENT: Hon. Danny C. Reeves, U.S. District Judge

| Renee Bundy | Cindy Oakes | Stephen C. Smith & Jason Parman |
|---|---|---|
| Deputy Clerk | Court Reporter | Assistant U. S. Attorneys |

DEFENDANTS:                          ATTORNEYS FOR DEFENDANTS:

Russell Cletus Maricle (present)(bond)      David Hoskins, Martin Pinales (retained)

Douglas C. Adams (present)(bond)            Bennett E. Bayer (retained)

Charles Wayne Jones (not present)           T. Scott White (CJA)( Not Present)

William E. Stivers (present)(bond)          Robert L. Abell (CJA)(Present)

Freddy W. Thompson (present)(bond)          Russell James Baldani (Retained)(Present)

William B. Morris (present)(bond)           Jerry W. Gilbert (Retained)

Debra L. Morris (present)(bond)             Elizabeth S. Hughes (CJA)(Present)

Stanley Bowling (present)(bond)             Daniel A. Simons (Retained)(Present)

PROCEEDINGS: STATUS CONFERENCE

This matter was called for a status conference to schedule hearing dates for resolution of audio recordings/transcript issues previously raised by counsel. Defense counsel, T. Scott White, was not present, having been previously relieved of attendance. However, he provided the Court dates during the month of December on which he was unavailable due to previously scheduled court appearances. [R. 546 and R. 548]

The Court being sufficiently advised, it is hereby **ORDERED** as follows:

1)      This matter is scheduled for hearing on **Tuesday, December 22, 2009,** and **Wednesday, December 23, 2009,** at **9:30 a.m.** on each date in **London,** Kentucky for resolution of audio recordings/transcript issues. In the event counsel for Defendant Jones is unable to reschedule hearings previously scheduled, he may request that the Court re-schedule this hearing to begin on December 24, 2009.

2)      The United States shall provide the Court with copies of the audio recordings and transcripts it proposes to use no later than **5:00 p.m.** on **Monday, December 14, 2009.**

-1-

3)      The Defendants shall provide the Court with a copy of the transcripts they would propose to use no later than **5:00 p.m. on Monday, December 14, 2009.** If the Defendants disagree on a particular transcript and intend to submit for the Court consideration more than one version of a transcript relating to a specific recording, they shall identify the Defendant(s) favoring each version.

The Court further advised the parties that, due to the substantial and numerous differences between the jury questionnaire suggested by the Court and the questionnaire proposed by the Defendants, a jury questionnaire would not be submitted to prospective jurors in advance of jury selection.

Dated:   December 3, 2009.



Signed By:

**Danny C. Reeves** DCR

**United States District Judge**

Copies: COR, USP, USM

TIC: 58 min.

-2-

## Exhibit G

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### SOUTHERN DIVISION
### LONDON

**CASE NO. 09-16-S-DCR**

**UNITED STATES OF AMERICA,**                                    **PLAINTIFF,**

**VS.**         **OBJECTION TO SENTENCING ON BASIS OF PROSECUTORIAL MISCONDUCT IN INITATION OF PROCEEDINGS**

**RUSSELL CLETUS MARICLE, ET AL,**                          **DEFENDANT.**


### INTRODUCTION

THE GRAND JURY INVESTIGATION

THE INDICTMENT

SEARCH WARRANTS

TRIAL TESTIMONY

COURT CONCLUSIONS – ELECTION RELATED OFFENSES


### PROSECUTORIAL MISCONDUCT

FALSE INFORMATION AND MISLEADING ADVICE TO GRAND JURY

FAILURE TO COMPLY WITH PUBLIC INTEGRITY SECTION, ELECTION CRIMES BRANCH CONSULTATION REQUIREMENTS

### PROCEDURAL BACKGROUND


### RELEVANT INFORMATION ON SHERIFF JORDAN


### CONCLUSION


1

# Exhibit G

## **INTRODUCTION**

On March 19, 2009, the defendant along with seven other persons were indicted for violation of 18 U.S.C. §1962(d) – racketeering conspiracy. The racketeering conspiracy was alleged to consist of the predicate acts of bribery,[1] extortion[2] and honest services mail fraud.[3] The only possible predicate act left is the alleged violation of KRS 119.205, an election offense.[4] A superseding indictment on July 9, 2009, added one count of money laundering and two counts of forfeiture seeking joint and several judgments for the totals of the salaries of Russell Cletus Maricle as Circuit Judge, Douglas C. Adams as Clay County School Superintendant, Freddy W. Thompson as Clay County Clerk, Stanley Bowling as Magistrate and Charles Wayne Jones as Election Commissioner. In addition the government sought a judgment for the gross receipts for the construction contracts of Stanley Bowling and the waste disposal contract of William "Bart" Morris and Debi Morris. Judgment was also sought against William "Al Man" Stivers even though his only income was disability social security.

On March 25, 2010, a jury returned a verdict of guilty and a forfeiture judgment for $4.7 million against each defendant which was the total of all of the defendants' laboring wages. Each person is liable for the entire amount including William Stivers whose only income was social security disability. The only evidence of income was for salaries of the officials and services performed with no deductions for expenses incurred.

---

[1] The bribery alleged in the indictment is supposedly a violation of KRS 119.205, an election offense. The word bribery does not appear in KRS 119.205. The bribery offenses are covered by the penal code. Under common law "bribery" is the crime of offering any undue reward or remuneration to any public officer or other person entrusted with public duty, with a view to influence his behavior in the discharge of his duty. Under the case of Com. v. Funk, 234 S.W. 2d 957, 314 Ky. 282 (1950) buying a vote is not bribery in Kentucky.

[2] A judgment of acquittal has been granted as to each of the defendants named in the extortion count. (Documents #947 and #1080)

[3] Honest services mail fraud was the basis for numerous motions attacking all convictions herein under Skilling v. United States, 130 S. Ct. 2896 (2010) WL 2518587. All honest services mail fraud convictions have been vacated. (Document #1082)

[4] The indictment is equivocal about obstruction of justice as a predicate offense.

# Exhibit G

In this case the United States has obtained convictions on crimes of its own imagination and invention without legislative authority or enactment in defiance of the general rule of no federal common law crimes. The Court has allowed the United States to unconstitutionally extend its control to state and county elections, the enforcement of state election laws, and state and county election officials by making RICO and money laundering applicable where only election related offenses are charged. An analysis of this case from the beginning of the grand jury investigation to the present produces this inescapable conclusion.

## THE GRAND JURY INVESTIGATION

The grand jury investigation began on May 3, 2007, with SA Timothy Briggs outlining his version of an election scheme that began with a slate of candidates pooling money from contributions throughout the community. He testified there were meetings for the purpose of pooling money, distributing money and choosing election officers. He stated that the target of the investigation was Circuit Judge Cletus Maricle. (G.J. Testimony, May 3, 2007, pp 4-5)

On July 12, 2007 SA Briggs took charge of seven (7) boxes of election related material delivered by Clay County Clerk Freddy Thompson. SA Briggs also testified before the grand jury on February 6, 2008.

On March 3, 2009, SA Briggs again testified regarding Clay County elections of 2002, 2004 and 2006. The focus of his entire testimony were those elections so the defendant will not detail his testimony and would point out that the testimony of Briggs and statements of AUSA Taylor with AUSA Smith present will be addressed hereinafter at pages 7-11 on the issue of prosecutorial misconduct.

Numerous persons appeared before the grand jury in Lexington, Kentucky, between May 3, 2007 and March 3, 2009. Their testimony dealt with the 2002, 2004, and 2006 elections.

3

## Exhibit G

A superseding indictment was obtained on July 9, 2009 adding the offense of money laundering to the charges plus two forfeiture counts. Stanley Bowling was also indicted at that time. Again, the testimony of SA Briggs concentrated on the pertinent elections. All counts of the superseding indictment were election related.

