United States District Court
Eastern District of Kentucky
Southern Division at London

| | |
|---|---|
| UNITED STATES OF AMERICA | ) London Criminal |
| | ) Action No. 09–16–S |
|   vs. | ) |
| | ) Frankfort, Kentucky |
| RUSSELL CLETUS MARICLE | ) March 25, 2010 |
| DOUGLAS C. ADAMS | ) 1:10 p.m. |
| CHARLES WAYNE JONES | ) |
| WILLIAM E. STIVERS | ) |
| FREDDY W. THOMPSON | ) |
| WILLIAM B. MORRIS | ) |
| DEBRA L. MORRIS | ) VOLUME 32 |
| STANLEY BOWLING | ) |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE DANNY C. REEVES, AND A JURY

Appearances of Counsel:

On behalf of the United States:     STEPHEN C. SMITH, ESQ.
                                    JASON D. PARMAN, ESQ.

On behalf of the Defendant          DAVID S. HOSKINS, ESQ.
Russell Cletus Maricle:             MARTIN S. PINALES, ESQ.

On behalf of the Defendant          R. KENT WESTBERRY, ESQ.
Douglas C. Adams:                   KRISTEN N. LOGAN, ESQ.

On behalf of the Defendant          T. SCOTT WHITE, ESQ.
Charles Wayne Jones:

On behalf of the Defendant          ROBERT L. ABELL, ESQ.
William R. Stivers:                 R. TUCKER RICHARDSON III, ESQ.

On behalf of the Defendant          RUSSELL JAMES BALDANI, ESQ.
Freddy W. Thompson:

On behalf of the Defendant          JERRY W. GILBERT, ESQ.
William B. Morris:

On behalf of the Defendant          ELIZABETH SNOW HUGHES, ESQ.
Debra L. Morris:

On behalf of the Defendant          DANIEL A. SIMONS, ESQ.
Stanley Bowling:

2

```
 1   Appearances of Counsel:

 2   On behalf of the United States:   STEPHEN C. SMITH, ESQ.
                                        JASON D. PARMAN, ESQ.
 3                                      Assistant U.S. Attorneys
                                        601 Meyers Baker Road
 4                                      Suite 200
                                        London, Kentucky  40741
 5

 6   On behalf of the Defendant        DAVID S. HOSKINS, ESQ.
     Russell Cletus Maricle:           107 East First Street
 7                                      Corbin, Kentucky  40701

 8                                      MARTIN S. PINALES, ESQ.
                                        150 East Fourth Street
 9                                      Federal Reserve Building
                                        Cincinnati, Ohio  45202
10

11   On Behalf of the Defendant        R. KENT WESTBERRY, ESQ.
     Douglas C. Adams:                 KRISTEN N. LOGAN, ESQ.
12                                      220 West Main Street
                                        Suite 1900
13                                      Louisville, Kentucky  40202

14
     On behalf of the Defendant        T. SCOTT WHITE, ESQ.
15   Charles Wayne Jones:              133 West Short Street
                                        Lexington, Kentucky  40507
16

17   On behalf of the Defendant        ROBERT L. ABELL, ESQ.
     William E. Stivers:               120 North Upper Street
18                                      Lexington, Kentucky  40507

19
     On behalf of the Defendant        RUSSELL JAMES BALDANI, ESQ.
20   Freddy W. Thompson:               R. TUCKER RICHARDSON III, ESQ.
                                        300 West Short Street
21                                      Lexington, Kentucky  40507

22
     On behalf of the Defendant        JERRY W. GILBERT, ESQ.
23   William B. Morris:                212 North Second Street
                                        Richmond, Kentucky  40475
24

25
```

```
 1   On behalf of the Defendant        ELIZABETH SNOW HUGHES, ESQ.
     Debra L. Morris:                  201 West Short Street
 2                                     Lexington, Kentucky  40507

 3   On behalf of the Defendant        DANIEL A. SIMONS, ESQ.
     Stanley Bowling:                  116 West Main Street
 4                                     Suite 2A
                                       Richmond, Kentucky  40475
 5
     Court Reporter:                   CYNTHIA A. OAKES, CRR
 6                                     Official Court Reporter
                                       United States District Court
 7                                     560 Athens Boonesboro Road
                                       Winchester, Kentucky  40391
 8                                     (859) 983-4346

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
     Proceedings recorded by mechanical stenography,
23   transcript produced by computer.

24

25
```

1        (Whereupon, the following proceedings were had outside the

2   presence of the jury.)

3            THE COURT:  Thank you.  The jury has indicated they

4   have reached a verdict on all counts and we will bring the jury

5   in at this time.

6        (Whereupon, the jury returned to the courtroom, after which

7   the following proceedings were had in open court.)

8            THE COURT:  Thank you, and please be seated.

9            The record will reflect that all parties and counsel

10  are present.  All members of the jury are present.

11           Ladies and gentlemen of the jury, have you reached a

12  verdict as to all counts?

13           THE JURY FOREPERSON:  Yes.

14           THE COURT:  If you could pass the verdict form to me,

15  please.

16           Thank you.

17           And, Madam Foreperson, several of these counts

18  indicate dates of March 24th and several with March 25th.  Was

19  that the jury's determinations on those dates?

20           THE FOREPERSON:  Yes.

21           THE COURT:  All right.  Madam Clerk, at this time, if

22  you could please announce the verdict to the parties.

23           THE CLERK:  Yes, Your Honor.

24           As to defendant, United States v. Russell Cletus

25  Maricle, as to defendant Mr. Maricle, we, the Jury, find the

1  defendant guilty on Count 1; we, the Jury, find the defendant

2  guilty as to Count 2; we, the Jury, find the defendant guilty as

3  to Count Eight; we, the Jury, find the defendant guilty as to

4  Count 10; we, the Jury, find the defendant guilty as to

5  Count 11, dated March 24th, signed by the foreperson.

6         In the case of United States v. Douglas Adams, we, the

7  Jury, find the defendant guilty as to Count 1; we, the Jury,

8  find the defendant guilty as to Count 2, dated March 24th,

9  signed by the foreperson.

10         In the case of United States v. Charles Wayne Jones,

11  we, the Jury, find the defendant guilty as to Count 1; we, the

12  Jury, find the defendant guilty as to Count 2; we, the Jury,

13  find the defendant guilty as to Count 3; we, the Jury, find the

14  defendant guilty as to Count 4; we, the Jury, find the defendant

15  guilty as to Count 5; we, the Jury, find the defendant guilty as

16  to Count 6; we, the Jury, find the defendant guilty as to

17  Count 7; we, the Jury, find the defendant guilty as to Count 10;

18  we, the Jury, find the defendant guilty as to Count 11, dated

19  March 24th, signed by the foreperson.

20         The United States v. William E. Stivers, we, the Jury,

21  find the defendant guilty as to Count 1; we, the Jury, find the

22  defendant guilty as to Count 2; we, the Jury, find the defendant

23  guilty as to Count 4; we, the Jury, find the defendant guilty of

24  Count 8; we, the Jury, find the defendant guilty of Count 10;

25  we, the Jury, find the defendant guilty of Count 11, dated

1   March 24th, signed by the foreperson.

2           Case of United States v. Freddy Thompson, we, the

3   Jury, find the defendant guilty to Count 1; we, the Jury, find

4   the defendant guilty as to Count 2; we, the Jury, find the

5   defendant guilty as to Count 3; we, the Jury, find the defendant

6   guilty as to Count 5; we, the Jury, find the defendant guilty to

7   Count 6; we, the Jury, find the defendant guilty to Count 7; we,

8   the Jury, find the defendant guilty, Count 9; we, the Jury, find

9   the defendant guilty, Count 10; we, the Jury, find the defendant

10  guilty, Count 11, dated March 25th, signed by the foreperson.

11          Case of United States v. William B. Morris, we, the

12  Jury, find the defendant guilty, Count 1; we, the Jury, find the

13  defendant guilty, Count 2; we, the Jury, find the defendant

14  guilty, Count 11, dated March 25th, signed by the foreperson.

15          Case of the United States v. Debra L. Morris, we, the

16  Jury, find the defendant guilty, Count 1; we, the Jury, find the

17  defendant guilty, Count 2; we, the Jury, find the defendant

18  guilty, Count 11, dated March 25th, signed by the foreperson.

19          Case of United States v. Stanley Bowling, we, the

20  Jury, find the defendant guilty, Count 1; we, the Jury, find the

21  defendant guilty, Count 2, dated March 25th, signed by the

22  foreperson.

23          THE COURT:  Thank you, Madam Clerk.

24          At this time, I'm going to ask to poll the jury.  And,

25  ladies and gentlemen, as your number is called, if you would

1  please indicate whether the verdict of the jury just announced

2  is your verdict.  Would you please call the poll.

3          (Whereupon, the Clerk polled the jury, after which the

4  following proceedings continued in open court.)

5          THE CLERK:  All answer in the affirmative, Your Honor.

6          THE COURT:  All right.  Thank you.

7          Now, ladies and gentlemen, we will begin forfeiture

8  proceedings very shortly.  I am going to give the attorneys a

9  few moments to —— first, we'll need to bring the exhibits back

10 into the courtroom.  They may need to make reference to those as

11 we proceed with the forfeiture proceedings.

12         There are two forfeiture counts to be presented to

13 you, one is related to Count 1, the RICO charge, and I'll be

14 explaining that to you in just a moment.  The second forfeiture

15 count relates to Count 2, which is the money laundering

16 proceeding.  The attorneys, of course, will be given an

17 opportunity to make an opening statement to you on those counts.

18 They'll also be given the opportunity to present any additional

19 evidence they wish to present, and then, of course, I'll be

20 giving you instructions on those counts as well.

21         So I'll excuse you at this time for approximately 30

22 minutes and we'll call you back just as soon as we're ready to

23 proceed with the issue of forfeiture.

24         (Whereupon, the jury retired from the courtroom, after

25 which the following proceedings were had in open court.)

1          THE COURT:  Thank you.  Please be seated.

2          The jury, having found the defendants guilty of all

3   counts charged in Counts 1 through 11, we will commence

4   forfeiture proceedings in approximately 30 minutes.  I do want

5   to discuss with the attorneys at this point if they intend to

6   present any additional proof with respect to forfeiture, also if

7   they wish to make opening statements with respect to the

8   forfeiture issues.

9          Mr. Smith?

10          MR. SMITH:  Your Honor, the United States will have

11   one witness and it will be a brief examination.  Typically, I

12   waive this opening part, but I do feel that closing remarks

13   would be required to discuss the counts with the jury.

14          THE COURT:  All right.

15          Mr. Hoskins and Mr. Pinales, do you anticipate

16   presenting any proof with respect to forfeiture?

17          MR. HOSKINS:  We do not anticipate presenting any

18   proof, Your Honor.

19          THE COURT:  All right.  What about opening, an opening

20   statement, do you wish to make any opening comments?

21          MR. HOSKINS:  I think probably just a closing.

22          THE COURT:  Just a closing?  All right.

23          Mr. Westberry?

24          MR. WESTBERRY:  Same, Your Honor, no additional proof

25   and we probably just want a statement in closing.

1    THE COURT:  All right.  Mr. White?

2    MR. WHITE:  The same, Your Honor.

3    THE COURT:  All right.  Thank you.

4    Mr. Abell?

5    MR. ABELL:  Judge, on behalf of William Stivers,

6  there's no additional proof.  I would waive any opening and just

7  make a closing.

8    THE COURT:  All right.  Thank you.

9    Mr. Richardson, same thing?

10    MR. RICHARDSON:  Yes, Your Honor, same.

11    THE COURT:  Mr. Gilbert, Ms. Hughes?

12    MR. GILBERT:  Same.

13    MS. HUGHES:  Same.

14    MR. SIMONS:  Same.

15    THE COURT:  All right.  Well, if the parties will be

16  prepared before 30 minutes, we can certainly commence before

17  that time, but I anticipate the parties may wish to have the

18  exhibits back in the courtroom, so we'll have those brought back

19  in before we commence with forfeiture.  After those exhibits are

20  brought back in, if the attorneys are ready to proceed, you can

21  advise me and I'll advise the jury and we can start prior to 30

22  minutes, but we'll give you that much time if you do need it.