## THE INDICTMENT

Count I of the indictment for alleging a racketeering conspiracy is in each and every paragraph and allegation election related:

(1)     Count I, paragraph 1, sets forth the composition and duties of the Clay County Board of Elections.

(2)     Count I paragraphs 2-8 names each defendant and alleges they were politically active within the county and sets forth their official position.

(3)     Count I, paragraph 9 alleges that in the discharge of their public duties the officials "...owed to the citizens of the county a duty of honest services to include the duty to act in the best interest of the citizens without corruption and self-dealing."

(4)     Count I, paragraph 10 designates the Clay County Board of Elections as an "enterprise" as defined in 18 U.S.C. §1961(4)

(5)     Count I, paragraph 11 states that the overall purpose of the defendants was "...political power and control within the county...."

(6)     Count I, paragraphs 12 (a) (b) (c) (d) (e) and (f) alleges the political roles of each of the defendants – Maricle and Adams as political bosses, Jones as Democrat election commissioner, Stivers as election officer, Thompson as County Clerk, the Morrises as expending political funds, and Bowling as expending political funds.

(7)     Count I, paragraph 13 sets forth the predicate acts of violating KRS 119.205 (an election offense), honest services mail fraud relative to elections (convictions vacated and acquittals granted), extortion that is election related, (acquittals granted) and obstruction of justice of an investigation relative to elections.

There are no non related election offenses.

Count 2, charging money laundering is also based on election offenses of violating KRS 119.205 and extortion, which is no longer applicable. Again, there are no non related election offenses as a part of money laundering.

Count 3, 5, 6, and 7 are the now defunct honest services mail fraud counts that have been vacated.

4

# Exhibit G

Count 4 is the extortion count on which the defendants have now been acquitted.

Counts 8 and 9 are the obstruction of justice charges.

Counts 10 and 11 are not predicate acts for purposes of Counts 1 and 2 but are election related offenses under federal law. The indictment connects Counts 10 and 11 to Count 1 by incorporating paragraphs 1-12.

Counts 12 and 13 seek forfeiture of the official salaries of defendants Maricle, Adams, Jones, Thompson and Bowling and the proceeds of contracts of the Morrises and Bowling.

The indictment uses the word "election" sixty-six (66) times. By contrast the word election or voter fraud is not contained in the list of predicate acts for racketeering.

## SEARCH WARRANTS

Search warrants were issued on March 19, 2009, the purpose of which was described by SA Briggs as follows:

> "…we were hoping to find evidence of election fraud with regard
> to you know, names of lists of voters or vote haulers or vote sellers,
> amounts of money paid, provided by other candidates. Just you know
> those types of things, which individuals typically involved in election
> fraud keep from election to election…" (R.880 Trial Transcript Vol. 20B p.52)

The affidavit filed to obtain search warrants, the search warrants, and the return of the search warrants support this statement.

## TRIAL TESTIMONY

Over a period of several weeks the United States called numerous witnesses about the 2002, 2004, and 2006 elections. In light of the testimony of SA Briggs, the defendant will not detail the testimony of these witnesses but reference the testimony of SA Briggs.

Timothy S. Briggs is a special agent with the London, Kentucky resident agency, where he has been located for 13 years. He has specialized in election crimes, attended and spoke at election

## Exhibit G

fraud seminars, and was the election crimes coordinator in the State of Kentucky for the FBI, dealing with agents in Kentucky who had issues that arose with regard to election fraud. (R.880 Trial Transcript Vol. 20B pp. 22-23)

The records of the 2002 election were initially obtained, reviewed, summarized and returned to the Clerk's office. (Id. pp. 26-27)  The FBI recruited Kennon White and Wanda White to assist in the investigation whose " ... primary focus, of course, was election fraud." (Id p. 31) Recordings were made to gather communications or talks about election fraud. (Id p. 37)

When requested to explain how the grand jury was going to help in the investigation Briggs stated:

> Well, we subpoenaed witnesses, of course, lot of witnesses to
> the grand jury to discuss their involvement, their role, their
> knowledge of the election, election process in Clay County and
> fraud, bribery that they had observed during their, either their
> voting process or, you know, if they hauled voters, if they were
> a paid voter, that type of thing. (Id p.38)

Briggs further stated "... it was quite clear we were looking into the issues regarding the elections in Clay County." (Id p. 38)

During his direct testimony Briggs referred to election fraud and/or election scheme forty seven (47) times.

## COURT CONCLUSIONS – ELECTION RELATED OFFENSES

In numerous orders issued by the Court post-trial the Court has correctly recited that this case was based upon election related offenses.  In an order of July 14, 2010, the Court stated: "The defendants were convicted on March 25, 2010, of various offenses relating to vote fraud in Clay County, Kentucky" (R. 990 p.2)  Following this the order of October 4, 2010, reads: "The defendants were charged in a thirteen-count Superseding Indictment with various crimes related to corrupt elections in Clay County, Kentucky." (R.1056 p.2)  The Court thereafter lists in

6

## Exhibit G

the same paragraph all of the alleged offenses. The memorandum opinion and order of December 1, 2010, states, "[t]he charges related to corruption surrounding elections in Clay County, Kentucky." (Record No. 1080 p.1)  The same statement is reflected in the December 7, 2010, memorandum opinion and order. (R.1081 pp.1-2) and in the last order of December 10, 2010, "[t]he defendants were charged with numerous offenses relating to corrupt elections in Clay County, Kentucky." (R.1082 p.2)

## PROSECUTORIAL MISCONDUCT

The wisdom behind Skilling v. United States, 130 S.Ct.2896(2010) is to curb and prevent arbitrary opportunistic and discriminatory enforcement of the law and crime invention by overly ambitious prosecutors and law enforcement officials in pursuit of their own personal agenda. These creative efforts are made for personal, professional, and economic advancement. In addition such are often vindicative against an individual or individuals or bestow political or financial benefits on a friend, relative or associate. The actions of the United States in this case amounts to prosecutorial misconduct.

## FALSE INFORMATION AND MISLEADING LEGAL ADVICE GIVEN TO GRAND JURY

Count I is designated as a racketeering conspiracy. In fact, it is an election fraud case brought in the name of racketeering so as to include activities in a 2002 election. The statute of limitations had run on activities relative to the 2002 election, so AUSA Smith, AUSA Taylor and SA Briggs renamed the case and advised the grand jury on the day of the indictment that a RICO charge lifts the statute of limitations and that honest services mail fraud counts were predicate acts for a RICO charge. [5]

---

[5] The United States is responsible for the destruction of the 2002 election records. The records were returned to the Clerk's office where they had to be destroyed according to law. Apparently, the United States did not keep copies. A request was made in discovery by the defendant Maricle for the 2002 election records but none were ever furnished.

7

# Exhibit G

On March 3, 2009, in his testimony before the grand jury, SA Timothy Briggs, in the presence of and with the acquiescence of AUSA Steve Smith and AUSA Kenneth Taylor, materially misrepresented the law.  SA Briggs testified as follows:

> A.  Okay, in 2002 many people who came to the Grand Jury, basically told us a tremendous amount of information, but most of it was on 2002 and our belief is that they believed it was beyond the statute of limitations which it truly was, unless you go with a RICO charge which lifts the statute of limitations and you can take it back further,
> (GJ Transcript 3/3/09 at Page 30 Lines 13-18)

Thereafter the following questioning, answers and statement of AUSA Kenneth Taylor occurred:

BY GRAND JUROR #30:

> Q.  If, I think I heard you say that in the elections, that the people were testifying thinking that the time frame was gone.  Would that still be allowed once it was changed to the RICO?
>
> A.  Well, they were correct in their thinking if they consulted their attorney or whatever the case may be that the 2004 during the time frame we were having these proceedings that statute of limitation had passed, but then when we changed the, or when we pursued RICO charges that now encompasses the 2002 election, so –

BY KEN TAYLOR, ATTORNEY:

> Q.  Let me make a point of that.  If you, this may have been so subtle it just went over your head, but in the indictment you'll notice that of the eight racketeering acts, seven of them are what we call substantive Counts, in other words we have charged those as crimes as those being the racketeering acts.  One of those racketeering acts, one through eight, in fact it's the first one, is not a substantive Count.  It's just listed as a racketeering act.  Why is that?  Because it's in 2002.  The statute of limitations has passed on that.  We can't prosecute it as a stand alone substantive Count, but we can list it as a racketeering act that has happened in furtherance of this racketeering conspiracy on this racketeering enterprise because the racketeering enterprise has come from way back in 'til prior times, well within the statute of limitations.
> (GJ Transcript 3/3/09 Page 35 Lines 9-25 and Page 36 Lines 1-8)

Specifically, AUSA Taylor, in his fiduciary capacity, advised the grand jury that the charges of mail fraud under 18 USC §1341 and 1346, which alleged the devising of a scheme or

8

## Exhibit G

artifice to defraud and deprive citizens of the right of honest services relative to elections in May and November of 2004 and May and November of 2006, were the racketeering acts. At said time and place and on said occasion AUSA Taylor and AUSA Smith had actual knowledge that the charges of honest services mail fraud were not applicable and could not be sustained in this case.