23    So we will be in recess for approximately 30 minutes.

24    (Whereupon, a short recess was had, after which the

25  following proceedings were had outside the presence of the

1    jury.)

2            THE COURT:  Thank you.  The record will reflect that

3    the parties and counsel are present.

4            And you can bring the jury in at this time.

5        (Whereupon, the jury returned to the courtroom, after which

6    the following proceedings were had in open court.)

7            THE COURT:  Thank you, and please be seated.

8            The record will reflect that all members of the jury

9    are present.

10            Ladies and gentlemen, as I advised you earlier, there

11    are two additional counts to present to you.  I am going to

12    briefly summarize the counts.  All parties have waived opening

13    statements with respect to these counts, but the United States

14    will present some brief additional proof on these issues.

15            Count 2 is the first forfeiture count.  It's alleged

16    pursuant to Title 18 of the United States Code, Section 1963,

17    and Title 28, Section 2461, that is the count that relates to

18    Count 1 of the indictment, the RICO charge.  Under this

19    particular forfeiture count, the United States seeks forfeiture

20    of all interest acquired and maintained in violation of Title 18

21    of the United States Code, Section 1962, including all interest

22    in, securities of, claims against, and property and contractual

23    rights of any kind affording a source of influence over the

24    enterprise named and described in the indictment which the

25    defendant established, operated, controlled, conducted, and

1  participated in the conduct of, in violation of Title 18,

2  Section 1962, and all property constituting and derived from

3  proceeds obtained directly and indirectly from racketeering

4  activity in violation of Title 18, Section 1962.

5       The property that the United States seeks to forfeit

6  under the statute that I've just mentioned, specifically Section

7  1963(a)(1), (a)(2), and (a)(3) includes, but is not limited to,

8  the following assets:

9       A money judgment in the amount of $3,472,847.38, said

10  amount being alleged to be the total of the interest acquired

11  and gross proceeds obtained through the violation of Title 18,

12  Section 1962.  That's Count 12.

13       Count 13 also is a forfeiture count and it relates to

14  Count 2 of the indictment, which is the money laundering charge.

15  The United States seeks to forfeit all property, real and

16  personal, involved in the aforestated offense and all property

17  traceable to such property as to which the defendants are

18  jointly and severally liable, including but not limited to cash

19  and currency in the sum of $1,513,512.36, which is alleged to

20  constitute the sum involved in the violation of Title 18 of the

21  United States Code, Section 1956(h).

22       Those are the two counts.  Of course, I will give you

23  further instructions after proof has been presented and the

24  attorneys have had a chance to summarize their positions.  At

25  this time we'll proceed with the United States' proof with

JEFF SAGRECY - DIRECT - MR. SMITH                12

1    respect to the two forfeiture counts.

2              Mr. Smith, you may call your first witness.

3              MR. SMITH:  Thank you.  Agent Jeff Sagrecy, Your

4    Honor.

5              THE COURT:  Thank you.

6                        JEFF SAGRECY,

7    having been first duly placed under oath, was examined and

8    testified as follows:

9              THE COURT:  Thank you.

10             Please proceed.

11                      DIRECT EXAMINATION

12   BY MR. SMITH:

13   Q    State your name, please.

14   A    Jeff Sagrecy.

15   Q    And you previously testified you're an IRS agent; is that

16   correct?

17   A    Yes.

18   Q    And you have participated in this investigation and I

19   believe we had previously marked M–15, I would like to hand that

20   to you now.

21   A    Yes.  I recognize this.

22   Q    Could you just briefly recognize — or summarize what that

23   is for the jury and the Court, please?

24   A    Exhibit M–15 is a summary of salaries and contracts for the

25   defendants from their salaries and also contracts for B & J

1  Transfer and B & B Excavating.

2  Q    And that exhibit also has multiple pages.  Can you explain

3  briefly what the attachments are?

4  A    It does.  There's a page —— for example, page two is a

5  salary per year for Russell Cletus Maricle; page three is a

6  summary of the salary per year for Douglas C. Adams; page four

7  is a summary of the salary per year for Freddy W. Thompson; page

8  five is a summary of election official wages paid to Charles

9  Wayne Jones; page six is a summary of salary per year for

10  Stanley Bowling as a magistrate; page seven is a summary of

11  payments to B & J Transfer from the City of Manchester and Clay

12  County; and page eight is a summary of payments to B & B

13  Excavating from the City of Manchester and Clay County.

14  Q    Agent Sagrecy, as part of your work, have you also

15  familiarized yourself with a chart that's been previously

16  referred to in parts of this case?

17  A    Yes, I have.

18         MR. SMITH:  I believe I would now ask if the witness

19  could be shown the Chart M—15a, Your Honor.

20         THE COURT:  Yes, sir.

21         MR. SMITH:  And if Your Honor please, we are going to

22  ask the Court's permission for the witness maybe to step down

23  just for a brief explanation of those numbers.

24         THE COURT:  Yes, sir.  He can step down but he'll need

25  to stay in a place where he won't obscure the chart from any of

1  the jurors.

2         But you can step down, Agent.

3  BY MR. SMITH:

4  Q    If you could, Agent Sagrecy, now, for the benefit of the

5  jury, explain to us that we have two numbers that appears I

6  believe on the center of the total for this chart.  If you

7  could, break those down for the Court and jury, please.

8  A    We'll start first with the $2,112,528.09.  That is the

9  money from the contracts from B & B Excavating and B & J

10 Transfer.  That's the total of the items that are in

11 Exhibit M-15.  And it breaks down even further to $1,064,160.74

12 for B & B Excavating and there was $1,048,367.30 that is paid to

13 B & J Transfer.  Those two numbers added together equal this

14 total.

15 Q    Now, we have a second number there, Agent Sagrecy, that is

16 $1,513,512.36, which is — what does that represent?

17 A    This is the number in Count 13 of the indictment.

18 Q    Could you explain to the jury why there is the difference?

19 A    The indictment I believe is from July of 2009 to

20 approximately seven months from the time of the indictment and

21 trial, and during that time, as I've prepared for trial, I found

22 additional contracts and monies paid to both B & B Excavating

23 and B & J Transfer, and that's why this number is a little

24 higher by approximately $600,000 more than what was actually

25 indicted.  We presented all that evidence in trial.

1  Q    And the government in this case is seeking the lesser

2  amount?

3  A    Yes, by seeking what was indicted.

4  Q    If you could, now explain as the chart defines the RICO

5  forfeiture amount totals.

6  A    In the RICO forfeiture, the total is $4,094,237.82.  That

7  represents, again, the totals from M-15, and that would include

8  all the salaries as noted here on the board from Russell Cletus

9  Maricle, Douglas C. Adams, Freddy W. Thompson, Charles Wayne

10 Jones, and Stanley Bowling.  It also includes the amount of the

11 contracts are quoted as well.  And, again, with this the

12 Count 12 number, $3,472,847.38, that was the number per the

13 indictment, and as can you tell, this number increased for the

14 contracts, it also made the overall RICO forfeiture limit

15 increase as well.

16 Q    Now, you've summarized previously a number, $4,094,237.82,

17 which is the total sum of those figures, but the government,

18 again, in this case, is seeking for a total amount of forfeiture

19 in Count 12 only the 3.472 million?

20 A    That is correct.

21 Q    Now, as part of the way these forfeiture mechanisms are —

22 To your understanding, does this allow the government to recoup

23 a double portion?

24 A    I'm not sure I understand.

25 Q    All right.  In this case you have a RICO forfeiture and a

1  money laundering forfeiture, and they're separate; is that

2  correct?

3  A    Correct.

4         MR. HOSKINS:  Your Honor, I'm going to object, it's

5  calling for a legal analysis.

6         THE COURT:  Sustained.  You'll be able to summarize

7  your position to the jury.

8  BY MR. SMITH:

9  Q    In the far corner there we have William "Al Man" Stivers

10 and Stanley Bowling, Russell Cletus Maricle, Douglas C. Adams,

11 Freddy W. Thompson, Charles Wayne Jones, those are only salaries

12 that were obtained, as your investigation has shown, pursuant to

13 these positions of public office?

14 A    Correct.

15        MR. SMITH:  You can retake the stand.

16 BY MR. SMITH:

17 Q    The contracts that you have summarized in M–15, have you

18 also broken down the years for which they represented to come to

19 a total for the final figure there?

20 A    Yes.

21 Q    And is that also contained in M–15?

22 A    Correct.

23        MR. SMITH:  May I have just a moment?

24        THE COURT:  Yes, sir.

25        MR. SMITH:  I pass the witness.

 1              THE COURT:  All right.  Thank you.

 2              Mr. Hoskins.

 3              MR. HOSKINS:  Thank you, Your Honor.  Your Honor, I

 4  wonder if I could move this chart?

 5              THE COURT:  Yes, sir, we'll get some assistance with

 6  that.

 7              Thank you.

 8                        CROSS-EXAMINATION

 9  BY MR. HOSKINS:

10  Q    Mr. Sagrecy, insofar as Judge Maricle's salary, that was

11  always set by state law, wasn't it?

12  A    As I testified earlier, I don't know how it was set.

13  Q    So you don't know of any money going from Clay County to

14  Judge Maricle as far as you can say, his salary came from the

15  State of Kentucky, he was paid by Frankfort; correct?

16  A    All that I can say is, is I required his salary information

17  from the Administrative Office of the Courts.  I do not know

18  exactly who paid his salary, whether it was through the county

19  or city or state.

20  Q    Well, you know the Administrative Office of the Courts is

21  here in Frankfort; right?

22  A    Yes.

23  Q    And you know Frankfort is the capitol of the State of

24  Kentucky?

25  A    Yes.

1    Q    You didn't go to anybody in Manchester to get those salary

2    records, did you?

3    A    No.

4    Q    You know that the only election that Judge Maricle had

5    during the period of time of the indictment was in 2006;

6    correct?

7    A    That's correct.

8    Q    And you know that he had no opposition that year?

9    A    That's correct.

10           MR. HOSKINS:  That's all.  Thank you.

11           THE COURT:  All right.  Thank you.

12           Mr. Westberry.

13           MR. WESTBERRY:  Thank you, Judge.

14                      CROSS-EXAMINATION

15   BY MR. WESTBERRY:

16   Q    Good afternoon, Mr. Sagrecy.  Just a couple of questions.

17   And we've met before, I'm Kent Westberry.  I wanted to ask you

18   just a couple of questions along the lines that Mr. Hoskins

19   talked about just a moment ago.

20        You testified at trial a couple of weeks ago, to my best

21   recollection, that it was the school board that actually hired

22   and retained the superintendent of schools and they would vote

23   on who they would hire and retain; is that correct?

24   A    I believe that's correct.

25   Q    And I believe you also testified that it was the school

1  board that actually would set the salary of a superintendent,

2  whoever they decided to hire and retain; correct?

3  A    His salary was outlined in a contract.

4  Q    And the contract would have been approved by the school

5  board; is that your understanding?

6  A    Yes.

7  Q    I think I know the answer to the question, but I would ask

8  you anyway.  Would you agree that from your investigation there

9  was no commingling of any superintendent salaries with any of

10  the city contracts that also been discussed in this trial;

11  correct?

12  A    I'm not sure I understand your question, sir.

13  Q    It's not very good.  The city contracts are separate —

14  that represents a separate set of numbers from that of a

15  superintendent's salary; correct?

16  A    Are you referring to the contracts for —

17  Q    B & B —

18  A    — B & J and B & B, the city and county contracts?

19  Q    Yeah.  Those are separate — those numbers come up — you

20  arrived at those numbers separately from that of the school

21  board salaries, am I doing a halfway decent job with this?