AUSA Taylor briefed, argued, and lost the issue of honest services mail fraud in the case of United States v. Turner, 465 F. 3d 667 (CA6 2006), a case arising out of elections in Knott and Pike counties in the Eastern District of Kentucky, hereinafter referred to as United States v. Turner or Turner case. The Turner case is very similar to this case. It arose in part out of the May 2002 election in Knott County, Kentucky, for County Judge Executive in which Donnie Newsome, the incumbent, was a candidate for re-election. The other election involved was the November 2002 race for District Judge in Pike County, Kentucky. It involved allegations of vote hauling checks, straw contributors, payment of cash to voters, cash withdrawals to pay straw contributors, and cash contributions to candidates. Not all of these activities were alleged to be present in this case which involved the 2002, 2004, and 2006 elections in Clay County, Kentucky, for local officials.

The convictions in the Turner case were for honest services mail fraud and conspiracy to commit mail fraud. Four of the convictions in this case were for honest services mail fraud violations which were used as predicate offenses for the RICO conviction but have now been vacated. The Turner case in interpreting §1341 and 1346 at page 683, recognized the federal-state balance in the prosecution of crimes and the significance of their decision because " . . . mail fraud is a predicate offense under RICO and the money laundering statute" citing Cleveland v. United States at 531 U.S. 12, 25, 121 S.Ct. 365, 148L.Ed 2d 221 (2000)

The Turner case held " . . . that the right to honest elections was separate and distinct from the right to honest services before McNally," and "[t]he legislative history of §1346 further

## Exhibit G

confirms that the statute revived the honest services cases to the exclusion of election-fraud cases."

(Turner case at 673) "In sum the plain terms of the statute, the Supreme Court's discussion of the

statute in Cleveland, and the legislative history of the statute all demonstrate the Congressional

enactment of §1346 did not revive those cases involving prosecutions under the mail fraud for

deprivation of the intangible right of honest elections." (Turner case at 674)

The Court further stated:

> Nor may Turner be prosecuted under §1346 because the alleged scheme
> involved a deprivation of honest services as that term was understood before
> McNally. The district court assumed that, even though Congress did not
> explicitly restore election fraud cases, Turner's conduct could still be
> prosecuted under an honest services theory so long as it fit within the "honest
> services" cases existing before McNally and thereby expressly revived by
> §1346. Attempting to fit this election fraud case under the pre-McNally
> honest services framework would circumvent Congressional intent to revive
> only the "honest services" cases and not election fraud cases. Moreover,
> obvious problems were in any attempt to recast this election fraud case as
> involving a deprivation of honest services.

The Court, in Turner, further determined that it was " . . . not persuaded . . . that the right to

fair and honest government is necessarily included in the right to honest services as that term is

used in §1346. The additional inference that assuming there is a right to fair and honest

government, the right to honest elections is included therein is also unwarranted." (Turner at 676)

For there to be honest services fraud, there must be misuse of public office for personal profit.

(Turner at 676) The United States has conceded that there was no bribery and kickback scheme,

which would have been as true at the time of the indictment as it is now.

Any discussion of the Turner case would be incomplete without mentioning the very

significant footnote 10.

> Finally, we also note that the Department of Justice itself decided after the
> passage of §1346 that prosecuting election fraud under the honest services
> doctrine was no longer viable. See U.S. DOJ, Federal Prosecution of Election
> Offenses (6th ed 1995) 1270 PLI/Corp 1019, 1072. "[W]hile the mail fraud

10

## Exhibit G

statute can once again be used to prosecute such things as corruption by
public servants and embezzlement by campaign officials; it does not reach
schemes to deprive citizens of fair elections because such schemes do not
include intent to deprive any identifiable victim of the 'honest services' of a
fiduciary." Moreover, although the government departed from this position in
this case, it conceded that the honest services theory was inapplicable to
"schemes to deprive citizens of fair election" in another recent case. See
United States v. Ratcliff, 381 F.Supp 2d 537, 543 n.32 (MD La. 2005).

AUSA Kenneth Taylor participated in the grand jury investigation of Maricle alongside

AUSA Steve Smith so they had, not just constructive knowledge, but actual knowledge of United

States v. Turner . They knew the Department of Justice did not prosecute election fraud cases

under the honest services doctrine. AUSA Taylor and AUSA Smith did not heed United States v.

Turner or Department of Justice policy but placed their own agenda (particularly AUSA Smith's)

above the law. They knew honest services mail fraud was not applicable in this case and

disregarded Turner's premises that the right to honest services did not include the right to a fair

and honest government and the right to honest elections. AUSA Taylor, admitted to the grand jury

that the statute of limitations had expired on Count I and it could only be used if designated

racketeering in conjunction with honest services mail fraud, which each knew did not exist as a

crime due to the Turner case.

The government's contention that "Turner was also indicted and convicted on the theory

that he participated in a scheme to fraudulently obtain money or property – specifically the salary

of the elected positions sought by Hays and Newsome" was also rejected. "An elected official's

salary does not constitute property in the hands of a victim" Turner at 682. Nor can the

Commonwealth unilaterally refuse to pay the salary of a fraudulently elected candidate. FN19

p.682.

11

## Exhibit G

Even before <u>Skilling</u> the law in the Sixth Circuit was very clear.  Honest services mail

fraud did not cover fair and honest government and the right to honest elections.  In spite of this

the United States proceeded in the case at bar.

## FAILURE TO COMPLY WITH PUBLIC INTEGRITY SECTION ELECTION CRIMES BRANCH CONSULTATION REQUIREMENTS

The AUSA's escaped with only a footnote in the <u>Turner</u> case relative to their departure

from the policies and procedures of the Department of Justice and in particular the Election Crimes

Branch of the Public Integrity Section but were stuck with it's binding authority.  The United

States through AUSA Smith concocted a theory based on RICO by which he was intentionally

insubordinate to his superiors and subversive of justice.  He simply disregarded his superiors who

were charged with ensuring national standards for the federal prosecution of election offenses,

respecting the state's primary responsibility in the electoral process, and guaranteeing prosecutors

who are detached from local political interests.  These interests could prove to be personally,

professionally and economically advantageous.  <u>Federal Prosecution of Election Offenses,</u> 7th

Edition, is the source book in the area of election offenses for criminal law enforcement of the

United States Department of Justice.  It was authored by Craig C. Donsanto and Nancy L.

Simmons, both of whom are veterans with the Department of Justice.