22  A    If I understand your question, his salary is not included

23  in those — in that calculation for the contracts.

24  Q    And the total number of his salary during the time period

25  mentioned in the indictment is a little over $700,000, 704, I

1    think?

2    A    Yes.

3              MR. WESTBERRY:  Thank you.

4              That's all the questions I have.  Thank you, sir.

5              THE COURT:  All right.  Thank you, Mr. Westberry.

6              Mr. White.

7              MR. WHITE:  May I just ask from here?

8              THE COURT:  Yes, sir, you may.

9                          CROSS-EXAMINATION

10   BY MR. WHITE:

11   Q    Agent Sagrecy, can you hear me?

12   A    Yes, I can.

13   Q    Thank you.  The amount that you attributed to Mr. Jones in

14   your analysis, the calculation was $2900?

15   A    That's correct.

16   Q    And that's money that was derived from his service on the

17   County Board of Elections?

18   A    Yes, that was the money from serving as a commissioner.  It

19   doesn't include any fees he received as an election officer.

20   Q    Okay.  But in terms of as the commissioner appointed by

21   State Board of Elections, that's the source of the 2900?

22   A    The position as commissioner — Now, when you say "source,"

23   are you talking about where the funds actually come from?

24   Q    No, I'm sorry, I asked that poorly.  Let me break that

25   down.  The $2900 that Mr. Jones received, those are dollars that

1  he received as a result of being appointed by the State Board of

2  Elections as the Democratic county commissioner on the Clay

3  County Board of Elections?  Would you agree with that?

4  A    Yes.

5  Q    And then the 2900 he received is actually paid by the Clay

6  County Fiscal Court?

7  A    That's where I received the records from.

8  Q    And he would have received those funds regardless of his

9  participation in a RICO enterprise or not, would you agree with

10  that, in terms of getting that appointment?

11  A    I wouldn't agree with that.

12           MR. WHITE:  That's all I have.  Thank you.

13           Thank you, Agent Sagrecy.

14           THE COURT:  All right.  Thank you.

15           Mr. Abell?

16           MR. ABELL:  Judge, I don't have any questions.

17           THE COURT:  All right.  Thank you.

18           Mr. Richardson?

19           MR. RICHARDSON:  No questions.

20           THE COURT:  Mr. Gilbert?

21           MR. GILBERT:  I have no questions.

22           THE COURT:  Ms. Hughes?

23           MS. HUGHES:  No questions.

24           THE COURT:  Mr. Simons.

25           MR. SIMONS:  I do have one or two.

1           THE COURT:  Yes, sir.

2                     CROSS-EXAMINATION

3   BY MR. SIMONS:

4   Q     Agent Sagrecy -- Am I saying your name correctly, is it

5   Sagrecy?

6   A     You're right.

7   Q     Thank you.  Just a couple of questions.  You can't see it

8   now, but the 1.5 million-dollar figure roughly, do you have it

9   in front of you?

10  A     No, I don't.

11  Q     But the lesser amount that Mr. Smith asked you about?

12  A     The amount charged in the indictment?

13  Q     Yes, yes, sir.  The contracts that B & B had, were those

14  exclusively with the City of Manchester, the ones that you

15  analyzed, sir?

16  A     Well, there was some payments from the county as well.

17  Q     Okay.  Do you have that on your -- in Exhibit M-15?

18  A     Yes, I do.

19  Q     Okay.  The contracts that the jury heard about for sewer

20  and water lines, were they all city contracts, to your

21  knowledge?

22  A     Yes.

23  Q     Okay.  Do you understand the position that my client had as

24  an elected official to be a magistrate?

25  A     A magistrate, yes.

1  Q    A county position, would you agree with that, sir?

2  A    Yes.

3  Q    Now, Mr. Smith asked you a question and I'm not quite sure

4  I understood.  The 1.5 million-dollar sum, the amount sought in

5  the indictment, that is also included within the 3.4 million-

6  dollar sum; is that correct?

7  A    That is correct.

8  Q    Okay.  Now, you also have Mr. Bowling's salary as a

9  magistrate.  Did your investigation reveal whether the other

10 five magistrates in Clay County made the same salary or not?

11 A    I did not review the other salaries of the magistrates.

12 Q    Do you have any information that he received any special

13 money as a magistrate from a salary?

14 A    No.

15             MR. SIMONS:  Okay.  That's all.

16             THE COURT:  All right.  Thank you.

17             Mr. Smith, any redirect?

18             MR. SMITH:  No, Your Honor.  That's all the questions

19 we have.

20             THE COURT:  Let me ask if any of the other attorneys

21 have questions based on what the defendants have asked?

22             MR. WHITE:  No, Your Honor.  Thank you.

23             THE COURT:  All right.  Thank you, and you may step

24 down.

25             Mr. Smith, any additional witnesses?

1          MR. SMITH:  No, Your Honor.

2          THE COURT:  All right.  Let's see.  Counsel, unless

3   you need to approach, we'll proceed with presentation of any

4   proof that you would have.

5          Mr. Hoskins or Mr. Pinales?

6          MR. HOSKINS:  We have no evidence, Your Honor.

7          MR. WESTBERRY:  Nothing additional.

8          THE COURT:  Anyone?

9          MR. WHITE:  Nothing additional, Your Honor.

10          MR. BALDANI:  No evidence, Judge.

11          MR. GILBERT:  Nothing additional.

12          THE COURT:  All right.  Thank you.

13          Are the parties prepared at this time to proceed with

14   their arguments, the closing arguments?

15          MR. SMITH:  Yes, Your Honor.

16          THE COURT:  All right.  Thank you.  You may proceed.

17   Before we do that, Counsel, let's address the issue of

18   instructions here before you proceed with arguments, I want to

19   make sure there's no issues.

20      (Whereupon, the following discussion was had between the

21   Court and counsel at the bench, out of the hearing of the jury.)

22          THE COURT:  Mr. White is a little under the weather,

23   so in case he needs to go out, make a quick exit, he can use the

24   door into my chambers.

25          MR. WHITE:  Thank you for making that room available.

1          THE COURT:  All right.  I had provided the jury

2    instructions that I believe constitute a correct statement of

3    the law.  I've given those to you earlier and I made one change

4    which is based upon the memo opinion that I've issued earlier

5    today and I want to just call that to your attention and make

6    sure you didn't have any additional instructions to tender.  I

7    wanted to do that before we proceeded with any arguments, and if

8    we need to take a break, of course, we can do it at this time or

9    we can proceed.

10          The additional language that was included, hopefully

11   my clerk has told you, is in paragraph three, page two.  Let me

12   ask if the parties have any additional instructions they would

13   like to tender at this time?  I also understand that the

14   defendants object to my rulings with respect to the proceeds

15   analysis, and so I believe everyone objects to that with respect

16   to Counts 12 and 13 and I wanted to make sure that you

17   understood that your objections were preserved in the record

18   with respect to those issues.

19          MS. HUGHES:  I would just say that your memorandum

20   opinion does address Bart Morris and Stanley Bowling, but

21   Mr. Craft was presented as an expert.

22          THE COURT:  I understand.

23          MR. GILBERT:  And I proffered proof in my expert

24   disclosure that I previously made.

25          THE COURT:  I understand that.

1          MR. SIMONS:  Same for Stanley Bowling, Your Honor.  I

2    did not call Mr. Stivers in light of your ruling.

3          THE COURT:  I had intended for the memo to be a little

4    more thorough, but time was short, so I wanted to give that to

5    you so you could understand what my reasoning was.  Unless

6    there's any objection, this will be our instructions conference

7    and we'll just proceed with arguments.

8          MR. ABELL:  Robert Abell on behalf of William Stivers.

9    Judge, I feel compelled to bring up this issue.  The evidence

10   has been that Mr. Stivers apparently derived not one dollar and

11   then is subject to full forfeiture, and I feel compelled to

12   advance on his behalf, in the absence of any evidence that he

13   derived even one dollar from this enterprise of money laundering

14   conspiracy, that it is a violation of substantive due process

15   for him to be held liable to forfeit the entire sum jointly and

16   severally.

17         THE COURT:  All right.  I am actually going to reserve

18   ruling on that issue.  I think it may be more of an Eighth

19   Amendment issue, but I'm going to allow you to brief that

20   matter.  I'm going to go ahead and proceed at this time, but I'm

21   going to reserve ruling on that because I want to look at that a

22   little more as well.

23         MR. ABELL:  I also note an Eighth Amendment on behalf

24   of Mr. Stivers.

25         THE COURT:  It will be so noted.  I do want to have a

1    chance to look at that further, but it would not affect, of

2    course, the jury's determination because the amounts aren't

3    calculated based on, as you said, anything from Mr. Stivers.  So

4    we'll proceed.  I will take it under advisement and we'll talk

5    about a briefing schedule after the jury is excused.

6            MR. WHITE:  Your Honor, Mr. Abell and I had discussed

7    this yesterday as well.  I would like to join in on that.  I

8    don't need to be heard.  I may file a brief as well.

9            THE COURT:  All right.  We'll talk about that as soon

10   as the jury is excused.  Otherwise, though, we'll proceed then

11   with the arguments.  Mr. Smith, how much time would you like?

12           MR. SMITH:  About ten minutes I can probably get

13   through this.

14           THE COURT:  I'm not going to limit counsel.  You can

15   take as much time as you need on this issue.

16       (Whereupon, the following proceedings continued in open

17   court.)

18           THE COURT:  All right.  Thank you, Counsel.  We will

19   proceed and allow the parties to summarize their position,

20   essentially closing arguments at this time.

21           Mr. Smith, you may proceed first.

22           MR. SMITH:  May it please the Court, Counsel.

23           THE COURT:  Mr. Smith, would you like the easel

24   brought around?

25           MR. SMITH:  Yes, please.

1          Ladies and gentlemen of the jury, I do want to discuss

2    a few of these instructions with you.  I understand that you—all

3    will get a copy of these, as well as the indictment and all the

4    evidence that you have heard, all the exhibits which have been

5    introduced will be for your consideration as to this portion of

6    the trial as well.  It's important.  Congress has basically

7    enacted statutes which have mandated that fruits of crime be

8    forfeited, that once it is shown to be forfeitable, that that

9    property should belong to the United States and not to those who

10   have been a part in gaining it, obtaining it, or maintaining it.

11         It's important that we look at Count 12, because

12   that's the RICO forfeiture statute under 18 U.S.C., Section

13   1963, and Congress has set out three different ways in which you

14   can consider whether or not any of the money, all of the money,

15   or part of the money that has been alleged in the indictment

16   should be forfeited to the United States.  Those three

17   categories include, number one, whether or not, again, the

18   property has been acquired or maintained in violation of the

19   statute.  Now, there's a definition for what that means.  As

20   you're familiar, the instructions, they'll set out what those

21   definitions are.  But essentially I want to remind you of what

22   you've found so far.  Your verdict at this point has found that

23   all eight defendants have conspired and agreed to commit a

24   violation of Title 18, United States Code, Section 1962, as the

25   RICO conspiracy, and if you're a part of that agreement,

1    Congress has said that those proceeds or properties or, as

2    further defined in your instructions, monies should be forfeited

3    by law.  And the first prong is whether it was acquired or

4    maintained.  That's the acquired or maintained.

5            As you-all recall, Agent Sagrecy set out that we have

6    sources of property that make up the Judge's salary, that makes

7    up the superintendent's salary.  Wayne Jones, as the

8    commissioner, had a fee as an election officer.  Freddy

9    Thompson, as a county clerk, had a salary.  Bart and Debbie

10   Morris, of course, B & J, and Stanley Bowling, B & B.  The

11   question that you'll be asked is to determine, again, whether

12   these members of this conspiracy and these properties that are

13   listed, whether or not — the first prong of the theory is

14   whether they were acquired or maintained, and that is something

15   that is to be found by a preponderance of the evidence standard.