Mr. Donsanto joined the Department of Justice in 1970 and became Director of the Public

Integrity Section's Election Crimes Branch in 1980.  It is part of his duty to oversee criminal

investigations and prosecutions by the Justice Department involving campaign financing crimes

and corruption of the election process.  He provides guidance to approximately 100 Assistant

United States Attorneys who serve as District Election Officers in the 93 federal judicial districts

involving voter fraud among other things. <u>Federal Prosecution of Election Offenses</u> (7th Ed 2007)

(1689 PLI/Corp 749,751)

12

# Exhibit G

Ms. Simmons joined the Justice Department in 1980. Before that she was legal counsel to the U.S. Senate Select Committee on Ethics and served with the Federal Election Commission's Office of General Counsel. She has practical trial experience in offenses involving vote buying and ballot fraud and works in the area of policy and legislation. Federal Prosecution of Election Offenses (7th Ed 2007) (1689 PLI/Corp 749,751-752)

The overview starts as follows:

> This book was written to help federal prosecutors and investigators discharge the responsibility of the United States Department of Justice in attacking corruption of the election process with ALL AVAILABLE STATUTES AND THEORIES OF PROSECUTION. (Emphasis added) It addresses how the Department handles ALL FEDERAL ELECTION OFFENSES, OTHER THAN THOSE INVOLVING CIVIL RIGHTS (Emphasis added) which are enforced by the Department's Civil Rights Division. This Overview summarizes the Department's policies, as well as key legal and investigative considerations, related to the investigation and prosecution of election offenses (Id. at 767)

The words emphasized say ALL, and all does not include RICO. See Federal Prosecution of Election Offenses (7th Ed 2007) (1689 PLI/Corp 749,799-852) for a complete and exhaustive list including The Travel Act but not RICO.

The Criminal Divisions Public Integrity Section has been delegated supervision over the enforcement of all criminal statutes and prosecutorial theories involving corruption of the election process and all criminal patronage violations. That consultation policy is contained in U.S. Department of Justice, U.S. Attorneys' Manual (USAM) Section 9-85.210. A summary of those requirements is as follows:

> United States Attorneys' Offices and FBI field offices may conduct a preliminary investigation of an alleged election fraud or patronage crime without consulting the Public Integrity Section. A preliminary investigation is limited to those investigative steps necessary to flesh out the complaint in order to determine whether a federal crime might have occurred, and, if so, whether it might warrant federal prosecution. However, a preliminary investigation does not include interviewing voters during the preelection or balloting periods concerning the circumstances under which they voted, as such interviews have the potential to

13

## Exhibit G

interfere with the election process or inadvertently chill the exercise of an individual's voting rights.

Consultation with the Public Integrity Section is required to:

- expand an election fraud or patronage investigation beyond a preliminary stage;
- conduct interviews with individual voters during the preelection period, on election day, or immediately after the election, concerning the circumstances under which they voted;
- issue a subpoena or search warrant in connection with an election fraud or patronage matter;
- present evidence involving an election fraud or patronage matter to a grand jury;
- file a criminal charge involving an election fraud or patronage offense; or
- present an indictment to a grand jury that charges an election fraud or patronage offense.

It is also recommended, although not required, that the Public Integrity Section be consulted with respect to sentencing issues during any plea negotiations in order to ensure consistency with similar cases.

Donsanto and Simmons clearly understood United States v Turner, 459 F.3d 775 (6th Cir. 2006) and it's "holding both salary theory and honest services theories inapplicable to election fraud by local candidate." Id. 773. "The application of the "honest services" theory of mail and wire fraud to election fraud schemes was expressly rejected by the Sixth Circuit in United States v Turner, 459 F.3d 775 (6th Cir. 2006)." Id. 843-844.

AUSA Smith has conceded that he did not obtain the approval of the Public Integrity Section's Election Crimes Branch as dictated by the United States Department of Justice Manual. (Record 1074-1 p.6). He will contend that it creates no substantive rights for the defendant, however, that is not the issue here.

The issue is prosecutorial misconduct at the behest of AUSA Smith in violating Department of Justice policies, rules and regulations depriving the defendant of his rights of constitutional due process and equal protection of the laws. Not only did he violate the requirements of the Justice Department but he disregarded and abused the principles from which

14

## Exhibit G

those very requirements emanated. His non-detachment from the persons and interests at play in

the subject matter of the investigation denied a prosecution based upon national standards and

insulated a corrupt family member who was an integral part of the election process and gave drug

protection to a major government witness, from prosecution.

### PROCEDURAL BACKGROUND

On April 30, 2007, Wanda Whire and Kennon White recorded a conversation with Edward

Jordan who was Sheriff of Clay County from 1989 until January of 2007, and a member of the

Clay County Board of Elections. He urged Wanda White to tell the grand jury that Doug Adams

was the man that ran Clay County and outlined his familial and personal relationship to AUSA

Steven Smith. He advised that he had conversed with Preston Smith, AUSA Steven Smith's

father, about assisting the White family in their legal problems with the United States. He further

promised to again contact Preston Smith for help.

Jordan stated that he had called Preston Smith (referring to the father of AUSA Steven

C.Smith) on the preceding Friday, which would have been April 27, 2007, and that he was going to

go see Preston Smith on their behalf on Wednesday, which would have been May 2, 2007. He told

them he couldn't talk directly to Steven Smith " . . . but I can go to his dad and talk to him and

maybe get something done . . . he runs a car lot over there." (20:45 on CD)

Later in the conversation Jordan says "I done told you I called that boy's daddy [Steven

Smith's father Preston Smith] right there Friday and actually I was going to go over there

Wednesday." He further said he didn't, ". . . want to go directly to Steven cause I don't know him

that well even though he's my kin folks." He reassuringly advises the Whites, "Preston will talk

to him and [51:24 on CD] . . . that boy is my kin folks" [1:05:57 on CD]

At 1:10:21 on the CD Jordan again promises, ". . . I'm gonna go talk to THEM

15

## Exhibit G

[Emphasis Added] and I'll do it this week Wednesday or Thursday." He further reiterates,

"Doug Adams is the man I want and I said that's who they want and I know it."

On the basis of this recording and other information of which the defendant Maricle was

knowledgeable, defendant Maricle filed a motion to disqualify AUSA Smith (Document 296)

pursuant to Section 528 of Title 28, United States Code, enacted as a part of the "Ethics in

Government Act of 1978" which provides:

> The Attorney General shall promulgate rules and regulations which require the disqualification of any officer or employee of the Department of Justice, including a United States Attorney or a member of such attorney's staff from participation in a particular investigation or prosecution if such participation may result in a personal, financial, or political conflict of interest, or the appearance thereof. Such rules and regulations may provide that a willful violation of any provision thereof shall result in removal from office.

28 C.F.R. § 45.2 directs:

> No employee shall participate in a criminal investigation or prosecution if he has a personal or political relationship with . . . any person or organization which he knows has a specific and substantial interest that would be directly affected by the outcome of the investigation or prosecution.

An evidentiary hearing was requested on the face of the motion.

AUSA Smith in an unverified response (R.326) denies any covered relationship between he

and Jordan and states that he has inquired extensively of the immediate family (no names given)

and that no one can state definitively the degree of relationship. He does not deny a relationship.

He also alleges he has no personal contact directly or indirectly with Jordan during his lifetime.

Under all ordinary circumstances this would have set the basis for the requested evidentiary

fact finding proceeding. A close, personal relationship did exist under 18 C.F.R. § 42.5 (c) (2) that

of father and son, Preston Smith and Steven C. Smith. Edward Jordan had outlined a familial and

personal relationship with Preston Smith and political implications could not be denied since Ed

16

## Exhibit G

Jordan and Preston Smith were both involved in politics and the instant case was based upon political activity.[6] In Eastern Kentucky there is a proclivity for "kin folks" to be a political unit. However, Magistrate Judge Robert Weir on August 7, 2009, and within three days of AUSA's unverified reply completely ignored the request of the defendant for an evidentiary hearing (R.296, p 1) and instead found that no hearing was requested. (R.337, p 1) Further, Magistrate Judge Weir entered his order denying disqualification eleven days before the defendant's reply to AUSA Smith's response was due violating LCrR 12.1(d), which allows fourteen days for a reply, and LCrR 12.1(h), which provides as follows:

> A motion is submitted to the Court for decision after completion of the hearing or oral argument – or if none – after the reply memorandum is filed, or the time for filing the reply has expired.