16           Now, a person's guilt, which you have already

17   determined, is by beyond a reasonable doubt.  The forfeiture,

18   Congress has said, does not have to be proven by that high

19   standard.  In fact, this is a very broad forfeiture provision, I

20   would submit to you, and it says that the government has to only

21   show by a preponderance of the evidence, which I'll submit to

22   you your instructions will say something along the lines of more

23   likely than not; more likely than not has the government shown

24   you proof that would establish that these properties that are

25   listed, the judge's salary, the superintendent's salary, Wayne

1  Jones' fees, county clerk's salary, Stanley Bowling, I forget to

2  mention his, magistrate's salary, and then the contracts,

3  whether or not, more likely than not, the government has shown

4  by all of the evidence.  So you look at all of the evidence

5  that's been introduced in this case and make a determination of

6  whether or not that first prong has been established under the

7  acquired or maintained factor.

8          And, again, by preponderance of the evidence, first,

9  that the government has shown that the defendant had an

10  ownership interest in the property.  That's not going to be

11  disputed in this case as to the judge's salary, it won't be

12  disputed as to the superintendent's salary, nor the election

13  officer's fee, nor the county clerk's salary, nor the

14  magistrate's salary.  All of them are claiming ownership

15  interest in that.

16          You also have Bart Morris, Debbie Morris, and Stanley

17  Bowling.  Of course, they have their contracts, and the proof,

18  as you will recall, is that Stanley Bowling owned B & B and that

19  Bart Morris owned B & J.  So, again, that first prong of whether

20  or not they had an ownership interest in it or not should be

21  considered under this first prong, and the second is whether or

22  not the interest was acquired or maintained.

23          If you believe from the evidence that when these

24  individuals came together to pool this money to buy these votes

25  that there was a motive and a purpose behind that, and that was,

1   again, either to acquire, which means attain or maintain,

2   because some of these individuals had salaries that were

3   established before the conspiracy began, but the RICO statute

4   says if you maintain it, if you're maintaining your position in

5   this property, maintaining your salary by participation in this

6   racketeering conspiracy, then it's also forfeitable.  So it's

7   either acquired or maintained under Count 1.

8           And, again, the second prong is whether or not it

9   afforded a source of influence.  That's the second way to

10  establish forfeiture under the RICO provision under 1963.  And

11  this one, again, is broad, and it says simply that if the

12  defendant had an ownership interest in the property and, second,

13  whether that interest afforded a source of influence, a source

14  of influence over the enterprise.  You know, this enterprise did

15  not, I submit to you, operate without money and they did not

16  operate without foot soldiers who were willing to go out there

17  and put the money in the hands of the voters.  So money, we

18  would submit to you, has been established and that money was

19  affording these individuals a source of influence.

20          So, again, if the government proves to you by a

21  preponderance of the evidence, that is more likely than not,

22  that these defendants were a part of this conspiracy, have

23  ownership interest in these properties that we listed or —— and,

24  I'm sorry, used such an interest to afford them a source of

25  influence over the enterprise, in either, again, the defendant

1  establishing, operating, controlling, conducting, or

2  participating in any of the conduct.

3         So those are the first two prongs.  The third prong is

4  -- again, the third theory that's possible for you to find, the

5  government's allegation, again, is that this was property that

6  but for -- this is the "but for" argument, that is property

7  constituting or derived from proceeds.  Again, the standard of

8  proof is the same and the question is did the defendant have an

9  interest in it and, second, was that interest obtained directly

10 or indirectly as a result of their conduct in this enterprise

11 affairs.  If they had -- again, in your determination, they were

12 all part of this conspiracy, they were all part of this

13 agreement, is it more likely than not that their interest, what

14 interest they had in these properties that have been listed,

15 were they obtained, directly or indirectly, by their

16 participation in this conspiracy, in this enterprise.

17        Again, what were the pattern of racketeering?  You-all

18 have already determined those things:  Briberies, acts of

19 attempted extortion, the mail fraud.  If those were, again,

20 salaries, contracts they had an interest in, they were obtained

21 directly from that activity or indirectly.

22        Count 13.  Count 13 relates to the money laundering.

23 Again, for purposes of illustration, I would submit to you that

24 the United States has proven in its case that there was --

25 again, money was being pooled together and in the course of that

1   there was an intent to promote, you already found there was an

2   agreement under the money laundering conspiracy.  Congress also

3   has said when individuals come together to conspire or agree —

4   conspire or agree, that means if you come and be part of this

5   agreement — then you're going to be responsible for forfeiture

6   if the government proves the following elements under 1956(h)

7   and 18 U.S.C., Section 982, property is subject to forfeiture by

8   the money laundering statute.  Property may be the proceeds of

9   the underlying specified unlawful activity being laundered or it

10  can be commingled with those properties.

11          Now, again, just for simple illustration, there were

12  monies pooled; okay?  And the government's theory was that those

13  monies were pooled for the purpose of, again, bribing voters to

14  vote for candidates and candidates, who in the end, agree to

15  pass on these awarded contracts that you have already heard

16  from, seen the evidence in, and, again, that summary is M-15.

17          Now, the question is, again — let's just assume for

18  illustration that in the front end you put in a thousand and at

19  the bottom you get a hundred thousand.  Do you forfeit only the

20  thousand that was put in or the hundred thousand that comes out,

21  and I would submit to you that the law and the jury instructions

22  will instruct you that once that money has passed through

23  financial transactions and ends up down here in the hands, it's

24  this bottom figure.  It's not the thousand, it would be the

25  10,000 or a hundred thousand that ends up down here.  That's

CLOSING ARGUMENT - MR. SMITH                    34

1  what the law says.  I submit to you that's what the instructions
2  will instruct you as to the law of money laundering.  In fact, I
3  expect you'll get an example of something similar to that effect
4  which will say if the defendant paid, for instance, $10,000 in
5  criminal proceeds to buy property worth $12,000, the amount
6  subject to forfeiture would be the 12,000, not the ten.  It's
7  gross, it's not net.  Proceeds are gross, not net.  There is no
8  provision under the law, under these instructions, I submit to
9  you, that will require you to figure out how much money was the
10 bottom line or were they bringing home in their salary, when you
11 take off their expenses, their taxes, and their insurance.  The
12 instructions, I submit to you, do not require you to look for
13 what the net is.  The same way with the contracts, contracts
14 would be the gross amount.

15         The second question you may have, again, is your
16 verdict form.  Your verdict form is something that I want to
17 draw your attention to, and, again, it gives you several
18 options.  As you've already understood from the evidence and
19 already heard from Special Agent Sagrecy, the government when
20 they indicted this case indicted for less than the amounts that
21 were proven; this is, when you take M-15 back there you're going
22 to see figures close to 4 million for the total of the RICO
23 forfeiture.  I submit to you the government didn't ask for that
24 amount, they asked for the lesser amount, which is, again, set
25 forth in this chart and will also be set forth in the

1    indictment.  When you take the indictment back there, it will

2    have that lesser amount, and this is the amount we're asking you

3    to find, nearly a 600,000-dollar lesser amount than what was

4    actually proved.  And, again, your verdict will give you the

5    option of finding more likely than not, was this property,

6    again, involved in a racketeering enterprise in one of those

7    three forms that I told you.  There's three ways the government

8    can prove it and you can decide either one of them or -- but

9    then that's the question.

10        If you do not agree about that amount and you'll have

11   the summary back there, you can calculate your own amount and

12   you can fill that in.  So if you decide that, look, this amount,

13   we don't agree on, we want a lesser amount, then a lesser amount

14   would have to be filled in, and that would be in your second

15   prong.  And, again, the same thing for the money laundering

16   forfeiture.

17        The last thing I want to tell you and advise -- I

18   submit to you that this is not an attempt by the government to

19   collect and both double-dip.  That is if you-all find, I submit

20   to you, under Count 12 and Count 13 that the government will not

21   be going after 3.4 million plus 1.5 million, that will be

22   rectified by the law.  But that's not to be a concern of yours,

23   your concern is, again, we found them guilty of the money

24   laundering conspiracy, we found them guilty of the racketeering

25   conspiracy, now those proceeds or those properties are now, the

CLOSING ARGUMENT - MR. HOSKINS                    36

1  question is, whether more likely than not the government has

2  satisfied its burden under the three-prong RICO forfeiture or,

3  again, satisfying you under the money laundering forfeiture.

4  Those are the instructions.

5          And, again, I would remind you that, again, all of the

6  evidence is to be considered in this phase.  Although we only

7  called one witness and asked just a few questions, you're still,

8  I submit to you, to consider the totality of the evidence.  And,

9  again, thank you.

10         THE COURT:  Thank you, Mr. Smith.

11         Mr. Hoskins.

12         MR. HOSKINS:  Thank you, Your Honor.  May it please

13  the Court.

14         THE COURT:  Mr. Hoskins.

15         MR. HOSKINS:  Mr. Parman and my friends and

16  colleagues.

17         Ladies and gentlemen of the jury, of course, we're

18  disappointed with your verdict, but we respect your verdict.

19  And now I'm going to come to you just for a few final words.  I

20  want to point out to you that you didn't hear any evidence that

21  any of these people were wealthy people.  Judge Maricle's house,

22  a 150,000-dollar house, sure it's a nice home, but it's not a

23  mansion.  You didn't hear any evidence that these people didn't

24  do the jobs that they got, however they got them.  You heard

25  about Mr. Morris out there digging scraps of trash out of the

1  hillside, Judge Maricle going to court every day, Mr. Adams

2  running a fine school system.

3       One of the things the jury instructions say to you is

4  that this is a joint and several liability.  That means whatever

5  number you come up with, all these people are going to owe.  And

6  we know it's going to be a big number.  We know that.  We know

7  that, if nothing else, you're probably going to put in these big

8  amounts for the contracts.  But I want to point out to you that

9  Judge Maricle was elected, most of the salaries that you heard

10 there were before these charges started.  He's not been

11 convicted of something —

12      THE COURT:  I think I understand your objection and as

13 I —

14      MR. SMITH:  I'm not sure I understood his statement,

15 and if I did, I would disagree, that the numbers that Agent

16 Sagrecy represented were during this period of the conspiracy.

17      THE COURT:  All right.  The jury will recall what the

18 testimony was on that.

19      MR. HOSKINS:  The salary was certainly paid during the

20 period of the conspiracy, but it was paid from an election that

21 was before that.  Ladies and gentlemen, these folks that did

22 this work, I would just ask you to come in with a number that's

23 realistic.  Don't include Judge Maricle's salary for all those

24 years, because those were not the fruits of anything that you

25 convicted him of in this case.

 1              THE COURT:  All right.  Thank you, Mr. Hoskins.

 2              Mr. Westberry.

 3              MR. WESTBERRY:  Thank you, Judge Reeves.  May it

 4    please the Court, Judge.

 5              THE COURT:  Mr. Westberry.

 6              MR. WESTBERRY:  Friends and colleagues.

 7              Members of the jury, I want to echo what David Hoskins

 8    said.  Sure, we're disappointed.  I've been doing this long

 9    enough now to –– I know that this is just part of the process

10    that we deal with.  We do respect your verdict.

11              I want to just talk a little bit about –– if I could

12    just spend a couple of minutes –– and I promise you this is not

13    going to be long.  Recall the testimony about Mr. Adams'

14    performance during the years that he served as superintendent.

15    He served from '99 through 2009, when he retired last June or

16    July.  The 704,000-dollar figure that you saw on the chart

17    represented his salary during those period of years in the

18    indictment, '02 through '07.  I remember the superintendent of

19    schools started out in the –– I think it was the low to mid 80s,

20    kind of progressively.  He got a contract renewal in 2006, I

21    think you will recall.  What they did, if you recall, they took

22    his salary and they took the salary of superintendents in four

23    or five, six of some of the surrounding counties and averaged

24    them out and came up with the figure that they did in '06.  The

25    last year that he served as superintendent, the year that he

1  retired, it spiked up, and that was because of a lot of unused

2  sick leave.  And that's why he was hired and had been in the

3  pass.  There's no proof in the record to indicate that this man,

4  like David said just a moment ago on behalf of his client,

5  Mr. Maricle, as well.  And really all we're asking you to do is

6  pick up a fair and reasonable figure.  It's your call.  It's

7  truly your call.  It's a figure.  It's a set based on the

8  evidence and the instructions that will be given.