This action was arbitrary and capricious denying the defendant his rights to a hearing and a reply.[7] Transparency in the court proceedings was replaced by opaqueness and AUSA Smith was insulated by this misguided action. Bludgeoning from Smith's playhouse of prosecutorial misconduct continued.

The comedy of errors did not terminate there. Defendant Maricle filed objections (R.383) on August 17, 2009, to which AUSA Smith responded (R.422) on August 24, 2009.[8] The defendant has not received and cannot locate any ruling by Judge Reeves on the objections. He has been informed by his counsel that no ruling was ever made. The prosecutorial misconduct has been allowed to continue unchecked.

---

[6] In the July 23, 2009 edition of "The Manchester Enterprise" Jordan stated that Preston Smith was a friend of his and that they had grown up together on Otter Creek. Otter Creek is in Clay County but the head of Otter Creek abuts Knox County.

[7] Canon 2A of the Code of Conduct for United States Judges states that "a judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The commentary to Canon 2A lists violations of court rules as an actual impropriety. Denial of a right to reply or be heard is an impropriety.

[8] See Document 383 for a partial outline of Jordan's opposition to many of the named defendants.

17

# Exhibit G

In AUSA Smith's response to motion to disqualify he writes; "Jordan has had no contact with the undersigned or his family in regard to this or any other prosecution by the undersigned. Moreover, the undersigned prosecutor has had no personal contact either directly or indirectly with Jordan during his lifetime." (R.326 p. 2)[9]

An issue of fact was established. Jordan said he had talked to Preston Smith. AUSA Steve Smith says Jordan has had no contact with him or his family. In denying any contact and any relationship, AUSA Smith never at any time stated that he had talked with his father Preston Smith about being contacted or his relationship.

The protective arm of the judiciary instinctively surrounded AUSA Smith, when the Court prematurely ruled on the motion to disqualify and denied an evidentiary hearing. At an evidentiary hearing defendant believes that he could have established at the time that Preston Smith, father of AUSA Smith, was contacted by Edward Jordan, on behalf of the White's; he was by *__consanquinity__* a first cousin once removed of Preston Smith. The defendant believes that he would have established that AUSA Smith did not advise his superiors of the potential conflict and that had Smith done so, Smith would have been removed from this case. The defendant could call a witness to that effect.

## RELEVANT INFORMATION ON SHERIFF JORDAN

On June 27, 2006 Ed Jordan within six weeks of his electoral defeat, contacted SA Timothy S. Briggs offering assistance in an attempt to incriminate a political adversary, Wayne Jones, a defendant in this case. SA Briggs wrote:

---

[9] On December 2, 2005 shortly after 9:00 AM in Federal Court in the Eastern District of Kentucky, at London, Kentucky in the presence of Judge Danny C. Reeves and Hon. Stephen D. Milner AUSA Steven C. Smith said: "Judge, I asked to come to the bench on this matter because, number one, I have been advised by Mr. Milner that he's going to be calling three judges to testify in the case AND I'VE ALSO SEEN THE SHERIFF OF CLAY COUNTY, ED JORDAN, OUT IN THE HALL WAITING TO BE CALLED AS WELL." (Emphasis Added) London Criminal Action No. 05-30, Volume IV p.14, lines 20-24. Undoubtedly AUSA Smith knows Ed Jordan personally despite his protestations to the contrary.

## Exhibit G

This tip was passed on to the Drug Enforcement Administration (DEA) of London, Kentucky as Sheriff Jordan is under investigation by the FBI for corruption in the following cases, _____, _____, and _____. It is believed by the FBI that Sheriff Jordan is involved in vote buying/election fraud, protecting drug dealers, _____ and many other issues.

Even though SA Briggs referred Sheriff Jordan to another agency on June 27, 2006, there were numerous interviews of Sheriff Jordan conducted by the FBI including SA Briggs and TFO Blair plus one recorded conversation. Interviews were conducted by the FBI on August 9, 2006, October 19, 2006, October 27, 2006, December 15, 2006, October 4, 2007, December 12, 2007, July 8, 2009, and August 19, 2009. SA Briggs participated in the interviews of October 19, 2006, October 27, 2006, December 15, 2006, July 8, 2009, and August 19, 2009. SA Briggs sidekick, TFO Edsel V. Blair, Jr., was present at all other interviews. Two cooperating witnesses, Kennon White and Wanda White, taped a conversation with Sheriff Jordan on April 30, 2007. This was the recording in which Ed Jordan talked about his familial relationship to AUSA Stephen Smith. No other recorded conversations with Ed Jordan after April 30, 2007 have been revealed.

Kenneth Day is a drug lord who was first convicted in the United States District Court for the Middle District of Florida (6:97-cr-00128 USA v. Day, et al) in 1997. While in prison he made national contacts for his future drug business, which he resumed immediately upon his release as well as returning to his romance with crystal meth. At the time he was released he was on conditional release supervised by a federal parole officer and should have been periodically tested for drugs. He has also testified that while he was under supervision he was protected by Sheriff Jordan. His drug empire grew extensively while he was under federal supervision and Jordan's protection.

During the course of his interviews and recorded conversations Ed Jordan has acknowledged numerous criminal activities including possible obstruction of justice, by contacting

19

# Exhibit G

and promising to contact Preston Smith, father of AUSA Stephen C. Smith, seeking leniency on

behalf of Daugh White, father of Kennon White. This necessarily implicates the

father of AUSA Smith particularly in light of the immunity granted Wanda White at a time almost

simultaneous to the contact of Preston Smith by Ed Jordan and the plea arrangement of Kennon on

April 27, 2007, the day Jordan says he called Preston Smith.

     In addition to the above, Jordan has admitted the following:

1.     Receiving a knife collection from Kenneth Day, which was valued by Day
at $3,000.00 on the day before Kenneth Day was arrested in 2005.
(Witness Statement July 8, 2009)

2.     Tampering with physical evidence in the cases of Commonwealth v.
Eugene "Corky" Price, Grant Hatfield Jr., Brian Collins and Eddie Joe
Cobb by removing a tape of a recorded conversation with one or more
of the defendants from the sheriff's office and keeping the tape after he
left office at his home. (CD 36:17 – 36:45 Recorded Conversation Ed
Jordan April 30, 2007)

3.     Failure to take action against Mike Bishop who according to Jordan
took a polygraph and admitted growing marijuana, selling marijuana
and sexually abusing certain persons. (CD 59:59 – 1:00:19 Recorded
Conversation Ed Jordan April 30, 2007)

4.     Giving money to Lehman Messer during the 2006 election allegedly for
the fire department (Witness statement 10/04/07 p.2) and
acknowledging that he asked Messer to highlight all the voters in

# Exhibit G

Gooserock precinct who sold their votes. (Witness Statement October

4, 2007, p. 2, recorded conversation April 30, 2007 CD 55:20 – 56:15)

5.       Being present at Patty's Place when there was a meeting of Todd

Roberts, Eugene "Moose" Stewart, Jennings White and Barbara Jo White

Colter. Jordan denies he sat at the table with them. (Witness Statement

of October 4, 2007 p. 2) Todd Roberts testified to the contrary by saying

that all of them were together at the same table. (Record #836, Vol 4B

pp. 25-27)

During the course of this trial, other allegations relative to Sheriff Jordan have surfaced

as follows:

(1)     In 2002 Kennon White and Ed Jordan took $2,000.00 to Clinton Johnson for the election. (Per 5-24-07 telephonic interview with TFO Blair of Kennon White)

(2)     Kenneth Day testified Ed Jordan was his protection. (Trial Transcript Vol 3A pp. 47-48)

(3)     Ed Jordan attended a meeting where money was distributed to buy votes in 2002. (Trial Transcript Volume 6A – Feb. 11, 2010 pp. 24-25)