9       You do recall the testimony and I asked you to

10  remember, oh, I guess it was a week, week and a half ago, from

11  the school board members that we called, Mr. Cornett and

12  Mr. Keith, talked about the kind of job that he did, he did a

13  good job.  I really don't think that's ever been disputed.

14  Ms. Samples, the current superintendent of schools, likewise has

15  said the same thing.

16       We would ask you to back out that 704,000-dollar

17  figure from whatever figure, if any, that you arrive upon based

18  upon the testimony, again, of the people that had worked with

19  him, knew what kind of superintendent he was.  We don't think

20  that salary is a property and, of course, one that afforded any

21  influence over the so-called enterprise and we would simply ask

22  you to back that out as well.

23       Count 13, the 1.5 million-dollar figure, I really

24  can't speak to that at all.  Those figures came from the

25  contracts that were mentioned with regard to Mr. Bowling,

 1  Mr. Morris, and their companies.  I'll let their counsel talk

 2  with you about them as well.

 3          However, as a result of the verdict we respect that

 4  you-all have given me, we all are jointly responsible for

 5  whatever figure that you come up with.  Those contracts, the

 6  dollar amount on those city contracts, the 1.5, that doesn't

 7  have anything to do with any testimony from any monies that may

 8  or may not have found pooled together at the Bishop's garage for

 9  example, the testimony that we had about that at various points

10  during the trial.

11          To be fair, that's all we ask.  Thank you very much.

12  We respect what you do, and with that, I will sit down.

13          THE COURT:  All right.  Thank you, Mr. Westberry.

14          Mr. White, I know you're feeling a little under the

15  weather day, but if you would like to proceed you may at this

16  time.

17          MR. WHITE:  The court security officer has renamed me

18  Mr. Green.

19          THE COURT:  Yes, sir.

20          MR. WHITE:  Mr. Parman, Mr. Smith, agents, my dear

21  friends, Your Honor.

22          We've all been doing this a long time.  I know you

23  don't want to look me in the eye just like I don't really —

24  this is the tough part of the case, and I really want you-all to

25  know that we do respect what you did.  This is not easy, and

1  we've talked about that in my opening statement, that you'd be
2  drafted to go to war, the federal government can draft you to go
3  to war and draft you for jury duty, and we appreciate that.  We
4  appreciate the time, we really do.
5         Having said that, I really have nothing more to add
6  other than to echo what Mr. Hoskins and Mr. Westberry have
7  already talked about.  I think it is entirely appropriate for
8  you-all to back out, if my math is even remotely correct, right
9  at about 1.3 million, which are the salaries Judge Maricle and
10 Superintendent Adams received.  And as they have said, there's
11 been absolutely no evidence that those jobs were not done very
12 well.  I'll particularly lift up Superintendent Adams' work,
13 because what he did in Clay County was fantastic.
14        My client received $2900, Wayne Jones, and you get
15 that, it's what the rules call for.  So that is what he received
16 out of this.  I will let my good friends over here talk about
17 the contracts.  You've heard plenty of evidence about that.  Of
18 course, you have no evidence that my client received any of
19 those funds.
20        Again, I think I predicted it would be a long eight
21 weeks, and I do thank you-all very much and best of luck to you
22 and we look forward to your fair verdict in just a little while.
23        Your Honor, thank you.
24        THE COURT:  Thank you, Mr. White.
25        Mr. Abell.

1          MR. ABELL:  May it please the Court.

2          THE COURT:  Mr. Abell.

3          MR. ABELL:  Ladies and gentlemen of the jury,

4     Mr. Stivers is my client and the evidence has been that he

5     didn't derive even a dollar out of this.  I believe this chart

6     that you saw at some point during this trial, that's my client

7     down there with nothing next to the dollar sign.  And you'll see

8     in Instruction No. 1, paragraph 4, it doesn't matter under the

9     law what somebody did or didn't do, that it's a joint and

10    several liability.  So whatever dollar figure you-all return as

11    forfeitable, my client, who didn't get a nickel out of it, is

12    liable to pay for it all.

13          Now, the evidence has got to be clear that each of

14    these people, Judge Maricle, Mr. Adams, Mr. Jones, Mr. Thompson,

15    B & J Transfer, and B & B Excavating did do apparently good work

16    to earn the money they were paid.  Now, I can in good conscious,

17    knowing that and knowing that my client derived zero, suggest to

18    you anything other than the appropriate amount to be forfeited

19    would be nothing.  That would be justice done as to this portion

20    of the case and that's what I'm going to ask you to do as to

21    both 12 and 13.  Thank you.

22          THE COURT:  Thank you, Mr. Abell.

23          Mr. Richardson.

24          MR. RICHARDSON:  Yes, on behalf of Freddy W. Thompson,

25    we'll waive our closing.

CLOSING ARGUMENT — MR. GILBERT                43

1          THE COURT:  All right.  Thank you.

2          Mr. Gilbert.

3          MR. GILBERT:  Thank you, Your Honor.  May it please

4    the Court.

5          THE COURT:  Mr. Gilbert.

6          MR. GILBERT:  Mr. Smith, Mr. Parman, Counsel.

7          I just have a few words, ladies and gentlemen.  You'll

8    look at the instructions and there's two counts that you'll be

9    involved in.  Count 12 is the RICO.  You will be required to

10   find that these monies were received or acquired or maintained

11   in violation of the RICO Act or conduct in the violation of

12   that, and it would be our argument that based upon the totality

13   of the circumstances — of the evidence that has been previously

14   submitted to you, that these contracts were obtained prior to

15   the time theory that's mentioned in the indictment and that they

16   were maintained by good work and good services to the community

17   after that date.

18          Also, as a part of that, we believe that you'll be

19   instructed as to a source of any influence prong that is

20   required to be made before you include the over a million

21   dollars that B & J acquired during this period of time, and that

22   instruction will be that the interest in B & J must afford a

23   source of influence over the enterprise.  And if you'll remember

24   the testimony with respect — and I believe it was conceded by

25   the government in their closing arguments that Bart Morris never

1   contributed to any pool of money.  So we would argue that that

2   prong cannot be met because he didn't provide —— his income from

3   his business did not provide a source of influence over the

4   enterprise.

5             And finally, on Count 13, which is the money

6   laundering, a similar argument that the money received by B & J

7   is not traceable to those acts because, again, the contract was

8   obtained some eight years prior to the time of the indictment,

9   and then as we have argued previously, that it was maintained

10  after that date as a result of their good work and good service

11  to the community.

12            We would like you to consider those facts in terms of

13  making your decision as to the amount of the forfeiture.  Thank

14  you.

15            THE COURT:  Thank you, Mr. Gilbert.

16            Ms. Hughes.

17            MS. HUGHES:  Thank you, Your Honor.  May it please the

18  Court.

19            THE COURT:  Ms. Hughes.

20            MS. HUGHES:  Counsel.

21            Obviously, as everyone said, it's joint and several

22  liability, but I guess we've just sort of broken down our

23  argument so that each defendant is taking responsibility for

24  what that defendant has contributed on Mr. Smith's chart.  In

25  that regard, I feel like Debra Morris is in the same spot as

1  Mr. Stivers, because although she is married to Bart Morris, it

2  does appear that the government has recognized, and although she

3  appears on the chart, that B & J Transfer, she does not have an

4  ownership interest in that and, therefore, separately as a

5  defendant, Debra Morris has not — doesn't separately appear on

6  the chart as adding any money to the calculation of the

7  forfeiture amount.  That being said, she is married to Bart

8  Morris, and I understand that.  Although I don't think that the

9  government proved that she necessarily derived any benefit.

10         So I guess I would like to echo both what Mr. Abell

11  said on behalf of Mr. Stivers, as well as what Mr. Gilbert just

12  stated, that the "but for" analysis, which I believe is

13  appropriate when you're analyzing whether or not an interest,

14  this money from these contracts, was acquired or maintained as a

15  result of the racketeering, again reminding you-all that the

16  proof has been that the contracts were acquired prior to the

17  conspiracy's inception date of 2002, that the conversion to

18  tonnage was reasonable and, in fact, provided a savings, that

19  there was no other game in town, that B & J Transfer provided

20  good service and did good work.

21         And I would echo what Mr. Gilbert said, I do believe

22  also that the government conceded in its closing statement that

23  the Morrises did not contribute any money into the pooling for

24  the purchase of votes and, therefore, any receipts that would

25  have come from B & J Transfer were not used to exert influence

CLOSING ARGUMENT - MR. SIMONS                    46

1  over the racketeering enterprise.  That's all, thank you.

2            THE COURT:  Thank you, Ms. Hughes.

3            And, Mr. Simons.

4            MR. SIMONS:  Your Honor, I'll be brief.  If necessary,

5  can I refer to the Government's charts?

6            THE COURT:  Yes, sir, you may.  If you need the easel,

7  we'll have that brought around.

8            MR. SIMONS:  No, I don't think I will.

9            THE COURT:  Okay.

10           MR. SIMONS:  Ladies and gentlemen.

11           May it please the Court.

12           THE COURT:  Mr. Simons.

13           MR. SIMONS:  Mr. Smith, co-counsel.

14           I will echo the sentiments of my many colleagues, and

15  we do respect your verdict.  Regretfully I'm standing here

16  arguing this portion of the case to you.  I would echo the

17  sentiments of most of my colleagues who have spoken to you

18  regarding this substance as well and I would make one additional

19  point.  And in order to do that, I want to look at the charts

20  for a second.

21           I'm going to use this simple chart.  First of all, the

22  first is pooled money for candidates.  Mr. Smith argued

23  yesterday and I argued to you yesterday that Stanley Bowling

24  pooled no money.  Then it says you vote for a candidate, elect a

25  candidate and then have money awarded.  It is a ladder that the

1  government has presented and argued to you and suggested that

2  Mr. Bowling received his city contracts in that fashion.

3      Ladies and gentlemen, that hasn't been what the proof

4  has demonstrated.  Mr. Bowling ran for a county position and was

5  elected magistrate.  The money that he got from contracts came

6  from the city and he did good work.  The nexus is not there.

7  His involvement in the enterprise that you have determined did

8  not result in the contracts that he was awarded.  And the

9  evidence has further been that he did good work and that the

10  citizens of Manchester are satisfied by the work that he did.

11  So I would suggest that from this figure, the 1.5 million-

12  dollar figure, that you would back out the numbers from the city

13  contracts performed by B & B, which were well done and not

14  connected with his involvement in the remainder of the case,

15  which you have determined.

16      Ladies and gentlemen, I really do appreciate your

17  consideration and your hard work over the last eight weeks.

18  It's been difficult for all of us, and thank you.

19      THE COURT:  Thank you, Mr. Simons.

20      Mr. Smith, would you like time for rebuttal?

21      MR. SMITH:  Yes, if Your Honor please.

22      THE COURT:  You may proceed.

23      MR. SMITH:  Just briefly, I would like to respond to a

24  couple of things.  That, first of all, this good job, good job

25  superintendent, good judge, good contracts and good county

1  clerk, I would submit to you, as I argued to you in my closing,

2  that we have never — that that's not the issue.  The issue is,

3  you know, how did this enterprise come together, and you-all

4  found that there was a conspiracy involving these eight

5  individuals.  Whether or not they have a ditch that was supposed

6  to have been dug, that's not the issue.  Whether a sewer line

7  was put in is not the issue.  Whether or not he showed up as a

8  judge on the bench, that's not the issue.

9         Why did these people get involved in this crime?

10  Because of money and power, I submit to you.  And this verdict

11  on this forfeiture is, again, an extension of what you have

12  found.  I would ask that you consider this an extension of what

13  you've already found, and, again, the issue is not whether or

14  not they've done a good job.