(4)     Kennon White and Ed Jordan talked with Jennings White to get Mike Bishop appointed as election officer at South Fork precinct in 2002. (Trial Transcript Volume 6A – February 11, 2010 p. 28)

(5)     Ed Jordan brought money for the election to Dobber Weaver at City Hall in the presence of Kennon White for the May 06 election. (Trial Transcript Volume 6B – February 11, 2010 pp. 16-17)

(6)     According to Wanda White, Ed Jordan was on "the Jennings White ticket" in 2002 for purchasing votes along with Kennon White and Barbara Colter, whom she described as selfish in her own nature. (Trial Transcript Feb. 19, 2010 Volume 10A p. 18)

(7)     The Sheriff (Ed Jordan) was on the ticket with Kennon White in 2002 (Trial Transcript Feb. 19, 2010 Volume 10A p. 33) and Clinton Johnson stated that he was on the ticket with Jennings White, Ed Jordan, Daugh White, Kennon White and Charles Marcum in 2002 (CJ interview of 01/09/08 p. 1)

(8)     Detailed testimony and/or interview statements from an accomplice that on the day before the election in 2002 he accompanied Jennings White and Ed Jordan in distributing envelopes stuffed with cash to various persons. (Denver Sizemore Case ID: _____ Working Copy p. 1 May 16, 2005).

(9)     Information that before 2000 Bobby Jones and Denver Dean Jones (known to be convicted drug dealers) met Sheriff Jordan at his office once per month behind

## Exhibit G

closed doors (Interview of a witness name deleted March 13, 2000) and that he once
told an informant not to purchase from Bobby Jones (Interview of a witness name
deleted of August 18, 1999).

(10)  In 2006 fall election Jordan (a write in candidate for Sheriff) told Ray Adams (an
independent candidate for magistrate) that Adams would get every absentee ballot
that he and Jeremy Vega took care of. (Interview Ray Adams December 23, 2009)

(11)  Todd Roberts saw Ed Jordan give a bag of money to Jennings White (Interview
Todd Roberts August 21, 2007 at page 8)

Even Judge Reeves has recognized the activities of Mr. Jordan. In his memorandum

opinion and order of August 27, 2009, (R.435) he refers to his finding in the Day case, Record No.

499, pp. 14-16, wherein he found Denver Sizemore to be a credible witness when he

testified he had accompanied Jennings White and Mr. Jordan, the Sheriff, in attempts to buy votes

in the community and that Mr. White had arranged a meeting with Mr. Day and Mr. Jordan, the

Sheriff in order to determine whether Mr. Day's operation was under investigation. (R.435 pp, 5-6

quoting Day case, R.499, pp 14-16)

## CONCLUSION

AUSA Smith did not comply with the consultation requirements of the Justice

Department's Public Integrity Section, Election Crimes Branch. He was required to consult with

the Public Integrity Section before expanding an election fraud investigation beyond the

preliminary stage; before conducting interviews with individual voters during the preelection

period, on election day, or immediately after the election concerning their voting circumstances;

before issuing a subpoena or search warrant in connection with the matter; before presenting

evidence to the grand jury; before filing a criminal charge involving election fraud; or before

presenting an indictment to the grand jury. He disregarded all of the above.

Culpability is not determined by the act itself but by the motive behind the act. It was the

motive behind the willful disregard of the high obligations of his office that was AUSA Smith's

22

# Exhibit G

breach of his legal, ethical and fiduciary duties. Why was the required consultation with the Public Integrity Section, Election Crimes Branch in a case involving election offenses circumvented. Stated as succinctly as possible they are:

I

Smith was not a detached prosecutor. His contacts and relationship with the unindicted Edward Jordan would jeopardize an objective investigation and prosecution because Jordan as Clay County Sheriff was a member of the Clay County Board of Elections, the alleged criminal enterprise, during the elections in question. Jordan was a strong political opponent of defendants Thompson and Jones, who were also members of the Board of Elections at the elections in question except for Thompson. He was not a board member in 2002.

Jordan was also the protection for drug lord Kenneth Day, who was on conditional release from a federal conviction out of Florida and a major witness for the United States in this and other cases. According to the FBI Jordan was involved in vote buying election fraud, protecting drug dealers, covering up murders and many other issues.

In addition Jordan has spoken of familial relationship to Preston Smith and Steven C. Smith, father and son. He also indicated efforts were made through Preston Smith to influence Steven C. Smith in his prosecutorial duties, which apparently went unreported.

II

Smith desired to pursue a RICO charge for his own personal aggrandizement, but the list of all available statutes and theories of prosecution (Emphasis added) recognized by the Public Integrity Section, Criminal Crimes Branch, did not include RICO. Since all election offense prosecutions are designated by the Justice Department as cases to be handled by Public Integrity

# Exhibit G

except those involving civil rights; he chose to evade and avoid Public Integrity Section, Criminal Crimes Branch.

### III

Smith was certainly aware of the <u>Turner</u> case and knew that he could not pursue an honest services mail fraud indictment based on election fraud. Knowing that Public Integrity would not approve such an indictment because of its knowledge of <u>Turner,</u> and that he was from the same U.S. Attorney's office that had lost the case. Again, he had to evade and avoid.

### IV

Smith also knew that the statute of limitations had expired on the 2002 elections and that any attempt to indict on those elections could not and would not be approved, and that any representation to the grand jury that the statute of limitations had been lifted was not permissible. Again, evade and avoid.

### V

The records for the 2002 election no longer existed but in fact had been destroyed in accordance with federal and state law. The FBI had in fact taken possession of the records but apparently returned the same without copying. Upon return the records were properly destroyed.

Because of the above reasons AUSA Smith knew that he could not ensure national standards for the prosecution of election offenses, respect the state's primary responsibility in the electoral process, and guarantee a detached prosecutor.

24

## EXHIBIT H

## DETENTION HEARINGS

Upon indictment of eight defendants in this case, the United States initially sought the detention of only the defendant Maricle. This was contrary to the recommendation of the officer who did the pre-trial interview. Maricle was detained for a period of 58 days after which he was released on home incarceration with electronic monitoring and allowed only contacts with some immediate family members, ministers, attorneys and physicians.

It is respectfully submitted that the real reason for Maricle's detention was not a risk of flight or threat of harm to anyone but was to curb his ability to prepare a defense. Maricle had extensive experience as a trial lawyer and circuit judge extending over a period of 43 years. He was born and raised in Clay County, father of 4 children, one of whom had passed away in January of 2009, grandfather of ten, spoke no foreign language and did not have a passport. His financial means was limited and his income was social security and judicial retirement.

In order to accomplish the desired detention the United States crossed the line and presented false, manufactured, and incomplete testimony set forth herein.

I

At the detention hearings, SA Briggs and TFO Blair testified that their source had informed them that Maricle was attempting to identify residences of Agents Briggs, Blair and Hopkins and the types of their vehicles. Briggs also testified that Maricle had gotten Richie Asher to obtain the same type of information. The evidence from both hearings clearly shows that either Wanda White lied to the agents or the agents manufactured the story. In either event, the evidence is clearly to the contrary.

At the detention hearing held on March 23, 2009, SA Briggs testified as follows:

Q      . . . During the time that you were conducting your investigation did you have
        occasion to learn that this defendant was seeking to identify your place of
        residence?

A      Yes

Q      If you could tell the court how you came to knowledge of that.

A      One of the sources had reported to us that Mr. Maricle was attempting to identify
        my      residence and the residence of two task force officers working on the

1

investigation, as well, Buddy Blair and Mark Hopkins, as well as the type of
vehicles we drove

Q    Were you able to make a confirmation by your recordings that he did have an
interest in finding out where you were?