15        The second thing is, well, somebody didn't do as much

16  as far as getting as much money and, therefore, how do we deal

17  with that?  Well, Congress said, look, if you're involved in a

18  joint enterprise and you-all are ultimately relying upon each

19  other to accomplish the criminal objective, then you're jointly

20  and severally liable.  That means if one of you got $10 or

21  $1 million, the whole group is responsible for what was

22  generated out of this criminal venture.  And I would submit to

23  you, again, whether Mr. Stivers made $10, made a hundred

24  dollars, or the Morrises made a million, again, those are

25  issues, again, you're going to find what was the forfeitable

1    amount and there — according to the law.  Whether you agree

2    with it or not.  You know, this is not a debate about whether

3    Congress was right in taking money from people who are

4    committing crime.  That's not the debate.  Whether or not we

5    agree with the law or not, you-all are asked, again, to follow

6    the law and instructed to follow the law, and the law is it's

7    joint and several liability.  And sympathy, feeling sorry for

8    somebody, is no more admissible in this part of this proceeding

9    than it was when you found them guilty in the first part.

10          Debbie Morris, again, no evidence that she — you

11    know, again, she was part of this criminal agreement and

12    according to the law she's responsible.  But did she derive any

13    benefit?  You ask yourself that.  The home she lived in, the

14    lifestyle she enjoyed, the benefit she got from that business.

15    You can infer from the circumstances how much that was.

16          And the city contracts, finally, the argument about

17    the city contracts, ladies and gentlemen, I would submit to you

18    that the fact that he is a magistrate in the county not loading

19    on the city contracts, I would submit to you that the law makes

20    no distinction in that.  Again, why — in your deliberations and

21    when you go back there, why were the Morrises and the Bowlings

22    out there buying votes, doing the dirty work that they were

23    doing?  What motivated them?  I would submit to you that it was

24    the contracts.  Their relationships, why did they associate with

25    Daugh White and Kennon White?  Why was this going on over those

1   years?  Why were they in those associations?  I would submit to

2   you, again, all that evidence that you've heard in your

3   determination of guilt is to be reviewed and considered in this,

4   and the standard is not beyond a reasonable doubt, the standard

5   at this stage, is it more likely than not.  And I would ask you,

6   ladies and gentlemen, to return a verdict as the grand jury

7   required in its verdict, which is a reduced amount, I would ask

8   that you return a verdict as set forth in Count 12 and Count 13.

9   Thank you.

10              THE COURT:  All right.  Thank you, Mr. Smith.

11              Thank you, Counsel.

12              Well, members of the jury, I'm going to give you the

13   last instructions at this point, and I will tell you that the

14   instructions on forfeiture are not as extensive as the

15   instructions I have given to you previously.  So let me proceed.

16              Members of the jury, you have reached a verdict that

17   Defendants Russell Cletus Maricle, Douglas C. Adams, Charles

18   Wayne Jones, William E. Stivers, also known as Al Man, Freddy W.

19   Thompson, William B. Morris, also known as Bart, Debra Morris,

20   also known as Debbie, and Stanley Bowling are guilty under Title

21   18 of the United States Code, Section 1962(d), as charged in

22   Count 1 of the indictment.

23              You've also reached a verdict that the defendants, the

24   same defendants, Russell Cletus Maricle, Douglas C. Adams,

25   Charles Wayne Jones, William E. Stivers, also known as Al Man,

1  Freddy W. Thompson, William B. Morris, also known as Bart,

2  Debra L. Morris, also known as Debbie, and Stanley Bowling are

3  guilty of money laundering pursuant to Title 18 of the United

4  States Code, Section 1956(h), as charged in Count 2 of the

5  indictment.

6          In view of your verdict, you now have one more task to

7  perform.  I must ask you to render a special verdict concerning

8  property the United States has alleged is subject to forfeiture

9  by the defendants to the United States in Counts 12 and 13 of

10 the indictment.

11         The term "forfeiture" means to be divested or deprived

12 of the ownership of something as a penalty for the commission of

13 a crime.  Interest is the most general term that can be employed

14 to denote a right, claim, title, or legal share in something.  I

15 instruct you that the term "interest" comprehends all forms of

16 real and personal property, including money, profits, and

17 proceeds.

18         The term "proceeds" means any property derived from or

19 obtained or retained, directly or indirectly, through some form

20 of unlawful activity, including the gross receipts, or total

21 amount received, of such activity.  Proceeds include currency

22 received by the illegal enterprise, whether or not it has been

23 seized by the government.  The government is entitled to a

24 personal money judgment against a defendant for an amount equal

25 to the value of the property that was involved in the violation.

Regarding a violation for which the government requests a money
judgment, it is your duty to determine the value of the property
involved in the violation.

I instruct you that in considering your forfeiture
verdict, you may not consider the degree to which a particular
defendant was involved in the offense, because by law each
defendant is liable for the entire amount of the money judgment.

The United States is seeking the forfeiture of certain
property alleged in Counts 12 and 13 of the indictment and it is
your duty to determine if this property should be forfeited.  I
will start by reviewing Counts 12 and 13 of the indictment with
you; next, I will explain the burden of proof; and, finally, I
will explain the rules that you must follow during your
deliberations in the jury room and the possible verdicts that
you may return.  Again, please listen very carefully to all of
these instructions.

Count 2 seeks forfeiture of certain property based
upon your guilty verdict regarding Count 1, conspiracy to
conduct or participate in the conduct of the affairs of an
enterprise affecting interstate commerce through a pattern of
racketeering activity in violation of Title 18 of the United
States Code, Section 1962(d).

The portion of Count 12 alleging these properties to
be forfeited to the United States is as follows:

The property subject to forfeiture to the United

1   States pursuant to Title 18 of the United States Code,

2   Section 1963(a)(1) and (a)(2) and (a)(3) includes, but is not

3   limited to, the following assets:

4         A money judgment in the amount of $3,472,847.38, said

5   amount being the total of the interest acquired and the gross

6   proceeds obtained through the violation of Title 18 of the

7   United States Code, Section 1962.

8         You will have a copy of the additional portions of the

9   indictment with you in the jury room for study during your

10  supplemental deliberations.

11        Now, Title 18 of the United States Code, Section

12  1963(a), provides that whoever violates any provision of

13  Section 1962 of this chapter shall forfeit to the United States,

14  one, any interest the person has acquired or maintained in

15  violation of Section 1962; or, two, any interest in, security

16  of, claim against, or property or contractual right of any kind

17  affording a source of influence over any enterprise which the

18  person has established, operated, controlled, conducted, or

19  participated in the conduct of, in violation of Section 1962;

20  and, three, any property constituting or derived from any

21  proceeds which the person obtained, directly or indirectly, from

22  racketeering activity or unlawful debt collection in violation

23  of Section 1962.

24        Now, Section 1963(a) provides for the forfeiture of

25  three general categories of property interests:  Number one,

those, quote, acquired or maintained in violation of Section

1962, close quote, as indicated in subsection (a)(1) that I have

just read to you; number two, those, quote, affording a source

of influence over any enterprise, close quote, as indicated in

subsection (a)(2); and, number three, those constituting or

derived from any proceeds as indicated in subsection (a)(3).

Now, to be entitled to forfeiture in Count 2, the

United States must prove one of the three prongs set out below

by a preponderance of the evidence:

A, that the defendant acquired or maintained the

interest in violation of Section 1962; or,

B, that such property interest afforded a source of

influence over an enterprise which the defendant conducted or

participated in the conduct of, in violation of 1962; or,

C, that property constituting or derived from any

proceeds were obtained, directly or indirectly, from

racketeering activity or unlawful debt collection in violation

of Section 1962, as charged in the forfeiture section of the

indictment.

I will discuss each prong in more detail below.

To establish the first prong known as the "acquired or

maintained prong," the United States must prove by a of the

preponderance of the evidence:

First, that the defendant had an ownership interest in

the property which is being considered for forfeiture; and,

Second, that such interest was acquired or maintained in violation of Section 1962, as charged in Count 1.

If you find from your consideration of all the evidence that both the elements listed above have been proved by a preponderance of the evidence, then you should find that the properties should be forfeited to the United States under the "acquired or maintained" prong.

In order to establish the second prong, known as the "affording a source of influence over any enterprise" prong, the United States must prove by a preponderance of the evidence:

First, that the defendant had an ownership in the property which is being considered for forfeiture; and,

Second, that such interest afforded a source of influence over the enterprise which the defendant had established, operated, controlled, conducted, or participated in the conduct of, in violation of Section 1962 as charged in Count 1.

A property that is owned by the defendant and used by him or her to further the affairs of the enterprise affords the defendant a source of influence over the enterprise.

If you find from your consideration of all the evidence that both the elements listed above have been proved by a preponderance of the evidence, then you should find that the property being forfeited to the United States under the "affording a source of influence over any enterprise" prong.

In order to establish the third prong, known as the "property constituting or derived from proceeds" prong, the United States must prove by a preponderance of the evidence the following two matters:

First, that the defendant had an ownership interest in the property which is being considered for forfeiture; and,

Second, that such interest was obtained, directly or indirectly, as a result of conducting the enterprise's affairs through a pattern of racketeering activity as charged in Count 1, in violation of Section 1962.

If you find from your consideration of all the evidence that both the elements listed above have been proved by a preponderance of the evidence, then you should find that the property being forfeited to the United States under the "property constituting or derived from proceeds" prong.

Count 13 seeks forfeiture of certain property based on your guilty verdict of Count 2, conspiring to launder money, in violation of Title 18 of the United States Code, Section 1956(h).

The portion of 13 alleging these properties to be forfeited to the United States is as follows:  All property, real and personal, involved in the aforesaid offense and all property traceable to such property as to which the defendants are jointly and severally liable, including, but not limited to, cash and currency in the amount of $1,513,512.36, which

1  constitutes the sum involved in the violation of Title 18 of the
2  United States Code, Section 1956(h).

3          Now, you will have a copy of the additional portions
4  of the indictment with you in the jury room, again, for study
5  during your supplemental deliberations.

6          Title 18 of the United States Code, Section 982,
7  provides that any person who is convicted of conspiring to
8  launder money, in violation of Title 18, Section 1956(h), is
9  required to forfeit to the United States any property, real or
10 personal, involved in such violation and any property traceable
11 to such property.

12         The phrase "any property, real or personal" includes
13 the money or other property laundered; any fees or commissions
14 paid to the persons involved in the money laundering offense;
15 any property used to facilitate the offense; and any property
16 traceable to such property.

17         Property may be the subject of the money laundering
18 financial transaction in a number of ways.  For example, the
19 property may be the proceeds of the underlying specified
20 unlawful activity being laundered.  It can be property that was
21 commingled with these proceeds at the time the financial action
22 took place or it can be property that was obtained as part of an
23 exchange or purchase that constitutes the money laundering
24 violation for which the defendant has been found guilty.

25         For example, if a defendant takes $1,000 in criminal

1   proceeds and commits a money laundering violation by depositing

2   the money into a bank account, the $1,000 would be subject to

3   forfeiture because it was involved in the money laundering

4   violation.  If the defendant then commits a money laundering

5   violation by withdrawing $10,000 from the account and that

6   $10,000 includes the criminal proceeds and other money

7   commingled with it, the amount subject to forfeiture would be

8   $10,000 because that is the amount involved in the money

9   laundering violation.  And if the defendant uses the $10,000 to

10  make a down payment on a house or to buy a car in the money

11  laundering violation, then the house or the car are subject to

12  forfeiture because they were involved in the money laundering

13  violation.  The property involved in the money laundering

14  violation is the total or gross amount of the property involved

15  in the money laundering violation, not just the profit the

16  defendant may have made.  So if the defendant paid $10,000 in

17  criminal proceeds to buy property worth $12,000 in a money

18  laundering transaction, the amount subject to forfeiture would

19  be $12,000, not just the $2,000 profit or the $10,000 in

20  proceeds.