A    Yes. In a follow up conversation the source and Mr. Maricle had further
conversations as to my whereabouts and – and a general knowledge myself.
(Detention hearing March 23, 2009, p.17)

SA Briggs made it very clear that this occurred while the source was operating at his
direction and while the defendant was attempting to obstruct a federal grand jury witness by
coaching (Id. pp. 16-17) He also went ahead to testify that Maricle had gotten Ricky Asher to
help him in trying to obtain this information. (Id. p.18)

At a hearing on April 20, 2009, Edsel V. Blair, Jr. testified. He was a task force officer
who was involved in this investigation from the beginning. Blair was asked, "Have you listened
to the recorded conversations in this case?" His reply was, "yes sir, I have" (Detention hearing
April 20, 2009 p.7 lines 8-10) He reaffirmed this statement when asked, "you've listened to all
the recordings though, haven't you?" At that time he said, "I think so, yes sir" (Id. p.22, line 25-
p.23 line 2) all meetings were recorded. (Id. p.10 lines 22-24)

Blair testified that there was nothing on the recordings where Maricle had asked what
kind of vehicle he drove or where he lived. (Id. p.7) Other than through their source (Wanda
White) he had no knowledge of Maricle asking for this information from anyone; that he had not
been harmed, threatened or intimidated relative to this case; and no one in the investigation had
been threatened, harmed, or intimidated.

Realizing that there was nothing on the recordings where Maricle had asked for
information about agents' homes or vehicles and that all meetings had been recorded, AUSA
Smith had to have a path of escape or his contention was destroyed. Here is what he asked:

Q    Are you aware of conversations that were had that were not recorded?

A    Yes sir

Q    Okay. Can you explain that?

A    There were at times things that the source was told that was after she had left Mr.
Maricles and was given information at the vehicle as she was exiting his
residence.

2

Q       And your testimony is, is that your source has provided you information that in an unrecorded conversation Mr. Maricle directly sought out the address of where you and other agents live, is that correct?

A       That's correct.

Q       And also the vehicles which you were driving?

A       That's also correct.

Q       Now, that information, you said, was not recorded directly. Was there some indirect recordings, though, that corroborated what your witness was telling you?

A       Yes sir.

Q       And in that, did you hear from those audio recordings mention of a follow-up where you and Agent Briggs had given her false information to give back to Mr. Maricle?

A       Yes sir there were

Q       Was that on the recording

A       Yes, it was.

        (Id. p. 10-11)

The first recording of Maricle by the White's was on March 27, 2007. It was begun by the FBI Agents and concluded by the FBI with no stops or starts in the recording during the time the FBI agents weren't present. All of Maricle's conversation is on the tape, and thee is no mention of any attempt to locate any residence or vehicle of Briggs, Blair or Hopkins.

Any such recording as described by Briggs and Blair would have had to have been before April 30, 2007, which is the date of the supposed corroborating conversation. In fact, there is no recording made between March 27, 2007, and April 30, 2007, that fits Blair's description of when, where and how such conversation took place.

Ironically, all notes made by the agents during their debriefing have been lost or destroyed so the agents cannot even corroborate that White gave them such information. Either White lied or Briggs and Blair lied. The absence of the notes under suspicious circumstances can only leave us mystified as to which or both.

In addition, the recordings of April 30, 2007, do not come close to corroborating the testimonies of Briggs and Blair. Reference is made to Trial Exhibits A9 and A9A that shows an

3

entirely different vein of conversation than an attempt to locate someone's residence or vehicle
identification. It is very important that these exhibits be read.

Contradicting the testimony of Briggs and Blair is the testimony of Kennon to the effect
that the attempt to get information relative to the agents was in a recorded conversation.

    A       We were directed by Agent Blair and Agent Briggs to tell him that because he had
            previously had requested trying to find out information of where the agent lives.
            And Agent Briggs did not want him to know where his family lived at that time.

    Q       Now, you said he had previously been asking where the agents lived. Was that in
            a recorded conversation or an unrecorded conversation?

    A       To the best of my recollection, it was a recorded conversation

    Q       And at the time that he made that statement, did you relay that to the FBI agents
            immediately?

    A       Yes I did.

Kennon White said Maricle sought the information about the agents in a recorded
conversation, which they relayed to the FBI Agents immediately. This cannot be corroborated
since the agents notes have all gone missing.

II

In his attempt to detain Maricle, SA Briggs testified that Maricle had Richie Asher trying
to locate the residences or autos of Briggs, Blair, and Hopkins. He based his testimony on what
he alleged had been told by Wanda White. This is completely unsupported by any recordings
and in particular the supposed corroborating recording of April 30, 2007. On that recording,
Wanda White brought up the subject of hiring Richie Asher herself to check on the FBI and the
following conversation occurred:

            CHS2:       (Wanda White) I need to hire you, Richie.

            RA:         (Richie Asher) don't know what I can do.
                        (CD 4/30/07 taped conversation at 1:03:20 – 1:01:28)

            CHS2:       (Wanda White) Kennon answer that. It might be Brent.
                        (CHS1ANSWERS PHONE) See you Richie.

4

RA:              (Richie Asher) I'm walking down with ya.

(CHS2 SPEAKS ON PHONE – NON PERTINENT CONVERSATION- ENDS CONVERSATION)

CHS2:            (Wanda White) Who's that back there?

RA:              (Richie Asher) Robin's behind Judy.  Judy's behind you.
                 (CHILD TALKING IN BACKGROUND)

CHS2:            (Wanda White) Buddy, this guy right here's been investigating.
                 You didn't know that, did you?

RA:              (Richie Asher) Here and there.  Here and there.

CHS2:            (Wanda White) How much you take to investigate the FBI?

RA:              (Richie Asher) (LAUGHS)   Oh.      (CHILD TALKING IN
                 BACKGROUND)

CHS2:            (Wanda White) Huh?

RA:              (Richie Asher) That'd be expensive because . . .

CHS2:            (Wanda White) Would it?

RA:              (Richie Asher) . . . and that turns their eyes on me.

CHS2:            (Wanda White) If you're good it don't.

RA:              (Richie Asher) Well, that untrue.  Let me tell you something.
                 When you're fighting, when you're dealing with the government,
                 they know everything; they know everything about me...

CHS2:            (Wanda White) Well it's...

RA:              (Richie Asher) ...everything about you as far as little things here
                 and there.  But.  I'm fixing to get shot at, but that's a whole nother
                 story.

CHS2:            (Wanda White) Why?

RA:              (Richie Asher) I'm looking into Bill Gilbert's death.  I know who
                 done it.

                 (CD 4/30/07 taped conversation at 1:16:03 – 01:16:40)

5

A reading of the above, whether cursory or in detail, in no way confirms or corroborated the position of the United States.

If there is a recorded conversation supporting the position of the United States, we should hear it. If there were notes to corroborate any such relay of information by the White's to the FBI, we should see. If we can neither hear nor see any supporting evidence in the outline of the United States, we must assume it is false.

### III

At the detention hearing held on April 20, 2009, SA Briggs demonstrated his wild and paranoid imagination when he interpreted a note on Judy Maricle's calendar as showing counter surveillance of him by Maricle. (Transcript of Detention Hearing April 20, 2009 p. 146 lines 12-25; p. 147 lines 1-25 Government's Exhibit No. 1) A copy of note is attached as Exhibit 1.

Briggs testified as follows:

Q    Did you find any documents that would support that Mr. Maricle was seeking to find out where you were?

A.    Yes

MR. SMITH: And I'm going to hand to the witness Government's Exhibit No. 1

THE COURT: Yes, sir.

MR. SMITH: I should say Exhibit 1 for this hearing. I'm not sure –

THE COURT: Yes, sir.

MR. SMITH: Thank you.

BY MR. SMITH:
Q    Can you identify Government's Exhibit 1?

A    Yes, sir.

Q    And tell the Court what that is.

6

A    This is a day planner, a page from a day planner, that was taken out of Mr. Maricle's residence, and the day of this calendar that was pulled out was May 4th, 2006.

Q    And what's the message in the planner?

A    There's a quote – a notation at the top, which I don't think relates to this investigation. There's a notation below that that says, "Call" – on one line it says, "Call Charles," and below that it says, "Briggs in London."