21          Now, property used to facilitate a money laundering

22  offense includes any property, real or personal, which makes the

23  commission of the offense less difficult or more or less free

24  from obstruction or hindrance.  If a portion of the property is

25  used to facilitate the offense, then all of the property is

1  subject to forfeiture.

2           To be forfeitable as facilitating property, there must

3  be a substantial connection between the property and the

4  violation.  But facilitating property need not be used

5  exclusively for illegal activity in order for it to be

6  forfeitable.  Property that is used the majority of the time for

7  legitimate purposes may nevertheless be forfeited if it

8  facilities a money laundering violation.  Property that may be

9  used to facilitate a money laundering violation includes money

10 in financial accounts, personal property, real property, and

11 businesses.

12          Now I will instruct you on the burden of proof in this

13 forfeiture proceeding.

14          My previous instructions on the United States' burden

15 of proof regarding your verdicts on the guilt of the defendants

16 does not apply to your deliberations and verdicts regarding

17 forfeiture.  In deliberating and deciding your verdicts

18 regarding forfeiture, the United States need only prove the

19 forfeiture by a preponderance of the evidence, not beyond a

20 reasonable doubt.  To prove something by a preponderance of

21 evidence is to prove that it is more likely true than not true.

22 A decision is made by considering all the evidence on the

23 subject and deciding which evidence you believe.  Each party is

24 entitled to the benefit of all evidence received, regardless of

25 who offered the evidence.  Preponderance of the evidence is a

1    lesser standard than proof beyond a reasonable doubt.

2         Now, while deliberating you may consider any evidence,

3    including testimony offered by the parties, at any time during

4    this trial.  In your consideration of the forfeiture claims of

5    the indictment, you are instructed that your previous

6    determination that the defendants are guilty of having committed

7    the offenses alleged in Counts One and Two are final and

8    conclusive and you must not seek to discuss or determine anew

9    the guilt or innocence of a particular defendant.

10        You are further admonished that all of the

11   instructions previously given to you concerning your

12   consideration of the evidence, credibility of the witnesses,

13   your duty to give separate and individual consideration to the

14   case of the defendant, your duty to deliberate together, and the

15   necessity of a unanimous verdict will all continue to apply

16   during your supplemental deliberations concerning the forfeiture

17   claims in Counts 12 and 13.

18        The specific instructions I gave you earlier

19   concerning Count 1 and the definitions of the term "enterprise"

20   and "pattern of racketeering activity" also continue to apply.

21        Other than the standard of proof, which I just

22   discussed with you, all of my previous instructions apply to

23   your deliberations with respect to the special verdict.

24        Now, a Special Verdict Form has been prepared for your

25   use.  You are asked to determine unanimously whether each amount

1    is forfeitable to the United States.  Each amount should be

2    considered individually, not as a whole.  You may answer by

3    simply put an X or a checkmark in the space provided next to the

4    words yes or no.  The foreperson must then sign and date the

5    verdict form, and then it will be returned to me.

6              Now, let me go over the Special Verdict Form.  It's a

7    two-page form and it reads as follows:

8              As to Count 12, we, the Jury, unanimously find by a

9    preponderance of the evidence that the money judgment in the

10   amount of $3,472,847.38 is subject to forfeiture pursuant to

11   Title 18 of the United States Code, Section 1963(a)(1), (2), or

12   (3).  And there's a space marked yes or no.  If you answer no,

13   then you should fill in the statement below the amount, if any,

14   you find as forfeitable.  If you answered yes, then you just go

15   on to question two.  But if you answer no, then you'll have a

16   blank space to fill in an amount and then which reads:  Blank

17   amount is subject to forfeiture pursuant to Title 18 of the

18   United States Code, Section 1963(a)(1); (a)(2), or (a)(3).

19             The second page pertains to Count 13, and the first

20   question reads:

21             As to Count 13, we, the Jury, unanimously find by a

22   preponderance of the evidence that the money judgment in the

23   amount of $1,513,512.36 is subject to forfeiture pursuant to

24   Title 18 of the United States Code, Section 982.  You answer yes

25   or no.  If you answer no, then you should fill in the statement

1   with the amount, if any, that you find forfeitable.  If you

2   answer yes, then your deliberations are completed.  You should

3   have your foreperson sign and date the verdict form and then it

4   will be returned.

5         If you answer no, then the next question is:  As to

6   Count 13, we, the Jury, unanimously find by a preponderance of

7   the evidence that blank amount is subject to forfeiture pursuant

8   to Title 18, Section 982.  Again, there is a place for the date

9   to be included and the foreperson's name and the foreperson's

10  juror number.

11        You will be given all of the exhibits if you wish to

12  review those documents again, ladies and gentlemen.  You will be

13  given the instructions that I have just given you, together with

14  the Special Verdict Form.  You will also be given a copy of the

15  indictment, which contains Counts 12 and 13.  Again, you are

16  reminded that the indictment itself is not evidence in the case,

17  but is to be used by you to help guide you during your

18  deliberations.

19        Let me ask if there is any objection to the

20  instructions as given before I excuse the jury?

21        MR. WHITE:  No, Your Honor.

22        THE COURT:  All right.  Thank you.

23        Ladies and gentlemen, again, there's no admonition for

24  you to not discuss the case among yourselves, but if anyone

25  should need to leave for any reason, of course, you may not

1    discuss or may not deliberate on the case until that person

2    returns.

3            The jury will be excused at this time to begin their

4    deliberations.

5        (Whereupon, the jury retired from the courtroom to

6    deliberate upon their verdict, after which the following

7    proceedings were had in open court.)

8            THE COURT:  We're going to take a brief recess while

9    the Clerk delivers those materials to the jury room.  We're

10   going to return back in five minutes and I'll schedule

11   sentencing dates at that time.  So we'll be in recess for five

12   minutes.  The parties are not allowed to leave the courtroom at

13   this point.

14           MR. PINALES:  Your Honor?

15           THE COURT:  Yes, sir.

16           MR. PINALES:  Point of inquiry.

17           THE COURT:  Yes, sir.

18           MR. PINALES:  Is the Court sending back any exhibits?

19           THE COURT:  All of the exhibits can go back to the

20   jury room, they can look at all exhibits that have been

21   introduced in the case if they wish to do so.

22           MR. PINALES:  On behalf of Mr. Maricle, Your Honor,

23   there's an objection to that.  They were not readmitted in this

24   proceeding.

25           THE COURT:  All right.  And the jury has been

1  instructed that they may consider all evidence previously

2  admitted.  This is a continuation of that proceeding, so the

3  objection would be overruled.  Thank you.

4           We'll be in recess for five minutes.

5        (Whereupon, a short recess was had, after which the

6  following proceedings were had in open court.)

7           THE COURT:  All right.  Thank you.

8           The record will reflect that the parties and counsel

9  are present at this time.  The jury having found the defendants

10 guilty of all counts charged in the indictment, Counts 1 through

11 11, I will proceed to schedule sentencing hearings with respect

12 to each of the defendants.

13          First, with regard to Defendant Maricle, the

14 sentencing hearing will be scheduled at 9:00 a.m. on August 17th

15 in London.

16          As to Defendant Douglas Adams, the sentencing hearing

17 will be scheduled for August 17th also beginning at 1:30, again

18 in London.

19          Defendant Charles Wayne Jones' sentencing hearing will

20 be scheduled for August 18th at 9:00 a.m. also in London.

21          Defendant William E. Stivers, August 18th at 1:30 in

22 the afternoon in London.

23          Freddy W. Thompson, August 19th at 9:00 a.m. in

24 London.

25          Defendant William Morris, August 20th at 9:00 a.m. in

 1   London.

 2            Debra Morris, August 20th at 1:30 p.m. in London.

 3            And, finally, Defendant Stanley Bowling, August 19th

 4   at 1:30 p.m., again in London.

 5            And that will be subject to any intervening orders of

 6   the Court.

 7            The parties' attention is now drawn to Title 18 of the

 8   United States Code, Section 3143.  What is the position of the

 9   United States with respect to those defendants that are

10   currently on bond?

11            MR. PARMAN:  Your Honor, it's the position of the

12   United States that all defendants be detained pending their

13   sentencings.

14            THE COURT:  All right.  Let me hear briefly from

15   counsel for each of the defendants.

16            Mr. Hoskins or Mr. Pinales?

17            MR. PINALES:  May it please the Court, on behalf of

18   Mr. Maricle, I know pre-conviction he has remained out, he has

19   on an ankle bracelet.  He has complied with each and every order

20   of the Court, and I believe that would be sufficient to protect

21   the community and ensure that he would be present, Your Honor.

22            THE COURT:  All right.  Thank you.

23            Mr. Westberry?

24            MR. WESTBERRY:  Of course, he's been detained in the

25   middle of trial and I think the matter being discussed now, I

1    think I know probably what the Court's intentions are.  I think

2    in the event you wish to give some consideration to any other

3    defendants, particularly the possibility of home incarceration

4    pending sentencing, we would request the same consideration.

5                THE COURT:  All right.  Thank you.

6                Mr. White?

7                MR. WHITE:  Your Honor, I would just simply echo

8    Mr. Pinales.  My client has been out on home incarceration since

9    sometime in May, I recall.  I believe he has followed all the

10   orders of the Court, I would ask the same consideration.  Thank

11   you, Your Honor.

12               THE COURT:  All right.  Thank you.

13               Mr. Abell, I assume that you would echo the comments

14   made by Mr. Westberry?

15               MR. ABELL:  I do, Judge, and those raised earlier at

16   Mr. Stivers' revocation hearing.

17               THE COURT:  All right.  Thank you.

18               MR. BALDANI:  Judge, I think all these defendants are

19   in somewhat of a different situation.  As you're aware, there's

20   been suggestions that certain defendants haven't followed

21   conditions of bond, have attempted to contact witnesses.  And in

22   all fairness, the only indiscretion attributable to Freddy

23   Thompson at all is that day he hit the .009 on the BA.  And in

24   reference to that, I personally suspect that was attributable to

25   his asthma inhalers.  But since then, Your Honor, he hasn't had

1  anything to drink and he's extremely concerned about the orderly

2  transition of the County Clerk's Office.

3           THE COURT:  Tell me about the situation that occurred

4  today when he left the courtroom and went out to get in his

5  vehicle and we had to send marshals out to bring -- That was

6  Mr. Morris, wasn't it?  Was it Mr. Thompson or Mr. Morris we had

7  to send the marshals out to return?

8           MS. HUGHES:  It's my understanding that the allegation

9  involved Mr. Morris.

10           THE COURT:  Mr. Morris?  All right.

11           MR. BALDANI:  Yeah.  But, Judge, as I was getting

12  ready to say, he's extremely concerned about the orderly

13  transition at the County Clerk's Office.  And, Judge, I can tell

14  you, as an officer of the Court, when it comes to taking

15  conditions of bond seriously, I believe Freddy has done it to a

16  "T."  Any additional conditions, Your Honor, surrender -- well,

17  I guess he already surrendered the passport, home detention.

18  But he's extremely concerned about running the County Clerk's

19  Office and wrapping up his business, and I don't think you got

20  to worry about him going anywhere, Judge.  So I would ask you,

21  under any additional conditions you deem necessary, to leave him

22  out till sentencing.

23           THE COURT:  All right.  Thank you.

24           Mr. Gilbert?

25           MR. GILBERT:  We would make the same request on behalf

1    of Mr. Morris.

2            THE COURT:  Tell me about the situation today.

3            MR. GILBERT:  When the verdict was returned, he made a

4    request, not of me but Ms. Hughes, if they could go to their car

5    to get their phone to call their children and to alert them to

6    the verdict so that they could hear it for themselves, and that

7    was the purpose of him going to his car, and that was the sole

8    purpose.