Q    And what significance do you place on the name Charles?

A    I know he – Mr. Maricle was very close with Stephan Charles, who is an attorney, and Mr. Charles was attending the grand jury throughout this investigation representing Mr. Maricle's son-in-law and then would report information back to Mr. Maricle.

Q    And was the grand jury investigation ongoing during this time period of May 4th, 2006?

A    Yes, I believe it was.

Q    Now, it references "Briggs." So what was the statement again for Briggs?

A    "Briggs in London."

Q    And what significance do you place on that?

A    Well, that's where my -- it's where my office is at, so –

Q    Okay. That's your name?

A    Some may assume – correct, that's my name.

In fact, Charles Biggs is an individual whom Judy Maricle had shown real estate in her business as a real estate broker and he lived in Michigan. (Transcript of Detention Hearing April 20, 2009, p. 167 lines18-25 and p. 168 lines 1-21)

Q    Would you read that, please, Mrs. Maricle?

A    You want me to read all of it or just the one?

Q    Read the whole thing.

7

A       It just says, "No motion hour today, call Charles Biggs," and "Cletus is in London."

Q       Does it say Biggs or Briggs?

A       Charles Biggs.

Q       Does that name mean anything to you?

A       Yes, sir, it does.

Q       Who is that?

A       He's a client in real estate several years ago that I showed farms to. He lives in Michigan.

Q       Do you have an address and phone number for him?

A       Yes, sir, I do.

Q       Do you have that with you?

A       I don't have it in front of me, but I have it. He lives in Michigan, and he was dating a lady from Tennessee, her name is Vivian and they have since married. I showed him farms in the London area.

MR. HOSKINS:  Your Honor, I would ask that the witness be shown this book to see if it refreshes her recollection as to an address and phone number.

THE COURT: Very well.

THE WITNESS: He lives at 1923 Clinton Avenue, Saint Clair, Michigan, is where he lives.

BY MR. HOSKINS:
Q       Are there phone numbers there for him as well?

A       Yes, sir, his home phone is 1-810-329-6678, and his cell phone, at least it was at the time, 1-810-434-5791

An examination of the note, Exhibit 1, whether cursory or detailed, shows

three distinct notes or thoughts:

(1)     No Motion Hour Today

8

    (2)     Call Charles Biggs with a check mark before it

    (3)     Cletus in London

Only manipulation with malice or paranoid imagery could produce the Briggs conclusion.

        The date of the note exposes the lie. The date of the note is May 4, 2006. The grand jury investigation did not begin until May 3, 2007. The primary election had not been held on May 4, 2006, and did not take place until May 18, 2006.

        When asked what significance was placed on the name Charles SA Briggs testified:

    A     I know he – Mr. Maricle was very close with Stephan Charles who is an Attorney, and Mr. Charles was attending the grand jury throughout this investigation representing Mr. Maricle's son-in-law and then would report information back to Mr. Maricle.

    Q     And was the grand jury investigation ongoing during the time period of May 4, 2006?

    A     Yes. I believe it was.

The time line is:

| May 4, 2006 | April 30, 2006 | May 1, 2007 | May 3, 2007 |
|---|---|---|---|
| Date of calendar note | Philip Mobley subpoenaed, employs Stephan Charles | Wanda White meets with FBI | Grand jury investigation begins, Philip Mobley obeys subpoena |

This is an anachronism birthed in mendacity. It clearly exposes the Machiavellian nature of Smith and Briggs – the end justifies the means. It was manufactured for the sole and exclusive purpose of detaining Maricle, who did not at that time, know when the grand jury investigation had begun and therefore could not expose the lie.

        Briggs and Smith both knew that this note was one year before the grand jury began. Briggs testified falsely. Smith knew it.

IV

        When Briggs was asked about how Maricle reacted in 1971 when he was charged with felony, he replied:

9

> We interviewed an employee of his who said that virtually for a month
> after that shooting occurred, he was non-existent and appeared to be
> hiding out until later when the – when the charges against him were
> dismissed. (Detention Hearing March 23, 2009, p.27)

In fact, Briggs did not tell the complete truth. Copy of the witness interview of
Sally Davidson will be submitted under seal as Exhibit 2, which clearly explains any
description of Maricle's activity in 1971.

### V

SA Briggs falsely testified that R. Cletus Maricle was the judge in a civil case in
which Kenneth Day was plaintiff and was awarded a large verdict. In fact, Maricle was
not the judge in the case nor was he even a judge at the time. The record of the case
clearly shows that Rickey D. Bailey of the firm of Maricle and Bailey was co-counsel for
the defendant, Gary Runion.

Again, this testimony was given in support of United States motion to detain the
defendant based upon an unconfirmed statement of Kenneth Day. Kenneth Day in
making such statement was seeking leniency from the sentence imposed in his drug
conspiracy case. It is hard to believe that he did not know who the judge was in a case
wherein he was the plaintiff in a representative capacity for a family member, received a
$3,000,000.00 recovery for the death of his sister-in-law, and badly injured niece because
of the acts of a drunken driver.

### VI

With respect to a list of 22 people who were allegedly subpoenaed to the grand
jury and supposedly given to White by Maricle, Briggs testified as follows:

> Yes. On one occasion, during a meeting between the source and
> Mr. Maricle, while this investigation was ongoing in federal grand
> Jury, Mr. Maricle provided the source a list of individuals that he believed
> were witnesses at the federal grand jury in this investigation, this federal
> investigation into election fraud. It contained approximately 22 names –
> many of those were in fact – I've not taken the time to go name by name
> and verify that everyone of them was witness, but many of them I know
> were witnesses at the federal grand jury in this investigation. (Detention
> Hearing March 23, 2009, pp.19-20)

There is no recording that supports the giving of such a list to White by Maricle,
and all meetings were recorded. (Detention Hearing April 20, 2009 p.10 lines 22-24)

10

Further, at trial Wanda White testified that the list was in Judy Maricle's handwriting, but handwriting analysis showed that it was not the handwriting of either Judy Maricle or Cletus Maricle. (R.856 Trial Vol. 22A, p.26 lines 4-12) and the record shows that the list was not turned over to the FBI until October of 2008.

This allegation made by the United States in seeking Maricle's detention and to a large extent being successful therein is unsupported and false.

VII

At the interview conducted by the probation officer, Maricle in reference to a case of situational depression in 1990 that he had said at that time, that he had rather go to New Mexico and live with the Indians than practice law. In 1990, Maricle had been to New Mexico. At the detention hearing on April 20, 2009, AUSA Smith altered that statement to provide the following discourse:

Q      So let's assume that this boat is worth 140 - $150,000. Is six figures –
       is a significant amount of money in your estimation for a person who
       made have made statements that rather than being a practicing judge he
       would like to live with the Indians in Mexico?

A      That's a sizeable dollar amount a lot of people don't pay that for their
       home, their primary residence.

Q      And to your knowledge, would six figures of American dollars be a
       significant amount of money in Mexico

A      Absolutely

Maricle's statements were altered in two respects to create a negative impression. Instead of saying practicing law, which he was doing in 1990, AUSA Smith said practicing. Instead of saying New Mexico, which is within the United States, Smith said Mexico.

11

EXHIBIT #1



May 2006
S M T W T F S
    1  2  3  4  5  6
 7  8  9 10 11 12 13
14 15 16 17 18 19 20
21 22 23 24 25 26 27
28 29 30 31

4

No Motion
Hour
Today

~ Care Chark
Buff

Cletus London

April 2006
S M T W T F S
                1
 2  3  4  5  6  7  8
 9 10 11 12 13 14 15
16 17 18 19 20 21 22
23 24 25 26 27 28 29
30

June 2006
S M T W T F S
             1  2  3
 4  5  6  7  8  9 10
11 12 13 14 15 16 17
18 19 20 21 22 23 24
25 26 27 28 29 30

124                    Thursday, May 4                    241

SEARCHMARICLE-198