9            THE COURT:  All right.  Thank you.

10           Ms. Hughes.

11           MS. HUGHES:  I would echo the previous arguments.  I

12   do realize that we're in a different situation now because

13   there's been a conviction and we're asking the Court to find by

14   clear and convincing evidence that there's not the risks and

15   that conditions will protect the community and the safety of

16   others.  I would suggest to the Court that there has been no

17   suggestion that Ms. Morris has had any problems or issues while

18   on release.  We do have family members here that we could offer

19   to testify if the Court felt like there needed to be any

20   additional conditions that I could offer in order to try to

21   convince the Court by clear and convincing evidence, but other

22   than that, I would simply refer to the fact that there have been

23   no issues or problems whatsoever with Debra Morris since she was

24   released back on March the 21st.  Thank you.

25           THE COURT:  All right.  Thank you.

1            Mr. Simons?

2            MR. SIMONS:  If Your Honor please, I would echo

3    Ms. Hughes' sentiments.  There's been no issue at all with

4    Stanley Bowling, in any respect.  He's been to court on time,

5    he's been early every day, there's been no contact with anyone.

6    He's certainly not a danger to the community and I would ask

7    that the Court allow him to remain released under the same

8    conditions presentence.

9            THE COURT:  Thank you.

10            Mr. Parman.

11            MR. PARMAN:  If I could briefly respond, Your Honor.

12            THE COURT:  Yes, sir.

13            MR. PARMAN:  As Ms. Hughes stated, the standard here

14    is whether or not the Court can find by clear and convincing

15    evidence that these defendants are neither a danger to the

16    community or a risk of flight.  That's not a reasonable danger,

17    as in the initial release context, but an absolute guarantee

18    essentially that they're neither a danger or risk of

19    non-appearance.

20            First, as it pertains to the danger, these defendants

21    were all found guilty of an agreement to violate the

22    racketeering statute, and in that we've heard multiple amounts

23    of evidence regarding obstruction of justice, witness tampering,

24    witness intimidation.  We've heard the testimony of many

25    witnesses who felt like they were threatened by these defendants

1    in the agreement in order to protect themselves from the charges

2    that were going on during the trial.  Now that these defendants

3    are convicted, all the witnesses that testified are at much

4    greater danger from the individuals that participated in the

5    enterprise itself.

6           Further, as it pertains to risk of nonappearance, both

7    as to Counts 1 and 2, there's a potential 20-year period of

8    imprisonment as to each of those counts, and from a preliminary

9    estimate of the guideline range, Your Honor, all of these

10   defendants face a substantial period of imprisonment that would

11   probably exceed at least one of the statutory maximums as to

12   each of the defendants.  So certainly there is a risk of

13   nonappearance as to every defendant here.

14          I don't know what circumstances occurred regarding

15   Mr. Morris, but that could potentially have been an incident

16   where there was attempted flight just right after the verdict

17   was read.

18          THE COURT:  Well, I'm crediting his attorney's

19   representation that he was going out to call family members, so

20   we'll —

21          MR. PARMAN:  Okay.  That notwithstanding, Your Honor,

22   there's also evidence that there was an attempt here to hide

23   assets by some of these defendants during the pretrial services

24   interview, further an attempt I would argue to conceal potential

25   assets that could be used to facilitate flight.  Certainly, many

1 of these defendants do have assets.  There's some that are

2 indigent to the point of needing court-represented counsel, but

3 many of them certainly are wealthy enough to probably properly

4 have the ability to flee the jurisdiction.  And certainly if you

5 take into consideration the age of many of these defendants, and

6 a defendant that's looking at a 20-year-plus period of

7 imprisonment that's 60 years old has a great incentive to

8 flight, and it would be very difficult for the Court to find by

9 clear and convincing evidence that there is no risk of

10 nonappearance based on the verdict that the jury has returned.

11            THE COURT:  All right.  Well, thank you, Counsel.

12            When the Court considers the standard under Title 18,

13 Section 3143, the Court has to look to a number of factors, not

14 only the arguments that have been made, but the testimony that

15 has been presented during the course of trial, which does

16 clearly establish a pattern of racketeering activity, organized

17 criminal activity by the defendants that are named in the

18 indictment.  All eight defendants have engaged in a pattern of

19 organized criminal activity and they've done so with the

20 assistance of other individuals that are not charged in this

21 indictment, some of which have been identified as holding

22 various elected positions within the county.  The Court believes

23 that considering all the testimony and evidence that has been

24 presented in this proceeding, all of the events that have

25 transpired in this proceeding, that these defendants pose a

72

1    danger to the community and a risk of flight.  The Court could

2    not find by clear and convincing evidence or even a lesser

3    standard, lesser burden of proof, that they should be released,

4    because I do feel that at this point, at this stage of the

5    proceedings, the defendants pose a very clear danger to the

6    community and a risk of flight.  And so for those reasons, those

7    defendants that are currently on bond, those bond conditions

8    will be revoked and all defendants in the case will be remanded

9    to the custody of the United States Marshal pending the

10   sentencing hearing.

11         I will call the parties' attention to the provisions

12   of Title 18, Section 3145.  In the event a particular defendant

13   feels that there are exceptional circumstances other than

14   arguments that have been raised today, then, of course, the

15   Court will address those at the appropriate time.

16         With respect to the issue of exceptional

17   circumstances, the parties' attention would be directed to the

18   case of the *United States v. Rocky Miller*, which is a published

19   decision in which I set forth the factors to be considered under

20   3145 for that type of an evaluation.  So the United States'

21   motion will be sustained.

22         Madam Clerk, I'm going to provide you with the

23   sentencing orders that I have signed.

24         The defendants will not be taken into custody until

25   the conclusion of the forfeiture proceedings, but they may not

 1  leave the courthouse at this time.

 2          We'll be in recess to await the verdict of the jury as

 3  to Counts 12 and 13.

 4      (Whereupon, a recess was had awaiting the verdict of the

 5  jury, after which the following proceedings were had in open

 6  court outside the presence of the jury.)

 7          THE COURT:  All right.  Thank you.

 8          I understand the jury has reached a verdict as to the

 9  two remaining counts.  Bring the jury in at this time.

10      (Whereupon, the jury returned to the courtroom, after which

11  the following proceedings were had in open court.)

12          THE COURT:  Thank you, and please be seated.

13          Madam Foreperson, has the jury reached a verdict as to

14  the two remaining counts, Counts 12 and 13?

15          THE CLERK:  Yes, Your Honor.

16          THE COURT:  All right.  If you could pass the verdict

17  form to me, please.

18          Madam Clerk, if you could please announce the verdict

19  of the jury to the parties.

20          THE CLERK:  Yes, Your Honor.

21          As to Count 12, we, the Jury, unanimously find by a

22  preponderance of the evidence that the money judgment in the

23  amount of $3,472,847.38 is subject to forfeiture pursuant to 18

24  U.S.C. 1963(a)(1), (2), or (3):  No.

25          As to Count 12, we, the Jury, unanimously find by a

1  preponderance of the evidence that $3,200,000 is subject to

2  forfeiture pursuant to 18 U.S.C., Section 1963(a)(1), (2), or

3  (3).

4          As to Count 13, we the jury unanimously find by a

5  preponderance of the evidence that the money judgment in the

6  amount of $1,513,512.36 is subject to forfeiture pursuant to 18

7  U.S.C., Section 982:  Yes.

8          Dated March 25th, signed by the foreperson.

9          THE COURT:  All right.  And, again, ladies and

10  gentlemen, we will poll all members of the jury at this time.

11  If you could please respond when your number is called as to

12  whether the verdict that's been announced is your verdict.

13      (Whereupon, the Clerk polled the jury.)

14          THE CLERK:  All answer in the affirmative, Your Honor.

15          THE COURT:  All right.  Thank you.

16          I'll ask the attorneys if there are any matters to

17  take up before I finally excuse this jury?

18          MR. PINALES:  No.

19          MR. WHITE:  No, Your Honor.

20          THE COURT:  All right.  Ladies and gentlemen, we've

21  been together for almost two months and you have been very

22  diligent in the work that you've performed, you have listened

23  carefully, as carefully as any jurors that I've ever seen in a

24  case.  You've certainly listened to the evidence and the verdict

25  that you've returned is certainly supported by the evidence in

75

1   the case.  I do want to offer you my thanks.  It seems like

2   saying thanks is just not enough in a case such as this when

3   you've been here for so long and you've worked so hard, but the

4   Court and the parties and the attorneys do appreciate the work

5   that you have performed.

6          I am going to finally excuse you at this time.  I do

7   have some brief instructions that I'll be giving you before you

8   leave the jury room.  Sometimes jurors wonder about their

9   obligations as jurors and I'm going to finally excuse you, but

10  I'll be coming back in just a moment just to speak with you

11  briefly before you do leave this afternoon.  It is late, I'm not

12  going to keep you very long, but, again, I do appreciate the

13  work that you've performed and I give you my sincere thanks on

14  behalf of all members of the court here.

15         The jurors will be excused at this time.

16       (Whereupon, the jury exited the courtroom, after which the

17  following proceedings were had in open court.)

18         THE COURT:  Thank you.  Are there any additional

19  matters to take up before we recess for the evening?

20         MR. ABELL:  Judge, as reluctant as I am to bring this

21  to the Court's attention, earlier I spoke about an Eighth and

22  Fifth Amendment issue as to Mr. Stivers —

23         THE COURT:  Yes, sir.

24         MR. ABELL:  — and the forfeiture issue and the Court

25  had mentioned a briefing schedule.

1          THE COURT:  Yes.  How much time would you like to

2    brief that issue?

3          MR. ABELL:  I think I better do it within seven days

4    or the Court would have no jurisdiction to address the motion.

5          THE COURT:  All right.  You can file your brief within

6    seven days and then I'm going to give the United States five

7    days to respond after that.  Seven and seven will be given.

8          MR. PINALES:  Your Honor, just briefly, for the

9    purposes of the record only, I would make a 29(c) motion.

10          THE COURT:  All right.  That motion will be denied at

11    this time.  Thank you.

12          Thank you, Counsel.  The defendants will be remanded

13    to custody at this time and we will be in recess.

14                    (Proceedings concluded at 5:00 p.m.)

15                    C E R T I F I C A T E

16     I, Cynthia A. Oakes, certify that the foregoing is a

17    correct transcript from the record of proceedings in the

18    above-entitled matter.

19

20    7/27/2011                    s/CYNTHIA A. OAKES
        DATE                       CYNTHIA A. OAKES, RPR, RMR, CRR
21

22

23

24

25

1

2                             I N D E X

3                                                              PAGE

4   Jury verdicts:                                              4

5

6   FORFEITURE PROCEEDINGS:

7
    Testimony of JEFF SAGRECY:
8        Direct Examination by Mr. Smith:                      12
         Cross-Examination by Mr. Hoskins:                     17
9        Cross-Examination by Mr. Westberry:                   18
         Cross-Examination by Mr. White:                       20
10       Cross-Examination by Mr. Simons:                      22

11  Closing argument on behalf of the Government
         By Mr. Smith:                                         28
12
13  Closing argument on behalf of Defendant Maricle
         By Mr. Hoskins:                                       36

14  Closing argument on behalf of Defendant Adams
         By Mr. Westberry:                                     38
15
16  Closing argument on behalf of Defendant Jones
         By Mr. White:                                         40

17  Closing argument on behalf of Defendant Stivers
         By Mr. Abell:                                         42
18
19  Closing argument on behalf of Defendant Thompson
         By Mr. Richardson:                                (Waived)

20  Closing argument on behalf of Defendant
         William B. Morris by Mr. Gilbert:                     43
21
22  Closing argument on behalf of Defendant
         Debra L. Morris by Ms. Hughes:                        44

23  Closing argument on behalf of Defendant Bowling
         By Mr. Simons:                                        46
24
25  Rebuttal argument on behalf of the Government
         By Mr. Smith:                                         47

1

2  INDEX (Cont'd)                                    PAGE

3

4  Instructions to the Jury
        By The Court:                                 50
5
   Jury Verdict:                                       73
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25